UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CASE NO.  2:21-cv-00080

DONNA LOU and DAREN PARSA, on their own behalf and
on behalf of their deceased minor child, E.P.

Plaintiffs,


VERSUS


SHERIFF JOSEPH P. LOPINTO, III, CHAD PITFIELD, RYAN
VAUGHT, STEVEN MEHRTENS, SHANNON GUIDRY, NICK VEGA,
MANUEL ESTRADA, MYRON GAUDET, JOHN DOES 1-3,
VICTORY REAL ESTATE INVESTMENTS LA, LLC D/B/A
WESTGATE SHOPPING CENTER, ABC INSURANCE COMPANY,
and XYZ INSURANCE COMPANY,

Defendants.


30(b)(6) DEPOSITION OF JEFFERSON PARISH

SHERIFF'S OFFICE, through its designated

representative, LIEUTENANT DONALD MEUNIER, given in

the above-entitled cause, via Zoom, pursuant to the

following stipulation, before Sandra P. DiFebbo,

Certified Shorthand Reporter, in and for the State

of Louisiana, on the 1st day of August, 2022,

commencing at 12:35 PM.

```
 1   APPEARANCES:
 2            LAW OFFICE OF WILLIAM MOST, L.L.C.
              BY:  WILLIAM MOST,
 3            ATTORNEY AT LAW
              201 St. Charles Avenue
 4            Suite 114
              New Orleans, Louisiana  70170
 5            -and-
              THE COCHRAN FIRM MID-SOUTH
 6            BY:  ANDREW CLARKE,
              ATTORNEY AT LAW
 7            One Commerce Square
              40 South Main, Suite 1700
 8            Memphis, Tennessee  38103
              REPRESENTING THE PLAINTIFFS
 9
              MARTINY & ASSOCIATES
10            BY:  FRANZ ZIBILICH,
              ATTORNEY AT LAW -and-
11            JEFFREY D. MARTINY,
              ATTORNEY AT LAW
12            131 Airline Drive
              Suite 201
13            Metairie, Louisiana  70001
              -and-
14            LINDSEY M. VALENTI, LEGAL ADVISOR
              1233 Westbank Expressway
15            Building B, Fifth Floor
              Harvey, Louisiana  70058
16            REPRESENTING JPSO DEFENDANTS
17            THOMPSON, COE, COUSINS & IRONS, LLP
              BY:  CHRISTOPHER W. KAUL,
18            ATTORNEY AT LAW
              601 Poydras Street
19            Suite 1850
              New Orleans, Louisiana  70130
20            REPRESENTING VICTORY REAL ESTATE
              INVESTMENTS LA, LLC, AND WESTGATE
21            SHOPPING CENTER
22   Also Present: Tim Anclade
23   Reported By:
24            Sandra P. DiFebbo
              Certified Shorthand Reporter
25            State of Louisiana
26
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

```
 1   E X A M I N A T I O N          I N D E X
 2                                       Page
 3   BY MR. MOST:                        5
 4
 5     E X H I B I T                  I N D E X
 6                          Page
 7
```

```
 8   Exhibit 52                        18
 9   Exhibit 53                        31
10   Exhibit 54                        41
11   Exhibit 55                        52
12   Exhibit 56                        54
13   Exhibit 57                        55
```

```
14
15
16
17
18
19
20
21
22
23
24
25
```

1     S T I P U L A T I O N

2

3      It is stipulated and agreed by and

4 between Counsel for the parties hereto that the

5 30(b)(6) Deposition of JEFFERSON PARISH SHERIFF'S

6 OFFICE, through its designated representative,

7 LIEUTENANT DONALD MEUNIER, Via Zoom, is hereby

8 being taken pursuant to the Federal Rules of Civil

9 Procedure for all purposes in accordance with law;

10      That the formalities of reading and

11 signing are specifically waived;

12      That the formalities of sealing,

13 certification, and filing are hereby specifically

14 waived.

15      That all objections, save those as to

16 the form of the question and responsiveness of the

17 answer are hereby reserved until such time as this

18 deposition or any part thereof is used or sought to

19 be used in evidence.

20       * * * * *

21      Sandra P. DiFebbo, Certified Shorthand

22 Reporter, in and for the State of Louisiana,

23 officiated in administering the oath to the witness

24 remotely.

25

```
 1                  LIEUTENANT DONALD MEUNIER, having
 2              been first duly sworn, was examined and
 3              testified on his oath as follows:
 4  EXAMINATION BY MR. MOST:
 5      Q.   Good afternoon.  I'm William Most.  I'm
 6  one of the attorneys for the plaintiffs in this
 7  case.  What is your rank?
 8      A.   Lieutenant.
 9      Q.   So I may call you lieutenant or officer
10  or call you by your last name.  Do you have a
11  preference how I call you?
12      A.   Whatever you are most comfortable with.
13  I have no preference.
14      Q.   Thank you, Lieutenant.  And, just for the
15  record, your name and title and job description.
16      A.   My name is Donald Meunier.  I am a
17  lieutenant with the Jefferson Parish Sheriff's
18  Office, and I am the commander of the Homicide
19  Division.
20      Q.   Have you ever given a deposition before?
21      A.   I have, yes.
22      Q.   Approximately how many depositions?
23      A.   Counselor, I'm not sure.  More than half
24  a dozen.  I don't recall.
25      Q.   And so you understand that you are under
```

```
 1   oath today?

 2        A.   I do, yes.

 3        Q.   That your answers here today have the

 4   same force as if we were in a courtroom with a

 5   judge and jury?

 6        A.   I do understand that, yes.

 7             MR. ZIBILICH:

 8                  And I disagree with that, but that's

 9             okay.

10   BY MR. MOST:

11        Q.   All right.  Is there anything that will

12   prevent you from giving me your full attention and

13   truthful and complete answers?

14        A.   No.

15        Q.   Are you taking any medications, suffering

16   from any illness, or anything else that would

17   prevent you from understanding my questions and

18   answering them truthfully and completely?

19        A.   No.  I believe I can fully understand

20   your questions.

21        Q.   All right.  And as probably with your

22   experience in prior depositions, you know this is

23   going to take a little bit of time, but it doesn't

24   have to be continuous.  So if at any point you need

25   to take a break for any reason, please, just let me
```

1    or your attorney know, and we'll take that break.

2    I will, however, warn you now that I will ask you

3    about or I may ask you about anybody you talked to

4    and anything you reviewed during a break, and it's

5    possible that it may not be privileged, your

6    communications during that time.  So just a heads-

7    up, but ask for a break any time.

8           A.   Understood.  Thank you.

9           Q.   One thing that you are already effective

10   at is waiting for me to finish my questions before

11   answering, and, in return, I will try and do you

12   the same courtesy of waiting until you are done

13   talking.  That way we have a clean transcript for

14   the court reporter.  All right?

15          A.   Yes.

16          Q.   If I ask a question that you don't

17   understand or is confusing, will you agree now to

18   tell me that that is the case rather than just

19   trying to answer it?

20          A.   I certainly agree with that.

21          Q.   And what is your understanding of the

22   case that you're here for today?

23          A.   That is a broad question.  What is my

24   understanding?  I participated in that case from

25   the beginning.

