UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CASE NO.  2:21-cv-00080

DONNA LOU and DAREN PARSA, on their own behalf and
on behalf of their deceased minor child, E.P.

Plaintiffs,


VERSUS


SHERIFF JOSEPH P. LOPINTO, III, CHAD PITFIELD, RYAN
VAUGHT, STEVEN MEHRTENS, SHANNON GUIDRY, NICK VEGA,
MANUEL ESTRADA, MYRON GAUDET, JOHN DOES 1-3,
VICTORY REAL ESTATE INVESTMENTS LA, LLC D/B/A
WESTGATE SHOPPING CENTER, ABC INSURANCE COMPANY,
and XYZ INSURANCE COMPANY,

Defendants.



  VIDEOTAPED DEPOSITION OF DETECTIVE NICHOLAS VEGA,

given in the above-entitled cause, pursuant to the

following stipulation, before Sandra P. DiFebbo,

Certified Shorthand Reporter, in and for the State

of Louisiana, at JPSO, 1233 Westbank Expressway,

Fifth Floor, Harvey, Louisiana, on the 20th day of

September, 2022, commencing at 1:17 PM.

```
 1   APPEARANCES:
 2            THE COCHRAN FIRM MID-SOUTH
              BY:  ANDREW CLARKE,
 3            ATTORNEY AT LAW
              One Commerce Square
 4            40 South Main, Suite 1700
              Memphis, Tennessee  38103
 5            -and-
              MOST & ASSOCIATES
 6            BY: WILLIAM MOST,
              ATTORNEY AT LAW
 7            201 St. Charles Avenue
              Suite 114, #101
 8            New Orleans,Louisiana  70170
              Representing the Plaintiffs
 9
              MARTINY & ASSOCIATES
10            BY:  FRANZ ZIBILICH,
              ATTORNEY AT LAW -and-
11            JEFFREY D. MARTINY,
              ATTORNEY AT LAW
12            131 Airline Drive
              Suite 201
13            Metairie, Louisiana  70001
              -and-
14            LINDSEY M. VALENTI, ATTORNEY AT LAW
              LEGAL ADVISOR
15            1233 Westbank Expressway
              Building B, Fifth Floor
16            Harvey, Louisiana  70058
              Representing JPSO Defendants
17
18            THOMPSON, COE, COUSINS & IRONS, LLP
              BY:  MARK HILL,
19            ATTORNEY AT LAW
              601 Poydras Street
20            Suite 1850
              New Orleans, Louisiana  70130
21            Representing Victory Real Estate
              Investments LA, LLC, and Westgate
22            Shopping Center
23
24
25
```

```
 1

 2    Also Present:   Daren Parsa, Donna Lou, Tim Anclade,
                      Myron Gaudet
 3

 4
      Videographer:   Aaron Palmer, CLVS, Depo-Vue
 5

 6
      Reported By:
 7

 8            Sandra P. DiFebbo
              Certified Shorthand Reporter
 9            State of Louisiana

10

11

12      E X A M I N A T I O N        I N D E X

13                                   Page

14  BY MR. CLARKE:                    5

15  BY MR. HILL:                     177

16

17      E X H I B I T                I N D E X

18                      Page

19

20  Exhibit 106                       9

21  Exhibit 107                      10

22  Exhibit 108                      10

23  Exhibit 109                      17

24  Exhibit 110                      17

25
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

S T I P U L A T I O N

1    

2    

3        It is stipulated and agreed by and

4   between Counsel for the parties hereto that the

5   Videotaped Deposition of DETECTIVE NICHOLAS VEGA is

6   hereby being taken pursuant to the Federal Rules of

7   Civil Procedure for all purposes in accordance with

8   law;

9        That the formalities of reading and

10  signing are specifically waived;

11       That the formalities of sealing,

12  certification, and filing are hereby specifically

13  waived.

14       That all objections, save those as to

15  the form of the question and responsiveness of the

16  answer are hereby reserved until such time as this

17  deposition or any part thereof is used or sought to

18  be used in evidence.

19       * * * * *

20       Sandra P. DiFebbo, Certified Shorthand

21  Reporter, in and for the State of Louisiana,

22  officiated in administering the oath to the

23  witness.

24   

25   

```
 1              DETECTIVE NICHOLAS VEGA, having been
 2         first duly sworn, was examined andtestified
 3         on his oath as follows:
 4    EXAMINATION BY MR. CLARKE:
 5         Q.    Would you please state your name for the
 6    record.
 7         A.    Nick Vega or Nicholas Vega.
 8         Q.    And are you a detective or a deputy?
 9         A.    I'm a detective.
10         Q.    Can I refer to you as Detective Vega?
11         A.    Sure.
12         Q.    Detective Vega, my name is Andy Clarke.
13    We haven't really met, but we've been around each
14    other during these depositions.  Have you given a
15    deposition before?
16         A.    Yes.
17         Q.    In what circumstance?
18         A.    A couple through the sheriff's office and
19    one personal.
20         Q.    Tell me a couple through the sheriff's
21    department, who they were?  Were those lawsuits?
22         A.    Yes.
23         Q.    How many times have you been sued?
24         A.    Including this?
25         Q.    Yes.
```

```
1        A.   Three, to my knowledge.  Four.  I'm
2    sorry.
3        Q.   One of them was Blum.  You were sued with
4    Gaudet as well in that case?
5        A.   Yes.
6        Q.   What other cases do you recall when you
7    were sued?  Do you know the -- well, let me ask you
8    this.  Do you know the resolution of the case, the
9    Samuel Blum case?
10       A.   Do I know the outcome of the lawsuits?
11       Q.   Yes.
12       A.   Not offhand.
13       Q.   What are the other lawsuits you've been
14   -- that involved use of force and an allegation
15   that you choked somebody, correct?
16       A.   For the sheriff's office one?
17       Q.   The Blum one.
18       A.   No.  I wasn't accused of choking anyone.
19       Q.   We previously marked this as an exhibit.
20   I can't find it, but you don't recall being -- an
21   allegation upon information and belief he was
22   attacked by Vega and Honess, Dunn, Gaudet, and
23   unknown deputies who choked and beat him with their
24   fists.  You don't recall having an allegation
25   against you and a complaint that you choked and
```

1    beat somebody?

2        A.    There was no allegation of choking, nor

3    did it ever come up in deposition in questioning.

4    He was struck, but there was no choking involved.

5        Q.    I just read that from the complaint.  You

6    were not aware that there were allegations that you

7    choked somebody in that complaint, right?

8        A.    No.

9        Q.    What other times have you been sued?

10       A.    We were sued for a Mardi Gras incident

11   with Cage and one for an officer-involved shooting.

12       Q.    Were you the officer who shot?

13       A.    Yes.

14       Q.    And when did that happen?

15       A.    2007.

16       Q.    Who were you with?  Were you with JPSO at

17   that time?

18       A.    Yes.

19       Q.    What was the outcome of the case where

20   you shot and killed somebody?

21       A.    That I don't know.

22       Q.    What was the --

23       A.    I did not kill him.

24       Q.    It wasn't a death case?

25       A.    No.

```
 1          Q.    Did you hit him?

 2          A.    Yes.

 3          Q.    Do you remember the name of the person?

 4          A.    Damian Blunt.

 5          Q.    Do you know the outcome of that case?

 6          A.    No.

 7          Q.    The Jacobi Cage case, that was with

 8   Dowling as well, correct?

 9          A.    Correct.

10          Q.    You know the outcome of that case?

11          A.    I believe they settled with Cage.

12          Q.    Did you have an Internal Affairs

13   investigation with the officer-involved shooting in

14   2007?

15          A.    They don't handle those.

16          Q.    Did you have an Internal Affairs

17   investigation with respect to the incident

18   involving Jacobi Cage that you are aware of?

19          A.    They don't handle those either.

20          Q.    And we have the Blum case.  What was the

21   other case where you were sued?

22          A.    No.  The first deposition I ever done we

23   were suing.

24          Q.    You were suing?

25          A.    Yeah.
```

```
 1        Q.   You were suing who?
 2        A.   The neighbor's insurance.
 3        Q.   That was just the private one?
 4        A.   Yes.
 5        Q.   So you know a little bit about -- you
 6   received training in the police academy on how to
 7   testify as well, didn't you?
 8        A.   They covered court processing stuff, but
 9   we never had an actual class of how to sit down and
10   testify.
11        Q.   Before you came in here to get ready for
12   your deposition, did you review anything?
13        A.   Before I came in here today?
14        Q.   Yes.
15        A.   No, I did not.
16        Q.   Did you meet with your lawyer to prepare
17   yourself for your deposition?
18        A.   This morning.
19        Q.   If you look, what you have in front of
20   you -- what I'm going to do for the record is I'm
21   going to mark a number of exhibits, and when we're
22   asking questions, if you need to refer to them, I
23   want you to have access to them.  Exhibit Number
24   106 is the bigger document.  That's your personnel
25   file that was produced by JPSO.  Have you ever
```

1   reviewed that?

2       A.   No.

3       Q.   You know you had to fill out an

4   application and fill out documents throughout your

5   service with JPSO, correct?

6       A.   Yes.

7       Q.   You know what a personnel file is?

8       A.   Yes.

9       Q.   You just have not reviewed it, correct?

10      A.   I'm sorry?

11      Q.   You just have not reviewed it before your

12  deposition?

13      A.   No, I have not.

14      Q.   Exhibit Number 107.  There is two

15  documents that look like they're typed papers.

16  Exhibit 107 and 108. 107 is your responses to

17  interrogatories and Requests for Production of

18  Documents.  Do you remember being asked a number of

19  questions and having to sign them and swear to them

20  under oath?

21      A.   Quite some time ago, yes.

22      Q.   It looks like June 21st, 2020.  If you

23  look at the last page, that's your verification on

24  Exhibit 107, right?

25      A.   On what page?

1        Q.    The last page. It says Verification on

2    the top.

3        A.    I have certification of service that Mr.

4    Zibilich signed.

5        Q.    Are you looking at 107?

6        A.    No.  I sure am not.  Yes.

7        Q.    So you read these answers and swore to

8    them under oath, correct?

9        A.    Yes.

10       Q.    They ask a lot of basic information about

11   your criminal record.  You noted you've never been

12   arrested, correct?

13       A.    Correct.

14       Q.    You ever been charged?

15       A.    No.

16       Q.    If you go to Interrogatory Number 11, it

17   says please state if you've ever been investigated

18   by Internal Affairs, GIB, Administration, or any

19   other division of any law enforcement agency,

20   including the JPSO, which is empowered to

21   investigate misconduct, complaints, or compliance

22   with policy.  You see that?

23       A.    Correct.

24       Q.    And your answer under oath was that you

25   never had an Internal Affairs complaint, correct?

```
 1        A.    Correct.

 2        Q.    And you understand this is not just

 3   asking about JPSO, this question?

 4        A.    No.  I assumed that it was at the time.

 5        Q.    It says, Please state whether you have

 6   been investigated by Internal Affairs, Security

 7   Squad, Precinct Commander, GIB, Administration or

 8   any division of any law enforcement agency,

 9   including the JPSO, which is empowered to

10   investigate officer misconduct, citizens complaints

11   and compliance with policy.  Have you been -- do

12   you want to amend this answer and tell me about any

13   Internal Affairs complaint that you had at any

14   other department?

15             MR. ZIBILICH:

16                  No.  He is not going to do that.

17             MR. CLARKE:

18                  He is going to do that.

19             MR. ZIBILICH:

20                  No, he's not.  Louisiana law

21               mandates that these things be expunged

22               after three years.  If you want to ask

23               him about IAD complaints in the last

24               three years, live it up.

25             MR. CLARKE:
```

13

```
 1                We're not -- I'm not making a public
 2            records request.
 3        MR. ZIBILICH:
 4                It is a mandate that they be
 5            expunged after three years under
 6            Louisiana law.
 7        MR. CLARKE:
 8                I know Monell prior -- in prior
 9            incidents.  I'm not going to get in an
10            argument with you.  I'm going to ask
11            the question.  If you instruct him --
12        MR. ZIBILICH:
13                Why don't you be quiet then and
14            quite arguing with me.
15   BY MR. CLARKE:
16        Q.   Have you been investigated by Internal
17   Affairs or any other division of a police
18   department that investigates officer misconduct
19   from any department?
20        A.   I had courtesy complaints that Internal
21   Affairs handles, but I couldn't give you any
22   specifics on that.
23        Q.   Courtesy complaints.  Somebody calling up
24   complaining you might have been rude or something?
25        A.   Correct.
```

```
 1          Q.   And were those at JPSO?  Where were they?
 2          A.   Yes.
 3          Q.   Go to Interrogatory Number 18.  We asked
 4    you to identify any accommodations, if any, that
 5    you provided to E██ P███ to accommodate his
 6    disability.  What did you answer?
 7          A.   You want me to read it aloud?
 8          Q.   Sure.
 9          A.   "Assuming this interrogatory pertains to
10    accommodations under the Americans with
11    Disabilities Act, no accommodations were requested
12    nor provided during the incident as described in
13    the police report produced in connection herewith."
14          Q.   One of the other documents that I pre-
15    marked was Exhibit Number 108, and this is your
16    supplemental responses to discovery.  If you'd
17    review those and tell me if they are accurate,
18    completely accurate, in responses to the questions.
19          A.   Read them all?
20          Q.   There is only one.  Or just 9.  I'm
21    sorry.
22          A.   Just 9?
23          Q.   Yeah.  Interrogatory Number 9.
24          A.   Okay.
25          Q.   That doesn't indicate all -- everything
```

```
 1    that you saw and what you did the whole time at the
 2    scene, does it?
 3         A.   No.
 4         Q.   Do you know why like you didn't put
 5    things on here about how his arms came up in this
 6    interrogatory response?
 7         A.   Because it is detailed in my -- in the
 8    report that was written, and it was detailed in the
 9    statement, therefore, I figured this would be a
10    gist.
11         Q.   Did you refer to anything else in this
12    interrogatory response that said please see
13    statement or please see video?
14         A.   No.
15         Q.   You would agree this is not something
16    with specificity and in chronological order the
17    exact sequence of events from the time you became
18    aware of the incident until you completed your
19    shift assignment and returned home, correct?
20         A.   Well, it is from start to finish.  It
21    just doesn't explain every minor detail or major
22    detail.
23         Q.   And one thing -- we didn't go over the
24    rules in depositions.  Obviously, you understand
25    your testimony here is under oath subject to the
```

1    penalty of perjury, right?

2        A.    I do.

3        Q.    You sat through other depositions in this

4    case, correct?

5        A.    I have.

6        Q.    Which depositions have you sat through?

7        A.    Sergeant Dowling's, Detective Vaught's

8    and yesterday, with Mr. Parsa.

9        Q.    So you understand a little bit about the

10   rules.  Obviously, we have a court reporter here.

11   Even though we have a videographer, please give

12   audible answers instead of shaking your head or

13   saying uh-huh or na-huh.

14       A.    Correct.

15       Q.    Also, if you need to refer to something

16   to provide an accurate answer, let me know, and I

17   will see if I can get that for you. Okay?

18       A.    Okay.

19       Q.    If I ask you a question, and you answer

20   it, I'm going to assume you understand it.  Is that

21   fair?

22       A.    Yes.

23       Q.    Now, another thing is a lot of times when

24   we are in communication, I may be asking a

25   particular question, and that's what I'm looking

1    for.  You may want to give me other information,

2    but if you look at Interrogatory Number 9, did you

3    actually answer that question or did you just make

4    some decisions about what you were going to put in

5    that answer?

6         A.   No.  I answered it to what I thought was

7    being asked.

8         Q.   And you thought to state the exact

9    sequence of events from the time that you became

10   aware of and involved in the incident until you

11   completed your shift assignment, that's what you

12   put in response to this?

13        A.   That's what I put.

14        Q.   The next document that I marked was

15   Exhibit Number 109, which is your statement.  Have

16   you read that before your deposition?

17        A.   The last time I looked at it was like

18   Sunday.

19        Q.   We'll get to that.  And then finally,

20   after the events, what I've marked as Exhibit

21   Number 110 are some photos that were produced.  Do

22   you recall when these photos were taken, who took

23   them, and why?

24        A.   Do I recall who took them?

25        Q.   Yeah.

```
 1              MR. ZIBILICH:
 2                   Why don't you answer them one at a
 3                time.
 4              THE WITNESS:
 5                   I believe it was crime scene.  It
 6                may have been Technician Steerwall.
 7    BY MR. CLARKE:
 8         Q.   Did they tell you why they were taking
 9    the pictures?
10         A.   Any time we are involved in an incident,
11    and even if there is minor injury, which there was
12    to my knees, they photograph it.
13         Q.   Did you fill an OJI complaint?
14              MR. ZIBILICH:
15                   Who?
16              THE WITNESS:
17                   What?
18    BY MR. CLARKE:
19         Q.   OJI.  On-the-job injury. Did you file a
20    --
21              MR. ZIBILICH:
22                   That must be a Memphis thing.
23              THE WITNESS:
24                   Yeah.  No.
25    BY MR. CLARKE:
```

```
 1          Q.    You say you were injured in the case?
 2          A.    Yeah.  The skin on my knees were tore up
 3    from them going back and forth against the
 4    pavement.
 5          Q.    And you didn't file a workers' comp case
 6    because of it?
 7          A.    I wasn't losing work over it.
 8          Q.    That's what I'm talking about.  It was
 9    minor injuries.
10          A.    So there was no need to.
11          Q.    So you are saying -- when they took your
12    pictures, did they tell you, you were under
13    investigation for criminal violations or under
14    investigation for Internal Affairs?
15          A.    Did the crime scene technician?  No.
16          Q.    When you took the pictures.  The other
17    documents that I have in front of you are Exhibit
18    Number 35, which is your training resume from JPSO.
19    We're not going to talk about -- we're going to do
20    everything. I'm just trying to let you know what is
21    in front of you.  Exhibit Number 22 is the RIPP
22    Hobble, to your right, and the policy book is
23    underneath that.  That's Exhibit 19.  Okay?
24          A.    Okay.
25          Q.    So if you need to look at anything while
```

1    we're asking questions, let me know.  All right.
2    Let's talk a little bit about your educational
3    background.  Are you from this area?
4         A.    From New Orleans, yeah.
5         Q.    Where did you go to high school and what
6    year?
7         A.    Holy Cross.
8         Q.    What year did you graduate?
9         A.    1991.
10        Q.    Did you have any post high school
11   education or obtain any degrees or certifications?
12        A.    I went to college after high school for a
13   brief period of time.
14        Q.    When did you go to college and what
15   college?
16        A.    University of New Orleans, and that was
17   -- I graduated in '91.  Started in '91, and I
18   joined the military and left in '93.
19        Q.    Thank you for your service.  What branch
20   of the military were you in?
21        A.    It was the Army National Guard.
22        Q.    Tell me how that works.  Is that -- were
23   you ever deployed?
24        A.    No.  I was in between the window.
25        Q.    Thank goodness.  But is that -- when you

```
 1   are in the National Guard, does that like have a
 2   certain monthly commitment and then a certain
 3   yearly commitment?
 4        A.   Yes.  It was a six-by-two enlistment.
 5        Q.   Explain that to me.
 6        A.   Six years in service, two years in active
 7   ready reserve.
 8        Q.   So you were actually in full service?
 9        A.   No.  It is National Guard, so you had
10   weekend, and then you had -- they call it a two-
11   week AT, which is annual training, but it's more
12   like three.
13        Q.   When you joined the military in '91, was
14   it just the weekend commitment?
15        A.   '92.
16        Q.   '92.  I'm sorry.  Was it just the weekend
17   commitment?  Was there a basic training you had to
18   go to?
19        A.   You were on active duty through your
20   basic training and your advanced individual
21   training.
22        Q.   Did you have any training on law
23   enforcement?
24        A.   I was an MP.
25        Q.   What did they -- there is different rules
```

1    of engagement, correct?

2         A.   Yes.

3         Q.   You learned how to use a weapon and

4    whatever skills you needed to do your job in the

5    National Guard, right?

6         A.   Yes.

7         Q.   And was your primary position in the

8    National Guard MP?

9         A.   Yes.

10        Q.   How did you do -- did you do MP duties

11   once a month?

12        A.   Yes, we did.

13        Q.   What did you do?

14        A.   It depended on what particular training

15   they had.  Sometimes it was weapons qualification.

16   Sometimes it was riot training.  Sometimes it was

17   EPW work.  Sometimes it was post security.

18   Sometimes it was security for air shows.  It just

19   varied.  There was different things, different

20   times.  Two-week training.  We were assigned to

21   different units in various capacities.

22        Q.   Did you serve as a military policeman?

23        A.   Yes.  I was on an AWOL Task Force.  I

24   worked post security.

25        Q.   After -- you went to UNO, Holy Cross.

