UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CIVIL ACTION NO. 2:21-cv-00080

DONNA LOU and DAREN PARSA, on their own behalf
and on behalf of their deceased minor child,
E.P.

Plaintiffs,

v.

SHERIFF JOSEPH P. LOPINTO, III, CHAD PITFIELD,
RYAN VAUGHT, STEVEN MEHRTENS, SHANNON GUIDRY,
NICK VEGA, MANUEL ESTRADA, MYRON GAUDET, JOHN
DOES 1-3, VICTORY REAL ESTATE INVESTMENTS LA,
LLC and WESTGATE INVESTORS NO LLC D/B/A
WESTGATE SHOPPING CENTER, ABC INSURANCE
COMPANY, and XYZ INSURANCE,

Defendants.

Videotaped Deposition of CHAD
MICHAEL PITFIELD, given the above-entitled
cause, pursuant to the following stipulation,
before Lori L. Marino, Certified Shorthand
Reporter, in and for the State of Louisiana,
at the Jefferson Parish Sheriff's Office, 1233
Westbank Expressway, Building B, 5th Floor,
Harvey, Louisiana 70058 on Thursday,
September 22, 2022, commencing at 9:07 AM.

1  detail officers covering the Sundays you

2  weren't working?

3      A    Yes.

4      Q    What were some of the other private

5  detail customers you worked for?

6      A    I was the -- I handled Lafreniere

7  Park in Jefferson Parish, and I also

8  previously was the detail administrator for

9  Best Buy in Jefferson Parish.

10      Q    Is Lafreniere Park, is that -- was

11  that under your jurisdiction as Director of

12  Parks and Rec for the City of Kenner.

13      A    No.  It's not in the City of Kenner.

14      Q    Did each customer pay the same hourly

15  rate for your private detail work, or did it

16  vary by customer?

17      A    It could vary.

18      Q    Was it $30 an hour for Westgate?

19      A    I believe at some point, yeah.  I'm

20  not sure what it is currently or what it was

21  towards the end, but at some point, yes, that

22  was --

23      Q    Okay, and the policies and procedures

24  that you were supposed to follow in your role

25  doing private detail work for customers were

1    the policies and procedures you were trained

2    on by JPSO, correct?

3              MR. ZIBILICH:

4                   Object to the form.  You can

5              answer it.

6              THE WITNESS:

7                   Correct.  The Sheriff's Office

8              has SOPs for public assignments.

9    BY MR. MOST:

10        Q    So your training and standard

11   operating procedures that applied when you

12   were a full-time JPSO employee also applied to

13   your work when you were doing private detail

14   work, agreed?

15        A    Correct.

16        Q    And the amount that customers would

17   pay for your private detail work, would that

18   come directly to you?

19        A    In which way?

20        Q    Yeah.  So did you receive a check

21   from the customer, or did you receive a check

22   or another form of payment from JPSO for your

23   private detail work?

24        A    It varied per location.

25        Q    How were you paid by Westgate?

```
1   scene vehicle?
2       A    Again, per officer.
3       Q    By per officer, do you mean the
4   officer brings it with them?
5       A    Yeah, depending.  I mean, the
6   sheriff's office will provide you with basic
7   gloves, that kind of stuff.  Most guys make
8   their own individual first aid kits, and
9   depending on your level of training, you
10  may -- we have first responders that have
11  full-on trauma kits in their cars.  Again, it
12  depends on the officer themself.
13      Q    I think it would be helpful to be a
14  little more specific.  So on the date of the
15  death of EP, you had the use of a JPSO crime
16  scene vehicle in your role as a private
17  detail; is that correct?
18      A    The vehicle that was assigned to me
19  by the sheriff's office, correct.
20      Q    Was a crime scene vehicle?
21      A    Correct.
22      Q    And so in it, there was a computer?
23      A    Correct.
24      Q    And no security screen?
25      A    Correct.
```

```
 1        Q     Some basic first aid stuff, like
 2   gloves?
 3        A     And some medical equipment that I
 4   would have had.
 5        Q     So it had some basic medical
 6   equipment, like gloves, and you brought
 7   additional medical equipment?
 8        A     Correct.  It stays stocked in the
 9   vehicle.
10        Q     So this was a vehicle assigned
11   particularly to you?
12        A     That's correct.
13        Q     Was it a take-home vehicle?
14        A     Yes.
15        Q     What was in the glove box?  Any
16   equipment in the glove box of that vehicle?
17        A     I don't recall.
18        Q     Was there equipment in the trunk of
19   that vehicle?
20        A     Yeah.
21        Q     Crime scene forensic equipment?
22        A     Correct.
23        Q     Any restraint devices?
24        A     No.
25        Q     So the only restraint device you had
```

