UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DONNA LOU, ET AL. | * | CIVIL ACTION NO. 21-80 |
| VERSUS | * | SECTION "D" (2) |
| SHERIFF JOSEPH P, LOPINTO, III, ET AL. | * | Judge Wendy B. Vitter<br>Magistrate Judge Donna P. Currault |

**Plaintiffs' Opposition to Westgate Defendants' Motion for Summary Judgment**

Westgate[1] owns a shopping center in Metairie, Louisiana. Westgate paid a 308-pound JPSO reserve deputy, Chad Pitfield, to work a paid security detail at the shopping center. On January 19, 2020, Pitfield placed Plaintiffs' minor son E.P. facedown in the shopping center's parking lot and sat on his back. Another deputy replaced Pitfield on the minor's back. Together, they sat on E.P. for over nine minutes. E.P. stopped breathing. He died.

In its motion for summary judgment, Westgate argues that it should not be liable for Pitfield's actions because Pitfield was an independent contractor, not an employee. R. Doc. 138-2. Westgate reaches that conclusion after applying a five-factor test for determining whether a worker is an independent contractor or an employee. *Id.* at 6 *et seq.*

But Plaintiffs do not contend that Westgate is liable for Pitfield because he was a direct employee of Westgate. They contend that Westgate is liable for Pitfield under the well-established doctrine of a "borrowed employee." *See* R. Doc. 1 at ¶¶ 27, 63 (complaint alleging that Pitfield was the "borrowed employee" of Westgate). Under that legal doctrine, which has been applied directly to paid detail officers like Pitfield, a defendant is liable for the actions of its borrowed employees regardless of whether they are independent contractors or not. *See, e.g., Benelli v. City of New Orleans*, 478 So.2d 1370 (La. App. 1985) ("If the officer commits a tort while on a paid

---

[1] "Westgate" here is used to refer to the Moving Defendants, Victory Real Estate Investments LA, LLC and Westgate Investors NO, LLC d/b/a Westgate Shopping Center. See R. Doc. 138-2 (Westgate's Motion for Summary Judgment).

1

detail, the primary employer . . . and the paid detail employer are liable in solido.") (emphasis added). That legal doctrine is distinct from the independent contractor/employee analysis, and has a nine-factor test. *Mays v. Dir.,* 938 F.3d 637 (5th Cir. 2019).

Thus, regardless of whether Westgate is correct that Pitfield was not Westgate's direct employee, this does not entitle Westgate to summary judgment. Westgate makes no argument whatsoever about whether Pitfield was an employee *borrowed* from JPSO, which is Plaintiffs' theory of the case. For that reason, Westgate's entire motion is non-responsive to the theory of liability at issue in this case – and should therefore be denied.

The motion should also be denied because applying the nine borrowed employee factors, a reasonable jury could find that Pitfield was a borrowed employee of Westgate.

And Westgate's motion should be additionally denied because it relies on an "undisputed" fact that Pitfield's restraint of E.P. in the prone position was not "a cause-in-fact of E.P.'s injuries." But that fact is very much disputed, considering that the Jefferson Parish Coroner's Office found that prone positioning was a "contributing cause" of E.P.'s death. Ex. C (Coroner's Report) at 2.

For all these reasons, Westgate's motion should be denied.

## I.  LEGAL STANDARD

"[S]ummary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[2] Summary judgment is only appropriate when the moving party identifies material facts not in dispute, "and the nonmoving party fails to produce or identify in the record summary judgment evidence sufficient to sustain a finding in its favor respecting such of those facts as to which it bears the trial burden of

---

[2] *Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).

proof."[3] This Court will view "the evidence and all justifiable inferences in the light most favorable to the non-moving party."[4]

## II. ANALYSIS

A. **Under the "borrowed employee" doctrine, a business may be liable for the actions of a non-employee it borrows from another employer.**

  i. <u>Background of the "borrowed employee" doctrine, and the Fifth Circuit's ten-part test for whether a person is a borrowed employee</u>.

