UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| DONNA LOU, ET AL. | * | CIVIL ACTION NO. 21-80 |
| --- | --- | --- |
| VERSUS | * | SECTION "D" (2) |
| SHERIFF JOSEPH P, LOPINTO, III, ET AL. | * | Judge Wendy B. Vitter<br>Magistrate Judge Donna P. Currault |

**Plaintiffs' Response to Westgate's Statement of Material Facts**

| # | Plaintiffs' Material Facts | Westgate's Response |
| --- | --- | --- |
|  | Chad Pitfield weighed about 308 pounds when he restrained E.P.[1] |  |
|  | Chad Pitfield placed E.P. in the prone position. |  |
|  | Chad Pitfield's placement of E.P. in the prone position was a contributing cause of E.P.'s death.[2] |  |
|  | While on shift hours, Pitfield was "working during those hours for Westgate."[3] |  |
|  | Westgate had the power to discharge Pitfield from working for Westgate.[4] |  |
|  | Westgate paid Pitfield by writing checks directly to him.[5] |  |
| # | **Westgate's Material Facts (R. Doc. 138-1)** | **Plaintiffs' Response** |
| 1 | Plaintiffs Donna Lou and Daren Parsa filed their Complaint on January 14, 2021, in which they allege that their 16-year-old child, E.P., who was severely autistic, died while in the custody and care | Undisputed. |

---

[1] Ex. B (Pitfield Dep.) at 176:4.
[2] Ex. C (Coroner's Report) at 2.
[3] Ex. B at 99:11-12.
[4] Ex. B at 100:6-8 ("Q If Westgate had wanted someone other than Chad Pitfield, could they have told that to the special detail scheduler? A Absolutely. Q And they would have gotten someone other than Chad Pitfield? A Sure.")
[5] Ex. B at 38:4-8 ("Q So you would receive a check periodically from Westgate directly to you for whatever number of hours times your hourly rate? A Correct").

1

| | | |
|---|---|---|
| | of Jefferson Parish Sheriff's Office (JPSO) deputies while in the parking lot of the Westgate Shopping Center. | |
| 2 | According to Plaintiffs, Moving Defendants "hired, authorized and/or provided security officers for its tenants, customers and visitors," and that DPSO Deputy Chad Pitfield ("Defendant Pitfield") was a member of the security team. | Undisputed. |
| 3 | Plaintiffs allege that Defendant Pitfield was a JPSO Reserve Deputy who was assigned to the crime scene for JPSO and who was working "off-duty" / "public assignment" on Moving Defendants' property at the time of the incident. | Undisputed that Plaintiffs allege that Pitfield was a JPSO Reserve Deputy working a private detail on Moving Defendants' property at the time of the incident. |
| 4 | In the "Causes of Action" section of their *Complaint*, Plaintiffs bring one count against Moving Defendants: "Violation of Louisiana Constitution and State Law," under which the only allegation involving Moving Defendants is that Moving Defendants "[are] liable for the actions and omissions of Defendant Pitfield, as stated herein, in his capacity as working a 'special detail' on 'public assignment' on the premises of the Westgate Shopping Center, and acting in the course and scope of his employment or agency, at all relevant times herein." | Undisputed that that is the one count against Moving Defendants.<br><br>Undisputed that that is the only allegation <u>in that section</u> that references Moving Defendants by name. There are, however, a number of specific allegations about Moving Defendants in the 456 paragraphs prior to that section. |
| 5 | The *Complaint* contains no factual allegation that Moving Defendants were directly negligent in any way. | Undisputed. |
| 6 | Moving Defendants had no regular meetings with the private security detail and had never had a discussion with Defendant Pitfield. | Undisputed. |
| 7 | Moving Defendants did not require security to write any type of reports. | **Disputed**. Westgate required security to follow JPSO procedures while on-site,[6] and JPSO procedures required security to write reports.[7] |

---

[6] Ex. D (Westgate Discovery Responses) at pg. 5 ("Utilize training and procedures provided by the Jefferson Parish Sheriff's Office while on-site to serve and protect the patrons and tenants of Westgate Shopping Center.")

