UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


DONNA LOU and DAREN PARSA, on their
own behalf and on behalf of their
deceased minor child, E.P.
    Plaintiffs           CIVIL ACTION NO. 2:21-cv-00080

v

SHERIFF JOSEPH P. LOPINTO, III, CHAD
PITFIELD, RYAN VAUGHT, STEVEN
MEHRTENS, SHANNON GUIDRY, NICK
VEGA, MANUEL ESTRADA, MYRON
GAUDET,JOHN DOES 1-3, VICTORY
REAL ESTATE INVESTMENTS LA, LLC
and WESTGATE INVESTORS NO LLC
D/B/A WESTGATE SHOPPING CENTER,
ABC INSURANCE COMPANY, and XYZ
INSURANCE COMPANY
    Defendants


    30(b)(6) DEPOSITION OF VICTORY REAL ESTATE

INVESTMENTS LA, LLC and WESTGATE INVESTORS NO

LLC D/B/A WESTGATE SHOPPING CENTER, through its

designated representative, GINA CHRISTOPHER,

given in the above-entitled cause, pursuant to

the following stipulation, before Raynel E.

Schule, Certified Shorthand Reporter in and for

the State of Louisiana, at the Law Offices of

Thompson, Coe, Cousins & Irons, 601 Poydras

Street, Suite 1850, New Orleans, Louisiana,

70130, commencing at 10:00 o'clock a.m., on

Wednesday, the 6th day of July, 2022.

```
 1                    I N D E X
 2                                      Page
 3   Caption                            1
 4   Appearances                        3
 5   Agreement of Counsel               4
 6   Examination
 7        MR. CLARKE    5
 8        MR. ZIBILICH               45
 9   Reporter's Certificate            47
10
11                 EXHIBIT INDEX
12   EXHIBIT 1        6
13   EXHIBIT 2        8
14   EXHIBIT 3        9
15   EXHIBIT 4        9
16   EXHIBIT 5        9
17   EXHIBIT 6        9
18   EXHIBIT 7         11
19   EXHIBIT 8         11
20
21
22
23
24
25
```

```
1   APPEARANCES:
2
    For the Plaintiffs:
3
    THE COCHRAN FIRM MIDSOUTH
4   Attorneys at Law
    BY:  ANDREW C. CLARKE, ESQ.
5   One Commerce Square, Suite 1700
    Memphis, Tennessee  38103
6
7   For Victory Real Estate Investments La, LLC,
         Westgate Investors No LLC, and
8        Westgate Shopping Center:
9   THOMPSON, COE, COUSINS & IRONS, LLP
    Attorneys at Law
10  BY:  MARK A. HILL, ESQ.
         CHRISTOPHER W. KAUL, ESQ.
11  601 Poydras Street, Suite 1850
    New Orleans, Louisiana  70130
12
13  For Jefferson Parish Sheriff's Office
         Defendants:
14
    MESSRS. MARTINY & ASSOCIATES
15  Attorneys at Law
    BY:  FRANZ ZIBILICH, ESQ.
16  131 Airline Drive, Suite 201
    Metairie, Louisiana   70011
17
18  Also Present:  Tate Clarke
19
    Videographer:  Jordan LaFrance
20               Depo-Vue, Inc.
21
    Reported By:  Raynel E. Schule
22               Certified Shorthand Reporter
                 State of Louisiana
23
24
25
```

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

S T I P U L A T I O N

It is stipulated and agreed by and among Counsel for the parties hereto that the 30(b)(6) DEPOSITION OF VICTORY REAL ESTATE INVESTMENTS LA, LLC and WESTGATE INVESTORS NO LLC, D/B/A WESTGATE SHOPPING CENTER, through its designated representative, GINA CHRISTOPHER, is hereby being taken pursuant to the Federal Rules of Civil Procedure for all purposes in accordance with law;

That the formalities of reading and signing are specifically waived;

That the formalities of sealing, certification, and filing are hereby specifically waived.

That all objections, save those as to the form of the question and responsiveness of the answer, are hereby reserved until such time as this deposition or any part thereof is used or sought to be used in evidence.

* * * * *

Raynel E. Schule, Certified Shorthand Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

