UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CASE NO.  2:21-cv-00080

DONNA LOU and DAREN PARSA, on their own behalf and
on behalf of their deceased minor child, E.P.

Plaintiffs,


VERSUS


SHERIFF JOSEPH P. LOPINTO, III, CHAD PITFIELD, RYAN
VAUGHT, STEVEN MEHRTENS, SHANNON GUIDRY, NICK VEGA,
MANUEL ESTRADA, MYRON GAUDET, JOHN DOES 1-3,
VICTORY REAL ESTATE INVESTMENTS LA, LLC D/B/A
WESTGATE SHOPPING CENTER, ABC INSURANCE COMPANY,
and XYZ INSURANCE COMPANY,

Defendants.



VIDEOTAPED DEPOSITION OF DONALD A.

CANATELLA, JR., given in the above-entitled cause,

via Zoom video conferencing, pursuant to the

following stipulation, before Sandra P. DiFebbo,

Certified Shorthand Reporter, in and for the State

of Louisiana, at JPSO, 1233 Westbank Expressway,

Fifth Floor, Harvey, Louisiana, on the 7th day of

July, 2022, commencing at 8:42 AM.

```
 1   APPEARANCES:
 2            THE COCHRAN FIRM MID-SOUTH
              BY:  ANDREW CLARKE,
 3            ATTORNEY AT LAW
              One Commerce Square
 4            40 South Main, Suite 1700
              Memphis, Tennessee  38103
 5            Representing the Plaintiffs
 6
              MARTINY & ASSOCIATES
 7            BY:  FRANZ ZIBILICH,
              ATTORNEY AT LAW -and-
 8            JEFFREY D. MARTINY,
              ATTORNEY AT LAW
 9            131 Airline Drive
              Suite 201
10            Metairie, Louisiana  70001
              -and-
11            LINDSEY M. VALENTI, LEGAL ADVISOR
              1233 Westbank Expressway
12            Building B, Fifth Floor
              Harvey, Louisiana  70058
13            Representing JPSO Defendants
14            THOMPSON, COE, COUSINS & IRONS, LLP
              BY:  MARK A. HILL,
15            ATTORNEY AT LAW -and-
              CHRISTOPHER W. KAUL,
16            ATTORNEY AT LAW
              601 Poydras Street
17            Suite 1850
              New Orleans, Louisiana  70130
18            Representing Victory Real Estate
              Investments LA, LLC, and Westgate
19            Shopping Center
20   Also Present:  Tate Clarke, Tim Anclade, Grant
     Gibson
21
     Videographer:  Todd Meaux, Depo-Vue
22
     Reported By:
23
              Sandra P. DiFebbo
24            Certified Shorthand Reporter
              State of Louisiana
25
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

```
 1   E X A M I N A T I O N          I N D E X

 2

 3                                        Page

 4   BY MR. CLARKE:                       5, 59

 5   BY MR. HILL:                         56

 6

 7

 8      E X H I B I T                  I N D E X

 9

10                        Page

11

12   Exhibit 9                          11

13   Exhibit 10                         13

14

15

16

17

18

19

20

21

22

23

24

25
```

S T I P U L A T I O N

It is stipulated and agreed by and between Counsel for the parties hereto that the deposition of DONALD A. CANATELLA, JR., is hereby being taken pursuant to the Federal Rules of Civil Procedure via Zoom videoconferencing, for all purposes in accordance with law;

That the formalities of reading and signing are specifically waived;

That the formalities of sealing, certification, and filing are hereby specifically waived.

That all objections, save those as to the form of the question and responsiveness of the answer are hereby reserved until such time as this deposition or any part thereof is used or sought to be used in evidence.

* * * * *

Sandra P. DiFebbo, Certified Shorthand Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness remotely.

```
 1            DONALD A. CANATELLA, JR., having been
 2       first duly sworn, was examined and testified on
 3       his oath as follows:
 4   EXAMINATION BY MR. CLARKE:
 5       Q.    Good morning.
 6       A.    Morning, sir.
 7       Q.    Would you please state your name for the
 8   record.
 9       A.    Donald Albert Canatella, Jr.
10       Q.    And, Mr. Canatella, my name is Andy
11   Clarke.  I represent the plaintiffs in a case that
12   has been brought against the Jefferson Parish --
13   Jefferson Parish deputies and Westgate Shopping
14   Center.  Have you ever given a deposition before?
15       A.    Yes, sir.
16       Q.    Well, in what circumstances have you
17   given a deposition?
18       A.    Traffic accidents with the Traffic
19   Division.
20       Q.    When you were an employee with the
21   Jefferson Parish Sheriff's Department or Sheriff's
22   Office?
23       A.    Yes, sir.
24       Q.    Let's just go over some ground rules
25   because -- to make sure we communicate well and
```

```
 1   have a good record.  All right?
 2        A.   Yes, sir.
 3        Q.   Obviously, your testimony here is under
 4   oath subject to the penalty of perjury.  You
 5   understand that?
 6        A.   Yes, sir.
 7        Q.   And a lot of times when people are asking
 8   questions or get in conversation, we start to talk,
 9   if we kind of think we know what the question is,
10   and start to answer, but let's let each other
11   finish the question and the answer before we speak.
12   Okay?
13        A.   Yes, sir.
14        Q.   And, obviously, we're on Zoom here today,
15   so there may be a little lag or time.  If you can't
16   hear us or anything, put your hand up.  Okay?
17        A.   Yes, sir.
18        Q.   And my purpose here is to try to find out
19   facts and information relevant to the case that we
20   have.  I'm not here to trick you, so if you don't
21   understand a question that I ask you, I would ask
22   you to tell me to rephrase it or just notify me
23   that you don't understand the question.  Okay?
24        A.   Yes, sir.
25        Q.   And I understand that we're doing this by
```

