**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

DONNA LOU and DAREN PARSA,  )
on their own behalf and on behalf  )
of their deceased minor child, E.P.  )
 )
      Plaintiffs,  )
 )
   v.  )
 )
SHERIFF JOSEPH P. LOPINTO, III,  )
CHAD PITFIELD, RYAN VAUGHT,  )
STEVEN MEHRTENS, SHANNON GUIDRY,  )
NICK VEGA, MANUEL ESTRADA, MYRON GAUDET,  )
JOHN DOES 1-3, VICTORY REAL ESTATE  )
INVESTMENTS LA, LLC and WESTGATE INVESTORS  )
NO LLC D/B/A WESTGATE SHOPPING CENTER,  )
ABC INSURANCE COMPANY, and XYZ INSURANCE  )
COMPANY,  )
 )
      Defendants.  )

**EXPERT REPORT OF JEFFREY J. NOBLE**

1.     My name is Jeffrey J. Noble, and I make this report at the request of plaintiff's counsel.

2.     I was a police officer in the City of Irvine for 28 years rising to the position of Deputy Chief of Police prior to my retirement. I served as an interim Deputy Chief of Police at the Westminster Police Department for nine months.

     a.     I was a police officer for 28 years and retired in July 2012 as the Deputy Chief of Police with the Irvine Police Department, located in southern California. As a Deputy Chief, I was directly responsible for all police operations including Patrol, Traffic, Criminal Investigations, Emergency Management, Crime Prevention, DARE, K9s, Training, and SWAT. The City of Irvine encompasses over 70 square miles with a population of over 218,000. I served in a wide range of assignments as an Officer, Senior Officer, Sergeant, Lieutenant, Commander and Deputy Chief, including Patrol, Traffic, Detective, SWAT, Training, Internal Affairs, Emergency Management and Crime Prevention. The Irvine Police Department had over 200 police officers and over 100 civilian employees during my employment with the department.

b.   In April 2014, I was hired by the Westminster, California Police Department as an interim Deputy Chief of Police. My employment with the Westminster Police Department was by means of a temporary contract, and I was asked to review the department's Internal Affairs unit; department policies relating to Internal Affairs investigations, discipline and police officer conduct; conduct department audits and inspections; and act as a liaison with a civilian oversight monitor who was hired during the same period. My employment was at the request of the Chief of Police, was ratified by the City Council and was sought due to the arrest of a police officer for an off-duty criminal sexual assault, the arrest of an on-duty officer for extortion and a lawsuit filed by three Latino officers alleging discrimination and retaliation. I concluded this interim position in January 2015. The Westminster Police Department had 87 police officers and 40 civilian employees during my temporary contracted employment.

c.   As a police supervisor and manager, I have extensive experience conducting internal administrative investigations on a wide range of issues including use of force, vehicle pursuits, officer misconduct, criminal interrogations and interviews, harassment and sexual assaults.

4.   I have a Juris Doctor degree, with honors, from Western State University College of Law and I am admitted to practice law in the State of California. I have a Bachelor's degree in Criminal Justice with an emphasis on Administration from California State University at Long Beach.

5.   As a police consultant and expert witness, I have extensive experience on matters involving police investigative procedures, misconduct and corruption. For example:

a.   In 2014, I was part of a Carnegie Institute of Peace Think Tank for addressing police use of force in developing countries.

b.   I have consulted with other police organizations on a wide range of police practices, procedures, including criminal and administrative investigations. For instance, I was retained in 2004 as an expert to review and evaluate the internal investigation conducted by the San Francisco, California, Office of Community Complaints of the case widely known as "Fajitagate" involving the indictment of seven command staff members and three officers of the San Francisco Police Department. In 2007 and again in 2009, I was retained by the City of Austin, Texas to review the police department's internal homicide and Internal Affairs investigation of two officer involved fatal shootings.

c.   I have been retained as both a defense and a plaintiff's expert in over 300 cases and have testified as an expert in state court in California, Washington, Tennessee, Connecticut, Minnesota, Illinois and New Mexico and in federal court

in Illinois, Tennessee, Georgia, South Carolina, North Carolina, Virginia, Texas and California.

d.  I have prepared expert reports for cases in the states of California, Washington, Pennsylvania, Georgia, Illinois, Tennessee, Idaho, Arkansas, Texas, Colorado, New York, Oklahoma, Connecticut, Florida, New Mexico, Minnesota, Ohio, Kentucky, Louisiana, Indiana, Wisconsin, Virginia, Delaware, Oregon, Arizona, New Mexico, New Jersey, Mississippi, North Carolina, South Carolina, Wyoming, Kansas and Missouri.

e.  I have been retained in criminal cases involving allegations of criminal uses of force by police officers in the states of New Mexico, Delaware, Minnesota, Pennsylvania, California, Georgia, Washington, and Florida.

f.  I served as an independent policy advisor to the Large City Internal Affairs Project, which was funded by the United States Department of Justice.  This group consists of the 12 largest police agencies in the United States as well as a select group of independent policy advisors and academics.  The project was an effort to develop national best practices in internal investigations for police agencies.  I was the chair of a sub-committee whose efforts were focused on the investigation of allegations of officer misconduct.  Because of this project the COPS Office published a document entitled, "Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice."

g.  I have given presentations at the International Association of Chiefs of Police conference in 2004, 2009, 2012, and 2014; the national COPS conference on Internal Affairs issues and the Academy of Criminal Justices Sciences annual meeting on tactical reckless decision making in 2009; the American Psychological Association annual conference in 2013; and National Tactical Officers' Association annual conference in 2004.

h.  In 2013, I gave a presentation in Mexico at the request of the Mexican government on preventing corruption in police institutions.

i.  I have published 21 articles on policing which discussed the subject matters of: Internal Affairs, personnel issues, pursuits, use of force issues and investigative procedures.  Those articles are listed in my attached resume.

j.  I have published two chapters for policing textbooks on tactical recklessness and the code of silence.

k.  I have co-authored, along with Geoffrey Alpert, Ph.D., a textbook on police Internal Affairs investigations titled, "Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight."

3

l.      As evidence that the opinions in our book are accepted by other experts of police administrative investigations, my book was cited extensively in the COPS 2009 publication, "Building Trust Between the Police and the Citizens They Serve: An Internal Affairs Promising Practice Guide for Local Law Enforcement."

m.      In 2020, I co-authored a textbook, "Evaluating Police Uses of Force," with Seth Stoughton and Geoffrey Alpert.

6.      My experience, training and background are more fully described in my attached resume.

7.      My areas of expertise in policing include, but are not limited to: police use of force; pursuits; police administration; training; police operations; criminal investigations; interviews and interrogations; civil rights violations and investigations; internal/administrative investigations; criminal investigations; police discipline; citizen complaints; and police policies and procedures.

8.      I reviewed the following material in making my opinions:

- Complaint
- Manuel Estrada's Responses to Plaintiffs' First Set of Interrogatories and Requests for Production of Documents and documents attached
- Manuel Estrada's Supplemental Responses to Plaintiffs' First Set of Interrogatories and Requests for Production of Documents and documents attached
- Manuel Estrada's transcribed Statement January 23, 2020
- Manuel Estrada's Training File
- Myron Gaudet's Responses to Plaintiffs' First Set of Interrogatories and Requests for Production of Documents and documents attached
- Myron Gaudet's Supplemental Responses to Plaintiffs' First Set of Interrogatories and Requests for Production of Documents and documents attached
- Myron Gaudet's transcribed Statement January 23, 2020
- Myron Gaudet's Training File
- Shannon Guidry's Responses to Plaintiffs' First Set of Interrogatories and Requests for Production of Documents and documents attached
- Shannon Guidry's Supplemental Responses to Plaintiffs' First Set of Interrogatories and Requests for Production of Documents and documents attached
- Shannon Guidry's transcribed Statement January 23, 2020
- Shannon Guidry's Training File
- Steven Mehrten's Responses to Plaintiffs' First Set of Interrogatories and Requests for Production of Documents and documents attached

4

- Steven Mehrten's Supplemental Responses to Plaintiffs' First Set of Interrogatories and Requests for Production of Documents and documents attached
- Steven Mehrten's transcribed Statement January 23, 2020
- Steven Mehrten's Training File
- Chad Pitfield's Responses to Plaintiffs' First Set of Interrogatories and Requests for Production of Documents and documents attached
- Chad Pitfield's Supplemental Responses to Plaintiffs' First Set of Interrogatories and Requests for Production of Documents and documents attached
- Chad Pitfield's transcribed Statement January 23, 2020
- Chad Pitfield's Training File
- Chad Pitfield Injury Report
- Ryan Vaught's Responses to Plaintiffs' First Set of Interrogatories and Requests for Production of Documents and documents attached
- Ryan Vaught's Supplemental Responses to Plaintiffs' First Set of Interrogatories and Requests for Production of Documents and documents attached
- Ryan Vaught's transcribed Statement January 23, 2020
- Ryan Vaught's Training File
- Nicholas Vega's Responses to Plaintiffs' First Set of Interrogatories and Requests for Production of Documents and documents attached
- Nicholas Vega's Supplemental Responses to Plaintiffs' First Set of Interrogatories and Requests for Production of Documents and documents attached
- Nicholas Vega's transcribed Statement January 23, 2020
- Nicholas Vega's Training File
- Responses to Plaintiffs' First Set of Interrogatories and Requests for Production of Documents of Joseph Lopinto, Individually and in his Official Capacity and all documents produced therein including Incident Report, Sgt. Dowling Homicide Report and attachments including witness/officer statements, JPSO policies, training documents, photographs, video tapes, IA files, etc.
- Plaintiffs' Responses to JPSO Defendants' First Set of Written Discovery to Plaintiffs and documents produced
- Plaintiffs' Responses to Defendants Victory Real Estate Investments LA, LLC & Westgate Investors No., LLC's First Set of Written Discovery to Plaintiffs and documents produced
- Plaintiffs' Rule 26(A) Disclosures
- Plaintiffs' First Set of Interrogatories and Request for production of Documents to the Individual Jefferson Parish Sheriff's Office Defendants and responses thereto
- Plaintiffs' First Set of Interrogatories and Requests for Production of Documents to Sheriff Joseph P. Lopinto and responses and attachments thereto
- Plaintiffs' First Set of Interrogatories and Request for Production of Documents and Requests for Admission to Defendants Victory Real Estate Investments LA,

        LLC and Westgate Investors No LLC D/B/A Westgate Shopping Center and responses thereto

- Defendants Victory Real Estate Investments LA, LLC and Westgate Investors No, LLC Initial Disclosures Pursuant to Rule 26 of the Federal Rules of Civil Procedure
- Defendants Victory Real Estate Investments LA, LLC and Westgate Investors No, LLC D/B/A Westgate Shopping Center's Supplemental Responses to Plaintiff's First Set of Written Discovery and documents attached thereto
- Defendants Victory Real Estate Investments LA, LLC and Westgate Investors No, LLC First Set of Written Discovery to Plaintiffs and Plaintiffs' responses and documents produced
- Depositions and Exhibits:
  - Craig Pond
  - Michael Pizzolato
  - Michael Voltolina
  - Donald Meunier
  - Joshua Wingrove
  - Donald Canatella
  - Gina Christopher
  - Keith Dowling
  - Manuel Estrada
  - Shannon Guidry
  - Timothy Genevay
  - Myron Gaudet
  - Dana Troxclair
  - Steven Mehrtens
  - Chad Pitfield
  - Nicolas Vega
  - Robert Blackwell
  - Joseph Deist
  - Jeanetta Euper
  - Mallory Smith
  - Ryan Vaught
  - Daren Parsa
  - Donna Lou
  - Sheriff Joseph Lopinto
- IACP Training Key #678 – Autism: Managing Police Field Contacts
- Articles and Documents referenced in this report
- All deposition exhibits

9.  At this point in the development of this case, I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such aid, I will ensure that they are made available for review, if requested, prior to their use.

10.    My professional charges for this litigation work is an hourly fee of $400 plus expenses including all travel time.  My fees for deposition and trial testimony are a flat rate of $2,500 for the first four hours and $600 per hour for every additional hour, plus travel time and expenses.

11.    If I am provided additional materials that changes, alters or amends my opinions, I will prepare a supplemental report.

12.    To ensure my methodology was reliable, my opinions are based on a comprehensive review of the provided materials that establishes my understanding of the facts of the case and on the professional and generally accepted principles and practices in policing as of the date of this incident.  "Generally accepted practices" refers to those protocols, techniques, and procedures that are widely known, acknowledged, and relied upon in the field.  A practice is generally accepted when well-educated, well-trained, and experienced professionals would agree that it is conventional, customary, and reasonably standard.  Generally accepted practices in policing reflect technical and specialized knowledge in the law enforcement field.  A practice can be generally accepted without necessarily being universally adopted or rising to the level of a long-established, empirically validated best practice.  Generally accepted practices may be, but are not necessarily, reflected in Department of Justice consent decrees, publications by professional associations (such as the International Association of Chiefs of Police, the Police Executive Research Forum, the National Police Foundation, etc.), in agency policies, and in reputable training materials.

13.    To identify and apply the applicable generally accepted practices in policing, I rely on my knowledge, skill, experience, training, and education in law enforcement.  This includes work in my field of study as a policing scholar and author; my knowledge of historical and contemporary law enforcement standards and methods; and the relevant professional and academic literature. I employ a similar methodology when I conduct professional evaluations of police officers or agencies as a consultant and when writing for reputable academic and professional publishers. The methodology I applied in this case is consistent with the methodology utilized by other experts in the field of law enforcement when analyzing incidents of this type.

14.    My use of terminology such as "excessive," "unreasonable," and "disproportionate," etc., is intended to and should be read as references to the professional and generally accepted standards in policing and is not intended and should not be interpreted as references to or the application of legal standards within the sole province of the factfinder or judge.

15.    The opinions that follow are made within a reasonable degree of certainty within the field of police practices based on over 35 years of professional law enforcement experience and scholarship.

**Summary of Incident**

16.   On January 19, 2020, EP accompanied his parents, Donna Lou and Daren Parsa, to the
      Laser Tag located in the Westgate Shopping Center in Metairie, Louisiana.  EP was 16
      years old and had Severe Autistic Spectrum Disorder (ASD).  While at the Laser Tag, EP
      and his father played games and when they got ready to leave, the family walked to the
      parking lot, headed to their vehicle.

17.   While they were in the parking lot, EP began to experience a sudden sensory outburst or
      "meltdown" caused by his severe autism.  EP, who was non-verbal, began slapping at
      himself and his father and grabbing his father as part of his meltdown.  The physical
      encounter lasted about 5 minutes and during the incident EP bit his father, who was
      bleeding from his chin.

