UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CASE NO.  2:21-cv-00080

DONNA LOU and DAREN PARSA, on their own behalf and
on behalf of their deceased minor child, E.P.

Plaintiffs,


VERSUS


SHERIFF JOSEPH P. LOPINTO, III, CHAD PITFIELD, RYAN
VAUGHT, STEVEN MEHRTENS, SHANNON GUIDRY, NICK VEGA,
MANUEL ESTRADA, MYRON GAUDET, JOHN DOES 1-3,
VICTORY REAL ESTATE INVESTMENTS LA, LLC D/B/A
WESTGATE SHOPPING CENTER, ABC INSURANCE COMPANY,
and XYZ INSURANCE COMPANY,

Defendants.



    VIDEOTAPED DEPOSITION OF DANA TROXCLAIR, M.D.,

given in the above-entitled cause, pursuant to the

following stipulation, before Sandra P. DiFebbo,

Certified Shorthand Reporter, in and for the State

of Louisiana, at the Jefferson Parish Forensic

Center, 2018 8th Street, Harvey, Louisiana, on the

12th day of September, 2022, commencing at 12:05

PM.

APPEARANCES:

        THE COCHRAN FIRM MID-SOUTH
        BY:  ANDREW CLARKE,
        ATTORNEY AT LAW
        One Commerce Square
        40 South Main, Suite 1700
        Memphis, Tennessee  38103
        Representing the Plaintiffs

        MOST & ASSOCIATES
        BY: WILLIAM MOST,
        ATTORNEY AT LAW
        201 St. Charles Avenue
        Suite 114, #101
        New Orleans,Louisiana  70170
        Representing the Plaintiffs

        MARTINY & ASSOCIATES
        BY:  FRANZ ZIBILICH,
        ATTORNEY AT LAW
        131 Airline Drive
        Suite 201
        Metairie, Louisiana  70001
        -and-
        LINDSEY M. VALENTI, ATTORNEY AT LAW
        LEGAL ADVISOR
        1233 Westbank Expressway
        Building B, Fifth Floor
        Harvey, Louisiana  70058
        Representing JPSO Defendants

        THOMPSON, COE, COUSINS & IRONS, LLP
        BY:  MATTHEW R. FEIGLER,
        ATTORNEY AT LAW
        601 Poydras Street
        Suite 1850
        New Orleans, Louisiana  70130
        Representing Victory Real Estate
        Investments LA, LLC, and Westgate
        Shopping Center

        YORSCH LAW GROUP
        BY:  FREDERICK E. YORSCH,
        ATTORNEY AT LAW
        4532 Napoleon Avenue
        Suite 201
        Metairie, Louisiana  70001
        Representing JPCO

1  APPEARANCES CONTINUED:

2

3  Also Present:  Tim Anclade

4

   Videographer:  Aaron Palmer,
5                 CLVS, Depo-Vue

6

7  Reported By:

8

           Sandra P. DiFebbo
9          Certified Shorthand Reporter
           State of Louisiana
10

11     E X A M I N A T I O N        I N D E X

12                                    Page

13  BY MR. CLARKE:                     5

14

15

16     E X H I B I T        I N D E X

17                     Page

18

19  Exhibit 68                        11

20  Exhibit 69                        14

21  Exhibit 70                        84

22  Exhibit 71                        85

23

24

25

S T I P U L A T I O N

It is stipulated and agreed by and
between Counsel for the parties hereto that the
Videotaped Deposition of DANA TROXCLAIR, M.D., is
hereby being taken pursuant to the Federal Rules of
Civil Procedure for all purposes in accordance with
law;

That the formalities of reading and
signing are specifically waived;

That the formalities of sealing,
certification, and filing are hereby specifically
waived.

That all objections, save those as to
the form of the question and responsiveness of the
answer are hereby reserved until such time as this
deposition or any part thereof is used or sought to
be used in evidence.

* * * * *

Sandra P. DiFebbo, Certified Shorthand
Reporter, in and for the State of Louisiana,
officiated in administering the oath to the
witness.

1              DANA TROXCLAIR, M.D., having been

2        first duly sworn, was examined and testified

3        on her oath as follows:

4    EXAMINATION BY MR. CLARKE:

5        Q.    Would you please state your name for the

6    record.

7        A.    Dana Troxclair.

8        Q.    And you are a doctor?

9        A.    Yeah.

10        Q.    Can I call you Dr. Troxclair during this

11    deposition?

12        A.    Sure.

13        Q.    Dr. Troxclair, my name is Andy Clark. I'm

14    a lawyer from Memphis, Tennessee.  I am here with

15    Mr. Most.  We represent the Parsas in a lawsuit

16    that has been brought.  Obviously, you've given

17    depositions before, correct?

18        A.    Yes.

19        Q.    So I'm going to just dispense of the

20    ground rules.  Before you came in to give your

21    deposition, did you prepare or review any

22    documents?

23        A.    I looked at my autopsy report.

24        Q.    And what we have in front of you are a

25    bunch of records that I've subpoenaed from the

1    Jefferson Parish Coroner's Office that we may be

2    referencing with you.  Did you meet with anybody?

3         A.   No.  I just met with Freddy.

4         Q.   What about Franz?  What did Franz ask

5    you?

6         A.   Yeah.  I met --

7         Q.   Just a second ago.

8         A.   I met with him prior to this deposition.

9         Q.   What did he talk to you about?

10        A.   We just went over the findings of the

11   autopsy.

12        Q.   Did he ask you anything about excited

13   delirium?

14             MR. YORSCH:

15                  Objection.  I was there.

16             MR. CLARKE:

17                  Well, if you're there and he is

18               there, there is no privilege.  So, I

19               mean, that's not a good objection.

20             MR. ZIBILICH:

21                  I disagree, but I'm going to let her

22               answer it, because we don't have

23               anything to hide.

24             THE WITNESS:

25                  What was the question?

BY MR. CLARKE:

    Q.    Did you talk about excited delirium?

    A.    Yes, sir.

    Q.    And it's my understanding, from what I have subpoenaed with the coroner's office, is this is the only case that they've ever ruled out as excited delirium; is that correct?

    A.    I don't know if they ruled excited delirium prior to my coming to the coroner's office.  I don't know.

    Q.    When did you come to the coroner --

    A.    I started working here in 2010.

    Q.    So since 2010, you're not aware of any other excited delirium cause of death at --

    A.    No, sir.

    Q.    -- the JPCO?

    A.    No, sir.

    Q.    Let's go through a little bit.  Tell me a little bit about your educational background.  I'm going to ask you your education and then your work history to where you got --

    A.    Okay.

    Q.    Take it away.

    A.    I went to medical school in 1996, graduated in 2000, from medical school.  That was

1  at LSU here in New Orleans.  I completed a
2  five-year residency in pathology at New Orleans
3  Medical School.  Following that, a one year of
4  forensic fellowship with the New Orleans Coroner's
5  Office through the LSU Medical School.  I'm board
6  certified in forensic pathology and anatomic
7  pathology.  Following the fellowship, I worked at
8  LSU Medical School.  I was the Assistant Director
9  of the autopsy service.  I stayed there from 2006
10  to 2010, and then I came here to the Jefferson
11  Parish Coroner's Office, and I've been here since.
12      Q.   You can't get away, right?
13      A.   Right.
14      Q.   That's what the newspaper says.
15      A.   That's right.
16      Q.   I understand that.  Let's talk about in
17  general.  I just want to know some kind of general
18  things about how you do autopsies and what is the
19  -- when you do an autopsy --
20          MR. ZIBILICH:
21             She would love to show you.
22  BY MR. CLARKE:
23      Q.   When you do an autopsy, do you dictate?
24      A.   No, sir.
25      Q.   So when you do an autopsy report, you

1 just type that up all yourself?

2     A.   During the autopsy, I make notes.  We

3 have a whiteboard next to the autopsy station.  So

4 I'll make notes on the whiteboard, usually the

5 organ weights and any kind of notes I need to

6 remember.  I write it on the whiteboard, and

7 following the autopsy, I sit down and write all my

8 notes on paper, and then following that I type the

9 report and then wait for other testing to come back

10 before I sign it out.

11     Q.   Do you have any handwritten notes from

12 this autopsy in the file?

13     A.   No, sir.  Once we -- once I sign a case

14 out, we destroy the handwritten notes.

15     Q.   Is that a matter of policy?

16     A.   That's what I was told ever since I came

17 here, that once we sign it out, we get rid of the

18 notes.

19     Q.   Well, you're aware you are a governmental

20 employee, correct?

21     A.   Yes.

22     Q.   And you know of the public records laws,

23 don't you?

24     A.   I'm familiar with some of them.

25     Q.   Who told you you could destroy officially

1    created records?

2            MR. YORSCH:

3                Objection.  They are not officially

4            created records.

5    BY MR. CLARKE:

6        Q.   You are an official coroner, correct, or

7    medical examiner?

8        A.   Assistant coroner.

9        Q.   Assistant coroner, right?

10       A.   Yes.

11       Q.   You take notes of what you are doing

12   during an autopsy, correct?

13       A.   Correct.

14       Q.   Those are in your official capacity when

15   you take those notes, correct?

16       A.   Correct.

17       Q.   Who told you that you can destroy the

18   notes once you are done?

19       A.   The chief pathologist that was here when

20   I came.

21       Q.   Who was that?

22       A.   Susan Garcia.

23       Q.   Is that your understanding of the

24   practice of all of the coroner's here at JPCO?

25       A.   Yes.

1    Q.   Now, we issued subpoenas in this case,

2    and we got documents that were produced.  One of

3    the subpoenas I issued was -- let me do this first.

4    Number 1, you're here pursuant to subpoena,

5    correct?

6    A.   Correct.

7    Q.   I'm going to enter as Exhibit Number 68

8    the subpoena to Dr. Troxclair.  If you look at -- I

9    issued a subpoena that has been entered into the

10   record as Exhibit Number 59, which requested --

11   here it is. Okay.  If you look at the last page of

12   that, it asks that you produce certain things.  The

13   policy and procedure manual, which we got.  All

14   documents pertaining to E██ P████, which we

15   received, and then, if you look at Exhibit Number

16   61, do you know whose handwriting that is?

17   A.   No, I don't.

18   Q.   In response to my subpoena, when I asked

19   for autopsy reports and death certificates for

20   Jefferson Parish Coroner's Office that listed

21   excited delirium as the cause of death, that was

22   produced.

23   A.   Yeah.  This looks like George's

24   handwriting.  That's our secretary.

25   Q.   It is consistent with your recollection

1    that this is the only time that excited delirium

2    has been ruled as a contributing cause of death in

3    a case since you've been here, since 2010?

