```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3                  CASE NO.  2:21-cv-00080

 4
    DONNA LOU and DAREN PARSA, on their own behalf and
 5  on behalf of their deceased minor child, E.P.

 6                             Plaintiffs,

 7

 8                         VERSUS

 9

10  SHERIFF JOSEPH P. LOPINTO, III, CHAD PITFIELD, RYAN
    VAUGHT, STEVEN MEHRTENS, SHANNON GUIDRY, NICK VEGA,
11  MANUEL ESTRADA, MYRON GAUDET, JOHN DOES 1-3,
    VICTORY REAL ESTATE INVESTMENTS LA, LLC D/B/A
12  WESTGATE SHOPPING CENTER, ABC INSURANCE COMPANY,
    and XYZ INSURANCE COMPANY,
13

14                             Defendants.

15

16          VIDEOTAPED 30(b)(6) DEPOSITION OF

17  JEFFERSON PARISH SHERIFF'S OFFICE, through its

18  designated representative, MICHAEL PIZZOLATO, given

19  in the above-entitled cause, pursuant to the

20  following stipulation, before Sandra P. DiFebbo,

21  Certified Shorthand Reporter, in and for the State

22  of Louisiana, at JPSO, 1233 Westbank Expressway,

23  Fifth Floor, Harvey, Louisiana, on the 7th day of

24  July, 2022, commencing at 12:37 PM.

25
```

```
1    APPEARANCES:

2              THE COCHRAN FIRM MID-SOUTH
               BY:  ANDREW CLARKE,
3              ATTORNEY AT LAW
               One Commerce Square
4              40 South Main, Suite 1700
               Memphis, Tennessee  38103
5              Representing the Plaintiffs

6
               MARTINY & ASSOCIATES
7              BY:  FRANZ ZIBILICH,
               ATTORNEY AT LAW -and-
8              JEFFREY D. MARTINY,
               ATTORNEY AT LAW
9              131 Airline Drive
               Suite 201
10             Metairie, Louisiana  70001
               -and-
11             LINDSEY M. VALENTI, LEGAL ADVISOR
               1233 Westbank Expressway
12             Building B, Fifth Floor
               Harvey, Louisiana  70058
13             Representing JPSO Defendants

14             THOMPSON, COE, COUSINS & IRONS, LLP
               BY:  CHRISTOPHER W. KAUL,
15             ATTORNEY AT LAW
               601 Poydras Street
16             Suite 1850
               New Orleans, Louisiana  70130
17             Representing Victory Real Estate
               Investments LA, LLC, and Westgate
18             Shopping Center

19   Also Present:  Tate Clarke, Tim Anclade, Grant
     Gibson
20

21   Videographer:  Aaron Palmer, CLVS, Depo-Vue

22   Reported By:

23             Sandra P. DiFebbo
               Certified Shorthand Reporter
24             State of Louisiana

25
```

E X A M I N A T I O N             I N D E X

Page

BY MR. CLARKE:                     5

E X H I B I T              I N D E X

Page

Exhibit 12                    9

Exhibit 13                    9

Exhibit 14                   14

Exhibit 15                   18

Exhibit 16                   19

Exhibit 17                   22

Exhibit 18                   33

Exhibit 19                   33

Exhibit 20                   33

Exhibit 21                   36

Exhibit 22                   36

Exhibit 23                   39

Exhibit 24                   40

Exhibit 25                   65

Exhibit 26                   76

Exhibit 27                  116

Exhibit 28                  122

Exhibit 29                  189

S T I P U L A T I O N

1

2

3        It is stipulated and agreed by and

4   between Counsel for the parties hereto that the

5   30(b)(6) Deposition of JEFFERSON PARISH SHERIFF'S

6   OFFICE, through its designated representative,

7   MICHAEL PIZZOLATO, is hereby being taken pursuant

8   to the Federal Rules of Civil Procedure for all

9   purposes in accordance with law;

10        That the formalities of reading and

11   signing are specifically waived;

12        That the formalities of sealing,

13   certification, and filing are hereby specifically

14   waived.

15        That all objections, save those as to

16   the form of the question and responsiveness of the

17   answer are hereby reserved until such time as this

18   deposition or any part thereof is used or sought to

19   be used in evidence.

20            *  *  *  *  *

21        Sandra P. DiFebbo, Certified Shorthand

22   Reporter, in and for the State of Louisiana,

23   officiated in administering the oath to the

24   witness.

25

```
 1              MICHAEL PIZZOLATO, having been first
 2      duly sworn, was examined and testified on his
 3      oath as follows:
 4  EXAMINATION BY MR. CLARKE:
 5      Q.   Would you please state your name for the
 6  record.
 7      A.   Michael Pizzolato.
 8      Q.   Mr. Pizzolato, do you have a rank or
 9  title?
10      A.   Sergeant.
11      Q.   Sergeant Pizzolato, my name is Andy
12  Clarke.  I think I met you before when we --
13      A.   Yes, sir.
14      Q.   -- were looking at -- looking for some
15  training records.  Have you given a deposition
16  before?
17      A.   Yes.
18      Q.   Have you given a deposition as a
19  corporate representative before?
20      A.   Yes.
21      Q.   How many depositions do you think you
22  have given?
23      A.   Just -- I can only recall that one prior
24  -- that one.
25      Q.   What kind of case was it?
```

1     A.    It was a burglary case, and then it was

2  civil.  That's the reason why we gave a deposition.

3     Q.    Let's go over some ground rules.

4  Obviously, you understand your deposition here is

5  under oath subject to the penalty of perjury,

6  correct?

7     A.    Yes, sir.

8     Q.    And a lot of times when people get in a

9  conversation, we tend to talk over each other.

10  Let's be cognizant to let each other finish the

11  question or the answer so the court reporter can

12  take everything down.  Okay?

13     A.    Uh-huh.

14     Q.    A lot of times people nod yes or no or

15  say uh-huh or na-huh.  If we can give verbal

16  answers, yes, no, I don't know, so the court

17  reporter can take it, so she doesn't have to

18  interpret it.

19     A.    Yes, sir.

20     Q.    And if you need -- if I ask you a

21  question, and you don't understand it, I want you

22  to tell me to rephrase it, and I'll do the best

23  that I can to make sure we're giving you a question

24  that you understand to answer.  All right?

25     A.    Yes, sir.

1    Q.    And today you are set as what is called a
2    corporate representative, a 30(b)(6)
3    representative.  Do you understand today that you
4    are going to be talking on behalf of the Jefferson
5    Parish Sheriff's Office with respect to certain
6    topics?
7        A.    Yes, sir.
8        Q.    What I want to show you is Exhibit Number
9    11.  If you look under Section 2, Training, my
10   understanding is that you are being produced as a
11   30(b)(6) on most of the topics in Subsection 2.  Is
12   that correct?
13       A.    Yes, sir.
14       Q.    Let's go through what you're not going to
15   be providing testimony on that's listed in
16   Subsection 2.  It's my understanding that you will
17   not be giving testimony on response to calls,
18   response to calls involving persons with
19   disabilities or experiencing mental issues,
20   communications with desk dispatch, codes used to
21   classify calls of arrest, criminal conduct, whether
22   persons with disabilities can form criminal intent,
23   that you are not providing testimony on those
24   topics; is that correct?
25       A.    Yes, sir.

```
 1        Q.    And you are providing topic -- testimony
 2   on deescalation, arrests, use of force, deadly
 3   force, use of handcuffs, use of leg restraints, use
 4   of the RIPP Hobble, use of other restraints, use of
 5   body weight, restraining persons in the prone
 6   position, recovery position, use of chokeholds, use
 7   of neck holds, use of martial art holds,
 8   compression asphyxia, positional asphyxia, hog-tie,
 9   excited delirium, encounters with persons with
10   disabilities, encounters with emotional disturbed
11   persons.  Are those the topics that you are
12   prepared to testify on?
13        A.    Yes, sir.
14        Q.    Providing medical attention, summoning
15   medical attention, report writing. --
16             MR. ZIBILICH:
17                  Stop after the two medical ones.
18             MR. CLARKE:
19                  So he is going to do providing
20             medical attention and summoning medical
21             attention?
22             MR. ZIBILICH:
23                  Can you do that?
24             THE WITNESS:
25                  Yes, sir.
```

```
 1            MR. ZIBILICH:

 2                 Yes.

 3  BY MR. CLARKE:

 4       Q.    Okay.   There's been a lot of documents

 5  that have been produced in this case, and I don't

 6  have access to every single document, but what I'm

 7  going to do is mark as Exhibit Number 12 an

 8  itemization of the documents we received with

 9  respect to our public records response to JPSO, and

10  I'll mark as Exhibit Number 13 the discovery --

11  itemization of the discovery documents we received

12  from JPSO through discovery in this litigation.

13  I'm going to provide these to you in case there is

14  something you need to refer to.   All right?

15       A.    Yes, sir.

16       Q.    You can review that now if you want to or

17  I'm just -- I just want to make sure you have the

18  universe of documents that we have in case you need

19  to review anything.   Just so you know, what is in

20  yellow are things that I have in my boxes.   That's

21  for informational purposes.   If we get to

22  something, and you need something, you can tell me

23  where it is on that.

24       A.    Yes, sir.

25       Q.    Before we get to any documents, let's
```

1    just talk about things in general.  Tell me -- you

2    are employed by Jefferson Parish Sheriff's Office.

3    How long have you worked there?

4         A.    23 years.

5         Q.    And you are a sergeant?

6         A.    Yes, sir.

7         Q.    Can you just kind of take me through a

8    little bit of your history with it.  Throw me a

9    softball.  When did you start, what division?

10        A.    Sure.  I graduated from the academy July

11   of 1999.  Six, seven months later, March of 2000, I

12   became a full-time officer.  I worked on the road

13   several years.  I worked in the bureau for several

14   years, came back to the road, got promoted.  Was a

15   road supervisor.  And then 2013 I became an academy

16   instructor to present.

17        Q.    So you've been an academy instructor from

18   2013 to the present?

19        A.    Correct.

20        Q.    Is your only law enforcement position

21   been with JPSO?

22        A.    Yes, sir.

23        Q.    And when you -- I think you said you got

24   certified in -- was it 1999?

25        A.    As a POST officer?

1        Q.    Yeah.

2        A.    Yes.   I graduated from the academy in

3    1999.

4        Q.    Was there a period of time after you

5    graduated from the academy where you didn't serve

6    as a law enforcement officer?

7        A.    I was a reserve officer, so I was still

8    upon graduation, and in 2000 became a full-time

9    officer.

10        Q.    I wrote that down wrong.  So you became a

11    full-time officer in 2000?

12        A.    Yes, sir.

13        Q.    Now, when you went to the academy in

14    1999, did you go to the JPSO Training Academy?

15        A.    Yes, sir.

16        Q.    And JPSO has a certified -- POST

17    certified training academy where officers can go

18    and meet the certification -- the qualifications

19    for certification as a law enforcement officer,

20    correct?

21        A.    Yes, sir.

22        Q.    Other people, like other departments, can

23    actually send their people there and be trained,

24    correct?

25        A.    Correct.

1   Q.   And with respect to basic training, even

2   though this training program is provided by

3   Jefferson Parish Sheriff's Office, the curriculum

4   is set forth by POST, correct?

5   A.   Correct.

6   Q.   And I think -- you know, I know the

7   requirements change over time as to how many hours

8   you have, but I believe the requirements now are

9   training academy has to have at least 400 hours; is

10  that correct?

11  A.   Yes, sir.

12  Q.   And in addition to the academy training,

13  there is also requirements for inservice training,

14  correct?

15  A.   Yes, sir.

16  Q.   I think those are 20 hours a year?

17  A.   Yes, sir.

18  Q.   So when Jefferson Parish provides the

19  academy training, that is general, basic law

20  enforcement training, correct?

21  A.   Yes, sir.

22  Q.   As opposed to a training academy focusing

23  solely on the policies of the Jefferson Parish

24  Sheriff's Office?

25  A.   Correct.

1     Q.   For example, you may train on emergency

2  vehicle operations and pursuits, but whether you

3  can utilize a pursuit would be depending on the

4  policy that your department has, correct?

5     A.   Yes, sir.

6     Q.   For example, some departments may say we

7  don't pursue.  They would get the EVOC -- the

8  pursuit training, but they couldn't do that based

9  on the directives of their own department?

10     A.   Correct.

11     Q.   So it's general basic academy, and, if

12  you can, I know the academies have changed over the

13  years, but if we can talk about in general how this

14  is done.  There are basic topics of instruction

15  throughout basic police training, correct?

16     A.   Yes, sir.

17     Q.   Fitness is one, correct?

18     A.   Yes, sir.

19     Q.   That's kind of a daily activity,

20  normally, right?

21     A.   During the academy, yes.

22     Q.   And so that takes up a certain amount of

23  the hours of the 400 hours?

24     A.   Yes, sir.

25     Q.   Do you have any way to break down what --

1    I'll make this Exhibit Number 14.   This is a

2    document I think you produced to me when we met

3    with your attorney.   If you can just kind of -- is

4    that kind of a basic -- I don't have another copy

5    of it.   What does it say at the top?

6         A.    Recruit Class 59.

7         Q.    For each particular class, there is a

8    curriculum that is provided, and is that kind of an

9    outline of the type of classes that are provided?

10        A.    Yes, sir.

11        Q.    So let's kind of break down the major

12   topics of instruction.   Obviously, we talked about

13   physical fitness, right?

14        A.    Yes, sir.

15        Q.    And in the academy, do they do both

16   training on whatever the topic is and then actual

17   testing?

18        A.    Depending on the subject.

19        Q.    Does JPSO require testing on any topic

20   other than topics that require a test, like taser?

21        A.    Taser requires a test, yes.

22        Q.    The baton, I think.

23        A.    Baton.   It's more of a proficiency test,

24   so they have to be proficient in the use of the

25   baton the way they are taught.

1     Q.   And is that scored by an instructor?

2     A.   Yes, sir.

3     Q.   So that would be kind of an evaluation,

4  and it's a physical test, not a written test?

5     A.   Correct.

6     Q.   Taser has -- I'm sure they have physical

7  aspects as well with training, but they also have a

8  written test that covers a lot of topics?

9     A.   Yes, sir.

10    Q.   Any other courses or topics within the

11 training academy for which there are written tests?

12    A.   Yes.  Like report writings, codes and

13 signals, legal aspects.  The other things -- the

14 majority of where in this document that you have

15 right here, where it says test, yes.  So they'll

16 have a line.  It will say, for example, right here

17 it says Test L9, Elements of Criminal Conduct 2-B

18 to 2-C.  That is a test.

19    Q.   So on that particular -- and while not

20 every officer had this exact training, is that

21 fairly standard?  Have the POST standards been

22 fairly regular over the last --

23    A.   POST standards have been regular,

24 however, they will increase hours.  We find it is

25 increasing hours per class.  For example, you

1  mentioned about 400 hours.  Last time I checked, it

2  was almost 490 something hours required by POST.

3  Jefferson Parish Sheriff's Office, this class

4  coming up, Recruit Class 60, is probably going to

5  get around 700 hours.

6      Q.   So it's the same topics but just there is

7  more time on the individual topics?

8      A.   Yes.

9      Q.   So if we look at that for the overall

10 structure of the type of courses and classes that

11 are provided to people in the basic training

12 academy, that would be fairly consistent other than

13 the hours?

14     A.   Yes, sir.

15     Q.   And you have a number of different

16 deputies in this case, Pitfield, Vaught, Mehrtens,

17 Guidry, Vega, Estrada, and -- how do you say that?

18 Gaudet?  Would they all have similar training to

19 that 59 -- that curriculum there?

20     A.   If they attended the JPSO Academy.

21     Q.   That's true.  Some of them may have gone

22 somewhere else. I'm going to show you -- let me

23 come over there.  In discovery, we got on each

24 officer a testing file.  So this is the testing

25 with respect to Manuel Estrada.  It is JPSO-000273.

1    Let me have you look at that for a second.

2              MR. ZIBILICH:

3                   What is the date on that testing

4              material?  I'm sorry.

5              MR. CLARKE:

6                   It is all different dates.

7              MR. ZIBILICH:

8                   What is the date on Estrada?

9              MR. CLARKE:

10                  7/17/02.  May 1, 2003.  This is the

11             testing file.

12   BY MR. CLARKE:

13        Q.   Does that contain the tests that are

14   administered from the academy?

15        A.   The only thing I see is just this first

16   page where it talks about the Cooper Standards for

17   the physical assessments.

18        Q.   Are there separate -- does the Jefferson

19   Parish Training Academy maintain the testing from

20   basic training on the officers that attended there?

21   You said there were some tests --

22        A.   This packet -- so this first page, as I'm

23   looking at it, this I can see is the Cooper

24   Standards for the physical assessment that we have

25   for a candidate to come into the academy.

1    Q.   To see whether they are medically

2  qualified?

3    A.   Physically qualified.

4    Q.   Physically qualified?

5    A.   Right.  This is nothing that I've ever

6  seen before, because I'm not privy to this.

7    Q.   I'm going to mark that as Exhibit 15.  I

8  guess my question is with respect to the taser

9  test, let's say.  If these officers in this case

10  have gone to the Jefferson Parish Training Academy

11  and took certain tests during their curriculum,

12  during their course of studies, would Jefferson

13  Parish Training -- where are those records?  Where

14  are the --

15    A.   If those records are kept.  You are

16  mentioning taser, which is a range thing.  The

17  range teaches taser.  So if we are going to use

18  taser as an example, if they take a test, then the

19  range probably -- I couldn't tell you what they do

20  with the test, whether they hold on to them or if

21  they are put into their file for that individual

22  officer.

23    Q.   But should there be documentation of the

24  test?

25    A.   It depends on the curriculum that they're

1   having, so.

2          Q.   Let's talk about taser, because --

3          A.   Again, that's going to be the range

4   thing.  So I have no personal hands-on with taser

5   on that aspect.

6          Q.   I'm going to mark as lay file Exhibit 16

7   any taser test maintained by JPSO on our deputies.

8               MR. ZIBILICH:

9                    On what deputies?

10              MR. CLARKE:

11                   On the deputies in this case.

12              MR. ZIBILICH:

13                   On defendant deputies?

14              MR. CLARKE:

15                   Excuse me?

16              MR. ZIBILICH:

17                   On defendant deputies?

18              MR. CLARKE:

19                   Yes.

20              MR. ZIBILICH:

21                   What is this document?

22              MR. CLARKE:

23                   What is --

24              MR. ZIBILICH:

25                   What is Exhibit 16?

```
 1              MR. CLARKE:
 2                   I'm asking you to produce the tests.
 3              I've already asked for the tests in
 4              discovery.  He identified that there
 5              may be other tests.  I want to make
 6              sure I have all the tests, because
 7              taser training is where you get excited
 8              delirium training.  Okay.
 9  BY MR. CLARKE:
10      Q.    All right.  So going through -- what are
11  the main topics -- what is the biggest topic of
12  instruction in the training academy?
13              MR. ZIBILICH:
14                   Object to the form.
15  BY MR. CLARKE:
16      Q.    The longest.
17      A.    Oh, geesh.  The way this is broken down,
18  I mean, I couldn't tell you exactly.  They spend a
19  huge amount of time on legal aspects. They spent a
20  lot of time on --
21      Q.    I'm sorry.  I interrupted you.  That's my
22  bad.
23      A.    -- defensive tactics.  Firearms training
24  is a big block as well.
25      Q.    Can you tell me the number of hours is
```

```
 1    what I'm asking you?
 2          A.    Not from this sheet.   Not from this
 3    sheet.   Like I would literally have to sit there
 4    and count how many hours.
 5          Q.    So are the hours listed on that?
 6          A.    No, sir, not on this particular form.
 7    There is not -- no.   This is just a schedule that
 8    the recruits get that we have that we look at and
 9    say, okay, Mike Pizzolato is teaching this day on
10    Tuesday, whatever, so I got to show up and teach on
11    that day for, let's say, two hours of defensive
12    tactics.   The POST curriculum broken down, there is
13    a different form for that.   How many hours per
14    block of instruction, so to speak.
15                MR. ZIBILICH:
16                    Let me see if I can help you.   Do
17                 you have the POST curriculum that has a
18                 breakdown of hours per class?
19                THE WITNESS:
20                    Yes.
21                MR. ZIBILICH:
22                    Can we get that for him?
23                THE WITNESS:
24                    Sure.   You have to talk to Mark
25                 Iannazzo.   Talk to Mark.
```

```
 1              MR. CLARKE:
 2                   I'm going to mark as lay file
 3              exhibit the POST curriculum.
 4              MR. ZIBILICH:
 5                   What is that, 17?
 6              MR. CLARKE:
 7                   17, yes.
 8    BY MR. CLARKE:
 9         Q.   That will expedite things.  That will say
10    we have eight hours of firearms or whatever,
11    correct?
12         A.   Yes, sir.
13         Q.   And they would add up to whatever the
14    requirement is, 496?
15         A.   Yes, sir.
16         Q.   Do you know how many hours that they
17    claim -- let me take this back.  Some of the bigger
18    topics that I am used to, and you tell me if
19    they're correct, is they go over all of the
20    criminal laws of the State of Louisiana, correct?
21         A.   Yes, sir.
22         Q.   They go through the use of force and the
23    use of deadly force, correct?
24         A.   Yes, sir.
25         Q.   You go through things like -- well, you
```

1    know, administrative things from report writing to

2    -- report writing to, you know, when you have to

3    file a report, correct?

4         A.   Yes, sir.

5         Q.   And some of this is classroom training.

6    Some of this is hands-on training, correct?

7         A.   Yes, sir.

8         Q.   You do pursuit training or EVOC training,

9    correct?

10        A.   NAPD.

11        Q.   What is --

12        A.   NAPD.

13        Q.   What does that stand for?

14        A.   National Academy of Professional Driving.

15   We don't use EVOC.

16        Q.   And do you cover civil rights laws?

17        A.   It's taught in the academy, yes.

18        Q.   Do you talk about cases in the

19   instruction?

20        A.   Whoever teaches that block of instruction

21   may.

22        Q.   Well, isn't the curriculum required to be

23   done a certain manner?

24        A.   Whoever teaches that block of

25   instruction.

1      Q.    But the lesson plan has to be approved by

2  POST, correct?

3      A.    Correct.

4      Q.    Does the lesson plan in JPSO for civil

5  rights violations include the discussion of case

6  law?

7           MR. ZIBILICH:

8                This is not one of his arenas.  We

9             already marked that.  He is not the

10            civil rights guy.

11          MR. CLARKE:

12               Oh, okay.  Yeah, you're right.

13          MR. ZIBILICH:

14               Jesus Christ, write that down.  He

15            just said I was right.

16          MR. CLARKE:

17               I will acknowledge it if I have to.

18          MR. ZIBILICH:

19               I never forced you to.

20  BY MR. CLARKE:

21      Q.    And once somebody -- once somebody

22  completes all the requirements from the training

23  academy, do they become then a Certified Level 1

24  Officer?

25      A.    Once they -- if they pass the POST exam,

1    yes.

2        Q.    So at the end of it, there is an overall

3    test on the whole program?

4        A.    Yes, sir.

5        Q.    And --

6        A.    The POST required overall test, if that's

7    what you're saying.  So they take a test for

8    several hours, but it has nothing to do with

9    defense tactics or nothing to do with taser or

10   anything like that.  It has to do with the POST

11   requirements are stated.

