UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CASE NO.  2:21-cv-00080

DONNA LOU and DAREN PARSA, on their own behalf and
on behalf of their deceased minor child, E.P.

Plaintiffs,


VERSUS


SHERIFF JOSEPH P. LOPINTO, III, CHAD PITFIELD, RYAN
VAUGHT, STEVEN MEHRTENS, SHANNON GUIDRY, NICK VEGA,
MANUEL ESTRADA, MYRON GAUDET, JOHN DOES 1-3,
VICTORY REAL ESTATE INVESTMENTS LA, LLC D/B/A
WESTGATE SHOPPING CENTER, ABC INSURANCE COMPANY,
and XYZ INSURANCE COMPANY,

Defendants.



VIDEOTAPED DEPOSITION OF SHERIFF JOSEPH P.

LOPINTO, III, given in the above-entitled cause,

pursuant to the following stipulation, before

Sandra P. DiFebbo, Certified Shorthand Reporter, in

and for the State of Louisiana, at JPSO, 1233

Westbank Expressway, Fifth Floor, Harvey,

Louisiana, on the 10th day of January, 2023,

commencing at 9:45 AM.

2

```
 1    APPEARANCES:
 2               THE COCHRAN FIRM MID-SOUTH
               BY:  ANDREW CLARKE,
 3             ATTORNEY AT LAW
               One Commerce Square
 4             40 South Main, Suite 1700
               Memphis, Tennessee  38103
 5             Representing the Plaintiffs
 6             MARTINY & ASSOCIATES
               BY:  FRANZ ZIBILICH,
 7             ATTORNEY AT LAW -and-
               JEFFREY D. MARTINY,
 8             ATTORNEY AT LAW
               131 Airline Drive
 9             Suite 201
               Metairie, Louisiana  70001
10             -and-
               LINDSEY M. VALENTI, ATTORNEY AT LAW
11             LEGAL ADVISOR
               1233 Westbank Expressway
12             Building B, Fifth Floor
               Harvey, Louisiana  70058
13             Representing JPSO Defendants
14
               THOMPSON, COE, COUSINS & IRONS, LLP
15             BY:  CHRISTOPHER KAUL,
               ATTORNEY AT LAW
16             601 Poydras Street
               Suite 1850
17             New Orleans, Louisiana  70130
               Representing Victory Real Estate
18             Investments LA, LLC, and Westgate
               Shopping Center
19
20    Also Present:  Donna Lou, Daren Parsa, Tim Anclade,
                     Tate Clarke, Aaron Palmer,
21                   Videographer
22    Reported By:
23
               Sandra P. DiFebbo
24             Certified Shorthand Reporter
               State of Louisiana
25
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

```
 1      E X A M I N A T I O N        I N D E X
 2                                    Page
 3    BY MR. CLARKE:                    5
 4
 5      E X H I B I T                 I N D E X
 6                        Page
```

```
 7    Exhibit 126                      6
      Exhibit 127                      6
 8    Exhibit 128                      7
      Exhibit 129                      7
 9    Exhibit 130                      7
      Exhibit 131                      7
10    Exhibit 132                      7
      Exhibit 133                      7
11    Exhibit 134                      7
      Exhibit 135                      8
12    Exhibit 136                     11
      Exhibit 137                     13
13    Exhibit 138                     16
      Exhibit 139                     17
14    Exhibit 140                     23
      Exhibit 141                     25
15    Exhibit 142                     32
      Exhibit 143                     32
16    Exhibit 144                     43
      Exhibit 145                     44
17    Exhibit 146                     45
      Exhibit 147                     47
18    Exhibit 148                    116
      Exhibit 149                    116
19    Exhibit 150                    125
      Exhibit 151                    145
20    Exhibit 152                    149
      Exhibit 153                    170
```

```
21
22
23
24
25
```

1          S T I P U L A T I O N

2

3              It is stipulated and agreed by and

4     between Counsel for the parties hereto that the

5     deposition of SHERIFF JOSEPH P. LOPINTO, III, is

6     hereby being taken pursuant to the Federal Rules of

7     Civil Procedure for all purposes in accordance with

8     law;

9              That the formalities of reading and

10    signing are specifically waived;

11             That the formalities of sealing,

12    certification, and filing are hereby specifically

13    waived.

14             That all objections, save those as to

15    the form of the question and responsiveness of the

16    answer are hereby reserved until such time as this

17    deposition or any part thereof is used or sought to

18    be used in evidence.

19                    * * * * *

20             Sandra P. DiFebbo, Certified Shorthand

21    Reporter, in and for the State of Louisiana,

22    officiated in administering the oath to the

23    witness.

24

25

1          SHERIFF JOSEPH P. LOPINTO, III, 1233

2      Westbank Expressway, Harvey, Louisiana 70058,

3      having been first duly sworn, was examined and

4      testified on his oath as follows:

5   EXAMINATION BY MR. CLARKE:

6      Q.    Would you please state your name for the

7   record.

8      A.    Joseph Peter Lopinto, III.

9      Q.    Sheriff Lopinto, my name is Andy Clarke.

10  We met briefly during this case.  Obviously, you

11  are a lawyer, and you know about depositions, so

12  I'm not going to go over all of the normal ground

13  rules.  What did you do to prepare yourself for the

14  deposition?  What have you reviewed?  Not your

15  talks with Franz.

16      A.    Everything I've done. I met with counsel

17  last week, reviewed the video.  I have perused

18  through the complaint and the Dropbox of

19  information, but I cannot say that I opened up

20  every file within that Dropbox.  Just kind of

21  highlighted it this morning, probably, within 30

22  minutes or so and looked to see what if I needed,

23  but I figured you'll ask the questions on it.

24      Q.    Sure, sure.  You have reviewed the video.

25  Have you reviewed the homicide report?

1        A.    I have not. I say that, Andy.  I may have

2    read that report when it first came out.  I have

3    not read it recently, but I don't always read every

4    report, and I don't recall if I've read this one

5    further back or not.

6        Q.    We had a previous deposition yesterday.

7    If you could look to your left.  Exhibit 123.  Have

8    you read the Keeven Robinson homicide report?

9        A.    I don't think I had read Keeven Robinson.

10        Q.    You know during this case we've asked a

11    lot of written discovery and what have you, and you

12    answered those, correct?

13        A.    We have, yeah.

14        Q.    What I'm going to do is just for the --

15    and, obviously, this isn't a memory contest.

16    There's a lot of documents.  If you need to look at

17    anything, let me know, but what I want to do is

18    have all of your discovery responses in front of

19    you in case you have to refer to them.  So I'm

20    going to mark as Exhibit Number 126 a copy of your

21    responses to the discovery sent to you in your

22    official capacity.  I'm going to hand all of these

23    to you in one second.  Let me just go ahead and

24    mark them.  Exhibit Number 127 I'm going to mark as

25    the responses to the First Set of Requests for

```
1    Admissions and the Second Set of Requests for
2    Production of Documents.  Exhibit 128.  I'm going
3    to mark your responses to our Second Request for
4    Admissions.  Exhibit 129.  I'm going to mark the
5    Supplemental Responses to the Second Set of
6    Interrogatories -- Second Request for Admissions.
7    Exhibit 128.
8              MR. TATE CLARKE:
9                  130.
10             MR. CLARKE:
11                 Sorry.  130 is Responses to the
12             Third Interrogatories and Requests for
13             Production.  Exhibit 131 is going to be
14             your Supplemental Responses to the
15             Fourth Set of Interrogatories.  Exhibit
16             Number 132 is going to be your Response
17             to the Fourth Set of Interrogatories.
18             Exhibit Number 133 is going to be a
19             response to the Sixth Request for
20             Production of Documents.
21             MR. ZIBILICH:
22                 The what?
23             MR. CLARKE:
24                 The Sixth Request for Production of
25             Documents.  Exhibit 134 is going to be
```

```
 1              a copy of the Fifth -- the response to
 2              the fifth set of discovery.  Hand all
 3              of these to him.
 4   BY MR. CLARKE:
 5       Q.    And then Exhibit 135 are going to be your
 6   response in your individual capacity.  I'm just
 7   going to have these all up there for you.  Give
 8   those to the sheriff.  If you need to refer to
 9   those at any time, just let me know.  I don't have
10   any specific questions on them right at this time.
11   I'm going to let you look at those real quick.
12       A.    I'm just putting them in order.
13       Q.    Let me know when you are ready.
14       A.    Oh, I'm ready when you are, counselor.
15       Q.    Sheriff Lopinto, let's talk just a little
16   bit about your background.  Tell me where you were
17   born and raised.  Take me through your educational
18   background.  Giving you a softball.
19       A.    Yeah.  Born and raised in Metairie,
20   Louisiana.  Grew up.  Grammar school at St.
21   Christopher.  High school at Brother Martin High
22   School.  You know, pretty much worked most of my
23   life.  As a young kid, probably before age, at
24   hunting and fishing shops for most of my life. Went
25   to -- after high school had a roundabout college
```

1   career.  Went off to USL, which is now ULL in
2   Lafayette.  I did one year in Lafayette.  I
3   obviously didn't score too well, which, you know,
4   mother and father sent me home and said, "Tough
5   luck.  You're not staying there anymore."  I came
6   back, and I joined the sheriff's office.  Well, I
7   went back to Delgado, took a semester or two at
8   Delgado.  Joined the sheriff's office when I was 20
9   years of age.  Went through the academy.  Became --
10        Q.   What year was that?
11        A.   That was 1997, March of '97.  Graduated
12   the academy in August.  I turned 21 in June and was
13   the 21 year old deputy.  Worked here for about
14   almost eight years as a deputy, narcotics
15   detective, and then back as a deputy, but then
16   continued the education.  I went back to Delgado,
17   took more classes, received my associates in
18   criminal justice, transferred to Loyola, received
19   my -- did probably, I guess, two years at Loyola.
20   Didn't have -- only had -- I was nine hours shy of
21   my undergraduate, but I was able to take the LSAT.
22   By that time, I had turned my educational career
23   back around.  I was paying for it myself and
24   studying hard.  And so I ended up back at Loyola
25   and was able to get into Loyola Law School before I

1    graduated.  So I did one year of law school and

2    then went back and took my nine hours the next

3    summer in undergraduate just because I wanted my

4    degree.  So officially I walked the stage in August

5    of 2002 at Loyola with my undergraduate, and then

6    December of 2004 I graduated law school at Loyola.

7    That's educational.

8         Q.   Right.  I'm trying to throw you a

9    softball so we can get a lot of stuff out, but let

10   me just follow up.  So you graduated from college

11   from Loyola in 2002 and law school from Loyola in

12   December of 2004?

13        A.   That's correct.

14        Q.   And JPSO, has that been the only law

15   enforcement agency that you've worked for?

16        A.   Officially, I was a reserve deputy when I

17   left JPSO for the levee district, but, to be honest

18   with you, I was officially on the books, but then

19   when I became in the legislature, I gave it up.  It

20   was a state agency.  Truthfully, I didn't really

21   work that much as a reserve deputy.  They didn't

22   really require that many hours.  It officially kept

23   my POST up, but I couldn't tell you how long I did

24   that, but it was a short period of time.

25        Q.   Your first stint with JPSO was from 1997

1   until when?

2        A.   Until September-ish of 2004.  September,

3   October, somewhere around there.

4        Q.   How old are you now?

5        A.   I am 46.

6        Q.   Why did you leave JPSO in September of

7   2000 or December of 2000? No.  September of 2004.

8        A.   I was graduating in December, studying

9   for the bar.  I had $100,000 in student loans that

10  the sheriff's office wasn't going to pay for.

11       Q.   My dad gave me a check for $750 and pat

12  me on the back and said, "Good luck being a

13  lawyer."  Let's talk about your first stint with

14  JPSO, 1997 to 2004.  Did you go through the JPSO

15  Training Academy?

16       A.   I did.

17       Q.   Did you have training on the RIPP Hobble?

18       A.   You know, I don't know that for a fact. I

19  mean, I know the basis of RIPP Hobble.  You know,

20  kind of what we do with RIPP Hobble in JPSO.  I

21  don't think it has really changed much since then,

22  but to tell you that I had RIPP Hobble training, I

23  don't know that for a fact.

24       Q.   I'll mark as Exhibit 136 -- I'm not going

25  to break my mic today. I'm going to make sure he

```
 1   doesn't go to sleep during this deposition.
 2             MR. ZIBILICH:
 3                  You are enough to put anybody to
 4               sleep.
 5             MR. CLARKE:
 6                  You stayed awake most of the time.
 7               You are a very good lawyer.  Tim, I
 8               don't know.
 9             MR. ZIBILICH:
10                  What is 136, Andrew?
11             MR. CLARKE:
12                  This is his training resume.  We got
13               some old school training records, and
14               then we got some computerized ones.
15             THE WITNESS:
16                  Do you have questions on it?
17   BY MR. CLARKE:
18        Q.   Okay.  It doesn't seem like you got RIPP
19   Hobble based on these documents.
20        A.   You know, these documents certainly
21   aren't -- I mean, like anything.  I had a four and
22   a half month academy.  Four and a half month
23   academy, could they have had a two-hour course or
24   an eight-hour course on RIPP Hobble while we were
25   there?  That's certainly not going to be, you know
```

1    -- it doesn't look like from there did I have a

2    separate class from that standpoint, but that

3    doesn't necessarily mean it wasn't included in the

4    academy back then.

5        Q.   Right.  Listen.  I try to be fair with

6    everything.  We're talking about old records.  If

7    you look at what I put at as 137, and I apologize

8    for all of the highlighting and stuff on that, but

9    I thought they were attached to 136, but 136, this

10   is old school record keeping.

11       A.   It wouldn't surprise me just from the

12   standpoint of the only people that carry the RIPP

13   Hobble on our department is supervisors.  So it

14   wouldn't surprise me that -- I wasn't a supervisor

15   when I was working here during that period of time.

16   It doesn't surprise me, but whether or not there

17   was a basic on RIPP Hobble in the academy, but I

18   agree with you.  I probably didn't have the full

19   class.

20       Q.   During your first stint with the JPSO,

21   tell me all of your assignments.  Were you always a

22   patrolman?

23       A.   I was patrol, night watch in Fat City.

24   Back then it was eight-hour shifts, so when I came

25   out during field training, I would rotate between

1    day, evening, and night watch for field training.
2    Once field training was over with, I was assigned
3    the night watch.  I worked the night watch in Fat
4    City for the first few years.  After about two
5    years on patrol, approximately, I went to
6    narcotics.  I was in narcotics for about, I guess,
7    three years or so, you know, handling basic
8    investigations to federal wiretaps.  I was assigned
9    to different -- not assigned but temporarily
10   assigned to different task force handling the
11   wiretaps, depending on the case, or just basic
12   narcotics undercover type work.  And then, when I
13   went back to law school, I was looking for more of
14   a permanent schedule, so I was transferred back to
15   the district.  I worked day watch for my remaining
16   three years or so on the department while I was
17   back in law school.
18        Q.    All as a patrolman, not as a supervisor?
19        A.    Correct.
20        Q.    Not as a detective?
21        A.    Well, I mean, officially our narcotics
22   agents are narcotics detectives, but, correct, not
23   in CIB.  Not in our Criminal Investigation Bureau,
24   Special Investigation Bureau.
25        Q.    All right.  During your first stint with

```
 1    the JPSO, did you have any Internal Affairs
 2    complaints?
 3         A.   I don't think I had any Internal Affairs
 4    complaints, no.
 5         Q.   Did you have any -- were you sued at any
 6    time for your actions as a deputy?
 7         A.   I was sued once.  After I left, the
 8    lawsuit came in, but I was -- it was obviously for
 9    actions while I was a deputy.  I guess it's what --
10    I was named in a lawsuit for actions against the
11    sheriff's office.  I wasn't on scene, so it wasn't
12    any actions of me, but I was named in a lawsuit.
13         Q.   Do you know what that lawsuit dealt with?
14         A.   I do.
15         Q.   Can you tell me?
16         A.   I mean, I had one of my other deputies
17    encountered a person in Fat City, got into a
18    struggle with them, ended up tasing them.  I ended
19    up getting called to the scene.  Not to the scene.
20    I got called to go notify the parents of that
21    individual, and so I didn't even make it to the
22    scene.  I went to the location of the parents,
23    because we were trying to get in touch with them,
24    and they obviously filed suit after the fact.
25         Q.   Do you recall that kid being an autistic
```

1    kid?

2         A.   You know, just because of the lawsuit, I

3    mean -- and I say that.  I think that was the

4    reason that I went to the scene itself.  I think

5    after the encounter between the deputy and the

6    individual.  You know, I'm not going to tell you

7    autistic.  I'll say some type of special needs.  I

8    think they realized he was some type of special

9    needs.  That's why I went to the parents.  The

10   parents told me, yes, he was off his medications at

11   the time, that type of stuff, but I don't have, you

12   know, any actual knowledge of it, because I had

13   never met the kid.

14        Q.   Let me mark as Exhibit Number 138 a

15   lawsuit filed by Patrick Dobb versus Harry Lee and

16   some deputies.  Is that the lawsuit you are

17   referring to?

18        A.   It is.

19        Q.   And according to that page, if we go to

20   -- according to this, they said you were at the

21   scene.  Do you know what happened to this case?

22   It's my understanding it was settled.

23        A.   That's my understanding, also.

24        Q.   Do you know if Internal Affairs did an

25   investigation of this incident?

1      A.   Not that I recall.

2      Q.   I'm going to mark as your personnel file

3  Exhibit 139.  I'm going to hand it up there in case

4  you need to refer to anything for dates.

5      A.   I have to change the picture.  I'm still

6  ugly.

7      Q.   Most people see their personnel file for

8  the first time when they come to the deposition.

9      A.   I'm diabetic, and when I first got hired,

10  I was about 40 pounds heavier than I am now, so

11  certainly you can see it in this picture.

12      Q.   So in 2004, when you left JPSO, you

13  started studying for the bar.  What happened --

14  When did you come back to JPSO and at what

15  position?

16      A.   I came back to JPSO July 1st of '16.

17      Q.   Okay.  Is that when you were elected

18  sheriff?

19      A.   No, no.  I was -- I mean, I was gone for

20  a long period of time.  I left the sheriff's office

21  in 2004.  I started Lopinto Law Firm.  Lopinto Law

22  Firm was -- well, let me back up a little bit.  I

23  had a short stint in a workers' compensation firm

24  for probably about six months before I passed the

25  bar.  Working with them, passed the bar, worked for

```
 1    them maybe a month and a half after that, realized
 2    workers' compensation was certainly not the route
 3    that I wanted to go and hung my own shingle after
 4    that probably in May or June of that year.  May or
 5    June of 2005.  Lopinto Law Firm was real big,
 6    literally out of the bedroom of my house, taking
 7    whatever case came through the door, DWI,
 8    policeman's divorce.  You know, you name it.
 9    Whatever came through the door.  Nothing major by
10    any means.  Did that.  I mean, officially Lopinto
11    Law Firm was opened until this year, although I
12    have not practiced law since becoming sheriff.  I
13    had, in 2007, ran for state representative in a
14    Metairie district, District 80.  Was elected state
15    representative in October of 2007, sworn in, in
16    January of 2008.  I was state representative for
17    nine years total before leaving to come back to the
18    sheriff's office.  You are looking at -- Lopinto
19    Law Firm, although it was open that entire time, I
20    ended up joining Martiny's firm maybe '10.
21              MR. ZIBILICH:
22                   You want me to give you the answer?
23              THE WITNESS:
24                   '10, yeah.  When was it?  '10?
25              MR. ZIBILICH:
```

```
 1                    When I left?  Late 2010.
 2           THE WITNESS:
 3                    Late 2010.  Okay.
 4  BY MR. CLARKE:
 5      Q.   As you can tell, we're real sticklers
 6  about the rules.
 7      A.   Right, right, yeah.  I think it was
 8  actually -- if you were elected in '10, it was '11
 9  then.
10           MR. ZIBILICH:
11                    Yeah.  It was afterwards.
12           THE WITNESS:
13                    Around the first of the year in '11
14               I joined Martiny's firm.  I practiced
15               then, still handling some of my old
16               cases, but then handling a lot of the
17               1983 Defense here for the sheriff's
18               office.  Did that from '11 to '16, and
19               then in '16 the executive counsel here
20               for the sheriff's office retired, and
21               the sheriff, Newell Normand, asked me
22               to come and be the executive counsel
23               for the sheriff's office.
24  BY MR. CLARKE:
25      Q.   Would that being Lindsey?
```

1       A.   Yes.  So I came and took that position in

2    '16, was in that position for approximately a year,

3    a little over a year.  Our chief deputy, chief of

4    operations, ended up retiring in '17, the summer of

5    '17.  Newell asked me to take the chief deputy

6    position, so I took that.  Well, unbeknownst to me,

7    about a month after I became the chief deputy

8    position, he got offered some position with WWL

9    radio, and so he talked to them for about two

10   months and negotiated and decided to leave and

11   literally takes my wife and I out to dinner on a

12   Sunday night and says, "I don't know how to tell

13   you this other than just to tell you, but I've

14   accepted a position with WWL.  I'm having a press

15   conference on Tuesday.  You are becoming the next

16   sheriff."  My wife's best line ever was,

17   "Literally, you brought one bottle of wine?"  She

18   was not happy about that, you know, to happen.  So,

19   you know, the world got kind of thrown upside down

20   at that point in time.  Became sheriff September

21   1st of 2017.  Had the election in March of 2018 for

22   the unexpired term, and then was reelected to the

23   full term in October of 2019.

24       Q.   So you've been the sheriff, the acting

25   sheriff, since 9/1/17 and then the elected sheriff

```
1   since 2018?
2        A.    Correct.
3        Q.    What did you do as the executive liaison?
4   You know, you just kind of assisted the attorneys
5   with respect to legal issues?
6        A.    We have -- with a department of the size
7   that we have, we're handling foreclosures.  We're
8   handling judicial and traffic accidents.  We're
9   handling, obviously, 1983 claims.  We've got tax
10  issues, tax lawsuits.  So dealing with whether it's
11  contracts that are coming for the sheriff's office
12  --
13       Q.    Anything legal?
14       A.    Anything legal.
15       Q.    I got you.  All right. Let's talk about
16  when you were in the legislature.  Were you
17  involved in any legislation designed to increase
18  the amount of training for officers with respect to
19  disability?
20            MR. ZIBILICH:
21                 Object to the form.  You can answer
22             it.
23            THE WITNESS:
24                 Yeah, it -- Counsel, you have to be
25             more specific, to be honest with you.
```

```
 1              I served on the Criminal Justice
 2              Committee my entire nine years.  We
 3              would have numerous bills per year, but
 4              I couldn't tell you that.
 5  BY MR. CLARKE:
 6      Q.   From my notes, you and Senator Martiny
 7  were the sponsors of Acts 2014 Number 811 Section
 8  22, effective June 23rd, 2014, which removed
 9  offensive language regarding persons with
10  disabilities in numerous states. Do you remember
11  doing that?
12              MR. ZIBILICH:
13                  Object to the form.  You can answer
14              it, if you remember. Your question --
15              THE WITNESS:
16                  No.  If you want me to take a look
17              at it.
18              MR. CLARKE:
19                  You can object to the form to
20              anything you want.
21              MR. ZIBILICH:
22                  I'm just going to make it so I don't
23              have to take up too much transcript
24              space.  Anything that has anything to
25              do with the legislature, I object to
```

```
 1            the form.
 2  BY MR. CLARKE:
 3       Q.   Okay. You understand in civil rights
 4  cases, you understand the law, correct?
 5       A.   You know, counsel, like anything, I have
 6  a better understanding than most people, but that
 7  being said, you know, there is always nuances that
 8  exist.
 9       Q.   Do you remember a time when there was a
10  minimum training requirement that required officers
11  to have training with respect to deescalations,
12  biased policing, sudden in-custody death, crisis
13  intervention training, that was passed, LSA-R.S.
14  40-2404.2?
15       A.   That wouldn't surprise me, counsel.
16       Q.   I'll mark that as Exhibit --
17            MR. ZIBILICH:
18                 140.
19            MR. CLARKE:
20                 140.
21            MR. ZIBILICH:
22                 What is it?
23            MR. CLARKE:
24                 This is Louisiana Statute 2404.2.
25            THE WITNESS:
```

24

```
 1                    This looks like this came into --
 2                when was this active? 2017.  I was
 3                already gone by then, counsel.
 4   BY MR. CLARKE:
 5        Q.    Are you aware of that statute? It would
 6   apply to your officers, correct?
 7        A.    Yeah.  I mean, you know, the truth of it
 8   is it depends on what you have with this.  So your
 9   POST Council -- POST Council sets up the minimum
10   training standards.  Every department is a little
11   bit different than the State of Louisiana, and so
12   although they'll mandate this type of training, it
13   probably wasn't mandated in the past of what it is.
14   Our academy and the sheriff's office averages 450
15   hours compared to what the minimum of 360 hours is.
16                So to tell you that this would mandate
17   our training needs is probably not the case.  We
18   have a person that sits on the POST Council and
19   Mark Iannazzo probably were already training all of
20   these topics for many years.  I'll give you an
21   example of like reserve deputies.  Reserve deputies
22   for years didn't require to be POST certified at
23   all.  You could anoint someone a POST
24   certification.  That changed well before my time in
25   Jefferson Parish.  All of my reserve deputies are
```

```
 1    POST certified officers.  Although the law changed
 2    recently to make all reserve officers POST
 3    certified, it really didn't affect the Jefferson
 4    Parish Sheriff's Office, because we had already
 5    been doing that for many, many years.  So this
 6    doesn't surprise me by any means.  To tell you it
 7    would affect us is probably not the case.
 8         Q.   Okay.  And this is the statute I was
 9    talking about.  This statute was passed in 2014.
10    You would have been in the legislature, correct?
11              MR. ZIBILICH:
12                   Is that an exhibit?
13              MR. CLARKE:
14                   Yes.  I'm sorry.  It's Exhibit 141.
15              MR. ZIBILICH:
16                   What are you calling it?
17              MR. CLARKE:
18                   Louisiana Statute 2405.5.
19              MR. ZIBILICH:
20                   240?
21              MR. CLARKE:
22                   5.5.
23              THE WITNESS:
24                   So you are looking at -- it looks
25                like it was added by an act in 2005,
```

```
 1              and then it was amended in 2014.  This
 2              document doesn't show what the
 3              amendment in 2014 was.
 4   BY MR. CLARKE:
 5       Q.   I'm going to identify to you that what
 6   was added in this had to deal with law enforcement
 7   training with people with mental illness and
 8   persons with developmental disabilities.
 9       A.   Okay.
10       Q.   Okay.  But it was repealed in 2017.  Did
11   you have anything to do with amending this to get
12   training for officers to deal with mental health
13   issues?
14       A.   Counsel, again, I was a member of the
15   legislature.  I don't remember this specifically,
16   but I was also on the Criminal Justice Committee.
17   In 2014, I was still chairman of the Criminal
18   Justice Committee, and so if you are telling me I
19   was the author of the bill, it's possible, but I
20   can do some research to figure out who the author
21   of the bill is, but I certainly probably took votes
22   on this.
23       Q.   All I'm trying to get at, and I don't
24   play hide the ball.  I'm trying to establish
25   certain types of notice or knowledge about certain
```

1    law enforcement issues, training, things like that.
2    You know what I'm doing.
3         A.    Yeah, but we have three to 5,000 bills
4    filed per year that come through.  Some are
5    controversial, some are not controversial.  This
6    probably would not have been controversial by any
7    means.  Not me trying to say it.  We can go pull
8    the record up and go see what my talking was on it.
9    It certainly exists, but I don't remember it as we
10   sit here.
11        Q.    I've got all kinds of other things on
12   this, but let's see if we can cut through all of
13   this.  You knew by 2014 that people with
14   intellectual disabilities are becoming an issue
15   with law enforcement, correct?
16        A.    I think it was before that, also, but
17   yeah.
18        Q.    I'm saying by at least 2014, you know, we
19   have -- in law enforcement we've had to deal with
20   certain things, opioids, drugs, and mental illness
21   is a big thing that law enforcement has to deal
22   with nowadays, correct?
23        A.    That's correct.
24        Q.    And back at that time, if they mandated
25   training on intellectual disabilities for a period

1  of time, at least 2014 to 2017, when that was

2  repealed, do you know if JPSO provided any type of

3  training with respect to intellectual disabilities

4  or autism?

5      A.   Back then, no, because I wasn't here, but

6  I know our CIT program was put in before then, so

7  the answer is yes.

8      Q.   Do you know that -- we've taken a bunch

9  of 30(b)(6) depositions already.  Do you know that

10  your trainers have created a PowerPoint to present

11  to officers during training on autism, and it was

12  completed in 2018?  Do you know that?

13      A.   I did not.

14      Q.   Do you know that even though it's been

15  completed, it has not been -- it has not been put

16  into play?  He is waiting on some type of approval

17  to provide it.

18          MR. ZIBILICH:

19              I am going to object to the form.  I

20          didn't understand the question, but you

21          can answer it.

22          THE WITNESS:

23              Did -- not aware.

24  BY MR. CLARKE:

25      Q.   Do you think training on autism would be

1  beneficial or helpful to officers?

2      A.   I'll answer it this way.  No training is

3  bad training, but, you know, when it comes to every

4  single scenario -- you know, I support training,

5  right.  I want my officers to go to certain

6  trainings on certain things or everything, but

7  there are a whole bunch of mental conditions,

8  physical conditions of different parties that come

9  on every day.  It kind of depends on what your

10 answer is, right.  I certainly am going to have

11 people that handle my cardinals, committals to do

12 more specific training on people that they deal

13 with on an everyday basis, but whether training is

14 going to be applied to all thousand POST certified

15 deputies or all 1,400 employees is another

16 situation that you've got to, you know, figure out

17 who is going to what, right.  Certain -- I have

18 certain employees that are going to encounter

19 things that other ones aren't going to encounter on

20 a regular basis.

21          So it's never a situation where I'm

22 against it, but it's also a reality of a department

23 that size of I can't have them in a classroom every

24 day all day long on certain training.  We still

25 have to answer the calls for service that come out

