UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


DONNA LOU and DAREN PARSA, on their
own behalf and on behalf of their
deceased minor child, E.P.
     Plaintiffs          CIVIL ACTION NO. 2:21-cv-00080

v

SHERIFF JOSEPH P. LOPINTO, III, CHAD
PITFIELD, RYAN VAUGHT, STEVEN
MEHRTENS, SHANNON GUIDRY, NICK
VEGA, MANUEL ESTRADA, MYRON
GAUDET,JOHN DOES 1-3, VICTORY
REAL ESTATE INVESTMENTS LA, LLC
and WESTGATE INVESTORS NO LLC
D/B/A WESTGATE SHOPPING CENTER,
ABC INSURANCE COMPANY, and XYZ
INSURANCE COMPANY
     Defendants


     30(b)(6) DEPOSITION OF JEFFERSON PARISH

SHERIFF'S OFFICE, through its designated

representative,SHERIFF JOSEPH P. LOPINTO, III,

given via Zoom Videoconferencing, in the

above-entitled cause, pursuant to the following

stipulation, before Raynel E. Schule, Certified

Shorthand Reporter in and for the State of

Louisiana, commencing at 9:15 o'clock a.m., on

Friday, the 16th day of September, 2022.

2

I N D E X

|  | Page |
| --- | --- |
| Caption | 1 |
| Appearances | 3 |
| Agreement of Counsel | 4 |
| Examination |  |
| MR. MOST | 6 |
| Reporter's Certificate | 35 |

EXHIBIT INDEX

| EXHIBIT 99 | 15 |
| --- | --- |
| EXHIBIT 41 | 20 |
| EXHIBIT Z (100) | 23 |

```
 1   APPEARANCES (Via Videoconferencing):
 2   For the Plaintiffs:
 3   THE COCHRAN FIRM MID-SOUTH
     Attorneys at Law
 4   BY:  ANDREW C. CLARKE, ESQ.
     One Commerce Square, Suite 1700
 5   Memphis, Tennessee  38103
 6   And
 7   LAW OFFICES OF WILLIAM MOST
     Attorneys at Law
 8   BY:  WILLIAM MOST, ESQ.
     201 St. Charles Avenue, Suite 114#101
 9   New Orleans, Louisiana   70170
10   For Victory Real Estate Investments La, LLC,
          Westgate Investors No LLC, and
11          Westgate Shopping Center:
12   THOMPSON, COE, COUSINS & IRONS, LLP
     Attorneys at Law
13   BY:  CHRISTOPHER W. KAUL, ESQ.
     601 Poydras Street, Suite 1850
14   New Orleans, Louisiana  70130
15   For Jefferson Parish Sheriff's Office
          Defendants:
16
     MESSRS. MARTINY & ASSOCIATES
17   Attorneys at Law
     BY:  FRANZ L. ZIBILICH, ESQ.
18        JEFFREY D. MARTINY, ESQ.
     131 Airline Drive, Suite 201
19   Metairie, Louisiana   70011
20   And
21   LINDSEY M. VALENTI, ESQ.
     Attorney at Law
22   1233 Westbank Expressway
     Building B,  Floor 5
23   Harvey, Louisiana   70058
24
     Reported By:  Raynel E. Schule
25                 Certified Shorthand Reporter
```

1      S T I P U L A T I O N

2          It is stipulated and agreed by and

3   among Counsel for the parties hereto that the

4   30(b)(6) DEPOSITION OF JEFFERSON PARISH

5   SHERIFF'S OFFICE, through its designated

6   representative, SHERIFF JOSEPH P. LOPINTO, III,

7   is hereby being taken pursuant to the Federal

8   Rules of Civil Procedure for all purposes in

9   accordance with law;

10          That the formalities of reading and

11   signing are specifically waived;

12          That the formalities of sealing,

13   certification, and filing are hereby

14   specifically waived.

15          That all objections, save those as to

16   the form of the question and responsiveness of

17   the answer, are hereby reserved until such time

18   as this deposition or any part thereof is used

19   or sought to be used in evidence.

20                * * * * *

21          Raynel E. Schule, Certified

22   Shorthand Reporter in and for the State of

23   Louisiana, officiated in administering the oath

24   to the witness.

