**ARMBRUSTER & ASSOCIATES**
**P.O. BOX 306**
**YOUNGSVILLE, LOUISIANA 70592**
**(337) 857-1509**

8 March 2023

Mr. Franz Zibilich
Mr. Jeffery Martiny
131 Airline Drive, Suite 201
Metairie, Louisiana 70001

RE: Donna Lou and Daren Parsa, on their own behalf and on behalf of their deceased minor child, E.P. v Sheriff Joseph P. Lopinto, III, et al

Dear Counselors:

I have received and reviewed, in anticipation of testifying at trial, the following materials all of which may be used as exhibits:

Complaint
Answer, Affirmative Defenses and Jury Demand
Investigative Report A-15489-20
JPSO Standard Operating Procedures:
    Table of Contents
    Restraining Devices & Defensive Devices (SOP- 8)
    Internal/Administrative Investigations & Suspension Policy (SOP-22)
    Use of Force (SOP-25)
    Rules for Administration of the Code of Conduct (Titles I, II, and III
Parsa Training Discovery (Thumb drive containing numerous files)
Parsa video
Howard video
Transcribed statements of:
    Detective Stephen Mehrtens
    Deputy Shannon Guidry
    Deputy Nick Vega
    Deputy Manuel Estrada
    Deputy Chad Pitfield
    Deputy Ryan Vaught
    Deputy Myron Gaudet
Depositions of:
    Chad Michael Pitfield
    Donna Lou
    Nicholas Vega
    Ryan Vaught
    M. Pizzalota
    Steven Mehrtens
    Manuel Estrada
    Myron Gaudet
    Darren Parsa

Joshua Wingrove
Shannon Guidry
Lieutenant Donald Meunier
Craig Pond
Sheriff Joseph Lopinto, III
Captain Robert Blackwell
Dana Troxclair, M.D.
Sgt, Michael Voltolino
Donald A. Canatella
Timothy Genevay
Joseph Diest
Jeanette Euper
Mallory Smith
Gina Christopher
Keith Dowling

Training files for:
Steven Mehrtens
Shannon Guidry
Ryan Vaught
Myron Gaudet
Manuel Estrada
Chad Pitfield
Nicholas Vega

Autopsy Report

International Association of Chiefs of Police (IACP) Model Policy:
Excited Delirium (and Concepts & Issues Paper)
Responding to Persons Experiencing a Mental Health Crisis
Interactions with Individuals with Intellectual and Developmental Disabilities
Investigation of Allegations of Employee Misconduct
Preliminary Death Investigation
Criminal Investigations
Obtaining A Search Warrant
Standards of Conduct
Use of Force

International Association of Chiefs of Police (IACP) Training Keys:
#429 – Custody Death Syndrome
#541 – The Four-Point Restraint
#654 – Special Needs Detentions
#678 – Autism: Managing Police Field Contacts
#679 – Autism: Interview and Interrogation

Answers to Interrogatories and Answers and Requests for Production of Documents and
Responses including Supplementals:
Sheriff Joseph Lopinto, III
Chad Pitfield
Steve Mehrtens
Shannon Guidry

-3-

Myron Gaudet
Ryan Vaught
Nicholas Vega
JPSO Organizational Chart
Louisiana P.O.S.T. Integrated Use of Force transcripts (Part 1 and 2)
Article from Calibre Press – Screaming Their Last Breath, December 10, 2015
Expert Report of Jeffrey J. Noble

In addition to the above listed materials, I have also relied upon the training, education and experience gained during my 41+ years as a law enforcement officer, my 39+ years as a law enforcement instructor and my 26+ years as a law enforcement administrator. This includes specialized training conducted by the Federal Bureau of Investigation, the United States Marshals Service, the United States Bureau of Prisons, the International Association of Chiefs of Police, the National Sheriffs' Association, the American Correctional Association, the FBI National Academy Associates, the Louisiana Sheriffs' Association, the Louisiana Chiefs of Police Association, the State of Louisiana Department of Public Safety & Corrections, the State of Louisiana Peace Officer Standards and Training Council and others. I am currently a State-certified Peace Officer and serve as instructor in the St. Martin Parish Sheriff's Training Academy.

