UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CASE NO.  2:21-cv-00080

DONNA LOU and DAREN PARSA, on their own behalf and
on behalf of their deceased minor child, E.P.

Plaintiffs,


VERSUS


SHERIFF JOSEPH P. LOPINTO, III, CHAD PITFIELD, RYAN
VAUGHT, STEVEN MEHRTENS, SHANNON GUIDRY, NICK VEGA,
MANUEL ESTRADA, MYRON GAUDET, JOHN DOES 1-3,
VICTORY REAL ESTATE INVESTMENTS LA, LLC D/B/A
WESTGATE SHOPPING CENTER, ABC INSURANCE COMPANY,
and XYZ INSURANCE COMPANY,

Defendants.


        30(b)(6) DEPOSITION OF JEFFERSON PARISH

SHERIFF'S OFFICE, through its designated

representative, MICHAEL VOLTOLINA, JR., given in

the above-entitled cause, via Zoom, pursuant to the

following stipulation, before Sandra P. DiFebbo,

Certified Shorthand Reporter, in and for the State

of Louisiana, on the 1st day of August, 2022,

commencing at 9:00 AM.

```
 1    APPEARANCES (Via Zoom):
 2            LAW OFFICE OF WILLIAM MOST, L.L.C.
              BY:  WILLIAM MOST,
 3            ATTORNEY AT LAW
              201 St. Charles Avenue
 4            Suite 114
              New Orleans, Louisiana  70170
 5            -and-
              THE COCHRAN FIRM MID-SOUTH
 6            BY:  ANDREW CLARKE,
              ATTORNEY AT LAW
 7            One Commerce Square
              40 South Main, Suite 1700
 8            Memphis, Tennessee  38103
              REPRESENTING THE PLAINTIFFS
 9
              MARTINY & ASSOCIATES
10            BY:  FRANZ ZIBILICH,
              ATTORNEY AT LAW -and-
11            JEFFREY D. MARTINY,
              ATTORNEY AT LAW
12            131 Airline Drive
              Suite 201
13            Metairie, Louisiana  70001
              -and-
14            LINDSEY M. VALENTI, LEGAL ADVISOR
              1233 Westbank Expressway
15            Building B, Fifth Floor
              Harvey, Louisiana  70058
16            REPRESENTING JPSO DEFENDANTS
17            THOMPSON, COE, COUSINS & IRONS, LLP
              BY:  CHRISTOPHER W. KAUL,
18            ATTORNEY AT LAW
              601 Poydras Street
19            Suite 1850
              New Orleans, Louisiana  70130
20            REPRESENTING VICTORY REAL ESTATE
              INVESTMENTS LA, LLC, AND WESTGATE
21            SHOPPING CENTER
22    Also Present: Tim Anclade
23    Reported By:
24            Sandra P. DiFebbo
              Certified Shorthand Reporter
25            State of Louisiana
26
```

```
E X A M I N A T I O N          I N D E X

                                Page

BY MR. MOST:                    5


   E X H I B I T                I N D E X

                    Page

```

Exhibit 40                      17

Exhibit 41                      21

Exhibit 42                      28

Exhibit 43                      34

Exhibit 44                      48

Exhibit 45                      52

Exhibit 46                      52

Exhibit 47                      52

Exhibit 48                      65

Exhibit 49                      71

Exhibit 50                      74

Exhibit 51                      91

1          S T I P U L A T I O N

2

3              It is stipulated and agreed by and

4    between Counsel for the parties hereto that the

5    30(b)(6) Deposition of JEFFERSON PARISH SHERIFF'S

6    OFFICE, through its designated representative,

7    MICHAEL VOLTOLINA, JR., via Zoom, is hereby being

8    taken pursuant to the Federal Rules of Civil

9    Procedure for all purposes in accordance with law;

10              That the formalities of reading and

11   signing are specifically waived;

12              That the formalities of sealing,

13   certification, and filing are hereby specifically

14   waived.

15              That all objections, save those as to

16   the form of the question and responsiveness of the

17   answer are hereby reserved until such time as this

18   deposition or any part thereof is used or sought to

19   be used in evidence.

20                   * * * * *

21              Sandra P. DiFebbo, Certified Shorthand

22   Reporter, in and for the State of Louisiana,

23   officiated in administering the oath to the witness

24   remotely.

25

```
 1              MICHAEL VOLTOLINA, JR., having
 2       been first duly sworn, was examined and
 3       testified on his oath as follows:
 4            MR. MOST:
 5                One housekeeping matter before get
 6            started.  Can we stipulate that this
 7            deposition was properly noticed and the
 8            court reporter is duly qualified? Any
 9            objection, Franz?
10            MR. ZIBILICH:
11                No.
12            MR. MOST:
13                And hearing none from Chris, who is
14            muted, he can tell us later, if he
15            objects.
16            MR. KAUL:
17                You didn't say Westgate but no
18            objection.
19            MR. MOST:
20                Thank you.
21       EXAMINATION BY MR. MOST:
22            Q.  Good morning.  My name is William Most.
23       I'm an attorney for the plaintiffs in this matter.
24       Sergeant, could you give us your name and title for
25       the record, please?
```

```
 1          A.    Sergeant Michael Voltolina, Jr.
 2          Q.    Great.  I may call you sergeant or
 3     officer.  Is there anything you particularly like
 4     to be called?
 5          A.    Mike is fine.
 6          Q.    Sergeant, have you ever given a
 7     deposition before?
 8          A.    Yes.
 9          Q.    Approximately how many depositions have
10     you given?
11          A.    Two.
12          Q.    So you realize that you are under oath
13     here today?
14          A.    Yes.
15          Q.    You understand that your answers here
16     have the same force as if we are in a courtroom
17     with a judge and jury?
18          A.    Yes.
19          Q.    Sergeant, is there anything that will
20     prevent you today from giving your full attention
21     and truthful and complete answers?
22          A.    No.
23          Q.    Are there any medications, illnesses, or
24     anything else that might impair your ability to
25     give complete and truthful answers?
```

1      A.   No.

2      Q.   And, you know, we're going to go with

3  this deposition, but it doesn't have to be

4  continuous, so if at any point you need to take a

5  break, you know, use the restroom, get a glass of

6  water, coffee, just let me or your counsel know,

7  and we'll take a break.  Although I'll tell you now

8  that during any break I will ask you what you

9  looked at, who you talked to, and even

10  communications with counsel during breaks may not

11  be privileged, so I just give you that heads-up

12  right now.

13      A.   Okay.

14      Q.   One thing you are already doing well is

15  waiting for me to finish my question before

16  answering which helps the court reporter have a

17  clean transcript, and I will try, in exchange, to

18  do the same courtesy to you, trying to wait until

19  you are finished with your answer before asking the

20  next question.  All right?

21      A.   Yes, sir.

22      Q.   One thing I will ask is if you don't

23  understand a question I have or it's confusing,

24  will you tell me that you don't understand or that

25  it is confusing rather than just trying to answer?

```
 1    Will you agree to do that?
 2         A.    Yes.
 3         Q.    Thank you.  Do you know what case you are
 4    here for today, Sergeant?
 5         A.    All I know is Parsa.
 6         Q.    Okay.  Yeah.  You know it's about a minor
 7    who died?
 8              MR. ZIBILICH:
 9                   I am going to object to the form.
10              MR. MOST:
11                   Why don't you --
12              MR. ZIBILICH:
13                   That's what the case is about, but
14                that's not what he is here for.
15    BY MR. MOST:
16         Q.    Do you know anything about what the case
17    is about besides the word "Parsa," Sergeant?
18         A.    Just that it was an autistic juvenile.
19         Q.    And that juvenile, I may refer to them as
20    EP, by their initials, because that makes it easier
21    if we later have to redact the transcript.  If I
22    refer to EP, will you know the juvenile I'm talking
23    about?
24         A.    That sounds good now.
25         Q.    And you are here to represent Sheriff
```

```
 1    Lopinto in his official capacity, correct?
 2         A.   I believe so.
 3         Q.   And when I say that, I mean essentially
 4    the same thing as the Jefferson Parish Sheriff's
 5    Office.  Is that your understanding as well?
 6         A.   Yes.
 7         Q.   And you are here to represent the
 8    sheriff's office?
 9         A.   Yes.
10         Q.   And if I use the abbreviation JPSO, I
11    will be referring to the sheriff's office and
12    Sheriff Lopinto in his official capacity.  Will you
13    understand me if I use that abbreviation?
14         A.   Yes.
15         Q.   Great.  And so you understand that you
16    are here speaking for the sheriff's office,
17    speaking on its behalf, correct?
18         A.   In regards to training, yes.
19         Q.   Okay.  And you understand that you're
20    here to make available the knowledge of the
21    sheriff's office, agreed?
22         A.   Yes.
23         Q.   And so when I'm asking a question of you
24    today, I'm asking a question of JPSO.  Will you
25    understand that?
```

```
 1        A.    Yes.
 2        Q.    And when you give an answer today, it's
 3   not the answer of you personally, it's the answer
 4   of the sheriff's office.  Do you understand that?
 5        A.    Yes.
 6        Q.    And because this is a little bit
 7   different than a normal deposition, where we are
 8   really asking questions of the entity, generally, I
 9   don't know may not be a sufficient answer, because
10   your side is required to put someone knowledgeable
11   up.  Do you understand that?
12              MR. ZIBILICH:
13                   I am going to object to the form.
14                If his answer is I don't know, that's
15                going to be his answer.  I'm sorry.
16                You are not going to dictate to him
17                that he can't say I don't know.
18   BY MR. MOST:
19        Q.    Do you need me to repeat the question,
20   Sergeant?
21        A.    No.
22        Q.    Sergeant, when did you begin preparing
23   for this deposition, roughly?
24        A.    Maybe a month ago.
25        Q.    And over how many days did you prepare
```

1   for this deposition over that month?

2        A.    Maybe about five.

3        Q.    Roughly, how much time did you spend over

4   those five days preparing for this deposition?

5        A.    About seven hours a day.

6        Q.    What did you do?  I don't need to know

7   the contents of any communications with lawyers,

8   but what did you do to prepare for this deposition?

9        A.    Just basically went over the things that

10  I teach on our department in regards to mental

11  illness and developmental disabilities.

12       Q.    So you spent about seven hours a day for

13  five days going over the training materials on

14  those topics?

15       A.    Correct.

16       Q.    What else?  Did you look at any other

17  documents other than training materials?

18       A.    I think the only thing that I looked at

19  was whatever y'all had sent in that packet, just

20  looking at the things that they had sent over.

21       Q.    And the packet.  What are you describing

22  there?

23       A.    It looked like it had warrants.  Inside

24  of there, it had training material from not even

25  our department, rough draft of training material

1    that we never used, and then they had two or three
2    PowerPoints from training that we use.
3        Q.    Was that an electronic file you received
4    yesterday?
5        A.    I didn't receive it.  I just had it in
6    hand here.
7        Q.    Okay.  Did you get that yesterday or this
8    morning?
9        A.    The packet?
10       Q.    Uh-huh.
11       A.    I just looked at it this morning,
12    correct.
13       Q.    And so how many training documents did
14    you look at to prepare for this deposition?
15       A.    On a guess, maybe a dozen.
16       Q.    Were those PowerPoints or what kind of
17    documents were those?
18       A.    PowerPoints, looking at notes from other
19    organizations, looking at things from the Crisis
20    International.
21       Q.    Do you have those approximately dozen
22    documents with you today?
23       A.    No.
24       Q.    Aside from those dozen training
25    documents, did you look at any documents other than

```
 1    the packet we talked about to prepare for today's
 2    deposition?
 3         A.    No.
 4         Q.    What else did you do to prepare for
 5    today's deposition other than look at that packet
 6    and, roughly, those dozen training materials?
 7         A.    Nothing.
 8         Q.    Did you talk to anyone other than lawyers
 9    to prepare for today's deposition?
10         A.    No.
11         Q.    Are any of those dozen documents really
12    long, like hundreds of pages long?
13         A.    I'd say for CIT International, probably.
14         Q.    And I'm not trying to trip you up.  I'm
15    just trying to figure out.  You spent about 35
16    hours preparing for this deposition.  So is looking
17    at about those dozen documents and anything else
18    that filled up that time?
19         A.    During that time? No.  That's why I took
20    an hour lunch.  That's why it wasn't eight hours.
21         Q.    Did you take any notes to prepare for
22    today's deposition?
23         A.    No.
24         Q.    So I'm going to pull up -- would you just
25    give us the nutshell version of your educational
```

1   and professional background and current role at

2   JPSO?

3          A.   You have to repeat one more time.

4          Q.   Sure.  Could you just give me the brief

5   version of your education and professional

6   background?

7          A.   So I went to Holy Cross here in

8   Louisiana.  From there I went to Nicholls State and

9   Southern New Hampshire University.  I went to New

10  Orleans Police Department's training academy.  I

11  left there in 2013.  Came to JPSO.  For education

12  for training wise, American Heart Association,

13  Department of Defense, Department of Health, set up

14  for Domestic Preparedness, Homeland Security, CIT

15  International, American Heart Association, TCCC,

16  TCC, Federal Law Enforcement Training Agency,

17  Regional Counterdrug Training Authority, Drug

18  Enforcement Agency, Alcohol, Tobacco, Firearms

19  Agency training, FBI's leadership, FBI'S

20  negotiations instructor training as well.  Let's

21  see.  I know I'm going to miss something.

22         Q.   That's okay.  I think that gives us a

23  sense.  We don't need to know every single thing.

24  What is your current job role at JPSO?

25         A.   Academy instructor.

```
 1         Q.    And, Sergeant, have you ever been
 2    arrested?
 3         A.    No.
 4         Q.    That's a question I ask of everybody.
 5    Because we're doing this deposition via Zoom, we
 6    can't necessarily see everything that is going on
 7    in the room on your side, so who is in the room
 8    with you there?
 9         A.    You want them to introduce themselves or
10    you want to point at them?
11         Q.    Sure.  Let's just get the names of who is
12    in the room with you.
13         A.    All right.
14               MR. ZIBILICH:
15                     Franz Zibilich.
16               MR. ANCLADE:
17                     Tim Anclade.
18               MR. MARTINY:
19                     Jeff Martiny.
20               MS. VALENTI:
21                     Lindsey Valenti.
22    BY MR. MOST:
23         Q.    Sergeant, is there anyone in the room
24    with you besides those four people?
25         A.    No.  That's it.
```

1      Q.   And one thing we may not be able to

2  monitor, since we're not in the room with you, is

3  if anyone tries to communicate with you.  So if

4  anyone tries to communicate with you, other than

5  verbally through an objection, would you please let

6  us know whether that is a text message, a passed

7  note, or any other form of communication?  Would

8  you tell us, please?

