UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DONNA LOU, ET AL. | * | CIVIL ACTION NO. 21-80 |
| VERSUS | * | SECTION "D" (2) |
| SHERIFF JOSEPH P, LOPINTO, III, ET AL. | * | Judge Wendy B. Vitter<br>Magistrate Judge Donna P. Currault |

**Plaintiffs' Opposition to JPSO Defendants' Motion for Partial Summary Judgment on Plaintiffs' ADA/RA Claim**

This case is about JPSO officers who secured a severely autistic child by putting him face down on the ground and then handcuffing his arms and shackling his legs. Two JPSO officers took turns sitting on the child until he asphyxiated and died. The child's parents filed a suit that included an Americans with Disabilities Act and Rehabilitation Act (ADA/RA) claim against Sheriff Lopinto in his official capacity (*i.e.*, JPSO). In discovery, JPSO conceded it did not provide any accommodations to the child for his disability.

JPSO Defendants have now moved for summary judgment on Plaintiffs' ADA/RA claim. They make two arguments, neither of which have merit.

**First**, JPSO Defendants invoke qualified immunity. But qualified immunity is only a defense when officers are sued for damages in their <u>individual capacity</u>. Here, Plaintiffs brought the ADA/RA claim against one defendant, Sheriff Lopinto, in his <u>official capacity</u>. There is no qualified immunity defense available to this claim.

**Second**, JPSO Defendants cite the Fifth Circuit's 2000 decision in *Hainze* that the ADA does not apply "prior to the officer's securing the scene." They argue that the ADA did not apply to the situation at issue here, because there was no point at which the scene was secure. *Hainze* is likely no longer controlling, due to recent Supreme Court rulings that require a textual basis for exceptions to statutes. But even if *Hainze* is still good law, the idea that the scene was not secure is directly contrary to (1) Defendants' own statements and (2) the video of the incident. Based on the

1

evidence, a reasonable jury could conclude the scene was secure once E.P. was face-down, hand-cuffed, foot-shackled, officer-surrounded, and sat-upon.

Defendants' motion should be denied.

## I.     LEGAL STANDARD

"[S]ummary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[1] Summary judgment is only appropriate when the moving party identifies material facts not in dispute, "and the nonmoving party fails to produce or identify in the record summary judgment evidence sufficient to sustain a finding in its favor respecting such of those facts as to which it bears the trial burden of proof."[2] This Court will view "the evidence and all justifiable inferences in the light most favorable to the non-moving party."[3]

## II.    ANALYSIS

**A.     The motion should be denied because qualified immunity is only available to a defendant in an <u>individual capacity</u>, and the ADA/RA claim here is only brought against Lopinto in his <u>official capacity</u>.**

Qualified immunity is a defense that "shields public officials sued in their individual capacities from liability for civil damages" when their conduct does not violate clearly established law.[4] It only shields officers sued in their *individual* capacity: "[o]fficials have no qualified immunity when they are sued in their official capacity."[5]

---

[1] *Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).
[2] *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 521 (5th Cir. 1999).
[3] *Vercher v. Alexander & Alexander Inc.,* 379 F.3d 222, 225 (5th Cir. 2004).
[4] *Solis v. Serrett*, 31 F.4th 975, 980 (5th Cir. 2022)
[5] *Zarnow v. City of Wichita Falls*, 500 F.3d 401, 407 n.1 (5th Cir. 2007). *See also Johnson v. Bowe*, 856 F. App'x 487, 491 (5th Cir. 2021) (unpub.) ("Municipalities and public officials in their official capacity do not enjoy qualified immunity against § 1983 actions—only officials in their individual capacities may assert qualified immunity.")

