UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| DONNA LOU, ET AL. | * | CIVIL ACTION NO. 21-80 |
|---|---|---|
| VERSUS | * | SECTION "D" (2) |
| SHERIFF JOSEPH P, LOPINTO, III, ET AL. | * | Judge Wendy B. Vitter<br>Magistrate Judge Donna P. Currault |

**Plaintiffs' Response to JPSO's Statement of Material Facts**

| # | Plaintiffs' Material Facts | JPSO's Response |
|---|---|---|
| 1 | There were points during the incident where E.P. was calm and everything was fine.[1] | |
| 2 | Pitfield was able to restrain E.P.[2] | |
| 3 | Vega was able to keep E.P. under control.[3] | |
| 4 | E.P. did not actively resist being handcuffed.[4] | |
| 5 | The scene was secure when JPSO officers had E.P. face-down, hand-cuffed, leg-shackled, sat-upon, and surrounded. | |
| # | JPSO's Material Facts (R. Doc. 154-2) | Plaintiffs' Response |
| 1 | This case involves the death of an individual (E.P.) who violently attacked his father and the responding Deputy that was called to the scene in the parking lot of the Westgate Shopping Center in Metairie, La. on January 19, 2020. The call for service was made by a horrified onlooker. | Generally uncontested, although it has yet to be determined whether the onlooker was "horrified."<br><br>The facts are generally uncontested. EP attacked his father during an autistic outburst. The description of the incident and onlooker are not facts, but statements of opinion. |

---

[1] Ex. A at 9-10 (Defendant Mehrtens said that at one point "Deputy Pitfield has got [E.P.] under control . . . so to engage him at that point just wasn't necessary, he was calm, everything was fine.")

[2] Ex. B at 2 (Defendant Shannon Guidry in her statement said that at one point "I'm putting my gloves on, at this point Chad had him restrained [with] the handcuffs in the back.").

[3] *Id*. (Defendant Guidry also said "Chad had him restrained and everything was fine . . . Nick came in and uh, continued to keep him, the kid or whatever under control.")

[4] Ex. C at 4-5 (Defendant Vaught described the situation at another point as "Q; Okay and again, no measurable resistance at the point where you secure his left hand and are able to—to cuff him, cuff him to the cuffs that Deputy Pitfield has? A: No, um, there—there was no active resistance from him. I was able to—to handcuff him and get them behind his back.")

1

| 2 | The Defendant J.P.S.O. Deputies were called to the scene based upon a report from a business manager that E.P. was violently out of control and severely beating his own father, Plaintiff, in the parking lot. | Generally uncontested. |
|---|---|---|
| 3 | The Defendant J.P.S.O. Deputies arrived to find a horrifying scene. E.P. had severely injured his father. E.P. had bitten a piece of his fathers face off, leaving open and obvious trauma. | Generally uncontested, although whether the scene was "horrifying" and the severity of injuries are statements of opinion, rather than fact. |
| 4 | The Defendant J.P.S.O. Deputies did as best they could to manage E.P. While trying to gain control over E.P., E.P. bit Deputy Pitfield, causing injury. | **Disputed**. JPSO Deputies continued to use deadly force on E.P. even after "there was no active resistance," and after "he was calm, everything was fine." None of the JPSO Deputies took basic steps to keep E.P. alive once he was restrained, such as placing him on his side in a recovery position, or monitoring his breathing.<br><br>But if it is a true fact that failing to take long-established, basic life-saving actions for restrained individuals is the "best" JPSO deputies can do, then that fact strongly supports – and perhaps establishes – Plaintiffs' claims against Sheriff Lopinto for failure to train and supervise.<br><br>Undisputed that E.P. bit Pitfield. |
| 5 | Regrettably, E.P. expired on the scene. | It is unclear whether E.P. expired on the scene or en route to the hospital, but that distinction is not relevant to Defendant's motion.<br><br>There is also little evidence that JPSO regrets the incident, given the agency's choice not to conduct an internal affairs investigation, and choice not to change any policy, practices, training, or procedures. |
| 6 | The entire incident was caught on surveillance cameras, the video of which is attached as Exhibit 1. | Uncontested that the surveillance cameras captured the key elements of the incident. |
| 7 | The video speaks for itself and clearly shows that the scene was never secure prior to E.P.'s demise. | **Disputed that the scene was never secure prior to E.P.'s demise**. |

2

| | |
|---|---|
| | Defendants described points at which the scene was "under control," "was calm," and "everything was fine":<br><br>• Defendant Mehrtens said that at one point "Deputy Pitfield has got [E.P.] under control . . . so to engage him at that point just wasn't necessary, he was calm, everything was fine."[5]<br><br>• Defendant Shannon Guidry in her statement said that at one point "I'm putting my gloves on, at this point Chad had him restrained [with] the handcuffs in the back."[6]<br><br>• Defendant Guidry also said "Chad had him restrained and everything was fine . . . Nick came in and uh, continued to keep him, the kid or whatever under control."[7]<br><br>• Defendant Vaught described the situation at one point as "Q: You're meeting resistance? A: No, no, no, not— not—not really, no Q: Okay. A: Um, he was, he was um, moving a little bit but he wasn't trying to resist or pull his—pull his arm away."[8]<br><br>• Defendant Vaught described the situation at another point as "Q; Okay and again, no measurable resistance at the point where you secure his left hand and are able to—to cuff him, cuff him to the cuffs that Deputy Pitfield has? A: No, um, there—there was no active resistance from him. I was able to— to handcuff him and get them behind his back."[9] |

---

[5] Ex. A at 9-10
[6] Ex. B at 2.
[7] *Id*.
[8] Ex. C at 4-5
[9] *Id*. at 12.

3

|  |  | Similarly, the JPSO homicide detective assigned to investigate the matter testified the officers "realized that [E.P.] had stopped resisting" at the point where Vega replaced Pitfield on top of E.P.[10] The detective said that when the handcuffs were put on E.P., there was no "resistance to the handcuff."[11]<br><br>Defendants offer only one piece of evidence for the proposition that the scene was never secure: the security camera tape of the incident. They do not point to any specific portion of the video. They just say that the "video speaks for itself."[12]<br><br>But the video does not support Defendants' argument. It shows an altercation, in which the severely autistic minor slaps at himself, his father, and Chad Pitfield. But by 13:30:30, the scene is secure: Pitfield has put E.P. face-down on the ground, and is sitting on his back. Other officers arrive, and help Pitfield hand-cuff and leg-shackle E.P. The arriving officers do not treat the situation as "unsecured." Instead, they stand around and talk to each other, as seen at 13:36:22.<br><br>The video shows a group of officers milling about as Deputy Pitfield and then Deputy Vega take turns sitting on top of a face-down, handcuffed, leg-shackled minor. |

RESPECTFULLY SUBMITTED,

Andrew C. Clarke (TN BPR # 15409)
The Cochran Firm Midsouth
One Commerce Square, Suite 1700
(901) 523-1222 (Telephone)
aclarke@cochranfirmmidsouth.com

*/s/ William Most*
WILLIAM MOST (BPR # 36914)

---

[10] Ex. D (Dowling Dep.) at 112:14-19 ("Q. The interviews, like Deputy Vega, when he gave his interview, he said that when they moved to switch out, that Mr. Parsa wasn't offering any resistance, correct? A. That's when they realized that he had stopped resisting, yes.");
[11] *Id.* at 122:6-8
[12] R. Doc. 154-1 at 8.

4

Most & Associates  
201 St. Charles Ave., Ste. 114 #101  
New Orleans, LA 70170  
Tel: (504) 509-5023  
williammost@gmail.com