UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CASE NO.  2:21-cv-00080

DONNA LOU and DAREN PARSA, on their own behalf and
on behalf of their deceased minor child, E.P.

Plaintiffs,


VERSUS


SHERIFF JOSEPH P. LOPINTO, III, CHAD PITFIELD, RYAN
VAUGHT, STEVEN MEHRTENS, SHANNON GUIDRY, NICK VEGA,
MANUEL ESTRADA, MYRON GAUDET, JOHN DOES 1-3,
VICTORY REAL ESTATE INVESTMENTS LA, LLC D/B/A
WESTGATE SHOPPING CENTER, ABC INSURANCE COMPANY,
and XYZ INSURANCE COMPANY,

Defendants.



VIDEOTAPED DEPOSITION OF SERGEANT KEITH DOWLING,

given in the above-entitled cause, pursuant to the

following stipulation, before Sandra P. DiFebbo,

Certified Shorthand Reporter, in and for the State

of Louisiana, at JPSO, 1233 Westbank Expressway,

Fifth Floor, Harvey, Louisiana, on the 13th day of

September, 2022, commencing at 9:33 AM.

```
1    APPEARANCES:
2              THE COCHRAN FIRM MID-SOUTH
               BY:  ANDREW CLARKE,
3              ATTORNEY AT LAW
               One Commerce Square
4              40 South Main, Suite 1700
               Memphis, Tennessee  38103
5
               -and-
6
               LAW OFFICE OF WILLIAM MOST, L.L.C.
7              BY:  WILLIAM MOST,
               ATTORNEY AT LAW
8              201 St. Charles Avenue
               Suite 114
9              New Orleans, Louisiana  70170
               Representing the Plaintiffs
10
11             MARTINY & ASSOCIATES
               BY:  FRANZ ZIBILICH,
12             ATTORNEY AT LAW -and-
               JEFFREY D. MARTINY,
13             ATTORNEY AT LAW
               131 Airline Drive
14             Suite 201
               Metairie, Louisiana  70001
15             -and-
               LINDSEY M. VALENTI, ATTORNEY AT LAW
16             LEGAL ADVISOR
               1233 Westbank Expressway
17             Building B, Fifth Floor
               Harvey, Louisiana  70058
18             Representing JPSO Defendants
19
               THOMPSON, COE, COUSINS & IRONS, LLP
20             BY:  CHRISTOPHER W. KAUL,
               ATTORNEY AT LAW
21             601 Poydras Street
               Suite 1850
22             New Orleans, Louisiana  70130
               Representing Victory Real Estate
23             Investments LA, LLC, and Westgate
               Shopping Center
24
25
```

```
1   APPEARANCES CONTINUED:

2

3   Also Present:  Tim Anclade, Nicholas Vega,
                   Steven Mehrtens
4

5   Videographer:  Jeffrey Horner, CLVS, VRS Media
                   Group
6

7   Reported By:

8

            Sandra P. DiFebbo
9           Certified Shorthand Reporter
            State of Louisiana
10

11     E X A M I N A T I O N        I N D E X

12                                  Page

13  BY MR. CLARKE:                  5, 128

14  BY MR. ZIBILICH:                126

15

16     E X H I B I T              I N D E X

17                   Page

18

19  Exhibit 72                     14

20  Exhibit 73                     20

21  Exhibit 74                     47

22  Exhibit 75                     53

23  Exhibit 76                     57

24  Exhibit 77                     69

25  Exhibit 78                     98
```

```
 1            S T I P U L A T I O N

 2

 3            It is stipulated and agreed by and

 4  between Counsel for the parties hereto that the

 5  Videotaped Deposition of SERGEANT KEITH DOWLING, is

 6  hereby being taken pursuant to the Federal Rules of

 7  Civil Procedure for all purposes in accordance with

 8  law;

 9            That the formalities of reading and

10  signing are specifically waived;

11            That the formalities of sealing,

12  certification, and filing are hereby specifically

13  waived.

14            That all objections, save those as to

15  the form of the question and responsiveness of the

16  answer are hereby reserved until such time as this

17  deposition or any part thereof is used or sought to

18  be used in evidence.

19                    * * * * *

20            Sandra P. DiFebbo, Certified Shorthand

21  Reporter, in and for the State of Louisiana,

22  officiated in administering the oath to the

23  witness.

24

25
```

```
 1                SERGEANT KEITH DOWLING, having been
 2        first duly sworn, was examined and testified
 3        on his oath as follows:
 4   EXAMINATION BY MR. CLARKE:
 5        Q.   Would you please state your name.
 6        A.   Keith Dowling, D-O-W-L-I-N-G.
 7        Q.   By whom are you employed?
 8        A.   Jefferson Parish Sheriff's Office.
 9        Q.   How long have you been employed by
10   Jefferson Parish Sheriff's Office?
11        A.   Over nine and a half years.
12        Q.   Have you ever given a deposition before?
13        A.   Yes, sir.
14        Q.   Under what circumstances?
15        A.   Accidents, crashes, stolen vehicles, and
16   a civil lawsuit.
17        Q.   A civil lawsuit?
18        A.   Yes.
19        Q.   Tell me about that.
20        A.   It was involving an arrest.
21        Q.   Jacobi Cage?
22        A.   Yes, sir.
23        Q.   Is that the only time you've been sued?
24        A.   Yes, sir.
25        Q.   Let's go over some ground rules.  I know
```

```
 1    you gave a deposition there, but, obviously, you
 2    understand your testimony here is under oath
 3    subject to the penalty of perjury, correct?
 4         A.   Yes.
 5         Q.   I know cops have been provided training
 6    on how to testify.  It's kind of similar
 7    instructions.  Obviously, we have a court reporter
 8    down here.  She can't take down while we're talking
 9    over each other, so we've got to let each other
10    finish.  Okay?
11         A.   Got it.
12         Q.   Also, it is important you give audible
13    answers, yes, no, or I don't know as opposed to
14    nodding your head or saying uhn-huh or uh-huh,
15    because the court reporter can't interpret that.
16    Okay?
17         A.   All right.
18         Q.   The other rule to remember is I don't
19    want you to answer a question you don't understand.
20    Okay?
21         A.   Got it.
22         Q.   If I ask you a question, and you don't
23    understand it, please ask me to rephrase it.  All
24    right?
25         A.   Will do.
```

1      Q.   If anybody here objects to the form of

2  the question, when I ask a question, you are still

3  going to have to answer it.  Okay? So pay attention

4  to the question, and that's what Franz likes to do.

5  That is just for the record.  All right?

6      A.   Okay.

7      Q.   Let's find out a little bit about your

8  background.  Take me through your educational

9  background.

10     A.   I graduated from Holy Cross High School

11  in 1989.  I graduated from Upper Iowa University in

12  New Orleans in maybe 2016, and then I graduated

13  from Loyola University in 2019.

14     Q.   What degrees did you get from New Orleans

15  and Loyola?

16     A.   I have a bachelor's in criminal justice

17  with a minor in public administration, and I have a

18  master degree in criminology from Loyola.

19     Q.   And you got the bachelor's in what year?

20     A.   2016.

21     Q.   And the master's?

22     A.   2019.

23     Q.   Any other college courses after high

24  school before you went back to school and got your

25  degree in 2016?

1        A.    I went a few years at St. Bernard
2   Community College and Elaine P. Nunez Community
3   College.
4        Q.    Were those classes you took counted
5   towards your bachelor's in criminal justice or were
6   they just --
7        A.    Some did, some didn't.
8        Q.    Just you were hoping to get more of them
9   transferred?
10       A.    Correct.
11       Q.    I got you. Now, let's go through your law
12   enforcement.  Let's go through your employment.
13   From high school up until the present time, tell me
14   everywhere you were employed.
15       A.    I worked for a couple of moving
16   companies, Lee Moving & Storage, Gallagher Transfer
17   & Storage.
18       Q.    What was your first law enforcement job?
19       A.    Orleans Parish Criminal Sheriff's Office.
20       Q.    When was that?
21       A.    1993.
22       Q.    From there on, prior to going to Orleans
23   Parish, did you have any law enforcement training?
24       A.    No.
25       Q.    So your first law enforcement job was

```
1    Orleans Parish in 1993.  Did you get -- I don't
2    know if it's the same word -- POST certified there?
3         A.   Corrections certified.  It wasn't a POST
4    one.
5         Q.   So your first job in law enforcement was
6    as a correctional officer for Orleans Parish?
7         A.   Yes.
8         Q.   How long did you work at Orleans Parish?
9         A.   Maybe around ten months.
10        Q.   Did you have any training or was it
11   on-the-job training?
12        A.   We had training.
13        Q.   Was there some type of certification for
14   correctional officers or was there in 1993?
15        A.   Yes.
16        Q.   So did you go to a training academy at --
17        A.   It was --
18        Q.   You've got to let me finish my question.
19   Did you go through a training academy?
20        A.   It was a week long course put on by the
21   sheriff's office, yes.
22        Q.   So you had a week long course to become a
23   correctional officer, a certified corrections
24   officer?
25        A.   Correct.
```

1    Q.    And that training, that whole week long

2    training, did you have training on -- you had to

3    cover everything that a correctional officer has to

4    do in a week?

5    A.    That's what the training was. It was

6    through the POST council, yes.

7    Q.    And the correctional training is a lot

8    different than police training, would you agree?

9    A.    Correct.

10   Q.    A lot more stuff about security of

11   building, keys, things of that nature that are

12   primarily involved in correctional officers,

13   correct?

14   A.    Correct.

15   Q.    I guess there are some things that are

16   transferable, but would you agree that the POST

17   officer training is significantly different than

18   the correctional training?

19   A.    Yes.

20   Q.    So you worked there for about ten months.

21   Were you ever disciplined or did you ever have any

22   complaints made against you there?

23   A.    No.

24   Q.    Why did you leave Orleans Parish --

25   MR. ZIBILICH:

```
 1                     Sheriff's Office.
 2    BY MR. CLARKE.
 3          Q.    Are they -- you're not deputies, right?
 4          A.    Yes.
 5          Q.    But still under the sheriff's office.
 6    All right.  Why did you leave Orleans?
 7          A.    I got a job in St. Bernard Parish
 8    Sheriff's Office.
 9          Q.    What was your job at St. Bernard Parish?
10          A.    I started out in corrections, and then I
11    went to patrol.
12          Q.    Did St. Bernard Parish get you POST
13    certified?
14          A.    Yes.
15          Q.    What training academy did you go to, to
16    get POST certified?
17          A.    At LSU.
18          Q.    Do you know how long that course was?
19          A.    I believe nine weeks.
20          Q.    That course, that course is the courses
21    that are required to become certified as a law
22    enforcement by the State of Louisiana, correct?
23          A.    Correct.
24          Q.    And there are numerous blocks of training
25    during that, correct?
```

1       A.    Yes, sir.

2       Q.    Physical fitness is one of the biggest

3   blocks of training at the academy, which is done

4   every day, correct?

5       A.    Correct.

6       Q.    Tell me some of the bigger groups of

7   training that you remember from your POST stuff.

8       A.    Legal aspects, traffic stops.

9       Q.    Deadly force?

10      A.    Use of force was included, yes.

11      Q.    Wasn't one of the biggest blocks

12  firearms?

13      A.    Yes.

14      Q.    That's what I'm trying to get at.  What

15  -- we know you did physical fitness every day.

16  Firearms was probably the second biggest block of

17  training?

18      A.    We had a couple of weeks of firearms,

19  yes.

20      Q.    So it was nine weeks, so a couple of

21  weeks of firearms.  That is both shooting, you

22  know, marksmanship, and when to use a firearm,

23  correct?

24      A.    Correct.

25      Q.    Did you have -- and your use of force

```
 1   training, was that -- tell me a little bit about
 2   that.  Did you have deescalation training?
 3           A.   No.
 4           Q.   Did you have training on compliance with
 5   the ADA?
 6           A.   What, sir?
 7           Q.   ADA.  Americans with Disabilities Act.
 8           A.   Not that I recall.
 9           Q.   Did you have any training with respect to
10   accommodating persons with disabilities?
11           A.   Not that I recall.
12           Q.   Did you have any training on the use of
13   restraints?
14           A.   Yes.
15           Q.   What restraints did they train you on?
16           A.   Handcuffs.
17           Q.   Did they train you on anything else other
18   than handcuffs?
19           A.   No, sir.
20           Q.   Did they train you on the RIPP Hobble?
21           A.   No, sir.
22           Q.   Did you have any training on positional
23   asphyxia at the academy?
24           A.   No, sir.
25           Q.   Did you have any training on excited
```

1    delirium at the academy?

2         A.    Not that I recall.

3         Q.    Have you ever heard of the term "excited

4    delirium?"

5         A.    I heard it before, yes, sir.

6         Q.    You've heard it in your training with

7    JPSO, haven't you?

8         A.    Not that I recall.

9         Q.    You didn't have the RIPP Hobble training?

10        A.    I didn't, no, sir.

11        Q.    You did.  You had it on 9/5/19, and you

12   had it on 8/7/15.

13        A.    It may have been included in another

14   class.

15        Q.    No.  It's its own course.  You did it

16   that day.  Let me show you -- I'll mark this as

17   Exhibit 72.

18             MR. CLARKE:

19                  This is stuff that I sent you

20              yesterday, Franz.

21   BY MR. CLARKE:

22        Q.    Does that confirm that you had RIPP

23   Hobble training?

24        A.    It says, "De-Escalating Training."  It

25   was online RIPP Hobble in 2015, I believe it says.

```
 1    '16.
 2         Q.    8/7/15 is one, and --
 3         A.    That's the only one for the RIPP Hobble.
 4         Q.    You didn't have RIPP Hobble training with
 5    Pizzolato?
 6         A.    Obviously, I did, sir.
 7         Q.    So you get out of -- you go to St.
 8    Bernard's.  How long did you stay at St. Bernard's?
 9         A.    Until 2001.
10         Q.    You ever have any discipline or Internal
11    Affairs investigations based on your conduct at
12    St. Bernard's?
13         A.    I had a couple of complaints.
14         Q.    What were the complaints about?
15         A.    Use of force.
16         Q.    Explain to me how many and describe each
17    incident.
18         A.    I don't recall all of that, sir.
19         Q.    How do you know you had a couple?  It
20    could be 20.
21         A.    I don't know how many.
22         Q.    Were any of them sustained?
23         A.    No, sir.
24         Q.    You had to go through an Internal Affairs
25    process when that happened, correct?
```

1       A.   Yes.

2       Q.   And when you go through an Internal

3   Affairs process, they have to advise you that

4   you're being looked at, correct?  They have to give

5   you certain notes pursuant to Louisiana law,

6   certain notice?

7       A.   I only know of one where I was called

8   into Internal Affairs.

9       Q.   What was that one about?

10      A.   It wasn't basically on me.  It was on my

11  partner.

12      Q.   What did your partner do?

13      A.   We arrested a subject who fled from us

14  and fought us at Kmart.

15      Q.   And did your partner use excessive force?

16      A.   No, he did not.

17      Q.   Have you ever used excessive force?

18      A.   No, I did not.

19      Q.   Have you ever?

20      A.   No.

21      Q.   So you had a couple complaints at St.

22  Bernard's.  You don't know what they were, but they

23  involved force, correct?

