UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DONNA LOU, ET AL.               *       CIVIL ACTION NO. 21-80

VERSUS                          *       SECTION "D" (2)

SHERIFF JOSEPH P, LOPINTO,      *       Judge Wendy B. Vitter
III, ET AL.                             Magistrate Judge Donna P. Currault

**Plaintiffs' Brief in Opposition to Motion for Partial Summary Judgment
of the Federal Claims against Sheriff Lopinto in his Official Capacity[1]**

This case involves the in-custody death of a severely autistic, non-verbal 16-year-old child experiencing a sensory outburst or "melt-down" due to his autism. JPSO deputies held the child, E.P., face down (prone position) on an asphalt surface parking lot, cuffed and shackled. Two deputies took turns sitting on top of E.P for over nine minutes. Three deputies held down his arms and legs, while another deputy, who was sitting on him, put him in a choke hold, as E.P. went limp and urinated on himself. Two additional deputies stood by and watched. None of the deputies made any effort to intervene or to place E.P. in a recovery position to allow him to breathe. As a result of the actions of these deputies, E.P. died. According to the Jefferson Parish Coroner's Office, the child "most likely" would have survived if the deputies had not restrained him face-down on the ground.[2]

Sheriff Lopinto has now filed a motion for partial summary judgment, seeking to dismiss all *Monell* claims against his office.[3]  However, Sheriff Lopinto's Motion only addresses *Monell* claims based on failure to train. In addition to the failure to train, plaintiffs also assert liability against Sheriff Lopinto under *Monell* for failure to supervise (which includes failure to investigate,

---

[1] In Louisiana, a sheriff's office is not a juridical entity capable of being sued. But a "claim against the Sheriff in his official capacity amounts to a claim against the municipality itself." *Rogers v. Smith*, 20-cv-517-JTM-DMD, Doc. 195 (E.D. La., May 13, 2022). This memorandum uses "JPSO" or "Sheriff Lopinto" or "Lopinto" as shorthand for "Sheriff Lopinto in his official capacity."

[2] R. Doc. 142-9 - JPCO - Dr. Troxclair Dep., 64:24-65:2 ("Q. So getting back to where the rubber meets the road, without the prone restraint, he wouldn't die that day? A. Most likely not, yes.")

[3] R. Doc. 144.

1

discipline, and hold deputies accountable for their actions) and ratification.[4]  As Sheriff Lopinto has not moved for summary judgment on Plaintiffs' *Monell*-by-failure to supervise or *Monell*-by-ratification, Plaintiffs submit that those claims remain for trial without requiring any further response.  With regard to the *Monell*-by-failure to train claim, Lopinto's motion should be denied because Plaintiffs have satisfied their *Monell* claim for failure to train in at least three ways:

**First**, Plaintiffs' failure to train *Monell* claim is satisfied by ratification: Sheriff Lopinto has ratified the deputies' conduct in word, deed, and in repeated representations to this Court.[5] After viewing the video of the encounter between E.P. and the deputies, Sheriff Lopinto condoned all of the actions of all of the deputies as consistent with JPSO policies, practices, customs and training. He had no problem with the way the deputies handled E.P., despite E.P. being severely autistic and obese, and described himself as "looking at it as a bystander, like you are, and saying okay."[6] None of the deputies were disciplined, counseled or re-trained. The fact that the deputies made no effort to place E.P. in recovery position until it was too late, was not deemed to be a violation of JPSO policy or training.  He saw no need to re-evaluate JPSO's restraint procedure or to change or update JPSO training on the TARP policy or the RIPP Hobble or asphyxia. The Sheriff's ratification of the deputies conduct in this incident confirms that their conduct is the best evidence of what the JPSO policies, practices, customs and training are in reality. Regardless of what JPSO may claim is their policies and/or training, what happened here, having been condoned by the Sheriff after viewing the video, is the actual, approved policy and practice of JPSO.[7] As such, there is no reason to believe that anything different would happen in the future should JPSO deputies respond to a call of a severely autistic, non-verbal, obese child having a sensory meltdown, with a similarly tragic outcome as what happened here.

---

[4] R. Doc. 150-150-5.
[5] R. Doc. 21-4 – Lopinto Disc. Response, Int. No. 6, pp. 11-12; 150-5 – Lopinto Dep., 174:8-20; 176:4-7; 260:7-21.
[6] R, Doc. 150-5 - Lopinto Dep., 174:15-175:2.
[7] R. Doc. 150-5 – Lopinto Dep., 260:7-21 (The Sheriff is so certain that the deputies' actions in this case reflected his policies, practices, customs and training that he has taken the extremely rare position of promising to indemnify the deputies against punitive damages, should a jury assess them after trial)

**Second**, Plaintiffs' failure to train *Monell* claim is satisfied by the training deficiencies that Plaintiffs have identified. Specifically, although JPSO provides some training on use of force, and some training on dealing with persons with autism, JPSO provides <u>no</u> training about use of force on persons with autism including those experiencing a sensory melt-down. As a result, the deputies treated this severely autistic, non-verbal child with <u>more</u> force than they would a typical criminal suspect. Discovery in this case revealed that Sheriff Lopinto and JPSO were well aware of the obvious need for training deputies about encounters with persons with autism and had a training module on autism written and prepared in 2018. However, JPSO never actually used it for training because supervisors failed to follow through on approving it for use.

And **third**, Plaintiffs' failure to train *Monell* claim is satisfied because of the policies, customs and practices JPSO has created which have essentially eliminated oversight, supervision or discipline of deputies involved in in-custody deaths, or any reviews of policies or training, by failing to provide for critical incident reviews or Internal Affairs investigations of in-custody deaths, so that the de facto policies, practices, customs and training of JPSO are whatever it is that the deputies have done, instead of whatever policies or training materials may be  in writing. No deputies were disciplined, counseled or re-trained for any of their actions in this incident. In addition, plaintiffs have identified 19 JPSO in-custody deaths from October 26, 2017 through March 2, 2021, none of which were subject to critical incident review or IA investigation.  Where in-custody deaths are concerned, JPSO deputies are aware that the Sheriff will 'have their back' and that there will be no repercussions or negative consequence after the fact.[8]

---

[8] R. Doc. 142-8 – Noble Report, ¶ 82.  At the time of this 2020 incident, JPSO deputies did not have body-worn cameras as Sheriff Lopinto repeatedly and publicly refused to provide them. It is revealing that in the first JPSO in-custody death where deputies wore body cameras in 2022, the cameras revealed alleged criminal misconduct by the deputies, forcing the Sheriff to arrest and fire them, unlike previous in-custody deaths where there were no consequences or policy/training review. See generally:  https://www.wdsu.com/article/two-jpso-deputies-arrested-and-charged-with-manslaughter-following-shooting-of-man-in-marrero/39168416

The Sheriff's motion regarding *Monell*-by-inadequate-training should be denied for the reasons herein.

