UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DONNA LOU, ET AL.                *       CIVIL ACTION NO. 21-80

VERSUS                           *       SECTION "D" (2)

SHERIFF JOSEPH P, LOPINTO,       *       Judge Wendy B. Vitter
III, ET AL.                              Magistrate Judge Donna P. Currault

**Plaintiffs' Response to Statement of "Uncontested"**
**Material Facts of Sheriff Lopinto, in his Official Capacity**

1.       **"The JPSO provided *extensive training in all the areas identified in Plaintiffs' Complaint and throughout the entirety of this litigation.*"**

Plaintiffs object to this Statement of Facts as it fails to provide any citation to the evidence in the record supporting this assertion.

Without waiving this objection, Plaintiffs dispute this assertion.  While the JPSO provided certain training to its deputies, Plaintiffs submit that this training was insufficient to avoid constitutional violations given that the JPSO deputies restrained an autistic child, in the prone position, for over 9 minutes without utilizing the TARP, RIPP Hobble or moving EP into the recovery position prior to death.[1]  Further, the JPSO failed to train its deputies on a central issue in this case, i.e., the appropriate use of force involving persons with intellectual disabilities, including autism, including those who are experiencing a sensory meltdown.  Finally, despite any training provided by JPSO, it is clear that the JPSO does not require its deputies to comply with their training as the Internal Affairs does not perform any review of in-custody deaths to determine compliance with the JPSO's policies, practices, customs or training and there is no critical incident review of in-custody deaths.  In further support, the Plaintiffs would state as follows:

*        The JPSO "training" of their deputies on JPSO written policies, is inadequate as deputies are simply required to acknowledge that they have read the policies and understand them.

---

[1] R. Doc. 142-8 - Noble Expert Report; Ex. 2 - Debbaubt Expert Report; Ex. 3 - Dr. Sperry Expert Report.

There is no requirement that deputies are tested to determine whether they have actually understood or comprehended the written policies.[2]

\*      The JPSO does not provide training on the use of force or restraining procedures when dealing with autistic persons,[3] does not incorporate any training concerning the RIPP Hobble device when providing training on autistic persons,[4] and does not cover any specific risks to autistic persons of prone restraint or positional asphyxia due to autism.[5]

\*      The individual Defendants did not have any training on dealing with subjects with autism.[6]

\*      The JPSO trains deputies that the most important thing to avoid positional asphyxia is to get a person seated upright or on their side in the recovery or modified recovery position once it is safe to do so.[7]  Deputies are trained to immediately put a subject into the recovery position once it is safe to do so to relieve the compression and dangers of positional asphyxia.[8]

Further, as a matter of policy, practice and custom, JPSO does not conduct a critical incident review or Internal Affairs investigation of in-custody deaths, including in this case, to determine whether deputies' actions complied with training and/or policy.[9]  Instead, Sheriff Lopinto, in his official capacity, reviewed the videotape of the encounter between EP and JPSO deputies and found that the deputies actions were consistent with and complied with the JPSO's policies, practices, customs and training.[10]  No deputy was disciplined or subject to any counseling or re-training as a result of their actions in this incident and their behavior was ratified by the Sheriff.  As such, the actions of the Individual Defendants

---

[2] R. Doc. 144-3 - Pizzolato Dep., 30:4-13 (Q. I call that a read and sign. They have to acknowledge that they have gotten it, and they have to comply with it, correct?  A. Yes. Q. And then during instruction, some policies may be brought up, but we don't have a class on the Jefferson Parish Sheriff's Office policies where you take a written test when you are done? A. Correct.); R. Doc. 142-3 - Pitfield Dep., 89:12-19; Ex. 4 - Vaught Dep., 72:6-19; Ex. 5 - Mehrtens Dep., 29:1 – 30:6; R. Doc. 105-9 - Vega Dep., 59:14-25;

[3] R. Doc. 151-9 - Voltolina Dep., 44:14-45:3; 45:23-46:7; 63:1-8.

[4] *Id.* at 87:11-18.

[5] R. Doc. 151-9 -Voltolina Dep., 93:22-94:13; Ex. 2 - Debbaudt Report, pp. 7-10.

[6] R. Doc. 142-3 Pitfield Dep., 155:7-13; Ex. 4 - Vaught Dep., 75:3-12; Ex. 5 -Mehrtens Dep., 21:10-14; 42:3-24; Ex. 6 - Guidry Dep., 29:17-23; R. Doc 105-9 - Vega Dep., 76:18-21; Ex. 7 - Estrada Dep., 20:22-24; 21:17-20; Ex. 8 – Gaudet Dep., 48:12-15; 49: 11-17 (Deputy Gaudet testified that he received some training on autism during CIT classes but no such training from the coroner's office); Ex. 27 – Deputies' Training Resumes.

[7] R. Doc. 144-3 - Pizzolato Dep., 76:5-77:6.

[8] *Id.* at 70:24-71:5; 71:15-72:9.

[9] R. A Blackwell Dep., 18:12-19:9; 23:12-25; 24:6-8; 26:2-9; 30:3-17; 56:9-13; R. Doc 21-4 – Lopinto Response to Interrogatory # 4 & 6, pp. 2-13.

[10] R. Doc. 150 – 150-5 – Plaintiffs' Motion for Partial Summary Judgment on Ratification.

during their encounter with EP represent the actual, de facto policies, practices, customs and training of the JPSO in all respects.

2.    **The JPSO trains its Deputies in the laws and policies governing the seizure of a person, including the use of force.** *See* **Corporate Deposition of JPSO Sergeant Pizzalota, attached as Exhibit 1, at 100-101, 103-109, 117-119, 161-163, 174-175.**

It is undisputed that JPSO provides some training on the topic of "seizure of a person, including the use of force."

It is disputed that the JPSO training is sufficient to avoid constitutional violations or that JPSO requires deputies to comply with whatever training is provided based on the following:

Sgt. Pizzolato was JPSO's corporate representative on training who taught use of force, de-escalation, and the RIPP hobble.[11]  Sgt. Pizzolato's training did not include training for dealing with persons with intellectual disabilities, including autism, or compliance with the ADA.[12]  Instead, Sgt. Voltolina was the JPSO's corporate representative on training regarding compliance with the ADA/RA, including the identification and handling of persons with disabilities in crisis.[13] Sgt. Voltolina was also JPSO's corporate representative on "how to handle a person who has mental illness or disability, including autism and any accommodations provided to EP.[14]

Sgt. Voltolina testified that the JPSO does not provide training on the use of force or restraint procedures when dealing with autistic persons,[15] does not incorporate any training concerning the RIPP Hobble device when providing training on autistic persons,[16] and does not cover any specific risks to autistic persons of prone restraint or positional asphyxia due to autism.[17]

Further, as a matter of policy, practice and custom, JPSO does not conduct a critical incident review or Internal Affairs investigation of in-custody deaths, including in this case, to determine whether

---

[11] R. Doc. 144-3 - Pizzolato Dep, 7:8-8:25.
[12] *Id.* at 117:4-6 (Q. You don't provide any training on autism yourself. This isn't your topic of autism? A. Correct).
[13] R. Doc. 151-9 - Voltolina Dep., 18:2-14.
[14] *Id.* at 18:2-14.
[15] *Id.* at 44:14-45:3; 45:23-46:7; 63:1-8.
[16] *Id.* at 87:11-18.
[17] R. Doc. 151-9 - Voltolina Dep., 93:22-94:13; Ex. 2 - Debbaudt Report, pp. 7-10.

deputies' actions complied with training and/or policy.[18]  Instead, Sheriff Lopinto, in his official capacity, reviewed the videotape of the encounter between EP and JPSO deputies and found that the deputies actions were consistent with and complied with the JPSO's policies, practices, customs and training..[19] No deputy was disciplined or subject to any counseling or re-training as a result of their actions in this incident and their behavior was ratified by the Sheriff. As such, the actions of the Individual Defendants during their encounter with EP represent the actual, de facto policies, practices, customs and training of the JPSO in all respects.

3.   **The JPSO trains its Deputies in the use of choke holds, which are strictly prohibited unless absolutely necessary to preserve life.  *See* Corporate Deposition of JPSO Sergeant Pizzalota, attached as Exhibit 1, at 55-58, 97, 129.**

It is undisputed that JPSO provides some training on the topic of "chokeholds" and that JPSO considers them a deadly force application that can only be used when absolutely necessary to preserve life.

It is disputed that JPSO training is sufficient to avoid constitutional violations or that JPSO requires deputies to comply with this training based on the following:

Deputy Vega employed a choke hold to E.P. which significantly impacted E.P.'s airway and ability to breathe.[20]  There was no consequence, no counseling, no disciplinary action or re-training of Deputy Vega or the other deputies regarding Vega's use of a choke hold on E.P.  Deputy Vega and other JPSO deputies had been previously sued for improperly utilizing a choke hold on another occasion.[21]  In addition, no deputies intervened to prevent or stop Deputy Vega from applying a choke hold on EP.

---

[18] Ex. 1 - Blackwell Dep., 18:12-19:9; 23:12-25; 24:6-8; 26:2-9; 30:3-17; 56:9-13; R. Doc 21-4 – Lopinto Response to Interrogatory # 4 & 6, pp. 2-13.
[19] R. Doc. 150 – 150-5 – Plaintiffs' Motion for Partial Summary Judgment on Ratification.
[20] R. Doc. 142-7 - Sperry Report Excerpt - ("The physical findings at autopsy confirm that Vega utilized a "forearm bar" choke hold which significantly impacted [E.P.]'s airway and ability to breathe.")
[21] Ex. 26 - *Blum, et al. v. Norman, et. al*; Case No. 09-2327 (USDC ED LA) ("¶ 15. Suddenly and without warning, as the plaintiff, BLUM, began to walk away from the defendants, he was grabbed from behind by the head and thrown to the ground by one or more of the defendants.  One of the defendants then proceeded to choke him.  While being choked, he was punched multiple times in his body by two of the other defendants.")

