UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CASE NO.  2:21-cv-00080

DONNA LOU and DAREN PARSA, on their own behalf and
on behalf of their deceased minor child, E.P.

Plaintiffs,


VERSUS


SHERIFF JOSEPH P. LOPINTO, III, CHAD PITFIELD, RYAN
VAUGHT, STEVEN MEHRTENS, SHANNON GUIDRY, NICK VEGA,
MANUEL ESTRADA, MYRON GAUDET, JOHN DOES 1-3,
VICTORY REAL ESTATE INVESTMENTS LA, LLC D/B/A
WESTGATE SHOPPING CENTER, ABC INSURANCE COMPANY,
and XYZ INSURANCE COMPANY,

Defendants.


    VIDEOTAPED 30(b)(6) DEPOSITION of the

Jefferson Parish Sheriff's Office, through its

designated representative, CAPTAIN ROBERT L.

BLACKWELL, given in the above-entitled cause,

pursuant to the following stipulation, before

Sandra P. DiFebbo, Certified Shorthand Reporter, in

and for the State of Louisiana, at 131 Airline

Drive, Suite 201, Metairie, Louisiana, on the 15th

day of November, 2022, commencing at 1:07 PM.

```
 1    APPEARANCES:
 2              THE COCHRAN FIRM MID-SOUTH
                BY:  ANDREW CLARKE,
 3              ATTORNEY AT LAW
                One Commerce Square
 4              40 South Main, Suite 1700
                Memphis, Tennessee  38103
 5              Representing the Plaintiffs
 6
                MARTINY & ASSOCIATES
 7              BY:  FRANZ ZIBILICH,
                ATTORNEY AT LAW -and-
 8              JEFFREY D. MARTINY,
                ATTORNEY AT LAW
 9              131 Airline Drive
                Suite 201
10              Metairie, Louisiana  70001
                -and-
11              LINDSEY M. VALENTI, ATTORNEY AT LAW
                LEGAL ADVISOR
12              1233 Westbank Expressway
                Building B, Fifth Floor
13              Harvey, Louisiana  70058
                Representing JPSO Defendants
14
15              THOMPSON, COE, COUSINS & IRONS, LLP
                BY:  MARK HILL,
16              ATTORNEY AT LAW
                601 Poydras Street
17              Suite 1850
                New Orleans, Louisiana  70130
18              Representing Victory Real Estate
                Investments LA, LLC, and Westgate
19              Shopping Center
20
      Videographer:  Aaron Palmer, Depo-Vue
21
      Also Present:  Tim Anclade, Michael Todd Highfill
22
      Reported By:
23
                Sandra P. DiFebbo
24              Certified Shorthand Reporter
                State of Louisiana
25
```

    E X A M I N A T I O N          I N D E X

                                     Page

BY MR. CLARKE:                        5


    E X H I B I T                  I N D E X
                            Page

Exhibit 116                          7
Exhibit 117                          9
Exhibit 118                          19
Exhibit 119                          19
Exhibit 120                          19
Exhibit 121                          69
Exhibit 122 (Additional IA files)

1                    S T I P U L A T I O N

2

3              It is stipulated and agreed by and

4      between Counsel for the parties hereto that the

5      deposition of the Jefferson Parish Sheriff's

6      Office, through its designated representative,

7      CAPTAIN ROBERT L. BLACKWELL, is hereby being taken

8      pursuant to the Federal Rules of Civil Procedure

9      for all purposes in accordance with law;

10               That the formalities of reading and

11     signing are specifically waived;

12               That the formalities of sealing,

13     certification, and filing are hereby specifically

14     waived.

15               That all objections, save those as to

16     the form of the question and responsiveness of the

17     answer are hereby reserved until such time as this

18     deposition or any part thereof is used or sought to

19     be used in evidence.

20                         * * * * *

21               Sandra P. DiFebbo, Certified Shorthand

22     Reporter, in and for the State of Louisiana,

23     officiated in administering the oath to the

24     witness.

25

```
 1              CAPTAIN ROBERT L. BLACKWELL, having
 2      been first duly sworn, was examined and
 3      testified on his oath as follows:
 4          MR. ZIBILICH:
 5              Before we get started, it is my
 6          understanding that there was an issue
 7          with some documents that Mr. Martiny
 8          turned over to you relative to some
 9          redactions.
10          MR. CLARKE:
11              We have not gotten those yet.
12          MR. ZIBILICH:
13              Are we squared away?
14          MR. CLARKE:
15              We're getting square.  I think we'll
16          be square by the end of the deposition.
17          What happened is you -- when you had
18          filed the original documents with IA,
19          there were some that were subject to
20          privilege that you said it was ongoing
21          or something.  I talked to him before
22          the depo, and he went checked them and
23          found --
24          MR. ZIBILICH:
25              I just want to make sure y'all are
```

```
 1                    working it out.
 2              MR. CLARKE:
 3                   Yeah.  He has produced me the e-mail
 4              files.  He is going to get a copy of
 5              them, and he is redacting them, and I'm
 6              going to make them exhibits.
 7              MR. ZIBILICH:
 8                   It is my understanding that's what
 9              they are working on now.
10              MR. CLARKE:
11                   Yes.  I've already seen them, so
12              it's not like I'm going to get them.
13        EXAMINATION BY MR. CLARKE:
14            Q.   Would you please state your name for the
15        record.
16            A.   Robert L. Blackwell.
17            Q.   And are you employed by JPSO?
18            A.   I am.
19            Q.   And do you have a title?
20            A.   I'm a captain.  Commander of Internal
21        Affairs Division.
22            Q.   Captain Blackwell, my name is Andy
23        Clarke.  I met you just briefly right before the
24        deposition.  Have you given depositions before?
25            A.   I've never given.  I've been in a bunch
```

```
 1   of them, though.
 2        Q.   Let's just go over some ground rules.
 3   Obviously, you understand your testimony here is
 4   under oath subject to the penalty of perjury,
 5   correct?
 6        A.   Yes, sir.
 7        Q.   We're here on a case that has been filed
 8   against JPSO and some of the deputies and the owner
 9   of the property, and I'm just here to ask questions
10   about certain topics that you've been designated
11   on.  Okay?
12        A.   Yes, sir.
13        Q.   Under the Rules of Civil Procedure, we
14   have something called a 30(b)6 deposition, which is
15   because a corporation or entity can't talk, we can
16   supply topics, and they have to designate somebody
17   the most knowledgeable about particular topics.  Is
18   that your understanding of why you are here today?
19        A.   Yes, sir.
20        Q.   If you'll look at -- I marked as Exhibit
21   Number 116 a copy of the notice.  If you'd just
22   look at that briefly, the next page.  You see the
23   two topics on Page 2, Number 3, Internal Affairs/
24   Professional Standards, and there is a paragraph?
25        A.   Yes, sir.
```

1       Q.   And then Number 7 is Early Intervention

2  System or Early Warning Files.  You see that?

3       A.   Yes, sir.

4       Q.   Is that your understanding, you have been

5  presented to prepare -- I mean to provide testimony

6  on those topics?

7       A.   Yes, sir.

8       Q.   Did you do anything to prepare yourself

9  for the deposition?  Look over documents or

10  policies or anything?

11       A.   I did.  I met with the attorneys.

12       Q.   Anything that you talked with the

13  attorneys about, I'm not asking that, but did you

14  actually look through documents?

15       A.   SOP-22.

16       Q.   And what I've also put in front of you

17  was previously marked Exhibit Number 19.  See if

18  that is the policy we're talking about.  I think

19  that's the Code of Conduct there.

20       A.   Yeah.  This is the Code of Conduct.  This

21  is all our SOP.  SOP-22 is the one that guides our

22  office.

23       Q.   Right.  I would get that out.  Turn to

24  it, if you don't mind.

25       A.   Got it.

```
 1        Q.   Yes, sir.  You reviewed that prior to
 2   this deposition?
 3        A.   Yes, sir.
 4        Q.   Did you review JPSO's interrogatory
 5   responses?
 6        A.   The interrogatories?  No.
 7        Q.   I think what I marked there as Exhibit
 8   117 is a copy of the JPSO's --
 9             MR. CLARKE:
10                  You need a copy, Franz?
11             MR. ZIBILICH:
12                  No.  Thanks.
13   BY MR. CLARKE:
14        Q.   Let's just do it this way.  I'm going to
15   get you to -- this has information about Internal
16   Affairs in it.  If we have to refer to it, some
17   questions we'll ask. And if you -- if I ask you a
18   question, and you need to review something else to
19   give an answer, let me know.  All right?
20        A.   Yes, sir.
21        Q.   It is not a memory contest, but we have
22   those in there, and I'm going to ask you some
23   questions about those.
24        A.   Okay.
25        Q.   So we are going to start out with the
```

```
 1    topic of Internal Affairs.  What is the function of
 2    Internal Affairs at JPSO?
 3          A.   Our function is to handle any complaints
 4    that come in on employees of the sheriff's office.
 5    It could be from, you know, a person just calling
 6    us or walking into our office or something similar
 7    to that.
 8          Q.   And does Internal Affairs work with
 9    training or the people who write policies or are
10    they kind of an independent division?
11          A.   I do not write policy, no, sir.
12          Q.   Does the Internal Affairs commander write
13    policy?  You're the county -- I mean you are the
14    parish right now.  Does JPSO's Internal Affairs
15    Division have any input in writing policies?
16          A.   We do -- we do not write the policies,
17    no, if that's what you are asking me.  Our legal
18    department does that.
19          Q.   What about training?  Does Internal
20    Affairs have any duties where they're assigned to
21    do with training?
22          A.   Yes.  We do a segment in the training
23    academy for recruits.  It is usually a two-hour
24    segment.
25          Q.   And what is the title of that topic?
```

1     A.   Well, the instructors themselves actually
2  go through the SOP and stuff with them.  We just go
3  in there to refresh.  Let them know how an
4  investigation takes place, what is expected of
5  them, if they're called in, in an investigation.
6     Q.   And I think I got you, but let me
7  paraphrase that.  During training academy, you give
8  -- Internal Affairs goes there and gives a lecture
9  or a training block on Internal Affairs where they
10  let you know what Internal Affairs does and your
11  rights and things like that?
12     A.   Correct.
13     Q.   And so you do actually provide training.
14  Okay.  Now, how does -- does Internal Affairs
15  review only complaints or do they review any use of
16  force by the department?
17     A.   Any discipline is reviewed by the
18  Internal Affairs Division.
19     Q.   You had to review it before discipline,
20  right?
21     A.   Correct.
22     Q.   Let's just go through the process of
23  Internal Affairs.  If you need to look at the
24  policy, let me know.  It's my understanding, in
25  reading this policy, is that complaints are

1    investigated only when you get a complainant come

2    in and make a complaint?

3         A.   No.  If a supervisor or another -- a

4    supervisor -- say it's a road person, jail person,

5    or something, finds a violation that they've done

6    something wrong, then they can start a complaint.

7    They're the complainant.

8         Q.   You can have an administrative start --

9         A.   Many different ways, yes.

10        Q.   If somebody comes in that does a

11   complaint, do they have to complete any type of

12   form or put their statement under oath?

13        A.   We do not put them under oath, no, sir.

14        Q.   Do you require them to fill out a written

15   statement?

16        A.   We take a recorded statement.

17        Q.   So how does the process happen.  Let's

18   say I'm going to go make a complaint against JPSO.

19   Do I go down to headquarters?

20        A.   No.  There is a few different ways.  Most

21   of it comes through telephone.  People call our

22   office or whatever.  Depending on the

23   circumstances, we'll either have them come in or

24   they can e-mail us at iad@jpso.com, put it in

25   writing to us.  If it is something more serious,

```
 1    we'll have them come -- we say, ma'am, sir, we need
 2    you to come into the office to give -- to provide a
 3    taped statement to us.
 4         Q.   So you can get a call like somebody was
 5    discourteous to me?
 6         A.   Correct.
 7         Q.   You can handle that with an e-mail
 8    through the supervisory chain, correct?
 9         A.   Yes, sir.
10         Q.   If somebody calls in and has a complaint
11    saying, "I was beat up.  I was injured," that is
12    the type of complaint that you would want them to
13    come in and give a statement, correct?
14         A.   Yes, sir.
15         Q.   So it's kind of during intake you kind of
16    categorize, for lack of a better word, the type of
17    complaint it is?
18         A.   Yes, sir.
19         Q.   Are there any issues that are automatic-
20    ally investigated by Internal Affairs regardless of
21    when there is a complaint?
22         A.   Only if -- when we're notified by a
23    supervisor or something of something, yes, we would
24    take the initiative to investigate it.
25         Q.   Let me find out a little bit about your
```

1    background.  How long have you been with JPSO?

2         A.   It will be 22 years in January.

3         Q.   And you are a captain now?

4         A.   Correct.

5         Q.   When did you go to Internal Affairs or

6    tell me when you were involved with Internal

7    Affairs?

8         A.   I took over command of Internal Affairs

9    the Sunday after Thanksgiving of last year, so '21.

10   I think it was the 28th or 29th of November.  I had

11   spent five years in Internal Affairs a time before,

12   though.  I had a gap in between.  I was actually in

13   the legal department, and then I took over.

