PRELIMINARY EXPERT REPORT OF DENNIS DEBBAUDT
*Donna Lou and Daren Parsa v. Sheriff Joseph Lopinto, et. al*
**Eastern District of Louisiana - Case No. 2:21-00080**

### Introduction

I have been retained by the Plaintiffs to review an incident which occurred on January 19, 2020, involving members of the JPSO and E   P:   who was 16 years old and severely autistic, which resulted in E1   death. I have been requested to provide my opinions with respect to JPSO policies and training provided to deputies of the JPSO with respect to dealing with persons with autism and provide an estimate of the costs to provide autism training to the JPSO. The opinions I express herein are based on my years of experience, study and training of law enforcement officers and departments with respect to law enforcement interactions involving autistic persons as described below.

In formulating my opinions, I have reviewed and relied upon:

1) Video Tape taken by a civilian in the parking lot at laser tag;
2) Video Tape of news story on events;
3) Security videos taken from Laser Tag;
4) Depositions of the corporate representatives of JPSO (Voltolino and Lopinto) with respect to ADA/RA and policies, practices and customs of JPSO with respect to ADA and Intellectual Disabilities including Exhibits;
5) Deposition of Sheriff Lopinto, individually;
6) Autism Awareness PowerPoint created in 2018 for CIT training which was not utilized by the JPSO as of the date of Sgt. Voltolino deposition (8/1/22);
7) JPSO CIT training materials – including PowerPoints – [1]
   a) Substance Abuse and Mental Illness;
   b) Louisiana Mental Health Law and Patrol;
   c) Crisis Intervention Training; and
   d) Deescalation with Suicidal Patients;
8) Defendants' Discovery responses regarding ADA compliance and accommodations;
9) Complaint
10) JPCO Autopsy Report re E:   P

---

[1] I am aware that a training session believed to be entitled "Deescalation and Autism," by JPSO Sgt. Voltolino and Chantrel Hunt from the Jefferson Parish Coroner's Office (JPSO) is referenced in the deposition of Sgt. Voltolino but am informed that no documentation of that course or its contents has been produced by the Defendants and therefore has not been reviewed for this report. Upon receipt of any documentation of such a course, I reserve the right to amend this report as may be appropriate and as any further information is provided.

1

11)    Communications with Donna Lou & Daren Parsa;

12)    Discussion with an official from the JPSO, believed to be Jim Arey, after a training session I conducted after the death of E ⸱ P

I have not provided expert witness testimony by deposition or trial in the last four years. I am being compensated for my time preparing this report at the hourly rate of $125.00.

## EXPERIENCE, BIOGRAPHY & PUBLICATIONS

Over the last thirty years, I have been deeply involved with research, writing, producing, speaking, consulting, curriculum development and training on the subject of law enforcement encounters with persons with autism.

In 1987 my son was diagnosed with autism. As the parent of an autistic child and a working journalist, I did extensive research from 1991-1993 on interactions between autistic people and the police.

I first reported on police related autism issues with the article/booklet titled Avoiding Unfortunate Situations in 1993 published by the Wayne County, Michigan chapter of The Autism Society. Since then I have continued to read, study, research, participate in discussions, conferences and meetings, consult with experts and families with loved ones with autism, as well as those with ASD, compile information and data, write/co-write articles, produce videos, speak, prepare curriculums and teach others about what I have learned about autism and in particular the interaction of law enforcement with persons with autism.

My experience in autism and law enforcement curriculum development includes serving as a Curriculum Review Team member and resource for the first ever autism curriculum developed for law enforcement, *Why Law Enforcement Needs To Recognize Autism*, developed by the Maryland Police and Correctional Training Commissions in Oct., 1999.

In April, 2001 I co-authored the article *Contact with Individuals with Autism: Effective Resolutions* published by the U.S. Department of Justice in the FBI Law Enforcement Bulletin. This is acknowledged as the first ever report published in a law enforcement publication on the interactions between autistic persons and law enforcement.

I have been credited as a resource for the Pennsylvania *POST Field Guide: Police Response to People with Mental Illness or Developmental Disability*, by the Municipal Police Officers' Education and Training Commission, 2001. I have successfully completed the Emergency Psychology Technician program entitled Managing Situations Involving Mentally Disturbed Persons: A Police Training

2

Program offered by John Jay College of Criminal Justice in 2005. I served as a consultant to the Chicago Police Department's autism training module in 2007 and as a Subject Matter Expert (SME) for California POST's 2009 training video on autism. I also developed and updated the *Autism Trainer's Guide* for NYPD from 2008 through 2018. I have served as a Subject Matter Expert (SME) and training video contributor for the Florida Department of Law Enforcement's curriculum *Autism Awareness for Law Enforcement* in 2017 and the online FDLE *Autism Awareness Training for 911 Telecommunicators* in 2022.

I have been acknowledged by the International Association of Chiefs of Police (IACP) for my contributions to IACP Training Keys #678, *Autism: Managing Police Field Contacts* ©2013 and #679 *Autism: Interview and Interrogation* © 2013. I have also been acknowledged and cited in the IACP Law Enforcement Policy Center's report *Interaction with Individuals with Intellectual and Developmental Disabilities: Model Policy Concepts & Issues Paper Need to Know* (Updated: August 2017)

My training, curriculum, DVDs and other resources have been adopted and used by policing and public safety professionals and agencies throughout the U.S., Canada, the UK, New Zealand, Iceland and Australia.

