Kris Sperry, M.D.
Forensic Pathologist

---

Certified by the American Board of Pathology in:
Anatomic Pathology
Clinical Pathology
Forensic Pathology

February 1, 2023

Re:  E    P

I have reviewed materials, documents, videos, reports, and other information concerning the death of E    P    .  These items include the following:

Videos of the scene, which include the incident with E     father, the interaction with deputies of the Jefferson Parish Sheriff's Office (with enlargements of the restraint sequence), and treatment at the scene by EMS personnel.

Transcripts of conversations with JPCO and JPSO personnel, deputies and detectives, and witnesses.

Statements taken of the officers and witnesses who were present and/or participated in restraint.

Autopsy report and complete Jefferson Parish Coroner's Office file, with attachments including photographs and slides.

EMS and Medical records from the terminal admission at East Jefferson General Hospital.

911 Recording and request forms.

Depositions (with exhibits) of the following individuals:

    Donna Lou
    Dana Troxclair, M. D.
    Nicholas Vega
    Ryan Vaught
    Daren Parsa
    Shannon Guidry
    Myron Gaudet
    Manuel Estrada
    Chad Pitfield
    Steven Mehrtens

---

Sperry Forensic Pathology Consultants
2194 Bear Creek Road
Moreland, Georgia  30259
Telephone:  (770)  252-2002
*e-mail Dr. Sperry:*  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
2/1/2023
Page 2 of 13

      Mallory Smith
      Jeanette Euper
      Joseph Geist

In forming my opinions, I have also relied on my training and experience as set forth in my CV and material from my medical library which includes numerous scholarly books, literature, journals and articles pertinent to the issues discussed herein, including the medical literature identified during Dr. Troxclair's deposition.

On January 19, 2020, E___ P___ was with his parents, Donna Lou and Daren Parsa, who had taken him to a Laser Tag entertainment facility in Metairie, Louisiana, in the Westgate Shopping Center.  The family had been to this location many times, and were well known there.  E___ was 16 years of age, was visibly obese, and had been diagnosed many years previously with Severe Autistic Spectrum Disorder (SASD).  According to his parents, this severely affected his life and activities of daily living, including causing severe limitations in his ability to verbalize and communicate, and limitations in his physical capabilities and motor skills, with poor muscle tone (hypotonia).  One of E___ physical limitations that was known to his parents was that he was unable to form his hands into fists, and thus was unable to "punch" someone or something with a closed fist.  Instead, he would appear to "flap" his hands and wave and flail his arms, causing open-handed slaps with his hands and/or forearms if these movements were directed towards other persons.  He could hold onto another person.  E___ was also known by his parents to sometimes bite or bang his head during an autistic crisis.  These limitations were behavioral manifestations of his SASD and not an indication of psychosis or psychotic behavior.

Upon leaving the Laser Tag, but while the family was in the parking lot, E___ began to experience a "melt-down" (as termed by E___ parents for an autistic crisis, who were familiar with these behavioral manifestations).  In the parking lot, E___ began to slap his head, which was also a behavior known and recognized by his parents as a manifestation of his SASD when he was experiencing a crisis.  While slapping himself, E___ also began slapping and grabbing at his father; the security camera videos document that this lasted about five minutes.  Also, he began to bite his father, as his father was trying to calm him.  The Laser Tag manager, came to the front of the facility when she noticed the apparent struggle between E___ and his father.  E___ parents then requested the manager to call the police.

The Laser Tag manager telephoned the Westgate Shopping Center's Security office.  At this time, one of the Security officers was Chad Pitfield, who was also a Reserve Deputy in the Jefferson Parish Sheriff's Office (JPSO).   The Laser Tag manager's statement to

---

Sperry Forensic Pathology Consultants, Inc.
2194 Bear Creek Road
Moreland, Georgia  30259
Telephone:  (770) 252-2002
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
2/1/2023
Page 3 of 13

JPSO documents that Pitfield was told by the manager, "there's a man with his autistic child, um, it's an autistic adult child. They're outside. They're in a confrontation. It's getting pretty serious, can you please come over here." Deputy Pitfield drove to the scene in a JPSO car with lights activated, but by the time he arrived at the parking lot location at 1:28:25 pm, the incident appeared to have ended, and E     was standing by the open car door with his father standing nearby. When Pitfield left his vehicle and approached the Parsas, E     father told him that E     had autism. [In his subsequent statement, Pitfield acknowledged that he knew that E     was "clearly the special needs child that they {Dispatch} had told me, uh, about."].

