UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CASE NO.  2:21-cv-00080

DONNA LOU and DAREN PARSA, on their own behalf and
on behalf of their deceased minor child, E.P.

Plaintiffs,


VERSUS


SHERIFF JOSEPH P. LOPINTO, III, CHAD PITFIELD, RYAN
VAUGHT, STEVEN MEHRTENS, SHANNON GUIDRY, NICK VEGA,
MANUEL ESTRADA, MYRON GAUDET, JOHN DOES 1-3,
VICTORY REAL ESTATE INVESTMENTS LA, LLC D/B/A
WESTGATE SHOPPING CENTER, ABC INSURANCE COMPANY,
and XYZ INSURANCE COMPANY,

Defendants.



  VIDEOTAPED DEPOSITION OF DETECTIVE RYAN VAUGHT,

given in the above-entitled cause, pursuant to the

following stipulation, before Sandra P. DiFebbo,

Certified Shorthand Reporter, in and for the State

of Louisiana, at JPSO, 1233 Westbank Expressway,

Fifth Floor, Harvey, Louisiana, on the 20th day of

September, 2022, commencing at 9:02 AM.

```
 1   APPEARANCES:
 2            THE COCHRAN FIRM MID-SOUTH
              BY:  ANDREW CLARKE,
 3            ATTORNEY AT LAW
              One Commerce Square
 4            40 South Main, Suite 1700
              Memphis, Tennessee  38103
 5            representing the Plaintiffs
 6
              MARTINY & ASSOCIATES
 7            BY:  FRANZ ZIBILICH,
              ATTORNEY AT LAW -and-
 8            JEFFREY D. MARTINY,
              ATTORNEY AT LAW
 9            131 Airline Drive
              Suite 201
10            Metairie, Louisiana  70001
              -and-
11            LINDSEY M. VALENTI, ATTORNEY AT LAW
              LEGAL ADVISOR
12            1233 Westbank Expressway
              Building B, Fifth Floor
13            Harvey, Louisiana  70058
              Representing JPSO Defendants
14
15            THOMPSON, COE, COUSINS & IRONS, LLP
              BY:  MARK HILL,
16            ATTORNEY AT LAW
              601 Poydras Street
17            Suite 1850
              New Orleans, Louisiana  70130
18            Representing Victory Real Estate
              Investments LA, LLC, and Westgate
19            Shopping Center
20
21
22   Also Present:  Daren Parsa, Donna Lou, Tim Anclade,
                     Nicholas Vega, Steven Mehrtens,
23                   Myron Gaudet
24
     Videographer:  Aaron Palmer, CLVS, Depo-Vue
25
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

```
 1     Reported By:

 2            .

 3            Sandra P. DiFebbo
               Certified Shorthand Reporter
 4             State of Louisiana

 5

 6

 7       E X A M I N A T I O N          I N D E X

 8                                      Page

 9    BY MR. CLARKE:                     5

10    BY MR. HILL:                      162

11

12

13       E X H I B I T                I N D E X

14                        Page

15

16    Exhibit 101                       10

17    Exhibit 102                       10

18    Exhibit 103                       10

19    Exhibit 104                       10

20    Exhibit 105                        6

21

22

23

24

25
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

1            S T I P U L A T I O N

2

3            It is stipulated and agreed by and

4   between Counsel for the parties hereto that the

5   Videotaped Deposition of DETECTIVE RYAN VAUGHT is

6   hereby being taken pursuant to the Federal Rules of

7   Civil Procedure for all purposes in accordance with

8   law;

9            That the formalities of reading and

10  signing are specifically waived;

11           That the formalities of sealing,

12  certification, and filing are hereby specifically

13  waived.

14           That all objections, save those as to

15  the form of the question and responsiveness of the

16  answer are hereby reserved until such time as this

17  deposition or any part thereof is used or sought to

18  be used in evidence.

19                  *  *  *  *  *

20           Sandra P. DiFebbo, Certified Shorthand

21  Reporter, in and for the State of Louisiana,

22  officiated in administering the oath to the

23  witness.

24

25

```
 1                    DETECTIVE RYAN VAUGHT, having been
 2          first duly sworn, was examined and testified
 3          on his oath as follows:
 4     EXAMINATION BY MR. CLARKE:
 5          Q.    Would you please state your name for the
 6     record.
 7          A.    Ryan Vaught.
 8          Q.    Do you have a title? Are you sergeant or
 9     deputy?
10          A.    Detective.
11          Q.    Detective Vaught, my name is Andy Clark.
12     I have seen you in the rooms here before I met you
13     briefly before your deposition.  Have you ever
14     given a deposition before?
15          A.    Yes, sir.
16          Q.    Under what circumstances?
17          A.    It was a traffic accident investigation.
18          Q.    Were you a fact witness?
19          A.    Correct.
20          Q.    Did you give a deposition -- have you
21     ever been sued before?
22          A.    Yes, sir.
23          Q.    Did you give a deposition in that case?
24          A.    No.  I don't believe I did.
25          Q.    Is that the Pratt versus Giroir,
```

```
 1   G-I-R-O-I-R?
 2              MR. ZIBILICH:
 3                   Close.  Giroir.
 4              THE WITNESS:
 5                   Giroir, right. Yes, sir.
 6   BY MR. CLARKE:
 7       Q.   What was that about?
 8       A.   What was the lawsuit about?
 9       Q.   Yeah.
10       A.   Allegations of unreasonable force.
11       Q.   And do you know if you had an Internal
12   Affairs -- who were you working for at that time?
13       A.   At that time, I was with the New Orleans
14   Police Department.
15       Q.   Do you know what happened to that
16   lawsuit?
17       A.   No, sir, I don't.
18       Q.   I'm going to mark -- I'm going to pass to
19   you what has been marked as Exhibit 105.  You have
20   seen a copy of that before, haven't you?
21              MR. ZIBILICH:
22                   Who represented him?
23              MR. CLARKE:
24                   Look at the last page.  Robert
25                Jenkins and Richard Root.
```

```
 1              MR. ZIBILICH:
 2                   No.  Who represented Mr. Vaught?
 3              MR. CLARKE:
 4                   I don't know.
 5              MR. ZIBILICH:
 6                   I got a feeling I was the Chief
 7                Deputy City Attorney at the time.
 8              MR. CLARKE:
 9                   Unlike the high-priced Jefferson
10                Parish lawyer they have.
11              MR. ZIBILICH:
12                   Do they have a high-priced Jefferson
13                Parish lawyer?
14              MR. CLARKE:
15                   You would think.
16       BY MR. CLARKE:
17           Q.   You do not remember a process server
18       coming out and serving you with a copy of the
19       complaint?
20           A.   I mean, it's been a long time.  I don't
21       specifically remember that.
22           Q.   In reviewing this, do you recall what the
23       allegations were that you did in this complaint, in
24       this incident?
25           A.   Yes, sir.  I see what the allegations are
```

1    right here.

2        Q.   What is your understanding of what

3    happened in this case?

4        A.   My understanding?

5        Q.   Yes. What did you -- I mean, they have

6    said what they said in this document that they

7    filed and sued you, right?

8        A.   Yes, sir.

9        Q.   What is your version?

10       A.   My version is what the petitioner said.

11   We did handcuff her.  Well, excuse me.  We did

12   place her on the ground, pepper sprayed her, which

13   ultimately gave us control of her, and we put her

14   in handcuffs.

15       Q.   How long did you have her on the ground?

16       A.   I don't remember, sir.

17       Q.   Brief period of time?

18       A.   Again, I don't know.  I mean, this is

19   back in 2006.

20       Q.   You were sued about it.  Doesn't that --

21   you get sued a lot?

22       A.   No.  I can't say that I have been.

23       Q.   So this isn't a big event?  It didn't

24   matter to you?

25       A.   I wouldn't say that, but you are asking

1   me about time from 2006.  I don't remember time.

2        Q.   That's fair.  Let's do a couple of

3   things.  I kind of jumped into something.  Before

4   we get going here, let's go through some ground

5   rules.  I know you sat through some depositions.

6   Which depositions did you sit through?

7        A.   Just yesterday's.

8        Q.   Just yesterday.  Okay.  And that was my

9   clients?

10        A.   Correct.

11        Q.   Or Mr. Parsa.  We didn't get to Miss Lou.

12        A.   Correct.

13        Q.   Well, let's just -- I'm going to go

14   through some ground rules to make sure we

15   communicate well.  Obviously, you understand your

16   testimony here is under oath subject to the penalty

17   of perjury, correct?

18        A.   Yes, sir.

19        Q.   And as you can tell from yesterday, a lot

20   of times people get into a conversation, and they

21   say uh-huh or na-huh or shake their head yes or no.

22   The court reporter can't take that down, so if

23   you'd please give audible answers.  Okay?

24        A.   I will.

25        Q.   Again, this is not a memory contest, and

```
 1    I appreciate what you've told me about that last
 2    question.  If you need to review something to give
 3    an accurate answer, if you'd please let me know,
 4    I'll see, depending on the nature of the question,
 5    I'll see if I can get that for you.  Okay?
 6         A.   I understand.
 7         Q.   And what I've also put in front of you
 8    today are a bunch of documents.  I'm going to go
 9    through the record and mark that.  If you look to
10    your left, there is a stack of documents marked
11    Exhibit 101.  That is your personnel file that was
12    produced by JPSO.  Okay?
13         A.   Okay.
14         Q.   Exhibit Number 102, which should be right
15    in front of you, are your interrogatory responses.
16    Okay.  Exhibit Number 103 are your supplemental
17    Interrogatory Answers, and Exhibit Number 104 is
18    your statement.  Okay?
19         A.   Yes, sir.
20         Q.   In addition, what you have up to your
21    left is a copy in that binder.  I'm sorry.  To your
22    right. I got that wrong.  The policies and
23    practices which are Exhibit 19, if you need to
24    refer to the policies, and Exhibit 22 is the RIPP
25    Hobble training, if you need to refer to that.
```

```
 1   Okay?
 2        A.   Yes, sir.
 3        Q.   Now, let's look at Exhibit Number 102
 4   first.  We'll go over this.  Never been arrested?
 5        A.   No, sir.
 6        Q.   Look at Interrogatory Number 11.  The
 7   questions are numbered.
 8        A.   Yes, sir.  Number 11.
 9        Q.   This question asks you to identify any
10   time you were investigated by Internal Affairs or
11   any other division of any law enforcement agency,
12   including the JPSO, which is empowered to
13   investigate officer misconduct.  It's your sworn
14   answer under oath that you've only been
15   investigated by the New Orleans Police Department
16   for use of force on one occasion.  Is that correct?
17        A.   To the best of my recollection, yes, sir.
18        Q.   Was there an Internal Affairs
19   investigation of the lawsuit, Pratt versus you and
20   some other officers?
21        A.   This is the complaint, sir.
22        Q.   Did you want to change that answer?
23        A.   So you're asking me is this the same
24   complaint that I'm referencing here, the same one
25   that I was sued on?
```

1    Q.   I'm asking you if your answer to Number

2    11, Interrogatory Number 11, is truthful and

3    accurate?

4    A.   Yes.

5    Q.   So if I go through your JPSO personnel

6    file, I'm not going to find a whole bunch of other

7    disciplinary investigations from you from other

8    departments?  Is that what you are telling me?

9    A.   Repeat your question.

10    Q.   If I go through your JPSO file, are you

11    trying to tell me that they're not going to have

12    any information of other investigations from other

13    departments regarding your conduct?

14              MR. ZIBILICH:

15                  Object to the form.  You can answer

16              it.

17              THE WITNESS:

18                  I'm not saying that at all.  I don't

19              know what is in my jacket.  I'm asking

20              -- you asked me specifically about

21              Number 11, so I was answering that

22              question, but if there is something

23              else in my jacket that I'm not aware

24              of, I'm not aware of.

25    BY MR. CLARKE:

```
 1        Q.   You would be aware if you were
 2   investigated by Internal Affairs, correct?
 3        A.    It depends on what agency and the case.
 4   I don't remember being investigated other than this
 5   time here.  This is the only time I was ever sued.
 6   I don't remember having any other investigations
 7   under my jacket.
 8        Q.   But in Interrogatory Number 11, the
 9   incident that you're talking about there, where you
10   were investigated on a use of force complaint is
11   the same event that is referenced in the Pratt
12   lawsuit, correct?
13        A.   Yes, sir.  That is correct.
14        Q.    If you go to Interrogatory Number 18, it
15   asks you to identify any and all accommodations, if
16   any, you contend you provided E███ P█████ to
17   accommodate his disability.  Can you read your
18   answer?
19        A.    "Assuming the interrogatory pertains to
20   accommodations under the Americans with
21   Disabilities Act, no accommodations were requested
22   nor provided during this incident as described in
23   the police report produced in connection herewith."
24        Q.   Do you even know what that means?
25        A.   That means that did not provide any
```

1   accommodations at that time.
2       Q.   What is an accommodation?
3       A.   What is an accommodation? What is the
4   word I want to use. The --
5       Q.   Americans with Disabilities Act?
6       A.   No.  It's -- an accommodation is
7   something that we allow for in a situation.
8       Q.   Do you know what the Americans with
9   Disabilities Act is?
10      A.   Not specifically, no, sir.  I know they
11  allow for accommodations, ramps, things of that
12  nature for those that are wheelchair bound.
13      Q.   Do you have any training on that?
14      A.   Not that I remember receiving, no, sir.
15      Q.   Let's go through a little bit about your
16  -- we are going to go through your education and
17  then your employment then your law enforcement
18  training.  Okay?
19      A.   Uh-huh.
20      Q.   Did you graduate from high school?
21  You've got to say yes or no.
22      A.   Yes, and, yes, I graduated from high
23  school.
24      Q.   What year did you graduate from high
25  school?

```
 1        A.    1995.

 2              MR. CLARKE:

 3                    Would you like another Cochran pen

 4                anybody?

 5              MR. ZIBILICH:

 6                    Are they worth anything?

 7              MR. CLARKE:

 8                    About 50 cents.  Here is one.

 9              MS. VALENTI:

10                    He thinks he's riding in Mardi Gras.

11              MR. ZIBILICH:

12                    He thinks this is going to keep him

13                from getting a ticket when he is out in

14                the streets of Jefferson Parish.

15              MR. CLARKE:

16                    Oh, shit.

17              MR. ZIBILICH:

18                    Can you imagine him on a Mardi Gras

19                float?

20              MS. VALENTI:

21                    We just got a preview.

22              MR. CLARKE:

23                    I'll show you my --

24              MS. VALENTI:

25                    Please, no.
```

16

```
 1          MR. MARTINY:
 2               It's the other way around.
 3          MR. CLARKE:
 4               I came in second in a wet T-shirt
 5            contest in Pensacola in my junior year
 6            in college, so.
 7          MR. ZIBILICH:
 8               Did you have a wig that made you
 9            look like a girl?
10          MR. CLARKE:
11               I did not, but I had some good
12            moves.
13     BY MR. CLARKE:
14          Q.   Education.  So you graduated high school.
15     What year?
16          A.   1995.
17          MR. CLARKE:
18               And you are going to love some of
19            these questions, Franz.
20          MR. ZIBILICH:
21               I can't wait.
22     BY MR. CLARKE:
23          Q.   Where did you receive your first law
24     enforcement -- Well, you lived in Shelby County,
25     didn't you?
```

```
 1        A.    Correct.
 2              MR. CLARKE:
 3                    He trained at the Memphis Police
 4                Academy.
 5              MR. ZIBILICH:
 6                    That makes him smarter than the rest
 7                of them?
 8              MR. CLARKE:
 9                    No.  That makes him have more
10                knowledge based on what I've done on
11                past cases.
12              MR. ZIBILICH:
13                    Well, why don't you give him a pass?
14              MR. CLARKE:
15                    No.
16  BY MR. CLARKE:
17        Q.    1995.  Was that here in Louisiana?
18        A.    That I graduated high school?
19        Q.    Yeah.
20        A.    Yes, sir.
21        Q.    Did you have any post high school
22  education classes?
23        A.    Yes, sir.
24        Q.    Take me through your educational training
25  outside of law enforcement.
```

18

```
 1        A.    After I graduated high school, I attended
 2   Delgado Community College.
 3        Q.    How long and did you get a degree?
 4        A.    No degree.  I probably attended just one
 5   semester, one year.
 6        Q.    Around 1996?
 7        A.    Yes, sir.
 8        Q.    Was that the extent of your education?
 9   Did you have more? Take me through it all.
10        A.    So after that I got into law enforcement,
11   basically, and then around 2012 I went back to
12   school and received my bachelor's from Loyola.
13        Q.    When did you get your bachelor's from
14   Loyola?
15        A.    Around 2013, 2014, somewhere in that time
16   period.
17        Q.    What was it in?  What was your bachelor's
18   in?
19        A.    Criminal justice.
20        Q.    Was that online or in class?
21        A.    It was both.
22        Q.    Any other college classes that you
23   attended?
24        A.    Yes.  I also attended Southwest.  I
25   forget how they worded it.  It was a community
```

```
 1   college in Tennessee.
 2         Q.   In Memphis, right?
 3         A.   Correct.  Southwest Community College.
 4   Something like that.
 5         Q.   Did you get a degree there?
 6         A.   No.  I got up to 54 hours.
 7         Q.   You were trying to get the number of
 8   hours to allow you to apply to be a police officer
 9   at the MPD, correct?
10         A.   That's correct.
11         Q.   They don't allow people just with a high
12   school education to become cops, correct?
13         A.   That is correct, unless you had military
14   experience.
15              MR. ZIBILICH:
16                   I thought he was going to say he
17               taught there.  I was going to fall off
18               the chair.
19   BY MR. CLARKE:
20         Q.   Did you serve in the military?
21         A.   No, sir, I did not.
22         Q.   So at that time, it was -- you had to
23   have 54 hours or did you use some of your Delgado
24   Community College Training?
25         A.   I don't remember specifically how many
```

1    hours I needed to get or what was accepted by

2    Southwest, what credits were accepted.

3          Q.   Did you go to the MPD, and they tell you,

4    you need to take certain courses, and then you did

5    a certain amount of courses recommended by the MPD

6    so you would have enough credits to become a police

7    officer?

8          A.   Correct.

9          Q.   So you went through the PST program at

10   Memphis, right?

11         A.   I did.

12         Q.   Because you didn't qualify for a police

13   officer, correct?

14         A.   That's correct.

15         Q.   Talked to the MPD brass about what you

16   needed, because you wanted to be a police officer,

17   and they told you what type of credits you needed

18   to get, correct?

19         A.   Correct.

20         Q.   You got those credits?

21         A.   Yes.

22         Q.   You went to the Memphis Police Academy in

23   2002, and you only served as a Memphis cop for,

24   roughly, a year, correct?

