UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CASE NO.  2:21-cv-00080

DONNA LOU and DAREN PARSA, on their own behalf and
on behalf of their deceased minor child, E.P.

Plaintiffs,


VERSUS


SHERIFF JOSEPH P. LOPINTO, III, CHAD PITFIELD, RYAN
VAUGHT, STEVEN MEHRTENS, SHANNON GUIDRY, NICK VEGA,
MANUEL ESTRADA, MYRON GAUDET, JOHN DOES 1-3,
VICTORY REAL ESTATE INVESTMENTS LA, LLC D/B/A
WESTGATE SHOPPING CENTER, ABC INSURANCE COMPANY,
and XYZ INSURANCE COMPANY,

Defendants.



VIDEOTAPED DEPOSITION OF SHANNON GUIDRY

given in the above-entitled cause, pursuant to the

following stipulation, before Sandra P. DiFebbo,

Certified Shorthand Reporter, in and for the State

of Louisiana, at JPSO, 1233 Westbank Expressway,

Fifth Floor, Harvey, Louisiana, on the 13th day of

September, 2022, commencing at 1:07 PM.

```
 1    APPEARANCES:
 2              THE COCHRAN FIRM MID-SOUTH
                BY:  ANDREW CLARKE,
 3              ATTORNEY AT LAW
                One Commerce Square
 4              40 South Main, Suite 1700
                Memphis, Tennessee  38103
 5              Representing the Plaintiffs
 6
                MARTINY & ASSOCIATES
 7              BY:  FRANZ ZIBILICH,
                ATTORNEY AT LAW -and-
 8              JEFFREY D. MARTINY,
                ATTORNEY AT LAW
 9              131 Airline Drive
                Suite 201
10              Metairie, Louisiana  70001
                -and-
11              LINDSEY M. VALENTI, ATTORNEY AT LAW
                LEGAL ADVISOR
12              1233 Westbank Expressway
                Building B, Fifth Floor
13              Harvey, Louisiana  70058
                Representing JPSO Defendants
14
15              THOMPSON, COE, COUSINS & IRONS, LLP
                BY:  CHRISTOPHER W. KAUL,
16              ATTORNEY AT LAW
                601 Poydras Street
17              Suite 1850
                New Orleans, Louisiana  70130
18              Representing Victory Real Estate
                Investments LA, LLC, and Westgate
19              Shopping Center
20
21    Also Present:  Tim Anclade
22    Videographer:  Jeffrey Horner, CLVS, VRS Media
                     Group
23
24
25
```

```
 1   Reported By:

 2
             Sandra P. DiFebbo
 3           Certified Shorthand Reporter
             State of Louisiana
 4

 5

 6      E X A M I N A T I O N        I N D E X

 7                                   Page

 8   BY MR. CLARKE:                    5

 9

10

11      E X H I B I T          I N D E X

12                     Page

13

14   Exhibit 79                       7

15   Exhibit 80                       7

16   Exhibit 81                       7

17   Exhibit 82                       9

18   Exhibit 83                      16

19

20

21

22

23

24

25
```

S T I P U L A T I O N

1

2

3          It is stipulated and agreed by and
4  between Counsel for the parties hereto that the
5  Videotaped Deposition of SHANNON GUIDRY is hereby
6  being taken pursuant to the Federal Rules of Civil
7  Procedure for all purposes in accordance with law;
8          That the formalities of reading and
9  signing are specifically waived;
10          That the formalities of sealing,
11  certification, and filing are hereby specifically
12  waived.
13          That all objections, save those as to
14  the form of the question and responsiveness of the
15  answer are hereby reserved until such time as this
16  deposition or any part thereof is used or sought to
17  be used in evidence.
18                    * * * * *
19          Sandra P. DiFebbo, Certified Shorthand
20  Reporter, in and for the State of Louisiana,
21  officiated in administering the oath to the
22  witness.
23

24

25

```
 1              SHANNON GUIDRY, having been first duly
 2         sworn, was examined and testified on her oath
 3         as follows:
 4    EXAMINATION BY MR. CLARKE:
 5         Q.   Would you please state your name.
 6         A.   Shannon Guidry.
 7         Q.   And by whom are you employed?
 8         A.   Gretna Police Department.
 9         Q.   At one point were you employed by the
10    Jefferson Parish Sheriff's Department?
11         A.   Yes.
12         Q.   Office.  I apologize.  Have you given a
13    deposition before?
14         A.   Yes.
15         Q.   Let's just go over some grounds rules
16    just because we want to maintain a good record.
17    Obviously, you understand your testimony is under
18    oath subject to the penalty of perjury, correct?
19         A.   Yes.
20         Q.   A lot of times when we get into a
21    conversation, people nod or say uh-huh or na-huh,
22    and the court reporter can't take that down, so
23    please give audible answers at all times.
24         A.   Okay.
25         Q.   This is not an exercise to try to trick
```

```
 1    you in any fashion.  If there is something that you

 2    need to give a full answer, let me know, and I'll

 3    see if I can provide it to you.  Okay?

 4         A.   Okay.

 5         Q.   If I ask you a question you don't

 6    understand, I want you to tell me that.  All right?

 7         A.   Okay.

 8         Q.   If you answer a question, I'm going to

 9    assume you understood that.  Is that fair?

10         A.   Okay.

11         Q.   In preparation for your deposition today,

12    did you review any documents?

13         A.   Yes.

14         Q.   What did you review?

15         A.   My statement.

16         MR. CLARKE:

17              Let's go ahead and -- Nobody has an

18           extra copy of her statement, do they?

19           Is that an extra copy that I can mark?

20         MR. ZIBILICH:

21              Whatever you want.

22         MR. CLARKE:

23              What we are going to do is we'll

24           mark that as Exhibit --

25                {OFF-THE-RECORD DISCUSSION}
```

```
 1              MR. CLARKE:
 2                   We will put 79 on that.
 3              MR. ZIBILICH:
 4                   That's the big report.
 5    BY MR. CLARKE:
 6         Q.   Let me show you what I'm going to mark as
 7    Exhibit 80 and Exhibit 81 and see if you recall
 8    reviewing these.  Exhibit 80 is going to be your --
 9              MR. ZIBILICH:
10                   What is 80, the depo notice?
11              MR. CLARKE:
12                   No.  Hang on.  80 is her discovery
13                   responses.  80 is actually the
14                   supplemental responses.  81 is the
15                   original responses.
16    BY MR. CLARKE:
17         Q.   If you would look over those.  Have you
18    reviewed those?
19         A.   No, sir.
20         Q.   If you look at the back of the last page
21    of 81. Do you not remember responding to these
22    questions and then swearing to them that they were
23    accurate under oath?
24         A.   81?
25         Q.   Right.  The last page.  Go to the back of
```

```
 1   80 then.  Maybe I've got them backwards.

 2        A.   Yes, sir.

 3        Q.   What does that say?  Is that -- what

 4   number is that one?

 5        A.   80.

 6             MR. CLARKE:

 7                  I've got them backwards, Franz.

 8             MR. ZIBILICH:

 9                  Okay.

10   BY MR. CLARKE:

11        Q.   Do you recall being asked to respond to

12   questions that were submitted to you by me, or my

13   office, to which you provided responses to and then

14   submitted a verification saying that it was -- they

15   were correct and accurate to the best of your

16   knowledge?

17        A.   Yes.

18        Q.   If you reviewed them -- if you want to

19   review over 80 and 81 and tell me if there is any

20   corrections or mistakes in it, please, let me know.

21        A.   Okay.

22        Q.   They appear to be accurate?

23        A.   Yes.

24        Q.   I'm also going to put in front of you --

25   and all these documents will be there in front of
```

1    you in case you need to refer to them during the
2    deposition.  I'm going to mark as Exhibit 82 your
3    personnel file, and then what has been previously
4    marked as Exhibit 36, that is going to be your
5    training resume from Jefferson Parish.
6        A.   Okay.
7        Q.   Let's find out a little bit about your
8    background.  Did you graduate from high school?
9        A.   Yes.
10       Q.   What year?
11       A.   1989.
12       Q.   And did you have any post high school
13   education outside of law enforcement?
14       A.   Yes.
15       Q.   Can you tell me when you -- what
16   education you had, what degrees you had and the
17   years?
18       A.   Bachelor's degree in Criminal Justice
19   from Loyola.
20       Q.   When did you get that?
21       A.   It was after Katrina.  I graduated, I
22   believe, maybe 2008.
23       Q.   Any other training, certificates,
24   vocational training, outside of law enforcement?
25       A.   Emergency medical technician.

```
 1        Q.    When did you become -- tell me about your
 2   training to be an EMT or when you had that.
 3        A.    I went through a certification program at
 4   Delgado, and that was back in '99, 2000, but I let
 5   that lapse after I graduated the police academy.
 6        Q.    Did you ever serve as an EMT?
 7        A.    Yes.
 8        Q.    Take me through your employment from your
 9   first government job.  I don't care about high
10   school jobs or non-law enforcement jobs.  What was
11   the first government employment you had?  That
12   would be whether it is an EMT or a police officer.
13        A.    EMT with the Gretna Police Department.
14        Q.    When did you become an EMT with Gretna?
15        A.    I believe I started with them as an EMT
16   in '99 or 2000, shortly after I got my EMT
17   certification.
18        Q.    How long did you serve as an EMT?
19        A.    Approximately a year and a half.
20        Q.    Tell me about the training that you had
21   to take to become an EMT.  Is there some type of --
22   like officers have POST certification or some type
23   of certification you have to get from the state?
24        A.    I don't remember what it is called, but
25   it is an EMT.  It's a certification through the
```

```
 1    State of Louisiana.
 2         Q.   How long is that training?
 3         A.   I don't remember.
 4         Q.   Do you recall anything about that
 5    training?
 6         A.   No, sir.
 7         Q.   As an EMT, were you ever trained or
 8    learned of the dangers of restraining somebody in
 9    the prone position?
10         A.   No, sir.
11         Q.   As an EMT, did you ever restrain people
12    on stretchers or work in the prone position?
13         A.   I don't remember.
14         Q.   After you were an EMT for Gretna for a
15    year, year and a half, or whatever it was, what was
16    your next employment?
17         A.   While I was working as an EMT, I went to
18    the police academy in Gretna and graduated in 2001.
19         Q.   Does Gretna have their own training
20    academy?
21         A.   Yes.
22         Q.   So you became POST certified in 2001?
23         A.   Yes.
24         Q.   Let's talk about your POST training.  Do
25    you recall how long your training was?
```

```
 1        A.    No, sir.
 2        Q.    Did you have to do physical fitness in
 3   your training academy at Gretna?
 4        A.    Yes.
 5        Q.    Did a big block of your training involve
 6   the use of firearms?
 7        A.    Yes.
 8        Q.    Did you have training on the Americans
 9   with Disabilities Act?
10        A.    I don't remember.
11        Q.    Did you have training on dealing with
12   autistic people?
13        A.    I don't remember.
14        Q.    Did you have training on a term called
15   "excited delirium?"
16        A.    I don't remember.
17        Q.    Did you have training on something called
18   positional asphyxia or compression asphyxia?
19        A.    I don't remember.
20        Q.    When you went to the Gretna Police
21   Department, after you graduated, did you then
22   become employed by Gretna?
23        A.    I remained employed with Gretna until I
24   took a job with Jefferson Parish Sheriff's Office
25   in September of '01.
```

