UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CIVIL ACTION NO. 2:21-cv-00080


DONNA LOU and DAREN PARSA, on their own behalf
 and on behalf of their deceased minor child,
E.P.

Plaintiffs,

v.

SHERIFF JOSEPH P. LOPINTO, III, CHAD PITFIELD,
RYAN VAUGHT, STEVEN MEHRTENS, SHANNON GUIDRY,
NICK VEGA, MANUEL ESTRADA, MYRON GAUDET, JOHN
DOES 1-3, VICTORY REAL ESTATE INVESTMENTS LA,
   LLC and WESTGATE INVESTORS NO LLC D/B/A
   WESTGATE SHOPPING CENTER, ABC INSURANCE
          COMPANY, and XYZ INSURANCE,

Defendants.


        Deposition of MANUEL ESTRADA, given

in the above-entitled cause, pursuant to the

following stipulation, before Lori L. Marino,

Certified Shorthand Reporter, in and for the

State of Louisiana, at the Jefferson Parish

Sheriff's Office, 1233 Westbank Expressway,

Building B, 5th Floor, Harvey, Louisiana 70058

on Wednesday, September 14, 2022, commencing

at 9:10 AM.

```
 1   APPEARANCES:

 2

 3   (ALL PARTICIPANTS PRESENT IN PERSON:)

 4

 5   THE COCHRAN FIRM MID-SOUTH
     ONE COMMERCE SQUARE, SUITE 1700
 6   MEMPHIS, TN  38103
     TELEPHONE:  (901) 523-1222
 7
     BY:  ANDREW C. CLARKE, ESQ.
 8   aclarke@cochranfirmmidsouth.com
     REPRESENTING THE PLAINTIFFS
 9

10   HONORABLE FRANZ L. ZIBILICH
     6611 GENERAL DIAZ
11   NEW ORLEANS, LOUISIANA  70124
     TELEPHONE:  (504) 508-6868
12
     BY:  FRANZ L. ZIBILICH, ESQ.
13   fzibilich@gmail.com

14              AND

15   MARTINY & ASSOCIATES, LLC
     131 AIRLINE DRIVE, SUITE 201
16   METAIRIE, LOUISIANA  70001
     TELEPHONE:  (504) 834-7676
17
     BY:  JEFFREY D. MARTINY, ESQ.
18   jeff@martinylaw.com

19              AND

20   JEFFERSON PARISH SHERIFF'S OFFICE
     1233 WESTBANK EXPRESSWAY
21   BUILDING B, FLOOR 5
     HARVEY, LOUISIANA  70058
22   TELEPHONE:  (504) 363-5704

23   BY:  LINDSEY M. VALENTI, ESQ.
     valenti_lm@jpso.com
24   REPRESENTING SHERIFF JOSEPH P. LOPINTO, III
     AND THE JPSO DEFENDANTS
25
```

1   APPEARANCES (CONTINUED)

2

3   THOMPSON, COE, COUSINS & IRONS, LLP
    650 POYDRAS STREET, SUITE 2105
4   NEW ORLEANS, LOUISIANA  70130
    TELEPHONE:  (504) 526-4321
5
    BY:  CHRISTOPHER W. KAUL, ESQ.
6   ckaul@thompsoncoe.com
    REPRESENTING VICTORY REAL ESTATE INVESTMENTS
7   LA, LLC AND WESTGATE INVESTORS NO LLC
    D/B/A WESTGATE SHOPPING CENTER, ABC INSURANCE
8   COMPANY, AND XYZ INSURANCE COMPANY

9

10  VIDEOGRAPHER:  AARON PALMER, CLVS, DEPO-VUE

11  ALSO PRESENT:  TIM ANCLADE, LEGAL INVESTIGATOR
                   MYRON A. GAUDET, JR.
12                 STEVEN A. MEHRTENS

13

14  REPORTED BY:  LORI L. MARINO
                  CERTIFIED COURT REPORTER
15                STATE OF LOUISIANA

16

17

18

19

20

21

22

23

24

25

```
 1      E X A M I N A T I O N        I N D E X

 2

        MANUEL ESTRADA
 3      1233 WESTBANK EXPRESSWAY
        HARVEY, LOUISIANA  70058
 4
```

```
 5      TITLE                              1

 6      APPEARANCES                        2-3

 7      WITNESS INDEX                      4

 8      AGREEMENT OF COUNSEL               5

 9      EXAMINATION BY MR. CLARKE          6

10      WITNESS'S CERTIFICATE              127

11      REPORTER'S CERTIFICATE             128

12
```

```
13          E X H I B I T      I N D E X
```

```
14      EXHIBIT 84                         9

15      EXHIBIT 85                         9

16      EXHIBIT 86                         10

17      EXHIBIT 87                         11

18      EXHIBIT 88                         76
```

```
19

20

21

22

23

24

25
```

```
1                    S T I P U L A T I O N

2              It is stipulated and agreed by and

3      between Counsel for the parties hereto that

4      the deposition of MANUEL ESTRADA is hereby

5      being taken pursuant to the Federal Rules of

6      Civil Procedure for all purposes in accordance

7      with law;

8              That the formalities of

9      certification and filing are specifically

10     waived;

11             That the formalities of reading and

12     signing are specifically not waived.

13             That all objections, save those as

14     to the form of the question and/or

15     responsiveness of the answer, are hereby

16     reserved until such time as this deposition or

17     any part thereof is used or sought to be used

18     in evidence.

19             *   *   *   *   *   *   *   *

20             LORI L. MARINO, Certified Court

21     Reporter, in and for the State of Louisiana,

22     officiated in administering the oath to the

23     witness.

24

25
```

```
 1              THE VIDEOGRAPHER:
 2                   This is the videotaped
 3         deposition of Manuel Estrada.  This
 4         deposition is being held at 1233
 5         Westbank Expressway in Harvey,
 6         Louisiana on September 14, 2022.  The
 7         time indicated on the video screen is
 8         9:10.  Would counsel please introduce
 9         themselves for the record?
10         MR. CLARKE:
11                   Andy Clarke for the plaintiff.
12         MR. ZIBILICH:
13                   Franz Zibilich and Jeff Martiny
14         on behalf of all the JPSO defendants,
15         including Sheriff Lopinto.
16         MR. KAUL:
17                   Chris Kaul on behalf of the
18         Westgate defendants.
19         THE VIDEOGRAPHER:
20                   Would the court reporter please
21         swear in the witness.
22                   MANUEL ESTRADA, having been
23         first duly sworn was examined and
24         testified on his oath as follows:
25                        EXAMINATION
```

```
 1   BY MR. CLARKE:
 2        Q    Would you please state your name?
 3        A    Manuel Estrada.
 4        Q    And by whom are you employed?
 5        A    Jefferson Parish Sheriff's Office.
 6        Q    Are you a deputy, or do you have any
 7   rank?
 8        A    Deputy.
 9        Q    Deputy Estrada, my name is Andy
10   Clarke.  I met you just briefly before your
11   deposition.  Have you given a deposition
12   before?
13        A    No.
14        Q    Because -- let me just go over some
15   ground rules, okay?  Obviously, you understand
16   your testimony here is under oath subject to
17   the penalty of perjury, correct?
18        A    Yes.
19        Q    A lot of times -- and this is my
20   opportunity to ask you questions that are
21   relevant to the lawsuit that's been filed by
22   the Parsas pertaining to the incident that
23   happened on January 19, 2020.
24             MR. ZIBILICH:
25                  That means I can object to any
```

```
 1              one that's not relevant?
 2              MR. CLARKE:
 3                   No.  That doesn't mean that at
 4              all.
 5    BY MR. CLARKE:
 6         Q    But obviously, I'm going to ask you
 7    questions, and if you don't understand my
 8    question, I want you to tell me, okay?
 9         A    (Witness nods head affirmatively.)
10         Q    Another thing you have to do is you
11    have to give audible answers, yes or no,
12    instead of nodding your head, because --
13         A    Yes.  Okay.
14         Q    -- even though we have a video here,
15    the court reporter has to take it down, okay?
16         A    Sure.
17         Q    So if I ask you something you don't
18    understand, just let me know, and I'll try to
19    rephrase it, okay?
20         A    Sure.
21         Q    Also, there are some documents that
22    have been produced in discovery during this
23    lawsuit that I have, and what I've done is
24    I've marked certain documents and put them in
25    front of you.
```

```
 1          MR. CLARKE:
 2               For the record, I want to go
 3          through what I've marked.  Exhibit 84
 4          is your personnel file.  That's the
 5          big one.  So if we ask you questions
 6          about your service and you need to
 7          refer to that, please feel free to,
 8          okay?
 9          THE WITNESS:
10               Sure.
11          MR. CLARKE:
12               Exhibit 85, if you'll look at
13          that, this is called "Manuel
14          Estrada's Supplemental Responses to
15          Plaintiffs' First Interrogatories and
16          Requests for Production."
17   BY MR. CLARKE:
18        Q    If you could briefly look over that.
19        A    (Witness peruses document.)
20        Q    Do you see your answer on the second
21   page?
22        A    Yes.
23        Q    Now, that's a paragraph that was
24   written on your behalf that says what happened
25   during the events on January 19th, correct?
```

1     A     Yeah.

2     Q     The statement you gave was much more

3 detailed than that.  Would you agree?

4     A     Yes.

5     Q     And the statement was given much

6 closer to the time of the events and while

7 watching the video, correct?

8     A     Yes.

9     Q     So would you agree that that was

10 probably more thorough and accurate?

11    A     I believe so, yes.

12          MR. CLARKE:

13               So that's Exhibit 85.

14               Exhibit 86 is your responses to

15          our first set of interrogatories and

16          requests for production, and I'm not

17          going to have you go through every

18          answer, but let's go to Interrogatory

19          Number 18.

20 BY MR. CLARKE:

21    Q     There's no page numbers on it.  Right

22 before, it says, "Request for Production," and

23 Interrogatory Number 18 says, "Identify all

24 accommodations, if any, you contend that you

25 provided █████ ██████ to accommodate his

1    disability."  Do you see that?

2        A    Yeah, I see it.

3        Q    And your answer was "No

4    accommodations were requested nor provided

5    during the incident as described in the police

6    report," correct?

7        A    Yes.

8        Q    All right, so you didn't provide any

9    type of accommodations due to his autism,

10    correct?

11        A    Yes.

12        Q    Exhibit Number 87 is your statement,

13    correct?

14        A    Yes.

15        Q    Now, this statement was given on

16    January 23rd, and while you were giving that

17    statement, you were reviewing the Laser Tag

18    video with the investigators, correct?

19        A    I don't remember.

20        Q    Well, if you look at it, if you look

21    on page two of it, it says, "So this is the

22    parking lot right in front of Laser Tag, um,

23    it's going to be Chad's vehicle and the two

24    detectives," correct?  Are you not looking at

25    the video?

```
 1        A     Where was that?
 2        Q     The second --
 3        A     Oh, okay.  Okay.  Yes.
 4        Q     And look, I'm not trying to trick
 5   you.
 6        A     Yeah.  No, I really, you know.
 7        Q     It's been awhile ago.  I understand
 8   that, but the way that I read that, it looks
 9   like all the officers looked at the video when
10   they were talking to them to try to describe
11   things, correct?
12        A     Okay.
13        Q     All right, and we'll get back to
14   this.  Now, the last thing that I have in
15   front of you is your training resume, and we
16   may get to that.  So those are documents that
17   may be relevant to the types of questions
18   we're going to ask you today; and if you need
19   to refer to them at any time, just let me
20   know, all right?
21        A     Okay.
22        Q     Let me find out a little bit about
23   you.  Did you graduate from high school?
24        A     Yes.
25        Q     Where did you gradate from high
```

```
 1   school?
 2       A     Bonnabel.
 3             MR. ZIBILICH:
 4                  Bonnabel, B-O-N --
 5             MS. VALENTI:
 6                  N.
 7             MR. ZIBILICH:
 8                  You want the rest of it?
 9             MR. CLARKE:
10                  E-A-U-7-9-4-E.
11             MR. ZIBILICH:
12                  Bonnabel, it's a high school in
13             Metairie.  You're going to pass it on
14             the way out of here.
15             MR. KAUL:
16                  It's Kenner.
17             MR. ZIBILICH:
18                  It is Kenner.
19   BY MR. CLARKE:
20       Q     What year was that?
21       A     Seventy-nine.
22       Q     Did you have any college courses or
23   get any degrees?
24       A     No.
25       Q     When did you start -- is Jefferson
```

```
1    Parish Sheriff's Office the first department
2    you've worked for?
3         A     Yeah.
4         Q     And the only department?
5         A     Yes.
6         Q     When did you start working for them?
7         A     In 2004.
8         Q     Tell me how that happens.  Why did
9    you want to go into law enforcement?
10        A     I had been wanting to do that since
11   probably the 80s.
12        Q     What type of work did you do after
13   high school and prior to becoming a deputy
14   with the JPSO?
15        A     Mostly automotive.
16        Q     Okay.
17        A     Two dealerships and managed an auto
18   repair shop.
19        Q     What I'm trying to get at, was any of
20   your prior work history relevant to law
21   enforcement?
22        A     No.
23        Q     So 2004, I guess you filled out an
24   application for the JPSO?
25        A     Probably in 2002.
```

```
 1        Q    So there was -- they weren't hiring
 2   for a period of time?
 3        A    (Witness nods head affirmatively.)
 4        Q    All right, so you put in your
 5   application, and then, tell me how you start
 6   your process to be hired.
 7        A    There's a large application to fill
 8   out to get the background check; and then, if
 9   you pass the background check, then,
10   eventually, you'll take some tests; and before
11   you take a couple of tests, then, if you pass
12   those, then, you'll go to the academy.
13        Q    Obviously, you came and you took
14   those tests.  You have to get medically
15   cleared and psychologically cleared?
16        A    Yes.
17        Q    And did you go to the academy at
18   JPSO?
19        A    Yes.
20        Q    Do you know when you became POST
21   certified?
22        A    In 2004.
23        Q    And let's talk a little bit about the
24   training that you had at the JPSO training
25   academy.  It's a fairly substantial class.
```

1    It's number of weeks, correct?

2        A    Yes.

3        Q    Do you recall how many weeks it was?

4        A    For the academy?

5        Q    Yeah.

6        A    I was part-time.  So it's longer than

7    usual.  It might have been like seven or eight

8    months.

