REPORT 2 OF THE COUNCIL ON SCIENCE AND PUBLIC HEALTH (June 2021)
Use of Drugs to Chemically Restrain Agitated Individuals Outside of Hospital Settings
(Reference Committee E)

## EXECUTIVE SUMMARY

Objective. The term "excited delirium" (ExD) is controversial and lacks a defined set of behavioral signs and symptoms used to identify a person in distress and in need of urgent medical or psychiatric help. Additionally, several media reports have recently highlighted the use of ketamine and other sedative/hypnotic agents by non-medical professionals to chemically incapacitate a person for a law enforcement purpose, and in many cases, ExD is listed as the reason for the use of a sedative/hypnotic agent. The Board of Trustees has requested that the Council on Science and Public Health study the use of ketamine and chemical restraints in the context of "excited delirium" and report back to the House of Delegates.

Methods. English-language reports were selected from a PubMed and Google Scholar search using the text terms "excited delirium," "delirium," "fatalities excited delirium," "excited delirium restraint," "excited delirium sedatives," "excited delirium ketamine," "police ketamine," "EMS ketamine," and "crisis response team." Articles were filtered based on relevance. Additional articles were identified by manual review of the references cited in these publications. Searches of selected medical specialty society and international, national, and local government agency websites were conducted to identify clinical guidelines, position statements, and reports.

Results. The assessment, diagnosis, and treatment of ExD remains controversial. Despite a lack of scientific evidence, a universally recognized definition, a clear understanding of pathophysiologic mechanisms, or a specific diagnostic test, law enforcement and EMS personnel are taught that ExD is a potentially deadly medical condition. Even deaths attributed to ExD have no consistent anatomical findings, resulting in ExD diagnosis being one of exclusion, defined by epidemiology and the subjective description of a clinical presentation. The individuals most likely to be disproportionately identified as experiencing ExD, and to die from first responder actions, or as a consequence of administration of chemical sedation for a presumed case of ExD, are otherwise healthy Black males in their mid-30s who are viewed as aggressive, impervious to pain, displaying bizarre behavior, and using substances – characterizations that may be based less on evidence and more on generalizations, misconceptions, bias, and racism. Additionally, the identification of ExD has frequently been used in defense cases of law enforcement violence, despite reported autopsy results listing asphyxiation as the cause of death.

Conclusion. Reviews of law enforcement agencies and EMS have been called for to evaluate the prevalence of ketamine use in the field in unmonitored individuals and also to assess that training and guidelines for law enforcement and EMS have been established by supervising medical and behavioral health specialists. Such reviews are appropriate. It is important to assure that de-escalation training be widely implemented, and that personnel are conducting themselves according to guidelines and training to ensure patient safety. New crisis intervention team models in which medical and behavioral health specialists, not police, are those first deployed to respond to behavioral emergencies in the community should be encouraged. These models can help assure that decision makers in medical and mental health emergencies who are most appropriate to the circumstances are present with first responders, and that administration of any pharmacological treatments in a non-hospital setting is done equitably, in an evidence-based, anti-racist, and stigma-free way.

EXHIBIT
24
PENGAD 800-631-6989

REPORT OF THE COUNCIL ON SCIENCE AND PUBLIC HEALTH

CSAPH Report 2-JUN-21

Subject:      Use of Drugs to Chemically Restrain Agitated Individuals Outside of Hospital Settings

Presented by:      Kira A. Geraci-Ciardullo, MD, MPH, Chair

Referred to:      Reference Committee E

BACKGROUND

Recent media reports refer to "excited delirium" in discussions about police brutality and the use of conducted electrical devices (CED).[1-4] The term "excited delirium" is controversial and lacks a defined set of behavioral signs and symptoms used to identify a person perceived as in distress and in need of urgent medical or psychiatric help. Additionally, several media reports have recently highlighted the use of ketamine and other sedative/hypnotic agents by non-medical professionals to chemically incapacitate a person for a law enforcement purpose and not for a legitimate medical reason.[4-6] In many cases, "excited delirium" is listed as the reason for the use of a sedative/hypnotic agent. The AMA Board of Trustees has requested that the AMA Council on Science and Public Health study the use of ketamine and chemical restraints in the context of "excited delirium" and report back to the AMA House of Delegates.

METHODS

English-language reports were selected from a PubMed and Google Scholar search using the text terms "excited delirium," "delirium," "fatalities excited delirium," "excited delirium restraint," "excited delirium sedatives," "excited delirium ketamine," "police ketamine," "EMS ketamine," and "crisis response team." Articles were filtered based on relevance. Additional articles were identified by manual review of the references cited in these publications. Searches of selected medical specialty society and international, national, and local government agency websites were conducted to identify clinical guidelines, position statements, and reports.

AMA POLICY

No current AMA policy exists related specifically to excited delirium or the use of chemical restraints by law enforcement. AMA Policy H-515.968, "Informing the Public & Physicians about Health Risks of Sedative Hypnotics, Especially Rohypnol," emphasizes that Rohypnol (a benzodiazepine), other benzodiazepines, and other sedatives and hypnotics carry the risk of misuse, morbidity and mortality. Policy H-345.979, "Evaluation of Delirium," supports efforts to educate physicians regarding the importance of evaluation of delirium for high-risk patients and patients who are symptomatic.

AMA has several polices related to law enforcement that are applicable to the topic of this report. Policy H-65.954, "Policing Reform," recognizes police brutality as a manifestation of structural racism which disproportionately impacts Black, Indigenous, and other people of color, notes AMA's willingness to work with interested national, state, and local medical societies in a public

© 2021 American Medical Association. All rights reserved.

1   health effort to support the elimination of excessive use of force by law enforcement officers, states
2   that AMA will advocate against the utilization of racial and discriminatory profiling by law
3   enforcement through appropriate anti-bias training, individual monitoring, and other measures, and
4   will advocate for legislation and regulations which promote trauma-informed, community-based
5   safety practices. Policy H-345.972, "Mental Health Crisis Interventions," supports jail diversion
6   and community based treatment options for mental illness, implementation of law enforcement-
7   based crisis intervention training programs for assisting those individuals with a mental illness,
8   such as the Crisis Intervention Team model programs, federal funding to encourage increased
9   community and law enforcement participation in crisis intervention training programs, and
10  legislation and federal funding for evidence-based training programs by qualified mental health
11  professionals aimed at educating corrections officers in effectively interacting with people with
12  mental health and other behavioral issues in all detention and correction facilities. Policy
13  H-145.977, "Use of Conducted Electrical Devices by Law Enforcement Agencies," recommends
14  that law enforcement departments and agencies should have in place specific guidelines, rigorous
15  training, and an accountability system for the use of CEDs that is modeled after available national
16  guidelines, encourages additional independent research involving actual field deployment of CEDs
17  to better understand the risks and benefits under conditions of actual use, and urges law
18  enforcement departments and agencies have a standardized protocol developed with the input of
19  the medical community for the evaluation, management and post-exposure monitoring of subjects
20  exposed to CEDs.
21
22  AMA has policy related to Emergency Medical Services (EMS) and prehospital patient care.
23  Policy H-130.976, "On-Site Emergency Care" reaffirms endorsement of the concept of appropriate
24  medical direction of all prehospital emergency medical services and notes that trauma management
25  differs markedly between locales, settings, and types of patients receiving care and for these
26  reasons, physician supervision of prehospital services is essential to ensure that the critical decision
27  to resuscitate in the field or to transfer the patient rapidly is made swiftly and correctly. Policy
28  H-160.949, "Practicing Medicine by Non-Physicians" opposes allowing non-physician groups to
29  engage in the practice of medicine without physician (MD, DO) training or appropriate physician
30  (MD, DO) supervision and supports the requirement of appropriate physician supervision of non-
31  physician clinical staff in all areas of medicine. Policy H-130.937, "Delivery of Health Care by
32  Good Samaritans" notes that bystander physicians should recognize that prehospital EMS systems
33  operate under the authority and direction of a licensed EMS physician, who has both ultimate
34  medical and legal responsibility for the system.
35
36  Ethical Opinion 1.2.7, "Use of Restraints," states that all individuals have a fundamental right to be
37  free from unreasonable bodily restraint. At times, however, health conditions may result in
38  behavior that puts patients at risk of harming themselves. In such situations, it may be ethically
39  justifiable for physicians to order the use of chemical or physical restraint to protect the patient.
40  Except in emergencies, patients should be restrained only on a physician's explicit order. Patients
41  should never be restrained punitively, for convenience, or as an alternate to reasonable staffing.
42  Physicians who order chemical or physical restraints should: (a) Use best professional judgment to
43  determine whether restraint is clinically indicated for the individual patient. (b) Obtain the patient's
44  informed consent to the use of restraint, or the consent of the patient's surrogate when the patient
45  lacks decision-making capacity. Physicians should explain to the patient or surrogate: (i) why
46  restraint is recommended; (ii) what type of restraint will be used; (iii) length of time for which
47  restraint is intended to be used. (c) Regularly review the need for restraint and document the review
48  and resulting decision in the patient's medical record. In certain limited situations, when a patient
49  poses a significant danger to self or others, it may be appropriate to restrain the patient
50  involuntarily. In such situations, the least restrictive restraint reasonable should be implemented
51  and the restraint should be removed promptly when no longer needed.

