

# IACP LAW ENFORCEMENT POLICY CENTER

# Interactions with Individuals with Intellectual and Developmental Disabilities

Model Policy

Concepts & Issues Paper

Need to Know....



EXHIBIT 27

Updated: August 2017

Publications of the IACP Law Enforcement Policy Center
44 Canal Center Plaza, Suite 200, Alexandria, VA 22314

These documents are the result of work performed by the IACP Law Enforcement Policy Center. The views and opinions expressed in these documents are sanctioned by the center's advisory group and do not necessarily represent the official position or policies of the International Association of Chiefs of Police.



# Model Policy

## Interactions with Individuals with Intellectual and Developmental Disabilities

**Updated: August 2017**

### I. PURPOSE

It is the purpose of this policy to provide law enforcement officers with guidelines for appropriately accommodating, interacting, and communicating with individuals with intellectual and developmental disabilities (I/DD).

### II. POLICY

It is the policy of this agency that personnel will be trained to recognize persons with I/DD; treat people with I/DD with dignity and respect; utilize de-escalation protocols when appropriate; and seek alternatives to physical custody whenever possible.[1]

### III. DEFINITIONS

*Intellectual disability (ID):* A group of disorders characterized by limited or diminished intellectual functioning and difficulty with adaptive behaviors, such as managing money, schedules and routines, or social interactions.

*Developmental disability (DD): A* long-term disability attributable to a physical, mental, or combination of impairments that result in functional limitations in major life activities, such as understanding and expressing language, learning, moving, self-direction, self-care, independent living, and economic self-sufficiency. The disability must have originated before the age of 22 and is likely to continue throughout the individual's life. "Developmental disability" is an umbrella term that encompasses intellectual disability, but also covers some physical disabilities. Some DDs might consist of physical or sensory impairments only, such as blindness from birth. Other DDs involve both physical impairments and diminished intellectual functioning stemming from genetic or other causes, such as Down syndrome.

### IV. PROCEDURES

A. Use of De-escalation Techniques
   Some people with I/DD might become easily upset and can engage in self-harming behaviors or act in aggressive ways. Fear, including fear of law enforcement, frustration, and changes in their daily routines and surroundings can trigger such behavior. The mere presence of an officer can also be a source of stress. People with I/DD often have impairments that make it difficult for them to process incoming sensory information. Therefore, when interacting with individuals with I/DD, officers should do the following:
   1. Speak calmly.
   2. Repeat short, direct phrases in a calm voice. Avoid slang or euphemisms.
   3. Use nonthreatening body language, soft gestures, and avoid abrupt movements or actions. Keep hands at sides and visible when possible.
   4. Whenever reasonable and practical, avoid touching the person unless there is an emergency situation.
   5. Maintain a safe distance, providing the person with a zone of comfort that will also serve as a buffer for officer safety.
   6. Eliminate, to the degree possible, loud sounds, bright lights, and other sources of overstimulation by turning off sirens and flashing lights; asking others to move away; or, if possible, moving the person to quieter surroundings.
   7. Keep canines in the law enforcement vehicle and preferably away from the area. However, be aware that the person might have a service

---

[1] Countries may have disability rights laws that can directly regulate law enforcement behavior when interacting with persons with disabilities. For example, in the United States, Title II of the Americans with Disabilities Act (ADA) applies to state and local government entities, including law enforcement. The ADA requires reasonable modification to existing policies and procedures to make them accessible to persons with disabilities. For more information on the ADA, visit www.ADA.gov.

1

animal. Do not separate a person from his or her service animal if at all possible

8. If safe to do so, avoid taking mobility devices, such as canes, scooters, or wheelchairs away from the person. If necessary to move or transport such items, ask the person the best way to do so.
9. Look for medical identification tags on wrists, necks, shoes, belts, or other apparel. Some persons, both verbal and non-verbal, carry wallet cards noting that they have I/DD and that provide a contact name and telephone number of a family member or other information.
10. If desired by the person with a disability, call his or her support person, when such information is available, or a disability advocacy organization for assistance.
11. Be prepared for a potentially long encounter, as dealings with such individuals should not be rushed unless there is an emergency situation. Officers should inform their communications personnel or supervisor if a prolonged encounter is expected.
12. Do not interpret odd behavior as belligerent or aggressive. In a tense or unfamiliar situation, some people with I/DD might shut down and close off unwelcome stimuli (e.g., cover ears or eyes, lie down, shake or rock, repeat questions, sing, hum, make noises, or repeat information in a robotic way). This behavior is a protective mechanism for dealing with troubling or frightening situations.
13. Do not stop the person from repetitive behavior unless it is harmful to him or her or others.
14. Be aware of different forms of communication. Some people with I/DD carry a book of universal communication icons. Pointing to one or more of these icons will allow them to communicate where they live, their family member or support person's name, address, or what they might need. Those with communication difficulties can also demonstrate different speaking capabilities, such as incorrectly using words.

