UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CIVIL ACTION NO. 2:21-cv-00080


DONNA LOU and DAREN PARSA, on their own behalf
and on behalf of their deceased minor child,
E.P.

Plaintiffs,

v.

SHERIFF JOSEPH P. LOPINTO, III, CHAD PITFIELD,
RYAN VAUGHT, STEVEN MEHRTENS, SHANNON GUIDRY,
NICK VEGA, MANUEL ESTRADA, MYRON GAUDET, JOHN
DOES 1-3, VICTORY REAL ESTATE INVESTMENTS LA,
LLC and WESTGATE INVESTORS NO LLC D/B/A
WESTGATE SHOPPING CENTER, ABC INSURANCE
COMPANY, and XYZ INSURANCE,

Defendants.


Videotaped Deposition of STEVEN A.

MEHRTENS, given the above-entitled cause,

pursuant to the following stipulation, before

Lori L. Marino, Certified Shorthand Reporter,

in and for the State of Louisiana, at the

Jefferson Parish Sheriff's Office, 1233

Westbank Expressway, Building B, 5th Floor,

Harvey, Louisiana 70058 on Wednesday,

September 14, 2022, commencing at 11:43 AM.

```
 1    APPEARANCES:

 2

 3    (ALL PARTICIPANTS PRESENT IN PERSON:)

 4

 5    THE COCHRAN FIRM MID-SOUTH
      ONE COMMERCE SQUARE, SUITE 1700
 6    MEMPHIS, TN  38103
      TELEPHONE:  (901) 523-1222
 7
      BY:  ANDREW C. CLARKE, ESQ.
 8    aclarke@cochranfirmmidsouth.com
      REPRESENTING THE PLAINTIFFS
 9

10    HONORABLE FRANZ L. ZIBILICH
      6611 GENERAL DIAZ
11    NEW ORLEANS, LOUISIANA  70124
      TELEPHONE:  (504) 508-6868
12
      BY:  FRANZ L. ZIBILICH, ESQ.
13    fzibilich@gmail.com

14              AND

15    MARTINY & ASSOCIATES, LLC
      131 AIRLINE DRIVE, SUITE 201
16    METAIRIE, LOUISIANA  70001
      TELEPHONE:  (504) 834-7676
17
      BY:  JEFFREY D. MARTINY, ESQ.
18    jeff@martinylaw.com

19              AND

20    JEFFERSON PARISH SHERIFF'S OFFICE
      1233 WESTBANK EXPRESSWAY
21    BUILDING B, FLOOR 5
      HARVEY, LOUISIANA  70058
22    TELEPHONE:  (504) 363-5704

23    BY:  LINDSEY M. VALENTI, ESQ.
      valenti_lm@jpso.com
24    REPRESENTING SHERIFF JOSEPH P. LOPINTO, III
      AND THE JPSO DEFENDANTS
25
```

```
 1   APPEARANCES (CONTINUED)

 2

 3   THOMPSON, COE, COUSINS & IRON, LLP
     650 POYDRAS STREET, SUITE 2105
 4   NEW ORLEANS, LOUISIANA  70130
     TELEPHONE:  (504)526-4321
 5
     BY:  CHRISTOPHER W. KAUL, ESQ.
 6   ckaul@thompsoncoe.com
     REPRESENTING VICTORY REAL ESTATE INVESTMENTS
 7   LA, LLC AND WESTGATE INVESTORS NO LLC
     D/B/A WESTGATE SHOPPING CENTER, ABC INSURANCE
 8   COMPANY,AND XYZ INSURANCE COMPANY

 9

10   VIDEOGRAPHER:  AARON PALMER, CLVS, DEPO-VUE

11   ALSO PRESENT:  TIM ANCLADE, LEGAL INVESTIGATOR
                    MYRON A. GAUDET, JR.
12

13

14   REPORTED BY:  LORI L. MARINO
                   CERTIFIED COURT REPORTER
15                 STATE OF LOUISIANA

16

17

18

19

20

21

22

23

24

25
```

1      E X A M I N A T I O N      I N D E X

2

STEVEN A. MEHRTENS
3      1233 WESTBANK EXPRESSWAY
HARVEY, LOUISIANA  70058

4

5      TITLE                                    1

6      APPEARANCES                              2-3

7      WITNESS INDEX                            4

8      AGREEMENT OF COUNSEL                     5

9      EXAMINATION BY MR. CLARKE                6

10     WITNESS'S CERTIFICATE                    107

11     REPORTER'S CERTIFICATE                   108

12

13        E X H I B I T      I N D E X

14     EXHIBIT 89                               8

15     EXHIBIT 90                               9

16     EXHIBIT 91                               9

17     EXHIBIT 92                               64

18

19

20

21

22

23

24

25

```
1              S T I P U L A T I O N

2              It is stipulated and agreed by and

3     between Counsel for the parties hereto that

4     the deposition of STEVEN A. MEHRTENS is hereby

5     being taken pursuant to the Federal Rules of

6     Civil Procedure for all purposes in accordance

7     with law;

8              That the formalities of

9     certification and filing are specifically

10    waived;

11             That the formalities of reading and

12    signing are specifically not waived.

13             That all objections, save those as

14    to the form of the question and/or

15    responsiveness of the answer, are hereby

16    reserved until such time as this deposition or

17    any part thereof is used or sought to be used

18    in evidence.

19             *  *  *  *  *  *  *  *

20             LORI L. MARINO, Certified Court

21    Reporter, in and for the State of Louisiana,

22    officiated in administering the oath to the

23    witness.

24

25
```

```
 1              THE VIDEOGRAPHER:

 2                   This is the videotaped

 3         deposition of Steven A.  Mehrtens.

 4         This deposition is being held at 1233

 5         Westbank Expressway in Harvey,

 6         Louisiana on September 14, 2022.  The

 7         time indicated on the video screen is

 8         11:43.  Would counsel please

 9         introduce themselves for the record.

10         MR. CLARKE:

11                   Andy Clarke for the plaintiffs.

12         MR. ZIBILICH:

13                   Franz Zibilich on behalf of the

14         defendant deputies, as well as

15         Sheriff Lopinto, along with Jeff

16         Martiny.

17         MR. KAUL:

18                   Chris Kaul on behalf of the

19         Westgate defendants.

20         THE VIDEOGRAPHER:

21                   Would the court reporter please

22         swear in the witness.

23                   STEVEN A. MEHRTENS, having been

24         first duly sworn was examined and

25         testified on his oath as follows:
```

```
 1                     EXAMINATION
 2    BY MR. CLARKE:
 3         Q    Would you please state your name for
 4    the record?
 5         A    Detective Steven Mehrtens.
 6         Q    Detective Mehrtens, --
 7         A    Yes, sir.
 8         Q    -- I'll try to pronounce it right.
 9         A    I appreciate that.
10         Q    My name is Andy Clarke.  I met you
11    just briefly just prior to your deposition,
12    and you sat in on the deposition of Deputy
13    Estrada, correct?
14         A    That is correct.
15         Q    Did you sit in on any other depo?
16         A    One other, Sergeant Keith Dowling.
17         Q    Okay, Dowling.  I didn't remember who
18    was -- who was there.  So you know a little
19    bit about the ground rules, correct?
20         A    Yes, sir.
21         Q    You know a little bit about how my
22    questions are very hard to understand, and
23    obviously, your testimony here is under oath
24    subject to the penalty of perjury, correct?
25         A    Yes, sir.
```

```
 1        Q    Do you understand that?
 2        A    Yes, sir.
 3        Q    Let's just do our best to try to not
 4   talk over each other and let each other
 5   finish, correct?
 6        A    Yes, sir.
 7        Q    If I ask you a question, you don't
 8   understand it, please let me know.  I'll try
 9   to rephrase it.  If Mr. Zibilich objects to
10   the form, that's a technical objection that we
11   do here.  You still have to answer the
12   question unless he instructs you not to answer
13   a question, okay?
14        A    I understand.
15        Q    Also, just make sure you give audible
16   answers.  Sometimes, when we have a videotape
17   or in a conversation, you nod your head up or
18   down.  So just give audible answers, okay?
19        A    Yes, sir.
20        Q    Let's just -- what I've done prior to
21   your deposition is I've marked a number of
22   exhibits, that are in front of you.  Exhibit
23   Number 84 -- oh, I'm sorry, 89 is going to be
24   your personnel file.  Exhibit Number 90, if
25   you'll look at that, those are your
```

```
 1   interrogatory responses.  Do you remember
 2   having to respond to written questions from
 3   us?
 4        A    Yes, sir.
 5        Q    If you look at Exhibit Number 18 -- I
 6   mean, Interrogatory Number 18.
 7        A    Which is on 90 or 91?
 8        Q    It's on 90.
 9        A    Okay.
10        Q    In that interrogatory, it asks to
11   identify all accommodations, if any, you
12   contend you provided to Eric Parsa to
13   accommodate his disability, and what was your
14   answer?
15        A    "Assuming this interrogatory pertains
16   to the accommodations under the Americans with
17   Disabilities Act, no accommodations were
18   requested nor provided during the incident as
19   described in the police report produced in
20   connection herewith."
21        Q    Then, if you look at Exhibit 91,
22   those are your supplemental answers.  If
23   you'll look at Interrogatory Number 9, have
24   you reviewed that?
25        A    Before now?
```

1    Q    Yeah.

2    A    No, sir.  I have not reviewed it.

3    I'm reviewing it now.  (Witness peruses

4    document.)  Okay.

5    Q    That's the first time you've seen

6    this document?

7    A    No, sir.  I mean, I wrote this.  I

8    answered the question.  Just reviewing it, as

9    I thought what you asked me for.

10    Q    That's what I understood, okay, and

11    you gave -- this answer in litigation is not

12    exactly the same as your statement that you

13    gave to the detectives on January 23rd,

14    correct?

15    A    I don't know.  I have to review my

16    statement to identify what discrepancies

17    you're referring to.

18    Q    Okay, well, we'll go through -- your

19    statement that you gave on January 23, 2020,

20    they allowed you to have a certain period of

21    time to decompress per policy before giving a

22    statement, correct?

23    A    Yes, sir.

24    Q    Now, when you gave a statement, were

25    you informed that you were the subject or the

```
 1   target of any investigation?
 2        A    At the time, no.  I understood it to
 3   be, obviously, a death investigation.
 4        Q    At anytime, were you identified as a
 5   target or a suspect or a victim in this
 6   investigation?
 7        A    Not to my knowledge, no.
 8        Q    You understand that if they were
 9   looking into you for a policy violation, they
10   have to give you certain types of warnings,
11   correct?
12        A    I'm not familiar with that, no.
13        Q    You've never had an internal affairs
14   complaint?
15        A    I've worked for a previous agency.
16   So before, I had rules for civil service.
17   Here's a little bit different, and I have not
18   been under investigation yet here.  So,
19   therefore, I wouldn't know.
20        Q    At the time that you gave your
21   statement, you weren't advised that you were
22   -- they were looking at your conduct for
23   potential criminal violations, did they?
24        A    No, sir.  I wasn't aware of that, no.
25        Q    Did you know that they were looking
```

1    at your conduct pursuant to any type of

2    internal affairs investigation?

3         A    No, sir.  I'm not aware of it.

4         Q    Was it your understanding this was

5    just a homicide investigation?

6         A    A death investigation, yes, sir.

7         Q    A death investigation, all right.

8    Did you note in your supplemental

9    interrogatories, Exhibit Number 91, that

10   Detective Vega engaged in pain compliance

11   techniques?

12        A    In the interrogatory, no, I don't

13   believe.

14        Q    Do you know why that's not in the

15   interrogatory?

16        A    Why?

17             MR. ZIBILICH:

18                  Which number interrogatory are

19             you referring to?

