UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CIVIL ACTION NO. 2:21-cv-00080

DONNA LOU and DAREN PARSA, on their own behalf
 and on behalf of their deceased minor child,
E.P.

Plaintiffs,

v.

SHERIFF JOSEPH P. LOPINTO, III, CHAD PITFIELD,
RYAN VAUGHT, STEVEN MEHRTENS, SHANNON GUIDRY,
NICK VEGA, MANUEL ESTRADA, MYRON GAUDET, JOHN
DOES 1-3, VICTORY REAL ESTATE INVESTMENTS LA,
   LLC and WESTGATE INVESTORS NO LLC D/B/A
   WESTGATE SHOPPING CENTER, ABC INSURANCE
            COMPANY, and XYZ INSURANCE,

Defendants.

        Deposition of MANUEL ESTRADA, given

in the above-entitled cause, pursuant to the

following stipulation, before Lori L. Marino,

Certified Shorthand Reporter, in and for the

State of Louisiana, at the Jefferson Parish

Sheriff's Office, 1233 Westbank Expressway,

Building B, 5th Floor, Harvey, Louisiana 70058

on Wednesday, September 14, 2022, commencing

at 9:10 AM.

```
1    APPEARANCES:

2

3    (ALL PARTICIPANTS PRESENT IN PERSON:)

4

5    THE COCHRAN FIRM MID-SOUTH
     ONE COMMERCE SQUARE, SUITE 1700
6    MEMPHIS, TN  38103
     TELEPHONE:  (901) 523-1222
7
     BY:  ANDREW C. CLARKE, ESQ.
8    aclarke@cochranfirmmidsouth.com
     REPRESENTING THE PLAINTIFFS
9

10   HONORABLE FRANZ L. ZIBILICH
     6611 GENERAL DIAZ
11   NEW ORLEANS, LOUISIANA  70124
     TELEPHONE:  (504) 508-6868
12
     BY:  FRANZ L. ZIBILICH, ESQ.
13   fzibilich@gmail.com
14            AND
15   MARTINY & ASSOCIATES, LLC
     131 AIRLINE DRIVE, SUITE 201
16   METAIRIE, LOUISIANA  70001
     TELEPHONE:  (504) 834-7676
17
     BY:  JEFFREY D. MARTINY, ESQ.
18   jeff@martinylaw.com
19            AND
20   JEFFERSON PARISH SHERIFF'S OFFICE
     1233 WESTBANK EXPRESSWAY
21   BUILDING B, FLOOR 5
     HARVEY, LOUISIANA  70058
22   TELEPHONE:  (504) 363-5704
23   BY:  LINDSEY M. VALENTI, ESQ.
     valenti_lm@jpso.com
24   REPRESENTING SHERIFF JOSEPH P. LOPINTO, III
     AND THE JPSO DEFENDANTS
25
```

```
 1   APPEARANCES (CONTINUED)

 2

 3   THOMPSON, COE, COUSINS & IRONS, LLP
     650 POYDRAS STREET, SUITE 2105
 4   NEW ORLEANS, LOUISIANA  70130
     TELEPHONE:  (504) 526-4321
 5
     BY:  CHRISTOPHER W. KAUL, ESQ.
 6   ckaul@thompsoncoe.com
     REPRESENTING VICTORY REAL ESTATE INVESTMENTS
 7   LA, LLC AND WESTGATE INVESTORS NO LLC
     D/B/A WESTGATE SHOPPING CENTER, ABC INSURANCE
 8   COMPANY, AND XYZ INSURANCE COMPANY

 9

10   VIDEOGRAPHER:  AARON PALMER, CLVS, DEPO-VUE

11   ALSO PRESENT:  TIM ANCLADE, LEGAL INVESTIGATOR
                    MYRON A. GAUDET, JR.
12                  STEVEN A. MEHRTENS

13

14   REPORTED BY:  LORI L. MARINO
                   CERTIFIED COURT REPORTER
15                 STATE OF LOUISIANA

16

17

18

19

20

21

22

23

24

25
```

```
 1      E X A M I N A T I O N        I N D E X

 2

 3   MANUEL ESTRADA
     1233 WESTBANK EXPRESSWAY
     HARVEY, LOUISIANA  70058
 4
```

```
 5   TITLE                                     1

 6   APPEARANCES                               2-3

 7   WITNESS INDEX                             4

 8   AGREEMENT OF COUNSEL                      5

 9   EXAMINATION BY MR. CLARKE                 6

10   WITNESS'S CERTIFICATE                     127

11   REPORTER'S CERTIFICATE                    128

12

13       E X H I B I T       I N D E X

14   EXHIBIT 84                                9

15   EXHIBIT 85                                9

16   EXHIBIT 86                                10

17   EXHIBIT 87                                11

18   EXHIBIT 88                                76
```

```
19

20

21

22

23

24

25
```

```
 1              S T I P U L A T I O N

 2           It is stipulated and agreed by and

 3    between Counsel for the parties hereto that

 4    the deposition of MANUEL ESTRADA is hereby

 5    being taken pursuant to the Federal Rules of

 6    Civil Procedure for all purposes in accordance

 7    with law;

 8           That the formalities of

 9    certification and filing are specifically

10    waived;

11           That the formalities of reading and

12    signing are specifically not waived.

13           That all objections, save those as

14    to the form of the question and/or

15    responsiveness of the answer, are hereby

16    reserved until such time as this deposition or

17    any part thereof is used or sought to be used

18    in evidence.

19           *   *   *   *   *   *   *

20           LORI L. MARINO, Certified Court

21    Reporter, in and for the State of Louisiana,

22    officiated in administering the oath to the

23    witness.

24

25
```

```
 1              THE VIDEOGRAPHER:
 2                   This is the videotaped
 3         deposition of Manuel Estrada.  This
 4         deposition is being held at 1233
 5         Westbank Expressway in Harvey,
 6         Louisiana on September 14, 2022.  The
 7         time indicated on the video screen is
 8         9:10.  Would counsel please introduce
 9         themselves for the record?
10         MR. CLARKE:
11                   Andy Clarke for the plaintiff.
12         MR. ZIBILICH:
13                   Franz Zibilich and Jeff Martiny
14         on behalf of all the JPSO defendants,
15         including Sheriff Lopinto.
16         MR. KAUL:
17                   Chris Kaul on behalf of the
18         Westgate defendants.
19         THE VIDEOGRAPHER:
20                   Would the court reporter please
21         swear in the witness.
22                   MANUEL ESTRADA, having been
23         first duly sworn was examined and
24         testified on his oath as follows:
25                        EXAMINATION
```

1    BY MR. CLARKE:

2         Q    Would you please state your name?

3         A    Manuel Estrada.

4         Q    And by whom are you employed?

5         A    Jefferson Parish Sheriff's Office.

6         Q    Are you a deputy, or do you have any

7    rank?

8         A    Deputy.

9         Q    Deputy Estrada, my name is Andy

10   Clarke.  I met you just briefly before your

11   deposition.  Have you given a deposition

12   before?

13        A    No.

14        Q    Because -- let me just go over some

15   ground rules, okay?  Obviously, you understand

16   your testimony here is under oath subject to

17   the penalty of perjury, correct?

18        A    Yes.

19        Q    A lot of times -- and this is my

20   opportunity to ask you questions that are

21   relevant to the lawsuit that's been filed by

22   the Parsas pertaining to the incident that

23   happened on January 19, 2020.

24             MR. ZIBILICH:

25                  That means I can object to any

```
 1              one that's not relevant?
 2              MR. CLARKE:
 3                   No.  That doesn't mean that at
 4              all.
 5  BY MR. CLARKE:
 6      Q    But obviously, I'm going to ask you
 7  questions, and if you don't understand my
 8  question, I want you to tell me, okay?
 9      A    (Witness nods head affirmatively.)
10      Q    Another thing you have to do is you
11  have to give audible answers, yes or no,
12  instead of nodding your head, because --
13      A    Yes.  Okay.
14      Q    -- even though we have a video here,
15  the court reporter has to take it down, okay?
16      A    Sure.
17      Q    So if I ask you something you don't
18  understand, just let me know, and I'll try to
19  rephrase it, okay?
20      A    Sure.
21      Q    Also, there are some documents that
22  have been produced in discovery during this
23  lawsuit that I have, and what I've done is
24  I've marked certain documents and put them in
25  front of you.
```

```
 1            MR. CLARKE:

 2                 For the record, I want to go

 3            through what I've marked.  Exhibit 84

 4            is your personnel file.  That's the

 5            big one.  So if we ask you questions

 6            about your service and you need to

 7            refer to that, please feel free to,

 8            okay?

 9            THE WITNESS:

10                 Sure.

11            MR. CLARKE:

12                 Exhibit 85, if you'll look at

13            that, this is called "Manuel

14            Estrada's Supplemental Responses to

15            Plaintiffs' First Interrogatories and

16            Requests for Production."

17   BY MR. CLARKE:

18       Q    If you could briefly look over that.

19       A    (Witness peruses document.)

20       Q    Do you see your answer on the second

21   page?

22       A    Yes.

23       Q    Now, that's a paragraph that was

24   written on your behalf that says what happened

25   during the events on January 19th, correct?
```

```
 1        A     Yeah.
 2        Q     The statement you gave was much more
 3   detailed than that.  Would you agree?
 4        A     Yes.
 5        Q     And the statement was given much
 6   closer to the time of the events and while
 7   watching the video, correct?
 8        A     Yes.
 9        Q     So would you agree that that was
10   probably more thorough and accurate?
11        A     I believe so, yes.
12              MR. CLARKE:
13                   So that's Exhibit 85.
14                   Exhibit 86 is your responses to
15              our first set of interrogatories and
16              requests for production, and I'm not
17              going to have you go through every
18              answer, but let's go to Interrogatory
19              Number 18.
20   BY MR. CLARKE:
21        Q     There's no page numbers on it.  Right
22   before, it says, "Request for Production," and
23   Interrogatory Number 18 says, "Identify all
24   accommodations, if any, you contend that you
25   provided Eric Parsa to accommodate his
```

1    disability."  Do you see that?

2        A    Yeah, I see it.

3        Q    And your answer was "No

4    accommodations were requested nor provided

5    during the incident as described in the police

6    report," correct?

7        A    Yes.

8        Q    All right, so you didn't provide any

9    type of accommodations due to his autism,

10   correct?

11       A    Yes.

12       Q    Exhibit Number 87 is your statement,

13   correct?

14       A    Yes.

15       Q    Now, this statement was given on

16   January 23rd, and while you were giving that

17   statement, you were reviewing the Laser Tag

18   video with the investigators, correct?

19       A    I don't remember.

20       Q    Well, if you look at it, if you look

21   on page two of it, it says, "So this is the

22   parking lot right in front of Laser Tag, um,

23   it's going to be Chad's vehicle and the two

24   detectives," correct?  Are you not looking at

25   the video?

```
 1        A    Where was that?

 2        Q    The second --

 3        A    Oh, okay.  Okay.  Yes.

 4        Q    And look, I'm not trying to trick

 5   you.

 6        A    Yeah.  No, I really, you know.

 7        Q    It's been awhile ago.  I understand

 8   that, but the way that I read that, it looks

 9   like all the officers looked at the video when

10   they were talking to them to try to describe

11   things, correct?

12        A    Okay.

13        Q    All right, and we'll get back to

14   this.  Now, the last thing that I have in

15   front of you is your training resume, and we

16   may get to that.  So those are documents that

17   may be relevant to the types of questions

18   we're going to ask you today; and if you need

19   to refer to them at any time, just let me

20   know, all right?

21        A    Okay.

22        Q    Let me find out a little bit about

23   you.  Did you graduate from high school?

24        A    Yes.

25        Q    Where did you gradate from high
```

13

```
 1   school?
 2       A     Bonnabel.
 3             MR. ZIBILICH:
 4                 Bonnabel, B-O-N --
 5             MS. VALENTI:
 6                 N.
 7             MR. ZIBILICH:
 8                 You want the rest of it?
 9             MR. CLARKE:
10                 E-A-U-7-9-4-E.
11             MR. ZIBILICH:
12                 Bonnabel, it's a high school in
13             Metairie.  You're going to pass it on
14             the way out of here.
15             MR. KAUL:
16                 It's Kenner.
17             MR. ZIBILICH:
18                 It is Kenner.
19   BY MR. CLARKE:
20       Q     What year was that?
21       A     Seventy-nine.
22       Q     Did you have any college courses or
23   get any degrees?
24       A     No.
25       Q     When did you start -- is Jefferson
```

```
 1    Parish Sheriff's Office the first department
 2    you've worked for?
 3         A    Yeah.
 4         Q    And the only department?
 5         A    Yes.
 6         Q    When did you start working for them?
 7         A    In 2004.
 8         Q    Tell me how that happens.  Why did
 9    you want to go into law enforcement?
10         A    I had been wanting to do that since
11    probably the 80s.
12         Q    What type of work did you do after
13    high school and prior to becoming a deputy
14    with the JPSO?
15         A    Mostly automotive.
16         Q    Okay.
17         A    Two dealerships and managed an auto
18    repair shop.
19         Q    What I'm trying to get at, was any of
20    your prior work history relevant to law
21    enforcement?
22         A    No.
23         Q    So 2004, I guess you filled out an
24    application for the JPSO?
25         A    Probably in 2002.
```

1    Q    So there was -- they weren't hiring

2    for a period of time?

3    A    (Witness nods head affirmatively.)

4    Q    All right, so you put in your

5    application, and then, tell me how you start

6    your process to be hired.

7    A    There's a large application to fill

8    out to get the background check; and then, if

9    you pass the background check, then,

10   eventually, you'll take some tests; and before

11   you take a couple of tests, then, if you pass

12   those, then, you'll go to the academy.

