UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CIVIL ACTION NO. 2:21-cv-00080


DONNA LOU and DAREN PARSA, on their own behalf
 and on behalf of their deceased minor child,
                    E.P.

                Plaintiffs,

            v.

SHERIFF JOSEPH P. LOPINTO, III, CHAD PITFIELD,
RYAN VAUGHT, STEVEN MEHRTENS, SHANNON GUIDRY,
NICK VEGA, MANUEL ESTRADA, MYRON GAUDET, JOHN
DOES 1-3, VICTORY REAL ESTATE INVESTMENTS LA,
   LLC and WESTGATE INVESTORS NO LLC D/B/A
   WESTGATE SHOPPING CENTER, ABC INSURANCE
          COMPANY, and XYZ INSURANCE,

                Defendants.


        Videotaped Deposition of CHAD

MICHAEL PITFIELD, given the above-entitled

cause, pursuant to the following stipulation,

before Lori L. Marino, Certified Shorthand

Reporter, in and for the State of Louisiana,

at the Jefferson Parish Sheriff's Office, 1233

Westbank Expressway, Building B, 5th Floor,

Harvey, Louisiana 70058 on Thursday,

September 22, 2022, commencing at 9:07 AM.

```
 1   APPEARANCES:

 2

 3   (ALL PARTICIPANTS PRESENT IN PERSON:)

 4

 5   LAW OFFICE OF WILLIAM MOST, L.L.C.
     201 ST. CHARLES AVENUE, SUITE 114#101
 6   NEW ORLEANS, LOUISIANA  70170
     TELEPHONE:  (504) 509-5023
 7
     BY:  WILLIAM MOST, ESQ.
 8   williammost@gmail.com

 9             AND

10   THE COCHRAN FIRM MID-SOUTH
     ONE COMMERCE SQUARE, SUITE 1700
11   MEMPHIS, TN  38103
     TELEPHONE:  (901) 523-1222
12
     BY:  ANDREW C. CLARKE, ESQ.
13   aclarke@cochranfirmmidsouth.com
     REPRESENTING THE PLAINTIFFS
14

15

16   HONORABLE FRANZ L. ZIBILICH
     6611 GENERAL DIAZ
17   NEW ORLEANS, LOUISIANA  70124
     TELEPHONE:  (504) 508-6868
18
     BY:  FRANZ L. ZIBILICH, ESQ.
19   fzibilich@gmail.com

20             AND

21   MARTINY & ASSOCIATES, LLC
     131 AIRLINE DRIVE, SUITE 201
22   METAIRIE, LOUISIANA  70001
     TELEPHONE:  (504) 834-7676
23
     BY:  JEFFREY D. MARTINY, ESQ.
24   jeff@martinylaw.com

25             AND
```

```
1    JEFFERSON PARISH SHERIFF'S OFFICE
     1233 WESTBANK EXPRESSWAY
2    BUILDING B, FLOOR 5
     HARVEY, LOUISIANA  70058
3    TELEPHONE:  (504) 363-5704

4    BY:  LINDSEY M. VALENTI, ESQ.
     valenti_lm@jpso.com
5    REPRESENTING SHERIFF JOSEPH P. LOPINTO, III
     AND THE JPSO DEFENDANTS

6

7

8    THOMPSON, COE, COUSINS & IRONS, LLP
     650 POYDRAS STREET, SUITE 2105
9    NEW ORLEANS, LOUISIANA  70130
     TELEPHONE:  (504)526-4321

10

     BY:  CHRISTOPHER W. KAUL, ESQ.
11   ckaul@thompsoncoe.com
     REPRESENTING VICTORY REAL ESTATE INVESTMENTS
12   LA, LLC AND WESTGATE INVESTORS NO LLC
     D/B/A WESTGATE SHOPPING CENTER, ABC INSURANCE
13   COMPANY,AND XYZ INSURANCE COMPANY

14

15   VIDEOGRAPHER:  AARON PALMER, CLVS, DEPO-VUE

16   ALSO PRESENT:  TIM ANCLADE, LEGAL INVESTIGATOR
                    DONNA LOU
17                  NICHOLAS VEGA

18

19   REPORTED BY:  LORI L. MARINO
                   CERTIFIED COURT REPORTER
20                 STATE OF LOUISIANA

21

22

23

24

25
```

E X A M I N A T I O N      I N D E X

CHAD MICHAEL PITFIELD
1233 WESTBANK EXPRESSWAY
HARVEY, LOUISIANA   70058

TITLE                                        1

APPEARANCES                                  2-3

WITNESS INDEX                                4

AGREEMENT OF COUNSEL                         5

EXAMINATION BY MR. MOST                      7

EXAMINATION BY MR. KAUL                      230

WITNESS'S CERTIFICATE                        236

REPORTER'S CERTIFICATE                       237


     E X H I B I T      I N D E X

EXHIBIT 111                                  106

EXHIBIT 112                                  186

EXHIBIT 113                                  224

EXHIBIT 114                                  225

EXHIBIT 115                                  227

```
 1                  S T I P U L A T I O N

 2            It is stipulated and agreed by and

 3      between Counsel for the parties hereto that

 4      the deposition of CHAD MICHAEL PITFIELD is

 5      hereby being taken pursuant to the Federal

 6      Rules of Civil Procedure for all purposes in

 7      accordance with law;

 8                  That the formalities of

 9      certification and filing are specifically

10      waived;

11                  That the formalities of reading and

12      signing are specifically not waived.

13                  That all objections, save those as

14      to the form of the question and/or

15      responsiveness of the answer, are hereby

16      reserved until such time as this deposition or

17      any part thereof is used or sought to be used

18      in evidence.

19                  *   *   *   *   *   *   *   *

20            LORI L. MARINO, Certified Court

21      Reporter, in and for the State of Louisiana,

22      officiated in administering the oath to the

23      witness.

24

25
```

```
 1          THE VIDEOGRAPHER:
 2              This is the videotaped
 3      deposition of Chad Pitfield.  This
 4      deposition is being held at 1233
 5      Westbank Expressway in Harvey
 6      Louisiana on September 22, 2022.  The
 7      time indicated on the video screen is
 8      9:07.  Would counsel please introduce
 9      themselves for the record.
10      MR. MOST:
11              Yeah, William Most.  With me
12      here is Andy Clarke for the
13      plaintiff, and we have Dr. Lou
14      present.
15      MR. ZIBILICH:
16              Franz Zibilich on behalf of Chad
17      Pitfield, on behalf of the other JPSO
18      defendant deputies and likewise on
19      behalf of Sheriff Joe Lopinto, along
20      with Jeff Martiny.
21      MR. KAUL:
22              And Chris Kaul on behalf of
23      Westgate and Victory defendants.
24      MR. MOST:
25              Thank you.  Could we identify
```

```
 1            the other people who are present, as

 2            well today?

 3            MR. ANCLADE:

 4                 Tim Anclade.

 5            MR. VEGA:

 6                 Nick Vega.

 7            THE VIDEOGRAPHER:

 8                 Would the court reporter please

 9            swear in the witness.

10                 CHAD MICHAEL PITFIELD, having

11            been first duly sworn was examined

12            and testified on his oath as follows:

13            MR. MOST:

14                 For the record, we have Jeffrey

15            Martiny here, as well today.

16                 Franz, an initial question:  Can

17            we stipulate that this deposition was

18            properly noticed and the court

19            reporter duly qualified?

20            MR. ZIBILICH:

21                 Sure.

22                      EXAMINATION

23   BY MR. MOST:

24       Q    Good morning, Mr. Pitfield.

25       A    Good morning.
```

```
 1        Q    My name is William Most.  I'm one of
 2   the attorneys for the plaintiffs in this case.
 3   How are you doing today?
 4        A    I'm doing good.
 5        Q    Could you give us your full name for
 6   the record please?
 7        A    Yeah.  Chad Michael Pitfield.
 8        Q    Mr. Pitfield, have you ever given a
 9   deposition before?
10        A    I have.
11        Q    Approximately, how many depositions
12   have you given before?
13        A    Three to four.
14        Q    What kind of cases were those
15   depositions?
16        A    Civil, civil car accident.
17        Q    Were those accidents where you were a
18   witness or where you were a plaintiff or a
19   defendant in those cases?
20        A    Both.
21        Q    How many cases have you been a
22   plaintiff or a defendant in court today before
23   this case?
24        A    One.
25        Q    Was that a car accident case?
```

```
 1        A     Yes, sir.
 2        Q     Were you the plaintiff or the
 3   defendant?
 4        A     I was the plaintiff.
 5        Q     So since you've given several
 6   depositions before, you understand that you're
 7   under oath here today?
 8        A     Yes, sir.
 9        Q     You understand that your answers here
10   today have the same force as if you were in a
11   courtroom with a judge and jury?
12        A     Yes, sir.
13        Q     Mr. Pitfield, is there anything,
14   whether it is medication, illness, fatigue,
15   substances or anything else that will prevent
16   you from giving us truthful and complete
17   answers today?
18        A     No, sir.
19        Q     And this deposition will go on for
20   some time, but it does not have to be
21   continuous.  So if you need to take a break at
22   any time, please just let me or your counsel
23   know, and we'll take a break.  However, I'll
24   tell you in advance that it's the practice to
25   ask you after each break who you spoke to and
```

1   what documents, if any, you reviewed, and

2   there may not be necessarily a guarantee of

3   privilege with an attorney during a break.  So

4   I just give you that advance heads-up.  All

5   right?

6        A    All right.

7        Q    One thing you are already doing well

8   is waiting for me to finish my questions

9   before you start answering them; and in

10  exchange, I'll try to give you the same

11  courtesy so that we have a clean record for

12  the court reporter, all right?

13       A    Yes, sir.

14       Q    If I ask a question that you don't

15  understand or is unclear, will you agree to

16  tell me that you don't understand it or that

17  it's not clear rather than just trying to

18  answer it?

19       A    Yes, sir.

20       Q    Thank you.  And do you know what case

21  you're here for today?

22       A    Yes, sir.

23       Q    What's your general understanding of

24  what that case is?

25       A    This is the Eric Parsa case.

11

```
1        Q     And Eric Parsa is a minor who passed
2   away?
3        A     Yes, sir.
4        Q     I may refer to him throughout this
5   deposition by the initials EP.  If I use those
6   initials, will you know who I'm talking about?
7        A     Yes, sir.
8        Q     Mr. Pitfield, approximately, when did
9   you begin preparing for this deposition?
10       A     Several months ago.  I've had several
11  meetings with my counsel.  I reviewed
12  statements in preparation.
13       Q     Did you have any meetings with
14  anybody besides your counsel to prepare for
15  this deposition?
16       A     No, sir.
17       Q     Was anyone present at those meetings
18  other than your counsel and yourself?
19       A     Yeah.  I mean, so we -- as a group,
20  we had a general meeting, and then, I've had
21  private meetings with my counsel.
22       Q     When you say a general meeting, you
23  mean with other defendants in this case and
24  counsel?
25       A     Correct.
```

1      Q    Was there anyone present at that

2  general meeting other than defendants in this

3  case and counsel?

4      A    Not that I recall.

5      Q    And you said you reviewed some

6  statements to prepare for this deposition.

7  What statements are you talking about?

8      A    The statement that I provided at the

9  detective bureau after the incident.

10     Q    So the statement you gave a few days

11 after EP died?

12     A    Correct.

13     Q    Were there any other statements that

14 you reviewed to prepare for this deposition?

15     A    No, sir.

16     Q    Any other documents you reviewed to

17 prepare for this deposition?

18     A    No, sir.

19     Q    Did you take any notes to prepare for

20 this deposition?

21     A    No, sir.

22     Q    You understand that this is a civil

23 case, not a criminal case, correct?

24     A    Correct.

25     Q    And so this is a civil case, but you

1    still retain the right to plead the Fifth to

2    questions.  That is a right you still have in

3    a civil case.  So I just give you that

4    heads-up in advance, all right?

5        A    All right.

6        Q    If you need to at any point plead the

7    Fifth, please just let me or your attorney

8    know, all right?

9        A    Got it.

10        Q    You said that you have been a party

11    to one lawsuit other than this one, a car

12    accident case, agreed?

13        A    Yes, sir.

14        Q    Do you recall any other lawsuits that

15    you've been a party to?

16        A    A recent with my home after Hurricane

17    Ida, but other than that, that's it.

18        Q    And this is a question I ask of all

19    witnesses.  It's not particular to you, but

20    Mr. Pitfield, have you ever been arrested?

21        A    No.

22        Q    Would you give us the brief nutshell

23    version of your educational and professional

24    background before you went into law

25    enforcement?

```
 1        A    So actually my -- it all bleeds
 2   together.  So I got into law enforcement right
 3   out of high school, went to college in the
 4   evening, worked during the day.  I did two
 5   years at the University of New Orleans while I
 6   was working for the Kenner Police Department.
 7             From there, it was on-the-job
 8   training.  I moved into the forensics field.
 9   So then, all of my training and education
10   shifted more towards forensics and getting
11   certifications and so forth.  When I came here
12   to Jefferson Parish, I did continue another
13   year at Loyola University, but then, again
14   shifted more into actual forensics, where I
15   obtained three international forensic
16   certifications.  Again, like I said, it was my
17   working career and education were hand in
18   hand.  They were happening at the same time.
19        Q    Okay.  So you completed high school,
20   obtained a range of certifications and
21   partially completed two college programs; is
22   that correct?
23        A    Yeah.  Approximately, three years of
24   college.
25        Q    Today is September 22nd.  We've got
```

```
1    the holidays coming up, Mr. Pitfield.  Do you
2    typically work Thanksgiving and Christmas most
3    years?
4         A    Yes, sir.
5         Q    Do you recall last year's
6    Thanksgiving and Christmas?
7         A    Yes.
8         Q    Did you work last Christmas?
9         A    Christmas, no.
10        Q    Did you work last Thanksgiving?
11        A    Yes.
12        Q    Did you have Thanksgiving dinner with
13   your family last year?
14        A    I did.
15             MR. ZIBILICH:
16                  Are you kidding me?  You can
17             answer it.
18   BY MR. MOST:
19        Q    Did you have Thanksgiving dinner with
20   your family last year?
21        A    Absolutely, I did.
22        Q    What time did you guys have dinner
23   last year for Thanksgiving?
24        A    I don't recall.
25        Q    At a normal dinner time?
```

```
 1            MR. ZIBILICH:

 2                  Object to the form.  What's

 3            normal?

 4  BY MR. MOST:

 5      Q    You can answer the question unless he

 6  instructs you not to.

 7      A    It was probably more around

 8  lunchtime.

 9      Q    So my understanding is you worked for

10  Kenner Police Department from 1997 to 2006.

11  Does that sound right to you?

12      A    Correct.

13      Q    You were a crime scene and

14  fingerprint technician there?

15      A    Correct.

16      Q    Why did you leave Kenner Police

17  Department?

18      A    For opportunities at the St. Charles

19  Parish Sheriff's Office where I resided.

20      Q    While you were at Kenner Police

21  Department, did you have any internal affairs

22  or other kinds of complaints against you?

23      A    Not that I'm aware of.

24      Q    Were you subject to any discipline at

25  the Kenner Police Department?
```

```
 1        A     Not that I'm aware of.
 2        Q     Did you receive training at the
 3   Kenner Police Department?
 4        A     Yes.
 5        Q     Was any of your role at the Kenner
 6   Police Department working as an officer on the
 7   streets?
 8        A     Towards the end.
 9        Q     Did you receive at Kenner Police
10   Department any training on the Americans with
11   Disabilities Act?
12        A     No.
13        Q     Did you receive any training at
14   Kenner Police Department regarding reasonable
15   accommodations for disabilities?
16        A     No.
17        Q     Did you receive any training at the
18   Kenner Police Department regarding excited
19   delirium?
20        A     Not that I'm aware of.
21        Q     Did you receive any training at the
22   Kenner Police Department about prone
23   restraint?
24        A     Possibly.
25        Q     I presume you were trained on the use
```

1    of handcuffs at the Kenner Police Department?

2         A    Yes, sir.

3         Q    What other restraining devices were

4    you trained on using at the Kenner Police

5    Department?

6         A    That was it.

7         Q    Then, my understanding is you worked

8    at the St. Charles Sheriff's Office from 2006

9    to 2007; is that correct?

10        A    Yes, sir.

11        Q    Your job there was as a crime scene

12   technician?

13        A    Correct and a deputy sheriff, as

14   well.

15        Q    Did that involve working as an

16   officer on the streets?

17        A    Yes.

18        Q    Why did you leave St. Charles

19   Sheriff's Office?

20        A    Being in the forensics field, doing

21   crime scene work is one thing, but working for

22   a crime laboratory in the region would have

23   brought my career to a different level, and I

24   was offered a position here at the Jefferson

25   Parish Sheriff's Office in the crime

1   laboratory.

2        Q     When you were at St. Charles

3   Sheriff's Office, did you have any internal

4   affairs or other kinds of complaints against

5   you?

6        A     No, not that I'm aware of.

7        Q     Were you subject to any discipline

8   while you were at the St. Charles Sheriff's

9   Office?

10       A     No, sir.

11       Q     Did you receive training at

12  St. Charles Sheriff's Office?

13       A     Yes.

14       Q     Did you receive any training on the

15  ADA?

16       A     Not that I'm aware of.

17       Q     When I say ADA, I'm using

18  abbreviation for the Americans with

19  Disabilities Act.  Is that your understanding?

20       A     Yes, sir.

21       Q     At St. Charles, did you receive any

22  training on reasonable accommodations for

23  disabilities?

24       A     Not that I'm aware of.

25       Q     Training on excited delirium?

```
 1        A     Possible.
 2        Q     Training on prone restraint?
 3        A     More than likely, yes.
 4        Q     Were you trained on the use of any
 5   restraining devices other than handcuffs at
 6   St. Charles?
 7        A     No, sir, not that I'm aware of.
 8        Q     So then, you left St. Charles
 9   Sheriff's Office and took a job with the
10   Jefferson Parish Sheriff's Office, correct?
11        A     Yes, sir.
12        Q     But before we move onto JPSO, you
13   said you may have received some training on
14   excited delirium at St. Charles Sheriff's
15   Office?
16        A     It's possible.  It could come up in
17   various topics that may come up.  I'm not
18   specific on just that topic, but it may have
19   been intertwined with something else.
20        Q     What was your recollection about what
21   you learned about excited delirium at
22   St. Charles Sheriff's Office?
23        A     I don't have any recollection to be
24   honest.  I don't recall what it would have
25   been.  I just know that it's a topic that
```

1  probably would have come up, combined with

2  another type of training class.

3      Q    So then, in 2007, you left

4  St. Charles Sheriff's Office and took a job

5  with the Jefferson Parish Sheriff's Office,

6  correct?

7      A    Correct.

8      Q    You took a job as a laboratory

9  technician?

10     A    Yeah.  That's probably the title, as

11  a deputy and assigned to the laboratory

12  services division.

13     Q    And you were at JPSO from 2007 to

14  2018, correct?

15     A    Full-time.

16     Q    What was the highest rank that you

17  achieved at JPSO?

18     A    Major.

19     Q    You were promoted to being commander

20  of laboratory services, correct?

21     A    Yes, sir.

22     Q    So does that mean you were the top

23  person in charge of the JPSO laboratory?

24     A    I had a boss above me that was the

25  chief, but yes, my day-to-day operation was

1    managing laboratory services.

2         Q    So you were the second in command of

3    the laboratory?

4         A    I guess that you could say that,

5    yeah.

6         Q    And this portrays my ignorance, but

7    that's not something that someone needs a

8    college degree -- completed college degree

9    for?

10        A    No, sir.  It was the law enforcement

11   role.  I was the liaison between law

12   enforcement and the laboratory.  Also, there

13   are sworn law enforcement crime scene

14   technicians assigned to the crime laboratory,

15   as well.  That was under my direct command.

16        Q    Did you conduct tests yourself?

17        A    Yes, latent fingerprints.

18        Q    While you were at JPSO full-time, did

19   you receive -- were you the subject of any

20   internal affairs or other kinds of complaints?

21        A    Not that I'm aware of.

22        Q    While you were at JPSO full-time,

23   were you subject to any discipline?

24        A    Not that I'm aware of.

25        Q    So from 1997 to 2018, a period of 21

```
 1    years, it's your understanding that you had in
 2    law enforcement a completely clean record with
 3    no complaints by anyone and no discipline and
 4    no investigations whatsoever?
 5         A    To the best of my knowledge.
 6         Q    Why did you leave JPSO in 2018?
 7         A    To take a different type of turn in
 8    my career to allow me to spend more time with
 9    my family.
10         Q    What was that turn in your career?
11         A    To take a job with the City of Kenner
12    as the Director of Parks & Recreation.
13         Q    Did you have any background that made
14    you a good candidate for that job?
15              MR. ZIBILICH:
16                   Object to the form.  You can
17              answer it.
18              THE WITNESS:
19                   Yeah.  I actually handled
20              special events and organizing
21              sporting events at a local facility.
22              So yeah, they were looking for
23              someone to attract and bring outside
24              people to handle certain things.  It
25              didn't necessarily mean that I have
```

1            to be the one coaching a certain

2            sport.  I needed enough common sense

3            and leadership ability to bring those

4            people in.

5    BY MR. MOST:

6        Q    So in 2018, you left the full-time

7    employ of JPSO and became a full-time employee

8    of the City of Kenner agreed?

9        A    Correct.

10       Q    You remained however a reserve deputy

11   for JPSO even after leaving JPSO's full-time

12   employ, agreed?

13       A    That's correct.

14       Q    In that role as a reserve deputy, you

15   did private detail work, correct.

16       A    That's correct.

17       Q    Private detail work is where you

18   could work for private companies, perhaps and

19   get paid to do so, correct?

20       A    Yeah, I guess that sums it up.

21       Q    Okay, how would you describe it?

22       A    Providing law enforcement presence

23   and law enforcement duties to private

24   businesses.  Or entities or individuals.

25   However, whoever the person would be.

```
 1        Q     And you would be paid by the hour to
 2   do that?
 3        A     Correct.
 4        Q     Could you do private detail -- let me
 5   back up.  In your role at Kenner as Director
 6   of Parks and Recreation, did you have set
 7   hours that you worked?
 8        A     No, sir.
 9        Q     Was there any expectation that you
10   worked a certain number of hours a week?
11             MR. ZIBILICH:
12                  Hold on.
13             MR. MOST:
14                  Yeah, I can clarify.
15   BY MR. MOST:
16        Q     Was there any expectation in your
17   role as Director of Kenner Parks & Rec that
18   you work a certain number of hours a week?
19        A     Thirty-five.
20        Q     But for Kenner, you could do those 35
21   hours whenever you wanted?
22        A     I was a salaried employee.  I far
23   exceeded those hours every week, but correct,
24   yeah, I was a salaried employee.
25        Q     Did you have to record for Kenner
```

```
 1    which hours you were working?

 2         A    No.

 3         Q    Okay, so for Kenner in your role as

 4    Director of Parks & Rec, you had to work at

 5    least 35 hours a week, but you could pick the

 6    hours, and you did not have to report to

 7    anyone which hours you were working; is that

 8    correct?

 9         A    Correct.

10         Q    So you were trusted to report

11    truthfully that you were working at least 35

12    hours a week, because there was no check on

13    that; is that fair?

14         A    Right.  As a salaried employee,

15    correct.  We submitted a form every two weeks

16    to the payroll clerk that said that we

17    certified that we worked the minimum number of

18    hours required, the 35 hours a week.

19         Q    Did you take any steps to keep track

20    of your hours to make sure each pay period

21    you had worked the minimum number of hours?

22         A    I would probably reach the 35 hours

23    by the second or third day in the pay period.

24    So, you know, I far exceeded it, as I said.

25         Q    So the answer is no, you didn't take
```

1   any steps to keep track of your hours?

2        A    Correct.

3        Q    Then, in your role -- so you were --

4   you had a full-time job for Kenner, which you

5   were far exceeding your 35 hours per week; and

6   at the same time, you also had a role as a

7   JPSO reserve deputy, correct?

8        A    Correct.

9        Q    What were the requirements for your

10  role as a JPSO reserve deputy?

11       A    To -- in a particular assignment that

12  I had was to work 34 hours a month for JPSO.

13       Q    And then, private detail would be on

14  top of those 34 hours?

15       A    That's correct.

16       Q    So you said you would, in your role

17  for Kenner be making, achieving your 35 hours

18  by the second or third day of each week,

19  correct?

20       A    That's correct.  It was not unlikely

21  to work a 10-hour day.

22       Q    So to achieve 35 hours in two days,

23  you'd have to be working 17 to 18 hours a day,

24  correct.

