UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CIVIL ACTION NO. 2:21-cv-00080


DONNA LOU and DAREN PARSA, on their own behalf
 and on behalf of their deceased minor child,
                  E.P.

                 Plaintiffs,

                   v.

SHERIFF JOSEPH P. LOPINTO, III, CHAD PITFIELD,
RYAN VAUGHT, STEVEN MEHRTENS, SHANNON GUIDRY,
NICK VEGA, MANUEL ESTRADA, MYRON GAUDET, JOHN
DOES 1-3, VICTORY REAL ESTATE INVESTMENTS LA,
   LLC and WESTGATE INVESTORS NO LLC D/B/A
   WESTGATE SHOPPING CENTER, ABC INSURANCE
           COMPANY, and XYZ INSURANCE,

                 Defendants.


         Videotaped Deposition of MYRON A.

GAUDET, JR., given the above-entitled cause,

pursuant to the following stipulation, before

Lori L. Marino, Certified Shorthand Reporter,

in and for the State of Louisiana, at the

Jefferson Parish Sheriff's Office, 1233

Westbank Expressway, Building B, 5th Floor,

Harvey, Louisiana 70058 on Wednesday,

September 14, 2022, commencing at 1:31 PM.

```
 1   APPEARANCES:

 2

 3   (ALL PARTICIPANTS PRESENT IN PERSON:)

 4

 5   THE COCHRAN FIRM MID-SOUTH
     ONE COMMERCE SQUARE, SUITE 1700
 6   MEMPHIS, TN  38103
     TELEPHONE:  (901) 523-1222
 7

 8   BY:  ANDREW C. CLARKE, ESQ.
     aclarke@cochranfirmmidsouth.com
     REPRESENTING THE PLAINTIFFS
 9

10   HONORABLE FRANZ L. ZIBILICH
     6611 GENERAL DIAZ
11   NEW ORLEANS, LOUISIANA  70124
     TELEPHONE:  (504) 508-6868
12

13   BY:  FRANZ L. ZIBILICH, ESQ.
     fzibilich@gmail.com
14             AND

15   MARTINY & ASSOCIATES, LLC
     131 AIRLINE DRIVE, SUITE 201
16   METAIRIE, LOUISIANA  70001
     TELEPHONE:  (504) 834-7676
17

18   BY:  JEFFREY D. MARTINY, ESQ.
     jeff@martinylaw.com
19             AND

20   JEFFERSON PARISH SHERIFF'S OFFICE
     1233 WESTBANK EXPRESSWAY
21   BUILDING B, FLOOR 5
     HARVEY, LOUISIANA  70058
22   TELEPHONE:  (504) 363-5704

23   BY:  LINDSEY M. VALENTI, ESQ.
     valenti_lm@jpso.com
24   REPRESENTING SHERIFF JOSEPH P. LOPINTO, III
     AND THE JPSO DEFENDANTS

25
```

1    APPEARANCES (CONTINUED)

2

3    THOMPSON, COE, COUSINS & IRON, LLP
     650 POYDRAS STREET, SUITE 2105
4    NEW ORLEANS, LOUISIANA  70130
     TELEPHONE:  (504)526-4321
5
     BY:  CHRISTOPHER W. KAUL, ESQ.
6    ckaul@thompsoncoe.com
     REPRESENTING VICTORY REAL ESTATE INVESTMENTS
7    LA, LLC AND WESTGATE INVESTORS NO LLC
     D/B/A WESTGATE SHOPPING CENTER, ABC INSURANCE
8    COMPANY,AND XYZ INSURANCE COMPANY

9

10   VIDEOGRAPHER:  AARON PALMER, CLVS, DEPO-VUE

11

12   REPORTED BY:  LORI L. MARINO
                   CERTIFIED COURT REPORTER
13                 STATE OF LOUISIANA

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      E X A M I N A T I O N        I N D E X

 2
        MYRON A. GAUDET, JR.
 3      1233 WESTBANK EXPRESSWAY
        HARVEY, LOUISIANA  70058
 4

 5      TITLE                               1

 6      APPEARANCES                         2-3

 7      WITNESS INDEX                       4

 8      AGREEMENT OF COUNSEL                5

 9      EXAMINATION BY MR. CLARKE           6

10      WITNESS'S CERTIFICATE               104

11      REPORTER'S CERTIFICATE              105

12

13        E X H I B I T       I N D E X

14      EXHIBIT 93                          13

15      EXHIBIT 94                          13

16      EXHIBIT 95                          14

17      EXHIBIT 96                          15

18      EXHIBIT 97                          46

19      EXHIBIT 98                          43

20

21

22

23

24

25
```

```
 1                  S T I P U L A T I O N
 2              It is stipulated and agreed by and
 3      between Counsel for the parties hereto that
 4      the deposition of MYRON A. GAUDET, JR. is
 5      hereby being taken pursuant to the Federal
 6      Rules of Civil Procedure for all purposes in
 7      accordance with law;
 8                  That the formalities of
 9      certification and filing are specifically
10      waived;
11                  That the formalities of reading and
12      signing are specifically not waived.
13                  That all objections, save those as
14      to the form of the question and/or
15      responsiveness of the answer, are hereby
16      reserved until such time as this deposition or
17      any part thereof is used or sought to be used
18      in evidence.
19                  *   *   *   *   *   *   *   *
20              LORI L. MARINO, Certified Court
21      Reporter, in and for the State of Louisiana,
22      officiated in administering the oath to the
23      witness.
24
25
```

```
 1              THE VIDEOGRAPHER:
 2                   This is the videotaped
 3         deposition of Myron A. Gaudet, Jr.
 4         This deposition is being held at
 5         1233 Westbank Expressway in Harvey,
 6         Louisiana on September 14, 2022.  The
 7         time indicated on the video screen is
 8         1:31.  Would counsel please introduce
 9         themselves for the record?
10    MR. CLARKE:
11                   Andy Clarke for the plaintiffs.
12    MR. ZIBILICH:
13                   Franz Zibilich and Jeff Martiny
14         for the JPSO defendant deputies, as
15         well as Sheriff Joseph Lopinto.
16    MR. KAUL:
17                   Chris Kaul for the Westgate
18         defendants.
19         THE VIDEOGRAPHER:
20                   Would the court reporter please
21         swear in the witness.
22                   MYRON A. GAUDET, JR., having
23         been first duly sworn was examined
24         and testified on his oath as
25         follows:
```

```
 1                        EXAMINATION
 2    BY MR. CLARKE:
 3         Q    Would you please state your name for
 4    the record?
 5         A    Yes, sir.  My name is Sergeant Myron
 6    Gaudet, M-Y-R-O-N G-A-U-D-E-T.
 7         Q    I've said your name --
 8              MR. ZIBILICH:
 9                   Butchered your name to death.
10    BY MR. CLARKE:
11         Q    I've butchered your name throughout
12    the --
13         A    It's a Cajun name.
14         Q    So it's Gaudet?
15         A    G-A-U-D-E-T, Gaudet.
16         Q    Right, but how do you say it?
17         A    Just like that.  Like G-O-D-A-Y.
18         Q    Gaudet.
19         A    That would be the way to say it.
20         Q    Sergeant Gaudet, my name is Andy
21    Clarke.  I met you just briefly.
22              MR. ZIBILICH:
23                   Put the accent on the first
24              syllable, please.  It's Gaudet.  It's
25              not Gaudet.  Gaudet.
```

```
 1              MR. CLARKE:
 2                  Well, my mom says Burger King.
 3              MR. ZIBILICH:
 4                  That's where you got it from.
 5              MR. CLARKE:
 6                  So I may have a problem.  So I
 7          would appreciate you accommodating
 8          me.
 9              MR. ZIBILICH:
10                  Are you disabled?
11              MR. CLARKE:
12                  Yes, I think so.
13    BY MR. CLARKE:
14        Q    Mr. Gaudet, is that the right thing?
15        A    That's fine.  Yes, sir.
16        Q    By whom are you employed?
17        A    Jefferson Parish Sheriff's Office.
18        Q    How long have you been employed
19    there?
20        A    Twenty-sixish years.
21        Q    Okay.  When did you start?
22        A    1992.
23        Q    Have you given a deposition before?
24        A    Yes.
25        Q    Plus, you sat through some of the
```

1   depositions of another officer or deputy,

2   correct?

3        A    Yes.

4        Q    So you understand kind of basically

5   what's going on, but let's just go over the

6   ground rules.

7        A    Yes, sir.  I wasn't always with JPSO.

8   I actually -- well, I was with JPSO.  I left

9   JPSO and came back.

10        Q    Well, we're going to go through all

11   that.

12        A    Okay, just for clarity.

13        Q    The general rules are, obviously,

14   your testimony is under oath subject to the

15   penalty of perjury.  Do you understand that?

16        A    Yes.

17        Q    This is my opportunity to ask

18   questions about this case and find out

19   information, but while we're talking, we have

20   a court reporter taking things down.  So it's

21   important for us to let each other finish

22   before the other person speaks, okay?

23        A    Yes.

24        Q    Also, a lot of times when you're in

25   conversation, you nod your head yes or no.

1      A      Yes.

2      Q      The court reporter can't interpret

3    that.   So please give audible answers.   Okay?

4      A      Okay.

5      Q      If I ask a question and you don't

6    understand it or you're unclear of what I'm

7    asking, please ask me to rephrase it, and I

8    will if I can.   All right?

9      A      Yes, sir.

10     Q      If you answer a question, I'm going

11   to assume you understood it.   Is that fair?

12     A      Yes, sir.

13     Q      Prior to coming to take your

14   deposition, did you review any documents to

15   prepare yourself?

16     A      My statement.

17     Q      Okay, and what I've marked in front

18   of you to put in front of you in case you need

19   it are a number of exhibits.   What's that

20   handwritten sheet in front of you?

21     A      That's my own notes.

22     Q      Okay, did you review those?

23     A      Yeah.   I've been writing them.

24            MR. CLARKE:

25                  Let's make that the next

```
 1              exhibit.  Do you have a copy of it?
 2              Can we ask Lindsey to make a copy of
 3              this?
 4              THE WITNESS:
 5                   Want to do that?
 6              MR. CLARKE:
 7                   He's doing notes for his
 8              deposition.  I'm going to make them
 9              an exhibit.  Let's go off the record.
10              THE VIDEOGRAPHER:
11                   Let's go off the record.  The
12              time is 1:35.
13                     (Brief pause.)
14              THE VIDEOGRAPHER:
15                   Back on the record.  The time is
16              1:39.
17    BY MR. CLARKE:
18         Q    Sergeant Gaudet, we made your notes.
19    We might get back to them in a little bit, but
20    let's kind of just go through kind of some
21    basic stuff.
22         A    Yes, sir.
23         Q    Let's talk about your education.
24         A    Um-huh (affirmative expression).
25         Q    Did you graduate from high school?
```

