# Law Enforcement Responses to People with Mental Illnesses:

## A GUIDE TO RESEARCH-INFORMED POLICY AND PRACTICE



MacArthur
The John D. and Catherine T. MacArthur Foundation



JUSTICE ★ CENTER
THE COUNCIL OF STATE GOVERNMENTS

# Law Enforcement Responses to People with Mental Illnesses:

## A GUIDE TO RESEARCH-INFORMED POLICY AND PRACTICE

Melissa Reuland

Matthew Schwarzfeld

Laura Draper

Council of State Governments Justice Center
New York, New York

*Supported by*





This project was supported by Grant No. 05-82376-000-HCD, awarded by the John D. and Catherine T. MacArthur Foundation.

Points of view or opinions in this document are those of the authors and do not represent the official position or policies of the MacArthur Foundation or the Council of State Governments members.

The MacArthur Foundation reserves the right to reproduce, publish, translate, or otherwise use and to authorize others to publish and use all or any part of the copyrighted material contained in this publication.

*The Council of State Governments Justice Center is a national nonprofit organization that serves policymakers at the local, state, and federal levels from all branches of government. The Justice Center provides practical, nonpartisan advice and consensus-driven strategies, informed by available evidence, to increase public safety and strengthen communities.*

Council of State Governments Justice Center, New York 10005
© 2009 by the Council of State Governments Justice Center
All rights reserved. Published 2009.

Cover design by Mina Bellomy. Interior design by David Williams.

# Contents

Executive Summary .................................................................... v

Acknowledgments .................................................................... vii

Introduction ........................................................................... 1

**SECTION ONE:**
**Encounters Between Law Enforcement and People with Mental Illnesses .......... 3**

**SECTION TWO:**
**Specialized Law Enforcement Strategies ........................................ 9**

**SECTION THREE:**
**Future Research Topics and Implications for Policy and Practice.................... 13**

Conclusion ............................................................................. 15

Appendix A: Understanding Apparent Inconsistencies in
Law Enforcement Research ......................................................... 17

Appendix B: Detailed List of Research Questions ................................ 19

Notes ................................................................................... 21

Bibliography ........................................................................... 23

# Executive Summary

The complex nature of law enforcement responses to people with mental illnesses has become an issue of national concern. These calls for service are often time-consuming and difficult to resolve, and, on relatively rare occasions, result in tragic injuries or deaths. Policymakers, community leaders, and the public are demanding better outcomes from these encounters. In the face of this mounting pressure, and with a desire to improve their interactions with people with mental illnesses, law enforcement officers are turning to specialized responses. These efforts show great promise for increasing the safety of everyone involved and connecting individuals to needed mental health supports and services when appropriate. However, policymakers generally implement these programs without the benefit of research and data documenting the scope and nature of the problem in their community, the weakness of past response models, and the relative importance of specific program features.

To ensure law enforcement policies and practices related to people with mental illnesses are data driven and well-informed, this guide summarizes the available research on law enforcement encounters with people with mental illnesses and strategies to improve these interactions.

### Encounters Between Law Enforcement and People with Mental Illnesses

Officers' encounters with people with mental illnesses are relatively infrequent, but they can be particularly challenging. These encounters

- often take much more time than other calls for service,

- require officers to have special training and skills,

- may depend on the availability of community mental health resources for successful outcomes,

- typically involve repeat contacts with the same individuals who have unresolved mental health needs,

- are mostly in response to a person with mental illness committing a minor or "nuisance" offense,

- occasionally involve volatile situations, risking the safety of all involved.

Officers generally have broad discretion in how they address minor offenses, or calls when no crime has been committed but citizens or business owners want them to "do something" about an individual whose actions are causing concern. Officers handle a majority of these incidents informally by talking to the person at the scene without taking him or her into custody. These encounters provide officers an opportunity—sometimes missed—to link individuals to effective interventions, which may prevent subsequent law enforcement encounters.

## Specialized Law Enforcement Strategies

Law enforcement–based specialized responses can create positive changes for all individuals involved, including the following:

- *improving* officer safety

- *increasing* access to mental health treatment, supports, and services

- *decreasing* the frequency of these individuals' encounters with the criminal justice system

- *reducing* certain costs incurred by law enforcement agencies

## Future Research Topics and Implications for Policy and Practice

The research presented in this guide is a useful foundation for making data-informed decisions about policies and practices related to law enforcement encounters with people with mental illnesses. But it is just that—a starting point. It does not negate the need for each community to conduct an analysis of its unique strengths and challenges. Once policymakers identify programmatic goals that specifically respond to the findings from this analysis, they can design, implement, or modify a program that best fits their community's needs. A research-based response will support program sustainability and help achieve systemwide efficiencies when people with mental illnesses are prevented from cycling through the criminal justice system.

# Acknowledgments

This report could not have been written without the support and leadership of the John D. and Catherine T. MacArthur Foundation and, in particular, Program Associate Steven Casey. His guidance was instrumental in framing the issue and ensuring the document's relevance to the field.

The National Institute of Mental Health (NIMH), National Institutes of Health, U.S. Department of Health and Human Services, also provided support for the initial meeting of researchers and for the development of early document drafts. Ms. Denise M. Juliano-Bult of NIMH's Services Research and Clinical Epidemiology Branch was especially helpful during this critical phase of the project.

Thanks are also due to the members of the project advisory board.* These leading researchers, practitioners, and policymakers (listed alphabetically below) provided early guidance on the implications of the research and the framework of the document.

- Mr. Stephen Baron, Director, *District of Columbia Department of Mental Health*
- Dr. Gary Cordner, Professor, *College of Law Enforcement, Eastern Kentucky University*
- Dr. Jeffrey Draine, Associate Professor, *School of Social Policy and Practice, University of Pennsylvania*
- Mr. Robert Hendricks, Acting Senior Policy Advisor for Mental Health, *Bureau of Justice Assistance, Office of Justice Programs, U.S. Department of Justice*
- Mr. Adam Kirkman, Project Associate, *Policy Research Associates, Inc.*
- Officer Joan M. Logan, Crisis Intervention Team Coordinator, *Montgomery County (Md.) Police Department*
- Ms. Susan E. Salasin, Public Health Advisor, *Center for Mental Health Services, Substance Abuse and Mental Health Services Administration, U.S. Department of Health and Human Services*
- Dr. Melissa Schaefer Morabito, Postdoctoral Research Fellow, *Center for Mental Health Services and Criminal Justice Research, Rutgers University and the University of Pennsylvania*
- Dr. Henry J. Steadman, President, *Policy Research Associates, Inc.*
- Dr. Jennifer Teller, Professor, *Department of Sociology, Kent State University*
- Dr. Amy C. Watson, Assistant Professor, *Jane Addams College of Social Work, University of Illinois at Chicago*

Special thanks must also be given to Council of State Governments Justice Center Director Michael Thompson, Health Systems and Services Policy Director Fred Osher, and Consensus Project Director Nancy Fishman for their leadership in shaping the scope and direction of this publication and ensuring its value to policymakers. Justice Center Director of Communications Martha Plotkin was instrumental at each phase of development; her input made this a more reader-friendly and useful contribution to the field.

