UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DONNA LOU, ET AL. | * | CIVIL ACTION NO. 21-80 |
| VERSUS | * | SECTION "D" (2) |
| SHERIFF JOSEPH P, LOPINTO, III, ET AL. | * | Judge Wendy B. Vitter Magistrate Judge Donna P. Currault |

**Plaintiffs' Brief in Opposition to Motions
for Partial Summary Judgment of the Individual Defendants
Pitfield, Vaught, Mehrtens, Guidry, Vega, Estrada and Gaudet**

This case involves the in-custody death of an obese, severely autistic, non-verbal 16-year-old child experiencing a sensory outburst due to his autism. Seven JPSO deputies responded to the scene. They held the child, E.P., face down on the asphalt parking lot, and handcuffed his hands and shackled his legs. Two deputies (Pitfield and Vega) took turns sitting on top of E.P for over nine minutes. Three deputies, Pitfield, Mehrtens and Vaught held down his arms and legs. Vaught and Estrada applied leg shackles. Vega put him in a choke hold. Two additional deputies Guidry and Gaudet stood by and watched. None of the deputies made any effort to intervene or to place E.P. in a recovery position to allow him to breathe. E.P. went limp, urinated on himself, and stopped breathing. He died.  According to the Jefferson Parish Coroner's Office, E.P. "most likely" would have survived if the deputies had not restrained him face-down on the ground.[1] E.P.'s parents brought suit.

At issue here is the eight motions for summary judgment filed by the seven deputies who were on the scene: one motion regarding failure to intervene, and seven motions addressing

---

[1] R. Doc. 142-9 - JPCO - Dr. Troxclair Dep., 64:24-65:2 ("Q. So getting back to where the rubber meets the road, without the prone restraint, he wouldn't die that day? A. Most likely not, yes.")

qualified immunity for each deputy.[2] Those motions present the Defendants' alleged facts, but are extremely thin on legal analysis. They describe the officer's alleged actions, cite generally to *Graham v. Connor*, and conclude that the officers' actions were reasonable.

But that legal analysis is insufficient in at least two regards. First, because Defendants do not engage in analysis of the specific *Graham* factors, which is necessary given that *Graham* requires a fact-and-factor intensive inquiry.

And second, because Defendants do not engage at all with the Fifth Circuit's robust line of cases on prone-restraint deaths. In that line of cases, which includes *Simpson v. Hines*,[3] *Gutierrez v. City of San Antonio*,[4] *Goode v. Baggett*,[5] *Timpa v. Dillard*,[6] *Fairchild v. Coryell County, Texas*,[7] *Perkins v. Hart*,[8] and *Darden v. City of Fort Worth*,[9] the Fifth Circuit has <u>repeatedly denied qualified immunity to officers in situations similar to the death of E.P.</u> Those cases hold that "[w]ithin the Fifth Circuit, the law has long been clearly established that an officer's continued use of force on a restrained and subdued subject is objectively unreasonable."[10] The Fifth Circuit has specifically concluded that in situations like the death of E.P., a jury "could find that an objectively reasonable officer with [the officer's] training would have concluded that [the prone-restrained

---

[2] Plaintiffs' file this singular response to the Motions for Partial Summary Judgment filed by the Individual Defendants including: 1) R. Doc. 169 – MPSJ of Vaught, Mehrtens, Guidry, Estrada and Gaudet (Failure to Intervene/QI); 2) 170 – MPSJ of Pitfield (Excessive Force/QI; 3) R. Doc. 171 – MPSJ of Vega (Excessive Force/QI); 4) R. Doc. 173 – MPSJ of Guidry (Excessive Force/QI); 5) R. Doc. 174 – MPSJ of Vaught (Excessive Force/QI); 6) R. Doc. 175 – MPSJ of Gaudet (Excessive Force/QI); 6) R. Doc. 176 – MPSJ of Mehrtens (Excessive Force/QI; and 7) R. Doc. 178 – MPSJ of Estrada (Excessive Force/QI).

[3] *Simpson v. Hines*, 903 F.3d 400 (5th Cir. 1990).

[4] *Gutierrez v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998)

[5] *Goode v. Baggett*, 811 Fed App'x 227 (5th Cir. 2020)

[6] *Timpa v. Dillard*, 20 F.4th 1020 (5th Cir. 2021)

[7] *Fairchild v. Coryell County, Texas*, 40 F.4th 359 (5th Cir. 2022).

[8] *Perkins v. Hart*, 617 F.Supp.3d 444 (ED LA 2022).

[9] *Darden v. City of Fort Worth*, 880 F.3d 722 (5th Cir. 2018),

[10] *Timpa* at 1031-1032.

detainee] was struggling to breathe, not resisting arrest."[11] This Court summarized the state of the law in *Perkins v. Hart*:

> Just recently, the Fifth Circuit "catalogued" its jurisprudence on this point and "identified features of the cases that had 'reaffirmed' this principle 'again and again.'" Some of those features included where "the seized individual as 'suspected of only a minor offense,' 'initially resisted,' 'was . . . forced to lie prone on [the] stomach with hands restrained and bodyweight force applied to [the] back,' and, 'most importantly . . . was subdued, unable to flee, and non-threatening during the continued use of force.'"[12]

Here, the facts of E.P.'s death have every single one of the "features" that this Court listed as characterizing cases where qualified immunity was *denied*: a minor offense, initial resistance, prone restraint, bodyweight on the back, subdued, unable to flee, non-threatening during the continued use of force. This Court should deny Defendants' motions.

This Court should also deny Defendants' motions because they rely on more than a dozen disputed facts – many of which are not even internally consistent.

And finally, Defendants' motions include a partial motion to dismiss certain claims based on *Iqbal/Twombly* pleading standards. But Fed. R. Civ. Proc. 12 requires that such a motion "must be made before pleading if a responsive pleading is allowed." Since Defendants have already filed answers, this portion of their motion should be denied as untimely.

---

[11] *Id.*

[12] *Perkins v. Hart*, 21-cv-00879-WBV-DPC, R. Doc. 70 at *26 (E.D. La. July 26, 2022), citing *Fairchild v Coryell County, Texas*, 2022 WL 2733704, -- F. 4th -- (5th Cir. 2022) (recently argued on interlocutory appeal before the Fifth Circuit).

# I.   STATEMENT OF FACTS

## A.   Defendants put E.P. face-down, handcuffed him, shackled his legs, and sat on him until he died.[13]

E.P. was a 16-year-old, non-verbal severely autistic child who experienced a sensory outburst related to his autism on January 19, 2020, in the parking lot of Laser Tag. The video shows that prior to the arrival of any JPSO deputies, E.P. and his father, Daren Parsa, leave the Laser Tag, walking towards their vehicle in the parking lot.[14] As they walk towards the vehicle, E.P. starts "stimming" and begins having an sensory outburst or meltdown related to his severe autism.[15] Mr. Parsa attempted to control E.P. while his mother, Donna Lou, held the Laser Tag door closed to keep E.P. from entering the Laser Tag while having an outburst.[16] At the request of the Plaintiffs, the manager at Laser Tag called JPSO Deputy Pitfield who was a JPSO deputy assigned to a special 'off-duty" private detail on the Westgate Shopping Center premises and told him that there was an incident involving an autistic child.[17] After struggling with E.P. for about four minutes, Mr. Parsa is able to get E.P. to their vehicle, opens the rear passenger door and tries to get E.P. into the car.[18]

At 08:11 on the video, Deputy Pitfield's vehicle can be seen approaching.[19] Deputy Pitfield arrives to the scene.[20]   At this time, E.P. and his father are standing next to the family vehicle and

---

[13] The following timeline is created by an analysis of the security video from Laser Tag, statements, discovery responses and depositions of the parties. The Laser Tag security video is approximately 44 minutes long and does not have any audio. All timed references to the Laser Tag Security video shall refer the total run time from 00:00 – 43:56. The Laser Tag security video has been manually filed in this action as R. Doc. 154-3 and can be accessed at the following dropbox link:
   https://www.dropbox.com/scl/fo/13u3a5brur1alkvjcscmg/h?dl=0&rlkey=w4it5r13jbyhu1m240sxjwrf3
[14] R. Doc. 154-3 – Laser Tag Video – 04:12.
[15] R. Doc. 154-3 – Laser Tag Video – 04:22.
[16] Ex. C – Donna Lou Dep., 157:17-25) (A. I went inside to try to prevent Eric from coming back inside. I was holding the doors, and then, also, I realized that they were close – we talked about more people involved and close proximity would be worse, so I thought that my being out there with them would escalate behaviors, so twofold.)
[17] Ex. A - Heather Hilton Statement, p. 10 ("I got on the phone.  I let Victory know that uh, you know there's a man with his autistic child um, it's an autistic adult child.  They're outside.  They're in a confrontation.  It's getting pretty serious, can you please come over her."
[18] R. Doc. 154-3 – Laser Tag Video – 07:55 – 08:13.
[19] R. Doc. 154-3 – Laser Tag Video - 08:11.

there is no struggle.[21]   Mr. Parsa informed Deputy Pitfield that E.P. was autistic.[22] Once Pitfield approaches, E.P. begins "stimming" and slapping himself, then his father and then Deputy Pitfield.[23] Deputy Pitfield appears to call for back-up on his radio.[24] At 08:51 on the videotape, Deputy Pitfield takes E.P. to the ground.[25] Deputy Pitfield strikes E.P. once in the head area after E.P. bit Pitfield while Mr. Parsa and Ms. Lou attempt to assist Pitfield.[26] Deputy Pitfield then goes to his vehicle to retrieve handcuffs while Mr. Parsa is attempting to control E.P.[27] Deputy Pitfield grabs E.P. by his right wrist, followed by the left, brings his arm behind his back as he attempts to secure the handcuffs.[28] During this attempt to handcuff E.P., Deputy Pitfield, who weighs over 300 pounds, assumes the position on E.P.'s backside while E.P. is in the prone position on the concrete parking lot.[29]