```
 1        Q.    Do you know that it's about the death of
 2   a minor in JPSO custody?
 3        A.    I do.
 4        Q.    Is that your understanding?
 5              MR. ZIBILICH:
 6                    Object to the form.
 7   BY MR. MOST:
 8        Q.    After Franz objects, you can answer,
 9   unless he instructs you not to.  Is it your
10   understanding that the case is broadly about the
11   death of a minor in JPSO custody?
12              MR. ZIBILICH:
13                    Same objection.  You can answer.
14              THE WITNESS:
15                    I do understand.  It is revolving
16               around the death of E███ P███.
17   BY MR. MOST:
18        Q.    And it's fine for you to say his name.  I
19   may refer to him as EP, because that makes it
20   easier to redact names later.  Will you understand
21   who I mean if I say EP, that same person?
22        A.    Of course.
23        Q.    Thanks.  This may or may not be different
24   than other depositions that you've done in the
25   past, but today it is my understanding that you are
```

1    here to speak on behalf of Sheriff Lopinto in his

2    official capacity, i.e., the Jefferson Parish

3    Sheriff's Office.  Is that your understanding as

4    well?

5         A.   That is, yes.

6         Q.   And if I use JPSO as an abbreviation for

7    the sheriff's office, or more specifically Sheriff

8    Lopinto in his official capacity, will you

9    understand me if I use that abbreviation?

10        A.   I will.

11        Q.   If you use that abbreviation or say

12   Jefferson Parish Sheriff's Office, is that what you

13   will mean as well?

14        A.   It would mean the same thing to me, yes.

15        Q.   And so because you are speaking on behalf

16   of JPSO today, do you understand that when I ask a

17   question of you, I'm really asking a question of

18   JPSO itself?  Do you understand that?

19        A.   That would be my understanding, yes.

20        Q.   And when you give answers, you are not

21   giving the answers of you, Lieutenant, you are

22   giving the answers of the sheriff's office itself,

23   agreed?

24        A.   I would understand that as well, yes.

25        Q.   And because this is a little bit

1   different than a typical deposition, the sheriff's

2   office is required to put someone knowledgeable

3   forward, and so I don't know may not be as valid an

4   answer in every context as it would be in a normal

5   deposition.  Just a heads-up. Okay. All right.

6   Lieutenant, when did you begin preparing for this

7   deposition?

8        A.   I was told about this last week.

9        Q.   And how much time between then and now

10  did you spend, approximately, preparing for this

11  deposition?

12       A.   Not that much time at all, to be honest

13  with you.  I familiarized myself with the basic

14  concepts.  I was told it was ostensibly surrounding

15  search warrants and the issuance of them and the

16  rationale for them, so that's what I focused on.

17       Q.   So do you think you spent more than an

18  hour or less than an hour?

19       A.   I would be guessing at this point.

20  Somewhere in that range.

21       Q.   So less than two hours, say?

22       A.   I would think that's fair, yes.

23       Q.   And what did you -- you said you reviewed

24  some things.  What did you review to prepare for

25  this deposition?

1    A.    As I said, primarily just the issuance

2  and acquisition of search warrants related to this

3  case.

4    Q.    So when you say the issuance and

5  acquisition, are you talking about policies or you

6  are talking about search warrant applications

7  themselves?

8    A.    No.  I'm actually talking about the

9  warrant and the application, the supporting

10 affidavit for those search warrants.

11   Q.    So warrants and application and

12 affidavits in support of search warrants.  Any

13 other documents you looked at to prepare for

14 today's deposition?

15   A.    No.

16   Q.    No JPSO policies or standard operating

17 procedures?

18   A.    I mean, I wouldn't tell you I know all of

19 the policies and procedures cold, but, no, I didn't

20 look up policies and procedures as it related to

21 search warrants.

22   Q.    Did you take any notes to prepare for

23 today's deposition?

24   A.    No.

25   Q.    Did you talk to anyone besides a lawyer

1    to prepare for today's deposition?

2         A.   No.

3         Q.   And because we're doing this deposition

4    via Zoom, I can't see everything that is in the

5    room with you see.  I see four people behind you.

6    Is there anyone besides those four people in the

7    room with you?

8         A.   No.  That's it.

9         Q.   And because we can't see the entire room,

10   we may not be able to tell if someone tries to

11   communicate with you, so will you agree now to tell

12   me if anyone tries to communicate with you, except

13   via spoken objection, during this deposition,

14   whether it's a note, a text message, whispers,

15   anything like that?

16        A.   My cell phones are behind me.  I think

17   you can see them all but certainly, yeah.

18        Q.   Thank you.  Have you brought any

19   documents with you today for this deposition?

20        A.   No, sir.

21        Q.   So you are a lieutenant and the commander

22   of the Homicide Division, correct?

23        A.   That is correct.

24        Q.   Could you give us just the very brief

25   nutshell of your education and professional

1    background?

2         A.    Bachelor of Arts degree.  I've been a

3    policeman since 1990. Been the commander of

4    Homicide since 2016.  I've been the commander of

5    other sections prior to that, and I have

6    approximately 16 to 17 years of service in the

7    Homicide Division.

8         Q.    Is the entirety of your law enforcement

9    experience with JPSO?

10        A.    It is not.  The first five years, from

11   '90 to '95 was spent with the New Orleans Police

12   Department, and from '95 on it's been with the

13   Jefferson Parish Sheriff's Office.

14        Q.    This is a question I ask of every

15   witness.  It's not specific to you, but,

16   Lieutenant, have you ever been arrested?

17        A.    No.  I have not.

18        Q.    I'm going to pull up Exhibit 40.  Can you

19   see this, if I pull this up on the screen,

20   Lieutenant?

21        A.    Yes.

22        Q.    I may be -- I'll be pulling up documents

23   on the screen during this deposition.  I can zoom

24   in, so if at any point it's hard to read, or it's

25   too small, please, just ask me, and I'll zoom in.

1   Also, if you need me to scroll down to review more

2   of the document, please, just ask, and I'll do so.

3   All right?

4        A.   Yes.

5        Q.   Do you see that this is a notice to take

6   a deposition?

7        A.   I do.

8        Q.   Going down to Page 2 of Exhibit 40, do

9   you see that Topic 4 here talks about the use of

10   search warrants?

11        A.   I do, yes.

12        Q.   So this is the topic that I understand

13   that you are here for, and I'll read it.  It's "Use

14   of Search Warrants:  JPSO's use of criminal search

15   warrants to obtain information and materials from

16   EP's doctor and school; what crime JPSO was

17   investigating with the use of criminal search

18   warrants for EP's medical and school records; any

19   basis for using criminal search warrants for

20   'generalized law enforcement inspection.'" Are you

21   prepared to talk knowledgeably about those topics?

22        A.   I believe so, yes.

23        Q.   So just table setting, the basics, it's

24   my understanding that JPSO used criminal search

25   warrants to obtain information and materials from

```
 1    EP's doctor and school, correct?
 2              MR. ZIBILICH:
 3                   Object to the form.  You can answer
 4                it.
 5              THE WITNESS:
 6                   My answer to that would be we
 7                obtained search warrants.  I don't
 8                distinguish criminal search warrants.
 9                We did obtain search warrants, yes.
10    BY MR. MOST:
11         Q.   Do you know of any kind of search warrant
12    besides a criminal search warrant?
13         A.   I've never used that term.  I don't know
14    anyone that uses that term.  The term, the
15    standard, would be a search warrant.
16         Q.   So JPSO used search warrants to obtain
17    information and materials from EP's doctor and
18    school, agreed?
19         A.   That is agreed to, yes.
20         Q.   Were the way those search warrants
21    requested and used, was that pursuant to JPSO
22    policy?
23         A.   There is no specific JPSO policy that
24    dictates the mechanisms of manner of search
25    warrants.  That would be state law.  I think we
```

1   abided by that.  We drafted search warrants, and we

2   supplied supporting affidavits for each.

3        Q.   So I understand JPSO doesn't have a

4   written policy on the use of search warrants,

5   agreed?

6        A.   Agreed.

7        Q.   Is there any way in which the search

8   warrants related to EP were used or obtained -- is

9   there any way in which that diverged from the way

10  JPSO requires its search warrants be used?

11       A.   I don't believe so, no.

12       Q.   So the way that these search warrants for

13  EP were obtained and used is consistent with

14  Sheriff Lopinto's directives on how search warrants

15  are to be used, agreed?

16            MR. ZIBILICH:

17                 Object to the form.  You can answer

18            it.

19            THE WITNESS:

20                 The search warrants were obtained in

21            a manner consistent with any

22            investigation conducted by JPSO.  Does

23            that answer your question?

24  BY MR. MOST:

25       Q.   Kind of.  The way that the search

1    warrants for EP were obtained and used was

2    consistent with the way Sheriff Lopinto requires

3    that search warrants be used within JPSO, agreed?

4          A.   That is pretty much the phrase you used

5    before, and I'm not trying to argue with you, but

6    when you say "the way," what do you mean by that?

7    I mean, we submit warrants through judges and

8    commissioners by electronic means.  Is that what

9    you mean by the way or the substance of them?

10          Q.   I mean, is there anything about the

11    substance, the physical means, the content?  Is

12    there anything about the search warrants for EP

13    that is inconsistent with the way Sheriff Lopinto

14    requires that they be used?

15          A.   The answer to that would be no.

16          Q.   So let's talk about the basic ground

17    rules for search warrants.  An officer can obtain a

18    search warrant for stolen things or evidence of a

19    crime, correct?

20          A.   Many other things but yes.

21          Q.   What are the other things?

22          A.   Well, I mean, Counsel, there could be a

23    sundry of things, an array of different

24    hypotheticals I could give you.  I don't think it

25    revolves around stolen things.  It could be the