```
1    Your first job out of high school was the military?
2         A.   I had --
3         Q.   Other than, you know, teenage jobs.  I
4    mean the first real job.
5         A.   No.  I had worked at the Hilton Hotel
6    briefly.
7         Q.   When was your first law enforcement or
8    correctional service?
9         A.   1994.
10        Q.   1994.  From 1992 to 1994, what type of
11   jobs did you have?
12        A.   Like I said, I worked at the Hilton Hotel
13   '92.  I shipped out in '93.  Came home in that
14   October.  Worked at the Hilton Hotel until 1994,
15   when I joined the sheriff's office.
16        Q.   And in 1994, tell me how you joined the
17   sheriff's office.  You filled out an application?
18        A.   Yes.
19        Q.   What position were you applying for?
20        A.   Correctional officer.
21        Q.   And were you accepted?
22        A.   Yes.
23        Q.   Is that the first place that you
24   submitted an application?
25        A.   For law enforcement?
```

24

```
 1        Q.   Yes.
 2        A.   Yes.
 3        Q.   Okay.  In 1994, when you became a
 4   correctional officer, did you have to go to a
 5   correctional academy?
 6        A.   Yes.
 7        Q.   Was that by JPSO?
 8        A.   No, no.  It was the Orleans Sheriff's
 9   Office.
10        Q.   Where did you go in '94?  JPSO?
11        A.   No, no.  Orleans Parish Criminal
12   Sheriff's Office.
13        Q.   How long was the training for Orleans
14   Parish Correctional Office?
15        A.   So their training was about a week long
16   for the correctional post.
17        Q.   You agree that you have come a long way
18   in training from 1994, correct?
19        A.   There is a lot of years after it, yes.
20        Q.   That week training, you have to train --
21   it's different than law enforcement training,
22   correct?
23        A.   It's different than patrol work, yes.
24        Q.   It's different than your basic police
25   academy, correct?
```

1        A.    Yes.

2        Q.    You've got a different environment,

3   different rules, different things you have to deal

4   with in a jail population than the public in the

5   streets, correct?

6        A.    Correct.

7        Q.    How long did you work at the Orleans

8   Parish Sheriff's Office?

9        A.    About six months.

10        Q.    Why did you leave?

11        A.    I left because I was going to St. Bernard

12   Sheriff's Office.

13        Q.    Did you quit?

14        A.    Yes.

15        Q.    At the Orleans Parish Sheriff's

16   Department, did you ever have any complaints

17   against you?

18        A.    No.

19        Q.    Did you ever have any Internal Affairs

20   investigations against you?

21        A.    No.

22        Q.    Did you ever have any discipline?

23        A.    No.

24        Q.    You worked there for six months.  So was

25   it still in 1994 when you moved to St. Bernard?

```
1        A.    It was '94 to '95. The end of '94 to like
2   about May of '95, and then I left, and a few months
3   later I got on with St. Bernard Sheriff's Office.
4        Q.    So in '95?
5        A.    Yes.
6        Q.    Did you already have the job at St.
7   Bernard's Sheriff Office when you left Orleans or
8   did you then go out and apply?
9        A.    No.  I applied for it.  I was in the
10  process of -- it was in transition.
11       Q.    Did you know that you were going to get
12  hired at St. Bernard's when you left Orleans Parish
13  or were you just hoping to?
14       A.    No.  I knew I was.
15       Q.    So you go to the St. Bernard Sheriff's
16  Department sometime in 1995.  How long did you work
17  for them?
18       A.    It was about three years.
19       Q.    When you went to St. Bernard Sheriff's
20  Office, and you worked there those three years, did
21  you work in corrections or on patrol?
22       A.    Both.
23       Q.    How long did you work in corrections?
24       A.    It was about six months.
25       Q.    Did you have to go through another
```

```
 1    training program at St. Bernard or did you already
 2    have --
 3              A.    I already had it.
 4              Q.    So for about two and a half years you
 5    were in patrol at St. Bernard?
 6              A.    About, yeah.  That's right.
 7              Q.    Were you always -- I don't know the
 8    ranking system.  St. Bernard's, were you always a
 9    deputy?
10              A.    Yes.
11              Q.    Didn't have any supervisory
12    responsibilities?
13              A.    No.
14              Q.    Never a detective?
15              A.    No.
16              Q.    While you were at St. Bernard's, is that
17    when you got POST certified?
18              A.    Yes.
19              Q.    You got that at Slidell?
20              A.    Slidell.
21              MR. CLARKE:
22                    I said that one right.
23              MR. ZIBILICH:
24                    Okay.  You're one for 40.
25    BY MR. CLARKE:
```

```
 1          Q.   I think that was in '97 is when you were
 2    POST certified; is that correct?
 3          A.   That's right.
 4          Q.   Tell me about the training academy.  From
 5    the records I looked at, it looks like it was only
 6    a month long.  Is that correct?
 7          A.   You are incorrect.
 8          Q.   It may be wrong in the documents.  We'll
 9    get to it.  How long was that program?
10          A.   It was several months.
11          Q.   Ten months?
12          A.   On the certificate for Slidell, it will
13    have all of the hours listed on it.
14          Q.   We will see if we have that in the
15    records when we go to your personnel file.  Let's
16    talk about what you were trained at when you were
17    in Slidell.  Were you trained about the Americans
18    with Disabilities Act?
19          A.   No.
20          Q.   Were you trained on accommodations for
21    people with disabilities?
22          A.   No.
23          Q.   Were you trained on something called
24    excited delirium?
25          A.   I don't believe so.
```

1      Q.   Were you trained on any type of
2  restraints of people in the prone position?
3      A.   We had defensive tactics and handcuffing
4  techniques.
5      Q.   Did you have any tactics that dealt with
6  restraining somebody's legs?
7      A.   I had that at the sheriff's office in
8  Orleans.
9      Q.   You're talking about shackles training?
10     A.   Yes.
11     Q.   Did you have any training with any type
12  of RIPP Hobble, LR-22, or any other type of device
13  used to restrain people?
14     A.   Not at Slidell, no.
15     Q.   At St. Bernard's sheriff, did you have
16  any IA complaints?
17     A.   No.
18     Q.   Any discipline?
19     A.   No.
20     Q.   What is the next department you went to
21  after St. Bernard's?
22     A.   New Orleans Criminal District Court,
23  Intensive Probation.
24     Q.   What year was that?
25     A.   I believe 1998.

```
 1          Q.    I'm not familiar with what that entity
 2    is.  Is that a law enforcement agency or is it a,
 3    you know, just dealing with probation?
 4          A.    It's rather unique.
 5          Q.    Explain it to me.
 6          A.    So Criminal Court Intense Probation was
 7    set up by the court where they had drug court, and,
 8    basically, what they did was they broke that down
 9    into a field operations bureau and a probations.
10    So you had probation officers who handled the court
11    aspect of it, and we handled the law enforcement
12    part of it.
13          Q.    Did you have a gun?
14          A.    Yes.
15          Q.    And then were you allowed to arrest
16    people?
17          A.    Yes.
18          Q.    So it was kind of a law enforcement
19    position within this setup?
20          A.    Yes.
21          Q.    Was there any particular additional
22    training that you had taking that job with just the
23    court probation?
24          A.    The only additional training I had was
25    they had sent me to instructor school for
```

1    Monadnock.

2         Q.    The weapon?

3         A.    The baton.

4         Q.    An intermediate weapon?

5         A.    Yes.   Baton and MDTS, which was the

6    Monadnock Defensive Tactic System that they had at

7    that time.

8         Q.    Now, when you were at St. Bernard's, did

9    you have inservice training?

10        A.    We did.

11        Q.    I don't think I asked you any questions

12   about your training with St. Bernard's.   I

13   apologize if I did.   Did you have any training on

14   the Americans with Disabilities Act at St.

15   Bernard's?

16        A.    No.

17        Q.    Accommodations?

18        A.    No.

19        Q.    Excited delirium?

20        A.    No.

21        Q.    Prone restraint?

22        A.    No.

23        Q.    I think you told me the training that you

24   had at the probation office.   That dealt with the

25   -- I don't know how to say it.   How do you say it?

1        A.     Intensive Probation?

2        Q.     No.   The Manadana.

3        A.     Monadnock.

4        Q.     Manomanock?

5        A.     Monadnock.

6        Q.     So no other training.  Did you have to do

7   inservice training when you were with Orleans

8   district court probation?

9        A.     We did do recerts with the baton and

10  firearms.

11       Q.     That would probably be part of your

12  inservice?

13       A.     That was considered our inservice.

14       Q.     That fulfilled your hours; is that

15  correct?

16       A.     We didn't have specific hours.  We just

17  had requirements to recertify.

18       Q.     Is it your understanding that to be a

19  police officer in Louisiana, you've got to pass the

20  basic police academy?

21       A.     That is correct.

22       Q.     You get POST certified, right?

23       A.     Yes.

24       Q.     And then to maintain your certification,

25  you have to do certain things yearly, correct?

1        A.    We do now.

2        Q.    Back then -- well, that's true.  Back

3    then, do you know if you had to do it?

4        A.    We did not.

5        Q.    So how long did you stay at the New

6    Orleans district court probation?

7        A.    I was there for approximately two years.

8        Q.    Did you rise up in the ranks or you just

9    maintained the same position?

10        A.    I was a sergeant.

11        Q.    What does a sergeant -- does that entail

12    you having to supervise people under you?

13        A.    Yes.  That's what a supervisor does.

14        Q.    And how many people did you supervise?

15        A.    About six.

16        Q.    Where did you go after New Orleans

17    district court probation?

18        A.    Jefferson Parish.

19        Q.    What year was that?

20        A.    2000.

21        Q.    You've been here ever since?

22        A.    No.

23        Q.    You had another break?

24        A.    Yes.

25        Q.    How long were you at JPSO the second --

```
1    the first time?
2         A.   Okay.  So from 2000 to 2011, and then I
3    did executive protection work for --
4         Q.   What was the name of that company?
5         A.   It was Talon.
6         Q.   That was started in 2011?
7         A.   Yes.
8         Q.   How long did you work with Talon?
9         A.   Oh, not very long.  I stayed there until
10   about July of the same year.
11        Q.   Still in 2011?
12        A.   Yes.
13        Q.   And what did you do next?
14        A.   I went to Gretna Police Department.
15        Q.   Do you know what year that was?
16        A.   Same year.
17        Q.   2011?
18        A.   Same month.
19        Q.   And what happened at Talon?
20        A.   You ever work with actors?
21        Q.   I got Franz.
22        A.   Well, he's not even close.  Yes. It was
23   --
24             MR. CLARKE:
25                  Don't be hurt by that.  You're a
```

```
 1              good actor.
 2         THE WITNESS:
 3              It just -- I did not like working as
 4         a glorified babysitter for prima
 5         donnas.
 6  BY MR. CLARKE:
 7    Q.   I gotcha.  That sounds fair.  How long
 8  did you work at Gretna?
 9    A.   I actually only stayed there until
10  October, when I was invited back to JP.
11    Q.   And when did you go back to JP?
12    A.   October of the same year.
13    Q.   2011 was an eventful year for job
14  changes, huh?
15    A.   It was.
16    Q.   At the Gretna Police, you were there a
17  short time.  Did you receive any training?
18    A.   Everything carried over.
19    Q.   It just appears you were there for a
20  short period of time, so no training.
21    A.   Other than firearms qualification.  That
22  is a mandatory thing when you come into a
23  department.  You have to qualify with your weapon.
24    Q.   Just whatever the basic things are to get
25  you on the street?
```

```
 1            A.    Correct.
 2            Q.    You know, at New Orleans district court
 3      you had to do certain recertifications, right?
 4            A.    Qualifications, yes.
 5            Q.    Same thing with Gretna?
 6            A.    Yes.
 7            Q.    You served at New Orleans for two years,
 8      but Gretna was very short until you went to back to
 9      JPSO.  Okay?
10            A.    That's right.
11            Q.    So let's talk about JPSO and your first
12      stint.  Explain to me how you become a deputy at
13      the JPSO.  You've got to go through a process,
14      right?
15            A.    Correct.
16            Q.    Fill out an application and --
17            A.    Yes.
18            Q.    They do background checks and interviews
19      and polygraphs, correct?
20            A.    That's right.
21            Q.    You have to get medical clearance from a
22      doctor and a psychiatrist, correct?
23            A.    Yes.
24            Q.    And did you have to do that both in 2000
25      and in 2011?
```

```
 1          A.    I did.
 2          Q.    You went through that process at JPSO
 3   twice?
 4          A.    Yes.
 5          Q.    Now, let's go to Exhibit 106.  It would
 6   be easier just to kind of have this in front of
 7   you.
 8          A.    Okay.  106.
 9          Q.    You see there is Bates stamped numbers on
10   the right-hand corner?
11              MR. ZIBILICH:
12                   Bottom right.
13   BY MR. CLARKE:
14          Q.    Bottom right.  You see those numbers like
15   on the --
16              MR. ZIBILICH:
17                   They're small.
18              THE WITNESS:
19                   Yes.
20   BY MR. CLARKE:
21          Q.    They're small.  There is numbers on them,
22   if we can find them, but that's to help you kind of
23   go through this.  I may send you the page numbers.
24          A.    Just give me a minute, because I left my
25   glasses at the office. You can call them out.  Just
```

```
 1   give me a minute to find it.
 2        Q.   Okay.  Your application is on Page 1901.
 3        A.   Okay.
 4        Q.   Is this your application from 9/2/11?
 5        A.   Yes.
 6        Q.   According to this -- go through your
 7   history.  You were still working at Gretna when you
 8   applied for the job at JPSO?
 9        A.   Yes.
10        Q.   And you go through all of your work
11   history on this, correct?
12        A.   Yes.
13        Q.   Also, on your application, it says the
14   places that you applied for and whether you were
15   accepted, correct?
16        A.   Yes.
17        Q.   You've never been rejected from any
18   application for law enforcement, correct?
19        A.   No.
20        Q.   It goes through your educational
21   background, too, right?
22        A.   Yes.
23        Q.   Go to 1910.
24        A.   1910?
25        Q.   Yes.  Just so you know, this is in your
```

```
 1    application from 2000.  It goes through the same
 2    things.
 3          A.   Show me what you are looking at, because
 4    this has no page numbers on this.
 5          Q.   They're on there somewhere.  If you look
 6    at Page 1907.  Go the other way.
 7          A.   1907?
 8          Q.   Yeah.  1907. This appears to be your
 9    application --
10               MR. ZIBILICH:
11                    He's got it.
12    BY MR. CLARKE:
13          Q.   -- from when you applied in 2000,
14    correct?
15          A.   Yeah.  Let me see.
16          Q.   Look up at the top right, 6/16.
17          A.   Yes.
18          Q.   Are your glasses somewhere where you can
19    get them?
20          A.   They're down the street.  I can make do.
21    Continue.
22          Q.   If we take a break, and you need to get
23    them, let me know.  All right?
24          A.   Okay.
25          Q.   So that's the first page of the
```

1    application.  Go back one,two -- go to the third
2    page of the application where it says Paragraph 8
3    at the top.  Education.
4         A.   Okay.
5         Q.   You see what I'm talking about?
6         A.   Education, Line 8.
7         Q.   It says, "Slidell Police Academy, 4/97 to
8    5/97."
9         A.   Okay.
10        Q.   That's where I got that, but that's
11   wrong.  It was longer than a month, right?
12        A.   Yes.
13        Q.   According to this, prior to your first
14   application with JPSO, you had put in a previous
15   application for JPSO which was not acted on,
16   correct?  Look at the same page you were at.  Look
17   at the last line.  It says have you applied --
18        A.   Oh, yeah, yeah.  Sure did.
19        Q.   So it wasn't that you were not rejected.
20   You put here did not follow through with
21   department.  What does that mean?
22        A.   It means I stopped my process.
23        Q.   That's what I thought.  Go to 1927, past
24   your fingerprint cards.  According to this, on
25   7/31/00, which would be at the time you were

41

```
1    applying for JPSO the first time, Lieutenant Donald
2    Lambert wrote this memo.  Do you see that?
3         A.   No.
4         Q.   Keep going.
5         A.   It's past the fingerprints?
6         Q.   Past the fingerprint page.  Keep going.
7    Keep going.  Keep going.  Should be 1927.
8         A.   Okay.
9         Q.   You see it?
10        A.   Yes.
11        Q.   This appears to be an interoffice memo
12   from Lieutenant Don Lambert to Colonel Jim Wood,
13   correct?
14        A.   Okay.
15        Q.   Dated 7/31/00, right?
16        A.   Okay.  Yes.
17        Q.   According to this memo, Lieutenant
18   Lambert spoke with Deputy Golini of the Orleans
19   Parish Sheriff's Office.  Do you know who that is?
20        A.   No.  Never heard of him.
21        Q.   It says you were there from 12/5/94 to
22   5/17/95.  Does that seem about right?
23        A.   That's about right.
24        Q.   It also said you had a disciplinary
25   resume or disciplinary record, correct?
```

1       A.    It says verbal reprimand.

2       Q.    That's discipline, isn't it?

3       A.    They never talked to me.

4       Q.    When you answered questions before, when

5  you said you had never been investigated or didn't

6  have a complaint, were you excluding verbal

7  reprimands or you're saying that they never talked

8  to you about any?

9       A.    I never spoke to anybody about a verbal

10 reprimand.

11      Q.    According to this, you've got three

12 verbal reprimands, correct?

13            MR. ZIBILICH:

14                 According to this.  You're asking

15            him if the paper is correct or if the

16            reality is correct?

17 BY MR. CLARKE:

18      Q.    According to this, you were reprimanded

19 three times, correct?

20      A.    That's what this paper says, but --

21      Q.    It says the first time was on 2/9/95 for

22 DM3 Article 65, the equipment to be carried.  Do

23 you ever remember being disciplined or reprimanded

24 because you were not carrying your proper equipment

25 at the Orleans Parish Criminal Sheriff's Office?