1    on that day personally was handcuffs; is that

2    correct?

3        A    Correct.

4        Q    And they were your personally owned

5    handcuffs?

6        A    That's correct.

7        Q    So the loadout of a crime scene

8    vehicle is, as we've established, different

9    from that of a standard patrol vehicle,

10   correct?

11       A    The main difference is it has more

12   equipment, and it doesn't have the prisoner

13   security screen.

14       Q    So the crime scene vehicle has more

15   equipment than a standard patrol vehicle?

16       A    Yes.

17       Q    Does a standard patrol vehicle have

18   restraint devices other than handcuffs?

19       A    I couldn't speak to that.

20       Q    And this -- the loadout of your crime

21   scene vehicle, other than what you provided

22   was provided by JPSO, correct?

23       A    That's correct.

24       Q    So JPSO did not provide you with a

25   RIPP Hobble device, agreed?

```
 1              MR. ZIBILICH:
 2                   Are you good?
 3              THE WITNESS:
 4                   I'm good.
 5              MR. ZIBILICH:
 6                   He's going to stop in about 15
 7              minutes for a little while.
 8              MR. MOST:
 9                   Yeah.
10    BY MR. MOST:
11         Q    All right, so you -- in January,
12    2020, you had a regularly assigned shift
13    working private detail at Westgate, correct?
14         A    That's correct.
15         Q    And so when it was time for your
16    detail, you would the take your JPSO take-home
17    vehicle and you would go to Westgate, correct?
18         A    Correct.
19         Q    Your role there was to be patrolling
20    the Westgate Shopping Center, correct?
21         A    Correct.
22         Q    You were serving and protecting the
23    patrons and the tenants of the Westgate
24    Shopping Center for Westgate, correct?
25              MR. KAUL:
```

```
 1        Q    At that particular time, you mean the
 2   time around the death of EP?
 3        A    Correct.
 4        Q    Was there like a storage closet, or
 5   was it behind a desk somewhere?  Where was the
 6   cell phone?
 7        A    It was in the manager's office.
 8        Q    So when it was time for your shift at
 9   Westgate, you would go to the Laser Tag, go to
10   the manager's office, get the cell phone?
11        A    Correct.
12        Q    And then, return it when you were
13   done with your shift?
14        A    Or hand it off to the next officer
15   that was relieving.
16        Q    You said at that time it, was stored
17   in the Laser Tag manager's office.  Where was
18   it stored at other times?
19        A    At the end, before I completed, it
20   was stored inside the Academy Sports, because
21   the Laser Tag had closed.
22        Q    Was there any other tools, devices,
23   anything else provided by Westgate for your
24   role of special detail?
25        A    No.
```

```
 1        Q     Westgate gave the instructions of
 2   where you were supposed to patrol on the
 3   shopping center premises, agreed?
 4             MR. KAUL:
 5                  Object to form.
 6             THE WITNESS:
 7                  The property.
 8   BY MR. MOST:
 9        Q     And it was Westgate that told you
10   this is where your suppose to be patrolling,
11   right?
12             MR. KAUL:
13                  Object to form.
14             THE WITNESS:
15                  It would come from the detail
16             administrator, Deputy Canatella, but
17             yes, we were there for the Westgate
18             Shopping Center.
19   BY MR. MOST:
20        Q     If you needed to use the restroom
21   while you were on the private detail for
22   Westgate, where would you use the restroom?
23        A     W could go inside any of businesses.