In many contexts, like taxes or the Fair Labor Standards Act, the employee/independent contractor distinction is the core question. But not for liability. Under Fifth Circuit and Louisiana law, the "borrowed employee" or "borrowed servant" doctrine is the rule that "[o]ne may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person with all the legal consequences of the new relation." *Total Marine Servs., Inc. v. Director*, OWCP, 87 F.3d 774, 777 (5th Cir. 1996) (*quoting Standard Oil Co. v. Anderson*, 212 U.S. 215, 220, 29 S.Ct. 252, 53 L.Ed. 480 (1909)).

The borrowed employee analysis is distinct and separate from the employee/independent contractor analysis. For example, in *McLeod v. Moore*, 7 So.3d 190, 192-194 (La. App. 2009) the state Second Circuit analyzed the borrowed employee question and the employee/independent contractor question in separate sections of an opinion, applying separate factors.

The Fifth Circuit applies a nine-factor test to determine whether an employee is a borrowed servant. *Mays v. Dir.*, 938 F.3d 637, 641-642 (5th Cir. 2019). Those nine factors are:

  (1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

  (2) Whose work is being performed?

  (3) Was there an agreement, understanding, or meeting of the minds between the

---

[3] *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 521 (5th Cir. 1999).
[4] *Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 225 (5th Cir. 2004).

>    original and the borrowing employer?
>
> (4)   Did the employee acquiesce in the new work situation?
>
> (5)   Did the original employer terminate his relationship with the employee?
>
> (6)   Who furnished tools and place for performance?
>
> (7)   Was the new employment over a considerable length of time?
>
> (8)   Who had the right to discharge the employee?
>
> (9)   Who had the obligation to pay the employee?

*Mays v. Dir.*, 938 F.3d 637 (5th Cir. 2019), *citing Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312–13 (5th Cir. 1969). Louisiana state courts also use these nine factors. *See Musa v. Litton–Avondale Indus. Inc.*, 63 So.3d 243, 246 (La. App. 2011) (listing and applying *Ruiz* factors).

> ii.   Courts have applied the borrowed employee doctrine to hold businesses liable for the security guards and private law enforcement details they hire.

Over the last four decades, Louisiana courts have repeatedly applied the borrowed employee doctrine to hold businesses liable for the security they hire – even when those security officers are independent contractors. For example, in *Cappo v. Vinson Guard Service, Inc.*, 400 So. 2d 1148 (La. App. 2nd 1981), the Ground Pat'i Restaurant contracted with Vinson Guard Service for a guard to patrol the parking lot of the restaurant. The guard struck a man, and the man sued both Vinson and the Ground Pat'i. The restaurant's defense was that it should not be liable "since the relationship between Ground Pat'i and Vinson Guard was that of independent contractor and not that of master and servant." *Id.* at 1150. But the court rejected that argument: it applied the borrowed employee analysis, and held the Ground Pat'i liable. *Id.*

In 1984, the Supreme Court of Louisiana made the rule clearer: a "business which undertakes to hire a security guard to protect itself and its patrons is liable for physical harm which occurs because of negligence on the part of that guard." *Harris v. Pizza Hut of Louisiana, Inc.*, 455 So. 2d 1364, 1369 (1984). The court held that "[w]hen a security guard fails to act in accordance with

4

established policies and procedures and that negligence is a substantial factor in bringing about injury to a third party, it can support a jury finding of causation." *Id.*

A year later, the state Fourth Circuit made the rule even clearer in *Benelli v. City of New Orleans*, 478 So.2d 1370 (La. App. 4th 1985): if an "officer commits a tort while on a paid detail, <u>the primary employer (the City of New Orleans) and the paid detail employer are liable in solido</u>." *Benelli* (emphasis added), *citing Cappo v. Vinson Guard Service*, 400 So.2d 1148 (La. App. 1st Cir.1981).