[7] Ex. E (Canatella Dep.) at 34:21-25 ("It's the detail officer's responsibility to write all necessary reports at his detail to include incidents in the parking lot which is owned by the business.")

| | | |
|---|---|---|
| 8 | The only instruction Moving Defendants gave to the private security detail was that they were to "have an officer present on the parking lot for specified periods of time to where they were protecting the patrons and the tenants of the Westgate Shopping Center." | **Disputed.** According to Westgate's discovery responses, the scope of work was to: "Be a prescence [*sic*] on-site during peak hours. Answer calls from tenants and respond if tenants have any security issues. Utilize training and procedures provided by the Jefferson Parish Sheriff's Office while on-site to serve and protect the patrons and tenants of Westgate Shopping Center."[8]<br><br>Thus, the private detail had to do more than just be present – they had to answer and respond to calls from tenants. |
| 9 | Moving Defendants never received a security plan or proposal from JPSO and Moving Defendants never developed a security plan themselves. | Undisputed. |
| 10 | Apart from a cell phone, Moving Defendants' private security detail used its own uniform, weapon, vehicle, and tools. | Undisputed. |
| 11 | The policies and procedures which Defendant Pitfield was supposed to follow in his role doing private detail work for customers were the policies and procedures he was trained on by JPSO. | Undisputed. |
| 12 | Moving Defendants had no policies, rules, or regulations of any type with which the security detail was required to comply. | **Disputed**. Westgate gave the private detail officers a cell phone and required them to "[a]nswer calls from tenants and respond if tenants have any security issues."[9] |
| 13 | As for location, Moving Defendants only instructed its private security detail to patrol the property. | Undisputed. |
| 14 | When called to the incident at issue, Defendant Pitfield was not "under any general directive or protocol provided by Westgate," was "at [his] discretion as a reserve deputy officer to respond to that incident," and in that moment would follow his JPSO training. | Undisputed. |

---

[8] Ex. D at 5.
[9] Ex. D at 5.

3

| | | |
|---|---|---|
| 15 | Moving Defendants provided no training to its security officers and Defendant Pitfield had no conversations with Moving Defendants following the incident at issue. | Undisputed. |
| 16 | The methods used by the security officers were to be the same methods they used as on-duty police officers. | Undisputed. |
| 17 | Moving Defendants' private security guards were expected to use their professional judgment gathered from their experience as police officers. | Undisputed. |
| 18 | E.P had been calm during the time that Defendant Pitfield was involved with his restraint. | **Disputed.** E.P. was calm at certain points, and not calm at other points. According to Pitfield, E.P. bit him in the leg. Ex. B at 121:16-17.<br><br>In its Answer, <u>Westgate</u> denied that E.P. was calm when Pitfield was on top of him. *Compare* R. Doc. 1 at ¶ 168 ("In the moments before Vega switched places with Pitfield, E.P. was 'calm' and 'everything was fine.'") *with* R. Doc. 10 at pg. 3 (denying paragraph 168). |
| 19 | At the time Defendant Pitfield was replaced in the restraint of E.P., there was nothing about E.P's situation that caused Donna Lou concern for things like need for CPR, and Defendant Pitfield did not have E.P. in a chokehold. | Undisputed that E.P. was still breathing at that moment and did not need CPR in that moment. |
| 20 | When Defendant Pitfield was replaced in the restraint of E.P., Plaintiff Donna Lou was still holding his hand and she wouldn't be able to hold his hand unless E.P. was calm at that point. | Undisputed that Daren Parsa indicated that in his deposition. |
| 21 | There was no indication that E.P. was having respiratory issues before Defendant Pitfield was replaced. | **Disputed.** E.P.'s actions during Pitfield's restraint were indicative that he was having trouble breathing. Plaintiffs' expert Dr. Kris Sperry will opine that while E.P. "made certain movements while being restrained by Pitfield, it is my opinion that these movements were not willful, active resistance or efforts to harm the officers, but behavioral manifestations of his autism and <u>evidence of oxygen deficiency</u> which was resulting |

4

|  |  | from his continuous and prolonged restraint." Ex. F at 4 (emphasis added).<br><br>Plaintiffs' expert Jeff Noble will similarly opine that E.P.'s movements while Pitfield was on him were "likely being done to help the subject to breathe." See Ex. G at ¶ 61(d).<br><br>Furthermore, the prone restraint itself, especially combined with E.P. and Pitfield's obesity, was indicative of risk of respiratory issues. See *id*. at ¶ 53 ("Here, there is overwhelming evidence that the members of the JPSO were trained in positional asphyxia and knew that maintaining an individual in a prone position could impact their ability to breathe."); Ex. F at pg. 9 ("In an obese individual who is restrained in a prone position, the impairment of adequate respiratory oxygen and carbon dioxide exchange causes upward displacement of the obese abdomen against the diaphragm and thorax, such that inspiratory and expiratory excursion is diminished.") |
|---|---|---|

RESPECTFULLY SUBMITTED,

Andrew C. Clarke (TN BPR # 15409)
The Cochran Firm Midsouth
One Commerce Square, Suite 1700
(901) 523-1222 (Telephone)
aclarke@cochranfirmmidsouth.com

*/s/ William Most*
WILLIAM MOST (BPR # 36914)
Most & Associates
201 St. Charles Ave., Ste. 114 #101
New Orleans, LA 70170
Tel: (504) 509-5023
williammost@gmail.com

5