1       GINA CHRISTOPHER, having been first
2       duly sworn by Raynel E. Schule, was examined
3       and testified on her oath as follows:
4                       EXAMINATION
5   BY MR. CLARKE:
6   Q.   Would you please state your name for the
7       record.
8   A.   Gina Christopher.
9   Q.   And Ms. Christopher, my name is Andy
10      Clarke.  I'm a lawyer.  I represent the
11      Parsas in a lawsuit that has been filed
12      against numerous defendants including
13      Victory Real Estate and Westgate Investors.
14      Have you ever given a deposition before?
15  A.   Yes.
16  Q.   Okay.  Well, you know the rules some, but
17      let's just go over a couple of them just to
18      make sure we communicate and have a good
19      record, all right?
20  A.   Okay.
21  Q.   Obviously, your testimony is under oath,
22      you know, subject to the penalty of
23      perjury.  You understand that?
24  A.   Yes.
25  Q.   Okay, and a lot of times when you get in a

```
 1        conversation, people seem to anticipate
 2        when somebody is questioning, and they
 3        start to answer before it's completed.  If
 4        we can let each other finish the question
 5        and the answer that will be helpful to the
 6        court reporter and the videographer, okay?
 7   A.   Okay.
 8   Q.   Obviously, this isn't a memory contest.
 9        There has been some discovery, some written
10        discovery that has been served in this
11        case.  If you need to refer to any of that
12        during the time, let me know, and depending
13        on the nature of the question, I'll see if
14        I can get that for -- for you, okay?
15   A.   Okay.
16   Q.   All right, and have you seen the Notice to
17        take deposition that was filed in -- that
18        was served on your attorney in this case?
19         I'm going to show you what I'm marking as
20        "Exhibit 1."  (Counsel hands document to
21        witness.)
22   A.   Yes, I have.
23   Q.   Okay, and when you've given depositions
24        before, were they in your capacity as a
25        corporate representative or a fact witness
```

```
 1       or do you know?
 2   A.   Corporate.
 3   Q.   Okay.  So you understand and -- and we have
 4       provisions under the Rules of Procedure
 5       that when we sue an entity because an
 6       entity can't speak, you know, they can
 7       designate somebody who they believe for the
 8       defendant or the -- the person or the
 9       entity that has the most knowledge on the
10       topics that are listed.
11   A.   Yes.
12   Q.   And is that your understanding that you
13       have gone through this or your company has
14       gone through this, and you are prepared to
15       testify as to the -- the items listed in
16       the Notice?
17   A.   Yes, sir.
18   Q.   All right, and did you do anything to
19       prepare yourself other than speak with your
20       lawyer?
21   A.   No.
22   Q.   Okay.  Now, during the course did you
23       review any documents, any of your discovery
24       responses, any -- anything to prepare
25       yourself?
```

```
1    A.   Yes.
2    Q.   Okay.  What did you prepare?  What did you
3         review?
4    A.   The Interrogatories plus the requests for
5         documentation.
6    Q.   Okay.  Well, I'm -- I'm just going to make
7         these an exhibit so you can have them in
8         front of you.  What I'm going to do is mark
9         as "Exhibit No. 2" and show this to you.
10        It's a copy of --
11                   MR. ZIBILICH:
12                   If you don't mind just saving me
13             a stack.  I'll just get the whole
14             stack at the end.  Thanks.
15                   THE WITNESS:
16                   Yes.
17   BY MR. CLARKE:
18   Q.   Okay, and I'm just going to -- you keep
19        those in front of you because we may need
20        to refer to them and attached to --
21                   MR. ZIBILICH:
22                   What is "Exhibit 2"?
23                   MR. CLARKE:
24                   "Exhibit 2" is the Westgate's and
25             Victory Real Estate's Responses to
```

```
 1              our first discovery requests.
 2    BY MR. CLARKE:
 3    Q.  All right, and attached as an exhibit to
 4        the discovery responses was an email from
 5        Mr. Canatella, which I'm going to mark as
 6        "Exhibit No. 3" and see if you've seen
 7        this.  (Counsel hands document to witness.)
 8    A.  Yes.
 9    Q.  Okay, and in this case, there were some
10        supplemental discovery responses that were
11        provided, which were a -- additional
12        responses to certain questions after I had
13        conversations with your lawyer.  I'm going
14        to mark those as "Exhibit No. 4," and there
15        were attachments to these, which I'm going
16        to mark as "Exhibit No. 5."
17                  MR. HILL:
18                  So No. 4 is the Supplemental
19              Answers and No. 5 --
20                  MR. CLARKE:
21                  No. 4 is the Supplemental
22              Answers.  No. 5 is the emails --
23                  MR. HILL:
24                  Emails with the supplement?
25                  MR. CLARKE:
```

```
 1              Emails with the supplement, and
 2         there's a second -- there were two
 3         separate files.  So 4, 5, and 6 are
 4         going to be the Supplemental
 5         Answers.
 6              MR. ZIBILICH:
 7              What exactly is 6?
 8              MR. CLARKE:
 9              I'm -- I'm going to explain it to
10         you.  4 is the actual written
11         Discovery Responses.  5 is a set of
12         emails, and 6 is another set of
13         emails.  They were produced in three
14         files.
15              MR. ZIBILICH:
16              You can tell how old a lawyer is
17         by whether or not they have a
18         computer or a legal pad.
19              MR. CLARKE:
20              What if you have both?
21              MR. ZIBILICH:
22              Then you -- then you get to be
23         you.
24              MR. KAUL:
25              I used to only take notes, but
```

```
 1                I've transitioned lately.
 2                    MR. ZIBILICH:
 3                    Dinosaur.
 4                    MR. KAUL:
 5                    Yeah, I know.  I prefer the notes
 6                too, but then when I'm going to do
 7                the report letters, it's easier.
 8                    MR. ZIBILICH:
 9                    I got a letter to change to this
10                way, but I'm not.
11   BY MR. CLARKE:
12   Q.   Okay.  You've -- you've reviewed those?
13   A.   Yes.
14   Q.   Okay, and finally this morning your
15        attorney provided it looks -- these look
16        like printouts of what -- what has been
17        paid to Pitfield and to Canatella and the
18        invoices.  "Exhibit No. 7" will be the
19        history for Pitfield, and "Exhibit No. 8"
20        will be the history for Canatella.
21        (Counsel hands document to witness.)
22   A.   Yes.
23   Q.   Okay.  All right.  Tell me -- well, let's
24        just get some background.  How long have
25        you worked for -- or who are you employed
```

```
1        by?
2   A.   Victory Real Estate Investments.
3   Q.   Okay, and what is the relationship between
4        Victory Real Estate and Westgate?
5   A.   Victory Real Estate Investments is the
6        owner of the Westgate Investors LL --
7        Westgate New Orleans Investors, LLC, which
8        is the entity for Westgate Shopping Center.
9   Q.   Okay, and -- and does West -- Westgate
10       Investors New Orleans -- NO LLC, do they
11       own any other -- any other or run any other
12       property other than the Westgate Mall?
13  A.   Not that entity, no.
14  Q.   Okay.  So Victory Real Estate, do they own
15       a number of other properties that are run
16       by other entities that are somehow
17       affiliated?
18  A.   Victory Investments owns and manages
19       numerous other individual entities.
20  Q.   And the -- the manner in which they run the
21       other or own or deal with the other
22       entities is on a specific case-by-case
23       basis?
24  A.   Yes.  I mean, it's -- it's an individual
25       entity.
```

```
1    Q.   Okay, and you are employed by Victory?

2    A.   I am.

3    Q.   Okay, and who -- who is in charge of

4         Westgate?

5    A.   Victory Real Estate Investments.

6    Q.   Okay.  Are they the same Board of

7         Directors, same -- same owners, same

8         corporate officers and everything?

9    A.   Yes.

10   Q.   Okay.  Now, how long has Victory owned the

11        Westgate Mall?

12   A.   Since 2006.

13   Q.   Okay, and the basic questions in this

14        deposition deal with security, so I mean,

15        we're not really worried about the business

16        affility -- the business affiliations of

17        it.  So if we go to the Notice, if you want

18        to just have it, I'm -- I'm just going to

19        make this easy.  We're going -- we're going

20        to go down a list.  And since 2006, have

21        they always had security at the property?

22   A.   Yes.

23   Q.   Okay, and has the security changed over

24        times?

25   A.   Not the -- it's still Jefferson Parish
```

```
 1        Sheriff's off duty, but the off-duty --
 2        duty officers have changed on occasion.
 3   Q.   Okay.  So explain to me how Victory or
 4        Westgate first obtained security services
 5        at the -- at the Westgate Shopping Center.
 6   A.   When we purchased the security from the
 7        previous -- or purchased the shopping
 8        center from the previous owner, the
 9        security came along with it.
10   Q.   Okay, and what was your understanding that
11        the security was?
12   A.   New Orleans or Jefferson Parish Sheriff's
13        Officers.
14   Q.   Okay, and -- and how was -- was there a
15        contract?
16   A.   No.
17   Q.   Okay.  How were the -- what were the terms
18        of the security services that were to be
19        provided?
20   A.   The same services that were being provided
21        to the previous owner.
22   Q.   Okay.  Were --
23   A.   Which --
24   Q.   Which were what?
25   A.   Security services.
```