```
 1    Zoom because of some medical issues or COVID
 2    issues, so if you need to take a break at any time
 3    or get water or anything, just let us know.  Okay?
 4         A.   Yes, sir.
 5         Q.   Last night did you get some information
 6    sent to you by Jeffrey Martiny?
 7         A.   Yes, sir.
 8         Q.   That is information that has been
 9    produced that may come up in this deposition to
10    talk about.  Do you have access to it, if we need
11    to question you about it?
12         A.   I think so, yes, sir.
13         Q.   Tell me a little bit about yourself. It's
14    my understanding you worked for the Jefferson
15    Parish Sheriff's Office at some point.  Can you
16    tell me when you worked there?
17         A.    I was employed full time with the
18    Jefferson Parish Sheriff's Office from 1984 until
19    2018.  Then I have been a reserve deputy from 2018
20    until present.
21         Q.   So you are currently still a JPSO reserve
22    deputy?
23         A.   Yes, sir.
24         Q.   Tell me -- just give me a softball.  Take
25    me through your history with JPSO until you ended
```

1    up -- I guess were you in charge of the public

2    assignments at JPSO?

3         A.   No, sir.

4         Q.   Tell me -- just take me through your

5    history with JPSO the best you can and what your

6    roles and your duties were.

7         A.   Okay.  I was a patrol deputy, the Fourth

8    District, and I handled all calls or just anything

9    that happened when I was working my beat.  I went

10   to Traffic Division.  I handled accidents, speeding

11   complaints, DWIs.  I went to the LASER Division.  I

12   was a scuba diver for the department, and then I

13   went to Second District.  Then I went to Detective

14   Bureau, Juvenile.  I handled juvenile crimes, and

15   then I went back to the Second District as a patrol

16   deputy.  And then I got transferred to the First

17   District as a patrol deputy.  Then I retired. And I

18   am in the First District Patrol Division as a

19   reserve deputy.

20        Q.   Did you ever increase in rank during your

21   time with JPSO?

22        A.    I was always a deputy or a detective, so,

23   basically, no.

24        Q.   Did you ever have any supervisory

25   functions at the JPSO?

1        A.    I was an acting supervisor, yes.

2        Q.    Is that if you were the most senior

3   person on the shift?

4        A.    Yes, sir.

5        Q.    And one of the things you said when you

6   were a scuba diver you said LASER Division?

7        A.    Yeah.  Land, Air, Sea, Emergency Rescue.

8        Q.    Let's just kind of -- when you became a

9   deputy, did you go through the JPSO Training

10  Academy?

11       A.    Yes.

12       Q.    Do you remember if you had any training

13  in your academy on positional asphyxia or

14  compression asphyxia?

15       A.    No, sir. I graduated at the academy like

16  in '85, and they didn't have that.

17       Q.    That is a long time.  A lot of the laws

18  and training have changed since then, correct?

19       A.    Yes.

20       Q.    Now, tell me -- let's just kind of get

21  right to where we're at.  Tell me how you became

22  involved in providing paid detail or security

23  services?  Can you describe for me what it is, for

24  Westgate Mall?

25       A.    Say that again.  I'm sorry.  I couldn't

1    hear you.

2         Q.   What I'm trying to get at is we took a

3    deposition yesterday of somebody from Westgate

4    Mall.  Their testimony was that they bought the

5    building or the property in 2006, and at that time,

6    you had been providing security services for the

7    mall, and when they bought the building, you went

8    and spoke with them and explained to them the

9    services that were being provided and asked them if

10   they wanted to continue that.  Did that occur?

11        A.   Yes, sir.

12        Q.   Tell me how you started working -- tell

13   me what that job is.  What do you describe that as?

14        A.   What we do on the detail is our main goal

15   is to handle any complaints that's in the parking

16   lot, handle all complaints that's in the parking

17   lot, and be visible.

18        Q.   Well, I understand that.  What I'm trying

19   to get at is if you are a reserve deputy, you have

20   to -- when you are a deputy, you have to comply

21   with the JPSO policies, correct?

22        A.   Yes, sir.

23        Q.   And there is a policy on -- Public

24   Assignment Policy for the Jefferson Parish

25   Sheriff's Office.  Are you aware of that?

1       A.   Yes, sir.

2       Q.   That's something that was provided to you

3   yesterday.  Do you have that in front of you?

4       A.   Yes, sir.

5       Q.   What I'm going to do is mark that as

6   Exhibit 9.

7            MR. ZIBILICH:

8                 It's none of my business, but why

9               wouldn't you just mark this as Exhibit

10               1 for this new deposition?

11            MR. CLARKE:

12                 Because this is the way I do it.

13            MR. ZIBILICH:

14                 Okay.

15   BY MR. CLARKE:

16       Q.   Does this policy apply to the services

17   that you were providing at Westgate?

18            MR. ZIBILICH:

19                 How do you know what he is looking

20               at is the same thing that you just gave

21               to the court reporter?

22            MR. CLARKE:

23                 Because I gave it to him, and I

24               asked him if he --

25            MR. ZIBILICH:

```
 1              Why don't you ask him how -- what is
 2          at the top of the page so we know.
 3   BY MR. CLARKE:
 4       Q.   Do you have SOP-11?
 5          MR. CLARKE:
 6              And, Franz, let's -- I don't need
 7          all of the interruptions during --
 8          MR. ZIBILICH:
 9              I understand, but --
10          MR. CLARKE:
11              I think the proper things are object
12          to the form or to assert a privilege.
13          I'm not going to be stopped and explain
14          things to you all day.
15          MR. ZIBILICH:
16              I'm not going to be sitting here
17          wondering whether or not y'all played
18          the match game.  He's identified the
19          document.
20          MR. CLARKE:
21              Let's just do this.  I'll mark this
22          as Exhibit 11.  Exhibit 10.  I am just
23          going to hand this to you, Franz, and
24          you can do with it what you want.  This
25          is my legal position on the conduct
```

```
 1              that you are allowed to participate in
 2              at a deposition.  That's my legal
 3              basis.  I don't want to argue with you.
 4         MR. ZIBILICH:
 5              You said 10 and 11.  You only gave
 6              me 10.
 7         MR. CLARKE:
 8              That's all I gave you was 10.  That
 9              is correct.
10    BY MR. CLARKE:
11         Q.   Do you see SOP-11, Public Assignment
12    Policy for the Jefferson Parish Sheriff's Office?
13         A.   Yes, I do.
14         Q.   Were you providing a paid detail or a
15    public assignment at the Westgate Shopping Center?
16         A.   Yes, sir.
17         Q.   So this policy applies to whatever your
18    activities are, correct?
19         A.   Yes, sir.
20         Q.   So tell me how the paid public -- the
21    public assignment paid detail worked at Westgate.
22         A.   What are you talking about? I don't
23    understand.
24         Q.   Well, I mean the corporate representative
25    from Westgate testified yesterday.  She testified
```

1    that -- well, let me ask you this.  Do you do this

2    -- do you do your work at Westgate through the JPSO

3    or do you do it independently?

4        A.   I do it through JPSO.

5        Q.   And to get the assignment approved, what

6    do you have to do?

7        A.   You got to contact the detail office,

8    officer that is in charge and explain to them the

9    detail, where the location was, and ask for

10   permission to run the detail.

11       Q.   How do you run the detail? I mean, do

12   they have to approve the hours that are set, the

13   security detail, the officers that are involved?

14            MR. ZIBILICH:

15                Object to the form.  Have no idea

16            who "they" is.

17   BY MR. CLARKE:

18       Q.   You can answer every time he says object

19   to the form.

20       A.   Westgate tells us what hours they want us

21   to work.

22       Q.   When you went there in 2006, did you go

23   to them and tell them what you were already

24   providing by the way of public assignment, paid

25   detail services for Westgate?

```
 1        A.   Yes.  I contacted them.
 2        Q.   And they accepted that particular
 3   schedule, correct, in turn?
 4        A.   Yes.
 5        Q.   There is a way that these things have to
 6   be done that they're -- in the policy, there is
 7   restrictions on how much people can make and what
 8   they are allowed to do, correct?
 9        A.   Yes.  You only can work a certain amount
10   of hours per pay period.
11        Q.   Do you select the officers who work on
12   that detail?
13        A.   Yes.
14        Q.   So were you kind of -- do you have a
15   title with respect to that detail?  Are you the
16   supervisor?  Are you the person who is running that
17   detail?  Is there any terminology as to what your
18   position is as opposed to somebody like Chad
19   Pitfield?
20        A.   I am the administrator of the paid
21   detail.
22        Q.   So you are the administrator of the paid
23   detail public assignment at Westgate, correct?
24        A.   Yes.
25        Q.   And you've been that since 2006?
```

1      A.    About 2006, 2007, yes.

2      Q.    Somewhere around there?

3      A.    Yes.

4      Q.    What is a POST Certified Level 1 Officer?

5      A.    Excuse me, sir.

6      Q.    What is a POST Certified Level 1 Officer?

7      A.    POST Certified Level 1 Officers has a

8  current firearms qualifications, qualified for

9  security of firearms.  Secure -- you know -- only

10 POST -- a POST deputy is a deputy that passed

11 through the academy, the police academy, and went

12 through the JPSO FTO program and passed.

13     Q.    Do you know if -- I'm sorry.  I thought

14 you were done.

15     A.    No.  I'm sorry. I was coughing.  That's

16 okay.

17     Q.    Do you know if Chad Pitfield was a POST

18 Certified Level 1 Officer?

19            MR. ZIBILICH:

20               Object to the form.  No idea when

21         you are talking about.

22 BY MR. CLARKE:

23     Q.    Let me ask the question again.  Do you

24 know if Chad Pitfield was a POST Certified Level 1

25 Officer?