18.   The manager at the Laser Tag, who was familiar with the family due to their frequent
      visits, asked Ms. Lou whether she wanted her to call the police for assistance and Ms.
      Lou said she did.  The Laser Tag manager called Deputy Pitfield, a Jefferson Parish
      Sheriff's Office (JPSO) deputy who was working a security detail at the shopping center
      and told him that a child has autism and was in a struggle with his father in front of the
      Laser Tag.

19.   Deputies who work the off-duty assignment at the shopping center are provided a cell
      phone so they can be contacted directly by the businesses.  Deputies who work private
      detail are employed by the private employer to perform security on their premises
      during their scheduled hours.  Although it is an off-duty overtime assignment, the
      deputies wear their sheriff's department uniform, use their sheriff's department
      equipment, and are required to follow sheriff's department policies, practices, rules and
      regulations.

20.   When Deputy Pitfield arrived, the physical encounter between EP and his father had
      ended and EP was standing by the open back door of the Parsa's vehicle.  Deputy Pitfield
      left his police lights activated after he exited his vehicle.

21.   Deputy Pitfield spoke with Mr. Parsa who told him EP had autism.

22.   Six seconds after Deputy Pitfield exited his vehicle, EP left the family car and began
      flailing his arms and slapping himself.  After slapping himself on the head, EP began
      slapping at his father and then at Deputy Pitfield.  Deputy Pitfield took EP to a prone
      position on the ground.  While on the ground, Deputy Pitfield said EP bit his leg and
      Deputy Pitfield responded with a single strike towards EP's head.  Deputy Pitfield
      radioed other deputies to assist in restraining EP.

23.   Deputy Pitfield said he realized he needed a second pair of handcuffs due to EP's size, so
      he retrieved a second pair from his vehicle and then sat on EP's back for approximately

7 minutes between 1:29:15 pm and 1:36:02 pm. Deputy Pitfield had RIPP Hobble training but was never assigned a RIPP Hobble.[1]

24. Ms. Lou sat next to EP and stroked his hand telling him he would be okay and she placed some clothing under his head as he has been known to bang his head during an outburst.  According to Deputy Pitfield, Ms. Lou's intervention was calming EP down.

25. At 1:34:20 pm, Detective Vaught arrived in response to Deputy Pitfield's radio call. Detective Vaught understood that EP was having a "mental episode" and was "special needs."  Detective Vaught assisted Deputy Pitfield in handcuffing EP's hands behind his back.  During his statement about these events to homicide detective, Vaught described the moment he arrived as follows: *"Q: You're meeting resistance? A: No, no, no, not—not—not really, no......Q: Okay. A: Um, he was, he was um, moving a little bit but he wasn't trying to resist or pull his—pull his arm away."* [2] And *"Q: Okay and again, no measurable resistance at the point where you secure his left hand and are able to—to cuff him, cuff him to the cuffs that Deputy Pitfield has?" A: No, um, there—there was no active resistance from him. I was able to—to handcuff him and get them behind his back."*[3]  Detective Vaught did not have a RIPP Hobble on the date of this event and does not know whether he received a RIPP Hobble after receiving the RIPP Hobble training.[4]

26. Although both Deputy Pitfield and Detective Vaught knew that EP was autistic, had just been involved in physical exertion, was obviously very obese, was not offering any resistance and was prone on the ground with his hands handcuffed behind his back, Deputy Pitfield who weighed approximately 300 pounds remained sitting on EP's back and the deputies failed to place EP in a recovery position by simply turning him on his side or sitting him up. Both Deputy Pitfield and Vaught knew EP had been in a struggle, and they each knew that he was autistic, obese and special needs, and they knew the dangers of excited delirium and positional asphyxia.

27. Deputy Mehrtens arrived at 1:34:20 pm and although he knew EP had been in a struggle, that he was autistic, obese and special needs, and he knew the dangers of excited delirium and positional asphyxia he made no effort to intervene and place EP in a recovery position. Mehrtens described the situation when he arrived to JPSO homicide detectives as follows: "Uh, at the time I physically observed him, he was face down on the ground, he had two (2) sets of handcuffs and his hands were handcuffed behind his back with Deputy Pitfield sitting on his buttocks area. Um." [5]  He further stated, *"At the time I arrived there wasn't, there wasn't a struggled (sic), it didn't appear to be a struggle..."*[6]  Finally, he notes, "So, once he's handcuffed, what occurs? A: *Once*

---

[1] Pitfield at 56.
[2] Vaught Statement at 4-5.
[3] Vaught Statement at 12.
[4] Vaught deposition at 92.
[5] Mehrtens Statement at 3.
[6] Mehrtens Statement at 3, 4

*he's handcuffed, myself, personally, I didn't see a struggle so there was no need for me to engage him, you know, or the, what was transpiring with the struggle portion at the point, so* I immediately start looking at dad…." [7]   Detective Mehrtens describes in his statement that he and Detective Vaught both talk with E.P.'s father "for a minute." After describing that conversation, he noted the following: "Q: So where is Deputy Pitfield right now?  A: He's still with, with uh, the subject on the ground. *Q: Non struggle?  A: No struggle.*" [8]  Finally, Deputy Mehrtens noted: "Oh yeah, from uh, from the point that I, that I arrived is when people were, I think it was the mother and the father, you know, he's special needs, he's got autism. Um, and that's also another reason why, you know, *Deputy Pitfield has got him under control, we train on this a lot, so we, we know that if he's autistic there's there are things, excited delirium, there's all, there's all kinds of stuff that can take place with somebody with any kind of mental illness or disability, so to engage him at that point just wasn't necessary, he was calm, everything was fine."* [9]  Deputy Mehrtens received a RIPP Hobble after training but did not utilize it during these events.[10]

28.   Deputy Vega arrived at 1:34:42 pm and although he knew EP had been in a struggle, that he was autistic, obese and special needs, and knew of the dangers of excited delirium and positional asphyxia, he made no effort to intervene and place EP in a recovery position.  In his statement to homicide detectives, Deputy Vega noted that Pitfield was in a "good position, he looked tired but he looked okay."[11] Vega was asked about Pitfield's control of the situation: "*Q: And it's your perception that he had control. A: It appeared to be…yeah.*" [12] E.P. "was fully handcuffed and there was two sets."[13] Deputy Vega also spoke with Deputy Pitfield and with E.P.'s mom noting, "And we talking to the kid . . . To calm down, you know it's okay… it's okay." He heard E.P. saying "firetruck, firetruck" when E.P. heard a siren.[14]  Vega told homicide investigative detectives that by this time he "kind of get the picture" that E.P. has "some special needs."[15]  When he was asked if anybody told him about E.P. being "special needs" he responded, "I… not directly, I overheard that he was a special needs kids, but you can…you can obviously tell because when he yells "Firetruck" you can hear the speech and…and the way he's talking and how the sirens set him off, he wasn't like, somebody else."[16]  At the time that Deputy Vega relieved Deputy Pitfield on EP's back, he noted: "I'm sitting there, I got my hands on the cuffs and I'm putting him on his back, I'm like, "It's going to be okay, calm down.. calm down. It's going to be okay." And the mom is

---

[7] Mehrtens Statement at 4
[8] Mehrtens Statement at 4.
[9] Mehrtens Statement at 10.
[10] Mehrtens deposition at 34.
[11] Vega Statement at 1.
[12] Vega Statement at 2.
[13] Vega Statement at 2-3.
[14] Vega Statement at 3.
[15] Vega Statement at 4.
[16] Vega Statement at 4.

steadily…. (Q) Is there resistance at this point?  (A) No he was fine, at this point. But then all of a sudden, it went from zero to one hundred. (Q) And what.. what does he do? (A) He starts trying to get up, he starts bucking.. he trying to roll me off."[17] Deputy Vega did not have a RIPP Hobble at the time of this incident, although he was provided one after training.[18]

29.    Deputy Guidry arrived at 1:34:42 pm and although she knew EP had been in a struggle, that he was autistic, obese and special needs, she made no effort to intervene and place EP in a recovery position.  In her statement to homicide detectives, Deputy Guidry noted that when she arrived E.P. was on his belly and handcuffed with Deputy Pitfield "straddling" him. Deputy Guidry further noted "… the first thing I noticed, I asked Chad (Deputy Pitfield) … I said, "Is he autistic?" And Chad said, "Yes, severely". I just recognized it."[19]  Deputy Guidry also reported that E.P. was saying "firetruck", something like "I don't want the firetruck. So, it was kind of incomplete sentences and a lot of mumbling."[20]  In Deputy Guidry observed that "*Chad (Deputy Pitfield) had him restrained and everything was fine.*"[21] Deputy Guidry was a former EMT and was trained in the dangers of excited delirium and the prone restraint at the JPSO.[22]  Deputy Guidry did not have a RIPP Hobble on the date of the incident and does not recall whether she ever received one.[23]

30.    Deputy Estrada arrived at about the same time as Deputy Guidry and although he knew EP had been in a struggle, that he was autistic, obese and special needs, he made no effort to intervene and place EP in a recovery position.  Deputy Estrada received the RIPP hobble training at JPSO where the dangers or excited delirium and positional asphyxia were covered.[24]  Deputy Estrada had a RIPP hobble in his vehicle, but did not understand that it was used in conjunction with the TARP procedure, and did not utilize the RIPP hobble.[25]  Instead, Deputy Estrada utilized leg shackles despite not being trained to utilize leg shackles in the field.[26]

31.    At 1:36:02 Deputy Vega switched positions with Deputy Pitfield and Deputy Vega applied pressure to EP to keep him in a prone position even though EP was not resisting, was handcuffed, and there were 6 deputies present at the scene.

---

[17] Vega Statement at 5.
[18] Vega deposition at 79, 165.
[19] Guidry Statement at 2.
[20] Guidry Statement at 3.
[21] Guidry Statement at 2.
[22] Guidry deposition at 23-26.
[23] Guidry deposition at 41-43.
[24] Estrada deposition at 29-33.
[25] Estrada deposition at 24.
[26] Estrada deposition at 25.

32.     Deputy Gaudet then arrived, making 7 deputies at the scene and although he knew EP
        had been in a struggle, that he was autistic, obese and special needs, he made no effort
        to intervene and place EP in a recovery position.  Deputy Gaudet was trained regarding
        the dangers of excited delirium and positional asphyxia.[27]  Further, Deputy Gaudet had a
        RIPP hobble in his "side pocket" but did not consider using it.[28]

33.     Deputy Vega then pushed EP's hands over his head, which is used as a pain compliance
        technique.  Deputy Vega claims that EP somehow pulled him forward with his hands
        handcuffed behind his back and denies that he used a pain compliance technique.
        Deputy Mehrtens acknowledged that Vega used this pain compliance technique in his
        statement to JPSO as follows: "*I turn around and I see the struggle happening again.
        Deputy Vega has technique, you know, when somebody starts struggling, you have
        handcuffs on them, you just begin to slightly elevate the arms so that you can just
        maintain control of the upper torso, um, he begins doing that….*"[29]  Deputy Mehrtens
        held EP's right arm down, Detective Vaught laid on EP's legs and Deputy Vega placed his
        arm across EP's head or neck.  Instead of rolling EP over into the recovery position,
        these three deputies continued to apply body weight on EP.

34.     According to Deputy Pitfield, it was not until Ms. Lou yelled out that EP was being
        choked that he was placed in a recovery position.  While Deputy Vega denies that he
        applied a choke hold on EP, Deputy Vega acknowledges hearing Ms. Lou complain about
        a chokehold being used.[30]  Further, Deputy Vega acknowledges that he did use some
        sort of head hold on EP.  In his statement to homicide detectives, Deputy Vega notes:
        "And he's trying to get up and he's trying to turn and get me off, so I put my forearm
        right here, underneath his chin to try to maintain some control and to keep him from
        hitting his head and doing anything else."[31]  In his deposition, Deputy Vega described
        the hold as follows: "Q.  What did you do? A. At that point, he was trying to bite me, so I
        was able to get -- he was going for the biceps, so I was able to get my arm right across
        his jaw line right here, and I could only get my hand right by his chin so he couldn't bite
        down, and I put my fingers up so my fingers would not get bitten or get in the way, and
        then I covered my fingers with this hand.  Q. So both hands were connected?  A. Yeah.
        They were just holding my fingers. Q. It was your right arm that was against his right --
        the right side of his face? A. Jaw. Q. Right jaw line? A. Right along here. Q. And went
        across his chin? A. Underneath. Right about here. Q. So your biceps was against his – the
        right side of his face, correct? A. In that area, yes. Q. And then your arm went down, and
        then your hand came up under his chin? A. Yes. I put it right here. Q. You are talking
        about the top of your wrist, correct? A. More behind it. Q. Somewhere around the wrist

---

[27] Gaudet deposition at 34-36.
[28] Gaudet deposition at 69.
[29] Mehrtens Statement at 6.
[30] Vega Statement at 9-10.
[31] Vega Statement at 4.

area, forearm area? A. Yeah. Small. Q. Then you grab -- you attach that hand. You grab your other hand to complete the hold, correct? A. Like this, yeah."[32]

35.     Nearly 12 minutes after Deputy Pitfield took EP to the ground, the deputies realized EP was in cardiac arrest and they began CPR after waiting for over a minute.  EP was transported to the hospital where he later died.

36.     The Jefferson Parish Coroner's Office (JPCO) concluded that EP "died as a result of Excited Delirium due to an Acute Psychotic Episode in the setting of Severe Autistic Spectrum Disorder and Disruptive Behavior Disorder.  Contributing factors include Morbid Obesity with Prone Positioning and Cardiomegaly."

### The Uses of Force by Deputies Pitfield and Vega were Excessive and Inconsistent with Generally Accepted Police Practices

37.     Police officers are trained that the U.S. Supreme Court in its landmark decision *Graham v. Connor* held that to determine whether the force used to affect a particular seizure is reasonable, one must balance the nature and quality of the intrusion on the individual's rights against the countervailing government interests at stake.  This balancing test is achieved by the application of what the Court labeled the objective reasonableness test.  The factors to be considered include: 1.) The severity of the crime, 2.) Whether the suspect poses an immediate threat to the safety of the officers or others, and 3.) Whether the suspect is actively resisting or attempting to evade arrest by flight.

38.     Whether one's actions were objectively reasonable cannot be considered in a vacuum, but must be considered in relation to the totality of the circumstances.  The standard for evaluating the unreasonable use of force reflects deference to the fact that peace officers are often forced to make split-second judgments in tense circumstances concerning the amount of force required.  The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

39.     Police officers are trained and prepared to assess dangerous situations and respond accordingly.  Police officers are trained that for their force to be reasonable the level and manner of force must be proportional to the level of resistance and threat with which they are confronted.  Proportionality is best understood as a range of permissible conduct based on the totality of the circumstances, rather than a set of specific, sequential, predefined force tactics arbitrarily paired to specified types or levels of resistance or threat.