4         A.   Yes, sir.

5         Q.   We have those documents produced.  Then

6    we issued a second subpoena, which is Exhibit 65.

7    That subpoena requested, if you look at the last

8    page.

9         A.   Yes.

10        Q.   Materials involved in the coroner's

11   office training of officers, any materials in your

12   library pertaining to excited delirium, autism,

13   compression asphyxia, positional asphyxia, or prone

14   positioning.  The third thing is a copy of any

15   materials in the possession regarding acute

16   psychotic episode, severe autism spectrum, or and

17   disruptive behaviors.  The only thing that was

18   produced by your office in respect to this was a

19   book from the DiMaios?

20        A.   Correct.

21        Q.   So you don't have anything in your

22   library pertaining to what an acute psychotic

23   episode is, disruptive behavior disorder, severe

24   autism spectrum disorder, other than the DiMaio

25   book?

1     A.   That's it.  Yes, sir.

2     Q.   Where did you get the DiMaio book?

3     A.   I purchased it a long time ago.

4     Q.   You're sure you purchased it?

5     A.   I did.

6     Q.   Are you --

7     A.   I purchased it at a conference, I

8 believe.

9     Q.   The Institute for Sudden In-Custody Death

10 Prevention Conference?

11     A.   No, sir.  It was a -- because I've never

12 been to that.  The only conferences I've been to is

13 the National Association of Medical Examiners and

14 the International Association of Coroners and

15 Medical Examiner conferences.

16     Q.   Neither one of those organizations

17 officially recognizes excited delirium as a

18 diagnosis or a cause of death, correct?

19     A.   I'm not sure.

20     Q.   Well, in order to give -- what do you

21 know about excited delirium?

22     A.   Well, I know it's accepted by

23 pathologists up until I believe it was January of

24 2020, when the Royal College of Pathologists

25 published a report against it, and I think they

1  suggested that it be renamed as hyperactive

2  delirium instead of excited delirium, or it might

3  have been agitated delirium.

4      Q.   You're talking about the Royal College of

5  Pathologists?

6      A.   Yes, sir.

7      Q.   Have you reviewed that article?

8      A.   I read through it.

9      Q.   I'm going to mark as Exhibit Number 69 a

10  copy of the Royal College of Forensic -- of

11  Pathologists.  This came out in --

12          MR. ZIBILICH:

13              What are you calling this thing?

14          Royal College of Forensic Pathologists

15          what?

16          MR. CLARKE:

17              Forensic Science Regulator Guidance.

18          The Use of "Excited Delirium" as a

19          Cause of Death.

20  BY MR. CLARKE:

21      Q.   In January of 2000, you knew that the

22  Royal College of Pathologists had issued an article

23  that said not to use excited delirium as a cause of

24  death, correct?

25      A.   That's correct.

1      Q.   Now, are you aware that -- of the AMA --

2  the American Medical Association's position on

3  that?

4      A.   Yes.  Well, I knew that it wasn't

5  approved by the AMA.

6      Q.   What about the American Psychiatric

7  Association?

8      A.   I'm not familiar with that. I don't

9  believe it's listed as one of their diagnoses in

10  the DSM.

11      Q.   Let me show you what has previously been

12  marked as Exhibit 23, the American Psychiatric

13  Association's position statement on excited

14  delirium.  The term "excited delirium" is too

15  non-specific to meaningfully describe and to convey

16  information about a person.  Do you agree with

17  that?

18      A.   Where are you reading this?

19      Q.   Number 1.

20      A.   Okay.  Yeah.  I mean, if that's their

21  position.

22      Q.   Well, you know, what I'm trying to get at

23  is you understand excited delirium is a

24  controversial cause of death, correct?

25      A.   Correct, correct.

1    Q.    Do you understand the origins of excited

2   delirium from Dr. Whetli in 1985?

3    A.    Yes.

4    Q.    Dr. Whetli coined the phrase when law

5   enforcement are involved in a struggle, and

6   somebody dies, correct?

7    A.    Correct.

8    Q.    Dr. Whetli then -- his theory was that a

9   certain amount of drugs in somebody's system, with

10  physical struggle or exertion, could result in a

11  catastrophic event, correct?

12   A.    Correct.

13   Q.    He then assigned out the cause of death

14  to a bunch of prostitutes who were dead without

15  obvious signs or symptoms of any type of homicide,

16  but he theorized that the amount of cocaine and the

17  exertion of a prostitute during sex caused the

18  death, correct?

19   A.    Correct.

20   Q.    Are you aware of that?

21   A.    Yes.

22   Q.    You're aware that his boss, Chief Medical

23  Examiner Joe Davis, then went through and

24  reevaluated all of those things and found there was

25  a serial killer in Broward County that was killing

1  these people that were assigned to the cause of

2  death excited delirium, correct?

3          A.    Yes.

4          Q.    So that's where it starts from.

5          A.    Correct.

6          Q.    What is your definition -- you've used

7  the term, so what do you define excited delirium

8  as?

9          A.    I've used the term, and, actually, I went

10  back and forth, because to me it's the same thing

11  as an acute psychotic episode.  It's synonymous

12  with it.  I mean, agitated delirium. I don't have a

13  problem --

14          Q.    Psychosis has a definition.  What is

15  psychosis?

16          A.    Psychosis is -- it's a --

17          Q.    It has a medical definition.  So, I mean

18  --

19          MR. ZIBILICH:

20              You interrupted her.

21          THE WITNESS:

22              It's like an abrupt disruption in

23            your mood, your behavior, your

24            thoughts. That's the definition of

25            acute psychotic.

BY MR. CLARKE:

    Q.   It's not autism?

    A.   No.

    Q.   So somebody having an autistic outburst is not psychotic?

    A.   No.

    Q.   Why are you saying E&#9608; P&#9608; was psychotic?

    A.   Well, I mean, he was very combative.  He was very aggressive.  He was a threat to himself and others at the time.

    Q.   That's completely different than psychosis, correct?

    A.   I don't know how a severe autistic person normally acts.  I know they have social problems.  They have verbal and nonverbal communication problems, but, to me, looking at the video, that was a classic acute psychotic episode he was having.

    Q.   But you're -- it could be just a normal autistic outburst, correct?

    A.   I don't know what a normal autistic outburst is.

    Q.   Well, the coroner teaches JPSO their training on autism.

1          A.    Okay.

2          Q.    Are you aware of that?

3          A.    The coroner here?

4          Q.    The coroner's office trains JPSO in

5     autism.  Are you aware of that?

6          A.    No.

7          Q.    A psychotic event involves somebody

8     acting outside of their normal thing and not being

9     aware of their surroundings, things of that nature,

10    correct?

11         A.    Right.  Correct.

12         Q.    In autism, when somebody has an outburst,

13    that is -- that could be completely normal

14    behavior, correct?

15         A.    I guess it could.  Depends on how the

16    person normally acts.

17         Q.    Right.  So if somebody has an outburst --

18    I mean, you're using terms. You use excited

19    delirium and acute psychotic episode.  I have

20    problems with those terms.

21         A.    Okay.

22         Q.    I'm just telling you on the front end.  I

23    don't play hide the ball.

24         A.    To me they are one and the same.  They

25    are synonymous.

1      Q.   To me, if we go back to where Whetli

2  coined the phrase, and was immediately found to be

3  wrong --

4      A.   Right.

5      Q.   -- where there was a serial murderer that

6  was left out on the streets --

7      A.   Right.

8      Q.   -- that the term should be put where it

9  needs to be, in the garbage can.

10          MR. ZIBILICH:

11              Wait, wait.  That's not a question.

12          THE WITNESS:

13              He was completely wrong in his

14          cases.

15  BY MR. CLARKE:

16      Q.   Right, but that's what you are using as

17  the diagnosis, ma'am.

18      A.   I'm --

19          MR. ZIBILICH:

20              Wait, wait.  Stop.  That's not a

21          question.  That's a lecture.

22  BY MR. CLARKE:

23      Q.   You are using excited delirium.  Where

24  did you pull that from?

25      A.   I consulted with two other pathologists,

1  two other forensic pathologists here.  Dr. Connor

2  at the time and also we brought in Dr. Mike

3  Defatta.

4      Q.   But you also sent out the brain slides to

5  do some type -- remember there was some kind of

6  test that they could find the -- they run the brain

7  slides on somebody during an autopsy, and Deborah

8  Morris thought she could pinpoint the excited

9  delirium based on the brain?

10     A.   Oh, they were looking for the heat shock

11 proteins, right.

12     Q.   And there was no heat shock proteins in

13 this case, were there? The test came back negative.

14     A.   I don't believe the test was run in this

15 case.

16     Q.   The neuropsychological test?

17     A.   Yes.

18     Q.   It's in your report.

19     A.   I know I sent the brain out to a neuro-

20 pathologist for brain examination.

21     Q.   What were the results?

22     A.   Everything he found was normal.

23     Q.   Which would be -- that would militate

24 against the diagnosis of excited delirium.  That's

25 what you were trying to find with that test, right?

1    A.    Well, no.  He would have to specifically

2    look for those heat shock proteins.

3    Q.    What did you send out the brain for then?

4    A.    For a complete neurologic examination by

5    a neuropathologist.  I'm not board certified in

6    neuropathology.

7    Q.    So let's just go -- let's do it this way.

8    Let me give you Exhibit 61.  We are going to go

9    through your report.

10    A.    Okay.

11    Q.    All right.  According to this, it looks

12    like the date of death was January -- and this is

13    your report plus all the documents I subpoenaed

14    from the JPSO.

15    A.    Okay.

16    Q.    So according to your report -- we'll just

17    start at the beginning and go through it.  The date

18    of death was the 19th, and the date of the exam was

19    1/22/20, correct?

20    A.    That's correct.

21    Q.    Why was JPSO at the autopsy?

22    A.    JPSO attends autopsies on a regular

23    basis.

24    Q.    Every autopsy?

25    A.    Pretty much.  They quit attending natural

1  cases unless I call them, if I find something

2  unnatural, but, yeah.  They were here today.  They

3  come every day.

4      Q.   And what is their participation?  Do they

5  discuss with you what happened, or what is their

6  purpose being in attendance?

7      A.   In case I have questions.  Sometimes they

8  will ask me, do you want me to tell you what

9  happened.  Sometimes they just stand around, unless

10  I -- they don't say anything unless I ask

11  questions.

12     Q.   So when did you first become aware of

13  E█████ P██████ and what was the first thing that you

14  did?

15     A.   I didn't know anything until the death

16  investigator contacted me and told me that he was

17  coming in for autopsy.

18     Q.   If you look -- I think there should be a

19  tabby on that up at the top.