12       Q.    That's just something mandated by the

13   state?

14       A.    Yes, sir.

15       Q.    It's their test?

16       A.    Yes, sir.

17       Q.    You just administer it?

18       A.    Yes, sir. Actually, POST administers it.

19       Q.    Is it like a bar exam for lawyers, I

20   guess?

21       A.    Yeah.  They have a representative from

22   POST come up, sits down.  We are out of the

23   classroom.  The class takes the test.

24       Q.    Once they pass that, they become a

25   certified officer?

```
1        A.    Yes, sir.
2        Q.    Now, this is kind of -- I'm going to --
3        MR. ZIBILICH:
4               Let me stop you one second.  Is that
5            the right nomenclature?  We call them
6            certified -- what is that phrase?
7        MR. CLARKE:
8               It's in your policy.  Certified
9            Level 1.
10       MR. ZIBILICH:
11              That's what we call them?
12       THE WITNESS:
13              POST certified Level 1 Officer.
14       MR. ZIBILICH:
15              POST certified is the part in front
16           that you were missing but go ahead.
17       MR. CLARKE:
18              Thank you.
19       MR. ZIBILICH:
20              You're welcome.
21       MR. CLARKE:
22              Now I'm thrown off.
23       MR. ZIBILICH:
24              That was not my goal.
25       MR. CLARKE:
```

```
 1                    I know it is.  It is always your
 2               goal, Franz.
 3          MR. ZIBILICH:
 4                    It was not.
 5          MR. CLARKE:
 6                    It is.  I just talked about --
 7          MR. ZIBILICH:
 8                    You talked about finishing the test.
 9          MR. CLARKE:
10                    Yeah.  Then I was going to another
11               topic.
12  BY MR. CLARKE:
13          Q.   What did you do to prepare yourself other
14  than meeting with your lawyer?  What did you do to
15  prepare yourself to speak on the topics today?
16          A.   I just spoke with them.
17          Q.   Did you review any documents, any of the
18  training materials, any of the documents that have
19  been produced?
20          A.   I just looked over the SOPs.  That was
21  about it.  The use of force SOP.
22          Q.   I know what I was going to ask you.  In
23  the academy, do they -- I think we covered this.
24  They do not train on the Jefferson Parish Sheriff's
25  Office Policies, correct?
```

```
 1        A.    Yes.
 2        Q.    During basic --
 3        MR. ZIBILICH:
 4              Yes, he is correct, or, yes, he is
 5          wrong, that we do not train?
 6        MR. CLARKE:
 7              Let me rephrase the question.
 8        MR. ZIBILICH:
 9              Yes.
10  BY MR. CLARKE:
11        Q.    I think we covered before the basic
12  general academy teaches general law enforcement
13  techniques and topics but not specific to a certain
14  department's policies, in the basic academy?
15        A.    No.  We do cover what this department
16  says.  We cover policy within this department.
17        Q.    So you train on the policies?
18        A.    Yes.
19        Q.    So you are prepared to speak on the
20  policies pertaining to these topics as well?
21        A.    Yes.
22        Q.    So we have policy books, and we
23  understand under the Code of Conduct that you
24  cannot give any instruction or institute any
25  procedures that are outside of the written SOP?
```

1      A.   Correct.

2      Q.   So everything that you train in there

3 should be consistent with the policies, correct?

4      A.   Yes.

5      Q.   Now, do they take a test to ensure that

6 they are knowledgeable about the policies?

7      A.   Not my block of instruction.

8      Q.   You are Jefferson Parish today.

9      A.   Yes.  So if I taught that block of

10 instruction, then they would.  For the POST

11 curriculum, it has nothing to do with the policy of

12 the Jefferson Parish Sheriff's Office.

13      Q.   That's what I thought we said.  So you go

14 through POST Academy.  You're not -- I mean, you

15 are going through the basic training academy at

16 Jefferson Parish.  You're not going through SOP-11?

17      A.   Correct.  We're not -- there is a block

18 of instruction in here that a member of IAD would

19 teach and would talk about the SOP and IAD, and he

20 would bring up policy within the SOP.

21      Q.   They're going over the Internal Affairs

22 policy or --

23      A.   They're going over -- whatever Internal

24 Affairs decides to teach on policy within the

25 Jefferson Parish Sheriff's Office, that's what they

1    do. We make it abundantly clear to the recruits

2    that the SOP is available on the website, and they

3    should become familiar with it.

4         Q.   I call that a read and sign. They have to

5    acknowledge that they have gotten it, and they have

6    to comply with it, correct?

7         A.   Yes.

8         Q.   And then during instruction, some

9    policies may be brought up, but we don't have a

10   class on the Jefferson Parish Sheriff's Office

11   policies where you take a written test when you are

12   done?

13        A.   Correct.

14        MR. CLARKE:

15             Now, if he is going to do policy and

16             training, I'm going to try to do both

17             of them.  Is that all right, Franz?

18        MR. ZIBILICH:

19             That's fine with the caveat, as I

20             told you before, if he doesn't know the

21             answer, he is going to tell you he

22             don't know the answer, and I'm going to

23             have to get you somebody that does.

24        MR. CLARKE:

25             I understand that.

```
1   BY MR. CLARKE:
2        Q.   So would you agree that policies and
3   training kind of work in conjunction with each
4   other?
5        A.   Yes, sir.
6        Q.   Policies are written guidelines
7   promulgated by the sheriff's office that expect
8   certain activities to be performed in certain ways,
9   correct?
10       A.   Yes, sir.
11       Q.   And policies can use words like "may" or
12  "shall," and they have different meanings in the
13  policy, correct?
14       A.   Correct.
15       Q.   Shall means it's mandatory, correct?
16       A.   Yes.
17       Q.   May means it's discretionary?
18       A.   Yes.
19       Q.   So why do we have policies?
20       A.   Liability.  To make us more professional
21  as well.
22       Q.   You can't have a policy on everything,
23  right?
24       A.   Correct.
25       Q.   What do you try to have policies on at
```

1    Jefferson Parish Sheriff's Office?

2        A.    If I may, just about everything that we

3    have at the sheriff's office has a policy.  Mostly

4    it's dealing with Code of Conduct, arrest reports,

5    just so many different -- I mean, the SOP is this

6    thick.  It's a lot.

7        Q.    Maybe that was a bad question.  What I'm

8    trying to get at is we can't write a policy on

9    everything, but we want to write policies on events

10   or issues involving law enforcement where we want

11   to give the officers some written instruction,

12   correct?

13       A.    Guidelines, yes.

14       Q.    And you also want to train them on the

15   topics covered by the policy so they know how to

16   use them in the field, correct?

17       A.    Correct.

18       Q.    So policy and training.  Policies is the

19   written thing about, you know, what the sheriff's

20   office wants, and we try to train them consistent

21   with the policy so they can act appropriately on

22   the topics that the Jefferson Parish thinks are

23   important enough to have a policy on?

24       A.    Correct.

25       Q.    And let me -- I am just going to mark --

```
 1    what I'm going to do is I'm going to mark as

 2    Exhibit 18 the Code of Conduct, Exhibit 19 the

 3    Sheriff's Office Standard Operating Procedures, and

 4    Exhibit 20, the Correctional Center Policies and

 5    Procedures.  If you'd look at those real quick and

 6    see if that's all the policies that apply.

 7             MR. ZIBILICH:

 8                  What is 20 again?

 9             MR. CLARKE:

10                  20 is the jail's policies.

11    BY MR. CLARKE:

12        Q.   My question is more are there additional

13    policies that you're aware of that apply to

14    deputies?

15        A.   Pretty much everything is going to be

16    handled into here.

17        Q.   For example, in other departments I have,

18    if you have OCU, they have their own standard

19    operating procedure.  Are these all the policies

20    that Jefferson Parish has?

21        A.   This looks like it.

22        Q.   Do we have a separate CIT policy or

23    standard operating procedures for CIT?

24        A.   Not within the confines of this.

25        Q.   I mean, everything is covered in those.
```

```
 1   That is the universe of the policies that apply to
 2   reserves, correct?  I mean deputies.
 3        A.    Deputies.
 4        Q.    And reserves?
 5        A.    For this department, yes.
 6        MR. ZIBILICH:
 7             So I didn't understand the question.
 8        Are you asking him if CIT policies are
 9        contained in 19, or are you asking him
10        if CIT policies are somewhere else?
11        MR. CLARKE:
12             I'm asking him if there is other
13        policies anywhere.
14        MR. ZIBILICH:
15             You understand the question?
16        THE WITNESS:
17             Yes, and he asked about CIT.
18   BY MR. CLARKE:
19        Q.    I was just -- in different departments,
20   if you have OCU in Memphis, OCU has its own
21   standard operating procedure.  Traffic would have
22   its own standard operating procedure.  It appears
23   from the documents that I've received that this
24   department has everything contained in one place.
25   Is that fair?
```

1    A.    That would be fair to say.

2    Q.    If there are any other policies that come

3  up, that something comes up, just let us know.  All

4  right?

5    A.    Yes, sir.

6    Q.    For example, any use of force would be

7  covered, regardless of what weapon you use, in the

8  policies for the sheriff's office, correct?

9    A.    Yes.

10    Q.    Let's just get to -- a lot of these

11  topics are very similar.  What I want to ask you

12  is, is there any particular way that you want to

13  address these; by grouping the topics together, by

14  doing them in one particular way that would be

15  easier, more efficient to you?

16    A.    However you want to.

17    Q.    Okay.  Well, let's just talk about use of

18  -- let's talk about the RIPP Hobble and the

19  training that is performed with respect to the RIPP

20  Hobble.

21    A.    Yes.

22    Q.    You are a certified RIPP Hobble

23  instructor, correct?

24    A.    Yes, sir.

25    Q.    And when I met with you and your

1    attorney, you provided me with a copy of a card

2    that has the RIPP Hobble training that JPSO

3    provides to its officers, correct?

4         A.   Yes, sir.

5         Q.   I'm going to mark this -- I want the card

6    in the record as the next exhibit, 21.

7              MR. ZIBILICH:

8                   What are you calling it?

9              MR. CLARKE:

10                  It is the RIPP Hobble training card

11                  produced by Sergeant Pizzolato.

12   BY MR. CLARKE:

13        Q.   Is that instruction -- we have

14   PowerPoints, too.  You want a copy of the paper

15   files?  Would that help you when we are talking

16   about this?

17        A.   If you have it.

18        Q.   I do.  What I'm going to mark as Exhibit

19   22 -- I'm going to show you this.  Can you look at

20   that?  Does that look like the PowerPoint on RIPP

21   Hobble training?

22        A.   Yes.

23        Q.   Now, the little -- Exhibit 21 that you

24   gave me, the card with the training on it, has a

25   number of videos, correct?

```
 1        A.    Yes, sir.
 2        Q.    The first video is 34 minutes.  It is
 3   done by the president and owner of RIPP Hobble
 4   restraints, Bill DeVane, correct?
 5        A.    Bill DeVane.  He's passed.
 6        Q.    He has passed?
 7        A.    Yes, he is.
 8        Q.    And you are a certified RIPP Hobble
 9   instructor, correct?
10        A.    Yes, sir.
11        Q.    Your training is on YouTube on the RIPP
12   Hobble website, correct?
13        A.    I'm sorry.  What was the question?
14        Q.    Your training -- RIPP Hobble puts your
15   training, actual classes, on their Facebook page.
16        A.    What classes are going to be held, yes.
17        Q.    No, actual -- the instruction.
18        A.    No.
19        Q.    You're sure?
20        A.    On the RIPP Hobble website?
21        Q.    Yeah.
22        A.    Not me.
23        MR. ZIBILICH:
24              Why didn't you subpoena his twin
25        brother?
```

```
 1                MR. CLARKE:
 2                     Just go on.
 3                MR. ZIBILICH:
 4                     Don't worry.  You got a good lawyer
 5                that can recover damages for people
 6                using your shit without telling you.
 7    BY MR. CLARKE:
 8         Q.    Do you have a twin brother?
 9         A.    I don't know.
10         Q.    That's the best answer of the day.  Well,
11    anyway, the video talks about -- are you aware of
12    the contents of the video?
13         A.    Yes.
14         Q.    He talks about -- spends a lot of time on
15    the pendulum of public opinion, correct?
16         A.    Yes.
17         Q.    How it goes from officers, people liking
18    the officers to people hating the officers,
19    correct?
20         A.    Pretty much.
21         Q.    And in that he talks about in-custody
22    deaths on the basis of cocaine psychosis or excited
23    delirium.
24         A.    Correct.
25         Q.    What is excited delirium?
```

1       A.    Excited delirium is a psychological event

2  caused by -- the majority of time it is caused by

3  the introduction of a substance into the body.

4       Q.    So it's your position it's a medical

5  opinion?

6       A.    No.  It's not AMA recognized.

7       Q.    It's not ADA?

8       A.    It's not recognized by the medical field.

9       Q.    So you're aware -- I'll mark as Exhibit

10  23 --

11          MR. ZIBILICH:

12              What happened to 22?

13          MR. CLARKE:

14              Did we not do 22 already?

15          THE WITNESS:

16              22 is this.

17  BY MR. CLARKE:

18       Q.    You're aware that the APA has come out

19  with a statement that says excited delirium is not

20  a medical or mental condition, correct?

21       A.    Correct.

22          MR. ZIBILICH:

23              Is that 23?

24          MR. CLARKE:

25              This is going to be 23.  I'm sorry,

```
 1                    24.    23 was the APA rejection of
 2                    excited delirium.
 3              MR. ZIBILICH:
 4                    That's what I thought.
 5   BY MR. CLARKE:
 6         Q.    You're aware the AMA also came out with a
 7   statement saying excited delirium is too
 8   nonspecific to be a medical diagnosis, correct?
 9         A.    Correct.
10         Q.    So what do you train officers that it is?
11   A medical condition or something else?
12         A.    If they observe a subject exhibiting
13   certain behavioral patterns that are normally
14   associated with quote/unquote excited delirium,
15   agitated chaotic event, then they are going to --
16   they are taught to observe these things and react
17   accordingly to them.
18         Q.    What about an autistic kid?
19         A.    Depends on the situation.
20         Q.    No.   I mean, an autistic kid -- you
21   understand autistic kids may stim, hit themselves,
22   attack people?
23         A.    Correct.
24         Q.    Is that excited delirium?
25         A.    Not until I can verify otherwise.   I
```

1   don't know if he is autistic right then and there.

2        Q.    Do you know the history of the term

3   "excited delirium," where it came from?

4        A.    All I know is, is that it came from -- so

5   the original studies were done back in the

6   seventies and eighties was cocaine psychosis,

7   because when the coroners finally cut -- were

8   starting to do more jobs, and looking into the body

9   as to reasons why these people were dying in

10  custody with the police, they found that because it

11  was a generational thing, meaning the drug at the

12  time, it was cocaine.  So they called it cocaine

13  psychosis.  Shortly thereafter, they started

14  realizing that other drugs were causing this event.

15  So LSD.  Just like in this packet.  LSD, marijuana.

16  Even your gateway drugs like this.  Alcohol can

17  cause it as well.  Even the lack of taking

18  medications can also cause an excited delirium

19  state.  So with cocaine psychosis, they transferred

20  and they -- substance-induced excited delirium,

21  meaning that the state of excited delirium was

22  caused by a substance.

23       Q.    Is that something coming up -- are you a

24  member of the Sudden Death Custody Task Force?

25       A.    No.

1    Q.    Do you go to any of the trainings?  Have

2    you been to any trainings with the doctor -- what

3    is the guy's name?  Newman Chan, and -- you know

4    Dr. --

5    A.    I know they are from Bill DeVane.

6    Q.    You said that -- do you know -- have you

7    ever heard of Dr. Wetli?

8    A.    No.

9    Q.    The literature, Dr. Wetli's literature,

10   that is mentioned in there, tracks the history of

11   excited delirium, correct?

12   A.    I've never seen him tracking excited

13   delirium about it.

14   Q.    The article -- have you never read the

15   articles that are set forth in that presentation?

16   A.    This presentation?

17   Q.    Yes.

18   A.    No.  I never read the articles.  This

19   presentation I am basically going off of some of

20   the court cases that was in there as well.

21   Q.    That PowerPoint is actually done with the

22   video of -- that is done by Bill DeVane, correct?

23   A.    Correct. What it does, it goes more

24   involved into what this whole entire packet or

25   PowerPoint or presentation is about.  More detailed

1  information with the studies and everything.

2      Q.   Well, did you know that excited delirium

3  was coined by a medical examiner in Miami Dade

4  named Dr. Wetli?

5      A.   No.

6      Q.   Do you know that his diagnosis was then

7  reversed by Dr. Joe Thomas, who was his boss,

8  because what he was writing out as excited delirium

9  actually was a serial killing, killing hookers?

10     A.   No.

11     Q.   Why do you use a term that is a medical

12 term when the medical professionals have rejected

13 it?

14     A.   I don't use it.

15          MR. ZIBILICH:

16              I object to the form. You can

17          answer.

18 BY MR. CLARKE:

19     Q.   What is the excited delirium?

20          MR. ZIBILICH:

21              You can answer it.

22          THE WITNESS:

23              It's a state.  It's a state of what

24          a person is going through if he or she

25          is going through the throws and

1          behavioral patterns that matches some

2          of the behavioral patterns normally

3          associated with cocaine psychosis or an

4          excited delirium state.  Substance-

5          induced excited delirium state.

6   BY MR. CLARKE:

7       Q.   But they can also be intellectual

8   disability, correct?

9          MR. ZIBILICH:

10            What can be? Object to the form.

11  BY MR. CLARKE:

12      Q.   The signs or symptoms, whatever this

13  constellation of garbage symptoms that they call

14  excited delirium is, that can be done by a -- that

15  can be the way a normal autistic kid acts.

16         MR. ZIBILICH:

17            Is that a question?

18         MR. CLARKE:

19            Yeah.

20  BY MR. CLARKE:

21      Q.   Correct?

22      A.   Possible.

23      Q.   What do you do to train them as to what

24  is excited delirium and what in an intellectual

25  disability?

1    A.   I train them to, if they arrive on scene,

2    and they identify several of these behavioral

3    patterns, then it's a possible, possible excited

4    delirium case.  Possible.

5    Q.   What is the significance of them making

6    that early recognition that --

7    A.   Because it's a medical emergency, sir.

8    Q.   It's a medical emergency that is rejected

9    by the medical field.

10    MR. ZIBILICH:

11        Is that a question? Sounds like a

12        declarative statement.

13    BY MR. CLARKE:

14    Q.   Correct? I mean, you are -- are you

15    phrasing it a medical condition or a constellation

16    of behaviors?

17    A.   There is a medical condition going on

18    right now.  There is things going on behind -- in

19    the body that we're not aware of that we only can

20    view from the outside. So if this person is, for

21    example, sweating profusely, acting a violent rage,

22    breaking glass, being extremely violent, being a

23    danger to himself, being a danger to others, we put

24    as a possible excited delirium.  Go ahead and start

25    medical this way.

1    Q.    So the first things that you are supposed
2    to do if you think somebody is experiencing -- is
3    this what you train?  If you observe certain signs
4    and symptoms that have been, according to the
5    training that you have provided, associated with
6    excited delirium the first thing they are supposed
7    to do, they're trained to do, is call medical?
8    A.    That's dependent.
9    Q.    Dependent on what?
10   A.    The situation.
11   Q.    Tell me all the things that it depends
12   on.
13   A.    If we roll up on scene or an officer
14   rolls up on scene, and they see this guy react in a
15   certain way, and all of a sudden this guy charges
16   at him and starts attacking him, then the last
17   thing he is going to do is try to get on the radio
18   and say I got a possible excited delirium.  Start
19   EMS this way.
20   Q.    Why?
21   A.    Because he needs to protect himself.
22   Q.    Well, we all understand what a weapon of
23   opportunity is, correct?
24   A.    No.
25   Q.    In certain circumstances, policies don't

1    mean anything, correct? You have to do whatever you

2    do to save your life.

3         A.   Yes.

4         Q.   You pick up a brick, if you have to, if

5    you are being attacked, and strike somebody with

6    it, correct?

7         A.   Deadly force encounter.

8         Q.   Right.  But when you have a whole

9    training on how to recognize something because it's

10   associated with what you call a medical condition

11   going on with -- inside of them, the first thing

12   they can do, if they have time, is to call

13   dispatch, right?

14        A.   If they have time, yes.

15        Q.   And it doesn't take long to say, hey,

16   we've got a potential ED person here?

17        A.   If we're talking about a guy who is not

18   attacking a police officer?

19        Q.   Right.  Let's say you are walking up

20   slowly to a scene after you have been dispatched to

21   a call of a kid fighting with their father.  You

22   got plenty of time to do that, right?

23        A.   Depends on the situation.

24        Q.   Unless he is attacking you, you have

25   time?

1      A.   If he is attacking somebody else, too.

2      Q.   Correct. Protect you or others?

3      A.   Correct.

4      Q.   So is there a code that they say for --

5  in Memphis PD, they call it mental consumer.  Do

6  you have a code or terminology that is used to

7  apprise dispatch of a possible ED person?

8      A.   Possible excited delirium case.

9      Q.   You just say that?

10     A.   Yes.

11     Q.   Do you just use plain codes in Jefferson

12  Parish -- County?

13     A.   That one is plain code, because there is

14  no code for it.

15     Q.   I got you.  There is no specialized

16  thing?

17     A.   Correct.

18     Q.   So if you suspect that, what do they

19  train you to do differently when you have somebody

20  who might be suspected of excited delirium?

21     A.   The example you just gave me, if he is

22  attacking a father or attacking somebody else or

23  attacking a police officer, or if he is by himself?

24     Q.   What do you do if you come up on a scene.

25  You are an officer.  You are by yourself, and it's

1   possible ED.   What do you do differently?   Why is

2   the recognition of somebody suffering from ED

3   treated differently where we have special training?

4        A.   Again, it's dependent upon the

5   circumstances when that officer arrives.

6        Q.   Why do you provide this trainings on the

7   RIPP Hobble?

8        A.   Why do I provide this training?   To give

9   them an understanding that sometimes the people

10  that they run into may not act normally.   They may

11  be extremely violent.   Unexpected physical strength

12  is one of the biggest criteria as well.   A lot of

13  officers have gotten hurt in the past because of

14  this, so they need to be careful.   The other thing,

15  too, is it's a medical emergency what is going on.

16  We discuss that that is a medical emergency going

17  on, that they need -- we need to try to get medical

18  assistance for them as quick as we possibly can,

19  dependent upon the situation.

20       Q.   What are you supposed to not do with a

21  person who is suspected of having ED?

22       A.   What are we not supposed to do?

23       Q.   Correct.

24       A.   In what situation?

25       Q.   In arresting and taking somebody into

1   custody.  You have the whole training there.  Don't

2   they tell you to do things differently in that

3   training?

4        A.   We try to talk -- I mean, very first

5   thing is we try to just talk calmly.  We try to

6   talk to them or whatever.  If that fails, then we

7   need to try to -- my rule is we try to control an

8   out of control person.

9        Q.   Your rule is Jefferson Parish's rule.  Is

10   that Jefferson Parish's rule?

11        A.   To control an out of control person? From

12   a defensive tactic standpoint, from an officer's

13   safety standpoint, that's what we're doing.  We're

14   trying to control an out of control person to make

15   sure that that person is not hurting others,

16   hurting himself, or hurting us.