```
 1   there.
 2        Q.   If you look at the statute that was in
 3   place from 2014 to 2017, everybody had to do it.
 4        A.   Yeah, but, also, that could be a one-hour
 5   presentation or an eight-hour presentation within
 6   the academy class.
 7        Q.   And I understand that.  We've taken a
 8   30(b)(6) on training, and there are no specific
 9   training courses dealing with autism.
10             MR. ZIBILICH:
11                  I object to the form.  First of all,
12               it's not a question.
13   BY MR. CLARKE:
14        Q.   Did you read Pizzolato's deposition?
15        A.   No, I did not.
16        Q.   I mean, whatever he says about the
17   training -- you know, that's who you designated to
18   speak on the training.  You would defer to him,
19   correct?
20        A.   I mean, we deferred to him, obviously, on
21   that particular issue, but there is also -- I don't
22   think he does the CIT training. You know, I mean,
23   so you got different people that are going to do
24   different types of training, you know.
25        Q.   But he was the 30(b)(6) on all training.
```

```
 1          A.    Okay.
 2          Q.    I mean, Pizzolato -- I mean, you
 3    understand 30(b)(6) and the --
 4          A.    You said Pizzolato now not Iannazzo.
 5          Q.    Correct.  Pizzolato is who they produced.
 6          A.    Oh, I thought you said Iannazzo to begin
 7    with.
 8          Q.    No.  It's always been Pizzolato.
 9          A.    Got it.
10          Q.    And don't get me saying names.
11          A.    No, no.  I overheard Iannazzo to begin
12    with.  That's why I was saying it.
13          Q.    He was something for yesterday. It looks
14    like, looking from the Secretary of State, the
15    Lopinto Law Firm was active in May of 2005.  Does
16    that sound about correct?
17          A.    That sounds correct.
18          Q.    And is it defunct now?
19          A.    It is just this year.
20          Q.    In 2022?
21          A.    2022, correct.
22          Q.    When you were working with the Lopinto
23    Law Firm and with the Martiny Law Firm, you
24    appeared in numerous cases, correct?
25          A.    I did.
```

```
 1       Q.   I'll mark these as the next two exhibits.
 2            MR. ZIBILICH:
 3                 142.
 4  BY MR. CLARKE:
 5       Q.   142 is a Pacer search of his cases, and
 6  143 is a Westlaw search of his cases.  Just if
 7  you'll look those over and confirm that you were
 8  the lawyer in those cases.
 9       A.   Give me one second.
10       Q.   Sure, sure, and if you ever need to take
11  a break.
12       A.   Let me make sure this isn't an emergency.
13  Okay.
14       Q.   When you filed pleadings in those cases,
15  under Rule 11, you would have to -- any argument
16  that you made would have to be based on the law or
17  good faith argument to change the law, correct?
18            MR. ZIBILICH:
19                 Object to the form.  You can answer
20              it.
21            THE WITNESS:
22                 Yeah. Repeat that, though, counsel.
23  BY MR. CLARKE:
24       Q.   You know under Rule 11 for lawyers who
25  file pleadings, correct?
```

```
 1        A.    Uh-huh.
 2        Q.    You have to say yes or no.
 3        A.    I'm sorry.  What was the question,
 4   though?
 5        Q.    No, no.  You said uh-huh.  The question
 6   is under Rule 11, when something is filed by you as
 7   a lawyer, you have to -- that you are certifying by
 8   signing something that it is based on a good faith
 9   argument of law or for a good faith argument to
10   change the law, correct?
11        A.    That's correct.
12        Q.    So anything that you filed in those cases
13   you would have some knowledge of, if you signed it?
14             MR. ZIBILICH:
15                  Again, object to the form.  He can
16               answer it.
17             THE WITNESS:
18                  You know, counsel, we -- I'll agree
19               with you in principle on that.  I mean,
20               let's face it.  I've got other
21               attorneys that work, also, but go
22               ahead.
23   BY MR. CLARKE:
24        Q.    Fair enough.
25        A.    I don't sign it unless I know it.
```

```
 1        Q.    But you understand what Rule 11 says, and
 2   you worked with other people as a team on certain
 3   things that they may have done more of the work?
 4        A.    Correct.
 5             MR. ZIBILICH:
 6                  Object to the quiz.
 7             THE WITNESS:
 8                  I'm sure some of the paragraphs from
 9                  William Most are different than what
10                  you would put, so that's the
11                  difference.
12   BY MR. CLARKE:
13        Q.    And Franz does the same paragraph many
14   times.
15        A.    Exactly.
16        Q.    Let's talk about your kind of philosophy
17   as a sheriff.  Let's see if we can kind of stream-
18   line some things.  Do you agree that in every
19   sheriff's department or anybody who runs a law
20   enforcement department that you need to have
21   written policies?
22             MR. ZIBILICH:
23                  Object to the form.  You can answer
24                  it.
25             THE WITNESS:
```

```
 1                  Yes, but that's a very vague
 2                  question when you are talking about
 3                  that.
 4      BY MR. CLARKE:
 5          Q.   I'm talking of a philosophy right now.
 6      Really, what I'm trying to get is, in order to run
 7      a department, you have to have written policies;
 8      you have to have training; you have to supervise
 9      your officers, and if they do something wrong, hold
10      them accountable.  Do you agree with those four?
11          A.   That's correct.
12          Q.   I call them the four legs to a chair.  If
13      you have good policies but no training, that can
14      create a problem, correct?
15          A.   Correct.
16               MR. ZIBILICH:
17                    Object to the form.
18      BY MR. CLARKE:
19          Q.   And if you have great written policies
20      and great training, but you don't supervise
21      anybody, that could present a problem, correct?
22               MR. ZIBILICH:
23                    Object to the form.
24               THE WITNESS:
25                    Correct.
```

1    BY MR. CLARKE:

2        Q.    And then, when you have written policies

3    and do the training, that's kind of what the

4    sheriff's department is trying to tell its officers

5    how they want them to act in the field, correct?

6                MR. ZIBILICH:

7                    Object to the form.  Go ahead.

8                THE WITNESS:

9                    Correct.

10   BY MR. CLARKE:

11       Q.    Obviously, you can't have a policy on

12   everything and training on everything, but you want

13   to train them and have policies on things that are

14   recurring.  Would that be fair?  That they face

15   more frequently.

16       A.    That's -- you know, I don't say that's

17   fair, right, because, you know, when you take it

18   from the eyes of the deputy on the street, you

19   don't know what that next call is going to be ever,

20   right.  That doesn't mean -- most calls are law

21   enforcement mundane.  All right.  It's not the

22   officer-involved shooting, right.  It's not the in-

23   custody death.  It's the mundane things that

24   happen.  They don't get to predict what the outcome

25   is going to be there.  So you'll have departments

1    that, in my opinion, they over policy, you know,

2    each individual scenario.  That's kind of difficult

3    to do, in my opinion.  I think the law, especially

4    the existing law that is out there, is going to

5    certainly give discretion for them to make

6    reasonable decisions on a call, and so that's where

7    -- I won't say I differ than many, but there is a

8    difference between departments that are civil

9    service compared to, you know, being compared to

10   ones that are not civil service, right, that have

11   to document certain things or not document certain

12   things.  I get to look at what were the actions and

13   whether they were reasonable or not.  So it's not

14   as easy as, okay, we're going to put this policy in

15   place or put this policy in place.  You've got to

16   look at it as how it affects the law itself.

17        Q.   Okay.  Well, let me give you an example.

18   Okay.  Pursuit driving.  Okay.  A department could

19   have a pursuit policy that says we don't pursue,

20   correct?

21        A.   Correct.

22        Q.   It could have a policy that we only

23   pursue when the benefit -- the need to immediately

24   apprehend somebody outweighs the danger by the

25   pursuit, correct?

     A.   Correct.

     Q.   They can have one that says we're only
going to pursue for violent felonies, and then you
have to go through the balancing test.  You're
aware of different types of policies, correct?

     A.   Sure.

     Q.   By picking a policy, you are picking an
approach that you want your officers to utilize in
the field with respect to the topic of the policy,
correct?

     A.   You're right.

     Q.   So while you can't have a policy for
everything, for example, you know officers are
going to use force, correct?

     A.   They are going to have to, correct.

     Q.   That's part of one of the duties they
have or one of the benefits of having a badge is
that they're allowed to utilize force, reasonable
force, correct?

     A.   That's correct.

     Q.   And are you also aware that why we have
written policies, there is numerous think tanks,
law enforcement think tanks, that have model
policies that can be reviewed and evaluated and
utilized with respect to any department?

1          A.    Right.  I am aware, yes.

2          Q.    Exhibit Number 19 that's in front of you

3     in that binder are your policies.  Okay.  Now, do

4     you -- we're not going to go through all of the

5     policies, but if you look at the Internal Affairs

6     policies, if you need to, when we go through.  I

7     think it's 22.  Let's go back to it.  First thing,

8     go to your use of force policy.  It is 25.  Do you

9     feel that this policy sets forth the proper

10    standards for use of force by the Jefferson Parish

11    Sheriff's Office?

12         A.    Counsel, I haven't read it in a long

13    time.

14         Q.    Let me withdraw that question.  When you

15    became sheriff, did you change any policies?

16         A.    I know I've had to revise some policies

17    at periods of time.

18         Q.    If you look at SOP-25, the use of force

19    policy was effective on June 25th, 1987 and revised

20    April 19th, 2016, correct?

21         A.    Correct.

22         Q.    When did you become --

23         A.    I didn't come to the sheriff's office

24    until July of '16.  That was before my time.

25         Q.    So you have not made any changes to the

1    use of force policy?

2         A.   I have not, no.

3         Q.   Let's go to SOP-8.

4         A.   Eight?

5         Q.   Yes.  This was effective October 26th,

6    1994, correct?

7         A.   Correct.

8         Q.   And revised on July 7th, 2014, correct?

9         A.   Correct.

10         Q.   You didn't make any changes to that

11    policy?

12         A.   I have not.

13         Q.   Let's go to Internal Affairs.  I think

14    it's 22.  Effective date May 25th, 1982, revised on

15    December 1st, 2007.  You see that?

16         A.   That's correct.

17         Q.   You didn't make any changes to that

18    policy, correct?

19         A.   I have not.

20         Q.   Now, you made a statement all training is

21    good training, or something like that, a little bit

22    before.  Have you seen the TARP training?

23              MR. ZIBILICH:

24                   Have you seen what?

25              MR. CLARKE:

```
 1              The TARP training.
 2         MR. ZIBILICH:
 3              Whose TARP training?
 4         MR. CLARKE:
 5              His.
 6  BY MR. CLARKE:
 7     Q.   Have you seen your TARP training?
 8     A.   I'm not familiar with that term.
 9     Q.   It's in your policy.  If you look under
10  SOP-8.
11         MR. ZIBILICH:
12              He's not familiar with the term,
13          sir.
14         THE WITNESS:
15              What is the -- if you give me the
16          acronym, I may understand.
17  BY MR. CLARKE:
18     Q.   Total Appendage Retraining Procedure.
19     A.   Okay.
20     Q.   Have you seen that training?
21     A.   I can't say I've seen it, but now I'm
22  familiar with the term.  I just didn't recognize
23  TARP.
24     Q.   With the TARP, they use the RIPP Hobble.
25  Let's see if we can agree on something.  Prior to
```

```
 1   January of 2019. No, 2020.  Prior to 2020, do you
 2   agree that in law enforcement there was knowledge
 3   of potential problems with restraining people in
 4   the prone position?
 5              MR. ZIBILICH:
 6                   Object to the form.  Which law
 7                 enforcement?
 8              MR. CLARKE:
 9                   Any law enforcement.
10              MR. ZIBILICH:
11                   Object to the form.
12              THE WITNESS:
13                   You know, I guess it's one of those
14                 questions.  Was there knowledge?
15                 Certainly.  We changed things, you
16                 know, dealing with RIPP Hobbles and
17                 that type of stuff.  I think the
18                 science is always still mixed, right,
19                 depending on what scientist you talk to
20                 that day, but it doesn't mean that law
21                 enforcement didn't take measures to try
22                 to prevent certain things from
23                 happening.
24   BY MR. CLARKE:
25        Q.   I understand.  Listen, I'm just getting
```

1    it noticed.  Okay.

2         A.   Sure.

3         Q.   We go back -- give me that file.  Are you

4    aware that in 1993, JPSO -- there was a judgment

5    against them for a positional asphyxia case in the

6    case of --

7         A.   I can answer that question now.  In 1993,

8    the answer is no.

9         Q.   Well, when you got involved -- I'll mark

10   this as the next exhibit.

11             MR. ZIBILICH:

12                  144.

13   BY MR. CLARKE:

14        Q.   This is the Williams versus Lee judgment.

15        A.   Okay.

16        Q.   Are you aware that in 1992 there were a

17   number of task force that were put together that

18   were talking about positional asphyxia and the

19   hog-tying cases coming out of San Diego?

20             MR. ZIBILICH:

21                  Object to the form.  Go ahead.

22             THE WITNESS:

23                  Well, yeah.

24   BY MR. CLARKE:

25        Q.   That's when it started.  We have all of

1    these competing experts at some point, correct?

2         A.   Correct.

3         Q.   And in 1992, the San Diego death custody

4    task force came out, and I believe around that time

5    is when you went to RIPP Hobble.  Is that your

6    understanding?

7              MR. ZIBILICH:

8                   Who went to the RIPP Hobble?

9              MR. CLARKE:

10                  JPSO.

11             THE WITNESS:

12                  I'm not sure when JPSO went to the

13                  RIPP Hobble, but I do know the RIPP

14                  Hobble was probably invented because of

15                  those type of cases, you know, which

16                  kind of changed it in law enforcement

17                  generally, but, again, all of this was

18                  before my time.

19   BY MR. CLARKE:

20        Q.   What I'm going to mark as Exhibit Number

21   145 is a complaint in Sullen versus JPSO.  Are you

22   aware of the Renee Alexander incident which

23   resulted in an asphyxia death?

24        A.   I am not.

25        Q.   Do you know whether that case was

```
 1   resolved?
 2        A.   I do not know.
 3        Q.   We'll go to the next one.  Do you
 4   remember a case called Khan versus Lee and a number
 5   of deputies?
 6        A.   I am not.
 7        Q.   I'll mark that as Exhibit one forty --
 8             MR. ZIBILICH:
 9                  146.  You can ask me about that one.
10             MR. CLARKE:
11                  In that one, do you remember what
12                the characteristics were of the
13                complaint, Franz?
14             MR. ZIBILICH:
15                  Do I remember them?
16             MR. CLARKE:
17                  Yeah.
18             MR. ZIBILICH:
19                  Sure.
20             MR. CLARKE:
21                  Okay.  Do you remember the court
22                saying that there were no risk factors
23                in that case like obesity?
24             MR. ZIBILICH:
25                  Do I remember that verbiage?  No.  I
```

1              remember the result.
2        THE WITNESS:
3              Counsel, do I need to object?
4        MR. CLARKE:
5              You let us do our thing for a little
6          bit.  It takes some pressure off of
7          you.
8        MR. ZIBILICH:
9              Off the record. I remember it took
10         forever to get a ruling.
11       MR. CLARKE:
12             Well, in that case, there was an --
13       THE COURT REPORTER:
14             Off this record or that record?
15       THE WITNESS:
16             No.  Keep going.
17       MR. CLARKE:
18             There was an asphyxial case that
19         resulted in a verdict in favor of
20         Jefferson Parish.  You didn't perform
21         -- what is the date of that complaint?
22       MR. ZIBILICH:
23             There was no verdict.
24       MR. CLARKE:
25             There wasn't?

```
 1              MR. ZIBILICH:
 2                   No.
 3              MR. CLARKE:
 4                   It was a summary judgment?
 5              MR. ZIBILICH:
 6                   Yes.
 7    BY MR. CLARKE:
 8         Q.   Keeven Robinson.  Were you aware -- let's
 9    mark the next one.
10              MR. ZIBILICH:
11                   147.  Must be getting paid twice to
12                be your paralegal, but you don't pay
13                that much.
14              MR. CLARKE:
15                   We pay more than you think, if we do
16                it, if you know that.
17    BY MR. CLARKE:
18         Q.   Do you remember the Keeven Robinson case?
19         A.   I am.
20         Q.   In that one, the court ruled -- two
21    medical examiners ruled that it was a homicide,
22    correct?
23         A.   That's correct.
24         Q.   And in that case, it was a prone
25    restraint that resulted in an asphyxial death,
```

```
 1    correct?
 2         A.   Yeah, with a whole bunch of other
 3    complications.
 4         Q.   There was a bigger scene.  There were a
 5    number of things that went on.  What we've marked
 6    as Exhibit 123 is a homicide report on that as
 7    well, correct?
 8         A.   That's correct.
 9         Q.   Internal Affairs didn't investigate
10    Keeven Robinson or the Parsa case, correct?
11         A.   Internal Affairs did not.  Homicide does
12    them, because, obviously, it was a -- I mean,
13    homicide will investigate that.  We handle it on a
14    criminal level, not an administrative level.
15         Q.   Well, your policy requires -- the IA
16    policies require you to do an administrative -- an
17    Internal Affairs investigation after anything that
18    is delayed for criminal, don't they?
19         A.   Wait.  I'm sorry.
20              MR. ZIBILICH:
21                   What?
22    BY MR. CLARKE:
23         Q.   Your IA policies require you to do an
24    Internal Affairs investigation after the criminal
25    aspect is handled, correct?
```

```
 1              MR. ZIBILICH:
 2                   Object to the form.
 3    BY MR. CLARKE:
 4         Q.   Go to SOP-22, Subsection G, Page 7 of 11.
 5         A.   I'm sorry.  Subsection what?
 6         Q.   G.
 7         A.   Do you know what page that was on,
 8    counsel?
 9         Q.   Seven of 11.  G(1).
10         A.   That's not -- so into a complaint.  I
11    don't think we ever had a complaint.
12         Q.   Let's talk about the way you take
13    complaints.  Are you aware that most law
14    enforcement think tanks, like the IACP, PERF -- I
15    would imagine even your sheriffs group require the
16    investigation of all critical incidents?
17              MR. ZIBILICH:
18                   Object to the form.
19              THE WITNESS:
20                   Yeah.
21    BY MR. CLARKE:
22         Q.   And if you -- I'm going to try to get you
23    to the discovery responses real quick.  Exhibit
24    126, Interrogatory Number 4.  In this interrogatory
25    we request information about in-custody deaths and
```

```
 1   then asked for information pertaining to them.  You
 2   see that?
 3        A.   Uh-huh.
 4        Q.   In this you list 19 in-custody deaths,
 5   correct?
 6        A.   If you're telling me that, counsel.
 7        Q.   If you just look.  You've got one --
 8        A.   Yeah.  I mean, you need me to flip
 9   through those pages to tell you it's 19?
10        Q.   Now, in all of these cases, no Internal
11   -- I want you to look through to confirm that there
12   was no Internal Affairs investigation of any of
13   these in-custody deaths.
14        A.   Okay.
15             MR. ZIBILICH:
16                  Counsel, let me ask you this.  How
17               would he know if there was an Internal
18               Affairs investigation when he wasn't
19               employed there?
20             MR. CLARKE:
21                  He signed it.  He signs it under
22               oath. Good question.
23             MR. ZIBILICH:
24                  Must have had some help from
25               somebody.
```

```
 1                THE WITNESS:
 2                     Okay.
 3    BY MR. CLARKE:
 4         Q.    Why don't you order the investigation or
 5    why don't the policies require an investigation of
 6    every in-custody death?
 7                MR. ZIBILICH:
 8                     Object to the form.  You can answer
 9                it.
10                THE WITNESS:
11                     I think your -- you got two separate
12                things, right.  Internal Affairs
13                Division doesn't handle our in-custody
14                deaths, right, or doesn't handle really
15                any type of homicide.  I'm going to let
16                the experts that handle those types of
17                situations handle that on a regular
18                basis.  My IA Division supervisors are
19                handling speeding complaints, courtesy
20                complaints, you know.  I don't think
21                it's fair to the investigation or
22                anybody else to have the person that's
23                normally handling the speeding
24                investigation handle a death complaint
25                when they've never been assigned to
```

```
 1                    homicide and never written those types
 2                    of reports, right.  So it is a better
 3                    situation, in my opinion, that our
 4                    homicide supervisors will handle those
 5                    type of cases, you know.
 6                        Now, that being said, I've actually
 7                    recently made changes.  Now, it wasn't
 8                    the in-custody deaths, but generally
 9                    before, in the past, Internal Affairs
10                    was just administrative types of --
11                    whether they violated some policy or
12                    whatever the case may be, courtesies,
13                    those types of things.
14                        I have them separated from a
15                    criminal section and an administrative
16                    section for those minor criminal
17                    offenses that wouldn't rise to the
18                    level of a detective bureau, right.  If
19                    one of my officers gets into a fight
20                    with somebody, punches somebody, they
21                    can make those types of arrests, but
22                    certainly in an in-custody situation,
23                    it is still going to be handled by my
24                    homicide division who will handle that.
25                    So this does not surprise me in the
```

1             least.
2    BY MR. CLARKE:
3         Q.    The homicide report goes to the DA,
4    correct?
5         A.    Correct.
6         Q.    The DA investigates crime, correct?
7         A.    Well, we have a practice that we send all
8    of our in-custody to the DA's office to do a review
9    after the fact, too.
10        Q.    I understand, but they don't look -- the
11   DA does not control whether or not the officers
12   violate policy or whether training needs to be in
13   the hands of the JPSO, correct?
14        A.    I don't disagree with you there, counsel,
15   but on the opposite standpoint, if I don't have --
16   if something comes up, we certainly can refer down
17   to Internal Affairs, but if there is nothing on the
18   surface that, you know, requires that referral down
19   to Internal Affairs, it's not going to go there,
20   correct.
21        Q.    Would you agree that that is against like
22   the IACP's beliefs on Internal Affairs and PERF's
23   or the think tanks?
24        A.    Well, you know, again, think tanks are
25   not -- you know, I belong to several of them,

```
 1    right.  I belong to IACP.  I also belong to the
 2    National Association of Sheriffs and all the rest
 3    of them, right.  The think tanks are what they are.
 4    You'll have different opinions on each one of them
 5    that exist.  That's part of the reason why I
 6    created the criminal section and civil section,
 7    administrative sections of it.  A change has been
 8    made, but it's still not going to change that these
 9    type of cases would not go to a detective that
10    doesn't have experience in these type of cases.
11         Q.   You can train anybody to do IA
12    investigations.  Send them to OIS, officer-involved
13    shooting schools, all that kind of stuff, if you
14    wanted to spend the resources, correct?
15         A.   You know --
16              MR. ZIBILICH:
17                   Object to the form.  You can answer.
18              THE WITNESS:
19                   I don't necessarily -- you know,
20              just because you are trained to be able
21              to do a homicide report when your
22              experience isn't that to do one, when
23              you have done one in your life, there
24              is a big difference than doing, you
25              know, 45 a year, right.  So that's the
```

```
 1                    argument that we obviously have.  We
 2                    handle more homicide investigations in
 3                    Jefferson Parish than the state will do
 4                    in the entire state.  Those people say,
 5                    hey, we should give this over to the
 6                    state.  Well, I've been on officer-
 7                    involved shooting scenes where state
 8                    police has been involved, and,
 9                    literally, their supervisor goes, "If
10                    you gave me four hours, I couldn't
11                    replicate what you have here to be able
12                    to make that happen."
13                         Now, that is not necessarily the
14                    same for Morehouse Parish.  Morehouse
15                    Parish, you know, they probable have
16                    one detective that's never been
17                    involved in anything, and they would
18                    welcome state police's expertise to be
19                    able to come in and to be able to
20                    handle that, but that's not necessarily
21                    the case of your big agencies that have
22                    the resources to be able to put it
23                    together.
24   BY MR. CLARKE:
25        Q.   Well, in the Parsa case, do you know who
```

 1    the homicide detective was who did the report?

 2    That's Keeven Robinson.  I can give you the Parsa

 3    report, if you want.  It's been already marked

 4    Exhibit 31.

 5         A.    Sergeant Keith Dowling.

 6         Q.    What do you know about his background?

 7         A.    He is a supervisor in our --

 8         Q.    I took his deposition here, and do you

 9    think he has any training in homicide

10    investigation?

11         A.    He actually doesn't work homicide, does

12    he? Yeah. He is in the gun violence unit.  I mean,

13    they are literally next to each other in the

14    hallway, right, handling -- because many gun

15    investigations turn into homicides eventually, but,

16    you know, it kind of just depends on what -- you

17    know, if it's a homicide on the scene, homicide

18    does certain things.  The gun violence unit, they

19    are going to start off with the gun violence unit,

20    but that means the person got transported to the

21    hospital.  If he dies two days later, it's still a

22    homicide.  They'll still handle it.

23         Q.    Do you know that he's been previously

24    arrested at his previous law enforcement thing

25    before coming to JPSO?

```
 1        A.    Did not.
 2        Q.    Did you know that he did not do any
 3   investigation pertaining to the TARP policy or the
 4   restraint policy?
 5        A.    No.
 6        Q.    I mean, the homicide -- here is what I'm
 7   getting at.  You know what a Garrity statement is,
 8   correct?
 9        A.    Uh-huh.
10        Q.    You have to say yes or no. I'm sorry.
11        A.    Yes.
12        Q.    Garrity is --
13             MR. ZIBILICH:
14                  He says he knows what it is.
15   BY MR. CLARKE:
16        Q.    Garrity allows you to take investigations
17   when the officers may have criminal liability,
18   correct?
19        A.    Sure.
20        Q.    Have you ever heard of a concurrent
21   investigation?
22        A.    Yeah.  I mean, certainly, if we have a
23   deputy refusing to give a statement, we can enact
24   the administrative procedures in order to force
25   one.
```

```
 1        Q.   I've taken -- he was -- I've taken
 2   Dowling's deposition.  He didn't do anything with
 3   respect to whether the officers violated policy. He
 4   was preparing a report to turn into the DA to
 5   determine whether criminal charges were going to be
 6   brought, correct?
 7        A.   I would say -- I mean, I haven't read his
 8   report, counsel, but that would probably be an
 9   accurate statement.
10        Q.   And you understand the distinction.  A DA
11   is looking for whether or not there is probable
12   cause to believe that a criminal statute has been
13   violated, correct?
14             MR. ZIBILICH:
15                  Object to the form.  Go ahead.
16             THE WITNESS:
17                  Yeah.
18   BY MR. CLARKE:
19        Q.   An Internal Affairs investigation is to
20   determine whether or not people are complying with
21   the written policies, the training they were
22   provided, and to be able to utilize that
23   information to make the department better, correct?
24             MR. ZIBILICH:
25                  Object to the form.
```

```
 1              THE WITNESS:
 2                   Whether -- an Internal Affairs
 3              investigation.  I mean, really, any
 4              investigation is to collect the
 5              statements, collect the evidence on the
 6              scene, right.  So that is you and our
 7              jobs to interpret those things of
 8              whether we believe they are violations
 9              or not violations, but it's the
10              collection of the evidence that is more
11              important to the investigator that's
12              out there.  That's whether it is an
13              Internal Affairs or a homicide
14              investigation.
15   BY MR. CLARKE:
16        Q.   Well, the Keeven -- pull up -- grab 123.
17   Now, when was that report completed? It's on the
18   second page.
19              MR. ZIBILICH:
20                   If you know, why are you asking?
21              THE WITNESS:
22                   Not on the second page.
23   BY MR. CLARKE:
24        Q.   Let me pull it.  Let me ask it to you
25   this way.  When the Keeven Robinson report gets
```

1  done, does this go to training or do you review it
2  to see whether or not there are any changes that
3  need to be done to the policies or the training or
4  the practices of the department?
5        A.   No.
6             MR. ZIBILICH:
7                  Wait.  Which question do you want
8              him to answer?
9             MR. CLARKE:
10                  He already answered it.
11             THE WITNESS:
12                  No.
13  BY MR. CLARKE:
14        Q.   With respect to the Parsa homicide
15  investigation, was that provided to training or
16  Internal Affairs or anybody else to determine
17  whether or not we need to look at the policies and
18  the training to change them?
19        A.   I won't say that there is a policy where
20  this report gets turned over to training to see if
21  that's there.  I mean --
22        Q.   Do you think that's a good idea?
23        A.   Certainly -- I mean, well, Counsel, we're
24  doing 30,000 reports a year, right.  Every one of
25  them, you know, do it.  This, of course, is the

```
 1   biggest case to you, because you are involved in
 2   it, but whether the reality of all 30,000 cases get
 3   turned over to training to see if somebody did
 4   something wrong, and we need to change that is not
 5   realistic.
 6        Q.   How about just death cases?
 7        A.   You know, no.  On their face, they're not
 8   turned over from that standpoint, right.
 9        Q.   Do you know if anybody -- with Keeven
10   Robinson, that was the case, and you ended up
11   settling Keeven Robinson for $307,000, correct?
12             MR. ZIBILICH:
13                  For how much?
14             MR. CLARKE:
15                  307.
16             THE WITNESS:
17                  I think it was 300, right? I think
18               it was 300 even.
19   BY MR. CLARKE:
20        Q.   Okay. 300 even.  Could anything be
21   learned from what happened in Keeven Robinson?
22             MR. ZIBILICH:
23                  Object to the form.
24             THE WITNESS:
25                  Again, when I looked at the
```