25                PROCEEDINGS

```
 1                    THE COURT REPORTER:
 2                    Will counsel please identify
 3              themselves and their affiliation and
 4              also stipulate that by agreement of
 5              all parties, this deposition is
 6              being held via videoconferencing,
 7              and there is no objection to the
 8              witness being sworn in remotely.
 9                    MR. MOST:
10                    This is William Most for
11              Plaintiffs.  I have with me here
12              Andrew Clarke, and we so stipulate.
13                    MR. ZIBILICH:
14                    Franz Zibilich and Jeff Martiny
15              on behalf of Sheriff Lopinto and all
16              the other JPSO Defendant Deputies,
17              and we likewise stipulate that the
18              oath can be taken via video.
19              SHERIFF JOSEPH P. LOPINTO, III, having
20        been first duly sworn by Raynel E. Schule,
21        Certified Shorthand Reporter, was examined
22        and testified on his oath as follows:
23                    MR. MOST:
24                    And Franz, a question for you.
25              Will you stipulate that the
```

```
 1              deposition was properly noticed and
 2              the court reporter duly qualified?
 3                    MR. ZIBILICH:
 4                    Sure.
 5                    MR. MOST:
 6                    Okay.  Thank you.
 7                       EXAMINATION
 8    BY MR. MOST:
 9    Q.   Good morning, Sheriff.  My name is William
10         Most.  I'm an attorney for the Plaintiffs
11         in this case, Lou v Lopinto.  How are you
12         doing this morning?
13    A.   Doing great.
14    Q.   Great.  Could you give us your name and
15         title for the record, please.
16    A.   Joseph Peter Lopinto, III, Sheriff of
17         Jefferson Parish.
18    Q.   And Sheriff, have you given a deposition
19         before?
20    A.   I have.
21    Q.   Just ballpark, how many depositions do you
22         estimate you've had?
23    A.   10 or 15 or so.
24    Q.   Okay.  So you understand that you're under
25         oath here today, correct?
```

```
 1   A.    I am.
 2   Q.    And your answers here today have the same
 3         force as if we're in a courtroom with a
 4         Judge and Jury?
 5   A.    That is correct.
 6   Q.    Sheriff, is there anything that will
 7         prevent you, whether it's fatigue,
 8         medications, substances, or anything else
 9         that will prevent you from giving me
10         complete and truthful answers today?
11   A.    No.
12   Q.    And if we need to take a break at any time,
13         whether to get a drink of water, use the
14         restroom, or because of your duties as
15         Sheriff, please just let me or your counsel
16         know.  We'll take a break at that time,
17         although, I will warn you that I will ask
18         you during any break who you talked to, any
19         documents you reviewed, and there's not
20         necessarily a guarantee of attorney-client
21         confidentiality during a break.  So just a
22         heads up, all right?  And Sheriff, if I ask
23         a question that is not clear or you don't
24         understand it, will you agree now to tell
25         me that that's the case rather than just
```

```
 1        trying to answer it?
 2   A.   I can't promise that, William.  I've done
 3        enough of these depositions, but I'll try.
 4   Q.   Okay.  Well, you can't agree to tell me if
 5        you don't understand a question?
 6   A.   If I don't understand one, that's fine, but
 7        -- but, you know, whether or not it's clear
 8        or not is always going to be an issue.