It is my understanding that on Sunday, January 19, 2020, Mr. Parsa, his wife Ms. Lou and their 16-year-old son, E.P. were at the Laser Tag location in the Westgate Shopping Center. The family had gone to this location earlier, left, and then returned. After being inside the Laser Tag for a period of time, E.P. asked to leave and the family began to exit the location. During this time E.P. began to experience an episode due to his autism. Mr. Parsa attempted to control E.P. but was unable to do so. E.P. physically resisted the efforts of Mr. Parsa to control him or to get E.P. inside the family vehicle, which was parked in the parking lot near the Laser Tag. This physical struggle can be seen on the video taken from outside the Laser Tag. This struggle between Mr. Parsa and E.P. lasted for several minutes, during which time E.P. bit Mr. Parsa more than once, causing injury to Mr. Parsa. The Jefferson Parish Sheriff's Office was contacted via telephone by an employee of Laser Tag. The deputy, Chad Pitfield, who was working an off-duty security detail at the Westgate Shopping Center, responded, and observed E.P., and Mr. Parsa near the family vehicle. Shortly after Pitfield's arrival E.P. then engaged in a physical struggle with Deputy Pitfield and Mr. Parsa. Deputy Pitfield, who was struck and bitten by E.P., was able to bring E.P. down to the pavement and after being bitten on the leg by E.P., struck E.P. one time in the head area to get E.P. to release the bite. Deputy Pitfield was then able to secure one handcuff onto EP's hand. Due to the continuing physical struggle and resistance of E.P., Deputy Pitfield requested backup. Additional deputies arrived at various times and were able to secure the other arm of E.P. with a second pair of handcuffs. The video shows the physical struggle for several minutes and after observing that E.P. was no longer struggling, deputies began to administer CPR until EMS, who had arrived on scene earlier, took over. E.P. was taken by ambulance to the hospital where he was later pronounced dead. This litigation is a result of this incident.

Based on my review of the above listed materials and in conjunction with the training, education and experience outlined previously I am of the opinion that the actions of the members of the Jefferson Parish Sheriff's Office in the handling of this situation fall well within the generally accepted guidelines of the law enforcement profession. Based on the information available at the time of this incident these deputies responded in a manner which is consistent with proper JPSO policy and training.

-4-

A review of the records shows that these deputies had successfully completed all training requirements of the State of Louisiana Peace Officer Standards and Training Council and was State certified at the time of this incident. P.O.S.T. training is the standard for law enforcement training within Louisiana and is required to become State- certified. The JPSO provided additional training to these deputies which exceeded the requirements of the State of Louisiana, not only in number of hours but also included topics such as handling mental persons and persons with autism which was not required by P.O.S.T.

A review of the policies of the Jefferson Parish Sheriff's Office which were pertinent to the issues in this matter shows that these policies were the type of policy generally seen within the law enforcement profession within the State of Louisiana. The policies are similar to the Model Policy of the International Association of Chiefs of Police, which is recognized as an authoritative resource within the law enforcement profession. The IACP Model Policy program does not mandate any compliance with these policies and specifically states so at the end of each policy. Likewise, there was no requirement that the JPSO follow any standards of the Commission on Accreditation of Law Enforcement Agencies (CALEA). Again, these standards can be used as a resource but there is no mandate they be followed unless an agency is seeking accreditation through CALEA.

The use of force employed by the deputies in this situation falls well within the guidelines of the Use of Force training of the State of Louisiana Peace Officer Standards and Training Council. The deputies utilized empty hand control tactics and handcuffs in their attempts to bring E.P. under control. The video shows the actions of these deputies, and their actions are well within the generally recognized guidelines of the law enforcement profession.