9      A.   Yes.

10     Q.   I'm going to pull up a document on the

11  screen here.  Can you see it, Sergeant?

12     A.   Yes.

13     Q.   I'm going to designate this as Exhibit A.

14  Do you see that this is the notice about this

15  deposition, setting up this deposition?

16     A.   Yes.

17         MR. CLARKE:

18              William, this is Exhibit A.  Are you

19          going to numerically number these after

20          the other exhibits or --

21         MR. MOST:

22              Yeah.  I can continue with the

23          numbering we used before.  So this will

24          be A(42).  That way we've got a

25          consecutive numbering system.

```
 1              THE COURT REPORTER:
 2                   I thought the next one was 40.  Am I
 3               missing something?
 4          MR. CLARKE:
 5                   Yeah.
 6          MR. MOST:
 7                   Is that right?
 8          MR. CLARKE:
 9                   It would be 40.
10          MR. MOST:
11                   Okay.  Let's make this one 40, and
12               we'll also call it A, to keep track of
13               it with the packet we sent over.
14     BY MR. MOST:
15          Q.   Okay.  Do you see the topics here,
16     Sergeant?
17          A.   Yes.
18          Q.   And as we go through documents today, I
19     can zoom in, so if at any point you need me to zoom
20     in, please just ask.  Do you see this Topic A that
21     is described as ADA --
22          A.   There you go.  Right there.  You zoomed
23     in way too much.
24          Q.   Got it.  Do you see this Topic 3 that is
25     entitled, "ADA/RA Compliance?"
```

1        A.    Yes.

2        Q.    I'll read it out.  It's, "A person with

3    knowledge of JPSO's process, policies, and

4    practices for ensuring ADA/RA compliance, including

5    the identification and handling of persons with

6    disabilities in crisis.  JPSO deputies' training on

7    how to handle a person who has a mental illness or

8    disability, including autism; any accommodations

9    provided to EP; any modifications JPSO deputies

10   made to their procedures and protocols in handling

11   EP; any attempts that JPSO deputies took to control

12   EP through less intrusive means."  Do you see that

13   Topic 3 there, Sergeant?

14       A.    Yes.

15       Q.    And are you prepared to testify about

16   this topic?

17       A.    All but what the deputies did, because I

18   have no clue what they did.

19              MR. MOST:

20                   Franz, this is a question for you.

21               Are we going to have a different

22               witness for that part of it?

23              MR. ZIBILICH:

24                   No, because I don't believe that to

25               be appropriate for a 30(b)(6).  That's

1           for a regular fact witness.  If you

2           want to ask people facts about what

3           happened out there, that's not

4           corporate representative type

5           deposition, in my mind.

6       MR. MOST:

7           Did you lodge an objection prior to

8           today to this topic?

9       MR. ZIBILICH:

10          Probably not.

11      MR. MOST:

12          Franz, are you aware that the

13          amendments to the Federal Rules of

14          Civil Procedure require a meet and

15          confer about 30(b)(6) topics in advance

16          of a deposition?

17      MR. ZIBILICH:

18          Of course I am.

19      MR. MOST:

20          Did you take any steps to meet and

21          confer with us prior to this deposition

22          this morning, Franz, about this topic?

23      MR. ZIBILICH:

24          Mr. Most, I'm going to do everything

25          in my power to get along today.  I'm

```
 1              not under oath.  I'm not going to drill
 2              you as to what you believe are
 3              appropriate topics pursuant to
 4              30(b)(6), nor am I going to allow you
 5              to drill me.  And we can be gentlemen,
 6              and you can go file whatever you want,
 7              but I do not believe those to be
 8              appropriate 30(b)(6) deposition topics,
 9              and that's that.  I'm not going to
10              answer any more questions other than
11              that.
12         MR. MOST:
13              So JPSO will not be providing a
14              witness who is knowledgeable about
15              anything from any accommodations
16              provided to EP and thereon?  Is that
17              correct, Franz?
18         MR. ZIBILICH:
19              As pertains a 30(b)(6) deposition,
20              that is correct.  I am not going to
21              disallow those questions as pertains
22              what happened factually, but as
23              pertains a corporate deposition, you
24              are correct.
25         MR. MOST:
```

```
 1                    Okay.  While we are on the record, I
 2               do think we intend to file a Motion to
 3               Compel.  Is there anything you'd like
 4               to confer about prior to our Motion to
 5               Compel, since we're here and are able
 6               to confer about it?
 7          MR. ZIBILICH:
 8                    I think we can do it after the
 9               deposition.
10          MR. MOST:
11                    We'll set up a time to confer.
12          MR. ZIBILICH:
13                    Thank you.
14     BY MR. MOST:
15          Q.    All right, Sergeant.  So to clarify,
16     Sergeant, you are prepared to testify about
17     everything within this paragraph up to and
18     including JPSO deputies' training on how to handle
19     a person who has a mental illness or disability,
20     including autism; is that correct?
21          A.    Correct.
22          Q.    I'm going to turn now to a document which
23     is N, as in Nancy, and we'll designate it 41.
24     Sergeant, do you see this document that is
25     entitled, "Joseph P. Lopinto, III, Individual
```

1    Supplemental Responses?"

2         A.    Yes.

3         Q.    And we're going to look at this document,

4    because it makes part of our conversation easier

5    when it comes to the question of accommodations.

6    Do you see that on Page 5 of this document there is

7    a verification by Sheriff Lopinto affirming that

8    the answers are true?

9         A.    Yes.

10        Q.    Then I'm going to go up to Interrogatory

11   Number 18 on Page 4.  The question was, "Identify

12   all accommodations, if any, you contend you

13   provided to E█████ P█████ to accommodate his

14   disability," and the answer is, "The factual

15   backdrop for the incident sued upon did not

16   implicate a need for an accommodation, therefore,

17   an accommodation was not provided."  Do you see

18   that, Sergeant?

19        A.    Yes.

20        Q.    Any reason to think that is wrong or not

21   the position of JPSO?

22             MR. ZIBILICH:

23                  Object to the form.  Object because

24               it's not appropriate pursuant to

25               30(b)(6).  You can answer it, if you

```
 1              want.  By the way, that's not in my
 2              packet of exhibits that was sent
 3              yesterday afternoon.
 4         THE WITNESS:
 5              Can you repeat that one?  I'm just
 6              trying to make sure I understood it.
 7         MR. MOST:
 8              Sure.  Franz, I'll note that all
 9              that is necessary here is to say object
10              to the form.  You do not need to
11              instruct the witness that he can
12              answer, if he wants.  That is not what
13              we're here to do, but if you'd like to
14              object, your objection is noted, so
15              thank you.
16    BY MR. MOST:
17         Q.   Sergeant, my question was, seeing this
18    answer to Interrogatory Number 18, do you have any
19    reason to think it's wrong or not the position of
20    JPSO?
21         MR. ZIBILICH:
22              Again, object to form.
23         THE WITNESS:
24              I don't know the facts of the case,
25              so I wouldn't be able to say yes or no
```

24

```
 1                    to that.
 2    BY MR. MOST:
 3         Q.   So, Sergeant, the topic that you are here
 4    to talk about today is ADA/RA, was the acronym
 5    used.  Did you see that?
 6         A.   Yes.
 7         Q.   And ADA stands for the Americans with
 8    Disabilities Act, agreed?
 9         A.   Yes.
10         Q.   And the RA stands for Rehabilitation Act,
11    agreed?
12         A.   I thought that was reasonable
13    accommodations. Are you talking about -- because it
14    falls under ADA.  That's why I'm just trying to
15    make sure I understand what you're asking.
16         Q.   Yeah.  Fair enough.  Have you ever heard
17    of the Rehabilitation Act?
18         A.   I've heard of ADA with RA being
19    reasonable accommodations, not the one you are
20    speaking of.
21         Q.   So do you know -- have you ever heard of
22    the Rehabilitation Act in any context?
23         A.   Only when it came to substance abuse.  I
24    haven't heard about it in regards to someone with
25    developmental disabilities.
```

1          Q.    Jefferson Parish Sheriff's Office is an

2     entity that's covered by the Americans with

3     Disabilities Act, agreed?

4          A.    Yes.

5          Q.    Do you know whether it is also covered by

6     the Rehabilitation Act?

7          A.    I don't know.

8          Q.    And at least the ADA covers a wide range

9     of JPSO's activities, agreed?

10          A.    In reference to what?

11          Q.    Sure.  For example, it might apply to the

12     way the sheriff's office deals with its employees,

13     correct?

14          A.    Yes.

15          Q.    And it might apply to the way JPSO

16     deputies interact with persons with disabilities

17     out in the field, agreed?

18          A.    Yes.

19          Q.    So, for example, if JPSO is seizing and

20     arresting someone in a wheelchair, they have to

21     take that disability into account and make

22     accommodations as necessary, agreed?

23          A.    Depending upon the situation, yes.

24          Q.    But arresting someone in a wheelchair is

25     a scenario, an example scenario, in which the ADA

1  might require JPSO deputies to make accommodations,

2  agreed?

3         A.    It would depend on the situation.  It's

4  not a black and white issue when it comes to that.

5         Q.    Right.  Look, I agree with you.  I'm not

6  saying any specific accommodations, but that's the

7  kind of scenario which would implicate the need to

8  think about accommodations and apply them, if

9  reasonable, agreed?

10        A.    In a nonviolent situation, yes.

11        Q.    So the Americans with Disabilities Act

12  applies to JPSO in an arrest or seizure context in

13  some scenarios, agreed?

14        A.    With nonviolence compliance, yes.

15        Q.    And you are raising the issue of violence

16  or nonviolence.  So are you saying that if there is

17  a violent situation, the ADA does not apply?

18        A.    Within what the ADA has listed, yes.

19        Q.    Once a situation has turned from a

20  violent situation to a nonviolent situation, does

21  the ADA then apply to possibly require reasonable

22  accommodations once it has become nonviolent?

23        A.    Yes, as long as there is nonviolence and

24  compliance.

25        Q.    JPSO has more than 50 employees, correct?

```
 1        A.    Yes.
 2        Q.    Does JPSO have an ADA coordinator?
 3        A.    I don't know.
 4        Q.    Do you know if there is any person at
 5   JPSO who is designated to deal with ADA issues?
 6        A.    No.
 7        Q.    Sorry.  You don't know or there isn't
 8   one?
 9        A.    I thought your question was do I know,
10   and my answer is no. I mean, did I mishear it?
11        Q.    No.  I think you heard me correctly.  I
12   just wanted to be clear.  So you don't know if
13   there is someone designated to deal with ADA issues
14   at JPSO, correct?
15        A.    Correct.
16        Q.    Do you know if JPSO has adopted and
17   published grievance procedures related to ADA
18   issues?
19        A.    Not to my knowledge.
20        Q.    And you train officers on how to deal
21   with ADA issues, correct?
22        A.    Correct.
23        Q.    So if there was a person at JPSO who is
24   specifically designated to deal with ADA issues,
25   you would know that because you would train
```

 1    officers to contact them, correct?

 2         A.   In what circumstance?

 3         Q.   Yeah.  You are the ADA trainer, right?

 4         A.   Correct, when dealing with people in

 5    public.

 6         Q.   Is there another ADA trainer who deals

 7    with other scenarios?

 8         A.   Not that I know of.

 9         Q.   So if there was a specifically designated

10    person to deal with ADA issues, that would be

11    something you would train your officers on, agreed?

12         A.   I don't understand that.

13         Q.   Do you know whether the law requires JPSO

14    to have an ADA coordinator or ADA grievance

15    procedures?

16         A.   No.

17         Q.   I'm going to pull up what is Exhibit O in

18    the packet, and I'm going to mark it Exhibit 42.

19    Do you see, Sergeant, that this is the table of

20    contents for JPSO's Standard Operating Procedures?

21         A.   Yes.

22         Q.   So this is like JPSO's policy manual.

23    Would you agree with that?

24         A.   Yes.

25         Q.   I've looked through this Standard

```
 1    Operating Procedures, and I don't see any policies
 2    about the Americans with Disabilities Act
 3    compliance.  Do you know of any?
 4         A.   No.
 5         Q.   To your knowledge, JPSO has no standard
 6    operating procedures or other policies related to
 7    ADA compliance.  Would you agree with that?
 8         A.   Policies, no.
 9         Q.   What about procedures?
10         A.   Not to my knowledge.
11         Q.   I searched within these Standard
12    Operating Procedures for the words "disability,"
13    "disabilities," and "accommodation."  The only
14    context I could find anything about it was in the
15    context of protected health information for
16    employees, use of polygraphs, and how officers can
17    receive short-term disability benefits.  I didn't
18    find anything about accommodating disabilities of
19    persons that officers interact with in the field.
20    Do you know of any written policies or procedures
21    that I'm missing?
22         A.   In this document, no.
23         Q.   What about any other document?
24         A.   The only thing we have is what is in
25    training.
```

1       Q.   So in terms of what an officer has to
2   guide them, if they're interacting with a person
3   with a disability in the field, the only thing they
4   have in terms of written materials is the documents
5   they would have viewed in training, agreed?
6       A.   Correct.
7       Q.   No other written guidance, policies,
8   procedures, or anything like that, agreed?
9       A.   Correct.
10      Q.   And when officers -- so there is some
11  written materials during training related to
12  disabilities, correct?
13      A.   Yes.
14      Q.   How are those presented to trainees?
15      A.   Through PowerPoint and verbal.
16      Q.   And do officers get a copy of those
17  PowerPoints, like a printout or an electronic copy?
18      A.   No.
19      Q.   Do they have any way of taking those
20  training documents with them in any other way?
21      A.   Do they have a way of taking it?  Like
22  taking notes in a class?
23      Q.   Can they take the written materials from
24  the class home with them?
25      A.   No.  It's on the screen.

1    Q.   If you don't know of any specific ADA
2  coordinator at JPSO, who do you go to with
3  questions about ADA compliance?
4    A.   It depends on which portion of ADA.
5    Q.   Let's talk about the portion of ADA that
6  deals with officers dealing with persons in the
7  field.  Who do you go to with questions about that?
8    A.   I would go to -- oh, God, I can't think
9  of that guy's name.  I'm sorry.  He's with the
10  state.
11    Q.   So not someone within JPSO, agreed?
12    A.   Yes.  I'm sorry.  It's going to be the
13  state attorney general.  I just can't think of his
14  name.
15    Q.   That's okay.  So if you have questions
16  about, as a trainer, or as an officer, about
17  dealing with persons with disabilities in the
18  field, there is no one you know to go to within the
19  Jefferson Parish Sheriff's Office?  You'd have to
20  go to someone outside the entity with those
21  questions, agreed?
22    A.   No.
23    Q.   What part did I get wrong?
24    A.   You're saying Americans with Disability.
25  It depends on which disability.  As in general with

1    Americans with Disability, the answer would be no,

2    I don't have someone specific to go to.  Specific

3    portions of it, yes.