Here, Plaintiffs bring their ADA/RA claim against Sheriff Lopinto in his official capacity.[6] They are not bringing an ADA/RA claim against Lopinto in his individual capacity, or any other defendant in any capacity. There is a reason for that: a Title II ADA/RA claim is a claim against a public entity.[7] There is no individual liability for a Title II ADA/RA claim.[8]

Because Defendants are raising a defense that is not available to the entity being sued, the motion should be denied.[9]

**B.     The motion should be denied because a reasonable jury could conclude the scene was secure once E.P. was face-down, hand-cuffed, foot-shackled, and sat-upon.**

Title II of the ADA and Section 504 of the Rehabilitation Act prohibit discrimination by a public agency.[10] Discrimination as defined does not require animus towards people with disabilities.[11] A defendant commits intentional discrimination where an employee of a public entity has knowledge of a plaintiff's disability but chooses not to accommodate him.[12]

---

[6] R. Doc. 1 at pg. 70 (ADA/RA claim brought against "Sheriff Lopinto in his Official Capacity"). See also R. Doc. 18 ("the Complaint brings claims against Sheriff Lopinto in his official capacity for violating the Americans with Disabilities Act and Section 504 of the Rehabilitation Act").

[7] See 42 U.S. Code § 12132 (Title II claim protects against discrimination by a "public entity");

[8] *See Albritton v. Quarterman*, Civ. A. No. 6:08-CV-268, [*690] 2009 U.S. Dist. LEXIS 17170, 2009 WL 585659 *10-11 (E.D. Tex. Mar. 6, 2009) ("Because the remedies, procedures, and rights under the Americans with Disabilities Act are the same as those under the Rehabilitation Act, there is likewise no individual liability for claims of violations under [**40] the ADA."); *Williams v. Hayman*, 657 F. Supp. 2d 488, 502 (D.N.J. 2008) ("Nearly every court that has addressed the question appears to have held that Title II does not authorize suits against government officers in their individual capacities.") (collecting cases).

[9] Because it is frivolous on its face, Plaintiffs' counsel asked JPSO Defendants' counsel to withdraw this part of their motion. JPSO Defendants' counsel declined to do so.

[10] 42 U.S.C. §§ 12131, 12132 and Section 504 of the Rehabilitation Act (RA).

[11] *Carter v. Orleans Par. Pub. Sch.*, 725 F.2d 261, 264 (5th Cir. 1984); *Esparza v. Univ. Med. Ctr. Mgmt. Corp.*, No. CV 17-4803, 2017 WL 4791185, at *17 (E.D. La. Oct. 24, 2017)

[12] *Delano-Pyle v. Victoria Cty., Tex*, 302 F.3d 567, 575 (5th Cir. 2002); *see also Miraglia v. Bd. of Supervisors of Louisiana State Museum*, 901 F.3d 565 (5th Cir. 2018) (affirming "damages based on a defendant's knowledge of the plaintiff's disability and his decision not to accommodate him[.]") *See also Phillips v. Prator*, No. 20-30110, 2021 U.S. App. LEXIS 22947, at *5-6 (5th Cir. Aug. 3, 2021) (unpub.) ("Plaintiffs may sue under the Title II of the ADA when a public entity discriminates against them because of [*6] their disability, including by failure to accommodate their disability. . . . Section 504 of the Rehabilitation Act prohibits essentially identical conduct, so the two provisions are interpreted in tandem."), *citing Windham v. Harris County*, 875 F.3d 229, 235-36 (5th Cir. 2017) (discussing 42 U.S.C. §§ 12131-33).

In passing the ADA, Congress intended Title II to cover all police agency activities, including arrests.[13] Accordingly, federal regulations explicitly apply those provisions to law enforcement conduct during arrests.[14]

In 2000, in *Hainze v. Richards,* the Fifth Circuit created an extra-statutory exception: that the ADA "does not apply to an officer's on-the-street responses to . . . incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life."[15] As described below, *Hainze* is likely no longer good law given the Supreme Court's requirements of a textual basis for statutory exceptions.

However, even under *Hainze,* once an area is secure and there is no threat to human safety, officers are "under a duty to reasonably accommodate" known disabilities of an arrestee.[16] For that reason, where there are fact questions regarding whether a scene was secure, courts will deny summary judgment on ADA/RA claims.[17]

---

[13] *See* House Comm. Judiciary, H.R. Rep. No. 101 485, pt. 3, at 50 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 473 ("[T]o comply with the non-discrimination mandate, it is often necessary to provide training to public employees about disability. For example, persons who have epilepsy, and a variety of other disabilities, are frequently inappropriately arrested and jailed because police officers have not received proper training . . .")