24      A.   Yes, sir.

25      Q.   Then why did you leave St. Bernard's?

1        A.    I got a job in St. Tammany Parish

2    Sheriff's Office.

3        Q.    So you started St. Tammany in 2001?

4        A.    Yes.

5        Q.    At St. Bernard's you were a correction

6    officer, and then you were a patrol officer.  Did

7    you rise in the ranks at all at St. Bernard's?

8        A.    Yes.

9        Q.    What did you leave St. Bernard's as?

10       A.    I was a corporal.

11       Q.    Is that deputy, corporal, sergeant?

12       A.    Yes, sir.

13       Q.    You went to St. Tammany in 2001?

14       A.    Yes, sir.

15       Q.    Did you go there as a deputy?

16       A.    Yes.

17       Q.    How long were you at St. Tammany?

18       A.    Until 2009.

19       Q.    Did you have any complaints -- well, let

20   me ask you this.  When you were at St. Bernard's,

21   did you have inservice --

22            MR. ZIBILICH:

23                There is no S behind Bernard.

24   BY MR. CLARKE:

25       Q.    When you went to St. Bernard's, did you

```
 1    have inservice training every year?
 2         A.   We went to the range.
 3         Q.   That's qualifying with your weapon.
 4    That's not inservice training.
 5         A.   That's the only training I remember.
 6         Q.   So no -- you understand now what
 7    inservice training is, correct?
 8         A.   Correct.
 9         Q.   You have to have a certain amount of
10    hours per week?
11         A.   Correct.
12         Q.   I mean per year.
13         A.   Yes.
14         Q.   And you've got problems with not
15    qualifying with your gun over the years, haven't
16    you?
17         A.   No, I haven't.
18         Q.   We'll get to that.  So you became a
19    deputy at St. Tammany's. How long did you serve as
20    a deputy there?  Was that the whole time you were
21    there or did you --
22         A.   No.  I think maybe two years on the road.
23         Q.   And you were promoted to --
24         A.   I went to narcotics as a detective.
25         Q.   Is that a promotion or are you still a
```

1    deputy?

2         A.    A detective.

3         Q.    Your chain of command is different,

4    correct? I'm trying to figure out do you consider

5    that a promotion?

6         A.    In a way it is, but pay wise, it's not.

7         Q.    That's where the rubber meets the road.

8    It's a different set of jobs.  I mean it's a

9    different set of job duties?

10        A.    Yes, sir.

11        Q.    Became a detective in narcotics.  How

12   long did you do that?

13        A.    Until right after Katrina.  I transferred

14   to property section still as a detective, and then

15   maybe a year later went back to narcotics. That's

16   '06 to '07.

17        Q.    When you were fired from St. Tammany's,

18   were you still a detective in narcotics?

19        A.    I wasn't fired.

20        Q.    All right.  You weren't fired.  Let me

21   ask you a couple of questions first, and then I'll

22   give you some documents.  When you were at St.

23   Tammany's, did you have any complaints or Internal

24   Affairs investigations?

25        A.    Yes.

1      Q.    How many?

2      A.    Two that I know of.

3      Q.    You wouldn't know if -- there were two

4    that you remember?

5      A.    Yes.

6      Q.    Could it be more than two?

7      A.    Could have been.

8      Q.    It could have been like, you know, more

9    than three, like in a four- or five-month period?

10     A.    I don't know.

11     Q.    Let me show you what I'm marking as

12   Exhibit 73.  These are separation notices from St.

13   Tammany's Parish.  The first one was -- apparently,

14   you worked there from 7/30/01.  It is the second

15   page.  I'm sorry.  Date hired 8/09.  This is from

16   St. Tammany's.  It says, "Reason for leaving."  It

17   says, "Discharge," does it not?

18     A.    This is not correct, no.  I tendered a

19   resignation.

20     Q.    Whether you tendered a resignation or

21   whether they actually fired you -- are you

22   suggesting you resigned prior to this paperwork

23   going through?

24     A.    I did resign.

25     Q.    Well, that doesn't mean they can't, you

```
 1   know -- in this thing, do you remember the event
 2   when you got -- that that is discussed in this
 3   document?
 4        A.   Yeah.  It was unsustained.
 5        Q.   Your use of force -- If you go through
 6   the document, you get down to probably about the
 7   second to last page of the documents from St.
 8   Tammany.  It says, "In reviewing with Human
 9   Resources, Detective Dowling's personnel folder
10   revealed the following disciplinary actions taken
11   against him."  Do you see where I am? It's on the
12   one, two, three, fourth page down towards the
13   bottom.
14        A.   Okay.
15        Q.   Do you see where I'm looking at?
16        A.   Read it again, sir.
17        Q.   Let me show you. Down at the --
18             MR. ZIBILICH:
19                  The second to last paragraph is what
20              he is pointing at.
21             THE WITNESS:
22                  I see it.
23   BY MR. CLARKE:
24        Q.   All right.  "In reviewing with Human
25   Resources, Detective Dowling's personnel folder
```

1    reveals the following disciplinary actions taken
2    against him."  6/23/09 General Regulations.
3    Damaged passenger side mirror on his car.  Do you
4    remember that?
5         A.   Yes.
6         Q.   4/23/09 to 5/9/09.  Willful disregard of
7    Agency rules.  He failed to qualify with his
8    weapon.  He was suspended for 40 hours.  Did I read
9    that correctly?
10        A.   Yeah.  I didn't not go to the range.  I
11   let my -- there was no issue with me qualifying.  I
12   didn't go to the range.
13        Q.   There is.  You didn't qualify.
14             MR. ZIBILICH:
15                  Don't argue.  Just ask him a
16             question, please.
17   BY MR. CLARKE.
18        Q.   You didn't qualify.  You cannot carry a
19   gun as a law enforcement officer without qualifying
20   yearly, correct?
21        A.   Yes.
22        Q.   So you didn't qualify. You didn't show
23   up.  It wasn't that you missed, you just didn't
24   qualify timely.
25        A.   Okay.

1        Q.    Is that correct?

2        A.    Yeah.

3        Q.    And you were suspended for 40 hours

4   because of that, right?

5        A.    Yes.

6        Q.    Now, is that one of the things that you

7   remember or is that one of the things that you

8   forgot?

9        A.    No.   That was not Internal Affairs.

10       Q.    I asked you if you had any disciplinary

11  action or Internal Affairs complaints.   Do I need

12  to -- did you have -- let me go back to Orleans, if

13  you are making a distinction.   Did you have any

14  disciplinary action or Internal Affairs complaints

15  at Orleans?

16       A.    No.

17       Q.    Did you have any at St. Bernard's, any

18  disciplinary actions, complaints, or Internal

19  Affairs investigations?

20       A.    I know I had complaints but no

21  disciplinary actions.

22       Q.    St. Tammany's.   Did you have any IA

23  investigations?

24       A.    Yes.

25       Q.    So we've gone through the 6/23/09 and the

```
1   4/23/09, and on 5/10 you were written up for
2   criminal/immoral conduct, disturbance between
3   Detective Dowling and his wife, and you were
4   suspended for 40 hours there, correct?
5        A.   That was together with the range.
6        Q.   Then on 6/29/09, you were disciplined for
7   unbecoming conduct by a St. Charles Parish
8   Sheriff's Office employee regarding a memo Major
9   Lentz wrote to you.  Do you know what that is
10  about?
11       A.   Major Lentz had said for me to stay away
12  from my ex-wife, yes.  I made a complaint against
13  her.
14       Q.   You were arrested because of your conduct
15  involving your ex-wife for stalking?
16       A.   Stalking by phone with the boyfriend,
17  yes.
18       Q.   These are not actions of a police
19  officer, correct?  These aren't actions of a proper
20  police officer, are they?
21            MR. ZIBILICH:
22                 Object to the form.  How can he
23             possibly answer that?
24  BY MR. CLARKE.
25       Q.   Do you know what Law Enforcement Code of
```

```
1    Ethics is where they trained you at the POST
2    Academy?
3         A.   Yes.
4         Q.   What is the Law Enforcement Code of
5    Ethics?
6         A.   I don't know it offhand, sir.
7         Q.   Well, how do you say you know it?
8         A.   Because we were trained in it, yes, sir.
9         Q.   You've got to keep your personal and
10   professional life above reproach, correct?
11        A.   Correct.
12        Q.   These are not conduct or actions of an
13   officer complying with the Law Enforcement Code of
14   Ethics, is it?
15            MR. ZIBILICH:
16                 Object to the form.  You can answer
17             it.
18            THE WITNESS:
19                 I was going through a divorce, sir.
20   BY MR. CLARKE:
21        Q.   I've been married three times, and I
22   ain't been arrested yet.
23        A.   Right.  Okay.
24            MR. ZIBILICH:
25                 Hooray.
```

```
 1              MR. CLARKE:
 2                   There is always today.
 3    BY MR. CLARKE:
 4         Q.   Then it says on 2/9/09 you were put on
 5    administrative leave without pay.  What were you on
 6    administrative leave without pay for?
 7         A.   That was for one -- that was one day I
 8    was put on administrative leave.  There was a
 9    disturbance at a bar in Slidell, and I broke it up
10    after I identified myself as a police officer, and
11    Slidell PD cited me for a disturbance.
12         Q.   Were you arrested?
13         A.   No.
14         Q.   A citation.  They charged you with
15    something?
16         A.   It was nol prossed the very next day,
17    because I -- because I said I was a police officer
18    and intervened at the behest of the bar owner, and
19    it was all on video, it was nol prossed right there
20    on the spot.
21         Q.   My question was, there were -- you had,
22    while you were at St. Tammany's, two separate times
23    where there were charges brought against you.  One
24    for stalking and one for what you just described,
25    correct?
```

```
 1        A.    That was an incident -- I'm telling you I
 2   used --
 3              MR. ZIBILICH:
 4                   That's not his question.  His
 5                question is did those two things
 6                happen.
 7              THE WITNESS:
 8                   Yes.
 9   BY MR. CLARKE:
10        Q.    So you are a police officer -- prior to
11   being hired by Jefferson Parish, you are a police
12   officer who has one, two, three, four, five, six
13   disciplinary write-ups at St. Tammany's and two
14   arrests, correct, or two criminal charges brought
15   against you, correct?
16        A.    Yes.
17        Q.    Now, when I ask you -- do these documents
18   refresh your recollection as to whether or not you
19   were fired?
20        A.    I was not fired.  I tendered a
21   resignation, and that resignation was accepted by
22   Major Lentz.
23        Q.    Who signed this?  If you can look on the
24   third page of the counseling form.  Who signed
25   that? Did you sign it on 8/14/09?
```

```
 1        A.    That's my signature.

 2        Q.    Is that Major Lentz' supervisor?

 3        A.    I believe.  I don't know.

 4        Q.    It is also signed by the human resources

 5   manager, Captain Donna --

 6        A.    Schlesinger.

 7        Q.    Schlesinger. This is the same document

 8   where it's been -- that states that you are

 9   terminated from St. Tammany's Parish Department.

10   Police office.  Parish sheriff's office.

11        A.    Sir, I keep telling you I resigned, and

12   they accepted my resignation.

13        Q.    Do you have a copy of your resignation

14   and the acceptance?

15        A.    No, but I'm sure St. Tammany does have

16   one.

17        Q.    St. Tammany has this.

18              MR. ZIBILICH:

19                   Come on.  Quit arguing with the man.

20                Ask him a question.  It's not a

21                question.  St. Tammany has this is not

22                a question.  Come on, man.

23              MR. CLARKE:

24                   Whatever, Franz.

25   BY MR. CLARKE:
```

1      Q.    When did you tender your resignation?

2      A.    That day.

3      Q.    What day? 8/14, the day that you signed

4  this?

5      A.    Yes.

6      Q.    So you signed this thing which

7  acknowledged that you were being terminated, and

8  then after that you gave in your resignation?

9      A.    No.  I walked into the office and handed

10 Major Lentz my resignation.

11     Q.    Because you knew you were going to get

12 fired?

13     A.    No.  That was unsustained by my sergeant.

14     Q.    It was unsustained, but the incident that

15 they're investigating is when you were involved

16 with a 60 year old disabled white female.

17     A.    Correct, and my sergeant, he handled that

18 investigation.  It was unsustained.  I decided to

19 tender my resignation, because I could see the

20 writing on the wall, that they were after -- they

21 were trying to get me away from the department.  I

22 was told by other people with the agency to just go

23 ahead and resign.

24     Q.    Well, this is actually the report here,

25 and while you say you were exonerated, this actual

1   document says, "Therefore, Detective Dowling has

2   violated several sections of DR 3.09:500 to

3   included but not limited to discourteous treatment

4   of the public, incompetence, and unprofessional

5   conduct."  All of these are a group of three

6   offenses.

7          MR. ZIBILICH:

8               What is the question?

9   BY MR. CLARKE:

10      Q.   Did I read that correctly?

11      A.   Yes.

12      Q.   So does this document indicate that they

13  exonerated you?

14      A.   This document does not.

15      Q.   You think there is another document that

16  says that you were exonerated?

17      A.   Yes. It would have been my sergeant's

18  report, which I also saw.

19      Q.   The sergeant can approve a conduct, but

20  if it's investigated above their -- a sergeant is

21  responsible for supervising all of their deputies,

22  correct?

23      A.   Correct.

24      Q.   So a sergeant can give you some kind of

25  approval about some type of conduct, but if it is

 1   investigated by the department, and they come to a
 2   different action, the sergeant's opinion is
 3   trumped, isn't it?
 4        A.   I don't know.
 5        Q.   So you just think your sergeant thought
 6   it was good.  Did he do a report like this or do an
 7   actual investigation?
 8        A.   He did an investigation, interviewed the
 9   witness, and he -- yes.  I saw the report that he
10   prepared.
11        Q.   According to this, there was a lady who
12   was driving with a stoma in her throat, correct,
13   who had cut off a motorcyclist, right?
14        A.   It was a hit and run, yes.
15        Q.   Well, she didn't hit him.
16        A.   It was initially a hit and run.  That's
17   how I did my accident report.  It was a non-
18   collision hit and run.
19        Q.   And the motorcycle laid the bike down,
20   and then you caught up to the car, correct?
21        A.   Yes.
22        Q.   And made a traffic stop?
23        A.   Yes.
24        Q.   And you handcuffed the lady with a stoma,
25   which she needed to help talk, correct?

```
 1        A.    Correct.
 2        Q.    You handcuffed her behind her back?
 3        A.    Initially I didn't see the trach.
 4              MR. ZIBILICH:
 5                    Is that a yes or a no?  Did you
 6                 handcuff her behind her back?
 7              THE WITNESS:
 8                    Initially, yes.
 9    BY MR. CLARKE:
10        Q.    Why did you do that?  Was she
11    intimidating?
12              MR. ZIBILICH:
13                    Why did you do what?
14    BY MR. CLARKE:
15        Q.    Why did you handcuff her?
16        A.    For my safety.
17        Q.    Did this 60 year old lady with a stoma
18    look dangerous to you?
19        A.    She fled from me.
20        Q.    Well, okay.
21        A.    For my safety, I handcuffed her, put her
22    on the passenger side of the vehicle, inspected the
23    vehicle, and when I walked back up to her, I
24    observed that she had a trach, and I put the
25    handcuffs in front of her.
```

```
 1        Q.    Were you told that you should have easily
 2   recognized that the driver was disabled and needed
 3   her hands to speak through a stoma? Did they tell
 4   you that?
 5        A.    Who?
 6        Q.    St. Tammany's when you were investigated
 7   or your supervisor?
 8        A.    He did not.
 9        Q.    Did you place the lady in the back of her
10   car?
11        A.    In the back of my car, yes.
12        Q.    When all of this was coming up in 2009,
13   you saw the writing on the wall, so you tendered
14   your resignation, correct?
15        A.    Yes, sir.
16        Q.    Obviously, since you don't believe that
17   you were terminated, at any other job that you
18   applied for, a law enforcement job after St.
19   Tammany's, you wouldn't have put that you were
20   fired from St. Tammany's on your application,
21   correct?
22        A.    I did.
23        Q.    Were you fired from St. Tammany?
24        A.    I was not.
25        Q.    If you filled out -- I know you went to a
```

1    number of other police departments before you went

2    to Jefferson Parish.   When you filled out

3    applications for law enforcement after the fact,

4    did you put in your application I was terminated

5    from St. Tammany's or I resigned from St.