## I.  PROCEDURAL BACKGROUND

Plaintiffs' Complaint identified four causes of action:

> Count One: ***Constitutional and Civil Rights Claims against Sheriff Joseph P. Lopinto III and various JPSO deputies under 42 USC 1983 and the U.S. Constitution, in their Individual and Official Capacities.***  (R. Doc. 1 at ¶¶ 385-404).

> Count Two: ***Constitutional and Civil Rights Claims Against Sheriff Joseph P. Lopinto III in his Individual and Official Capacity.***  (R. Doc. 1 at ¶¶ 405-429)

> Count Three: **Americans with Disabilities Act and Section 504 of the Rehabilitation Act** *Sheriff Lopinto in his Official Capacity.*  (R. Doc. 1 at ¶¶ 430-456).

> Count Four: **Violation of Louisiana Constitution and State Law** *All Plaintiffs against all Defendants in All Capacities.*  (R. Doc. 1 at ¶¶ 457-481)

The *Monell* claims against Sheriff Lopinto in his official capacity include: ratification (R. Doc. 1 at ¶ 319); failure to properly train deputies regarding obvious and recurring activities (*id.* at ¶ 417(c) & (d)); failure to properly supervise, monitor and evaluate the activities of deputies (*id.* at ¶ 417(e)); and failure to properly investigate critical incident or civilian complaints (*id.* at ¶ 417(f)). The preceding chart identifies the pending claims against Sheriff Lopinto in both his official and individual capacity and the claims sought to be dismissed by Sheriff's Lopinto's motion. The only claim at issue in this motion is highlighted in yellow.

| *Plaintiff's claims against Lopinto in his individual and official capacities* | | | | | | |
|---|---|---|---|---|---|---|
| 42 USC § 1983 (Individual) | 42 USC § 1983 (*Monell* – Ratification) | 42 USC § 1983 (*Monell* – Failure to Train) | 42 USC § 1983 (*Monell* – Policies/Failure to Supervise/ Investigate) | ADA / RA Section 504 | State Constitution | State Tort |
| **Lopinto (Individual Capacity)** | | | | | | |
| **X** | **X** | **X** | **X** | | **X** | **X** |
| **Lopinto (Official Capacity)** | | | | | | |
| | **X** | **X** | **X** | **X** | **X** | **X** |

## II.    FACTUAL BACKGROUND

E.P. was a 16-year-old, non-verbal severely autistic child who experienced a sensory outburst related to his autism on January 19, 2020, in the parking lot of Laser Tag. As a result of his outburst, he began flailing his arms, slapping his head and then grabbed, slapped and bit his father.[9]  At the request of the Plaintiffs, the manager at Laser Tag called for assistance. Deputy Pitfield who was a JPSO deputy assigned to a special detail on the premises, responded to that call. When Deputy Pitfield arrived on the scene, the physical encounter between E.P. and his father had ended. E.P. was standing next to the open door of the family car as Deputy Pitfield drove up.[10] E.P.'s father advised Deputy Pitfield that E.P. was autistic.  E.P. began "stimming" (slapping himself), flailing his arms at his father, and finally flailed his arms at Deputy Pitfield and struck him.  Deputy Pitfield forced E.P. to the ground at which point E.P. bit Deputy Pitfield near his ankle, resulting in Deputy Pitfield striking E.P. in the head area one time. These two actions towards Deputy Pitfield are the only time that EP's conduct was directed at a JPSO deputy. Once E.P. was on the ground, Deputy Pitfield, who weighed over 300 pounds, restrained him in the prone position, sat on E.P.'s backside, and called for back-up.

Detective Vaught was the first JPSO deputy to arrive on the scene. Detective Vaught assisted Deputy Pitfield in handcuffing E.P. behind his back with two sets of handcuffs without any difficulty.  E.P. wasn't resisting and didn't try to pull away.[11]  Despite the fact that E.P. was securely handcuffed, the deputies did not then roll E.P. into the recovery position.[12]  Instead, Deputy Pitfield continued to restrain E.P. in the prone position, sitting on E.P.'s backside, for

---

[9] These are common characteristics of a person with autism experiencing an "outburst." Ex. 2 – Debbaubt Report, p, 7 ([Autistic persons] "are subject to sensory overload outbursts a/k/a "outbursts" or "meltdowns" which are involuntary, automatic "reflex" responses to stressors, which can result in self-injurious behaviors and injuries to others, such as hitting, kicking and biting.").

[10] R. Doc. 154-3 – Laser Tag Security Video (Manually Filed) and can be assessed at this Dropbox link: https://www.dropbox.com/scl/fo/13u3a5brur1alkvjcscmg/h?dl=0&rlkey=w4it5r13jbyhu1m240sxjwrf3

[11] R. Doc 155-4 – Vaught Statement, p. 4 (Q. You're meeting resistance. A. No, no, no, not – not really, no… Um, he was – he was um, moving a little bit but he wasn't trying to resist or pull – pull his arm away).

[12] The recovery position is a term used by law enforcement to describe rolling someone from the prone position to their side or seated upright to allow a subject to breathe more freely.  R. Doc. 144-3 – Pizzolato Dep., 63:15-18; 69:3-8; 76:17-77:6.

approximately 6 minutes, as additional deputies arrived, including Detective Mehrtens, Deputy Guidry and Deputy Vega.  Despite the fact that E.P. was under control and there were sufficient law enforcement officers on the scene to move him into the recovery position, these deputies took no actions to remove E.P. from the prone position or to relieve him from the body weight on his back. Instead, Deputy Pitfield got off of E.P. and Deputy Vega replaced Pitfield in sitting on E.P.'s backside. At the time of this switch, E.P. was not offering any resistance yet the deputies again failed to roll him into the recovery position. Two deputies then shackled E.P.'s legs.

After Deputy Vega took over the prone restraint of EP, Deputy Vega employed a pain compliance technique by raising E.P.'s handcuffed hands up from behind his back, forcing his arms to extend above his head. Shortly thereafter, Deputy Vega used a choke hold to continue to restrain E.P while E.P. was restrained in the prone position, with two deputies holding his arms, one deputy restraining his legs until E.P. went limp and urinated on himself.  Deputy Vega did not get off E.P. until E.P. went limp and urinated and Deputy Gaudet moved E.P. into a recovery position.  Other deputies arrived on the scene including Deputy Brian Kahrs.

After over a minute, deputies then began CPR on E.P. Deputy Brian Kahrs spoke with Deputy Vega, went back to his patrol car for a camera, and took two separate sets of photographs of Daren Parsa's injuries while deputies were doing CPR on his dying son. Deputy Kahrs later deleted these photographs.  Deputies refused to allow E.P.'s parents to follow the ambulance to the hospital and detained them in the parking lot as their son died, alone, in the emergency room.