Further, as a matter of policy, practice and custom, JPSO does not conduct a critical incident review or Internal Affairs investigation of in-custody deaths, including in this case, to determine whether deputies' actions complied with training and/or policy.[22]  Instead, Sheriff Lopinto, in his official capacity, reviewed the videotape of the encounter between EP and JPSO deputies and found that the deputies' actions were consistent with and complied with the JPSO's policies, practices. customs and training during their encounter with EP.[23]   No deputy was disciplined or subject to any counseling or re-training as a result of their actions in this incident and their behavior was ratified by the Sheriff. As such, the actions of the Individual Defendants during their encounter with EP represent the actual, de facto policies, practices, customs and training of the JPSO in all respects.

**4.    The JPSO trains its Deputies in the use of defensive tactics and martial arts holds, which again exclude the use of choke holds. *Id*. at 128-129.**

It is undisputed that JPSO provides some training on the topic of "defensive tactics and martial arts holds."

It is disputed that the JPSO training is sufficient to avoid constitutional violations or that JPSO requires deputies to comply with whatever training is provided based on the following:

With respect to martial arts holds, the JPSO trains deputies that they can use martial arts holds around the head, but not the neck.[24]  In particular, the JPSO trains deputies that they can utilize a head hold to control the head by placing "one hand on one ear and one hand on the other ear and hold it straight."[25]  Despite this training, Deputy Vega employed a choke hold to EP which significantly impacted EP's airway and ability to breathe.[26]  Further, while Deputy Vega denies he performed a choke hold, his description of the hold he utilized on EP is inconsistent with the training JPSO claims that they

---

[22] Ex. 1 - Blackwell Dep., 18:12-19:9; 23:12-25; 24:6-8; 26:2-9; 30:3-17; 56:9-13; R. Doc 21-4 – Lopinto Response to Interrogatory # 4 & 6, pp. 2-23
[23] R. Doc. 150 – 150-5 – Plaintiffs' Motion for Partial Summary Judgment on Ratification.
[24] R. Doc. 144-3 - Pizzolato Dep., 128:8-129:22.
[25] *Id.* 129:10-14.
[26] R. Doc. 142-7 (Sperry Report Excerpt) ("The physical findings at autopsy confirm that Vega utilized a "forearm bar" choke hold which significantly impacted [E.P.]'s airway and ability to breathe.")

give regarding authorized head holds to all deputies.[27]  Further, Deputy Vega and other deputies have been previously sued for improperly utilizing a choke hold on another occasion.[28]  In addition, no deputies intervened to prevent or stop Deputy Vega from applying a choke hold on EP.

Further, as a matter of policy, practice and custom, JPSO does not conduct a critical incident review or Internal Affairs investigation of in-custody deaths, including in this case, to determine whether deputies' actions complied with training and/or policy.[29]  Instead, Sheriff Lopinto, in his official capacity, reviewed the videotape of the encounter between EP and JPSO deputies and found that the deputies actions were consistent with and complied with the JPSO's policies, practice, customs and training..[30] No deputy was disciplined or subject to any counseling or re-training as a result of their actions in this incident and their behavior was ratified by the Sheriff. As such, the actions of the Individual Defendants during their encounter with EP represent the actual, de facto policies, practices, customs and training of the JPSO in all respects.

5.   **The JPSO trains its Deputies in passive and active resistance and in confronting. *Id*. at 79-82.[31]**

It is undisputed that JPSO provides some training on the topic of "passive and active resistance."

It is disputed that the JPSO's training is sufficient to avoid constitutional violations or that JPSO requires deputies to comply with this training based on the following:

 Sgt. Pizzolato testified that there is no "definition" of active and passive resistance provided to deputies in training.[32]  According to Sgt. Pizzolato, whenever a deputy resorts to going "hands on" with

---

[27] R. Doc., 18-5 - Vega Statement, p. 6 ("And he's trying to get up and he's trying to turn and get me off, so I put my forearm right here, underneath his chin to try to maintain some control and to keep him from hitting his head…); R. Doc 105-9 -Vega Dep., 129:16-130:24 (testifying that he had his right bicep against the right side of EP's face, right arm underneath EP's chin and then attached right hand to left wrist).

[28] Ex. 26 - *Blum, et al. v. Norman, et. al*; Case No. 09-2327 at ¶ 15 (USDC ED LA).

[29] R. Doc 21 - Blackwell Dep., 18:12-19:9; 23:12-25; 24:6-8; 26:2-9; 30:3-17; 56:9-13; R. Doc 21-4 – Lopinto Response to Interrogatory # 4 & 6, pp. 2-13.

[30] R. Doc. 150 – 150-5 – Plaintiffs' Motion for Partial Summary Judgment on Ratification.

[31] This statement appears to be incomplete as there is no explanation or description for the term "confronting." It is disputed that JPSO deputies are trained in "confronting", whatever that is.

[32] R. Doc. 44-3 - Pizzolato Dep., 80:21-80:25.

a subject, this represents active resistance.[33]  Sgt. Pizzolato testified that a protestor sitting on the street who refuses to move is engaging in active resistance for which intermediate uses of force, such as a baton, OC spray and Taser can be utilized.[34]  Further, this training fails to take into consideration a subject's inability to properly understand or respond to commands, especially persons with intellectual disabilities such as autism, or persons suffering from oxygen deficiency like EP as noted by Plaintiffs' expert, Dr. Sperry.[35]

Further, as a matter of policy, practice and custom, JPSO does not conduct a critical incident review or Internal Affairs investigation of in-custody deaths, including in this case, to determine whether deputies' actions complied with training and/or policy.[36]  Instead, Sheriff Lopinto, in his official capacity, reviewed the videotape of the encounter between EP and JPSO deputies and found that the deputies actions were consistent with and complied with the JPSO's policies, practices, customs and training during their encounter with EP.[37]  No deputy was disciplined or subject to any counseling or re-training as a result of their actions in this incident and their behavior was ratified by the Sheriff..  As such, the actions of the Individual Defendants during their encounter with EP represent the actual, de facto policies, practices, customs and training of the JPSO in all respects.

6.      **The JPSO trains its Deputies in de-escalation techniques when dealing with the public.** *Id*. **at 83-84, 110-112.**

---

[33] R. Doc. 14403 - Pizzolato Dep., 81:5-19; 82:1-83:3.

[34] *Id.* at 82:1-83:3

[35] Ex.3 – Dr. Sperry Expert Report – which notes: 1) "While [EP] made certain movements while being restrained by Pitfield, it is my opinion that these movements were not willful, active resistance or efforts to harm the officers, but behavioral manifestations of his autism and evidence of oxygen deficiency which was resulting from his continuous and prolonged restraint." (Page 4); 2) "Again, at this time, it doesn't appear that [EP] is offering any real resistance or danger to the deputies. As previously noted, the actions of [E.P.] appear to be consistent with the physical manifestation of his SASD and oxygen deficiency stemming from the prolonged restraint." (Page 6); and 3) "The inability of the autistic person to understand and comprehend commands, and especially an individual with Severe Autistic Spectrum Disorder, who are confronted by or otherwise involved in an incident with law enforcement officers, can result in disaster if the officer(s) decide to continue to utilize a prone restraint against an obese, severely autistic person." (Page 11).

[36] Ex. 1 - Blackwell Dep., 18:12-19:9; 23:12-25; 24:6-8; 26:2-9; 30:3-17; 56:9-13; R. Doc 21-4 – Lopinto Response to Interrogatory # 4 & 6, pp. 2-13.

[37] R. Doc. 150 – 150-5 – Plaintiffs' Motion for Partial Summary Judgment on Ratification.

It is undisputed that JPSO provides some training on the topic of "de-escalation techniques when dealing with the public."

It is disputed that the training is sufficient to avoid constitutional violations or that JPSO requires deputies to comply with this training.

The JPSO does not provide training on the use of force or restraining procedures when dealing with autistic persons,[38] does not incorporate any training concerning the RIPP Hobble device when providing training on autistic persons,[39] and does not cover any specific risks to autistic persons of prone restraint or positional asphyxia due to autism.[40]

At deposition, JPSO's 30(b)(6) witness testified about a training module used by JPSO in association with the Jefferson Parish Coroner's Office (JPCO) to train deputies. The witness was asked about the title of the training, and he testified: "I think it's Deescalation with Autism."[41] He testified that JPSO does not possess a copy of the training: it is a document that the coroner brings.[42]  Plaintiffs sent a subpoena to the coroner's office for their training materials. There was no training entitled "Deescalation with Autism" or anything similar in the coroner's subpoena return.

Regardless of whether this particular training block exists, the Individual Defendants did not have any training on dealing with autistic persons from the JPCO.[43]  Plaintiffs dispute that the JPSO provided any training with respect to de-escalation with autistic persons.

Further, as a matter of policy, practice and custom, JPSO does not conduct a critical incident review or Internal Affairs investigation of in-custody deaths, including in this case, to determine whether

---

[38] R. Doc. 151-9 - Voltolina Dep., 44:14-45:3; 45:23-46:7; 63:1-8.
[39] Id. at 87:11-18.
[40] R. Doc 151-9 - Voltolina Dep., 93:22-94:13; Ex. 2 - Debbaudt Report, pp. 7-10.
[41] R. Doc. 151-9 – Voltolina Dep., 48:11.
[42] Id. at 55:5-10 ("Q. So the Deescalation with Autism PowerPoint presentation is something the coroner brings to JPSO, does the training and leaves with them, and JPSO never gets a copy of it? Is that correct? A. Correct.")
[43] R. Doc. 142-3 Pitfield Dep., 155:7-13; Ex. 4 - Vaught Dep., 75:3-12; Ex. 5 -Mehrtens Dep., 21:10-14; 42:3-24; Ex. 6 - Guidry Dep., 29:17-23; R. Doc 105-9 - Vega Dep., 76:18-21; Ex. 7 - Estrada Dep., 20:22-24; 21:17-20; Ex. 8 – Gaudet Dep., 48:12-15; 49: 11-17 (Deputy Gaudet testified that he received some training on autism during CIT classes but no such training from the coroner's office).