14        Q.   You were with him?

15        A.   Yes, sir, and then I took over as

16   commander.  I actually went in October.  I took

17   over command at the end of November.

18        Q.   What was your rank when you were in there

19   for that five-year stint?

20        A.   I was a sergeant.

21        Q.   Who was your supervisor?

22        A.   Major William Boudreaux.

23        Q.   Boudreaux.  Okay.  I would have butchered

24   that.  Franz, wasn't even looking at me to butcher

25   a name.

```
 1              MR. ZIBILICH:
 2                   I mean, if you can't do Boudreaux.
 3              I mean, that's like Smith.
 4    BY MR. CLARKE:
 5         Q.   When you went to Internal Affairs as a
 6    sergeant, did they send you to any schooling to
 7    learn how to do Internal Affairs?  Was that just
 8    detective --
 9         A.   Initially, it was just on-the-job
10    training with a pad with a senior detective, a
11    sergeant.
12         Q.   Now, we have SOP-22 that JPSO uses.  Are
13    you aware of any other Internal Affairs policies
14    that any other departments use?
15         A.   Am I -- no, sir.
16         Q.   So you don't know whether or not this is
17    in compliance with IACP policies or PERF policies
18    or CALEA standards, correct?
19         A.   No, sir.
20         Q.   Your knowledge of Internal Affairs is
21    through working at JPSO, working in Internal
22    Affairs, and now being the commander, correct?
23         A.   Correct.
24         Q.   Did you do any research at any time when
25    you were sergeant or commander about the applicable
```

```
 1   requirements of an Internal Affairs policy or did
 2   you just utilize the policy that was in place?
 3        A.   I just utilized the policy that was in
 4   place, sir.
 5        Q.   And this policy, if you look at SOP-22,
 6   was written in 1982 and revised in 2007?
 7        A.   Correct.
 8        Q.   In law enforcement, 13 years, you know --
 9   well, I'll just strike that.
10             MR. ZIBILICH:
11                  Thank you for the editorial
12               noncommittal.
13             MR. CLARKE:
14                  It just goes with my theme.
15             MR. ZIBILICH:
16                  I understand.  That's the reason why
17               I'm sitting here, to pay attention to
18               such matters.
19   BY MR. CLARKE:
20        Q.   Does Internal Affairs have any -- well,
21   let me go back to general questions first.  Have
22   you ever heard of Internal Affairs being used to
23   evaluate use of force reports?
24        A.   No. Have I ever heard of -- I don't
25   understand the --
```

1     Q.    Other departments.

2     A.    I have heard of other departments, yes.

3     Q.    You know what a use of force report is?

4     A.    I've never seen one.

5     Q.    But do you understand what I'm saying --

6     A.    Yes, sir.

7     Q.    -- that other departments use use of

8  force reports?

9     A.    Yes, sir.

10    Q.    Is it your understanding that use of

11  force reports, when an officer engages in anything

12  or whatever the criteria is on their policy, that

13  they fill out a separate form, a use of force

14  report that is somehow evaluated through his chain

15  of command?

16    A.    Yes, sir.

17    Q.    JPSO puts everything in their incident

18  report, correct?

19    A.    Correct, sir.

20    Q.    They don't do a separate use of force

21  report?

22    A.    Correct.

23    Q.    With respect to use of force reports,

24  have you -- do you have any knowledge of what other

25  departments -- how they utilize them, and then

```
 1    Internal Affairs should review every use of force
 2    report?  Have you ever heard of that in law
 3    enforcement?
 4         A.   No, sir.
 5         Q.   So Internal Affairs at JPSO would only
 6    look at any type of use of force incident if there
 7    was a complaint made by a person, correct?
 8         A.   Yes, sir.
 9         Q.   Or a supervisor decided to initiate an
10    Internal Affairs complaint?
11         A.   Yes, sir.
12         Q.   Does Internal Affairs investigate all
13    deaths in custody?
14         A.   No, sir.
15         Q.   Have you ever heard of departments that
16    require or policies that require all use of -- all
17    critical incidents of injury or death must be
18    investigated by Internal Affairs?
19              MR. ZIBILICH:
20                   Object to the form.  You can answer
21                it.
22              THE WITNESS:
23                   Yes, I have.
24    BY MR. CLARKE:
25         Q.   Do you know why JPSO doesn't do that?
```

```
 1              MR. ZIBILICH:
 2                   Object to the form.  You can answer,
 3              if you can.
 4              THE WITNESS:
 5                   I do not, sir.
 6   BY MR. CLARKE:
 7       Q.    Are you aware that other departments do
 8   that?
 9       A.    Yes, sir.
10       Q.    Now, Internal Affairs, while they can
11   investigate things based on a complaint from a
12   citizen or from somebody in the office, the sheriff
13   can tell you to do an Internal Affairs complaint,
14   right?
15       A.    Correct.
16       Q.    On anything?
17       A.    Correct.
18       Q.    I think you said -- are you aware of the
19   IACP, International --
20       A.    International Association of Chiefs of
21   Police, yes, sir.
22       Q.    I'm going to show you what I am going to
23   mark as Exhibit 118.  Hand this to him.  I'm going
24   to show you what I've marked as Exhibits 118
25   through 120.
```

20

```
1            MR. ZIBILICH:
2                You got some for me?
3        MR. CLARKE:
4                I can give you mine.
5        MR. ZIBILICH:
6                Thanks.  I was about to say I only
7            got two here.
8        MR. CLARKE:
9                Here.
10       MR. ZIBILICH:
11               And even before you start asking
12           questions about all of this IACP stuff,
13           I'm going to object to the form as to
14           each and every question.
15       MR. CLARKE:
16               You can have an object to the form
17           of every question that I ask in this
18           deposition, if that will prevent you
19           from --
20       MR. ZIBILICH:
21               About IACP, yeah.
22       MR. CLARKE:
23               You want to take me up on that so
24           you don't have to object to the form
25           anymore?
```

```
 1              MR. ZIBILICH:

 2                   No.  I have to think.

 3   BY MR. CLARKE:

 4       Q.   Don't you think it is a good idea that

 5   anybody who dies in the custody of law enforcement

 6   that there be an Internal Affairs investigation?

 7              MR. ZIBILICH:

 8                   Well, I'm going to object to the

 9                form.  Hold the phone here.

10              MR. CLARKE:

11                   That's all you get.  Don't --

12              MR. ZIBILICH:

13                   No, no.  I'm doing it.  You can take

14                me up.

15              MR. CLARKE:

16                   I'll ask the witness to leave the

17                room.

18              MR. ZIBILICH:

19                   You can leave the room.

20                   {WITNESS HAS LEFT THE ROOM}

21              MR. ZIBILICH:

22                   So this is a 30(b)(6) deposition, as

23                I've heard you lecture ad nauseam the

24                last several months.  Don't you think

25                it's a good idea.  You, him personally.
```

```
 1              That's a no.  That's a no.
 2         MR. CLARKE:
 3              I'm not going to -- we have talked
 4         about it before.  You do your thing, I
 5         do my thing.
 6         MR. ZIBILICH:
 7              Come on back, Lee.  So that's why I
 8         have to object to the form on all of
 9         these, because I know the disease that
10         you have.
11              {WITNESS HAS RETURNED}
12  BY MR. CLARKE:
13      Q.    All right. You are Jefferson Parish
14  today.  You understand that?
15      A.    Yes, sir.
16      Q.    Do you not think it would be a good idea
17  for Jefferson Parish to investigate all deaths in
18  custody?
19         MR. ZIBILICH:
20              Object to the form.  You can answer
21         it.
22         THE WITNESS:
23              We do investigate.  Not my office,
24         but the sheriff's office does
25         investigate.
```

1   BY MR. CLARKE:

2       Q.    Homicide is looking for a crime, correct,

3   when they do an investigation?

4           MR. ZIBILICH:

5               Object to the form.  Outside the

6               scope of the 30(b)6 deposition notice,

7               but go ahead.

8           THE WITNESS:

9               I would say they're looking to find

10              what the cause of death was.

11  BY MR. CLARKE:

12      Q.    You understand you can't -- Homicide

13  investigates homicides, right?

14      A.    Correct.

15      Q.    Homicide doesn't investigate policy

16  violations.  They investigate crimes, correct?

17      A.    Correct.

18      Q.    IA is a division of a department that is

19  designed to evaluate cases to find out if officers

20  acted according to policy, training, and customs

21  and practices, correct?

22      A.    Correct.

23      Q.    That is the division that is designed to

24  make those determinations, correct?

25      A.    Correct.

```
 1        Q.    Homicide doesn't go through and look at
 2   whether a crime was committed based on SOP-84?
 3              MR. ZIBILICH:
 4                   Object to the form. Go ahead.
 5   BY MR. CLARKE:
 6        Q.    They look at the crimes as set forth by
 7   the Louisiana statutes, correct?
 8        A.    Correct.
 9        Q.    So do you not think it's a good idea for
10   a police department or a sheriff's department to
11   investigate all deaths?
12              MR. ZIBILICH:
13                   Object to the form.  Go ahead.
14              THE WITNESS:
15                   I would say it wouldn't be a bad
16                idea, no.
17   BY MR. CLARKE:
18        Q.    Well, I mean, the IACP articles I just
19   gave you illustrate that, correct?
20              MR. ZIBILICH:
21                   Object to the form.  They speak for
22                themselves.
23   BY MR. CLARKE:
24        Q.    Look at the second line of Exhibit 118.
25   The second block.  I don't have it.  You have my --
```

```
 1              MR. ZIBILICH:
 2                   It's not in the 30(b)(6) notice.  I
 3              object.
 4              MR. CLARKE:
 5                   This is Internal Affairs.
 6              MR. ZIBILICH:
 7                   No, it's not.  This is IACP.
 8              MR. CLARKE:
 9                   On Internal Affairs.
10              MR. ZIBILICH:
11                   I object.  Lots of luck to you.
12  BY MR. CLARKE:
13       Q.   Does Jefferson Parish Sheriff's Office
14  Internal Affairs investigate all officer-involved
15  shootings?
16       A.   No, sir, we do not.
17       Q.   Do you think that's a good idea? Does
18  Jefferson Parish -- I guess Jefferson Parish knows
19  that other departments investigate all critical
20  incidents, correct?
21              MR. ZIBILICH:
22                   Object to the form.  You can answer
23              it.
24              THE WITNESS:
25                   Yes.
```

```
 1   BY MR. CLARKE:
 2       Q.   They just chose to not investigate those
 3   under their policy, correct?
 4           MR. ZIBILICH:
 5               Object to the form.  You can answer
 6           it.
 7           THE WITNESS:
 8               I would say because we don't have a
 9           unit or the manpower to do it.
10   BY MR. CLARKE:
11       Q.   Well, the sheriff can assign as many
12   people as they want, right?
13       A.   Uh-huh.  Yes, yes.
14       Q.   So you're aware that other departments
15   investigate all use -- Internal Affairs
16   investigates all uses of force, right?
17           MR. ZIBILICH:
18               Object to the form.  You can answer
19           it.
20           THE WITNESS:
21               Yes, sir.
22   BY MR. CLARKE:
23       Q.   You're aware that other departments
24   investigate all officer-involved shootings or
25   critical incidents where there is a death or
```

1    serious injury, correct?

2         A.    Correct.

3              MR. ZIBILICH:

4                   Object to the form.  You can answer

5              it.

6    BY MR. CLARKE:

7         Q.    And JPSO doesn't do that in the Internal

8    Affairs Division, correct?

9         A.    That is correct, sir.

10        Q.    For example, if you look at Exhibit 117,

11   Interrogatory Number 4, there is a listing of -- if

12   you look at the question in Interrogatory Number 4

13   on Page 2, it is asking about in-custody death

14   information pertaining to them, right?

15        A.    Correct.

16        Q.    And there is a list of some 19 in-custody

17   deaths, and Internal Affairs investigated none of

18   those, correct? It is Subsection B of the response,

19   if you want to look at it.

20        A.    To my knowledge, no, sir.

21        Q.    And a lot of these involve people who

22   died at the jail, correct?

23        A.    Correct.

24        Q.    But, for example, if we go to Number 11

25   on Page 7, Keeven Robinson.  You see that?

1      A.   Yes, sir.

2      Q.   That was a case that involved the death

3  of somebody in custody with JPSO and some other

4  departments that were on the scene, correct?

5      A.   I know JPSO was on the scene.  I don't

6  know anything about any other departments.

7      Q.   There is a lawsuit filed, correct?

8      A.   There was, yes, sir.

9      Q.   JPSO settled that lawsuit for $307,000,

10 right?

11     A.   I'm not sure of the specific amount.  I

12 know that they did settle the case.

13     Q.   Throughout that whole litigation, after

14 the event, everything, Internal Affairs never did

15 an investigation in Keeven Robinson, correct?

16     A.   To my knowledge, no, sir.

17     Q.   Do you know why Internal Affairs does not

18 investigate all deaths in custody?

19          MR. ZIBILICH:

20               Object to the form.  You can answer

21            it.