I have consulted with and trained numerous law enforcement agencies and institutions, including the FBI, Department of Homeland Security Federal Law Enforcement Training Center, NYPD, Chicago PD, Houston PD, Illinois Attorney General, Prosecutor's Association of New Jersey, Iowa State Sheriffs' and Deputies' Association, Ontario Association of Chiefs of Police (Canada), Police Service of Northern Ireland (Belfast) and many other local and state law enforcement agencies.

I have presented the closing session for the 2018 class of the FBI's National Executive Institute for chief executives of top-level law enforcement agencies in the U.S., Canada, Australia and Europe. I also presented a keynote address for Arkansas Attorney General Leslie Rutledge at the 2018 Arkansas Law Enforcement Summit and virtual training for the FBI's Child Abduction Rapid Deployment program.

I have presented training sessions for college and university police departments, including the SUNY Police Chiefs of Police conference, Florida Atlantic University, Florida International University Police Department, Ohio University Police Department, University of Oregon Police Department, University of California-Berkeley Police Department and Texas State University Police Department among others.

Since 1993, I have authored or co-authored over 40 autism and law enforcement related articles, books and videos, including the book *Autism, Advocates, and Law Enforcement Professionals: Recognizing and Reducing Risk Situations for People with Autism Spectrum Disorder*, Jessica Kingsley Publishers. (2001) and *Contact with Individuals with Autism: Effective Resolutions* for the FBI Law Enforcement Bulletin (Vol. 70, Issue 4. April 2001) and *Beyond Guilt or Innocence* for the Eunice Kennedy Shriver Center at the University of Massachusetts (2004). I have also published articles in the newsletters of the Autism Society of America, Autism Europe, Organization for Autism Research and other autism related publications.

My training course and materials have been approved for credit units in over 20 states in the U.S., including Louisiana. I have conducted training sessions for a number of law enforcement agencies and officers in Louisiana, sponsored by various Autism organizations and other non-profits. The agencies and officers in Louisiana include Calcasieu Parish Sheriff's Office, Baton Rouge area SWAT team and others. At the invitation of Fort Polk Police Department in 2020, I trained officers, including military police, at Fort Polk facilities, Leesville, La.   I also presented training in 2020 for the Carencro Police Department in Acadiana, which was attended by law enforcement officers from other departments in Louisiana.

As part of my work on this topic, I provide referenced, detailed, easy-to-read handouts that can be modified for a 10-to-20-minute roll call briefing sessions or two, three and four hour sessions. I have also written the scripts for a number of law enforcement training video scenarios that illustrate the various types of encounters by law enforcement with individuals with autism. These include the highest risk encounters as well as strategies designed to lower risk when police officers and first responders interact with autistic persons. These videos also educate law enforcement officers to recognize autism related behaviors and characteristics and utilize appropriate approaches and tactics. My website autismriskmanagement.com has more information about my work and experience in this area.

Working through Debbaudt Legacy Productions, LLC, I have produced up-to-date, copyright protected and licensed autism and law enforcement training curriculum objectives. course outlines. and learning outcomes with video illustrations. See Debbaudt Legacy Productions, LLC.: autism and law enforcement video production team. I have been a consultant to ABC News 20/20 for a 1999 segment on autism and false confession and have been featured in reports by numerous print and television outlets in the U.S. and Europe, including the NYTimes, Associated Press, Dallas Morning News, Houston Chronicle, Times Picayune, People Magazine, WIRED Magazine, and HBO.

I have also served on the Parent Advisory Committee for the Detroit Public Schools Office of Specialized Student Services 1995-2001, the Board of Directors of Autism Society chapters in Michigan (1989-2000) and Florida (2002-2005), the constituency boards of the Centers for Autism and Related Disabilities at the University of South Florida 2002-03 and the Florida Atlantic University 2004-2011. I received an award for my advocacy on behalf of children with disabilities and special needs from Detroit Public Schools on June 21, 2001 and was honored by the Autism Society of America as a Champion of Safety Education, Training and Awareness at the Evening of Champions Gala, Providence, Rhode Island on July 14, 2006.

I have also consulted with various state and federal legislators about state and federal laws regarding training requirements for law enforcement agencies and officers and encounters with persons with autism. I testified about autism related contacts with police and the criminal justice system in 2009 before a working group of North Carolina state legislators who subsequently authorized production of the 2009 video *Autism in the Criminal Justice System*. I produced that video and was a co-writer of a companion report that year published in the North Carolina State Bar Association journal.

As a presenter, trainer and public speaker, I am well known for my ability to connect with diverse audiences, and my clear, concise and detailed handouts, creative and effective video illustrations and insight and experience with this subject matter.

I am retired from a 37-year career as a licensed private investigator. I am the proud father of a young man with autism. I reside in Port Saint Lucie, Florida, with my wife, Gay, and son, Brad.