At 1:28:37 in the security camera video, E     left his position alongside the family automobile and is again seen flailing his arms and slapping himself on the head, then flailing at and slapping his father. Seconds later, E     begins slapping at Pitfield, who then "escorted" [Pitfield's word] E     to the ground, with E     in the prone position (face down) on the asphalt. According to Pitfield, E     purportedly bit him on the leg, and then Pitfield struck E     on the head. Then, Pitfield began attempting to handcuff E    , and the video reveals that he is sitting on E    , who remained prone, and from 1:29:15 to about 1:36:02 in the video recording (almost 7 minutes). Pitfield is a very large, obese man (he gave a weight of 308 pounds at time of incident at deposition).

After Pitfield arrived, he radioed other JPSO deputies to come and assist him as he was in a struggle with a mental patient, and he also contacted Emergency Medical Services (EMS) to assess injuries to Mr. Parsa. While still restraining E     in the prone position by himself, Pitfield contacted dispatch and requested backup to "step it up." The later arriving deputies could see that the father was injured and were informed that there was a physical struggle between E     and his father prior to their arrival. They also knew that there had been a physical encounter between Pitfield and E     prior to their arrival. While Pitfield was sitting on E    , E     mother sat down beside E    , stroking his hand and telling him that he should calm down because everything was going to be OK. During these events, E     only verbalized the word "firetruck" most likely from the sirens of other emergency vehicles. The words "fire truck" are the only thing that E     said during this entire incident. His mother also placed clothing under E     head, which she stated that she did in case he began to bang his head against the concrete.

While sitting on E    , Pitfield radioed to other deputies who were in the process of responding, telling them that he was dealing with "a mental patient. The other deputies were thus aware that an individual was experiencing a mental health crisis of some sort. At 1:34:20 in the video, JPSO Detective Ryan Vaught arrived, and later indicated that he was aware that an individual was having a "mental episode." When Vaught arrived, Pitfield told him that, "the kid….special needs." Vaught assisted Pitfield in placing two

---

Sperry Forensic Pathology Consultants, Inc.
2194 Bear Creek Road
Moreland, Georgia  30259
Telephone:  (770) 252-2002
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
2/1/2023
Page 4 of 13

sets of interlinked handcuffs on E__, pulling his hands behind his back as he remained prone.  The video does not reveal visual evidence that E__ was actively resisting the placement of the handcuffs, and this was later confirmed by Vaught during questioning by JPSO detectives.  Despite no resistance, Pitfield and Vaught failed to roll E__ to his side (the "recovery position") or otherwise monitor his condition.

Other than the word "firetruck," E__ made no other intelligible sounds, but made moaning and groaning sounds.  During this entire time, E__ remained prone with Pitfield sitting on him, and there was no effort made to either turn E__ or move him on his side (the "recovery position").  While E__ made certain movements while being restrained by Pitfield, it is my opinion that these movements were not willful, active resistance or efforts to harm the officers, but behavioral manifestations of his autism and evidence of oxygen deficiency which was resulting from his continuous and prolonged restraint.  Subsequently, Pitfield stood up and removed himself from E__.  At this time, there is no visible evidence or testimony that E__ offered any struggle or resistance at all when the deputies made this switch.  Despite this fact, the deputies on the scene failed to place E__ in the recovery position or otherwise monitor his condition.  After Pitfield stood up, JPSO Deputy Nicholas Vega took his place on E__'s back, keeping E__ in a prone position.  At this point, six JPSO personnel were present, and E__ remained prone, being held in this position by Vega sitting on his back with his hands cuffed behind his back.  A seventh deputy (Myron Gaudet) arrived at the scene.