25         A.   Six months.

```
 1        Q.   They trained you all about excited
 2   delirium and positional asphyxia, correct?
 3        A.   Not that I remember, sir. I don't know.
 4        Q.   You were in the 82nd Academy there?
 5        A.   Again, I don't remember.
 6        Q.   Let's pull out your personnel file.
 7        A.   This is Exhibit 101 you're saying?
 8        Q.   Yes, sir.
 9        MR. CLARKE:
10             For you, Franz, I took notes on a
11          legal pad, because I figured that's
12          more your age category.
13        MR. ZIBILICH:
14             I was going to tell you something.
15          You just reminded me of An Officer and
16          a Gentleman.  I thought the quiz was if
17          he remembered what number class he was
18          in.
19        MR. CLARKE:
20             But he didn't, so he failed.
21   BY MR. CLARKE:
22        Q.   MPD.  Page 1823 is the Bates stamp
23   number.
24        A.   I'm sorry.  Page what?
25        Q.   1823.  JPSO-000 -- 001823.  Actually,
```

```
1    1824.
2              MR. ZIBILICH:
3                   You see where that Bates stamp is
4              at?
5              THE WITNESS:
6                   Yes.
7              MR. ZIBILICH:
8                   It's probably 15 up the road.
9              THE WITNESS:
10                  00 --
11             MR. CLARKE:
12                  It is towards the back, and these
13               Bates numbers are hard to see because
14               they're on the side.
15             MR. ZIBILICH:
16                  What is the number we're looking
17               for?
18             MR. CLARKE:
19                  1824.  It's one of your
20               certificates.
21             MR. ZIBILICH:
22                  Close.  One of your certificates.
23   BY MR. CLARKE:
24        Q.   I apologize.  You were with the 86th
25   Basic Police Recruit Training Session.  So you
```

```
 1    would have gone through all of the training that
 2    was provided in this basic training program,
 3    correct?
 4         A.   Yes, sir.
 5         Q.   Do you remember any of it?
 6         A.   Some, sure.
 7         Q.   Do you remember that they -- whether the
 8    MPD used the RIPP Hobble?
 9         A.   Yes.
10         Q.   Do you know when they went to the RIPP
11    Hobble or why?
12         A.   No, sir.
13         Q.   1994 because of the Boyd case versus City
14    of Memphis.
15              MR. ZIBILICH:
16                   That wasn't a question, but we
17                appreciate the editorial.
18              MR. CLARKE:
19                   Well, you know.
20    BY MR. CLARKE:
21         Q.   So let's go through.  Let's go back to
22    the front of it.  We are just going to go through
23    this whole document.  You filled out an
24    application.  Well, let's go through this first,
25    before we get to that.  What was your first law
```

1    enforcement job?

2         A.   My first law enforcement job was as a

3    corrections officer with the Orleans Parish

4    Criminal Sheriff's Office.

5         Q.   When was that?

6         A.   1999. I say my first law enforcement.  I

7    wasn't POST certified.  I was a jailer.

8         Q.   We'll get to that.  When you were -- I

9    would consider being a jailer in law enforcement

10   for the purpose of these questions. Okay?

11        A.   Okay.

12        Q.   So your first job in law enforcement was

13   -- what did you say, 19 --

14        A.   '99.

15        Q.   1999.  That would have been in

16   corrections for the Orleans Parish Sheriff?

17        A.   Criminal sheriff, yes, sir.

18        Q.   Tell me about the training that you had

19   to do to become a correctional officer in 1999 for

20   Orleans Parish.

21        A.   It was an inservice style training which

22   consisted of the care and custody and control of

23   inmates.

24        Q.   Would you agree that law enforcement

25   training is different?

```
 1              MR. ZIBILICH:
 2                   Is what?
 3              MR. CLARKE:
 4                   Different.
 5              MR. ZIBILICH:
 6                   Than correctional officer training?
 7                Is that the whole question?
 8              MR. CLARKE:
 9                   Yes.
10              THE WITNESS:
11                   I'm sorry.  Repeat your question.
12   BY MR. CLARKE:
13        Q.   Is correctional officer training
14   different than law enforcement training?
15        A.   There are some different avenues to each,
16   yes, sir.
17        Q.   Well, first of all, the inservice, how
18   long was it?
19        A.   I don't remember.
20        Q.   It wasn't as long, was it?
21        A.   That's correct.
22        Q.   So that would be a difference, right?
23        A.   Yes.
24        Q.   The topics that are covered are
25   different, right?
```

26

1      A.    Yes.

2      Q.    So it's different, right?

3      A.    There are some differences, yes, sir.

4      Q.    Tell me all the similarities.

5      A.    Handcuffing, verbal judo, verbal skills,

6  things of that nature.

7      Q.    The use of force nature for take-downs

8  and things like that?

9      A.    Correct.

10     Q.    Don't they teach you to do that

11  differently in a jail through teams with different

12  equipment, different strategies?

13     A.    There are some variances, yes, sir.

14     Q.    So in 1999 you go to Orleans Parish as a

15  correctional officer.  How long did you serve

16  there?

17     A.    Approximately six months.

18     Q.    Did you have any complaints made against

19  you there?

20     A.    None that I remember.

21     Q.    Did you have any Internal Affairs

22  investigations while you were there?

23     A.    None that I can remember.

24     Q.    Did you have any training other than your

25  basic inservice type training where you became

1    certified?

2         A.    Firearms training.

3         Q.    Do correctional officers carry guns in

4    the jail?

5         A.    Not in the jail, but those that are

6    required to transport inmates to different

7    locations.

8         Q.    What is your next -- well, why did you

9    leave Orleans Parish Corrections?

10        A.    I resigned and moved to Memphis.

11        Q.    When did you move to Memphis and why?

12   Living there, why did you move to Memphis?

13        A.    I moved there in 1999.

14        Q.    Was that to follow your girlfriend?

15        A.    Yes, sir.

16              MR. ZIBILICH:

17                   He is spooky, huh?

18   BY MR. CLARKE:

19        Q.    What was -- your girlfriend had something

20   to do in Memphis?

21        A.    She did.

22        Q.    What did she move to Memphis for?

23        A.    To go to school.

24        Q.    What school did she go to?

25        A.    The college of optometry.

1   Q. SCO?

2   A. Yes.

3   Q. Did she become an optometrist or an

4 ophthalmologist?

5   A. She did.

6   Q. Which one?

7   A. Optometrist.

8   Q. So that was 1999.  What did you do for

9 work when you got there?

10   A. I believe I went to work for Target.  I

11 don't know if that was my first job, or if I did

12 some other odds and end jobs, but Target was one of

13 them.

14   Q. Let me ask you this.  Prior to becoming

15 an Orleans Parish Correctional Officer, you didn't

16 work in law school from high school, 1995 until

17 then, but you obviously had jobs during that period

18 of time?

19   A. Can you break your question down a little

20 bit?

21   Q. Yeah.  From 1995 to 1998, did you have

22 jobs?

23   A. Yes.

24   Q. Were any of them law enforcement related?

25   A. No, sir.

1    Q.   Were you fired from any of those jobs?

2    A.   No, sir.

3    Q.   So we go -- from 1999, when you went up

4  to Memphis, when your girlfriend was going to SCO,

5  tell me what your next law enforcement job was.

6    A.   I was hired by the Shelby County

7  Sheriff's Office.

8    Q.   As what?

9    A.   At that time, it was just a recruit to be

10  a jailer, corrections officer.

11    Q.   Did your certification from Orleans

12  Parish Corrections transfer to Shelby County?

13    A.   No, sir.

14    Q.   So you applied for a job as a

15  correctional officer at Shelby County?

16    A.   Correct.

17    Q.   They accepted you, and when you go

18  through the hiring process with something, they --

19  you have to go through a certain number of steps

20  before you get a conditional offer, correct?

21    A.   That's correct.

22    Q.   So you went through the process there

23  where you kind of passed the background in certain

24  things, and they accepted you as a candidate for

25  their training program, correct?

1       A.    Yes, sir.

2       Q.    And who gave you training in Shelby

3   County Sheriff's Correctional Office?  Was it

4   Bonner, Floyd Bonner?

5       A.    I don't remember any names, sir.

6       Q.    How long was the Shelby County Sheriff's

7   Office correctional officer training?

8       A.    I don't remember.  I don't even think --

9   I didn't stay the full time.  I ended up leaving

10  there and going to the Memphis Police Department.

11      Q.    Were you actually in the training

12  academy?

13      A.    Yes.

14      Q.    So you were accepted.  You were being

15  trained to be certified to be a correctional

16  officer in Tennessee, but before that training

17  completed, you went to -- you applied for a PST job

18  at Memphis, right?

19      A.    Yes, sir.

20      Q.    Do you know when you applied at Memphis

21  or when you became a PST officer?

22      A.    No, sir.  2001, maybe.

23      Q.    I'm just going to make this easier. I'm

24  just going to come show it to you.  I'm going to

25  show you part of Exhibit 101, Page 1824.  What is

1    that?

2         A.    This is the certificate that I received

3    upon completing the Police Service Technician or

4    PST training for the Memphis Police Department.

5         Q.    So the date of that was July 28th, 2000?

6         A.    Correct.

7         Q.    So you had applied before that time?

8         A.    Yes.

9         Q.    So how long were you in the Shelby County

10   correctional officer training program?

11        A.    I don't remember a specific.  Maybe a

12   week, maybe two.

13        Q.    Do you know whether or not you are

14   capable of being rehired by Shelby County due to

15   the fact that you left during training?

16             MR. ZIBILICH:

17                 I object to the form.  You can

18             answer, if you can.

19             THE WITNESS:

20                 I believe I am.  I didn't leave

21             under any investigation.

22   BY MR. CLARKE:

23        Q.    But they put funds together to enter you

24   into the training academy to train you, and you

25   quit, right?

```
 1        A.    Correct, but that doesn't precluded me
 2   from ever being hired again.
 3        Q.    Did you have an exit interview?
 4        A.    No.
 5        Q.    So you don't know?
 6              MR. ZIBILICH:
 7                    That's why I objected to the form.
 8              MR. CLARKE:
 9                    He is saying he's not.
10              THE WITNESS:
11                    Well, I never -- I didn't leave
12                 under any, like I said, formal
13                 investigation that I would believe
14                 would prevent me from being rehired.
15   BY MR. CLARKE:
16        Q.    Why did you leave?
17        A.    Because I accepted a position with the
18   Memphis Police Department.
19        Q.    Did you tell Shelby County when you were
20   applying to them that you were also applying for a
21   PST position?
22        A.    Yes, sir.
23        Q.    Do you know who you told that to?
24        A.    It would have been on the application.
25        Q.    I think we have all of that.  If not,
```

```
 1    we'll get them. So what is a PST?
 2         A.    It stands for Police Service Technician.
 3         Q.    Can they arrest people?
 4         A.    No, sir.
 5         Q.    Can they carry a gun?
 6         A.    No, sir.
 7         Q.    They basically go to traffic accidents
 8    and complete traffic reports, correct?
 9         A.    That is correct.
10         Q.    From 2000 until -- do you remember who
11    your chain of command was or any of your reports
12    when you were a PST?
13         A.    No, sir.
14         Q.    And then you went to -- at some point
15    during the PST, while you were serving as a PST,
16    you applied to the City of Memphis for a patrol
17    job?
18         A.    No, sir.  That's not quite how it works.
19         Q.    Tell me how it works in Memphis.
20         A.    To be a policeman, like you said, you
21    have to have 54 hours of college credit or the
22    military experience or prior law enforcement in
23    Tennessee, POST Tennessee.  To be a policeman, if
24    you don't have those requirements, they have the
25    Police Service Technician Program, which is a
```

1    temporary position.  You have three years to gain

2    two years worth of college to become a police

3    officer, so it's an entry level program.

4         Q.   So the whole program that you went in

5    involved both getting the education and doing the

6    PST service; is that fair?

7         A.   To become a police officer, yes, sir.

8         Q.   So the process was a longer process, not

9    just any one aspect of it.  You have to have all

10   three of these things?

11        A.   Correct.

12        Q.   So while you were doing that and while

13   your girlfriend was doing the SCO, you were taking

14   classes, correct?

15        A.   Yes, sir.

16        Q.   At Southwest Community College, right?

17        A.   Correct.

18        Q.   And then it appears at some point you

19   were accepted to the 86th Basic Police Recruit

20   Training Academy, and you completed your POST

21   certification, as we looked before, on December

22   5th, 2002, correct?

23        A.   Yes, sir.

24        Q.   How long did you serve as a Memphis cop?

25        A.   I was only POST certified in Tennessee

1    approximately six months.

2         Q.    Where did you serve?

3         A.    I'm sorry?

4         Q.    What precinct were you at?

5         A.    The North.   North Precinct.

6         Q.    Do you remember any of your chain of

7    command there?

8         A.    I remember my shift lieutenant,

9    Lieutenant Ed Vidulich.   I believe I'm saying his

10   name right.

11              MR. ZIBILICH:

12                   Sounds like my people.

13   BY MR. CLARKE:

14        Q.    Let's talk about your training academy at

15   the MPD.   It's comprehensive.   It's like 600 hours,

16   correct?

17        A.    If you say so.   I don't remember how many

18   hours it was.

19        Q.    It's a month-long training program,

20   correct?   Months?

21        A.    Months, yes, sir.

22        Q.    And in the MPD Training Academy, one of

23   the biggest blocks of training is physical fitness,

24   correct?

25        A.    Yes, sir.

1     Q.    It's done pretty much every single day,

2  correct?

3     A.    That is correct.

4     Q.    And there are numerous kind of topics you

5  had to -- one of the biggest blocks of training at

6  the MPD Training Academy is the laws of the State

7  of Tennessee.  You had to learn the laws you were

8  supposed to enforce, correct?

9     A.    I don't know if it was the biggest, but

10  you do have to learn the laws, of course.

11     Q.    Tell me what the biggest aspects of

12  training are that you remember at the MPD training

13  academy, the blocks?

14     A.    Like you said, the physical.

15     Q.    That always sticks out to all the

16  officers.  You had to be trained in use of force,

17  correct?

18     A.    Correct.

19     Q.    You were trained on the use of the RIPP

20  Hobble, correct?

21     A.    Yes, sir.

22     Q.    You were trained on the physiology of a

23  struggle and why you use the RIPP Hobble, correct?

24  Let me rephrase that question.  The dynamics of a

25  struggle.

1        A.   No, sir.  I don't believe that's correct.

2        Q.   Jeff Tau (spelled phonetically) does the

3   RIPP Hobble training and has since 1994 at MPD.  Do

4   you remember him?

5        A.   No, sir.

6        Q.   Do you remember Neil Trautman?

7        A.   No, sir.

8        Q.   Were you trained at the MPD that a

9   suspect who is restrained in the face-down

10  position, their breathing may become labored?

11       A.   When hog-tying, yes, sir.

12       Q.   Well, a suspect restrained in the face-

13  down position, breathing may become labored.  Were

14  you trained that?

15       A.   As it relates to hog-tying, yes, sir.

16       Q.   Memphis doesn't hog-tie.

17       A.   Correct.

18       Q.   They haven't since 1994.

19       A.   That's correct.

20       Q.   So they're not trying to train you how to

21  hog-tie, correct?

22       A.   No.  That's why they are saying not to

23  hog-tie, right, because labored breathing.

24       Q.   They are training you on different

25  methods to restrain people who are resistant in the

1    safest possible manner, correct?

2         A.    Correct.

3         Q.    Part of that training is when somebody is

4    restrained in the face-down, prone position, their

5    breathing may become impaired or labored, correct?

6         A.    As it relates to hog-tying, yes, sir.

7         Q.    When weight is applied to somebody's

8    back, that can compress the breathing more.  Are

9    you trained that?

10        A.    Yes, sir.

11        Q.    Were you trained that the more severe the

12   weight on the back, the more restriction of the

13   ability to breathe of somebody in the prone

14   position?

15        A.    I mean, I don't specifically remember

16   being taught that, but it's common sense, yes, sir.

17        Q.    Were you trained that the natural

18   reaction to oxygen deficiency, a person can start

19   to struggle more?

20        A.    I don't remember that specific training,

21   no, sir.

22        Q.    Were you trained that if somebody

23   struggles more, then the officer applies more

24   compression, and it's a vicious cycle?  Were you

25   trained that?

1    A.    Not that I can remember.

2    Q.    Were you trained that obesity is a risk

3 factor for restraining people in the prone

4 position?

5    A.    No, sir.  I don't specifically remember

6 that.

7    Q.    Well, you did have that training at JPSO.

8 Are you aware of that?

9         MR. ZIBILICH:

10             Object to the form.  You can answer

11         it.

12         THE WITNESS:

13             I assume I did.  I don't

14         specifically remember it.

15 BY MR. CLARKE:

16    Q.    Well, do you know -- is it your under-

17 standing that officers are trained so that they can

18 develop skills so that they can react in an

19 appropriate manner in the field?

20    A.    Yes, sir.

21    Q.    And if your -- wouldn't it be important

22 that you remember the training on RIPP Hobbles and

23 prone restraint when you come on the scene with

24 somebody who is restrained in the prone position?

25         MR. ZIBILICH:

```
 1                    Object to the form.  You can answer
 2                it.
 3                THE WITNESS:
 4                    I believe that it is important to
 5                remember our training, yes, sir, when
 6                it is practical.
 7    BY MR. CLARKE:
 8        Q.   You are trained on the use of deadly
 9    force, correct?
10        A.   Yes, sir.
11        Q.   That is you are trained when practical,
12    but you are trained to do it under stressful
13    circumstances, correct?
14        A.   As stressful as it can be in training.
15        Q.   Listen, if you don't want to get dirty,
16    don't be a garbage man, right?
17        A.   I don't understand.
18        Q.   If you are going to be a cop, you are
19    going to have to deal with certain things, right?
20        A.   Correct.
21        Q.   You are going to have to deal with people
22    who are belligerent, correct?
23        A.   Yes.
24        Q.   People who are going to be aggressive,
25    correct?
```

```
 1        A.    Yes.
 2        Q.    People under the influence of drugs,
 3   correct?
 4        A.    Yes, sir.
 5        Q.    People who have mental -- what do they
 6   call mental -- the people with mental episodes in
 7   Memphis?
 8             MR. ZIBILICH:
 9                  Who cares.
10             MR. CLARKE:
11                  I'm trying to figure out if he knows
12               his training.
13             MR. ZIBILICH:
14                  In Memphis?
15             MR. CLARKE:
16                  Yes.
17             MR. ZIBILICH:
18                  I'll say it again.  Who cares.  You
19               can answer it.
20             THE WITNESS:
21                  No.
22   BY MR. CLARKE:
23        Q.    You ever heard the word "mental
24   consumer?"
25        A.    Yes.
```

1      Q.   Okay.  That's a Memphis term, correct?

2      A.   I know it was used in Memphis.

3      Q.   Did they use it in JPSO?

4      A.   Not that I've heard.

5      Q.   How do they use the term "mental

6  consumer" in the City of Memphis?

7      A.   How did they use it?

8      Q.   Yeah.  You were trained on RIPP Hobble,

9  mental consumers.  Did you take their -- let me ask

10  you this.  Did you take their CIT program there?