1     Q.   Were you serving from -- if you started
2  in Gretna in 2001, were you only there for a short
3  period of time?
4     A.   I didn't start Gretna in 2001.  I started
5  Gretna in '99 as an EMT.
6     Q.   When did you start Gretna police officer
7  work?
8     A.   I did not work as a police officer in
9  Gretna.  I remained as an EMT until I started JPSO
10  in September of 2001.
11     Q.   So you never served at Gretna.  You just
12  went to their academy?
13     A.   Went through their academy and remained a
14  POST-certified EMT.
15     Q.   But you were not performing law
16  enforcement duties for Gretna?
17     A.   No, but I still had a POST certification.
18     Q.   Correct.  You were not allowed to make
19  arrests, were you?
20     A.   I don't remember.
21     Q.   So your first law enforcement job was
22  with the JPSO in September of '01?
23     A.   Yes.
24     Q.   How long did you serve in your first
25  stint at Jefferson Parish?

14

1        A.    2009.

2        Q.    Did you have any training from 2001 to

3   2009 at the JPSO?

4        A.    Yes.

5        Q.    It wasn't the basic training academy

6   training, but was it inservice training?

7        A.    Yes, sir.

8        Q.    There is a certain amount of hours that

9   they have to get each year?

10       A.    Yes.

11       Q.    If you look at Exhibit -- I think it's

12  36.  Does that show your training all the way back

13  to 2001? It only goes to 2013.

14       A.    Yeah.  This only goes to 2013.

15       Q.    But you recall having some type of

16  inservice training during that period of time?

17       A.    More than likely we had to go for POST

18  recertification once a year.

19       Q.    Is that done kind of all at one week or

20  you take courses throughout the year?

21       A.    Take classes throughout the year.

22       Q.    Do you have to get a certain amount?

23       A.    Yes, sir.

24       Q.    Do you get to select the courses you

25  choose or are some of them mandatory?

1      A.    From what I remember, they were mostly

2  mandatory.

3      Q.    Did you have training both online and in

4  class?

5      A.    They were pretty much all class, I

6  believe.

7      Q.    So when you were at JPSO from 2001 to

8  2009, were you a deputy the whole time or did you

9  increase in rank?

10     A.    I was a deputy.

11     Q.    And tell me, you know, describe for me

12 where you were assigned to the best of your

13 recollection and what type of duties or divisions

14 you were working under from 2001 to 2009.

15     A.    I started out in the first district, in

16 Metairie, and remained there until after Katrina

17 and then transferred to the Fourth.

18     Q.    To the Fourth?

19     A.    Fourth District.

20     Q.    Some people may be a patrol.  You were

21 just assigned to patrol the whole time?

22     A.    Patrolman.

23     Q.    During your first stint with JPSO, did

24 you have any complaints made against you?

25     A.    I believe I may have had one or two IA

1     investigations.  I don't remember exactly.

2          Q.   According to documents that were produced

3     by the Jefferson Parish Sheriff's Office, you had

4     no IA complaints.  I'm going to show you what I'm

5     going to mark as Exhibit 83.

6               MR. ZIBILICH:

7                    What is that?

8     BY MR. CLARKE:

9          Q.   What events are you thinking of that

10    might have resulted in an IA complaint from 2001 to

11    2009?

12         A.   What I'm thinking about is just

13    complaints that were made to my rank, so they may

14    have not been actual internal affair complaints.

15         Q.   How does that process work, to your

16    understanding? Certain things are handled just by

17    your supervisor?

18         A.   If the complaint was made to the

19    supervisor.

20         Q.   That's handled by the supervisor.  Do you

21    know -- have you ever been --

22         A.   To the best of my knowledge, it was.

23         Q.   Have you ever had to go through a formal

24    Internal Affairs complaint for any conduct that you

25    had committed or as a witness to any other

```
 1   officers?
 2        A.   I don't recall.
 3        Q.   So what you're dealing with, complaints,
 4   wasn't necessarily IA complaints, some type of
 5   citizen complaint that was handled through your
 6   supervisory rank?
 7        A.   Yes, sir.
 8        Q.   Some people remember when somebody makes
 9   a complaint about them.  A lot of times those are
10   discourtesy or something.  Do you recall any
11   allegation or any nature of what any of the
12   complaints were?
13        A.   I don't remember.
14        Q.   That's fair.  So from 2001 to 2009, you
15   worked at JPSO.  Why did you leave in 2009?
16        A.   Honestly, I don't remember why I left,
17   but I did go to Gretna.  I went back to Gretna.
18        Q.   And when you went back to Gretna, that
19   was in 2009?
20        A.   Yes, sir.
21        Q.   How long did you work at Gretna?
22        A.   Not very long.  Approximately, maybe a
23   year.  There was an issue about -- well, about a
24   year.
25        Q.   Tell me the issue.
```

```
 1              MR. ZIBILICH:
 2                  See what happens.  Y'all see.
 3              MR. CLARKE:
 4                  You can tell --
 5              THE WITNESS:
 6                  But it's nothing -- you don't have
 7                to worry about it.  It's more of a
 8                personal thing for me, though.
 9              MR. ZIBILICH:
10                  That's all right.  Ring the bell to
11                remind him.
12              THE WITNESS:
13                  No, no, no.  It's just -- no. My
14                former captain at Gretna had made some
15                promises that didn't get lived up to
16                after I left JP, and I tried to come
17                right back to JP, but Newell Normand
18                had just taken over, and he was like,
19                no, we're going to shut the revolving
20                door at JP.  So I stayed in Gretna as
21                long as I could afford to.  Let's just
22                put it that way.
23      BY MR. CLARKE:
24          Q.   So when you went to Gretna, did you go
25      there as a deputy?
```

```
 1        A.    Patrol.
 2        Q.    Patrol officer.
 3        A.    Patrolman.  They don't have deputies.  We
 4   have patrol officers.
 5        Q.    What were the promises that were made
 6   that were not lived up to?
 7        A.    It was the salary.  There was a big
 8   conflict with the salary.  I was told I was going
 9   to be making a certain amount, and the captain
10   didn't realize he was going to get city hall's
11   approval, and city hall said nope.  So, yeah.  I
12   kind of got caught in the middle.
13        Q.    He tried to deal with the promise?
14        A.    He tried.  He tried his best.  He's a
15   good man.  I don't hold it against him.
16        Q.    So you stayed there.  You were a patrol
17   officer.  Any complaints, any IA investigations or
18   any discipline?
19        A.    I don't believe so.
20        Q.    Did you have any training when you were
21   there?
22        A.    Yes.
23        Q.    Do you recall what?
24        A.    Accident reconstruction.  I went to state
25   police, at state police -- Louisiana State Police
```

```
 1    Academy, fatality reconstruction.
 2         Q.    Any other training that you can recall?
 3         A.    No.  I think that's it.
 4         Q.    Where did you go after Gretna?
 5         A.    Causeway.
 6         Q.    Looked at some files there.  It doesn't
 7    look like the pay is too good there either.
 8         A.    It's not good anywhere, actually.
 9         Q.    I got you.  So you went to Causeway.
10         A.    It was better than Gretna at the time.
11    Let's just put it that way.
12         Q.    At Causeway, did you have any discipline,
13    any complaints, or any Internal Affairs
14    investigations?
15         A.    Not that I recall.
16         Q.    Have you ever been sued before, other
17    than this case?
18         A.    Not that I recall.
19               MR. ZIBILICH:
20                   Why?  Do you feel like letting her
21                out?
22               MR. CLARKE:
23                   What?
24               MR. ZIBILICH:
25                   Do you feel like letting her out?
```

```
 1            MR. CLARKE:
 2                 Are you going to make all the
 3            changes to the policy?
 4            MR. ZIBILICH:
 5                 You've never given me a list.  We'll
 6            see.  We can bargain.
 7            MR. CLARKE:
 8                 I've given you the list ten times.
 9            MR. ZIBILICH:
10                 You must be dreaming.
11            MR. CLARKE:
12                 I'll get all the e-mails together
13            and send them to you at once.
14  BY MR. CLARKE:
15       Q.   How long did you stay at Causeway? Short
16  time?
17       A.   Roughly, three years, until JP decided to
18  start hiring back laterals.
19       Q.   Any training at Causeway that you
20  remember?
21       A.   Water rescue training.
22       Q.   And then you came back to --
23       A.   Oh, and DWI certification.
24       Q.   Then you came back to Jefferson Parish in
25  2013?
```

```
 1        A.    Sure did.
 2        Q.    And you stayed at Jefferson Parish until?
 3        A.    2020.
 4        Q.    Right after this incident, right?
 5        A.    Yes.
 6        Q.    In one of your interrogatories it says
 7   you served at Jefferson Parish from 12/13 to 2/20.
 8   Does that sound right?
 9        A.    Yes, sir.
10        Q.    Your second stint at JPSO.  I think we
11   have the training that you had, correct?
12        A.    Yes.  This is it here.
13        Q.    Any discipline, any complaints, or any IA
14   investigations of you during your second stint at
15   JPSO?
16        A.    Not that I recall.
17        Q.    Let's go through some of the training
18   that you had.  Do you recall training at the JPSO
19   during your second stint on excited delirium,
20   positional asphyxia, and the RIPP Hobble?
21        A.    Yes.
22        Q.    What do you recall about that training?
23        A.    That I had it.
24        Q.    You don't recall what they trained you to
25   do or what is excited delirium?
```

```
 1        A.    Excited delirium.  I can't give you a
 2   medical definition on it.  I mean, I know -- I
 3   can't give you the medical definition, if that's
 4   what you're asking.
 5        Q.    Give me the law enforcement definition.
 6        A.    Excited delirium?
 7        Q.    Yes.
 8        A.    I mean, I know what it is.  I just can't
 9   express it into words.  I don't know what you are
10   wanting me to tell you.
11        Q.    What are the signs or symptoms?  How do
12   you recognize it?  What do you do when you see it?
13             MR. ZIBILICH:
14                  It's like pornography, you know.  I
15                can't give you a definition.  I know it
16                when I see it.
17             MR. CLARKE:
18                  These have definitions.
19             THE WITNESS:
20                  Well, I don't recall how long ago I
21                had the training, so.
22   BY MR. CLARKE:
23        Q.    Well, according to your -- you had it on
24   4/14/2015, and you had it on 2/26/2014, so you had
25   it at least twice.
```

```
 1        A.    Eight years ago.  There's been a lot of
 2   hurricanes since then, too, so my memory is not too
 3   great.
 4        Q.    You had it again on 8/21/2015.  So you
 5   had it three times.
 6        A.    Okay.
 7        Q.    Did you recall Sergeant Pizzolato
 8   providing that training?
 9        A.    Yes.
10        Q.    And that was in class?
11        A.    Yes.
12        Q.    So were you trained about the dangers of
13   restraining people in the prone position during
14   that training?
15        A.    I'm sure.
16        Q.    What -- and you are an EMT as well,
17   correct?
18        A.    Used to be.
19        Q.    Used to be.  All right.  So what are the
20   dangers of restraining somebody in the prone
21   position based on the training you received?
22        A.    What are the dangers?
23        Q.    Yeah.
24        A.    Just have to make sure that they're not
25   in a position to where their breathing is
```