9        Q    So it's the same curriculum, but

10   because it's part-time, it's spread out over a

11   longer period of time than if you went to the

12   full-time academy; is that fair?

13       A    Yes.

14       Q    In the academy, they train you all

15   the general rules about how to be a police

16   officer, correct?

17       A    Yes.

18       Q    From report writing to deadly force,

19   correct?

20       A    Yes.

21       Q    Some of the bigger blocks of training

22   in the academy are, number one, physical

23   fitness is done all the time, correct?

24       A    Yes.

25       Q    Firearms qualifications is a very big

```
 1   block of the training, correct?
 2        A    I believe so.
 3        Q    If you remember.
 4        A    Yeah.
 5        Q    I mean, you have to qualify in a
 6   number of different ways, --
 7        A    Sure.
 8        Q    -- different hands, left right,
 9   different distances, correct?
10        A    Yes.
11        Q    Did you have any training on dealing
12   with people suffering from autism or
13   intellectual disabilities?
14        A    I believe we did.  I don't remember
15   all of them, but I would assume possibly.
16        Q    Well, we can assume possibly you
17   didn't, correct?
18        A    Did we?  I don't remember.
19        Q    If you don't remember, I mean --
20             MR. ZIBILICH:
21                  This is what he's trying to tell
22             you:  He's trying to tell you not to
23             guess.
24             THE WITNESS:
25                  All right.
```

```
 1    BY MR. CLARKE:
 2        Q    In your training academy, did you
 3    have any training on deescalation?
 4        A    Sure.  Yes.
 5        Q    Do you recall any of it?
 6        A    Yes.
 7        Q    Did any of the deescalation tactics
 8    or scenarios deal with people suffering from
 9    autism or some type of inability to
10    communicate?
11        A    I don't remember that, no.
12        Q    In the academy, did you receive any
13    training on the Americans with Disabilities
14    Act that you recall?
15        A    I don't recall.
16        Q    Did you receive any training on the
17    requirement to provide accommodations to
18    people with disabilities?
19        A    I don't recall.
20        Q    When you were in the academy, were
21    they teaching you general basic police stuff,
22    or were they training you on the JPSO policy?
23        A    That's like two questions you're
24    asking me.
25        Q    Okay, let me rephrase it then.  It's
```

```
 1    my understanding that the training academy is
 2    a POST certified academy and follows a POST
 3    curriculum.  Is that your understanding?
 4         A    Yes.
 5         Q    That's where you go to get certified,
 6    correct?
 7         A    Yes.
 8         Q    So they teach you general law
 9    enforcement skills, but not particular to a
10    policy of a particular department, because
11    it's not just JPSO officers that are there.
12    Is that your understanding?
13         A    I'm not sure what you're asking me.
14         Q    What I'm trying to get at is you can
15    have -- okay, every department can have a
16    different policy, correct?
17         A    Okay.
18         Q    Like we've had a lot of pursuit
19    issues going on here in the recent days.  You
20    can go to an academy and learn how to drive
21    and how to brake and how to steer and things
22    like that, but a department can have a policy
23    that says, we don't chase anybody, and then,
24    you would have to follow that policy, right?
25         A    (Witness nods head affirmatively.)
```

1      Q    Or we can only chase violent felons.

2  That might be a policy that they have?

3      A    (Witness nods head affirmatively.)

4      Q    Or we can chase anybody, right?

5      A    Okay.

6      Q    So a department can have different

7  policy decisions on the skills that you learn

8  in basic academy.  Is that fair?

9      A    Yes.

10     Q    So you go through your basic training

11  with -- at the JPSO, and then, if you go to

12  Exhibit 33, your training resume, what I want

13  to do is go over that.  Did you receive any

14  training, you know -- after the academy you

15  had a in-service, correct?

16     A    Yes.

17     Q    When I'm asking you these questions

18  about training, I'm going to ask you if you've

19  had training on certain topics, and I need you

20  to see if you can identify whether you have.

21     A    Okay.

22     Q    Have you had any training on dealing

23  with people with autism?

24     A    I don't remember.  It's possible.

25     Q    That's why I'm asking you to look at

```
 1   the record.
 2        A     Okay.
 3              MR. ZIBILICH:
 4                   Without being picky, that's a
 5              different question.  If the question
 6              is do the records reflect that he got
 7              training, that's one thing, but if he
 8              doesn't have any independent
 9              recollection, that's two different
10              questions.
11              MR. CLARKE:
12                   I'll disagree.
13              THE WITNESS:
14                   I don't know if it's in here.  I
15              took it.
16   BY MR. CLARKE:
17        Q     Well, do you see anything, the name
18   of any class that tells you you took anything
19   on autism?
20        A     I don't see anything.
21        Q     Did you take any classes on the
22   Americans with Disabilities Act?
23        A     Not that I know of.
24        Q     Did you take any classes on dealing
25   with intellectually disabled people?
```

1      A     Not that I know of.

2      Q     Did you take any classes on -- you

3  took classes on use of force, correct?

4      A     Yes.

5      Q     You took a lot of classes on

6  preventing sexual harassment, correct?

7      A     Yes.

8      Q     Do you recall getting training on the

9  RIPP Hobble?

10     A     Yes.

11     Q     Was that Sergeant Pizzolato who

12  provided that training?

13     A     It's possible.  I don't recall.  They

14  have lots of --

15     Q     Let's talk about the RIPP Hobble

16  training.  What is a RIPP Hobble?

17     A     It's like a -- it's a belt type

18  material, cloth maybe.  It's got a loop.  You

19  just loop it around to -- you asked what is

20  it?

21     Q     Yeah.

22     A     Basically, it's used where you loop

23  it around someone's ankles, and then, you

24  bring it up around to the handcuffs when

25  they're applied to the back to keep people

1  from running.

2      Q    So you attach the legs to the

3  handcuffs?

4      A    The hobble goes, it's looped around

5  your ankles and then you adjust it.  Then it

6  comes up you loop it around to the handcuffs,

7  and it locks.

8      Q    So is that a hog-tie?

9      A    No.

10      Q    So you know what a hog-tie is, right?

11      A    Um-huh (affirmative expression).

12      Q    You have to say yes or no.

13      A    Yes.

14      Q    Are you allowed to hog-tie at the

15  Jefferson Parish --

16      A    No, sir.

17      Q    Okay, and is the belt of sufficient

18  length so that the legs can be extended

19  straight?

20      A    You could stand with the hobble when

21  it's applied.

22      Q    So that's -- the distinction is it's

23  a longer piece of nylon or rope, correct?

24      A    Yes.

25      Q    When are you supposed to use the

24

```
 1   hobble from your training?
 2        A    It's been used, say, if you have
 3   someone in a car that's trying to kick the
 4   window out.
 5        Q    You weren't trained that it's used to
 6   restrain people in the street?
 7        A    I've used it if someone is
 8   handcuffed, and they might try to run.
 9        Q    All right.
10        A    So they could stand, and it's applied
11   around the ankles, and it's looped around the
12   handcuffs.
13        Q    After you took the training, did you
14   get a RIPP Hobble?
15        A    Yes.
16        Q    Did you have one on January 19, 2020?
17        A    Yes.
18        Q    Did you have it in your car?
19        A    Yes.
20        Q    Is there any reason why you didn't
21   use it that day?
22        A    Because I felt that it would come
23   loose.
24        Q    Well, your training says to use that
25   when you have a violent prisoner, correct?
```

```
 1        A     Yes.

 2        Q     You just disregarded your training?

 3        A     No.  He was -- you're asking why I

 4   didn't use it?

 5        Q     Yeah.

 6        A     Because I felt that at the time, I

 7   had shackles or I had the hobble, and he was a

 8   large man.  I wasn't sure if it could reach,

 9   and the shackles would be right there just on

10   his ankles.

11        Q     Were you trained to use shackles on

12   somebody's ankles to other than transport?

13        A     Trained, no.

14        Q     I mean, you understand that the JPSO

15   has written policies that you're supposed to

16   comply with, right?

17        A     Yes.

18        Q     And the training, you're supposed to

19   comply with, correct?

20        A     Yes.

21        Q     Okay.  So we'll go over -- if you'll

22   look at that notebook that I have out in front

23   of you, Exhibit 19, the notebook.

24             MS. VALENTI:

25                  The binder.
```

```
 1          MR. ZIBILICH:

 2               He's trying to say binder.

 3          THE WITNESS:

 4               This (indicating)?

 5          MR. ZIBILICH:

 6               The one to the right, yes.

 7          MR. CLARKE:

 8               Okay.

 9   BY MR. CLARKE:

10      Q    Are you aware of the Use of Force

11   Policy?

12      A    Yes.

13      Q    SOP-25, I think.  Can you go to

14   SOP-25.  Now, according -- were you trained in

15   in-service or at any time on the actual Use of

16   Force Policy, or were you just provided a copy

17   of the policy and told that you have to comply

18   with it?

19      A    We were trained this.

20      Q    Okay, who trained you on the policy?

21      A    That, I don't remember.

22      Q    So were you trained on a continuum of

23   force?

24      A    What exactly do you mean?

25      Q    If you look at Subsection B of the
```

```
 1   Use of Force Policy.
 2        A    B?
 3        Q    B?
 4        A    Okay.
 5        Q    If there's an escalation of force in
 6   response to the conduct of the suspect.
 7        A    Okay.
 8        Q    Were you trained in that?
 9        A    Yes.
10        Q    Okay.  So you start with verbal
11   commands and then move up to bodily force, and
12   then, you can escalate to intermediate
13   weapons, correct?
14        A    Yes.
15        Q    And then, up to deadly force.  Were
16   you aware of the policy -- let's go to SOP-8.
17        A    (Witness complies.)  Okay.
18        Q    Are you there?
19        A    Yeah.
20        Q    Were you aware of the policy on
21   restraining devices and defensive devices?
22        A    Yes.
23        Q    According -- do you know what a TARP
24   is?
25        A    No.
```

```
 1        Q    If you go to section -- it's Page 5
 2   of 6, Section B.  What is the Total Appendage
 3   Restraining Procedure?
 4        A    I don't understand what you're
 5   asking.
 6        Q    Section D on Page 5.
 7        A    Okay.
 8        Q    Do you know what the Total Appendage
 9   Restraining Procedure is?
10        A    Yes.
11        Q    What is the Total Appendage
12   Restraining Procedure?
13        A    From when I look at D, I'm assuming
14   that's just additional restraints, type of
15   restraining.
16        Q    I mean, if -- you're supposed to know
17   the policy, correct?
18        A    Yeah.  I don't remember it.
19        Q    Does the Total Appendage Restraining
20   Procedure involve the use of leg shackles?
21        A    It says, extremely violent prisoners
22   may be additionally restrained.
23        Q    Right:  "If necessary to restrain the
24   movements of both hands and legs, it may be
25   done by the 'Total Appendage Restraining
```

1 Procedure'."

2  A Okay.

3  Q You don't know what that is?

4  A No.  I don't understand what it

5 means, but I'm --

6  Q Well, if you don't -- did you

7 understand what it meant on January 19, 2020?

8  A It says, "Extremely violent prisoners

9 may be additionally restrained."  So I used an

10 additional restraint by putting the shackles

11 on his ankles.

12  Q It actually says if you want to

13 restrain them you do it through the "Total

14 Appendage Restraining Procedure," in quotation

15 marks, correct?

16  A Okay.

17  Q So that is an actual procedure; it's

18 not what you think, correct?

19  A But what that means, I don't

20 understand exactly what it means.

21  Q Okay.  It's the RIPP Hobble.

22  A Okay.  If you look at exhibit -- I'll

23 get to something.  I'm going to show you

24 what's Exhibit 22.  That was produced by JPSO

25 as what the TARP procedure is.  Okay, now, --

1              MR. ZIBILICH:

2                   Manny, listen to his question.

3    BY MR. CLARKE:

4        Q    Were you trained at anytime on

5    excited delirium or positional asphyxia?

6        A    I don't remember.

7        Q    Well, let's just go through the TARP

8    training then.  Take out Exhibit 22.  I just

9    handed --

10             MR. ZIBILICH:

11                  That's the one he just handed

12             you on your right.

13   BY MR. CLARKE:

14       Q    Let's do one thing first before we do

15   that.  Were you trained at anything -- were

16   you trained at all about the dangers of

17   restraining somebody in the prone restraint --

18   in the prone position?

19       A    Prone meaning laying down?

20       Q    Laying down facedown.

21       A    Yes.

22       Q    Were you told that when a suspect is

23   restrained in a facedown position, breathing

24   may become labored?