1    EXCITED DELIRIUM
2
3    Delirium is a well-defined clinical entity with both hypoactive and hyperactive manifestations,
4    commonly caused by an underlying medical condition and not associated with sudden death. The
5    term "excited delirium" (ExD) has been used since the 1980s to refer to a subcategory of delirium
6    that has primarily been described in forensic literature and the term "excited delirium syndrome"
7    (ExDS) was originally used in the forensic literature to describe findings in a subgroup of patients
8    with ExD who suffered lethal consequences from untreated severe agitation. Currently, ExD and
9    ExDS are used interchangeably in literature and media.
10
11    *History*
12
13    In 1849, the lead psychiatrist at McLane Asylum for the Insane introduced a condition synonymous
14    to ExD into medical literature as "Bell Mania."[7] The term "excited delirium" first emerged in 1985
15    from two University of Miami professors who set out to explain a new phenomenon of sudden
16    deaths, mostly in police custody, of otherwise healthy men under the influence of a non-lethal
17    amount of cocaine.[8,9] Soon after, the term gained academic traction, as the United States saw a
18    dramatic rise in use of cocaine and other sympathomimetic substances along with increased efforts
19    to deinstitutionalize patients with chronic mental illness.[10] Currently, ExD and ExDS are referred to
20    as conditions of illness marked by a combination of autonomic hyperadrenergic dysfunction,
21    agitation, and delirium. The purported root of ExD, involving psychiatric, neurologic, and
22    metabolic imbalance, is highly variable and linked to a complicated array of co-morbid and severe
23    health issues.[11]
24
25    Historically, the concept of ExD was synonymous with death, but over time the term has made its
26    way into the emergency medicine, psychiatric, law enforcement, prehospital, and medicolegal
27    literature to generally describe patients displaying altered mental status with severe agitation and
28    perceived combative or assaultive behavior that has eluded a unifying, prospective clinical
29    definition. Studies have failed to define ExD as one specific clinical entity, and it remains without a
30    plausible biological pathway to sudden death. Multiple published series highlight that when CEDs
31    and/or police restraints are used, ExD most often becomes fatal.[12-17] CSAPH Report 6-A-09, *Use of*
32    *Tasers® by Law Enforcement Agencies*, included a very brief paragraph on ExD and notes that
33    ExD is not a validated diagnostic entity in either the World Health Organization's International
34    Classification of Diseases or the *Diagnostic and Statistical Manual of Mental Disorders*, but is
35    widely accepted in forensic pathology and is cited by medical examiners to explain the sudden in-
36    custody deaths of individuals who are combative and highly agitated.[18]
37
38    *Pathophysiology*
39
40    Although it is extensively used in academic and medical literature, considerable debate exists in
41    medicine about how to characterize ExD and ExDS, if they even exist, and how ExD contributes to
42    sudden death. The pathophysiologic mechanisms of ExD have not been elucidated and ExD does
43    not currently have a known etiology.[10,19-21] However, ExD has been characterized in the literature
44    by delirium, agitation, acidosis, and hyperadrenergic autonomic dysfunction, typically in the setting
45    of drug use or serious mental illness or a combination of both.[11] Currently, a general function of the
46    sympathetic nervous system is associated with the listed clinical manifestations of ExD, with
47    possible nervous system dysfunction in some way inciting symptoms. While some authors correlate
48    elevated synaptic dopamine levels to ExD, its causes are yet to be discovered and the absence of a
49    unique pathophysiologic cause or specific diagnostic test remains.[22-24]

1   No consistent anatomical features define ExD. Due to the biological ambiguity in diagnosing ExD,
2   postmortem findings from autopsy and forensic evidence collection to identify or support ExD are
3   unlikely, and a postmortem diagnosis of ExD is one of exclusion.[8,17,25,26] Because ExD does not
4   currently have a known specific etiology or a consistent anatomic feature, it can only be explained
5   by its epidemiology and described clinical presentation.[20]
6
7   *Epidemiology*
8
9   Studies have shown that delirium occurs in between 11 and 42 percent of general medical
10  inpatients and 50 percent of elderly hospitalized patients. This figure is even greater for those with
11  pre-existing cognitive impairments, terminal illness, or in need of intensive care.[27] Patients
12  diagnosed with delirium are found to have extended stays in the hospital by five to ten additional
13  days, and are more likely to be transferred to a long-term care facility post-release.[28]
14
15  Those who are most likely to be identified as having ExD are men, with 83 to 95 percent of ExD
16  cases occurring in this population.[24] Otherwise healthy males in their mid-30s who are seen as
17  "aggressive, impervious to pain, and display bizarre behavior" have the highest rate of mortality
18  from ExD/ExDS.[10] Despite similar rates of drug use across race and ethnicity in the United States,[29]
19  epidemiological studies show that it is specifically and disproportionately younger Black men who
20  use cocaine and other psychostimulants and are in police custody that are at highest risk for death
21  from ExD/ExDS.[24,30,31] Mortality rates associated with ExD/ExDS have been reported to be
22  between 8 to 16.5 percent.[11,24,32]
23
24  LAW ENFORCEMENT, EMS, AND EXCITED DELIRIUM
25
26  Because of its reference in forensic literature, law enforcement groups and EMS have started
27  training staff to identify ExD as a potentially deadly medical condition, despite the absence of a
28  unique pathophysiologic cause or specific diagnostic test.[33,34] ExD often presents itself as a
29  behavioral issue initially evaluated by law enforcement with subsequent EMS involvement.[11,35]
30  Additionally, the identification of ExD/ExDS has been frequently used in defense cases of police
31  violence.[9,36] Some of the cases in which ExD has been invoked in defending the deaths of people,
32  all Black, in police custody include Natasha McKenna,[14] Manuel Ellis,[2] Elijah McCain,[5] George
33  Floyd,[3] and Daniel Prude.[1]
34
35  The prevalence of ExD appears to vary widely, both because of varying definitions and context.
36  Reports estimate that ExD is in question in more than 3 percent of police interventions that use
37  force and more than 10 percent of the deaths that occur within law enforcement custody are
38  associated with ExD.[24] Reports also note that between 38 and 86 percent of all fatal ExD cases
39  occur in police custody[24] and that law enforcement officers encounter one person with ExD in
40  every 58 use of force incidents.[25] In cases of suspected ExD, law enforcement officers are
41  encouraged to contact EMS personnel; the combined effort of EMS and law enforcement to
42  provide effective care to those with ExDS has been termed the "dual response."[33,34] Training for
43  EMS personnel states that treatment of ExDS must be focused on rapidly, safely, and effectively
44  sedating the patient and providing intensive, supportive care.[37]
45
46  Since ExD lacks a consensus clinical definition and few pathophysiological findings exist about the
47  condition, wrongly characterizing symptoms as ExD, especially by law enforcement with little
48  medical knowledge, frequently leads to additional and potentially fatal medical complications
49  including hypoxia.[17,38-40] The profile of a death attributed to ExD is usually a sudden, unexpected
50  one that occurs most frequently in the summer.[41] It usually occurs immediately following chemical
51  or physical restraint to control ExD and occurs most frequently when the patient is in the prone