B. Taking Persons with I/DD into Custody
Officers should seek alternatives to physical custody of individuals with I/DD, as it is likely to initiate a severe anxiety response and further escalate a situation. This might include release of the person to his or her family, a support person, or a community-based diversion program. In more serious offense situations or where alternatives to arres are not permissible, officers shall observe the following guidelines:

1. Contact a supervisor.
2. Employ calming and reassuring language and de-escalation protocols.
3. If possible, contact the person's family member, support person, or other trusted individual to accompany him or her and to assist in the calming and intervention process. If a support person is not readily available, request an individual appropriately trained in crisis intervention, if available.
4. When reasonable and practical, avoid physical restraints. The use of such restraints can injure the person or limit the person's ability to communicate (e.g., a person who uses American Sign Language can no longer sign) or move independently (e.g., someone who uses a wheelchair or scooter can no longer use these devices).
5. When possible, avoid using body weight to restrain the individual. When unavoidable, extreme caution should be exercised.
6. In accordance with this agency's policy on transportation of prisoners, search the individual for weapons prior to transport. Do not remove any assistive devices from the person if at all possible, including canes, communication icons, hearing aids, braces, etc.
7. Prior to giving a *Miranda* warning or rights pertaining to custodial interrogation, consult a detective or investigator and have the person's lawyer present to help protect his or her rights.
8. If possible and practical, do not incarcerate the person in a holding facility. If the person must be detained, ask if the person prefers to be housed alone, with a smaller group of people, or in a larger group, in accordance with agency policy. Some people with I/DD will be greatly harmed by placement in administrative segregation. Note during booking that the person has I/DD and should be classified and assigned to the appropriate housing unit. No person with I/DD should be housed in a medical unit unless treatment is needed.
9. Until alternative arrangements can be made, and when safe to do so, place the individual in a quiet room with a support person if requested, another responsible individual, or an officer who has experience interacting with people with I/DD.
10. Provide the person with any comfort items or assistive devices that might have been in his or her possession at the time of arrest (e.g., toys, canes, reading devices, etc.), in accordance with agency policy.

2

C. Interviews, Interrogations, and Use of the *Miranda*/Custodial Rights Warnings
   1. Officers conducting interviews or interrogations of a person who is suspected of having I/DD should consult with a supervisor, detective, or investigator assigned to the case, or the prosecuting attorney's office to determine how to proceed.
   2. A support person or disability advocate should be allowed to be present to help ensure the person's rights are protected.
   3. *Miranda* or other custodial rights warnings should not be given to a suspect with I/DD without his or her lawyer present. Many people with I/DD are not able to fully understand their rights, but will agree with the officer in order to hide their disability or to appear cooperative. However, alternative or simpler versions of these warnings may be used. Officers should also ask suspects to repeat their rights in their own words to ensure understanding.
   4. Interrogations of suspects with I/DD should be recorded and the person should be notified that the interrogation is being recorded. If the interrogation is not recorded, the reason shall be documented.
   5. When interviewing individuals with I/DD, officers should do the following:
      a. Determine the individual's primary mode of communication and provide necessary accommodations, translation services, or both.
      b. Not interpret lack of eye contact and seemingly strange actions or responses as indications of deceit, deception, or evasion of questions.
      c. Use simple, straightforward questions. However, avoid yes or no questions, as the individual might simply choose either yes or no in an effort to please the officer, rather than provide factual information.
      d. Not suggest answers, attempt to complete thoughts of persons slow to respond, or pose hypothetical conclusions, recognizing that people with I/DD can be more easily manipulated and might also be highly suggestible.

> Every effort has been made by the IACP Law Enforcement Policy Center staff and advisory group to ensure that this document incorporates the most current information and contemporary professional judgment on this issue. Readers outside of the United States should note that, while this document promotes procedures reflective of a democratic society, its legal basis follows United States Supreme Court rulings and other federal laws and statutes. Law enforcement administrators should be cautioned that no "model" policy can meet all the needs of any given law enforcement agency. Each law enforcement agency operates in a unique environment of court rulings, state laws, local ordinances, regulations, judicial and administrative decisions and collective bargaining agreements that must be considered, and should therefore consult its legal advisor before implementing any policy. In addition, the formulation of specific agency policies must take into account local political and community perspectives and customs, prerogatives and demands; often divergent law enforcement strategies and philosophies; and the impact of varied agency resource capabilities among other factors. This document is not intended to be a national standard.

© Copyright 2017. Departments are encouraged to use this policy to establish one customized to their agency and jurisdiction. However, copyright is held by the International Association of Chiefs of Police, Alexandria, Virginia U.S.A. All rights reserved under both international and Pan-American copyright conventions. Further dissemination of this material is prohibited without prior written consent of the copyright holder.

**Acknowledgment**

This document was developed in conjunction with The Arc.

3



## IACP LAW ENFORCEMENT POLICY CENTER

# Interactions with Individuals with Intellectual and Developmental Disabilities

Concepts and Issues Paper

Updated: August 2017

## I. INTRODUCTION

### A. Purpose of the Document

This paper is designed to accompany the *Model Policy on Interacting with People with Intellectual and Developmental Disabilities* developed by the IACP Law Enforcement Policy Center. This paper provides essential background material and supporting documentation to provide greater understanding of the developmental philosophy and implementation requirements for the model policy. This material will be of value to law enforcement executives in their efforts to tailor the model policy to the requirements and circumstances of their community and their law enforcement agency.

## II. PERSONS WITH INTELLECTUAL AND DEVELOPMENTAL DISABILITIES (I/DD)

### A. Definitions

A *developmental disability* (DD) is a long-term disability attributable to a physical, mental, or combination of impairments, that result in functional limitations in major life activities, such as understanding and expressing language, learning, moving, self-direction, self-care, independent living, and economic self-sufficiency. The disability must have originated before the age of 22 and is likely to continue throughout the individual's life. "Developmental disability" is an umbrella term that encompasses intellectual disability, but also covers some physical disabilities. Some DDs might consist of physical or sensory impairments only, such as blindness from birth. Other DDs involve both physical impairments and diminished intellectual functioning stemming from genetic or other causes, such as Down syndrome.