20             MR. CLARKE:

21                  Supplemental interrogatory

22             response number nine, which states,

23             please state in chronological order

24             the exact sequence of events from the

25             time that you became aware of the

```
 1              involved incident involving the
 2              plaintiff until you completed your
 3              shift assignment and returned home.
 4    BY MR. CLARKE:
 5         Q    Do you know why that's not in your
 6    written response in litigation?
 7         A    No, I'm not sure.
 8         Q    Did you put in your written response
 9    that Eric Parsa, when you showed up, wasn't
10    resisting?
11         A    Did I put in my written interrogatory
12    response?
13         Q    Right.
14         A    That he was not resisting?
15         Q    Yes.
16         A    (Witness peruses document.)  I didn't
17    put either way.
18         Q    Okay.  Did you talk about any
19    allegation that there was a chokehold in your
20    written interrogatory response?
21         A    An allegation, no, sir.
22         Q    Let's kind of go through a little bit
23    of background stuff.  Did you graduate from
24    high school?
25         A    Yes, sir.
```

1      Q     What year and where?

2      A     2009, Riverdale High School.

3      Q     Just made me feel old.

4      MR. ZIBILICH:

5            I have my 50th high school

6      reunion in two weeks.  So get ahold

7      of yourself.

8      MR. CLARKE:

9            Yeah, well, I, you know.

10 BY MR. CLARKE:

11     Q     Did you have any educational classes

12 or college courses after high school?

13     A     Just military service.  Professional

14 military education.

15     Q     Obviously, you served in the

16 military.  Thank you for your service.

17     A     Thank you.

18     Q     What branch did you serve in?

19     A     Air National Guard.

20     Q     How long did you serve, or --

21     A     Still serving.

22     Q     Still serving, okay.  Well, double

23 thank you for your service.  When did you go

24 into the Air National Guard?

25     A     2009, I believe I enlisted.  I had a

```
 1    delayed entry for training -- getting a date
 2    basically.  So I think 2010 is when I actually
 3    left or departed.
 4         Q    What was your first law enforcement
 5    job?
 6         A    At the Harahan Police Department.
 7         Q    Could you spell that for me?
 8         A    H-A-R-A-H-A-N.
 9         Q    Is that here in Louisiana?
10         A    Yes, sir.
11         Q    What year was that?
12         A    I believe -- I started as a reserve
13    police officer in late 2011, early 2012.  I
14    went to the academy six months -- six to eight
15    month after that.
16         Q    Do you know when you were POST
17    certified?
18         A    It was 2012.  I just don't remember
19    the exact month.
20         Q    That's fine.  2012 POST certified.
21    Where did you get your basic police training?
22         A    It was the Lafourche Parish Sheriff's
23    Office Training Academy, Regional Training
24    Academy.
25              MS. VALENTI:
```

1          There's an "R" in that word just
2      so you know.
3      THE WITNESS:
4          Oh, yeah.  I could probably kind
5      of spell it out for you.
6      MR. CLARKE:
7          I spelled it L-A-F-U-S-H.
8      MR. ZIBILICH:
9          Not even close.
10     MR. CLARKE:
11         That's the way it sounds to me.
12     MR. ZIBILICH:
13         L-A-F-O-U-R-C-H-E.
14     MS. VALENTI:
15         There's an "R" in there.
16     MR. CLARKE:
17         I'm not trying to spell things
18     correctly.
19     MR. ZIBILICH:
20         I tell you what.  If you name
21     the college that's in that parish,
22     I'll give you a dollar.
23     MR. CLARKE:
24         Let's see.  Who are the Ragin'
25     Cajuns.

```
 1          MR. ZIBILICH:
 2               Close, but no cigar.  You lose.
 3          Nicholls State.  Ragin' Cajuns, poor
 4          fella.  He almost got it right.  He
 5          would have cost me a dollar.
 6  BY MR. CLARKE:
 7     Q    So, obviously, training in the
 8  military, some of that is -- carries over to
 9  being a law enforcement?
10     A    A lot less than I thought until I got
11  into the police academy.
12     Q    Correct.  I mean, there's different,
13  you know.
14     A    Rules of engagement, yes, sir.
15     Q    Rules of engagement, things of that,
16  but there are skills that you learned in the
17  military that are applicable in law
18  enforcement?
19     A    Yes, sir.
20     Q    Weapons handling, things of all that?
21     A    Yes, sir.
22     Q    Any other job that you had that had
23  any law enforcement type background or
24  assistance prior to you going to Harahan?
25     A    Not to my knowledge, no.
```

```
 1      Q    So you went to the Lafourche
 2   Regional Training -- did I if say it wrong?
 3      A    Lafourche.
 4      Q    I'm going to do L-A-F-O-O-S-H.
 5           MR. ZIBILICH:
 6                That's better.
 7           MR. CLARKE:
 8                I'm going to spell everything
 9           phonetically.
10           THE WITNESS:
11                That works.
12   BY MR. CLARKE:
13      Q    When you went to the Lafourche
14   Regional Academy --
15           MR. CLARKE:
16                I'm just trying to make you feel
17           better, Franz.
18   BY MR. CLARKE:
19      Q    That was basic police training,
20   correct?
21      A    Correct.
22      Q    Do you know how long --
23      A    It was, approximately,
24   two-and-a-half-months.  It was an accelerated
25   class.  Two and a half or three.  I can't
```

1    remember exactly.

2        Q    You were full-time?

3        A    Yes, sir.

4        Q    At the academy, they don't train you

5    on the policies of the department; they train

6    you in general police procedures and

7    standards?

8        A    Specifically that academy, because

9    it's regional, yes.  It's basic policing by

10   POST standards at least.

11       Q    POST is the commission that certifies

12   police officers, correct?

13       A    Yes, sir.

14       Q    And they require a certain amount of

15   training to be certified, correct?

16       A    And hours.

17       Q    Certain amount of hours, and then, to

18   continue your certification, you have to have

19   a certain amount of in-service hours per year,

20   correct?

21       A    Yes, sir.

22       Q    Tell me a little bit about -- I'm

23   going to talk to you a little bit about your

24   basic training academy.  One of the big areas

25   that you have to deal with in the basic law

```
 1   enforcement academy is physical fitness,
 2   correct?
 3        A    Yes, sir.
 4        Q    That's kind of like a daily thing, a
 5   block of training that's done?
 6        A    Couple of times a week in my academy.
 7        Q    Fairly frequently, correct?
 8        A    Twice a week.
 9        Q    Then, you have -- you know, you cover
10   topics from report writing all the way up to
11   deadly force, correct?
12        A    Yes, sir.
13        Q    Learn the laws of the State of
14   Louisiana that you're going to be required to
15   enforce, correct?
16        A    Yes, sir.
17        Q    Did you have -- is another one of the
18   bigger blocks of your training firearm safety
19   and marksmanship and use of deadly force?
20        A    The use of firearms and then
21   subsequently deadly force during use of force.
22        Q    This is two types of training,
23   whether you can hit a target and then when to
24   use it, correct?
25        A    Correct.
```

```
 1        Q    So you had both of that training in
 2   the academy?
 3        A    Yes, sir.
 4        Q    Did you have any training in the
 5   academy on the Americans with Disabilities
 6   Act?
 7        A    I don't recall during the academy.
 8   That would be something that we received, I
 9   think, online database training thereafter.
10        Q    Okay, and we'll get to that.  Did you
11   at the academy have any specific training
12   dealing with people with intellectual
13   disabilities, like autism?
14        A    Not that I recall in the academy, no.
15        Q    At the academy, did you get any
16   training on positional asphyxia, restraint
17   asphyxia or compression asphyxia?
18        A    If there was, it was minimal.
19        Q    Excuse me?
20        A    If there was, it was minimal exposure
21   to that.  The focus of the training would have
22   been surrounding restraints, and then, of
23   course, the things that you try and avoid when
24   restraining somebody.
25        Q    Okay, well, tell me about what you
```

1    were trained about what to avoid when trying

2    to restrain somebody?

3        A    In reference, you want to try your

4    best, depending on the situation and the

5    totality of said circumstances, when

6    restraining somebody, obviously, keep an open

7    airway; make sure that the movement is not

8    limited so much that they can't regain any

9    type of airway if need be; but also monitoring

10   the said subject depending on the position

11   that he's placed in.

12       Q    Well, did they train you that the

13   most dangerous position for a restraint is in

14   the prone position?

15       A    I would not actually say that's the

16   most dangerous position based on my training

17   and experience, no.

18       Q    What do they tell you is the most

19   dangerous position?

20       A    In general?

21       Q    Yes.

22       A    I mean, everything is dangerous in

23   police work.

24       Q    We don't want to go there.

25       A    Well, that's to my point.  There's

```
 1    risk involved with every position that we
 2    have.  Whenever restraining an individual,
 3    there are risks that you take, and there's
 4    multiple factors that contribute to that.
 5         Q    You said you had minimal training on
 6    positional asphyxia, correct?
 7         A    You're referencing the academy.
 8         Q    Right.
 9         A    In the academy, you're talking basic
10    foundational levels.
11         Q    That's all we're getting at.  You had
12    additional training at a later time, and we'll
13    get to that.
14         A    Sure.
15         Q    So the academy training, there was
16    minimal training.  They just kind of taught
17    you the safe techniques to restrain and what
18    to do, correct?
19         A    Yes, sir.
20         Q    And they said when your restraining
21    someone -- did they talk anything specifically
22    about the prone restraint?
23         A    We learned the prone restraint.
24         Q    Did you learn -- did they train you
25    anything about the dangers of the prone
```

```
 1    restraint and the requirement to put people in
 2    the recovery position after they've been
 3    restrained in the prone restraint?
 4         A    The requirement?
 5         Q    Yes.
 6         A    No, sir.
 7         Q    Okay.  So you got out of the training
 8    academy sometime in 2012, and you went to work
 9    at the Harahan -- is  it a police department?
10         A    Yes, sir.
11         Q    How long did you serve at the Harahan
12    Police Department?
13         A    Just shy of six years.
14         Q    When did you go to JPSO?
15         A    2016.  I believe it was October.
16    2016.
17         Q    Are those the only two law
18    enforcement jobs you've had?
19         A    The only two agencies I've worked
20    for, yes, sir.  Military police in the
21    National Guard, but that's it.
22         Q    While you were at the Harahan Police
23    Department, are you aware of whether or not
24    you had any citizen complaints against you?
25         A    I am not aware of any.
```

```
 1      Q    Are you aware of whether or not you
 2  had any internal affairs investigations?
 3      A    I am not aware of any.
 4      Q    Are you aware -- did you receive any
 5  discipline or counseling while you were at
 6  Harahan?
 7      A    Not to my knowledge.
 8      Q    Why did you leave the -- when you
 9  were at Harahan, did you -- so did you rise up
10  in the ranks at all, or were you always a
11  patrol officer?
12      A    I did patrol, detective, special
13  response team, and that's it.
14      Q    What is a special response team?  Is
15  that like SWAT?
16      A    It's an alternative form of what you
17  would refer to as SWAT.
18      Q    Okay.  So it's not CIT?
19      A    No, sir.
20      Q    It's more akin to -- is it an
21  alternative of SWAT, a different --
22      A    It's just a lesser version.  If your
23  department doesn't meet the criteria, the
24  characteristics for labeling something SWAT,
25  right, certain equipment available, training
```

1    hours, stuff like that.  A minimal -- a

2    different type of response force, I guess.

3        Q    Then, when you went to JPSO, tell me

4    why you went to the JPSO.

5        A    Why did I leave Harahan to come here?

6        Q    Yes.

7        A    Career development, progression, more

8    opportunity.

9        Q    All right, and did you fill out an

10   application?  Was there a waiting period to

11   get hired?  Or tell me how that went.

12       A    Application process as normal.  Fill

13   out an application, go through a series of

14   aptitude -- or just tests to gain employment.

15   Interview.

16       Q    When you were hired on, what were you

17   hired on -- were you hired on as a deputy?

18       A    As a patrolman, yes, sir.

19       Q    As a patrolman, okay, and that was

20   2016.  Take me through your positions or where

21   you've worked at JPSO up until today?