13   Q    Obviously, you came and you took

14   those tests.  You have to get medically

15   cleared and psychologically cleared?

16   A    Yes.

17   Q    And did you go to the academy at

18   JPSO?

19   A    Yes.

20   Q    Do you know when you became POST

21   certified?

22   A    In 2004.

23   Q    And let's talk a little bit about the

24   training that you had at the JPSO training

25   academy.  It's a fairly substantial class.

1   It's number of weeks, correct?

2        A    Yes.

3        Q    Do you recall how many weeks it was?

4        A    For the academy?

5        Q    Yeah.

6        A    I was part-time.  So it's longer than

7   usual.  It might have been like seven or eight

8   months.

9        Q    So it's the same curriculum, but

10  because it's part-time, it's spread out over a

11  longer period of time than if you went to the

12  full-time academy; is that fair?

13       A    Yes.

14       Q    In the academy, they train you all

15  the general rules about how to be a police

16  officer, correct?

17       A    Yes.

18       Q    From report writing to deadly force,

19  correct?

20       A    Yes.

21       Q    Some of the bigger blocks of training

22  in the academy are, number one, physical

23  fitness is done all the time, correct?

24       A    Yes.

25       Q    Firearms qualifications is a very big

```
1    block of the training, correct?

2        A    I believe so.

3        Q    If you remember.

4        A    Yeah.

5        Q    I mean, you have to qualify in a

6    number of different ways, --

7        A    Sure.

8        Q    -- different hands, left right,

9    different distances, correct?

10       A    Yes.

11       Q    Did you have any training on dealing

12   with people suffering from autism or

13   intellectual disabilities?

14       A    I believe we did.  I don't remember

15   all of them, but I would assume possibly.

16       Q    Well, we can assume possibly you

17   didn't, correct?

18       A    Did we?  I don't remember.

19       Q    If you don't remember, I mean --

20            MR. ZIBILICH:

21                 This is what he's trying to tell

22            you:  He's trying to tell you not to

23            guess.

24            THE WITNESS:

25                 All right.
```

1    BY MR. CLARKE:

2        Q    In your training academy, did you

3    have any training on deescalation?

4        A    Sure.  Yes.

5        Q    Do you recall any of it?

6        A    Yes.

7        Q    Did any of the deescalation tactics

8    or scenarios deal with people suffering from

9    autism or some type of inability to

10   communicate?

11       A    I don't remember that, no.

12       Q    In the academy, did you receive any

13   training on the Americans with Disabilities

14   Act that you recall?

15       A    I don't recall.

16       Q    Did you receive any training on the

17   requirement to provide accommodations to

18   people with disabilities?

19       A    I don't recall.

20       Q    When you were in the academy, were

21   they teaching you general basic police stuff,

22   or were they training you on the JPSO policy?

23       A    That's like two questions you're

24   asking me.

25       Q    Okay, let me rephrase it then.  It's

```
 1    my understanding that the training academy is
 2    a POST certified academy and follows a POST
 3    curriculum.  Is that your understanding?
 4         A    Yes.
 5         Q    That's where you go to get certified,
 6    correct?
 7         A    Yes.
 8         Q    So they teach you general law
 9    enforcement skills, but not particular to a
10    policy of a particular department, because
11    it's not just JPSO officers that are there.
12    Is that your understanding?
13         A    I'm not sure what you're asking me.
14         Q    What I'm trying to get at is you can
15    have -- okay, every department can have a
16    different policy, correct?
17         A    Okay.
18         Q    Like we've had a lot of pursuit
19    issues going on here in the recent days.  You
20    can go to an academy and learn how to drive
21    and how to brake and how to steer and things
22    like that, but a department can have a policy
23    that says, we don't chase anybody, and then,
24    you would have to follow that policy, right?
25         A    (Witness nods head affirmatively.)
```

```
1        Q    Or we can only chase violent felons.
2   That might be a policy that they have?
3        A    (Witness nods head affirmatively.)
4        Q    Or we can chase anybody, right?
5        A    Okay.
6        Q    So a department can have different
7   policy decisions on the skills that you learn
8   in basic academy.  Is that fair?
9        A    Yes.
10       Q    So you go through your basic training
11  with -- at the JPSO, and then, if you go to
12  Exhibit 33, your training resume, what I want
13  to do is go over that.  Did you receive any
14  training, you know -- after the academy you
15  had a in-service, correct?
16       A    Yes.
17       Q    When I'm asking you these questions
18  about training, I'm going to ask you if you've
19  had training on certain topics, and I need you
20  to see if you can identify whether you have.
21       A    Okay.
22       Q    Have you had any training on dealing
23  with people with autism?
24       A    I don't remember.  It's possible.
25       Q    That's why I'm asking you to look at
```

```
 1    the record.
 2         A     Okay.
 3               MR. ZIBILICH:
 4                    Without being picky, that's a
 5               different question.  If the question
 6               is do the records reflect that he got
 7               training, that's one thing, but if he
 8               doesn't have any independent
 9               recollection, that's two different
10               questions.
11               MR. CLARKE:
12                    I'll disagree.
13               THE WITNESS:
14                    I don't know if it's in here.  I
15               took it.
16    BY MR. CLARKE:
17         Q     Well, do you see anything, the name
18    of any class that tells you you took anything
19    on autism?
20         A     I don't see anything.
21         Q     Did you take any classes on the
22    Americans with Disabilities Act?
23         A     Not that I know of.
24         Q     Did you take any classes on dealing
25    with intellectually disabled people?
```

1     A     Not that I know of.

2     Q     Did you take any classes on -- you

3  took classes on use of force, correct?

4     A     Yes.

5     Q     You took a lot of classes on

6  preventing sexual harassment, correct?

7     A     Yes.

8     Q     Do you recall getting training on the

9  RIPP Hobble?

10    A     Yes.

11    Q     Was that Sergeant Pizzolato who

12 provided that training?

13    A     It's possible.  I don't recall.  They

14 have lots of --

15    Q     Let's talk about the RIPP Hobble

16 training.  What is a RIPP Hobble?

17    A     It's like a -- it's a belt type

18 material, cloth maybe.  It's got a loop.  You

19 just loop it around to -- you asked what is

20 it?

21    Q     Yeah.

22    A     Basically, it's used where you loop

23 it around someone's ankles, and then, you

24 bring it up around to the handcuffs when

25 they're applied to the back to keep people

```
 1    from running.
 2        Q    So you attach the legs to the
 3    handcuffs?
 4        A    The hobble goes, it's looped around
 5    your ankles and then you adjust it.  Then it
 6    comes up you loop it around to the handcuffs,
 7    and it locks.
 8        Q    So is that a hog-tie?
 9        A    No.
10        Q    So you know what a hog-tie is, right?
11        A    Um-huh (affirmative expression).
12        Q    You have to say yes or no.
13        A    Yes.
14        Q    Are you allowed to hog-tie at the
15    Jefferson Parish --
16        A    No, sir.
17        Q    Okay, and is the belt of sufficient
18    length so that the legs can be extended
19    straight?
20        A    You could stand with the hobble when
21    it's applied.
22        Q    So that's -- the distinction is it's
23    a longer piece of nylon or rope, correct?
24        A    Yes.
25        Q    When are you supposed to use the
```

```
1   hobble from your training?
2       A    It's been used, say, if you have
3   someone in a car that's trying to kick the
4   window out.
5       Q    You weren't trained that it's used to
6   restrain people in the street?
7       A    I've used it if someone is
8   handcuffed, and they might try to run.
9       Q    All right.
10      A    So they could stand, and it's applied
11  around the ankles, and it's looped around the
12  handcuffs.
13      Q    After you took the training, did you
14  get a RIPP Hobble?
15      A    Yes.
16      Q    Did you have one on January 19, 2020?
17      A    Yes.
18      Q    Did you have it in your car?
19      A    Yes.
20      Q    Is there any reason why you didn't
21  use it that day?
22      A    Because I felt that it would come
23  loose.
24      Q    Well, your training says to use that
25  when you have a violent prisoner, correct?
```

```
 1        A     Yes.
 2        Q     You just disregarded your training?
 3        A     No.  He was -- you're asking why I
 4   didn't use it?
 5        Q     Yeah.
 6        A     Because I felt that at the time, I
 7   had shackles or I had the hobble, and he was a
 8   large man.  I wasn't sure if it could reach,
 9   and the shackles would be right there just on
10   his ankles.
11        Q     Were you trained to use shackles on
12   somebody's ankles to other than transport?
13        A     Trained, no.
14        Q     I mean, you understand that the JPSO
15   has written policies that you're supposed to
16   comply with, right?
17        A     Yes.
18        Q     And the training, you're supposed to
19   comply with, correct?
20        A     Yes.
21        Q     Okay.  So we'll go over -- if you'll
22   look at that notebook that I have out in front
23   of you, Exhibit 19, the notebook.
24             MS. VALENTI:
25                 The binder.
```

```
 1            MR. ZIBILICH:
 2                 He's trying to say binder.
 3            THE WITNESS:
 4                 This (indicating)?
 5            MR. ZIBILICH:
 6                 The one to the right, yes.
 7            MR. CLARKE:
 8                 Okay.
 9    BY MR. CLARKE:
10        Q    Are you aware of the Use of Force
11    Policy?
12        A    Yes.
13        Q    SOP-25, I think.  Can you go to
14    SOP-25.  Now, according -- were you trained in
15    in-service or at any time on the actual Use of
16    Force Policy, or were you just provided a copy
17    of the policy and told that you have to comply
18    with it?
19        A    We were trained this.
20        Q    Okay, who trained you on the policy?
21        A    That, I don't remember.
22        Q    So were you trained on a continuum of
23    force?
24        A    What exactly do you mean?
25        Q    If you look at Subsection B of the
```

```
 1   Use of Force Policy.
 2        A     B?
 3        Q     B?
 4        A     Okay.
 5        Q     If there's an escalation of force in
 6   response to the conduct of the suspect.
 7        A     Okay.
 8        Q     Were you trained in that?
 9        A     Yes.
10        Q     Okay.  So you start with verbal
11   commands and then move up to bodily force, and
12   then, you can escalate to intermediate
13   weapons, correct?
14        A     Yes.
15        Q     And then, up to deadly force.  Were
16   you aware of the policy -- let's go to SOP-8.
17        A     (Witness complies.)  Okay.
18        Q     Are you there?
19        A     Yeah.
20        Q     Were you aware of the policy on
21   restraining devices and defensive devices?
22        A     Yes.
23        Q     According -- do you know what a TARP
24   is?
25        A     No.
```

```
 1        Q    If you go to section -- it's Page 5
 2   of 6, Section B.  What is the Total Appendage
 3   Restraining Procedure?
 4        A    I don't understand what you're
 5   asking.
 6        Q    Section D on Page 5.
 7        A    Okay.
 8        Q    Do you know what the Total Appendage
 9   Restraining Procedure is?
10        A    Yes.
11        Q    What is the Total Appendage
12   Restraining Procedure?
13        A    From when I look at D, I'm assuming
14   that's just additional restraints, type of
15   restraining.
16        Q    I mean, if -- you're supposed to know
17   the policy, correct?
18        A    Yeah.  I don't remember it.
19        Q    Does the Total Appendage Restraining
20   Procedure involve the use of leg shackles?
21        A    It says, extremely violent prisoners
22   may be additionally restrained.
23        Q    Right:  "If necessary to restrain the
24   movements of both hands and legs, it may be
25   done by the 'Total Appendage Restraining
```

1   Procedure'."

2        A    Okay.

3        Q    You don't know what that is?

4        A    No.  I don't understand what it

5   means, but I'm --

6        Q    Well, if you don't -- did you

7   understand what it meant on January 19, 2020?

8        A    It says, "Extremely violent prisoners

9   may be additionally restrained."  So I used an

10  additional restraint by putting the shackles

11  on his ankles.

12       Q    It actually says if you want to

13  restrain them you do it through the "Total

14  Appendage Restraining Procedure," in quotation

15  marks, correct?

16       A    Okay.

17       Q    So that is an actual procedure; it's

18  not what you think, correct?

19       A    But what that means, I don't

20  understand exactly what it means.

21       Q    Okay.  It's the RIPP Hobble.

22       A    Okay.  If you look at exhibit -- I'll

23  get to something.  I'm going to show you

24  what's Exhibit 22.  That was produced by JPSO

25  as what the TARP procedure is.  Okay, now, --

```
 1              MR. ZIBILICH:

 2                   Manny, listen to his question.

 3    BY MR. CLARKE:

 4       Q    Were you trained at anytime on

 5    excited delirium or positional asphyxia?

 6       A    I don't remember.

 7       Q    Well, let's just go through the TARP

 8    training then.  Take out Exhibit 22.  I just

 9    handed --

10              MR. ZIBILICH:

11                   That's the one he just handed

12              you on your right.

13    BY MR. CLARKE:

14       Q    Let's do one thing first before we do

15    that.  Were you trained at anything -- were

16    you trained at all about the dangers of

17    restraining somebody in the prone restraint --

18    in the prone position?

19       A    Prone meaning laying down?

20       Q    Laying down facedown.

21       A    Yes.

22       Q    Were you told that when a suspect is

23    restrained in a facedown position, breathing

24    may become labored?

25       A    Yes.
```

```
 1        Q    Were you trained that when weight is
 2   applied to a person's back, the more weight,
 3   the more severe the degree of compression?
 4        A    On their back?
 5        Q    Yes.
 6        A    Yes.
 7        Q    Were you trained that when there's
 8   compression on a back, a person experiencing
 9   increased difficulty breathing?
10        A    Yes.
11        Q    Were you trained that the natural
12   reaction to oxygen deficiency, when that
13   happens, the person who's being restrained
14   struggles more violently?
15        A    I'm trying to understand what you're
16   --
17             MR. ZIBILICH:
18                  He's asking you very simply.
19             THE WITNESS:
20                  Okay.
21             MR. ZIBILICH:
22                  Were you trained, and then, he's
23             filling in the blanks.  So it's yes,
24             no, don't remember.
25             THE WITNESS:
```

```
 1                    Don't remember.
 2    BY MR. CLARKE:
 3         Q    All right.  So you're not -- you
 4    weren't -- did you play football in high
 5    school?
 6         A    A little.
 7         Q    Have you ever been at the bottom of a
 8    pile?
 9         A    No.
10              MR. ZIBILICH:
11                   You?
12              MR. CLARKE:
13                   I have.  I made tackles.  I
14              didn't sit on the bench.
15              THE WITNESS:
16                   I was a safety.  So I wasn't up
17              there in the front.
18    BY MR. CLARKE:
19         Q    Well, what I'm trying to get at,
20    common sense, if there's people on top of you,
21    you start breathing.  If you can't breathe,
22    you struggle, right?
23         A    Yes.
24         Q    Were you trained that you have to be
25    careful of these things in how you restrain
```

1    people?