25       A    I don't think I said necessarily two

```
 1   days, but the first several days of the week.
 2        Q    Okay.  And by several, do you mean
 3   three?
 4        A    Could be.
 5        Q    So to work 35 hours in three days,
 6   you would have to be working nearly 12 hours a
 7   day, correct?
 8        A    Calculations, correct.
 9        Q    So it's your testimony that you would
10   be typically working 12-hour days for Kenner?
11        A    Depending on the day or what was
12   going on.  I had office duties during the day,
13   and I had activities going on at night that
14   required my attention.  So yeah, a lot of days
15   I did work 12-hour days.
16        Q    An average of roughly 12-hour days?
17             MR. ZIBILICH:
18                  Object  to the form.  You can
19             answer it.
20             THE WITNESS:
21                  Not everyday.
22   BY MR. MOST:
23        Q    What would you estimate was your
24   average hours per day?
25             MR. ZIBILICH:
```

```
 1                    Object to the form.
 2           THE WITNESS:
 3                    I can't average that.  I mean, I
 4           don't -- it changed daily depending
 5           on what activities were going on,
 6           what was going on in the city at the
 7           time.  There was no set schedule.
 8  BY MR. MOST:
 9      Q    Would you work on weekends, as well?
10      A    Frequently.
11      Q    Did you ever work shorter than
12  eight-hour days during the work week?
13           MR. ZIBILICH:
14                    Object to the form.
15           THE WITNESS:
16                    I'm not aware.
17  BY MR. MOST:
18      Q    So then, on top of your Kenner hours,
19  you would be working 34 hours, at least 34
20  hours per month for JPSO as a reserve deputy,
21  correct?
22      A    Yes, sir.
23      Q    What did that work entail?
24      A    Initially, I was assigned to the
25  reserve crime scene division.  So I was still
```

```
 1   working in the forensics field and providing
 2   services, responding to calls for service for
 3   the crime scene division.
 4        Q    You say initially.  Did you later do
 5   something different?
 6        A    I did.
 7        Q    What did you do later?
 8        A    I was assigned to the reserve motor
 9   pool, where I was in charge of operating and
10   maintaining several of the Sheriff's Office
11   high water fleet vehicles.
12        Q    In your time doing the JPSO reserve
13   deputy work, setting aside private detail,
14   were you doing any on the street work or
15   patrol work?
16        A    Periodically.  I mean, I was a sworn
17   officer, you know, riding the streets around
18   crime scene calls for service.
19        Q    Were you paid by the hour by JPSO for
20   these reserve deputy hours?
21        A    No.
22        Q    Did you they give you a salary?
23        A    No.
24        Q    So you were essentially a volunteer
25   for JPSO for those 34 hours a week?
```

```
 1        A    That's correct.
 2        Q    I'm sorry, 34 hours a month?
 3        A    Correct.
 4        Q    And then, in addition to your
 5   full-time job at Kenner and your 34 hours a
 6   month for JPSO reserve deputy, you also did
 7   private detail work after you left JPSO; is
 8   that correct?
 9        A    When I left JPSO full-time and was in
10   the reserves, that's correct.
11        Q    Approximately, how many hours per
12   week or month would you be working private
13   detail?
14             MR. ZIBILICH:
15                  Object to the form.  You can
16             answer it.
17             THE WITNESS:
18                  I don't have the schedule.  It
19             really -- it wasn't a lot.  I didn't
20             work as many as I did when I was
21             full-time.
22   BY MR. MOST:
23        Q    Did you have one specific location
24   that you did private detail work for or a
25   range of them?
```

1       A    It was a range.

2       Q    One of those locations that you did

3   private detail work was the Westgate Shopping

4   Center, correct?

5       A    Correct.

6       Q    If I refer just to the word

7   "Westgate," will you understand I mean

8   Westgate Shopping Center?

9       A    Sure.

10      Q    So when you were doing -- as a JPSO

11  reserve deputy, did you have to continue with

12  training through JPSO?

13      A    That's correct.

14      Q    What was your training requirements

15  as a reserve deputy?

16      A    So we have the same minimum

17  requirements as a full-time deputy has, where

18  we have to maintain 20 hours of continuing

19  education per year.

20      Q    Did you have additional training to

21  do special detail?  Or private detail?

22      A    No, sir.

23      Q    When you were doing reserve deputy

24  work, did you have assigned shifts?

25      A    Where?

```
 1        Q    I'm sorry.  When you were doing
 2   reserve deputy work for JPSO, not private
 3   detail, did you have set shifts that you would
 4   be working?
 5        A    No.
 6        Q    Did you choose your own hours as a
 7   JPSO reserve deputy?
 8        A    For the most part, yes.
 9        Q    Did you or JPSO keep track of your
10   hours as a JPSO reserve deputy?
11        A    Yes.
12        Q    And how was that done?
13        A    I would report the hours in, and it
14   was logged with the reserve division.
15        Q    Was there a sheet that you did that
16   on or a form?
17        A    It was a -- I can't remember what it
18   was in the beginning, but at the end, it was a
19   computer system.
20        Q    And you could log into the computer
21   system and report your hours?
22        A    Correct.
23        Q    Do you know the name of that system
24   that logged hours?
25        A    No, I don't.
```

```
 1        Q    Did you have a swipe card that
 2   allowed -- from JPSO that allowed you access
 3   to the JPSO facilities when you were a reserve
 4   deputy?
 5        A    Yes.
 6        Q    Did you use that swipe card every
 7   time that you were doing your reserve deputy
 8   work?
 9        A    No.
10        Q    The private detail work, how were
11   you -- were you assigned hours for private
12   detail, or did you pick hours for a private
13   detail?
14             MR. ZIBILICH:
15                  Object to the form.  You can
16             answer it.
17             THE WITNESS:
18                  It was based on the  customer's
19             needs.
20   BY MR. MOST:
21        Q    So the customer would reach out to
22   who about their needs?
23        A    Depending whether the Sheriff's
24   Office had a detail administrator that ran
25   that particular detail or the JPSO public
```

1   assignment office.

2       Q    Okay, and then, either that

3   coordinator or the public assignment office

4   would then contact you?

5       A    They would offer the shift if you

6   were interested in taking in for that date at

7   those particular hours and it was available.

8       Q    How would they offer that to you?

9   Would they call you on the telephone, send you

10  an email?  How did that work?

11      A    It varied per location, whether you

12  were a permanent assigned to that location on

13  a specific day, hour or reaching out to you

14  however.

15      Q    So let's be more specific.  For

16  Westgate, were you a permanent assigned to

17  Westgate?

18      A    Yes.

19      Q    And so did you have regular hours

20  doing private detail for Westgate?

21      A    I did.

22      Q    What were those regular hours?

23      A    Every other Sunday from 10:00 AM to

24  3:00 PM.

25      Q    Do you know if they had other private

```
1    detail officers covering the Sundays you
2    weren't working?
3         A    Yes.
4         Q    What were some of the other private
5    detail customers you worked for?
6         A    I was the -- I handled Lafreniere
7    Park in Jefferson Parish, and I also
8    previously was the detail administrator for
9    Best Buy in Jefferson Parish.
10        Q    Is Lafreniere Park, is that -- was
11   that under your jurisdiction as Director of
12   Parks and Rec for the City of Kenner.
13        A    No.  It's not in the City of Kenner.
14        Q    Did each customer pay the same hourly
15   rate for your private detail work, or did it
16   vary by customer?
17        A    It could vary.
18        Q    Was it $30 an hour for Westgate?
19        A    I believe at some point, yeah.  I'm
20   not sure what it is currently or what it was
21   towards the end, but at some point, yes, that
22   was --
23        Q    Okay, and the policies and procedures
24   that you were supposed to follow in your role
25   doing private detail work for customers were
```

```
1    the policies and procedures you were trained
2    on by JPSO, correct?
3              MR. ZIBILICH:
4                   Object to the form.  You can
5              answer it.
6              THE WITNESS:
7                   Correct.  The Sheriff's Office
8              has SOPs for public assignments.
9    BY MR. MOST:
10       Q    So your training and standard
11   operating procedures that applied when you
12   were a full-time JPSO employee also applied to
13   your work when you were doing private detail
14   work, agreed?
15       A    Correct.
16       Q    And the amount that customers would
17   pay for your private detail work, would that
18   come directly to you?
19       A    In which way?
20       Q    Yeah.  So did you receive a check
21   from the customer, or did you receive a check
22   or another form of payment from JPSO for your
23   private detail work?
24       A    It varied per location.
25       Q    How were you paid by Westgate?
```

```
 1        A     Check.

 2        Q     A check?

 3        A     To me.

 4        Q     So you would receive a check

 5   periodically from Westgate directly to you for

 6   whatever number of hours times your hourly

 7   rate?

 8        A     Correct.

 9        Q     Did part of -- did you have to pay

10   part of that money to anybody else?

11        A     To the Sheriff's Office.

12        Q     So you would then write a check to

13   the Sheriff's Office for a percentage of what

14   you got?

15        A     Correct.

16        Q     Was there someone involved in this

17   process named Canatella?

18        A     Correct.  He's the detail

19   administrator.

20        Q     Do you know if he worked directly for

21   JPSO, or he was sort of a free agent?

22             MR. ZIBILICH:

23                  Object to the form.  You can

24             answer it.

25             THE WITNESS:
```

```
 1              At the time, he was a JPSO
 2         deputy and JPSO reserve deputy after.
 3   BY MR. MOST:
 4      Q    Did you pay him anything directly out
 5   of your proceeds from Westgate?
 6      A    No.
 7      Q    Okay, we may come back to this some
 8   later but just getting a timeline down.  So in
 9   January 2020, your full-time job was Director
10   of Parks and Rec for the City of Kenner,
11   correct?
12      A    Correct.
13      Q    Then, in January 2020, you were also
14   working at least 34 hours a month for JPSO as
15   a reserve deputy, correct?
16      A    Correct.
17      Q    And that was on a volunteer basis?
18      A    That's correct.
19      Q    And then, you were also working 10:00
20   to 3:00 every other Sunday for Westgate doing
21   private detail, correct?
22      A    Correct.  Unless there was a day that
23   I told them I couldn't work.
24      Q    You were also doing private detail
25   work for other customers, as well around the
```

```
 1    time of January 2020; is that correct?
 2         A    Possibly.  I don't have the record in
 3    front of me.
 4         Q    So you already had an intense
 5    full-time job that you were working
 6    substantially more than 40 hours a week in
 7    early 2020, correct?
 8         A    Correct.
 9         Q    What was the reason that you were
10    also volunteering 34 hours a week for the JPSO
11    as a reserve deputy?
12              MR. ZIBILICH:
13                   Object to the form.  You can
14              answer it.
15              THE WITNESS:
16                   Because I wasn't ready to get
17              rid of law enforcement.  Law
18              enforcement has been in my family.
19              Although, I wanted to make a career
20              change for my immediate family's
21              benefit, I wasn't ready to give up
22              law enforcement.
23    BY MR. MOST:
24         Q    Would you be able to do the private
25    detail work if you were not also doing at
```

```
1    least 34 hours a month as a reserve deputy?
2         A    No.
3         Q    So in other words, doing the 34 hours
4    a month as a reserve deputy gave you access to
5    doing more hours for pay as private detail; is
6    that correct?
7         A    The 34 hours a month met my
8    requirement of the Sheriff's Office to
9    maintain my position.  My position allowed me
10   to work private details as needed.
11        Q    And at some point, you transitioned
12   from being the Director of Parks & Rec for the
13   City of Kenner to be the Chief Administrative
14   Officer for the City of Kenner, correct?
15        A    Deputy Chief Administrative Officer.
16        Q    And that's abbreviated CAO?
17        A    DCAO.
18        Q    Approximately, when did you become
19   DCAO?
20        A    October of either -- I'm trying to
21   think.  It's either '20 -- October of --
22   October of '20.  Sorry.  October 2020.
23        Q    And you left that job earlier this
24   year, correct?
25        A    Correct.
```

```
 1        Q    What have you been doing for -- are
 2   you employed?
 3        A    Yes.
 4        Q    What are you employed as?
 5        A    I work in the private industry, not
 6   in government.  I'd prefer not to give my
 7   current employer out.  They're not affiliated
 8   with this.
 9            MR. MOST:
10                Why don't we go off the record
11            for a moment.
12            THE VIDEOGRAPHER:
13                Off the record.  The time is now
14            9:46.
15            (Off-the-record discussion.)
16            THE VIDEOGRAPHER:
17                Back on the record.  The time is
18            9:46.
19            MR. ZIBILICH:
20                Y'all's concern is that in some
21            way, shape or form, this line of
22            questioning can go to punitive
23            damages.  Okay, all right.  I
24            disagree by more than a hundred
25            percent.  When y'all attempted to
```

```
 1              have me disqualified from this case
 2              and y'all were concerned about
 3              whatever the reason was that you
 4              wanted me disqualified from this
 5              case, I couldn't have not made it
 6              more abundantly clear that in this
 7              case, under this factual backdrop,
 8              that the sheriff himself would pick
 9              up the punitive damages.
10         MR. MOST:
11              In his individual capacity?
12         MR. ZIBILICH:
13              No.  He didn't say in his
14         individual capacity.  Those are your
15         words.  Those aren't mine.
16         MR. MOST:
17              I'm just asking.  You said the
18         sheriff himself.
19         MR. ZIBILICH:
20              The sheriff himself in his
21         capacity as the sheriff.  Punitive
22         damages as pertains to these
23         individual defendants are of no
24         moment.
25         MR. MOST:
```

```
 1              Okay.
 2         MR. ZIBILICH:
 3              That's clear as a bell from the
 4         argument we had in front of whoever
 5         the magistrate was.  Who was it?
 6         MR. KAUL:
 7              Currault.
 8         MR. ZIBILICH:
 9              Magistrate Currault.  I don't
10         know whether you participated or not.
11         As a matter of fact, I think after
12         making that argument, I think I was
13         instructed by the magistrate to
14         reduce that argument into writing,
15         which I did and which you all have.
16         MR. MOST:
17              But you're not instructing the
18         witness not to answer the question?
19         MR. ZIBILICH:
20              I'm not instructing him to.  He
21         said he doesn't want to answer it.  I
22         respect his decision.
23   BY MR. MOST:
24        Q    Mr. Pitfield, the reason why you
25   don't want to answer this question, is there
```

```
 1    some special sensitivity related to your job?
 2    I don't know.  National security, or is it
 3    some other particularly sensitive job?
 4              MR. ZIBILICH:
 5                   I object to the form.  You can
 6              do whatever you want, Mr. Pitfield.
 7              THE WITNESS:
 8                   I prefer not to answer any
 9              further on that.
10              MR. MOST:
11                   I understand that you'd prefer
12              not to, but --
13              MR. ZIBILICH:
14                   Well, translated, that means
15              he's not.
16    BY MR. MOST:
17         Q    -- but the basis for your desire not
18    to answer the question, is it based on any
19    particular sensitivity as to the nature of
20    your work?
21         A    Could be.
22         Q    Or is it merely you do not want to
23    bring reputational harm to your employer?
24              MR. ZIBILICH:
25                   Object to the form.
```

```
 1              THE WITNESS:
 2                    I'm gonna go back.  I'm not
 3              going to answer any further on my
 4              current employment.
 5    BY MR. MOST:
 6         Q    So you will not answer any questions
 7    about your current employment?
 8         A    Correct.
 9         Q    And you will not tell us the reason
10    why you're choosing not to answer any
11    questions about your current employment?
12         A    Correct.
13         Q    Your current employment, is that the
14    only job you've had since being DCAO of
15    Kenner?
16         A    Correct.
17         Q    I want to turn to talking to you
18    about your training as an officer, as a law
19    enforcement officer.  In any of your jobs as a
20    law enforcement officer, were you POST
21    certified?
22         A    Yes.
23         Q    Do you recall who was your employer
24    when you became POST certified?
25         A    Kenner Police Department.
```

1     Q     Did you maintain that POST
2   certification throughout your role as a law
3   enforcement officer?
4     A     That's correct.
5     Q     Are you currently POST certified?
6     A     Firearms proficiency only.
7     Q     One final question about your current
8   employment:  Are you currently employed as a
9   law enforcement officer?
10     A     No.
11     Q     Another kind of public office?
12     A     No.
13     Q     So when you came to JPSO, you
14   received training from JPSO, correct?
15     A     That's correct.
16     Q     Did you go through the JPSO academy?
17     A     No, sir.
18     Q     Did you have an initial set of
19   training at the beginning of your role as
20   JPSO?
21     A     Correct.
22     Q     Then, you received in-service
23   training over the subsequent years at JPSO?
24     A     That's correct.
25     Q     You received training from JPSO about

1   how to safely restrain a person, correct?

2       A    Throughout, yeah, various courses

3   yeah, handcuffing techniques, so forth.

4       Q    If handcuffs are not sufficient to

5   restrain a person, you received training from

6   JPSO on how to use the RIPP Hobble device,

7   correct?

8       A    On a supervisory level.  I was never

9   assigned one.  On a supervisory level, just a

10  basic understanding.

11      Q    You took the RIPP Hobble training

12  program, correct?

13      A    I don't recall if it was a full

14  training program or as I said, a supervisory

15  level.

16      Q    So I want to go into --

17          THE VIDEOGRAPHER:

18              Off the record.  The time is

19          9:52.

20              (Brief pause.)

21          THE VIDEOGRAPHER:

22              Back on the record.  The time is

23          9:53.

24  BY MR. MOST:

25      Q    So, Mr. Pitfield, we'll be looking at

```
 1    documents using the screen today.  I can zoom

 2    in.  So if at any point you need me to zoom

 3    in, please just ask me, all right?

 4         A    Yes, sir.

 5         Q    Do you use glasses?

 6         A    Yes.

 7         Q    Are you able to read what's on the

 8    screen?

 9         A    Yes, sir.

10              MR. MOST:

11                   Do you see that this document,

12              which is -- we're going to mark as

13              Exhibit 111.

14              MR. CLARKE:

15                   It's already marked.  Give me a

16              second.

17              MR. MOST:

18                   Okay.

19              MR. CLARKE:

20                   Previously marked as Exhibit 32.

21              MR. MOST:

22                   This is previously Exhibit 32,

23              not 111.

24              MR. ZIBILICH:

25                   What are you calling it?
```

```
 1            MR. MOST:
 2                 I'm sorry?
 3            MR. ZIBILICH:
 4                 What are you calling it?
 5  BY MR. MOST:
 6       Q    So, Mr. Pitfield, you see that this
 7  is your training file from JPSO?
 8       A    It's listing classes.  I'm assuming.
 9  I've never seen a document like this before.
10       Q    Sure.  But looking at it, does this
11  appear to list classes that you recall taking?
12       A    It lists classes.  I'm assuming it's
13  complete.
14       Q    Sure, but you remember, for example,
15  taking the Advanced Firearms class in April of
16  2021?
17       A    I'm sure I did.
18       Q    Going down to page five of Exhibit
19  32, do you see that you took a RIPP Hobble
20  course in 2007?
21            MR. ZIBILICH:
22                 Object to the form, but you can
23            answer it.
24            THE WITNESS:
25                 Yes, that would have been part
```

```
 1              of my initial training when I came
 2              into JPSO in 2007.
 3    BY MR. MOST:
 4         Q    And you passed that course?
 5         A    Correct.
 6         Q    So you must have taken the entirety
 7    of the RIPP Hobble in the course?
 8              MR. ZIBILICH:
 9                   Object to the form.  You can
10              answer.
11              THE WITNESS:
12                   I'm assuming.  We're looking at
13              the date here, right.  I mean, that's
14              from 2007.  I don't recall what the
15              content of it was.
16    BY MR. MOST:
17         Q    Do you recall being trained by
18    Officer Pizzolato during your initial training
19    in 2007?
20         A    I don't recall.
21         Q    Do you recall taking this RIPP Hobble
22    course in 2007?
23         A    Not other than from the document on
24    the screen.  No, I don't recall in 2007.
25         Q    Do you recall that you took a RIPP
```

1   Hobble course?

2        A    I do not.

3        Q    Well, a few minutes ago, it sounded

4   like you did testify that you recall taking a

5   course related to the RIPP Hobble.  You

6   couldn't recall if it was supervisory or not

7   supervisory.

8        A    Right.  I've had some training in a

9   RIPP Hobble.  I couldn't tell you what we

10  talked about in September 20th of 2007 is what

11  I'm saying.

12       Q    So at least we agree that you were

13  trained by JPSO to use -- in something related

14  to the use of the RIPP Hobble device, agreed?

15       A    Sure.  Yes, sir.

16       Q    And the training regarding the RIPP

17  Hobble device was to safely restrain someone

18  when restraint more than handcuffs was

19  necessary, agreed?

20           MR. ZIBILICH:

21               Object to the form.  You can

22           answer.

23           THE WITNESS:

24               It was an additional tool in the

25           toolbox is basically what it was.  If

```
 1              you needed something else other than
 2              handcuffs, it was an additional tool
 3              at our -- at our -- available to us.
 4    BY MR. MOST:
 5         Q    Were you trained by JPSO on any
 6    restraint devices other than handcuffs and the
 7    RIPP Hobble device?
 8         A    I'm not sure where any other -- I
 9    guess I'm not following what you mean.  Any
10    other physical restraints?
11         Q    Correct.
12         A    Not that I'm aware of.
13         Q    Do you see, Mr. Pitfield, on the
14    screen here, that you also completed a RIPP
15    Hobble proficiency course in 2015?
16         A    Correct.
17         Q    Do you recall taking that course?
18         A    Not specifically, but again, going to
19    the overall knowledge of the device.
20         Q    Do you see that on November 24, 2015,
21    you took another RIPP Hobble online course,
22    and you completed that course, as well?
23         A    Correct, I see that on the screen.
24         Q    So based on these records, it appears
25    that that you took and completed three
```

```
 1    training courses on the RIPP Hobble device?
 2         A    Sure.   It's listed three times on the
 3    record, yes.
 4         Q    Any reason to think that's incorrect?
 5         A    No.
 6         Q    We've established that the two
 7    physical restraint devices you were trained on
 8    by JPSO were handcuffs and the RIPP Hobble
 9    device, correct?
10         A    Yes.
11         Q    Not any others?
12         A    Not that I'm aware of.
13         Q    Do you recall anything about the
14    content of any of these three RIPP Hobble
15    trainings?
16              MR. ZIBILICH:
17                   Object to the form.
18              THE WITNESS:
19                   No, because I wasn't a user.  I
20              didn't -- I was not assigned a RIPP
21              Hobble.  It was a mandatory class
22              that I had to go through, but I was
23              not assigned one.  So that's why I
24              wasn't sure if it was supervisory or
25              not, but I know the understanding and
```

```
 1              the overall use of the device but I
 2              was not a user.  I was not assigned
 3              one.
 4   BY MR. MOST:
 5       Q    Do you know generally what a RIPP
 6   Hobble device is used to prevent?
 7       A    Yeah, kicking, so forth.
 8       Q    You say you weren't assigned -- or
 9   you weren't a user of a RIPP Hobble device?
10       A    Correct.
11       Q    Because most of your work as a JPSO
12   officer was as a crime scene technician or
13   similar?
14              MR. ZIBILICH:
15                   Object to the form.  You can
16              answer.
17              THE WITNESS:
18                   In the forensics field.
19   BY MR. MOST:
20       Q    Yeah.  But some of your work as a
21   JPSO full-time officer was sometimes doing
22   patrol and street work; is that correct?
23       A    Sure.
24       Q    In that role, were you a user of a
25   RIPP Hobble device?
```

```
1        A     No, sir.  I wasn't assigned one,
2    because of the assignment that I was primarily
3    assigned to.
4        Q     What assignment was that?
5        A     Laboratory services.
6        Q     I see.  So you were mostly laboratory
7    services and only partly street patrol, and so
8    for that reason, you not given a RIPP Hobble
9    device; is that correct?
10              MR. ZIBILICH:
11                   Object to the form.
12              THE WITNESS:
13                   I don't know the reason behind
14              why not, but no one in laboratory
15              services, which is an enforcement
16              division, we were not assigned a RIPP
17              Hobble.
18   BY MR. MOST:
19       Q     You didn't really need a RIPP Hobble,
20   because most of the people you were
21   interacting with were either dead or other
22   officers, correct?
23              MR. ZIBILICH:
24                   Object to the form.
25              THE WITNESS:
```

```
 1              No, not necessarily.
 2    BY MR. MOST:
 3        Q    Did you need a RIPP Hobble device for
 4    your role as a JPSO officer?
 5              MR. ZIBILICH:
 6                   Object to the form.
 7              THE WITNESS:
 8                   That could be by any -- whatever
 9              situation was presented to me.  I
10              mean, we wore a uniform just like
11              everybody else.  People on the street
12              don't see that you work in  crime
13              scene; they see that you're a police
14              officer.
15    BY MR. MOST:
16        Q    So you carried a gun as a crime scene
17    officer, correct?
18        A    Yes.
19        Q    You carried handcuffs as a crime
20    scene officer, correct?
21        A    Yes.
22        Q    Because even though you were crime
23    scene officer, you might have occasion to need
24    a gun or handcuffs, correct?
25        A    I was an enforcement officer, as
```

```
 1   well.
 2       Q    Right, because you were an
 3   enforcement officer, you might come across a
 4   situation in which you needed to restrain
 5   someone.  So that's why you carried handcuffs,
 6   correct?
 7       A    Sure.
 8       Q    But at no point during your role as a
 9   full-time JPSO officer were you provided with
10   a RIPP Hobble device; is that correct?
11       A    That's correct.
12       Q    What about in your role as private
13   detail.  So when you were private detail, you
14   would be using a JPSO vehicle?
15       A    Correct.
16       Q    And JPSO provided you with a gun and
17   handcuffs?
18       A    A gun.  Handcuffs are mine.
19       Q    The private detail vehicle -- the
20   vehicle that you used for private detail work,
21   was it a standard JPSO patrol vehicle?
22            MR. ZIBILICH:
23                Object to the form.
24            THE WITNESS:
25                It was the vehicle assigned to
```

```
 1              me by the sheriff's office.
 2    BY MR. MOST:
 3         Q    Was it a vehicle specifically to be
 4    used for private detail?
 5         A    No.
 6         Q    So it had the standard compliment of
 7    equipment as other vehicles used by JPSO
 8    full-time officers?
 9              MR. ZIBILICH:
10                   Object to the form.
11              THE WITNESS:
12                   No.
13    BY MR. MOST:
14         Q    In what way did it not?
15         A    We did not have a security screen
16    inside the crime scene vehicles.
17         Q    I see.  So you had a crime scene
18    vehicle when you were doing private detail
19    work?
20         A    During this particular time, yes.
21         Q    So a crime scene vehicle is different
22    than a standard patrol vehicle in that it
23    doesn't have a security screen?
24              MR. ZIBILICH:
25                   Object to the form.
```

```
 1            THE WITNESS:
 2                 For the most part yes.
 3   BY MR. MOST:
 4       Q    I don't know what a security screen
 5   is.  What is that?
 6       A    It goes between the backseat and the
 7   front seat.
 8       Q    I see.
 9            MR. ZIBILICH:
10                 It keeps Mr. Clarke away from
11            the driver.
12   BY MR. MOST:
13       Q    Is there equipment that's provided
14   in -- let me ask this:  Does a crime scene
15   vehicle have a computer in it?
16       A    Yes.
17       Q    Does it have any equipment in the
18   trunk or glove box?
19       A    Yes.
20       Q    What kind of equipment?
21       A    Forensics equipment.
22       Q    Are there any other weapons in a
23   crime scene vehicle?
24       A    That would be per officer, depending.
25       Q    Any first aid equipment in a crime
```

1    scene vehicle?