```
 1        A     Yes.
 2        Q     And what high school and what year?
 3        A     I went to Riverdale High School,
 4   graduated in 1991.
 5        Q     Did you have any post high school
 6   education, college courses?
 7        A     I had some college.  I don't
 8   remember.  It was about a year and a half.
 9        Q     Where did you have some college?
10        A     UNO.
11        Q     Just never got a degree?
12        A     No.  I went straight into the police
13   academy.
14        Q     So what year did you apply for --
15   what was your first law enforcement job?
16        A     1992.  I was a police cadet for JPSO.
17        Q     When did you graduate from high
18   school?
19        A     1991.
20        Q     So right after high school?
21        A     Yeah.  It was pretty much after high
22   school.  Well, I went to my college when I was
23   still a cadet.  I was actually employed with
24   the Sheriff's Office.
25        Q     So after high school, you sought some
```

1    college courses?

2        A    Um-huh (affirmative expression).

3        Q    And then applied for the JPSO?

4        A    Yes, sir.

5        Q    I forgot to do something before we

6    went in here.  There's some documents in front

7    of you.  I want to identify them for the

8    record.

9        A    These (indicating)?

10       Q    Yes.

11            MR. CLARKE:

12                 If you look to your left,

13            Exhibit 93 is your personnel file

14            from JPSO.  If you need to refer to

15            that for any questions, it's there

16            for you.

17                 Exhibit Number 94 is a copy of

18            your interrogatory responses.

19   BY MR. CLARKE:

20       Q    Do you recall getting questions to

21   answer and --

22       A    Yeah.  The thing we had to fill out

23   from the email?

24       Q    Right.

25       A    Yes.

14

1     Q    Is this all true and accurate to the
2  best of your understanding and knowledge?
3     A    Yes, sir.
4     Q    If you go to Exhibit Number 18, it
5  asked to --
6     A    I don't see 18.
7     Q    I'm sorry.  It's in Exhibit 94.  Go
8  to Exhibit Number 94.  Go to interrogatory
9  Number 18.  It says, "Identify all
10  accommodation and, if any, you contend you
11  provided to Eric Parsa to accommodate his
12  disability."  Do you see that?
13     A    Um-huh (affirmative expression).
14     Q    What is your response?
15     A    It say, "Assuming this interrogatory
16  pertains  to accommodations under the
17  Americans with Disabilities Act, no
18  accommodations were requested nor provided
19  during the incident as described in the police
20  report produced in connection herewith."
21     Q    Let's go to page Exhibit 95, which is
22  your supplemental responses to
23  interrogatories.
24     A    Okay.
25     Q    If you look at interrogatory number

```
 1    nine, and if you will review that.
 2         A    "Please state with specificity --
 3         Q    No.  No.  No.  Don't read it out
 4    loud.
 5         A    Oh, I thought you wanted me to.
 6         Q    Look at interrogatory number nine,
 7    and look at your answer, and I'm going to ask
 8    you if that's true to the best of your
 9    knowledge information and belief?
10         A    (Witness peruses document.)  Yes.
11         Q    What I also marked as Exhibit Number
12    96 is a copy of the statement you gave to the
13    homicide division, correct?
14         A    Yes.
15         Q    Also, what I have in front of you is
16    Exhibit Number 34.  Look above the big stack,
17    the training records.
18         A    Okay.
19         Q    So all those document are here for
20    you to refer to --
21              MR. ZIBILICH:
22                   If you choose.
23              MR. CLARKE:
24                   -- if you choose or if a
25              question asks for it.
```

1          THE WITNESS:

2               That's fine.

3    BY MR. CLARKE:

4        Q    Now, the statement that you gave that

5    was Exhibit 96, did you give that on the day

6    of the incident?

7        A    No.  I think it was like maybe,

8    maybe, make a couple of days after.

9        Q    And that's what I thought.  In here

10   according -- if you look at Exhibit 96, it

11   says it was given on Sunday, January 19th.

12   Look at Exhibit 96.

13       A    Okay.  The incident occurred on

14   Sunday, January 19th.

15       Q    Oh, okay, I may be reading that --

16   that's not when you gave your statement.

17       A    No.  It was a couple of days after.

18       Q    Now, your statement, do you believe

19   that everything that you were asked in your

20   statement was put in your interrogatory

21   responses on Exhibit Number 95?

22       A    It looks pretty close.  I don't know

23   if it's everything word for word, but it looks

24   like pretty close.

25       Q    So we talked about your education.

```
 1    Let's talk about your work history.  Was your
 2    first job in law enforcement JPSO?
 3         A    My first job, no.
 4         Q    Tell me what your first job in law
 5    enforcement was.
 6         A    Oh, my first job in law enforcement.
 7         Q    Yes.
 8         A    It was a police cadet.
 9         Q    Okay.
10         A    That's an administrative position
11    that shuttles paperwork back and forth.  It's
12    like a delivery person.
13         Q    Okay, and when did you do that?
14         A    1992.
15         Q    And who did you do that for?
16         A    The 4th District and JPSO.
17         Q    Were you actually an employee?
18         A    Yes.
19         Q    But your title was police cadet?
20         A    Well, Sheriff's cadet.
21         Q    Sheriff's cadet, okay.
22         A    Um-huh (affirmative expression).
23         Q    Did you do that while you were going
24    to the academy?
25         A    No.  That's a different position.
```

```
1        Q    How long did you work as a police
2   cadet?
3        A    About two years.  Almost two years.
4        Q    When were you hired by JPSO?
5        A    In 1992.
6        Q    When you were hired, is that when you
7   put in an application?
8        A    Yeah.  I put in an application, got
9   hired and got offered a cadet position.
10       Q    A cadet position in the training
11  academy?
12       A    No.  No.  No.  No.  The cadet -- do
13  we still have cadets?  I don't know.  What it
14  was was you could go to the jail, or you could
15  go as administrative cadet.  At the time, the
16  administrative cadet position was open.  You
17  would get assigned to a district.  You would
18  handle filing paperwork, making deliveries,
19  things like that.  You would go all over the
20  agency doing stuff like that.  Then, what you
21  would is then, you had to apply for an
22  upcoming academy and then get accepted into
23  that.
24       Q    Okay.  So there's two routes where
25  you can become a deputy:  One is the police
```

```
 1   cadet route, and one is going through the
 2   correctional --
 3        A     At that time, yes.
 4        Q     In 1992?
 5        A     Correct.
 6        Q     So rather than working the jail, you
 7   attempted or you actually did go through the
 8   process of being cadet first and then applying
 9   to the basic academy when there was a position
10   open?
11        A     Yes, sir.
12        Q     You served as a cadet for two years,
13   and then, you applied and were accepted as a
14   deputy, correct?
15        A     Um-huh (affirmative expression).
16        Q     You have to say yes or no.
17              MR. ZIBILICH:
18                    Yes or no are better than
19              Um-huhs and unh-unhs.
20              THE WITNESS:
21                    Yes.
22              MR. ZIBILICH:
23                    Not that I don't trust the court
24              reporter.
25              THE WITNESS:
```

```
 1                  I'm sorry.  I'm sorry.  Yes.
 2    BY MR. CLARKE:
 3         Q    When did you become POST certified?
 4         A    I became POST certified in 1994.  I
 5    believe it was like late in 94.
 6         Q    Did you go to the JPSO Training
 7    Academy?
 8         A    Yes.
 9         Q    Let's talk about the training at the
10    training academy to the extent you recall it.
11         A    Yes.
12         Q    When you went to the training
13    academy -- well, let me just -- let me go
14    through all your law enforcement service
15    first, and then, we'll get back to training.
16    So you went through the basic academy, and you
17    served as a deputy.  How long did you serve as
18    a deputy?
19         A    I served as a deputy from '94 until
20    around '96, and at which point, I was
21    transferred to the Street Crimes Division.  I
22    went from the Street Crimes Division until
23    roughly, '98, '98, '99 -- I don't know.
24    Probably mid to late '98.  Then, from '98, I
25    went briefly to the 4th District.  I was in
```

```
1    the 4th District, maybe, not a year.  Then, I
2    went to the Detective Bureau.  I was a gang
3    investigator, gangs and violent crimes.  It
4    was kind of a -- we don't have it anymore.
5    That was a detective position back then.  From
6    there, I left and this was probably 2003.
7    Yeah, right at 2003, early 2003, I went
8    oversees.  I got called up by the United
9    States State Department and some contracting
10   companies that requested my assistance in the
11   Kosovo Mission for the United Nations.  I
12   spent almost three years there doing that.
13        Q    All right.
14        A    From there, some turmoil with
15   Hurricane Katrina.  I came back after
16   Hurricane Katrina.  My family needed me.  My
17   dad lost everything, and I came back to JPSO
18   in the position of an auto theft detective.
19   Then, from that point, I did that for several
20   years.  I couldn't -- i don't know exactly how
21   many years.  Then, I got taken into the
22   training academy as an instructor.
23        Q    When were you in the training academy
24   as an instructor?
25        A    I was in the training academy in, I
```

1    want to say in the 2012 range probably.  I was

2    there for, approximately, two years.  So like

3    probably 2012 to 2014.

4         Q    All right.

5         A    Then I went -- from there, I went

6    back to the patrol district.  I went to the

7    4th District.

8         Q    The only law enforcement agency that

9    you worked for is JPSO?

10        A    If you don't count the United Nations

11   and state department.  That was a law

12   enforcement position.

13        Q    Right.  Who was your employer at that

14   time?

15        A    I had three employers.  I got three

16   paychecks:  The United Nations, the state

17   department and a contracting company.  Dyncorp

18   was the contracting company.

19        Q    Was it something specialized that you

20   did to go over there?

21        A    It was several specialized things.

22   It was having trainer experience, my

23   background in law enforcement and in my side

24   background in martial arts, and so I went over

25   there, and I was supposed to spend six months,

1    and I spent close to three years.

2        Q    Okay.  I didn't mean to suggest that

3    wasn't comparable to law enforcement.

4        A    No.  No.  I understand.  I totally

5    understand.

6        Q    Okay, but it's not like you worked

7    for another police department that provided

8    training and policies and stuff for operating

9    on the beat?

10       A    Well, it did.  It did.  It was a very

11   big part of that, yes.  Basically, what I --

12   just to clarify.  When I went over there -- if

13   you're familiar back in 1999 to the early

14   2000s, there was a war in Kosovo.  It

15   destroyed the country.  They had to bring in

16   foreign contractors to rebuild the

17   infrastructure, okay.  I was one of those

18   foreign contractor to help rebuild the law

19   enforcement segment of their society.

20       Q    So you're putting it back together

21   from scratch?

22       A    From scratch.

23       Q    But did you have to have an

24   understanding of different laws or different

25   constitutions or different requirements?