*Advisory board members' titles and agency affiliations reflect the positions they held at the time of their involvement with the project.

# Introduction

**"Mentally Ill Man with Gun is Shot and Killed by Police"**[1]
**"Bed Shortage Forces…County Mental Health Staff to Rely on Police"**[2]
**"Mom Knows Anguish of Calling Police to Deal with Mentally Ill Son"**[3]

Headlines such as these appear every day in newspapers across the country. The stories focus on safety issues when law enforcement officers encounter an individual whose behavior appears to be related to a mental illness. They also focus on how officers come in contact with the same person with mental illness again and again, often without positive results. They all express a common theme: the complex nature of law enforcement responses to people with mental illnesses has become an issue of national concern, and policymakers, community leaders, and the public are increasingly demanding improved outcomes.

In the face of mounting pressure and the desire to better serve people with mental illnesses, law enforcement officials are turning to specialized responses to people with mental illnesses. In these programs—the most common of which is known as a Crisis Intervention Team (CIT)—law enforcement agencies partner with mental health and community groups to train police responders to use crisis de-escalation strategies and to prioritize treatment over incarceration when appropriate. Although specialized responses are relatively new, hundreds of communities have implemented them since they first appeared in the 1980s.*

Specialized responses increasingly are regarded as having great potential to improve law enforcement encounters with people with mental illnesses. However, they generally are developed without the benefit of research and data documenting the scope of the problem they are designed to address, the weaknesses of the traditional response, and the relative importance of specific program features. Rather, they have spread as many such innovative practices do: practitioners and advocates provide anecdotal information attesting to the need and effectiveness of the programs and then work with policymakers to adapt other jurisdictions' successes. This "from-the-ground-up" process may be appropriate for initial innovators, but, ultimately, programs developed based on data and research are more effective and easier to sustain.

Modest research on law enforcement encounters with people with mental illnesses and specialized responses does exist. As national attention to this issue has grown, so too has the pool of studies examining the various aspects of these approaches; however, there are still relatively few comprehensive or in-depth studies. In addition, as more and more communities implement the CIT model and other types of responses, an increasing number of local law enforcement agencies and their research partners have collected data to inform their own program's development. Unfortunately, the results often present an incomplete or complex story that does not necessarily translate into clear policy recommendations.

---

*Agencies engaged in "law enforcement–based" responses to people with mental illnesses have implemented programs that require significant changes in law enforcement department policies and procedures. This guide does not examine practices that rely solely on mental health agencies to respond to incidents involving people with mental illnesses.

In response to these perceived gaps, this guide summarizes and helps translate the available research on law enforcement encounters involving people with mental illnesses and strategies to improve these encounters. Based on an extensive review of the research by experts in the field, this document presents illustrative examples from a range of studies representing diverse perspectives on this subject. It is not meant to be an exhaustive inventory of the literature, but rather a guide to what the research tells us about law enforcement's response to people with mental illnesses, with support from studies that reflect the body of knowledge in that area. This guide also outlines questions left unanswered by current research. In so doing, the intention is to make sense of the information in a way that will inform policy and program design decisions and suggest future topics for researchers to explore. This guide is divided into three sections.

- Section One: Encounters Between Law Enforcement and People with Mental Illnesses explores the extent, nature, and outcomes of law enforcement interactions involving people with mental illnesses. The data demonstrate the scope of the problem and illustrate the challenges and risks involved with these incidents.

- Section Two: Specialized Law Enforcement Strategies examines a range of law enforcement responses specially designed to improve officers' encounters with people with mental illnesses

and their outcomes. The data provide readers with the context to understand the impact of these strategies on communities and the potential effects on officers' attitudes.

- Section Three: Future Research Topics and Implications for Policy and Practice highlights the gaps in the current body of research that could help law enforcement better design its programs and policymakers determine how best to allocate resources that would support these efforts. It also outlines the implications of the findings presented in this guide for policy and practice.

Each section is organized around the questions policymakers most often pose, and, in Sections One and Two, the guide provides succinct answers that draw on existing research.

The policy statements summarizing the research were developed with a group of experts—leading researchers, law enforcement and mental health practitioners, and policymakers—who participated in an advisory panel to provide input on which studies to include, how to interpret the research, and the implications for policy development. With their help, this document is meant to bridge the gap between research and practice, and to provide a springboard for policymakers interested in supporting research-based practices.

## Limitations and Details of the Research

**THE AUTHORS DID NOT APPROACH THIS PROJECT WITH DEFINED CRITERIA** for "acceptable" research methodologies, but chose to include data derived using a wide variety of methodologies, some more rigorous than others. Because of the varied design sophistication, findings reflect a range of validity and generalizability, and readers are urged to consider a specific study's methodology when extrapolating from these data.

This document presents the most recent data available. Certain topics and questions have not been explored in depth in the past decade, so some studies from the 1980s and 1990s are included to provide a thorough picture of the scope of research. The time period can be an important factor when considering relevance, and readers should take this into account when examining the findings.

For more information about the challenges and apparent inconsistencies of law enforcement research, see Appendix A.

## SECTION ONE

# Encounters Between Law Enforcement and People with Mental Illnesses

*Law enforcement encounters with people with mental illnesses are relatively infrequent, but they can be disproportionately time-consuming and complex. They often involve repeat contacts with individuals suspected of low-level crimes or exhibiting nuisance behavior, without positive outcomes. Some encounters do involve volatile situations that may place officers, the person with mental illness, and others at risk.*

Law enforcement officers engaged in today's community policing efforts inevitably provide citizens with services that go well beyond enforcing laws or maintaining public safety and order. Law enforcement officers are first-line, around-the-clock, emergency responders, mediators, referral agents, counselors, youth mentors, crime prevention actors, and much more. Among their growing list of responsibilities is the need to effectively respond to people with mental illnesses. All too often, individuals' inadequately treated mental illnesses are manifested in ways that can result in their contact with law enforcement—sometimes with tragic results. How law enforcement responds to these individuals can have a tremendous impact on how encounters are resolved and what future these individuals can expect. Law enforcement's actions and perceptions often determine whether the individual will find much-needed treatment, continue in his or her current situation, or enter the criminal justice system.

Experience in the field has led frontline officers to acknowledge they need more resources and training to respond to these challenging calls. Experts in the mental health field—including practitioners, advocates, and individuals with mental illnesses and their families—agree and can offer broad anecdotal support. Policymakers, however, need more than personal experiences; they need data that quantify the nature and extent of the problem in order to commit resources and energy toward a potential response. This section highlights the research available to address this need by exploring the scope and scale of law enforcement encounters with people with mental illnesses.