While E.P. has not yet been completely handcuffed, it does not appear that Deputy Pitfield is having difficulty controlling him. For example, E.P. is able to extend his right arm out, but Deputy Pitfield quickly moves his arm back behind his back.[30] Further, Deputy Pitfield appears to use his left free hand to access his radio three times.[31]

---

[20] R. Doc. 154-3 – Laser Tag Video - 08:29.
[21] R. Doc. 154-3 – Laser Tag Video - 08:29-08:34.
[22] Ex. B - Daren Parsa Dep., 208:20-209:3.
[23] R. Doc. 154-3 – Laser Tag Video - 08:36-08:49; Ex. B - Daren Parsa Dep., 208:20-209:3.
[24] R. Doc. 154-3 – Laser Tag Video - 08:42-08:44; (Dispatch Records have Pitfield's initial call time as 1:28:40)
[25] R. Doc. 154-3 – Laser Tag Video - 08:51-08:54.
[26] R. Doc. 154-3 – Laser Tag Video – 08:51-08:55; R. Doc. 142-3 – Pitfield Dep., 121:18-122:1-6.
[27] R. Doc. 154-3 – Laser Tag Video - 08:55-9:09.
[28] R. Doc. 154-3 – Laser Tag Video – 9:10-9:20.
[29] R. Doc. 154-3 – Laser Tag Video – 9:10-9:45; Ex. B – Daren Parsa Dep., 210:13-211:6 (Mr. Parsa testified that Deputy Pitfield was sitting on EP's "buttocks to above buttocks."); Ex. C – Donna Lou Dep., 170:8-11 ("He is sitting on Eric. He is sitting on like the waist. I'm sorry. Like this part. The waist part of Eric. The waistline near his buttocks.").
[30] R. Doc. 154-3 – Laser Tag Video – 11:11.
[31] R. Doc. 154-3 – Laser Tag Video - 09:45; 10:55; 13:55.

Both parents continue to attempt to calm E.P. as they remain crouched down by their son's head.[32] In an effort to calm E.P., Ms. Lou tried to provide a cushion, using an orange jacket, to protect E.P.'s head against the hard surface of the parking lot.[33] However, Deputy Pitfield told Ms. Lou to remove the jacket so as not to interfere with E.P.'s breathing – thus demonstrating that Pitfield was subjectively aware of the risk to E.P.'s breathing.[34]

At 14:09, Detective Vaught arrives on the scene. At that point, E.P. had already been held face down in a prone position with Deputy Pitfield sitting on his back for over 5 minutes. As Detective Vaught approaches the scene, Deputy Pitfield advised Detective Vaught that E.P. was special needs.[35] Detective Vaught assisted Deputy Pitfield in fully handcuffing E.P. with two sets of handcuffs.[36] Deputy Vaught admitted that when he handcuffed E.P., E.P. was not resisting and was "moving little bit but he wasn't trying to resist or pull his- -pull his arm away."[37] Despite the fact that E.P. was fully handcuffed and that he was not offering any active resistance, neither Deputy Pitfield or Deputy Vaught made any effort to roll E.P. over into the recovery position.

At 14:24, Detective Mehrtens arrives on the scene. When Detective Mehrtens arrived on the scene, he observed that E.P. "was face down on the ground, he had two (2) sets of handcuffs and his hands were handcuffed behind his back, with Deputy Pitfield sitting on his buttocks area."[38] Deputy Mehrtens said when he arrived, "there wasn't, there wasn't a struggle, it didn't appear to be a struggle."[39] Deputy Mehrtens further stated, "I didn't see a struggle so there was no need for me to

---

[32] R. Doc. 154-3 – Laser Tag Video - 09:30-12:25
[33] R. Doc. 154-3 – Laser Tag Video – 13:18-13:22.
[34] R. Doc. 142-3 – Pitfield Dep., 126:10-128:3.
[35] R. Doc. 155-4 – Vaught Statement, p. 4 ("Yes, yeah he was seated on the individual's lower back buttocks area…. Deputy Pitfield… proceeds to tell me that the kid has… special needs."); R. Doc. 156-5 – Vaught Dep., 122:2-3 – ("I saw the deputy seated on the lower portion of the subject's back.")
[36] R. Doc. 154-3 – Laser Tag Video - 14:15 – 14:22.
[37] R. Doc. 155-4 - Vaught statement at 5.
[38] R. Doc. 155-2 - Mehrtens Statement, p. 3.
[39] *Id.*

engage him."[40]  Deputy Mehrtens can be seen on the video standing in the immediate area with his hands in his pockets from  14:45 until 16:30.[41] At no time did Deputy Mehrtens intervene to place E.P. in a recovery position.

At 14:40 Deputy Guidry arrives on the scene. Deputy Guidry said she was not actively involved in controlling E.P., and when she arrived, Deputy Pitfield was trying to control E.P. Deputy Pitfield said he "pretty much" had E.P. under control and there was nothing she could do.[42] In addition to training she received as a deputy, Deputy Guidry had previously been employed with E.M.S. and had medical training as an E.M.T.[43] At no time did Deputy Guidry intervene to place E.P. in recovery position.

At 14:44 Deputy Vega arrives on the scene. Deputy Vega said when he arrived, Deputy Pitfield was on E.P.'s "butt area," and he believed Deputy Pitfield had control.[44]  Deputy Vega did not intervene to place E.P. in recovery position.

At 14:55, Deputy Estrada arrives. Deputy Estrada said he did not see a struggle where he believed Deputy Pitfield needed his help.[45] Deputy Estrada did not intervene to place E.P. in recovery position.

Instead of placing E.P. in recovery position, Deputy Vega and Deputy Pitfield switch positions with Deputy Vega now taking over the prone restraint of E.P. at 16:00.[46] Prior to the switch Deputy Vega observed that Deputy Pitfield "was pretty well spent at that point, so he asked

---

[40] *Id.* at 4.
[41] R. Doc. 154-3 – Laser Tag Video – 14:45-16:30.
[42] R. Doc. 156-7 - Guidry Dep., 49-50.
[43] R. Doc. 156-7 – Guidry Dep., 10:1-19.
[44] R. Doc. 18-5 - Vega Statement, p. 2.
[45] R. Doc. 156-8 – Estrada Dep., 95.
[46] R. Doc. 154-3 – Laser Tag Video – 16:00.

to exchange. We exchanged."[47]  During the transfer, Deputy Vega noted that E.P. was calm and not offering any resistance.[48] After the transfer, Deputy Pitfield is assessed by Deputy Guidry, Deputy Estrada moves his vehicle closer, and Detectives Mehrtens and Vaught appear to speak with Deputy Pitfield.[49] After getting off of E.P.'s back, Deputy Pitfield made no effort to intervene to place E.P. in recovery position.

With Deputy Vega now on top of E.P. while still in the prone position, E.P.'s mother remained at E.P.'s head area, calming and comforting him.[50] Deputy Vega is seen leaning forward and repositioning his body weight while holding E.P.'s. handcuffed arms.[51] At 16:55, Deputy Vega employs a pain compliance technique by pushing E.P.'s cuffed hand up behind his back.[52] As this is occurring, Detective Vaught and Mehrtens approach to assist Deputy Vega and go hands on with E.P.[53] By 17:13, E.P.'s arms are pushed above his head and onto the ground in front of him.[54]

At 17:14, Detective Vaught moves to E.P.'s legs and all six deputies are in the immediate vicinity of the events. At 17:24, Detective Mehrtens places his knee on E.P.'s left back/side and Detective Vaught placed his body weight on E.P. right side while Deputy Vega remains on E.P.'s backside.[55] At 17:25, Deputy Estrada goes to his patrol car to retrieve leg shackles. While this is going on, all of the Individual Defendants are either assisting Vega restrain E.P. or in the immediate vicinity watching the events. Again, no one intervenes to place E.P. in recovery position.

---

[47] R. Doc. 105-9 – Vega Dep., 120:23-25.
[48] R. Doc. 18-5 – Vega Statement at 5.
[49] R. Doc. 154-3 – Laser Tag Video – 16:00-17:00.
[50] R. Doc. 154-3 – Laser Tag Video - 16:02-17:24.
[51] R. Doc. 154-3 – Laser Tag Video – 16:00-17:00.
[52] R. Doc 154-3 – Laser Tag Video – 16:55-17:27; R. Doc. 155-2 - Mehrtens Statement at 6 ("Deputy Vega has technique, you know, when somebody starts struggling, you have handcuffs on them, you just begin to slightly elevate the arms so that you can just maintain control of the upper torso, um, he begins doing that….").
[53] R. Doc. 154-3 – Laser Tag Video – 17:03-17:10 - (Mehrtens is to Vega's right and Vaught is to Vega's left).
[54] R. Doc. 154-3 – Laser Tag Video - 17:13.
[55] R. Doc. 154-3 – 17:23-17:27

After E.P.'s arms were pushed to the ground in front on him, he remains prone with Deputy Vega on his backside., Deputy Vega then performs a chokehold on E.P. while Detectives Mehrtens and Vaught continue to place their body weight on E.P.[56]  While Deputy Vega denies he used a choke hold, he did acknowledge that he put his forearm underneath E.P.'s chin and connected his hands together and he heard Ms. Lou complain that he was choking E.P.[57] While this was occurring, Ms. Lou testified that she told the deputies that E.P. was having trouble breathing and they were choking E.P.[58] Despite his denial, the forensic evidence reveals that Deputy Vega did utilize a forearm bar choke hold which impacted E.P.'s ability to breathe.[59]