```
 1    seizure of potential evidence at a location through
 2    investigation that has been deemed relevant and
 3    potential collection of that evidence therein.  I
 4    could give you a hundred of those, but I don't
 5    think -- I'm simply saying it's not solely
 6    revolving around stolen items.
 7         Q.   Yeah, and I can restate it, because what
 8    I said was stolen items or evidence of a crime.  I
 9    agree with you.  It's not just limited to stolen
10    items, and perhaps it would be useful to pull up --
11    this is Exhibit 52, which is labeled B in the
12    dropbox.  Do you see this, Lieutenant?
13         A.   I do.
14         Q.   So this is the Code of Criminal Procedure
15    statute that governs the use of search warrants,
16    correct?
17         A.   That is.
18         Q.   And this governs how JPSO officers are
19    authorized to use search warrants, agreed?
20         A.   That is the standard set forth in Article
21    161, yes.
22         Q.   And so this allows for search warrants
23    for anything that's been the subject of theft, is
24    intended for use or has been used as a means of
25    committing an offense or may constitute evidence
```

1  tending to proof the commission of an offense.

2  Agreed?

3          A.   I agree.

4          Q.   So anything that is to be the subject of

5  a search warrant either has to be the subject of

6  theft, the means of an offense, or evidence of an

7  offense, agreed?

8              MR. ZIBILICH:

9                  Object to the form.  It's not even

10                 close to what the article says, sir.

11                 Not even close.  You need to read the

12                 sentence that starts with A.

13             MR. MOST:

14                 The witness can answer the question.

15                 If he's got an objection -- if he

16                 thinks it is misstating, he can say so.

17  BY MR. MOST:

18         Q.   Lieutenant, would you answer the

19  question?

20         A.   Well, I would have to tell you that it

21  does start with A saying except as authorized in

22  163.1, and then the following numbers would

23  constitute what is specifically itemized in Article

24  161.

25             MR. ZIBILICH:

```
 1                    Just so the record is clear, so we
 2                 don't get into a legal discussion,
 3                 these questions call for legal
 4                 conclusions, and for that reason, I,
 5                 likewise, object.
 6             MR. MOST:
 7                    All right.  Objection noted.
 8             MR. ZIBILICH:
 9                 Okay.
10      BY MR. MOST:
11          Q.   So as you noted, 161, except as
12      authorized by 163.1, allows for the seizure of
13      items that have been the subject of theft, related
14      to the means of an offense, or evidence of an
15      offense.  Is that a fair summary, aside from 163.1?
16          A.   It is, yes.
17          Q.   And 163.1 talks about bodily examples,
18      right?
19          A.   It does, yes.
20          Q.   So aside from those things we've
21      itemized, a search warrant can't be used to obtain
22      other things other than those, agreed?
23             MR. ZIBILICH:
24                 Objection.  Calls for a legal
25                 conclusion.  You can answer it.
```

1           THE WITNESS:
2                No.  I don't agree with that.  In a
3           variety of investigations, one may
4           obtain a search warrant that is, in
5           fact, granted by a judge or issuing
6           authority, which was done in each of
7           these cases.  I understand you are
8           making a legal point with me about the
9           purpose or substance of the warrants,
10          but they were reviewed and endorsed by
11          a judge.
12    BY MR. MOST:
13        Q.   So you think it's JPSO's position that
14    items can be obtained through search warrants that
15    do not fall within 161 or 163.1; is that --
16          MR. ZIBILICH:
17                Same objection.  Calls for a legal
18          conclusion.  You can answer it.
19          THE WITNESS:
20                I do, yes.
21    BY MR. MOST:
22        Q.   What items outside of 161 and 163.1 can
23    be obtained through a search warrant in JPSO's
24    understanding?
25        A.   Again, as it is being said, I'm not an

1    attorney, but I would tell you that if you were

2    killed tomorrow on the street, Mr. Most, by JPSO,

3    that I would be seeking search warrants on both

4    sides of that issue to determine the justification

5    or lack of it.  I may apply for a search warrant

6    for your residence.  If you have a bomb strapped to

7    your waist at the time, I may want to seek evidence

8    in furtherance of that.  You are no longer alive,

9    but I'm still going to pursue the answers, and some

10   of those answers may come through search warrants

11   to gather more information during the course of

12   that investigation.

13        Q.    What else?

14        A.    I mean, it's a hypothet.  We could go

15   through many of those.  I just gave you one as an

16   example.  I would not be looking for stolen

17   property in your residence.  I would be looking for

18   answers.  I'd be looking for things that might shed

19   light on the full investigative process.

20        Q.    Right, because you'd be searching for

21   evidence attempting to prove the commission of an

22   offense, right?

23        A.    Or perhaps even your state of mind at the

24   time, but we're talking a hypothetical.  Again, the

25   checks and balances on that fall to the judiciary.

1    We submit the warrant, and the judge reviews it,

2    and the judge either endorses or declines to

3    endorse a warrant on its merits.

4         Q.   So it is JPSO's position that JPSO can

5    properly use search warrants to try and obtain

6    things that are outside of 161 and 163.1, agreed?

7         A.   No, no.  I would say that it is the

8    purview of an investigator or an entity, JPSO in

9    this case, to seek a search warrant.  That ultimate

10   determination is made by the judge.

11        Q.   So JPSO can seek a search warrant for

12   anything it wants?

13        A.   I didn't say that, Mr. Most.  I said in a

14   given set of circumstances, JPSO, as an entity, may

15   apply for a search warrant.  A judge may say this

16   is beyond the scope, or, yes, I agree.  You've

17   established probable cause.  You've established a

18   reasonable basis bringing the issue to warrant.

19   That would be a determination made by a judge.

20        Q.   Could a JPSO officer seek a search

21   warrant just because they were curious about what

22   the inside of the house looked like?

23        A.   With giving me no other information, I

24   would tell you no.

25        Q.   Could a JPSO officer seek a criminal

```
 1   search warrant to help them in a divorce?
 2        A.    Again --
 3              MR. ZIBILICH:
 4                   Wait, wait.  Mr. Most, show me where
 5              in Number 4 where he is supposed to be
 6              prepared for that.
 7              MR. MOST:
 8                   If your objection is that it's
 9              outside the scope of the 30(b)(6)
10              notice, you can just note that, Franz,
11              and we'll continue.
12              MR. ZIBILICH:
13                   It is.
14   BY MR. MOST:
15        Q.    All right.  Lieutenant, could a JPSO
16   officer properly seek a search warrant to help them
17   in a divorce?
18              MR. ZIBILICH:
19                   Object to the form.  You can answer
20              it.
21              THE WITNESS:
22                   To help whom?
23   BY MR. MOST:
24        Q.    I don't know what that word is.
25        A.    To help whom?
```

1       Q.   To help the officer.  Say an officer is
2  going through a divorce.  Could he go try and get a
3  search warrant just to help himself out in a
4  divorce?
5       A.   Well, an officer should not be getting
6  any type of document or doing anything like that in
7  any proceeding that involves himself.  He should be
8  excluded from that.  So the short answer to your
9  question in that scenario would be no.
10      Q.   What about a friend's divorce that he's
11 not a party to?
12      A.   The same would apply.
13      Q.   Could a JPSO deputy seek a search warrant
14 for another civil matter?
15      A.   That's a broad question.
16           MR. ZIBILICH:
17                I object to the form.  Go ahead.
18           THE WITNESS:
19                It's possible.  Again, not involving
20             him, a friend, a family member, no
21             vested interest.  If objectively he is
22             uninvolved, you'd have to flesh out the
23             circumstances for me more.
24 BY MR. MOST:
25      Q.   So you don't -- so you think that JPSO