```
1        A.   I don't know what equipment they're
2   speaking of, because they never issued any.
3        Q.   Number 2 is they say on 4/6/95, you were
4   reprimanded for violation of DM1 Article 50,
5   Instructions from Authoritative Source.  Do you
6   ever remember being reprimanded about problems with
7   DM1 Article 50, Instructions from Authoritative
8   Source?
9        A.   No.
10        Q.   And it looks like on 5/3/95 you were
11   reprimanded for violation of DM1 Article 50 and 51,
12   Instructions from Authoritative Source and Neglect
13   of Duty.  Did I read that correctly?
14        A.   You read it correctly.
15        Q.   Do you recall ever being reprimanded for
16   neglect of duty?
17        A.   Never.
18        Q.   Go another three pages further, 1930.
19        A.   Okay.
20        Q.   According to this, does this seem to
21   accurately set forth all of your correctional and
22   basic academy training in addition to the law
23   enforcement departments that you worked for?
24        A.   Seems about right.
25        Q.   Go to Page 1934.
```

1      A.   34?

2      Q.   Yeah. I don't know who wrote this, but

3  this is in your personnel file, and it's talking

4  about -- it looks like it's setting you up for the

5  employment process.  Does that seem correct?

6      A.   Yes.

7      Q.   So it says on 9/12 they set a

8  preemployment testing on the 13th, correct?

9      A.   On the 13th?

10      Q.   Yes.  I'm just looking ---

11      A.   Set for a polygraph on the 13th, yes.

12      Q.   On 9/12 applicant set for preemployment

13  testing.

14      A.   Oh, yes.

15      Q.   Then on 9/13, upon completion of the

16  testing, they are going to schedule you for a

17  polygraph on 9/15/11, correct?

18      A.   Correct.

19      Q.   On 9/15/11, Captain -- do you know who

20  Captain Stacy Phillips is?

21      A.   I do.

22      Q.   And they advised, whoever wrote this,

23  that Vega had an arrest which had not been listed

24  in his application and further advised that Vega

25  had a disposition on a case which he would be

```
 1   bringing to personnel.  You had previously
 2   testified you were not arrested, and do you know
 3   what this is referencing?
 4        A.   Because that's how they termed it.  I was
 5   summonsed.  That's not an arrest.
 6        Q.   You were charged with a criminal
 7   violation, correct?
 8        A.   I was issued a ticket.  There was no
 9   physical arrest involved.
10        Q.   Have you ever been charged with crimes --
11   so you have been charged with a crime.  You just
12   haven't been arrested?
13        A.   I have not been arrested.
14        Q.   How many crimes have you been charged
15   with but not arrested?
16        A.   I've never been arrested, and I was
17   summonsed once.
18        Q.   And you didn't put that in your
19   application to JPSO in 2011?
20             MR. ZIBILICH:
21                  Because it asks for an arrest.
22   BY MR. CLARKE:
23        Q.   Correct?
24        A.   That's correct.  They asked for an
25   arrest.
```

```
1          Q.    I'm just -- you know, I didn't write this
2     for JPSO.  Upon receiving Lieutenant Miligor's --
3          A.    Migliore.
4          Q.    Upon receiving Lieutenant's polygraph
5     report on Vega, it was learned that Vega had been
6     arrested by misdemeanor summons for simple battery
7     in some parish in 2000.
8               MR. ZIBILICH:
9                    I object.  There is no such thing as
10                   an arrest by misdemeanor summons.  I
11                   don't care what he wrote.
12              MR. CLARKE:
13                   Well, I'm going to ask the
14                   questions.
15              MR. ZIBILICH:
16                   You can ask whatever you want.  I'm
17                   just telling you there ain't no such
18                   animal.
19              MR. CLARKE:
20                   You're not a judge here today.
21              MR. ZIBILICH:
22                   I'm not looking to be one.  I'm just
23                   telling you there is no such animal.
24     BY MR. CLARKE:
25          Q.    Did I read that correctly, that Vega had
```

```
 1    been arrested by misdemeanor summons for simple
 2    battery in Tanga something parish in 2010?
 3         A.    You read it mostly correct.
 4         Q.    Except for the Tanga whatever?
 5         A.    Tangipahoa?
 6         Q.    Yeah.  Forget that.  Tangipawho.  I can't
 7    say that.
 8              MR. ZIBILICH:
 9                   You better learn it.  There is going
10                to be some jurors from there.
11    BY MR. CLARKE:
12         Q.    And they put in here that you have never
13    been arrested.  You just read the question as to
14    not require you to provide that information,
15    correct?
16         A.    It wasn't a physical arrest, so I wasn't
17    arrested.
18         Q.    Right.  But here is the way it goes. When
19    you go in for your polygraph, you talk to the
20    polygraph examiner, correct?
21         A.    Yes.
22         Q.    He asks you some background questions. He
23    actually gives you all the questions he is going to
24    ask you, correct?
25         A.    That's right.
```

```
1         Q.   He tells you that if there is anything
2    you need to tell me, you need to tell me now,
3    correct?
4         A.   Uh-huh.
5         Q.   And then we have a polygraph test which
6    is on 1931.  1937.  So you made these admissions of
7    a prior arrest for simple battery?
8         A.   No.  I admitted admission of a summons,
9    which he said he considers that an arrest, so
10   that's what they went with.
11        Q.   When you -- do you call that citation in
12   lieu of arrest?
13        A.   It's just like a traffic ticket.  It's --
14   everything on a citation is in lieu of arrest.
15        Q.   But it's not for a crime.  A traffic
16   violation is not a crime.
17             MR. ZIBILICH:
18                  Is that a statement or a question?
19             THE WITNESS:
20                  That's how you consider it.  A
21                traffic violation is a crime.
22   BY MR. CLARKE:
23        Q.   Okay.
24             MR. CLARKE:
25                  Is a traffic violation a crime here?
```

```
 1              I stand corrected.  In Tennessee --
 2         MR. ZIBILICH:
 3              I have to agree with the choir.  Mr.
 4         Most is absolutely correct.  You can
 5         find these in Title 14 and in Title 32.
 6         So you can confirm myself and
 7         Mr. Most's conclusion.
 8         MR. CLARKE:
 9              No thank you.
10  BY MR. CLARKE:
11       Q.   So you just felt like they didn't -- were
12  you trying to hide the fact that you got a summons,
13  and you got in a fight with somebody at a football
14  game?
15       A.   If I was trying to hide the fact, I
16  wouldn't have told him in the first place.
17       Q.   You didn't put it in your application,
18  and then you made the admission to the polygraph
19  guy, right?
20       A.   It wasn't an admission.  I was talking to
21  him about it.
22       Q.   And why -- have you ever given a
23  polygraph to a suspect?
24       A.   I've never given a polygraph to a
25  suspect, no.
```

1      Q.   Have you ever been present when you had a

2   suspect who gave a polygraph that was administered

3   by somebody else?

4      A.   Separately, yes.

5      Q.   Did they sit down with them and talk

6   about all the stuff and give them all the questions

7   first?

8      A.   I don't know.  I'm not privy to the room.

9      Q.   Go to Page 1940 and then 1941 to 44 is

10   the actual arrest report.  If we go to Page 1914,

11   is this your explanation of what happened when you

12   got the summons for a criminal charge of assault?

13      A.   It wasn't assault.

14      Q.   You got a summons for assault, correct?

15      A.   No.

16      Q.   Simple assault?

17      A.   No.  Look again.

18      Q.   I'm not going to look again.

19      A.   It was for simple battery.

20      Q.   I stand corrected.  It was worse.  All

21   right.  On 1940, Page 1940, is this your

22   explanation of what happened that you provided to

23   the JPSO on September 20th, 2011 at 8:43 AM?

24      A.   Looks like it.

25      Q.   According to this, there was a verbal --

```
 1   tell me what happened in the incident.
 2        A.   We were actually coaches.  They were
 3   putting some children in jeopardy, and we had a
 4   disagreement.  And then the coach and his father
 5   and a friend engaged me, and I defended myself, and
 6   that was it.
 7        Q.   So your son is playing on a football
 8   team.
 9        A.   They weren't playing.  It was before.
10        Q.   Your son is playing on this coach's
11   football team, correct?
12        A.   On my football team.
13        Q.   It's your football team?
14        A.   Yes.  We coach on the same team.
15        Q.   So you got in a fight with another -- was
16   the other coach a father of a kid on the football
17   team?
18        A.   No.  Prior to practice, I got into a
19   verbal altercation with one of the coaches with me.
20   His father, the coach's father, was a coach on
21   another team.  While we were arguing, him and
22   another person -- I don't know whether it was a
23   coach or not -- came over and engaged me as well.
24        Q.   So did you punch him?
25        A.   It was an open hand.
```

```
 1        Q.   And is that worse than a closed hand?
 2             MR. ZIBILICH:
 3                   Object to the form.
 4             THE WITNESS:
 5                   It depends.
 6   BY MR. CLARKE:
 7        Q.   Well, in this situation, was it better
 8   than if you punched him with your fist?
 9        A.   Absolutely.
10             MR. ZIBILICH:
11                   Better than.
12             MR. CLARKE:
13                   Yeah.  I'll let him interpret that.
14             THE WITNESS:
15                   So if you are asking me if an open
16                hand was less damaging than a fist --
17             MR. CLARKE:
18                   Yeah.
19             THE WITNESS:
20                   -- then yes.
21   BY MR. CLARKE.
22        Q.   Let's go to the police report, because
23   you have your story, right?
24        A.   Yes.
25        Q.   And they have theirs.  As a result of
```

```
 1   this thing, you were not allowed back to the park,
 2   right?
 3        A.   Wrong.
 4        Q.   Let's read what it says.
 5        A.   You can read what it says, but I actually
 6   went to the park and continued coaching.
 7        Q.   Were you told not to go back to the park?
 8        A.   They rescinded that.  That would be old
 9   man Kennedy who ran the park at the time.
10        Q.   So old man Kennedy didn't want you back
11   there, but you appealed it somehow to be able to go
12   back?
13        A.   I wouldn't say appealed. There was no
14   formal appeal.  I spoke to him on the phone.  He
15   was like, you can come on back.
16        Q.   There was bad language and all kinds of
17   stuff going on between -- in this altercation,
18   correct?
19        A.   I'm sure there was.
20        Q.   And when the cops came out there, you
21   were already a cop, right?  Were you with Gretna at
22   the time?
23        A.   No.
24             MR. ZIBILICH:
25                  He was a policeman if he was with
```

```
 1              Gretna.  If he was here, he was a
 2              deputy.
 3   BY MR. CLARKE:
 4       Q.    You were with the probation court at that
 5   time?
 6       A.    No.
 7       Q.    Who were you with?
 8       A.    Jefferson Parish.
 9       Q.    When you were on the scene there and the
10   cop came out, you demanded to speak with that
11   officer's superior, correct?
12       A.    I did.
13       Q.    And you spoke to the superior.
14       A.    Via telephone briefly.
15       Q.    And you explained your position about
16   self defense, blah, blah, blah, and you were
17   advised to -- the cop on the scene was advised to
18   write you a summons for simple assault, correct?
19       A.    Wrong.
20       Q.    Did you advise the deputy on the scene
21   that you should have been more professional towards
22   this matter, and putting his hands on people
23   because of words is not the way to handle this?
24       A.    I'd have to read it.
25              MR. ZIBILICH:
```

```
 1                    What Bates number is that, please?
 2              MR. CLARKE:
 3                    1944.  The last paragraph.
 4              THE WITNESS:
 5                    The deputy advised me that he should
 6               have been more professional towards
 7               this matter.
 8    BY MR. CLARKE:
 9         Q.   You got two summons, right?
10         A.   It was one summons.
11         Q.   According to this, sergeant -- the deputy
12    got all the parties to write a statement.  Deputy
13    proceeded to contact Sergeant Steve Jenkins in
14    reference to this matter and was advised to issue
15    two misdemeanor summons to Nick.
16         A.   One summons, two counts on a summons.
17         Q.   What were the two counts?
18         A.   Same thing.
19         Q.   Two counts of misdemeanor assault, simple
20    assault?
21         A.   Simple battery.
22         Q.   Simple battery.  You wrote a statement
23    and signed it and turned it in to the deputy?
24         A.   I believe so.
25         Q.   Did you tell them after this whole
```

```
1    encounter with the police that you're going to take
2    your kid off the team?
3         A.    What?
4         Q.    Did you tell them you were going to get
5    your kid off the team?   Take your ball and go home.
6         A.    No.
7         Q.    Well, according to this, it says Roger,
8    who is the football commissioner, and he advised
9    that this manner will not be tolerated, and Nick
10   will no longer be at the park.  Was that told to
11   you?
12        A.    No.
13        Q.    And Nick stated he was going to get his
14   son off the team, and the deputy stood by until he
15   did so, so there was nothing else that was going to
16   happen.
17        A.    I had to take him home.
18        Q.    The deputy didn't want to leave you on
19   the scene with your kid in this incident, so he
20   stayed there, correct?
21        A.    He stated --
22        Q.    That's what his report says.
23              MR. ZIBILICH:
24                   Object to the form.
25              MR. CLARKE:
```

```
 1                    It don't matter.
 2           MR. ZIBILICH:
 3                    He can answer it.
 4    BY MR. CLARKE:
 5         Q.   These charges -- you had to go through
 6    pretrial diversion, correct?
 7         A.   Yeah.  They did that to dismiss it.
 8         Q.   Look at 1945.  You were not -- you went
 9    through a procedure by which you could go through
10    pretrial diversion, which, if you stayed out of
11    trouble for a certain period of time and did
12    whatever the conditions, that you could apply to
13    the court to have the charges dismissed, correct?
14         A.   It was cheaper than going further.
15         Q.   Go to Page 1977.  I think you testified
16    you didn't have any Internal Affairs investigations
17    at Gretna.  Apparently, when JPSO contacted Gretna,
18    that wasn't true, correct?
19         A.   I don't know.  I'm reading this now.  Oh,
20    that wasn't an Internal Affairs thing.
21         Q.   What does it say it is?
22         A.   My car got flooded. They didn't like
23    that.
24         Q.   It's an Internal Affairs complaint.
25         A.   No.  Jason is in Internal Affairs, but it
```

```
 1    is not an Internal Affairs complaint.  I didn't go
 2    in and give a statement or anything.  I told them
 3    my car got flooded in Fat City, and they're like,
 4    okay, and that was the end of it.
 5         Q.    Lieutenant Jason -- they spoke with
 6    Lieutenant Jason DiMarco with the Gretna Police.
 7    He advised that he had been employed from 12/10 to
 8    the present.  He also stated there is one incident
 9    in his file, and it was a flooded unit.
10         A.    Uh-huh.  And Mr. Vega was not at fault.
11    They never called me in and talked to me or gave me
12    the riot act or anything about it.  They asked me
13    how did the car get flooded, and I told them.  That
14    was it.  That wasn't an investigation whatsoever.
15         Q.    Okay.  I can only say what they say they
16    are.
17         A.    And for clarification, I'm advising you
18    that that is what it was.
19         Q.    And just so we're all fair, on 1989, you
20    were correct about having no investigations at St.
21    Bernard.  That is confirmed.  All right.  When you
22    came to the JPSO in 2000, and then when you were
23    rehired in 2011, did you have any testing or
24    training on the policies of the JPSO?
25         A.    On the policies itself, the SOP?  Not
```

```
 1   that I recall.  Not a test, no.
 2         Q.   If you look at Page 2096.
 3         A.   Say that again.
 4              MR. ZIBILICH:
 5                   2096.
 6              MR. CLARKE:
 7                   2096. Listen to my interpreter over
 8                there.
 9              MR. ZIBILICH:
10                   I'm just more articulate.
11              MR. CLARKE:
12                   I agree.
13   BY MR. CLARKE:
14         Q.   Now, this is what I call a read and sign
15   document.  When you were hired with JPSO, they had
16   you sign a document saying that they had provided
17   you with access to the policy, and you had to
18   acknowledge that it's your responsibility to read,
19   understand, obey, and stay current with the
20   policies, correct?
21         A.   Yes.
22         Q.   So you had access to it, but there wasn't
23   a class on the policies where you were tested and
24   things like that?
25         A.   No.
```

```
1        Q.   When you went to JPSO in 2000, you didn't
2   have to get POST -- you didn't have to get
3   recertified by POST.  You didn't have to go to the
4   basic academy?
5        A.   No.  I was already certified.
6        Q.   At the JPSO, has there been any
7   discipline, verbal reprimands, from 2000 to the
8   present?
9        A.   Like I said, over the past, there was
10  courtesy complaints.
11       Q.   And those aren't handled by Internal
12  Affairs?  They're handled by the line supervisor?
13       A.   Depends.  Sometimes yes, sometimes no.
14       Q.   You're not aware of anyone turning it
15  into  Internal Affairs?
16       A.   I've been to Internal Affairs for
17  courtesy complaints.
18       Q.   I've got a document that says there are
19  no Internal Affairs complaints.
20       A.   Because they are expunged after three
21  years.
22            MR. CLARKE:
23                Let's go off the record for a
24             second.
25            THE VIDEOGRAPHER:
```

```
 1              Off the record.  The time is now
 2         2:20.
 3              {BRIEF RECESS}
 4         THE VIDEOGRAPHER:
 5              Back on the record.  The time is now
 6         2:21.
 7  BY MR. CLARKE:
 8     Q.   Explain to me, if you can recall.  You
 9  had actual times where you've gone to Internal
10  Affairs because of a courtesy complaint?
11     A.   Yes.
12     Q.   You had to a give statement and go
13  through the process?
14     A.   Yes.
15     Q.   Tell me what the process involved in
16  Internal Affairs.
17     A.   They have a piece of paper.  They read it
18  to you.  You sign it.  Then they ask -- tell you
19  what the complaint is, and then that's it.
20     Q.   And give your statement.  You just do
21  what they ask you, correct?
22     A.   More or less, yes.
23     Q.   You come in.  There is a process you have
24  to go through, but there's been times where you
25  have actually gone in to the Internal Affairs
```

```
 1    office because of an Internal Affairs complaint?
 2         A.    Yes.
 3         Q.    Why didn't you put that in your
 4    interrogatory responses, Exhibit Number 107?
 5         A.    Because it is expunged.  Courtesy
 6    complaints, they are no longer.
 7              MR. ZIBILICH:
 8                   Just so the record is clear,
 9              expunged is as if it never happened.
10              MR. MOST:
11                   Are you talking about the Police
12              Officer's Bill of Rights or are you
13              talking about --
14              MR. ZIBILICH:
15                   I'm taking about a state statute.
16              MR. MOST:
17                   The Public Records Act retention?
18              MR. ZIBILICH:
19                   I don't know what the number is. I'm
20              not trying to be coy. I mean, I get
21              upset every now and then, since we are
22              off the record --
23              MR. CLARKE:
24                   We're not off.  We are on the
25              record.
```

63

```
 1              MR. ZIBILICH:
 2                  You can keep it on.  Keep it on.
 3              When I get a discovery item from
 4              somebody, and I go look the stuff up, I
 5              have somebody look it up, and I got two
 6              pieces of paper that are four years
 7              old.  If you would have just done what
 8              you were supposed to do, this would be
 9              gone.  Now that it's not gone, I'm
10              stuck with the consequences.
11    BY MR. CLARKE:
12        Q.   Is that your understanding, that when you
13    are in litigation, that you don't have to answer
14    anything about what happened three years before
15    because it's expunged?
16              MR. ZIBILICH:
17                  This man is not a lawyer.  Object to
18              the form.
19    BY MR. CLARKE:
20        Q.   Do you know why you didn't list any
21    Internal Affairs investigations in Exhibit Number
22    107 in response to Interrogatory Number 11?
23              MR. ZIBILICH:
24                  That's lawyer-client privilege.  He
25              is not answering that.
```

1    BY MR. CLARKE:

2        Q.    Interrogatory Number 11 says state

3    whether you have ever been investigated by Internal

4    Affairs.  That's the first line.  Okay.  The answer

5    you put was, "Defendant Vega has not had any

6    Internal Affairs complaints."  That's false, right?

7        A.    He just told me not to answer it.

8        Q.    It's a different question.

9            MR. ZIBILICH:

10                We're getting into legal

11                technicalities here.  I've said what I

12                had to say.  You're not going to get

13                him to say it's false.  He is a liar,

14                he is this.  Don't answer that one.

15                Y'all go take it up.

16    BY MR. CLARKE:

17        Q.    You are going to answer it.  Have you had

18    Internal Affairs complaints?

19        A.    I'm not answering it.

20        Q.    Okay.  That's a different question.

21            MR. CLARKE:

22                You better talk to him.

23            MR. ZIBILICH:

24                You want to ask him if he's had

25                Internal Affairs complaints in the last

1           three years, he'll answer.

2      MR. CLARKE:

3           No.  I'm not going to ask that.

4      MR. ZIBILICH:

5           And you're not going to get an

6        answer.

7      MR. CLARKE:

8           Okay.  Let's go off the record.

9      MR. MOST:

10           Let's go off the record.  Let's go

11        talk for a minute.

12      THE VIDEOGRAPHER:

13           Off the record.  The time is 2:25.

14           {BRIEF RECESS}

15      THE VIDEOGRAPHER:

16           Back on the record.  The time is

17        2:27.

18      MR. ZIBILICH:

19           You got me in a box, because you are

20        trying to get me to order him to do

21        something that the law is on the other

22        -- is on the other pole from.

23      MR. CLARKE:

24           That's what we have to understand

25        what the law is you are talking about,

```
 1                because I don't have any clue, but I do
 2                know this.  The Jefferson Parish
 3                Sheriff's Office has not filed a
 4                document retention policy record with
 5                the state archives.
 6          MR. ZIBILICH:
 7                I have no earthly idea what the
 8                application is there.
 9          MR. CLARKE:
10                What is the statute or the law that
11                you are -- it's my understanding there
12                is a provision under the Public Records
13                Act that -- let me finish -- that
14                allows a municipality to dispose of
15                complaints within three years upon the
16                filing --
17          MR. ZIBILICH:
18                After three years.
19          MR. CLARKE:
20                Upon the filing of a document
21                retention plan with the state
22                archivist.
23          MR. ZIBILICH:
24                Can I tell you something?  You may,
25                in fact, be right.  You may, in fact,
```

```
 1              be wrong.  I am not familiar with the
 2              procedure, and I'm going to cite
 3              whatever it is that I got to cite and
 4              do the full research after you file
 5              your motion.
 6         MR. CLARKE:
 7              I'm not trying to jam you up, Franz.
 8         MR. ZIBILICH:
 9              She knows more than me.
10         MR. CLARKE:
11              Right.  Now, Franz, let me just ask
12              you a question.  Have you answered --
13              and I'm not trying to jam you up.  I'm
14              just trying to figure out where this
15              puts us.  Has the discovery that has
16              been answered to date been based on the
17              premise that anything three years older
18              or longer has not been produced or has
19              not been responded to in the
20              interrogatories?
21         MR. ZIBILICH:
22              I would say that is probably 80
23              percent accurate.  I don't have the --
24              I'm not going to sit here and pretend
25              that I go through every file that's
```

1              housed some place where I'm not.
2         MR. CLARKE:
3              I understand.  What I'm just trying
4         to get at --
5         MS. VALENTI:
6              I think there is a distinction
7         between what the response is and what
8         doc -- there are no documents beyond
9         the three years.  So the documents have
10        not been produced because they don't
11        exist.  Now, if you have an issue with
12        the answer to the interrogatory, that's
13        a different issue.
14        MR. CLARKE:
15             No.  We'll take up the other part,
16        because I did all my research on the
17        archivist and whether or not you can
18        destroy stuff at a different time, but
19        --
20        MR. ZIBILICH:
21             We disagree with your
22        interpretation, but that's what makes
23        horse races.
24        MR. MOST:
25             Three years from what?