24        Q     Did you have a break room or anything
25   like that?
```

```
 1            MR. KAUL:
 2                 Object to the form.
 3            THE WITNESS:
 4                 Yes.
 5  BY MR. MOST:
 6      Q    So at that point, with him pushing
 7  his hips up, he was struggling, agreed?
 8            MR. KAUL:
 9                 Object to the form.
10            THE WITNESS:
11                 I don't know to what extent
12            other than trying to get up.
13  BY MR. MOST:
14      Q    But he was struggling with you is
15  what I mean; is that right?
16      A    Yes.
17      Q    And did you know if he was struggling
18  to breathe?
19      A    I didn't.  No appearance of that.
20      Q    But also no reason to think he wasn't
21  struggling to try and breathe, agreed?
22            MR. ZIBILICH:
23                 Object to the form.
24            MR. KAUL:
25                 Object to the form.
```

```
 1            THE WITNESS:
 2                 Yeah, I mean, I had -- there was
 3            no indication that he was having
 4            respiratory issues.
 5  BY MR. MOST:
 6       Q    So you didn't have any indication
 7  that he was or was not having respiratory
 8  issues, agreed?
 9       A    Correct.
10       Q    At some point, you told EP's mother
11  not to put something in front of his face?
12       A    Correct.
13       Q    You told her not to put something in
14  front of EP's face so as to not prevent any
15  impairment of his breathing, agreed?
16       A    That's correct.
17       Q    Because you understood at that point
18  with EP in the prone position, impairment of
19  breathing was a risk factor, agreed?
20            MR. ZIBILICH:
21                 Object to the form.  Go ahead.
22            MR. KAUL:
23                 Object to the form.
24            THE WITNESS:
25                 It doesn't matter.  If you're
```

```
 1   anybody who was employed by Westgate?
 2           MR. MOST:
 3                Objection.
 4           THE WITNESS:
 5                That's correct.
 6   BY MR. KAUL:
 7       Q    You testified that you received a
 8   phone call from the phone provided to you on
 9   your detail when you were notified of what was
10   happening in the parking lot.
11       A    That's correct.
12       Q    At that point, were you under any
13   general directive or protocol provided by
14   Westgate that you were to follow?
15       A    No, sir.
16       Q    At that point, were you at your
17   discretion as a reserve deputy officer to
18   respond to that incident?
19       A    That's correct.
20       Q    In that moment, you would follow your
21   JPSO training?
22       A    That's correct.
23       Q    You had mentioned also that as of --
24   I can't recall if it's as a deputy officer or
25   reserve deputy, but you were under an
```

 1    kind of stuff.

 2        Q    Let's narrow it to a business that

 3    would relate similarly to the Westgate

 4    Shopping Center.  So if you're providing

 5    detail to a retail business, --

 6        A    No.

 7        Q    -- you've never received any sort of

 8    training outside of what you've been trained

 9    as a JPSO officer?

10        A    That's correct.

11        Q    Aside from Donald Canatella, were

12    there any other administrators who oversaw the

13    Westgate detail for the JPSO?

14        A    Not that I'm aware of.

15        Q    You said you -- on average, you

16    worked about two detail shifts a month.  I

17    believe, it was every other Sunday from

18    10:00 AM to 3:00 PM.

19        A    That's correct.

20        Q    How much were you paid hourly?

21        A    I believe at the time, it was $30 an

22    hour.

23        Q    Have you had any conversations with

24    anybody at Westgate following this incident?

25        A    No, sir.