This line of cases was upheld in in 2022 in *Bolden v. Tisdale*, 347 So.3d 697 (La. 2022). In that case the question was "whether the Tampa Bay Buccaneers football organization is vicariously liable, as an employer, for the alleged negligence of an off-duty Jefferson Parish sheriff's deputy, who was part of a motorcycle escort for the team's buses." *Id*. at 700. In that case, the Louisiana Supreme Court concluded that the football team would not be liable for the actions of its motorcycle escort. But the court explicitly distinguished the escort context from the premises context, and noted that a company <u>could</u> be held liable for the actions of a paid detail officer working premises security. The court explained:

> we distinguish the cases relied on by the plaintiffs, since they involved off-duty law enforcement officers performing private duty *premises* security, and *premises* security differs significantly from a motorcade escort in that the private entities hiring premises security officers must necessarily have greater control over the work performed by the officers given that the private entities in the cited cases had custody and control over the premises they were occupying.

*Id*. at 711 (emphasis in original.) Furthermore, the Court in *Bolden* cited *Blair v. Tynes*, 621 So.2d 591 (La. 1993), in which a special detail employer (an American Legion hall) was held to be liable for the special detail officers. There, the court held:

> The Legion argues that it was not the special employer of the deputies, suggesting that the deputies were independent contractors. This contention however overlooks David Rester's power to hire and schedule the deputies, his power to decide how many deputies should be hired as provided for in the lease agreement, as well as his power to assign the deputies to perform particular duties. Clearly, the court of appeal erred when it reversed the judgment of the trial court with respect to the

5

> liability of the American Legion as we find no manifest error on the part of the trial court in concluding that the American Legion was liable for the accident and injuries suffered by plaintiffs.

*Id.*

The Louisiana Supreme Court in *Bolden* also noted a series of cases in which businesses were held liable for the actions of paid detail officers working premises security: *Wright v. Skate Country, Inc.*, 734 So.2d 874 (La. App. 4 Cir. 1999) (concluding that paid detail "police officers were employees of [premises owner] Skate Country"), *writ denied*, 99-2272 (La. 11/5/99), 750 So.2d 194, *Duryea v. Handy*, 96-1018 (La. App. 4 Cir. 10/3/97), 700 So.2d 1123 (holding premises owner Gentilly Carnival Club liable for actions of private detail officer), and *Kramer v. Continental Casualty Company*, 92-1131 (La. App. 3 Cir. 6/22/94) (court held that for liability purposes, it would "treat the security guards as the Downtowner's employees"), 641 So.2d 557, *writ not considered*, 94-2576 (La. 12/19/94), 648 So.2d 399, *writs denied*, 94-2473, 94-2474, 94-2475 (La. 12/19/94), 648 So.2d 402-03.

Thus, Westgate is wrong to suggest that its liability can be resolved by only looking to whether Pitfield was an employee or independent contractor.

**B.     Westgate's motion should be denied because it fails to make any borrowed employee argument whatsoever. The motion is therefore non-responsive to the theory of liability at issue in this case.**

Plaintiffs' complaint is explicit in alleging that "Defendant Pitfield was the borrowed employee of" Westgate. R. Doc. 1 at ¶ 27; s*ee also id*. at ¶ 63. The pleadings further show that Westgate is aware that the "borrowed employee" doctrine is Plaintiffs' theory of the case against Westgate. For example, Westgate's second affirmative defense is that the circumstances "do not support a claim under a theory of vicarious liability, borrowed employee, or premises liability." R. Doc. 10 at 1.  And the memorandum in support of Westgate's motion for summary judgment specifically notes that "according to Plaintiffs," Defendant Pitfield "was 'acting as an agent, servant, and <u>borrowed employee</u>" of Westgate R. Doc. 138-2 at 2 (emphasis added).

6

This is reflected in JPSO's policies, which describe paid detail work as "employment" by a business. Ex. I (JPSO SOP-11 at 1). That policy, which Westgate required Pitfield to follow (Ex. 138-1 at Material Fact No. 11), says that it "is very important for each member working paid details to clearly understand that private details are 'private employment.'" Ex. I at 4.