 1    Q.   Okay.  Did they -- what did you expect them
 2         to do?
 3    A.   Basically patrol the property, make sure
 4         that the patrons were safe, make sure that
 5         the tenants were safe, keep the shopping
 6         center safe.
 7    Q.   Okay, and how do you -- how do you go about
 8         -- you know, how do you know how much --
 9         how much security you needed?
10    A.   We absorbed the security exactly as it was
11         previously needed.
12    Q.   Okay.  Did you do any safety analysis or
13         any type of crime surveys to determine the
14         -- the need or the amount of security you
15         needed?
16    A.   No.
17    Q.   Okay, and the security services that are
18         provided, was there -- is there any
19         documentation, any communication as to, you
20         know, what is supposed to be provided for
21         what amount of pay?
22    A.   No.
23    Q.   No written contract, no oral contract?
24    A.   No.
25    Q.   All right.  Well, how do you -- how do you

```
 1        work --
 2                    MR. CLARKE:
 3                    What are you looking for?
 4                    MR. ZIBILICH:
 5                    I'm looking for a copy of the
 6             Notice.
 7                    MR. CLARKE:
 8                    Okay.
 9                    MR. ZIBILICH:
10                    That was missing.  I'm sorry.
11             That way I can keep a timer on you.
12                    MR. CLARKE:
13                    This isn't your -- this isn't
14             your time.
15                    MR. ZIBILICH:
16                    Still -- I'm still keeping the
17             timer.
18                    MR. CLARKE:
19                    All right.  Well, I'll -- we'll
20             go seven then.  When did we start?
21             If you want to be here for seven
22             hours, that will be fine.
23       BY MR. CLARKE:
24       Q.   I mean, how -- how does -- how does
25            security services work at Westgate?
```

```
 1   A.   When we purchased that property, I was
 2        approached by Donald Canatella, who is one
 3        of the security officers.  He explained to
 4        me basically how many days they week -- a
 5        week they worked, what shifts they covered,
 6        and would I like for him to continue
 7        scheduling that, and which I said yes.
 8   Q.   Okay.  What was the schedule?
 9   A.   The -- it was basically the same scheduling
10        that the previous owners had requested --
11   Q.   Okay.
12   A.   -- which was what was needed, they thought
13        was needed.
14   Q.   Okay.  So they made a recommendation that
15        when -- when Westgate --
16              MR. ZIBILICH:
17              Who's "they"?
18   BY MR. CLARKE:
19   Q.   When Westgate --
20              MR. ZIBILICH:
21              Who's "they"?
22   BY MR. CLARKE:
23   Q.   When -- when Westgate got a -- bought the
24        building, they were approached by Mr.
25        Canatella, who said we had previously
```

```
 1          provided security services at the -- at the
 2          Westgate Mall, and at -- this is the amount
 3          of security we were providing?
 4     A.   Correct.
 5     Q.   All right, and he asked would you -- would
 6          you like to continue that?
 7     A.   Correct.
 8     Q.   And you said yes?
 9     A.   Yes.
10     Q.   Okay.  What were the arrangements of -- you
11          know, did he talk about price?
12     A.   My understanding if I remember that
13          conversation was that it was the going rate
14          of whatever JSO required, which they set
15          that price.
16     Q.   Okay.  So it was a --
17                    MR. ZIBILICH:
18                    I'm ignorant.  What's JSO?
19                    THE WITNESS:
20                    Jefferson Parish Sheriff.
21                    MR. ZIBILICH:
22                    JPSO.
23                    THE WITNESS:
24                    JPSO.
25                    MR. ZIBILICH:
```

```
 1              I'm sorry.  I'm not trying to
 2          correct you.
 3                  THE WITNESS:
 4                  No, I'm not from here so --
 5                  MR. ZIBILICH:
 6                  That's okay.
 7                  THE WITNESS:
 8                  -- I forget.
 9  BY MR. CLARKE:
10  Q.   All right, and did you have to pay any type
11       of administrative fee to the JPSO?
12  A.   No.
13  Q.   All right.  So was it hourly?  Was it
14       weekly?  Was it monthly?
15  A.   Well, they're -- they're paid hourly, but
16       they get paid a check biweekly.
17  Q.   Okay.  All right.  So he came to you.  He
18       said we provide these services.  Do you
19       recall any of the services that he said he
20       was going to provide?
21  A.   Basic patrolling, keeping the shopping
22       center safe.
23  Q.   Okay, and was it for a -- you know, was --
24       was it done for a period of time?  For
25       example, if you have -- if you hire a
```

```
 1        security guard, they wouldn't patrol once
 2        an hour or would they be there a whole
 3        hour?
 4   A.   They're there for the term of their shift.
 5   Q.   Okay.  So if you -- if -- if they said we
 6        need -- you know, we -- we provided four
 7        hours of security service on Friday from
 8        8:00 to 12:00, then you expected them to
 9        have a Jefferson Parish Deputy on -- on the
10        actual location from 8:00 to 12:00,
11        correct?
12   A.   Yes.
13   Q.   All right.  So during that period of time,
14        they weren't to do other work for other
15        people, correct?
16   A.   No.
17   Q.   All right.  So that was kind of an assigned
18        -- now, did the assignments change or the
19        schedule change over time?
20   A.   It has -- yes, it -- it has changed
21        depending on if the needs that we needed
22        maybe moving forward.  If it was a holiday,
23        there would usually be a request from
24        Donald stating that Thanksgiving was coming
25        up, did we want to go ahead and do
```