```
 1              MR. ZIBILICH:
 2                   Object to the form.
 3              THE WITNESS:
 4                   Yes.
 5    BY MR. CLARKE:
 6         Q.   It says -- do you know that he had --
 7    that he was authorized to work solo public
 8    assignments by the JPSO?
 9         A.   Yes.
10         Q.   When you are running the detail, when you
11    are the administrator of the detail, do the
12    officers -- do you get to select the officers or is
13    there a list of officers in the public assignment
14    office?
15         A.   Both.
16         Q.   And did you pick Chad Pitfield?
17         A.   Yes.
18         Q.   And do you know how long he worked at
19    Westgate?
20         A.   Probably about four years off and on.
21         Q.   Who keeps up with the number of hours
22    that an officer can work both in paid detail and
23    regular time?
24         A.   I believe the detail officer.
25         Q.   So as administrator, you don't have any
```

1  duties to make sure somebody isn't working more

2  than 16 hours a day?

3       A.   No, sir.

4       Q.   Now, do you turn in any documents to JPSO

5  pertaining to the money that is earned on the paid

6  detail?

7       A.   Yes.  I turn in -- but it's not for the

8  money.  It's the hours.

9       Q.   Well, you have to pay the sheriff's

10 department $5 for every shift, correct?

11      A.   No, sir.  $5 per hour.

12      Q.   How do you pay the sheriff's department?

13      A.   Payroll deduction.

14      Q.   Why did Chad Pitfield get 1099s from

15 Victory?

16      A.   Because it's -- I can't think of the word

17 I'm trying to think of.  It's -- they don't take

18 taxes out until -- that's how they do it.

19      Q.   How do they take out the payroll

20 deduction?  If it's --

21      A.   Payroll deduction.

22      Q.   Do they just take out the $5?  Does it

23 show up on your check?

24           MR. ZIBILICH:

25               I am going to object to the form.

```
 1              You can answer it, if you can.
 2         MR. CLARKE:
 3              Franz, that's not a proper
 4         objection.
 5         MR. ZIBILICH:
 6              You just asked two different
 7         questions, sir.  You asked about
 8         payroll deductions, and then you asked
 9         about --
10         MR. CLARKE:
11              You object to the form.  You don't
12         make -- provide a commentary and coach
13         the witness.
14    BY MR. CLARKE:
15         Q.   On your paycheck.  So the money -- how do
16    you get paid for your work at Westgate? Just take
17    me through the process.
18         A.   I fill out the time sheets, the payroll
19    sheets, and I submit them to pay -- submit them to
20    Victory, and Victory sends us a check.
21         Q.   Does Victory send you a check for just
22    your hours or your hours and any other deputy who
23    worked paid detail?
24         A.   They send me the checks for every deputy
25    that works a detail, and then I submit it -- I get
```

```
 1   the checks to the deputies that worked the detail.
 2        Q.   So they get mailed to your house or your
 3   office, and then you just hand them the checks,
 4   correct?
 5        A.   Yes, sir.
 6        Q.   So you are just passing the check
 7   through?
 8        A.   Yes, sir.
 9        Q.   When you are on paid detail there, are
10   officers required -- what are officers required to
11   bring to paid detail? I mean, they're supposed to
12   --
13        A.   Their uniform.
14        Q.   Go ahead.  Uniform. What else?
15        A.   His duty gear.
16        Q.   What duty gear?
17        A.   His gun, handcuffs, radio, flashlight.
18   Anything he needs to work a detail.  And his unit.
19   The radio.
20        Q.   I'm sorry.  Continue.  I mean, you said
21   uniform, gun, handcuffs.  What about OC spray?
22        A.   OC.  Everything.  Everything that is
23   included on his detail.  Yes.  Everything that is
24   normal duty.  His OC spray, his ASP, his handcuffs,
25   his flashlight, his unit, his radio.
```

1        Q.    What about a taser?

2        A.    If he is registered to have one, yes.

3        Q.    What about a RIPP Hobble?

4        A.    I'm not sure.  Some deputies has them,

5    some deputies don't.

6        Q.    Are you aware of a policy, the TARP

7    policy? Total Appendage Restraint Procedure?

8        A.    No, sir, I'm not.

9        Q.    Have you ever had any training on the

10   RIPP Hobble, whether an inservice or at the

11   academy?

12       A.    Yes, I have.

13       Q.    What is the RIPP Hobble, and what is it

14   used for?

15       A.    The RIPP Hobble is used to make sure a

16   person -- when a person is aggressive is to put it

17   on his legs so he can't kick out, kick out the --

18   kick out, or they got it around his -- yeah, around

19   his legs.

20       Q.    Are you allowed to use that to connect

21   the bound legs to the handcuffs?

22       A.    I'm not sure.  No, sir.

23       Q.    But you have had no RIPP Hobble training,

24   correct?

25       A.    I did have RIPP Hobble training, but I

 1    don't remember.

 2         Q.   Did you have it in inservice?

 3         A.   Yes, sir.  They do have it in inservice,

 4    yes.  They had it.

 5         Q.   Do you remember --

 6         A.   I don't remember.

 7         Q.   I'm sorry.  There is a little lag on the

 8    Zoom here.  All right.  So if they had a RIPP

 9    Hobble, and they had the RIPP Hobble training, they

10    should have that as part of their duty gear,

11    correct?

12         A.   Some people have them.  Some people

13    don't.  I'm not sure who has them and who doesn't.

14         Q.   Well, as the administrator of the detail,

15    do you have any obligation to make sure that your

16    cops or your deputies are fully equipped?

17         A.   Yes, sir, I am, but the RIPP Hobbles,

18    some people has them, some people don't.

19         Q.   Well, then, if you are the administrator,

20    and you wanted to make sure all of the tools were

21    available, then you would -- and you can select

22    people, you need to select somebody that has RIPP

23    Hobble training, correct?

24         A.   You could.

25         Q.   Did you?