40.     Whether or not the suspect poses an immediate threat to the safety of the officer or others is the most important of the *Graham* factors.  There must be objective factors to

---

[32] Vega deposition at 129-130.

justify an immediate threat, as a simple statement by an officer that he fears for his safety or the safety of others is insufficient.  There is no requirement that a police officer wait until a suspect harms another to confirm that a serious threat of harm exists, but merely a subjective fear or a hunch will not justify the use of force by police.

41.     When determining whether or not there is an immediate threat to the officer or others, police officers are trained to assess a number of factors. These factors include, but are not limited to:

    a.     Severity of the threat to officers or others.

    b.     The conduct of the individual being confronted as reasonably perceived by the officer at the time.

    c.     Officer/subject factors (age, size, relative strength, skill level, injury/exhaustion and number of officers vs. subjects).

    d.     The effects of drugs or alcohol.

    e.     Subject's mental state or capacity, including disabilities such as autism.

    f.     Proximity of weapons or dangerous improvised devices.

    g.     The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained.

    h.     The availability of other options and their possible effectiveness.

    i.     Seriousness of the suspected offense or reason for contact with the individual.

    j.     Training and experience of the officer.

    k.     Potential for injury to citizens, officers and suspects.

    l.     Whether the person appears to be resisting, attempting to evade arrest by flight or is attacking the officer.

    m.     The risk and reasonable foreseeable consequences of escape.

    n.     The apparent need for immediate control of the subject or a prompt resolution of the situation.

    o.     Whether the conduct of the individual being confronted no longer reasonably appears to pose an immediate threat to the officer or others.

    p.     Prior contacts with the subject or awareness of any propensity for violence.

    q.     Other exigent circumstances

42.     Parking Lot Video

    a.     13:24:12 – EP exits the Laser Tag followed by his father.

    b.     13:24:21 – EP walks toward the Parsa vehicle and begins to slap his head.  Ms. Lou exits the Laser Tag.

    c.     13:24:24 – EP begins to chase his father into the parking lot.

    d.     13:24:30 – EP begins slapping his head and his mother runs back to the front door of the Laser Tag.  EP then grabs onto his father's arm.  Mr. Parsa opens the

rear driver's side door of his vehicle and EP continues to grab him.  Ms. Lou watches from the sidewalk area.

e. 13:24:54 – EP pulls his father to the ground.

f. 13:25:02 – Mr. Parsa stands up and backs away from EP.

g. 13:25:10 – EP stands up and begins to run toward his mother who retreats inside the Laser Tag.  Mr. Parsa prevents EP from entering the Laser Tag.  Mr. Parsa holds EP on the ground.

h. 13:26:31 – EP and Mr. Parsa stand up and EP grabs ahold of Mr. Parsa at the doors to the Laser Tag and the two are struggling.

i. 13:26:58 – A woman enters the Laser Tag.

j. 13:27:54 – Mr. Parsa runs toward his vehicle and EP follows.

k. 13:28:01 – Mr. Parsa opens the rear driver's side door and EP again begins to struggle with his father.

l. 13:28:10 – Deputy Pitfield's vehicle can be seen approaching with its emergency lights activated.

m. 13:28:28 – Deputy Pitfield parks adjacent to the Parsa vehicle.  Mr. Parsa and EP are standing next to their vehicle and Ms. Lou exits the Laser Tag.  There is no struggle going on at this time.

n. 13:28:35 – EP begins to slap his head and his father stands between EP and Deputy Pitfield.  EP begins to slap at his father's head and then slaps Deputy Pitfield several times on the head.

o. 13:28:51 – Deputy Pitfield takes EP to the ground.  Both Mr. and Ms. Lou are standing near EP.  Mr. Parsa appears to be holding EP's legs.

p. 13:28:54 – Deputy Pitfield punches EP.  The video does not show the impact area.  However, Deputy Pitfield punched EP with a closed fist to the head area according to his statement.

q. 13:29:03 – Deputy Pitfield reaches into the driver's door of his vehicle and then appears to be trying to handcuff EP.  Ms. Lou is kneeling on the ground and appears to be assisting Deputy Pitfield.

r. 13:29:29 – Both Mr. Parsa and Ms. Lou are on their knees near EP's head and

Deputy Pitfield continues to sit of EP.

s.     13:30:34 – EP appears to slap his head with his left hand.  Deputy Pitfield appears to be seated on EP's lower back and Mr. Parsa and Ms. Lou are kneeling next to EP.  While EP is not yet handcuffed, it does not appear that Deputy Pitfield is having difficulty controlling him.

t.     13:31:10 – EP is able to extend his right arm out, but Deputy Pitfield quickly moves his right arm back behind his back.

u.     13:32:28 – Mr. Parsa stands up and Deputy Pitfield is still controlling EP by sitting on his lower body while Ms. Lou appears to be speaking with EP.

v.     13:34:08 – Detective Vaught arrives and exits his vehicle.  Detective Vaught takes control of EP's left arm and brings it behind his back.

w.     13:34:20 – EP is handcuffed with both hands behind his back.

x.     13:34:23 – Detective Mehrtens arrives and exits his vehicle.

y.     13:34:39 – Detective Vaught stands up.  Detective Mehrtens is standing next to EP.  Detective Mehrtens appears to have not made any contact with EP.

z.     13:34:39 – Deputy Guidry arrives and exits her vehicle.

aa.     13:34:43 – Deputy Vega walks into view and approaches EP.

bb.     13:34:54 – Deputy Estrada arrives and exits his vehicle.  All of the deputies are standing near EP, but only Deputy Pitfield appears to be controlling him.

cc.     13:35:09 – Detective Vaught begins speaking with Mr. Parsa.  There are 6 deputies surrounding EP.  Only Deputy Pitfield is sitting on EP and Ms. Lou is still kneeling down next to EP apparently speaking to him.

dd.     13:36:01 – Deputy Vega exchanges positions with Deputy Pitfield and Deputy Vega is now seated on EP's back.

ee.     13:36:16 – Deputy Estrada returns to his vehicle and moves his vehicle to in front of Deputy Pitfield's vehicle.

ff.     13:36:39 – Deputy Pitfield opens the rear hatch of his vehicle.  Only Deputy Vega is seated on EP.  The other deputies are standing nearby but taking no action.

gg.     13:36:55 – Deputy Vega leans forward and appears to pull EP's arms up behind

16

his back.  There is some movement from EP, but none of the other deputies make any movement toward EP.

hh.   13:37:05 – Detectives Vaught and Mehrtens approach EP and begin to assist Deputy Vega in holding EP in a prone position.

ii.   13:37:10 – Unidentified person with orange bag shows up on scene.

jj.   13:37:23 – Ms. Lou stands up.

kk.   13:37:41 – Deputy Estrada obtains shackles from the rear of his vehicle and approaches EP.

ll.   13:37:47 – Deputy Gaudet arrives.

mm.   13:38:24 – Deputy Gaudet appears to assess EP and perform a sternum rub.

nn.   13:38:56 – EP is removed from the prone position and placed on his side/back. CPR is not started.

oo.   13:39:15 – A paramedic vehicle arrives.

pp.   13:40:30 – The paramedic runs to his vehicle.

qq.   13:40:33 – A deputy begins chest compressions.

rr.   13:44:30 – A deputy takes pictures of Mr. Parsa's face while CPR being performed.

ss.   13:44:55 A deputy takes pictures of Mr. Parsa's hand while CPR being performed.

tt.   13:45:11 A deputy holds a measuring device to Mr. Parsa's face while another deputy takes pictures while CPR is being performed.

uu.   13:45:28 A deputy holds a measuring device to Mr. Parsa's hand while another deputy takes pictures while CPR is being performed.

### *Positional Asphyxia*

43.   It is generally accepted in policing that, under certain circumstances, restraint techniques, including physically holding a subject down, can constitute a use of force.[33] Moreover, Officers are responsible for the health, safety and welfare of people in their

---

[33] Seth W. Stoughton, Jeffrey J. Noble, Geoffrey P. Alpert, Evaluating Police Uses of Force 195-96, 202-03 (2020).

custody and must protect them from known risks of harm. Officers learn that they can, when appropriate, put a subject into a prone (face down) position on the ground to facilitate handcuffing or to secure the individual.  However, it is well known and generally accepted that keeping handcuffed individuals in the prone position after handcuffing can negatively affect the subject's breathing and cause or contribute to positional asphyxia.[34]  It is generally accepted in policing that the risks of asphyxiation are magnified when officers apply weight or pressure to a handcuffed, prone subject, especially when the subject is obese.

44.   It is also generally accepted that subjects who appear to be in an agitated or excited state, usually due to mental illness, intoxication, or a combination, and are acting delirious or irrational, have a significantly elevated need for oxygen and are therefore more susceptible to positional asphyxiation.  Compounding the risk is that people who are in such a state of "excited" or "agitated" "delirium," while frequently not involved in any significant criminal activity, nevertheless are not responsive to "officer presence" and verbal commands that are effective to gain compliance without the use of force in most other situations.  Officers not infrequently have to use devices such as Tasers and wrestle the subject into restraints.  The altercation itself further increases the demand for oxygen and increases the risk of positional asphyxiation from a prone restraint.

45.   Importantly, it is also generally accepted that the oxygen deficit that can result in positional asphyxia does not preclude speech.  As an article first published in 2015 by Calibre Press—one of the largest publishers of police media, if not *the* largest publisher of police media, in the United States—explained, the idea that someone can breathe because they are speaking is a "major misconception" and "perhaps one of the **most lethal** misconceptions in . . . law enforcement."[35]

46.   As an industry, policing has known about the risks of positional asphyxia for over thirty years.  In 1988, four doctors published an article describing that keeping individuals "prone, handcuffed, 'and hog-tied'" had negatively affected their ability to recover "peripheral oxygen saturation and heart rate" when compared to individuals "at rest"

---

[34] Some commentators have distinguished between "positional asphyxia" and "compression asphyxia" on technical grounds. In technical usage, positional asphyxia is typically used to refer to situations in which the subject's respiration (breathing) is compromised by the positioning of the subject's body, while compression asphyxia is typically used to refer to situations where weight or pressure on the subject can mechanically limit the subject's respiration. Both positional asphyxia and compression asphyxia are types of mechanical asphyxia, a phrase that refers to some mechanical interference with normal breathing. Commentators also sometimes use the phrase "restraint asphyxia" to refer to a combination of separate factors that, *in toto*, can contribute to mechanical asphyxia. As an industry, however, policing has generally adopted less technical terminology, often using "positional asphyxia" in a somewhat generalized way to refer to a combination of mechanical factors that can inhibit a restrained subject's breathing.

[35] Steve Cole, *Screaming Their Last Breath: Why First Responders Must Never Ignore the Words "I Can't Breathe"*, Dec. 11, 2015, reprinted Jun. 2, 2020, https://bit.ly/37kTnRJ (emphasis in original).

and "during exercise."[36]  The authors, writing in the American Journal of Medical Pathology, contended that "the physiological effects produced by positional restraint should be recognized in deaths where such measures are used."[37]  This was followed, several years later, by an article in the same journal reporting a case study of three in-custody deaths "attributed to positional asphyxia."[38]  Early research focused particularly on the risks of keeping a "hog-tied" individual—that is, someone who is handcuffed behind their back with their legs bound at the ankles and connected to their wrists such that their legs are bent with their feet brought to a position near their buttocks—but it was quickly recognized that handcuffed individuals were at heightened risk of positional asphyxia even when they were not hog-tied.[39]

47.     This issue was brought into the forefront of police policymaking in the early 1990s, after a 16-year-old died after being restrained by San Diego Police Department officers.  A police task force surveyed the medical literature and hundreds of police agencies around the country before issued a series of recommendations, including "[o]nce an individual has been controlled and handcuffed, the officer should roll the subject onto his/her side, or into a sitting position as soon as possible to reduce the risk of positional asphyxia."[40]

48.     The International Association of Chiefs of Police—the world's oldest and largest professional policing organization—endorsed this directive in 1993, writing, "when it is necessary to use the weight of several officers in order to subdue an individual for handcuffing, the arrestee should be freed from that weight as soon as possible in order to allow him to breathe freely. In order to facilitate the individual's breathing, he should also be rolled onto his side or into a sitting position as soon as possible."[41]  In 1995, the United States Department of Justice provided a bulletin that stated, "[A]s soon as the

---

[36] Donald T. Reay *et al.*, *Effects of Positional Restraint on Oxygen Saturation and Heart Rate Following Exercise*, 9 AM. J. FORENSIC MED. & PATHOLOGY 16 (1988).

[37] *Id.*

[38] Donald T. Reay, *et al.*, *Positional Asphyxia During Law Enforcement Transport*, 13 AM. J. FORENSIC MED. & PATHOLOGY 90 (1992). Later articles disputed the degree of risk posed by positional asphyxia and criticized the methodology of earlier research, but such research suffered from its own methodological flaws. Specifically, later research was based on experiments involved healthy, non-obese, and usually younger, individuals without preexisting health conditions who were not under the influence of drugs or alcohol and who did not violently struggle with officers. Such study participants are not, of course, representative of the at-risk population with whom the police interact. Indeed, there is good reason to think that a researcher proposing an experimental study involving individuals from the relevant population would be denied approval on ethical grounds because such research would be too dangerous. Additionally, experimental studies generally did not try to replicate field conditions. As one such study acknowledged, "It is possible that a combination of factors, including underlying medical condition, intoxication, agitation, delirium, and struggle as well as body position, may result in respiratory compromise that would not be detected by our study." Theodore C. Chan, *et al.*, *Restraint Position and Positional Asphyxia*, 30 ANNALS OF EMERGENCY MEDICINE 578, 585 (1997).

[39] See, e.g., Ronald L. O'Halloran & Janice G. Frank, *Asphyxial Death During Prone Restraint Revisited; A Report of 21 Cases*, 21 AM. J. FORENSIC MED. & PATHOLOGY 39, 48 (2000).

[40] SAN DIEGO POLICE DEP'T, FINAL REPORT OF THE CUSTODY DEATH TASK FORCE (1992).

[41] INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE, TRAINING KEY NO. 429, CUSTODY DEATH SYNDROME (1993).

suspect is handcuffed, get him off his stomach."[42]  Any failure to do so, the bulletin made clear, could create a "vicious cycle of suspect resistance and officer restraint" in which the handcuffed, prone subject's breathing becomes labored as they begin to experience an oxygen deficit, the subject responses to the oxygen deficiency by struggling, and the officers respond to the subject's struggling by putting more weight on their back, which further compromises the subject's breathing.[43]  In 1998, the International Association of Chiefs of Police wrote, "during the past decade police departments have been repeatedly warned not to permit the restraint of prisoners in the prone position."[44]  In 2001, the Department of Justice advised police agencies to "develop use of force policies that address . . . particular use of force issues such as . . . positional asphyxia."[45]  In the 2015 consent decree with the City of Ferguson, the Department of Justice required the adoption of procedures and training that "[m]inimiz[e] the risk of positional asphyxia" and instruct officers to "use restraint techniques that do not compromise a subject's breathing."[46]  A 2017 textbook on policing, *Police in America*, states that "positional asphyxia occurs when a person's body position prevents normal and adequate breathing," and that this "[u]sually" occurs "when the subject is face down with hands secured behind the back."[47]  In short, concerns about positional asphyxia and the corresponding directive to avoid keeping handcuffed individuals in the prone position had become generally accepted in policing by at least the turn of the century.