20     A.   Oh, yeah.

21     Q.   That's a different one.  Let me see.

22  I'll put the other tab on here that we always use.

23  Go to the first tab.  Tell me how -- what I want to

24  ask you is how the process works.  So if you get

25  called that there is a death, is there a criteria

1   for whether the coroner's office gets involved?

2       A.   The death investigator goes to the scene,

3   and they evaluate the situation and determine

4   whether or not the case needs to be brought in for

5   an autopsy, and if there is any questions on

6   whether or not it should be brought in, then

7   they'll contact me.

8       Q.   So the way it would work is there would

9   be some type of notification to the coroner's

10  office.  The death investigator would go out and

11  take the preliminary information?

12      A.   That's correct.

13      Q.   If there is anything that that death

14  investigator thinks needs further analysis, then he

15  brings that to the coroner?

16      A.   Yes.  He will give me a call, if there is

17  any question on whether or not to bring the body in

18  for autopsy.  Sometimes they release the body at

19  the scene to the funeral home, and the body does

20  not come in for autopsy.

21      Q.   Do you recall whether you were called

22  from the hospital by Mr. Genevay?

23      A.   I don't know if he was at the hospital

24  when he called me, but he did let me know that the

25  case was coming in for autopsy.

1    Q.   You knew that day?

2    A.   Yes.

3    Q.   Did you find out any information about

4    it?

5    A.   That day, no.

6    Q.   Tell me when the first day is that you

7    found out any information about this event.

8    A.   I mean, he may have called me within the

9    days between the date of death and then the date of

10   autopsy, you know, filling me in information.  I

11   don't recall, you know, but the morning of autopsy

12   I usually review his report, and if it's not

13   complete at the time, then talk to him about the

14   particulars of the case before doing the autopsy.

15   Q.   And in this case, there was a separate --

16   there was a private medical examiner who attended

17   on behalf of the Parsas, too, right?

18   A.   That's correct.

19   Q.   Do you know Dr. Lauridson?

20   A.   I didn't know him until that day.

21   Q.   At that time.  Okay.  At any time did you

22   -- well, tell me what happened when you started the

23   autopsy.  Did you have to go through -- did you

24   have to meet with Dr. Lauridson?  Did you review

25   documents?  Did you review videotapes?

1      A.    No.  We did not discuss anything at all

2  prior to the autopsy.

3      Q.    So you go in, and you do the autopsy.

4  Let's just go through what your findings are.

5      A.    Okay.

6      Q.    And the way you write out your report,

7  you have Findings, Roman numeral one, Excited

8  delirium?

9      A.    Yes.

10      Q.    So by January 22nd, you had a working

11  diagnosis of excited delirium?

12      A.    Oh, no, sir.

13      Q.    This is after your event.  Why did you

14  set it up in this particular fashion?

15      A.    What do you mean?

16      Q.    Why is excited delirium listed as Roman

17  numeral one?

18      A.    Because I looked at all of the evidence

19  that I was given, all of the findings that the

20  autopsy -- all of the evidence.  I used all of that

21  to render an opinion on the cause of death with a

22  certain degree of medical certainty, and I felt

23  like excited delirium or acute psychotic episode

24  was an important finding in the cause of death.

25      Q.    So under your findings, this A, B, C, you

1  know, and under one, are those supposed to be

2  findings that demonstrate or tell you that this was

3  excited delirium?

4      A.   Well, it's just supportive evidence.

5      Q.   So bilateral pulmonary congestion and

6  edema.  Why is that evidence of excited delirium?

7      A.   It's just -- that's a non-specific

8  finding, but, I mean, that can be seen in excited

9  delirium cases or in acute psychotic episode cases.

10 You have an adrenalin surge.  During that time, the

11 epinephrine, norepinephrine, it causes your heart

12 to beat fast and harder.  You end up with pulmonary

13 edema.

14     Q.   But you also -- there was -- when it says

15 congestion, when you asphyxiate, one of the ways --

16 reasons you asphyxiate is because your lung gets

17 filled up, correct?

18     A.   It depends how you are asphyxiated.

19     Q.   In order to asphyxiate, you have to be

20 able to -- in order to -- are you aware of any

21 dangers of the prone position?

22     A.   Yes.

23     Q.   In order to properly breathe, you have to

24 bring in oxygen, correct?

25     A.   Correct.

1        Q.    You have to expel CO2, correct?

2        A.    Correct.

3        Q.    If you are in a struggle, you get acido

4    -- you start suffering acidosis, correct?

5        A.    Yeah.  Acidotic.

6        Q.    And that systemic acidosis can result in

7    a heart event, correct?

8        A.    Correct.

9        Q.    So is the fact that the left lung is

10    congested and has edema in it, can that be evidence

11    of the buildup of lactic acid or the improper

12    exchange of oxygen and CO2 in the lungs?

13        A.    Yeah.  It can be the result of that,

14    also.  That's what I said.  It's non-specific.

15        Q.    That doesn't support excited delirium any

16    greater than asphyxial death, correct?

17            MR. YORSCH:

18                Objection.

19    BY MR. CLARKE:

20        Q.    Correct?

21        A.    Correct.  It could be found in both.

22        Q.    Your Section B, focal edema with

23    extensive intra-alveolar hemorrhage

24    microscopically, what does that mean?

25        A.    Right.  That he had fluid in the lungs

1    with hemorrhage.

2        Q.   Which can be caused from being forcibly

3    compressed on the ground, correct?

4        A.   It could be caused from that.  It could

5    be caused from CPR.  There is no way of telling.

6        Q.   Then it says death investigation

7    information and videotape.  Is this telling us what

8    you reviewed?

9        A.   This is a synopsis of investigative

10   information and watching the video.

11       Q.   Did you ever do anything with the video

12   so that you can actually zoom in on the aspect of

13   the events more closely?

14       A.   Yes.  I watched it, and we did zoom in on

15   parts of it, yes.

16       Q.   Did you see Vega choke him?

17       A.   No, sir.

18       Q.   So you're saying that's not on the video?

19       A.   I did not see that.

20       Q.   Are you aware of any dangers of

21   restraining obese people in the prone position?

22       A.   Yes, sir.

23       Q.   Why is that dangerous to them?

24       A.   Well, when somebody is obese, it pushes

25   up their thoracic cavity.  Puts some restriction.

1          Q.    Pushes against the diaphragm muscle?

2          A.    Correct.

3          Q.    So a person just by the body habitus who

4     is laying in the prone position with force on their

5     back, that's going to interfere with their

6     breathing, correct?

7          A.    Correct.  I mean, it's been shown that

8     people in the prone position, it reduces their lung

9     capacity.  They're forced lung capacity by like 13

10    percent, so it does restrict some of their --

11         Q.    So it's not -- are you talking about the

12    Bilkie, Chan studies?

13         A.    Yes.

14         Q.    It's 23 percent, correct?

15         A.    I thought I read 18.8 or 13.8 percent.

16         Q.    Did you read those in preparation for

17    this deposition?

18         A.    Yes, sir.

19         Q.    Did you get those provided to you by

20    Franz?

21         A.    No, sir.

22         Q.    Do you know the whole Bilkie, Chan, the

23    whole Sudden Custody Death Institute, correct?

24         A.    Right.

25         Q.    They're all -- are you aware that they're

1  all hired experts from Taser?

2      A.   No, sir.

3      Q.   When is the first time you saw the video?

4      A.   We met with the sheriff's office

5  detectives.  I don't recall the date.

6      Q.   Was it at the date of the time that you

7  had the JPSO Case Review Committee or did you have

8  --

9      A.   Yes.

10      Q.   That was June 15th, 2020.  The third?

11      A.   Oh, this one.  Yes.

12      Q.   Up until that time, you had not reviewed

13  the video?

14      A.   No, sir.

15      Q.   So you made -- and when did you complete

16  your autopsy report?  You completed your autopsy

17  report on June 22nd?

18      A.   June 22nd, yes.

19      Q.   So the first time you looked at the

20  video, with whoever is listed on the JPSO Case

21  Committee -- Case Review Committee notes, was June

22  15th?

23      A.   That's correct.

24      Q.   You only watched this video one time?

25      A.   Yes.  I don't recall watching it a second

1  time.

2      Q.   Do you think that -- excited delirium is

3  a controversial diagnosis?

4      A.   Correct.

5      Q.   Do you believe that you studied that

6  videotape sufficiently to understand everything

7  that happened?

8      A.   I did at the time.

9      Q.   Did you have officers or deputies in here

10 kind of describing what was going on while the

11 video was there?

12     A.   They were describing what they were

13 showing on the video.  Like if they fast-forwarded

14 it or backed up or stuff like that.

15     Q.   Did you talk to the Parsas who were

16 actually eyewitnesses to the scene?

17     A.   No, sir.

18     Q.   Why didn't you talk to them?

19     A.   We leave that for the death investigator.

20 I mean, I never met with them.

21     Q.   The death investigator basically said --

22 we took his deposition before, that he does the

23 death investigation report, and then he is done

24 with that case unless the medical examiner asks him

25 to do stuff.  Is that your understanding?

1     A.   Correct.

2     Q.   So you never asked him to meet with the

3 Parsas?

4     A.   No, but he would relay information that

5 they would tell him.  He would relay that

6 information to me.

7     Q.   Did you review any of the statements of

8 the officers?

9     A.   No, sir.

10    Q.   Why not?

11    A.   I didn't find it necessary, I guess.

12    Q.   Do you believe he pulled his arms up over

13 his head without any assistance of Deputy Vega

14 applying a pain compliance technique?

15       MR. ZIBILICH:

16          Applying what?

17       MR. CLARKE:

18          A pain compliance technique.

19       MR. YORSCH:

20          Objection.

21 BY MR. CLARKE:

22    Q.   You know what a pain compliance technique

23 is, right?

24    A.   No, sir.

25    Q.   Did you see Deputy Vega pull his hands up

1  and push them over his head?

2      A.   No, sir.

3      Q.   What is your definition of excited

4  delirium?

5      A.   Like I told you, I think it's synonymous

6  with acute psychotic episode.

7      Q.   But --

8      A.   It's a disturbance in the thoughts, the

9  mood, the behavior of someone out of the ordinary.

10          MR. YORSCH:

11              Objection.  Asked and answered.

12  BY MR. CLARKE:

13     Q.   You don't know if it's out of the

14  ordinary.  Did you -- let me ask you this.  What --

15  before you completed your autopsy, what else did

16  you review?  So we know that you did the autopsy.

17     A.   Correct.

18     Q.   We know that on June 15th you reviewed

19  the videotape.

20     A.   No.  That was on --

21     Q.   June 15th.

22     A.   Oh, that was June 15th.  Yes.

23     Q.   He died on the 19th.  You did the autopsy

24  on January 22nd.