17        Q.   Well, the training that was provided by

18   Bill DeVane in his portion of it, during his video,

19   he goes through and talks about certain types of

20   things, and then he plays video clips from other

21   events, correct?

22        A.   Yes.  There is videos, yes.

23        Q.   And --

24        MR. ZIBILICH:

25             I am just going to lodge a little

```
 1              objection right here.  I can't find
 2              DeVane's name in this 30(b)(6)
 3              deposition.  I have --
 4         MR. CLARKE:
 5              He is not.  He owns RIPP Hobble.
 6         MR. ZIBILICH:
 7              I understand that.  I'm giving you
 8         some leeway.
 9         MR. CLARKE:
10              That's not leeway.  I got you.
11         MR. ZIBILICH:
12              It's an ongoing objection.  If you
13         want to ask him what he teaches, fine,
14         I got it.  He trains, got it.  The
15         objection is noted.  It's okay.
16         MR. CLARKE:
17              I got you.
18    BY MR. CLARKE:
19         Q.   They teach people -- Jefferson Parish
20    teaches people through the presentation provided by
21    RIPP Hobble to Jefferson Parish that people who may
22    be suffering from ED are impervious to pain.  They
23    have bizarre behavior.  They take their shirts off.
24    They have high body temperature.  Correct?
25         A.   Yes.
```

1      Q.    So use of force against somebody with ED
2  is ineffective, correct?
3      A.    In certain instances it may be
4  ineffective.  We forewarn them that there is a
5  possibility that certain tools, and I always say
6  tools and talents.  Techniques may not work on the
7  subject.
8      Q.    And that's why, according to the training
9  that's provided by Jefferson Parish, through Bill
10  DeVane, he says that you never attempt to restrain
11  a person who may be suspected of ED by yourself,
12  correct?
13     A.    Correct.
14     Q.    And you should use a swarm technique,
15  correct?
16     A.    Correct.
17     Q.    And the swarm technique is deployed so
18  you can quickly stop the threat and get the person
19  in a position of recovery, correct?
20     A.    Correct.
21     Q.    So the training that is provided by Bill
22  DeVane in this PowerPoint talks about the dangers
23  of prone restraint and hog-tying, correct?
24     A.    Yes.
25     Q.    And the --

1    A.    Not the prone restraint, hog-tying.

2    Q.    It talks about the bellows.  What are the

3    three points of respiration that are critical when

4    you are taking somebody into custody?

5    A.    Right.  The bellows action, diaphragm,

6    the belly, breathing, the gas exchange or the

7    functions of the lungs, the oxygen within the

8    blood, all of -- and things like that.

9    Q.    He says three things.  The gas exchange

10   in the lungs, the openness of the airway, and the

11   bellows and the muscular pump, correct?

12   A.    Correct.

13   Q.    Do you train -- I didn't see it in there.

14   Do you train about risk factors of restraining

15   people in the prone position?

16   A.    Do I?

17   Q.    Does Jefferson Parish?

18   A.    We talk about the prone position.

19   Q.    Do you talk about people who have risk

20   factors, people who are suffering from diminished

21   capacity?

22   A.    Yes.

23   Q.    People who are obese?

24   A.    Yes.

25   Q.    And there are cases that are cited in

```
 1    there, Cruz versus City of Laramie.  Are you aware
 2    of that case?
 3         A.   Yes.
 4         Q.   Are you aware of -- do you know of any
 5    other cases other than what is put in there with
 6    respect to asphyxial death, hog-tied, compression
 7    asphyxia, or any other type of asphyxia?
 8         A.   No.  Just talked about what's ever the
 9    contents of here, Laramie versus Cruz, the West
10    Palm Beach video, the two cops videos that they
11    have.
12         Q.   And the videos are terrible, aren't they?
13         A.   Well, they're old.  That is the only
14    reason -- the only reason why they --
15              MR. ZIBILICH:
16                   I object to the form.  Terrible in
17                what regard?
18              MR. CLARKE:
19                   Every regard.  I'm making a blank --
20                they're terrible in every respect for a
21                training academy.
22              MR. ZIBILICH:
23                   Okay.  For a training academy
24                terrible.
25              THE WITNESS:
```

```
 1                    In what regard?
 2          MR. CLARKE:
 3               I'll move on.  He is doing this to
 4          throw me off, and --
 5          MR. ZIBILICH:
 6               He's not. I just don't know what the
 7          word means.
 8          MR. CLARKE:
 9               That is what he does, because it's
10          not a proper objection.  So but that's
11          -- it will just take longer.  We'll get
12          it all done.
13  BY MR. CLARKE:
14      Q.    There are four videotapes that are shown.
15  Two cops videos.  Two cops videos, one called the
16  Jefferson Street Incident and one called Lewis
17  versus West Palm Beach.
18      A.    Yes.
19      Q.    In Lewis v. West Palm Beach, the guy
20  chokes him out.
21      A.    Okay.
22      Q.    Doesn't he?
23      A.    Yes.  He puts a choke on him.
24      Q.    He chokes him out, and then they put him
25  in a hog-tie position, correct?
```

1          A.    Yes.

2          Q.    Do you train officers that it's

3    acceptable to choke people who are suspected of

4    having ED while you are trying to restrain them?

5          A.    No.

6          Q.    That's prohibited, correct?

7          A.    Yes.

8          Q.    Why would you show a video --

9          A.    To show them what not to do.

10          Q.    Does it say in that video -- that

11    PowerPoint presentation what not to do?

12          A.    No.  That's up to me to do that.

13          Q.    So we have to just trust the trainer who

14    says this is a bad video, and this is a good video?

15          A.    Yes.  This is what not to do.

16          Q.    Of the four videos, whiches are the ones

17    that are to do and whiches are the ones that are

18    not to do?

19          A.    The Jefferson Street incident was a very

20    good video.

21          Q.    The other one was good.  They didn't

22    hog-tie him.  They restrained him with one set of

23    handcuffs, and they deescalated the situation,

24    correct?

25          A.    He deescalated himself when he was laying

1    on the ground, yeah.

2         Q.   There is no need to --

3         A.   There was no need to do anything but to

4    get him care.

5         Q.   And do you know what year Bill DeVane's

6    video was copyrighted?

7         A.   No.  I do not know what year that was.

8         Q.   It is at the end of it. It is 1994.  Do

9    you know if that video was shot in 1994?

10        A.   I have no idea about that.

11        Q.   You would agree that the training that we

12   have for law enforcement in 1994, it's a lot better

13   today?

14        A.   Yes.

15        Q.   We know more now, right?

16        A.   I'm sorry?

17        Q.   We know more now.

18        A.   Yes, yes, yes.

19        Q.   Departments want to progress and learn

20   things and change behaviors to protect and serve

21   better?

22        A.   Yes.

23        Q.   In all four of the videos that is showed,

24   the people died, right?

25        A.   Except the last one, the Jefferson Street

1    incident.

2        Q.    That's true.  I got the last one as --

3    all right.  So if you all are trying to restrain

4    somebody, do you train them as to whether or not

5    it's proper to sit on their back while they're

6    trying to restrain them?

7        A.    It depends.

8        Q.    What does it depend on?

9        A.    It depends on the officer and the

10   situation of the subject, if he is overpowering the

11   officer.

12       Q.    That's, again -- you know, you got to do

13   what -- you got to do what you have to in a

14   situation if you are getting overpowered?

15       A.    It is dependent upon the situation,

16   correct.

17       Q.    The more officers you have, would you

18   agree, the less likely -- the less the need for

19   force?

20       A.    If the officers need to use force, they

21   need to use force.

22       Q.    I understand.  There is a difference

23   between one person trying to arrest somebody and

24   six people trying to arrest people?

25       A.    Correct.

1    Q.    There are different techniques, tactics,

2  and issues that can be done if you have more

3  officers on the scene, correct?

4    A.    Correct.

5    Q.    You may have to use weapons of

6  opportunities or unconventional tactics if you are

7  by yourself, and you are being overpowered,

8  correct?

9    A.    Correct.

10    Q.    So if you have more officers on the scene

11  -- let's say you had four officers on the scene.

12  Is there any reason to sit on anybody's back?

13    A.    It depends.

14    Q.    What does it depend on?

15    A.    It depends on how overpowering this

16  subject is compared to the officers.  Again, one of

17  the things we explain is the unexpected physical

18  strength of an agitated, chaotic event or an

19  excited delirium type state.

20    Q.    But you also explain that as a medical

21  condition that's been rejected?  You understand

22  those are things that people with no medical

23  conditions can do?

24    A.    Correct.

25    Q.    I can walk around the streets naked.  It

```
 1    wouldn't be --
 2              MR. ZIBILICH:
 3                   Yuck.
 4              MR. CLARKE:
 5                   Listen, I agree with you.
 6    BY MR. CLARKE:
 7         Q.   But all of those -- you know --
 8         A.   It's not just one.  It's several factors
 9    that must be met.
10         Q.   Anything made up by a police officer that
11    comes to justify an in-custody death.
12         A.   Made up by a police officer?
13         Q.   Made up by Dr. Wetli in 1985, who was
14    rejected by his own medical examiner, that was
15    written by Bilkie, Newman, and Chan who now have a
16    boondoggle called The Sudden Death Custody Death
17    Prevention Course.  All these symptoms are not
18    medical symptoms.  Is taking off your clothes a
19    medical symptom?
20         A.   No.
21         Q.   Is attacking glass a medical symptom?
22         A.   No.
23         Q.   Is unexpected strength a medical
24    condition?
25         A.   No, but you combine them all, it's
```

```
 1   possible.
 2        Q.    Well, listen.  It's possible that you
 3   just have a dirt bag who is wanting to fight,
 4   right?
 5        A.    Correct.
 6             MR. ZIBILICH:
 7                  Can I make an objection here?
 8             MR. CLARKE:
 9                  No, unless it's object to the form.
10             MR. ZIBILICH:
11                  This is a lovely debate that I'm
12                  listening to, but I thought the goal
13                  was for you to ask questions.
14             MR. CLARKE:
15                  Franz, I'm going to ask my questions
16                  my way.  I don't really want you
17                  interrupting me.
18             MR. ZIBILICH:
19                  It's not an interruption.
20             MR. CLARKE:
21                  It is.  It's a flat out
22                  interruption.  I've given you my -- I
23                  e-mailed you the article, if you need
24                  it, so you wouldn't say I don't have
25                  it.
```

```
1              MR. ZIBILICH:
2                   I haven't said that.
3              MR. CLARKE:
4                   I know, but I wanted to make sure
5              you couldn't.
6    BY MR. CLARKE:
7         Q.   So what do they tell you?  What do you
8    train your officers about recovery position?  What
9    is the recovery position?
10        A.   So prior to this year, we talked about --
11   not prior to this year.  We are just basically
12   putting them onto their side.  So for an arrest
13   technique, we call it a -- I call it a modified
14   recovery position, because the arms are not
15   forward.  So I lay them on their side.  Why are we
16   laying them on their side?  So that the ground, the
17   earth, is not negating the fact that they can
18   expand.  The bellows action of the belly and the
19   torso in order to breathe.  They're able to breathe
20   freely.  The officer has a good view of his face.
21   If he is going to vomit, he is going to vomit
22   outside of his mouth and on the side.  We have
23   control of him as well.
24        Q.   Right.  You can control somebody from
25   laying on the side position as opposed to the prone
```

1    position?

2         A.    Correct.

3         Q.    So the recovery position, while you say

4    that talks about hog-tie, I say it talks about

5    asphyxia, because it talks about the bellows

6    action, correct?

7         A.    Uh-huh.

8         Q.    If you have somebody on somebody's back,

9    that restricts the bellows action, correct?

10        A.    It can.

11        Q.    It can.  All right.  And if you cannot be

12   breathing in and out, you can't get the gas

13   exchange in your lungs, correct?

14        A.    Possible.

15        Q.    And that is what the purpose of the

16   recovery position is, correct?

17        A.    To have them breathe.  To have them

18   breathe or seated upright position.

19        Q.    Right.  Recovery is seated or on the

20   side.  Does it matter right side or left side?

21        A.    It does not matter.

22        Q.    Are sure about that?

23        A.    To me it does not matter.  It depends on

24   the situation.

25        Q.    You are Jefferson Parish.

```
 1        A.    Yes, I am.
 2        Q.    So to Jefferson Parish it doesn't matter
 3   whether it's the right side or the left side?
 4        A.    It depends on the situation.  If that
 5   officer is only able to go to this side or to that
 6   side, depending on the situation, the surroundings,
 7   and this is after he's been properly secured as
 8   well.
 9        Q.    When do you train them to put them in the
10   recovery position?
11        A.    I train them never to leave anybody in a
12   prone position.
13        Q.    Is the training academy, and I know they
14   are, they subscribe to the IACP?
15        A.    International Association of -- yes.
16        Q.    So you are aware of their model policies
17   and their concepts and issue papers?
18        A.    Not all of it.
19        Q.    But, I mean, you understand that they
20   have access to it? They get monthly newsletters
21   from them, correct?
22        A.    Okay.
23        Q.    Yes or no?
24        A.    I don't know.
25        MR. CLARKE:
```

```
 1                     You need to put a 25 on that, Franz.
 2   BY MR. CLARKE:
 3       Q.   Have you ever seen this article?
 4       A.   No.
 5       Q.   Do you train people that while they're
 6   being restrained in the prone position, and they
 7   run down their oxygen reserves, do you train them
 8   -- do you need to read that?
 9       A.   Yes.  I'm reading it.
10       Q.   Okay.
11       A.   Your question?
12       Q.   Bill DeVane in the training from RIPP
13   Hobble talks about the mechanics of asphyxia,
14   correct?
15       A.   Yes.
16       Q.   And would you agree that the prone
17   position is a position that can cause respiratory
18   compromise? That's why you put them in the recovery
19   position, right?
20       A.   Yes.
21       Q.   I mean, that's the point.  If you go and
22   you look under -- on Exhibit 25, about the basic
23   physiology of a struggle, it says, "A person lying
24   on his stomach has trouble breathing when pressure
25   is applied to his back."  Do you agree with that?
```

1    Does Jefferson Parish agree with that and do they

2    train on that?

3        A.    Yes.

4        Q.    The remedy is relatively simple.  Get the

5    pressure off the back.  Do you agree -- does

6    Jefferson Parish agree with that and do you train

7    on it?

8        A.    Yes.  I do have a question, though.  A

9    person lying on their stomach has trouble breathing

10   when pressure is applied to his back.  What portion

11   of the back are they talking about?

12       Q.    I don't know.  I mean, I didn't write

13   this article.

14       A.    Okay.

15       Q.    But the more pressure -- the pressure

16   point changes if somebody is obese, too, correct?

17       A.    Yes, depending on where the deputy is at

18   that time.

19       Q.    Because the restriction of the bellows

20   action has to do with the diaphragm muscle,

21   correct?

22       A.    Okay.

23       Q.    In obese people, the diaphragm muscle,

24   according to the charts in the thing, is at the

25   bottom, and that's where it gets compressed against

1   the asphalt, correct?

2        A.   Correct.

3        Q.   So sitting on somebody's legs, as an

4   obese person, may not be something that relieves

5   the pressure, correct?

6        A.   Correct.

7        Q.   That's why it's a complete risk factor to

8   get fat people off their stomach, correct?

9        A.   Correct.

10        Q.   So if you arrested me, I would assume you

11   would put me in the recovery position?

12        A.   Seated up right or recovery.

13        Q.   Or a coroner's car.  The way they go

14   through this is the suspect is restrained.  If you

15   go through the basic physiology of a struggle, the

16   suspect is restrained face down, and his breathing

17   may become labored.  The more weight put on his

18   back, the more severe the degree of compression,

19   correct?

20        A.   Correct.

21        Q.   When you have more compression, the

22   suspect or the citizen experiences more difficulty

23   breathing, correct?

24        A.   Based on what you are reading, yes.

25        Q.   Is this what you train, too?

1    A.    I train to not leave somebody in a prone
2    position.
3    Q.    It's not just prone.  What we're talking
4    about is the dynamics of a struggle.
5    A.    Correct.
6    Q.    You show up there.  If you get them down
7    prone, and you put pressure on them, that's going
8    to restrict their breathing?
9    A.    Yes.
10    Q.    When somebody is compressed on the ground
11    by body weight, they have more trouble breathing,
12    correct?
13    A.    Yes.
14    Q.    And if you look here -- do you train
15    officers about this.  When the natural reaction to
16    oxygen deficiency occurs, the person struggles more
17    violently?
18    A.    Yes.
19    Q.    So somebody who is on the ground being
20    restrained in a prone position, if they are
21    reacting in some way, that could be from oxygen
22    deficiency?
23    A.    Possible.
24    Q.    And do you train them to take that into
25    consideration whether or not there is any active

1    resistance for the need for additional force?

2         A.   Yes.

3         Q.   And that's why you just get off their

4    back, and you turn them on their side, right?

5         A.   If he has not been restrained yet.  I

6    mean, if he has been properly restrained, now we're

7    going to put him on his side.  Recovery position,

8    or the modified recovery or seated upright.

9         Q.   And once -- if we're going through the

10   physiology of a struggle, a natural reaction to

11   oxygen deficiency is the person struggles more

12   violently, and then the officer applies more

13   compression to subdue the individual. That's what

14   you are trying to prevent with training, correct?

15        A.   Yes.

16        Q.   If you handcuff somebody, once they're

17   handcuffed, is that sufficient control to put them

18   in the recovery position?

19        A.   Not always.

20        Q.   That would be a significant factor in the

21   amount of control you have, correct?

22        A.   Correct.

23        Q.   Once you have the arms done, at least

24   that is taken care of, right?

25        A.   Yes.

1      Q.    I mean, they could --

2      A.    In some instances, yes.

3      Q.    Now, it also notes that people have

4  predisposing factors with respect to positional

5  asphyxia.  Do you train that people who are obese

6  are particularly susceptible to a bad result

7  because they are obese?

8      A.    Correct.

9      Q.    When they're high on drugs?

10     A.    Yes.

11     Q.    Or alcohol, or they have an underlying

12  heart condition?

13     A.    Correct.

14     Q.    It says, "The risk of positional asphyxia

15  is compounded when an individual with predisposing

16  factors becomes involved in a violent struggle with

17  an officer or officers, particularly when the

18  restraint includes behind the back handcuffing

19  combined with placing the subject on the stomach

20  down position," correct?

21     A.    Correct.

22     Q.    So that's what we want to avoid?

23     A.    Leaving them in the prone position, yes.

24     Q.    Okay.  All right.  Now, what do you train

25  them to do -- okay.  We have a situation where they

1   have restrained somebody.  They put them on the

2   ground.  They have handcuffed them.  Do you train

3   them on an amount of time they have to put them in

4   a recovery position?

5          A.   When it's safe to do so.

6          Q.   How do you know -- what does safe mean?

7          A.   He could still be kicking.  He could

8   still be trying to grab.  He could still be trying

9   to really, really fight.  We cannot force anybody

10  into a particular position if they're still

11  resistant to the utmost.  We can try our best, but

12  we cannot force.  The only thing we can do is try

13  to mitigate them constantly being in the prone

14  position.

15         Q.   Right.  What I'm saying is you got

16  somebody handcuffed.  You are on their back.  You

17  had to take them down.  You had to put them in the

18  prone position.  He is obese.  Let's make sure he

19  has a risk factor in there.  He is on his back.

20  They handcuff him.  Regardless of whether he is

21  kicking, why wouldn't you put him in the recovery

22  position?

23         A.   When it's safe to do so.  I don't know

24  the dynamic.  When it is safe to do so, we are

25  going to put him into a recovery position.  The

```
 1   very first thing out of my mouth is seated upright,
 2   but it is very, very hard to keep somebody seated
 3   upright, so we put them in a recovery position.
 4   Modified recovery.
 5        Q.   Right.  On the side?
 6        A.   Right.
 7        Q.   That relieves the compression, relieves
 8   the asphyxial type danger, correct?
 9        A.   Correct.
10        Q.   So if he is kicking, and you can control
11   him by holding his handcuffs behind his back in the
12   modified recovery position, correct?
13        A.   Correct.
14        Q.   There would be no reason to remain on
15   somebody's back after they're handcuffed, would
16   there?
17        A.   They're on the side.  They are not
18   kicking on their back.
19        Q.   I mean, in the -- there would be no
20   reason to stay on somebody's back after they're
21   handcuffed and put -- and not put them in the
22   recovery position?
23        A.   Not unless he is still fighting.
24        Q.   What do you mean fighting?  If he is
25   kicking, who cares? Don't go in front of his feet.
```

1    A.    Because he can shrimp.  He can continue

2  to roll one way or the other.  Legs, the most

3  powerful muscles in the body, can still do damage.

4  We need to make sure that he is under control.  So

5  just handcuffs alone -- handcuffs alone are not

6  going to be enough.  So we can secure him with

7  handcuffs, but handcuffs alone sometimes are not

8  enough.

9    Q.    But you can secure a hand with handcuffs

10  in the recovery position?

11    A.    No.  Not successfully in the recovery

12  position.

13    Q.    That's why you have the TARP policy,

14  correct?

15    A.    When handcuffs alone are not enough to

16  control a subject who is a danger to self, danger

17  to others.  That's why we TARP.  That's why we have

18  the TARP policy.

19    Q.    What is TARP?  It's just a nylon belt?

20    A.    No.  TARP is a procedure used with a

21  hobble and handcuffs.

22    Q.    It is used with a RIPP Hobble?

23    A.    Yes.

24    Q.    And the training says under no

25  circumstances attach -- don't hog-tie, right?

```
 1        A.    We do not hog-tie.
 2        Q.    Do you know when they stopped hog-tying?
 3        A.    Who is they?
 4        Q.    Jefferson Parish Sheriff's Office.
 5        A.    I've never hog-tied since I've been here,
 6   so we were taught not to hog-tie.
 7        Q.    In '99?
 8        A.    1999.
 9        Q.    Does training utilize -- is training in
10   any way a work in conjunction with Internal Affairs
11   or look at litigation when they're trying to
12   provide the training on these -- on topics?
13        A.    I don't know what you mean by that.
14        Q.    Training.  You know, does training
15   coordinate with any other divisions within the JPSO
16   with respect to their research or their curriculum,
17   or what they're trying to do with issues that are
18   facing deputies? For example, do you get lawsuits?
19   We have this lawsuit.  Look at it to see if there
20   is any training ramifications or things we need to
21   do differently.
22        A.    A JPSO lawsuit or just a lawsuit around
23   the country?
24        Q.    Right.  Either one.
25        A.    We'll look at it and address it and
```

```
 1   figure out -- you know, we hate to say it, and we
 2   hate to do it.  We hate to talk about Monday
 3   morning quarterbacking, but, you know, if it's
 4   something that's --
 5        Q.   That's my job, man.
 6        A.   If we sit there and look at and say,
 7   okay, maybe something could have been different, we
 8   use it as a training tool.
 9        Q.   Has anybody used anything from the Parsa
10   incident, any tape, as a training tool?
11        A.   No.
12        Q.   Have you seen the tape?
13        A.   Only what was on TV.
14        Q.   So this case, with this lawsuit and
15   everything that's going on, you have never been
16   asked by somebody from JPSO to look at this video
17   and provide an opinion as to the training issues
18   that may be involved?
19        A.   No.
20        Q.   Do you do that with Internal Affairs?
21   For example, do you have any coordination or work
22   with Internal Affairs?  We are seeing a number of
23   A, B, and C things here.  Do we need more training
24   to --
25        A.   No.
```

1    Q.    You have kind of a separate stand-alone
2  thing, and if the sheriff asks you to do something,
3  you do it?
4    A.    Yes.
5    Q.    Do you teach officers to minimize the
6  amount of time you put people in the prone
7  position?
8    A.    No.  Do I teach them to minimize?
9    Q.    Minimize.
10   A.    The only thing I teach is when it's safe
11 to do so.
12         MR. ZIBILICH:
13             This is 26, I take it?
14         MR. CLARKE:
15             Yeah.
16 BY MR. CLARKE:
17   Q.    About halfway down.  "Due to the
18 potential rapid death in these instances, law
19 enforcement must act quickly to minimize the
20 duration of the resistance and struggle which was
21 thought to contribute to the death."  Do you train
22 them that your most important thing when you are
23 dealing with them is to make sure you get them on
24 their side or in a recovery position?
25   A.    Either on their side or seated upright.