```
 1              testimony that was there from that
 2              standpoint, I believe the deputies
 3              acted appropriately for the conditions
 4              that they were in.  You know, certainly
 5              bad facts turn into bad consequences,
 6              you know, but when you looked at the
 7              testimony of the deputies, those
 8              consequences were certainly severe.
 9                  I've got to make choices from my
10              standpoint of whether it was settled in
11              that case.  The bad -- there was more
12              bad facts than I thought bad practices,
13              so the circumstances were not great, as
14              in this one.  I mean, this is a tragic
15              event.  I don't take anything from
16              that.  I think the circumstances are
17              absolutely horrible, but that doesn't
18              mean our deputies' hearts aren't in the
19              right place and trying to do the right
20              thing when those actions happened.
21                  The circumstances and the outcome of
22              it can be bad, but that doesn't
23              necessarily mean that what was done on
24              the day of was unreasonable.
25  BY MR. CLARKE:
```

1      Q.   Correct.  All I'm trying to say is that's

2  what you're saying after the fact.  It didn't go

3  through analysis from the training department, from

4  Internal Affairs, and then to you to make the

5  decision.  It was through litigation.

6      A.   Certainly, but you've also got to look at

7  the circumstances of litigation.  Litigation can

8  bring something from it, and it's a bad -- you

9  know, when you are making the amount of arrests

10  that we're making, if we're not seeing this on a

11  regular basis, it's one thing, but when -- you got

12  to make changes, right, you know.  These are

13  specific sets of circumstances of what occurred,

14  you know, and so am I going to change those things

15  because of this case when I know how it applies to

16  this one, this one, this one, right.  And those are

17  always scenarios that exist.  We don't get to

18  cherry pick the outcomes.  I certainly can find

19  numerous cases of the sheriff's office where

20  someone was put down in a prone position and that

21  was handcuffed and brought to jail and didn't have

22  a problem.

23      Q.   Any of them down, held in the prone

24  position, for nine minutes?

25      A.   I don't know the answer to that question,

```
1    right, because it probably didn't have the outcome
2    that this one did, right.
3         Q.   We don't know.
4         A.   Right.  That's just what it comes.  It's
5    not like that is a normal scenario, right.  I mean,
6    could it have happened?  Could somebody have been
7    held down nine minutes, and they went to jail, and,
8    you know, didn't have a problem?  We wouldn't be
9    here.  That's just what it comes down to.
10        Q.   But this isn't a new position.  I mean,
11   this isn't a new issue with law enforcement.
12             MR. ZIBILICH:
13                  What isn't?
14             MR. CLARKE:
15                  About the prone position.
16             MR. ZIBILICH:
17                  I'm very bad with pronouns.
18   BY MR. CLARKE:
19        Q.   Prone position and tragic outcomes. I'm
20   going to show you what we've marked as Exhibit 25.
21   This has been talked about since the 1990s,
22   correct?
23        A.   Correct.
24        Q.   And the issue isn't just prone
25   positioning.  It is the use of force during prone
```

1    position, correct, or the use of weight?

2              MR. ZIBILICH:

3                   Object to the form.  You can answer

4              it.

5              THE WITNESS:

6                   Right.  I believe that is the use of

7              weight, the use of force, the use of --

8              you know, I mean, you've got -- you

9              know, I haven't seen this particular

10             article.  This goes back to 1995, but

11             I'll agree with you, counsel, there is

12             a ton of articles whether excited

13             delirium exist, whether it doesn't

14             exist, positional asphyxia.  There are

15             articles on every step of the way with

16             everybody that claims to be an expert

17             that can give you both sides of those

18             positions, right.  It is not a new

19             phenomenon.  I agree with you.  It's

20             been around for awhile.

21   BY MR. CLARKE:

22        Q.   Let me put -- every cop doesn't shoot

23   their gun in the line of duty, correct?

24        A.   That's correct.

25        Q.   You give a lot of training on it because

```
 1   the misuse or the improper use of a gun can have
 2   catastrophic results, correct?
 3                   MR. ZIBILICH:
 4                        Object to the form.  You can answer
 5                it.
 6                   THE WITNESS:
 7                        That's true.  Correct.
 8   BY MR. CLARKE:
 9        Q.   There are certain things that happen over
10   and over again that you like to train on.  There
11   are certain things that the consequences could be
12   bad, so you provide training even though you hope
13   your officers never have to utilize that tool,
14   correct?
15        A.   That's correct.
16        Q.   Prone restraint, like if you would have,
17   after the Keeven Robinson investigation was
18   completed, if you would have trained people to not
19   -- be careful with the prone restraint, that could
20   have had an impact on what happened with Parsa,
21   correct?
22                   MR. ZIBILICH:
23                        Objection to the form.
24                   MR. KAUL:
25                        Object to the form.
```

```
 1                 THE WITNESS:
 2                     I disagree on that.  Prone restraint
 3             is still not a -- prone restraint is
 4             something that is not prohibited
 5             anywhere in law enforcement, right.  I
 6             mean, prone restraint is still
 7             effective.  In the Keeven Robinson
 8             case, in fact, he was -- his hands were
 9             underneath him.  They were trying to
10             force his hands back underneath him.
11             He was -- he did have -- you know, what
12             was it?  I don't remember what type of
13             narcotics were concealed on him from
14             that standpoint, pushed him back off
15             the ground, and so there are
16             circumstances that prone restraint
17             certainly was there.
18                 Now, we are -- you know, any type of
19             prone restraint, whether it's taking a
20             felony takedown, you know.  You are
21             looking at putting them down and
22             putting them in a prone position.
23             Having them lay down in a prone
24             position in order for you to be able to
25             approach.  So prone restraint is
```

1          something that is not barred in law

2          enforcement by any means.  Where the

3          connections have come into is you've

4          got some type of struggle, and now

5          we've got a sudden death immediately

6          thereafter.

7              So some people call that excited

8          delirium, right.  That's what occurred.

9          You got, as I said, other experts that

10         will say there is no such thing as

11         that.  Most of these things have said,

12         okay, you don't hog-tie.  We found that

13         several people that have died in these

14         types of positions were because the

15         handcuffs were hooked to leg shackles

16         where they were, you know, literally

17         hog-tied from that standpoint.

18             So that was the invention of the

19         RIPP Hobble.  Try not to put weight on

20         the person's back.  You know, in order

21         to make that.  Moving them to a

22         recovery position after the fight is

23         over with, right.  All of those things

24         are suggestions, but the circumstances

25         have to dictate where they are and when

1          do they come into place. So it's not
2          something that is new to us.  We
3          certainly have noticed.  We certainly
4          have changed our policies and positions
5          in order to make that happen, but that
6          doesn't mean that a bad scenario
7          doesn't occur.
8               You know, people are put in prone
9          positions.  Prone position is not
10         something in and of itself that
11         normally kills you.  I mean, think of
12         COVID.  COVID they started turning
13         people in the prone positions because
14         they were having better reactions from
15         it, right.
16              Does that mean we are supposed to
17         put them in prone positions now if we
18         think they are  testing positive for
19         COVID.  You know, I mean that's good.
20         The next attorney is going to try to
21         argue for me, right.  The reality of it
22         is those scenarios have to come forward
23         with what is happening on that
24         particular scene, and they've got to
25         use, you know, their judgment of what

1              do they believe is the best position at
2              that particular time.
3    BY MR. CLARKE:
4         Q.   Well, I mean, you are the sheriff.
5    They've got to use what you tell them to use,
6    correct?
7         A.   You know, I'm the sheriff 24 hours a day,
8    seven days a week, but I'm not there and out on a
9    call with them at that time.  If they are waiting
10   for me to tell them when they can pull the trigger
11   and when they can't pull the trigger, they're too
12   late already, so.
13        Q.   They're waiting -- that's why you give
14   them training, and the training --
15             MR. ZIBILICH:
16                  That's not a question.  Can we time
17             out for a second?
18             MR. CLARKE:
19                  No.  Hang on.  He is just talking a
20             lot, so --
21             MR. ZIBILICH:
22                  Can we time out for a second?
23             Questions, answers.  This is not a
24             debate.
25             MR. CLARKE:

```
 1                   You done?
 2              MR. ZIBILICH:
 3                   Yeah.
 4              MR. CLARKE:
 5                   Okay.  All right.
 6    BY MR. CLARKE:
 7         Q.   The issue isn't prone restraint or prone
 8    positioning.  It's what do you do when you get
 9    them.  After they've been prone for awhile, you
10    have to put them in a recovery position, correct?
11              MR. ZIBILICH:
12                   Object to the form.
13              THE WITNESS:
14                   You know, I can't -- there are
15                suggestions, obviously, right, but --
16    BY MR. CLARKE:
17         Q.   What is the suggestion for how long you
18    should hold somebody in a prone position?
19              MR. ZIBILICH:
20                   Object to the form.
21              MR. KAUL:
22                   Object to form.
23              THE WITNESS:
24                   And I will tell you the -- if I have
25                someone in a prone position, and I put
```

1              them in handcuffs, and the fight is

2              over with, do I need to put them in a

3              recovery position, or can we pick them

4              up and put them in the back of the

5              police car?

6    BY MR. CLARKE:

7         Q.    That would be a recovery position.

8         A.    Well, a recovery position is laying on

9    your side.

10        Q.    Pizzolato said the recovery position is

11   sitted upright.

12             MR. ZIBILICH:

13                  That's not a question.  You don't

14             have to answer that one.  Whatever

15             Pizzolato said, that's not a question.

16   BY MR. CLARKE:

17        Q.    What is the recovery position?

18        A.    The way I define a recovery position,

19   which is the position, that doesn't mean that you

20   can't -- you know, recovery position is someone's

21   laying on their side, right.  Normally their knees

22   are bent, you know, but we utilize that and several

23   different things, whether it would be the

24   administration of Narcan.  You know, try to

25   increase certain things. I mean, that's a recovery

```
 1  position, right.  That's what I define as a
 2  recovery position.  Turning someone on their side,
 3  knees bent.  That's what I define as a recovery
 4  position.
 5       Q.   But if you pulled him up, and you put him
 6  in a car, that would take him out of the prone
 7  position, correct?
 8       A.   That's correct.
 9       Q.   So those two things would serve the same
10  purpose, correct?
11            MR. ZIBILICH:
12                 Object to the form.
13            THE WITNESS:
14                 I don't disagree, yeah.
15  BY MR. CLARKE:
16       Q.   And you looked at the tape.  I'm just
17  going to ask you this question.  Is it your
18  testimony that there was no opportunity for the six
19  officers who got on the scene to turn Mr. E▇
20  P▇ into the recovery position prior to him
21  having his medical episode?
22       A.   You know, I think -- I don't think that's
23  a -- well, I'll say it this way.  There is always
24  an opportunity to do that, right.  Now, when was
25  that right opportunity? That's the definition of
```

1    what's reasonable at that point in time, right.  I

2    can see his legs still kicking.  I can see the

3    mother still talking to him.  You know, you are

4    trying to get him to calm down.  If they would have

5    turned him 15 seconds earlier, would I have had an

6    objection to it, no.

7        Q.   How about -- let me ask the question to

8    you this way.  Whence the first deputy gets up

9    there, and they handcuff him completely behind his

10   back, did you think that they had no ability to put

11   him in the recovery position at that time due to

12   his fighting?

13       A.   No.  I think his -- yeah.  I mean, I

14   could still see his legs kicking.  I mean, the

15   perfect example I would have probably tried to --

16   which I think it looks like they did.  I didn't

17   talk to anybody, but it looks like they went to try

18   to get shackles at that point in time.  You know,

19   it looks like Ms. Parsa was trying to calm him down

20   at that moment.  I'm looking at Officer Pitfield

21   and -- who was the second officer?  Was it Vega?

22   I'm looking at their body position.  From the

23   standpoint, it looked like it was well back on it.

24   Again, counsel, when was it reasonable?  That's

25   going to be a conversation.  I'm not going to be

```
 1   the person that says they couldn't have, because if
 2   they did, I would say, all right.  They made the
 3   decision to move him to the side, and now they're
 4   back into a fight again.  Now, what do they do?
 5   You've got -- those are the things that they've got
 6   to try to make those decisions on the scene, but
 7   it's not something that is set in stone that this
 8   is the moment of.
 9        Q.   Well, you've not -- haven't read
10   Pizzolato's deposition?
11        A.   I have not.
12        Q.   It's my understanding that the training
13   that provided is you never leave people in the
14   prone position, and you move them to the recovery
15   position or the modified recovery position whenever
16   it's safe.  Does that sound fair?
17        A.   Yeah.  That sounds fair.
18        Q.   You have never seen the TARP training,
19   have you?
20        A.   I don't know if I've ever seen it.  I'm
21   familiar with the term, right.
22        Q.   Well, let's --
23        A.   Everybody grabs on to an appendage, holds
24   them down or -- oh, no, no.  I'm sorry.  The TARP
25   is the RIPP Hobble, correct.
```

```
 1              MR. CLARKE:
 2                   Let's take a little break here,
 3              because I'm going to show some videos.
 4              THE VIDEOGRAPHER:
 5                   Going off the record.  The time is
 6              now 11:07.
 7                   {BRIEF RECESS}
 8              THE VIDEOGRAPHER:
 9                   Back on the record.  The time is now
10              11:21.
11    BY MR. CLARKE:
12         Q.   Sheriff, just to make sure, you said
13    something about there is -- all training is good,
14    but I don't believe you know for certain whether
15    you took the TARP or the RIPP Hobble training at
16    JPSO, so what I'm going to do is I have the
17    training.  What you have in front of you is Exhibit
18    Number 22.  Have you ever seen -- does this screen
19    look like anything that you had training of or does
20    it refresh your recollection?
21         A.   It does not, no.
22         Q.   This particular video goes with that
23    PowerPoint that you have in front of you, Exhibit
24    22.  Sheriff, if you look at me for a second, this
25    is -- the PowerPoint goes with this, and then they
```

1   play videos during training.  Are you aware of

2   that?

3          A.   I'm not aware of it.

4          Q.   If you look through Exhibit Number 22,

5   the first thing says SCDS video.  That is the

6   Sudden Custody Death Video that's up in front of

7   you.  And they go through -- let's just go through

8   the PowerPoint.  We are not going to play the whole

9   PowerPoint, but it is talking about cocaine

10  psychosis and -- are you aware of the case Cruz

11  versus City of Laramie?

12         A.   Not specifically.

13         Q.   Are you aware that in that particular

14  case, obesity is listed as a risk factor for

15  positional asphyxia?

16             MR. ZIBILICH:

17                  Object to the form.

18             THE WITNESS:

19                  I'm aware of that, yeah.

20  BY MR. CLARKE:

21         Q.   Do you know whether or not JPSO officers

22  are trained on whether obesity is a risk factor?

23             MR. ZIBILICH:

24                  Object to the form.  You can answer

25           it.

```
 1              THE WITNESS:
 2                   No.  I'm going to make an assumption
 3              again.  I haven't gone through the
 4              training.  RIPP Hobble was not
 5              something that was there for me.  I
 6              would assume that that is the case, but
 7              I think it's still an assumption,
 8              counsel.
 9  BY MR. CLARKE:
10      Q.   I went through Pizzolato.  If you want to
11  look at Exhibit 25 as well.  The philosophy or the
12  physiology of an encounter involves a couple of
13  things.  Number one, the person being taken to the
14  prone position, and then when weight gets put on
15  their back, would you agree that the more weight,
16  the more restriction of the breathing?
17              MR. ZIBILICH:
18                   I'll object to the form.
19              THE WITNESS:
20                   Yeah.  I think they try to put --
21              that puts me into an expert position,
22              you know.  I've seen it both ways where
23              experts have said that that's
24              different.  I've seen --
25  BY MR. CLARKE:
```

```
 1        Q.   I'm not asking your expert opinion.  I'm
 2   asking your opinion as the sheriff of Jefferson
 3   Parish what the training is that's provided to your
 4   officers.
 5             MR. ZIBILICH:
 6                  That was not your first question.
 7              Not even close to it.
 8             THE WITNESS:
 9                  Right.  Yeah.
10   BY MR. CLARKE:
11        Q.   All right.  Do you train them that
12   obesity is a risk factor?
13        A.   I would defer to Sergeant Pizzolato, but
14   I believe that that is the case, correct.
15        Q.   Would you agree that the more weight that
16   you put on somebody, the more compression of the
17   airway?
18             MR. ZIBILICH:
19                  Object to the form.  Put on them
20              where?
21   BY MR. CLARKE:
22        Q.   Put on his back.
23        A.   I believe that law enforcement and
24   probably JPSO defer to Detective Pizzolato, yes.
25   The higher you go on the back, the more pressure
```

1    you put on it is a risk factor that could

2    contribute to this.  Now, whether or not that is

3    sound medical science, I'm not necessarily sure,

4    but that doesn't mean that our training doesn't

5    take it into account.

6         Q.   Do you know what the cause of death in

7    this case was?

8              MR. ZIBILICH:

9                   Object to the form.  You can answer,

10              if you can.

11             THE WITNESS:

12                  I would -- if I recall, counsel,

13              some type of excited delirium with, I'm

14              assuming, positional asphyxia, you

15              know, but you have to give me the

16              autopsy report to -- I can give it to

17              you.

18   BY MR. CLARKE:

19        Q.   We'll just go right to it.

20        A.   Died as a result of excited delirium due

21   to an acute psychotic episode and a sudden, severe

22   autism spectrum disorder and destructive behavior

23   disorder.  Contributing factors, morbid obesity,

24   prone position, carbon majalia (phonetic).  The

25   manner of death is classified as an accident, yeah.

1      Q.    Do you know -- have you read the

2    deposition of Dr. Troxclair?

3      A.    I have not.

4      Q.    Do you know that she testified if they

5    had not put him in the prone restraint that he

6    probably would not have died?

7            MR. ZIBILICH:

8                Wait, wait.  Not only do I object to

9              the form, show him that answer.

10           MR. KAUL:

11               Object to the form.

12           MR. ZIBILICH:

13               Show him that answer.

14           MR. CLARKE:

15               I'm not going to show him that, but

16             that is what it says.

17           MR. ZIBILICH:

18               No.  It's not a quote.  I've got it

19             memorized.

20           MR. CLARKE:

21               Well, you can answer.

22           MR. ZIBILICH:

23               Show him that particular transcript.

24           THE WITNESS:

25               I have not seen that, and nor would

```
 1                I, in my nonexpert opinion, nor would I
 2                say I agree with that.
 3     BY MR. CLARKE:
 4          Q.   See the question?
 5                MR. ZIBILICH:
 6                     Let the record reflect that the
 7                question and the answer are not even
 8                close to what it is that Mr. Clark said
 9                that she said.
10                MR. CLARKE:
11                     Let's go to a better one.
12     BY MR. CLARKE:
13          Q.   Let me ask you to -- let's do it this
14     way.  Do you believe the prone positioning had
15     anything to do with E███ P█████'s death?
16                MR. ZIBILICH:
17                     Object to the form.
18                MR. KAUL:
19                     Object to form.
20                MR. ZIBILICH:
21                     What he believes.
22                THE WITNESS:
23                     Yeah.  I think that's outside my
24                expertise.
25     BY MR. CLARKE:
```

```
 1        Q.    When are you supposed to put somebody in
 2   the recovery position?
 3              MR. ZIBILICH:
 4                  Object to the form.
 5              MR. KAUL:
 6                  Object to the form.
 7              THE WITNESS:
 8                  Again, that is a speculative answer,
 9              you know.  I can give you a million
10              different reasons of having them in the
11              prone position, not moving them to a
12              recovery position.  It's pure
13              speculation.
14   BY MR. CLARKE:
15        Q.    Go through Exhibit Number 22, because
16   we're going to go through the rest of this
17   training.  Just peruse it.  Do you know that you
18   show Cops videos in your training?
19              MR. ZIBILICH:
20                  He shows what?
21              MR. CLARKE:
22                  Cops videos.  Bad boys, bad boys,
23              what you want to do.
24              MR. ZIBILICH:
25                  I didn't know what that meant.
```

```
 1   BY MR. CLARKE:
 2        Q.   Did you know that?
 3        A.   I may have seen them.  Obviously, that's
 4   -- it gives real world scenarios before body
 5   cameras, so that wouldn't surprise me by any means.
 6        Q.   Let's look at the video that you show,
 7   and you tell me whether it's acceptable or not
 8   acceptable.
 9            MR. ZIBILICH:
10                Object to the form.  This is not a
11            quiz.
12                {VIDEO PLAYED}
13   BY MR. CLARKE:
14        Q.   Have you seen that before?
15        A.   No.  I may have seen that video before,
16   but I don't think it was connected with this.
17        Q.   This is a video played in the RIPP Hobble
18   training.
19            MR. ZIBILICH:
20                Is that a question?
21            MR. CLARKE:
22                I'm going to ask a question.
23            THE WITNESS:
24                This is a --
25            MR. ZIBILICH:
```

```
 1                      Wait.  He hasn't asked the question
 2               yet.
 3               THE WITNESS:
 4                    Go ahead.
 5   BY MR. CLARKE:
 6        Q.   Do you know what they're supposed to take
 7   from that video?
 8        A.   Well, no, so --
 9               MR. ZIBILICH:
10                    I object to the form.
11               THE WITNESS:
12                    Let's face it.  RIPP Hobble training
13                 produces this PowerPoint in connection
14                 with this video, and then we pass that
15                 on to, I'm assuming, the supervisors
16                 that are issued a RIPP Hobble when
17                 they're issued the RIPP Hobble.
18   BY MR. CLARKE:
19        Q.   Are only supervisors given RIPP Hobbles?
20        A.   That's correct.
21        Q.   So the deputies on the scene who get this
22   training don't get a RIPP Hobble?
23        A.   No.  I don't know if any of our deputies
24   -- I don't know the answer to that.  I don't know
25   if the deputies that don't get RIPP Hobbles receive
```

1    this training, also.

2         Q.   All that we've gone -- we've taken all

3    the individual deputies' depositions.  Every one of

4    them had RIPP Hobble training.

5         A.   They had?  Okay.

6         Q.   Why would you give somebody RIPP Hobble

7    training but not the RIPP Hobble?

8              MR. ZIBILICH:

9                   Object to the form.  You can answer

10                it.

11             THE WITNESS:

12                  Do you know -- I guess a few things

13                may have happened.  We may have --

14                again, I wasn't here, counsel, when

15                RIPP Hobbles came into existence, so I

16                don't know if we all had them at one

17                point in time or if it was always a

18                supervisory thing, but I know now, and

19                as long as I've been here, the RIPP

20                Hobble is carried by the supervisors

21                and has to be requested for the

22                supervisors.

23   BY MR. CLARKE:

24        Q.   Well, I mean, does JPSO provide -- what

25   do they provide officers for their duty belt?  Gun.

1    Do they --

2         A.   Gun.  It depends on your position and

3    where you are working, but the regular patrol

4    deputy probably has a gun, taser, pepper spray,

5    PR-24, but, yeah, a tourniquet.

6         Q.   Would you agree that if you train

7    somebody on how to utilize a RIPP Hobble, it would

8    be good for them to have a RIPP Hobble so they can

9    utilize it?

10        A.   No.  I don't necessarily -- yeah.

11        Q.   Do you know -- did you see when they got

12   him down and pulled him outside that they were

13   holding him down on his side?

14        A.   When they pulled him outside?  I don't

15   think I ever saw him go outside.  I think he was

16   right there wedged by the door, right?

17        Q.   Wedged by the door, but he was wedged in

18   the -- on the side position, correct?

19             MR. ZIBILICH:

20                  I object to the form of the

21                  question.  It's not a quiz.

22             THE WITNESS:

23                  Again, you know, whether that's

24                  necessity or whether that was

25                  intentional, after that fight, is a

```
 1                totally different story.
 2    BY MR. CLARKE:
 3         Q.    Well, this is the training you provide,
 4    so there's got to be an answer to that question.
 5         A.    Counsel, you're -- every scenario is
 6    different, you know.  So you would have to go back
 7    and interview those officers to see if they were
 8    actually putting him on the side, because that was
 9    what they were doing.  In 1995, when that was, you
10    know, I mean, that -- I don't know if that was the
11    case.
12         Q.    2005.
13         A.    2005.  Okay.
14         Q.    Well, how do you utilize it in training?
15    What are the cops supposed to take away from that
16    video?
17              MR. ZIBILICH:
18                   Oh, wait, wait, wait.  So I am going
19                to object now.
20              MR. CLARKE:
21                   That's okay.
22              MR. ZIBILICH:
23                   You had your opportunity with a
24                30(b)(6) deposition to do that.  You're
25                not going to ask him what his cops are
```

1          supposed to take out of it.  I object.

2               THE WITNESS:

3                    I really don't have an answer, you

4               know.  I mean, that's not the entire

5               training.  I mean, you know --

6               MR. CLARKE:

7                    That's one of the videos.  There is

8               four videos.  Let's go to the next one.

9                    {VIDEO PLAYED}

10   BY MR. CLARKE:

11        Q.    That video, if you look at Exhibit 22.

12   Go to the last pages.  Do you know about the swarm

13   technique?

14        A.    Swarm?

15        Q.    Yeah.  The last couple of pages.

16               MR. ZIBILICH:

17                    Let the record reflect he is

18               reviewing the document clearly

19               indicating he is not independently

20               familiar with the swarm technique.

21               THE WITNESS:

22                    Okay.  But, in general, the answer

23               is yes.

24   BY MR. CLARKE:

25        Q.    If you go through the steps of it and

1    when you use the swarm, you are supposed to -- if

2    you go through Steps 1 through 7, handcuff the

3    suspect quickly as possible, and then the next step

4    applied the Hobble restraints and sit him up,

5    correct?

6        A.   Correct.

7        Q.   And in that case, in the first case,

8    there was significant -- the first video clip we

9    looked at, that person was incredibly resistant,

10   the naked, black gentleman, correct?

11       A.   Yeah.

12            MR. ZIBILICH:

13                 Object to the form.  Incredibly

14             resistant.  Object.

15   BY MR. CLARKE:

16       Q.   In the second case, he was resisting

17   going to the ground, but they were able to take him

18   down, handcuff him, and get him up very quickly,

19   correct?

20       A.   I don't know about that.  If you go back

21   and look at the video, it is obviously edited.

22       Q.   I didn't -- these are your training

23   videos.  I didn't.

24            MR. ZIBILICH:

25                 That has nothing to do with his

1              interpretation versus yours.
2         THE WITNESS:
3              But it is an edited video.  The
4         camera angle changes, so I don't know
5         how long he was on the ground by the
6         time they picked him up.
7         MR. CLARKE:
8              That's true.  I don't either. All
9         right.  Let's look at the next video,
10        Louis versus West Palm Beach.
11             {VIDEO PLAYED}
12        MR. ZIBILICH:
13             When is this?
14        MR. CLARKE:
15             Whenever Pizzolato got it.
16        MR. ZIBILICH:
17             Let the record reflect counsel is
18        showing a video that he has no idea
19        what the date of it is.
20        MR. CLARKE:
21             It was produced by Jefferson Parish.
22        MR. ZIBILICH:
23             That is not -- you are the one
24        asking questions about when certain
25        things came into play.  You don't even

```
 1              have the date on it.
 2                   {VIDEO PLAYED}
 3   BY MR. CLARKE:
 4       Q.    Let's stop it for a second.  He is
 5   choking him, correct?
 6       A.    Uh-huh. Looks like it.
 7       Q.    That's not proper, is it?
 8             MR. ZIBILICH:
 9                   Object to the form.
10             THE WITNESS:
11                   In today's world, the answer is no.
12                I don't know when this video was, but
13                --
14                   {VIDEO PLAYED}
15   BY MR. CLARKE:
16       Q.    I'll stop it there.  Do you think it's
17   proper for the second officer who came up to put
18   his knee on the back of his shoulders or neck while
19   they are handcuffing him?
20             MR. ZIBILICH:
21                   Object to the form.
22             MR. KAUL:
23                   Object to the form.
24             THE WITNESS:
25                   Again, training has certainly
```

1          changed over the years, but it is also

2          what's reasonable under those

3          circumstances.  We are trained that the

4          neck and head and all that type of

5          stuff are a higher level from there.

6          For a temporary moment to get him

7          handcuffed in that situation, I can't

8          say it's unreasonable.  How long that

9          knee stays there becomes a little bit

10         more unreasonable every second it's

11         there.

12         MR. CLARKE:

13              Okay.  I'll keep going.

14              {VIDEO PLAYED}

15    BY MR. CLARKE:

16         Q.   Does it appear they hog-tie him?

17         A.   I didn't see that, counsel.

18         Q.   Okay.  Let's go back. Do you see he is

19    hog-tied there?

20         A.   Yeah.  It looks like it.  I mean,

21    definition of a hog-tie is different, but, yes, it

22    looks like his feet are pulled up backwards

23    connected.

24         Q.   In this video, there was a chokehold,

25    correct?

```
 1            MR. ZIBILICH:

 2                 Object to the form.

 3            THE WITNESS:

 4                 I mean, was his hand in front of the

 5            guy's neck?  The answer is yes, right.

 6            Now, whether or not -- I mean,  a

 7            chokehold is normally when they are

 8            connecting their arms and really

 9            putting pressure on it from that

10            standpoint, so, I mean, but was one of

11            his arms around his neck at one point

12            in time -- and, counsel, now I'm going

13            back, because that video is pretty

14            long.  It was in that video that we

15            recognized it, right?

16    BY MR. CLARKE:

17        Q.   Yeah, right.  JPSO people aren't supposed

18    to use a chokehold, correct, unless it's a deadly

19    force situation?

20        A.   Correct.  Unless it is a deadly force

21    situation.

22        Q.   That wasn't a deadly force situation, was

23    it?

24            MR. ZIBILICH:

25                 Object to the form.
```

```
 1              THE WITNESS:
 2                   When?
 3  BY MR. CLARKE:
 4       Q.   When he put him in a chokehold.
 5       A.   Here?
 6       Q.   Yeah.
 7       A.   I mean, you know, the reality of it is
 8  all of them can be deadly force.  Certainly the guy
 9  didn't have a gun, necessarily, but it is still a
10  -- you know, it can turn into that under those
11  circumstances, but I agree with you in theory that,
12  you know, in today's training, no, you are not
13  supposed to be using a chokehold or try not to use
14  a chokehold.
15       Q.   Also, in today's training, they are not
16  supposed to actually -- JPSO prohibits the
17  hog-tying, correct?
18       A.   That's correct.  Well, hog-tying from the
19  standpoint of connecting, you know --
20              MR. ZIBILICH:
21                   I am going to object to the form.  I
22                don't know what the definition is.
23              THE WITNESS:
24                   Yeah.  You know, hog-tying is always
25                the way that it's been defined in the
```

1           past, is the connection of a pair of

2           handcuffs to a pair of handcuffs on a

3           leg shackle with a pair of handcuffs,

4           you know, where there is a tight

5           restraint.  You know, RIPP Hobbles

6           aren't defined as hog-tying.  It looks

7           like in this case they tried to use a

8           hog-tie.  I mean, they tried to use a

9           RIPP Hobble.  I'm sorry.

10   BY MR. CLARKE:

11        Q.   But they pulled it up too tight?

12        A.   Is that -- no, no, because it looked like

13   the RIPP Hobble was actually on side of the

14   individual after the fact.  So I don't know if they

15   had a separate RIPP Hobble out or if they connected

16   it.

17        Q.   And they kept him in the prone position

18   the whole time?

19           MR. ZIBILICH:

20             Object to the form.

21           THE WITNESS:

22             That is not necessarily true.  I

23           mean, they, you know, obviously picked

24           him up to move him out of the street.

25           They tried to get him off to the side.