 9   Q.   Okay.  Fair enough.  So if you don't
10        understand a question that I ask, will you
11        agree to tell me that you don't understand
12        rather than trying to answer it?
13   A.   I will do that.
14   Q.   Thank you.  Sheriff, do you know what case
15        you're here for today?
16   A.   I do.
17   Q.   Do you know that this case is about the
18        death of a young person during an
19        interaction -- or in and around -- around
20        an interaction with JPSO Officers?
21   A.   Correct.
22   Q.   And if I use JPSO as an abbreviation for
23        Jefferson Parish Sheriffs Office, will you
24        understand what I mean?
25   A.   I will.
```

```
 1   Q.   Okay, and do you understand that today
 2        you're appearing as a representative of the
 3        Sheriff in his official capacity, not as an
 4        individual?
 5   A.   I didn't think this was 30(b)(6).  No, I
 6        wasn't.
 7   Q.   Okay.  This -- so this is a 30(b)(6)
 8        deposition.
 9   A.   Okay.
10   Q.   Do you need a minute to confer with your
11        counsel about the nature of this
12        deposition?
13              MR. ZIBILICH:
14              No, no, we're good.  I mean --
15              THE WITNESS:
16              Well, I'm going to answer what I
17          can from it so --
18   BY MR. MOST:
19   Q.   Right.
20   A.   -- so we -- we can go.  I -- I didn't think
21        it was a 30(b)(6), but I can -- I'll still
22        answer what I can answer.
23   Q.   Okay.  So Sheriff, you brought up the word
24        30(b)(6).  So you understand what a
25        30(b)(6) deposition is, right?
```

```
 1   A.   Right, yes.  I'm an attorney also.

 2   Q.   Okay.  I know you are.  That's why --

 3        nobody is volunteering the words 30(b)(6)

 4        unless it's an attorney.  So you understand

 5        that as a 30(b)(6) witness today, you are

 6        appearing not as an individual, but on

 7        behalf of the government entity, that is,

 8        the Sheriff in his official capacity;

 9        agreed?

10   A.    Agreed.  Now, I'm not always the best

11        30(b)(6) representative of our corporation.

12        That's -- that's a different story.  So

13        depending on what the question is, I'll

14        answer what I can, and -- and if I need to

15        designate someone else, I'll do so

16        accordingly.

17   Q.   Certainly.

18                   MR. CLARKE:

19                   Let the record reflect that the

20             witness is drinking a Diet Coke.

21                   THE WITNESS:

22                   You -- you know, Mr. -- Mr.

23             Clarke, let the record reflect that

24             you're -- you have a -- you have a

25             fishing shirt on today.
```

```
 1              MR. CLARKE:
 2              Yeah, I had enough long sleeves.
 3         I -- I apologize.  Everybody makes
 4         fun of my Diet Coke.
 5              THE WITNESS:
 6              No, no, because normally -- I'm
 7         sorry.  Normally I have a fishing
 8         shirt on on Friday too, so, you
 9         know, I'm jealous.
10              MR. CLARKE:
11              All right.
12              MR. ZIBILICH:
13              And, trust me, Mr. Clarke, he
14         can't drink as many Diet Cokes in
15         one day as you can.
16              MR. CLARKE:
17              We'll have a competition at some
18         point.
19   BY MR. MOST:
20   Q.   All right.  So Sheriff, because this is a
21        30(b)(6) deposition, you understand that if
22        I say, "you" or ask you a question of you,
23        I'm really asking a question of the
24        government entity itself, correct?
25   A.   Correct.
```