It is a fact that Deputy Pitfield recognized that E.P. was autistic and was attempting to control E.P. while Ms. Lou and Mr. Parsa were attempting to calm E.P. down. In my opinion, if this had been a subject who was not autistic, Deputy Pitfield and others would have been justified in using a much greater level of force to control E.P. The accommodation of not escalating to a higher level of force shows that these deputies recognized the situation and attempted to control this resistance without using greater force. As a matter of fact, more force was definitely justified in this situation.

Plaintiffs claim that E.P. was sat upon on his back for over 9 minutes, but a review of the video shows that Deputy Pitfield and Deputy Vega were not sitting on E.P.'s back. The video is the best evidence of the position of these respective deputies during the time they were attempting to control E.P. The statements and testimony also contradicts this accusation as many of the deputies testified that Deputy Pitfield and Vega were not on E.P.'s back.

Plaintiffs claim that once E.P. was handcuffed that he no longer posed any danger to the deputies or others due to the restraints and his physical and mental disabilities. The video does not confirm this allegation. During the length of time these deputies were attempting to control E.P. there is obvious resistance on the part of E.P.

There has been much testimony around the need to put E.P. into a "recovery position". The "recovery position" is utilized for a person who shows signs of needing to be in recovery. The testimony of the deputies and the video shows that during the time of this encounter, E.P. was not under control

-5-

and continued to resist. Any momentary lack of resistance quickly became active again as testified to by deputies. EP did not show any signs of being in distress, and therefore did not need to be placed into the "recovery position". Once the deputies observed E.P.'s condition change, they changed the position that E.P. was in, removed the handcuffs and began CPR. This continued until EMS took over the medical needs of E.P. and transported E.P. to the hospital.

During the depositions of the deputies, there was questioning surrounding the perception of the various deputies to the resistance of E.P. Based on the perceptions of these deputies, they did testify that at various times, in their opinion, it did not appear that E.P. was resisting. It should be noted that none of these deputies were actually attempting to control E.P. The only two who actually had physical contact with E.P. was Deputy Pitfield and Deputy Vega, until the later part of the encounter. These two deputies had the opportunity to both feel and see the amount of resistance they were encountering while dealing with E.P. To suggest that these deputies should have released E.P. and let him either be seated or stand up would not follow the use of force guidelines as taught within the law enforcement profession. This encounter took place in a public parking lot. There was the danger of E.P. running into traffic, possibly harming innocent people in the vicinity of this encounter, and an additional threat to both the deputies and the family members present. It should be noted that prior to the arrival of any JPSO personnel, Mr. Parsa and Ms. Lou were unable to control E.P., which is why they requested that assistance be called. Mr. Parsa was also injured by E.P. both prior to and during the arrival of Deputy Pitfield.

Plaintiffs contend that the JPSO did not properly train the deputies in dealing with a subject with autism. In my review of the training provided by the JPSO, there was training in handling people with mental disorders and in special needs. It should be noted that the State of Louisiana Peace Officer Standards and Training Council did not mandate any training on handling persons with Autism Spectrum Disorder until January 2023. JPSO provided training in this area prior to January 2023.

JPSO also provided training on restraint techniques and each of the defendants had received some level of training in this area. JPSO had in place a policy on NOT hog-tying a subject and each of these deputies had received information on this topic and were aware of this policy.

I have reviewed no information which supports the allegation that Sheriff Lopinto hired any of these deputies in a negligent manner. All of these deputies had undergone an extensive hiring process, and then successfully completed a training program which exceeds the requirements of the State of Louisiana Peace Officer Standards and Training Council on both the basic academy level and the In-service level.

I have reviewed no documentation to support the accusation that any of these deputies had engaged in an unlawful use of force prior to this incident. If an accusation was made, an internal investigation was conducted and if sustained, then disciplinary action would be taken. I did not observe any documentation concerning a sustained use of force complaint about any of these deputies. Even if a prior incident had occurred, depending on the facts of the investigation, the disciplinary action taken by JPSO would depend on the infraction.