4        Q.   What specific portions of it would you

5    have someone to go to with it?

6        A.   So with mental illness, I'd be able to go

7    to Doc Arey, and in reference to developmental

8    disabilities, I would probably go to David Roddy so

9    that I can speak with someone from Magnolia

10   Schools.

11       Q.   Does he work for JPSO?

12       A.   Yes.

13       Q.   So are you saying you would go to those

14   persons with questions about specific medical or

15   questions about the aspects of a particular

16   disability?  Is that what you're saying?

17       A.   I would go to them with any questions I

18   had about something I didn't understand in

19   reference to those.

20       Q.   Is there anyone within JPSO you could go

21   to, to ask questions about what the ADA requires

22   for a particular situation?

23       A.   Can you be more specific as to which

24   situation?

25       Q.   Sure.  So I understand if you've got

1  someone with a particular medical condition you

2  could contact Dr. Arey, right?

3       A.   No.

4       Q.   No? What would you go to Dr. Arey with a

5  question for?

6       A.   Anything with mental illness.

7       Q.   So if there is a person with a particular

8  mental illness, you could go to Dr. Arey to ask him

9  questions about the aspects of that mental illness,

10  agreed?

11       A.   Yes.

12       Q.   Is there anyone you could go to, to ask

13  questions about what would be reasonably required

14  as an accommodation for that mental illness? Anyone

15  else?

16       A.   Yes.

17       Q.   Who would that be?

18       A.   Him and MaryAnn Dankert.

19       Q.   Who is MaryAnn Dankert?

20       A.   She is over the mental health section of

21  the coroner's office.

22       Q.   Anybody besides Dr. Jim Arey within JPSO?

23       A.   No.

24       Q.   So, Sergeant, you referred to some

25  training materials that are used during training

```
 1    with officers on how to do ADA compliance.  Is that
 2    correct?
 3         A.   Yes.
 4         Q.   I want to go through the ones that I've
 5    got and see if they're the ones you are talking
 6    about and see if I'm missing any.  I'm going to
 7    share the screen here.  This is one document which
 8    is P, as in Paul, which I'll designate as 43.  Do
 9    you see this PDF entitled, "Autism Awareness?"
10         A.   Yes.
11         Q.   Is this one of the training materials
12    that you're describing?
13         A.   No.
14         Q.   What is this?
15         A.   That's a rough draft from one that we're
16    creating for autism awareness.
17         Q.   So this document is not actually used in
18    training?
19         A.   Correct.
20         Q.   Is there a final draft of this
21    presentation that you use?
22         A.   Yes.
23         Q.   So this is a rough draft of another
24    document.  Is the final document also called Autism
25    Awareness?
```

1      A.    Yes.

2      Q.    Do you have access to it today?

3      A.    Not here.

4            MR. MOST:

5                  Franz, do you think it's possible to

6              get a copy of that so we can use it

7              during this deposition?

8            MR. ZIBILICH:

9                  When you send me some discovery,

10             I'll be more than happy to.

11           MR. MOST:

12                 This is responsive to discovery we

13             have already propounded.

14           MR. ZIBILICH:

15                 Which question?

16           MR. CLARKE:

17                 Same question you produced this half

18             done autism awareness deal.  Come on,

19             Franz.

20           MR. ZIBILICH:

21                 I don't know what the question is.

22             If you want to read me the question,

23             I'll be more than happy to look at it.

24           MR. MOST:

25                 Okay.  Stand by.

```
 1              MR. ZIBILICH:
 2                   Believe me, I don't want to do this
 3              twice or thrice.
 4         MR. MOST:
 5                   I think the easiest thing to do is
 6              to just get a copy of it.
 7         MR. ZIBILICH:
 8                   That may or may not be possible.
 9              Let me hear the question.  There's
10              obviously a question out there that
11              y'all believe we didn't fully respond
12              to, and that's what I'm looking for.
13         MR. MOST:
14                   All right.  I'm sharing the screen.
15              "Produce a copy of all training records
16              from all officers identified in
17              response to Interrogatory Number 2,
18              including, but not limited to, all
19              records from all law enforcement
20              training program, all records regarding
21              inservice training, street survival,
22              CIT recertifications," et cetera.
23         MR. ZIBILICH:
24                   I don't see where what it is that
25              you are looking at is responsive to
```

```
 1              that.  I'm not trying to be picky.  I
 2              just don't see where that query makes
 3              this document responsive.
 4         MR. CLARKE:
 5              Why did you produce it before,
 6              Franz?  We didn't get this.  This was a
 7              half-baked autism CIT PowerPoint that
 8              you produced in discovery, and now
 9              you're saying we don't get the updated
10              one?
11         MR. MOST:
12              I'll point you, Franz, to Request
13              21.  "All policies and training
14              materials for deputies and
15              communications dispatchers regarding
16              notifying or calling for CIT regarding
17              incidents involving persons with
18              intellectual, mental health, or
19              developmental disabilities."
20              The second one, 22, is, "Any and all
21              policies and training materials
22              regarding interactions with persons
23              with intellectual, mental health, or
24              developmental disabilities."  A
25              PowerPoint that is used in training
```

```
 1                    about autism awareness is very clearly
 2                    responsive to RFP-22, which is what I
 3                    think --
 4          MR. ZIBILICH:
 5                    Let me say this much to you.  Let's
 6                    read it real slow.  "Any and all
 7                    policies and training materials."
 8                    We're premature on this question,
 9                    because I don't know if this final
10                    draft has yet been used as a training
11                    material.
12          MR. MOST:
13                    Okay.  I'll ask the sergeant.
14          MR. ZIBILICH:
15                    I'm not being picky, but at the same
16                    time, if it's used, I'm going to go
17                    fetch it up.  If it hadn't been used
18                    yet, I don't think you are entitled to
19                    it yet.
20          MR. MOST:
21                    Okay.
22    BY MR. MOST:
23         Q.   Sergeant, you described the final draft
24    of the autism awareness training materials,
25    correct?
```

```
 1      A.   From the one that you showed me?
 2      Q.   Yes.
 3      A.   Yes.
 4      Q.   Have you ever used the final draft for
 5  training officers?
 6      A.   Not yet.
 7           MR. CLARKE:
 8                William, let's go off the record for
 9            a second.  Let me talk to you.
10           MR. MOST:
11                Sure.
12                {BRIEF RECESS}
13           MR. ZIBILICH:
14                This is what I'm going to do for
15            you.  At some point in time Mr. Clarke
16            spent a day or two at the training
17            academy, and we let him view everything
18            under the sun that we do.  We let him
19            copy everything and anything that he
20            looked at that he wanted.  I can't
21            imagine that a whole lot has changed
22            between when Mr. Clarke was there.
23            It's only been a couple of months, but
24            I've got somebody right now taking a
25            look to see if there was anything else
```

```
 1                that was either not finished, not
 2                available, not yet utilization for me
 3                to attempt to go over it and see what I
 4                can turn over.
 5           MR. MOST:
 6                Can you have someone see if they can
 7                provide us a copy during this
 8                deposition of the final draft that the
 9                sergeant is talking about?
10           MR. ZIBILICH:
11                I can't imagine, because it's about
12                12 miles from here, and I'm going to
13                have to stop and read it, and I'm going
14                to have to go over with somebody at the
15                training academy, whether it's this
16                gentleman or somebody else, to ask all
17                the appropriate questions to see if
18                it's in use, to see if it's still being
19                amended, et cetera.
20           MR. MOST:
21                Look, if the answer is no, that's
22                the answer.
23                {OFF-THE-RECORD DISCUSSION}
24      BY MR. MOST:
25           Q.   So we're talking about there is a final
```

1    draft of an autism awareness PowerPoint that you
2    have, Sergeant, correct?
3         A.   Not yet.  It still needs approval.
4         Q.   So you have a draft of the Autism
5    Awareness PowerPoint that is subsequent to the one
6    we just looked at but has not yet been approved,
7    correct?
8         A.   For the autism awareness singular class,
9    yes.
10        Q.   And that, if approved, that is training
11   materials?
12        A.   It would be.
13        Q.   Whose approval is it waiting on?
14        A.   It depends on who is going to be there at
15   the time.  It will either be the academy director
16   or the chief.
17        Q.   I don't think I understand.  So what do
18   you mean who would be there at the time?
19        A.   That's what I was saying.  It depends on
20   if it is going to be the director of the academy
21   that is there or the chief over the academy.
22        Q.   That is there for what, for the training?
23        A.   No, for when it needs approval.
24        Q.   When does it need approval?
25        A.   When they tell me they need it for the

1    department.

2         Q.   So let's back up a little bit.  This

3    draft we looked at, when did you create that?

4         A.   That would have probably been 2018 to go

5    with the CIT class itself.

6         Q.   So in 2018, you started working on some

7    autism awareness materials, correct?

8         A.   Correct.

9         Q.   And then you've been working on it for

10   the last three to four years, and you now have a

11   more final draft of it?

12        A.   Correct.

13        Q.   And when did you get to the point where

14   the current draft is where it is?  When did you

15   stop working on it?

16        A.   I haven't stopped actually working on it.

17   I still -- there is so much changes in autism it's

18   hard to be final, to be honest.

19        Q.   But at this point, it's ready for higher

20   level approval?

21        A.   Without any notes, yes.

22        Q.   You mean you might submit it to someone

23   higher up, and they might provide notes, then it

24   has to be changed before it's approved?  Is that

25   what you mean?

1        A.    No.  I confer with my peers.

2        Q.    So you are going to confer with your

3   peers to see if they have any notes on it?

4        A.    Correct.

5        Q.    Have you solicited input from your peers

6   yet?

7        A.    On the first portion of it, yes.

8        Q.    When did you solicit input from your

9   peers on it?

10       A.    To tie down an actual date, I don't

11   know.

12       Q.    But in the last week, the last month, the

13   last year?  Approximately when?

14       A.    Probably all of those. We talk on a

15   regular basis about it.

16       Q.    So starting approximately about a year

17   ago you started asking peers for input on your

18   draft?

19       A.    No.  2018 would have been when I was

20   starting to ask questions from my peers because of

21   the changes in autism and other.

22       Q.    So in 2018, you started drafting this

23   autism awareness training, and at that point you

24   started soliciting input and notes from your peers,

25   correct?

1          A.    Correct.

2          Q.    And then over the last four years, you

3     have been working on this document, correct?

4          A.    Yes, and it will never be a hundred

5     percent complete, because it has to be evolved

6     every year or every month depending on what happens

7     in the world.

8          Q.    Sure.   Things change.   The training

9     changes but at some point this has to go for

10    approval by a supervisor so that it can actually be

11    used to train officers, correct?

12         A.    Correct, but it has to be constantly

13    updated. It can't be redacted from a physical file.

14         Q.    Sure.   So what are you waiting on to

15    submit it for approval to a supervisor?

16         A.    For them to say we need it on the

17    department.

18         Q.    So you've got this document sort of ready

19    at least to be reviewed by a supervisor, but no one

20    has asked you to submit it to them for approval; is

21    that correct?

22         A.    Correct.

23         Q.    Are your supervisors aware that this

24    document exists?

25         A.    Yes.

1        Q.    When did you start making them aware that
2    it existed or that you were working on it?
3        A.    2018.
4        Q.    So in 2018, you notified your supervisors
5    that you were working on an autism awareness
6    training, so they could ask you to submit it for
7    approval so that it could be used for training
8    officers, correct?
9        A.    One more time.  I'm sorry.
10       Q.    Sorry.  So in 2018, you started working
11   on an autism awareness document, and you let your
12   supervisors know that you were working on it so
13   that they could ask you to approve it, if they
14   wanted to implement it for training, correct?
15       A.    Outside of the CIT program, yes.
16       Q.    But, otherwise, what I said is accurate?
17       A.    Yes.
18       Q.    But at no point in those four subsequent
19   years has any supervisor asked you to move it
20   forward to implementation and actual training,
21   agreed?
22       A.    Correct.
23       Q.    And what caused you to start on this
24   document in 2018 in the first place?
25       A.    Because of the need for it in law

```
 1   enforcement.
 2        Q.   So there was -- you had an awareness at
 3   the time that law enforcement officers were
 4   interacting with persons with autism, and that
 5   created special needs and situations for officers
 6   to be trained on, correct?
 7        A.   Yes.
 8        Q.   Is this something that only you knew
 9   about or this was widely known by officers, as far
10   as you know, at the time?
11             MR. ZIBILICH:
12                  Object to the form.  You can answer
13               it.
14             THE WITNESS:
15                  I was just going to ask you to
16               repeat it.
17   BY MR. MOST:
18        Q.   Sure.
19        A.   In reference to what?  I'm sorry.
20        Q.   So how did you first learn about this
21   broad issue, to the best of your recollection?
22        A.   In reference to law enforcement?
23        Q.   Uh-huh.
24        A.   I believe it would have been the incident
25   that happened with the caretaker and the autistic
```

1    person where the caretaker was shot in the leg.

2         Q.   Was that a Louisiana situation?

3         A.   I believe it was in Tennessee.  I have to

4    look it up again.

5         Q.   That's fine.  So you, as an officer, were

6    just sort of learning about stuff going on in the

7    world and realized that there is a need for

8    training of officers on how to deal with persons

9    with autism, agreed?

10        A.   Within that context, yes.

11        Q.   When we talked about you notifying your

12   supervisors about this existence of this training

13   document that you were working on, this draft

14   training document, what supervisors are we talking

15   about that you notified about the existence of it?

16        A.   At the time, it would have been Doc Arey,

17   Scott Wildy, and Sean Lusk.

18        Q.   Any other supervisors since then that you

19   told about or talked about this draft training

20   document with?