[14] 28 C.F.R. pt. 35, app. B (2014) ("The general regulatory obligation to modify policies, practices, or procedures requires law enforcement to make changes in policies that result in discriminatory arrests or abuse of individuals with disabilities."); id. ("[T]itle II applies to anything a public entity does."); U.S. Dep. of Justice, Civil Rights Div., The ADA and City Governments: Common Problems (2008) ("When dealing with persons with disabilities, law enforcement agencies often fail to modify policies, practices, or procedures in a variety of law enforcement settings— including citizen interaction, detention, and arrest procedures. . . . When interacting with police and other law enforcement officers, people with disabilities are often placed in unsafe situations or are unable to communicate with officers because standard police practices and policies are not appropriately modified."); U.S. Dep. of Justice, Civil Rights Div., Commonly Asked Questions About The Americans With Disabilities Act And Law Enforcement (2006) ("The ADA affects virtually everything that officers and deputies do, for example: . . . arresting . . . suspects[.]"); U.S. Dep. of Justice, Civil Rights Div., Communicating with People Who Are Deaf or Hard of Hearing: ADA Guide for Law Enforcement Officers (2006).

[15] *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000).

[16] Id. at 802.

[17] *Sullivan v. City of Round Rock*, No. A-14-CV-349-AWA, 2017 U.S. Dist. LEXIS 146312, 2017 WL 4001572, at *1 (W.D. Tex. Sept. 11, 2017) (noting prior denial of summary judgment on ADA claim because of "fact questions surrounding whether Sullivan posed a threat or whether there was any need for officers to secure the scene")

Here, Defendants have conceded that they made no accommodations for E.P.'s disability.[18] Their motion contends that the ADA/RA claim should nevertheless be dismissed because "the scene was never secure prior to E.P.'s demise."[19] That characterization by Defendants' counsel, however, is contrary to the way Defendants themselves describe the situation. Defendants described points at which the scene was "under control," "was calm," and "everything was fine":

- Defendant Mehrtens said that at one point "Deputy Pitfield has got [E.P.] under control . . . so to engage him at that point just wasn't necessary, he was calm, everything was fine."[20]

- Defendant Shannon Guidry in her statement said that at one point "I'm putting my gloves on, at this point Chad had him restrained [with] the handcuffs in the back."[21]

- Defendant Guidry also said "Chad had him restrained and everything was fine . . . Nick came in and uh, continued to keep him, the kid or whatever under control."[22]

- Defendant Vaught described the situation at one point as "Q: You're meeting resistance? A: No, no, no, not— not—not really, no Q: Okay. A: Um, he was, he was um, moving a little bit but he wasn't trying to resist or pull his—pull his arm away."[23]

- Defendant Vaught described the situation at another point as "Q; Okay and again, no measurable resistance at the point where you secure his left hand and are able to—to cuff him, cuff him to the cuffs that Deputy Pitfield has? A: No, um, there—there was no active resistance from him. I was able to—to handcuff him and get them behind his back."[24]

Similarly, the JPSO homicide detective assigned to investigate the matter testified the officers "realized that [E.P.] had stopped resisting" at the point where Vega replaced Pitfield on top

---

[18] R. Doc. 151-6 at pg. 4 (Interrogatory response: "The factual backdrop of the incident sued upon did not implicate a need for an accommodation. Therefore, an accommodation was not provided."); R. Doc. 151-7 at 23:5-13 (30b6 witness testimony: "Q. Okay. So this statement that we're looking at here, 'The factual backdrop for the incident sued upon did not implicate a need for an accommodation,' that's an accurate reflection of the entity's position; agreed? A. You know, of the entity, I would say yes.")
[19] R. Doc. 154-1 at 8.
[20] Ex. A at 9-10
[21] Ex. B at 2.
[22] *Id*.
[23] Ex. C at 4-5
[24] *Id*. at 12.