6    Tammany's?

7          A.   At one location, yes.

8          Q.   Which location was that?

9          A.   St. Bernard.

10         Q.   You said you were terminated?

11         A.   Yes.

12         Q.   Which places did you not tell them that

13   you were terminated?

14         A.   I spoke with Major Lentz, and he accepted

15   my resignation, so at Causeway and Jefferson Parish

16   I put on the paperwork that I resigned, and I am

17   sure when they checked, it was verified.

18         Q.   How are you sure?

19         A.   I have a job.

20         Q.   That's a good answer.   So with St.

21   Bernard -- so where did you go after St. Tammany's

22   in law enforcement?

23         A.   Causeway Police Department.

24         Q.   When you left St. Tammany, did you resign

25   so you wouldn't be terminated?

```
 1      A.    No.
 2      Q.    But the writing was on the wall?
 3      A.    Yes, sir.
 4            MR. ZIBILICH:
 5                Again.
 6            MR. CLARKE:
 7                All right.  You can make it go
 8              longer, if you want, Franz.
 9            MR. ZIBILICH:
10                It doesn't matter to me.  Why don't
11              we --
12            MR. CLARKE:
13                Start the seven hours.
14            MR. ZIBILICH:
15                No.  I don't care.  It really
16              doesn't matter.  None of this is
17              getting into evidence anyway.
18            MR. CLARKE:
19                That's what you think.  And wait
20              until you question the Parsas about
21              E██'s past.  You think that's coming
22              in?  It's your whole theory, Dude.
23            MR. ZIBILICH:
24                Whenever you are ready to make some
25              bets, I can bet.
```

```
 1              MR. CLARKE:
 2                   This whole thing is a bet.  All
 3              right.
 4    BY MR. CLARKE:
 5         Q.    So you leave St. Tammany's in 2009.  Did
 6    you -- was your next job in law enforcement?
 7         A.    Causeway Police Department.
 8         Q.    Did you have any jobs any time out of law
 9    enforcement from 2009 until you went to Causeway?
10         A.    Yes.
11         Q.    What did you do from two -- when did you
12    go to Causeway?
13         A.    2012, I believe.
14         Q.    From 2009 to 2012, what did you do?
15         A.    Worked at a friend's restaurant.  I
16    worked in hotel businesses, and I owned my own
17    restaurant.
18         Q.    What was the name of your restaurant?
19         A.    Mout's Place.
20         Q.    Did you have any complaints or discipline
21    at any of those jobs?
22         A.    I had a complaint, yes.
23         Q.    What job did you have a complaint on?
24         A.    At the Marriott.
25         Q.    What was the complaint?
```

```
 1        A.    Somebody complained because they thought
 2   that I should not have a job because I was
 3   arrested.
 4        Q.    Who was that?
 5        A.    I don't know.  It was anonymous.
 6        Q.    Did you get fired because of that?
 7        A.    No.
 8        Q.    Did you tell the Marriott you had been
 9   arrested in your application?
10        A.    Yes.
11        Q.    And so you just had a complaint.  They
12   just said, okay, no problem.  You can just continue
13   working here?
14        A.    Yes.
15        Q.    How long did you work at the Marriott?
16        A.    From February, I believe, of 2010 to I
17   want to say maybe April of '11.
18        Q.    Short period of time?
19        A.    Yes, sir.
20        Q.    Then I think you said in 2012 you went to
21   the Causeway Police Department?
22        A.    Yes, sir.
23        Q.    And you filled out an application there?
24        A.    Yes, sir.
25        Q.    Did you tell them you had been arrested
```

```
 1   twice or been charged twice?
 2        A.   I did put down I was arrested.
 3        Q.   Did you put in that you were terminated
 4   or that you resigned in lieu of termination?
 5        A.   I was resigned.
 6        Q.   You told them you resigned?
 7        A.   Yes.
 8        Q.   Did you have any -- well, let me go back
 9   for a second.  When you were at St. Tammany's, did
10   you have inservice training there?
11        A.   Yes, sir.
12        Q.   Did you have any training on the
13   Americans with Disabilities Act?
14        A.   Not that I recall.
15        Q.   Did you have any training on use of
16   force?
17        A.   Yes.  Use of force.
18        Q.   Did you have any training on use of
19   restraints?
20        A.   Yes.
21        Q.   Other than handcuffs?
22        A.   Not that I recall.
23        Q.   Did you have any training on the TARP?
24        A.   I don't recall.
25        Q.   Do you know what the TARP is?
```

```
 1        A.    I know I've heard it.  I can't tell you
 2   exactly what it is, but, yes.
 3        Q.    Do you know what it stands for?
 4        A.    No, sir, not off the top of my head.
 5        Q.    Do you know what it is used for?
 6        A.    Not that I recall, sir.
 7        Q.    Do you know if the Jefferson Parish
 8   Sheriff's Office policy, use of force policy,
 9   refers to a TARP policy?
10        A.    I don't know.
11        Q.    Would you agree that as a Jefferson
12   Parish Sheriff's deputy, you are required to know
13   the policies?
14        A.    Yes, sir.
15             MR. ZIBILICH:
16                  Required to know what?
17             MR. CLARKE:
18                  The policies.
19             MR. ZIBILICH:
20                  Which ones?
21             MR. CLARKE:
22                  All of them.
23   BY MR. CLARKE:
24        Q.    You are supposed to know all of them,
25   aren't you?
```

1        A.   Or be able to go to the book and find it,
2    yes, sir.
3        Q.   When you are out in the field, do you
4    carry a book?
5        A.   No, sir.
6        Q.   So you are supposed to have a working
7    knowledge, and you probably signed things in your
8    personnel file that says you acknowledge you
9    received them, and you will abide by them, correct?
10       A.   Yes, sir.
11       Q.   So you are at the Causeway Police
12   Department.  How long were you there? Hang on a
13   second.  At St. Tammany's, did you -- well, that's
14   where you ended up as a detective in narcotics,
15   right?
16       A.   Yes, sir.
17       Q.   Then you had some private jobs in 2012.
18   When you went to the Causeway Police Department,
19   what was your title?
20       A.   Patrol officer.
21       Q.   Did you get promoted or --
22       A.   No, sir.
23       Q.   Were you there a short period of time?
24       A.   Yes, sir.
25       Q.   About how long?

```
 1        A.    Nine months.

 2        Q.    Any complaints?

 3        A.    No, sir.

 4        Q.    Discipline or Internal Affairs

 5   investigation?

 6        A.    No, sir.

 7        Q.    Where did you go after Causeway?

 8        A.    Jefferson Parish Sheriff's Office.

 9        Q.    That was in 2013?

10        A.    Yes, sir.

11        Q.    Have you had any complaints, any

12   discipline, while you have been at JPSO?

13        A.    No discipline, and I'm not sure about

14   complaints.

15        Q.    Never been suspended or anything?

16        A.    No, sir.

17        Q.    You've never been called down to IA where

18   you had to give a statement about your conduct?

19        A.    No, sir.  Not that I recall.

20        Q.    Even in the Jacobi Cage matter?

21        A.    That wasn't handled -- Internal Affairs

22   didn't interview me.

23        Q.    That's what I'm trying to get at. When

24   you came to the JPSO, and every department after

25   you were POST certified, you obviously didn't have
```

1    to go back through the basic training academy,

2    correct?

3         A.   No, sir.

4         Q.   When you came to JPSO, was there any type

5    of training that you had to do before they put you

6    on duty?

7         A.   Yes.

8         Q.   What kind of training did they give you?

9         A.   I had to qualify for firearm and qualify

10   with baton, Taser, and it was like a week long

11   course of classes.

12        Q.   We showed you before some of the training

13   that you had there on an exhibit.  You were trained

14   in the RIPP Hobble, correct?

15        A.   Yes, sir.

16        Q.   Did you carry a RIPP Hobble?

17        A.   No, sir. I don't have a RIPP Hobble.

18        Q.   Why not?

19        A.   Don't know.  I don't have one.

20        Q.   Do you know what a RIPP Hobble is used

21   for?

22        A.   Yes, sir.

23        Q.   What is a RIPP Hobble used for?

24        A.   To restrain someone's legs inside of a

25   vehicle.

 1       Q.   Do you remember anything from the RIPP
 2   Hobble training that you had at JPSO about holding
 3   people down in the prone position and excited
 4   delirium?
 5       A.   I don't recall exact training, no, sir.
 6       Q.   Were you trained that it's dangerous or
 7   not dangerous to hold people in the prone position?
 8       A.   For extended periods of time, yes, sir.
 9       Q.   What is an extended period of time?
10       A.   I don't know.
11       Q.   Were you trained that you should -- well,
12   you tell me what you are supposed to do.  Tell me
13   anything you remember about the RIPP Hobble
14   training and why -- did they give you a -- do you
15   recall why they said you wanted to use a RIPP
16   Hobble?
17       A.    To keep the subject upright inside of the
18   vehicle, strapped in with the seat belt, and I
19   believe part of the RIPP Hobble is -- I can't
20   remember exactly where it is supposed to go, but
21   it's set up to where the person can still be
22   setting up inside the vehicle.
23       Q.   Were you trained that if you hold
24   somebody down in a prone position, you should
25   immediately put them in the recovery position once

```
 1   they --
 2        A.   Once safe, yes, sir.
 3        Q.   And why? Did they tell you why you want
 4   to put them -- move them out of the prone position?
 5        A.   Get them into a recovery position for
 6   breathing purposes and --
 7        Q.   Were you trained that it's a risk factor
 8   with people who are restrained in the prone
 9   position that a risk factor is whether or not
10   somebody is obese?
11        A.   I don't recall.  I have to look at the
12   training again.
13        Q.   I've got the training.
14        A.   I'm sure you do.
15             MR. CLARKE:
16                  Let's take a break.  I'm going to
17                get him the training.  It is previously
18                Exhibit 22.  I'm going to let him look
19                at that.  I'm going to take a break for
20                a second.  We can go off the record.
21             THE VIDEOGRAPHER:
22                  Going off the record.  The time is
23                10:17.
24                  {BRIEF RECESS}
25             THE VIDEOGRAPHER:
```

1                We are back on the record.  The time

2          is 10:27.

3    BY MR. CLARKE:

4          Q.    Sergeant Dowling, right?

5          A.    Yes, sir.

6          Q.    Sergeant Dowling, we took a little break.

7    You were able to look over the RIPP Hobble

8    training.  Does that refresh your recollection

9    about the training?

10         A.    Yes, sir.

11         Q.    Now, it's my understanding that is

12   training that -- would you agree that that training

13   is to provide you with options on how to restrain

14   somebody who is acting violent in the safest

15   possible manner?

16         A.    Yes, sir.

17         Q.    And the department provided you with this

18   training, but you never received a RIPP Hobble?

19         A.    I don't have one.  No, sir.

20         Q.    Do you know if anybody at JPSO carries a

21   RIPP Hobble?

22         A.    I'm sure they do.

23         Q.    Did you even look into, when you did your

24   reports in this case, whether or not deputies used

25   RIPP Hobbles?

```
 1        A.    No, sir.
 2              MR. ZIBILICH:
 3                    Wait.  What is the question?
 4                 Whether they used RIPP Hobbles on that
 5                 day or whether they carried them?
 6              MR. CLARKE:
 7                    He answered the question. I'm not --
 8              MR. ZIBILICH:
 9                    Well, I didn't hear it.
10              MR. CLARKE:
11                    Can you read it back?
12                    {COURT REPORTER READ BACK}
13              MR. ZIBILICH:
14                    Used.  Okay.
15              THE WITNESS:
16                    On that date, they did not use RIPP
17                 Hobbles, no.
18    BY MR. CLARKE:
19        Q.    Did you look into whether the deputies
20    have RIPP Hobbles?
21        A.    No, sir, I did not.
22        Q.    Would you agree that in reading that
23    training, that those type of restraints are --
24    there is a procedure whereby you can use things to
25    make it less dangerous to a suspect?
```

```
 1        A.    It could be used.  It could have been one
 2    tool.
 3        Q.    Well, but you don't even have the tool.
 4    You didn't even look into whether or not other
 5    officers on the scene had that tool.
 6              MR. ZIBILICH:
 7                    That's a statement or a question?
 8    BY MR. CLARKE:
 9        Q.    Correct?
10        A.    I didn't, no.
11        Q.    Let me show you what I've marked as
12    Exhibit 74.  This is the Louisiana Peace Officer
13    Standards and Training, Form PC-201 Certification
14    of Request.  Is that your handwriting?
15        A.    Yes.
16        Q.    According to this, it said -- this is
17    signed by who? It is signed by Newell Normand from
18    the JPSO, correct?
19        A.    Yes.
20        Q.    And signed by you, correct?
21        A.    Yes.
22        Q.    What did you put down for your reason for
23    leaving St. Tammany's?
24        A.    Moved away during the divorce.
25        Q.    You didn't say you resigned or you were
```

```
 1    terminated or you were charged, correct?
 2              MR. ZIBILICH:
 3                   It says what it says.
 4              THE WITNESS:
 5                   Correct.  Reason for Leaving.  I
 6                moved away during my divorce.
 7              MR. ZIBILICH:
 8                   What is 74 again?
 9    BY MR. CLARKE:
10         Q.   Now, take me through what -- your service
11    at JPSO.  When you started in 2013, you started --
12    did you start as a deputy?
13         A.   Yes, sir.
14         Q.   And you moved up to sergeant, and that's
15    where you are today?
16         A.   Yes.
17         Q.   Take me through -- were you a patrol
18    deputy up until the time you became a sergeant?
19         A.   No.
20         Q.   Take me through your positions at JPSO
21    since 2013.
22         A.   I worked in the First District in patrol
23    for about four months, and then I transferred to
24    narcotics, where I was an audio/video tech.  I
25    stayed there approximately two years.  I went to
```

1    burglary as a detective.  That was in -- had to be

2    somewhere in '15.  I stayed in burglary until I got

3    promoted to sergeant in homicide.

4        Q.   When did you get promoted to sergeant in

5    homicide?

6        A.   In February of 2019.

7        Q.   Is that what your position is today?

8        A.   Yes, sir.

9        Q.   So as a sergeant, you have certain

10   supervisory responsibilities, correct?

11       A.   Yes, sir.

12       Q.   And I believe you -- you have not had any

13   Internal Affairs investigations, correct?

14       A.   Not that I know of.

15       Q.   Let's talk about the Jacobi Cage

16   incident.  What was your involvement in that?