Despite the fact that Sheriff Lopinto has represented to this Court that E.P. "never stopped resisting their (deputies) efforts with extreme violence,"[13] the video contradicts this false narrative. The only time that E.P.'s actions were directed towards any deputy was when Deputy Pitfield first arrived. After this initial encounter, E.P. was held in the prone position for over 9 minutes despite the fact that there were numerous deputies on the scene who both handcuffed and leg shackled

---

[13] R. Doc. 144-1 – Memo in Support of MPSJ, p. 4.

E.P. without placing him in the recovery position. As a result of the failure to place E.P. in the recovery position, he died of positional asphyxia.   E.P.'s actions were "not willful, active resistance, or efforts to harm the officers, but behavioral manifestations of his autism and evidence of oxygen deficiency which was resulting from his continuous and prolonged restraint."[14]

Sheriff Lopinto and the JPSO were aware of the dangers of prone restraint and positional asphyxia. The JPSO provided its officers with limited training pertaining to the risks of positional asphyxia during RIPP Hobble classes. According to JPSO policy, the RIPP Hobble was a law enforcement device that was designed to restrain "extremely violent persons" through the Total Appendage Restraint Procedure (TARP). During the RIPP Hobble classes, deputies were advised of the risk of asphyxia when restraining persons in the prone position. Sgt. Pizzolato, JPSO's 30(b)(6) witness on training, testified that deputies are trained to never leave a person in the prone position due to risks of positional asphyxia.[15] This training also advised deputies to utilize a "swarm technique" to quickly neutralize any alleged resistance from a suspect and control him using the RIPP Hobble and removing the body weight from the suspects back. Several of the defendant deputies had a RIPP Hobble with them but never used it. Neither the RIPP Hobble nor the swarm technique were utilized by the deputies and instead the deputies continued to hold E.P. down in a pressurized, prone restraint, until he died.

In addition, while JPSO provided limited training to deputies on dealing with autistic persons, there was NO training on the use of force to restrain autistic persons, especially regarding the well-known, heightened risk of death during prone restraint of those individuals.

In addition, while the JPSO provided some training to its deputies pertaining to identifying persons with intellectual disabilities like autism and some training regarding the risk of prone restraint to the general public, the JPSO has no system in place to determine whether deputies

---

[14] Ex. 3 – Dr. Sperry Report, p. 4.
[15] Pizzolato Dep., p. 64:9-12 - (Q. When do you train them to put them in the recovery position?  A. I train them never to leave anybody in a prone position); Pizzolato Dep., 68:1-2 - A. I train to not leave somebody in a prone position).

acted in accordance with their policies and/or training. Most departments utilize Internal Affairs to investigate in-custody deaths and/or critical incident reviews to determine whether deputies acted according to departmental policy or training. These reviews are also used to determine whether changes need to be made to policy and/or training.  However, the JPSO does not conduct critical incident reviews, nor does Internal Affairs investigate in-custody deaths. In a five-year period starting in 2017, there were 19 in-custody deaths at JPSO – and JPSO did not conduct internal affairs investigations or critical incident reviews for any of them.

## II.      FACTS RELEVANT TO FAILURE-TO-TRAIN CLAIM

**A.      JPSO's written policies fail to conform to generally accepted law enforcement standards, and Deputies are not trained on all written policies.**

The JPSO has written policies which are outdated and fail to conform to generally accepted law enforcement standards and practices.[16] In particular, the policies fail to identify and provide policy guidance regarding active/passive resistance, positional asphyxia, prone restraint, the Americans with Disabilities Act, dealing with persons with intellectual disabilities, including autism and the investigation of critical incidents and officer misconduct. Given the known dangers of the risk of death during prone law enforcement restraint, numerous national law enforcement groups and publications have provided written policy guidance on these specific issues which were known and available to law enforcement agencies, including JPSO.[17] Further, the JPSO does not even provide training on its written policies. Instead, deputies are only required to read and sign a form that acknowledges that they understand the policies.[18]  Deputies are not even tested to determine whether they actually understand the policies or not. This failure to train on policies and failure to confirm that deputies even know what the policies are, combined with the failure to investigate in-

---

[16] R. Doc. 142-8 - Noble Expert Report, ¶¶ 84-87.
[17] *Id.* at ¶¶ 48-52, 82, 84-87.
[18] R. Doc. 144-3 - Pizzolato Dep., 30:4-13 (Q. I call that a read and sign. They have to acknowledge that they have gotten it, and they have to comply with it, correct?  A. Yes. Q. And then during instruction, some policies may be brought up, but we don't have a class on the Jefferson Parish Sheriff's Office policies where you take a written test when you are done? A. Correct.); R. Doc. 142-3 - Pitfield Dep., 89:12-19; Ex. 4 - Vaught Dep., 72:6-19; Ex. 5 - Mehrtens Dep., 29:1 – 30:6; R. Doc. 105-9 - Vega Dep., 59:14-25.

custody deaths and critical incidents and subsequent ratification by the Sheriff of deputies' actions, results in a situation where the ad hoc practices of what the deputies do become the department's de facto policy, practice, custom and training, despite whatever may exist in writing.

**B.     JPSO was aware of the need for autism training and had prepared a training module to prepare deputies on how to interact with persons with autism – but has left the training on a shelf and never used it.**

Both Sheriff Lopinto and JPSO's corporate representative on autism acknowledged that law enforcement encounters with persons with intellectual disabilities, like autism, has been an issue for law enforcement for years before this incident.[19]

In fact, the Louisiana legislature passed a statute R.S. 40:2405.5 on June 3, 2014, which specifically addressed this issue and required P.O.S.T. to develop specific training on persons with mental illness and developmental disabilities to include:

(a) The cause and nature of mental illnesses and developmental disabilities.

(b) How to identify indicators and symptoms of mental illness and developmental disabilities and how to respond appropriately in a variety of common situations involving persons suffering from a mental illness or developmental disability.

(c) Conflict resolution and de-escalation techniques for potentially dangerous situations involving persons with mental illness or persons with developmental disabilities.

(d) Appropriate language usage when interacting with persons with mental illness or persons with developmental disabilities.

(e) Alternatives to lethal force when interacting with potentially dangerous persons with mental illness or persons with developmental disabilities.

(f) Community and state resources available to serve persons with mental illness or person with developmental disabilities and how these resources can best be utilized by law enforcement to benefit and safely serve the mentally ill or developmentally disabled community.