8

deputies' actions complied with training and/or policy.[44]   Instead, Sheriff Lopinto, in his official capacity, reviewed the videotape of the encounter between EP and JPSO deputies and found that the deputies actions were consistent with and complied with the JPSO's policies, practices, customs and training during their encounter with EP.[45]   No deputy was disciplined or subject to any counseling or re-training as a result of their actions in this incident and their behavior was ratified by the Sheriff. As such, the actions of the Individual Defendants during their encounter with EP represent the actual, de facto policies, practices, customs and training of the JPSO in all respects.

**7.     The JPSO trains its Deputies in dealing with emotionally disturbed persons. *Id.*, at 114-115.**

It is undisputed that the JPSO provides some training on "dealing with emotionally disturbed persons" during RIPP Hobble training.

It is disputed that the training is sufficient to avoid constitutional violations or that JPSO requires deputies to comply with this training based on the following:

The JPSO provides training on dealing with emotionally disturbed persons during RIPP Hobble training including persons who are suffering from cocaine psychosis, excited delirium and/or mental illness.[46]  This training includes: 1) recognition of the problem; 2) treatment/handling – subject is placed in the seated position; 3) transport in car or ambulance; 4) medical attention, preferably by a health care provider; 5) communication to jail about the condition of the subject; and 6) observation while in custody of jail.[47]  EP suffered from an intellectual disability and was not an "emotionally disturbed person."  EP did not have "cocaine psychosis," "excited delirium" (which is disputed as an actual, valid medical condition) or mental illness. The JPSO training in "dealing with emotionally disturbed persons" did not include persons with intellectual disabilities including autism.

---

[44] Ex. 1 - Blackwell Dep., 18:12-19:9; 23:12-25; 24:6-8; 26:2-9; 30:3-17; 56:9-13; R. Doc 21-4 – Lopinto Response to Interrogatory # 4 & 6, pp. 2-13.
[45] R. Doc. 150 – 150-5 – Plaintiffs' Motion for Partial Summary Judgment on Ratification.
[46] Ex. 10 - RIPP Hobble Training Power Point.
[47] Ex. 10 - RIPP Hobble Training Power Point, pp. 41-43.

Further, as a matter of policy, practice and custom, JPSO does not conduct a critical incident review or Internal Affairs investigation of in-custody deaths, including in this case, to determine whether deputies' actions complied with training and/or policy.[48]  Instead, Sheriff Lopinto, in his official capacity, reviewed the videotape of the encounter between EP and JPSO deputies and found that the deputies actions were consistent with and complied with the JPSO's policies, practices, customs and training. .[49] No deputy was disciplined or subject to any counseling or re-training as a result of their actions in this incident and their behavior was ratified by the Sheriff. As such, the actions of the Individual Defendants during their encounter with EP represent the actual, de facto policies, practices and customs of the JPSO in all respects.

8.    **The JPSO trains its Deputies in confronting people exhibiting signs of what is often referred to as Excited Delirium, which was a contributing cause of death in this case. *Id*., at 40-46, 48-53, 130-131.**

It is undisputed that JPSO provides some training on what it describes as "Excited Delirium" during RIPP Hobble training.

It is disputed that the training is proper and/or sufficient to avoid constitutional violations or that JPSO requires deputies to comply with this training based on the following:

It is disputed that Excited Delirium was a contributing cause of death in this case.[50]

It is further disputed that Excited Delirium is an actual, valid medical condition.  Excited Delirium as a medical condition has been rejected by the American Medical Association, [51] the American

---

[48] Ex. 1 - Blackwell Dep., 18:12-19:9; 23:12-25; 24:6-8; 26:2-9; 30:3-17; 56:9-13; R. Doc 21-4 – Lopinto Response to Interrogatory # 4 & 6, pp. 2-13.

[49] R. Doc. 150 – 150-5 – Plaintiffs' Motion for Partial Summary Judgment on Ratification.

[50] Ex. 3 – Dr. Sperry Report – "Excited Delirium is not a valid cause of death and [EP] did not exhibit any of the vast array of alleged symptoms of Excited Delirium." (PAGE 7); "Excited Delirium is not uniformly accepted in forensic medicine and forensic pathology as a valid cause of death…"  (PAGE 8); "[EP] did NOT die of the Excited Delirium Syndrome, and furthermore, that the utilization of this syndromic diagnosis is improper and should not be used to explain [EP]'s death." (PAGE 12).

[51] Ex. 11 - AMA Position Statement on Excited Delirium, p. 11 (June 2021) ("Believes that the current evidence does not support "excited delirium" or "excited delirium syndrome" as a medical diagnosis and opposed the use of the terms until a clear set of diagnostic criteria are validated.")

Psychiatric Association,[52] the National Association of Medical Examiners,[53] the Royal College of Pathologists[54] and Physicians for Human Rights.[55] Instead, Excited Delirium is a term utilized by law enforcement to justify the in-custody death of individuals who are restrained by law enforcement.[56]

Sgt. Pizzolato testified that "excited delirium is a psychological event caused by… the introduction of substances into the body."[57] Sgt. Pizzolato acknowledged that both the American Medical Association and American Psychiatric Association reject "excited delirium" as a medical diagnosis.[58] However, JPSO deputies are trained that if they observed signs or symptoms of "excited delirium," it is a medical emergency and health care personnel should be called to the scene.[59] Deputies are trained that persons experiencing "excited delirium" are at risk of death from being restrained in the prone position.[60] Further, deputies are trained that obese persons and persons suffering from diminished capacity and obesity are particularly at risk when restrained in the prone position.[61]

---

[52] Ex. 12 - APA Position Statement on Excited Delirium, p. 1 (December 2020) ("Police responses to call for behavioral health crisis have been known to have tragic outcomes, including injury or death.  The concept of "excited delirium" or "excited delirium" (also referred to as "excited delirium syndrome (ExDs) has been invoked to explain or justify injury or death to individuals in police custody….  APA has not recognized excited delirium as a mental disorder, and it is not included in the *Diagnostic and Statistical Manual of Mental Disorders*…  1.  The term "excited delirium" (ExDs) is too non-specific to meaningfully describe or convey information about a person.  "Excited delirium" should not be used until a clear set of diagnostic criteria are validated."

[53] Ex. 13 – National Association of Medical Examiners Position Statement on Excited Delirium (March 2023) ("Although the terms "Excited Delirium" or "Excited Delirium Syndrome" have been used by forensic pathologists as a cause of death in the past, there terms are not endorsed by NAME or recognized in the renewed classification of WHO, ICD-10, and DSM-V.)

[54] Ex. 14 - Royal College of Pathologists, "The Use of 'Excited Delirium' as a Cause of Death," p. 3 (2020) ("'Excited Delirium' should never be used as a term that, by itself, can be identified as the cause of death.  The use of Excited Delirium as a term in guidance to police officers should also be avoided."

[55] Physicians for Human Rights, "'Excited Delirium' and Deaths in Police Custody," p. 6 (March 2020) ("PHR holds that "excited delirium" is a descriptive term of myriad symptoms and signs, not a medical diagnosis, and, as such, should not be cited as a cause of death."

[56] Ex. 3 - Sperry Report, p. 8 – ("ExDs has and still is used by some law enforcement agencies in order to attempt to explain a negative outcome, up to and including death, that results from forcibly restraining someone.  In any event, [E.P.] did not meet the ever changing and ill-defined characteristics of Excited Delirium as [EP] did not have an extremely elevated body temperature, was not under the influence of illegal drugs and his behavior was not out of character but represented the behavioral manifestations of his SASD.")

[57] R. Doc. 144-3 - Pizzolato Dep., 38:25-29-3.

[58] *Id.* at 39:4-40:9.

[59] *Id.* at 45:5-45:25.

[60] *Id.* at 52:21-24.

[61] *Id.* at 53:19-24.

Further, as a matter of policy, practice and custom, JPSO does not conduct a critical incident review or Internal Affairs investigation of in-custody deaths, including in this case, to determine whether deputies' actions complied with training and/or policy.[62]  Instead, Sheriff Lopinto, in his official capacity, reviewed the videotape of the encounter between EP and JPSO deputies and found that the deputies' actions were consistent with and complied with the JPSO's policies, practices. customs and training. despite the fact that EP was obese and the deputies knew that he was autistic and "special needs." [63]   No deputy was disciplined or subject to any counseling or re-training as a result of their actions in this incident and their behavior was ratified by the Sheriff. As such, the actions of the Individual Defendants during their encounter with EP represent the actual, de facto policies, practices, customs and training of the JPSO in all respects.

**9.    The JPSO trains its Deputies in providing medical attention to those in need. *Id*., at 129, 131-133.**

It is undisputed that the JPSO provides some training on "providing medical attention to those in need."