22          THE WITNESS:

23               I do not.

24 BY MR. CLARKE:

25     Q.   I think there was a recent shooting where

```
1    the cops were indicted, JPSO.  Do you know that
2    case?
3         A.   Yes, sir.
4         Q.   Internal Affairs -- did Internal Affairs
5    investigate in that complaint?
6         A.   No, sir.  It was a criminal matter.
7         Q.   But you're aware that Internal Affairs --
8    an internal investigation and a criminal
9    investigation are separate tracks, right?
10        A.   I understand that.
11        Q.   Internal Affairs investigation, you can
12   make officers talk and give them a Garrity warning,
13   correct?
14        A.   Correct.
15        Q.   That can't be used in the criminal
16   investigation, correct?
17        A.   Correct.
18        Q.   Have you ever -- do you know or does
19   Jefferson Parish know anything about parallel
20   tracks with respect to IA investigations and
21   criminal cases?
22        A.   Yes, sir.
23        Q.   So there is nothing that prevents
24   somebody who is also investigating a criminal
25   matter from investigating an internal matter,
```

1    correct?

2         A.    I would say no.

3         Q.    What I'm getting at is, a criminal

4    investigation is looking for whether there is

5    evidence beyond a reasonable doubt to determine

6    whether or not somebody committed a crime, correct?

7         A.    Correct.

8         Q.    Internal Affairs investigation is a

9    different standard.  It is not beyond reasonable

10   doubt, right?

11        A.    Uh-huh.

12        Q.    You got to say yes or no.

13        A.    Yes.

14        Q.    And it's based on whether or not they

15   were properly trained or acted poorly in their

16   training, their policies or the practices of the

17   Jefferson Parish Sheriff's Office, correct?

18        A.    Correct.

19        Q.    So that's a completely different reason

20   for the Internal Affairs investigation than a

21   criminal investigation, right?

22        A.    Yes, sir.

23        Q.    But you don't know why they don't run a

24   parallel investigation?

25        A.    No, sir, I don't.

```
 1        Q.   Have you ever heard from other depart-
 2   ments that Internal Affairs is involved with
 3   training to evaluate cases to make sure that the
 4   training that is provided to officers on the
 5   streets is adequate?
 6             MR. ZIBILICH:
 7                  Object to the form.
 8             THE WITNESS:
 9                  No.
10   BY MR. CLARKE:
11        Q.   You guys are just separate?
12        A.   I have never heard that.  As far as
13   speaking to other agencies, no.
14        Q.   Well, in other agencies, you have the use
15   of force report that goes up through the chain of
16   command.  It goes -- and a copy of that goes to
17   both training and Internal Affairs.
18             MR. ZIBILICH:
19                  Wait.  That's not a question.
20   BY MR. CLARKE:
21        Q.   You ever heard of that?
22             MR. ZIBILICH:
23                  Oh, did you ever hear of it.  Object
24              to the form.
25             THE WITNESS:
```

```
 1                    Yes.  I know they have a use of
 2              force form, yes.  I don't know where it
 3              goes from.
 4   BY MR. CLARKE:
 5       Q.   But you understand that if Internal
 6   Affairs does an investigation, they can make a
 7   determination that somebody acted contrary to
 8   policy, but in evaluating the case, they could say
 9   the policy is not real good.  You can make
10   suggestions, correct?
11       A.   Correct.
12       Q.   Same thing.  If people are going out --
13   if you are seeing a bunch of people who are
14   involved in a particular use of force or doing
15   something, that may show a training deficiency,
16   correct?
17       A.   Correct.
18       Q.   But JPSO doesn't utilize Internal Affairs
19   to coordinate with training or the policy writers
20   to make the necessary changes to policy or
21   training, correct?
22              MR. ZIBILICH:
23                   Object to the form.
24              THE WITNESS:
25                   I wouldn't agree with that 100
```

```
 1              percent.
 2   BY MR. CLARKE:
 3        Q.   I mean, they could ask you, but as part
 4   --
 5        A.   Right, right.
 6        Q.   If the sheriff asked you to look at this
 7   and tell me what the training issues are, you'd do
 8   it, right?
 9        A.   Correct.
10        Q.   But as a matter of a mandate, that's not
11   what you do?
12        A.   Correct.
13        Q.   So whatever the sheriff tells you, you
14   could do, you would have to do, right?
15        A.   Correct.
16        Q.   So in all of these 19 in-custody deaths,
17   he could have said regardless of what the policy
18   shows, we could investigate all of those, correct?
19        A.   If he would mandate it, yes, sir.
20        Q.   He can say you could look at all of those
21   investigations, and I want you to tell me if our
22   policies are adequate, our training is adequate, or
23   whether we need to make any changes, correct?
24        A.   Correct.
25        Q.   Has the sheriff ever done that in any
```

1    case that you're aware of?

2         A.   If you are asking me if he has asked us

3    to look at things before, yes.

4         Q.   Has he asked you to write a report as to

5    whether or not there is any training implications

6    or policy implications pertaining to a particular

7    event?

8         A.   No, sir.

9         Q.   My understanding of -- I may get this all

10   wrong.  Did you ever receive a complaint -- did you

11   get a complaint from the son of the victim who was

12   -- what was the name of the guy that was shot

13   recently with a criminal -- where the officers were

14   charged?

15              MR. ZIBILICH:

16                   Object to the form.

17              THE WITNESS:

18                   I don't remember his name, to be

19              honest with you.

20   BY MR. CLARKE:

21        Q.   Whatever that case is, did you not

22   receive a complaint from that written in crayon by

23   a kid?

24        A.   We did.

25        Q.   Are you investigating it?

1      A.   We did not investigate it.

2      Q.   So in that case, you have an actual

3  complaint that is written, and you are still not

4  investigating it, correct?

5      A.   We did not investigate.  That actually

6  came from an attorney.  It didn't come from --

7  actually from someone coming to our office or

8  e-mailing it to us or something like that.

9      Q.   You received a signed statement written

10  in crayon from a kid that it was sent to you by an

11  attorney.  Is that not a valid complaint?

12      A.   I would say no.

13      Q.   Why?  Because if an attorney is involved

14  --

15      A.   We don't take third-party complaints,

16  number one.  Second of all, I don't really remember

17  the response, if we asked for some further

18  information.  We already knew an investigation was

19  already underway, so we didn't get involved in the

20  criminal investigation, no, sir.

21      Q.   The investigation underway was a criminal

22  investigation.  It wasn't an Internal Affairs

23  investigation.

24      A.   Correct.

25      Q.   He didn't ask for a criminal

```
 1    investigation in his crayon letter, did he?
 2         A.    I don't recall what the exact wording was
 3    on that, correct.
 4         Q.    Well, is it the practice of JPSO that if
 5    law -- if -- what if I wrote a complaint?  If I
 6    wrote a letter saying investigate the Eric Parsa
 7    case, that would not be a valid complaint?
 8              MR. ZIBILICH:
 9                   Good question.
10              THE WITNESS:
11                   It would not be being that there was
12                a homicide -- it was a homicide case
13                and investigated by them, we would not.
14    BY MR. CLARKE:
15         Q.    There is nothing that prevents you from
16    doing that, correct? You just don't.
17         A.    Usually, if there is a criminal
18    investigation involved or something -- a homicide,
19    we don't get involved in it, no, sir.
20         Q.    But if you send out Homicide to every
21    death, then you are precluding IA from getting
22    involved, correct?
23         A.    Correct.  I assume.
24         Q.    Okay.  If a lawsuit -- is a lawsuit a
25    complaint?
```

```
 1        A.   A lawsuit is not a complaint, no, sir.
 2        Q.   Even though it says complaint on the
 3   front of it?
 4        A.   It's not a complaint.
 5             MR. ZIBILICH:
 6                  You don't have to answer that.  He's
 7               got that smart mouth working.  It's
 8               afternoon now.  It's afternoon time.
 9   BY MR. CLARKE:
10        Q.   Let's go through the policy.  SOP-22.
11             MR. ZIBILICH:
12                  You could have asked him if those
13               two police officers were disciplined.
14   BY MR. CLARKE:
15        Q.   Were the two officers fired?
16        A.   They were terminated, yes, sir.
17        Q.   They're criminally charged, too.
18        A.   Correct.
19        Q.   And it wasn't through any results of IA?
20        A.   No.  No, sir.
21             MR. ZIBILICH:
22                  And then you can help me with what
23               jurisdiction I have to discipline
24               somebody that I already fired.  I know
25               you can figure it out.  You just need
```

```
 1              to help me.
 2          MR. CLARKE:
 3              You understand that Internal Affairs
 4          is -- well, you don't -- well, we'll go
 5          through your policy.  We'll get to it,
 6          Franz, in the policy.
 7          MR. ZIBILICH:
 8              I figure you can write a law review
 9          article on that, because it's over my
10          head.
11          MR. CLARKE:
12              Lots is over your head.
13  BY MR. CLARKE:
14      Q.   So it starts out with Internal
15  Investigations, and it says, "This policy has set
16  forth the procedures for receiving complaints of
17  violations," correct?
18      A.   Yes.
19      Q.   I know you said that you have to have an
20  actual written complaint from a victim or an
21  officer to open a case, correct?
22      A.   A complaint, yes.  We have to have a
23  complainant.
24      Q.   Are you aware -- what about an anonymous
25  complaint?
```

```
 1        A.   We generally -- we'll look at it, but we
 2   will generally not do an anonymous complaint.
 3        Q.   You know anonymous -- a lot of people
 4   call anonymously because they are scared of the
 5   cops, correct?
 6        A.   I've heard that, yes.
 7        Q.   You ever heard of the Code of Silence?
 8             MR. ZIBILICH:
 9                  Object to the form.
10             THE WITNESS:
11                  No.
12   BY MR. CLARKE:
13        Q.   You never heard of the Code of Silence?
14        A.   No.
15        Q.   And you are a commander of Internal
16   affairs?
17        A.   Correct.
18        Q.   You ever heard of the thin blue wall?
19        A.   I've heard of the --
20        Q.   Cops don't rat cops out.
21        A.   I've heard of the thin blue line.  I've
22   never heard of the thin blue wall.
23             MR. ZIBILICH:
24                  Object to the form.
25   BY MR. CLARKE:
```

```
 1        Q.   So you have no training on -- you never
 2   had training on integrity at the JPSO?
 3             MR. ZIBILICH:
 4                  Object to the form.
 5             THE WITNESS:
 6                  I'm sure I had it somewhere down the
 7             line, yes, sir.
 8   BY MR. CLARKE:
 9        Q.   You don't think you got any training on
10   the fact that cops or deputies or law enforcement
11   officers are reluctant to report misconduct by
12   fellow officers?
13             MR. ZIBILICH:
14                  Object to the form.
15             THE WITNESS:
16                  I do.  Yes, I do.  I just never --
17             the terms you put at me I've never
18             heard.
19   BY MR. CLARKE:
20        Q.   I got you.  Nobody likes answering Code
21   of Silence, but the best answer ever was it's a
22   Chuck Norris movie.  Look it up.
23             So it talks about how discipline --
24   officers share the responsibility in the
25   disciplinary process, and they're supposed to
```

```
 1    report misconduct, correct?
 2         A.    Correct.
 3         Q.    That's an effort to combat any type of
 4    reluctance of an officer, correct?
 5         A.    Correct.
 6         Q.    Making it a policy statement?
 7         A.    Yes, sir.
 8         Q.    So we have, under Responsibilities, we
 9    are going through the different types of
10    complaints, I think, and I think you talked about
11    one being the supervisor-observed violation,
12    correct?
13         A.    Correct.
14         Q.    So when a supervisor observes a
15    violation, what happens? Is there a way to do it
16    without bringing Internal Affairs involved or is it
17    always Internal Affairs?
18         A.    No.  There is a -- they can do it if it's
19    a simple --
20         Q.    Courtesy.
21         A.    -- courtesy or something, they have a
22    form, a complaint form, that they will write up,
23    and it's then -- once they write it up, it goes to
24    their commander for review, and a discipline can be
25    administered.
```