## FACTS ABOUT AUTISM

There is a large body of literature, documentation and public source material regarding autism available to interested persons. This includes official government sources, as well as publications by a wide range of organizations and advocacy groups which regularly provide information about autism. In forming my opinions regarding Sheriff Lopinto, the JPSO and the encounter between JPSO deputies and E. P       I have relied upon my knowledge and experience gathered over the past three decades, as well as my experience as a parent of an autistic child and those of other parents, caregivers and family members with autistic children, a number of whom are law enforcement officers. Among the well-established facts regarding autism are the following:

Autism spectrum disorder (ASD) is a neurological and developmental disorder that affects how people interact with others, communicate, learn, and

behave. Although autism can be diagnosed at any age, it is described as a "developmental disorder" because symptoms generally appear in the first two years of life.    According to the *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, a guide created by the American Psychiatric Association that health care providers use to diagnose mental disorders, people with ASD often have:

- Difficulty with communication and interaction with other people
- Restricted interests and repetitive behaviors
- Symptoms that affect their ability to function in school, work, and other areas of life

Autism is known as a "spectrum" disorder because there is wide variation in the type and severity of symptoms people experience. People of all genders, races, ethnicities, and economic backgrounds can be diagnosed with ASD. Although ASD can be a lifelong disorder, treatments and services can improve a person's symptoms and daily living skills. The American Academy of Pediatrics recommends that all children receive screening for autism. Parents and caregivers are encouraged to talk  to their child's health care provider about ASD screening or evaluation.

According to the Center for Disease Control (CDC), about 1 in 44 children in the U.S. has been identified with Autism Spectrum Disorder (ASD).[2] The CDC also estimates that 1-2% of the U.S. adult population is autistic. Based on these statistics, it is estimated that there are thousands of children and adults in the Greater New Orleans Metropolitan Area who have ASD. The percentage of the population with identified ASD in the Greater New Orleans Metropolitan Area and the State of Louisiana, is significant and rapidly growing as access to medical care, attention to early childhood development, and proper diagnosis increases.

The causes of autism are not known. And while every individual is unique, what is known is that: (a) 20-30% of people with this diagnosis are on the severe end of the spectrum (b) boys outnumber girls 4-1 (c) 30% or more of adolescents with autism are obese or overweight[3] (d) about 40% of people with ASD also have Intellectual Disabilities (ID) (e) up to 40% are prone to seizures and (5) autism occurs across all races, ethnic groups, income and education levels, and lifestyles.

---

[2] https://www.cdc.gov/ncbddd/autism/data.html

[3] A number of medications commonly prescribed for young people with ASD have side effects of weight gain. In addition, related physical disabilities, reduced access to participation in sports, using food as a soothing device, and other factors contribute to the high incidence of obesity in this age-group.   The American Academy of Pediatrics recently reported that there are over 14.4 million children and adolescents in the U.S. who are obese, "making it one of the most common pediatric chronic diseases in the U.S." In addition, Louisiana has one of the highest rates of childhood obesity in the country. In the 2016-17 National Survey of Children's Health, 19.1 percent of Louisiana children ages 10 to 17 were obese, much higher than the national average of 15.8 percent.

A significant number of persons diagnosed with ASD are also known to have (a) low muscle tone, making them potentially more susceptible to injury or positional/compressional asphyxia related to prone restraint, (b) hypermobility or hyperextension, *i.e.*, "double-jointed", (c) impairment of receptive and expressive language, sometimes severe,  so that they may be non-verbal or have limited verbal skills and difficulty expressing their needs  and/or being understood (d) co-disabilities such as intellectual and physical disabilities (e) respiratory issues such as asthma (f) co-conditions such as depression, obsessive/compulsive disorder (OCD), attention-deficit-hyperactivity disorder (ADHD), aggression, self-injurious behaviors, and mood disorders and (g) are subject to sensory overload outbursts a/k/a "outbursts" or "meltdowns" which are involuntary, automatic "reflex" responses to stressors, which can result in self-injurious behaviors and injuries to others, such as hitting, kicking and biting.

There is no cure for autism spectrum disorder (ASD). ASD is a life-long disability.  While a number of persons on the spectrum lead successful and independent lives, those diagnosed as severe will need life-time care, support and supervision of varying degrees.  Under the American with Disabilities Act (ADA) and state disability laws, all persons with autism, including those diagnosed as severe, are entitled to access to public areas, accommodations, facilities, and services with reasonable accommodations for any disability which impacts their daily lives, including the services of law enforcement.

LAW ENFORCEMENT INTERACTIONS WITH PERSONS WITH AUTISM

Based on the growing population of autistic persons and the legal protections and encouragement by modern society, including the State of Louisiana, to enable persons with disabilities, including those with autism, to participate fully in the social and economic life of the state, to achieve maximum personal independence and to fully enjoy and use all public facilities available in the state, it is reasonable and foreseeable that there have been and will continue to be encounters between members of the JPSO and persons with autism. This includes those on the severe end of the spectrum who may be experiencing a sensory overload or "outburst". These encounters can take place in a variety of circumstances and scenarios. It is also reasonable and foreseeable that these persons, and their caregivers on their behalf, would need to avail themselves of services from the JPSO. It is also reasonable and foreseeable that, in the course of these encounters, deputies may need to physically restrain persons who have ASD, including those who are undergoing the crisis of a sensory outburst caused by and related to autism.