After switching with Pitfield, Vega is seen in the video to take E__ cuffed hands and push them upwards and towards E__ head, with the effect of pushing E__ face and upper body forward and down into the parking lot surface.  Detective Mehrtens confirmed that Vega utilized this procedure to control suspects in his statement.  (Mehrtens Statement, p. 7).  Again, at this time, it doesn't appear that E__ is offering any real resistance or danger to the deputies.  As previously noted, the actions of E__ appear to be consistent with the physical manifestation of his SASD and oxygen deficiency stemming from the prolonged restraint. E__ arms became hyperextended, bent forward and upward over his head.  This maneuver appears to have caused E__ to react, whereupon Deputy Vega (who was still sitting on E__) applied a neck hold, changing his position such that he appears to be essentially "laying" upon E__ back.  Vega later told JPSO detectives that he performed a neck hold, "put[ing]] my forearm right here, underneath his chin to try to maintain some control and to keep him from hitting his head and doing anything else."  What Vega is describing is a so-called "forearm bar" hold from behind.  The physical findings at autopsy confirm that Vega utilized a "forearm bar" choke hold which significantly impacted E__ airway and ability to breathe.  Vega remained in this position and with his arm around E__ neck until

Sperry Forensic Pathology Consultants, Inc.
2194 Bear Creek Road
Moreland, Georgia  30259
Telephone:  (770) 252-2002
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
2/1/2023
Page 5 of 13

Deputy Myron Gaudet was about to switch positions with Vega, taking over the restraint as E___ remained prone and handcuffed.

At or around this point, leg shackles are affixed to E___ legs. When Gaudet was switching positions with Vega, it was noticed that E___ had "gone limp," and had urinated. Almost at the same time, E___ appears to be completely limp and unresponsive, and the officers finally rolled him onto his side and into the "recovery position." This occurred after E___ had been held prone, under the body weight of deputies who were sitting on him, with his hands cuffed behind his back and with E___ abdominal panniculus being pushed superiorly against his diaphragm and chest, for nine minutes and six seconds. When it was determined that E___ was not breathing, CPR was not commenced immediately after moving E___ out of the prone position onto his side/back. After about a minute and a half, deputies started CPR and attempted to perform chest compressions, and the video reveals that their hand placement appears to be low on E___ chest, which would thus push his abdomen up against his diaphragm instead of compressing the chambers of the heart and effecting blood circulation.

E___ was unconscious at this point, and never regained consciousness nor exhibited any purposeful movements. The EMS personnel attended to him, placed him on a Lucas machine and secured an airway using a Laryngeal Mask Airway (LMA). E___ was not intubated by EMS. The use of the LMA to secure his airway does not require the paramedic to use the Sellick Maneuver which would put pressure on the hyoid bone. E___ was then taken by ambulance to East Jefferson Hospital for emergency treatment. The EMS records noted that E___ was warm to touch and not a highly elevated body temperature. The EMS records note that his ETCO2 was 41 at 13:58; 46 at 14:04; 93 at 14:09 and 83 at 14:14 which is evidence of an increasing buildup of CO2, acidosis and oxygen depletion. EMS administered Sodium Bicarb at 13:57; 14:02 and 14:12 to reverse acidosis. No labs were taken at the hospital. A short time later, a nurse telephoned his parents and told them that E___ was in cardiac arrest; however, the JPSO deputies would not let them leave the scene. At the hospital, E___ remained in complete cardiac arrest, which was refractory to all emergency medical procedures and medications, and was pronounced dead at 1435 hours (2:35 pm).