11      A.   No, sir.  I was not CIT trained.

12      Q.   They attributed people who were suffering

13  some type of mental episode, either from physical

14  conditions or some psychiatric condition, they

15  referred to those as mental consumers, correct?

16      A.   Correct.

17      Q.   And that was something that you could say

18  on dispatch that would provide other officers the

19  information necessary to know what you were dealing

20  with, correct?

21      A.   I'm not really sure if that was used over

22  the air or not or if that was just a term for the

23  CIT members.  I'm not really sure.

24      Q.   So your training at the MPD, you had

25  deescalation and verbal judo there, correct?

```
 1        A.    Yes, sir.
 2        Q.    You had your intermediate weapons
 3   training and use of force continuum, correct?
 4        A.    Yes.
 5        Q.    What is the use of force continuum?
 6        A.    What is it?
 7        Q.    Yes.
 8        A.    It's the levels of force that you can use
 9   and the steps you can take.
10        Q.    In a perfect world, you want to escalate
11   your force in increments in response to the force
12   from the other side, correct?
13        A.    Yes, sir.
14        Q.    But that's not -- we don't live in a
15   perfect world, right?
16        A.    Unfortunately not.
17        Q.    So while there is a progression that they
18   would like you to get, that's in teaching you to
19   use the least amount of force that is reasonably
20   necessary to handle the situation, correct?
21        A.    Yes, sir.
22        Q.    So if somebody cusses at you, you should
23   not shoot them, right?
24        A.    That's correct.
25        Q.    So you go through, and you had hands-on
```

1  training there as well as classroom training,

2  correct?

3      A.   What do you mean by hands-on?

4      Q.   You had to go out -- you had to do take-

5  downs.  You had to use the baton.  You had to --

6  you had to go through actual physical exercises

7  with respect to use of force.

8      A.   Yes, sir.

9      Q.   And so after Memphis, in 2003, I think

10  you said you worked there about six months.  Did

11  you actually patrol by yourself ever in Memphis?

12      A.   Yes.  I completed the FTO program and was

13  assigned a one-man unit.

14      Q.   And at the MPD Training Academy, they

15  test you on everything, correct?

16      A.   Correct. Excuse me.  Yes.

17      Q.   They have a policy book that is 1,500

18  pages.

19      A.   I don't know the exact number, but they

20  have a policy book, yes, sir.

21      Q.   It's a lot bigger than the JPSO policy

22  book, correct?

23      A.   Again, I really don't --

24          MR. ZIBILICH:

25              Congratulations to them for having a

```
 1              bigger book.
 2    BY MR. CLARKE:
 3         Q.   You were trained on the actual policies
 4    of the MPD there, correct?  Actual classes.
 5         A.   We had some, yes, sir.  I wouldn't say we
 6    went through every one of the policies.
 7         Q.   But you had policies and procedures
 8    classes where -- at the training academy where they
 9    taught you the actual policies, correct?
10         A.   Again, I don't remember going through
11    every one of the policies, but we did cover some,
12    yes, sir.
13         Q.   You didn't have that at JPSO?
14         A.   Didn't have what?
15         Q.   You didn't have any training on the
16    actual written policies at JPSO where you had to
17    take a test?
18         A.   I don't remember.
19         Q.   We'll get to that.  So after 2002, did
20    your wife or girlfriend or wife at that time
21    complete her optometry school, by 2002?
22         A.   2002 or 2003.
23         Q.   I'm sorry. 2012.
24         A.   '12?  No, sir, not '12.  It was either
25    2002 or 2003 that she finished.
```

46

```
 1        Q.    Sorry.  I'm getting my dates wrong.  So
 2   when she finished, was your plan always to come
 3   back?
 4        A.    Yes, sir.
 5        Q.    Did you have any -- what was your next
 6   law enforcement job?
 7        A.    New Orleans Police Department.
 8        Q.    What year was that?
 9        A.    2004 I was hired.
10        Q.    How long did you serve at the NOPD?
11        A.    Until my resignation in 2016.
12        Q.    Is that when you went to JPSO?
13        A.    That's correct.
14        Q.    From your last employment with the MPD
15   until you became a New Orleans Police Department
16   officer in 2004, what did you do?
17        A.    I attended UNO and worked at Safelite
18   Glass Company.
19        Q.    Is that the job that you had when you
20   applied for the NOPD?
21        A.    I believe so.
22        Q.    It wasn't law enforcement in between that
23   time, correct?
24        A.    Correct.  It wasn't law enforcement.
25        Q.    Any complaints, investigations, or
```

1   discipline at Safelite?

2       A.   No, sir.

3       Q.   Any complaints, investigations at the MPD

4   for your conduct as an officer or a PST?

5       A.   None that I can remember.

6       Q.   Anything I can do to help you remember?

7            MR. ZIBILICH:

8                 Object to the form.  Is there

9              anything he can do to help your memory?

10           THE WITNESS:

11                If you have documentation, I can

12             take a look at it, sure. It might help

13             jog my memory.

14           MR. CLARKE:

15                Well, I don't have that.  I'll get

16             it, though.

17  BY MR. CLARKE:

18      Q.   So at NOPD -- take me through what you

19  did at the NOPD.  Your service, whether you were a

20  deputy, or officer, any assignments.

21      A.    I was assigned as a patrolman in the

22  Third -- excuse me, in the First District, and then

23  I subsequently went to the Third District as a

24  patrolman.  From there I went to the district level

25  task force.  From there I went to the district

48

```
 1   level investigations unit, and then from there I
 2   went to the homicide section.
 3        Q.   Were all of these at the rank -- I don't
 4   know what the rank structure is. Were you a
 5   patrolman all this time or had you been promoted or
 6   changed to a detective?
 7        A.   Detective at the time wasn't a rank, so
 8   everything was patrolman.
 9        Q.   So you were basically -- the first couple
10   of jobs you were a patrolman, kind of patrolling
11   the streets in the district, and then you were
12   assigned to a particular section later on in your
13   career?
14        A.   Yes, sir.
15        Q.   What separate divisions did you serve in?
16   Like robbery, homicide?
17        A.   District level investigations handled
18   everything from nonfatal shootings to robberies,
19   burglaries, thefts.  So I was there for a period of
20   time before I went to the homicide section.
21        Q.   How long did you serve in the homicide
22   section?
23        A.   Five years.
24        Q.   The homicide section there doesn't
25   investigate Internal Affairs complaints, do they?
```

1      A.    Not at the time I was there, no, sir.

2      Q.    NOPD had their own Internal Affairs

3  Division that did whatever type of investigations

4  for policy violations, correct?

5      A.    Yes.

6      Q.    Did you ever investigate a police-

7  involved shooting when you were at NOPD in the

8  homicide section?

9      A.    Yes, sir.

10      Q.    Were you investigating the criminal

11  actions of a police officer?

12      A.    I think we were just investigating -- I

13  don't want to say the criminal actions of a

14  policeman, but we were investigating the use of

15  deadly force.

16      Q.    That would be in a place where the cop

17  uses it, right?

18      A.    Correct.

19      Q.    So you would be looking at -- in

20  homicide, you would be looking at whether the cop

21  committed a crime, correct?  Because you're not

22  Internal Affairs.

23      A.    We were documenting the entire event,

24  correct.

25      Q.    You were -- basically, the crime scene

1   people went out there and did a report; is that

2   correct?

3         A.   Yes.

4         Q.   And the conclusion of that report, it

5   doesn't go to IA.  It went to -- you made a

6   decision to give it to your higher-ups, and they

7   determine whether there is charges to be brought,

8   correct?

9         A.   It was turned over to the district

10  attorney's office.

11        Q.   Right.  And they determined whether

12  charges are going to be brought, correct?

13        A.   Yes.

14        Q.   In 2016, you applied for the JPSO,

15  correct?

16        A.   Yes.

17        Q.   And you said you only had one Internal

18  Affairs investigation at the NOPD, correct?

19        A.   I only remember this one Internal Affairs

20  investigation.

21        Q.   You have this in front of you.  We're

22  going to go through this.  I'm just starting from

23  the top of 101.  If you go to JPSO 1668.

24        A.   Yes, sir.  I'm there.

25        Q.   In your Background Check Data Sheet, you

```
 1   noted that you tried illegal drugs other than
 2   marijuana, correct?
 3        A.   Other than marijuana?  No, sir. Just
 4   marijuana.
 5             MR. ZIBILICH:
 6                  Object to the form.  You can answer.
 7   BY MR. CLARKE:
 8        Q.   Look at Question 5.  "Have you ever
 9   tried/ used any illegal drugs other than
10   marijuana?" I apologize. My highlighting is off. So
11   Question 4, "Have you ever tried marijuana?"  You
12   said yes, correct?
13        A.   Yes, sir.
14        Q.   And how often did you try marijuana?
15   Because sometime you say one to five times.
16   Sometimes you say five to 20.
17             MR. ZIBILICH:
18                  Object to the form.  You can answer
19              it.
20             THE WITNESS:
21                  I don't remember specifically how
22              many times I tried it, sir.
23   BY MR. CLARKE:
24        Q.   More than once?
25        A.   Again, I don't remember.
```

```
 1              MR. ZIBILICH:
 2                   If you read the front page of the
 3                paper this morning, NOPD says that's
 4                okay.
 5              MR. CLARKE:
 6                   That's good to know.
 7  BY MR. CLARKE:
 8       Q.    Then you have an addendum to this.  It
 9  says, "Have you ever received a traffic citation."
10  You were involved in a traffic accident while
11  operating a City of Memphis vehicle.  You're saying
12  you didn't get investigated for that?
13              MR. ZIBILICH:
14                   He said he didn't remember.
15              THE WITNESS:
16                   I'm sorry.  What was the question?
17  BY MR. CLARKE:
18       Q.    Any time there was an accident with a MPD
19  vehicle, the MAI team comes out.  Did the MAI team
20  come out when you were involved in a minor traffic
21  accident while driving a City of Memphis vehicle?
22       A.    Honestly, I don't remember who
23  investigated, whether it was my supervisor or the
24  -- I don't know what acronym you are using, but the
25  traffic division.
```

```
 1        Q.   Did you have a panel where you had to go
 2   in front of people and meet with them about the
 3   accident?
 4        A.   No, sir.
 5        Q.   Do you recall being investigated for
 6   violation of DR-803?
 7        A.   In --
 8        Q.   Memphis.
 9        A.   No, I don't.
10        Q.   Then it says in 2015 you were involved in
11   a minor accident while operating an unmarked police
12   vehicle.  In that one you were not investigated.
13   You were not at fault, correct? The action wasn't
14   your fault?
15        A.   That's correct.  It took me a second to
16   remember it.  Yes, sir.  You're right.
17        Q.   And then you have a little bit of your
18   history in here that you were hired as a jailer,
19   and then you went to the MPD, and in 2003 you came
20   back home.  You applied for jobs at Kenner,
21   Louisiana State Police, Gretna, and Westwego Police
22   Department.
23             MR. ZIBILICH:
24                  It's Westwego.  Right down the
25                street.
```

```
 1              THE WITNESS:
 2                   Yes, sir.  That's correct.
 3    BY MR. CLARKE:
 4         Q.   Did they all not accept you?
 5         A.   Not all.
 6         Q.   Who rejected you?
 7         A.   Kenner, State Police.  I don't remember
 8    Gretna.  I think Westwego gave me -- accepted me.
 9         Q.   Did they tell you why they rejected you?
10         A.   No, sir.
11         Q.   Then you were -- in 2004, you were hired
12    by NOPD, and you were working homicide at the time
13    you put in your application, correct?
14         A.   Yes, sir.
15         Q.   When you give a -- when you apply for a
16    job at JPSO, they go through a process, correct?
17    You have to go through a background check.  You
18    have to take a polygraph.  You've got to get
19    clearance from a doctor and a psychiatrist,
20    correct?
21         A.   That's correct.
22         Q.   So when they meet you to give a polygraph
23    test, they go over all the questions with you?
24         A.   Yes.
25         Q.   So in trying to find out whether you are
```

```
 1    truthful or not, they tell you all the questions,
 2    and then give you the ability to correct anything
 3    in your application before you do the polygraph,
 4    correct?
 5         A.   They go over all of the questions.  I
 6    don't know about the ability to correct anything.
 7         Q.   That might be Vega's file.  So then going
 8    to 1871, this looks like your actual application,
 9    correct?
10         A.   1871?
11         Q.   Yes. I'm sorry. 1671.  The numbers are
12    blocked out.  These are bad Bates stamps.
13         A.   Yes, sir.
14         Q.   You put in here you worked for the City
15    of Memphis as a Police Service Technician and
16    police officer for three years, correct?
17         A.   Where are we looking?
18         Q.   On 1672.  Employment History.
19         A.   From 2000 to 2003.  Yes, sir.
20         Q.   You said your wife took a job.  Did she
21    get a job back in Metairie?
22         A.   Yes, sir.
23         Q.   Then it looks like, if you go to 1673,
24    this lists that you were working for JPSO as a
25    jailer or -- no.  Is that an application?  You were
```

```
 1   denied an application as a jailer to JPSO in 1997
 2   and in 2003?
 3        A.   That's correct, yes, sir.
 4        Q.   Do you know why Jefferson Parish rejected
 5   you twice, once in '97 and one in 2003?
 6        A.   No, sir, I don't.
 7        Q.   Then it says you worked for Orleans
 8   Parish from 1999 for six months, correct?
 9        A.   Correct.
10        Q.   And then it said you worked as a police
11   officer in 2000.  That is false, right? You didn't
12   work as a Memphis police officer.  You were not
13   even POST certified until 2002.
14        A.   Well, I guess I was putting down that I
15   was a Police Service Technician.
16        Q.   It's doesn't say that.  You put down
17   police officer, right?
18             MR. ZIBILICH:
19                  That's not a question.
20             THE WITNESS:
21                  I did put down police officer, sir.
22   BY MR. CLARKE:
23        Q.   Did you put PST?
24        A.   No, sir, not there.
25        Q.   If you see it anywhere in your
```

1   application, let me know.

2       A.   Sure.

3       Q.   Then it goes through your education, and

4   you signed that on 7/22/16, correct?

5       A.   Correct.

6       Q.   Page 1675.  This has your resume in it.

7   Let's go to -- then you went -- if you go to 1689.

8   You put in here -- tell me how this polygraph

9   works.  You walk in there.  They tell you all the

10  questions.  Then there is this provision in every

11  one of these polygraphs that I read, "The applicant

12  disclosed the following admissions."  Did you have

13  a discussion with the polygraph examiner about your

14  use of marijuana?

15      A.   Yes, sir.  It looks like I did.

16      Q.   According to that, you said five to 20

17  times, correct?

18      A.   Correct.

19          MR. ZIBILICH:

20              It says what it says.

21  BY MR. CLARKE:

22      Q.   It also puts in here, in your job

23  history, before -- you told me today that you were

24  not fired from anywhere.  You advised the poly--

25  grapher that you were terminated from your

1   employment with Asplundh.

2       A.   No.   The correct conversation that we had

3   was that I left Asplundh, but they, Asplundh, said

4   that I was terminated.   That's what the

5   conversation was.

6       Q.   Well, what does the paper say?

7       A.   "The applicant advised that he was

8   terminated from his employment with Asplundh."

9       Q.   You wouldn't think the polygraph examiner

10  is lying, would you?

11          MR. ZIBILICH:

12              Don't answer that.   Next question.

13  BY MR. CLARKE:

14      Q.   Go to 1691.   It asks you -- you know, you

15  have different answers, one to the polygraph guy,

16  and here is questions answered to Shelley Vaccaro.

17  They ask you how many times you used marijuana.

18  What did you say?

19      A.   One to five times.

20      Q.   So what is it?

21          MR. ZIBILICH:

22              What year was it?

23  BY MR. CLARKE:

24      Q.   What year was the last time you used it,

25  according to this document?

```
 1        A.    1995.
 2        Q.    They asked you if you are currently
 3   taking any pain medication.  What did you say?
 4        A.    What question are we on?
 5        Q.    About halfway down.
 6        A.    Yes.  I said I was taking Vicodin.
 7        Q.    What were you taking Vicodin for?
 8        A.    Back pain.
 9        Q.    Who was prescribing it, and when did you
10   have a back injury doctor prescribe it to you?
11        A.    I don't remember.
12        Q.    Did you have a prescription for it?
13        A.    Yes, of course.
14        Q.    Who was your doctor -- who was your
15   doctor that -- when did you have back pain?  Who
16   was your back doctor?
17        A.    I don't remember, sir.  I'd have to check
18   my records.
19        Q.    This is 2016.  This wasn't in Memphis or
20   anything.  Are you still taking Vicodin?
21        A.    No, sir.
22        Q.    When did you stop taking Vicodin?
23        A.    It would have been when this prescription
24   ran out.
25        Q.    You don't recall why or what injury you
```

```
 1   had that led you to be placed on the prescription
 2   Vicodin?
 3        A.   No.  I recall that.
 4        Q.   What was the incident where you hurt your
 5   back?
 6        A.   I have degenerated discs in my lower
 7   back.
 8        Q.   So it wasn't an incident?  It is a
 9   progressive thing over time, or was there an
10   incident where, you know, you tweaked it, and you
11   found out you had an underlying problem?
12        A.   I guess, to answer your question, I
13   didn't have a specific injury.  I did have pain and
14   a MRI showed that I had degenerating discs.
15        Q.   Go to Page 1694.  This is all part of
16   your application process, it looks like, for your
17   hiring at JPSO.  They asked you about tickets and
18   stuff.  You don't put in the ticket that you got in
19   Memphis, do you?
20        A.   No, sir.
21        Q.   It says you had a speeding ticket in '94,
22   a traffic control signal in '98, and a child
23   restraint violation in -- it doesn't say the year.
24   What was the child restraint ticket for?
25        A.   In '94? That was probably -- I don't
```

1   know.  I didn't have children in '94.  The only
2   thing I can think is that it was a ticket that the
3   ADA bumped down to a nonmoving violation, but this
4   is not even my handwriting here, so I don't know
5   who filled this in.
6        Q.   This is all part -- if you want to look
7   through your file, you can confirm this, but these
8   are all the people you talked to about getting
9   hired.
10       A.   Sure. But, again, this is not my hand-
11  writing.  I don't know if the information is coming
12  off a computer screen.
13       Q.   I got you.  Go to Page 1815.
14       A.   Okay.
15       Q.   Do you know what this form is, a Form
16  PC-201:  Certification Status Request?
17       A.   It has do with the Peace Officer
18  Standards and Training for Louisiana.
19       Q.   It's a verification of your past
20  employment?  Is that your understanding?
21       A.   Yes.
22       Q.   If you go through, it talks about your
23  service with New Orleans and then Memphis.  You
24  said you were a police officer for three years.
25  That's false, correct?