1    obstructed.

2         Q.   Well, when you are restrained in the

3    prone position, your breathing isn't restricted,

4    correct?

5         A.   No.

6         Q.   I've taken Pizzolato's deposition.  He

7    told me about the training.  Were you trained that

8    when a suspect is restrained face down, breathing

9    can become labored, just by sitting in that

10   position?

11        A.   Yes.

12        Q.   Were you trained that when weight is

13   applied to a person's back, and the more weight,

14   the more severe the degree of compression?

15        A.   Yes.

16        Q.   Were you then trained that when there is

17   more compression on somebody being restrained in

18   the prone position, they can experience increased

19   difficulty in breathing?

20        A.   Yes.

21        Q.   Were you trained that the natural

22   reaction to oxygen deficiency occurs when you are

23   restrained with compression, and the person then

24   will struggle due to oxygen deficiency?

25        A.   Yes.

1     Q.   And then the problem comes up is when the
2  person reacts to oxygen deficiency and struggles
3  more, the officer applies more compression or more
4  force.
5     A.   Okay.
6     Q.   Were you trained about the dynamics of a
7  physical altercation in the prone position?
8     A.   Yes, sir.
9     Q.   In the training, what were you taught to
10 alleviate those dangers or concerns?
11    A.   You don't sit on the back.
12    Q.   You don't sit on the back.  Did they also
13 tell you, you don't restrain in the prone position?
14    A.   If they're under control.
15    Q.   You roll them to their side, correct?
16    A.   Once they're under control.
17    Q.   I understand.  What is your definition of
18 control? Did they train you?
19    A.   They are no longer fighting.
20    Q.   Does it matter how many officers you have
21 on the scene?
22    A.   I don't understand the question.
23    Q.   Well, I mean, you can have ten officers
24 watching somebody with somebody sitting on
25 somebody's back who is resisting, right?

```
 1        A.    Nobody was sitting on anyone's back.
 2              MR. ZIBILICH:
 3                    He's talking about training right
 4                 now.  He is not talking about the
 5                 incident.
 6              THE WITNESS:
 7                    Okay.
 8   BY MR. CLARKE:
 9        Q.    So the amount of people -- were you
10   trained in the RIPP Hobble training that what you
11   are supposed to do is to stop the resistance as
12   quickly as possible and put them in the recovery
13   position?
14        A.    Yes.
15        Q.    The more officers you have on the scene
16   to accomplish that task, the more resistance that
17   can be overcome to put them in the recovery
18   position, correct?
19        A.    You would think so, yes.
20        Q.    Is that what you were trained?
21        A.    According to my training documents, yes.
22        Q.    Were you trained by Pizzolato that you
23   can actually restrain people in the recovery
24   position?
25        A.    I don't recall.
```

```
 1          Q.    You follow what -- let me make sure my
 2    question was clear.  If somebody is resisting on
 3    the ground, the recovery position is just pulling
 4    them off the back.  Pulling them off their stomach,
 5    correct?
 6          A.    It's not just pulling them off their
 7    stomach.  It's putting them into a recovery
 8    position.
 9          Q.    On their side, correct?
10          A.    Yes.
11          Q.    So if you have somebody handcuffed behind
12    their back, you can roll them on the side, and you
13    can restrain them by holding the handcuffs,
14    correct?
15          A.    If they are no longer fighting.
16          Q.    Even if they're fighting, you can hold
17    them and fight them in the recovery position,
18    correct?
19          A.    Depends on the size of the person and the
20    size of the officer.
21          Q.    Or how many officers you have on the
22    scene?
23          A.    It depends.  That can change.
24          Q.    Everything depends.
25          A.    Yes, sir.
```

1      Q.   If you have six officers on the scene
2  with one sitting on the back or buttocks or the
3  legs area, and they're violently resisting while
4  they're in the prone position, those other officers
5  can assist to roll them on the side and restrain
6  them in the recovery position, correct?
7      A.   It depends on the situation.
8      Q.   That's what you were trained, correct?
9      A.   Yes.
10     Q.   Were you also trained that somebody who
11 is obese or has a pot belly, or is fat, like me, it
12 is more dangerous to restrain them in the prone
13 position?
14     A.   I believe so.
15     Q.   Were you trained that or you don't know?
16     A.   I believe I don't remember.
17     Q.   Were you trained at all on autism?
18     A.   We may have touched on it in one of the
19 classes.  I don't recall.
20     Q.   If you can look at your training resume
21 and tell me whether you had any training on autism.
22     A.   I don't see anything that says autism on
23 it.
24     Q.   Did you have any training ever provided
25 to you by the coroner's office?

1          A.    I remember one training session the
2    coroner's office coming in, but I can't recall
3    exactly what it was about.  It's been so long ago.
4          Q.    Just one time?
5          A.    No, sir.  I can't say how many times
6    we've dealt -- that was a crisis negotiator, so we
7    had the coroners at most of our training sessions
8    anyway.
9          Q.    So were you a CIT officer?
10         A.    Yeah.
11         Q.    And were you trained on the proper
12   methods to restrain persons with mental
13   disabilities as a crisis intervention officer?
14         A.    Yes.
15         Q.    What do they train you on how to restrain
16   somebody suffering a mental episode?
17         A.    It depends on the situation.  I mean, you
18   have to secure them.  It doesn't matter.  If
19   they're actively fighting, they're fighting.  You
20   just need to secure the scene.
21         Q.    So you don't know that the major training
22   for CIT is deescalation?
23         A.    It is deescalation.  I'm aware of that.
24   That wasn't your question.
25         Q.    So you can control the scene by

1    deescalating a situation, correct?

2         A.   Of course.

3         Q.   Do you think that it was -- after you

4    looked at your training resume, and you don't see

5    anything on autism, do you think that would be

6    training that you think officers should have?

7         A.   It may have been in the CIT training.  It

8    may just not be listed under the CIT in this, so.

9         Q.   And it may not have been trained, right?

10        A.   May not, but.

11        Q.   Well, you dealt with an autistic kid that

12   ended up dying.  Do you not think that you wished

13   you had better training on how to deal with

14   autistic people?