25       A    Yes.

```
 1      Q    Were you trained that when weight is
 2   applied to a person's back, the more weight,
 3   the more severe the degree of compression?
 4      A    On their back?
 5      Q    Yes.
 6      A    Yes.
 7      Q    Were you trained that when there's
 8   compression on a back, a person experiencing
 9   increased difficulty breathing?
10      A    Yes.
11      Q    Were you trained that the natural
12   reaction to oxygen deficiency, when that
13   happens, the person who's being restrained
14   struggles more violently?
15      A    I'm trying to understand what you're
16   --
17           MR. ZIBILICH:
18               He's asking you very simply.
19           THE WITNESS:
20               Okay.
21           MR. ZIBILICH:
22               Were you trained, and then, he's
23           filling in the blanks.  So it's yes,
24           no, don't remember.
25           THE WITNESS:
```

```
 1                    Don't remember.
 2   BY MR. CLARKE:
 3       Q    All right.  So you're not -- you
 4   weren't -- did you play football in high
 5   school?
 6       A    A little.
 7       Q    Have you ever been at the bottom of a
 8   pile?
 9       A    No.
10            MR. ZIBILICH:
11                 You?
12            MR. CLARKE:
13                 I have.  I made tackles.  I
14            didn't sit on the bench.
15            THE WITNESS:
16                 I was a safety.  So I wasn't up
17            there in the front.
18   BY MR. CLARKE:
19       Q    Well, what I'm trying to get at,
20   common sense, if there's people on top of you,
21   you start breathing.  If you can't breathe,
22   you struggle, right?
23       A    Yes.
24       Q    Were you trained that you have to be
25   careful of these things in how you restrain
```

1    people?

2         A    Was I trained on how to restrain

3    people?

4         Q    No.  Were you trained that this type

5    of interaction, this type of struggle with

6    somebody in the prone position is dangerous?

7         A    I believe so.  I'm not sure.  I don't

8    remember.

9         Q    Were you trained that people who are

10   obese are at a greater risk of being

11   asphyxiated being restrained in the prone

12   position?

13        A    That, I don't recall.  I don't

14   remember.

15        Q    If you look at -- were you trained on

16   excited delirium?

17        A    Was I?

18        Q    Yes.

19        A    I don't recall.

20        Q    Well, you agree that when a

21   department gives you training, they're trying

22   to give you tools to utilize to do your job

23   safely?

24        A    Yes.

25             MR. ZIBILICH:

```
 1                    Object to the form.  You can
 2           answer it.
 3                MR. CLARKE:
 4                    Okay.
 5    BY MR. CLARKE:
 6        Q    You understand that you have to be
 7    able to -- the training is designed so that
 8    you can be able to utilize the skill in the
 9    field, correct?
10                MR. ZIBILICH:
11                    Object to the form again.  You
12           can answer it.
13                THE WITNESS:
14                    Yes.
15    BY MR. CLARKE:
16        Q    Like they don't train you with --
17    they don't let you carry equipment that they
18    don't train you with, correct?
19        A    Correct.
20        Q    I mean, you can't bring your own
21    equipment in and utilize your own type of
22    pepper spray or -- the department tells you
23    what type of tools you have and how to use
24    them, correct?
25        A    Yes.
```

```
 1       Q    So, if we look at Exhibit 22, do you
 2    remember seeing any videos when you had RIPP
 3    Hobble training?
 4       A    I don't remember that.
 5       Q    All right, let's go -- was your RIPP
 6    Hobble training -- when -- was it done by
 7    Kerry Najolia?
 8       A    I don't remember that.  It's been
 9    awhile.
10       Q    Let's just go through this thing.
11    Just start at the beginning.  This is the
12    PowerPoint.  The second page, they show you a
13    video, right?  We're just going to go through
14    this whole thing.
15            MR. ZIBILICH:
16                 Excuse me a second.  What's the
17            date on that?
18            MR. CLARKE:
19                 It's whenever you produced it to
20            me.  The copyright date is 1994 on
21            this.
22            MR. ZIBILICH:
23                 You're presuming that was the
24            PowerPoint that was used then.
25            MR. CLARKE:
```

```
 1              I've got the same one that
 2         Najolia did in 2004.  It's the same
 3         PowerPoint.
 4         MR. ZIBILICH:
 5              I'm just suggesting that you're
 6         presuming that's the same one that he
 7         learned from.
 8         MR. CLARKE:
 9              I'm presuming that when I asked
10         the question about what the training
11         is, I get produced the training.
12    BY MR. CLARKE:
13         Q    So let's start on -- just go to the
14    top page.  The second page, it says they
15    showed a video, right?
16         A    Um-huh (affirmative expression).
17         Q    You don't recall the video.  Do you
18    remember being trained anything about sudden
19    custody death syndrome versus police custody
20    death syndrome?
21         A    Not really.
22         Q    Do you even know what sudden custody
23    death syndrome is or police custody death
24    syndrome are?
25         A    No.
```

1      Q    Next slide talks about perception.
2  The next slide, did you talk about cocaine
3  psychosis?  You ever had any training on that?
4      A    I don't recall.
5      Q    Do you know any symptoms, were you
6  trained on any of the symptoms of cocaine
7  psychosis?
8      A    I don't remember.
9      Q    Do you know if somebody is acting in
10  an irrational way and they have a high body
11  temperature, is that an indication of
12  anything?
13      A    It could be -- is it an indication if
14  you have a high body --
15      Q    Were you trained, were you trained
16  that it's an indication on anything?
17      A    I don't remember that.
18      Q    Well, do you even recall even being
19  trained at all on excited delirium?
20      A    No.  I don't recall.
21      Q    Do you know what it is?
22      A    I would look at it as somebody that's
23  acting erratic.
24      Q    All right, disabled people act
25  erratic, right?

```
 1        A     No.
 2              MR. ZIBILICH:
 3                    Object to the form.  You can
 4              answer it.
 5              THE WITNESS:
 6                    No.
 7  BY MR. CLARKE:
 8        Q     They don't?
 9        A     No.  My sister was disabled she
10  wasn't erratic.
11        Q     What about autistic people?
12        A     Possibly.
13        Q     But you just don't know what it is,
14  correct, excited delirium?
15              MR. ZIBILICH:
16                    He gave you his answer.
17  BY MR. CLARKE:
18        Q     Answer it.  What's your answer?
19        A     Somebody that is acting erratic.
20        Q     Let's keep going through.  They have
21  a whole bunch of slides on substance abuse,
22  excited delirium, and the signs and symptoms
23  of them, correct?  You don't recall any of
24  that training though, right?
25        A     (Witness shakes head negatively.)
```

1    No, it's been awhile.

2        Q     They kind of just go through it.

3    Then, they have another video that they show

4    you, and then, they go through some scenarios,

5    correct?  A clinical picture, and then, they

6    do some case histories.  Do you remember case

7    histories in training?

8        A     I mean, I see it here, but I don't

9    remember it.

10       Q     Do you remember seeing COPS videos in

11   training at the Jefferson Parish Sheriff's

12   Office?

13       A     If it's COPS, I don't know

14   specifically.

15       Q     Okay.  Did you know -- were you

16   trained that people who are suffering from

17   O.C. -- I mean, excited delirium or cocaine

18   psychosis, that pain compliance techniques are

19   normally not helpful?

20       A     What was the question again?

21       Q     Were you trained at anytime that

22   people who are experiencing excited delirium,

23   that the following techniques are ineffective:

24   Pain compliance techniques, impact weapons,

25   defensive tactics and O.C.?

```
 1      A     If it's in here, yes.
 2            MR. ZIBILICH:
 3                  No, that's not his question,
 4            sir.  His question is do you remember
 5            being trained on that area?
 6            THE WITNESS:
 7                  No.
 8   BY MR. CLARKE:
 9      Q     Were you trained when you're dealing
10   with an erratic person that it's better to
11   have more officers there?
12      A     I don't remember that.
13      Q     Well, it's common sense, if you have
14   an erratic person, do you agree, that the more
15   officers, the better it is to control?
16            MR. ZIBILICH:
17                  Object to the form, common
18            sense.
19            MR. CLARKE:
20                  Are you saying you don't have
21            it?
22            MR. ZIBILICH:
23                  Pardon?
24            MR. CLARKE:
25                  Why do you object?
```

```
 1              MR. ZIBILICH:
 2                  Because your definition of
 3              common sense could be entirely
 4              different than his.  As a matter of
 5              fact, I'm sure it is.  Can I just
 6              grill you on sales and leases when
 7              you were in law school?
 8              MR. CLARKE:
 9                  No.
10              MR. ZIBILICH:
11                  No, I can't?
12              MR. CLARKE:
13                  I mean, we can do it after the
14              fact.
15  BY MR. CLARKE:
16      Q    You had no training that in
17  interacting with members of the public, that
18  it's better to have more officers to control
19  people?
20      A    I don't recall hearing that.
21      Q    So if you go to this line on pain
22  compliance, about -- it's after the --
23      A    I see it.
24      Q    Okay.  Pain compliance, okay.  The
25  next page it says, "Never go one-on-one with
```

1    these subjects unless a life depends on it."
2    Do you see that?
3         A    Yes.
4         Q    Always call for back-up as soon as
5    possible as you are faced with a substance
6    induced excited delirium suspect, right?
7         A    Yes.
8         Q    Call for as much backup as you can,
9    correct?
10        A    Yes.
11        Q    Talk to the subject in a calm,
12   soothing manner, and when you have adequate
13   manpower, then, take them into custody,
14   correct?
15        A    Yes.
16        Q    But you don't recall that training,
17   right?
18        A    No.
19        Q    Go to the next slide.  Positional
20   restraint asphyxia, what is positional
21   restraint asphyxia?
22        A    It says occurs when the position of
23   the body interferes with respiration.
24        Q    And that's in -- what position of the
25   body interferes with respiration?

```
 1      A    What position of the body?
 2      Q    Right.
 3      A    It says it's increased when the
 4  subject is placed in a physically-compromised
 5  position.
 6      Q    What is a physically-compromised
 7  position?
 8           MR. ZIBILICH:
 9                Object to the form.  Go ahead.
10           You can answer it.
11           THE WITNESS:
12                I don't know.  It could be maybe
13           a few.  I don't know.
14  BY MR. CLARKE:
15      Q    Tell me one that you were trained on.
16      A    What would be a compromised position?
17      Q    Yeah.
18      A    I guess sitting in the wrong
19  direction.
20      Q    In which direction?  You can look at
21  the whole thing.  I'm not trying to trick you,
22  --
23      A    Yeah.
24      Q    -- but I'm trying to find out --
25      A    Yeah.  Like, if you're slouched over.
```

```
 1        Q    What about being restrained in the
 2   prone position?
 3        A    I don't know.
 4        Q    Let's go to the next slide.
 5   Respiratory compromise, were you trained on
 6   the elements of respiration?
 7        A    If this is the course you're saying I
 8   took, you're asking me about the course.
 9        Q    You took RIPP Hobble training.  It's
10   in Exhibit 33, right?  You took RIPP Hobble
11   training, right?
12        A    Yes.  Yes.
13        Q    So were you trained -- there's two
14   questions here:  Were you trained on it, and
15   would you agree, if you don't remember your
16   training on it, you can't apply it in the
17   field?
18        A    I don't remember every aspect --
19   everything in here that the class has, I don't
20   remember everything that we did that day, but
21   does it mean, that I can't use the hobble, no.
22   It doesn't mean that I'm not capable of using
23   the RIPP Hobble safely.
24        Q    If you don't know the training and
25   what the dangers are and how to use it, then,
```

```
 1   would you agree you can't -- you're making a
 2   guess?
 3        A    You're asking me everything that is
 4   listed here, do I know it all by detail, no.
 5        Q    Well, I'm not going to get in an
 6   argument with you.  I'm not saying that you
 7   don't know it by detail.  I don't think you
 8   know it at all --
 9        A    Okay.
10        Q    -- and that's why we're going through
11   it.  Were you trained on the respiratory --
12   the three elements of respiration?
13        A    If it's in this class that I took,
14   yes.
15        Q    Did you know it on January 19, 2020
16   and apply it in the field?
17        A    I didn't use the hobble that day.
18        Q    But these are why you use the hobble.
19        A    Okay.
20        Q    This is not saying anything about the
21   hobble.  This is telling you about events that
22   occur if you don't use the hobble.
23        A    Okay.
24        Q    All right.  So in order to actually
25   breathe, you got to suck in oxygen according
```

1    to this slide; you have to have an open

2    airway, and you have to be able to expel CO2.

3         A    Okay.

4         Q    And if that doesn't happen, then, you

5    have respiratory compromise.

6         A    Okay.

7         Q    Were you trained on that?

8         A    Was I trained on the use of the

9    hobble, yes.

10        Q    No.  Were you trained -- listen to my

11   question, buddy.  I'm asking you a question

12   about respirations.  This is where the

13   training was provided.  Do you not agree that

14   it's in there?

15        A    Yes.

16        Q    So according to this, you should have

17   known that the gas exchange, you have to -- to

18    breathe properly, you have to breathe in

19   oxygen; you have to have an open airway, and

20   you've got to be able to expel oxygen.

21        A    Okay.

22        Q    All right.  Then, do you recall going

23   over a bunch of studies about how putting

24   people in the prone position actually

25   decreased their -- decreased their oxygen

1    saturation and recovery rate?

2         A    If it's in the course, yes.

3         Q    Were you told that there -- were you

4    trained about the recovery position or the

5    modified recovery position?

6         A    I believe so, yes.

7         Q    What is the recovery position?

8         A    That would be to roll somebody over

9    on their side, and also, I would have somebody

10   sitting up instead of laying down.

11        Q    Either laying on their side or

12   sitting up?

13        A    Yes.

14        Q    And that is the recovery position,

15   because it allows you to breathe, correct?

16        A    Yes.

17        Q    And turning somebody on their side

18   does not interact with the bringing in of

19   oxygen or the expelling of oxygen because of

20   weight on your back, correct?