1   position; both chemical restraints and CEDs have been cited to result in sudden death due to
2   ExD.[15,17,42] An *FBI Law Enforcement Bulletin* article discussing ExD describes it as "a serious and
3   potentially deadly medical condition involving psychotic behavior, elevated temperature and an
4   extreme flight-or fight response," and notes that "these patients often die within 1 hour of police
5   involvement."[33]
6
7   Studies have evaluated the factors associated with death attributed to ExD in police custody and the
8   confounding effect that restraint has on the risk of death. Results have indicated that a diagnosis of
9   ExD and potentially fatal restraint are "inextricably interwoven."[43,44] Some form of restraint was
10  described in 90 percent of all ExD deaths, making it the most common factor that is a plausible
11  cause or contributing cause of the death. Authors note that there is no evidence to support ExD as a
12  cause of death in the absence of restraint.[44] The reported autopsy results for the individuals
13  referenced above, in which law enforcement officers cited ExD as the cause of death provide
14  examples of this: in the death of Natasha McKenna, "excited delirium," was noted although a stun
15  gun was utilized 4 times resulting in loss of consciousness;[14] the death of Elijah McClain was
16  "undetermined," although carotid hold and excessive restraint were utilized;[5] the death of Manuel
17  Ellis was reported as "hypoxia due to physical restraint;"[2] George Floyd died from "asphyxia due
18  to neck and back compression;"[3] and Daniel Prude's death was due to "complications of asphyxia
19  in the setting of physical restraint."[1]
20
21  While the mortality rate associated with ExD is estimated to be between 8 and 16.5 percent,[11,24,32]
22  in the past three decades, a significant decrease in restraint-related deaths of those with ExD has
23  been noted. The period from 2004 to 2011 shows a 33 percent reduction in fatalities from ExD
24  compared to the period 1988 to 1995; authors comment that the decrease is likely due to an
25  increase in warnings and repeated recommendations concerning the association between restraint,
26  especially in a prone position and fatal ExD.[24] However, little information related to the specific
27  details of law enforcement or EMS training related to ExD could be located.
28
29  CHEMICAL RESTRAINT
30
31  A chemical restraint is when a drug is used to restrict the movement of a patient or in some cases to
32  sedate a patient. Chemical restraint is used in emergency, acute, and psychiatric medical settings to
33  reduce agitation, aggression, or violent behaviors. Drugs that are often used as chemical restraints
34  include benzodiazepines, antipsychotics, and dissociative anesthetics. However, no drugs are U.S.
35  Food and Drug Administration (FDA) approved for use as chemical restraints. The long history of
36  restraint and associated controversies of the use of restraints (physical, mechanical, and chemical)
37  in patients is outside of the scope of this report.
38
39  *Drugs Used as Chemical Restraints*
40
41  Medications that are typically used for chemical restraint include the dissociative ketamine,
42  benzodiazepine sedatives such as midazolam, and antipsychotic medications including olanzapine
43  or haloperidol, both alone or in combination.
44
45  Studies over the last several years have evaluated and compared the efficacy of sedation for several
46  medications used for chemical restraint, as well as adverse effects associated with them.[45-49] A
47  recent systematic review summarizes available evidence on the effectiveness and safety of
48  chemical restraint from 21 randomized controlled trials conducted in pre-hospital, hospital
49  emergency department, or ward settings and notes limited comparability between studies in drug
50  choice, combination, dose, method of, or timing of repeat administrations. Drugs used in chemical
51  restraint and included in the review include olanzapine, haloperidol, droperidol, risperidol,

1   flunitrazepam, midazolam, promethazine, ziprasidone, sodium valproate, or lorazepam. The review
2   notes little clarity about the superiority of any of the drugs and recommends additional research on
3   the topic.[50]
4
5   Because sedation with slower-onset chemical restraints, such as haloperidol and some
6   benzodiazepines present a risk of delay to adequate sedation, ketamine has emerged as a potentially
7   preferred drug for the control of patient agitation in a pre-hospital context and for a law
8   enforcement purpose.[35,37,39,40,51-54] Although little literature exists directly reporting the frequency of
9   EMS use, authors note that this medication could easily be implemented into out-of-hospital
10  protocols and that ketamine offers a "safe and effective method of controlling the severely agitated
11  patient."[35,37]
12
13  *Ketamine*
14
15  Ketamine is FDA approved for use as an anesthetic agent for diagnostic and surgical procedures
16  and esketamine (a pure ketamine stereoisomer) is FDA approved for treatment-resistant depression.
17  Ketamine and esketamine are classified as Schedule III controlled substances.
18
19  Ketamine is commonly used off-label in medical settings as an analgesic, antidepressant, and anti-
20  inflammatory medication. No FDA-approved indication for use to treat ExD exists, which is
21  understandable given that there is no medical consensus on definitions of or diagnostic criteria for
22  ExD. Therefore, no standard dosing regimen has been established and there has been no
23  consideration of co-morbid medical conditions for ketamine use for ExD. A rapidly growing
24  movement calls for expanded use of ketamine for several applications, both in and out of the
25  hospital, including for sedation of agitated patients in non-clinical situations and for restraint in
26  custody.[35,55]
27
28  *Ketamine Use as a Chemical Restraint by Law Enforcement and EMS*
29
30  Police officers and EMS professionals are the most likely first responders to encounter agitated
31  patients exhibiting what they might consider to be symptoms of ExD. While law enforcement
32  usually evaluates this syndrome, it is usually EMS personnel who provide the sedation, in the "dual
33  response" model. While several chemical restraints are used to sedate those purportedly
34  experiencing ExD within law enforcement custody and in EMS contexts, most commonly the
35  sedative is ketamine. Authors report that the use of ketamine for restraint of an agitated patient
36  induces rapid, predictable sedation within three to four minutes when given by intramuscular
37  injection.[37,54,56]
38
39  A recent national survey assessed ketamine training, use, and perceptions among paramedics in
40  civilian prehospital settings. The survey noted that training related to ketamine use was commonly
41  reported among paramedics, however, few are authorized to administer the drug according to their
42  agency protocol. Of those paramedics authorized to use ketamine, most had limited experience
43  administering the drug, but have the perception that the use of ketamine for sedation is safe and
44  effective.[52] Dosing guidelines, safety profile, and efficacy have been described in only a limited
45  fashion for the use of ketamine to chemically restrain a patient in a pre-hospital scenario.[51]
46
47  Many police departments have seen a dramatic rise in ketamine administration over the past several
48  years. As an example, a 2018 City of Minneapolis report "MPD Involvement in Pre-Hospital
49  Sedation" documented an average of 4 cases of ketamine use per year prior to 2015, 14 uses in
50  2015, and 62 instances in 2017.[57] From January 2018 through April 2018, 11 instances of ketamine
51  use were documented in police reports, exceeding the annual use in each year from 2010-2014.[57]