*Intellectual disabilities*[1] (IDs) are a subset of DDs that consist of a group of disorders characterized by limited or diminished intellectual functioning and difficulty with adaptive behaviors, such as managing money, schedules and routines, or social interactions. Onset of ID occurs before age 18. In some cases, ID can be identified before the age of two because of delayed social, language, or motor milestones. Mild levels might not be identifiable until school age when struggles with academic learning are more noticeable. ID can result from physical or genetic causes, such as autism spectrum disorder (ASD) or cerebral palsy, or from nonphysical causes, such as a lack of stimulation and adult responsiveness during early development. In some legal systems, the additional parameter of an IQ of 70-75 or below is often used.

The term *intellectual and developmental disability* (I/DD) can be used to describe either an ID or DD.

I/DDs are not the same as and should not be confused with mental illnesses, such as schizophrenia, bipolar

---

[1] At times, intellectual disability is still referred to as "mental retardation"; however, this phrase is considered outdated, pejorative terminology and is not the term preferred by people who have this disability.

A publication of the IACP Law Enforcement Policy Center
44 Canal Center Plaza, Suite 200, Alexandria, VA 22314

This document is the result of work performed by the IACP Law Enforcement Policy Center. The views and opinions expressed in this document are sanctioned by the center's advisory group and do not necessarily represent the official position or policies of the International Association of Chiefs of Police.

disorder, and depression.[2] Officers might not be able to distinguish between the two during an initial encounter, but over time, will need to tailor accommodations and services to meet individual needs.

Some of the more common types of I/DD officers might encounter include ASD, Down syndrome, and fetal alcohol spectrum disorder (FASD).

## B. Commonly Encountered I/DD Diagnoses

One to two percent of the general population has I/DD.[3] In one-third of the people affected by I/DD, the cause is unknown. In these cases, there is no specific diagnosis, yet a very real disability is present. While there are many diagnoses associated with I/DD, the following are more commonly known disabilities that law enforcement officers are most likely to encounter:

*"Mild" ID (no specific diagnosis).* The essential features of ID are deficits in general mental abilities and impairment in everyday adaptive functioning when compared to an individual's age-, gender-, and socioculturally-matched peers. Approximately 85 percent of all people with ID have a "mild" disability.[4] Due to the nature of this disability, it often goes unrecognized by officers and can lead to serious challenges for people once they become involved in the criminal justice system as suspects, defendants, incarcerated persons, witnesses, or victims.

*Down Syndrome.* Down syndrome is a genetic disorder caused when abnormal cell division results in extra genetic material from chromosome 21. This genetic disorder, which varies in severity, causes lifelong intellectual disability and developmental delays—and in some people causes health problems. A majority of people with Down syndrome have ID as well. They might also have musculoskeletal weakness and easily recognizable facial features, including an upward slant to the eye and single creases on the palms of the hands.

*Cerebral Palsy.* The term cerebral palsy refers to any one of a number of neurological disorders that appear in infancy or early childhood and permanently affect body movement and muscle coordination, although profound disabilities are not always present. While one person with severe cerebral palsy might be unable to walk and need extensive, lifelong care, another with mild cerebral palsy might not require such assistance. It is caused by abnormalities in parts of the brain that control muscle movements. More than 40 percent of people with cerebral palsy also have ID.[5] Cerebral palsy cannot be cured, but treatment can improve capabilities.

*Autism Spectrum Disorder (ASD).* One of the most common forms of I/DD currently being diagnosed is ASD. The essential features of ASD are persistent impairment in social communication and social interaction and repetitive patterns of behavior, interests, or activities. The symptoms are present from early childhood and can limit or impair everyday functioning. About 40 percent of people with ASD also have ID.[6] According to the Autism Society of America (ASA), the disability affects 1 in 68 individuals in the United States.[7] Boys are affected about four times more often than girls. Autism occurs across all races, ethnic groups, income and education levels, and lifestyles.

ASD is a lifelong disability. With maturity, some people with ASD might be able to enhance their coping mechanisms in the areas of communication, socialization, and decision making. A lack of interpersonal, social, and verbalization skills is often associated with people who have ASD.

*Fetal Alcohol Spectrum Disorders (FASDs).* Children whose mothers drink alcohol during pregnancy can develop a wide range of physical, mental, behavioral, and learning disabilities that fall into the broad continuum of FASDs, including fetal alcohol syndrome (FAS) and alcohol-related neurodevelopmental disorder (ARND). Within the spectrum, some individuals have more severe deficits, and some have only mild deficits—with the majority falling somewhere in between. Characteristics of FASDs can include the following:

---

[2] There are a variety of terms that can be used to describe the concept of what is commonly referred to as mental illness. In the disability community, it is common to hear terms such as "psychiatric disability," "mental disability," "mental health disability," "psychosocial disability," or "behavioral health disability." Those with lived experience might use terms such as, "consumer of mental health services," "consumer," "peer," or "client." Generally speaking, those with lived experience would not say they are "mentally ill," though they might say they "have a mental illness" or use any of the other terminology described above. Mental health professionals tend to use diagnostic labels, such as "schizophrenia," "bipolar disorder," or "major depression."

[3] Sheryl A. Larson et al., "Prevalence of Mental Retardation and Developmental Disabilities: Estimates from the 1994/1995 National Health Interview Survey Disability Supplements," *American Journal on Mental Retardation* 106, no. 3 (May 2001): 231-252.