22       A    2016 until right around early 2019, I

23   believe I spent just over two years in patrol.

24   I applied for and got a position with the

25   burglary division in the Detective Bureau, I

```
1   spent roughly two years with the burglary
2   division, so 2019ish to 2021.  I applied for a
3   position with the homicide section.  I was
4   selected there.  So I currently -- I'm
5   assigned to homicide.
6        Q    Would that be a detective with
7   homicide?
8        A    Yes, sir.
9        Q    You were a detective -- is a
10  detective a promotion or not?
11       A    Not necessarily.  People have their
12  own opinion about how you view it, but in
13  essence, it's a lateral move to a specialized
14  unit.
15       Q    Right.
16       A    So, I mean, you do just as much as a
17  normal policeman but just a little bit, you
18  know, detail of what you're taking on.
19       Q    Pay is the same; it's just a
20  different beat?
21       A    Sure.
22       Q    Now, when you got to -- so currently,
23  you're a homicide detective at the JPSO,
24  correct?
25       A    Yes, sir.
```

1     Q    At the time of this incident, were

2  you, had you just become a burglary detective?

3  The incident happened January 19, 2020.

4     A    Yeah.  So I had been there for

5  sometime.  Exactly how long, I don't remember

6  when I was transferred, but I was in burglary.

7     Q    You were a detective.  You were in

8  plain clothes -- I mean, you were in plain

9  clothes at the time.

10    A    I was in a JPSO polo that we get and

11 of course, a uniform jacket.

12    Q    Let's go over your training and the

13 policies at JPSO.

14    A    Um-huh (affirmative expression).

15    Q    Number one -- and the policy book is

16 up there.  You don't have -- I'm not going to

17 ask you questions about specific policies yet.

18    A    Okay.

19    Q    Did you have to -- did you get a copy

20 of the policy book when you were hired on at

21 the JPSO?

22    A    No.  We're given access to a website.

23 We actually go through more policy during FTO

24 field training while you're in the district.

25 You have access to the website and view it.

1      Q     So you have online access to the

2   policy book?

3      A     Correct.

4      Q     Did you take any tests or have any

5   training in classroom with respect to the

6   policies?

7      A     Most of my training here was done in

8   patrol during field training, and that's

9   because of the fact that I worked for a

10   previous agency and went to the academy

11   somewhere else.  So you'd have to be more

12   specific with that question to be honest with

13   you.

14      Q     I'm not trying to trick you.

15      A     No, I understand.

16      Q     A lot of departments, what they have

17   is what we call a read and sign policy; that

18   when you're signed on, they give you access to

19   the book, and you have to acknowledge that you

20   received the book, and that you agree to abide

21   by it.

22      A     So there are certain steps during the

23   field training program where you sign off on

24   policy items that you have been trained in.

25   Is that your question?

1      Q    No.  It's before that.  Did you have

2   any tests or anything on the training

3   policies?

4      A    Prior to field training?

5      Q    Right.

6      A    No, sir.

7      Q    Then, after you're hired on and you

8   get all your equipment, sign all the forms,

9   you know, that your not going to sue?

10      A    The only in-class training we receive

11   as a lateral coming into JPSO are the things

12   that you didn't have from your previous

13   department.

14      Q    Do you know what they were?

15      A    RIPP Hobble training was one of them.

16      Q    Say it again.

17      A    RIPP Hobble training.

18      Q    Okay.

19      A    Pepper spray would have been another

20   one.  However, I had the type of pepper spray

21   we carry here at JPSO.  I had that

22   certification through the international guard.

23   So I was given a certificate -- I had already

24   provided a certificate for that.  I'm trying

25   to think of what else, if there was any other

```
 1    lateral classes that I took.  There were

 2    several things that -- again, if you were able

 3    to produce a certificate for something, a

 4    taser, for example, you know, I went through a

 5    class, but it was more of a transitional

 6    thing.

 7         Q    And my question -- I have a different

 8    witness now.  You answered the question.  So

 9    I'm a little discombobulated from the last

10    question, so -- last depo.

11         A    That's okay.

12         Q    But I think we're saying the same

13    thing.  The most training that you got on the

14    policies was during FTO --

15         A    Right.

16         Q    -- training, and that's when you ride

17    with another officer, correct?

18         A    Correct.

19         Q    They go through stops and different

20    things and then kind of describe how you're

21    supposed to do it according to the policy,

22    correct.

23         A    According to the JP, yes.

24         Q    You can look at the policy.  Did

25    anybody pull up the policies while you're
```

1   doing something to --

2       A    I was to review it and go over

3   certain sections that we were covering on a

4   regular tour of duty.

5       Q    Since you're a lateral hire, you

6   know, normally, an FTO, they kind of let the

7   person start communicating with citizens and

8   getting involved in traffic stops and doing

9   stuff, and they kind of walk you through it

10  about what you did or what you didn't do

11  right, correct?

12      A    So I would have been slightly

13  advanced rather than a phase one, day one so

14  to speak rookie.

15      Q    Right.  Did you have any FTO training

16  on the RIPP Hobble?

17      A    FTO, no.

18      Q    Right.  Because the FTO you're kind

19  of out in the field, you don't get to see

20  everything that happens in the policy book to

21  go over every policy, right?

22      A    True.

23      Q    And then, you didn't have to TARP

24  somebody as an FTO.  Correct?

25      A    Not to my knowledge.

```
 1        Q    You didn't have to use a RIPP Hobble
 2   when you were an FTO, did you?
 3        A    I don't recall.  So no.
 4        Q    So after you got there and you're in
 5   patrol, what I want you to look at is
 6   Exhibit 37, your training resume.
 7        A    Um-huh (affirmative expression).
 8        Q    Just look over it generally, does
 9   this look to be accurate from the time that
10   you were at JPSO?
11        A    Yes.
12        Q    If you look on this, it looks like
13   you had RIPP Hobble training in 10/4/2016.
14        A    Correct.
15        Q    Do you see that?
16        A    Um-huh (affirmative expression).
17        Q    Tell me what the RIPP Hobble training
18   was or who provided it.  Was it Sergeant
19   Pizzolato?
20        A    Yes, sir, it was.
21        Q    During the presentation, did you look
22   at a number of videos?
23        A    No, I did not.
24        Q    Tell me what the training was that
25   you remember about RIPP Hobble.
```

```
 1        A    So, obviously, you see quite a few
 2   things outlined on this date.  The
 3   transitional process for lateral tends to be
 4   rather expedited.  Sergeant Pizzolato
 5   instructed us on the proper application of the
 6   RIPP Hobble.  So where it's placed, obviously,
 7   around the ankles and then the fact that you
 8   can connect it to the handcuff while somebody
 9   is in the standing position without - you
10   know, not hog-tieing someone basically.  He
11   then allowed us to try it on each other to
12   make sure we were in his eyes applying it
13   appropriately, and he provided us a worksheet,
14   and I don't recall what I did with that sheet;
15   but it had just the instructions on the device
16   on it.
17        Q    How to use the device?
18        A    I don't remember if it was like a
19   step-by-step use, but it definitely was -- I
20   don't see it here.  It was a very small pack,
21   maybe --
22        Q    Promotional --
23        A    Yeah.
24        Q    Did you get a RIPP Hobble?
25        A    I did.
```

1     Q     So they gave you a RIPP Hobble after

2  you had the training?

3     A     Yes, sir.

4     Q     And it appears that your training was

5  more practical, hands-on, how to use it,

6  correct?

7     A     Correct.

8     Q     Were you trained in anything during

9  that training on the RIPP Hobble about excited

10 delirium?

11    A     I've received that in other classes.

12    Q     But not in the RIPP Hobble?

13    A     No, sir.

14    Q     It appears your RIPP Hobble, maybe,

15 because you're a lateral, --

16    A     So there are other things that will

17 be covered, I believe, in that class.  So,

18 yeah, it's going to be more application than

19 it is going to be --

20    Q     If you'll look at Exhibit 22 that's

21 been up there.

22    A     Um-huh (affirmative expression).

23    Q     Just flip through this real quick,

24 and this is what has been produced as the RIPP

25 Hobble training in this litigation.

1      A     Okay.

2      Q     It seems like it's not what you're

3  describing.  You didn't have this particular

4  PowerPoint?

5      A     I don't recall.  No, I do not.

6      Q     Do you recall training in the RIPP

7  Hobble about the recovery position?

8      A     Yes, sir.

9      Q     What is the recovery position?

10     A     It's an available option when you're

11 dealing with somebody who is in a certain type

12 of crisis or, you know, needs, you know, more

13 assistance.

14     Q     Well, isn't the recovery position a

15 position you push somebody in after they've

16 been restrained in the prone position?

17     A     Not always.  It's an option.

18     Q     What other circumstances is the

19 recovery position utilized for?

20     A     Typically, if somebody is -- could be

21 choking, vomiting, spitting up, hard

22 breathing.  Things of that nature would be an

23 option for recovery position.  However, it's

24 not mandatory that you utilize it.  There are

25 other options than just recovery.

```
 1      Q    Tell me all the options other than
 2   recovery.
 3      A    Some of them including prone,
 4   standing, kneeling, sitting.
 5      Q    Is it not your understanding that a
 6   recovery position is a position that you put
 7   somebody in to decrease the dangers of an
 8   event to a suspect?
 9      A    Again, I go back to this:  There's
10   numerous risk factors, and it is an option.
11      Q    Were you trained on, at least the
12   RIPP Hobble training, of the dangers of the
13   respiratory compromise that can occur from the
14   prone position?
15      A    In the RIPP Hobble training?
16      Q    Yes.
17      A    Not to my knowledge.  Again, you
18   mentioned recovery position and RIPP Hobble.
19   Again, it was an option to put somebody in at
20   a certain point.
21      Q    How long was your RIPP Hobble
22   training?
23      A    I don't recall.
24      Q    It says four hours.
25      A    If it's -- yeah.  If it's four hours
```

```
 1   on the sheet, it's accurate.  Again, that was
 2   a busy day.  So for me to tell you exactly
 3   what it was --
 4        Q    It looks like you had OC saver, four
 5   hours.  Actually, it looks like you had 16
 6   hours of training that day.
 7        A    (Witness nods head affirmatively.)
 8        Q    Is that correct?  Or actually more
 9   than that.
10        A    It was a long day.  Again, I don't
11   recall exactly.
12        Q    Hang on.  Let's actually do some math
13   here.  How many hours did you train on October
14   4th?
15        A    Are we doing math based on the sheet
16   --
17        Q    Yes.
18        A    -- because I remember being here all
19   day for a very long day, so.
20        Q    Twenty-seven hours of training that
21   day.
22        A    It doesn't mean that it all happened
23   that day.  It could be the day it was also
24   signed off on, as well.  I was in a lateral
25   process for, I think, two or three days before
```

1    going to my district.

2        Q    Well, according to this, it's 27

3    hours, right, on 10-4?

4        A    It's 27 hours of training that was

5    signed off on 10-4.

6        Q    When did you -- how long was your

7    RIPP Hobble training?

8        A    I don't recall.  It says -- it's a

9    four-hour block worth of training.  So I

10   assume I was in that for four hours, whether

11   that day or a day following or before.

12       Q    Four hours, and you didn't go through

13   anything that's in 22?

14       A    Like I said, it was application and a

15   few of us in a class, so.

16       Q    Did you receive any training on the

17   Americans with Disabilities Act according to

18   your training profile?

19       A    I recall according to this ADA, I

20   recall online referencing.  Specifics and

21   when, I don't remember.

22       Q    And what class?

23       A    I don't recall.  It was an online --

24   there was a brief description of ADA.  I don't

25   recall which one it was to be honest with you.

1    It may have been in first aid.

2        Q    Did you have any training on excited

3    delirium or any type of restraint, positional

4    or compression asphyxia?

5        A    I recall excited delirium in crisis

6    intervention training.

7        Q    Okay.  In the crisis intervention

8    training, they did not -- did they tell you to

9    use the RIPP Hobble during crisis intervention

10   events?