2         A     Was I trained on how to restrain

3    people?

4         Q     No.  Were you trained that this type

5    of interaction, this type of struggle with

6    somebody in the prone position is dangerous?

7         A     I believe so.  I'm not sure.  I don't

8    remember.

9         Q     Were you trained that people who are

10   obese are at a greater risk of being

11   asphyxiated being restrained in the prone

12   position?

13        A     That, I don't recall.  I don't

14   remember.

15        Q     If you look at -- were you trained on

16   excited delirium?

17        A     Was I?

18        Q     Yes.

19        A     I don't recall.

20        Q     Well, you agree that when a

21   department gives you training, they're trying

22   to give you tools to utilize to do your job

23   safely?

24        A     Yes.

25              MR. ZIBILICH:

```
 1                Object to the form.  You can
 2          answer it.
 3                MR. CLARKE:
 4                Okay.
 5  BY MR. CLARKE:
 6      Q    You understand that you have to be
 7  able to -- the training is designed so that
 8  you can be able to utilize the skill in the
 9  field, correct?
10          MR. ZIBILICH:
11                Object to the form again.  You
12          can answer it.
13          THE WITNESS:
14                Yes.
15  BY MR. CLARKE:
16      Q    Like they don't train you with --
17  they don't let you carry equipment that they
18  don't train you with, correct?
19      A    Correct.
20      Q    I mean, you can't bring your own
21  equipment in and utilize your own type of
22  pepper spray or -- the department tells you
23  what type of tools you have and how to use
24  them, correct?
25      A    Yes.
```

```
 1        Q    So, if we look at Exhibit 22, do you
 2   remember seeing any videos when you had RIPP
 3   Hobble training?
 4        A    I don't remember that.
 5        Q    All right, let's go -- was your RIPP
 6   Hobble training -- when -- was it done by
 7   Kerry Najolia?
 8        A    I don't remember that.  It's been
 9   awhile.
10        Q    Let's just go through this thing.
11   Just start at the beginning.  This is the
12   PowerPoint.  The second page, they show you a
13   video, right?  We're just going to go through
14   this whole thing.
15             MR. ZIBILICH:
16                  Excuse me a second.  What's the
17             date on that?
18             MR. CLARKE:
19                  It's whenever you produced it to
20             me.  The copyright date is 1994 on
21             this.
22             MR. ZIBILICH:
23                  You're presuming that was the
24             PowerPoint that was used then.
25             MR. CLARKE:
```

```
 1              I've got the same one that
 2         Najolia did in 2004.  It's the same
 3         PowerPoint.
 4         MR. ZIBILICH:
 5              I'm just suggesting that you're
 6         presuming that's the same one that he
 7         learned from.
 8         MR. CLARKE:
 9              I'm presuming that when I asked
10         the question about what the training
11         is, I get produced the training.
12  BY MR. CLARKE:
13     Q    So let's start on -- just go to the
14  top page.  The second page, it says they
15  showed a video, right?
16     A    Um-huh (affirmative expression).
17     Q    You don't recall the video.  Do you
18  remember being trained anything about sudden
19  custody death syndrome versus police custody
20  death syndrome?
21     A    Not really.
22     Q    Do you even know what sudden custody
23  death syndrome is or police custody death
24  syndrome are?
25     A    No.
```

1       Q    Next slide talks about perception.
2   The next slide, did you talk about cocaine
3   psychosis?  You ever had any training on that?
4       A    I don't recall.
5       Q    Do you know any symptoms, were you
6   trained on any of the symptoms of cocaine
7   psychosis?
8       A    I don't remember.
9       Q    Do you know if somebody is acting in
10  an irrational way and they have a high body
11  temperature, is that an indication of
12  anything?
13      A    It could be -- is it an indication if
14  you have a high body --
15      Q    Were you trained, were you trained
16  that it's an indication on anything?
17      A    I don't remember that.
18      Q    Well, do you even recall even being
19  trained at all on excited delirium?
20      A    No.  I don't recall.
21      Q    Do you know what it is?
22      A    I would look at it as somebody that's
23  acting erratic.
24      Q    All right, disabled people act
25  erratic, right?

```
 1      A     No.

 2            MR. ZIBILICH:

 3                  Object to the form.  You can

 4            answer it.

 5            THE WITNESS:

 6                  No.

 7  BY MR. CLARKE:

 8      Q     They don't?

 9      A     No.  My sister was disabled she

10  wasn't erratic.

11      Q     What about autistic people?

12      A     Possibly.

13      Q     But you just don't know what it is,

14  correct, excited delirium?

15            MR. ZIBILICH:

16                  He gave you his answer.

17  BY MR. CLARKE:

18      Q     Answer it.  What's your answer?

19      A     Somebody that is acting erratic.

20      Q     Let's keep going through.  They have

21  a whole bunch of slides on substance abuse,

22  excited delirium, and the signs and symptoms

23  of them, correct?  You don't recall any of

24  that training though, right?

25      A     (Witness shakes head negatively.)
```

1    No, it's been awhile.

2        Q    They kind of just go through it.

3    Then, they have another video that they show

4    you, and then, they go through some scenarios,

5    correct?  A clinical picture, and then, they

6    do some case histories.  Do you remember case

7    histories in training?

8        A    I mean, I see it here, but I don't

9    remember it.

10        Q    Do you remember seeing COPS videos in

11   training at the Jefferson Parish Sheriff's

12   Office?

13        A    If it's COPS, I don't know

14   specifically.

15        Q    Okay.  Did you know -- were you

16   trained that people who are suffering from

17   O.C. -- I mean, excited delirium or cocaine

18   psychosis, that pain compliance techniques are

19   normally not helpful?

20        A    What was the question again?

21        Q    Were you trained at anytime that

22   people who are experiencing excited delirium,

23   that the following techniques are ineffective:

24   Pain compliance techniques, impact weapons,

25   defensive tactics and O.C.?

```
 1        A      If it's in here, yes.
 2               MR. ZIBILICH:
 3                    No, that's not his question,
 4               sir.  His question is do you remember
 5               being trained on that area?
 6               THE WITNESS:
 7                    No.
 8   BY MR. CLARKE:
 9        Q      Were you trained when you're dealing
10   with an erratic person that it's better to
11   have more officers there?
12        A      I don't remember that.
13        Q      Well, it's common sense, if you have
14   an erratic person, do you agree, that the more
15   officers, the better it is to control?
16               MR. ZIBILICH:
17                    Object to the form, common
18               sense.
19               MR. CLARKE:
20                    Are you saying you don't have
21               it?
22               MR. ZIBILICH:
23                    Pardon?
24               MR. CLARKE:
25                    Why do you object?
```

```
 1          MR. ZIBILICH:
 2              Because your definition of
 3          common sense could be entirely
 4          different than his.  As a matter of
 5          fact, I'm sure it is.  Can I just
 6          grill you on sales and leases when
 7          you were in law school?
 8          MR. CLARKE:
 9              No.
10          MR. ZIBILICH:
11              No, I can't?
12          MR. CLARKE:
13              I mean, we can do it after the
14          fact.
15 BY MR. CLARKE:
16     Q    You had no training that in
17 interacting with members of the public, that
18 it's better to have more officers to control
19 people?
20     A    I don't recall hearing that.
21     Q    So if you go to this line on pain
22 compliance, about -- it's after the --
23     A    I see it.
24     Q    Okay.  Pain compliance, okay.  The
25 next page it says, "Never go one-on-one with
```

```
 1    these subjects unless a life depends on it."
 2    Do you see that?
 3         A    Yes.
 4         Q    Always call for back-up as soon as
 5    possible as you are faced with a substance
 6    induced excited delirium suspect, right?
 7         A    Yes.
 8         Q    Call for as much backup as you can,
 9    correct?
10         A    Yes.
11         Q    Talk to the subject in a calm,
12    soothing manner, and when you have adequate
13    manpower, then, take them into custody,
14    correct?
15         A    Yes.
16         Q    But you don't recall that training,
17    right?
18         A    No.
19         Q    Go to the next slide.  Positional
20    restraint asphyxia, what is positional
21    restraint asphyxia?
22         A    It says occurs when the position of
23    the body interferes with respiration.
24         Q    And that's in -- what position of the
25    body interferes with respiration?
```

```
 1        A     What position of the body?
 2        Q     Right.
 3        A     It says it's increased when the
 4   subject is placed in a physically-compromised
 5   position.
 6        Q     What is a physically-compromised
 7   position?
 8             MR. ZIBILICH:
 9                  Object to the form.  Go ahead.
10             You can answer it.
11             THE WITNESS:
12                  I don't know.  It could be maybe
13             a few.  I don't know.
14   BY MR. CLARKE:
15        Q     Tell me one that you were trained on.
16        A     What would be a compromised position?
17        Q     Yeah.
18        A     I guess sitting in the wrong
19   direction.
20        Q     In which direction?  You can look at
21   the whole thing.  I'm not trying to trick you,
22   --
23        A     Yeah.
24        Q     -- but I'm trying to find out --
25        A     Yeah.  Like, if you're slouched over.
```

```
 1        Q    What about being restrained in the
 2    prone position?
 3        A    I don't know.
 4        Q    Let's go to the next slide.
 5    Respiratory compromise, were you trained on
 6    the elements of respiration?
 7        A    If this is the course you're saying I
 8    took, you're asking me about the course.
 9        Q    You took RIPP Hobble training.  It's
10    in Exhibit 33, right?  You took RIPP Hobble
11    training, right?
12        A    Yes.  Yes.
13        Q    So were you trained -- there's two
14    questions here:  Were you trained on it, and
15    would you agree, if you don't remember your
16    training on it, you can't apply it in the
17    field?
18        A    I don't remember every aspect --
19    everything in here that the class has, I don't
20    remember everything that we did that day, but
21    does it mean, that I can't use the hobble, no.
22    It doesn't mean that I'm not capable of using
23    the RIPP Hobble safely.
24        Q    If you don't know the training and
25    what the dangers are and how to use it, then,
```

```
 1   would you agree you can't -- you're making a
 2   guess?
 3        A    You're asking me everything that is
 4   listed here, do I know it all by detail, no.
 5        Q    Well, I'm not going to get in an
 6   argument with you.  I'm not saying that you
 7   don't know it by detail.  I don't think you
 8   know it at all --
 9        A    Okay.
10        Q    -- and that's why we're going through
11   it.  Were you trained on the respiratory --
12   the three elements of respiration?
13        A    If it's in this class that I took,
14   yes.
15        Q    Did you know it on January 19, 2020
16   and apply it in the field?
17        A    I didn't use the hobble that day.
18        Q    But these are why you use the hobble.
19        A    Okay.
20        Q    This is not saying anything about the
21   hobble.  This is telling you about events that
22   occur if you don't use the hobble.
23        A    Okay.
24        Q    All right.  So in order to actually
25   breathe, you got to suck in oxygen according
```

1   to this slide; you have to have an open
2   airway, and you have to be able to expel CO2.
3         A     Okay.
4         Q     And if that doesn't happen, then, you
5   have respiratory compromise.
6         A     Okay.
7         Q     Were you trained on that?
8         A     Was I trained on the use of the
9   hobble, yes.
10        Q     No.  Were you trained -- listen to my
11  question, buddy.  I'm asking you a question
12  about respirations.  This is where the
13  training was provided.  Do you not agree that
14  it's in there?
15        A     Yes.
16        Q     So according to this, you should have
17  known that the gas exchange, you have to -- to
18   breathe properly, you have to breathe in
19  oxygen; you have to have an open airway, and
20  you've got to be able to expel oxygen.
21        A     Okay.
22        Q     All right.  Then, do you recall going
23  over a bunch of studies about how putting
24  people in the prone position actually
25  decreased their -- decreased their oxygen

1    saturation and recovery rate?

2        A    If it's in the course, yes.

3        Q    Were you told that there -- were you

4    trained about the recovery position or the

5    modified recovery position?

6        A    I believe so, yes.

7        Q    What is the recovery position?

8        A    That would be to roll somebody over

9    on their side, and also, I would have somebody

10   sitting up instead of laying down.

11       Q    Either laying on their side or

12   sitting up?

13       A    Yes.

14       Q    And that is the recovery position,

15   because it allows you to breathe, correct?

16       A    Yes.

17       Q    And turning somebody on their side

18   does not interact with the bringing in of

19   oxygen or the expelling of oxygen because of

20   weight on your back, correct?