2         A    Again, per officer.

3         Q    By per officer, do you mean the

4    officer brings it with them?

5         A    Yeah, depending.  I mean, the

6    sheriff's office will provide you with basic

7    gloves, that kind of stuff.  Most guys make

8    their own individual first aid kits, and

9    depending on your level of training, you

10   may -- we have first responders that have

11   full-on trauma kits in their cars.  Again, it

12   depends on the officer themself.

13        Q    I think it would be helpful to be a

14   little more specific.  So on the date of the

15   death of EP, you had the use of a JPSO crime

16   scene vehicle in your role as a private

17   detail; is that correct?

18        A    The vehicle that was assigned to me

19   by the sheriff's office, correct.

20        Q    Was a crime scene vehicle?

21        A    Correct.

22        Q    And so in it, there was a computer?

23        A    Correct.

24        Q    And no security screen?

25        A    Correct.

1      Q      Some basic first aid stuff, like
2  gloves?
3      A      And some medical equipment that I
4  would have had.
5      Q      So it had some basic medical
6  equipment, like gloves, and you brought
7  additional medical equipment?
8      A      Correct.  It stays stocked in the
9  vehicle.
10      Q      So this was a vehicle assigned
11  particularly to you?
12      A      That's correct.
13      Q      Was it a take-home vehicle?
14      A      Yes.
15      Q      What was in the glove box?  Any
16  equipment in the glove box of that vehicle?
17      A      I don't recall.
18      Q      Was there equipment in the trunk of
19  that vehicle?
20      A      Yeah.
21      Q      Crime scene forensic equipment?
22      A      Correct.
23      Q      Any restraint devices?
24      A      No.
25      Q      So the only restraint device you had

1    on that day personally was handcuffs; is that

2    correct?

3         A    Correct.

4         Q    And they were your personally owned

5    handcuffs?

6         A    That's correct.

7         Q    So the loadout of a crime scene

8    vehicle is, as we've established, different

9    from that of a standard patrol vehicle,

10   correct?

11        A    The main difference is it has more

12   equipment, and it doesn't have the prisoner

13   security screen.

14        Q    So the crime scene vehicle has more

15   equipment than a standard patrol vehicle?

16        A    Yes.

17        Q    Does a standard patrol vehicle have

18   restraint devices other than handcuffs?

19        A    I couldn't speak to that.

20        Q    And this -- the loadout of your crime

21   scene vehicle, other than what you provided

22   was provided by JPSO, correct?

23        A    That's correct.

24        Q    So JPSO did not provide you with a

25   RIPP Hobble device, agreed?

```
 1            MR. ZIBILICH:
 2                 Fourth time.  Go ahead.
 3   BY MR. MOST:
 4       Q    Correct?
 5       A    Yes.
 6       Q    So the only restraint device other
 7   than handcuffs that JPSO trained you on, they
 8   did not issue you, agreed?
 9       A    Correct.
10            MR. ZIBILICH:
11                 Fifth time.
12   BY MR. MOST:
13       Q    So going back to your training, in
14   your training by JPSO, were you trained about
15   positional asphyxia?
16       A    Yes.  Probably in various different
17   types of classes.  I don't know if it was a
18   specific class just on it, but yeah, at some
19   point.
20       Q    And that's what I'm asking for, --
21       A    Yeah.
22       Q    -- whether this was a topic covered
23   by your training?
24       A    Got you.
25       Q    In your training by JPSO, were you
```

```
 1   trained on the recovery position?
 2        A     Yes, sir.
 3        Q     And the recovery position is for
 4   restrained persons.  Once they are restrained,
 5   they should been rolled onto their side or sat
 6   up to avoid positional asphyxia; --
 7             MR. ZIBILICH:
 8                  Object to the form.  You can
 9             answer it.
10   BY MR. MOST:
11        Q     -- is that correct?
12        A     No.
13        Q     What's incorrect about my statement?
14        A     It's not just for people that are in
15   handcuffs, but recovery position could also be
16   for medical, as well.
17        Q     So the recovery position, when we say
18   the recovery position, we mean the process of
19   either rolling someone on their side or
20   sitting them up if they are either restrained
21   or having a medical situation, agreed?
22             MR. ZIBILICH:
23                  Object to the form.
24             THE WITNESS:
25                  Yes.
```

```
 1              MR. MOST:

 2                   Franz, I don't mind the

 3              objections, but just wait until I'm

 4              finished.

 5              MR. ZIBILICH:

 6                   Okay.

 7   BY MR. MOST:

 8       Q    At least with regard to the recovery

 9   position for a restrained person, part of the

10   reason the recovery position is important is

11   to avoid positional asphyxia, agreed?

12       A    Yeah.  Okay, yeah.

13       Q    When we talk about --

14              MR. ZIBILICH:

15                   Who's we?

16              MR. MOST:

17                   You can ask me after I'm done

18              with the question.

19              MR. ZIBILICH:

20                   Okay.  Well, I'm going to

21              object, because it confuses me.

22   BY MR. MOST:

23       Q    If we talk about the prone position,

24   is that something you were trained on at JPSO?

25              MR. ZIBILICH:
```

```
 1                    Object to the form.
 2            THE WITNESS:
 3                    Yeah.  In many different facets,
 4            prone positioning, yes.
 5   BY MR. MOST:
 6       Q    By prone position, do you mean the
 7   position where a person is laying face down on
 8   the ground?
 9       A    Flat, flat, face on the ground
10   (indicating)?
11       Q    You were trained not to leave someone
12   for an extended period of time in the prone
13   position, correct?
14            MR. ZIBILICH:
15                    Object to the form.
16            THE WITNESS:
17                    I'm not sure we were ever
18            trained that there's a certain amount
19            of time, no.  I'm not sure there's a
20            timeframe for that.
21   BY MR. MOST:
22       Q    But you were trained that there are
23   certain dangers associated with leaving
24   someone in the prone position for an extended
25   period of time, agreed?
```

```
 1              MR. ZIBILICH:
 2                   Object to form.
 3              THE WITNESS:
 4                   Yeah.  There's risk with a lot
 5              of things, but yes.
 6   BY MR. MOST:
 7      Q    One of the risks that you're talking
 8   about is the risk of asphyxiation, correct?
 9      A    It could be, yes.
10      Q    One of the other risks that you're
11   talking about is the risk of death, correct?
12      A    Possibly.
13      Q    Asphyxiation and death are per your
14   training by JPSO, risks associated with
15   keeping a restrained person in the prone
16   position for an extended period of time,
17   agreed?
18              MR. ZIBILICH:
19                   Object to the form.
20              THE WITNESS:
21                   It could be.  It's a risk.  It
22              could be a risk involved with it.
23   BY MR. MOST:
24      Q    Right, and those are risks that you
25   were trained on by JPSO associated with the
```

```
 1    prone position for a restrained person,

 2    agreed?

 3         A    Yes.

 4         Q    In your training with JPSO regarding

 5    a restrained person, is that when a person has

 6    been -- well, let me just start over.  Your

 7    training with JPSO was that when the struggle

 8    with the restrained person has stopped, that's

 9    the time to put them in the recovery position,

10    agreed?

11         A    Correct.

12         Q    So, for example, when a person is

13    handcuffed and surrounded by officers and in

14    the prone position, that would be a time to

15    put them in the recovery position, correct?

16              MR. ZIBILICH:

17                   Object to the form.

18              MR. KAUL:

19                   Object to form.

20              THE WITNESS:

21                   No.

22    BY MR. MOST:

23         Q    What part of my statement was

24    inaccurate?

25         A    You didn't add when under control.
```

```
 1      Q    Okay.  So when a person is handcuffed
 2   and under control and surrounded by officers,
 3   that would be the appropriate time to put them
 4   in the recovery position, agreed?
 5              MR. ZIBILICH:
 6                   Object to the form.
 7              MR. KAUL:
 8                   Object to form.
 9              THE WITNESS:
10                   Surrounded by officers doesn't
11              matter.  When the person is under
12              control.
13   BY MR. MOST:
14      Q    Okay.  So when a person is handcuffed
15   and under control, that would be the
16   appropriate time to put them in the recovery
17   position, correct?
18              MR. ZIBILICH:
19                   Object to the form.
20              MR. KAUL:
21                    Object to form.
22              THE WITNESS:
23                   Sure.
24              MR. ZIBILICH:
25                   Double objection.
```

BY MR. MOST:

    Q   As part of your training by JPSO, you were trained that when a subject is restrained in a facedown position, their breathing may become labored, correct?

    A   I'm not sure.  I'm not sure specifically.

    Q   Is it your understanding that when a suspect is restrained in a facedown position, it may become more difficult for them to breathe?

    A   I mean, I think it goes -- no, I'm not specifically.  No, I'm not sure specifically.  Again, there are risks with every type of action that are taken.  It could be a risk, but I'm not sure it's a -- I'm not sure we were ever trained it's a absolute every time that happens.

    Q   Your training with JPSO, however, was that restraining a person in the prone position increases the risk of a negative effect on their breathing.  Would that be fair?

    A   I don't know about the increase.  I would say it's a risk.

```
 1        Q    It's the same risk as any other
 2   position?
 3        A    Could be, depending on the person.
 4        Q    Okay.  When you say depending on the
 5   person, one factor that might increase the
 6   risk of problems with breathing in the prone
 7   position would be obesity, agreed?
 8        A    Could be.  Could be an accelerated
 9   risk.
10        Q    When you say could be, you're
11   agreeing with me that a person who is obese is
12   at greater risk of having breathing problems
13   when restrained in the prone position, agreed?
14             MR. ZIBILICH:
15                  Object to the form.
16             THE WITNESS:
17                  I wouldn't say they're at a
18             greater risk.  I would say it's a
19             risk.
20   BY MR. MOST:
21        Q    But you don't recollect any training
22   on this?
23        A    No.
24        Q    Were you trained by JPSO that when
25   weight is applied to someone's backside who's
```

1    in the prone position, there's an increased

2    risk of impingement of the person's breathing?

3        A    You have to be a little more specific

4    on backside for me.

5        Q    Sure.  Weight applied to a person in

6    the prone position's back according to your

7    training increases the risk of an impairment

8    of breathing, agreed?

9        A    Back, yes.

10        Q    According to your training by JPSO,

11    one common result of a person's impaired

12    breathing is that that person my struggle,

13    correct?

14        A    Struggle how?  I don't -- I don't

15    grasp the question.  Sorry.

16        Q    So as part of your training by JPSO,

17    part of it was preventing people from stopping

18    breathing, agreed?

19        A    Well, sure.

20        Q    And as part of that training, it was

21    discussed that when a person is having trouble

22    breathing, they may struggle more than they

23    would if they were breathing fine, agreed?

24        A    I'm not sure that was ever

25    specifically mentioned, but it's -- yeah.  I

```
1    mean, if I couldn't breathe, I'd probably want
2    to fight to breathe.
3        Q    Right.  So your training with JPSO
4    was that that these factors sometimes lead to
5    a cycle where a person who's struggling to
6    breathe struggles.  The officer then reacts to
7    that struggle by applying more restraint, and
8    it becomes a problematic cycle.  Do you recall
9    that training?
10            MR. ZIBILICH:
11                Object to the form.
12            MR. KAUL:
13                Object to the form.
14            THE WITNESS:
15                Yeah, I don't recall
16            specifically.
17   BY MR. MOST:
18       Q    Is it your understanding that that is
19   a potentially problematic cycle that is a real
20   thing?
21            MR. ZIBILICH:
22                Object to the form again.
23            THE WITNESS:
24                Again, I'm not sure that that's
25            was really -- I'm not grasping a
```

1          hundred percent of it.
2    BY MR. MOST:
3        Q    Okay.  So we discussed that part of
4    your training at JPSO addressed the topic of
5    positional asphyxia, correct?
6        A    Correct.
7        Q    Positional asphyxia is a shorthand
8    for saying that someone's physical positioning
9    may affect their ability to breathe, agreed?
10       A    Yeah.
11       Q    Your training was that risk factors
12   for positional asphyxia include obesity,
13   correct?
14       A    Could be a risk factor, yes.
15       Q    Right, and that was part of your
16   training that that is a risk factor?
17       A    I don't recall.
18       Q    But it's your understanding that that
19   is a risk factor, agreed?
20       A    Yes, sir.
21       Q    Was it your training that alcohol or
22   drug use is a risk factor for positional
23   asphyxia.
24       A    Again, I don't recall those actual
25   specifics.

```
 1        Q    Were you trained -- during your
 2   training, was there a similar term of
 3   restraint asphyxia used?
 4        A    Was there a what?
 5        Q    A similar term of restraint asphyxia
 6   used?
 7        A    I don't recall.
 8        Q    So we'll move onto --
 9        MR. MOST:
10             Help me keep an eye for 11:00
11        o'clock.
12        MR. CLARKE:
13             All right.
14        MR. ZIBILICH:
15             I got you covered.  It's 10:20.
16        MR. MOST:
17             Thank you.  If everyone can help
18        me make sure I don't miss my court
19        appearance, I'd appreciate it.
20        MR. ZIBILICH:
21             Who is the judge?  I'll tell you
22        if I can change the clock on you.
23        MR. MOST:
24             It's -- well, -- okay.
25   BY MR. MOST:
```

```
 1        Q    Going onto Exhibit 22, I am going to
 2   pull up a document that's been previously
 3   identified as Exhibit 22.  Can you see this,
 4   Mr. Pitfield?
 5        A    Yes, sir.
 6        Q    Do you see that this is entitled "Law
 7   Enforcement/SCDS Instructor Certification
 8   Training Course," and it says RIPP Restraints
 9   International?
10        A    Yes, sir.
11        Q    Do you recall seeing this
12   presentation as part of at least one of your
13   RIPP Hobble trainings?
14        A    I don't recall.
15        Q    I'm going to go to page 22 of Exhibit
16   22.  Do you see that this says, "Positional
17   asphyxia occurs when the position of the body
18   interferes with respiration"?
19        A    I do.
20        Q    Is that consistent with the training
21   you received at JPSO?
22        A    Sure.  Yes, sir.
23        Q    It says this interference is
24   increased when the subject is placed in a
25   physically compromised position from which
```

1  they cannot remove themselves.  Do you see

2  that?

3       A    I do.

4       Q    Is that consistent with your training

5  at JPSO?

6       A    I would agree.

7       Q    So an example of when someone is in a

8  physically compromised position could be the

9  prone position, agreed?

10       A    It could, yes.  It could be.

11       Q    And A position from which a person

12  cannot remove themselves would be, for

13  example, a person who is handcuffed and has

14  someone physically on top of them preventing

15  them from going somewhere, agreed?

16       A    It could be.

17       Q    Okay, I'm turning to page 44 of

18  Exhibit 22.  Do you see that this is training

19  about the SWARM technique?

20       A    Correct.

21       Q    Do you recall being trained on the

22  SWARM technique?

23       A    I don't recall specifically.

24       Q    Do you have a general understanding

25  of what the SWARM technique is?

1      A    Yes.  I've heard the term, and I know
2  what the term is.  I'm not sure -- I just
3  don't recall the specifics on the actual
4  training part.
5      Q    Sure.  Is your general understanding
6  of the SWARM technique a technique in which a
7  group of officers can work together to
8  restrain someone even if that person is
9  resisting?
10      A    That they can?
11      Q    I mean, that's -- well, I can
12  rephrase.
13      A    Okay, go ahead.
14      Q    Is it your understanding of the SWARM
15  technique is that it's a technique designed to
16  allow a group of officers to restrain someone
17  even if that person is resisting?
18      A    Yes.
19      Q    Going down to page 47, do you see
20  part of the SWARM technique is the application
21  of the Hobble device?
22      A    I see it listed under number eight,
23  yes.
24      Q    The last part of the SWARM technique
25  is to put the person in the recovery position,

 1   correct?

 2       A    Yes.  That's listed as number 10.

 3       Q    Does this reflect your understanding

 4   of the SWARM technique?

 5       A    That's correct.

 6       Q    Turning to page 40 of Exhibit 22, do

 7   you see that this part describes building a

 8   defensible platform?

 9       A    Correct.  Yes, that's what's

10   displayed.

11       Q    Do you recall being trained on

12   building a defensible platform?

13       A    Not specifically.

14       Q    Going back to the SWARM technique,

15   page 47 of Exhibit 22, do you see that Part B

16   of the SWARM technique describes what to do if

17   a subject kicks or attempts to use his or her

18   legs as a weapon?

19       A    Yes.

20       Q    So the SWARM technique is a technique

21   that can be used by officers even when a

22   subject is kicking or trying to use their legs

23   as a weapon, agreed?

24       A    It could be, yes.

25       Q    So even if a subject is resisting,

1    kicking, trying to use their legs as a weapon,

2    JPSO officers can apply the SWARM technique to

3    restrain the person, apply the RIPP Hobble

4    device and put them in the recovery position,

5    agreed?

6         A    Yeah, it's one tool.

7         Q    Yeah.  And it's an effective tool,

8    agreed?

9              MR. ZIBILICH:

10                  Object to the form.

11             THE WITNESS:

12                  I'm not sure how it would be

13             effective on each individual person.

14   BY MR. MOST:

15        Q    Okay, but it's one of the tools in

16   the JPSO officer's toolbox of techniques,

17   agreed?

18        A    That's correct.

19        Q    But it's a technique that requires a

20   physical RIPP Hobble device, agreed?

21        A    Correct.

22        Q    One aspect of -- let me rephrase.

23   Sometimes, a person is in the prone position

24   with their hands handcuffed behind their back,

25   correct?

```
 1        A    Correct.
 2        Q    That person having their hands
 3   handcuffed behind their back prevents them
 4   from using their hands to relieve pressure on
 5   their chest or diaphram, agreed?
 6             MR. ZIBILICH:
 7                  Object to the form.
 8             MR. KAUL:
 9                  Object to the form.
10             THE WITNESS:
11                  I mean, yeah, your hands are
12             occupied, but as far as being able to
13             release pressure, I mean, no.  I
14             mean, yeah, their hands are occupied,
15             but just by simply having your hands
16             handcuffed behind your back would not
17             keep you from relieving pressure.
18   BY MR. MOST:
19        Q    Right.  So if a person with their
20   hands handcuffed behind their back won't
21   necessarily have trouble breathing, but the
22   handcuffing of hands behind the back increases
23   the risk of trouble breathing, would you
24   agree?
25             MR. ZIBILICH:
```

```
 1                    Object to the form.
 2           MR. KAUL:
 3                    Object to the form.
 4           THE WITNESS:
 5                    Could be a risk.
 6  BY MR. MOST:
 7      Q    Any reason to think it's not a risk?
 8      A    Depending on the person's physical
 9  capabilities.
10      Q    A person who is obese would be
11  particularly susceptible to that kind of risk,
12  agreed?
13           MR. ZIBILICH:
14                    Object to the form.
15           THE WITNESS:
16                    I don't think it's a standard,
17           but it's a possible risk.
18  BY MR. MOST:
19      Q    During your training with JPSO, you
20  were trained that law enforcement must quickly
21  put someone in the recovery position to avoid
22  the risk of death, agreed?
23      A    Once under full control, sure, the
24  recovery position would be the next method --
25  would be the next step.
```

1      Q    What do you mean by full control?

2      A    That you have that person under

3  control.  They are no longer fighting or being

4  combative.

5      Q    So when there is a cessation of

6  struggle, that would be the time to put

7  someone in the recovery position, agreed?

8           MR. ZIBILICH:

9                Object to the form.

10          THE WITNESS:

11               Yes.

12 BY MR. MOST:

13     Q    Someone who is both handcuffed and

14 has their legs restrained, is that person

15 under control?

16          MR. ZIBILICH:

17               Object to the form.

18          MR. KAUL:

19               Object to the form.

20          THE WITNESS:

21               No, I wouldn't say.

22 BY MR. MOST:

23     Q    What is the defining characteristic

24 of a person that's under control?  Is it that

25 they're not moving at all?

```
 1            MR. ZIBILICH:
 2                 Object to the form.
 3            MR. KAUL:
 4                 Object to the form.
 5            THE WITNESS:
 6                 Compliance.
 7   BY MR. MOST:
 8      Q    So by compliance, you mean that the
 9   person is following instructions, agreed?
10      A    Yes.
11      Q    So if a person is not following law
12   enforcement's instructions, that person is not
13   under control, agreed?
14            MR. ZIBILICH:
15                 Object to the form.
16            MR. KAUL:
17                 Object to the form.
18            THE WITNESS:
19                 I don't think just verbal.  I
20            think -- we're not talking about just
21            verbal compliance.  We're talking
22            physical compliance, as well.  No
23            longer fighting or doing what we were
24            trying to stop them from doing.
25   BY MR. MOST:
```

```
 1        Q    Right.  So if a person is not
 2   complying with law enforcement's verbal or
 3   physical directives, that person is not under
 4   control, agreed?
 5        A    Correct.
 6        Q    According to your training, a person
 7   cannot be rolled into the recovery position
 8   until they're under control, agreed?
 9        A    Correct.
10        Q    So a person who is so impaired as to
11   not be able to comply with law enforcement
12   commands cannot be under control, agreed?
13             MR. ZIBILICH:
14                  Object to the form.
15             MR. KAUL:
16                  Object to the form.
17             THE WITNESS:
18                  Again, depending on what
19             situation we're presented with, but
20             generally, yes.  If they're
21             physically being combative or not
22             conforming or not coming under
23             control, yeah, they're not ultimately
24             under control.
25   BY MR. MOST:
```

```
 1        Q    Right.  So a person who does not have
 2   the capability of following commands, it's
 3   going to be longer before they're put in the
 4   recovery position by JPSO officers, agreed?
 5             MR. ZIBILICH:
 6                  Object to the form.
 7             MR. KAUL:
 8                  Object to the form.
 9             THE WITNESS:
10                  Depends on their level of
11             resistance, if they have physical
12             resistance, as well.
13   BY MR. MOST:
14        Q    Right.  Were you trained on the
15   difference between active and passive
16   resistance?
17        A    Yes.
18        Q    What's your understanding of the
19   difference?
20        A    Passive is I'm telling you to get
21   against the wall; you tell me, no.  Active
22   resistance is I tell you to get against the
23   wall, and you fight me.
24             MR. MOST:
25                  I'm going to pull up, it's in
```

```
 1           the Dropbox as Exhibit ZS, which I'm
 2           going to mark as Exhibit 111.
 3           MR. ZIBILICH:
 4               What are you calling this?
 5           MR. MOST:
 6               Exhibit 111.
 7           MR. ZIBILICH:
 8               What is it?  I can't read that
 9           far.
10           MR. MOST:
11               Sorry, that's the wrong one.
12           MR. CLARKE:
13               It's right in front of him in
14           that book.  What is the exhibit
15           number?
16           MR. MOST:
17               Okay.  Here we go.
18   BY MR. MOST:
19       Q   We're looking at Exhibit 19.
20           MR. ZIBILICH:
21               So 111 is gone?
22           MR. MOST:
23               Yeah.  Nothing has been
24           designated as 111.
25   BY MR. MOST:
```

1      Q    Let's start at the top.  Do you see

2    Exhibit 19 is JPSO Standard Operating

3    Procedures?

4      A    That's correct.

5      Q    And you were trained on these

6    operating procedures?