```
 1        A     Well, at the time --
 2        Q     You got to let me finish.  We can't
 3   talk at the same time.
 4        A     Sorry.
 5        Q     I mean, did you have to learn the
 6   particular -- where you putting together a law
 7   enforcement agency based on the US
 8   Constitution?
 9        A     No.
10        Q     Okay.  What parameters were you
11   utilizing about -- were you training them on
12   just hands-on stuff, like basic police
13   training, or were you training them on
14   specific things about the laws in that
15   particular area?
16        A     My training aspect was, basically,
17   field training and academy training.  The laws
18   were attended to by the European union.
19        Q     All right, now, when you served in
20   the training  academy around 2012 to 2014, was
21   there a particular topic or segment of
22   training that you provided?
23        A     Defensive tactics, also report
24   writing, patrol activities, a variety of
25   things.
```

```
 1        Q    Okay, well, I'm trying to find out
 2   what that variety is.  What other things?
 3        A    Patrol tactics, defensive tactics,
 4   report writing and physical fitness.
 5        Q    Did you train on the RIPP Hobble?
 6        A    Yes.
 7        Q    Did you train people on the RIPP
 8   Hobble?
 9        A    Yes.
10        Q    Was Pizzolato there when you were
11   there?
12        A    Yes.
13        Q    Did you look at Exhibit 22, to your
14   left -- to your right?
15        A    Yes.  There it is.
16        Q    Does that look familiar to you?
17        A    Yes.
18        Q    So you're aware of the training on
19   the RIPP Hobble that was done?
20        A    Yes.
21        Q    Are you a certified RIPP Hobble
22   instructor?
23        A    Yes.
24        Q    We're going to go start with your
25   training with basic training, all right?
```

26

```
 1        A     Um-huh (affirmative expression).
 2        Q     Okay, the basic training was at
 3   JPSO's training academy, correct?
 4        A     Yes.
 5        Q     Okay, and that was generalized law
 6   enforcement stuff, training, that's approved
 7   by POST, correct?
 8        A     Yes.
 9        Q     It's not policy specific, correct?
10        A     Correct.
11        Q     In your basic training, would you
12   agree that basic training in 1992 is a little
13   bit different than basic training is today?
14        A     Yes.
15        Q     Obviously, you were trained on what
16   the status of the law was and the tools
17   available to you at that time, correct?
18        A     Yes.
19        Q     Were you trained in the basic
20   academy about anything pertaining to the
21   Americans with Disabilities Act?
22        A     At that time, I don't remember, but
23   since then, I would say yes.  We've had some
24   exposure to it.
25        Q     We're just talking about basic
```

1    training.  We're going to go through --

2         A    I don't think so back then.

3         Q    Did you have any training on excited

4    delirium?

5         A    Back then, no.

6         Q    Did you have any training on

7    positional asphyxia or compression asphyxia or

8    restraint asphyxia?

9         A    Back then, no.  I mean, I think

10   restraint asphyxia may have been mentioned

11   back then, but it wasn't as verbalized as it

12   is now.

13        Q    You would agree from a training

14   perspective, we know a lot more about the

15   restraint and positional asphyxia today than

16   we did in 1992?

17        A    Not necessarily.

18        Q    Okay.  Now, when you train on

19   defensive tactics, is that -- when you were a

20   trainer of defensive tactics, tell me what

21   courses are you teaching.  Is this hands-on

22   stuff --

23        A    Um-huh (affirmative expression.)

24        Q    -- or is it classroom?

25        A    Both.

1    Q    What defensive tactics did you train
2  on?  Were they particular weapons?
3    A    Baton, the pepper spray, hand to
4  hand.  So we had several systems that we would
5  teach as far as hand to hand.  This was the
6  physical part of the academy for use of force.
7  I mean, there's lecture involved in it too,
8  but yeah, it's a curriculum.
9    Q    Right, but some classes are more
10 hands-on versus classroom.
11   A    Yes.
12   Q    Would you agree?
13   A    Yes.
14   Q    So the use of force stuff and
15 defensive tactics is a lot more hands on.
16 Although, there is lecture.
17   A    Yes.  Yes.
18   Q    You try to teach them what to do, and
19 then, you have them apply it?
20   A    Yes.
21   Q    Okay.  At JPSO, did you have -- how
22 many times do you think you provided RIPP
23 Hobble training?
24   A    That's hard to say.  I really don't
25 know.  Yeah, I wouldn't.  I couldn't guess

1    that.  It was a bunch, because I did it for

2    in-service, and I did it for police recruits.

3    So I really don't know.

4         Q    All right, I mean, but you did it --

5         A    Regularly.

6         Q    So you're aware of the -- do you know

7    about the PowerPoint, the PowerPoint in

8    Exhibit 22, that's what you used as lecture,

9    correct?

10        A    Let me see.

11        Q    Had a bunch of videos and things in

12   it.

13        A    To be fair, I believe the videos at

14   the time I was in the academy were not working

15   right, but everything else -- this looks like

16   the PowerPoint.  I can't say that it's exactly

17   specifically it, but it looks like it.

18        Q    You're aware of the training that was

19   provided where there were COPS videos that

20   were shown as clips, correct?

21        A    I believe so, yeah.  I've seen

22   videos, yes.

23        Q    Did you see videos that were produced

24   in training involving people who were actually

25   choked and then put in the hog-tie restraints?

1      A     I don't remember.

2      Q     Where did you get certified with the

3  RIPP Hobble?  Was that through RIPP Hobble,

4  the company?

5      A     Um-huh (affirmative expression).  It

6  was JPSO.

7      Q     Tell me since your training, since

8  the basic training academy, you have received

9  training on excited delirium and positional

10 asphyxia, compression asphyxia and restraint

11 asphyxia, correct.

12     A     Yes.

13     Q     Let's just talk about that training

14 in general, okay.  What is excited delirium?

15     A     Excited delirium is not one given

16 thing.  It's not like a diagnosis.  It's

17 actually used as a catch-all to describe a

18 variety of behaviors that can result from lots

19 of different things.

20     Q     Or they can just be somebody acting

21 that way on purpose, correct?

22     A     I mean, it depends.  It depends on

23 what you're dealing with.

24     Q     What are some of the constellation of

25 symptoms or indicators of excited delirium?

 1      A    Extremely erratic behavior, profuse

 2   sweating.  Pupils very dilated.  Screaming,

 3   highly aggressive, very irrational, sometimes

 4   stripping clothes off, running towards glass.

 5   There's lots.

 6      Q    All those can happen in a regular

 7   fight, right?

 8      A    I don't think all of those would

 9   happen in one fight.

10      Q    They could?

11      A    I mean, they could.  Anything is

12   possible.

13      Q    Right.

14      A    But everything is not probable.

15      Q    All right, what were you trained

16   about the dangers of excited delirium?

17      A    Excited delirium, depending on what

18   it is, can be a contributing factor to

19   somebody dying.

20      Q    Okay.  Are you aware that the coroner

21   in this case ruled that there was excited

22   delirium?

23      A    No.

24      Q    Are you aware that the medical

25   examiner in this case ruled that the prone

```
 1    restraint was a contributing factor in the
 2    death?
 3         A    No.  I didn't see that report.
 4         Q    Have you ever seen the autopsy
 5    report?
 6         A    No, I didn't.
 7         Q    Okay, so what were you trained to do
 8    when you recognized somebody who may be
 9    suffering from excited delirium?
10         A    Well, the first thing you have to
11    consider is safety.  You have to consider the
12    safety of officers.  You have to consider the
13    safety of bystanders, and safety of the person
14    themselves.
15         Q    Okay.
16         A    Because it is wildly varying of what
17    this could be.
18         Q    I understand, but you train people to
19    give them the tools so they know what to do in
20    these wildly varying situations, correct?
21         A    Yes.  I can give you a tool.  I can
22    give hammers and saws and nails, and I can
23    tell you how to build a house, but until you
24    actually have to build a house, that's a very
25    different story.
```

```
 1        Q    All right.
 2        A    To apply things in the filed is a
 3   unique situation.
 4        Q    Right, and you can't train on
 5   everything, right?
 6        A    That's impossible.  There's no way to
 7   have a hundred percent for anything when it
 8   comes to training.
 9        Q    You can't have training and policies
10   on everything, correct?
11        A    No.  That's impossible.
12        Q    You try to have training and policies
13   on things that that are either -- or could be
14   catastrophic, like firearms, correct?
15        A    Correct.
16        Q    Or things that officers encounter in
17   a routine manner, correct?
18        A    Yes.  Correct.
19        Q    So excited delirium and the RIPP
20   Hobble seems like a very specific type of
21   training, correct.
22        A    I would wouldn't say it's a very
23   specific type of training.  I think it's a
24   general type of training that's included in
25   the RIPP Hobble; and at the time they
```

```
1    developed this training, they didn't
2    understand it at all to be fairly honest, and
3    they still don't fully understand it.  I mean
4    I'm telling you what I know.  It's not fully
5    understood.
6         Q    You know that the American Medical
7    Association says it's not a medical diagnosis?
8         A    Yeah.
9         Q    And American Psychiatric Association?
10        A    Right.
11        Q    Do you know where it came from?
12        A    Excited delirium?
13        Q    Yeah, where it was coined?
14        A    If I had to guess, --
15             MR. ZIBILICH:
16                  He asked you if you knew.
17             THE WITNESS:
18                  No.
19   BY MR. CLARKE:
20        Q    In the materials on the RIPP Hobble
21   training, they talk about the origins of
22   excited deliriums from Dr. Charles Wetli,
23   correct?
24        A    Okay.  So you're talking about the
25   cocaine psychosis.
```

1    Q    Right.  Excited delirium early on was

2  primarily associated with drugs, correct?

3    A    Primarily, yes.  Associated, but that

4  didn't mean it was always that.

5    Q    Right.  So the RIPP Hobble training

6  was a specific training to use a device in

7  certain circumstances, correct?

8    A    Yes.

9    Q    And the way the training was

10  presented and still is presented, it's still

11  presented as cocaine psychosis and excited

12  delirium, correct?

13    A    Um-huh (affirmative expression).

14    Q    Correct?

15    A    To my knowledge.  I haven't taught it

16  in a few years though.

17    Q    Throughout that training, they tell

18  of the dangers of sudden death after prone

19  restraint, correct?

20    A    Yes.

21    Q    And that is a recognized risk is why

22  you're trying to train people to give them the

23  tools in that situation, correct?

24    A    Yes.

25    Q    And the training talked a lot about

1    the physiology of a struggle and how certain

2    types of restraints can interfere with

3    breathing, correct?

4        A    Yes.

5        Q    And the primary issue in the training

6    on excited delirium and the RIPP Hobble dealt

7    with the dangers of the prone restraint,

8    correct?

9        A    Sometimes.

10       Q    Did they talk about any other type of

11   restraint in the RIPP Hobble training.  You

12   have it right there.

13       A    It focuses on the prone restraint,

14   but it doesn't -- I believe we also would

15   utilize kneeling, different positions,

16   walking, because you can also use the RIPP

17   Hobble to walk someone.  You can use the RIPP

18   Hobble around the knees, around the ankles.

19   It depends.

20       Q    That's not why your training with the

21   device is to be able to walk people.  This is

22   a device that's designed for certain type of

23   circumstances --

24       A    Actually, it is.  The RIPP Hobble is

25   diverse, there's a lot of things you can do

```
 1    with it, and there's a lot of things I have
 2    done with it.
 3         Q    Yeah, you can hang somebody with it.
 4         A    Sure.  Absolutely.
 5         Q    But the training and the materials
 6    are dealing with the dangers of the prone
 7    restraint and how it interferes with
 8    respiration, correct?
 9         A    That's part of the training, yes.
10         Q    And part of the training is that when
11    a suspect is restrained face down, that can
12    impact their breathing, correct?
13         A    Sure.
14         Q    When weight is applied to somebody's
15    back and the more weight that's applied, the
16    more severe that the breathing can be
17    impaired, correct?
18         A    Not necessarily.  That very much
19    depends.
20         Q    You're not a doctor, right?
21         A    Not a doctor.
22         Q    Were you trained this:  That the more
23    weight on somebody's back, the more severe the
24    compression can be?
25         A    So you're trying to make this an
```

```
 1   always and never situation.
 2       Q    No, I'm asking --
 3            MR. ZIBILICH:
 4                 He said can be.
 5            THE WITNESS:
 6                 It can be, sure.  Absolutely.
 7            Yes.
 8   BY MR. CLARKE:
 9       Q    Were you trained that the more weight
10   on somebody's back, the more severe the degree
11   of compression?
12       A    Could be.
13       Q    Okay, you were trained that it could
14   be?
15       A    Could be.
16       Q    Were you trained that the more
17   pressure that's applied to somebody's back
18   increases difficulty breathing on the person
19   restrained in the prone position?
20       A    Again, it could be.
21       Q    You were trained it could be.  You
22   weren't trained it actually does it, correct?
23       A    Again, it's not an always and never
24   situation.
25       Q    All cops want to talk about it
```

1   depends, but when --

2       A    Well, it does depend, because that's

3   a very, very real part of this job.

4       Q    When you're training, do you train

5   we're training you maybe to do this, but it

6   just all depends.  You just do it if you want?

7       A    I don't definitively tell someone

8   that if you put all of your weight on a

9   certain part of somebody's body that it will

10  definitely do this or definitely do that,

11  because every situation is very different and

12  has an unlimited amount of variables as far as

13  the environment, what's around you and all

14  that.  So again, it's not an always and ever.

15  It's not a catch-all.  Okay.  It can

16  contribute yes, but it's absolutely not an

17  absolute.

18      Q    That's fine, and this is how you

19  trained your people when you trained them,

20  right?

21      A    Yes.

22      Q    Do you train them when somebody is

23  being restrained in the prone position, that

24  the natural reaction to an oxygen deficiency

25  results in the suspect struggling?

40