## Trends of People with Mental Illnesses in the Criminal Justice System

**FEW INSTITUTIONS HAVE ATTEMPTED SO COMPLETE** a change in recent years as has the United States' mental health system. In 1964, driven in part by fiscal reality, political realignment, philosophical shifts, and medical advancements, Congress passed the Community Mental Health Centers Act. Since then, the system has shifted its emphasis almost entirely from institutional care and segregation to providing community-based support for individuals with mental illnesses. In 1955, there were 339 state psychiatric beds for every 100,000 people in the population. By 2005, this number had dropped to 17 per 100,000.[4] This process is referred to as "deinstitutionalization."

Some observers suggest that deinstitutionalization is a main cause of the increased number of people with mental illnesses in contact with the criminal justice system. In fact, no study has definitively shown a transition of this population from mental health institutions to jails and prisons. Other trends in criminal justice and mental health policy—for example, higher arrest rates for drug offenses and underfunded community-based treatment—are likely to account for this population's increasing contact with law enforcement, courts, and corrections.

# Research Findings

## 1. What types of encounters do law enforcement officers have involving people with mental illnesses?

**a. The *majority* of law enforcement encounters with people with mental illnesses are with individuals suspected of committing *low-level, misdemeanor crimes*, or who are exhibiting nuisance behavior.\* Law enforcement may receive calls when a business owner or community member wants officers to "do something" about a person—whether or not a crime was committed.**

- Based on 148 contacts between police and people believed to have mental illnesses during one month in 1994 in Honolulu (Hawaii) city and county, officers determined that the majority of individuals either had committed no criminal offense (45.3 percent) or had exhibited disorderly conduct (27.7 percent). The person's conduct most frequently included "loud or obnoxious behavior" or "untidiness."[5]

- In a study conducted in a large Midwestern city in 1980 and 1981, the majority (71 percent) of police encounters with people who were "mentally disordered" involved individuals known to officers either as "neighborhood characters," "troublemakers," or "relatively unobtrusive" individuals.[6]

**b. Law enforcement officers encounter people with mental illnesses at risk of harming themselves.**

- In the first nine months of 2006, the Los Angeles (Calif.) Police Department made 46,129 contacts with people suspected of having a "mental disorder." Of those, 709 had attempted suicide and 4,686 were taken into custody for an emergency evaluation.[7]

- The Albuquerque (N.Mex.) Police Department's CIT program reported that in one year 15 percent of CIT calls involved individuals attempting suicide, and 30 percent involved individuals threatening suicide.[8]

### Understanding "Suicide-by-Cop"

**A 2006 LITERATURE REVIEW** determined that available data on incidents in which individuals intend to end their own lives by engaging in criminal behavior to prompt a lethal response by law enforcement officers—known colloquially as "suicide-by-cop"—are too flawed by methodology to provide a reliable understanding of this phenomenon. However, when considered in its entirety, the body of research *does* suggest that a mental illness and history of substance abuse, coupled with substance use at the time of the incident, are relevant factors in these events.[9]

---

\*"Nuisance behavior" refers to those actions that violate community norms by causing damage, annoyance, or inconvenience. Examples include public drunkenness and loitering.

**c. Of all calls for service involving people believed to have mental illnesses, law enforcement officers encounter individuals at risk of harming someone else relatively infrequently.**

- The Albuquerque (N.Mex.) Police Department's CIT program reported that in one year 14 percent of calls for service involved a suspect possessing a weapon.[10]

- Police officers in Honolulu (Hawaii) city and county noted that a person's behavior was "assaultive or violent" in 12.2 percent of their 148 encounters with people believed to have mental illnesses.[11]

## Understanding Mental Illness and Violence*

**THE STEREOTYPE THAT PEOPLE WITH MENTAL ILLNESSES** are more likely than the general population to be violent is not fully supported by the evidence.[12] Several large-scale research projects found a weak statistical association between mental illness and violence.[13] The association becomes stronger, however, when a person with a mental illness has a co-occurring substance use disorder and/or is not taking his or her medication.[14] Still, it is important to note that research focusing solely on people with mental illnesses who were involuntarily committed to a psychiatric facility may distort the relationship between violence and mental illness as these individuals represent only a small fraction—the most severely ill—of this group.[15]

Although data are scarce on the precise number of law enforcement field contacts with someone with a mental illness who is exhibiting violent or aggressive behavior, research shows that officers do respond to calls for service that involve people with mental illnesses whose violent behavior is at issue.[16] For law enforcement policymakers, the critical question is not whether people with mental illnesses are dangerous, but how best to maintain safety when violent or dangerous behavior results in calls to law enforcement.

## 2. What is the extent of law enforcement officers' encounters with people with mental illnesses?

**a. A relatively small percentage of total law enforcement contacts are in response to calls that involve individuals who officers believe have mental illnesses.**

- In a six-year period (1998–2004), the Akron (Ohio) Police Department responded to 10,004 calls related to a "mental disturbance." This represents 6.55 percent of the total call load (1,527,281 calls) during that period.[17]

- Approximately 12,000 emergency calls for service to the Los Angeles (Calif.) Police Department (2.3 percent) annually are coded as "mental disturbance calls."[18]

---

*This sidebar was adapted from Reuland, M., "Police Use of Force and People with Mental Illness." In J. Ederheimer (Ed.) *Strategies for Resolving Conflict and Minimizing Use of Force*. Washington, DC: Police Executive Research Forum, 2007.

- Three percent of more than 12,000 police field encounters in two large cities involved someone who was "mentally impaired."[19]
- In 174 U.S. police departments serving more than 100,000 people examined in 1998, approximately seven percent of all police contacts—including both investigations and complaints—involved a person believed to have a mental illness.[20]

## b. Law enforcement officers *repeatedly respond to a small subset of individuals* whom they believe have mental illnesses.

- Twenty percent of 507 calls for service identified as involving a person with a mental illness in one year in Lexington (Ky.) occurred in just 17 locations; police responded to each of the 17 locations three or more times in that year.[21]
- In Santa Fe (N.Mex.), an analysis of a random sample of individuals taken into police custody—either through arrest, protective custody (for example, for intoxication) or involuntary mental health hold— indicates that people detained due to mental health or substance use problems generated significantly more police contacts during the two-year study period than did those without ascertainable mental health or substance use disorders. Individuals who had multiple prior detentions for mental health or substance abuse problems or prior treatment for those problems were significantly more likely to be taken into custody—either through arrest or involuntary hold—in the future.[22]
- The Los Angeles (Calif.) Police Department identified 67 people with mental illnesses who had a minimum of five contacts with law enforcement during the first eight months of 2004. This resulted in a total of 536 calls for service during this time period.[23]
- In 148 incidents involving people believed to have mental illnesses, police officers in Honolulu (Hawaii) city and county "recognized the person on sight" in 94 of these encounters.[24]

## c. Although the amount of time varies by disposition, officers can spend significant time trying to resolve situations involving people with mental illnesses, during which they cannot respond to other calls for service. The most time-consuming disposition is when law enforcement transports an individual to an emergency medical facility and waits for medical clearance or admission.