At 17:46, Estrada starts attaching the leg shackles and Deputy Gaudet arrives.  Ms. Lou advises the deputies that crowding E.P. can make matters worse.[60] However, Ms. Lou is told by the deputies to let them do their job.[61] At 18:05, Ms. Lou leaves the immediate area and goes to her vehicle to attempt to find E.P.'s treatment plan in the hopes the deputies would listen to her.[62]

By 18:12, Deputies Estrada and Vaught shackle E.P.'s legs. At this time, Detective Vaught is restraining E.P.'s legs, Deputy Vega on E.P.'s backside and Detective Mehrtens restraining E.P. from Vega's right side.[63] At 18:20, Deputy Gaudet taps Deputy Vega on the back and appears to be telling Deputy Vega to move out of the way and, as Deputy Gaudet attempts to assess E.P., Deputy Vega, Deputy Vaught and Deputy Mehrtens are all still restraining E.P. in the prone position.[64]

---

[56] R. Doc. 154-3 – Laser Tag Video – 17:27-17:51.
[57] R. Doc. 18-5 - Vega Statement at 6; R. Doc. 105-9 - Vega Dep., 129:16-130:24.
[58] Ex. C – Donna Lou Dep., 195:4-8 ("He's having trouble breathing. He is having trouble breathing. He is in a chokehold just like the man from New York, Eric Garner, died. It is just like the man from Baton Rouge, how he died.").
[59] R. Doc. 142-7 - Sperry Report Excerpt ("The physical findings at autopsy confirm that Vega utilized a "forearm bar" choke hold which significantly impacted [E.P.]'s airway and ability to breathe.")
[60] Ex. C – Donna Lou Dep., 182:9-183:21; 195:16-19.
[61] Id.
[62] Ex. C – Donna Lou Dep., 182:20-25; 183:1-7
[63] R. Doc. 154-3 – Laser Tag Video – 18:12-18:20.
[64] R. Doc. 154-3 – Laser Tag Video.

During this period of time, Deputy Guidry remembers Ms. Lou stating that E.P. was not breathing.[65]  At 18:58, E.P. is finally rolled onto his back. When E.P. was rolled onto his back, Ms. Lou remembers a deputy saying, "He pissed himself."[66] After rolling E.P. onto his back, Ms. Lou observed E.P. had urinated on himself, his eyes were slits (with one slit larger than the other), his lips were blue and there was foam coming out of his mouth.[67] At 20:31, Deputy Gaudet begins CPR.  At 27:25, E.P. is wheeled off in a gurney to an ambulance. When the ambulance left the scene, Ms. Lou and Mr. Parsa were not allowed to leave to go to the emergency room as they were told by deputies that the event was a crime scene.[68] As a result, E.P. died alone as his parents were being detained in the parking lot by the deputies.  When they were finally allowed to leave and go to their son at the hospital, once arrived, they were informed by medical personnel that their only son was already dead.

**B.    JPSO Defendants were trained to use the recovery position, the SWARM technique, and the RIPP Hobble device in situations like this. They did not use any of those.**

JPSO trained each of the individual Defendants about the risks of positional asphyxia. JPSO provided each Defendant with specific techniques and a physical device called a "RIPP Hobble" to mitigate the risk of positional asphyxia during restrain. Specifically:

   *    JPSO Standard Operating Procedures # 8 entitled Restraining Devices & Defensive Devices Policy requires deputies to take necessary precautions to protect the lives and safety of persons in custody and requires the use of the Total Appendage Restraining Procedure (TARP) with the RIPP Hobble devices with "extremely violent prisoners."[69]

   *    With respect to the prone position, JPSO trains it deputies the following: 1) the prone position can cause respiratory compromise;[70] 2) placing weight on a person's back

---

[65] R. Doc. 155-3 – Guidry Statement, p. 2.
[66] Ex. C. – Donna Lou Dep., 184:7-16;
[67] Ex. C. – Donna Lou Dep., 185:15-186-10.
[68] Ex. B – Daren Parsa Dep., 179:15-186-25.
[69] R. Doc. 156-10 - SOP 8 –Restraining Devices and Defensive Devices
[70] R. Doc. 144-3 - Pizzolato Dep., 65:18-20.

can restrict breathing and the bellows action;[71] 3) prone restraint causes the diaphragm muscle to be compressed against the ground which restricts breathing;[72] 4); this restriction on breathing can impact the exchange of gases (O2/CO2) in the lungs and result in oxygen deficiency;[73] and 5) when oxygen deficiency occurs, a person may struggle more violently.[74]

\*    JPSO trains it deputies that: 1) people suffering from diminished capacity are at increased risk of death from prone restraint;[75] 2) people who are obese are at increased risk of death from prone restraint;[76] and 3) sitting on an obese person's legs instead of back may not relieve pressure and still poses risks during prone restraint.[77]

\*    During RIPP Hobble training, JPSO trains deputies to never leave suspects in the prone position to avoid positional asphyxia.[78] JPSO trains its deputies to place persons in the recovery position (on side or seated upright) after prone restraint to allow them to breathe to avoid positional asphyxia.[79]

\*    The JPSO trains deputies that the most important thing to avoid positional asphyxia is to get a person seated upright or on their side in the recovery or modified recovery position once it is safe to do so.[80]   The JPSO does not train regarding a specific amount of time that deputies can restrain a subject in the prone position, but that deputies should immediately put a subject into the recovery position once it is safe to do so to relieve the compression and dangers of positional asphyxia.[81]

\*    To prevent potential death from positional asphyxia, the RIPP Hobble training recommends that deputies use the "SWARM" technique on violent prisoners which instructs deputies to take a suspect down and then "apply a hobble restraint to the ankles and roll the subject into an upright seated position…. Position the subject so that he or she can lean back against a fixed object.  This helps relieve pressure on the diaphragm and make breathing easier.[82]

---

[71] R. Doc. 144-3 - Pizzolato Dep., 63:8-63:19.

[72] R. Doc. 144-3 - Pizzolato Dep., 66:19-67.

[73] R. Doc. 144-3 - Pizzolato Dep., 63:11-14.

[74] R. Doc. 144-3 - Pizzolato Dep., 68:14-23.

[75] R. Doc. 144-3 – Pizzolato Dep., 53:13-22.

[76] R. Doc. 144-3 – Pizzolato Dep., 53:23-24; 66:15-67:12.

[77] R. Doc. 144-3 – Pizzolato Dep., 53:23-24; 66:15-67:12.

[78] R. Doc. 144-3 - Pizzolato Dep., p. 64:9-12 - (Q. When do you train them to put them in the recovery position?  A. I train them never to leave anybody in a prone position); Pizzolato, 68:1-2 - A. I train to not leave somebody in a prone position).

[79] R. Doc. 144-3 - Pizzolato Dep., 63:15-18.

[80] R. Doc. 144-3 - Pizzolato Dep., 76:5-77:6.

[81] R. Doc. 144-3 - Pizzolato Dep., 70:24-71:5; 71:15-72:9.

[82] R. Doc. 156-11 – RIPP Hobble Training Power Point, pp. 46-47.

\*      JPSO trains its deputies that to decrease the risks associated with prone restraint, the remedy is simple – get pressure of the back.[83]

\*      Sgt. Pizzolato acknowledged that if you have six deputies on a scene and the subject's legs are not restrained, this is a sufficient number of deputies to restrain someone in the recovery position and avoid the dangers of positional asphyxia.[84]

\*      In RIPP Hobble training, JPSO trains it deputies that they can control a suspect in the recovery position.[85]

\*      JPSO trains deputies that a significant factor in gaining control of a person being restrained in the prone position is whether they have been handcuffed.[86]

\*      Sgt. Pizzolato acknowledged that everyone who is provided RIPP Hobble training is provided a RIPP Hobble.[87] Deputies Pitfield, Vaught, Guidry and Vega had RIPP Hobble training but did not have a RIPP Hobble on the date of the incident.[88] Deputy Mehrtens received a RIPP Hobble training and received a RIPP Hobble but did not use it on the date of the incident.[89] Deputies Estrada and Gaudet had RIPP Hobble training and a RIPP hobble on the scene on the date of the incident but did not use it.[90]

Accordingly, the Individual Defendants all received some training on the dangers of prone restraint and positional asphyxia during RIPP Hobble Training.[91] According to JPSO policy, the RIPP Hobble was a law enforcement device that was designed to restrain "extremely violent persons" through the Total Appendage Restraint Procedure (TARP).[92] During the RIPP Hobble classes, deputies were advised of the risk of asphyxia when restraining persons in the prone position.[93] Sgt. Pizzolato, JPSO's 30(b)(6) witness on training, testified that deputies are trained to

---

[83] R. Doc. 144-3 - Pizzolato Dep., 66:4-8.
[84] R. Doc. 144-3 -Pizzolato Dep., 90:21-94:19.
[85] R. Doc. 144-3 -Pizzolato Dep., 62:25-63:2.
[86] R. Doc. 144-3 -Pizzolato Dep., 69:16-22.
[87] R. Doc. 144-3 -Pizzolato Dep., 88:14-23.
[88] R. Doc. 142-3 - Pitfield Dep., 48:4-14; R. Doc. 156-5 - Vaught Dep., 92:8-7; 94:20-21; R. Doc. 156-7 - Guidry Depo., 41:18-25; 43:20-25; R. Doc. 105-9 - Vega Depo, 164:22-165:8.
[89] R. Doc. 156-6 - Mehrtens Dep., 34:24-35:7.
[90] R. Doc. 156-7 - Estrada Dep., 24:16-23; R. Doc. 156-8 - Gaudet Dep., 69:7-15
[91] R. Doc. 156-11 – RIPP Hobble Training, pp. 46-48; R. Doc. 156-28 – Deputies' Training Resumes.
[92] R. Doc. 156-10 – JPSO SOP 8 – Restraining Devices.
[93] R. Doc. 144-3 – Pizzolato Dep., 53:13-24; 62:25-63:2; 63:8-63:19; 64:9-12; 65:18-20; 66:4-67-66:12; 68:102; 70:24-71:5; 71:15-72:9; 76:5-77:6; 88:14-23.

never leave a person in the prone position due to risks of positional asphyxia.[94] This training also advised deputies to utilize a "swarm technique" to quickly neutralize any alleged resistance from a suspect and control him using the RIPP Hobble and removing the body weight from the suspects back.[95]

When it came to interacting with E.P., none of the Individual Defendants used the swarm technique. None of them used the RIPP Hobble device. None of them rolled E.P. into the recovery position or even tried to do so, until it was too late. Instead, they kept E.P. restrained, facedown, with pressure on his backside, used a pain compliance technique and chokehold, resulting in E.P.'s death.