```
 1   officers can go to criminal court and seek a search
 2   warrant for civil matters?  Is that what you're
 3   saying, in some circumstances?
 4              MR. ZIBILICH:
 5                   Object to the form.  I have to
 6              object to the form.  There is only one
 7              criminal court in the State of
 8              Louisiana.
 9         MR. MOST:
10                   Franz, just object to the form.
11              Anything more than that is a speaking
12              objection which is prohibited by the
13              Rules of Evidence.  You want to say
14              object to the form, that is all we need
15              to hear.
16         MR. ZIBILICH:
17                   You know the place is wrong.  Okay.
18              I'll do it better.  Don't answer it.
19         MR. MOST:
20                   Are you instructing the witness not
21              to answer, Franz?
22         MR. ZIBILICH:
23                   It is an impossible question to
24              answer, because there is no such thing.
25              Your question is inappropriate.
```

1    MR. MOST:

2         Are you objecting -- Franz, are you

3         instructing the witness not to answer

4         the question?

5    MR. ZIBILICH:

6         Yes, because it's impossible to

7         answer.

8    MR. MOST:

9         The only three legitimate bases for

10        instructing a witness not to answer are

11        to preserve a privilege, to enforce a

12        limitation order by the Court, or to

13        present a motion under Rule 30(d)(3) of

14        the Federal Rules of Civil Procedure.

15        Franz, which of those is it?

16   MR. ZIBILICH:

17        There is no such thing as a criminal

18        court in Louisiana, so the question

19        can't be answered.  If you want to

20        limit it to going to Tulane and Broad,

21        which is the only criminal court in the

22        State of Louisiana, I won't object, or

23        you have to use a different word.

24   MR. MOST:

25        Franz, you have instructed the

```
 1                 witness not to answer.  I don't hear
 2                 you to be articulating any of the three
 3                 bases of Federal Rules of Civil
 4                 Procedure.
 5          MR. ZIBILICH:
 6                 You heard what I said.  If you want
 7                 to be hardheaded, and not change the
 8                 word from "criminal" court to some
 9                 other example, it's okay with me, but
10                 since there is no other criminal court,
11                 he can't answer the question, and since
12                 he can't answer it, I'm ordering him
13                 not to answer it.
14          MR. MOST:
15                 All right.
16          MR. ZIBILICH:
17                 All you got to do is change it, and
18                I won't object.
19          MR. MOST:
20                 Franz, you have just given us about
21                three paragraphs of a speaking
22                objection.
23          MR. ZIBILICH:
24                 I'm not giving him the answer.  I'm
25                trying to help you ask a question
```

```
 1              that's legitimate.
 2         MR. MOST:
 3              I will ask you to discontinue
 4         continued efforts to making speaking
 5         objections during this deposition.  All
 6         right?
 7         MR. ZIBILICH:
 8              I'm not answering your question,
 9         sir.
10         MR. MOST:
11              It wasn't a question.
12         MR. ZIBILICH:
13              Yeah, it was.  When you said "All
14         right," with that little "All right,"
15         that's a question.
16         MR. MOST:
17              Okay.  Moving on.
18    BY MR. MOST:
19         Q.   Lieutenant, so it is JPSO's position that
20    in some circumstances officers can seek search
21    warrants to obtain material for civil matters?  Is
22    that JPSO's position?
23         A.   That's not JPSO's position, nor is it
24    mine.  Given the broad nature of your hypothet
25    before, I was telling you without having more
```

```
 1    facts, I can't exclude the possibility of the
 2    issuance or at least an application for one, and,
 3    again, I'll go back to my other answer, that,
 4    ultimately, that will fall under judicial review,
 5    and a determination will be made by a judge whether
 6    it merits issuance.
 7         Q.    So could a JPSO officer properly use a
 8    search warrant to obtain evidence to protect the
 9    officer from liability in a civil matter?
10         A.    Again, I'm not an attorney.  I would
11    defer to attorneys for those hypothets.
12              MR. ZIBILICH:
13                    I'll object to the form.  You can
14                 answer it.
15              THE WITNESS:
16                    I don't believe that would be
17                 appropriate.
18    BY MR. MOST:
19         Q.    Is it JPSO's position that an officer can
20    seek a search warrant to protect the sheriff's
21    office from liability?
22              MR. ZIBILICH:
23                    Object to the form.  You can answer
24                 it.
25              THE WITNESS:
```

```
 1                    To protect a sheriff's office from
 2               liability? No.  I don't believe so.
 3               Again, as a policeman, not an attorney,
 4               I would tell you, if you are asking my
 5               opinion, I don't believe so, but
 6               without more facts, I'm left with broad
 7               hypothets, and I am making legal
 8               determinations.
 9   BY MR. MOST:
10        Q.   I'll pull up Exhibit 53, which is -- do
11   you see that this is the Fourth Amendment to the
12   U.S. Constitution, Lieutenant?
13        A.   I do, yes.
14        Q.   Do you see that it says no warrant shall
15   issue but upon probable cause?
16        A.   I do.
17        Q.   That's probable cause of a crime, right?
18               MR. ZIBILICH:
19                    Object to the form.  Calls for a
20               legal conclusion.
21   BY MR. MOST:
22        Q.   You can answer, Lieutenant.
23        A.   It says, "but upon probable cause."
24        Q.   Do you understand -- does JPSO understand
25   that to mean probable cause of a crime?
```

```
 1              MR. ZIBILICH:

 2                   Same objection.  You can answer it.

 3              THE WITNESS:

 4                   I would imagine in most

 5                   circumstances that is what we are

 6                   talking about, some measure of

 7                   investigation related to a crime.

 8    BY MR. MOST:

 9         Q.   Are there any scenarios in which -- you

10    said most.  Is there any other scenarios other than

11    probable cause of a crime?

12         A.   Could you rephrase that for me?

13         Q.   Sure.  I think you said in most

14    circumstances it would be probable cause of a

15    crime.  What else is there?

16         A.   Well, I am offering a back door on

17    absolutes, to be honest with you.  I don't want to

18    give you a definitive answer to nothing more than a

19    broad hypothet.

20         Q.   I'm just trying to understand.  Does JPSO

21    consider that for search warrants there has to be

22    probable cause of a crime, yes or no?

23         A.   Or the potential of one, or an ongoing

24    investigation designed to establish whether a crime

25    was committed or not by one or the other parties
```

1  involved in the incident.  I would think that would

2  more accurately define it, at least from my

3  perspective.

4      Q.   And when you say from my perspective, you

5  mean JPSO, agreed?

6      A.   Well, I faulted on that.  Yes.  I meant

7  literally from my personal perspective, but, yes, I

8  would think from JPSO's perspective as well, yes.

9      Q.   So let's talk about Affidavits of

10  Probable Cause.  So when an officer seeks a search

11  warrant, they have to provide an affidavit in

12  support of the warrant, right?

13      A.   They do, yes.

14      Q.   And that affidavit has to state the facts

15  establishing the probable cause that they're

16  seeking the warrant for, right?

17      A.   Agreed.

18      Q.   That means identifying what crime is

19  suspected, agreed?

20      A.   I wouldn't agree.  We have routinely

21  gotten search warrants on what we've defined at the

22  outset as a death investigation.  During my career,

23  my experience, we have obtained warrants on the

24  basis of no definitive established cause and manner

25  of death.  It is at that juncture a death

1    investgation, and yet we have secured search

2    warrants on that basis.  Perhaps no crime has

3    occurred.  Perhaps no crime has been committed.  We

4    do not know, so we seek a search warrant in

5    furtherance of determination, for the sake of a

6    better term.

7        Q.   Even when a crime is not even suspected?

8        A.   Well, you seem to be comfortable with

9    hypothets.  May I give you one?

10       Q.   Sure.

11       A.   Okay.  If there is a death of an elderly

12   person at a house, and we're initially told, at

13   least anecdotally, that the decedent lived alone,

14   we perhaps have concerns as to cause and manner of

15   death or we see some anomalies within, and when I

16   say we, I'm talking about first responders, not

17   investigators.  We may apply for a search warrant

18   in furtherance of our investigation.  Hopefully,

19   that will assist us in ultimate determination.  We

20   do not know that a crime has been committed, but

21   yet we seek the search warrant, and, again, you

22   obviously know this.  We submit that to a judge who

23   makes the ultimate determination as to whether that

24   warrant is issued or not.

25       Q.   Your hypothetical provided indicia to

1    suspect a crime might have been committed, right?

2         A.   The potential.  The potential.  So in

3    furtherance of potentials, reasonable potentials,

4    yes.

5         Q.   What about in the absence of indicia that

6    a crime may have been committed?  So in the absence

7    of a suspected crime.

8         A.   I would tell you whatever we banter

9    about, in the end the judge makes a determination

10   whether probable cause existed and whether an

11   issuance of that warrant will come forth or not.

12        Q.   Yeah.  I'm well aware of that,

13   Lieutenant, but what I'm trying to figure out is

14   does JPSO contend it's proper to seek a search

15   warrant related to a death even if there is no

16   suspicion of a crime?

17        A.   If there is no suspicion of a crime, I

18   would have to think about a scenario where that

19   might apply, and I can't right now.  No crime, no

20   investigation of a crime, no potential for one, I

21   wouldn't know what our standing would be at that

22   point.

23        Q.   Okay.  So going back to the affidavit in

24   support of a search warrant, you are saying it

25   doesn't have to specify the crime that's suspected?