```
 1              MR. ZIBILICH:
 2                   Three years from the event.
 3         MS. VALENTI:
 4                   From the date of the document.
 5         MR. ZIBILICH:
 6                   Right.  So you go to IAD today.
 7             There is not a rule on your -- on the
 8             complaint where you are the person that
 9             is being targeted for three months.
10             It's three years from the three months.
11             Three years from the closing of the
12             file.
13         MR. MOST:
14                   So JPSO has not paused its document
15             destruction practices because of this
16             lawsuit?
17         MR. ZIBILICH:
18                   Oh, God, no.
19         MS. VALENTI:
20                   For every person?  What do you mean?
21         MR. MOST:
22                   Even for these officers who are sued
23             in this lawsuit?
24         MR. ZIBILICH:
25                   No.  There is nothing special, with
```

1                    all due respect to these officers and
2                    this lawsuit.  This policy has been in
3                    place for a long time.
4          MR. CLARKE:
5                         Right, but, Franz, he's been sued
6                    four times.
7          MR. ZIBILICH:
8                         So what.
9          MR. CLARKE:
10                        So there would be documents that are
11                   maintained because of litigation that
12                   are relevant to a Monell claim.
13         MR. ZIBILICH:
14                        That's a big giant presumption,
15                   because that is not necessarily true
16                   either.
17         MR. MOST:
18                        I think we have established that
19                   JPSO has not stopped for this lawsuit
20                   its document destruction prejudice.
21         MS. VALENTI:
22                        That's not been established.
23         MR. MOST:
24                        That's what I thought he just said.
25         MR. ZIBILICH:

```
 1              No, no, no.
 2         MR. CLARKE:
 3              Let's move on.  I know where I am in
 4         this.  I would tell you on the record
 5         here that I don't believe that your
 6         argument is valid, because, and I
 7         produced these documents to you before.
 8         I did a FOIA to the state archivist,
 9         and if you read all the statutes, you
10         have to have a record retention policy
11         with the state archivist.
12         MR. ZIBILICH:
13              That is your interpretation, and if
14         you are right, I'm going to comply with
15         whatever it is the magistrate, the
16         judge, or the Court of Appeals
17         ultimately rules.
18         MR. CLARKE:
19              I'm not being aggressive with you,
20         buddy.
21         MR. ZIBILICH:
22              I know you're not.  I've been
23         telling you I'm going to comply.
24         MR. CLARKE:
25              And I'll get that stuff to you
```

```
 1              again.  I will tell you this, though,
 2              on the record.  The only records
 3              retention plan that they actually filed
 4              with the state archivist was in
 5              November of 2021, one month after they
 6              went to the body cameras.
 7         MR. ZIBILICH:
 8              So that is some sort of evil
 9         coincidence?
10         MR. CLARKE:
11              Yeah, it is.  It is, and you may --
12         MR. ZIBILICH:
13              I'll say this in front of the
14         sheriff's lawyer.  You give this place
15         way too much credit.
16         MR. MOST:
17              One final question before we move
18         on.  So, currently, has JPSO
19         implemented a litigation hold of
20         document destruction for this lawsuit?
21         MR. ZIBILICH:
22              Not that I know of.
23         MR. MOST:
24              Okay.
25         THE WITNESS:
```

```
 1              Can I say something that might clear
 2         it up for you?
 3    MR. ZIBILICH:
 4              You can answer it.
 5    MS. VALENTI:
 6              Once the lawsuit was filed, their
 7         files -- there would be a hold.  We
 8         would not -- so if something -- if he
 9         had something three years ago today, we
10         would not destroy that, because he is
11         involved in this lawsuit. So,
12         essentially, yes.
13    MR. MOST:
14              From the filing of the lawsuit.
15    MS. VALENTI:
16              I mean, it's not -- that's not the
17         approach, like it is a -- yes, it's a
18         litigation hold.  So his file has not
19         been touched since the moment you filed
20         this lawsuit.
21    MR. CLARKE:
22              It's been secured at that point.
23    MS. VALENTI:
24              Correct.
25    MR. ZIBILICH:
```

```
 1              So in the old days what used to
 2          happen with your mentee -- actually,
 3          your mentor.  She would file a motion
 4          corresponding with the federal lawsuit
 5          to stay, to -- however it is that she
 6          worded it, that nothing get destroyed.
 7      MR. CLARKE:
 8          I don't have to do that.
 9      MR. ZIBILICH:
10          As of X, Y, Z.  That is what Mary
11          did all the time.
12      MS. VALENTI:
13          That's the practice, though.  That's
14          what we do.
15      MR. ZIBILICH:
16          That's the deal.
17      THE WITNESS:
18          Just to clear something up for you.
19          The depositions that you are talking
20          about, the previous lawsuits, not one
21          was ever handled or seen by IAD.  It
22          was all conducted by the Investigations
23          Bureau and documented by the
24          Investigations Bureau.
25      MR. ZIBILICH:
```

75

```
 1                    See.  You see what happened?
 2            MR. CLARKE:
 3                    He just gave me --
 4            MR. ZIBILICH:
 5                    See what happens when they offer
 6               unsolicited information? It makes you
 7               smile.
 8            MR. CLARKE:
 9                    I get the best answers without even
10               having to ask a question.
11            MR. ZIBILICH:
12                    Don't do it no more.
13    BY MR. CLARKE:
14        Q.    Let's get to your training at JPSO.  You
15    have your training certificate in front of you.
16    Your training, Exhibit 35.
17            MR. ZIBILICH:
18                    The one closest to me.
19    BY MR. CLARKE:
20        Q.    Are you Crisis Intervention Team trained?
21        A.    Yes.
22        Q.    In your training at JPSO, were you
23    trained on anything called excited delirium?
24        A.    It was spoken about.
25        Q.    Were you trained with respect to the
```

```
 1    dangers of prone restraint?
 2          A.    I'm sorry.  Say that again.
 3          Q.    Were you trained with respect to the
 4    dangers of prone restraint?
 5          A.    We discussed prone restraining.
 6          Q.    Good or bad?
 7                MR. ZIBILICH:
 8                      Object to the form.
 9    BY MR. CLARKE:
10          Q.    We are going to get into it all, so you
11    can either tell me now or I can keep asking --
12          A.    Well, it can lead to bad but not always.
13          Q.    Were you trained -- according to your
14    training syllabus, were you trained on anything
15    with the ADA?
16          A.    Oh, you talking about the Americans with
17    Disabilities Act. No.
18          Q.    Were you trained on anything on dealing
19    specifically with autistic kids?
20          A.    Not that I can -- no.  I don't believe
21    so.
22          Q.    Were you trained on anything with respect
23    to persons with intellectual disabilities?
24          A.    I think they covered some of that with
25    the CIT.
```

1    Q.   Tell me what you recall of that training.

2    A.   We mostly -- they were learning how to

3  deal with people with paranoid schizophrenia, how

4  to handle that.  We actually visited a couple of

5  institutions as well, spoke to some patients.

6    Q.   Did they teach you -- you said how to

7  deal with somebody having a psychotic episode or

8  something.  What did they tell you to do?

9    A.   Oh, when dealing with like somebody who

10  is paranoid schizophrenic, if they were hearing

11  voices, you know, they told us about like don't

12  pretend like -- if they ask you do you hear voices,

13  don't lie to them and say you hear voices, too.

14    Q.   Did they tell you how to restrain

15  somebody who is going through such a crisis?

16    A.   No.

17    Q.   That wasn't in the crisis intervention

18  training?

19    A.   I don't recall that.

20    Q.   You had the RIPP Hobble training,

21  correct?

22    A.   Yes.

23    Q.   You had the RIPP Hobble training on

24  1/7/14, correct?

25    A.   1/7/14?

1      Q.   On the second to last -- let's go back
2  all the way to the last page.  Looks like in two
3  thousand -- 10/20/2011 you had RIPP Hobble
4  training, correct?
5      A.   10/20/11.
6      Q.   And then you had RIPP Hobble training
7  again on 1/7/14.  I'm sorry. 2/2/15.
8      A.   On 2/15?
9      Q.   2/2/15.  February 2nd, 2015.
10     A.   Okay.  2/2/2015, yes.
11     Q.   Four hours of training then.  Then you
12 had -- on 7/31/15 you had RIPP Hobble training,
13 correct?
14     A.   On 7/31?
15     Q.   On 7/15.  I'm sorry.  7/31/15.  Page 3.
16 July 31st, 2015.
17     A.   Online.
18     Q.   It is RIPP Hobble training, correct?
19     A.   Online, yes.
20     Q.   It looks like you had the crisis
21 intervention training on 10/23/15.
22     A.   Yes.
23     Q.   Did you have any training from the
24 coroner's office?
25     A.   From the what?

1      Q.   Coroner's office?

2      A.   No.  Not that I recall.

3      Q.   Let's talk about your RIPP Hobble

4   training.  When you had your RIPP Hobble training,

5   did they give you a RIPP Hobble?

6      A.   Yes.

7      Q.   And was it Pizzolato that gave you your

8   training?

9      A.   That I don't recall who gave it.

10     Q.   If you look at Exhibit -- let me ask you

11   some basic things about it.  During the RIPP Hobble

12   training, they talked to you about the dangers of

13   prone restraint, correct?

14     A.   They talked about the risk of prone

15   restraints.

16     Q.   Restraint asphyxia, correct?

17     A.   The risk of it.

18     Q.   Right.  And in doing that, they talked to

19   you about the actual operation of how the airway

20   works, correct?

21     A.   I don't recall the particulars.

22     Q.   If you look at Exhibit Number 22, where

23   it says -- there are numbers on these, but they're

24   hard to see.  Go to 8725.  8752 and 8753.

25     A.   8752 and 8753?

1      Q.    Right.   8752 talks about positional
2   restraint asphyxia, and 8753 talks about
3   respiratory compromise, correct?
4      A.    Yes.
5      Q.    So if you had the RIPP Hobble training,
6   they used this material that was produced to me as
7   part of the RIPP Hobble training, you had it,
8   correct?
9      A.    It was gone over, yes.
10     Q.    Do you remember in the RIPP Hobble
11  training that there was videos that were -- where a
12  guy named Bill DeVane was presenting a lecture and
13  then produced clips of interactions between law
14  enforcement and citizens during the presentation?
15     A.    I do not remember the video.
16     Q.    Do you know what is excited delirium?
17     A.    I don't have a technical definition for
18  it.
19     Q.    Do you have any definition?
20     A.    Just somebody reaches a point of
21  excitement.
22     Q.    How do you determine if somebody might be
23  suffering from excited delirium?
24     A.    That's the thing.   Sometimes you may be
25  able to tell.   Sometimes you may not.

```
1        Q.   That's why you restrain people in the
2   recovery position, right?
3        A.   Well, not necessarily.
4             MR. ZIBILICH:
5                  Object to the form.  You can answer
6             it.
7             THE WITNESS:
8                  Not necessarily.
9   BY MR. CLARKE:
10        Q.   That's what the training said, right?
11        A.   The training doesn't account for
12   altercations that are preceding it or during it, so
13   you can't put somebody in the recovery position
14   until --
15        Q.   Let's go to --
16             MR. ZIBILICH:
17                  Wait.  I'm sorry.  Were you
18             finished?
19             MR. CLARKE:
20                  Let him finish.
21             THE WITNESS:
22                  Waiting on y'all.
23             MR. ZIBILICH:
24                  You can finish your answer.
25             THE WITNESS:
```

```
 1                    Okay.  So you can't put somebody in
 2                a recovery position when they're still
 3                in active resistance, passive
 4                resistance, any type of resistance, or
 5                if the scene is not safe, not safe for
 6                you, not safe for them, or not safe for
 7                others.
 8      BY MR. CLARKE:
 9          Q.   Let's just go through Exhibit 22, the
10      very beginning.
11          A.   The first one?
12          Q.   The first page.  We are going to go
13      through every bit of it.  You have the first page
14      that is the cover.  The next thing is a slide that
15      says, "SCDS Video."  Do you remember seeing -- do
16      you know what SCDS means?
17          A.   No.
18          Q.   Sudden Custody Death Syndrome.
19          A.   Okay.
20          Q.   You were shown a video on Sudden Custody
21      Death Syndrome.  Do you recall that?
22          A.   I don't recall the video, no.
23          Q.   And then you recall the training on the
24      difference between Police Custody Death Syndrome
25      and Sudden Custody Death Syndrome?
```

1      A.    We covered it, but I don't recall
2  particulars.
3      Q.    Did you talk about, going two pages in,
4  about cocaine psychosis?
5      A.    You are asking me if --
6      Q.    Were you trained on cocaine psychosis?
7      A.    If they went over it, yes.
8      Q.    What is cocaine psychosis?
9      A.    Somebody used cocaine and is now altered.
10     Q.    So everybody who takes cocaine is
11 suffering from cocaine psychosis?
12     A.    No.   Not everybody placed in the prone
13 position or facing down position becomes deceased
14 either.
15     Q.    You can't -- did they train you, you
16 can't use the recovery position on a dead person?
17     A.    You can roll them in the recovery
18 position.   It may not get you far.
19     Q.    Because the recovery position is to
20 recover, correct?
21     A.    Yeah.
22     Q.    Do you remember talking about a case
23 called Cruz versus City of Laramie?
24     A.    I'm looking at it.   I don't recall it,
25 but I'm looking at it.   That's about hog-tying,

```
 1    which we've never done, to my knowledge, since I've
 2    been here.
 3         Q.   When did you get here?
 4         A.   2000.
 5         Q.   Were you told that excited delirium is
 6    related to people with respect to drugs or was it
 7    identified -- was excited delirium -- is it a
 8    requirement of them that they be high on drugs?
 9         A.   I don't know, necessarily, if they said
10    requirement, but people on drugs --
11         Q.   Did they tell you identifiable symptoms
12    and behavioral patterns?
13         A.   I think they said something about
14    excessive sweating.
15         Q.   Do you remember them showing you a video
16    on the -- regarding West Palm Beach versus Lewis
17    where an officer choked somebody out, puts them in
18    the hog-tie position, and they die?
19         A.   I don't remember that video.
20         Q.   Beware -- they gave you a caution on
21    8741.  "Beware of naked, sweating, screaming,
22    irrational 200-pound man."  You see that?
23         A.   I'm looking at it.
24         Q.   E█████ P██████ wasn't a naked, sweating,
25    screaming, irrational 200-pound man, was he?
```

1     A.   No.

2     Q.   Do you remember the whole history of

3 excited delirium and sudden deaths that was

4 presented to you at training?

5     A.   I don't remember the history, no.

6     Q.   Do you remember anything about a clinical

7 picture of excited delirium?

8     A.   I'm sorry?

9     Q.   Do you remember going over the symptoms

10 of -- the clinical symptoms of excited delirium?

11     A.   No.  Not offhand.

12     Q.   Do you remember seeing a video of a case

13 study, another video, and it was actually a -- do

14 you remember seeing video at the Jefferson Parish

15 Training Academy that used actual clips from the

16 show Cops for training?

17     A.   No.

18     Q.   Bad boys, bad boys, what you gonna do --

19     A.   I'm familiar with the show.  I don't

20 watch it, but I don't recall that.

21     Q.   Well, did you ever go to training and

22 didn't pay attention?

23     A.   I pay attention in my training.  I've had

24 a lot of it.

25     Q.   So if you go to 8746.  Here is one of the

1   Cops videos that was shown to you.  Do you know

2   what happened in that video?

3        A.   No, I do not.

4        Q.   Do you know that this person was naked

5   and was being --

6        MR. ZIBILICH:

7            He just said he didn't know.

8   BY MR. CLARKE:

9        Q.   That's true.  Let's go to 8750.

10       A.   I'm sorry.  What number?

11       Q.   8750.

12       A.   Okay.  I'm there.

13       Q.   Were you trained that pain compliance

14   techniques, impact weapons, defensive tactics

15   techniques, and OC spray are generally ineffective

16   on people who are suffering from excited delirium?

17       A.   I know that.

18       Q.   Go to 8752.  Were you trained that

19   positional asphyxia occurs when the position of the

20   body interferes with respiration?

21       A.   Yes.

22       Q.   Were you trained that the interference is

23   increased when the suspect is placed in a

24   physically prone position from which they cannot

25   remove themselves?

1       A.   Yes.

2       Q.   Were you trained that the prone position

3  -- a suspect restrained in the prone position,

4  their breathing may become labored or compromised?

5       A.   Are we still on this page?

6       Q.   I'm just asking you questions.

7       A.   I'm sorry.  Repeat it, please.

8       Q.   Were you trained that a suspect is

9  restrained in the face-down position, their

10  breathing may become compromised or labored?

11       A.   It's a possibility.

12       Q.   Were you trained that when weight is

13  applied to a person's back, the more weight the

14  more severe the degree of compression?

15       A.   We were told about that.

16       Q.   Were you trained that when there is more

17  compression there can be more restriction to the

18  breathing?

19       A.   I think that goes without saying.

20       Q.   Were you trained that when the natural

21  reaction to oxygen deficiency occurs the person

22  being restrained may struggle more violently?

23       A.   I believe so.

24       Q.   So oxygen deficiency can cause a person

25  to not be passive?

1        A.    In some instances, yes.

2        Q.    And then when -- the reason why they are

3    giving you this training is when an officer feels

4    this additional compression, to make sure that he

5    is not putting more compression on the subject --

6    let me take that back.  Were you trained that to be

7    careful of when you are restraining somebody, and

8    they are struggling, to make sure you monitor their

9    breathing?

10       A.    I believe so.

11       Q.    How do you monitor -- how were you

12   trained to monitor their breathing?

13       A.    You look for them breathing.

14       Q.    Check a pulse?

15       A.    If you can.

16       Q.    Check -- were you told to count

17   respirations?

18       A.    Can I count the respirations? No.

19       Q.    Were you trained, when you are monitoring

20   somebody, to count their respirations?

21       A.    I don't recall that.

22       Q.    Did you have CPR training?

23       A.    Yes.

24       Q.    Do you know how to count respirations?

25       A.    If I remember, we count our chest

1    compressions, and then, if you are using a bag, you

2    are going to count the respirations when you are

3    squeezing it.

4        Q.   Were you trained that people who are

5    obese are at a greater risk of death by being

6    restrained in the face-down position?

7        A.   I don't recall that like exact verbiage.

8        Q.   Were you trained on the respiratory -- if

9    you go to Page 8753, on the three elements of

10   respiration.  In order to breathe, you have to have

11   an open airway.  You need to be able to suck in

12   oxygen, and you need to expel CO2, correct?

13       A.   Okay.

14       Q.   Were you trained on that?

15       A.   It's in the PowerPoint.

16       Q.   Did you know this on January 19th, 2020,

17   what we're going over that's in the PowerPoint?

18       A.   I can't say that I stopped and

19   specifically thought about this PowerPoint, no.

20       Q.   Go to 8767.  Were you trained that people

21   who are restrained in the prone position, and after

22   they've been sued, they may become extremely

23   tranquil, appearing to have given up and accepted

24   their fate?

25         MR. ZIBILICH:

```
 1                      After they have been what?
 2              MR. CLARKE:
 3                      Appearing to have given up and --
 4              MR. ZIBILICH:
 5                      No.  The sentence before that.  And
 6                 after they have been.
 7    BY MR. CLARKE:
 8         Q.    Do you know what you were trained on
 9    sudden tranquility?
10         A.    I don't recall that terminology.
11         Q.    You understand that, according to this
12    training, that people go completely quiet right
13    before they die?
14         A.    Well, if that's what you are telling me.
15         Q.    That's what it says.  This says the state
16    of sudden tranquility usually occurs just prior to
17    death, right?
18              MR. ZIBILICH:
19                      Right that it happens or that's what
20                 the thing says?
21              THE WITNESS:
22                      That's what it says.
23    BY MR. CLARKE:
24         Q.    Are you trained that?
25         A.    If it's in the PowerPoint, we went over
```

```
1    it.
2         Q.   Were you trained on how much resistance
3    -- like when you are considering putting somebody
4    into the recovery position, do you have to have 100
5    percent compliance and no movement on the suspect
6    before you roll them into the recovery position?
7         A.   Depends on the circumstances and the
8    situation at hand.  There is no definitive answer.
9         Q.   The more officers you have on the scene,
10   the more resistance you can overcome to put them in
11   the recovery position, right?
12        A.   Not necessarily.
13        Q.   Well, you know, okay.  Were you trained
14   on -- go to 8770.  Were you trained on how to build
15   a defensible platform to an in-custody death?
16             MR. HILL:
17                  Can we go off for a second?
18             THE VIDEOGRAPHER:
19                  Off the record.  The time is 2:53.
20                  {BRIEF RECESS}
21             THE VIDEOGRAPHER:
22                  Back on the record.  The time is now
23             3:03.
24   BY MR. CLARKE:
25        Q.   Before I get to where we were in this,
```

```
1   when was the officer-involved shooting case?  What
2   year?
3        A.    '07.
4        Q.    And you were sued for that?
5        A.    Yes.
6        Q.    Do you know if it was sued in federal
7   court or state court?
8        A.    Federal.
9        Q.    Do you remember the name of the person
10  you shot?
11       A.    I told you Damien Blunt.
12            MR. MOST:
13                 How do you spell it?
14            THE WITNESS:
15                 B-L-U-N-T.  Don't ask me about the
16            first name.  I'm not quite sure.  The
17            variation.
18  BY MR. CLARKE:
19       Q.    What is building a defensible -- we are
20  back to the RIPP Hobble training.  Are you trained
21  on how to build a defensible platform to an
22  in-custody death?
23       A.    I don't recall.
24       Q.    Would you agree that when you arrest
25  somebody and remove them from their custody,
```

```
1    they're in your custody?
2         A.   I'm sorry.  Say that again.
3         Q.   Would you agree that when you arrest
4    somebody, you place them in your custody, and
5    they're your responsibility?
6              MR. ZIBILICH:
7                   I'm going to object to the form.
8                 That's a legal question.  You can
9                 answer it, if you can.
10             MR. CLARKE:
11                  It's the first line in the training
12                materials.
13             MR. ZIBILICH:
14                  I don't care.
15             MR. CLARKE:
16                  They're trying to teach cops how to
17                make a legal defense in the training,
18                which is funny, but.
19             MR. ZIBILICH:
20                  I understand.
21   BY MR. CLARKE:
22        Q.   Once you have somebody in your custody,
23   do you agree that it becomes incumbent upon you to
24   do everything within your power to help that person
25   stay alive?
```

```
 1        A.   Well, they're in our custody.  They're in
 2   our care, so, yeah.
 3        Q.   It does not matter what the person would
 4   have done on their own.  Once they're in your
 5   custody, you've got to take all actions to make
 6   them safe, correct?
 7             MR. ZIBILICH:
 8                  His question is pursuant to
 9              training.
10             MR. CLARKE:
11                  No.
12             MR. ZIBILICH:
13                  It's not?
14             MR. CLARKE:
15                  No.
16             MR. ZIBILICH:
17                  Then I object to the form.
18             MR. CLARKE:
19                  Read it back to him, please.
20                  {COURT REPORTER READ BACK}
21             THE WITNESS:
22                  I don't understand the first part.
23   BY MR. CLARKE:
24        Q.   Read your training.  Okay?
25        A.   You asked a question.  I'm trying to
```

1    answer it, but I don't understand the first part of

2    your question.

3         Q.   I'm asking questions based on your

4    custody, their custody, based on the training at

5    JPSO.  You can't understand this when you read it

6    today?

7         A.   I can't understand that question. Can you

8    rephrase it?

9         Q.   I will move on.  To build a defensible

10   platform, there are a number of steps, right? One

11   through six?

12        A.   One through six. Two pages, yes.

13        Q.   So you have to have recognition of a

14   problem such as the subject demonstrating symptoms

15   or behavioral patterns of cocaine psychosis or

16   substance-induced excited delirium.  You have to

17   recognize what you are dealing with, correct?

18        A.   Okay.  Yes.

19        Q.   Then you have to make sure the subject is

20   placed in a seated position, never hog-tied,

21   correct?

22        A.   Are you on Number 2?

23        Q.   Yes.

24        A.   So placed in a seated position, yes.

25        Q.   So it doesn't say prone position, and the

```
 1    hog-tie is in a prone position, correct?
 2         A.   That's an entirely different position all
 3    together.  You are face down, but your feet and
 4    your hands are bound together in an upward
 5    position.
 6         Q.   It's in the prone position, though,
 7    right?
 8         A.   Modified.
 9         Q.   You have to -- if you transport them, you
10    call an ambulance.  That's what they said.  It's
11    cheap insurance, right? And you need to get them
12    medical attention, correct?  Immediately, correct,
13    or as fast as you can?
14         A.   As fast as you can.
15         Q.   And you need to communicate about the
16    circumstances of the incident with other people on
17    the scene or in a jail when you take them there or
18    medical people, right?
19         A.   Right.
20         Q.   You have to observe them in there,
21    correct?  Were you trained on the SWARM technique?
22    Go to 8774.
23         A.   Yeah.  I don't recall that.
24         Q.   According to the SWARM training, you take
25    the suspect down and handcuff them as quickly as
```

1    possible, correct? Number 6 and 7.

2         A.    From the point he takes control of the

3    head.  Between his or her hands.  Continues the

4    take-down effort.  Two side officers.  So it is

5    using multiple officers to take control of various

6    body parts.

7         Q.    Correct.  And handcuff them as quickly as

8    possible, right?

9         A.    As possible.

10        Q.    That's what it says.  That's so that you

11   can gain more control of them when they're in

12   handcuffs, correct? More.  I didn't say lack of.

13        A.    So you can --

14        Q.    Ever got beat up by a handcuffed person?

15        A.    Yes.  I've had fights with handcuffed

16   people.

17        Q.    How did you do?

18        A.    Huh?

19        Q.    How did you do in the fight?

20        A.    Okay.

21        Q.    Okay.  So you got to handcuff them.  Why

22   do you handcuff them as quick as possible?  To get

23   better control of the suspect, correct?

24        A.    To attempt to get better control of them,

25   yes.

```
 1        Q.   And then once you do that, apply the
 2   Hobble restraint to the ankles and roll the suspect
 3   in an upright, seated position.  If the suspect
 4   kicks or attempts to use his legs as a weapon,
 5   attach the Hobble snap to the handcuff chain at its
 6   full extension.  So they cover people kicking and
 7   even after you had to restrain them, correct?
 8        A.   Yeah.  That wouldn't have worked.
 9        Q.   When were are trained to put somebody in
10   a recovery position?
11             MR. ZIBILICH:
12                  The most dangling participle
13               question in the world.
14             MR. CLARKE:
15                  I don't know what that means, but
16               that's my question.
17             THE WITNESS:
18                  When need be.
19   BY MR. CLARKE:
20        Q.   When are you -- okay.  So you've had
21   training.  You've had training on the recovery
22   position.  When are you trained to put them in the
23   recovery position?
24        A.   When we need to.  If there is an event
25   that requires us to.  When we have control of them,
```

```
 1    we usually get them up into a vehicle, if they're
 2    non-combative, if we have control of the scene and
 3    the situation.
 4         Q.   Does it matter --
 5         A.   So it varies.  There is not a specific
 6    point in time.
 7         Q.   Well, you got to do it before you kill
 8    them, right?
 9         A.   Well, that's the objective in anything we
10    do.
11         Q.   But the recovery position, you know --
12    the recovery position wasn't something that could
13    rise people from the dead, could it?
14              MR. ZIBILICH:
15                   Object to the form.  Come on.
16              THE WITNESS:
17                   Could it rise people from the dead?
18              No.
19    BY MR. CLARKE:
20         Q.   So we've gone through the training about
21    respiratory compromise, the prone position, the
22    oxygen deficiency.  Remember all that questioning?
23         A.   Yes.
24         Q.   The recovery position has to be -- and
25    you also had training that people can struggle
```

```
1    because of oxygen deficiency, correct?
2         A.   That's what they went over, yes.
3         Q.   Were you aware that the medical examiner,
4    before you started sitting in and listening in on
5    the depositions, that she found that the prone
6    restraint by the deputies on the scene was a
7    contributing factor to the death of E███ P███?
8         A.   I knew that was part of several
9    contributing factors.
10        Q.   What were the other ones?
11        A.   Enlarged heart, obesity, and --
12        Q.   Excited delirium.
13        A.   Excited delirium, and I think that's it.
14        Q.   Obesity wasn't in it but psychosis was.
15   Do you remember that?
16        A.   I don't recall that.
17        Q.   So I'm trying to get to the point when
18   you are going to use the recovery position as -- to
19   help them be able to breathe after they've been
20   restrained in the prone position, correct?
21        A.   That's what the recovery position is for.
22        Q.   And do they say -- do you believe that
23   you're supposed to wait for how many minutes before
24   they don't resist when you can put them in the
25   recovery position?
```

```
 1              MR. ZIBILICH:
 2                   Object to the form.  You can answer
 3                it.
 4              THE WITNESS:
 5                   There is no predetermined time.
 6   BY MR. CLARKE:
 7        Q.   Would you agree -- did you have -- you
 8   don't know if Pizzolato trained you, do you?
 9        A.   Again, I can't recall if he did it or
10   not.
11        Q.   Were you trained that you can actually
12   restrain people by Pizzolato -- were you actually
13   trained at JPSO that you can restrain people in the
14   recovery position?
15        A.   If possible.
16        Q.   What makes it impossible on this date?
17        A.   On this date, his resistance, his biting.
18              MR. ZIBILICH:
19                   Wait, wait, wait. He's given you an
20                answer.  You might not like it.
21              MR. CLARKE:
22                   I'm probably going to like it.
23              MR. ZIBILICH:
24                   So why you making a face at him?
25              MR. CLARKE:
```

```
 1                    I'm trying to help you out, Franz.
 2              MR. ZIBILICH:
 3                    You're trying to help me out by
 4                making a face at him?  I don't think
 5                so.
 6              MR. CLARKE:
 7                    I'm not making a face at him. That's
 8                just my face.
 9   BY MR. CLARKE:
10         Q.   Well, tell me, you know, what does it
11   depend on?
12         A.   It depends on if we have a safe moment in
13   time where we can get him into that position
14   safely, for our safety and everyone else's safety,
15   not only his safety, and then we do it.
16         Q.   Were you trained that if you don't want
17   to get bit by somebody, to move away from their
18   mouth?
19         A.   I don't think you need training to know
20   not to get bit.
21         Q.   Were you trained about whether you were
22   allowed to use a chokehold or any type of modified
23   chokehold at JPSO?
24         A.   None was used.
25         Q.   Are you into martial arts of some sort?
```

1        A.    I've taken some.

2        Q.    Do you know -- do you have any type of

3    restraint that you use from martial arts to control

4    somebody's head?

5        A.    Not particularly.

6        Q.    Do you know one that is kind of?  What

7    does not particularly mean?

8        A.    Not anything in particular that is

9    specific in design.

10        Q.    If somebody is attempting to bite some-

11    body, and you roll them on their side -- if

12    somebody is handcuffed, that's more control than

13    not handcuffed, correct?

14        A.    You have two pairs of handcuffs on, so

15    you got a wider base for movement and grabbing.

16        Q.    That's because you needed two set of

17    handcuffs because he wasn't -- he couldn't move his

18    hands back there, right?

19        A.    Whatever reason.  I didn't handcuff him.

20        Q.    If you are concerned about biting, and he

21    is on his side, you can restrain him just the way

22    -- just the same -- you can avoid the same amount

23    of danger when he is in the prone position or being

24    restrained in the recovery position, correct?

25        A.    I don't think so.

1      Q.   So if somebody is lying on their side,

2    they can -- they have a better ability to bite you

3    than if they're laying in the prone position?

4      A.   They have an ability.

5      Q.   They have ability in both positions,

6    correct?

7      A.   They have ability in those positions,

8    yes, to bite.

9      Q.   So by moving him from -- by leaving him

10   in the prone position as opposed to the recovery

11   position, you have not decreased the danger to

12   yourself, but you have increased the danger to

13   E███, correct?

14     A.   I don't think -- there is a risk.  I'm

15   not certain about the danger aspect.  There is

16   always a risk in anything that we do or perform,

17   and we try to limit those risks.

18     Q.   What did you do to try to limit the risk

19   of death by restraint asphyxia to E███ P███ on

20   January 19th, 2020?

21     A.   Well, we did everything we could to calm

22   him down.  We did everything we could to keep

23   weight off of his lower legs and buttocks.  We did

24   everything we could to get him in another position,

25   but we just could not do it at that particular

1    time.

2        Q.   Is it your testimony that you actually

3    tried to put him in the recovery position and you

4    couldn't?

5        A.   I didn't say that.  I said we could not.

6        Q.   Did you ever try to -- did anybody ever

7    try to put him in the recovery position except

8    before you noticed that he pissed on himself?

9        A.   Say it again.

10       Q.   Did anybody try to put him in the

11   recovery position at any time before E█ P███, as

12   you noted in this statement, pissed on himself?

13       A.   The situation didn't allow for it.

14       Q.   That's not my question.  So the answer is

15   no?

16       A.   Correct.

17       Q.   Would you agree that once somebody is

18   handcuffed, there is no reason to be on their back?

19       A.   I wasn't on his back.

20       Q.   I'm not asking you a P███ question.  This

21   is from training.  Were you trained that if some-

22   body is kicking, you can control him by holding his

23   handcuffs behind his back in the modified recovery

24   position?  Were you trained that?

25            MR. ZIBILICH:

```
 1                    Object to the form.  You can answer
 2              it.
 3            THE WITNESS:
 4                  I don't recall exact positioning in
 5              the training.
 6   BY MR. CLARKE:
 7       Q.   Were you trained that there is no reason
 8   to be on somebody's back after they're handcuffed
 9   because you can move them to their side?
10            MR. ZIBILICH:
11                  Object to the form.  You can answer
12              it.
13            THE WITNESS:
14                  Again, I don't recall anything like
15              that.
16   BY MR. CLARKE:
17       Q.   Were you trained that the most effective
18   remedy to somebody resisting in the prone position
19   is to take the weight off their back?
20            MR. ZIBILICH:
21                  Object to the form.  You can answer
22              it.
23            THE WITNESS:
24                  He is going to have to speak up a
25              little louder.  You are looking down
```

1          and mumbling.

2               MR. CLARKE:

3                    I apologize.  That's fair.

4     BY MR. CLARKE:

5          Q.   Were you trained -- So is it your

6     testimony to the jury that the six officers on the

7     scene did not have any ability, prior to E█ P█

8     urinating on himself, to move him into the recovery

9     position due to his resistance?

10         A.   No.  We didn't --

11              MR. ZIBILICH:

12                   Don't answer that.  To the jury?

13              MR. CLARKE:

14                   Yeah.  I'm going to play this at

15                court.  That's why I'm asking.

16              MR. ZIBILICH:

17                   He can't answer no question about

18                what his testimony is going to be to

19                the jury.

20    BY MR. CLARKE:

21         Q.   Are you telling the ladies and gentlemen

22    of the jury that there was no time under which the

23    six officers on the scene could not have placed him

24    in the recovery position prior to him urinating on

25    himself?

```
 1            MR. ZIBILICH:
 2                 Don't answer that.  He's not talking
 3              to a jury right now.  You've got to
 4              rephrase the question.
 5            MR. CLARKE:
 6                 This is testimony that is presented
 7              like it is at court.  I can play his
 8              testimony at court any time I want.
 9              That's my question.
10            MR. ZIBILICH:
11                 You better rephrase it.
12            MR. CLARKE:
13                 Read it back.  I'll have her
14              rephrase it.
15                 {COURT REPORTER READ BACK}
16            THE WITNESS:
17                 That's not rephrased.
18            MR. CLARKE:
19                 I don't care.  That's my question.
20            THE WITNESS:
21                 Okay.
22            MR. ZIBILICH:
23                 We're making this hard for
24              Mr. Clark.  I'm pretty familiar with
25              the Rules of Evidence.  You can impeach
```

```
 1              him with --
 2         MR. CLARKE:
 3              I can play his deposition in my case
 4          and see if the --
 5         MR. ZIBILICH:
 6              I disagree.  Don't answer it.
 7         MR. CLARKE:
 8              You instruct him not to answer?
 9         MR. ZIBILICH:
10              I just did.
11         MR. CLARKE:
12              Okay.
13         MR. ZIBILICH:
14              As phrased, I just did.
15    BY MR. CLARKE:
16         Q.   Was there any time on the scene that the
17    six officers who were there could have placed him
18    in the recovery position prior to him urinating on
19    himself?
20         MR. ZIBILICH:
21              Object to the form.  You can answer
22          it.
23         THE WITNESS:
24              No.
25    BY MR. CLARKE:
```

```
1        Q.   Were you trained that you want to control
2   people in the least dangerous position possible?
3        A.   Control people in -- yes.
4        Q.   Were you trained that the modified
5   recovery position or the recovery position is less
6   dangerous than the prone position?
7             MR. ZIBILICH:
8                  Object to the form.  You can answer
9              it.
10            THE WITNESS:
11                 I'm not sure if less dangerous or
12             not.
13  BY MR. CLARKE:
14       Q.   If you didn't have that training, you
15  didn't have that training.  We just went through it
16  all, but --
17       A.   I'm just giving you the answer.
18            MR. ZIBILICH:
19                 Whoa, whoa, wait.  This is not a
20             debate.
21  BY MR. CLARKE:
22       Q.   Let's look at the policy book.  Exhibit
23  19.  Were you aware that the JPSO had a written
24  policy on restraining devices and defensive tactics
25  on January 19th, 2020?
```

```
 1        A.    Yes.
 2        Q.    According to the restraining policy on
 3   Page 6, it says, "It shall be the policy of the
 4   Sheriff's Office to take the necessary precautions
 5   to protect the lives and safety of their officers,
 6   the public, and persons in our care and custody,
 7   during any situation."
 8        A.    You said Page 6?
 9        Q.    Page 4 of 6 on SOP-8.
10        A.    SOP-8.  You said 4 of 6 you said.
11        Q.    Yeah.  At the bottom. Restraining Policy.
12   Paragraph 3 Roman numeral III.  You see that?
13        A.    Yes.
14        Q.    According to the policy, officers -- it
15   shall be the policy of the sheriff's department to
16   take necessary precautions to protect the life and
17   safety of their officers, the public, and persons
18   in our care and custody during any situation,
19   correct?
20        A.    Correct.
21        Q.    And they give you a bunch of things that
22   you can do to help try to minimize the risk of the
23   danger to people, correct?
24        A.    Yes.
25        Q.    And that is dealing with how you lock the
```

1   handcuffs, correct?

2        A.   Yes.

3        Q.   And would you consider E███ P███ on that

4   day extremely violent?

5        A.   Yes.

6        Q.   And according to the policy, one of the

7   options that they gave you to deal with him, to

8   restrain both their hands and legs, is the Total

9   Appendage Restraining Procedure, correct?

10       A.   Yes.

11       Q.   That's the TARP.  Is that the RIPP

12  Hobble?

13       A.   According to this it is used with the

14  RIPP Hobble, yes.

15       Q.   I'm just asking you.  Different names.

16  Is that your understanding that that is the RIPP

17  Hobble or is it a different procedure?

18       A.   I guess so.

19       Q.   Did you have any discussion with anybody

20  on the scene about whether to use the RIPP Hobble?

21       A.   No.

22       Q.   Did anybody say the word "RIPP Hobble?"

23       A.   I didn't hear anything.

24       Q.   Did you hear anybody say the word

25  "excited delirium" on the scene?