But strangely, despite acknowledging Plaintiffs' theory of liability in its memo, Westgate does not engage in any borrowed servant analysis at all. It only analyzes the Westgate-Pitfield relationship for whether it was an employment or independent contractor relationship. R. Doc. 138-2. The two cases that Westgate primarily relies on, *Duronslet* and *Trichell*,[5] do not address the borrowed servant doctrine at all – they deal only with the employee/independent contractor issue. But Plaintiffs have never alleged that Pitfield was an employee of Westgate. As a result, Westgate's motion is not responsive to the theory of liability articulated by Plaintiffs' complaint.

Furthermore, *Duronslet* and *Trichell* are distinguishable from the facts here. In *Duronselet*, the relevant parties signed a contract specifying that neither the company providing special detail officers to Walmart "nor any of its employees or agents may be considered [Walmart]'s agents or employees for any purpose and have no authority to act or purport to act on [Walmart]'s behalf." *Duronslet, supra,* at 1142. There is no such contractual term here.

*Trichell* dealt with a "courtesy officer" who lived at an apartment complex and was provided with a monthly rent credit in exchange for being on-call generally and checking on the property "on a random basis." *Trichell, supra,* at 861. The courtesy officer in *Trichell* did not declare the rent credit as income, nor did he inform his police department about the arrangement. *Id.* That is very different than the Westgate-Pitfield relationship, in which Westgate paid Pitfield directly by the hour, with the knowledge and consent of JPSO.

Thus, because Westgate's motion does not engage with the theory of liability at issue in the

---

[5] *Duronslet v. Wal-Mart Stores, Inc.*, 2022-0019 (La. App. 4 Cir. 7/27/22), 345 So.3d 1136; *Trichell v. McClure*, 2021-1240 (La. App. 1 Cir. 4/8/22), 341 So.3d 856.

case, and because Westgate's own cases are distinguishable, Westgate's motion should be denied.

**C. Westgate's motion should be denied because a reasonable jury could find that Pitfield was a borrowed employee of Westgate.**

Because Westgate's motion does not engage in any borrowed-employee analysis, it is not strictly necessary for Plaintiffs to conduct that analysis to defeat summary judgment. But it may be helpful to the Court to briefly note that the large majority of the nine borrowed-employee factors weigh in favor of finding that Pitfield was a borrowed employee of Westgate. This suggests that a reasonable jury could conclude that Pitfield was the borrowed employee of Westgate. The factors are as follows:

(1) <u>Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?</u>

This factor is mixed. According to Westgate's 30(b)(6) representative, Westgate could pick the times and location of work for Pitfield. Ex. A (Westgate 30(b)(6) dep.) at 25:7-10 ("Q. All right. Now, so you had the right to select the times and to confine the location to the Westgate Mall, correct? A. Correct."); Ex. E (Canatella Dep.) at 14:20-21 (Westgate tells us what hours they want us to work.") But Westgate did not specifically set policies for Pitfield's work, other than adopting JPSO's policies. *Id*. at 25.

(2) <u>Whose work is being performed?</u>

This factor weighs in favor of Pitfield as a borrowed employee. According to Westgate's 30(b)(6) representative, the private detail work was "for the benefit of Westgate, Victory, and the tenants" of the mall. Ex. A at 34:3-9. Officers like Pitfield "weren't to do other work for other people" while on shift at the Westgate mall. *Id.* at 20:13-16. According to Pitfield, his role was "patrolling the Westgate Shopping Center." Ex. B at 95:19-20. He agreed that when he was on a Westgate shift, he was "working during those hours for Westgate." *Id*. at 99:11-12. See also Ex. E (Canatella Dep.) at 27:18-28:2 ("So you are working for money, for Westgate, on their property to enforce the laws and to make sure there is not crime occurring on the Westgate or Victory premises, correct? . . .

8

Yes.")