1      additional details to provide, you know,

2      security coverage since it's -- it's a busy

3      time.

4  Q.  Right.

5  A.  And we would usually, yeah, change it for

6      that.

7  Q.  Okay, and -- and did it work both ways.  If

8      you knew of something that was going on on

9      the Westgate, you know, Shopping Center,

10     you know, they were having some type of

11     parade or something, you could ask Mr.

12     Canatella, say, we need more than one

13     security guard for this shift?

14  A.  Yes.

15  Q.  Okay.  So you had to -- you had to approve

16     whatever the changes were, whether there

17     would be more or less people, correct?

18  A.  Anything above their normal set schedule,

19     yes.

20  Q.  Okay.  I mean, do we even know what their

21     normal set schedule is?  That's what I'm

22     trying to figure out.

23  A.  It was Monday through Friday usually from

24     4:30 until 10:00.  Saturday was a split

25     shift, Saturday and Sunday from morning

```
 1        until 10:00 until maybe 2:00.  I believe
 2        they took a little bit of a break, and then
 3        the second shift was from 4:00 to 10:00,
 4        and the same work for Sunday.
 5   Q.   Okay.  All right, and who selected the
 6        actual officers to go out there?
 7   A.   The officers were scheduled through Donald
 8        Canatella per shift.
 9   Q.   Okay, and every one of those were you told
10        whether they were full-time officers,
11        reserve officers?
12   A.   I knew -- I knew nothing about their
13        schedule outside of whatever shift they
14        worked for us.
15   Q.   Okay, but your agreement was to have a -- a
16        licensed police officer, certified police
17        officer, correct?
18   A.   Correct.
19   Q.   All right.  Now, did you have -- and that
20        has been -- it has been that way since 2006
21        up 'til today?
22                  MR. HILL:
23                  I'm just going to object.  I
24             mean, your Notice limited it to five
25             years but --
```

```
 1                MR. CLARKE:

 2                Well, I --

 3                MR. HILL:

 4                -- you can answer.

 5                MR. CLARKE:

 6                I didn't -- I didn't mean to go

 7           outside.

 8                THE WITNESS:

 9                My understanding is Donald

10           Canatella has since retired.  I do

11           not know the date, but he is still

12           working an off-duty detail for us

13           per Jefferson Parish Sheriff.

14  BY MR. CLARKE:

15  Q.   Okay.  Do you ever have to speak with

16       anybody at Jefferson Parish Sheriff about

17       security detail?

18  A.   No.

19  Q.   Have you ever spoken to them?

20  A.   No.

21  Q.   Okay.  Do you know if Canatella when he

22       started this or within the last five years

23       was actually a -- an actual certified law

24       enforcement officer?

25  A.   He told me he was.
```

```
 1   Q.   Okay, and you said he's retired.  When did
 2        he -- do you know when he retired?
 3   A.   I don't remember the date.
 4   Q.   I mean, recently?
 5   A.   Within the last couple of years.
 6   Q.   Okay.  Do you know if he was retired on
 7        January 19th, 2020?
 8   A.   I do not remember.
 9   Q.   Okay.  What number do you call to schedule
10        your security or how do you communicate
11        with Canatella?
12   A.   I communicate with Donald Canatella through
13        his personal cell phone.
14   Q.   Okay.  All right.  What's that number?
15   A.   Right off -- it's -- it's programmed into
16        my phone.
17   Q.   All right.
18   A.   I honestly don't know it right off the top
19        of my head.
20   Q.   Okay.
21                  MR. CLARKE:
22                  Tate, write that down.
23                  MR. ZIBILICH:
24                  You're going to take his
25             deposition tomorrow.  Ask him.
```

```
 1              MR. CLARKE:
 2                 Well, I understand.  I got to
 3              understand what numbers she had.
 4              You've got -- you'll have your time
 5              to take depositions.
 6    BY MR. CLARKE:
 7    Q.   All right.  Now, so you had the right to
 8         select the times and to confine the
 9         location to the Westgate Mall, correct?
10    A.   Correct.
11    Q.   All right.  Did you have any policies or
12         any type of -- any type of rules or
13         regulations that the security -- that the
14         security detail had to comply with?
15    A.   No, we did not write policy for them.
16    Q.   Okay.  Did you have any policy -- you know,
17         are there any -- now, explain to me, did
18         you give them any equipment, any type of
19         tools to perform their job?
20    A.   They have a cell phone which is stored
21         during off-duty hours in the Academy
22         Sports.  Each officer picks it up prior to
23         their shift, and the tenants have that --
24         that phone number.
25    Q.   Okay.  So if somebody was scheduled to work
```

```
 1          tomorrow at 4:00, they go to Academy Sports
 2          at 4:00 o'clock; they go in; they get the
 3          -- the assigned cell phone that everybody
 4          knows, all the tenants know the number,
 5          correct?
 6     A.   Yes.
 7     Q.   All right.  Did you require security -- the
 8          security detail to write any type of
 9          reports?
10     A.   No.
11     Q.   All right.  I mean, were they not supposed
12          to notify you of incidents that occurred on
13          the premises?
14     A.   They notified us of anything that was
15          major, but nothing -- we didn't keep up
16          with reports.
17     Q.   Okay.  I mean, but did you even require
18          them?
19     A.   No.
20     Q.   Okay.  Did you have regular or any type of
21          regularly scheduled meetings with Mr.
22          Canatella about the security needs of the
23          Westgate Mall?
24     A.   No.
25     Q.   Okay.  Now, I think we have the invoices
```

```
 1          that -- that have been produced as Exhibit
 2          No. 6 or 7.  Were the -- all the security
 3          detail officers paid the same amount of