```
 1        A.   Some people have them.  Some people
 2    don't, sir.
 3        Q.   Did you ensure that the people on your --
 4    that the detail that you were running, that
 5    somebody had RIPP Hobble training and the tools
 6    that Jefferson Parish Sheriff's Office gives to
 7    officers to deal with somebody who needs to be
 8    restrained by their legs?
 9              MR. HILL:
10                   Object to the form.
11              THE WITNESS:
12                   All my deputies have all the tools
13                they need that are required.  I believe
14                -- I'm not sure now about the RIPP
15                Hobble, because I believe it's taught
16                that supervisors carried RIPP Hobbles,
17                if I'm not mistaken.
18    BY MR. CLARKE:
19        Q.   Where do you get that assumption from?
20        A.   I'm thinking.  I'm guessing, sir.  I'm
21    not sure.
22        Q.   Okay.  You understand -- you know the use
23    of force continuum, correct?
24        A.   Yes, sir.
25        Q.   If an officer shows up to his work, and
```

```
 1    he doesn't have anything except a gun, that
 2    detracts from the number of options he has
 3    available, correct?
 4         A.   Yes.
 5         Q.   So a RIPP Hobble, from your under-
 6    standing, from your rememberance of the training
 7    you have, is a tool that Jefferson Parish has
 8    available to its deputies that is used to restrain
 9    people who are acting in an aggressive manner and
10    need their legs bound, correct?
11         A.   Yes, sir.
12         Q.   You don't know whether Chad Pitfield had
13    that?
14         A.   No, sir.
15         Q.   Did you actually work detail like shifts
16    at the Westgate or were you just the administrator?
17         A.   I worked shifts at the detail.
18         Q.   Did you have a RIPP Hobble?
19         A.   No, sir.
20         Q.   Do you know of anybody who worked at any
21    time at the Westgate Mall under the detail that you
22    were administering that had access to a RIPP
23    Hobble?
24         A.   Not that I know of, sir.  I believe the
25    rank has the -- I believe rank has the RIPP
```

```
 1    Hobblers.  I believe you have to call the rank to
 2    get them.
 3          Q.    Do you know anything about the RIPP
 4    Hobble policy or have you even looked at it?
 5          A.    No, sir.  I don't think.  I haven't
 6    looked at it in a long time.
 7          Q.    It's your understanding of it -- you
 8    understand the policies would say who has them,
 9    right?
10          A.    I believe so.
11          Q.    When a person is on paid detail at
12    Westgate, there is a minimum amount of time -- a
13    shift has to be at least four hours, correct?
14          A.    Yes.
15          Q.    For those four hours, they're supposed to
16    -- it's my understanding that they go to the mall,
17    and they check in at the sports academy and pick up
18    a cell phone.  Is that correct?
19          A.    Yes, sir.
20          Q.    And the cell phone is provided to the
21    detail officers or the public assignment officers
22    by Westgate, correct, or Victory?
23          A.    Yes, sir.
24          Q.    What is that phone used for?
25          A.    That phone is used for the businesses
```

```
 1    that need to get in touch with us to call us or
 2    they can call -- dial 911 and get us.
 3         Q.    But that is a way that they can directly
 4    contact you, correct?
 5         A.    Yes, sir.
 6         Q.    And is that the way most calls come?
 7              MR. ZIBILICH:
 8                   Object to the form.
 9              THE WITNESS:
10                   Some calls come.
11    BY MR. CLARKE:
12         Q.    Do people, if they call 911, is the paid
13    detail or public assignment officer supposed to
14    respond?
15         A.    Yes.
16         Q.    Is the paid detail officer supposed to
17    wait for an on-duty officer to arrive before he
18    does anything?
19         A.    No.
20         Q.    So what are -- the job functions of the
21    paid detail deputy or a public assignment deputy
22    are to be present and protect the businesses,
23    correct?
24              MR. ZIBILICH:
25                   Object to the form.
```

```
 1   BY MR. CLARKE:
 2        Q.   You can answer.
 3        A.   The detail's responsibilities is to
 4   handle any calls for service in the parking lot or
 5   in the businesses and to make sure everybody is,
 6   you know, visible, and, you know --
 7        Q.   You are paid money by Westgate or Victory
 8   to perform only things on their premises, correct?
 9             MR. HILL:
10                  Object to the form.
11             THE WITNESS:
12                  Yes, sir.
13   BY MR. CLARKE:
14        Q.   If a call comes in across the street,
15   that's not your responsibility of a paid detail or
16   public assignment, correct?
17        A.   It's our responsibility?  No, sir.
18        Q.   Right.  So you are working for money, for
19   Westgate, on their property to enforce the laws and
20   to make sure there is not crime occurring on the
21   Westgate or Victory premises, correct?
22             MR. HILL:
23                  Object to the form.
24             MR. ZIBILICH:
25                  Object to the form.
```

```
 1              THE WITNESS:
 2                   Yes.
 3   BY MR. CLARKE:
 4        Q.   So part of your duties as a paid detail
 5   is to attend to the needs of Westgate, Victory, and
 6   the tenants at the mall, correct?
 7              MR. HILL:
 8                   Object to the form.
 9              THE WITNESS:
10                   Yes.
11   BY MR. CLARKE:
12        Q.   Who supervises somebody on paid detail?
13              MR. ZIBILICH:
14                   Object to the form.
15              THE WITNESS:
16                   I can't answer who supervises people
17               on all the details.
18   BY MR. CLARKE:
19        Q.   Well, you are the administrator of the
20   detail, correct?
21        A.   You said details.  You didn't say for
22   Westgate Shopping Center details, sir.  I can't --
23        Q.   I'm sorry.
24        A.   I can't answer about other people's
25   details.
```

1      Q.   I understand, and that was a bad

2    question.   I appreciate you letting me know.   Who

3    supervises the paid detail or public assignment

4    deputies at the Westgate Mall?

5              MR. ZIBILICH:

6                   I object to the form.

7              THE WITNESS:

8                   I do.

9    BY MR. CLARKE:

10     Q.   What do you do to supervise them?

11     A.   Sometime go over there.   Sometimes I go

12   over there.   I check on them, see if they doing

13   what they're supposed to be doing and make sure

14   everything is okay.

15     Q.   Do you check to make sure they have all

16   of their duty weapons and duty belts and issued

17   equipment?

18     A.   I make sure they have the equipment they

19   need, and I make sure everything is okay when they

20   are on their detail and they --

21     Q.   Well, as a law enforcement officer who

22   has many years of experience, you know at times

23   officers are going to encounter people who are on

24   drugs, out of control, or resisting arrest,

25   correct?

```
 1        A.   Yes, sir.
 2        Q.   One of the tools that is given to JPSO or
 3   JPSO deputies are trained on is the use of the RIPP
 4   Hobble, correct?
 5             MR. ZIBILICH:
 6                  Object to the form.
 7             THE WITNESS:
 8                  We already answered that one.  I
 9              said I believe so.
10   BY MR. CLARKE:
11        Q.   What do you do to make sure that they
12   have that equipment to deal with such a situation?
13             MR. ZIBILICH:
14                  Object to the form.
15             MR. HILL:
16                  Object to the form.
17             THE WITNESS:
18                  Some deputies have hip hobblers.
19              Some rank has hip hobblers.  Okay.  Not
20              everybody is qualified -- not everybody
21              is certified on hip hobblers, I
22              believe.
23   BY MR. CLARKE:
24        Q.   Do you have any communication with JPSO
25   about the detail?  Do you have to complete any
```

```
 1    reports for JPSO pertaining to any activity that
 2    occurs on the premises?
 3         A.   No, no.
 4         Q.   But anybody working on paid detail is
 5    required to follow the JPSO Code of Conduct and the
 6    SOPs, correct?
 7         A.   Yes.
 8         Q.   If you look at SOP-11.  It says Parish
 9    Details.
10              MR. ZIBILICH:
11                   What page?
12              MR. CLARKE:
13                   Page -- it is Subsection 7 on Page
14                JPSO-008285.
15              THE WITNESS:
16                   Yes, sir.
17    BY MR. CLARKE:
18         Q.   Paid Details.  It says, "Parish details
19    may be paid through the sheriff's office general
20    fund biweekly.  Taxes are taken out for regular
21    officers and reserve officers."  You see that?
22         A.   Yes, sir.
23         Q.   Did you get a 1099 from Victory or a W-2?
24         A.   I get a 1099.  That does not apply to my
25    detail.
```

1      Q.   Explain to me what Paragraph -- Section
2   7, Parish Detail, applies to?
3      A.   Parish Detail applies to high schools,
4   like any kind of details like parish.   Like
5   schools, playgrounds, like that.   That's what that
6   handles.   It does not handle property detail like
7   --
8      Q.   So a parish detail would be something for
9   a Jefferson Parish entity, like --
10      A.   Like a football game, basketball game,
11   something like that.
12      Q.   Let's go to page -- Section 4, page
13   JPSO-008284.
14      A.   Where do you want to go?
15      Q.   Section 4 of the policy.
16         MR. ZIBILICH:
17            Roman numeral four.
18         THE WITNESS:
19            Yes, sir.   I'm trying to get to it
20         right now.   Okay.
21   BY MR. CLARKE:
22      Q.   Look at Section B-1.
23      A.   Okay.
24      Q.   It says, "The paid detail office and the
25   traffic division are authorized to serve as a

```
 1   clearing house."  What is a clearing house?