49.    Today, many police agencies around the United States have policies explicitly restricting the use of prone restraint; those policies overwhelmingly direct officers to avoid keeping handcuffed individuals in the prone position for any extended period of time.[48]  Many

---

[42] United States Department of Justice, National Institute of Justice, *Positional Asphyxia—Sudden Death*, June 1995, https://bit.ly/36o4lXc.

[43] *Id.*

[44] International Association of Chiefs of Police, *The Prone Restraint—Still A Bad Idea*, 10 POL'Y REV. 1,2 (1998).

[45] UNITED STATES DEP'T OF JUSTICE, PRINCIPLES FOR PROMOTING POLICE INTEGRITY 4 (2001).

[46] Consent Decree at 41, United States v. City of Ferguson, No. 4:16-cv-00180 (E.D. Mo. Apr. 19, 2016), https://bit.ly/3mp0VZZ. In the 2016 consent decree with the City of Cleveland, the Department of Justice required officers to be trained in and follow protocols related to "the risks of positional asphyxia," specifically in "using restraint techniques that do not impair the subject's respiration" following the use of pepper spray or electronic control weapons. Settlement Agreement at 17, 19, United States v. City of Cleveland, No. 1:15-cv-01046-SO (N.D. Ohio June 12, 2015), https://bit.ly/3fUBo8n.

[47] STEVEN G. BRANDL, POLICE IN AMERICA 252 (2018).

[48] *See, e.g.*, Berkeley Police Department, Handcuffing and Restraints, Policy 302 ("If the person being handcuffed is on the ground or in a prone position, officers should, as soon as possible, place the person in an upright sitting position or on their side for respiratory recovery and to mitigate the potential for positional asphyxia.), Albuquerque Police Department, Use of Force, SOP 2-52 at 5, https://bit.ly/33wYrRJ ("In situations when the individual is forced into a face down position, officers shall release pressure/weight from the individual and position the individual on their side or sit them up as soon as they are restrained and it is safe to do so."), Charlotte-Mecklenburg Police Department, Directive 500-003, https://bit.ly/3mp7uM7 ("Avoid placing a subject in a position that is likely to contribute to positional asphyxia . . . control restraints while lying on back/stomach should be avoided."); Denver Police Department, Operations Manual, Force Related Policies, 105.01(5)(e), https://bit.ly/3Imlq77 ("[O]fficers will immediately cease applying body weight to an individual's back, head, neck, or abdomen once the individual is restrained and other control tactics may reasonably be utilized other than body

other agencies do not have specific policies, but officers are still expected to mitigate the risks of positional asphyxia by not keeping subjects in the prone position after handcuffing.

50.     The IACP developed a Model Policy in 2017 that was accompanied by a Concepts and Issues Paper on Excited Delirium.  That policy directed that, "When restrained, officers should position the subject in a manner that will assist breathing, such as placement on his or her side, and avoid pressure to the chest, neck or head.  Officers should not attempt to control continued resistance or exertion by pinning the subject to the ground or against a solid object, using their body weight.  Officers should check the subject's pulse and respiration on a continuous basis until transferred to EMS personnel. Officers shall ensure the airway is unrestricted and be prepared to administer CPR or an automated external defibrillator (AED) if the subject becomes unconscious.  Following a struggle, the subject should be showing normal signs of physical exertion such as heavy breathing.  However, if the subject becomes calm and breathing is not labored during or after the application of restraints, it might be an indication that he or she is in jeopardy and requires immediate medical attention to avoid cardiac arrest."

51.     As mentioned above, it is also well known and generally accepted in policing that there are certain factors that exacerbate the risk of positional asphyxia.  The 1995 DOJ bulletin, for example, identified certain factors that "appear to be associated most often with" in-custody deaths, including "cocaine-induced excited delirium," "[d]rug and acute

---

weight. As soon as possible after an individual has been handcuffed, the individual should be turned onto his/her side or allowed to sit up, so long as the individual's actions no longer place officers at risk of imminent injury. Officers will make all reasonable efforts to ensure that the individual is not left in a prone position for longer than absolutely necessary to gain control over the resisting individual."); Detroit Police Department, Use of Force, 304.2-7, Duty to Report/Render Aid, https://bit.ly/2HR7h59 ("Restrained subjects should be placed in an upright or seated position to avoid Positional Asphyxia which can lead to death, when a subject's body position interferes with breathing."); Indianapolis Police Department, General Order 8.1, Prisoner Handling, Transportation and Escape, https://bit.ly/2HQFFx0 ("A subject placed on their chest or stomach, with the legs and arms restrained behind the back, may have difficulty breathing, leading to serious injury or death. 1. Officers should avoid leaving any prisoner on their chest or stomach for any period of time longer than is absolutely necessary, regardless of the type of restraint used. 2. The subject should be moved onto their side, allowing less interference with normal breathing, as soon as possible."); New Orleans Police Department, Operations Manual, Chapter 1.3.1.1, Handcuffing and Restraint Devices, https://bit.ly/3lokG2u ("If a subject has been placed on his or her stomach, turn him or her on the side or in a seated position as soon as handcuffs are properly applied. If the subject continues to struggle, *do not* sit, lie or kneel on the subject's back." (emphasis in original)); New York Police Department, Patrol Guide, Use of Force, 221-02, https://on.nyc.gov/37ixnXG ("Avoid actions which may result in chest compression, such as sitting, kneeling, or standing on a subject's chest or back, thereby reducing the subject's ability to breathe. . . . Position the subject to promote fee breathing, as soon as safety permits, by sitting the person up or turning the person onto his/her side."); Metropolitan Police Department (Washington, D.C.), General Order 901.07, Use of Force, https://bit.ly/3moUnum ("In order to avoid asphyxiation, members shall ...[p]osition the individual in a manner to allow free breathing once the subject has been controlled and placed under custodial restraint using handcuffs or other authorized methods....Members are prohibited from: Placing a person in a prone position (i.e., lying face down) for a prolonged period of time ... except during exigent circumstances. Prisoners shall be carefully monitored while in a prone position as a prone position may be a contributing factor to cause a prisoner to suffocate, also referred to as positional asphyxiation.").

alcohol intoxication," "[v]iolent struggle," and "unresponsiveness of subject during or immediately after a struggle."[49]  A 2017 policing textbook described positional asphyxia risk factors that include drug-induced "psychosis," "preexisting physical conditions," and "pressure on the abdomen" that can result from officers "holding a person down in the prone position."[50]  In 2019, *Police Magazine*, a police-oriented publication, published an article titled *How to Prevent Positional Asphyxia*, which identified positional asphyxia as "a potential danger of some common physical restraint techniques," and explained that "positional asphyxia is not just about the position of the subject's body.  There are precipitating factors that make positional asphyxia deadly. These factors include intoxication due to alcohol, drug use, obesity, psychiatric illnesses, and physical injury," as well as "predisposing medical conditions" and "violent struggle."[51]  The article instructs officers that they should "avoid the use of prone restraint techniques" when feasible and "[o]nce the suspect is handcuffed, get them off the face-down position."[52]

52.    There are four specific factors that, officers learn, can indicate that a subject is particularly susceptible to the risks of positional asphyxia.

   a.    First, officers learn that positional asphyxia results when a subject cannot take in sufficient oxygen over time to sustain themselves.  For that reason, indications that a subject is becoming oxygen deprived indicate a particular susceptibility to positional asphyxia.  It is generally accepted in policing that officers must take seriously and should never ignore a subject's statements that they cannot breathe.[53]

   b.    Second, officers are taught that pre-existing health conditions can exacerbate the risk of positional asphyxia, including obesity.[54]

   c.    Third, officers are taught that intoxication and substance abuse can exacerbate the risk of positional asphyxia.[55]

   d.    Fourth, officers are taught that excited delirium can exacerbate the risk of positional asphyxia.[56]

---

[49] *Id.*
[50] *Id.*
[51] Lawrence E. Heiskell, *How to Prevent Positional Asphyxia*, POLICE Mag. (Sept. 9, 2019), https://bit.ly/3fQqKPU.
[52] *Id.*
[53] See, e.g., Steve Cole, Screaming Their Last Breath: Why First Responders Must Never Ignore the Words "I Can't Breathe", Dec. 11, 2015, reprinted Jun. 2, 2020, https://bit.ly/37kTnRJ
[54] Lawrence E. Heiskell, *How to Prevent Positional Asphyxia*, POLICE Mag. (Sept. 9, 2019), https://bit.ly/3fQqKPU; STEVEN G. BRANDL, POLICE IN AMERICA 252 (2018).
[55] Lawrence E. Heiskell, *How to Prevent Positional Asphyxia*, POLICE Mag. (Sept. 9, 2019), https://bit.ly/3fQqKPU; STEVEN G. BRANDL, POLICE IN AMERICA 252 (2018).
[56] Lawrence E. Heiskell, *How to Prevent Positional Asphyxia*, POLICE Mag. (Sept. 9, 2019), https://bit.ly/3fQqKPU; STEVEN G. BRANDL, POLICE IN AMERICA 252 (2018).

53.    Here, there is overwhelming evidence that the members of the JPSO were trained in positional asphyxia and knew that maintaining an individual in a prone position could impact their ability to breathe.  In fact, all of the deputies involved received RIPP Hobble training on at least once occasion and many had the training multiple times.[57]  Sheriff Lopinto did not have any RIPP Hobble training.[58]

    a.    Sergeant Pizzolato is the JPSO's training officer for the RIPP Hobble.[59]

        1.    Sergeant Pizzolato said he trains deputies that if they observe a subject exhibiting certain behavioral patterns that are normally associated with excited delirium they are to react accordingly.[60]  Sergeant Pizzolato said it is important to recognize these signs because it is a medical emergency and they are to have EMS start responding.[61]

        2.    Sergeant Pizzolato said deputies are trained to never attempt to restrain the person by themselves, but to call additional deputies and use a swarm technique.[62]

        3.    Sergeant Pizzolato said he discusses the dangers of the prone position that has on a person's ability for gas exchange in the lungs, the openness of their airway, and the bellows or muscular pump.[63]

        4.    Sergeant Pizzolato said he discusses risk factors such as diminished capacity and people who are obese.[64]

        5.    Sergeant Pizzolato said he trains officers to place suspects on their side in a recovery position which allows for the bellows action to allow them to breathe, it provides a good view of the suspect's face, and deputies can control a person who is on their side.[65]

        6.    Sergeant Pizzolato said he trains to "never leave anybody in a prone

---

[57] Ex. 32 – Pitfield - RIPP Hobble training – 9/20/07; 11/24/15; Ex. 33 – Estrada – RIPP Hobble training – 2/9/04; 4/9/15; 8/2/15; 8/9/15; Ex. 34 – Gaudet – RIPP Hobble training – 7/31/07; 10/24/14 (RIPP Hobble Instructors Course); 12/13/15; Ex. 35 – Vega – RIPP Hobble training – 10/20/11; 2/2/15; 7/31/15; Ex. 36 – Guidry – RIPP Hobble training – 2/26/14; 4/14/15; 8/21/15; Ex. 37 – Mehrtens – RIPP Hobble training – 10/4/16; Ex. 38 – Vaught – RIPP Hobble training – 9/26/16.

[58] Ex. 37 – Lopinto training records.

[59] Pizzolato deposition at 35.

[60] Pizzolato deposition at 40.

[61] Pizzolato deposition at 45.

[62] Pizzolato deposition at 52.

[63] Pizzolato deposition at 53.

[64] Pizzolato deposition at 53.

[65] Pizzolato deposition at 62.

position," as the prone position can cause respiratory compromise.[66]

      7.    Sergeant Pizzolato said sitting on an obese person's legs may not relieve the pressure, obese people need to be placed on their side,[67] and obese people are particularly susceptible to positional asphyxia.[68]

      8.    Sergeant Pizzolato said being handcuffed is a significant factor in the amount of control a deputy has on a person.[69]

      9.    Sergeant Pizzolato said that choking someone out is prohibited.[70]

      10.    Sergeant Pizzolato testified that every JPSO deputy who was trained in the RIPP Hobble should carry a RIPP Hobble while on duty.[71]

b.    Sergeant Voltolina said the JPSO provided training on a "Agitated Chaotic Event," that includes autism and directs deputies to "not allow person to remain prone for an unreasonable amount of time" and to "place on side; sit upright; supine; stand."[72]

c.    Sergeant Dowling said if an arrestee is in a prone position, deputies should put them in a recovery position when it is safe.[73]  Sergeant Dowling said the recovery position requires deputies to place suspects on their side so they can breathe.[74]

d.    Deputy Estrada said suspects should be moved into a recovery position as fast as possible if the subject is under control and when it is safe.[75]  Deputy Estrada said when a suspect is handcuffed, deputies must do everything in their power to keep these suspects alive, including placing someone in a recovery position.[76] Deputy Estrada said deputies can't control someone in the recovery position and safe does not mean zero resistance.[77]

      1.    Deputy Estrada said he has been trained that placing pressure to the back of an individual who is in a prone position may cause the person to have trouble breathing.  Deputy Estrada said the remedy is simple and that is

---

[66] Pizzolato deposition at 64-65.
[67] Pizzolato deposition at 67.
[68] Pizzolato deposition at 70.
[69] Pizzolato deposition at 69.
[70] Pizzolato deposition at 56.
[71] Pizzolato deposition at 87-89
[72] Exhibit 48.
[73] Dowling deposition at 43-44.
[74] Dowling deposition at 108.
[75] Estrada deposition at 48-50.
[76] Estrada deposition at 51.
[77] Estrada deposition at 53-54.

to get pressure off the suspects back.[78]  Deputy Estrada said Deputy
Pitfield was seated on EP's legs right below his butt.[79]

2.     Deputy Estrada said he heard Deputy Pitfield's radio call and he
responded to the scene code 3.[80]  When he arrived, Deputy Pitfield was
sitting on EP legs below his butt.[81]  Deputy Estrada said when he arrived,
two detectives, Deputy Vega and Deputy Pitfield were already at the
scene.[82]  Deputy Estrada said he did not see a struggle where he believed
Deputy Pitfield needed his help.[83]