25     A.   Correct.

1      Q.   You reviewed the video on June 15, 2020.

2      A.   Correct.

3      Q.   You completed your autopsy report on June

4  22nd, 2020.

5      A.   Correct.

6      Q.   I want to know everything that you

7  reviewed prior to completing your report. So we

8  know we have the autopsy findings.

9      A.   Correct.

10     Q.   We know we have the video that you looked

11  at one time?

12     A.   Correct.

13         MR. ZIBILICH:

14             Wait, wait, wait. She said they went

15          back and forth.  Your words are one

16          time.

17         THE WITNESS:

18             Right.

19         MR. CLARKE:

20             What?

21         THE WITNESS:

22             We went back and forth looking at --

23          rewinding the video and going forward.

24          We spent a lot of time with the video,

25          looking at the video.

BY MR. CLARKE:

Q.   With all due respect, the police exited the meeting at 12:58.  The video -- the meeting started at 12:15.  So there is only 30 minutes that you could -- or whatever --

MR. ZIBILICH:

Forty-three minutes.

BY MR. CLARKE:

Q.   Forty-three minutes.

A.   Well, that was 43 minutes of looking at the video, because that's all we did was look at the video for that meeting.  So I spent at least 43 minutes of looking at that video.

Q.   No.  We'll get back to it.  What else did you review?  Did you review medical records?

A.   I reviewed the medical records, yes.

Q.   What medical records?

A.   I don't recall.  I did ask for the admit records.  I remember reviewing those.  As far as like his past medical records, I don't recall if I had any at the time.

Q.   And any records you would have had, you destroyed?

A.   No.  Usually, medical records are uploaded into the MDI log system.

1      Q.   We subpoenaed everything.  I don't have
2  one medical record that you produced.
3      A.   I should say back -- I don't know when it
4  started, but we used to have to destroy the medical
5  records, because they are actually not our -- what
6  is the word.  They're not -- they belong to the
7  hospital, not to us.  So at one time we were told
8  not to upload medical records, because they are not
9  for us.  They're the hospitals.  We get them.  We
10  look at them, and then we destroy them.  So at one
11  time we weren't destroying them. Now we upload the
12  pertinent medical records to the MDI log.
13      Q.   If we take a break, can you check and see
14  if they have been uploaded?
15      A.   Yeah.  We can look.
16      Q.   We don't have to do that right now.
17  We'll do it if we have a break.  I want to make
18  sure I have everything that --
19      A.   Right.
20      Q.   Now, did you -- now, a coroner can do a
21  death investigation themselves and issue subpoenas
22  and things like that, correct?
23      A.   That's correct.
24      Q.   Did you do that in this case?
25      A.   I don't issue subpoenas for anything.  The

1  death investigators will make -- put out a medical

2  request for medical records.

3      Q.   Well, I took the death investigator's

4  investigation, and that is not -- he doesn't recall

5  doing that.

6      A.   Okay.

7      Q.   Did you ask anybody to subpoena the

8  records from anybody?

9      A.   I don't recall.

10     Q.   Would there be a record of it, if you did

11 that?

12     A.   No, because I would verbally ask him.

13     Q.   So in talking here today, you can't tell

14 me what you reviewed to come up with your

15 diagnosis; is that fair?

16     A.   No.  I reviewed -- I mean, I reviewed

17 hospital records, because I reviewed his admit

18 records, when he went to the hospital that day.  I

19 know I did review that.

20     Q.   And the hospital records, on admit, they

21 didn't have -- was there any type of high body

22 temperature that was recorded?

23     A.   No.  They did not take a temperature, and

24 I did review medical records, because that's where

25 I got his clinical diagnosis, from the medical

1   records.

2      Q.   You understand that excited delirium, to

3   the extent it's real, one of the only objective

4   signs is a high body temperature, correct?

5      A.   Yes.

6      Q.   And there wasn't a high body temperature

7   recorded, correct?

8      A.   It wasn't recorded.

9      Q.   According to Mr. Genevay, he wrote a

10  report where he said the body was warm to touch,

11  and his testimony earlier would be that that is not

12  a body temperature of 104 or above.  Would you

13  agree with that?

14     A.   Yes.  I don't know what time --

15         MR. YORSCH:

16             Objection.  She wasn't there.

17         THE WITNESS:

18             Yeah.  I don't know what time he got

19          to the hospital, you know, how long

20          after the incident.

21  BY MR. CLARKE:

22     Q.   According to his testimony within an

23  hour.

24     A.   Okay.

25     Q.   So that would be inconsistent with an

1  excited delirium diagnosis, somebody not having an
2  abnormally high body temperature, correct?
3       A.   Yeah.  In this case, we don't know the
4  temperature, so I can't say it's against the
5  diagnosis.  I don't have it to say it is.
6       Q.   What body temperature would you -- at
7  what body temperature does it suggest excited
8  delirium?
9       A.   I'm not sure.
10      Q.   Well, would it be 101?  That's not the
11  type of body temperature associated with excited
12  delirium.
13           MR. YORSCH:
14                She just answered you.  She was
15             unsure.
16  BY MR. CLARKE:
17      Q.   You read DiMaios stuff, right?
18      A.   Yeah.  I don't recall the temperature of
19  the body.
20      Q.   Well, that's an important fact that you
21  need in making a diagnosis of excited delirium,
22  correct?
23      A.   Correct.  I didn't have that temperature
24  here in this case.
25      Q.   Does a death investigator -- do they --

1    we have -- let me get you to look at Exhibit Number

2    -- Keeven Robinson, Exhibit Number 62.

3         A.   Yes.

4         Q.   Are death investigators supposed to make

5    sure that they get a body temperature?

6         A.   No.  Not on all cases.

7         Q.   Well, in the Keeven Robinson case, if you

8    look at the investigative report prepared by

9    Mr. Rodovich, it says -- he described -- he says

10   that while enroute to the ER, the death

11   investigator requested a core temperature be taken.

12   That was done at 98.4 degrees.  You see that?

13        A.   Yes.

14        Q.   If you go to the next page, when he goes

15   through and looks at the body, he describes the

16   body as warm to touch.

17        A.   Yes.

18        Q.   So both of these -- both Mr. Parsa and

19   Keeven Robinson were with no rigor mortis, warm to

20   touch, correct?

21        A.   Yes.

22        Q.   And the body temperature on warm to touch

23   in Keeven Robinson was 98.4.  That would be

24   inconsistent with excited delirium, correct?

25        A.   Yes.

1     Q.   Now, let's go through your actual

2  examination and the findings in it.  These are kind

3  of standardized points that are contained in all

4  stuff.  Let's go through the Evidence of Injury.

5  Let me ask you this.  Did you do any type of

6  analysis or any type of dissection of E███ P████'s

7  shoulders?

8     A.   Yes.

9     Q.   Did you determine whether or not there

10 were any injuries or anything unusual about his

11 shoulders, double jointed, things of that nature?

12    A.   Oh, no.  I mean, we don't do a dissection

13 of the joints.

14    Q.   You didn't dissect the joint.  You don't

15 know if --

16    A.   No.

17    Q.   -- there was an injury to the joint?

18    A.   No, sir.

19    Q.   So according to -- on the head and neck

20 -- and we have all of the photographs here, too,

21 Dr. Troxclair, if you need to look at them.

22    A.   Okay.

23    Q.   The head and neck.  There were a couple

24 -- A, B, C.  There were some abrasions on his lip,

25 his right nare and the right temporal scalp, right?

1      A.    Correct.

2      Q.    And I want you to tell me what D is. What

3    you found with D.

4      A.    I did a layered dissection of the neck,

5    and I had an area of hemorrhage within the distal

6    aspect of the left sternocleidomastoid muscle, so

7    that is your muscle here in the neck.  So the

8    distal aspect of that, where its attachment at the

9    clavicle, and hemorrhage within the posterior

10   aspect of the anterior left strap muscle.

11     Q.    Can you show me where --

12     A.    The sternohyoid.  So it's behind the

13   sternocleidomastoid.  Sternocleidomastoid is this

14   big muscle here.  See?

15     Q.    Yep.

16     A.    It's behind that. So there was hemorrhage

17   there.

18     Q.    Now, this hemorrhage where you're

19   describing that would not be caused by any type of

20   intubation efforts? It's a different area.

21     A.    Well, it's hard to say, because I had Tim

22   call.  They had a really tough time intubating him.

23     Q.    I understand.  You note other injuries

24   around his hyoid bone.

25     A.    Correct.

1     Q.   That would be more directly involved with

2  intubation, correct?

3     A.   That's correct.

4     Q.   Where you're describing is somewhere off

5  to the side of where the intubation impacts would

6  have been.

7     A.   Well, it's right here.  So if somebody is

8  trying to hold this, hold this part to try to

9  intubate him, their wrists could cause hemorrhage

10  in that area.

11     Q.   Did you have any evidence that they used

12  their hands to grab his neck like that trying to

13  intubate him?

14     A.   No, I didn't.

15     Q.   It could also be from an arm bar

16  chokehold, correct?

17     A.   Well, it could be.

18     Q.   Section E.  You removed part of the

19  spinal cord, and everything was fine, correct?

20     A.   Correct.

21     Q.   Then you looked at the -- under Trunk you

22  noted that there was an abrasion on his right

23  shoulder?

24     A.   Correct.

25     Q.   The areas of erythema on his right upper

1    back and right lower back, where are they?

2         A.   Erythema.  That's just a small area of

3    redness.

4         Q.   Could that be caused by a deputy -- what

5    did you determine the cause of that to be?

6         A.   I didn't know the cause of that.

7         Q.   Could that have been caused by deputies

8    putting pressure on his back?

9         A.   It could be.  It could be by somebody

10   putting pressure on the back.

11        Q.   And you saw that he was in the prone

12   position for nine minutes, correct?

13        A.   Yes.  I don't remember how long.

14             MR. ZIBILICH:

15                  I object.  The position speaks for

16               itself.

17             MR. CLARKE:

18                  It's in your -- I don't play --

19             MR. ZIBILICH:

20                  I don't care what you know.

21             MR. CLARKE:

22                  I don't play hide the ball, and I

23               don't deal with Franz.

24   BY MR. CLARKE:

25        Q.   It's in here.

```
 1        A.    Uh-huh.
 2        Q.    Okay.  So that -- did you -- you saw the
 3   video, right?
 4        A.    Yes.
 5        Q.    They were on top of him for nine minutes,
 6   right?
 7             MR. ZIBILICH:
 8                  Same objection.
 9             MR. CLARKE:
10                  It's in your coroner's --
11             MR. ZIBILICH:
12                  I don't care where it's at.
13   BY MR. CLARKE:
14        Q.    How long were they in the prone position?
15        A.    I don't recall the time that he was in
16   the prone position.
17        Q.    If you look at the third chart, it says
18   during this thing nine minutes in the prone
19   position at the parking lot.
20        A.    Okay.
21        Q.    Did you -- who created this case
22   committee report?
23        A.    This one here?
24        Q.    Yes.
25        A.    This had to be from Dr. Eckert.
```

1      Q.    Do you see on Page 2 it notes nine

2   minutes in the prone position in the parking lot?