1    Q.   Right.  Can we agree that both of those

2   are some form of the recovery position?

3    A.   No.  Seated upright is literally seated

4   upright, and recovery position or the modified

5   recovery position is laying on their side while

6   they are still on the ground.

7    Q.   So you would not use those

8   interchangeably?

9    A.   No.

10   Q.   In one of the cops videos that was

11  presented at the RIPP Hobble training, a white male

12  with no shirt was standing, holding a fence.  Do

13  you remember that?

14   A.   Yes.

15   Q.   And three separate officers started

16  striking him with batons in his hands, correct?

17   A.   Yes.

18   Q.   Is that a representation of what you want

19  your Jefferson Parish Sheriff's deputies to do or

20  is that a bad video?

21       MR. ZIBILICH:

22            When you say bad video, is that -- I

23        take it that's what you are not

24        supposed to do?  Is that what that

25        means?

```
 1              MR. CLARKE:
 2                   If he asks me a question about what
 3              bad means, I'll be sure to --
 4              MR. ZIBILICH:
 5                   I object, but go ahead.
 6    BY MR. CLARKE:
 7         Q.   You said don't -- we train them, hey,
 8    don't do the West Palm Beach chokehold, hog-tie.
 9    Do you -- in the cops two video, with the white
10    male citizen with no shirt and a cap, was on drugs,
11    and they were taken down and held in the prone
12    position for less than 50 seconds.
13         A.   In the video with the guy on the fence?
14         Q.   Yeah.
15         A.   Because they successfully were able to
16    handcuff him and picked him up.
17         Q.   Right.   After they beat him with -- three
18    different people struck him with batons.
19         A.   Striking his knuckles to release the
20    fence.
21         Q.   Correct.
22         A.   Correct.
23         Q.   And that's an approved tactic by JPSO?
24         A.   Yes, to effect the release.
25         Q.   What about deescalation?
```

```
 1        A.    Yes.
 2        Q.    You know, somebody is just holding on to
 3   something.  What do you call that?  Passive
 4   resistance, correct?
 5        A.    I'm going back in my head with the video.
 6   He was told to do a number of things, and then he
 7   ran.  Then he latched onto the fence, and they were
 8   telling him to let go, and then they were trying to
 9   pull him down, and he was overpowering them, so
10   then they struck him with the batons to hit his
11   knuckles.
12        Q.    Do you train with respect to passive
13   resistance and active resistance?
14        A.    Yes.  There is a difference.
15        Q.    What is passive resistance?
16        A.    Passive resistance.  My example has
17   always been, "Sir, can you please stand up, turn
18   around, and place your hands behind your back?"
19   "But I really don't want to go to jail."  "Sir, can
20   you please stand up, turn around, place your hands
21   behind your back?"  "I don't really want to go to
22   jail."  That's passive.
23        Q.    Is that JPSO's -- is that yours or JPSO?
24        A.    That's mine.  That is an example of.
25        Q.    I need JPSO's.  I mean, there are law
```

1    enforcement terms that define active and passive

2    resistance, correct?

3        A.    Active is physically resisting an

4    officer's attempt.

5        Q.    So you're saying passive resistance is

6    only verbal?

7        A.    No.  It's not only verbal.  He can always

8    be here, this way, too, try to place --

9        Q.    He could also be holding on to a fence

10   with his hands?

11       A.    Correct.

12       Q.    So that's passive resistance?

13       A.    He is actively resisting my attempts to

14   arrest him now.

15       Q.    Not through active --

16       A.    He is actively resisting my attempts to

17   place his hands behind his back.

18       Q.    So anybody who is alive is actively

19   resisting if they don't do what you say?

20       A.    No.

21       Q.    What is the -- I don't want -- I, JPSO.

22   If they don't make a distinction between passive

23   and active resistance and don't have a definition,

24   I need to know that.

25       A.    There is no definition in here.

1      Q.   Is there any definition in the training

2   that you provide?

3      A.   I gave you those examples.  For example

4   --

5      Q.   An example is if somebody doesn't want to

6   go to jail, you consider that passive resistance?

7      A.   "Sir, please stand up, turn around, place

8   your hands behind your back." "But I really don't

9   want to go to jail."  "Sir, can you please stand

10   up, place your hands behind your back?"  "I really

11   don't want to go to jail."  Now he is sitting like

12   this.  Now I go, "Sir, you need to come.  We are

13   going to go hands-on."  And now he starts, "I don't

14   want to go to jail."  Now he is actively resisting

15   my attempts to arrest him.

16      Q.   Okay.  We'll stick with that.  And that's

17   what you train officers?

18      A.   Yes.

19      Q.   So anything other than -- any time they

20   disobey a command and don't do what you do, and you

21   have to go hands-on, that becomes active

22   resistance?

23      A.   In those examples, yes.

24      Q.   I'm talking about in your training.  Your

25   examples don't make sense to me, so -- because

1    they're not active and passive resistance.  A

2    protester who doesn't get up, can you use force on

3    them, hit them with a baton?

4         A.   It is depending upon the situation.

5         Q.   They sit on the street, and they are not

6    moving.  Can you strike them with a baton?

7         A.   If you are giving me that example where

8    he is sitting down on the street, and he is not

9    moving, and we're telling him you need to move on

10   or you are going to jail.  I'm not moving.  Okay.

11   Now you are under arrest, and he continues to sit

12   there.  Now, based on the situation, based on this

13   guy, whoever it is, I can go hands-on first.

14        Q.   I understand.  He is -- is he actively

15   resisting?

16        A.   He is passively resisting by not

17   listening to my verbal commands.  The moment I go

18   here, lay hands on him to make him understand he is

19   about to go to jail, and he continues to not give

20   me what is the lawful command of you are under

21   arrest, then he is now actively resisting me.

22        Q.   You're allowed to strike people in that

23   circumstance with a baton if they don't comply,

24   under the training provided by JPSO?

25        A.   Yes.   Intermediate weaponry can come in,

1   yes.

2        Q.    You can use OC or a taser?

3        A.    OC, taser, correct.

4        Q.    Let's talk about deescalation.  Does

5   Jefferson Parish train people with Verbal Judo

6   techniques?

7        A.    If that's the lack of a better term,

8   Verbal Judo.  If that is lack of a better term,

9   because that's the buzzword for that particular

10  lecture or lesson or plan that was ever taught, but

11  do we teach people to talk to people, yes.

12       Q.    Do you teach a class on deescalation

13  entitled -- that has a course curriculum that is

14  standard throughout the United States called Verbal

15  Judo?

16       A.    No.

17       Q.    What do -- do you teach them something

18  similar?

19            MR. ZIBILICH:

20                Object to the form.  You can answer

21             it.

22            THE WITNESS:

23                Depends on the situation.

24  BY MR. CLARKE:

25       Q.    What does it depend on?

1      A.    It depends on the interaction between the
2  officer and the subject at that particular moment
3  in time.
4      Q.    What do you teach them about -- you ever
5  heard time is on my side?
6           MR. ZIBILICH:
7                Who is saying it?
8           THE WITNESS:
9                No.  Time is on my side in what
10               situation?
11  BY MR. CLARKE:
12     Q.    That's the main theory of deescalation.
13  Use time, not force, correct?
14     A.    Depending upon the situation.
15     Q.    Everything depends.
16     A.    Yes.  Everything does depend.
17     Q.    Do you train people that, hey, we're
18  going to teach you how to use a TARP, but it just
19  depends on whether you want to use it?
20     A.    It depends on if the situation draws on
21  that the TARP can be used.
22     Q.    What is the situation where a TARP is to
23  be used?
24     A.    The majority of time that I've known that
25  TARP has been used is when a subject has already

1    been placed in the rear of a vehicle, and his legs

2    have not been controlled or bound.  He is arrested,

3    and he goes ahead and turns on -- kicks out the

4    windows of the vehicle.

5         Q.   What does your policy say about when you

6    are supposed to use the TARP?

7         A.   I believe the SOP basically dictates when

8    handcuffs alone are not enough to control a subject

9    who is a danger to self and a danger to others that

10   we can use TARP.

11        Q.   Go ahead and get to SOP-8.

12             MR. ZIBILICH:

13                  What do you want him to look at?

14             MR. CLARKE:

15                  SOP-8.

16             MR. ZIBILICH:

17                  The whole thing?

18             MR. CLARKE:

19                  Yes.

20   BY MR. CLARKE:

21        Q.   There is numbers at the bottom.  It is at

22   like 329 where the restraining policy starts.

23        A.   Yes.

24        Q.   So the first -- this is -- what is this

25   policy?  It says, "Restraining devices and

```
 1    defensive tactics."  This isn't the use of force
 2    policy, is it?
 3         A.    Correct.   It's not the use of force
 4    policy.
 5         Q.    And what is -- is there any discussion in
 6    this policy about the dangers of compression
 7    asphyxia or positional asphyxia?
 8         A.    Not in this policy.
 9         Q.    Do you know why not?
10         A.    No.  I do not know why not.
11         Q.    If you were able to write the policy,
12    would you have that in there?
13              MR. ZIBILICH:
14                   Wait.  That's a corporate
15               representative question?  I object.
16              MR. CLARKE:
17                   He is the company now.
18              MR. ZIBILICH:
19                   I object.
20    BY MR. CLARKE:
21         Q.    Is this policy consistent with all the
22    training that's provided by Bill DeVane?
23         A.    Is this?
24         Q.    Yeah.
25         A.    This has nothing to do with Bill except
```

1    Total Appendage Restraint Procedure.

2         Q.    Correct.   Is that all that you have?

3    Would you want -- well, I'll move on.   It says,

4    "Extremely violent prisoners may be additionally

5    restrained, if necessary, to restrain the movements

6    of both hands and legs.   It may be done by the

7    Total Appendage Restraining Procedure."

8         A.    Correct.

9         Q.    And they do that with the RIPP Hobble

10   device, correct?

11        A.    Correct.

12        Q.    Let me ask you this.   The people who have

13   RIPP Hobble training, are they supposed to have a

14   RIPP Hobble with them?

15        A.    If the majority -- it is supposed to be

16   the majority of the police officers that are out on

17   the road should have a Hobble for themselves.

18        Q.    But you are only allowed to carry

19   something if you had the approved training?

20        A.    Correct.

21        Q.    So does everybody have RIPP Hobble

22   training? It appears to --

23        A.    Not everybody.

24        Q.    There was none in inservice like two

25   years ago.   Everybody -- you do it in inservice?

1    A.   Yes.   I did that several years ago.   I
2  did a refresher on RIPP several years ago.
3    Q.   We have all of the training resumes.   We
4  went over them when I met you before.
5    A.   Yes, sir.
6    Q.   Do you train people that if you have the
7  certification on a certain piece of equipment that
8  you are required to carry it?
9    A.   I don't train them on that.   I say you
10  are certified to use this device, and at the
11  district level, they hand out the Hobbles to them.
12  So that's basically it.   If you are certified to
13  carry it, then you can carry it.
14    Q.   Well, if you are certified to carry it,
15  does Jefferson Parish give you it?
16    A.   Yes.
17    Q.   So you complete the RIPP Hobble training,
18  get a RIPP Hobble?
19    A.   Yes.
20    Q.   So everybody who had that particular
21  training should have, when they're on duty, a RIPP
22  Hobble?
23    A.   Should, yes.
24    Q.   Anybody who has OC spray training and
25  receives OC spray should have that when they're on

1  that, correct?

2       A.   Yes.

3       Q.   That's why you provide the training, so

4  they have these tools available to them so that

5  they can deal with them, correct?

6       A.   Correct.

7       Q.   Now, how do you do -- what is the total

8  appendage -- the TARP procedure?  How is it done?

9       A.   Several ways.  One of the ways is

10 actually handcuffed.  Hobble goes through the

11 chain, hooks back onto the back part of the Hobble,

12 so now their legs are prevented from kicking out,

13 which is the things we're trying to prevent them

14 doing, from kicking out.

15      Q.   And the actual RIPP Hobble cord is of

16 sufficient length so it doesn't bind?

17      A.   Yes.

18      Q.   So it doesn't allow you to hog-tie them?

19      A.   Correct.

20      Q.   So it's -- do you know how long it is?

21      A.   That one is 18 inches, I believe.  The

22 SUV model is 18 inches.

23      Q.   That's all it is? No.  You got to --

24      A.   I'm trying to think of the --

25      Q.   That's not right.  That's a hog-tie.

1          A.    No, no. It's 18 inches longer than the
2    standard, so it is longer now.  I'm not sure of the
3    exact length.
4          Q.    But it's long like a belt?
5          A.    It's very, very long.
6          Q.    And that's one of the devices that Bill
7    DeVane was trying to sell Jefferson Parish when he
8    gave you the little card is to use this longer rope
9    when you are trying to restrain somebody's hands
10   and feet?
11         A.    Rope.
12         Q.    Well, that's what they used to use in
13   Memphis.  Belt, nylon cord.
14         A.    We have a Hobble, so I have never seen
15   the rope.
16         Q.    So can you -- do you even have to attach
17   it to their hands?  All you got to do is control
18   the feet in that situation.
19         A.    Correct.  You have to control the kick of
20   the legs.
21         Q.    And if somebody is in the recovery
22   position, being held down -- let's say you have six
23   officers on the scene.
24         A.    Okay.
25         Q.    And somebody is not under the influence

1    of drugs.

2         A.    Okay.

3         Q.    If their legs are not TARP'd or put into

4    the RIPP Hobble, is that enough people to restrain

5    somebody in the recovery position?

6         A.    I believe so.

7         Q.    And do you also train them if somebody is

8    kicking, one of the things that you can do is you

9    can just walk away from their feet so you don't get

10   kicked?

11        A.    Initially, yes, but then we have to

12   control the legs.

13        Q.    Correct.  You've got time.  If you are

14   holding somebody in the recovery position, and they

15   are kicking their legs, you can lay on them without

16   respiratory compromise, correct?

17        A.    You can control them, yes.

18        Q.    I mean, that's what you should do,

19   correct?

20        A.    Try to control them, yes.

21        Q.    You want to try to control them in the

22   least dangerous position that's available?

23        A.    Correct. We never leave them in a prone

24   position.

25        Q.    Let me give you a hypothetical and see

1   what you would do with it.

2         MR. ZIBILICH:

3              I object to the form.

4         MR. CLARKE:

5              I know you are.  I'll give you a

6         copy.

7         MR. ZIBILICH:

8              It's not what he would do, to use

9         your words.  He would train people.

10  BY MR. CLARKE:

11        Q.   Do you use scenarios in your training?

12        A.   Yes.

13        Q.   Like the videos that Bill DeVane does.

14  He probably has videos for a number of different

15  topics, correct?

16        A.   Correct.

17        Q.   So if an officer was called to a scene

18  for a violent and out of control person severely

19  beating his own father in a parking lot and arrive

20  to find that the father had been bitten in the

21  face, leaving open and obvious trauma, and then he

22  struck a deputy and never resisted, and they got

23  him handcuffed, and there were six officers on the

24  scene, is that person a candidate for the TARP?

25        MR. ZIBILICH:

```
 1                    I object.  Montana versus Sandstrom.
 2               Go ahead.  You can answer.
 3          THE WITNESS:
 4               If he is still resisting, yes.
 5   BY MR. CLARKE:
 6      Q.    That's what you would do.  If he -- let's
 7   assume if somebody was being restrained in the
 8   prone position, and you get them handcuffed, and at
 9   that time they're not resistant, would that be the
10   time that you would train them to move them to the
11   recovery position?
12      A.    Seated upright is always going to be
13   first.
14      Q.    Seated upright.
15      A.    If they resist, because a lot of -- it is
16   extremely difficult to force somebody into a
17   seated, upright position successfully.  If they're
18   not seated upright, then the side position is
19   optimal, in those cases.
20      Q.    The seated position is the best position?
21      A.    Yes.
22      Q.    The prone -- the on your side is -- the
23   recovery position is better than being compressed,
24   correct?
25      A.    Correct.
```

1    Q.   So when you have somebody when you are in

2    the prone position, which we have gone through the

3    dangers of what that does.  If you can put

4    handcuffs on them, and they're not resisting at

5    that time, you should at least try to put them on

6    their side, correct?

7    A.   At the very least, yes.

8    Q.   Because you want to get the pressure off

9    the back, correct?

10   A.   Correct.

11   Q.   If they continue to -- if they then start

12   kicking or something, then you may be able to --

13   you can actually try to restrain their legs from

14   the recovery position, correct?

15   A.   Yes.

16   Q.   And that would be preferred, correct?

17   A.   Yes.

18   Q.   Is that what you train them?

19   A.   Yes.

20   Q.   If you can't somehow, when do you use leg

21   shackles instead of the RIPP Hobble?

22   A.   I don't teach nor do I know when they use

23   leg shackles.

24   Q.   Do deputies on the street normally have

25   leg shackles?

1    A.   Some may, some may not.

2    Q.   Are you allowed to use -- do you train

3    them that it is acceptable to use leg shackles when

4    you are potentially dealing with an excited

5    delirium person as opposed to go through the TARP

6    procedures and training and use the RIPP Hobble?

7    A.   No.

8    Q.   Are officers trained that they are,

9    except for the weapon of opportunity situation,

10   that they are supposed to use the tools that JPSO

11   gives them in the manner that they were trained?

12   A.   Correct.

13   Q.   So, for example, people can't have their

14   own different -- you know, they can't make up their

15   own baton and use it, correct?

16   A.   Correct.

17   Q.   They're only allowed to use techniques

18   that are trained or tools that are trained,

19   correct?

20   A.   Yes.

21   Q.   And what do you train on the use of leg

22   restraints?

23   A.   Hobble is the only thing.

24   Q.   Hobble?

25   A.   Yes.

1      Q.    Why would somebody use -- you'd have to

2  train them or JPSO would have to train them.  What

3  do they train them on shackles?

4      A.    I do not train them on shackles.

5      Q.    Does Jefferson Parish Sheriff's

6  Department train any deputies on the use of

7  shackles?

8      A.    I don't know if the JPCC trains their

9  people on the use of shackles.  That's where I've

10  mostly seen that being used.

11      Q.    Do you know why a deputy on the scene

12  would have leg shackles?

13      A.    No.

14      Q.    What do you train people on chokeholds?

15      A.    Do not do them.  Not unless it's a deadly

16  force encounter.

17      Q.    You don't train on the LVNR?

18          MR. ZIBILICH:

19              The who?

20          MR. CLARKE:

21              LVNR.

22          THE WITNESS:

23              No.

24          MR. CLARKE:

25              He knows.  You may not.

```
 1              MR. ZIBILICH:
 2                   I couldn't.  You were mumbling.
 3              MR. CLARKE:
 4                   It gets worse as time goes on.
 5              MR. ZIBILICH:
 6                   I could tell.
 7              MR. CLARKE:
 8                   Maybe I should have had a sandwich.
 9    BY MR. CLARKE:
10         Q.   Chokehold is a no-no?
11         A.   Correct.
12         Q.   Do you train in -- what if a officer
13    knows some type of judo, or, you know, the marshal
14    artist, MMA guy, are they allowed to use those
15    tactics?
16         A.   No.
17         Q.   Is there any type of approved head hold?
18         A.   Are we talking about LVNR, carotid
19    restraint, rear naked?
20         Q.   Any.  Is any of them approved?
21         A.   No.
22         Q.   That would just be a weapon of
23    opportunity that's a preservation of life, deadly
24    force situation, correct?
25         A.   Yes, sir.
```

1    Q.    And to be -- to use deadly force, you

2    have to -- there has to be an imminent threat,

3    correct?

4    A.    Danger of great bodily harm, injury or

5    death, yes.

6    Q.    Do you train with respect to the

7    difference between risk versus threat?

8    A.    Imminent versus immediate.  That's the

9    way I use those terms.

10    Q.    Tell me the difference between those.

11    A.    If I was standing in front of you with a

12    gun down like this, I'm not pointing it at you, I'm

13    an imminent threat to you.  I level it off, it's

14    now immediate.

15    Q.    Have you not heard of the curriculum on

16    risk versus threat training?

17    A.    No.

18    Q.    For example, with a crowbar, there is a

19    risk that they could hit you, correct?

20    A.    Correct.

21    Q.    If somebody is utilizing a crowbar to pry

22    open -- I don't know what you use crowbars for.

23    Let's use a tire iron.  Anybody with a tire iron

24    could be a risk of hitting you with a tire iron,

25    correct?

1      A.    Correct.

2      Q.    So if you see somebody with a tire iron,

3  there is always a risk, right?

4      A.    Yes.

5      Q.    But if the person is down there on the

6  ground trying to take his lug nuts out, then you

7  look at that risk, and there is no immediate

8  threat, correct?

9      A.    Correct.

10     Q.    Because you have to have a -- there has

11 got to be a distinction.  We are open carry now.

12 Anybody -- I don't know down here.  In Memphis,

13 everybody can carry a gun anyway.  Just having a

14 gun or a weapon doesn't make it -- there could be a

15 risk, but it doesn't make you a threat, correct?

16     A.    Correct.

17     Q.    Because people can lawfully have those

18 things, correct?

19     A.    Correct.

20     Q.    And you cannot overreact to a lawful

21 action of a citizen, correct?

22     A.    Correct.

23     Q.    Let's talk about what you train on use of

24 force.  Does the JPSO train on a use of continuum

25 of force, a pyramid?  What -- how do they train on

```
 1   force?

 2        A.   Levels of force.

 3        Q.   Tell me all the levels.

 4        A.   Lawful presence, verbal dialogue,

 5   personal weaponry, intermediate weaponry, deadly

 6   force.

 7        Q.   No hands-on first?

 8        A.   No.  Dependent.

 9        Q.   Well, I mean, does your training -- do

10   you go through a whole course, and then at the end

11   of it say, hey, listen this all depends?

12        A.   No.  Consistently throughout the course I

13   say it depends.

14        Q.   And do you tell them what it depends on?

15        A.   Yes.

16        Q.   So when you say it depends, I'd like you

17   to give me the answer of what you tell the people

18   that you're training what it depends on.  Okay?

19        A.   Yes.

20        Q.   So go through that again.  You said

21   verbal presence?

22        A.   Lawful presence, verbal dialogue,

23   personal weaponry, intermediate weaponry, deadly

24   force.

25        Q.   Why don't you have hands-on first? So you
```

1   go from being there to talking to them to a weapon?