```
 1                   They -- I mean, there was a whole bunch
 2                   of -- you know, but he continued to
 3                   fight during that period of time, too.
 4      BY MR. CLARKE:
 5           Q.   Well, would you agree that the training
 6      that has been presented in these videos seems kind
 7      of outdated?
 8                   MR. ZIBILICH:
 9                       Object to the form.  Wait, wait.
10                   Object to the form.  We don't even know
11                   what the dates are.
12                   MR. CLARKE:
13                       Outdated to today. It's 2005.
14                   MR. ZIBILICH:
15                       No, no, no, sir.  No, sir.  The last
16                   one had no date.  The other two
17                   ironically had the same date.  That
18                   doesn't mean it was done on the same
19                   date.  That could have been the date of
20                   the tape.
21                   MR. CLARKE:
22                       This is what you produced.  I can't
23                   put a date on it.
24                   MR. ZIBILICH:
25                       I can produce it, but you can't
```

1              classify it as something that it's not.
2       BY MR. CLARKE:
3          Q.    Is it outdated or is it --
4              MR. ZIBILICH:
5                   Object to the form.
6       BY MR. CLARKE:
7          Q.    -- state of the art law enforcement
8       tactics?
9          A.    This is a -- this isn't law enforcement
10      tactics.  This is a training specific to the RIPP
11      Hobble, which came out probably around the time
12      that this training was done, so that was the videos
13      that they utilized in their training.  Certainly
14      tasers came after this.  Their training is going to
15      be more up to date when tasers were invented,
16      right.  Certain situations here they probably would
17      have tased him today instead of hands-on type
18      deals, right.  So this is a product training
19      course, not a JPSO training course, and the product
20      training course is probably not updated, because
21      the RIPP Hobble has not been really updated in the
22      last 30 years.
23         Q.    Do you not understand that this is the
24      actual training video that your officers got in
25      2018, '19, '20?

```
 1        A.   For the introduction to a RIPP restraint,
 2   correct.
 3             MR. CLARKE:
 4                  It's 12:08.
 5             MR. ZIBILICH:
 6                  148.
 7             MR. CLARKE:
 8                  No, no.  I'm saying does anybody
 9               need to get lunch?  I don't eat lunch,
10               that kind of stuff.
11             MR. ZIBILICH:
12                  Tell me how long you're going to be?
13             MR. CLARKE:
14                  I would be shorter if I had -- if
15               everybody ate lunch now, and I go
16               through my shit and get it done.
17             MR. ZIBILICH:
18                  That's non-responsive to the
19               question.
20             MR. CLARKE:
21                  I don't eat lunch.
22             MR. ZIBILICH:
23                  I don't care.  What do you want to
24               do, sheriff?
25             THE WITNESS:
```

```
 1                    I really don't care.  It doesn't
 2              make a difference to me.  If you are
 3              going to take a break to review your
 4              stuff anyway.
 5         MR. CLARKE:
 6                    I'm trying to do it so we can
 7              expedite things.
 8         THE VIDEOGRAPHER:
 9                    We are going off the record.  The
10              time is 12:08.
11                    {LUNCHEON RECESS}
12         THE VIDEOGRAPHER:
13                    Back on the record.  The time is
14              1:06.
15    BY MR. CLARKE:
16         Q.   I hope you had a good lunch, sheriff.
17         A.   I did.
18         Q.   I heard you got the same thing as Franz.
19              MR. ZIBILICH:
20                    Actually, he ordered first.
21    BY MR. CLARKE:
22         Q.   You got the 28.  He got the 28?
23         A.   Exactly, and that's how I have to
24    pronounce it, 28.
25         Q.   That's good.  If you'd been here for the
```

```
 1   previous depositions, you would have heard some
 2   butchery of the New Orleans --
 3               MR. ZIBILICH:
 4                   Well, you never had a chance with
 5               Aiavolasiti yesterday.  I can tell you
 6               that much.  And there are some other
 7               ones.  He looks like the Butcher Block.
 8           MR. CLARKE:
 9                   Mehrten?
10           THE WITNESS:
11                   Mehrtens.
12           MR. CLARKE:
13                   Well, if you didn't know, I have a
14               condition where I emphasis the last
15               thing on every deal, like Bur-Ger KING,
16               instead of Burger King.  That's from my
17               mom.
18           MR. ZIBILICH:
19                   Lo-Pin-TO.
20           THE WITNESS:
21                   Yeah.
22   BY MR. CLARKE:
23       Q.   Sheriff, we've gone through kind of the
24   policies and the training fairly well.  What I want
25   to do is kind of close those things up.  We talked
```

1  about your IA policy and how it works and how they

2  investigate things.  Are you aware of any other

3  police department that has homicide investigate

4  in-custody deaths rather than IA?

5          MR. ZIBILICH:

6              Object to the form.  You can answer

7          it.

8          THE WITNESS:

9              You know, it depends on -- well, I

10             mean, I can't say specifically, right.

11             State police obviously handles their

12             own.  It doesn't come from Internal

13             Affairs.  I think they have -- they

14             actually have a team, you know, state-

15             wide that they'll bring in, so it's not

16             an Internal Affairs deal, from

17             Louisiana.  I'm trying to think from a

18             federal level what we've done with --

19             even like the FBI handling their own.

20             I don't think it's Internal Affairs.  I

21             still think it is investigators that

22             come in and handle it, but I don't

23             think it is the Internal Affairs that

24             handled those types of shootings.

25  BY MR. CLARKE:

1      Q.   Would those departments have specifically

2  identified people who only investigate officer-

3  involved shootings or --

4      A.   No.  I mean, they certainly don't just

5  handle officer-involved shootings, because they

6  don't happen at that frequency.  I couldn't have

7  people that are specifically just officer-involved

8  shootings.  That's not the reality.

9      Q.   Would you agree that policies and

10  training, as time goes on, we learn more, and we

11  can get better policies and better training to deal

12  with the things we've learned?

13          MR. ZIBILICH:

14              Object to the form.  You can answer

15          it.

16          THE WITNESS:

17              You know, certainly policies should

18          change, and should -- I won't say

19          should change, right.  Some are things

20          that have been in place for awhile,

21          because they work.  Other ones, things

22          evolve, right.  I mean, many of these

23          policies didn't exist.  I'll give taser

24          as an example. I wasn't going to have a

25          taser policy in 1994, because a taser

```
 1                   didn't exist.  So as equipment evolves,
 2                   as training evolves, then other things
 3                   are going to do, but on the opposite
 4                   standpoint, there is also whether it's
 5                   legal precedent and stuff like that
 6                   going back years that you don't --
 7                   you're not going to change it, because
 8                   this is what your policy has been built
 9                   on.
10    BY MR. CLARKE:
11         Q.    Are you aware that most departments --
12         A.    I think that's a big term, most
13    departments, but go ahead.
14         Q.    Are you aware of the IACP?
15         A.    Uh-huh.
16         Q.    Are you aware that they issue model
17    policies and then they have what are called
18    Concepts and Issues papers where they discuss kind
19    of the reasoning behind the policy?
20         A.    I am.
21         Q.    You have access to those, if you wanted
22    to?
23         A.    I do.
24         Q.    Are you aware that they have model
25    policies that say all serious and critical
```

1  incidents or officer-involved shootings should be

2  investigated by IA?

3          MR. ZIBILICH:

4              Object to the form.  You can answer

5          it.

6          THE WITNESS:

7              Even specific to that it wouldn't

8          surprise me.  IACP.  We disagree a lot

9          with IACP.  So the National Sheriff's

10         Association are a lot big different --

11         a lot different.

12         MR. ZIBILICH:

13             What's the number?

14         THE WITNESS:

15             120.

16         MR. CLARKE:

17             These are previously marked

18         exhibits, 119 and 120.

19         THE WITNESS:

20             So IACP is one organization.  It's

21         chiefs of police.  Most chiefs are not

22         elected.  Handle -- most of the chiefs

23         also handle a lot of urban larger

24         departments, you know, that are in

25         different cities, and so a lot of times

1      you are going to find the IACP policy

2      is a lot more restrictive than a model

3      policy by the National Association of

4      Major County Sheriffs, right, like

5      myself.  There is about 100 others.

6      3,000 sheriffs in the United States.

7      Only about 100 of us are what we call

8      Major County sheriffs.  So the policies

9      for IACP aren't necessarily going to be

10     in line with major kind of sheriffs

11     policies.

12         You've got different companies that

13     sell their products, like Lexipol.

14     Lexipol is a model policy type company

15     that sells model policies.  I've done

16     review for them on policies that are

17     there.  There are certainly sometimes

18     not policies that I would adopt as a

19     sheriff or adopt even as a chief of

20     police, but there are model policies

21     that exist.  So, you know, I've looked

22     at IACP's policy.  In fact, they was

23     trying to create a model policy for the

24     United States.  It was two years ago,

25     that was trying to be adopted by the

```
 1                    president and put in a model use of
 2                    force policy in place, and there was a
 3                    lot of a disagreement of IACP's model
 4                    policy compared to what Major County
 5                    Sheriffs' policy was.  In fact, we had
 6                    opposition to them.
 7     BY MR. CLARKE:
 8          Q.   Is there a model -- what is the
 9     organization you are talking about?
10          A.   The -- well, you have -- you've got the
11     National Association of Major County Sheriffs.
12          Q.   Say that again.
13          A.   National Association of Major County
14     Sheriffs.  You also have Major County Chiefs.
15     You've got National Sheriffs Association.
16          Q.   Do any of those model policies say
17     critical incidents are not investigated by IACP?
18     By Internal Affairs.
19          A.   That I'm not sure of.
20          Q.   Here I'm not trying to hide the ball.
21     What I'm trying to do is say that there are
22     alternatives out there, and maybe you have chosen a
23     particular path.
24          A.   So I don't disagree, yeah.  I don't
25     disagree with that.
```

1      Q.   You're aware of people that have Internal

2   Affairs investigate critical incidents and officer-

3   involved shootings.  Why is it that you want just

4   homicide to do it?

5              MR. ZIBILICH:

6                   Object to the form.

7              THE WITNESS:

8                   Because they have more experience on

9         --

10   BY MR. CLARKE:

11      Q.   I think we've covered that before.

12      A.   Yeah.  They certainly have more

13   experience with those types of -- I mean, my

14   typical Internal Affairs investigator has never

15   been to an autopsy.  Why do I want them to

16   investigate, you know, a death from that stand-

17   point.  That doesn't make sense.  I mean, their job

18   is to collect the facts, and then it's our job to

19   interpret what those facts are.

20      Q.   To be fair, like at least with Keeven

21   Robinson and Parsa, there was a report that was

22   done by the homicide detective, but that wasn't

23   shared with Internal Affairs or training, correct?

24              MR. ZIBILICH:

25                   Or who?

```
 1              MR. CLARKE:
 2                   Or training.
 3              MR. ZIBILICH:
 4                   Okay.
 5              THE WITNESS:
 6                   I disagree with that.  I mean,
 7              certainly we -- you know, we're always
 8              in discussion.  My detective bureau is
 9              nextdoor to training, right.  I
10              wouldn't say that there is an automatic
11              procedure in place that every report
12              gets sent over to training.
13  BY MR. CLARKE:
14       Q.   That's what I'm talking about.
15       A.   Look, I had to put two of my deputies in
16  jail not too long ago.  Those conversations were
17  certainly had.  Okay.  I don't like what I saw
18  here.  I won't say that it was -- they messed up.
19  In my opinion, they messed up, but on the opposite
20  standpoint, we certainly -- you know, did they --
21  was this an isolated incident or was this something
22  that they did more of, right?  I mean, we've got to
23  have those communications.
24       Q.   I understand there are communications.
25  There is not a policy when you have an in-custody
```

```
 1   death investigation that there is a sit-down or a
 2   formal meeting with Internal Affairs or training
 3   where you go over that particular report for
 4   training or other issues, correct?
 5        A.   A formal policy?  No, there is not.
 6        Q.   Obviously, if you talk to somebody, you
 7   can talk about it, but what I'm trying to look at
 8   is the policies and practices of the department.
 9        A.   Sure.
10        Q.   Are you also aware that we've gone
11   through your use of force reports, correct? Use of
12   force policies.
13        A.   Yes.  What about it?
14        Q.   Are you aware that other departments
15   require in their use of force policies to have a
16   continuum of force?
17             MR. ZIBILICH:
18                  Object to the form.
19             THE WITNESS:
20                  Yeah, and that's a -- you know,
21                you've always -- continuum of force can
22                go from zero to 100 real quick.  I
23                mean, that is a term that is used all
24                over the place.  You know, what it
25                always comes down to is, you know, go
```

```
 1                  back to the same word.  It comes back
 2                  to what is reasonable under the
 3                  circumstances.
 4     BY MR. CLARKE:
 5          Q.    You're aware -- and your Internal Affairs
 6     handles -- your Internal Affairs only investigates
 7     complaints, correct?
 8          A.    So yes, for the most part.  Like there
 9     has got to be something that is -- targets set
10     that.  I mean, we make, whatever, 20,000 arrests a
11     year.  Not every one of them generates -- if
12     someone comes into ID to make a complaint, we
13     certainly will investigate that complaint depending
14     on -- you know, generally, we let the criminal case
15     go first before we are going to investigate it on
16     the administrative end, but if there is no
17     complaint that is made, or if it's criminal in
18     nature, normally -- well, remember, there has been
19     some changes.  Not because of this incident.  I
20     have -- some lower level things, I have separate
21     detectives, because there is a difference of
22     whether the statement is taken under Garrity, is it
23     taken under Miranda, and so I do have -- my
24     Internal Affairs has expanded under me to give them
25     a little bit more jurisdiction where it's not
```

```
 1   automatically going to the detective bureau for
 2   simple battery.
 3        Q.   Well, are you aware that other
 4   departments, for numerous years, have required,
 5   with respect to force, the completion of
 6   use-of-force reports?
 7             MR. ZIBILICH:
 8                  Object to the form.  You can answer
 9             it.
10             THE WITNESS:
11                  A separate use-of-force report?
12             MR. CLARKE:
13                  Correct.
14             THE WITNESS:
15                  Yeah.  I mean, I'm aware that some
16             people require a separate use-of-force
17             report depending on what it is.  We
18             have a separate use-of-force report
19             when you have a taser.  We have a
20             separate use-of-force report for
21             certain, you know, weapons.  There is
22             not a separate use-of-force report for
23             hands on.
24   BY MR. CLARKE:
25        Q.   Do you know of any of the literature why
```

```
 1    -- you know, what the reasoning is behind officers
 2    completing use-of-force reports?
 3               MR. ZIBILICH:
 4                    Object to the form.
 5               THE WITNESS:
 6                    Again, if you have zero supervision,
 7               it's given the ability to let somebody
 8               know that this occurred from it, but
 9               all of my sergeants are reading every
10               report that comes through, you know,
11               for approval, so I don't need a
12               separate report that tells me that they
13               put somebody in handcuffs and used
14               reports from that standpoint.
15    BY MR. CLARKE:
16         Q.   My understanding, for my hypothetical,
17    you complete a use-of-force report.  It gets
18    reviewed by your supervisor.  Are you aware of
19    that?
20               MR. ZIBILICH:
21                    Object to the form.  You're talking
22               about other places?
23               THE WITNESS:
24                    Every report gets reviewed by a
25               supervisor.
```

```
 1   BY MR. CLARKE:
 2        Q.   In other departments, they use use-of-
 3   force reports and send them to training and
 4   Internal Affairs.  Are you aware of that?
 5             MR. ZIBILICH:
 6                  Object to the form.
 7             THE WITNESS:
 8                  You know, again, what other
 9                departments do, you know.  Sometimes
10                it's easy.  Sometimes it's not.  I
11                don't necessarily agree with every
12                single time that we put a -- you put
13                hands on somebody you need a separate
14                use-of-force report.
15   BY MR. CLARKE:
16        Q.   I'm basically just trying to figure out
17   why we have what we have and what we're doing and
18   that you're aware that other people use use-of-
19   force reports to track their officers uses of force
20   and then to send that to Internal Affairs and to --
21             MR. ZIBILICH:
22                  Object to the form.
23   BY MR. CLARKE:
24        Q.   -- training, correct?
25        A.   And similar to, you know, our line of
```

```
 1    work being attorneys, you know, it would be me
 2    having an objection report on every objection you
 3    made and whether it was sustained or whether it was
 4    overruled and for us to go back and try to make
 5    that difference, right.  I think it's -- it doesn't
 6    necessarily work that way.
 7        Q.   Okay.  But you're aware that it's out
 8    there and that other departments utilize it?
 9        A.   Sure.
10             MR. ZIBILICH:
11                  Object to the form.
12    BY MR. CLARKE:
13        Q.   All right.  Are you aware that -- do you
14    know of anybody, any other department, that has an
15    Internal Affairs policy similar to yours anywhere?
16             MR. ZIBILICH:
17                  Object to the form. Similar.I don't
18                know.
19                  You can answer it, if you can.
20    BY MR. CLARKE:
21        Q.   Are you aware IACP has model policies on
22    IAs, correct?
23        A.   (Witness nods head)
24             MR. ZIBILICH:
25                  Object to the form.
```

```
1              MR. CLARKE:
2                   I'm going to mark as Exhibit Number
3            48 --
4              MR. ZIBILICH:
5                   148.
6              MR. CLARKE:
7                   148 the Model Policy from IACP, and
8               Exhibit 149, a Concepts and Issues
9               Paper on Internal Affairs.
10             MR. ZIBILICH:
11                  What are the key numbers?
12             MR. CLARKE:
13                  There's no key numbers.
14             THE WITNESS:
15                  148, 149.
16             MR. ZIBILICH:
17                  They don't have key numbers?
18             MR. CLARKE:
19                  They don't. That's a different
20              document.
21     BY MR. CLARKE:
22        Q.   Are you also aware that departments have
23     written policies with respect to dealing with
24     people with intellectual disabilities, including
25     autism?
```

```
 1              MR. ZIBILICH:
 2                   Object to the form.
 3              THE WITNESS:
 4                   Wouldn't surprise me.
 5   BY MR. CLARKE:
 6        Q.   Have you ever reviewed any such thing?
 7        A.   I may have reviewed some with Lexipol.
 8        Q.   I'm going to show you what has previously
 9   been marked as Exhibit Number 27.  Sheriff, a lot
10   of these things that I'm showing you right now, I'm
11   not trying to get -- ask you questions about what
12   you have spoken with Mr. Zibilich about, but have
13   you seen that document before?
14        A.   I have not.
15        Q.   Would you agree that we're learning more
16   about autism, and you have more interactions with
17   autistic people today as there were ten, fifteen
18   years ago?
19        A.   I don't necessarily agree with that, that
20   statement.  I think, you know, when I look at our
21   calls for service on a regular basis, it's not
22   something that happens regularly.
23        Q.   But do you not believe that there should
24   be a separate policy on dealing with IDDs?
25        A.   You know --
```

```
 1              MR. ZIBILICH:

 2                   Object to the form.

 3              THE WITNESS:

 4                   Truthfully, no.  I don't believe you

 5              should have a separate policy for it.

 6              I mean, the fact of it is there is

 7              certain things that you can have

 8              separate practices that involve with

 9              it.  I mean, I also believe you can

10              also policy yourself to death.  It goes

11              back to the old -- what was that, Men

12              of Honor.  Do we need a policy to tell

13              them where the lunch hall is?  Right.

14                   The fact of it is every situation is

15              a little bit different.  Most of these

16              policies are very broad in nature, even

17              if they are adopted, and so it really

18              just depends on whether the actions

19              that are being taken by the deputies

20              are in relation to what their training

21              is, but, more importantly, in relation

22              to whether those actions are

23              reasonable.

24     BY MR. CLARKE:

25         Q.   Let me show you what has been previously
```

 1     marked as Exhibit Number 43.  If you'll just look

 2     through this and see if you've seen this before.

 3          A.   I have not.

 4          Q.   This was produced in discovery, and Franz

 5     objected to it, but it's my belief that the

 6     30(b)(6) who spoke on this topic said that this was

 7     prepared in 2018 and has not been put into

 8     circulation or practice yet.  Are you aware of

 9     that?

10               MR. ZIBILICH:

11                    Object to your belief, but you can

12                 answer it.

13               THE WITNESS:

14                    It wouldn't surprise me.  We are

15                 doing -- my training staff -- this

16                 looks like it was prepared for by

17                 Sergeant Michael Voltolina, who was on

18                 the training staff at the time, so he

19                 probably prepared this as an inservice

20                 type training, and for whatever reason,

21                 when they're doing inservice training,

22                 they change that up from year to year

23                 and something else was taken in its

24                 place.  We still do an inservice

25                 training every year, but something else

```
 1                    took its place, so this was probably
 2                    prepared as a course, you know, to put
 3                    in place, and they utilized something
 4                    else.
 5      BY MR. CLARKE:
 6           Q.    If you go to -- there is numbers in the
 7      -- JPSO-008548.
 8           A.    Okay.
 9           Q.    It talks about the statistics about
10      people who have autism.  One in 59, according to
11      the CDC.  You see that?
12           A.    Uh-huh.
13           Q.    And four times more likely in males.  Do
14      you see that?
15           A.    Uh-huh.
16           Q.    And then it goes through a number of the
17      characteristics that are going through everything
18      about sensory overload, speech pattern, body
19      movement.  Do you see that?
20           A.    Uh-huh.
21           Q.    Don't you think officers should have some
22      training on how to deal with people who may not be
23      able to speak or are subject to sensory overloads
24      or things like that to learn some avenues to deal
25      with them during encounters?
```

1     A.   I think we deal with that all the time on

2  any type of condition.  I mean, you are bringing

3  autism into a big group.  I mean, my nephew is

4  autistic.  The reality of it is he is high

5  functioning.  The communication goes well.  So it

6  kind of just depends on, you know, where that

7  person fits into it.  Our deputies don't have the

8  medical records of people before they get onto a

9  scene, so often they have to figure it out.  You

10  know, they have to figure it out on every homicide

11  investigation, because the homicide victim can't

12  speak for themselves, so they've got to figure out

13  what happened, what's caused and what's there.

14          So for you to say that we need this

15  specific on autism, well, there is different levels

16  of autism.  I mean, your client certainly wasn't

17  anywhere near what my nephew is.  I mean, it's not

18  -- I certainly feel sorry for the Parsas, but it is

19  a totally different -- this would be a totally

20  different PowerPoint if we're dealing with one

21  level of individual and a different level of

22  individual.  I'm not opposed to the training, you

23  know, but it is also something, as I said earlier,

24  that it needs -- we need to have somebody for every

25  single person.  I'm diabetic.  I don't have

```
 1    specific training on diabetic, although most of my
 2    officers, because of their experiences on the job,
 3    showing up, going, okay, this person is nonverbal,
 4    can't talk.  We need to get their blood sugar
 5    checked in order to see if they're low right now,
 6    right.  That's not a specific training from the
 7    sheriff's office that says you shall check for
 8    diabetes.  It is because of their experiences on
 9    different scenes to be able to go through and say,
10    okay, this person looks like they are having some
11    type of medical emergency right now.  What do we
12    need to do to figure out what it is, right.  Call
13    for EMS, get an EMS on scene, those type of things.
14         Q.   You know City of Canton v. Harris was a
15    diabetic person, correct?
16         A.   Which one?
17              MR. ZIBILICH:
18                   Say that again.
19    BY MR. CLARKE:
20         Q.   City of Canton versus Harris.  No?
21         A.   No.
22         Q.   I mean, that's the big Monell claim.  You
23    know the case, right?
24         A.   Yeah.  I mean, I know what Monell is.
25              MR. ZIBILICH:
```

```
 1                    We have now heard from Professor
 2              Clarke on the City of Canton.  Thank
 3               you, sir.
 4          MR. CLARKE:
 5                 You're welcome.
 6          THE WITNESS:
 7                 Canton, Mississippi?
 8          MR. ZIBILICH:
 9                 No.
10          MR. CLARKE:
11                 Canton, Ohio.
12          MR. ZIBILICH:
13               He's more familiar with Canton,
14             Mississippi, because he passes by it
15              every time he comes down here.
16   BY MR. CLARKE:
17       Q.   Let me show you what is a training key.
18   It's been previously marked as Exhibit 50.
19          MR. ZIBILICH:
20                 What is the number of the training
21               key?
22          MR. CLARKE:
23                 678.
24          THE WITNESS:
25                 678.
```

```
 1    BY MR. CLARKE:
 2         Q.    Go to Page 4.   Look under Restraint. They
 3    have four bullet points under that, correct?
 4         A.    Okay.
 5         Q.    The first one talks about how you
 6    approach them, to try to do it a little bit
 7    differently if you know they're autistic, taking
 8    into consideration some of the deficiencies they
 9    may have, correct?
10         A.    Okay.
11         Q.    Then the second one says, "Be aware that
12    people with autism may have underdeveloped trunk
13    muscles and not be able to support their airway.
14    After takedown, the individual should be turned on
15    his or her side to be transferred into an upright
16    position as soon as possible to allow normal
17    breathing to occur."  Do you see that?
18         A.    I see that.
19         Q.    Do you think that your officers would
20    benefit from having training that identifies that
21    they have -- people with autism may not be able to
22    support their airway, and that it is important to
23    get them in an upright, seated position as soon as
24    possible?
25              MR. ZIBILICH:
```

```
 1                    Object to the form.
 2              THE WITNESS:
 3                    This is somebody's opinion that was
 4              put into place.  I've never heard that
 5              before.  Never heard that under-
 6              developed trunk muscle scenario before.
 7              If that's reality, as I said before,
 8              I'm never opposed to it, but, again, we
 9              can't train for every scenario, and nor
10              would I expect them.  I mean, let's be
11              real.  Even if I had a eight-hour
12              course tomorrow that implemented this,
13              this wouldn't have that in there,
14              probably, you know, and so --
15     BY MR. CLARKE:
16         Q.   Jim Arey went to an autism training
17     seminar after the Parsa case, correct?
18         A.   If you telling me that's correct.  It
19     wouldn't surprise me.  He goes to a lot of
20     different training seminars.
21              MR. ZIBILICH:
22                    150, I take it?
23              MR. CLARKE:
24                    Yeah, 150.
25              MR. ZIBILICH:
```

```
 1                    What is it?
 2             MR. CLARKE:
 3                    It is Dennis Debbaudt's training
 4           card.
 5    BY MR. CLARKE:
 6        Q.   I mean, maybe you don't need to train
 7    them.  You think you can give them a card with this
 8    stuff on it?
 9             MR. ZIBILICH:
10                    Object to the form.
11             THE WITNESS:
12                    I mean, counsel, you know, people
13               sell these things all the time, whether
14               it is Miranda cards, autism cards,
15               diabetic cards, medical cards.
16             MR. CLARKE:
17                    These are free.
18             THE WITNESS:
19                    I get it, but I can go find a whole
20               bunch of different things.  I'm not --
21               you know, coulda, shoulda, woulda all
22               the time, right.  It's not a situation
23               that did I know this card existed?  No,
24               but it's not something that I would
25               have -- this wouldn't be in every one
```

127

```
 1              of my deputies' pockets.  I mean,
 2              they've got hundreds of thousands of
 3              calls for service a year that they go
 4              to, and from that standpoint, it's not
 5              all about this.  I mean, it's all the
 6              other calls they have to go to service
 7              on. It's kind of like their gun belt. I
 8              mean, not every one of them has patrol
 9              rifles.  Not every one of them has the
10              ability to carry everything on their
11              belts, right.  You know, I can always
12              justify that they should have this
13              weapon or should not have this weapon
14              or every deputy needs a shield.
15                  I don't have every deputy that has a
16              shield.  I've got two of them that are
17              assigned to each district for them to
18              pull when situations occur, right.
19              So, you know, would I love to have
20              everyone have a shield?  Yeah, but I
21              don't have the room in the vehicles to
22              be able to do all of that.  So you can
23              continue to give me things to say this
24              should be in their pockets or this
25              should be in their car, or this should
```

```
 1                  be on their belt, but that's just not
 2                  how police work works in general.
 3      BY MR. CLARKE:
 4          Q.   We can have a disagreement on that.  If
 5      you go back to the training key, 678. It says the
 6      third thing you have to do is monitor the person's
 7      condition frequently to prevent further trauma.  Up
 8      to 40 percent of this population may have some form
 9      of seizure disorder.
10              MR. ZIBILICH:
11                  Object to the form.  It doesn't say
12                have to do, as you just said it said.
13              MR. CLARKE:
14                  What did it say?
15              MR. ZIBILICH:
16                  You said that you have to do.  I
17                can't find those words.
18              MR. CLARKE:
19                  I don't think I said those words.
20              MR. ZIBILICH:
21                  I know you did.  I can have her read
22                it back to you.
23      BY MR. CLARKE:
24          Q.   Okay.  "Monitor the person's condition
25      frequently to prevent further trauma or injury.  Up
```

```
 1    to 40 percent of this population may have some sort
 2    of seizure disorder."  Did I read that correctly?
 3         A.   You did.
 4         Q.   So part of the thing is to monitor them,
 5    and then the fourth one is -- this says with
 6    autistic people, you have to basically understand
 7    --
 8              MR. ZIBILICH:
 9                   It doesn't say you have to.  I
10                object.
11    BY MR. CLARKE:
12         Q.   With respect to this, paraphrasing it, it
13    says that people who are being restrained who have
14    autism may not understand what is going on,
15    correct, and that can be identified by an officer
16    as resistance?
17         A.   I mean, yes.  That's what it says.
18         Q.   Do you think that that is something that
19    would be beneficial for people with --
20              Is that somebody from Antarctica saying
21    they got killed?
22              MR. ZIBILICH:
23                   It's a penguin.
24              THE WITNESS:
25                   Counselor, I think -- repeat the
```

```
 1              question.
 2  BY MR. CLARKE:
 3      Q.    I'm going over best practices, and this
 4  one -- one of the things, keys, that I get out of
 5  this is that officers should understand that
 6  autistic people may be resisting because they don't
 7  know what is going on, and that should be
 8  considered in the use of force.  Wouldn't you
 9  agree?
10            MR. ZIBILICH:
11                 Object to the form.
12            THE WITNESS:
13                 I think that's what they did in this
14            case.
15  BY MR. CLARKE:
16      Q.    We'll get to that.  What do you know
17  about excited delirium?
18      A.    You know, I don't know a lot.  Again,
19  excited delirium, from what I know about it, is not
20  really a medical term.  It's a -- how it came about
21  probably had nothing to do with police work but
22  people looking for an excuse of why somebody passed
23  away that they don't have the answers to
24  necessarily go with, you know.
25      Q.    That was Dr. Whetli.
```

```
 1        A.   Yeah.  I mean, I don't know the doctor,
 2   but that's kind of what it is.  You know, sometimes
 3   you don't find the answers that are clear cut in
 4   stone, and somewhere down the line some person
 5   said, well, it's excited delirium, and that kind of
 6   term stuck, and people use it, and you have experts
 7   that say it's alive and well and excited delirium
 8   exists, and you've got other doctors that say we
 9   can't find anything that, you know, causes that to
10   be the case.
11             I don't necessarily have a hard set
12   feeling either way.  I know that the circumstances
13   behind death don't always give us the answers,
14   right.  Sometimes homicides are very easy to solve.
15   Sometimes they're not, right.  You know, there is
16   times that, you know, my detectives, despite all
17   their best effort, can go out to a scene and know
18   someone got shot, but the person that got shot
19   showed up at the hospital.  We say, "What is your
20   name," and they go, "I don't know."  "Where were
21   you shot?"  "I don't know."  "Do you want to press
22   any charges?"  "No."  And the reality is my
23   detectives are never going to solve that case,
24   because they're not able to get the facts of why
25   and where it occurred, or if it occurred or who it
```

```
 1    occurred by or any of that type of stuff.  That's
 2    the same thing for medical examiners.  They look at
 3    an autopsy.  They don't see the physical evidence
 4    that they need to come up with an actual diagnosis
 5    of what occurred on this particular situation, so
 6    they put factors in place, and that's how they kind
 7    of came up with excited delirium.
 8         Q.   I'm going to show you something up on the
 9    screen real quick.  This is just because Franz
10    challenged me.  This is Troxclair's deposition. The
11    question is, "The issue is had they not had him in
12    the prone position, it's your position that he
13    wouldn't have died?"  And her answer was what?
14         A.   "Most likely not."
15         MR. ZIBILICH:
16              A far cry from what your answer was
17           before to a different question, I might
18           add.
19         MR. CLARKE:
20              That's all I'm doing for that.
21         MR. ZIBILICH:
22              That's what you spent your lunch
23           hour doing, trying to find that and
24           prove that I was right, and you were
25           wrong again?
```

```
 1            MR. CLARKE:
 2                 I think you lost that one.
 3            MR. ZIBILICH:
 4                 I don't think so.
 5      BY MR. CLARKE:
 6            Q.   Now, let's talk about the Parsa case.
 7      You have the homicide report somewhere there in
 8      case you need to look at it.  Exhibit 31.  Now,
 9      according to when this gets completed, this goes to
10      the DA, correct?
11            A.   Yes.
12            Q.   The DA then determines whether or not to
13      bring any charges?
14            A.   I mean, remember, on cases that we feel
15      that there is probable cause, we'll charge our
16      deputies, if we feel there's probable cause, or put
17      it in front of a judge.  Our practice has always
18      been, though, that we take these cases, and we
19      refer them to the district attorney's office as an
20      extra step, even if we're making the determination
21      that we don't believe it's probable cause.
22            Q.   And in this particular case, are you
23      aware that they sent out a bunch of warrants?
24            MR. ZIBILICH:
25                 Who is they?
```

```
 1              MR. CLARKE:

 2                   Jefferson Parish Sheriff's

 3              Department or Office.

 4              THE WITNESS:

 5                   Search warrant you're talking about,

 6              correct?