1    Q.   And if you give an answer, you are giving

2         the answer of the government entity itself;

3         agreed?

4    A.   That's correct.

5    Q.   Okay, and if I use the initial E.P. to

6         repre -- to refer to the juvenile who died

7         in the incident we discussed, will you know

8         who I mean?

9    A.   I don't know his name, so if E.P. is the

10        initials that we're using, I will know that

11        now.

12   Q.   Okay, thank you.  So Sheriff, when did you

13        -- just roughly, when did you begin

14        preparing for this deposition?

15   A.   Probably this week when they called me and

16        asked me to set up for today, but I can't

17        say there was much preparation.  I showed

18        up here this morning.

19   Q.   Okay.  Did you do any preparation prior to

20        this morning for this deposition?

21   A.   I did not.

22   Q.   Okay, and approximately how much time did

23        you spend this morning preparing for this

24        deposition?

25   A.   I dropped my kids off about 30 minutes ago,

```
 1        came straight here.
 2   Q.   Okay.  So you spent less than 30 minutes
 3        preparing for this deposition; agreed?
 4   A.   That's agreed.
 5   Q.   And what did you do to prepare for this
 6        deposition?
 7   A.   I haven't done anything.  They -- they
 8        handed me my Answers to Interrogatories and
 9        Requests for Admissions, but I can't tell
10        you even I read them today.  I mean, I
11        certainly read them when I signed them when
12        they were presented to you, but I have
13        them, but I haven't read them this morning.
14   Q.   Okay.  Have you read -- reviewed any
15        documents to prepare for this deposition?
16   A.   I have not.
17   Q.   Okay.  Did you take any notes to prepare
18        for this deposition?
19   A.   I did not.
20   Q.   Did you review any video or audiotape to
21        prepare for this deposition?
22   A.   I did not.
23   Q.   Did you review any statements or listen to
24        any statements by deputies to prepare for
25        this deposition?
```

```
1    A.   I did not.
2    Q.   Okay, and what documents do you have with
3         you?  You said your Responses to
4         Interrogatories and Requests for
5         Admissions.  Do you have any other
6         documents with you?
7    A.   No.  The only two documents I was just
8         handed to this morning was my Individual
9         Supplemental Responses to Plaintiffs and
10        then you have a Plaintiffs Request For
11        Admissions to Sheriff Lopinto.
12   Q.   Okay, and so you said you did some
13        preparation for this deposition.  Without
14        telling me the content of any
15        communications with attorneys, what did you
16        do to prepare for this deposition, if
17        anything?
18   A.   That's it.  I -- I walked in this morning
19        and said, okay, we're having a deposition
20        in about ten minutes, and then we talked
21        about other things.
22   Q.   Okay, and by, "other things," you mean
23        things other than --
24   A.   Not related to this case.
25   Q.   Okay, and because this is a Zoom
```

```
 1        deposition, Sheriff, we can't necessarily
 2        see the entirety of the room around you.  I
 3        -- I see that behind you is Mr. Zibilich
 4        and Ms. Valenti.  Is there anyone else in
 5        the room with you?
 6   A.   Martiny, Jeff Martiny is behind me, Lindsey
 7        Valenti, and then Franz Zibilich is over
 8        here on my right.
 9   Q.   Okay, and because this is a Zoom
10        deposition, we may not be able to see if
11        anyone tries to communicate with you.  So
12        will you agree now to tell me if anyone
13        tries to communicate with you during this
14        deposition either by whispers, hand
15        signals, head indications, passed note,
16        text message, anything like that?
17   A.   It can be under the table, yeah, I will.
18        No problem.  Thank you.
19   Q.   Great.  All right.  So I am going to pull
20        up a document which I'm going to designate
21        as "Exhibit 99," which is the 30(b)(6)
22        Notice in this case.  Sheriff, I may pull
23        up documents during this deposition, and I
24        can zoom in.  Can you see and read this
25        document?
```

```
 1   A.   I can.
 2   Q.   Okay.  If at any point you need us to zoom
 3        in to read it more clearly, please just let
 4        me know, all right?
 5   A.   Okay.
 6   Q.   Okay.  I'm going down to Page 2 of Document
 7        99.  Do you see the listed topic here?
 8   A.   Yep.
 9   Q.   The topic for today is "ADA/RA Compliance:
10        A person with knowledge of any
11        accommodations provided to E.P; any
12        modifications JPSO deputies made to their
13        procedures and protocols in handling E.P;
14        any attempts that JPSO deputies took to
15        control E.P. through less intrusive means."
16         Are you prepared to testify about that
17        topic today, Sheriff?
18   A.   I mean, I certainly wasn't a factual
19        witness on scene, but I can give you what
20        my opinion of that is, and I'll go from
21        there.
22   Q.   Can you provide us with the position of the
23        governmental entity on these topics?
24   A.   I think according to my Interrogatories in
25        this, I really believe that there was --
```

```
 1        you know, when we were trying to just
 2        maintain a -- a -- a person in this case
 3        and this disability, I don't think there
 4        was any modifications that were given or
 5        necessarily needed during those
 6        circumstances.
 7   Q.   Okay, yeah, and we'll get into that
 8        certainly, and you'll have an opportunity
 9        to explain that, but can you at least
10        provide the governmental entity's position
11        with regard to this topic?
12   A.    I mean, I -- I think that's pretty -- a
13        vague question.  I mean, ADA handles a
14        whole bunch of different things when it
15        comes to JPSO.  I certainly have, you know,
16        employees that fall under an ADA that I
17        have to do certain accommodations for that
18        are directly that work for me.  I certainly
19        have to deal with ADA compliance for
20        inmates that are under my control that are
21        actually at our facility.  I certainly have
22        to deal with ADA compliances of people out
23        on the street, depending on what that
24        accommodation is, whether it is a witness
25        that is blind or deaf or, you know,
```

1    incapacitated.  So there's a whole lot of

2    things that that comes into play, so for a

3    government position, it's really a -- a

4    fact scenario that has to come in place of

5    what that -- any type of modification would

6    be.  You know, I always say JPSO is in the

7    accommodation business.  You know, we -- we

8    have to take it as we see it and come

9    wherever the 911 call comes.  So it's not

10   something that is as black and white as

11   this is what you do in this particular

12   situation.  You know, some are easier than

13   others, whether it's an employee that works

14   for me on a regular basis compared to

15   somebody that we're just handling a 911

16   call for.