I also have not reviewed any documentation to support the accusation that the JPSO had a history of the "Code of Silence" since there was testimony by Sheriff Lopinto of disciplinary action taken

against employees under his employ. This included the filing of criminal charges in situations which resulted from a criminal investigation. Captain Blackwell, who was the supervisor of Internal Affairs for JPSO also testified about disciplinary actions being taken against employees once a sustained complaint was determined. To suggest that Sheriff Lopinto and/or JPSO ignored internal discipline is unfounded.

The investigation which resulted from this incident included the taking of recorded statements from the deputies involved in this incident. The reports included the descriptions of the use of force and the investigation concluded that no departmental policy was violated by these deputies. Whether this investigation was conducted by the criminal investigators as opposed to an Internal Affairs investigator is of no moment. The information obtained during this investigation provided ample facts to make both a criminal and internal decision on the actions of the deputies involved. To suggest that an Internal Affairs investigation would have resulted in a different outcome is not accurate. None of these deputies refused to provide a statement during this investigation. Their statements were recorded and transcribed and available for review by Internal Affairs if necessary.

Plaintiffs contend that Sheriff Lopinto and the JPSO failed to provide training on the Americans with Disability Act. It should be noted that the Louisiana P.O.S.T. training does not address this topic nor does the IACP have a Model Policy on ADA. I have not seen any lesson plan within any law enforcement agency or POST Academy which mandates training on this subject. The JPSO Academy is a certified academy within the State of Louisiana and meets all requirements of the State of Louisiana Peace Officer Standards and Training Council. The academy is a regional academy and trains law enforcement personnel from both within and outside of the JPSO.

Mr. Noble, in his report, offers several opinions which are not accurate. These will be addressed as fully as possible:

The summary listed by Mr. Noble states that the Laser Tag manager called Deputy Pitfield and advised him that "...a child has autism and is in a struggle with his father in front of the Laser Tag." This is in direct conflict with the testimony of Deputy Pitfield who testified that he was advised that this call involved a child with "special needs."

Deputy Pitfield was contacted to respond to this complaint via a phone provided by the shopping center, not a phone provided by JPSO.

Deputy Pitfield was not advised that EP had autism until after the physical struggle and EP had been taken to the ground.

Mr. Noble repeatedly refers to the deputies (Pitfield and Vega) as sitting on EP's Back. This is in direct conflict with the testimony of several of the deputies and clearly differs from the video.

There was no intention by any deputy to eventually bring E.P. to jail. No deputy testified that this was the course of action that was going to occur. Deputy Pitfield testified that he was detaining EP to determine what had occurred. Answers to Interrogatories also supports that no deputy had the intention to arrest EP.

Mr. Noble states that both "Deputy Pitfield and Detective Vaught knew that EP was autistic, had just been involved in physical exertion, was obviously very obese, was not offering any resistance and was prone on the ground with his hands handcuffed behind his back..." This is in direct conflict with the testimony of both Deputy Pitfield and Detective Vaught throughout portions of their testimony. It is taking a portion of their testimony to support his opinion but ignores other portions which conflict with his opinions.

-7-

Noble states that Deputy Vega knew that EP was autistic but ignores the testimony of Deputy Vega about hearing something about special needs but not directly about autism. Also ignores the testimony that EP was "fine, at this point. But then all of a sudden, it went from zero to one hundred".

Noble opines that each arriving deputy knew that EP was autistic but ignores the testimony that each one either learned or detected their observations at various times during the encounter.

Noble opines that Deputy Vega utilized a choke hold on EP but ignores the testimony of Deputy Vega and others that no choke hold was used.

According to Mr. Noble the uses of force by Deputies Pitfield and Vega were excessive and inconsistent with generally accepted police practices. This is directly in conflict with the Use of Force Continuum as taught within the Louisiana P.O.S.T. training guidelines. The use of force applied in this situation was all empty hand control tactics and fell well within the use of force guidelines as recognized within Louisiana law enforcement training. The factors which supports this are that at the time of this incident, deputies were responding to a call for service concerning a physical struggle, which may result in a crime which had occurred. They definitely observed the struggle and had reason to believe that the subject, EP. posed an immediate threat to the safety of officers and others (he had already physically struggled with his father and Deputy Pitfield and had inflicted injury to both of them) and was actively resisting.