21        A.   No.

22        Q.   So this document, you've been updating it

23   over four years, improving it, adding to it,

24   working with it, waiting for someone to say let's

25   get this approved so it can be used for training

```
 1    with officers, agreed?
 2         A.    Correct.
 3         Q.    And as far as you know, this document,
 4    any draft of the autism awareness document has
 5    never been used to train any JPSO officers, to your
 6    knowledge, agreed?
 7         A.    No. The one that we use is one that
 8    myself and Chantrel Hunt from the coroner's office
 9    do for CIT training.
10         Q.    Do you know the title of that one?
11         A.    I think it's Deescalation with Autism.
12         Q.    I think my question may have been
13    confusing before.  Just to clarify, no officer has
14    received training -- no officer at JPSO has
15    received training based on the autism awareness
16    document that you're working on, agreed?
17         A.    Correct.
18         Q.    The document you described there is
19    Deescalation with Autism?  Is that the title of it?
20         A.    I believe so.
21         Q.    I'm going to pull up a document here that
22    is ZA, and we'll mark it as 44.
23              MR. ZIBILICH:
24                   Where is this ZA? What does that
25                mean?
```

```
 1            MR. MOST:
 2                Franz, I sent you via Dropbox a set
 3            of exhibits yesterday.
 4            MR. ZIBILICH:
 5                I got it.  I got it.
 6   BY MR. MOST:
 7       Q.   Sergeant, do you see that this is a
 8   PowerPoint entitled, "Deescalation with Suicidal
 9   Patient?"
10       A.   Yes.
11       Q.   Is this the document you are talking
12   about?
13       A.   No.  That's Deescalation with Suicidal
14   Patients.
15            MR. CLARKE:
16                We don't have it.
17            MR. MOST:
18                Yeah, that's right.
19            THE WITNESS:
20                Actually, the title of that one for
21            the newest version of that one is
22            Suicidal Consumers.
23   BY MR. MOST:
24       Q.   So what I just showed you is a draft, not
25   the one that is actually used?
```

```
 1        A.    No.   This is one that was used.  I'm just
 2   saying it's been updated.
 3              MR. ZIBILICH:
 4                  Without getting too picky, I am
 5               going to object, because I don't think
 6               this is part of the 30(b)(6) notice,
 7               but I'm going to let him answer it.
 8          MR. CLARKE:
 9                  Franz, this is what you produced on
10               CIT, dude.
11          MR. ZIBILICH:
12                  I understand that, but I'm reading
13               the 30(b)(6).
14          MR. CLARKE:
15                  We can only use the documents that
16               you produced, Franz.  He is talking
17               about other PowerPoints that you
18               haven't produced.
19          MR. ZIBILICH:
20                  Why don't you just let me object and
21               be done with it?
22          MR. CLARKE:
23                  Because this whole deposition -- the
24               witness is not ready, and you haven't
25               produced the documents, dude.
```

```
 1              MR. MOST:
 2                   Franz, can we get a copy of the
 3              Deescalation with Autism document that
 4               he is describing?
 5          MR. ZIBILICH:
 6                   That's the one that we are searching
 7              for.  I told you I've got to read that
 8              first.
 9          MR. MOST:
10                   You are not willing to produce it
11              today so we can use it during this
12              deposition?
13          MR. ZIBILICH:
14                   No.
15          MR. MOST:
16                   Okay.  That's all right.  We'll move
17              on.
18          MR. ZIBILICH:
19                   Thank you.
20     BY MR. MOST:
21          Q.   So, Sergeant, this PowerPoint,
22     Deescalation with Suicidal Patients, you said this
23     and a subsequent version of it is a training
24     document.  This is used during the CIT training; is
25     that correct?
```

 1          A.    Yes.

 2          Q.    That's 44.  The next one, which is ZB,

 3     which I'll mark as 45, do you see this PowerPoint,

 4     CIT Crisis Intervention Training?

 5          A.    Yes.

 6          Q.    Is this a document that is used in the

 7     CIT training program?

 8          A.    Without seeing the other slides, it looks

 9     like the first one, yes.

10          Q.    At any point I can scroll through these

11     so you can see them.

12          A.    Okay.

13          Q.    Having scrolled through it, does this

14     look like one of the documents used in the CIT

15     training program?

16          A.    Yes.

17          Q.    ZC, which we'll mark as 46, is Louisiana

18     Mental Health Law and Patrol.  Do you see this one?

19          A.    Yeah.

20          Q.    Is this a PowerPoint that is used in the

21     CIT training program?

22          A.    Yes.

23          Q.    Then ZD, which I'll mark as 47, Substance

24     Abuse with Mental Illness.  Do you see this one?

25          A.    Yes.

1      Q.   Is this used in the JPSO CIT training?

2      A.   Yes.

3      Q.   What other documents are there that are

4  used in the CIT training program except these ones

5  that we've looked at?

6      A.   They would be ones from specialists in

7  their fields that come out and speak during the CIT

8  program.

9      Q.   And do they provide PowerPoints or

10  written materials?

11      A.   They bring it with them, yes.

12      Q.   And does JPSO get a copy of their written

13  materials or PowerPoints?

14      A.   No.  That stays with them.

15      Q.   So in terms of what JPSO has in terms of

16  its training for CIT, it is these four PowerPoints;

17  Substance Abuse with Mental Illness, Louisiana

18  Mental Health Law and Patrol, Crisis Intervention

19  Training, and Deescalation with Suicidal Patients.

20  Just those four plus anything a specialist brings,

21  agreed?

22      A.   Correct.

23      Q.   No other written materials or slides

24  presented other than these four documents and

25  anything a specialist might bring with them,

1    correct?

2        A.   Is that the end?  Repeat it again,

3    because it sounded open-ended.

4        Q.   So my goal here is I'm just trying to

5    understand the total set of documents that are used

6    for training, for CIT training, for JPSO officers.

7    And so my understanding, based on what you have

8    told me, is that these four documents we just

9    looked at, plus any written materials an outside of

10   JPSO person might bring into the classroom and then

11   take with them when they leave but nothing else,

12   agreed?

13       A.   Correct.

14       Q.   And then there is this other training

15   material.  You said Deescalation with Autism.

16   That's not used during CIT?

17       A.   No.  That is the one that is used with

18   CIT is what I said, and that's with the coroner's

19   office, so that would fall under the specialist.

20       Q.   Do you have a copy of Deescalation with

21   Autism?

22       A.   Not with me.

23       Q.   Right, but do you have one on your

24   computer or in your office?

25       A.   No, not on my computer in my office.

 1      Q.   Does JPSO anywhere have a copy of
 2  Deescalation with Autism?
 3      A.   No.  It falls under what I was talking
 4  about with the specialist having it.
 5      Q.   So the Deescalation with Autism
 6  PowerPoint presentation is something the coroner
 7  brings to JPSO, does the training and leaves with
 8  them, and JPSO never gets a copy of it?  Is that
 9  correct?
10      A.   Correct.
11      Q.   Okay.  So the Deescalation with Autism
12  presentation, is that the only autism specific
13  training that JPSO officers receive?
14      A.   No.
15      Q.   What other autism specific training do
16  they receive other than the Deescalation with
17  Autism presentation?
18      A.   They go to outside training when
19  Pensacola came through.  They go through training
20  when Autism Now network comes through.  It all
21  depends on where or who comes through with the
22  training with that.
23      Q.   Those are periodic trainings that come
24  through JPSO periodically for officers to sort of
25  update their knowledge and skills; is that right?

```
 1        A.    Correct.  We put it out for the whole
 2   department, and they request to go to the class.
 3        Q.    But in terms of mandatory training for
 4   JPSO officers, the only autism specific training
 5   they receive is the Deescalation with Autism
 6   training from the coroner's office, correct?
 7        A.    If they are assigned to the CIT class,
 8   yes.
 9        Q.    So the only autism specific training that
10   officers receive as part of the CIT class is
11   something that JPSO doesn't even have a copy of,
12   agreed?
13        A.    I'd have to check with my superiors to
14   see if they have a copy of it, but, to my
15   knowledge, you asked if I had a copy.  I said I
16   don't have a copy.
17        Q.    What is spheres?
18        A.    Superiors?
19        Q.    Oh, superiors.  Okay.  To your knowledge,
20   no one at JPSO has a copy of Deescalation with
21   Autism, agreed?
22        A.    Correct.
23        Q.    And the Deescalation with Autism, the
24   coroner comes in and does that training with CIT
25   officers, right?
```

 1          A.    They come in with people from the
 2    coroner's office and with me in the room as well.
 3          Q.    How long has that Deescalation with
 4    Autism been part of the CIT training?
 5          A.    2018.
 6          Q.    Why did it start in 2018?
 7          A.    Because that's when I took over the CIT
 8    training.
 9          Q.    So in terms of autism specific CIT
10    training, to sum it up, the coroner, the coroner's
11    personnel, come in and provide some training about
12    autism but do not provide JPSO, to your knowledge,
13    with a copy of that, and JPSO has a training
14    written up, but it has not been approved or put
15    into use.  Is that a fair summary?
16          A.    To my knowledge of what has been given to
17    JPSO.  I don't know who has a copy of it at JPSO,
18    if they have been provided with one.
19          Q.    And the second part was JPSO has a
20    training module on autism prepared, written, but it
21    has not been approved or put into use in actual
22    training, agreed?
23          A.    Well, just the autism awareness class as
24    an individual, correct.
25          Q.    There is a training module that's been

```
 1   written up but not approved or put into use,
 2   agreed?
 3        A.   Correct.
 4        Q.   Can you describe to me the content of the
 5   Deescalation with Autism training that JPSO CIT
 6   officers received?
 7        A.   They have already received or the one I'm
 8   working on?
 9        Q.   Sorry.  What?
10        A.   That's what I was asking.
11        Q.   I'm sorry.  Could you describe for me the
12   content of the coroner's Deescalation with Autism
13   training that the officers receive?  What is
14   covered in that training?
15        A.   So it goes over common signs and symptoms
16   that you would see with someone with autism.  It
17   teaches you that you can't really look at a person
18   and tell that they have autism.  It talks to you
19   about the same kind of things you teach with
20   deescalation and active listening, and it gives you
21   best practices on how to approach and the
22   environment that you're in.
23        Q.   And this training began being provided to
24   CIT officers in 2018?
25        A.   For the ones that come to the class, yes.
```

```
 1        Q.   Do you know when in 2018 it first started
 2   being included in the CIT training?
 3        A.   It would have been late 2018.
 4        Q.   If you look at someone's training
 5   records, are you able to see if they got that
 6   specific coroner's Deescalation with Autism
 7   training?
 8        A.   It would go by the date that they were
 9   given it, yes.
10        Q.   Would you be able to figure out what was
11   the first date that the coroner's Deescalation with
12   Autism was provided to officers?
13        A.   I'm sure I can look at when the first CIT
14   class was once I got to the training academy and
15   made sure that was the first one that was used.
16        Q.   Does the coroner's training cover
17   meltdowns of people with autism?
18        A.   Does it cover meltdowns?
19        Q.   Uh-huh.
20        A.   In what sense?
21        Q.   Do you know what a meltdown is, the word
22   "meltdown" in the context of a person with autism
23   or other developmental disability?
24        A.   For meltdown, I haven't heard that used
25   with someone with autism.  I've heard of crisis and
```

1  violent outbursts but not that.

2      Q.   Does the coroner's training cover crisis

3  or violent outbursts for persons with autism?

4      A.   Yes.

5      Q.   And since late 2018 was the first time

6  this coroner's Deescalation with Autism training

7  was provided, and we haven't identified any other

8  training related specifically to autism, am I

9  correct in understanding that late 2018 would have

10  been the first time JPSO officers received training

11  specific to persons with autism?  Is that correct?

12      A.   To my knowledge.  That's all I have from

13  when I started at the academy.

14      Q.   Yeah.  I understand, but at least today

15  you are speaking for Jefferson Parish Sheriff's

16  Office.  Can you say whether late 2018 was the

17  first time that officers received training

18  specifically regarding autism?

19      A.   I can't say.

20      Q.   Would you be able to figure out whether

21  any prior training specific to autism had been

22  provided to JPSO officers prior to late 2018?

23      A.   I'd have to ask my supervisor that was

24  there before me.

25      Q.   But that is something you could figure

```
 1    out the answer to, right?
 2         A.    That they have it, yes. But there was
 3    training provided to JPSO deputies prior to me
 4    being there for autism.
 5         Q.    There was.  Okay.
 6         A.    And that was those outside agencies that
 7    I talked about that come through with Pensacola and
 8    other organizations that come through and talk
 9    about it.
10         Q.    So prior to late 2018, you don't know
11    whether there was any training in the CIT training
12    regarding autism, but there may have been periodic
13    trainings that officers could voluntarily
14    participate in that might have addressed autism?
15    Is that what you're saying?
16         A.    So prior to me being there for CIT
17    training, there was a portion on developmental
18    disabilities.  Now, if it spoke specifically to
19    autism, I don't know.
20         Q.    That would have been a voluntary periodic
21    training that officers could choose or choose not
22    to participate in, correct?
23         A.    No.
24         Q.    No, it was a mandatory training?
25         A.    On what I was just talking about?
```

1      Q.   Uh-huh.
2      A.   It would have been a mandatory training
3  if it was the CIT class.
4      Q.   Okay.  So prior to the coroner's
5  Deescalation with Autism training, which began in
6  late 2018, you're saying prior to that, the CIT
7  program did have content about dealing with persons
8  with developmental disabilities?  Is that what
9  you're saying?
10      A.   Yes.
11      Q.   Did it address autism specifically?
12      A.   That's why I said I don't know if it had
13  that specific --
14      Q.   Okay.  And you're saying there also might
15  have been periodic voluntary trainings that
16  officers could choose or choose not to participate
17  in that might have addressed autism?  Is that what
18  you are also saying?
19      A.   For the outside agencies and
20  organizations that came in, yes.
21      Q.   Going back to the content of Deescalation
22  with Autism from the coroner's office, does that
23  training deal specifically with restraint of
24  persons with autism?
25      A.   No.

63

1      Q.   Does it cover how to evaluate whether

2    someone experiencing issues surrounding autism is

3    capable of having criminal intent?  Does it cover

4    that topic?

5      A.   Does it cover someone with autism having

6    criminal intent?

7      Q.   Uh-huh.

8      A.   No.

9      Q.   Does it cover anything about physical

10   movements of persons with autism possibly being

11   involuntary?  Does it cover that?

12     A.   Yes.

13     Q.   Does it cover specific accommodations

14   that officers should consider in dealing with

15   persons with autism?

16     A.   In nonviolent and noncriminal matters,

17   yes.

18     Q.   So what kind of accommodations does the

19   training describe for those contexts?

20     A.   With nonviolent encounters, it gives you

21   a general idea of what to and what not to do with

22   someone that is in crisis with autism.

23     Q.   What are some of those to do items?

24     A.   To do is turn off your overhead lighting,

25   shut down the most amount of noise possible, cover

1   shiny objects, if possible.  Don't overcrowd.  Be

2   very specific in your answers.  I mean in your

3   questions.  Allow for time for them to respond.

4   Repeat, if necessary, and try to find a caretaker.

5        Q.   What are some of the things not to do?

6        A.   Use jargon or slang.  Don't attempt to

7   put physical hands on the person, if they're

8   nonviolent, and if they're in crisis, in a

9   situation where there is no other public danger.

10  Don't take away an object that they have fixated on

11  unless it's dangerous or could be potentially

12  dangerous to someone else.

13       Q.   So you are saying these are potential

14  accommodations in the context -- in a nonviolent

15  context, right?

16       A.   Correct.

17       Q.   So if there is an active, unrestrained

18  person who is violent, you're saying JPSO officers

19  are not instructed to apply these accommodations,

20  agreed?

21       A.   They are instructed to use the training

22  that they have to overcome violence and resistance.