5

of E.P.[25] The detective said that when the handcuffs were put on E.P., there was no "resistance to the handcuff."[26]

Defendants offer only one piece of evidence for the proposition that the scene was never secure: the security camera tape of the incident. They do not point to any specific portion of the video. They just say that the "video speaks for itself."[27]

But the video does not support Defendants' argument. It shows an altercation, in which the severely autistic minor slaps at himself, his father, and Chad Pitfield. But by 13:30:30, the scene is secure: Pitfield has put E.P. face-down on the ground, and is sitting on his back. Other officers arrive, and help Pitfield hand-cuff and leg-shackle E.P. The arriving officers do not treat the situation as "unsecured." Instead, they stand around and talk to each other, as seen at 13:36:22. Their conduct gives no indication that the scene is unsecured or there is an ongoing "threat to human life" as contemplated by the Fifth Circuit in *Hainze*.[28] Instead, the video shows a group of officers milling about as Deputy Pitfield and then Deputy Vega take turns sitting on top of a face-down, handcuffed, leg-shackled minor.

It is hard to imagine how the scene could have been *more* secure unless the officers gagged and hogtied E.P., or unless JPSO interprets "secure" to mean "dead." But that does not track the law. For example, in *Windham v. Harris County*, the Fifth Circuit held that the *Hainze* exception would not "apply on these non-exigent facts" in a context where a suspect was not even handcuffed.[29] Likewise, in *Phillips v. Prator*, applied the ADA when a youth had run towards an

---

[25] Ex. D (Dowling Dep.) at 112:14-19 ("Q. The interviews, like Deputy Vega, when he gave his interview, he said that when they moved to switch out, that Mr. Parsa wasn't offering any resistance, correct? A. That's when they realized that he had stopped resisting, yes.");
[26] *Id.* at 122:6-8
[27] R. Doc. 154-1 at 8.
[28] *See, e.g. Bailey v. United States*, 568 U.S. 186, 198 (2013) (describing officers as "secur[ing] the scene" by "detaining those present")
[29] 875 F.3d 229, 235 n.4 (5th Cir. 2017) (unpub.)

administrator, kicked in the direction of adults, was not handcuffed or otherwise restrained, and an officer used his Taser.[30]

Defendants' argument goes no further: they only argue that the scene was never secured, and so the ADA should not apply. But it is worth noting for the sake of completeness that Defendants were actually aware of E.P.'s disability,[31] and Defendants have conceded that there were accommodations they could have provided to him.[32] The 30(b)(6) representative testified that there were specific accommodations that could have been provided, including use of the RIPP Hobble device,[33] rolling E.P. onto his side,[34] etc. Indeed, JPSO's 30(b)(6) representative testified that "from what I know, I would assume that that accommodation would be necessary."[35] JPSO's only defense is their false narrative that the scene was not secure.

For the purpose of this motion, it is sufficient that the motion should be denied because, when viewed in the light most favorable to Plaintiffs, a reasonable jury could find that the scene was secure when officers said that it was "under control," "was calm," and "everything was fine," And because a reasonable jury could find that the scene was secure when a half-dozen officers surrounded a face-down, hand-cuffed, leg-shackled, sat-upon minor, the motion should also be denied.

---

[30] No. 20-30110, 2021 U.S. App. LEXIS 22947, at *5-6 (5th Cir. Aug. 3, 2021) (unpub.)
[31] R. Doc. 142-3 (Dep. of Pitfield) at 113:13-16 ("Q On the phone, the laser tag manager told you that the incident involved a child with special needs, agreed? A Correct."); *id*. at 119:19-22 ("I was told that he was autistic after we were already on the ground."); R. 104-9 (Vega Dep.) at 123:7-9 ("Q. So you know before you got on him that you were dealing with an autistic child? 9 A. I believe so."); Ex. B (Guidry Statement) at 4 ("when I walked up, I just assumed he was autistic."); Ex. A (Mehrtens Statement) at 9 ("from the point that I, that I arrived is when people were, I think it was the mother and the father, you know, he's special needs, he's got autism.")
[32] R. Doc. 151-7 (ADA 30b6 Dep.) at 28:8-12 ("Q. Okay. So if E.P. had stopped resisting at -- at various points during the incident, accommodations could be appropriate in that scenario; agreed? A. I'm sure they would be, yeah.").
[33] Id. at 29:25-30:8.
[34] Id. at 31:5-15.
[35] Id. at 28:19-20.