17       A.   I arrested Mr. Cage.

18       Q.   When you arrested him, did you know that

19   a cop had previously flipped off Mr. Cage and

20   slapped the phone out of his hand?

21       A.   No, sir.

22       Q.   Is that information that impacts your

23   decision?

24            MR. ZIBILICH:

25                What decision?

```
 1   BY MR. CLARKE:
 2        Q.   Your decision to arrest him.
 3        A.   Not to arrest him, but it would have been
 4   taken into consideration.
 5        Q.   What did you arrest Jacobi Cage for?
 6        A.   Because he resisted me.
 7        Q.   But he had a right -- did he -- I mean,
 8   does a citizen -- why does a citizen have to --
 9   well, you tell me what he did that made you say you
10   had to arrest him.
11        A.   He was creating a disturbance and
12   inciting the crowd by his vulgarities toward law
13   enforcement.
14        Q.   Kind of like the -- oh, go ahead. I
15   interrupted you.
16        A.   So when I leaned forward to tell him to
17   come with me, that's when he pulled away from me
18   and pulled me back into the crowd with my gun
19   exposed, so I pulled him with me back over the
20   barrier and went to the ground and continued to
21   fight.
22        Q.   And his conduct was a reaction to what
23   the cop did, correct?
24        A.   I learned about that the next day, yes.
25        Q.   Did you apologize to Mr. Cage?
```

1      A.   No.

2      Q.   The cop did exactly the same thing Cage

3    did, correct?

4      A.   The same thing?

5      Q.   He flipped him off and -- well, he

6    actually did more.  He slapped the phone away from

7    him, correct?  That's improper, right?

8      A.   It's improper, yes.

9      Q.   And were you the supervisor on that day?

10     A.   Yes.

11     Q.   Did you ever review the video?

12     A.   Yes.

13     Q.   When you saw that the cop slapped the

14   phone away from Mr. Cage and shot him the bird, did

15   you write a report or discipline your officer?

16     A.   I did not, because his supervisor did.

17     Q.   And what discipline -- who was his

18   supervisor and what discipline happened?

19     A.   Captain Danny Jewel.  I'm not sure about

20   the discipline.

21     Q.   But you, as a supervisor, did you write a

22   report to anybody saying it was improper conduct on

23   behalf of -- who was the officer -- let me take

24   that back.  Who was the officer who slapped the

25   cell phone out of Mr. Cage's hand?

```
 1          A.    Detective Nick Broussard.

 2          Q.    Broussard?

 3          A.    Uh-huh.

 4          Q.    And what was his -- was he a deputy?

 5          A.    He was a detective.

 6          Q.    He was a detective.  Were you his

 7    supervisor?

 8          A.    Not that night, no.

 9          Q.    Did you write a report to anybody -- you

10    understand under the policies if you find out that

11    somebody does something wrong, you are supposed to

12    report it, correct?

13          A.    It was handled, sir.

14          Q.    I'm asking you did you report it?

15          A.    I didn't have to.

16          Q.    You agree that what Deputy Broussard or

17    Detective Broussard did was completely

18    inappropriate, don't you?

19          A.    I didn't approve of it.

20          Q.    What happened -- and then you were sued,

21    correct?

22          A.    Yes.

23          Q.    When did you complete the official

24    report?  What I want to do is, do you need to --

25    let me just show you the tape.  I'm going to enter
```

```
 1    it as an exhibit.
 2              MR. ZIBILICH:
 3                   What exhibit is this?
 4              MR. CLARKE:
 5                   This is going to be Exhibit --
 6              MR. ZIBILICH:
 7                   75.
 8              MR. CLARKE:
 9                   -- 75.
10              MR. ZIBILICH:
11                   This is getting into evidence at
12                this trial, too?
13              MR. CLARKE:
14                   What?
15              MR. ZIBILICH:
16                   This is going to get into evidence
17                at the trial?
18              MR. CLARKE:
19                   Yes.
20              MR. ZIBILICH:
21                   What are you calling Exhibit 75?
22              THE COURT REPORTER:
23                   Cage Tape.
24              MR. CLARKE:
25                   It's got a little advertisement at
```

```
 1            first.
 2        MR. ZIBILICH:
 3            This is a tape of what?
 4        MR. CLARKE:
 5            This is the tape of a Subway
 6        sandwich.  This is Jacobi Cage.
 7            {VIDEO PLAYED}
 8  BY MR. CLARKE:
 9    Q.   In that tape, is that the tape of your
10  interaction with Jacobi Cage?
11    A.   Yes, sir.
12    Q.   And the deputy, Broussard, who slapped
13  the phone out of his hand, it was -- and Mr. Cage
14  kept yelling, "That ain't right.  That ain't right,
15  man."
16    A.   That's not who was yelling that.  That
17  was another person in the crowd that was yelling
18  that.
19    Q.   What was Jacobi Cage -- is it what he was
20  doing that was causing the disturbance on that
21  tape?
22    A.   Yes.
23    Q.   And are you the person that pulls him
24  across the -- you had a hat on, and you pulled him
25  across the fencing, whatever that is called?
```

1          A.    Yes, sir.

2          Q.    And what was Jacobi Cage's crime that he

3     committed that you were trying to ask him to come

4     with you for?

5          A.    He was disturbing the peace, and he was

6     inciting the crowd.

7          Q.    Did you hear it on the tape?

8          A.    He was yelling, "Fuck you, fuck you, fuck

9     you," as he was shooting the bird gesture towards

10    the police officers.

11         Q.    That's a First Amendment protected

12    action, isn't it?

13         A.    Not at that point, no, sir.  He is

14    inciting the crowd.

15         Q.    So if somebody slaps a camera from him,

16    and you say, "F you, F you, F you," and shoot the

17    bird at them, that's inciting the crowd?

18         A.    I didn't know that part of it, sir.

19         Q.    I understand.  Officers need to -- that's

20    why I asked did you apologize to Mr. Cage.

21         A.    I had not talked to Mr. Cage since the

22    arrest.

23         Q.    If you saw him, would you apologize to

24    him?

25              MR. ZIBILICH:

```
1                    Don't answer that.
2           THE WITNESS:
3                    He apologized to me.
4           MR. ZIBILICH:
5                    I said don't answer it.
6    BY MR. CLARKE:
7       Q.   Now, you settled -- that case was
8    settled, right?
9       A.   The sheriff did, yes, sir.
10      Q.   Did you not want the case settled?
11      A.   I don't think --
12          MR. ZIBILICH:
13                   Object to the form.  You can answer
14            it.
15          THE WITNESS:
16                   I don't think it should have been
17            settled.
18   BY MR. CLARKE:
19      Q.   When did you write your initial report in
20   the Jacobi Cage case?
21      A.   I believe it was approved on that Monday.
22      Q.   The incident happened on what?
23      A.   On a either Friday or Saturday night.
24      Q.   Had you seen the tape by then?
25      A.   Yes.
```

```
 1          Q.    Let me pass you the Jacobi Cage crime
 2   report as Exhibit 76.  Did you put in here anything
 3   about the officer flipping off -- swiping the phone
 4   away from Mr. Cage and flipping him off?
 5          A.    No, sir.
 6          Q.    Why didn't you put that in your report?
 7          A.    That wasn't my probable cause for the
 8   arrest.
 9          Q.    Are you not told to put in all relevant
10   information in a report?
11          A.    I have a supplement.
12          Q.    You have a supplement?
13          A.    Yes, I do.
14          Q.    I don't have that.  Was that placed in
15   the supplement?
16          A.    Yes, sir.
17          Q.    I will move off of that.  At the time you
18   wrote this report, why did you do -- actually, let
19   me ask you this.  Why did you do a supplement in
20   that case?
21          A.    That's when I took the video and put it
22   into evidence and explained the video.
23          Q.    So do you do a supplemental report after
24   -- you do an initial report when there is any type
25   of arrest or something, correct?
```

1      A.    Correct.

2      Q.    And what are the requirements when you do

3  a supplemental report?  You did one in Parsa, and I

4  guess you did one in Jacobi Cage, correct?

5      A.    The only thing -- the supplement for this

6  case was in reference to logging the evidence and

7  explaining the video.

8      Q.    What I'm trying to get at is it's my

9  understanding, when you are doing an initial

10  arrest, there is the initial report that's done.

11  It's given a number, right?

12      A.    Yes.

13      Q.    And then, I guess, if there is further

14  investigation that is -- or evidence that is logged

15  in on that particular case, it all gets logged in

16  under that number, correct?

17      A.    Correct.  Everything is under the same

18  number.

19      Q.    Is there a requirement that an actual

20  supplemental report be done, or is it just kind of

21  the evidence and the information that you're

22  getting as you are investigating the crime that is

23  just loaded up on that file name? Did you do a

24  report like you did in Parsa and the Dowling

25  thing?

```
 1        A.    No, sir.
 2        Q.    So when you found out about the evidence,
 3   you logged it into evidence, and you gave a
 4   description.  What did you put in that report?
 5        A.    I obtained the video and logged it into
 6   evidence.
 7        Q.    But did you say that you felt that Deputy
 8   Broussard inappropriately swiped --
 9        A.    No, sir.
10        Q.    Did you even mention in your supplemental
11   report that -- did you actually write down anywhere
12   an evaluation of the videotape that you observed?
13        A.    No, sir.
14        Q.    You just logged it in, and the evidence
15   was there?
16        A.    Correct.
17        Q.    But you didn't fill out a report that
18   said this evidence shows Broussard's swiping away
19   the cell phone and flipping him off?
20        A.    I don't believe I did.
21        Q.    Have you ever heard of the Code of
22   Silence?
23        A.    Code of Silence?  No, sir.
24        Q.    You never heard of cops don't rat other
25   cops out?
```

1       A.    Yes.

2       Q.    Do you understand that if you log -- if

3  you see something, and you don't document it, that

4  could be interpreted as the Code of Silence?

5       A.    No, sir.  This was already addressed by

6  his supervisors.

7       Q.    Do you believe that somebody saying fuck

8  you to an officer is a crime that they need to be

9  arrested for?

10       A.    When inciting the crowd, yes, sir.

11       Q.    Explain that to me.  What is an

12  acceptable fuck you or a non-acceptable fuck you?

13       A.    It was just me and you sitting here, and

14  I say, "Fuck you," that's fine, but if there is a

15  crowd out there, a large disturbance, a large

16  fight, where it took multiple police officers,

17  including officers that were inside of the parade

18  to stop the parade and use their mounted horses to

19  disperse this crowd and try and get everybody to

20  calm down, which is what we were trying to do, was

21  calm the crowd down, and then you have Mr. Cage who

22  starts exciting the crowd by yelling, "Fuck you,"

23  to the police.  That's a problem.  So I was trying

24  to get him off the parade route.  He wasn't under

25  arrest at that point.  I was trying to remove him

```
1    from that crowd, from agitating the crowd any
2    further and get him off the parade route, and he
3    refused to cooperate.
4         Q.   But he wasn't involved in the original
5    altercation, was he?
6         A.   We have information that he was.
7         Q.   You have information that he was?
8         A.   We had information that he was, yes, sir.
9         Q.   What information did you have?
10        A.   Witnesses saying that guy was involved.
11        Q.   Are they in some kind of -- did he get
12   charged for it?
13        A.   No, sir.
14        Q.   So if he wasn't under arrest, under what
15   authority were you pulling him down to the ground?
16        A.   At that point --
17             MR. ZIBILICH:
18                  Is that pertinent to this case?  I
19             mean, really.
20             MR. CLARKE:
21                  Dude, yes.
22             MR. ZIBILICH:
23                  All right.
24             THE WITNESS:
25                  Because at that point he resisted my
```

```
1              order, so I pulled him -- he pulled me
2              across.  I didn't pull him.  He pulled
3              me across into his area, and when he
4              pulled back, I put my hand on him and
5              said, "Come with me," and he pulled me
6              back, and when he pulled back and
7              pulled me across the barrier, I pulled
8              him back across.
9   BY MR. CLARKE:
10      Q.    So you put your hands on him -- I mean,
11  you put your hands on him to escort him out of the
12  parade route?
13      A.    Yes, sir.  It's in the report.
14      Q.    Does he have an obligation to actually go
15  with you if he has not committed a crime?
16      A.    He was committing a crime, sir.
17      Q.    Well, we are going to differ on that. The
18  crime was -- was the guy behind him that was
19  yelling, "This ain't right, man.  This ain't right,
20  man," was that guy inciting the crowd, too?
21      A.    No, he wasn't.  Not in my perception.
22      Q.    If it wasn't at a parade -- well, no. Let
23  me -- now, let's get to your report in this case.
24  On January 19th, 2020, what was your shift and what
25  were you doing that ended up with you taking over
```

```
1    being the reporting officer on the Parsa matter?
2         A.   I was actually off duty, and I got
3    notified of an officer-involved incident and
4    requested to go to the scene.
5         Q.   Who notified you?
6         A.   My lieutenant.
7         Q.   Lieutenant?
8         A.   Tom Meunier.
9         Q.   And you said an officer-involved
10   incident.  What does that mean?
11        A.   Correct.  We had officers that were
12   involved in an incident where the subject passed.
13        Q.   And why would homicide get called out?
14        A.   We work all in-custody issues.  We
15   investigate death investigations.
16        Q.   Did you consider this an in-custody
17   death?
18        A.   He was in our custody, yes.
19        Q.   I mean, it says it on the top of your
20   report, doesn't it?
21        A.   Yes, sir.
22             MR. ZIBILICH:
23                  I told you this deposition is not
24             going to last long.  It's a term of
25             art.
```

```
 1          MR. MOST:

 2               Off the record for a second.

 3          THE VIDEOGRAPHER:

 4               We are going off the record.  The

 5            time is 10:49.

 6               {BRIEF RECESS}

 7          THE VIDEOGRAPHER:

 8               We are back on the record.  The time

 9            is 10:50.

10  BY MR. CLARKE:

11       Q.   So you were off duty?

12       A.   Yes, sir.

13       Q.   Were you part of a special team or is it

14  --

15       A.   We're all on call.

16       Q.   So you were off duty but on call?

17       A.   We are always on call.

18       Q.   You never have an off-duty day?

19       A.   No, sir.

20       Q.   I'm sure the Homicide Bureau or Division

21  has a number of people in it.  Do you know why you

22  were selected?

23       A.   Lieutenant Meunier called myself,

24  Detective Scott Bradley, and Detective Jesus

25  Falcon.
```

```
1        Q.   Obviously, at some point you became the
2   reporting officer or what --
3        A.   Investigating officer, yes, sir.
4        Q.   So you are the primary investigating
5   officer, and there were other people who were
6   assigned to assist on the team, correct?
7        A.   Yes, sir.
8        Q.   But you did most of the legwork, right?
9        A.   Yes, sir.
10       Q.   How many other -- what is the term we
11  want to use for this?  Does homicide get called out
12  every time the officers are involved with somebody,
13  and the suspect dies?
14       A.   Yes, sir.
15       Q.   You're not with Internal Affairs,
16  correct?
17       A.   No, sir.
18       Q.   You didn't do an Internal Affairs
19  investigation, did you?
20       A.   No, sir.
21       Q.   About how many deaths in custody have you
22  responded to?
23       A.   There was a few.  I don't know offhand.
24       Q.   Can you recall any of them?
25       A.   Yeah.  I mean, there were a couple of
```

 1   shootings.

 2        Q.   Were you called for the recent shooting

 3   where the cops were indicted or charged?