While this statute as a mandate to P.O.S.T. was repealed in 2017, it provided notice and identification of particular issues regarding law enforcement encounters with persons with

---

[19] R. Doc. 150-5 -Lopinto Dep., 27:13-17 (Q…You knew by 2014 that people with intellectual disabilities are becoming an issue with law enforcement, correct? A. I think it was before that, also, but yeah.); R. Doc. 151-9 - Voltolina Dep., 110:12-110:20 (Q. Okay. Would you agree that autism is a prevalent issue that officers are likely to encounter in their careers in Jefferson Parish? A. I think any law enforcement officer has the potential of dealing with someone with autism when one in 54 males are diagnosed.).

intellectual disabilities, including autism, and the importance of  specific training to address these issues, which was consistent with publications by national law enforcement think tanks.[20] Plaintiffs' expert, Dennis Debbaubt, summarized the state of police literature surrounding the particular issues impacting autistic persons and their interactions with law enforcement:

- "Be aware that people with autism may have underdeveloped trunk muscles and may not  be able to support their airway. After takedown, the individual should be turned on his or her side and be transferred into an upright position as soon as possible to allow normal breathing to occur." Training Key # 678, International Association of Chiefs of Police (IACP), © 2013.

- "Realize the person may not understand the futility of resistance and continue an intense struggle. When the person is contained after restraint,  continue  the  use  of  calming  and non-threatening  words  and  body  language,  de-escalation  techniques,  sensory  scene management and simple words." Training Key #678, IACP, © 2013.

- "When possible, avoid using body weight to restrain the individual.  When unavoidable, extreme  caution  should  be  exercised." Model  Policy:  Interactions  with  Individuals  with Intellectual and Developmental Disabilities. Updated August 2017. IACP.

- "Avoid  using  body  weight  to  restrain  a  person  with  I/DD  whenever  possible.  If unavoidable,  extreme  caution  should  be  exercised.  For  people  with  certain  types  of disabilities,  body  weight  restraints  can  be  dangerous  or  harmful…for  those  with  other types of I/DD, such as ASD, being subjected to a body weight restraint can be physically excruciating,  as  the  person  may  experience  physical  stimuli  much  more  intensely  than individuals  without  I/DD."   Interactions  with  Individuals  with  Intellectual  and Developmental Disabilities.  Concepts and Issues Paper, IACP Law Enforcement Policy Center, Updated:  August, 2017.

- "If you must restrain a person with autism, consider the following tips to maintain safety  for both yourself and the person being arrested:  Avoid positional asphyxia. People with autism may have a difficult time supporting their airways during restraint due to underdeveloped chest muscles. Officers should turn the person on their side to ensure normal breathing." Law Enforcement Guide to Interacting with People with Autism, Illinois Attorney General, June, 2019.

- "Never place a person with autism on his or her stomach. Persons with autism frequently have underdeveloped trunk, abdomen, and shoulder muscles or hypotonia. Placing them on their stomach may compromise their diaphragm, causing breathing difficulties." Autism, Advocates, and Law Enforcement Professionals, Recognizing and Reducing Risk Situations for  People  with  Autism  Spectrum  Disorders,  Dennis  Debbaubt,  Jessica  Kingsley Publishers, London and Philadelphia, 2002, p. 27.

---

[20] Ex. 18 - International Association of Chiefs of Police, Training Key No. 678, Autism: Managing Field Contacts (2013); Ex. 17 - IACP Law Enforcement Policy Center, Model Policy, Concepts and Issues Paper, Need to Know – Interactions with Individuals with Intellectual and Developmental Disability (August 2017)

- "Never restrain a patient in a prone position, "hog-tie" the patient or use hobble restraints, as cases of sudden death have been reported."  (Stratton, Rogers, Green, 1995 and Kupas & Wydro, 2002)." The ABC's of Autism, Dean R. Kelble, Jr., EMT-P, Autism EMS: Autism Preparedness for EMS, © 2009.[21]

Despite this information and JPSO's acknowledgement of the need for training, the JPSO failed to provide any training on use of force and restraint against persons with autism despite the particular risk factors associated with the restraint of autistic persons.[22]

JPSO does not have any policies dealing with the ADA.[23] Sgt. Voltolina testified that the ADA only applies to arrest or seizure in non-violent situations or with compliant suspects.[24] However, Sgt. Voltolina acknowledged that the ADA can apply once a violent situation becomes non-violent.[25]

In 2018, Sgt. Voltolina began preparing a training module entitled "Autism Awareness" for Crisis Intervention Training (CIT).[26] Sgt. Voltolina noted that he began working on the Autism Awareness training in 2018 "because of the need for it in law enforcement" and that there was an awareness at that time that law enforcement would be interacting with persons with autism "and that created special needs and situations for officers to be trained on."[27] This training has been available since 2018, but it has never been used by JPSO. That is because Voltolina has been waiting for a supervisor to ask him to submit it for approval. He has been waiting for at least four years, even though his supervisors knew the training exists:

> Q. Sure. So what are you waiting on to submit it for approval to a supervisor?
> A. For them to say we need it on the department.
> Q. So you've got this document sort of ready at least to be reviewed by a supervisor, but no one has asked you to submit it to them for approval; is that correct?
> A. Correct.
> Q. Are your supervisors aware that this document exists?

---

[21] Ex. 2 - Debbaubt Expert Report, 7-10.
[22] *Id.* at 15-16.
[23] R. Doc. 151-9 - Voltolina Dep., 28:22-29:22.
[24] *Id.* at 26:11-18.
[25] *Id.* at 26:19-24.
[26] *Id.* at 34:11-35:1; 38:23-6; 40:25-42:8.
[27] *Id.* at 45:23-46:7.

A. Yes. [28]

This is worth emphasizing: JPSO supervisors are aware that JPSO's training department has prepared a training on dealing with people with autism – but that training has never been used to train deputies because the supervisors have never requested it.

Sgt. Voltolina testified that JPSO provides no training on restraining persons with autism,[29] does not incorporate anything about the RIPP Hobble device training regarding persons with intellectual disabilities, including autism training,[30] and does not cover any specific risks to autistic persons of prone restraint or positional asphyxia due to autism.[31]   Despite the JPSO assertions  that they provided training on dealing with persons with autism, the individual defendants testified that they received no such training.[32]

After review of the JPSO  training, Plaintiffs' expert, Dennis Debbaubt, opined that "it was both foreseeable and predictable that there will be encounters between members of the JPSO and persons with severe autism experiencing a sensory overload or 'outburst'… that "deputies may need to physically restrain."[33] Debbaubt opined that "JPSO deputies did not have proper training or guidance from appropriate policies on how to deal with persons suffering from autism, including the significant risks of utilizing prone restraint on such persons, especially if they are obese and non-verbal, and failed to make any reasonable and necessary accommodations for [E.P.]'s disability, contrary to nationally recognized standards for law enforcement encounters with persons suffering from autism."[34]

---

[28] *Id.* at 44:14-45:3.
[29] *Id*. at 63:1-8 (Q. Going back to the content of Deescalation with Autism from the coroner's office, does that training deal specifically with restraint of persons with autism? A. No.).
[30] *Id.* at 87:11-18.
[31] *Id.* at 93:22-94:13.
[32] R. Doc. 142-3 Pitfield Dep., 155:7-13; Ex. 4 - Vaught Dep., 75:3-12; Ex. 5 -Mehrtens Dep., 21:10-14; 42:3-24; Ex. 6 - Guidry Dep., 29:17-23; R. Doc 105-9 - Vega Dep., 76:18-21; Ex. 7 - Estrada Dep., 20:22-24; 21:17-20; Ex. 8 – Gaudet Dep., 48:12-15; 49: 11-17 (Deputy Gaudet testified that he received some training on autism during CIT classes but no such training from the coroner's office); Ex. 27 – Deputies' Training Resumes.
[33] Ex. 2 - Debbaubt Expert Report, p. 15, ¶ 5.
[34] *Id*. at 16, ¶ 7.