It is disputed that the training is sufficient to avoid constitutional violations or that JPSO requires deputies to comply with this training based on the following:

Sgt. Pizzolato testified that JPSO deputies are trained in CPR, Narcan and the use of torniquets.[64] Further, deputies are trained to monitor a person's breathing frequently once they have been restrained.[65] To monitor a person's breathing, deputies are trained to place hand on person's back to feel if they are breathing or visually observe back rising and falling.[66]  There is no specific training pertaining to checking a person's breathing at certain intervals.[67]  Deputies are not trained to check for a pulse unless

---

[62] Ex. 1 - Blackwell Dep., 18:12-19:9; 23:12-25; 24:6-8; 26:2-9; 30:3-17; 56:9-13; R. Doc 21-4 – Lopinto Response to Interrogatory # 4 & 6, pp. 2-13.
[63] R. Doc. 150 – 150-5 – Plaintiffs' Motion for Partial Summary Judgment on Ratification.
[64] R. Doc. 144-3 - Pizzolato Dep., 131:5-8.
[65] R. Doc. 151-9 - Voltolina Dep., 79:2-11; 80:19-90:1.
[66] *Id.* at 82:25-83:7.
[67] *Id.* at 83:8-14.

a person becomes limp.[68]  Deputies are also trained on recovery position, i.e., "After takedown, the individual should be turned on his or her side and be transferred into an upright position as soon as possible to allow normal breathing to occur."[69]

Further, as a matter of policy, practice and custom, JPSO does not conduct a critical incident review or Internal Affairs investigation of in-custody deaths, including in this case, to determine whether deputies' actions complied with training and/or policy.[70]  Instead, Sheriff Lopinto, in his official capacity, reviewed the videotape of the encounter between EP and JPSO deputies and found that the deputies actions were consistent with and complied with the JPSO's policies, practices, customs and training .[71] No deputy was disciplined or subject to any counseling or re-training as a result of their actions in this incident, and their behavior was ratified by the Sheriff.  As such, the actions of the Individual Defendants during their encounter with EP represent the actual, de facto policies, practices, customs and training of the JPSO in all respects.

**10.    The JPSO trains its Deputies that the hogtying technique is strictly prohibited. *Id*., at 74, 89.**

It is undisputed that the JPSO trains that hogtying is strictly prohibited during RIPP Hobble training and E.P. was not hog-tied.

**11.    The JPSO trains its Deputies in restraining persons in the prone position. *Id*., at 53-55, 64-66, 68, 70, 76, 91, 135, 172.**

It is undisputed that the JPSO provides some training on "restraining persons in the prone position" during RIPP Hobble training.

It is disputed that the training is sufficient to avoid constitutional violations or that JPSO requires deputies to comply with this training based on the following:

---

[68] R. Doc. 151-9 - Voltolina Dep., 87:19-88:16.
[69] *Id.* at 75:1-77:25.
[70] Blackwell Dep., 18:12-19:9; 23:12-25; 24:6-8; 26:2-9; 30:3-17; 56:9-13; R. Doc 21-4 – Lopinto Response to Interrogatory # 4 & 6, pp. 2-13.
[71] R. Doc. 150 – 150-5 – Plaintiffs' Motion for Partial Summary Judgment on Ratification.

Sgt. Pizzolato was JPSO's corporate representative on training who taught use of force, de-escalation, and the RIPP hobble.[72] Sgt. Pizzolato's training did not include training for dealing with persons with intellectual disabilities, including autism, or compliance with the ADA.[73] Instead, Sgt. Voltolina was the JPSO's corporate representative on training regarding compliance with the ADA/RA, including the identification and handling of persons with disabilities in crisis.[74] Sgt. Voltolina was also JPSO's corporate representative on "how to handle a person who has mental illness or disability, including autism and any accommodations provided to EP.[75]

Sgt. Voltolina testified that the JPSO does not provide training on the use of force or restraining procedures when dealing with autistic persons,[76] does not incorporate any training concerning the RIPP Hobble device when providing training on autistic persons,[77] and does not cover any specific risks to autistic persons of prone restraint or positional asphyxia due to autism.[78]

During RIPP Hobble training, JPSO trains deputies to never leave suspects in the prone position to avoid positional asphyxia.[79] JPSO trains its deputies to place persons in the recovery position (on side or seated upright) after prone restraint to allow them to breathe to avoid positional asphyxia.[80] With respect to the prone position, JPSO trains its deputies in the following: 1) the prone position can cause respiratory compromise;[81] 2) placing weight on a person's back can restrict breathing and the bellows action;[82] 3) prone restraint causes the diaphragm muscle to be compressed against the ground which restricts breathing;[83] 4); this restriction on breathing can impact the exchange of gases ($O2/CO2$) in the

---

[72] R. Doc. 144-3 - Pizzolato Dep, 7:8-8:25.
[73] *Id.* at 117:4-6 (Q. You don't provide any training on autism yourself. This isn't your topic of autism? A. Correct).
[74] R. Doc. 151-9 - Voltolina Dep., 18:2-14.
[75] *Id.* at 18:2-14.
[76] *Id.* at 44:14-45:3; 45:23-46:7; 63:1-8.
[77] *Id.* at 87:11-18.
[78] R. Doc. 151-9 – Voltolina Dep., 93:22-94:13; Ex. 2 - Debbaudt Report, pp. 7-10.
[79] R. Doc. 144-3 - Pizzolato Dep., p. 64:9-12 - (Q. When do you train them to put them in the recovery position?  A. I train them never to leave anybody in a prone position); *Id.* at 68:1-2 – (A. I train to not leave somebody in a prone position).
[80] *Id.* at 63:15-18.
[81] *Id.* at 65:18-20.
[82] *Id.* at 63:8-63:19.
[83] *Id.* at 66:19-67.

lungs and result in oxygen deficiency;[84] and 5) when oxygen deficiency occurs, a person may struggle more violently.[85] To prevent potential death from positional asphyxia, the RIPP Hobble training recommends that deputies use the "SWARM" technique on violent prisoners which instructs deputies to take a suspect down and then "apply a hobble restraint to the ankles and roll the subject into an upright seated position…. Position the subject so that he or she can lean back against a fixed object.  This helps relieve pressure on the diaphragm and make breathing easier.[86]

The JPSO trains deputies that the most important thing to avoid positional asphyxia is to get a person seated upright or on their side in the recovery or modified recovery position once it is safe to do so.[87]  The JPSO does not train regarding a specific amount of time that deputies can restrain a subject in the prone position, but that deputies should immediately put a subject into the recovery position once it is safe to do so to relieve the compression and dangers of positional asphyxia.[88]

In RIPP Hobble training, JPSO trains its deputies that they can control a suspect in the recovery position.[89]  JPSO trains deputies that a significant factor in gaining control of a person being restrained in the prone position is whether they have been handcuffed.[90]  JPSO trains its deputies that to decrease the risks associated with prone restraint, the remedy is simple – get pressure off the back.[91]  Sgt. Pizzolato acknowledged that if you have 6 deputies on a scene, even if the subject's legs are not restrained, this is a sufficient number of deputies to restrain someone in the recovery position and avoid the dangers of positional asphyxia.[92]

Further, as a matter of policy, practice and custom, JPSO does not conduct a critical incident review or Internal Affairs investigation of in-custody deaths, including in this case, to determine whether

---

[84] R. Doc. 144-3 - Pizzolato Dep., 63:11-14.
[85] *Id.* at 68:14-23.
[86] Ex. 10 – RIPP Hobble Training, pp. 46-47.
[87] R. Doc. 144-3 - Pizzolato Dep., 76:5-77:6.
[88] *Id.* at 70:24-71:5; 71:15-72:9.
[89] *Id.* at 62:25-63:2.
[90] *Id.* at 69:16-22.
[91] *Id.* at 66:4-8.
[92] *Id.* at 90:21-94:19.

deputies' actions complied with training and/or policy.[93]   Instead, Sheriff Lopinto, in his official capacity, reviewed the videotape of the encounter between EP and JPSO deputies and found that the deputies' actions were consistent with and complied with the JPSO's policies, practices, customs and training.[94]   No deputy was disciplined or subject to any counseling or re-training as a result of their actions in this incident and their behavior was ratified by the Sheriff.   As such, the actions of the Individual Defendants during their encounter with EP represent the actual, de facto policies, practices, customs and training of the JPSO in all respects.

**12.    The JPSO trains its Deputies when and how to place persons in a recovery position. *See* Exhibit 1, at 62-66, 69-73, 77, 91, 94.**

It is undisputed that the JPSO provides some training on "when and how to place persons in a recovery position."   It is disputed that the training is sufficient to avoid constitutional violations or that JPSO requires deputies to comply with this training based on the following:

The JPSO does not provide training on the use of force or restraining procedures when dealing with autistic persons,[95] does not incorporate any training concerning the RIPP Hobble device when providing training on autistic persons,[96] and does not cover any specific risks to autistic persons of prone restraint or positional asphyxia due to autism.[97]

The JPSO does not train regarding a specific amount of time that deputies can restrain a subject in the prone position, but that deputies should immediately put a subject into the recovery position once it is safe to do so to relieve the compression and dangers of positional asphyxia.[98]

---

[93] Ex. 1 - Blackwell Dep., 18:12-19:9; 23:12-25; 24:6-8; 26:2-9; 30:3-17; 56:9-13; R. Doc 21-4 – Lopinto Response to Interrogatory # 4 & 6, pp. 2-13.
[94] R. Doc. 150 – 150-5 – Plaintiffs' Motion for Partial Summary Judgment on Ratification.
[95] R. Doc. 151-9 - Voltolina Dep., 44:14-45:3; 45:23-46:7; 63:1-8.
[96] *Id.* at 87:11-18.
[97] *Id.* at 93:22-94:13; Ex. 2 - Debbaudt Report, pp. 7-10.
[98] R. Doc. 144-3 - Pizzolato Dep., 70:24-71:5; 71:15-72:9.