1       Q.   And is that wholly outside of your
2   division or when it gets to discipline, does it
3   come to you?
4       A.   They recommend the discipline.  Once the
5   bureau chief signs off on it, then it comes to us.
6       Q.   And what do you do?  Do you enact the
7   discipline or are you just a clearing house for the
8   files?
9       A.   What we do is, we are the custodian of
10   records for discipline.  Also, we are the ones that
11   actually type the -- one of my clerks types the
12   letter up of discipline to the officer, and it's
13   sent to the officer to let him know what his
14   penalty is.
15       Q.   So you are kind of the ultimate
16   notification after an administrative supervisory
17   complaint?
18       A.   Correct.
19       Q.   And if it's -- no discipline is done, you
20   just maintain the file for a period of time?
21       A.   Correct. Yes, sir.
22       Q.   So when a supervisor does it, I think you
23   were talking about they use a JPSO complaint form?
24       A.   Yes, sir.
25       Q.   Is it the same complaint form that would

```
 1   be filled out when a citizen comes in?
 2         A.   Yes, sir.
 3         Q.   It's the same form?
 4         A.   It's the same form, yes, sir.
 5         Q.   And then, if it's something they can
 6   handle by themselves -- what is a Deficiency
 7   Counseling Acknowledgment?
 8         A.   A Deficiency Counseling Acknowledgment is
 9   a form that they fill out, and it is basically like
10   a warning to -- as a first violation for something
11   simple.  It's a written warning form.
12         Q.   And can a supervisor investigate a
13   complaint, for example, for any type of complaint
14   about excessive force through this process?
15         A.   No.  They wouldn't do that.
16         Q.   But there is --
17         MR. ZIBILICH:
18              His question was can it, not
19           wouldn't.
20         THE WITNESS:
21              Can they?  I would say they --
22         MR. CLARKE:
23              I'll withdraw the question, because
24           it was a bad question.
25         MR. ZIBILICH:
```

```
 1              Thank you.
 2    BY MR. CLARKE:
 3        Q.   But the normal process would be limited
 4    to minor violations with an administrative
 5    supervisory complaint evaluation?
 6        A.   Yes, sir.  Correct.
 7        Q.   Can you just kind of -- I know we always
 8    talk about discourtesy.  What about getting in a
 9    car wreck?
10        A.   Actually, if it's a driving violation,
11    such as, you know, I saw the car do X, Y, or Z, if
12    it's something minor that the person doesn't
13    actually want to make a formal complaint and just
14    would like the officer to -- the sergeant to speak
15    to the officer about it, we'll let them handle it.
16    Otherwise, it will come to us.  Mainly, what
17    they're handling is maybe a performance issue or a
18    courtesy issue.
19        Q.   Call in as something, you know --
20        A.   Correct.  Something that happens at their
21    district station or something like that.
22        Q.   So if a officer -- if a supervisor
23    observes somebody who he thought might have used
24    excessive force, would he fill out the same
25    complaint form and then hand it to Internal
```

```
 1    Affairs, or do you wait for a complainant to come
 2    in?
 3         A.   No, sir.  Sometimes they'll fill out the
 4    form and send it to us.  Other times the district
 5    commander will call us and say, "I think you need
 6    to look at this."  They'll send everything over to
 7    us, the reports.  Tell us the item number so we can
 8    look at body cam footage, and then we will go from
 9    there.
10         Q.   So anything that would require kind of
11    more investigation --
12         A.   Comes to us, yes, sir.
13         Q.   You are dealing with things where you can
14    just talk to the guy.  They made this complaint,
15    you know, don't do it again, if you did it?
16         A.   Correct, correct.
17         Q.   I got you.  They use this language in
18    here.  All of these kind of rules kind of -- if you
19    -- I'm on Page 2 of 11, Section 2.  This is in here
20    a number of times.  Any violation that they saw,
21    they have the ability to kind of take them to do
22    anything, right then, to make sure it's safe?
23         A.   Correct. Yes, sir.
24         Q.   For example, if an officer ended up --
25    they saw an officer drunk.  They could relieve him
```

```
 1   of duty at that point?
 2        A.   Correct.  Yes, sir, yes, sir.
 3        Q.   And then it says -- so we're talking
 4   about the kind of tardiness, the smaller
 5   violations, and then it says, "A supervisor shall,"
 6   which is mandatory, "initiate a formal
 7   investigation and make the necessary notification
 8   of serious administrative violations."  So is this
 9   kind of the breakdown of what they can do by them-
10   selves versus where they had to get more formal?
11        A.   Correct.  Yes, sir.
12        Q.   It looks like if there is a serious
13   violation, which is what we've been talking about,
14   correct?
15        A.   Yes, sir.
16        Q.   Number 2.  If it's something that is
17   criminal, or if it's something that came up more
18   than three times in a 12-month period?
19        A.   Correct.  Yes, sir.
20        Q.   So if you had three courtesy complaints
21   in a 12-month period, that would require an IA
22   investigation?
23        A.   Yes, sir.  Usually, yes.
24        Q.   What do you mean usually?
25        A.   Yes.  I would say yes.
```

1      Q.   Is there a place where -- how do you know

2   if it's the third thing in two months?  I mean in

3   12 months.

4      A.   Everything comes across my desk.

5      Q.   How does the supervisor know that?

6      A.   Usually, what they'll do is, if they have

7   the knowledge or think that the person had a prior

8   one, they call -- they'll call our office and ask

9   us to run a history on that person.  We'll run a

10  history, and we'll let them know their prior

11  violations.

12     Q.   And the history only goes back three

13  years, correct?

14     A.   Yes, sir.

15     Q.   Have you heard departments that

16  maintained disciplinary charts on officers from the

17  time that they were hired until the time they

18  leave?

19          MR. ZIBILICH:

20              Object to the form.

21          THE WITNESS:

22              I have heard of a local department

23           that keeps all sustained cases forever,

24           yes.

25  BY MR. CLARKE:

```
1          Q.    So you don't keep any -- you don't keep
2    any exonerated or not sustained -- let me take that
3    back.  All complaints, no matter what, whether they
4    are -- whether the findings are sustained,
5    exonerated, are they kept for three years?
6          A.    All of them are kept for a period of
7    three years, yes, sir.
8          Q.    Then, after three years, do you have
9    something on your calendar that says January 1st,
10   we are going to start destroying all these records
11   that are three years old?
12         A.    A computer program gives the clerk that
13   handles our records a notice every month of which
14   ones are coming up for expungement, yes, sir.
15         Q.    Are there documents that show what has
16   been expunged, at least through the computer?
17         A.    No, sir.  After three -- you are talking
18   about when we expunged for the three years?
19         Q.    Right.  No.  What I'm saying is you -- I
20   think I understood you to say is that there is some
21   kind of computer system that after three years
22   somebody in your office, a clerk, is notified that
23   three-year time period is up on these files.
24         A.    Correct.
25         Q.    Is that done in a document, an e-mail?
```

1    Is it in a part of the program?

2          A.   I think it's in part of the program, yes,

3    sir.

4          Q.   So is there a way to look at the computer

5    and find out what was destroyed every month?

6          A.   Going past three years or --

7          Q.   Yeah, because the computer --

8          A.   No, it's not.  The record is deleted out

9    of the system.

10         Q.   Is there a paper copy anywhere or is it

11   all computerized?

12         A.   It is all computerized, to my knowledge,

13   yes, sir.

14         Q.   So like, you know, there is not -- there

15   is not -- there is only a computer file.  There is

16   not going to be an actual paper file in a cabinet

17   in Internal Affairs?

18         A.   No, sir, no, sir.

19         Q.   It's all electronic?

20         A.   It's all expunged after the three-year

21   period.

22         Q.   But what I'm trying to say is you don't

23   maintain a hard copy?

24         A.   No, sir.  Not of that, no, sir.

25         Q.   We're at Subsection 3.  "A supervisor

```
1    shall initiate a formal investigation."  We talked
2    about serious administrative violations, criminal
3    violations, and three violations the same rule,
4    correct?
5         A.   Correct.  Yes, sir.
6         Q.   It goes through how it started, and I
7    think we talked about that, that they fill out the
8    complaint form.
9         A.   Correct.
10        Q.   And they investigate if it is going to be
11   handled by somebody within his chain of command?
12        A.   Yes, sir.
13        Q.   Any investigation normally with these
14   cases is not as in-depth as what Internal Affairs
15   would do, correct?
16        A.   Correct.  Yes, sir.
17        Q.   That may be talking to a witness, talking
18   to the officer, reviewing reports, correct?
19        A.   Yes, sir.
20        Q.   And then, when they're having to
21   investigate a -- do you call the investigations
22   that are done without notification to Internal
23   Affairs informal investigations?
24        A.   I don't understand the question, sir.
25        Q.   Well, if you look at Subsection 3, it
```

1    says, "A supervisor shall initiate a formal

2    investigation," and this is after what we talked

3    about is -- the supervisor or drunk thing.  I'm

4    just trying to get the terminology. What would we

5    call the administrative one that's handled just

6    without notification by IAD?

7        A.    It's just a -- it's a complaint, just

8    like anything else.  It's just handled by somebody

9    outside of the Internal Affairs Division.

10       Q.    So there is no -- formal investigation

11   probably means that it's just IA.  Would that be

12   fair? Look at Subsection 3 on Page 2.

13       A.    Well, a supervisor can -- anything that

14   would document, and there is actually a formal

15   investigation.

16       Q.    So do they not document the informal

17   investigations or the administrative?

18       A.    I would assume that they -- yes.  They

19   document them, yes, but I think if it's a simple

20   thing that they observed that -- a minor violation

21   that can be done on a deficiency counseling form or

22   something like that, that would not be a formal

23   investigation.

24       Q.    How would they know whether somebody has

25   committed the same regulation within three times in

```
 1    a 12-month period if there is not documentation of
 2    it?  Who maintains that?
 3         A.   We have the documentation of the record.
 4         Q.   Even if it is an informal one handled by
 5    the supervisor and no discipline?
 6         A.   Well, if there is no discipline, there is
 7    no formal investigation.
 8         Q.   I made the complaint that you talked to
 9    me nasty.
10         A.   Correct.
11         Q.   I go to your supervisor, and I say,
12    "Captain Blackwell talked to me nasty."  He could
13    come to you, as part of the procedure, and say,
14    "Hey, what happened," right?
15         A.   Correct.
16         Q.   And you say, "Well, I didn't talk to him
17    nasty," and he says you did.  You can't -- unless
18    you have a videotape, you can't say who is right,
19    correct?
20         A.   Right, but they are going to document
21    that on a complaint form.
22         Q.   So that would be documented.  That is
23    where you'd be able to track the three in 12
24    months?
25         A.   Correct.  Yes, sir.
```

1    Q.   Is this the -- why it's your separate

2    topic -- I'm trying to kill two birds with one

3    stone.  You don't have an early warning process

4    other than this three and 12 months, right?

5    A.   I would say I'm the early warning

6    process.

7    Q.   We'll get to that.  So when they do it,

8    he fills out the form.  It goes up through his

9    commander, and once that is signed off on, then it

10   gets to IAD, right?

11   A.   Yes, sir.

12   Q.   And do you -- are you the clearing house

13   for the Deficiency Counseling Acknowledgment forms

14   as well?

15   A.   They come to our office, too, yes, sir.

16   Q.   So you track those?

17   A.   Yep.

18   Q.   Subsection D looks like if a supervisor

19   in the field gets a complaint from a citizen, it

20   gives the procedures that he is supposed to do,

21   correct?

22   A.   Correct.  Yes, sir.

23   Q.   He is supposed to -- if somebody comes to

24   you as a captain, not knowing you're Internal

25   Affairs, you have to give them information about

1    how to do a proper complaint or steer them in the
2    right direction or make the notification?
3         A.   Yes, sir.
4         Q.   Then you have a whole bunch of stuff of
5    -- the employee has rights that are listed in the
6    policy, correct?
7         A.   Correct.
8         Q.   And these are based on Garrity, correct?
9         A.   Correct.
10        Q.   So there is no Fifth Amendment. If
11   somebody wants to take the Fifth in an IA
12   investigation, they can be terminated, correct?
13        A.   Yes, sir.
14        Q.   Then it has a section dealing with the
15   investigator.  Would this be you kind of in your
16   sergeant role before you became captain?
17        A.   Yes, sir.
18        Q.   Are all of the people in IAD sergeant
19   level or above?
20        A.   Yes, sir.
21        Q.   So the way it works is if some complaint
22   came in to do it, you would have it, and you would
23   assign it to an investigator?
24        A.   Correct.
25        Q.   And that would be the lead investigator

1    on that particular IAD file?

2        A.   Yes, sir.

3        Q.   Now, IAD I'm sure, like every IAD, is

4    understaffed, and everybody has to help out

5    everybody with investigations, correct?

6        A.   We all help each other, yes, sir.

7        Q.   One guy is the guy that's got to write

8    the report and do everything on that particular

9    file?

10       A.   Yes, sir, yes, sir.

11       Q.   It says under Investigator, "A supervisor

12   who has been assigned to conduct an administrative

13   or a criminal investigation of an accused employee

14   shall be designated to the investigator."  You see

15   that?

16       A.   Yes, sir.

17       Q.   Does IAD investigate criminal violations?

18       A.   No, sir.

19       Q.   What does that mean then?

20       A.   Well, I think what it means is, if we are

21   doing a criminal investigation on someone, then the

22   criminal investigator is the person from our

23   Criminal Investigations Bureau or Special

24   Investigations Bureau that would be handling the

25   investigation would be the investigator.

1    Q.   Now, that is saying we don't use IAD when

2  it's a criminal thing?

3    A.   Correct, sir.

4    Q.   I guess Subsection 4 sets forth -- you

5  know, commanders should not be looking at excessive

6  force type complaints.  Those should be only IAD

7  files, correct?

8    A.   Correct, sir.

9    Q.   Do you know of any cases where there has

10  been an investigation -- for example, in this case,

11  there was no -- in the Eric Parsa case, there was

12  no Internal Affairs investigation, correct?

13    A.   Not to my knowledge, sir.

14    Q.   According to this, according to what I

15  know, Homicide investigated it, and it says after

16  completion of that investigation, then

17  administratively by Internal Affairs.  Have you

18  ever -- has Internal Affairs or JPSO ever done an

19  Internal Affairs investigation, to your knowledge,

20  after a criminal investigation?