The need for law enforcement agencies to have reasonable and adequate policies and training to deal with encounters with persons with autism, including those on the severe end of the spectrum, as part of their duty to protect public safety and the safety of their officers, is obvious and has been known to law

enforcement leaders and agencies for decades. It is also well-known that the failure to have appropriate policies, practices and training creates a significant risk that such encounters, if not properly handled, could have catastrophic results, including death or serious bodily harm.

There are a number of reliable sources from which law enforcement agencies can readily access reasonable and appropriate policy guidance and training materials regarding law enforcement encounters with persons with autism. Numerous law enforcement and first responder agencies have recognized this obvious need and have adopted sound policies and training regarding the safe manner to handle these interactions, which includes:

1.    "Be aware that people with autism may have underdeveloped trunk muscles and may not be able to support their airway. After takedown, t h e individual should be turned on his or her side and be transferred into an upright position as soon as possible to allow normal breathing to occur." Training Key # 678, International Association of Chiefs of Police (IACP), © 2013.

2.    "Monitor the person's condition frequently to prevent further trauma or injury. Up to 40% of this population may have some form of seizure disorder." Training Key, #678, IACP, © 2013.

3.    "Realize the person may not understand the futility of resistance and continue an intense struggle. When the person is contained after restraint, continue the use of calming and non-threatening words and  body language, de-escalation techniques, sensory scene management  and simple words." Training Key #678, IACP, © 2013.

4.    "When possible, avoid using body weight to restrain the individual. When unavoidable, extreme caution should be exercised." Model P o l i c y : Interactions with Individuals with Intellectual and D e v e l o p m e n t a l Disabilities. Updated August 2017. IACP.

5.    "Avoid using body weight to restrain a person with I/DD whenever possible. If unavoidable, extreme caution should be exercised. For people with certain types of disabilities, body weight restraints can be dangerous or harmful...for those with other types of I/DD, such as ASD, being subjected to a body weight restraint can be physically excruciating, as the person may experience physical stimuli much more intensely than individuals without I/DD." Interactions with Individuals with Intellectual and Developmental Disabilities.    C o n c e p t s and Issues Paper, IACP Law Enforcement Policy Center, U p d a t e d : August, 2017.

6.    "If you must restrain a person with autism, consider the following tips    to maintain safety for both yourself and the person being arrested: Avoid positional asphyxia. People with autism may have a difficult    time supporting their airways during restraint due to underdeveloped chest muscles. Officers should turn the person on their side to ensure normal breathing." Law Enforcement Guide to Interacting with People with Autism, Illinois Attorney General, June, 2019.

7.    "Physical restraint should be used only after all other interventions have been tried and have failed. Restraint should never be the first reaction when a person with autism escalates.... Extreme care must    b e taken whenever restraining a person with autism. Never place a person with autism on his or her stomach. Persons with autism frequently have underdeveloped trunk, abdomen, and shoulder        m u s c l e s    o r hypotonia. Placing them on their stomach may compromise        t h e i r diaphragm, causing breathing difficulties. This action may lead  to  further struggle, often misinterpreted as attempts to get free, when actually the person is struggling to breathe. Many persons with autism also have seizure disorders or other common medical conditions such as asthma. Restraining a person during a seizure or asthmatic attack can cause injury or death." Autism, Advocates, and Law Enforcement Professionals, Recognizing and Reducing Risk Situations for People with Autism Spectrum Disorders, Dennis Debbaudt, Jessica Kingsley  P u b l i s h e r s , London and Philadelphia, 2002, p. 27.

8.    "Support and constantly monitor breathing. Because they (subjects who may have an intellectual or developmental disorder, including autism) are often hypotonic, they often have difficulty breathing under stress. Also, their chest muscles may be weak and have difficulty supporting even their own weight, in some positions. Position your handcuffed subject on their side in the lateral recumbent (low-level fetal) position, meaning slightly bent at the waist and knees. If it is        safe, sit them up. Consider transporting them in the lateral recumbent position in an ambulance. Every cop knows about positional asphyxia. Consider all your subjects with developmental disabilities to be at risk. The 'Autism tsunami', Joel Lashley, Police 1, July 7, 2008. Also see "Autism Spectrum Disorders, A Special Needs Subject Response Guide f o r Police Officers, Joel Lashley, Children's Hospital and Health System, (c) 2009.

9.    "Avoid Manual Restraining: In prone position-Hypotonia and underdeveloped muscles may lead to hypoxia, trouble breathing. By crossing arms in front or behind patient-May restrict diaphragm movement in those with hypotonia, leading to respiratory compromise.

Never use "hard" force to restrain person (such as putting your knee  t  o their chest or using your body to hold the person down.)" Autism Preparedness for Emergency Medical Services Professionals, Dean R. Kelble, Jr., Autism Preparedness for EMS Professionals, Revised 11/09 (emphasis in original).

10.     Never restrain a patient in a prone position, "hog-tie" the patient or use hobble restraints, as cases of sudden death have been reported. (Stratton, Rogers, Green, 1995 and Kupas & Wydro, 2002)." The ABC's of Autism, Dean R. Kelble, Jr., EMT-P, Autism EMS: Autism Preparedness for EMS, © 2009.