An autopsy was performed at the Jefferson Parish Forensic Center by Dana Troxclair, M. D., three days after E___ death, on January 22, 2020. The autopsy examination was extensive, and included separate neuropathology and cardiac pathology consultants' reports, detailed toxicology studies including tryptase and serum IgE analysis, vitreous chemistry studies, and analyses for certain known genetic markers of cardiomyopathy and increased arrhythmogenic potential. At the postmortem examination, E___ body weighed 321 pounds and was 70 inches in height, giving a

---

Sperry Forensic Pathology Consultants, Inc.
2194 Bear Creek Road
Moreland, Georgia  30259
Telephone:  (770) 252-2002
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
2/1/2023
Page 6 of 13

Body Mass Index (BMI) of 46.05, which is "overweight", and also "obese Class III", the highest category used by the World Health Organization for BMIs >40.  No petechiae were found on the face or within the eyes or eyelids, but the sclerae and conjunctivae were congested.  A layered dissection of the anterior neck revealed a 3.0 X 1.5 X 2 cm area of hemorrhage within the distal aspect of the left sternocleidomastoid muscle at the attachment to the left clavicle, and a 2.0 X 0.5 cm area of hemorrhage within the posterior aspect of the anterior left strap muscle (sternohyoid).  These areas are documented in the autopsy photographs.  Although the hyoid bone was intact and not fractured, an area of hemorrhage was identified within the posterior proximal esophagus and surrounding the left greater hyoid horn; in the autopsy report, the medical examiner attributed this injury to intubation attempts during E___ resuscitation attempts.  However, E___ was not intubated by EMS as an LMA was placed, negating the need for cricoid pressure or manipulation of the hyoid bone.  The lungs were congested and mildly increased in weight.  Superficial abrasions were identified on the upper and lower extremities, which were opined to be consistent with the result of the interaction with JPSO officers and the handcuff placement about his wrists.

The heart was mildly enlarged (490 grams), and a detailed examination at the Jesse E. Edwards Registry of Cardiovascular Diseases gave a reference weight of 233-463 grams for E___ height.  The further detailed cardiac examination revealed no abnormalities, save for four chamber enlargement and biventricular hypertrophy in keeping with the mildly increased heart weight.  No microscopic conduction system abnormalities were identified.  The cardiac genetic studies disclosed the presence of the SCN5A gene, which has uncertain significance.  Toxicology studies revealed only the medications that E___ took routinely.  The neuropathology examination revealed no diagnostic abnormalities, meaning that E___ brain and spinal cord were normal to both gross and microscopic evaluation.  The vitreous analyses were normal as well.

The "Findings" section of the autopsy report included a narrative, which was generated after recorded video footage of the event was viewed, with the statement that, "…the decedent remained combative, necessitating further restraint" after Deputy Pitfield took E___ to the ground and with E___ prone. The "Findings" continue with the statement that, "The decedent continued to struggle, culminating in a severe physical outburst where he pulled his restrained arms over his head."  The final diagnosis for the Cause of Death was, "Excited Delirium," and the Manner of death was certified as being "Accident."  Specifically, the narrative stated that, "E___ P___, a 16-year-old male, died as a result of Excited Delirium due to an Acute Psychotic Episode in the setting of Severe Autistic Spectrum Disorder and Disruptive Behavior Disorder."  "Morbid Obesity with Prone Positioning and Cardiomegaly" were listed as contributing factors to the death.

---

Sperry Forensic Pathology Consultants, Inc.
2194 Bear Creek Road
Moreland, Georgia  30259
Telephone:  (770) 252-2002
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
2/1/2023
Page 7 of 13

As will be discussed, these findings are incorrect as the manner and cause of death. First, this incident should have been classified as a homicide as even Dr. Troxclair noted that had the deputies not placed E      in the prone position for over 9 minutes, E      most likely would not have died. (Troxclair depo., p. 58).  Second, Excited Delirium is not a valid cause of death and E      did not exhibit any of the vast array of alleged symptoms of Excited Delirium.  Third, Dr. Troxclair did not address or evaluate the contribution of the "forearm bar" chokehold administered by Deputy Vega to E      death.  Fourth, E      was not experiencing a psychotic episode but was exhibiting his long-standing, behavioral manifestations of the SASD.