1      A.   No.  It says Police Service Technician/
2  Police Officer.
3      Q.   Yeah, the police officer.  The other one
4  was false.  My bad. Go to Page 1765.
5      A.   1765?
6      Q.   Yes.
7      A.   I'm at 1765.
8      Q.   This is your PIB Officer Complaint
9  History and Short Report from the NOPD, correct?
10     A.   I see it says, "PIB Officer Complaint
11  History and Short Form," yes, sir.
12     Q.   That's New Orleans, correct?
13     A.   Yes, sir.
14     Q.   It looks like you had a complaint made on
15  August 5th, 2006 for adherence to law that was not
16  sustained. You see that?
17     A.   Yes, sir.
18     Q.   The rule -- the allegation that you were
19  investigated for was moral conduct.  Paragraph 1,
20  adherence to law.  Do you remember anything about
21  that incident?
22     A.   You're talking about the April 5th, 2006?
23  That would be the lawsuit that we referenced
24  earlier, would it not?
25     Q.   That's what I was trying to confirm

```
 1    today.  It looks like this says April 4th, citizen
 2    complaint.  So that was probably the complaint from
 3    Pratt, correct?
 4          A.   Correct.
 5          Q.   In that one a lawsuit was filed, and it
 6    was settled, correct?
 7          A.   I don't know whatever became of the
 8    lawsuit, sir.
 9          Q.   Okay.  Look at Exhibit 102.
10          A.   102?
11          Q.   Interrogatory Number 12.
12          A.   I'm sorry.  I had 103.
13          Q.   It identifies this lawsuit.  What is the
14    last portion of that sentence that you put in your
15    sworn answer?
16          A.   The case was settled.
17          Q.   You say, "I understand the case was
18    settled," correct?
19          A.   Yes.
20          Q.   You understood that when you filled out
21    these discovery responses on June 21st, 2021,
22    correct?
23          A.   Yes, sir.
24          Q.   So you had a complaint that was not
25    sustained where you were sued that was settled,
```

```
 1   correct?
 2        A.    Correct.
 3        Q.    And then it looks like--
 4        MR. ZIBILICH:
 5              He didn't say it was settled.  He
 6           said he understood it was settled.
 7   BY MR. CLARKE:
 8        Q.    Then the next complaint you had was
 9   October 2nd, 2014.  There was violations alleged of
10   professional conduct, professionalism, performance
11   of duty, instructions from authoritative source,
12   and building -- self-identification, building
13   security.  Do you remember what this complaint was
14   about?
15        A.    No, sir.
16        Q.    Do you not remember any actions where you
17   were investigated and had to give statements
18   concerning your actions during a building search?
19        A.    No, sir.
20        Q.    Then it looks like -- so you know nothing
21   about October 2nd, 2014, this citizen complaint?
22        A.    No, sir.  Not based on what is here.  It
23   doesn't ring a bell.
24        Q.    Then it looks like on July 23rd, 2015
25   there was a citizen complaint against you for
```

1    performance of duty, Paragraph 2, instructions from

2    an authoritative source, search and seizure policy,

3    rule -- performance of duty, Paragraph 2,

4    instructions from authoritative source, department

5    directives, Policy 232, private property. According

6    to this thing, you were investigated, and

7    performance of duty, instructions from authority --

8    authoritative source was sustained against you.

9         A.    Yes, sir.

10        Q.    Do you know what the citizen complaint on

11   July 23rd, 2015 that resulted in a sustained

12   finding from Internal Affairs at NOPD, what that

13   was about?

14        A.    I do.

15        Q.    Tell me what that was.

16        A.    During the execution of a search warrant

17   on a homicide suspect, our SOD breached the front

18   door.  And then once it was breached, we secured

19   it, but I didn't write a separate report document-

20   ing that it was -- that the damage had been done

21   and was covered by our -- I can't think of the unit

22   that comes out to place up plywood or whatnot on

23   the door.  But it all has to do with I didn't write

24   a report documenting that.  I thought it fell upon

25   SOD to write, but it turned out it was supposed to

1  be my responsibility.

2      Q.    What is SOD?

3      A.    Special Operations Division.  Our SWAT

4  team.

5      Q.    So explain that to me.  Were you a member

6  of the SWAT team?

7      A.    No, sir.

8      Q.    Were you an officer who was on the scene

9  with a SWAT team?

10     A.    Correct.  I was the homicide

11 investigator.

12     Q.    So there was a homicide investigation

13 that -- was this an officer -- did the SWAT people

14 kill somebody?

15     A.    No.  This was related to a homicide

16 investigation.  This was the suspect's house.  So I

17 had a search warrant to go inside of the home to

18 search for the suspect and any evidence.  The SOD

19 breached the door, and then I didn't write a second

20 report.  I covered it in my arrest report, but I

21 didn't cover it in a separate incident report.

22     Q.    And NOPD -- it appears at NOPD, if you

23 use force, you have to complete a separate use of

24 force report, correct?

25     A.    This wouldn't be --

```
 1              MR. ZIBILICH:
 2                   Object to the form.  You can answer
 3                it.  You are talking about force on a
 4                piece of property or a person?
 5              MR. CLARKE:
 6                   I'm not asking questions to you,
 7                Franz.
 8              MR. ZIBILICH:
 9                   Then don't answer it.  The question
10                is vague.
11     BY MR. CLARKE:
12         Q.   NOPD required officers to fill, in
13     addition to their regular arrest report, or
14     incident report, other documents at times, correct?
15         A.   Correct.
16         Q.   Every time you use force, their use of
17     force policy requires you to fill out a use of
18     force report.  It is covered by the consent decree,
19     buddy.
20              MR. ZIBILICH:
21                   Same objection.  Object to the form.
22              THE WITNESS:
23                   Well, you're saying use of force.
24                This would not fall under use of force.
25                I'll answer your question.  Yes.  For a
```

```
 1              use of force, you have to fill out a
 2              second form, yes.
 3   BY MR. CLARKE:
 4        Q.   In this particular situation, there
 5   seemed to be some other type of secondary form that
 6   you had to complete because of the damage to
 7   property to bring out a particular division,
 8   correct?
 9        A.   It would be not a form but just a report
10   you have to write.
11        Q.   Right.  And a use of force report is a
12   report.  That is what it's called?
13        A.   Yes.
14        Q.   You may fill out stuff on the computer
15   and answer questions and check boxes, but it's a
16   separate form that is done, and it's reviewed by
17   separate people, correct?
18        A.   Correct, but this wasn't a use of force.
19        Q.   I'm asking you two different -- I'm off
20   this.  I'm not asking you about this anymore.
21        A.   Oh, we're off that.  Okay.
22        Q.   So after you came back -- came back from
23   Memphis.  You went through the Memphis academy.
24   When you came back, and your first job then was
25   with the NOPD, did that POST certificate transfer
```

1  in any way?

2       A.   No, sir.

3       Q.   Did you have to go through the NOPD

4  Training Academy?

5       A.   I did.

6       Q.   Did you go to NOPD or Slidell?  Where did

7  you go?

8       A.   The New Orleans Police Academy.

9       Q.   When did you -- you got POST certified

10  with NOPD in 2005? Does that sound about right?

11      A.   For me, it probably would have been a

12  little later.

13      Q.   Look at 1825.  It looks like you are --

14  no.  That's not it.  I'm sorry.  1821.  Actually,

15  it's 1822.  Looks like you were POST certified

16  March 11th, 2005, correct?

17      A.   1825?

18      Q.   Yes.  I'm sorry. 1822.

19      A.   March 11, 2005, yes, sir.

20      Q.   Let's talk about the training you had at

21  -- and this was at -- NOPD has its own training

22  academy?

23      A.   Correct.

24      Q.   Let's talk about what they trained you.

25  Was it similar to what you went through at the MPD

```
1    Training Academy?
2         A.    Similar, yes, sir.
3         Q.    Is physical fitness a big aspect of the
4    training?
5         A.    Yes.
6         Q.    Did you have a big block of training on
7    learning the laws of the State of Louisiana to
8    enforce?
9         A.    Correct.
10        Q.    Did you have classes on how to testify in
11   court?
12        A.    Not that I remember.
13        Q.    Did you have a big block of training on
14   the reports that you had to complete and write and
15   how to document things?
16        A.    There was a section on report writing,
17   yes, sir.
18        Q.    Was there a section on the actual
19   policies of the NOPD?
20        A.    Some, yes, sir.
21        Q.    Was that both classroom training and --
22   you tell me.  Was it classroom training?  Did you
23   have tests?
24        A.    Yes, sir.
25        Q.    Did you have any training on asphyxia in
```

```
1    the prone restraint at the NOPD?
2         A.    Not that I remember.
3         Q.    Did the NOP teach you on whether or not
4    you can utilize any type of chokehold or any type
5    of hold around somebody's neck?
6         A.    No.  I don't remember.
7         Q.    Did they train you on the aspects -- any
8    aspects of the dangers of prone restraint?
9         A.    Not that I can recall.
10        Q.    And if you go to Page 1852.  You didn't
11   go to any training academy at JPSO because you were
12   a lateral hire -- or a hire from another -- a POST
13   certified officer already, correct?
14        A.    It was a lateral program, correct.  It
15   wasn't a full academy.
16        Q.    So you did go to some academy?
17        A.    Some training, yes, sir.
18        Q.    Did the NOPD use the RIPP Hobble or train
19   you on the RIPP Hobble or the LR-22 or any other
20   device like that?
21        A.    Not that I can remember.
22        Q.    What did they train you to do?
23             MR. ZIBILICH:
24                  Who is they?
25   BY MR. CLARKE:
```

1    Q.   What did NOPD train you to do to restrain
2  a violent prisoner?
3    A.   I don't know.  I don't remember what the
4  training was.
5    Q.   When you went to Jefferson -- if you look
6  at Page 1852, and you look at that, when you came
7  on board at JPSO, they made you sign saying -- sign
8  something saying that you have access to the
9  policies, and you are required to understand, obey,
10  and stay current with that, correct?
11    A.   That's correct.
12    Q.   They didn't train you on the actual
13  policies, correct?
14    A.   I don't remember receiving specific
15  training on it, so I don't know if we did or not.
16    Q.   Do you remember having a test on where
17  you had to study policy, and they were asking
18  questions about the policies?
19    A.   No.  I can't say that I do.
20    Q.   We're going to put 101 away.  We're going
21  to move that to the side.  If you'll pick up 38. So
22  once you came to JPSO, you had certain inservice
23  training.  Tell me about the -- well, first of all,
24  when you came in, you said you had some lateral
25  academy or lateral hired training.  Tell me what

1    that was.

2         A.   You mean because I already had POST

3    certification?

4         Q.   Right.  I didn't know if they said you're

5    a deputy, you can come on board, you start

6    tomorrow, or, if, when they brought you in, there

7    was some type of training that they put you through

8    before you went out on the street, and that

9    training was not basic police academy training.

10        A.   Correct.  It was a lateral training. You

11   are right.

12        Q.   Tell me what you remember about how long

13   that program was or what it entailed, what courses

14   it dealt with.

15        A.   I don't remember how long it was, but it

16   entailed firearms training, OC spray.  I had to get

17   sprayed again.

18        Q.   You didn't like that, did you?

19        A.   No, not really.  Taser training.  And

20   those are the three big ones that I can remember,

21   of course, for obvious reasons.  There may have

22   been others.  I just don't recall.

23        Q.   We have your training.  We have your

24   resume here, so we will look at them, but those are

25   the type of things that require an actual

1    certification.  You have to certify with your
2    firearm every year, correct?
3         A.   Yes, sir.
4         Q.   And taser.  They require you to -- every
5    time you get a new taser to be trained, correct?
6         A.   Correct.
7         Q.   And OC spray.  I don't know if that's the
8    same.  I guess it depends on what product it is,
9    but those were testing that is pretty much provided
10   by the manufacturer of the product, correct?
11        A.   I wouldn't know.
12        Q.   You don't remember the test all saying
13   Taser on them?  You can't actually go out with a
14   taser unless Taser has a certification on file?
15        A.   Say that again.
16        Q.   You are not aware that you can't carry a
17   taser unless Taser knows you are certified?
18        A.   I'm unaware of that.  I know you have to
19   be trained in it, but I don't know if Taser
20   requires certification.
21        Q.   Let's look at your training.  Your
22   training -- I'm starting from the back page to the
23   front.  First of all, in any of your training at
24   Memphis or at NOPD, did you have training on the
25   Americans with Disabilities Act?

```
1          A.   Not that I can remember.  I'm not saying
2    we didn't.  I just don't remember.
3          Q.   I understand.  At any of your training,
4    and I'm trying to set a baseline before I ask you
5    about JPSO training.  At any of your training, from
6    any of your previous law enforcement, did you have
7    training on autism or any of the problems of
8    autistic people?
9          A.   Nothing that I ever remember, sir.
10         Q.   Did you have any training on -- you
11   weren't -- are you CIT certified now?
12         A.   I am not.
13         Q.   I think we covered it, but -- we covered
14   your MPD training on the prone restraint, correct?
15   And at NOPD, you didn't have any training on the
16   prone restraint.  Is that fair?  You don't recall
17   it?
18         A.   I don't remember it, correct.
19         Q.   But you do remember having some in
20   Memphis, correct?
21         A.   Correct.
22         Q.   Look through your training -- now we're
23   getting to JPSO.  At JPSO, did you have any
24   training on the Americans with Disabilities Act?
25         A.   Nothing that stands out in my mind, sir.
```

```
 1        Q.   Did you have any training on dealing with
 2   people with intellectual disabilities, like autism?
 3        A.   No, sir.
 4        Q.   Did you have any training ever provided
 5   to you by the coroner's office that you're aware
 6   of?
 7        A.   No, sir.
 8        Q.   It looks like on 9/12/16 or 9/20/16 you
 9   had RIPP Hobble training, correct?
10             MR. ZIBILICH:
11                  You're asking him if he had the
12                  training or if that paper says he had
13                  the training?
14   BY MR. CLARKE:
15        Q.   Do you understand my question?
16        A.   The paper says on 9/20/16 I received RIPP
17   Hobble training.
18        Q.   Did you have that with Pizzolato?
19        A.   I don't remember.
20        Q.   It says you had four hours, right?
21        A.   Yes, sir.
22        Q.   Count out the number of hours you had on
23   9 -- hours of training this says you had on 9/20.
24   Go back to the previous page.  You had 20 hours of
25   training on September 20th?
```

1          A.    Yes, sir.

2          Q.    Do you ever remember being here and

3     training for 20 hours in a row?

4          A.    Specifically, no, sir.  I don't remember.

5     That's not to say it didn't happen.  I'm just

6     saying, going back to 2016, I don't really

7     remember.

8          Q.    How far back do you remember stuff?

9          A.    It just depends.

10         Q.    It says here you had four hours of RIPP

11    Hobble training, correct?

12         A.    Yes, sir.

13         Q.    And the RIPP Hobble training -- I've

14    given you Exhibit 22.  Do you remember in your RIPP

15    Hobble training where there was a presentation

16    given by a guy named Bill DeVane?

17         A.    You want me to go through this?

18         Q.    No.  I'm asking you.  The RIPP Hobble

19    training.  I've taken the deposition of what we

20    call a 30(b)(6) corporate representative of JPSO,

21    and that was Mr. -- or Sergeant Pizzolato, and they

22    produced somebody who provided me with information

23    from JPSO on the training that was provided.  Okay?

24         A.    Okay.

25         Q.    And the training that he has provided is

```
 1    -- there is a whole card that is entered as Exhibit
 2    Number 21, that you don't have, that has a whole
 3    bunch of videos on it.  There is a video from a guy
 4    presenting it. His name is Bill DeVane, who was the
 5    president of the RIPP Hobble Company.  Do you
 6    remember that?
 7         A.   No, sir.
 8         Q.   Do you remember seeing videotapes of --
 9    do you remember him talking to -- do you remember
10    any training talking about in-custody deaths?
11              MR. ZIBILICH:
12                   Who is him?
13              MR. CLARKE:
14                   Anybody at JPSO on the RIPP Hobble
15                training.
16              THE WITNESS:
17                   I can't recall specifically that
18                training. Not to say I didn't receive
19                it.  I just don't remember it.
20    BY MR. CLARKE:
21         Q.   Do you recall any training on cocaine
22    psychosis or excited delirium?
23         A.   No, sir.
24         Q.   Do you know, were you trained on what
25    excited delirium is?
```

```
 1              MR. ZIBILICH:
 2                   I assume you mean at JPSO, because
 3                you asked that earlier.  At JPSO is
 4                your question?
 5              MR. CLARKE:
 6                   I'm to JPSO now.
 7              THE WITNESS:
 8                   So this is related to JPSO you're
 9                asking?
10              MR. CLARKE:
11                   Yes.
12              THE WITNESS:
13                   No, sir, not that I remember.
14     BY MR. CLARKE:
15         Q.   Did you have any training on excited
16     delirium, cocaine psychosis anywhere else? I know
17     you did, but --
18              MR. ZIBILICH:
19                   Then why are you asking him, if you
20                know he did?
21              MR. CLARKE:
22                   I want to see if he tells the truth
23                or not.
24              MR. ZIBILICH:
25                   It ain't about telling the truth.
```

1          MR. CLARKE:

2               It is.

3          MR. ZIBILICH:

4               He might not remember.  No, it ain't

5            about telling the truth.

6          MR. CLARKE:

7               I know he had it.

8          MR. ZIBILICH:

9               Well, why are you asking him?

10          MR. CLARKE:

11               Because I want to see what he

12            remembers.

13          MR. ZIBILICH:

14               That's a better answer.

15          MR. CLARKE:

16               Anything to please you, Franz.

17          MR. ZIBILICH:

18               Thank you.

19          THE WITNESS:

20               So repeat your question.

21   BY MR. CLARKE:

22        Q.   Were you trained anywhere on cocaine

23   psychosis or excited delirium?

24        A.   I recall taking a class with the New

25   Orleans Police Department.  I believe it was put on

```
 1   through -- I don't know if it was the Orleans
 2   Coroner's Office or another coroner's office, and
 3   it had some information about excited delirium.
 4        Q.   What did they tell you about it?
 5        A.   Sir, I couldn't tell you.
 6        Q.   Is it a good, a bad thing?
 7             MR. ZIBILICH:
 8                  Is cocaine a good or bad thing?
 9   BY MR. CLARKE:
10        Q.   Is excited delirium a good or a bad
11   thing?
12        A.   I guess to understand your question --
13             MR. ZIBILICH:
14                  Object to the form.
15             THE WITNESS:
16                  -- what do you mean by good or bad?
17   BY MR. CLARKE:
18        Q.   What were you trained about excited
19   delirium?  That's something you have to look out
20   for?  Is it problematic?
21        A.   I know it causes death. It can cause
22   death.
23        Q.   How can it cause death?
24        A.   Again, I don't know, sir.
25        Q.   Your training went through Dr. -- Do you
```

1    remember being trained never to use a SWARM

2    technique when you are dealing with somebody who

3    might be suffering from excited delirium?