15        A.   I have real-life training.  I have family

16   members who are autistic.

17        Q.   You understand that --

18        A.   I do understand it.

19        Q.   You understand that actions that an

20   autistic person takes are not volitional?

21        A.   I understand that.

22        Q.   That they do not understand what they're

23   doing at times, correct?

24        A.   Yes.

25        Q.   They engage in self-injurious behavior

```
 1    and stimming, slapping their head, correct?
 2         A.    Yes, they do.
 3         Q.    They can be aggressive at times?
 4         A.    Yes, they do.
 5         Q.    There are special schools that people go
 6    where they -- actually, teachers are taught how to
 7    restrain autistic kids.  Are you aware of that?
 8         A.    Yes.
 9         Q.    Do you think cops should have at least
10    that training?
11              MR. ZIBILICH:
12                   Does she think that?
13              MR. CLARKE:
14                   Yes.
15              MR. ZIBILICH:
16                   Object to the form.  You can answer
17                it.
18              THE WITNESS:
19                   They should not have to go -- they
20                should not be at Laser Tag to begin
21                with.
22    BY MR. CLARKE:
23         Q.    So you're saying autistic people aren't
24    allowed to go out in public?
25         A.    You just made a contradiction.  I didn't
```

1     say out in public.

2         Q.    They should not go to Laser Tag?

3         A.    Look at Laser Tag, the type of

4     environment.

5         Q.    Do you know how many times that the

6     Parsas had been to the Laser Tag?

7         A.    No, sir, I don't.

8         Q.    Do you know if that was their every

9     weekend event that they went through because they

10    dealt with an autistic type schedule?

11        A.    It doesn't mean it was healthy for the

12    child.

13        Q.    Do you believe Laser Tag made him go

14    crazy and attack everybody that day?

15        A.    It's not what I said.

16            MR. ZIBILICH:

17                Does she believe that?

18            MR. CLARKE:

19                Yeah.

20            MR. ZIBILICH:

21                Objection to the form.  You can

22            answer it.

23    BY MR. CLARKE:

24        Q.    Were you taught the SWARM technique to

25    utilize on people who are in an altercation with a

```
 1   cop so that you can quickly immobilize somebody and
 2   get them into the recovery position?
 3        A.   I'm not familiar with the term "SWARM."
 4        Q.   If you look at Exhibit Number 22.  It's
 5   on top of that notebook.
 6        A.   This?
 7        Q.   It was previously marked.  I think it's
 8   towards the end, the last couple of pages.
 9        A.   I see it.
10        Q.   Look that over.
11             THE VIDEOGRAPHER:
12                  Off the record at 1:46.
13                  {BRIEF RECESS}
14             THE VIDEOGRAPHER:
15                  We are back on the record.  The time
16               is 1:47.
17             MR. ZIBILICH:
18                  What is the question?
19             THE WITNESS:
20                  Yeah.  What is the question?
21   BY MR. CLARKE:
22        Q.   Did you look over the stuff on --
23        A.   I'm looking over SWARM.  I don't recall
24   this. Has this always been part of the RIPP Hobble,
25   though?  They may have added --
```

```
 1              MR. ZIBILICH:

 2                   No, no.  You don't get to ask

 3              questions today.  You have to wait for

 4              him to ask, and then you can either

 5              answer or you can't.

 6         THE WITNESS:

 7                   Oh, okay.

 8    BY MR. CLARKE:

 9         Q.   I have taken the deposition of Pizzolato.

10              MR. ZIBILICH:

11                   Congratulations.

12    BY MR. CLARKE:

13         Q.   And I requested documentation pertaining

14    to the training that he provides, and this is what

15    was provided.  Do you recall having training on the

16    SWARM technique?

17         A.   Not when I was employed at JPSO.  I don't

18    recall SWARM.

19         Q.   Do you recall training that says if you

20    are dealing with somebody who is out of control,

21    you use a bunch of officers to control the

22    situation immediately, and immediately put them in

23    the recovery position?

24              MR. ZIBILICH:

25                   The question is real simple.  I do
```

```
 1                   recall, I don't recall, I don't recall
 2                   --
 3           THE WITNESS:
 4               I don't recall.
 5           MR. CLARKE:
 6               Easy there, champ.
 7           MR. ZIBILICH:
 8               Pardon?
 9           MR. CLARKE:
10               Easy there, champ.
11           MR. ZIBILICH:
12               I got you, but I want her to focus
13             on answering your question.
14           MR. CLARKE:
15               I understand.
16   BY MR. CLARKE:
17       Q.   Well, you don't seem to recall a lot
18   about a lot of things, so if Pizzolato says that
19   that's what he's trained, you wouldn't dispute him?
20   You wouldn't dispute that, would you?
21       A.   Not if it was when I was there.  Things
22   may have changed since I left, so I don't know.
23       Q.   These are the documents that were
24   produced by JPSO that was the training at the time
25   on March 19th, 2020.
```

```
 1        A.    Okay.
 2        Q.    It makes sense, doesn't it?  If you have
 3   a bunch of officers on the scene, and somebody is
 4   being resistant, you want to immediately immobilize
 5   them and put them in the safest position that you
 6   can, correct?
 7        A.    Yes.
 8        Q.    So, for example, if you have five
 9   officers on the scene, and one of them was
10   restraining them in the prone position, you don't
11   just wait for that -- for the suspect to completely
12   tire out underneath the officer, correct?
13        A.    No.
14        Q.    Because the longer you stay on his back,
15   the more restriction to breathing, correct?
16        A.    No one was on his back.
17        Q.    You didn't know that obesity was a risk
18   factor for positional asphyxia, did you?
19        A.    Yes, I did.
20        Q.    If you did, then do you also know that if
21   you sit on the legs of a fat person, that that
22   pushes your diaphragm -- your stomach up to your
23   diaphragm and restricts your breathing?
24        A.    But he wasn't face down.
25        Q.    You are saying that Parsa wasn't face
```

1    down during this incident?

2         A.    He kept rearing up.

3         Q.    In the prone position?

4         A.    Yes.

5         Q.    He never stopped resisting the whole

6    time?

7         A.    Not until towards the end.

8         Q.    That's when he urinated on himself and

9    turned blue, right?

10        A.    According to the other officers.  I

11   wasn't there right at that second.

12        Q.    You are an EMT.  That's kind of a bad --

13        A.    I used to be an EMT.

14        Q.    That is a bad sign when you get up off

15   him he has urinated on himself, and he is foaming

16   from the mouth, correct?

17        A.    Of course, but.

18        Q.    If you saw that the resistance was so bad

19   while you were at the scene at that time, you would

20   have gone down to help, correct?

21        A.    The other officers -- there were enough

22   officers on the scene already.

23        Q.    But nobody -- not enough officers to roll

24   him on his side is what you are saying?