21        A    Okay, yes.

22        Q    Were you trained that when you're

23   dealing with an erratic suspect that you

24   should move them into the recovery position as

25   quickly as you can?

```
 1        A    Yes.
 2        Q    That doesn't mean you have to wait
 3   until somebody is completely not struggling at
 4   all.  Whenever you have enough officers on the
 5   scene to put somebody in the recovery
 6   position, it should be done, correct?
 7             MR. ZIBILICH:
 8                  Object to the form.  You can
 9             answer it.
10             THE WITNESS:
11                  If they're under control, yes.
12   BY MR. CLARKE:
13        Q    Well, I mean under control is --
14        A    I'm not gonna --
15        Q    Under control is a relative term.
16   The recovery position, we went through --
17             MR. ZIBILICH:
18                  No lecture about it being
19             relative.
20   BY MR. CLARKE:
21        Q    We went through previously the basic
22   physiology of a struggle, where people sit on
23   people's back.  They have problems breathing,
24   and then, they struggle more.  Remember those
25   questions?
```

```
 1      A    Yes.
 2      Q    So the recovery position needs to be
 3  put in for it to be effective before somebody
 4  is dead, right?
 5           MR. ZIBILICH:
 6                Object to the form.  You can
 7           answer it.
 8           THE WITNESS:
 9                The recovery position, yes,
10           before somebody is dead, yes.
11  BY MR. CLARKE:
12      Q    Okay, were you trained that you
13  should put somebody in the recovery position
14  as soon as possible, or did they say wait
15  until he goes limp before you put him in the
16  recovery position?
17           MR. ZIBILICH:
18                Object to the form.  There could
19           be possibilities three, four, five,
20           six and seven.  It's not limited to
21           two.
22  BY MR. CLARKE:
23      Q    You can give me anything from three
24  to seven, as well.
25      A    So you're saying --
```

```
 1              MR. ZIBILICH:
 2                   No.  No.  He's not saying
 3              nothing.  He's asking you a question.
 4              THE WITNESS:
 5                   Okay, can you repeat the
 6              question?
 7              MR. ZIBILICH:
 8                   Repeat the question please.
 9    BY MR. CLARKE:
10         Q    Were you trained -- you say you put
11    them in the recovery position when it's safe,
12    okay?
13         A    Um-huh (affirmative expression).
14         Q    Is that what you say you were
15    trained?
16         A    Well, if I were to see someone in
17    distress, I would put them in the recovery
18    position.
19         Q    That's not my question.  Were you
20    trained that you need to put somebody in the
21    recovery position when it's safe, when it's
22    safe?
23         A    Yes.
24         Q    Were you trained -- safe to who?
25    Safe to the officers, or safe to the suspect?
```

```
 1              MR. ZIBILICH:
 2                   Or any other possibility.
 3              MR. CLARKE:
 4                   There's only one person getting
 5              put in the recovery position.
 6              THE WITNESS:
 7                   Yes.
 8    BY MR. CLARKE:
 9         Q    Now, the more officers you have on
10    the scene -- well, let's go to building a
11    defensible platform in this.
12         A    (Witness complies.)
13         Q    Were you trained that when you take
14    somebody into custody by handcuff, you have to
15    do everything in your power to help that
16    person stay alive?
17         A    Yes.
18         Q    And that includes putting somebody in
19    the recovery position, right?
20         A    Yes.
21         Q    I'm trying to -- were you trained on
22    what it means to be safe so that somebody can
23    be put in the recovery position?  What does
24    that mean?
25         A    If somebody is fighting with you, you
```

```
 1    have to first control the person and then put

 2    them in the recovery position.

 3         Q    Were you not trained that you can

 4    control somebody from a recovery position?

 5         A    But if they're not --

 6              MR. ZIBILICH:

 7                   That question is a yes or a no,

 8              sir.  Repeat the question, please.

 9              MR. CLARKE:

10                   No.

11              THE WITNESS:

12                   What was it again?

13              MR. CLARKE:

14                   Could you read back the

15              question.  When he objects to the

16              form, you still have to answer the

17              question.  Okay?

18                   (Whereupon, the court reporter

19              read back the last question.)

20              THE WITNESS:

21                   Was I trained that I cannot

22              control -- can control somebody from

23              a recovery position?

24    BY MR. CLARKE:

25         Q    Were you trained that you can or
```

```
 1   cannot control somebody from a recovery
 2   position?
 3        A    Yes, we can control somebody from a
 4   recovery position.
 5        Q    So if somebody is struggling, you can
 6   still turn them in a recovery position, and
 7   you can restrain them without the compression
 8   on their back, right?
 9             MR. ZIBILICH:
10                  Object to the form.  You can
11             answer it.
12             THE WITNESS:
13                  See, I'm trying to understand
14             the question.
15   BY MR. CLARKE:
16        Q    Okay, and every time, he objects, you
17   know, I just don't want you to have problems
18   understanding the question.
19        A    No, I'm just --
20        Q    You get somebody -- we're talking
21   about the training and the policies that you
22   have, all right, --
23        A    Um-huh (affirmative expression).
24        Q    -- whether it's contained in the
25   policies, the Total Appendage Restraining
```

```
 1    Procedure, the TARP procedure, whether it's in
 2    the RIPP Hobble training or any other
 3    training, okay.  You have somebody down in the
 4    prone position.  Were you trained on when it's
 5    safe or how long you can allow somebody to be
 6    in the prone position before you should turn
 7    them into the recovery position?
 8         A    I don't recall.
 9         Q    So when you're saying we can put them
10    in the recovery position when he's safe, does
11    that mean the person has to be providing zero
12    resistance whatsoever?
13              MR. ZIBILICH:
14                   Object to the form.  You can
15              answer it.
16              THE WITNESS:
17                   No.
18    BY MR. CLARKE:
19         Q    Right, because the more officers you
20    have on the scene, the quicker you can put
21    somebody into a recovery position and still
22    restrain them.  Would you agree with that?
23              MR. ZIBILICH:
24                   Object to the form.  You can
25              answer it.
```

```
 1              THE WITNESS:
 2                   Yes.
 3   BY MR. CLARKE:
 4       Q    I mean, it makes sense, you know.
 5   You can restrain people that are violent.  It
 6   just takes more effort or more people, right?
 7              MR. ZIBILICH:
 8                   Object to the form.  You can
 9                   answer it.
10   BY MR. CLARKE:
11       Q    And if you're by yourself, you may be
12   limited on what you can do to restrain
13   somebody.  It may not be safe to move somebody
14   to the recovery position as quickly, correct?
15       A    Yes.
16       Q    I mean, would you agree that the
17   recovery position only works if you can do it
18   in sufficient time for the suspect to recover.
19       A    The way you're wording things, it's
20   just -- it's throwing me off.
21       Q    I'll try to rephrase that.  We just
22   went through a lot of this training in the
23   RIPP Hobble, and what they're trying to do is
24   tell you to go into the recovery position is
25   to allow them to recover their breathing,
```

 1    correct?

 2         A    Okay.  Yes.

 3         Q    So were you trained on the Swarm

 4    technique in dealing with erratic people?

 5    It's kind of towards the end.

 6         A    (Witness peruses document.)  It's in

 7    here.

 8         Q    What this says, if you have somebody

 9    dealing with an erratic behavior or from

10    excited delirium, you, basically -- there's

11    seven -- there's 10 things that they talk

12    about that you're doing, but you, basically,

13    make a plan, take him down and then

14    immediately put him in the recovery position,

15    correct?

16              MR. ZIBILICH:

17                   Is the question is that what it

18              says?  What's the question?  There

19              was no question.

20              MR. CLARKE:

21                   Go ahead.

22              THE WITNESS:

23                   I was listening to you, but --

24    BY MR. CLARKE:

25         Q    What is the Swarm technique?

```
 1            MR. CLARKE:
 2                 If you're going to object to
 3            everything, --
 4            MR. ZIBILICH:
 5                 That's the question.  The last
 6            one was just a little mini lecture.
 7  BY MR. CLARKE:
 8       Q    What is the Swarm technique?  You
 9  can't answer any other question.  Read the
10  Swarm technique, and tell me if you were
11  trained on that in any way.
12       A    "Surround the subject-front, sides
13  and rear."
14            MR. ZIBILICH:
15                 He's not asking you to read it.
16            He's asking you if you remember being
17            trained on it.
18  BY MR. CLARKE:
19       Q    I can't ask you --
20       A    I don't -- I don't.
21       Q    Read it first, please, and then, I'm
22  going to ask you if you were trained on any of
23  the techniques, whether it's called the Swarm
24  or not?
25       A    I'm looking at it, but I don't
```

1    remember.

2        Q    So you don't know -- you didn't know

3    that if you're dealing with an erratic person

4    and you have a bunch of people there, that you

5    were trained to take the person down quickly

6    and immediately put them in the recovery

7    position?

8        A    I don't know.  I'm looking at it, but

9    I don't know if that's what it says.

10       Q    That's why I asked you to read it

11   first, but you didn't want to do that.

12       A    I don't remember.

13       Q    So you don't -- is it acceptable to

14   you under your training to sit on somebody for

15   as long as they are struggling no matter what

16   the circumstances?

17           MR. ZIBILICH:

18               Object to the form.  You can

19           answer it.

20           THE WITNESS:

21               Is it acceptable to sit on them

22           as long as possible and what?

23   BY MR. CLARKE:

24       Q    Were you trained -- when were you

25   trained to put somebody in a recovery

```
 1   position:  Quickly, slowly at anytime at your
 2   discretion?
 3        A    As soon as I have someone in control
 4   and if they're having any problems breathing.
 5        Q    What if they're not having any
 6   problems breathing?
 7        A    Still, I would -- once they're
 8   controlled, I put them in the recovery person.
 9        Q    Is handcuffed controlled?
10        A    Yes.
11        Q    Okay, so once somebody is handcuffed,
12   then, you would agree, you can put them in the
13   recovery position?
14             MR. ZIBILICH:
15                  Object to the form.  You can
16             answer it.
17             MR. CLARKE:
18                  Listen, I know you've probably
19             been told that every time he objects
20             to the form, to think about the
21             question or to say I don't know, but
22             --
23             MR. ZIBILICH:
24                  Nothing of the sort is true.
25             THE WITNESS:
```

```
 1                    No.
 2           MR. CLARKE:
 3                    Can you read back my last
 4           question?
 5                    (Whereupon, the court reporter
 6           read back the last question.)
 7           THE WITNESS:
 8                    No.
 9  BY MR. CLARKE:
10      Q    What do you need to put somebody in
11  the recovery position?
12      A    Someone being -- having them in
13  control and if someone is in need or in
14  distress, then, the recovery position also.
15  It's a few things.
16      Q    What are you looking for when
17  somebody is in distress?  What type of, you
18  know -- you're not a medical doctor, right?
19      A    No.
20      Q    You weren't trained that it's better
21  to put them in the recovery position as
22  quickly as possible?
23      A    Yes.
24      Q    And what are the signs and symptoms
25  that you would be looking for that somebody is
```

1  experiencing difficulty?

2       A    Well, I usually just -- once someone

3  is handcuffed, if I were on the ground with

4  them, I would put them in a recovery position

5  once I have them under control.

6       Q    Right, because once you have the

7  handcuffs -- it may not be full control, but

8  you can roll them on the side, and you can

9  control his upper body with the handcuffs,

10  right?

11       A    No.

12       Q    You can hold his hands on the ground

13  behind him, correct?

14       A    Grabbing the handcuffs doesn't mean

15  I'm going to have control of somebody, no.

16       Q    What type of control are you talking

17  about?  Like you put somebody --

18       A    I mean, I --

19       Q    Let me finish my question.  I'm

20  starting to get cranky now.