1    Additionally, the report from Minneapolis presented 8 cases that occurred between 2016 and 2018
2    in which EMS professionals and Minneapolis Police Department (MPD) officers cooperated in
3    order to administer ketamine. These cases involved instances in which the police officers, with
4    limited medical training, directed EMS professionals to use ketamine.[57] A recent investigation of
5    the death of Elijah McCain in Colorado determined that the use of ketamine contributed to his
6    death.[58]
7
8    Little information related to the specific details of law enforcement or EMS training related to the
9    use of ketamine or other chemical restraints could be located. Reviews of law enforcement
10   agencies and EMS have been called for to evaluate the prevalence of ketamine use in the field in
11   unmonitored individuals and to assess that training and guidelines have been established by
12   supervising medical and behavioral health specialists, are appropriate, include de-escalation
13   training, and personnel are conducting themselves according to guidelines and training to ensure
14   patient safety.[35,57,58] Additionally, agencies currently using ketamine for sedation of agitation are
15   encouraged to report their outcomes and protocols to increase the body of evidence and determine
16   best safe practices for this indication.[35]
17
18   *Ketamine Pharmacology in Pre-hospital Contexts*
19
20   Ketamine dose dependently exerts broad influences on consciousness and perception, with some
21   patients reporting dissociative and extracorporeal sensations. The most common psychoactive
22   effects reported after a single subanesthetic intravenous administration of ketamine include
23   dissociation, positive psychotomimetic effects (conceptual disorganization, hallucinations,
24   suspiciousness, unusual thought content, and frank paranoia), and negative psychotomimetic
25   effects (blunted affect, emotional withdrawal, and psychomotor retardation). In addition, studies
26   have identified unfavorable effects of administration of ketamine on cognition (including amnesia),
27   vestibular perturbations, nausea/vomiting, tachycardia, hypertension, palpitations, hypersalivation,
28   and respiratory depression. Ketamine has also been found to have negative interactions with
29   alcohol in intoxicated individuals and those taking MAO inhibitors, which is of concern because
30   when ketamine is used by EMS in out-of-hospital settings, individuals may be under the influence
31   of alcohol, cannabis, sedative-hypnotics, or other psychoactive drugs or under medical treatment
32   with a pharmaceutical with potential adverse drug-drug interactions with ketamine.[48,59-62]
33
34   Because of the ketamine dose-response and side effects, careful administration and medical
35   expertise is necessary, especially in non-medical and non-hospital contexts.[17,38-40] In general, the
36   duration of sedation should only be long enough to allow for patient assessment, initial treatment,
37   and transfer to a medical facility; restraint beyond this timeframe may induce additional medical
38   complications. Ketamine dosing is dependent on a person's body weight, with a reported standard
39   dosing of 5mg per kilogram of bodyweight starting at 250 mg for pre-hospital treatment.[44,51,63,64]
40   Because of this weight dosing requirement, incorrect dosing of ketamine by law enforcement or
41   EMS can and has led to serious adverse events or death.[58] A recent investigation of the death of
42   Elijah McClain in Aurora, Colorado found that an incorrect estimation of weight for a weight-
43   based dose calculation contributed to his death.[58] Additionally, several studies have reported that
44   while ketamine provides rapid sedation for agitated patients, its use in a pre-hospital setting is
45   associated with higher intubation and hospital admission rates when used by
46   EMS.[35,38,48,51,54,60,62,65,66] Studies have also linked the use of ketamine to death from metabolic
47   acidosis.[67-69]

1   CRISIS INTERVENTION TEAM PROGRAMS
2
3   Crisis Intervention Team programs (CITs) are community partnerships of law enforcement,
4   behavioral health providers, people with mental and substance use disorders, along with their
5   families and others. CITs have become a globally recognized model for safely and effectively
6   assisting people who experience crises in the community. The Substance Abuse and Mental Health
7   Services Administration (SAMHSA) notes that the need for CIT programs is urgent, as
8   communities are challenged with insufficient mental health funding and services.[70] Advocates of
9   CITs, including the National Alliance on Mental Illness (NAMI), note that the programs can reduce
10   police encounters and arrests of people with mental illness while simultaneously increasing the
11   likelihood that individuals will receive mental health services.[71-73] Additional goals of CITs include
12   improving police responses to people in crisis; diverting individuals from the criminal justice
13   system when appropriate; and developing more robust community-based crisis-response systems
14   that minimize both the role of law enforcement and the need to utilize emergency departments.[74] A
15   foundational aspect of successful CITs is a strong and ongoing community partnership.[74]
16
17   CITs promote both law enforcement officer safety and the safety of the individual in crisis. NAMI
18   notes that CITs give law enforcement officers more tools to do their job safely and effectively and
19   promotes the expansion of CITs nationwide, providing resources and working with stakeholders to
20   establish standards and promote innovation for CITs.[73] While law enforcement agencies have a
21   central role in program development and ongoing operations, a continuum of crisis services
22   available to citizens prior to police involvement is core to the model. SAMHSA notes that for
23   safety and optimal engagement, two person CIT teams should be put in place to support
24   communities and EMS should be aware of the teams and partner as warranted. SAMHSA guides
25   also note minimum expectations for CITs, including the involvement of a licensed and/or
26   credentialed behavioral health clinician, response to where the person in need is located, and
27   connecting the individual to appropriate care, with a warm hand-off and coordinated transportation.
28   SAMHSA guides and CIT International, the leading national organization promoting successful
29   CIT models, detail best practices for CIT services[75,76] and experts have documented and noted
30   challenges for rural communities.[77]
31
32   The Denver Support Team Assisted Response program (STAR), which has been operational for six
33   months, is an example of a CIT. STAR pairs a mental health clinician and a paramedic to address
34   low-level incidents, such as trespassing and mental health episodes, that would have otherwise
35   fallen to uniformed law enforcement officers carrying firearms. In its first six months, STAR has
36   responded to 748 incidents, none of which required police or led to arrests or jail time.[78,79]
37
38   Officials note that "STAR represents a more empathetic approach to policing that keeps people out
39   of an often-cyclical criminal justice system by connecting people with services like shelter, food
40   aid, counseling, and medication. The program also deliberately cuts down on encounters between
41   uniformed officers and civilians." The STAR policing alternative empowers behavioral health
42   experts to dictate patient interactions, even when police officers are around, and has been hailed as
43   a success in local Denver communities.[78,79] Many communities around the United States are
44   exploring alternatives to incarceration and law enforcement response to minor incidents.
45
46   NATIONAL ASSOCIATION POSITIONS
47
48   The American Psychiatric Association (APA) released a position statement in 2020 related to ExD
49   and the use of ketamine. APA does not recognize ExD as a mental disorder and states that the term
50   should not be used until a clear set of diagnostic criteria are validated. APA notes that persons
51   being detained by the police and described as having ExD have frequently received medication