[4] American Psychiatric Association, "What Is Intellectual Disability?" https://www.psychiatry.org/patients-families/intellectual-disability/what-is-intellectual-disability

[5] Centers for Disease Control and Prevention, "Cerebral Palsy (CP): Data & Statistics for Cerebral Palsy," https://www.cdc.gov/ncbddd/cp/data.html

[6] Autism Speaks, "Frequently Asked Questions," https://www.autismspeaks.org/what-autism/faq

[7] Autism Society, "Facts and Statistics," What Is Autism? http://www.autism-society.org/what-is/facts-and-statistics/; National Institutes of Health, "How Many People Are Affected by Autism?" At Risk, https://www.nichd.nih.gov/health/topics/autism/conditioninfo/Pages/at-risk.aspx; Autism Science Foundation, "How Common Is Autism?" http://autismsciencefoundation.org/what-is-autism/how-common-is-autism/; Centers for Disease Control and Prevention, "Autism Spectrum Disorder: Prevalence," https://www.cdc.gov/ncbddd/autism/data.html

2

- Abnormal facial features, including a thin upper lip, a smooth philtrum (area between upper lip and nose), and small eye openings
- Central nervous system impairment, which can be evidenced by microcephaly (a small head) or decreased intelligence or both
- Hyperactivity and behavior problems, including explosive episodes, and a lack of impulse control
- Difficulty with judgment and reasoning, including vulnerability to peer pressure, struggles delaying gratification, and problems connecting cause and effect[8]

Signs of FASDs are often invisible to officers, yet studies estimate 35 percent of individuals with FASD have been in jail or prison at some point in the lifetimes.[9] Individuals with FASDs are at high risk for entering the criminal justice system because their behaviors are usually assumed to be a result of poor choices, as they might struggle to understand the consequences of their actions and often repeat mistakes multiple times.

### C. Identifying People with I/DD

Officers are not expected to diagnose people with different types of I/DD. However, the more knowledge they have about general behaviors or characteristics of this population, the more likely it is that they can respond appropriately. Persons with ASD and other forms of I/DD are generally nonviolent, unless "triggered" or frightened by officers or others. Their behaviors can be a response to the level of frustration they are experiencing or from overstimulation. The behaviors should not be confused with those who are in crisis, those who are affected by mental illness in crisis, or those under the influence of drugs or alcohol. While everyone with a diagnosis of I/DD is unique, some indicators officers should keep in mind include the following.

*General Signs.* In general, individuals with I/DD may display the following:

- Have difficulty communicating, speaking, and/or expressing themselves
- Be easily influenced by and/or eager to please others
- Be unaware of the severity or level of danger of situations
- Wish to hide their disability and make efforts to disguise it
- Exhibit uneven gross or fine motor skills
- Be unresponsive to verbal commands
- Have trouble making eye contact
- Be oversensitive or undersensitive to pain or other stimuli, such as light or sound
- Become easily overwhelmed by a situation
- Try to run away or act upset if detained
- Wear medical alert tags or possess other written material indicating I/DD

As *Victims*, individuals with I/DD may display these characteristics:

- Be more easily victimized and targeted for victimization
- Be less likely or able to report victimization
- Think that how they have been treated is normal and not realize the victimization is a crime
- Think the perpetrator is a "friend"
- Not be considered as credible witnesses
- Have very few ways to get help, reach a safe place, or obtain victim services or counseling

As *Suspects/Defendants*, individuals with I/DD might also do the following:

- Not understand, but pretend to understand, their rights
- Say what they think officers want to hear in an effort to hide their disability or obtain acceptance
- Have difficulty describing facts or details of the offense
- Be confused about who is responsible for the crime and falsely "confess" even though innocent

In addition, individuals with ASD might exhibit the following behaviors:

- Lack of verbal communication or preference to communicate by pointing or using gestures rather than words
- Monotone speech without expected inflections
- Repetition of words and phrases, which can include repeating exactly what an officer says
- Repetitive body movements including, but not limited to, spinning, rocking, hand flapping, or flailing arms
- Unusual behaviors and movements, including rocking back and forth, pacing, or sitting on the ground or floor
- Pigeon-toed gait or running style, or walking on the balls of the feet or on the toes
- Perceived aloofness and detachment
- Inappropriate clothing for the weather

---

[8] American Academy of Pediatrics, "Fetal Alcohol Spectrum Disorders," https://www.healthychildren.org/English/health-issues/conditions/chronic/Pages/Fetal-Alcohol-Spectrum-Disorders.aspx; U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, *Fetal Alcohol Spectrum Disorders and the Criminal Justice System* (2007), https://store.samhsa.gov/shin/content//SMA06-4238/SMA06-4238.pdf

[9] National Organization on Fetal Alcohol Syndrome, *FASD: What the Justice System Should Know About Affected Individuals*, http://www.nofas.org/wp-content/uploads/2014/05/Facts-for-justice-system.pdf

3

- Struggle to understand and read others' verbal, nonverbal, and various other social cues
- Aversion to touch, loud noise, bright lights, and general commotion[10]

Officers should remember that persons with ASD and similar I/DDs have unique personalities and characteristics and are affected by their disability to different degrees. For example, contrary to popular conceptions of persons with ASD, some children and adults with this disability will make eye contact, show affection, smile, laugh, and demonstrate a variety of other emotions.

One method officers should consider when responding to calls for service is referred to as the access and functional needs approach, which focuses on the concept that each individual at a scene might have different needs that should be addressed, including needs related to a disability.[11] Following this approach, the officer first responds to any threats to the safety of the individuals at the scene, including threats of self-harm. Once safety has been established, the officer then directs his or her attention to determining if any of the involved individuals have specific needs. This might include additional time to calm down or requesting that a family member be contacted. Through the use of this approach, officers shift their focus from determining a diagnosis for the individual to a focus instead on what actions are needed to successfully resolve the current situation.