11       A    Crisis intervention training, again,

12   gave you a multitude of options based on form

13   of policy what's approved as far as restraints

14   are concerned.  There were cases in crisis

15   intervention where restraints weren't even

16   necessary.

17       Q    Well, that's the whole purpose of

18   crisis intervention, to have specially-trained

19   officers who can deescalate a situation,

20   correct.

21       A    Provide as many tools in the toolbox

22   as you have at your disposal.

23       Q    Do you know what model your crisis

24   intervention -- who your crisis intervention

25   training is modeled after?

```
 1      A    I don't recall, no.
 2           MR. CLARKE:
 3                For the record, it's the Memphis
 4           model.  It's in your training.  I
 5           hadn't said that word for you for
 6           awhile.
 7           MR. ZIBILICH:
 8                Let me just tell you how they do
 9           it in many other departments.
10           MR. CLARKE:
11                They train long here, 27 hours a
12           day, you know.
13           MR. ZIBILICH:
14                That's why he's so good.
15 BY MR. CLARKE:
16      Q    Did they train you -- did you have
17 any training ever from the coroner's office?
18      A    I don't recall if we got direct
19 training from the coroner's office.  There
20 were references -- contacts were provided
21 during CIT training of who to call at the
22 coroner's office for crisis and all that kind
23 of -- like a sheet of phone numbers for
24 assistance.
25      Q    Do you recall them providing any
```

```
1   specific training?
2       A    I don't recall, no.
3       Q    Do you recall any specific training
4   on autism?
5       A    No.  No specific training on autism,
6   no.
7       Q    What about intellectual disabilities?
8       A    General disabilities is my
9   recollection, people with disabilities who are
10  in crises.
11      Q    I need to differentiate things.
12  Intellectual disabilities would be something
13  medical, or you didn't have that on autism or
14  any type of -- let me take that back.  Was the
15  crisis intervention more dealing with people
16  who are suffering some type of psychotic
17  episode?
18      A    Some of it.
19      Q    Did it deal with people who are
20  just -- did it deal with deaf people?
21      A    Specifically?
22      Q    Yeah.
23      A    I don't recall it specifically
24  surrounding deaf people, no.
25      Q    Were most of the people, when you
```

1    were called to the scene, was somebody who had

2    some type of psychiatric condition that is out

3    of control and making them act erratically?

4        A    Being objective, anytime we respond

5    to a scene, there's no immediate determination

6    on who it is your dealing with.  So it's an

7    assistance of certain identified factors for a

8    multitude of different things that could be

9    someone in crises.

10       Q    What are those factors?

11       A    It could be things like excited

12   delirium, cocaine psychosis, drug usage,

13   alcohol over abusage.  It could be mental

14   illness of sorts.  I mean, it could be a

15   multitude of things.

16       Q    Okay, well, let's talk about excited

17   delirium.  What is excited delirium, and what

18   were you trained about it?

19       A    What was I trained about on excited

20   delirium?

21       Q    Yeah.

22       A    There were certain indications of

23   what was described as excited delirium.

24   However, as time goes on, more experts look at

25   things, and things change.  I mean, currently

1    today, excited delirium is something that

2    people are actually -- some experts that we

3    have been told through, you know, our updates

4    and emails are trying to start to get away

5    from, because there's a multitude of effects

6    that include that.

7         Q    All right.

8         A    Drug usage, mental illness, things of

9    that nature.

10         Q    Being autistic?

11         A    It potentially could be one of them,

12    but again, there's a multitude of things that

13    attribute to that.

14         Q    So it's your understanding that

15    excited delirium is falling out of use now?

16         A    I'm understanding that they're

17    trying -- it's becoming trying to break it

18    down of what all of these different things

19    could be and then giving them their unique

20    identifier, as well to properly address what

21    we have.

22         Q    You're aware of the George Floyd

23    incident where he was killed by Chauvin.

24         A    Generally aware, yes.  Whatever the

25    media says.  Take that for what it's worth.

1      Q     They tried to argue that he died of

2   excited delirium.  Are you aware of that?

3      A     Who is they?

4      Q     The defense in that case.

5      A     Meaning the police?

6      Q     The police officers, yes.

7      A     Okay.

8      Q     Are you aware that they tried to say

9   he died of excited delirium?

10     A     No, not specifically.  Again, I know

11  what the news tells me.  I have not read a

12  report nor have I researched that event to

13  extent.

14     Q     So you only had the one course which

15  dealt with the hands-on application of the

16  RIPP Hobble.  Where did you get the excited

17  delirium training?

18     A     That would have been through CIT as

19  previously mentioned.

20     Q     Oh, the CIT training program?

21     A     Correct.

22     Q     What did they tell you the

23  significance of somebody who is experiencing

24  or exhibits the signs of excited delirium?

25     A     Excited delirium doesn't have --

```
 1    there is no step-by-step protocol for somebody
 2    in crises.  All right, and again, when we talk
 3    about crisis intervention, excited delirium is
 4    just one aspect of many aspects of crisis
 5    intervention, right.  So there is no
 6    step-by-step process, but in all essence, you
 7    need to again -- you're constantly trying to
 8    reassess a situation based on what the subject
 9    is exhibiting to you.  Perception to reaction.
10         Q    Right, but why do they train you on
11    it?  Do they train you that you need to be
12    careful of whatever these things are that
13    could be called excited delirium, because
14    these people are at a greater risk of death?
15         A    They're training me on it so I'm
16    better to identify what I have in front of me.
17    So that, as I'm making my reassessment, to
18    make sure that the individual, myself and the
19    public are safe.
20         Q    What are you supposed to do when you
21    know it's excited delirium differently than
22    anything else?
23         A    In what aspect?
24         Q    In any aspect.
25         A    That's too vague.
```

```
 1        Q    Okay.  When you restrain somebody, if
 2   you restrain somebody in the prone position
 3   who was suspected or meets some of the
 4   criteria of excited delirium, did they train
 5   you that that is a dangerous position?
 6        A    Again, I go back to what I said
 7   before, there are risks involved with
 8   restraining any person in any such position.
 9        Q    Listen, I'm not asking your opinion
10   on this.  I'm asking what your training was.
11   Did they train you that there were dangers
12   from the prone position?
13        A    You say the word "danger." I have not
14   heard people say the prone position is a
15   dangerous position.  I've heard there are
16   risks with putting somebody in the prone
17   position.
18        Q    What are the risk?
19        A    As I mentioned before, you know, the
20   reason you use the recovery position, the
21   airway, the airflow, if somebody has vomiting
22   airway, air flow.
23        Q    Or been restrained in the prone
24   position.
25        A    Prone position, again, I'm not going
```

```
 1    to agree that it's dangerous.

 2        Q    Okay.

 3        A    It's an option that we are utilized

 4    here at the sheriff's office for restraining

 5    an individual.

 6        Q    Were you trained about the prone

 7    position that when a suspect is restrained, in

 8    a facedown position, breathing may become

 9    labored?

10        A    Labored, no.

11        Q    Okay.  So you weren't trained that?

12        A    I have not heard that before, and if

13    I had, I don't recall hearing that.

14        Q    Labored just means -- do you know

15    what labored -- are you taking issue with the

16    term "labored"?

17        A    To me, that's shallowed breathing,

18    and presumably -- as a homicide detective, we

19    refer to labored breathing as somebody that's

20    just before death.

21        Q    Okay.  All right.  Were you trained

22    that a suspect restrained in a facedown

23    position, breathing may become more difficult?

24        A    Sure.

25        Q    Were you trained that if weight is
```

1    applied to a person's back and the more

2    weight, the more severe of that compression?

3         A    Yes, that could be accurate.

4         Q    Were you trained that when somebody

5    is in the prone position and being compressed

6    in the back, that they can experience

7    difficulty breathing?

8         A    Sure.

9         Q    And you're you trained that when

10   somebody experiences difficulty breathing, the

11   natural reaction is for the person to

12   struggle?

13        A    It depends.

14        Q    It depends on how much oxygen

15   deficiency they have?

16        A    And the pressure of blood.

17        Q    Correct?

18        A    If any.

19        Q    Right.  Were you trained to be

20   careful of -- to know about this, because the

21   reaction of an officer when somebody starts to

22   struggle again would be to apply more

23   compression?

24        A    That's too specific.  It depends on

25   the circumstances you're being dealt with, and

```
 1    no, I don't think somebody would apply more
 2    compression if somebody is suffering.
 3         Q    Right.  Well, if somebody
 4    misinterprets somebody trying to struggle to
 5    get oxygen as resistance, that could result in
 6    more compression.
 7         A    That's too vague.
 8         Q    Were you trained that obesity is a
 9    predisposing factor for asphyxia during prone
10    restraint?
11         A    Specifically, no.  Obesity is a risk
12    factor for a multitude of health issues.
13         Q    Listen, I understand that.  I'm just
14    talking about restraint and what Pizzolato
15    says he trained people.
16         A    Um-huh (affirmative expression).
17         Q    You weren't trained about obesity
18    being a risk factor?
19         A    It's a risk factor, and I said that.
20         Q    A risk factor for prone restraint?
21    That's my question.
22         A    Specifically?
23         Q    Yes.
24         A    I don't recall.  No.
25         Q    Any other courses other than the RIPP
```

1    Hobble or the crisis intervention training

2    where you would have had any training on

3    asphyxia and restraint?

4        A    Not to my knowledge, no.

5        Q    You've had a number of use of force

6    stuff, correct?

7        A    Use of force classes, yes, sir.

8        Q    But they didn't deal with the RIPP

9    Hobble or the prone restraint, did they?

10       A    Would it have been mentioned,

11   potentially, but exactly --

12       Q    There were specific classes that

13   dealt with the actual RIPP Hobble.

14       A    There's a focus for each, and then,

15   there's a focus for use of force and the

16   options you have in your toolbox so to speak.

17       Q    Did you have deescalation training?

18       A    Yes, sir.

19       Q    Do you know what deescalation

20   training is designed to do?

21       A    To deescalate.

22            MR. ZIBILICH:

23                 I knew that was the answer.  I

24            knew that was the answer.

25            MR. CLARKE:

```
 1              And you were hoping that was the
 2        answer too.
 3        MR. ZIBILICH:
 4              Oh, no I knew it.  And you knew
 5        it as you spit out the question.
 6        MR. CLARKE:
 7              As it was coming out.
 8        MR. ZIBILICH:
 9              Right.
10  BY MR. CLARKE:
11     Q    Let's look at the policy book.
12     A    Okay.
13        MR. ZIBILICH:
14              I mean, you haven't given -- you
15        know, sometimes, you can -- what was
16        the game we played when we were kids?
17        Monkey or something?  I give.  You
18        haven't given yet.
19        MR. CLARKE:
20              Monkey -- I don't -- you'll have
21        to rephrase that question.
22        MR. ZIBILICH:
23              It was something with --
24        MR. CLARKE:
25              Yeah, I played monkey, and yeah,
```

```
 1              I got it.
 2         MR. ZIBILICH:
 3              Where you played a game, and you
 4         said, I give.  In other words, I give
 5         up.
 6         MR. CLARKE:
 7              It's called monkey.
 8         MR. ZIBILICH:
 9              Been a long-time.
10         MR. CLARKE:
11              I wasn't born in the 1800s.  Is
12         that before lights?
13              Sorry.  We've been at this a
14         long-time, and it's better for you
15         that we're jovial.
16         THE WITNESS:
17              I'm aware.
18    BY MR. CLARKE:
19       Q    Use of Force Policy is 25.  Does
20    that -- you've reviewed that, and you're
21    required to comply with that, right?
22       A    Yes, sir.
23       Q    The policies general gives you --
24    tells you only use that amount of force that
25    is necessary to accomplish the task.  Right?
```

54

1       A      Reasonableness, correct.

2       Q      Then, it has kind of a continuum of

3   force that we like to use in a perfect world,

4   correct?