21       A    Okay, yes.

22       Q    Were you trained that when you're

23   dealing with an erratic suspect that you

24   should move them into the recovery position as

25   quickly as you can?

```
 1        A    Yes.
 2        Q    That doesn't mean you have to wait
 3   until somebody is completely not struggling at
 4   all.  Whenever you have enough officers on the
 5   scene to put somebody in the recovery
 6   position, it should be done, correct?
 7             MR. ZIBILICH:
 8                  Object to the form.  You can
 9             answer it.
10             THE WITNESS:
11                  If they're under control, yes.
12   BY MR. CLARKE:
13        Q    Well, I mean under control is --
14        A    I'm not gonna --
15        Q    Under control is a relative term.
16   The recovery position, we went through --
17             MR. ZIBILICH:
18                  No lecture about it being
19             relative.
20   BY MR. CLARKE:
21        Q    We went through previously the basic
22   physiology of a struggle, where people sit on
23   people's back.  They have problems breathing,
24   and then, they struggle more.  Remember those
25   questions?
```

```
 1        A    Yes.
 2        Q    So the recovery position needs to be
 3   put in for it to be effective before somebody
 4   is dead, right?
 5             MR. ZIBILICH:
 6                  Object to the form.  You can
 7             answer it.
 8             THE WITNESS:
 9                  The recovery position, yes,
10             before somebody is dead, yes.
11   BY MR. CLARKE:
12        Q    Okay, were you trained that you
13   should put somebody in the recovery position
14   as soon as possible, or did they say wait
15   until he goes limp before you put him in the
16   recovery position?
17             MR. ZIBILICH:
18                  Object to the form.  There could
19             be possibilities three, four, five,
20             six and seven.  It's not limited to
21             two.
22   BY MR. CLARKE:
23        Q    You can give me anything from three
24   to seven, as well.
25        A    So you're saying --
```

50

```
 1            MR. ZIBILICH:
 2                 No.  No.  He's not saying
 3            nothing.  He's asking you a question.
 4            THE WITNESS:
 5                 Okay, can you repeat the
 6            question?
 7            MR. ZIBILICH:
 8                 Repeat the question please.
 9   BY MR. CLARKE:
10       Q    Were you trained -- you say you put
11   them in the recovery position when it's safe,
12   okay?
13       A    Um-huh (affirmative expression).
14       Q    Is that what you say you were
15   trained?
16       A    Well, if I were to see someone in
17   distress, I would put them in the recovery
18   position.
19       Q    That's not my question.  Were you
20   trained that you need to put somebody in the
21   recovery position when it's safe, when it's
22   safe?
23       A    Yes.
24       Q    Were you trained -- safe to who?
25   Safe to the officers, or safe to the suspect?
```

```
 1            MR. ZIBILICH:
 2                 Or any other possibility.
 3            MR. CLARKE:
 4                 There's only one person getting
 5            put in the recovery position.
 6            THE WITNESS:
 7                 Yes.
 8   BY MR. CLARKE:
 9        Q    Now, the more officers you have on
10   the scene -- well, let's go to building a
11   defensible platform in this.
12        A    (Witness complies.)
13        Q    Were you trained that when you take
14   somebody into custody by handcuff, you have to
15   do everything in your power to help that
16   person stay alive?
17        A    Yes.
18        Q    And that includes putting somebody in
19   the recovery position, right?
20        A    Yes.
21        Q    I'm trying to -- were you trained on
22   what it means to be safe so that somebody can
23   be put in the recovery position?  What does
24   that mean?
25        A    If somebody is fighting with you, you
```

```
 1    have to first control the person and then put
 2    them in the recovery position.
 3        Q    Were you not trained that you can
 4    control somebody from a recovery position?
 5        A    But if they're not --
 6             MR. ZIBILICH:
 7                  That question is a yes or a no,
 8             sir.  Repeat the question, please.
 9             MR. CLARKE:
10                  No.
11             THE WITNESS:
12                  What was it again?
13             MR. CLARKE:
14                  Could you read back the
15             question.  When he objects to the
16             form, you still have to answer the
17             question.  Okay?
18                  (Whereupon, the court reporter
19             read back the last question.)
20             THE WITNESS:
21                  Was I trained that I cannot
22             control -- can control somebody from
23             a recovery position?
24    BY MR. CLARKE:
25        Q    Were you trained that you can or
```

```
 1   cannot control somebody from a recovery
 2   position?
 3        A    Yes, we can control somebody from a
 4   recovery position.
 5        Q    So if somebody is struggling, you can
 6   still turn them in a recovery position, and
 7   you can restrain them without the compression
 8   on their back, right?
 9            MR. ZIBILICH:
10                 Object to the form.  You can
11            answer it.
12            THE WITNESS:
13                 See, I'm trying to understand
14            the question.
15   BY MR. CLARKE:
16        Q    Okay, and every time, he objects, you
17   know, I just don't want you to have problems
18   understanding the question.
19        A    No, I'm just --
20        Q    You get somebody -- we're talking
21   about the training and the policies that you
22   have, all right, --
23        A    Um-huh (affirmative expression).
24        Q    -- whether it's contained in the
25   policies, the Total Appendage Restraining
```

1    Procedure, the TARP procedure, whether it's in
2    the RIPP Hobble training or any other
3    training, okay.  You have somebody down in the
4    prone position.  Were you trained on when it's
5    safe or how long you can allow somebody to be
6    in the prone position before you should turn
7    them into the recovery position?
8         A    I don't recall.
9         Q    So when you're saying we can put them
10   in the recovery position when he's safe, does
11   that mean the person has to be providing zero
12   resistance whatsoever?
13            MR. ZIBILICH:
14                Object to the form.  You can
15            answer it.
16            THE WITNESS:
17                No.
18   BY MR. CLARKE:
19        Q    Right, because the more officers you
20   have on the scene, the quicker you can put
21   somebody into a recovery position and still
22   restrain them.  Would you agree with that?
23            MR. ZIBILICH:
24                Object to the form.  You can
25            answer it.

```
 1            THE WITNESS:
 2                 Yes.
 3  BY MR. CLARKE:
 4      Q    I mean, it makes sense, you know.
 5  You can restrain people that are violent.  It
 6  just takes more effort or more people, right?
 7            MR. ZIBILICH:
 8                 Object to the form.  You can
 9                 answer it.
10  BY MR. CLARKE:
11      Q    And if you're by yourself, you may be
12  limited on what you can do to restrain
13  somebody.  It may not be safe to move somebody
14  to the recovery position as quickly, correct?
15      A    Yes.
16      Q    I mean, would you agree that the
17  recovery position only works if you can do it
18  in sufficient time for the suspect to recover.
19      A    The way you're wording things, it's
20  just -- it's throwing me off.
21      Q    I'll try to rephrase that.  We just
22  went through a lot of this training in the
23  RIPP Hobble, and what they're trying to do is
24  tell you to go into the recovery position is
25  to allow them to recover their breathing,
```

```
 1  correct?
 2       A     Okay.  Yes.
 3       Q     So were you trained on the Swarm
 4  technique in dealing with erratic people?
 5  It's kind of towards the end.
 6       A     (Witness peruses document.)  It's in
 7  here.
 8       Q     What this says, if you have somebody
 9  dealing with an erratic behavior or from
10  excited delirium, you, basically -- there's
11  seven -- there's 10 things that they talk
12  about that you're doing, but you, basically,
13  make a plan, take him down and then
14  immediately put him in the recovery position,
15  correct?
16            MR. ZIBILICH:
17                 Is the question is that what it
18            says?  What's the question?  There
19            was no question.
20            MR. CLARKE:
21                 Go ahead.
22            THE WITNESS:
23                 I was listening to you, but --
24  BY MR. CLARKE:
25       Q     What is the Swarm technique?
```

```
 1              MR. CLARKE:

 2                   If you're going to object to

 3              everything, --

 4              MR. ZIBILICH:

 5                   That's the question.  The last

 6              one was just a little mini lecture.

 7   BY MR. CLARKE:

 8       Q    What is the Swarm technique?  You

 9   can't answer any other question.  Read the

10   Swarm technique, and tell me if you were

11   trained on that in any way.

12       A    "Surround the subject-front, sides

13   and rear."

14              MR. ZIBILICH:

15                   He's not asking you to read it.

16              He's asking you if you remember being

17              trained on it.

18   BY MR. CLARKE:

19       Q    I can't ask you --

20       A    I don't -- I don't.

21       Q    Read it first, please, and then, I'm

22   going to ask you if you were trained on any of

23   the techniques, whether it's called the Swarm

24   or not?

25       A    I'm looking at it, but I don't
```

```
 1   remember.
 2        Q    So you don't know -- you didn't know
 3   that if you're dealing with an erratic person
 4   and you have a bunch of people there, that you
 5   were trained to take the person down quickly
 6   and immediately put them in the recovery
 7   position?
 8        A    I don't know.  I'm looking at it, but
 9   I don't know if that's what it says.
10        Q    That's why I asked you to read it
11   first, but you didn't want to do that.
12        A    I don't remember.
13        Q    So you don't -- is it acceptable to
14   you under your training to sit on somebody for
15   as long as they are struggling no matter what
16   the circumstances?
17             MR. ZIBILICH:
18                  Object to the form.  You can
19             answer it.
20             THE WITNESS:
21                  Is it acceptable to sit on them
22             as long as possible and what?
23   BY MR. CLARKE:
24        Q    Were you trained -- when were you
25   trained to put somebody in a recovery
```

```
 1   position:  Quickly, slowly at anytime at your
 2   discretion?
 3        A    As soon as I have someone in control
 4   and if they're having any problems breathing.
 5        Q    What if they're not having any
 6   problems breathing?
 7        A    Still, I would -- once they're
 8   controlled, I put them in the recovery person.
 9        Q    Is handcuffed controlled?
10        A    Yes.
11        Q    Okay, so once somebody is handcuffed,
12   then, you would agree, you can put them in the
13   recovery position?
14             MR. ZIBILICH:
15                  Object to the form.  You can
16             answer it.
17             MR. CLARKE:
18                  Listen, I know you've probably
19             been told that every time he objects
20             to the form, to think about the
21             question or to say I don't know, but
22             --
23             MR. ZIBILICH:
24                  Nothing of the sort is true.
25             THE WITNESS:
```

```
 1              No.
 2         MR. CLARKE:
 3              Can you read back my last
 4         question?
 5              (Whereupon, the court reporter
 6         read back the last question.)
 7         THE WITNESS:
 8              No.
 9  BY MR. CLARKE:
10    Q    What do you need to put somebody in
11  the recovery position?
12    A    Someone being -- having them in
13  control and if someone is in need or in
14  distress, then, the recovery position also.
15  It's a few things.
16    Q    What are you looking for when
17  somebody is in distress?  What type of, you
18  know -- you're not a medical doctor, right?
19    A    No.
20    Q    You weren't trained that it's better
21  to put them in the recovery position as
22  quickly as possible?
23    A    Yes.
24    Q    And what are the signs and symptoms
25  that you would be looking for that somebody is
```

1   experiencing difficulty?

2       A    Well, I usually just -- once someone

3   is handcuffed, if I were on the ground with

4   them, I would put them in a recovery position

5   once I have them under control.

6       Q    Right, because once you have the

7   handcuffs -- it may not be full control, but

8   you can roll them on the side, and you can

9   control his upper body with the handcuffs,

10  right?

11      A    No.

12      Q    You can hold his hands on the ground

13  behind him, correct?

14      A    Grabbing the handcuffs doesn't mean

15  I'm going to have control of somebody, no.

16      Q    What type of control are you talking

17  about?  Like you put somebody --

18      A    I mean, I --

19      Q    Let me finish my question.  I'm

20  starting to get cranky now.

21          MR. ZIBILICH:

22              Starting to?

23  BY MR. CLARKE:

24      Q    I mean, are you going to put him in a

25  recovery position only after you have like a

```
 1   psychiatric, you know, jacket on them that
 2   binds their hands around their body?
 3       A    No.
 4       Q    So somewhere before that type of
 5   control is when you do it, but wouldn't you
 6   agree you need to have training on how long
 7   and what the amount of control it is before
 8   you put somebody in the recovery position?
 9       A    I don't think there's a set time.
10       Q    The Swarm thing --
11           MR. ZIBILICH:
12                He's not finished his answer.
13   BY MR. CLARKE:
14       Q    Give me the set time, and we'll go to
15   the training and see if they have one.
16       A    As soon as I have someone handcuffed
17   and I'm not having any problems with them, and
18   I have them safely sitting up and comfortable
19   and not laying on the ground.
20       Q    Right, but even if somebody is
21   struggling, you can put them in the recovery
22   position, correct, --
23           MR. ZIBILICH:
24                Object to the form.
25           MR. CLARKE:
```

63

```
 1              -- and try to restrain them in
 2         that position on their side, correct?
 3         THE WITNESS:
 4              Not exactly.
 5  BY MR. CLARKE:
 6      Q    Well, tell me why it's not exactly.
 7      A    Like I said, in this situation it's
 8  just -- just because someone is handcuffed,
 9  that doesn't mean that I have them in control.
10      Q    Right.  It's more control than if he
11  wasn't handcuffed, right?
12      A    Yes.
13      Q    The more officers you have -- you
14  think six officers on the scene of a
15  handcuffed person can't put somebody in a
16  recovery position?
17         MR. ZIBILICH:
18              Object to the form.  You can
19         answer it.
20         THE WITNESS:
21              Do I think six officers on scene
22         can't put them in a recovery position
23         you said?
24  BY MR. CLARKE:
25      Q    Right.
```

```
 1        A     Once he's not combative, but I'm not
 2    --
 3        Q     Let's assume he's still combative,
 4    and you have six officers on the site.  You
 5    could actually put him on his side.  You could
 6    have some people holding him on the ground on
 7    his side holding his hands, correct?
 8              MR. ZIBILICH:
 9                   Object to the form.  You can
10              answer it.
11    BY MR. CLARKE:
12        Q     One of the six could be holding the
13    hands?  Or let's put two.
14        A     Possibly.
15        Q     Then, if he's kicking his legs, you
16    could have somebody lay on his legs, correct?
17        A     Okay.
18        Q     Right?
19        A     Yes.
20        Q     You could get the RIPP Hobble, which
21    you're supposed to get, put it around his
22    legs, correct?
23              MR. ZIBILICH:
24                   Object to the form, supposed to
25              get.  Go ahead.
```

```
 1            THE WITNESS:
 2                 Not in this situation.
 3    BY MR. CLARKE:
 4        Q    Your training says -- does your
 5    training say use leg restraints to control a
 6    erratic suspect?  I mean, we just went through
 7    it.
 8        A    I wouldn't -- I wouldn't -- I didn't
 9    use the hobble, because he was handcuffed, but
10    he was laying on his stomach.  So I just put
11    the shackles instead of having him further
12    restrained with the hobble.
13        Q    All right, whatever.
14        A    The shackles were just to keep him
15    from kicking.
16        Q    But you can do that whether he's on
17    his belly or on his side, correct?
18        A    The kicking?
19        Q    No.  You could put on the shackles,
20    the RIPP Hobble or anything.
21            MR. ZIBILICH:
22                 Once again, object to the form.
23            You can answer it.
24            THE WITNESS:
25                 No.
```

BY MR. CLARKE:

    Q    So you can't restrain him.  So if Pizzolato is the training officer, and he says you can restrain people on the side, you would disagree with that, correct?