7           MR. ZIBILICH:

8                Object to the form.

9           MR. MOST:

10               Let me rephrase that.

11   BY MR. MOST:

12     Q    You're familiar with JPSO's Standard

13   Operating Procedures, correct?

14     A    Correct.

15     Q    You had to read them and certify that

16   you've read them?

17     A    And be familiar with them.

18     Q    Were you ever tested on them?

19     A    I don't recall.

20     Q    Did your training as a JPSO officer

21   refer to these Standard Operating Procedures

22   as part of the training?

23     A    Yes.

24     Q    And you were the trained to do things

25   consistent with these Standard Operating

1   Procedures, agreed?

2        A    Correct.

3        Q    Going down to page 52 of Exhibit 19.

4   Okay, do you see that we are looking at

5   page 52 of Exhibit 19?

6        A    No.  Oh, okay, now, it's changed.

7   I'm sorry.  I was looking at the top still.

8        Q    No problem.  So do you see that we're

9   looking at SOP 8 "Restraining Devices &

10  Defensive Devices Policy for the Jefferson

11  Parish Sheriff's Office"?

12       A    That's correct.

13       Q    So this is the SOP that you were

14  familiar with and trained on for using

15  restraining devices, agreed?

16       A    Yes.

17       Q    Going down to page 56, do you see

18  where it says, D, extremely violent prisoners?

19       A    Um-huh (affirmative expression).

20       Q    This says, "Extremely violent

21  prisoners may have to be additionally

22  restrained.  If necessary to restrain the

23  movements of both the hands and legs, it may

24  be done by the 'Total Appendage Training

25  Procedure'"  Do you see that?

```
1        A    I do.
2        Q    Total Appendage Restraining
3   Procedure, is that the procedure of using the
4   RIPP Hobble device?
5        A    That is correct.
6        Q    So when a person that you are dealing
7   with as a JPSO officer is extremely violent
8   and you have to restrain the movements of both
9   their hands and legs, you were trained to use
10  the Total Appendage Restraining Procedure of
11  applying a RIPP Hobble, agreed?
12           MR. ZIBILICH:
13                Object to the form.
14           THE WITNESS:
15                Again, it's another tool.
16  BY MR. MOST:
17       Q    Okay.
18       A    So yes.
19       Q    What other tools or techniques were
20  you trained on for use with an extremely
21  violent person to restrain the movements of
22  both their hands and legs other than the RIPP
23  Hobble device?
24       A    As far as that particular total
25  appendage, it would be the RIPP Hobble; but
```

```
1    again, that doesn't necessarily mean it has to
2    be used.
3         Q    Sure.  Were there any other
4    techniques that you were trained on using in
5    this scenario?
6         A    No.
7         Q    As part of your training at JPSO, you
8    were trained to monitor someone's breathing if
9    they were in the prone position, agreed?
10        A    Yeah.  Sure.  I'd say yes, I guess.
11        Q    You were trained to count the
12   person's respirations?
13        A    While?
14        Q    Yeah, let me rephrase.  Your were
15   trained for monitoring a person in the prone
16   position included counting the person's, the
17   restrained person's respirations, agreed?
18        A    No.  I'm going to say no on that.
19        Q    Were you trained to monitor a person
20   in the prone position's pulse?
21        A    No.
22        Q    What were you trained to do in terms
23   of monitoring for a person in the prone
24   position?
25        A    First of all, compliance.  Compliance
```

1    has to be achieved before you go into the

2    recovery position.  So from prone position,

3    once you receive that control, then, you move

4    into the control position; but as far as

5    counting breaths or reading pulses, no, that's

6    nothing you would do, because if you were in

7    that prone position still and you haven't gone

8    to the recovery, it's because you're still in

9    a combative situation.

10        Q    I'm sorry.  I thought you just

11   testified that you were trained to monitor the

12   breathing of a person in the prone position;

13   is that correct?

14        A    I guess, maybe, I should have asked

15   you to clarify.  Monitor, meaning I'm watching

16   you to see what's going on.  Clearly, if I see

17   you're in some type of -- having some type of

18   issue, but as far as counting breaths --

19   that's why I said no.  Counting breaths and

20   pulse rates and so forth, no.

21        Q    Did you at any point participate in

22   putting EP into the recovery position?

23        A    No.

24        Q    Was that because there was no point

25   at which in your interaction with EP that he

1    was under control?

2         A    That is correct.

3         Q    Do you know if any of the persons on

4    scene of the death of EP had a RIPP Hobble

5    device?

6         A    I don't.

7         Q    Did anyone call for the use of a RIPP

8    Hobble device?

9         A    I don't recall.

10        Q    Do you recall anyone on scene at the

11   death of EP saying anything about the RIPP

12   Hobble device?

13        A    I don't recall.

14        Q    Do you recall anyone at the scene of

15   the death of EP referring to excited delirium?

16        A    No, I don't recall.

17        Q    Do you recall anyone at the scene of

18   EP's death referring to the recovery position?

19        A    I don't recall.

20        Q    So I'm going to turn a little bit to

21   your role working a private detail for

22   Westgate Shopping Center, all right?

23        A    Okay.

24        Q    So we've already established

25   Westgate, you had --

```
1              MR. ZIBILICH:

2                   Are you good?

3              THE WITNESS:

4                   I'm good.

5              MR. ZIBILICH:

6                   He's going to stop in about 15

7              minutes for a little while.

8              MR. MOST:

9                   Yeah.

10     BY MR. MOST:

11        Q    All right, so you -- in January,

12     2020, you had a regularly assigned shift

13     working private detail at Westgate, correct?

14        A    That's correct.

15        Q    And so when it was time for your

16     detail, you would the take your JPSO take-home

17     vehicle and you would go to Westgate, correct?

18        A    Correct.

19        Q    Your role there was to be patrolling

20     the Westgate Shopping Center, correct?

21        A    Correct.

22        Q    You were serving and protecting the

23     patrons and the tenants of the Westgate

24     Shopping Center for Westgate, correct?

25              MR. KAUL:
```

```
 1                    Object to form.
 2              THE WITNESS:
 3                    Correct.
 4    BY MR. MOST:
 5        Q    So when you were doing your private
 6    detail for Westgate, you had to be physically
 7    at the Westgate Shopping Center, correct?
 8        A    Correct.
 9        Q    You couldn't be patrolling some other
10    part of Jefferson Parish, agreed?
11        A    Correct.
12        Q    And you had a cell phone that was
13    specific for that role at Westgate, agreed?
14        A    Correct.
15        Q    Westgate gave you that cell phone?
16        A    I don't know who provided it, but it
17    was for that particular location.
18        Q    Did you have it with you all the
19    time, or did you go get it when it was time
20    for your shift at Westgate?
21        A    You would get it at the time of the
22    shift.
23        Q    So where was that cell phone stored?
24        A    At that particular time, it was
25    stored inside of the Laser Tag facility.
```

```
1        Q    At that particular time, you mean the
2   time around the death of EP?
3        A    Correct.
4        Q    Was there like a storage closet, or
5   was it behind a desk somewhere?  Where was the
6   cell phone?
7        A    It was in the manager's office.
8        Q    So when it was time for your shift at
9   Westgate, you would go to the Laser Tag, go to
10  the manager's office, get the cell phone?
11       A    Correct.
12       Q    And then, return it when you were
13  done with your shift?
14       A    Or hand it off to the next officer
15  that was relieving.
16       Q    You said at that time it, was stored
17  in the Laser Tag manager's office.  Where was
18  it stored at other times?
19       A    At the end, before I completed, it
20  was stored inside the Academy Sports, because
21  the Laser Tag had closed.
22       Q    Was there any other tools, devices,
23  anything else provided by Westgate for your
24  role of special detail?
25       A    No.
```

```
 1        Q    Westgate gave the instructions of
 2   where you were supposed to patrol on the
 3   shopping center premises, agreed?
 4             MR. KAUL:
 5                  Object to form.
 6             THE WITNESS:
 7                  The property.
 8   BY MR. MOST:
 9        Q    And it was Westgate that told you
10   this is where your suppose to be patrolling,
11   right?
12             MR. KAUL:
13                  Object to form.
14             THE WITNESS:
15                  It would come from the detail
16             administrator, Deputy Canatella, but
17             yes, we were there for the Westgate
18             Shopping Center.
19   BY MR. MOST:
20        Q    If you needed to use the restroom
21   while you were on the private detail for
22   Westgate, where would you use the restroom?
23        A    W could go inside any of businesses.
24        Q    Did you have a break room or anything
25   like that?
```

```
 1        A     No.
 2        Q     Your checks came directly -- let me
 3   rephrase.  Your payment for the Westgate
 4   private detail came directly from Westgate to
 5   you by check made out to you, agreed?
 6        A     Correct.
 7        Q     So during your private detail time,
 8   you were working -- Westgate was the customer,
 9   you said, correct?
10        A     Correct.
11        Q     So you were working during those
12   hours for Westgate, agreed?
13             MR. KAUL:
14                  Object to the form.
15             THE WITNESS:
16                  Correct.
17   BY MR. MOST:
18        Q     This might be a stupid question, but
19   Westgate --
20             MR. ZIBILICH:
21                  Oh, don't be so hard on
22             yourself.
23   BY MR. MOST:
24        Q     Westgate consented to you being the
25   private detail officer working there, agreed?
```

```
 1              MR. KAUL:

 2                   Object to the form.

 3              THE WITNESS:

 4                   I would have to say so.

 5    BY MR. MOST:

 6         Q    If Westgate had wanted someone other

 7    than Chad Pitfield, could they have told that

 8    to the special detail scheduler?

 9         A    Absolutely.

10         Q    And they would have gotten someone

11    other than Chad Pitfield?

12         A    Sure.

13         Q    Private detail was an optional part

14    for you as part of your role as a reserve

15    deputy, correct?

16         A    It's optional for every employee.

17    You're not mandated to work.

18         Q    Got it.  You worked for -- you did

19    private detail work for Westgate from 2018 to

20    2020; is that correct?

21         A    I'm not sure of the dates, but I'm

22    not sure I did it from 2018.  It could be.

23    I'd have to -- I don't know the record -- I

24    don't know the dates offhand.

25         Q    Do you know when you stopped doing
```

```
 1    private detail work for Westgate?
 2         A    Yes.  When I stopped my employment
 3    with the Sheriff's Office in February.
 4         Q    February of 2022?
 5         A    2022, yes.
 6         Q    So after the death of EP, Westgate
 7    did not ask you to stop doing private detail
 8    for them, agreed?
 9         A    Correct.
10         Q    Okay.  The next thing  we'll be
11    shifting to a different topic, talking about
12    that particular day.  So I wonder if it's work
13    taking a break now.  We could get a couple of
14    minutes.  Anyone have a preference?
15              MR. CLARKE:
16                   Stop now.
17              MR. MOST:
18                   Yeah, why don't we go off the
19              record.
20              THE VIDEOGRAPHER:
21                   Off the record.  The time is now
22              10:50.
23                   (Whereupon, a lunch recess was
24              taken.)
25              THE VIDEOGRAPHER:
```

```
 1                    Back on the record.  The time is
 2           now 11:46.
 3   BY MR. MOST:
 4       Q    Mr. Pitfield, I'll ask you the
 5   standard questions I ask after breaks.  So
 6   during the break, did you talk to anyone
 7   besides a lawyer?
 8       A    No.
 9       Q    Did you look at any documents during
10   the break?
11       A    No.
12           MR. ZIBILICH:
13                Go ahead.
14   BY MR. MOST:
15       Q    All right, Mr. Pitfield, we talked
16   earlier about your definition of when someone
17   is under control.
18       A    Um-huh (affirmative expression).
19       Q    Is your definition consistent with
20   the way you were trained at JPSO?
21       A    I'm thinking training overall, yes,
22   someone being under control when they're not
23   being combative.
24       Q    And able to comply with commands,
25   correct, verbal or physical?
```

1        A    I don't know if I would go that far.
2    I would say they're not being combative.   I
3    mean, obviously, complying with commands would
4    be nice, but if I asked somebody to go into
5    roll or sit in a seated position, and they
6    didn't want to do it, then, I would assist
7    them.
8        Q    But what you described earlier was a
9    truthful description of how you understand
10   under control to mean, correct?
11       A    Yes.
12       Q    That truthful description you gave
13   earlier was consistent with what you were
14   trained at JPSO; is that correct?
15       A    I would say I've had training,
16   obviously, throughout the departments, but
17   yes, under control would be yeah, that you're
18   no longer fighting.
19       Q    What you described earlier, that was
20   specifically consistent with the way JPSO
21   trained you, agreed?
22       A    Remind me what I said earlier.
23       Q    Sure.  When you talked before our
24   lunch break about what under control meant and
25   you described it to us, was that consistent

```
 1   with the way JPSO trained you about when
 2   someone is under control?
 3       A    That's what I'm asking.  I don't
 4   remember exactly what I told you.  I just want
 5   to make sure that I'm not telling you anything
 6   different now.
 7       Q    Okay.
 8       A    My definition now under control, I'm
 9   assuming it's the same as I said before is
10   when someone is no longer -- is no longer
11   combative.  Now, it's nice if they're verbally
12   compliant, but again, like I said, if they're
13   no longer fighting, and they're being passive,
14   and I say, hey, let's sit up, and they say no,
15   then, I'm going to sit them up.  I will help
16   them to a seated position.  So I just want to
17   make sure that we're on the same page on that.
18   So verbal would be nice, if you're going to be
19   verbally compliant and not passive-aggressive;
20   but as long as you're not active aggressive is
21   where I would understand that you would be
22   under control.
23       Q    Okay, and during your time at JPSO,
24   did you receive any training about the
25   Americans with Disabilities Act?
```

```
 1        A    No, sir.
 2        Q    You were trained to be a CIT officer
 3   at JPSO, correct?
 4        A    I went through a -- I did not go
 5   through the complete CIT course.  I went
 6   through a training course.  I believe it was
 7   handling special -- I don't know exactly what
 8   it was called, but it was -- I did not go
 9   through the full 40-hour CIT course.
10        Q    Okay.  So you did not complete -- and
11   by CIT, we mean crisis intervention training?
12        A    Correct.  I think I had a very basic
13   level that was offered during our in-service
14   training, but that did not complete the entire
15   course.
16        Q    Okay.  We're going to move onto
17   talking about the day of the EP's death.
18   Before we do that, I'd like to have you --
19   well, let me ask you a question.  Are you
20   aware that in this case, the lawyers
21   representing you have told the Court that
22   there was probable cause of a crime being
23   committed related to the death of EP?
24        A    No.
25             MR. MOST:
```

```
 1                    If you'll look at the screen, it
 2              says what's designated in the Dropbox
 3              folder is ZY.  This is one we will
 4              call Exhibit 111.
 5  BY MR. MOST:
 6       Q    You see that this is a filing from
 7  the lawsuit Lou v. Lopinto?
 8       A    That's correct.
 9       Q    And that's the lawsuit that you're a
10  defendant in.  Is that your understanding?
11       A    Yes.
12       Q    Going to page 23 --
13              MR. ZIBILICH:
14                    I'm just going to lodge an
15              overall objection.  This man had zero
16              to do with the obtaining of any
17              warrants, was not a participant in
18              any way, shape or form; and as a
19              result, I'm going to object to the
20              form for every single question that
21              you ask about that.
22              MR. MOST:
23                    Okay, yeah, we'll note that
24              there's a form objection to this line
25              of questioning.
```

```
 1   BY MR. MOST:
 2       Q    Looking at page 23, you see that this
 3   is signed by Daniel Martiny?
 4       A    Correct.
 5       Q    Is he one of your lawyers?
 6       A    Correct.
 7            MR. ZIBILICH:
 8                  Well, I have to correct you.
 9                  It's not signed per se.  It's just a
10                  blank.  Oh, I'm sorry.  I'm not on
11                  the top.  Heavens forbid.  No wonder
12                  I misspoke.
13            MR. MOST:
14                  Not a problem.  Moving on.
15   BY MR. MOST:
16       Q    Looking at page 22, do you see on
17   page 22 of this document, it's describing an
18   affidavit in the context of the death of EP?
19            MR. ZIBILICH:
20                  Show him where.
21            MR. MOST:
22                  Sure.
23   BY MR. MOST:
24       Q    Do you see that this paragraph on
25   page 22 --
```

```
1        A     Um-huh (affirmative expression).
2        Q     -- is talking about the death of a
3    minor?
4        A     It's the first time I'm seeing it.
5    So I'm reading it real quick.
6        Q     Yeah.
7        A     (Witness peruses document.)  Okay.
8        Q     Do you see that the last sentence of
9    this paragraph says, "On the contrary, given
10   the totality of the circumstances, the
11   Affidavit stated probable cause that the
12   records sought had a sufficient nexus to the
13   potential criminal activity that was being
14   investigated, the use of force by law
15   enforcement officials"?
16       A     I see that.
17       Q     This is the first time you're seeing
18   that lawyers on your behalf are arguing that
19   there was probable cause of the commission of
20   a crime involving the use of law
21   enforcement -- use of force by law enforcement
22   officers?
23            MR. ZIBILICH:
24                 Object to the form.  It doesn't
25            say anything of the sort.  It says
```

```
 1              what it says. I don't see the word
 2              "crime" anywhere in there.
 3          MR. MOST:
 4                Criminal activity.
 5          MR. ZIBILICH:
 6                That's not the word crime.
 7          MR. MOST:
 8                Okay, I'll rephrase the
 9          question.
10          MR. ZIBILICH:
11                You don't have to.
12   BY MR. MOST:
13      Q    Mr. Pitfield, is this the first time
14   that you are learning that the lawyers
15   representing you are arguing in court that
16   there was an affidavit that stated probable
17   cause that the records sought as sufficient
18   nexus to the potential criminal activity that
19   was being investigated, the use of force by
20   law enforcement officials?
21      A    This is the first time I'm seeing
22   this, yes.
23      Q    Are you aware of ever being under
24   criminal investigation by JPSO related to the
25   death of EP?
```

1          A     No.

2          Q     Were you ever Mirandized by any

3    member of JPSO related to the death of EP?

4          A     No.

5          Q     When you gave a statement, were you

6    told that it was in the context of a criminal

7    investigation?

8          A     Yes.  It was at the Detective Bureau

9    by the investigators, yes.  I may have --

10          Q     Sir?

11          A     -- done a rights form at that point.

12    Now, I am not sure.  I'm not a hundred

13    percent.

14          Q     Did you understand that you were

15    giving a statement where you might be the

16    subject or target of a criminal investigation?

17          A     No.  I mean, at the time I was just

18    stating the facts of what occurred.

19          Q     Do you recall the day that EP died?

20          A     Yeah, sure.

21          Q     That was a date in January of 2020,

22    correct?

23          A     That's correct.

24          Q     And you were working a private detail

25    for Westgate that day, correct?

111

```
 1        A    Correct.
 2        Q    And one thing I don't think we talked
 3   about earlier is did you fill out time sheets
 4   for your private detail work for Westgate?
 5        A    Yeah, we had a sign-in log.
 6        Q    Was that sign-in log located with the
 7   cell phone in the Laser Tag manager's office?
 8        A    Correct.
 9        Q    Did you fill out any other sort of
10   invoices or time sheets for Westgate?
11        A    No.
12        Q    This was at the time that you were
13   also working a full-time job for Kenner; is
14   that correct?
15        A    What is at the same time?
16        Q    Sure.  So the day of the death of EP,
17   that was during the period of time when you
18   had a full-time job for the City of Kenner,
19   agreed?
20        A    Correct.
21        Q    On the date of the death of EP, you
22   learned about a potential incident at the
23   Laser Tag through a phone call from the Laser
24   Tag manager, correct?
25        A    That's correct.
```

112

```
 1        Q    Did the Laser Tag manager call you on
 2   the cell phone provided to you by Westgate?
 3        A    That's correct.
 4        Q    So you weren't dispatched to the
 5   scene by 911, correct?
 6        A    Correct.
 7        Q    So you had a phone call with the
 8   Laser Tag, you had a phone conversation with
 9   the Laser Tag manager, and then, you drove to
10   the Laser Tag, correct?
11        A    Correct.
12        Q    Do you recall where you were before
13   you drove there?
14        A    I was at the Louisiana Purchase
15   restaurant in the front of the complex.
16        Q    Were you in the restaurant, or you
17   were in your vehicle?
18        A    In the restaurant.
19        Q    And what were you doing in the
20   restaurant?
21        A    Having lunch.
22        Q    Does your shift for Westgate, did it
23   include a lunch break?
24        A    It's included, yes.  I'm on the
25   property.
```

1        Q     I should have written this down, but

2    your hours of your shift were -- was it like

3    11 to three?  I don't recall what it was.

4        A     I believe it was 10:00 AM to 3:00.

5        Q     How long a lunch break were you

6    allowed?

7        A     There was no set timeframe.

8        Q     So you get a call from the Laser Tag

9    manager.  You talk to them on the phone, and

10   then, you drive to the Laser Tag from the

11   restaurant, correct?

12       A     Correct.

13       Q     On the phone, the laser tag manager

14   told you that the incident involved a child

15   with special needs, agreed?

16       A     Correct.

17       Q     Was the restaurant that you were

18   having lunch at, was it at the Westgate

19   Shopping Center?

20       A     Correct.

21       Q     So you were told that the child

22   involved -- so you were told that there was a

23   child with special needs involved in this

24   incident, right?

25       A     Correct.

114

```
 1      Q    Special needs, what does that mean to
 2  you?
 3      A    It could be a wide variety, but that
 4  was the terminology that they used.
 5      Q    Yeah.  Did that indicate to you that
 6  this was a child with a disability of some
 7  sort?
 8      A    Could be.
 9      Q    What are the other possibilities?
10      A    I mean, it could be physical.  It
11  could be mental. I mean, I don't know what
12  their definition of special needs is.
13      Q    Sure, but some kind of physical or
14  mental impairment of some kind, agreed?
15      A    Yes, agree.
16      Q    You were the first law enforcement
17  officer to arrive on the scene of the incident
18  involving EP, correct?
19      A    That's correct.
20      Q    Does JPSO have a designation of the
21  first officer to arrive on the scene as a
22  primary officer?
23      A    Yeah, generally.  The officer that --
24  well, the officer that's dispatched to a call
25  or the officer that is self initiated,
```

```
 1    that's -- yeah, that's the primary officer for
 2    that incident.
 3         Q    The fact that an officer is the
 4    primary officer, what does that mean?  Does
 5    that mean they direct other officers what to
 6    do if they join the scene?
 7         A    The other officers would assist.
 8    That officer generally is the one that is
 9    investigating the incident, whatever it may.
10         Q    Right.  I guess my question is does
11    being a primary officer create essentially a
12    chain of command, where the primary officer is
13    in charge of a situation once other officers
14    arrive?
15         A    I wouldn't say not all the time,
16    because the secondary officer could be a
17    supervisor.
18         Q    Is the primary officer on the scene
19    in charge in the absence of a superior
20    officer?
21         A    Not always.
22         Q    In what scenarios is the primary
23    officer not in charge without a superior
24    officer?
25         A    Where there is an acting supervisor
```

1    that could possibly be there.  I guess being

2    in charge, I guess I'm not following what

3    you're meaning.  In charge, like in charge of

4    what?

5        Q    Sure.  Well, so tell me -- maybe,

6    instead of asking questions, why don't you

7    tell me when an officer arrives on a scene,

8    and then, other officers follow and join the

9    scene, is there any sort of command structure

10   or indication of who's the lead or in charge

11   or anything like that?