```
 1        A     Once again, it can, but it doesn't
 2   always.
 3        Q     Do you train them that that's a sign
 4   to look for?
 5        A     Yes.
 6        Q     Okay.
 7        A     Definitely.
 8        Q     And the reason why -- do you tell
 9   them to understand that, because their
10   resistance may be from oxygen deficiency as
11   opposed to resisting the officer?
12        A     Yes.
13        Q     Okay, so that has to be in the
14   officer's mind if somebody is struggling,
15   whether that's due to a lack of breathing
16   versus the compression, correct?
17        A     It's one factor that should be in an
18   officer's mind, yes.
19        Q     Do you know or were you trained that
20   obesity is a risk factor involving restrained
21   in a prone information?
22        A     Yes.  Obesity can be a risk factor
23   for anything.
24        Q     I'm not asking you if it's a risk
25   factor for anything.
```

```
1         A    I'm telling you it's a risk factor
2    for this as --
3         Q    If you want to talk about other
4    things, I need you to answer my question.
5         A    And I'm gonna answer your questions,
6    but sometimes, they're intertwined --
7              MR. ZIBILICH:
8                   He said yes, it could be
9              anything.  He gave you an answer.
10             MR. CLARKE:
11                  No.  He said it's a risk factor
12             for anything.  I'm fat.  I'm at risk
13             for a lot of things.  It has nothing
14             to do with this depo.
15             THE WITNESS:
16                  So what I'm trying --
17   BY MR. CLARKE:
18        Q    Stop.  I'm going to ask a question.
19        A    Yes, sir.
20        Q    My question is do you train that
21   obesity increases the likelihood of a
22   dangerous result from prone restraint?
23        A    Not necessarily.
24        Q    Okay, that's fine.
25             MR. ZIBILICH:
```

```
 1                  I don't want you to have a heart

 2            attack on us.

 3      BY MR. CLARKE:

 4           Q    Does Exhibit 22 recognize obesity as

 5      a factor?

 6           A    Yes, it's a factor.  It's absolutely

 7      a factor.

 8           Q    All right.  You ever been sued

 9      before?

10           A    Yes.

11           Q    Have you ever had any complaints,

12      civilian complaints, made against you?

13           A    Not to my knowledge.

14           Q    Have you had ever had an internal

15      affairs investigation of you?

16           A    Not to my knowledge.

17           Q    You were sued by -- you and Vega were

18      sued in a case together, weren't you?

19           A    Yes.

20           Q    Do you remember the name of that

21      case?

22           A    I do not.  That was awhile back.

23            MR. CLARKE:

24                  I'll mark as Exhibit 98 Samuel

25            Blum, Richard Brooke and Christina
```

```
 1              Hellmers versus Normand and a bunch
 2              of deputies.  Let me pass this to you
 3              (handing).
 4    BY MR. CLARKE:
 5        Q    You gave a deposition in this case
 6    too, correct?
 7        A    Yes.
 8        Q    Do you remember the allegations in
 9    this complaint were that Vega had choked
10    somebody?
11        A    I don't remember the allegations on
12    this.  This was a long-time ago.
13        Q    Look at page four.  Actually, and you
14    choked.
15              MR. ZIBILICH:
16                   Actually what?
17              MR. CLARKE:
18                   Actually and Gaudet -- that they
19              allege that Gaudet choked too.
20              MR. ZIBILICH:
21                   This is Mr. Gaudet.  I don't
22              know who Gaudet is.
23              MR. CLARKE:
24                   Burger King.
25              THE WITNESS:
```

44

```
 1              Okay.  I mean, I remember the
 2         case.
 3  BY MR. CLARKE:
 4      Q    Do you know how that case resolved?
 5      A    I don't remember.  I don't believe he
 6  got anything.
 7      Q    Okay, so we've gone through
 8  complaints.  Let's just go ahead and talk
 9  about March 19, 2020.
10      A    Okay.
11         MR. ZIBILICH:
12              I'd prefer to talk about
13         January 19th, but if you want to talk
14         about March, rock and roll.
15         MR. CLARKE:
16              I don't know why when I miss it,
17         it always goes to March.  January 19?
18         MR. ZIBILICH:
19              Who handled this case for the
20         defendants.
21         MR. CLARKE:
22              I don't know.  Let me see it if
23         I have something else in it.
24         MR. ZIBILICH:
25              Your buddy, Gary Bizal.
```

45

```
 1              MR. CLARKE:
 2                   I've never met Gary, but I know
 3              who he is.  Sheriff Lopinto.  No.
 4              Martiny and Associate and Timothy
 5              Valenti.
 6              MR. ZIBILICH:
 7                   You got the answer to the
 8              lawsuit in there?
 9              MR. CLARKE:
10                   I got the deposition.
11              MR. ZIBILICH:
12                   Who appeared at the deposition?
13              MR. CLARKE:
14                   He might later.
15              MR. ZIBILICH:
16                   Who's he?
17              MR. CLARKE:
18                   The witness.
19              MR. ZIBILICH:
20                   No.  Who appeared at that
21              deposition?
22              MR. CLARKE:
23                   I just told you Timothy Valenti
24              and Danny Martiny and Brad Theard.
25              MR. ZIBILICH:
```

```
 1              What date was the deposition?
 2         MR. CLARKE:
 3              April 9, 2010.
 4         MR. ZIBILICH:
 5              I must have been on sabbatical.
 6    BY MR. CLARKE:
 7    Q    When did you take -- before we get to
 8    the event, when did you take the notes that we
 9    marked as Exhibit 97?
10    A    I was recollecting as I was listening
11    to the other depositions.
12    Q    This was today?
13    A    Yes, sir.
14    Q    Let's just go through your notes real
15    quick.
16    A    Okay.
17    Q    What does variables mean?
18    A    Variables means that there's a lot of
19    variables going on in the situation.  Now,
20    when I take notes, it's kind of all over the
21    place.  So we can explain it.
22    Q    You have here, must have control,
23    immobilization before the Hobble is applied.
24    A    Um-huh (affirmative expression).
25    Q    What type of -- complete
```

1    immobilization, completely still?

2         A    Read the next sentence under it.

3         Q    It don't work that way.

4         A    Okay.  So let's go into this.  So

5    here's the thing:  Before you can put a hobble

6    on somebody you have to have some semblance of

7    control, okay.  You also have to have some

8    kind of immobilization as far as to

9    effectively get it applied.

10        Q    You saw the videos that they present

11   in the RIPP Hobble training, correct?

12        A    Yes.

13        Q    They were able to hobble those people

14   who were extremely, extremely, extremely

15   violent, correct?

16        A    Yes.

17        Q    Eric Parsa never displayed that type

18   of violence that was displayed in those video

19   tapes, correct.

20        A    It's different.  The case is

21   completely different.

22        Q    One guy is sitting on the ground for

23   nine minutes with somebody sitting on his

24   back.  The other people are getting up,

25   running, striking, getting away and then,

```
1    having to be subdued again, correct?
2         A    Once again, it's a very different
3    case.
4         Q    Excited delirium isn't a one --
5    suspect possibly could not understand
6    commands.  What does that mean?  How do you
7    take that into consideration?
8         A    He's special needs, and a lot of
9    times the kind of commands that he might have
10   been traditionally given, he may have
11   misunderstood.
12        Q    All right, did you have any training
13   on autism?
14        A    In CIT.
15        Q    Okay, in the crisis response.  Was
16   that provided to you by the coroner's office,
17   that aspect of training?
18        A    Well, it's JPSO.  We have a crisis
19   intervention team that provides the training
20   and it was under Jim, who is our psychologist
21   at JPSO.
22        Q    So you never had any training on
23   autism from the coroner's office?
24        A    Not from the coroner's office but
25   from CIT.
```

1     Q    In CIT, did they talk about excited

2   delirium and the prone restraint, or was that

3   covered in the RIPP Hobble?

4     A    It's both.

5     Q    So in the CIT training, do they

6   actually train you how to apply a RIPP Hobble,

7   or is that done in the RIPP Hobble?

8     A    No.  That's going to be RIPP Hobble.

9   The CIT doesn't go into hands-on training like

10  that.

11    Q    Did you have any specific training on

12  how to interact or how to approach an autistic

13  person?

14    A    I don't recall a specific lesson plan

15  on approaching autistic people, but CIT is

16  more of a general class as far as dealing with

17  people that are mentally ill.

18    Q    Do you make a distinction between

19  mentally ill and intellectually disabled?

20    A    I can't make that distinction,

21  because I'm not a psychiatrist.

22    Q    CIT generally deals with people

23  suffering from some psychiatric episode or

24  some type of mental disorder, correct?

25    A    Generally, yes.

1      Q    You understand autism is different

2   than that, correct?

3      A    Yes.

4      Q    While you can't diagnose it or

5   anything, there is a distinction between

6   behaviors attributed to mental health issues

7   or psychiatric issues versus medical

8   conditions, correct?

9      A    Um-huh (affirmative expression).

10     Q    You have to say yes or no.

11     A    Yes.  Sorry.  Yes.

12     Q    Your note here, excited delirium

13  isn't one specific condition.  Are you trying

14  to write things that Mehrtens says that you

15  want to say or --

16     A    No, I was just -- when I take -- I'm

17  a visual thinker, and when I take notes, it

18  allows me to articulate myself better.

19     Q    So excited delirium, what do you mean

20  that it represents a broad spectrum catch-all?

21     A    Because it's not one thing.  It is

22  generally a catch-all term for a lot of things

23  that occur over a broad spectrum, and this is

24  why I'm telling you as before, they don't

25  fully understand it even now as before.  It's

51

```
1    not a fully understood situation.
2         Q    Well, do you know about the -- you
3    write positional asphyxia.
4         A    Um-huh (affirmative expression).
5         Q    Why did you write that down?
6         A    Because you were mentioning it, and I
7    didn't get a chance to follow-up on that note.
8    Positional asphyxia can contribute to someone
9    dying, but it's a very -- once again, it's not
10   one thing.
11        Q    You're not a medical examiner, right?
12        A    No, I'm not.
13        Q    So you don't -- you can't -- are you
14   relaying on some medical literature?
15        A    No.  What I'm relying on is to tell
16   you that positional asphyxia can be simply a
17   matter of inches, and it can be a matter of
18   time, and it can be a matter of inches, like
19   literally.  So when you're dealing with
20   someone who is resisting you, okay, that
21   literally, their breathing could be compressed
22   for one second, and one little wiggle, one
23   little move, they can then be breathing again.
24   It's a very dynamic and moving situation.
25        Q    And that's why -- and one little
```

1    movement can compress the air more.

2        A    Yes.

3        Q    That's why when you train people,

4    when you restrain somebody in the prone

5    position, it's important to get them into the

6    recovery position as quickly as you can.

7        A    Okay, I'm not going to agree with as

8    quickly as you can.

9        Q    As quickly as you safely can?

10       A    No.  I'm not going to even agree with

11   that.

12       Q    Okay.  Just whenever the hell you

13   want to.

14       A    You would get somebody in a recovery

15   position when there's something to recover

16   from.

17       Q    And the prone one -- if somebody is

18   in the prone position, the training says that

19   you have to be on the lookout for respiratory

20   compromise, correct?

21       A    You should be on the lookout for

22   that, yes.

23       Q    How do you monitor respiratory

24   compromise?

25       A    It depends.  You can feel them