- The Lincoln (Neb.) Police Department handled more than 1,500 "mental health investigation cases" in 2002 and found that it spent more time on these cases than on injury traffic accidents, burglaries, or felony assaults.[25]
- Officers in Honolulu (Hawaii) spent a significant amount of time resolving incidents involving people believed to have mental illnesses, varying by disposition. When transporting a person to a hospital for an emergency evaluation, the officer spent an average of 145 minutes on the incident. When arresting a person with a mental illness, the officer spent an average of 64.2 minutes on the incident. When officers executed informal dispositions, incidents were resolved in 23.3 minutes on average.[26]
- The Los Angeles (Calif.) Police Department reported spending more than 28,000 hours a month on calls involving people with mental illnesses.[27]
- In 1986, a suburban Colorado police department reported spending an average of 74 minutes addressing each of the 60 "mental health-related calls" studied.[28]

## 3. What are the outcomes of law enforcement officers' responses to people with mental illnesses?

### a. Though violent outcomes are relatively rare, law enforcement has reported that these encounters can present risks for all involved.

- According to FBI Uniform Crime Reporting statistics, during a ten-year period (1997–2006) 1,058 officers were assaulted and 13 officers feloniously killed in the line of duty when "handling persons with mental illnesses." This represents approximately 1.8 percent of all assaults and 2.3 percent of felonious killings during this period.[29]

- In the Police Executive Research Forum (PERF) 2004 study of 28 police departments with specialized responses to people with mental illnesses, nearly half of the departments reported that a tragic incident involving a person with a mental illness served as a main impetus for developing the program.[30]

- Officers surveyed in a study on police use of force considered "mentally impaired" people significantly more "threatening" during arrests and "required more effort to arrest," but did *not* consider this population more likely than individuals without "mental impairments" to inflict injury on officers.[31]

### b. Officers handle a majority of incidents informally by talking to the people with mental illnesses, without taking them into police custody or connecting them to treatment.*

- Seventy-two percent of situations involving a person believed to have a mental illness in Honolulu (Hawaii) were handled informally by "counseling and releasing" the individual at the scene (52 percent) or with "no action" (20 percent).[32]

- Findings from an observational study conducted in a large Midwestern city in 1980 and 1981 demonstrated that officers handled informally more than 70 percent of incidents involving people with mental illnesses.[33]

### c. Officers sometimes take people with mental illnesses into custody, either in the course of an arrest or to provide transportation to a medical facility. The frequency of custodial actions varies by jurisdiction.

- Of calls for service involving someone with a mental illness during the two years before implementing a CIT program, police officers in the Akron (Ohio) Police Department executed an arrest in three percent of the calls and transported an individual to an emergency psychiatric facility in 26 percent of the calls.[34]

- Law enforcement officers in Florida transported more than 40,000 people with mental illnesses for involuntary 72-hour psychiatric examinations under the Baker Act—the state's emergency evaluation statute—in 2000. This exceeded the number of arrests in the state during the same period for either aggravated assault (39,120) or burglary (26,087).[35]

- Officers in Honolulu (Hawaii) made an arrest in 14.9 percent of incidents involving individuals believed to have mental illnesses. Officers were significantly more likely to arrest a person suspected of committing a misdemeanor *and* known to have a criminal history.[36]

*Informal actions in which the individual is not linked to services may be a contributing factor in repeat calls for service.

## SECTION TWO

# Specialized Law Enforcement Strategies

*Law enforcement–based specialized response programs have been shown to improve officer safety; increase access to mental health treatments, supports, and services; decrease the frequency of these individuals' encounters with the criminal justice system; and reduce certain costs incurred by law enforcement agencies.*

Since the 1980s, law enforcement agencies have increasingly collaborated with mental health providers and advocates to design specialized responses to people with mental illnesses. In a 1996 survey of specialized law enforcement–based response programs (which studied U.S. law enforcement departments serving populations greater than 100,000), the authors identified two primary response models. The first type trains sworn officers to provide crisis intervention services and act as liaisons to the formal mental health system; the Crisis Intervention Team (CIT) model, pioneered in Memphis (Tenn.), fits into this category. The second type partners mental health professionals with law enforcement at the scene to provide consultation on mental health-related issues and assist individuals in accessing treatments and supports; this strategy is commonly referred to as the co-responder model. Since both models first emerged, the number of such specialized programs has grown from fewer than 30 reported in the 1996 survey to more than 1,050 agencies today.

### Calculating the Number of Law Enforcement Agencies with Specialized Response Programs

**ESTIMATES OF THE NUMBER OF LAW** enforcement agencies with specialized programs vary widely. The CIT Center at the University of Memphis places the number at around 1,050 communities, but others have estimated far fewer.[37] Differences likely stem from two factors. First, those based on an online survey, such as the one from the Criminal Justice/Mental Health Information Network (www.cjmh-infonet. org) coordinated by the Council of State Governments Justice Center, includes only law enforcement agencies that submitted a survey.* Second, "program" can be defined differently. Smaller estimates may refer to agencies with fully implemented programs; larger numbers may include agencies just beginning program implementation.

*The Criminal Justice/Mental Health Information Network (InfoNet), coordinated by the Council of State Governments Justice Center, includes examples of law enforcement–based specialized response programs throughout the United States.

Although research has not yet documented which program features are most critical to a successful program, agencies involved with specialized response programs report that certain key components of their programs contribute to their success, including strong collaborative ties between law enforcement and mental health service providers and a broad range of training for all relevant personnel.[38] Another study suggests jurisdictions must have a "specialized crisis response site" to which officers can transport people for formal mental health assessment. This allows law enforcement officers a quick turnaround, minimizing the time they spend resolving these encounters.[39]

---

### Understanding Specialized Responses: A Bureau of Justice Assistance, U.S. Department of Justice, Toolkit

**THE COUNCIL OF STATE GOVERNMENTS JUSTICE CENTER** and Police Executive Research Forum (PERF) developed a series of resources that foster improved law enforcement responses to people with mental illnesses. One of these practical materials is *The Essential Elements of a Specialized Law Enforcement–Based Program,* which describes the 10 critical features in any successful law enforcement–led response.*

Other resources include a guide for overcoming common barriers to effective law enforcement training on mental health responses, web-based information and peer-to-peer learning opportunities (available on the InfoNet, www.cjmh-infonet.org), and case studies of statewide efforts to improve law enforcement responses to people with mental illnesses. At this writing, an additional product in development examines jurisdictions that designed law enforcement programs that have been tailored to unique challenges and community supports and services.

---

*The findings in this document were corroborated through a consensus-based project that resulted in the *Essential Elements* (Schwarzfeld, Reuland, and Plotkin 2008) and involved multiple reviews by expert policymakers and practitioners in several disciplines.

The *Essential Elements* and related resources were supported by the Bureau of Justice Assistance, U.S. Department of Justice, and are available online at the Justice Center's Consensus Project website, www.consensusproject.org/issue-areas/law-enforcement.