## II.    SUMMARY JUDGMENT AND QUALIFIED IMMUNITY STANDARD

Summary judgment is appropriate where there is no genuine disputed issue as to any material fact, and the moving party is entitled to judgment as a matter of law.[96] When assessing whether a dispute regarding any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[97] While all reasonable inferences must be drawn in favor of the nonmoving party, a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions or "only a scintilla of

---

[94] R. Doc. 144-3 – Pizzolato Dep., p. 64:9-12 - (Q. When do you train them to put them in the recovery position?  A. I train them never to leave anybody in a prone position); Pizzolato Dep., 68:1-2 – (A. I train to not leave somebody in a prone position).

[95] R. Doc. 156-11 – RIPP Hobble Training, pp. 46-48.

[96] Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986).

[97] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co*., 530 F.3d 395, 398-99 (5th Cir. 2008) (citations omitted).

evidence."[98] Instead, summary judgment is appropriate if a reasonable jury could not return a verdict for the nonmoving party.[99]

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."[100] The nonmoving party can then defeat summary judgment by either submitting evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."[101] If, however, the nonmoving party will bear the burden of proof at trial on the dispositive issue, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.95 [102]The burden then shifts to the nonmoving party who must go beyond the pleadings and, "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"[103]

In *Tolan v. Cotton*,[104] the Supreme Court addressed the proper manner to evaluate summary judgment motions when qualified immunity is asserted.  In reversing the Fifth Circuit, the Supreme Court noted "the importance of drawing inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong of the standard;" "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions;" and

---

[98] *Id*. (quoting *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994)) (internal quotation marks omitted).
[99] *Delta & Pine Land Co*., 530 F.3d at 399 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
[100] *International Shortstop, Inc. v. Rally's, Inc*., 939 F.2d 1257, 1264-65 (5th Cir. 1991).
[101] *Id*. at 1265.
[102] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)
[103] *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed. R. Civ. P. 56(e)).
[104] *Tolan v. Cotton*, 134 S.Ct.1861 (2014)

noting that the "Fifth Circuit failed to view the evidence at summary judgment in the light most favorable to Tolan with respect to the central facts of this case. By failing to credit evidence that contradicted some of its key factual conclusions, the court improperly 'weigh[ed] the evidence' and resolved disputed issues in favor of the moving party.[105]

"Put another way, if the district court determines that the plaintiff's evidence would reasonably support a jury's finding that the defendant violated a clearly established right, the court must deny summary judgment."[106]

"In qualified immunity cases," which often involve competing versions of events, we take "the plaintiff's version of the facts," unless that version "is blatantly contradicted by the record, so that no reasonable jury could believe it."[107]  Therefore, if there are questions of fact pertaining to the objective material events that could reasonably support a jury's finding that a defendant violated a clearly established right, the district court must deny summary judgment.[108]

"[T]he test for immunity is solely one of objective reasonableness, any 'subjective intent, motive, or even outright animus [is] irrelevant in a determination of qualified immunity…, just as an officer's good intent is irrelevant when he contravenes settled law.'"[109] Further, qualified immunity is limited to the objectively ascertainable facts viewed through the lens of a reasonably well-trained officer.[110] Accordingly, in evaluating the Individual Defendants entitlement to qualified immunity, the training set forth herein should be considered.[111]

---

[105]  *Id.* at 1866.
[106]  *DiLuzio v. Vill. of Yorkville, Ohio*, 796 F.3d 604, 608–09 (6th Cir. 2015).
[107]  *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 325 (5th Cir. 2020).
[108]  *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015); *Thompson v. City of Lebanon, Tennessee*, 831 F.3d 366, 370 (6th Cir. 2016).
[109]  *Mendenhall v. Riser*, 213 F.3d 226, 231 (5th Cir.2000).
[110]  *Malley v. Briggs*, 475 U.S. 335, 345 (1986).
[111]  Significantly, Sheriff Lopinto, in his official capacity, filed a Motion for Partial Summary Judgment, arguing that all of the Individual Defendants were properly trained on use of force, active/passive resistance, excited delirium, prone restraint, recovery position, TARP and the RIPP Hobble.  R. Doc. 144-144-2.

In the alternative, Plaintiffs contend that the doctrine of qualified immunity is incorrect. As Judge Willett recently explained in a concurring opinion, the doctrine of qualified immunity was born out of the Supreme Court's assumption that because Section 1983 is silent with regard to common-law immunities, it must incorporate those immunities.[112] But recent scholarship has brought light to the fact that the Supreme Court's assumption was wrong: the original text of Section 1983 <u>did</u> contain a clause addressing common-law immunities. As Judge Willett explains, "the Supreme Court's original justification for qualified immunity—that Congress wouldn't have abrogated common-law immunities absent explicit language—is faulty because the 1871 Civil Rights Act expressly included such language."[113] For that reason, he concludes:

> Professor Reinert's scholarship supercharges the critique that modern immunity jurisprudence is not just *a*textual but *counter*textual. That is, the doctrine does not merely *complement* the text—it brazenly *contradicts* it.[114]

For a fuller explanation, including a copy of the original text certified by the National Archives and Records Administration, see *Skinner v. Gautreaux,* 20-cv-00595, R. Doc. 76 at *9 *et seq.* (M.D. La. Oct. 14, 2022), available online at https://tinyurl.com/26b84hmp .

## III.   DISCUSSION

**A.   Defendants' motions should be denied because they rely on dozens of disputed facts, and their facts are not even internally consistent.**

In order to prevail on summary judgment, the moving party must "demonstrate the absence of any genuine issue of material fact."[115] Here, that is not the case. Many of Defendants' material facts contradict each other, in addition to being disputed.

---

[112] *Rogers v. Jarrett*, 63 F.4th 971 (5th Cir. 2023) (Willet, J., concurring).
[113] *Id.*
[114] *Id*. Emphasis in original.
[115] *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2552 (1986).

Specifically, the facts are contradictory regarding whether the scene was secure prior to E.P.'s death. On one hand, Defendants' facts contend that "the scene was never secure prior to E.P.'s demise."[116] But on the other hand, the facts contend that Pitfield told Guidry that "I pretty much have him under control."[117] The facts contend that "Deputy Mehrtens did not perceive a need to assist Deputy Pitfield."[118] And that Estrada "did not observe anything that required his assistance."[119] And that Vaught "left to speak with E.P.'s father believing that it was safe for him to do so."[120] It cannot be the case both that (1) the "scene was never secure" and also (2) that Pitfield had E.P. under control, that there was no need to assist Pitfield, and that it was safe for deputies to walk off.

Many of the facts are also disputed. Some are contradicted by Defendants' own statements, like Fact # 34, which claims that Estrada did not hear "anyone say anything to the effect that E.P. was being choked." That is directly contrary to Estrada's statement, in which he admits that he heard E.P.'s mother saying things like "you're choking him."[121] Similarly, Fact # 28 claims that "Deputy Guidry did not hear anyone say anything about E.P. being choked or unable to breath." That fact is contrary to Guidry's statement, in which she said "And then I hear the mom said, 'I don't know if he's breathing, I don't know if he's breathing.'"[122]

Defendants also contend that it is "undisputed" that the "moment that E.P. ceased resisting," the deputies put him in the recovery position. But that is contrary to Defendants' statements, like

---

[116] R. Doc. 169-3, Fact # 7.
[117] *Id.* at Fact # 23.
[118] *Id.* at Fact # 16.
[119] *Id.* at Fact # 32.
[120] *Id.* at Fact # 11.
[121] R. Doc. 156-8 – Estrada Dep., pp. 119-120; Ex. D. – Estrada Statement, p. 7 ("Q. I usually don't share information (inaudible) but the reason I'm asking you, she asserts that she, she said out loud whether it's you're choking him, or y'all killing him but you're cooperating.  She.  She was audible about that.  She was saying things like that. A. Yea, she was saying things like that but the whole time we weren't hurting him.  We were just trying to control him.")
[122] R. Doc. 155-3 – Guidry Statement, p. 2.

Deputy Vaught who said that when he handcuffed E.P., E.P. was not resisting and was "moving little bit but he wasn't trying to resist or pull his - pull his arm away."[123] The JPSO's investigator likewise testified that multiple deputies said that there was no resistance at different points during the incident.[124] And Plaintiffs experts agree that any movements by E.P. were either manifestations of his Severe Autism Spectrum Disorder, or E.P. struggling to breathe as a result of the prone restraint.[125]

Because the parties dispute critical elements like the security of the scene and whether E.P. was resisting or not, this Court should deny Defendants' motions.