```
 1          A.    I would --
 2                MR. ZIBILICH:
 3                     Objection to the form.  Calls for a
 4                legal conclusion.  You can answer.
 5                THE WITNESS:
 6                     I would say that, and I use the
 7                example, because it's been done many
 8                times.  We don't know what type of
 9                death we have.  We don't know whether
10                we have a natural death, an accidental
11                death, a suicide, a homicide, so we
12                will simply label it, for the sake of a
13                better term, "death investigation."  We
14                still seek the same issuance of that
15                warrant, but we have not defined what
16                the crime is or that there, in fact, is
17                even a crime.  We're in investigative
18                mode at that juncture.
19     BY MR. MOST:
20          Q.    And that's the mode that the warrants
21     related to EP were, correct?
22          A.    In investigative mode, yes.
23          Q.    Because JPSO didn't know whether a crime
24     had been committed related to EP, correct?
25          A.    Whether a crime had been committed, yes.
```

```
 1    That is correct as you stated it.
 2         Q.   Is generalized law enforcement inspection
 3    a proper basis for a search warrant for JPSO's
 4    processes?
 5              MR. ZIBILICH:
 6                   I'll object to the form.  You can
 7                answer it.
 8              THE WITNESS:
 9                   I'm not familiar with the term.
10    BY MR. MOST:
11         Q.   But would it be proper for JPSO's
12    practices for an officer to seek a search warrant
13    just for generalized law enforcement inspection
14    with no identified link to a crime?  Would that be
15    proper?
16              MR. ZIBILICH:
17                   Objection to the form.  It's the
18                same question.
19              THE WITNESS:
20                   It's the same term I don't
21                understand, generalized law enforcement
22                inspection.  It's not a term we use.
23              MR. MOST:
24                   Right.
25              THE WITNESS:
```

```
 1              If you could define what you mean by
 2         that term, I could maybe better answer
 3         your question.
 4  BY MR. MOST:
 5      Q.   Right.  Okay.  We'll move on.  But I
 6  think we can agree that that phrase is not
 7  intelligible as a basis for seeking a search
 8  warrant because you don't understand it.  You don't
 9  understand it to be properly forming the basis for
10  a search warrant, agreed?
11              MR. ZIBILICH:
12              Object to the form.  You can answer
13         it.
14              THE WITNESS:
15              I don't recognize that term.  I
16         understand the words.  I recognize your
17         meaning.  Your meaning sounds to me, a
18         layman, more like fishing expedition,
19         otherwise identified as generalized law
20         enforcement inspection.
21  BY MR. MOST:
22      Q.   Right.  And a fishing expedition is not a
23  proper basis for a search warrant, agreed?
24      A.   A fishing expedition certainly would not
25  be, no.
```

1      Q.   A dead person can't be investigated for a

2  crime, agreed?

3      A.   For a crime?  Maybe for resolution for

4  facts but certainly with no ultimate outcome, no.

5      Q.   So if a person is dead, and they're the

6  suspect of a crime, JPSO can't go get search

7  warrants to try and obtain evidence of the crime

8  the dead person committed, agreed?

9      A.   I don't agree with that.

10     Q.   You think JPSO can go seek warrants for

11 the crimes of dead people?

12     A.   I think under some circumstances it would

13 be obligatory.

14     Q.   Like what?

15     A.   You are asking for a hypothetical?

16     Q.   You are saying some circumstances.  What

17 are those circumstances?

18     A.   Well, I'd have to give you a hypothetical

19 on that.

20     Q.   Okay.

21     A.   Okay.  If I walk into Lakeside Mall with

22 -- we'll use a bomb strapped to me again.  Yes, JP

23 may have an obligation, even though I blow myself

24 up in the center of the mall, have an obligation to

25 get answers to certain things.  Not only would the

```
 1    public deserve the answers, we're obligated to get
 2    answers.  Is the apartment I lived in safe, safe to
 3    the nearby residents?  Was that bomb strapped to me
 4    or did I strap it to myself?  Am I the perpetrator
 5    or am I a dupe of another?  Is this part of a
 6    larger thing?  All of those things would fall under
 7    the umbrella of full investigative measures
 8    undertaken to get the answers.  So I believe, yes,
 9    we'd be well within our rights to seek and to
10    obtain reasonable search warrants on that basis.
11         Q.   Okay.  To your knowledge, has JPSO ever
12    obtained a search warrant to investigate a crime
13    committed by a dead person?
14         A.   A crime committed by a dead person.  I
15    would tell you I served in Homicide for 16 or 17
16    years, and we have obtained warrants on residences,
17    vehicles, and the like belonging to our decedents,
18    our victims, because that may shed light on motive
19    and the like, so, yes.
20         Q.   I understand that if someone is dead, and
21    you think they were killed, you might use search
22    warrants to try and find out information about the
23    killer, but, to your knowledge, has JPSO ever used
24    search warrants to obtain evidence of crimes
25    committed by the dead person themselves without
```

1    another suspect?

2        A.    Again, I can imagine where that might be

3    relevant as well.  If you are looking for motive or

4    identity of the perpetrator, you may seek

5    information as to the decedent's past that may

6    offer motive for another.  It may give us

7    direction, so, again, I would say, yes.

8        Q.    So, yes, JPSO has used search warrants to

9    obtain evidence of crimes committed by dead people?

10       A.    So let me clarify.  You say crimes

11   committed by dead people, yes.  In pursuit of their

12   prosecution, obviously not.  They're the decedent

13   at that point, but yes to the first part.

14       Q.    This may be a stupid question, but JPSO

15   understands the Fourth Amendment to the U. S.

16   Constitution to constrain the way it uses search

17   warrants, agreed?

18       A.    Agreed.

19       Q.    So trying to move us from the realm of

20   hypotheticals.  Let's look at a specific search

21   warrant.  This is Exhibit E, which I'll mark as 54.

22            MR. CLARKE:

23                William, I think you didn't mark 53.

24            MR. MOST:

25                I think 53 was the Fourth Amendment