```
 1          A.    No.
 2          Q.    Did you hear anybody say recovery
 3    position on the scene?
 4          A.    Yes.
 5          Q.    Was that after he urinated on himself?
 6          A.    That was as we were getting him into the
 7    recovery position.
 8          Q.    After he urinated on himself?
 9          A.    I'm trying to recall if it was before,
10    during, or after.  I don't recall the exact moment.
11          Q.    Well, after he urinated on himself, did
12    you think he was in medical distress?
13          A.    Yes.
14          Q.    And prior to that, was he actively
15    resisting up until the second that you realized he
16    went limp?
17          A.    He was actively resisting, yes.
18          Q.    He was actively resisting, actively
19    resisting, and just went limp?
20          A.    I'm not going to say he just like all of
21    a sudden went limp.
22          Q.    Tell me how it progressed.  He ended up
23    -- by the time he urinated on himself, he was in a
24    medical emergency, correct?
25          A.    Yes.
```

```
 1        Q.   So how many seconds of -- was he
 2   resisting up to the very last second until you got
 3   up and noticed that he had urinated on himself, and
 4   he was in a medical emergency?
 5        A.   I can't specify a time.
 6        Q.   We'll watch the tape about that later.
 7        A.   Okay.
 8        MR. CLARKE:
 9             Oh, he's back.
10        MR. HILL:
11             Was that the end of training?
12        MR. CLARKE:
13             What?
14        MR. HILL:
15             Was that the end of training?
16        MR. CLARKE:
17             Yeah, yeah.  I'm getting ready to go
18           there.
19        MR. HILL:
20             Sorry.
21        MR. MOST:
22             There were a few questions about
23           what happened on the scene, about
24           whether anyone said the words "RIPP
25           Hobble," "excited delirium."
```

```
 1            MS. VALENTI:
 2                 Then he said Westgate seven times,
 3            and I objected for you.
 4            MR. CLARKE:
 5                 We all agreed not to object.
 6    BY MR. CLARKE:
 7       Q.   We're going to talk about the events. I'm
 8    going to talk to you about what you recall, and
 9    then we are going to look at the video.  First of
10    all, after this event, were you ever notified that
11    you were being investigated for a crime?
12       A.   No.
13       Q.   Were you ever given a Miranda warning?
14       A.   No.
15       Q.   Were you ever advised that you were being
16    -- Internal Affairs was looking into this?
17       A.   No.
18       Q.   Were you ever given a Garrity warning?
19       A.   No.
20       Q.   So tell me how you ended up giving a
21    statement in this case.
22       A.   They called me in and asked.
23       Q.   And why didn't you give your statement on
24    the date of the incident?
25       A.   Because, with any incident, they don't
```

```
 1   immediately take a statement.
 2        Q.   If you went to the scene of a crime, and
 3   you saw somebody there, would you give them three
 4   days -- at the scene of a murder, would you give
 5   them three days before you tried to question them?
 6        A.   You are talking about a suspect?
 7        Q.   Yeah.
 8        A.   No.
 9        Q.   Do you know why people give -- why you
10   get three days to think about the event before you
11   are called in to give a statement?
12        A.   No.
13        Q.   When you gave a statement in this case,
14   you gave it to Sergeant Dowling and a Lieutenant
15   Don something.
16        A.   Meunier.
17        Q.   Meunier?
18        A.   Yes.
19        Q.   And while you were giving a statement,
20   you were actually watching the video with them,
21   correct?
22        A.   Yes.
23        Q.   Tell me how you became involved or what
24   you heard to get you involved in this event.
25        A.   So I was working my beat in the Fourth
```

1    District, and I heard a radio transmission.
2    Pitfield came over requesting assistance.
3         Q.   Did he call out a code?
4         A.    I don't recall if he used a signal or
5    not.  I can remember him requesting assistance.
6         Q.   Have you listened to the dispatch tapes
7    since this lawsuit has been filed?
8         A.   I've never heard them.
9         Q.   Whatever you heard about the event would
10   be contained on dispatch, correct?
11        A.   Yes.
12        Q.   You didn't have any other method?  You
13   were not texting or calling on a personal phone?
14        A.   No.
15        Q.   So you hear.  How does this come out?  Is
16   it an excited -- is it an excited dispatch?  You,
17   know tell me about what you -- did you observe Chad
18   Pitfield's voice or hear Chad Pitfield's voice that
19   would make you think he was in any type of danger?
20        A.   Yes.
21        Q.   That is based on what you heard on
22   dispatch, right?
23        A.   How it sounded, yes.
24        Q.   Did you hear him request an ambulance for
25   E█████ P██████'s father?

A. I heard him call for an ambulance, yes.

Q. And if he said for the father on the tape, that would be what you heard, right?

A. Correct.

Q. You said in your statement for some reason that he gave a 1083 code, which is radio silence. What is -- is 1083 radio silence?

A. It means don't come on the air and tie up the air and get to the scene. I believe that was a headquarter's decision. I think they put out 1083 and roll.

Q. The dispatch?

A. I think so, yeah.

Q. I mean, it's on the tape. But, in any event, you heard an officer needs help. You immediately then start running blue lights and siren?

A. Yes.

Q. And that's so you can get there faster and make sure you are protecting the public by warning them you are going to be driving --

A. Correct.

Q. -- in a fast manner, correct? So tell me what happens. And if at any time you want to go to the video, I'll let you do this any way you want,

1    but when you got to the scene, what did you

2    observe?

3        A.   When I initially got to the scene, I got

4    out, and I observed Mr. Parsa with a rag on his

5    chin.  So I assessed him.  That's when he showed me

6    the gaping hole in his chin right here, and I asked

7    him -- I actually did ask him where was the other

8    piece of his chin, and he is like, "I don't know."

9    So I kind of scanned around the ground to see if I

10   could see it, and I saw Pitfield with E███ P████.

11       Q.   Were there other officers on the scene

12   already?

13       A.   You know, after watching the video, yes,

14   but not within my sight, because I was focused on

15   him and his wound and then Pitfield.

16       Q.   You got out of the car.  There was

17   nothing that was calling your attention.  You could

18   see how many cops were on the scene, right?

19       A.   No.  Not necessarily, no.

20       Q.   So where did you park?  Did you park

21   behind the mall?

22       A.   No.  I came in, and I believe I came in

23   off to the side.

24       Q.   Were you running lights and sirens when

25   you were coming in?

```
 1          A.    I shut them down before hitting the
 2    parking lot.
 3          Q.    Both lights and sirens?
 4          A.    I believe so, yes.
 5          Q.    When you go up there, you don't -- do you
 6    know how many officers were on the scene now, by
 7    looking at the tape?
 8          A.    I'd have to look at it again.
 9          Q.    We'll do that at the time. So you go
10    there.  You assess Mr. P███.  How long does that
11    take?  Is that a matter of seconds?
12          A.    Probably so.
13          Q.    Then what did you do?
14          A.    After that, I was talking to Chad.  He
15    was still going back and forth.  E███ was moving
16    about, picking himself up, and Chad had said he had
17    gotten bitten, so we had to switch off so he could
18    assess his injuries.
19          Q.    Did Chad say I need to be relieved so I
20    can assess my injuries or was anything said about
21    that?
22          A.    Yeah.  I asked him.  He is like he didn't
23    know.  He had to look.  So he -- and he was pretty
24    well spent at that point, so he asked to exchange.
25    We exchanged.
```

```
 1          Q.    Chad was pretty well spent?
 2          A.    Yeah.  He was breathing kind of hard.
 3          Q.    Big guy, right?
 4          A.    Uh-huh.
 5          Q.    Over 300 pounds?
 6          A.    I don't know what his exact weight is.
 7    He is tall.
 8          Q.    Out of shape?
 9          A.    Relatively.
10          Q.    Not really fit to do patrol work and
11    restrain people?
12          A.    I wouldn't say that.
13          MR. ZIBILICH:
14                Object to the form.  You can answer
15            it.
16          THE WITNESS:
17                I wouldn't say that.
18    BY MR. CLARKE:
19          Q.    Where was Chad sitting, Deputy Pitfield?
20          A.    Where was he placed?
21          Q.    Yeah.
22          A.    He was over his buttocks, like below the
23    waist, right by the belt line would be.
24          Q.    In your statement, you said he was
25    sitting over his butt area.
```

```
 1         A.   Yeah.  After looking at the video, you
 2    can kind of see that he wasn't exactly seated
 3    either.  He was still up on his -- I'm sorry.  Is
 4    something funny?
 5         Q.   Yeah.  I mean, it is.  Chad Pitfield --
 6         A.   When we look at the video, I'll explain
 7    what I'm talking about, and you'll understand.
 8         Q.   Okay.  You'll do it.  No, I won't.  You
 9    were asked a number of times in your statement
10    about where he was, and they went back and forth,
11    and he was on his -- around his belt line you say
12    and beyond.
13         A.   Buttocks area.
14         Q.   So you talk to Parsa.  You talk to Deputy
15    Pitfield.  He tells you about his injury, so he
16    wants to have that assessed.  Do you have an actual
17    communication or a conversation that you're going
18    to be the next one up?
19         A.   I think I was the only one around him at
20    that moment.
21         Q.   Where were all these other cops that were
22    on the scene?
23         A.   I couldn't tell you.  I was focused on
24    Chad.
25         Q.   So by the time you come up, and you are
```

```
 1    getting ready to move to have the switchover, to
 2    where you get on him, do you have any discussion or
 3    do you hear that E███ P███ is autistic or special
 4    needs?
 5         A.   I believe Chad had mentioned it when --
 6    as I was walking up.
 7         Q.   So you know before you got on him that
 8    you were dealing with an autistic child?
 9         A.   I believe so.
10         Q.   An autistic person?
11         A.   I believe so.
12         Q.   When you walk up, and you are having this
13    conversation with Deputy Pitfield about allowing
14    him to get himself assessed, do you hear Daren
15    Parsa or Donna Lou, that's E███'s mother, say
16    anything?
17         A.   Miss Parsa was talking to E███.
18         Q.   Was she holding his hand?
19         A.   I didn't see that.
20         Q.   Do you remember anything she said?
21         A.   Telling him basically to calm down.  I
22    can't say verbatim precisely what she was saying,
23    but she was calling his name, telling him to calm
24    down, trying to talk to him.
25         Q.   Was there anything inappropriate that you
```

1    observed about the way she was trying to be

2    involved with this?

3           A.    At that moment, no.

4           Q.    Where was she?  She was by his head?

5           A.    Yes.  Like right up in this area.

6           Q.    So after Pitfield got off of E█████, did he

7    show you the bite mark?

8           A.    He lifted up his pants leg and pulled his

9    sock down.  Like right off to the side of me.

10          Q.    Did he show you his injuries?

11          A.    I wasn't quite exactly taking my

12   attention away from what I was doing to look fully

13   at it, but I saw the bite mark on his leg.

14          Q.    When you got on top of him, was he

15   resisting?

16          A.    He was still doing so, yes.

17          Q.    Explain to me what his resistance is.

18          A.    So when I positioned myself, he was still

19   turning, pulling up, fighting with his hands.

20          Q.    They were handcuffed, right?

21          A.    They were.

22          Q.    And you were sitting on his buttocks area

23   as well, correct?

24          A.    I wasn't sitting.  I was positioned.  So

25   I had my weight on my toes and my other knee was

1    down on the ground, so I didn't put a lot of weight
2    on him.
3         Q.   Where you were sitting on him was his
4    buttocks, correct?
5         A.   I was positioned over his buttocks.
6         Q.   You were basically straddling in the same
7    way that Pitfield was, correct?
8         A.   Not exactly.
9         Q.   That's exactly what you said in your
10   statement, correct?
11        A.   Well, we're here to clarify things, and
12   I'm clarifying it for you.
13        Q.   Was your memory better on January -- it
14   don't have the date on here.  On when you gave your
15   statement a couple of days after the incident than
16   it is today?
17        A.   It's about the same.
18        Q.   After you make the switch-out, tell me
19   what happened.
20        A.   After Chad and I swapped?
21        Q.   Yeah.
22        A.   More of the same.  He was resisting.  We
23   were trying to calm him down.  He is yelling fire
24   truck.  You can hear sirens.  I don't know whether
25   it was ambulance sirens or additional police

1    officers coming.  I couldn't tell you.  He was
2    picking himself up and turning side to side, like
3    to the left, to the right.  Rolling to one side and
4    then to the other.
5         Q.   Why didn't you just role him over and put
6    him in the recovery position?
7         A.   Because then I'm in a compromised
8    position.
9         Q.   How?  You got six officers on the scene.
10        A.   So if I roll him over, now I'm allowing
11   face-to-face contact.  He rolls on top of me or
12   rolls me over as I'm trying to do that, it's just a
13   bad situation.  It's not safe.
14        Q.   Well, if you roll him over on his side,
15   and you hold his handcuffs behind his back, and you
16   position yourself by his handcuffs, he can't bite
17   you, right?
18        A.   From the back, no, but he is still
19   actively resisting, so.  I can't necessarily
20   release him to regain.
21        Q.   Of course you can.
22             MR. ZIBILICH:
23                  Wait, wait, wait.  Come on.  Ask
24             questions.  That's not a question.
25   BY MR. CLARKE:

1     Q.    Were you trained that you can restrain

2  somebody in the modified or the recovery position?

3     A.    Not while we are engaged.

4     Q.    What does engaged mean? Any time touching

5  him, touching a suspect, while the suspect is

6  moving?

7     A.    No.  Any time that we're trying to

8  overcome resistance.

9     Q.    So what happens -- so he is -- you switch

10  out with Pitfield, and you get on his buttocks

11  area.  Take me through it up to the time where his

12  arms start going up.

13     A.    Okay.  So from the point we had switched

14  out, it was a continual thing.  Then he started

15  picking his arms up from behind his back.  So I was

16  like okay.  I tried to get his arms to stay down,

17  but I couldn't.  So basically I just held what I

18  had, and then he kept pulling, and then I lost my

19  balance, and he went over with them.

20     Q.    When you lost your balance, did you push

21  him forward?

22     A.    No.  I was not pushing.

23     Q.    When you lost your balance, were you

24  trying to regain your balance, and could you have

25  pushed his arms forward?

```
 1          A.   I wasn't pushing his arms forward.  I was
 2     trying to regain my balance.  I think I had used
 3     one of my elbows to kind of reposition myself, but
 4     the momentum was just carrying us.
 5          Q.   So it's your testimony that he pulled you
 6     up forward over his head from behind --
 7          A.   He pulled me forward.
 8          Q.   So once he started doing that, what did
 9     you do?
10          A.   Once he started --
11          Q.   Once he started lifting his arms up, I
12     think --
13          A.   At a certain point, I was just holding
14     on.  At a certain point, I let go so we wouldn't
15     damage any of his shoulders, and it went forward.
16          Q.   Were you scared that -- were you
17     attempting to use a pain compliance technique at
18     the time?
19          A.   No.
20          Q.   Do you know what a pain compliance
21     technique is?
22          A.   Yes.
23          Q.   Is lifting somebody's handcuffs up while
24     they are handcuffed behind --
25               MR. ZIBILICH:
```

```
 1                    He doesn't need a sermon.  He told
 2               you, yes, he knows what it is.
 3      BY MR. CLARKE:
 4           Q.   In a pain compliance technique, one of
 5      the pain compliance techniques that you've been
 6      trained on is when you are escorting somebody to be
 7      able to lift their handcuffs up, correct?
 8           A.   There is various types of --
 9           Q.   Is that one of them that you were
10      trained?
11           A.   I don't recall just like lifting their
12      handcuffs up.
13           Q.   So after his hands get completely in
14      front of him, what do you do?
15           A.   That's when I fell forward.
16           Q.   What did you do?
17           A.   At that point, he was trying to bite me,
18      so I was able to get -- he was going for the
19      biceps, so I was able to get my arm right across
20      his jaw line right here, and I could only get my
21      hand right by his chin so he couldn't bite down,
22      and I put my fingers up so my fingers would not get
23      bitten or get in the way, and then I covered my
24      fingers with this hand.
25           Q.   So both hands were connected?
```

1        A.   Yeah.  They were just holding my fingers.

2        Q.   It was your right arm that was against

3   his right -- the right side of his face?

4        A.   Jaw.

5        Q.   Right jaw line?

6        A.   Right along here.

7        Q.   And went across his chin?

8        A.   Underneath.  Right about here.

9        Q.   So your biceps was against his -- the

10  right side of his face, correct?

11       A.    In that area, yes.

12       Q.   And then your arm went down, and then

13  your hand came up under his chin?

14       A.   Yes.  I put it right here.

15       Q.   You are talking about the top of your

16  wrist, correct?

17       A.    More behind it.

18       Q.   Somewhere around the wrist area, forearm

19  area?

20       A.   Yeah.  Small.

21       Q.   Then you grab -- you attach that hand.

22  You grab your other hand to complete the hold,

23  correct?

24       A.   Like this, yeah.

25       Q.   Did you hear Miss Donna Lou say anything

1    at that time?

2        A.    She was actually screaming at him to calm

3    down.

4        Q.    Was she screaming, you are choking him?

5        A.    No.

6        Q.    She did at some point, right?

7        A.    No.  I didn't hear that.

8        Q.    You didn't hear her saying you are

9    choking him?

10       A.    No.  Afterwards she accused of choking

11   him.

12       Q.    Did you hear anything -- do you recall

13   anything that you heard that Miss Lou said and

14   Mr. -- or Mr. Parsa said while you were on top of

15   him?  Do you recall anything that they said?

16       A.    No.

17       Q.    Do you know who Detective Mehrtens is?

18       A.    Mehrtens?  I do.

19            MR. ZIBILICH:

20                So do you.  You asked him questions

21            for hours the other day.

22   BY MR. CLARKE:

23       Q.    Do you know why he told homicide that

24   Deputy Vega has a technique, you know, when

25   somebody starts struggling, you have handcuffs on

```
 1   them, you just slightly begin to elevate their arms
 2   so you can just maintain control of the upper
 3   torso?
 4             MR. ZIBILICH:
 5                  Object to the form.  Does he know
 6               why Mehrtens said that?
 7             MR. CLARKE:
 8                  Yeah.
 9             MR. ZIBILICH:
10                  Is that the question?
11             THE WITNESS:
12                  I never knew he said that.
13   BY MR. CLARKE:
14        Q.   Did you know that Mehrtens -- did you
15   ever tell Mehrtens about --
16             MR. ZIBILICH:
17                  Mehrtens.  Syllable on the first
18               syllable.
19             MR. CLARKE:
20                  We already went through my syllable
21               problem.  I was taught it's Bur-GER
22               King, not Burg-ER King, so I can't do
23               that.
24   BY MR. CLARKE:
25        Q.   Did you tell Detective Mehrtens --
```

```
 1    Mehrtens --
 2              MR. ZIBILICH:
 3                   Bingo.
 4              MR. CLARKE:
 5                   There you go.  Bingo.
 6    BY MR. CLARKE:
 7         Q.   Detective Mehrtens about a special
 8    technique you have when somebody starts struggling,
 9    and you have handcuffs on them?  Did you ever tell
10    him about something like that?
11         A.   No.
12         Q.   So after you were able to try to control
13    his head with your arm the way you described it,
14    tell me what happened.
15         A.   So after we get to that point?
16         Q.   Right.  I'm trying to go through the
17    timeline.  We've got the --
18         A.   So after we get to that point, it's a
19    struggle.  That's when Deputy Gaudet arrives on the
20    scene and comes up.  EMS is already in the
21    background.  And at this point, I'm pretty well
22    spent, and Myron and I were like -- he noticed that
23    I'm wore out, so he is like, I'll take over.  So he
24    tries to take control of the head, and I slide off.
25    And then pretty much instantaneously, that's when I
```

```
1    noticed the urination.  I told them recovery
2    position, CPR, ambulance.
3         Q.   Up until that time, there was no
4    discussion of the recovery position, correct?
5         A.   Prior to that moment?
6         Q.   Yeah.
7         A.   No.  It was called for when needed.
8         Q.   Did somebody say the word "recovery
9    position?"
10        A.   I don't recall who said it.  It was --
11             MR. ZIBILICH:
12                  His question is do you recall
13               anybody saying it.
14             THE WITNESS:
15                  Yes.
16             MR. ZIBILICH:
17                  Good.
18   BY MR. CLARKE:
19        Q.   When was that?  Was that after or before?
20   Did you announce that he had urinated on himself?
21        A.   It was kind of parallel.
22        Q.   All at the same time? You are getting up,
23   you notice it.
24        A.   Yeah.  People were all talking.
25        Q.   If you look at your statement, on Page 6,
```

1    you describe how you restrained his head.

2         A.   Which paragraph?

3         Q.   I'm looking for it.  About middle way

4    down the page.

5         A.   I'm sorry.  Where?

6         Q.   First big paragraph.  I'm showing you

7    without your glasses.

8         A.   I can see the yellow and the positioning.

9         Q.   According to this, you say, "I put my

10   forearm right here, underneath his chin to try to

11   maintain some control and to keep him from hitting

12   his head and doing anything else."  Did I read that

13   correctly?

14        A.   Yes.

15        Q.   So did you have your forearm under his

16   chin?

17        A.   Yeah.  Right here.  Right below the

18   wrist.  That's part of my forearm.

19        Q.   Do you know whether he was kicking while

20   you were on top of him?

21        A.   Yes, he was.

22        Q.   Did you see it or feel it?

23        A.   I felt it.

24        Q.   Did you call for the RIPP Hobble?

25        A.   I did not.