    (3)    <u>Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?</u>

This factor weighs in favor of Pitfield as a borrowed employee. According to Westgate's 30(b)(6) representative, when Westgate bought the shopping center, it reached agreement with the special detail coordinator to have JPSO deputies provide security. Ex. A (Westgate 30(b)(6) dep.) at 17:23-18:15. The representative specifically testified that there was "an agreement or understanding between the Victory and Westgate and Mr. Canatella about what was to be done". *Id*. at 36:7-16. *Cf. Musa v. Litton–avondale Indus. Inc*., 63 So.3d 243, 247 (La. App. 2011) ("a formal agreement between the two employers is not considered indispensable").

    (4)    <u>Did the employee acquiesce in the new work situation?</u>

This factor weighs in favor of Pitfield as a borrowed employee. Pitfield chose to do private detail work like at Westgate. Ex. B at 27:9-121. He could accept the work if he was interested or not. *Id*. at 35:5-7.

    (5)    <u>Did the original employer terminate his relationship with the employee?</u>

This factor weighs in favor of Pitfield as a borrowed employee. Pitfield remained as a reserve deputy for JPSO when he did private detail work for Westgate and, thus, Westgate simply borrowed Pitfield from JPSO to allow a uniformed officer to provide a police presence of the property to provide security for Westgate. *See* Ex. B at 24:10-16.

    (6)    <u>Who furnished tools and place for performance?</u>

This factor is mixed. Westgate provided the place for performance and a cell phone. Ex. A at 25:20-25. JPSO provided the uniform, gun, and vehicle.

    (7)    <u>Was the new employment over a considerable length of time?</u>

This factor weighs in favor of Pitfield as a borrowed employee. Pitfield worked a special detail at Westgate for approximately four years. Ex. B at 100:18 to 101:4. *Cf. Mays v. Dir*., 938 F.3d

9

637, 646 (5th Cir. 2019) (a 30 or 90 day period was neutral; a seven year period weighed in favor of borrowed servant status).

(8)  Who had the right to discharge the employee?

This factor weighs in favor of Pitfield as a borrowed employee. Westgate's 30(b)(6) representative confirmed that Westgate had the power to "discharge" Pitfield. Ex. A at 33 ("Q. You had the power to discharge Pitfield if you wanted to, correct? . . . THE WITNESS: Yes."); *see also* Ex. A at 32:20-24 ("Q. Okay. What I'm saying is, if there's something that they're doing that you don't think is correct, you can have them removed? A. Yes."). Pitfield agreed. Ex. B at 100:6-8 ("Q If Westgate had wanted someone other than Chad Pitfield, could they have told that to the special detail scheduler? A Absolutely. Q And they would have gotten someone other than Chad Pitfield? A Sure.") *Cf. Mays, supra*, at 646 (this factor asks whether the borrowing employer could remove the borrowed employee from their premises).

(9)  Who had the obligation to pay the employee?

This factor weighs in favor of Pitfield as a borrowed employee. Pitfield was paid by check directly from Westgate to him. Ex. B at 38:4-8 ("Q So you would receive a check periodically from Westgate directly to you for whatever number of hours times your hourly rate? A Correct"). *Cf. Mays, supra,* at 646 (analyzing this factor in terms of whether employee paid directly and whether by hours).

Because almost all of the factors weigh in favor of Pitfield being a borrowed employee of Westgate, a reasonable jury could reach that conclusion. And so the motion should be denied.

**D.     Westgate's motion should be denied because it relies on disputed facts – particularly Westgate's idea that Pitfield did not injure E.P.**

In order to prevail on summary judgment, the moving party must "demonstrate the absence of any genuine issue of material fact."[6]

Here, Westgate has failed to demonstrate the absence of any genuine issue of material fact. Westgate relies on several material facts which Plaintiff has evidence to dispute, including facts about the instructions Westgate gave to private detail officers (Material Facts No. 7, 8, and 12), about whether E.P. was calm the entire time Pitfield restrained him (Material Fact No. 18), and about whether there was any indication that "E.P. was having respiratory issues before Defendant Pitfield was replaced" (Material Fact No. 21).