 4          money or were you -- how were you billed
 5          for them?
 6     A.   They were paid the same amount of money and
 7          just on their scheduled days of work per
 8          hour.  Some officers might have worked more
 9          than, say, four hours.  Some of them, if
10          the shift got shortened, you know, it may
11          have only been three hours, and then
12          sometimes during holidays, the pay was more
13          due to it being holiday pay.
14     Q.   Okay.  Well, what I'm saying is, like, we
15          have different invoices if you look at
16          Exhibit Nos. 6 and 7, I think your
17          attorneys has produced, and it says up at
18          the top, "History for Vendor."
19     A.   Huh-huh.
20     Q.   I don't know what you would call this
21          document, but it has a list of what was
22          paid, you know, Mr. Pitfield or Mr.
23          Canatella in both of these things.  You see
24          that?
25     A.   Correct.
```

```
 1   Q.    There is an invoice that -- that are
 2         attached to these things, right?
 3   A.    Correct.
 4   Q.    Okay.  Does Chad Pitfield submit this
 5         invoice to -- you know, it looks like
 6         there's different -- different properties
 7         that he worked at, but, you know, for
 8         Wilshire Plaza and Westgate Shopping
 9         Center?
10   A.    Donald Canatella submits the invoices to
11         me.
12   Q.    Okay.
13   A.    The officers are scheduled by him, and I
14         guess they submit their hours to him.
15   Q.    Okay.  So did you receive a copy of -- and
16         I don't know what Pitfield's one, the
17         smaller one is, is that Exhibit 7 or 6?
18   A.    7.
19   Q.    All right.  All right.  This invoice on the
20         first -- the first page after the -- the
21         summary has Chad Pitfield up at the top,
22         his address.  Did -- did Westgate or
23         Victory get a copy of this actual document?
24   A.    Yes.
25   Q.    Okay, and this was submitted to you by
```

```
 1        Donald Canatella?
 2   A.   Correct.
 3   Q.   All right.  So he would have his --
 4        whatever -- whatever invoices he had for
 5        the security officers -- the security
 6        officers that worked during that pay
 7        period, it would come as a package?
 8   A.   Correct.
 9   Q.   All right.  Were there other officers
10        besides Mr. Canatella and -- and Mr.
11        Pitfield who -- who worked security at
12        Westgate?
13   A.   Yes.
14   Q.   Okay.  Do you know how many different
15        officers worked there?
16   A.   It has changed over the years.  Sometimes
17        we have six or seven.  Sometimes some of
18        those move away, and we gain another one.
19   Q.   All right.  All right, and so there's no
20        contract between Canatella and Westgate?
21   A.   No.
22   Q.   There's no contract or agreement or
23        anything between Pitfield and Westgate or
24        Victory?
25   A.   No.
```

```
 1    Q.   All right.  Never received a security plan
 2         or proposal from Canatella?
 3    A.   No.
 4    Q.   Never had one performed yourself?
 5    A.   No.
 6    Q.   We went over the schedule of security as
 7         split -- split on the weekends and from
 8         8:00 -- what -- what is the schedule during
 9         the week again?
10    A.   Usually it is 4:00 to 10:00.  Sometimes it
11         varies when school is out.  It just depends
12         on what we have going on.
13    Q.   Right.  For example --
14    A.   But as a whole, it's mostly 4:00 to 10:00.
15    Q.   All right.  Now, does Victory or Westgate
16         have the ability to cancel or terminate the
17         security officers?
18    A.   Not the officers.  It would be the contract
19         with --
20    Q.   But there's no --
21    A.   -- JSO.  I mean, it is -- whatever we set
22         up with them.  I could call Donald and say,
23         we no longer want police officers to do the
24         security, that was would end it for us.
25     Q.  Right, but what I'm saying is, you could
```

```
 1        also call up Donald and say, I don't like
 2        Chad Pitfield; we don't want him at our --
 3        we don't want him at our --
 4   A.   I've never done that.
 5   Q.   I mean, you could?
 6   A.   I could, but not --
 7                 MR. HILL:
 8                 Object.
 9   BY MR. CLARKE:
10   Q.   Right.  I mean, the issue is you're saying
11        that would be -- you know, when I asked
12        you, you answered, and you said, well, you
13        know, that's not part of the contract.
14        There is no contract?
15   A.   It was -- that was just a response.
16   Q.   And -- and I understand.  I'm not trying to
17        be critical of you.  What -- what I'm
18        saying is, Victory doesn't have a contract.
19        They request people to be there for a
20        certain period of time, correct?
21   A.   Correct.
22   Q.   They give them a phone and a number of all
23        the tenants there in case they have a
24        security concern, correct?
25   A.   Correct.
```

```
 1   Q.   And if Victory doesn't want them there,
 2        they can tell them, you go home?
 3   A.   I could, yes.
 4   Q.   Okay, and if -- if Mr. -- if you got some
 5        kind of complaint about how security was
 6        being run -- for example, this is a
 7        hypothetical, they had a dep -- you know, a
 8        deputy out there doing a security detail,
 9        and you got a complaint that he was
10        harassing to young women.  You can call up
11        Canatella and have that officer removed or
12        to tell him not to speak with particular
13        female customers, correct?
14                   MR. HILL:
15                   I'm going to object, but you can
16              answer.
17                   THE WITNESS:
18                   Yes.
19   BY MR. CLARKE:
20   Q.   Okay.  What I'm saying is, if there's
21        something that they're doing that you don't
22        think is correct, you can have them
23        removed?
24   A.   Yes.
25   Q.   Okay.  Now, and -- and I think we've
```

```
 1        covered it, you provide the actual place
 2        where they work, which is the confines of