 2        A.    I have no idea.

 3        Q.    And it says, "to require the person or

 4   company, (employers) employer meets department

 5   standards before such work can be authorized."  Who

 6   is the employer in that?

 7             MR. HILL:

 8                  Object to the form.

 9             THE WITNESS:

10                  I have no idea, sir.  That -- a paid

11                  detail office in the traffic division

12                  are authorized to be -- I think that

13                  leads -- that goes to traffic detail,

14                  sir.  I'm not sure.  You have to

15                  contact somebody from the detail office

16                  to --

17   BY MR. CLARKE:

18        Q.    Okay.  We're going to take -- I'm just

19   trying to figure out if you understand it.  Do you

20   believe that the way that you ran this detail at

21   Westgate was in compliance with all of the

22   requirements of SOP-11?

23        A.    SOP-11?

24        Q.    That's what this is.

25        A.    What page are you on, sir?
```

```
 1        Q.   The Public Assignment Policy that we've
 2   entered as Exhibit --
 3        A.   Oh, SP -- oh, yes.
 4        Q.   I'm trying to see if we can short change
 5   this.  It appears that some of these questions
 6   about the policy aren't properly directed at you.
 7   There should be somebody from the detail office,
 8   correct?
 9             MR. ZIBILICH:
10                  Object to the form.
11             THE WITNESS:
12                  They can probably answer it better
13               than I can, yes.
14   BY MR. CLARKE:
15        Q.   I'm not here to try do anything with
16   that.  But all right.  I thought if you go to Roman
17   numeral three, Section G.
18        A.   What is that, sir?  I'm sorry.
19        Q.   Roman numeral three, Section G.
20        A.   Okay.
21        Q.   It says, "It's the detail officer's
22   responsibility to write all necessary reports at
23   his detail to include incidents in the parking lot
24   which is owned by the business."  Do you see that?
25        A.   Yes, sir.
```

1      Q.    What reports are those?

2      A.    Anything that happens on the property.

3      Q.    So was Chad Pitfield required to write a

4   report regarding the Parsa incident which occurred

5   on January 19th, 2020?

6      A.    I'm not sure who wrote the report, but I

7   believe the road wrote the report on it, the road

8   deputy wrote the report on it, and on incidents

9   that happened that are -- I guess -- sometimes road

10  deputies handle reports.

11     Q.    So it would be the same as if a bunch of

12  different officers ended up at a different scene.

13  It doesn't necessarily mean a particular person

14  needs to write a report.  A report needs to be

15  written about that incident.  Would that be fair?

16     A.    A report needs to be written on the

17  incidents, yes.

18     Q.    And whether Chad -- you don't read

19  Subsection G as to require a detail officer to

20  write a report if there are a number of officers

21  both on duty or off duty who arrived or were

22  involved in the incident as long as a report is

23  done, correct?

24     A.    A deputy that works the detail writes

25  reports.  If something happens, something occurs as

```
 1    like that incident, the road would handle that -- a
 2    road would handle that call.
 3         Q.   And I'm just looking through some of the
 4    terminology.  I'm not suggesting anything.  So when
 5    you work a private detail, do you have to -- do
 6    reserve deputies get paid anything, first of all?
 7              MR. ZIBILICH:
 8                   Object to the form.
 9              THE WITNESS:
10                   Paid by who?
11    BY MR. CLARKE:
12         Q.   Paid by -- if you are a reserve deputy at
13    Jefferson Parish Sheriff's Office, do you get a
14    salary?
15         A.   No.  I do volunteer time.
16         Q.   Are there certain amount of requirements
17    for a reserve deputy to perform on-duty Jefferson
18    Parish Sheriff's Office work a certain amount of
19    hours per month or per week?
20         A.   Yes.
21         Q.   Do you know what the number of hours are?
22         A.   24 hours.
23         Q.   Per month?
24         A.   Yes, sir.
25         Q.   And that --
```

```
 1        A.    24 hours if you don't work details, 34
 2   hours if you do work details.
 3        Q.    And if you need to take a break at any
 4   time, let me know, Mr. Canatella.
 5        A.    That's fine.
 6        Q.    But the 24 hours per month, that is done
 7   without actual wages being paid?
 8             MR. ZIBILICH:
 9                  Object to the form.  He did not say
10             24.
11   BY MR. CLARKE:
12        Q.    I thought -- does a reserve have to work
13   24 hours per month?
14        A.    A reserve deputy works 24 hours a month
15   if he is not working any details or doesn't have a
16   unit.  34 hours a month if he has a unit, and he
17   has -- and he works details.
18        Q.    What does have a unit mean?
19        A.    Have a take-home unit.
20        Q.    Take-home car?
21        A.    Take-home unit, car.
22        Q.    And all of the people that you use for
23   detail at Westgate, at Westgate Mall, did they have
24   a unit?
25        A.    Yes.
```

```
 1        Q.   That was part of the paid details to have
 2   a police car there for visibility, correct?
 3        A.   Yes.
 4        Q.   And that was to hopefully deter people
 5   from performing crimes on the Westgate -- at the
 6   Westgate Mall, correct?
 7             MR. ZIBILICH:
 8                  Object to the form.
 9             THE WITNESS:
10                  Yes.
11   BY MR. CLARKE:
12        Q.   And if you are not earning a wage as a
13   reserve, how do they do it by payroll deduction?
14   How do you --
15             MR. ZIBILICH:
16                  Object to the form.
17   BY MR. CLARKE:
18        Q.   How do you pay the money to the sheriff's
19   office, the administrative fee?  Do you have to
20   write a check to the sheriff's department for five
21   bucks for every shift?
22        A.   It's $5 for every hour, sir.
23        Q.   $5 for every hour.  How does the sheriff
24   get that if you're not actually earning wages?
25        A.   A reserve deputy?
```

```
1        Q.   Yes.

2        A.   I send in a check.

3        Q.   So you should -- you were a reserve from

4   2018 to the present, so you have not been earning

5   wages from JPSO, correct?

6        A.   Correct.

7        Q.   So for every shift that you've had, there

8   should be a -- or for every hour of every shift,

9   there should be a $5 payment to the sheriff's

10  office, correct?

11       A.   At the end of the month, yes.

12       Q.   Is that how it's done, monthly?  At the

13  end of the month, you submit your hours to the

14  sheriff's department and then a check?

15       A.   Yes.

16       Q.   Do you make the other deputies submit --

17  like did Chad Pitfield, under your detail, have to

18  submit a check to JPSO at the end of the month for

19  the hours he worked on paid detail?