3.     Deputy Estrada said he did not see a struggle when Deputy Vega
transitioned with Deputy Pitfield.[84]

4.     Deputy Estrada had a RIPP Hobble in his vehicle, but did not understand
that it was used in conjunction with the TARP procedure, and did not
utilize the RIPP hobble.[85]  Instead, Deputy Estrada utilized leg shackles
despite not being trained to utilize leg shackles in the field.[86]

e.     Deputy Guidry said she is sure that she was trained in the dangers of a prone
position and is aware that breathing can be labored if a subject is in a prone
position, that more weight on a person's back causes more compression and
increases the difficulty in breathing, and the natural reaction to a lack of oxygen
is that a person will struggle.[87]

1.     Deputy Guidry said she has been trained to roll a person on their side
once they are under control.[88]

2.     Deputy Guidry said an obese person is at a greater risk.[89]

3.     Deputy Guidry said she was not actively involved in controlling EP, and
when she arrived, Deputy Pitfield was trying to control EP.  Deputy
Pitfield said he "pretty much" had EP under control and there was

---

[78] Estrada deposition at 66.
[79] Estrada statement at 2.
[80] Estrada deposition at 73-74.
[81] Estrada deposition at 75.
[82] Estrada deposition at 93.
[83] Estrada deposition at 95.
[84] Estrada deposition at 100.
[85] Estrada deposition, p. 24.
[86] Estrada deposition, p. 25.
[87] Guidry deposition at 24-25.
[88] Guidry deposition at 26.
[89] Guidry deposition at 29.

nothing she could do.[90]

4.  Deputy Guidry said she did not know EP was autistic at the time she was dispatched, but she was told he was autistic by Deputy Pitfield.[91]  Deputy Guidry said she asked Deputy Pitfield if he was autistic and Deputy Pitfield said, "Yes, severely," and that she asked because she "just recognized it."[92]

5.  Deputy Guidry said the best and safest method to control a person is to put them in a recovery position and she does not recall any effort to put EP in a recovery position.[93]  Deputy Guidry said if a person is in a recovery position and actively resisting, deputies would be able to control the person.[94]

6.  Deputy Guidry did not have a RIPP Hobble on the date of the incident and does not recall whether she ever received one.[95]

f.  Deputy Gaudet said he taught the RIPP hobble restraint at the JPSO academy between 2012-2014 and part of that training included the dangers of the prone restraint.[96]

1.  Deputy Gaudet said the lack of oxygen can cause a person to struggle.[97]

2.  Deputy Gaudet said obesity is a factor.[98]

3.  Deputy Gaudet said in his deposition he arrived, Deputy Vega was on EP's hips and EP had his hands handcuffed in front of his body.[99]  However, in his statement he said Deputy Vega was on EP's "back."[100]

4.  Deputy Gaudet said when Deputy Vega got up EP was limp.  He applied a sternum rub and then CPR.[101]  Deputy Gaudet said when Deputy Vega got up, they rolled EP "to the rescue position."[102]

---

[90] Guidry deposition at 49-50.
[91] Guidry deposition at 54-56.
[92] Guidry statement at 2.
[93] Guidry deposition at 62.
[94] Guidry deposition at 74.
[95] Guidry deposition, pp. 41-43.
[96] Gaudet deposition at 37.
[97] Gaudet deposition at 40.
[98] Gaudet deposition at 42.
[99] Gaudet deposition at 81-82.
[100] Gaudet statement at 3.
[101] Gaudet deposition at 83-85.
[102] Gaudet statement at 3.

5.     Deputy Gaudet did not see EP violently struggle between 14:00 – 15:12 on the video and he did not see a struggle when Deputy Vega exchanged positions with Deputy Pitfield at 16:00 on the video.[103]

6.     Deputy Gaudet said he did not see EP bite anyone nor did he see Deputy Vega use a choke hold.[104]

7.     Deputy Gaudet said, "Mom was implying that we did wrong yes. Mom was implying that we were choking him and mom was implying that we were using excessive force and mom was screaming that he was special needs after and uh, but again this started. Mom started with this after the fact. This mom was not saying that while this was going on."[105]

8.     Deputy Gaudet had a RIPP hobble in his "side pocket" but did not consider using it.[106]

g.     Deputy Mehrtens said the recovery position is an "option" to be used if a person is choking, vomiting, spitting up, or having difficulty breathing.  Deputy Mehrtens said it was not mandatory to place a person in a recovery position.[107]

1.     Deputy Mehrtens said he does not agree that a prone position is dangerous, but said breathing may be more difficult in a prone position.[108]

2.     Deputy Mehrtens said weight placed on a person's back may contribute,[109] but he does not recall if obesity is a factor.[110]

3.     Deputy Mehrtens said when he arrived, EP "was face down on the ground, he had two (2) sets of handcuffs and his hands were handcuffed behind his back, with Deputy Pitfield sitting on his buttocks area."[111]

4.     Deputy Mehrtens said when he arrived, "there wasn't, there wasn't a struggle, it didn't appear to be a struggle. Deputy Pitfield was trying to calm him. There was another lady, who we later found out was his

---

[103] Gaudet deposition at 96-98.
[104] Gaudet deposition at 90.
[105] Gaudet statement at 6.
[106] Gaudet deposition at 69.
[107] Mehrtens deposition at 36.
[108] Mehrtens deposition at 48.
[109] Mehrtens deposition at 49.
[110] Mehrtens deposition at 50.
[111] Mehrtens statement at 3.

mother, who was trying to calm him as well next to his head while he was on the ground."[112]  Deputy Mehrtens said, "I didn't see a struggle so there was no need for me to engage him."[113]

5.  Deputy Mehrtens said Deputy Pitfield had control and "Why would I move him to recovery and potentially lose control?"[114]  Deputy Mehrtens acknowledged that Vega uses a pain compliance technique in his statement to JPSO as follows: "I turn around and I see the struggle happening again. Deputy Vega has technique, you know, when somebody starts struggling, you have handcuffs on them, you just begin to slightly elevate the arms so that you can just maintain control of the upper torso, um, he begins doing that…."

6.  Deputy Mehrtens said at 16:00 on the video, he can be seen standing with his hands in his pockets.[115]

7.  Deputy Mehrtens said Deputy Vega's arm was down on the right side of EP's neck and across his chest, but he was not choking EP (17:44 in the video).[116]

8.  Deputy Mehrtens received a RIPP Hobble after training but was not asked whether he had RIPP Hobble on the date of this incident.[117]

h.  Detective Vaught said he was the first deputy to arrive after Deputy Pitfield and he has been trained that if a person is in a prone position and there is weight on their back, their breathing can be compressed.[118]

1.  Deputy Vaught said he does not recall being trained on positional asphyxia,[119] he does not know a recovery position,[120] and he does not recall being trained not to leave a person in a prone position.[121]

2.  Deputy Vaught said when he arrived, Deputy Pitfield told him that EP was "special needs."[122]  Deputy Vaught said when he applied that handcuff EP was not resisting and was "moving a little bit but he wasn't trying to

---

[112] Mehrtens statement at 3.
[113] Mehrtens statement at 4.
[114] Mehrtens deposition at 70.
[115] Mehrtens deposition at 74.
[116] Mehrtens deposition at 88
[117] Mehrtens deposition, p. 34.
[118] Vaught deposition at 38.
[119] Vaught deposition at 83.
[120] Vaught deposition at 82.
[121] Vaught deposition at 96.
[122] Vaught statement at 4.

resist or pull his- -pull his arm away."[123]

3.   Although the video evidence does not support his conclusion, Detective Vaught said there was never a lull in the fight with EP.[124]  Detective Vaught said when the person has stopped all resistance, it would then be safe to move the person into a recovery position.[125]

4.   Detective Vaught said although he had been trained in the hobble,[126] he did not have a hobble at the time of the incident.[127]

5.   Detective Vaught said it was possible for the 6 deputies to put EP in a recovery position.[128]

6.   Detective Vaught said EP did not resist after he was handcuffed,[129] and he did not place EP in a recovery position after he was handcuffed because he went to speak with Mr. Parsa.  Detective Vaught said he would not have left Deputy Pitfield alone if he did not believe it was safe to do so.[130]

7.   Detective Vaught did not have a RIPP Hobble on the date of this event and does not know whether he received a RIPP Hobble after receiving the RIPP Hobble training.[131]

i.   Deputy Pitfield said he was trained on positional asphyxia and the recovery position.[132]

1.   Deputy Pitfield said he was trained to place a person in the recovery position once the struggle has stopped, that an obese person is at a greater risk of harm, and that weight on a person's back risks impairment of their ability to breathe.[133]

2.   Deputy Pitfield said one of the risks of positional asphyxia is that the person could die.[134]

---

[123] Vaught statement at 5.
[124] Vaught deposition at 97.
[125] Vaught deposition at 102.
[126] Vaught deposition at 36.
[127] Vaught deposition at 109.
[128] Vaught deposition at 110.
[129] Vaught deposition at 122.
[130] Vaught deposition at 123.
[131] Vaught deposition at 92.
[132] Pitfield deposition at 64-65.
[133] Pitfield deposition at 69-73.
[134] Pitfirld deposition at 67.

3.    Deputy Pitfield said he did not place EP in a recovery position because EP was never in control.[135] Further, at no point did Deputy Pitfield request other deputies to assist him in moving EP into the recovery position.

4.    Deputy Pitfield had RIPP Hobble training but was never assigned a RIPP Hobble.[136]

j.    Deputy Vega said he received training in positional asphyxia and the instructor discussed the risks of the prone position.[137]

1.    Deputy Vega said when he arrived, Deputy Pitfield was on EP's "butt area," and he believed Deputy Pitfield had control.[138]

2.    Deputy Vega said he was trained it is possible to impact a person's ability to breathe if they are in a prone position and that oxygen deficiency can cause a person not to be passive.[139]

3.    Deputy Vega said he could not place a person in a recovery position if they are still actively resisting.[140]

4.    Deputy Vega said he did not make any efforts to place EP in a recovery position[141] because EP was resisting and biting deputies.[142]

5.    Deputy Vega said he did not believe that the six deputies present could have placed EP in a recovery position.[143]

6.    While Deputy Vega acknowledged that he must do everything in his power to help to keep a person in his custody alive,[144] he said he had no other option but to leave EP in a prone position.[145]  At no point did Deputy Vega request assistance from other officers to place EP in recovery position.

7.    Deputy Vega did not have a RIPP Hobble at the time of this incident,

---

[135] Pitfield deposition at 93-94.
[136] Pitfield deposition at 56.
[137] Vega deposition at 79.
[138] Vega statement at 2.
[139] Vega deposition at 87-88.
[140] Vega deposition at 82.
[141] Vega deposition at 105.
[142] Vega deposition at 101.
[143] Vega deposition at 109.
[144] Vega deposition at 94.
[145] Vega deposition at 162.

although he was provided one after training.[146]

54. Here, there is overwhelming evidence that the members of the JPSO were trained in positional asphyxia and knew that maintaining an individual in a prone position could impact their ability to breathe.  In fact, all of the deputies involved received RIPP Hobble training on at least once occasion and many had the training multiple times.[147]  Sheriff Lopinto did not have any RIPP Hobble training.[148]  Significantly, only two deputies had the RIPP Hobble on their duty belt, but never considered utilizing it.

55. Here, Deputy Pitfield was working at the mall when he received a call on his department issued cell phone from the manager of the laser tag who told him that a child with autism is involved in an incident with his father.[149]  Deputy Pitfield said he was the first deputy to arrive,[150] and that he escorted EP to the ground – not to arrest him, but to control him so he could investigate what was happening.[151]  Deputy Pitfield said he was not immediately told that EP was autistic, but he was told after he had EP on the ground.[152]

    a. Deputy Pitfield said that EP bit him on the leg and in response he delivered one strike that was "possibly" to EP's head.[153]  In his statement, Deputy Pitfield said he believed he delivered a hand strike to EP's "head area."[154]

        i. Under some circumstances strikes to the head or face can be reasonably expected to risk of causing death or serious physical injury.  There is a substantial likelihood, depending on the type of strike and where the strikes connect, that a strike will damage the eyes, nose, orbital bone, cheekbone, or jaw through blunt trauma; cause permanent scarring by, for example, tearing the skin or damaging the outer ear; cause a head to twist beyond normal rotation in a way that injures the cervical spine and or associated muscles; or cause an epidural hematoma, which can carry a substantial risk of death.

        ii. There is no legitimate police training that instructs officers to strike

---

[146] Vega deposition at 79, 165.
[147] Ex. 32 – Pitfield - RIPP Hobble training – 9/20/07; 11/24/15; Ex. 33 – Estrada – RIPP Hobble training – 2/9/04; 4/9/15; 8/2/15; 8/9/15; Ex. 34 – Gaudet – RIPP Hobble training – 7/31/07; 10/24/14 (RIPP Hobble Instructors Course); 12/13/15; Ex. 35 – Vega – RIPP Hobble training – 10/20/11; 2/2/15; 7/31/15; Ex. 36 – Guidry – RIPP Hobble training – 2/26/14; 4/14/15; 8/21/15; Ex. 37 – Mehrtens – RIPP Hobble training – 10/4/16; Ex. 38 – Vaught – RIPP Hobble training – 9/26/16.
[148] Ex. 37 – Lopinto training records.
[149] Pitfield deposition at 113; Heather Hilton Statement at 10.
[150] Pitfield deposition at 114.
[151] Pitfield deposition at 120.
[152] Pitfield deposition at 119.
[153] Pitfield deposition at 121.
[154] Pitfield statement at 8.

subjects in the head or face; indeed, police agencies commonly instruct officers to avoid such strikes unless circumstances justify the application of deadly force.[155]

    iii.    If Deputy Pitfield struck EP on the head in these circumstances, his use of force would be excessive, objectively unreasonable and inconsistent with generally accepted police practices.

b.    Deputy Pitfield said he sat on EP's hip/butt area and had his knees on either side of EP's body.[156] In his statement, Deputy Pitfield said he was "mounted on his butt."[157] Deputy Pitfield said he purposely never mounted higher than EP's butt because he knows his size.[158]

c.    Deputy Pitfield said he believed that EP was trying to stand up.[159]

d.    Deputy Pitfield said he knew that EP was obese and he placed a handcuff on one of EP's hands and Mr. Parsa held EP's other hand.[160] Deputy Pitfield said he was able to handcuff EP with two sets of handcuffs linked together when Detective Vaught arrived.[161]

e.    Deputy Pitfield said Ms. Lou told him that EP was autistic when she placed a jacket on the ground next to EP's head and said that EP will bang his head on the ground.[162] Deputy Pitfield said he told Ms. Lou not to put the jacket near EP's head as it may impair his ability to breathe.[163] Deputy Pitfield also said the manager of the Laser Tag told him that EP was "special needs" when she had called him.[164]

f.    Deputy Pitfield said he never considered the swarm technique or using a hobble to control EP's legs.[165]

g.    Deputy Pitfield said he asked Deputy Vega to replace him on top of EP so he could check the area where he had been bitten.[166]