3      A.    Yes.

4      Q.    Did you see anything else in the video

5   that could have caused the small areas of erythema

6   on his right upper back and right lower back?

7      A.    No, sir.

8      Q.    Under Section C, it says there is a

9   hemorrhage of the posterior wall of the proximal

10  esophagus and surrounding greater horn of the hyoid

11  bone.

12     A.    Correct.

13     Q.    And in that -- in this report, you

14  attribute that specifically or potentially to

15  intubation attempts.

16     A.    Intubation attempts.

17     Q.    You didn't do that with respect to the

18  injuries to the sternio --

19     A.    Sternocleidomastoid.

20     Q.    Right.

21     A.    Yes, but it could be.  I've seen it

22  before in other cases.

23     Q.    I understand, but you specifically put it

24  in what is most likely due to intubation effects in

25  this report --

1     A.   Okay.

2     Q.   -- with respect to one injury and not

3 with respect to another, correct?

4     A.   Okay.  But it could be, yes.

5     Q.   It could be.  Then you pulled out -- you

6 did some further spine cuts and found they were

7 fine, correct?

8     A.   Correct.

9     Q.   The extremities.  You noted that there

10 were a number of abrasions on the arm, elbow, wrist

11 and legs.

12     A.   That's correct.

13     Q.   Any of those significant or any

14 contributing factor to his death?

15     A.   No, sir.  I mean, he had some abrasions

16 around his wrists from being handcuffed.

17     Q.   Did you know he was leg shackled?

18     A.   Yes.  No.  No, I did not.  I don't

19 recall, actually, if they did or not.

20     Q.   It's not in your -- it's not in any of

21 your documents.

22     A.   Yeah.  I don't recall.

23     Q.   Would you agree that a thorough

24 evaluation of an event to a certain cause of death

25 would have to know all of the forms of restraint

1 that were applied?

2     A.   Yes, and I did at the time.  I just don't

3 recall right now.

4     Q.   Well, if you don't recall, you don't

5 recall what you recalled at the time, right?

6     A.   Not necessarily.

7     Q.   I mean, you are going to recall things

8 that are helpful to your testimony, but --

9     A.   No.

10     MR. ZIBILICH:

11         Objection.  Argumentative.  Come on.

12     MR. YORSCH:

13         Objection.

14     MR. ZIBILICH:

15         Come on.

16 BY MR. CLARKE:

17     Q.   You -- Jesus.  All right.  So you have

18 all of these things.  Do any of -- are any of the

19 injuries that you see on the right or on the upper

20 extremities or lower extremities caused by the

21 deputies?

22     A.   I don't know if they're caused by the

23 deputies.  All I could tell you is they are there.

24     Q.   Then you have a note.

25     A.   Some of them may have been caused when he

1  was in the Laser Tag.  Some of them may have been

2  caused when he was at home.  I don't know.  All I

3  could tell you is they are there.

4      Q.   Let's talk about the note that you put in

5  here.  This is, again -- I think this is an

6  additional description of the injury to the sternio

7  --

8      A.   Cleidomastoid.

9      Q.   Right.  Explain to me what this is.

10     A.   Yes.  In certain cases, usually in

11 custodial cases, we'll do what is called a layer

12 dissection of the body.  So we make an incision on

13 the back side, and we dissect away the skin and the

14 underlying tissues to reveal the muscles to see if

15 there is any hemorrhage, because sometimes you'll

16 see bruises within the muscle that had not made it

17 to the surface yet, so you can't see them

18 externally.  So it requires layered dissection.  So

19 that's what I did, a dissection of his torso and

20 his upper and lower extremities, and this is areas

21 of hemorrhage that I saw.

22     Q.   Point to me where they were.

23     A.   The medial right clavicle area on the

24 left midback, the anterolateral left wrist, and a

25 small area within the left and right wrist.

1    Q.    Where is that on the back?

2    A.    On the back. Left midback.  So midway on

3 the left side.

4    Q.    Do you know what caused that?

5    A.    No, I don't know.  I do not.

6    Q.    Could that be caused by compress -- the

7 officers on his back?

8    A.    It could be caused by anything, yes.

9    Q.    Well, not anything.

10    A.    Well, yeah.  I mean, he could have fallen

11 and hit something, and it could cause that.  It

12 could be by anything.

13    Q.    Did you see that on the tape?

14    A.    No, sir.

15    Q.    So he had -- when you did -- in this

16 note, we talked about having an area of hemorrhage

17 on his left side that you identified in Section

18 I-D, right?

19    A.    Correct.

20    Q.    And you have now an identification of

21 another soft tissue thing on the right clavicle?

22    A.    On the right clavicle.  The left side was

23 within the sternocleidomastoid where it attached to

24 the clavicle, so it was a little in the neck, not

25 on the clavicle.

1      Q.   Which is consistent with a chokehold

2  coming from being choked with your elbow on the --

3  on your left side and the arm bar coming across

4  your throat, correct?

5      A.   It could be consistent with something

6  like that.

7      Q.   Did you try to rule that out?

8      A.   I didn't see any evidence of that in the

9  video.

10     Q.   Did you talk to the Parsas who at the

11 scene said, "Stop.  You're choking him?"

12     A.   No, sir.

13     Q.   Would you have wanted to know that the

14 Parsas at the scene, while they were actually

15 restraining him, were complaining that they were

16 choking him?

17     A.   No.  I mean, I didn't know.  What I knew

18 what the Parsas had to say was through the death

19 investigator.  I didn't talk to them directly, but

20 watching the video, Mr. Parsa was actually towards

21 Eric's head, like on his shoulder, on the back

22 side.

23     Q.   Mr. Parsa?

24     A.   Yes.  We are going to have to look at the

25 video.  But you also -- you talked to JPSO deputies

1    before you gave a conclusion, and you never talked

2    to the Parsas.  How is --

3              MR. ZIBILICH:

4                   That's the sixth time.

5              MR. CLARKE:

6                   I'm going to ask it -- if I have to

7                ask it 50 times, I'm going to ask it.

8              MR. YORSCH:

9                   No.  It is asked and answered.

10             MR. ZIBILICH:

11                  Until I decide to walk out of here,

12                and then you can call the magistrate.

13             MR. CLARKE:

14                  That's fine.

15             THE WITNESS:

16                  I've never spoken to a family prior

17                to signing out cases.  I mean, it's

18                just not practice.

19   BY MR. CLARKE:

20        Q.   Do you always talk to the deputies when

21   part of their conduct could be implicated by the

22   investigation?

23        A.   Well, I think I would know that

24   information through the death investigator.  They

25   talk to the family, so I get the information from

1    the death investigator.  I work independently from

2    the sheriff's office.  I use the video.  I didn't

3    listen to statements from the sheriff's office and

4    their deputies to make my conclusion.

5         Q.   Is it your understanding --

6         A.   To come to my conclusion.

7         Q.   Is it your understanding that he was

8    actively resisting the whole time he was in the

9    prone position?

10        A.   I don't recall exactly what happened

11   during the video, but I'm sure he was.

12             MR. CLARKE:

13                  Let's go off the record for a

14             second.

15             THE VIDEOGRAPHER:

16                  Off the record. The time is now

17             12:58.

18                  {BRIEF RECESS}

19             THE VIDEOGRAPHER:

20                  Back on the record.  The time is now

21             1:00.

22   BY MR. CLARKE:

23        Q.   Dr. Troxclair, if there was a chokehold

24   used by one of the deputies, would that impact your

25   findings or your conclusions?

1    A.   Well, I did contribute the prone

2   position.  If it was a chokehold, if I see a

3   chokehold, yes, it would.

4    Q.   Because excited delirium -- you're not

5   pointing to a test to come up with -- that we ran

6   this test, and it came back excited delirium,

7   right?

8    A.   No.  There is no specific test.

9    Q.   There is, according to Deborah Morris,

10  but that was not done, but you don't -- it's a

11  diagnosis of exclusion, correct?

12   A.   Correct.  The heat shock protein test is

13  shown not to work in these cases.

14   Q.    Yeah.  So there isn't a test.  There was

15  a test that was supposedly going around, but it

16  doesn't work, right?

17   A.   That's correct.

18   Q.   This is diagnosis by exclusion, and other

19  things that would be more directly impacted would

20  be a chokehold or the amount of force, correct?

21   A.   Correct.

22   Q.   What did the deputies tell you when they

23  went over the video?

24   A.   I don't recall what -- I mean, during the

25  video they were just telling me what was happening

1    in the video.  In other words, here he is coming

2    out of Laser Tag.  Now you are going to see him go

3    to the parking lot.  They were kind of just letting

4    me know what was coming ahead.

5         Q.   Well, you couldn't have figured that out

6    your -- Why were they narrating a video to you?

7         A.   Because they telling me what happened

8    prior to him exiting the Laser Tag and what was

9    going to happen, so I'm -- when they fast-forwarded

10   it, they going through stuff that I didn't see.  So

11   they would say, We are going to fast-forward it,

12   because here he is -- now he is going to be exiting

13   the Laser Tag, or now he is going to try to go back

14   in.  They are telling me his mom is at the door

15   from trying to keep him from reentering the Laser

16   Tag.  So they narrated as far as that, but they

17   didn't, you know, give their opinion to me about

18   what actually was happening during the incident.

19        Q.   Did you discuss the term "excited

20   delirium" with the JPSO deputies?

21        A.   Not at all.

22        Q.   Did you discuss it with Dr. Lauridson at

23   the autopsy?

24        A.   No, sir.

25        Q.   Have you ever used the term "exhausted

```
 1   mania?"
 2        A.    No, sir.
 3        Q.    Was the brain swelling at all?
 4        A.    Yes.
 5        Q.    That is a sign of hypoxia, correct?
 6        A.    Yes.  It could be.  It's non-specific
 7   again, that you see in other things, also.
 8        Q.    Well, the whole excited delirium, even
 9   the definition, is non-specific.  Would you agree?
10        A.    Yes.
11        Q.    It's a constellation of actions not
12   medical?
13        A.    Correct.  The cause of death is multi-
14   factorial.  It's not one thing, you know.
15        Q.    Well, here is the way I look at it. Is it
16   your testimony that had the deputies not shown up
17   and put him in the prone position that he would
18   have died at the time that he died without their
19   contribution?
20             MR. YORSCH:
21                  Object to speculative.
22             THE WITNESS:
23                  Prone positioning did contribute to
24               his death, and I did put it as a
25               contributing factor.
```

BY MR. CLARKE:

    Q.    The issue is, had they not had him in the prone position, it's your opinion that he wouldn't have died?

    A.    Most likely not, correct.

    Q.    So while it's a contributing thing, it's a factor that is essential to your finding that the death occurred in whatever state his mental state was, correct?