2       A.   I'm sorry.  Being there, talking to them,

3   personal weaponry.  This is what we mean just in

4   case it goes.  Just in case something happens.

5       Q.   Are hands first -- I understand.  I

6   didn't see any continuum of force in training or in

7   the policies.  Is that correct?

8       A.   Correct.

9       Q.   So you --

10      A.   The use of force is in the policy,

11  though.

12      Q.   Right, but it doesn't go through a

13  continuum or levels of force, does it?

14      A.   Correct.

15      Q.   Do you know why it doesn't go through the

16  levels of force in the policy?

17      A.   No, sir.

18      Q.   Have you read anybody else's policies of

19  any kind?

20      A.   No, sir.

21      Q.   So you would have no basis to say whether

22  that's a good policy or bad policy?

23      A.   The ones that I've known, they've added

24  layers to their use of force policy.

25      Q.   You know the IACP, you can order model

```
1   policies, correct?

2        A.    Okay.  I don't know.

3        Q.    You didn't know that?

4        A.    No.

5        Q.    Franz has them all.

6        MR. CLARKE:

7              Did you ever get them to JPSO,

8           Franz?

9        MR. ZIBILICH:

10             Did I get them to JPSO?

11       MR. CLARKE:

12             You laughed at me when I tried to

13          talk to you about resolving the case,

14          maybe trying to work on doing some

15          better training.  I sent you a whole

16          link to the entire IACP --

17       MR. ZIBILICH:

18             You did.

19       MR. CLARKE:

20             You didn't get them to the sheriff?

21       MR. ZIBILICH:

22             I did not.

23       MR. CLARKE:

24             I thought that's what you said you

25          were going to -- you said get them to
```

```
 1                          me.  I tell you like everybody else.
 2                          Get them to me, and I'll talk to the
 3                          sheriff.  So that hasn't happened?
 4             MR. ZIBILICH:
 5                          I did talk to the sheriff.  You
 6                          asked me if I gave him all your stuff.
 7                          I did not give him all the stuff, but I
 8                          did talk to him.
 9             MR. CLARKE:
10                          Okay.  Fantastic.
11   BY MR. CLARKE:
12        Q.   Do you know if the policies, as written,
13   on use of force are consistent with any national
14   standards that you've reviewed?
15        A.   Our use of force is guided by federal,
16   state, and SOP.
17        Q.   What federal?
18        A.   Whatever federal lawsuits have come
19   around.  We base the -- our policy is based off
20   federal, state, and the policies, the way the
21   policies are dictated.  So our use of force covers
22   federal lawsuits, state lawsuits, or state -- state
23   rules and laws, and then they orchestrated and made
24   our use of force the way it is.
25        Q.   So let's talk about the federal
```

1    authorities, the federal cases.  Do you train --

2    what cases do you train on with respect to use of

3    force?

4         A.    We mentioned more about the constitution,

5    when they go through legal aspects, the

6    constitutional -- Fourth Amendment, Eighth

7    Amendment, Fourteenth Amendment within the use of

8    force lecture.

9         Q.    What is the Eighth Amendment?

10        A.    For the use of -- for our use of force

11   punishment.

12        Q.    What does the Fourth Amendment say?

13        A.    Search and seizure.

14        Q.    Do you train -- you said you look at

15   federal, state.  Are there federal laws that you

16   teach about use of force?

17        A.    Not when I teach use of force.

18        Q.    What about when JPSO teaches the use of

19   force?

20             MR. ZIBILICH:

21                  Just so you know, this is not the

22             civil rights law deponent.

23             MR. CLARKE:

24                  I'm understand.  I'm asking his use

25             of force thing.  He said --

```
1          MR. ZIBILICH:
2              I heard.  I'm just telling you he is
3          not my civil rights law 30(b)(6) guy.
4          MR. CLARKE:
5              We will have some cop lawyer for
6          that, right.
7          MR. ZIBILICH:
8              Well, you are quizzing him like he
9          was that guy.
10         MR. CLARKE:
11             No.  I'm quizzing him like -- he
12         said he deals with federal, state, and
13         SOP for the use of force.
14         MR. ZIBILICH:
15             I heard.
16         THE WITNESS:
17             What I'm saying about federal,
18         state, local is our SOP on use of force
19         is based off of federal, state, and
20         that's how our SOP is designed.  Our
21         SOP for use of force is based off of
22         federal, state, and then we have our
23         SOP.  So that's what I teach.  I teach
24         what our use of force is based off the
25         SOP.
```

```
 1   BY MR. CLARKE:
 2        Q.    What federal use of force --
 3        A.    I do not know when Jefferson Parish came
 4   up with their -- what they studied in order to come
 5   up with the use of force.
 6        Q.    What do you train? Do you train -- when
 7   you are doing -- like do you know what the Graham
 8   Reasonableness Test is?
 9        A.    We teach the Graham factors in there.
10        Q.    What are the Graham factors?
11        A.    The Graham factors are going to be the --
12        MR. ZIBILICH:
13             This is going to be your one time
14             out.  You can keep going, but you ain't
15             getting nobody else.  You ain't getting
16             two.  If you want to play
17             constitutional law with him --
18        MR. CLARKE:
19             Well, this is his -- I'm not --
20        MR. ZIBILICH:
21             Graham versus Connors is a
22             constitutional law case that you and I
23             are very familiar with.  If you want to
24             go there --
25        MR. CLARKE:
```

1          I'm asking if he trains.  This is
2          law enforcement training that is done.
3          Okay.
4      MR. ZIBILICH:
5          Ask him if he trains.  I'm not going
6          to bitch.
7      MR. CLARKE:
8          That's what I said.
9      MR. ZIBILICH:
10         No, no.  You asked him about Graham
11         versus Connor.
12  BY MR. CLARKE:
13     Q.   Do you train on -- you say you train on
14  the requirements of federal law, correct? Do you
15  train on the reasonable factors from Graham v.
16  Connor?
17     A.   Yes.  That is also -- that is mostly
18  addressed within legal aspects.
19     Q.   What do you train on use of force about
20  Graham v. Connor?
21     A.   The severity of the crime.  Graham
22  factors are the severity of the crime as well as
23  the -- was he actively resisting and little
24  reasonableness.
25     Q.   The severity of crime at issue, the

1    threat of the suspect to officers and citizens and

2    whether he is fleeing?

3        A.    Right.

4        Q.    So you train those things, and those are

5    the three tools that an officer is supposed to

6    evaluate when applying force, correct?

7        A.    Yes.

8        Q.    And that is -- now what do you use from

9    state, from state law?

10       A.    State law is what the state law dictates

11   within what can be used as reasonable force.

12       Q.    Those are Louisiana statutes that --

13       A.    Yes.

14       Q.    -- define the use of deadly force and

15   things like that?

16       A.    Yes.

17       Q.    So those are more statutory based?

18       A.    Yes.

19       Q.    Do you train on -- do you do the same

20   thing when you train on deadly force?  Do you use

21   federal, state, and SOP?

22       A.    Deadly force is -- yes.  The whole use of

23   force is designed -- we base everything off the

24   SOP.  We try to use -- you know, try to understand

25   and make them understand the reasonableness.  The

1     Graham factors are the biggest thing that we talk

2     about.

3          Q.   Do you train on anything pertaining to --

4     and if you need to take a break at any time, let me

5     know.  It's not a --

6          A.   Soon.

7          Q.   Do you want to take a break now?

8          A.   No.

9          Q.   Do you train on the standard of deadly

10    force set forth by Tennessee v. Garner?

11         A.   Yes.  We do discuss Tennessee versus

12    Garner.

13         Q.   What does Tennessee v. Garner stand for?

14         A.   That was basically you cannot shoot an

15    unarmed felon.  A fleeing unarmed felon.

16         Q.   It is basically a defense of life

17    standard.  Defense of your life or somebody else's

18    life, correct?

19         A.   Correct.

20         Q.   And just so you know, in Memphis, if you

21    were a felon, which is a burglary --

22              MR. ZIBILICH:

23                   Tell you what.  If I had $5 for

24                   every time the word "Memphis" came out

25                   of his mouth, which, by the way, I

```
 1            don't care, I'd be rich.
 2       MR. CLARKE:
 3            You'd be rich?
 4       MR. ZIBILICH:
 5            Right, because it's been about 100
 6       times.
 7       MR. CLARKE:
 8            All right.  We'll find your word,
 9       and I'll make sure I put a bet on it
10       when you take my client's deposition.
11  BY MR. CLARKE:
12       Q.   There was a state statute that allowed
13  them to shoot anybody who had committed a felon,
14  felony.
15       MR. ZIBILICH:
16            That's why it is called Tennessee
17       versus Garner, because it came out of
18       Tennessee.
19       MR. CLARKE:
20            Correct.  We fixed it.
21  BY MR. CLARKE:
22       Q.   Anything else on deescalation that you
23  train them other than it depends?
24       A.   I go with it depends on the situation.
25       Q.   Can you tell me what it depends on?
```

1      A.   It depends on how the subject is acting
2  towards us initially.
3      Q.   Isn't deescalation what the actual
4  officer does, not what the suspect does?
5      A.   We are trying to deescalate the suspect's
6  actions.
7      Q.   Do you train them on an appropriate way
8  to go up to a encounter or to approach a citizen?
9      A.   Yes.
10      Q.   You don't go up yelling and screaming and
11  cussing.  That wouldn't be deescalation, correct?
12      A.   Depending on the situation.
13      Q.   Would you agree that if you are screaming
14  at somebody, it doesn't depend on the situation?
15  That's not deescalation?
16      A.   If you just walk up to somebody who is
17  just calm, cool, collected, and you walk up and
18  start cursing them out, that's wrong.
19      Q.   Right. Deescalation is what an officer
20  does to try to calm down the situation so they can
21  handle it better?
22      A.   Correct.
23      Q.   So it starts with the whole way you
24  approach a situation?
25      A.   Yes.

1   Q. It depends on, you know, if you know

2 somebody is autistic or ED, that -- how do you deal

3 with deescalation in that situation?

4   A. From my standpoint, I try to get as much

5 information as possible.  As far as -- you are

6 talking about somebody who is emotionally disturbed

7 or is autistic?

8   Q. Intellectual disability.

9   A. So that's not my purview.  That's not for

10 me.  That is not for me to talk about.

11   Q. So you're not talking with encounters

12 with emotionally disturbed persons?  I thought you

13 were.

14   A. No.  That's going to be --

15   Q. Encounters with persons with disabilities

16 and encounters with emotionally disturbed persons,

17 is that --

18    MR. ZIBILICH:

19     We didn't start there.  We started

20   at deescalation.

21    MR. CLARKE:

22     I understand.

23    MR. ZIBILICH:

24     That was you.  I got somebody for

25   that.

1      MR. CLARKE:

2          So he is not doing encounters with

3      persons with disabilities or encounters

4      with emotionally disturbed persons.  I

5      thought you said --

6  MR. ZIBILICH:

7          He sort of did earlier.

8  MR. CLARKE:

9          I am just asking.  He said he is

10     not.

11 MR. ZIBILICH:

12         Why don't you ask him a question.

13     If he can answer it --

14 MR. CLARKE:

15         He said it's not him.  He just said

16     that.

17 MR. ZIBILICH:

18         Well, that means you can't answer

19     it.

20 THE WITNESS:

21         No.  If we're talking about

22     emotionally disturbed persons in a

23     situation, what situation are we

24     talking about that I teach? So if you

25     give me a situation --

1    BY MR. CLARKE:

2        Q.    What are you trained on -- do you train

3    on how to handle -- and you know -- you've heard of

4    the EDP, right?

5        A.    Uh-huh.

6        Q.    Emotionally disturbed person?

7        A.    Yes.

8        Q.    It's law enforcement nomenclature, right?

9        A.    Uh-huh.

10       Q.    We call them mental consumers.  We call

11   them EDPs.  Okay.  What do you train them on how to

12   handle an encounter with somebody who is an EDP

13   person?

14       A.    By himself or with somebody else?

15       Q.    Let's start by himself, and then you can

16   do it with one officer, two officers, three

17   officers --

18       A.    If he is by himself --

19       Q.    -- five officers and then nine.

20       A.    Fine.  By himself.  What location?  Is

21   there anybody else around?

22       Q.    Westgate Mall.

23       A.    Westgate Mall.  Is he by himself?

24       Q.    He bit his father in the face.

25       A.    Emotionally disturbed person bit his

1    father in his face, so he is showing violence, so I

2    need to protect the father.

3         Q.   How do you protect the father?

4         A.   By doing what I have to do in order to

5    control the subject that is attacking the father.

6    If I can shield the father, then I will.

7         Q.   Can you just ask the father to leave?

8         A.   And if he doesn't?  So this is all

9    dependent.  So if he doesn't.

10        Q.   But you understand the training is

11   supposed to give them a tool to answer the question

12   so they can do their job in conjunction with the

13   policy, right?

14        A.   Correct.

15        Q.   Everything doesn't just depend.

16        A.   It does depend.

17        Q.   So your training -- you just kind of give

18   it to them so they have some kind of knowledge, and

19   they can use it or it depends on whether they use

20   it or not?

21        A.   Yes.  It's a tool.  It's a tool to give

22   them to use if it's called upon.

23        Q.   When do you tell -- what do you tell them

24   when you are dealing with somebody with a

25   disability, and is that your topic?

```
 1        A.    We're talking about disability? That's
 2   not my topic.
 3        Q.    I can go through every one.  I can give
 4   you an IAC --
 5        A.    That's not me for disability.  We're
 6   talking about disability like a guy with no leg?
 7        Q.    Autism.
 8        A.    No.
 9        Q.    Intellectual disability.
10        A.    That's not me.
11        MR. CLARKE:
12             What is my number?
13        MR. ZIBILICH:
14             27.
15   BY MR. CLARKE:
16        Q.    Do you need to take a break?
17        A.    No.  I'm good.
18        THE COURT REPORTER:
19             At 3:00 we will take a break.
20        MR. ZIBILICH:
21             Let me say this much to you.  He is
22          a gentleman, Mr. Pizzolato, but the
23          person I'm most concerned about in this
24          room is the court reporter, so whenever
25          you need --
```

1          THE COURT REPORTER:

2               I said 3:00.

3    BY MR. CLARKE:

4       Q.   You don't provide any training on autism

5    yourself.  This isn't your topic of autism?

6       A.    Correct.

7          MR. ZIBILICH:

8               Franz, you can have that so that

9               whoever you pick can read that next to

10              speed up the deposition.  I don't hide

11              the ball.

12   BY MR. CLARKE:

13      Q.   So we covered deescalation.  Arrests I

14   don't care about.  Use of force.  We covered a

15   little bit about it.  Now, is there any written

16   test with respect to use of force other than the

17   manufacturer's test?

18      A.    It is the POST test.  I mean it is the

19   test -- we have a test that we give them for use of

20   force.

21      Q.   And what is -- explain to me the test.  Is

22   it a written test?

23      A.    It's a computer test with multiple

24   choice.

25      Q.   Are a lot of --

1       A.    True, false.

2       Q.    Are a lot of the answers D, it depends?

3       A.    No.

4             MR. ZIBILICH:

5                   You know, you're funny.

6             MR. CLARKE:

7                   I think I am.  I'm funny to myself.

8   BY MR. CLARKE:

9       Q.    So we have previously marked the testing.

10  There should be a test on use of force.

11      A.    There is a test on use of force.

12      Q.    That will give one -- when you score that

13  test, is it just one right answer on the multiple

14  choices or --

15      A.    Yes.

16      Q.    -- does it depend?

17      A.    Just one right answer.

18      Q.    So in those scenarios and the questions

19  that you ask them in that, it doesn't depend.  They

20  have to give an answer on the particular question?

21      A.    Because that question is specific.

22      Q.    And we'll look at -- I don't have the

23  questions, because we can look at it and figure out

24  what type of questions it depends on or it doesn't

25  depend on.  When people use force, does the JPSO --

```
1    do you train them on what they have to do after
2    they utilize any type of force option under the
3    policy?
4         A.   Yes.
5         Q.   What do you train them they're supposed
6    to do?
7         A.   So if force was used -- are we talking
8    about a fight, use of baton?
9         Q.   Listen, I don't -- I'm trying not to be
10   rude or anything, but what I'm saying is you know
11   what a use of force policy is.  You know what is in
12   it, right?
13        A.   Yes.
14        Q.   When they use force, whatever force is in
15   that policy, what are they supposed to do?  Let's
16   start with your first level of threat.  They show
17   up there.  You don't have to fill out any report or
18   do anything, correct?
19        A.   Correct.
20        Q.   What is the next level of force?
21        A.   Verbal.
22        Q.   Verbal.  Do they have to fill out any
23   forms or reports to identify that that level of
24   force was used?
25        A.   Yes.
```

```
 1        Q.    And how do they do that?

 2        A.    MIC.   Depending on situation.

 3        Q.    MIC?

 4        A.    Yes.   Miscellaneous Incident Card.

 5        Q.    So any time anybody uses from the threat

 6   level of force verbal -- what was the --

 7        A.    Verbal, dialogue.

 8        Q.    They are supposed to write a report?

 9        A.    Majority of the time they're supposed to.

10        Q.    The policy either says you write a report

11   if you use force A, B, C, or D, or it doesn't.

12              MR. ZIBILICH:

13                   I object to the form.

14   BY MR. CLARKE:

15        Q.    Do you understand what a use of force

16   report is?

17        A.    We don't have a use of force report.

18        Q.    You don't use use of force reports?

19        A.    No.   We write a report.

20        Q.    Oh, my God. So how do you -- do you know

21   whether or not they analyze use of force to

22   determine whether or not the officers are acting

23   year to year, month to month, more force, less

24   force?

25              MR. ZIBILICH:
```

```
 1                     Object to vague.
 2             THE WITNESS:
 3                     That's not me.
 4    BY MR. CLARKE:
 5        Q.   You don't use use of force reports?
 6        A.   No.  We don't have -- I understand what
 7    you are asking, but we don't have a use of force
 8    report.
 9        Q.   So you do have requirements that you have
10    to complete certain reports when you use a taser.
11        A.   Correct.
12        Q.   What is that report called?
13        A.   That is what we call a RTF report to
14    follow.
15        Q.   Is it something where you have to fill
16    out -- is it just a narrative, or is it something
17    where you check boxes, time of day, weather, you
18    know, where --
19        A.   All of that.  All of that.  The standard
20    ARMMS Report has all that stuff that we need to
21    fill out.
22        Q.   So it's a form that they have to
23    complete?
24        A.   It is not a form.  It's a complete
25    report.  It is within a computer.  It's a
```

```
 1    computerized report.  It is several pages.
 2         Q.    And they go through different questions
 3    they have to answer; is that correct?
 4         A.    Yes.  Fill in certain information, yes.
 5         Q.    What is that called?
 6         A.    ARMMS, A-R-M-M-S.  It's our standard
 7    report.
 8         Q.    Is that used for all levels of force?
 9         A.    For -- not all levels.
10         Q.    I mean, the report of a level.
11         A.    Yes.
12         Q.    I'm going to mark as Exhibit 28 what I'd
13    like to have produced as a lay file exhibit, just a
14    template of the ARMMS Report.  You can print that
15    off a computer, right?
16         A.    If I can get a blank one.
17         Q.    I mean, you can --
18         A.    No.  We can't get a blank one.  No.  We
19    cannot get a blank report.
20         Q.    Can I get a redacted one?
21              MR. ZIBILICH:
22                   This is what you are going to have
23                   to do.  You are going to have to send
24                   me a discovery device so you and I
25                   don't --
```

```
1           MR. CLARKE:
2                I've already asked for this in
3           discovery.
4           MR. ZIBILICH:
5                You are going to have to show me
6           which discovery device that is.
7           MR. CLARKE:
8                I'm going to do it this way.  I'm
9           going to ask you to produce it, and I'm
10          going to make it a lay file.
11          MR. ZIBILICH:
12               I don't know what it is technically
13          you are asking me to produce.
14          MR. CLARKE:
15               It is called a lay file, an ARMMS
16          Report.  You can -- if there is one
17          that you use, you can redact it.  I
18          just want to see what the questions
19          are.  You understand what I'm saying?
20          THE WITNESS:
21               Uh-huh.
22          MR. CLARKE:
23               Template, redacted or original.  Is
24          that sufficient enough?
25 BY MR. CLARKE:
```

1      Q.   Okay.  What type of things does the ARMMS

2  Report cover? Does it make the officer identify the

3  circumstances in which the application of force was

4  used?

5      A.   Yes.

6      Q.   Does it ask for certain data points, you

7  know, when it was used, how many times it was used?

8      A.   The majority of that is put within the

9  narrative of the report.

10     Q.   In the narrative of the report?

11     A.   Yes.

12     Q.   So the ARMMS Report has a narrative and

13  some things that they have to check off to

14  complete?

15     A.   Check off boxes and -- yes.  Check off

16  boxes within the report and then, of course, the

17  narrative is the entire event that took place,

18  according to the officer.

19     Q.   Well, if an officer punched somebody,

20  would they have to fill out an ARMMS Report?

21     A.   Yes.

22     Q.   So if Deputy Pitfield struck somebody,

23  even if it was defensive, he would have to fill out

24  an ARMMS Report?

25     A.   Yes.

1      Q.    What if somebody used force by holding
2  somebody down on the ground while trying to
3  handcuff him?  Would they have to --
4      A.    Yes.
5      Q.    And what level of force would that be?
6      A.    What level?  At that particular moment,
7  it would just be the hands, the personal weaponry.
8      Q.    Personal weaponry which includes
9  intermediate weapons and hands?
10      A.    No.   Intermediate weapons are actually
11  your baton, pepper spray, taser.   Hands is --
12      Q.    So there is a separate hands-on?
13      A.    Yes.
14      Q.    That's what I thought.
15      A.    Defensive tac -- unarmed.
16      Q.    Y'all trying to jam me. But if you
17  restrain somebody -- like in the Parsa case, with
18  an incident where somebody dies, and there was
19  restraint used, would all of the deputies have to
20  fill -- who were involved in that have to fill out
21  an ARMMS Report?
22      A.    No.
23      Q.    Just the people who actually had -- you
24  know, what is the deciding point?
25      A.    If I'm correct, in this instance, the

1    detective bureau is the ones that is going to

2    conduct that particular report.  We're going to

3    provide the statements to the detective bureau.  If

4    the detective bureau or the rank decide to say,

5    hey, we need you to go ahead and do the initial

6    report, then we do the initial report.

7          Q.   So it's kind of a modified just regular

8    incident report?

9          A.   Correct.

10         Q.   And it's not the same actual form that

11   you would do -- you know, I went down here, and I

12   arrested Joe Blow.  It's a separate -- it's a

13   different form?

14         A.   Which one, sir?

15         Q.   I'm trying to figure out.  So if you have

16   a normal arrest, and you go there.  It's a theft.

17   You go there.  You arrest them.  You put it in.  You

18   have to fill out a report.