 7   BY MR. CLARKE:

 8        Q.   Search warrants, yes.  I mean, if you

 9   look through -- pull up --

10        A.   I don't need to pull it.  The reality of

11   it is just recently, because I'm kind of aware of

12   the Skinner case when it came up with y'all's

13   motion, because we had talked about it, so I know

14   some warrants went out, yes.

15        Q.   Has anything -- was that appropriate, in

16   your --

17        A.   Yeah, yeah, I think it is.  Whether or

18   not I completely agree with the old opinions is of

19   no moment.  I mean, my personal opinion is I

20   probably believe that they should be under

21   subpoena, but back in Skinner, the courts ruled

22   that medical records were not to be obtained by

23   subpoena anymore.  They needed to be obtained by

24   search warrants, and so that was the practice that

25   changed back then that we now ask for search
```

```
 1   warrants for that situation.
 2        Q.   But you have to have a crime to issue a
 3   search warrant, correct?
 4        A.   The reality of it is it could be a crime,
 5   right.
 6        Q.   The reality of it is when you put out a
 7   warrant, you've got to list a crime, right?
 8        A.   I don't --
 9             MR. ZIBILICH:
10                 I'm going to object to the form.
11               Wait, wait.  Hold on.
12             THE WITNESS:
13                 I think an unclassified death.  I
14               mean, y'all certainly had y'all's
15               motions on that.  We can agree to
16               disagree.  I mean, I think --
17             MR. CLARKE:
18                 Pending.  We got a motion pending.
19             THE WITNESS:
20                 Right.  I mean, I think it's
21               appropriate based off of the scenarios
22               that they were going from.  I mean, you
23               can make the argument that that's the
24               case, but we certainly, like any type
25               of unclassified death, even if it
```

```
 1              wasn't the sheriff's office, we would
 2              still do those same types of things to
 3              make a determination whether it was
 4              something more, right.
 5    BY MR. CLARKE:
 6         Q.   We've got our motion filed on that one,
 7    and we'll go there.  Now, the person who did this
 8    report is Dowling, correct?
 9         A.   I think he wrote the main report.  I
10    don't know if he did everything.
11         Q.   Get this in front of you.  It's 31.  Now,
12    Dowling is no trained homicide detective, correct?
13              MR. ZIBILICH:
14                   Object to the form.
15              THE WITNESS:
16                   I don't know that for a fact.
17    BY MR. CLARKE:
18         Q.   If he wasn't, then that would -- your
19    reason for having a homicide detective being more
20    experienced in performing that type of
21    investigation wouldn't be applicable, if he's not a
22    homicide detective, correct?
23              MR. ZIBILICH:
24                   Object to the form.
25              THE WITNESS:
```

```
 1              You know, again, we utilize our
 2              supervisors for those positions.  He is
 3              a supervisor over that gun violence
 4              unit, so.
 5   BY MR. CLARKE:
 6       Q.   But that's not homicide.
 7       A.   You and I can disagree on that.  Although
 8   I have a separate homicide division, the --
 9   utilizing -- you know, a gun squad certainly
10   handles homicides pretty often, so that's not
11   unusual that he would be under, and he still falls
12   under the homicide -- if you look at the bottom of
13   that, Lieutenant Don Meunier is the homicide
14   commander that signs off on it.  So, I mean, we
15   officially call them two separate things, but
16   they're literally in the same hallway.
17       Q.   Did you review any of the statements of
18   the officers or the witnesses in this case?
19       A.   I did not.
20       Q.   Did you know that Deputy Vega used his
21   hands to try to control his head, E██ P████'s
22   head, during the --
23              MR. ZIBILICH:
24                   I object to the form.
25              THE WITNESS:
```

```
 1              No.  I haven't reviewed any of his
 2         statements.
 3  BY MR. CLARKE:
 4      Q.   Did you review any of the Parsas'
 5  statements?
 6      A.   I did not.
 7      Q.   Do you know that there is an allegation
 8  that she believed that they were choking him and
 9  screamed it out during the events prior to him
10  urinating on himself?
11         MR. ZIBILICH:
12              I have to object.
13         MR. KAUL:
14              Object to the form.
15         MR. ZIBILICH:
16              How would he know that?  He didn't
17           read it, unless he learned it from me,
18           and then you're not entitled to it.
19           Object.
20         THE WITNESS:
21              No, I'm not aware of that
22           allegation, but I go from my, I guess,
23           my own eyes, and I never saw any of
24           that at any time.
25  BY MR. CLARKE:
```

```
1          Q.    In an investigation of a homicide, would
2     -- in the investigation of this case, do you know
3     why it would be relevant for them to get E█████
4     P█████'s school records or medical records when he
5     was a child?
6               MR. ZIBILICH:
7                    Out of an abundance of caution, I'm
8               going to object to the form.
9               THE WITNESS:
10                   Certainly, especially with the
11              situation.  We were not -- we throw
12              around the term "autism" pretty
13              regularly, but, as I said earlier,
14              there is a lot of difference in autism,
15              and we, you know, had information, you
16              know, about the school history and past
17              violence and all that type of stuff.
18              Certainly the video -- I mean, I know
19              I've been told utilizing zip ties to
20              put him in the car and that type of
21              stuff.  And so we're going to try to
22              figure out what brought us to this
23              point, right.  You know, and getting
24              that information is not something that
25              we wouldn't do.
```

BY MR. CLARKE:

    Q.   What crime was there to investigate?

    A.   Well, I mean, I've got to look at -- I look at a past history of someone's past violence, whether that's their rap sheet, whether -- I mean, any of those type of things is -- certainly we're going to utilize that information. You know, somebody has got a propensity for resisting arrest. Using their past violent history.  Those type of things, you know, whether it's a domestic abuse, and I'm looking for, okay, is this a domestic homicide.  Has he ever been arrested for domestic abuse in the past.  We are certainly going to look at the people's history, because sometimes their history can show us what their present is.

    Q.   But if this is -- is this report an investigation of crimes of the officers that is presented to the DA --

           MR. ZIBILICH:

               Object to the form.

BY MR. CLARKE:

    Q.   -- or is it just an investigation of the facts surrounding the events?

           MR. ZIBILICH:

               Object to the form.

```
 1              THE WITNESS:
 2                   I think it's both.  We certainly
 3              want to find out what the history is,
 4              what brought Mr. Parsa to his steps
 5              that day, you know, the abuse that he
 6              was exhibiting upon his father, all
 7              those type of things.  So, you know, it
 8              doesn't take away from the situation
 9              that this is an unclassified death at
10              that moment in time, but what brought
11              it to that person.
12    BY MR. CLARKE:
13         Q.   By the same token, if you are trying to
14    be fair and balanced, you look at -- if you are
15    saying you are looking at that to figure out the
16    circumstances, what about looking -- did you guys
17    look at the prior records of Pitfield, Vega,
18    Mehrtens, Guidry, Gaudet?
19              MR. ZIBILICH:
20                   He gets the first syllable.
21              Mehrtens is the second.
22              MR. KAUL:
23                   Object to form.
24              MR. ZIBILICH:
25                   I object.  I object --
```

1    BY MR. CLARKE:
2         Q.   Did you look at their past?
3              MR. ZIBILICH:
4                   I object to the form.  The preamble
5                about being fair and --
6              THE WITNESS:
7                   No, because that is already --
8              MR. ZIBILICH:
9                   I object because of the editorial
10               being fair and balanced --
11             THE COURT REPORTER:
12                  I can't take all of y'all at the
13               same time.
14             MR. ZIBILICH:
15                  So I am going to object because of
16               the editorial being fair and balanced.
17                  You can ask the question without that.
18   BY MR. CLARKE:
19        Q.   When you do an investigation, are you
20   trying to do it fair and balanced to both sides,
21   the officers and the public?
22        A.   Well, it's not -- you know, certain
23   records of even police officers are still there.
24   It doesn't necessarily mean they're part of this
25   report.  You know, I mean, I don't list every --

```
 1   you know, when the person has their first encounter
 2   with law enforcement from that standpoint, and this
 3   is what occurs, you know, I've got a lot of
 4   unanswered questions.  The other records of Chad
 5   Pitfield still exist on this department.  They are
 6   still there.  You know, it's not that they don't
 7   exist, but we -- they can still speak and come and
 8   give us an answer, you know.  Now we've got to go
 9   look at the opposite side.
10        Q.   What about -- I mean, do you think
11   somebody who is actively being sued for excessive
12   force and who had previously been arrested and
13   fired from a previous police department is the
14   person that should be doing this investigation?
15             MR. ZIBILICH:
16                  Object to the form.
17             THE WITNESS:
18                  I don't know what his -- when he was
19                  fired from another police department.
20                  Certainly that was before my time,
21                  because he's been with us for many,
22                  many years.  And, no, just because
23                  that's the case, it's not.  We've all
24                  had prior jobs before.  You know, just
25                  because someone had something bad in
```

```
 1                their past or not bad in their past. I
 2                know people that have been fired from
 3                this department that should not have
 4                been fired from this department under
 5                previous regimes, and I have certainly
 6                probably fired some people that I
 7                should not have fired, right.  So, no.
 8                Every single person out there makes
 9                mistakes.  The biggest problem with
10                this job is I hire human beings.
11    BY MR. CLARKE:
12         Q.   And you're aware of the Jacobi Cage case,
13    correct?
14         A.   What's that?
15         Q.   The Jacobi Cage case involving Dowling.
16         A.   Yeah, uh-huh.
17         Q.   In that case, there was a lawsuit that
18    was brought, correct?
19         A.   Uh-huh.
20         Q.   You have to say yes or no.
21         A.   Yes.
22         Q.   Internal Affairs didn't investigate that,
23    correct?
24         A.   No.  I think they did, because we had a
25    complaint on that one, yeah.
```

```
 1        Q.   Okay.
 2        A.   Maybe I'm --
 3        Q.   Let me just put --
 4        A.   Maybe because it was a criminal case, it
 5   may have been a different case, but --
 6        Q.   I'm going to put down as 151.  I think
 7   you -- Jacobi Cage IA file.  If one exists, if you
 8   could get it to us.  I think you have produced all
 9   the IA files you have.  I don't think --
10        A.   Yeah.  I don't recall seeing one,
11   counsel, so if I'm saying something wrong, it's a
12   possibility.
13             MR. ZIBILICH:
14                  To use your patented phrase, we
15               don't play hide the ball.  If we got
16               it, you got it.
17             THE WITNESS:
18                  Yeah.  You got it.
19   BY MR. CLARKE:
20        Q.   Right.  That's what I'm telling you.  If
21   there is one, I'm asking that it be produced.  I
22   don't think there is one.
23        A.   Okay.
24             MR. ZIBILICH:
25                  So you got that answer wrong.
```

```
 1    BY MR. CLARKE:
 2        Q.    What are you -- why didn't Internal
 3    Affairs investigate?
 4              MR. ZIBILICH:
 5                    Investigate what?
 6              MR. CLARKE:
 7                    The Jacobi Cage matter.
 8              MR. ZIBILICH:
 9                    Object to the form.
10              THE WITNESS:
11                    Again -- well, obviously, I gave you
12                 the wrong answer, if that's the case.
13                 So I can't necessarily go on my
14                 recollection.  I don't remember when it
15                 occurred or not, you know.  I mean, I
16                 think my deputy messed up in that case.
17                 I addressed that immediately.  I think
18                 he got some suspension days off of it.
19                 Not Dowling but the other kid messed
20                 up.
21    BY MR. CLARKE:
22        Q.    That's what I was trying to ask you.
23    According to -- Dowling, I believe, didn't know
24    what happened prior to when he utilized force
25    against Mr. Cage, correct?
```

```
 1          A.   Right.  Correct.
 2          Q.   Is it your belief that you disciplined in
 3     some manner the officer who slapped the phone out
 4     of somebody else's hand?
 5          A.   Yeah.  I think I did.
 6          Q.   I have not seen anything on that.  Are
 7     you pretty sure about that?
 8          A.   I think I did.  I can find out for sure,
 9     but, yeah, I think I did.
10              MR. ZIBILICH:
11                   When did this alleged event occur?
12              MR. CLARKE:
13                   Jacobi Cage.
14              THE WITNESS:
15                   Truthfully, I'll say that.  This may
16                have came -- what's that?
17              MS. VALENTI:
18                   I think it was before you were
19                sheriff.
20              MR. MARTINY:
21                   I don't think so, no.
22              THE WITNESS:
23                   I don't think so, but it may have
24                came through --
25              MR. CLARKE:
```

```
 1              Hang on.
 2         THE WITNESS:
 3              -- Internal Affairs.  It may have
 4         just been directly by Satulo against
 5         that deputy.  No?  I'll get the answer
 6         for you.  I'm not --
 7         MR. CLARKE:
 8              March 1st, 2019.
 9         THE WITNESS:
10              Yeah.
11    BY MR. CLARKE:
12         Q.   You would have been sheriff?
13         A.   I was definitely sheriff then.
14         Q.   Deputy sheriff at that point?
15         A.   No.  I was the sheriff.  I was the
16    sheriff then.
17         Q.   You can see by doing an Internal affairs
18    investigation, you sometimes can find out
19    additional policy violations that are not
20    necessarily tied to the event, correct?
21         A.   I wouldn't say that.  That's why I took
22    the discipline I needed to take.  Sometimes they
23    require an investigation.  Sometimes they don't
24    require an investigation, depending on what the
25    facts are.  I mean, I don't -- you know, if I
```

```
 1   observe one of my police cars speeding on the
 2   Causeway, I can write them up for a suspension day,
 3   and I don't need an investigation to determine what
 4   I observed and what I didn't.
 5        Q.   Right, but if you didn't observe them,
 6   and nobody else did a use-of-force report that went
 7   to IA that was reviewed, then you wouldn't know
 8   about it?
 9        A.   That's not necessarily true.
10             MR. ZIBILICH:
11                  A great postulate.
12             THE WITNESS:
13                  Because not everything goes -- not
14               everything has to go to IA, you know.
15   BY MR. CLARKE:
16        Q.   I understand that.  If something comes to
17   you, you can act, correct?
18        A.   Yeah, or their direct supervisor can.
19        Q.   I'm going to mark as lay file 152 if we
20   have any discipline stemming from the Cage case.
21   All right.
22        A.   Okay.
23        Q.   But, you know, running a department is a
24   process, correct? I mean, you have to have
25   institutional memory, correct?
```

1      A.   Yeah.  I agree with that.

2      Q.   They teach law enforcement officers to

3  write reports and to be detailed so that they can

4  -- you know, if they're called to be questioned on

5  it, they can refresh their recollection, correct?

6      A.   Correct.

7      Q.   And you understand institutional memory,

8  correct?

9      A.   Well, yeah.  I mean, it's what -- I mean,

10  I certainly don't have the same memory as what my

11  predecessor did and everything else, so what was

12  happening back then.

13     Q.   Right.  That's why we kind of write

14  things out, document things, in case we -- in case

15  we're called to talk about them, correct?

16     A.   Uh-huh.

17     Q.   Tell me what happened.  It looks like

18  this report was completed, Exhibit 31, on September

19  9th, 2020.

20     A.   Okay.

21     Q.   Did you get a copy of the report?

22     A.   Probably not.

23     Q.   Did you have any discussions with anybody

24  when it was completed?

25     A.   When it was completed, probably not.

```
 1        Q.   Did you look at this after the lawsuit
 2   was filed or ever?
 3        A.   No.  I don't think I had it.
 4        Q.   Everything you know about the particular
 5   case is pretty much based on what you reviewed in
 6   the video; is that fair?
 7        A.   No.  I mean, I'll have certain
 8   communications with probably Chief Dax Russo, maybe
 9   with Lieutenant Don Meunier, as the case is going
10   on.  You know, higher profile case, which this
11   certainly was.  I'll have communications with them
12   as things are going on.  You know, I can --
13   probably never saw the medical records or the
14   school records that were produced, but I probably
15   got the Cliff Note versions of, you know, what came
16   in and what is there, you know.
17        Q.   Was there ever a meeting that was set up
18   to discuss Parsa or did you just talk about this,
19   you know, when you ran into people, and --
20        A.   I don't remember having a meeting
21   specific on Parsa, no.
22        Q.   What about Keeven Robinson?
23        A.   Keeven Robinson --
24             MR. ZIBILICH:
25                  Object to the form.
```

```
 1            THE WITNESS:
 2                 Keeven Robinson.  I was present when
 3                 their interviews were being conducted.
 4                 I don't know if we had specific
 5                 meetings after the fact.
 6  BY MR. CLARKE:
 7       Q.   So you were kind of -- are you listed on
 8  that?  Let me see.
 9       A.   I wasn't present in the room with them.
10  I was just at the detective bureau.  I wasn't part
11  of the interview.
12       Q.   Did you listen to them?
13       A.   Yeah.  I was in the room -- I mean on
14  television, you know.
15       Q.   You had a screen where you could watch
16  it?
17       A.   Correct, yeah.
18       Q.   Let's talk about Pitfield.  Does Pitfield
19  work for you anymore?
20       A.   He does not.
21       Q.   How did he no longer become employed?
22  Did you fire him or did he resign?
23       A.   No.  He left. He resigned.
24       Q.   Did you do any investigation of Pitfield
25  after all of this stuff came out with him and the
```

1    City of Kenner and all of that?

2              MR. ZIBILICH:

3                   Object to the form.  Go ahead.

4              THE WITNESS:

5                   I won't say investigation.  We

6              produced several documents and

7              different public records requests to

8              the agencies that were looking for it.

9              I will say that we looked into those

10             records as they were being produced.

11             It wasn't necessarily a formal

12             investigation from that standpoint but

13             looked into those records to see if

14             there was anything that he was doing

15             wrong, and, in my opinion, he wasn't.

16   BY MR. CLARKE:

17        Q.   Did you have access to the City of Kenner

18   records when you --

19             MR. ZIBILICH:

20                  Time out, time out. They can't

21             divulge stuff that may have gone

22             through the U.S. Attorney's Office.

23             MR. CLARKE:

24                  I didn't know that he was divulging

25             stuff to the U. S. Attorney's Office.

```
 1            MR. ZIBILICH:
 2                 I'm just saying that out loud for
 3            him.
 4   BY MR. CLARKE:
 5       Q.   Did you have access to the Kenner
 6   records?
 7       A.   No.
 8       Q.   The whole thing was with respect to him
 9   or the gist of it was that he was double-dipping.
10   That was one of the allegations.
11       A.   That's the allegation, but -- although I
12   thought the news anchor in this case was
13   stretching, you know, from the standpoint of how we
14   were calculating hours.  I couldn't tell you from
15   this day to this day of whether he was doing it,
16   but, remember, he is a non-paid position from us.
17   I'll say it the way it was.  Reserve hours are
18   fantasy hours, right.  I mean, so if they show up
19   at a reserve meeting, and the meeting takes them 15
20   minutes, I'm probably going to give them two hours
21   credit, you know, for travel there, travel back,
22   and do whatever.  What Pitfield's job, and later on
23   during that period was, is to deal with our
24   International trucks.  Our International trucks are
25   only really utilized in high water events, for
```

1 hurricanes, and the rest of it. We have 20

2 International trucks that have to be run, have to

3 be maintained, because if we let them sit there,

4 they won't run when we need them.  So his job was

5 to take care of that.  So from before Pitfield, if

6 a person came and drove there, took care of a

7 truck, rode it 50 miles, made sure every blinker

8 was working, made sure the hydraulics were working,

9 the compressor was working, everything else

10 between, we'd give you three hours to care of a

11 truck.

12    Well, if you're smart, you could show up

13 and line four of those trucks up together, do the

14 walkarounds on each one of them, run them out, run

15 them back, run them out, run them out, run them

16 out, run them back, and you probably could do two

17 hours of work and get nine hours of credit or 12

18 hours of a credit, right.  So he could get 12 hours

19 of credit for going in that morning to handle a few

20 trucks.  Our system was not 12 hours of credit.  It

21 was, okay, you clock in at noon to midnight.  He

22 certainly wasn't working noon to midnight, you

23 know, but he was getting 12 hours of credit.  So if

24 he was with us from noon to three, and he left

25 there, and he did some Kenner work at six, yes, it

1   is showing that he is officially on reserve time

2   from 6:00 PM to 12 AM in the morning, because

3   that's how our schedule is set up, but it is not

4   realistic of what was happening, right.  So it's

5   not a double-dipping.  He is not getting paid by

6   the sheriff's office to be here doing that reserve

7   time.

8       Q.   But he's lying to the sheriff's

9   department.

10      A.   No, he is not lying, because our system

11   was set up by clocking in the hours that you were

12   there, not the credit.  I certainly could set the

13  system up to say you get three hours of work and

14  just don't put -- it doesn't have to be from the

15  time you were here until the time you were there.

16  I'm giving you three hours of work.  That's not

17  lying by any means.  It was just their reserve

18  system was set up that you got -- he could have

19  said that he was working from 6:00 AM to 6:00 PM,

20  you know.

21      Q.   Do you know that he changed all of his --

22  a number of his Kenner time sheets?

23              MR. ZIBILICH:

24                  Object to the form.

25              THE WITNESS:

```
 1              That was dealing with his details.
 2  BY MR. CLARKE:
 3       Q.   Right.
 4       A.   Correct.  And I think there was two
 5  occasions out of the 200 and something details that
 6  he probably was working on the clock.  Now, that
 7  being said, I agree that there was probably a
 8  problem with him in Kenner.  Look, hindsight 20/20.
 9  He would have said, hey, I was working my detail,
10  and I was also sitting there with my Kenner
11  computer open and working, right.  I'm not -- I
12  don't know what he does from that standpoint, but
13  we certainly have two hats that we could put on at
14  the same time.  We looked at the whatever, 200
15  something details that he worked, and I think there
16  was two occasions that he had Kenner time at the
17  same thing.  Now, whether that was a mistake,
18  whether that was him doing it the same time, or
19  whether he went back and changed it, that you are
20  going to have to ask him, but it wasn't -- it
21  certainly wasn't the reserve time or the details in
22  and of itself was the case.
23       Q.   As a sheriff -- and I have -- do you
24  budget for training?
25       A.   Yeah.  It is training, but most of the
```

```
 1    time it's budgeted individual -- between the
 2    individual bureaus.
 3         Q.   Explain that to me.
 4         A.   I mean, you've got Executive Bureau,
 5    you've got Special Investigations Bureau, Criminal
 6    Investigations Bureau.  Each of those are separate.
 7    Operations Bureau.  And that training is put in
 8    from each one of them.  Now, there are certain
 9    things that are, you know, that are department-wide
10    training, i.e, the academy.  It's still in the
11    Management Service Bureau, but if my SWAT team
12    members are going to the SHOT show in Las Vegas,
13    that's coming out of the Special Operations
14    Division training budget.
15         Q.   Do you know what percentage of your
16    budget is devoted to training?
17         A.   I do not.
18         Q.   I have your financials, but for 2008, so
19    that's not going to help.  What are the biggest
20    line items of your budget?
21         A.   The salary and benefits.
22         Q.   Salary and benefits?
23         A.   Yeah.
24         Q.   If we were going through the line items,
25    would training be one of them?
```

```
 1          A.   For individual deputies, no.   For
 2    bureaus, probably.
 3          Q.   Do you know if there was -- I just asked
 4    you that.   All right.   Let's take a quick break,
 5    and then we are going to get to Parsa.
 6               THE VIDEOGRAPHER:
 7                    Going off the record.   The time is
 8               2:02.
 9                    {BRIEF RECESS}
10               THE VIDEOGRAPHER:
11                    Back on the record.   The time is now
12               2:06.
13    BY MR. CLARKE:
14          Q.   We are going to get to the Parsa video in
15    a second.   I'm just going to do some cleanup stuff.
16    Do you know if JPSO trains people with respect to
17    the Americans with Disabilities Act?
18          A.   Yeah.   I think -- I mean, that also
19    depends on who you are training and where you are
20    training, right.
21          Q.   You tell me where and when.
22          A.   It makes a difference from whether it's
23    my personnel division with new hires, whether it's
24    civilian employees, whether it's -- you're talking
25    about training with disabilities out in the street.
```

1    I mean, that's a big, vague topic from the

2    standpoint, but, I mean.

3        Q.    Do you train officers out in the street

4    about the ADA?

5        A.    I'm sure --

6        Q.    If you don't know, you don't know.

7        A.    I don't know.  I'm sure we have a slot

8    there somewhere.

9        Q.    Does the JPSO have an ADA coordinator?

10            MR. ZIBILICH:

11                Object to the form.  You can answer

12            it.

13            THE WITNESS:

14                Probably me, but, again, there is a

15            whole lot of things that can be taken

16            care of before they get to my level.

17   BY MR. CLARKE:

18        Q.    There is no -- Are you aware that a

19    public entity with  more than 50 employees must

20    designate an ADA coordinator under the law?

21        A.    No.  I'm not aware of that.

22        Q.    Do you have a -- does JPSO have a

23    federally mandated system for ADA grievances that

24    is published?

25        A.    Published?  I'm not aware of that.