17 Q.  Okay.

18           MR. ZIBILICH:

19           Let me -- let me be clear.  Your

20       Notice is specific vis-a-vis

21       accommodations relative to E.P.

22       That's the limitation of this

23       deposition as I understand it.  He's

24       not here to testify about

25       accommodations in the jail, in the

```
 1                    medical facility, or anything else.
 2                    He's only going to opine or give
 3                    corporate answers relative to
 4                    accommodations regarding E.P. is --
 5                    is my understanding.
 6                         MR. MOST:
 7                         Yes.
 8    BY MR. MOST:
 9    Q.   So setting aside the -- the part in bold,
10         the part not bolded here in the topic, are
11         you prepared to provide the government's
12         position on these -- this topic here?
13    A.   That's correct.
14    Q.   Okay.  All right.  So Sheriff, could you
15         just provide us with a very brief nutshell
16         of your educational and professional
17         background.
18    A.   High school, college graduate, criminal
19         justice, both Associates and Bachelors
20         degree in criminal justice; law degree from
21         Loyola School of Law, JPSO Academy back in
22         1997.  You know, obviously, if you want to
23         go into CLEs and everything else, but just
24         college education, that's -- that's it.
25    Q.   Okay, thank you.  And as Sheriff, you are
```

```
 1        the highest decision-maker for JPSO.  Is
 2        that correct?
 3   A.   I am.
 4   Q.   Okay.  I'm going to pull up -- we're going
 5        to start with the easy part, which as you
 6        pointed out there have been Interrogatory
 7        Responses.  So I'm going to pull that up.
 8        I'm going to pull up what has been
 9        designated as "Exhibit 41."  Do you see
10        that this is the document entitled, "Joseph
11        P. Lopinto, III Individual Supplemental
12        Responses to Plaintiffs' First Set of
13        Interrogatories and Requests for
14        Production"?
15   A.   I can, yes.
16   Q.   And going down to the fifth page of this
17        document, do you see a verification page
18        here?
19   A.   I do.
20   Q.   And is this your signature on that
21        verification page?
22   A.   It is.
23   Q.   And when you signed this, you were
24        verifying that the Answers in this document
25        are true, complete, and accurate; agreed?
```

```
 1   A.   Correct.
 2   Q.   And you swore that under oath?
 3   A.   I did.
 4   Q.   Great.  I'm going to go up to Page 4.  Do
 5        you see that Page 4, there was an
 6        Interrogatory that asked for all
 7        accommodations provided to E.P. to
 8        accommodate his disability?
 9   A.   Correct.
10   Q.   Okay, and the -- your Answer was, "The
11        factual backdrop for the incident sued upon
12        did not implicate a need for an
13        accommodation.  Therefore, an accommodation
14        was not provided."  That was your answer;
15        agreed?
16   A.   That's my answer, correct.
17   Q.   Okay, and -- and that's a truthful answer?
18   A.   You know, I can opine a million times over,
19        but the -- as part of the entity, I don't
20        believe an accommodation was made, but if
21        I'm reviewing as an expert looking at it, I
22        can -- I can -- I can show you that
23        accommodations probably were made, but
24        that's going to be a factual decision of
25        the deputy that was on the scene.
```

```
 1   Q.   Okay.  So we -- we don't need your opinion,
 2        because you're not being called as an
 3        opinion witness at this point, but I -- I
 4        think I heard you say that the entity's
 5        position is that an accommodation was not
 6        provided; agreed?
 7   A.   Yeah, okay.  Yep.
 8   Q.   And it's the entity's position that the
 9        factual backdrop for the incident involving
10        E.P. did not implicate the need for an
11        accommodation; agreed?
12   A.   You know, again, I'm coming in after the
13        fact as the entity.  I'm not the person on
14        the scene itself, but I don't believe the
15        -- you know, the -- the few minutes that
16        we're dealing with what they were dealing
17        with, that an accommodation is needed for
18        that.  Certainly if that individual was
19        placed in custody or, you know, other
20        things that would have occurred from there,
21        then I would have had to, you know, put
22        accommodations because it would have been
23        -- whether it was an in-custody arrest or
24        any of those things would have occurred,
25        then -- then it may have called for
```

```
 1           accommodation.  What they were dealing with
 2           at that particular time probably did not
 3           deal for an accommodation when they were