Noble opines that the use of a punch to the head area of EP by Deputy Pitfield was an excessive use of force and that strikes to the head are prohibited. That is not accurate and Pressure Point Control Tactics (PPCT) which is recognized and taught within the Louisiana P.O.S.T. training guidelines, does allow strikes to the head with empty hand control tactics. Generally accepted guidelines prohibit strikes to the head or face area with an impact weapon  cannot be used unless deadly force is appropriate.

Noble opines that during the time that Deputy Pitfield is restraining EP that EP is not struggling, and that Deputy Pitfield is in control of EP. This is in conflict with the testimony of Deputy Pitfield and the video.

Noble states that although several deputies are on scene that other deputies are standing nearby but taking no action. This is in conflict with the testimony of the deputies. Some were checking on the injury to Mr. Parsa and others were assisting in other manners.

According to the timeline as listed by Mr. Noble, Deputy Pitfield was removed from contact with EP at 13:36:01 and deputies observed EP in distress at 13:38:24. This is a total of 2:23 that Deputy Pitfield was no longer involved in attempting to restrain EP. At 13:38:24 deputies begin to provide emergency care to EP based on the change in EP's condition.  A total of 32 seconds elapsed from the time of observing a change in condition until EP was removed from the prone position and placed on his side/back. This was proper under the change in circumstances.

Noble states that an article he references describes that "keeping individuals prone, handcuffed and hog-tied" had negatively affected their ability to recover..." EP was not hog-tied at any point during this incident.

Noble states that a task force recommends "Once an individual has been controlled and handcuffed, the officer should roll the subject onto his/her side, or into a sitting position as soon as possible to reduce the risk of positional asphyxia". The testimony of the various deputies refutes that EP was controlled and not resisting throughout this incident.

Noble states that Deputy Estrada utilized leg shackles despite not being trained to utilize leg shackles in the field. Is Mr. Noble stating that Deputy Estrada used the leg shackles in a negligent

manner? If so, what specific training requirement exists which states that this training was mandatory for Deputy Estrada? Were they applied in an improper manner?

Noble states that Deputy Gaudet said he did not see EP bite anyone nor did he see Deputy Vega use a choke hold. Gaudet also states that EP was handcuffed in the front when Gaudet arrived.  This shows a change in the position of EP in conflict with opinions by Noble.

Noble states that Deputy Gaudet said, "Mom was implying that we did wrong yes. Mom was implying that we were choking him, and Mom was implying that we were using excessive force and Mom was screaming that he was special needs after and uh, but again this started. Mom started with this after the fact. This mom was not saying that while this was going on." Ms. Lou was not advising any deputy that she believed that EP could not breathe during this encounter until after EP had changed position of his hands and urinated on himself.

Noble states that Deputy Mehrtens said Deputy Vega's arm was down on the right side of EP's neck and across his chest, but he was not choking EP. In conflict with Noble's opinion that Deputy Vega used a choke hold but consistent with Deputy Vega's testimony that no choke hold was used.

Noble states that Deputy Pitfield said he did not place EP in a recovery position because EP was never in control. In conflict with Noble's opinion that EP was not struggling.

Noble states that Deputy Vega said he could not place a person in a recovery position if they are still actively resisting. Deputy Vega said he did not make any efforts to place EP in a recovery position because EP was resisting and biting deputies. Noble disregards this testimony.

Noble states that Deputy Pitfield was working at the mall when he received a call on his department issued cell phone. This is in direct conflict with the testimony of Deputy Pitfield, Deputy Canatella and Ms. Christopher. The cell phone was supplied by the shopping center, not by JPSO.

Noble states that Deputy Pitfield claimed that EP was struggling the entire time. Pitfield said he did not move EP into a recovery position because EP was actively resisting and trying to push up the entire time. Does not base his opinion on these statements but if this is what Deputy Pitfield was experiencing during this encounter, someone not in the position of Deputy Pitfield would not sense that resistance.