23       Q.   Sure.  And then once the violent person

24  is restrained, then these accommodations might come

25  into play, agreed?

```
 1          A.   If they're noncombative, yes.
 2          Q.   So once someone is restrained and non-
 3    combative, JPSO officers are trained to start
 4    applying these accommodations where reasonable,
 5    agreed?
 6          A.   Yes.
 7          Q.   Your training uses the phrase, "An
 8    agitated chaotic event."  Are you familiar with
 9    that?
10          A.   It says agitated chaotic event?
11          Q.   I think so.  Let's double-check.  This is
12    Exhibit R, which we'll mark as 48.  I believe this
13    was provided to us.  Is this -- do you recognize
14    this document here entitled, "Agitated Chaotic
15    Event?"
16          A.   I don't teach that.
17               MR. ZIBILICH:
18                    Listen to his question.  His
19               question is do you recognize it.
20               THE WITNESS:
21                    No.  I don't recognize this one.
22    BY MR. MOST:
23          Q.   I'll represent to you that this is
24    something that was provided to us by JPSO, but I
25    understand you are not particularly familiar with
```

1    it.  Do you see that this document identifies

2    agitated chaotic events and includes autism as one

3    potential form of agitated chaotic event?  Do you

4    see that?

5         A.   It has it listed, yes.

6         Q.   Is that what officers -- I mean, I

7    understand you are not familiar with this document,

8    but is part of the training for JPSO officers about

9    autism that it can sometimes, you know, be a person

10   who is agitated?  It can be a complicated

11   situation.  It can be a little chaotic.  That

12   fairly describes sometimes what officers may see

13   when they address someone with autism; is that

14   right?

15        A.   We give them the specifics of things that

16   they would possibly encounter, but you can't tie

17   down everything with autism.  Even the CDC can't

18   tie down everything with autism.

19        Q.   Sure.  There is a range in which -- a

20   range of different ways that the issue presents

21   itself, agreed?

22        A.   In which context?

23        Q.   Well, I understand you to be saying that

24   autism doesn't always look the same.  It can

25   present itself in many different ways, so officers

```
 1   need to be aware there is different ways it could
 2   look, different ways it could manifest itself, and
 3   so officers need to be prepared for a range of
 4   situations.  That's what I understand you to be
 5   saying.  Is that correct?
 6        A.   Yes.  We give them a general of things
 7   that would happen but not everything that could
 8   possibly happen.
 9        Q.   Sure.  So going down to Page 6 of this
10   exhibit, which is entitled, "Theory to Training,"
11   do you see where it says, "Restrain.  Do not
12   hog-tie.  Do not allow person to remain prone for
13   an unreasonable amount of time.  Place on side.
14   Sit upright, supine, stand."  Do you see that
15   section?
16        A.   Yes, I see it.
17        Q.   And do you see that this document, which
18   I understand you're not familiar with, is at least
19   characterizing that as recommendations for how to
20   deal with a person experiencing an agitated chaotic
21   event like autism?  Is that your interpretation?
22        A.   Repeat just that last portion of the
23   question.
24        Q.   Sure.  The question is, do you understand
25   that this document is suggesting these proven
```

1   practices as suggestions for how to handle someone
2   who is experiencing an agitated chaotic event like
3   autism?
4        A.   I don't see it as specific to autism on
5   here. It says something about chaotic event.  To me
6   that would be separate from autism.
7        Q.   This recommendation of placing on side,
8   sitting upright, is that incorporated into any of
9   the CIT training for how to deal with a person with
10  autism?
11            MR. ZIBILICH:
12                 Object to the form.
13            THE WITNESS:
14                 So that would actually be put into
15              our use of force.
16  BY MR. MOST:
17        Q.   So that is a general recommendation for
18  any person who is restrained, agreed?
19            MR. ZIBILICH:
20                 Object to the form.
21            THE WITNESS:
22                 No, because if the person is
23              actively resisting, combative, it
24              doesn't go towards that.
25  BY MR. MOST:

1          Q.   So that's a general recommendation for

2    any person who has been restrained and is not in

3    that moment actively combative, agreed?

4               MR. ZIBILICH:

5                    Object to the form.

6    BY MR. MOST:

7          Q.   Sir, was your answer agreed, Sergeant?

8          A.   Hold on.  I lost you.

9          Q.   Sorry. I'll just note that the same

10   objection has been made.  I'll reask the question.

11         A.   I got you back.

12         Q.   So the recommendation of placing someone

13   on their side or sitting them upright, that's a

14   general recommendation for any person in JPSO

15   custody who is not, in that moment, actively

16   combative, agreed?

17              MR. ZIBILICH:

18                   Object to the form.

19              THE WITNESS:

20                   It would depend on the situation, so

21            I don't know.

22   BY MR. MOST:

23         Q.   Okay.  Sergeant, are you familiar with

24   the International Association of Chiefs of Police?

25   Is that an organization you are familiar with?

1    A.    Yes.

2    Q.    That's an organization, a group, that

3  provides training materials and recommendations and

4  best practices to police departments.   Is that your

5  understanding?

6    A.    Yes.

7    Q.    And why are you familiar with it?   Does

8  JPSO use some IACP materials in any of its

9  training?

10    A.    So the first question was am I aware of

11  what?

12    Q.    Sure.   So the International Association

13  of Chiefs of Police, which I'll abbreviate IACP,

14  you are familiar with that group, right?

15    A.    Yes.

16    Q.    And why are you familiar with that group?

17  Do they intersect with your job as a trainer at

18  all?

19          MR. ZIBILICH:

20             Object to the form.   It was two

21          questions.

22          THE WITNESS:

23             Yes.   That's what I was going to

24          ask.   Which portion you want me to

25          answer first?

```
1    BY MR. MOST:
2         Q.    Sure.  Why do you know about the IACP?
3         A.    Having gone to outside training, they
4    mention it with regards to federal consent decrees
5    on organizations.
6         Q.    Have you ever looked at IACP training
7    materials or best practices?
8         A.    No.
9         Q.    Are you aware that they do provide or at
10   least offer training materials and best practices?
11        A.    During consent decrees, from my
12   knowledge.
13        Q.    Does JPSO use any IACP materials in any
14   of its trainings, as far as you're aware?
15        A.    I don't know.
16        Q.    So you're not aware of any IACP materials
17   used by JPSO, agreed?
18        A.    Correct.
19        Q.    I'm pulling up Exhibit T, which I'll
20   label as 49.  I may have to zoom in, but do you see
21   that this is a document --
22        A.    You could leave it where it was at.
23        Q.    I just wanted to show you the seal at the
24   top.  You see it is an IACP document?
25        A.    Correct.
```

1        Q.   Do you see that this is a Model Policy

2    dated August 2017 for Interactions with Individuals

3    with Intellectual and Developmental Disabilities?

4        A.   Yes.   The Model Policy.

5        Q.   Yes.   Have you looked at this document in

6    developing any of JPSO's trainings or policies?

7        A.   No. I'm looking at it right there for

8    your procedures that you have on it, and that's

9    what I talk about.   We talk about autism awareness,

10   though.

11       Q.   So this is -- some elements of this are

12   analogous or similar to what is in the autism

13   awareness training that you've developed, correct?

14       A.   One through six.

15       Q.   These are techniques that can be used by

16   officers in dealing with persons with autism in the

17   field, correct?

18       A.   Which part?

19       Q.   Well, these one through six you

20   identified.

21       A.   Yes.   You can use that.

22       Q.   So these could be potential

23   accommodations for a person with an autism

24   disability if they're interacting with an officer

25   in the field, agreed?

1        A.    It depends on the situation.

2        Q.    Right.  Which accommodations might be

3    reasonable or necessary would depend on the

4    situation, but these are among the potential

5    accommodations that could be used, depending on the

6    situation, for a person with an autism disability,

7    agreed?

8        A.    Yes.

9        Q.    And the reason why it's important to

10   train -- one reason it is important to train

11   officers in that is because the ADA requires

12   officers to provide reasonable accommodations when

13   dealing with persons in the field, in some

14   scenarios, agreed?

15       A.    What is the question?

16       Q.    Yeah.  The question is do you agree that

17   the ADA requires officers to provide reasonable

18   accommodations to persons with disabilities, in

19   some scenarios, when interacting with them in the

20   field.  Would you agree with that?

21       A.    I agree that the ADA says we should

22   provide reasonable accommodations for people that

23   are nonviolent, yes.

24       Q.    More than should.  They are required to,

25   agreed?

1        A.    Yes.

2        Q.    That's what you train officers, that they

3    are required to do so?  Is that correct?

4        A.    In nonviolent encounters, yes.

5        Q.    I'm going to pull up Exhibit Y, which I'm

6    going to designate as 50.  Do you see that this an

7    IACP training key, Training Key Number 678?

8        A.    So that's that same symbol on the left

9    you're asking.

10       Q.    Yeah.  At the bottom.  Do you see at the

11   bottom it says, "This is published by the

12   International Association of Chiefs of Police?"

13       A.    Yes.

14       Q.    Do you see that this is -- this Training

15   Key Number 678 entitled, "Autism:  Managing Police

16   Field Contacts," you don't have any reason to doubt

17   this is an IACP training key, agreed?

18       A.    From what you showed me, no.

19       Q.    Go to Page 4 of it.  Do you see this

20   section that is entitled, "Restraint?"

21       A.    Yes.

22       Q.    Do you see that there is four bullet

23   points under Restraint?

24       A.    Yes.

25       Q.    And that the second bullet point says,

1     "Be aware that people with autism may have under-

2     developed trunk muscles and may not be able to

3     support their airway.  After takedown, the

4     individual should be turned on his or her side and

5     be transferred into an upright position as soon as

6     possible to allow normal breathing to occur."

7          A.    Which bullet point were you looking at?

8     I'm sorry.

9          Q.    Yeah.  That's all right.  The second

10    bullet point under restraint on Page 4 of this

11    exhibit.  Do you see that the first sentence of

12    that second bullet point is, "Be aware that people

13    with autism may have underdeveloped trunk muscles

14    and may not be able to support their airway?"

15         A.    I agree that's what it says.

16         Q.    Is there any reason that JPSO has to

17    disagree with that statement?

18         A.    Yes.

19         Q.    What basis do you have to -- does JPSO

20    have to disagree with that statement?

21         A.    It's not specific to a situation.  This

22    appears to be a perfect uniform world, how it's

23    saying it.  If the person is violent, you can't do

24    that.

25         Q.    Well, the first sentence is just a

1    statement.  "Be aware that people with autism may

2    have underdeveloped trunk muscles and may not be

3    able to support their airway."  So let's break it

4    down.

5         A.    That part I can agree with, the one

6    sentence you read.

7         Q.    Okay.  Is that incorporated into JPSO's

8    training at all?

9         A.    That is talked about with autism, yes.

10   That one sentence.

11        Q.    Okay.  And that's in the autism training

12   that the coroner provides?

13        A.    Yes.

14        Q.    So any officer who went to CIT training

15   from late 2018 through the present would be trained

16   in the fact that people with autism may have under-

17   developed trunk muscles and may not be able to

18   support their airway, agreed?

19        A.    Correct.

20        Q.    Do you know whether -- well, let me start

21   over.  You don't know whether that fact would have

22   been incorporated before the coroner's autism

23   training, agreed?

24        A.    Correct.

25        Q.    So the second sentence of this second

1   bullet point on Page 4 says, "After takedown, the
2   individual should be turned on his or her side and
3   be transferred into an upright position as soon as
4   possible to allow normal breathing to occur."  Do
5   you see that sentence?
6        A.   Yes, I see it.
7        Q.   Does JPSO have a basis to disagree with
8   this sentence?
9        A.   Yes.  It's too vague.
10        Q.   So officers are not trained in the
11   contents of this sentence in their -- or something
12   similar in their autism training and CIT, agreed?
13        A.   It depends on the situation that that
14   point is talking about.
15        Q.   Okay.  Well, let's break it down.  So
16   once a person has been restrained and is not in
17   that moment combative or violent, is that when they
18   should be transferred to their side or into an
19   upright position?
20        A.   Yes.
21        Q.   So with that caveat, is that incorporated
22   into the training of officers for dealing with
23   persons with autism?
24        A.   That is what is trained when we teach use
25   of force and compliance.

1    Q.   And how long has that been part of the
2   general JPSO use of force and compliance training?
3    A.   To my knowledge, for me, it would be
4   since 2013, since I got there, but as far as what
5   happened prior to me being there, I couldn't tell
6   you.
7    Q.   So at least since 2013 that has been a
8   standard part of every JPSO officer's training on
9   use of force and compliance, agreed?
10    A.   To my knowledge, yes.
11    Q.   And that is a training that every officer
12   receives that is part of JPSO, not just CIT
13   officers, agreed?
14    A.   For use of force, correct.
15    Q.   Going back to document Y50, Page 4, this
16   third bullet point under restraint, you see that it
17   says, "Monitor the person's condition frequently to
18   prevent further trauma or injury.  Up to 40 percent
19   of this population may have some sort of seizure
20   disorder."  Do you see that part?
21    A.   Yes.
22    Q.   Let's take it sentence by sentence.  The
23   monitoring a person's condition upon restraint, is
24   that part of JPSO's training for CIT training?
25    A.   That is part of CIT training and the use

1  of force training as well.

2      Q.   So the recommendation to monitor a

3  person's condition frequently once they've been

4  restrained, that is part of the training that every

5  JPSO officer receives, agreed?

6      A.   Yes.

7      Q.   And by monitoring the condition, we're

8  not talking about their haircut, we are talking

9  about things like whether they're still breathing,

10 correct?

11     A.   Yes.  That's part of it.

12     Q.   The second sentence of this is that up to

13 40 percent of this population by which, I take it

14 to mean, the autistic population, may have some

15 sort of form of seizure disorder.  Do you see that

16 part?

17     A.   Yes.

18     Q.   Is that consistent with your

19 understanding?

20     A.   No.  I believe it went up.  This is

21 probably an old document.  I believe that number

22 has fluctuated down as far as 30 percent up to 55

23 percent.

24     Q.   So it's your understanding that a large

25 portion of persons with autism, maybe 30, maybe

1  somewhere between 30 and 50 percent, may have some

2  form of seizure disorder, correct?

3       A.   Yes.

4       Q.   And is that described in the CIT training

5  that JPSO officers receive?

6       A.   With regards to seizure on people with

7  autism, no, it's not mentioned.

8       Q.   So it is something that you personally

9  know, but it's not incorporated into the training

10 of JPSO officers, agreed?

11      A.   Yes.

12      Q.   The fact that that population may have

13 such a high prevalence of seizure disorder, that is

14 a reason to be extra careful with monitoring that

15 person's breathing upon restraint, agreed?