C.  **This Court should find that the holding of *Hainze* is no longer law because it violates recent Supreme Court rulings that statutory exceptions must have textual support.**

As described above, Plaintiffs' facts satisfy the *Hainze* holding that a scene must be secured before the ADA applies in an on-the-street responses. Plaintiffs suggest, however, that this Court hold that *Hainze* is no longer good law. That is because the Supreme Court's has recently emphasized strict textual interpretation of governing texts, and the holding of *Hainze* has no textual support.

Twenty-three years ago, in *Hainze v. Richards*, the Fifth Circuit was tasked with being one of the first district courts to decide police officers' obligations under the ADA in the face of extreme danger.[36] The officers in *Hainze* reached a convenience store parking lot and encountered an individual wielding a knife and standing next to a pickup truck occupied by two persons.[37] After being ordered to get away from the truck, the knife-wielding individual immediately began walking towards the officer brandishing the knife and ignoring the officer's repeated orders to stop.[38] When the knife-wielding assailant was within "a few feet," the officer made a quick decision out of self-defense to fire his weapon.[39] A mere twenty seconds elapsed between the time the officers arrived on the scene and the time they were forced to make a "split-second" decision to fire his weapon.[40]

Under this very-specific set of facts, the Fifth Circuit held that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life."[41] The Court went on to explain that "[t]o require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby

---

[36] 207 F.3d 795 (5th Cir. 2000).
[37] *Id*. at 801.
[38] *Id*.
[39] *Id*.
[40] *Id*. at 802.
[41] *Id*. at 801 (emphasis added).

8

civilians, would pose an unnecessary risk to innocents."[42] That exception, however, does not appear anywhere in the text of the ADA. And the Fifth Circuit has not yet issued any subsequent opinions delineating the scope of this holding.

Other circuits have not followed the Fifth Circuit's approach. Around the same time, in 1999, in *Gohier v. Enright*, the Tenth Circuit held that "a broad rule categorically excluding arrests from the scope of Title II ... is not the law."[43]

In 2007, in *Bircoll v. Miami–Dade County*, the Eleventh Circuit held that "the question is not so much one of the applicability of the ADA because Title II prohibits discrimination by a public entity by reason of [a person's] disability. The exigent circumstances presented by criminal activity and the already onerous tasks of police on the scene go more to the reasonableness of the requested ADA modification than whether the ADA applies in the first instance."[44]

In 2008, the Sixth Circuit ruled in *Tucker v. Tennessee* that police officers "discriminated against them in violation of the ADA by failing to provide a qualified sign language interpreter or other such reasonable accommodation(s) during the domestic disturbance call that resulted in their arrest."[45]

In 2009, in *Waller ex rel. Estate of Hunt v. City of Danville*, the Fourth Circuit reserved judgment on the Fifth Circuit's approach and then went on to consider a reasonable accommodation claim involving an arrest.[46] Like the Eleventh Circuit, *Waller* held that "exigency is one circumstance that bears materially on the inquiry into reasonableness under the ADA."[47]

In 2014, in *Sheehan v. City & Cty. of San Francisco*, the Ninth Circuit held that because the ADA covers public "services, programs, or activities," § 12132, the ADA's accommodation

---

[42] *Id*.
[43] 186 F.3d 1216, 1221 (10th Cir.1999).
[44] 480 F.3d 1072, 1085 (11th Cir. 2007).
[45] 539 F.3d 526, 534 (6th Cir.2008)
[46] 556 F.3d 171, 175 (4th Cir. 2009)
[47] *Id*.

requirement should be read to "to encompass 'anything a public entity does,'"[48] The Ninth Circuit agreed "that exigent circumstances inform the reasonableness analysis under the ADA,"[49] but concluded that it was for a jury to decide whether San Francisco should have accommodated Sheehan by, for instance, "respect[ing] her comfort zone, engag[ing] in non-threatening communications and us[ing] the passage of time to defuse the situation rather than precipitating a deadly confrontation."[50]