 4        A.   No, sir.

 5        Q.   Any other -- any investigation, any --

 6   what is the purpose of your investigation as a

 7   homicide?  Are you looking into whether the cops

 8   committed a crime?

 9        A.   Yes, sir.

10        Q.   So for the purpose of your investigation,

11   the suspects were the cops?

12             MR. ZIBILICH:

13                  We call them deputies here.

14             THE WITNESS:

15                  I was looking to see if their use of

16                force was reasonable and necessary,

17                yes.

18   BY MR. CLARKE:

19        Q.   If you look at Exhibit 30, you list -- I

20   just need to go through some of these numbers and

21   things on the reports.  What is a Signal 29 at the

22   top?

23        A.   That's a death.

24        Q.   And the Rep Area? That's just the

25   geographic?

1      A.   Yes, sir.

2      Q.   A-15489-20, is -- that -- does the A mean

3  anything or --

4      A.   It is January.

5      Q.   Excuse me?

6      A.   It's the first month.  It's January.

7      Q.   In here you note the victim is E████

8  P████, correct?

9      A.   Correct.

10     Q.   You put offense, none, right?

11     A.   Correct.

12     Q.   Suspect, none?

13     A.   Correct.

14     Q.   Why didn't you put the officers in there?

15     A.   They were not suspects.

16     Q.   Well, if you were investigating whether

17  they did anything wrong, then they would be the

18  person to investigate.  That would be the suspect,

19  wouldn't it?

20     A.   I didn't view them as a suspect in a

21  crime yet.

22     Q.   If you go to your narrative.  When did

23  you complete this narrative?

24     A.   It appears to be January the 30th, 2020.

25     Q.   Up at the top.  I got you.  What

```
 1    information did you have?  What had you done before

 2    you wrote the report?  Had you responded to the

 3    scene?

 4         A.   Yes.

 5         Q.   Had you reviewed the tape?

 6         A.   Yes.

 7         Q.   Tell me everything you've done.  Well,

 8    I'll take that back.  It would be easier to go

 9    through it on a time basis.  This is done January

10    30th.  According to this, when you reviewed the

11    tape -- what tapes did you end up getting?  Did you

12    get the tape from Laser Tag?

13         A.   Yes.

14         Q.   Did you get the tape that was showed on

15    the news?

16         A.   We didn't get that.

17         Q.   Did you see it on the news?

18         A.   Yes.

19         Q.   In that particular tape, Deputy Pitfield

20    comes up.  He is told, when he comes up, that E████

21    P████ is autistic, correct?

22         A.   Throughout the --

23              MR. ZIBILICH:

24                   Are you asking if that is on the

25                tape?
```

```
 1            MR. CLARKE:
 2                Yes.
 3            THE WITNESS:
 4                I don't recall that being on the
 5           tape.
 6  BY MR. CLARKE:
 7       Q.   This is going to be Exhibit 77.  It is
 8  going to be the tape from the news broadcast.  I'll
 9  play you the tape.
10                {VIDEO PLAYED}
11  BY MR. CLARKE:
12       Q.   Did you hear him tell him he is autistic?
13       A.   No, sir.
14       Q.   Listen to it again.
15            MR. ZIBILICH:
16                My usual objection, that it speaks
17               for itself.  Whether you hear it or not
18               is --
19            MR. CLARKE:
20                He did the investigation.
21            MR. ZIBILICH:
22                I got it.
23                {VIDEO PLAYED}
24  BY MR. CLARKE:
25       Q.   You didn't hear that?
```

```
 1        A.    I couldn't make out what he was saying,
 2   no, sir.
 3             MR. CLARKE:
 4                  That is going to be Exhibit 77.
 5   BY MR. CLARKE:
 6        Q.    In your report, you noted that E███ had a
 7   mental disorder.  Did you know he was autistic at
 8   the time you wrote the report?
 9        A.    Yes, sir.
10        Q.    Why did you put in mental disorder?
11        A.    Well, we did know that -- the parents
12   told us that he had autism.  That's all we knew.
13        Q.    Did you have any training at any time at
14   JPSO about autism?
15        A.    No, sir.
16        Q.    Never had any training from the coroner's
17   office on autism?
18        A.    No, sir.
19        Q.    No training on how to deal with autistic
20   people then?
21        A.    Not that I can recall.
22        Q.    No training on accommodations to provide
23   autistic people?  No?
24        A.    Not that I can recall.
25        Q.    The initial report doesn't have every-
```

```
 1    thing in it, because you were going to do a
 2    supplemental report, correct?
 3         A.   This was just a gist.
 4         Q.   This is -- does it normally take 11 days
 5    to complete the narrative or to complete the
 6    incident report?
 7         A.   Yes, sir.
 8         Q.   So you get the call.  Did you start
 9    filling out this report on -- January 30th was the
10    first time this report was put in the system?
11         A.   I don't know.
12         Q.   Did you talk to anybody before you
13    completed your report?  Let me ask it this way.  So
14    you were called by -- how do you say his name?
15         A.   Meunier.
16         Q.   Meunier.  Who arrived -- when you get to
17    the scene, who is there?
18         A.   Lieutenant Meunier was there, Scott
19    Bradley was there, a bunch of rank.  Myself,
20    Meunier, and Scott Bradley were the only homicide
21    section personnel there.
22         Q.   I'm trying to say anybody who was there.
23         A.   They had multiple people there, sir.
24         Q.   What did you do at the scene?
25         A.   I went to review video, recovered the
```

1    video.  Lieutenant Meunier and Detective Bradley

2    started interviewing employees, and then we

3    relocated to the hospital.

4         Q.   So when you were there, everybody did a

5    little bit of different parts?

6         A.   Yes, sir.

7         Q.   You obtained the Laser Tag video?

8         A.   Yes.

9         Q.   Did you ever go to the hospital?

10        A.   Yes.

11        Q.   Who was at the hospital when you got

12   there?

13        A.   Detective Falcon was there and the

14   Parsas.

15        Q.   Did you speak with the Parsas?

16        A.   Yes, sir.

17        Q.   What did you talk to them about?

18        A.   What occurred that day.

19        Q.   Is that where you took their statement?

20        A.   Yes, sir.

21        Q.   And you took that at the hospital?

22        A.   Yes, sir.

23        Q.   Then some of the other deputies on your

24   team started taking statements of the officers,

25   correct?

 1          A.    Yes.

 2          Q.    Let's go to Exhibit 31, which is your --

 3    this will be your supplemental report, correct?

 4          A.    Yes, sir.

 5          Q.    This is not an Internal Affairs report,

 6    correct?

 7          A.    No, sir.

 8          Q.    This is not a determination as to whether

 9    or not somebody violated policy, correct?

10          A.    No, sir.

11          Q.    This is a determination as to whether or

12    not there was probable cause to determine whether

13    or not the officers had committed a crime, correct?

14          A.    Criminal investigation, yes, sir.

15          Q.    And you sought out warrants attempting to

16    get information about this, correct?

17          A.    Yes, sir.

18          Q.    And the probable cause that you were

19    seeking was that you said in those warrants was

20    probable cause that the officers had committed a

21    crime?

22          A.    It was relative to a death investigation,

23    yes, sir.

24          Q.    Do you know the requirements of what you

25    have to have to actually get a warrant?

1      A.   Yes, sir.

2      Q.   You have to have evidence of a crime,

3   correct?  Probable cause.

4      A.   Not evidence of a crime.  You have to

5   have probable cause.

6      Q.   Probable cause of a what?

7      A.   It's an investigative tool that we use to

8   get information for our investigation.

9      Q.   You know what the Fourth Amendment is?

10      A.   Yes, sir.

11      Q.   It requires you to have probable cause of

12   a crime to get an actual warrant and to get the

13   documentation, correct?

14      A.   There was a potential crime, yes.

15      Q.   What was the potential crime?

16      A.   If I deemed that these officers used

17   unnecessary force.

18      Q.   Did you tell that to the judge?

19      A.   Sir?

20      Q.   Did you tell the judge that your probable

21   cause was that the officers might have committed a

22   crime?

23      A.   It's in the warrants.  There is a death

24   investigation at the hands of possibly these

25   officers, yes.

```
1          Q.   That's not -- let's pull up the warrants.
2     We'll start at Exhibit 52.
3               MR. ZIBILICH:
4                   Which warrant is that?
5               THE WITNESS:
6                   It's from Louisiana --
7               MR. CLARKE:
8                   This is a Louisiana -- I'm trying to
9               figure out how I can pull something up
10              without that being on there.  Can we
11              turn the TV off for now?  I have to use
12              my computer.
13    BY MR. CLARKE:
14         Q.   Look at Exhibit 52.  Are you aware of the
15    Louisiana statute on search warrants?
16         A.   Yes.
17         Q.   In order to issue a warrant, it has to be
18    the subject of a theft, intended to use or has been
19    used as a means of committing an offense, or may
20    constitute evidence tending to prove the commission
21    of the offense.  What were you using a warrant for?
22         A.   To obtain information for my
23    investigation.
24         Q.   Is it one of those three things?
25              MR. ZIBILICH:
```

```
 1                    Wait.  That calls for him to make a
 2               legal interpretation.  He is not
 3               answering that.  He gave you the answer
 4               as to why he was doing it.  That's
 5               enough.
 6    BY MR. CLARKE:
 7         Q.    Which one of these three is it?
 8               MR. ZIBILICH:
 9                    I told you he is not answering that.
10               Don't answer it, sir.
11               MR. CLARKE:
12                    He is not your lawyer.
13               MR. ZIBILICH:
14                    I told him not to answer it.
15               MR. CLARKE:
16                    You're not his lawyer.
17               MR. ZIBILICH:
18                    I don't care.
19    BY MR. CLARKE:
20         Q.    Well, you can listen to him, if you want,
21    or you can see what happens if you don't. At that
22    time, the time that you sought the warrant, did you
23    have any conclusion of any officer that may have
24    committed a crime?
25         A.    No.
```

1     Q.   Did you conclude that there was probable

2   cause that any officer of the Jefferson Parish

3   Sheriff's Office committed a crime?

4     A.   No.

5     Q.   When you sought the warrants?

6     A.   No.

7     Q.   So, for example, if we go to Exhibit --

8   we will get off warrants.  Move that book away.  Do

9   you have your supplemental report?

10     A.   Yes.

11     Q.   And when there is an in-custody death, is

12   there a different protocol or report that's done?

13     A.   No, sir.

14     Q.   For an officer-involved death?

15     A.   No, sir.

16     Q.   There is no -- Do you have any training

17   on investigating -- you completed your report on

18   September 9th, 2020 after the autopsy came in,

19   correct?

20     A.   Yes, sir.

21     Q.   You note up at the top it is an

22   in-custody death, right?

23     A.   Yes.

24     Q.   You put in the death classification that

25   you got from the autopsy, correct?

```
 1        A.   Yes.
 2        Q.   And then you go through the different
 3   people that were involved in the events, correct?
 4        A.   Yes.
 5        Q.   You have people from the homicide
 6   division, investigations bureau, crime scene, crime
 7   lab, and digital forensics, correct?
 8        A.   Yes, sir.
 9        Q.   You were the primary person from the
10   homicide section.  What did the people from the
11   investigations bureau do?
12        A.   They just responded to the scene, and
13   they were on the scene.
14        Q.   But they were not involved in the further
15   investigation?
16        A.   No, sir.
17        Q.   Is that primarily just you?
18        A.   Yes, sir.
19        Q.   So these are the people that ended up on
20   the scene?
21        A.   Yes, sir.
22        Q.   Then you list the people that were
23   involved in the autopsy, correct?
24        A.   Yes, sir.
25        Q.   Then you go through all of the people
```

1  that you dealt with and took statements from,

2  correct?

3      A.   Yes, sir.

4      Q.   So you took statements of the Parsas and

5  then people from Laser Tag, Miss Hilton, Miss

6  Kracke, and Miss Houck, correct?

7      A.   Mister.

8      Q.   Mr. Houck.  I'm sorry. And you did those

9  right on the scene, correct?

10     A.   I didn't, no, sir.

11     Q.   Somebody with your team was?

12     A.   Correct.

13     Q.   But you got that information incorporated

14 in your supplemental report, correct?

15     A.   Correct.

16     Q.   How did you know Jan Quatroy knew

17 anything about this case on January 19th, 2020?

18     A.   She contacted the sheriff's office with

19 information.

20     Q.   Same with Marty Luquet?

21     A.   We contacted him.

22     Q.   When you were investigating whether or

23 not the police officers committed any crime, why

24 did you need E█████ P█████'s medical records and

25 school records?

1    A.   I was also trying to corroborate what the
2  parents told me.
3    Q.   So you were getting a warrant to
4  corroborate what the parents told you?
5    A.   Yes.
6    Q.   Do you think that's appropriate?
7    A.   Yes, sir.
8    Q.   Did you get warrants to determine -- to
9  try to corroborate what the officers said?
10    A.   Yes, sir.  It should have been in his
11  medical records.
12    Q.   The officers?
13    A.   They told me he had strength and all, how
14  strong he was, and this is how he was acting, and I
15  wanted to corroborate that as well.
16    Q.   But did you get any medical records?  I
17  mean, how do you corroborate getting records,
18  school records, from somebody in middle school?
19  How does that corroborate anything that the parents
20  said that's relevant to your investigation?
21    A.   Because it's going to show previous
22  incidents.
23    Q.   So you were using this to try to find out
24  -- to try to investigate E▆▆ P▆▆'s previous
25  conduct, correct?

```
 1        A.   I was trying to find out victimology on
 2   him, yes, sir.
 3        Q.   And what did your victimology tell
 4   you? He's an autistic kid?
 5        A.   He has a couple of issues with, one,
 6   being autism, yes.
 7        Q.   You're not a medical doctor, are you?
 8        A.   No, sir.
 9        Q.   Do you know whether or not all of his
10   behaviors are related to his autism?
11        A.   I do not.  I do know what the results
12   came back as far as evidence from Kennedy Krieger
13   and from Ochsner.  I'm sorry, Children's.
14        Q.   How did that help you in your
15   investigation?
16        A.   Well, it showed that this was not a
17   one-time deal, that he did not just act out on his
18   dad and attack the police officer.  This was an
19   ongoing ordeal.
20        Q.   These are medical records that you're
21   looking at that you subpoenaed to show that they
22   were related to his autism, correct, and his
23   diagnosis of autism?
24        A.   No, sir.  It showed -- it painted the
25   picture on why this occurred that day.
```

1      Q.   You know if you had training on autism

2   and what autistic people do, that might have been

3   helpful to you, correct?

4      A.   It could have been, yes.

5      Q.   Why does E███ P████'s history inform you

6   in any way as to the reasonableness of the

7   officers' use of force on January 19th, 2020?

8      A.   It helps explain the situation that the

9   police officers were involved in, and it

10  corroborated them saying about his strength and how

11  he was acting.

12     Q.   But the officers didn't know his past,

13  did they?

14     A.   No, sir.

15     Q.   So the officers, whether they knew their

16  past or not, they would have to deal with the same

17  thing, correct?

18     A.   Correct.

19     Q.   Are you trying to exonerate the officers

20  and trying to basically show that E███ P████ -- try

21  to muddy up his background?