**C.**     **JPSO fails to properly evaluate its deputies' compliance with policy and training: nineteen people died in JPSO custody in five years without a single Internal Affairs investigation or critical incident review.**

JPSO's 30(b)(6) witness on Internal Affairs (IA) and Early Warning Systems, Captain Blackwell,[35]  testified that Internal Affairs' function at JPSO is to handle complaints made against deputies by citizens.[36] Captain Blackwell testified that IA investigates whether deputies complied according to policy, training, customs and practices of JPSO.[37]

Captain Blackwell  testified that for a JPSO IA investigation to be opened, "we have to have a complaint."[38] JPSO does not perform investigations of anonymous complaints.[39] Captain Blackwell acknowledged that the policy requires that "Internal Affairs shall conduct administrative investigations into all complaints forward to the Criminal Investigations Bureau after the criminal investigation is complete."[40] However, Captain Blackwell acknowledged that the JPSO does not perform investigations of matters that were investigated by the criminal divisions.[41]

Captain Blackwell testified that IA is the custodian of records for all discipline and advises a deputy of any discipline.[42] Captain Blackwell testified that IA keeps all IA investigative files for only 3 years regardless of outcome and then destroys them.[43] JPSO does not keep records of destruction of evidence when destroying records.[44]

Captain Blackwell testified JPSO does not utilize separate Use of Force reports to document use of force applications of deputies on a separate form.[45] Instead, JPSO deputies are supposed to note any application of force in an incident report.[46] Thus, Internal Affairs does not review or

---

[35] Ex. 1 - Blackwell Dep., 7:20-8:7.
[36] *Id.* at 10:1-7.
[37] *Id.* at 23:18-25.
[38] Ex. 1 - Blackwell Dep., 38:19-23.
[39] *Id.* at 38:24-39:6.
[40] *Id.* at 63:1-3.
[41] *Id.* at 63:1:3.
[42] *Id.* at 42:6-18.
[43] *Id.* at 48:1-49:9; 63:7-22.
[44] *Id.* at 66:20-25.
[45] *Id.* at 17:10-22.
[46] *Id.* at 17:17-18.

evaluate all deputies' applications of force – even lethal uses of force – only any use of force that results in a complaint.[47]

Captain Blackwell testified that IA does not investigate in-custody deaths.[48] Captain Blackwell is aware that many departments require IA to investigate all critical incidents or deaths.[49] Captain Blackwell does not know why JPSO does not require Internal Affairs to investigate all critical incidents or in-custody deaths.[50]  Captain Blackwell testified that the homicide division investigates all in-custody deaths.[51] Further, Captain Blackwell acknowledged that the Sheriff can request him to perform an IA investigation on any incident.[52]

Captain Blackwell acknowledged that homicide investigations are conducted to determine whether a crime had been committed and not whether a deputy violated policy.[53] Captain Blackwell testified that IA investigates whether deputies complied according to policy, training, customs and practices of the JPSO but only if a complaint is filed[54] Captain Blackwell noted that it "wouldn't be a bad idea" to have IA investigate all deaths.[55] Captain Blackwell acknowledged that the IACP recommends that Internal Affairs investigate all critical incidents or deaths to determine whether the actions of the officers conformed to the agencies policies, procedures and training.[56] Captain Blackwell was aware other departments utilize IA to investigate all critical incidents and deaths.[57]

Captain Blackwell reviewed the JPSO discovery responses and acknowledged that JPSO did not conduct an IA investigation into any of 19 in-custody deaths.[58] Nor was Captain Blackwell aware of any IA investigation arising from the following lawsuits against JPSO which alleged in

---

[47] *Id.* at 17:23-18:11.
[48] *Id.* at 18:12-14.
[49] *Id.* at 18:15-19:9.
[50] Ex. 1 - Blackwell Dep., 17:25-18:5.
[51] *Id.* at 23:12-23:14.
[52] *Id.* at 19:10-17; 33:13-24.
[53] *Id.* at 23:15-17; 24:6-8; 30:3-7.
[54] *Id.* at 23:18-25; 30:14-22.
[55] *Id.* at 24:9-16.
[56] *Id.* at 24:18-25:25
[57] *Id.* at 26:23-27:2.
[58] *Id.* at 27:10-20.

custody death due to positional asphyxia: 1) *Williams v. Lee*, Case No. 89-11943 (Civil District for the Parish of Orleans) (Judgment against Defendants), 633 So.2d 976, La.App. 4 Cir., Mar. 15, 1994 (Affirmed on Appeal); 2) *Sullen v. Lee, et al.*, Case No. 95-0767 (USDC ED LA) (Settlement); 3) *Kahn v. Lee*, Case No. 07-7272 (USDC ED LA) (SJ for Defendant); and 4) *Boutte v. Lopinto*, Case No. 19-9613 (USDC ED LA) (Settlement).[59]

In discovery, Plaintiffs requested information pertaining to prior claims, complaints and investigations of JPSO deputies regarding similar uses of force.[60] In response, JPSO produced documentation of 14 Internal Affairs investigations which met the criteria. JPSO sustained exactly zero of the use of force complaints against the twenty-three officers involved in the fourteen incidents.[61]

### E.      JPSO has no early warning system.

Captain Blackwell acknowledged that JPSO does not have a written policy pertaining to early warning.[62] Captain Blackwell testified that an early warning system is a program that attempts to identify patterns in deputy behavior as a proactive as opposed to disciplinary matter, to potentially intervene and counsel the deputy before it becomes a disciplinary matter.[63] Captain Blackwell suggested, however, that he is the early warning system because all discipline comes across his desk.[64] But he acknowledged that he does not follow any criteria or protocols to determine whether early intervention is necessary.[65]

---

[59] *Id.* at 27:24-16; 110:9-23.
[60] The Court limited Plaintiffs' request to "claims, complaints or investigations regarding efforts to subdue with use of force or restraints (such as hand-cuffs, leg restraints, body weight, choke holds, neck holds) persons resisting arrest, experiencing excited delirium, experiencing an episode due to a disability, emotionally disturbed persons, or persons suffering compression asphyxia or positional asphyxia" over the last 5 years. R. Doc. 47 at 19-20.
[61] Ex. 1 - Blackwell Dep., 69:7-109:23 (Q. All right.  So all of the cases we went through, none of the excessive force complaints were sustained, correct? A. I don't recall any of them being sustained.)
[62] *Id.* at 96:16-18.
[63] *Id.* at 96:5-98:15.
[64] Ex. 1 - Blackwell Dep., 53:1-6; 98:16-25.
[65] *Id.* at 99:7-19.