During RIPP Hobble training, JPSO trains deputies to never leave suspects in the prone position to avoid positional asphyxia.[99]  JPSO trains its deputies to place persons in the recovery position (on side or seated upright) after prone restraint to allow them to breathe to avoid positional asphyxia.[100]  To prevent potential death from positional asphyxia, the RIPP Hobble training recommends that deputies use the "SWARM" technique on violent prisoners which instructs deputies to take a suspect down and then "apply a hobble restraint to the ankles and roll the subject into an upright seated position…. Position the subject so that he or she can lean back against a fixed object.  This helps relieve pressure on the diaphragm and make breathing easier.[101]

The JPSO trains deputies that the most important thing to avoid positional asphyxia is to get a person seated upright or on their side in the recovery or modified recovery position once it is safe to do so.[102]  The JPSO does not train regarding a specific amount of time that deputies can restrain a subject in the prone position, but that deputies should immediately put a subject into the recovery position once it is safe to do so to relieve the compression and dangers of positional asphyxia.[103]

In RIPP Hobble training, JPSO trains it deputies that they can control a suspect in the recovery position.[104]  JPSO trains deputies that a significant factor in gaining control of a person being restrained in the prone position is whether they have been handcuffed.[105]  JPSO trains its deputies that to decrease the risks associated with prone restraint, the remedy is simple – get pressure of the back.[106]  Sgt. Pizzolato acknowledged that if you have 6 deputies on a scene, even if the subject's legs are not restrained, this is

---

[99] R. Doc. 144-3 - Pizzolato Dep., p. 64:9-12 - (Q. When do you train them to put them in the recovery position?  A. I train them never to leave anybody in a prone position); *Id.* at 68:1-2 – (A. I train to not leave somebody in a prone position).
[100] *Id.* at 63:15-18.
[101] Ex. 10 – RIPP Hobble Training, pp. 46-47.
[102] R. Doc. 144-3 - Pizzolato Dep., 76:5-77:6.
[103] *Id.* at 70:24-71:5; 71:15-72:9.
[104] *Id.* at 62:25-63:2.
[105] *Id.* at 69:16-22.
[106] *Id.* at 66:4-8.

a sufficient number of deputies to restrain someone in the recovery position and avoid the dangers of positional asphyxia.[107]

Further, as a matter of policy, practice and custom, JPSO does not conduct a critical incident review or Internal Affairs investigation of in-custody deaths, including in this case, to determine whether deputies' actions complied with training and/or policy.[108] Instead, Sheriff Lopinto, in his official capacity, reviewed the videotape of the encounter between EP and JPSO deputies and found that the deputies actions were consistent with and complied with the JPSO's policies, practices, customs and training during their encounter with EP.[109] No deputy was disciplined or subject to any counseling or re-training as a result of their actions in this incident and their behavior was ratified by the Sheriff. As such, the actions of the Individual Defendants during their encounter with EP represent the actual, de facto policies, practices, customs and training of the JPSO in all respects.

**13.     The JPSO trains its Deputies in the use of the T.A.R.P. (Total Appendage Restrain Procedure) technique. *Id.*, at 73, 85, 87-95.**

It is disputed that the JPSO provides training on the T.A.R.P. The T.A.R.P. (Total Appendage Restraining Procedure) is referred to in JPSO Standard Operating Procedure 8 – Restraining Devices and Defensive Devices. However, JPSO does not provide training on its written policies and, instead, deputies are required to read and acknowledge that they understand the JPSO policies.[110] Further, the T.A.R.P. is not mentioned in the RIPP Hobble training.[111]

Further, as a matter of policy, practice and custom, JPSO does not conduct a critical incident review or Internal Affairs investigation of in-custody deaths, including in this case, to determine whether

---

[107] R. Doc. 144-3 - Pizzolato Dep., 90:21-94:19.
[108] Exhibit 1 - Blackwell Dep., 18:12-19:9; 23:12-25; 24:6-8; 26:2-9; 30:3-17; 56:9-13; R. Doc 21-4 – Lopinto Response to Interrogatory # 4 & 6, pp. 2-13.
[109] R. Doc. 150 – 150-5 – Plaintiffs' Motion for Partial Summary Judgment on Ratification.
[110] R. Doc. 144-3 - Pizzolato Dep., 30:4-13 (Q. I call that a read and sign. They have to acknowledge that they have gotten it, and they have to comply with it, correct? A. Yes. Q. And then during instruction, some policies may be brought up, but we don't have a class on the Jefferson Parish Sheriff's Office policies where you take a written test when you are done? A. Correct.); R. Doc. 142-3 - Pitfield Dep., 89:12-19; Ex. 4 - Vaught Dep., 72:6-19; Ex. 5 - Merhtens Dep., 29:1 – 30:6; R. Doc. 105-9 - Vega Dep., 59:14-25;
[111] Ex. 10 - RIPP Hobble Training Power Point.

deputies' actions complied with training and/or policy.[112] Instead, Sheriff Lopinto, in his official capacity, reviewed the videotape of the encounter between EP and JPSO deputies and found that the deputies actions were consistent with and complied with the JPSO's policies, practices, customs and training during their encounter with EP.[113]   No deputy was disciplined or subject to any counseling or re-training as a result of their actions in this incident and their behavior was ratified by the Sheriff.   As such, the actions of the Individual Defendants during their encounter with EP represent the actual, de facto policies, practices, customs and training of the JPSO in all respects.

**14.    The JPSO trains its Deputies in the use of the RIPP hobble (restraining device for dealing with combative persons).** *Id.*, at 35-39, 52-53, 87-95, 135.

It is undisputed that the JPSO provides some training on the "use of the RIPP Hobble."

It is disputed that the training is sufficient to avoid constitutional violations or that JPSO requires deputies to comply with this training based on the following:

Sgt. Pizzolato was JPSO's corporate representative on training who taught use of force, de-escalation, and the RIPP hobble.[114]  Sgt. Pizzolato's training did not include training for dealing with persons with intellectual disabilities, including autism, or compliance with the ADA.[115]  Instead, Sgt. Voltolina was the JPSO's corporate representative on training regarding compliance with the ADA/RA, including the identification and handling of persons with disabilities in crisis.[116] Sgt. Voltolina was also JPSO's corporate representative on "how to handle a person who has mental illness or disability, including autism and any accommodations provided to EP.[117]

Sgt. Voltolina testified that the JPSO does not provide training on the use of force or restraining procedures when dealing with autistic persons,[118] does not incorporate any training concerning the RIPP

---

[112] Ex. 1 - Blackwell Dep., 18:12-19:9; 23:12-25; 24:6-8; 26:2-9; 30:3-17; 56:9-13; R. Doc 21-4 – Lopinto Response to Interrogatory # 4 & 6, pp. 2-13.
[113] R. Doc. 150 – 150-5 – Plaintiffs' Motion for Partial Summary Judgment on Ratification.
[114] R. Doc. 144-3 - 7:8-8:25.
[115] *Id.* at 117:4-6 (Q. You don't provide any training on autism yourself. This isn't your topic of autism? A. Correct).
[116] R. Doc. 151-9 - Voltolina Dep., 18:2-14.
[117] *Id.* at 18:2-14.
[118] *Id.* at 44:14-45:3; 45:23-46:7; 63:1-8.

Hobble device when providing training on autistic persons,[119] and does not cover any specific risks to autistic persons of prone restraint or positional asphyxia due to autism.[120]

During RIPP Hobble training, JPSO trains deputies to never leave suspects in the prone position to avoid positional asphyxia.[121]  JPSO trains its deputies to place persons in the recovery position (on side or seated upright) after prone restraint to allow them to breathe to avoid positional asphyxia.[122]  With respect to the prone position, JPSO trains it deputies the following: 1) the prone position can cause respiratory compromise;[123] 2) placing weight on a person's back can restrict breathing and the bellows action;[124] 3) prone restraint causes the diaphragm muscle to be compressed against the ground which restricts breathing;[125] 4); this restriction on breathing can impact the exchange of gases ($O_2/CO_2$) in the lungs and result in oxygen deficiency;[126] and 5) when oxygen deficiency occurs, a person may struggle more violently.[127]

To prevent potential death from positional asphyxia, the RIPP Hobble training recommends that deputies use the "SWARM" technique on violent prisoners which instructs deputies to take a suspect down and then "apply a hobble restraint to the ankles and roll the subject into an upright seated position…. Position the subject so that he or she can lean back against a fixed object.  This helps relieve pressure on the diaphragm and make breathing easier."[128]

The JPSO trains deputies that the most important thing to avoid positional asphyxia is to get a person seated upright or on their side in the recovery or modified recovery position once it is safe to do so.[129]  The JPSO does not train regarding a specific amount of time that deputies can restrain a subject in

---

[119] R. Doc. 151-9 - Voltolina Dep., 87:11-18.
[120] *Id.* at 93:22-94:13; Ex. 2 - Debbaudt Report, pp. 7-10.
[121] R. Doc. 144-3 - Pizzolato Dep., 64:9-12 - (Q. When do you train them to put them in the recovery position?  A. I train them never to leave anybody in a prone position); *Id.* at 68:1-2 – (A. I train to not leave somebody in a prone position).
[122] *Id.* at 63:15-18.
[123] *Id.* at 65:18-20.
[124] *Id.* at 63:8-63:19.
[125] *Id.* at 66:19-67.
[126] *Id.* at 63:11-14.
[127] *Id. at* 68:14-23.
[128] Ex. 10 – RIPP Hobble Training, pp. 46-47.
[129] R. Doc. 144-3 - Pizzolato Dep., 76:5-77:6.

the prone position, but that deputies should immediately put a subject into the recovery position once it is safe to do so to relieve the compression and dangers of positional asphyxia.[130]

In RIPP Hobble training, JPSO trains it deputies that they can control a suspect in the recovery position.[131]  JPSO trains deputies that a significant factor in gaining control of a person being restrained in the prone position is whether they have been handcuffed.[132]  JPSO trains its deputies that to decrease the risks associated with prone restraint, the remedy is simple – get pressure of the back.[133]  Sgt. Pizzolato acknowledged that if you have 6 deputies on a scene. Even if the subject's legs are not restrained, this is a sufficient number of deputies to restrain someone in the recovery position and avoid the dangers of positional asphyxia.[134]