21    A.   No, sir.  Not to my knowledge.

22    Q.   It requires the investigator to, you

23  know, follow certain forms and formalities in

24  taking statements from deputies, right?

25    A.   Yes, sir.

1        Q.    There is limitations on how long you can

2  investigate them and that kind of stuff, correct?

3        A.    Limitations on how long we can --

4        Q.    You can question people, question --

5        A.    Oh, yes, sir.  Yeah.  Without a break and

6  stuff, yes, sir.

7        Q.    In Subsection 8 it talks about kind of

8  the obligations or duties of the investigator,

9  correct?

10        A.    Correct, sir.

11        Q.    So you got to complete the form, complete

12  the investigation, do his investigation, interview

13  employees, collect evidence, and write the report,

14  correct?

15        A.    Correct, sir.

16        Q.    At the conclusion of the report, does the

17  sergeant or the investigator come up with

18  recommendations, or is that a process that involves

19  the commander after the report is done?

20        A.    He makes his recommendation as to whether

21  it's sustained, not sustained, exonerated, or

22  unfounded.

23        Q.    And I will just ask. So the investigator

24  actually does that first, and before anything does

25  -- then does it come to the commander to review?

```
 1         A.    It comes to me, yes, sir.
 2         Q.    Have there been circumstances where an
 3   investigator provided his opinion on what the
 4   resolution of the claim was, sustained, exonerated,
 5   whatever, where you have changed it?
 6         A.    In my tenure, a year, I don't believe
 7   that I've changed any.
 8         Q.    What about the five years when you were
 9   working there?  Did your commander ever change any
10   of yours?
11         A.    Not that I recall, sir.
12         Q.    And sustained means that you established
13   it, correct?
14         A.    Correct.
15         Q.    Not sustained means there is insufficient
16   information to say whether it happened or didn't
17   happen?
18         A.    Correct.
19         Q.    The not sustained is we couldn't
20   determine it, right?
21         A.    Yes, sir.
22         Q.    Exonerated means it didn't happen?
23         A.    It doesn't mean it doesn't happen.  It
24   means that we didn't find any violation of policy
25   or procedure.
```

1     Q.    Unfounded is when it is -- we got some

2     unfoundeds here?

3     A.    Yes, sir.

4     Q.    So once that is done, then what do you

5     do?

6     A.    Once they're finished with a case, it

7     comes to me.  I review the case.  If it's an

8     exoneration -- I mean a sustained case, I recommend

9     discipline.  After I do that, I then forward it on

10    to the sheriff, and the sheriff is the final say in

11    what discipline is.

12    Q.    Have you ever been involved in a case

13    where the sheriff has changed a sustained violation

14    and not disciplined somebody?

15    A.    There was one when it was, I guess,

16    started when I first took over, sent to the

17    sheriff.  It came back from the sheriff when I was

18    -- and he did change it from sustained to not

19    sustained, I believe it was.

20    Q.    Do you know what the basis is for his

21    changing that or did you --

22    A.    I don't remember exactly what the basis

23    was.  I remember the basis of the complaint.

24    Q.    Tell me a little bit about the complaint.

25    A.    It was a traffic type thing with a

```
 1    deputy.  A guy was blocking the road.  Deputy, I
 2    think, honks at the guy.  The guy yells something
 3    at him, and then the deputy wrote the gentleman a
 4    ticket.  Some people said that the deputy probably
 5    used some harsh language or something like that.
 6    My investigator sustained the case based on the --
 7    and the sheriff changed it to not sustained.
 8         Q.   That doesn't make sense, does it?
 9         A.   No, it's --
10              MR. ZIBILICH:
11                   Wait, wait, wait.  Object to the
12                form.
13    BY MR. CLARKE:
14         Q.   Your people found that he violated --
15    sustained means you were able to prove it.
16              MR. ZIBILICH:
17                   That's not a question.
18    BY MR. CLARKE:
19         Q.   Correct?
20         A.   Sustained means --
21              MR. ZIBILICH:
22                   Object to the form.
23              THE WITNESS:
24                   Sustained means we were able to
25                prove it, yes, sir.
```

```
 1   BY MR. CLARKE:
 2        Q.   A violation of the rules is established?
 3        A.   Correct.
 4        Q.   In that case, how was the violation of
 5   the rules established?  Was there videotape?
 6        A.   There was not videotape.  There was a
 7   witness.  A witness came in to corroborate the
 8   complainant's story.
 9        Q.   So it was sustained.  He just didn't feel
10   that there was discipline that was needed?
11             MR. ZIBILICH:
12                  Object to the form.
13             THE WITNESS:
14                  I think he figured that it was kind
15             of a he-said, she-said type situation.
16   BY MR. CLARKE:
17        Q.   That's not sustained.  If your
18   investigator would have found a he-said, she-said
19   thing, that would have a different conclusion.
20        A.   Correct.
21        Q.   That's not what IAD found,correct?
22        A.   Correct.
23        Q.   Are you the commander of Internal -- is
24   there a difference between -- tell me the chain of
25   command.  The commander is you right now, correct?
```

```
 1        A.    Correct.
 2        Q.    You are the highest person that is
 3   actually working in Internal Affairs?
 4        A.    Yes, sir.
 5        Q.    And the bureau.  And then it says the
 6   bureau chief.  Who is the bureau chief in your
 7   chain of command?
 8        A.    Chief Dax Russo.
 9        Q.    Is he just your supervisor?
10        A.    He is our bureau -- we fall under the
11   Criminal Investigations Bureau, and he is the
12   commander of the Criminal Investigations Bureau.
13        Q.    So after you review it, do you then go to
14   the bureau chief before the sheriff?
15        A.    Yes, sir.  On sustained cases, yes, sir.
16        Q.    If they're not sustained -- if there is
17   any discipline that is going to be given from an
18   IAD investigation, does it come from the sheriff? I
19   mean, does it -- does he have to approve it?
20        A.    Any discipline is approved by the
21   sheriff, yes, sir.
22        Q.    Whether it is a verbal reprimand or --
23        A.    Yes, sir.
24        Q.    Days off or --
25        A.    Yes, sir.
```

1      Q.   Subsection G.  "Internal Affairs shall

2  conduct administrative investigations into all

3  complaints forwarded to the Criminal Investigations

4  Bureau after the criminal investigation has been

5  completed."  You don't do that at JPSO, do you?

6      A.   No, sir.

7      Q.   Subsection G(3).  Is it your under-

8  standing that the amount of time that they maintain

9  records is three years?

10     A.   Yes, sir.

11     Q.   And then they are expunged and completely

12  removed from the system?

13     A.   Correct. Yes, sir.

14     Q.   No paperwork of anything is maintained

15  after that?

16     A.   No, sir.

17     Q.   And that is regardless of what the

18  complaint is, correct?

19     A.   Yes, sir.

20     Q.   Whether it is sustained, exonerated,

21  anything, it's gone?

22     A.   Yes, sir.

23     Q.   Or do you keep exonerated or anything

24  other than sustained complaints at least three

25  years?

64

```
 1       A.   The only way it's kept past three years
 2  is if that file goes into a litigation file.
 3       Q.   Okay.  I asked a bad question.  It
 4  doesn't matter whether or not the complaint is
 5  sustained or exonerated, it's going to be
 6  maintained for the three years?
 7       A.   Yes, sir.
 8            MR. ZIBILICH:
 9                 That is the same question as you
10              asked a half hour ago, and you got the
11              same answers.
12            MR. CLARKE:
13                 I've got time to ask it five more
14              times.
15            MR. ZIBILICH:
16                 If I can put up with you.
17            MR. CLARKE:
18                 You don't have to be here.  You can
19              leave whenever you want.  You got nine
20              other lawyers here.
21            MR. ZIBILICH:
22                 Let me see.  How many deputies do
23              you think it would take to remove him?
24            MR. CLARKE:
25                 One.  Your smallest guy.
```

```
 1   BY MR. CLARKE:
 2       Q.   All right.  Polygraph examination.
 3            MR. ZIBILICH:
 4                Oh, boy.
 5            MR. CLARKE:
 6                I love this.
 7            MR. ZIBILICH:
 8                Oh, boy.
 9   BY MR. CLARKE:
10       Q.   Have you ever done a polygraph on an
11   officer?
12       A.   I did when I was a sergeant as an
13   investigator.  Yes, I did.
14       Q.   Did you have to get approval from the
15   sheriff?
16       A.   Yes, sir.
17       Q.   What were the circumstances of that?
18       A.   It was a correctional officer who lived
19   in the City of Slidell, Louisiana.  His neighbor
20   called and said that their garage door was halfway
21   up, and he observed the deputy put his hands around
22   his wife's neck.  He came in, denied it, and we
23   asked the sheriff for a polygraph.  He said yes.
24   When they were getting ready to start the
25   polygraph, he wanted to speak to me and admitted
```

1    that he had, in fact, committed the act, and he was
2    terminated.
3         Q.    Have you ever requested a polygraph
4    examination but the chief -- the sheriff did not
5    allow you?
6         A.    No, sir.
7         Q.    Is that the only time you have ever asked
8    for it?
9         A.    Yes, sir.
10        Q.    Was that just -- why in that particular
11   case did you request a polygraph?
12        A.    Because I felt that he was being
13   deceptive.
14        Q.    You used your detective skills, and you
15   --
16        A.    Yes, sir.
17        Q.    -- figured that was the way to get it
18   done?
19        A.    Yes, sir.
20        Q.    Do you know what an SSARC-93 is? A
21   Certificate of Destruction of Evidence?
22        A.    No, sir, I do not.
23        Q.    Would it be fair to say you don't
24   complete those?
25        A.    No, sir.

```
 1        Q.   And the rest of the details, officers
 2   have certain rights depending on the types of
 3   suspension, how you can do it.  That's the protocol
 4   for how discipline is meted out?
 5        A.   Yes, sir.
 6        Q.   You have to do certain things in order to
 7   formally discipline them and to make it work,
 8   correct?
 9        A.   Yes, sir.
10        Q.   What I am going to show you first is
11   Exhibit Number 83.  Explain to me what this report
12   is.  I think this is how you can call in, and they
13   can check somebody?
14        A.   No, sir.
15        Q.   Explain to me what 83 is.
16        A.   This is when we have litigation, when
17   we're being sued.  Mr. Martiny's office will send
18   us a letter over asking for disciplinary records on
19   any of these people, either because y'all are
20   requesting or whatever.  This is just a synopsis
21   that our clerk types up.  Not only does she send
22   records over, if there are any records, she types
23   this brief synopsis up for Mr. Martiny or Mr.
24   Zibilich or whatever.
25        Q.   So this would be something -- looks like
```

```
 1   on 4/21/21, apparently, at that point, there was
 2   some inquiry pertaining to these particular
 3   officers?
 4        A.   Yes, sir.  That would be correct.
 5        Q.   And then your employee or clerk, whoever,
 6   would then go to the computer and put in Chad
 7   Pitfield, put his number in, and see if there is
 8   anything there?
 9        A.   Yes, sir.  They put in that payroll
10   number, and it would tell them if they have
11   anything.
12        Q.   And this is kind of something that
13   happens fairly frequently whenever litigation is
14   involved and the lawyer --
15        A.   Yes.  That's something we just do mainly
16   for the attorneys, yes, sir.
17        Q.   And this would say, if you look at 83,
18   this would say that for all the employees there,
19   there was no active files or no files within the
20   last three years of 4/21/21?
21        A.   Correct.  Yes, sir.
22        Q.   This wouldn't say he's never had any
23   disciplinary problems?
24        A.   No, sir.
25        Q.   All right.  What I'm going to do is --
```

1    these what I've marked as -- what is the number I

2    put on there?

3           A.    121.

4                 MR. ZIBILICH:

5                     121.

6    BY MR. CLARKE:

7           Q.    These are things that were produced in

8    discovery.  I'm not going to spend a lot of time on

9    them, but I want to go through these and make sure

10   I understand exactly what they are, whether they

11   are administrative, you know, what track these ones

12   are on.  So, obviously, there is some stuff that is

13   redacted here with the names and stuff, but when

14   you have -- the first one goes from -- there is

15   numbers down at the bottom you see.  JPSO-12035?

16          A.    Correct.

17          Q.    It goes from 12035 -- the next one starts

18   at 12044.

19          A.    Okay.

20          Q.    I'm just going to kind of go through this

21   and make sure. So is this -- what is an Article 21

22   Investigation?  That just means Internal Affairs?

23          A.    Yes, sir.  It is just a general

24   investigation, yes, sir.

25          Q.    So in this case, somebody came in and

1    made some type of complaint, correct? You got a --

2         A.    Yes, sir.

3         Q.    And is this a format -- the format in how

4    this report is done, is this basically how they're

5    done in Internal Affairs?

6         A.    Yes, sir.  This is our template.

7         Q.    So you start out with a synopsis of a

8    case, and then you get to the witness statements

9    and then any particular evidence or anything that

10   was pulled, correct?