11.     "The segment on restraint and arrests highlights risks associated with   physical control. People with autism typically lack the understanding that continued struggling may require officers to use a higher level of force to restrain them. Lights and sirens can create too much sensory input, causing even greater problems with communication and control. Approximately 40 percent of people with autism have seizures, which stress can trigger. Additionally, they may have underdeveloped trunk muscles making them unable to support their airways, which creates a high potential for positional asphyxia." FBI Law Enforcement Bulletin, March, 2005, Video Reviews of Autism and Law Enforcement, produced by Dennis Debbaudt and directed by Dave Legacy.

12.     "Persons with autism should never have their arms crossed in front of     them or be held from behind. This may, once again, compromise the diaphragm in those with hypotonia. A more effective method is to have people on both sides holding the upper arm and wrist areas. Once a person with autism is down on the floor he or she should be released     a n d geographical containment should be used. Geographical   containment  is the preferred method of control for a person with    autism, a safe space should be provided for the person to calm     h i m / h e r s e l f  t h r o u g h movement, rocking, packing, finger-flicking, hand-flapping, etc. Restraint may only serve to escalate apparently aggressive behaviors." Autism, Advocates, and Law Enforcement Professionals, Recognizing and Reducing Risk Situations for People with Autism Spectrum Disorders, Dennis Debbaudt, Jessica Kingsley Publishers, London and Philadelphia, 2002, p. 27.

Through my research, experience and training, I have developed Autism Communication Cards which provide officers with important information and necessary accommodations when dealing with persons with autism. These cards are free to the public and I have provided more them to more than 200,000 of these cards law enforcement officers and agencies.   The card can also be

downloaded onto an officer's cell phone.   This is information is also available on my website – https://autismriskmanagement.com.  This card reads as follows:

## Autism



### COMMUNICATION

*The person you are interacting with:*

- May be non verbal or have limited verbal skills
- May not respond to your commands or questions
- May repeat your words & phrases; your body language and emotional reactions
- May have difficulty expressing needs

### BEHAVIOR

- May display tantrums or extreme distress for no apparent reason
- May laugh, giggle or ignore your presence
- May be extremely sensitive to lights, sounds or touch
- May display a lack of eye contact
- May have no fear of real danger
- May appear insensitive to pain
- May exhibit self-stimulating behavior: hand flapping, body rocking or attachment to objects

### IN CRIMINAL JUSTICE SITUATIONS

- May not understand rights or warnings
- May become anxious in new situations
- May not understand consequences of their actions
- If verbal, may produce false confession or misleading statement

11

As with Alzheimers patients, persons with autism may wander. Persons with autism may be attracted to water sources, roadways, or peer into and enter dwellings.

## TIPS FOR INTERACTIONS WITH PERSONS WITH AUTISM

- Display calming body language; give person extra personal space
- Use simple language
- Speak slowly, repeat and rephrase questions
- Use concrete terms and ideas; avoid slang
- Allow extra time for response
- Give praise and encouragement
- Exercise caution during restraint
- Person may have seizure disorders and low muscle tone
- Avoid positional asphyxia. Keep airway clear. Turn person on side often.
- Given time and space, person may deescalate their behavior
- Seek advice from others on the scene who know the person with autism

If in custody, alert jail authorities. Consider initial isolation facility. Person would be at risk in general prison population. REMEMBER: Each individual with autism is unique and may act or react differently. PLEASE contact a professional who is familiar with autism.

Further Info: debbaudtlegacy.com                    ©Debbaudt/Legacy Productions. 2005

### JPSO POLICIES AND TRAINING

To my knowledge, at the time of the encounter between JPSO and E P    the JPSO did not have any written policies governing interactions with persons with autism or any training of deputies.[4] During their encounter with E P    on January 19, 2020, the JPSO deputies should have been trained on the information described above, including the risks involved, and the use of appropriate tactics and accommodations.   It is my opinion that had the JPSO deputies been properly trained and applied that training properly, E   P would not have been restrained in the prone position for over 9 minutes and would not have been exposed to the risks of asphyxia and death.

In formulating my opinion, I have relied upon certain written discovery responses from the Defendants dealing with autism and ADA compliance:

1. Plaintiffs' Interrogatory No. 18 and Defendants' responses:

Sheriff Lopinto and the individual deputies provided the following response to Interrogatory No. 18:

Interrogatory No. 18: Identify all accommodations, if any, you contend you provided to E   P    to accommodate his disability.

ANSWER: Assuming this interrogatory pertains to accommodations under

---

[4] See footnote 1

the Americans with Disabilities Act, no accommodations were requested nor provided during the incident as described in the policy report produced in connection herewith.

It is my understanding that the Plaintiffs filed a Motion to Compel against Sheriff Lopinto pertaining to this particular response and the Court ruled as follows:

Sheriff Lopinto's answer is ambiguous and not directly responsive to the question. The response implies that, since facts did not implicate a need for a n accommodation, none was provided. Sheriff Lopinto is therefore directed to supplement this response to make clear that he does not contend that he provided any accommodation in this matter. (DE 79, p. 19).

In supplementation of his discovery response to Interrogatory No. 18, Sheriff Lopinto noted:

ANSWER: The factual backdrop for the incident sued upon did not implicate a need for an accommodation. Therefore, an accommodation was not provided.