The term "Excited Delirium Syndrome" (ExDS) was first used in 1985, in a scientific article discussing sudden deaths in cocaine users, and of the seven cases discussed, five occurred while the individuals were in police custody.  Since that time, this diagnosis has been imbued with controversy.  The medical diagnosis of "Excited Delirium" is often made based solely upon ill-defined criteria that comprise "risk factors" that are purported to be diagnostic for ExDS, without any specific pathologic diagnostic criteria.  This often causes the clinical or autopsy diagnosis of ExDS to be subjective, rather than based upon scientific and medical objective diagnostic findings.  These purported "risk factors" include such things as, "bizarre behavior generating phone calls to police," "failure to respond to police presence (or "failure to follow commands of police")," "highly elevated body temperature" and "continued struggle despite restraint." Persons with ExDS also supposedly exhibit "superhuman strength" and are "impervious to pain."  The list of purported "risk factors" has expanded over nearly three decades, to include the presence of a plethora of illicit (and some licit) drugs, drug toxicity (especially cocaine or methamphetamine), profuse sweating, exhibiting verbal or physical threats, lack of ability to control one's behaviors and actions, and even the presence of a known mental disorder.

Neither Excited Delirium or an essentially similar diagnosis, Agitated Delirium, are accepted as valid medical diagnoses by many professional medical organizations and societies.  Many professional organizations, including the World Health Organization and the American Medical Association, do not recognize these syndromes as valid medical diagnoses, and these are not listed as diagnoses by the International Classification of Diseases or The Diagnostic and Statistical Manual of Mental Disorders. The American Psychiatric Association's position is that the term ExDS is "too nonspecific to meaningfully describe and convey information about a person."  The Royal College of Psychiatrists in the United Kingdom released a statement that they do "not support the use of such terminology, which has no empirical evidential basis."  Most published scientific literature has indicated that ExDS-related deaths are due to an occult and as-yet uncharacterized occult pathophysiologic process.  A 2020

---

Sperry Forensic Pathology Consultants, Inc.
2194 Bear Creek Road
Moreland, Georgia  30259
Telephone:  (770) 252-2002
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
2/1/2023
Page 8 of 13

investigation by the United Kingdom's forensic science regulator found that the diagnosis should not have been used since it "has been applied in some cases where other important pathological mechanisms, such as positional asphyxia and trauma may have been more appropriate."

The diagnosis of Excited Delirium is not uniformly accepted in forensic medicine and forensic pathology as a valid cause of death, primarily because the purported "risk factors" as delineated above do not, in and of themselves or in combination, begin to adequately explain the exact pathophysiologic mechanism or mechanisms which ultimately cause a death.  Furthermore, a very large percentage of persons with supposed "Excited Delirium" deaths have illicit stimulant drugs in their blood, primarily cocaine and methamphetamine (and/or amphetamine).  These stimulant drugs are well-known to cause systemic toxicity, usually producing a catecholamine or adrenergic "storm", with tachycardia, often elevated body temperature, and behavioral aberrations that are identical to those attributed to ExDS patients.  Furthermore, ExDS has and still is used by some law enforcement agencies in order to attempt to explain a negative outcome, up to and including death, that results from forcibly restraining someone.  In any event, E     did not meet the ever changing and ill-defined characteristics of Excited Delirium as E     did not have an extremely elevated body temperature, was not under the influence of illegal drugs and his behavior was not out of character but represented the behavioral manifestations of his SASD.

For many years, the forensic pathology community accepted that a death might occur from the prone restraint of an individual being subdued by law enforcement officers, and the terms, "positional restraint," "prone restraint," or "positional asphyxia" were coined in order to give a diagnosis to deaths that occurred when an individual was prone, handcuffed (with or without hobble restraints on the feet), and often with the weight of officers on his or her back.  Experimental observations eventually revealed that, for the vast majority of young, healthy and non-obese individuals, such prone restraint with handcuffs and even with weight on the back did not produce deleterious outcomes, and it was gradually recognized that such restraint methods were not physically or physiologically dangerous.  However, as individual patient characteristics were more closely examined in situations where the outcome was severe organ system damage, brain damage, or death, it was found that one particular risk factor that did, in fact, prove to be potentially serious and even life-threatening in prone-restraint events.  This factor was the presence of obesity in the person being restrained, and specifically, significant abdominal obesity such that a distinct protuberant abdomen will push up on the diaphragm when an obese person is prone and restrained in the prone position, thus impairing adequate thoracic expansion while breathing. The American Psychiatric Association recognized prone restraint, or the utilization of prone "5-point restraints" in

an agitated and mentally ill patient as significantly posing a life-threatening risk. Thus, prone restraint in obese persons should be avoided altogether, or if required as a part of the overall restraint of an agitated patient, should last as short a time as possible. Once the individual is restrained, they should be turned on their side, in the "rescue position," alleviating the diaphragmatic excursion impairment caused by staying in a prone position.