4         A.    What kind of technique?

5         Q.    SWARM.

6         A.    I've never heard that phrase.

7         Q.    You can look at Exhibit 22.  It's the

8    last two pages.

9         A.    The last two pages?

10        Q.    It starts on the fourth to last page.

11        A.    Yeah.  I'm not familiar with the SWARM

12   technique.

13        Q.    So you don't recall when you are dealing

14   with somebody who is violent, they train you to put

15   together a group of people and restrain them and

16   handcuff them quickly and immediately roll the

17   subject to an upright, seated position or to hold

18   them in the recovery position?

19        A.    No, sir.

20        Q.    Do you remember if you go through these

21   slides here -- these aren't Bates numbered, but

22   JPSO-8572 is the number on it.

23        A.    8572?

24        Q.    8752.  Positional restraint asphyxia.

25             MR. ZIBILICH:

```
 1                    What is the question?
 2            MR. CLARKE:
 3                    I'm getting him to that page.
 4            THE WITNESS:
 5                    I'm there, sir.
 6   BY MR. CLARKE:
 7       Q.   Read this and the next three.  Read the
 8   next three pages then I'm going to ask you some
 9   questions.  Do you remember being trained that
10   positional asphyxia occurs when the position of the
11   body interferes with respiration?
12       A.   I see it here, yes, sir.
13       Q.   Do you recall that training?
14       A.   No, sir.
15       Q.   Did you recall this training on January
16   19th, 2020?
17       A.   January 19th of 2020?
18       Q.   Yeah.  The date of this incident.
19            MR. ZIBILICH:
20                    You want him to opine on what he
21              remembered --
22            MR. CLARKE:
23                    I do, just like you did asking my
24              people what happened when my kid was --
25              when E▓▓▓ was two.
```

```
 1              THE WITNESS:
 2                   I'm sorry.  Can you rephrase it?
 3    BY MR. CLARKE:
 4         Q.   Did you recall this training on March
 5    19th -- January 19th, 2020, the date of the Parsa
 6    incident?
 7         A.   What do you mean by did I recall the
 8    training?
 9         Q.   Did you apply your training?  This is
10    your training, correct?
11         A.   Yes.  I applied training to that day.  I
12    don't know if it is answering your specific
13    question, though.
14         Q.   On that day, did you understand that
15    positional asphyxia occurs when the position of the
16    body interferes with respiration?
17         A.   Did I apply that day?
18         Q.   Yeah.
19         A.   You have to ask it a different way.
20         Q.   Were you trained that the interference
21    with respiration is increased when the subject is
22    placed in a physically compromised position from
23    which they cannot remove themselves?
24         A.   The best way I can answer your question,
25    I think, and if this is the way -- what you're
```

```
 1    asking, there was never a time where it was safe to
 2    place --
 3              MR. ZIBILICH:
 4                   That's not his question.  His
 5                question is whether you recall the
 6                training.
 7              THE WITNESS:
 8                   Do I recall the training?
 9    BY MR. CLARKE:
10        Q.   Right.  That the interference is
11    increased with somebody's breathing when they're
12    placed in a physically compromised position from
13    which they cannot remove themselves?
14        A.   Then I'm going to have to say no.  I
15    don't recall the training.
16        Q.   Did you recall being trained on the three
17    elements of respiration?
18        A.   No, sir.
19        Q.   Were you aware that the training provided
20    by JPSO noted that you have to have oxygen coming
21    in the lungs, you have to have an open airway, and
22    you've got to be able to breathe the air out to
23    expel CO2?
24        A.   That makes sense, sure.
25        Q.   Were you trained that?
```

```
 1          A.    Again, I don't remember.

 2          Q.    Were you trained that the prone position

 3   -- I think you already testified to this.  Were you

 4   trained that the prone position restricts

 5   breathing?

 6          A.    Correct.  The prone position is not an

 7   ideal position, yes, sir.

 8          Q.    And whenever possible, you need to remove

 9   somebody from a prone position when safe, correct?

10          A.    When safe, yes, sir.

11          Q.    Do you ever remember seeing videos in

12   your RIPP Hobble training that showed a person

13   being choked out and then hog-tied?

14          A.    Something to that effect with Memphis.

15   That's why the hog-tying comes to mind.

16          Q.    I'm talking about JPSO.  There were five

17   videos shown at --

18          A.    No.  I don't remember.

19          Q.    So you don't know if you were -- do you

20   remember them showing you a video that says this is

21   a video of what we don't want you to do?

22              MR. ZIBILICH:

23                  He just answered it.

24              THE WITNESS:

25                  No.  I don't remember, sir.
```

```
 1   BY MR. CLARKE:
 2        Q.   Were you trained at JPSO that it is
 3   acceptable or unacceptable to use a chokehold?
 4        A.   I believe it's unacceptable.
 5        Q.   Have you ever used a chokehold?
 6        A.   No, sir, not that I can remember. I've
 7   been in some fights, but I don't ever remember
 8   using the chokehold.
 9        Q.   You got in fights where you had to use
10   force during an altercation with somebody?
11        A.   Correct.
12        Q.   And you don't fill out a separate use of
13   force report that gets independently reviewed.  You
14   just put the information in your incident report,
15   correct?
16        A.   At that time, right.  I don't know if
17   things have changed since then.
18        Q.   Do you still work with the JPSO?
19        A.   Oh, I'm sorry.  I was -- in my mind, I
20   was referencing back to NOPD.
21             MR. ZIBILICH:
22                  All of his questions now are about
23               JPSO training.
24             THE WITNESS:
25                  I gotcha.  My mistake.
```

```
1   BY MR. CLARKE:
2        Q.   Let me ask you that.
3             MR. ZIBILICH:
4                  It's actually his mistake for being
5             vague, but it's okay.
6   BY MR. CLARKE:
7        Q.   So the use of -- have you ever had to use
8   force at JPSO?
9        A.   No, sir.  No.  I don't believe I have.  I
10  wasn't on the road for very long.
11       Q.   Take me through where you served at JPSO.
12       A.   When I was first hired, I was assigned to
13  the Second District, which is this area here out in
14  Harvey.  I may have did a year, maybe less, on the
15  road, and then I went to their -- they call the
16  follow-up unit.  They investigate misdemeanor
17  crimes.
18       Q.   Pre-detective?
19       A.   Yeah.  Good word for it.  Sure.  We
20  author arrest warrants and sometimes search
21  warrants and investigate things of domestic
22  violence, thefts with known perpetrators.
23       Q.   So that's kind of a follow up for the
24  general patrol?  That's not really a detective case
25  yet?
```

```
 1        A.    Correct.  Anything the bureau doesn't
 2   handle.
 3        Q.    Did you ever have any training that
 4   people who exhibit the signs of ED are potentially
 5   dead prisoners, that they're all going to die?
 6        A.    And when you say ED?
 7        Q.    Excited delirium.  I'm sorry.
 8        A.    Nothing I remember specifically.  I
 9   believe in that coroner's class they said something
10   that delirium will usually associate with death or
11   there is some deaths associated to excited
12   delirium.
13        Q.    Did you follow any of the George Floyd
14   trial?
15        A.    Just what was reported on the news.
16        Q.    There was a lot reported on the news,
17   wasn't there?
18        A.    Well, I didn't watch all of it.
19        Q.    Do you know that they tried to say that
20   George Floyd -- the police officers in their
21   defense said that George Floyd died of excited
22   delirium --
23             MR. ZIBILICH:
24                  Object to the form.
25   BY MR. CLARKE:
```

```
 1      Q.    -- in that case?
 2      A.    Do I know that?
 3      Q.    Yeah.
 4      A.    Oh, I don't --
 5            MR. ZIBILICH:
 6                  Wait. Object to the form.  Do you
 7               want to name those police officers,
 8               please?
 9            MR. CLARKE:
10                  Chavon.
11            MR. ZIBILICH:
12                  Chauvin.  Okay.  You can ask the
13               question.  You said police officers.
14               Which ones?
15            MR. CLARKE:
16                  All of them.
17            MR. ZIBILICH:
18                  All of them?
19            MR. CLARKE:
20                  All of them --
21            MR. ZIBILICH:
22                  I need their names, sir.
23            MR. CLARKE:
24                  Okay.  I'll get them for you on a
25               break.
```

```
 1            MR. ZIBILICH:

 2                 Okay.

 3    BY MR. CLARKE:

 4        Q.   Were you trained that sudden tranquility

 5    can be followed immediately by death when you are

 6    restraining people in the prone position?

 7        A.   That doesn't sound familiar to me, sir.

 8        Q.   Were you told when somebody is restrained

 9    in the prone position that you had to monitor him?

10        A.   No, sir.  I can't recall that

11    specifically.

12        Q.   You wouldn't know what they -- how you

13    would monitor somebody in the prone position,

14    correct?

15        A.   Correct.

16        Q.   Were you trained that people who may be

17    suffering from excited delirium are impervious to

18    pain so pain compliance techniques should not be

19    used?

20        A.   I have -- I do remember hearing that they

21    are -- I don't want to say impervious, but their

22    pain tolerance is different, but I don't -- the

23    second part of your question, that pain techniques

24    should not be applied, I never heard that.

25        Q.   So in your RIPP Hobble training, with all
```

```
 1    of the issues dealing with prone restraint, what do
 2    they tell you to do?
 3         A.   I thought I said I don't remember a lot
 4    about the RIPP Hobble training.
 5         Q.   Do you know what a RIPP Hobble looks
 6    like?
 7         A.   I do.
 8         Q.   Did you have a RIPP Hobble March -- on
 9    January 19th, 2020?
10         A.   No, sir.
11         Q.   Did you have one after you got the
12    training?
13         A.   I don't know if I was issued one or not.
14    I'm not saying I wasn't.  I don't remember.
15         Q.   It's not part of your duty belt now or
16    your equipment today?
17         A.   No, sir.
18         Q.   Do you ever remember a time when you had
19    a RIPP Hobble?
20         A.   When I was --
21              MR. ZIBILICH:
22                   He just said he don't remember if he
23                was issued one.
24              THE WITNESS:
25                   If I can -- are we referring to JPSO
```

```
 1              or --
 2         MR. CLARKE:
 3              Yeah.
 4         MR. ZIBILICH:
 5              Everything is JPSO now.
 6         THE WITNESS:
 7              Again, my apologies.  No, I don't
 8          remember having a RIPP Hobble.
 9  BY MR. CLARKE:
10     Q.   Memphis gave you a RIPP Hobble.
11     A.   Correct.
12     Q.   If they trained you, they give you the
13  equipment, correct?
14     A.   Not always. Some of the stuff we had to
15  self-purchase.
16     Q.   In Memphis?
17     A.   Yes, sir.
18     Q.   What did you have to self-purchase in
19  Memphis?
20     A.   I'm thinking the RIPP Hobble.  There were
21  some things we had to purchase there.
22         MR. CLARKE:
23              Are we having an attack?
24         MR. ZIBILICH:
25              This guy flies from Fort Walton or
```

```
 1                    Destin, Florida, or Panama City,
 2                    Florida, to Belle Chasse Naval Station
 3                    where they typically drop off
 4                    presidents of the United States.  Do
 5                    you have any idea how long that flight
 6                    takes?
 7              MR. CLARKE:
 8                    No.
 9              MR. ZIBILICH:
10                    About 14 minutes.
11              MR. CLARKE:
12                    How long would the drive be?
13              MR. ZIBILICH:
14                    The drive to Destin, four and a half
15                    hours.  It's almost the crow flies.
16                    This guy cuts across over the Gulf, but
17                    it's unbelievable.  Sometimes you see
18                    three of them flying together or two.
19   BY MR. CLARKE:
20        Q.   Did you ever have a RIPP Hobble at JPSO?
21        A.   Again, I don't remember being issued one.
22        Q.   Well, did they train you that if you have
23   a violent prisoner, this is what we have the RIPP
24   Hobble for, to control their legs and to then move
25   them into the recovery position so they don't
```

1   suffer from the potential restraint asphyxia?

2        A.   I remember being told or trained that the

3   RIPP Hobble was to prevent a violent prisoner in

4   the back of your car from kicking out the windows.

5        Q.   Look through Exhibit 22 and -- hang on a

6   second.  Look through Exhibit 22, and you let me

7   know if it says anything about stopping a prisoner

8   from kicking in the back of the car.

9             MR. ZIBILICH:

10                 It says what it says, Andrew.  I

11              mean, really.

12            MR. CLARKE:

13                 I know.  I try to please you all the

14              time, Franz.  I just can't today.

15            MR. ZIBILICH:

16                 It says what it says.

17            MR. CLARKE:

18                 He said he had some training about

19              -- the only thing he remembers training

20              on is something that's not in the

21              training.

22            MR. ZIBILICH:

23                 Some people's memories are better

24              than others.

25            THE WITNESS:

```
 1                    I could be getting confused with
 2              some of -- with Memphis on some of this
 3              training.
 4                    These all appear to be about excited
 5              delirium and not about restraining
 6              someone that is kicking the car.
 7   BY MR. CLARKE:
 8        Q.   Were you trained that you should never
 9   leave somebody in the prone position by Sergeant
10   Pizzolato?
11        A.   I don't remember him specifically saying
12   it, but I'm not -- that's not to say he didn't.
13        Q.   I asked him a question.  When do you
14   train them to put in the recovery position, and his
15   answer was, I train them never to leave anybody in
16   the prone position.
17        A.   Okay.
18        Q.   You left Parsa in the prone -- E███  P███
19   in the prone position for a long period of time,
20   didn't you?
21              MR. ZIBILICH:
22                    Object to the form.
23              THE WITNESS:
24                    Can you rephrase it some other way?
25   BY MR. CLARKE:
```

1      Q.    How long did you leave E███ P████ in the

2   prone position?

3                  MR. ZIBILICH:

4                      Object to the form.  You can answer

5                  it.

6                  THE WITNESS:

7                      Again, as I remember it, there was

8                  never a lull in the fight.  It was

9                  always a fight.  So to say how long we

10                 left him in the prone position, I don't

11                 think he was ever in the prone position

12                 for any extended period of time without

13                 there being a fight.

14  BY MR. CLARKE:

15     Q.    And we'll get to the tape when we get to

16  that, but were you -- you understand when you are

17  dealing with a suspect there is going to be times

18  where they may be aggressive and times where they

19  may be less aggressive, correct?

20     A.    I'll agree with that, sure.

21     Q.    And we went through -- and the training

22  is the more pressure on somebody's back, the more

23  restriction of his breathing.  Remember that?

24     A.    Yes, sir.

25     Q.    And I don't know if you recalled that or

```
 1    if you -- Pizzolato says, according to his
 2    training, that -- well, let me strike that back.
 3    Were you trained by Pizzolato that a person lying
 4    on the stomach has trouble breathing when there is
 5    pressure on their back?
 6              MR. ZIBILICH:
 7                   Object to the form.  Object to no
 8              foundation.  If you go back 45 minutes,
 9              he don't remember being taught by
10              Pizzolato, so it's an impossible
11              question to answer.
12              MR. CLARKE:
13                   I got you.
14    BY MR. CLARKE:
15         Q.   You can answer it.
16         A.   Can you ask it again, please?
17         Q.   Yeah.  Were you trained by Pizzolato that
18    a person lying on his stomach has trouble breathing
19    when pressure is applied to their back?
20         A.   I mean, again, I don't specifically
21    remember being told that.
22         Q.   Do you remember being trained that the
23    remedy to alleviate this is relatively simple? Just
24    simply get the pressure off their back.
25              MR. ZIBILICH:
```

```
1                   Trained by whom?
2              MR. CLARKE:
3                   JPSO, Pizzolato, or whoever you are
4                going to say did your RIPP Hobble
5                training.
6              THE WITNESS:
7                   Again, can you rephrase your
8                question?
9    BY MR. CLARKE:
10        Q.   Were you trained at JPSO, in your RIPP
11   Hobble training, that the remedy to somebody having
12   -- who is being restrained in the prone position,
13   to minimize the risk of asphyxia, that the remedy
14   is relatively simple.  Get the pressure off their
15   back?
16        A.   I would add when it's safe to do so, yes,
17   sir.
18        Q.   Were you told that you have to wait until
19   somebody is completely still before you attempt to
20   put them in the recovery position?
21        A.   I don't remember specifically being
22   trained that, but I would say that I would wait for
23   the person to stop fighting before I put them in --
24   you can't put someone in recovery if they're
25   resistant to you.
```