25        A.    That wasn't my call.

1    Q.   If it was your call, and you got there,
2    would your first thing be to roll him on his side?
3        A.   He was actively fighting.
4        Q.   You can restrain people in the recovery
5    position, can you not?
6        A.   If he is still actively fighting, no.
7        Q.   If he is actively fighting, why is there
8    more -- you can have somebody lay across his legs
9    when he is on his side, correct?
10       A.   You can Monday morning quarterback all
11   you want, but the situation --
12       Q.   This is the training that Pizzolato gave
13   you.
14       A.   I understand that.  We've clarified that.
15       Q.   We went through -- you know, were you
16   trained on the difference between active resistance
17   and passive resistance?
18       A.   Yes.
19       Q.   Were you trained on how an autistic kid
20   would react to force?
21       A.   Depends on the child.  There is different
22   levels of autism.
23       Q.   Were you trained on how an autistic child
24   would react to the use of force?
25       A.   No.

```
 1        Q.    When you went to the JPSO, were you also
 2   required to know and understand the policies?
 3        A.    Repeat the question.
 4        Q.    The policies.
 5        A.    The policies?
 6        Q.    Yes.  The JPSO policies.
 7        A.    Yes.
 8        Q.    Do you know what a TARP is?
 9        A.    Into what relation?  I mean, you say
10   TARP.  I think of roof.
11        Q.    If that's all you think of, that's fine.
12        A.    I'm asking.  Is it a trick question?
13             MR. ZIBILICH:
14                  No, no.  You don't get to ask him.
15               The only question you can ask him is to
16               please repeat the question.
17             THE WITNESS:
18                  Okay.
19   BY MR. CLARKE:
20        Q.    There is a policy book here.  Let's go
21   through some of the policies.  Look at SOP-8.  Does
22   that say Restraining Devices and Defensive Devices?
23        A.    SOP-8, Restraining Devices and Defensive
24   Devices Policy.
25        Q.    You had the RIPP Hobble training three
```

```
 1   times.  Did you have a RIPP Hobble?
 2        A.   I had training, according to this, in
 3   2015.  I don't see it anywhere else.
 4        Q.   If you look at Exhibit 23, you had it on
 5   8/21/15, 4/14/15, and 2/26/14.
 6        A.   Exhibit 23?
 7        Q.   Exhibit 36 is --
 8        A.   You said 23, though.  So Exhibit 36 I'm
 9   looking at?
10        Q.   Yeah.
11        A.   So what dates did you say?  Because I
12   just saw it on 2015.
13        Q.   Okay. 8/21/15.
14        A.   Okay.
15        Q.   4/14/15, and 2/26/14.
16        A.   Okay.  So since '15 I had no RIPP Hobble
17   training.
18        Q.   Did you get a RIPP Hobble after you had
19   any of those three RIPP Hobble training courses?
20        A.   Not necessarily.
21             MR. ZIBILICH:
22                  Did you?  Did you have one
23               personally?
24             THE WITNESS:
25                  No.
```

```
 1   BY MR. CLARKE:
 2        Q.   Did you ever have a RIPP Hobble?
 3        A.   I don't recall.
 4        Q.   Do you know what a RIPP Hobble is?
 5        A.   Yes.
 6        Q.   What does it look like?
 7        A.   It's just a black strap, basically.
 8        Q.   A nylon strap?
 9        A.   Yeah.
10        Q.   Would you agree that if they train you to
11   use a device -- if a police department trained you
12   to use a device in a circumstance, they need to
13   give you the device to use it?
14             MR. ZIBILICH:
15                  Wait.  Does she believe they need to
16              give you one?
17             MR. CLARKE:
18                  Yeah.
19             MR. ZIBILICH:
20                  I object to the form.  You can
21              answer it.
22             THE WITNESS:
23                  What is your question?
24   BY MR. CLARKE:
25        Q.   My question is, if you had RIPP Hobble
```

```
 1   training, and they told you how to use it and the
 2   circumstances in when they use it, shouldn't they
 3   give you a RIPP Hobble so you can utilize it in the
 4   field?
 5           MR. ZIBILICH:
 6               Object to the form.  You can answer.
 7           THE WITNESS:
 8               They should.
 9   BY MR. CLARKE:
10      Q.   Did you have OC training?
11      A.   Yes.
12      Q.   Did they give you OC?
13      A.   Yes.
14      Q.   Did you have taser training?
15      A.   Yes.
16      Q.   Did they give you a taser?
17      A.   Yes.
18      Q.   You had RIPP Hobble training, right?
19      A.   Yes.
20      Q.   But they didn't give you a RIPP Hobble?
21      A.   They may.  They may have, and I may have
22   lost it, if someone borrowed my RIPP Hobble, and I
23   never got another one replaced.
24      Q.   You didn't have one on March 19th, 2020?
25      A.   I don't recall.
```

```
 1          MR. ZIBILICH:

 2               March 19th?

 3          MR. CLARKE:

 4               January 19th.  Sorry.

 5          MR. ZIBILICH:

 6               Don't be sorry.

 7   BY MR. CLARKE:

 8     Q.   If you look at the RIPP Hobble policy.  I

 9   mean the restraining device policy.  Go to Page 5

10   of 6.  Were you aware that the policy required

11   extremely violent prisoners to be restrained?  If

12   they need to be additionally restrained, they were

13   supposed to be restrained with the Total Appendage

14   Restraining Procedure, TARP?

15     A.   According to the policy.

16     Q.   Did you know that on January 19th, 2020?

17     A.   I don't recall.

18     Q.   Would you say that Parsa was extremely

19   violent?

20     A.   Yes.

21     Q.   If he was extremely violent, this

22   actually gives you the actual particular

23   restraining devices you are supposed to use,

24   correct?

25     A.   According to policy, yes.
```

```
 1        Q.   So would you agree that you didn't comply
 2   with policy on March -- on January 19th, 2020?
 3             MR. ZIBILICH:
 4                  Object to the form.
 5   BY MR. CLARKE:
 6        Q.   The TARP policy.
 7             MR. ZIBILICH:
 8                  Object to the form.
 9             THE WITNESS:
10                  No.  I disagree.
11   BY MR. CLARKE:
12        Q.   What in this policy -- he was an
13   extremely violent prisoner.  Are you saying he
14   didn't need to be additionally restrained?
15        A.   That wasn't my call.  He was actively
16   fighting, and we were attempting to secure him.
17        Q.   When you come on the scene, if you see an
18   officer using excessive force or something
19   improper, what is your obligation?
20        A.   I didn't see anything being done
21   improper.
22        Q.   That's not my question.
23             MR. ZIBILICH:
24                  He said if.  Hypothetically, if you
25                saw that.
```

```
 1            THE WITNESS:
 2                 If I saw something being improper,
 3            yes, I would respond in the way I need
 4            to.
 5   BY MR. CLARKE:
 6       Q.   So you had training that the prone
 7   positioning can cause respiratory compromise or
 8   trouble breathing.  You have an extremely violent
 9   prisoner.  You have a procedure that the department
10   wants you to use, which then is accomplished by the
11   RIPP Hobble, and nobody used the RIPP Hobble that
12   day, right?
13       A.   Not that I recall.
14       Q.   Did you at any time tell any of the
15   officers we need to get him in the recovery
16   position?
17            MR. ZIBILICH:
18                 Yes, exactly.
19            THE WITNESS:
20                 I'm sorry. Can you ask --
21   BY MR. CLARKE:
22       Q.   Did you tell the officers at any time
23   from the time you got there that we should put him
24   in the recovery position?
25       A.   There was a senior officer on the scene
```

```
 1   who was advising what to do.
 2        Q.   Who was the senior officer?
 3        A.   Myron Gaudet.
 4        Q.   And he is senior because of his rank?
 5        A.   His seniority.  No.  He was a deputy at
 6   the time.
 7        Q.   So he had seniority over Deputy Pitfield?
 8        A.   I don't know if he had seniority over
 9   Deputy Pitfield.  I don't know.
10        Q.   Would you agree that during the course of
11   a restraint of somebody there may be periods where
12   somebody is actively resisting and sometimes where
13   they are passively resisting?
14             MR. ZIBILICH:
15                  That's a hypothetical.
16             THE WITNESS:
17                  Hypothetically, yes.
18   BY MR. CLARKE:
19        Q.   What is the difference between active
20   resistance and passive resistance?
21        A.   Active is exactly what you're saying.
22   It's active.
23        Q.   How do you differentiate that from
24   passive?
25        A.   Passive is just more in a passive way.  I
```

 1  don't know how to explain it.

 2      Q.   Is that how -- were you trained on the

 3  difference between active and passive aggression?

 4      A.   I'm sure I was.

 5      Q.   You can't tell us what the distinction is

 6  today?

 7      A.   No.  I'm sure it's laid out in the policy

 8  book.

 9      Q.   Look at the policy.

10          MR. ZIBILICH:

11              The question is -- no, no.  He is

12            not asking you if it's laid out in

13            there.  He is asking you if you can

14            recall today.

15          THE WITNESS:

16              I don't recall.

17  BY MR. CLARKE:

18      Q.   Go ahead and look, if you want to look

19  through.  What other policy would you think -- the

20  use of force policy is SOP-8, if you want to look

21  at that to see if there is a differentiation

22  between active or passive resistance.

23          MR. ZIBILICH:

24              She is not hunting.  If you want to

25            tell her where it is, tell her.

```
 1            THE WITNESS:

 2                  What is your question?

 3     BY MR. CLARKE:

 4        Q.   Go head and look through the policy book

 5     and tell me if there is anywhere in it where it

 6     defines the distinction between active and passive

 7     resistance, because you said it's in the policy

 8     book.  It may be in the policy --

 9        A.   No.  I said it may be in the --

10        Q.   It may not, right?

11        A.   I didn't say it was.  It may not be.

12        Q.   So why didn't you use the TARP?

13        A.   I was not actively involved in

14     controlling the subject.

15        Q.   What were you -- have you looked at the

16     tape any time recently?

17        A.   Within the last week or so.

18        Q.   Do you have a good recollection of the

19     tape?  Now, I'm trying to avoid having to play the

20     tape, unless you want it played, of your

21     involvement on the scene that day.  Do you have a

22     -- do you want to look at the tape before you

23     answer questions about the scene or do you want to

24     answer them now?

25        A.   No, sir.  I can answer them now. Whatever
```

```
 1   you want.
 2        Q.   When did you -- when you got to the
 3   scene, what did you come in -- what did you
 4   confront, and who was there?
 5        A.   When I arrived on the scene, Deputy
 6   Pitfield was in the process of securing Parsa.  It
 7   was still an active scene.  He was still trying to
 8   get him under control.  He had him under control
 9   for the most part, but he was still bucking and
10   trying to bite.  And when I arrived on scene, he
11   told me, he said, "Shannon, I pretty much have him
12   under control.  There is not much you can do,"
13   looking at my size.  And there were two other
14   detectives already on the scene as well.
15        Q.   When you got there, what deputies -- what
16   people from Jefferson Parish were already there?
17   Pitfield?
18        A.   From what I recall, it was me.  Manny
19   showed up at the same time, Manny Estrada, maybe
20   Steve Mehrtens.
21             MR. ZIBILICH:
22                  His question is who was already
23               there once you arrived, if you
24               remember.
25             THE WITNESS:
```

```
 1                   I believe it was Pitfield, Mehrtens,
 2              and maybe Ryan Vaught.
 3   BY MR. CLARKE:
 4       Q.   Was he handcuffed when you got there?
 5       A.   I don't know if he was totally handcuffed
 6   or not.
 7       Q.   Were you trained that if you are trying
 8   to restrain somebody, and you get them handcuffed,
 9   then you are supposed to put them in the recovery
10   position?
11       A.   If they're handcuffed, yes.
12       Q.   So when you got there, we had Pitfield,
13   Mehrtens, and -- how do you say his name?
14       A.   Mehrtens.
15       Q.   And what is the other -- and who else was
16   there?
17       A.   I believe it was Vaught, maybe.
18       Q.   Vaught.  Okay.  What were they doing?
19       A.   I don't recall.
20       Q.   Where was Pitfield?
21       A.   Pitfield was -- he had -- Parsa was on
22   the ground, and Pitfield was securing Parsa, but he
23   was sitting on his legs closer to where the back of
24   his knee bends, trying to keep him under control,
25   calm him down until we could get EMS on the scene.
```

```
 1         Q.   Well, EMS had already been called for the
 2    father, correct?
 3         A.   I believe so.
 4         Q.   EMS was never called, until after he was
 5    found to be unresponsive, for E███ P████, correct?
 6         A.   I don't recall.
 7         Q.   That would be on the tape, right?
 8         A.   It should be, yes.
 9              MR. ZIBILICH:
10                   It would be on the tape that
11                somebody called EMS from where?
12              MR. CLARKE:
13                   From the scene.
14    BY MR. CLARKE:
15         Q.   Now, you get there.  You have a brief
16    conversation with Pitfield, who says he's got it
17    under control, correct?
18         A.   Yes.
19         Q.   Are any other officers assisting Pitfield
20    in restraining him when you first come up?
21         A.   I only recall Pitfield.  I don't --
22         Q.   So after you come up, and you come to the
23    scene, and you have a brief conversation with
24    Pitfield, do you see E███ P██████ parents?
25         A.   Yes.
```