21            MR. ZIBILICH:

22                 Starting to?

23  BY MR. CLARKE:

24       Q    I mean, are you going to put him in a

25  recovery position only after you have like a

```
 1   psychiatric, you know, jacket on them that
 2   binds their hands around their body?
 3        A    No.
 4        Q    So somewhere before that type of
 5   control is when you do it, but wouldn't you
 6   agree you need to have training on how long
 7   and what the amount of control it is before
 8   you put somebody in the recovery position?
 9        A    I don't think there's a set time.
10        Q    The Swarm thing --
11             MR. ZIBILICH:
12                  He's not finished his answer.
13   BY MR. CLARKE:
14        Q    Give me the set time, and we'll go to
15   the training and see if they have one.
16        A    As soon as I have someone handcuffed
17   and I'm not having any problems with them, and
18   I have them safely sitting up and comfortable
19   and not laying on the ground.
20        Q    Right, but even if somebody is
21   struggling, you can put them in the recovery
22   position, correct, --
23             MR. ZIBILICH:
24                  Object to the form.
25             MR. CLARKE:
```

```
 1                -- and try to restrain them in
 2           that position on their side, correct?
 3           THE WITNESS:
 4                Not exactly.
 5   BY MR. CLARKE:
 6       Q    Well, tell me why it's not exactly.
 7       A    Like I said, in this situation it's
 8   just -- just because someone is handcuffed,
 9   that doesn't mean that I have them in control.
10       Q    Right.  It's more control than if he
11   wasn't handcuffed, right?
12       A    Yes.
13       Q    The more officers you have -- you
14   think six officers on the scene of a
15   handcuffed person can't put somebody in a
16   recovery position?
17           MR. ZIBILICH:
18                Object to the form.  You can
19           answer it.
20           THE WITNESS:
21                Do I think six officers on scene
22           can't put them in a recovery position
23           you said?
24   BY MR. CLARKE:
25       Q    Right.
```

```
 1        A    Once he's not combative, but I'm not
 2   --
 3        Q    Let's assume he's still combative,
 4   and you have six officers on the site.  You
 5   could actually put him on his side.  You could
 6   have some people holding him on the ground on
 7   his side holding his hands, correct?
 8             MR. ZIBILICH:
 9                  Object to the form.  You can
10             answer it.
11   BY MR. CLARKE:
12        Q    One of the six could be holding the
13   hands?  Or let's put two.
14        A    Possibly.
15        Q    Then, if he's kicking his legs, you
16   could have somebody lay on his legs, correct?
17        A    Okay.
18        Q    Right?
19        A    Yes.
20        Q    You could get the RIPP Hobble, which
21   you're supposed to get, put it around his
22   legs, correct?
23             MR. ZIBILICH:
24                  Object to the form, supposed to
25             get.  Go ahead.
```

```
 1              THE WITNESS:
 2                   Not in this situation.
 3    BY MR. CLARKE:
 4         Q    Your training says -- does your
 5    training say use leg restraints to control a
 6    erratic suspect?  I mean, we just went through
 7    it.
 8         A    I wouldn't -- I wouldn't -- I didn't
 9    use the hobble, because he was handcuffed, but
10    he was laying on his stomach.  So I just put
11    the shackles instead of having him further
12    restrained with the hobble.
13         Q    All right, whatever.
14         A    The shackles were just to keep him
15    from kicking.
16         Q    But you can do that whether he's on
17    his belly or on his side, correct?
18         A    The kicking?
19         Q    No.  You could put on the shackles,
20    the RIPP Hobble or anything.
21              MR. ZIBILICH:
22                   Once again, object to the form.
23              You can answer it.
24              THE WITNESS:
25                   No.
```

```
1   BY MR. CLARKE:
2       Q    So you can't restrain him.  So if
3   Pizzolato is the training officer, and he says
4   you can restrain people on the side, you would
5   disagree with that, correct?
6            MR. ZIBILICH:
7                 Object to the form.
8   BY MR. CLARKE:
9       Q    Were you trained that you put them in
10  the recovery position -- that you were trained
11  to never leave anybody in the prone position?
12      A    I believe so.
13      Q    Were you trained that a person lying
14  on his stomach may have trouble breathing when
15  pressure is applied to his back?
16      A    Yes.
17      Q    Were you trained that the remedy to
18  that is relatively simple:  Just get the
19  pressure off his back?
20      A    Yes.
21      Q    Were you trained that obese people
22  have an increased risk of breathing
23  difficulties while being restrained in the
24  prone position?
25      A    I don't recall that.
```

 1      Q    Were you trained that sitting on
 2   somebody's legs who is obese will still cause
 3   respiratory compromise?
 4      A    I don't recall.
 5      Q    Were you trained fat people are at a
 6   greater risk of death by asphyxia restrained
 7   in the prone position?
 8      A    I don't remember.
 9      Q    So if you're not -- were you trained
10   that when somebody is being restrained and
11   they suffer oxygen deficiency, that they will
12   struggle more?
13      A    I don't remember.
14      Q    Okay.  This is what I'm getting at:
15   If you're completely restraining somebody in
16   the prone position and they're struggling to
17   breathe, they're never going to stop
18   struggling?
19           MR. ZIBILICH:
20                Object to the form.
21   BY MR. CLARKE:
22      Q    Do you understand what I'm saying?
23      A    I understand what you're saying.
24      Q    Okay, so at what point -- you've got
25   to put somebody in the recovery position even

```
 1    if there's some resistance.  Would you agree
 2    with that?
 3              MR. ZIBILICH:
 4                   Object to the form.
 5              THE WITNESS:
 6                   Yes.
 7    BY MR. CLARKE:
 8         Q    Were you trained that if somebody is
 9    kicking, you control him by holding his
10    handcuffs behind his back in the modified
11    recovery position?
12         A    Can you rephrase it?
13              MR. ZIBILICH:
14                   Object to the form.
15              MR. CLARKE:
16                   I'll strike that one.
17    BY MR. CLARKE:
18         Q    Were you trained that people
19    restrained in the prone position can be
20    struggling and then go into a very calm and
21    limp procedure and die quickly?
22         A    I don't recall that.
23         Q    Were you trained that if you're
24    concerned about being bitten by somebody, that
25    one of the best techniques you can have is to
```

1  get away from their face?

2       A    I don't recall that.

3       Q    Were you trained that if somebody is

4  restrained on the ground and they're kicking,

5  one of your best methods of handling that is

6  to stay away from his legs?

7       A    I don't recall that.

8       Q    Were you trained that when you're

9  trying to control somebody, you want to

10  control them in the least dangerous position?

11       A    I don't recall that.

12       Q    Were you trained that if somebody is

13  struggling and then, they are calm for a

14  period of time, that at that time, you should

15  put them in the recovery position?

16       A    That once they're calm, I should put

17  them in a recovery position, you're saying?

18  Is that what the question was?

19       Q    My question was were you trained that

20  if you're in a struggle -- struggle is a

21  dynamic situation, correct?

22       A    Yes.

23       Q    There's times where it could be more

24  aggressive.  There are times where it calms

25  down, and during those periods of times, as an

```
 1   officer, you should try to take advantage of
 2   it, correct?
 3        A    Okay, yes.
 4        Q    Do you agree with that?
 5        A    You're saying it's dynamic, so --
 6        Q    Right.  I mean, if you have an
 7   opportunity to place somebody in a recovery
 8   position when they've been in an active
 9   struggle, you should try it when you have the
10   opportunity, correct?
11        A    Once the struggle stops, yes.
12        Q    No.  It has to stop completely is
13   what you're saying?
14        A    Well, it's not just -- I mean, if I'm
15   having a problem with somebody and they're
16   struggling, I'll try to control them; and
17   then, once it's over, then -- or it's -- the
18   struggling stops and the person is fine, I'll
19   sit them up.  I'm not going to sit there and
20   hold them down until they're in distress.
21        Q    Well, that's what happened in this
22   case, isn't it?
23             MR. ZIBILICH:
24                  Object to the form.  You can
25             answer it.
```

```
1            THE WITNESS:
2                  No.
3    BY MR. CLARKE:
4         Q    Well, we're going to go through the
5    whole thing.  I mean -- have you ever been
6    involved in an arrest where, you know,
7    somebody was combative for a period of time
8    and then kind of calmed down and then
9    combative again and then kind of calmed down?
10        A    Yes.
11        Q    Okay.  I mean, that's what I mean by
12   dynamic.
13        A    Okay.
14        Q    You may talk to somebody.  He may be
15   aggressive to you.  You may have to go
16   hands-on, correct?
17        A    Yes.
18        Q    He may struggle with you, and then,
19   you put handcuff on him, and then, you got a
20   certain amount of control, correct?
21        A    Yes.
22        Q    If he gets aggressive, you got to go
23   hands-on.  If he's calm for a second -- you
24   deescalate, right?
25        A    Yes.
```

```
 1        Q    Deescalate with somebody who's
 2   struggling while on the ground could mean
 3   relieving the pressure on his back, correct?
 4        A    Yes.
 5        Q    Then, you try to move them in a
 6   recovery position, because that's the best
 7   position to keep your suspect safe, right?
 8        A    Yes.
 9        Q    And if he struggles after that, you
10   would have at least tried to put him in the
11   recovery position, right?
12        A    Okay, yes.
13        Q    As opposed to riding him like a horse
14   until the horse stops bucking.
15             MR. ZIBILICH:
16                  Object to the form.
17   BY MR. CLARKE:
18        Q    Were you trained that you stay on him
19   until he stops moving at all?
20        A    No, but you're saying -- you're
21   saying -- you keep insisting on riding on
22   someone's back.  Nobody was on his back.
23        Q    We'll get to your statement, because
24   I think you actually said it, but we'll do it.
25        A    No.  I said they were sitting on his
```

```
 1    legs, not on his back.
 2         Q    We're going to go through your whole
 3    statement, so.  All right, let's talk about
 4    January 19, 2020.  Were you in plain clothes
 5    that day?
 6         A    In uniform.
 7         Q    You were in uniform, that's right.
 8    How did you find out about what was going on
 9    at the Laser Tag?
10         A    I heard Chad request assistance on
11    the radio.
12         Q    Is there a code that was called out?
13         A    108.
14         Q    If you want to put your statement in
15    front of you, that's fine.
16         A    108.
17         Q    What is that, officer needs
18    assistance?
19         A    Yes.
20         Q    What were you doing at the time?
21         A    Patrolling my area.
22         Q    Is it the same area where this
23    happened?
24         A    No.
25         Q    Were you in a different -- I mean, I
```

```
1    don't know how you break them up.  Were you in
2    a different ward or district?
3         A    Same district, just a different area.
4         Q    What did you do?  Did you respond to
5    the call?
6         A    Yes.
7         Q    Did you respond on dispatch?
8         A    Yes.
9         Q    What did you tell dispatch, you're on
10   the way?
11        A    Yep.  Yes.
12        Q    Did you run lights and sirens to the
13   scene?
14        A    Yes.
15        Q    When you pulled up to the scene, did
16   you have your lights and sirens on?
17        A    Yes.
18        Q    Do you know if lights and sirens
19   are -- did you know anything about what the
20   altercation was or why he needed assistance?
21        A    No.
22        Q    Did you know what was going on, you
23   know -- well, is that an emergency a 108?
24        A    Yes.
25        Q    Okay, when it comes out.  So whatever
```

1    it is, kind of if you're not doing something,

2    you drop what you're doing, and you go there

3    if your close, right?

4        A    Yes.

5        Q    All right, so you did that, ran

6    lights and sirens.  When you pulled up on the

7    scene with your lights and siren on, what did

8    you observe?

9        A    I observed Chad sitting on a male's

10   legs right below his butt.

11       Q    Who all -- was anybody else helping

12   restrain him?

13       A    I don't believe at the time.  They

14   had two other detectives show up, but I don't

15   know exactly when, --

16       Q    Well, I'm trying to figure out --

17       A    -- it was before me or not.

18       Q    Have you looked at the tape anytime

19   recently?

20       A    Yeah.

21       Q    I have the video here if you want to

22   watch it at anytime.  You let me know, all

23   right?

24       A    Um-huh (affirmative expression).

25       Q    But if you feel you need to look at

1    the video to give a truthful answer, let me

2    know, all right?

3        A    I'd probably prefer to.

4            MR. CLARKE:

5                Let's go off the record for a

6            second.

7            THE VIDEOGRAPHER:

8                Off the record.  The time is now

9            10:24.

10               (Brief recess.)

11           THE VIDEOGRAPHER:

12               Back on the record.  The time is

13           now 10:33.