1   from EMS personnel intended to chemically sedate them, without a medical condition warranting
2   the use of the drug. The APA statement further cautions that chemical sedation medications,
3   including ketamine, used outside of hospital contexts have significant risks, including respiratory
4   suppression. APA also states that an investigation should be undertaken of cases labeled as ExD,
5   that all relevant data be analyzed for disproportionate application of the term, and that all
6   jurisdictions should develop, implement, and routinely update evidence-based protocols for the
7   administration of chemical restraint medications.[80]
8
9   The American College of Emergency Physicians (ACEP) recognizes ExD as a medical condition
10   and notes that the exact pathophysiology of ExD remains unidentified.[11,32,81] In articles on the topic,
11   ACEP representatives note that a large component of treating patients is helping law enforcement
12   and EMS recognize possible ExDS patients, and that prehospital ExDS should be presumed if a
13   patient is disoriented or not making sense, constantly physically active, impervious to pain, has
14   superhuman strength, is sweating and breathing rapidly, has tactile hyperthermia, and fails to
15   respond to a police presence. ACEP experts have also advocated that chemical sedation, with
16   ketamine or benzodiazepines, is a first-line treatment.[32,81]
17
18   In a 2020 statement, ACEP and the American Society of Anesthesiologists (ASA) discussed the
19   safe use of ketamine in the emergency department and in prehospital care for effective pain
20   management, sedation, the control of delirium in acute psychotic emergencies and drug
21   intoxications. ACEP and ASA noted the dependence on an appropriate medical assessment by a
22   paramedic with medical direction. The statement notes firm opposition to the use of ketamine or
23   any other sedative/hypnotic agent to chemically incapacitate someone solely for a law enforcement
24   purpose and not for a legitimate medical reason.[82]
25
26   The American College of Medical Toxicologists (ACMT) hosts educational information related to
27   ExD and ExDS, including definitions, signs and symptoms, and treatment with chemical
28   support/sedation.[83] In a statement released in 2020, ACMT recognized ExD as a condition that
29   warrants consideration of the decision to administer sedating medications. Based on current
30   evidence, ACMT supports the use of sedative and dissociative medications by appropriately trained
31   prehospital paramedical professionals for treatment of severe agitation when other measures have
32   failed, but ACMT does not support the use of these medications solely for the purpose of behavior
33   control on behalf of law enforcement.[84]
34
35   In 2020, ACMT, the American Society of Addiction Medicine (ASAM), and the Opioid Response
36   Network (ORN) co-hosted an Addiction Toxicology Case Conference on the topic of intoxication
37   and ExD.[85] The webinar, for continuing medical education credit, featured "discussion of drug-
38   induced agitated delirium with experts dissecting the mechanism and common course of events that
39   occur in the most severe type of agitated delirium, often referred to as Excited Delirium Syndrome.
40   Myths and misperceptions in care of patients with agitation and delirium [were] addressed, as [was]
41   discussion of the appropriate use of sedation..."[83]
42
43   The National Association of EMS Physicians (NAEMSP) recognizes that EMS personnel often
44   encounter agitated and combative patients, and these patients frequently require clinical treatment
45   and transportation. A 2016 statement details the NAEMSP position on a several issues related to
46   patient restraint. Notably, NAEMSP believes that EMS agencies should develop scientific
47   protocols for dealing with violent or combative patients, that EMS agencies must assure that all
48   personnel are knowledgeable about the clinical conditions that are associated with agitated or
49   combative behavior and are trained to apply the principles of the system's restraint protocol during
50   patient care. The NAEMSP position statement provides significant details about restraint protocols,
51   notes the use of chemical restraint for ExD, and that chemical restraint, usually with a

1   butyrophenone, a benzodiazepine, ketamine or other dissociative agents, or a combination of these
2   agents, is an effective and safe method of protecting the violent or combative patient from self-
3   injury. Importantly, the NAEMSP notes that local law enforcement restraint policies/practices may
4   differ from EMS-based restraint protocols, but both agencies should recognize their roles and work
5   cooperatively and proactively to ensure the safe care of patients when application of restraint(s) is
6   necessary.[86]
7
8   CONCLUSION
9
10  The assessment, diagnosis, and treatment of ExD remains controversial. Despite a lack of scientific
11  evidence, a universally recognized definition, a clear understanding of pathophysiologic
12  mechanisms, or a specific diagnostic test, law enforcement and EMS personnel are taught that ExD
13  is a potentially deadly medical condition – including at time, by physicians. Even deaths attributed
14  to ExD have no consistent anatomical findings, resulting in ExD diagnosis being one of exclusion,
15  defined by epidemiology and the subjective description of a clinical presentation. The individuals
16  most likely to be disproportionately identified as experiencing ExD, and to die from resulting first
17  responder actions, or as a consequence of administration of chemical sedation for a presumed case
18  of ExD, are otherwise healthy Black males in their mid-30s who are viewed as aggressive,
19  impervious to pain, displaying bizarre behavior, and using substances – characterizations that may
20  be based less on evidence and more on generalizations, misconceptions, bias, and racism.
21  Additionally, the identification of ExD has frequently been used in defense cases of law
22  enforcement violence, despite reported autopsy results listing asphyxiation as the cause of death.
23
24  While chemical restraint is used in emergency, acute, and psychiatric medical settings to reduce
25  agitation, aggression, or violent behaviors, a rapidly growing movement calls for expanded use of
26  chemical restraint, specifically using ketamine, for several applications, both in and out of the
27  hospital, including for sedation of agitated patients in non-clinical situations and for chemical
28  restraint of persons in law enforcement custody. Police officers and EMS professionals are the
29  most likely first responders to encounter patients perceived to be exhibiting purported ExD. While
30  law enforcement usually evaluates this syndrome, it is usually EMS personnel who provide the
31  sedation, in the "dual response" model.
32
33  Reviews of law enforcement agencies and EMS have been called for to evaluate the prevalence of
34  ketamine use in the field in unmonitored individuals and to assess that training and guidelines have
35  been established by supervising medical and behavioral health specialists. Such reviews are
36  appropriate. It is important to assure that de-escalation training be widely implemented, and that
37  personnel are conducting themselves according to guidelines and training to ensure patient safety.
38  New CIT models in which medical and behavioral health specialists, not police, are those first
39  deployed to respond to behavioral emergencies in the community should be encouraged. These
40  models can help assure that decision makers in medical and mental health emergencies who are
41  most appropriate to the circumstances are present with first responders, and that administration of
42  any pharmacological treatments in a non-hospital setting is done equitably, in an evidence-based,
43  stigma-free way.

1  RECOMMENDATION
2
3  The Council on Science and Public Health recommends that the following be adopted and the
4  remainder of the report be filed:
5
6  1.  That the following new AMA policy be adopted:
7
8      Use of Drugs to Chemically Restrain Agitated Individuals Outside of Hospital Settings
9      Our American Medical Association:
10         1.  Believes that current evidence does not support "excited delirium" or "excited delirium
11             syndrome" as a medical diagnosis and opposes the use of the terms until a clear set of
12             diagnostic criteria are validated;
13
14         2.  Is concerned about law enforcement officer use of force accompanying "excited
15             delirium" that leads to disproportionately high mortality among communities of color,
16             particularly among Black men, and denounces "excited delirium" solely as a
17             justification for the use of force by law enforcement officers.
18
19         3.  Opposes the use of sedative/hypnotic agents, including ketamine, to chemically
20             restrain an individual solely for a law enforcement purpose;
21
22         4.  Recognizes that drugs for chemical restraint used outside of a hospital setting by non-
23             physicians have significant risks intrinsically, in the context of underlying medical
24             conditions, and also related to potential drug-drug interactions with agents the
25             individual may have taken;
26
27         5.  Calls for comprehensive reviews, performed by independent investigators including
28             appropriate medical and behavioral health professionals, of law enforcement agencies
29             and emergency medical service agencies to:
30                 a.  Investigate any cases labeled as "excited delirium" for disproportionate
31                     application of the term, including prevalence of its use by race, ethnicity,
32                     gender, age, and other demographic factors;
33                 b.  Evaluate the prevalence of ketamine use in the field in unmonitored
34                     individuals;
35                 c.  Assess that training and guidelines have been properly established by
36                     supervising medical and behavioral health specialists, are appropriate, and
37                     include de-escalation training; and
38                 d.  Assess, on an ongoing basis, that personnel are conducting themselves
39                     according to guidelines and training to ensure patient safety; and
40
41         6.  Urges law enforcement and emergency medical service personnel to participate in
42             appropriate training that minimally includes de-escalation techniques and the
43             appropriate use of drugs used to restrain individuals; and
44
45         7.  Urges medical and behavioral health specialists, not law enforcement, to serve as first
46             responders and decision makers in medical and mental health emergencies in local
47             communities and that administration of any pharmacological treatments in a non-
48             hospital setting be done equitably, in an evidence-based, anti-racist, and stigma-free
49             way.
50             (New HOD Policy)