## III. INTERACTIONS WITH INDIVIDUALS WITH I/DD

### A. Common Law Enforcement Encounters with People with I/DD

Law enforcement officers may encounter people with I/DD in a variety of situations. Many encounters will relate to nuisance calls or situations, odd behavior, persons acting suspiciously or suspected of being affected by mental illness, in crisis, or under the influence of drugs, or situations in which a crime has been presumed to have been committed even though the person with I/DD is not aware of any wrongdoing. Common encounters might include the following:

*Wandering.*[12] Some people with I/DD, and especially ASD, might wander without telling family, support persons, or others where they are going or when they plan to return. This is sometimes characterized as elopement from a caregiver or support person, but it is important to note that not all people with I/DD have or need supervision as part of their support needs. When adults or children do wander, they might run aimlessly or may be spotted walking down the middle of a street or through neighborhood yards, inappropriately clothed for the weather conditions, entering unlocked homes or cars, or wandering into stores or places of business, causing suspicion. According to a 2017 study, 49 percent of all children with I/DD attempt to wander or elope and a substantial number of these children are at risk of bodily harm.[13] People with ASD often have a high attraction to water. Because of this, first responders and search teams should immediately check all nearby bodies of water when a person or child with ASD is missing.

*Seizure-like symptoms.* Officers may encounter people with I/DD related to calls for medical assistance, as in the case of someone having a seizure. Research indicates that between 20 and 30 percent of children with ASD develop epilepsy by the time they reach adulthood.[14]

***Domestic disputes and disturbance calls.*** Most contacts with people with I/DD involve non-criminal activity. Most people with I/DD live in the community with varying levels of support. They often have careers and go about their daily lives just like everyone else. But, due to their disability, they might react to a situation, event, noise, or other incident differently than those without a disability. The initial call for assistance to law enforcement can therefore appear to deal with a domestic dispute or some kind of public disturbance.

In these and most other situations, the officer's greatest source of information concerning the individual's condition, support needs, and the most appropriate way to communicate and work with the person comes from that individual. This knowledge can be supplemented by those who also know the person well—a support person, parent, peer, or friend.

*Atypical, offensive, or suspicious behavior.* Persons with I/DD might not understand social conventions and appropriate social behavior. This can trigger suspicion on the part of those who witness atypical, offensive, or

---

[10] Dennis Debbaudt and Darla Rothman, "Contact with Individuals with Autism: Effective Resolutions," *FBI Law Enforcement Bulletin* (April 2001): 20, https://leb.fbi.gov/2001-pdfs/leb-april-2001

[11] For more information, visit "IS-0368 - Including People With Disabilities and Others With Access and Functional Needs in Disaster Operations," https://emilms.fema.gov/IS0368/DIS01summary.htm and "Disabilities or Access and Functional Needs," https://www.disasterassistance.gov/information/disabilities-access-and-functional-needs

[12] Note that the term "eloping" can be used to describe an autistic individual's tendency to roam or wander.

[13] Connie Anderson et al., "Occurrence and Family Impact of Elopement in Children with Autism Spectrum Disorders," *Pediatrics*, 130, no. 5 (November 2012): 870-877, http://pediatrics.aappublications.org/content/130/5/870

[14] "Autism Spectrum Disorder Information Page," National Institute of Neurological Disorders and Stroke, https://www.ninds.nih.gov/Disorders/All-Disorders/Autism-Spectrum-Disorder-Information-Page

suspicious actions in public and who subsequently call for assistance. For example, some people with I/DD might be drawn to a playground in order to use the swings because this repetitive motion provides pleasure. However, the individual may be viewed by others as a stranger playing with young children. The adult with I/DD would not recognize that it is considered inappropriate for an unknown adult to play with children. In another example, a complaint from a store owner of a person rearranging items or display objects might not be a shoplifter, but, instead, a person with ASD engaging in the behavior of "ordering" those items in some sequence that other individuals might not notice.

The lack of understanding of acceptable social conventions can manifest itself in other ways. People with I/DD, like every human being, have sexual urges and drives, but may lack the full understanding of when, where, or how to act upon these feelings. Thus, they might engage in inappropriate sexual behavior or touch others inappropriately, sometimes out of curiosity rather than for sexual stimulation or pleasure.

In other cases, the person with I/DD might be attracted to or infatuated with someone and attempt to speak with or follow that person. People with I/DD can have a difficult time reading the emotions of others. Therefore, facial gestures, body language, subtle remarks, or attempts to extricate oneself might not be understood by those with I/DD.

## B. High Rate of Victimization

The National Crime Victim Survey revealed that people with disabilities are more likely to be victimized than those without disabilities, and that people with cognitive disabilities (including people with ID) face the greatest risk.[15] In fact, violence, abuse, and bullying are frequent realities for people with I/DD, and officers must be aware of this in order to better serve and protect this population. The high rate of victimization is due, in part, to a lack of social skills and awareness that is common in some people with I/DD, susceptibility to suggestion from others, and a lack of appreciation for the difference between lawful and unlawful acts. People with I/DD might also be used as "runners" to carry out criminal activity in unsafe neighborhoods or environments, or they can experience abuse or neglect from caregivers in private or institutional settings.