5       A      Yes, if it works in a perfect world,

6   yes, sir.

7       Q      If everything went according to the

8   steps, you'd show up.  You'd try to talk to

9   them.  If they didn't talk to them, you'd go

10  to soft hands.  If they didn't do anything,

11  you go to hard hands, and then to your

12  intermediate weapons, right?

13      A      In general.  Generally speaking, yes.

14      Q      You come up on the scene and somebody

15  pulls a gun out, you don't have to do the five

16  steps before you pull your gun.

17      A      Right.  Meet force with force.

18      Q      When you use force, according to the

19  policy, you don't have to fill out a separate

20  use of force report.  Do you?

21      A      The criminal report.  Notify your

22  supervisor.

23      Q      You just fill out the normal incident

24  report and identify the use of force within

25  the report?

```
 1        A    Yes, sir.
 2        Q    Did the City of Harahan have use of
 3   force reports that they used independently?
 4        A    Similar to the policy at Jefferson
 5   Parish.
 6        Q    So they didn't use a separate use of
 7   force?
 8        A    No, sir.
 9        Q    If you go to SOP-8 restraining
10   devices?
11        A    Okay.
12        Q    And you're aware of this policy?
13        A    Yes, sir.
14        Q    Your aware of this policy on
15   January 2020?
16        A    Yes, sir.
17        Q    According to this, it goes through a
18   number of different of the tools that officers
19   are allowed to carry and the reporting
20   requirements on those tools, correct?
21        A    Yes, sir.
22        Q    Then you have a section that deals
23   with restraining policy?
24        A    Um-huh (affirmative expression).
25        Q    All right, and according to the
```

1    restraining policy, it is the policy of the

2    Sheriff's Department to take necessary

3    precautions to protect the life and safety of

4    law officers, the public and the people in our

5    care and custody, correct?

6         A    Correct.

7         Q    And according to the policy on

8    restraining, if somebody is extremely violent

9    and they have to be additionally restrained,

10   one of the tools that they give you to use is

11   the TARP, the total appendage restraining

12   procedure, correct?

13        A    One of multiple tools.

14        Q    What other tools did they give you?

15        A    Handcuffs, leg irons, the hobble

16   without TARPing, flex cuffs, body and chest

17   restraints maintained by the supervisor.

18        Q    Have you ever used your RIPP Hobble?

19        A    Yes.

20        Q    In what circumstance?

21        A    Somebody trying to kick my windows

22   out of my unit.

23        Q    So it was after somebody was arrested

24   and in the vehicle?

25        A    Correct.

1     Q    Did you ever use it out in the field?

2     A    I don't believe so no.  If I used it

3  more than once, it was again because somebody

4  was trying to kick the windows out on the

5  unit, to keep their feet on the floor versus

6  elevated.

7     Q    When you went through the training

8  with Pizzolato, were you trained that it was

9  only for use in the vehicle situation if

10  somebody is kicking or that it can be utilized

11  in the field?

12     A    Other manners.  Yeah, it can be

13  utilized in the field.

14     Q    What course did you get any training

15  on the recovery position?

16     A    I mean, there's a multitude of

17  medical response courses, first aid.  Several

18  different environments.

19     Q    What is your understanding of what

20  the recovery position is?

21     A    Somebody who's in any form of crisis

22  that needs -- again vomiting, spitting up,

23  breathing.  There's a multitude of reasons you

24  would put somebody in the recovery position,

25  but of course, after a scene is safe and under

1    control.

2        Q    You have had no specific training

3    that the recovery position refers to a

4    position that is with the person on their side

5    or in a seated position?

6        A    Say that again.

7        Q    I mean, you're saying what the

8    recovery position is used for.  What is the

9    recovery position?

10        A    Oh, recovery position would normally

11    be the individual is placed on their side with

12    an open airway making sure that they can

13    breathe.  Normally, a person in recovery

14    positions, when I've used it, they were

15    unconscious.

16        Q    Right, and you're doing that to make

17    sure that they can breathe, correct.

18        A    Correct.

19        Q    Were you told that the recovery

20    position is also a position that people should

21    be put in after there restrained in the prone

22    position?

23        A    Again, that's subjective to what the

24    totality of the circumstances on that scene

25    are.

```
 1        Q    What was your training?  What did the
 2   training tell you?  I'm not asking what you
 3   would do in that circumstance.
 4        A    I fall back on my training, and my
 5   training would tell me that the recovery
 6   position is an option of positions similar to
 7   being prone or standing or kneeling or
 8   anything else.
 9        Q    All the other ones are descriptions
10   of what the person is doing or where the
11   suspect is lying.  Do you know why they call
12   it the recovery position?
13        A    Because they would be recovering from
14   an event.
15        Q    Recovering so that they can breathe
16   correctly?
17        A    Um-huh (affirmative expression).
18        Q    Right?
19        A    It's an option.
20        Q    At JPSO, have you ever had any
21   complaints?
22        A    Not to my knowledge, no.
23        Q    Have you had any internal affairs
24   investigations?
25        A    Not to my knowledge, no.
```

1       Q    Have you had any discipline

2    suspensions or warnings or anything?

3       A    Not to my knowledge, no.

4       Q    Let's get to January 19, 2020.

5       A    Are you finished with this

6    (indicating)?

7       Q    Yes.  What were you doing when the

8    call -- when you first became aware of any

9    event?

10      A    I was on the scene of a burglary.

11      Q    Okay, and just doing your normal job?

12      A    Investigating a burglary, yes.

13      Q    What do you hear -- what calls your

14   attention to the event that eventually

15   involved Eric Parsa and you get to the scene?

16      A    Deputy Chad Pitfield got on the radio

17   and put himself out on, I believe, it was what

18   we refer to as a 103, or a disturbance.  His

19   voice appeared rather excited to me when I

20   initially heard it.

21      Q    This occurred on the weekend, didn't

22   it?

23      A    Yes, sir.  To my recollection,

24   Saturday.

25      Q    Yeah, according to your statement you

1    gave, you were on a weekend duty assignment.

2    What's that?

3         A     So, obviously, the Detective Bureau

4    generally works Monday through Friday eight to

5    four depending on your division or where you

6    work.  Sometimes, you have rotating evenings

7    and nights.  However, most detectives are off

8    on the weekends.  So somebody has to be

9    assigned.  We share the job over a period of a

10   year.

11        Q     And you had just started being in the

12   burglary section, right?  So you were low man

13   on the totem pole?

14        A     Not necessarily.  No.  Again, I don't

15   recall how long I was there.  It's all good.

16        Q     So you hear it, and you think of it

17   as a 103, not a 108?

18        A     Initially.

19        Q     Okay.

20        A     That's the first part, and I did not

21   immediately respond.  Again, either I was just

22   wrapping up or finishing up my investigation

23   off of Richland.

24        Q     Have you looked at the tape recently?

25        A     Recently, no.

```
 1        Q    You looked at it when you gave your
 2   statement, right?
 3        A    Correct.
 4        Q    Kind of went through what happened
 5   while you were giving your statement, correct?
 6        A    Correct.
 7        Q    Do you have a recollection of this?
 8   I'm going to give you the same boxes that I
 9   gave --
10        A    I prefer the video if we're being
11   honest.
12        Q    You want to look at it?
13        A    Yeah.
14             MR. ZIBILICH:
15                  I don't really want to correct
16             him.  When you asked him if he looked
17             at the video recently, about a half
18             hour ago.
19             THE WITNESS:
20                  Well, yeah.  I mean, okay.
21             MR. CLARKE:
22                  You want to look at it again?
23             THE WITNESS:
24                  I mean.  Yeah.  No.  If we're
25             talking about me, I mean, I'm gonna
```

```
 1              be honest, I was not paying attention
 2              to his.  I was mostly dealing with my
 3              phone, so.
 4         MR. CLARKE:
 5              We'll watch this real quick.
 6         MR. ZIBILICH:
 7              Underline the word real quick.
 8         MR. CLARKE:
 9              I'll try to put it at a time
10         after the other officers show up.  Is
11         that fair to everybody?
12         MR. ZIBILICH:
13              It's your show.
14         THE VIDEOGRAPHER:
15              Off the record.  The time is
16         12:36.
17                (Brief pause.)
18         THE VIDEOGRAPHER:
19              Back on the record.  The time is
20         now 12:37.
21    BY MR. CLARKE:
22       Q    Detective Mehrtens, what we've done
23    is we're going to start this video, and I just
24    randomly picked a time to try to get it to
25    where the deputies are coming up, but this is
```

```
 1   starting at in the corner down here, it's at
 2   13:50, and Mr. Pitfield is restraining
 3   Mr. Parsa at this time, okay?  If you want to
 4   stop it at any time, let me know; and if I
 5   have question, I'll stop and ask you about it.
 6   If you need to refer to your statement, as
 7   well, go ahead, all right.
 8             We're going to start it at 13:50.
 9                   (Video played.)
10             MR. CLARKE:
11                   I'm going to stop it at 14:29.
12                   (Video stopped.)
13   BY MR. CLARKE:
14        Q    Is that you that came into the video
15   with the long sleeve polo shirt?
16        A    No, sir.  That's going to be
17   Detective Ryan Vaught.
18        Q    That's Detective Vaught.  So are you
19   on the scene yet?
20        A    I believe that's me at the top of the
21   screen.  It looks like my jacket.  Play it a
22   couple more, and I should be able to confirm
23   that for you.
24        Q    So you're not the first detective on
25   the scene?
```

1     A     No, sir.

2     Q     You weren't involved in the

3  handcuffing of Eric Parsa?

4     A     No, sir.

5     Q     Did you see it?  Did you see him

6  being handcuffed?

7     A     I recall his arm being under his

8  body, and Detective Vaught having to pull his

9  arm out from under his body to complete the

10 handcuffing, but I was semi-blocked by

11 Detective Pitfield.

12    Q     Did you notice any type of struggle

13 when you came by?

14    A     I noticed Mr. Parsa rolling to and

15 from his side and struggling.

16    Q     In your statement when you said when

17 you pulled up, you said there was no struggle,

18 correct?

19    A     He had control is what I referred to.

20 There was a certain amount of control and he

21 was maintaining what he had and what he could

22 gain.  With the assistance of

23 Detective Vaught, he completed the

24 handcuffing.

25    Q     And handcuffing gives you more

1    control than not handcuffing, right?

2         A    At times.  That's objective.

3         Q    Would you ever want to observe a

4    circumstance where you'd want to fight

5    somebody that's un-handcuffed as opposed to

6    somebody handcuffed?

7         A    No.  What I mean by that is even

8    people that are handcuffed can cause damage.

9         Q    And handcuffed people, the handcuffs

10   can also restrict their ability to cause

11   damage.

12        A    Yes, sir.

13        Q    So at the time that you're coming up,

14   are you coming up at around the same time that

15   Detective Vaught is?

16        A    Shortly after.

17        Q    Did you feel the need to assist

18   Deputy Pitfield when you came up in

19   restraining Eric Parsa due to his actions?

20        A    No, sir.

21        Q    Where was Pitfield sitting on him to

22   your recollection?

23        A    To my recollection, he was on his

24   buttocks.