            MR. ZIBILICH:

                Object to the form.

BY MR. CLARKE:

    Q    Were you trained that you put them in the recovery position -- that you were trained to never leave anybody in the prone position?

    A    I believe so.

    Q    Were you trained that a person lying on his stomach may have trouble breathing when pressure is applied to his back?

    A    Yes.

    Q    Were you trained that the remedy to that is relatively simple:  Just get the pressure off his back?

    A    Yes.

    Q    Were you trained that obese people have an increased risk of breathing difficulties while being restrained in the prone position?

    A    I don't recall that.

1       Q     Were you trained that sitting on
2    somebody's legs who is obese will still cause
3    respiratory compromise?
4       A     I don't recall.
5       Q     Were you trained fat people are at a
6    greater risk of death by asphyxia restrained
7    in the prone position?
8       A     I don't remember.
9       Q     So if you're not -- were you trained
10   that when somebody is being restrained and
11   they suffer oxygen deficiency, that they will
12   struggle more?
13      A     I don't remember.
14      Q     Okay.  This is what I'm getting at:
15   If you're completely restraining somebody in
16   the prone position and they're struggling to
17   breathe, they're never going to stop
18   struggling?
19            MR. ZIBILICH:
20                 Object to the form.
21   BY MR. CLARKE:
22      Q     Do you understand what I'm saying?
23      A     I understand what you're saying.
24      Q     Okay, so at what point -- you've got
25   to put somebody in the recovery position even

```
 1    if there's some resistance.  Would you agree
 2    with that?
 3              MR. ZIBILICH:
 4                   Object to the form.
 5              THE WITNESS:
 6                   Yes.
 7    BY MR. CLARKE:
 8        Q    Were you trained that if somebody is
 9    kicking, you control him by holding his
10    handcuffs behind his back in the modified
11    recovery position?
12        A    Can you rephrase it?
13              MR. ZIBILICH:
14                   Object to the form.
15              MR. CLARKE:
16                   I'll strike that one.
17    BY MR. CLARKE:
18        Q    Were you trained that people
19    restrained in the prone position can be
20    struggling and then go into a very calm and
21    limp procedure and die quickly?
22        A    I don't recall that.
23        Q    Were you trained that if you're
24    concerned about being bitten by somebody, that
25    one of the best techniques you can have is to
```

1    get away from their face?

2        A    I don't recall that.

3        Q    Were you trained that if somebody is

4    restrained on the ground and they're kicking,

5    one of your best methods of handling that is

6    to stay away from his legs?

7        A    I don't recall that.

8        Q    Were you trained that when you're

9    trying to control somebody, you want to

10   control them in the least dangerous position?

11       A    I don't recall that.

12       Q    Were you trained that if somebody is

13   struggling and then, they are calm for a

14   period of time, that at that time, you should

15   put them in the recovery position?

16       A    That once they're calm, I should put

17   them in a recovery position, you're saying?

18   Is that what the question was?

19       Q    My question was were you trained that

20   if you're in a struggle -- struggle is a

21   dynamic situation, correct?

22       A    Yes.

23       Q    There's times where it could be more

24   aggressive.  There are times where it calms

25   down, and during those periods of times, as an

```
 1    officer, you should try to take advantage of
 2    it, correct?
 3         A    Okay, yes.
 4         Q    Do you agree with that?
 5         A    You're saying it's dynamic, so --
 6         Q    Right.  I mean, if you have an
 7    opportunity to place somebody in a recovery
 8    position when they've been in an active
 9    struggle, you should try it when you have the
10    opportunity, correct?
11         A    Once the struggle stops, yes.
12         Q    No.  It has to stop completely is
13    what you're saying?
14         A    Well, it's not just -- I mean, if I'm
15    having a problem with somebody and they're
16    struggling, I'll try to control them; and
17    then, once it's over, then -- or it's -- the
18    struggling stops and the person is fine, I'll
19    sit them up.  I'm not going to sit there and
20    hold them down until they're in distress.
21         Q    Well, that's what happened in this
22    case, isn't it?
23              MR. ZIBILICH:
24                   Object to the form.  You can
25                   answer it.
```

```
 1              THE WITNESS:
 2                   No.
 3    BY MR. CLARKE:
 4         Q    Well, we're going to go through the
 5    whole thing.  I mean -- have you ever been
 6    involved in an arrest where, you know,
 7    somebody was combative for a period of time
 8    and then kind of calmed down and then
 9    combative again and then kind of calmed down?
10         A    Yes.
11         Q    Okay.  I mean, that's what I mean by
12    dynamic.
13         A    Okay.
14         Q    You may talk to somebody.  He may be
15    aggressive to you.  You may have to go
16    hands-on, correct?
17         A    Yes.
18         Q    He may struggle with you, and then,
19    you put handcuff on him, and then, you got a
20    certain amount of control, correct?
21         A    Yes.
22         Q    If he gets aggressive, you got to go
23    hands-on.  If he's calm for a second -- you
24    deescalate, right?
25         A    Yes.
```

1      Q    Deescalate with somebody who's

2   struggling while on the ground could mean

3   relieving the pressure on his back, correct?

4      A    Yes.

5      Q    Then, you try to move them in a

6   recovery position, because that's the best

7   position to keep your suspect safe, right?

8      A    Yes.

9      Q    And if he struggles after that, you

10  would have at least tried to put him in the

11  recovery position, right?

12     A    Okay, yes.

13     Q    As opposed to riding him like a horse

14  until the horse stops bucking.

15          MR. ZIBILICH:

16               Object to the form.

17  BY MR. CLARKE:

18     Q    Were you trained that you stay on him

19  until he stops moving at all?

20     A    No, but you're saying -- you're

21  saying -- you keep insisting on riding on

22  someone's back.  Nobody was on his back.

23     Q    We'll get to your statement, because

24  I think you actually said it, but we'll do it.

25     A    No.  I said they were sitting on his

```
 1   legs, not on his back.
 2        Q    We're going to go through your whole
 3   statement, so.  All right, let's talk about
 4   January 19, 2020.  Were you in plain clothes
 5   that day?
 6        A    In uniform.
 7        Q    You were in uniform, that's right.
 8   How did you find out about what was going on
 9   at the Laser Tag?
10        A    I heard Chad request assistance on
11   the radio.
12        Q    Is there a code that was called out?
13        A    108.
14        Q    If you want to put your statement in
15   front of you, that's fine.
16        A    108.
17        Q    What is that, officer needs
18   assistance?
19        A    Yes.
20        Q    What were you doing at the time?
21        A    Patrolling my area.
22        Q    Is it the same area where this
23   happened?
24        A    No.
25        Q    Were you in a different -- I mean, I
```

```
 1    don't know how you break them up.  Were you in
 2    a different ward or district?
 3         A    Same district, just a different area.
 4         Q    What did you do?  Did you respond to
 5    the call?
 6         A    Yes.
 7         Q    Did you respond on dispatch?
 8         A    Yes.
 9         Q    What did you tell dispatch, you're on
10    the way?
11         A    Yep.  Yes.
12         Q    Did you run lights and sirens to the
13    scene?
14         A    Yes.
15         Q    When you pulled up to the scene, did
16    you have your lights and sirens on?
17         A    Yes.
18         Q    Do you know if lights and sirens
19    are -- did you know anything about what the
20    altercation was or why he needed assistance?
21         A    No.
22         Q    Did you know what was going on, you
23    know -- well, is that an emergency a 108?
24         A    Yes.
25         Q    Okay, when it comes out.  So whatever
```

```
 1   it is, kind of if you're not doing something,
 2   you drop what you're doing, and you go there
 3   if your close, right?
 4        A    Yes.
 5        Q    All right, so you did that, ran
 6   lights and sirens.  When you pulled up on the
 7   scene with your lights and siren on, what did
 8   you observe?
 9        A    I observed Chad sitting on a male's
10   legs right below his butt.
11        Q    Who all -- was anybody else helping
12   restrain him?
13        A    I don't believe at the time.  They
14   had two other detectives show up, but I don't
15   know exactly when, --
16        Q    Well, I'm trying to figure out --
17        A    -- it was before me or not.
18        Q    Have you looked at the tape anytime
19   recently?
20        A    Yeah.
21        Q    I have the video here if you want to
22   watch it at anytime.  You let me know, all
23   right?
24        A    Um-huh (affirmative expression).
25        Q    But if you feel you need to look at
```

```
 1    the video to give a truthful answer, let me
 2    know, all right?
 3         A    I'd probably prefer to.
 4              MR. CLARKE:
 5                   Let's go off the record for a
 6              second.
 7              THE VIDEOGRAPHER:
 8                   Off the record.  The time is now
 9              10:24.
10                   (Brief recess.)
11              THE VIDEOGRAPHER:
12                   Back on the record.  The time is
13              now 10:33.
14    BY MR. CLARKE:
15         Q    Deputy Estrada, before we went on
16    break, you said you wanted to look at the
17    video.  Let me -- before I show this -- I've
18    got it up on the screen.  Prior to you
19    arriving, you didn't know anything about what
20    occurred between Eric Parsa and his father or
21    Chad Pitfield and Eric Parsa, correct?
22         A    No.
23         Q    You didn't know he was autistic,
24    didn't know anything about him or the incident
25    before that time, correct?
```

```
 1      A    Correct.
 2           MR. ZIBILICH:
 3                You know what we're going to do?
 4           We're going to turn you around this
 5           way.  I'd rather you have your back
 6           to me than to her.
 7           THE WITNESS:
 8                Okay.
 9           MR. ZIBILICH:
10                Thanks.  She's just too kind to
11           say anything.
12           THE WITNESS:
13                Sorry.
14   BY MR. CLARKE:
15      Q    So what I'm going to do is start the
16   tape.
17           THE VIDEOGRAPHER:
18                Do you want the witness and the
19           screen or just the screen?
20           MR. CLARKE:
21                The witness and the screen.
22   BY MR. CLARKE:
23      Q    I'm going to start.  You see the
24   timer down here at 8:08.  I'm going to start
25   this at 8:08; and if you want me to stop it --
```

```
 1    I'm going to play it through until he's
 2    restrained or until you're done, until you
 3    tell me you don't need to see anymore, okay?
 4              MR. ZIBILICH:
 5                   You know what part you need to
 6              see, Mr. Estrada?
 7              THE WITNESS:
 8                   I figured I'd just go through it
 9              while you're asking me.  I don't
10              know.  Whatever is easiest.
11              MR. CLARKE:
12                   All right, we're going to start
13              it at 8:08 on the media timer.
14                     (Video played.)
15              MR. ZIBILICH:
16                   It's none of my business, but
17              why would we start this before he
18              gets there?
19              MR. CLARKE:
20                   Because I don't know how
21              to exactly --
22              MR. ZIBILICH:
23                   Well, that's a pretty good
24              answer.  That's the first time I
25              heard you say I don't know.
```

1    BY MR. CLARKE:

2        Q     That's Chad Pitfield who pulled up?

3    Nevermind.

4            MR. ZIBILICH:

5                 X-rated here.

6                 (Video stopped.)

7    BY MR. CLARKE:

8        Q     I'm going to stop it at 11 minutes.

9    From the point that we started it, there was a

10   number of times where Eric Parsa tried to

11   raise up after he was on the ground, correct?

12       A     Yes.

13       Q     There's also times where he's sitting

14   there still, correct?

15       A     Yes.

16       Q     Playing it forward from 11 minutes.

17                 (Video played.)

18                 (Video stopped.)

19   BY MR. CLARKE:

20       Q     I stopped it from around 12 minutes

21   from the time we just replayed it.  From 11

22   minutes to 12 minutes, there's very little

23   struggle at all, correct, from Eric Parsa?