12       A    So generally, supervisors show up.

13   That is where the overall command structure

14   would come from, but as far as, you know -- so

15   details are different than an actual beat in a

16   patrol district.  So generally, the officer

17   whose beat that call is in would be the

18   primary officer who would be there to handle

19   that incident.

20       Q    So in the absence of a superior

21   officer or an acting superior officer or

22   something else like that, if there are

23   officers of equal rank, the primary officer is

24   the one in command?

25       A    That would take lead of the

```
 1    investigation.
 2         Q    Okay.
 3         A    Until relieved.
 4         Q    Yeah.  Were you the primary officer
 5    on the scene of EP's incident?
 6         A    Yes.
 7         Q    The subsequent officers that arrived,
 8    were they your superiors?
 9         A    There was some ranking officers that
10    did show up, but other than that they were
11    peers, peer officers.
12         Q    Who was the first ranking officer to
13    show up?
14         A    I don't know in which order they
15    came.  I know that I did speak with the
16    lieutenant.  I don't know which order they
17    showed up.
18         Q    Right.  So Ryan Vaught, Steven
19    Mehrtens, Shannon Guidry, Nick Vega, Manuel
20    Estrada, Myron Gaudet, were any of those your
21    superiors?
22         A    No.
23              MR. ZIBILICH:
24                   He got them all right.
25              MR. CLARKE:
```

```
 1                    I was trying to see.
 2           MR. ZIBILICH:
 3                    You would have got an "F."
 4   BY MR. MOST:
 5      Q    So long as it just you and those
 6   officers on the scene, you were the primary
 7   officer, and you were at the top of the chain
 8   of command while just those officers and you
 9   were at the scene, agreed?
10      A    Sure.
11      Q    And by sure, you mean yes?
12      A    Yes.
13      Q    So you arrived on the scene of the
14   incident with EP, and when you arrived, you
15   saw EP and his father in an altercation?
16      A    No.  I first witnessed the father
17   with no shirt in the parking lot and did not
18   immediately see Eric at the time.
19      Q    When you arrived on scene, do you
20   recall EP's father or anyone else telling you
21   that EP was autistic?
22      A    No.  Eric's father did not inform me
23   of that.  He's the one that I had interaction
24   with in the beginning.
25      Q    So you don't recall him telling you
```

```
 1  that?
 2       A    Oh no, he absolutely did not.
 3       Q    You're positive that --
 4       A    100 percent.
 5       Q    Just to be clear, you are positive
 6  100 percent that neither EP's father nor
 7  anyone else on scene told you that EP was
 8  autistic?
 9       A    Not initially.
10       Q    When you say not initially, do you
11  mean -- well, let me rephrase it like this.
12  Are you a hundred percent sure and positive
13  that before you got off of EP, no one told you
14  he was you autistic?
15       A    Oh, no, someone did, but again, we
16  were talking about the beginning first
17  interaction, and then, we jumped.  So no.
18       Q    Sure.
19       A    Initially, no, but yes, as the
20  situation progressed, yes, I was told that he
21  was autistic after we were already on the
22  ground.
23       Q    And you were already on top of EP?
24       A    Correct.
25       Q    And you're a hundred percent positive
```

1    that you were not told he was autistic before

2    you got on EP, agreed?

3         A    That is correct.

4         Q    Okay.  So you arrived on scene.  You

5    saw EP -- well, you saw his father.  You saw

6    EP.  You had a conversation with the father,

7    and then, you escorted EP to the ground,

8    correct?

9         A    Correct.

10        Q    When you escorted EP to the ground,

11   were you arresting him?

12        A    I was trying to control him.

13        Q    Did you understand that EP wounded

14   his father by that point?

15        A    At the point, I took him to the

16   ground, yes.

17        Q    So were you thinking I need to arrest

18   this person for battery or something else?

19        A    I was trying to get the situation

20   under control so we could determine what

21   exactly occurred.

22        Q    Okay.  Had you realized -- had you

23   realized at this point that this wasn't a

24   criminal situation?

25        A    Again, I was trying to get it under

1    control so we could find out what was going

2    on.  I still wasn't even a hundred percent

3    that's I was called for.  I encountered that

4    in the parking lot.  I still wasn't a hundred

5    percent sure that there wasn't a disturbance

6    going on inside the business.

7         Q    Got you.  So you escorted EP to the

8    ground and placed him in a prone position,

9    agreed?

10        A    Um-huh (affirmative expression).

11        Q    Is that a yes?

12        A    I'm sorry.  Yes.

13        Q    That's okay.  Just for the court

14   reporter.

15        A    I got it.

16        Q    EP bit you on the leg?

17        A    Yes.

18        Q    And you struck EP in the head?

19        A    I don't know exactly where it was,

20   but yes, there was one strike delivered.

21        Q    So you delivered a strike somewhere

22   to the upper part of EP's body?

23        A    Correct.

24        Q    Possibly the head?

25        A    Could be.

```
 1        Q    And so was EP biting you at the time
 2   of the strike?
 3        A    Yes.
 4        Q    And did your strike stop him from
 5   biting you?
 6        A    It did.
 7        Q    With EP in a prone position, you sat
 8   on top of EP, correct?
 9            MR. ZIBILICH:
10                Object to the form.  You can
11            answer.
12            MR. KAUL:
13                Object to the form.
14            THE WITNESS:
15                I need a little bit more
16            description of where you're talking
17            about on top of.
18   BY MR. MOST:
19        Q    Sure.  So I believe you described
20   where you were sat on EP's butt area while you
21   were on top of him?
22        A    Hip butt area, yes.
23        Q    And you had your knees on either side
24   of EP?
25        A    Correct.
```

1      Q    So with you on top of EP's butt area,

2    EP was unable to roll over onto his back,

3    agreed?

4              MR. ZIBILICH:

5                   Object to the form.

6              MR. KAUL:

7                   Object to the form.

8              THE WITNESS:

9                   He was trying to continuously

10              roll and push his hips to get up.

11   BY MR. MOST:

12      Q    Right, but he was unsuccessful in

13   doing so because you were on his butt area,

14   correct?

15             MR. ZIBILICH:

16                  Object to the form.

17             MR. KAUL:

18                  Object to the form.

19             THE WITNESS:

20                  Because I was counteracting his

21              force.

22   BY MR. MOST:

23      Q    So you were successful in preventing

24   EP from rolling onto his back, agreed?

25      A    Correct.

124

1      Q    In your statement that you gave to
2    officers, you said that you could feel EP's
3    hips push up on you?
4      A    Correct.
5      Q    You said the hips were pushing up on
6    you to stand up?
7      A    Correct.
8      Q    How did you know that EP was the
9    purpose of that was to stand up?
10     A    Because I could feel the pressure
11   where he was trying to get himself up.
12     Q    So he was trying to get himself out
13   of the prone position?
14          MR. ZIBILICH:
15              Object to the form.
16          MR. KAUL:
17              Object to the form.
18          THE WITNESS:
19              My feelings were he was trying
20          to stand up.
21   BY MR. MOST:
22     Q    And that would have gotten him out of
23   the prone position, agreed?
24          MR. ZIBILICH:
25              Object to the form.

```
 1              MR. KAUL:
 2                   Object to the form.
 3              THE WITNESS:
 4                   Yes.
 5   BY MR. MOST:
 6       Q    So at that point, with him pushing
 7   his hips up, he was struggling, agreed?
 8              MR. KAUL:
 9                   Object to the form.
10              THE WITNESS:
11                   I don't know to what extent
12              other than trying to get up.
13   BY MR. MOST:
14       Q    But he was struggling with you is
15   what I mean; is that right?
16       A    Yes.
17       Q    And did you know if he was struggling
18   to breathe?
19       A    I didn't.  No appearance of that.
20       Q    But also no reason to think he wasn't
21   struggling to try and breathe, agreed?
22              MR. ZIBILICH:
23                   Object to the form.
24              MR. KAUL:
25                   Object to the form.
```

126

```
 1              THE WITNESS:
 2                   Yeah, I mean, I had -- there was
 3              no indication that he was having
 4              respiratory issues.
 5    BY MR. MOST:
 6         Q    So you didn't have any indication
 7    that he was or was not having respiratory
 8    issues, agreed?
 9         A    Correct.
10         Q    At some point, you told EP's mother
11    not to put something in front of his face?
12         A    Correct.
13         Q    You told her not to put something in
14    front of EP's face so as to not prevent any
15    impairment of his breathing, agreed?
16         A    That's correct.
17         Q    Because you understood at that point
18    with EP in the prone position, impairment of
19    breathing was a risk factor, agreed?
20              MR. ZIBILICH:
21                   Object to the form.  Go ahead.
22              MR. KAUL:
23                   Object to the form.
24              THE WITNESS:
25                   It doesn't matter.  If you're
```

```
 1              standing or sitting, if somebody puts
 2              some kind of object in front of your
 3              face, it's going to impair your
 4              breathing.  So it was a generic -- I
 5              asked her not to place the jacket or
 6              whatever she was trying to place
 7              under his head in front of his face,
 8              because she was blocking his facial
 9              area where he was breathing.
10   BY MR. MOST:
11        Q    Okay.  Were you -- so your concern
12   about EP's breathing, are you saying that was
13   completely unrelated to his prone positioning?
14        A    Yes.
15        Q    Did you have a concern about the
16   prone positioning impacting EP's ability to
17   breathe at that point?
18              MR. ZIBILICH:
19                   Object to the form.
20              MR. KAUL:
21                   Object to the form.
22              THE WITNESS:
23                   Well, I'd have to say initially,
24              yes.  That's why I was conscious on
25              my positioning on him.  Yeah, I was
```

```
 1              conscious of making sure that I was
 2              not doing any form -- that I was not
 3              causing any form of obstruction.
 4    BY MR. MOST:
 5         Q    And you were aware that EP was obese?
 6         A    Yeah.
 7         Q    When you were the only officer on the
 8    scene, you tried to handcuff EP's hands behind
 9    his back but were unsuccessful in doing so; is
10    that correct?
11         A    That is correct.
12         Q    You had the cuff around one of his
13    wrists?
14         A    That's correct.
15         Q    Were you -- you were holding his
16    hands behind his back by holding the handcuff
17    in the other arm; is that right?
18         A    The handcuff was on his right arm,
19    and I was holding the other handcuff behind
20    his arm.  His left arm was free.
21         Q    Did you have any control over the
22    left arm?
23         A    No.  His dad did.
24         Q    Do you recall if it was his mother or
25    his father holding his left arm?
```

```
 1       A    I said his father.

 2       Q    I'm sorry.  What did you say?

 3       A    His father.

 4       Q    His father.  You sat -- it's your

 5   testimony that you sat on EP's butt area until

 6   other officers arrived, correct?

 7            MR. ZIBILICH:

 8                 Object to the form.

 9            MR. KAUL:

10                 Object to the form.

11            THE WITNESS:

12                 Correct.

13   BY MR. MOST:

14       Q    When other officers arrived, they

15   assisted you in completing the handcuffing of

16   EP, correct?

17       A    That's correct.

18       Q    Using two sets of handcuffs?

19       A    Correct.

20       Q    That's what double cuffing means?

21       A    Yes, sir.

22       Q    That was done before you got off of

23   EP, correct?

24       A    That is correct.

25       Q    So was EP in control at the time that
```

1    he was first double cuffed?

2         A    No.

3         Q    Was he still struggling at that

4    point?

5         A    Yes.

6         Q    Was he kicking?

7         A    I couldn't tell.  Lower portion of

8    the body was absolutely moving.  I couldn't

9    see behind me what he was doing with his feet,

10   though.

11        Q    Yeah.  And so you were trained that

12   as we described before, one tool technique in

13   your tool technique toolbox is to apply the

14   SWARM technique, agreed?

15        A    That's what's taught in hobble yes.

16        Q    As the primary person on the scene,

17   did you direct the officers there to implement

18   the SWARM technique?

19        A    No.  I was still trying to gain

20   control.

21        Q    And the SWARM technique is one method

22   of gaining control, agreed?

23        A    It could be, yes.

24        Q    So did you consider applying the

25   SWARM technique?

1      A     Not at that time.

2      Q     Did you consider applying the RIPP

3  Hobble device?

4      A     Not at that time.

5      Q     Did you ask any of the other officers

6  if they had a RIPP Hobble device with them?

7      A     Not at that time.

8      Q     So then, at some point, you got off

9  of EP, and Officer Vega replaced you, correct?

10     A     That's correct.

11     Q     Did you direct Vega to replace you?

12     A     I did.

13     Q     So you made the decision that another

14  officer would follow you in sitting at

15  someplace on top of EP, agreed?

16          MR. ZIBILICH:

17               Object to the form.

18          THE WITNESS:

19               Replacing my position, I think

20          it was a mutual agreement at the time

21          so I could assess my injury.

22  BY MR. MOST:

23     Q     Certainly.  How did you direct Vega

24  to do that.  Like what words did you say if

25  you recall?

```
 1        A     I don't recall exactly what was said.
 2        Q     Did you tell Vega how long EP had
 3   been in the prone position?
 4        A     No.
 5        Q     Did you tell any of the other
 6   officers how long EP had been in the prone
 7   position?
 8            MR. ZIBILICH:
 9                 Object to the form.
10            MR. KAUL:
11                 Object to the form.
12            THE WITNESS:
13                 No.  I had no idea how long it
14            had been.
15   BY MR. MOST:
16        Q     Did you provide any person on the
17   scene with any estimate of how long EP had
18   been prone?
19            MR. ZIBILICH:
20                 Object to the form.
21            MR. KAUL:
22                 Object to the form.
23            THE WITNESS:
24                 No.
25   BY MR. MOST:
```

133

```
 1        Q    So you left the area where EP was,
 2   and you tended to your wound, correct?
 3        A    That's correct.
 4        Q    And then, you came back to the area
 5   where EP was, correct?
 6        A    Correct.
 7        Q    We can look at this if you like, but
 8   in your statement you gave shortly after EP's
 9   death, at this point, you were asked is there
10   a struggle, and you said at this point no.  Do
11   you recall saying that?
12        A    Yes.
13        Q    That was a truthful statement you
14   gave as part of your statement?
15        A    Um-huh (affirmative expression).
16        Q    During your provision of a statement,
17   you were watching the video of the incident,
18   agreed?
19        A    Yeah, okay.  I didn't -- yes.
20        Q    So after tending to your wound, when
21   you returned to the area with EP, you saw that
22   the struggle had ceased at that point, agreed?
23             MR. ZIBILICH:
24                  Object to the form.
25             THE WITNESS:
```

```
 1              Yes.  That is when medical
 2         attention was being performed by the
 3         officers that were there.
 4    BY MR. MOST:
 5         Q    By medical attention, do you mean
 6    CPR?
 7         A    Yes.
 8         Q    So you're saying when you -- after
 9    tending to your wound, you returned to EP;
10    that's the point at which CPR was applied?
11         A    It was at the time when I heard a
12    louder disturbance going on is when I
13    retreated and went to go see what else was
14    going on, and that's when that was occurring.
15         Q    Okay.  Also in your statement, you
16    describe that EPs mother said something about
17    EP being choked.
18         A    That's what drew my attention back to
19    see what was going on, because I knew I
20    definitely had tunnel vision while I was
21    initiated in it, and then, I went to make sure
22    that the other officers, that someone was
23    watching to make sure no bystanders were
24    coming in.  So when I heard the loud yelling
25    and screaming is what made me go back to the
```

1   location.

2      Q    So you're saying that EP's mother

3   saying something about choking was at the same

4   time as the CPR being applied?

5      A    It was all relative about the same

6   time.  I couldn't see from my position at the

7   back of my car what was going on.  I could

8   only verbally hear.

9      Q    But you heard commotion, heard the

10  mother say something about choking.  You went

11  back to where EP was, and you saw CPR being

12  applied?

13     A    That's when the process was starting

14  where when they were assessing.

15     Q    So when you left the group of

16  officers to tend to your wound, did you

17  designate someone else to be in charge while

18  you weren't immediately there?

19     A    No.

20     Q    So at that point, the person in

21  charge was you, and you left to go tend to

22  your wound.  So there was no person in charge

23  among the people immediately around EP,

24  agreed?

25     A    It was still an active scene with,

```
 1    you know, assigning roles would come once
 2    everything is under control.  It was still
 3    very active.  So yeah, there was no verbal on
 4    you're now in control or anything like that.
 5         Q    Is that the way you were trained by
 6    JPSO that during an active situation, there's
 7    not supposed to be a designation of roles?
 8              MR. ZIBILICH:
 9                   Object to the form.
10              THE WITNESS:
11                   I mean, again, every situation
12              is going to illicit a different
13              response.  I mean, in the middle of a
14              heat of battle, you're not assigning
15              roles.  You're worried about getting
16              the situation under control.
17    BY MR. MOST:
18         Q    Okay, and so you're describing this
19    as the heat of battle.  At the point where you
20    left to tend to your wound, you're saying this
21    was comparably chaotic to a battle?
22         A    There was still active aggression
23    going on, but again, I had an injury that I
24    had no idea what it was that I needed to tend
25    to.
```

1        Q     Okay, in the absence of an injury, if
2    you had to step away, would you have
3    designated someone to be in charge?
4        A     Not at that time, no.
5        Q     But at least while you were in
6    charge, you placed EP into the prone position,
7    agreed?
8        A     Correct.
9        Q     While you were in charge, you
10   directed Vega to replace you on EP in the
11   prone position, agreed?
12           MR. ZIBILICH:
13                Object to the form.
14           MR. KAUL:
15                Object to the form.
16           THE WITNESS:
17                Yes.
18   BY MR. MOST:
19       Q     So when EP's mother said something
20   about choking, you told her to let the police
21   do their jobs, right?
22       A     Yeah.  I was trying to, I guess, be
23   that person there just to let her know, look,
24   these are trained professionals.  Let them do
25   their jobs.

```
 1        Q    Then, you led her away from the
 2   officers behind a car, correct?
 3        A    We walked over to the side, because
 4   the ambulance was showing up, so that we would
 5   not be impeding their path in.  We walked to
 6   the rear of their car, and she left and went
 7   around to the front, and I didn't follow.
 8        Q    When you say we went behind the car,
 9   did you lead her behind the car, or did she
10   lead --
11        A    No.  I followed her.  We kind of
12   pushed out the way, because the ambulance was
13   coming up.
14        Q    Were you aware on the scene that EP's
15   mother and father were doctors?
16        A    She mentioned that she was a
17   physician when we were standing behind the
18   car.
19        Q    Did you ask her assistance given that
20   there was a medical situation going on?
21        A    No.
22        Q    Why not?
23        A    We had EMS personnel that were on
24   scene.
25        Q    EMS are not typically medical
```

1   doctors, correct?

2       A    Right.  If they needed assistance

3   then, they could have -- she did nothing other

4   than state that verbally, didn't try to

5   continue to go forward.  She just stated it

6   verbally, I'm a physician.

7       Q    So you knew she was a doctor?

8       A    She said it at the rear of the truck

9   when EMS was already working on him.

10      Q    Did you tell EMS that she was a

11  doctor?

12      A    No.

13      Q    So how would EMS have asked for her

14  assistance if they didn't know she was a

15  doctor?

16          MR. ZIBILICH:

17              Object to the form.

18          THE WITNESS:

19              Again, they weren't asking for

20          any other assistance.  She only told

21          me.  She mentioned to me that she was

22          a physician, and that was it.

23  BY MR. MOST:

24      Q    Right, but you've got a child on the

25  ground that's so medically impaired that he

```
 1    needs CPR, right?

 2         A    Correct.

 3         Q    EMS is arriving.  You know you've a

 4    doctor on the scene, and you don't tell anyone

 5    else that there's a doctor on scene?

 6         A    No.  It all occurred at the -- this

 7    all happened within seconds.

 8         Q    Did you hear anyone complaining that

 9    CPR was being done wrong?

10         A    I did not hear that.

11         Q    Once EP became nonresponsive, he was

12    rolled into a recovery position, right?

13              MR. ZIBILICH:

14                   Object to the form.

15              MR. KAUL:

16                   Object to the form.

17              THE WITNESS:

18                   I'm assuming.  That was the time

19              when I was still behind my vehicle.

20              The first thing I remember hearing,

21              as I stated before, was the verbal.

22    BY MR. MOST:

23         Q    So you didn't witness EP being rolled

24    into a recovery position?

25         A    I don't believe so.
```

```
 1        Q    Did you witness leg shackles being
 2   applied to EP?
 3        A    No.  I remember it was off to my
 4   side.  Because I was behind my vehicle, I
 5   don't know exactly what was going on, but I do
 6   know there were leg shackles that someone had
 7   taken out, but I didn't know what was going
 8   on.
 9             MR. MOST:
10                  Next, we're going to go through
11             the video.  Anybody need a break?
12             MR. ZIBILICH:
13                  You need some more paper to
14             write some more notes to him?  You
15             got enough?
16             MR. CLARKE:
17                  I need a pad.
18             MR. ZIBILICH:
19                  You can just take over whenever
20             you want.
21             MR. CLARKE:
22                  You want me to start from my
23             beginning?
24             MR. ZIBILICH:
25                  No.  You want to get home to
```

```
 1            Memphis tonight?
 2            MR. CLARKE:
 3                 I got to get four new tires.
 4   BY MR. MOST:
 5       Q    We're looking at the video that's
 6   previously been designated as Exhibit 88.  So
 7   starting at the beginning of this video, time
 8   stamp in the upper right-hand corner, do you
 9   see, Mr. Pitfield, that it says 2020/19/1
10   13:20:01.
11       A    That's correct.
12       Q    That would be 1:20 PM on January 19,
13   2020?
14       A    As long as that's accurate as it's
15   depicted.
16       Q    Sure.  Have you seen this video
17   before?
18       A    I have.
19       Q    This is the surveillance footage of
20   the incident that resulted in EP's death?
21            MR. ZIBILICH:
22                 I object to the form of that
23            question.
24            MR. KAUL:
25                 Object to the form.
```

1    BY MR. MOST:

2        Q    Does it look like the video that you

3    saw, surveillance video of EP's death?

4            MR. KAUL:

5                Object to the form.

6            THE WITNESS:

7                It's the picture of the parking

8            lot currently on that same date

9            around that same time.  Currently,

10           it's a parking lot.

11   BY MR. MOST:

12       Q    Sure.  So we're going to go through

13   this.  I'll skip ahead.  I'm skipping ahead to

14   seven minutes and 33 seconds.  Do you see on

15   the left-hand side there's a person partially

16   obscured?

17       A    I do.

18       Q    Yeah.  I'm pausing it now at seven

19   minutes 58 seconds.  Do you see EP and his

20   father in the frame?

21       A    I do.

22       Q    Okay, and then, just before eight

23   minutes and 14 seconds do you see that the

24   video zooms in here?