```
 1    breathing.  You can maybe see them breathing.
 2    You can hear them breathing.  So it depends on
 3    the observation of the officer who is actually
 4    dealing with the suspect.
 5         Q    What is the normal rate of
 6    respiration of a person?
 7         A    Normal is anywhere between 12 and 15
 8    breathes a minute.
 9         Q    Twelve breathes a minute?
10         A    That's about right.  Twelve to
11    something like that.  Between and 15 breathes
12    a minute is about normal.
13         Q    Okay.
14         A    You can look it up.
15         Q    I can.
16              MR. ZIBILICH:
17                   Why?  What's yours?
18              MR. CLARKE:
19                   I don't know.  I wish it was
20              zero.
21              MR. ZIBILICH:
22                   You mean, then, you wouldn't be
23              here.  I'd be crushed.
24              MR. CLARKE:
25                   Correct.  Correct.  Correct.
```

Case 2:21-cv-00080-WBV-DPC   Document 175-5   Filed 05/01/23   Page 54 of 105

54

1    BY MR. CLARKE:

2        Q    So the recovery position, you have

3    all this training; you have all this

4    acknowledgment that the prone position can

5    cause respiratory compromise, and the recovery

6    position is a position that you can put them

7    in to allow them to recover from any oxygen

8    depletion, correct?

9        A    The recovery position is

10   multifunctional, but yes.

11       Q    The RIPP Hobble training is

12   singularly functionable with respect to the

13   actual restraints in the prone position,

14   correct?

15       A    Yes.

16       Q    Center of gravity on the hips and not

17   on the torso, what does that mean?

18       A    So in my statement, when I said that

19   Nick had his back, right, I was clarifying

20   what I actually meant by that.  So that's a

21   term -- that's a marshal arts term.  To say I

22   have someone's back, that's a vernacular in

23   another discipline, in marshal arts.

24            So when Nick was on him, Nick's

25   center of gravity was centered above his hips,

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

```
 1    okay; and now, if you measure your hips to
 2    your knees, there's a little bit of distance
 3    there.  And at the same time where Nick's
 4    compression was was much more on his tailbone
 5    than it was on anything else.
 6         Q    Were you trained about obesity being
 7    a risk factor or no?
 8         A    Yes.
 9         Q    Okay.  Why is obesity a risk factor?
10         A    Obesity is a risk factor, because
11    obesity in and of itself can inhibit
12    breathing.
13         Q    When you have a fat stomach when
14    you're being pushed up -- it's in your
15    training if you want to look at it.
16         A    I don't see --
17         Q    It pushes up on the diagram.  Don't
18    talk when I'm talking please.  It pushes up on
19    the diagram which restricts the breathing,
20    correct?
21         A    Um-huh (affirmative expression).
22         Q    That's the way you train?
23         A    Yeah.
24         Q    You put fight versus flight.
25         A    No.  I said flight is fluid.  The
```

```
 1   flight is fluid.
 2        Q    Graham v. Connor, what are the three
 3   factors from Graham v. Connor?
 4        A    Graham v. Connor is, it must be
 5   reasonable under the given circumstances is
 6   the gist of it.  As far as what, --
 7        Q    Do you understand my question?
 8        A    Say it again.
 9        Q    What are the three factors from
10   Graham v. Connor?
11             MR. ZIBILICH:
12                  This is not a law school class.
13             MR. CLARKE:
14                  He wrote it down.
15             MR. ZIBILICH:
16                  I don't care what he wrote down.
17             He could have wrote down pumpkins and
18             potpies.
19             MR. CLARKE:
20                  And I'm going to ask him about
21             that if he did.
22             THE WITNESS:
23                  I don't recall all three, but I
24             recall that the gist of Graham versus
25             Connor is that it has to be
```

```
 1                reasonable under the circumstances,
 2                and different tactics and techniques
 3                may be used depending on the
 4                situation.
 5   BY MR. CLARKE:
 6        Q    What does it depend on?  It gives you
 7   factors that it depends on.
 8        A    Right.  So it depends on how
 9   dangerous the situation is.  It depends on
10   how dangerous it is perceived to be.  That's
11   another big one.  It depends on your
12   surroundings.  It depends on the overall
13   totality of events of what's happening.
14        Q    My question is what are the three
15   Graham factors to evaluate the reasonableness
16   of the use of force?
17        A    I told you I don't recall.
18        Q    Do you recall the severity of the
19   crime at issue?
20        A    The severity of?
21        Q    The severity of the crime at issue.
22        A    There's really not a crime to deal
23   with here.
24        Q    I am asking you if you recall that it
25   dealt -- I'm trying to give you the three
```

```
1    factors.
2         A    Okay.
3         Q    One of them is the severity of the
4    crime at issue, right?
5         A    Um-huh (affirmative expression).
6         Q    In this particular case, you're
7    saying there was no crime.
8         A    It was unknown.
9         Q    The threat of the suspect to the
10   officer, that's one of the factors, correct?
11        A    Yes.
12        Q    And the resistance of the suspect and
13   whether he's trying to escape?
14        A    Um-huh (affirmative expression).
15   Yes.
16        Q    Are you aware of those factors?
17        A    Yes.
18        Q    If top priority -- on your notes, you
19   have in here top priority is safety.
20        A    Yes.
21        Q    Who's safety?
22        A    Everyone's.
23        Q    And the recovery position is a
24   position you put somebody in after they've
25   been in the prone position in a struggle for
```

```
 1   their safety, correct?
 2       A    Sometimes.
 3       Q    Why would you put them in the prone
 4   position not for their safety?
 5       A    Well, you wouldn't -- the thing about
 6   it is this:  When you put someone in a
 7   recovery position, they have to be recovering
 8   from something, okay.  This -- no.  No.  What
 9   you're getting at and where we're going with
10   this is very relevant.  It's very relevant,
11   because of the totality of what you're going
12   to see on that video, and I know you've
13   watched that video a million times, and I can
14   tell you --
15       Q    What question are you answering?
16           MR. ZIBILICH:
17               Whoa.  Whoa.  Whoa.  Timeout.
18           MR. CLARKE:
19               He's talking.
20           MR. ZIBILICH:
21               You got all discombobulated when
22           he interrupts you.  Let him answer
23           the question.
24           MR. CLARKE:
25               What question are you answering?
```

```
 1              THE WITNESS:
 2                   I'm answering the question you
 3              just asked me that I don't even
 4              recall.  Let's go again.
 5    BY MR. CLARKE:
 6         Q    Top priority is safety.
 7         A    Yes.  Okay, that's where we were.
 8         Q    The recovery position is something
 9    that would be top priority for safety to put
10    somebody in if they've been restrained in the
11    prone position when it's safe?
12         A    Not necessarily.
13         Q    Perfect, and that's what you trained,
14    correct?
15         A    Um-huh (affirmative expression).
16    That's correct.
17         Q    You understand that in a struggle,
18    there can be periods where somebody is
19    actively resisting and times that they're
20    calm, correct?
21         A    Yes.
22         Q    Dynamic situation, right?
23         A    Dynamic and fluid, yes.
24         Q    You train people that when they get
25    into a calm state, that is the time that you
```

```
1   should put them in the recovery position?
2        A    Not necessarily.
3        Q    So the answer is no?
4             MR. ZIBILICH:
5                  The answer is not necessarily.
6             THE WITNESS:
7                  This was never a calm state.
8   BY MR. CLARKE:
9        Q    You need to pay attention to my
10  questions.
11       A    I'm paying attention to your
12  questions.
13       Q    When somebody is in a calm -- how
14  many minutes of calmness do you have to
15  experience before you roll somebody into the
16  recovery position?
17            MR. ZIBILICH:
18                 Object to the form.
19            THE WITNESS:
20                 That's a very subjective
21            question that has no answer here.
22  BY MR. CLARKE:
23       Q    Well, what do you train people?
24       A    There is no specific amount of time.
25       Q    So if he's resisting or if he's still
```

1    moving 20 minutes in, you still stay on him if

2    you don't feel you have enough control?

3         A    Depends on the situation.

4         Q    Right.  The next thing you said

5    judgment call to get him up, dangerous.  What

6    did you write there?

7         A    When you talk about putting someone

8    in a recovery position, it's often a judgment

9    call of the officer that is primarily

10   responsible for the use of force.  If that

11   officer feels that it's safe to do so, maybe,

12   he will do that; but at the same time, if he

13   doesn't feel that it's safe to do so, because

14   he still is in the process of controlling this

15   person, he's not going to do that.

16        Q    Do you train people that you can

17   restrain people in the recovery position?

18        A    That you can -- I don't understand

19   that question.

20        Q    Okay.  The recovery position is on

21   the side, correct?

22        A    Um-huh (affirmative expression).

23        Q    Yes?

24        A    Yes.

25        Q    Do you train them that one method you

```
1   can restrain them to decrease the risk of
2   positional asphyxia or restraint asphyxia is
3   to try to restrain them while they're in the
4   recovery position?
5       A    The recovery position is not a
6   restrained position.
7       Q    I didn't ask you that.
8       A    But that's what you're insinuating.
9   That there is a way to restrain someone while
10  they're in the recovery position, and I'm
11  telling you it's two very different things.
12      Q    Was Pizzolato your boss?
13      A    No.
14      Q    He actually spoke on behalf of the
15  county.  It's called a 30(b)(6).  So he speaks
16  on behalf of Jefferson county.
17      A    Okay.
18          MR. ZIBILICH:
19              Where's Jefferson county?
20          MR. CLARKE:
21              It's right by Jefferson Parish.
22  BY MR. CLARKE:
23      Q    Let me see.  This is what he said he
24  trained.  I'm going to ask you if you agree or
25  disagree.
```

```
 1        A     Okay.
 2        Q     The first thing and we've already
 3   gone through that.  Sitting on somebody's legs
 4   as an obese person does not relieve the
 5   pressure.  His answer was correct.  Do you
 6   agree with that?
 7        A     Sitting on?
 8        Q     Sitting on somebody's legs, an obese
 9   person, may not be something that relieves the
10   pressure.
11        A     I don't agree with that.
12        Q     He said yes.  You don't agree with
13   him?
14        A     No.
15        Q     Do you agree that it's a complete
16   risk factor to get fat people off their
17   stomach immediately?
18        A     No.  I don't agree with that.
19        Q     That's what he trains.
20        A     Um-huh (affirmative expression).
21        Q     Do you voice objections to his
22   training?
23        A     I think that it's taken out of
24   context in what you're asking me.
25        Q     Have you read Pizzolato's deposition?
```

1     A    No, I didn't, but I do think it's

2   being taken -- I think you're taking it out of

3   context from what it actually is.

4     Q    I'm asking the question and the

5   answer?

6     A    And I'm telling you that that is not

7   exactly the way it works.

8     Q    Do you train officers that the

9   natural reaction to oxygen deficiency is that

10  a person struggles more violently.  His answer

11  was yes.  Do you agree with that?

12    A    It's possible.  I agree with it

13  generally, but it's not an always thing.

14    Q    Well, Pizzolato is not being sued

15  here.  You are, correct?

16    A    That's fine.  Yes.

17    Q    So somebody who's struggling on the

18  ground could be reacting from oxygen

19  deficiency, correct?

20    A    Yes.

21    Q    When you're evaluating whether you

22  need to continue to restrain somebody, you

23  train people that that is a consideration that

24  you have to take into account, right?

25    A    Yes.

66