# Research Findings

## 1. What is the impact of specialized law enforcement responses to people with mental illnesses?

### a. Departments employing specialized responses to people with mental illnesses experience *decreased* injuries to officers.

- The San Jose (Calif.) Police Department's CIT program reported a 32 percent decrease in officer injuries in the year following program implementation.[40]

- The Memphis (Tenn.) Police Department reported that in the three years before implementing a CIT program the rate of injuries to officers responding to "mental disturbance calls" was 0.035 per 1,000 events (equal to one in 28,571 events). In the three years following program implementation, this rate decreased to 0.007 per 1,000 events (equal to one in 142,857 events). Other types of disturbance calls, including domestic violence calls, did not show a similar trend during this period.[41]

### b. Specialized responses *increase* the frequency with which law enforcement officers transport individuals to mental health facilities for evaluations and treatment, resulting in greater access to needed crisis and noncrisis supports and services.

- In a study comparing the outcomes of calls handled by CIT-trained officers with those handled by non-CIT trained officers in the Akron (Ohio) Police Department, CIT-trained officers transported people with mental illnesses to psychiatric emergency services significantly more often than their non-CIT trained counterparts.[42]

- The Memphis (Tenn.) Police Department's CIT program reported that during its first four years, the rate of referrals by law enforcement officers to the regional psychiatric emergency service increased by 42 percent.[43]

- A three-city analysis comparing dispositions by responders in a CIT program, a co-responder program, and a mobile crisis team revealed that officers in a police-based response were more likely than other officers to transport individuals to mental health services or treatment and to resolve fewer incidents informally.[44]

- In a four-site study comparing outcomes for individuals diverted by police with those for individuals not diverted, diverted individuals had greater access to mental health crisis services: 31.6 percent of men and women diverted used emergency room (ER) services and 35.6 percent used hospital services. Of the nondiverted group, 25.7 percent used ER services and 20.6 percent used hospital services. Diverted individuals likewise had greater access to noncrisis services: 81.6 percent received medication and 57.5 percent received counseling. Of nondiverted individuals, 72.7 percent received medication and 55.3 percent received counseling.[45]

**c. Individuals referred to mental health treatment by law enforcement officers experience fewer subsequent contacts with the criminal justice system than individuals who were not referred to services.**

- In an article summarizing studies of one-year outcomes of pre- and postarrest diversion programs, diverted individuals with mental illnesses spent more time in the community without a related increase in arrests.[46]

**d. Specialized law enforcement–based response programs have mixed effects on the frequency with which law enforcement officers arrest people believed to have mental illnesses.**

- A study that compared the outcomes of calls handled by CIT-trained officers with those handled by non-CIT officers in the Akron (Ohio) Police Department showed no difference between the two groups in numbers of arrests.[47]
- In a study examining two specialized police-based programs (CIT and co-response) in police departments in Memphis (Tenn.) and Birmingham (Ala.), arrest rates of people with mental illnesses were two percent and 13 percent, respectively.[48] These rates can be compared with an earlier study that noted a 16 percent arrest rate in a different community without a specialized police program.[49]

**e. Specialized responses reduce certain costs incurred by law enforcement agencies, including high-cost SWAT call-outs.**

- In studies of outcomes of pre- and postarrest diversion programs, diverted individuals with mental illnesses incurred lower criminal justice costs and greater treatment costs than those who were not diverted.[50]
- The number of Tactical Apprehension Containment Team (TACT, similar to SWAT) calls in the Memphis (Tenn.) Police Department has decreased by nearly 50 percent since the implementation of its CIT program.[51]
- Since the implementation of CIT in the Albuquerque (N.Mex.) Police Department, the use of SWAT teams involving a mental health crisis intervention has decreased by 58 percent.[52]

## 2. What is the impact of training on law enforcement officers' attitudes toward people with mental illnesses?

**a. Specialized training improves officers' understanding of mental illness and the effects of mental illness on an individual's behavior.**

- CIT training for law enforcement officers reduces "stigmatizing attitudes" toward people with schizophrenia.[53]

## SECTION THREE

# Future Research Topics and Implications for Policy and Practice

There is still a lot to learn about law enforcement encounters with people with mental illnesses and specialized responses. The research findings in Section One illustrate the need for more information on law enforcement responses to people with mental illnesses, and, although Section Two highlights some promising specialized practices, many gaps in the knowledge base remain. This section highlights some of those major knowledge gaps and discusses how the state of the research affects policy and practice.

## FUTURE RESEARCH TOPICS

The research presented in this guide provides a strong start to the study of law enforcement encounters with people with mental illnesses. However, when considered as a whole, the body of research also clearly reveals important gaps in the knowledge base. To obtain a more complete national picture of these complicated encounters, researchers must drill down into the specifics of these interactions and their outcomes. (For readers interested in a more detailed potential research agenda, see Appendix B.)

- Although research to date indicates injury is an atypical outcome of these encounters, what is the rate of injury to the officer, the person with mental illness, and bystanders across a broad and diverse sample of jurisdictions?

- Law enforcement encounters involving people with mental illnesses as offenders appear to be relatively infrequent, but how often do officers encounter people with mental illnesses as crime victims?

- Connection to mental health treatment services can be an appropriate diversion for people suspected of committing low-level, nuisance offenses, but what can the mental health system do to improve the efficiency and effectiveness of this connection?

## A Call for Prospective Research

MOST OF THE RESEARCH HAS BEEN "RETROSPECTIVE," relying on information about past experiences. In contrast, "prospective research" assesses a program's impact by examining data collected before, during, and after implementation of a given program. Data from prospective research are generally more reliable in assessing whether a program is effecting the positive outcomes it seeks, as they provide more accurate, consistent, and objective findings. The body of literature on law enforcement–based specialized responses would benefit from methodologically rigorous, prospective research designs that would examine the questions outlined here.

- Once an agency implements a specialized response program, what information does it need to collect to sustain it, and what are the best methods to carry out the process?

These questions represent just a few of the many holes in the research that, if filled, can build on the valuable foundation provided by research efforts to date and help guide policy-makers and practitioners in their efforts to improve law enforcement interactions involving people with mental illnesses.

## IMPLICATIONS FOR POLICY AND PRACTICE

The information in this guide can provide a concise orientation to the issue and help policy-makers and practitioners interested in developing research-based arguments adopt or change pro-grams. As the findings suggest, law enforcement encounters with people with mental illnesses present a wide range of challenges, and, although there is no single solution, specialized response programs and training can increase positive outcomes.

A pervasive limitation of the research presented in Sections One and Two is that the results may not be generalized to other jurisdic-tions. This lack of universal applicability of the findings suggests that each community needs to study and examine its own unique circumstances when developing or enhancing a specialized response program. No two communities are identical, and, although this research provides a broad understanding of some common issues many communities face, it does not obviate the need for an in-depth review of local problems and resources to address them. When deciding to design a specialized response program, policy-makers must take into account a variety of issues that can affect program design.*

- What is the impetus for change in the community (for example, to reduce injuries or repeat calls for service)?