**B.     Defendants' motions should be denied with regard to excessive force because "[w]ithin the Fifth Circuit, the law has long been clearly established that an officer's continued use of force on a restrained and subdued subject is objectively unreasonable."**

1.   In a series of cases spanning three decades, the Fifth Circuit has applied *Graham v. Connor* to prone restraint cases and denied qualified immunity to officer conduct like the conduct at issue here.

In *Graham v. Conner,* the Supreme Court determined that claims resulting from the use of excessive force — whether involving deadly or non-deadly force — are to be analyzed under the Fourth Amendment's objective reasonableness standard.[126] The Supreme Court described that analysis as follows:

---

[123] R. Doc. 155-4 - Vaught statement at 5.

[124] R. Doc. 155-5 - Dowling Dep. at 112:14-19 ("Q. The interviews, like Deputy Vega, when he gave his interview, he said that when they moved to switch out, that Mr. Parsa wasn't offering any resistance, correct? A. That's when they realized that he had stopped resisting, yes."); Id. at 122:6-8 ("Q. And doesn't he state when he got there he put his handcuff on, and there was no resistance? A. No resistance to the handcuff.")

[125] R. Doc. 156-4 - Dr. Sperry Expert Report (While [EP] made certain movements while being restrained by Pitfield, it is my opinion that these movements were not willful, active resistance or efforts to harm the officers, but behavioral manifestations of his autism and evidence of oxygen deficiency which was resulting from his continuous and prolonged restraint." (Page 4)); R. Doc. 142-8 – Noble Report, ¶ 61 ("The deputies claim that EP was actively resisting and that they had no other option other than maintain EP in the prone position is absurd."); ¶ 61(d) ("A reasonable police officer would know that a subject's movement in these circumstances is likely being done to help the subject breathe and is not active resistance."); ¶ 61(e).

[126] *Graham v. Conner*, 490 U.S. 386, 388 (1989).

18

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, … however, its proper application requires careful attention to  the facts and circumstances of each particular case, including the severity of the crime at issue,  whether  the  suspect  poses  an **immediate** threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.  *See Tennessee v. Garner*, 471 U.S., at 8-9 (the question is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure").[127]

In other words, *Graham* requires that the force used be proportional to the threat.  Unless the suspect is posing an immediate threat to human life, there is no justification for the use of force that is likely to kill or seriously injure the suspect.

Applying *Graham,* the Fifth Circuit and other circuits have repeatedly established that the continued  use  of  pressurized,  prone  restraint  on  a  subject  who  is  not  actively  resisting  is unconstitutional and poses a serious risk of death by positional asphyxia.

In *Simpson v. Hines*,[128] police officers were sued as a result of a death of prisoner.  The police officers filed a Motion for Summary Judgment based on qualified immunity.  In denying the officers' qualified immunity based on factual disputes, the Fifth Circuit noted:

> Captain Hines admittedly placed Simpson in a neckhold and exerted sufficient pressure to subdue him. Broussard admittedly sat "astraddle him;" . . .  according to a physician's report submitted by plaintiffs, Simpson could have died of asphyxiation resulting from the pressure exerted when Broussard sat on his chest.[129]

In *Gutierrez v. City of San Antonio*,[130] police officers were sued for an in-custody death. In denying the officers qualified immunity, the Fifth Circuit noted:

> Viewing these disputed facts in the light most favorable to Gutierrez, the summary judgment record shows that the officers knew that Gutierrez was under the influence of drugs and that they placed him face down in a prone position. Further, the record shows that the SAPD either had prohibited hog-tying or informed its officers of its dangers in these circumstances. The record also shows that Gutierrez

---

[127] *Id.* at 396 (emphasis added).
[128] *Simpson v. Hines*, 903 F.3d 400 (5th Cir. 1990).
[129] *Id.* at 403.
[130] *Gutierrez v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998)

did not pose a threat of death or serious physical harm to the officers or to others, for at least some time, perhaps even a significant period of time, meaning that the officers were not justified in using deadly force.[131]

In *Cruz v. City of Laramie*,[132] (a case that the JPSO defendants were trained on[133]) the Tenth Circuit analyzed an in-custody death that occurred during a hog-tie restraint of a person suffering from diminished capacity.  In *Cruz,* the Tenth Circuit noted:

> In addition to the case law highlighting problems associated with the hog-tie restraint, appellee provided the district court with numerous articles and other materials discussing "sudden custody death syndrome" and noting the relationship between improper restraints and positional asphyxia. The articles detail the breathing problems created by pressure on the back and placement in a prone position, especially when an individual is in a state of "excited delirium." These breathing problems lead to asphyxiation. The materials provided to the district court include police handbooks, Justice Department symposia, various journals and periodicals, and newspaper articles detailing deaths of individuals while in custody.[134]

After the Fifth Circuit decision in *Cruz,* in *Champion v. Outlook Nashville*,[135] the Sixth Circuit found the prone restraint of a mentally handicapped persons to be constitutionally excessive force and denied qualified immunity.  Reviewing the facts in the light most favorable to the plaintiff, "the Officers lay on top of Champion, a mentally retarded individual who had stopped resisting arrest and posed no flight risk, and sprayed him with pepper spray even after he was immobilized by handcuffs and a hobbling device."[136] Based on these facts, the Sixth Circuit found that this conduct was not objectionably reasonable.[137] In analyzing whether the law was clearly established, the Sixth Circuit noted:

---

[131] *Id.* at 449.
[132] 239 F. 3d 1183 (10th Cir. 2001).
[133] See R. Doc. 156-11 – RIPP Hobble Training, p. 7.
[134] 239 F. 3d 1183, 1188-1189 (10th Cir. 2001).
[135] *Champion v. Outlook Nashville*, 380 F.3d 893 (6th Cir. 2004)
[136] *Id.* at 901.
[137] *Id.*

> Second, it also clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force.
>
> . . .
>
> It cannot be forgotten that the police were confronting an individual whom they knew to be mentally ill or retarded, even though the Officers may not have known the full extent of Champion's autism and his unresponsiveness. The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted. [138]

In *Darden v. City of Fort Worth,*[139] police officers were sued stemming from an in-custody death that occurred in 2013.  In *Darden*, officers served a no-knock warrant based on alleged drug sales. Once the team breached the front door, an altercation occurred between Darden and the officers where Darden was struck, tasered and held in the prone position until he died. Plaintiff's medical expert noted that Darden died "as a result of the application of restraint (physical struggle, 4 taser dart strikes, prone positioning with weight of police officer on top of Mr. Darden) and consequential hypoxia."[140] The Fifth Circuit also noted that the officer "forced Darden – an obese man – onto his stomach, pushed his face to the floor and pulled Darden's hands behind his back.[141] Further, the Fifth Circuit noted that the officers were trained concerning the dangers of prone restraint of an obese person, noting:

> We also find relevant, but not dispositive, the fact that Officer Romero's alleged conduct appears to have violated Fort Worth Police Department policies requiring officers to exercise "[e]xtreme caution" when arresting "a prisoner that is obese ... since cuffing behind the back and laying the prisoner in a prone position could lead to positional asphyxia" (otherwise known as hypoxia). Fort Worth, Tex., Police Department General Orders § 314.04(D). While we certainly do not suggest that the violation of police department policies is sufficient to make out a constitutional violation, we have found their existence and corresponding notice to officers relevant in analyzing the reasonableness of a particular use of force under the totality of the circumstances. [142]

---

[138] *Id.* at 903-904.
[139] *Darden v. City of Fort Worth,* 880 F.3d 722 (5th Cir. 2018),
[140] *Id.* at 728.
[141] *Id.* at 733.
[142] *Id.* at 732, footnote 8.

In *Goode v. Baggett*,[143] law enforcement officers were sued for an in-custody death occurring on July 18, 2015. In this case, law enforcement officials were called to the scene of a disturbance. After confronting the subject, an altercation ensued which resulted in the use of a taser and then prone restraint "with multiple officers on top of him with their knees in his back."[144] The Fifth Circuit further noted that the subject "was pinned down by multiple officers and appeared to be struggling to breathe.[145] Thereafter, the subject was hog-tied and later died. In finding that there were factual disputes which precluded summary judgment, the Fifth Circuit noted:

> [T]here's a dispute as to whether Troy was actively resisting arrest when the Officers hog-tied him. Keep in mind, "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." So even if Troy's conduct earlier in the encounter amounted to active resistance, "the force calculus changes substantially once that resistance ends." The Officers claim that Troy was kicking    and trying to roll over, but Kelli denies this. We must accept Kelli's version of the facts and draw all reasonable inferences in her favor. Given the testimony that Troy was pinned down by multiple officers and appeared to be struggling to breathe, a jury could find that he was "merely trying to get into a position where he could breathe and was not resisting arrest." [146]

In *Lombardo v. City of St. Louis*,[147] the Supreme Court vacated a grant of qualified immunity and remanded it back to the Eighth Circuit for a proper analysis. In its order, the Supreme Court noted that the decedent was arrested on December 8, 2015, for failing to appear on a traffic ticket and was subsequently involved with an altercation with police officers where he was restrained in the prone position. The factual circumstances of the incident were noted:

> Several more officers responded. They relieved two of the original three officers, leaving six officers in the cell with Gilbert, who was now handcuffed and in leg irons. The officers moved Gilbert to a prone position, face down on the floor. Three officers held Gilbert's limbs down at the shoulders, biceps, and legs. At