```
 1              itself.
 2         MR. CLARKE:
 3              You put that out there, but you
 4         didn't say mark it.
 5         MR. MOST:
 6              Oh, okay.  Well, thank you.  Exhibit
 7         53.  That will be the text of the
 8         Fourth Amendment, the exhibit I used.
 9         Thank you, Andy.
10   BY MR. MOST:
11        Q.   Okay.  Lieutenant, do you see this
12   Affidavit for Search and Seizure warrant that is
13   Exhibit 54 here?
14        A.   Yes, sir, I do.
15        Q.   And this was a search warrant sought by
16   Keith Dowling, a member of JPSO, correct?
17        A.   Correct.
18        Q.   And this search warrant was seeking
19   medical records of EP, correct?
20        A.   Correct.
21        Q.   And it talks about violation via
22   statutes:, and then it says, "No charge at this
23   time."  Do you see that part?
24        A.   Correct.
25        Q.   Does that mean that at that point there
```

1   was not a suspected crime?

2        A.   The only reason the Homicide Division

3   investigated that is arguably use of force.  The

4   only crime that could have conceivably been

5   considered at that point would be one by deputy or

6   deputies against E███  P████.

7        Q.   So the only conceivable crime in this

8   context was by the deputies against EP, correct?

9        A.   Well, I mean, arguably E███  P████

10  committed a crime by biting his father and biting

11  the deputy, but at the point at which he passed

12  away, yes.  The answer to your question would be

13  yes.

14       Q.   So was JPSO using this search warrant to

15  investigate the potential crimes of deputies

16  against EP?

17       A.   That is the only purpose for the presence

18  of homicide and the assumption of investigative

19  responsibility by the Homicide Division at that

20  point.  Potential use of force, potential

21  violation, were they within their rights, did they

22  exceed reasonable and necessary force.  That would

23  be our focus.

24       Q.   So the answer is yes, the search warrant

25  was sought and obtained to investigate potential

1    crimes by JPSO deputies against EP, correct?

2         A.    Yes, but it would also provide direct and

3    clear information regarding the medical records by

4    East Jefferson regarding injuries.  That is the

5    purpose of it, for seeking his medical records.

6         Q.    Right.

7         A.    He was brought into East Jefferson

8    Hospital.

9         Q.    To help evaluate whether the JPSO

10   deputies committed a crime against EP, correct?

11        A.    In furtherance of the investigation, yes.

12        Q.    And that investigation was an

13   investigation of potential crimes against -- by

14   JPSO deputies against EP, correct?

15        A.    In its general form, yes.

16        Q.    Did JPSO have suspicion that its deputies

17   committed crimes against EP at the time of the

18   search warrant application?

19             MR. ZIBILICH:

20                  Object to outside the scope, but you

21               can answer it.

22             THE WITNESS:

23                  I'm not trying to be difficult.

24               Suspicion of -- no, no direct

25               suspicion, but in the interest of

```
 1                  thoroughness and the obligation to
 2                  conduct the investigation, things of
 3                  this nature were done to obtain all of
 4                  the information.
 5      BY MR. MOST:
 6           Q.   Yeah.  I understand that.  And so JPSO
 7      didn't have any reason to suspect a crime was
 8      committed against EP at the time of this search
 9      warrant application, agreed?
10           A.   No.  No particular reason to believe so,
11      agreed.
12           Q.   So in this first part, it says, "Keith
13      Dowling deposes and says that probable cause exists
14      for the issuance of the search warrant."  You see
15      that part?
16           A.   I do.
17           Q.   But in the absence of basis to suspect
18      crimes, I don't understand.  What was the probable
19      cause in this scenario?  Probable cause of what,
20      that Keith Dowling's work was the basis for this
21      search warrant?
22                  MR. ZIBILICH:
23                     Object to the form.  Legal
24                  conclusion.  Go ahead.
25                  THE WITNESS:
```

```
 1                    That's pro forma language.  Keith
 2              Dowling doesn't generate that language.
 3              This is almost fill in the blank at
 4              this stage.  He has no control over the
 5              language, deposes and says the probable
 6              cause exists.
 7   BY MR. MOST:
 8        Q.    Yeah.  That's form language, right?
 9        A.    Correct.
10        Q.    So there wasn't actually probable cause
11   in this scenario, correct?
12              MR. ZIBILICH:
13                    Object to the form.  Legal
14              conclusion.  Go ahead.
15              THE WITNESS:
16                    That would be the language in any
17              warrant JPSO obtains for medical
18              records on any individual, living
19              victim, decedents, perpetrator.  It
20              would be the same language.
21   BY MR. MOST:
22        Q.    I got you, Lieutenant.  This is the form
23   language.  You fill in the blanks, right.  I got
24   that part, but was there probable cause on these
25   facts that form the basis of this search warrant
```

```
 1    application?
 2              MR. ZIBILICH:
 3                   Object to the form.  Legal
 4              conclusion.  You can answer it.
 5              THE WITNESS:
 6                   The judge believed so by issuing the
 7              warrant.
 8    BY MR. MOST:
 9         Q.   But what is JPSO's position?  Was there
10    probable cause on these facts?
11              MR. ZIBILICH:
12                   Object to the form.  Legal
13              conclusion.  You can answer it.
14              THE WITNESS:
15                   I don't control the statutory
16              language.  What I tell you is
17              reasonable expectation to obtain the
18              answers relevant to the investigation
19              for the most thorough and complete
20              investigation, so, yes, JP uses a
21              Louisiana search warrant, a search
22              warrant put forth to a commissioner or
23              a judge in Jefferson Parish, and the
24              judge makes a determination whether
25              probable cause exists for the issuance.
```

```
 1   BY MR. MOST:
 2        Q.   I understand, and, look, someone else is
 3   going to determine the legality of it, right?
 4   That's not up to me.  That's not up to you.  I
 5   heard you explain earlier that there was not a
 6   basis to believe that crimes had been committed
 7   here, so my question is, is it JPSO's position that
 8   there was or was not probable cause at the time of
 9   this search warrant application on these facts?
10   Yes or no.  What is JPSO's position?
11             MR. ZIBILICH:
12                  Object to the form.  Legal
13                  conclusion.  You can answer it.
14             THE WITNESS:
15                  My answer remains the same.  I would
16                  tell you the obligation is to conduct
17                  the most thorough investigation.
18                  Toward that end, search warrants will
19                  be sought, and, if reasonable, obtained
20                  at the judicial review, as in this
21                  case.  I believe we would have been
22                  remiss had we not gotten the warrants
23                  we got in this case because we wouldn't
24                  have all the answers.  We wouldn't have
25                  any of the answers.
```

```
1    BY MR. MOST:
2         Q.   I understand, but there was no probable
3    cause that a crime had been committed that was the
4    basis for this?  There were other reasons that I
5    understand JPSO was seeking out, but would you
6    agree with me there was not probable cause of a
7    crime that was the basis for this search warrant,
8    agreed?
9              MR. ZIBILICH:
10                  Most, it is now seven times.  Object
11             to the form.  Legal conclusion.  Last
12             time.
13   BY MR. MOST:
14        Q.   Agree or disagree, Lieutenant?
15        A.   I would tell you, to use my hypothet
16   earlier, a generic death investigation, not
17   involving intervention by JPSO or anyone else, that
18   would negate the ability to get a search warrant
19   based on your line of questioning.  I don't agree
20   with that.
21        Q.   So you will not answer me whether JPSO
22   contends that there was or was not probable cause?
23   You will not answer that question; is that correct?
24             MR. ZIBILICH:
25                  That's an editorial.  He has
```

```
 1                  answered you, sir.  He just hasn't
 2                  given you the answer that you want.  I
 3                  suggest that you ask another question.
 4          MR. MOST:
 5                  Franz, no more speaking objections,
 6              please.
 7          MR. ZIBILICH:
 8                  It's not an objection.
 9          MR. MOST:
10                  Then no more speaking instructions
11              to the client.
12          MR. ZIBILICH:
13                  The instruction was to you.  I don't
14              want the editorial.  I want a question.
15      BY MR. MOST:
16          Q.   Lieutenant, I'll ask you one more time,
17      and either say agreed, disagree, or you won't
18      answer the question.
19              MR. ZIBILICH:
20                  No, no, no, no.  Don't answer the
21              question.  He is not going to tell you
22              how to answer it.  He is going to
23              answer it the way he wants to answer
24              it, sir.  You don't get to tell him how
25              to answer a question, with all due
```