```
1        Q.    Why not?

2        A.    I was a bit busy.

3        Q.    Did anybody?

4        A.    I didn't hear anyone.

5        Q.    There were a lot of people on the tape

6   walking around with their hands in their pockets

7   and stuff, right?

8        A.    As I see later, other officers are doing

9   some things.

10       Q.    Tell me about any conversations that you

11  heard Miss Lou or anybody talk about choking on the

12  scene?

13       A.    The only thing I heard about the choking

14  was when she said, "You all choked him," and I

15  responded to it.

16       Q.    What did you respond?

17       A.    I told her, "No, we did not."

18       Q.    And did you have any other communication

19  with her about it?

20       A.    No.

21       Q.    Was she talking to you at that time or

22  just talking to the group?

23       A.    I think it was just kind of like a blurt

24  out.  It was just not specifically cast at anyone

25  in particular.
```

137

```
 1         Q.   And your testimony is that that happened
 2   after you got off him, after he was already put in
 3   the ambulance?
 4         A.   What happened?
 5         Q.   Her statement.
 6         A.   No, no, no.  I -- I can't say for sure
 7   whether or not he was already in the ambulance or
 8   not, but she was on the back side.  I remember
 9   that, and I think he may have been on his way to
10   the ambulance, but I can't say specifically.
11         Q.   So it was while the situation was winding
12   down, and he was getting medical treatment but
13   before E███ was taken off the scene?
14         A.   I would say that's a fair statement.
15         Q.   Did you have any other conversations with
16   Daren Parsa other than the initial evaluation when
17   you came on?
18         A.   No.
19         Q.   Did you have any other conversations with
20   Donna Lou?
21         A.   No.
22         Q.   Did you hear Daren Parsa or Donna Lou say
23   anything else at the scene?
24         A.   Not that I recall.
25         Q.   Did you call for the shackles?
```

```
 1        A.    No.

 2        Q.    Did somebody call for shackles?

 3        A.    Someone did.

 4        Q.    Did you hear it?

 5        A.    I did.

 6        Q.    The shackles got put on him, correct?

 7        A.    I believe so, yes.

 8        Q.    Prior to you getting off him where you

 9   were going to switch out with Gaudet, did you

10   notice that his resisting was getting lessened or

11   that he was tiring or that he was limp?

12        A.    It appeared that he was tiring out and

13   just was done.

14        Q.    Now, you didn't know that he was

15   restrained in the prone restraint for like six

16   minutes before you got there, correct?

17             MR. ZIBILICH:

18                  Object to the form.  You can answer

19           it.

20             THE WITNESS:

21                  I didn't know how long he and

22             Pitfield were engaged.

23   BY MR. CLARKE:

24        Q.    If you had known that he had been

25   restrained in the prone position for six minutes
```

```
1    before you got there, would you have done anything
2    differently?
3                   MR. ZIBILICH:
4                        Object to the form.  You can answer
5                   it.
6                   THE WITNESS:
7                        Would I have done anything dif --
8                   no.
9    BY MR. CLARKE:
10        Q.    Would you agree that being in a prone
11   position for six minutes made the restraint more
12   dangerous to him based on your training?
13        A.    No.
14        Q.    Now, you were asked in your questions --
15   in your statement about whether or not Miss Lou
16   could have misperceived what you were doing as a
17   chokehold.  Do you recall that?
18        A.    Yeah.  That would be toward the end, is
19   it not?
20        Q.    Yeah.  It's around Page 10. I mean, from
21   her perspective as a civilian on the scene, it
22   would -- what you did could look like a chokehold,
23   correct?
24        A.    It could have.
25        Q.    And what is the brachial?
```

1      A.    Right here.

2      Q.    The carotid artery?

3      A.    Right on the side.  The nerves and

4  everything that run alongside your neck.

5      Q.    When Myron came up, you told him to watch

6  the brachial.

7      A.    Yeah.  In case he was going to coddle the

8  side of his head to keep from getting bitten.  I

9  didn't want -- his neck was so big, it was just

10 hard to deal with.  So I was telling Myron just

11 watch that side so we don't add any pressure to

12 anything.

13           MR. CLARKE:

14                Let's take a break.  I may get to

15             the video and be done.

16           THE VIDEOGRAPHER:

17                Going off the record.  The time is

18             now 3:56.

19             {BRIEF RECESS}

20           THE VIDEOGRAPHER:

21                Back on the record.  The time is now

22             4:07.

23 BY MR. CLARKE:

24     Q.    Detective Vega, what I have up here has

25 been previously marked as an exhibit in this case.

1   It is the video from the Laser Tag.  Have you

2   watched the whole videotape from start to end?

3       A.   No.

4       Q.   What portions did you look at?

5       A.   Just about the beginning to the point to

6   where he is rolled in recovery.

7       Q.   From the time you got there is what

8   you're saying?

9       A.   I've seen a little bit before.

10      Q.   There was an incident before.  Did you

11  see the incident between E███ P███ and his father?

12      A.   In person or on video?

13      Q.   On video.

14      A.   Yes.

15      Q.   That's the beginning of the video.  Then

16  Chad Pitfield comes up, and there is different

17  people that show up at different times.  Did you

18  watch it from the time of the incident with E███

19  and his father up until the time he was rolled into

20  the recovery position?

21      A.   I've seen that portion.

22      Q.   You didn't know of anything that happened

23  in the parking lot prior to arriving there,

24  correct?

25      A.   No.

1      Q.   We talked about who you talked to and

2   what you learned once you got on the scene,

3   correct?

4      A.   Yes.

5      Q.   What we're going to do is I'm going to

6   play this video.  If there is a point of it where

7   you want to stop it and tell me something, let me

8   know.  I'll stop it.  I'm going to go in minute

9   increments, and I'm going to ask you some

10  questions, or if I need to stop you and ask you a

11  question about what is going on, I'll do that.  All

12  right?

13     A.   Okay.

14     Q.   So we are going to start at 7:19.  Well,

15  this says 8:12.  Hang on.  I'm going to stop it

16  here and get the -- we are at 8:08 is where we're

17  going to stop.  Okay.  Start.

18                  {VIDEO PLAYED}

19  BY MR. CLARKE:

20     Q.   From the time we stopped -- we started

21  until now, Deputy Pitfield arrives on the scene,

22  correct?

23     A.   Yes.

24     Q.   And there is an altercation with E█████ and

25  his father, and then E████ strikes Pitfield,

```
1    correct?
2         A.    Yes.
3         Q.    With open hands, correct?
4         A.    Yes.
5         Q.    E████ goes to the ground.  His father goes
6    to the ground, and Pitfield strikes him one time,
7    correct?
8         A.    That's what it appeared to be.  I can't
9    see the actual contact.
10        Q.    That's what it looked like.  Okay.  We
11   are going to start it at 8:56 and go forward.
12                    {VIDEO PLAYED}
13   BY MR. CLARKE:
14        Q.    I'm going to stop it at ten minutes.  Up
15   until this time --
16             MR. ZIBILICH:
17                  What is the count number?
18             MR. CLARKE:
19                  Ten minutes.  10:01.
20             MR. ZIBILICH:
21                  Okay.
22   BY MR. CLARKE:
23        Q.    Deputy Pitfield has positioned himself on
24   his back and is trying to get him under control,
25   correct?
```

```
 1        A.    I can't see how --
 2              MR. ZIBILICH:
 3                    Object to the form.  Once again,
 4                 this thing speaks for itself but go
 5                 ahead.
 6              THE WITNESS:
 7                    I can't really see his exact
 8                 position at that point, because Miss
 9                 Parsa is kind of covering it up, but he
10                 is over E███ P███ trying to gain
11                 control.
12    BY MR. CLARKE:
13        Q.    Correct.  I'll start at 10:01.
14                    {VIDEO PLAYED}
15    BY MR. CLARKE:
16        Q.    For some reason I stopped it.  I didn't
17    mean to. I'll stop it at 10:56.  Up until this
18    time, would you consider that active resistance,
19    violent resistance, or passive resistance, or
20    anything else?
21        A.    He is being violent.  He is still
22    throwing strikes during that time.
23        Q.    You saw him throw strikes at people?
24        A.    He was hitting himself.  He is striking
25    himself.
```

```
 1        Q.   Is that a danger to the officer, when
 2   somebody strikes themselves?
 3        A.   It's a danger to him.
 4        Q.   Would you consider this active
 5   resistance, passive resistance?
 6        A.   This is active.
 7        Q.   And the resistance that he exhibited that
 8   you can see on the videotape, can you tell me what
 9   that is?
10        A.   I'm sorry?
11        Q.   The resistance that you are saying is
12   active is him moving side to side and trying to
13   pull himself up?
14        A.   Yes.  He is still trying to get up, and
15   he is rolling.  He is trying to strike, and Miss
16   Parsa is trying to hold his hand down is what it
17   appears on the video, along with the father.
18        Q.   He is trying to strike himself, correct?
19        A.   Yes.
20        Q.   So from 10:56 we're going to roll.
21                   {VIDEO PLAYED}
22   BY MR. CLARKE:
23        Q.   I'm going to stop it.  From the last time
24   we stopped it to the present, do you -- oh, I'm
25   sorry.  I didn't stop it.  It is still playing.  We
```

```
 1    stopped it at 12:11.  From the time we last started
 2    the tape until now, would you consider that active
 3    resistance?
 4         A.   Yes, and I can still see him.  I can see
 5    his foot kicking in the back as well.
 6         Q.   Who cares about it?  What does the
 7    kicking in the back have to do with anything?
 8         A.   It's part of resisting.
 9         Q.   I mean, is it resisting that is -- do you
10    know if that's resistance or oxygen deficiency?
11         A.   I can't give you an opinion on that.
12         Q.   He is lifting his legs up and down.  He
13    moves his right part of his torso, tries to lift it
14    up a couple of times during this clip, during this
15    period, right?
16         A.   He tries to lift up, yes.
17         Q.   And Pitfield pretty handily controls him,
18    correct?
19              MR. ZIBILICH:
20                   Object to the form.  You can answer
21                it.
22              THE WITNESS:
23                   Yeah.  I wouldn't say that he had
24                full control.  He is struggling.
25    BY MR. CLARKE:
```

```
 1        Q.    Is he struggling, in your opinion,
 2   because of the resistance of E███ or because of his
 3   physical condition?
 4              MR. ZIBILICH:
 5                   Object to the form.  Whose physical
 6                condition?
 7              MR. CLARKE:
 8                   Pitfield's.
 9              MR. ZIBILICH:
10                   I'm real bad with pronouns.
11              THE WITNESS:
12                   I would say at this point it is due
13                to the resistance.
14   BY MR. CLARKE:
15        Q.    Okay.  But this isn't somebody -- there
16   are times where he is, after he moves, that
17   Pitfield is able to reposition him in the prone
18   position where he is calm for a period of time,
19   correct?
20              MR. ZIBILICH:
21                   Object to the form. You can answer
22                it.
23              THE WITNESS:
24                   He is going to have to repeat that.
25   BY MR. CLARKE:
```

```
1        Q.   During this last clip that we showed, we
2   said his resistance that we can see on the tape is
3   he moves his right shoulder up and kind of wiggles
4   around a little bit, right?
5        A.   He is trying to roll.
6        Q.   But Pitfield, when he does that, is able
7   to counter that fairly effectively to where he
8   calms down for periods of time, correct?
9             MR. ZIBILICH:
10                 Object to the form.  You can answer
11             it.
12            THE WITNESS:
13                 I say he is able to briefly counter
14             that, yeah.
15   BY MR. CLARKE:
16        Q.   Were there times while he is being
17   restrained here where E███ is still?
18        A.   I can't --
19            MR. ZIBILICH:
20                 Object to the form.  You can answer
21             it, if you can.
22            THE WITNESS:
23                 I can't tell you that he was or
24             wasn't.
25   BY MR. CLARKE:
```

1      Q.   I'm going to run it from 12:11.  We are
2  going to move forward.
3                    {VIDEO PLAYED}
4  BY MR. CLARKE:
5      Q.   So based on the clip that we saw, you can
6  tell that he is still resisting, but you can't tell
7  if there is periods of time when he's still?
8      A.   Yeah.  I can see him resisting, but
9  Pitfield is on top of him, on his buttocks, so he
10  can feel more than what I can see in the video.
11      Q.   I've got to ask you one other question
12  from before.  When you were talking to Gaudet about
13  the brachial, was that because you were concerned
14  that that would restrict his breathing?
15      A.   I was concerned that it would cut oxygen
16  off if we compressed that.
17      Q.   So while you were on top of him, at least
18  at that time, you thought about the potential
19  asphyxiating nature of the restraint, correct?
20      A.   That's why we made sure we didn't do it.
21      Q.   We are going to start from 12:14.
22                    {VIDEO PLAYED}
23  BY MR. CLARKE:
24      Q.   I'm going to stop it at 13 minutes.  From
25  the last clip from where we stopped it until now,

1    did you see any resistance?

2         A.   I could still see some resistance going

3    on, yes.

4         Q.   During that period of time, he moved his

5    shoulder up one time, correct?

6         A.   He rolled to his left.

7         Q.   And Pitfield was able to put his shoulder

8    back down, and then there was not much resistance

9    after that, correct?

10              MR. ZIBILICH:

11                   Object to the form.

12              THE WITNESS:

13                   So he is still resisting.

14   BY MR. CLARKE:

15        Q.   How was he resisting?

16        A.   Exactly like he's been doing.

17        Q.   But there are periods of time, when you

18   were taught about deescalation and everything at

19   the training academy, you try to do things to get

20   the suspect or the person you are dealing with in a

21   different frame of mind so you can deal with them

22   in a different way, correct?

23        A.   When someone is functioning that way,

24   yes.

25        Q.   During the time -- well, I'll move on.

```
 1   We are going to start at 13:01.
 2                   {VIDEO PLAYED}
 3   BY MR. CLARKE:
 4        Q.   I stopped it at 14:00.  From the time we
 5   last stopped it at 14:00, he tries to roll to the
 6   left one time, and that's it, right?
 7             MR. ZIBILICH:
 8                  Object to the form.  You can answer
 9              it.
10             THE WITNESS:
11                  From what I can see.
12   BY MR. CLARKE:
13        Q.   And you can't see any other resistance in
14   the video, do you?
15        A.   Other than, again, still kicking.
16        Q.   Pitfield seemed to have him under
17   control?
18        A.   I can't give you a definite answer on
19   that.  He still appears to be having trouble.
20        Q.   He is having trouble, but he is --
21             MR. ZIBILICH:
22                  Try to ask a question, sir.
23             MR. CLARKE:
24                  From 14:00.
25                  {VIDEO PLAYED}
```

```
 1   BY MR. CLARKE:
 2        Q.   I'll stop it at 14:28.  Is that Detective
 3   Mehrtens that came in?
 4             MR. ZIBILICH:
 5                  You must do it on purpose.
 6             MR. CLARKE:
 7                  Do you think I could do it this many
 8               times on purpose?  I can't.  I mean --
 9             MR. ZIBILICH:
10                  Then I'm sorry for you.
11             MR. CLARKE:
12                  I'd like an accommodation.
13             THE WITNESS:
14                  You are talking about the person in
15               the blue shirt?
16   BY MR. CLARKE:
17        Q.   The person in the blue shirt.  Is that
18   Detective Mehrtens?
19        A.   No.
20        Q.   Is that Detective Vaught?
21        A.   Yes.
22        Q.   He was able to handcuff him without any
23   problems, correct?
24             MR. ZIBILICH:
25                  Object to the form.
```

```
 1              THE WITNESS:

 2                   He was able to handcuff him.

 3   BY MR. CLARKE:

 4       Q.   Did you see him experience any problems

 5   trying to handcuff him?

 6       A.   It doesn't appear to be.

 7       Q.   Do you know of any reason why E███

 8   couldn't be put in the recovery position at that

 9   point?

10       A.   That would have been a determination of

11   Pitfield, depending on what was going on, but I

12   can't see.  It's obscured.

13       Q.   There is nothing on the tape that would

14   -- that you could look at or point to that would

15   say that there it was impossible to put him in the

16   recovery position, correct?

17       A.   There is nothing I could see at all.

18              MR. ZIBILICH:

19                   Object to the form.

20              MR. CLARKE:

21                   We are at 14:28.  I'm going to move

22                forward.

23                   {VIDEO PLAYED}

24   BY MR. CLARKE:

25       Q.   I'll stop it at 14:54.  On the scene
```

154

```
1   right now we have Detective Mehrtens, Detective
2   Vaught, and an officer just walked up, correct? Let
3   me go back ten seconds.  I'm going to play it.  You
4   see an officer walk in.  You see that? 14:48.
5       A.   Yes.
6       Q.   Do you know what officer that is?
7       A.   That would be me.
8       Q.   So have you talked to Daren Parsa by now?
9       A.   I believe so.
10      Q.   Have you talked to Pitfield about the
11  switch yet?
12      A.   I'm not quite sure.
13      Q.   14:52.  Did you talk to Detective
14  Mehrtens or Vaught?
15      A.   No.
16      Q.   If you arrived on the scene -- you didn't
17  feel that Pitfield -- did you feel Pitfield had
18  sufficient control of him when you came on the
19  scene such that you didn't have to assist him?
20      A.   I wasn't sure.  I was assessing as I was
21  walking up and taking a different position to get a
22  different look.
23      Q.   And you saw two deputies just standing by
24  the side when you walked up, right?
25      A.   I see two detectives.
```

1        Q.   Two detectives.  I'm sorry.  They're not

2   assisting Pitfield trying to control him, correct?

3        A.   I don't know what they're doing.

4        Q.   Are they touching him, E███ P████, or

5   Pitfield?

6        A.   No.

7        Q.   You'd agree, as a cop or a deputy on the

8   scene, if you have an officer struggling that you

9   would attempt to assist them, if they needed help,

10  correct?

11            MR. ZIBILICH:

12                 Object to the form.  You can answer

13            it.

14            THE WITNESS:

15                 It depends.  If things are going in

16            a certain direction, we're going to be

17            helping him out, but if you're talking

18            about like dog piling on top of

19            somebody, no.

20  BY MR. CLARKE:

21       Q.   No.  I'm talking about if you felt that

22  Deputy Pitfield was not in control of the

23  situation, then you would have helped him and gone

24  hands on.

25       A.   At that moment in time, I don't believe

```
 1   we needed to do anything with Pitfield.
 2        Q.   Was he actively resisting at that time?
 3   He is handcuffed now, right?
 4        A.   Yes.
 5        Q.   Did you see him actively resisting on
 6   this video next clip?
 7        A.   I don't recall.  I'm actually behind
 8   Pitfield now so I can't see what was happening up
 9   front.
10        Q.   Did you have any conversation with the
11   detectives or with Pitfield at this time, 14:52 on
12   the tape, about what to do?
13        A.   Did I speak to one of the detectives? No.
14        Q.   Anybody.
15        A.   No.
16        Q.   Have you had your conversation with
17   Pitfield about relieving him yet?
18        A.   Not yet.
19        Q.   I'm going to start from 14:52.
20                  {VIDEO PLAYED}
21   BY MR. CLARKE:
22        Q.   Now we have two deputies.  Three deputies
23   and two detectives on the scene, correct?
24        A.   I see Estrada.  I don't know who that is.
25        Q.   This is enough officers to perform the
```