Furthermore, Westgate's memorandum argues that "it is undisputed that the private security detail's actions were not a cause-in-fact of E.P.'s injuries." R. Doc. 138-2 at 11. Westgate supports that idea with deposition testimony from Plaintiffs that Pitfield did not use a chokehold on E.P. and that E.P. was calm while Pitfield was on top of him. *Id.* at 13. Westgate concludes that "Defendant Pitfield did not have E.P. in a chokehold, and that E.P. was calm – thus unharmed – at the time that Defendant Pitfield ceased to be involved." *Id.*

But Westgate provides no citation to authority – or even common sense – for the premise that someone is calm, they must necessarily be unharmed. And in its Answer, Westgate <u>denied</u> that E.P. was calm when Pitfield was on top of him. *Compare* R. Doc. 1 at ¶ 168 ("In the moments before Vega switched places with Pitfield, E.P. was 'calm' and 'everything was fine.'") *with* R. Doc. 10 at pg. 3 (denying paragraph 168).

More importantly, Plaintiffs are not suing Westgate because Pitfield used a chokehold. They are suing because the 308-pound Pitfield placed E.P. facedown, in a prone position, and sat on top of him. *See* R. Doc. 1 (Complaint) at ¶ 76 ("Pitfield remained seated on E.P.'s back, with E.P. in a

---

[6] *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2552 (1986).

11

prone position, face down on the hard surface of the parking lot, for approximately seven minutes, from 1:29:15 p.m. to approximately 1:36:02 p.m.")

The coroner concluded that "Prone Positioning" – which Pitfield implemented – was a contributing factor in E.P.'s death. Ex. C (Coroner's Report) at 2. At deposition, Dr. Dana Troxclair of the Jefferson Parish Coroner's Office was asked "had they not had him in the prone position, you're your opinion that he wouldn't have died?" Dr. Troxclair responded "Most likely not, correct." Ex. H (Troxclair Dep.) at 58:2-5; *see also id*. at 64:24-65:2 ("Q. So getting back to where the rubber meets the road, without the prone restraint, he wouldn't die that day? A. Most likely not, yes.")

And the problems with that positioning presented themselves while Pitfield was still restraining E.P. Plaintiffs' expert Dr. Kris Sperry will testify that E.P. showed "evidence of oxygen deficiency" while Pitfield was on top of him. Ex. F at 4. (Indeed, E.P.'s calmness was a sign of oxygen deficiency – not proof of the absence of injury like Westgate implies.) Pitfield's period of pressure on E.P.'s back is part of what Dr. Sperry concludes "culminated in the evolution of a lethal cardiac arrhythmia, which was fatal." *Id*. at 11. Plaintiffs' expert Jeff Noble will similarly opine that E.P.'s movements while Pitfield was on him were "likely being done to help the subject to breathe." See Ex. G at ¶ 61(d).

Thus, it is far from "undisputed" that Pitfield caused E.P. no injury. Pitfield's actions were a contributing cause in E.P.'s death. Both the Jefferson Parish Coroner and Plaintiffs' expert reach that conclusion. Just because Pitfield was not on top of E.P. at the exact moment of E.P.'s death does not mean he did not contribute to the death. Westgate's motion should be denied.

### III.   CONCLUSION

Plaintiffs ask that this Court deny Westgate's motion for summary judgment.

RESPECTFULLY SUBMITTED,

Andrew C. Clarke (TN BPR # 15409)
The Cochran Firm Midsouth
One Commerce Square, Suite 1700
(901) 523-1222 (Telephone)
aclarke@cochranfirmmidsouth.com

*/s/ William Most*
WILLIAM MOST (BPR # 36914)
Most & Associates
201 St. Charles Ave., Ste. 114 #101
New Orleans, LA 70170
Tel: (504) 509-5023
williammost@gmail.com