 3        the Westgate Shopping Center, correct?
 4   A.   Yes.
 5   Q.   You had the power to discharge Pitfield if
 6        you wanted to, correct?
 7                  MR. HILL:
 8                  Objection to form.
 9   BY MR. CLARKE:
10   Q.   You can answer.
11                  MR. ZIBILICH:
12                  You can answer.  That's -- he's
13             -- that's only the sixth time by the
14             way.
15                  MR. CLARKE:
16                  Right.
17                  THE WITNESS:
18                  Yes.
19   BY MR. CLARKE:
20   Q.   All right.  I may be done.
21                  MR. CLARKE:
22                  Hold on a second.  Let's go off
23             the record for a second.
24                  (Off the record.)
25   BY MR. CLARKE:
```

```
1    Q.   Okay.  It's Ms. Christopher, right?
2    A.   Yes.
3    Q.   I wanted to make sure.  I was going to call
4         you a different name.  Ms. Christopher, the
5         security services that you provided, would
6         you agree that they were for the benefit of
7         Westgate, Victory, and the tenants in the
8         park -- in the -- in the mall?
9    A.   Yes.
10                  MR. HILL:
11                  I'm going to object to form.
12                  THE WITNESS:
13                  Yes.
14   BY MR. CLARKE:
15   Q.   And because it's security, you understand
16        that the services could involve somebody
17        having to use force, which is why you hired
18        paid police officers, correct?
19                  MR. HILL:
20                  Object to form.
21                  You can answer.
22                  THE WITNESS:
23                  Yes.
24   BY MR. CLARKE:
25   Q.   All right, and -- and that -- and when they
```

```
 1          are on your property and on their assigned
 2          shift, that work is only to be performed
 3          for you, not for any other employer or any
 4          other person, correct?
 5                    MR. HILL:
 6                    Object to form.  Object to form
 7               to the extent you said employer but
 8               --
 9                    THE WITNESS:
10                    They work for me, but they also
11               work for the tenants.
12     BY MR. CLARKE:
13     Q.   Okay.  Well, the tenants, the -- I mean,
14          Westgate owns the mall.  They're there to
15          protect the -- the tenants in the mall,
16          which is part of what you provide to the
17          tenants when they lease properties,
18          correct?
19     A.   Yes.
20     Q.   All right.  When you took over secure --
21          when you guys bought the mall and took over
22          the security services that were recommended
23          by Canatella and were -- had been
24          previously providing, you know, while you
25          don't have a written contract, there was a
```

```
 1          meeting and an understanding as to what
 2          they were supposed to do, correct?
 3                    MR. HILL:
 4                    Object to the form.  Outside the
 5               scope of the Notice.
 6     BY MR. CLARKE:
 7     Q.   Well, let's just go for the last five
 8          years.  In the last five years, was there
 9          an agreement or understanding between the
10          Victory and Westgate and Mr. Canatella
11          about what was to be done?
12                    MR. HILL:
13                    Object to form.
14                    You can answer.
15                    THE WITNESS:
16                    Yes.
17     BY MR. CLARKE:
18     Q.   And -- and it -- and what -- what was to be
19          done was to have an officer present on the
20          parking lot for specified periods of time
21          to where they were protecting the patrons
22          and the tenants of the Westgate Shopping
23          Center, correct?
24                    MR. HILL:
25                    Object to form.
```

```
 1              MR. ZIBILICH:
 2              I'm going to object to the form
 3         too.
 4              You can answer.
 5              THE WITNESS:
 6              Yes.
 7   BY MR. CLARKE:
 8   Q.  Do you still schedule Chad Pitfield?
 9   A.  I don't schedule any of the officers.
10   Q.  Does Chad Pitfield still provide services
11       at Westgate Mall?
12   A.  No.
13   Q.  Okay.  Did that stop at a period of time?
14   A.  Yes.
15   Q.  And when did it stop?
16   A.  Months ago.
17   Q.  Was it on the --
18   A.  I don't remember the exact date.  I'd have
19       to go back and look at the last time we had
20       an invoice from him.
21   Q.  Okay.  Well, if you look at "Exhibit No. 7"
22       --
23   A.  I think that it was after this.
24              MR. ZIBILICH:
25              When you say, "after this," you
```

```
 1                    mean after the event that brings us
 2                    here today?
 3                         THE WITNESS:
 4                         Yes, oh, yes.
 5                         MR. ZIBILICH:
 6                         We -- I'll agree to that.
 7                         MR. CLARKE:
 8                         Yeah, it looks like --
 9                         MR. ZIBILICH:
10                         By the way, this question that
11                    you're asking, this series of
12                    questions, what -- what number does
13                    that fall under?
14                         MR. CLARKE:
15                         What?
16                         MR. ZIBILICH:
17                         What number does that fall under
18                    in your Notice?
19                         MR. CLARKE:
20                         I don't know.
21                         MR. ZIBILICH:
22                         Well, you better figure it out,
23                    because I'm going to instruct her
24                    not to answer unless you can give me
25                    a hint.
```

```
 1              MR. CLARKE:
 2              You're going to -- you're going
 3         to instruct a different witness?
 4              MR. ZIBILICH:
 5              Sure.
 6              MR. CLARKE:
 7              I mean, I'm not -- I'm not paying
 8         attention to you, Franz.
 9  BY MR. CLARKE:
10  Q.   It looked like he worked on -- 1-19-20 was