20            MR. ZIBILICH:

21                 Object to the form.

22            THE WITNESS:

23                 Yes, a reserve deputy.

24  BY MR. CLARKE:

25       Q.   You are the administrator.  You get --
```

```
1    all of the checks come to you.  Do you collect
2    those checks and turn them in to JPSO or does
3    Pitfield or the deputies have to do that
4    independently?
5              MR. ZIBILICH:
6                   Object to the form.
7              THE WITNESS:
8                   Sir, I just answered that question.
9              I told you that he turns his in.
10   BY MR. CLARKE:
11        Q.   But you turn in Pitfield's hours,
12   correct?
13        A.   I turn in the hours of every -- I turn in
14   the hours that each deputy works on a detail.
15        Q.   What did you do to check to make sure
16   Chad Pitfield was actually at the Westgate Mall at
17   the times that he was there, that he was -- that he
18   turned in his time sheet for?
19             MR. ZIBILICH:
20                  Object to the form.
21             THE WITNESS:
22                  Sometimes I go over there, and we
23                have a sign-in sheet.
24   BY MR. CLARKE:
25        Q.   You understand there is some issues going
```

```
 1   on with Chad Pitfield pertaining to payroll fraud,
 2   correct?
 3              MR. ZIBILICH:
 4                  Object to the form.
 5   BY MR. CLARKE:
 6        Q.   You've seen the news?
 7              MR. ZIBILICH:
 8                  Object to the form.
 9              THE WITNESS:
10                  To be honest with you, I don't know
11                too much -- I don't know nothing really
12                about that, sir.  It has nothing to do
13                with my detail.
14   BY MR. CLARKE:
15        Q.   Does Chad Pitfield still work under your
16   detail?
17        A.   No, sir, he does not.  He resigned from
18   the sheriff's office.
19        Q.   Do you know when he resigned?
20        A.   No, sir. He resigned from the detail.
21        Q.   He resigned from the detail.  Did he
22   resign to you or does he do that to JPSO?
23        A.   From a detail.  He resigned from a
24   detail.  He told me he quit.
25        Q.   What I'm asking is did he tell you he
```

```
 1    resigned from the detail or was he required to
 2    report that to the detail office?
 3         A.   Sir, I told you he told me that he quit.
 4         Q.   And do you -- what do you do?  Do you
 5    have to tell -- do you have to report that a person
 6    on paid detail has quit to JPSO?
 7         A.   No, sir.  I just find another deputy to
 8    work the detail.
 9         Q.   When you were adminstrating this detail,
10    did you ever have any complaints about any officer
11    on public detail from Westgate?
12         A.   No, sir.
13         Q.   At times during the time that you
14    administrated the detail at Westgate, were there
15    times where you found out certain information and
16    made requests for additional officers or additional
17    people to be on the detail other than the regular
18    schedule?
19         A.   Extra details?
20         Q.   Extra officers.  For example, we have
21    some e-mails here.  If you knew that there was
22    going to be a protest, would you -- how would you
23    -- can you request more officers to be on the
24    detail at a particular time for a particular event?
25         A.   Sometimes.  During Christmas time we
```

```
 1   always have more than one deputy.  Sometimes on
 2   special -- on some occasions we have an extra
 3   deputy.
 4       Q.   Who was your main contact at Westgate or
 5   Victory?
 6       A.   Gina Christopher.
 7       Q.   Let's get to January 19th, 2020, the
 8   Parsa incident.  What do you know about the Parsa
 9   incident?
10           MR. ZIBILICH:
11               I am going to object to the form.
12           THE WITNESS:
13               They had an incident over there with
14             a teenager and he had an altercation
15             with his parents, an altercation with a
16             deputy, and he passed away.
17   BY MR. CLARKE:
18       Q.   Do you know whether the kid was autistic?
19       A.   I read it in the paper.
20       Q.   Did you talk to Chad Pitfield about what
21   happened?
22       A.   That day?  I talked to him at the end,
23   later on in the day.
24       Q.   Before 5:33 PM?
25       A.   I don't know.  I don't recall what I
```

1    talked to him about.

2          Q.   If you look in the documents that were

3    provided to you, and it's been marked in the

4    previous deposition as Exhibit 6, there is an

5    e-mail from you to Gina Christopher dated January

6    19th, 2020 at 5:33 PM.  Do you see that?

7          A.   I didn't get that.

8          Q.   Do you have any e-mails there?

9          A.   No, sir.

10         Q.   I thought I talked to --

11              MR. MARTINY:

12                   You can share it on the screen.

13              THE WITNESS:

14                   I know I e-mailed Miss Gina.  I just

15                 don't know the time and everything like

16                 that.  I don't know what time I talked

17                 to Chad.

18   BY MR. CLARKE:

19         Q.   Well, I'm trying to get you to look at

20   the e-mail that we e-mailed to you yesterday and

21   put it in front of you.  I don't have it on my

22   computer.

23         A.   I'm looking at it, sir.  I don't have it.

24   I have three -- I got Exhibit 8, 7, and JPSO

25   policy.  That's all I have.

```
 1              MR. CLARKE:
 2                   Let's stop for a second here.  I got
 3                to share it on this computer.  I don't
 4                have the files on this computer.
 5              MR. MARTINY:
 6                   If he scrolls down to the bottom --
 7      BY MR. CLARKE:
 8         Q.   Can you scroll all the way down on your
 9      e-mail?
10         A.   I'm doing it.  All I got is Exhibit 8, 7,
11      and JPSO policy.
12              MR. ZIBILICH:
13                   Why don't you just read it to him.
14              MR. CLARKE:
15                   That's what I did, but I'm asking
16                him if he talked to him before that.
17              THE WITNESS:
18                   I don't know.  I don't know what
19                time I talked to him.
20              MR. CLARKE:
21                   I understand.  I'm trying to put a
22                document in front of you that has a
23                time stamp, and I am going to ask you
24                questions if that refreshes your
25                recollection of whether you talked to
```

```
 1                   him before or after that time.
 2              MR. MARTINY:
 3                   Mr. Canatella, look at the e-mail
 4              that was forwarded to you by Tim
 5              Anclade at 11:17 last night.  The
 6              e-mail he is referencing should be in
 7              that.  There should be two e-mails you
 8              received from him.  The one that was
 9              11:17 last night.
10              THE WITNESS:
11                   What time?
12              MR. MARTINY:
13                   11:17 the e-mail was sent from
14              Anclade to you.
15              THE WITNESS:
16                   I was sleeping.
17              MR. MARTINY:
18                   There should be four attachments in
19              that e-mail.
20              THE WITNESS:
21                   I see it now.  Okay.  I got it.
22         BY MR. CLARKE:
23              Q.   Do you see the e-mail dated Sunday,
24         January 19th, 2020 at 5:33 PM?
25              A.   Yes.
```

1      Q.   And on this thing you write an e-mail

2  about the incident to Miss Christopher, correct?

3      A.   Yes.

4      Q.   If you read that to yourself here, does

5  that let you know whether or not you spoke to Chad

6  Pitfield before or after the sending of that

7  e-mail?

8      A.   Okay.  I'm not sure if I talked to Chad

9  Pitfield before or after that e-mail.

10      Q.   Where did you learn by January 19th,

11  2020, at 5:33 PM, that there was an autistic

12  teenager fighting with his father in the parking

13  lot?

14      A.   I was notified by I don't remember who

15  about the incident, and I left what I was doing,

16  and I went to the detail.  When I went to the

17  detail, someone told me or give me the information

18  on it, and they told me I wasn't needed on the

19  scene, and I left.  And then I contacted Miss Gina.

20      Q.   So the events of this is the event

21  happened.  At some point, do you know who called

22  you?

23      A.   No, sir, I don't.

24      Q.   But after you received information that

25  there was an incident on the detail, you went to