---

[155] SETH W. STOUGHTON, JEFFREY J. NOBLE, GEOFFREY P. ALPERT, EVALUATING POLICE USES OF FORCE 201 (2020).
[156] Pitfield deposition at 122.
[157] Pitfield statement at 10.
[158] Pitfield statement at 16.
[159] Pitfield deposition at 124.
[160] Pitfield deposition at 128.
[161] Pitfield deposition at 129.
[162] Pitfield deposition at 153.
[163] Pitfield deposition at 127.
[164] Pitfield statement at 5.
[165] Pitfield deposition at 131.
[166] Pitfield deposition at 131.

h.      Deputy Pitfield claimed that EP was struggling the entire time.[167]

i.      Deputy Pitfield said he did not move EP into a recovery position because EP was actively resisting and trying to push up the entire time.[168]

j.      Deputy Pitfield said he weighed approximately 308 pounds at the time of the incident.[169]

56.     Deputy Vega said when he arrived, he saw a gaping hole in Mr. Parsa's chin.[170]  Deputy Vega said he spoke with Mr. Parsa for a few seconds and then spoke with Deputy Pitfield.  Deputy Pitfield asked him to switch positions so he could assess his injury.[171] Deputy Vega said Deputy Pitfield told him that EP was autistic.[172]

a.      Deputy Vega said he straddled EP and his weight was mainly on his toes and knees and not a lot of his body weight was on EP.[173]  During the transfer, Deputy Vega noted that EP was calm and not offering any resistance.[174]

b.      Deputy Vega said that EP was turning, pulling up, and fighting with his hands.[175]

c.      Deputy Vega said EP pulled forward and lifted his arms up.  Deputy Vega denied that he used a pain compliance technique on EP by lifting his arms.[176]  Deputy Vega said he moved forward and his bicep was across the right side of EP's face.[177]  Deputy Vega said Ms. Lou accused him after the incident of choking EP.[178]

d.      In his statement, Deputy Vega said, "I put my forearm right here, underneath his chin to try to maintain some control and to keep him from hitting his head and doing anything else. And then he turns and he gets my arm to bite. And so at that point, he's starting to get to my bicep."[179]

---

[167] Pitfield deposition at 149.
[168] Pitfield deposition at 149
[169] Pitfield deposition at 176.
[170] Vega deposition at 119.
[171] Vega deposition at 120.
[172] Vega deposition at 123.
[173] Vega deposition at 125.
[174] Vega Statement at 5.
[175] Vega deposition at 124.
[176] Vega deposition at 128.
[177] Vega deposition at 130.
[178] Vega deposition at 131.
[179] Vega statement at 6.

e.  Deputy Vega denied that he choked EP.[180]

f.  Deputy Vega said he felt EP kicking, but he did not ask for a hobble to control EP's legs.[181]

g.  Deputy Vega said he put EP in a recovery position when he noticed that EP had urinated.[182]

h.  Deputy Vega said even if he had known that EP had been in a prone position for six minutes prior to his arrival, he would not have done anything any differently.[183]

57.  Ms. Lou said she told Deputy Vega, ""You have a -- there is a arm across his neck. There is a arm across his neck. He is having trouble breathing. He is having trouble breathing. That is how the man in New York died. Eric Garner. That is how the man in Baton Rouge died. There is a -- you have him in a chokehold. You have an arm across his neck."[184] Ms. Lou said one of the deputies responded, "That is not a chokehold."[185]

58.  Mr. Parsa said he told Deputy Pitfield that EP was autistic[186] when Deputy Pitfield first arrived.[187]  Mr. Parsa said after Deputy Pitfield took EP to the ground, Deputy Pitfield was sitting on EP's lower back area or butt.[188]  Mr. Parsa said he did not see EP bite Deputy Pitfield.[189]

59.  Deputy Pitfield was assisting Mr. Parsa in controlling his son, who was in the midst of a melt down due to his autism.  Although EP had struck his father, the deputies knew that EP suffered from autism, was non-verbal, and lacked the capacity to form criminal intent.  The only word that the deputies were able to understand was "firetruck."

60.  Deputy Pitfield placed EP in a prone position with his stomach on the ground with Deputy Pitfield on his back or lower body for just over 5 minutes before both of EP's hands were handcuffed behind his back.  Deputy Pitfield kept EP in a prone position, and he continued to place his body weight on EP's back for 1 minute and 41 seconds after EP was handcuffed, with deputies present, until Deputy Vega took his position. Deputy Vega then held EP in a prone position, and he placed his body weight on EP's

---

[180] Vega statement at 10.
[181] Vega deposition at 135.
[182] Vega deposition at 134.
[183] Vega deposition at 139.
[184] Lou deposition at 181.
[185] Lou deposition at 182.
[186] Parsa deposition at 173.
[187] Parsa deposition at 208.
[188] Parsa deposition at 210.
[189] Parsa deposition at 212.

back with the assistance of other deputies for an additional 2 minutes before EP went into medical distress.  The deputies' use of force by maintaining EP in a prone position after he had been handcuffed and placing their body weight on his back in these circumstances where EP needed medical intervention, not a jail cell, was excessive, objectively unreasonable, and inconsistent with generally accepted police practices.

61.     The deputies' claim that EP was actively resisting and that they had no other option other to maintain EP in a prone position is absurd.  Detective Vaught assisted Deputy Pitfield in handcuffing EP.  Deputy Vaught then stood up and moved away within about 15 seconds and at that point Detective Mehrtens is present and Deputy Guidry arrives in her vehicle.  Deputy Vega arrived one minute after EP was handcuffed, Deputy Estrada arrived 15 seconds later, and Deputy Gaudet arrived 1 ½ minutes after Estrada.  Other than Vaught assisting Pitfield in handcuffing EP, during this time, deputies were seen standing nearby and not making any effort to assist either Deputy Pitfield during the time he was on EP or assisting Deputy Vega until after Deputy Vega pushes EP's hands up and places his arm on EP's head or neck.

      a.     There is no video evidence that suggests that EP was somehow trying to lift the deputies off of his back.

      b.     Deputy Pitfield acknowledged that he never asked for help or asked for a hobble or shackles despite his claim that EP was kicking his feet.

      c.     Indeed, none of the deputies moved to hold EP's legs or tried to hobble his legs until Deputy Estrada obtained shackles from his vehicle nearly 3 ½ minutes after EP had been handcuffed.

      d.     A reasonable police officer would know that a subject's movements movement in these circumstances is likely being done to help the subject to breathe and is not active resistance.

      e.     While it would have been safe and reasonable for two deputies to roll EP on his side even if he was kicking to place him in a recovery position, it is unconscionable that after the arrival of multiple deputies, none of whom are assisting in holding EP, that the deputies somehow could not have placed EP in a recovery position when the known consequence of their failure to do so may cause the death of EP.

62.     Additionally, while Deputy Vega was on EP's back, Deputy Vega pushed EP's handcuffed arms forward toward his head in a pain compliance hold.  This type of hold is very painful especially for larger individuals who may lack flexibility.  Here, while there is testimony that EP may have been "double jointed" there is also evidence of his lack of flexibility in that the deputies had to use two sets of handcuffs to handcuff EP's hands behind his back.

63.     If Deputy Vega used a pain compliance hold in this manner, in these circumstances, his use force was excessive, objectively unreasonable, and inconsistent with generally accepted police practices.  Deputy Mehrtens acknowledged that Vega uses this pain compliance technique in his statement to JPSO as follows: "I turn around and I see the struggle happening again. Deputy Vega has technique, you know, when somebody starts struggling, you have handcuffs on them, you just begin to slightly elevate the arms so that you can just maintain control of the upper torso, um, he begins doing that…."

64.     Moreover, if Deputy Vega placed his arm on EP's neck as stated by Ms. Lou, that use of force would be excessive, objectively unreasonable and inconsistent with generally accepted police practices.  Any use of a choke hold would be the application of deadly force and completely unreasonable under the circumstances.

65.     Law enforcement departments are required to comply with the ADA and provide reasonable accommodations to persons with known disabilities, which includes autism. The factual backdrop of this case implicated a need for reasonable accommodations to EP as a result of his autism which included:

    a.      rolling him on his side or sitting him up once restrained;

    b.      Use other officers at the scene to hold EP's legs if he was indeed kicking to allow the deputies to place EP in a recovery position;

    c.      checking his airway;

    d.      monitoring his breathing and pulse;

    e.      assigning a specific officer to talk to EP's parents about what works in managing his behavior, and then reporting back to group; backing officers up to give him some space and reduce stimuli;

    f.      setting up a perimeter to create a larger safe area;

    g.      using the RIPP hobble device; and,

    h.      using the swarm technique to control EP's legs if necessary.

**The Responding Deputies Failed to Intervene and Prevent Deputies Pitfield and Vega's Excessive Use of Force**

66.     It is generally accepted in law enforcement that police officers have a duty to intervene to prevent or stop wrongdoing by another officer when it is safe and reasonable to do

so[190] and where the officer has the opportunity to act.

67. Here, there were five other officers present when Deputy Vega replaced Deputy Pitfield and sat on EP's back while EP was handcuffed in a prone position. Any reasonable police officer in these circumstances would have known that EP was obese, he was handcuffed with his hands behind his back, he was in a prone position, that a police officer was applying his body weight to EP's back, that EP was not resisting, and that there were more than a sufficient number of officers to move EP into a recovery position, yet none of the officer intervened into Deputy Pitfield's and Deputy Vega's obvious use of excessive force.

68. It would have been obvious to any reasonable police officer that EP was in need of medical assistance not a jail and that they were there to help him, not to arrest him. Yet, none of these officers intervened to prevent the obvious excessive uses of force by Deputies Pitfield and Vega. Indeed, regardless of EP's autism, the deputies should have immediately intervened and placed EP into the recovery position.

69. The failure of the deputies to intervene in this obvious use of excessive force is inconsistent with generally accepted police practices.

70. The deputies were trained to use the swarm technique in circumstances where there was a need to gain immediate control of a suspect prior to placing in the recovery position. Their failure to do so is inconsistent with generally accepted police practices. The use of the swarm technique, with immediate placement into the recovery position, would also have been a reasonable and feasible accommodation for EP's disability.

### The JPSO Failed to Reasonably Supervise Deputy Pitfield

71. Unlike any other profession, police officers hold incredible powers over the people whom they serve. Police officers have the legal authority to detain, physical restrain and arrest without first seeking approval from a neutral magistrate, or even their own supervisors. Dressed in uniforms that more and more resemble those of the military, police officers openly carry handguns and most have ready access to batons, shotguns, carbine rifles, Tasers, and OC spray. Police officers have awesome powers and are

---

[190] See, e.g., International Association of Chiefs of Police, Law Enforcement Policy Center: Standards of Conduct (July 2019) at2; Police Executive Research Forum, Guiding Principles on Use of Force (March 2016) at 41; "A police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent." (Figueroa v. Mazza, 825 F.3d 89 (2d Cir. 2016); and California Government Code §7286, An officer shall intercede when present and observing another officer using force that is clearly beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances, taking into account the possibility that other officers may have additional information regarding the threat posed by a subject. Intercede includes, physically stopping the excessive force (when safe and reasonable to do so) and recording the excessive force, if equipped with a body worn camera (2021).

permitted to use reasonable force to take a suspect into custody.  the fact that a police officer can handcuff and take someone to jail, depriving citizens of their most basic civil liberties, demands that police agencies create policies to control their officers' actions, train officers to ensure they can comply with department policies, and supervise officers to guide their decision making and to hold officers accountable for their misconduct.

72.  Deputy Pitfield was working a paid detail.  Deputy Chief Wingrove said regular officers report their activities, tell dispatch where they are and what they are doing, and comply with the chain of command.  Deputy Chief Wingrove said these basic components of supervision do not apply to deputies who are working paid details.[191]  The JPSO acknowledges that it does not provide any supervision for paid details like it does for patrol officers.[192]  Deputies who work the off-duty assignment at the Westgate shopping center are paid by the off-duty employer and provided a cell phone so they can be contacted directly by the businesses.  Deputies who work private detail are employed by the private employer to perform security on their premises during their scheduled hours.  Although it is an off-duty assignment, the deputies wear their sheriff's department uniform, use their sheriff's department equipment, and are required to follow sheriff's department policies, practices, rules and regulations.

73.  Deputy Canatella said he was the administrator for the JPSO Westgate Mall detail and paid by Westgate.[193]  Deputy Canatella said that deputies working that assignment are required to have all of their duty gear,[194] are responsible to handle all calls for service at the mall,[195] and are required to follow all department policies.[196]

   a.  Deputy Canatella said the Sheriff's Office takes $5 per hour from detail officers as compensation.[197]

   b.  Deputy Canatella said he supervises the detail officers at the mall and will sometimes go there to ensure the officers have all of their equipment.[198]

74.  Although Deputy Pitfield was working in uniform, operating a marked sheriff's department vehicle, and performing police services for the benefit of the mall and the sheriff's department, the sheriff's department failed to adequately supervise his activities.  The failure to supervise a police officer in these circumstances was inconsistent with generally accepted police practices.

---

[191] Wingrove deposition at 24.
[192] Wingrove deposition at 23.
[193] Canatella deposition at 15.
[194] Canatella deposition at 20.
[195] Canatella deposition at 27.
[196] Canatella deposition at 31.
[197] Canatella deposition at 18.
[198] Canatella deposition at 29.

**No Reasonable Deputy Would Have Sought a Search Warrant in These Circumstances**

75. Sergeant Dowling obtained a search warrant for Daren Parsa's medical records for his treatment at East Jefferson General Hospital due to injuries he suffered from EP.[199]

   a. In his affidavit in support of the warrant, Sergeant Dowling states that the investigation is related to the undetermined death of EP.

   b. Sergeant Dowling does not provide any evidence of a specific crime that he is investigating or how the medical records of Mr. Parsa would somehow assist in his investigation.  Sergeant Dowling did not provide the magistrate with probable cause to believe that Mr. Parsa's medical records would constitute evidence of a crime, particularly when the suspect of the crime was deceased and there is no evidence that Mr. Parsa was making a criminal complaint or considered himself a victim of a crime.

76. Sergeant Dowling also obtained a search warrant for EP's school records, any video of EP having outbursts or violent behavior at school, a complete list of teachers and staff who may have monitored EP, and access to all equipment, restraints or similar devices use in the care or monitoring of EP.[200]

   a. Sergeant Dowling's affidavit in support of the warrant fails to provide probable cause to believe that these items would assist the sheriff's department in its investigation of EP's death.

   b. Instead, as stated in the warrant, Sergeant Dowling was seeking information relative to EP's physical and mental health while he was at school.