    A.    Right.  I mean, I can't ignore the fact that he was having an acute psychotic episode.

    Q.    That's a psychiatric term, is it not?

    A.    Correct, but there is a lot of physiologic things going on in the body during that time.  That's what I was telling you earlier.  Your catecholamines increase.  Your norepinephrin, your epinephrine increases, especially once a struggle has stopped.  And so when you get that increase, you are prone to arrhythmias, cardiac arrhythmias.

    Q.    Acidosis, too, correct?

    A.    Correct.

    Q.    Whatever.  The heart eventually stops?

    A.    Correct.

    Q.    You're trying to figure out what the path was for it, correct?

1       A.    Correct.  You can't pinpoint one thing,

2   and that's why I have contributing factors there.

3       Q.    Have you ever heard of excited delirium

4   being written out as a cause of death when there

5   were not drugs being used?

6       A.    Yes.  There's been cases when there

7   weren't any drugs.  There have been cases in mental

8   institutions.  There have been cases in mental

9   institutions where there is no police involved, no

10  restraints used, but yet, after they calm down, and

11  the struggle has ceased, they're found

12  unresponsive.

13      Q.    Have you -- and petechial hemorrhage is

14  something you are looking for with asphxial deaths,

15  correct?

16      A.    That's correct.

17      Q.    They're non-specific, too, correct?

18      A.    Correct.

19      Q.    And you can die of asphyxia without

20  having petechial hemorrhages, correct?

21      A.    True.

22      Q.    You can cough and get petechial

23  hemorrhages, correct?

24      A.    Correct.

25      Q.    So they're non-specific?

```
 1        A.    Right.
 2        Q.    Is it your testimony that you are going
 3   to testify, if called in front of the jury, that
 4   you didn't talk to Dr. Lauridson about excited
 5   delirium?
 6        A.    I did not talk to him.
 7        Q.    You know what confirmational bias is?
 8        MR. ZIBILICH:
 9             Say it again.
10        MR. CLARKE:
11             Confirmational bias is.
12        MR. ZIBILICH:
13             Did she talk to him about those?
14   BY MR. CLARKE:
15        Q.    Do you know what confirmational bias is?
16        A.    No, sir.
17        Q.    So is any autistic kid who has an
18   outburst that is violent, aggressive to himself or
19   others, would you call that psychosis?
20        A.    You would have to know their norm.  You
21   would have to -- I mean --
22        Q.    So how are you calling this -- what did
23   you know about E███ P███'s norm to call this
24   psychosis?
25        A.    I mean, I would think he is not normally
```

1     combative, aggressive, a threat to himself and

2     others.  I mean, is that norm? To me that's not

3     norm.  Looking at that video, that is a clear case

4     of an acute psychotic episode.

5         Q.   You need to define psychotic for me,

6     because that's a medical term.  Are you using it

7     just as a general term, like he is acting out of

8     the ordinary?

9         A.   It's a disturbance in his behavior, his

10    mood, his thoughts.  It's out of the ordinary.

11        Q.   What if he had -- in the past he had

12    violent outbursts or aggressive outbursts in the

13    past?  It would not be outside his normal, correct?

14        A.   Well, if he had violent outbursts, such

15    as that, then I don't think he should have been in

16    a public domain.

17        Q.   So you're saying that people with

18    disabilities aren't allowed to be outside?

19        A.   No.  That's not true.  That's not what

20    I'm saying.  I'm saying if that is normal for him,

21    then I don't think it's too safe to bring him in a

22    public domain.

23        Q.   So you're saying the extent of the fight

24    -- I mean, slapping his head, would that be

25    psychotic?

1      A.    No.  That could be norm.

2      Q.    What about, you know, if he's nonverbal,

3  and he is just saying the word "fire truck"

4  repeatedly?

5      A.    No.

6      Q.    What if, when he is pushed down, you

7  understand -- did you understand that E█████ was

8  nonverbal?

9      A.    Yes.

10     Q.    Did you take into consideration the

11 officer's actions with respect to a nonverbal

12 person with respect to how he reacted with the

13 officer?

14     A.    Yes.

15     Q.    Does that make it psychotic?  If somebody

16 is pushing somebody down, and they can't

17 communicate with you, that's a difficult situation,

18 correct?

19     A.    It is a difficult situation.

20     Q.    And how did that impact or play into your

21 evaluation of the case, that he was nonverbal?

22     A.    Well, I mean, like I said, it's a multi-

23 factorial thing.  It's not just one thing or

24 another thing.  Him being nonverbal, you are still

25 seeing an acute psychotic episode there.  I mean,

1   if his father couldn't calm him down or his mother

2   couldn't calm him down, they had to call officers

3   to come and help, that's not norm.

4       Q.   If somebody gets in a fistfight, is that

5   an acute psychotic episode?

6       A.   No, sir.

7       Q.   I'm trying to figure out how you're

8   saying this is outside the norm of an autistic kid

9   that you don't know if you reviewed his prior

10  records to make that determination?

11      A.   Well, like I said, if that's norm, then I

12  don't understand how he would be out in the public.

13  This was an outburst.  That was a clear outburst on

14  video.

15      Q.   I don't have a problem if you use the

16  word "outburst."  I have a problem that you used

17  the word acute psychosis, which is a medical

18  definition of a psychiatric nature, correct?

19      A.   Correct.

20      Q.   Are you using it in a technical aspect or

21  are you using it as a descriptive aspect?

22      A.   A technical aspect.  If he is just having

23  an outburst or a psychotic episode or whatever, his

24  adrenaline is still pumping.  You are still in that

25  fight or flight.  You still have that hyper-

1　adrenergic state going on.  So, I mean, we getting

2　here looking at technical terms when it -- the

3　outcome is the same.

4　　　Q.　The outcome is the same if you don't

5　release him from the -- are you aware of any

6　training for law enforcement or paramedics about

7　the use of the prone restraint?

8　　　A.　Yes.

9　　　Q.　And you are not supposed to, right?

10　　　A.　It happens all the time.

11　　　Q.　I'm not saying it happens all the time.

12　You're not supposed to, if you can, correct?

13　　　A.　I think that -- I'm not sure, but I think

14　that is the latest recommendation.

15　　　Q.　As a medical examiner, if somebody is in

16　the prone position, that is significant to you,

17　correct?

18　　　A.　Yes.

19　　　Q.　Because you have to take that into

20　consideration because of the impact it has on the

21　airways and breathing and the diaphragm, correct?

22　　　A.　That's correct, and I did take it into

23　consideration.

24　　　Q.　So getting back to where the rubber meets

25　the road, without the prone restraint, he wouldn't

1    die that day?

2         A.   Most likely not, yes.

3         Q.   Let's go back to your thing.  We're going

4    to finish up the findings.  Going through this, I'm

5    on Page 4 of 6.  The body cavities.  Everything was

6    fine with the organs, correct?

7         A.   Yes, yes.

8         Q.   Central nervous system.  Anything wrong

9    with the central nervous system?

10        A.   No, sir.

11        Q.   The neck.  We've talked about that with

12   all of the injuries on both the right side and the

13   left side of the neck?

14        A.   That's correct.

15        Q.   The respiratory system.  The cardio-

16   vascular system says 490 grams.

17        A.   Correct.

18        Q.   Anything important about that?

19        A.   No.  His heart was a little enlarged, but

20   --

21        Q.   But not --

22        A.   Other than that --

23        Q.   -- anything significantly enlarged,

24   correct?

25        A.   No.  Just a little enlarged.

1    Q.   You actually sent it out for testing.

2  We'll get to it.  And the heart functioned

3  properly, correct?

4    A.   That's correct.

5    Q.   The respiratory system.  Again, we show

6  that there was a lot of fluid in his lungs,

7  correct?

8    A.   That's correct.

9    Q.   Did you make a determination where that

10  fluid came from?

11    A.   No, sir.

12    Q.   What are the places it could come from?

13    A.   You can see that in many diagnoses.  You

14  can see that with heart failure.  You could see it

15  with drownings.  You could see it with --

16    Q.   Asphyxia?

17    A.   Asphyxia.  You could see it with a number

18  of things.  It's non-specific.

19    Q.   You checked the liver.  It was fine.

20  Then you say the gastrointestinal system.  You said

21  sectioning of the tongue reveals a focal hemorrhage

22  of the posterior aspect of the distal tongue.  Tell

23  me what that injury is.

24    A.   Correct.  There was some hemorrhage in

25  the tongue.  Usually, when you see hemorrhage in

1  the tongue, you think of seizure activity, if they

2  bite their tongue or bit their tongue for some

3  other reason.

4      Q.   In layman's terms, he bit his tongue?

5      A.   He bit his tongue.

6      Q.   Nothing of any importance with the geni

7  -- how do you say that?

8      A.   Genitalia. Genitourinary system.

9      Q.   Right.  Endocrine system or any of the --

10     A.   Correct.

11     Q.   No broken bones or anything, correct?

12     A.   No, sir.

13     Q.   Microscopic Examination.  You note that

14  there was focal pulmonary edema and extensive

15  intra-alveolar?

16     A.   Intra-alveolar.

17     Q.   Hemorrhage?

18     A.   Correct.

19     Q.   What is -- was that a more specific

20  finding or a quantification of the finding of the

21  fluid in the lungs?

22     A.   That's exactly what it means.  There is

23  fluid in the lungs, and there is some intra-

24  alveolar hemorrhage, which is where the air should

25  be, there is fluid, and there is hemorrhage.

1      Q.   Can that occur when somebody becomes
2  acidosis and can't expel the CO2?
3      A.   Yes.  The hemorrhage is most likely
4  caused from -- that could be from CPR.  They did
5  extensive CPR on him.
6      Q.   Or it could be from them pushing down on
7  his back, correct?
8      A.   That could -- yes.  If that happened,
9  yes.
10     Q.   You didn't see them pushing down on his
11 back?
12     A.   I saw the lower -- I saw an officer
13 towards the lower end of his back.  Like I said, I
14 believe from the video, if I remember correctly,
15 the dad was towards the head, in this area, the
16 shoulder.
17     Q.   You ran drug tests and everything.  He
18 didn't have any drugs that he wasn't supposed to be
19 on, correct?
20     A.   No, sir.
21     Q.   I'm just going to try to go through the
22 things that you ruled out.  So do you review the
23 investigative report?
24     A.   Yes, sir.
25     Q.   When it comes in.  So you had at least

1   that information?