19         A.   Yes, sir.

20         Q.   Is that an ARMMS Report?

21         A.   Yes.

22         Q.   So the ARMMS Report is not something

23   separate that deals with use of force.  It's

24   something that you train them all uses of force

25   should be put in the ARMMS Report?

```
 1        A.    Yes.
 2              MR. ZIBILICH:
 3                   You want me to save you 15 minutes?
 4              MR. CLARKE:
 5                   Sure.
 6              MR. ZIBILICH:
 7                   It's a regular police report.
 8              MR. CLARKE:
 9                   Okay.  That's what -- he said ARMMS
10         Report.
11              THE WITNESS:
12                   ARMMS is just the name.  ARMMS is
13         the name.
14              MR. ZIBILICH:
15                   See, you got that.  You can get rid
16         of Number 28.
17              MR. CLARKE:
18                   I'll ask another question on
19         whatever 28 is.
20              MR. ZIBILICH:
21                   I'm just trying to -- I know your
22         son wants a big dinner tonight.  I want
23         to make sure you get there on time.
24              MR. CLARKE:
25                   He got lunch.  He gets one meal from
```

```
 1              daddy.  He has to work for the next
 2              meal.  He showed up late.
 3                   {BRIEF RECESS, 2:50-3:01}
 4   BY MR. CLARKE:
 5        Q.    Sergeant Pizzolato, we want to kind of
 6   finish up some of the topics here, and then we're
 7   going to try to see if we can utilize you as the
 8   policy guy.  Do you train people on the use of
 9   martial arts holds?
10        A.    Defensive tactics has martial arts holds
11   in it, so, yes.
12        Q.    Are you allowed to use any martial arts
13   holds around the head or neck area?
14        A.    Not the neck.
15        Q.    How about the head?
16        A.    Yes.
17        Q.    I thought we already covered this, and
18   there was nothing with the head.
19        A.    No.  You said neck.  The head is for
20   control.
21        Q.    What is the name of the hold that they're
22   allowed to use on somebody's head?
23        A.    So it's not a name.  It's more like if we
24   can control the head.  I'll also use pressure
25   points from PPCT.
```

```
 1        Q.    I don't need to know PPCT.    What I'm
 2   talking about is head holds.
 3        A.    Head holds.    Just if we can control the
 4   head, we'll hold the head.
 5        Q.    How?
 6        A.    Hold it.    Just like this.
 7        Q.    So in order to --
 8        A.    If I was holding your head, I was going
 9   to hold your head.
10        Q.    You train not to put -- one hand on one
11   ear and one hand on the other ear and hold it
12   straight?
13        A.    Try to hold it, yes.    Try to control the
14   head.
15        Q.    Do you tell them that if you're dealing
16   with a head hold, make sure you don't slip down and
17   get on the neck?
18        A.    Correct.
19        Q.    You don't just prohibit head holds?
20        A.    No.    We don't prohibit head holds.
21        Q.    You prohibit chokeholds?
22        A.    Yes.
23        Q.    Do you provide training on providing
24   medical attention or summoning medical attention?
25        A.    Yes.
```

1      Q.   And I think we touched on this some.   If
2  you train the officers if they suspect somebody who
3  is exhibiting the symptoms of excited delirium,
4  which are whatever is put in that training stuff,
5  that they should try, if possible, to summon
6  medical before they go into the encounter?
7      A.   Yes.
8      Q.   What if you received a call that said I'm
9  dealing with somebody who is autistic.   Well, yeah,
10 that's not your topic, right?
11     A.   Correct.
12     Q.   Not at all. All right. But you agree that
13 an autistic kid can have the signs and symptoms of
14 ED?
15     A.   Yes.
16     Q.   If they have the signs and symptoms of
17 ED, aren't they also already supposed to -- you
18 know, because they can't confirm it, they have to
19 act like it's ED?
20     A.   Yes.   I mean, they have to act on what
21 they observe.
22     Q.   So if somebody was striking their head,
23 that could be a sign of ED, right?
24     A.   Possible.
25     Q.   If somebody pulls up to a scene, and they

1    have enough time to get out of their car and walk

2    at a leisurely pace, not at a fast pace, they have

3    time to call EMS, right?

4        A.   Correct.

5        Q.   What do you train them about providing

6    medical attention?  Are they all Red Cross, CPR?

7        A.   Yes.  We're certified with CPR, Narcan,

8    and tourniquets.

9        Q.   What did you say the last --

10       A.   CPR, Narcan, and tourniquets.

11       Q.   Oh, tourniquets.  You don't use Ketamine?

12       A.   No, sir.

13       Q.   Under what circumstances are they

14   required to summon -- are they trained that they

15   are required to summon medical attention?

16       A.   Numerous instances where they can -- they

17   could call medical.

18       Q.   I mean, that's just -- that is really

19   kind of discretionary, correct?

20       A.   Yes, sir.

21       Q.   Somebody can ask for medical and --

22       A.   And we have to -- we'll call them.

23       Q.   I know there is probably training on

24   involuntary commitments and all that type of thing.

25       A.   Correct.

1    Q.   In circumstances like that, what do you
2    -- is there a term for that type of OPC?   What is
3    it?
4    A.   So we have an OPC.   We also have an
5    emergency committal.
6    Q.   What is the difference between those two?
7    A.   The OPC comes directly from the coroner's
8    office saying that we have to take this person.   We
9    have to put them in custody and take them to the
10   hospital that has been chosen.   The emergency
11   committals, when we arrive on scene, and we go
12   through -- we get whatever information, if a danger
13   to self, danger to others, gravely disabled, then
14   we can go ahead and execute an emergency committal.
15   The law enforcement can go ahead and do emergency
16   committal on that person.
17   Q.   Do you train people -- is that something
18   that -- Jefferson Parish has a CIT program?
19   A.   Correct.
20   Q.   Do you know what it's based on?
21   A.   Do I know what it's based on?
22   Q.   Yeah.
23   A.   It's based on a litany of things.   On the
24   instructors that teach it.   It covers a lot.
25   MR. CLARKE:

```
 1                    Franz, this is for you.  I'm going
 2              to say Memphis.
 3   BY MR. CLARKE:
 4       Q.   Do you know that even your policies
 5   indicate that they follow the Memphis model on CIT?
 6       A.   I do not know.
 7       Q.   That's where I got my first hog-tie case.
 8            MR. ZIBILICH:
 9                 Is Memphis in the Eighth Circuit?
10            MR. CLARKE:
11                 Nope, Sixth.
12            MR. ZIBILICH:
13                 Sixth.  Okay.
14   BY MR. CLARKE:
15       Q.   When you have -- I think the first term
16   you used was OPC.  That's like where there has
17   already been a determination that somebody is a
18   danger to themself or something that you have a
19   directive from, I think you said, the coroner's
20   office?
21       A.   Coroner's office.
22       Q.   And that is basically almost like serving
23   a warrant?
24       A.   Yes.  A seizure.  A seizure of that
25   person.
```

1      Q.   It's an order to go get that guy and
2  bring them to wherever the order tells you?
3      A.   Correct.
4      Q.   When you have that, do you train them --
5  is that something that CIT officers are only
6  allowed to do?
7      A.   No.
8      Q.   Would you agree that if you are actually
9  dealing with somebody who has an order of
10 commitment, that they are a danger to themselves or
11 others, that that's a high-risk execution of a
12  --
13     A.   Depends.
14     Q.   Well, in a normal case, if you show up to
15 the mall, you don't have an actual signed document
16 from a coroner saying this person is a danger to
17 themself or others.
18     A.   Correct.
19     Q.   So would you not anticipate, as a
20 trainer, that those type of calls will need people
21 who are very up to speed on how to handle those
22 type of potential violent encounters?
23     A.   Yes.
24     Q.   How does somebody get served?  How does
25 OPC -- I don't know what they are called.  Orders

1     --

2         A.   Order of Protective Custody.

3         Q.   OPC order, how does it get divvied out to

4     the -- you know, who serves them? Just whoever

5     comes up on call?

6         A.   The supervisor will determine who is

7     going to go to that call.

8         Q.   Would you agree that on that type of

9     call, you need somebody who is very well understood

10    with the RIPP Hobble and the prone restraint and

11    the things that are trained by Bill DeVane?

12        A.   Sure.

13        Q.   And should have a RIPP Hobble if you are

14    going to that, right?

15        A.   Sure.

16        Q.   What we're going to try to do is go over

17    the policies.  If you will look at -- let's first

18    go over --

19        MR. ZIBILICH:

20           Do you have the Notice of Deposition

21         in front of you?

22        THE WITNESS:

23          This one?

24        MR. ZIBILICH:

25          Number 2.  It's Number 1.

1          MR. CLARKE:

2              Code of Conduct.  It's this one.

3      MR. ZIBILICH:

4              You want something different then.

5          You don't want the 30(b)(6).  You got

6          the Code of Conduct up here?

7      MR. CLARKE:

8              It's right in front of him.  I think

9          he's got his hands on it.  Look down.

10     THE WITNESS:

11             No.  This one?

12     MR. ZIBILICH:

13             Yes.

14     MR. CLARKE:

15             There should be three separate

16         documents we're going to try to go

17         through.  One is the Code of Conduct.

18         One is the jail policies, and one is

19         the SOPs.

20     MR. ZIBILICH:

21             Not that I care, but why do you care

22         about the jail policies?

23     MR. CLARKE:

24             Because it has an in-custody death

25         policy, and it's the same department.

```
 1            MR. ZIBILICH:

 2                 Right.

 3            MR. CLARKE:

 4                 I mean, that's how you define it.

 5                 That's not how law enforcement defines

 6                 it.  We'll do that.  Okay.

 7   BY MR. CLARKE:

 8        Q.   So the first one, can you tell me what

 9   exhibit number it is on the front?

10        A.   18.

11        Q.   18.  And this is what we call the Code of

12   Conduct, correct?

13        A.   Yes.

14        Q.   These are policies that all deputies are

15   required to know.  We may not be having any

16   depositions tomorrow.  That all deputies and

17   reserves must comply with, correct?

18        A.   Correct.

19        Q.   I'm just going to kind of go through

20   them.  Article 1 talks about compliance is

21   required, correct?

22        A.   Compliance with them is required, yes.

23        Q.   It's not optional.  It doesn't depend.

24        A.   "These rules shall govern the Jefferson

25   Parish Sheriff's Office and compliance with them is
```

1   required," correct.

2       Q.   Look at Article 9.  The word "shall" is

3   mandatory. It is undependable, correct?

4       A.   Correct.

5       Q.   Article 5.  I think we covered this.  It

6   says that a member is deemed to have knowledge of

7   the rules and required to sign a Code of Conduct

8   and Standard Operating Procedure Acknowledgment.

9       A.   Correct.

10      Q.   We talked about that some before. Deeming

11  somebody having knowledge of a rule doesn't mean

12  that they have knowledge of a rule.  Would you

13  agree?

14      A.   Yes.

15      Q.   What they're basically saying is you are

16  responsible for this, correct?

17      A.   Yes.

18      Q.   What does JPSO do to make sure that they

19  have people who are knowledgeable about the rules?

20  Written test?

21      A.   We don't have a test on SOP.

22      Q.   Anything else?

23      A.   No, sir.

24      Q.   So you are just accepting the signature

25  that that officer has read it and understands it?

1        A.    Correct.

2        Q.    Article 8 deals with deviations from the

3   rules.  You see that?

4        A.    Yes, sir.

5        Q.    No procedure or instructions shall be

6   issued which conflict with the provision of these

7   rules, correct?

8        A.    Correct.

9        Q.    So your training -- your training, any

10  instruction, any order, to anybody at the JPSO,

11  must be in compliance with those rules, correct?

12       A.    Correct.

13       Q.    However, the sheriff has the right to

14  temporarily suspend the rules and do what he wants,

15  correct?

16       A.    Yes, sir.

17       Q.    Again, Article 9, the word "shall" is

18  mandatory, right?

19       A.    Correct.

20       Q.    Article 12 is entitled Related Rules,

21  that you are supposed to try to interpret all of

22  these rules in conjunction with each other so none

23  are made obsolete by interpretation of another

24  rule, correct?

25       A.    Correct.

1    Q.   Definitions in Chapter B deals with
2  instruction which talks about any issue, command,
3  or method of performance that that's what is
4  prohibited, and instruction can't be outside of the
5  SOPs?
6    A.   Correct.
7    Q.   Infraction is -- that's okay.  Then we
8  have a chapter on disciplinary action.  It says an
9  infraction of the rules, regulations, directives,
10  or orders shall subject a member to disciplinary
11  action.  That means it's mandatory, correct?
12    A.   Correct.
13    Q.   So if the rule is to wear a Class B
14  uniform, and they don't have the Class B uniform
15  on, according to this policy, they have to be
16  subject to disciplinary action?
17    A.   If they are told to wear a Class B, they
18  wear a Class B.
19    Q.   If they don't, it's not just that.  It's
20  saying it shall subject the member to discipline.
21    A.   Uh-huh.
22    Q.   Correct?
23    A.   Correct.
24    Q.   So you understand what a custom is as
25  opposed to a policy?

1        A.    Correct.

2        Q.    So we can't have customs.  That defeats

3    customs, correct?

4        A.    Correct.

5        Q.    Article 19 deals with everybody has to

6    report any infraction of another officer, correct?

7        A.    Uh-huh.  Yes.

8        Q.    Now, when you train, is that -- have you

9    ever heard of the Code of Silence?

10       A.    That means you are shutting up.

11       Q.    Don't rat -- cops don't rat on other --

12       A.    Yeah.

13       Q.    There is a Code of Silence with

14   everybody, but you understand it with respect to

15   law enforcement, correct?

16       A.    Uh-huh.

17       Q.    You need to say yes or no.

18       A.    Yes.

19       Q.    According to this, anybody who observes

20   any violation is mandatorily required to report it

21   to -- who do they report it to?

22       A.    Supervisors.

23       Q.    Do they do it verbally or in writing?

24       A.    Either.

25       Q.    How do you keep track of verbal?  You

1 understand what institutional memory is?

2   A. Yes.

3   Q. Verbal things cannot be doc -- you know

4 --

5   A. So if somebody tells a supervisor, and

6 the supervisor tells him to document it, then he'll

7 document it.

8   Q. So supervisor -- you know, you could have

9 one bad supervisor who gets a hundred complaints,

10 and they say don't document it to the people who

11 are making the complaint, and nobody would know

12 about it in the command staff, right?

13   A. If a supervisor is being complained on?

14   Q. Yeah.  Let's say -- you said that you

15 report an infraction to your supervisor, and the

16 supervisor will tell you whether you write

17 something or not.

18   A. Yes, sir.

19   Q. Let's assume you have a supervisor in a

20 hypothetical department who is somebody who agrees

21 with the Code of Silence, and he tells everybody

22 who reports a complaint to him don't write it down.

23 The command staff would never get wind of that,

24 correct?

25   A. Not unless that deputy goes above that

1    supervisor's head.

2        Q.   Which is outside of the chain of command.

3    He is not supposed to, correct?  That is how you

4    get ratted out, right? You've seen Serpico.

5        A.   No.  Actually, it is too old of a movie

6    for me to see.

7        Q.   You might have been a baby when that came

8    out.

9            MR. ZIBILICH:

10               Seen it a million times.

11   BY MR. CLARKE:

12       Q.   So this makes everybody duty bound to

13   report any violation of the policy?

14       A.   Yes.

15       Q.   No matter how minor.  There is no

16   distinction.  Ain't no depends in these policies,

17   right?

18       A.   No, sir.

19       Q.   Alleged, suspected, or observed

20   violations of statutes by a member shall be

21   reported to the sheriff through the proper

22   channels.  Does that mean that a supervisor must

23   report it to the sheriff?

24       A.   Yes.

25       Q.   Do you know that that is what happened?

1        A.     Should go to the supervisor and the

2   supervisor above that supervisor and so forth and

3   so on.  So the steps of that ladder.

4        Q.     But these are shalls in these things.

5        A.     Correct.

6        Q.     The people have to do it?

7        A.     Yes.

8        Q.     And you testified that they report it to

9   them, and the supervisor says whether you write a

10  report or not, correct?

11       A.     Yes.

12       Q.     That supervisor actually has to report

13  that complaint to the sheriff?

14       A.     According to this, yes.

15       MR. ZIBILICH:

16              It doesn't say that.  Read it again.

17       MR. CLARKE:

18              Alleged, suspected, or observed

19          violations of statutes, ordinance, or

20          department rules, regulations, or

21          orders by a member of this department

22          shall be reported to the sheriff.

23       MR. ZIBILICH:

24              Through the channels.

25       MR. CLARKE:

```
 1                    Right.
 2          MR. ZIBILICH:
 3                    It doesn't say report it to the
 4             sheriff.
 5          MR. CLARKE:
 6                    It does say report it to the sheriff
 7             through the chain of command.
 8  BY MR. CLARKE:
 9          Q.   Is that what --
10          A.   Through the proper channels.
11          Q.   What are the proper channels?
12          A.   So deputy to sergeant, sergeant to
13  lieutenant, so forth and so on.
14          Q.   So depending on where you start at, it's
15  going up and up until it gets to the sheriff?
16          A.   Correct.
17          Q.   So according to this policy, because it
18  has a shall in it, he is supposed to get every
19  complaint, right?
20          A.   Correct.
21          Q.   Do you know if he does?
22          A.   No.
23          Q.   Investigation.  Once a sheriff receives
24  notice of that, do you know -- and this is where
25  this might get into IA.  You tell me if you can or
```

```
 1   can't answer this.  Do you know how the process
 2   goes through if a complaint is made?
 3        A.   No.
 4             MR. CLARKE:
 5                  So that will be, Franz, if you are
 6             writing your little thing down.
 7             MR. ZIBILICH:
 8                  I am.
 9             MR. CLARKE:
10                  That will be covered on IA.
11   BY MR. CLARKE:
12        Q.   Do you know anything about how IA works
13   at all?
14        A.   No.
15        Q.   Have you ever had an IA complaint against
16   you?
17        A.   Yes.
18        Q.   What was it for?
19        A.   A narcotics warrant that we did.  The
20   subject stated that I struck him, and I did not.
21   It was not sustained.
22        Q.   So it was an excessive force complaint?
23        A.   Yes.
24        Q.   And it was investigated and found to be
25   unfounded?
```

```
1        A.    Correct.
2              MR. CLARKE:
3                   So we're going to take IA policies
4              off this and cover that with somebody
5              else.
6              MR. ZIBILICH:
7                   We are going to go over the list one
8              more time.
9    BY MR. CLARKE:
10       Q.    Go through the policies, talk about
11   investigations and disciplinary actions.  You have
12   progressive discipline, correct?
13       A.    Correct.
14       Q.    Standard of Conduct, Title II.  Is this
15   kind of like Article 25, the Law Enforcement Code
16   of Ethics?
17       A.    Yes.
18       Q.    That's basically all -- deputies must
19   keep both their personal and private --
20   professional and personal life in such a manner as
21   to not bring discredit to the sheriff's department,
22   correct?
23       A.    Yes.
24       Q.    What is moral turpitude?
25       A.    Have morals, decent morals.
```

1     Q.   Members shall not participate in any

2  incident involving moral turpitude which impairs

3  their ability to perform as members of the office.

4     A.   We say don't tarnish the badge.

5     Q.   That is both in personal and professional

6  life, correct?

7     A.   Correct.

8     Q.   If somebody was involved in payroll

9  fraud, that would be something that would give

10  disrespect to the department, correct?

11     A.   Yes.

12     Q.   It talks about all officers have to obey

13  by all laws.  Article 27.  If you are convicted of

14  it, that's -- the policy says that's a prima facie

15  violation of the rule, correct?

16     A.   Correct.

17     Q.   But even if you are not convicted, it

18  doesn't say you cannot be disciplined?

19     A.   Correct.

20     Q.   Officers are all required to act in a

21  courteous manner to members of the public and not

22  use violent, vulgar, discourteous language, or

23  gestures, correct?

24     A.   Correct.

25     Q.   Article 29.  Officers have to answer

1    everything from the superior officer truthfully and

2    have to answer all questions when questioned

3    concerning the scope of their employment, correct?

4         A.    Correct.

5         Q.    You understand what Garrity warnings are?

6         A.    Yes.

7         Q.    So even if somebody is doing an

8    investigation on something, they can be compelled

9    to speak, and it can't be used against them

10   criminally, correct?

11        A.    Yes, sir.

12        Q.    If you don't respond to those questions,

13   you can be disciplined, correct?

14        A.    Yes.

15        Q.    There is a whole bunch of statements,

16   policies with respect to other than -- other than

17   people who are designated by the sheriff to speak

18   about the sheriff's department, people should not

19   be out there criticizing while they work for the

20   sheriff's department, correct?

21        A.    Yes.

22        Q.    Can't use their names or images or the

23   Jefferson Parish in any type of appearances, things

24   like that, right?

25        A.    Correct.

1      Q.   Can't use -- go on.  Article 35 which is

2 called Intimidation.  Members of the department

3 shall only use reasonable force.  That's confirmed

4 by the SOPs as well, correct?

5      A.   Yes.

6      Q.   Are these articles that are used in this

7 Code of Conduct, are these the type of things that

8 are looked at or an officer can be charged with?

9 That's Internal Affairs, right?

10     A.   Yes, Internal Affairs.

11     Q.   Article 48.  A member shall not consume

12 alcoholic beverages except in proper performance of

13 a duty.  When do officers need to drink alcohol to

14 perform their duties?

15         MR. ZIBILICH:

16              When looking at you.

17 BY MR. CLARKE:

18     Q.   That may be true, but what does that

19 mean?

20     A.   Undercover officers, when they may have

21 to consume alcohol.

22     Q.   They prohibit the use of steroids,

23 correct?

24     A.   Yes.

25     Q.   Go to Chapter 3, Official Obligations.

1   Again, Article 55 requires them to know all the

2   laws, ordinances, and standards and act

3   accordingly, correct?

4        A.   Yes.

5        Q.   They are required to comply with orders

6   from a superior under Article 56 unless they know

7   they require them to commit an illegal act,

8   correct?

9        A.   Yes.

10       Q.   Article 57 talks about unsatisfactory

11  performance.  Unsatisfactory performance may be

12  demonstrated by, and it lists a number of things.

13  Lack of knowledge of the law, failure to conform to

14  work standards.  Do you know what Jefferson Parish

15  does to determine whether people have a proper

16  understanding of the laws or confirm with work

17  standards?  Is that just the general first line

18  supervisor?

19       A.   Yes, sir.

20       Q.   Whatever tests they have -- do they have

21  tests on inservice?

22       A.   That depends on the block of instruction.

23  So there are several blocks of instruction that we

24  do for inservice.  Some of them may require a test,

25  some of them may not.