```
 1        Q.   With respect to -- you're aware of the
 2   public records laws, correct?
 3        A.   Uh-huh.
 4        Q.   Has JPSO ever submitted to the state
 5   archivist a record destruction or record retention
 6   policy that you're aware of?
 7             MR. ZIBILICH:
 8                  Object to the form.  You can answer
 9             it.
10             THE WITNESS:
11                  We recently did one for body-worn
12             cameras.
13   BY MR. CLARKE:
14        Q.   Prior to that, are you aware of whether
15   or not there was any destruction schedule filed
16   with the state archivist?
17             MR. ZIBILICH:
18                  Object to the form.  You can answer
19             it.
20             THE WITNESS:
21                  My -- you know, what we did in the
22             past and what we do now.  I mean, the
23             state law requires us to carry some-
24             thing -- to keep things for over three
25             years.  We keep them for at least three
```

```
 1                    years.
 2   BY MR. CLARKE:
 3        Q.   You are also a lawyer, correct?
 4        A.   I am.
 5        Q.   You understand the Monell theory,
 6   correct?
 7        A.   Yeah.
 8        Q.   Do you think that records should only be
 9   maintained for three years on individual officers
10   pursuant to Monell?
11             MR. ZIBILICH:
12                  Object to the form.  It's not
13                  pursuant to Monell. Object to the form.
14             THE WITNESS:
15                  No.  Not pursuant to Monell.  It's
16                  like anything else.  Three years is the
17                  requirement for the state that I have
18                  to keep things.  Some things I keep for
19                  a lot longer.  Some things I need to
20                  get rid of now.  Certainly, it's not a
21                  situation of whether it's Monell or
22                  not.  It's just are you keeping things
23                  around forever and ever.  It's less of
24                  a problem today because of digital
25                  evidence, you know, being able to make
```

```
 1              that happen.  That was certainly a lot
 2              bigger of a problem in years past.
 3  BY MR. CLARKE:
 4      Q.   Do you know if there is any training with
 5  respect to the public records laws with respect to
 6  deputies on the street?
 7              MR. ZIBILICH:
 8                   Object to the form.
 9              THE WITNESS:
10                   Deputies on the street and public --
11              no, probably not.
12  BY MR. CLARKE:
13      Q.   Do you comply with any -- Do you have any
14  safeguards that are implemented at JPSO to prevent
15  the destruction of public records by deputies?
16      A.   You know, I mean --
17              MR. ZIBILICH:
18                   Object to the form.  You can answer
19              it.
20              THE WITNESS:
21                   A deputy -- generally speaking, you
22              know, it depends on what type of public
23              record.  Let's face it.  I mean, most
24              of them don't have access to be able to
25              destroy anything.
```

1    BY MR. CLARKE:

2        Q.   What about somebody taking a picture of a

3    crime scene?

4        A.   Yeah, I heard about that, but, in my

5    opinion, it should have been written as a 1018

6    report, and it should have been -- it shouldn't

7    have been deleted.

8        Q.   What's a 1018?  Miscellaneous?

9        A.   Yeah.  He should have cut a report that

10   said, I took pictures, and then crime scene came,

11   and here are the five pictures I took or whatever

12   he took.  I heard about that after the fact.  I

13   mean --

14       Q.   Now that you've heard about that, are you

15   going to do anything with that deputy?

16            MR. ZIBILICH:

17                Object to the form.

18            THE WITNESS:

19                I mean, again, the deputy messed up.

20            Certainly been told that that's the

21            case.  I haven't seen that as something

22            that was there.  I mean, I understand

23            the reasoning behind it, but, in my

24            opinion, it's simple -- that's a

25            simple, two-line report, that I took

1          these pictures and was done, and he

2          didn't know any better, I guess, you

3          know, and thought he was doing the

4          right thing, but, you know, I don't

5          disagree with you.

6   BY MR. CLARKE:

7       Q.   How do you think he could have been doing

8   the right thing by deleting photos?

9          MR. ZIBILICH:

10             Come on.

11         THE WITNESS:

12             I mean, it's not like we are not

13         taking pictures for it to document the

14         scene, right, you know, but I don't

15         disagree with you, counsel. I mean,

16         it's not --

17  BY MR. CLARKE:

18      Q.   Do you know if JPSO obtains approval from

19  the archivist before they destroy any records?

20         MR. ZIBILICH:

21             Object to the form.

22         THE WITNESS:

23             For things that are over three years

24         old?

25         MR. CLARKE:

```
 1                    Correct.
 2              THE WITNESS:
 3                    No.
 4    BY MR. CLARKE:
 5         Q.   Do you know whether they keep
 6    certificates of destruction?
 7              MR. ZIBILICH:
 8                    Object to the form.
 9              THE WITNESS:
10                    I do not know that.
11    BY MR. CLARKE:
12         Q.   I think we've talked about -- the use of
13    warrants in this case, while we have a pending
14    motion for it, the way they used them in the Parsa
15    case, you have no problem with, correct?
16         A.   I don't, no.
17         Q.   That's pursuant to the policies,
18    practices, and customs of JPSO, correct?
19         A.   I think law enforcement in general, yeah.
20         Q.   And all of the discussion that we had
21    about the policies and the different things, do you
22    think it would be beneficial to update your
23    policies?
24              MR. ZIBILICH:
25                    Object.  Wait.  Which policies?
```

```
1              THE WITNESS:

2                   Yeah.

3              MR. CLARKE:

4                   Use of force, Internal Affairs,

5              critical incidents.

6              MR. ZIBILICH:

7                   Why don't you ask him one at a time.

8    BY MR. CLARKE:

9         Q.   Do you think -- do you believe that your

10   use of force policies need updating?

11        A.   No.

12        Q.   Do you think your restraint policy,

13   SOP-8, needs updating?

14        A.   You know, I mean, I'd say no.  If you are

15   dealing -- I mean, the simple answer is no.

16        Q.   I'm sure they're no to all these, but let

17   me get them out, because Franz likes his questions

18   in a particular manner.

19              MR. ZIBILICH:

20                   That's not about that, but he talked

21              to you about six. He's got four nos and

22              two yeses, then the answer is going to

23              be no.

24              MR. CLARKE:

25                   Well, they're all going to be no.
```

1          We know that.  He knows it.  I know it.

2          MR. ZIBILICH:

3               If you know it, why are you asking

4               the question?  Go ask something else.

5   BY MR. CLARKE:

6      Q.   Do you think you should update your

7   Internal Affairs policies that we went over?

8      A.   No.

9      Q.   The training on -- the TARP training.  Do

10  you think that needs to be updated?

11     A.   I mean, again, that's a product training

12  course.  I don't think that's really relevant.

13     Q.   Let's be fair about it.  That is the

14  training that JPSO gives their people during

15  training.

16     A.   Counsel, you're not -- you have attended

17  CLEs that you've gotten stuff out of, and you

18  haven't gotten some out of.  The reality of it is

19  you chose those CLEs, and we don't -- I don't

20  necessarily have the instructor's course for TARP

21  training for me to be able to put RIPP Hobble --

22  RIPP Hobble says this is the course that you shall

23  teach, you know, so.

24     Q.   RIPP Hobble, the guy is dead, so you can

25  do whatever you want.

```
 1        A.    What's that?
 2        Q.    The guy is dead.
 3        A.    I get it, but that's the course that's
 4   coming from them.
 5              MR. ZIBILICH:
 6                   How do you want us to change our
 7                policy to have him teach it, if he's
 8                dead?
 9              MR. CLARKE:
10                   I don't.  I want Dennis Debbaudt to
11                teach it.
12              MR. ZIBILICH:
13                   Uh-huh.
14   BY MR. CLARKE:
15        Q.    Does the training need updating on the
16   TARP policy or the RIPP Hobble or asphyxia?
17        A.    No.  I don't think so.
18        Q.    I'm trying to do all my little things
19   first.  Are you on Facebook much?
20        A.    Am I?
21              MR. ZIBILICH:
22                   Say again.
23   BY MR. CLARKE:
24        Q.    Are you on Facebook much?
25              MR. ZIBILICH:
```

```
 1                     Object to the form.
 2            MR. KAUL:
 3                     Object to form.
 4            THE WITNESS:
 5                     Nah.  I mean, it depends.  If I'm --
 6  BY MR. CLARKE:
 7       Q.    Depends on what?
 8       A.    If I am spending the weekend in a hunting
 9  stand, the answer is no.  I'm not on it at all,
10  right.  Generally speaking, I get on it, I don't
11  know, once or twice every day to scroll through,
12  but I am not a big poster.
13       Q.    Have you ever posted anything about this
14  case?
15       A.    Yeah, I think I did.
16       Q.    Let me show you what I found and mark it
17  as Exhibit 153.
18       A.    That's me.  Me responding to Pitfield or
19  something like that, yeah.
20            MR. ZIBILICH:
21                     When is your exhibit list due?
22            MR. CLARKE:
23                     What did it do?
24            MR. ZIBILICH:
25                     When is it due?
```

```
 1              MR. CLARKE:
 2                   When is it due?  I don't know.
 3              MR. ZIBILICH:
 4                   All right.
 5     BY MR. CLARKE:
 6         Q.   Why did you feel compelled to respond to
 7     --
 8              MR. ZIBILICH:
 9                   I'm just counting exhibits.  That's
10                all.
11              THE WITNESS:
12                   You know, Walt Bennetti, who I know
13                personally, is obviously -- was a huge
14                Ben Zahn hater.  He is fighting with
15                local politics, on local politics, from
16                the standpoint -- I certainly am not an
17                enemy of Walt Bennetti.  I know him.
18                I'm not -- I like him.  I mean, I don't
19                have anything -- but he's run against
20                -- Walt Bennetti ran against Ben Zahn
21                for mayor, so he was trying to make all
22                of this into political points.  If you
23                look at Walt Bennetti's posts over a
24                year, that's all it is, is about trying
25                to make Ben look bad.  Trust me, I
```

```
 1                    wasn't a Ben supporter either.  I'm not
 2                    a supporter by any means, but I thought
 3                    this was inappropriate.  That's just
 4                    what it came down to, and I think
 5                    that's what my answer was.  The fact of
 6                    it is you may not like him, and, look,
 7                    I'm not personal friends with Chad
 8                    Pitfield.  I don't know where lives.  I
 9                    don't have anything from it, but I
10                    thought it was an inappropriate post.
11                    Sometimes I'll, you know, probably make
12                    remarks on Facebook that my PIO doesn't
13                    like to hear.  That's why I don't have
14                    access to my sheriff's office account
15                    or anything like that either.
16      BY MR. CLARKE:
17           Q.   Okay.  We're going to go through the
18      Parsa video.  Before we go on, sheriff, let me ask
19      you a couple of questions in general.  You have
20      reviewed the whole tape?
21           A.   I doubt that I have reviewed 43 minutes.
22           Q.   Have you reviewed primarily the part
23      where the officers were interacting with E█████
24      P█████?
25           A.   Yes.  I've seen certainly from the
```

```
 1    beginning to, you know, until at least CPR, maybe
 2    transportation.
 3         Q.    We'll limit it to that.  I don't think
 4    there is much after that.
 5         A.    Sure.
 6         Q.    Now, from what you reviewed on the video,
 7    previous to watching it right now, do you believe
 8    that everybody on the scene acted in compliance
 9    with the policies of Jefferson Parish Sheriff's
10    Office?
11              MR. ZIBILICH:
12                   I am going to object to the form.
13                That's for the factfinder, but I'm
14                going to let him answer it.
15              THE WITNESS:
16                   You know, I'll say, for example, I
17                don't think I've ever seen the guy that
18                took the pictures of what was deleted.
19                I don't think I've ever seen that, but
20                I've heard that it's there, and that's
21                where it came forward.  And, you know,
22                but when you are dealing with the
23                interactions with Mr. E█████ P█████, from
24                what I can see with my eyes -- I mean,
25                look.  I'm not a fact witness.  I
```

```
 1                wasn't there.  I'm looking at the
 2                reactions of the parents, the responses
 3                of, obviously, the deputies involved,
 4                and although the outcome is certainly
 5                horrible, I don't see anything that
 6                they did that was unreasonable.
 7   BY MR. CLARKE:
 8        Q.    What I'm trying to get at, and you know
 9   the question I'm getting at is, is you ratified
10   what their conduct is as being according to the
11   policies, practices, customs of JPSO, correct?
12                MR. ZIBILICH:
13                     Object to the form.
14                THE WITNESS:
15                     You know, again, everything is
16                situational.  I'll say it a million
17                times and a million times over.  I want
18                them to act reasonable under the
19                circumstances, and I think they were
20                reasonable under the circumstances.
21                That doesn't mean that I can't second
22                guess it, and you certainly will second
23                guess it and say they should have done
24                this and shouldn't have done that.  I
25                wasn't there at that moment.  I'm just
```

```
 1                looking at it as a bystander, like you
 2                are, and saying okay.
 3      BY MR. CLARKE:
 4           Q.   If you did an Internal Affairs
 5      investigation then --
 6           A.   There is nothing that I would hold them.
 7           Q.   That's what I'm trying to get at.
 8      Internal Affairs is supposed to do this type of
 9      investigation where they go through everything, and
10      they match it up against the training and the
11      policies.  That wasn't done in this particular
12      case?
13                MR. ZIBILICH:
14                     I object.  Don't answer that one.
15                MR. CLARKE:
16                     No.  We are not --
17                MR. ZIBILICH:
18                     I just told him not to answer it.
19                  You can call the magistrate, if you
20                  want.  You are not going to tell him
21                  what they're supposed to do.
22                THE WITNESS:
23                     Correct.
24      BY MR. CLARKE:
25           Q.   Prior to us reviewing this tape here, did
```

```
 1   you find anything that you observed on the tape
 2   that was problematic to you?
 3                MR. ZIBILICH:
 4                     Object to the form.  You can answer
 5                it.
 6                THE WITNESS:
 7                     No.
 8   BY MR. CLARKE:
 9        Q.   You could have reviewed all of these
10   statements, if you wanted to, correct, of the
11   officers and the witnesses?
12        A.   Yeah.  I could have, I guess, yeah.
13        Q.   That would give you more context of what
14   is going on in the video potentially, correct?
15        A.   Yeah, but I also feel that I'm not the
16   fact witness, you know, here on this standpoint.
17   Their statements need to stand on their own for
18   what they are.
19        Q.   But you didn't review them, so you don't
20   know how they stand up, do you?
21        A.   No, but if you want me to become your
22   expert, I can do so, but I also don't necessarily
23   believe that these type of situations is best for
24   me to review every single deposition before my
25   depositions that could influence me on what my, you
```

```
 1   know, take is.
 2        Q.   I was talking about any time that you
 3   reviewed it.  I think you said you reviewed it
 4   before this, but you haven't necessarily reviewed
 5   the whole homicide report, correct?
 6        A.   What do you mean?  I reviewed the video.
 7        Q.   Reviewed the video previously, correct?
 8        A.   Correct.
 9        Q.   Did you make your determination as to
10   whether or not they all acted appropriately under
11   the circumstances that they were facing based on
12   your review of the video?
13        A.   I think my deputy chief and Dax Russo who
14   -- Lieutenant Don Meunier, they make those
15   decisions of whether they believe it was there and
16   if anything needed to be referred up, they could do
17   so accordingly.
18        Q.   Did you have any discussions with any of
19   the people involved in the report about whether or
20   not they even looked into the use or -- the lack of
21   the use of the RIPP Hobble?
22        A.   I don't know if you had anybody with a
23   RIPP Hobble on scene until -- you know, I would
24   have to check, but I don't think we have anybody
25   with a RIPP Hobble on the scene.
```

```
 1              MR. ZIBILICH:
 2                   The question is whether or not you
 3                had a discussion.
 4              THE WITNESS:
 5                   No.  Have I had a discussion with
 6                anybody on it?  No.
 7  BY MR. CLARKE:
 8      Q.   Do you not think after this and with the
 9  litigation that's going on and everything, that it
10  would be important to reevaluate your restraint
11  procedure?
12              MR. ZIBILICH:
13                   Object to the form.  It calls for
14                subsequent remedial measure.  We don't
15                have those in Louisiana.
16              MR. CLARKE:
17                   It doesn't matter.
18              MR. ZIBILICH:
19                   You can answer it, if you want.
20              THE WITNESS:
21                   But, no.  I mean, I could have a
22                RIPP Hobble with every deputy, but then
23                if an in-custody happened with a RIPP
24                Hobble, you'd be blaming the RIPP
25                Hobble.  So, you know, it's not a --
```

```
 1              I'm not -- I think it's a good
 2              procedure to have the supervisors with
 3              that RIPP Hobble so that way it takes a
 4              second level of supervision before
 5              they're being used.
 6    BY MR. CLARKE:
 7         Q.   Pizzolato said everybody gets a RIPP
 8    Hobble, even the trainees.  Would you dispute that?
 9         A.   Maybe I'm wrong, to be honest with you.
10    I was under the impression it was just the
11    supervisors.
12         Q.   Do you think in the investigation that,
13    based on what you saw, that an investigation of
14    whether or not they used RIPP Hobble training
15    should have been undertaken?
16              MR. ZIBILICH:
17                   Object to the form.
18              THE WITNESS:
19                   Again, at what point?  At what point
20                in time?  That's something that they're
21                going to have to, you know, articulate
22                when they should and what was going on
23                at that moment.
24    BY MR. CLARKE:
25         Q.   Do you know if Pizzolato trains people
```

1   that as soon as it is safe, you put the people into

2   -- get them out of the prone position and put them

3   in the recovery position?

4        A.   I don't.

5        Q.   Do you think that's the way it should be

6   done?

7             MR. ZIBILICH:

8                  Object to the form.

9             THE WITNESS:

10                 That's a speculation.  I think

11            Pizzolato is the best person to answer

12            that.

13   BY MR. CLARKE:

14        Q.   Throughout -- and we'll start the tape at

15   zero.  Do you even know whether or not the deputies

16   knew any details about the interaction between E█████

17   P█████ and his father before they showed up?

18        A.   I do not.

19        Q.   I'm starting at -- I'm going to move it

20   forward some until we get to -- I'm going to go

21   back.  I have stopped it at four minutes and ten

22   seconds at the bottom corner.  This is when they

23   come out.

24                  {VIDEO PLAYED}

25   BY MR. CLARKE:

```
 1        Q.   The video zoomed in at that point. From
 2   your observations of that part of the video, did
 3   E███ P███ appear to be obese?
 4        A.   I'm not going to give a medical
 5   diagnosis.  Is he a little overweight?  Yes.  I
 6   wouldn't say obese.  I've probably been that heavy
 7   in my lifetime.
 8        Q.   Based on your observation of that, would
 9   you believe that he is suffering from some type of
10   intellectual disability?
11        A.   Yeah.
12             MR. ZIBILICH:
13                  Object to the form as to what he
14             believes.
15   BY MR. CLARKE:
16        Q.   Some of the things that you saw him
17   doing, he was slapping himself, correct?
18        A.   Sure.
19        Q.   He didn't seem to be making a fist.  He
20   was slapping his father and grabbing his father,
21   correct?
22        A.   Correct.
23        Q.   We stopped it at 8:15 on the tape
24   counter.  I'm going to move forward.  This is when
25   Deputy Pitfield pulls up, I believe.
```

1               {VIDEO PLAYED}

2          THE WITNESS:

3               Why is it zoomed out?

4          MR. CLARKE:

5               Because we are going to zoom in on

6            the action.  I can zoom it out, but

7            it's not going to be able to show you

8            what happens.

9          THE WITNESS:

10               You are zoomed in right now?

11          MR. CLARKE:

12               Yeah.

13          THE WITNESS:

14               But this isn't the actual video?

15          MR. CLARKE:

16               Hang on.  Let me stop it. This is

17            the actual Laser Tag video zoomed in

18            when Pitfield shows up.

19          THE WITNESS:

20               Okay.

21    BY MR. CLARKE:

22       Q.   You see Pitfield there?

23       A.   But this is a zoomed-in version of the

24    actual video?

25       Q.   Correct.

```
 1        A.   Got it.
 2        Q.   What we did --
 3        A.   I just didn't remember seeing it.  That's
 4   why I was making sure.  This isn't the actual
 5   video.  This is the zoomed-in version of the actual
 6   video.
 7        Q.   Right.  We've taken the regular video,
 8   and when the officers come up, we've zoomed in as
 9   close as we can.
10        A.   Got it.
11        Q.   You see Officer Pitfield show up there?
12        A.   I do.
13        MR. ZIBILICH:
14             Let me make an objection for the
15          record, when you continue to ask the
16          deponent what it is that he is seeing.
17          Let the record reflect that the
18          objection is that the video is the best
19          evidence.  It speaks for itself, but
20          you can ask him whatever you want.
21        MR. CLARKE:
22             Thank you, Franz. I really
23          appreciate that.
24        MR. ZIBILICH:
25             You're quite welcome.
```

```
 1              MR. CLARKE:
 2                   All right.  I'm starting it at 8:44.
 3                   {VIDEO PLAYED}
 4    BY MR. CLARKE:
 5         Q.   He is striking his father, and then he
 6    strikes Pitfield, correct?
 7         A.   I know from the other video that he does
 8    strike Pitfield, but I think this one is too zoomed
 9    in to actually see Pitfield having that moment.
10         Q.   It looks like Pitfield takes him to the
11    ground.  Everything is appropriate so far, correct?
12              MR. ZIBILICH:
13                   Same objection.
14              THE WITNESS:
15                   Again, I think he goes to the
16                ground.  I don't know if he takes him
17                to the ground.  I think Mr. Parsa goes
18                to the ground, though, certainly.
19    BY MR. CLARKE:
20         Q.   If Pitfield's statement said I escorted
21    him to the ground, you wouldn't --
22              MR. ZIBILICH:
23                   Time out.  I don't care what
24                Pitfield said.  You're going to ask him
25                what he saw.  He is going to tell you
```

```
 1                what he saw.  Whether you like it or
 2                not is of no moment.
 3           MR. CLARKE:
 4                And what you say I don't really care
 5                about either.
 6           MR. ZIBILICH:
 7                Good.  That makes two of us.
 8   BY MR. CLARKE:
 9        Q.   All right.  He struck him once.  Do you
10   know why he struck him?
11           MR. ZIBILICH:
12                Why who struck whom?
13           MR. KAUL:
14                Object to form.
15           MR. CLARKE:
16                Why Pitfield struck E███ P███.
17           MR. KAUL:
18                Object to form.
19           THE WITNESS:
20                I think I was told at one point in
21                time, probably by counsel, not by
22                Pitfield, because that's what --
23           MR. ZIBILICH:
24                Don't tell him --
25           THE WITNESS:
```

```
 1                    But I think that he was being bit at
 2               the time.  So that's my understanding,
 3               but I certainly can't see it from here.
 4   BY MR. CLARKE:
 5        Q.   If you are getting bit, it would be
 6   appropriate, in your mind, to give one strike,
 7   correct?
 8        A.   Correct.
 9            MR. CLARKE:
10               We're going to play it forward from
11               8:56.
12                  {VIDEO PLAYED}
13   BY MR. CLARKE:
14        Q.   I'm going to stop it at ten minutes,
15   10:02.  Up to that point, does it appear that
16   Deputy Pitfield was trying to get him restrained,
17   and he is still resisting some?
18        A.   I think both parties were trying to get
19   him restrained during that period of time.  When
20   Mr. E████ P████ was able to roll over, it appeared
21   that he bit Mr. Parsa on the back, if that was the
22   case.  That's what it kind of looked like, and
23   where you stopped the video, it looks like Mr.
24   Pitfield was trying to get him restrained.  He was
25   holding him down at that point.
```

```
 1        Q.   Right.  So far everything seems, in your
 2   opinion, seems to be done appropriately?
 3             MR. ZIBILICH:
 4                  Object to the form.
 5             MR. KAUL:
 6                  Object to form.
 7             THE WITNESS:
 8                  I agree.
 9             MR. CLARKE:
10                  Starting at 10:02.
11                  {VIDEO PLAYED}
12   BY MR. CLARKE:
13        Q.   I'm going to stop it at 11:01.  It
14   appeared at the beginning of where we stopped that
15   he was still trying to raise himself up some for a
16   period of time while Pitfield was trying to
17   restrain him, correct?
18             MR. ZIBILICH:
19                  Object to the form.  It speaks for
20               itself.
21             MR. KAUL:
22                  Object to form.
23             THE WITNESS:
24                  I agree.
25   BY MR. CLARKE:
```

1        Q.   Does it appear that he started to calm

2   down towards the end of the last clip from ten

3   minutes to 11 minutes?

4             MR. ZIBILICH:

5                  Object to the form.

6             MR. KAUL:

7                  Object to form.

8             THE WITNESS:

9                  I wouldn't say that.  He certainly

10               doesn't have him restrained yet,

11               because I don't think he has the other

12               arm yet.  You can tell Deputy Pitfield

13               is spent, also.  I don't know if

14               Mr. Parsa had a history of hitting his

15               head, but it looks like they were

16               putting stuff underneath his head to

17               try to protect him from banging his

18               head on the ground.  If I had to take a

19               guess, that was part of his previous

20               stuff, and at this moment, it looks

21               like the parents are trying to talk to

22               him to calm him down, but he is

23               certainly still not restrained yet.

24   BY MR. CLARKE:

25        Q.   Would you call this -- do you know

```
 1    whether or not this is resisting to being arrested
 2    or part of his autistic outburst?
 3              MR. ZIBILICH:
 4                   Objection to form.
 5              MR. KAUL:
 6                   Object to form.
 7              THE WITNESS:
 8                   I think it could be both.
 9              Truthfully, I don't think he was being
10              arrested, based off of what we know
11              today and what they would have learned
12              out there, but, I mean, it certainly
13              could still be both.  From what I know
14              of his history, do I think he was
15              resisting arrest or resisting a deputy?
16              No.  He was resisting in general.  It
17              didn't make a difference if it was a
18              uniform or not a uniform at that
19              moment.
20              MR. CLARKE:
21                   Okay.  I'm going to play it from
22              11:02.
23                   {VIDEO PLAYED}
24    BY MR. CLARKE:
25         Q.   I'm stopping at, roughly, minute
```

1    increments.  During that period of time, did his

2    resistance seem to subside compared to when Officer

3    Pitfield originally encountered him?

4              MR. ZIBILICH:

5                   Object to the form.

6              MR. KAUL:

7                   Objection to form.

8              THE WITNESS:

9                   He is still not in compliance. Still

10                doesn't have both hands.  It's not

11                active as it was before, but he is

12                certainly not subdued.

13   BY MR. CLARKE:

14        Q.   Right.  He doesn't have him fully

15   handcuffed, correct?

16        A.   Correct.

17             MR. ZIBILICH:

18                  Object to the form.

19   BY MR. CLARKE:

20        Q.   Do you know whether or not E█ P█ was

21   verbal or nonverbal?

22        A.   I am under the impression he was

23   nonverbal.

24        Q.   He could say certain words at times but

25   could not communicate, correct?  Is that your

1    understanding?

2          A.    That's my understanding, yeah.

3          Q.    Doesn't that pose problems to officers

4    when they are trying to restrain somebody, not

5    being able to communicate with them?

6               MR. ZIBILICH:

7                    Object to the form.

8               THE WITNESS:

9                    Well, again, every scenario is

10                  different.  From this standpoint, the

11                  communication is really being done by

12                  the parents at this point in time, from

13                  the appearances of the video, right.

14                  So I wouldn't expect Pitfield to be

15                  having much communication at that

16                  point.  It's going to be the parents

17                  trying to calm the situation down.

18   BY MR. CLARKE:

19         Q.    You wouldn't want Pitfield to try to put

20   him in the recovery position when he is calming

21   down?

22              MR. ZIBILICH:

23                   Object to the form.

24              MR. KAUL:

25                   Objection to form.