 4           trying to subdue a person.
 5    Q.    Okay.  So this statement that we're looking
 6           at here, "The factual backdrop for the
 7           incident sued upon did not implicate a need
 8           for an accommodation," that's an accurate
 9           reflection of the entity's position;
10           agreed?
11    A.    You know, of the entity, I would say yes.
12           Now, whether or not that's an individual
13           statement, that -- that could differ.
14    Q.    Okay.  All right, moving on.  Now, I'm
15           going to pull up a document which I'm
16           designating as "Exhibit Z."  Do you see
17           that this is a filing from this case?
18    A.    I do.
19    Q.    It's Record Document 26.  Do you see that?
20    A.    Yeah.
21    Q.    Do you see Page 2, the highlighted section
22           says -- well, actually, let me go down to
23           the bottom.  Do you see that this is a
24           document submitted by Daniel Martiny?
25    A.    Yes.
```

```
 1   Q.   And he's your attorney in this case, one of
 2        your attorneys in this case; agreed?
 3   A.   Right.
 4   Q.   So this is a document filed on behalf of
 5        the Sheriff's Office; agreed?
 6   A.   I would assume so, yes.
 7   Q.   Okay.  Do you see on Page 2 it says, "The
 8        Defendants did as best they could to manage
 9        E.P., who never stopped resisting their
10        efforts"?  Do you see that section?
11   A.   I do.
12   Q.   Okay, and -- and is that an accurate
13        reflection of the entity's position with
14        regard to -- to E.P. that he never stopped
15        resisting their efforts?
16                  MR. ZIBILICH:
17                  Wait, wait, time out, time out.
18             Mr. Most, I think that is off the
19             topic.
20                  MR. MOST:
21                  It's -- it's not, and I'll
22             explain why, Franz.  We're just --
23             we're going to get into that this is
24             -- this may be the reason why the
25             entity contends that no
```

```
 1              accommodations were provided.  So
 2              it's -- I'm going to directly tie it
 3              to whether or not any accommodations
 4              were provided.  So thank you.
 5   BY MR. MOST:
 6   Q.  Sheriff, this statement that E.P. never
 7       stopped resisting the deputies' efforts, is
 8       this an accurate reflection of the entity's
 9       position?
10   A.   Well, again, this goes directly to what I
11       would probably opine for, right?  If I'm
12       the deputy on the scene handling this
13       particular case, I can articulate why
14       accommodations were given, right?
15       Obviously, the second line of that
16       paragraph being that they didn't use any
17       intermediate or lethal force weapons.  I --
18       I have not seen this document before, but I
19       -- that's an accurate statement, right?
20       You can -- you can say that we didn't use a
21       Taser because we knew that, you know, he
22       was -- had some mental conditions and --
23       and we were not going to do that, right?
24       So that's an accommodation as a deputy on
25       the scene could say we did because of these
```

```
1         particular reasons, right?  As a -- as the
2         entity, I don't necessarily believe that
3         that accommodation needed to be done in
4         those situations, right?  Just because
5         someone is mentally challenged doesn't
6         prohibit them from utilizing tools when
7         they're trying to subdue a suspect.
8         Mentally challenged people commit crimes
9         and -- and hurt people on a regular basis,
10        and so they've got to use the tools that
11        they have in order to do so.  So they may
12        be able to testify and -- and articulate
13        this is an accommodation that they did.  As
14        an entity, I don't necessarily believe that
15        that accommodation was required of them,
16        but this is a -- this is probably what I
17        was talking about opining on just a few
18        minutes ago.
19   Q.   Right.  So I think you're -- you're -- it
20        sounds like you're describing what you
21        imagine deputies on the scene might testify
22        to as individuals, right?
23   A.   Yeah.  I mean, I'm putting myself in their
24        shoes.
25   Q.   Right, but -- but speaking on behalf of the
```

```
 1          entity, is it the entity's position that
 2          this statement is accurate, that E.P.
 3          never stopped resisting the deputies'
 4          efforts?  Is that the entity's position?
 5     A.   Well, I mean, obviously he stopped at one
 6          point in time, right?  You know, I mean,
 7          now, when -- when did -- when did that
 8          stopped is -- is obviously when it
 9          happened.  I mean, I -- I can -- I saw the
10          video, you know, years ago, and -- and he