Noble states that if Deputy Vega placed his arm on EP's neck as stated by Ms. Lou, that use of force would be excessive, objectively unreasonable, and inconsistent with generally accepted police practices. Any use of a choke hold would be an application of deadly force and completely unreasonable under the circumstances. This is in conflict with the testimony of Deputy Vega and others.

Noble opines that JPSO has a policy, practice, and custom of not accepting community member complaints and not investigating serious misconduct. Testimony shows that although IA may not do the investigation, investigations were conducted. In-custody deaths were not investigated by Internal Affairs, but every in-custody death was investigated. Also, testimony shows that Internal Affairs did conduct investigations for several complaints made against JPSO personnel.

CALEA does not mandate any standards which applied to Sheriff Lopinto or JPSO.

Noble's suggestion that an investigation should continue after the employee resigns – not able to meter out any discipline after employee is no longer part of the agency. No mandate that this occur which applies to Sheriff Lopinto or JPSO.

Noble opines that the policies of Sheriff Lopinto and the JPSO with respect to Use of Force/Restraint and Internal Affairs are outdated, unreasonable and inadequate and fail to conform to generally accepted law enforcement standards and practices. The JPSO and Sheriff Lopinto met all guidelines as required by P.O.S.T. and met the generally accepted guidelines of law enforcement agencies within the State of Louisiana. No mandate from any law enforcement entity which applies to Sheriff Lopinto or the JPSO was in conflict with policy, procedure, or training.

Noble opines that the strike to the head area of E.P. by Deputy Pitfield was an unreasonable use of force which amounted to deadly force. PPCT, which is recognized throughout United States law enforcement, allows strikes to the head area. Strikes to the head area with a baton requires an authorized use of deadly force. This amount of force was a hard empty hand tactic which was allowed due to the injury that Deputy Pitfield was experiencing.

Noble opines there is no video evidence that suggests that EP was somehow trying to lift the deputies off his back. The video speaks for itself and definitely shows this not to be accurate.

Noble repeatedly opines that a choke hold was used by Deputy Vega. This completely ignores the testimony of deputies who dispute that a choke hold was used.

Noble states several times that deputies sat on the back of EP. This is in conflict with the testimony of the deputies and in conflict with the video.

Noble states that deputies should have intervened and stopped the use of excessive force by Deputy Pitfield and Deputy Vega. Neither of these deputies were on the back of EP. If the other deputies did not reasonably believe that excessive force was being used, then there would be no duty to intervene. Takes portions of testimony out of context.

Noble claims Sheriff Lopinto agreed that there were several opportunities to put EP into the recovery position. Takes portions of the testimony but does not put into context of the entire testimony.

Noble claims Sheriff Lopinto has a policy of destroying deputy disciplinary records after three years. Sheriff Lopinto testified that was done according to the law.

Noble claims that Deputy Pitfield was not supervised while working this off-duty detail. This is in contrast to the testimony of Joshua Wingrove and Deputy Canatella. Again, taken out of context.

Noble claims that Sheriff Lopinto does not second guess his deputies. Taken out of context to the line of questioning.

Noble opines that no reasonable Deputy would have sought a search warrant in these circumstances. Louisiana Code of Criminal Procedure, Article 162A states the basis for obtaining a search warrant as cited by Mr. Noble. The warrant was applied for and obtained after presentation to a Judge and approved by the Judge. This opinion is in conflict with the testimony of Sgt. Dowling and Lt. Meunier, who both appear, based on their testimony and experience, to be reasonable officers. This issue is a question of law for the Court to decide, but since Mr. Noble opines on it, it was included with this report.

Noble opines that the JPSO policy on investigation of allegations of complaints is unreasonable. Although the JPSO policy appears to not be to Mr. Noble's liking, there is no mandate or policy applicable to Sheriff Lopinto and/or the JPSO that requires the policy to be written a certain way. Investigations were conducted, as stated earlier, by both Internal Affairs and Homicide detectives based on what type of issue was involved.