16      A.   I wouldn't make it as specific as that.

17 It doesn't matter what the condition is.  We're

18 going to monitor them.

19      Q.   So JPSO officers are always supposed to

20 monitor a restrained person's breathing.  So it

21 doesn't matter if they might have a seizure

22 disorder or not, it's still mandatory that officers

23 monitor breathing, agreed?

24      A.   That's the practice.

25      Q.   And that's the training, correct?

1      A.    Yes.

2      Q.    And the purpose of that training is to

3  ensure that someone who is restrained does not stop

4  breathing and die, correct?

5      A.    Correct.

6      Q.    And how are JPSO officers trained to

7  monitor breathing?  If there is a group of

8  officers, Is one officer supposed to be assigned to

9  monitor breathing?

10      A.    In what situation?

11      Q.    Let's say you've got a group of officers.

12  There is six or eight officers standing around a

13  restrained person.  How are they supposed to

14  monitor the person's breathing?

15          MR. ZIBILICH:

16              Object to the form.  You can answer

17          it.

18          THE WITNESS:

19              I'm trying to figure out which.  It

20          depends on the situation.  It's not

21          specific.

22  BY MR. MOST:

23      Q.    Sure.  Look, pretend I have no idea about

24  any of this.  Is there -- how do you monitor

25  breathing?  Is there a device they use to monitor

```
 1    breathing?  Do you get close to the person's face
 2    to check?  Are you supposed to put your hand on
 3    them?  Like how do you monitor -- how is a JPSO
 4    officer supposed to monitor breathing?
 5              MR. ZIBILICH:
 6                   Again, I object to the form.
 7              THE WITNESS:
 8                   Only thing I think you could use
 9                would probably be American Heart, which
10                is chest rise and fall.
11    BY MR. MOST:
12         Q.   Okay.  So are you talking about a visual
13    assessment of chest rising and falling?
14         A.   That's what I'm saying.  It just depends
15    on the situation.  You can't --
16         Q.   Well, officer, how would you monitor
17    someone's breathing if they were restrained?  What
18    would you do?
19         A.   What would I do?
20         Q.   Yeah.
21         A.   Okay.  So which way are they facing?
22         Q.   They're prone, face down.
23         A.   Face down.  You can feel the back of
24    their chest expand and contracting.
25         Q.   So that assessing someone who is prone,
```

1   monitoring their breathing requires a hand on their
2   back to see if they're moving; is that correct?
3        A.   You can visually look at the back rising
4   and falling.
5        Q.   So either a hand on the back or visually
6   watching; is that correct?
7        A.   Yes.
8        Q.   What else is incorporated into the
9   requirement to monitor a restrained person's
10  breathing?  Is someone supposed to -- are there
11  periodic checks, you know, check every ten seconds
12  or --
13       A.   It's not specific.  Nothing specific to
14  that.
15       Q.   Okay.  Are officers trained with the hand
16  on the back technique?
17       A.   American Heart Association, yes.
18       Q.   When you say American Heart Association,
19  is that someone else who comes in and trains or is
20  that -- why are you saying those words?
21       A.   No.  That's through the -- either if they
22  take the BLS, basic life support, or they take the
23  heart saver course in reference to CPR.
24       Q.   And do all officers take that training or
25  just some?

1        A.    Yes, every two years.

2        Q.    Every officer?

3        A.    Every gun-carrying member for JPSO.

4        Q.    So the only specific technique that

5   officers are trained in, in monitoring breathing of

6   a prone person, is hand on the back, correct?

7        A.    No.

8        Q.    What is the other?

9        A.    Watching the chest rise and fall or back

10  rise and fall.

11       Q.    So officers are specifically trained to

12  visually assess; is that right?

13       A.    Yes.

14       Q.    Is that incorporated into any written

15  training?

16       A.    That's what I was talking about, the

17  American Heart Association.

18       Q.    So the American Heart Association

19  training should describe, in writing, the methods

20  for monitoring breathing that officers are trained

21  on?

22       A.    Yes.

23       Q.    So if we ask for the American Heart

24  Association training, JPSO would be able to provide

25  it to us? That's descriptive enough?

```
 1        A.    I believe American Heart Association
 2   would provide it to you, because it's copyrighted.
 3   I guess that would be a request through them.
 4        Q.    Does JPSO have a copy of it?
 5        A.    The American Heart Association has a copy
 6   of it.
 7        Q.    No, I understand, but does JPSO also have
 8   a copy?
 9        A.    All we have is what is taught in the
10   class itself, and that's through American Heart
11   Association.  The agreement that you have as an
12   instructor for American Heart Association is that
13   we don't disseminate the material outside of the
14   class.
15        Q.    Yeah.  Look, I understand.  I'm sure your
16   lawyers will make sure that JPSO is not violating
17   copyright or licensing.  I just want to know does
18   JPSO have a copy of these written materials,
19   setting aside whether they're allowed to share
20   them?
21        A.    Do we have a copy to use for training?
22   Yes.
23        Q.    Okay.  And that training document
24   provides the entirety of the specific methods by
25   which JPSO officers are trained to monitor
```

1    breathing, correct?

2        A.    Yes.

3        Q.    You mentioned earlier recommendations

4    like turning off lights and sirens for a person

5    with autism, correct?

6        A.    Yes.

7        Q.    That's a form of sensory scene

8    management.  Have you heard that phrase?

9        A.    It's a form of deescalation for us.  Part

10   of controlling the environment that you can.

11       Q.    Because lights, sirens, and other sensory

12   inputs may be particularly triggering for a person

13   with autism, agreed?

14       A.    Yes.  Bright flashing lights would be a

15   trigger in autism.

16       Q.    And same with people crowding around a

17   person with autism, agreed?

18       A.    Some people.

19       Q.    So once a person with autism has been

20   restrained and is in that moment no longer

21   combative, possible accommodations that JPSO

22   officers could provide to that person would be

23   creating a space around that person and managing

24   the sensory inputs, agreed?

25       A.    It depends on the situation.

87

1      Q.   Right, but those are potential

2  accommodations that could be provided that would be

3  within the scope of potential accommodations for a

4  person with autism who has been restrained and in

5  that moment is no longer combative, agreed?

6      A.   Dependent upon the situation, yes.

7      Q.   Okay.  Depending on the situation, you

8  agree with my statement, right?

9      A.   Depending on -- yes.  Dependent on the

10  situation.

11      Q.   Okay.  Does the CIT training that JPSO

12  officers receive incorporate anything about the

13  RIPP Hobble device?

14      A.   No.

15      Q.   Does the CIT training that JPSO officers

16  receive address specific methods of restraint at

17  all?

18      A.   No.

19      Q.   And we talked about when you are -- there

20  is the directive for officers to monitor a

21  restrained person.  We talked about monitoring

22  breathing.  Are there any other physical attributes

23  that is incorporated within monitoring? Like I

24  don't know.  Like pulse or anything else?

25      A.   If they become limp, that would be a sign

1    that you would want to look for.  If they go from

2    being extremely combative to, like I said, limp or

3    complying quickly, that would be something we would

4    monitor.  Profuse sweating would be another one.

5    Shaking would be another one.

6         Q.    Any other physical attributes?

7         A.    Not that I can think of at this time.

8         Q.    Is pulse something that is incorporated

9    in monitoring?

10        A.    If they go limp, you would have to.

11   You'd have to assess whether they are breathing and

12   have a pulse.  That falls back into the American

13   Heart Association with CPR.

14        Q.    So if a person goes limp, then an officer

15   on the scene should check them for a pulse?

16        A.    Yes.

17        Q.    And are officers trained to do a neck

18   pulse or a wrist pulse?

19        A.    Both.  That would be a distal pulse, not

20   a wrist pulse.

21        Q.    I'm not sophisticated enough to know the

22   difference.  What is a distal pulse?

23        A.    A distal pulse is going to be at the

24   extremities.

25        Q.    And how is that distinct from a wrist

1  pulse?

2      A.   Pedal pulse would be around the radius of

3  the arms, inside the brachial plexus, down at the

4  top of the ankle, instep of the foot.  Different

5  locations. That's all being if there is no EMS on

6  the scene at the time.

7      Q.   So if EMS is on the scene at the time,

8  are officers relieved of their requirement of

9  monitoring?

10     A.   Because that's the whole purpose of

11 medical.  We are not a medical team.

12     Q.   So once EMS is on the scene and hands on

13 the restrained person, that's when officers can

14 stop monitoring?

15          MR. ZIBILICH:

16              Object to the form.

17          THE WITNESS:

18              That would be dependent on the

19          situation.

20 BY MR. MOST:

21     Q.   I understand, but I'm just trying to

22 understand.  You're saying officers have to monitor

23 -- generally have to monitor a restrained person,

24 right?

25     A.   I was going specific to your pulse

1    question.  If medical is on the scene, it depends

2    on the situation whether we relinquish to them or

3    stay monitoring.

4        Q.   But at least until EMS is directly

5    treating that person, officers should continue with

6    their monitoring applications, agreed?

7        A.   Depending on the situation, yes.

8        Q.   What situation would officers not have to

9    continue monitoring until EMS took over with that

10   particular person?

11       A.   Active resistance again.

12       Q.   Any other situations?

13       A.   I'm sure we can probably what if a bunch

14   of them.

15              MR. ZIBILICH:

16                  Let me ask you a question.  Are we

17              still pretty much on target this

18              morning so I can let this next officer

19              know if we're going to be early or

20              late?

21         MR. MOST:

22                  Let's see.  It's 11:00 now.  I would

23              be surprised if we went all the way to

24              1:30.  I think we will probably -- I

25              strongly suspect we will wrap up with

```
 1                    the sergeant here before 1:30, but it's
 2                    fine.  We can have a break and then
 3                    reconvene at 1:30, or we could just
 4                    role on into the next one.  I don't
 5                    have a strong preference.
 6              MR. ZIBILICH:
 7                    Just checking.
 8              MR. MOST:
 9                    Sergeant, do you or anyone else in
10                  y'all's room or the court reporter,
11                  anybody need a break at this time?
12              MR. ZIBILICH:
13                    I'm good.
14     BY MR. MOST:
15         Q.   We'll just keep going.  I'm going to pull
16     up a document.  Do you see this document dated July
17     7, 2008, entitled, "The Autism Tsunami?"
18         A.   Yes.
19         Q.   This is Exhibit U. I'll designate it 51.
20     Have you ever seen this document before?
21         A.   No.
22         Q.   Do you see that it looks to be an article
23     from Corrections 1?
24         A.   I mean, I see it up at the top, yeah.  I
25     can see that.
```

```
 1        Q.    So going down to Page 8, Item Number 27.
 2   Do you see that this is describing -- persons with
 3   autism is the third quote. "Chest muscles may be
 4   weak and have difficulty supporting even their own
 5   weight in some positions."  Do you see that
 6   sentence?
 7        A.    Yes.
 8        Q.    And that's similar to what we talked
 9   about before, that CIT training incorporates that
10   -- something similar to that statement, agreed?
11        A.    Yes, but we also put it into the context
12   that this is not everyone with autism.  This is
13   such a -- just like with everything in autism, it
14   is very vague.  This is not specific to one
15   individual with autism.
16        Q.    Right.
17        A.    Classification of autism out of the three
18   that they have.
19        Q.    Right.  So it's not the case that every
20   person with autism may have weak chest muscles, but
21   it turns up with people with autism enough that
22   it's something to be on the lookout for, agreed?
23        A.    Maybe in 2008.  There has been a lot of
24   changes in the autism spectrum.
25        Q.    Any reason to think that this sentence is
```

1    wrong now, given your current understanding?

2         A.   Pending looking into the newest position

3    that they have on it, I couldn't say.  This was not

4    talked about recently.

5         Q.   But it is at least in the training for

6    JPSO CIT training that persons with autism,

7    something to look out for, be aware of, is that

8    they may have weak chest muscles and difficulty

9    supporting even their own weight in some positions,

10   agreed?

11        A.   We do speak about it, but it's general

12   for the general population, not just for autism.

13        Q.   The last two sentences of this Item 27

14   says, "Every cop knows about positional asphyxia.

15   Consider all your subjects with developmental

16   disabilities to be at risk."  Do you see those

17   sentences?

18        A.   I see those two, yes.

19        Q.   Any reason to disagree with either of

20   those sentences?

21        A.   No.

22        Q.   And the recommendation to consider all

23   subjects with developmental disabilities to be at

24   risk of positional asphyxia, is that incorporated

25   into the JPSO CIT training?

1      A.   Not the CIT training.  It's in general

2 population that we talk about it, so that also

3 encompasses developmental disabilities, because

4 everyone can be at risk.

5      Q.   So JPSO training requires officers to

6 consider all subjects to be at risk of positional

7 asphyxia but doesn't specifically call out that as

8 an issue for persons with developmental

9 disabilities; is that correct?

10      A.   Correct, because they would be part of

11 the general population.  I'm not familiar with this

12 organization, so I don't know where they're getting

13 most of this information.

14      Q.   Yeah.  Look, I understand you have not

15 read this before.  I'm just trying to compare it to

16 what you understand in your training.

17           MR. ZIBILICH:

18                Just so the record is clear, let the

19                record reflect that this was dropped

20                into a Dropbox Sunday afternoon.  It

21                appears to be somewhat in the

22                neighborhood of a hundred plus pages,

23                so, no, he did not have an opportunity

24                to read this.

25           MR. MOST:

```
 1              Okay.
 2          MR. CLARKE:
 3              Did he read the notice to take
 4          deposition and know that we were asking
 5          him about EP?
 6          MR. ZIBILICH:
 7              I can't hear you, sir.
 8          MR. MOST:
 9              Let's just -- we will move on.
10          Objection noted.
11 BY MR. MOST:
12     Q.   All right.  So a person who has under-
13 developed trunk muscles is particularly at risk of
14 positional asphyxia, agreed?
15     A.   Yes, they would be.
16     Q.   And to the extent that their under-
17 developed trunk muscles are a manifestation of
18 their disability, a potential accommodation could
19 be ensuring that they are rolled into the recovery
20 position, agreed?
21          MR. ZIBILICH:
22              Object to the form.
23          THE WITNESS:
24              I didn't understand it.
25 BY MR. MOST:
```

1    Q.    Sure.  So we established someone with
2    underdeveloped trunk muscles is at particular risk
3    of positional asphyxia.  Could underdeveloped trunk
4    muscles be a manifestation of a disability?
5    A.    I don't know.
6    Q.    If it was, a reasonable accommodation for
7    that person could be rolling them into the recovery
8    position when they are restrained, agreed?
9    A.    I don't know on that one, because I'm not
10   diagnosing them on the scene without someone
11   telling me.
12   Q.    But if someone is known to have autism,
13   specifically known to have autism, and persons with
14   autism may have underdeveloped trunk muscles, a
15   potential accommodation, once things have become
16   nonviolent, in that scenario, could be to roll that
17   person into the recovery position, agreed?
18   A.    It depends on the situation.
19   Q.    Okay.  But that is at least a potential
20   accommodation in some situations like the one I
21   described, agreed?
22   A.    The recovery position could be
23   potentially what someone would do, yes.
24   Q.    Potentially something JPSO would do, as
25   an accommodation in some scenarios, depending on

1    the circumstances, agreed?