Indeed, the shaky grounds of the *Hainze* decision is evidenced from the Supreme Court's attempt to resolve whether the ADA requires an officer to accommodate an "armed and violent" individual with a mental illness. In *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1772, 191 L. Ed. 2d 856 (2015), the Supreme Court granted certiorari to decide whether § 12132 of the ADA "requires law enforcement officers to provide accommodations to an armed, violent, and mentally ill suspect in the course of bringing the suspect into custody."[51] However, the Court determined that in its briefing "San Francisco chose to rely on a different argument than what it pressed below."[52] Given this procedural error and the lack of sufficient briefing, this question was dismissed as improvidently granted.[53]

"It is well-settled law that 'if a precedent...has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower court] should follow the case which directly controls, leaving to [the binding authority] the prerogative of overruling its own decisions.'"[54] That rule coexists with the "equally well-settled [proposition] that a district court may recognize when a precedent has been 'explicitly or implicitly overruled by a subsequent Supreme

---

[48] 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part, cert. dismissed in part sub nom. City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 191 L. Ed. 2d 856 (2015).
[49] *Id*.
[50] *Id*., at 1233.
[51] *Id*. at 1768.
[52] *Id*. at 1772-73.
[53] *Id*. at 1778.
[54] *Does 1–7 v. Round Rock Indep. Sch. Dist*., 540 F. Supp. 2d 735, 749 (W.D. Tex. 2007) (*quoting Agostini v. Felton*, 521 U.S. 203 (1997))); *see United States v. Short*, 181 F.3d 620, 624 (5th Cir. 1999)).

Court decision.'"[55] To decide which rule applies, "the question to ask is whether the holding (not the rationale) of the Supreme Court can be squared with the holding (not the rationale) of the Court of Appeals."[56]

The language of *Hainze* indicates that the Fifth Circuit crafted an exception to ADA based on perceived risk to "innocents," not based on a strict textual interpretation of the statute.[57] A review of the text of § 12132 of the ADA does not reveal any such "on-the-street response to [a] reported disturbance" exception. And that should be fatal to the continued viability of the *Hainze* holding, given that the U.S. Supreme Court has noted that in interpreting a statute, "Congress sets the rules — and courts have a role in creating exceptions only if Congress wants them to."[58] And in *Bostock*, the Supreme Court held that:

> When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit.[59]

Abandoning the *Hainze* rule would not mean that officers will necessarily be liable for ADA violations for failure to accommodate disabilities in exigent circumstances. The ADA only requires <u>reasonable</u> accommodations.[60] And as the *Bircoll* court noted, the exigency of the circumstances can be evaluated as part of the reasonableness of the requested accommodation.[61]

Because the *Hainze* rule violates the U.S. Supreme Court's holdings about textual support for statutory exceptions, this Court should rule that *Hainze* is no longer binding precedent.

---

[55] *Does 1–7*, 540 F. Supp. 2d at 739 (*quoting Enriquez v. Union Pac. R.R.*, No. 5:03–CV–174, 2004 U.S. Dist. LEXIS 28989, 35–36 (E.D. Tex. Jan. 30, 2004)).
[56] *Id.* (*quoting EEOC v. Sidley Austin Brown & Wood*, 406 F. Supp. 2d 991, 996 (N.D. Ill. 2005)); *see Short*, 181 F.3d at 625 (conducting substantively the same analysis to conclude that intervening Supreme Court decision did not alter prior, binding Fifth Circuit precedent).
[57] *Hainze*, 207 F.3d at 801 ("To require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents.").
[58] *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016).
[59] *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1737 (2020).
[60] 42 U.S.C. § 12112 (b)(5)(A).
[61] *Bircoll v. Miami–Dade County*, 480 F.3d 1072, 1085 (11th Cir. 2007),

### III. CONCLUSION

The Motion should be denied.

RESPECTFULLY SUBMITTED,

Andrew C. Clarke (TN BPR # 15409)
The Cochran Firm Midsouth
One Commerce Square, Suite 1700
(901) 523-1222 (Telephone)
aclarke@cochranfirmmidsouth.com

*/s/ William Most*
WILLIAM MOST (BPR # 36914)
Most & Associates
201 St. Charles Ave., Ste. 114 #101
New Orleans, LA 70170
Tel: (504) 509-5023
williammost@gmail.com