22     A.   No, sir.

23     Q.   You understand that whether or not E███

24  P███ was a serial rapist or serial murderer in the

25  past, it doesn't have any impact on whether or not

```
 1   the officers used force to him on January the 19th,
 2   2020?
 3              MR. ZIBILICH:
 4                   Object to the form.  You can answer
 5                it.
 6              THE WITNESS:
 7                   What I was looking for is a reason
 8                why this occurred.
 9   BY MR. CLARKE:
10        Q.   The reason is he is autistic, correct?
11        A.   It was a little more than that, as far as
12   his medical records, but part of it is autism.
13        Q.   You've got to explain that to me, because
14   you are making a medical conclusion that --
15        A.   It's not a conclusion, sir.  It's what
16   the records revealed.
17        Q.   But do the records show that what his
18   mental capacity was, was of a child, correct?
19        A.   It was very low, yes, sir.
20        Q.   He was nonverbal or spoke very few words,
21   correct?
22        A.   Correct.
23        Q.   He went to special schools, correct?
24        A.   Correct.
25        Q.   And he went to special schools because of
```

```
 1   his autism and behavior issues, correct?
 2        A.   Yes, sir.
 3        Q.   And if you had training on autism, you'd
 4   know that a lot of autistic people engage in self-
 5   injurious behavior, correct?
 6        A.   Yes, they do.
 7        Q.   They also can engage in violent behavior
 8   or have outbursts, correct?
 9        A.   Yes.
10        Q.   So are you making a distinction that he
11   was acting somehow volitionally to try to attack
12   people on that particular day or that he was --
13   didn't understand what was going on because he is
14   autistic?
15             MR. ZIBILICH:
16                  Hold on.  I object.  I'm sorry.  I
17                mean, it's not necessarily A or B.  It
18                could be a thousand different things.
19                You can answer it.
20             THE WITNESS:
21                  What I saw and what the
22                investigation revealed is it was
23                repeated ordeals with his outbursts and
24                his attacks.  I don't -- I can't answer
25                if it was malicious.  I would hope that
```

```
 1                    it wasn't, but --
 2    BY MR. CLARKE:
 3         Q.   You don't have autism training, right?
 4         A.   Correct.
 5         Q.   That would be helpful to you in
 6    evaluating that situation, wouldn't it?
 7              MR. ZIBILICH:
 8                   You already asked him that a bunch
 9                of times.
10              MR. CLARKE:
11                   I'm going to keep asking it.  I'm
12                going to ask the questions I want to
13                ask.
14    BY MR. CLARKE:
15         Q.   Do you know of any particular -- were you
16    trained on anything -- well, you had no training on
17    autism, right?
18         A.   Not that I recall, sir.
19         Q.   Look at your little training thing and
20    see if you --
21         A.   Specifically with autism?  Is that what
22    you are asking me, sir?
23         Q.   Yes.  Or any class that touched on it.
24         A.   I don't see anything, sir.
25         Q.   So you took the Parsas and people at
```

```
1    Laser Tag and at least Miss Quatroy's statement on
2    January 19th, correct?
3         A.   Yes, sir.
4         Q.   You took all the officers' statements at
5    least -- why did you wait until 1/20 -- January
6    22nd to take the statements of the officers?
7         A.   That's part of our protocol.
8         Q.   What is your protocol?
9         A.   That we wait at least three days.
10        Q.   Is that written somewhere?
11        A.   I don't know if it's written, but that's
12   how we handle our investigations.
13        Q.   Did you tell -- I mean, were they allowed
14   to speak with each other or did they review the
15   tape prior to giving a statement?
16             MR. ZIBILICH:
17                  I assume you are talking about the
18               deputies?
19             MR. CLARKE:
20                  Yes.
21             THE WITNESS:
22                  They reviewed the video, I believe,
23               inside of the interview, not prior to.
24   BY MR. CLARKE:
25        Q.   Did you have any technology or anything
```

1   to zoom in?  Zoom in on the events of the incident

2   as opposed to just looking at the big video?

3        A.   At that time, it was just what video we

4   had.

5        Q.   Have you looked at any video that has

6   been zoomed in at any time?

7        A.   I did not.

8        Q.   Do you know if anybody did something with

9   the video so that you can see more closely the

10  struggle?

11       A.   Not at that time, no.

12       Q.   At any time?

13       A.   I believe that our DFU section has been

14  able to do that.

15       Q.   The what section?

16       A.   Digital forensics.

17       MR. CLARKE:

18           Do you have some other tape that we

19       don't have?

20       MR. ZIBILICH:

21           Not that I know of.  We are talking

22       the same tape.

23       MR. CLARKE:

24           He is saying it was zoomed in.

25       MR. ZIBILICH:

```
 1                      He is saying what?
 2      BY MR. CLARKE:
 3           Q.   Are you saying --
 4           A.   Not that it is zoomed in, but it's a
 5      clearer picture.
 6                      MR. ZIBILICH:
 7                      I think that is a distinction
 8                 without a difference.
 9      BY MR. CLARKE:
10           Q.   You have not manipulated the tape to --
11           A.   No, no. What I'm saying is we didn't look
12      at it on a laptop like that.
13           Q.   You just had a better quality or --
14           A.   Correct.
15           Q.   -- whatever.  I mean, it was a more
16      appropriate whatever.  We'll move on.  When you --
17      when officers are allowed or given this three days
18      before they are going to give a potential
19      statement, are they given any instructions about
20      whether they can talk to each other?
21           A.   I didn't give those instructions.  I'm
22      not sure if it was or not.
23           Q.   That's not part of the protocol that
24      you're aware of?
25           A.   They are allowed to work.
```

1    Q.   If you are investigating an officer,

2  aren't there requirements that you have to provide

3  them under the law, such as allow them to get

4  notification of a representative or to have a

5  lawyer there?

6    A.   We didn't advise them of their rights,

7  no.

8    Q.   I understand.  The issue is you're saying

9  -- were you looking at any potential crimes on

10  Daren Parsa?

11    A.   Not on Daren Parsa.

12    Q.   How about E████ P████?

13    A.   No.

14    Q.   Donna Lou?

15    A.   No.

16    Q.   The only people that it could possibly be

17  are the officers, correct?

18    A.   We did not advise them of their rights or

19  anything like that.  We took statements from them.

20    Q.   Well, if you are doing an investigation

21  that could implicate an officer, officers have

22  rights, don't they?

23    A.   Yes.

24    Q.   They have a right to be notified that

25  there are possible charges or an investigation of

```
 1   them, correct?
 2        A.   They understood that they were under
 3   investigation for the use of force, yes.
 4        Q.   You're investigating a crime.  You're not
 5   IA.  You don't investigate use of force, do you?
 6        A.   No.  Use of force is our investigation.
 7        Q.   You don't -- do you know that you use --
 8   we'll get there.  Did you notify the officers prior
 9   to giving a statement that it was a criminal
10   investigation?
11        A.   I don't know if I used those words.
12             MR. ZIBILICH:
13                  Object to the form.  You got to lay
14             a foundation.
15   BY MR. CLARKE:
16        Q.   Did you or did you not?
17        A.   I'm not sure if I used those exact words.
18        Q.   What words did you use then about what
19   the investigation was?
20        A.   That it was a use of force investigation
21   in reference to the death of E███ P███.
22        Q.   Policy violations are investigated by IA,
23   correct?
24        A.   Correct.
25        Q.   This is a criminal use of force that you
```

1    were investigating, correct?

2         A.   Yes.

3         Q.   Would you agree that policy violations

4    and crimes are a different analogy?

5         A.   Can be.

6         Q.   Would what you told them be on the actual

7    statements that you asked them?

8         A.   Excuse me.

9         Q.   Would what you told them about the

10   purpose of the investigation be on tape or would it

11   be something that you told them before?

12        A.   I believe we explained it to them on tape

13   as well, after review.

14        Q.   Then in your report you go through your

15   attachments and evidence.  This goes through what

16   you collected and the warrants that you served. You

17   also served a warrant on the news, some news

18   broadcaster, didn't you?

19        A.   Yes, we did.

20        Q.   Do you know why that is not listed in

21   your report?

22        A.   Because they never responded to the

23   warrant.

24        Q.   So this is all the evidence that was

25   actually obtained?

```
 1          A.   Yes, sir.
 2          Q.   I got you.  And this goes through all of
 3     the school records you got, medical records you
 4     got, correct?
 5          A.   Yes, sir.
 6          Q.   And all the statements.
 7          MR. CLARKE:
 8               I've got to go to the bathroom. I've
 9            got to take a break.
10          MR. ZIBILICH:
11               Thanks for the information.
12          THE VIDEOGRAPHER:
13               Off the record.
14               {BRIEF RECESS}
15          THE VIDEOGRAPHER:
16               We are back on the record.  The time
17            is 11:32.
18     BY MR. CLARKE:
19          Q.   Your report goes through everything that
20     you did, and then you kind of summarize everything,
21     correct? Did you prepare any other documents other
22     than the initial report and the supplemental report
23     on that?
24          A.   Other than search warrants, no.
25          Q.   I apologize.  Yeah, the search warrants.
```

```
1    Do you recall meeting with -- tell me about your
2    interactions that you had with the coroner's
3    office.
4         A.    We met with them to discuss the case.
5         Q.    Let's start at the beginning.  Did you
6    meet with people at the coroner's office on January
7    19th?
8         A.    Yes.
9         Q.    And that was Mr. Genevay?
10        A.    Yes.
11        Q.    I need to know about any conversations or
12   communications you had with the coroner's office or
13   information that you gave to the coroner's office
14   from January 19th up until the time you completed
15   your report, your September 9th, 2020.
16        A.    We met with them a lot and looked at the
17   video.
18        Q.    There is a report there that is part of
19   Exhibit Number 20 -- 61, which is from the
20   coroner's office that sets forth there was a JPCO
21   case review committee meeting on 6/15/2020, and
22   Jefferson Parish employees in attendance were
23   Scanlan, Ranch --
24             MR. ZIBILICH:
25                  Close.
```

```
 1              MR. CLARKE:
 2                   Rauch.
 3              THE WITNESS:
 4                   Rauch.
 5   BY MR. CLARKE:
 6        Q.   I'm not going to say that one.  Dowling
 7   and Falcon and somebody M-E-U-N-I-E-R.  Is that the
 8   time that you reviewed the video with them?
 9        A.   Yes, sir.
10        Q.   Did you review the video with them at any
11   other time?
12        A.   No, sir.
13        Q.   Are all of the people that are listed on
14   the case review committee memo, are they all with
15   the homicide division?
16        A.   No.
17        Q.   Tell me who is with what.
18        A.   Chief Scanlan and Sergeant Rauch is with
19   the crime lab.  Lieutenant Meunier, myself, and
20   Detective Falcon are in the homicide section.
21        Q.   Tell me -- Did you have conversations
22   with -- Did you ever talk with anybody from the
23   coroner's office or hear them talk to you about
24   anything concerning excited delirium?
25        A.   I believe it was talked about.
```

 1     Q.   Was that before this meeting?  I would
 2 imagine from the time -- from January 19th until
 3 you completed your report, there was some
 4 communication with the coroner's office back and
 5 forth; is that correct?
 6     A.   No, sir.  Not with me.
 7     Q.   So you had none, and the next time you
 8 saw them after January 19th was June 15th, 2020?
 9 Is that correct?
10     A.   Yes.
11     Q.   And when you were there, you brought the
12 tape to that meeting, correct?
13     A.   Correct.
14     Q.   And you played the tape at that meeting,
15 correct?
16     A.   Yes, sir.
17     Q.   How long do you think you guys were at
18 that meeting?
19     A.   I have no idea.
20     Q.   Well, according to the -- Did the
21 officers narrate the tape, what was happening?
22     A.   Didn't narrate it, no.
23     Q.   I'm trying to get -- tell me what
24 happened.  They come in here.  We put on the tape.
25 You just watch it, and nobody talks?

1      A.   We watched the video, and I think at one
2 point we pointed out who was where.
3      Q.   Were the people from the corner's office
4 asking questions about what was on the tape?
5      A.   I think it was a conversation, if I'm not
6 mistaken.
7      Q.   Was there any discussion as to what the
8 cause of death in that meeting was?
9      A.   No, sir.
10      Q.   According to this memo, it says, if you
11 look at it, it says the start time of the meeting
12 was 12:15.  You see at the very top, the first
13 page?  Not at the top.  The top of the page, right?
14      A.   Yes.
15      Q.   It says -- if you go to the next page, it
16 says at 12:50 there was a discussion where
17 Troxclair presents the lab results.  See that?
18      A.   Yes, sir.
19      Q.   Did you listen to her present the lab
20 results?
21      A.   I believe that's just what was the
22 toxicology, initial toxicology.
23      Q.   And what was your recollection of that?
24 Came back negative?
25      A.   I don't recall exactly.

1      Q.    There wasn't any type of drugs in your
2   investigation in his system, correct?
3      A.    I think just what his medicine was.
4      Q.    I guess I should use street drugs or
5   illegal drugs.
6      A.    Correct.
7      Q.    There is kind of a brief discussion at
8   the bottom of Page 1 to Page 2.  Did you guys tell
9   the medical examiners that the parents used zip
10  ties to restrain him in their vehicle? That didn't
11  happen this day, did it?
12           MR. ZIBILICH:
13                What didn't happen?
14           THE WITNESS:
15                I don't recall if that is exactly
16             how that was phrased, but we did say we
17             found zip ties inside of the vehicle.
18  BY MR. CLARKE:
19      Q.    So you did find zip ties in the vehicle
20  that day?
21      A.    On the day of the incident, yes.
22      Q.    But that's not on the video, right?
23      A.    No, sir.
24      Q.    So that's some other information that was
25  provided to the coroner that wasn't on the video,

```
 1   right?
 2        A.   I'm not sure who told them that part,
 3   that they restrained in the vehicle.
 4        Q.   This has general stuff, and we have the
 5   tape, and we can do stuff.  Do you agree in
 6   generally he was in the prone position for nine
 7   minutes?
 8        A.   Yes.
 9        Q.   And during that time, is it your opinion,
10   based on your investigation, that he struggled and
11   resisted for that entire nine minutes or were there
12   periods of calm and no resistance?
13        A.   From the interviews that I took, he was
14   combative the whole time.
15        Q.   So I'm going to mark as Exhibit 78 the
16   investigative -- the whole investigative file on
17   Parsa.  I'm just giving that to you right now.
18   We're not going to just start going through it.
19   That -- just look at that briefly.  You can just
20   flip through it.  It's been produced by them.  Look
21   at it and tell me if those are the documents that
22   you obtained in your investigation.
23        A.   (Witness peruses documents.)
24             MR. CLARKE:
25                  I didn't mean for it to take this
```

```
 1                    long.
 2              MR. ZIBILICH:
 3                    Are you halfway through or more?
 4              MR. CLARKE:
 5                    Oh, I'm more than halfway through on
 6                 this.  I was talking about this
 7                 particular question.
 8              MR. ZIBILICH:
 9                    No.  The whole deposition.
10              MR. CLARKE:
11                    Yeah.  I'm more than halfway
12                 through.
13              THE WITNESS:
14                    It appears this is everything.
15      BY MR. CLARKE:
16         Q.   That question took on too much of a life
17      of its own.  That was produced by the county.  I
18      just wanted to --
19              MR. ZIBILICH:
20                    By whom?
21              MR. CLARKE:
22                    By the parish.  By the parish.
23      BY MR. CLARKE:
24         Q.   In case you need to look at anything.  So
25      we have your report that's a summary of what is
```

```
 1    contained in that file, correct?
 2         A.   Yes, sir.
 3         Q.   So does your conclusion that the officers
 4    didn't use criminal use of force rest on the fact
 5    that E███  P███ was resisting the entire nine
 6    minutes?
 7         A.   That's not the initial -- that's not the
 8    only factor.
 9         Q.   What are the factors you looked at to
10    determine whether or not the force was criminal or
11    not?
12         A.   I believe that what they used was much
13    restraint.  It was -- they tried to control him.
14    That's all they were trying to do.
15         Q.   Did you even look at the policies on use
16    of force when you were making this conclusion?
17         A.   Yes, sir.
18         Q.   The policy books are in front of you, so
19    if you'd pull them out.  What was the standard --
20    What I'm trying to get at is when you determined
21    whether or not there was a crime committed by the
22    officers, how did you determine whether or not
23    something was -- that it was a good use of force
24    versus another?  Did you review -- was it based on
25    the policy definition or criminal statute?
```

1      A.   It was both along with the video, along

2  with their interviews.  It was reasonable and

3  necessary.