JPSO would not be able to implement an early warning system even if it wanted to, because JPSO has a policy of destroying "all disciplinary records" after three years.[66] That policy violates Louisiana state law.[67] JPSO also keeps no records of document destruction, even though such records of document destruction is explicitly required by state law.[68] As a result, if JPSO wanted to look at patterns of complaints about officers, it would be unable to do so, because it has destroyed the records and failed to keep evidence of the destruction.

## III.    SUMMARY JUDGMENT STANDARD

"[S]ummary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[69] Summary judgment is only appropriate when the moving party identifies material facts not in dispute, "and the nonmoving party fails to produce or identify in the record summary judgment evidence sufficient to sustain a finding in its favor respecting such of those facts as to which it bears the trial burden of proof."[70] This Court will view "the evidence and all justifiable inferences in the light most favorable to the non-moving party."[71]

## IV.    Lopinto's motion should be denied because Plaintiff has abundant evidence to support a *Monell* claim via ratification, failure to train, and failure to supervise/investigate.

A governmental entity  is not liable under 42 USC §1983 on the theory of *respondeat superior*.[72] A municipality is liable only for acts directly attributable to it "through some official action or imprimatur."[73] In *Monell v. Department of Social Servs.,* 436 U.S. 658 (1978), the Supreme Court established that a local governmental entity can be held liable under 42 U.S.C. §

---

[66] R. Doc. 105-4 - JPSO SOP 22 – Internal Affairs, at 9.
[67] See R. Doc. 105 at 5-7, detailing Louisiana's Law of Public Record Preservation.
[68] La. Admin. Code tit. 4, § XVII-913 ("Agencies shall document the destruction of their records by maintaining a certificate of destruction . . .").
[69] *Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016) (quoting Fed. Civ. P. 56(a)).
[70] *Stearns Airport Equip. Co. v. FMC Corp*., 170 F.3d 518, 521 (5th Cir. 1999).
[71] *Vercher v. Alexander & Alexander Inc.,* 379 F.3d 222, 225 (5th Cir. 2004).
[72] *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978).
[73] *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir.2001)

1983 for violating an individual's constitutional rights.[74] Shortly after *Monell*, the Supreme Court recognized the existence of "'systemic' [constitutional] injuries that result not so much from the conduct of any single individual, but from the interactive behavior of several government officials, each of whom may be acting in good faith."[75]  Therefore, a municipality is not protected by qualified immunity.[76]  Further, a municipality can still be liable for civil rights violations for its policies, practices and customs even if individual officers are entitled to qualified immunity.[77]

To establish municipal liability under § 1983, a plaintiff must show the deprivation of a federally protected right caused by action taken "pursuant to an official municipal policy."[78]  A plaintiff must identify: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom."[79]

A plaintiff can establish *Monell* liability for constitutional violations by showing any of five different things:

   a.   An express policy;[80]

   b.   The decision or action of a person with final policymaking authority;[81]

   c.   The government entity's deliberately indifferent failure to screen, train, or supervise its employees when the failure to act and the "inadequacy [of the existing practice is] so likely to result in the violation of constitutional rights, that the policymaker ... can reasonably be said to have been deliberately indifferent to the [plaintiff's rights]";[82]

   d.   Deliberate indifference to a clear and persistent pattern of illegal activity or "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage' with the force of law";[83] or

---

[74] *Monell* at 690

[75] *Owen v. City of Independence*, 445 U.S. 622, 652 (1980).

[76] *Id.* at 650. (In sum, we can discern no "tradition so well grounded in history and reason" that would warrant the conclusion that in enacting § 1 of the Civil Rights Act, the 42d Congress *sub silentio* extended to municipalities a qualified immunity based on the good faith of their officers).

[77] *Doe v. Sullivan County*, 956 F.2d 545, 554 (6th Cir. 1992)**.**

[78] *See Monell,* 436 U.S. at 691.

[79] *Pineda v. City of Houston,* 291 F.3d 325, 328 (5th Cir.2002)

[80] *Monell*, 436 U.S. at 660–61.

[81] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986).

[82] *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)); *Gomez v. Galman*, 18 F. 4th 769, 778 (5th Cir. 2021).

[83] *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

e. Ratification by a final policymaker of its employee's acts; *i.e.*, when the "policymaker approves a subordinate's decision and the basis for it."[84]

**A.     Lopinto's motion should be denied because Sheriff Lopinto repeatedly ratified the deputies' actions, thus satisfying *Monell*.**

Ratification is one "way of holding a city liable under § 1983."[85] Under that theory, a government entity may "be held liable if the policymaker approves a subordinate's decision and the basis for it, as this 'ratification' renders the subordinate's decision a final decision by the policymaker."[86]

As addressed in Plaintiffs' Motion for Partial Summary Judgment based on ratification, Sheriff Lopinto has acknowledged in both written discovery and testimony that the deputies' actions on the scene were all in accordance with the policies, practices, customs and training of Sheriff Lopinto, in his official capacity as final policy maker for JPSO.[87] Accordingly, if the deputies' actions violated EP's or the Plaintiffs' constitutional rights, Sheriff Lopinto, in his official capacity, would be liable.[88]

**B.     Lopinto's motion should be denied because JPSO failed to properly train deputies with respect dealing with persons with intellectual disabilities and autism.**

"It is clear that a municipality's policy of failing to train its police officers can give rise to § 1983 liability."[89] In order to establish municipal liability for failure to train, the plaintiffs must show (1) inadequate training procedures; (2) that inadequate training was the moving force being the

---

[84] *Allen v. Hays*, 21-20337 (5th Cir., March 21, 2023) at *15.
[85] *Allen v. Hays*, 21-20337 (5th Cir., March 21, 2023) at *15.
[86] *Id*. at 15-16, *citing City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality op.).
[87] R. Doc. 150-1.
[88] *Kersh v. Derozier*, 851 F.2d 1509, 1513 (5th Cir. 1998) ("The jury's determination that Linebaugh and Derozier's conduct deprived Kersh of his constitutional rights leads us, as it did the district court, to the conclusion that the customs and policies of the city necessarily operated to deprive Kersh of his constitutional rights.  Thus, the district court committed no error in ruling that the stipulation would automatically trigger the city's liability if the jury ruled against Linebaugh and/or Derozier.").
[89] *Pineda v. City of Houston*, 291 F.3d 325, 331–32 (5th Cir. 2002); *City of Canton v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

underlying constitutional violations; and (3) the deliberate indifference of municipal policymakers.[90]