Sgt. Pizzolato acknowledged that everyone who is provided RIPP Hobble training is provided a RIPP Hobble.[135]  Deputies Pitfield, Vaught, Guidry and Vega had RIPP Hobble training but did not have a RIPP Hobble on the date of the incident.[136] Deputy Mehrtens received a RIPP Hobble training and received a RIPP Hobble but did not use it on the date of the incident.[137] Deputies Estrada and Gaudet had RIPP Hobble training and a RIPP hobble on the scene on the date of the incident but did not use it.[138] Further, as a matter of policy, practice and custom, JPSO does not conduct a critical incident review or Internal Affairs investigation of in-custody deaths, including in this case, to determine whether deputies' actions complied with training and/or policy.[139] Instead, Sheriff Lopinto, in his official capacity, reviewed the videotape of the encounter between EP and JPSO deputies and found that the deputies'

---

[130] R. Doc. 144-3 - Pizzolato Dep., 70:24-71:5; 71:15-72:9.
[131] *Id.* at 62:25-63:2.
[132] *Id.* at 69:16-22.
[133] *Id.* at 66:4-8.
[134] *Id.* at 90:21-94:19.
[135] *Id.* at *88*:14-23.
[136] R. Doc. 142-3 - Pitfield Dep., 48:4-14; Ex. 4 - Vaught Dep., 92:8-7; 94:20-21; Ex. 6 - Guidry Depo., 41:18-25; 43:20-25; R. Doc. 105-9 - Vega Depo., 164:22-165:8.
[137] Ex. 5 - Mehrtens Dep., 34:24-35:7.
[138] Ex. 7 - Estrada Dep., 24:16-23; Ex. 8 - Gaudet Dep., 69:7-15
[139] Ex. 1 - Blackwell Dep., 18:12-19:9; 23:12-25; 24:6-8; 26:2-9; 30:3-17; 56:9-13; R. Doc 21-4 – Lopinto Response to Interrogatory # 4 & 6, pp. 2-13.

actions were consistent with and complied with the JPSO's policies, practices, customs and training.[140]
No deputy was disciplined or subject to any counseling or re-training as a result of their actions in this
incident and their behavior was ratified by the Sheriff. As such, the actions of the Individual Defendants
during their encounter with EP represent the actual, de facto policies, practices, customs and training of
the JPSO in all respects.

15.     **The JPSO trains its Deputies in dealing with persons with emotional and intellectual
        challenges, including autistic persons.** *See* **Corporate Deposition of JPSO Sergeant
        Voltolina, attached as Exhibit 2.**

        It is undisputed that the JPSO provides some training on "dealing with persons with emotional
and intellectual challenges, including autism."

        It is disputed that the training is sufficient to avoid constitutional violations or that JPSO requires
deputies to comply with this training based on the following:

        In 2018, Sgt. Voltolina began preparing a training module entitled "Autism Awareness" for Crisis
Intervention Training (CIT).[141]  Sgt. Voltolina noted that he began working on the Autism Awareness
training in 2018 "because of the need for it in law enforcement" and there was an awareness at that time
that law enforcement would be interacting with persons with autism "and that created special needs and
situations for officers to be trained on."[142]  This training has been available since 2018, but it has never
been used by JPSO.[143]

        Sgt. Voltolina testified that the JPSO provided a training course on autism in conjunction with
Chantrell Hunt from the Jefferson Parish Coroner's Office (JPCO).[144]  This training is incorporated into
a 2-hour block of training during the CIT program which is a total a 40 or 48 hours depending on whether
the training is provided to either new recruits or veteran officers.[145]  Sgt. Voltolina testified that deputies

---

[140] R. Doc. 150 – 150-5 – Plaintiffs' Motion for Partial Summary Judgment on Ratification.
[141] R. Doc. 151-9 - Voltolina Dep., 34:11-35:1; 38:23-6; 40:25-42:8.
[142] *Id.* at 45:23-46:7.
[143] *Id.* at 44:14-45:3.
[144] *Id.* at 48:3-9.
[145] *Id.* at 100:22-101:9.

who are trained on these topics do not receive any policy guidance or written materials.[146]  The training is simply provided via PowerPoint on a screen.[147]  Sgt. Voltolina also testified that the JPSO provides access to other voluntary training on autism from outside venders like Autism Now.[148]  These Power Points are directed at the general statistics concerning autism and characteristics of autism.

However, the JPSO does not provide training on the use of force or restraining procedures when dealing with autistic persons,[149] does not incorporate any training concerning the RIPP Hobble device when providing training on autistic persons,[150] and does not cover any specific risks to autistic persons of prone restraint or positional asphyxia due to autism.[151]

The Individual Defendants did not have any training on dealing with autistic persons.[152]

After review of this training, Plaintiffs' expert, Dennis Debbaubt, opined that "it was both foreseeable and predictable that there will be encounters between members of the JPSO and persons with severe autism experiencing a sensory overload or 'outburst'… that "deputies may need to physically restrain."[153] Mr. Debbaubt opined that "JPSO deputies did not have proper training or guidance from appropriate policies on how to deal with persons suffering from autism, including the significant risks of utilizing prone restraint on such persons, especially if they are obese and non-verbal, and failed to make any reasonable and necessary accommodations for [E.P.]'s disability, contrary to nationally recognized standards for law enforcement encounters with persons suffering from autism."[154]

Further, as a matter of policy, practice and custom, JPSO does not conduct a critical incident review or Internal Affairs investigation of in-custody deaths, including in this case, to determine whether

[146] R. Doc. 151-9 - Voltolina Dep., 30:1-25.
[147] *Id.* at 30:23-25.
[148] *Id.* at 55:15-56-6.
[149] *Id.* at 44:14-45:3; 45:23-46:7; 63:1-8.
[150] *Id.* at 87:11-18.
[151] *Id.* at 93:22-94:13; Ex.10 - Debbaudt Report, pp. 7-10.
[152] R. Doc. 142-3 Pitfield Dep., 155:7-13; Ex. 4 - Vaught Dep., 75:3-12; Ex. 5 -Mehrtens Dep., 21:10-14; 42:3-24; Ex. 6 - Guidry Dep., 29:17-23; R. Doc 105-9 - Vega Dep., 76:18-21; Ex. 7 - Estrada Dep., 20:22-24; 21:17-20; Ex. 8 – Gaudet Dep., 48:12-15; 49: 11-17 (Deputy Gaudet testified that he received some training on autism during CIT classes but no such training from the coroner's office); Ex. 27 – Deputies' Training Resumes.
[153] Ex. 2 - Debbaubt Expert Report, p. 15, ¶ 5.
[154] Ex. 2 - Debbaubt Expert Report, p. 16, ¶ 7.

deputies' actions complied with training and/or policy.[155]  Instead, Sheriff Lopinto, in his official capacity, reviewed the videotape of the encounter between EP and JPSO deputies and found that the deputies actions were consistent with and complied with the JPSO's policies, practices, customs and training during their encounter with EP.[156]   No deputy was disciplined or subject to any counseling or re-training as a result of their actions in this incident and their behavior was ratified by the Sheriff. As such, the actions of the Individual Defendants during their encounter with EP represent the actual, de facto policies, practices, customs and training of the JPSO in all respects.

### Plaintiffs' Statement of Material Facts

1.    Sheriff Lopinto has testified under oath that the JPSO deputies acted in compliance with the policies, practice, customs and training of the JPSO during their interactions with E.P. He has approved and ratified their actions during their encounter with E.P. as being the de facto policy, practices, customs and training of the JPSO.[157]

2.    The assertion in Sheriff Lopinto's Memorandum in Support of Motion for Partial Summary Judgment that EP "never stopped resisting their (deputies) efforts with extreme violence" is directly contradicted by the security videotape from Laser Tag, which Sheriff Lopinto personally reviewed.[158] As the videotape reveals, it is untrue that EP "never stopped resisting their efforts with extreme violence" towards the deputies.[159]

3.    In addition, the assertion in Sheriff Lopinto's Memorandum in Support of Motion for Partial Summary Judgment that EP "never stopped resisting their (deputies) efforts with extreme violence" is directly contradicted by the following other evidence:

---

[155] Ex. 1 - Blackwell Dep., 18:12-19:9; 23:12-25; 24:6-8; 26:2-9; 30:3-17; 56:9-13; R. Doc 21-4 – Lopinto Response to Interrogatory # 4 & 6, pp. 2-13.
[156] R. Doc. 150 – 150-5 – Plaintiffs' Motion for Partial Summary Judgment on Ratification.
[157] R. Doc. 21-4 (Lopinto Discovery Responses, Response to Interrogatory No. 5) at 11-12; R. Doc. 150-150-5 (Plaintiffs' Motion for Partial Summary Judgment on Ratification).
[158] R. Doc 144-1 – Memo. in Support of MPSJ, p. 4.
[159] R. Doc. 154-3 – Laser Tag Security Video (Manually Filed) and can be assessed at this dropbox link: https://www.dropbox.com/scl/fo/13u3a5brur1alkvjcscmg/h?dl=0&rlkey=w4it5r13jbyhu1m240sxjwrf3

a.  Deputy Vaught said when he handcuffed EP, EP was not resisting and was "moving little bit but he wasn't trying to resist or pull his- -pull his arm away."[160] Detective Vaught said EP did not resist after he was handcuffed,[161] and he did not place EP in a recovery position after he was handcuffed because he went to speak with Mr. Parsa. Detective Vaught said he would not have left Deputy Pitfield alone if he did not believe it was safe to do so.[162]  Detective Vaught said it was possible for the 6 deputies to put EP in a recovery position.[163]