11        A.    Correct.  Yes, sir.

12        Q.    So this one would be assigned to David

13   Canas, who was the investigator?

14        A.    Yes, sir.

15        Q.    And Major Boudreaux?

16        A.    Boudreaux.

17        Q.    That's who you took over for, correct?

18        A.    Yes, sir.

19        Q.    In this particular one -- Did anybody, to

20   your knowledge, have any training on how to

21   question police officers?

22             MR. ZIBILICH:

23                  Object to the form.  You can answer

24             it.

25             THE WITNESS:

```
 1                    We have basic interview and
 2                 interrogation stuff, you know,
 3                 training.
 4    BY MR. CLARKE:
 5         Q.    And, you know, do you know what -- do
 6    they, in your basic investigative training, do they
 7    teach you to ask open-ended questions?
 8              MR. ZIBILICH:
 9                 Object to form.  You can answer it.
10              THE WITNESS:
11                 I really don't -- I don't know.
12    BY MR. CLARKE:
13         Q.    That's fine.  So the first one involving
14    black out, black out, black out, black out four
15    times.  The date -- let me -- well here is the item
16    number, B-13551-21, right?
17         A.    Yes, sir.
18         Q.    This is an incident that happened on
19    February 23rd, '21, and the conclusion in this was
20    that he was exonerated, and the event didn't occur,
21    correct?
22         A.    It's --
23              MR. ZIBILICH:
24                 Object to the form.
25              THE WITNESS:
```

```
 1                   It's that they found him not to be
 2              in any violation of policies or
 3              procedures.
 4   BY MR. CLARKE:
 5        Q.   Do you make credibility determinations
 6   when you are doing Internal Affairs investigations?
 7        A.   I don't understand what you mean.
 8        Q.   I think the complainant is a liar.
 9        A.   I would say if we have the evidence to
10   show that, you know, the person is not telling the
11   truth.
12              MR. ZIBILICH:
13                   I think his question was do you
14              consider credibility when arriving at a
15              decision.
16              THE WITNESS:
17                   I would say yes.  If I believe that
18              they were deceptive or something, yes.
19   BY MR. CLARKE:
20        Q.   Cops can be deceptive, right?
21        A.   Oh, absolutely.  Yes, sir.
22        Q.   If you look at the last page of this
23   file, JPSO-12043, is this the complaint form?
24        A.   Yes, sir.
25        Q.   So this one doesn't appear to be signed
```

```
1    by anybody.  How was this complaint initiated?
2         A.   I'm assuming that there was a
3    complainant's name on here.  I'm assuming that the
4    person's mother came in to make a complaint is what
5    it's saying.  Her son was involved in a physical
6    altercation.
7         Q.   I'm just saying why is this not -- isn't
8    this supposed to be completed when it's done, the
9    form?  It says Investigator's Recommendation,
10   Supervisor's --
11        A.   When it is an IAD case, we do not put --
12   fill the bottom out.  When it comes from, say, the
13   correctional center or one of them, they fill out
14   this.  We do not do that.  Our recommendations are
15   on our report.
16        Q.   So this would be --
17        A.   This would be something that we -- that
18   came to our office.
19        Q.   And if it didn't make it all the way to
20   your office, and there was -- the supervisor could
21   handle it, they would fill out these lines,
22   Investigator, Supervisor, Bureau Commander?
23        A.   Correct.
24        Q.   So that would be how the -- I don't want
25   to use terms that are on -- the informal or the
```

```
1    supervisory initiated --

2         A.   Correct.  Yes, sir.

3         Q.   -- complaint process is completed on this

4    form?

5         A.   Yes, sir.

6         Q.   So then the next one looks like Item

7    J-07343-20.  This looks like a complaint that was

8    made 10/13/20, and it is assigned to Sergeant

9    Canas, correct?

10        A.   Correct.

11        Q.   There were -- somebody -- Mr. Foster came

12   in and made a complaint against certain deputies.

13   They took statements, correct?

14        A.   Correct.  Yes, sir.

15        Q.   They did an investigation and looked at

16   the detail history for the event, correct?

17        A.   Yes, sir.

18        Q.   And based on the investigation, it was

19   sustained that he was operating his vehicle too

20   fast, I guess, and smoking in the car?

21        A.   Yes, sir.

22        Q.   But intimidation and use of force were

23   not sustained, correct?

24        A.   Correct, sir.

25        Q.   So this would have been signed by Canas,
```

```
 1    goes to Boudreaux.  What is this handwriting at the
 2    bottom?  Is this Boudreaux's handwriting?
 3         A.   That is Boudreaux's handwriting, yes,
 4    sir.
 5              MR. ZIBILICH:
 6                   Notice how the accent is on the
 7              first syllable, not the second.
 8              MR. CLARKE:
 9                   Burger King.  I got a syllable
10              problem, and I've told you that, and I
11              don't like you bringing it up.
12              MR. ZIBILICH:
13                   I don't mean to hurt your feelings,
14              but you might be in a restaurant
15              tonight, and the waitress' name might
16              be Boudreaux, and you may hurt her
17              feelings.
18              MR. CLARKE:
19                   I don't want to get my food spit on
20              so.
21    BY MR. CLARKE:
22         Q.   Is that just him putting in notes that he
23    agrees with it?
24         A.   Yes, sir.  It seems like that.
25         Q.   And where is the sheriff's signature or
```

1    how do we know that the sheriff got this?

2         A.    The sheriff used -- the sheriff sends,

3    usually, a typed page back saying either he

4    concurs, changes it, or -- it's usually a typed

5    like interoffice memorandum I guess you would say.

6         Q.    These are the records I got.  I mean, if

7    there isn't something like that, that is something

8    that is required to be maintained with the file,

9    correct?

10        A.    Yes, sir.  It's with the file, yes.

11        Q.    It's not in this particular file,

12   correct?

13        A.    I don't see it, no, sir.

14        Q.    So we can't tell whether the sheriff

15   actually reviewed this or not, correct?

16        A.    I would say he reviewed it.  I don't see

17   his response.

18        Q.    I understand.  Do you know what

19   institutional memory is?

20        A.    No, sir, I do not.

21             MR. ZIBILICH:

22                  I object to the form.

23   BY MR. CLARKE:

24        Q.    Do you know that police officers are told

25   to write everything down, correct?

```
 1         A.    Correct.
 2               MR. ZIBILICH:
 3                     Object to the form.
 4    BY MR. CLARKE:
 5         Q.    And at Internal Affairs you are creating
 6    a report to show what your findings are, correct?
 7         A.    Yes, sir.
 8         Q.    And how you came to those findings,
 9    correct?
10         A.    Yes, sir.
11         Q.    And are you following processes and
12    policies, correct?
13         A.    Yes, sir.
14         Q.    And if everything was done in that case,
15    we would have something from the sheriff that said
16    he concurred, correct?
17         A.    There should be a letter from the sheriff
18    in the file, yes, sir.
19         Q.    In the previous one, it was exonerated,
20    so he wouldn't get that, correct?
21         A.    Correct.
22         Q.    So there would not be one there?
23         A.    No, sir.
24         Q.    So if it exists, it should be with the
25    file.  If it doesn't exit, he may not have reviewed
```

```
 1   it?
 2        A.   I can't answer that question.
 3        Q.   Right.  The third one, Complaint
 4   C-06288-20.  Date filed 3/8/20.  An excessive force
 5   complaint, correct?
 6        A.   I'm sorry.  Which one are you on?
 7        Q.   We are starting at 012051.
 8        A.   Okay.  Yes, sir.
 9        Q.   Mr. Richardson made a complaint about
10   excessive force in the synopsis?
11        A.   Yes, sir.
12        Q.   And we go through the investigator's
13   report.  This is a summary now.  Are these
14   summaries -- there will be a tape maintained in
15   Internal Affairs of this?
16        A.   There is a transcribed statement, yes,
17   sir.
18        Q.   What about the tape?
19        A.   The tape, I believe, is maintained in the
20   computer system.  After three years, that is gone,
21   too.
22        Q.   That's part of it?
23        A.   Yes.
24        Q.   But what I'm getting -- what we're
25   looking at on Page 012052 is a summary of an
```

```
 1    official interview?
 2         A.   Of a statement, yes, sir.
 3         Q.   And the interview -- are all your
 4    interviews taped?
 5         A.   Yes, sir, they are.
 6         Q.   They are maintained for the same
 7    three-year period?
 8         A.   Correct.  Yes, sir.
 9         Q.   So this tape could potentially still be
10    there? We have March 9th --
11         A.   Yes, sir, it could be, if it's in that
12    time frame.  March of --
13         Q.   So on this one you go through the
14    particular officers who were on the scene.  You
15    looked at the taser.  There was some footage from
16    Taser in this case that they looked at, but it was
17    a short tape.  It didn't have much information on
18    it, correct?
19         A.   Correct.
20         Q.   In this case, they learned that after the
21    investigation, Sergeant Canas found that the
22    complaint was not sustained, correct?
23         A.   Not sustained, yes, sir.
24         Q.   Not sufficient evidence to prove or
25    disprove the allegations, correct?
```

```
 1        A.    Correct.  Yes, sir.
 2        Q.    Not saying it didn't happen or it did
 3   happen, correct?
 4        A.    Correct.  Yes, sir.
 5        Q.    The next one is 012058, the page number.
 6   Item D-19565-19.  Complaint of 4/24/19.  In this
 7   one, there is an allegation of excessive force,
 8   correct?
 9        A.    Yes, sir.
10        Q.    Go through the investigation again.  Take
11   the officers' statements.  There were some
12   photographs that were taken, correct?
13        A.    Correct.
14        Q.    Checked up on some of the information
15   pertaining to her story where she said there was a
16   previous domestic involving somebody at this thing.
17   You checked the Kenner Police Department for that
18   report, correct?
19        A.    Correct.  Yes, sir.
20        Q.    When you are looking through an Internal
21   Affairs investigation, do you also look at the
22   disciplinary history of an officer when you are
23   evaluating a complaint?
24        A.    I do, yes, sir.
25        Q.    When you say I do, does JP -- did they do
```

```
 1    it before we were there?
 2          A.   Are you asking me if we -- like when we
 3    get a complaint if we look at the previous history?
 4          Q.   Right.
 5          A.   Yes.  Usually, the commander of the
 6    division will do that, yes, sir.
 7          Q.   That's what I'm trying to get at.
 8          A.   Yes, sir.
 9          Q.   So while you are looking at stuff to
10    corroborate their story, you are also looking at
11    the officer's past?
12          A.   Yes, sir.
13          Q.   If an officer had a number of complaints,
14    would that impact your evaluation of the
15    credibility of the officer?
16          A.   It could, yes, sir.
17          Q.   So you are going to try to be fair either
18    way?
19          A.   Correct.
20          Q.   You are looking at the past of the victim
21    or the complainant, and you are looking at the past
22    of the officer?
23          A.   Correct.  Yes, sir.
24          Q.   And whatever that past is and how it
25    affects your analysis of the evidence, that's what
```

1   you do?

2        A.   Yes, sir.

3        Q.   Now, in this particular case, they were

4   claiming that Deputy Troy Boulas --

5        A.   Boulas, yes, sir.

6        Q.   -- was involved in this, but he resigned

7   under the investigation, correct?

8        A.   Resigned.  I'm assuming that says

9   resigned while under investigation, yes, sir.

10       Q.   Look at --

11       A.   It's kind of hard to --

12       Q.   Look at Page 012060.

13       A.   Yes, sir.  I see it.  Resigned.  He

14   resigned while under investigation, yes, sir.

15       Q.   Did you complete the report? Complete the

16   investigation?

17       A.   I don't see -- the conclusion is, is that

18   he resigned while under investigation.

19       Q.   That's of no -- that doesn't help solve

20   the -- so the -- if somebody resigns under

21   investigation, the complaint is not investigated?

22       A.   I would say it depends.

23       Q.   What does it depend on?

24       A.   If the complaint -- sometimes the report

25   is completed, and before it actually comes back to

```
1   us, like say it could be at the sheriff -- the
2   sheriff could have it or whatever.  They can
3   resign, whatever.  I don't know the reason why.  I
4   can't answer as to why there is nothing further in
5   this report other than he resigned while under
6   investigation.
7        Q.   There is a handwritten note there.  Is
8   that Major Boudreaux's?
9        A.   Where?
10       Q.   At the conclusion page.  012061.
11       A.   That is Major Boudreaux's handwriting,
12  yes, sir.
13       Q.   It says, "Per SOP, not sustained.
14  Resigned while under investigation."
15       A.   Correct, sir.
16       Q.   So per the SOP, a complaint that is --
17  where an officer resigned is not investigated,
18  correct?
19       A.   I don't see -- apparently, he must have
20  resigned before they could get a statement from him
21  and stuff.  I don't know if I see his statement in
22  here, unless I'm missing it.  Oh, here is -- yeah.
23  Oh, no.  He resigned before they could interview
24  him.  I don't see his statement.
25       Q.    I understand, but the process is so a
```

1    complainant can go there and make a complaint and

2    to give justification for the complaint.  You've

3    got to be fair to the complainant, right?

4         A.    Correct.

5         Q.    So if somebody makes a complaint about

6    somebody, and they resign, JPSO says, well, he's

7    gone.  We don't do anything else?