2. Deposition of JPSO Sgt. Michael Voltolino:

JPSO Sgt. Michael Voltolino was produced as the corporate representative of Sheriff Lopinto and the JPSO regarding their policies, practices, processes and training regarding interactions with persons with disabilities, including autism. (Voltolino, p. 18).

Sgt. Voltolino testified that the JPSO does not have any policies or procedures that deal with compliance with the Americans with Disabilities Act or dealing with persons with Intellectual Disabilities, including autism. (p. 29-30). Therefore, any guidance provided by the JPSO to its deputies would have to have come through training. (30-31). Sgt. Voltolino was questioned about the JPSO training provided to deputies on compliance with the ADA and dealing with persons with Intellectual Disabilities, including autism.

Sgt. Voltolino was questioned about a 21-page PowerPoint entitled Autism Awareness – Exhibit 43. (p.30-42). When there were questions as to whether this document was the most recent or updated draft of the training block on Autism Awareness, Sgt. Voltolino testified as follows: 1) He began working on the Autism Awareness PowerPoint in 2018 (p. 42); 2) while working on this PowerPoint, he solicited input from his peers and has updated the PowerPoint (p.43-44); 3) Sgt. Voltolino has submitted this PowerPoint for supervisory approval for use in training (p.44); 4) At the time of his deposition on August 1, 2022, Sgt. Voltolino

was still waiting for approval from his supervisor to utilize this PowerPoint during training (p.44-45); 5) the training set forth in the Autism Awareness PowerPoint and none of the updates to this PowerPoint have been provided to deputies at the JPSO (p34-35, 39).

Sgt. Voltolino noted that he began working on the Autism Awareness PowerPoint in 2018 "because of the need for it in law enforcement." Sgt. Voltolino testified that there was an awareness at that time that law enforcement would be interacting with persons with autism "and that created special needs and situations for officers to be trained on." (p.46).

With respect to CIT training, CIT officers are trained by the JPSO utilizing PowerPoints – 1) Substance Abuse and Mental Illness; 2) Louisiana Mental Health Law and Patrol; 3) Crisis Intervention Training and 4) Deescalation with Suicidal Patients. (Voltolino, p.53, Exhibits p. 44-47). None of these training materials address persons with autism or intellectual disabilities. Sgt. Voltolino also noted that some outside vendors provide training to CIT officers including a training course he believed was entitled "Deescalation and Autism," which was provided by himself and Chantrel Hunt from the Jefferson Parish Coroner's Officer. (p.48). Sgt. Voltolino does not have a copy of this alleged training material. (p.54-55). I have been advised that this information has been subpoenaed by the Plaintiffs from the Jefferson Parish Coroner's Office (JPCO) but has not been produced. Sgt. Voltolino testified that this training is specific to CIT deputies and deals with the signs and symptoms of autism but does not deal with restraining autistic persons. (p.62).[5]

3. Deposition of Sheriff Lopinto:

Sheriff Lopinto was produced as the representative the Sheriff in his official capacity/JPSO to testify on whether the JPSO deputies provided E    P    any accommodations during this incident. Sheriff Lopinto confirmed that no accommodations were provided. (Corp. Rep. Dep, p.21).

Sheriff Lopinto also testified at his deposition of January 10, 2023, that he was unaware that the ADA required that a public agency have an assigned ADA coordinator. (p. 160-61).     He then testified that the ADA coordinator was "probably" him. (p. 161). Sheriff Lopinto was aware that other law enforcement agencies have specific policies on intellectual disabilities, including autism. (p. 116). Sheriff Lopinto did not believe that law enforcement departments need to have separate policies dealing with IDD or autism. (p. 118). Sheriff Lopinto was questioned concerning the training that was prepared by Sgt. Voltolino, but not

---

[5] It is my understanding that CIT is a special course for designated deputies and not all JPSO deputies are CIT trained.

14

provided to his deputies, IACP Training Key # 678 and even a copy of my Autism Communication Card, and appeared to deny that this type of training is needed or required.   (p. 118-130).   This approach is contrary to my 30 plus years of experience and the available police and public literature regarding interactions with persons with intellectual disabilities, including autism, and exposes the ever-increasing, disabled public to unreasonable risks of death or serious injury.

## AUTISM TRAINING COSTS FOR JPSO

At the request of Mr. Clarke, I prepared a proposal and a quote for what would be a reasonable, complete and comprehensive autism training program for the JPSO, including dispatchers, deputies, supervisors and command staff over a period of two years. This would also include training for instructors that can be utilized by the JPSO to provide autism training on an ongoing basis in the future. This proposed training outline is attached as Exhibit A.

### IN SUMMARY

1.     E ˙ P     was a 16-year-old severely autistic child who appears to be obese.

2.     On January 19, 2020, E₁ ˙ P₁     had gone to a Laser Tag with his parents as part of their normal routine. After they left the Laser Tag and while they were in the parking lot, E˙ P     began to experience a sudden sensory outburst or "meltdown" caused by his severe autism. EP, who was non-verbal, began slapping at himself and his father and grabbing his father as part of his meltdown. The physical encounter lasted about 5 minutes and during the incident EP bit his father, who was bleeding from his chin.