The terms "positional asphyxia" and "restraint asphyxia" may also be vague, in that true asphyxia, or lack of oxygen entering the lungs and then being distributed by the heart, is not an adequate explanation for how deaths occur in prone restraint situations, especially in obese individuals. Experimental data has shown that when an individual is restrained in the prone position and weights are placed upon the back, this will have the result of decreasing the cardiac index, which is the amount of blood pumped by the heart as a function of the Body Mass Index (BMI). Thus, as the body weight of an individual increases, a prone restraint will impair the adequate circulation of blood. Additionally, a fight or altercation, such as when an individual struggles with police officers who are attempting to subdue him/her, with continued struggling once the person is effectively restrained, can produce acidosis and an elevated serum Potassium level (hyperkalemia). In an obese individual who is restrained in a prone position, the impairment of adequate respiratory oxygen and carbon dioxide exchange causes upward displacement of the obese abdomen against the diaphragm and thorax, such that inspiratory and expiratory excursion is diminished.

The evolution of systemic acidosis is exacerbated by the resulting inadequate oxygen and carbon dioxide exchange; and carbon dioxide retention compounds the evolving systemic acidosis. Ultimately, the postulated mechanism of true prone positional asphyxia is progressive acidosis and hyperkalemia that is compounded by respiratory embarrassment caused by the physical upward displacement of the obese abdomen, limiting the expansion of the chest. The systemic acidosis progresses to cause cardiac arrhythmias which may themselves be lethal, as well as hypoxic and hypoperfusion damage to other organs. Many survivors of actual positional asphyxia sustain renal damage, liver damage, central nervous system damage, and respiratory failure. In specific instances where an obese individual who has a large, protuberant abdomen is held prone, with weight upon the posterior body surface, the physical effect is that the abdomen is forced superiorly, impinging upon the diaphragm and impairing adequate inspiration and expiration. This has been demonstrated to be a known and recognized risk in the restraint of obese individuals. For this reason, the American Psychiatric Association has recommended that this practice be avoided or minimized in mentally ill patients, as deaths in mental treatment facilities have occurred when obese mentally ill patients were restrained and prone.

Sperry Forensic Pathology Consultants, Inc.
2194 Bear Creek Road
Moreland, Georgia  30259
Telephone:  (770) 252-2002
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
2/1/2023
Page 10 of 13

Autism spectrum disorder is a neurological and developmental disorder that affects how people interact with others, communicate, learn and behave.  Symptoms and signs usually begin to appear by two years of age, and there is a very wide variation in the type and severity of the symptoms that individuals exhibit and experience.  In the more severe manifestations of the autism spectrum disorder (SASD), persons may become upset with even slight changes in a routine and have difficulty with transitions, and have either increased sensitivity or decreased sensitivity as compared to other non-autistic people to various sensory inputs, such as light, sound, clothing or temperature.  The more severe manifestations of the disorder may require almost complete continual care and supervision by others, including parents and other designated caregivers.  The communication difficulties may profoundly interfere with the ability of an autistic individual to "obey" the simplest of commands, which may readily be misinterpreted as uncooperativeness or intentional disobedience.  These severe communication impairments can be catastrophic in situations where the autistic person is confronted by others, such as law enforcement officers.  E      parents knew that when he began to have a "melt-down," he would engage in self-injurious behaviors and sometimes aggressive actions towards others.  His parents knew best how to calm him and diminish the excessive environmental stimulations that precipitate these crises.  The inability of the autistic person to understand and comprehend commands, and especially an individual with Severe Autistic Spectrum Disorder, who are confronted by or otherwise involved in an incident with law enforcement officers, can result in disaster if the officer(s) decide to continue to utilize a prone restraint against an obese, severely autistic person.  While Dr. Troxclair noted in her autopsy report that E     died of "Excited Delirium due to an Acute Psychotic Episode," the evidence does not support either finding as E     failed to meet even the ill-defined characteristics of Excited Delirium and his actions were not psychotic or delusional but the long-standing behavioral manifestations of his SASD.