1      Q.   You can't put somebody in the recovery
2  position if they're dead either, right?
3      A.   That is true.
4      Q.   So what did they train you of where the
5  line is?
6              MR. ZIBILICH:
7                  Object to the form.
8  BY MR. CLARKE:
9      Q.   You weren't trained that obese people
10  were at high risk of restraint asphyxia, correct?
11      A.   Again, I do not specifically remember.
12      Q.   According to Pizzolato, he does train you
13  or trained people at JPSO when the natural reaction
14  to oxygen deficiency occurs, the person struggles
15  more violently.  You don't recall that training,
16  correct?
17      A.   You're correct.
18      Q.   You don't recall training that says so
19  somebody being restrained on the ground in a prone
20  position, if they're reacting in some way, that
21  could be the result of oxygen deficiency?
22      A.   No, sir.
23      Q.   Were you trained that you can restrain
24  people that you're trying to get out of the prone
25  position in the recovery position or the modified

```
1    recovery position?
2         A.   I am familiar with being told that we
3    need to put people into prone positions as soon as
4    possible.
5         Q.   I don't think you said that right.  I'll
6    let you correct that, if you want.
7         A.   Oh, okay.  What was your question again?
8         Q.   I mean, you -- I'll move on.  I think you
9    -- you said you put them in the prone position as
10   quickly as possible.
11        A.   Oh, I'm sorry.  Recovery.
12        Q.   I'm not one of these lawyers who, like
13   Franz, tries to trip you up.  I try to be fair.
14        A.   I appreciate that.
15        Q.   So in --
16             MR. ZIBILICH:
17                  Somebody go in my truck and get my
18                gold medal for him.
19   BY MR. CLARKE:
20        Q.   Can somebody -- so what you were saying
21   is you were trained to get them in the recovery
22   position as quick as possible, if they had been in
23   the prone position, correct?
24        A.   Yes, sir.
25        Q.   So I asked him, so if somebody is
```

```
 1   kicking, and you control him by holding his
 2   handcuffs behind his back in the modified recovery
 3   position.  His answer was correct.  Then I asked
 4   him, there would be no reason to remain on
 5   somebody's back after they're handcuffed, would
 6   there.  No, they're on their side.  They can't kick
 7   on their back.  I don't know what that means, but
 8   were you told that -- were you trained that once
 9   you have handcuffs on somebody, that's when you are
10   supposed to put them in the recovery position?
11        A.   No, sir.  My interpretation is that once
12   the person has stopped resisting, the fight is
13   over.  Then it's safe to put them in a recovery
14   position.
15        Q.   Well, that's completely opposite of what
16   the SWARM technique is, correct?
17             MR. ZIBILICH:
18                  He told you he didn't know what the
19             SWARM technique was.  It's an
20             impossible question to answer.
21             MR. CLARKE:
22                  You can read it.  The SWARM
23             technique is --
24             MR. ZIBILICH:
25                  He don't want to read it.
```

```
 1              MR. CLARKE:

 2                   I don't care if he wants to read it.

 3              He should have.  He was trained it.

 4    BY MR. CLARKE:

 5         Q.   You have to deal with resisting people,

 6    correct?

 7         A.   Correct.

 8         Q.   And you have to try to restrain them in a

 9    way that doesn't endanger them, correct?

10         A.   Yes, sir.

11         Q.   To the best of your ability, correct?

12         A.   To the best of our ability.

13         Q.   And when everybody says, you know, roll

14    them over when they're safe, safe is a relative

15    term, correct?

16         A.   I don't think so.  I don't find where it

17    is relative, no, sir.

18         Q.   If there is ten cops on the scene and one

19    resisting person, that is different than if it is

20    one-on-one, correct?

21         A.   No.

22              MR. ZIBILICH:

23                   Object to the form.  You can answer

24              it.

25    BY MR. CLARKE:
```

```
 1        Q.   If somebody is handcuffed versus somebody
 2   unhandcuffed, they're more under control
 3   handcuffed, correct?
 4        A.   More under control, but I still wouldn't
 5   call it -- I don't like the term "relatively safe."
 6   They're not safe until you have them at lockup.
 7        Q.   Well, with the SWARM technique, you are
 8   supposed to rush in, knock him down quick, put him
 9   on his side and immediately put him in the recovery
10   position, correct?
11             MR. ZIBILICH:
12                  Object to the form.
13   BY MR. CLARKE:
14        Q.   That's what it says, right?
15             MR. ZIBILICH:
16                  Are you asking him if that's what it
17             says?
18             MR. CLARKE:
19                  I mean, listen.  The fact that he
20             doesn't understand or remember the
21             training that he actually had, I'm
22             going to question him however the hell
23             I want.
24   BY MR. CLARKE:
25        Q.   Look at the SWARM technique.  You take
```

```
1    them down, and you put them in the recovery
2    position.
3                   MR. ZIBILICH:
4                       This ain't a training class.  Don't
5                   look at the SWARM technique.
6               MR. CLARKE:
7                       If you are going to instruct him not
8                   to, then you do it at your own peril.
9               MR. ZIBILICH:
10                      This is not a training class.
11              MR. CLARKE:
12                      This is a training deposition for my
13                  municipal claim.  You may not like
14                  that, but that's the way it's going to
15                  go.
16   BY MR. CLARKE:
17       Q.   Okay.  The SWARM technique.  Take them
18   down immediately, roll them into the recovery
19   position, correct?
20       A.   I mean, I would add but when it's safe to
21   do so.
22       Q.   Does it say when it's safe to do so in
23   the SWARM training technique?
24       A.   I don't know.  All I know is --
25       Q.   Read it.  It is right in front of you,
```

```
 1   Exhibit 22.
 2        A.   When I'm on the scene and the person is
 3   actively resisting --
 4        Q.   My question is -- look at Exhibit 22, and
 5   look at the SWARM technique.
 6             MR. ZIBILICH:
 7                  You can read it.  I object to the
 8             form.
 9             THE WITNESS:
10                  Where is it?
11   BY MR. CLARKE:
12        Q.   The last three or four pages.
13        A.   The disclaimer?
14        Q.   No.  The last three or four pages. That's
15   the second to last. That's the third to last.
16   That's the fourth to last.
17        A.   I'm a little bit further than four. You
18   are saying four?
19        Q.   I want you to look at the document that
20   says, "SWARM Technique" on it.
21        A.   I see SWARM disclaimer.  SWARM continued.
22        Q.   Go to the page where it says, "SWARM
23   Disclaimer," and then go to the next page and the
24   next page.
25        A.   SWARM disclaimer continued, continued.
```

1        Q.    SWARM technique.  Those two pages.

2        A.    Okay.  So I'm at disclaimer.

3        Q.    Read the SWARM technique.  Does it say to

4    put him in the recovery position when it's

5    completely safe or does it say to take him down

6    with a large group of officers and put him in the

7    recovery position?

8              MR. ZIBILICH:

9                   Object to the form.  It says what it

10             says.

11             THE WITNESS:

12                  Apply Hobble restraint to ankles and

13             roll the subject into an upright -- a

14             seated position?

15             MR. CLARKE:

16                  Yeah.

17             THE WITNESS:

18                  Yes.

19   BY MR. CLARKE:

20       Q.    Does it say when safe or does it say use

21   the overwhelming force to do that and put him in

22   recovery position?

23             MR. ZIBILICH:

24                  Same objection.  It says what it

25             says.

```
 1            THE WITNESS:
 2                 You're right.  It doesn't say when
 3            safe to do so, but common sense would
 4            say out of injury to that person or
 5            other officers to do it when it is safe
 6            to do so.
 7   BY MR. CLARKE:
 8       Q.   That's why you use the SWARM technique,
 9   because you use an overwhelming amount of force to
10   take that and put somebody in that position whether
11   they want to or not.
12            MR. ZIBILICH:
13                 That's not a question.  That's a
14            sermon.
15   BY MR. CLARKE:
16       Q.   All right.  So were you trained that --
17   were you trained of any length of time that it's
18   dangerous to hold somebody in the prone position?
19       A.   Was I trained -- I'm sorry.  Repeat it
20   one more time.
21       Q.   Were you trained of any length of time
22   that is dangerous to hold somebody in the prone
23   position?
24       A.   When you say length of time, no.
25       Q.   I mean, that's what I'm just trying to
```

```
1    get at.  Were they trained you can keep somebody in
2    the prone position for one minute, five minutes,
3    ten minutes, or was that not said?
4         A.   No time limit that I'm aware of has ever
5    been taught.  Again, it's when it is safe and
6    reasonable to do so.
7         Q.   Were you trained that due to potential
8    rapid death in prone restraints, law enforcement
9    must act quickly to minimize the duration of the
10   resistance and struggle which is thought to
11   contribute to the death?
12        A.   No, sir, not that I recall.
13        Q.   You didn't have a Hobble on the 19th,
14   January 19th?
15             MR. ZIBILICH:
16                  Fourth time.
17             MR. CLARKE:
18                  Right.
19   BY MR. CLARKE:
20        Q.   Correct?
21        A.   No, sir.
22        Q.   Do you know if anybody did?
23        A.   I don't.
24        Q.   Do you know if anybody --  did you hear
25   any discussion about a RIPP Hobble?
```

```
 1        A.   No, sir.

 2        Q.   Do you think it was impossible for the

 3   six officers on the scene to restrain B███ P███ in

 4   the recovery position on his side?

 5        A.   Yes.

 6        Q.   Do you know what your policies say about

 7   what you are supposed to do with a person who is

 8   violently resisting?

 9             MR. ZIBILICH:

10                  Object to the form.  You can answer

11             it.

12             THE WITNESS:

13                  Can you ask a specific question

14             about -- are asking me specifically

15             what it says?  Like I can't recite it

16             verbatim.

17   BY MR. CLARKE:

18        Q.   I mean, do you know what in general it

19   says?

20        A.   No, sir.

21        Q.   Go to the policy book.

22        A.   Which exhibit are we on?

23        Q.   That binder.  Exhibit 19.  Go to SOP-8.

24        A.   Okay.

25        Q.   Were you aware on January 19th, 2020
```

```
 1    about the Restraining Devices and Defensive Devices
 2    Policy for the Jefferson Parish Sheriff's Office?
 3         A.   I don't think I would have known
 4    specifically, no, sir.
 5         Q.   They didn't test you on it, correct?
 6         A.   If they did, I don't remember it.
 7         Q.   And would you consider E███ P█████ on that
 8    particular day to be an extremely violent person?
 9         A.   I would, yes.  Yes, sir.
10         Q.   So according to your policy, if you go to
11    Page 5 of 6, Section B.
12         A.   Extremely Violent Prisoners?
13         Q.   Yeah.  What are you supposed to do with
14    them, according to the policy?
15         A.   If necessary, to restrain -- extremely
16    violent prisoners may have to be additionally
17    restrained.  If necessary, to restrain the
18    movements of both hands and legs, it may be done by
19    the Total Appendage Restraining Procedure.
20         Q.   What is that?
21         A.   The RIPP Hobble?
22         Q.   Is that what -- the TARP is the RIPP
23    Hobble?
24         A.   I would think so, yes, sir.
25         Q.   So if you have people, according to your
```

```
 1   policy, that are extremely violent and need to be
 2   additionally restrained, you are supposed to do it
 3   through the TARP policy, correct?
 4        A.   No, sir.  It says may be done.  It
 5   doesn't say shall, so that doesn't say we have to
 6   do it that way.
 7        Q.   Well, did you make a decision on that day
 8   as to why the RIPP Hobble wouldn't be, or the Total
 9   Appendage Restraining Procedure wasn't -- couldn't
10   be used?
11        A.   Shackles were available, so that's what
12   we used.
13        Q.   Well, the shackle training doesn't also
14   have the training pertaining to getting people out
15   of the prone position, does it?
16        A.   I wouldn't know.
17        Q.   Did you have shackle training?
18        A.   No, sir.  Not that I remember receiving.
19        Q.   I know you were a jailer, so you had
20   shackle training.
21        A.   Well, you are -- well, in that training
22   --
23             MR. ZIBILICH:
24                  Whoa, whoa.  That's another sermon.
25             MR. CLARKE:
```

113

```
 1              Sermon?
 2         MR. ZIBILICH:
 3              Yeah.  You had shackle training
 4           doesn't sound like a question to me. I
 5           don't know --
 6         MR. CLARKE:
 7              You got to put in the inflection.  I
 8           kind of pushed my shoulders up like
 9           this.
10         MR. ZIBILICH:
11              Well, we've been talking about JPSO
12           training for about a week.  Are you
13           going to someplace else now, because he
14           didn't get any correctional training at
15           JPSO?
16         MR. CLARKE:
17              Check your e-mail.  I think I gave
18           you a listing of what I do and how to
19           do it.
20         MR. ZIBILICH:
21              I got it.  You don't understand.
22           You've been asking questions for about
23           an hour and a half on JPSO training.
24           Are you now going to something else?
25         MR. CLARKE:
```

```
 1              No.  I am just kind of astounded
 2              that he would say he didn't have
 3              shackle training when he's been a
 4              jailer on three or four different
 5              occasions or whatever.
 6         MR. ZIBILICH:
 7              Maybe he thought you were talking
 8              about JPSO training like the last hour.
 9  BY MR. CLARKE:
10      Q.   What did you consider when you came on
11  the scene about how to restrain or how to deal with
12  -- I'll move off that.  Let's take a break. I think
13  I am going to get to the facts.
14         THE VIDEOGRAPHER:
15              We are going off the record.  The
16              time is now 11:03.
17              {BRIEF RECESS}
18         THE VIDEOGRAPHER:
19              We are back on the record.  The time
20              is now 11:13.
21  BY MR. CLARKE:
22      Q.   This training goes through 3/1/21.  Have
23  you had RIPP Hobble training since March of 2021?
24      A.   No.  No, sir.
25      Q.   Have you had it any other time other than
```

```
 1    the time listed on this training resume?
 2         A.   No, sir.
 3         Q.   Let's get to the date of the incident
 4    involving E███.  Where were you working, and -- you
 5    have in front of you your statement.  If you look
 6    at Exhibit Number 103 as well.  Pull up Exhibit
 7    103.
 8         A.   I have Exhibit 103.
 9         Q.   Look at Interrogatory Number 9.
10         A.   I'm at Number 9.
11         Q.   Read that and tell me if it's accurate.
12         A.   Yes, sir.
13         Q.   Would you agree that the question asks,
14    "Please state with specificity and in chronological
15    order the exact sequence of events from the time
16    that you became aware of involved and in the
17    incident involving the plaintiff until your shift
18    assignment and returned home."  There is a lot of
19    information that you put in your statement that is
20    not contained within this interrogatory answer.
21    Would you agree?
22         A.   No.  Could you be a little bit more
23    specific about what is missing?
24         Q.   Did you talk about his arms going over
25    his head?
```

1      A.    In which part?

2      Q.    In any part of your statement. Did you --

3            MR. ZIBILICH:

4                  Object.  It's the same.  They both

5               speak for themselves.  They say what

6               they say.

7            MR. CLARKE:

8                  No, sir.

9   BY MR. CLARKE:

10     Q.    Why did you not put in any discussion of

11  the lack of resistance when you placed the second

12  handcuffs on Parsa like you did in your statement?

13     A.    In this particular question, on Question

14  Number 9, I guess I was just trying to be brief and

15  to the point.

16     Q.    Was there discussion of which facts you

17  are going to leave out or which facts you are going

18  to put in?  Because it doesn't say to be brief,

19  does it, the question? It says, "Please state with

20  specificity and in chronological order the exact

21  sequence of events" --

22            MR. ZIBILICH:

23                  Object to the form.  He's already

24               answered your question.

25   BY MR. CLARKE:

```
 1        Q.   Do you know why things were omitted from
 2   this discovery response?
 3                  MR. ZIBILICH:
 4                     Again, object to the form.
 5                  THE WITNESS:
 6                     Again, I was just stating the facts
 7                  that led up to my being there and what
 8                  I observed.  My statement, obviously,
 9                  is another statement along with report.
10   BY MR. CLARKE:
11        Q.   You could have wrote, see my statement,
12   as an answer, right?
13        A.   Would that have been acceptable?
14        Q.   Yes.
15        A.   Then I'll remember that for next time.
16        Q.   There are certain facts in here that you
17   discuss in your statement.  I'm trying to figure
18   out why you selected these particular facts to put
19   in your answer to Interrogatory Number 9 and not
20   all the facts that are contained in your statement.
21        A.   Well, again, sir, it's a totality of
22   everything.  You have my statement.  You have the
23   video, and you have these questions here.
24        Q.   Does it say, see the video, or see the
25   statement?
```

```
 1        A.    Does it need to?

 2        Q.    If you are going to refer to it.

 3        A.    I would assume, and, again, that's on my

 4   part for assuming, that that would all be covered.

 5        Q.    So you agree that this isn't everything

 6   that you saw on the scene in Interrogatory Number

 7   9, Exhibit Number 103?

 8        A.    No.  I would agree to that.

 9        Q.    Now, we're going to play the video at

10   some point.  We can either do it while you are

11   talking about it or -- let's do it this way.  Where

12   were you when you heard the call and what was the

13   call that you heard?

14        A.    May I refer back to 103?

15        Q.    If you need it.  Is it 103 or 104?

16        A.    I have 103.

17        Q.    I wouldn't refer back to 103, but you

18   can.

19        A.    It has the -- you want me to do 104?  Oh,

20   I see what you're saying.

21             MR. ZIBILICH:

22                  You can review anything that you

23             feel like may help you answer a

24             question, if you so choose.

25   BY MR. CLARKE:
```

```
 1        Q.   Yeah.  If it came out wrong, that is
 2   correct.  I was trying to get you to the more
 3   complete statement.
 4            MR. ZIBILICH:
 5                  Again, if you so choose.  They gave
 6              your guy 30 years this morning.
 7   BY MR. CLARKE:
 8        Q.   Are you waiting for a question?
 9        A.   Yes, sir.  I'm sorry.
10        Q.   Oh, I'm sorry.  Where were you and what
11   happened when you heard anything about this event?
12        A.   I was working what we refer to as weekend
13   duty.  I was responsible for all persons crimes for
14   the weekend.  Eight to four. 8:00 AM to 4:00 PM was
15   my tour of duty.  When this call came out, I was in
16   the Kenner area, the Loyola/I-610 area.
17        Q.   What was the call?
18        A.   I remember an officer asking for
19   assistance.
20        Q.   And the only thing that you heard would
21   be contained on what was over dispatch, correct?
22        A.   The audio recordings from dispatch?
23        Q.   Yes.
24        A.   Yes.  Yes, sir.
25        Q.   There wasn't any telephone communication
```

1   or some type of communication outside of dispatch,

2   correct?

3        A.   That's correct.  There was no outside

4   communication.

5        Q.   So whatever he said on dispatch is what

6   he said on dispatch, correct?

7        A.   That's what I would have heard, yes, sir.

8        Q.   You recall it being an officer needs

9   assistance, correct?

10       A.   Yes, sir.

11       Q.   What does an officer needs assistance

12   call mean?

13       A.   It can mean a number of things.  In this

14   particular case, it meant that he was in a struggle

15   and needed additional units to help.

16       Q.   Are you not also -- did you state that

17   you believe that on dispatch it said there was

18   somebody having a mental episode which is why they

19   needed backup?

20       A.   Yes.

21       Q.   What does a mental episode mean to you,

22   when you hear that?

23       A.   I'm not sure.  I didn't know what it

24   meant.  I just knew I needed to get there and help

25   him out.

1    Q.   And when you heard the officer requesting

2  for assistance, did you run blue lights and siren

3  from the first time you heard it?

4    A.   No, sir.

5    Q.   Do you know how long it was until you got

6  there?

7    A.   Not off the top of my head, no, sir.

8    Q.   And when you got there, when you pulled

9  into the lot, were you running lights and siren?

10    A.   I don't remember.

11    Q.   When you got out of the car, did you keep

12  your lights and siren going?

13        MR. ZIBILICH:

14            After he got out the car?

15        MR. CLARKE:

16            Yes.

17        THE WITNESS:

18            Again, I don't remember if I turned

19          them off entering the parking lot or if

20          I left them on.

21  BY MR. CLARKE:

22    Q.   You were the first officer to arrive on

23  the scene, correct?

24    A.   I was.

25    Q.   When you arrived, what did you see when

1  you got out of your car?

2      A.   I saw the deputy seated on the lower

3  portion of the subject's back.  I saw the, what I

4  later learned to be the parents, standing at the

5  head, and I saw that the deputy had one handcuff

6  affixed to the subject's right arm and was

7  struggling to get the left arm connected to the

8  handcuff.

9      Q.   Did you tell anybody that you struggled

10  to get the handcuff on in your statement to JPSO?

11      A.   I don't remember using the specific words

12  "a struggle."  I didn't have to fight or wrestle

13  with the left arm.

14      Q.   You actually said -- when you arrived,

15  did you meet any resistance, and you said, "No, no,

16  no, not -- not -- not really, no."  You weren't

17  meeting any resistance when you handcuffed him,

18  correct?

19      A.   That's correct.

20      Q.   Why didn't you move him into the prone

21  position then?

22      A.   At that point, I went and spoke with the

23  father about what was -- what had occurred.

24      Q.   Why didn't you put him in the prone

25  position?  I mean put him in the recovery position

123

 1   then?

 2        A.   Because I went and spoke with the father.

 3        Q.   Was that because Pitfield had everything

 4   covered? You wouldn't leave -- let me take that

 5   back.  You wouldn't leave an officer to struggle

 6   with a suspect by himself if you didn't think it

 7   was safe, correct?