1       Q.   Where are they?

2       A.   The mother is trying to calm Parsa down.

3 The dad is wandering around bleeding from the face,

4 so I asked the dad, I said, "Are you okay?"  And he

5 said, "Yeah.  He bit part of my face off," and I

6 said, "Are you serious?  I mean, he bit a part of

7 it off?"  And he said, "Yeah.  I picked it up off

8 the ground in the parking lot."  I said, "Where is

9 it?"  He said, "In my car."  I said, "Can you show

10 me?"  So we went to the car, and he showed me where

11 a piece of his chin or whatever he had picked up

12 off the ground in the parking lot and put it in the

13 car.

14       Q.   So during this period of time, you were

15 attending to Mr. Parsa?

16       A.   Right.

17       Q.   So at that time are you observing

18 anything that is going on, on the ground with

19 Parsa?

20       A.   Not necessarily, because there were other

21 officers on the scene that were all assisting.

22       Q.   Now, the first thing is you talk to

23 Pitfield.  The second thing is you talk to

24 Mr. Parsa, and he shows you where the piece of skin

25 from his chin was in the car.  What is the next

1    thing you do?

2         A.    I don't recall exactly.

3         Q.    If you look at your statement, would that

4    help you?  Let's just pull up your statement.  When

5    you got the call, how did the call come in or how

6    -- what was the call that led you to go to the

7    scene?

8         A.    I remember Deputy Pitfield asking --

9    advising headquarters he needed assistance. What we

10   call, I believe, a 108.  I think it came out as a

11   108.

12        Q.    What is a 108?

13        A.    Officer needs assistance.

14        Q.    And that is kind of a drop what you are

15   doing and get there if you can, right?

16        A.    Right.

17        Q.    So you go to the scene.  You are the

18   third -- the fourth or the fifth person who shows

19   up.  Did you have any indication at that time that

20   E█████ P██████ was autistic?

21        A.    At the time of the dispatch?

22        Q.    Yes.

23        A.    No.

24        Q.    When you got at the scene, and you talked

25   to Pitfield, did you realize he was autistic?

1       A.    I asked Pitfield if he was autistic.

2       Q.    You dealt with autistic people in the

3   past.  Was it somewhat obvious to you?

4       A.    I knew something was going on.  I wasn't

5   sure exactly what.  I didn't want to assume

6   anything, but, yeah.

7       Q.    And because you had experience with --

8   have you ever had to deal with -- you said you had

9   a family member who has autism?

10      A.    Yes.

11      Q.    Have you ever had to deal with outbursts

12  with them?

13      A.    Not on a regular basis.

14      Q.    It comes and goes?

15      A.    It comes and goes, right.

16      Q.    And the family member -- you know, I

17  don't want names or anything.  Do they take him out

18  and try to keep him on a schedule to do things?

19      A.    Yeah.

20      Q.    And all autism is somewhat different.

21  Would you agree?

22      A.    Different levels of the spectrum.

23      Q.    And different triggers, different --

24      A.    Exactly, right.

25      Q.    Different things that bother people?

```
 1        A.    Right.
 2        Q.    You know, different ability to
 3   communicate?
 4        A.    Yes.
 5        Q.    So by the time you talked to Pitfield,
 6   and you see there is something wrong, and he
 7   confirms that he knew that he was dealing with an
 8   autistic person, correct?
 9        A.    Yes, sir.
10        Q.    Do you know of any accommodation that
11   anybody from the JPSO made for E███ P███ as a
12   result of his disability?
13        A.    What do you mean by accommodations?
14        Q.    If you don't know, you don't know. You
15   answered the discovery request.  If you look at
16   Exhibit 80, on the last question, we asked to
17   identify all accommodations, if anything, if any
18   you contend you provided to E███ P███ to
19   accommodate the disability.  It is Interrogatory
20   Number 18.
21        A.    That's about my net worth. 81 we're
22   looking at?
23        Q.    Yeah.
24              MR. ZIBILICH:
25                    He's got them ass backwards.  Let's
```

```
 1              go to 18 on the second one.
 2   BY MR. CLARKE:
 3        Q.   The longer one.  You were looking at
 4   Request for Production.  Look at Interrogatory
 5   Number 18.  There is no page numbers on it.
 6        A.   None.
 7        Q.   So we find out he has autism.  You go
 8   deal with Mr. Parsa.  What do you do next?
 9        A.   I don't recall exactly.
10        Q.   Do you want to look at the tape so you
11   can recall, or do you just want to go through your
12   statement?
13        A.   I can go through my statement.
14        Q.   At what point -- so after you deal with
15   Mr. Parsa -- did you already have gloves on at that
16   time?
17        A.   Yes.
18        Q.   Why did you put gloves on?
19        A.   I automatically put them on when I got
20   out of my unit.
21        Q.   That's just a habit?
22        A.   That's a habit now with Fentanyl being
23   out and about.  It was around at that time, too.
24        Q.   So that's kind of the first thing that
25   you do when you are going to have -- you have a
```

1    potential to have to be involved with somebody?

2         A.   Yes.  Yes, sir.

3         Q.   That wasn't because of anything you saw

4    or anything?

5         A.   No, sir.

6         Q.   So you put your gloves on before you even

7    talk to Pitfield?

8         A.   I believe so.  I believe probably when I

9    was getting out of my car I was getting my gloves

10   on, probably.  That's my normal routine.

11        Q.   Your normal routine would be getting out

12   and putting them on?

13        A.   Yes, yes.

14        Q.   Did you hear E█████ P█████ say anything at

15   all during this whole event?

16        A.   I remember him saying fire trucks.  I

17   guess from the sirens.

18        Q.   Did you hear him making any noises or

19   anything?

20        A.   Just yelling.

21        Q.   Yelling words or just sounds?

22        A.   Yeah, sounds.  Just not making -- that's

23   what I heard the minute I came up.  That's why I

24   asked Pitfield if he was autistic just because of

25   the noises he was making.

1    Q.   I got you.  So according to your

2  statement on Page 2, you said he was restrained and

3  everything was fine, correct?

4    A.   Chad had him restrained.  Everything was

5  fine.  At some point -- yeah, because Chad had told

6  me he had him under control.  We were just waiting

7  for additional units to get there.

8    Q.   Why didn't you try to put him in the

9  recovery position then, if he was under control?

10    A.   Because any time Chad attempted to let

11  up, he started bucking, trying to bite Chad.  He

12  had already bit Chad once.

13    Q.   If you turn him in the recovery position,

14  and he is trying to move back, it's of no danger to

15  you, correct?

16    A.   Chad was already exhausted, and we were

17  waiting for the other units to get on scene so that

18  we could do it securely.

19    Q.   Do you think that --

20    A.   A proper way.

21    Q.   Do you think that E███ P███ would be

22  severely tired if Pitfield was tired?