14   BY MR. CLARKE:

15       Q    Deputy Estrada, before we went on

16   break, you said you wanted to look at the

17   video.  Let me -- before I show this -- I've

18   got it up on the screen.  Prior to you

19   arriving, you didn't know anything about what

20   occurred between E▉ P▉ and his father or

21   Chad Pitfield and E▉ P▉, correct?

22       A    No.

23       Q    You didn't know he was autistic,

24   didn't know anything about him or the incident

25   before that time, correct?

```
 1      A    Correct.
 2           MR. ZIBILICH:
 3                You know what we're going to do?
 4           We're going to turn you around this
 5           way.  I'd rather you have your back
 6           to me than to her.
 7           THE WITNESS:
 8                Okay.
 9           MR. ZIBILICH:
10                Thanks.  She's just too kind to
11           say anything.
12           THE WITNESS:
13                Sorry.
14  BY MR. CLARKE:
15      Q    So what I'm going to do is start the
16  tape.
17           THE VIDEOGRAPHER:
18                Do you want the witness and the
19           screen or just the screen?
20           MR. CLARKE:
21                The witness and the screen.
22  BY MR. CLARKE:
23      Q    I'm going to start.  You see the
24  timer down here at 8:08.  I'm going to start
25  this at 8:08; and if you want me to stop it --
```

```
 1   I'm going to play it through until he's
 2   restrained or until you're done, until you
 3   tell me you don't need to see anymore, okay?
 4            MR. ZIBILICH:
 5                 You know what part you need to
 6            see, Mr. Estrada?
 7            THE WITNESS:
 8                 I figured I'd just go through it
 9            while you're asking me.  I don't
10            know.  Whatever is easiest.
11            MR. CLARKE:
12                 All right, we're going to start
13            it at 8:08 on the media timer.
14                 (Video played.)
15            MR. ZIBILICH:
16                 It's none of my business, but
17            why would we start this before he
18            gets there?
19            MR. CLARKE:
20                 Because I don't know how
21            to exactly --
22            MR. ZIBILICH:
23                 Well, that's a pretty good
24            answer.  That's the first time I
25            heard you say I don't know.
```

```
 1   BY MR. CLARKE:
 2       Q    That's Chad Pitfield who pulled up?
 3   Nevermind.
 4           MR. ZIBILICH:
 5                X-rated here.
 6                (Video stopped.)
 7   BY MR. CLARKE:
 8       Q    I'm going to stop it at 11 minutes.
 9   From the point that we started it, there was a
10   number of times where E███ P███ tried to
11   raise up after he was on the ground, correct?
12       A    Yes.
13       Q    There's also times where he's sitting
14   there still, correct?
15       A    Yes.
16       Q    Playing it forward from 11 minutes.
17                (Video played.)
18                (Video stopped.)
19   BY MR. CLARKE:
20       Q    I stopped it from around 12 minutes
21   from the time we just replayed it.  From 11
22   minutes to 12 minutes, there's very little
23   struggle at all, correct, from E███ P███?
24           MR. ZIBILICH:
25                Object to the form.
```

```
 1              THE WITNESS:
 2                   I was going to ask you can you
 3              just get it to where I'm?
 4         MR. ZIBILICH:
 5                   That's not his question.
 6              THE WITNESS:
 7                   No.
 8                   (Video played.)
 9                   (Video stopped.)
10    BY MR. CLARKE:
11         Q    I stopped it at 13 minutes from where
12    we stopped it last at around 12 minutes to
13    13 minutes, there's very little struggle,
14    correct?
15              MR. ZIBILICH:
16                   Object to the form.  You can
17              answer.  Additional objection is that
18              the video speaks for itself.
19              MR. CLARKE:
20                   No.  Object to the form is
21              itself.  You've made representations
22              in pleadings, Franz, about what
23              happened on behalf of your clients,
24              and I'm entitled to --
25              MR. ZIBILICH:
```

```
 1                  You're entitled to get his
 2            interpretation?
 3            MR. CLARKE:
 4                  Yes.
 5            MR. ZIBILICH:
 6                  Okay.
 7            THE WITNESS:
 8                  You could see what, yeah.
 9   BY MR. CLARKE:
10       Q    Very little struggle, correct?
11       A    But she's on top of him.
12       Q    Right.  Pitfield is on top of him.
13   He's not sitting on his legs; he's sitting on
14   his --
15            MR. ZIBILICH:
16                  That's a statement, sir.  If you
17            want to ask him a question, it's
18            okay.
19   BY MR. CLARKE:
20       Q    Is he sitting on his legs or on his
21   backside?
22       A    I wasn't there at the time.
23            MR. ZIBILICH:
24                  The question is what do you see?
25            THE WITNESS:
```

```
 1                    I can't tell.  I see her on his
 2           upper body.
 3  BY MR. CLARKE:
 4      Q    You see Pitfield's legs touching
 5  skin, correct?
 6      A    It's blurred.
 7      Q    Is that going to be your testimony?
 8  You can't tell that he's not sitting on his
 9  legs from this screenshot at 13:02?
10      A    It's blurred.
11      Q    Okay.
12      A    I was just hoping you would show like
13  once -- I thought you were going to play it
14  like once I got there.
15      Q    I don't know where --
16           MR. ZIBILICH:
17                He don't know how to do that.
18           THE WITNESS:
19                Well, hit the --
20           MR. CLARKE:
21                Well, now, I'm doing this.
22                (Video played.)
23                (Video stopped.)
24  BY MR. CLARKE:
25      Q    Stopping at 14 minutes.  From the
```

```
 1    point we last stopped it around 13 minutes to
 2    14 minutes, did you see any violent struggle?
 3         A    I wasn't there at the time.
 4         Q    I'm not asking --
 5              MR. ZIBILICH:
 6                   Do you see it on the screen,
 7              sir?
 8              THE WITNESS:
 9                   No.
10                   (Video played.)
11                   (Video stopped.)
12    BY MR. CLARKE:
13         Q    Stop it there at 14:14.  Do you know
14    who that is, who came up?
15         A    I don't recall his name, no.
16         Q    I was looking to see if it was --
17              MR. ZIBILICH:
18                   It's a no.
19    BY MR. CLARKE:
20         Q    Is it your understanding that was a
21    detective from JPSO?
22         A    Yes.
23         Q    And he comes in at around 14:14,
24    right?
25         A    Yes.
```

```
 1       Q    Does it appear that they -- by 14:22
 2   on the tape, does it appear that he gets him
 3   handcuffed?
 4       A    It looks like they were working on
 5   it.
 6       Q    Did you see any resistance to the
 7   detective getting him handcuffed?
 8            MR. ZIBILICH:
 9                 Object to the form.  You can
10            answer it.
11            THE WITNESS:
12                 Dad's in the way.  I can't tell.
13   BY MR. CLARKE:
14       Q    Well, we can go back 10 seconds.
15   We'll go back.  We'll start at 14:17.  We're
16   going to play it through, and you tell me if
17   they get him handcuffed and whether there was
18   a struggle.
19                 (Video played.)
20                 (Video stopped.)
21   BY MR. CLARKE:
22       Q    Did he get handcuffed without a
23   struggle?
24            MR. ZIBILICH:
25                 Is that a question?
```

| | |
|---|---|
| 1 | MR. CLARKE: |
| 2 | Yes. |
| 3 | BY MR. CLARKE: |
| 4 | Q    Did he get handcuffed without a |
| 5 | struggle? |
| 6 | MR. ZIBILICH: |
| 7 | Object to the form.  You can |
| 8 | answer. |
| 9 | THE WITNESS: |
| 10 | I can't tell.  It looks like it. |
| 11 | BY MR. CLARKE: |
| 12 | Q    Do you know of any reason why E█ |
| 13 | P█ wasn't put in the recovery position at |
| 14 | this time? |
| 15 | A    No.  I wasn't there. |
| 16 | Q    Well, you're looking at it now. |
| 17 | A    Yeah, but -- |
| 18 | Q    Do you see any -- based on your |
| 19 | training and your policies, do you see any |
| 20 | reason why they couldn't put him in the |
| 21 | recovery position at the time? |
| 22 | MR. ZIBILICH: |
| 23 | Object to the form.  You can |
| 24 | answer it. |
| 25 | THE WITNESS: |

```
 1                    I don't know.
 2   BY MR. CLARKE:
 3       Q    Okay, well, you said you put people
 4   in the recovery position when it's safe when
 5   he's not resisting, right?
 6       A    (Witness nods head affirmatively.)
 7   But I can't see, and I wasn't there at the
 8   time.
 9       Q    Okay, but you didn't see any -- you
10   saw him struggling at different points of this
11   tape.  You don't see that at this point of the
12   tape, correct?
13            MR. ZIBILICH:
14                 Object to the form.
15            THE WITNESS:
16                 I can't see.
17   BY MR. CLARKE:
18       Q    We're at 14:40.  Another person
19   showed up.  Do you know who this is?
20       A    I can't see his face.
21       Q    Yeah.  I can't either.  Is that a
22   detective or a deputy?
23       A    (Witness shakes head negatively.)
24       Q    You don't know?
25       A    (Witness shakes head negatively.)
```

1      Q     Do you know who the female person is

2    at the front of the car?

3      A     No.

4      Q     Do you know if it's an officer or

5    EMS?

6      A     I don't know.

7      Q     Playing from 14:40.  Another officer

8    came in around 14:50.  Do you know who that

9    officer was?

10     A     I didn't see his face.

11     Q     So at this point, we have at least

12    four officers on the scene, correct?

13     A     Yes.

14     Q     Is he resisting sufficiently to where

15    it was prevented from them putting him in the

16    recovery position?

17          MR. ZIBILICH:

18               Object to the form.

19          THE WITNESS:

20               You've been stopping it.  I

21          don't know.

22    BY MR. CLARKE:

23     Q     Well, let's go back.

24     A     Just play it.

25     Q     Well, no.  I'm asking you --

1      A    Well, because it goes -- but --

2      Q    Hang on, sir.  You testified earlier

3  that you were trained to put somebody in the

4  recovery position when it's safe or when

5  they're not fighting.  Have you seen him

6  fighting to the extent that these four

7  officers cannot put him in the recovery

8  position?

9           MR. ZIBILICH:

10               Object to the form.  You can't

11          even see him.

12          THE WITNESS:

13               That's what I was --

14      Q    There's four officers --

15      A    When you go back, the people are in

16  the way, so I can't --

17      Q    Hey, look, listen.  There's four

18  people there.  Did you see on the tape that he

19  was struggling sufficiently that four officers

20  on the scene of a handcuffed person couldn't

21  put him in the recovery position?

22          MR. ZIBILICH:

23               Object to the form.

24          THE WITNESS:

25               I can't see it.

BY MR. CLARKE:

    Q     You can't see that he's struggling.
If he's not struggling, you would agree that
would be a safe time to put him in the
recovery position based on your training and
your policy, correct?

            MR. ZIBILICH:

                    Object to the form.

            THE WITNESS:

                    It all depends.  When I got

            there, he was kicking, so.

BY MR. CLARKE:

    Q     Well, I understand.  We went through
the --

    A     But I don't know if he's kicking now.

    Q     We went through the physiology --

            MR. ZIBILICH:

                    He said he doesn't know if he's

            kicking now, sir.

BY MR. CLARKE:

    Q     We already went through the thing of
a struggle; that when you sit on somebody's
back, it compromises their oxygen, and then,
they struggle at a later time to get oxygen
deficiency.  Do you remember that?

```
 1            MR. ZIBILICH:
 2                  Not sitting on nobody's back.
 3   BY MR. CLARKE:
 4        Q    Do you remember that?
 5        A    Um-huh (affirmative expression).
 6   Yes.
 7        Q    So if you're sitting on him for four
 8   or five minutes and he's becoming depleted of
 9   oxygen, your training says that they start to
10   struggle.  That's why you put them in the
11   recovery position, right?
12            MR. ZIBILICH:
13                  Object to the form.  No
14            foundation.
15            THE WITNESS:
16                  I don't know what he's doing
17            there at the time though.
18   BY MR. CLARKE:
19        Q    If he's calm, that's when you put him
20   in the recovery position based on your
21   training, correct?
22        A    Sometimes.
23        Q    Okay, well, what does it --
24        A    It's a lot of variables.
25        Q    Well, you tell me all the variables.
```

```
 1    You're the one who's out in the street who has
 2    to act based on the training, the policies you
 3    have to deal with the variables.
 4              MR. ZIBILICH:
 5                   He can't act.  He's not even
 6              there.
 7    BY MR. CLARKE:
 8        Q    The variable is you've testified
 9    before that you put people in the recovery
10    position once they're safe or in control,
11    correct?
12        A    Yes.
13        Q    There is a period of time with these
14    officers here where he's not -- where you
15    can't see that he's actively resisting, or
16    he's not doing what he was doing raising up
17    like he was earlier, correct?
18              MR. ZIBILICH:
19                   You can't see it either way,
20              sir.  You can't just have it one way.
21              That's your description.  If you want
22              to get under oath and testify to his
23              resistance or not resistance, I'm
24              fine.
25              MR. CLARKE:
```

```
 1              Let's get through these

 2         depositions.

 3         MR. ZIBILICH:

 4              Let's ask fair questions.

 5         MR. CLARKE:

 6              The fair question is -- this is

 7         going to get sour real quick.  Let's

 8         take a break here for a second.

 9         MR. ZIBILICH:

10              I'm not ready for a break.

11         MR. CLARKE:

12              I need to take a break, because

13         I don't want it to go in a different

14         direction right now.  That's what I'm

15         saying.

16         THE VIDEOGRAPHER:

17              Off the record at 10:51.

18                (Brief recess.)

19         MR. CLARKE:

20              Let's go back on.

21         THE VIDEOGRAPHER:

22              Back on the record.  The time is

23         10:54.

24   BY MR. CLARKE:

25      Q    Deputy Estrada, okay, we have stopped
```

```
1    the video at 14:51.  I'm going to start it
2    again, all right?
3         A    Yes.
4                   (Video played.)
5    BY MR. CLARKE:
6         Q    You are not on the scene yet,
7    correct?
8         A    Correct.
9         Q    Do you know when you got on the scene
10   who was there?
11        A    Two detectives and Chad.
12        Q    So there's at least another
13   plainclothes officer there, isn't there?
14        A    Oh, and Nick.
15        Q    Nick Vega?
16        A    Yes.
17        Q    So that's not Nick.
18        A    I don't know if that's -- it didn't
19   show the faces.
20        Q    All right.
21        A    That's me.
22        Q    Okay, right at around 15 minutes is
23   when you come in?
24        A    Yes.
25        Q    And you had two detectives there.
```

```
 1    And in your statement, did you say Vega was
 2    there?  You don't know who that officer is in
 3    uniform?
 4         A    Unh-unh (negative expression).
 5         Q    Okay, let's stop.
 6                   (Video stopped.)
 7    BY MR. CLARKE:
 8         Q    When you came in there, where is Chad
 9    Pitfield sitting on E███ P███?
10              MR. ZIBILICH:
11                   Object to the form.  You can
12              answer it, sir.
13              THE WITNESS:
14                   It's so blurred.  I can't tell.
15    BY MR. CLARKE:
16         Q    And in your statement, on page three
17    of your statement, you said that E███ was
18    laying face down, and Chad was sitting on his
19    legs, like, just below his butt.
20         A    Um-huh (affirmative expression).
21         Q    So that's where you think he's
22    sitting right there?
23         A    If that's what I said, but it's
24    blurred here on the picture.
25         Q    You don't think that shows that he's
```

1  sitting on his buttocks?

2      A    It's blurred.  I know what I saw

3  though when I was there.  He was sitting on

4  his legs.

5      Q    We know what you saw when you came

6  in, because it's on the tape, right?

7      A    Sir?

8      Q    We know what you saw when you came

9  in, because it's on the tape.  We saw you walk

10  in and walk up and look, right?

11      A    But this here is blurred from it

12  being blown up.

13      Q    Whatever.  Playing it from 15:08.

14                  (Video played.)

15  BY MR. CLARKE:

16      Q    Now, when you came in, did you see a

17  struggle that Pitfield needed assistance with?

18      A    When I got there, I didn't see one,

19  no.

20      Q    Why didn't you tell Pitfield to put

21  him in the recovery position?

22      A    Because I still didn't know what the

23  situation was.

24      Q    It doesn't matter.  You're trained --

25          MR. ZIBILICH:

```
 1              Don't tell him it doesn't
 2          matter.  You can ask him a question
 3          please.
 4   BY MR. CLARKE:
 5       Q    You were trained not to leave people
 6   in the prone position and to move them to the
 7   recovery position when they're safe, correct?
 8       A    Trained, okay, yes.
 9       Q    Okay, so you were trained.  When you
10   come up here and look, you got two detectives
11   and two deputies on the scene, and Pitfield on
12   E███ P██████, his back, correct?
13              MR. ZIBILICH:
14                  Object to the form.
15   BY MR. CLARKE:
16       Q    Or sitting on his -- what do you want
17   to describe it?  You want to describe it as
18   legs?
19       A    What I saw is I saw him sitting below
20   his butt on his legs.
21                  (Video stopped.)
22   BY MR. CLARKE:
23       Q    So E███ P██████ at this stop at 15:12,
24   his butt would be somewhere up where this
25   deputy's leg is, correct?
```

1    A    It's blocked.

2    Q    Right.  I understand, but that's what

3  you're saying his butt is, right?