1    2.   That Policy H-65.954, "Policing Reform," which recognizes police brutality as a
2         manifestation of structural racism which disproportionately impacts Black, Indigenous, and
3         other people of color, notes AMA's willingness to work with interested national, state, and
4         local medical societies in a public health effort to support the elimination of excessive use
5         of force by law enforcement officers, states that AMA will advocate against the utilization
6         of racial and discriminatory profiling by law enforcement through appropriate anti-bias
7         training, individual monitoring, and other measures, and will advocate for legislation and
8         regulations which promote trauma-informed, community-based safety practices, be
9         reaffirmed. (Reaffirm Current AMA Policy)
10
11   3.   That Policy H-345.972, "Mental Health Crisis Interventions," which supports jail diversion
12        and community based treatment options for mental illness, implementation of law
13        enforcement-based crisis intervention training programs for assisting those individuals with
14        a mental illness, such as the Crisis Intervention Team model programs, federal funding to
15        encourage increased community and law enforcement participation in crisis intervention
16        training programs, and legislation and federal funding for evidence-based training
17        programs by qualified mental health professionals aimed at educating corrections officers
18        in effectively interacting with people with mental health and other behavioral issues in all
19        detention and correction facilities, be reaffirmed. (Reaffirm Current AMA Policy)

Fiscal Note:  Less than $1000

CSAPH Rep. 2-JUN-21 -- page 13 of 17

REFERENCES

1. Ashley P. What to Know About Daniel Prude's Death. The New York Times. https://www.nytimes.com/2020/09/04/nyregion/rochester-daniel-prude.html. Published September 4, 2020. Updated Oct 9, 1010. Accessed January 4, 2021.
2. Q13 Fox Seattle. Video shows officer take Manuel Ellis to the ground in a chokehold during struggle with police. https://www.q13fox.com/news/video-shows-officer-take-manuel-ellis-to-the-ground-in-a-chokehold-during-struggle-with-police. Published June 17, 2020. Accessed January 4, 2021.
3. Santo A. As George Floyd Died, Officer Wondered About "Excited Delirium". The Marshall Project. https://www.themarshallproject.org/2020/06/04/as-george-floyd-died-officer-wondered-about-excited-delirium. Published June 4, 2020. Accessed January 4, 2021.
4. O'Hare M, Budhu J, Saadi A. Police keep using 'excited delirium' to justify brutality. It's junk science. https://www.washingtonpost.com/outlook/chokehold-police-excited-delirium/2020/07/17/fe907ec8-c6bc-11ea-b037-f9711f89ce46_story.html. Published July 17, 2020. Accessed January 4, 2021.
5. Elijah McClain case: Death after arrest by Colorado police receiving renewed attention. ABC 7 Eyewitness News Colorado. https://abc7.com/elijah-mcclain-mccain-colorado-police-death-aurora/6266195/. Published June 25, 2020. Accessed January 4, 2021.
6. Mannix A. At urging of Minneapolis police, Hennepin EMS workers subdued dozens with a powerful sedative. https://www.startribune.com/at-urging-of-police-hennepin-emts-subdued-dozens-with-powerful-sedative/485607381/. Published June 15, 2018. Accessed February 18, 2021.
7. Bell L. On a form of disease resembling some advanced stages of mania and fever, but so contradistinguished from any ordinary observed or described combination of symptoms as to render it probable that it may be overlooked and hitherto unrecorded malady *Am J Insanity.* 1849(6):97-127.
8. Wetli CV, Fishbain DA. Cocaine-induced psychosis and sudden death in recreational cocaine users. *J Forensic Sci.* 1985;30(3):873-880.
9. Meyer M. Police Call it "Excited Delirium." Civil Rights Groups Call It a Sham. Harvard Civil Rights - Civil Liberties Law Review. https://harvardcrcl.org/police-call-it-excited-delirium-civil-rights-groups-call-it-a-sham/. Published November 15, 2019. Accessed January 4, 2021.
10. Sekhon S, Fischer M, Marwaha R. Excited Delirium. StatPearls. https://www.ncbi.nlm.nih.gov/books/NBK546674/. Published Novermber 29, 2020. Accessed January 4, 2021.
11. Vilke GM, DeBard ML, Chan TC, et al. Excited Delirium Syndrome (ExDS): defining based on a review of the literature. *The Journal of emergency medicine.* 2012;43(5):897-905.
12. Balaban E. How officials use a dubious medical condition to explain stun gun deaths. The Guardian. https://www.theguardian.com/commentisfree/2015/sep/17/dubious-medical-condition-stun-gun-deaths. Published September 17, 2015. Accessed January 4, 2021.
13. Balaban E. Cops and Guards Getting Away With Murder (Taser Edition). ACLU Blog. https://www.aclu.org/blog/prisoners-rights/cops-and-guards-getting-away-murder-taser-edition. Published September 17, 2015. Accessed January 4, 2021.
14. Bidgood J. Virginia Sheriff Releases Video of Effort to Subdue Inmate Who Died. The New York Times. https://www.nytimes.com/2015/09/11/us/virginia-sheriff-releases-video-of-effort-to-subdue-inmate-who-died.html. Published September 10, 2015. Accessed January 4, 2021.
15. Grant JR, Southall PE, Mealey J, Scott SR, Fowler DR. Excited delirium deaths in custody: past and present. *Am J Forensic Med Pathol.* 2009;30(1):1-5.
16. O'Halloran RL, Lewman LV. Restraint asphyxiation in excited delirium. *Am J Forensic Med Pathol.* 1993;14(4):289-295.