Once victimization occurs, barriers to justice include the following:

- Lower rates of law enforcement follow-up, prosecution, and conviction of perpetrators
- Physical and cognitive barriers to the judicial system, including difficulties accessing courtrooms and the judicial process
- Mistaken beliefs that people with disabilities are untrustworthy or are not credible or competent to be witnesses
- Speech and/or cognition difficulties[16]

There are few supports in place to help victims with I/DD report crimes. Often people with I/DD experience multiple victimizations over their lifetime. Many people with I/DD are credible witnesses as proven by case law in which people have been permitted to testify using accommodations, such as answering only yes or no questions, pointing, or tapping a pencil to answer questions. It is important that law enforcement officers do not assume that people with I/DD cannot communicate but should instead determine what supports the person needs to communicate. Officers must be aware of how common victimization is in this population and make every effort to take allegations of victimizations seriously.

## C. General Rules for De-escalating Encounters with Individuals with I/DD

If officers recognize factors that underlie the fears and anxieties of a person with I/DD, they can generally resolve a situation without it escalating into a crisis situation. Knowing that a person with I/DD might have a hard time following detailed instructions or may repeat instructions, commands, statements, or questions, officers should keep in mind that the person is not being willfully or purposefully belligerent or noncompliant, but might be acting in a typical fashion given the disability.

Officers may encounter situations in which an individual with I/DD is or becomes highly agitated. There can be signs and behaviors that lead an officer to believe the person is affected by mental illness, is in crisis, or has I/DD. However, it is not the officer's responsibility to make a diagnosis. The first objective in these situations is to de-escalate the situation or avoid escalating an otherwise non-emergency or non-threatening situation.

Some people with I/DD can become easily upset, engage in self-harming behaviors, or potentially become aggressive. Fear, including fear of officers, frustration, and changes in their daily routines and surroundings, can trigger such behavior. The mere presence of an officer can be a source of stress. In addition, people with I/DD often

---

[15] Erika Harrell, *Crimes against Persons with Disabilities, 2009-2012 Statistical Tables* (Washington, D.C.: Bureau of Justice Statistics, U.S. Department of Justice, February 2014), http://www.bjs.gov/content/pub/pdf/capd0912st.pdf

[16] *Violence, Abuse and Bullying Affecting People with Intellectual/Developmental Disabilities: A Call to Action for the Criminal Justice Community* (Washington, D.C.: The Arc's National Center on Criminal Justice and Disability, 2015), http://www.thearc.org/document.doc?id=5145

5

have impairments that make it difficult for them to process incoming sensory information. For example, some might experience buzzing or humming in their ears that makes it difficult for them to hear. Therefore, officers should utilize the following de-escalation strategies when interacting with individuals with I/DD.[17]

*Speak calmly.* Using a stern, loud command tone to gain compliance will often have either no effect or a negative effect on a person with I/DD.

*Repeat short, direct phrases in a calm voice.* For example, rather than saying "Let's go over to my car where we can talk," officers should simply repeat "Come here," while pointing until the person's attention and understanding is obtained. Officers should be aware that the person may have a visual, hearing, or other impairment that limits his or her ability to follow instructions. Slang and expressions (e.g., "spread 'em") may have little or no meaning to persons with I/DD. It is preferable to use simple and direct language, giving the person additional time to process and understand a request.

*Use nonthreatening body language, soft gestures, and avoid abrupt movement or actions.* In addition, officers should attempt to keep their hands at their sides and visible to the person.

*When reasonable and practical, avoid touching the person.* Some individuals might react to touch by pulling away or slapping the officer's hand. Officers should recognize that the reaction is not a form of resisting arrest, but a reaction to the sensation of being touched.

*Maintain a safe distance.* Officers should provide the person with a zone of comfort that will also serve as a buffer for officer safety.

*Eliminate possible sources of stress.* Knowing that some people with I/DD are hypersensitive to loud sounds, bright lights, and other sources of stimulation, to the degree possible, officers should turn off sirens and flashing lights; ask others to move away; or, if possible, move the person to more quiet surroundings. Public address systems should not be used to issue directives.

*Keep animals away.* Officers should keep canines in the law enforcement vehicle and preferably away from the area, but be aware that a person may have a service animal. Whenever reasonable and practical, officers should not separate a person and his or her service animal.

*Whenever reasonable and practical, do not take mobility devices, such as canes, scooters, or wheelchairs away from the person.* If necessary to move or transport such items, officers should ask the person the best way to do so.

*Look for personal identification.* Some people with I/DD wear medical identification tags on the their wrists, neck, shoes, belt, or other apparel. Some individuals, both verbal and non-verbal, carry wallet cards noting that they have I/DD and providing a contact name and telephone number of a family member, disability advocacy agency, information about where they live, or other contact information. Officers should understand that if a person with I/DD is reaching into a pocket or bag, it could be to pull out such an identification card. Some people with I/DD have been trained to retrieve their identification card automatically upon interacting with an officer. Some people with I/DD may also have motor impairments that make it difficult to retrieve such a card. If safe to do so, officers should wait patiently for the person to retrieve the card and be ready to provide assistance if asked. Officers must keep in mind that not everyone who has I/DD will have such an identification card—programs do not exist in every jurisdiction and where they do exist, they should be voluntary for those who wish to self-identify as having a disability to their local first responders.

*Call the contact person, support person, or disability advocacy organization.* If desired by the person, officers should call the appropriate support person, caseworker, group home worker, or disability advocate. Such support people can be a valuable resource to officers and may be able to offer specific advice on calming or ensuring the safety of the person.

*Be prepared for a potentially long encounter.* Dealings with such individuals should not be rushed unless there is an emergency situation. De-escalation of the situation using calming communication techniques can take time, and officers should inform their communications personnel or supervisor or both that this might be the case if circumstances dictate.