25        Q    On his buttocks, all right.  Let's

```
 1   move forward from 14:29.
 2              (Video played.)
 3              MR. CLARKE:
 4                   I'm sorry.  I don't know why
 5              I -- I hit it by mistake.  We'll stop
 6              it at 15:00.
 7                   (Video stopped.)
 8   BY MR. CLARKE:
 9       Q    From the time that you arrived on the
10   scene to 15:00, do you consider him to be
11   violently resisting and him being Eric Parsa?
12       A    So what I'm observing there is
13   Mr. Parsa is still resisting.  He's rolling to
14   and from.  He's trying to get out from
15   whatever control that was already established.
16       Q    Would you call that violent
17   resistance?
18       A    That's subject to opinion.  It was
19   resisting nonetheless.
20       Q    Well, the amount of force that you
21   can use is in direct proportion to the
22   suspect's action?
23       A    Correct.
24       Q    So how would you categorize his
25   actions, aggressive?
```

```
 1        A    His actions are he's resisting, and
 2   Deputy Pitfield is maintaining what control he
 3   had over that resistance.
 4        Q    Okay, and you didn't feel the need to
 5   help Deputy Pitfield control him at that time
 6   based on his actions and the amount of control
 7   Pitfield had?
 8        A    Correct, over the resistance.
 9        Q    Did you at any time when you saw him
10   sitting on him in your mind think that this is
11   a dangerous position; we need to get him
12   rolled over?
13        A    No, sir, because of where he was
14   positioned and the fact that Mr. Parsa was
15   able to actually elevate himself several
16   times.
17        Q    But you weren't trained that obesity
18   is a risk factor for asphyxia, correct?
19        A    Again, that is a general risk factor.
20    It's not something specific.
21        Q    I'm not asking about general risk
22   factors.  I'm talking about specific risk
23   factors that were at least put in the
24   training, the full training of the RIPP
25   Hobble.
```

```
 1        A    It's an appropriate -- and that's
 2   RIPP Hobble training is it's an appropriate
 3   position based on my observation of when I'm
 4   appearing being it from.
 5        Q    Based on your training, your RIPP
 6   Hobble training or any training, did they tell
 7   you that there's any period of time where --
 8   that is too long to sit on somebody in the
 9   prone position?
10        A    Sit on somebody.  He wasn't sitting.
11   He was sitting on his buttocks.
12        Q    He's sitting on --
13        A    Sure.  You're being very specific as
14   to on him.  However, being on his buttocks,
15   him still being able to move and only
16   providing that much control based on the
17   amount of resistance provided by the subject.
18        Q    If you needed more control, there
19   were enough officers -- this is at 15:00
20   there.  It looks like there's a uniform deputy
21   out there, two detectives and Pitfield,
22   correct?
23        A    Um-huh (affirmative expression).
24        Q    Do you know who this female with the
25   jacket on is in the left-hand corner?
```

```
 1      A     No.

 2      Q     Do you know Deputy Guidry?

 3      A     Yes.  That's not Deputy Guidry.

 4      Q     Do you believe if you four officers

 5   wanted to at this particular time, at 15:00,

 6   that you could have moved Eric Parsa into the

 7   recovery position?

 8      A     Do I believe?

 9      Q     Yeah.

10      A     Not in that moment, no.

11      Q     What was preventing you from putting

12   him into the recovery position?

13      A     The resistance that Deputy Pitfield

14   was still dealing with at the time.

15      Q     Why can't you try to restrain him in

16   the recovery position?

17      A     Deputy Pitfield had control.  Why

18   would I eliminate that control moving the

19   subject into a position to where I potentially

20   could lose what control he already has?  Thus,

21   making more officers have to be dealing with

22   this individual.

23      Q     The answer since you asked me a

24   question was so you don't kill him.

25      A     I'm sorry.  What?
```

1      Q    So you don't kill him by asphyxia.

2      A    I asked you.  I said we didn't roll

3    him, because the control was there.  All

4    right, he was breathing.  His mother was

5    maintaining that.

6      Q    Were you trained that that is a

7    dangerous position of control?

8      A    Type of force.  It's a position, and

9    it's an approved position.

10     Q    It's an approved position.  Is it

11   approved for 20 minutes?

12     A    Depends on the act and amount of

13   resistance.

14     Q    So as long as somebody is making any

15   type of movements back and forth, you should

16   stay on him in the prone position until he

17   stops?

18     A    In this moment, he was still

19   breathing, conscious, alert and talking with

20   his mother.

21     Q    Talking with his mother?

22     A    Well, speaking or verbalizing with

23   his mother in whatever manner he could.

24     Q    Did you know he was autistic at the

25   time you got the call?

```
 1        A    At the time I got the call, no, sir.
 2        Q    Did you find out during this event
 3   that he had some type of intellectual
 4   disability?
 5        A    At some point, yes, sir.
 6        Q    Do you know when or how?
 7        A    No.
 8        Q    Were your observations consistent
 9   with somebody who may be --
10        A    In crises?
11        Q    I'm talking about autistic or
12   intellectually disabled.
13        A    In crisis is what I thought.
14        Q    So you feel that the resistance that
15   he showed from the time we stopped it until
16   then was too significant for the four officers
17   on the scene to put him in the recovery
18   position?
19        A    Yes, sir.
20        Q    Let's play from 15:00.  I'm going to
21   try to do it by a minute at a time.
22                    (Video played.)
23             MR. CLARKE:
24                  Let me stop for a second.
25                    (Video stopped.)
```

1   BY MR. CLARKE:

2        Q    Just to make sure, is this you with

3   the blue shirt on and the blue jacket?

4        A    Yes, sir.

5        Q    You don't seem very concerned with

6   Mr. Parsa or Mr. Pitfield at this time,

7   correct?

8        A    At that very moment, I was speaking

9   to his father.

10       Q    Got your hands in your pocket,

11  correct?

12       A    Sure, yeah.

13            MR. ZIBILICH:

14                 What number is that?  What

15            number were you at?

16            MR. CLARKE:

17                 15:13.

18            MR. ZIBILICH:

19                 Thanks.

20            MR. CLARKE:

21                 Now, we're at 15:15, I'm going

22            to move forward.

23                 (Video played.)

24            MR. CLARKE:

25                 We're going to stop at 16:00.

```
 1                    (Video stopped.)
 2   BY MR. CLARKE:
 3        Q    It looks like Deputy Vega -- there's
 4   a switch, correct?
 5        A    Yes, sir.
 6        Q    Where we stopped before at around
 7   15:15 up until 16:00, did you see anything
 8   that you would consider violent resistance?
 9        A    He was still continuing the same
10   amount of resistance that I spoke on earlier.
11        Q    If you had to write a police report
12   and they told you to quantify the amount of
13   resistance that he was giving, what would you
14   --
15        A    Refer to it as active resistance.
16        Q    Active as opposed to passive?
17        A    Sure.
18        Q    Now, we're going to play from 16:00.
19                    (Video played.)
20   BY MR. CLARKE:
21        Q    This looks like where the switch from
22   Pitfield to Vega is, correct?
23        A    Yeah.  I believe so.
24        Q    You're not assisting in any way.
25   You're still standing there with your hands in
```

1    your pocket, right.

2         A    Yes, sir.

3         Q    I'm going to stop it at 16:39.

4                   (Video stopped.)

5    BY MR. CLARKE:

6         Q    There's like four or five -- four

7    other police officers on the scene, and they

8    all leave Vega by himself at 16:39, huh?

9         A    I don't -- this is a very zoomed in

10   image of what I recall this video looking at.

11   So I can't tell you where they went or what

12   they're doing.

13        Q    He's starting to move his body a

14   little more aggressively at this time.  Would

15   you agree?

16        A    I would agree.  My recollection is I

17   was with Deputy Pitfield assessing his injury.

18        Q    Did all the deputies go over to

19   assess Pitfield and leave Vega on top of him?

20        A    I don't recall --

21        Q    But it doesn't appear that there's

22   anything that's causing any other officer

23   concern to have to come in and go hands on

24   with Vega, right?

25        A    Well, we're stopped at the moment,

```
 1    but --
 2        Q    Let's go back 10 seconds and see all
 3    the concern you guys have.  All right.  So
 4    Vega gets on top of him.  There's one, two,
 5    three.  Is that Guidry?
 6        A    Yes, sir.
 7        Q    And there's an officer on top.  So
 8    there's four officers on him at 16 -- it
 9    should be 29.  And then, all the officers
10    leave, correct?
11        A    I can't.  Again, this is a zoomed in
12    version.  If you pull it out, I can tell you
13    where they went.  Did they leave?  No, they
14    didn't leave.  They're still there.
15        Q    They left the immediate area.
16        A    They left the area directly
17    surrounding him, which was within several feet
18    of what I can't see in this video.
19        Q    If an officer was in jeopardy because
20    of a suspect, you wouldn't want to leave them
21    by yourself if you didn't think he had it
22    under control, correct?
23        A    They didn't leave.  They're still
24    there.
25        Q    I mean, does your training tell you
```

```
 1    when one officer is engaged with somebody,
 2    that you kind of walk away from him while he's
 3    struggling in the event?  Didn't they tell you
 4    to stay closer in the event they need
 5    assistance?
 6         A    I don't know what's going on over
 7    here.  So I can't attest to that.
 8                    (Video played.)
 9              MR. CLARKE:
10                   16:42.  Let's stop at 17:00.
11                    (Video stopped.)
12    BY MR. CLARKE:
13         Q    Is this your observation of
14    Deputy Vega pulling a pain compliance
15    technique?
16         A    So initially, that's what I would
17    have thought.  However, later on, I found out
18    that not to be true.
19         Q    Well, you reviewed this with internal
20    affairs and at the time --
21         A    No, sir, with the Detective Bureau.
22         Q    With the detectives with homicide,
23    and you actually said in your statement on
24    page six, "Deputy Vega has a technique, you
25    know, when somebody starts struggling."
```

```
 1        A     Um-huh (affirmative expression).
 2        Q     First of all, what technique does
 3   Deputy Vega have that he uses when somebody
 4   starts struggling?
 5        A     Speaking in general, there's --
 6        Q     No, this is --
 7        A     I understand, but I'm speaking in --
 8        Q     Listen to my question.  Stop.
 9        A     All right.
10        Q     You wrote Deputy Vega has a
11   technique, you know, when somebody starts
12   struggling.  What technique does Deputy Vega
13   have when somebody starts struggling?
14        A     I understand that.  Speaking in
15   general, there is a technique available that
16   if you elevate --
17        Q     No, I'm not -- let's go back.
18             MR. ZIBILICH:
19                  Wait.  Wait.  Timeout.
20             MR. CLARKE:
21                  He's not answering the question.
22             MR. ZIBILICH:
23                  Guess what?  He's not giving you
24             the answer that you want.  You get to
25             ask the question, and he gets to give
```

```
 1              the answer.  If you don't like the
 2              answer, you start over.
 3         MR. CLARKE:
 4              I withdraw the question.
 5         MR. ZIBILICH:
 6              Thank you.
 7    BY MR. CLARKE:
 8       Q    What technique did Deputy Vega have
 9    to utilize when somebody starts struggling?
10    I'm only talking about Deputy Vega.
11       A    The technique that officers use to
12    elevate the arms to gain compliance from a
13    subject.
14       Q    That's trained as a pain compliance
15    technique, correct.
16       A    I don't know if it's referred to as
17    pain compliance.
18       Q    You don't know that?
19       A    I don't recall it being called pain
20    compliance, moreso recall it being leverage.
21       Q    Have you ever in training heard of
22    pain compliance?
23       A    Yes, sir.
24       Q    I mean, there's certain areas of body
25    where you can strike that are --
```

```
 1        A    I'm not an expert on that.
 2        Q    You don't have to be an expert to
 3   have the training.  Do you know what the red
 4   zone is for striking somebody?
 5        A    Sure.
 6        Q    What is that?
 7        A    That would be your lower midback,
 8   your head -- you're talking about MEB
 9   training?
10        Q    Any kind of training.  You've never
11   been trained on what are red, yellow or green?
12        A    You're going into the lines of use of
13   force, deadly force --
14        Q    No.  No.  No.
15        MR. ZIBILICH:
16             Wait.  Wait.  Timeout.  She's
17             starting to hate you all.
18        THE WITNESS:
19             Sorry.
20        MR. ZIBILICH:
21             She's starting to hate both of
22             you all.  You got to let him finish.
23             You got to let him finish.  Don't be
24             so shy.  I can handle you.
25   BY MR. CLARKE:
```

1     Q    Have you ever been trained that there

2   are certain areas of the body that are a red

3   zone, a yellow zone and a green zone?

4     A    Yes, sir.

5     Q    What is a green zone?

6     A    Normally speaking, it would be your

7   outer extremities.