24            MR. ZIBILICH:

25                 Object to the form.

```
 1              THE WITNESS:
 2                   I was going to ask you can you
 3              just get it to where I'm?
 4         MR. ZIBILICH:
 5                   That's not his question.
 6         THE WITNESS:
 7                   No.
 8                   (Video played.)
 9                   (Video stopped.)
10    BY MR. CLARKE:
11         Q    I stopped it at 13 minutes from where
12    we stopped it last at around 12 minutes to
13    13 minutes, there's very little struggle,
14    correct?
15              MR. ZIBILICH:
16                   Object to the form.  You can
17              answer.  Additional objection is that
18              the video speaks for itself.
19              MR. CLARKE:
20                   No.  Object to the form is
21              itself.  You've made representations
22              in pleadings, Franz, about what
23              happened on behalf of your clients,
24              and I'm entitled to --
25              MR. ZIBILICH:
```

```
 1              You're entitled to get his
 2         interpretation?
 3         MR. CLARKE:
 4              Yes.
 5         MR. ZIBILICH:
 6              Okay.
 7         THE WITNESS:
 8              You could see what, yeah.
 9    BY MR. CLARKE:
10       Q    Very little struggle, correct?
11       A    But she's on top of him.
12       Q    Right.  Pitfield is on top of him.
13    He's not sitting on his legs; he's sitting on
14    his --
15         MR. ZIBILICH:
16              That's a statement, sir.  If you
17         want to ask him a question, it's
18         okay.
19    BY MR. CLARKE:
20       Q    Is he sitting on his legs or on his
21    backside?
22       A    I wasn't there at the time.
23         MR. ZIBILICH:
24              The question is what do you see?
25         THE WITNESS:
```

```
 1                    I can't tell.  I see her on his
 2          upper body.
 3   BY MR. CLARKE:
 4       Q    You see Pitfield's legs touching
 5   skin, correct?
 6       A    It's blurred.
 7       Q    Is that going to be your testimony?
 8   You can't tell that he's not sitting on his
 9   legs from this screenshot at 13:02?
10       A    It's blurred.
11       Q    Okay.
12       A    I was just hoping you would show like
13   once -- I thought you were going to play it
14   like once I got there.
15       Q    I don't know where --
16          MR. ZIBILICH:
17              He don't know how to do that.
18          THE WITNESS:
19              Well, hit the --
20          MR. CLARKE:
21              Well, now, I'm doing this.
22              (Video played.)
23              (Video stopped.)
24   BY MR. CLARKE:
25       Q    Stopping at 14 minutes.  From the
```

```
 1    point we last stopped it around 13 minutes to
 2    14 minutes, did you see any violent struggle?
 3         A    I wasn't there at the time.
 4         Q    I'm not asking --
 5              MR. ZIBILICH:
 6                   Do you see it on the screen,
 7              sir?
 8              THE WITNESS:
 9                   No.
10                    (Video played.)
11                    (Video stopped.)
12    BY MR. CLARKE:
13         Q    Stop it there at 14:14.  Do you know
14    who that is, who came up?
15         A    I don't recall his name, no.
16         Q    I was looking to see if it was --
17              MR. ZIBILICH:
18                   It's a no.
19    BY MR. CLARKE:
20         Q    Is it your understanding that was a
21    detective from JPSO?
22         A    Yes.
23         Q    And he comes in at around 14:14,
24    right?
25         A    Yes.
```

```
 1        Q    Does it appear that they -- by 14:22
 2   on the tape, does it appear that he gets him
 3   handcuffed?
 4        A    It looks like they were working on
 5   it.
 6        Q    Did you see any resistance to the
 7   detective getting him handcuffed?
 8             MR. ZIBILICH:
 9                  Object to the form.  You can
10             answer it.
11             THE WITNESS:
12                  Dad's in the way.  I can't tell.
13   BY MR. CLARKE:
14        Q    Well, we can go back 10 seconds.
15   We'll go back.  We'll start at 14:17.  We're
16   going to play it through, and you tell me if
17   they get him handcuffed and whether there was
18   a struggle.
19                  (Video played.)
20                  (Video stopped.)
21   BY MR. CLARKE:
22        Q    Did he get handcuffed without a
23   struggle?
24             MR. ZIBILICH:
25                  Is that a question?
```

```
 1            MR. CLARKE:
 2                 Yes.
 3    BY MR. CLARKE:
 4        Q    Did he get handcuffed without a
 5    struggle?
 6            MR. ZIBILICH:
 7                 Object to the form.  You can
 8            answer.
 9            THE WITNESS:
10                 I can't tell.  It looks like it.
11    BY MR. CLARKE:
12        Q    Do you know of any reason why Eric
13    Parsa wasn't put in the recovery position at
14    this time?
15        A    No.  I wasn't there.
16        Q    Well, you're looking at it now.
17        A    Yeah, but --
18        Q    Do you see any -- based on your
19    training and your policies, do you see any
20    reason why they couldn't put him in the
21    recovery position at the time?
22            MR. ZIBILICH:
23                 Object to the form.  You can
24            answer it.
25            THE WITNESS:
```

```
 1                    I don't know.
 2    BY MR. CLARKE:
 3         Q    Okay, well, you said you put people
 4    in the recovery position when it's safe when
 5    he's not resisting, right?
 6         A    (Witness nods head affirmatively.)
 7    But I can't see, and I wasn't there at the
 8    time.
 9         Q    Okay, but you didn't see any -- you
10    saw him struggling at different points of this
11    tape.  You don't see that at this point of the
12    tape, correct?
13              MR. ZIBILICH:
14                    Object to the form.
15              THE WITNESS:
16                    I can't see.
17    BY MR. CLARKE:
18         Q    We're at 14:40.  Another person
19    showed up.  Do you know who this is?
20         A    I can't see his face.
21         Q    Yeah.  I can't either.  Is that a
22    detective or a deputy?
23         A    (Witness shakes head negatively.)
24         Q    You don't know?
25         A    (Witness shakes head negatively.)
```

1      Q    Do you know who the female person is

2    at the front of the car?

3      A    No.

4      Q    Do you know if it's an officer or

5    EMS?

6      A    I don't know.

7      Q    Playing from 14:40.  Another officer

8    came in around 14:50.  Do you know who that

9    officer was?

10     A    I didn't see his face.

11     Q    So at this point, we have at least

12   four officers on the scene, correct?

13     A    Yes.

14     Q    Is he resisting sufficiently to where

15   it was prevented from them putting him in the

16   recovery position?

17         MR. ZIBILICH:

18             Object to the form.

19         THE WITNESS:

20             You've been stopping it.  I

21         don't know.

22   BY MR. CLARKE:

23     Q    Well, let's go back.

24     A    Just play it.

25     Q    Well, no.  I'm asking you --

```
 1        A     Well, because it goes -- but --
 2        Q     Hang on, sir.  You testified earlier
 3   that you were trained to put somebody in the
 4   recovery position when it's safe or when
 5   they're not fighting.  Have you seen him
 6   fighting to the extent that these four
 7   officers cannot put him in the recovery
 8   position?
 9             MR. ZIBILICH:
10                  Object to the form.  You can't
11             even see him.
12             THE WITNESS:
13                  That's what I was --
14        Q     There's four officers --
15        A     When you go back, the people are in
16   the way, so I can't --
17        Q     Hey, look, listen.  There's four
18   people there.  Did you see on the tape that he
19   was struggling sufficiently that four officers
20   on the scene of a handcuffed person couldn't
21   put him in the recovery position?
22             MR. ZIBILICH:
23                  Object to the form.
24             THE WITNESS:
25                  I can't see it.
```

```
1    BY MR. CLARKE:
2         Q    You can't see that he's struggling.
3    If he's not struggling, you would agree that
4    would be a safe time to put him in the
5    recovery position based on your training and
6    your policy, correct?
7              MR. ZIBILICH:
8                   Object to the form.
9              THE WITNESS:
10                  It all depends.  When I got
11             there, he was kicking, so.
12   BY MR. CLARKE:
13        Q    Well, I understand.  We went through
14   the --
15        A    But I don't know if he's kicking now.
16        Q    We went through the physiology --
17             MR. ZIBILICH:
18                  He said he doesn't know if he's
19             kicking now, sir.
20   BY MR. CLARKE:
21        Q    We already went through the thing of
22   a struggle; that when you sit on somebody's
23   back, it compromises their oxygen, and then,
24   they struggle at a later time to get oxygen
25   deficiency.  Do you remember that?
```

```
 1              MR. ZIBILICH:
 2                   Not sitting on nobody's back.
 3    BY MR. CLARKE:
 4        Q    Do you remember that?
 5        A    Um-huh (affirmative expression).
 6    Yes.
 7        Q    So if you're sitting on him for four
 8    or five minutes and he's becoming depleted of
 9    oxygen, your training says that they start to
10    struggle.  That's why you put them in the
11    recovery position, right?
12              MR. ZIBILICH:
13                   Object to the form.  No
14              foundation.
15              THE WITNESS:
16                   I don't know what he's doing
17              there at the time though.
18    BY MR. CLARKE:
19        Q    If he's calm, that's when you put him
20    in the recovery position based on your
21    training, correct?
22        A    Sometimes.
23        Q    Okay, well, what does it --
24        A    It's a lot of variables.
25        Q    Well, you tell me all the variables.
```

```
 1    You're the one who's out in the street who has
 2    to act based on the training, the policies you
 3    have to deal with the variables.
 4          MR. ZIBILICH:
 5                He can't act.  He's not even
 6          there.
 7    BY MR. CLARKE:
 8      Q    The variable is you've testified
 9    before that you put people in the recovery
10    position once they're safe or in control,
11    correct?
12      A    Yes.
13      Q    There is a period of time with these
14    officers here where he's not -- where you
15    can't see that he's actively resisting, or
16    he's not doing what he was doing raising up
17    like he was earlier, correct?
18          MR. ZIBILICH:
19                You can't see it either way,
20          sir.  You can't just have it one way.
21          That's your description.  If you want
22          to get under oath and testify to his
23          resistance or not resistance, I'm
24          fine.
25          MR. CLARKE:
```

```
 1                  Let's get through these
 2           depositions.
 3           MR. ZIBILICH:
 4                  Let's ask fair questions.
 5           MR. CLARKE:
 6                  The fair question is -- this is
 7           going to get sour real quick.  Let's
 8           take a break here for a second.
 9           MR. ZIBILICH:
10                  I'm not ready for a break.
11           MR. CLARKE:
12                  I need to take a break, because
13           I don't want it to go in a different
14           direction right now.  That's what I'm
15           saying.
16           THE VIDEOGRAPHER:
17                  Off the record at 10:51.
18                    (Brief recess.)
19           MR. CLARKE:
20                  Let's go back on.
21           THE VIDEOGRAPHER:
22                  Back on the record.  The time is
23           10:54.
24     BY MR. CLARKE:
25        Q    Deputy Estrada, okay, we have stopped
```

```
 1    the video at 14:51.  I'm going to start it
 2    again, all right?
 3         A    Yes.
 4                   (Video played.)
 5    BY MR. CLARKE:
 6         Q    You are not on the scene yet,
 7    correct?
 8         A    Correct.
 9         Q    Do you know when you got on the scene
10    who was there?
11         A    Two detectives and Chad.
12         Q    So there's at least another
13    plainclothes officer there, isn't there?
14         A    Oh, and Nick.
15         Q    Nick Vega?
16         A    Yes.
17         Q    So that's not Nick.
18         A    I don't know if that's -- it didn't
19    show the faces.
20         Q    All right.
21         A    That's me.
22         Q    Okay, right at around 15 minutes is
23    when you come in?
24         A    Yes.
25         Q    And you had two detectives there.
```

```
 1    And in your statement, did you say Vega was
 2    there?  You don't know who that officer is in
 3    uniform?
 4         A    Unh-unh (negative expression).
 5         Q    Okay, let's stop.
 6                    (Video stopped.)
 7    BY MR. CLARKE:
 8         Q    When you came in there, where is Chad
 9    Pitfield sitting on Eric Parsa?
10              MR. ZIBILICH:
11                    Object to the form.  You can
12              answer it, sir.
13              THE WITNESS:
14                    It's so blurred.  I can't tell.
15    BY MR. CLARKE:
16         Q    And in your statement, on page three
17    of your statement, you said that Eric was
18    laying face down, and Chad was sitting on his
19    legs, like, just below his butt.
20         A    Um-huh (affirmative expression).
21         Q    So that's where you think he's
22    sitting right there?
23         A    If that's what I said, but it's
24    blurred here on the picture.
25         Q    You don't think that shows that he's
```

1   sitting on his buttocks?

2      A   It's blurred.  I know what I saw

3   though when I was there.  He was sitting on

4   his legs.

5      Q   We know what you saw when you came

6   in, because it's on the tape, right?

7      A   Sir?

8      Q   We know what you saw when you came

9   in, because it's on the tape.  We saw you walk

10   in and walk up and look, right?

11      A   But this here is blurred from it

12   being blown up.

13      Q   Whatever.  Playing it from 15:08.

14            (Video played.)

15   BY MR. CLARKE:

16      Q   Now, when you came in, did you see a

17   struggle that Pitfield needed assistance with?

18      A   When I got there, I didn't see one,

19   no.

20      Q   Why didn't you tell Pitfield to put

21   him in the recovery position?

22      A   Because I still didn't know what the

23   situation was.

24      Q   It doesn't matter.  You're trained --

25          MR. ZIBILICH:

```
 1              Don't tell him it doesn't
 2         matter.  You can ask him a question
 3         please.
 4    BY MR. CLARKE:
 5         Q    You were trained not to leave people
 6    in the prone position and to move them to the
 7    recovery position when they're safe, correct?
 8         A    Trained, okay, yes.
 9         Q    Okay, so you were trained.  When you
10    come up here and look, you got two detectives
11    and two deputies on the scene, and Pitfield on
12    Eric Parsa's, his back, correct?
13              MR. ZIBILICH:
14                   Object to the form.
15    BY MR. CLARKE:
16         Q    Or sitting on his -- what do you want
17    to describe it?  You want to describe it as
18    legs?
19         A    What I saw is I saw him sitting below
20    his butt on his legs.
21                   (Video stopped.)
22    BY MR. CLARKE:
23         Q    So Eric Parsa at this stop at 15:12,
24    his butt would be somewhere up where this
25    deputy's leg is, correct?
```

1        A     It's blocked.

2        Q     Right.  I understand, but that's what

3    you're saying his butt is, right?