25       A    Yes.

1      Q      Pausing at eight minutes and 33
2  seconds, do you see that JPSO vehicle that's
3  pulled up, and an officer has gotten out?
4      A      That's correct.
5      Q      Is that you?
6      A      It is.
7      Q      Pausing at eight minutes 53 seconds,
8  is this where you escort EP to the ground?
9      A      That's correct.
10     Q      As far as you can tell, does this
11  video match your recollection of what
12  happened?
13     A      Yes, sir.
14     Q      So this appears to you to be an
15  accurate reflection of the events at least up
16  to this point?
17     A      Yes, sir.
18     Q      Pausing here at 9:57 of the video,
19  you're at this point on top of EP in what you
20  describe as on top of his butt area?
21     A      Butt, hip area.  Lower butt area.
22     Q      Did you see EP slapping himself in
23  the head?
24     A      Yes.
25     Q      So did you understand at this point

```
 1    this to be a person who was impaired in some
 2    way?
 3         A    Oh, absolutely.
 4         Q    Yeah.  Was he responding to your
 5    verbal commands?
 6              MR. ZIBILICH:
 7                   Object to the form.
 8              MR. KAUL:
 9                   Object to the form.
10              MR. MOST:
11                   Yeah, let me back up.
12    BY MR. MOST:
13         Q    Did you give EP any verbal commands?
14         A    I was telling him to calm down.
15         Q    Yeah.  Did he comply with your verbal
16    commands?
17              MR. KAUL:
18                   Object to the form.
19              THE WITNESS:
20                   No.
21    BY MR. MOST:
22         Q    Was there any indication -- did he
23    give any indication of understanding your
24    verbal commands?
25         A    At the time, I couldn't tell.  I was
```

```
 1    just trying to calm him down so we could find
 2    out exactly what was going on.
 3         Q    Was EP verbal in any way?
 4         A    Yes.
 5         Q    What did he verbalize?
 6         A    He was yelling firetruck repeatedly.
 7         Q    Other than the word "firetruck," did
 8    he verbalize anything else to your
 9    recollection?
10         A    Not that I could hear.
11         Q    So pausing at --
12         MR. CLARKE:
13              There's a lag.
14         MR. MOST:
15              Yeah, there's a slight lag
16         between me hitting pause and the
17         screen pausing.
18    BY MR. MOST:
19         Q    Paused it here at 10 minutes 27
20    seconds, correct?
21         A    Yes.
22         Q    If I inaccurately describe where
23    we're pausing it any point, will you tell me?
24         A    Yes, sir.
25         Q    Did you see -- at this point, you are
```

```
 1   still on top of EP's butt or hip area,
 2   correct?
 3             MR. ZIBILICH:
 4                  Object to the form.
 5             MR. KAUL:
 6                  Object to the form.
 7             THE WITNESS:
 8                  Yes.
 9   BY MR. MOST:
10       Q    You were pressing down with your left
11   arm on EP's right shoulder?
12             MR. ZIBILICH:
13                  Object to the form.
14             MR. KAUL:
15                  Object to the form.
16             THE WITNESS:
17                  Correct.
18   BY MR. MOST:
19       Q    Thus, keeping his chest against the
20   ground, correct?
21             MR. ZIBILICH:
22                  Object to the form.
23             MR. KAUL:
24                  Object to the form.
25             THE WITNESS:
```

148

```
 1                 No.
 2    BY MR. MOST:
 3         Q    In what way is that inaccurate?
 4         A    The pressure was not applied to keep
 5    his chest down.  The pressure was to try to
 6    keep his shoulder blade -- because as you can
 7    see, I'm still continuing to fight with his
 8    arm.  I'm trying to control his arm and still
 9    trying to gain that left arm to get him
10    totally in handcuffs.  So it was not a push to
11    the ground.  It was a push to control his
12    shoulder blade from movement, because I was
13    holding the handcuff in the palm of my hand.
14         Q    Okay, but you were pushing on his
15    right shoulder, agreed?
16         A    Just the shoulder blade area, yes.
17         Q    So that would be the upper back
18    shoulder blade area?
19         A    Right.  Yes.
20         Q    I'm pausing at 11:07 here.  Is he
21    struggling with you at this point?
22         A    Yes.
23         Q    I'm going to press play, and would
24    you tell me to stop at the next point he
25    struggles?
```

```
 1            MR. ZIBILICH:
 2                 Object to the form.
 3            MR. KAUL:
 4                 Object to the form.
 5            THE WITNESS:
 6                 He's struggling right there.
 7            You could see his legs moving.  He's
 8            trying to roll and push up.
 9   BY MR. MOST:
10       Q    Okay.  Going back to 11:12 -- I've
11   just paused at 11:13.  That's where you said
12   he was struggling by pushing his arm up,
13   correct?
14            MR. ZIBILICH:
15                 I want to object to the form.
16            THE WITNESS:
17                 The struggling was the entire
18            time.
19   BY MR. MOST:
20       Q    This is where you told me he was
21   pushing his arm up?
22            MR. ZIBILICH:
23                 Again, I'll object to the form.
24            THE WITNESS:
25                 I don't think there was anytime
```

```
 1              with everything that we've viewed
 2              that he wasn't.
 3    BY MR. MOST:
 4         Q    Okay, I'm going to press play again
 5    here starting at 11:13, and please tell me
 6    when you see him resisting.
 7         A    Right now, I can see his legs, moving
 8    and his hips, and he's trying to roll.
 9         Q    I paused it at 11:18.
10         A    It was a little bit before that.
11         Q    Yeah, agreed.  Going again, tell me
12    if you see his resistence.
13              MR. KAUL:
14                   Object to the form.
15              THE WITNESS:
16                   Yeah, it's constant.  He's
17              constantly trying to pull his hand.
18              I can see his thighs moving and his
19              legs and his middle -- he's
20              constantly moving.  It's continuous.
21              There is no stop.
22    BY MR. MOST:
23         Q    So pausing at 11:39.  So it's your
24    testimony that he's exhibited continuous
25    resistance through this entire period from
```

```
 1    when you got on top of him to where we're
 2    paused?
 3         A    Correct.
 4         Q    Again, pausing here at 12:53, did you
 5    see -- it appears to me that I see heavy
 6    breathing by EP.  Do you agree that that's
 7    what you see?
 8              MR. ZIBILICH:
 9                   Object to the form.
10              MR. KAUL:
11                   Object to the form.
12              THE WITNESS:
13                   No.  I mean, I can't tell other
14              than him continuously moving and
15              jerking his arm and trying to stand
16              up.  I can't tell heavy breathing or
17              not.
18    BY MR. MOST:
19         Q    Sure.  So I'll press play.  Just
20    watch under your hands, see what you see
21    there.  Do you see a regular up and down?
22              MR. ZIBILICH:
23                   Regular up and down what?
24              MR. KAUL:
25                   Object to the form.
```

```
 1          MR. ZIBILICH:

 2               Object to the form.

 3          MR. KAUL:

 4               Can we take a two-minute break?

 5          THE VIDEOGRAPHER:

 6               Off the record.  The time is

 7          12:43.

 8               (Brief recess.)

 9          THE VIDEOGRAPHER:

10               Back on the record.  The time is

11          now 12:50.

12  BY MR. MOST:

13     Q    So we're resuming at 13:26, pressing

14  play.  So pressing pause at 14:14, here, it

15  appears that two other officers have joined

16  the scene at this point.

17          MR. ZIBILICH:

18               I'm sorry.  Was that a question?

19  BY MR. MOST:

20     Q    One other officer.  Another officer

21  has joined you on the scene; is that correct,

22  Mr. Pitfield?

23     A    Yes, one officer has come in display

24  of the camera.

25     Q    Who is that?
```

```
 1        A      Detective Ryan Vaught.
 2        Q      So prior to this point, you've been
 3   sitting for several minutes on EP with his
 4   parents nearby.  Did they give you any
 5   information about EP?
 6        A      During the time when his mother moved
 7   the jacket from in front of his face is when
 8   she told me he's autistic, and he likes to
 9   bang his head.  That's why she was putting
10   that on the ground, and that's when I
11   instructed her well, put it below his head and
12   not in front of his face.
13        Q      Did they provide you with any other
14   information about EP?
15        A      No.
16        Q      Throughout this time up until now,
17   had EP shown any compliance to verbal or
18   nonverbal directives?
19        A      No.
20        Q      Could you tell at this point whether
21   he could understand verbal directives?
22             MR. ZIBILICH:
23                 Object to the form.
24             MR. KAUL:
25                 Object to the form.
```

```
 1              THE WITNESS:
 2                   No.  I had no knowledge of his
 3              capability.
 4    BY MR. MOST:
 5         Q    Was he saying firetruck at this
 6    point?
 7         A    I don't recall.
 8         Q    Did you do anything to assess whether
 9    this was -- EP's behavior was resistence or
10    manifestation of his autism?
11              MR. ZIBILICH:
12                   Object to the form.
13              MR. KAUL:
14                   Object to the form.
15              THE WITNESS:
16                   I have no knowledge of one or
17              the other.  I mean, other than him
18              resisting and still continuing  to
19              pull and stand up, try to stand up.
20    BY MR. MOST:
21         Q    By this point, you had seen he had
22    slapped his head?
23         A    Correct.
24         Q    Is that an unusual behavior?
25              MR. ZIBILICH:
```

```
 1                    Object to the form.
 2          MR. KAUL:
 3                    Object to the form.
 4          THE WITNESS:
 5                    I would say yes.
 6   BY MR. MOST:
 7      Q    Did JPSO ever train you on how to
 8   deal with a person with autism?
 9      A    Not specifically.
10      Q    Did you receive any training from any
11   other entity about how specifically to deal
12   with a person with autism?
13      A    No.
14      Q    But I think you've been saying
15   throughout so far that EP had continuously
16   resisted you through this point where you were
17   on top of EP, agreed?
18      A    Correct.
19      Q    So you interpreted EP's actions as
20   resistance towards an officer, agreed?
21      A    Active aggression.
22      Q    So you interpreted EP's behavior as
23   active aggression towards an officer, agreed?
24      A    Yeah, and unable to get him under
25   control.
```

```
 1        Q     Pausing at 14:29, is this the point
 2   in which the officer aids you in double
 3   cuffing EP?
 4        A     Correct.
 5        Q     So at this point, by 14:29, EP's
 6   hands are handcuffed behind his back, correct?
 7        A     In the process.  I'm not sure if it's
 8   been completed yet or not, but the process is
 9   going on.
10        Q     Sure.  Pausing at 14:34, the other
11   officer is now taking his hands away from EP,
12   correct?
13        A     Correct.
14        Q     At this point, are EP's hands cuffed
15   behind his back?
16        A     It would be safe to assume.
17        Q     Yeah, and it appears that there's now
18   at least four officers on scene; is that
19   correct?
20        A     No.
21        Q     Well, I see three officers, and then,
22   you're there on top of EP; is that correct?
23        A     Where do you see three officers?
24              MR. ZIBILICH:
25                    I object to the form.
```

```
 1            MR. KAUL:
 2                  Object to the form.
 3    BY MR. MOST:
 4       Q    Oh, okay.  I apologize.  The woman on
 5    the far left, is that the manager at the Laser
 6    Tag or personnel for the Laser Tag?
 7       A    Correct.
 8       Q    So at this point, 14:34, EP's hands
 9    are cuffed behind his back, your still on top
10    of him, correct?
11       A    Still in the same position as before,
12    on his hip, buttocks, lower buttocks area.
13       Q    At this point, did you consider
14    rolling EP into the recovery position?
15       A    No.
16       Q    Why not?
17       A    Because he was still actively
18    resisting and trying to push to stand up.
19       Q    And he wasn't complying with verbal
20    commands, correct?
21       A    At this point, we were trying to just
22    calm him.  My verbal words to him at this
23    point were calm down, Eric.  The mother had
24    told me his name.  So it was more of a calming
25    to try to get him to calm down, but he was
```

```
 1    still trying to stand up.
 2         Q    So he wasn't calming down, agreed?
 3         A    Correct.
 4         Q    His failure to comply with your
 5    directive was part of what led you to conclude
 6    he wasn't under control agreed?
 7              MR. ZIBILICH:
 8                   Object to the form.
 9              MR. KAUL:
10                   Object to the form.
11              THE WITNESS:
12                   He was still actively trying to
13              stand up.
14    BY MR. MOST:
15         Q    Right.  So his physical movements and
16    his failure to comply with your directives
17    were what led you to conclude he was still not
18    in control, agreed?
19         A    Sure.  Yes.
20         Q    In your training about the recovery
21    position, were you trained that you can
22    continue to exert control over someone in the
23    recovery position by holding onto their
24    handcuffs?
25              MR. ZIBILICH:
```

```
 1                   Object to the form.
 2             THE WITNESS:
 3                   Not when the person is actively
 4             trying to stand up.
 5   BY MR. MOST:
 6        Q    Yeah, and I understand, but part of
 7   your training regarding the recovery position
 8   was that there can be continued control over a
 9   person in some circumstances when they're in
10   the recovery position by holding on to their
11   handcuffs, agreed?
12        A    Once they're under control, yes.
13        Q    So the way you were trained is that a
14   person has to be totally under control before
15   they can be put in the recovery position,
16   agreed?
17        A    Have to stop --
18             MR. ZIBILICH:
19                   Object to the form.
20             THE WITNESS:
21                   The active aggression has to
22             stop in order to make that happen.
23   BY MR. MOST:
24        Q    Okay, I'm pausing at 14:48.  Are
25   there now four officers visible on the scene?
```

```
 1      A      Including myself?

 2      Q      Yes.

 3      A      Yes.

 4      Q      Is this a sufficient number of

 5   officers to engage the SWARM technique?

 6           MR. ZIBILICH:

 7               Object to the form.

 8           THE WITNESS:

 9               Yeah, I believe that's what it

10           teaches.

11   BY MR. MOST:

12      Q      Did you consider engaging the SWARM

13   technique at this point?

14      A      No.

15      Q      Any reason why not?

16      A      I was still actively fighting his

17   aggression.

18      Q      But the SWARM technique is

19   specifically for use for people who are still

20   resisting, agreed?

21           MR. ZIBILICH:

22               Object to the form.

23           THE WITNESS:

24               Training through the RIPP Hobble

25           system, yes, but it was not implored
```

```
 1           here.
 2    BY MR. MOST:
 3       Q    Okay, I'm pausing at 15:13.  So now,
 4    there are more officers on scene, agreed?
 5       A    Yes.
 6       Q    One of them is standing facing away
 7    from you and EP with his hands in his pockets;
 8    is that correct?
 9       A    Correct.
10       Q    When there is a chaotic, active
11    resistance scenario, should an officer be
12    standing facing away with his hands in his
13    pockets?
14           MR. ZIBILICH:
15               Object to the form.
16           MR. KAUL:
17               Object to the form.
18           THE WITNESS:
19               He was tending to the other
20           victim who was bleeding all over his
21           face.  That's what he was doing.
22    BY MR. MOST:
23       Q    Okay.  So it's your testimony that
24    it's appropriate; that this was appropriate?
25           MR. ZIBILICH:
```

```
 1                    Object to the form.
 2           MR. KAUL:
 3                    Object to the form.
 4           THE WITNESS:
 5                    He was checking on the other
 6           victim who had injuries.
 7  BY MR. MOST:
 8      Q    I'm pausing at 16 minutes.  Is this
 9  the point at which you get off of EP and are
10  replaced by Vega?
11      A    That's correct.
12      Q    Was he struggling at the time of the
13  transition from you to Vega on top of EP?
14      A    Yes.
15      Q    Was it safe for you to get off of him
16  and be replaced by Vega?
17           MR. ZIBILICH:
18                    Object to the form.
19           MR. KAUL:
20                    Object to the form.
21           THE WITNESS:
22                    It was a coordinated effort that
23           we did the transition.
24  BY MR. MOST:
25      Q    Right.  So it was a coordinated
```

1  effort of multiple officers to continue to

2  restrain in a safe manner, agreed?

3       A    Yeah, we -- yes.

4       Q    But you did not engage in at this

5  point in the coordinated effort of a SWARM

6  technique and apply the RIPP Hobble and place

7  him in the recovery position, agreed?

8       A    No.  He was still actively

9  aggressing.

10      Q    Okay.  Pausing at 16:25, it would

11 appear to me that you opened your car door and

12 then stepped away from the immediate area of

13 EP; is that right?

14      A    That's correct.

15      Q    I'm pausing at 16:57.  Do see that

16 Vega is on top of EP?

17      A    Yes.  He's still maintaining that

18 position.

19      Q    Yeah.  Vega is leaning forward over

20 EP's back.

21      A    You're asking me that?

22      Q    Um-huh (affirmative expression).

23      A    Yeah.  He's still maintaining that

24 position on the rear.  I'm not in the view.

25      Q    Yeah.  Did you see this -- were you

164

```
 1    in a position where you witnessed this part?
 2         A    No.
 3         Q    I'm pausing at 17:14.  Is this an EMS
 4    officer who's arrived carrying an orange bag?
 5         A    I don't know.
 6         Q    I'm pausing at 17:30.  Is this you
 7    returning to the immediate area of EP?
 8         A    Yes.
 9         Q    So this is the point where you heard
10    EP's mother say something about choking?
11         A    I don't know if it was at this point,
12    but I heard some type of commotion, and
13    obviously, I saw the other officers going back
14    over there.
15         Q    Right, but I think you testified
16    earlier that you heard her say something about
17    choking and a commotion, and you returned.
18    What we're looking at here is after you heard
19    EP's mother say something about choking; is
20    that correct?
21              MR. ZIBILICH:
22                   Object to the form.
23              THE WITNESS:
24                   I heard a commotion.  I'm not
25              sure if she said that at this point
```

165

```
 1              is what I'm saying.
 2  BY MR. MOST:
 3       Q    Okay, I'm pausing at 17:41.  You're
 4  now standing sort of over the group of
 5  officers tending to EP, correct?
 6       A    Yes, and at this point, I was trying
 7  to figure out how his hands had come into the
 8  front of him.
 9       Q    So he's still facedown at this point.
10       A    I'm not sure.
11            MR. ZIBILICH:
12                 Object to the form.
13  BY MR. MOST:
14       Q    Is this the point at which chest
15  compressions are being applied, or has that
16  not yet happened?
17       A    I'm not sure.  I can't tell.  I mean,
18  all I see is my leg and a hand.  I can't tell
19  what's going on at this point.
20       Q    At this point when you're standing
21  there, can you see where Vega's hands were
22  positioned?
23       A    No.
24       Q    Okay, pausing at 17:49, do you see
25  that an officer is applying leg shackles to
```

1    EP's feet?

2        A    I do now, yes.

3        Q    Pausing at 18:19, do you see that the

4    leg shackles have been applied?

5        A    It looks like they're doing something

6    around the feet area.

7        Q    And you stepped to the left out of

8    the frame.  Are you still watching what's

9    going on at this point?

10       A    I went back to my vehicle, where I

11   had my back of my car open with my med kit

12   open.

13       Q    What were you getting the med kit

14   for?

15       A    I was still trying to clean the wound

16   on my leg.

17       Q    Did you direct an officer to put leg

18   shackles on EP?

19       A    No.

20       Q    During any of this time where you

21   returned to the area where EP was, did you

22   direct anyone to put him in a recovery

23   position?

24       A    No.

25       Q    At 18:47, you returned to the area

```
 1    where EP is again, correct?
 2        A    Correct.
 3        Q    And you can see that there are
 4    several officers with their hands on EP?
 5        A    Correct.
 6        Q    And his hands are handcuffed?
 7        A    I don't recall.
 8        Q    And his legs are shackled?
 9        A    I don't recall.
10        Q    At this point, is EP under control
11    enough to put him in a recovery position?
12            MR. ZIBILICH:
13                Object to the form.
14            MR. KAUL:
15                Object to the form.
16            THE WITNESS:
17                I'm not sure what's going on.
18            I'm returning again for hearing
19            another commotion.  Again, I was out
20            of view behind my vehicle.
21    BY MR. MOST:
22        Q    At 19:22, officers have stepped away
23    from EP, correct?
24            MR. ZIBILICH:
25                Object to the form.
```

BY MR. MOST:

Q    Let me rephrase.  The officers have taken their hands off of EP, correct?

MR. ZIBILICH:

Object to the form.

THE WITNESS:

Yeah.  I'm not a hundred percent what was going on at this time.  As you see, I'm standing next to dad.  I was focusing my attention more on him and then who was surrounding us.  By this time we had several bystanders, as well.  My attention was geared more towards mom and dad, who looked like frankly, we had just been on the ground together for the last however many minutes.  My attention was back to them and who was standing around us.  I don't recall exactly what was going on at the time.  I just know that the officers that relieved me were handling the situation at that time.

BY MR. MOST:

Q    At this point, is EP still actively

169

```
 1    resisting?
 2         A    I can't tell.
 3         Q    Pausing at 19:53, you're still
 4    standing over EP, correct?
 5         A    Standing next to the right.
 6         Q    Is EP actively resisting -- do you
 7    see any indication of EP actively resisting at
 8    this point?
 9         A    At that point, no, I did not.
10         Q    Is he in the recovery position at
11    this point?
12         A    I can't tell.
13         Q    Pausing at 20:08, does it look like
14    EP was rolled over at this point?
15         A    Some form of movement.
16         Q    So was he in the recovery position at
17    this point?
18         A    Again, I can't tell.
19         Q    Okay, pausing at 20:31, is this the
20    point at which CPR is applied?
21         A    That's what it appears.
22         Q    Do you know why CPR is being applied?
23              MR. ZIBILICH:
24                   Object to the form.
25              THE WITNESS:
```

```
 1              Because he needed -- he was no
 2         longer responsive.
 3   BY MR. MOST:
 4      Q    It's safe to say he's not actively
 5   resisting at this point?
 6      A    Correct.
 7      Q    Pausing at 23:05?
 8         MR. MOST:
 9              Let's take a five-minute break.
10         Go off the record.
11         THE VIDEOGRAPHER:
12              Off the record.  The time is now
13         1:16.
14                (Brief recess.)
15         THE VIDEOGRAPHER:
16              Back on the record.  The time is
17         now 1:20.
18   BY MR. MOST:
19      Q    So, Mr. Pitfield, obviously, there's
20   video of what happened, right?
21      A    Um-huh (affirmative expression).
22      Q    But the video does not have an audio
23   component, correct?
24      A    Correct.
25      Q    So I want to know about anything that
```

```
1   you can recall that anyone said on the scene.
2   So I think we've covered a couple of things.
3   You said that the only word you heard EP
4   verbalize was firetruck, correct?
5        A    Correct.
6        Q    You told us that EP's mother told you
7   she was a physician, right?
8        A    Correct.
9        Q    One of EP's parents told you that EP
10  was autistic, correct?
11       A    Mother.
12       Q    Um-huh (affirmative expression).
13  Anything else the parents told you at any
14  point during this incident that you can
15  recall?
16       A    No.
17       Q    What about the other officers, do you
18  recall anything that they would have said --
19  that they did say?
20       A    Nothing that would have -- nothing
21  that stuck out.
22       Q    Did you tell some of the other
23  officers that EP was autistic?
24       A    I did.
25       Q    Did you tell any of the other
```

1  officers that he had been slapping his head?

2      A    No.

3      Q    Did you tell any of the other

4  officers he had bit you?

5      A    Yes.

6      Q    Did you discuss any plan of action

7  other than the switch of you to Vega, any

8  other discussion of implemented or not

9  implemented plans of action?

10      A    No.

11      Q    Did you hear any discussion by

12  yourself or any other officer about what kind

13  of restraint devices to use on EP?

14      A    No.

15      Q    Do you recall any discussion yourself

16  or any of the other officers about the

17  nature -- other than he was autistic about the

18  nature or extent of EP's impairment?

19      A    No.

20      Q    Anything else you can remember anyone

21  said at the scene other than what we've talked

22  about?

23      A    No, sir.

24      Q    Did someone at the scene tell you he

25  was dead?

1      A      No.   I know he was transported to the
2    hospital.
3      Q      After he was transported to the
4    hospital, did you remain on scene?
5      A      For a short amount of time, I did.
6      Q      Do you recall what was discussed
7    during that period?
8      A      About my treatment.   As far as where
9    I was going to go to receive treatment for my
10   injury.
11     Q      So you discussed with other officers
12   where you would go for your treatment?
13     A      No.   The supervisor that was on the
14   scene, the lieutenant.
15     Q      Did you discuss with your supervisor
16   anything related to the condition of EP?
17     A      No.
18     Q      Did you ask your supervisor how EP
19   was doing?
20     A      Not at that time.
21     Q      Did you ask someone later how EP was
22   doing?
23     A      Lieutenant Meunier.
24     Q      When was it that you asked him?
25     A      When he got on scene, and it was

```
 1   discussed, because we were on the Eastbank,
 2   the traditional hospital for us to go to was
 3   East Jefferson Hospital; and once I learned of
 4   his passing, I requested to go to the West
 5   Jefferson location, which is normally where
 6   you would go if you worked on the Westbank of
 7   the Parish, because I didn't feel it
 8   appropriate to go into East Jefferson Hospital
 9   where the family and he was.
10       Q    Why didn't you think it wouldn't be
11   appropriate?
12       A    I just don't think that it would be
13   appropriate for me to be the officer that was
14   with them while they were grieving and having
15   their moment, for me to be in there and cause
16   any issues that would have occurred in the
17   hospital.  It would be better for me to go to
18   a different location to not even cause that
19   issue.
20       Q    Because your concern was they might
21   blame you in part for EP's death?
22           MR. ZIBILICH:
23               Object to the form.
24           THE WITNESS:
25               Not at all.  It just -- it
```

```
 1              wasn't an appropriate thing.  If I
 2              had an option and we had that option,
 3              we should use that option.
 4    BY MR. MOST:
 5         Q    Okay.  So, Mr. Pitfield, I'm going to
 6    ask you about your weight, and it's not in any
 7    way to shame you.
 8         A    Um-huh (affirmative expression).
 9         Q    It's because, as we discussed, you
10    were physically on top of EP, and so that's
11    why I ask.  So, Mr. Pitfield, you're six foot
12    three?
13         A    Correct.
14         Q    And I saw from your personnel records
15    that when you applied to work at JPSO, you
16    listed your weight as 365 pounds; is that
17    correct?
18         A    In 2007, yes.
19         Q    Right, and then, I saw some other
20    records reflected in 2018, you weighed
21    219 pounds.  Does that sound about right?
22         A    No.
23         Q    Oh, I apologize.  The records that I
24    saw indicated that in 2018, you weighed 290
25    pounds; is that accurate?
```

```
 1        A     Yes, sir.
 2        Q     Then, from twenty -- do you know how
 3   much you weighed in January of 2020?
 4        A     Relatively about the same right now,
 5   about 308.
 6        Q     Do you keep any records of your
 7   weight?
 8        A     No.
 9        Q     Do you have a fitness tracker on your
10   phone or keep a log?
11        A     No.
12        Q     Who was your primary care physician
13   in 2020?
14        A     Dr. Marideli Scanlan.
15        Q     Are they through -- what hospital
16   system are they through?
17        A     West Jefferson.
18        Q     How do you spell the last name?
19        A     S-C-A-N-L-A-N.
20        Q     But you're confident that your weight
21   in January of 2020 was, approximately, 308?
22        A     It's relatively the same.
23        Q     Okay.  Plus or minus a couple pounds?
24        A     Depends on whether it's a salad day
25   or a pizza day.
```

1      Q    Mr. Pitfield, you were born in 1979?

2      A    Correct.

3      Q    You were an officer in both your 20s,

4  your 30s and your 40s, correct?