```
 1        Q    So I asked questions to Pizzolato:
 2   So if somebody is kicking, can you control him
 3   by holding his handcuffs behind his back in
 4   the modified recovery position, his answer was
 5   correct.  Do you agree with that?
 6        A    It depends.
 7        Q    So you don't agree with it?
 8             MR. ZIBILICH:
 9                  He didn't say that.  He said it
10             depends.
11             THE WITNESS:
12                  It depends.
13   BY MR. CLARKE:
14        Q    What does it depend on?
15        A    It's depends on a lot.  Let's go
16   through what it could depend on.  It could
17   depends on a person being 330 pounds.  It
18   could also depend on someone --
19        Q    Are you talking about Pitfield?
20        A    Huh?
21        Q    Are you talking about Pitfield?
22        A    I'm talking about whoever it could
23   be.  I'm talking about it could be anyone.  So
24   when you're talking about someone who is
25   extremely large and extremely violent and
```

1   extremely erratic, you might not necessarily

2   be able to control them.

3        Q    Tell me when your done.

4        A    Again, I'm going to go to this is an

5   always and never argument.  The answer is it

6   very much is case to case.

7        Q    Well, this is the JPSO statement on

8   trainings.  So you're saying you disagree with

9   these statements?

10       A    I'm not telling you I disagree with

11  that.  I'm telling you that those answers are

12  based on very limited context.

13       Q    You were not at this deposition, sir.

14       A    I understand that.  I'm trying to

15  tell you that the questions that you're asking

16  have many intersecting points, because this is

17  a complicated issue.  This is not a microcosm

18  of any one thing.  This is a very large

19  situation.

20       Q    Wake me up when you're done.

21       A    Okay.  Go ahead.  You're not going to

22  rattle me by doing that.  So go ahead.

23       Q    Do you agree that due to the

24  potential rapid death in instances of the

25  prone restraint, law enforcement officers must

1    act quickly to minimize the duration of the

2    resistance in the struggle which is thought to

3    contribute to the death?

4        A    I didn't catch that whole thing.

5        Q    Do you agree that in cases where

6    somebody is restrained in the prone position,

7    due to the potential of rapid death in these

8    instances, law enforcement must act quickly to

9    minimize the duration of the resistance and

10   struggle, because it is thought to contribute

11   to death?

12       A    Law enforcement does not minimize

13   the duration of the struggle; the suspects

14   does.

15       Q    Well, you can struggle with him,

16   according to Pizzolato, in the recovery

17   position or the prone position.

18       A    You can struggle with anyone in any

19   position.

20       Q    And it's safer for the suspect if

21   he's struggling in the recovery position?

22       A    I don't agree.

23       Q    Okay.  That's perfect.

24       A    I don't agree, because --

25       Q    You answered.

```
 1        A     We can go there.
 2        Q     Do you agree that when you put
 3   handcuffs on somebody, that that is a more
 4   degree of control that you have than if
 5   they're un-handcuffed?
 6        A     Yes.
 7        Q     On the date in question, when you had
 8   the RIPP Hobble training, did you have a RIPP
 9   Hobble in your car?
10        A     Yes.
11        Q     Did you consider using it?
12        A     No.  I actually had it on my person.
13        Q     Did you have it on your belt or
14   something?
15        A     I had it in my side pocket.
16        Q     I'm going to read a couple of
17   questions and answers and see if you agree
18   with them.  Somebody is in the recovery
19   position being held down, and you have six
20   officers on the scene, if their legs are not
21   TARPed, is that enough people to restrain him
22   in the recovery position?  He says, I believe
23   so.  Do you believe that?
24        A     Let's go through that again, because
25   I really -- I'm sorry.  I didn't catch that.
```

```
 1        Q    If you have somebody that's
 2   handcuffed?
 3        A    Yes.
 4        Q    And there are six officers on the
 5   scene?
 6        A    Um-huh (affirmative expression).
 7        Q    Do you believe that that's enough
 8   officers to get him into the recovery position
 9   and attempt to restrain him in the recovery
10   position?
11        A    It depends.
12        Q    In this case?
13        A    In this case, no.  Go ahead.  I can
14   elaborate on that, but go ahead.
15        Q    I don't really care.
16        A    Okay.  But it's very relevant.
17        Q    Do you agree that you want to control
18   people in the least dangerous position
19   available?
20        A    No.
21        Q    Do you agree that if somebody is
22   restrained in the prone position and you get
23   them handcuffed, and they're not resisting at
24   the time you get them handcuffed, that you
25   should you put them in the recovery position
```

1   right away?

2       A    Again, it depends on the

3   circumstances.

4       Q    Here's the circumstances:  You got

5   somebody in the prone position.  He's

6   handcuffed, and at that time, they are not

7   resisting.

8       A    So he was resisting.  And --

9       Q    Listen to my question.

10      A    I am.  I'm answering your question.

11      Q    I'm not asking you a question about

12  whether Eric Parsa was resisting.  I'm asking

13  a question as to training and what you're

14  suppose to do.  If you have somebody

15  restrained in the prone position, and they're

16  handcuffed, and at the time that they're

17  handcuffed that they're not resisting, do you

18  train them that that is the time that you put

19  them in the recovery position?

20      A    You have to assess what's going on,

21  and then, you may put them in the recovery

22  position?

23      Q    If Pizzolato trained you one way, and

24  you disagree with Pizzolato on some of these

25  things we're talking about --

```
 1          A     Pizzolato didn't train me.
 2          Q     If Pizzolato is the training officer
 3    for JPSO who has provided the information for
 4    what the training is --
 5          A     Okay.
 6          Q     If this is his training, do you
 7    comply with this in the field, or does it
 8    depends?
 9          A     It depends.
10          Q     And so it depends -- it's up to you
11    to decide what it depends on when you are
12    trained something differently, correct?
13          A     Correct.
14          Q     Do you train people that whenever you
15    get somebody in the prone position that your
16    primary concern is to get them safe and out of
17    the prone position?
18          A     No.
19          Q     Let's go back to your notes.  Do you
20    not see your conflict now?  You got one guy
21    going against the sheriff?
22          MR. ZIBILICH:
23                You got one guy asking questions
24          that are in a total vacuum, which I
25          probably objected to for those
```

```
 1            reasons.
 2            MR. CLARKE:
 3                 You didn't object to them.
 4            MR. ZIBILICH:
 5                 Pardon?
 6            MR. CLARKE:
 7                 You didn't object to any of
 8            these questions.
 9            MR. ZIBILICH:
10                 Probably got bored with you.
11   BY MR. CLARKE:
12       Q    You put in here no good place to
13   immobilize.
14       A    Yes.
15       Q    What does that mean?
16       A    That means if this situation ideally
17   could have happened in like a medical
18   facility, there would have been a bed or a
19   gurney that we could have restrained this guy
20   to, okay, but it doesn't work like that in the
21   real world.  So that's a factor in
22   understanding what's the totality.  This was a
23   medical emergency is what this was.
24       Q    I'm listening to you.  You can go
25   ahead.
```

```
 1       A    No.  I'm just saying.  That's why I
 2  made that down is because in an ideal
 3  situation like this, when you have a person
 4  who is in this state of mind, like this kid
 5  was, obviously, it's better if it happens in a
 6  mental facility or a hospital facility where
 7  you actually have a bed that you can restrain
 8  him to.  Then, a lot of this stuff becomes
 9  irrelevant.
10       Q    You have on the next page of your
11  notes, the ADA is irrelevant.
12       A    Yes.
13       Q    You can expand on that all you want.
14       A    The ADA is irrelevant here --
15       Q    What is the ADA?
16       A    It's the Americans with Disabilities
17  Act.
18       Q    What does it mean?
19       A    It generally deals with like access
20  ramps, service dogs, things like that, but it
21  certainly in my recollection does not deal
22  with a dangerous situation where people are
23  restrained while a fight is going on.
24       Q    Who trained you that?
25       A    That's my recollection.  I don't
```

1    remember, but I've read the Americans with

2    Disability Act.

3        Q    But you're aware you have to

4    accommodate people's disability under the

5    Americans with Disabilities Act?

6        A    Yes.

7        Q    You write we are witnessing an unsafe

8    medical emergency.

9        A    Which we are.

10       Q    All right, what is the medical

11   emergency?

12       A    The medical emergency is that this

13   kid is in serious distress, and nobody at the

14   scene, besides probably his mother, really

15   understands what's going on fully.

16       Q    Why is it an unsafe medical

17   emergency?  What is the medical emergency?

18       A    The medical emergency, well, the fact

19   that he bit a chunk out of his father's face

20   is a pretty good medical emergency.

21       Q    You talked to the father after this,

22   and he didn't even want medical treatment for

23   it, right?

24       A    Okay.  That's fine, but if I see

25   someone who's got the muscles torn out of

```
 1   their face and you can see the bones, that's
 2   kind of a medical emergency; and at the same
 3   time, when you at the same time when you have
 4   a kid acting like this and you have a kid that
 5   is this size and you have a kid that is not
 6   calming down when it comes to this whole
 7   thing, that's a medical emergency.
 8        Q    Right.
 9        A    When you talk about -- when you start
10   to see this for what it actually is, okay, we,
11   as the police, in recent years, have been
12   having to to deal with mental health quite
13   often.  And this is a very different kind of
14   situation than a traditional arrest, and what
15   you're seeing here is just that.  This kid is
16   dangerous to himself, and he's dangerous to
17   other people, and he certainly can't take care
18   of himself.
19        Q    Okay.  Could the medical emergency be
20   that he's struggling, because he's been
21   deprived of oxygen like you're aware of?
22        A    But that's not what happened at the
23   beginning, because he started punching on his
24   father and starting punching Pitfield.
25        Q    So you have to assess that.  So he's
```

1   exerted energy right there which probably gets
2   him out of breath, right?
3       A    Um-huh (affirmative expression).
4       Q    Are you aware that from the time
5   Pitfield got there to the time he was put in
6   the recovery position was around nine minutes?
7       A    That's what the video shows, I would
8   imagine.
9       Q    Right.
10      A    I'm the one who put him in the
11  recovery position.
12      Q    Right.  It's your contention that
13  this obese kid struggled violently for nine
14  minutes.
15      A    Yes.  I think that struggle has lots
16  of connotations here.
17      Q    Struggled to the point where you
18  couldn't put him in the recovery position,
19  correct?
20      A    I did put him in the recovery
21  position.
22      Q    Well, he was dead by that point,
23  right?
24      A    As far as them putting him in the
25  recovery position, he was still resisting, and

1   he was still -- the level of tension, his

2   mother was communicating with him.  She was

3   trying to calm things down.  The deputies were

4   trying to calm things down, and that's why I

5   was telling you before that there was nothing

6   to recover from at that point.

7       Q    The recovery position is a position

8   you put somebody in after they've been

9   restrained in the prone position, correct?

10      A    Um-huh (affirmative expression).  He

11  was still being restrained.

12      Q    He was in the prone position.

13      A    Yes.

14      Q    And to get him -- what you want to do

15  is move him out of that and put him in the

16  recovery position.  The recovery is from the

17  compression that occurs while he's in the

18  prone position, right?

19      A    Right.

20      Q    Okay.

21      A    Yes.

22      Q    You said this is different from an

23  arrest.

24      A    Yes.

25      Q    Why is this different?  Were you

1   trying to arrest -- what were you trying to do

2   with him?

3        A    See, that's the whole thing.  In a

4   situation like this, this could be a mental

5   committal, because of what's going on.  This

6   meets all the criteria to take someone into a

7   mental hospital for what this kid is doing.

8        Q    Okay.

9        A    At the same time, there could be

10  criminal charges depending on the context of

11  whats happening.  There's a lot of unsure

12  things happening; and on scenes like this,

13  very often, you don't know what the result is

14  going to be until after the fact.

15       Q    Well, if you sit on him for nine

16  minutes, you know the result -- if you sit on

17  somebody in the prone position for nine

18  minutes, you know there is a greater

19  likelihood that the result will end in death

20  than if you don't restrain them in the prone

21  position, correct?

22       A    It depends.

23       Q    All right, let's go to your

24  statement.  I'm just going to go through it,

25  because I'm too tired to think.