- What characteristics of the jurisdiction make it unique (for example, demographics or geographic distribution of resources)?

- What mental health resources are available in the community?

The research presented in this guide plays an important role in framing the discussion about improving public safety, officer safety, and out-comes for people with mental illnesses, but it is still not well developed and should be just a start-ing point for community problem-solving efforts. Once policymakers identify programmatic goals that are specific to their community's needs and resources, they can use the data collected by law enforcement, mental health practitioners, and others to supplement the research done to date. They can then consider the full range of strategies to achieve their goals and plan or modify a pro-gram to achieve desired outcomes.

---

*The Justice Center and PERF are developing a resource that examines jurisdictions that have developed a law enforcement program tailored to their unique challenges and strengths. This product will be part of the suite of materials developed with support by the Bureau of Justice Assistance, and is described in more details in the sidebar "Under-standing Specialized Responses: A Bureau of Justice Assistance, U.S. Department of Justice, Toolkit," on p. 10.

# Conclusion

The current body of research provides a window into how specialized law enforcement responses to people with mental illnesses can contribute to greater safety for all those involved in encounters and provide better long-term results. Though study design issues—such as sampling, methodology, and reporting errors—require cautious interpretation of the results, the findings can begin to inform defensible policy and practice.

Circumstances do not always allow time for policymakers to thoroughly investigate a problem in their community before responding; tragic incidents can require quick decisions. This guide can help ready policymakers for a quick, responsible response and assist them in communicating the research-based benefits of instituting a specialized law enforcement response to people with mental illnesses. It can also justify the investment of resources in determining the scope of the problem in a particular jurisdiction. Once the decision to explore a specialized response is reached, the additional resources described in this guide can help jurisdictions understand the essential elements and particular considerations for any successful initiative. Although there is still much more information needed to guide decision-making, researchers and practitioners who have contributed to the current body of knowledge have put us on track to create collaborative law enforcement strategies that are based on the best thinking and evidence available. With the proper leadership at all levels of government, that work can be continued and carried out in jurisdictions across the United States.

# Appendix A
# Understanding Apparent Inconsistencies in Law Enforcement Research

Researchers face many challenges when trying to explore and evaluate law enforcement practices and policies. Specifically, when studying law enforcement encounters with people with mental illnesses, a researcher must first define *mental illness*. The difficulty of this task is illustrated by the inconsistent ways the studies cited in this guide define and describe mental illnesses. Studies that use existing law enforcement agency data typically use nonclinical terms and often describe individuals "*believed* to have a mental illness," based on an officer's impression. Studies that use data beyond existing law enforcement reports tend to use more refined definitions. Similarly, language used to describe mental illnesses differs in communities and across the country and has changed over time. Throughout this guide, the authors preserve both the original definitions and language used by researchers.

Another obstacle that researchers face is deciding how to measure outcomes, or what the policy is trying to address, such as changes in arrest rates, calls for service, or total law enforcement contacts. Listed below are a few possible outcome measures and the difficulties associated with each option.

**Arrest rates:** The arrest rates for people with mental illnesses range from three to 16 percent. The different policies that govern officer decision-making in certain arrest situations could explain this broad range. Some jurisdictions mandate arrest in certain situations, whereas others provide more discretion to responding officers. This difference in policies can have a major impact on officers' handling of calls in which mental illness may be a factor and, consequently, on arrest rates.

**Calls for service:** Data on the number of calls for service coded as potentially involving a person with a mental illness exclude field contacts that are not the result of an actual call for service (such as street encounters), calls inaccurately coded (logged as a trespass but not involving a person with mental illness), or incidents that responding officers could categorize as involving a person with mental illness only at the completion of the call (a call for service is often not recoded to indicate the encounter did in fact involve a person believed to have a mental illness). As a result, using calls for service data likely underestimates the frequency of law enforcement encounters with people with mental illnesses.

**Total law enforcement contacts:** When comparing different data illustrating the percentages of law enforcement encounters involving a person with a mental illness compared with all law enforcement encounters, it is important to understand how different studies define "law enforcement encounters." For example, the authors from one study refer to the total number of calls for service, whereas another pair of authors considers calls for service in addition to other types of contacts, such as officers observing behaviors while on patrol. Both methods are valid, but may still yield different results.

Some of the findings presented in this guide may appear contradictory or inconsistent because of the reasons described above and other variations in terminology and methodology. This does not mean only one set of findings is accurate, but rather that readers should take into account differences of time, place, and methodology, and how these factors can affect study outcomes. For those interested in reading more about a given study, refer to the Bibliography for the original research citation information.

# Appendix B
# Detailed List of Research Questions

These research questions are not an exhaustive list of potential avenues for new study, but rather are illustrative of the direction new efforts might take. The authors identified these questions following discussions with consultants and reviewing the data that are currently available. These questions remain largely unanswered by the extant literature.

1. **Information needed to better understand law enforcement encounters involving people with mental illnesses:**

   a. What is the frequency of law enforcement encounters with people with mental illnesses as the victims, not perpetrators, of crime?

   b. What measures can be collected to better identify the full scope and nature of all law enforcement interactions with people with mental illnesses?

   c. How often are people injured—the officer, the person with mental illness, a bystander—as a result of a law enforcement encounter involving someone with a mental illness, and in what circumstances?

2. **Information needed to guide specialized response program development in a given jurisdiction:**

   a. What aspects of community collaboration are most effective in developing these specialized programs (e.g., number and type of partners, meeting structures, participant activities, accountability measures, group processes)?

   b. What elements of the specialized response program are critical to the program's success given a community's unique characteristics?

   c. How can rural jurisdictions adapt specialized response models to be effective in their community, particularly with limited access to local mental health resources? And what about very large urban jurisdictions' special concerns?

3. **Information needed to better understand the training involved with a specialized response program:**

   a. What type and amount of training is most effective in changing officer attitudes and behavior on scene?

   b. How does the quality of dispatch information affect the response?

   c. What portion of the law enforcement agency should receive what level of training to be most effective?

   d. What training protocol is most effective in ensuring an officer trained in de-escalation is on scene quickly given local agency and community factors—training all patrol officers extensively, training only a subset of officers extensively, or training all officers with de-escalation techniques while a subset receives more intensive training?

**4. Information needed to better understand the tactics, protocols, and procedures involved in specialized responses:**

   a. What factors influence protocol effectiveness?

   b. What tactics are most effective in safely de-escalating situations involving people with mental illnesses?

   c. What protocols, tactics, or technologies are most effective in safely de-escalating "critical incidents," those involving people with mental illnesses who have weapons or are violent?