---

[143] *Goode v. Baggett*, 811 Fed App'x 227 (5th Cir. 2020)
[144] *Id.* at 229.
[145] *Id.* at 232.
[146] *Id.* (Citations omitted).
[147] *Lombardo v. City of St. Louis*, 141 S.Ct. 2239 (2021).

least one other placed pressure on Gilbert's back and torso. Gilbert tried to raise his chest, saying, "'It hurts. Stop.'"  After 15 minutes of struggling in this position, Gilbert's breathing became abnormal and he stopped moving.  The officers rolled Gilbert onto his side and then his back to check for a pulse. Finding none, they performed chest compressions and rescue breathing. An ambulance eventually transported Gilbert to the hospital, where he was pronounced dead.[148]

While the District Court and 8th Circuit granted qualified immunity to the officers, the Supreme Court vacated the decision and instructed the 8th Circuit to perform a proper qualified immunity analysis which included:

> Such details could matter when deciding whether to grant summary judgment on an excessive force claim. Here, for example, record evidence (viewed in the light most favorable to Gilbert's parents) shows that officers placed pressure on Gilbert's back even though St. Louis instructs its officers that pressing down on the back of a prone subject can cause suffocation. The evidentiary record also includes well-known police guidance recommending that officers get a subject off his stomach as soon as he is handcuffed because of that risk. The guidance further indicates that the struggles of a prone suspect may be due to oxygen deficiency, rather than a desire to disobey officers' commands. Such evidence, when considered alongside the duration of the restraint and the fact that Gilbert was handcuffed and leg shackled at the time, may be pertinent to the relationship between the need for the use of force and the amount of force used, the security problem at issue, and the threat—to both Gilbert and others—reasonably perceived by the officers. Having either failed to analyze such evidence or characterized it as insignificant, the court's opinion could be read to treat Gilbert's "ongoing resistance" as controlling as a matter of law. *Id.*, at 1014. Such a *per se* rule would contravene the careful, context-specific analysis required by this Court's excessive force precedent.[149]

In *Timpa v. Dillard*,[150] Anthony Timpa died while being restrained by police in the prone position on August 10, 2016. The District Court granted summary judgment based on qualified immunity. The Fifth Circuit reversed the decision, finding that the law was clearly established as of August 10, 2016, that prolonged use of the prone restraint was both unconstitutional and violated

---

[148] *Id.* at 2239-2240. (Citations omitted).
[149] *Id.* at 2241-2242.
[150] *Timpa v. Dillard*, 20 F.4th 1020 (5th Cir. 2021)

clearly established law and held as follows:

> The Officers next argue that Timpa continued to actively resist arrest by "squirm[ing]" and "mov[ing] his head from left to right" in the final minutes of the restraint. Plaintiffs contend that Timpa moved his body in order to breathe. Plaintiffs' expert, Dr. Collins, testified that pressing down on the torso of a subject held in a prone restraint "greatly increases the work of breathing," which leads the subject to "experience[ ] air hunger, panic, and anxiety as Mr. Timpa did." She concluded: "[i]t can be anticipated that the victim will attempt to move his body in order to breathe."[3]

> The risks of asphyxiation in this circumstance should have been familiar to Dillard because he had received training on the use of a prone restraint to control subjects in a state of excited delirium. DPD training instructed that a subject in a state of excited delirium must, "as soon as possible[,] [be] mov[ed] ... to a recovery position (on [their] side or seated upright)," because the prolonged use of a prone restraint may result in a "combination of increased oxygen demand with a failure to maintain an open airway and/or inhibition of the chest wall and diaphragm [that] has been cited in positional asphyxia deaths." . . . A jury could find that an objectively reasonable officer with Dillard's training would have concluded that Timpa was struggling to breathe, not resisting arrest.[151]

In addressing whether the law was clearly established, the Fifth Circuit noted:

> Within the Fifth Circuit, the law has long been clearly established that an officer's continued use of force on a restrained and subdued subject is objectively unreasonable. . . .

> This conclusion comports with the decisions of our sister circuits that have considered similar facts. *See McCue v. City of Bangor*, 838 F.3d 55, 64 (1st Cir. 2016) (holding that "it was clearly established in September 2012 that exerting significant, continued force on a person's back 'while that [person] is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force' " (citation omitted)); *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008) (holding that "the law was clearly established," by December 2002, "that applying pressure to [a subject's] upper back, once he was handcuffed and his legs restrained, was constitutionally unreasonable due to the significant risk of positional asphyxiation associated with such actions"); *Abdullahi v. City of Madison*, 423 F.3d 763, 764–66 (7th Cir. 2005) (holding that the record supported an inference of deadly force when an officer restrained a mentally ill individual in the prone restraint position with bodyweight force for thirty to forty-five seconds until the individual lost consciousness); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004) (holding that the law in April 2000 clearly

---

[151] *Id.* at 1031-1032. (Citations omitted.)

established that "putting substantial or significant pressure on a     suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constituted excessive force"); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1061 (9th Cir. 2003) (holding that the continued use of a prone restraint with weight force "despite [the arrestee's] repeated cries for air, and despite the fact that his hands were cuffed behind his back and he was offering no resistance" constituted excessive force).[152]

\* \* \* \* \*

Here, a prone restraint was used in tandem with Dillard's body weight for over fourteen minutes. If a jury were to find that Timpa was subdued and nonthreatening by nine minutes into the restraint, then the continued use of force for five additional minutes was necessarily excessive. . . .  Because the state of the law in August 2016 had clearly established that the continued use of force against a restrained and subdued subject violates the Fourth Amendment, Defendant-Officer Dillard is not entitled to qualified immunity.[153]

In *Fairchild v. Coryell County, Texas*,[154] the Fifth Circuit denied qualified immunity to jailers who improperly utilized prone restraint. In denying qualified immunity, the Fifth Circuit noted:

But a jury's finding that the jailers continued to apply pressure to Page's neck, back, and legs for more than two minutes after she was subdued—Page at this point in the encounter was lying prone on her stomach with her hands handcuffed behind her back—would establish a violation of clearly established law. . . .  In cataloguing our jurisprudence on this point last year, *Timpa* identified features of the cases that had "reaffirmed" this principle "again and again." Most will sound familiar: the seized individual was "suspected of only a minor offense," "initially resisted," "was obese and forced to lie prone on [the] stomach with [ ] hands restrained and bodyweight force applied to [the] back," and "[m]ost importantly ... was subdued, unable to flee, and non-threatening during the continued use of force." By the time of this October 2017 encounter, the law had thus "clearly established the unreasonableness of [Pelfrey's and Lovelady's] continued use of bodyweight force to hold [Page] in the prone restraint position after [she] was subdued and restrained." *Id.*[155]

---

[152] *Id.* at 1036-1037.
[153] *Id.* at 1038.
[154] *Fairchild v. Coryell County, Texas*, 40 F.4th 359 (5th Cir. 2022).
[155] *Id.* at 368 (citations omitted).

Finally, in *Perkins v. Hart*,[156] this Court denied qualified immunity to officers involved in the use of force and prone restraint against the plaintiff.  In denying qualified immunity, this Honorable Court catalogued the Fifth Circuit case law establishing that continued restraint of a subdued subject violates clearly established law as follows:

> Within the Fifth Circuit, the law has long been clearly established that an officer's continued use of force on a restrained and subdued subject is objectively unreasonable."  Just recently, the Fifth Circuit "catalogued" its jurisprudence on this point and "identified features of the cases that had 'reaffirmed' this principle 'again and again.'" Some of those features included were "the seized individual as 'suspected of only a minor offense,' 'initially resisted,' 'was ... forced to lie prone on [the] stomach with hands restrained and bodyweight force applied to [the] back,' and, 'most importantly ... was subdued, unable to flee, and non-threatening during the continued use of force.'" The Court would be remiss not to point out how many of those features apply to the matter before it. Plaintiff has properly rebutted Defendants' claim of qualified immunity. Defendants' Motion for Summary Judgment seeking qualified immunity for the Defendants in regard to Plaintiff's arrest is denied.[157]

The factors catalogued in *Fairchild* and *Perkins* all apply here: E.P. was not suspected of any criminal offense at all; he was forced to lie prone on his stomach with his hands restrained and bodyweight force applied to his backside, he was fully subdued, unable to flee, and non-threatening. And yet the officers continued to apply force. Defendants' motions should be denied.

**B.    Defendants' motions should be denied because all of the *Graham* factors weigh in favor of denying qualified immunity.**

As described above, *Graham* directs courts to assess force using a range of factors, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. All of those factors here point to the plausibility that a reasonable jury could conclude that Defendants' force was excessive.

---

[156] *Perkins v. Hart*, 617 F.Supp.3d 444 (ED LA 2022).
[157] *Id.* at 462.

1. <u>The "severity of crime" factor weighs against qualified immunity, because E.P. was not suspected of any crime at all.</u>

E.P. was a severely autistic, non-verbal 16-year-old child who lacked the mental capacity to commit a crime.  After leaving Laser Tag, E.P. had an outburst or meltdown caused by his severe disability[158] This outburst or meltdown was a symptom of his severe autism and was a medical condition caused by his incurable, severe disability, not a criminal violation.[159]

The Defendants admitted that E.P. was not suspected of committing a crime. All of the Individual Defendants responded to Interrogatory No. 13 as follows:

INTERROGATORY NO. 13: Please state all charges placed against Plaintiff or intended to be placed against Plaintiff and the factual basis for each charge from your initial observation of the Plaintiff until his death.