```
 1                  respect to you.
 2            MR. MOST:
 3                  You are instructing the client not
 4            to answer the question?
 5            MR. ZIBILICH:
 6                  I am instructing him not to answer
 7            your multiple choice, because there
 8            might be a fourth, fifth, or sixth
 9            choice.
10            MR. MOST:
11                  You're instructing the client not to
12            answer the question, Franz?
13            MR. ZIBILICH:
14                  I've already said what I have to
15            say.  Do what you got to do.
16      BY MR. MOST:
17         Q.    Okay.  I'll ask the question, and you can
18      give me whatever answer you want, Lieutenant.
19         A.    All right, Mr. Most.
20         Q.    Was there probable cause of a crime that
21      formed the basis of this search warrant?
22            MR. ZIBILICH:
23                  Objection to the form.  Legal
24            conclusion.  You can answer it.
25            THE WITNESS:
```

1           According to the language in the
2           warrant that was reviewed and endorsed
3           by a judge, the term is "probable cause
4           exists."  Whether that is a crime or
5           not, this warrant does not define a
6           crime.  It states no charge at this
7           time, and yet the warrant was issued.
8           So while you are hanging on probable
9           cause, as a layman, I tell you it's
10          submitted to a judge.  We articulate
11          the facts, the basis on which we want a
12          warrant for certain records, and a
13          judge either declines or agrees.
14  BY MR. MOST:
15      Q.   Okay.  Moving on to the next exhibit.
16  This is G, which will be 55.  Do you see this
17  warrant here, Lieutenant?
18      A.   I do, Mr. Most.  It's a --
19      Q.   This is another search warrant applied
20  for by Keith Dowling for records related to EP,
21  correct?
22      A.   Correct.
23      Q.   This likewise does not investigate --
24  identify either a target of the investigation or a
25  potential crime, agreed?

1     A.   Correct.

2     Q.   And this one seeks EP's pediatric

3  records, correct?

4     A.   Correct.

5     Q.   For what purpose was EP's pediatric

6  records sought using this search warrant?

7     A.   Again, it would be the same rationale.

8  As much information as we could obtain on his state

9  of mind, physical well-being.  Again, to submit a

10  report without having delved into those facts, I

11  think we would have been remiss, so these search

12  warrants will all be designed to gather as much

13  information and paint as clear a picture of whoever

14  P████ was and what he was dealing with.

15     Q.   So not in furtherance of the

16  investigation of a crime but simply to get

17  background information and an understanding of this

18  person who died, agreed?

19     A.   I'm really not trying to struggle with

20  you, Mr. Most.  I can't agree to that, no.  It

21  isn't solely as it relates to E███ P████.  There is

22  interactions between E███ P████ and the deputies,

23  so as much as we're going to interview the deputies

24  and get an account of events from their

25  perspectives, their individualized perspectives, we

1   don't have that ability with Mr. P█████, so we're
2   gathering evidence as we can.  Search warrants
3   would be the mechanism for which gathering his
4   records would be achieved for us.
5       Q.   Okay.  But with this one, like the one
6   before, there was no indication to believe that a
7   crime had been committed, but JPSO wanted these
8   records for these other reasons, agreed?
9       A.   For the investigative purposes I've
10  stated, yes.
11      Q.   But, otherwise, my statement is correct?
12      A.   As I remember it, yes.
13      Q.   This is Exhibit H, which is Document 56.
14  Do you see that this is, likewise, a search warrant
15  sought by Keith Dowling for, in this case, the
16  records of Daren Parsa?  Do you see that?
17      A.   Yes.  That's correct.
18      Q.   Are you familiar that Daren Parsa is the
19  father of EP?
20      A.   Yes.
21      Q.   So this search warrant had the same
22  purposes as the search warrants we saw before,
23  right?
24      A.   Furtherance of the investigation, yes,
25  sir.

 1        Q.   So it's not that it was for the purpose
 2   of investigating a potential crime committed by
 3   Daren Parsa, agreed?
 4        A.   Not by a crime committed by Daren Parsa.
 5   We agree, yes.
 6        Q.   This is Exhibit J, which is 57.  I'll
 7   zoom in a little bit on this one.  Do you see that
 8   this is a search warrant by the St. Charles Parish
 9   Sheriff's Office?
10        A.   Yes, sir.
11        Q.   Where does it say -- it says -- you see
12   at the bottom of this on Page 3 it says, "Pursuant
13   to the totality of the circumstances, Sergeant
14   Keith Dowling of the Jefferson Parish Sheriff's
15   Office is seeking these records?"
16        A.   Yes, I do.
17        Q.   So JPSO asked St. Charles Parish
18   Sheriff's Office to obtain the search warrant?
19        A.   That's correct.
20        Q.   Do you see in this paragraph sort of
21   second from the bottom on Page 1, it says -- the
22   first sentence of that paragraph says, "Access to
23   any and all equipment, restraints, or other devices
24   utilized in the care and monitoring of E█  P█
25   for purposes of generalized law enforcement

```
 1    inspection and acquisition of documentary
 2    photographs."  Do you see that part?
 3         A.   I do.
 4         Q.   So that generalized law enforcement
 5    inspection, that's the language you earlier
 6    characterized as a fishing expedition, right?
 7              MR. ZIBILICH:
 8                   No.  I object to the form.
 9              THE WITNESS:
10                   I think, I think, a more appropriate
11                   response to this is he is looking to
12                   inspect it.  He doesn't know what he is
13                   inspecting it for.  I think that is
14                   different than what we were talking
15                   about before with a fishing expedition.
16                   The way you phrased it earlier, and I
17                   meant no disrespect by it, could easily
18                   be defined as for fishing expedition.
19                   I don't think this is -- this is for
20                   inspection.  His choice of words was
21                   his choice of words.
22    BY MR. MOST:
23         Q.   The applicant here doesn't know why he is
24    asking for it?
25         A.   Specifically --
```

```
 1              MR. ZIBILICH:
 2                   Wait.  Object to the form.  Go
 3                ahead.
 4              THE WITNESS:
 5                   Specifically why, no, no.  He wants
 6                to establish the existence of and what,
 7                if anything, it is and the extent of
 8                it.
 9    BY MR. MOST:
10         Q.   One of the things that is sought in this
11    search warrant -- and so JPSO asked St. Charles
12    Parish Sheriff's Office to get these particular
13    things for a search warrant, right?
14         A.   Because it was out of JPSO jurisdiction,
15    yes, sir.
16         Q.   Right.  So JPSO asked St. Charles Parish
17    Sheriff's Office to seek a search warrant for
18    P█████'s grades, for example.  That's in this top
19    line, correct?
20         A.   That is one of the things, yeah.  All
21    school records, yes.
22         Q.   Why was Jefferson Parish Sheriff's Office
23    seeking EP's grades?
24         A.   They weren't specifically, but it has
25    been our experience over the years that unless you
```

1    are all-inclusive in your language, you allow

2    others the opportunity to pick and choose what they

3    disseminate to you, so we try and be as inclusive

4    as possible to gather all the records.  That would

5    be the simplest phrase.  We want everything.  We're

6    asking for everything.

7         Q.   So JPSO is using search warrants to just

8    obtain everything about EP, correct, as much as

9    they could?

10        A.   His school records so that we could

11   determine what would or would not be relevant

12   rather than allowing a school or other entity to

13   determine it for us, yes.

14        Q.   Relevant to what?  What would those

15   grades help JPSO determine?

16        A.   As would many things.  Maybe a better

17   understanding or perspective on what transpired at

18   the laser tag on Veterans Boulevard.

19        Q.   So JPSO didn't have any reason to believe

20   that EP's grades were evidence of a crime, fruits

21   of a crime, anything like that?  It was just sought

22   to obtain information about the death of this

23   person, agreed?

24        A.   Potentially relevant to the investigation

25   to a full understanding of what transpired and the

```
 1    mindsets of those involved.
 2         Q.    When you say investigation, do you mean a
 3    criminal investigation or just a general
 4    investigation?
 5         A.    Again, I mean, I work at the Criminal
 6    Investigations Bureau, but I would call this an
 7    investigation.  An investigation on two fronts.  An
 8    investigation into the death of E███ P█████ and an
 9    investigation as to the use of force to the extent
10    that force was used against E███ P█████ in that
11    encounter.
12         Q.    To determine whether it was like
13    consistent with JPSO policy?
14         A.    Or more importantly reasonable and
15    necessary pursuant to state law.
16         Q.    The question of whether it was consistent
17    with policy, that would be for Internal Affairs not
18    the Homicide Division, correct?
19              MR. ZIBILICH:
20                   Outside of the scope.  You can
21                answer it.
22              THE WITNESS:
23                   No.  You would be incorrect on that.
24                That would be the purview of the
25                Homicide Division.
```

```
 1   BY MR. MOST:
 2        Q.   The Homicide Division of JPSO determines
 3   whether or not officers broke policy?
 4             MR. ZIBILICH:
 5                  Objection.  Way outside the scope.
 6             You can answer it.
 7             THE WITNESS:
 8                  They would not.  They would more
 9             correctly determine whether the force
10             employed in any given set of
11             circumstances was both reasonable and
12             necessary or not.
13   BY MR. MOST:
14        Q.   EP's family did not consent to the
15   obtaining of this information, correct?
16             MR. ZIBILICH:
17                  Objection.  Outside of the scope.
18             You can answer it.
19             THE WITNESS:
20                  They didn't seek their permission,
21             to my knowledge.  We simply obtained
22             the warrants.
23   BY MR. MOST:
24        Q.   Do you know whether the family
25   specifically objected to these warrants?
```

```
 1              MR. ZIBILICH:

 2                   Objection.  Outside the scope.  You

 3              can answer it.