```
 1    SWARM technique, isn't it?
 2                 MR. ZIBILICH:
 3                      Object to the form.  You can answer
 4              it.
 5                 THE WITNESS:
 6                      Maybe.
 7    BY MR. CLARKE:
 8         Q.   How many people were you trained are
 9    sufficient to perform a SWARM in your RIPP Hobble
10    training?
11                 MR. ZIBILICH:
12                      Object to the form.  You can answer
13              it.
14                 THE WITNESS:
15                      I don't recall.
16    BY MR. CLARKE:
17         Q.   Whatever is in the document?  If it says
18    four, and you have five there, that would be
19    enough, right?
20                 MR. ZIBILICH:
21                      Object to the form.
22                 THE WITNESS:
23                      It's kind of hard to SWARM somebody
24              with the mom.
25    BY MR. CLARKE:
```

1      Q.    You can ask the mom to leave, can't you?

2      A.    She wasn't responding to any requests we

3  made.

4      Q.    Did you make a request for her to leave?

5      A.    Toward -- yes.  Toward the end, I told

6  her to move.

7      Q.    Did you make a request for her to leave

8  at this point?

9      A.    No.  I was talking to Pitfield at this

10  point.

11      Q.    Is this when you were talking to Pitfield

12  about --

13      A.    This is when I started talking to

14  Pitfield.

15      Q.    Who is the person with the sheriff's

16  office jacket on?  Do you know?

17      A.    It's a little pixilated, but I believe

18  that's going to be Mehrtens.

19      Q.    He's got his hands in his pocket, right?

20      A.    You blew it up, so it's pixilated.  I

21  can't exactly see.  It's blending with the pants.

22      Q.    It kind of looks like it, though, right?

23          MR. ZIBILICH:

24              Object to the form.

25  BY MR. CLARKE:

```
 1        Q.   Vaught is sitting over there talking to
 2   Daren Parsa, correct?
 3        A.   Yes.  He is talking to the father.
 4        Q.   You got two deputies over here.  I think
 5   Guidry and Estrada, correct?
 6        A.   I can say for sure that's Estrada.  I
 7   don't know if that's Guidry or not.
 8        Q.   They don't seem to be concerned about any
 9   resistance from E███ right now, do they?
10        A.   I can't see their faces.
11             MR. ZIBILICH:
12                  Object to the form.
13   BY MR. CLARKE:
14        Q.   And we have you to the left, correct?
15        A.   That's right.
16        Q.   Are you observing any resistance at this
17   time?
18        A.   I can't recall exactly what was going on
19   at that time.  I was talking to Pitfield.
20        Q.   If Pitfield was getting ready to get
21   bucked off or was losing his balance, you would
22   have jumped in, correct?
23        A.   I believe I did.
24        Q.   I thought you guys made a decision.
25        A.   We did, and that's when it was happening
```

```
 1   again.
 2        Q.   Okay.  Starting at 15:19.
 3                  {VIDEO PLAYED}
 4   BY MR. CLARKE:
 5        Q.   I'll stop it at 15:58.  Before you get
 6   on, did you see any resistance prior to you --
 7   prior to the switch being made?
 8        A.   He is starting to roll over again.
 9        Q.   Prior to.
10        A.   Say what?
11        Q.   Prior to your efforts to get on top of
12   him from the last time we stopped the tape until
13   15:58, did you see any resistance?
14        A.   He was still bucking and moving as we
15   were trying to make an exchange.
16        Q.   What do you mean bucking and moving?
17        A.   Turning, coming up.
18        Q.   You got --
19        A.   Trying to control the hands.
20        Q.   You got six cops on the scene.  You don't
21   know how to control that except in the prone
22   position?
23        A.   We did what we had to do.  We couldn't
24   get him into a recovery position at this point.
25        Q.   You're saying those six cops on the scene
```

```
 1   had no ability other than to sit on him in the
 2   prone position to restrain him?
 3              MR. ZIBILICH:
 4                   Object to the form.
 5              THE WITNESS:
 6                   I'm saying at this time it wasn't
 7               safe to put him in a recovery position.
 8   BY MR. CLARKE:
 9        Q.   And it's because of the resistance?  I
10   mean, you are looking right down at him at this
11   time, when you are getting ready to make the
12   switch, right?
13        A.   I'm looking at where I'm going to
14   position myself and where Pitfield is positioned at
15   this time so I don't trip over him, fall on anyone.
16        Q.   What kind of resistance are you seeing?
17        A.   Like I explained before.
18        Q.   Moving to the side?
19        A.   His hands, pulling his hands, turning.
20        Q.   Does somebody have to be completely still
21   before you put them in a recovery position?
22              MR. ZIBILICH:
23                   Object to the form.
24              THE WITNESS:
25                   It depends.
```

```
 1    BY MR. CLARKE:
 2         Q.   What does it depend on?
 3         A.   It depends on safety concerns for
 4    ourselves and everyone else around.
 5         Q.   What about safety concerns for the guy
 6    who has now been sat on by an over 300-pound deputy
 7    for more than six minutes?
 8              MR. ZIBILICH:
 9                   Object to the form.
10              THE WITNESS:
11                   We always have concern for them as
12                well.
13    BY MR. CLARKE:
14         Q.   What did you do to deal with the concerns
15    for E███? Got back on top of him?
16         A.   At that point, we had to.
17         Q.   No other option?
18         A.   No.
19         Q.   I mean, if he is wriggling to his right
20    and his left and lifting his head up, he is already
21    handcuffed, right?  Where we are now, right?
22         A.   Yes.
23         Q.   Why didn't you just back away from him,
24    let him squirm?
25         A.   Because that would be even more of a
```

```
 1    danger, because then he gets up, he can still
 2    charge somebody.  He can still bite somebody, and
 3    if he bites a kid coming in and out or someone
 4    else, then we have to take even more drastic
 5    actions.  We're trying to minimize everything that
 6    we can at this point.
 7         Q.   You understand that the medical examiner
 8    ruled that the prone restraint was a contributory
 9    to his death, right?
10         A.   Do you understand that when we have a
11    safe situation, that's when we can make that
12    switch?
13         Q.   I need to know what you mean by safe,
14    because safe from all the --
15         A.   When it's not putting anyone else in
16    danger.
17         Q.   And the danger of somebody rocking side
18    to side when you have six cops on the scene is he
19    may get up, this special needs kid with autism, may
20    get up and may be able to escape all of these six
21    cops sitting on the scene?
22              MR. ZIBILICH:
23                   They don't have any cops on the
24              scene.  They have deputies and
25              detectives.  Try to have a little
```

```
 1                     respect.
 2              THE WITNESS:
 3                   What your suggestion, what I took
 4              from what you told me, was to just
 5              allow him to get up. That's not an
 6              option.
 7   BY MR. CLARKE:
 8        Q.   That's not an option that you had, and
 9   it's possible to roll him on his side.  The only
10   thing that you could do is put more weight on his
11   back, correct?
12        A.   I didn't put more weight on his back.
13        Q.   You did not release the weight on his
14   back to allow him to be breathing correctly?  You
15   put somebody else on his back, correct?
16              MR. ZIBILICH:
17                   Object to the form.
18              THE WITNESS:
19                   I didn't see any hindrance in his
20              breathing.
21   BY MR. CLARKE:
22        Q.   I mean, if he is resisting this bad, why
23   aren't you calling for the RIPP Hobble instead of
24   trying to get him in the prone position again?
25              MR. ZIBILICH:
```

165

```
 1                    Object to the form.
 2           THE WITNESS:
 3                    Because the RIPP Hobble -- I didn't
 4              have it with me.
 5   BY MR. CLARKE:
 6       Q.   Did anybody on the scene have one that
 7   you know?
 8       A.   I don't know.
 9       Q.   We are at 15:58, and it looks like you
10   are getting on.  This is when the switch happens.
11                    {VIDEO PLAYED}
12   BY MR. CLARKE:
13       Q.   I'll stop it at 16:10. When you made the
14   switch, he wasn't resisting, correct?
15       A.   He was -- he was tossing and turning.
16       Q.   You consider that resisting?
17       A.   That is resisting.
18       Q.   Such that you have to use a prone
19   pressurized restraint on him?
20       A.   He wasn't --
21           MR. ZIBILICH:
22                    Object to the form.  You can answer
23              it.
24           THE WITNESS:
25                    He wasn't exactly prone.  He is
```

```
 1                    turning to his side.
 2    BY MR. CLARKE:
 3         Q.   But you are getting on top of him to make
 4    sure he is in the prone position, correct?
 5         A.   It's not to make sure he is in a prone
 6    position.  It's to assume control.
 7         Q.   But that's what happened.  When you get
 8    on him, you put him back in the prone position,
 9    correct?
10         A.   He rolls back over.
11         Q.   And that's what you were trying to do to
12    control him, is to keep him in the prone position,
13    correct?
14         A.   I was trying to keep him from getting up.
15         Q.   And by doing that, you weren't trying to
16    ride him while he was sitting in the recovery
17    position.  You were trying to sit on his butt area,
18    correct?
19              MR. ZIBILICH:
20                   Object to the form.  You can answer
21                it.
22              THE WITNESS:
23                   I wasn't exactly sitting.  My other
24                leg -- I'm -- my weight is on that
25                other leg, and, actually, you can see
```

```
 1                   in the video daylight between my crotch

 2                   and his back.

 3              MR. CLARKE:

 4                   16:10 we're going to run it.

 5                   {VIDEO PLAYED}

 6    BY MR. CLARKE:

 7         Q.   I'm going to stop it at 16:38.  From the

 8    time you got onto him until 16:38, did you -- was

 9    he violently resisting?

10         A.   Yes.  He is amping up at that point.

11         Q.   And when he was amping up, what was he

12    doing to amp up?

13         A.   That's when he was trying to roll me off

14    of him.

15         Q.   So you know what he was thinking?  He is

16    autistic.  You know that?

17         A.   Yes, I do.

18         Q.   Do you know whether or not his actions

19    during this thing are even volitional?

20         A.   I never said it was intentional.  I just

21    said that's what he was doing.

22         Q.   All right.  And at this point, at 16:38,

23    it looks like you place your left hand underneath

24    P█████'s left hand and then what do you do with your

25    right hand?
```

1      A.   I really can't see.

2      Q.   What are you doing with your left arm

3   with respect to E████'s left arm?

4      A.   It's underneath on -- and my palm is on

5   his back.

6      Q.   What are you trying to do with that?

7      A.   I just rested it there.

8      Q.   Are you trying to do something because

9   you testified that he is amping up?

10     A.   I'm trying not to get caught between the

11  cuffs.

12     Q.   Have you told Miss Lou to leave at this

13  time?

14     A.   No.

15     Q.   Is anything Miss Lou doing inappropriate?

16     A.   I really didn't focus on what she was

17  doing, like physically doing.  I could hear her,

18  but I wasn't focused.  I'm trying to watch what I

19  am doing and what he is doing.

20     Q.   Well, you didn't tell her to leave at

21  this point, correct?

22     A.   I couldn't have if I wanted to at that

23  point.

24     Q.   You could have said leave.

25     A.   No, I couldn't have.

1      Q.   Something was wrong with your mouth?

2      A.   No.  I was engaged.

3      Q.   You can't talk when you are engaged?

4      A.   I'm focused.

5      Q.   So when you focus, you were trained that

6  you -- when you are in a focused situation, the

7  officers won't be talking to each other?

8      A.   No.  It's a physiological thing.  Certain

9  things happen in the body when your adrenaline goes

10 up, like audio exclusion, tunnel vision.  So we try

11 to combat that by breathing, but, clearly, this is

12 what is going on.

13     Q.   So we're at 16:38.  I'm going to run it.

14             {VIDEO PLAYED}

15 BY MR. CLARKE:

16     Q.   I'll stop it.  16:55.  Are you pushing

17 the handcuffs forward now?

18     A.   No.  I'm holding on to the cuffs, the two

19 pair of cuffs.

20     Q.   Are you pulling backwards or are you --

21     A.   I was trying to.  I was trying to get his

22 arm down, and I was failing at that, so that's when

23 I moved my arm to readjust.

24     Q.   Which arm did you move to readjust?

25     A.   That would have been my right arm.

170

```
1        Q.   And let's run it from here, 16:55.
2                   {VIDEO PLAYED}
3   BY MR. CLARKE:
4        Q.   I'm going to stop it at 17:01.  You put
5   your right hand on E███'s right hand.  Are you
6   pushing it forward?
7        A.   No.  I'm holding on.
8        Q.   You are pulling it back?
9        A.   I stopped pulling back, because I didn't
10  want to cause any damage, and I am losing my
11  balance at this point.
12       Q.   If you are pulling back, it wouldn't
13  cause damage.  It would be pulling his arms closer
14  to his back side.
15       A.   No, but the resistance is going to cause
16  stress to his shoulders.  If he is pulling against
17  me, and I'm pulling against him, two forces,
18  opposing forces, is going to tear his shoulders.
19       Q.   Were you trained on that with respect to
20  the training on pain compliance techniques?
21       A.   That's just sheer physics.
22       Q.   Are you a physicist?
23       A.   No.
24       Q.   17:01.
25                  {VIDEO PLAYED}
```

1    BY MR. CLARKE:

2         Q.   Stop it at 17:27.  Do you have your arm

3    around his head at this time?

4         A.   I am positioning, because that's -- when

5    I fell forward prior to that, I'm exposed.

6         Q.   And while this happens, after his arms go

7    up behind his back, other deputies get involved,

8    correct?

9         A.   Yes.  I believe that's when they were

10   trying to shackle him.

11        Q.   Were you calling for shackles?

12        A.   I did not.

13        Q.   Did you hear somebody call for shackles?

14        A.   I did hear shackles.

15        Q.   Did you hear anybody call for a RIPP

16   Hobble?

17        A.   No, sir.

18        Q.   So we are at 17:27.  This is when you are

19   positioning your arm along the side of the jaw

20   line?

21        A.   Correct.

22                   {VIDEO PLAYED}

23             THE WITNESS:

24                   Can you stop it for a second?

25             MR. CLARKE:

```
 1                    Yeah.
 2              THE WITNESS:
 3                    Okay.
 4              MR. CLARKE:
 5                    You want to go back?  I can go back
 6                ten seconds, if you want.
 7              THE WITNESS:
 8                    No.  That's fine.  I saw the head.
 9   BY MR. CLARKE:
10        Q.   So we stopped it at 18:12.  At this
11   point, it looks like more officers are getting
12   involved in the restraint, correct?
13        A.   Yes.
14        Q.   Do you know whether any of his struggling
15   is due to oxygen deficiency or because he is trying
16   to get away?
17        A.   No.
18              MR. ZIBILICH:
19                    Object to the form.  He already
20                answered it.
21   BY MR. CLARKE:
22        Q.   He's been in the prone position now for
23   seven or eight minutes, correct?
24        A.   I wasn't keeping count.
25        Q.   And are you still -- do you still at this
```

```
 1   point have your hand in the hold around his head
 2   that you described before?  I know it's hard to
 3   see.
 4        A.   I can't see it.
 5        Q.   Do you know how long you had him in the
 6   head hold?  Was that until you got up?
 7        A.   Not exactly, no.
 8        Q.   How many seconds before you got up?
 9        A.   I couldn't tell you.
10        Q.   I'm going to run it until you tell me
11   when they put him in the recovery position.  All
12   right?
13        A.   Okay.
14                  {VIDEO PLAYED}
15             THE WITNESS:
16                  Right about there.
17             MR. ZIBILICH:
18                  What was the number there?  I can't
19               read that far.
20             MR. CLARKE:
21                  It says 18:28 now, but he said it a
22               second or two before that.
23   BY MR. CLARKE:
24        Q.   Had you told the mother to move away at
25   this time?
```

1          A.    Oh, yeah.  Before that, yeah.

2          Q.    Did she move away when you asked her?

3          A.    I think she scooted back, and then later

4    on she had relocated.

5          Q.    Did she comply with your request?

6          A.    Not to get like completely away from us,

7    no.

8          Q.    Did you tell her to get eight feet away

9    or ten feet away?

10         A.    I told her to keep moving.  She scooted

11   back.  I told her to move again, because I didn't

12   want to get tossed or turned on top of her.

13         Q.    And did she do that every time you asked

14   her?

15         A.    I don't know.  She did it at least once.

16         Q.    Are you standing up yet?

17         A.    I believe so, yes.

18         Q.    So you've already seen that he has

19   urinated?

20         A.    Yeah.  As they turning him, that's when I

21   saw it.

22         Q.    What did you actually see?  Did you see a

23   stain on his pants or did you see urine coming out?

24         A.    I saw a spot and then urine come out.

25         Q.    Was the urine coming out of his pants or

1    down his leg?

2         A.   It looked to be from his pants.  From on

3    that side position.

4         Q.   Did it look like he was actively

5    urinating or he had urinated?

6         A.   That would be hard to tell.

7         Q.   Did you see liquid being pushed out of

8    his pants at this time?

9         A.   I couldn't see if it was being pushed out

10   of his pants.

11        Q.   I don't know how to ask the question. You

12   understand was I'm saying?  Did you see --

13        A.   I don't know how to answer that.

14        Q.   Did you see water dripping?

15        A.   I saw fluid coming out.

16        Q.   Was it coming out onto the ground from

17   his pants around his zipper area?

18        A.   In that region.

19             MR. CLARKE:

20                 I'm going to take a break here.  I

21              think I'm close to being done.

22             THE VIDEOGRAPHER:

23                 We are going off the record.  The

24              time is now 4:50.

25                 {BRIEF RECESS}

```
 1            THE VIDEOGRAPHER:
 2                 Back on the record. The time is now
 3              4:54.
 4  BY MR. CLARKE:
 5       Q.    I think I asked you this, but I was told
 6  I didn't.  At any point did you ask anybody for leg
 7  shackles?
 8       A.    You asked me that, and I told you no.
 9       Q.    That's what I thought.
10            MR. MOST:
11                 That's my fault.
12            THE WITNESS:
13                 That's okay.
14  BY MR. CLARKE:
15       Q.    You can blame that one on him. So we've
16  gone through all your training, all the policies.
17  We've reviewed the statements.  We reviewed the
18  video.  Is it your testimony that E█████ P█████ was an
19  extremely violent person the whole time?
20       A.    He was violent.
21       Q.    And your policies tell you what to do
22  with extremely violent people, correct, to use the
23  Total Appendage Restraint Procedure, correct?
24       A.    That's one procedure.
25       Q.    You didn't use that procedure, correct?
```

```
 1        A.   No.  We used other options.
 2        Q.   The other options that you used were use
 3   prone restraint until he stopped resisting
 4   completely, until you had determined to put him in
 5   the recovery position?
 6        A.   No.  Until it was deemed safe to do so.
 7        Q.   Knowing everything that you know now,
 8   after going through your training and stuff, would
 9   you have done anything differently?
10        A.   No.
11             MR. CLARKE:
12                  That's all we have.
13             MR. HILL:
14                  Just a couple.
15   EXAMINATION BY MR. HILL:
16        Q.   Detective, thank you for being here
17   today.  I am Mark Hill for the Westgate and Victory
18   defendants.  I just have a couple of questions.  I
19   just want to confirm on the date of the incident
20   made the basis of this litigation, were you working
21   paid off-duty detail for JPSO?
22        A.   No, I was not.
23        Q.   You were an on-duty detective that day?
24        A.   Deputy.
25        Q.   Deputy, correct.
```

178

1      A.   At that time, yes.

2      Q.   For JPSO?

3      A.   Yes.

4           MR. HILL:

5               Thank you.  No further questions.

6           MR. ZIBILICH:

7               None by me.

8           THE VIDEOGRAPHER:

9               This is the conclusion of the

10        videotaped deposition.  We are going

11        off the record.  The time is 4:56.

12              [End of deposition, 4:56]

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3                    This certification is valid only for
a transcript accompanied by my original signature
4 and original required seal on this page.

5                    I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6 as the officer before whom this testimony was
taken, do hereby certify that DETECTIVE NICHOLAS
7 VEGA, after having been duly sworn by me upon
authority of R.S. 37:2554, did testify as
8 hereinbefore set forth in the foregoing 178 pages;

9                    That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10 or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11 ability and understanding;

12                    That the transcript has been
prepared in compliance with transcript format
13 guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14 prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15 and in rules and advisory opinions of the board;

16                    That I am not related to Counsel or
to the parties herein, nor am I otherwise
17 interested in the outcome of this matter.

18

19

20

21 _____
Sandra P. DiFebbo,
22 Certified Shorthand Reporter

23 Date:  _____

24

25