11       the date of the incident, 2-2-20 and 2-11.
12       Did you request that he no longer be
13       assigned?
14  A.   No.
15  Q.   Okay.  Do you know why he is no longer
16       providing security services at the -- at
17       the Westgate Mall?
18  A.   Just what I've heard.
19  Q.   And what have you heard?
20  A.   That he's no longer a police officer I
21       guess with the city.
22  Q.   Okay.
23              MR. HILL:
24              You mean the parish?
25              THE WITNESS:
```

```
 1                    The parish.
 2   BY MR. CLARKE:
 3   Q.   And because that wouldn't meet the
 4        qualifications of what you ordered,
 5        correct?
 6                    MR. HILL:
 7                    Object to form.
 8   BY MR. CLARKE:
 9   Q.   You -- you -- you hired -- you were hiring
10        a paid --
11   A.   I --
12   Q.   You were hiring --
13   A.   I don't hire.  I didn't hire him.  He --
14   Q.   I apologize for the question.  Let me --
15        let me rephrase that question.  The
16        security detail that you contracted for to
17        have out at the Westgate Mall required it
18        to be a certified police officer, correct?
19                    MR. HILL:
20                    Object to the form.
21                    Don't answer that.  You did not
22               contract, so that question needs to
23               be restated.
24   BY MR. CLARKE:
25   Q.   Okay.  You had an agreement with Mr.
```

```
 1        Canatella, correct?
 2                    MR. HILL:
 3                    Object to form.  She testified
 4             there's no agreement.  Please
 5             restate the question to fit what she
 6             testified to earlier.
 7   BY MR. CLARKE:
 8   Q.   What -- what is your relationship with
 9        Canatella?
10   A.   We acquired security.  At the time that we
11        purchased the shopping center --
12   Q.   Okay.
13   A.   -- the security was working at the shopping
14        center.
15   Q.   Right, and you maintained that.  What would
16        you --
17   A.   We
18   Q.   -- call that relationship?
19   A.   We continued to employ them.
20   Q.   Okay, and the criteria for the employment
21        of the security detail was that they be
22        certified police officers, correct?
23   A.   That was not --
24                    MR. ZIBILICH:
25                    I'm going to object to the form,
```

```
 1                  because I've been listening for a
 2                  hour.  I don't know what a certified
 3                  police officer is.
 4                      MR. CLARKE:
 5                      Okay.
 6                      MR. HILL:
 7                      I'll join the objection.
 8   BY MR. CLARKE:
 9   Q.   What -- what were the requirements of
10        security people providing services on your
11        premises?
12                      MR. ZIBILICH:
13                      Whose requirements?
14                      MR. CLARKE:
15                      Westgate's.
16                      MR. ZIBILICH:
17                      Okay.
18                      THE WITNESS:
19                      Off-duty sheriff's officers.
20   BY MR. CLARKE:
21   Q.   Okay.  Would that include retired officers
22        or would it be active off-duty officers?
23   A.    It had always been active off-duty officers
24        up until very recently where we continued
25        to allow Donald Canatella to continue his
```

```
 1        services.
 2   Q.   Do you know if Donald Canatella has a -- a
 3        security license?
 4   A.   I do not.
 5   Q.   Are any other -- and how was that decision
 6        made to allow Mr. Canatella to continue
 7        providing security services after he
 8        retired?
 9   A.   My understanding from him is that he still
10        is -- he still is part of the off-duty
11        program, so he still uses a car, equipment,
12        uniform.  So under those circumstances, we
13        still allowed him to stay and continue --
14   Q.   Okay, and that --
15   A.   -- after he retired.
16   Q.   Okay, and were the officers, another
17        requirement of the security detail is that
18        they come in a police car?
19   A.   That was what was established by the
20        previous owner.
21   Q.   Right.
22   A.   So yes.
23   Q.   And you continued that?
24   A.   Correct.
25   Q.   And they would be in police uniforms?
```

```
 1   A.   Correct.
 2   Q.   Would they have -- did you want them to be
 3        armed or did you have any discussion of
 4        what type of weapons or what type of uses
 5        of force they'd be allowed to use?
 6                   MR. ZIBILICH:
 7                   What uses of force they would be
 8             allowed to use per her permission is
 9             the question?
10                   MR. CLARKE:
11                   Right.
12                   MR. ZIBILICH:
13                   Go ahead.
14                   THE WITNESS:
15                   I expected them to continue to
16             maintain the property just as they
17             did when they were an on-duty police
18             officer.
19   BY MR. CLARKE:
20   Q.   Okay.
21   A.   So if a gun was part of their uniform, then
22        I -- they had a gun.
23   Q.   Okay.  You wanted a police presence on the
24        property?
25   A.   Correct.
```

```
1   Q.   Right.  Have you ever -- has -- have you
2        ever in the past five years informed Mr.
3        Canatella that -- or sent any security --
4        any -- any officer who provided security
5        detail home?
6   A.   No.
7   Q.   Have you ever had any complaints about any
8        of the security detail?
9   A.   No.
10  Q.   And I think that's in your discovery
11       responses.  All right.  Is the only person
12       with -- you know, with -- with providing
13       security at Westgate that you communicated
14       with directly Mr. Canatella?
15  A.   Yes.
16  Q.   So you never had any discussion with
17       Pitfield or anybody else?
18  A.   No.
19  Q.   That's all I have.
20                    EXAMINATION
21  BY MR. ZIBILICH:
22  Q.   You can leave it right there.  Have you
23       been satisfied with the performance of the
24       Jefferson Parish Sheriff's Office detail
25       officers during the last five years?
```