```
 1    the detail location?
 2         A.   Yes, sir.
 3         Q.   Who was present at the detail location
 4    when you got there?
 5         A.   Sir, I don't remember.
 6         Q.   Are you not supposed to take any notes or
 7    reports concerning --
 8         A.   I didn't go --
 9              MR. ZIBILICH:
10                   Object to the form.
11              THE WITNESS:
12                   -- inside the crime scene.  I was
13                stopped in the parking lot and told I
14                was not needed, and they would contact
15                me later.
16    BY MR. CLARKE:
17         Q.   Was an ambulance on the scene at the time
18    you got there?
19         A.   I don't remember.
20         Q.   Do you remember any deputies who were
21    there?
22         A.   No, sir, I don't.
23         Q.   Where did you talk to Chad Pitfield about
24    the incident?
25         A.   I don't remember when I talked to him.  I
```

1    think I talked to him over the phone.  I don't

2    remember when.  I think it was after leaving for

3    the hospital.

4         Q.    Tell me everything that you can remember

5    Chad Pitfield telling you?

6         A.    Don't remember too much about what he

7    told me.

8         Q.    Did you have any training at JPSO on how

9    to deal with autistic teenagers?

10        A.    I'm not sure.

11        Q.    Do you know if Chad Pitfield had any

12   training at JPSO on dealing with autistic

13   teenagers?

14        A.    I'm not sure, sir.

15        Q.    Do you understand that -- do you have any

16   understanding one way or the other whether or not

17   E█   P█████   could even communicate with people?

18        A.    Wait.  Excuse me, sir.

19        Q.    Do you know whether or not E█  P█████,

20   who is the teenager who died, was a nonverbal

21   autistic kid?

22        A.    I can't answer that.  I never met the

23   man.  I never met the child.

24        Q.    This might be easier.  Did you do any

25   independent investigation to try to figure out the

```
 1   facts of what happened to report to Westgate other
 2   than what you've put in this e-mail?
 3        A.   No, sir.
 4        Q.   So the amount of investigation that you
 5   did that was provided to Westgate is contained
 6   within the e-mail dated January 19, 2020, correct?
 7             MR. ZIBILICH:
 8                  Object to the form.
 9             THE WITNESS:
10                  I believe so.
11   BY MR. CLARKE:
12        Q.   Did you complete -- did you have any
13   telephone discussion with Miss Christopher about
14   the events?
15        A.   I don't know.  I don't remember.
16        Q.   Do you remember Miss Christopher
17   e-mailing you and wanting to request a written
18   statement from Chad Pitfield about the incident
19   wanting Westgate's insurance company to obtain a
20   written statement from Mr. Pitfield?
21        A.   I'm not sure about that.
22        Q.   In those e-mails -- there should be three
23   e-mails together.  One e-mail dated Wednesday,
24   February 12, 2020, where Miss Christopher writes,
25   "Hi, Donald.  Our insurance company is requesting a
```

1 written statement from Chad about the incident that

2 happened in front of Laser Tag. Would he be

3 willing to do that?" And your response was, "I

4 will ask him." Did you ask Chad Pitfield whether

5 he would give a statement to Westgate's insurance

6 company?

7     A. I don't remember. If you don't hit

8 reply, I don't remember.

9     Q. The next e-mail that I have that you

10 wrote to Gina Christopher is Wednesday, February

11 12th, 2020, at 8:59 where you write, "Hey, we spoke

12 to our supervisors and learned that we can't give

13 statements concerning an open sheriff's order and

14 for the insurance company to contact JPSO legal and

15 ask for Lindsey Valienta."

16         MR. ZIBILICH:

17             Close. Valenti.

18         MR. CLARKE:

19             Valenti.

20 BY MR. CLARKE:

21     Q. Who did you learn that you can't give a

22 statement to Westgate's insurance company where you

23 -- where Mr. Pitfield was performing paid private

24 detail? Who told you you can't give a statement?

25     A. Probably the JPSO Legal Department.

```
 1        Q.   Do you know who you spoke to at JPSO
 2   Legal Department?
 3        A.   No, sir.
 4        Q.   Do you know that you even contacted them
 5   or did they contact you?
 6        A.   I don't remember.
 7        Q.   Is there any -- if there was an incident
 8   that occurred on the Westgate property, was it your
 9   practice, as the administrator of the detail, to
10   send a brief e-mail summarizing any type of
11   incident that occurred on the property to Miss
12   Christopher?
13             MR. ZIBILICH:
14                  Object to the form.
15             THE WITNESS:
16                  Say that again, sir.  I'm sorry.
17   BY MR. CLARKE:
18        Q.   When you were the administrator of the
19   detail at Westgate, was it your practice to write
20   an e-mail if there was an incident to Miss
21   Christopher to apprise her of any event that
22   occurred on the property?
23             MR. ZIBILICH:
24                  Object to the form.
25             THE WITNESS:
```

```
 1                    Not all incidents.
 2   BY MR. CLARKE:
 3        Q.   How do you make the decision as to what
 4   incidents you reported to Miss Christopher?
 5        A.   Minor stuff I don't report and something
 6   major I would report.
 7        Q.   I understand.  Some people might think
 8   something is major.  Some people might think
 9   something is minor.  What do you do, as the
10   administrator of -- obviously -- let me strike
11   that.  Obviously, the Parsa incident was something
12   that was significant enough where you felt like you
13   needed to provide some type of information to the
14   person paying for the paid detail, correct?
15        A.   Yes.
16        Q.   There is some other things in the
17   e-mails.  I'm not going to go -- certain e-mails.
18   There was a huge fight at one time with 40
19   teenagers.  That was something that you felt was
20   significant enough to report to Miss Christopher,
21   correct?
22        A.   Yes.  I guess so.
23        Q.   If you had intel that protesters are
24   going to loot a business, you can request
25   additional deputies, correct?  You've done that?
```

```
 1        A.   Yes.
 2        Q.   Car crashes on the parking lot where
 3   somebody was arrested for stalking, that is
 4   something that is significant enough for you to
 5   report to the person paying for the paid detail,
 6   correct?
 7        A.   Yes, sir.
 8        Q.   You also notified Miss Christopher at one
 9   time there was a customer that said there was a
10   woman living in her white SUV between the furniture
11   store and the old Payless Shoe space.  That was
12   something that you felt was significant enough to
13   inform Miss Christopher, correct?
14        A.   Yes, sir.
15        Q.   Any other things that you ever informed
16   Miss Christopher about that occurred on the
17   property?
18             MR. HILL:
19                  Object to the form.
20             THE WITNESS:
21                  I don't remember if there is
22             anything else.  I don't know.
23   BY MR. CLARKE:
24        Q.   Let's go back.  I am just going to go
25   over this January 19th e-mail with you.  Did you
```

```
 1   ever see any injury to Pitfield's leg?
 2        A.    No, sir.
 3        Q.    Did you obtain the Laser Tag videos?
 4             MR. ZIBILICH:
 5                  Object to the form.
 6             THE WITNESS:
 7                  Did I?
 8   BY MR. CLARKE:
 9        Q.    Yes.
10        A.    No.
11        Q.    I mean, you note in here Laser Tag has
12   video surveillance cameras and was able to capture
13   the entire incident outside.  That's all the
14   information I have right now.  I mean, that was you
15   giving her information about the incident and what
16   she could look at to apprise herself of it?
17        A.    I knew Laser Tag has cameras in front of
18   the business.
19        Q.    It says -- you said, "Was able to capture
20   the entire incident outside."  Did you review it?
21        A.    No, sir, I did not.
22        Q.    So you don't know if it was able to
23   capture the entire incident; that was just your
24   assumption, correct?
25        A.    Yeah.
```

```
 1              MR. CLARKE:

 2                    That's all the questions I have.

 3              MR. HILL:

 4                    I have a couple.

 5      EXAMINATION BY MR. HILL:

 6          Q.   Mr. Canatella, I am Mark Hill.  I

 7      represent, along with Chris Kaul, who is here with

 8      me, the defendants, Westgate and Victory and their

 9      interests.  I just have a couple of questions for

10      you.  It won't take very long.  First question.