77. Lieutenant Meunier said the JPSO obtained a search warrant for EP's medical and school records.[201]

   a. Lieutenant Meunier said the warrants were consistent with the way the sheriff requires warrants to be used.[202]

   b. Lieutenant Meunier said the purpose of a search warrant is to obtain evidence to prove a crime[203] and it would be improper to seek a warrant for a civil matter or to protect an officer from civil liability.[204]

---

[199] Exhibit 56.
[200] Exhibit 57.
[201] Meunier deposition at 15.
[202] Meunier deposition at 17.
[203] Meunier deposition at 19.
[204] Meunier deposition at 29-30.

    c.     Lieutenant Meunier said the detectives were looking at whether a deputy committed a crime,[205] but said there was no particular reason to believe a crime had been committed against EP.[206]

    d.     Lieutenant Meunier said he believed EP's grades were potentially relevant to the investigation.[207]

78.    Sergeant Dowling said he was off-duty at the time of the incident and he was called in to conduct the investigation along with Detectives Falcon and Bradley.[208]

    a.     Sergeant Dowling said the investigation focused on whether the deputies had committed a crime.[209]

    b.     Sergeant Dowling said the potential crime they were investigating was unnecessary force.[210]

    c.     Sergeant Dowling said there was no probable cause to believe a crime had been committed by any officer.[211]

    d.     Sergeant Dowling said they obtained a search warrant to corroborate the parents' statements.[212]

    e.     Sergeant Dowling said EP's middle school records showed "victimology."[213]

79.    A search warrant is a warrant signed by a judge authorizing a police officer to conduct a search on a certain place or person for criminal evidence.  The purpose of the warrant is to protect a person's 4th Amendment right of reasonable expectation of privacy from unlawful government searches and seizures.  Police officers are trained that to obtain a warrant they must be able to articulate probable cause that evidence of a crime will be located.[214]

---

[205] Meumier deposition at 43.
[206] Meumier deposition at 45.
[207] Meumier deposition at 58.
[208] Dowling deposition at 63.
[209] Dowling deposition at 66.
[210] Dowling deposition at 74.
[211] Dowling deposition at 77.
[212] Dowling deposition at 80.
[213] Dowling deposition at 81.
[214] Louisiana CCRP, Art. 162A, "A search warrant may issue only upon probable cause established to the satisfaction of the judge, by the affidavit of a credible person, reciting facts establishing the cause for issuance of the warrant."  And, CCRP, Art. 161 A, "a judge may issue a warrant authorizing the search for and seizure of anything within the territorial jurisdiction of the court which: (3) May constitute evidence tending to prove the commission of an offense."

80.     Here, a reasonable police officer would not have believed that probable cause existed to obtain a search warrant for either Mr. Parsa's medical records or for EP's school records. Indeed, Sergeant Dowling admitted that he did not possess any information that a crime had been committed and he stated he was investigating whether the deputies had committed a crime, not whether EP had committed a crime.

81.     A reasonable police officer would have known they lacked probable cause to obtain these warrants and seeking the warrants to investigate EP rather than the deputies' actions that caused EP's death was inconsistent with generally accepted police practices.

**The JPSO Complaint Acceptance, Investigation, and Accountability Policies and Procedures are Inconsistent with Generally Accepted Police Practices and Evidence a Pattern, Practice, and Custom of Ignoring Serious Misconduct that Would Lead an Unprincipled Officer to Believe They Could Violate the Constitutional Rights of Others with Impunity**

82.     Captain Blackwell is in-charge of the JPSO's Internal Affairs Unit and was designated as the sheriff's department person most knowledgeable regarding Internal Affairs.

  a.     The JPSO has a policy, practice and custom of not accepting community member complaints and not investigating allegations of serious misconduct.

    1.     Captain Blackwell said Internal Affairs does not investigate all officer involved shootings because they lack the staffing.[215] Captain Blackwell acknowledged that the JPSO had 19 in custody deaths that occurred between 2017 – 2020 and Internal Affairs did not conduct investigations into any of those cases.[216] Captain Blackwell acknowledged that the Sheriff could request him to investigate any in-custody death or assign more investigators to IA.[217]

    2.     Captain Blackwell said in a recent officer involved shooting where JPSO deputies were indicted there was no Internal Affairs investigation as it was a criminal matter.[218] Captain Blackwell said nothing prevented an Internal Affairs investigation from being conducted and he does not know why a parallel investigation was not conducted.[219]

---

[215] Blackwell deposition at 25-26.
[216] Blackwell deposition at 27.
[217] Blackwell deposition at 19, 26.
[218] Blackwell deposition at 29.
[219] Blackwell deposition at 30.

     a.    Captain Blackwell said he did receive a complaint from the victim's young son written in crayon, but no investigation was conducted because it was not a valid complaint.[220]

     b.    Captain Blackwell said the sheriff's department does not accept third party complaints from anyone – even an attorney.[221]

     c.    Captain Blackwell said the two deputies who were charged criminally were fired.[222]

3.    Captain Blackwell said the department does not generally accept anonymous complaints.[223]

4.    Captain Blackwell said Internal Affairs would only look at a use of force if there was a complaint.  Internal Affairs does not investigate all deaths in custody and while he is aware that other agencies do investigate in custody deaths, he does not know why the JPSO does not.[224]

5.    Captain Blackwell said the Homicide Unit would investigate deputies who used deadly force, but he acknowledged that Homicide is only looking to determine of the deputy committed a crime while Internal Affairs evaluates whether the deputy followed department policy, training, customs and practices.[225]

6.    Professional law enforcement agencies are aware that they must investigate all misconduct complaints, regardless of the source.  CALEA[226] accreditation standards require a written directive that "all complaints against the agency or its employees be investigated, including anonymous complaints."  A standard practice of accepting any and all complaints is the best way to ensure that any method of complaint is accepted.  Complaints should be accepted in all forms including in-person, in writing, by e-mail and web pages, or by telephone.[227]

---

[220] Blackwell deposition at 34.

[221] Blackwell deposition at 35.

[222] Blackwell deposition at 37.

[223] Blackwell deposition at 39.

[224] Blackwell deposition at 18-19.

[225] Blackwell deposition at 23-24.

[226] See, CALEA.org The Commission on Accreditation for Law Enforcement Agencies (CALEA).

[227] See e.g., "Building Trust Between the Police and the Citizens They Serve," U.S. DOJ, (Oct. 2009), "Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight," Jeffrey J. Noble and Geoffrey P. Alpert (2009),"Law Enforcement Administrative Investigations," Lou Reiter (3rd Ed, 2006), "Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice," US DOJ (Nov. 2012), Best Practices Guide – Internal Affairs: A Strategy for Smaller Departments," Beau Thurnauer, IACP, IACP Model Policy – "Investigation of Allegations of Employee Misconduct," (April 2019).

7.  The failure to accept complaints or to investigate serious uses of force sends a strong message to unprincipled deputies that they may violate the constitutional rights of others with impunity.  The failure to investigate allegations of wrongdoing can serve to undermine the complainant's confidence in the department's willingness to examine the conduct of its own employees.  It can prevent a department from becoming fully aware of deviant behaviors that will in all likelihood evolve into a pattern of misconduct that will have a foreseeable risk of harm on constituents and threaten the public trust and confidence.  When a municipality and its policy makers consciously and deliberately adopt such restrictive and antiquated practices, they create a tremendous disincentive to come forward with legitimate claims and, thus, keeps hidden serious police misconduct that should be investigated.  Not only does the behavior itself become concealed, those responsible for the behavior are emboldened.

b.  Captain Blackwell said he does not know what a use of force report is and that deputies put all of the information regarding their uses of force in their incident reports.[228]

1.  Professional law enforcement agencies require their officers to complete use of force reports to review and track uses of force and how often any particular officer may be using force.

2.  The purpose of reviewing and tracking these incidents is not just to identify possible misconduct by deputies, but also to review the department's polices and training.  For example, an officer may be improperly using force due to a lack, or misunderstanding, of training and when these issues are addressed, they may prevent future similar issues by that office or by another officer.

c.  Captain Blackwell said he has never heard of the "code of silence."[229]

1.  The concept of solidarity refers to the unique sense of identity, belonging, and cohesion that one develops as part of a group of colleagues who share common roles, interests, problems or concerns.  In some organizations, solidarity results in loyalty to one's colleagues instead of loyalty to an organization, community, or set of principles.[230]  In those instances individuals will sometimes engage in a "code of

---

[228] Blackwell deposition at 17.
[229] Blackwell deposition at 39.
[230] "The Encyclopedia of Police Science," Jack R. Greene, Ed. (3rd ed. 2007) at 994-1000.

silence" where they do not report the misdeeds of others within their group. In policing, a code of silence results in officers not reporting misconduct by other officers; falsely claiming not to have seen the events in question; actively lying to investigators; or colluding with other officers to create a cover story.[231]

2.    In an organization where the code of silence is fostered, the organization creates an atmosphere that officers may engage in misconduct knowing that their fellow officers and supervisors will not report their misconduct, or if they are questioned, they will deny knowledge of the misconduct. While all professions have employees who may be reluctant for a variety of reasons to report the misconduct of others employees,[232] law enforcement officers are entrusted with incredible powers and have an affirmative duty to prevent, intervene and report misconduct, particularly criminal misconduct, when it comes to their attention. Indeed, the Christopher Commission report stated, "Police officers are given special powers, unique in our society, to use force, even deadly force, in the furtherance of their duties. Along with that power, however, must come the responsibility of loyalty first to the public the officers serve. That requires that the code of silence not be used as a shield to hide misconduct."[233]

3.    The code of silence may exist at some level in all law enforcement agencies and when it does manifest it contributes immensely to incidents of abuse of citizens by law enforcement. Officers who are aware of misconduct by other officers often do not come forward for fear of reprisal by fellow officers or the department. Those who report misconduct may be ostracized and harassed, become targets of complaints and even physical threats, and are made to fear that they will be left alone on the streets in a time of crisis.[234] The Mollen Commission wrote, "The pervasiveness of the code of silence is bolstered by the grave consequences for violating it: Officers who report misconduct are ostracized and harassed; become targets of complaints and even physical threats; and are made to fear that they will be left alone on the streets in

---

[231] "The Christopher Commission Report," (1991) at 168, "The code of silence consists of one simple rule: an officer does not provide adverse information against a fellow officer."
[232] "Above the Law: Police and the Excessive Use of Force," by Jerome H. Skolnick and James J. Fyfe (1993) at 110.
[233] "The Christopher Commission Report" (1991) at 170-1.
[234] "The Encyclopedia of Police Science," Jack R. Greene, Ed. (3rd ed. 2007) at 219. See also, "Above the Law: Police and the Excessive Use of Force," by Jerome H. Skolnick and James J. Fyfe (1993) at 110.

a time of crisis."[235]  The report continued, "Honest officers who know or suspect corruption among their colleagues, therefore, face an exasperating dilemma.  They perceive that they must either turn a blind eye to the corruption they deplore, or risk the dreadful consequences of reporting it."[236]

4.      The Mollen Commission found that "despite years of open and frequent corruption . . . virtually none of their colleagues or supervisors reported this corruption to Internal Affairs."[237]

5.      Law enforcement officers who know that their fellow officers and supervisors will engage in a code of silence may develop the belief that they may engage in misconduct, even criminal misconduct, with impunity as they know they will not be reported and if they are investigated, they know that other officers will not provide evidence adverse to their interests.  The code of silence is even more insidious when police officers victimize individuals, who because of their criminal history; level of intoxication; involvement in prostitution or the commercial sex industry; minors; immigrants and undocumented persons; or those with mental illnesses or developmental disabilities, are more vulnerable due to a perceived lack of credibility.[238]  Moreover, other police officers are often the only witnesses to a police abuse of a citizen's rights and without a witness officer coming forward it is very difficult to prove misconduct even by a preponderance of evidence.

6.      It is shocking that a law enforcement manager and a captain who is in-charge of a Sheriff's office's Internal Affairs Unit would not know about the code of silence.  This lack of knowledge would prevent investigators from recognizing signs of the code of silence such as: Law enforcement officers  who are comfortable engaging in misconduct in the presence of other officers without fear of being compromised or complained about; Through repeated acts of misconduct that go unreported or without any remedial action whatsoever; Through the lack of any complaints initiated or otherwise investigated by supervisors; Through acts of retaliation within the ranks when someone defies the code; When officers are behaving contrary to reasonable practices at the "critical moment" when

---

[235] "Mollen Commission Report" (1994) at 53.
[236] "Mollen Commission Report" (1994) at 57.
[237] "Mollen Commission Report" (1994) at 57.
[238] "Addressing Sexual Offenses and Misconduct by Law Enforcement: Executive Guide," International Association of Chiefs of Police (June 2011).

the act of misconduct transpires; When the situation should have alerted a reasonable officer and focused their attention on the wrong that was taking place, yet when asked, nobody seen or heard a thing; When the incident was so obvious that officers would have had to shut their eyes and ears not to have been aware of the wrong that was taking place; When asked, officers avoid, rather than deny, their response is simply "I don't recall;" When the development of cliques begin to form within the organization; and When officers specifically request not to work with specific officers or units.

d.   Captain Blackwell said there was no Internal Affairs investigation in the EP matter.[239]

e.   Captain Blackwell said if a deputy resigns during the course of an internal investigation, the investigation will be stopped.[240]

   1.   While an organization cannot take any administrative action against an individual who is no longer in their employment, it is improper to stop an investigation simply because the employee resigned.

   2.   First, failing to address allegations of misconduct does not provide the community with the assurance that the organization is taking their complaints seriously.

   3.   Second, the investigation of a complaint may reveal that active officers were involved and at those current employees engaged in misconduct.

   4.   Third, all internal investigations provide the opportunity for the organization to review their policies and procedures to determine if the agency has made all reasonable efforts to prevent and identify the type of misconduct is being alleged.

   5.   Finally, and perhaps most importantly, there are a group of law enforcement officers across the country who have left one agency under a cloud of suspicion only to be employed by another agency unaware of the allegations.  These officers sever their employment relationship once the complaint comes to light and no investigation is conducted, there is no record in the officer's personnel file.

f.   Captain Blackwell said the JPSO does not maintain an early warning system, but

---

[239] Blackwell deposition at 56.
[240] Blackwell deposition at 84.

he would take action if the deputy's name came across his desk three times within one year.  He said there is no protocol and he would only take action if he recalled the prior incidents.[241]

83.    At the relevant times, Joseph Lopinto was the duly elected Sheriff of Jefferson Parish and ultimately responsible for the overall operation of the JPSO which includes:

- Set clear goals and objectives to ensure the alignment and development of systems to support the organization's mission, vision and values.
- Build a unit culture that supports the attainment of desired outcomes.
- Secure resources needed for successful implementation of the agency's mission, vision and values, and ensure that those resources are managed effectively and efficiently.
- Manage relations with other departments, agencies, organizations, the community and other stakeholders.
- Develop a competent and diverse staff to ensure that the agency's mission, vision and values are achieved.
- Coordinate and manage the development and expenditure of the budget.
- Recognize and honor staff for outstanding achievements and goal attainment.
- Ensure that systems are in place to receive, investigate and report on allegations of employee misconduct.
- Lead, mentor and develop subordinates by being fully informed about the activities of the department and deputies.
- Develop and maintain policies, practice, training, supervision and accountability which are consistent and comply with constitutional and statutory requirements regarding law enforcement encounters with the public, including those with disabilities.