2       A.   Yes, sir.

3       Q.   Did you have that at the time of the --

4   you actually did the autopsy?

5       A.   His report wasn't complete, but I did

6   speak to him.

7       Q.   When we go to the coroner's report, the

8   next page of it, where it says communications, I

9   want to ask you about that.

10      A.   Okay.

11      Q.   Do you remember having communications --

12  is this kind of a log of everybody that supposed to

13  have talked about or -- tell me what this

14  communications log is supposed to show.

15      A.   Yeah.  This is -- any time we request

16  something or something comes in on the case, it's

17  logged in MDI logs, so this keeps track of what

18  we're asking for and what we're receiving on the

19  case.

20      Q.   Did you ever talk to the Parsas?

21      A.   No, sir.  I spoke to them once, after the

22  autopsy, after I signed it out.  We did have a

23  conference call with them.  It was myself, Tim

24  Genevay, and Dr. Ellen Connor.

25      Q.   That was on the telephone?

1          A.    Yes, sir.

2                MR. ZIBILICH:

3                     Was that after the June report?

4                THE WITNESS:

5                     That was after I signed the autopsy

6                out.

7    BY MR. CLARKE:

8          Q.    Now, it looks like you sent out -- you

9    sent out things for testing, correct?

10         A.    Correct.

11         Q.    Tell me -- let's go to the things that

12   were sent out for testing and the results.

13         A.    Okay.

14         Q.    The first thing I see is you sent

15   something to Invitae?

16         A.    Invitae, yes.

17         Q.    For a gene analysis?

18         A.    That's correct.

19         Q.    And what were you -- why did you send out

20   stuff for a gene analysis?

21         A.    This is on the heart just to make sure

22   there was no conduction problems or anything with

23   him, and they just found one variant of a gene of

24   unknown significance.

25         Q.    Do you do this on every case or just

1    cases where there is an in-custody death with

2    officers?

3         A.   I do -- a lot of cases I do send -- in

4    fact, I just got one back last week.  I do send if

5    I suspect there is any kind of heart issues or if I

6    want to rule out any kind of heart issues.

7         Q.   Did you know that this one was going to

8    be looked at differently because the death occurred

9    in custody?

10        A.   No, sir.  I wanted to be complete.  I

11   wanted to make sure I cover all bases.

12        Q.   So you sent it out for a gene analysis.

13   That came back that there was nothing in his genes

14   that was problematic?

15        A.   Yes.  Just that one variant of unknown

16   significance.

17        Q.   Then it looks like you sent out something

18   to Jesse E. Edwards Registry of Cardiovascular

19   Diseases?

20        A.   That's correct.

21        Q.   What were you sending that out for?

22        A.   I sent his heart out -- like I said, I

23   just wanted to cover all bases.  I'm not a cardiac

24   pathologist.  I sent it to the cardiac pathologist

25   just to be very thorough.

1    Q.   The heart came back, and it functioned
2  properly, correct?
3    A.   Right.  Cardiomegaly, like we talked
4  about.  A little bit enlarged with four-chamber
5  enlargement and hypertrophy.
6    Q.   I mean just had a heart that was a little
7  bit bigger.  That's not anything that was a cause
8  of death.  It just might make his heart more
9  susceptible?
10    A.   It could make his heart more susceptible
11  to arrhythmias.
12    Q.   The neuropathology consultation report.
13  Why did you send this stuff out?
14    A.   Because I'm not a neuropathologist, so we
15  have the access to a neuropathologist at Tulane, so
16  I asked him to review the case for me.
17    Q.   Why were you wanting a neuropathologist
18  to look at it?
19    A.   Just because they are more thorough than
20  we are, because they're trained in neuropathology.
21  So, like I said, I wanted to cover all bases to
22  rule out anything, so I sent it to him to be more
23  thorough.  We can't do it on every case, because,
24  you know, Number 1, it could cost a lot of money,
25  and, Number 2, it takes a very long time to do a

1  thorough examination.

2      Q.   Are you doing this case with these types

3  of testing, this thoroughness, because it's an

4  in-custody death with JPSO?

5      A.   Well, according to NAME.  They recommend

6  you do a very thorough investigation, including all

7  kind of tests you would not normally do on a normal

8  case.

9      Q.   Who is they?

10     A.   The National Association of Medical

11  Examiners.

12     Q.   So they have a statement, it's your

13  understanding, of -- is this with respect to

14  excited delirium or just in general?

15     A.   No.  Just in general in-custody deaths,

16  and, also, it's also in DiMaios' book.

17     Q.   Do you know that -- well, so the heart,

18  everything came back fine?

19     A.   Well, the heart, like I said, the heart

20  was enlarged, but --

21     Q.   I'm sorry.  We're on the neuropathology.

22     A.   Yeah.  The neuropath is fine.

23     Q.   None of that had anything to do with --

24  his brain or his heart did not have any type of

25  defect that would have caused his sudden death,

1   right?

2        A.   Well, his heart was enlarged with the

3   hypertrophy and the four-chamber dilatation, so he

4   did have some heart issues.

5        Q.   But you're not suggesting that that --

6   whatever time he died, that he would have died

7   absent this struggle with the deputies?

8        A.   Say that again.

9        Q.   If he -- he had an enlarged heart?

10       A.   Right.

11       Q.   He had it the day before, correct?

12       A.   Correct.

13       Q.   He didn't die the day before?

14       A.   Correct.

15       Q.   And while these things may be --

16   everybody has underlying conditions, correct?

17       A.   Correct.

18       Q.   That could impact how a certain trauma or

19   event occurs, correct?

20       A.   Correct.

21       Q.   You're not saying his heart was in such a

22   state that he would have dropped dead absent the

23   intervention of the officers and the struggle,

24   correct?

25       A.   Or the surge in his adrenalin and

1    everything.  What I'm saying, and I've said is it's

2    multi-factorial.  You have to weigh in all the

3    findings.  You cannot pinpoint it's just this that

4    killed him.  It's just this, it's just this. That's

5    why I say it's multi-factorial.  It's a

6    combination.  The acute psychotic episode.  You get

7    the increase in the catecholamines.  You have his

8    heart is enlarged with left ventricular

9    hypertrophy, four-chamber dilatation.  That makes

10    you susceptible to arrhythmias.  If you have an

11    acute psychotic episode with the increase in

12    catecholamines, that alone will make you

13    susceptible to arrhythmias.  So you have the heart,

14    the catecholamines, then you have the prone

15    position and the restraint.

16        Q.   Right.  In every situation, when somebody

17    is restrained in the prone position, there is going

18    to be some type of event or some time of incident

19    where force has to be used, correct?

20        A.   Say that again.  The first part.

21        Q.   Basically, what you have in a situation

22    -- you take the person as -- they can't tell he has

23    an enlarged heart, correct?

24        A.   Correct, correct.

25        Q.   They go in there.  The way these events

1  happen a lot, an in-custody death, is there is a

2  struggle.  There is some type of restraint, and

3  there is some type of time where they realize he is

4  no longer breathing like George Floyd, correct?

5      A.   That's correct, and, usually, they go

6  unresponsive after the struggle, and that's once

7  the catecholamines increase, because your

8  catecholamines start increasing during the

9  struggle, but following the struggle, they increase

10 tremendously, which is -- that's the time when you

11 are susceptible to cardiac arrhythmias.  So that

12 with the prone positioning.

13     Q.   And the prone positioning is a part of

14 your death cause -- I mean your cause of death

15 because that also impacts the breathing in of

16 oxygen and expelling of $CO_2$, which in and of itself

17 can cause acidosis and arrhythmias and heart

18 failure, correct?

19     A.   Correct, correct.

20     Q.   There is not -- you are basically saying

21 there is a bunch of factors together.  They all

22 have the ability to cause it.  I don't know which

23 one it is.

24     A.   That's correct.  You have to take into

25 consideration all of them, and that's why I put the

1  heart and the prone position as contributing

2  factors.

3      Q.   Right.  And had he not -- you cannot

4  belittle the significance of that restraint with

5  all the other things that are coming in, correct?

6      A.   Right, and you can't belittle the other

7  stuff.  That's what I'm saying.  It's

8  multi-factorial.

9          MR. CLARKE:

10             Let's take a break for a second.

11          THE VIDEOGRAPHER:

12             Off the record.  The time is now

13          1:25.

14             {BRIEF RECESS}

15          THE VIDEOGRAPHER:

16             Back on the record.  The time is now

17          1:30.

18  BY MR. CLARKE:

19      Q.   You did your autopsy on June 22nd, 2020?

20      A.   Yes.

21      Q.   If you would have received a preservation

22  record from an attorney, like myself or Mr. Most,

23  prior to that time, would you still have destroyed

24  the record?

25      A.   Oh, no.

1    Q.   We should have checked for the records on
2  the time out.  Before we leave, I'd like to see if
3  you can go to the computer and see if you have
4  anything uploaded.
5    A.   Yes, sir.
6    Q.   So we'll stop that.  The meeting -- the
7  committee meeting, there were five JPSO officers
8  there, right?
9    A.   Yes.  I believe so. Yes.
10    Q.   And they were the ones that showed you
11  the video, correct?
12    A.   Yes, sir.
13    Q.   They forwarded it and reversed it or
14  whatever and kind of described what happened?
15    A.   Yes, sir.
16    Q.   So you reviewed what they decided to show
17  you?
18    A.   No.  I saw the whole video, but then
19  after it went through, I told them back it up to
20  this point or back it up, go forward to this point,
21  so they were just controlling the video, going
22  where I tell them to go.
23    Q.   Well, the video is like 45 minutes, and
24  the whole amount of this meeting is 43 minutes when
25  you were there with the officers.

1     A.   Right.

2     Q.   There were other things that you did at

3 this meeting while the officers were there.  You

4 gave a presentation of discussion on the lab

5 results, correct? The second page.

6     A.   Yeah.  I might have told them what came

7 in so far.

8     Q.   So, actually, from 12:15 to 12:50, that

9 is when you would have looked at the video,

10 correct?

11     A.   Yes.

12     Q.   Do you normally -- do you not spend more

13 time with videos when you have an actual video of

14 an event rather than just look at it one time

15 before you provide --

16     A.   I looked at it multiple times, the

17 incident itself.  I might have not looked at what

18 led up to it multiple times, but the incident

19 itself I looked at multiple times.

20     Q.   Well, I understand, but I thought the

21 only time you saw it was this meeting.