1    Q.    The test is required by somebody else,
2  not Jefferson Parish?
3    A.    It could be whoever is running that block
4  of instruction.  For example, CPR.  There is a test
5  that is required, but that's required by --
6    Q.    American Red Cross.
7    A.    Exactly.
8    Q.    That's what I am saying.
9    A.    Yes, sir.
10   Q.    JPSO doesn't require --
11   A.    No.  We do not require any test.
12   Q.    Once you are on, you are done with the
13 testing except for outside vendors or outside
14 trainers?
15   A.    Yes.
16   Q.    Public assignments.  We have covered
17 those.  When you're on public assignment, all of
18 the rules apply, correct?
19   A.    Yes, sir.
20   Q.    Article 62 seems to deal with if a person
21 makes a complaint and agrees to a polygraph, the
22 officer must submit to a polygraph.  Is That
23 correct?
24   A.    Shall not be required to submit to a
25 polygraph unless the citizen is a suitable subject

```
 1   for polygraph --
 2            THE COURT REPORTER:
 3                 I can't hear you.
 4            THE WITNESS:
 5                 I'm just reading the paragraph.
 6            "Whenever a complaint from a citizen is
 7            the basis for the investigation, the
 8            matter is non-criminal and no
 9            corroborating information has been
10            discovered, members shall not be
11            required to submit to a polygraph
12            examination unless the citizen is a
13            suitable subject for polygraphing and
14            first submits to a polygraph
15            examination which is specifically
16            directed and narrowly related to the
17            complaint, and such examination
18            corroborates the allegation."
19   BY MR. CLARKE:
20       Q.   So if somebody makes a complaint against
21   an officer, before they're going to make the
22   officer do anything, they are going to make the
23   citizen come in and pass a polygraph performed by
24   JPSO?
25            MR. ZIBILICH:
```

1          Only if it's uncorroborated.  You
2          got to read the whole thing.
3  BY MR. CLARKE:
4     Q.   Chapter C, Individual Obligations.  It
5  says Equipment to be Carried.  What equipment is
6  required to be carried?
7     A.   "A member shall have on his person at all
8  times while within the Parish limits his printed
9  credentials and a firearm authorized by the
10  department except when engaged in recreation of a
11  nature such that the carrying of credentials or a
12  firearm would be impractical, dangerous or its
13  presence would be revealed."
14    Q.   What does that mean?  Does that mean they
15  don't have to have their OC spray, the RIPP Hobble,
16  their taser?
17    A.   According to what this says.
18    Q.   That's terrible, isn't it?  If you have
19  somebody just showing up with a gun, right? You are
20  in training, right?
21    A.   Yes.
22    Q.   You understand that you're trying to
23  train people so they don't have to shoot people?
24    A.   Correct.
25    Q.   If the policy is you only had to come

```
 1   with your gun, you're taking away all the training
 2   you are providing them to provide them with the
 3   tools to facilitate an incident in a manner that
 4   doesn't have to resort to deadly force, correct?
 5        A.   Correct.
 6        Q.   Would you agree that that is a terrible
 7   policy?
 8        A.   If they're in their duty, I can't go
 9   beyond that, so.
10        Q.   All right.  Use of Weapons.  You have to
11   use the weapon that you have in accordance with the
12   law and the policy.  Would that be also in
13   accordance with the training?
14        A.   Yes.
15        Q.   And this policy, why it says -- while we
16   talked some about taser and use of force reports
17   that are put in an incident report, the only --
18   according to this, a firearm has to be -- has to be
19   submitted with a written report regarding the
20   incident.
21        A.   Firearm, yes, and that's in this policy,
22   yes.
23        Q.   Article 91.  Again, with respect to any
24   equipment provided by the sheriff's office, it may
25   only be used for the purpose of what you have
```

```
 1   intended, and you can't alter or use it in any
 2   different manner, correct?
 3        A.   Correct.
 4        Q.   You couldn't use the TARP or RIPP Hobble
 5   to put around somebody's neck?
 6        A.   No.
 7        Q.   Unless it was a deadly force situation,
 8   but that policy doesn't say that, does it?
 9        A.   No.
10        Q.   Let's go to the JPSO policies, SOPs.
11   We're going to start out with --
12             MR. ZIBILICH:
13                  For whatever it's worth, I'll
14               stipulate that they say what they say.
15        MR. CLARKE:
16                  Nope.
17        MR. ZIBILICH:
18                  I tried.
19        MR. CLARKE:
20                  I just want everybody to say it out
21               loud.  The first policy I'm looking at
22               is SOP-2, uniform policy for Jefferson
23               Parish.
24        MR. ZIBILICH:
25                  What's the number?
```

1          MR. CLARKE:

2               I don't know.  What is the number on

3          the SOPs.

4          THE WITNESS:

5               This is 19.  The SOP is 19.

6    BY MR. CLARKE:

7          Q.  Go to Section 18, Roman numeral 18, Duty

8    Belt And Associated Tools.  This actually indicates

9    what they have to have on their duty belt, correct?

10         A.  Yes.

11         Q.  And it has limitations on how many sets

12   of handcuffs they can have, correct?

13         A.  Yes.

14         Q.  The sheriff makes deputies buy handcuffs?

15         A.  Yes.

16         Q.  What other things does the sheriff make

17   -- that would be on your duty belt that the sheriff

18   make officers buy?

19         A.  Flashlight.

20         Q.  How about OC spray?

21         A.  No.  We provide that.

22         Q.  Taser?

23         A.  We provide.

24         Q.  RIPP Hobble?

25         A.  We provide.

1    Q.    Radio?

2    A.    We provide.

3    Q.    The prohibition against using zap gloves.

4  What is a zap glove?

5    A.    That's a glove with lead in it.

6    Q.    Is there an issue with people wearing zap

7  gloves before that it had to be prohibited?

8    A.    Not since my time.

9    Q.    Do you even know anybody who had a zap

10  glove?

11    A.    No, sir.

12    MR. CLARKE:

13         Do you know what a zap glove is?

14    MR. ZIBILICH:

15         First cousin to a brass knuckle.

16    MR. CLARKE:

17         Okay.

18  BY MR. CLARKE:

19    Q.    Fairly specific prohibition, but if you

20  go to SOP-5, this is an actual policy dealing with,

21  I guess, the Civil Court Order stuff.  Is that

22  correct?

23    A.    Civil Court Order Policy for the

24  Jefferson Parish Sheriff's Office.

25    Q.    For example, in this one, a field deputy

1    responding to a -- what is a signal 21/Civil?

2        A.    It's a civil matter.   A miscellaneous

3    complaint.   It's a civil matter.

4        Q.    So that is if -- why would a deputy be

5    called to a civil matter?

6        A.    Why would they?

7        Q.    Yeah.

8        A.    Because if headquarters receives a call,

9    and the complainant, whoever called, provides

10   information, and they say I want to see the police.

11   I want the police here.   Then headquarters is

12   required to send the police.   When we get on site,

13   then we can determine right then and there if it is

14   a 21/Civil.

15       Q.    The policy then talks about -- we talked

16   about some of the civil court orders that are

17   provided by the coroner.   This policy actually sets

18   forth that you have to approach those things in a

19   different manner, correct?

20       A.    The civil or the OPC?

21       Q.    Look at Page 2 of that policy under

22   Procedure.   You see the section on --

23       A.    Yes, sir.

24       Q.    Is that the OPC?

25       A.    No.   That's protective court orders.

1    Protective orders, obstruction of court orders.

2    It's not OPC related.

3        Q.    Those are separate orders?

4        A.    Yes, sir.

5        Q.    And it has an actual procedure by which

6    you deal with those, and it makes a point that

7    there should be a careful approach to try to

8    resolve the matter without any physical arrest,

9    correct?

10       A.    Yes.

11       Q.    And it has kind of a list in order of

12   escalation and how they're supposed to attempt to

13   serve obstruction of court orders or violation of

14   protective orders, correct?

15       A.    Yes, sir.

16       Q.    SOP-6.  This deals with communication,

17   phone, and e-mail notification, and it has a list

18   of terms and definitions.  What is a major

19   incident?

20       A.    Hurricanes is a major incident.

21       Q.    Well, it's in the policy.  There is no

22   trick.  There is a definition.

23       A.    "Any incident, crime, or event that will

24   impact the parish as a whole will require a

25   response beyond routine operations and includes

1    specific incidents listed in this policy.".

2        Q.    Is the Parsa event a major incident?

3        A.    I would consider that a major incident.

4        Q.    So if there is a major incident, like the

5    Parsa thing, there is a list of people in Procedure

6    3-A, A through I, which are the people that are

7    supposed to be notified, correct?

8        A.    Yes, sir.

9        Q.    The next policy is SOP-8.  We went over

10   this, but these policies -- you know, we went

11   really more over the retraining portion of the

12   policy.  Let's look at the beginning of the policy.

13   And what this appears to be, and you correct me if

14   -- you tell me if I'm right or wrong, is this is a

15   list of the department authorized tools.

16       A.    Let me find SOP-8.  It's scattered around

17   with all of this stuff.

18       Q.    Here is one, if you want to eyeball it.

19       A.    Thank you.  Okay.

20       Q.    If you look at it, it looks like it's a

21   list of the different type of force options or

22   tools that they have in the first section of the

23   policy, Section 1.

24       A.    Yes, sir.

25       Q.    And the policy says that you can only use

1    these particular things, OC spray, once you've been

2    certified, correct?

3        A.    Correct.

4        Q.    And the policy says a deputy may employ

5    OC pepper spray in any situation where that degree

6    of force is justified. When is OC force justified?

7    OC spray force justified.

8        A.    Justified for resisting arrest, justified

9    for protection, protection of that deputy.

10        Q.    What are the procedures that have to be

11    followed when OC spray is used?

12        A.    Once OC is deployed, Rule Number 1, or

13    one of -- the very first thing you should do is get

14    the subject out of the contaminated area.

15    Immediately call EMS and start the decontamination

16    process.

17        Q.    Washing them down?

18        A.    Yes, sir.

19        Q.    Would you rather be pepper sprayed or

20    tasered?

21        A.    Taser me every single day.

22        Q.    I never had a cop that didn't.

23        A.    Every single day.

24        MR. ZIBILICH:

25            We could do you.

```
 1              MR. CLARKE:

 2                   What?

 3              MR. ZIBILICH:

 4                   We can do you.

 5              MR. CLARKE:

 6                   I don't want pepper spray.

 7              MR. ZIBILICH:

 8                   We could do a taser on you, if you'd

 9              like, prefer.

10              MR. CLARKE:

11                   Let me try my son out first.  He

12              wants to be a lawyer.  By the end of

13              this case, we may have all of these

14              uses of force going on.  I don't know.

15  BY MR. CLARKE:

16       Q.   And then there are some prohibitions

17  about the use of pepper spray with respect to

18  crowds, correct?

19       A.   Correct.

20       Q.   And then there are reporting

21  requirements.  When you use OC spray, is this,

22  again, just filled out in the ARMMS Report, which

23  is just a general incident report?

24       A.   Yes, sir.

25       Q.   Do you know if once these things are
```

1    reported they are provided anywhere where they can

2    analyze this data to determine how much force JPSO

3    officers are using?

4         A.    That report goes -- so once he does the

5    report, it goes to the supervisor.  Then the

6    supervisor views the report and approves it or

7    unapproves it for corrections or whatever needs to

8    be there.

9         Q.    We talking about two different things.

10   Every time a report is written, it's approved or

11   not approved by a supervisor --

12        A.    Correct.

13        Q.    -- based on typing or --

14        A.    Correct.

15        Q.    Do they have to write a report that is

16   specific solely to OC spray and the circumstances

17   of OC spray that have to be evaluated by a

18   supervisor to determine whether that use of OC

19   spray was justified?

20        A.    In C it says department chemical agent

21   electronic control device usage.  We no longer use

22   a department chemical agent form.  All that was a

23   discharge form.  That meant that this officer used

24   pepper spray.  He documented on this piece of paper

25   why this was used, if it was effective, not

1    effective, and then it was just submitted.  We no

2    longer use that.

3        Q.   Do you have a different policy now?

4        A.   The sheriff's order came out in reference

5    to it.

6        Q.   Where were those department chemical

7    agent electronic control device uses reports

8    maintained?

9        A.   Where are they maintained?  Since now

10   it's taser, it's mostly taser.  Taser is maintained

11   at the range.

12       Q.   Because they are the people that provide

13   the taser --

14       A.   Taser training, yes.

15       Q.   Did the range provide OC training or was

16   that --

17       A.   That was us.  That was at the academy

18   level.

19       Q.   When they were still using the department

20   chemical agent electronic control device usage

21   report, did you maintain them at the training

22   academy?

23       A.   No, I did not.

24       Q.   Do you know where they went?

25       A.   No, I do not.

1        Q.    Do you know what the purpose of filling

2   out a report is and not knowing where it goes?

3        A.    No.

4        Q.    Because it doesn't make sense, does it?

5        A.    No.   I mean, they would send it up

6   through the chain.

7        Q.    What happens to it? What is it used for?

8        A.    I do not know.   Based on what it was, it

9   was about the effectiveness.   The use of the spray,

10  was it effective, so that way we can determine,

11  okay, in this particular instance why wasn't it --

12  why was it or why wasn't it effective.   The

13  majority of it we get it from the actual report,

14  the ARMMS Report, within the narrative.

15       Q.    Right, but have you not heard of

16  departments who utilize use of force reports and

17  track use of forces and actually analyze them?

18       A.    Yes.   I've heard departments also use use

19  of force as placing handcuffs on somebody to arrest

20  them if there is no resistance whatsoever.   They

21  are arrested for a warrant.   They get taken to

22  jail, and they still had to put a use of force, or

23  they have to use a use of force in order to place

24  the subject into danger to self, danger to others,

25  but for their safety, for an officer's safety.

```
 1          Q.    Do you know what CALEA is?

 2          A.    I've heard of it.

 3          Q.    How about PERF?

 4          A.    No. I've never heard of that.

 5          Q.    You've heard of the IACP, correct?

 6          A.    Yes.

 7          Q.    Those are law enforcement sources that

 8    set forth standards, correct?

 9          A.    Yes, sir.

10          Q.    Do you know whether or not any law

11    enforcement group or standard group allows for a

12    policy without a separate completion of use of

13    force reports that are submitted for analysis, that

14    any of those organizations allow that type of

15    policy?

16          A.    Not that I'm aware of.

17          Q.    It forces a liability issue, correct?

18          A.    Yes, sir.

19          Q.    In order to track liability, you need to

20    track the uses of force, correct?

21          A.    Yes, sir.

22          Q.    You know, for example, if somebody may be

23    using force -- you know, somebody may be assigned

24    to a Friday night shift, and they use ten times as

25    much force as somebody else.  That doesn't make it
```

1  right or wrong, correct?  That might be just the

2  shift, right?

3       A.   Ten times more force than --

4       Q.   Than somebody else.  If you're not

5  tracking the force -- you know, what was the form

6  used for, when it was in use?

7       A.   This form?

8       Q.   Yes.

9       A.   For the use of either taser or the

10  chemical agent.

11       Q.   And so you fill it out, and then what

12  happens to it?

13       A.   And then it was filed away.

14       Q.   Do you know why you write a report and

15  file it away and not analyze it?

16       A.   I have no idea about that.

17       Q.   So if they had a requirement to have

18  these reports, they could be available for the

19  department to review and analyze the officers' in

20  the field use of OC spray and taser to determine

21  whether or not it is rising, falling, staying the

22  same?

23       A.   No, sir.  The bible was the ARMMS Report,

24  the initial report.

25       Q.   But it's not -- is the ARMMS Report, when

```
 1   it has use of force involved using hands or OC
 2   spray or something else, submitted to somebody else
 3   who analyzes just the use of force?
 4        A.   Supervisor.
 5        Q.   So it is all up to the supervisor?
 6        A.   Supervisor.
 7        Q.   How many deputies -- how big is Jefferson
 8   Parish Sheriff's Office?
 9        A.   Sheriff's office?  For officers, Level 1
10   officers, or gun-carrying members, I mean, we're
11   pretty huge, so let's say over 1,100 gun-carrying
12   officers within the sheriff's office.
13        Q.   That's a big department.
14        MR. ZIBILICH:
15             Bigger than Memphis.
16        MR. CLARKE:
17             Memphis has 2,200.  I didn't say it.
18        Yeah, I did.  I said 2,200.
19   BY MR. CLARKE:
20        Q.   So we have the same type of policy and
21   requirements for ECDs, right?  I'm just going --
22        A.   Yes, sir.  Yes, sir.
23        Q.   Similar to the same thing, same
24   requirements, correct?
25        A.   Yes, sir.
```

1    Q.    There are some different things about
2    tasers on how they have to be held.  They have to
3    be on your weak side leg, correct, or --
4    A.    Support side.
5    Q.    And there are some requirements, some
6    different requirements, about, you know, how you
7    stop it, how you get your weapon ready, you know,
8    spark it, things like that, that make sure that
9    it's able to be deployed, correct?
10   A.    Yes, sir.
11   Q.    Today they're still doing the chemical
12   agent ECD report, correct?
13   A.    They're doing -- they're still doing the
14   taser report, I believe.
15   Q.    And you don't know what the range does
16   with them?
17   A.    No, I do not.
18   Q.    They just put them in a file as far as
19   you know, and that's it?
20   A.    Do not know.
21   Q.    Then it says the following are listed
22   acceptable restraining devices for use by officers
23   to restrain suspects.  Handcuffs.  What are
24   authorized chains, leg irons and straps, and
25   shackles?

1      A.    So I don't know what they mean by chains,

2   leg irons and straps, shackles.  I can only assume

3   that that's mostly jail requirements.  Chain seems

4   like that is going to be the chain extension for

5   the long prisoner transport type system.

6      Q.    When you are walking somebody in for a --

7      A.    Walking a group of people.

8      Q.    Right.  Authorized body restraint

9   devices.  Is that only the RIPP Hobble?

10      A.    Hobble, and we also have the violent

11   prisoner transport restraint.

12      Q.    Explain to me what that is.  That is the

13   first time I --

14      A.    So if we have a subject in the back seat

15   of a vehicle who we have Hobbled, but he is still,

16   regardless of the seat belt, he is still able to

17   move forward and try to crash his head against the

18   cage or to the side and crash his head against the

19   side.  We have a transport restraint where he is

20   handcuffed, and he is locked in, and now he is

21   restrained here.  He cannot move left or right or

22   forward.

23      Q.    It somehow prohibits his mobility in the

24   back seat of a car?

25      A.    Yes.

1    Q.    Is it called a seat belt?

2    A.    No.  It's not a seat belt.  Seat belt

3 won't work in that.

4    Q.    Flex cuffs.  Those are the zip-tie

5 things?

6    A.    Yes, sir.

7    Q.    We've already gone through the

8 restraining policy.  Again, does this say anything

9 about with restraint not to place people in the

10 prone position or the dangers of the prone

11 position?

12    A.    No, sir.

13    Q.    Look at the end of this policy on Page 6

14 of 6.  There is a note here.  It says LA R.S.13

15 provides that those who have not reached the age of

16 ten are excluded from criminal responsibility but

17 are still subject to the jurisdiction of the

18 courts.  Does that mean that a child under ten

19 cannot commit a crime?

20    A.    Based on this, he cannot commit a crime,

21 but he is still a child in need of supervision.

22    Q.    The juvenile court can be involved.  So

23 what about an autistic -- somebody with

24 intellectual disabilities who has the mental

25 capacity of a ten year old or less? Do you know

```
 1   what --
 2         A.   That's not my --
 3         Q.   I didn't think so, but I highlighted it.
 4              MR. ZIBILICH:
 5                   I can answer that one.
 6   BY MR. CLARKE:
 7         Q.   Public assignment.  We already did that.
 8   IA you are not doing.  The use of force policy.
 9   It's five pages.  SOP-25.  The policy is just use
10   reasonable force.  If you want to keep this to hold
11   it.  This might have all the policies.  It has my
12   highlighting for you.  Officer, this is basically
13   just the reasonable test.  It doesn't set forth the
14   Graham factors, does it?
15         A.   It doesn't have listed the Graham factors
16   in here, no.  It doesn't say that.
17         Q.   You got to smile at that.  Do you think
18   that's not something that is in most policies?
19         A.   I don't know.  I've never seen other
20   policies.
21         Q.   Here is the levels of -- this would be
22   similar to a continuum of force in the old
23   vernacular Section B, right?  These other threat
24   levels?
25         A.   Yes, sir.
```

1    Q.   So it's verbal communication or
2  persuasion and bodily force including hands and
3  face used in a variety of situations.  So that is
4  actually a separate level of force, correct?
5    A.   Yes.
6    Q.   And you have a baton.  Do you guys --
7  what kind of batons do you use?  Do you use a PR24?
8    A.   We have PR24, Monadnock expandable baton,
9  MEB.
10   Q.   So the next level, according to the -- it
11 goes verbal communication, bodily force, then
12 baton.
13   A.   Yes, sir.
14   Q.   It goes verbal communication, hands-on,
15 then baton, right?
16   A.   Yes, sir.
17   Q.   And then after that, the next level is OC
18 spray and electronic control devices, correct?
19   A.   Yes.
20   Q.   There is a requirement that any time
21 anybody uses physical force which doesn't limit it
22 to baton, taser, or OC spray?
23   A.   You said not limited?  I'm just trying to
24 figure out where you are.
25   Q.   Right.  I'm looking at Section C.

1    A.    In all instances where physical force is

2  used to control the individual.

3    Q.    The officer shall complete an offense

4  report covering the circumstances surrounding the

5  incident.  That's the ARMMS Report?

6    A.    Yes, sir.

7    Q.    They have a definition of deadly force,

8  correct?

9    A.    Yes, sir.

10   Q.    Officers on duty.  I think this is what

11 you referenced earlier.  Any time an officer is

12 operating a department vehicle, they have to have

13 their gun with them, right?

14   A.    Yes, sir.

15   Q.    These guidelines caution to not be

16 pulling out your gun.  Do you train people don't

17 pull out your gun unless you are ready to kill

18 somebody?

19   A.    We don't say that.

20   Q.    Well, what do you tell them when it is

21 proper to pull your gun?

22   A.    It is dependent upon a threat.

23   Q.    What threat?  Immediate threat is when

24 you pull the gun?  You pull it when you --

25   A.    Yeah.  If a subject has a gun, an officer

1    gun.   If the subject has a knife, gun.   If the

2    subject definitely has a weapon of some sort that

3    can injure anybody, that officer, that's a deadly

4    -- that weapon can be used in a deadly force

5    manner, yes.

6         Q.    Officer shall not draw a weapon or

7    exhibit a weapon unless the circumstances

8    surrounding an incident create a reasonable belief

9    that it may be necessary to use the firearm.

10        A.    Yes.

11        Q.    You can only use the -- pull the firearm

12   in cases where you could use the firearm, correct?

13        A.    Yes.

14        Q.    Subsection D talks about weapons of

15   opportunity, correct?

16        A.    Yes.

17        Q.    Under Section 3 it talks about -- I think

18   these are the Louisiana statutes that you were

19   referring to that you train on, correct?

20        A.    Yes, sir.

21        Q.    The deadly force statute?

22        A.    Yes, sir.

23        Q.    There is a prohibition against

24   discharging a weapon out a moving car, correct?

25        A.    Yes, sir.

1    Q.    Can't fire warning shots.  Generally,

2  that's a depender, right?

3    A.    Yes, sir, generally.

4    Q.    Subsection I.  An officer is not to place

5  any suspect or arrestee on the hood of a vehicle in

6  order to restrain or secure him unless exigencies

7  of the circumstances demand that.

8    A.    Correct.

9    Q.    What are the exigent circumstances that

10  demand it?

11    A.    You are placing somebody into handcuffs,

12  for example, and you are right in front of that

13  vehicle and something happens.  A fight breaks out

14  between you and the subject, and the only thing you

15  could do is place him on the hood of that car in

16  order to effect his arrest.  That's an example of

17  it.

18    Q.    Why wouldn't you do that?  Is it because

19  of the restraint asphyxia?

20    A.    I'm sorry.  Why wouldn't we do what?

21    Q.    Why is -- there is a prohibition unless

22  there is exigent circumstances, correct?

23    A.    So that was an exigent circumstance I

24  gave you.  We don't put them  on the hood of the

25  car because it's hot.