```
 1              THE WITNESS:
 2                   The answer is no.  From what I saw
 3              just a minute earlier, when Mr. Parsa
 4              was trying to hold him down in a prone
 5              position, when Pitfield got off of him
 6              to get back in, that's when turned and
 7              bited -- bit him in the back.  So you
 8              see what happens quickly from that
 9              standpoint.  He doesn't have backup
10              there yet.  I wouldn't want to lose
11              control of that situation.
12    BY MR. CLARKE:
13         Q.   You don't want to let somebody go with a
14    loose handcuff, correct?
15         A.   Correct.
16              MR. CLARKE:
17                   Starting at 12:01.
18                   {VIDEO PLAYED}
19    BY MR. CLARKE:
20         Q.   I'm going to stop it at 1300.  Pitfield
21    seems to be sitting on his behind.  Is that fair to
22    say?
23         A.   Behind I think is fair to say.  Certainly
24    below the belly, and you can still see the arms
25    there.
```

```
 1        Q.   During this minute, his mount, I think he
 2   only raised up once or twice, correct?
 3        A.   Yeah.  I mean, he certainly raised up
 4   during that period of time.  Kind of turned to his
 5   right side.
 6        Q.   And, again, you wouldn't want Pitfield to
 7   try to put him in the recovery position because he
 8   is not fully controlled, correct?
 9              MR. ZIBILICH:
10                   Object to the form.
11              MR. KAUL:
12                   Object to the form.
13              THE WITNESS:
14                   That is correct.  Well, not just
15                because he is not fully controlled,
16                also, at that time.  I mean, I don't
17                know what communications are being had
18                between the mother, but, obviously, she
19                is still communicating, so that is --
20                if we're getting to a better place,
21                that's where you want to get him to a
22                better place, but I don't know what is
23                happening verbally during the
24                situation, but I certainly don't want
25                Pitfield to let him go.
```

```
 1   BY MR. CLARKE:
 2        Q.   If he was a dangerous person, you
 3   wouldn't want the mother and father to be there
 4   close to him, correct?
 5             MR. ZIBILICH:
 6                  Object to the form.
 7             MR. KAUL:
 8                  Object to form.
 9             THE WITNESS:
10                  That's not necessarily true.  Look,
11               if this is a -- you know, if this
12               wasn't a special needs individual, I
13               agree with you, I probably wouldn't
14               have the mother and father within that
15               close proximity.
16   BY MR. CLARKE:
17        Q.   You know, I guarantee you I'm --
18        A.   No.  You are not trying to trick me. I
19   mean, I think -- I think, you know, you can have
20   deputies that would shoo the parents away during
21   that situation.  That wasn't happening here.  I
22   think, you know, he recognized what the situation
23   was, and that's why he gave lenience that that was
24   happening at that point.
25        Q.   To hopefully be able to calm him down
```

```
 1   because he can't communicate with him or he --
 2        A.    Sure.  If I'm fighting with --
 3              MR. ZIBILICH:
 4                   Object to the form.
 5              THE WITNESS:
 6                   -- an individual on the street, a
 7              drug dealer, I'm not letting mom come
 8              put, you know, pillows under his head,
 9              right.  I mean, that's not the case,
10              and so I certainly think he recognized
11              the situation, and that's why the
12              proximity was there.
13   BY MR. CLARKE:
14        Q.    Right.  If he got completely out of
15   control to where it could be a danger, you would
16   then expect him to tell people to back off, but in
17   this particular case, it seems like the best thing
18   to do, right?
19              MR. ZIBILICH:
20                   Object to the form.
21              THE WITNESS:
22                   Yes and no.  There is a reason we're
23              there to begin with, because, you know,
24              mother and father couldn't control the
25              situation, but that doesn't mean that
```

```
 1                    he could control it by himself, also.
 2                    You know, I want good Samaritans to
 3                    help out.  In this case, parents are
 4                    good Samaritans, and so we take the
 5                    help that we can get when it's needed.
 6   BY MR. CLARKE:
 7        Q.   And Pitfield is a pretty good-sized
 8   deputy, correct?
 9              MR. KAUL:
10                    Object to form.
11              THE WITNESS:
12                    I don't think we have to object to
13                 anything.  The answer is yes, you know.
14              MR. CLARKE:
15                    We'll play it forward from 1300.
16                    {VIDEO PLAYED}
17              THE WITNESS:
18                    I wouldn't say he is the best shaped
19                 deputy, but he is a size deputy.
20   BY MR. CLARKE:
21        Q.   I stopped it at 1400.  Kind of a little
22   bit of the same.  Would you agree that his
23   resisting level is minimal?
24              MR. ZIBILICH:
25                    Objection to the form.
```

```
 1              MR. KAUL:
 2                   Objection to form.
 3              THE WITNESS:
 4                   Again, I think I seen the leg move a
 5              few times.  I certainly can see his
 6              breathing on the belly, but, I mean,
 7              head and upper body are blocked by the
 8              mom.  I don't have any other knowledge
 9              other than that.
10     BY MR. CLARKE:
11         Q.   Does Pitfield during that last minute
12     that we watched appear to have trouble controlling
13     him?
14              MR. ZIBILICH:
15                   Object to the form.
16              MR. KAUL:
17                   Object to form.
18              THE WITNESS:
19                   I mean, look, I've been in those
20              situations before.  He is just waiting
21              for his backup.  Pitfield is spent.  He
22              is waiting for his backup to get there.
23              He is just making sure he holds on to
24              what he has.
25     BY MR. CLARKE:
```

```
 1        Q.   Correct, but, by the same token, you have
 2   to look at his actions in coordination with what
 3   the actions of the suspect are, correct?
 4            MR. ZIBILICH:
 5                Object to the form.
 6            THE WITNESS:
 7                Yeah.  I mean, I don't see him
 8                trying to gain ground.  I guess you
 9                could say that, but I don't see him
10                loosing ground either.
11   BY MR. CLARKE:
12        Q.   Like some of the videos before that we
13   showed that were from the TARP thing, those people
14   were violently resisting.  Would you agree?
15            MR. ZIBILICH:
16                You are talking about the Cops
17                video?
18            MR. CLARKE:
19                Yeah.
20            THE WITNESS:
21                Hey, again, having been in those
22                situations before, you never predict
23                where they are.  That's four
24                individuals, and this is one right now.
25   BY MR. CLARKE:
```

```
 1        Q.   I understand.  I'm talking about the
 2   level of resistance of the suspect.  In this case,
 3   it would be E███ P███ versus whoever they were
 4   trying to restrain in the training videos.  His
 5   level of resistance is not --
 6        A.   Is not where it was two minutes prior.
 7             MR. ZIBILICH:
 8                  Object to the form.
 9             THE WITNESS:
10                  Or a minute prior, whatever it was.
11   BY MR. CLARKE:
12        Q.   And up to this point, you think Pitfield
13   is doing what he can to wait for his backup and
14   acting appropriately, correct?
15        A.   I do.
16             MR. ZIBILICH:
17                  Object to the form.
18   BY MR. CLARKE:
19        Q.   Starting at 1401. It looks like -- I'm
20   just going to give you a head-up.  I think
21   Detective Vaught is going to come here shortly, and
22   I'm going to ask you some questions when he gets
23   there.  Okay?
24        A.   Okay.
25             MR. CLARKE:
```

```
 1                    Starting it at 1401.
 2                 {VIDEO PLAYED}
 3   BY MR. CLARKE:
 4        Q.   I'll stop it here at 1433.  You see
 5   Detective Vaught came up.  You see that he got his
 6   other hand handcuffed?
 7        A.   I did see some active resistance right
 8   before that handcuff happened.  So we went back to,
 9   you know, having none to having some right after
10   that 1401, and then Detective Vaught was able to
11   arrive and get his other hand presumably from
12   underneath him and get the second handcuff
13   together.  I'm assuming it was two sets of cuffs.
14        Q.   I mean, that's what the testimony is, but
15   we -- obviously, we had somebody blocking the way
16   where you could see where they were connected.
17        A.   Right.
18        Q.   Would you agree that once he is hand-
19   cuffed, there is more control than when it was just
20   Pitfield with one handcuff on him?
21             MR. ZIBILICH:
22                  Object to the form.
23             THE WITNESS:
24                  Yeah.  There is more control.
25   BY MR. CLARKE:
```

```
 1        Q.   Do you see anything -- do you know
 2   whether or not they should put him in the recovery
 3   position now?
 4              MR. ZIBILICH:
 5                   Object to the form.
 6              THE WITNESS:
 7                   And, again, I can't make the
 8              determination from looking at the
 9              video.  If they tried to put him into
10              the recovery position, if they were
11              feeling resistance from it, that's
12              something that they've got to make that
13              determination from out there on the
14              scene.
15   BY MR. CLARKE:
16        Q.   Well, people can be struggling -- I think
17   we went over it -- based on the fact that they're
18   having trouble breathing or they can be resisting.
19   Remember that line of questioning?
20        A.   Uh-huh.
21        Q.   Up till this point, once he's handcuffed,
22   do you not think they should have attempted to put
23   him in the recovery position?
24              MR. ZIBILICH:
25                   Object to the form.
```

```
 1            MR. KAUL:

 2                 Object to the form.

 3            THE WITNESS:

 4                 Again, I don't know what is going on

 5              with the mother at that point in time,

 6              what the communication is from there,

 7              if there is any other communication

 8              back with him, but they literally just

 9              got him handcuffed.  I think they were

10              going to give that a second or two and

11              see what happens, you know.

12   BY MR. CLARKE:

13       Q.   Did you see anything that would have

14   prevented them from putting him in a recovery

15   position?

16            MR. ZIBILICH:

17                 Object to the form.

18            THE WITNESS:

19                 I can't see what his lower body is

20              doing right now or even feel what his

21              movements are right now.

22   BY MR. CLARKE:

23       Q.   If his legs were kicking, does that

24   prevent you from putting him in the recovery

25   position?
```

```
 1        A.    I think it's --
 2              MR. ZIBILICH:
 3                    Object to the form.
 4              MR. KAUL:
 5                    Object to the form.
 6              THE WITNESS:
 7                    More less than likely that you -- I
 8                wouldn't put him into the recovery
 9                position, you know, with legs kicking,
10                his tendency for biting.  You know,
11                those things that they've learned.
12                That's a decision they've got to make
13                at that moment.
14              MR. CLARKE:
15                    All right.  I'm playing it from 1433
16                forward.
17                    {VIDEO PLAYED}
18    BY MR. CLARKE:
19        Q.    I'm going to stop it at 1500.  You see
20    another -- I think we have Detective Mehrtens.
21              MR. CLARKE:
22                    Did I get it right?
23              MR. ZIBILICH:
24                    Not even close, but it's okay.
25    BY MR. CLARKE:
```

1       Q.   Mehrtens and Vega show up.  Do you see

2  that there is four officers on the scene there or

3  actually five?

4       A.   That's them up at the top?

5       Q.   Yeah.

6       A.   You're telling me that's who they are.  I

7  mean, I can't see their heads, but it wouldn't

8  surprise me.

9       Q.   Do you think that having five officers on

10  the scene would prevent -- would preclude them from

11  being able to put him in the recovery position?

12           MR. ZIBILICH:

13              Object to the form.

14           THE WITNESS:

15              Again, not in and of its face, but,

16             again, when you are letting the mother

17             communicate in that position, I think

18             they are doing what they believe is

19             reasonable at that moment.

20  BY MR. CLARKE:

21       Q.   You can let the mother communicate to him

22  when he is laying on his side too, correct?

23       A.   Could have.  Yeah, could have, sure.

24       Q.   Do you know whether or not Pizzolato has

25  provided training to the deputies that you move

1 them into the recovery position as soon as you have

2 sufficient number of officers and the person is

3 restrained enough so that it's safe?

4         MR. ZIBILICH:

5             Object to the form.

6         THE WITNESS:

7             I do not.

8 BY MR. CLARKE:

9    Q.    Would you agree that having five officers

10 on the scene with a handcuffed kid that they could

11 move him into the recovery position?

12         MR. ZIBILICH:

13             Object to the form.  At that point?

14         MR. CLARKE:

15             Yeah. At this point, 1500.

16         THE WITNESS:

17             Yeah.  Not necessarily after the

18           footage that I just observed.

19 BY MR. CLARKE:

20    Q.    Well, people can resist, and you can use

21 force, and then when they stop, you can't use

22 force, correct?

23         MR. ZIBILICH:

24             Object to the form.

25         THE WITNESS:

```
 1                    Yeah, but it doesn't always work
 2             that way.
 3   BY MR. CLARKE:
 4        Q.   Well, you have to escalate your force in
 5   conjunction to the suspect's action, and you also
 6   have to deescalate the force consistent with the
 7   subject's actions, correct?
 8             MR. ZIBILICH:
 9                  Object to the form.
10             THE WITNESS:
11                  I think that force is deescalated by
12             -- you looking at four deputies that
13             are not taking any additional, you
14             know, detention techniques.
15   BY MR. CLARKE:
16        Q.   Right, but they can all assist in getting
17   him in the recovery position, correct?
18             MR. ZIBILICH:
19                  Object to the form.
20             THE WITNESS:
21                  Sure.
22   BY MR. CLARKE:
23        Q.   Did you ever look into, at any point
24   during these events, up to the present, by looking
25   into whether or not there was a time that these
```

1   officers could have put him in the recovery
2   position prior to the ultimate result?
3               MR. ZIBILICH:
4                   Object to the form.
5           THE WITNESS:
6                   Counsel, I mean, you have the
7               ability to hit the pause button and ask
8               all these questions second by second by
9               second.  When I look at the video in
10              its entirety all the way through, I
11              don't see it in that light.  So we
12              certainly are going to have the ability
13              to go through this second by second by
14              second to make sure that that is what
15              he was thinking at that second.  That's
16              what he was thinking at that second.
17              But I don't believe, as a person that
18              has been in those positions before, and
19              been in those fights, that that's not
20              necessarily what they're going through.
21              They don't have that pause button.
22  BY MR. CLARKE:
23      Q.  Well, that's why you train them, correct?
24              MR. ZIBILICH:
25                  It's not a debate.  Object.  It's

```
 1              not a question either.
 2         THE WITNESS:
 3              Yeah, yeah.
 4    BY MR. CLARKE:
 5      Q.   You train people so that they can react
 6    in a manner that is more consistent with officer
 7    safety and also suspect safety, correct?
 8         MR. ZIBILICH:
 9              Object to the form.
10         THE WITNESS:
11              Sure.
12    BY MR. CLARKE:
13      Q.   The amount of -- if he was resisting
14    violently, wouldn't you expect the other officers
15    to assist Pitfield?
16         MR. ZIBILICH:
17              Object to the form.
18         MR. KAUL:
19              Objection.
20         MR. ZIBILICH:
21              I don't know when you are talking
22          about.
23         MR. CLARKE:
24              It's 1500.
25         MR. ZIBILICH:
```

```
 1                    Everything is at 1500.  Okay.  You
 2               didn't say that before.
 3          MR. CLARKE:
 4                    Well, I didn't think I had to.
 5          MR. ZIBILICH:
 6                    I still object to the form.
 7  BY MR. CLARKE:
 8      Q.   Do you understand the question, sheriff?
 9      A.   I think the other deputies that arrived
10  on scene have arrived after the fact.  Deputy
11  Pitfield is the one that is in the best scenario
12  from his standpoint of knowing what was happening
13  just a minute prior.
14      Q.   Should he have told them, hey, I've been
15  sitting on top of him for four minutes, so we need
16  to make sure we get him in the recovery position?
17          MR. ZIBILICH:
18                    Object to the form.
19          MR. KAUL:
20                    Objection to form.
21          THE WITNESS:
22                    I think that's a woulda, coulda,
23               shoulda, which is pure speculation,
24               because I'm not the one that is sitting
25               there and feeling what resistance is
```

```
 1                happening at that moment in time.  I'm
 2                not the one that is hearing what the
 3                mother is saying at that time.
 4    BY MR. CLARKE:
 5         Q.   I think you said earlier that Pitfield
 6    seemed spent.  Do you remember that?
 7         A.   I mean, it looked like he was breathing
 8    heavy, from what I can observe.
 9         Q.   Would you agree that the person sitting
10    underneath him was probably spent?
11                MR. ZIBILICH:
12                    Object to the form.
13                THE WITNESS:
14                    Probably was.
15    BY MR. CLARKE:
16         Q.   Are you aware of the fact that the more
17    weight put on somebody's back can compress the
18    ability to breathe, and the longer that you're on
19    somebody's back, the longer that compression?
20                MR. KAUL:
21                    Object to the form.
22                MR. ZIBILICH:
23                    Yeah, object to the form.
24                THE WITNESS:
25                    I think we have tried and
```

```
 1                    established that, you know, most of the
 2                    things is try not to put pressure on
 3                    the back, which I don't believe, and I
 4                    think you said so earlier, it looks
 5                    like he is sitting on his butt at the
 6                    time.  You can still see his belly.
 7                    You could still see his belly breathing
 8                    oxygen in and out at the time and see
 9                    his arms which are extended back behind
10                    him, which makes me believe that he is
11                    not on his back.
12              MR. CLARKE:
13                    Let's move forward from 1500.
14                    {VIDEO PLAYED}
15     BY MR. CLARKE:
16        Q.    I stopped it at 1528.  For that period of
17     30 seconds, did it appear that he was resisting at
18     all?
19              MR. ZIBILICH:
20                    Object to the form.
21              THE WITNESS:
22                    Again, you can't see his body, but
23                 what I did notice in that picture, it
24                 looks like there is a rain jacket or
25                 some type of jacket was actually put
```

```
 1                    over his head.  I'm assuming he is
 2                    trying -- she is trying to talk to him
 3                    through that.  I certainly can't see
 4                    what is going on with his head from
 5                    that standpoint, but it looks like it
 6                    is over the top of it.  That is
 7                    something new that I observed.
 8      BY MR. CLARKE:
 9          Q.   There is a number of police officers
10      still in close proximity to everything, correct?
11          A.   Uh-huh.
12          Q.   During that 30 seconds, from 1500 to
13      1528, do you think they had the ability to put him
14      in the recovery position?
15                    MR. ZIBILICH:
16                         Object to the form.
17                    MR. KAUL:
18                         Object to the form.
19                    THE WITNESS:
20                         Again, woulda, coulda, shoulda, is
21                    my same answer from the standpoint.
22      BY MR. CLARKE:
23          Q.   I'm just asking you if you think that
24      they physically could have done it or there was too
25      much violence that they couldn't have done it?
```

```
 1              MR. ZIBILICH:

 2                   Object to the form.

 3              THE WITNESS:

 4                   Again, it's when does the resistance

 5              stop, and it goes back, and, again, the

 6              communication with mother I think is a

 7              -- probably, in a catchall, should not

 8              be there.  May have moved to other

 9              things, but when you are relying on the

10              mother to help calm down the situation,

11              if things appear to be working, you

12              know, they weren't going to change it

13              to mess that up.

14  BY MR. CLARKE:

15      Q.   You want your officers to apply the TARP

16  training in this, and the training they had on

17  asphyxia, correct, regardless of what the mother

18  does?

19              MR. ZIBILICH:

20                   Object to the form.

21              THE WITNESS:

22                   No, no.  That's not necessarily

23              true.  We -- the TARP training will

24              have you where no one is put in a prone

25              position.  That's obviously not the
```

1          case.  We can find scenarios where TARP

2          training, as we believe, is a practice

3          that can work, and, you know, in this

4          type of situation, you know, it's

5          sometimes a little bit different than

6          others.  I mean, it's what it comes

7          down to.

8   BY MR. CLARKE:

9        Q.   If you look at Exhibit 22 and the swarm

10  training, it acknowledges you have to put them in

11  the prone position.  It just says you need to sit

12  them up, correct?

13       A.   I think sitting them up is what you are

14  trying to get to.  Now, I don't see anywhere in the

15  TARP training where it's telling you a specific get

16  them up in 15 seconds, get them up in a minute when

17  other things are going on.

18       Q.   We're not talking about 15 seconds.

19  We're talking about they had been on him for some

20  number of minutes now, correct?

21       A.   Yeah, but --

22            MR. ZIBILICH:

23                 I object to the form and the

24            characterization.

25            THE WITNESS:

1          Yeah, but there is also still
2               resisting that has been going on during
3               this period of time.  It goes from a
4               moment of resistance to a moment of
5               weakness.  That's the same reason that
6               Deputy Pitfield wasn't trying to gain
7               ground at that moment in time, because
8               he didn't have the ability to be able
9               to gain ground, so that's not unusual
10              in a hand-to-hand fight.
11  BY MR. CLARKE:
12      Q.   I know, but you got five officers on the
13  scene now, right?
14      A.   And if I had five officers on the scene,
15  you'd be blaming me because I was utilizing five
16  officers on the scene.  I mean, that's just --
17      Q.   I'm not blaming you for anything,
18  sheriff.  I'm just trying to say is it physically
19  impossible for them to roll him on his side --
20      A.   I'm not saying it was physically
21  impossible.  It's just whether or not it was
22  reasonable.
23      Q.   You understand the recovery position and
24  his resistance.  Do you expect the officers to know
25  whether that is really active resistance or whether

1  he is having problems breathing?

2          MR. ZIBILICH:

3              Object to the form.

4          MR. KAUL:

5              Object to the form.

6          THE WITNESS:

7              Again, I could see him breathing on

8          several moments of that.  I can see

9          Deputy Pitfield putting his hands

10         actually on his stomach, kind of, you

11         know, tapping him.  It looks like

12         trying to reassure him.  So, you know,

13         on the other standpoint, the mom is

14         right in his face to where to know he's

15         having trouble breathing or not at that

16         moment.

17         MR. CLARKE:

18             All right.  I'm going to move

19         forward from 1528.

20             {VIDEO PLAYED}

21 BY MR. CLARKE:

22     Q.   Did you see where Pitfield got up, and

23 Vega then got on top of him?

24     A.   Yes.

25     Q.   Do you know why they didn't put him in

1  the recovery position then, and why they put him in

2  continued prone restraint?

3       A.   I do not.

4       Q.   Do you think that would have been a good

5  opportunity to put him in the recovery position?

6       A.   You know, that's going to be their

7  observations on the scene.

8       Q.   You're the sheriff.

9       A.   Again, it's going to be their

10 observations on the scene.  I don't know where his

11 level of resistance was at that moment.

12      Q.   You were looking at that videotape. Did

13 you see any resistance that would preclude the five

14 or six officers on the scene from putting him in

15 the recovery position?

16      A.   Again, you know, you're talking about

17 seconds that you continue to pause.

18           MR. CLARKE:

19               We are going to play it from 1600.

20           16.01.

21               {VIDEO PLAYED}

22 BY MR. CLARKE:

23      Q.   I stopped it at 1629. Let me go forward a

24 little to get the car out of the way.  I'm stopping

25 it at 1630.  Did you see any type of resistance in

```
 1    that portion of the videotape that would preclude
 2    people from putting him in the recovery position?
 3              MR. ZIBILICH:
 4                  Object to the form.
 5              MR. KAUL:
 6                  Object, form.
 7              THE WITNESS:
 8                  Not preclude, but I saw still some
 9                resistance.  I saw his legs go up in
10                the back.  I saw him wiggling his toes.
11                Still had control, obviously, of his
12                extremities during that period of time.
13    BY MR. CLARKE:
14        Q.   Do you know when you are supposed to put
15    somebody in the recovery position?
16        A.   You know, again, it comes down to when
17    it's practical to put them in.  Could it have been
18    practical at that time, that's an educated guess.
19        Q.   That's my question.  What is your
20    educated guess?
21        A.   You know, at that moment, they're the
22    ones that are sitting on his butt and letting that
23    communication occur with the mother.
24        Q.   We already established --
25        A.   You want a black and white answer, and
```

```
1   there is no black and white answer to that.
2        Q.   You're saying that at that point it's
3   fine not to put him --
4        A.   I can justify both scenarios.
5        Q.   Well, justify my position.
6        A.   Just -- good, right. I mean, I can. I can
7   justify both scenarios, Mr. Clarke.  This isn't
8   black and white where this is the exact moment that
9   occurs, right.  I can give you a whole bunch of
10  reasons that, you know, when you've been in fights
11  with people of this, as violent of a fight that
12  this was, that you're trying to make sure that this
13  communication can still occur, right.
14       Q.   The violence of the fight.  The only
15  violence was him slapping Pitfield once or twice
16  before he was escorted to the ground or got on the
17  ground, correct?
18            MR. ZIBILICH:
19                 Thank you Mr. Witness, but I don't
20             see it that way.  I object to the form.
21            MR. KAUL:
22                 Object to the form.
23            THE WITNESS:
24                 Yeah.  I don't see it that way at
25             all.  I mean, you know, that's the good
```

```
 1                  of this video from the standpoint of
 2                  not only what was done on the scene
 3                  from Mr. Pitfield.  Obviously, you have
 4                  the father with his chin bitten off
 5                  from there.  That's a visual that they
 6                  can see from that.
 7      BY MR. CLARKE:
 8           Q.   Chin bitten off?
 9           A.   What's that?
10           Q.   Chin bitten off?
11           A.   Well, whatever it was.  Bitten.  I mean,
12      bleeding, you know.  And so they observed that from
13      there.  It doesn't appear that any of them are
14      taking any punitive actions against Mr. Parsa.  You
15      know, from the standpoint I think they're generally
16      trying to do the right thing.  It's just when is
17      that moment in time.
18           Q.   Right.  And we'll get to Pizzolato's
19      testimony.  As soon as it is safe to do it.  Has it
20      been, at any point up until now, has it been safe
21      with all of those officers on the scene to be able
22      to roll him onto his side into the recovery
23      position?
24                  MR. ZIBILICH:
25                       Object to the form.
```

```
 1            THE WITNESS:
 2                 You certainly will be able to
 3            provide an expert to say it was safe,
 4            and it should have happened at this
 5            minute, this minute, and this minute.
 6   BY MR. CLARKE:
 7        Q.   What is your position?
 8            MR. ZIBILICH:
 9                 Objection to his position.
10            THE WITNESS:
11                 I don't have a position.
12            MR. ZIBILICH:
13                 That's for the fact finder.
14            THE WITNESS:
15                 I don't have a position.  They were
16            there on that particular day.  They
17            made a judgment call from the
18            circumstances that were happening
19            around them of when this should have
20            happened or should not have happened.
21            You certainly -- when they recognized a
22            substantial change, they took action
23            from that substantial change.  I mean,
24            I see that, you know, when it occurred.
25   BY MR. CLARKE:
```

```
 1          Q.    You do?
 2          A.    But before that substantial change, there
 3    was still resistance going on here, right.  It's
 4    not as active as it was before, but they also have
 5    more control than they had before.
 6          Q.    You understand the recovery position is a
 7    position where you put the suspect in so that they
 8    can start breathing better?
 9                MR. ZIBILICH:
10                     Object to the form.
11                THE WITNESS:
12                     Well, that also, same recovery
13                  position, allows them to start biting
14                  better, because that's what we saw
15                  earlier when he was in that position on
16                  numerous times and had the ability he
17                  was able to bite.
18    BY MR. CLARKE:
19          Q.    So you're saying because he is biting,
20    the only acceptable position would be in the prone?
21          A.    That's not what I'm saying.
22                MR. ZIBILICH:
23                     Object to the form.
24                MR. KAUL:
25                     Object to form.
```

```
 1            THE WITNESS:
 2                  That is certainly not what I'm
 3               saying.  It is scenarios that continue
 4               to happen that they made adjustments
 5               for.
 6   BY MR. CLARKE:
 7        Q.   If you don't want to get bit, you cannot
 8   put your hands by his face, right?
 9            MR. ZIBILICH:
10                  Object to the form and the
11               argumentativeness.
12            THE WITNESS:
13                  Yeah, okay.
14   BY MR. CLARKE:
15        Q.   So at 1630, do you feel that it's safe
16   with this amount of officers to attempt to put him
17   in the recovery position?
18        A.   Again --
19            MR. ZIBILICH:
20                  Object to the form.
21            MR. KAUL:
22                  Object to the form.
23            THE WITNESS:
24                  Just made the transfer.  I know that
25               there is some additional resistance
```

```
 1                    that occurs, and so it goes back to the
 2                    coulda, shoulda, would ya.  I know that
 3                    the resistance continues to occur.
 4    BY MR. CLARKE:
 5         Q.   You don't know if the resistance is due
 6    to lack of oxygen or because he is trying to
 7    resist, correct?
 8               MR. ZIBILICH:
 9                    Object to the form.
10               THE WITNESS:
11                    That's not really the reality.  If
12                    you even look at the video --
13    BY MR. CLARKE:
14         Q.   That's what the findings says.
15         A.   No.  I mean, when we are dealing with
16    excited delirium, it's the sudden change.  Similar
17    to the video that you played for me earlier where
18    it was active resistance, and then it went to a
19    sudden change.  And so, you know, you are trying to
20    characterize something as this is the moment, this
21    is the moment, this is the moment, but the reality
22    of it is those changes happen often, like any other
23    type of fight, a boxing match.  There is ups and
24    downs to a fight that occur, and I don't see it any
25    different here in this one.
```

1    Q.   I'm actually trying to ask you questions

2  about numerous opportunities where they could put

3  him in.  There is nothing that precludes them from

4  putting him in the recovery position, correct?

5              MR. ZIBILICH:

6                  Object to the form.

7              MR. KAUL:

8                  Object to the form.

9              THE WITNESS:

10                 I'll agree with you that there is

11               nothing other than their observances

12               that precludes them from putting him

13               into a recovery position.

14             MR. CLARKE:

15                 All right.  We are going to play it

16               from 1630.

17                   {VIDEO PLAYED}

18  BY MR. CLARKE:

19    Q.   Let me stop it there, 1655.  What is Vega

20  doing?

21    A.   It looked like he was loosing control of

22  him.  Obviously, Deputy Vega is not as big as

23  Deputy Pitfield.  The guy is extending his hands

24  back, you know, up over the top of his head portion

25  of it.

1        Q.   So it is your view of this that he's not

2   using a pain compliance technique and pushing his

3   arms up to try to control him?  You think that's

4   E███ P███ pulling Vega forward?

5        A.   I don't see anything that is a pain

6   compliance.  It looks like this hand is, you know,

7   back below him.  This hand looks like it's on the

8   cuffs itself.  Pain compliance would --

9        Q.   Pushing forward.

10        A.   -- be maybe a wrist pain compliance, but

11   I don't see anything from my view of that that

12   would show me any of that.

13        Q.   When I'm referring to a pain compliance

14   technique, I'm talking about lifting your handcuffs

15   up behind your back.  Have you ever been taught

16   that as a pain compliance technique?

17        A.   No, and if you look at it from that --

18   when Mr. Parsa started rolling, he is actually

19   getting pulled, kind of pulled over that way.

20        Q.   You think Parsa is pulling Vega up over

21   his head with his handcuffs behind his back?

22        A.   That's what it looked like to me.

23             MR. CLARKE:

24                  Okay.  We'll go from 1655 forward.

25                  {VIDEO PLAYED}

1  BY MR. CLARKE:

2       Q.   I'm going to stop at 1700.  Do you see

3  Vega actually pushing his hands up forward?

4       A.   I mean --

5            MR. ZIBILICH:

6                 Object to the form.

7            THE WITNESS:

8                 I mean, he moves his right hand to

9             that other hand.  I don't really see

10            him pushing it, but, I mean, it's not

11            -- no.  I mean, nothing from -- nothing

12            on his face to see where it looks like

13            it's pain compliance.  I mean, don't

14            get me wrong.  I don't think

15            necessarily think that feels good, but,

16            I mean, I don't see it as a technique

17            of pain compliance.

18            MR. ZIBILICH:

19                 Mr. Clarke, give me two minutes.

20            That's all I need.

21            MR. CLARKE:

22                 All right.  Now I've got to ask all

23            the questions real quick, sheriff.

24            THE WITNESS:

25                 It doesn't make a difference.

228

```
 1              THE VIDEOGRAPHER:
 2                   We are off the record at 3:15.
 3                   {BRIEF RECESS}
 4              THE VIDEOGRAPHER:
 5                   Back on the record.  The time is now
 6              3:21.
 7              MR. CLARKE:
 8                   We are going to play the video
 9              starting at 1700.  You see that?
10              THE WITNESS:
11                   I do.
12                   {VIDEO PLAYED}
13  BY MR. CLARKE:
14       Q.   Do you see Vega's arm around his neck?
15              MR. ZIBILICH:
16                   Object to the form.
17              THE WITNESS:
18                   You have to go back and see that.
19  BY MR. CLARKE:
20       Q.   Let me go back ten seconds. Stopping at
21  1735.  You didn't see his arm around his neck?
22       A.   I did not, counsel.
23       Q.   Do you know that E███ had injuries on
24  autopsy to his clavicle, his neck, and his hyoid
25  bone?
```