11          certainly was -- was resisting until a
12          period of time, and then when he stopped
13          resisting, then CPR began, right?
14     Q.   Okay.
15     A.   So that -- you know, it depends on what
16          your definition is he never stopped.  You
17          know, he stopped at certain -- certainly at
18          one point in time.
19     Q.   Of course, right, because he died.  So he
20          could not have never stopped resisting.
21          But at least until the point where he went
22          limp and then CPR was administered, he
23          continually resisted prior to that point;
24          agreed?
25     A.   I -- I'd agreed with that.
```

```
 1   Q.   Okay, and -- and that continuous resistance
 2        until going limp and then CPR being
 3        administered, is -- is that the reason why
 4        the factual backdrop did not implicate the
 5        need for an accommodation?
 6   A.   I -- I agree.  Yeah, I'll agree with that
 7        statement.
 8   Q.   Okay.  So if E.P. had stopped resisting at
 9        -- at various points during the incident,
10        accommodations could be appropriate in that
11        scenario; agreed?
12   A.   I'm sure they would be, yeah.
13   Q.   Okay, and, in fact, if --
14   A.   Mr. Most, let me -- let me be clear.  I
15        know very -- I won't say very little,
16        right.  I -- I know some of the medical
17        from the Plaintiff in this case or the
18        decedent in this case, right, but I -- but
19        I would assume that accommodation would be
20        necessary, but, I mean, I don't -- I don't
21        -- I didn't know him personally, but the
22        fact of it is from what I know, I would
23        assume that that accommodation would be
24        necessary.
25   Q.   For example, an accommodation that might be
```

```
 1         necessary in a scenario where E.P. stopped
 2         struggling would be an accommodation of
 3         using the RIPP Hobble device and turning
 4         E.P. on his side; agreed?
 5    A.   Yeah, if that -- if that would have been
 6         necessary, yeah.  Well, I mean -- well, I'm
 7         sorry.  I -- I don't think they used a RIPP
 8         Hobble in this, did they?
 9    Q.   No, they did not, but I'm saying if -- if
10         the struggle had ceased at some point, you
11         know, before he went limp and CPR was
12         administered, if the struggle had ceased at
13         some point, an accommodation at that point
14         could have been to use the RIPP Hobble
15         device and put E.P. on his side; agreed?
16    A.   I mean, you can add a whole bunch of
17         accommodations.  In this case knowing what
18         the -- the mental factors of the client, I
19         mean, it may have been, you know, once he
20         calmed down, that we just released him back
21         to the custody of his parents, right?  I
22         mean, so the -- the accommodations can be
23         limitless.  You know, we're there to -- to
24         handle the problem that's at hand, but --
25         but the truth of it is is, you know, using
```

```
 1          a RIPP Hobble isn't per se that this person
 2          would have been automatically going to jail
 3          or even put back into our vehicle.  So I
 4          think, you know, limiting that is -- is --
 5          you know, is probably incorrect.  I don't
 6          think they got to the point to figure out
 7          what accommodations that they would have
 8          used.
 9    Q.    I agree with you.  There's a range of
10          accommodations that might be appropriate,
11          but one example could have been if he had
12          -- if -- if the struggle had temporarily
13          ceased, one -- one example among the range
14          of accommodations could have been the use
15          of the RIPP Hobble device and putting him
16          on his side; agreed?
17    A.    You know, I -- I don't know if he was
18          really kicking that much to say that I
19          would have put him in a RIPP Hobble.  Like,
20          I mean, I -- I would agree that that was
21          certainly an option that they could have
22          utilized to do so, but that's not -- you
23          know, normally you're putting someone in a
24          RIPP Hobble because they're violently
25          kicking and -- and dealing with those type
```

```
 1        of things, and I don't -- I don't foresee
 2        that that was automatically the case that a
 3        RIPP Hobble would have been the first thing
 4        to use.
 5   Q.   Okay, and rolling E.P. onto his side could
 6        have likewise been among the range of
 7        possible accommodations had the struggle at
 8        some point ceased; agreed?
 9   A.   Yeah, I mean, that -- that's -- normally,
10        if you're, you know, putting -- especially
11        if you're putting them in a RIPP Hobble,
12        you try to move them to the recovery
13        position, which is on the side, but I don't