Noble cites the CALEA accreditation standards which do not apply to Sheriff Lopinto or the JPSO. Can be used as a resource but unless the JPSO sought accreditation, these standards do not apply.

Noble opines that the JPSO procedure of documenting use of force into a police report is improper. No mandate that requires the JPSO to comply with any IACP Model Policy. Testimony shows that the use of force is included in the incident report.

Noble states that JPSO does not have any policy or provide training to deputies on dealing with persons with intellectual disabilities even though the training academy had completed training materials for dealing with autistic persons in 2018. This is totally in conflict with the testimony of the training academy staff members who testified. Training was provided and specifically was mentioned in deposition that a member from the Coroner's Office, who had a child with Autism, was part of the instructional staff dealing with this block of instruction.

-10-

Mr. Noble states that Sheriff Lopinto and the JPSO acknowledges that it has a pattern, practice, and custom of not accepting complaints of deputy misconduct even in cases where the deputy has used excessive force. Cites one example of refusing to investigate based on a crayon written complaint. This was the result of a criminal investigation which resulted in two deputies being criminally charged and fired. An investigation resulted in these decisions, so to claim that nothing was done is incorrect.

Noble lists several actions which could have been used by deputies, including:

Rolling him on his side or sitting him up once restrained – restrained does not equate control and safety.

Use other officers at the scene to hold EP's legs if he was indeed kicking to allow the deputies to place EP in a recovery position – the use of leg irons would also prevent this kicking but does not meet the approval of Mr. Noble.

Checking his airway – both Deputy Pitfield and Ms. Lou along with Mr. Parsa were in the position to determine if EP was in distress the entire time Deputy Pitfield was engaged with EP.

Monitoring his breathing and pulse – no one advised that this was a problem, because it was not, until after EP urinated on himself.

Assigning a specific officer to talk to EP's parents about what works in managing his behavior, and then reporting back to group; backing officers up to give him some space and reduce stimuli – Deputy Pitfield was only deputy involved and allowed both Mr. Parsa and Ms. Lou to be in contact to assist in calming EP. Criticizes Deputy Vaught for speaking with Mr. Parsa and checking on his injury. Criticizes the deputies because they were not directly involved in putting hands on EP, which would be in conflict with the suggested accommodations listed.

Setting up a perimeter to create a larger safe area – this was done by both vehicles and the actions of the deputies in not going hands-on due to their opinion about the need to do so.

Using the RIPP hobble device – even if this was utilized, does not guarantee that EP would have been able to successfully be placed into the recovery position.

Using the swarm technique to control EP's legs if necessary – in conflict with suggested accommodations of creating space, speaking with parents, and setting up a perimeter.

The fact that Deputy Pitfield allowed Ms. Lou and Mr. Parsa to attempt to help calm EP down was in itself, in my opinion, an accommodation in this situation. Normally a deputy would not allow the parents to be involved in the detention of an individual. Due to Deputy Pitfield being informed and recognizing the uniqueness of this situation, it is my opinion that Deputy Pitfield did in fact provide accommodations that he would normally not have allowed. The use of two (2) sets of handcuffs was also an accommodation which was provided to EP.

Recognizing that EP was autistic, the use of force was not increased from empty hand control at any point in this incident. That also, in my opinion, is an accommodation that resulted from the recognition of the condition of EP.

It is my understanding that discovery in this matter is ongoing. I respectfully reserve my right to supplement this report, if necessary, based on my review of additional information.

I have enclosed with this report a copy of my resume, rate sheet and list of cases I have testified in during the previous four (4) years to meet the requirements of the Court. I have been accepted as a Police Policy and Use of Force expert in all three Districts of the United States District Courts in Louisiana. This includes the Courts in New Orleans, Baton Rouge, Lafayette, Lake Charles, Alexandria,

-11-

Shreveport and Monroe. I have also been accepted in USDC in the Southern District of Texas and the Eastern District in Arkansas. I have testified in 29 District Courts in the State of Louisiana as an expert in various law enforcement and corrections issues.

Respectfully Submitted:

George J. Armbruster, Jr.