2         A.    Yes, depending on the circumstances.

3         Q.    I want to talk about other potential

4    accommodations for a person with autism.  I under-

5    stand every accommodation depends on the

6    circumstances, right?  Agreed?

7         A.    Yes.

8         Q.    So a potential accommodation for a person

9    with autism, depending on the circumstances, could

10   be setting up a perimeter with police tape to

11   create a large, safe area, agreed?

12              MR. ZIBILICH:

13                   Object to the form.

14              THE WITNESS:

15                   I'm not following that one.

16   BY MR. MOST:

17        Q.    Sure.  So we talked about a potential

18   accommodation for a person with autism under some

19   circumstances could be giving them space, right?

20        A.    Yes.

21        Q.    And one way to do that, a potential way

22   of implementing that accommodation, could be to

23   create a perimeter. Have officers create a

24   perimeter so that there could be a safe area that

25   doesn't crowd the person with autism, agreed?

```
1           A.    I don't know on that one.

2           Q.    Okay.  Could providing a restrained

3    person with autism food or water be an

4    accommodation under some circumstances?

5           A.    Would that be an accommodation?

6           Q.    Could it be?

7           A.    Yeah, for anybody.

8           Q.    If there was a person knowledgeable about

9    the person with autism's limitations on scene,

10   could interviewing that knowledgeable person be an

11   accommodation for the person with disability?

12          A.    It depends on the situation as well.

13          Q.    Right.  But depending on the situation,

14   if there was a knowledgeable person on scene,

15   interviewing them about the person with autism's

16   limitations could be an accommodation under some

17   circumstances, agreed?

18          A.    If there is a caretaker or a person that

19   is knowledgeable, yes, we could potentially

20   interview them.

21          Q.    If there is a person with autism, could

22   officers, as an accommodation, consult with a

23   medical expert, call a trainer, perhaps you, or

24   perhaps another CIT person?  Could that be a

25   potential accommodation, depending on the
```

```
 1    circumstances?
 2         A.   Yes.
 3         Q.   We talked about the CIT training.   How
 4    many hours is the CIT training total?
 5         A.   For the recruits, 48 hours.   For veteran
 6    officers, 40.
 7         Q.   Forty for veteran officers?
 8         A.   Correct.
 9         Q.   For both new recruits and veteran
10    officers, this is an optional thing that they can
11    opt into?  Is that right?
12         A.   No.
13         Q.   It's mandatory?
14         A.   For the recruits.
15         Q.   It's mandatory for recruits and optional
16    for veteran officers?
17         A.   Correct.  If they walk in the class and
18    say they don't want to attend, we can't force them.
19         Q.   Sure.  When did the CIT start being part
20    of the mandatory education for new recruits?
21         A.   2018.
22         Q.   Was CIT training provided optionally
23    before 2018?
24         A.   I believe so, yes.
25         Q.   But it first became mandatory for new
```

```
 1   recruits in 2018 and has been optional for veteran
 2   officers thereafter, agreed?
 3        A.   Yes, unless they are told to do so by
 4   their rank.
 5        Q.   Sorry.  What do you mean?
 6        A.   So if the veteran officers are ordered to
 7   do so by their rank, they have to attend.  At that
 8   point, it's not voluntary.
 9        Q.   Do you know of any officers who have been
10   ordered to participate in CIT training?
11        A.   Yes.
12        Q.   And then what scenario is an officer
13   ordered to participate?  Is it in response to a
14   particular event or what?
15        A.   Because their rank told them to do so.
16   We don't question it.  We just train them.
17        Q.   Is it a form of discipline or is it just
18   a particular supervisory officer who cares a lot
19   about it?
20        A.   Like I said, I wouldn't know, because I
21   don't ask those questions.  I just train them.
22        Q.   So of the 48 hours for new recruits and
23   40 hours for veteran officers, how much of that
24   time is spent dealing with persons with autism?
25        A.   Two hours.
```

1    Q.   And that two hours, is that taken up by

2  the coroner's Deescalation with Autism training?

3    A.   Myself and the coroner's office, yes.

4    Q.   So that's a training you do in

5  collaboration with the coroner's office, and it

6  takes two hours?

7    A.   For that portion, yes.

8    Q.   For the autism portion?

9    A.   Yes.

10   Q.   And when you say you do it together with

11  the coroner's office, does that mean both you and

12  someone from the coroner's office are standing up

13  giving the training?

14   A.   It will be three of us.

15   Q.   Who are the three people?

16   A.   Chantrel Hunt.  I can't remember Ashley's

17  last name, and then myself.

18   Q.   Are both Chantrel and Ashley from the

19  coroner's office?

20   A.   Yes.

21   Q.   So you participate in providing this

22  training, but you don't have a copy of the actual

23  slides?

24   A.   For which?

25   Q.   Look, I think we covered this, but it

1    just surprises me a little bit that you actually

2    participate in giving this training but you don't

3    have a copy of the slides or written materials for

4    that training.  You don't ever get a copy of that?

5         A.   When they're in the class, it's on the

6    board, but they're allowed to change it with things

7    that change within society, diagnoses, and current

8    things that are going on.

9         Q.   Has the coroner's office ever e-mailed

10   you in advance and said, hey, here is the newest

11   version of the PowerPoint we're going to use,

12   anything like that?

13        A.   No.  We meet two weeks in advance on

14   everything before we do a class.

15        Q.   And you meet with them and do they show

16   you the newest version of the slides at that time?

17        A.   If there is an update, yes, and we talk

18   about it, see if it's within best practices.

19        Q.   But they only show it to you on a

20   computer or a screen?  They don't ever e-mail you

21   or give you a copy?

22        A.   They bring it with a laptop.

23        Q.   Does this two-hour training incorporate

24   any videos?

25        A.   Yes.

1       Q.    Does it incorporate any simulated

2   scenarios?

3       A.    Not for that two hours.

4       Q.    What about adult teaching techniques?

5   Are you familiar with that phrase?

6       A.    I'm sorry.

7       Q.    Adult teaching techniques.

8       A.    You've got to be more specific.

9       Q.    Yeah.  Does it involve any participatory

10  aspects for the learners?  Like do they get

11  involved in hypothetical scenarios and have to act

12  out what to do?

13      A.    Not during that two-hour block.  That

14  comes later on in the training when we go over the

15  training in general for the entire 40 hours that

16  was given.

17      Q.    Is there any -- do the learners take a

18  test or any other sort of evaluation regarding this

19  training?

20      A.    During scenario training, yes.

21      Q.    So they don't take any sort of evaluation

22  at the end of this two-hour autism block but

23  evaluation is incorporated into scenarios later on?

24      A.    Yes.

25      Q.    And do you use the same scenarios with

 1   each training class?

 2        A.   I believe we've kept it the same for each

 3   one.

 4        Q.   And how many scenarios do you run through

 5   with each learner?

 6        A.   Each person has to hit, I believe, four

 7   of them, is what we're doing.

 8        Q.   And is that four from a wider group of

 9   potential scenarios?

10        A.   Yes.

11        Q.   How many are in that wider group?

12        A.   How many what?

13        Q.   Scenarios.  Like do you have a list of 20

14   scenarios, and you test them on four of them?

15        A.   No.  We have four scenarios is what I

16   said.  Like we have four scenarios that a person

17   has to do.

18        Q.   So each officer that goes through the CIT

19   training does the same four scenarios; is that

20   correct?

21        A.   Separately, correct.

22        Q.   Do any of those four scenarios involve a

23   person with autism?

24        A.   Yes.

25        Q.   How many of the four involve a person

1    with autism?

2         A.   One.

3         Q.   And is this a -- do you have a written

4    description of the scenario?

5         A.   I believe I could find it, yeah.

6         Q.   Like a what?

7         A.   I believe I could find it for you, yeah.

8    I've been doing it so long I don't have to really

9    read it anymore.

10        Q.   Could you describe that scenario to me?

11   What is it?

12        A.   So it's a person that is in crisis at the

13   time.  They're not given that it is a person with

14   autism.  We put some general aspects of autism into

15   the role player's actions for them to key in that

16   it might potentially be someone with autism, but it

17   also could be potentially someone with

18   developmental disabilities, and they have to be

19   able to judge that in that scenario, but they're

20   given ample time to do so, and it's a nonviolent

21   encounter that we give them.

22        Q.   Does it implicate the need for restraint?

23        A.   No.  It's just somewhat keeping them

24   contained by using distance.

25        Q.   Do any of the four scenarios implicate

1    the need for restraint?

2         A.   No.   We don't implement restraint.  That's

3    to deal with violent encounters, and violent

4    encounters goes into hands-on training with

5    defensive tactics.

6         Q.   This is a question I think we've answered

7    it.  There is no written materials associated with

8    -- that are handed out -- no handouts, written

9    materials, or printed slides handed out as part of

10   the Deescalation with Autism training, correct?

11        A.   Correct.

12        Q.   Is there any evaluation or measurement to

13   determine whether this autism training is

14   effective?

15        A.   I'm sorry?

16             MR. ZIBILICH:

17                  I Object to the form.

18   BY MR. MOST:

19        Q.   Sure.  Have you done -- has JPSO done any

20   evaluation to determine whether or not this

21   training is effective?

22        A.   I don't know.

23        Q.   Does a person with autism or a family

24   member or relation of a person with autism

25   participate in the training at all?

```
 1        A.    Yes.

 2        Q.    Who is that?

 3        A.    Ashley is there.

 4        Q.    And Ashley is actually a person with

 5   autism?

 6        A.    No.  She had a child with autism.

 7        Q.    Does Ashley describe her personal

 8   experience being the parent of a person with

 9   autism?

10        A.    Yes, and then we have a field trip that

11   we do where they are able to interact with upwards

12   of 20 plus people with autism and developmental

13   disabilities.

14        Q.    That field trip is part of every CIT

15   training?

16        A.    Yes.

17        Q.    Where is the field trip to?

18        A.    Magnolia Community Services.

19        Q.    What happens on that field trip?

20        A.    We get to speak with, and we have a

21   presentation that's done by the specialists that

22   are over there, one of them being a psychiatrist.

23   I believe he is the director now over it.  We have

24   the assistant activities director.  Or, actually,

25   I'm sorry, the activity director and then the
```

 1  facility director that's there.  They do a

 2  presentation on their best practices of how to

 3  interact with people with developmental

 4  disabilities and autism.  We also get to have a

 5  one-on-one interaction with people there that have

 6  developmental disabilities and autism.

 7        Q.   Does Magnolia use slides for that

 8  presentation?

 9        A.   No.  I believe he just goes up and --

10  well, I shouldn't say I believe.  He just speaks to

11  us about encounters he's had and different things

12  to deal with.

13        Q.   Yeah.  So between a field trip and this

14  training from the coroner's office, this is a

15  significant investment of training time to deal

16  specifically with how to handle persons with

17  autism, agreed?

18             MR. ZIBILICH:

19                  Object to the form.

20             THE WITNESS:

21                  Are you asking how much time?

22  BY MR. MOST:

23        Q.   Well, not really.  So there is two hours

24  of training from the coroner's office and you about

25  persons with autism, right?

```
 1        A.   Yes.
 2        Q.   And then separately a field trip, which
 3   is another, presumably, another couple of hours,
 4   agreed?
 5        A.   Yes.
 6        Q.   And that is a significant chunk of the
 7   total 40- or 48-hour CIT training, agreed?
 8             MR. ZIBILICH:
 9                  Object to the form.
10             THE WITNESS:
11                  I wouldn't say significant chunk.
12                I'd say it's a portion of the training.
13                It all goes together.
14   BY MR. MOST:
15        Q.   The reason why there is a portion of the
16   training focused on persons with autism is because
17   that's a prevalent issue in Jefferson Parish like
18   other jurisdictions, agreed?
19             MR. ZIBILICH:
20                  Object to the form.
21             THE WITNESS:
22                  No.  I am going to go with no on
23                that one.
24   BY MR. MOST:
25        Q.   What part of my statement do you think I
```

1   got wrong?

2       A.   Because it's mandated by CIT

3   International, which I'm a coordinator for.

4       Q.   So the reason why JPSO does this autism

5   specific training is because it's mandated to do so

6   by this national organization?

7       A.   To do the 40-hour CIT in accordance with

8   CIT International, they have a certain amount of

9   things that need to be covered within that, and

10  developmental disabilities is a portion of it, and

11  autism falls under the developmentally.

12      Q.   Okay.  Would you agree that autism is a

13  prevalent issue that officers are likely to

14  encounter in their careers in Jefferson Parish?

15      A.   I think any law enforcement officer has

16  the potential of dealing with someone with autism

17  when one in 54 males are diagnosed.

18      Q.   So it is likely that a given Jefferson

19  Parish sheriff's deputy will interact with the

20  person with autism in their career, agreed?

21          MR. ZIBILICH:

22              Object to the form.

23          THE WITNESS:

24              It depends on where they work.

25  BY MR. MOST:

1    Q.    So it is important for JPSO officers to

2    be trained in how to handle persons with autism and

3    the particular risk factors we've discussed today,

4    because they may interact with those kind of

5    persons in Jefferson Parish, agreed?

6         A.    Yes.  That's why we train them.

7              MR. MOST:

8                   Let's take a five-minute break.  I

9                want to go over my notes and just see.

10                We may be close to the end here.  For

11                this section, at least, noting that, of

12                course, we are reserving our right to

13                address the full scope of this topic,

14                but let's just take five.  Go off the

15                record and reconvene at 11:30 and take

16                it from there.

17                   {BRIEF RECESS}

18   BY MR. MOST:

19        Q.    Are you ready, Sergeant?

20        A.    Can you hear me?

21        Q.    Yeah.  So a couple of follow-up

22   questions.  Zooming out a little bit about the big

23   picture of CIT itself.  So CIT stands for Crisis

24   Intervention Training?  What does it stand for?

25        A.    It depends on the context.  If you are

 1  talking about the class itself, it is Crisis

 2  Intervention Team Training.  If you are talking

 3  about when people refer to it, it is usually Crisis

 4  Intervention Team.

 5      Q.   So the Crisis Intervention Team is --

 6  what is that team?  Is it the body of officers who

 7  have taken this training?

 8      A.   Yes.

 9      Q.   Do they have a specific badge, tools,

10  anything else that designates them as part of that

11  team except having taken the training?

12      A.   You are talking about how do we identify

13  that person on scene?