4      Q.   The use of force policy is SOP --

5      A.   25.

6      Q.   -- 25.  Did you look into -- When you

7  were trying to determine whether the force was

8  unreasonable, did you look at the severity of the

9  crime that E█████ P█████ would supposedly have

10 committed?

11     A.   It wasn't a crime.  He was being detained

12 for a medical episode.

13     Q.   So there was no crime.  So the severity of

14 the crime for E████ P█████ was zero, because there

15 wasn't a crime, correct?

16     A.   No, sir.  We were trying to do an

17 objective, which was to control him and get him

18 medical assistance.

19     Q.   But the use of force policy, Exhibit 25,

20 it goes through a use of force continuum that says

21 only use that much force as is reasonably

22 necessary, correct?

23     A.   Correct.

24     Q.   And it has a use of force continuum that

25 says the escalating nature of the force options

```
 1   that an officer has, correct?
 2        A.    Correct, and they never escalated.
 3        Q.    Correct.  They only used hands --
 4        A.    Minimal force necessary.
 5        Q.    -- and body weight.  Did you consider
 6   body weight as a use of force?
 7        A.    Yes.
 8        Q.    So you have the first two pages of SOP-25
 9   talk about you can only use that much force as
10   necessary to accomplish a lawful police objective,
11   correct?
12        A.    Yes, sir.
13        Q.    And then we go through the continuum of
14   the force, correct?
15        A.    Yes, sir.
16        Q.    Did you look at -- Did you then look at
17   SOP-8 --
18        A.    Yes.
19        Q.    -- in evaluating that?
20        A.    Yes, we did.
21        Q.    And that is the policy pertaining to
22   restraining devices, correct?
23        A.    Yes.
24        Q.    And you looked at the training that was
25   given with the RIPP Hobble earlier in your
```

1    deposition, correct?

2        A.    Yes.

3        Q.    And according to that training, people

4    who are having some type of episode need to be

5    restrained and put into the recovery position,

6    correct?

7        A.    Correct.

8        Q.    And you are supposed to use a RIPP Hobble

9    if somebody is acting out of control to where they

10   can't be contained, correct?

11       A.    It's not written in stone, no, sir.

12       Q.    Go to SOP-8 and go to the restraining

13   policy on Page 4 of 6 and then 5 of 6.  "Extremely

14   violent prisoners may have to be additionally

15   restrained.  If necessary to restrain the movement

16   of both the hands and legs, it may be done by the

17   Total Appendage Restraining Procedure."  Do you see

18   that?

19       A.    Yes, sir.

20       Q.    If he was violent and resisting the

21   entire time, according to this policy, you were

22   supposed to TARP him, correct?

23       A.    We may have.  It doesn't say must.

24       Q.    What is the may based on?

25       A.    On the situation.

```
 1        Q.    And the situation is that six officers
 2   were on the scene.   One person on his back, right?
 3        A.    No, sir.
 4        Q.    There was not somebody on his back or
 5   back side?
 6        A.    He was on his buttocks by his legs, yes,
 7   sir.
 8        Q.    Were you trained that being obese,
 9   sitting on the back of the legs is just as
10   dangerous as sitting on the back?
11        A.    No, sir.
12        Q.    Did you know that obesity was a risk
13   factor for prone restraint?
14        A.    It shows it as a factor.
15        Q.    Did you know it was a risk factor?
16        A.    It's a factor.
17        Q.    Do you know what risk factor means?   It's
18   something that increases the risk of a bad outcome
19   if you restrain somebody who is obese in a prone
20   position.   Did you know that?
21        A.    I'm sure it was a consideration, yes.
22        Q.    I'm trying to figure out.   You never
23   mentioned TARP or restraints or anything in your
24   report.
25             MR. ZIBILICH:
```

```
 1                    Is that a question?
 2           THE WITNESS:
 3                    No, sir.
 4  BY MR. CLARKE:
 5       Q.   Did you?
 6       A.   No.
 7       Q.   So did you look into whether or not they
 8  properly applied the -- they used their -- the
 9  training and the policy on restraining officers --
10       A.   They did use their training, yes, sir.
11       Q.   Where were they trained?  I took the
12  training deposition of Pizzolato.  He said they're
13  not trained -- that people who are trained in the
14  RIPP Hobble should have a copy of the -- should
15  have the RIPP Hobble with them at all times.  You
16  didn't have a RIPP Hobble, correct?
17       A.   No, sir.
18       Q.   Did you know --
19           MR. ZIBILICH:
20                    He wasn't there.
21  BY MR. CLARKE:
22       Q.   Did you know --
23           MR. CLARKE:
24                    He was there.  He ended up --
25  BY MR. CLARKE:
```

```
 1        Q.    You ended up there on January --
 2              MR. ZIBILICH:
 3                    He wasn't there while the gentleman
 4                was alive.
 5              THE WITNESS:
 6                    Not for the incident, no, sir.
 7   BY MR. CLARKE:
 8        Q.    You understand, do you?  Are you trained
 9   in a taser?
10        A.    Yes.
11        Q.    Do you carry a taser?
12        A.    No.
13        Q.    Are you trained in OC spray?
14        A.    Yes.
15        Q.    Do you carry OC spray?
16        A.    No.
17        Q.    So the department gives you these, and if
18   you have -- You can't go through the continuum of
19   force if you don't have your other applications of
20   force on your belt, right?
21        A.    Because of my job, and where I'm at, I
22   don't carry a taser and pepper spray.
23        Q.    You're not -- people with -- maybe he was
24   talking about patrol officers.
25        A.    Yes, sir.
```

```
 1        Q.   All the people on the scene that you
 2   investigated were all patrol officers, correct?
 3        A.   Correct.  Well, the other two responded,
 4   because they heard the call for the assistance.
 5        Q.   There was some detective that came up.
 6        A.   Yes.
 7        Q.   Pitfield was a deputy?
 8        A.   Correct.
 9        Q.   Vega was a deputy?
10        A.   Yes.
11        Q.   Gaudet?
12        A.   Yes.
13        Q.   Is it your understanding or did you
14   investigate whether or not they had all of the
15   proper tools or police equipment with them at the
16   time?
17        A.   No, I didn't.
18        Q.   You would agree that if you don't have
19   the RIPP Hobble, you can't do the RIPP Hobble --
20           MR. ZIBILICH:
21               Brilliant deduction.
22   BY MR. CLARKE:
23        Q.   -- procedure, correct?
24        A.   That's correct.
25        Q.   Did you look into whether or not they
```

1    should have TARP'd him?

2        A.    I did not.

3        Q.    Is it your belief that if -- that the

4    amount of struggling that he had, that Parsa was

5    going through in his encounter with the officers,

6    that there was no ability for the six officers on

7    the scene to move him to the recovery position?

8        A.    No, sir.

9        Q.    So you have six -- Do you know what the

10   recovery position is?

11       A.    Yes, sir.

12       Q.    What is the recovery position?

13       A.    Place them on the side to expand the

14   airway.  Let them breathe.

15       Q.    And if somebody is -- if you have an

16   autistic kid, did you take into consideration that

17   -- let me ask you this.  Did you have training

18   about the dynamics of a struggle in your RIPP

19   Hobble training?

20       A.    I don't recall.

21       Q.    Have you ever had training like this when

22   a suspect is restrained face down his breathing may

23   be compromised?  Did you have training on that?

24       A.    Yes.

25       Q.    Did you have training that when weight is

1   -- when more weight is applied to somebody's back,

2   the more weight, the more severe the degree of

3   compression? Did you have that training?

4        A.   I don't recall.

5        Q.   Pizzolato said everybody had this. It

6   says the third thing is when there is more

7   compression on somebody's back, an individual

8   experiences increased difficulty breathing.

9        A.   That's common sense.

10       Q.   Were you trained that when the natural

11  reaction to oxygen deficiency occurs, the person

12  struggles more violently?

13       A.   I don't recall that.

14       Q.   And then once the person struggles more

15  violently, the officer applies more compression to

16  subdue the individual? You don't have -- do you

17  recall any training like that?

18       A.   I don't recall that terminology.  I'm not

19  sure, sir.

20       Q.   Do you not believe in your investigation

21  that the officers could have turned him to the side

22  and held him by the handcuffs and restrained him?

23            MR. ZIBILICH:

24                 When?

25  BY MR. CLARKE:

```
 1        Q.    During the altercation.
 2        A.    No, sir.
 3              MR. ZIBILICH:
 4                   At what point during the
 5               altercation?
 6              MR. CLARKE:
 7                   Any point.
 8              THE WITNESS:
 9                   At the very end they did, yes, sir.
10   BY MR. CLARKE:
11        Q.    Well, he was dead when they did that.
12              MR. ZIBILICH:
13                   Whoa, whoa, whoa, whoa, whoa.
14              MR. CLARKE:
15                   No?  They say --
16              THE WITNESS:
17                   He wasn't pronounced until the
18               hospital.
19   BY MR. CLARKE:
20        Q.    Right.  He had foam coming out of his
21   mouth.  He was turning purple, and he urinated on
22   himself when they got up, correct?
23        A.    Correct.
24        Q.    So how much longer would you think -- was
25   there any amount of time that they could have
```

```
 1   continued to stand on him that would make it
 2   excessive?
 3        A.   Who stood on him?
 4        Q.   I mean stayed on -- held him down,
 5   compressed him.
 6        A.   Wait.  You have to rephrase it.
 7        Q.   They were on top of him for nine minutes,
 8   right, roughly?
 9        A.   About.
10        Q.   Did you consider, in any part of your
11   investigation, the length of the time of the
12   restraint in the prone position?
13        A.   Of course I did.
14        Q.   You also -- did you take into
15   consideration the training that you're supposed to
16   move people to the recovery position?
17        A.   Yes, sir.
18        Q.   And it's your understanding and your
19   investigation that during that nine minutes that
20   the officers had no ability to actually move him to
21   the recovery position?
22        A.   Correct.
23        Q.   While there were numerous officers just
24   walking around the scene not doing anything,
25   correct?
```

1        A.    That's your perception.  Yes, sir.

2        Q.    There were people that were talking to

3   Mr. Parsa.  There were people talking to the

4   paramedics, correct?

5        A.    Yes, sir.

6        Q.    What do you base that belief on?

7              MR. ZIBILICH:

8                   Which belief?

9   BY MR. CLARKE:

10        Q.    Your belief that they could not have

11   moved him to the recovery position at any time

12   during those nine minutes.

13        A.    Their interviews and the video.

14        Q.    The interviews, like Deputy Vega, when he

15   gave his interview, he said that when they moved to

16   switch out, that Mr. Parsa wasn't offering any

17   resistance, correct?

18        A.    That's when they realized that he had

19   stopped resisting, yes.

20        Q.    At that point, you put him in the

21   recovery position, correct?

22        A.    Correct.

23        Q.    So when Vega got on top of him, he had

24   stopped resisting. They could have put him in the

25   recovery position, correct?

1      A.    Not when Vega got on top of him, no, sir.

2      Q.    Did you know that Pizzolato trained that

3  you can put people in the recovery position and

4  restrain their legs in the recovery position?  Were

5  you trained that?

6      A.    I don't recall.

7      Q.    If you could restrain somebody in the

8  recovery position, that would be relevant to your

9  investigation, correct?

10      A.    Yes.

11      Q.    Do you agree with this statement.  If

12  somebody is being handcuffed, and they're not

13  resisting at that time, that you should at least

14  put them in the recovery position at that time?

15      A.    If it's safe, yes.

16      Q.    Well, how long -- I mean, how long are

17  you trying to make a determination as to when it's

18  safe?  You got an autistic kid, right?

19      A.    Yes.

20      Q.    The autistic kid -- do you understand or

21  did your investigation reveal that it would be hard

22  to communicate with an autistic kid?

23      A.    Yes.

24      Q.    That he may not understand what the

25  officers are trying to do?

```
 1        A.   Yes.
 2        Q.   That he may be acting kind of in a way
 3   that is irrational based on his problem?
 4        A.   Yes.
 5        Q.   So if you've got somebody who can't
 6   communicate and is mentally or intellectually
 7   disabled, did you not take into consideration that
 8   his actions may not be volitional or not be
 9   intentional?
10        A.   I did, and I believe the officers did as
11   well.
12        Q.   Did you believe they complied with the
13   restraint policy?
14        A.   Yes.
15        Q.   Do you know why they tried to put leg
16   shackles on his feet?
17        A.   Because he was kicking them.
18        Q.   But that's what the TARP policy is for,
19   correct? I mean, you have an actual policy on what
20   you are supposed to do to restrain -- hang on -- to
21   restrain somebody's legs, right?
22        A.   It says may, yes, sir.
23        Q.   Does it say anywhere that deputies in the
24   restraint policy can use leg shackles to control a
25   violent prisoner?
```

```
 1              MR. ZIBILICH:
 2                   My usual objection.  It says what it
 3                says.
 4              THE WITNESS:
 5                   It's under B, sir.  "Approved
 6                restraint devices may be used to secure
 7                a prisoner who violently resists arrest
 8                or who manifests mental disorders such
 9                as poses a threat to himself, the
10                officer or the public."  It's under leg
11                restraints.
12       BY MR. CLARKE:
13          Q.   What section?
14          A.   B.
15          Q.   That doesn't say violent person.
16          A.   Violently resists arrests.  That is
17       violent, I would say.
18          Q.   The TARP policy -- where are you reading?
19       What page?
20          A.   Page 5 of 6.  Section B, Number 5.
21          Q.   Then D said -- would you consider E█████
22       P████ extremely violent such that six officers on
23       the scene couldn't turn him on his side and
24       restrain him?
25          A.   He was violent, sir.  It's under B-5.  A
```

1  prisoner who violently resists arrest or manifests

2  mental disorders.  That's exactly what they were

3  dealing with, somebody that was having a mental

4  episode and needed medical care.  They were trying

5  to restrain him with the minimum force necessary.

6       Q.   Does that say to use leg shackles?

7       A.   Yes.

8       Q.   Where does it say that -- I mean you --

9       A.   Section 2-B.  Department authorized

10  chains, leg irons, straps, shackles.

11       Q.   Department authorized body restraint.  Do

12  you know what that is?

13       A.   That would be C.

14       Q.   That would be the TARP?

15       A.   That would be the RIPP Hobble.

16       Q.   So was he extremely violent or just

17  violent?