A municipality can be liable for a failure to train if "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."[91] As noted by the Supreme Court in *Canton*:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force [citation omitted] can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.[92]

Under this theory of municipal liability standard, there is no need to prove a widespread pattern of improper behavior.[93]  *Brown* left no doubt that *Canton* can impose municipal liability in situations like the one at bar:

> In *Canton*, we did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability. 489 U.S., at 390, and n.10, 109 S.Ct., at 1205, and n.10 ("[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious ... that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need"). *Id.* at 409

Pursuant to *Canton*, when a constitutional violation is such a "highly predictable consequence" of a failure to train, a municipality can be found to have been deliberately indifferent to its citizens' constitutional rights."[94]

---

[90] *Pineda v. City of Houston*, 291 F.3d 325, 331–32 (5th Cir. 2002); *Conner v. Travis County,* 209 F.3d 794, 796 (5th Cir.2000).
[91] *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)
[92] *Id.* at 390, footnote 10.
[93] *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409-410 (1997)
[94] *Id.* at 409.

JPSO's training notes that: 1) according to the CDC, 1 in 59 children have autism; 2) according to the Autism Group, 1 in 40 children have autism; and 3) autism is 4 times more likely in males.[95] Further, both Sheriff Lopinto and Sgt. Voltolina acknowledged that it is obvious that deputies will encounter and potentially need to use force on autistic persons.[96]

However, the JPSO completely failed to train its deputies on the appropriate use of force against autistic persons and the specific risks of applying prone restraint to autistic persons. Instead, through their counsel, the defendants are attempting to justify the deputies' actions by falsely describing E.P.'s actions after he was handcuffed and was being held down, as active or "violent resistance" instead of manifestations of his disability and/or his efforts to breathe. Indeed, the deputies utilized more force than was necessary or reasonable, including the use of an extended period of pressurized prone restraint, pain compliance techniques and a chokehold. This unreasonable use of force placed E.P. who, in addition to his autism, was also obese, at an increased risk of death due to positional asphyxia.

In addition, the deputies failed to utilize the SWARM technique and place E.P. in the recovery position and failed to utilize the TARP procedure and RIPP Hobble training to avoid the risks of positional asphyxia. Instead, they continued to utilize prone, pressurized restraint and excessive force upon EP and failed to put him in recovery position until he went limp and urinated on himself. Further, as the JPSO does not conduct IA investigations or critical incident reviews of in-custody deaths, the deputies conduct with E.P. was never evaluated by Internal Affairs to determine whether the deputies complied with policy or training or whether the training needed to be changed.[97]

---

[95] Ex. 28 – Autism Awareness Power Point.

[96] R. Doc. 150-5 - Lopinto Dep.), 27:13-17 (Q…You knew by 2014 that people with intellectual disabilities are becoming an issue with law enforcement, correct? A. I think it was before that, also, but yeah.); R. Doc. 151-9 - Voltolina Dep., 110:12-110:20 (Q. Okay. Would you agree that autism is a prevalent issue that officers are likely to encounter in their careers in Jefferson Parish? A. I think any law enforcement officer has the potential of dealing with someone with autism when one in 54 males are diagnosed.).

[97] R. Doc. 142-8 – Noble Expert Report ¶¶ 54-65 (Plaintiffs' expert, Jeff Noble, has opined that the deputies failed to comply with their training, subjecting EP to an increased risk of death through prone restraint).

While Plaintiffs submit that there is an obvious need for training on use of force and restraint against autistic persons and the risk of positional asphyxia, Plaintiffs also note that the JPSO has a long history of dealing with litigation involving positional asphyxia.   These cases provided the JPSO with notice that deputies were using restraint techniques that resulted in deaths, sufficient to put it on notice of the need for proper policies and training for dealing with positional asphyxia. See cases cited, *infra*. Significantly, the JPSO did not conduct an Internal Affairs investigation or critical incident review of any of the previous JPSO asphyxial death cases.[98]

### C.    Lopinto's motion should be denied because Plaintiffs have provided evidence of *Monell* liability through failure to investigate and supervise.[99]

While not raised in Sheriff Lopinto's motion for partial summary judgment, liability under 42 USC §1983 can be established against a municipality which fails to adequately supervise, investigate and discipline police officers.[100] As noted by the Fifth Circuit in *Grandstaff v. City of Borger, Texas*, 767 F.2d 161, 171 (5th Cir. 1985):

> The disposition of the policy maker may be inferred from his conduct after the events of that night. Following this incompetent and catastrophic performance, there were no reprimands, no discharges, and no admissions of error. The officers testified at trial that no changes had been made in their policies. If that episode of such dangerous recklessness obtained so little attention and action by the City policymaker, the jury was entitled to conclude that it was accepted as the way things are done and have been done in the City of Borger. If prior policy had been violated, we would expect to see a different action. If what the officers did and failed to do on August 11, 1981 was not acceptable to the police chief, changes would have been made....

In this case, Sheriff Lopinto personally viewed the video tape and determined that everything the deputies did was in compliance with the policies, practices, customs and training of

---

[98] Ex. 1 - Blackwell Dep., 27:24-16; 110:9-23.

[99] Sheriff Lopinto's Motion for Summary Judgment only addresses Plaintiffs' failure to train claims but requests the dismissal of all Plaintiffs' *Monell* claims.  Therefore, Plaintiffs' other municipal liability claims should remain for trial without further discussion.  Out of an abundance of caution, Plaintiffs provide certain information pertaining to their other *Monell* claims but submit that they are not required to provide this evidence or that these claims are properly before the Court based on Sheriff Lopinto's Motion for Summary Judgment.

[100] *See Bordanaro v. McLeod*, 871 F.2d 1151 (9th Cir. 1989); *Vineyard v. County of Murray, Ga.*, 990 F.2d 1207 (11th Cir. 1993); *Gentile v. County of Suffolk*, 926 F.2d 142 (2d Cir. 1991); *McRorie v. Shimoda*, 795 F.2d 780 (9th Cir. 1985); *Grandstaff v. City of Borger, Texas*, 767 F.2d 161, 171 (5th Cir. 1985); *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir. 1985); *Harris v. City of Pagedale*, 821 F.2d 499, 508 (8th Cir. 1987), Avery and Rudovsky, *Police Misconduct: Law and Litigation*, §§ 3.5(b)(3), 3.5(b)(7) (1995 ed.)

the JPSO.[101] Lopinto further testified that even with hindsight, he did not think it would be "important to reevaluate [JPSO's] restraint procedure."[102] Nor does the "training need updating on the TARP policy or the RIPP Hobble or asphyxia."[103]