b.  Deputy Mehrtens said when he arrived, EP "was face down on the ground, he had two (2) sets of handcuffs and his hands were handcuffed behind his back, with Deputy Pitfield sitting on his buttocks area."[164]  Deputy Mehrtens said when he arrived, "there wasn't, there wasn't a struggle, it didn't appear to be a struggle."[165]  Deputy Mehrtens further stated, "I didn't see a struggle so there was no need for me to engage him."[166]

c.  Deputy Vega said when he arrived, Deputy Pitfield was on EP's "butt area," and he believed Deputy Pitfield had control.[167]  Deputy Vega switched positions with Deputy Pitfield to continue the prone restraint of EP.  During the transfer, Deputy Vega noted that EP was calm and not offering any resistance.[168]  While restraining EP in the prone position, Deputy Vega used a pain compliance technique on EP by elevating EP's handcuffed hands behind his back.[169]  While Deputy Vega denies he used a choke hold, he did acknowledge that he put his forearm underneath EP's chin, while connecting his hands.[170]  However, the forensic evidence indicates that Deputy Vega did utilize a forearm bar choke hold which impacted EP's ability to breathe.[171]

d.  Deputy Guidry said she was not actively involved in controlling EP, and when she arrived, Deputy Pitfield was trying to control EP.  Deputy Pitfield said he "pretty much" had EP under control and there was nothing she could do.[172]  Further, Deputy Guidry said if a person is in a recovery position and actively resisting, deputies would be able to control the person.[173]

e.  Deputy Gaudet did not see EP violently struggle between 14:00 – 15:12 on the video and he  did  not see a struggle when Deputy Vega exchanged positions with Deputy Pitfield at

[160] R. Doc. 155-4 - Vaught statement at 5.
[161] Ex. 4 - Vaught Dep., at 122.
[162] Id. at 123.
[163] Id. at 110.
[164] R. Doc. 155-2 - Mehrtens Statement, p. 3.
[165] Id.
[166] Id. at 4.
[167] R. Doc. 18-5 - Vega Statement, p. 2.
[168] Id. at 5.
[169] R. Doc. 155-2 - Mehrtens Statement at 6 ("Deputy Vega has technique, you know, when somebody starts struggling, you have handcuffs on them, you just begin to slightly elevate the arms so that you can just maintain control of the upper torso, um, he begins doing that….").
[170] R. Doc. 18-5 - Vega Statement at 6; R. Doc. 105-9 - Vega Dep., 129:16-130:24.
[171] R. Doc. 142-7 - Sperry Report Excerpt -  ("The physical findings at autopsy confirm that Vega utilized a "forearm bar" choke hold which significantly impacted [E.P.]'s airway and ability to breathe.")
[172] Ex. 6 - Guidry Dep., 49-50.
[173] Id. at 74.

16:00 on the video.[174]

f.   Deputy Estrada testified that when he arrived, two detectives, Deputy Vega and Deputy Pitfield were already at the scene.[175]   Deputy Estrada said he did not see a struggle where he believed Deputy Pitfield needed his help.[176]   Deputy Estrada said he did not see a struggle when Deputy Vega transitioned with Deputy Pitfield.[177]

g.   Sergeant Dowling who performed a homicide investigation of this incident and was involved in taking many of the deputies' statements also acknowledged that EP was calm during many periods of time.[178]

h.   Sheriff Lopinto admitted after watching the tape that there were several occasions during the prone restraint where the deputies could have placed EP in the recovery position including: 1) after Detective Vaught arrived and assisted Pitfield in cuffing EP behind his back;[179] 2) after other deputies arrived and there were five officers on the scene during video between 14:33 – 15:00;[180] 3) on the video tape from 15:00 – 15:28, Sheriff Lopinto stated that it was not physically impossible to place EP into the recovery position and noted that the issue was "whether or not it was reasonable" to place him in the recovery position;[181]   4) on the video tape from 16:00 – 16:29, Sheriff Lopinto acknowledged that there was no resistance which would preclude placing EP in the recovery position[182] and that "there is nothing other than their [deputies] observances that precludes them from putting him in the recovery position;"[183] and 5) after review of the video tape, Sheriff Lopinto provided the following response with respect to whether EP should have been placed in the recovery position: "And, again as you are pausing it second by second by second, it makes it look like there is numerous opportunities, but if you let it run out from the changes of, you know, his reactions 30 seconds apart, 30 seconds apart, you know, I'm going to tell you no at this moment, yes at this moment.  No at this moment, yes at this moment, right. And so, you know, you have the ability to pause every second and ask me that same question, and I'm going to go back to the one where he is resisting and say this is why they weren't." [184] Significantly, Sheriff Lopinto could not state whether any movements by EP while restrained were efforts to resist, efforts to breathe, or were caused by a lack of oxygen caused by the effects of the prone restraint on an obese suspect.[185]

---

[174] Ex. 8 - Gaudet Dep., 96-98.
[175] Ex. 7 - Estrada Dep., 93.
[176] *Id.* at 95.
[177] *Id.* at 100.
[178] R. Doc. 155-5 - Dowling Dep. at 112:14-19 ("Q. The interviews, like Deputy Vega, when he gave his interview, he said that when they moved to switch out, that Mr. Parsa wasn't offering any resistance, correct? A. That's when they realized that he had stopped resisting, yes."); *Id.* at 122:6-8 ("Q. And doesn't he state when he got there he put his handcuff on, and there was no resistance? A. No resistance to the handcuff."
[179] R. Doc. 150-5 - Lopinto Dep., 222.
[180] *Id.* at 226.
[181] *Id.* at 211-215.
[182] *Id.* at 217-218.
[183] *Id.* at 225.
[184] *Id.* at 235.
[185] *Id.* at 235-237.

4.     The JPSO has written policies which are outdated, unreasonable, inadequate and fail to confirm to generally accepted law enforcement standards and practices.[186]  In particular, the policies fail to identify and provide policy guidance regarding positional asphyxia, prone restraint, the Americans with Disabilities Act, dealing with persons with intellectual disabilities/autism and the investigation of critical incidents and officer misconduct.  Given the known dangers of the risk of death during prone law enforcement restraint, numerous national law enforcement groups and publications have provided written policy guidance on these specific issues which were known and available to law enforcement, such as the JPSO.[187]

5.     Sheriff Lopinto acknowledged that the dangers of prone restraint and positional asphyxia have been known to law enforcement since the 1990s[188] which is consistent with the available law enforcement literature.[189]

6.     The JPSO does not provide training on its written policies.  Instead, deputies are required to read and acknowledge that they understand the policies.[190]

7.     JPSO SOP 8 entitled Restraining Devices & Defensive Devices Policy requires deputies to take necessary precautions to protect the lives and safety of persons in custody and requires the use of the Total Appendage Restraining Procedure (TARP) with extremely violent prisoners.[191]

---

[186] R. Doc. 142-8 - Noble Expert Report, ¶¶ 77.
[187] Ex. 16 - United States Department of Justice, National Institute of Justice, *Positional Asphyxia—Sudden Death*, June 1995; Ex. 19 - INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE, TRAINING KEY NO. 678, AUTISM: MANAGING FIELD CONTACT (2013); Ex. 17 - IACP LAW ENFORCEMENT POLICY CENTER, MODEL POLICY, CONCEPTS AND ISSUES PAPER, NEED TO KNOW – INTERACTIONS WITH INDIVIDUALS WITH INTELLECTUAL AND DEVELOPMENTAL DISABILITY (AUGUST 2017); Ex. 18 - IACP LAW ENFORCEMENT POLICY CENTER, MODEL POLICY, CONCEPTS AND ISSUES PAPER, AND NEED TO KNOW – INVESTIGATION OF OFFICER-INVOLVED SHOOTING AND OTHER SERIOUS INCIDENTS (APRIL 2019).
[188] R. Doc. 150-5 - Lopinto Dep., 64:19-65:20.
[189] R. Doc. 142-8 - Noble Expert Report, ¶¶ 43-51.
[190] R. Doc. 144-3 - Pizzolato Dep., 30:4-13 (Q. I call that a read and sign. They have to acknowledge that they have gotten it, and they have to comply with it, correct?  A. Yes. Q. And then during instruction, some policies may be brought up, but we don't have a class on the Jefferson Parish Sheriff's Office policies where you take a written test when you are done?  A. Correct.); R. Doc. 142-3 - Pitfield Dep., 89:12-19; Ex. 4 - Vaught Dep., 72:6-19; Ex. 5 - Merhtens Dep., 29:1 – 30:6; R. Doc. 105-9 - Vega Dep., 59:14-25.
[191] Ex. 9 – JPSO SOP 8 – Restraining Devices, 8(a) and 8(d)

8.      Prior to 2018, JPSO knew that its officers would encounter autistic persons in the field and needed training on how to deal with autistic persons.[192]

9.      JPSO's training notes that: 1) according to the CDC, 1 in 59 children have autism; 2) according to the Autism Group, 1 in 40 children have autism; and 3) autism is 4 times more likely in males.[193]

10.     Autistic persons, like EP, are at increased risk of death from positional asphyxia based on obesity, inability to communicate and underdeveloped trunk muscles.[194]

11.     The JPSO provides no training on restraining persons with autism,[195] does not incorporate anything about the RIPP Hobble device training with autistic persons,[196] and does not cover any specific risks to autistic persons of prone restraint or positional asphyxia due to autism.[197]

12.     The Individual Defendants did not have any training on autism.[198]

13.     From October 26, 2017 through March 2, 2021, there were 19 in-custody deaths involving persons in the custody of JPSO. JPSO did not conduct an Internal Affairs investigation or critical incident review of these in-custody deaths to determine compliance with policies, practices, customs or training.[199]

14.     There was no Internal Affairs investigation regarding the death of E.P.[200]

---

[192] R. Doc. 150-5 - 27:13-17 (Q…You knew by 2014 that people with intellectual disabilities are becoming an issue with law enforcement, correct? A. I think it was before that, also, but yeah.). R. Doc. 151-9 - Voltolina Dep., p. 46:2-18; 110:4-111:6 (Q. Okay. Would you agree that autism is a prevalent issue that officers are likely to encounter in their careers in Jefferson Parish? A. I think any law enforcement officer has the potential of dealing with someone with autism when one in 54 males are diagnosed) (Q. So it is important for JPSO officers to be trained in how to handle persons with autism and the particular risk factors we've discussed today, because they may interact with those kind of persons in Jefferson Parish, agreed? A. Yes. That's why we train them).