8         A.    I'm assuming -- in this one, they didn't,

9    being he resigned under investigation.

10             MR. ZIBILICH:

11                  He wants to discipline people after

12               they quit or were fired.

13             THE WITNESS:

14                  We can't discipline someone that no

15               longer is employed with us.

16   BY MR. CLARKE:

17        Q.    Right, but you don't use IAD for any

18   impact with training or policies?  An IAD

19   investigation can figure out other things that

20   could be helpful to the department, correct?

21        A.    Yes.

22        Q.    You didn't do it in that case, correct?

23        A.    They did not.  When he resigned,

24   apparently, they ended the investigation, sir.

25        Q.    The next one is 12064, Case Number,

1    20190402, date 5/29/19.  Date filed 4/9/19.  This

2    is -- I don't know if it's excessive force, but he

3    is alleging they brought him outside and dragged

4    him or kicked him, correct, under the --

5         A.   Yes.  Yes, sir.

6         Q.   Took the complainant's investigative

7    statement and a number of officers, correct?

8         A.   Correct.

9         Q.   On 12066, it says, "Albert Becker never

10   provided any witnesses to this incident nor did he

11   return his signed statement to the IAD."  Why is

12   that in the report?

13        A.   What we'll do is, when we take a

14   statement from somebody, and the statement is

15   transcribed, we send the statement to whoever made

16   the complaint.  We'll mail it to your house, or if

17   you want it to be picked up, you know, come pick it

18   up.  We'll let them review the statement.  If there

19   is anything they want to add it to, or, you know,

20   they can write it on a separate form.  They can

21   write on the back.  And then once it's -- they

22   finish with it, they sign it and return it to us,

23   and that goes into the file.

24        Q.   And if somebody doesn't sign a statement,

25   does that have any impact on the investigation?

1      A.   It just -- basically, they didn't sign

2   and return it to us.

3      Q.   It could mean that it's complete, right,

4   but they don't have any changes?

5      A.   No, because we ask to send it back.  Sign

6   it and send it back to us.

7      Q.   Why do they have to sign it?

8      A.   It's just a procedure that we do.

9      Q.   I understand.  It's so that they have

10  their name written to what they said, right?

11     A.   Correct.  Just like the deputies, yes,

12  sir.

13     Q.   So if they say something wrong, they can

14  be charged for lying to the police, right?

15          MR. ZIBILICH:

16              Object to the form.  He said it

17            before they didn't take them under

18            oath.

19          THE WITNESS:

20              In my five years previously there or

21            this time, I've never arrested anyone

22            for being untruthful in a statement.

23  BY MR. CLARKE:

24     Q.   That's good.

25     A.   It's not something we do.

```
 1        Q.    They do it a lot of other places.
 2              MR. ZIBILICH:
 3                    Good Lord.  We do something better
 4                 than other places.  Mark it.
 5              MR. CLARKE:
 6                    I'll give you a star.
 7              MR. ZIBILICH:
 8                    Thank you.  Is it gold?
 9              MR. CLARKE:
10                    Gold star to you?  No.
11  BY MR. CLARKE:
12        Q.    So this one they went through.  They took
13  all of the statements.  Now, you have body cameras
14  now, correct?
15        A.    Correct.  Yes, sir.
16        Q.    Are you having more sustained complaints
17  now?
18        A.    Actually, the body cams have helped us
19  more than they've hurt us.
20              MR. ZIBILICH:
21                    Who is us?
22              THE WITNESS:
23                    The sheriff's office.
24  BY MR. CLARKE:
25        Q.    We went through -- you went through this
```

1    stuff, and they looked at the reports.  They pulled

2    the reports of what the deputies did in this case,

3    right?

4          A.   Yes, sir.

5          Q.   Pulled the 911 calls.  Had photographs, a

6    bunch of stuff, right, in this investigation?

7          A.   Yes, sir.

8          Q.   The conclusion starts out, "Albert Becker

9    showed untruthfulness from the beginning of his

10   interview by denying that he drove a pickup truck

11   through the neighborhood while yelling.  He denied

12   all" -- this is him making a credibility

13   determination, correct?

14         A.   Correct.

15         Q.   And makes another note at the end of this

16   that he failed to return his signed statement since

17   the interview, and then he found that this case was

18   exonerated, correct?

19         A.   Correct.

20         Q.   Go to the next one 12074, Item J-18905-19

21   complaint from 10/28/19.  This is a complaint made

22   by somebody -- what is the SET Team?

23         A.   It's a Strategic Engagement Team.

24         Q.   What do they do?

25         A.   They kind of target repeat offenders,

1    and, you know, stuff like that.

2         Q.   They said misconduct and excessive force

3    was investigated by Sergeant Canas.  He -- it looks

4    like he took complaint -- statements in -- oh, he

5    withdrew it.  Never mind.

6         A.   He withdrew his complaint.

7         Q.   So this guy made a complaint, and then

8    during the Internal Affairs process, he withdrew

9    his complaint, correct?

10        A.   Correct, sir.

11        Q.   Next one is 1-23141-19, 10/1/19.  This

12   was a complaint that a deputy used excessive force

13   or threw him against the wall and injured him,

14   correct?

15        A.   Yes, sir.

16        Q.   They went through and took all the

17   statements of people, even witnesses, correct?

18   Looked at the police reports?

19        A.   Yes, sir.

20        Q.   There was video evidence that didn't

21   support the complainant's story, correct?

22        A.   Correct, sir.

23        Q.   As a result of this, he was exonerated,

24   correct?

25        A.   Yes, sir.

1    Q.    The next one is complaint Item Number

2    F-13541-20.  Date filed 6/29/20.  You see that?

3    A.    Yes, sir.

4    Q.    This is an excessive force complaint and

5    an excessive handcuffing complaint, correct?

6    A.    Yes, sir.

7    Q.    Go through all the statements.  Look at

8    the EMS stuff, the 911 calls, Facebook, and

9    whatever else they could find, correct?

10   A.    Yes, sir.

11   Q.    The conclusion states, "Sergeant Canas'

12   investigation shows all deputies involved in the

13   case did nothing wrong and handled the

14   investigation in the scope of the law and the

15   Sheriff's Office Policy," correct?

16   A.    Correct, sir.

17   Q.    Mrs. Gibbs' complaint seems to have no

18   merit, correct?

19   A.    Yes, sir.  No misconduct something.  I

20   can't read that.

21   Q.    And they were exonerated, correct?

22   A.    Yes, sir.

23   Q.    And the last one starts on 12096, and it

24   is kind of a different format.  Can you explain to

25   me why this is in this format?

1       A.    Because this was a grievance that came

2   from an inmate in the Jefferson Parish Correctional

3   Center.

4       Q.    So IAD may -- is this just the same -- is

5   it an IAD file, or do they do their own separate

6   investigations outside of IAD?

7       A.    This was done by the Criminal

8   Investigations Bureau.

9       Q.    Who were they criminally investigating?

10          MR. ZIBILICH:

11                 Object to the form.

12          THE WITNESS:

13                 Sergeant Rabb.

14   BY MR. CLARKE:

15       Q.    This isn't IAD?  This is a criminal

16   investigation?

17       A.    Yes, sir.

18       Q.    So in this one, they were trying to

19   determine whether or not Sergeant Rabb committed a

20   crime, correct?

21       A.    Correct, sir.

22       Q.    This one has -- at 12101, it has the

23   complaint form.  Was this done administratively?

24   Why are there supervisors signing here? Second to

25   last page.

1     A.   Because it was done by Criminal
2  Investigations, the captain put his recommendations
3  on it.
4     Q.   Well, this is an allegation of excessive
5  force.  That should not have been investigated --
6  that should have been investigated, by policy, by
7  IAD, right?
8     A.   Well, he was making criminal allegations.
9  That's why they investigated it.
10    Q.   Every time a cop uses excessive force
11  against somebody, if that's true, that's a criminal
12  violation, right?
13          MR. ZIBILICH:
14              I'll object to the form.  You can
15           answer it.
16  BY MR. CLARKE:
17    Q.   Excessive force is a violation of the
18  law, correct?
19    A.   Excessive force --
20          MR. ZIBILICH:
21              Wait.  I object.
22          MR. CLARKE:
23              I know you do.
24          MR. ZIBILICH:
25              He is not answering that.  He is not

```
 1              a lawyer.  He is not answering it.  You
 2              can take me up.
 3         MR. CLARKE:
 4              Okay.
 5  BY MR. CLARKE:
 6      Q.   Excessive force is a violation of the
 7  law, correct?
 8         MR. ZIBILICH:
 9              Don't answer it.  Don't answer it.
10  BY MR. CLARKE:
11      Q.   What is excessive force?
12         MR. ZIBILICH:
13              You can answer that.  By the way, I
14            object to the form.  That's not even
15            close to the scope of the 30(b)(6), but
16            you can answer that one.
17         MR. CLARKE:
18              It's an Internal Affairs --
19         MR. ZIBILICH:
20              You can answer that one.
21         THE WITNESS:
22              I mean, anything excessive is too
23            much force or unjust force was used,
24            correct.
25  BY MR. CLARKE:
```

1        Q.    What I'm trying to get at is we went

2     through the policy, correct?

3        A.    Correct.

4        Q.    It says IAD shall investigate excessive

5     force, correct?

6        A.    Correct.

7        Q.    This is an excessive force allegation,

8     correct?

9        A.    Yes, sir, it is.

10       Q.    It was not investigated by IAD?

11       A.    Correct.

12       Q.    Why?

13       A.    I don't know.

14       Q.    You said something because it was a

15    criminal investigation.  I'm trying to figure out

16    how you make a distinction, when an allegation is

17    excessive force by an officer, as to whether or not

18    it's a criminal violation or an administrative

19    violation.

20             MR. ZIBILICH:

21                  Object to the form.

22    BY MR. CLARKE:

23       Q.    How do you make that -- why did this one

24    not go to IA?

25       A.    I do not know why this one did not go to

 1   IAD.  I don't know if it went to IAD, and they sent
 2   it to CIB, because they thought it was a criminal
 3   violation.
 4        Q.   But we went through a bunch of excessive
 5   force complaints before, and they were not sent
 6   out, right?
 7        A.   No, sir.  I'm not sure.
 8        Q.   Sergeant Rabb, is he still working with
 9   JPSO?
10        A.   I think he does.  I'm not a 100 percent
11   sure.  He was in the jail, yes.
12            MR. CLARKE:
13                 Jeff, do you have those other
14              things?
15            MR. MARTINY:
16                 They are finishing right now.
17            MR. CLARKE:
18                 Let me see if I can do early warning
19              real quick before we look at those.
20   BY MR. CLARKE:
21        Q.   The second topic that was on the notice
22   is early warning.  What do you know about early
23   warning?
24        A.   If you are asking me what it is or --
25        Q.   Right.

```
 1              MR. ZIBILICH:
 2                   I will object to the form to make it
 3              easy.  What do you know about.  Okay.
 4    BY MR. CLARKE:
 5         Q.   What is early warning?
 6         A.   It advises us if a person gets a -- I
 7    guess has a pattern of, you know, complaints or
 8    something on that order.
 9         Q.   You understand other departments have
10    actual formal early warning policies?
11              MR. ZIBILICH:
12                   Object to the form.
13              THE WITNESS:
14                   I'm sure they do, yes.
15    BY MR. CLARKE:
16         Q.   If you look at the policy book, you don't
17    have an early warning policy, do you?
18         A.   No, sir.
19         Q.   Early warning is -- are you aware -- do
20    you know whether or not early warning is a
21    disciplinary measure or a proactive measure?
22              MR. ZIBILICH:
23                   Object to the form.
24              THE WITNESS:
25                   I would say it's a proactive
```

```
 1                    measure, of course.
 2    BY MR. CLARKE:
 3         Q.   For example, if you have a cop that has a
 4    whole bunch of uses of force, you may want to tag
 5    him to see what is going on with him, correct?
 6         A.   Correct.
 7         Q.   He could be going through a divorce,
 8    right?
 9         A.   Correct.
10         Q.   He could maybe not have particular
11    training that might be helpful, correct?
12         A.   Correct.
13         Q.   So if you have an early warning system,
14    you track certain data points pertaining to an
15    officer, correct?
16         A.   Yes, sir.
17         Q.   And when they meet a particular threshold
18    of some sort, then you go talk to the officer,
19    correct?
20         A.   Correct.
21         Q.   And, you know, for example, some early
22    warnings talk about tardiness or absenteeism.  If
23    somebody is not showing up a lot, that could be an
24    indicator of problems at home, correct?
25         A.   Yes, sir.
```

 1      Q.   Some early warning things track
 2  litigation.  If they've been sued or are going
 3  through a divorce.  Have you heard that?
 4      A.   Yes, sir.
 5      Q.   And it doesn't mean anything is wrong.
 6  Somebody could have a lot of use of forces, but
 7  they may be assigned to Friday night on Mardi Gras,
 8  right?
 9      A.   Correct.  Yes, sir.
10      Q.   But you want to kind of look at certain
11  things to determine if there is any type of early
12  intervention that can be done to help him, assist
13  him doing his job and making sure everything is
14  okay, correct?
15      A.   Correct.
16      Q.   I think kind of halfway through your
17  deposition, you kind of said you are an early
18  warning. Tell me how --
19      A.   All discipline comes across my desk.
20      Q.   But discipline -- early warning doesn't
21  only track discipline, correct?
22      A.   I guess --
23      Q.   You don't know, because you don't have
24  one, right?
25      A.   Correct.