3.     As a result of this event, JPSO deputies were called to the scene to assist. Once Deputy Pitfield arrived, he was advised by Mr. Parsa that E₁ P₁ was autistic. (Cell Phone Video of Events). Other deputies arrived on the scene and observed and/or were generally advised that E₁ P₁     had autism and/or was special needs. They could see that he was obese. They were also aware that he was essentially non-verbal. As acknowledged by the written discovery responses, the deputies on the scene who were advised that E₁ ˙ P₁     was autistic failed to utilize this information to provide any reasonable accommodations to E     P₁     due to his disability as set forth herein. Instead, the deputies held E     P₁     in the prone position for over 9 minutes which contributed to his death according to the Jefferson Parish Coroner's Office.

4.     It is well-known and documented in law enforcement and first responder's literature that subjecting autistic persons to prone, pressurized restraint poses significant risk of asphyxia. Non-verbal, severely autistic persons

are unable to understand or comprehend even the simplest commands which may be interpreted as resistance or intentional disobedience. The continued, prone restraint of severely autistic children, especially those who are obese and non-verbal, is known to law enforcement to pose a significant risk of catastrophic outcomes.    Proper policies, training and supervision is essential in order to prevent such outcomes.

5.    Based on the known growing population of autistic persons, it is both foreseeable and predictable that there will be encounters between members of the JPSO and persons with severe autism experiencing a sensory overload or "outburst" and that these persons would need to avail themselves of services of the JPSO.    On January 20, 2019, any reasonable, competent law enforcement executive knew or should have known that deputies may need to physically restrain persons who have ASD, including those who are undergoing the crisis of a sensory outburst caused by and related to autism.   In addition, on January 20, 2019, any reasonable, competent law enforcement executive knew or should have that there was an obvious need to ensure that appropriate policies, practices and training were in place in order to prevent catastrophic results during law enforcement encounters with persons with autism who are experiencing crisis caused by and related to autism.   The knowledge of the dangers which can arise from interactions between law enforcement and persons with autism has been known in the law enforcement community for decades. Further, Sgt. Voltolino, as corporate representative for Sheriff Lopinto and the JPSO, testified that he began working on Autism Awareness PowerPoint in 2018 "because of the need for it in law enforcement" and that there was an awareness that law enforcement would be interacting with persons with autism which "created special needs and situations for officers to be trained on." (p. 46).   However, this training was never approved and appropriate and reasonable policies and training were not implemented by JPSO.

6.    Based on my review of the deposition of Sgt. Voltolino, the JPSO does not have any particular policies covering the ADA or dealing with persons with intellectual and developmental disabilities, such as autism.    Further, I have reviewed the training provided to CIT officers set forth in the PowerPoint produced.    None of these training materials address dealing with persons suffering from intellectual disabilities or developmental, such as autism.   While Sgt. Voltolino testified concerning a course on de-escalation and autism provided by himself in conjunction with the JPCO, training materials from that class have not been produced to evaluate.

7.    Based on my review of the training materials, discovery responses, videos of the deputies' actions on the scene and other information and documents

referenced in this report, it is my opinion that Sheriff Lopinto and the JPSO did not have proper policies or training in effect regarding law enforcement encounters with persons with autism at the time of the death of E:     ?:     while in the custody of JPSO deputies. It is further my opinion that JPSO deputies did not have proper training or guidance from appropriate policies on how to deal with persons suffering from autism, including the significant risks of utilizing prone restraint on such persons, especially if they are obese and non-verbal, and failed to make any reasonable and necessary accommodations for E:   P:     s disability, contrary to nationally recognized standards for law enforcement encounters with persons suffering from autism.

Dennis Debbaudt

Dated: 2 -4 - 23

Debbaudt expert report. Draft 02 Feb 2023-ACC

17



Debbaudt Legacy Productions, LLC
2338 SE Holland Street
Port Saint Lucie FL 34952

January 23, 2023

Sheriff Joseph P. Lopinto, III
Jefferson Parish Sheriff's Office (JPSO)
1233 Westbank Expressway
Harvey, LA 70058

RE: Proposal to JPSO for training and policy review. (per request)

Subject matter:  Autism Recognition, Response & Risk Management for Law Enforcement

Trainers: Dennis Debbaudt and selected subject matter experts (SMEs).

Type of training: Direct and Train-the Trainer

Attendees:
1. JPSO Sheriff and Command Staff. (4 hours) (Direct training)
2. All JPSO sworn employees of all rank and service description, including jail personnel and Emergency Operations Center (911) telecommunicators. (4 hours) (Direct training)
3. JPSO Trainers (Train the Trainers) (40 hours) (4 of those hours is attendance at a Direct training session).

Subject matter materials: Training print and audiovisual subject matter materials will be provided by Dennis Debbaudt and selected subject matter experts (SME).

Goals:
1. To train and assist JPSO in adopting best practices and model policies in encounters and interactions between JPSO and individuals with autism in a variety of situations in which the department may become involved.
2. To further enhance and advance the mission of JPSO to keep Jefferson Parish a safe place to live, work and raise a family and the vision of JPSO to be a model law enforcement agency, accountable to maintain the public trust.

Time-line: Training could commence in 30 days, beginning with command staff and proceeding from there.  Estimated completion of training of all JPSO sworn personnel, policy review and consultations: Two (2) years.