Persons with autism, and especially severe autism, frequently have co-existing physical and motor problems, such as obesity, and impairment of both gross and fine motor abilities and skills.  Other physical findings are "low muscle tone" (hypotonia), as well as hypermobility (markedly increased and excessive flexibility) which involves many joints.  E     P      exhibited these features.  E     was obese, his motor skills were clearly impaired, and his joints were excessively mobile and flexible.  He was unable to make closed fists, and exhibited hypermobility of his arms and shoulders, which was demonstrated when Deputy Vega grasped E       cuffed hands and elevated them over E      upper back and his head.  This apparent "hypermobility" is thought to be the result of poor muscle tone, with concomitant increased mobility beyond that of non-autistic persons; but no definitive structural or biochemical abnormality has been yet

---

Sperry Forensic Pathology Consultants, Inc.
2194 Bear Creek Road
Moreland, Georgia  30259
Telephone:  (770) 252-2002
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

discovered.  The aberrations in the sensory interpretations by autistic persons will often cause them to strike themselves, or appear to "act out," in order to provide self-stimulation that assists the autistic person to cope with the world around him/her.  Such self-stimulation has never been shown to be evidence of intentional self-harm, however.

The decision to restrain E    P     by members of the JPSO essentially represents a clash between the decisions of law enforcement, and the communication discordance that typifies autism.  The sequence of events as documented in the video recordings and other sources reveals that the JPSO deputies and other officers knew that E    was autistic, knew that he was not "normal," and although autism is not classified as a psychiatric illness, nonetheless knew that there were significant "mental" issues affecting this young man.  The decision to restrain E    for a prolonged period of time would cause E    to react as his autism interfered with his ability to understand what he was being asked to do, much less why, or to communicate verbally with the deputies.  Further, the prolonged restraint further depleted his oxygen reserves and increased his retention of $CO_2$ which made him acidotic which made him struggle to breathe.  E    was observed to have periods of complete calmness followed by efforts to react as he struggled for breath as he was asphyxiating.  Further, E    was morbidly obese, which immediately put him at risk for serious medical consequences and even death if he was held in a prone restraint, which is exactly what occurred.

The specific maneuver performed by Deputy Vega, wherein E      cuffed arms were forcibly pushed up and over E     head, would result in E     experiencing pain.  This was the completely gratuitous infliction of pain, and E    was not resisting or struggling.  At no time during the more than nine minutes that E    P     was restrained, face-down on the cement, was the pressure on his back relieved for more than mere seconds, nor was he ever turned in to a recovery position, until the deputies noticed that E    was not breathing, unresponsive and had urinated on himself.

It is my opinion, to a reasonable degree of medical certainty, that the prone restraint of E    P    , with continuous weight upon his posterior body for all but a few seconds of a time period of more than nine minutes, caused progressive respiratory insufficiency as pressure forced his obese abdomen upwards, impairing adequate inhalation and exhalation, and the continual struggle likewise produced gradual systemic acidosis.  Both of these conditions eventually culminated in the evolution of a lethal cardiac arrhythmia, which was fatal.  The appropriate pathologic diagnosis for his death is thus "positional asphyxia," or "restraint asphyxia."  The  mechanism of his death is a sudden cardiac arrhythmia which arose from systemic acidosis and progressive respiratory insufficiency, caused by continual prone restraint with very significant body weight pressure being directed on his back, pressing E    into the underlying cement with

---

Dr. Kris L. Sperry
2/1/2023
Page 12 of 13

superior displacement of his abdominal panniculus that impaired diaphragmatic excursion, and the exchange of oxygen and carbon dioxide  It is also my opinion, to a reasonable degree of medical certainty, that E    P      did NOT die of the Excited Delirium Syndrome, and furthermore, that the utilization of this syndromic diagnosis is improper and should not be used to explain E    P        death.