 8        A.   Correct.

 9        Q.   So when you got there, you handcuffed

10   him, which placed more control on him, correct?

11        A.   Yes, sir.

12        Q.   If you thought about your RIPP Hobble

13   training at that time, you would have known that he

14   is not resisting at that time, put him in the

15   recovery position, right? That's what the training

16   says.

17        A.   Yes.  That's what it says.

18        Q.   He wasn't struggling at that particular

19   time, correct?  That would be a perfect opportunity

20   to move him into the prone recovery position,

21   right?

22        A.   Well, I don't know how much struggling he

23   was doing, but I did get up to go and talk to the

24   father.  I did feel that is was safe enough for me

25   to go do that.

1    Q.   So he wasn't struggling the whole time?

2    A.   Correct.

3    Q.   If your lawyer tried to get up and argue

4  that in court, that would not be an accurate

5  statement, correct?

6    A.   What would not be an accurate statement?

7    Q.   That he was struggling the whole time

8  that you were there.

9    A.   That's correct.

10    Q.   Now, at the time that you show up, you go

11  down there.  You put the handcuff on, and then I

12  think you said you went and spoke with the father?

13    A.   Yes, sir.

14    Q.   Tell me about any conversation that you

15  had with the father.

16    A.   Well, I mean, in reviewing the statement,

17  I asked him about what occurred, if there was any

18  medications or whatnot that we could give to his

19  son to help him calm down.  At some point, the

20  fight began again.

21    Q.   When you were talking to the father, were

22  you paying attention to the incident on the ground?

23    A.   Not so much watching it, no, sir.

24    Q.   How did Mr. Parsa appear to you? Did he

25  appear to be in shock?

 1      A.    Which Mr. Parsa are you referring?

 2      Q.    Daren Parsa, the father.

 3      A.    The father.  I don't know if I would

 4  categorize it as shock.  I was focused mainly on

 5  his injuries.  He was able to answer my questions

 6  and engage in a conversation.

 7      Q.    So are the only statements or discussion

 8  that you recall that you had with the father, Daren

 9  Parsa, contained in your statement that is attached

10  as Exhibit 104?

11      A.    Are you asking me if what is documented

12  here is my only conversation with Mr. Parsa?

13      Q.    Right. I'm just trying to speed things up

14  is what I'm trying to do.  Do you remember any

15  other conversations that you had with Mr. Parsa

16  that are not contained within your statement?

17      A.    No, sir.

18      Q.    How long did you speak with Mr. Parsa

19  until other people showed up?

20      A.    As I remember it, there was another

21  deputy coming right behind me, so it was within

22  seconds.

23      Q.    So there was the first deputy.  Another

24  deputy that showed up second, correct?

25      A.    Yes, sir.

1      Q.   And then after that some uniformed

2    officers came in at different times, correct?

3      A.   That would be accurate.

4      Q.   Did you have any discussion -- was there

5    anything that prevented you, when you got there and

6    put handcuffs on E███ P███, from rolling him into

7    the recovery position?

8      A.   If I remember right, he was still

9    struggling some, flailing about, so it would have

10   been difficult to place him in recovery position.

11     Q.   My question was is there anything that

12   prevented you from putting him in the recovery -- I

13   didn't ask you if it was going to be difficult.

14     A.   Yes.  Him struggling and still continuing

15   to flail about would have made it impossible to put

16   him in the recovery position.

17     Q.   Okay. Let's go to the video now.

18          MR. CLARKE:

19               Let's go off the record.

20          THE VIDEOGRAPHER:

21               Off the record.  The time is 11:28.

22               {BRIEF RECESS}

23          THE VIDEOGRAPHER:

24               Back on the record.  The time is now

25            11:30.

1    BY MR. CLARKE:

2         Q.    You've reviewed the whole video, correct?

3         A.    Not the entirety of it.  My arrival and

4    then once the subject was removed by EMS.

5         Q.    Were you aware whether or not he was

6    resisting the entire time he was with Pitfield?

7         A.    At the time of my arrival?

8         Q.    Yeah.

9         A.    No, sir. I was not aware of the level of

10   resistance or when he started and ended.

11        Q.    Would the fact that he is in the prone

12   position for an extended period of time impact

13   whether or not you should roll him into the

14   recovery position when you got there?

15             MR. ZIBILICH:

16                  Object to the form.  You can answer

17              it.

18             THE WITNESS:

19                  No, sir.

20             MR. CLARKE:

21                  We're going to watch the whole

22              thing.

23             MR. ZIBILICH:

24                  The nine-minute version or the

25              43-minute version?

```
 1              MR. CLARKE:

 2                   Nine minute.

 3              MR. ZIBILICH:

 4                   I was about to have a panic attack.

 5   BY MR. CLARKE:

 6        Q.   What I'm going to do is I'm going to play

 7   this video at particular intervals.  I may play you

 8   a minute, then I'm going to ask you some questions.

 9   If you want to stop it at any time, you let me

10   know, too.  All right?

11        A.   Yes, sir.

12        Q.   We're starting this minute -- this video

13   which has been previously marked. I don't know the

14   exhibit number, starting at 8:04 on the counter, on

15   the bottom, and I'm going to run until nine

16   minutes.

17                   {VIDEO PLAYED}

18   BY MR. CLARKE:

19        Q.   During that period of time, he is

20   actively resisting, correct?

21        A.   Yes, sir.

22        Q.   And when Pitfield comes up, he strikes

23   his father, and he strikes Pitfield, correct?

24              MR. ZIBILICH:

25                   He meaning EP?
```

```
 1            MR. CLARKE:
 2                 Yeah.
 3            THE WITNESS:
 4                 Yes, sir.
 5    BY MR. CLARKE:
 6        Q.   Open-hand slaps, correct?
 7        A.   I'd have to look at it again.  I believe
 8    they were, though.
 9            MR. ZIBILICH:
10                 And my objection is the video speaks
11              for itself.
12            MR. CLARKE:
13                 I understand.  I was a lawyer in
14              Scott v. Harris.
15            MR. ZIBILICH:
16                 You were what?
17            MR. CLARKE:
18                 I was a lawyer in Scott v. Harris.
19            MR. ZIBILICH:
20                 Excuse me.
21    BY MR. CLARKE:
22        Q.   And E█████ goes to the ground, and Deputy
23    Pitfield strikes him once, correct?
24        A.   I didn't see that.
25        Q.   Let's go back.
```

```
 1                    {VIDEO PLAYED}
 2    BY MR. CLARKE:
 3         Q.    Did you see that?
 4         A.    What Deputy Pitfield did with his hand?
 5         Q.    Yeah.
 6         A.    I don't know if he is hitting him or
 7    slapping an arm away from his ankle.  I don't know.
 8         Q.    Well, E███ is on the ground, and the
 9    parents are around E███, and Deputy Pitfield is the
10    only one there, correct?
11         A.    Yes. Mr. Parsa is on top of his son.
12    Deputy Pitfield is trying to get, I guess, control
13    of his hands, and mom is standing behind his dad.
14         Q.    I'll play it from here, 8:56.
15                    {VIDEO PLAYED}
16    BY MR. CLARKE:
17         Q.    I'm going to stop it at ten minutes.
18    During this time, E███ is actively resisting,
19    correct?
20         A.    Yes, sir.
21         Q.    Starting at 10:02.
22                    {VIDEO PLAYED}
23    BY MR. CLARKE:
24         Q.    During that period of time, it appeared
25    that he was still resisting, correct?
```

1          A.    I think so, yes, sir.

2          Q.    Starting at 11:01.

3                      {VIDEO PLAYED}

4    BY MR. CLARKE:

5          Q.    I will stop it at 11:26.  He is not

6    resisting now, is he?

7          A.    I can't see what his other arm is doing.

8          Q.    When he was resisting before, it seemed

9    like he was trying to roll side to side and lift

10   his front of his torso up, correct?

11         A.    Well, at that point, but I'll agree there

12   is other levels of resistance.

13         Q.    What is the level of resistance or non-

14   resistance you have to have to put somebody in a

15   recovery position?

16         A.    Well, they have to be restrained.  They

17   have to be not resisting, not fighting you.

18         Q.    And you were trained that?

19         A.    No.  I don't specifically mean being

20   trained that, but common sense will tell you that

21   if he is not secured, and he is still fighting,

22   that he is not going to go in the recovery

23   position.  He won't stay there.

24         Q.    That is correct, until you get there.  So

25   here we are starting at 11:30.

```
1                    {VIDEO PLAYED}
2     BY MR. CLARKE:
3          Q.    From the time we last stopped until 12,
4     is he resisting?
5          A.    I would characterize him as resisting,
6     yes, sir.
7          Q.    Okay.  Starting at 12 minutes.
8                    {VIDEO PLAYED}
9     BY MR. CLARKE:
10         Q.    Did that appear to be the entire time
11    from where we stopped it and started until now, was
12    he actively resisting the whole time?
13         A.    Again, I would say yes.  Deputy Pitfield
14    still was not able to get his left hand into the
15    handcuff.
16         Q.    Is Pitfield sitting on Parsa at this
17    frame, 13:00, in the same position he was when you
18    showed up?
19              MR. ZIBILICH:
20                   Object to the form.  You can answer
21              it.
22              THE WITNESS:
23                   I'd have to see the video.  I
24              believe so, though.
25    BY MR. CLARKE:
```

```
 1          Q.   You saw him sitting on his buttocks or
 2    belt line area, correct?
 3          A.   Yes, sir.
 4          Q.   And not on his legs, correct?
 5          MR. ZIBILICH:
 6               Object to the form.  You can answer
 7            it.
 8          THE WITNESS:
 9               Wait.  Repeat the question.  I'm
10            sorry.
11    BY MR. CLARKE:
12          Q.   Pitfield wasn't sitting on the back of
13    his legs.  He was sitting on his buttocks or belt
14    line area.
15          A.   I would say buttocks.  You could
16    characterize it as the upper leg, I guess.
17          Q.   Starting at 13:00.
18                    {VIDEO PLAYED}
19    BY MR. CLARKE:
20          Q.   Stopped at 14:00.  During that last
21    period of time, would you consider that active
22    resistance?
23          A.   Again, I cannot see what the left hand is
24    doing, but I would assume that because Deputy
25    Pitfield has not gotten him into the handcuff yet
```

```
 1  that he is still resisting by pulling away or
 2  keeping that hand from being handcuffed.
 3       Q.   What if he is holding his mom's hand?
 4       A.   He is still actively resisting and not
 5  being able to get it back to the secure position.
 6       Q.   Do you know if Pitfield asked her to move
 7  it to the back secure position?
 8       A.   I don't know that.  You just asked me if
 9  he was actively resisting.
10       Q.   Right.  You said I don't know. I don't
11  know what he is doing with his other hand.
12       A.   Is that what I sound like?
13       Q.   Yeah.
14            MR. ZIBILICH:
15                 I can assure you, you don't.
16  BY MR. CLARKE:
17       Q.   What I'm getting at here is the only --
18  do you see active resistance on this particular
19  clip, because you can't see his left hand?
20       A.   So I --
21            MR. ZIBILICH:
22                 On this still shot?
23            MR. CLARKE:
24                 No.  On this previous clip.  I'm
25              doing minute clips.
```

```
 1            THE WITNESS:
 2                So the best way I can answer it is I
 3            don't know what his left hand is doing,
 4            and because he is not secured in the
 5            handcuff, then I'm going to say, yes,
 6            he is actively resisting.
 7  BY MR. CLARKE:
 8      Q.   It would only be active resistance if he
 9  is not giving his hand to Pitfield or Pitfield is
10  not requesting it.  Is Pitfield --
11            MR. ZIBILICH:
12                Wait, wait.  This is not a debate.
13            MR. CLARKE:
14                Right.
15            MR. ZIBILICH:
16                You asked a question, he gave you an
17            answer.
18            THE WITNESS:
19                So whether it's passive or active
20            resistance, it's still resistance.
21  BY MR. CLARKE:
22      Q.   Passive and active resistance are two
23  different law enforcement terms.
24            MR. ZIBILICH:
25                Wait, wait.  This is another sermon.
```

1    BY MR. CLARKE:

2         Q.    Correct? Have you been trained on the

3    difference between passive and active resistance?

4         A.    Have I been trained specifically on it?

5    Yes, sir.

6         Q.    So there is a difference, correct?

7         A.    It's still resistance, though.

8         Q.    I said active resistance.  When I asked

9    active resistance.  Can you put a passively

10   resistant person in the recovery position?

11        A.    Once they're secured, yes.

12        Q.    Okay.  All right.  So we're on 14:00.

13                  {VIDEO PLAYED}

14   BY MR. CLARKE:

15        Q.    Is that you showing up?

16        A.    Yes, sir.

17        Q.    So around 14:10 to 13 you show up on the

18   scene, correct?

19        A.    That's correct.

20        Q.    Do you know at this time that E███ is

21   autistic or intellectually disabled?

22        A.    No, sir.  I'm unaware.

23        Q.    You knew he was -- there was a mental

24   episode coming on, correct?

25        A.    Yes, sir.

1      Q.   When you got to the scene, did you make a

2   determination as to what that mental episode meant?

3      A.   Not at this point, no, sir.

4      Q.   So at 14:13, you come into the scene, and

5   at this still shot it looks like you are reaching

6   for your handcuffs, correct?

7      A.   I don't know.  I might be putting my

8   radio on my belt.

9                   {VIDEO PLAYED}

10  BY MR. CLARKE:

11     Q.   I'm going to stop it at 14:25.  Did you

12  see any resistance whatsoever to your efforts to

13  handcuff him?

14     A.   No, sir.

15     Q.   We are at 14:25.

16                   {VIDEO PLAYED}

17  BY MR. CLARKE:

18     Q.   I'm going to stop it there.  I'm going to

19  stop at 14:55.  So from the time you got there, you

20  handcuffed him.  Until the time you get up, did you

21  see him actively resisting?

22     A.   I believe at this point he was still

23  yelling or grunting and flailing his head around.

24     Q.   Is that active resistance?

25     A.   Yes, sir.

1      Q.    Could it be oxygen deficiency from being

2  sat on for six minutes?

3            MR. ZIBILICH:

4                Object to the form.

5            THE WITNESS:

6                I wouldn't know, sir.  I know that

7            he was still flailing about.

8  BY MR. CLARKE:

9      Q.    Why didn't you try to help Pitfield

10  control him?

11     A.    Well, I figured at this point the mother

12  was there talking to him, and she could do a little

13  bit more good than maybe I could do.

14     Q.    But the best thing to do was put him in

15  the recovery position right now, correct?

16     A.    Again, I couldn't agree with that,

17  because I felt like he was still active.

18     Q.    He was moving his head back and forth.

19  He was handcuffed behind his back, and you and

20  Pitfield couldn't roll him in the recovery position

21  is what your testimony is?

22     A.    Right.  I didn't feel like it -- I guess

23  it wasn't safe enough to do so. He was still,

24  again, grunting, screaming, and flailing his head.

25     Q.    Grunting and screaming aren't active

```
 1   resistance, correct?
 2        A.   I would disagree, because to me, it's him
 3   trying to get up, trying to still get to his feet
 4   and get Deputy Pitfield off.
 5        Q.   How is he going to get to the feet with
 6   -- how much do you think Pitfield weighs?
 7        A.   I'm not comfortable to guess, sir.
 8             MR. CLARKE:
 9                  Franz, you -- what do you think,
10            Franz?
11            MR. ZIBILICH:
12                  He weighs a little more than you.
13            MR. CLARKE:
14                  That's bad.  You might want to get
15            him to a doctor.
16            MR. ZIBILICH:
17                  There is nothing funny about this.
18            MR. CLARKE:
19                  It's my only way to get through it.
20   BY MR. CLARKE:
21        Q.   So up until this time, you haven't spoken
22   to the mother.  You were down there for some
23   seconds after you handcuffed him, and then you
24   stood up, correct?
25        A.   Correct.  I may have spoken to her when I
```

```
 1    was down there.  I don't remember.
 2         Q.   Do you remember anything she was saying
 3    or you were saying or B███ was saying or Pitfield
 4    was saying?
 5         A.   No.
 6         Q.   Did you have any conversation when you
 7    came up with Pitfield?
 8         A.   Not that I remember, no, sir.
 9         Q.   Kind of instinctively, when you got down
10    there and saw the scene and saw his hand was not
11    cuffed, you wanted to make that safe, right?
12         A.   Correct.
13         Q.   But you didn't go the other step and put
14    him in the recovery position, correct?
15         A.   No, sir.  Again, did not feel it was safe
16    to do so.
17         Q.   Based on what you saw on the scene and
18    what is shown in this tape, right?
19         A.   What I saw on the scene, yes, sir.
20         Q.   We are starting at 14:55.
21                   {VIDEO PLAYED}
22    BY MR. CLARKE:
23         Q.   I am going to stop it at 15:05.  How many
24    cops are on the scene?  We have two detectives, one
25    --
```

```
 1              MR. ZIBILICH:
 2                   I don't see any cops.  I see some
 3              deputies.
 4    BY MR. CLARKE:
 5         Q.   All right.  You see -- how many deputies
 6    do you think are on the scene now?
 7         A.   Maybe four.
 8         Q.   And two detectives?
 9         A.   I'm sorry.  Two detectives and two
10    deputies.
11         Q.   Do you think that's enough people to be
12    able to -- if you used all four of those people to
13    restrain him in the recovery position?
14              MR. ZIBILICH:
15                   Object to the form.  You can answer
16              it.
17              THE WITNESS:
18                   No, sir.
19    BY MR. CLARKE:
20         Q.   Okay. 15:06.
21                   {VIDEO PLAYED}
22    BY MR. CLARKE:
23         Q.   Let me stop this for a second, 15:13.  Is
24    that Detective Mehrtens and you talking with Mr.
25    Parsa?
```

```
 1          A.    Correct.

 2          Q.    He's got his hands in his pockets, right?

 3          A.    Detective Mehrtens?

 4          Q.    Yeah.

 5          A.    Yes, sir.

 6          Q.    We got a deputy in the back standing up,

 7     correct?

 8          A.    Yes, sir.

 9          Q.    Have you seen him resisting since the

10     time you moved over to Mr. Parsa?

11          A.    Are you saying actually there or on

12     video?

13          Q.    Either.

14          A.    There I can still hear the grunts and

15     seeing his head go up and down.  On video,

16     obviously, it's blocked.

17                     {VIDEO PLAYED}

18     BY MR. CLARKE:

19          Q.    I'm going to stop it.  It is 15:37.

20     You've got one,two -- I'll just move on.  We are

21     going to continue from 15:37.  Have you seen him

22     resist in this video from the last time we stopped

23     the clip?

24          A.    Yes, sir.  Just before you started it, it

25     looked like he tried to raise up, and his back came
```

up. Kind of shoved his mom a little bit.