23        MR. ZIBILICH:

24            Does she think that?  Object to the

25            form.  You can answer it.

```
1   BY MR. CLARKE:
2        Q.   You said Pitfield was tired, right?
3   Getting exhausted from --
4        A.   I would assume he was exhausted.
5        Q.   Would you assume that E███ P████, who is
6   underneath him, is exhausted?
7        A.   He didn't appear to be.
8        Q.   So you would make an assumption for
9   Pitfield but not the person that Pitfield was
10  sitting on?
11       A.   Well, Pitfield was -- he was out of
12  breath.  Parsa was still actively trying to get up
13  and bite and scream and yell.
14       Q.   Did they train you in any way to not be
15  bit at the training academy?
16            MR. ZIBILICH:
17                 To not be what?
18  BY MR. CLARKE:
19       Q.   To not be bit. To avoid being bitten.
20       A.   Oh, we avoid it at all costs.  Are we
21  specifically trained on it?  I mean, yeah.
22       Q.   The simple thing is to just get away from
23  his mouth, right?
24       A.   Yeah.
25       Q.   If you put him in the recovery position,
```

```
 1   then his mouth is facing away from you while you
 2   are restraining him, correct?
 3          A.   Yeah.  In a perfect scenario.
 4          Q.   That's what the training is for, correct?
 5          A.   Right, right.
 6          Q.   So when you get there, did you ask -- did
 7   you first ask Chad -- how did you know Pitfield was
 8   injured or got bit?
 9          A.   Okay.  When Nick Vega came on the scene,
10   that's when Nick asked Chad, "You want me to take
11   control?"  And at some point during that encounter,
12   that's when we found out Chad had been bit already.
13          Q.   So when Vega was taking over for
14   Pitfield, you overheard or somebody said --
15          A.   No.  That was the whole point of him
16   taking over, so Pitfield could get treatment for
17   his leg, so we could see how bad his bite was.
18          Q.   And at the time that Vega relieved
19   Pitfield on Parsa, was he resistant?
20          A.   Yes.
21          Q.   And if Vega says he wasn't at that time,
22   were you actually looking at the scene at that
23   time, when the transfer was made?
24          A.   Yeah, because when the transfer was made
25   was when Parsa tried to get up.  That's when he
```

```
1    arched his back up.
2         Q.    Did you go down to assist in any way?
3         A.    No.
4         Q.    Is it because they had him under control?
5         A.    No.  They had enough people around him to
6    get him under control.  There was nothing else I
7    could offer.
8         Q.    The best way to control him and the
9    safest way is in the recovery position, correct?
10        A.    Yes, sir.
11        Q.    Nobody attempted to put him in the
12   recovery position when there was a transfer,
13   correct?
14        A.    He was still actively resisting.
15        Q.    Well, we will take Vega's deposition.  He
16   gave a statement, too.  But there was no effort to
17   put him in the recovery position when that change
18   was made, correct?
19        A.    Not that I recall.
20        Q.    When Vega got on top of him -- so you
21   talked with Pitfield when he came, and you talked
22   with Parsa for a while.  Are you now focused on
23   events with E███ for the rest of the time or do you
24   walk away from the scene or deal with other things?
25        A.    Yeah.  I walked away from the scene at
```

```
 1    some point, because there were other calls holding,
 2    and rank came on scene wanting us to pull up to go
 3    handle other calls.
 4         Q.   Who, from rank, pulled up and told you to
 5    go do other calls?
 6         A.   Sergeant Aivolasiti.
 7         Q.   What did you see of what Deputy Vega did
 8    while he was restraining Parsa in the prone
 9    position?
10         A.   Parsa was actively still resisting.  I
11    remember Deputy Vega being on top of him.  Myron
12    was down on his -- watching what was going on to
13    make sure Parsa's airway was open.  That's why I
14    wasn't paying much attention to it.  I was handling
15    other things, because Myron -- I knew with Myron's
16    background, he was on top of that.
17         Q.   So it is your -- did Myron -- who was
18    Myron?
19         A.   Myron Gaudet.
20              MR. ZIBILICH:
21                   Gaudet.
22    BY MR. CLARKE:
23         Q.   Gaudet.  Are you speculating that Myron
24    was checking his airway or did he tell you, I'm
25    monitoring and checking his airway?
```

```
 1        A.    He said he was monitoring and checking.
 2        Q.    Were you trained on how to monitor or
 3   check somebody's airway while they're being
 4   restrained in the prone position?
 5        A.    Yeah.
 6        Q.    How did you do it?
 7        A.    You make sure that -- the way Nick had
 8   him under con -- make sure he wasn't -- didn't have
 9   anything obstructed, blocking his airway.
10        Q.    Do you check the pulse?
11        A.    I don't recall.
12        Q.    But that's the way to check?
13        A.    That is a way to check, yeah. A pulse and
14   an airway are two different things.
15        Q.    I understand.  You are trying to protect
16   your suspect at the time, correct?
17        A.    Right.
18        Q.    So you think Gaudet is monitoring his --
19              MR. ZIBILICH:
20                   There is only about three different
21                ways to pronounce it, and he's found
22                six ways that are wrong.
23   BY MR. CLARKE:
24        Q.    You think he is checking his airway,
25   correct?
```

1      A.    Myron stated several times that he saw

2  that he was breathing.

3      Q.    Did you see Vega use a pain compliance

4  technique on E███ P████ to try to control him?

5      A.    What would you consider a pain

6  compliance?

7      Q.    Lifting his handcuffs up from behind

8  them.  You were not trained on pain compliance in

9  the academy?

10     A.    I'm sure I was 20 years ago.

11     Q.    Well, if somebody -- if you are escorting

12  somebody out, and they're being disruptive, were

13  you not taught that you can lift their hands up to

14  try to give them pain so they stop resisting?

15     A.    Once they are handcuffed.

16     Q.    Right.  Well, let's --

17     A.    I don't inflict pain after -- once

18  they're handcuffed.

19     Q.    Well, you inflict pain -- you use force.

20  There is red, yellow, and green areas where you can

21  strike people, right?

22     A.    I'm aware of that.

23     Q.    So a pain compliance technique is an

24  actual escalation of force pursuant to your use of

25  force continuum?  You understand that, right?

1      A.   Sounds like a definition, yes.

2      Q.   So I'm not saying they're trying to beat

3  somebody up or anything.  It's a technique that

4  officers have that inflicts a little amount of pain

5  to try to get control.  Have you heard of that?

6      A.   Okay.  Yes.

7      Q.   Did you see Vega use a pain compliance

8  technique by lifting his arms up behind his back,

9  his handcuffed arms, up behind his back?

10     A.   I didn't notice if he did or not.

11     Q.   Did you notice that E███ P███████ arms

12 came up from behind his back in front of him?

13     A.   I know his arms were coming up.

14     Q.   Explain that to me.

15     A.   E███ P████ was trying to get up.  He was

16 trying to put his arms over his head.

17     Q.   So you're saying it wasn't Vega pushing

18 the arms up?

19     A.   Not that I recall.

20     Q.   Did you see Vega put any type of hold

21 around Parsa's head?

22     A.   He did have his arm around his -- around

23 the front of him, but it wasn't in an actual --

24 like around the neck, so to say.

25     Q.   You are going to have to describe that

```
 1    for me a little bit better.  Which arm was it?
 2         A.   I don't remember.
 3         Q.   Do you remember which side of ██████
 4    head?
 5         A.   No.  I can't remember the details.
 6         Q.   So at some point you saw Deputy Vega with
 7    his arm across the front of his head, but your
 8    testimony is it wasn't touching his neck?
 9         A.   It wasn't touching around the neck, no.
10         Q.   But was around his forehead?
11         A.   I don't remember if it was around his
12    forehead.  I just remember his arm being around the
13    front of him, and it was just to keep him from
14    biting.  Just to keep him from moving around.
15         Q.   Why can't you just not put people in
16    front of his mouth?
17              MR. ZIBILICH:
18                   What kind of question is that?
19              THE WITNESS:
20                   Yeah.
21              MR. ZIBILICH:
22                   I don't understand.  Why can't who,
23                when, where, how, under what
24                circumstances?
25              THE WITNESS:
```

```
 1                   I can't answer for what another
 2              deputy does.  I'm trying to understand
 3              why you're asking me this question,
 4              because I wasn't actively involved in
 5              the subduing.
 6    BY MR. CLARKE:
 7         Q.   You weren't.   You were --
 8         A.   Okay.  So I'm not going to answer that
 9    question, though.
10         Q.   You are going to answer whatever question
11    I ask that's appropriate.  We're not going to get
12    into this argument.
13         A.   No.  It's not an argument.  I'm not
14    trying to debate you on it.  I'm just trying to
15    understand the question.
16         Q.   There are techniques that you're trained
17    to eliminate the risk of danger to yourself while
18    performing your jobs as a deputy, correct?
19         A.   Right.  When I'm actively making the
20    arrest, but I wasn't actively making the arrest on
21    the subject.
22         Q.   I'm talking about your training, because
23    I'm going after the JPSO based on their training.
24    Were you trained that officers can do stuff like
25    deescalation, right?
```

```
 1          A.    Right.
 2          Q.    If somebody is trying to bite you, one
 3    method that you can deal with is stay away from
 4    their mouth, correct?
 5          A.    Of course.
 6          Q.    So if he is in the prone position, trying
 7    to bite people, with Nick Vega on his back area --
 8    I don't want to talk about where he is -- isn't it
 9    easy for officers not to get bitten by just moving
10    theirself away from his head?
11          A.    Not when you are still active -- someone
12    is actively fighting, and you are still trying to
13    subdue this person, based on his size.
14          Q.    He was handcuffed, was he not?
15          A.    I'm not sure, sir.  I can't even answer
16    that.
17          Q.    Well, according to the statements, Ryan
18    -- he was handcuffed by the first deputy that
19    showed up, which was --
20                MR. ZIBILICH:
21                      Well, that presumes she's read
22                   everybody's statement, sir.  You didn't
23                   listen to her answer.
24    BY MR. CLARKE:
25          Q.    Do you know that Ryan Vaught handcuffed
```

1    him when he arrived on the scene, and when he did

2    that, he was not meeting any resistance from E██

3    P███?

4              MR. ZIBILICH:

5                   How many hands?

6              MR. CLARKE:

7                   All handcuffed.

8    BY MR. CLARKE:

9         Q.   You know what handcuffed means.  That's

10   when you have both hands together.

11             MR. ZIBILICH:

12                  Both hands.  Okay.

13             THE WITNESS:

14                  Uh-huh.

15   BY MR. CLARKE:

16        Q.   Are you aware that Ryan Vaught

17   handcuffed, with another set of handcuffs, E██

18   P███, when he arrived there, when he was the first

19   officer to arrive there on the scene?

20        A.   I didn't know what Ryan Vaught had done,

21   no, sir.

22        Q.   Did you believe during the struggle that

23   you were observing the time that E██  P███ was not

24   handcuffed?