4    A    You're looking at a video.  What I

5  saw, you know, it doesn't show like if he was

6  in distress or not either on the video.

7    Q    Right.  Well, you saw him in distress

8  later on when he turned blue in the face,

9  right?

10    A    A good while later after I got there.

11    Q    We'll say it's 15:12 right now.  You

12  got there at around 15 minutes, right?

13    A    (Witness nods head affirmatively.)

14    Q    So we'll know exactly when that

15  happens.  Do these officers look like there's

16  a violent struggle where Pitfield needs

17  assistance restraining him?

18    A    No.

19    Q    If there was a violent struggle where

20  they needed help, wouldn't your training and

21  just decency require the officers to go

22  hands-on with Pitfield to assist?

23    A    Yes.

24    Q    We're going to start at 15:12.

25                (Video played.)

```
 1                   (Video stopped.)
 2   BY MR. CLARKE:
 3       Q    We're going to stop it here at 15:45.
 4   From 15:00, from the time that you arrived
 5   until 15:45, did you see any violent struggle
 6   on the tape?
 7       A    I know I remember --
 8       Q    My question is --
 9            MR. ZIBILICH:
10                  Not what you know.  Did you see
11               is his question.
12            THE WITNESS:
13                  When I was there, yes.
14   BY MR. CLARKE:
15       Q    Do you see it on the tape?
16       A    Everything is blocked.
17       Q    Do you see a violent -- so you can't
18   tell -- all the officers -- nobody was
19   hands-on with Pitfield, correct?  Except
20   Pitfield, right?
21       A    Yeah.  Nothing was going wrong.
22       Q    All the officers were sitting around.
23   Some people are talking to Mr. Parsa, but you
24   cannot see a violent struggle on the
25   videotape, correct?
```

```
 1        A     On the videotape, no.  It's blocked.
 2        Q     Did you see him try to raise off the
 3   ground or anything like he did before?
 4        A     She's above his -- covering his whole
 5   upper body.  You can't see him.
 6        Q     But when she was down there before
 7   and he lifted up, you could see him, correct?
 8        A     Yeah, before she got there, yes.
 9        Q     I'll play it from 15:45.
10                   (Video played.)
11                   (Video stopped.)
12   BY MR. CLARKE:
13        Q     Let me stop here at 15:47.  Are you
14   in the screen?
15        A     Up there.
16        Q     You're at the top right?
17        A     (Witness nods head affirmatively.)
18        Q     What are you doing?
19        A     Nothing.
20        Q     If he was struggling, you would try
21   to help, right?
22        A     If I saw Chad needed help, yeah, but
23   I believe Nick is there talking to Chad
24   probably to help him.
25        Q     But there is -- up until this time,
```

```
 1    you don't see anything on the tape that's a
 2    violent struggle until -- right?
 3         A    Not there, no.
 4         Q    Let's play -- we're at 15:47 -- up to
 5    16:02, Deputy Pitfield gets off him, and is
 6    that -- are you aware that Nick Vega is the
 7    one that got on him?
 8         A    I didn't see his face, but I believe
 9    that's Nick.
10         Q    Well, you know it was.  Based on your
11    statement you knew it was Vega, right?
12         A    Yes.
13         Q    Vega -- that transition happened
14    without any struggle, correct?
15         A    It looked like it.
16         Q    Do you know, the training -- do you
17    not agree that your training would require you
18    at that point to put him in the recovery
19    position?
20              MR. ZIBILICH:
21                   Object to the form.  You can
22              answer it.
23              THE WITNESS:
24                   Usually, yes.
25    BY MR. CLARKE:
```

```
 1        Q    So Nick Vega is on his back, and
 2   you're up by the Parsa car, correct?
 3        A    Yes.  I'm out of view.
 4        Q    Do you see Nick Vega's legs even
 5   touching the ground here while he's on his
 6   back?
 7        A    I can't tell, but --
 8        Q    Does it look like his knee is bent up
 9   with his feet up in the air behind him?
10        A    From what I recall, he was sitting on
11   his butt.
12        Q    I mean, your recollection is wrong,
13   correct?
14             MR. ZIBILICH:
15                  Whoa.
16   BY MR. CLARKE:
17        Q    Is your recollection wrong?  He's not
18   sitting on his butt, is he?
19        A    Well, you're asking me.  So I'm
20   answering you, and that's what I recall.
21        Q    As an officer, let's assume that you
22   wrote a report, and you saw something, and you
23   wrote up a report some way, and you look at a
24   tape, and it's, you know.  Do you not agree
25   you could be wrong or misperceived something?
```

```
 1        A    It's blurred, but like I said, I
 2   don't recall him sitting on his back.
 3        Q    Are you up --
 4        A    That's not me.
 5        Q    That's not you.  I'm going to go back
 6   10 seconds to 16:37.  We're going to do the
 7   transition again.
 8                    (Video played.)
 9                    (Video stopped.)
10   BY MR. CLARKE:
11        Q    So Nick Vega gets on his back at 16
12   minutes, right?
13        A    He gets on his butt.
14        Q    Gets on -- what do we want to use the
15   word for the back that is not going to cause
16   concert?  What's the whole back part of your
17   body called?
18             MR. KAUL:
19                  You can Google it.
20             THE WITNESS:
21                  When it's in motion, when he
22             comes down, it's more like he's on
23             his heels.
24   BY MR. CLARKE:
25        Q    Well, he's prone, and he's laying
```

```
 1   somewhere on the back portion of his body,
 2   correct?
 3        A    On his rear-end, yes.
 4        Q    Rear-end.  See, I'm not going to
 5   agree to that term, but --
 6                   (Video played.)
 7   BY MR. CLARKE:
 8        Q    Up until 16:30, do you see any
 9   significant resistance?
10            MR. ZIBILICH:
11                 On a still, is that the
12            question?
13            MR. CLARKE:
14                 No.  Up until.
15            MR. ZIBILICH:
16                 Okay, I misunderstood.
17   BY MR. CLARKE:
18        Q    From 16:00 to -- from the time that
19   Vega went over there, do you see any violent
20   struggle from Parsa?
21        A    You keep like just moving and
22   stopping it.
23        Q    Okay, we'll go back.
24        A    It looks like Nick's trying --
25        Q    I'm going to ask you a question from
```

```
 1   16:00 to 16:32, do you see any violent
 2   struggle?  So I'm going back to 16:00.
 3              (Video played.)
 4              (Video stopped.)
 5   BY MR. CLARKE:
 6       Q    Was there any violent struggle during
 7   that period from 16:00 to 16:31?
 8       A    It doesn't appear.
 9       Q    Do you know why you didn't tell them
10   to put him in the recovery position?
11       A    No.
12       Q    Did anybody -- you had the ability to
13   talk to them and say, hey, you're in the prone
14   position, put him in the recovery position,
15   correct?
16              MR. ZIBILICH:
17                  Object to the form.  You can
18              answer it.
19              THE WITNESS:
20                  No.
21   BY MR. CLARKE:
22       Q    You didn't have the ability to say
23   that.
24       A    That -- well, --
25       Q    Any officer --
```

```
 1        A    After --
 2        Q    Go ahead.
 3        A    After this is when I believe he was
 4   given Nick trouble, and that's when I offered
 5   the shackles.
 6        Q    Well, I understand.  You put them in
 7   the recovery position -- we went through the
 8   physiology of a struggle; that when people get
 9   depleted of oxygen, they can start to
10   struggle, right?
11             MR. ZIBILICH:
12                  He said he didn't recall knowing
13             that.  You said that.
14   BY MR. CLARKE:
15        Q    Did you learn that, or did you not
16   learn that?
17        A    We were taught that, yes.
18        Q    So he's been in the prone position
19   for quite a number of minutes, right?
20             MR. ZIBILICH:
21                  Object to the form.  You can
22             answer it.
23             THE WITNESS:
24                  No.
25   BY MR. CLARKE:
```

```
 1        Q    Okay.

 2        A    You're saying minutes.  It started at

 3   15, I think, I believe is when I got there.

 4        Q    Fifteen is when you showed up.  He

 5   had already been in the prone position for six

 6   minutes.

 7             MR. ZIBILICH:

 8                  No.  No.  That's your testimony,

 9             sir.  Again, if you want to raise

10             your hand.  You don't get to say what

11             that was.

12             MR. CLARKE:

13                  It's in evidence right now.  The

14             tape will show how long he's in the

15             prone position.

16             MR. ZIBILICH:

17                  Look, the tape can show whatever

18             it wants.  However, on the other side

19             of the coin, you don't get to say

20             what it shows.

21             MR. CLARKE:

22                  I get to ask my questions the

23             way I want.

24             MR. ZIBILICH:

25                  Okay, well, it wasn't a
```

```
 1              question.  It was a statement.
 2     BY MR. CLARKE:
 3         Q    He was in the prone position for a
 4     period of time with Chad Pitfield, correct?
 5              MR. ZIBILICH:
 6                   Object to the form.  You can
 7              answer it.
 8              THE WITNESS:
 9                   I wasn't there.
10     BY MR. CLARKE:
11         Q    No, I understand.  You have reviewed
12     the tape, correct?  You've reviewed it
13     actually with -- when you gave your statement,
14     correct?
15         A    Okay, yes.
16         Q    So when you do police work, you look
17     at all the evidence, correct?
18         A    Yes.
19         Q    So from 16:00 to 16:30, by the time
20     of the switch, he had already been in the
21     prone position with Deputy Pitfield on his
22     backside for a period of time, correct?
23              MR. ZIBILICH:
24                   Object to the form.
25              THE WITNESS:
```

```
 1               Yeah.  He was sitting on the
 2          back of him, on the back of him, on
 3          his rear-end.
 4  BY MR. CLARKE:
 5     Q    That's a position that compromises
 6  somebody's breathing, correct?
 7     A    Not from sitting on his legs, no, his
 8  buttocks.
 9     Q    All right, we'll just go on.  You
10  didn't see any resistance from 16:00 to 16:31
11  after the switch, correct?
12     A    Well, we just switched just now.
13     Q    We didn't switch just now.  Nothing
14  switched.  We went back to 16:00, when Vega
15  switched over, and then, I played it for you
16  again.  Did you see any resistance where you
17  could not put somebody in the recovery
18  position during that period of time?
19          MR. ZIBILICH:
20               Again, object to the form.  You
21          can answer it.
22          THE WITNESS:
23               With the video, it's hard to
24          say, because you have no sound or
25          anything, you know.
```

```
 1   BY MR. CLARKE:
 2       Q    So is your answer you can't tell?
 3       A    No, I can't tell.
 4       Q    So after Vega gets on him, that's
 5   when there is, at least according to your
 6   statement, where there's resistance -- E██
 7   P█████ starts to resist, correct?
 8       A    I believe so, yes.
 9       Q    When that happened, you testified
10   that -- or you put in your statement that Nick
11   Vega used some pain compliance technique to
12   lift his arms up, correct?
13       A    No.  I don't recall saying that.
14       Q    All right, I'm just going to play it
15   from 16:32.
16                    (Video played.)
17                    (Video stopped.)
18   BY MR. CLARKE:
19       Q    I'm stopping it at 16:58.  Did you
20   see E███ P████ start to struggle?
21       A    When I was there, I didn't see that
22   part.
23            MR. ZIBILICH:
24                Do you see it on the tape?
25            THE WITNESS:
```

```
 1                    His arms looks like they're
 2          going forward.
 3                        (Video played.)
 4   BY MR. CLARKE:
 5       Q    Does it look like Nick Vega is
 6   pushing them forward?
 7       A    No.  Pulling Nick.
 8       Q    You think he's pulling Nick over his
 9   head, over his head?
10       A    It looks like it.
11       Q    It doesn't look like Nick Vega is
12   pushing his hands forward with a pain
13   compliance technique?
14       A    No.
15       Q    Okay.  Is that you coming back into
16   the screen?
17       A    No.
18       Q    Do you know who that is?
19       A    No.
20                    (Video stopped.)
21   BY MR. CLARKE:
22       Q    We're stopped at 17:11.  By this
23   time, it appears that his hands went over his
24   head, right?
25       A    It looks like it, but I didn't see
```

1    that when I was there.

2        Q    What you saw is why, according to

3    your statement, why he was struggling, why he

4    had -- if you look at page four of your

5    statement, about a third of the way down, you

6    wrote, he struggled and then they were just

7    trying to control him because he had his hands

8    above his head.  We were trying to control him

9    and then just quick I just saw him like go

10   blue in the face.  Do you see that?

11       A    Yes.

12       Q    A couple of lines before that, did

13   you see at any point -- when you actually

14   looked back -- you didn't see him actually

15   arms go in front of his head, correct?

16       A    No, I didn't see that.

17       Q    When you looked back, his arms, were

18   they on the ground in front of him?

19       A    When what?

20       Q    When you saw him turn blue in the

21   face, were his hands already in front of him

22   all the way to the ground, or were they in the

23   air?

24       A    I don't remember where his hands

25   were.  I just remember seeing his face.