17. Pollanen MS, Chiasson DA, Cairns JT, Young JG. Unexpected death related to restraint for excited delirium: a retrospective study of deaths in police custody and in the community. *CMAJ : Canadian Medical Association journal = journal de l'Association medicale canadienne.* 1998;158(12):1603-1607.
18. Council on Science and Public Health. *Use of Tasers by Law Enforcement Agencies.* American Medical Association; June 2009. 6-A-09.
19. Paquette M. Excited delirium: does it exist? *Perspect Psychiatr Care.* 2003;39(3):93-94.
20. Holstege C. Emerging Illicit Drug Trends and Appropriate EMS Management. https://www.vdh.virginia.gov/content/uploads/sites/23/2016/05/MED-1220.pdf. Published 2015. Accessed January 4, 2021.
21. Takeuchi A, Ahern TL, Henderson SO. Excited delirium. *West J Emerg Med.* 2011;12(1):77-83.
22. Byard RW. Ongoing issues with the diagnosis of excited delirium. *Forensic Sci Med Pathol.* 2018;14(2):149-151.
23. Mash DC. Excited Delirium and Sudden Death: A Syndromal Disorder at the Extreme End of the Neuropsychiatric Continuum. *Front Physiol.* 2016;7:435.
24. Gonin P, Beysard N, Yersin B, Carron PN. Excited Delirium: A Systematic Review. *Academic emergency medicine : official journal of the Society for Academic Emergency Medicine.* 2018;25(5):552-565.
25. Baldwin S, Hall C, Blaskovits B, Bennell C, Lawrence C, Semple T. Excited delirium syndrome (ExDS): Situational factors and risks to officer safety in non-fatal use of force encounters. *Int J Law Psychiatry.* 2018;60:26-34.
26. Gill JR. The syndrome of excited delirium. *Forensic Sci Med Pathol.* 2014;10(2):223-228.
27. Siddiqi N, House AO, Holmes JD. Occurrence and outcome of delirium in medical in-patients: a systematic literature review. *Age Ageing.* 2006;35(4):350-364.
28. Fong TG, Tulebaev SR, Inouye SK. Delirium in elderly adults: diagnosis, prevention and treatment. *Nat Rev Neurol.* 2009;5(4):210-220.
29. Substance Abuse and Mental Health Service Administration. Results from the 2018 National Survey on Drug Use and Health:  Detailed Tables. Center for Behavioral Health Statistics and Quality. https://www.samhsa.gov/data/sites/default/files/cbhsq-reports/NSDUHDetailedTabs2018R2/NSDUHDetailedTabs2018.pdf. Published June 2020. Accessed January 4, 2021.
30. Ruttenber AJ, Lawler-Heavner J, Yin M, Wetli CV, Hearn WL, Mash DC. Fatal excited delirium following cocaine use: epidemiologic findings provide new evidence for mechanisms of cocaine toxicity. *J Forensic Sci.* 1997;42(1):25-31.
31. Ruttenber AJ, McAnally HB, Wetli CV. Cocaine-associated rhabdomyolysis and excited delirium: different stages of the same syndrome. *Am J Forensic Med Pathol.* 1999;20(2):120-127.
32. Hoffman L. ACEP Recognizes Excited Delirium Syndrome. *Emergency Medicine News.* 2009;31(10).
33. Roach B, Echols K, Burnett A. Excited Delirium and the Dual Response. Law Enforcement Bulletin Provided by FBI Training Division, United States Department of Justice. https://leb.fbi.gov/articles/featured-articles/excited-delirium-and-the-dual-response-preventing-in-custody-deaths. Published July 8, 2014. Accessed January 4, 2021.
34. Ordoobadi A, Kivlehan SM. CE Article: Excited Delirium. EMS World. https://www.emsworld.com/216063/ce-article-excited-delirium. Published 2017. Accessed March 16, 2021.
35. Kitch BB. Out-of-hospital ketamine: review of a growing trend in patient care. *J Am Coll Emerg Physicians Open.* 2020;1(3):183-189.
36. Budhu J, O'Hare M, Saadi A. How "excited delirium" is misused to justify police brutality. Brookings Blog Web site. https://www.brookings.edu/blog/how-we-rise/2020/08/10/how-

excited-delirium-is-misused-to-justify-police-brutality/. Published August 10, 2020. Accessed March 15, 2021.

37. Scaggs TR, Glass DM, Hutchcraft MG, Weir WB. Prehospital Ketamine is a Safe and Effective Treatment for Excited Delirium in a Community Hospital Based EMS System. *Prehosp Disaster Med.* 2016;31(5):563-569.

38. Burnett AM, Peterson BK, Stellpflug SJ, et al. The association between ketamine given for prehospital chemical restraint with intubation and hospital admission. *Am J Emerg Med.* 2015;33(1):76-79.

39. Linder LM, Ross CA, Weant KA. Ketamine for the Acute Management of Excited Delirium and Agitation in the Prehospital Setting. *Pharmacotherapy.* 2018;38(1):139-151.

40. Scheppke KA, Braghiroli J, Shalaby M, Chait R. Prehospital use of i.m. ketamine for sedation of violent and agitated patients. *West J Emerg Med.* 2014;15(7):736-741.

41. Grant JR, Southall PE, Fowler DR, Mealey J, Thomas EJ, Kinlock TW. Death in custody: a historical analysis. *J Forensic Sci.* 2007;52(5):1177-1181.

42. Hall CA, Kader AS, Danielle McHale AM, Stewart L, Fick GH, Vilke GM. Frequency of signs of excited delirium syndrome in subjects undergoing police use of force: Descriptive evaluation of a prospective, consecutive cohort. *J Forensic Leg Med.* 2013;20(2):102-107.

43. Ross DL. Factors associated with excited delirium deaths in police custody. *Mod Pathol.* 1998;11(11):1127-1137.

44. Strömmer EMF, Leith W, Zeegers MP, Freeman MD. The role of restraint in fatal excited delirium: a research synthesis and pooled analysis. *Forensic Sci Med Pathol.* 2020;16(4):680-692.

45. Isbister GK, Calver LA, Page CB, Stokes B, Bryant JL, Downes MA. Randomized controlled trial of intramuscular droperidol versus midazolam for violence and acute behavioral disturbance: the DORM study. *Annals of emergency medicine.* 2010;56(4):392-401.e391.

46. Macht M, Mull AC, McVaney KE, et al. Comparison of droperidol and haloperidol for use by paramedics: assessment of safety and effectiveness. *Prehosp Emerg Care.* 2014;18(3):375-380.

47. Martel M, Sterzinger A, Miner J, Clinton J, Biros M. Management of acute undifferentiated agitation in the emergency department: a randomized double-blind trial of droperidol, ziprasidone, and midazolam. *Academic emergency medicine : official journal of the Society for Academic Emergency Medicine.* 2005;12(12):1167-1172.

48. Cole JB, Moore JC, Nystrom PC, et al. A prospective study of ketamine versus haloperidol for severe prehospital agitation. *Clinical toxicology (Philadelphia, Pa).* 2016;54(7):556-562.

49. Wilson MP, MacDonald K, Vilke GM, Feifel D. A comparison of the safety of olanzapine and haloperidol in combination with benzodiazepines in emergency department patients with acute agitation. *The Journal of emergency medicine.* 2012;43(5):790-797.

50. Muir-Cochrane E, Oster C, Gerace A, Dawson S, Damarell R, Grimmer K. The effectiveness of chemical restraint in managing acute agitation and aggression: A systematic review of randomized controlled trials. *Int J Ment Health Nurs.* 2020;29(2):110-126.

51. Olives TD, Nystrom PC, Cole JB, Dodd KW, Ho JD. Intubation of Profoundly Agitated Patients Treated with Prehospital Ketamine. *Prehosp Disaster Med.* 2016;31(6):593-602.

52. Buckland DM, Crowe RP, Cash RE, et al. Ketamine in the Prehospital Environment: A National Survey of Paramedics in the United States. *Prehosp Disaster Med.* 2018;33(1):23-28.

53. Ho JD, Smith SW, Nystrom PC, et al. Successful management of excited delirium syndrome with prehospital ketamine: two case examples. *Prehosp Emerg Care.* 2013;17(2):274-279.

54. Mankowitz SL, Regenberg P, Kaldan J, Cole JB. Ketamine for Rapid Sedation of Agitated Patients in the Prehospital and Emergency Department Settings: A Systematic Review and Proportional Meta-Analysis. *The Journal of emergency medicine.* 2018;55(5):670-681.

55. Mo H, Campbell MJ, Fertel BS, et al. Ketamine Safety and Use in the Emergency Department for Pain and Agitation/Delirium: A Health System Experience. *West J Emerg Med.* 2020;21(2):272-281.