*Don't interpret atypical or odd behavior as belligerent.* In a tense or even unfamiliar situation, some people with I/DD might shut down and close off unwelcome stimuli (e.g., cover ears or eyes, lie down, shake or rock, repeat questions, sing, hum, make noises, or repeat information in a robotic way). This behavior is a protective mechanism for dealing with troubling or frightening situations. Officers should not stop the person from such behavior unless it is harmful to himself or herself or others.

*Be aware of different forms of communication. Some people with I/DD carry a book of universal communication icons.* Pointing to one or more of these icons will allow these individuals to communicate where they live, their parent's name, address, or what the individuals might need. Those with communication difficulties may also demonstrate limited speaking capabilities, at times incorrectly using words, such as "You" when they mean "I."

---

[17] Dennis Debbaudt, *Autism, Advocates, and Law Enforcement Professionals: Recognizing and Reducing Risk Situations for People with Autism Spectrum Disorders* (Philadelphia, PA: Jessica Kingsley Publishers, 2002), 29-30.

In some situations, de-escalation strategies may not be appropriate. However, the use of force should be carefully considered among this population especially, and law enforcement agencies should provide examples of how and when using force is applicable to those with I/DD.[18]

### D. Taking People with I/DD into Custody

Officers should seek alternatives to physical custody of individuals with I/DD, as it is likely to initiate a severe anxiety response and further escalate the situation. Therefore, in minor offense situations, officers should explain the circumstances to the complainant and explore alternative means to remedy the situation. This normally will involve release of the person to a family member, support person, or community-based diversion program. In more serious offense situations or where alternatives to arrest are not permissible, officers shall observe the following guidelines:

1. Contact a supervisor.
2. Employ calming and reassuring language and de-escalation protocols.
3. If possible, contact the person's family member, support person, or other trusted individual to accompany him or her and to assist in the calming and intervention process. If a support person is not readily available, request an individual appropriately trained in crisis intervention, if available.
4. When reasonable and practical, avoid physical restraints. The use of such restraints might injure the person or limit the person's ability to communicate (e.g., a person who uses American Sign Language can no longer sign) or move independently (e.g., someone who uses a wheelchair or scooter can no longer use these devices). In many countries, the law requires that reasonable modifications be made to existing policies and procedures for persons with disabilities. Agencies should work to create flexible restraint policies when persons with disabilities must be taken into custody.
5. Avoid using body weight to restrain a person with I/DD whenever possible. If unavoidable, extreme caution should be exercised. For people with certain types of disabilities, body weight restraints can be dangerous or harmful. For example, for those with limited ability to control their motor movement, commonly seen in those with cerebral palsy, body weight restraint can increase the chance of bone fractures and other severe injuries. For those with other types of I/DD, such as ASD, being subjected to a body weight restraint can be physically excruciating, as the person may experience physical stimuli much more intensely than individuals without I/DD.
6. In accordance with this agency's policy on transportation of prisoners, search the individual for weapons prior to transport. Do not remove any assistive devices from the person if at all possible, including canes, communication icons, hearing aids, braces, etc.
7. Prior to giving a *Miranda* or other custodial rights warning, consult a detective or investigator and have the person's lawyer present to help protect his or her rights.
8. Do not incarcerate the person in a holding facility, if possible and practical. If the person must be detained, ask if the person prefers to be housed alone or with a smaller group of people or in a larger group, in accordance with agency policy. Some people with I/DD will be greatly harmed by placement in administrative segregation. Note during booking that the person has I/DD and should be classified and assigned to the appropriate housing unit. No person with I/DD should be housed in a medical unit unless treatment is needed.
9. Until alternative arrangements can be made, and when safe to do so, put the person in a quiet room with subdued lighting with a support person if requested, another responsible individual, or an officer who has experience interacting with individuals with I/DD.
10. Provide the person with any comfort items or assistive devices that might have been in his or her possession at the time of arrest (e.g., toys, canes, reading devices, etc.) in accordance with agency policy.

### E. Interviews and Interrogations

Officers conducting interviews or interrogations of people suspected of having I/DD should obtain training on this topic in order to conduct effective interviews and protect individual rights.[19]

Officers should consult a supervisor, detective, or investigator assigned to the case or the prosecuting attorney's office to determine how to proceed. Interrogations of people with I/DD should be recorded and the person notified that the interrogation is being recorded. The *Miranda* or other custodial rights warning should not be given to suspects with I/DD without their lawyer

---

[18] The Arc's National Center on Criminal Justice and Disability, *Pathways to Justice: A Comprehensive Training Program for Law Enforcement, Victim Service Providers, and Attorneys on Intellectual, Developmental, and Other Disabilities*, http://www.thearc.org/NCCJD/training

[19] For example, see *Victims with Disabilities: The Forensic Interview – Techniques for Interviewing Victims with Communication and/or Cognitive Disabilities* (Washington, D.C.: The Office for Victims of Crime, revised July 2011), http://www.ovc.gov/publications/infores/pdftxt/VictimsGuideBook.pdf

present. Some people with I/DD might not fully understand their rights, but will agree with the officer in order to hide their disability or appear cooperative. Alternative or simpler versions of the *Miranda* or other custodial rights advisements may be used, but officers should ask suspects to repeat their rights in their own words to ensure understanding.

When interviewing individuals with I/DD, officers should observe the following in order to obtain valid information:

1. Determine the individual's primary mode of communication and provide necessary accommodations, devices, or translation services, or any combination of these.
2. Do not interpret lack of eye contact and atypical actions or responses as indications of deceit, deception, or evasion of questions.
3. Use simple, straightforward questions. However, avoid yes or no questions, as the individual might simply choose either yes or no in an effort to please the officer, rather than provide factual information.
4. Do not suggest answers, attempt to complete thoughts of persons slow to respond, or pose hypothetical conclusions, recognizing that people with I/DD can be more easily manipulated and can also be highly suggestible.