8     Q    Right.  Places where you can inflict

9   force or strike to cause pain to get them to

10  comply that don't cause injury to the people,

11  correct?

12    A    Any use of force can result in

13  certain amounts of injury even in a green

14  yellow or red zone, and it's how you

15  articulate it, plus what type of force we're

16  using.  Is it hands?  Is it less legal means.

17  Is it an item --

18    Q    I'll live with that one.

19         MR. ZIBILICH:

20              Gee, thanks.

21  BY MR. CLARKE:

22    Q    So you said Deputy Vega has a

23  technique, and it's to pull his arms up.

24    A    Slightly raise his arms.

25    Q    Slightly raise his arms.  And how

1    does that stop somebody from struggling?

2         A    It would stop somebody -- it would

3    limit the amount of movement.

4         Q    Is it comfortable --

5         A    Not normally.

6         Q    -- for the suspect?

7         A    No.

8         Q    So according to your statement, he

9    begins to slightly elevate the arms.  He can

10   maintain control of the upper torso.  He

11   begins doing that, and from that point, and I

12   don't recall when, the individual's arms go

13   over his head, and he's now got his hands on

14   the ground flat.  Did you see all that, that

15   whole event?

16        A    I was behind the car.  I saw from

17   behind it.

18        Q    And did you see the hands go being

19   lifted up and then forward?

20        A    I saw his hands raised.  I didn't

21   know whether or not if that was Deputy Vega

22   deliberately raising or if that was from

23   something else.

24        Q    Right, and at the time you gave the

25   statement, you believed that it was a

1  technique that he was using, correct?

2      A    The early portions, yes.

3      Q    That was when you reviewed it with

4  the tape with the homicide detectives,

5  correct?

6      A    At that moment, I realized that he

7  was being pulled forward; that it wasn't

8  anything of a technique.

9      Q    Did you say anywhere in your

10  statement that you saw him being pulled

11  forward?

12      A    I do.  (Witness peruses documents.)

13  I recall describing it.  I don't exactly

14  remember where.

15      Q    Well, review your statement, and tell

16  me where.

17      A    I described it back in the paragraph

18  that you were reading from where Deputy Vega

19  was over -- you could see the force that he

20  was trying to like push up, trying to get

21  himself up.  So I don't know if that was

22  referring to Mr. Parsa or Deputy Vega.

23      Q    Do you see in there anything where

24  you said that Eric Parsa pulled Deputy Vega

25  forward?

```
 1        A    I don't see it, but that's what I
 2   recall.
 3        Q    What you put in here is that what you
 4   observed at the time was you thought he was
 5   doing a technique, and you don't know how his
 6   hands got in front, correct?
 7        A    Yes, sir.
 8        Q    At this point, do you get involved in
 9   the -- do you get involved -- do you go
10   hands-on on Eric at any time?
11        A    I believe I was at his right arm.
12        Q    We'll get there.  So we're at 17:00,
13   and we'll go from there.
14                  (Video played.)
15             MR. CLARKE:
16                  I'm going to stop it at 17:14.
17                  (Video stopped.)
18   BY MR. CLARKE:
19        Q    His hands went in front of him from
20   17:00 to 17:14.  Correct?
21        A    I believe that's accurate, yes, sir.
22        Q    You actually put your arm in-between
23   the kind of -- I think you described an
24   L-shape with Eric Parsa's arm --
25        A    It was his, his L-shaped arm.
```

```
 1      Q    And that was before his hands were
 2   put down on the ground in front of him,
 3   correct?
 4      A    No, sir.  His arm was in an L-shape,
 5   like this, and I was holding this portion of
 6   his arm where his elbow -- his forearm would
 7   be flat on the ground.  His elbow would be in
 8   my hands.  (Indicating.)
 9      Q    I'm going to go back 10 seconds.  At
10   17:05, Eric Parsa's hands are not on the
11   ground, are they?
12      A    Correct.  No, I'm talking about after
13   that is what I'm referring to.
14           MR. CLARKE:
15                We're going to start at 17:05.
16           THE WITNESS:
17                So it would be there where his
18           arm --
19   BY MR. CLARKE:
20      Q    Did Eric Parsa pull you forward?
21      A    Slightly yes, sir.
22      Q    Slightly.
23      A    Um-huh (affirmative expression).  He
24   was pulling.
25           MR. CLARKE:
```

```
 1                    After this, we'll just run it
 2           from 17:11.
 3                    (Video played.)
 4           MR. CLARKE:
 5                    I stopped it at 17:29.
 6                    (Video stopped.)
 7    BY MR. CLARKE:
 8       Q    You're holding down Eric Parsa's
 9    right hand?
10       A    His arm.
11       Q    Right.
12       A    That would be his elbow.  If I recall
13    correctly, that would my right hand and his
14    elbow in an L-shape.
15       Q    What is Vega doing?
16       A    He's trying to control just the
17    cheekbone and the head.  So his arm is across
18    the chest area.
19       Q    So you saw him try to control his
20    head, because of biting, correct?
21       A    Correct.
22       Q    And it went down the right side of
23    his neck and across his chest?
24       A    That's what I recall, yes.
25       Q    You don't know if it slipped up into
```

```
 1    his neck at any time.  Do you?
 2         A    It didn't appear that that ever
 3    happened, no.
 4         Q    I mean, you didn't observe every
 5    second of --
 6         A    That's my head right there.
 7         Q    So you see it.  So if he's choking
 8    him right now --
 9         A    I would know.
10         Q    -- you would know.  Do you hear
11    Ms. Parsa saying you're choking him?
12         A    No.
13         Q    Did you hear that at any time?
14         A    I believe it was after the event.
15              MR. CLARKE:
16                   Starting at 17:29.
17                   (Video played.)
18              MR. CLARKE:
19                   We'll stop it at 17:44.
20                   (Video stopped.)
21    BY MR. CLARKE:
22         Q    Is Deputy Vega still got his -- to
23    your understanding, how long did Deputy Vega
24    have him where he was trying to control his
25    head with his arm across his chest?
```

```
 1        A     To this point.  Deputy Vega kept
 2   indicating to me, that he -- watch out.  He
 3   bites.  He bites is what I remember from that
 4   moment.
 5        Q     At 17:44, he's released the hold?
 6        A     No, I don't believe so, I.  Believe
 7   he's still trying to -- again, his arm is here
 8   across the chest (indicating).  I'm not sure
 9   exactly what Deputy Vega is trying to do, but
10   I can tell you he's not choking him.
11        Q     Okay, but what you're describing as
12   an arm down the right side of his neck or the
13   right side of his body and across his chest.
14        A     Correct.
15        Q     Did Deputy Vega maintain that hold
16   until they put him in the recovery position,
17   or did he release it at some point?
18        A     I don't recall exactly specifics.
19        Q     But before you said your head is
20   right there.  You saw everything.
21        A     Correct.  I was telling you I know
22   he's not choking him.  That's what I'm paying
23   attention to.
24        Q     I'm trying to say when he released
25   whatever potential hold that he had.
```

```
 1       A    Deputy Vega was in that position in
 2   front of me so.  With the movement and the
 3   ever evolving scene, I mean, I know he wasn't
 4   choking him, and his arm was in that position
 5   for quite a while.
 6       Q    Did it remain in that position that
 7   he first put it in until he moved him to the
 8   recovery position?
 9       A    I don't recall.
10       Q    At 17:44 here, it's blocked.  Do you
11   recall whether or not the hold was still
12   being --
13       A    I don't recall.
14            MR. CLARKE:
15                 Playing from 17:44.
16                 (Video played.)
17   BY MR. CLARKE:
18       Q    At 18:30, did it appear they moved
19   him to the recovery position?
20       A    I believe that's when it happened,
21   but it's blocked, and it's hard for me to
22   remember exactly when.
23       Q    Was there any discussion about
24   putting him in the recovery position?
25       A    During a situation like this, you
```

1    continue to reassess.  I believe Deputy Gaudet

2    showed up and lent assistance and said we need

3    to reassess.  At the point that we reassessed,

4    we also -- the actions that he was displaying

5    simmered down.  He was still resisting at one

6    point.  We rolled him to the recovery

7    position.

8         Q    Was there a discussion about it?

9         A    I don't recall.

10        Q    Did you observe Eric Parsa's face

11   turning blue?

12        A    I did not, no.

13        Q    Did you observe foam coming from his

14   mouth?

15        A    Not until after he was on his back

16   and EMS had arrived.

17        Q    Okay.  When you say assess, were you

18   trained how to assess a patient for breathing?

19        A    Airway breathing and circulation, is

20   that what you're referring to?

21        Q    No.  I'm talking about respiration

22   rate.

23        A    First aid -- no, sir.

24        Q    Did anybody check his pulse while you

25   were there?

1        A     I don't recall.

2        Q     Did you check his pulse?

3        A     I did not.

4        Q     Did you check the amount of

5    respirations he was having?

6        A     I did not.

7        Q     Do you know what a normal respiration

8    rate is?

9        A     I do not.

10       Q     We're at 18:30.  Yeah, he's in a

11   recovery position.  We're going to be done.

12            MR. ZIBILICH:

13                 He's narrating.  Thank you.

14            MR. CLARKE:

15                 That's the way you do your

16            statements at JPSO.

17   BY MR. CLARKE:

18       Q     In your statement, you talk about

19   what happened before he got into the recovery

20   position, and if you'd look at like page seven

21   at the bottom paragraph.

22       A     Okay.

23       Q     So by the time he went into the

24   recovery position, you felt that Eric Parsa

25   was not stressing or pulling anymore?

```
 1            MR. ZIBILICH:
 2                Where are you?
 3            MR. CLARKE:
 4                Page seven, the last paragraph.
 5            MR. ZIBILICH:
 6                Okay.
 7            THE WITNESS:
 8                So Lieutenant Meunier asked me
 9            if he goes into cardiac arrest or
10            distress, and I indicate we didn't
11            know at that point.
12   BY MR. CLARKE:
13       Q    Right, and then, you say, but what I
14   do know as we start to feel him not stressing
15   or pulling to resist, we begin coming off.
16       A    Correct.
17       Q    Is that -- you begin coming off is
18   when you rolled him into the recovery
19   position?
20       A    We begin releasing.
21       Q    So on that video, right before you
22   put him in the recovery position, that's when
23   you feel like he was not stressing or pulling
24   anymore or trying to resist.
25       A    Correct.  At the point of the lack of
```

```
 1    resistance, we begin deescalating our use of
 2    force.
 3         Q    Did he go limp?
 4         A    I don't believe he went limp, and I
 5    don't recall specifics, but again, --
 6         Q    And you -- I interrupted you.
 7         A    That's okay.  At the point that he
 8    began -- the resistance subsided, we subsided
 9    within our use of force.
10         Q    So you never received training that
11    when you -- you tell me if you received
12    training on this or not.  When you restrain
13    somebody in the prone position, for the
14    suspect's safety, you need to roll them on his
15    side in the recovery position once it's safe.
16         A    Is it in every single situation, no.
17    Is it --
18         Q    I'm not asking you about situation.
19    I'm asking you about your training.
20         A    When he's under control and you
21    establish control and there's compliance,
22    that's an option.
23         Q    So you got to have all three of
24    those.  You have to have compliance.  How do
25    you get compliance from an autistic kid who
```

1    doesn't speak?

2        A    I'm just telling you that based on

3    the situation, the level of compliance

4    dictates what position you put them in.

5        Q    But were you not trained that with

6    excited delirium people, that they resist for

7    a period of time; and after they're restrained

8    in the prone position, they suffer a sudden

9    death, because of a lack of oxygen?

10       A    Every situation is different, and

11   that's not something that I can definitively

12   say.

13       Q    I'm asking your training.  I'm asking

14   your training.  I'm not asking situations.

15       A    Right, but that's a specific example

16   of one part of training.