4        A     You're looking at a video.  What I

5    saw, you know, it doesn't show like if he was

6    in distress or not either on the video.

7        Q     Right.  Well, you saw him in distress

8    later on when he turned blue in the face,

9    right?

10       A     A good while later after I got there.

11       Q     We'll say it's 15:12 right now.  You

12   got there at around 15 minutes, right?

13       A     (Witness nods head affirmatively.)

14       Q     So we'll know exactly when that

15   happens.  Do these officers look like there's

16   a violent struggle where Pitfield needs

17   assistance restraining him?

18       A     No.

19       Q     If there was a violent struggle where

20   they needed help, wouldn't your training and

21   just decency require the officers to go

22   hands-on with Pitfield to assist?

23       A     Yes.

24       Q     We're going to start at 15:12.

25             (Video played.)

```
 1                    (Video stopped.)
 2   BY MR. CLARKE:
 3        Q    We're going to stop it here at 15:45.
 4   From 15:00, from the time that you arrived
 5   until 15:45, did you see any violent struggle
 6   on the tape?
 7        A    I know I remember --
 8        Q    My question is --
 9             MR. ZIBILICH:
10                  Not what you know.  Did you see
11             is his question.
12             THE WITNESS:
13                  When I was there, yes.
14   BY MR. CLARKE:
15        Q    Do you see it on the tape?
16        A    Everything is blocked.
17        Q    Do you see a violent -- so you can't
18   tell -- all the officers -- nobody was
19   hands-on with Pitfield, correct?  Except
20   Pitfield, right?
21        A    Yeah.  Nothing was going wrong.
22        Q    All the officers were sitting around.
23   Some people are talking to Mr. Parsa, but you
24   cannot see a violent struggle on the
25   videotape, correct?
```

```
 1        A     On the videotape, no.  It's blocked.
 2        Q     Did you see him try to raise off the
 3   ground or anything like he did before?
 4        A     She's above his -- covering his whole
 5   upper body.  You can't see him.
 6        Q     But when she was down there before
 7   and he lifted up, you could see him, correct?
 8        A     Yeah, before she got there, yes.
 9        Q     I'll play it from 15:45.
10                    (Video played.)
11                    (Video stopped.)
12   BY MR. CLARKE:
13        Q     Let me stop here at 15:47.  Are you
14   in the screen?
15        A     Up there.
16        Q     You're at the top right?
17        A     (Witness nods head affirmatively.)
18        Q     What are you doing?
19        A     Nothing.
20        Q     If he was struggling, you would try
21   to help, right?
22        A     If I saw Chad needed help, yeah, but
23   I believe Nick is there talking to Chad
24   probably to help him.
25        Q     But there is -- up until this time,
```

```
 1    you don't see anything on the tape that's a
 2    violent struggle until -- right?
 3         A    Not there, no.
 4         Q    Let's play -- we're at 15:47 -- up to
 5    16:02, Deputy Pitfield gets off him, and is
 6    that -- are you aware that Nick Vega is the
 7    one that got on him?
 8         A    I didn't see his face, but I believe
 9    that's Nick.
10         Q    Well, you know it was.  Based on your
11    statement you knew it was Vega, right?
12         A    Yes.
13         Q    Vega -- that transition happened
14    without any struggle, correct?
15         A    It looked like it.
16         Q    Do you know, the training -- do you
17    not agree that your training would require you
18    at that point to put him in the recovery
19    position?
20              MR. ZIBILICH:
21                   Object to the form.  You can
22              answer it.
23              THE WITNESS:
24                   Usually, yes.
25    BY MR. CLARKE:
```

```
 1        Q    So Nick Vega is on his back, and
 2   you're up by the Parsa car, correct?
 3        A    Yes.  I'm out of view.
 4        Q    Do you see Nick Vega's legs even
 5   touching the ground here while he's on his
 6   back?
 7        A    I can't tell, but --
 8        Q    Does it look like his knee is bent up
 9   with his feet up in the air behind him?
10        A    From what I recall, he was sitting on
11   his butt.
12        Q    I mean, your recollection is wrong,
13   correct?
14             MR. ZIBILICH:
15                  Whoa.
16   BY MR. CLARKE:
17        Q    Is your recollection wrong?  He's not
18   sitting on his butt, is he?
19        A    Well, you're asking me.  So I'm
20   answering you, and that's what I recall.
21        Q    As an officer, let's assume that you
22   wrote a report, and you saw something, and you
23   wrote up a report some way, and you look at a
24   tape, and it's, you know.  Do you not agree
25   you could be wrong or misperceived something?
```

```
 1        A    It's blurred, but like I said, I
 2   don't recall him sitting on his back.
 3        Q    Are you up --
 4        A    That's not me.
 5        Q    That's not you.  I'm going to go back
 6   10 seconds to 16:37.  We're going to do the
 7   transition again.
 8                    (Video played.)
 9                    (Video stopped.)
10   BY MR. CLARKE:
11        Q    So Nick Vega gets on his back at 16
12   minutes, right?
13        A    He gets on his butt.
14        Q    Gets on -- what do we want to use the
15   word for the back that is not going to cause
16   concert?  What's the whole back part of your
17   body called?
18             MR. KAUL:
19                  You can Google it.
20             THE WITNESS:
21                  When it's in motion, when he
22             comes down, it's more like he's on
23             his heels.
24   BY MR. CLARKE:
25        Q    Well, he's prone, and he's laying
```

```
 1    somewhere on the back portion of his body,
 2    correct?
 3         A    On his rear-end, yes.
 4         Q    Rear-end.  See, I'm not going to
 5    agree to that term, but --
 6                    (Video played.)
 7    BY MR. CLARKE:
 8         Q    Up until 16:30, do you see any
 9    significant resistance?
10              MR. ZIBILICH:
11                    On a still, is that the
12              question?
13              MR. CLARKE:
14                    No.  Up until.
15              MR. ZIBILICH:
16                    Okay, I misunderstood.
17    BY MR. CLARKE:
18         Q    From 16:00 to -- from the time that
19    Vega went over there, do you see any violent
20    struggle from Parsa?
21         A    You keep like just moving and
22    stopping it.
23         Q    Okay, we'll go back.
24         A    It looks like Nick's trying --
25         Q    I'm going to ask you a question from
```

```
 1    16:00 to 16:32, do you see any violent
 2    struggle?  So I'm going back to 16:00.
 3              (Video played.)
 4              (Video stopped.)
 5    BY MR. CLARKE:
 6         Q    Was there any violent struggle during
 7    that period from 16:00 to 16:31?
 8         A    It doesn't appear.
 9         Q    Do you know why you didn't tell them
10    to put him in the recovery position?
11         A    No.
12         Q    Did anybody -- you had the ability to
13    talk to them and say, hey, you're in the prone
14    position, put him in the recovery position,
15    correct?
16              MR. ZIBILICH:
17                   Object to the form.  You can
18              answer it.
19              THE WITNESS:
20                   No.
21    BY MR. CLARKE:
22         Q    You didn't have the ability to say
23    that.
24         A    That -- well, --
25         Q    Any officer --
```

```
 1       A     After --
 2       Q     Go ahead.
 3       A     After this is when I believe he was
 4  given Nick trouble, and that's when I offered
 5  the shackles.
 6       Q     Well, I understand.  You put them in
 7  the recovery position -- we went through the
 8  physiology of a struggle; that when people get
 9  depleted of oxygen, they can start to
10  struggle, right?
11            MR. ZIBILICH:
12                 He said he didn't recall knowing
13            that.  You said that.
14  BY MR. CLARKE:
15       Q    Did you learn that, or did you not
16  learn that?
17       A    We were taught that, yes.
18       Q    So he's been in the prone position
19  for quite a number of minutes, right?
20            MR. ZIBILICH:
21                 Object to the form.  You can
22            answer it.
23            THE WITNESS:
24                 No.
25  BY MR. CLARKE:
```

```
 1        Q    Okay.
 2        A    You're saying minutes.  It started at
 3   15, I think, I believe is when I got there.
 4        Q    Fifteen is when you showed up.  He
 5   had already been in the prone position for six
 6   minutes.
 7             MR. ZIBILICH:
 8                  No.  No.  That's your testimony,
 9             sir.  Again, if you want to raise
10             your hand.  You don't get to say what
11             that was.
12             MR. CLARKE:
13                  It's in evidence right now.  The
14             tape will show how long he's in the
15             prone position.
16             MR. ZIBILICH:
17                  Look, the tape can show whatever
18             it wants.  However, on the other side
19             of the coin, you don't get to say
20             what it shows.
21             MR. CLARKE:
22                  I get to ask my questions the
23             way I want.
24             MR. ZIBILICH:
25                  Okay, well, it wasn't a
```

```
 1              question.  It was a statement.
 2    BY MR. CLARKE:
 3        Q    He was in the prone position for a
 4    period of time with Chad Pitfield, correct?
 5              MR. ZIBILICH:
 6                   Object to the form.  You can
 7              answer it.
 8              THE WITNESS:
 9                   I wasn't there.
10    BY MR. CLARKE:
11        Q    No, I understand.  You have reviewed
12    the tape, correct?  You've reviewed it
13    actually with -- when you gave your statement,
14    correct?
15        A    Okay, yes.
16        Q    So when you do police work, you look
17    at all the evidence, correct?
18        A    Yes.
19        Q    So from 16:00 to 16:30, by the time
20    of the switch, he had already been in the
21    prone position with Deputy Pitfield on his
22    backside for a period of time, correct?
23              MR. ZIBILICH:
24                   Object to the form.
25              THE WITNESS:
```

```
 1              Yeah.  He was sitting on the
 2         back of him, on the back of him, on
 3         his rear-end.
 4   BY MR. CLARKE:
 5      Q    That's a position that compromises
 6   somebody's breathing, correct?
 7      A    Not from sitting on his legs, no, his
 8   buttocks.
 9      Q    All right, we'll just go on.  You
10   didn't see any resistance from 16:00 to 16:31
11   after the switch, correct?
12      A    Well, we just switched just now.
13      Q    We didn't switch just now.  Nothing
14   switched.  We went back to 16:00, when Vega
15   switched over, and then, I played it for you
16   again.  Did you see any resistance where you
17   could not put somebody in the recovery
18   position during that period of time?
19         MR. ZIBILICH:
20              Again, object to the form.  You
21         can answer it.
22         THE WITNESS:
23              With the video, it's hard to
24         say, because you have no sound or
25         anything, you know.
```

```
 1   BY MR. CLARKE:
 2       Q    So is your answer you can't tell?
 3       A    No, I can't tell.
 4       Q    So after Vega gets on him, that's
 5   when there is, at least according to your
 6   statement, where there's resistance -- Eric
 7   Parsa starts to resist, correct?
 8       A    I believe so, yes.
 9       Q    When that happened, you testified
10   that -- or you put in your statement that Nick
11   Vega used some pain compliance technique to
12   lift his arms up, correct?
13       A    No.  I don't recall saying that.
14       Q    All right, I'm just going to play it
15   from 16:32.
16                   (Video played.)
17                   (Video stopped.)
18   BY MR. CLARKE:
19       Q    I'm stopping it at 16:58.  Did you
20   see Eric Parsa start to struggle?
21       A    When I was there, I didn't see that
22   part.
23             MR. ZIBILICH:
24                   Do you see it on the tape?
25             THE WITNESS:
```

```
 1              His arms looks like they're
 2         going forward.
 3                   (Video played.)
 4   BY MR. CLARKE:
 5      Q    Does it look like Nick Vega is
 6   pushing them forward?
 7      A    No.  Pulling Nick.
 8      Q    You think he's pulling Nick over his
 9   head, over his head?
10      A    It looks like it.
11      Q    It doesn't look like Nick Vega is
12   pushing his hands forward with a pain
13   compliance technique?
14      A    No.
15      Q    Okay.  Is that you coming back into
16   the screen?
17      A    No.
18      Q    Do you know who that is?
19      A    No.
20                   (Video stopped.)
21   BY MR. CLARKE:
22      Q    We're stopped at 17:11.  By this
23   time, it appears that his hands went over his
24   head, right?
25      A    It looks like it, but I didn't see
```

1    that when I was there.

2        Q    What you saw is why, according to

3    your statement, why he was struggling, why he

4    had -- if you look at page four of your

5    statement, about a third of the way down, you

6    wrote, he struggled and then they were just

7    trying to control him because he had his hands

8    above his head.  We were trying to control him

9    and then just quick I just saw him like go

10   blue in the face.  Do you see that?

11       A    Yes.

12       Q    A couple of lines before that, did

13   you see at any point -- when you actually

14   looked back -- you didn't see him actually

15   arms go in front of his head, correct?

16       A    No, I didn't see that.

17       Q    When you looked back, his arms, were

18   they on the ground in front of him?

19       A    When what?

20       Q    When you saw him turn blue in the

21   face, were his hands already in front of him

22   all the way to the ground, or were they in the

23   air?

24       A    I don't remember where his hands

25   were.  I just remember seeing his face.