5      A    Correct.

6      Q    Was your physical fitness as an

7  officer better in your 20s or in your 40s?

8      A    In my 40s.

9      Q    At age 41, was your physical fitness

10  better than at age 27?

11         MR. ZIBILICH:

12              Object to the form.

13         MR. KAUL:

14              Object to the form.

15         THE WITNESS:

16              Yes.

17  BY MR. MOST:

18      Q    At age 27, were you physically fit

19  enough to be a law enforcement officer?

20         MR. ZIBILICH:

21              Object to the form.

22         THE WITNESS:

23              Yes.

24  BY MR. MOST:

25      Q    Did any department determine at age

1    27 that you did not meet the physical fitness

2    standards of that department?

3         A    No.

4         Q    Your physical fitness at age 41, were

5    you physically fit enough to be a law

6    enforcement officer?

7         A    Yes.

8         Q    And we've talked that you gave a

9    statement to JPSO personnel about the death of

10   EP a few days after the death of EP, correct?

11        A    That's correct.

12        Q    You gave that statement three days

13   after the death of EP?

14        A    I'm not sure.

15        Q    But it was at least a couple of days

16   after the death of EP, agreed?

17        A    Yes.

18        Q    In the three days -- in the days

19   in-between -- let me rephrase.  In the time

20   in-between the death of EP and giving your

21   statement, did you talk to anyone else about

22   the incident that led to the death of EP?

23        A    No.

24        Q    In your role as Director of Kenner

25   Parks & Recreation, you started out by making

1    $75,000 a year?

2         A    Correct.

3         Q    And that was plus benefits, correct?

4         A    Correct.

5         Q    Those benefits included a $300 a

6    month car allowance?

7         A    Yes.

8         Q    And $125 a month cell phone

9    allowance?

10        A    Yes.  I know there was an allowance.

11   If that's the figure, that's the figure.

12        Q    Sure, and then, by January 2020, your

13   salary had been increased to $84,000 a year,

14   plus benefits?

15            MR. ZIBILICH:

16                 Object to the form.  You can

17            answer it.

18            THE WITNESS:

19                 Yes.

20   BY MR. MOST:

21        Q    So at the time of EP's death, you

22   were making $84,000 a year from your job as

23   Parks & Rec Director, plus $300 a month for a

24   car allowance, plus --

25            MR. ZIBILICH:

```
 1                    Object to the form.
 2          MR. MOST:
 3                    I'd like you to wait until I'm
 4          finished.
 5          MR. ZIBILICH:
 6                    I thought you were.  I'm sorry.
 7  BY MR. MOST:
 8      Q    In January 2020, you were making
 9  $84,000 a year from your Kenner job, plus a
10  car allowance, plus a cell phone allowance,
11  plus income from your private detail work,
12  correct?
13          MR. ZIBILICH:
14                    Object to the form.
15          THE WITNESS:
16                    Yes.
17  BY MR. MOST:
18      Q    So as of today, you have reviewed the
19  video of the incident involving EP several
20  times, correct?
21      A    Yes.
22      Q    And you've gone back over some of
23  your training by JPSO, correct?
24          MR. ZIBILICH:
25                    Gone back over?  Object to the
```

```
 1            form.
 2   BY MR. MOST:
 3      Q    We've discussed some of your
 4   training, and you've recalled some of your
 5   training with JPSO, correct?
 6      A    Yes.
 7      Q    Knowing everything you know now,
 8   having reviewed the video again, would you
 9   have done anything differently with regard to
10   EP?
11            MR. KAUL:
12                 Object to the form.
13            MR. ZIBILICH:
14                 Object to the form.
15            THE WITNESS:
16                 No.
17   BY MR. MOST:
18      Q    Changing topics, I'm going to discuss
19   your role as Kenner DCAO, all right.  So you
20   were making $137,000 a year as Kenner DCAO,
21   correct?
22            MR. ZIBILICH:
23                 Object to the form.
24            THE WITNESS:
25                 Yes.
```

```
 1   BY MR. MOST:
 2        Q    And you were -- as DCAO, you were
 3   also doing private detail work for through
 4   JPSO, as well?
 5             MR. ZIBILICH:
 6                  Object to the form.
 7             THE WITNESS:
 8                  Yes.
 9   BY MR. MOST:
10        Q    And you were fired from the DCAO
11   position earlier this year, correct?
12             MR. ZIBILICH:
13                  Object to the form.
14             THE WITNESS:
15                  Correct.
16   BY MR. MOST:
17        Q    Records related to your role as DCAO
18   were subpoenaed as part of a grand jury
19   investigation earlier this year, correct?
20             MR. ZIBILICH:
21                  Object to the form.
22             THE WITNESS:
23                  So I've been told.
24   BY MR. MOST:
25        Q    Did you receive a grand jury subpoena
```

```
 1   for testimony of records?
 2           MR. ZIBILICH:
 3                   Object to the form.
 4           THE WITNESS:
 5                   No.
 6   BY MR. MOST:
 7       Q    Had you been informed that you are
 8   the target or subject of a federal criminal
 9   investigation?
10           MR. ZIBILICH:
11                   Object to the form.  It may also
12           call for attorney-client privilege; I
13           don't know.  I don't know.  The
14           question really needs to be
15           rephrased, but I know y'all don't
16           like to do that.  Have you been told?
17           MR. MOST:
18                   Yeah, let me rephrase that.
19           MR. ZIBILICH:
20                   Thank you.
21   BY MR. MOST:
22       Q    Are you aware of being the subject or
23   target of a federal criminal investigation?
24           MR. ZIBILICH:
25                   Same objection.  Same reason.
```

184

```
 1          MR. MOST:
 2               Are you instructing him not to
 3          answer?
 4          MR. ZIBILICH:
 5               If he's been told that by his
 6          attorney, I'm gonna instruct him not
 7          to answer it.
 8          MR. MOST:
 9               Well, do you want to go confer
10          with him, because I don't know the
11          answer to that.
12          MR. ZIBILICH:
13               Neither do I.
14          MR. MOST:
15               Okay.
16          MR. ZIBILICH:
17               He understands my English.
18          THE WITNESS:
19               I'll answer it.
20          MR. MOST:
21               Okay.
22          THE WITNESS:
23               No.
24          MR. ZIBILICH:
25               That's another hat I used to
```

```
 1            wear.
 2    BY MR. MOST:
 3        Q    You were, however, the target of an
 4    investigation by the Kenner Department of
 5    Risk, Insurance, Audit and Compliance,
 6    correct?
 7            MR. ZIBILICH:
 8                 Object to the form.
 9            THE WITNESS:
10                 Yes.
11    BY MR. MOST:
12        Q    One of the subjects of that
13    investigation was about whether you falsified
14    records, correct?
15            MR. ZIBILICH:
16                 Object to the form.
17            THE WITNESS:
18                 Correct.
19    BY MR. MOST:
20        Q    Part of the topic of that
21    investigation was whether you double-dipped by
22    billing JPSO and Kenner for the same time,
23    correct?
24            MR. ZIBILICH:
25                 Object to the form.
```

```
 1              THE WITNESS:
 2                   That was the allegation, yes.
 3   BY MR. MOST:
 4      Q    It would have been impermissible for
 5   you to bill JPSO and Kenner for the same
 6   hours, agreed?
 7              MR. ZIBILICH:
 8                   Object to the form.
 9              MR. KAUL:
10                   Object to the form.
11              THE WITNESS:
12                   Absolutely, and it wasn't done.
13   BY MR. MOST:
14      Q    So there should not be any true
15   records of times where you were billing those
16   two agencies for the same hours, correct?
17              MR. ZIBILICH:
18                   Object to the form.
19              THE WITNESS:
20                   That is correct.
21              MR. MOST:
22                   Let me pull up Dropbox ZV, and
23              we'll designate it 112.  Well, I
24              don't know why this isn't connecting.
25              Franz, can you have him take a look
```

```
 1              at your copy of 112?
 2         MR. CLARKE:
 3              Give him the other one.  I can
 4         give that back to Franz.
 5         MR. MOST:
 6              Sure.
 7    BY MR. MOST:
 8     Q    This document that's been designated
 9    112, do you see that it says near the top Chad
10    Pitfield Audit Report?
11     A    That's correct.
12     Q    So this is a report of that City of
13    Kenner Risk, Insurance, Audit, and Compliance
14    Department investigation that we discussed; is
15    that right?
16         MR. ZIBILICH:
17              Object to the form.
18         THE WITNESS:
19              Correct.
20    BY MR. MOST:
21     Q    Have you seen this document before?
22     A    I have.
23     Q    Have you seen an unredacted version
24    of this report?
25     A    I have not.
```

188

```
 1      Q    If you look at page two, under the
 2   section that says, "Findings #1."  Do you see
 3   that?
 4      A    Yes, sir.
 5      Q    Do you see that it indicates "An
 6   examination of city records found Pitfield
 7   originally submitted 214 for city hours
 8   worked?"  Do you see that?
 9      A    I do.
10      Q    214s are forms that report hours you
11   work for the city?
12      A    That's a FEMA designated form for any
13   type of disaster time.
14      Q    So it's recording the extra disaster
15   hours that you worked that would be submitted
16   for reimbursement.  Correct?
17           MR. ZIBILICH:
18                Object to the form.
19           THE WITNESS:
20                It would be submitted to the
21           city and how they -- if they
22           handled -- if they submit it for
23           reimbursement or what have you.  That
24           was their decision.
25   BY MR. MOST:
```

```
 1        Q    Right.  This was in the period after
 2   Hurricane Ida, correct?
 3        A    That's correct.
 4        Q    And you were working extra hours
 5   after Hurricane Ida, correct?
 6        A    Yes, sir, that's correct.
 7        Q    And you were getting paid extra for
 8   those hours, correct?
 9        A    Yes, that's correct.
10        Q    In fact, you made approximately an
11   additional $86,000 of money for extra time
12   from the extra hours for disaster relief,
13   correct?
14             MR. ZIBILICH:
15                  Object to the form.
16             THE WITNESS:
17                  That's what the city paid me,
18        yes.
19   BY MR. MOST:
20        Q    So you submitted reports showing
21   hours you worked to the city.  The city was
22   reimbursed by FEMA, and then, you were paid
23   extra money on top of your salary, correct?
24             MR. ZIBILICH:
25                  Object to the farm.
```

```
 1            THE WITNESS:
 2                 I'm not so sure it was in that
 3            order, but I submitted my time
 4            sheets, and I was compensated by city
 5            policy, yes.
 6   BY MR. MOST:
 7        Q    So this report found that Pitfield
 8   originally submitted 214s for November 7th and
 9   November 21, 2021 for hours worked for the
10   city from 5:00 PM to 11:00 PM, correct?
11            MR. ZIBILICH:
12                 Object to the form.
13            THE WITNESS:
14                 That's what it says for 11/7,
15            correct.
16   BY MR. MOST:
17        Q    Right, and 11/21?
18        A    Different times, 5:00 PM to 10:00 PM,
19   but yes.
20        Q    Thank you.  Did you, in fact,
21   originally submit 214s for those hours?
22            MR. ZIBILICH:
23                 Object to the form.
24            THE WITNESS:
25                 Yes.
```

```
1    BY MR. MOST:
2        Q    This audit report reflects that you
3    also submitted JPSO private detail hours for
4    some of those same hours as you submitted to
5    Kenner, agreed?
6              MR. ZIBILICH:
7                   Object to the form.
8              THE WITNESS:
9                   That's correct.
10   BY MR. MOST:
11       Q    Did you, in fact, submit the JPSO
12   private detail hours for 11/7 and 11/21 that's
13   described here?
14             MR. ZIBILICH:
15                  Object to the form.
16             THE WITNESS:
17                  Yes.
18   BY MR. MOST:
19       Q    So at least, according to the
20   original submission of these hours, there is
21   overlap between the hours you submitted for
22   reimbursement from the City of Kenner and to
23   the JPSO detail, correct?
24             MR. ZIBILICH:
25                  Object to the form.
```

```
 1            THE WITNESS:
 2                 On two days, yes, there was
 3            found to be a discrepancy.
 4   BY MR. MOST:
 5       Q    And your explanation was that it
 6   was -- it was a discrepancy, but it was a
 7   mistake, correct?
 8            MR. ZIBILICH:
 9                 Object to the form.
10            THE WITNESS:
11                 Correct.
12   BY MR. MOST:
13       Q    And that, in fact, the dates were
14   wrong on one set of the records, agreed?
15            MR. ZIBILICH:
16                 Object to the form.
17            THE WITNESS:
18                 On both sets.
19   BY MR. MOST:
20       Q    Right.  Was it the Kenner 214 hours
21   that were wrong, or was it the JPSO detail
22   hours that were wrong?
23            MR. ZIBILICH:
24                 Object to the form.
25            THE WITNESS:
```

```
 1              It was the Kenner dates, not the
 2        hours.
 3  BY MR. MOST:
 4     Q    So your explanation was that the
 5  Kenner 214 for November 7th should have
 6  actually been November 3rd, and the 214 for
 7  November 21st, should have actually been
 8  November 25th, correct?
 9        MR. ZIBILICH:
10              Object to the form.
11        THE WITNESS:
12              That's correct.
13  BY MR. MOST:
14     Q    November 25, 2021 was Thanksgiving
15  Day, correct?
16     A    That's correct.
17     Q    And you had turned in documents to
18  Kenner saying you did not work on Thanksgiving
19  Day, agreed?
20        MR. ZIBILICH:
21              Object to the form.
22        THE WITNESS:
23              No.  It was a handwritten tablet
24        that was on my desk that just said
25        Thanksgiving Day with no hours.  That
```

```
 1              was not written next to it.
 2    BY MR. MOST:
 3         Q    Okay.
 4         A    And it may have had the word
 5    "holiday" next to it, as well.
 6         Q    So is it your testimony that you
 7    worked on Thanksgiving Day 2021?
 8              MR. ZIBILICH:
 9                   Object to the form.
10              THE WITNESS:
11                   Absolutely, and this report even
12              shows it.
13    BY MR. MOST:
14         Q    Where does this report show that?
15              MR. ZIBILICH:
16                   Object to the form.
17              THE WITNESS:
18                   Look at the very bottom of the
19              page in the footnotes that they wrote
20              shows that I worked on November 25th.
21    BY MR. MOST:
22         Q    Are you talking about footnote three?
23              MR. ZIBILICH:
24                   Object to the form.
25              THE WITNESS:
```

```
 1                    The very last line shows
 2            November 25th with the hours that I
 3            was performing work.
 4   BY MR. MOST:
 5       Q    Right.  So it says 11/25, six emails
 6   between 8:17 AM and 4:02 PM?
 7            MR. ZIBILICH:
 8                 Object to the form.
 9            THE WITNESS:
10                 Correct.
11   BY MR. MOST:
12       A    None of those are between 6:00 PM and
13   10:00 PM, correct?
14            MR. ZIBILICH:
15                 Object to the form.
16            THE WITNESS:
17                 Correct.  I didn't do emails
18            during that time, but this clearly
19            shows when they made the initial
20            claim that I -- when a newscaster
21            doesn't believe that people work on
22            Thanksgiving, that this clearly shows
23            in their own report that I was
24            working on Thanksgiving, and I did
25            work on that evening, as well.
```

```
 1   BY MR. MOST:
 2        Q    What were you doing work-wise that
 3   evening?
 4             MR. ZIBILICH:
 5                  Object to the form.
 6             THE WITNESS:
 7                  That afternoon, I was reviewing
 8             debris maps and coming up with a plan
 9             for debris pickup throughout the City
10             of Kenner that was devastated by the
11             storm.
12   BY MR. MOST:
13        Q    Who did you have your Thanksgiving
14   meal with in 2021?
15             MR. ZIBILICH:
16                  Object to the form.
17             THE WITNESS:
18                  My family.
19   BY MR. MOST:
20        Q    So if you look at the fourth page,
21   the conclusion section, --
22        A    Um-huh (affirmative expression).
23        Q    -- this report concluded that "it can
24   be surmised that Mr. Pitfield did falsify two
25   public documents by changing the dates
```

```
 1   original ICS 214 forms to 11/07/21 and
 2   11/21/2021."  Do you see that?
 3              MR. ZIBILICH:
 4                   Object to the form.
 5              THE WITNESS:
 6                   I do.
 7   BY MR. MOST:
 8      Q    It's your testimony that this is
 9   incorrect, agreed?
10              MR. ZIBILICH:
11                   Object to the form.
12              THE WITNESS:
13                   One-hundred percent.
14   BY MR. MOST:
15      Q    Someone falsifying a public record is
16   a crime, correct?
17              MR. ZIBILICH:
18                   Is a what?
19              MR. MOST:
20                   Crime.
21              MR. ZIBILICH:
22                   Object to the form.
23              MR. KAUL:
24                   Object to form.
25              MR. ZIBILICH:
```

```
 1                    He's not a lawyer.
 2                    You can answer if you can.  I
 3           don't care.
 4           THE WITNESS:
 5                    Absolutely.
 6  BY MR. MOST:
 7      Q    When you had the Kenner job and the
 8  JPSO private detail job, you weren't supposed
 9  to get paid for the time driving between those
10  jobs, correct?
11           MR. ZIBILICH:
12                    Object to the form.
13           THE WITNESS:
14                    I'm not sure where you're going
15           with that.  I don't understand the
16           question.
17  BY MR. MOST:
18      Q    Sure.  Yeah.  So let's say you
19  finished your Kenner job for the day.  You get
20  in your car.  You drive to the JPSO job,
21  right?
22      A    (Witness nods head affirmatively.)
23      Q    The JPSO private detail work had
24  specific locations you were supposed to be at,
25  right?
```

```
 1        A     Correct.
 2        Q     Could you bill either Kenner or JPSO
 3   for the time driving between those two?
 4             MR. ZIBILICH:
 5                   Object to the form.
 6             THE WITNESS:
 7                   I'm not sure, sir.  I understand
 8             what you're trying to say.  You're
 9             talking about something less than a
10             mile apart from each other or
11             two miles apart from each another.
12             The length of time is minutes.
13   BY MR. MOST:
14        Q     What was the physical location of
15   your Kenner job?
16        A     Williams Boulevard and West Napoleon.
17        Q     And then, your private detail work at
18   this time was?
19        A     Lafreniere Park at David Drive and
20   West Napoleon.
21        Q     Okay, and your 214s and JPSO detail
22   reports show that you would bill City of
23   Kenner up until 5:00 PM and then start the
24   billing of the private detail work also at
25   5:00 PM on several days, correct?
```

```
 1            MR. ZIBILICH:
 2                 Object to the form.
 3            THE WITNESS:
 4                 That's correct.
 5    BY MR. MOST:
 6        Q    With no gap in-between?
 7            MR. ZIBILICH:
 8                 Object to the form.
 9            THE WITNESS:
10                 That's correct.
11    BY MR. MOST:
12        Q    So you were billing one of these
13    agencies for the time you spent even if it was
14    a short period of time between those two jobs
15    --
16            MR. ZIBILICH:
17                 Object to the form.
18            MR. MOST:
19                 Wait for me to finish, counsel.
20    BY MR. MOST:
21        Q    So you were billing one of these
22    agencies for the period of time you spent
23    driving between the two jobs, even if was a
24    short period of time, agreed?
25            MR. ZIBILICH:
```

```
 1                    Object to the form.
 2           THE WITNESS:
 3                    Again, we're talking minutes.
 4  BY MR. MOST:
 5       Q    But the answer is yes, correct?
 6           MR. ZIBILICH:
 7                    Object to the form.
 8           THE WITNESS:
 9                    Yes.
10  BY MR. MOST:
11       Q    And that was time you shouldn't have
12  been billing to anyone, agreed?
13           MR. ZIBILICH:
14                    Object to the form.
15           THE WITNESS:
16                    I'm not going to agree with
17           that.  I disagree with that.
18  BY MR. MOST:
19       Q    You think it's permissible to bill
20  either City of Kenner or JPSO private detail
21  for the time you spent driving to those jobs?
22           MR. ZIBILICH:
23                    Object to the form.
24           THE WITNESS:
25                    I was available if needed.
```

```
 1   BY MR. MOST:
 2       Q    Okay.  When you were Kenner DCAO,
 3   part of your job was to oversee invoices and
 4   payments of trash collection contractors to
 5   the city, correct?
 6            MR. ZIBILICH:
 7                Object to the form.
 8            THE WITNESS:
 9                Yes.
10   BY MR. MOST:
11       Q    One of those contractors was IV
12   Waste, correct?
13            MR. ZIBILICH:
14                Object to the form.
15            THE WITNESS:
16                Yes.
17   BY MR. MOST:
18       Q    You approved invoices for IV Waste to
19   be paid, correct?
20            MR. ZIBILICH:
21                Object to the form.
22            THE WITNESS:
23                I forwarded them on for payment.
24   BY MR. MOST:
25       Q    With your approval?
```

```
 1              MR. ZIBILICH:
 2                   Object to the form.
 3              THE WITNESS:
 4                   Yes.
 5   BY MR. MOST:
 6       Q    What was the nature of your
 7   relationship with IV Waste?
 8              MR. ZIBILICH:
 9                   Object to the form.
10              THE WITNESS:
11                   They were a contractor for the
12              city, and I was an employee of the
13              city.
14   BY MR. MOST:
15       Q    Was your only relationship with IV
16   Waste that of -- in your role as a city
17   administrator and them as a contractor to the
18   city?
19              MR. ZIBILICH:
20                   Object to the form.
21              THE WITNESS:
22                   Yes.  Prior to that, I wasn't
23              even the administrator when IV Waste
24              initially came to the City of Kenner.
25   BY MR. MOST:
```

```
 1        Q    Did you at some point have an
 2   IV Waste email account?
 3             MR. ZIBILICH:
 4                  Object to the form.
 5             THE WITNESS:
 6                  Yes, I did.
 7   BY MR. MOST:
 8        Q    Why did you have an IV Waste email
 9   account?
10             MR. ZIBILICH:
11                  Object to the form.
12             THE WITNESS:
13                  Because that was how we
14             communicated when we had a -- COVID
15             was shutting down the cities; COVID
16             was shutting down the country.  We
17             had people -- the city decided -- the
18             city administration at that time
19             decided to change garbage providers.
20             We're seeing it now in the City of
21             New Orleans, where people had rotted
22             garbage in the front of their house.
23             We were doing our best to try and
24             accommodate the citizens of Kenner.
25             I was not receiving the emails that
```

```
 1                  were coming from IV Waste, 'cause
 2                  they were going to the spam blocker
 3                  that the city had in place, and I
 4                  wasn't seeing them mixed with my City
 5                  of Kenner emails.  Therefore,
 6                  Mr. Torres created an IV Waste
 7                  account, which would be a dedicated
 8                  account to the garbage since it was
 9                  such a huge issue going on in the
10                  City of Kenner.
11   BY MR. MOST:
12        Q    Were any other city administrators
13   provided with a IV Waste email account?
14             MR. ZIBILICH:
15                  Object to the form.
16             THE WITNESS:
17                  No.  I was the one overseeing it
18             at that time.
19   BY MR. MOST:
20        Q    Did you set up any social media
21   accounts for IV Waste?
22             MR. ZIBILICH:
23                  Object to the form.
24             THE WITNESS:
25                  Yes, I did.
```