```
 1              MR. ZIBILICH:
 2                   You're too tired to what?
 3              MR. CLARKE:
 4                   Think.
 5     BY MR. CLARKE:
 6         Q    So I'm just going to go through it
 7     page by page.
 8         A    Okay.
 9         Q    So you gave this statement at some
10     point to the homicide detectives while you
11     were watching the film, correct?
12         A    I believe so, yes.
13         Q    So were you told when they were when
14     taking your statement that you were being
15     investigated for your use of force?
16         A    No.
17         Q    Were you told that there was an IA
18     investigation?
19         A    No.
20         Q    Were you told that they were
21     investigating potential criminal violations by
22     the officers?
23         A    No.
24         Q    When you pulled up, were you the last
25     the officer on the scene or close to it?
```

1      A     Close to it.

2      Q     When you pulled up on the scene, who

3   do you recall -- well, let's just go through

4   your statement.  Do you want to look at the

5   video?

6      A     We can look at the video.

7      Q     We'll do that after this.

8      A     Okay.

9      Q     So you go through this.  When you get

10  there, what do you see?

11     A     I see a group of people surrounding

12  this kid.  I see Vega on his hips, and I see

13  Vega holding his face to the side, and I see

14  his mother trying to communicate with him.

15     Q     So you never saw Pitfield on top of

16  him?

17     A     No, I didn't.

18     Q     So when you got there, the switch had

19  already happened?

20     A     Yes, it had.

21     Q     When you pulled up, were you running

22  lights and sirens?

23     A     I didn't run lights and sirens in the

24  parking lot, but I ran lights and sirens to

25  get there.

1    Q    So you turned them off when you got

2  there?

3    A    Yeah, I turned them off in the

4  parking lot.

5    Q    When you got there, according to your

6  statement, the first thing you did was ask

7  Nick if he needed help, correct?

8    A    Yes.

9    Q    You felt that he may be tired?

10    A    Yes.

11    Q    Did you believe that Eric Parsa might

12  be tired?

13    A    Sure.

14    Q    Or depleted of oxygen?

15    A    I didn't know at that point.

16    Q    When you got there, you knew he was

17  handcuffed, correct, or you found out very

18  quickly?

19    A    Yes.

20    Q    When you got there, were his

21  handcuffs already in front of him?

22    A    Yes.

23    Q    Did you see how his hands got in

24  front of him?

25    A    No, I didn't.

1      Q    When you walked up on this, Parsa is

2   prone with Nick on his back is what you say in

3   your statement, correct?

4      A    Yes.

5      Q    And then, what happens, it says okay.

6   So then, Nick gets up, and what happens.  Nick

7   gets up and he's essentially limp.

8      A    Correct.

9      Q    That's Eric?

10      A    Yes.

11      Q    So when you come up on the scene,

12   Nick Vega is on top of him and then starts to

13   get up, and he's limp?

14      A    Yes.

15      Q    And then, you rolled him in the

16   rescue position?

17      A    Yes, sir.

18      Q    And then, you started trying to do

19   CPR, correct?

20      A    No.  Sternum rubs first.

21      Q    Sternum rubs.  You started doing

22   resuscitative efforts?

23      A    Yes.

24      Q    You note in here that prior to it

25   they had requested a sprint car and an EMT?

84

1        A    A sprint car is -- it's like -- it's

2    a car, not an ambulance.  Usually, what

3    happens is paramedics will come in sprints

4    cars and try to stabilize things as the truck

5    is coming.  So it's, basically, like a first

6    response, kind of EMS thing.

7        Q    Do you know why they requested

8    medical prior to you getting there?

9        A    I didn't know while I was in route,

10   because it was requested while I was in route.

11   So I didn't know at the time.

12       Q    Well, do you know now?

13       A    Oh, yeah, I know now.

14       Q    It was for Mr. Parsa, correct?

15       A    That, I don't know.  I don't know if

16   was wholistically for the whole situation.  I

17   don't know.

18       Q    Okay.  You didn't know he was special

19   needs based on the call, but when you got

20   there, you recognize he's special needs,

21   correct?

22       A    The wording around me, everybody

23   talking, yes.

24       Q    Did you confirm it with your

25   observations too?

85

```
 1        A    Yes.  Yes.
 2        Q    He wasn't really talking in words,
 3   was he?
 4        A    No.  I didn't hear him say anything.
 5        Q    You didn't hear him say firetruck or
 6   anything?
 7        A    No.
 8        Q    After you started CPR, you did it for
 9   awhile, and then, you were relieved, correct?
10        A    Yes.  I was actually requested by EMS
11   to start chest compressions.  Yeah.
12        Q    Well, you had already -- I mean --
13        A    I had already done the sternum rub,
14   but it was kind of at the same time as EMS
15   came up.
16        Q    You recognized when he was in the
17   recovery position that he was in bad shape,
18   right?
19        A    Yes.
20        Q    According to your statement, did you
21   hear Eric's mother talking about that the
22   officers were mistreating Eric?  If you'd go
23   to page six is around where I'm at.
24        A    Okay.  Yeah.  After we started the
25   first aid and after EMS started working on
```

1  him, that's when she started becoming

2  hysterical.  Before that, that wasn't

3  happening.

4       Q    Once he was rolled over and there was

5  medical intervention, --

6       A    That's when.

7       Q    -- that's when she started

8  complaining?

9       A    Yes.

10      Q    Do you recall anything about her

11  complaining, whether she said they were

12  choking him or using too much force or

13  anything?

14      A    She started saying that he was being

15  choked.

16      Q    When you came up on the scene and saw

17  Nick on top of him, where were Nick's hands?

18      A    One of Nick's hands was around like

19  this, and I know I have to verbalize this so

20  you can get it.  It looked liked the back of

21  his hand was pushing on his cheek to keep him

22  from biting people.  That was one of the first

23  things that Nick said, he's biting people.

24  He's biting people.

25      Q    Why don't you just move away from his

1  face?

2      A    Because when -- you see, that's one

3  of those things it's not a simple answer,

4  because you have this kid that's acting like

5  this, if you let his face go and he starts

6  banging his head on the concrete and moving

7  around and then, trying to bite, you don't

8  have control anymore.

9      Q    Okay.  When you got there, you note

10  in your report, when you got there, Nick Vega

11  was on top of him.  Nick's arm was circled

12  around his head, shoulder and neck; and

13  clearly, Nick was trying to stop him from

14  biting people, because that's what Nick had

15  said.

16      A    He was saying that, and I recognized

17  what he was doing.  He was moving his face to

18  the side, so that he couldn't turn and bite.

19      Q    Well, you didn't say moving his face

20  to the side.  You said his arm was circled.

21  Show me how his arm was circled around his

22  head, neck and shoulders.

23      A    If I remember it correct, I think his

24  arm was under Parsa's arm, like kind of here,

25  and moving his face kind of to the side, and

```
1   his other arm was kind of towards his
2   shoulder.  So he was kind of  like this.
3   Demonstrating.
4        Q    You don't know if the hold itself at
5   anytime put pressure on his carotid artery or
6   any part of his neck?
7        A    When I saw it, it was not near his
8   carotid artery.
9        Q    Did you see everything about Nick
10  Vega's hold around his head until he was put
11  in the recovery position?
12       A    I wouldn't say everything, because it
13  was very fast moving, so.
14       Q    Yeah.  Marshal arts, are you allowed
15  to use marshal arts holds that you weren't
16  trained on in the academy?
17       A    Well, you're asking me?
18       Q    Yeah.
19       A    Because everything I use, I'm
20  certified in.
21       Q    If there is some type of marshal arts
22  hold that's not taught in the academy, are you
23  allowed to use that in the street?
24       A    Yes.
25       Q    And if Pizzolato says you're only
```

```
 1   allowed to use the type of training that was
 2   provided in the academy, you wouldn't comply
 3   with that?
 4        A    So if you go to the Use of Force
 5   Policy of the sheriff's office, it says that
 6   in extenuating circumstances, officers may use
 7   tactics that are not in line with training
 8   based on the circumstances.
 9        Q    It's a weapon of opportunity,
10   correct?
11        A    What do you mean by a "weapon of
12   opportunity"?
13        Q    If  you're in a situation and you
14   can't get your gun and your weapons, you can
15   smash them over the head with a rock.
16        A    That's part of it.
17             MR. ZIBILICH:
18                  Or throw a refrigerator at them.
19             MR. CLARKE:
20                  That's true.  You're making a
21             fat joke about me?
22             MR. ZIBILICH:
23                  No.  Why, you need to go back to
24             the refrigerator?
25             MR. CLARKE:
```

```
 1                  If there's a Diet Coke left.
 2    BY MR. CLARKE:
 3         Q    According to your statement, you
 4    didn't see any type of thing that you would
 5    identify as a chokehold.
 6         A    No, sir.
 7         Q    Later on in your statement, on page
 8    seven, "And the fact that it was around his
 9    head and neck had directly to do with the fact
10    that he was biting people."
11         A    Yes.
12         Q    Who did you see him bite?
13         A    I didn't see him bite anyone.
14         Q    Do you train anything in the academy
15    about how to immobilize somebody's head and
16    neck?
17         A    Not specifically, and that's why it
18    goes into the Use of Force Policy.
19         Q    Well, specifically, you do train them
20    you can't choke them, right?
21         A    No.  I wouldn't agree with that
22    either.
23         Q    Pizzolato says that.  I mean, have
24    you ever used a chokehold in the field?
25         A    Yes.
```

91

```
1        Q    How many times?
2        A    I don't know how many times, but I
3   can tell you that each time I used it, it
4   would have been a lethal force encounter.
5        Q    Did the people die?
6        A    No.
7        Q    Did you use the LVNR?
8        A    Yes.
9        Q    Are you trained on the LVNR?
10       A    Yes.
11            MR. ZIBILICH:
12                 Would you like a demonstration?
13            MR. CLARKE:
14                 I would.  It's supposed to be
15            safe but not from him.
16            MR. ZIBILICH:
17                 That's all I got.
18            MR. CLARKE:
19                 An LVNR is not supposed to not
20            kill you.
21            THE WITNESS:
22                 And I didn't kill anyone.
23   BY MR. CLARKE:
24       Q    No offense.  I'm going to opt out of
25   the LVNR.
```