**5. Information needed to guide disposition practices and policies:**

   a. What is the range of appropriate dispositions?

   b. What factors affect disposition choice?

   c. What is the safest way to transport people with mental illnesses in police custody that minimizes the stress and stigma of confinement?

   d. What procedures promote safe and efficient custodial transfer at the mental health facility and ensure effective triage and referral?

   e. What are the clinical challenges for people with mental illnesses who are arrested? How can they be minimized?

   f. What police referrals and treatment protocols are associated with long-term wellness and reduced repeat encounters with police?

**6. Information needed to sustain a law enforcement specialized response program:**

   a. What changes are needed in the law enforcement agency's policies, practices, and culture to support the specialized response program and the personnel who further its goals?

   b. What are the financial implications of a specialized law enforcement response?

**7. Information needed to develop or enhance data collection and evaluation practices:**

   a. What information should call takers obtain to facilitate on-scene response?

   b. What information should be maintained in the database to facilitate program evaluation and inform future calls?

# Notes

1. Vargas, *Washington Post,* May 16, 2007.

2. Hennessey-Fiske, *Los Angeles Times,* November 21, 2008.

3. Erwin, *Sacramento Bee,* November 11, 2004.

4. NASMHPD Research Institute. *2006 State Mental Health Agency Profiles*. Alexandria, Va.: October 2007.

5. Green, "Police as frontline mental health workers: The decision to arrest or refer to mental health agencies," 1997.

6. Teplin, "Managing disorder: Police handling of the mentally ill," 1984.

7. Wall, Los Angeles Police Department, personal communication with the author, March 2007.

8. Bower and Petit, "The Albuquerque police department's crisis intervention team: A report card," 2001.

9. McKenzie, "Forcing the police to open fire: A cross-cultural/international examination of police-involved, victim-provoked shootings," 2006.

10. Bower and Petit, "The Albuquerque police department's crisis intervention team: A report card," 2001.

11. Green, "Police as frontline mental health workers: The decision to arrest or refer to mental health agencies," 1997.

12. For a scholarly review, see Harris and Lurigio, "Mental illness and violence: A brief review of research and assessment strategies," 2007.

13. Angermeyer, Cooper, and Link, "Mental disorder and violence: Results of epidemiological studies in the era of deinstitutionalization," 1998.

14. Steadman et al., "Violence by people discharged from acute psychiatric inpatient facilities and by others in the same neighborhoods," 1998; Swartz et al., "Violence and severe mental illness: The effects of substance abuse and nonadherence to medication," 1998.

15. Choe, Teplin, and Abram, "Perpetration of violence, violent victimization, and severe mental illness: Balancing public health concerns," 2008.

16. Panzarella and Alicea, "Police tactics in incidents with mentally disturbed persons," 1997; Solomon, Cavanaugh, and Gelles, "Family violence among adults with severe mental illness," 2005; Swartz et al., "Violence and severe mental illness: The effects of substance abuse and nonadherence to medication," 1998.

17. Teller et al., "Crisis Intervention Team training for police officers responding to mental disturbance calls," 2006.

18. Lodestar, *Los Angeles Police Department Consent Decree Mental Illness Project: Final Report,* 2002.

19. Terrill and Mastrofski, "Situational and officer-based determinants of police coercion," 2002.

20. Deane et al., "Emerging partnerships between mental health and law enforcement," 1999.

21. Cordner, "People with mental illness," 2006.

22. White, Goldkamp, and Campbell, "Co-occurring mental illness and substance abuse in the criminal justice system: Some implications for local jurisdictions," 2006.

23. CSG Justice Center, "Law Enforcement Responses to People with Mental Illnesses: Improving Outcomes," 2008.

24. Green, "Police as frontline mental health workers: The decision to arrest or refer to mental health agencies," 1997.

25. Cordner, "People with mental illness," 2006.

26. Green, "Police as frontline mental health workers: The decision to arrest or refer to mental health agencies," 1997.

27. DeCuir and Lamb, "Police response to the dangerous mentally ill," 1996.

28. Pogrebin, "Police responses for mental health assistance," 1986.

29. U.S. Department of Justice, Federal Bureau of Investigation, *Law Enforcement Officers Killed and Assaulted, 2006,* 2007.

30. Reuland and Cheney, *Enhancing Success in Police-Based Diversion Programs for People with Mental Illness,* 2005.

31. Kaminski, Digiovanni, and Downs, "The use of force between the police and persons with impaired judgment," 2004.

32. Green, "Police as frontline mental health workers: The decision to arrest or refer to mental health agencies," 1997.

33. Teplin, "Managing disorder: Police handling of the mentally ill," 1984.

34. Teller et al., "Crisis Intervention Team training for police officers responding to mental disturbance calls," 2006.

35. McGaha and Stiles, *The Florida Mental Health Act (The Baker Act) 2000 Annual Report,* 2001.

36. Green, "Police as frontline mental health workers: The decision to arrest or refer to mental health agencies," 1997.

37. Cochran, Department of Criminology and Criminal Justice, University of Memphis, personal communication with the author, December 2008.

38. Reuland, *A Guide to Implementing Police-Based Diversion Programs for People with Mental Illness,* 2004.

39. Steadman et al., "A specialized crisis response site as a core element of police-based diversion programs," 2001.

40. Reuland, *A Guide to Implementing Police-Based Diversion Programs for People with Mental Illness,* 2004.

41. Dupont and Cochran, "Police response to mental health emergencies— barriers to change," 2000.

42. Teller et al., "Crisis Intervention Team training for police officers responding to mental disturbance calls," 2006.

43. Dupont and Cochran, "Police response to mental health emergencies— barriers to change," 2000.

44. Steadman et al., "Comparing outcomes of major models of police responses to mental health emergencies," 2000.

45. Steadman and Naples, "Assessing the effectiveness of jail diversion programs for persons with serious mental illness and co-occurring substance use disorders," 2005.

46. Ibid.

47. Teller et al., "Crisis Intervention Team training for police officers responding to mental disturbance calls," 2006.

48. Steadman et al., "Comparing outcomes of major models of police responses to mental health emergencies," 2000.

49. Teplin, "Managing disorder: Police handling of the mentally ill," 1984.

50. Ibid.

51. Dupont and Cochran, "Police response to mental health emergencies— barriers to change," 2000.

52. Bower and Petit, "The Albuquerque police department's crisis intervention team: A report card," 2001.

53. Compton et al., "Crisis intervention team training: Changes in knowledge, attitudes, and stigma related to schizophrenia," 2006.

# Bibliography

Angermeyer, M.C., B. Cooper, and B.G. Link. "Mental disorder and violence: Results of epidemiological studies in the era of deinstitutionalization." *Social Psychiatry and Psychiatric Epidemiology* 33(13): S1–S6, 1998.

Bower, D.L, and G. Petit. "The Albuquerque police department's crisis intervention team: A report card," *FBI Law Enforcement Bulletin* 70: 1–6, 2001.

Choe, J.Y., L.A. Teplin, and K.M. Abram. "Perpetration of violence, violent victimization, and severe mental illness: Balancing public health concerns." *Psychiatric Services* 59: 153–164, 2008.