RESPONSE:  Defendant's involvement in this incident sued upon was to assist the Plaintiffs, whose son was reportedly uncontrollable.  No criminal charges were anticipated relative to this incident. (Response of Pitfield, Vaught, Mehrtens, Vega, Guidry, Estrada, and Gaudet).

RESPONSE:  To the best of my knowledge, no charges were placed or were intended to be placed against E.P.  (Response of Sheriff Lopinto in his individual capacity).

Lt. Meunier, Sheriff Lopinto's 30(b)(6) corporate representative regarding the issuance of warrants for E.P.'s school and medical records, testified that the "only crime that could have conceivably been considered at that point would be one by deputy or deputies against [E.P.]"[160]

Finally, Defendant's own expert, George Armbruster noted:

---

[158] These are common characteristics of a person with autism experiencing an "outburst."  R. Doc. 156-3 - Debbaubt Report, p, 7 ([Autistic persons] "are subject to sensory overload outbursts a/k/a "outbursts" or "meltdowns" which are involuntary, automatic "reflex" responses to stressors, which can result in self-injurious behaviors and injuries to others, such as hitting, kicking and biting.").

[159] R. Doc. 156-4 - Dr. Sperry Expert Report, p. 4 ("While [EP] made certain movements while being restrained by Pitfield, it is my opinion that these movements were not willful, active resistance or efforts to harm the officers, but behavioral manifestations of his autism and evidence of oxygen deficiency which was resulting from his continuous and prolonged restraint.").

[160] R. Doc. 93-5, Meunier Dep., 43:2-6

There was no intention by any deputy to bring E.P. to jail. No Deputy testified that this was the course of action that was going to occur. Deputy Pitfield testified that he was detaining E.P. to determine what had occurred. Answer to Interrogatories also support that no deputy had the intention to arrest EP.[161]

2.     <u>The "immediacy of threat" factor weighs against qualified immunity, because E.P. was facedown, handcuffed, shackled, and surrounded – and not a threat to anyone.</u>

When Deputy Pitfield arrived on the scene, the physical encounter between E.P. and his father had ended. E.P. was standing next to the open door of the family car as Deputy Pitfield drove up.[162] E.P.'s father advised Deputy Pitfield that E.P. was autistic. E.P. began "stimming" (slapping himself), flailing his arms at his father, and finally flailed his arms at Deputy Pitfield and struck him. Deputy Pitfield forced E.P. to the ground at which point E.P. bit Deputy Pitfield near his ankle. Deputy Pitfield struck E.P. in the head area with his fist one time. These two actions towards Deputy Pitfield are the only time that E.P.'s conduct was directed at any JPSO deputy. <u>But Plaintiffs are not alleging that the take-down was excessive.</u> They are suing for what happened next. Once E.P. was on the ground, Deputy Pitfield, who weighed over 300 pounds, restrained E.P. in the prone position, sat on E.P.'s backside, and called for back-up.

Approximately six minutes after being placed in the prone position, Detective Vaught was the first back-up officer to arrive and helped Pitfield handcuff E.P. with two sets of handcuffs without any difficulty.[163] Detective Vaught said he would not have left Deputy Pitfield alone if he did not believe it was safe to do so.[164]

---

[161] R. Doc. 151-8 – Ambruster Report, p. 7.
[162] R. Doc. 154-3 – Laser Tag Security Video (Manually Filed) and can be assessed at this Dropbox link: https://www.dropbox.com/scl/fo/13u3a5brur1alkvjcscmg/h?dl=0&rlkey=w4it5r13jbyhu1m240sxjwrf3
[163] R. Doc 155-4 – Vaught Statement, p. 4 (Q. You're meeting resistance. A. No, no, no, not – not really, no… Um, he was – he was um, moving a little bit but he wasn't trying to resist or pull – pull his arm away); R. Doc. 156-5 – Vaught Dep., at 122.
[164] *Id.* at 123.

Shortly thereafter, Detective Mehrtens arrived and noted "there wasn't, there wasn't a struggle, it didn't appear to be a struggle"[165] and "I didn't see a struggle so there was no need for me to engage him."[166]  Then Deputy Vega arrived and noted that Deputy Pitfield was on E.P.'s "butt area" and he believed Deputy Pitfield had control of E.P.[167] Deputy Guidry arrived and testified that Deputy Pitfield said he "pretty much" had E.P. under control and there was nothing she could do.[168] Deputy Estrada arrived and said he did not see a struggle where he believed Deputy Pitfield needed his help.[169]

Deputy Vega switched positions with Deputy Pitfield to continue the prone restraint of E.P. During the transfer, Deputy Vega noted that E.P. was calm and not offering any resistance.[170] Deputies Estrada and Gaudet did not see any struggle during this transition.[171]  While Deputy Vega was restraining E.P. in the prone position, Deputies Estrada obtained leg irons and proceeded to shackle E.P.'s legs with Deputy Vaught.  At that point, E.P. was facedown, on the ground, hands cuffed behind his back, with his legs shackled. He was not an immediate threat to anyone. If he had begun to move his legs around, the deputies could have applied the RIPP Hobble device that they had with them or simply hold his legs as they moved E.P. into the recovery position or set E.P. upright.[172]

3.     <u>The "active resistance" factor weighs against qualified immunity, because a reasonable jury could conclude that E.P. was struggling to breathe, not resisting arrest.</u>

---

[165] *Id.*

[166] *Id.* at 4.

[167] R. Doc. 18-5 - Vega Statement, p. 2.

[168] R. Doc. 156-7 - Guidry Dep., 49-50.

[169] R. Doc. 156-8 – Estrada Dep., at 95.

[170] R. Doc. 18-5 - Vega Statement, pp. 2, 5.

[171] R. Doc. 156-8 – Estrada Dep., at 100; R. Doc. 156-9 - Gaudet Dep., 96-98.

[172] R. Doc. 168-8, Gaudet Dep. at 69:7-10 ("Q On the date in question, when you had the RIPP Hobble training, did you have a RIPP Hobble in your car? 10 A Yes.")

Once E.P. was forced to the ground by Deputy Pitfield, he remained under continuous, pressurized restraint, was handcuffed and leg-shackled for over nine minutes.[173] For most of that time, E.P. was still. But from time to time, his body would move.  Plaintiffs' forensic pathologist, Dr. Kris Sperry, reviewed the tape and noted that E.P.'s behavior appeared to be manifestations of his Severe Autism Spectrum Disorder and oxygen deficiency.[174] Second, Plaintiffs' police expert, Jeff Noble, reviewed the tape and also opined that E.P. was not actively resisting but more likely struggling to breathe as a result of the prone restraint.[175] Finally, Plaintiffs' autism expert, Dennis Debbaubt, reviewed the video tape and opined that E.P. conduct was consistent with have a sudden, sensory outburst or meltdown and not active resistance.[176] Accordingly, a reasonable jury could conclude that E.P.'s actions were manifestations of his disability and oxygen deficiency, not "active resistance."

---

[173] R. Doc. 154-3 – Laser Tag Video – 08:51 (Pitfield forces E.P. to the ground) – 18:57 (E.P. rolled onto his back) = 10 minutes and 6 seconds.

[174] R. Doc. 156-4 - Dr. Sperry Expert Report – which notes: 1) "While [EP] made certain movements while being restrained by Pitfield, it is my opinion that these movements were not willful, active resistance or efforts to harm the officers, but behavioral manifestations of his autism and evidence of oxygen deficiency which was resulting from his continuous and prolonged restraint." (Page 4); 2) "Again, at this time, it doesn't appear that [EP] is offering any real resistance or danger to the deputies.  As previously noted, the actions of [E.P.] appear to be consistent with the physical manifestation of his SASD and oxygen deficiency stemming from the prolonged restraint." (Page 6); and 3) "The inability of the autistic person to understand and comprehend commands, and especially an individual with Severe Autistic Spectrum Disorder, who are confronted by or otherwise involved in an incident with law enforcement officers, can result in disaster if the officer(s) decide to continue to utilize a prone restraint against an obese, severely autistic person." (Page 11).

[175] R. Doc. 142-8 – Noble Report, ¶ 61 ("The deputies claim that EP was actively resisting and that they had no other option other than maintain EP in the prone position is absurd."); ¶ 61(d) ("A reasonable police officer would know that a subject's movement in these circumstances is likely being done to help the subject breathe and is not active resistance."); ¶ 61(e) ("While it would have been safe and reasonable for two deputies to roll EP on his side even if he was kicking to place him in the recovery position, it is unconscionable that after the arrival of multiple deputies, none of whom are assisting in holding EP, that the deputies somehow could not have placed EP in a recovery position when the known consequence of their failure to do so may cause the death of EP.")

[176] R. Doc. 156-3 – Debbaudt Report, pp. 15-16 ("It is well-known and documented in law enforcement and first responder's literature that subjecting autistic persons to prone, pressurized restraint poses significant risk of asphyxia. Non-verbal, severely autistic persons are unable to understand or comprehend even the simplest commands which may be interpreted as resistance or intentional disobedience. The continued, prone restraint of severely autistic children, especially those who are obese and non-verbal, is known to law enforcement to pose a significant risk of catastrophic outcomes.").

Each of the *Graham* factors thus weigh heavily in favor of E.P.  Based on an analysis of the *Graham* factors, it is clear that the continued pressurized restraint of E.P., use of pain compliance techniques and a chokehold, and failure to place E.P. into the recovery position was excessive, objectively unreasonable and, therefore, unconstitutional. Defendants' motions should be denied.