 4         THE WITNESS:

 5                   I would imagine that they did.  I

 6              believe, Mr. Most, you represented them

 7              when you sought to quash a warrant for

 8              the school, so the answer would be they

 9              did object.

10    BY MR. MOST:

11         Q.   So the JPSO Standard Operating

12    Procedures.  I looked through it and couldn't find

13    anything about search warrants.  Is that correct,

14    in your understanding?

15         A.   Yes.

16         Q.   So the JPSO's Standard Operating

17    Procedures, that's like the policy manual?  Is that

18    correct?

19         A.   Yes.

20         Q.   Nothing about when search warrants are

21    proper or how to do them, agreed?

22         A.    It has nothing regarding search warrants,

23    to my knowledge.

24         Q.    Is there any other document or form in

25    which the sheriff's office has provided guidance to
```

```
 1   deputies about when search warrants are proper or
 2   not proper?
 3        A.   To answer your question as you asked it,
 4   I don't believe so.  No documents.
 5        Q.   I looked through the field training
 6   materials.  I couldn't find anything in there about
 7   search warrants.  Is that consistent with your
 8   understanding?
 9        A.   I couldn't speak specifically to the
10   field training manual, but that would not surprise
11   me, no.  It's going to be a learning on the job
12   thing, and that's perhaps, with JPSO, is going to
13   come later in someone's career than the outset of
14   their patrol division duties.
15            MR. MOST:
16                 Let's take five and break.  I think
17              we're near or at the end, which is
18              probably welcome news.  So we'll take
19              five.  We will come back here at 2:05.
20              We'll talk then.  Thank you.
21                 {BRIEF RECESS}
22   BY MR. MOST:
23        Q.   Lieutenant, I think I understand your
24   perspective.  A person died, right, and JPSO wanted
25   to have the fullest picture of who was involved,
```

63

```
 1   what led up it, states of mind, background, stuff
 2   like that to have the fullest understanding of what
 3   happened so that, you know, for the purpose of this
 4   investigation, right?
 5        A.   I think that is a fair statement, yes,
 6   sir.
 7        Q.   Pursuant to that, JPSO sought search
 8   warrants to obtain the minor's school records,
 9   medical records, older medical records, records
10   about the father, stuff like that, right?
11        A.   Records about the father as it related to
12   this incident, but, yes.
13        Q.   So what search warrants were used related
14   to the officers involved?
15             MR. ZIBILICH:
16                  Objection.  Outside the scope.  You
17                can answer it.
18             THE WITNESS:
19                  No search warrants as it related to
20                the officers involved.  They were
21                compliant with requests.  There was no
22                indication of wrongdoing on their part.
23                The answer is no search warrants as it
24                related directly to them.
25   BY MR. MOST:
```

64

1      Q.    So JPSO sought EP's grades but not the

2  officers' background information, correct?

3      A.    We have their background information.

4  They work for the sheriff's office.

5      Q.    What about their employment records prior

6  to the sheriff's office?

7              MR. ZIBILICH:

8                   Objection.   Outside the scope.   Go

9                ahead.

10             THE WITNESS:

11                   If it were deemed relevant or

12                probative, I would think that is a

13                reasonable question, but, in this case,

14                we also have a video.   We don't have

15                just their individualized or even

16                collective accounts of the event.   We

17                have a video of the incident as it

18                unfolded.

19  BY MR. MOST:

20     Q.    So search warrants were used to obtain

21  things like EP's grades on the theory that we don't

22  know why, but, who knows, they could be relevant,

23  right?

24     A.    Insofar as your question goes, yes.

25     Q.    But no search warrants --

1     A.   I'm sorry.  It was more, as I told you

2  before, the language is designed to preclude

3  someone eliminating, for no nefarious reason, well,

4  you didn't ask for it.  You didn't get it, so we

5  try and use as inclusive language as we can.

6     Q.   Right, because you just wanted everything

7  about the decedent, right, that you could get?

8     A.   Yeah.  I would like -- I mean, I believe

9  I would be remiss in running the division or

10  running that particular investigation if you, sir,

11  or the sheriff of Jefferson Parish were to ask me,

12  well, what is his background?  What is his level of

13  understanding?  Could he communicate?  And I were

14  unable to answer those things in any definitive

15  way, I would think my investigation would be

16  remiss.

17     Q.   You said you didn't need search warrants

18  because the officers were compliant.  What

19  documents were requested from the officers

20  themselves?

21     A.   No. I meant --

22          MR. ZIBILICH:

23               Objection.  Outside the scope.  You

24            can answer it.

25          THE WITNESS:

```
 1                    Sorry.  No.  What I meant in general
 2               was, and, again, we're back to
 3               hypothets.  We have body-worn camera
 4               now.  We did not at the time.  We have
 5               a video of the incident from area
 6               surveillance, but if a deputy said,
 7               when I got on the scene, I photographed
 8               the interactions.  I wasn't involved.
 9               I just stood back and photographed them
10               on the phone.  I would ask him for a
11               copy of that in its entirety.  If he
12               didn't supply it, I would seek, and, I
13               believe, obtained a warrant for those
14               documents, that video.  That's what I
15               mean.
16    BY MR. MOST:
17         Q.   But the short answer is no documents were
18    requested from the deputies themselves, agreed?
19         A.   Agreed.
20         Q.   Were documents requested from the parents
21    of EP?
22         A.   Were documents requested from the
23    parents?  As I sit here today, I can only tell you
24    it is my belief the answer would be no.
25                    MR. MOST:
```

```
1               Okay.  I think I know the answer to
2            the following question, but, Chris, do
3            you have any questions for the witness?
4     MR. KAUL:
5               No questions.
6     MR. MOST:
7               Franz, anyone in your room have any
8            follow-up questions for the witness?
9     MR. ZIBILICH:
10              No thanks.
11    MR. MOST:
12              Lieutenant, thank you very much for
13           your time here today.  We appreciate
14           you coming here and answering these
15           questions.
16    THE WITNESS:
17              Thank you, Mr. Most.
18    MR. MOST:
19              I think we'll wrap this up.
20    MR. ZIBILICH:
21              Just one little housekeeping thing.
22           I appreciate you giving us until
23           Friday.  I just inquired.  The sheriff
24           is still out of town.  If I could get
25           you an answer as to Subpart B, for lack
```

68

```
 1              of a better word, as to Question 3,
 2              I'll get it to you ASAP.
 3         MR. MOST:
 4              Cool.  Thank you.
 5         MR. MOST:
 6              We've already picked a gang of
 7              dates.  That would be an hour or so
 8              fill in, I presume.
 9         MR. MOST:
10              Yeah, although, hopefully we could
11         do it sooner.
12              [End of deposition, 2:01]
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1         C E R T I F I C A T E

2

3              This certification is valid only for
a transcript accompanied by my original signature
4  and original required seal on this page.

5              I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6  as the officer before whom this testimony was
taken, do hereby certify that LIEUTENANT DONALD
7  MEUNIER, after having been duly sworn by me upon
authority of R.S. 37:2554, did testify as
8  hereinbefore set forth in the foregoing 68 pages;

9              That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10  or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11  ability and understanding;

12              That the transcript has been
prepared in compliance with transcript format
13  guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14  prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15  and in rules and advisory opinions of the board;

16              That I am not related to Counsel or
to the parties herein, nor am I otherwise
17  interested in the outcome of this matter.

18

19

20

21  _____
Sandra P. DiFebbo,
22  Certified Shorthand Reporter

23  Date: _____

24

25