1    A.    Yes.

2    Q.    Okay.  That's all I have.

3                    MR. HILL:

4                    No questions.

5                    MR. CLARKE:

6                    All right.  I'd run.

7                    (Whereupon, the taking of the

8          witness' testimony was concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E
 2              THIS CERTIFICATION IS VALID ONLY FOR
      A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL
 3    SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS
      PAGE.
 4
              I, RAYNEL E. SCHULE, Certified Court
 5    Reporter, #77005, in good standing, in and for
      the State of Louisiana, as the officer before
 6    whom this testimony was taken, do hereby certify
      that GINA CHRISTOPHER, after having been duly
 7    sworn by me upon authority of R.S. 37:2554, did
      testify as hereinbefore set forth in the
 8    foregoing 46 pages; that this testimony was
      reported by me in stenotype reporting method,
 9    was prepared and transcribed by me or under my
      personal direction and supervision, and is a
10    true and correct transcript to the best of my
      ability and understanding; that the transcript
11    has been prepared in compliance with transcript
      format guidelines required by statute or by
12    rules of the Board, that I have acted in
      compliance with the prohibition on contractual
13    relationships, as defined by Louisiana Code of
      Civil Procedure Article 1434 and in rules and
14    advisory opinions of the Board; that I am not of
      counsel, not related to counsel or to the
15    parties herein, nor am I otherwise interested in
      the outcome of this matter.
16
17
18    _____   _____
      Date                   Raynel E. Schule, CSR
19                           Certified Shorthand Reporter
                             State of Louisiana
20
21
22
23
24
25
```