11      The paid security detail that you were providing to

12      the Westgate Mall, does the Jefferson Parish

13      Sheriff's Office make that service available to

14      other businesses parish wide?

15          A.   Yes.

16          Q.   Are you the administrator for any other

17      paid detail, paid detail services provided by the

18      Jefferson Parish Sheriff's Office in Jefferson

19      Parish?

20          A.   No, sir.

21          Q.   So this is your only detail that you are

22      the administrator on?

23          A.   Okay.  What it is I do for Victory Real

24      Estate.  They have other properties in Metairie.

25      Sometimes, when they need a deputy there, they call
```

```
 1    me to do that.  So, yes, but just one detail, but
 2    it's one location, but it's one business, and
 3    that's why I say it's one.
 4         Q.   I understand that.  You also said that
 5    you work details yourself in addition to being the
 6    administrator.  Is that correct?
 7         A.   Yes.
 8         Q.   Do you serve on other details where
 9    you're not the administrator for other properties
10    not owned by Westgate?
11         A.   Yes.
12         Q.   What other details are those?
13         A.   Metairie Country Club.
14         Q.   Who is the administrator for that detail?
15         A.   I can't think of the guy's name.
16         Q.   That's okay.  It's not a memory test.
17         A.   He is in charge of traffic.  Lonero, Greg
18    Lonero.
19         Q.   Do you have any idea how many businesses
20    or private properties in Jefferson Parish that this
21    paid, off-duty detail is available to?
22         A.   No, sir.  You have to call the detail
23    office.
24         Q.   Are you aware of the requirements that a
25    private property or business needs to meet in order
```

```
 1   to be eligible for the paid Jefferson Parish off-
 2   duty program to provide private patrol?
 3        A.   Wait.  Can you repeat that question?
 4        Q.   Yeah. I got a little distracted at the
 5   end.  What I'm trying to establish is that the
 6   Westgate Mall is not the only property in Jefferson
 7   Parish that the Jefferson Parish Sheriff's Office
 8   provides off-duty private patrol to, correct?
 9        A.   Correct.
10        Q.   And you have identified Metairie Country
11   Club as another one of those properties, correct?
12        A.   Yes, sir.
13        Q.   And so I'm just trying to find out if you
14   have a ball park estimate.  I understand it's a
15   ball park estimate of how many properties the
16   sheriff's department provides the service to.
17        A.   I can't give you an estimate.  I can just
18   tell you it's a lot.
19             MR. HILL:
20                  That's all I needed.  Thank you,
21             sir.
22             THE WITNESS:
23                  No problem.
24             MR. ZIBILICH:
25                  Nothing by the JPSO defendants.
```

```
 1   BY MR. CLARKE:
 2       Q.   I've got a follow-up.  Mr. Canatella, I
 3   have a follow-up.  A paid detail cannot be
 4   performed at a place that serves alcoholic
 5   beverages, correct?
 6               MR. ZIBILICH:
 7                   Well, I object to the -- whoa, whoa.
 8               I object to the form.  That is way
 9               outside a follow-up, sir.
10               MR. CLARKE:
11                   No.  I don't --
12   BY MR. CLARKE:
13       Q.   So look at the policy again.  What is an
14   ABO?
15               MR. ZIBILICH:
16                   Object to the form again.
17               THE WITNESS:
18                   Alcohol beverage outlet.
19   BY MR. CLARKE:
20       Q.   You are not allowed to work inside a
21   place -- a paid detail can't be performed inside an
22   alcoholic beverage outlet, correct?
23       A.   I guess so, sir.  I have no information
24   on that.
25       Q.   SOP-11, Section 6-A.
```

```
 1          A.    Okay.
 2          Q.    "Officers are not permitted," in all
 3    caps, "to work a public assignment inside an
 4    alcoholic beverage unit," correct?
 5          A.    I guess so.  That's what it says.
 6          Q.    And why -- Jefferson Parish offers this
 7    to certain businesses if they meet the criteria.
 8    When you are assigned on the special detail for a
 9    particular shift, those deputies are required to
10    perform the duties solely on the premises of the
11    paid detail, correct?
12          A.    I don't understand your question.
13          Q.    That's fine.  If you have -- if you work
14    on more than one paid detail.  You work on the paid
15    detail for Victory, which includes Westgate and a
16    number of their other properties, correct?
17          A.    Couple of other properties, yes.
18          Q.    You also work at a paid detail, not as
19    the administrator, at the Metairie Country Club,
20    correct?
21          A.    Yes.
22          Q.    You can't be assigned to work at the
23    Metairie Country Club and at Westgate at the same
24    time, correct?
25          A.    Correct.
```

1      Q.   During the period of time that you are
2   assigned or scheduled to work at a particular
3   detail, your job is to protect or provide services
4   for that property, on that property, and that
5   property only, correct?
6      A.   Yes, sir.
7      Q.   So during the times that you were
8   scheduled at Westgate or Pitfield was scheduled at
9   Westgate, they should only be performing security
10  functions or law enforcement functions on the
11  Westgate property for that period of time, that
12  shift, correct?
13             MR. ZIBILICH:
14                  Object to the form.
15          THE WITNESS:
16                  Yes.
17          MR. CLARKE:
18                  That's all I have.
19          MR. ZIBILICH:
20                  Okay.  Thank you, sir.
21                  [End of deposition, 9:52]
22
23
24
25

```
1                    C E R T I F I C A T E

2

3                    This certification is valid only for
   a transcript accompanied by my original signature
4  and original required seal on this page.

5                    I, SANDRA P. DIFEBBO, Certified
   Court Reporter, in and for the State of Louisiana,
6  as the officer before whom this testimony was
   taken, do hereby certify that DONALD A. CANATELLA,
7  JR., after having been duly sworn by me upon
   authority of R.S. 37:2554, did testify as
8  hereinbefore set forth in the foregoing 61 pages;

9                    That the testimony was reported by
   me in stenotype, was prepared and transcribed by me
10 or under my personal direction and supervision, and
   is a true and correct transcript to the best of my
11 ability and understanding;

12                   That the transcript has been
   prepared in compliance with transcript format
13 guidelines required by statute or by rules of the
   board, that I have acted in compliance with the
14 prohibition on contractual relationships as defined
   by Louisiana Code of Civil Procedure Article 1434
15 and in rules and advisory opinions of the board;

16                   That I am not related to Counsel or
   to the parties herein, nor am I otherwise
17 interested in the outcome of this matter.

18

19

20

21 _____
   Sandra P. DiFebbo,
22 Certified Shorthand Reporter

23 Date:  _____

24

25
```