84.    Sheriff Lopinto acknowledged that in order to properly run a law enforcement department, he must: 1) develop proper policies regarding police encounters with citizens and the constitutional limitations of their police powers to arrest, use force and restrain citizens; 2) ensure that its officers understand these policies and the constitutional  limitations on their authority to arrest, use force and restrain citizens; 3) properly supervise its officers during the course of law enforcement activities and encounters with citizens; and 4) hold police officers accountable for complying with these policies and protecting the constitutional rights of citizens.[242]

85.    A law enforcement department is required to have policies and training which address situations that deputies will face on a recurring basis to provide deputies with guidance and limit their discretion.  Every day, or almost every day, a deputy will be faced with the decision of whether or not to arrest, restrain and/or use force.  Further, deputies

---

[241] Blackwell deposition at 96-100.
[242] Lopinto deposition at 35-39.

are increasingly having to deal with persons suffering from intellectual disabilities or mental disorders.  Sheriff Lopinto acknowledged that dealing with persons suffering from intellectual disabilities was becoming an issue for law enforcement well before 2014.[243]  Despite this fact, the JPSO does not have any policy or provide training to deputies on dealing with persons with intellectual disabilities even though the training academy had completed training materials for dealing with autistic persons in 2018.[244]  This illustrates that Sheriff Lopinto and the JPSO have actual knowledge of the need for training for dealing with people suffering from intellectual disabilities but has failed to provide this training to its deputies.

86.     Further, a law enforcement department is required to have policies and training which address high-risk activities which pose an obvious danger of potential harm without adequate guidance and training.  For example, while most deputies may never be called upon to discharge their weapon in the line of duty, most law enforcement departments, including the JPSO, have written deadly force policies and extensive firearm training due to the catastrophic consequences of improper use of deadly force.  Based on decades of information, literature and experience, the restraint of a handcuffed, obese person in the prone position poses a serious risk of serious injury or death and akin to deadly force.  Therefore, proper policy and training on this form of restraint must be provided and deputies must be trained, supervised and investigated regarding applications of this dangerous restraint.

87.     The policies maintained by the Sheriff Lopinto and the JPSO with respect to Use of Force/Restraint and Internal Affairs are outdated, unreasonable and inadequate and fail to conform to generally accepted law enforcement standards and practices as set forth herein.

88.     At deposition, Sheriff Lopinto provided the following testimony relevant to my opinions:

  a.     Sheriff Lopinto said there was no Internal Affairs investigation on the Robinson or Parsa cases[245] or any of the 19 in custody deaths listed in discovery.[246]

  b.     Sheriff Lopinto said Internal Affairs handles speeding and courtesy complaints and lacks the skills to investigate an in-custody death,[247] rather those cases are investigated by Homicide.[248]

  c.     Sheriff Lopinto said if there is no obvious policy violation on the surface, the case

---

[243] Lopinto deposition at 27-28.
[244] Lopinto deposition at 28-29.
[245] Lopinto deposition at 48.
[246] Lopinto deposition at 50.
[247] Lopinto deposition at 51.
[248] Lopinto deposition at 52.

will not be referred to Internal Affairs.[249]

d.   Sheriff Lopinto said he wanted Homicide to investigate in-custody deaths because they are more experienced,[250] but acknowledged that Investigator Dowling investigated the EP case and that Dowling was in the gun unit and had no Homicide experience.[251]

e.   Sheriff Lopinto said he is aware that individuals in prone positions can lead to bad outcomes and there are "tons" of articles on positional asphyxia.[252] Sheriff Lopinto said a deputy should place a person on their side in a recovery position after the "fight."[253] Sheriff Lopinto said he is also aware the obesity is a risk factor for positional asphyxia.[254] Further, the JPSO has been involved in litigation involving bad results arising from restraint in the prone position dating back to 1993.[255]

f.   Sheriff Lopinto said there is no formal policy that requires Internal Affairs or Training to review an in-custody death.[256]

g.   Sheriff Lopinto said his sergeants review all police reports, so he does not feel there is a need for use of force reports.[257] Sheriff Lopinto said he is aware that other agencies require use of force reports for tracking.[258]

h.   Sheriff Lopinto does not routinely review the results of homicide investigations of in-custody deaths.[259] Sheriff Lopinto did not review the homicide report in the Keevan Robinson case which was determined by the medical examiner to be a homicide and involved a death after the use of a prone restraint[260] or this case.[261] Sheriff Lopinto completely abdicated his responsibility to properly review and evaluate in-custody deaths or to properly delegate this responsibility, to determine if deputies complied with their policies and training.

i.   In this case, Sheriff Lopinto did not review the homicide report completed by Sgt.

---

[249] Lopinto deposition at 53.
[250] Lopinto deposition at 108.
[251] Lopinto deposition at 56.
[252] Lopinto deposition at 64-65.
[253] Lopinto deposition at 72-75.
[254] Lopinto deposition at 77.
[255] Lopinto deposition at 43-48, Exs. 144-147.
[256] Lopinto deposition at 110.
[257] Lopinto deposition at 113.
[258] Lopinto deposition at 115.
[259] Lopinto deposition at 6.
[260] Lopinto deposition at 47-48.
[261] Lopinto deposition at 58.

Dowling in this case.[262]  He did not review any of the statements obtained during the homicide investigation from the deputies, Plaintiffs or witnesses.[263]  He did not review the autopsy report of EP.[264]  As such, Sheriff Lopinto did not know that the deputies noted in their statements that there were many periods of time that EP was calm, that the Plaintiffs complained that EP was choked, that Deputy Vega acknowledged using some sort of hold around EP's chin during the restraint, that JPSO deputies took pictures of Daren Parsa's injuries (on two occasions) while paramedics were performing CPR on his son and that Plaintiffs were told that they could not leave the scene to go to the hospital with their son because the parking lot was a crime scene.

j.    After reviewing the video of the EP incident, Sheriff Lopinto said he does not have a position on whether or not it was safe to place EP in a recovery position.[265]

k.    Sheriff Lopinto admitted after watching the tape that there were several occasions during the prone restraint where the deputies could have placed EP in the recovery position including: 1) after Detective Vaught arrived and assisted Pitfield in cuffing EP behind his back;[266] 2) after other deputies arrived and there were five officers on the scene during video between 14:33 – 15:00;[267]3) on the video tape from 15:00 – 15:28, Sheriff Lopinto stated that it was not physically impossible to place EP into the recovery position and noted that the issue was "whether or not it was reasonable" to place him in the recovery position;[268] 4) on the video tape from 16:00 – 16:29, Sheriff Lopinto acknowledged that there was no resistance which would preclude placing EP in the recovery position[269] and that "there is nothing other than their [deputies] observances that precludes them from putting him in the recovery position;"[270] and 5) after review of the video tape, Sheriff Lopinto provided the following response with respect whether EP should have been placed in the recovery position: "And, again as you are pausing it second by second by second, it makes it look like there is numerous opportunities, but if you let it run out from the changes of, you know, his reactions 30 seconds apart, 30 seconds apart, you know, I'm going to tell you no at this moment, yes at this moment.  No at this moment, yes at this moment, right. And so, you know, you have the ability to pause every second and ask me that same question, and I'm going to go back to the one where he is resisting and

[262] Lopinto deposition at 58.
[263] Lopinto deposition at 137-138, 176, 247-248.
[264] Lopinto deposition at 229.
[265] Lopinto deposition at 221.
[266] Lopinto deposition at 222.
[267] Lopinto deposition at 226.
[268] Lopinto deposition at 211-215.
[269] Lopinto deposition at 217-218.
[270] Lopinto deposition at 225.

say this is why they weren't."[271] Significantly, Sheriff Lopinto could not state whether any movements by EP while restrained were efforts to resist, efforts to breathe, or were caused by a lack of oxygen caused by the effects of the prone restraint on an obese suspect.[272]

l.  With respect to his management style with respect to investigating incidents to determine if changes need to be made in policies or training or to discipline deputies, Sheriff Lopinto stated: "I don't allow a specific lawsuit when I'm looking at where are my deputies' hearts compared to where are my deputies' minds and what made those changes happen, right. In this situation, I think their hearts are in the right place, **and I don't second guess**, you know, decisions that are made and split-second decisions and those type of things in order to try to -- oh, this should not have happened."[273] While Sheriff Lopinto testified that he does not second guess his deputies, it is his job to properly investigate his deputies and "second-guess" his deputies if they fail to comply with their policies and training.

m.  After reviewing the tape, Sheriff Lopinto was asked whether or when EP should have been placed in the recovery position. In response, Sheriff Lopinto stated he could justify the position that EP was able to be placed in the recovery position and also that the deputies could not place EP in the recovery position.[274] Further, Sheriff Lopinto declined to provide his personal opinion as to whether the deputies should have placed EP in the recovery position noting: "I don't have a position. They were there on that particular day. They made a judgment call from the circumstances that were happening around them of when this should have happened or should not have happened."[275] Sheriff Lopinto's routine practice of failing to review the homicide reports and evidence contained in investigations of in-custody deaths, and failing to take a position on the deputies' actions at deposition, represents a complete abdication of his responsibilities and duties as Sheriff of the JPSO to properly supervise and investigate potential misconduct and to ensure policies, practices and training are consistent with constitutional and legal duties of deputies with respect to the use of force.

n.  Sheriff Lopinto was unaware that public entities with more than 50 employees are required to have a designated ADA Coordinator.[276] He then testified that he is "probably" the federally required ADA Coordinator for the JPSO.[277] Sheriff Lopinto does not know if his deputies in the field are trained on the Americans

---

[271] Lopinto deposition at 235.
[272] Lopinto deposition at 235-237.
[273] Lopinto deposition at 258.
[274] Lopinto deposition at 217-218.
[275] Lopinto deposition at 221.
[276] Lopinto deposition at 159-160.
[277] Lopinto deposition at 159-160.

with Disabilities Act.[278]  The JPSO has no policies on compliance with the ADA.[279]
The JPSO does not have a policy on dealing with persons suffering from
intellectual disabilities or mental disorders.[280]  Sheriff Lopinto testified that he
"doesn't believe that you should have a separate policy" for handling persons
suffering from intellectual disabilities.[281]

89. Sheriff Lopinto and JPSO has a policy of destroying deputy disciplinary and misconduct
records after three years, but keeping positive information about deputies indefinitely.
This makes it impossible for JPSO to implement an early warning system even if it
wanted to, and creates a skewed perspective of officer quality.

90. Sheriff Lopinto and the JPSO acknowledges that it has a pattern, practice and custom of
not accepting  complaints of deputy misconduct even in cases where the deputy has
used excessive force.  In fact, the JPSO refused to accept a complaint from the attorney
who represented a victim who killed by shooting by two deputies were later charged
with criminal conduct. After the refusal, the attorney obtained a written complaint
completed by the victim's minor child in crayon and submitted it to the JPSO.  The JPSO
again refused the complaint demonstrating that even in the most egregious cases they
would turn a blind eye to investigating deputy misconduct.

91. Sheriff Lopinto and the JPSO failed to have a policy, practice of custom of reviewing
critical incidents and in-custody deaths which fails to comply with nationally acceptable
practices.  A proper review of critical incidents and in-custody deaths would require an
evaluation of the current policies and training provided to officers to determine whether
policies and training need updating.  As a result of the failure to investigate critical
incidents and in-custody deaths, the JPSO deliberately fails to evaluate itself and make
necessary changes to its policies and training.  As a result, numerous instances of death
while in custody have occurred at JPSO allows deputy actions which cause to death to
continue without any evaluation or change.

92. In discovery, Sheriff Lopinto and the JPSO has identified 19 in custody deaths that have
occurred since 2017– 2020 in response to written discovery.  The JPSO acknowledged
that it has a pattern, practice and custom and failing to conduct administrative
investigations on serious uses of force or for in-custody deaths.  With respect to the 19
in-custody deaths that occurred between 2017 – 2020, none were investigated by IA for
officer compliance with policy and training.  Instead, only criminal investigations are
performed and provided to the DA's office to determine whether there is probable
cause to believe that an officer committed a crime.  Therefore, the JPSO fails to properly
perform IA investigations to identify whether deputies have complied with policy and

---

[278] Lopinto deposition at 159-160.

[279] Voltolina deposition at 29.

[280] Lopinto deposition at 116-118.

[281] Lopinto deposition at 118.

training and, therefore, problem officers and deficiencies in policy and training are not evaluated, even in cases involving the death of a suspect or victim.

93. Sheriff Lopinto knew the risks of positional asphyxia, but chose not to investigate the EP matter to evaluate the actions of his deputies or determine whether there needed to be changes made to policy or training. The systems in place under Sheriff Lopinto result in a policy and practice of avoiding investigation of possible deputy misconduct regarding use of force and restraint which need to be addressed. Sheriff Lopinto's policies, practices and customs are intentionally designed and result in avoiding investigating possible deputy misconduct and to avoid identifying issues that may be resolved by changes to policy or training to prevent similar future incident. Moreover, the failure to have deputies complete use of force reports or to conduct administrative investigations on use of force incidents prevents the organization from identifying, tracking, and resolving potentially problematic deputies or issues. This is especially problematic in a department that routinely destroy IA files after 3 years. It appears that Sheriff Lopinto is consciously making it difficult for citizens to have complaints of improper force investigated and has created a system to avoid investigating or tracking deputies to address deputies who may use excessive force or to make changes to training or policy based on the results of investigations.

94. The patterns, practices, and customs, of Sheriff Lopinto and the JPSO are contrary to generally accepted law enforcement practices practice and serve to embolden unprincipled deputies who may believe that because the JPSO does not conduct critical incident reviews, administrative investigations or hold their deputies accountable for serious misconduct involving force including use of force and deadly force, that they may violate the constitutional rights of others with impunity. This is best illustrated by Sheriff Lopinto agreement to indemnify the officers in the action for any potential liability for punitive damages in this case.[282] Sheriff Lopinto acknowledged in his deposition that punitive damages are normally recoverable only in cases where the conduct is criminal.[283] Despite this fact, Sheriff Lopinto agreed to indemnify the officers against any liability for punitive damages.[284]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed at Rancho Santa Margarita, CA.

_____          _____1/31/23_____
Jeffrey J. Noble                                         Date

---

[282] Lopinto deposition at 260.
[283] Lopinto deposition at 260.
[284] Lopinto deposition at 260.

53