22     A.   Yes.

23     Q.   So multiple times is only 30 minutes,

24 from 12:15 to 12:50 or 35 minutes.

25     A.   Yeah.  I don't believe I looked at it

1  another time.  I may have, but I don't recall

2  looking at it at another meeting or another time.

3      Q.   If you went back -- before we close this

4  depo, if you go back, would you see if that's

5  uploaded?  Would that be something you maintain or

6  not?

7      A.   No.  They do not give us videos.  I have

8  to call them over to come show it.

9      Q.   Well, there was a listing in your report

10 that showed the communications.  If you would have

11 wanted the video, it should have been in that,

12 right?

13     A.   No, because if I want a video, I just

14 pick up the phone and call them and ask them could

15 they come show me the video again.

16     Q.   Do you not have -- does your office not

17 have records or documentation of when you do things

18 pertinent to a case?

19     A.   I mean, if I want to look at a video, I

20 just call them and ask them to come show me the

21 video again.  I don't document every little thing.

22 I mean, I'd spend all my time documenting.

23     Q.   I understand.  Did you watch -- there was

24 nine minutes when they were on the prone position,

25 according to your report.  Okay.  Did you watch

1     that nine minutes multiple times?

2          A.    I did watch that all the way through, and

3     I don't recall where we backed up, because I asked

4     them to back up a few times in different places.

5          Q.    If you look at the committee note thing,

6     you started at 12:15.  The police exit the meeting

7     at 12:58, but at 12:50 is when you started your

8     discussion to present the lab results.

9          A.    Okay.

10         Q.    Did you look at the video again after you

11    presented the lab results?

12         A.    Where do you see lab results?

13         Q.    At the 12:50 on the second page.

14         A.    Yeah, okay.

15         Q.    The way that I'm reading this, and you

16    correct me if I'm wrong, you had a meeting.  It

17    started at 12:15.  Everybody who is listed on the

18    first page was in attendance.

19         A.    Correct.

20         Q.    At 12:50, you just have some kind of

21    general notes about looking at the video, correct?

22         A.    Correct.

23         Q.    And at 12:50, that is when you start your

24    discussion of the lab results.

25         A.    Yeah.  I was letting them know what came

1    in on the case, yes.

2         Q.   And then they left the meeting.  Is that

3    so you could discuss what it was with the other

4    medical people?

5         A.   Yes, because we don't discuss any of that

6    with law enforcement present.

7         Q.   Did you discuss or did any law

8    enforcement officer or anybody from the medical

9    examiner's office, while you were both in the

10   meeting, say the term "excited delirium?"

11        A.   No, sir.  There would be no reason for

12   it.

13        Q.   I agree there is no reason for it.  Do

14   you know why Mr. Genevay called up the Parsas on

15   more than one occasion and talked about the

16   diagnosis of excited delirium?

17             MR. ZIBILICH:

18                  I have to object to the form.

19             MR. CLARKE:

20                  That's okay.

21             THE WITNESS:

22                  No, sir.  I wasn't aware of that.

23   BY MR. CLARKE:

24        Q.   If Dr. Lauridson said that you discussed

25   excited delirium with him, I guess you'd be calling

1  him a liar, right?

2       MR. ZIBILICH:

3            Objection.  Guess what.  Don't

4            answer that one.  Don't answer that

5            one.

6  BY MR. CLARKE:

7       Q.   He would be incorrect or could you be

8  incorrect?

9       A.   I could be incorrect, because maybe I

10 don't recall, but I don't recall talking to him

11 about that.

12      Q.   According to my clients, on January 20th,

13 they were called by Mr. Genevay and advised that

14 they were looking into excited delirium.

15      A.   Okay.

16      Q.   He said that he does not know the terms

17 or whatever.  He is just a conduit of information

18 from you to them.

19      A.   Okay.

20      Q.   When did you start considering that it

21 could be excited delirium?

22      A.   When I put all the pieces together.  Like

23 I told you, I mean, I'm giving -- I take the

24 evidence from the investigation, the evidence from

25 the autopsy, everything together to render my

1  opinion, you know, based on a certain degree of

2  medical certainty and come to my conclusion.

3      Q.  Do you know any actual medical

4  organization that accepts excited delirium as a

5  actual thing, a actual medical condition?

6      A.  No.  I would have to research that.

7      Q.  Have you done research on excited

8  delirium?

9      A.  Yes.  I mean, I've read about it.

10     Q.  Have you ever read the article by Michael

11 Freeman and Ellen Strommer, an epidemiological

12 analysis of it?

13     A.  I don't recall that one.

14     Q.  I'm mark this Exhibit 70.

15         MR. ZIBILICH:

16             What is it?

17         MR. CLARKE:

18             This is, "The role of restraint in

19           fatal excited delirium:  A research

20           synthesis and pooled analysis."

21         MR. ZIBILICH:

22             This is in my box?

23         MR. CLARKE:

24             It should be.

25         MR. ZIBILICH:

1                    I think you kept this one from me.

2              Thanks.

3     BY MR. CLARKE:

4         Q.   You know epidemiologists, they kind of do

5     studies to try to take factors out of things?

6         A.   Yes.

7         Q.   I mean, I'm not real smart, but I think

8     you understand what I'm saying.

9         A.   I guess that's part of their job.

10        Q.   So this was a study of all the literature

11    whatsoever on excited delirium and trying to

12    pinpoint certain factors that played a role.  And,

13    you know, the only factor that actually played a

14    role in all of these events is the prone position.

15    Not all the other stuff.  You're not aware of that,

16    are you?

17        A.   No.

18        Q.   Have you ever read -- have you ever read

19    the Physicians for Human Rights --

20             MR. ZIBILICH:

21                  Say again.

22             MR. CLARKE:

23                  Physicians for Human Rights, PHR,

24                "Excited Delirium" and Deaths in Police

25                Custody, The Deadly Impact of a

1        Baseless Diagnosis."

2            THE WITNESS:

3                No.

4   BY MR. CLARKE:

5        Q.   You are aware that other people have done

6   research and analysis on excited delirium, and most

7   of the medical literature that's been done recently

8   rejects it?  Would you agree with that?

9        A.   Correct.  This paper actually here it

10  said that in medical-legal death investigations,

11  the term "excited delirium syndrome" should be

12  abandoned in favor of agitated delirium syndrome

13  modified by no restraint, mild restraint, or

14  aggressive restraint.

15       Q.   What was the restraint in this case?

16  Mild, aggressive?

17       A.   As far as the restraint themselves,

18  itself?  Holding him down you talking about?

19       Q.   You pointed that out.

20       A.   Right.

21       Q.   And you gave a whole another -- if you

22  are going to utilize that type of analysis, what do

23  you categorize the restraint that you saw?  Was it

24  mild, was it moderate, was it aggressive?

25       A.   I guess it would be moderate.  I don't

1 think it was aggressive.

2 　　　Q.　If an officer was actually on top of his

3 back with his feet off the ground, would that be

4 aggressive?

5 　　　A.　No.　I consider that moderate.　He wasn't

6 totally on his back, from what I saw in the video.

7 　　　Q.　He wasn't in the prone position the whole

8 time?

9 　　　A.　Oh, he was in the prone position.　I'm

10 saying the officer wasn't on top of his back.

11 　　　Q.　Now, we may be talking semantics.　If you

12 are fat like me, and they are going to sit on the

13 back of my legs, that is going to push my fat belly

14 up to my diaphragm and cause --

15 　　　A.　Correct.

16 　　　Q.　So you have an obese person.　Where they

17 were sitting, the further back, there are still

18 problems with an obese person, correct?

19 　　　A.　Correct.

20 　　　Q.　So what I'm saying is, what you may call

21 mild or moderate, do you recall seeing on the video

22 that when Deputy Vega gets involved in restraining

23 him -- did you see that more than one deputy was on

24 their back?

25 　　　A.　I saw more than one deputy, yes, in the

1   video.

2       Q.   Did you see if there was a change from

3   one deputy to a primary deputy being on the back?

4       A.   Yes.

5       Q.   Did you see after that happened is when

6   the arms were pulled up, pushed up over his head?

7       A.   I don't recall that portion of the video.

8       Q.   Do you recall Deputy Vega -- if Deputy

9   Vega was sitting on his back area, whether it be

10  the top of the back of the legs or his back, just

11  in that area, if he lifted his feet off the ground

12  to where there were no feet on the ground, that

13  would be aggressive restraint, right? His full

14  body.

15      A.   Yeah, unless his knees are on the ground.

16      Q.   I've looked at the video more than 30

17  minutes.

18      A.   Right, but I'm trying to answer what you

19  said.  You said the feet are off the ground.  It

20  depends, I guess, if his knees are on the ground.

21  So his knees are being used as his feet.

22      Q.   Well, if nothing was touching the ground,

23  that would be an aggressive --

24      A.   Yes.  It would be more weight on him,

25  yes.

1      Q.   That's all I -- let me go over one other
2 thing.  You are busy as all can be here, aren't
3 you?
4      A.   Oh, yes.
5      Q.   Were you busy as all could be back in
6 2020?
7      A.   2020, no, not as busy, because thank God
8 I had other forensic pathologists to help out.
9      Q.   Are you by yourself now?
10     A.   I'm by myself now.
11          MR. ZIBILICH:
12               She didn't have you.
13          MR. CLARKE:
14               I've given her a break from the dead
15           bodies.  I don't know if it's much of a
16           break.
17          MR. ZIBILICH:
18               I'll pass on your definition of
19           break.
20          THE WITNESS:
21               That's true.
22          MR. CLARKE:
23               That's all I'm going to do.
24          MR. ZIBILICH:
25               Doc, thanks a bunch. I thank you for

1          being kind and nice and cordial with
2          Mr. Clark.
3     THE VIDEOGRAPHER:
4          This is the conclusion of the
5     videotaped deposition.  We're going off
6     the record.  The time is 1:44.
7          [End of deposition, 1:44.]
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1            C E R T I F I C A T E

2

3            This certification is valid only for
a transcript accompanied by my original signature
4 and original required seal on this page.

5            I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6 as the officer before whom this testimony was
taken, do hereby certify that DANA TROXCLAIR, M.D.,
7 after having been duly sworn by me upon authority
of R.S. 37:2554, did testify as hereinbefore set
8 forth in the foregoing 90 pages;

9            That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10 or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11 ability and understanding;

12            That the transcript has been
prepared in compliance with transcript format
13 guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14 prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15 and in rules and advisory opinions of the board;

16            That I am not related to Counsel or
to the parties herein, nor am I otherwise
17 interested in the outcome of this matter.

18

19

20

21 _____
Sandra P. DiFebbo,
22 Certified Shorthand Reporter

23 Date: _____

24

25