1    Q.   You know that why or how?  Is that just
2  your guess?
3    A.   Because if a police car has been running
4  all day, the hood is going to be hot.  So we don't
5  want to purposely just take somebody and say, all
6  right, get on the hood of my car, no.
7    Q.   So that's a heat thing?
8    A.   Yes, sir.
9    Q.   You learn something every day. Subsection
10 J.  When stopping a subject in the field for a
11 legitimate reason, the officer may detain the
12 subjects in one of the following positions, if
13 necessary.  Standing, kneeling, or prone.  What --
14 you know, I mean, you can tell people to get down
15 on the ground on their belly to simply stop and
16 detain somebody?
17   A.   Normal traffic stops.  If it's a high-
18 risk traffic stop, it's a different story.
19   Q.   Do you do the stop training?
20   A.   Yes.
21   Q.   This isn't talking about a high-risk
22 stop, is it?
23   A.   No.  It says normal traffic stops.
24   Q.   Right.  So why would you put somebody in
25 the prone position on a normal traffic stop?

1        A.    It's not on a normal traffic stop. Absent

2   exigent circumstances, the driver or occupants of

3   the vehicle stopped should not be placed on the

4   ground.  It says normal traffic stops.  High-risk

5   stops, we will order them to get to the ground.

6        Q.    After you stopped and communicated to

7   them and talked to them on the radio and

8   illuminated the --

9        A.    Yes.  If it's a high-risk stop, yes.

10       Q.    I mean --

11       MR. ZIBILICH:

12            Can you let me object one time based

13         on relevancy?  I'll just use it once.

14       MR. CLARKE:

15            You can object.  You can have a

16         standing objection to the whole

17         deposition, if you want.  I don't care.

18         Me and you aren't going to agree on

19         what's relevant.

20       MR. ZIBILICH:

21            We are certainly not going to agree

22         on traffic stops in this case I can

23         assure you.

24       MR. CLARKE:

25            You understand municipal liability.

1        I'm trying to show how pathetic the

2        policies are, you know.  I gave you

3        those things.  I think you should give

4        them to the sheriff.

5        MR. ZIBILICH:

6            And this case goes away if I bring

7        them to the sheriff?

8    MR. CLARKE:

9            If you do that, you pay some money.

10   MR. ZIBILICH:

11           No, no.

12   MR. CLARKE:

13           It would be an axiom.  My clients

14       would probably consider that.

15   MR. ZIBILICH:

16           Either or.  Well, send me a little

17       note that says that.

18   MR. CLARKE:

19           I've already sent you two notes.

20       This is the third time we've done this,

21       and you can read the e-mails.  We'll do

22       it on the record.  Now we got it for

23       the fourth time.

24   BY MR. CLARKE:

25       Q.   So we're going to Section 5 on Use of

1    Force/Resisting Arrest Incidents.  Any time there

2    is a situation where somebody is injured, does a

3    supervisor have to come to the scene?

4          A.    Yes.

5          Q.    And the supervisor is the one who has to

6    prepare that report?

7          A.    Assist in the preparation of the crime

8    report.

9          Q.    Subsection E. In all cases where a PR24

10   ASP, MEB, OC pepper spray, or electronic control

11   device is used, a supervisor must come to the scene

12   to ascertain that the proper reports are completed

13   as per departmental policies, correct?

14         A.    Create a crime report or other necessary

15   reports such as for discharge of -- chemical agent

16   discharge, yes.

17         Q.    And then we go put them in a file, and

18   you don't know what happens to them?

19         A.    I do not know.

20         Q.    Go to SOP-34.  Let me just ask it to you

21   this -- this is an easy question.  You have a

22   policy against racial profiling, correct?

23         A.    Yes.

24         Q.    It also deals with physical handicaps,

25   correct?

1      A.    I believe so.

2      Q.    That's all I'm asking you about it.

3      A.    Yes.

4      Q.    So it's not just racial.  It also deals

5  with disability. Let's go to the last one, Exhibit

6  20.  Just two policies out of it.  This is the jail

7  policy.

8      A.    Jail policy.

9      Q.    The jail policies have certain things

10  that are particular to the jail, but then they also

11  utilize -- does the JPSO Training Academy also

12  train correctional officers?

13      A.    No. Only firearms.  Firearms and taser.

14      Q.    If you look at -- there is page numbers

15  on the bottom, Bates numbers.

16      A.    Yes, sir.

17      Q.    JPSO-008035.  There are a number of SOPs

18  that we just went over in the previous exhibit.  I

19  think it was 19, that require the officers to

20  follow the particular policies of the SOPs that are

21  not just confined to correctional facilities,

22  correct?

23      A.    Yes.

24      Q.    You don't train them on any of that?

25      A.    No, sir.

```
 1        Q.    In the previous policies that we went
 2   through, is there any requirement that people who
 3   die in custody that are not -- in custody of
 4   officers, who have not been killed by a gun or a
 5   weapon, that that be reported to -- that it be
 6   reported in any manner?
 7        A.    For the jail?
 8        Q.    No.  I'm talking about --
 9        A.    So somebody dies in custody?
10        Q.    Yeah.  Parsa.  He's dead on the scene.
11   They didn't shoot him.  They didn't kill him.  They
12   sat on him.
13        A.    That notification goes out to everybody.
14        Q.    And that is because it's a major
15   incident, correct?
16        A.    Yes.
17        Q.    Do you know -- the only question -- if
18   you look at -- there is a policy called In-Custody
19   Deaths in JPCC-3-4-19.  There is no in-custody
20   death policy in the SOPs, is there?
21        A.    Not that I'm aware of.  I've never seen
22   the JPSO corrections policy.
23        Q.    If you go to 008050.
24        A.    Okay.
25        Q.    It says it is the policy that JPCC/JPSO
```

1    to immediately respond to all in-custody deaths and

2    conduct a complete investigation.  Do you see that?

3         A.   Correct.

4         Q.   So you know that Bill DeVane, in his

5    training that he provided, he noted how to write

6    reports and what things should be put in reports,

7    correct?

8         A.   Yes.

9         Q.   The symptoms or these things that he says

10   illustrate excited delirium.  If you look at

11   Section C of this policy, isn't that what you are

12   supposed to put in a report, as trained by Bill

13   DeVane? It looks like a checklist for excited

14   delirium, does it not?

15        A.   Yes.

16        Q.   Why don't we have a policy that requires

17   that to be done by the deputies on the street?

18             MR. ZIBILICH:

19                  Object to the form.

20             THE WITNESS:

21                  Why don't we have a policy?  Because

22             we're trained to.  We are trained to

23             document everything for our report.

24             What were your observations.  That's

25             the report writing part.

```
 1   BY MR. CLARKE:
 2        Q.   We'll have that guy here, but the things
 3   that are listed in Subsection C are the things that
 4   Bill DeVane says should be put into a report of any
 5   in-custody death to avoid liability to cover those
 6   factors, correct?
 7        A.   Okay.
 8             MR. ZIBILICH:
 9                  Object to the form.
10   BY MR. CLARKE:
11        Q.   Is that correct?
12        A.   Yes.
13        Q.   There wasn't a policy in the SOPs that
14   dealt with that for street deputies.  This applies
15   to correctional officers, correct?
16        A.   This looks like it.
17        Q.   But it does say this policy is somewhat
18   ambiguous or why -- if a policy says here -- you
19   see where it says purpose and then policy on the
20   first page? The very beginning of it.
21        A.   Yes, sir.
22        Q.   Is the policy, the JPCC/JPSO, is this a
23   policy applied to deputies in the field?
24        A.   Yes, for this particular JPCC in-custody
25   death.
```

```
 1          Q.    So this would apply to then the
 2   investigation of Parsa?
 3          A.    This JPCC/JPSO is referring to in-custody
 4   deaths at the jail.  Homicide Division,
 5   Correctional Administrator, notify crime scene,
 6   JPCC Special Investigations Unit, medical staff,
 7   mental screening, so this is for the in-custody
 8   death within the jail.
 9          Q.    You've heard of in-custody death syndrome
10   in law enforcement?
11          A.    Yes.
12          Q.    That is what Bill DeVane talks about,
13   correct?
14          A.    Sudden custody death syndrome, yes.
15          Q.    And it occurs in the field as well,
16   correct?
17          A.    Yes.
18          Q.    Do you know why JPSO doesn't have a
19   policy that requires this type of analysis for
20   people who die in custody outside of the jail?
21          A.    No, sir.
22          MR. ZIBILICH:
23               Object to the form.
24          MR. CLARKE:
25               That's all I have.
```

```
 1              MR. ZIBILICH:

 2                  You leaving the 911 calls alone?

 3              MR. CLARKE:

 4                  Oh, yeah.  I didn't know we --

 5              MR. ZIBILICH:

 6                  This is your shot.

 7              MR. CLARKE:

 8                  Let's see if we can get it done.

 9              MR. ZIBILICH:

10                  This is your shot.  You can pass.

11              MR. CLARKE:

12                  No.  Let's talk about communications

13             with dispatch.

14              MR. ZIBILICH:

15                  With whom?

16              MR. CLARKE:

17                  With dispatch.  Is that 911?

18              MR. ZIBILICH:

19                  I just didn't understand you again.

20              MR. CLARKE:

21                  I do understand that.

22   BY MR. CLARKE:

23       Q.   All right.  Tell me what the policies are

24   or the training that is provided to officers about

25   when they utilize dispatch and how they utilize
```

1    dispatch.  For example, when you go on duty, are

2    they required to check in?

3         A.   Yes, sir.

4         Q.   Are they required to report their status

5    or their location to dispatch at any type of

6    intervals?

7         A.   No.

8         Q.   Would you agree that dispatch and the

9    reporting of locations allows the department to

10   know where officers are so they can utilize

11   resources in the best manner?

12        A.   They're assigned beats, so headquarters

13   knows the beats.  They know what location a

14   particular deputy, if he is clear or not, and if he

15   is close to a beat that is -- and that beat unit

16   happens to be occupied with something, then they

17   will send the next available unit.

18        Q.   And how -- I just need this on the

19   record.  Are there -- is there a ten code list?

20   Like when you go on duty, do you say 10-8?

21        A.   Yes, sir.

22        Q.   Do we have a ten code sheet?

23        A.   There is a ten code card, yes, sir.

24        Q.   That's what I need.

25             MR. ZIBILICH:

```
1                    Because you asked for it before?
2          MR. CLARKE:
3                    Yes.  Listen, if I didn't ask for
4               it, that means I had not figured out to
5               ask for it in 30 years, because my same
6               discovery.  Ten code card.
7  BY MR. CLARKE:
8        Q.   Give me an example of what's on a ten --
9          MR. ZIBILICH:
10                   So this is what, 29?
11         MR. CLARKE:
12                   Lay file 29.
13         MR. ZIBILICH:
14                   What do you want to call this?
15         MR. CLARKE:
16                   Ten code card.
17         MR. ZIBILICH:
18                   Who?  What code?
19         MR. CLARKE:
20                   Ten code card.
21  BY MR. CLARKE:
22        Q.   If we get the card, it will be
23  self-explanatory, right?
24        A.   Yes.
25        Q.   Just give me an example.  What are the
```

```
1   type of things --
2           MR. ZIBILICH:
3                   I'm going to give you one right now.
4           MR. CLARKE:
5                   Okay.  That's all I have on that, I
6               think.  I got to look at the card on
7               that.
8   BY MR. CLARKE:
9       Q.   Let me ask you this while she is doing
10  that.  Are there any codes that are provided by
11  officers to dispatch with respect to dealing with
12  different levels of threats, either a Signal Q, a
13  Signal Red?
14      A.   Code 2 traffic.
15      Q.   What is Code 2 traffic?
16      A.   Code 2 means it's -- let's give an
17  example.  A burglary in progress.
18      Q.   And Code 2 -- do the codes set forth the
19  type of responses required?
20      A.   Not required.
21      Q.   Authorized?
22      A.   Authorized.  So the deputy is trained and
23  taught that even though it comes out as a Code 2
24  call, it doesn't necessarily mean you are going to
25  use your lights and sirens the whole entire time.
```

1    Q.   Well, how many codes -- how many levels

2    of calls are there?

3    A.   How many levels of calls?

4    Q.   Like a Code 2 is --

5    A.   So normal is Code 1. Code 2 is an

6    emergency response.  Code 3 -- they are almost

7    married.  Code 3 is more of a situation.  So an

8    officer-involved shooting would be like almost a

9    Code 3 call.

10    Q.   So in Code 2 and Code 3, they could allow

11    or authorize an emergency response, correct?

12    A.   That is an emergency response.

13    Q.   A Code 3 would be a much more significant

14    Code 2?

15    A.   It's more along the lines the emergency

16    -- it's not so much like officers drive at Code 3.

17    It's not what they're saying.  They'll say Code 2

18    traffic, and then let's say a burglary in progress.

19    Okay.  The officer's discretion of how he is going

20    to drive to that scene to get there.

21    Q.   That lets you know it's a certain level

22    that may need a --

23    A.   Yes, sir.

24    Q.   -- quicker response?

25    A.   Yes, sir.

1     Q.   Code 3 is drop everything and go?

2     A.   It's more along the lines of Code 3 is

3 describing more this is a very emergent situation.

4     Q.   Is that --

5     A.   So it's -- officer-involved shooting is

6 usually the only type of thing that we think about

7 when we talk about the Code 3 type of call, you

8 know.

9     Q.   What about officer needs help?

10    A.   Definitely, but they won't dispatch it as

11 such.  We respond according to the way the call

12 comes out.

13    Q.   Do officers have an emergency button on

14 their radio?

15    A.   Yes, sir.

16    Q.   And what does that send out?

17    A.   That sends out a big emergency -- that is

18 so if you have headquarters sitting there, press

19 that button.  All the computers light up.  It

20 alerts headquarters immediately.  Oh, oh, this

21 unit's got a problem.  It opens up the mic to where

22 nobody else can talk through the mic.  So that way

23 it is an open mic so that way things can -- the

24 deputy does not have to continually press the

25 button, depress the button, in order to talk.

1        Q.    So when that -- am I okay to --
2             MR. MARTINY:
3                  You're fine.
4    BY MR. CLARKE:
5        Q.    So in that, it's an emergency button that
6    frees his hands and allows dispatch to maintain
7    communication with him without having to --
8        A.    Yes.  They can hear everything. Yes.
9        Q.    Is there any other -- that to me sounds
10   like a prioritization of calls based on code level.
11       A.    Yes.
12       Q.    The ten codes talk about certain types of
13   things.  I'm going out of service, I'm in service?
14       A.    Yes, sir.
15       Q.    General things, correct?
16       A.    Yes, sir.
17       Q.    And then are there any special codes or
18   special calls -- I think we covered this. When you
19   are dealing with either a disabled person or an EDP
20   person, you just use plain talk, right?
21       A.    So they'll describe -- exactly.  They
22   will do clear text.  They will describe what the
23   events are, and they won't describe it other than
24   maybe what they call a disturbance.  If you want to
25   go code, it will be a Signal 103, a disturbance.

1      Q.    But that could cover anything?

2      A.    That can cover anything.  That's why the

3  information provided from headquarters is important

4  to them to pay attention to.

5      Q.    When you mean headquarters, you mean --

6      A.    Headquarters is going to dispatch that

7  information to that officer.

8      Q.    When an officer gets on the radio and is

9  talking to dispatch, everybody can hear that,

10  right?

11      A.    Yes, sir.

12      Q.    So if they heard somebody say Code 3, you

13  don't really need to wait for --

14      A.    Nobody is going to say Code 3.  So an

15  officer will say I need backup or I need assistance

16  or send me another unit.

17      Q.    Then the headquarters will say you can

18  respond Code 3?

19      A.    No.  Headquarters will not say that.

20      Q.    When does Code 3 get said?

21      A.    It does not get said.

22      Q.    What is it used for?

23      A.    Again, they use Code 2.  They use Code 2

24  as a description of -- so, in other words, it is

25  kind of like this alert.  Copy Code 2 traffic.

1    Okay.  So that is sending out an alert to us to

2    listen up to what is going on.  So this might be a

3    hot call or something like that, and that's the way

4    they send it out.

5         Q.   If you will look at the document that was

6    just handed to you?

7         A.   Yes, sir.

8         Q.   Is that your ten code card?

9         A.   Yes, sir.

10        MR. CLARKE:

11             What I'm going to do is, we had

12             previously marked lay file Exhibit 31

13             the ten code card.  I'm going to --

14             actually, it was Exhibit 29. I'm sorry.

15             I am going to replace --

16        MR. ZIBILICH:

17             We don't know if this is the latest

18             and the greatest.

19        MR. CLARKE:

20             I understand that.  This is enough

21             for me to ask my questions, but I'm

22             getting rid of the lay file exhibit.

23   BY MR. CLARKE:

24        Q.   So this ten code, they were asking -- do

25   you know whether this is the most recent ten code

1    card? If you don't, I'm not trying to jam you up on

2    this.  I'm just trying to get an idea of what you

3    use these for.

4         A.   I believe is it, but I can't answer

5    thoroughly on that one.

6         Q.   There can be changes, so we have a number

7    of things.  If somebody says 10-1, that means they

8    can't really hear you?

9         A.   Correct.

10        Q.   10-2 receiving well.  10-3 is stop

11   transmitting.  Is that when somebody is trying to

12   communicate with another officer, and there is too

13   much traffic?

14        A.   Correct.

15        Q.   10-4.  I know that one.  10-5, pick up or

16   delivery of what?

17        A.   Anything.  Anything can be a 10-5.

18        Q.   10-5 lunch?

19        A.   No.  10-40 is lunch.

20        Q.   I'm just trying to find what you pick up.

21        A.   This could be a 10-5.

22             MR. ZIBILICH:

23                  Wallace's dog.

24   BY MR. CLARKE:

25        Q.   10-5 policies.  All right.  10-6 means

1   call home, so they can tell you to do that.  10-7,

2   out of service.  10-12.  What does official,

3   visitor, suspect present mean?

4        A.   So if I am running a subject via radio,

5   and you were that subject, and NCIC --

6        Q.   This is a hypothetical, right?

7        A.   This is --

8        MR. ZIBILICH:

9             I'd love it to be real.

10       MS. VALENTI:

11            That's what is going to happen when

12          you leave here.

13       MR. CLARKE:

14            We will demonstrate it for you.

15       THE WITNESS:

16            You are that subject, and I am

17          running you through NCIC, then NCIC

18          will come back and ask me 10-12.  What

19          that means is am I next to you, or are

20          you away from me, because she doesn't

21          want to transmit it across the radio,

22          if you can hear it.

23   BY MR. CLARKE:

24       Q.   You don't want to tell them that we know

25   you got a warrant?

1      A.   Exactly.

2      Q.   I got you. 10-14.  You say I'm going

3 10-14 to somewhere?

4      A.   We don't even use that.

5      Q.   10-25, assume command of scene.  What

6 does that mean?

7      A.   I'll give out an example of an active

8 shooter.  So if I arrive first, or I arrive second,

9 and I know there is a deputy already inside or

10 whatever, I'm going to say I am 10-25 on scene,

11 which means that I'm in charge of the scene until

12 somebody relieves me.

13      Q.   You let them know you are the most senior

14 officer there?

15      A.   Yes.

16      Q.   So those are the ten codes.  They go

17 through a phonetic alphabet.  We got Code 1, Code

18 2, Code 3, Signal Red.

19      A.   Yes.

20      Q.   Signal Red is -- is that when there is a

21 pursuit going on?

22      A.   Signal Red is usually that officer-

23 involved shooting.

24      Q.   So Code 1 is normal response.  Signal Red

25 is what you were describing as Code 3 before?

1     A.   Code 2 and Code 3 are almost synonymous

2  with each other. Trust me.  I understand what

3  you're saying, but Code 2 and Code 3 are synonymous

4  with each other.  Headquarters will say copy Code 2

5  traffic.  That means they're letting us know, hey,

6  open your ears, listen to what is about to go on.

7  Okay.  Our response to that is dependent upon that

8  police officer and the situation.

9     Q.   But there are -- Code 3 allows you to

10  engage in emergency driving?

11     A.   Emergency driving.  We still have to obey

12  traffic laws.

13     Q.   When you have the lights and sirens on --

14     A.   We can obey, but we've got to -- I can't

15  just blast through a red light just because.

16     Q.   Due regard.

17     A.   Right, right, exactly.

18     Q.   When you use your lights and sirens, you

19  are exempt from certain rules of the road, but you

20  still have to drive with due regard?

21     A.   Right.  Our rule is get there safely.

22     Q.   And then I guess on the second page these

23  are a bunch of what -- we have a bunch of ten

24  codes, and then we have the police complaint calls.

25  If you could look through the police complaint

1  calls and see if there is any one that deals with

2  EDP people.

3        A.   The only thing we have is 103-M.

4        Q.   Disturbance, fight.

5        MR. ZIBILICH:

6             To make your life easy, if you

7        Google our code, it's Title 14 in the

8        Louisiana Revised Statutes.  All of the

9        various offenses, and that's how they

10       are coded through dispatch.

11       MR. CLARKE:

12            So there is a statute called 103-M?

13       THE WITNESS:

14            Not a statute.

15       MR. ZIBILICH:

16            Yep. Well, 14:103.

17       MR. CLARKE:

18            M means there is an actual code for

19            --

20       THE WITNESS:

21            103-M, yes.

22       MR. ZIBILICH:

23            We got more crime than that. That's

24       just Title 14.

25       MR. CLARKE:

1          These are the ones that they put --

2     I understand.  I'm just figuring out

3     what numbers I'm going to hear tonight.

4     MR. ZIBILICH:

5          Pardon me.

6     MR. CLARKE:

7          Trying to figure out what  I am

8     going to be listening for on the mic

9     when they come get me.

10    MR. ZIBILICH:

11         Yours are going to be in Title 40.

12    MR. CLARKE:

13         I got to make sure what that is, but

14    I don't think it is a good one.

15    MR. ZIBILICH:

16         Narcotics code.

17    MR. CLARKE:

18         We got a Signal Red, 103-M, Title

19    40. All of them.  That's all I got.

20    MR. ZIBILICH:

21         Okay.  Can't thank you enough.

22    MR. KAUL:

23         I've got two hours of questions.

24    MR. ZIBILICH:

25         I'm sorry.

1          MR. KAUL:

2               No questions for Westgate or

3          Victory.

4          MR. ZIBILICH:

5               How presumptuous of me.

6          THE VIDEOGRAPHER:

7               This is the conclusion of the

8          videotaped deposition. We are going off

9          the record.

10              [End of deposition, 4:30]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

1

2

3          This certification is valid only for
a transcript accompanied by my original signature
4   and original required seal on this page.

5          I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6   as the officer before whom this testimony was
taken, do hereby certify that MICHAEL PIZZOLATO,
7   after having been duly sworn by me upon authority
of R.S. 37:2554, did testify as hereinbefore set
8   forth in the foregoing 202 pages;

9          That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10  or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11  ability and understanding;

12         That the transcript has been
prepared in compliance with transcript format
13  guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14  prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15  and in rules and advisory opinions of the board;

16         That I am not related to Counsel or
to the parties herein, nor am I otherwise
17  interested in the outcome of this matter.

18

19

20

21  _Sandra P. DiFebbo_____
    Sandra P. DiFebbo,
22  Certified Shorthand Reporter

23  Date: _7-25-22_

24

25