```
 1              MR. ZIBILICH:
 2                   Object to the form.
 3              THE WITNESS:
 4                   Did not know that.
 5    BY MR. CLARKE:
 6         Q.   Do you know what the significance of
 7    injury to the hyoid bone is?
 8         A.   I know what it can be, but --
 9         Q.   It can be choking, correct?
10         A.   Can be, yeah, correct.
11         Q.   Did you ever look at the autopsy report?
12         A.   Other than what you showed me here today?
13         Q.   Yeah. No?  Okay.
14              MR. CLARKE:
15                   I'm playing it at 1736.
16                   {VIDEO PLAYED}
17    BY MR. CLARKE:
18         Q.   Stop it at 1805.  From the last time we
19    started, it appears that the officers now are more
20    involved, correct?
21              MR. ZIBILICH:
22                   Object to the form.
23              THE WITNESS:
24                   The answer is yes.
25    BY MR. CLARKE:
```

1        Q.    It looks like there is a deputy trying to
2    put leg shackles on him, correct?
3        A.    Correct.
4        Q.    Do you know why they wouldn't use the
5    RIPP Hobble?
6              MR. ZIBILICH:
7                   Object to the form.
8              THE WITNESS:
9                   No.  They do either/or, but, I mean,
10                obviously, he was kicking.  I don't
11                know if that deputy has a RIPP Hobble
12                or just went and grab the shackles.  I
13                don't know he had either/or, but I
14                think, you know, the ability -- I mean,
15                it looked like he was fighting more,
16                and that's why, obviously, you have
17                more deputies that were involved at
18                that moment in time.
19    BY MR. CLARKE:
20        Q.    Well, he was fighting more when his hands
21    came up over his head.  Let me ask you this.  Do
22    you believe that E█████ --
23              MR. ZIBILICH:
24                   Object to the declarative sentence.
25    BY MR. CLARKE:

1    Q.   Do you believe that E█████ P██████ was

2    pulling Vega up or do you believe that Vega was

3    trying to control him by pushing his arms up?

4         MR. ZIBILICH:

5              Object to the form.

6         THE WITNESS:

7              It looked to me that E███ P█████ was

8              pulling his hands up.  Just from the

9              way that it pushed him forward, you

10             know, originally to make that happen.

11   BY MR. CLARKE:

12   Q.   Well -- go ahead.

13   A.   I mean, that's going to be their

14   testimony on the scene of what occurred, but that's

15   what I'm getting out of it.

16   Q.   Would you -- if he used the pain

17   compliance hold by pushing his arms up on top of

18   him, would you think that's appropriate?

19        MR. ZIBILICH:

20             Object to the form.

21        THE WITNESS:

22             You know, I don't know a pain

23             compliance form that pushes the arms up

24             from that standpoint.  I'm not saying

25             it wouldn't hurt, but I don't know a

```
 1                    pain compliance technique that is
 2                    there.  I mean, so, I mean, I don't
 3                    know if that's what his testimony was
 4                    or not, but that's going to be a
 5                    speculation by me.
 6              MR. CLARKE:
 7                    I'm starting at 1805.
 8                    {VIDEO PLAYED}
 9    BY MR. CLARKE:
10         Q.   Did you see them roll him over there?
11         A.   I don't think any of us can see that, but
12    we can assume that that's what happened.
13         Q.   It appears something was going on with
14    E███ P████?
15         A.   Correct.  I don't think any of us can see
16    it just because we're blocked, but I'm assuming
17    that's the case.
18         Q.   You had not read the statements, but do
19    you know what happened right before they rolled him
20    over?
21         A.   I'm assuming they noticed an immediate
22    change, and he was not breathing at that point in
23    time.
24         Q.   He urinated on himself.  Did you know
25    that?
```

1      A.   I think I was told that.  Did he vomit,

2  also, or was -- did he just urinate?  It was just

3  urinated?  Okay.  That I don't know if I -- I

4  thought I remember a vomit, but, okay.  If it was

5  urination, then that's the case.

6      Q.   What should the officers -- I mean,

7  should that be any indication of anything to the

8  officers, after he has been in the prone restraint

9  for some period of time?

10          MR. ZIBILICH:

11              Should what be any indication?

12          MR. CLARKE:

13              Urinating.

14          THE WITNESS:

15              Yeah, I mean, I think --

16          MR. ZIBILICH:

17              Urinating?  Okay.  Object to the

18            form.  Go ahead.

19          THE WITNESS:

20              Urinating?  I mean, I think the

21            urination is secondary to the, you

22            know, lack of pulse and lack of

23            breathing.  I think that's what

24            determines.  I think the urination is a

25            secondary.

BY MR. CLARKE:

    Q.   Right.  At that point, would you agree
with me that you need to put somebody in the
recovery position if you are going to utilize it
before they're dead?

    A.   You know, and, again, counsel, we can
always second guess when it should have happened.
There was certainly struggling that occurred 30
seconds before this moment that occurred, and
similar to the other video, it occurs immediate,
when that is the case.  So we can second guess and
say it needed to be here, it needed to be here, it
needed to be here.  There was certainly struggling
still within that moment in time, you know, before
it happened, and then, obviously, there was a
sudden change, and they took actions to change
because of that sudden change.  I don't disagree
with you, you know, that, you know, a recovery
position is taught, you know, when you think it's
best practical to be able to do so.  The difference
that you and I are going to disagree is when is
that exact moment in time.

    Q.   I believe, and my hypothetical is going
to assume this fact.

    A.   Sure.

1    Q.   That you put them in the recovery
2  position as soon as it's safe.   Okay.   So assume
3  that as whatever the training.   Prior to this, at
4  1900, they had numerous opportunities to put him in
5  the recovery position, if they wanted to, correct?
6    A.   And, again --
7          MR. ZIBILICH:
8                Object to the form.
9          THE WITNESS:
10                -- as you are pausing it second by
11              second by second, it makes it look like
12              there is numerous opportunities, but if
13              you let it run out from the changes of,
14              you know, his reactions 30 seconds
15              apart, 30 seconds apart, you know, I'm
16              going to tell you no at this moment,
17              yes at this moment.   No at this moment,
18              yes at this moment, right.
19                And so, you know, you have the
20              ability to pause every second and ask
21              me that same question, and I'm going to
22              go back to the one where he is
23              resisting and say this is why they
24              weren't.
25  BY MR. CLARKE:

```
 1        Q.   Right, but, I mean, what I'm trying to
 2   get at -- I think we covered this, and maybe we
 3   didn't.  When you have weight on somebody, you can
 4   compress somebody's oxygen, and then at a
 5   particular point in time, they can struggle because
 6   they have a lack of oxygen.  Are you --
 7        A.   Well --
 8        Q.   -- aware of that training?
 9        A.   I think you are -- again, you are
10   proposing the fact that you had weight on them, you
11   know, weighted on their back.  That's not what is
12   being shown in those videos.
13        Q.   Well, let me explain --
14             MR. ZIBILICH:
15                  Wait.  He's not finished his answer.
16             THE WITNESS:
17                  That's not what is being shown in
18                the videos, so you can't just -- it's
19                not just weight on someone, because
20                that's not what the training is, and I
21                think they've, you know, exhibited
22                through that.
23   BY MR. CLARKE:
24        Q.   Do you know how -- that obesity is a risk
25   factor to positional asphyxia in a prone position?
```

237

```
 1        A.   I do not.
 2        Q.   Do you know why?
 3             MR. ZIBILICH:
 4                  Do you know why he doesn't know?
 5             MR. CLARKE:
 6                  No.  He says he knew.
 7             MR. ZIBILICH:
 8                  He said he does not.
 9             THE WITNESS:
10                  No, no.  I mean, I knew that --
11             MR. CLARKE:
12                  He said he did.
13             MR. ZIBILICH:
14                  Oh, okay.  I'm sorry.
15             THE WITNESS:
16                  -- obesity is a risk factor.  I
17               mean, I think you are asking me for a
18               medical expert opinion that I'm not
19               going to be able to --
20   BY MR. CLARKE:
21        Q.   It's in the TARP training.
22        A.   I know, but I'm not -- but you are asking
23   me why.  I can tell you it's in the training, but
24   to tell you why, no.  I can't tell you that reason.
25        Q.   Well, do you understand the diaphragm to
```

```
 1    be the muscle that pumps the lungs?
 2              MR. ZIBILICH:
 3                   Wait.  Whoa, whoa, whoa.  Object --
 4              MR. CLARKE:
 5                   It's in the training, Franz.
 6              MR. ZIBILICH:
 7                   Object to the form.  If you want to
 8                lay a foundation that he is a medical
 9                person.  I'm not going to let him
10                answer it.  You can call the
11                magistrate.
12              MR. CLARKE:
13                   Yeah.
14              THE WITNESS:
15                   Well, I'm not going to answer that
16                regardless.
17    BY MR. CLARKE:
18        Q.   I'm asking you questions based on law
19    enforcement training. When you're obese, do you
20    understand that your RIPP Hobble training says that
21    obesity impacts the diaphragm muscle so it has a
22    problem with pumping the oxygen to the lung?
23              MR. ZIBILICH:
24                   Object to the form.
25              THE WITNESS:
```

```
 1                    Only from what you showed me on one
 2              of those training bulletins from
 3              earlier.
 4   BY MR. CLARKE:
 5        Q.   Okay.  All right.  So they've turned him
 6   to the side at this point, or we assume that,
 7   correct?
 8        A.   We are assuming that they did.
 9             MR. CLARKE:
10                    Let's see what they do after that.
11              We're starting at 1900.
12                    {VIDEO PLAYED}
13   BY MR. CLARKE:
14        Q.   I stopped it at 1944.  For that period of
15   time, nobody is doing CPR, correct?
16        A.   I'm sure they are assessing.  They've got
17   EMS over there.  I'm sure they are assessing to see
18   if he's got a pulse, breathing at that point in
19   time.  I mean, again, I can't see anything.
20                    {VIDEO PLAYED}
21   BY MR. CLARKE:
22        Q.   I stopped it at 20.  Do you see anybody
23   doing CPR?
24        A.   Nope.  Not yet.
25             MR. CLARKE:
```

```
 1                    Running it from 20.
 2                 {VIDEO PLAYED}
 3   BY MR. CLARKE:
 4       Q.   It looks like CPR started somewhere
 5   around 2035, correct?
 6       A.   Uh-huh.
 7       Q.   Is that a yes?
 8       A.   Yeah.  It looks like it.
 9       Q.   Now, have you seen the video -- rather
10   than continue to play this.  I don't have much more
11   on it -- pertaining to what Kahrs did?
12       A.   I have not seen it, but I heard about it.
13           MR. CLARKE:
14               I'm going to move it.  We're
15             stopping it at 2035.  I'm going to try
16             to get it to 2429.
17                 {VIDEO PLAYED}
18           MR. ZIBILICH:
19               Right there.
20           MR. CLARKE:
21               I'm going to go back ten seconds.
22             Go back 20 seconds.  We are going to
23             start it at 2418.
24   BY MR. CLARKE:
25       Q.   It is my understanding, and you correct
```

1   me if I'm wrong, that this is Nick Vega, and this

2   is Deputy Kahrs.  You can't make it out from here,

3   but --

4       A.   No.

5            MR. CLARKE:

6                 Let's see what Deputy Vega and

7            Deputy Kahrs do.  Started at 2419.

8                 {VIDEO PLAYED}

9   BY MR. CLARKE:

10      Q.   What do you think about your deputy

11  taking photographs of Mr. Parsa's injuries while

12  his son is having CPR performed?

13      A.   You know, it's sad, but on the other

14  standpoint, I get it from a few different

15  perspectives, right.  What policemen see on a

16  regular basis other than what the normal public

17  sees, right.  And so to them it's a job.  This is

18  what has to be done.  This is what has to be

19  documented.  They know that, you know, the parents

20  are going to the hospital --

21      Q.   But he is --

22           MR. ZIBILICH:

23                Let him finish.

24           THE WITNESS:

25                The parents are going to the

```
 1              hospital.  He is taking the pictures to
 2              document the report.  I agree with you
 3              that those pictures can wait.  That's
 4              not -- you know, should he have taken
 5              pictures at that moment in time?  No.
 6              You know, it's absolutely -- you know,
 7              pictures can wait.  You know, that's
 8              not something that has to happen at
 9              that moment.  Again, they -- you know,
10              I'm not here to justify it.  I mean, it
11              looks horrible, because it is horrible.
12                  I mean, you know, it's not the case,
13              but let's be real.  I think we just
14              noticed this a few weeks ago.  You
15              know, not one of us -- you know, it's
16              not in your complaint.  It's not from
17              anywhere from there, because we didn't
18              know about it until just two weeks ago,
19              right, and so it's not something that
20              is normal, but it is something that, of
21              course, you bring up to try to make it
22              happen, and I'm not trying to defend
23              it, because I don't disagree with you.
24              I'm kind of glad that they didn't
25              remember it as it happened, but I'm
```

 1                    also disappointed that it did happen.
 2                    It should not have.  They should be
 3                    better than that and understand the
 4                    gravity of the situation, and, you
 5                    know, sometimes they -- we see death a
 6                    lot more often than most people, and
 7                    it's -- the couth isn't always there.
 8   BY MR. CLARKE:
 9       Q.   Well, you agree that prior to him taking
10   pictures, he spoke to the deputy that was beside
11   him, correct, who then pointed --
12                    MR. ZIBILICH:
13                         Object to the form.
14                    THE WITNESS:
15                         Yeah.
16   BY MR. CLARKE:
17       Q.   I'm just going to tell you it is Deputy
18   Vega.
19       A.   Okay.
20       Q.   Prior to this happening, my client
21   testified that she yelled out, "You're choking him
22   like they did to the people in Baton Rouge or the
23   guy up in New York." Have you ever heard of the
24   Code of Silence before?
25       A.   I mean, I've heard that alleged in a

```
 1   whole bunch of lawsuits over the years.
 2        Q.   I understand.  If you are a plaintiffs'
 3   lawyer, you would use it a lot more.  But, in this
 4   case, what we have is Deputy Vega speaking to
 5   Deputy Kahrs to take photographs of somebody while
 6   CPR is going on, and then those photographs are
 7   deleted.  That's pretty bad police work, isn't it?
 8             MR. ZIBILICH:
 9                  Object to the form.
10             THE WITNESS:
11                  Not because of the reasoning behind
12               the deletion, right. You know, I mean
13               --
14   BY MR. CLARKE:
15        Q.   We don't know.  We don't have the photos.
16        A.   If you want to go down that conspiracy
17   theory, we'll deal with that all day long, but I
18   just don't think it holds water.
19        Q.   I understand.
20        A.   You know, we brought our crime scene out
21   there to document the pictures.  I don't disagree
22   that there is no reason they should have been
23   deleted.  He probably should have taken the two
24   pictures and go, wait, y'all, I already took two.
25   Well, tough luck.  We're taking them again, you
```

1    know, or whatever the case may be, but I don't

2    think that conspiracy theory really holds water.

3         Q.   So they already took pictures once.  Do

4    you know that he came back, and Vega brought a

5    ruler and put it up on Daren Parsa's face to take

6    another set of photos?

7         A.   That wouldn't surprise me.

8              MR. CLARKE:

9                   Let's play it at 244 --

10             MR. ZIBILICH:

11                  Why do you have to play it?  He just

12               agreed with you.

13             MR. CLARKE:

14                  He said it wouldn't surprise him, so

15               I'm going to show it to him.

16                  {VIDEO PLAYED}

17             MR. ZIBILICH:

18                  Guess what?  I'll stipulate that he

19               brought a ruler there.

20             MR. CLARKE:

21                  I'm not going to let you.

22    BY MR. CLARKE:

23         Q.   You see him putting it up to his face?

24         A.   Okay.  I won't even stipulate that's a

25    ruler, because you can't see it.

```
 1        Q.    He testified yesterday it was a ruler.
 2        A.    It wouldn't surprise me.
 3        Q.    Well, that is something that was -- could
 4   have waited, correct?
 5        A.    Sure.
 6        Q.    Do you know that the officers on the
 7   scene prevented Mr. and Mrs. Parsa from leaving to
 8   go to the hospital after the ambulance left?
 9             MR. ZIBILICH:
10                  Wait.  Object. Don't answer that.
11               Don't answer it.
12             THE WITNESS:
13                  Yeah, I'm not.
14   BY MR. CLARKE:
15        Q.    My clients have testified that --
16             MR. ZIBILICH:
17                  That's a different question.
18   BY MR. CLARKE:
19        Q.    -- they were instructed by officers on
20   the scene that they couldn't leave to go to the
21   hospital because it was a crime scene.  Would that
22   be appropriate?
23             MR. ZIBILICH:
24                  Would it be appropriate that your
25               clients said that? Is that the
```

```
 1              question?
 2  BY MR. CLARKE:
 3       Q.   I'm not asking Franz questions.  I'm
 4  talking to you.
 5       A.   I have no knowledge of that whatsoever.
 6       Q.   If they prevented --
 7       A.   My impression is they did go to the
 8  hospital.
 9       Q.   At some point they did.
10       A.   Okay.
11       Q.   Was this a crime scene that required
12  documentation of the injuries to my clients and for
13  them to stay at the scene while their son was being
14  transported to the hospital, in your opinion?
15       A.   Again, I don't have any testimony to lead
16  me one way or the other.  This is the first you're
17  telling me about it.
18       Q.   We have the statements of the officers
19  that you didn't review, correct?
20            MR. ZIBILICH:
21                 That what?  Oh, that he didn't
22            review?
23            THE WITNESS:
24                 Yeah, yeah.
25            MR. ZIBILICH:
```

```
 1                    Of course we have those.
 2    BY MR. CLARKE:
 3         Q.    You could have looked at all of these
 4    things and determined what type of questions were
 5    asked and what happened.
 6         A.    But, again, your -- I can't testify to
 7    facts, even facts of them, you know.  I certainly
 8    disagree with statements probably made by your
 9    clients and statements that -- you know, I'm
10    testifying to what my fact knowledge is.  Just
11    because somebody gave a statement doesn't
12    necessarily mean that that's what happened.
13         Q.    But certain sheriffs may be involved in
14    every Internal Affairs thing, and you have your
15    people do it through a homicide investigation that
16    doesn't even get sent to you for discussion.
17         A.    Yeah, but you're asking me whether or not
18    they were allowed or not allowed to go to the
19    hospital.  I mean, they were not in custody by any
20    means.  And so, you know, now you're asking me were
21    they allowed at that moment or not allowed at that
22    moment.  I don't have any information to believe
23    either which way.
24         Q.    Well, they should have been allowed to
25    leave and go to the hospital with their son if they
```

```
1   wanted to.  Do you agree with that?
2        A.   Yeah.  I don't foresee them not having a
3   problem going to the hospital.  Now, I mean,
4   obviously, whether they were able to ride in the
5   ambulance is a different story just because of CPR,
6   but, yeah.
7        Q.   I'm getting down to my last sheet.
8             MR. ZIBILICH:
9                  You're my hero.
10  BY MR. CLARKE:
11       Q.   After you have reviewed all of the
12  training --
13            MR. CLARKE:
14                  Do you want to put that thing back
15             up?  Don't mess it up, Tim.
16  BY MR. CLARKE:
17       Q.   We kind of covered a lot of things, and I
18  appreciate your time and your testimony here, but
19  we covered a lot about the training and the
20  policies and what happened on the event.  Do you
21  think that your officers are properly trained and
22  have the correct policy guidance to deal with
23  nonverbal people with disabilities?
24            MR. ZIBILICH:
25                  Object to the form.
```

1          MR. KAUL:

2               Object to form.

3          THE WITNESS:

4               I think that is so vague it's really

5               impossible to answer, because it just

6               applies to too many different things.

7    BY MR. CLARKE:

8          Q.   Did they have any training on it?

9          A.   You know, you're talking about individual

10   officers, and I'm not sure about those individual

11   officers on it, but I think from the testimonies

12   that you've seen, even the actions that you've

13   seen, right, whether -- you know, if they had zero

14   training, they wouldn't have put him in the

15   recovery position whatsoever.  They did when they

16   had -- at one point in time.  May not have been

17   early enough, and we can agree to disagree on that,

18   right, but you -- your question is all too vague,

19   because you're putting it into just different

20   scenarios that just didn't exist.

21         Q.   Well, I mean, we know that there is

22   statistics that are in these documents that we did

23   and even the PowerPoint that was prepared by one of

24   your sergeants but isn't in place.  Do you intend

25   to get that autism training block put in place?

1          MR. ZIBILICH:

2               Object to the form.

3          THE WITNESS:

4               When my training academy discerns

5            it's appropriate for them to fit it

6            into the next block of instructions,

7            again, I don't have any objection to

8            it.  I haven't reviewed that particular

9            one other than you giving it today.

10           But, again, there is a difference

11           between autism and, what is it, you

12           know, just different classifications of

13           medical diagnosis.  We go right back to

14           my diabetes example from earlier,

15           right.  You know, and I think you

16           trying to lump them all into the same

17           category is not fair.

18   BY MR. CLARKE:

19       Q.   You've given a previous deposition in

20   this case with respect to certain issues pertaining

21   to the ADA.  Remember that?

22       A.   Yeah.

23       Q.   In that deposition, I believe it says

24   that you didn't think E███'s kicking was aggressive

25   enough as to require a RIPP Hobble.  Do you think

```
 1    that he was --
 2         A.   So I don't --
 3              MR. ZIBILICH:
 4                   Wait.  Time out.  You're reading
 5                that?  Is that a direct quote?
 6              MR. CLARKE:
 7                   I'm reading it as a direct quote
 8                from my question.
 9              MR. ZIBILICH:
10                   That doesn't get it.  That doesn't
11                get it.
12              MR. CLARKE:
13                   I don't have to have a direct quote.
14              THE WITNESS:
15                   I think why you saw the shackles
16                come out later was because his kicking
17                got more aggressive later on in the
18                incident than before.  I think earlier
19                kicking during that probably would have
20                elicited a different response, but
21                that's speculation, you know, from the
22                deputies that were there, but, you
23                know, if he would have been kicking the
24                entire time, I think the response would
25                have been different.
```

1    BY MR. CLARKE:

2        Q.   So you think if he was kicking all the

3    time, that would be when you'd go to the TARP

4    restraint?

5        A.   Yeah.   I believe so.   We certainly don't

6    put every person that gets put in handcuffs into a

7    TARP restraint.   The TARP is to, you know, prevent

8    that movement of the legs.

9        Q.   You did not believe what you saw Nick

10   Vega doing to be a pain compliance technique, do

11   you?

12       A.   I don't know of that pain compliance

13   technique, so, no.

14       Q.   Would it even be appropriate to use pain

15   compliance techniques against somebody who has

16   autism or somebody who has an intellectual

17   disability?

18            MR. ZIBILICH:

19                 Object to the form.

20            THE WITNESS:

21                 You know, again, it's certainly not

22              barred, you know, but I think they use

23              several accommodations, you know, in

24              order to try to put some type of

25              control.   I'm not going to say it's not

254

```
 1                      -- you know, that it's never used.  One
 2                      of the videos you showed with -- the
 3                      guy was -- ended up being on
 4                      methamphetamine.  You could possibly
 5                      use a pain compliance from a taser
 6                      today that you may not have used,
 7                      obviously, 20 years ago before a taser,
 8                      and so, you know, could they have used
 9                      a taser in this case?  You know, that
10                      can be used as pain compliant.  I don't
11                      know if the effect -- I think the
12                      training on tasers is sometimes that
13                      pain compliance has less of an effect
14                      on someone that is affected different
15                      ways.
16  BY MR. CLARKE:
17      Q.    While E██ P██ was in the prone
18  position, do you not train people to have somebody
19  monitoring their breathing?
20      A.    Well, I think there were.  I think you
21  had enough people within close proximity.  Not only
22  our deputies, but, also, Mr. Parsa's mother that
23  were in direct proximity, and you can see him
24  breathing on the video at many parts of the time
25  when his stomach is being shown.  You can see that.
```

```
 1              MR. CLARKE:
 2                   Let me take a minute.  I think I'm
 3               done.
 4              THE VIDEOGRAPHER:
 5                   Off the record.  The time is now
 6               3:51.
 7                   {BRIEF RECESS}
 8              THE VIDEOGRAPHER:
 9                   Back on the record.  The time is now
10               3:54.
11   BY MR. CLARKE:
12       Q.   As sheriff, have you worked with any
13   autism or disability groups to try to understand
14   and provide training and policies to officers about
15   the particular problems or issues that may come up
16   in law enforcement contacts with people with
17   intellectual disability?
18       A.   I know Doc Arey has.  Not necessarily me
19   specifically, but I think Doc Arey has worked with
20   some of those groups in the past.
21       Q.   Do you know that he went to -- did you
22   approve of him to go to an autism training after
23   the Parsa events?
24              MR. ZIBILICH:
25                   You already told us this about six
```

```
 1                  hours ago.
 2             THE WITNESS:
 3                  If he went to one, I approved it.
 4   BY MR. CLARKE:
 5        Q.   Do you remember having any conversation
 6   with -- you call him Doc Arey?
 7        A.   Doc Arey, yeah.
 8        Q.   When he came back from autism training
 9   about anything that he --
10        A.   Not specifically, no.
11        Q.   Since this event, has any policies or
12   training been changed with respect to how you deal
13   with people with intellectual disabilities in
14   Jefferson Parish?
15             MR. ZIBILICH:
16                  Object to the form.  We talked about
17               subsequent remedial measures earlier,
18               but you can answer it.
19             THE WITNESS:
20                  I don't think anybody specific
21               because of this case, no.
22   BY MR. CLARKE:
23        Q.   Well, I think you said you changed some-
24   what of the IA stuff, but that -- this doesn't have
25   to be because of this case.  Have you made any
```

1    changes to training or policies with respect to

2    dealing with people with disabilities? That's the

3    first question.

4         A.   I don't think I've changed anything with

5    policy.  Now, when you come to training, we have

6    training that is inservice with us.  We certainly

7    have training that we send people out to.  Doc Arey

8    from that standpoint.  And I also will have

9    training that is required by the POST, which is

10   online type stuff that each deputy has to take.

11        Q.   Whatever those --

12        A.   Could, could -- whatever those are, they

13   are, but, I mean, I'm not telling you that there is

14   something specific to autism and special

15   intellectual disabilities.  There may or may not

16   have been, but there is certainly the training that

17   gets changed every year.  Whether or not specific

18   to this subject matter, I'm not sure of.

19             MR. ZIBILICH:

20                  I can't tell if he is reading a text

21               message or he is looking for the next

22               question.

23             MR. CLARKE:

24                  It's a little bit of both.

25   BY MR. CLARKE:

1      Q.   Throughout this time, I mean, are you --

2  you know, are you amenable to making changes to the

3  policies and the trainings if it will help deputies

4  in the field?

5           MR. ZIBILICH:

6                Object to the form.  Same objection.

7           We don't have subsequent remedial

8           measures in Louisiana.

9           THE WITNESS:

10               I'm also amenable when I think

11          things should be because of the law or

12          certain things that needed to change,

13          right.  I don't allow a specific

14          lawsuit when I'm looking at where are

15          my deputies' hearts compared to where

16          are my deputies' minds and what made

17          those changes happen, right.  In this

18          situation, I think their hearts are in

19          the right place, and I don't second

20          guess, you know, decisions that are

21          made and split-second decisions and

22          those type of things in order to try to

23          -- oh, this should not have happened. I

24          can certainly recognize where failures

25          -- you know, I mean, my deputies aren't

259

```
 1                      perfect.  They're human beings like
 2                      everybody else that is out there.
 3                      There are times that they mess up that
 4                      have to be disciplined.  There is times
 5                      that I go, you know what?  That's got
 6                      to change, you know.  I mean, and I
 7                      certainly make changes in this
 8                      department regularly.  That has nothing
 9                      to do with this case or anything else.
10                      The department certainly isn't the same
11                      way that it was five years ago when I
12                      took office.
13     BY MR. CLARKE:
14          Q.   And, hopefully, it will be better in five
15     years from now, right?
16          A.   Correct.  Right.
17          Q.   You are always trying to improve, right?
18     Did you get any of these documents throughout -- I
19     have submitted numerous model policies and
20     trainings through your attorney throughout this
21     case.  Did you get an opportunity to review those?
22          A.   Specifically from you, no, but I've
23     reviewed model policies, as I said, through Lexipol
24     over the years on use of force policy.  I sat on
25     one of the legal committees, so I get a lot of
```

1    draft model policies when Biden was trying to make

2    changes, what, two years ago with IACP.  So I've

3    seen a whole bunch of model policies over my

4    career, you know, attempt to be put in place or not

5    be put in place.  Most of them I would never put in

6    place, but.

7         Q.   And in this case, even after we've had

8    this discussion, and we may have our disagreements

9    about certain things, you stand by what your

10   officers did, and that they acted appropriately?

11        A.   I do.

12        Q.   And you even agreed to indemnify the

13   deputies for both compensatory and punitive

14   damages, correct?

15        A.   Well, I think we did in this case, didn't

16   we?  Normally, in a punitive damage type case, you

17   know, you are basically saying they committed a

18   crime, but I think we ended up doing that in this

19   case, didn't we?

20        Q.   Yep.

21        A.   That answer is yes.

22             MR. CLARKE:

23                  I've just got three more boxes.  You

24             good?  You got anything else?  That's

25             all I have.

261

```
 1            THE WITNESS:
 2                 Thank you very much.
 3            MR. ZIBILICH:
 4                 No questions.
 5            MR. KAUL:
 6                 No questions.
 7            THE VIDEOGRAPHER:
 8                 This is the conclusion of the
 9              videotaped deposition.  We are going
10              off the record.  The time is now 4:00.
11                 [End of deposition, 4:00]
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    C E R T I F I C A T E

2

3              This certification is valid only for
a transcript accompanied by my original signature
4  and original required seal on this page.

5              I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6  as the officer before whom this testimony was
taken, do hereby certify that SHERIFF JOSEPH P.
7  LOPINTO, III, after having been duly sworn by me
upon authority of R.S. 37:2554, did testify as
8  hereinbefore set forth in the foregoing 261 pages;

9              That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10  or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11  ability and understanding;

12              That the transcript has been
prepared in compliance with transcript format
13  guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14  prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15  and in rules and advisory opinions of the board;

16              That I am not related to Counsel or
to the parties herein, nor am I otherwise
17  interested in the outcome of this matter.

18

19

20

21  _____
Sandra P. DiFebbo,
22  Certified Shorthand Reporter

23  Date:  _____

24

25

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**