14        think they ever got to point in order to do
15        so.
16   Q.   Okay.  Okay, and JPSO deputies in dealing
17        with E.P. did not make any alterations to
18        their policy -- procedures and protocols in
19        handling E.P. due to his disabilities;
20        agreed?
21   A.   Wait, repeat that question.
22   Q.   Sure.  So we've established that the
23        position of the entity is that
24        accommodations for disability were not
25        provided.  Were any modifications to
```

```
 1        policies and protocols made for E.P. by
 2        JPSO deputies due to his disability?
 3    A.   Well, we wouldn't have -- I mean, are you
 4        asking me about modified policy after the
 5        death of E.P. or I mean --
 6    Q.   No.  I'm sorry.
 7    A.   -- policy -- policy during, you know, the
 8        incident?  So that's -- that's the
 9        confusion that I have from here, right?  I
10        mean, the policy -- I don't believe our
11        policy has been updated since this
12        particular time so --
13               MR. ZIBILICH:
14               That's not the question.
15   BY MR. MOST:
16    Q.   Yes.  I'll be clear.  During the incident,
17        did any JPSO officers make any alterations
18        to procedures or protocols during the
19        incident due to E.P.'s  disability?
20    A.   And I -- I think that's a fact question,
21        Mr. -- Mr. Most.  I mean, that's --- that's
22        a -- as we said earlier, I don't know if --
23        I don't know if their testimony is I didn't
24        do this because of that, and -- and they --
25        they certainly can answer that question
```

```
 1            truthfully and accordingly of what they
 2            did.  I just don't know the answer to that
 3            question.
 4    Q.   Okay.  So you're not aware of any
 5            alterations to policies, procedures, or
 6            protocols made by JPSO deputies during the
 7            incident due to E.P.'s disability; agreed?
 8    A.   I am not aware of any.
 9    Q.   Okay.  Okay.  I'd like to take five minutes
10            and just take a five-minute break and then
11            come back, and we -- I may have a few
12            follow-up questions.  Your counsel may have
13            follow-up questions, and then we may be
14            done at that point, all right?
15    A.   Okay.
16    Q.   So let's -- let's reconvene at 9:38.
17                    (Break in proceedings.)
18    BY MR. MOST:
19    Q.   Okay.  Let's go back on the record.  Thank
20            you, Sheriff, that's all the question I've
21            got for now, though I'll reserve the right
22            for followup in case your counsel asks you
23            any questions.
24                    MR. MOST:
25                    Franz, do you of any questions
```

```
 1              for the witness?

 2                   MR. ZIBILICH:

 3                   No, sir.

 4    BY MR. MOST:

 5    Q.   Okay.  Well, Sheriff, thank you very much

 6         for your time this morning.  We appreciate

 7         your being here.  Thank you, Franz.  Thank

 8         you, everybody.  Have a good weekend.

 9                   (Whereupon, the taking of the

10             witness' testimony was concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1               C E R T I F I C A T E
 2               THIS CERTIFICATION IS VALID ONLY FOR
      A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL
 3    SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS
      PAGE.
 4
                 I, RAYNEL E. SCHULE, Certified Court
 5    Reporter, #77005, in good standing, in and for
      the State of Louisiana, as the officer before
 6    whom this testimony was taken, do hereby certify
      that SHERIFF JOSEPH P. LOPINTO, III, after
 7    having been duly sworn by me upon authority of
      R.S. 37:2554, did testify as hereinbefore set
 8    forth in the foregoing 34 pages; that this
      testimony was reported by me in stenotype
 9    reporting method, was prepared and transcribed
      by me or under my personal direction and
10    supervision, and is a true and correct
      transcript to the best of my ability and
11    understanding; that the transcript has been
      prepared in compliance with transcript format
12    guidelines required by statute or by rules of
      the Board, that I have acted in compliance with
13    the prohibition on contractual relationships, as
      defined by Louisiana Code of Civil Procedure
14    Article 1434 and in rules and advisory opinions
      of the Board; that I am not of counsel, not
15    related to counsel or to the parties herein, nor
      am I otherwise interested in the outcome of this
16    matter.
17
18
      _____   _____
19    Date               Raynel E. Schule, CSR
                         Certified Shorthand Reporter
20                       State of Louisiana
21
22
23
24
25
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**