14      Q.   Sure.

15      A.   So on their pocket, they would have a CIT

16  -- a JPSO specific CIT pin.

17      Q.   Do CIT members carry any specific tools

18  or equipment or anything like that?

19      A.   Knowledge.

20      Q.   In addition to knowledge, do they carry

21  anything with them different than any other

22  officers?

23      A.   No.

24      Q.   And my understanding of the idea behind

25  CIT is that specially trained officers, who have

1  taken CIT training, are best equipped to deal with

2  persons in crisis or dealing with mental health or

3  physical or developmental disabilities, agreed?

4       A.   I would disagree.

5       Q.   What would you disagree with?

6       A.   Because the best person to deal with

7  someone with mental illness, developmental

8  disabilities, would be a specialist in that field,

9  not law enforcement.  That's been thrust upon us.

10      Q.   But among JPSO officers, among the group

11 of JPSO officers, the best equipped would be the

12 persons with CIT training, right?

13      A.   No.

14      Q.   Who among JPSO officers would be better

15 equipped than the ones with CIT training?

16      A.   Dr. James Arey.

17      Q.   And so among JPSO, the best person to

18 deal with a person with a developmental disability

19 or another sort of mental health crisis would be

20 Dr. Jim Arey, and the next officers with CIT

21 training?

22      A.   No.  Mobile Crisis Unit.

23      Q.   So Arey then Mobile Crisis Unit then

24 officers with CIT training?

25      A.   I would say more of the people that work

```
1   at the hospitals that deal with the crisis unit
2   would be better trained than us.
3        Q.   I'm talking about within JPSO.  I
4   understand --
5        A.   We should be the last line of resort for
6   that.
7        Q.   What is that?
8        A.   We should be the last line of resort for
9   that.
10       Q.   But within JPSO, regardless of whether
11  it's right or wrong, the person best equipped for
12  dealing with someone in mental health crisis or
13  with a developmental disability would be Jim Arey,
14  then the Mobile Crisis Unit, then persons with CIT
15  training?
16       A.   The coroner's office.  After the
17  coroner's office then JPSO, because the coroner's
18  office is integrated into it with us.  Yes.
19       Q.   The coroner's office is a distinct
20  entity, right?
21       A.   Yes, but they are integrated with us.
22  That's the whole CIT model.  You quoted CIT model.
23  If we are going to quote CIT model, it is an
24  incorporation of law enforcement, mental health
25  organizations, public health organizations, and
```

1   public organizations that deal specifically with

2   people that have mental disabilities, developmental

3   disabilities, and the veterans organizations.

4        Q.   Does Dr. Arey go out to the scenes of

5   field situations?

6        A.   He has.

7        Q.   So when there is an issue with someone in

8   crisis or with a developmental disability, he can

9   be called to go out to the scene?

10       A.   He can be.

11       Q.   And so officers have the discretion to

12  call for Arey to come to the scene of a situation?

13       A.   It depends on the actual situation, yes.

14       Q.   So depending on the situation, one thing

15  officers can do is they can call and ask that Jim

16  Arey show up, right?

17       A.   Correct.

18       Q.   Another thing that officers can do is

19  call for the -- what did you call it, the Mobile

20  Crisis Unit?

21       A.   Yes.

22       Q.   What is that?

23       A.   I think it's RHD now.  What the acronym

24  for that is I have no clue.  They have changed so

25  many times, because it's about where the money

1    goes.

2         Q.    Is that a JPSO unit?

3         A.    No.  They are assigned to Jefferson

4    Parish.  It's a regional organization.

5         Q.    So another thing officers can do is they

6    can call for this Mobile Crisis or RHD Unit,

7    correct?

8         A.    Yes.

9         Q.    And how does an officer do that?  Is

10   there a special code they radio in or something

11   they ask of the dispatcher?

12        A.    It is situational specific.  If it's

13   nonviolent encounters, then you can request those.

14   Or dispatch can actually request it prior to

15   sending out law enforcement.

16        Q.    Right, but my question is, if an officer

17   is calling for the Mobile Crisis Unit or RHD, what

18   do they actually do?  Do they get on the radio and

19   say send the Mobile Crisis Unit?

20        A.    They can request it, yes.

21        Q.    Is there a special code they use for it?

22        A.    No.  Just pretty much how you said it.

23        Q.    Same with Arey.  Is there a special code

24   or they just say, hey, could y'all see if Jim Arey

25   is available?

1     A.   We'll actually call dispatch instead of
2  putting his name over the radio.
3     Q.   So they contact dispatch through some
4  means other than radio and ask for Jim Arey?
5     A.   They'll either ask for him or ask for the
6  Crisis Intervention Unit.
7     Q.   Does dispatch make a notation of requests
8  like for Arey or the crisis unit?
9     A.   I'm sure they do.
10     Q.   Can an officer ask for a CIT member to be
11  dispatched to a scene?
12     A.   I'm sure they can.
13     Q.   And other than the pin on their shirt and
14  their training, CIT members, they don't have
15  special vehicles or anything else other than the
16  knowledge that they've got and their pin, correct?
17     A.   For JPSO, correct.
18     Q.   When a CIT member shows up to the scene,
19  should they do anything specific by virtue of their
20  membership in CIT?  Like do they have special
21  procedures or special things they're supposed to
22  do?
23     A.   No.
24     Q.   Are they supposed to notify other
25  officers that they are a CIT member?

```
 1          A.    It depends on the situation.
 2          Q.    When there is a -- when dispatch has a --
 3    is aware of a mental health situation, are they
 4    supposed to dispatch CIT members preferentially?
 5          A.    Not that I know.
 6          Q.    You've done some of the CIT trainings
 7    over the years, so I'm just going to ask you
 8    whether the officers involved in this case are CIT
 9    members, and you can let me know if you know and
10    let me know if you don't know.  All right?
11          A.    All right.
12          Q.    Is the sheriff himself a CIT member?
13          A.    I don't know.
14          Q.    Chad Pitfield?
15          A.    I don't know.
16          Q.    Ryan Vaught?
17          A.    Are you asking -- you just said are they
18    members?
19          Q.    Well, so there is the CIT -- CIT is
20    Crisis Intervention Team, right?
21          A.    Correct.
22          Q.    And so CIT members are the people who
23    have received CIT training, right?
24          A.    If you using team as in reference to an
25    entity, yes, but as far as JPSO is concerned, it's
```

```
 1   whether a person is CIT trained.  It's not a
 2   membership.
 3        Q.   Okay.
 4        A.   So if you are asking me whether they've
 5   had the training, I can answer that.  If they're
 6   part of the CIT team, I don't know either.
 7        Q.   Is there a CIT team apart from just the
 8   people who have had CIT training at JPSO?
 9        A.   There is a Crisis Intervention Unit.
10        Q.   Is that staffed by JPSO personnel?
11        A.   Yes.
12             MR. ZIBILICH:
13                  Why don't you just ask him who is in
14                the Crisis Intervention Unit?
15             MR. MOST:
16                  Yeah.  I'm going to.
17   BY MR. MOST:
18        Q.   Who is in the Crisis Intervention Unit?
19        A.   Lieutenant Gilbert Reith, R-E-I-T-H,
20   Derrick Leggett, L-E-G-G-E-T-T, I believe, and we
21   have -- I can't think of the other two names.
22   Alvin Farris.  I don't know how to spell his last
23   name.  And then we also have one other one.  I
24   can't think of his name at this point.
25        Q.   That's okay.  So there is a four-member
```

1   Crisis Intervention Unit?

2        A.    Correct.

3        Q.    Do they have a specialized vehicle?

4        A.    No.  They got JPSO marked units.

5        Q.    Do they have any special equipment in

6   those units?

7        A.    Not that I know of.

8        Q.    So the Crisis Intervention Unit has the

9   same restraint equipment that every other officer

10  carries in their vehicles?

11       A.    I don't know.  You'd have to -- I don't

12  know.

13       Q.    And is it set up so one of these -- one

14  or more of these Crisis Intervention Unit officers

15  is always available?

16       A.    I don't know.

17       Q.    So you've got Jim Arey.  You've got the

18  four Crisis Intervention Unit officers, and then

19  you've got the broader pool of people who have

20  received CIT training, right?

21       A.    Yes, we do.

22       Q.    So then I will just ask you if the

23  following officers received CIT training to your

24  knowledge.  Sheriff Lopinto?

25       A.    I don't know.

```
 1        Q.    Chad Pitfield?

 2        A.    I don't know.

 3        Q.    Ryan Vaught?

 4        A.    I don't know.

 5        Q.    Steven Mehrtens?

 6        A.    Oh, I don't know.

 7        Q.    Shannon Guidry?

 8        A.    I don't know.

 9        Q.    Nick Vega?

10        A.    I don't know.

11        Q.    Manuel Estrada?

12        A.    Don't know.

13        Q.    Myron Gaudet?

14        A.    I believe Myron has, yes.

15        Q.    And if we looked at an officer's training

16   files, would it reflect -- would there be some sort

17   of notation that they had taken CIT training?

18        A.    Yes.

19        Q.    Is there a particular language we should

20   be on the lookout for on that?

21        A.    CIT.

22        Q.    Okay.

23        A.    Or crisis intervention training,

24   depending on if they spelled it out.

25             MR. ZIBILICH:
```

```
 1              Or behind Door Number 2 is when
 2         Mr. Clarke can't give you the answer,
 3         just send me a discovery device.
 4    MR. MOST:
 5              Yeah.  Okay.  Chris, would you like
 6         to ask any questions?  You may not, but
 7         I'll give you the option.
 8    MR. KAUL:
 9              I have no questions.
10    MR. MOST:
11              Franz, does anyone, you or anyone
12         else in your room, want to ask any
13         questions?
14    MR. ZIBILICH:
15              No thank you.
16    MR. MOST:
17              Okay.  So we can close this topic
18         although with the reservation that we
19         are going to challenge the fact that
20         the witness was not prepared about all
21         aspects of this topic.
22              Do you want to talk about that now,
23         Franz?  We can let the witness go, and
24         then we could just talk about it right
25         now while we're on the record, and then
```

```
 1              proceed with the next witness when he
 2              is available.
 3         MR. ZIBILICH:
 4              We got a call in the next witness.
 5         All right.  So it's just not my idea of
 6         what a corporate deposition is.  The
 7         only people that would have known the
 8         answers to that query were the
 9         participants, and I figured you could
10         ask the participants those questions at
11         a fact deposition.
12         MR. MOST:
13              Yeah.  I understand that take.
14         MR. ZIBILICH:
15              You can't force me to find somebody
16         with knowledge when maybe I don't have
17         anybody with knowledge.  Maybe I didn't
18         want to educate people and have them
19         knowledgeable.  And, again, the best
20         people to ask about what went on would
21         have been the people that were present
22         at the scene.
23         MR. MOST:
24              I understand that's your take,
25         Franz, however, the Americans with
```

```
 1                    Disabilities and Rehabilitation Act
 2                    claims are claims against the entity
 3                    themselves.  They are not claims
 4                    against any individual officer.  They
 5                    can't be.  Under the ADA, it's only the
 6                    entity itself that is a defendant.
 7              MR. ZIBILICH:
 8                    Who do you think the entity is?
 9              MR. MOST:
10                    Sheriff Lopinto in his official
11               capacity is subject to the ADA.  I
12               refer to it colloquially, as I think
13               probably you do as well, JPSO.
14              MR. ZIBILICH:
15                    JPSO, as well you know, and I have
16               no --
17              MR. MOST:
18                    I am aware of that, Franz, but,
19               also, I know you and other people use
20               the words "JPSO" because that is how
21               people commonly refer to it.  I very
22               rarely hear people say Sheriff Lopinto
23               in his official capacity.  But, look,
24               we're on the same page about what
25               official entity is.
```

1      MR. ZIBILICH:

2          I have no problem with you deposing

3      Sheriff Lopinto relative to this stuff.

4      MR. MOST:

5          Well, the 30(b)(6) notice is for a

6      person knowledgeable to speak on behalf

7      of the entity, the legal entity, which

8      is Sheriff Lopinto in his official

9      capacity, about issues like

10      accommodations provided to EP, any

11      modifications deputies made to the

12      procedures and protocols, and the

13      answer may be there were not.

14      MR. ZIBILICH:

15          But he wasn't on the scene.

16      MR. MOST:

17          Okay.  Look, I think we have

18      conferred about this.  We have --

19      MR. ZIBILICH:

20          He can't answer those questions.

21      MR. MOST:

22          What's that?

23      MR. ZIBILICH:

24          I said he can't answer those

25      questions.  He was not on the scene.

```
 1              MR. MOST:
 2                  Well, the entity can provide someone
 3              knowledgeable and educate them as
 4              30(b)6 requires, and if he can't do
 5              that, then put someone up that says we
 6              don't have any knowledge about this. We
 7              can't find any knowledge about it.  If
 8              that's the answer, that will be the
 9              answer, but we'll have to designate
10              someone and ask them the questions.
11                  If you'd like to confer and get back
12              to us by tomorrow about whether you are
13              willing to provide someone to answer
14              these questions, that's fine,
15              otherwise, I do think it's appropriate
16              for a Motion to Compel, unless there is
17              a reason not to.
18          MR. ZIBILICH:
19                  Let me think about it.  I can't
20              promise you tomorrow, but I can promise
21              you the end of the week.
22          MR. MOST:
23                  Okay.  That's fine.
24          MR. ZIBILICH:
25                  So I'm going to do something exactly
```

1          the opposite with the next one.
2     MR. MOST:
3          Okay.  What are you going to do?
4     MR. ZIBILICH:
5          Although I do not believe that the
6        next one falls squarely under 30(b)(6),
7        I'm going to have somebody here anyway.
8     MR. MOST:
9          Okay.  That's fine.
10    MR. ZIBILICH:
11         And I think I can get us started by
12       a quarter to one. I need a few minutes
13       with him.
14         [End of deposition, 11:46]
15
16
17
18
19
20
21
22
23
24
25

1                   C E R T I F I C A T E

2

3              This certification is valid only for
a transcript accompanied by my original signature
4  and original required seal on this page.

5              I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6  as the officer before whom this testimony was
taken, do hereby certify that SERGEANT MICHAEL
7  VOLTOLINA, JR., after having been duly sworn by me
upon authority of R.S. 37:2554, did testify as
8  hereinbefore set forth in the foregoing 127 pages;

9              That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10  or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11  ability and understanding;

12              That the transcript has been
prepared in compliance with transcript format
13  guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14  prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15  and in rules and advisory opinions of the board;

16              That I am not related to Counsel or
to the parties herein, nor am I otherwise
17  interested in the outcome of this matter.

18

19

20

21  _____
Sandra P. DiFebbo,
22  Certified Shorthand Reporter

23  Date:  _____

24

25

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**