18            MR. ZIBILICH:

19                 When?

20            MR. CLARKE:

21                 At any time.

22            THE WITNESS:

23                 He was violent when he was being

24              controlled.  He was extremely violent

25              when he was biting his dad's face off.

1    BY MR. CLARKE:

2        Q.    That is what your investigation

3    concluded?

4        A.    Yes, sir.

5        Q.    Did you see E█████ P█████ at any time strike

6    people with a closed fist?

7        A.    Who?

8        Q.    E█████ P█████.

9        A.    It appeared that it was a fist when he

10   hit Deputy Pitfield in the head.

11       Q.    Most of the time he was kind of flailing

12   his arms, wasn't he?  Kind of slapping.

13       A.    Slapping, punching.

14       Q.    There is a difference between slapping

15   and --

16       A.    Slapping is open handed. It appeared his

17   hands were closed.

18       Q.    In your report, you say you assumed

19   responsibility.  Does that mean the homicide

20   section because there was a death?

21       A.    Yes, and I assumed it as far as being the

22   investigative officer.

23       Q.    Prior to this case, have you ever heard

24   of excited delirium before?

25       A.    I've heard it in other incidents, on the

```
1    news, newspapers.
2         Q.   In any training?
3         A.   No, sir, other than --
4         Q.   The RIPP Hobble?
5         A.   It's for narcotics, excited delirium,
6    drug induced.  So you don't hog-tie somebody.
7    That's what's in the RIPP Hobble.  That's what it
8    is used for, in lieu of hog-tying someone.
9         Q.   Go to Page 18 of 32 of your report,
10   supplemental report.  In the last paragraph, it
11   says, in order to complete -- conduct a complete
12   investigation to understand why this incident
13   occurred.  Are you still looking into the officers
14   for potential crime or are you just wanting to find
15   out more information about the event?
16        A.   I'm trying to corroborate what the
17   officers are saying.
18        Q.   And by doing that, you got -- you
19   authored a search warrant for E███ P█████'s medical
20   and school records?
21        A.   Yes.
22        Q.   To determine -- and why is that relevant
23   to your investigation?
24        A.   Because it's providing information to
25   confirm or deny what these officers were saying and
```

1   what the parents say.

2       Q.   Did you look into the officers'

3   backgrounds?  Like did you know if they had been

4   sued before or did you look and see -- try to get

5   depositions from lawsuits that Vaught was in?

6       A.   We looked into their internal affairs,

7   yes.

8       Q.   Did you subpoena any records from their

9   previous police department's service?

10      A.   No, sir.

11      Q.   Why not? Give you a better picture of the

12  officers, wouldn't it?

13      A.   Possibly.

14      Q.   I'm just trying to ask.  I want to make

15  sure that the seesaw is balanced.  All right.  If

16  you are looking at everything from them, why aren't

17  you looking at everything from the officers?

18      A.   We looked at everything that we had in

19  our files from Internal Affairs.

20      Q.   You didn't have stuff in your files.  You

21  issued subpoenas for an investigation as to whether

22  the cops committed a crime, and you looked at more

23  stuff from the victim, right?

24      A.   The items that I got, the records that I

25  got from the victim, from the school and from the

```
 1    hospital, allowed me to make a determination that
 2    if they were telling the truth about his strength,
 3    about his capacity, especially with the parents.
 4    The parents were telling me one thing as well.
 5         Q.   Well, everything the parents told you was
 6    true, correct?
 7         A.   And I confirmed that, yes.
 8         Q.   So --
 9         A.   Other than they were saying that he was
10    explosive -- what was it --
11         Q.   Intermittent explosive?
12         A.   Yeah.  That's never been said in any of
13    his records.
14         Q.   And so, you know, rather than -- why did
15    you suspect them not telling you the truth?
16         A.   I had to confirm it.  This was a tragic
17    incident, and, I mean, this just doesn't happen.
18         Q.   All your -- all these warrants, all they
19    confirmed was that he had autism, and he had
20    problems related to autism, correct?
21         A.   Other incidents where he was violently
22    attacking people, yes.
23         Q.   How many other incidents did you find?
24         A.   One against the parents, one against a
25    school teacher.  Actually, there were multiple
```

```
 1    against school teachers. I think there was three I
 2    saw, and then he acted out at the haircutting
 3    place.
 4         Q.   Yeah.  He knocked off a toilet paper
 5    roll, correct?
 6         A.   Yeah.  Two-inch bolts inside of it.
 7         Q.   Go to Page 21 of your report.  You
 8    attribute a lot of comments to -- like you note
 9    here throughout 2018 and 2019 E▇▇ P▇▇▇'s parents
10    were worried about his behavioral development,
11    temper outbursts, aggression, and violence.  What
12    is that based on?
13         A.   Based on the records from the school.
14         Q.   That they -- you read a statement where
15    they said the parents are worried about his
16    behavioral development, temper, outbursts,
17    aggression, and violence.  You read that?
18         A.   Yes.
19         Q.   That's in the records that you got?
20         A.   Yes.
21         Q.   If you can find the Vaught statement.
22         MR. ZIBILICH:
23              You said Huff or Vaught?
24         MR. CLARKE:
25              Vaught.
```

```
 1   BY MR. CLARKE:
 2        Q.   In the Vaught statement, doesn't he state
 3   when -- he was the first officer on the scene,
 4   correct?
 5        A.   Yes.
 6        Q.   And doesn't he state when he got there he
 7   put his handcuff on, and there was no resistance?
 8        A.   No resistance to the handcuff.
 9        Q.   No resistance?
10        A.   To the handcuff.
11        Q.   At that point, did you look into whether
12   they should have put him in the recovery position?
13        A.   I did.
14        Q.   Why couldn't they?
15        A.   Because other statements contradict, that
16   he was resisting.  All that Detective Vaught said
17   was that when he put him in the handcuffed position
18   -- when he handcuffed him, he didn't resist the
19   handcuff.
20        Q.   Detective Vaught, or whatever his --
21   whether he is a deputy or detective, he put him in
22   a handcuff, and if he was struggling, wouldn't you
23   think that Detective Vaught would have stayed down
24   on the ground with him?
25        A.   You have to ask Detective Vaught.
```

```
 1        Q.    Excuse me?
 2        A.    You have to ask Detective Vaught that.
 3        Q.    You should have asked him that, correct?
 4   You could have asked him that in your
 5   investigation, right?
 6        A.    If you say so.
 7        Q.    You could ask any question you wanted,
 8   right?
 9        A.    Sure.
10        Q.    Like when you talked to Vega about
11   whether or not there was a chokehold, you just
12   allowed him to answer there was no chokehold, and
13   you didn't ask him anything further about that,
14   right?
15        A.    He told me there was no chokehold.  I
16   confirmed that with another deputy who was on the
17   scene.
18        Q.    He said he was doing some kind of martial
19   arts hold, correct?
20        A.    It wasn't a martial arts hold.
21        Q.    That's what Gaudet says.
22        MR. ZIBILICH:
23             Who?
24        MR. CLARKE:
25             Gaudet.
```

BY MR. CLARKE:

    Q.   And the parents told you he had a -- they thought he was in a chokehold, correct?

    A.   Correct.

    Q.   And that immediately after that, that's when he urinated, and they got off him, correct?

    A.   There was no chokehold.

    Q.   I understand.  After she complained about a chokehold, according to your investigation, they found out that he urinated on himself and then put him in the recovery position, correct?

    A.   No.  Her choke assertion was made after the fact.  Detective -- well, at the time Deputy Vega.

    Q.   It was made on the scene.

    A.   Correct.  After he was in recovery.

    Q.   Okay.  That's your story?  You are going to stick with that?  Would you agree that if there were periods of time where he was calm or not resisting for a sufficient period of time to place him in a recovery position, they should have done that?

    A.   If that was the case, yes.

    Q.   I mean, that is a determination of a fact, that throughout this whole nine minutes, he

```
 1   was resisting in such a manner, such that they
 2   couldn't put him in the recovery position?
 3        A.   Correct.
 4        Q.   If somehow your factual analyses are
 5   wrong, would you have concluded that it was an
 6   improper use of force, if there was time to put him
 7   in the recovery position or situation?
 8        A.   If that occurred, yes.
 9        Q.   I mean, that's the key factor in the
10   case, right?
11        A.   Yes, sir.
12        Q.   That it was a continuous struggle for the
13   whole nine minutes?
14        A.   Correct.
15        MR. CLARKE:
16             Give me one second.  I think I'm
17          done.
18        MR. ZIBILICH:
19             You know when to quit today?
20        MR. CLARKE:
21             I don't, but I've got to be here so
22          I may as well ask questions, because
23          when I'm talking, you're not talking.
24        THE VIDEOGRAPHER:
25             Off the record at 12:16.
```

```
 1              {BRIEF RECESS}
 2         THE VIDEOGRAPHER:
 3              We are back on the record.  The time
 4          is 12:17.
 5         MR. CLARKE:
 6              No questions.
 7         MR. KAUL:
 8              No questions on behalf of Westgate.
 9         MR. CLARKE:
10              Let me say one thing.  Westgate.
11         MR. KAUL:
12              Objection.
13         MR. ZIBILICH:
14              Did he ever put on the record that
15          he is here?
16         MR. KAUL:
17              I heard my appearance was made on my
18          behalf.
19         MR. ZIBILICH:
20              I have a couple of questions,
21          believe it or not.
22    EXAMINATION BY MR. ZIBILICH:
23         Q.   Counsel asked you a gang of questions
24    about whether people on that scene committed a
25    crime.  You recall that?
```

127

```
1          A.   Yes, sir.
2          Q.   Did E███ P█████ commit a crime on the date
3     of the incident, while he was still alive?
4          A.   He did.
5          Q.   Was it a crime when he bit a hole is his
6     daddy's face?
7          A.   Yes, sir.
8          Q.   What crime would that have been?
9          A.   Aggravated battery, at least.
10         Q.   Possibly second degree battery?
11         A.   Yes, sir.
12         Q.   And when he bit a hole into Reserve
13    Deputy Pitfield --
14              MR. CLARKE:
15                   Object to the form.
16    BY MR. ZIBILICH:
17         Q.   -- would that have been considered a
18    crime?
19         A.   That was a crime as well, aggravated
20    battery.
21         Q.   Is it aggravated battery in your mind
22    because you believe the teeth to be a weapon?
23         A.   Yes, sir.
24         Q.   So it's likewise, at least it's possible,
25    that it could have been the bite on Pitfield's
```

```
1    ankle either second degree battery or, at the very
2    least, a simple battery?
3         A.   Yes, sir.
4              MR. ZIBILICH:
5                   I assume your objection was to the
6                whole in the ankle.
7              MR. CLARKE:
8                   No.
9              MR. ZIBILICH:
10                   I don't have anything else.
11   BY MR. CLARKE:
12        Q.   Sergeant Dowling, can you prosecute a
13   crime against a dead person?
14        A.   No, sir.
15        Q.   Can you get a warrant to investigate a
16   crime against a dead person?
17        A.    Search warrants, not an arrest warrant.
18        Q.   What is the basis so you get a search
19   warrant?
20        A.   A search warrant for investigation of a
21   death, not against a person.
22        Q.   But it's your belief that you can
23   investigate an event, not a particular crime and
24   get a search warrant?
25        A.   For a death investigation in reference to
```

```
 1   use of force by officers, yes, sir.
 2        Q.   And what is your legal basis or your
 3   training that provides you the basis that you can
 4   get a warrant to investigate a death investigation
 5   without an identifiable crime?
 6        A.   There wasn't an identifiable crime at the
 7   time, but there was a potential crime.
 8        Q.   I understand.  You understand what --
 9   when you get a warrant -- sometimes you don't have
10   enough evidence to get a warrant, right?
11        A.   You have probable cause.
12             MR. ZIBILICH:
13                  Why am I letting you ask all these
14               questions?
15             THE WITNESS:
16                  The reasonable -- a reasonable --
17             MR. ZIBILICH:
18                  Whoa, whoa.  It has nothing to do
19               with what it is that I asked.
20             MR. CLARKE:
21                  It does have what to do with what
22               you asked.
23             MR. ZIBILICH:
24                  I disagree.  I'm going to give you a
25               little bitty leash.
```

```
 1            MR. CLARKE:
 2                 I don't care what leash you think
 3            you are giving me.
 4            MR. ZIBILICH:
 5                 Until I tell him to stop.
 6            MR. CLARKE:
 7                 You can do that.  I mean, we all
 8            have that option.
 9  BY MR. CLARKE:
10       Q.   Who told you or trained you that you can
11  get a warrant, a general warrant, for a death
12  investigation without identification of a crime?
13            MR. ZIBILICH:
14                 Objection.  Outside of the scope.
15            You can answer it.
16            THE WITNESS:
17                 It was a death investigation. That's
18            what our search warrant was based off
19            of.  The death investigation involved
20            the officers use of force.
21  BY MR. CLARKE:
22       Q.   Have you ever heard of somebody trying to
23  go get a warrant, and the judge says there's not
24  enough evidence of probable cause, so I'm going to
25  reject the warrant, you've got to go get more
```

```
1    evidence?
2         A.   Yes, and all these warrants were signed
3    with probable cause.
4         Q.   We've got motions about whether they are
5    appropriate or not.  The issue is the court has to
6    make sure that they're satisfied that there is
7    enough information to establish, the phrase is,
8    probable cause of a crime, correct?
9              MR. ZIBILICH:
10                  Objection.  Outside the scope.  You
11               can answer it.
12             THE WITNESS:
13                  Correct.
14             MR. CLARKE:
15                  Okay.  That's all I have.
16             MR. ZIBILICH:
17                  Thank you, sir.
18             THE VIDEOGRAPHER:
19                  I wanted to ask does anybody want
20               copies of the deposition?
21             MR. ZIBILICH:
22                  Oh, God, yes.
23             THE VIDEOGRAPHER:
24                  How about the video?
25             MR. KAUL:
```

```
1                    I just want copies of the
2              deposition.  I don't need the video.
3         THE VIDEOGRAPHER:
4                    Thank you very much.  We are going
5              off the record.  This is the completion
6              of the deposition of Sergeant Keith
7              Dowling.  The time is 12:21.
8                    [End of deposition, 12:21]
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    C E R T I F I C A T E

 2

 3              This certification is valid only for
     a transcript accompanied by my original signature
 4   and original required seal on this page.

 5              I, SANDRA P. DIFEBBO, Certified
     Court Reporter, in and for the State of Louisiana,
 6   as the officer before whom this testimony was
     taken, do hereby certify that SERGEANT KEITH
 7   DOWLING, after having been duly sworn by me upon
     authority of R.S. 37:2554, did testify as
 8   hereinbefore set forth in the foregoing 132 pages;

 9              That the testimony was reported by
     me in stenotype, was prepared and transcribed by me
10   or under my personal direction and supervision, and
     is a true and correct transcript to the best of my
11   ability and understanding;

12              That the transcript has been
     prepared in compliance with transcript format
13   guidelines required by statute or by rules of the
     board, that I have acted in compliance with the
14   prohibition on contractual relationships as defined
     by Louisiana Code of Civil Procedure Article 1434
15   and in rules and advisory opinions of the board;

16              That I am not related to Counsel or
     to the parties herein, nor am I otherwise
17   interested in the outcome of this matter.

18

19

20

21   _____
     Sandra P. DiFebbo,
22   Certified Shorthand Reporter

23   Date:  _____

24

25
```