Further, JPSO, by matter of policy, fails to conduct Internal Affairs investigations or critical incident reviews regarding in-custody deaths to determine whether deputies' actions were in accordance with the policies, practices, customs and/or training of the JPSO or to determine if changes to the policies or training need to be considered. Instead, only criminal investigations are performed by the Homicide Division which seeks to determine whether there was probable cause to believe that a deputy committed a crime. The failure to have IA investigate in-custody death to determine compliance with policy and training in contrary to all nationally recognized standards.[104] Accordingly, the JPSO completely fails to evaluate deputies' compliance with policies and training during events which lead to death which illustrates deliberate indifference. Lopinto personally declines to exert even the barest form of supervision. At deposition, he conceded that he does not even consistently *read the report* when someone dies in JPSO custody.[105]

The failure of supervision was particularly stark here. JPSO says it trains its deputies to use the T.A.R.P. and the "SWARM" technique to restrain "extremely violent" prisoners in a safe way and to avoid the risks of positional asphyxia.[106] The Sheriff claims that E.P. was "extremely violent". Yet none of the seven deputies used a RIPP Hobble to T.A.R.P. or the SWARM technique,

---

[101] R. Doc. 150- – Pl. MSPJ Ratification.
[102] R. Doc. 150-5 - Lopinto Dep. - 178:8-21.
[103] *Id.* at 169:15-18.
[104] R. Doc. 142-8 - Noble Report, ¶ 82; Ex. 18 - IACP LAW ENFORCEMENT POLICY CENTER, MODEL POLICY, CONCEPTS AND ISSUES PAPER, AND NEED TO KNOW – INVESTIGATION OF OFFICER-INVOLVED SHOOTING AND OTHER SERIOUS INCIDENTS (APRIL 2019).
[105] R. Doc. 150-5 (Lopinto Dep.) at 5:24-6:9.
Q.      Sure, sure. You have reviewed the video. Have you reviewed the homicide report?
A.      I have not. I say that, Andy. I may have read that report when it first came out. I have not read it recently, but I don't always read every report, and I don't recall if I've read this one further back or not.
Q.      We had a previous deposition yesterday. If you could look to your left. Exhibit 123. Have you read the Keeven Robinson homicide report [regarding in-custody death]?
A.      I don't think I had read Keeven Robinson.
[106] Ex. 9 - JPSO SOP 8 - Restraining Devices & Defensive Devices Policy

and a 16-year-old severely autistic child died. Not one of the seven deputies were investigated by IA, sanctioned, counseled or even re-trained on the use of the device.

And finally, JPSO says that it trains its deputies that the most important thing to avoid positional asphyxia is to get a person seated upright or on their side in the recovery position once it is safe to do so.[107] But none of the seven deputies here used the recovery position, or even attempted to use the recovery position, and a 16-year-old severely autistic child died. Not one of the seven deputies were investigated by IA, sanctioned, or even re-trained on the use of the technique. From these facts, a reasonable jury could conclude that JPSO has a failure of supervision and oversight that led to the death of E.P.

### D.    Lopinto's Motion for Partial Summary Judgment should be denied because the JPSO failed to have adequate policies.

Again, while not addressed in Sheriff Lopinto's Motion for Partial Summary Judgment, Plaintiffs submit that the JPSO's written policies are inadequate, outdated and fail to conform to generally accepted law enforcement standards and practices.   In particular, the policies fail to identify and provide policy guidance regarding active/passive resistance, positional asphyxia, prone restraint, the Americans with Disabilities Act, dealing with persons with intellectual disabilities/autism and the investigation of critical incidents and officer misconduct.[108] Given the known dangers of the risk of death during prone law enforcement restraint, numerous national law enforcement groups and publications have provided written policy guidance on these specific issues which were known and available to law enforcement, such as the JPSO.[109]

The absence of policies may also give rise to *Monell* liability. In *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575 (3d Cir. 2003), a diabetic inmate sued a prison medical provider for failing to provide insulin which led to stroke and contended that the entity defendant had not established appropriate policies for ensuring the provision of important medications. Reversing a

---

[107] R. Doc. 144-3 - Pizzolato Dep., 76:5-77:6.

[108] R. Doc. 142-8 - Noble Expert Report, ¶¶ 84-87.

[109] *Id.* at ¶¶86-87

grant of summary judgment, the Court ruled that "[a] reasonable jury could conclude that *the failure to establish a policy* to address the immediate medication needs of inmates with serious medical conditions creates a risk that is sufficiently obvious as to constitute deliberate indifference to those inmates' medical needs." *Id.*at 585 (emphasis added).[110]

The JPSO acknowledged that law enforcement encounters with persons with intellectual disabilities, like autism, has been an issue for law enforcement well before this incident.[111] The IACP has developed model policies that address handling persons with intellectual disabilities which how to interact with autistic persons, including the risk associated with using force and/or the prone restraint.[112] The failure to have written policies which comply with generally accepted law enforcement practices which address the risk and dangers associated with handling autistic persons is an obvious situation where deliberate indifference can be inferred.[113]

### III.   CONCLUSION

JPSO's motion should be denied because the evidence in this case, when read in a light most favorable to Plaintiffs, more than makes out a viable *Monell* claim.

RESPECTFULLY SUBMITTED,

WILLIAM MOST (BPR # 36914)
Most & Associates
201 St. Charles Ave., Ste. 114 #101
New Orleans, LA 70170
Tel: (504) 509-5023
williammost@gmail.com

---

[110] *See Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1185, 1190 (9th Cir. 2006) (noting that "[a] policy can be one of action or inaction" and finding triable issue as to whether failure to implement policies constituted deliberate indifference); *Warren v. Dist. of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004) (allowing *Monell* claim to proceed on ground that "faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction"); *Sims v. Mulcahy*, 902 F.2d 524 (7th Cir. 1990) ("[I]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable".); *Avery v. Burke Cty.*, 660 F.2d 111, 114 (4th Cir. 1981) (holding that conduct of county entities "may be actionable if their failure to promulgate policies and regulations rise to the level of deliberate indifference")

[111] R. Doc. 150-5 (Lopinto Dep.), 27:13-17; R. Doc. 151-9 (Voltolina Dep.), 110:12-111:6.

[112] Ex. 17 - IACP LAW ENFORCEMENT POLICY CENTER, MODEL POLICY, CONCEPTS AND ISSUES PAPER, NEED TO KNOW – INTERACTIONS WITH INDIVIDUALS WITH INTELLECTUAL AND DEVELOPMENTAL DISABILITY (AUGUST 2017).

[113] *Alves v. Riverside County,* Case No. 19-2083 at 5 (CD Cal. 3/13/23) (In other words, policies and practices of other agencies are relevant to show that Defendants are 'outliers in policing.'")

/s/ Andrew C. Clarke
Andrew C. Clarke (TN BPR # 15409)
The Cochran Firm Midsouth
One Commerce Square, Suite 1700
(901) 523-1222 (Telephone)
aclarke@cochranfirmmidsouth.com