[193] Ex. 28 – Autism Awareness Power Point.

[194] Ex. 3 – Dr. Sperry Report at 9-13; Ex. 2 - Debbaubt Report at 7-12, 15-17; Ex. 19 - IACP Training Key # 678.

[195] R. Doc. 151-9 – Voltolina Dep., 63:1-8 (Q. Going back to the content of Deescalation with Autism from the coroner's office, does that training deal specifically with restraint of persons with autism? A. No.).

[196] *Id.* at 87:11-18.

[197] *Id.* at 93:22-94:13.

[198] R. Doc. 142-3 Pitfield Dep., 155:7-13; Ex. 4 - Vaught Dep., 75:3-12; Ex. 5 -Mehrtens Dep., 21:10-14; 42:3-24; Ex. 6 - Guidry Dep., 29:17-23; R. Doc 105-9 - Vega Dep., 76:18-21; Ex. 7 - Estrada Dep., 20:22-24; 21:17-20; Ex. 8 – Gaudet Dep., 48:12-15; 49: 11-17 (Deputy Gaudet testified that he received some training on autism during CIT classes but no such training from the coroner's office); Ex. 27 – Deputies' Training Resumes.

[199] R. Doc. 21-4, Lopinto Response to Interrogatory No. 4 at 2-11.

[200] Ex. 1 - Blackwell Dep., 56:9-13.

15.     Sgt. Keith Dowling was assigned by JPSO to perform the homicide investigation regarding the death of EP.[201]  Sgt. Dowling is a member of the Gun Violence Unit and not the Homicide Unit.[202]

16.     Prior to working at the JPSO, Sgt. Dowling worked for: 1) St. Bernard's Parish Sheriff's Office and was the subject of a couple of excessive force complaints;[203] and 2) St. Tammany Parish Sheriff's Office where he was the subject of numerous complaints and was discharged.[204]  Further, while employed by St. Tammany, Sgt. Dowling was arrested for stalking his ex-wife's boyfriend by phone[205] and received a citation for created a disturbance.[206]

17.     On March 1, 2019, Sgt. Dowling, along with Deputies Vega, Baldassaro and Broussard, were involved in an incident with Jacobi Cage which resulted in a lawsuit for civil rights violations and excessive force.[207]  This case remained pending from 2/24/20 – 10/4/21 when it was settled by the Sheriff.[208]  During the time when Sgt. Dowling was the lead investigator regarding the events which led to the death of E.P, which involved Deputy Vega, both Sgt. Dowling and Deputy Vega were Co-Defendants in the civil rights lawsuit filed by Jacobi Cage.[209]

18.     With respect to the investigation of the death of EP, Sgt. Dowling acknowledged that his investigation was focused on whether the deputies committed a crime.[210]  Sgt. Dowling acknowledged that his report did not determine whether the deputies violated the policies, practices, customs and training of the JPSO or whether there needed to be changes made to the policies and/or training, but was

---

[201] R. Doc. 155-5 - Dowling Dep., 62:24-65:9.
[202] R. Doc. 150-5 - Lopinto Dep., 136:11-137:16
[203] R. Doc. 155-5 – Dowling Dep., 15:10-18
[204] Ex. 25 - Dowling Discharge Papers from St. Tammany Sheriff's Office reveal the following disciplinary actions: 1) 6/23/09 – Damage to Patrol Car for which he received a warning; 2) 4/5/09 – 5/9/09 – Willful Disregard of Agency Rules for failing to qualify with his weapon for which he was suspended for 40 hours; 3) 5/10/09 – Criminal/Immoral Conduct for a disturbance with his wife for which he was suspended for 40 hours; 4) 6/29/09 – Unbecoming Conduct; and 5) 8/13/09 – Discourteous Treatment of the Public, Incompetence, and Unprofessional Conduct for which he was terminated.
[205] R. Doc. 155-5 - Dowling Dep., 24:14-17.
[206] *Id.* at 26:4-27:8.
[207] R. Doc. 155-5 - Dowling Dep., 49:15-50:6; *Cage v. Lopinto, et al.,* 2:20-cv0658 (ED LA 2/24/20)
[208] *Id.* at 56:7-9.
[209] *Id.* at 49:15-50:6; *Cage v. Lopinto, et al.,* 2:20-cv0658 (ED LA 2/24/20)
[210] *Id.* at 66:5-17; 90:25-91:2.

focused on whether or not the deputies had committed a crime.[211]  During Dowling's investigation, he did not investigate whether the deputies carried RIPP Hobbles or whether the deputies should have utilized the Total Appendage Restraining Procedure (TARP).[212]

19.     Prior to the death of E.P. on January 19, 2020, JPSO was on notice regarding the serious risk of in-custody death by positional asphyxia involving JPSO use of restraints. JPSO has been sued in the past for cases involving death by positional asphyxia, including *Williams v. Lee*, Case No. 89-11943 (Civil District for the Parish of Orleans) (judgment in favor of Plaintiff); *Sullen v. Lee, et al.*, Case No. 95-0767 (USDC ED LA) (settled); *Kahn v. Lee*, Case No. 07-7272 (USDC ED LA) (SJ for Defendant); *Boute v. Lopinto*, Case No. 19-9613 (USDC ED LA) (settled).  The JPSO did not conduct an Internal Affairs investigation or critical incident review of any of the previous in-custody death cases.[213]

20.     On June 19, 1987, Joel Williams died of positional asphyxia while in the custody of JPSO deputies, a state court lawsuit was filed and judgment was entered against the JPSO Defendants.[214] There was no Internal Affairs investigation of this incident.[215]

21.     On March 13, 2004, Rene Alexander died of positional asphyxia while in the custody of the JSPO, a federal civil rights lawsuit was filed and the case settled.[216]  There was no Internal Affairs investigation of this incident. .[217]

22.     On May 10, 2018, Keevan Robinson was a 22-year-old African-American who died during a physical altercation with JPSO officers on May 10, 2018.[218]  Mr. Robinson's cause of death was Compression Asphyxia and Blunt Force Injuries and the manner of death was ruled a Homicide.[219]

---

[211] *Id.* at 73:8-14
[212] *Id.* at 107:13-17; 107:25-108:2
[213] Ex. 1 - Blackwell Dep., 27:24-16; 110:9-23.
[214] Ex. 22 - *Williams v. Lee, et al.,* 633 So.2d 976, La.App. 4 Cir., Mar. 15, 1994, *writ denied,* 637 So.2d 502 (June 1994); Case No. 89-11943 (Civil District for the Parish of Orleans) – Judgment.
[215] Ex. 1 - Blackwell Dep., 27:24-16; 110:9-23.
[216] Ex. 23 - *Sullen v. Lee,* Case No. 85-0767 (ED LA) – Complaint.
[217] Ex. 1 - Blackwell Dep., 27:24-16; 110:9-23.
[218] Ex. 20 - Keeven Robinson Coroner's Report, p. 1.
[219] *Id.*

During the course of the physical altercation with JPSO deputies, Mr. Robinson was restrained in the prone position and struck multiple times.[220]  As a result of the death of Keevan Robinson, a lawsuit was filed against the JPSO and numerous deputies.[221]  This case was settled by JPSO.[222]  There was no Internal Affairs investigation of this incident. [223] The JPSO did not perform an Internal Affairs investigation of this case to determine whether the deputies complied with the JPSO's policies, practice, customs or training.[224]  Sheriff Lopinto did not review the Keeven Robinson homicide investigation.[225]

23.    Sheriff Lopinto did not review the homicide investigation involving E.P.[226] Sheriff Lopinto did not review the statements of the deputies and the Plaintiffs concerning this incident.[227] Sheriff Lopinto did not even review the autopsy report regarding E.P.[228] He did review the videotape of the encounter between EP and JPSO deputies and approved of and ratified their actions as consistent with and in conformity with JPSO policies, practices, customs and training.

RESPECTFULLY SUBMITTED,

WILLIAM MOST (BPR # 36914)
Most & Associates
201 St. Charles Ave., Ste. 114 #101
New Orleans, LA 70170
Tel: (504) 509-5023
williammost@gmail.com

/s/ Andrew C. Clarke
Andrew C. Clarke (TN BPR # 15409)
The Cochran Firm Midsouth
One Commerce Square, Suite 1700
(901) 523-1222 (Telephone)
aclarke@cochranfirmmidsouth.com

---

[220] Ex. 21 - Keeven Robinson Homicide Report, pp. 38-39, 42, 54, 85, 88.
[221] Ex. 24 - *Boute v. Lopinto*, Case No. 19-9613 (USDC ED LA))
[222] R. Doc. 150-5 0 Lopinto Dep., 61:9-18.
[223] Ex. 1 - Blackwell Dep., 27:24-16; 110:9-23
[224] R. Doc. 21-3, Lopinto Discovery Response at 7.
[225] *Id.* at 6:6-9; 59:24-61:8
[226] R. Doc. 150-5 - Lopinto Dep., 5:24-6:5; 150:21-151:3.
[227] *Id.* at 137:17-138:24; 176:9-177:1.
[228] *Id.* at 81:1-3.