1      Q.   So the early warning -- have you ever or

2  do you know of anybody at JPSO, as the commander of

3  Internal Affairs, who has provided any type of

4  early warning notification based on some type of

5  pattern that they have identified?

6      A.   Not that I can think of, sir.

7      Q.   When you are -- when you're trying to

8  track the discipline, are you -- how do you track

9  it?  Are all complaints looked at the same, or are

10  we looking at particular categories of complaints?

11      A.   No.  What I do is if a person's name

12  comes across my desk on a regular basis, then

13  that's my flag, and I look -- I'll go pull their

14  history, look at the priors, and see if it's

15  something that I need to address or go up the chain

16  with.

17      Q.   But there is no protocol or anything.

18  You're saying I've seen this name too many times?

19      A.   Correct.

20      Q.   How many is too many times?

21      A.   Correct.

22      Q.   How many is too many times?

23      A.   Three.

24      Q.   Three.  All right.  And how long?

25      A.   It depends.  Usually --

```
 1         Q.   You don't have a protocol?
 2         A.   Right.  I don't have a protocol.  If, you
 3    know, three times it comes across, it will throw a
 4    flag at me, usually.
 5         Q.   If you remember it, correct?
 6         A.   Correct.
 7              MR. CLARKE:
 8                   I'm just waiting for those
 9                documents.
10              MR. MARTINY:
11                   You want to take a break?
12              MR. CLARKE:
13                   Yeah.  Let's take a break.
14              MR. ZIBILICH:
15                   You're done with the early warning?
16              MR. CLARKE:
17                   I believe so.
18                   {BRIEF RECESS, 2:49-2:53}
19    BY MR. CLARKE:
20         Q.   I think I've got an overall understanding
21    of everything we have, but let me just ask you a
22    couple of follow-up questions.  According to the
23    JPSO policy, if a person is shot and killed by a
24    deputy, Internal Affairs doesn't automatically do
25    an investigation, correct?
```

```
 1          A.    That's correct.

 2          Q.    If a person is killed in a car crash

 3    after a pursuit, IA doesn't do an investigation?

 4          A.    That's correct.

 5          Q.    Now, we showed you Exhibit 83 that had

 6    the prior discipline -- the memo created by the

 7    clerk?

 8          A.    Yes, sir.

 9          Q.    All those officers, Vaught, Mehrtens,

10    Guidry, Vega, Estrada, Gaudet, Pitfield, are you

11    aware of any discipline against them?

12               MR. HILL:

13                    Wow.

14               MR. ZIBILICH:

15                    Butcher.  An absolute butcher.

16               THE WITNESS:

17                    No, sir.

18    BY MR. CLARKE:

19          Q.    But the sheriff -- has the sheriff ever

20    told you to investigate something without a

21    complaint?

22          A.    Yes, sir, he has.

23          Q.    Do you know the circumstances of it?  I

24    know there is a recent case in the paper.

25               MR. ZIBILICH:
```

```
 1              God, now he believe everything he
 2           reads in the paper.
 3        MR. CLARKE:
 4              I believe it more than your cops.
 5        THE WITNESS:
 6              I'm trying to recall if there was
 7           one since I've been there.  I'm drawing
 8           a blank.
 9  BY MR. CLARKE:
10     Q.   Can you think of any case where the
11  sheriff asked you to investigate an Internal
12  Affairs complaint when there has not been a
13  complaint?
14     A.   I can think of one involving an
15  interaction between a deputy and a female.
16     Q.   Like a sexual harassment?
17     A.   No.  It was a use of force type incident
18  that was on social media.
19     Q.   Is that the one where they pulled
20  somebody by the dreadlocks?
21     A.   Yes, sir.
22     Q.   Has that been investigated?
23     A.   Yes, sir.  I believe it has.
24     Q.   Exonerated, sustained?
25     A.   He was exonerated on one part and
```

1    sustained on another part.

2        Q.    Was that excessive force?

3        A.    I don't think he was sustained for

4    excessive force.

5        Q.    Do you know the name of the officer?

6        A.    Alvarado.

7        Q.    Alvarado.  What was he sustained on?

8        A.    Not documenting it correctly.

9        Q.    So is that not sustained?  You can't

10   prove -- I mean sustained where they found evidence

11   of a policy violation was sustained, so they found

12   the evidence of that, correct?

13       A.    Correct.

14       Q.    The excessive force, was it not

15   sustained, exonerated?  Do you recall?

16       A.    I don't recall what the actual one was.

17       Q.    That was an investigation that occurred

18   while you were the commander?

19       A.    It actually started before I took over.

20       Q.    And then it completed --

21       A.    And kind of rolled over.

22             MR. CLARKE:

23                  I'm just waiting for these other

24               records.

25             MR. MARTINY:

```
 1                    Go off the record for a second.
 2                    {BRIEF RECESS, 2:57-3:00}
 3    BY MR. CLARKE:
 4        Q.   Captain, we've got -- we have some files
 5    in front of you, and we've got to do some
 6    redactions with the records, but I have these on my
 7    computer.  If you could tell me the -- well, let me
 8    do it this way.  Can you find IAD File 20190601?
 9        A.   Yes, sir.  Okay.
10        Q.   This particular file involves an
11    incident.  Can you tell me when the incident
12    happened? It looks like date filed 6 --
13        A.   6/14/2019.
14        Q.   Case Number 20190601.  This particular
15    complaint involved an excessive force complaint?
16        A.   Yes, sir.
17        Q.   Took statements from the complainant and
18    the deputies, and then conclusions.  What is the
19    conclusion of this one?  Do you see the conclusion
20    of this one?
21        A.   Yes, sir.
22        Q.   What is it?  Not sustained?
23        A.   It's not sustained.  No, sir.
24        Q.   It means you can't prove or disprove it,
25    correct?
```

1         A.    Correct, sir.

2         Q.    According to the conclusion, this person

3    didn't stop when he did, which elevated the

4    concerns of the officers, so they had to conduct a

5    felony stop, correct?

6         A.    Yes, sir.

7         Q.    So that one was found to be not

8    sustained, correct?

9         A.    Correct.

10        Q.    And the next one.  If you can look at

11   20190801.

12        A.    2019?

13        Q.    Yes.

14        A.    Yes, sir.

15        Q.    This is a complaint from August 8th,

16   2019, correct?

17        A.    Correct, sir.

18        Q.    In this case, the complainant said he was

19   pulled over in his motor home, and the deputies

20   pointed a gun at him and slammed him against the

21   motor home in an excessive manner or an aggressive

22   manner, correct?

23        A.    Correct, sir.

24        Q.    It also says that when he was arrested,

25   they drove over 100 miles an hour, and they stole

 1    $160 from him.  Correct?

 2         A.   Yes, sir.

 3         Q.   Took the statement of the officers. The

 4    conclusion was of this report that is was not

 5    sustained for all three officers, correct?

 6         A.   Correct, sir.

 7         Q.   Go to the next one, 20210702.

 8         A.   All right.  Got it.

 9         Q.   It's a complaint against the sheriff,

10    correct?

11         A.   Correct.

12         Q.   The caller claims she was injured by

13    Sheriff Lopinto and his son.

14         A.   Yes, sir.

15         Q.   Is his son a deputy?

16         A.   His son is, I think, in 6th grade.

17         Q.   Listen --

18         MR. MARTINY:

19              Junior.  Junior deputy.

20         MR. CLARKE:

21              Cadet.

22    BY MR. CLARKE:

23         Q.   So this is one where somebody said the

24    sheriff and his six year old son were out roughing

25    people up and investigated that and found that was

```
 1    not true, correct?
 2              MR. ZIBILICH:
 3                   Imagine by John Lennon.
 4              THE WITNESS:
 5                   Correct.
 6    BY MR. CLARKE:
 7         Q.   Go to the next one.
 8              MR. ZIBILICH:
 9                   That's the one you are going to
10              introduce into evidence, the last one?
11              MR. CLARKE:
12                   Yep.  This is the one.  This is the
13              whole case right here.  You finally
14              figured out my numbering system.
15    BY MR. CLARKE:
16         Q.   This was a complaint dated 4/28/20, Case
17    Number 20200401.
18         A.   Okay.
19         Q.   There is another one against Lopinto,
20    huh?
21         A.   No.  I have -- if I'm on the right one,
22    20200401? I have one, two, three, five deputies.
23    Oh, no, those are witnesses.  I'm sorry.
24         Q.   I was just looking at the conclusion of
25    the synopsis.  One of the deputies talked crazy,
```

```
 1    and she asked him why he wasn't doing anything, and
 2    he responded, "I'm the boss, bitch," and proceeded
 3    to point to the picture in the hallway at Sheriff
 4    Lopinto.
 5               MR. ZIBILICH:
 6                    I got this picture.  Very
 7                 alliterative.
 8               THE WITNESS:
 9                    Am I on the right one, 20200401?
10    BY MR. CLARKE:
11         Q.    Jaheria Rodriguez (spelled phonetically)?
12         A.    Yeah, Jaheria Rodriguez.  Okay.
13         Q.    I can do Spanish.  I can't do Creole.
14               MR. ZIBILICH:
15                    It's called Cajun.  Boudreaux is
16                 Cajun.
17               MR. CLARKE:
18                    I'm going to go with Creole.
19               THE WITNESS:
20                    Okay.  I got it.
21    BY MR. CLARKE:
22         Q.    This is one -- this is one where the
23    actual complainant came in and says he was going to
24    pick up drugs for somebody, and the person that was
25    going to get the drugs got robbed, correct?
```

```
 1        A.    Correct.
 2              MR. ZIBILICH:
 3                    Imagine that.
 4   BY MR. CLARKE:
 5        Q.    And they took all the statements, what
 6   have you.  What was their conclusion on this one?
 7        A.    Not sustained.
 8        Q.    Not enough evidence to prove or disprove
 9   it?
10        A.    Correct.
11        Q.    Last one.  This one is Case Number
12   20210801.  Date filed, date of complaint, 7/14/21.
13        A.    Yes, sir.
14        Q.    This is an excessive force complaint?
15        A.    Yes, sir.
16        Q.    Took the statements of everybody, and
17   what was the conclusion of this one?
18        A.    Exonerated.
19        Q.    All right.  So all of the cases that we
20   went through, none of the excessive force
21   complaints were sustained, correct?
22        A.    I don't recall any of them being
23   sustained.  We went through so many of them.
24        Q.    That's my recollection, but we did go
25   over -- do you know anything about any statistics
```

1   or anything about how many complaints are normally

2   lodged or sustained against large police

3   departments?

4         MR. ZIBILICH:

5            Object to the form.

6         THE WITNESS:

7            No, sir, I do not.

8   BY MR. CLARKE:

9     Q.   Apparently, neither do I.  I have an

10   article from the Department of Justice that is

11   somewhere.  Let me look at my notice, and I think

12   I'm done.  Do you know of any file investigation,

13   IAD file, Critical Incident Review, videotapes, or

14   other documentations pertaining to the case called

15   Dorothy Williams versus Sheriff Harry Lee from

16   1989?

17     A.   No, sir.

18     Q.   Do you know of any Internal Affairs

19   investigation or any type of investigation

20   documentation pertaining to the lawsuit brought by

21   Dezanne Sullen against Harry Lee in 1995 stemming

22   from the death of Rene Alexander?

23     A.   No, sir.

24     Q.   Joseph E. Bartlett.  Are you aware of

25   that case?

```
1        A.    No, sir.
2        Q.    Then you wouldn't be aware of whether or
3   not there is any Internal Affairs investigation
4   pertaining to it, correct?
5        A.    No, sir.
6              MR. CLARKE:
7                   That's it.
8              MR. ZIBILICH:
9                   Mr. Hill.
10             MR. HILL:
11                  None.
12             MR. ZIBILICH:
13                  Pass.   Thanks.
14                  [End of deposition, 3:12]
15
16
17
18
19
20
21
22
23
24
25
```

1          C E R T I F I C A T E

2

3               This certification is valid only for
a transcript accompanied by my original signature
4   and original required seal on this page.

5               I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6   as the officer before whom this testimony was
taken, do hereby certify that CAPTAIN ROBERT L.
7   BLACKWELL, after having been duly sworn by me upon
authority of R.S. 37:2554, did testify as
8   hereinbefore set forth in the foregoing 111 pages;

9               That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10  or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11  ability and understanding;

12              That the transcript has been
prepared in compliance with transcript format
13  guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14  prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15  and in rules and advisory opinions of the board;

16              That I am not related to Counsel or
to the parties herein, nor am I otherwise
17  interested in the outcome of this matter.

18

19

20

21  _____
    Sandra P. DiFebbo,
22  Certified Shorthand Reporter

23  Date: _____

24

25