<u>Proposal includes the following</u>:

1. Licensing and further production of Debbaudt Legacy Productions, LLC's (DLP) instructional videos.

2. Licensing of selected Dennis Debbaudt print subject matter including lesson plans, goals and objectives, learning outcomes, test modules, handouts and tip cards.

3. Training session with Sheriff and JPSO command staff (4 hours) (Debbaudt and selected SME).

4. Train all JPSO sworn employees of all rank and service description, including jail personnel and Emergency Operations Center (911) telecommunicators. (4 hours) (Debbaudt and selected SME).

5. Train-the-trainer instruction of approved sworn and civilian instructors (Up to forty (40) hours) (Debbaudt and selected SME).

6. Production of a baseline Powerpoint, Keynote or other presentation software application, review and use of text slides from the provided model, review of recommended open source video clips and photo images, a review of each section of the audiovisual and print material and instructor questions. A summary of the subject matter along with the lesson plan may be submitted for issuance of educational credits.

7. Review and recommendations re JPSO relevant policies.

8. Instructor and trainer interactions, discussions and extended Q & A regarding any relevant issue are encouraged throughout the training courses.

The licensed videos and subject matter print reports are for the sole use of JPSO's instructor(s) and may not be copied, given away, sold, placed on the world wide internet or broadcast without further written permission from Debbaudt Legacy Productions, LLC.

**DLP Instructional videos included for this quote**:

Autism & Law Enforcement Roll Call Briefing
Autism Spectrum Disorder, Missing Persons, Search & Rescue
Autism & Suspicious Persons
Autistic Driver: Traffic Stop
Autism & Wandering: Escape From Campus
Autism & Victim Interview (contains sexually graphic language)
Autism in the Criminal Justice System

Autism, Fire-Rescue & Emergency Medical Services

Reasonable JPSO special editing requests from the DLP library will be honored throughout the consultancy period. Editing requests may include development of public service announcements and brief audiovisuals for JPSO web and social media sites. DLP will provide technical support for all audiovisual products as needed.

**Instructor (Train the trainer) session includes:**

Preparation for instruction of Autism Recognition, Response & Risk Management training for Law Enforcement & Public Safety professionals for four hour presentation will include a thorough review of each 50 minute section of the four hour block, review of recommended text slides, review of open source video, a review of "need to know" autism technical terminology and review of materials that 911 dispatcher/telecommunicators "need to know" and review of a model two-hour autism victim, witness and suspect interview are included.

Open source and Debbaudt Legacy Productions (DLP) video materials (relevant print, audiovisual, open source and produced scenario videos) that may be embedded in existing (or potential) JPSO training curriculum including suspicious person calls, narcotics/drug impaired or intoxicated individuals, use of force, traffic stops-reasonable suspicion to search, Crisis Intervention Training (CIT) crisis calls, police-mental health field response. Debbaudt will further recommend SME materials for shorter blocks of instruction: roll call 5 to 15 minutes, 1, 2 and 3 hour blocks, and 911 dispatcher training block.

**Policy review includes:**

A review and discussion of recommended policy decisions that are supported by SME advice will include:

- Review and assistance with development of JPSO written policies consistent with national best practices and model policies for law enforcement encounters with persons with autism.

- Empowerment by command level supervisors of frontline personnel to invest all necessary time into autism related interactions

- Creation of a voluntary vulnerable persons program (VVPP) that provides personal information (actionable intelligence) within the emergency call center and accessible by frontline deputies prior to arrival at scene.

- Creation of fusion tech (communications technology) that provides proximity disclosure of child or adult's ASD diagnosis, additional communication and personalized strategies to manage environment and behavior and technology that can track a missing, vulnerable autistic

child or adult in real time and alert frontline deputies and other responders through artificial intelligence (AI) keywords to the presence of autistic individuals in a location in the vicinity.

- Creation of an autism unit within JPSO that will seek out partnerships in public safety with ASD parents and   independent adults on the autism spectrum. educators, therapists, advocates—The Autism Community. This unit may also explore direct, controlled, safe interactions between police officers and autistic individuals, the consideration of employment with JPSO or through vendors of autistic individuals and other programs that serve to integrate into the community individuals and families affected by ASD. This unit will participate in development of a training video including scenario and public service announcements

Training Services & Materials Fee Quote:

Total Fee for Training Services, Policy Review and Licensing estimated at: $48,000.00

Travel and accommodations expenses while travelling are not included in this estimate.

Appropriate training venue(s) will be provided by JPSO.

Audio Visual (A/V) Needs: projector, screen and speakers to support computer based multimedia presentation. A/V will be provided by JPSO.

DBT will be available for consultation and discussion via remote telecommunications with JPSO personnel throughout this two-year period *at no additional cost*. Any additional presentations/discussions/conferences other than those described above, which involve travel, will be at additional cost.

**Contact Person** for quote and subject matter content:

Dennis Debbaudt
Debbaudt Legacy Productions, LLC
2338 SE Holland Street
Port Saint Lucie FL 34952
Phone: 772-398-9756
Email: ddpi@flash.net

For further information about Dennis Debbaubt and Debbaudt Legacy Productions, LLC:

https://autismriskmanagement.com/

Thank You!