Except for mild heart enlargement, the autopsy examination was negative, with no identification of structural abnormalities of the heart, brain, or other organs, no evidence of biochemical indicators of possible systemic allergic reactions (anaphylaxis), and no genetic abnormalities which may have somehow precipitated his sudden death.  In effect, the extensive autopsy concluded no pre-existing anatomic or pathologic cause of his death.

Several hemorrhages were identified within the strap muscles of the neck, without fracture of the hyoid bone or laryngeal cartilages.  When Deputy Vega was holding E    prone, Vega placed a forearm across the front of E     neck, an extremely dangerous neck restraint termed a "forearm bar" hold.  This neck hold causes the forearm to push posteriorly upon the restrained person's larynx, and should never be used in law enforcement restraints except in life-or-death struggles.  Even if the larynx or hyoid are not fractured, the forearm bar hold across the front of the neck displaces the larynx backwards, against the anterior cervical spinal column, and impairs breathing through deformation of the upper airway anatomic structures.  The incident between the JPSO officers and E    P     was not a life-or-death situation, and the deputies were also aware that E   was "special needs."  These hemorrhages of the neck and injuries around the hyoid bone confirm Vega applied the forearm bar hold, and it is my opinion, to a reasonable degree of medical certainty, that this neck hold must be considered a contributory cause of E    P       death.

A final conclusion of the autopsy examination of E    P     was the determination of a "Manner of Death."  There are five generally recognized manners of death, which include Natural, Accident, Suicide, Homicide, and Undetermined.  In the case of E    P   , the autopsy pathologist opined that the Manner of Death was "Accident."  It is my opinion, to a reasonable degree of medical certainty, that E    P      death should have been more properly called a "Homicide."  From the forensic pathology perspective, "Homicide" specifically means that a person's death was caused or contributed to by the action or actions of others.  A homicidal manner of death does not imply intent to cause death; such intent definitions of intent are legal conclusions, and not medical conclusions.  A "Homicide" manner of death likewise does not imply negligence.  The "Findings" portion of the autopsy report clearly describes that E    was involved in a struggle with law enforcement officers, and that he was restrained in a prone position on

---

Sperry Forensic Pathology Consultants, Inc.
2194 Bear Creek Road
Moreland, Georgia  30259
Telephone:  (770) 252-2002
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
2/1/2023
Page 13 of 13

the ground, until he physiologically decompensated and his condition rapidly deteriorated, until he died. This event sequence very clearly delineates that E     P; was held and restrained in a prone position by others, and that this restraint and the characteristics of this restraint are at least a contributing factor to his death, if not actually the primary causative factor. In light of this, and following the guidelines for Manner of Death determination promulgated by the National Association of Medical Examiners, the proper Manner of Death classification for E    P.    is, "Homicide." This opinion is also given to a reasonable degree of medical certainty.

It is also my opinion, to a reasonable degree of medical certainty, that if E   P     had not been restrained in a prone position with the body weight of officers (and one especially morbidly obese officer) been exerted on his posterior body surface, he would not have died. Also, if E     had been rapidly moved from the prone position to a recovery position, before he became completely unresponsive, more probably than not he would have survived. Finally, the placement of the forearm neck choke hold by Deputy Vega was a substantial contributing cause to his death, by causing pressure against E       upper airway, further interfering with adequate air exchange, and would have been very painful to E    as well. E    P,    sustained significant pain and suffering over the entirety of the prone restraint which culminated in his death.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing is true and correct.

*Kris Sperry, MD.*

Sperry Forensic Pathology Consultants, Inc.
2194 Bear Creek Road
Moreland, Georgia 30259
Telephone: (770) 252-2002
e-mail Dr. Sperry: stiffdoc@bellsouth.net