Q. How long do you have to keep them in the prone position without him going up one time for you to consider it not to be resisting anymore?

A. I would imagine every scene is different, every scenario is a little different.

Q. What about this scene?

A. No. At this time, no. Once seeing the injuries, no, it wasn't safe yet.

Q. Well, now that you've seen that he was restrained in the prone position for six minutes before you came up, would that fact have assisted you in what you needed to do with him vis-a-vis the recovery position?

A. No, sir.

Q. You didn't have a RIPP Hobble there, right?

A. No. I did not.

Q. Do you know anybody who did?

A. I don't, sir.

Q. Playing it from 15:37.

{VIDEO PLAYED}

BY MR. CLARKE:

Q. I am going to stop at 15:59. From the last time we stopped it up until 15:59, did you see

```
 1   him resist at all prior to Vega getting on top of
 2   him?
 3        A.   I couldn't really tell, but it appeared
 4   that Miss Parsa was talking to him, so I couldn't
 5   see what his head was doing, if he was still
 6   thrashing.
 7        Q.   Did you see -- her name is Miss Lou.
 8        A.   Excuse me.
 9        Q.   That's okay.  That's okay.  You wouldn't
10   have known that.  Miss Lou.  Did her talking -- can
11   you say anything about the tone of her talking
12   about what she was saying?
13        A.   Not that I remember, sir, no.
14        Q.   Was she trying to calm him did it appear?
15        A.   I would think so, yeah.
16        Q.   You were standing there looking right at
17   him.
18        A.   But I'm also engaged in conversation with
19   Mr. Parsa, so I'm not focused on what she was
20   saying.
21        Q.   Do you know why Vega -- was there any
22   discussion about Pitfield getting up off of E███
23   and Vega getting on that you overheard?
24             MR. ZIBILICH:
25                  Did he know then or does he know
```

```
 1              now?
 2   BY MR. CLARKE:
 3        Q.   I'm asking you questions.  Franz might
 4   have some follow-up questions for you.
 5        A.   No.  I did not hear any discussion
 6   between them, but, again, E█████ was still thrashing
 7   about with his head and yelling.
 8        Q.   So you would consider him an extremely
 9   violent prisoner?
10        A.   I would concede that he is still violent,
11   yes, sir.
12        Q.   And if you would have applied your
13   training in order to potentially use the RIPP
14   Hobble, you got to consider it, right?
15        A.   Say that again.
16        Q.   In order to use -- did you think of using
17   the RIPP Hobble at this time but then considered I
18   can't do it?
19              MR. ZIBILICH:
20                   Object to the form.  You can answer
21                it.
22              THE WITNESS:
23                   No, because I don't think at this
24                point he was kicking or flailing about
25                with his legs.
```

```
 1   BY MR. CLARKE:
 2        Q.   Did they ever teach you if you don't want
 3   to get kicked by somebody, move away from their
 4   feet?
 5        A.   That's not always feasible.
 6        Q.   Well, I mean, you've got six people
 7   mulling around there, some with their hands in
 8   their pockets, right?
 9             MR. ZIBILICH:
10                  That's not a debate.
11             MR. CLARKE:
12                  You are going to stipulate to that?
13             MR. ZIBILICH:
14                  No.   I said it's not a debate.   You
15             can ask him questions.
16   BY MR. CLARKE:
17        Q.   All right.   Does it look like anybody is
18   overly concerned about E███ P██████ in this still
19   shot at 15:59?
20             MR. ZIBILICH:
21                  Anybody?   Does that include mom and
22             dad?
23             MR. CLARKE:
24                  Yes.
25   BY MR. CLARKE:
```

```
 1        Q.   Identify each person that you think is
 2   concerned and why.
 3        A.   I don't think I understand the phrasing
 4   of your question.
 5             MR. ZIBILICH:
 6                  And I object to the form anyway. You
 7             can answer it.
 8   BY MR. CLARKE:
 9        Q.   It's all right.  So when Vega goes on,
10   gets on top of him, that is around 16:00.  Okay.
11   I'm going to play this from 15:59.
12                  {VIDEO PLAYED}
13   BY MR. CLARKE:
14        Q.   Vega gets on top of him, correct? You've
15   seen this part of the video before.  You don't have
16   to guess, do you?
17        A.   Well, I've learned --
18             MR. ZIBILICH:
19                  Wait, wait.  That wasn't the
20             question.  That was a declarative
21             statement.
22   BY MR. CLARKE:
23        Q.   Does Vega get on top of him at 16:00?
24        A.   I think that's Deputy Vega.  I'm not real
25   sure.
```

```
 1        Q.   Vega got on the same position on Parsa as
 2   Pitfield, correct?  On the buttocks area.
 3        A.   Yes, sir.
 4        Q.   When you actually gave your statement to
 5   Internal Affairs, you were actually reviewing this
 6   video with them, right?
 7              MR. ZIBILICH:
 8                   Object to the form.  You can answer
 9              it.
10              THE WITNESS:
11                   Yes, sir.
12   BY MR. CLARKE:
13        Q.   When you arrest somebody on the scene,
14   and there is a video, do you show them the video
15   while you are interviewing them or do you try to
16   take their statement without the video to see if
17   they're going to lie?
18        A.   No.  If there is video available, I'll
19   show it to them.
20        Q.   All right.  So from 16:00, we're going to
21   -- 16:02 we're going to play it.
22                   {VIDEO PLAYED}
23   BY MR. CLARKE:
24        Q.   Do you see any resistance up until 16:21?
25        A.   It looks like his head is still flailing
```

1    about down by --

2        Q.   Is that too much resistance for the six

3    deputies, the two detectives and four deputies on

4    the scene, to roll him over into the recovery

5    position?

6        A.   Yes.  I would think that it would be, if

7    he is able to get in recovery and stand to his

8    feet, get up.

9        Q.   Do you know what the recovery position

10   is?

11       A.   Yes, sir.

12       Q.   What is the recovery position?

13       A.   When they lay on the side, knee bent, leg

14   straight.

15       Q.   Is there anything preventing all these

16   cops on the scene right now from placing him in the

17   recovery position?

18       A.   Again, it's not safe.

19            MR. ZIBILICH:

20                I object to the form.

21   BY MR. CLARKE:

22       Q.   He is handcuffed behind his back,

23   correct?

24       A.   He is.

25       Q.   What are the dangers that you six

```
 1    officers on the scene are fearful of this
 2    handcuffed person --
 3              MR. ZIBILICH:
 4                  He can talk about his danger.  He
 5              can't talk about anybody else's.
 6    BY MR. CLARKE:
 7         Q.   I don't listen to Franz when he talks.
 8              MR. ZIBILICH:
 9                  I understand.
10    BY MR. CLARKE:
11         Q.   You've got to answer my questions.
12         A.   Okay.  Can you repeat it, please?
13              MR. CLARKE:
14                  No.  Can you read it back to him?
15                  {COURT REPORTER READ BACK}
16              MR. ZIBILICH:
17                  Same objection.
18              THE WITNESS:
19                  So if he is able to get to his feet,
20              and we have to restrain him again, he
21              can do more damage, more hurt to him,
22              more harm.  So keeping him in the prone
23              position, keeping him down, is safer
24              for him, I believe, and then put him in
25              recovery position.  He is still
```

```
 1                actively resisting, and I'd be fearful
 2                of him getting to his feet. He could
 3                run into traffic.  He could -- there
 4                are a number of things that could
 5                happen.
 6     BY MR. CLARKE:
 7          Q.   You guys, you six officers on the scene,
 8     couldn't control him?
 9          A.   So by controlling him, you want us all to
10     pile up on him, or if he gets to his feet, then we
11     have to tackle him, which could do more damage,
12     because his hands are behind his back.  I mean, I
13     think being on the ground, being talked to by his
14     mother, is more of a better position than us trying
15     to stand him up or sit him upright.
16          Q.   That's just your opinion.  You don't
17     understand the -- well, I mean, you were trained on
18     the prone position being dangerous, right?
19          A.   Correct.
20          Q.   And you thought it was a bigger danger to
21     potentially roll him into the recovery position
22     because he could get up and somehow injure himself
23     or other officers fully handcuffed behind his back?
24          A.   I've seen it happen before, sir, yes,
25     sir.
```

```
 1        Q.   Have you seen cops ever beat people up
 2   for no reason before?
 3             MR. ZIBILICH:
 4                  Object to the form.  Come on.
 5             THE WITNESS:
 6                  No, I have not.
 7             MR. CLARKE:
 8                  16:22.
 9                  {VIDEO PLAYED}
10   BY MR. CLARKE:
11        Q.   Stopping at 16:33.  Where do you and
12   Detective Mehrtens go, and why do you leave the
13   area where Vega is restraining him?
14        A.   I don't remember.
15        Q.   You wouldn't have left him if it was
16   unsafe, would you, in your opinion?
17        A.   No.  That's not necessarily true.
18        Q.   So you were, you know --
19        A.   So, as you pointed out, there is other
20   officers there, and my role at this point would be
21   the investigator, so I think I might have been
22   getting paperwork to start documenting everything.
23        Q.   Did you ever document anything or
24   complete any paperwork in this case?
25        A.   No, sir.
```

1    Q.   Why not?

2    A.   It turned into a homicide investigation.

3    Q.   Did you know that the medical examiner

4  indicated that the prone restraint by officers was

5  a contributing factor to the death of ███ █████?

6         MR. ZIBILICH:

7              Object to the form.

8         THE WITNESS:

9              No, sir.  I'm unaware of it.

10  BY MR. CLARKE:

11    Q.   Now that you know that, do you think that

12  your calculus about him being restrained in the

13  prone position versus potentially trying to move

14  him into the recovery position, because he might

15  get up and hurt the officers while he is handcuffed

16  behind his back, might be wrong?

17    A.   No, sir.

18              {VIDEO PLAYED}

19  BY MR. CLARKE:

20    Q.   I'm going to stop it at 16:55.  Did you

21  see what is being shown on the videotape when █

22  █████  arms starts coming up from behind him?

23    A.   I see it, yes, sir.

24    Q.   Did you see it on the scene, because I

25  don't see where you are?

1        A.    I did.

2        Q.    Do you see here where we stopped it at

3   16:55 that Vega's hands are in between his

4   handcuffs and pushing forward?

5        A.    I see where they're in between the

6   handcuffs.  I wouldn't characterize it has pushing

7   forward.

8        Q.    Would you characterize it as pulling

9   backwards?

10       A.    I would characterize it as his hands are

11  on the center of the handcuffs.

12       Q.    In front of the actual hands, correct?

13       A.    No, sir.  In front of the actual hands?

14       Q.    Right.  That can be your answer.

15       A.    I mean, I'm asking -- I am trying to get

16  a clarification.  I don't know what you mean by --

17       Q.    We have two handcuffs together.  If he is

18  pushing it forward, the handcuff -- his hand would

19  be in front of the hands.  If he was pulling it

20  back, it would be toward -- behind the hand to the

21  rear?

22       A.    Or if he is holding them, and ▮▮▮▮ is

23  bringing his arms forward, that would do the same

24  thing.

25       Q.    Do you believe, when you were watching

```
 1    this, that E███ is picking up and pulling Officer
 2    Vega up off his back towards the front?
 3         A.   I did.
 4                    {VIDEO PLAYED}
 5    BY MR. CLARKE:
 6         Q.   I'm going to stop it at 17:01.  Now Vega
 7    has his hand on E███ right hand.  It looks like
 8    he is pushing his hand, correct?
 9         A.   On the left shoulder? His left hand is on
10    the left shoulder?
11         Q.   No.  Vega's right hand --
12         A.   Oh, right hand.
13         Q.   -- is pushing down E███ right hand onto
14    Donna Lou.
15         A.   So my appreciation --
16              MR. ZIBILICH:
17                   Object to the form.  You can answer
18                it.
19              THE WITNESS:
20                   My appreciation for it was that that
21                day it looked like Vega had lost his
22                balance and was trying to right
23                himself.
24    BY MR. CLARKE:
25         Q.   Looking at the video, does it look like
```

1    he is pushing the arm forward?

2         A.   It looks like he has lost his balance and

3    is using the arm for balance.

4         Q.   And pushing it forward?

5         A.   I don't know about he's pushing it.

6         Q.   Well, we'll go with that.  17:01.

7                   {VIDEO PLAYED}

8    BY MR. CLARKE:

9         Q.   I'm going to stop it at 17:34.  It looks

10   like after the arms started going up, you came back

11   to assist Vega, correct?

12        A.   Correct.

13        Q.   Did you see Vega choke him?

14        A.   No, sir.

15        Q.   Did you see Vega put his arms around his

16   head?

17        A.   No, sir.

18        Q.   Did you see Vega put his arms around his

19   chin?

20        A.   No, I did not.

21        Q.   Did you see Vega's hands -- where were

22   Vega's hands?

23        A.   Sir, I don't know.

24        Q.   Did you hear Miss Lou, E█████ mother, say

25   anything about somebody is choking him?

```
 1        A.    No.
 2        Q.    Did you hear his mother say he is
 3   wheezing?
 4        A.    No, sir.
 5        Q.    Did you hear the mother say he is not
 6   breathing?
 7        A.    After the EMTs came back and said that he
 8   wasn't breathing, I heard that, yes, sir.
 9        Q.    So had the EMTs showed up on the scene
10   yet?
11        A.    No.
12        Q.    Let's run it from 17:34 until the EMTs
13   show up.
14                    {VIDEO PLAYED}
15   BY MR. CLARKE:
16        Q.    We're at 18:00 or 17:59.  Has he been
17   rolled into the recovery position?
18        A.    No, sir.  We're still struggling.
19                    {VIDEO PLAYED}
20   BY MR. CLARKE:
21        Q.    Has he been rolled into the recovery
22   position by this time, 18:57?
23        A.    No, sir.
24        Q.    I'm going to run it until you tell me
25   when he is rolled into the recovery position. Okay?
```

158

```
 1                    {VIDEO PLAYED}
 2          THE WITNESS:
 3               All right.  I guess he already was.
 4          I didn't see it.
 5    BY MR. CLARKE:
 6      Q.   At some point in there -- I'm not going
 7    to go back.  It will take too long.  You missed
 8    where -- we both missed where they moved him to the
 9    recovery position, right?
10      A.   I guess so.
11          MR. ZIBILICH:
12               You want him to comment on what you
13          missed?
14          MR. CLARKE:
15               No.  I'm just trying to let him know
16          it wasn't just him.
17    BY MR. CLARKE:
18      Q.   Tell me -- were you involved in moving
19    him into the recovery position?
20      A.   I don't remember.  I know I turned him at
21    one point.  I don't know if that was to get him
22    more on his side, from his back to his side, or
23    from his stomach to his side, but I did at some
24    point turn him.
25      Q.   Do you know how many times he was placed
```

```
 1  in the recovery position?  Did the cops put him in
 2  the recovery position first, one time, and then put
 3  him back in the prone position, and then put him in
 4  the recovery position a second time, when the EMS
 5  showed up?
 6       A.    I don't remember.
 7            MR. CLARKE:
 8                 Let's take a break.  I think I'm
 9             done.
10            THE VIDEOGRAPHER:
11                 Off the record.  The time is now
12             12:09.
13                 {BRIEF RECESS}
14            THE VIDEOGRAPHER:
15                 Back on the record.  The time is
16             12:14.
17  BY MR. CLARKE:
18       Q.    Detective Vaught, we've gone through a
19  lot of the training, and we've looked at the
20  videos, and, you know, the statements and
21  everything about this case.  Do you believe that
22  you complied with all the training and the policies
23  of the Jefferson Parish Sheriff's Office in this
24  incident?
25       A.    As this incident dictated, yes, sir.
```

```
 1        Q.   Do you also -- we went through some of

 2   the training on the RIPP Hobble and stuff.  Do you

 3   wish you had better training on RIPP Hobble or

 4   better understanding of the RIPP Hobble training on

 5   January 19th, 2020?

 6              MR. ZIBILICH:

 7                   Object to the form.  You can answer

 8           it.

 9              THE WITNESS:

10                   I don't believe RIPP Hobble would

11              have been effective in this scenario.

12   BY MR. CLARKE:

13        Q.   So you don't think there was anything

14   that you or other Jefferson Parish deputies did on

15   that date that you would like to change?

16              MR. ZIBILICH:

17                   Object to the form.

18              THE WITNESS:

19                   No, sir.  No.

20   BY MR. CLARKE:

21        Q.   You wished you would have rolled him over

22   in the recovery position earlier?

23        A.   I wish we were given the opportunity to

24   do so, yes, sir.

25        Q.   Do you want to apologize to Mr. and
```

```
 1   Mrs. Parsa?
 2           MR. ZIBILICH:
 3               Wait.  Are you kidding me?
 4           MR. CLARKE:
 5               It's punitive.
 6           MR. ZIBILICH:
 7               Not today it's not.  Don't answer
 8             that.  I mean unless you want to.
 9           THE WITNESS:
10               On the advice of counsel.
11           MR. CLARKE:
12               We'll certify that.  You're going to
13             say they are not allowed, if he wants
14             to apologize in a punitive claim?
15           MR. ZIBILICH:
16               Yes.
17           MR. CLARKE:
18               We'll certify that for the judge, if
19             they need to.
20           MR. ZIBILICH:
21               Fine.
22           MR. CLARKE:
23               That's it.
24           MR. ZIBILICH:
25               Thanks.
```

1   EXAMINATION BY MR. HILL:

2        Q.   I have a couple questions.  Very few.

3   Detective, thank you for your time today.  My name

4   is Mark Hill.  I represent the Westgate and Victory

5   defendants, the people who own and operate the

6   shopping mall where this incident happened.  I just

7   want to clarify for the record, on the date of the

8   Parsa incident made the basis of this litigation,

9   you were not working paid off-duty private detail

10  at that time, correct?

11       A.   I was not.

12       Q.   You were working for the Jefferson Parish

13  Sheriff's Office?

14       A.   Correct.

15            MR. HILL:

16                 Thank you.

17            THE VIDEOGRAPHER:

18                 This is the conclusion of the

19              videotaped deposition.  We're going off

20              the record.  The time is now 12:16.

21                 [End of deposition, 12:16]

22

23

24

25

1  C E R T I F I C A T E

2

3          This certification is valid only for
a transcript accompanied by my original signature
4  and original required seal on this page.

5          I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6  as the officer before whom this testimony was
taken, do hereby certify that DETECTIVE RYAN
7  VAUGHT, after having been duly sworn by me upon
authority of R.S. 37:2554, did testify as
8  hereinbefore set forth in the foregoing 162 pages;

9          That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10  or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11  ability and understanding;

12          That the transcript has been
prepared in compliance with transcript format
13  guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14  prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15  and in rules and advisory opinions of the board;

16          That I am not related to Counsel or
to the parties herein, nor am I otherwise
17  interested in the outcome of this matter.

18

19

20

21  _____
Sandra P. DiFebbo,
22  Certified Shorthand Reporter

23  Date:  _____

24

25