25        A.   When I arrived on scene, all I saw was

 1     Chad on top of him.
 2          Q.   Would you agree that if he was hand-
 3     cuffed, and he was resisting as opposed to not
 4     handcuffed and resisting, there is more danger or
 5     there is less danger when there is a handcuffed
 6     person who is resisting?
 7               MR. ZIBILICH:
 8                    Is this a hypothet or is this, this
 9               case?
10     BY MR. CLARKE:
11          Q.   No.  You can answer.
12          A.   What is the question?
13          Q.   The question is, did you consider his
14     resistance to be more dangerous to the officers at
15     the time because he didn't think he was handcuffed?
16          A.   I wasn't sure if he was totally
17     handcuffed or not.  I came in after the fact.
18          Q.   If he was unhandcuffed, he would be more
19     dangerous, correct?
20          A.   Yes, sir.
21          Q.   If he was handcuffed, that gives you more
22     options, correct?
23          A.   Options to what?
24          Q.   Options to safely handle him.
25          A.   Yeah.

```
 1        Q.   For example, if he is already handcuffed,
 2   you can roll him on his side and control him by
 3   holding the handcuffs, correct?
 4        A.   In a perfect world, yeah, but based on
 5   his size and trying to get on his feet again, they
 6   were trying to prevent from any more harm happening
 7   to him.
 8        Q.   If you roll him on his side in the
 9   recovery position, he doesn't have the ability then
10   to push off the ground to get up, right?
11             MR. ZIBILICH:
12                  Objection to the form.  She can't
13                answer about somebody else's ability,
14                sir.
15             THE WITNESS:
16                  I don't know.
17   BY MR. CLARKE:
18        Q.   You don't know?
19        A.   No, sir.
20        Q.   Pizzolato didn't train that to you?
21             MR. ZIBILICH:
22                  She told you she didn't recall
23                everything Pizzolato trained.
24             MR. CLARKE:
25                  Franz, let me just ask you questions
```

```
 1                    now.
 2              MR. ZIBILICH:
 3                    I'm just telling you.  You are
 4                 putting words in her mouth.
 5              MR. CLARKE:
 6                    Of course I am.  That's my job.
 7              MR. ZIBILICH:
 8                    No.
 9              MR. CLARKE:
10                    I'm trying to get at what her
11                 perception of the thing is and why she
12                 didn't intervene.
13              MR. ZIBILICH:
14                    Why don't you ask her that?
15    BY MR. CLARKE:
16         Q.   Did you feel that you had somebody who
17    was trying to be restrained by Pitfield who was
18    unhandcuffed which made him a more dangerous
19    person?
20         A.   No one was doing anything wrong.  That's
21    why I didn't intervene.
22         Q.   You sat on him -- they sat on him for
23    nine minutes.  Do you think that was appropriate?
24         A.   He was actively resisting, sir.
25         Q.   If he's in the handcuffs, you are talking
```

1   about --
2         A.   You can still actively resist in
3   handcuffs.
4         Q.   You can actively control somebody with
5   handcuffs who is actively resisting, who is
6   handcuffed, without sitting on their back in the
7   prone position, correct?
8         A.   Say that again.
9         Q.   Somebody actively resisting, you can
10  actively resist standing on the ground or in the
11  recovery position, correct?
12        A.   Yeah.  You can resist anywhere.
13        Q.   According to your training, the best
14  method to try to restrain somebody would be in the
15  recovery position, correct?
16        A.   Best method, yeah.
17        Q.   And to put somebody in the recovery
18  position, you roll them off their belly out of the
19  prone position onto their side, correct?
20        A.   Correct.
21        Q.   If somebody is actively resisting, and
22  they're in the recovery position, you can try to
23  control them in that position, correct?
24        A.   You can.
25        Q.   And one of the methods you can do that is

1    somebody can be holding the handcuffs behind his

2    back together, correct?

3          A.    You can.

4          Q.    And somebody can lay on his legs, right?

5          A.    You can.

6          Q.    And that would decrease any of the

7    dangers that the RIPP Hobble and the training you

8    had from Pizzolato was designed to prevent,

9    correct?

10         A.    In a perfect scenario, like I said

11   before, but he was actively aggressively still

12   kicking and trying to get to his feet.  They were

13   trying to keep him from causing any more harm to

14   himself.

15         Q.    Do you think it's more harmful -- well,

16   let me ask you this.  Did you see him banging his

17   head?

18         A.    I remember somebody trying to put a

19   jacket to keep him from hurting his head, because,

20   yeah, he was trying -- his mother said he had a

21   history of banging his head.

22         Q.    And did you hear -- did you have any

23   conversations with the mother?

24         A.    I don't recall.

25         Q.    Do you remember the mother yelling out,

```
 1    "You're choking him?"
 2         A.   I don't recall.
 3         Q.   Did you hear anybody say the word "choke"
 4    on the scene?
 5         A.   I don't recall.
 6         Q.   Did you hear anybody talk about he can't
 7    -- did you hear the mother yell, "He can't
 8    breathe?"
 9         A.   I don't recall.
10         Q.   What did you do -- okay.  After Vega got
11    -- relieved Pitfield, what did you do?
12         A.   I don't recall.
13         Q.   What do you recall that you -- other than
14    what we talked about today, what do you recall
15    doing on the scene?
16         A.   I've told you everything.
17         Q.   Did you write any report pertaining to
18    this event?
19         A.   I don't think so.
20         Q.   You gave a statement at some point?
21         A.   Yes, sir.
22         Q.   And have you reviewed the statement?  Is
23    anything inaccurate in this statement?
24         A.   No, sir.
25         Q.   According to your statement, Myron tells
```

```
 1   him, "Let's put him in" -- this is on Page 4.
 2   "Let's put him in the recovery position."  When did
 3   that happen?
 4              MR. ZIBILICH:
 5                   Third sentence from the top.
 6              THE WITNESS:
 7                   Yeah.  I see it.  So you are asking
 8                me when it happened in relation to
 9                what?
10   BY MR. CLARKE:
11        Q.   Why did it -- why did he say that?  When
12   did it happen?  Who was on him?
13        A.   You have to ask him that.
14              MR. ZIBILICH:
15                   Objection to why he said it.
16              MR. CLARKE:
17                   She testified to why Gaudet did
18                things.
19              MR. ZIBILICH:
20                   She can't testify as to why anybody
21                did anything.
22              MR. CLARKE:
23                   Sauce for the goose, sauce for the
24                gander.
25              THE WITNESS:
```

```
 1                    I'm still trying to figure out
 2                 what's your question.
 3     BY MR. CLARKE:
 4          Q.   My question is, you are going through a
 5     timeline of the events, and you're describing
 6     everything in your statement to them.  You get to
 7     the point where you say, in your statement, Myron
 8     says let's put him in the recovery position.  What
 9     was happening at the time in the event?
10          A.   I --
11                 MR. ZIBILICH:
12                    He is asking you what is going on
13                 when Myron says that.
14                 THE WITNESS:
15                    I don't recall exactly what was
16                 going on.  I just heard Myron say,
17                 "Let's put him in the recovery
18                 position."
19     BY MR. CLARKE:
20          Q.   Were you looking at the altercation when
21     that happened?
22          A.   I don't recall.
23          Q.   Did you at any time do any assessment of
24     E███ P███ to determine his respiration rate or his
25     pulse?
```

1      A.   No, sir.

2      Q.   Did you know -- did you see anybody try

3  to put leg shackles on E███  P████?

4      A.   I remember Manny going back to his unit

5  saying he had leg shackles, but I don't recall who

6  or if anybody was putting leg shackles on Parsa.

7      Q.   You didn't physically see that?  You just

8  -- you knew -- you somehow overheard that he was

9  going to get them?

10      A.   I remember Manny saying he had leg

11  shackles in the car, in his unit.

12      Q.   Did you carry leg shackles in your unit?

13      A.   No, sir.

14      Q.   Do you know why he didn't go try to get a

15  RIPP Hobble?

16      A.   You'd have ask him that.

17      Q.   We will.  The policy says if you have an

18  extremely violent person you need to restrain,

19  that's what you are supposed to use, correct?

20      A.   Okay.

21      Q.   Do you agree with that?

22      A.   Yes, sir.  Yes, sir.

23      Q.   He didn't go to get a RIPP Hobble.  He

24  went to go get some other device?

25      A.   Like I said, you have to ask him.

```
1        Q.    We're going to ask everybody.
2              MR. ZIBILICH:
3                    Imagine that.  Imagine that.  Jeff,
4                he might ask you next.
5              MR. CLARKE:
6                    I might as well just depose you,
7                Franz.  You're talking more than the
8                witness.  That's all I have.
9              MR. ZIBILICH:
10                   Thank you, sir. Thank you, ma'am.
11             THE WITNESS:
12                   Thank you.
13             THE VIDEOGRAPHER:
14                   This is the conclusion of the
15               deposition.  We're going off the
16               record.  The time is 2:30.
17             MR. KAUL:
18                   No questions.
19             MR. ZIBILICH:
20                   I don't have any.
21                   [End of deposition, 2:30]
22
23
24
25
```

1              C E R T I F I C A T E

2

3              This certification is valid only for
a transcript accompanied by my original signature
4 and original required seal on this page.

5              I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6 as the officer before whom this testimony was
taken, do hereby certify that SHANNON GUIDRY, after
7 having been duly sworn by me upon authority of R.S.
37:2554, did testify as hereinbefore set forth in
8 the foregoing 80 pages;

9              That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10 or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11 ability and understanding;

12              That the transcript has been
prepared in compliance with transcript format
13 guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14 prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15 and in rules and advisory opinions of the board;

16              That I am not related to Counsel or
to the parties herein, nor am I otherwise
17 interested in the outcome of this matter.

18

19

20

21 _____
Sandra P. DiFebbo,
22 Certified Shorthand Reporter

23 Date:  _____

24

25