1      Q    Has that happened yet on this tape,
2   where you saw when he went blue in the face?
3      A    You can't see his face.  I just
4   saw -- you could just see his hands moving
5   forward.
6      Q    What I'm trying to get is, on this
7   tape, do you know when he went blue in the
8   face?
9      A    No.
10      Q    But it was after the whole maneuver
11   with his arms going over his head, and they
12   were already on the ground in front of him?
13      A    I didn't see when it happened, so.
14      Q    Well, you're seeing it now.
15      A    Yeah, but you can't see his face.
16      Q    Okay, so, anytime after this.  Well,
17   maybe, we'll see you come back in the screen.
18   Maybe, that will help.  From here on out, if
19   you can tell me at any time that you can
20   identify when you saw him go blue in the face,
21   all right.
22                    (Video played.)
23   BY MR. CLARKE:
24      Q    Playing at 17:11.  Is that you?
25      A    I'm going to get the shackles.

```
1       Q    Was he blue in the face before or
2   after you went to go get the shackles?
3       A    From what it looks like there, I
4   didn't even look at him at the time.
5       Q    And can you tell from your statement?
6       A    From what I recall, I'll get the
7   shackles and then sometime after that.
8       Q    He went blue in the face.
9       A    (Witness nods head affirmatively.)
10      Q    Okay.  So we're playing from 17:22.
11  You see Nick Vega with his arm around his head
12  and neck?
13      A    No.
14      Q    Did you see that on the day?
15      A    No.
16      Q    I'm going to go back 10 seconds.  See
17  if you can see what Nick Vega is doing when
18  Ms. Lou moves out of the picture.  Did you see
19  Nick have E███ P█████ in a chokehold?
20      A    No.  I couldn't make it out.
21      Q    Did you see any part of his arm going
22  across his head that you could make out on the
23  tape?
24      A    No.
25      Q    17:34, moving forward, is that you
```

1  getting your leg shackles.

2       A    I believe I did.  Yeah.

3       Q    Did you have any trouble shackling

4  him?

5       A    I did.  I actually was grabbing one

6  of the guy's legs by mistake.

7       Q    Okay, well, that's a you problem,

8  right?  You made a mistake on the leg, right?

9       A    Well, because he was kicking.  That's

10  why I was trying, you know, to keep track

11  which, whose legs what, and I grabbed Nick's

12  leg by accident.

13       Q    You got the shackles on within

14  seconds and then handed the other shackle to

15  another officer, correct?

16       A    Yes.

17       Q    So however long it took you to get

18  that leg shackle on, that's what you're

19  considering difficulty and lengthy?

20       A    No.  It's probably the other leg

21  though.

22       Q    Well, you didn't put that one on.  I

23  can ask him.

24       A    No, I didn't put that one on, but I'm

25  saying that's probably when that happened.

```
 1        Q     When he turned blue?
 2        A     No.
 3        Q     When he started kicking?
 4        A     When the other shackle went to get --
 5   was put on.
 6        Q     We'll watch, 17:50.
 7               (Video played.)
 8              MR. CLARKE:
 9                  Stop it at 18:23.
10                  (Video stopped.)
11   BY MR. CLARKE:
12        Q     It looked like it took a longer time
13   to put on the shackle on the other leg,
14   correct?
15        A     Yes.
16        Q     Did you see him kicking?
17        A     Yes.
18        Q     You saw him on the video tape
19   kicking?
20        A     He had kicked earlier.  That's why I
21   offered the shackles.
22        Q     Did you see him while he was trying
23   to put the shackle on him kicking?
24        A     You can't see a lot on the video.
25   No, you can't see it.
```

```
 1        Q    We're starting at 18:23.
 2             (Video played.)
 3   BY MR. CLARKE:
 4        Q    Has he turned blue by now?
 5        A    You can't see.
 6        Q    I'm asking you --
 7        A    Oh.
 8        Q    You saw it at some point.  We
 9   have and idea --
10        A    I don't remember.
11        Q    Do you know what the officers are
12   doing there other than standing around and
13   looking at him?
14        A    It looked like he was on his side
15   earlier.
16        Q    So they put him in the recovery --
17        A    Yeah, a few seconds back.
18        Q    Let's go back 10 seconds.
19        A    He's already on his side there.
20        Q    Let's go back a little bit.  We can
21   go to -- see if you can tell me when they move
22   him to his side.  Right there?
23        A    It looks like it.
24        Q    Okay, around 18:27.  Did you see him
25   go blue before or after he was moved to his
```

```
1   side?
2        A    I don't remember.  I would say -- I
3   don't remember.
4        Q    Well, if you look at your statement
5   on page four, you wrote that he struggled.
6   They were trying to control him, and then,
7   just like that, I saw him, like, go blue in
8   the face.  So it was while they were still
9   trying to control him, not after they put him
10  in the recovery position, correct?
11       A    Yeah.  I said that he had his arms
12  above his head, and then, that's when his face
13  went blue.
14       Q    It says while they were trying to
15  control him, right?
16       A    Yeah.  Because his hands were rolling
17  over.
18       Q    Right, but that was before he was put
19  in the recovery position.
20       A    I believe so.
21       Q    I mean, they weren't trying to
22  control him anymore when they rolled him in
23  the recovery position.  They were trying to,
24  you know, help him, right?
25                  MR. ZIBILICH:
```

```
1              Object to the form.
2  BY MR. CLARKE:
3      Q    They were starting to do a sternum
4  rub, right?
5      A    Right there, yes.
6      Q    When you saw his face go blue, did
7  you yell out his face is blue?
8      A    No.
9      Q    Why not?
10     A    Because they had other people already
11 doing the sternum rub.
12     Q    So you assume that they had seen it
13 based on their actions?
14     A    They were already attending to him
15 before I even noticed it.
16     Q    Did you hear the mother saying you're
17 choking him; you're choking him?
18     A    I don't remember.
19     Q    Do you remember anything that Daren
20 Parsa or Donna Parsa said during this whole
21 incident?
22     A    No.
23     Q    Well, you talked to the father and
24 got his information, correct?
25     A    Yes.
```

```
 1        Q    According to your statement, you
 2   said, yeah, she was saying things like, but
 3   the whole time we weren't hurting.  She was
 4   just trying to control him.  She was
 5   complaining the whole time.  Do you recall
 6   saying that in your statement?
 7        A    Yes.
 8        Q    And she was complaining about the
 9   manner in which she perceived that her son was
10   being treated, correct?
11             MR. ZIBILICH:
12                  Object to the form.
13             THE WITNESS:
14                  It was like -- I'd hear her
15             saying things, but I was focused on
16             them, and then, I also tried to check
17             on the dad that was injured and
18             collect info.
19   BY MR. CLARKE:
20        Q    Right, for the report, correct?
21        A    Yes.
22             MR. CLARKE:
23                  All right, give me a second.  I
24             think I'm done.
25             THE VIDEOGRAPHER:
```

```
 1                    Off the record.  The time is now
 2           11:25.
 3                    (Brief recess.)
 4           MR. CLARKE:
 5                I'm ready.
 6           THE VIDEOGRAPHER:
 7                    Back on the record.  The time is
 8           now 11:27.
 9  BY MR. CLARKE:
10      Q    In your statement on page five, you
11  note that she just -- I remember her shouting
12  y'all are killing my son, when all we were
13  doing was trying to control him.  Do you see
14  that?
15           MR. ZIBILICH:
16                    Right in the middle of the page.
17           THE WITNESS:
18                Yes.
19  BY MR. CLARKE:
20      Q    Nobody put him in the recovery
21  position until he turned blue in the face,
22  correct?
23      A    I don't -- really -- I really don't
24  recall.
25      Q    Well, you didn't put him in the
```

```
1   recovery position, correct?
2        A    Well, --
3             MR. ZIBILICH:
4                  Listen to the question.
5             THE WITNESS:
6                  No, I didn't.
7   BY MR. CLARKE:
8        Q    According to your statement, he was
9   face down when you were trying to control him
10  when you saw him go blue in the face, right?
11       A    Where is that?
12       Q    That's on page four.
13            MR. ZIBILICH:
14                 Right at the middle of the page
15            again, the question by Dowling.  Got
16            it?
17            THE WITNESS:
18                 The one where he's blue in the
19            face.
20  BY MR. CLARKE:
21       Q    He's face down, and then, it's just
22  all of a sudden, I seen him turn blue.  So
23  that tells us it was prior to him being put in
24  the recovery position, correct?
25       A    Yes.
```

```
 1        Q    When you saw that, you didn't tell
 2   anybody that his face went blue, correct?
 3        A    No.
 4        Q    Despite all the training you had
 5   about asphyxia and breathing and compression,
 6   you never asked anybody to put him in the
 7   recovery position, correct?
 8        A    I didn't need to.  I wasn't hands-on.
 9   As soon as he went blue in the face, then, he
10   was in recovery.
11        Q    Right, but if he was struggling
12   violently, you would have went hands-on
13   correct?
14        A    If I saw somebody needed help.
15        Q    There was nothing in this video from
16   the time that Pitfield got there to where
17   while he was in prone position, more than one
18   officer was required to hold him down,
19   correct?
20        A    There was no need?
21        Q    Right.  I mean, they didn't do it,
22   correct?
23             MR. ZIBILICH:
24                  Object to the form.  You can
25                  answer it.
```

```
 1              THE WITNESS:
 2                   There was a need if he was
 3              pulling Nick forward.
 4   BY MR. CLARKE:
 5       Q    Well, if there was a need, why didn't
 6   you get on the ground and stop it?
 7       A    I didn't see that happen.  Like I
 8   said, I didn't see when that happened.
 9       Q    Right, but there were plenty of times
10   in this tape during the nine minutes when he
11   was in the prone position that he was calm
12   enough to put in the recovery position,
13   correct?
14              MR. ZIBILICH:
15                   Object to the form.
16              THE WITNESS:
17                   I didn't see anything wrong.  So
18              there wasn't any need for me to do
19              anything.
20              MR. CLARKE:
21                   If you have people who are
22              involved in the struggle; you're an
23              objective person who came out there,
24              and you should have known about the
25              dangers of the prone position,
```

```
 1              correct?
 2              THE WITNESS:
 3                    Yeah, but there wasn't anything
 4              going wrong at that time.
 5   BY MR. CLARKE:
 6       Q    He was getting deprived of oxygen the
 7   whole time, don't you think?
 8              MR. ZIBILICH:
 9                    Whoa, whoa, whoa.  No.  No.
10              Object to the form.
11   BY MR. CLARKE:
12       Q    We've gone through the physiology of
13   a struggle a number of times in this case.
14   While they're sitting on him, they are
15   depleting his oxygen.  That's what your
16   training tells you, correct?
17              MR. ZIBILICH:
18                    Object to the form.
19   BY MR. CLARKE:
20       Q    Correct?
21       A    Yes, but they weren't sitting on him.
22       Q    If your distinction is they sat in a
23   place that was special on him, because he was
24   obese that didn't compromise his respiratory
25   function, that's a fine answer, but was it
```

125

```
1    your belief based on your training that where
2    they were sitting did not cause compromise?
3         A    No, it didn't.
4         Q    Do you know that the coroner noted
5    that the prone restraint was a contributing
6    factor to his death?
7         A    No.
8         Q    If you would have known that, would
9    you then agree that the restraint was not safe
10   for him?
11             MR. ZIBILICH:
12                  If he would have known that
13             after he was dead?  Is that the
14             question?
15             MR. CLARKE:
16                  No.
17             MR. ZIBILICH:
18                  You got to try it again, then.
19   BY MR. CLARKE:
20        Q    I mean, you've been told to not
21   answer a question when he objects?
22        A    No.
23             MR. ZIBILICH:
24                  No, not at all.  Nice try.
25             MR. CLARKE:
```

```
 1              I'm just going to tender.
 2        MR. ZIBILICH:
 3              Pardon?
 4        MR. CLARKE:
 5              I'm just going to end it.
 6        MR. ZIBILICH:
 7              Okay.  All right.  Deputy, thank
 8        you, very much.
 9        MR. KAUL:
10              No questions.
11        MR. ZIBILICH:
12              Neither from me.
13        THE VIDEOGRAPHER:
14              This is the conclusion of the
15        videotaped deposition.  The time is
16        11:32.
17              (Whereupon, the deposition was
18        concluded at 11:32 am.)
19           WITNESS CERTIFICATE
20
21
22         I, MANUEL ESTRADA, do hereby certify
23    that the foregoing testimony was given by me,
24    and that the transcription of said testimony,
25    with corrections and/or changes, if any, is
```

127

1    true and correct as given by me on the

2    aforementioned date.

3

4

5

6

     DATE SIGNED              MANUEL ESTRADA

7

8

9

10           Signed with corrections as noted.

11

12           Signed with no corrections noted.

13

14

15

16

17

18

19

20

21

22

23

24

25

1           C E R T I F I C A T E

2

3           I, LORI L. MARINO, Certified Court
Reporter, in and for the State of Louisiana,
4    as the officer before whom this testimony was
taken, do hereby certify that MANUEL ESTRADA,
5    after having been duly sworn by me upon
authority of R.S. 37:2554, did testify as
6    hereinbefore set forth in the foregoing 127
pages; that this testimony was reported by me
7    in the stenotype reporting method, was
prepared and transcribed by me or under my
8    personal direction and supervision, and is a
true and correct transcript to the best of my
9    ability and understanding; that the transcript
has been prepared in compliance with
10   transcript format guidelines required by
statute or by rules of the board, that I have
11   acted in compliance with the prohibition on
contractual relationships, as defined by
12   Louisiana Code of Civil Procedure Article 1434
and in rules and advisory opinions of the
13   board; that I am not related to counsel or to
the parties herein, nor am I otherwise
14   interested in the outcome of this matter.

15

16        Dated this the 22nd day of September,

17   2022.

18

19

20

21

22        LORI L. MARINO, CCR
          CCR #87069
23        STATE OF LOUISIANA

24

25