56. Hopper AB, Vilke GM, Castillo EM, Campillo A, Davie T, Wilson MP. Ketamine use for acute agitation in the emergency department. *The Journal of emergency medicine.* 2015;48(6):712-719.

57. City of Minneapolis. MPD Involvement in Pre-Hospital Sedation. http://www2.minneapolismn.gov/www/groups/public/@civilrights/documents/webcontent/wc msp-212775.pdf. Published July 26, 2018. Accessed January 4, 2021.

58. Smith J, Costello M, Villasenor R. Investigation Report and Recommendations:  City of Aurora Colorado, Pursuant to a City Council Resolution Approved July 20, 2020. https://www.auroragov.org/UserFiles/Servers/Server_1881137/File/News%20Items/Investigati on%20Report%20and%20Recommendations%20(FINAL).pdf. Published February 22, 2021. Accessed February 23, 2021.

59. Strote J, Walsh M, Auerbach D, Burns T, Maher P. Medical conditions and restraint in patients experiencing excited delirium. *Am J Emerg Med.* 2014;32(9):1093-1096.

60. Sullivan N, Chen C, Siegel R, et al. Ketamine for emergency sedation of agitated patients: A systematic review and meta-analysis. *Am J Emerg Med.* 2020;38(3):655-661.

61. Zanos P, Moaddel R, Morris PJ, et al. Ketamine and Ketamine Metabolite Pharmacology: Insights into Therapeutic Mechanisms. *Pharmacological reviews.* 2018;70(3):621-660.

62. Riddell J, Tran A, Bengiamin R, Hendey GW, Armenian P. Ketamine as a first-line treatment for severely agitated emergency department patients. *Am J Emerg Med.* 2017;35(7):1000-1004.

63. Kunz SN, Þórðardóttir S, Jónasson JG. Arrest-related death on the basis of a drug-induced excited delirium syndrome. *J Forensic Leg Med.* 2020;77:102091.

64. Otahbachi M, Cevik C, Bagdure S, Nugent K. Excited delirium, restraints, and unexpected death: a review of pathogenesis. *Am J Forensic Med Pathol.* 2010;31(2):107-112.

65. O'Connor L, Rebesco M, Robinson C, et al. Outcomes of Prehospital Chemical Sedation With Ketamine Versus Haloperidol and Benzodiazepine or Physical Restraint Only. *Prehosp Emerg Care.* 2019;23(2):201-209.

66. Parks DJ, Alter SM, Shih RD, Solano JJ, Hughes PG, Clayton LM. Rescue Intubation in the Emergency Department After Prehospital Ketamine Administration for Agitation. *Prehosp Disaster Med.* 2020;35(6):651-655.

67. Allam S, Noble JS. Cocaine-excited delirium and severe acidosis. *Anaesthesia.* 2001;56(4):385-386.

68. Steenblock D. Treatment of Behavior Disturbances with Ketamine in a Patient Diagnosed with Major Neurocognitive Disorder. *Am J Geriatr Psychiatry.* 2018;26(6):711-714.

69. Stratton SJ, Rogers C, Brickett K, Gruzinski G. Factors associated with sudden death of individuals requiring restraint for excited delirium. *Am J Emerg Med.* 2001;19(3):187-191.

70. Substance Abuse and Mental Health Service Administration. Crisis Intervention Team (CIT) Methods for Using Data to Inform Practice:  A Step-by-Step Guide. https://store.samhsa.gov/sites/default/files/d7/priv/sma18-5065.pdf. Published 2018. Accessed March 30, 2021.

71. Franz S, Borum R. Crisis Intervention Teams may prevent arrests of people with mental illnesses. *Police Practice and Research.* 2011;12(3):265-272.

72. Broner N, Lattimore PK, Cowell AJ, Schlenger WE. Effects of diversion on adults with co-occurring mental illness and substance use: outcomes from a national multi-site study. *Behav Sci Law.* 2004;22(4):519-541.

73. National Alliance on Mental Illness. Crisis Intervention Team (CIT) Programs. https://nami.org/Advocacy/Crisis-Intervention/Crisis-Intervention-Team-(CIT)-Programs. Published 2021. Accessed March 30, 2021.

74. Watson AC, Compton MT. What Research on Crisis Intervention Teams Tells Us and What We Need To Ask. *Journal of the American Academy of Psychiatry and the Law Online.* 2019:JAAPL.003894-003819.

75. Substance Abuse and Mental Health Service Administration. National Guidelines for Behavioral Health Crisis Care Best Practice Toolkit. https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-care-02242020.pdf. Published 2020. Accessed March 30, 2021.

76. CIT International. CIT International's Guide to Best Practices in Mental Health Crisis Response. https://www.citinternational.org/bestpracticeguide. Published 2021. Accessed March 30, 2021.

77. Bratina MP, Carsello JA, Carrero KM, Antonio ME. An Examination of Crisis Intervention Teams in Rural Jurisdictions. *Community Ment Health J.* 2021.

78. Sachs D. In the first six months of health care professionals replacing police officers, no one they encountered was arrested. Denverite. https://denverite.com/2021/02/02/in-the-first-six-months-of-health-care-professionals-replacing-police-officers-no-one-they-encountered-was-arrested/. Published February 2, 2021. Accessed March 30, 2021.

79. STAR PRogram Evaluation. https://wp-denverite.s3.amazonaws.com/wp-content/uploads/sites/4/2021/02/STAR_Pilot_6_Month_Evaluation_FINAL-REPORT.pdf. Published 2021. Accessed March 30, 2021.

80. American Psychiatric Association. *Position Statement on Concerns About Use of the Term "Excited Delirium" and Appropriate Medical Management in Out-of-Hospital Contexts.* November 2020.

81. ACEP Excited Delirium Task Force. White Paper Report on Excited Delirium Syndrome. https://www.acep.org/globalassets/uploads/uploaded-files/acep/clinical-and-practice-management/ems-and-disaster-preparedness/ems-resources/acep-excited-delirium-white-paper-final-form.pdf. Published September 10, 2009. Accessed March 18, 2021.

82. American Society of Anesthesiologists and American College of Emergency Physicians. ASA/ACEP Joint Statement on the Safe Use of Ketamine in Prehospital Care. https://www.asahq.org/about-asa/newsroom/news-releases/2020/08/asa-acep-joint-statement-on-the-safe-use-of-ketamine-in-prehospital-care. Published 2020. Accessed January 4, 2021.

83. American College of Medical Toxicology. Case Summary: Walking a Tightrope – Intoxication and Agitated Delirium FAQs. https://www.acmt.net/October_2020_FAQ.html. Published 2020. Accessed January 4, 2021.

84. American College of Medical Toxicology. ACMT Statement on Ketamine Sedation and Law Enforcement. https://www.acmt.net/cgi/page.cgi/_zine.html/The_ACMT_Connection/Statement_on_Ketamine_Sedation_and_Law_Enforcement. Published 2020. Accessed March 16, 2021, 2021.

85. American College of Medical Toxicology. Addiction Toxicology Case Conference, October 2. https://www.acmt.net/_Library/2020_Webinar/ACMT-ASAM-ORN_Addiction_Tox_Presentation_Slides_10_02_2020.pdf. Published 2020. Accessed January 4, 2021, 2020.

86. The National Association of EMS Physicians. Patient Restraint in Emergency Medical Services https://naemsp/NAEMSP/media/NAEMSP-Documents/Restraint-position-statement-Approved-Version-for-PEC.pdf. Published 2016. Accessed March 16, 2021.