The diversity among the I/DD community can create its own set of challenges because some persons might not clearly show signs of the disability until they are questioned more closely. In these types of cases, the interviewer may sense that there is something unusual about the manner in which the person acts or responds to questions. These behaviors, as previously noted, can cause interviewers to make assumptions about the person that are untrue or misleading.

For example, the person's inability to maintain eye contact would understandably be seen as an indicator that he or she is attempting to hide something or is being untruthful. Interviewers and interrogators may attempt to elicit more information by showing great personal appreciation and friendliness, mock sympathy, or personal understanding for the individual's "situation," or may plant suggestions to gain responses. People with I/DD might have a variety of reactions to such interview and interrogation techniques. For example, they may believe that the officer who shows personal friendship, sympathy, and helpful understanding is a true friend. As such, the suspect might simply go along with whatever suggestions the officer may make under the belief that a "friend" would not be wrong or misguide them. Persons with I/DD might respond affirmatively to suggestions that they saw things, committed acts, or were accomplices in activities to please their "friend."

Some individuals with I/DD are very literal/concrete, honest, and straightforward in their approach to others and believe that others are the same with them. They do not understand trickery or deceit just as they typically do not comprehend innuendo, jokes, slang, or sarcasm. Because of these factors, officers who are questioning victims, witnesses, or suspects who have or are suspected of having I/DD should be as straightforward as possible and recognize that typical interrogation techniques that employ half-truths or subterfuge will not work effectively with this population and may even increase the risk of false confessions. When an officer or investigator begins to establish that the person might have I/DD, he or she should seek the assistance of a trained mental health professional or volunteer with experience working with people with I/DD.

**Acknowledgment**

This document was developed in conjunction with The Arc.

Every effort has been made by the IACP Law Enforcement Policy Center staff and advisory group to ensure that this document incorporates the most current information and contemporary professional judgment on this issue. Readers outside of the United States should note that, while this document promotes procedures reflective of a democratic society, its legal basis follows United States Supreme Court rulings and other federal laws and statutes. Law enforcement administrators should be cautioned that no "model" policy can meet all the needs of any given law enforcement agency. Each law enforcement agency operates in a unique environment of court rulings, state laws, local ordinances, regulations, judicial and administrative decisions and collective bargaining agreements that must be considered, and should therefore consult its legal advisor before implementing any policy. In addition, the formulation of specific agency policies must take into account local political and community perspectives and customs, prerogatives and demands; often divergent law enforcement strategies and philosophies; and the impact of varied agency resource capabilities among other factors. This document is not intended to be a national standard.

© Copyright 2017. International Association of Chiefs of Police, Alexandria, Virginia U.S.A. All rights reserved under both international and Pan-American copyright conventions. No reproduction of any part of this material may be made without prior written consent of the copyright holder.



## IACP LAW ENFORCEMENT POLICY CENTER

# Need to Know......
# Interactions with Individuals with Intellectual and Developmental Disabilities

*Individuals with intellectual and developmental disabilities (I/DDs) might be limited in their ability to effectively communicate and interact with law enforcement. Therefore, officers should be familiar with the potential signs of I/DDs and adjust their responses accordingly.*

- **Developmental disabilities (DDs)** are long-term disabilities attributable to a physical, mental, or a combination of impairments that result in functional limitations in major life activities, such as understanding and expressing language, learning, moving, self-direction, self-care, independent living, and economic self-sufficiency.
- **Intellectual disabilities (IDs)** are a subset of DDs characterized by limited or diminished intellectual functioning and difficulty with adaptive behaviors such as managing money, schedules and routines, or social interactions.
- Examples of I/DD include **autism spectrum disorder, Down syndrome, and fetal alcohol spectrum disorder**.
- **Severity** of I/DD can range from mild to severe. These individuals might be high-functioning, active members of the community; they can also be non-verbal and require higher levels of supports and services.
- **Common law enforcement interactions** with individuals with I/DD might include manipulation by criminals without disabilities, victimization, disruptive or suspicious behavior, domestic disturbances, wandering, and medical emergencies, including seizures.
- Utilize **de-escalation techniques** during encounters with individuals believed to have I/DD.
- Exercise **patience** when interacting with individuals with I/DD. The person with I/DD might become easily upset, engage in self-harming behaviors, or may even become aggressive. However, an officer's calm response can assist in minimizing such behaviors.
- When available, **consult a family member or other support person** if unable to effectively communicate or interact with the person himself or herself. A support person or family member should be familiar with the individual's disability and may be able to provide suggestions on how to more effectively communicate with the individual. Officers might also wish to request the assistance of a disability advocacy organization.
- If possible, **consider alternatives** to taking custody of the individual. However, if an arrest is necessary, make every effort to minimize the possibility of associated trauma.
- Avoid giving *Miranda* **or other custodial rights warnings** to suspects with I/DD without an attorney or other advocate present who can ensure the person's rights are protected. Officers should check for understanding of the *Miranda* or other custodial rights warning by asking the person in custody to repeat back his or her rights using their own words.

Updated: August 2017

A publication of the IACP Law Enforcement Policy Center
44 Canal Center Plaza, Suite 200, Alexandria, VA 22314

This document is the result of work performed by the IACP Law Enforcement Policy Center. The views and opinions expressed in this document are sanctioned by the center's advisory group and do not necessarily represent the official position or policies of the International Association of Chiefs of Police.