17       Q    Did you have that training?

18       A    No.  Say it again.  I'm sorry.

19       Q    Were you trained with any of your

20   training with excited delirium, that they can

21   be combative for a period of time, and they

22   get suddenly tranquil, which is when they've

23   gone into respiratory compromise?

24       A    I do not recall that specific

25   sentiment, no.

1    Q    Do you recall any sentiment about
2  excited delirium go from fighting aggressively
3  to immediately stopping, and that's when they
4  die?
5    A    Again, death, not specifically, no.
6    Q    When he rolled over, did you see him
7  breathing?
8    A    Rolled over?
9    Q    When Eric Parsa was rolled over into
10  the recovery position.
11    A    I don't recall.
12    Q    Did you assess him to see if he was
13  breathing?
14    A    Multiple deputies were in front of me
15  at that point.
16    Q    Did you assess him?
17    A    I did not.
18    Q    Do you know anybody who did?
19    A    I don't recall exactly who was beyond
20  me at that point.
21    Q    You were just dealing with what you
22  had in front of you?
23    A    I don't recall exactly what I did.  I
24  remember EMS showing up and me ultimately
25  trying to assist them getting items.

```
 1        Q     Did you assist in performing CPR?
 2        A     I did not.
 3        Q     It appears that once EMS got back,
 4   you kind of extricated yourself from the
 5   situation and assisted them in getting their
 6   equipment?
 7        A     Yes, sir.
 8        Q     Did you see Eric Parsa get shackled?
 9        A     I believe I removed the shackles.
10        Q     Why did you remove the shackles?
11        A     Just to give EMS the opportunity to
12   have free movement to treat.
13        Q     If you look at page nine of 11 of
14   your statement, you note that there were two
15   episodes of a fight where he resisted; is that
16   correct?
17        A     Where exactly?
18        Q     Towards the bottom, like four.
19        A     Where?
20        Q     It says, Lieutenant M-E-U.
21        A     Meunier.
22        Q     He says, "Okay, have you learned yet,
23   that Deputy Pitfield has been bitten?"  See
24   that?
25        A     Okay.
```

1      Q    I learned that just prior to the

2   second episode of the fight.  So were there

3   two episodes of the fight?

4      A    Well, I understand that Deputy

5   Pitfield had been bitten prior to my arrival.

6      Q    So is that episode one?

7      A    What I understand it, that's what I

8   believe that that means, yes.

9      Q    Do you believe we watched the video

10  from the time you got on there that there was

11  no time in there where he was not struggling

12  enough for the six cops on the scene to put

13  him in the recovery reposition?

14     A    Again, the recovery position is an

15  option.  However, at the time, no, I believe

16  they were doing -- he was in an appropriate

17  position, and he was --

18     Q    Listen to my question.

19     A    Okay.

20     Q    There's six cops on the scene, right?

21     A    Um-huh (affirmative expression).

22     Q    Not everybody that you take into

23  custody complies, correct?

24     A    Correct.

25     Q    There can be a certain amount of

```
 1   resistance that one officer can overcome,
 2   correct.
 3       A    There's a certain amount of
 4   resistance one officer can overcome?
 5           MR. ZIBILICH:
 6               That's a hypothet?
 7           MR. CLARKE:
 8               No.  Let me go back.
 9   BY MR. CLARKE:
10       Q    If you have one officer and one
11   suspect, trying to get him under control is
12   more difficult than if you had six officers,
13   correct?
14       A    Depends on size, stature, education
15   training -- I mean, there's numerous --
16       Q    Okay, you're just not going to answer
17   questions.  We'll just do it that way.
18           So it's your testimony from the time
19   you got on the scene, that he was struggling
20   in such a manner that all the officers on the
21   scene could not move him into the recovery
22   position, correct?
23       A    It's my understanding that we again,
24   based on his actions and his amount of
25   resistance, there was a response.
```

```
 1      Q    Once you put him in the recovery --
 2   if he's dead when you put him in the recovery
 3   position, it doesn't work, right?
 4      A    That's an if.  I don't recall that
 5   being accurate.
 6      Q    He ended up dead.  Are you aware that
 7   the medical examiner noted that the prone
 8   restraint was a contributing factor to his
 9   death?
10      A    I'm not aware of that, no.
11      Q    Okay.  In your statement, you just
12   bring up on page -- the bottom of page nine,
13   top of page 10, you bring up excited delirium.
14      A    Um-huh (affirmative expression).
15      Q    What are you referencing here that
16   people with mental illness or disability --
17   explain to me why you brought up excited
18   delirium.
19      A    I don't recall why.
20      Q    Did you suspect this was an excited
21   delirium case when you got there?
22      A    When I arrived on scene?
23      Q    Or after you assessed it.
24      A    Potentially.
25      Q    Do you know excited -- you say, "We
```

1    train a lot on this, so we, we know that if

2    he's autistic, there are things, excited

3    delirium, there's all kinds of stuff that can

4    take place with somebody with any kind of

5    mental illness or disability, so to engage him

6    at that point just wasn't necessary, he was

7    calm, everything was fine.  It wasn't until

8    the second episode that so many people had to

9    engage because he was so strong."  Do you see

10   that?

11        A    Yes.

12        Q    What are all the dangers and stuff

13   from excited delirium with people who have

14   some type of mental illness or disability that

15   you were talking about?

16        A    What are the dangers?

17        Q    Yeah.

18        A    Specifically in reference to what,

19   because in this statement I'm being just as

20   general as I am explaining to you what my

21   knowledge of excited delirium is?  There are

22   multiple options, multiple contributing

23   factors.

24        Q    Let's do it this way.  There are all

25   kinds of stuff that can take place with

1  somebody.  What are all the kinds of stuff

2  that can take place with somebody suffering

3  from --

4      A    I'm listing them.  Excited delirium

5  is a possibility.  Mental illness or

6  disability is a possibility.

7      Q    Those are all why he's acting that

8  way.  Do you have any training on what to do

9  when you experience somebody with excited

10  delirium with respect to the prone restraint?

11      A    There is no step-by-step process of

12  this.

13      Q    But there were periods of time when

14  you were there when he was calm, correct?

15      A    Periods, yes.  Small periods.

16      Q    During those periods of time, were

17  you not trained that when somebody has a

18  period of calmness when they've been

19  struggling and restrained in the prone

20  position that that's when you should put them

21  in the recovery position?

22      A    Counselor, your suggesting that

23  somebody in that case goes up and down.  In

24  this event, there was a level of resistance

25  that Deputy Pitfield had control; and again, I

1    say why would you change that level of control
2    combating another point of resistance.
3         Q    Because of the -- were you not
4    trained because of the dangers of asphyxiation
5    because of prone restraint?
6         A    Say it again.  It's an option in the
7    dangers.  There are risks.  I wouldn't
8    classify them as dangers.
9         Q    What are the risks of putting
10   somebody in the recovery position?
11        A    There are numerous risks.
12        Q    Go ahead and list them.  List them
13   for the jury.
14        A    Recovery position is an option again
15   with standing, kneeling, prone, recovery.
16        Q    What are the risks of putting
17   somebody in a recovery position?
18        A    The risks?
19        Q    Yeah.
20        A    I mean, it depends if they have
21   something else going on that we don't know
22   about.
23        Q    Okay.
24        A    Again, there's a risk for every
25   position when somebody is restrained.

```
 1        Q    I mean, there's a risk when you wake
 2   up and get out of bed.
 3        A    Absolutely.
 4        Q    Okay.  I mean, in law enforcement,
 5   you're supposed to deal with risks versus
 6   threats, correct?  There's a risk on every
 7   traffic stop, but you don't walk out with your
 8   gun pointed at the driver, do you?
 9        A    It depends.
10        Q    Okay, this is JPSO.
11        A    Did the person just commit an armed
12   robbery, and I'm making a traffic stop on it,
13   sure, maybe.
14        Q    But what if the person is just a
15   traffic ticket?
16        A    What if?  What if?
17        Q    Did you have any conversation or
18   communication at anytime with Donna Lou or
19   Daren Parsa?
20        A    Who's -- the father?
21        Q    Yeah, the father or the mother.
22             MR. ZIBILICH:
23                  The father and the mother.
24             THE WITNESS:
25                  I spoke briefly with the father.
```

```
 1                I don't remember what the grounds of
 2                the conversation were, because I
 3                believe he was primarily speaking
 4                with Detective Vaught, but I was
 5                present.
 6    BY MR. CLARKE:
 7         Q    What I'm trying to say is do you
 8    recall anything that Eric Parsa said, Donna
 9    Lou said, the mother --
10         A    I don't --
11         Q    Let me finish.  Or Daren Parsa said
12    on the scene?
13         A    I don't.  I do not recall.
14         Q    Do you recall Eric Parsa saying
15    anything?
16         A    I remember him speaking.  I don't
17    remember what it was that he said.
18         Q    Was it words, or was it sounds?
19         A    Oh, I'm sorry.  Eric.
20         Q    Yes.
21         A    I don't recall.  I don't remember.  I
22    remember sounds put it that way.
23                MR. CLARKE:
24                    I think I'm done.  Give me a
25                second.
```

```
 1            THE VIDEOGRAPHER:
 2                 Off the record.  The time is now
 3            1:20.
 4                   (Brief pause.)
 5            THE VIDEOGRAPHER:
 6                 Back on the record.  The time is
 7            1:20.
 8   BY MR. CLARKE:
 9       Q    Deputy Mehrtens, what did you hear
10   about -- I think I asked you the question, did
11   you hear Ms. Lou make any complaints -- let me
12   just start over.  Did you hear Ms. Lou make
13   any complaint that he was being choked?
14       A    I did not hear her directly, no.
15       Q    Did you hear on the scene that she
16   had said that?
17       A    I heard after the event that she had
18   said it, yes.
19       Q    So did you hear her make any
20   complaints or anything on the scene before you
21   left?
22       A    No, not to my recollection.
23       Q    Or Mr. Parsa?
24       A    Not to my recollection.
25            MR. CLARKE:
```

1            That's all I have.

2       MR. ZIBILICH:

3            Thank you very much, sir.

4       THE VIDEOGRAPHER:

5            This is the conclusion of

6       videotaped deposition.  We're going

7       off the record.  The time is now

8       1:21.

9            (Whereupon, the deposition was

10      concluded at 1:21 PM.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    WITNESS CERTIFICATE

 2

 3

 4           I, STEVEN A. MEHRTENS, do hereby

 5    certify that the foregoing testimony was given

 6    by me, and that the transcription of said

 7    testimony, with corrections and/or changes, if

 8    any, is true and correct as given by me on the

 9    aforementioned date.

10

11

12

13
      DATE SIGNED          STEVEN A. MEHRTENS
14

15

16

17           Signed with corrections as noted.

18

19           Signed with no corrections noted.

20

21

22

23

24

25
```

```
 1              C E R T I F I C A T E

 2

 3         I, LORI L. MARINO, Certified Court
     Reporter, in and for the State of Louisiana,
 4   as the officer before whom this testimony was
     taken, do hereby certify that STEVEN A.
 5   MEHRTENS,  after having been duly sworn by me
     upon authority of R.S. 37:2554, did testify as
 6   hereinbefore set forth in the foregoing 107
     pages; that this testimony was reported by me
 7   in the stenotype reporting method, was
     prepared and transcribed by me or under my
 8   personal direction and supervision, and is a
     true and correct transcript to the best of my
 9   ability and understanding; that the transcript
     has been prepared in compliance with
10   transcript format guidelines required by
     statute or by rules of the board, that I have
11   acted in compliance with the prohibition on
     contractual relationships, as defined by
12   Louisiana Code of Civil Procedure Article 1434
     and in rules and advisory opinions of the
13   board; that I am not related to counsel or to
     the parties herein, nor am I otherwise
14   interested in the outcome of this matter.

15

16        Dated this 24th day of September, 2022.

17

18

19

20

21        LORI L. MARINO, CCR
          CCR #87069
22        STATE OF LOUISIANA

23

24

25
```