1      Q      Has that happened yet on this tape,
2    where you saw when he went blue in the face?
3      A      You can't see his face.  I just
4    saw -- you could just see his hands moving
5    forward.
6      Q      What I'm trying to get is, on this
7    tape, do you know when he went blue in the
8    face?
9      A      No.
10      Q      But it was after the whole maneuver
11   with his arms going over his head, and they
12   were already on the ground in front of him?
13      A      I didn't see when it happened, so.
14      Q      Well, you're seeing it now.
15      A      Yeah, but you can't see his face.
16      Q      Okay, so, anytime after this.  Well,
17   maybe, we'll see you come back in the screen.
18   Maybe, that will help.  From here on out, if
19   you can tell me at any time that you can
20   identify when you saw him go blue in the face,
21   all right.
22                    (Video played.)
23   BY MR. CLARKE:
24      Q      Playing at 17:11.  Is that you?
25      A      I'm going to get the shackles.

 1      Q    Was he blue in the face before or

 2  after you went to go get the shackles?

 3      A    From what it looks like there, I

 4  didn't even look at him at the time.

 5      Q    And can you tell from your statement?

 6      A    From what I recall, I'll get the

 7  shackles and then sometime after that.

 8      Q    He went blue in the face.

 9      A    (Witness nods head affirmatively.)

10      Q    Okay.  So we're playing from 17:22.

11  You see Nick Vega with his arm around his head

12  and neck?

13      A    No.

14      Q    Did you see that on the day?

15      A    No.

16      Q    I'm going to go back 10 seconds.  See

17  if you can see what Nick Vega is doing when

18  Ms. Lou moves out of the picture.  Did you see

19  Nick have Eric Parsa in a chokehold?

20      A    No.  I couldn't make it out.

21      Q    Did you see any part of his arm going

22  across his head that you could make out on the

23  tape?

24      A    No.

25      Q    17:34, moving forward, is that you

```
 1   getting your leg shackles.
 2        A    I believe I did.  Yeah.
 3        Q    Did you have any trouble shackling
 4   him?
 5        A    I did.  I actually was grabbing one
 6   of the guy's legs by mistake.
 7        Q    Okay, well, that's a you problem,
 8   right?  You made a mistake on the leg, right?
 9        A    Well, because he was kicking.  That's
10   why I was trying, you know, to keep track
11   which, whose legs what, and I grabbed Nick's
12   leg by accident.
13        Q    You got the shackles on within
14   seconds and then handed the other shackle to
15   another officer, correct?
16        A    Yes.
17        Q    So however long it took you to get
18   that leg shackle on, that's what you're
19   considering difficulty and lengthy?
20        A    No.  It's probably the other leg
21   though.
22        Q    Well, you didn't put that one on.  I
23   can ask him.
24        A    No, I didn't put that one on, but I'm
25   saying that's probably when that happened.
```

```
 1        Q    When he turned blue?
 2        A    No.
 3        Q    When he started kicking?
 4        A    When the other shackle went to get --
 5   was put on.
 6        Q    We'll watch, 17:50.
 7                  (Video played.)
 8              MR. CLARKE:
 9                  Stop it at 18:23.
10                  (Video stopped.)
11   BY MR. CLARKE:
12        Q    It looked like it took a longer time
13   to put on the shackle on the other leg,
14   correct?
15        A    Yes.
16        Q    Did you see him kicking?
17        A    Yes.
18        Q    You saw him on the video tape
19   kicking?
20        A    He had kicked earlier.  That's why I
21   offered the shackles.
22        Q    Did you see him while he was trying
23   to put the shackle on him kicking?
24        A    You can't see a lot on the video.
25   No, you can't see it.
```

```
 1        Q    We're starting at 18:23.
 2             (Video played.)
 3   BY MR. CLARKE:
 4        Q    Has he turned blue by now?
 5        A    You can't see.
 6        Q    I'm asking you --
 7        A    Oh.
 8        Q    You saw it at some point.  We
 9   have and idea --
10        A    I don't remember.
11        Q    Do you know what the officers are
12   doing there other than standing around and
13   looking at him?
14        A    It looked like he was on his side
15   earlier.
16        Q    So they put him in the recovery --
17        A    Yeah, a few seconds back.
18        Q    Let's go back 10 seconds.
19        A    He's already on his side there.
20        Q    Let's go back a little bit.  We can
21   go to -- see if you can tell me when they move
22   him to his side.  Right there?
23        A    It looks like it.
24        Q    Okay, around 18:27.  Did you see him
25   go blue before or after he was moved to his
```

```
 1   side?
 2        A    I don't remember.  I would say -- I
 3   don't remember.
 4        Q    Well, if you look at your statement
 5   on page four, you wrote that he struggled.
 6   They were trying to control him, and then,
 7   just like that, I saw him, like, go blue in
 8   the face.  So it was while they were still
 9   trying to control him, not after they put him
10   in the recovery position, correct?
11        A    Yeah.  I said that he had his arms
12   above his head, and then, that's when his face
13   went blue.
14        Q    It says while they were trying to
15   control him, right?
16        A    Yeah.  Because his hands were rolling
17   over.
18        Q    Right, but that was before he was put
19   in the recovery position.
20        A    I believe so.
21        Q    I mean, they weren't trying to
22   control him anymore when they rolled him in
23   the recovery position.  They were trying to,
24   you know, help him, right?
25             MR. ZIBILICH:
```

```
 1              Object to the form.
 2    BY MR. CLARKE:
 3         Q    They were starting to do a sternum
 4    rub, right?
 5         A    Right there, yes.
 6         Q    When you saw his face go blue, did
 7    you yell out his face is blue?
 8         A    No.
 9         Q    Why not?
10         A    Because they had other people already
11    doing the sternum rub.
12         Q    So you assume that they had seen it
13    based on their actions?
14         A    They were already attending to him
15    before I even noticed it.
16         Q    Did you hear the mother saying you're
17    choking him; you're choking him?
18         A    I don't remember.
19         Q    Do you remember anything that Daren
20    Parsa or Donna Parsa said during this whole
21    incident?
22         A    No.
23         Q    Well, you talked to the father and
24    got his information, correct?
25         A    Yes.
```

```
 1        Q    According to your statement, you
 2   said, yeah, she was saying things like, but
 3   the whole time we weren't hurting.  She was
 4   just trying to control him.  She was
 5   complaining the whole time.  Do you recall
 6   saying that in your statement?
 7        A    Yes.
 8        Q    And she was complaining about the
 9   manner in which she perceived that her son was
10   being treated, correct?
11             MR. ZIBILICH:
12                  Object to the form.
13             THE WITNESS:
14                  It was like -- I'd hear her
15             saying things, but I was focused on
16             them, and then, I also tried to check
17             on the dad that was injured and
18             collect info.
19   BY MR. CLARKE:
20        Q    Right, for the report, correct?
21        A    Yes.
22             MR. CLARKE:
23                  All right, give me a second.  I
24             think I'm done.
25             THE VIDEOGRAPHER:
```

```
 1              Off the record.  The time is now
 2         11:25.
 3                   (Brief recess.)
 4         MR. CLARKE:
 5              I'm ready.
 6         THE VIDEOGRAPHER:
 7              Back on the record.  The time is
 8         now 11:27.
 9    BY MR. CLARKE:
10      Q    In your statement on page five, you
11    note that she just -- I remember her shouting
12    y'all are killing my son, when all we were
13    doing was trying to control him.  Do you see
14    that?
15         MR. ZIBILICH:
16              Right in the middle of the page.
17         THE WITNESS:
18              Yes.
19    BY MR. CLARKE:
20      Q    Nobody put him in the recovery
21    position until he turned blue in the face,
22    correct?
23      A    I don't -- really -- I really don't
24    recall.
25      Q    Well, you didn't put him in the
```

```
1    recovery position, correct?
2         A    Well, --
3              MR. ZIBILICH:
4                   Listen to the question.
5              THE WITNESS:
6                   No, I didn't.
7    BY MR. CLARKE:
8         Q    According to your statement, he was
9    face down when you were trying to control him
10   when you saw him go blue in the face, right?
11        A    Where is that?
12        Q    That's on page four.
13             MR. ZIBILICH:
14                  Right at the middle of the page
15             again, the question by Dowling.  Got
16             it?
17             THE WITNESS:
18                  The one where he's blue in the
19             face.
20   BY MR. CLARKE:
21        Q    He's face down, and then, it's just
22   all of a sudden, I seen him turn blue.  So
23   that tells us it was prior to him being put in
24   the recovery position, correct?
25        A    Yes.
```

```
 1        Q    When you saw that, you didn't tell
 2   anybody that his face went blue, correct?
 3        A    No.
 4        Q    Despite all the training you had
 5   about asphyxia and breathing and compression,
 6   you never asked anybody to put him in the
 7   recovery position, correct?
 8        A    I didn't need to.  I wasn't hands-on.
 9   As soon as he went blue in the face, then, he
10   was in recovery.
11        Q    Right, but if he was struggling
12   violently, you would have went hands-on
13   correct?
14        A    If I saw somebody needed help.
15        Q    There was nothing in this video from
16   the time that Pitfield got there to where
17   while he was in prone position, more than one
18   officer was required to hold him down,
19   correct?
20        A    There was no need?
21        Q    Right.  I mean, they didn't do it,
22   correct?
23             MR. ZIBILICH:
24                  Object to the form.  You can
25                  answer it.
```

```
 1              THE WITNESS:
 2                   There was a need if he was
 3              pulling Nick forward.
 4    BY MR. CLARKE:
 5       Q    Well, if there was a need, why didn't
 6    you get on the ground and stop it?
 7       A    I didn't see that happen.  Like I
 8    said, I didn't see when that happened.
 9       Q    Right, but there were plenty of times
10    in this tape during the nine minutes when he
11    was in the prone position that he was calm
12    enough to put in the recovery position,
13    correct?
14              MR. ZIBILICH:
15                   Object to the form.
16              THE WITNESS:
17                   I didn't see anything wrong.  So
18              there wasn't any need for me to do
19              anything.
20              MR. CLARKE:
21                   If you have people who are
22              involved in the struggle; you're an
23              objective person who came out there,
24              and you should have known about the
25              dangers of the prone position,
```

```
 1            correct?
 2            THE WITNESS:
 3                  Yeah, but there wasn't anything
 4            going wrong at that time.
 5   BY MR. CLARKE:
 6       Q    He was getting deprived of oxygen the
 7   whole time, don't you think?
 8            MR. ZIBILICH:
 9                  Whoa, whoa, whoa.  No.  No.
10            Object to the form.
11   BY MR. CLARKE:
12       Q    We've gone through the physiology of
13   a struggle a number of times in this case.
14   While they're sitting on him, they are
15   depleting his oxygen.  That's what your
16   training tells you, correct?
17            MR. ZIBILICH:
18                  Object to the form.
19   BY MR. CLARKE:
20       Q    Correct?
21       A    Yes, but they weren't sitting on him.
22       Q    If your distinction is they sat in a
23   place that was special on him, because he was
24   obese that didn't compromise his respiratory
25   function, that's a fine answer, but was it
```

```
 1    your belief based on your training that where
 2    they were sitting did not cause compromise?
 3         A    No, it didn't.
 4         Q    Do you know that the coroner noted
 5    that the prone restraint was a contributing
 6    factor to his death?
 7         A    No.
 8         Q    If you would have known that, would
 9    you then agree that the restraint was not safe
10    for him?
11              MR. ZIBILICH:
12                   If he would have known that
13              after he was dead?  Is that the
14              question?
15              MR. CLARKE:
16                   No.
17              MR. ZIBILICH:
18                   You got to try it again, then.
19    BY MR. CLARKE:
20         Q    I mean, you've been told to not
21    answer a question when he objects?
22         A    No.
23              MR. ZIBILICH:
24                   No, not at all.  Nice try.
25              MR. CLARKE:
```

```
 1                    I'm just going to tender.
 2          MR. ZIBILICH:
 3                 Pardon?
 4          MR. CLARKE:
 5                 I'm just going to end it.
 6          MR. ZIBILICH:
 7                 Okay.  All right.  Deputy, thank
 8          you, very much.
 9          MR. KAUL:
10                 No questions.
11          MR. ZIBILICH:
12                 Neither from me.
13          THE VIDEOGRAPHER:
14                 This is the conclusion of the
15          videotaped deposition.  The time is
16          11:32.
17                 (Whereupon, the deposition was
18          concluded at 11:32 am.)
19            WITNESS CERTIFICATE
20
21
22          I, MANUEL ESTRADA, do hereby certify
23     that the foregoing testimony was given by me,
24     and that the transcription of said testimony,
25     with corrections and/or changes, if any, is
```

1    true and correct as given by me on the

2    aforementioned date.

3

4

5

6

7    DATE SIGNED            MANUEL ESTRADA

8

9

10             Signed with corrections as noted.

11

12             Signed with no corrections noted.

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3          I, LORI L. MARINO, Certified Court
   Reporter, in and for the State of Louisiana,
4  as the officer before whom this testimony was
   taken, do hereby certify that MANUEL ESTRADA,
5  after having been duly sworn by me upon
   authority of R.S. 37:2554, did testify as
6  hereinbefore set forth in the foregoing 127
   pages; that this testimony was reported by me
7  in the stenotype reporting method, was
   prepared and transcribed by me or under my
8  personal direction and supervision, and is a
   true and correct transcript to the best of my
9  ability and understanding; that the transcript
   has been prepared in compliance with
10 transcript format guidelines required by
   statute or by rules of the board, that I have
11 acted in compliance with the prohibition on
   contractual relationships, as defined by
12 Louisiana Code of Civil Procedure Article 1434
   and in rules and advisory opinions of the
13 board; that I am not related to counsel or to
   the parties herein, nor am I otherwise
14 interested in the outcome of this matter.

15

16     Dated this the 22nd day of September,

17 2022.

18

19

20

21

22        LORI L. MARINO, CCR
          CCR #87069
23        STATE OF LOUISIANA

24

25