206

```
 1   BY MR. MOST:
 2        Q    What kind of social media accounts?
 3             MR. ZIBILICH:
 4                  Object to the form.
 5             THE WITNESS:
 6                  I started their Instagram page
 7        for them.
 8   BY MR. MOST:
 9        Q    Any other social media accounts?
10             MR. ZIBILICH:
11                  Object to the form.
12             THE WITNESS:
13                  No.
14   BY MR. MOST:
15        Q    Were you paid to set up IV Waste
16   social media accounts?
17             MR. ZIBILICH:
18                  Object to the form.
19             THE WITNESS:
20                  Not a single penny.
21   BY MR. MOST:
22        Q    Have you ever set up a social media
23   account for any other contractor to the City
24   of Kenner?
25             MR. ZIBILICH:
```

```
 1                    Object to the form.
 2           THE WITNESS:
 3                    No.
 4   BY MR. MOST:
 5      Q    Why were you setting up IV Waste
 6   social media accounts --
 7           MR. ZIBILICH:
 8                    Object to the form.
 9   BY MR. MOST:
10      Q    -- social media account?
11           MR. ZIBILICH:
12                    Object to the form.
13           THE WITNESS:
14                    Because I was two weeks away
15           from being the operations manager for
16           IV Waste.  I was actually going to be
17           leaving the City of Kenner when I got
18           promoted to Deputy CAO to run the
19           operations for IV Waste.
20   BY MR. MOST:
21      Q    I'm sorry.  So you left the City of
22   Kenner to work at IV Waste?
23           MR. ZIBILICH:
24                    Object to the form.
25           THE WITNESS:
```

```
 1                    No.
 2   BY MR. MOST:
 3        Q    Take it back.
 4        A    I was two weeks away from leaving the
 5   City of Kenner, putting in my two-weeks notice
 6   when I got promoted to stay at the city.
 7        Q    I see.  So when you were Director of
 8   Parks & Rec, you were going to leave the city
 9   and take a job with IV Waste?
10        A    Correct.
11             MR. ZIBILICH:
12                  Object to the form.
13   BY MR. MOST:
14        Q    But instead, you were promoted to
15   DCAO?
16             MR. ZIBILICH:
17                  Object to the form.
18             THE WITNESS:
19                  Correct, and I decided to stay
20             at the city, and that's when that
21             ceased.
22   BY MR. MOST:
23        Q    Did you have a contract that you had
24   signed with IV Waste?
25             MR. ZIBILICH:
```

```
 1                     Object to the form.
 2            THE WITNESS:
 3                     No.
 4   BY MR. MOST:
 5       Q    But you had -- did you have a written
 6   agreement to go work at IV Waste?
 7            MR. ZIBILICH:
 8                     Object to the form.
 9            THE WITNESS:
10                     A verbal.
11   BY MR. MOST:
12       Q    Verbal agreement.  Is that a verbal
13   agreement with Sidney Torres, IV?
14            MR. ZIBILICH:
15                     Object to the form.
16            THE WITNESS:
17                     Yes.
18   BY MR. MOST:
19       Q    So you had a verbal agreement to go
20   work for IV Waste; the verbal agreement was
21   with Sidney Torres, IV; and then, instead, you
22   took a role within the City of Kenner, in
23   which you were overseeing IV Waste; is that
24   correct?
25            MR. ZIBILICH:
```

```
 1              Object to the form.
 2         THE WITNESS:
 3              Yeah.  Look, I have no problem
 4         explaining all of this, but
 5         absolutely, the City of Kenner didn't
 6         want to lose me, because I busted my
 7         ass there for the entire city and all
 8         the citizens in the City of Kenner.
 9         IV Waste wanted me to go there and do
10         the same thing for him, and I was
11         going in to do my two-weeks notice at
12         the end of that week when the mayor
13         found out.  The mayor did not want to
14         lose me, because of what I was doing
15         in the City of Kenner.  Therefore,
16         they promoted me to that position.
17    BY MR. MOST:
18        Q    Did you tell anyone at the city that
19    you had accepted a job with IV Waste?
20         MR. ZIBILICH:
21              Object to the form.
22         THE WITNESS:
23              No, because I hadn't accepted
24         it.
25    BY MR. MOST:
```

```
 1      Q    Well, you had a verbal agreement to
 2  work at IV Waste, correct?
 3            MR. ZIBILICH:
 4                 Object to the form.
 5            THE WITNESS:
 6                 Right, and I hadn't given the
 7            word yet.
 8  BY MR. MOST:
 9      Q    Did you tell anyone at the city that
10  you had a verbal agreement to go work at IV
11  Waste?
12            MR. ZIBILICH:
13                 Object to the form.
14            THE WITNESS:
15                 Once I was going in to give my
16            two-weeks notice, yes, the mayor.
17  BY MR. MOST:
18      Q    Okay, so you went to talk to the
19  mayor to give him your two-weeks notice,
20  correct?
21            MR. ZIBILICH:
22                 Object to the form.
23            THE WITNESS:
24                 Correct.
25  BY MR. MOST:
```

212

```
 1        Q     And you told him in that meeting that
 2   you were going to work for IV Waste?
 3             MR. ZIBILICH:
 4                  Object to the form.
 5             THE WITNESS:
 6                  Correct.
 7   BY MR. MOST:
 8        Q     And instead, he asked you to stay on
 9   and become DCAO?
10             MR. ZIBILICH:
11                  Object to the form.
12             THE WITNESS:
13                  Correct.
14   BY MR. MOST:
15        Q     A role in which you'd be overseeing
16   IV Waste?
17             MR. ZIBILICH:
18                  Object to the form.
19             THE WITNESS:
20                  One of many.
21   BY MR. MOST:
22        Q     IV Waste was one of the many
23   contractors you'd be overseeing, correct?
24             MR. ZIBILICH:
25                  Object to the form.
```

```
 1              THE WITNESS:
 2                   Correct.
 3     BY MR. MOST:
 4          Q    Okay.  At some point, IV Waste gave
 5     you a sum of money, correct?
 6              MR. ZIBILICH:
 7                   Object to the form.
 8              THE WITNESS:
 9                   No.
10     BY MR. MOST:
11          Q    Did IV Waste ever give you $4,000?
12              MR. ZIBILICH:
13                   Object to the form.
14              THE WITNESS:
15                   They gave me a reimbursement.
16     BY MR. MOST:
17          Q    So IV Waste did give you $4,000,
18     correct?
19              MR. ZIBILICH:
20                   Object to the form.
21              THE WITNESS:
22                   As a reimbursement.
23     BY MR. MOST:
24          Q    How did they give you that
25     reimbursement?  Was it cash, a check?
```

```
 1              MR. ZIBILICH:
 2                   Object to the form.
 3              THE WITNESS:
 4                   It was a check.
 5    BY MR. MOST:
 6         Q    Made out to Chad Pitfield?
 7              MR. ZIBILICH:
 8                   Object to the form.
 9              THE WITNESS:
10                   Correct.
11    BY MR. MOST:
12         Q    At the time of receiving that check,
13    is that when you were Director of Parks & Rec
14    or when you were DCAO?
15              MR. ZIBILICH:
16                   Object to the form.
17              THE WITNESS:
18                   Director of Parks & Recreation.
19    BY MR. MOST:
20         Q    What was it reimbursement for?
21              MR. ZIBILICH:
22                   Object to the form.
23              THE WITNESS:
24                   For having garbage cans
25              delivered throughout the city,
```

1          because the company that came in to
2          deliver garbage cans to residents had
3          pulled out, because the manufacturing
4          company of the cans had shut down
5          because of COVID.  So they left.
6          Cans needed to be distributed
7          throughout the city.
8               Mr. Torres, did not have any
9          contacts in the city.  Since we were
10         already working with him, picking up
11         22,000 garbage cans from the old
12         trash collector in 10 days, realized
13         that I had the resources to make it
14         happen.  I pulled together some
15         college kids and had them deliver
16         those cans, and I paid them, because
17         I wanted to make sure that they
18         received their money at the time, and
19         then, I got reimbursed by Mr. Torres
20         later down the line.
21    BY MR. MOST:
22         Q    And it was 350 cans?
23              MR. ZIBILICH:
24                   Object to the form.
25              THE WITNESS:

```
 1                    I don't know the number
 2           Mr. Torres has all the documentation.
 3           That's what he wrote the check off
 4           of.
 5  BY MR. MOST:
 6      Q    Okay, and these college kids, what
 7  college do they go to?
 8           MR. ZIBILICH:
 9                Object to the form.
10           THE WITNESS:
11                I'm not sure.  They were
12           neighborhood kids that wanted to make
13           some summer money.
14  BY MR. MOST:
15      Q    How did you pay them?  Did you pay
16  them cash or check or something else?
17           MR. ZIBILICH:
18                Object to the form.
19           THE WITNESS:
20                I believe it was cash.
21  BY MR. MOST:
22      Q    Did you keep any receipts or
23  inventories for that -- or invoices for the
24  money you paid to the college kids?
25           MR. ZIBILICH:
```

```
 1              Object to the form.
 2         THE WITNESS:
 3              Yes.  Mr. Torres was invoiced
 4         with serial numbers on every single
 5         garbage can that was tied to an
 6         address.
 7   BY MR. MOST:
 8     Q    All right, but is there any
 9   documentation of the money you paid to the
10   college kids?
11         MR. ZIBILICH:
12              Object to the form.
13         THE WITNESS:
14              I'm not sure.
15   BY MR. MOST:
16     Q    Any other money that IV Waste or
17   Sidney Torres, IV paid to you directly other
18   than that $4,000?
19         MR. ZIBILICH:
20              Object to the form.
21         THE WITNESS:
22              No, not that I'm aware of.
23   BY MR. MOST:
24     Q    Were you doing that trashcan
25   distribution as your role -- in your role as
```

```
 1   Director of Parks & Rec?
 2            MR. ZIBILICH:
 3                 Object to the form.
 4            THE WITNESS:
 5                 No.
 6   BY MR. MOST:
 7       Q    So it's something you were doing on
 8   the side for IV Waste?
 9            MR. ZIBILICH:
10                 Object to the form.
11            THE WITNESS:
12                 Correct.
13   BY MR. MOST:
14       Q    When you took the job as DCAO, did
15   you disclose to anyone at City of Kenner that
16   you had previously taken money from IV Waste?
17            MR. ZIBILICH:
18                 Object to the form.
19            THE WITNESS:
20                 I didn't take any money.  It was
21            a reimbursement for services that
22            happened in the city.  I did not
23            receive anything.
24   BY MR. MOST:
25       Q    Well, you took a check, right?
```

```
 1              MR. ZIBILICH:
 2                   Object to the form.
 3              THE WITNESS:
 4                   It was a reimbursement.
 5   BY MR. MOST:
 6      Q    And you deposited in your bank
 7   account, right?
 8              MR. ZIBILICH:
 9                   Object to the form.
10              THE WITNESS:
11                   As a reimbursement, yes.
12   BY MR. MOST:
13      Q    Did you disclose to anyone in the
14   City of Kenner when you took the job as DCAO
15   that you had received money as a reimbursement
16   from IV Waste?
17              MR. ZIBILICH:
18                   Object to the form.
19              THE WITNESS:
20                   I don't recall.
21   BY MR. MOST:
22      Q    So in 2020, you received bids from
23   trash companies to collect trash from the Isis
24   parade, correct?
25              MR. ZIBILICH:
```

220

```
 1                    From what?
 2          MR. MOST:
 3                    The Isis parade.
 4          MR. ZIBILICH:
 5                    Object to the form.
 6          THE WITNESS:
 7                    Incorrect.
 8   BY MR. MOST:
 9      Q    Okay, what was incorrect?
10      A    It was not bids.
11      Q    Okay, what were they?
12      A    Proposals for work.  It was not
13   through the City of Kenner.
14      Q    You were doing this for the Isis
15   group?
16          MR. ZIBILICH:
17                    Object to the form.
18          THE WITNESS:
19                    Visit Kenner is the tourism
20          group for the City of Kenner.  They
21          were responsible for all of the
22          parade operations.  I was the one who
23          actually made the route for the City
24          of Kenner's parade for Isis.
25          Therefore, I had the information.
```

221

```
 1                   They came and met with me.  I rode
 2                   the route with them, showed them what
 3                   they needed, and they submitted their
 4                   proposals.  This was not a public bid
 5                   scenario.  This was a public bid that
 6                   would have gone through the finance
 7                   department for that amount.
 8      BY MR. MOST:
 9           Q    You were doing this work in your role
10      as an employee for the City of Kenner,
11      correct?
12                   MR. ZIBILICH:
13                        Object to the form.
14                   THE WITNESS:
15                        That's correct.
16      BY MR. MOST:
17           Q    So in your role as an employee of the
18      City of Kenner, you worked with the trash
19      companies to, I guess, generate proposals to
20      Visit Kenner for collecting the trash from the
21      Isis parade.  Would that be an accurate
22      description?
23                   MR. ZIBILICH:
24                        Object to the form.
25                   THE WITNESS:
```

```
 1                    Yeah.  I was the one that had
 2             the knowledge on where the route was
 3             going to go and what was needed.
 4  BY MR. MOST:
 5      Q    Sure, and one of those proposals was
 6  from Ramelli trash company, correct?
 7             MR. ZIBILICH:
 8                    Object to the form.
 9             THE WITNESS:
10                    That's correct.
11  BY MR. MOST:
12      Q    Then, on January 21, 2020, you
13  forwarded Ramelli's proposal to IV Waste,
14  correct?
15             MR. ZIBILICH:
16                    Object to the form.
17             THE WITNESS:
18                    That's correct, along with the
19             message.  Let's include the message
20             on that, as well if we're going to go
21             there.
22  BY MR. MOST:
23      Q    Yeah, I can read it if you like.  By
24  the message, you mean in the email you sent,
25  you said, per your conversation with
```

223

```
1    Ms. Roussel, please see the attached proposal
2    from Ramelli.  Is that what you meant?
3              MR. ZIBILICH:
4                   Object to the form.
5              THE WITNESS:
6                   Yes.  That's the city attorney.
7    BY MR. MOST:
8         Q    Ms. Roussel?
9         A    Um-huh (affirmative expression).
10        Q    Did Ms. Roussel direct you to send
11   Ramelli's proposal to IV Waste?
12             MR. ZIBILICH:
13                  Object to the form.
14             THE WITNESS:
15                  Yeah.  I'm pretty sure that's
16             exactly what that says.  She asked me
17             to send it to this email address that
18             she gave me on a Post-it Note, and
19             that's exactly what I did.
20   BY MR. MOST:
21        Q    Okay.
22             MR. ZIBILICH:
23                  You got anymore questions?
24             MR. MOST:
25                  Yes, a few more, but we're
```

```
 1              getting close to the end.
 2                   This is -- I'm looking at --
 3              it's in the Dropbox as ZH, which
 4              we'll mark it as Exhibit 113,
 5              starting at --
 6   BY MR. MOST:
 7        Q    So in 2007, you applied to work at
 8   JPSO, correct?
 9        A    That's correct.
10              MR. CLARKE:
11                   We'll mark it 113, the personnel
12              file?
13              MR. MOST:
14                   (Mr. Most nods head
15              affirmatively.)
16   BY MR. MOST:
17        Q    What you're seeing on the screen
18   here, is this your job application that you
19   filled out?
20        A    Yeah.  Appears to be, yes.
21        Q    Going down to page five of this
22   document, do you see this is your signature
23   here (indicating)?
24        A    Correct.  Correct.
25        Q    Do you see that you filled out a
```

225

```
1    pre-polygraph questionnaire?
2         A    Yes.
3         Q    And you were the person to check yes
4    or no to these boxes one to 13?
5         A    Correct.
6         Q    Number nine says, "Have you ever been
7    fired or asked to resign from a job," correct?
8         A    That's correct.
9         Q    And you checked no.
10        A    Correct.
11        Q    Was that a truthful answer?
12        A    Yes.
13        Q    So as of 2007, you'd never been fired
14   from a job?
15        A    No.
16             MR. MOST:
17                  I'm going to pull up what's in
18             the Dropbox as ZQ, which will be made
19             as Exhibit 114.  This starts at Bates
20             Kenner 000183.
21   BY MR. MOST:
22        Q    You see that this is part of your
23   personnel file from when you were a officer
24   with the City of Kenner?
25        A    Yes.
```

1      Q      Going down through your personnel
2  file going down to page 43, --
3      A      Um-huh (affirmative expression).
4      Q      -- do you see that this is listing
5  flag, the Flag Report?
6      A      Yes.
7      Q      Do you see that Flag-59 says, "In the
8  last five years, I have been fired from a job:
9  More than four times"?
10     A      Yes.
11     Q      Do you recall saying that you've been
12  fired more than four times?
13     A      No, I didn't say that.
14     Q      Were you suspended in high school?
15     A      No.
16     Q      You see that it says Pitfield in the
17  upper left?
18     A      Yeah.  No.
19     Q      Had you been in two to three
20  accidents by this point, by 2005?
21     A      More than that.
22     Q      Did you have past experience as a
23  police intern, volunteer, cadet or explorer?
24     A      I did.
25     Q      So the first two flags here are true,

1   and the third and fourth are false?

2       A    Again, this is the first time I'm

3   seeing this.  I have no idea what this is or

4   where it came from.

5       Q    Yeah, fair enough, but as far as you

6   know, you've never been fired from a job

7   except the one you were fired from earlier

8   this year?

9       A    That's correct.

10      Q    You said you've been in a number of

11  car accidents, correct?

12      A    Correct.

13      Q    Were some of them before 2005?

14      A    Yes.

15          MR. MOST:

16              This is in the drop box as ZI,

17          which we'll designate as 115,

18          Exhibit 115.

19  BY MR. MOST:

20      Q    Do you see that this is a report of a

21  2007 polygraph?

22      A    Correct.

23      Q    It says, Subject:  Pre employment

24  polygraph exam of Chad M. Pitfield?

25      A    Correct.

228

1        Q    Did you, in fact, take a polygraph

2   exam in 2007 when you were applying for JPSO?

3        A    I did.

4        Q    It says, "The relevant areas covered

5   are as follows," and it lists a number of

6   topics, correct?

7        A    Correct.

8        Q    These are things that you were asked

9   about during your polygraph?

10       A    I can't recall back in 2007.

11       Q    You see it says, "The applicant made

12  the following ADMISSIONS:  None," correct?

13       A    Correct.

14       Q    So does that indicate that you said

15  that you'd never used an alias?

16            MR. ZIBILICH:

17                 Object to the form.

18            THE WITNESS:

19                 Correct.

20  BY MR. MOST:

21       Q    That you've never been involved in an

22  automobile collision?

23            MR. ZIBILICH:

24                 Object to the form.

25            THE WITNESS:

```
 1                    I don't recall answering that
 2              question.  If you ran my driver's
 3              license record from back then, you
 4              would have seen that.
 5  BY MR. MOST:
 6       Q    So you don't recall being asked in
 7  your polygraph if you'd had traffic
 8  collisions?
 9       A    I don't recall being asked that, no.
10       Q    Okay.
11              MR. MOST:
12                   Okay, let's just take a few
13              minutes, and then, we'll come back.
14              I might have some follow-up, maybe,
15              not; and then, if you all have some
16              questions.
17              THE VIDEOGRAPHER:
18                   Off the record.  The time is
19              2:13.
20                     (Brief recess.)
21              THE VIDEOGRAPHER:
22                   Back on the record.  The time is
23              now 2:17.
24              MR. MOST:
25                   Mr. Pitfield, that's all the
```

```
 1              questions I've got for you barring
 2              any redirect of you if anyone has any
 3              questions for you.  Thank you for
 4              your time.
 5                        EXAMINATION
 6   BY MR. KAUL:
 7        Q    Afternoon, Mr. Pitfield.
 8        A    Good afternoon.
 9        Q    We met off the record, but my name is
10   Chris Kaul.  I represent Westgate and Victory.
11   Can you confirm you were not employed by
12   Westgate at anytime relevant to you providing
13   a special detail at the Westgate property and
14   specifically on the day of January 19, 2020?
15              MR. MOST:
16                   Objection.
17              THE WITNESS:
18                   Correct.  I was an outside
19              contractor.
20   BY MR. KAUL:
21        Q    On the day of the incident, you were
22   scheduled by -- you would have been scheduled
23   by Deputy Canatella, correct?
24        A    That's correct.
25        Q    You never communicated directly with
```

```
1    anybody who was employed by Westgate?
2            MR. MOST:
3                  Objection.
4            THE WITNESS:
5                  That's correct.
6    BY MR. KAUL:
7       Q    You testified that you received a
8    phone call from the phone provided to you on
9    your detail when you were notified of what was
10   happening in the parking lot.
11      A    That's correct.
12      Q    At that point, were you under any
13   general directive or protocol provided by
14   Westgate that you were to follow?
15      A    No, sir.
16      Q    At that point, were you at your
17   discretion as a reserve deputy officer to
18   respond to that incident?
19      A    That's correct.
20      Q    In that moment, you would follow your
21   JPSO training?
22      A    That's correct.
23      Q    You had mentioned also that as of --
24   I can't recall if it's as a deputy officer or
25   reserve deputy, but you were under an
```

```
1   obligation to maintain, I guess, a certain
2   continuing education as an officer every year?
3        A    That's correct.
4        Q    Did you have any sort of training or
5   education that you were required to report to
6   Westgate?
7        A    No, sir.
8        Q    Have you ever had any complaints made
9   against you when you were providing your
10  special detail at Westgate?
11       A    Not complaints.  Many accolades, but
12  no complaints.
13       Q    You also testified that you in your
14  role as a JPSO reserve officer, you provided
15  special detail to other properties in the
16  parish?
17       A    That's correct.
18       Q    Had any private entity that you
19  provide a special detail, did any of them ever
20  provide you with any training?
21       A    So outside of -- so obviously, the
22  JPSO detail at the airport that I had
23  previously worked, but it's safety, because
24  you're in an industrial-style setting.  So
25  more stuff that size, the airport and that
```

233

1    kind of stuff.

2         Q    Let's narrow it to a business that

3    would relate similarly to the Westgate

4    Shopping Center.  So if you're providing

5    detail to a retail business, --

6         A    No.

7         Q    -- you've never received any sort of

8    training outside of what you've been trained

9    as a JPSO officer?

10        A    That's correct.

11        Q    Aside from Donald Canatella, were

12   there any other administrators who oversaw the

13   Westgate detail for the JPSO?

14        A    Not that I'm aware of.

15        Q    You said you -- on average, you

16   worked about two detail shifts a month.  I

17   believe, it was every other Sunday from

18   10:00 AM to 3:00 PM.

19        A    That's correct.

20        Q    How much were you paid hourly?

21        A    I believe at the time, it was $30 an

22   hour.

23        Q    Have you had any conversations with

24   anybody at Westgate following this incident?

25        A    No, sir.

234

```
 1      Q     Provided any statements to anybody at

 2   Westgate?

 3      A     No, sir.

 4      Q     When you responded to the incident,

 5   you had the ability to make a call to other

 6   officers to respond?

 7      A     That's correct.

 8      Q     That was through what means, what

 9   mechanism?

10      A     My two-way -- my JPSO issued two-way

11   radio.

12      Q     You didn't have a two-way radio on

13   your person that would have allowed you to

14   contact directly to Westgate, did you?

15      A     No.

16      Q     Because you were on the premises to

17   provide law enforcement services.

18      A     That's correct.

19      MR. KAUL:

20           That's all the questions I have.

21      MR. ZIBILICH:

22           No questions.

23      MR. MOST:

24           Mr. Pitfield, thank you for

25           coming in today.  Thank you for your
```

```
 1            time.
 2            THE WITNESS:
 3                    Thank you.  Yes, sir.
 4            THE VIDEOGRAPHER:
 5                    This is the conclusion of the
 6            videotaped deposition.  The time is
 7            now 2:21.
 8                    (Whereupon, the deposition was
 9            concluded at 2:21 PM.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                  WITNESS CERTIFICATE

 2

 3

 4            I, CHAD MICHAEL PITFIELD, do hereby

 5    certify that the foregoing testimony was given

 6    by me, and that the transcription of said

 7    testimony, with corrections and/or changes, if

 8    any, is true and correct as given by me on the

 9    aforementioned date.

10

11

12

13
      DATE SIGNED          CHAD MICHAEL PITFIELD
14

15

16

17            Signed with corrections as noted.

18

19            Signed with no corrections noted.

20

21

22

23

24

25
```

1          C E R T I F I C A T E

2

3          I, LORI L. MARINO, Certified Court
Reporter, in and for the State of Louisiana,
4    as the officer before whom this testimony was
taken, do hereby certify that CHAD MICHAEL
5    PITFIELD,  after having been duly sworn by me
upon authority of R.S. 37:2554, did testify as
6    hereinbefore set forth in the foregoing 236
pages; that this testimony was reported by me
7    in the stenotype reporting method, was
prepared and transcribed by me or under my
8    personal direction and supervision, and is a
true and correct transcript to the best of my
9    ability and understanding; that the transcript
has been prepared in compliance with
10   transcript format guidelines required by
statute or by rules of the board, that I have
11   acted in compliance with the prohibition on
contractual relationships, as defined by
12   Louisiana Code of Civil Procedure Article 1434
and in rules and advisory opinions of the
13   board; that I am not related to counsel or to
the parties herein, nor am I otherwise
14   interested in the outcome of this matter.

15

16       Dated this 4th day of October, 2022.

17

18

19

20

21          LORI L. MARINO, CCR
CCR #87069
22          STATE OF LOUISIANA

23

24

25