```
 1        A    None taken.  You're doing your job.
 2        Q    Do you recall anything that my client
 3   said on the scene other than what we talked
 4   about?  Did you talk to Mr. Parsa, the father?
 5        A    Briefly.
 6        Q    I mean, anything of --
 7        A    He actually kind of was -- I'm going
 8   to describe it as he was very, very worn.  He
 9   was very worn, and when it was over, he
10   appeared very relieved.
11        Q    Like that you killed his son for him?
12        A    No.  I'm talking about after -- kind
13   of afterwards -- I don't think he was really
14   processing the whole situation fully at that
15   point.
16        Q    Did he seem like he was kind of in
17   shock and worn out?
18        A    Yes.  Yes.
19        Q    That would be a good description?
20        A    Yes.
21        Q    I think a lot of people tried to talk
22   to him to get information to help --
23        A    Yes.  Absolutely.  Yes.
24        Q    During the time, at least when you
25   were talking about it, he seemed kind of out
```

1    of it and shocked, right?

2        A    Um-huh (affirmative expression).

3    Yes.

4        Q    All right, let's look at the tape.

5            THE VIDEOGRAPHER:

6                Off the record.  The time is now

7            2:56.

8                (Brief pause.)

9            THE VIDEOGRAPHER:

10               Back on the record, the time is

11           now 2:58.

12   BY MR. CLARKE:

13       Q    I tried to move more towards the time

14   when the other officers come up on the scene.

15       A    The other officers, you're talking at

16   the beginning?

17       Q    You've seen the whole videotape,

18   correct?

19       A    Yes.

20       Q    The altercation between Eric Parsa

21   and his dad occurs for a period of time,

22   Correct?

23       A    Correct.

24       Q    Then, Pitfield shows up, and he's

25   there on Parsa's back for a period of time,

1    correct?

2         A    Yes.

3         Q    Then, at some point, different

4    officers start showing up, and all I'm trying

5    to do is I've kind of fast forwarded this

6    video to start at the time when another

7    officer is showing up.

8         A    Yes, sir.

9         Q    Where we're starting it at is 14:14.

10   Do you see that?

11        A    Yes.

12        Q    Do you know who this lady is right by

13   Daren Parsa?

14        A    I do not know.

15        Q    What do people who drive sprints

16   cars, what do they -- do they have a uniform

17   or anything?

18        A    They usually have an EMS uniform.

19   They're usually dressed the same as the

20   regular paramedics.

21        Q    I don't know what that is.  Does this

22   person look like they're dressed like a sprint

23   driver?

24        A    No.  She might have been an employee

25   of Laser Tag.  That's possible.

1      Q    So we're going to play it.  I'm going
2  to stop it like every minute.
3      A    That's fine.
4                (Video played.)
5            MR. CLARKE:
6                So we're going to go to 15:00.
7            I stopped it at 14:59.
8                (Video stopped.)
9  BY MR. CLARKE:
10     Q    You see that lady with her back to us
11  on the left-hand side?  She had some kind of
12  --
13     A    This lady (indicating)?  The one we
14  don't know who she is?
15     Q    The one where the pointer is.
16     A    I don't know who that lady is.
17     Q    Let's go back 10 seconds for a
18  second.  Do you see what she has in her hand?
19     A    I don't.  I don't know what that is.
20     Q    You sure that's not the sprint lady?
21     A    I don't know that that's the sprint
22  lady.  I don't know who that is.  Go back.
23  There's a logo on her shirt.  I don't know
24  what it is, but it's not EJ EMS.  I don't know
25  what that is.

```
 1       Q    Does it appear she had some medical
 2  things?
 3       A    She had a box of something.  I don't
 4  know what it is.
 5       Q    Up from the point where we started
 6  around 14:00 to where we are now, 15:12, did
 7  you see Eric Parsa violently struggling on the
 8  video?
 9       A    No.  Go ahead.
10       Q    From the time that we played it at
11  15:15 to 15:59, did you see Eric Parsa
12  violently struggling on the video?
13       A    No, but I can tell you what I did
14  see.
15            MR. ZIBILICH:
16                 I wish you would just answer his
17            questions, because now, he's going to
18            ask you what did you see.
19            THE WITNESS:
20                 Because you're really missing
21            the point.
22            MR. ZIBILICH:
23                 And that's all right.  Guess
24            what?  If he's missing the point,
25            don't share it with him.
```

```
 1              MR. CLARKE:
 2                  Then, you're winning, but
 3              MR. ZIBILICH:
 4                  If he's missing the point, there
 5              ain't no sense in giving it to him.
 6              MR. CLARKE:
 7                  Right, I don't want you to do
 8              that.  Plus, I'm not missing the
 9              point.
10              THE WITNESS:
11                  We will agree to disagree on
12              that.
13              MR. ZIBILICH:
14                  I feel like this is Daniel
15              Webster over here, some sort of
16              debate I'm missing.
17      BY MR. CLARKE:
18         Q    At this point, at 15:59, is this when
19      Vega is getting on him?
20         A    I don't know.  I'd have to see.
21         Q    Let's go back.
22         A    It's a still.  So I don't know.
23         Q    We're going to go back 10 seconds,
24      starting at 15:49.
25                  (Video played.)
```

98

```
 1            THE WITNESS:
 2                 Okay, yeah.
 3                    (Video stopped.)
 4   BY MR. CLARKE:
 5       Q    At 16:00, there's a switch of
 6   personnel from Pitfield to Vega, correct?
 7       A    Yes.
 8       Q    Was he violently struggling while
 9   they made that switch?
10       A    I don't know.
11       Q    Did you see it on the tape?
12       A    I didn't see it, I don't know.  It's
13   blocked.
14       Q    I understand.  I'm just asking you
15   what you see on the tape?
16       A    Yeah, no.
17       Q    Starting at 16:00.
18                    (Video played.)
19            MR. CLARKE:
20                 Stop it at 16:30.
21                    (Video stopped.)
22   BY MR. CLARKE:
23       Q    From 16:00 to 16:30, did you see him
24   violently struggling?
25       A    His mom is blocking him, and that's
```

```
 1   all I see.
 2        Q    There are a number of officers on the
 3   scene at this time, correct?  They've been
 4   walking around, correct?
 5        A    Yes.
 6        Q    Nobody is down there trying to assist
 7   him, trying to restrain him, correct?
 8        A    No, because the more people you pile
 9   on him, the more dangerous it will get.
10        Q    And you already knew he had enough
11   danger there?
12        A    What you're seeing is deescalation.
13        Q    I'm sorry.
14        A    I'm glad you're laughing.
15        Q    That is horrendous.  All right, we're
16   going to play from 16:30.
17                    (Video played.)
18   BY MR. CLARKE:
19        Q    Do you want me to stop it?
20        A    Go ahead.
21                    (Video stopped.)
22   BY MR. CLARKE:
23        Q    From 16:30 to 16:54, do you see Eric
24   Parsa tensing himself up some?
25        A    It appears to be, yes.
```

```
 1        Q    Are you aware of pain compliance
 2   techniques?
 3        A    Yes.
 4        Q    One pain compliance technique that
 5   you train in the academy is to lift their
 6   handcuffs up behind their back, correct?
 7        A    It's more of a leverage compliance,
 8   but it can cause pain.
 9        Q    Is that what Vega is doing in your
10   estimation?
11        A    I don't know what Vega doing, because
12   you have to ask Vega that.  I'm not sure what
13   he's feeling at that point.
14             MR. CLARKE:
15                  16:54.
16                     (Video played.)
17             MR. CLARKE:
18                  Stopped at 17:02.
19                     (Video stopped.)
20   BY MR. CLARKE:
21        Q    Does it appear that Officer Vega is
22   putting his body weight, pushing Eric's arms
23   forward onto his mother.
24        A    He's pushing his arms forward, but if
25   you look at his torso, there's separation.
```

```
 1   His are still hip to hip.  You can see the
 2   space between Vega's torso and his.
 3            (Video played.)
 4   BY MR. CLARKE:
 5       Q    Tell me when you arrive on the scene
 6   or when you see yourself on here.
 7       A    I believe that's me.
 8       Q    Coming in from the top of the screen?
 9       A    Yeah.  I'm pretty sure.
10       Q    Right up here (indicating)?
11       A    Keep going.  Yeah.
12       Q    Is that your first observation when
13   you came up on the scene?
14       A    Yes.
15       Q    Okay.
16       A    Like I said, a gang of people around.
17       Q    Right.  I'll stop.
18            (Video stopped).
19   BY MR. CLARKE:
20       Q    Did you just put him in the recovery
21   position?
22       A    I think so.  It's hard to tell, but
23   it was very quick when I did.
24       Q    So you were there -- did you talk to
25   anybody about moving him into the recovery
```

1    position?

2         A    Yes.

3         Q    Who did you -- I mean, did you say

4    the words put him in the recovery position?

5         A    I believe I did.  I saw what was

6    going on.  I was assessing, and as I saw him

7    appear to be limp, I said let's put him in the

8    recovery position, and we went from there.

9         Q    So when you came in there and you

10   tried to do kind of an assessment to see

11   whether he was breathing or to see what the

12   situation was?

13        A    Yeah, that was really the first thing

14   I did.

15        Q    During this period of time before you

16   put him in the recovery position, you saw him

17   go limp?

18        A    I don't want to say I saw him go

19   limp.  I was assessing everything at once, and

20   I realized that he wasn't moving.  That's when

21   I said let's go to put him in the recovery

22   position.

23        Q    Was he breathing?

24        A    No.

25        Q    So was it more that you didn't see

```
1    him breathing that you felt he needed to be in
2    the recovery position?
3         A    It was more a collection of things.
4    He was limp and wasn't breathing, yeah.
5              MR. CLARKE:
6                   I'm done with this.  I'm done.
7              MR. ZIBILICH:
8                   Have a safe trip.  See you
9              Monday.
10             THE VIDEOGRAPHER:
11                  This is the conclusion of
12             videotaped deposition.  We're going
13             off the record.  The time is now
14             3:10.
15                  (Whereupon, the deposition was
16             concluded at 3:10 PM.)
17
18
19
20
21
22
23
24
25
```

```
 1                 WITNESS CERTIFICATE
 2
 3
 4           I, MYRON A. GAUDET, JR., do hereby
 5     certify that the foregoing testimony was given
 6     by me, and that the transcription of said
 7     testimony, with corrections and/or changes, if
 8     any, is true and correct as given by me on the
 9     aforementioned date.
10
11
12
13
       DATE SIGNED          MYRON A. GAUDET, JR.
14
15
16
17           Signed with corrections as noted.
18
19           Signed with no corrections noted.
20
21
22
23
24
25                          .
```

105

1                   C E R T I F I C A T E

2

3          I, LORI L. MARINO, Certified Court
   Reporter, in and for the State of Louisiana,
4  as the officer before whom this testimony was
   taken, do hereby certify that MYRON A. GAUDET,
5  after having been duly sworn by me upon
   authority of R.S. 37:2554, did testify as
6  hereinbefore set forth in the foregoing 104
   pages; that this testimony was reported by me
7  in the stenotype reporting method, was
   prepared and transcribed by me or under my
8  personal direction and supervision, and is a
   true and correct transcript to the best of my
9  ability and understanding; that the transcript
   has been prepared in compliance with
10 transcript format guidelines required by
   statute or by rules of the board, that I have
11 acted in compliance with the prohibition on
   contractual relationships, as defined by
12 Louisiana Code of Civil Procedure Article 1434
   and in rules and advisory opinions of the
13 board; that I am not related to counsel or to
   the parties herein, nor am I otherwise
14 interested in the outcome of this matter.

15

16      Dated this 25th day of September, 2022.

17

18

19

20

21         LORI L. MARINO, CCR
           CCR #87069
22         STATE OF LOUISIANA

23

24

25