Cochran (ret), Major Sam. Department of Criminology and Criminal Justice, University of Memphis. Personal communication with the author, December 2008.

Compton, M.T., M.L. Esterberg, R. McGee, R.J. Kotwicki, and J.R. Oliva. "Crisis intervention team training: Changes in knowledge, attitudes, and stigma related to schizophrenia." *Psychiatric Services* 57(8): 1199–1202, 2006.

Cordner, Gary. "People with mental illness." *Problem-Oriented Guides for Police Problem-Specific Guides Series,* 40, U.S. Department of Justice. Washington, DC: Office of Community Oriented Policing Services, 2006.

Council of State Governments Justice Center. "Law Enforcement Responses to People with Mental Illnesses: Improving Outcomes." Webinar broadcast on October 28, 2008.

Deane, M.W., H.J. Steadman, R. Borum, B.M. Veysey, and J.P. Morrissey. "Emerging partnerships between mental health and law enforcement." *Psychiatric Services* 50: 99–101, 1999.

DeCuir, Jr., Walter, and H. Richard Lamb. "Police response to the dangerous mentally ill." *The Police Chief* October: 99–106, 1996.

Dupont, R., and S. Cochran. "Police response to mental health emergencies—barriers to change." *Journal of the American Academy of Psychiatry and Law* 28(3): 228–244, 2000.

Erwin, Diana Griego. "Mom knows anguish of calling police to deal with mentally ill son." *Sacramento Bee,* November 11, 2004.

Green, Thomas M. "Police as frontline mental health workers: The decision to arrest or refer to mental health agencies." *International Journal of Law and Psychiatry* 20: 469–486, 1997.

Harris, A., and A.J. Lurigio. "Mental illness and violence: A brief review of research and assessment strategies." *Aggression and Violent Behavior* 12: 542–551, 2007.

Hennessey-Fiske, Molly. "Bed shortage forces L.A. County mental health staff to rely on police." *Los Angeles Times,* November 21, 2008.

Kaminski, Robert J., Clete Digiovanni, and Raymond Downs. "The use of force between the police and persons with impaired judgment." *Police Quarterly* 7: 311–338, 2004.

Lodestar. *Los Angeles Police Department Consent Decree Mental Illness Project: Final Report.* Los Angeles, Calif.: Lodestar Management/Research, Inc., 2002.

McGaha, Annette C., and Paul G. Stiles. *The Florida Mental Health Act (The Baker Act) 2000 Annual Report.* Florida: Louis de la Parte Florida Mental Health Institute, 2001.

McKenzie, Ian K. "Forcing the police to open fire: A cross-cultural/international examination of police-involved, victim-provoked shootings." *Journal of Police Crisis* 6(1): 5–25, 2006.

NASMHPD Research Institute. *2006 State Mental Health Agency Profiles.* Alexandria, Va.: October 2007.

Panzarella, R., and J.O. Alicea. "Police tactics in incidents with mentally disturbed persons." *Policing: An International Journal of Police Strategies and Management* 20(2): 326–338, 1997.

Pogrebin, Mark R. "Police responses for mental health assistance." *Psychiatric Quarterly* 58: 66–73, 1986.

Reuland, Melissa. *A Guide to Implementing Police-Based Diversion Programs for People with Mental Illness.* Delmar, NY: Technical Assistance and Policy Analysis Center for Jail Diversion, 2004.

Reuland, Melissa, and Jason Cheney. *Enhancing Success in Police-Based Diversion Programs for People with Mental Illness.* Delmar NY: Technical Assistance and Policy Analysis Center for Jail Diversion, 2005.

Schwarzfeld, Matt, Melissa Reuland, and Martha Plotkin. *Improving Responses to People with Mental Illnesses: The Essential Elements of a Specialized Law Enforcement–Based Program.* New York: Council of State Governments Justice Center, 2008.

Solomon, Phyllis L., Mary M. Cavanaugh, and Richard J. Gelles. "Family violence among adults with severe mental illness."

*Trauma, Violence and Abuse* 6(1): 40–54, 2005.

Steadman, H.J., M.W. Deane, R. Borum, and J.P. Morrissey. "Comparing outcomes of major models of police responses to mental health emergencies." *Psychiatric Services* 51(5): 645–649, 2000.

Steadman, H.J., E.P. Mulvey, J. Monahan, P.C. Robbins, P.S. Appelbaum, T. Grisso, L.H. Roth, and E. Silver. "Violence by people discharged from acute psychiatric inpatient facilities and by others in the same neighborhoods." *Archives of General Psychiatry* 55: 393–401, 1998.

Steadman, H.J., and M. Naples. "Assessing the effectiveness of jail diversion programs for persons with serious mental illness and co-occurring substance use disorders." *Behavioral Sciences and the Law* 23(2): 163–170, 2005.

Steadman, H.J., Kristin A. Stainbrook, Patricia Griffin, Jeffrey Draine, Randy Dupont, and Cathy Horey. "A specialized crisis response site as a core element of police-based diversion programs." *Psychiatric Services* 52: 219–222, 2001.

Swartz, M.S., J.W. Swanson, V.A. Hiday, R. Borum, H.R. Wagner and B.J. Burns. "Violence and severe mental illness: The effects of substance abuse and nonadherence to medication." *American Journal of Psychiatry* 155: 226–231, 1998.

Teller, Jennifer L.S., Mark R. Munetz, Karen M. Gil, and Christian Ritter. "Crisis Intervention Team training for police officers responding to mental disturbance calls." *Psychiatric Services* 57: 232–237, 2006.

Teplin, Linda. "Managing disorder: Police handling of the mentally ill." In Linda Teplin (Ed.) *Mental Health and the Criminal Justice System.* Beverly Hills, Calif.: Sage Publications, 1984.

Terrill, W., and S. Mastrofski. "Situational and officer-based determinants of police coercion." *Justice Quarterly* 19: 215–248, 2002.

U.S. Department of Justice, Federal Bureau of Investigation, *Law Enforcement Officers Killed and Assaulted, 2006.* 2007.

Vargas, Theresa. "Mentally ill man with gun is shot and killed by police." *Washington Post,* May 16, 2007.

Wall, Lt. Richard. Los Angeles Police Department. Personal communication with the author, March 2007.

White, Michael, John Goldkamp, and Suzanne Campbell. "Co-occurring mental illness and substance abuse in the criminal justice system: Some implications for local jurisdictions." *The Prison Journal* 86(3): 301–326, 2006.

**Council of State Governments
Justice Center**

100 Wall Street
20th Floor
New York, NY 10005
tel: 212-482-2320
fax: 212-482-2344

4630 Montgomery Avenue
Suite 650
Bethesda, MD 20814
tel: 301-760-2401
fax: 240-497-0568

504 W. 12th Street
Austin, TX 78701
tel: 512-482-8298
fax: 512-474-5011

**www.justicecenter.csg.org**