**C.      This Court should deny Defendants' motion for summary judgment on Plaintiffs' failure-to-intervene claim because Defendants do not deny they witnessed deputies sit on top of an obese, face-down, hand-cuffed, foot-shackled minor – and they did nothing prevent his death.**

In R. Doc. 169, Defendants Vaught, Mehrtens, Guidry, Estrada, and Gaudet moved for partial summary judgment regarding Plaintiffs' failure to intervene (aka "bystander liability") theory.[177]

The basis for Plaintiffs' theory is that in the Fifth Circuit, it has been clearly established since 1995 that officers have a constitutional obligation to protect a suspect from another officer's unconstitutional actions and that the failure to intervene may subject an officer to liability under 42 U.S.C. Section 1983.[178] Under Fifth Circuit law, "an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983."[179] "[A]n officer may be liable under § 1983 under [this] theory of

---

[177] Deputies Pitfield and Vega filed separate Motions for Partial Summary Judgment which did not include any argument regarding failure to intervene claims made against them.  The complaint made failure to intervene claims against all seven deputies, including Deputy Pitfield and Deputy Vega. R. Doc. 1 – Complaint, ¶ 213 (And even then, none of the seven (7) deputies made any effort to de-escalate or mitigate the use of force or to intervene to roll him over on his side or sit him up or stand him up or to place in him in "recovery position."); ¶ 386 The actions of the JPSO Deputy Defendants, *i.e.*, Pitfield, Vaught, Mehrtens, Vega, Guidry, Estrada and Gaudet in using excessive and unreasonable force in the seizure and restraint of E.P. and in failing to intervene or act to prevent such actions, despite having the opportunity and duty to do so, as set forth herein, violated the rights of E.P.).  As set forth herein, both Deputy Pitfield and Deputy Vega used excessive force and restraint; Deputy Vega failed to intervene in Deputy Pitfield's excessive restraint of E.P; and Deputy Pitfield failed to intervene in Deputy Vega's excessive restraint, use of a pain compliance hold and use of a chokehold.

[178] *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995); *Harris v. Chanclor*, 537 F.2d 203, 205–06 (5th Cir.1976); *Smith v. Dooley*, 591 F.Supp. 1157, 1168 (W.D.La.1984), *aff'd*, 778 F.2d 788 (5th Cir.1985); *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 205 n. 3 (1st Cir.1990), *cert. denied*, 500 U.S. 956, 111 S.Ct. 2266, 114 L.Ed.2d 718 (1991).

[179] *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).

bystander liability where the officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.'"[180]

In their motion, Vaught, Mehrtens, Guidry, Estrada, and Gaudet do not deny that they saw their fellow officers sit on top of an obese, face-down, prone-positioned, hand-cuffed, foot-shackled developmentally disabled minor.[181] They do not deny that they had the means and opportunity to intervene and roll E.P. into the recovery position. They only deny that they "saw Deputy Vega choke E.P. or apply any type of choke hold," and deny that they heard "anyone complain that E.P. was being choked."[182] But Plaintiffs' excessive force claim is not limited to the choking – it includes the nine minutes of officers sitting on E.P.'s backside during which time none of the deputies intervened to place E.P. in the recovery position, or even attempted to do so, despite the obvious and known risks of positional asphyxia.  For that reason, Defendants' motion should be denied.

Furthermore, each and every one of the deputies was in close proximity to the scene and were in a position to observe the prone restraint of E.P. and both the pain compliance technique and chokehold employed by Deputy Vega. And many of them conceded that they were told E.P. was choking or couldn't breathe.

Ms. Lou testified that she told the deputies that E.P. was having trouble breathing and they were choking E.P. yet her statement were ignored.[183] Deputy Vega denied he was choking E.P.,

---

[180] *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013).
[181] R. Doc. 169-1 at 8-9 ("Deputy Mehrtens did observe E.P.'s resistance to Deputy Pitfield's efforts to control him." Deputy Mehrtens observed Deputy Pitfield to be sitting on E.P.'s "buttocks.")
[182] R. Doc. 169-1 at 8-11.
[183] Ex. C – Donna Lou Dep., 181:6-182:2; 183:10-16; 185:24-186:10; 195:4-11; 197:1-9. ("He's having trouble breathing. He is having trouble breathing. He is in a chokehold just like the man from New York, Eric Garner, died. It is just like the man from Baton Rouge, how he died.").

32

however, the forensic evidence reveals that Deputy Vega did utilize a forearm bar choke hold which impacted E.P.'s ability to breathe.[184] Deputy Guidry acknowledged that Ms. Lou complained that E.P. was not breathing.[185] Deputy Estrada acknowledged that Ms. Lou was complaining that the deputies were killing her son[186] and choking him.[187] Deputy Vega acknowledged that Ms. Lou complained about him choking E.P.[188] This complaint was made in front of all the deputies on the scene.[189] Deputy Vega also acknowledged that he understood why Ms. Lou complained that he was choking E.P.[190]

The Individual Defendants could see that E.P. was obese and, by their own admissions were aware that E.P. was non-verbal, autistic or "special needs." They could see that he was being held down in a prone position which they each knew could pose a serious risk of positional asphyxia. By their own statements and the videotape, they were in close proximity to E.P. as he was being held down and were able to observe the use of excessive force and prone restraint on E.P. They had the knowledge, the time and the opportunity to intervene once E.P. was restrained and posed no immediate threat to the deputies. Further, after Deputy Vega took over the prone restraint, he

---

[184] R. Doc. 142-7 - Sperry Report Excerpt ("The physical findings at autopsy confirm that Vega utilized a "forearm bar" choke hold which significantly impacted [E.P.]'s airway and ability to breathe.")

[185] R. Doc. 155-3 – Guidry Statement, p. 2 ("So Nick had his arm around him and Myron was down below, I guess checking to make sure everything was okay, and the kid was still, everything was fine. And then I hear the mom said, "I don't know if he's breathing, I don't know if he's breathing." And Myron said, "He's breathing, his stomach is going up and down. He's breathing." And then Myron said, "Let's put him on his side."")

[186] Ex. D – Estrada Statement, p. 5 ("She was I remember her standing, um, by the door, the open door of her SUV and she kept fooling around with her phone and she, she just I remember just hearing her shout y'all are killing my son when all we were doing was trying to control him." "She just kept, she was hysterical.")

[187] R. Doc. 156-8 – Estrada Dep., pp. 119-120; Ex. D. – Estrada Statement, p. 7 (Q. I usually don't share information (inaudible) but the reason I'm asking you, she asserts that she, she said out loud whether it's you're choking him, or y'all killing him but you're cooperating. She. She was audible about that. She was saying things like that. A. Yea, she was saying things like that but the whole time we weren't hurting him. We were just trying to control him.).

[188] R. Doc. 105-9 - Vega Dep., 129:16-130:24; R. Doc. 18-5 - Vega Statement at 6 (Q. So the mother, who makes an assertion, two fold actually that he was choked and that she asserted it at the time. Did you ever hear her say anything about him being choked. A. I did. Q. Did you hear her say that. A. Yes. Q. So she did do that. A. Yes.).

[189] R. Doc. 18-5 – Vega Statement – at 10 (Q. Who was she saying that to, do you know. A. Everybody that was standing around).

[190] R. Doc. 18-5 - Vega Statement at 10 (Q. Well you can see that maybe, it's a perception thin, maybe that's a legitimate perception from her standpoint. A. Oh absolutely, I could understand her perception of it.)

employed a pain compliance technique and then a choke hold which resulted in Ms. Lou complaining out loud in the presence of all of the Individual Defendants.  However, none of the [] seven (7) Individual Defendants intervened. To the extent that these five (5) defendants now attempt to dispute these facts, there are genuine issues of material facts.  The five (5) Individual Defendants' Motion for Partial Summary Judgment on Plaintiffs' Failure to Intervene/Bystander Liability Claims should be denied.

**D.      This Court should deny Defendants' Motion to Dismiss because it is untimely.**

In Section IV of the Motions for Summary Judgment, Individual Defendants' move to dismiss claims asserted in Plaintiffs' complaint under the First, Ninth and Fourteenth Amendment. Citing *Iqbal* and *Twombly,* the Defendants argue that the "well-pleaded factual allegations 'do not permit the court to infer more than the mere possibility of misconduct.'"[191] The Motion to Dismiss these claims is untimely. Pursuant to Fed. R. Civ. Proc. 12(b), a motion for failure to state a claim upon which relief can be granted "must be made before pleading if a responsive pleading is allowed."  For example, in *Armstrong v. Ashley*[192] the Fifth Circuit affirmed the dismissal of a motion to dismiss as untimely when filed after the Answer. Here, Answers have previously been filed by all of the JPSO defendants.[193] Their Motion to Dismiss is untimely, and must be denied. Should this Court decide to consider the merits of defendants' untimely motion, plaintiffs reserve the right to respond on the merits.

## III.     CONCLUSION

The Motions for Partial Summary Judgment filed by the Individual Defendants for the use of excessive force and failure to intervene should be denied because the evidence, when read in a

---

[191] R. Doc. 171-1 at 14-15.
[192] 918 F.3d 419 (5th Cir. 2019).
[193] R. Doc. 9.

light most favorable to Plaintiffs, shows that the conduct of the Individual Defendants was objectively unreasonable, unconstitutional and in violation of clearly established law. And Defendants' motions to dismiss should be denied as untimely.

RESPECTFULLY SUBMITTED,

WILLIAM MOST (BPR # 36914)
Most & Associates
201 St. Charles Ave., Ste. 114 #101
New Orleans, LA 70170
Tel: (504) 509-5023
williammost@gmail.com

/s/ Andrew C. Clarke
Andrew C. Clarke (TN BPR # 15409)
The Cochran Firm Midsouth
One Commerce Square, Suite 1700
(901) 523-1222 (Telephone)
aclarke@cochranfirmmidsouth.com

35