UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DONNA LOU, ET AL. | * | CIVIL ACTION NO. 21-80 |
| VERSUS | * | SECTION "D" (2) |
| SHERIFF JOSEPH P, LOPINTO, III, ET AL. | * | Judge Wendy B. Vitter |
| | | Magistrate Judge Donna P. Currault |

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNCONTESTED FACTS IN SUPPORT OF JPSO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56 (R. Doc. 169-3)**

1. **This case involves the death of an individual (E.P.) who violently attacked his father and the responding Deputy that was called to the scene in the parking lot of the Westgate Shopping Center in Metairie, La. on January 19, 2020. The call for service was made by a horrified onlooker. R. Doc. 1.**

   It is not contested that this case involved the in-custody death of an individual (E.P.) who is a 16-year-old severely autistic child who physically assaulted his father during an involuntary sensory outburst or "melt-down" related to his disability, i.e., severe autism. This sensory outburst resulted in E.P. manifesting self-injurious and aggressive behaviors towards himself, as well as his father and JPSO Deputy Pitfield who was the first responding deputy. The description of the incident and mindset of the onlooker are not facts, but statements of opinion and are denied. For further response, it was at the request of Ms. Donna Lou, E.P.'s mother, that Heather Hilton, the manager at Laser Tag, called JPSO Deputy Pitfield who was a JPSO deputy working a special off-duty detail on the premises and told him that there was an incident involving an autistic child and his father.[1]

2. **The Defendant J.P.S.O. Deputies were called to the scene based upon a report from a business manager that E.P. was violently out of control and severely beating his own father, Plaintiff, in the parking lot. *Id*.**

---

[1] Ex. A - Heather Hilton Statement, pp. 9-10 ("I got on the phone. I let Victory know that uh, you know there's a man with his autistic child um, it's an autistic adult child. They're outside. They're in a confrontation. It's getting pretty serious, can you please come over here.")

1

**DISPUTED.** The defendants' description of the incident by the business manager to Deputy Pitfield is inaccurate and is disputed.[2]

3.      **The Defendant J.P.S.O. Deputies arrived to find a horrifying scene. E.P. had severely injured his father. E.P. had bitten a piece of his fathers face off, leaving open and obvious trauma.**

**Disputed as worded**. This Statement of Fact does not identify any specific deputy or the time of their alleged observation.  Plaintiffs do not dispute that Mr. Parsa had a bite injury on his chin for which he subsequently received medical treatment, caused by the behavior of his son, E.P. due to a sensory outburst E.P. was experiencing related to his severe autism. This behavior took place prior to the deputies' arrival.  In their statements shortly after the incident, none of the deputies described the scene upon arrival as "horrifying."

If this Statement of Fact is attempting to describe Deputy Pitfield's initial arrival on the scene, Plaintiffs' dispute that he arrived to a horrifying scene.  At 08:11 on the video, Deputy Pitfield's vehicle can be seen approaching with emergency lights activated.[3]   Deputy Pitfield arrives to the scene and parks adjacent to the Parsa vehicle.[4]  At this time, E.P. and his father are standing next to the family vehicle and there is no struggle or physical encounter taking place.[5] Mr. Parsa informed Deputy Pitfield that E.P. was autistic.[6]  Once Pitfield approached, E.P. began "stimming", flailing  his arms and slapping himself, then his father and then Deputy Pitfield.[7] Deputy Pitfield appears to call for back-up on his radio.[8]  At 08:51 on the videotape, Deputy

---

[2] See Footnote 1.
[3] R. Doc. 154-3 – Laser Tag Video - 08:11.
[4] R. Doc. 154-3 – Laser Tag Video - 08:29.
[5] R. Doc. 154-3 – Laser Tag Video - 08:29-08:34.
[6] Ex. B - Daren Parsa Dep., 208:20-209:3.
[7] R. Doc. 154-3 – Laser Tag Video - 08:36-08:49; Ex. B - Daren Parsa Dep., 208:20-209:3.
[8] R. Doc. 154-3 – Laser Tag Video - 08:42-08:44.

Pitfield takes E.P. to the ground.[9]   Deputy Pitfield remains seated on E.P.'s backside for 7  minutes

and 9 seconds, until 16:00 on the video tape, when he is relieved by Deputy Vega.[10]

If this statement of fact refers to the time period when other deputies arrived, Plaintiffs'

dispute that as well as set forth in response to Statement of Facts Nos. 7-9.

4.     **The Defendant J.P.S.O. Deputies did as best they could to manage E.P. While trying to gain control over E.P., E.P. bit Deputy Pitfield, causing injury.**

**Disputed**.  The JPSO deputies did not do "as best they could to manage E.P.," because they

failed to use specific management techniques they had been trained on. For example, each deputy

was trained to immediately place a restrained person in the "recovery position" (i.e., place them

on their side or seated upright) to avoid the risk of positional asphyxia.[11] None of the deputies

placed E.P. in the recovery position until it was too late – after he had gone limp and urinated on

himself.

Similarly, the deputies were trained to use a "SWARM" technique to prevent potential

death from positional asphyxia, even when dealing with a violently resisting person. Per that

training, deputies were to work together to take a suspect down and then "apply a hobble restraint

to the  ankles  and roll the subject into an upright seated position…. Position the subject so that he

or she can lean back against a fixed object.  This helps relieve pressure on the diaphragm and make

breathing easier."[12]   None of the deputies used the SWARM technique. They also failed to

positioned E.P. so that he would be able to breathe, until it was too late

---

[9] R. Doc. 154-3 – Laser Tag Video – 08:51-08:54.
[10] R. Doc. 154-3 – Laser Tag Video – 08:41-16:00.
[11] R. Doc. 144-3 - Pizzolato Dep., p. 64:9-12 - (Q. When do you train them to put them in the recovery position?  A. I train them never to leave anybody in a prone position); Pizzolato, 68:1-2 (A. I train to not leave somebody in a prone position).
[12] R. Doc. 156-11 – RIPP Hobble Training Power Point, pp. 46-47.

JPSO Standard Operating Procedures # 8, entitled Restraining Devices & Defensive Devices Policy, requires the use of the Total Appendage Restraining Procedure (TARP) with the RIPP Hobble devices with "extremely violent prisoners."  None of the deputies used the TARP or RIPP Hobble device.  Further, while all deputies are provided a RIPP Hobble after training,[13] only Deputies Gaudet and Estrada had a RIPP Hobble on the scene.[14]

The deputies knew that E.P. was autistic, "special needs", was essentially non-verbal and obese.  JPSO trains its deputies that: 1) people suffering from diminished capacity are at increased risk of death from prone restraint;[15] 2) people who are obese are at increased risk of death from prone restraint;[16] and 3) sitting on an obese person's legs instead of back may not relieve pressure and still poses risks during prone restraint.[17] According to JPSO's 30(b)(6) witness, six deputies at a scene is a sufficient number of deputies to restrain someone in the recovery position and avoid the dangers of positional asphyxia.[18] Nevertheless, Pitfield and Vega, in sequence, sat on E.P.'s backside, holding him  in prone restraint for over 9 minutes, almost 4 minutes of time which E.P. was fully handcuffed. During this extended period, they did not roll him over or sit him upright into the recovery position or even attempt to do so. Instead, more physical pressure was applied after he was fully handcuffed, including leg shackles, other deputies physically holding E.P. down, and application of a pain compliance technique and a choke-hold by Deputy Vega.  None of the deputies intervened to place E.P. in recovery position despite having knowledge of the serious risk of death to E.P. by positional asphyxia and the opportunity to intervene.

---

[13] *Id.* at *88*:14-23.
[14] R. Doc. 142-3 - Pitfield Dep., 48:4-14; R. Doc. 156-5 - Vaught Dep., 92:8-7; 94:20-21; R. Doc. 156-7 - Guidry Depo., 41:18-25; 43:20-25; R. Doc. 105-9 - Vega Depo, 164:22-165:8; R. Doc. 156-6 - Mehrtens Dep., 34:24-35:7; R. Doc. 156-8 - Estrada Dep., 24:16-23; R. Doc. 156-9- Gaudet Dep., 69:7-15.
[15] R. Doc. 144-3 – Pizzolato Dep., 53:13-22.
[16] R. Doc. 144-3 – Pizzolato Dep., 53:23-24; 66:15-67:12.
[17] R. Doc. 144-3 – Pizzolato Dep., 53:23-24; 66:15-67:12.
[18] R. Doc. 144-3 -Pizzolato Dep., 90:21-94:19.

Plaintiffs submit that the deputies' failure to comply with their specific policies and training and clearly established law with respect to dealing with subjects held in prone restraint, especially those who are obese, given the known risks involved with prone restraint and the obvious vulnerabilities of E.P. to death by positional asphyxia, demonstrates that they did not do the best they could to manage the situation.

**5.     Regrettably, E.P. expired on the scene.**

It is unclear whether E.P. expired on the scene or en route to the hospital, but that distinction is not relevant to Defendant's motion.  There is little evidence that JPSO regrets the incident, given Sheriff Lopinto's choice not to conduct an internal affairs investigation or critical incident review, his decision to indemnify the deputies for punitive damages should the jury find that they acted willfully, intentionally or with malice, his ratification of the conduct of the deputies and his decision to not review or change any policy, practices, training, or procedures as a result of the actions of the deputies which resulted in the death of E.P.[19]

**6.     The entire incident was caught on surveillance cameras, the video of which is attached as Exhibit 1.**

It is disputed that the "entire incident" was caught on surveillance cameras. It is not disputed that security video tapes from the Laser Tag captured many key elements of this incident, albeit without any audio, which is obviously an element of the "entire incident" which is missing. It is also undisputed that Sheriff Lopinto made the decision to not require or provide his deputies with body cameras, which, if properly utilized, would have recorded all or almost all of the events, at close range, with audio.

**7.     The video speaks for itself and clearly shows that the scene was never secure prior to E.P.'s demise.**

---

[19] R. Doc. 150-5 – Lopinto Dep., 169:15-18; 178:8-21.

**Disputed.** This alleged fact is contradicted by other of Defendants' alleged material facts. It is also contradicted by the video and the deputies' own statements.

Specifically, this alleged fact is contradicted by Defendants' alleged Fact # 23, which contends that Pitfield told Guidry that "I pretty much have him under control."[20] It is also contradicted by alleged Fact # 16, that "Deputy Mehrtens did not perceive a need to assist Deputy Pitfield."[21] And alleged Fact # 11, that Vaught "left to speak with E.P.'s father believing that it was safe for him to do so."[22] It cannot be the case that (1) the "scene was never secure" _and also_ (2) that Pitfield had E.P. under control, that there was no need to assist Pitfield, and that it was safe for Vaught to walk off.

This alleged fact is also contradicted by the video of the interactions between JPSO deputies and E.P. The video initially shows an altercation, in which the severely autistic minor slaps at himself, his father, and Deputy Pitfield. At 10:13 the video shows that Pitfield has put E.P. face-down on the ground, and is sitting on his back. Detective Vaught arrived at 14:09 on the video, and helped handcuff E.P. without any issues. Additional deputies arrive and can be seen to treat the situation as "secured" and, indeed, rather than taking any action in order to secure the scene, they stand around and talk to each other.[23] What the video shows is a group of officers milling about as Deputy Pitfield and then Deputy Vega take turns sitting on top of a face-down, handcuffed, leg-shackled, obese, severely autistic minor for an extended period of time without anyone putting him in recovery position until it is too late.

This alleged fact is also contradicted by the deputies' initial statements, in which the deputies described many points at which the scene was "under control," "was calm," and

---

[20] Id. at Fact # 23.
[21] Id. at Fact # 16.
[22] Id. at Fact # 11.
[23] R. Doc. 154-3 – Laser Tag Video – 14:09 – 16:00.

"everything was fine:"

a.   Deputy Vaught said when he handcuffed EP, EP was not resisting and was "moving little bit but he wasn't trying to resist or pull his- -pull his arm away."[24] Detective Vaught said EP did not resist after he was handcuffed,[25] and he did not place EP in a recovery position after he was handcuffed because he went to speak with Mr. Parsa.  Detective Vaught said he would not have left Deputy Pitfield alone if he did not believe it was safe to do so.[26]  Detective Vaught said it was possible for the six deputies to put EP in a recovery position.[27]

b.   Deputy Mehrtens said when he arrived, EP "was face down on the ground, he had two (2) sets of handcuffs and his hands were handcuffed behind his back, with Deputy Pitfield sitting on his buttocks area."[28]  Deputy Mehrtens said when he arrived, "there wasn't, there wasn't a struggle, it didn't appear to be a struggle."[29] Deputy Mehrtens further stated, "I didn't see a struggle so there was no need for me to engage him."[30]

c.   Deputy Vega said when he arrived, Deputy Pitfield was on EP's "butt area," and he believed Deputy Pitfield had control.[31]  Deputy Vega switched positions with Deputy Pitfield to continue the prone restraint of EP.  During the transfer, Deputy Vega noted that EP was calm and not offering any resistance.[32]  While restraining EP in the prone position, Deputy Vega used a pain compliance technique on EP by elevating EP's handcuffed hands behind his back.[33]  While Deputy Vega denies he used a choke hold, he did acknowledge that he put his forearm underneath EP's chin, while connecting his hands.[34]  However, the forensic evidence reveals that Deputy Vega did utilize a forearm bar choke hold which impacted EP's ability to breathe.[35]

d.   Deputy Guidry said she was not actively involved in controlling EP, and when she arrived, Deputy Pitfield was trying to control EP. Deputy Pitfield said he "pretty much" had EP under control and there was nothing she could do.[36]  Further, Deputy Guidry said if a person is in a recovery position and actively resisting, deputies

---

[24] R. Doc. 155-4 - Vaught statement at 5.
[25] R. Doc. 156-5 - Vaught Dep., at 122.
[26] *Id.* at 123.
[27] *Id.* at 110.
[28] R. Doc. 155-2 - Mehrtens Statement, p. 3.
[29] *Id.*
[30] *Id.* at 4.
[31] R. Doc. 18-5 - Vega Statement, p. 2.
[32] *Id.* at 5.
[33] R. Doc. 155-2 - Mehrtens Statement at 6 ("Deputy Vega has technique, you know, when somebody starts struggling, you have handcuffs on them, you just begin to slightly elevate the arms so that you can just maintain control of the upper torso, um, he begins doing that….").
[34] R. Doc. 18-5 - Vega Statement at 6; R. Doc. 105-9 - Vega Dep., 129:16-130:24.
[35] R. Doc. 142-7 - Sperry Report Excerpt - ("The physical findings at autopsy confirm that Vega utilized a "forearm bar" choke hold which significantly impacted [E.P.]'s airway and ability to breathe.")
[36] R. Doc. 156-7 - Guidry Dep., 49-50.

would be able to control the person.[37]

e.     Deputy Gaudet did not see EP violently struggle between 14:00 – 15:12 on the video and he did not see a struggle when Deputy Vega exchanged positions with Deputy Pitfield at 16:00 on the video.[38]

f.     Deputy Estrada testified that when he arrived, two detectives, Deputy Vega and Deputy Pitfield were already at the scene.[39]  Deputy Estrada said he did not see a struggle where he believed Deputy Pitfield needed his help.[40]  Deputy Estrada said he did not see a struggle when Deputy Vega transitioned with Deputy Pitfield.[41]

g.     Sergeant Dowling who performed a homicide investigation of this incident and was involved in taking many of the deputies' statements also acknowledged that EP was calm during many periods of time.[42]

h.     Sheriff Lopinto admitted after watching the tape that there were several occasions during the prone restraint where the deputies could have placed EP in the recovery position including: 1) after Detective Vaught arrived and assisted Pitfield in cuffing EP behind his back;[43] 2) after other deputies arrived and there were five officers on the scene during video between 14:33 – 15:00;[44] 3) on the video tape from 15:00 – 15:28, Sheriff Lopinto stated that it was not physically impossible to place EP into the recovery position and noted that the issue was "whether or not it was reasonable" to place him in the recovery position;[45]  4) on the video tape from 16:00 – 16:29, Sheriff Lopinto acknowledged that there was no resistance which would preclude placing EP in the recovery position[46] and that "there is nothing other than their [deputies] observances that precludes them from putting him in the recovery position;"[47] and 5) after review of the video tape, Sheriff Lopinto provided the following response with respect to whether EP should have been placed in     the recovery position: "And, again as you are pausing it second by second by second, it makes it look like there is numerous opportunities, but if you let it run out from the changes of, you know, his reactions 30 seconds apart, 30 seconds apart, you know, I'm going to tell you no at this moment, yes at this moment.  No at this moment, yes at this moment, right. And so, you know, you have the ability to pause every second and ask me that same question, and I'm going to go back to the one

[37] *Id.* at 74.
[38] R. Doc. 156-9 - Gaudet Dep., 96-98.
[39] R. Doc. 156-8 - Estrada Dep., 93.
[40] *Id.* at 95.
[41] *Id.* at 100.
[42] R. Doc. 155-5 - Dowling Dep. at 112:14-19 ("Q. The interviews, like Deputy Vega, when he gave his interview, he said that when they moved to switch out, that Mr. Parsa wasn't offering any resistance, correct? A. That's when they realized that he had stopped resisting, yes."); *Id.* at 122:6-8 ("Q. And doesn't he state when he got there he put his handcuff on, and there was no resistance? A. No resistance to the handcuff."
[43] R. Doc. 150-5 - Lopinto Dep., 222.
[44] *Id.* at 226.
[45] *Id.* at 211-215.
[46] *Id.* at 217-218.
[47] *Id.* at 225.

where he is resisting and say this is why they weren't."[48] Significantly, Sheriff Lopinto could not state whether any movements by EP while restrained were efforts to resist, efforts to breathe, or were caused by a lack of oxygen caused by the effects of the prone restraint on an obese suspect.[49]

Plaintiffs' have also presented expert testimony to dispute the narrative that the scene was not secure or that E.P.'s occasional movements in response to the continued, pressurized restraint being applied, amounted to intentional resistance (or as defense counsel repeatedly falsely asserts, "extreme violence".) First, Plaintiffs' forensic pathologist, Dr. Kris Sperry reviewed the tape and noted that E.P.'s behavior appeared to be manifestations of his Severe Autism Spectrum Disorder and oxygen deficiency.[50] Second, Plaintiffs' police expert, Jeff Noble, reviewed the tape and also opined that E.P. was not actively resisting but more likely struggling to breath as a result of the prone restraint.[51] Finally, Plaintiffs' autism expert, Dennis Debbaubt, reviewed the video tape and opined that E.P. conduct was consistent with having a sudden, sensory outburst or meltdown and not active resistance.[52]

---

[48] *Id.* at 235.

[49] *Id.* at 235-237.

[50] R. Doc. 156-4 - Dr. Sperry Expert Report – which notes: 1) "While [EP] made certain movements while being restrained by Pitfield, it is my opinion that these movements were not willful, active resistance or efforts to harm the officers, but behavioral manifestations of his autism and evidence of oxygen deficiency which was resulting from his continuous and prolonged restraint." (Page 4); 2) "Again, at this time, it doesn't appear that [EP] is offering any real resistance or danger to the deputies. As previously noted, the actions of [E.P.] appear to be consistent with the physical manifestation of his SASD and oxygen deficiency stemming from the prolonged restraint." (Page 6); and 3) "The inability of the autistic person to understand and comprehend commands, and especially an individual with Severe Autistic Spectrum Disorder, who are confronted by or otherwise involved in an incident with law enforcement officers, can result in disaster if the officer(s) decide to continue to utilize a prone restraint against an obese, severely autistic person." (Page 11).

[51] R. Doc. 142-8 – Noble Report, ¶ 61 ("The deputies claim that EP was actively resisting and that they had no other option other than maintain EP in the prone position is absurd."); ¶ 61(d) ("A reasonable police officer would know that a subject's movement in these circumstances is likely being done to help the subject breathe and is not active resistance."); ¶ 61(e) ("While it would have been safe and reasonable for two deputies to roll EP on his side even if he was kicking to place him in the recovery position, it is unconscionable that after the arrival of multiple deputies, none of whom are assisting in holding EP, that the deputies somehow could not have placed EP in a recovery position when the known consequence of their failure to do so may cause the death of EP.")

[52] R. Doc. 156-3 – Debbaudt Report, pp. 15-16 ("It is well-known and documented in law enforcement and first responder's literature that subjecting autistic persons to prone, pressurized restraint poses significant risk of asphyxia. Non-verbal, severely autistic persons are unable to understand or comprehend even the simplest commands which may be interpreted as resistance or intentional disobedience. The continued, prone restraint of severely autistic

8.    **It is uncontested, and the video clearly shows that E.P.'s parents, who were both present at the scene, themselves never took any action to intervene in or bring a stop to the Deputies' actions.**

**Disputed.** It is undisputed that E.P.'s parents never took any physical actions to intervene or to bring a stop to the deputies' actions. Plaintiffs recognized and did not challenge the authority of the deputies as law enforcement officers and assumed that the deputies were properly trained and knew what they were doing. However, Plaintiffs dispute that they did not take "any action" to intervene in this situation.

When Deputy Pitfield first arrived, Mr. Parsa informed him that E.P. was autistic which, to a properly trained deputy, should have alerted him that special precautions needed to be taken. When Deputy Pitfield was sitting on E.P. who was being held face down on the asphalt parking lot, Ms. Lou attempted to prevent injury to E.P. by placing a jacket under his head as a cushion. She was instructed by Deputy Pitfield to remove the jacket/cushion. She complied with his order. Both parents recognized that E.P.'s behaviors manifested that he was experiencing a sensory outburst, and tried to calm and soothe him in order to assist him in recovering from the physical and emotional consequences of the melt-down.

After Deputy Vega utilized a choke hold on E.P., Ms. Lou testified that she told the deputies that E.P. was having trouble breathing and they were choking E.P. which was denied and/or ignored.[53]

Further, when additional deputies arrived, Ms. Lou advised the deputies that crowding E.P. was not helpful and can make matters worse.[54]  Her advice was ignored. At 18:05 on the videotape,

---

children, especially those who are obese and non-verbal, is known to law enforcement to pose a significant risk of catastrophic outcomes.").

[53] Ex. C – Donna Lou Dep., 181:6-182:2; 183:10-16; 185:24-186:10; 195:4-11; 197:1-9. ("He's having trouble breathing. He is having trouble breathing. He is in a chokehold just like the man from New York, Eric Garner, died. It is just like the man from Baton Rouge, how he died.").

[54] Ex. C – Donna Lou Dep., 182:9-183:21; 195:16-19.

Ms. Lou leaves the immediate area and goes to her vehicle to attempt to find E.P.'s treatment plan in the hopes the deputies would listen to her.[55]

When Ms. Lou complained about the actions of the deputies' actions which she observed, she was told repeatedly, "Let us do our job.  Let us do our business."[56]

In addition to Ms. Lou's testimony, many of the deputies confirmed that Ms. Lou complained about the deputies' actions. There is no indication that any of the deputies responded to her complaints or that they changed their behaviors as a result of her statements.

Deputy Guidry acknowledged that Ms. Lou complained that E.P. was not breathing.[57]

Deputy Estrada acknowledged that Ms. Lou was complaining that the deputies were killing her son[58] and that the deputies were choking him.[59]

Deputy Vega acknowledged that Ms. Lou complained about him choking E.P.[60] This complaint was made in front of all the deputies on the scene.[61] Deputy Vega also acknowledged that he understood why Ms. Lou complained that he was choking E.P.[62] Despite her complaints about E.P. being choked, Deputy Vega ignored her comment and persisted in his hold until E.P.

---

[55] Ex. C – Donna Lou Dep., 182:20-25; 183:1-7

[56] Ex. C – Donna Lou Dep., 182:9-183:21; 195:4-19; 197:1-9.

[57] R. Doc. 155-3 – Guidry Statement, p. 2 ("So Nick had his arm around him and Myron was down below, I guess checking to make sure everything was okay, and the kid was still, everything was fine. And then I hear the mom said, "I don't know if he's breathing, I don't know if he's breathing." And Myron said, "He's breathing, his stomach is going up and down. He's breathing." And then Myron said, "Let's put him on his side."")

[58] Ex. D – Estrada Statement, p. 5 ("She was I remember her standing, um, by the door, the open door of her SUV and she kept fooling around with her phone and she, she just I remember just hearing her shout y'all are killing my son when all we were doing was trying to control him." "She just kept, she was hysterical.").

[59] R. Doc. 156-8 – Estrada Dep., pp. 119-120; Ex. D. – Estrada Statement, p. 7 (Q. I usually don't share information (inaudible) but the reason I'm asking you, she asserts that she, she said out loud whether it's you're choking him, or y'all killing him but you're cooperating.  She.  She was audible about that.  She was saying things like that. A. Yea, she was saying things like that but the whole time we weren't hurting him.  We were just trying to control him.).

[60] R. Doc. 105-9 - Vega Dep., 129:16-130:24; R. Doc. 18-5 - Vega Statement, p. 6 (Q.  So the mother, who makes an assertion, two fold actually that he was choked and that she asserted it at the time.  Did you ever hear her say anything about him being choked.  A. I did.  Q.  So she did do that.  A. Yes.).

[61] R. Doc. 18-5 – Vega Statement, p. 10 (Q.  Who was she saying that to, do you know.  A.  Everybody that was standing around).

[62] R. Doc. 18-5 - Vega Statement, p. 10 (Q. Well you can see that maybe, it's a perception thin, maybe that's a legitimate perception from her standpoint.  A. Oh absolutely, I could understand her perception of it.)

had urinated on himself and then went limp.

9.    **It is uncontested, and the video clearly shows that these Defendants did not view or perceive any use of force that was excessive or that necessitated an intervention.**

      **Disputed.** It is disputed that the video clearly shows that the Defendants did not perceive any use of force that was excessive or needed intervention. The video tape shows that all of the Individual Defendants were in the immediate vicinity of all of the events involving E.P. from their arrival until E.P.'s death which included the continuous, pressurized prone restraint of E.P. who was handcuffed, the pain compliance technique employed by Defendant Vega, and the chokehold employed by Defendant Vega.[63]

      As this Statement of Fact is conclusory, rather than factual, an analysis of the Laser Tag video and other evidence is necessary to properly refute this alleged fact as follows:

      As set forth in response to Statement of Fact No. 4, it is undisputed that all of the deputies had RIPP Hobble training and were trained on the dangers of prone restraint on obese persons and the importance of the recovery position to prevent positional asphyxia. All of the deputies could see that E.P. was obese, was "special", and was essentially non-verbal.[64] The deputies reported that the only word that E.P. uttered throughout this incident was "firetruck".[65] At 08:11 on the video, Deputy Pitfield's vehicle can be seen approaching with emergency lights activated.[66] Deputy

---

[63] R. Doc. 154-3 – Laser Tag Security Video.

[64] Ex. A – Hilton Statement, p. 10 ("I let Victory [Pitfield] know that uh, you know there's a man with his autistic child um, it's an autistic adult child."); Ex. E – Pitfield Statement, p. 5 ("… the only pre knowledge I had was from the phone call from the manager of Laser Tag that told me he was special needs."); R. Doc. 155-4 – Vaught Statement, p. 3 ("Deputy Pitfield.. proceeds to tell me that the kid or individual he's trying to arrest is… special needs."); R. Doc. 155-2 – Mehrtens Statement, p. 9 ("… from the point I arrive… arrived is when people were, I think it was the mother and the father, you know, he's special needs, he's got autism."); R. Doc. 155-3 Guidry Statement, p. 2 ("… the first thing I notice, I asked Chad. I said, "Is he autistic?" And Chad said, "Yes, severely." I just recognized it."); R. Doc. 18-5 – Vega Statement, p. 4 ("I overheard that he was a special needs kid, but you can… obviously tell because when he yells "Firetruck" you can hear the speech and… he wasn't like somebody else."); R. Doc. 18-6 – Gaudet Statement, p. 5 ("… I just remember hearing that he's, um, special needs kid.")

[65] R. Doc. 142-3 – Pitfield Dep., 146:5-10.

[66] R. Doc. 154-3 – Laser Tag Video - 08:11.

Pitfield arrives to the scene and parks adjacent to the Parsa vehicle.[67]  At this time, E.P. and his father are standing next to the family vehicle and there is no struggle.[68]  Mr. Parsa informed Deputy Pitfield that E.P. was autistic.[69]  Once Pitfield approaches, E.P. begins "stimming" and slapping himself, then his father and then Deputy Pitfield.[70]  Deputy Pitfield appears to call for back-up on his radio.[71] At 08:51 on the videotape, Deputy Pitfield takes E.P. to the ground and sits on his backside/buttocks area.[72]

At 14:09, Detective Vaught arrives on the scene. At this point, E.P. had already been held, face down in a prone position with Deputy Pitfield sitting on his backside for over 5 minutes. As Detective Vaught approaches the scene, Deputy Pitfield advised Detective Vaught that E.P. was special needs and Vaught observed that Deputy Pitfield was seated on E.P.'s lower back/buttocks area while restraining him in the prone position.[73] Detective Vaught assisted Deputy Pitfield in fully handcuffing E.P. with two sets of handcuffs.[74] Deputy Vaught admitted  that when he handcuffed E.P., E.P. was not resisting and was "moving little bit but he wasn't trying to resist or pull his- -pull his arm away."[75] Despite the fact that E.P. was fully handcuffed and that he was not offering any active resistance, neither Deputy Pitfield or Deputy Vaught made any effort to intervene or roll E.P. over into the recovery position. Detective Vaught remained in the immediate area for the remainder of the incident.

---

[67] R. Doc. 154-3 – Laser Tag Video - 08:29.
[68] R. Doc. 154-3 – Laser Tag Video - 08:29-08:34.
[69] Ex. B - Daren Parsa Dep., 208:20-209:3.
[70] R. Doc. 154-3 – Laser Tag Video - 08:36-08:49; Ex. B - Daren Parsa Dep., 208:20-209:3.
[71] R. Doc. 154-3 – Laser Tag Video - 08:42-08:44; (Dispatch Records have Pitfield's initial call time as 1:28:40)
[72] R. Doc. 154-3 – Laser Tag Video – 08:51-08:54.
[73] R. Doc. 155-4 – Vaught Statement, p. 4 ("Yes, yeah he was seated on the individual's lower back buttocks area…. Deputy Pitfield… proceeds to tell me that the kid has… special needs."); R. Doc. 156-5 – Vaught Dep., 122:2-3 – ("I saw the deputy seated on the lower portion of the subject's back.")
[74] R. Doc. 154-3 – Laser Tag Video - 14:15 – 14:22.
[75] R. Doc. 155-4 - Vaught statement at 5.

At 14:24, Detective Mehrtens arrives on the scene.  When Detective Mehrtens arrived on the scene, he observed that E.P. "was face down on the ground, he had two (2) sets of handcuffs and his hands were handcuffed behind his back, with Deputy Pitfield sitting on his buttocks area."[76] Deputy Mehrtens said when he arrived, "there wasn't, there wasn't a struggle, it didn't appear to be a struggle."[77] Deputy Mehrtens further stated, "I didn't see a struggle so there was no need for me to engage him."[78]  Deputy Mehrtens was also aware E.P. was special needs and had autism.[79] Despite the fact that E.P. was fully handcuffed and that he was not offering any active resistance, neither Deputy Pitfield, Deputy Vaught nor Deputy Mehrtens made any effort to intervene or roll E.P. over into the recovery position.  Deputy Mehrtens can be seen on the video standing in the immediate area with his hands in his pockets from 14:45 until 16:30.[80]

At 14:40 Deputy Guidry arrives on the scene. Deputy Guidry said she was not actively involved in controlling E.P., and when she arrived, Deputy Pitfield was trying to control E.P. According to Deputy Guidry, Deputy Pitfield said he "pretty much" had E.P. under control and there was nothing she could do.[81] Deputy Guidry noticed immediately that E.P. was autistic.[82] Despite the fact that E.P. was fully handcuffed and that he was not offering any active resistance, none of the 4 deputies present, i.e., Deputy Pitfield, Deputy Vaught, Deputy Mehrtens and Deputy Guidry, made any effort to intervene or roll E.P. over into the recovery position. Deputy Guidry remained in the immediate area of the incident for the remainder of the incident.

---

[76] R. Doc. 155-2 - Mehrtens Statement, p. 3.
[77] Id.
[78] Id. at 4.
[79] R. Doc. 155-2 – Mehrtens Statement, p. 9 ("… from the point I arrive… is when people were, I think it was the mother and the father, you know, he's special needs, he's got autism.").
[80] R. Doc. 154-3 – Laser Tag Video – 14:45-16:30.
[81] R. Doc. 156-7 - Guidry Dep., 49-50.
[82] R. Doc. 155-3 Guidry Statement, p. 2 ("… the first thing I notice, I asked Chad.  I said, "Is he autistic?"  And Chad said, "Yes, severely." I just recognized it.").

At 14:44 Deputy Vega arrives on the scene. Deputy Vega said when he arrived, Deputy Pitfield was on E.P.'s "butt area," and he believed Deputy Pitfield had control.[83] Deputy Vega was advised and noticed that E.P. was special needs.[84]  Despite the fact that E.P. was fully handcuffed and that he was not offering any active resistance, none of the 5 deputies, i.e., Deputy Pitfield, Deputy Vaught, Deputy Mehrtens, Deputy Guidry and Deputy Vega, made any effort to intervene or roll E.P. over into the recovery position. Deputy Vega remained in the immediate area of the incident for the remainder of the incident.

At 14:55, Deputy Estrada arrives. Deputy Estrada said he did not see a struggle where he believed Deputy Pitfield needed his help.[85] Despite the fact that E.P. was fully handcuffed and that he was not offering any active resistance, none of the 6 deputies, i.e., Deputy Pitfield, Deputy Vaught, Deputy Mehrtens, Deputy Guidry, Deputy Vega and Deputy Estrada, made any effort to intervene or to roll E.P. over into the recovery position.  Deputy Estrada remained in the immediate area of the incident for the remainder of the incident.

At 15:00, Deputy Guidry appears to put on some blue gloves and appears to bend over and say something to E.P.'s mother who is still by E.P.'s head as Deputy Vega and Deputy Pitfield have a conversation.[86]

At this time, E.P. has now been held in the prone position for over 6 minutes.  There are now 6 deputies in the immediate area who have all received the RIPP Hobble training and trained on the risks of positional asphyxia to persons who are obese and/or suffering from diminished capacity.  They have been trained to utilize the SWARM technique to neutralize any threat and

---

[83] R. Doc. 18-5 - Vega Statement, p. 2.
[84] R. Doc. 18-5 – Vega Statement, p. 4 ("I overheard that he was a special needs kid, but you can… obviously tell because when he yells "Firetruck" you can hear the speech and… he wasn't like somebody else.").
[85] R. Doc. 156-8 – Estrada Dep., 95.
[86] R. Doc. 154-3 – Laser Tag Video – 15:35.

place a subject into the recovery position.  However, these deputies failed to intervene and place E.P. into the recovery position or even attempt to do so.  Instead, they allowed Deputy Pitfield to continue to restrain E.P. in the prone position.[87]

Instead of placing E.P. in recovery position, Deputy Vega and Deputy Pitfield switched positions with Deputy Vega now taking over the prone restraint of E.P. at 16:00.[88]  During the transfer, Deputy Vega noted that E.P. was calm and not offering any resistance.[89]  After the transfer, Deputy Pitfield is assessed by Deputy Guidry, Deputy Estrada moves his vehicle closer, and Detectives Mehrtens and Vaught appear to speak with Deputy Pitfield.[90]  While the deputies move back and forth during this time period, they are all within the immediate area of where E.P. is being restrained. None of the deputies appear to make any effort to assess E.P.

With Deputy Vega now restraining E.P. in the prone position, E.P.'s mother remained at E.P.'s head area  to calm and comfort him.[91]  Deputy Vega is seen leaning forward and repositioning his body weight while holding E.P.'s. handcuffed arms.[92] At 16:55, Deputy Vega employs a pain compliance technique by pushing E.P.'s cuffed hands up behind his back.[93]  As this is occurring, Detective Vaught and Mehrtens approach to assist Deputy Vega and go hands on with E.P.[94] By 17:13, E.P.'s arms are pushed above his head and onto the ground in front of him.[95]

At 17:14, Detective Vaught moves to E.P.'s legs and all six deputies are in the immediate vicinity of the events.  At 17:24, Detective Mehrtens places his knee on E.P.'s left back/side and

---

[87] R. Doc. 154-3 – Laser Tag Video – 14:59-15:30.
[88] R. Doc. 154-3 – Laser Tag Video – 16:00.
[89] R. Doc. 18-5 – Vega Statement at 5.
[90] R. Doc. 154-3 – Laser Tag Video – 16:00-17:00.
[91] R. Doc. 154-3 – Laser Tag Video - 16:02-17:24.
[92] R. Doc. 154-3 – Laser Tag Video – 16:00-17:00.
[93] R. Doc 154-3 – Laser Tag Video – 16:55-17:27; R. Doc. 155-2 - Mehrtens Statement at 6 ("Deputy Vega has technique, you know, when somebody starts struggling, you have handcuffs on them, you just begin to slightly elevate the arms so that you can just maintain control of the upper torso, um, he begins doing that….").
[94] R. Doc. 154-3 – Laser Tag Video – 17:03-17:10 - (Mehrtens is to Vega's right and Vaught is to Vega's left).
[95] R. Doc. 154-3 – Laser Tag Video - 17:13.

Detective Vaught places his body weight on E.P.'s right side while Deputy Vega remains on E.P.'s backside.[96] At 17:25, Deputy Estrada goes to his patrol car to retrieve leg shackles. While this is going on, all of the Defendants are either assisting Vega restrain E.P. or in the immediate vicinity watching the events. None of them intervene to place E.P. in recovery position.

After E.P.'s arms were pushed to the ground in front on him, Deputy Vega then performs a chokehold on E.P. while Detectives Mehrtens and Vaught continue to place their body weight on E.P.[97] While Deputy Vega denies he used a choke hold, he did acknowledge that he put his forearm underneath E.P.'s chin and connected his hands together and he heard Ms. Lou complain that he was choking E.P.[98] While this was occurring, Ms. Lou testified that she told the deputies that E.P. was having trouble breathing and they were choking E.P.[99] Despite his denial, the forensic evidence reveals that Deputy Vega did utilize a forearm bar choke hold which impacted E.P.'s ability to breathe.[100]

At 17:46, Estrada starts attaching the leg shackles on E.P. and Deputy Gaudet arrives. Deputy Gaudet is advised that E.P. is special needs.[101] Ms. Lou advises the deputies that crowding E.P. can make matters worse.[102] In response, Ms. Lou is told by the deputies to let them do their job.[103] At 18:05, Ms. Lou leaves the immediate area and goes to her vehicle to attempt to find E.P.'s treatment plan in the hopes the deputies would listen to her.[104]

---

[96] R. Doc. 154-3 – 17:23-17:27
[97] R. Doc. 154-3 – Laser Tag Video – 17:27-17:51.
[98] R. Doc. 18-5 - Vega Statement at 6; R. Doc. 105-9 - Vega Dep., 129:16-130:24.
[99] Ex. C – Donna Lou Dep., 195:4-8 ("He's having trouble breathing. He is having trouble breathing. He is in a chokehold just like the man from New York, Eric Garner, died. It is just like the man from Baton Rouge, how he died.").
[100] R. Doc. 142-7 - Sperry Report Excerpt ("The physical findings at autopsy confirm that Vega utilized a "forearm bar" choke hold which significantly impacted [E.P.]'s airway and ability to breathe.")
[101] R. Doc. 18-6 – Gaudet Statement, p. 5 ("… I just remember hearing that he's, um, special needs kid.")
[102] Ex. C – Donna Lou Dep., 182:9-183:21; 195:16-19.
[103] Id.
[104] Ex. C – Donna Lou Dep., 182:20-25; 183:1-7

By 18:12, Deputies Estrada and Vaught have shackled E.P.'s legs.  At this time, Detective Vaught is restraining E.P.'s legs, Deputy Vega is on E.P.'s backside and Detective Mehrtens is restraining E.P. from Vega's right side.[105]  At 18:20, Deputy Gaudet taps Deputy Vega on the back and appears to tell Deputy Vega to move out of the way to assess E.P.  As Deputy Gaudet assesses E.P., Deputy Vega, Deputy Vaught and Deputy Mehrtens are all still restraining E.P. in the prone position.[106]

During this period of time, Deputy Guidry remembers Ms. Lou stating that E.P. was not breathing.[107]  At 18:42, Deputy Gaudet performs a sternum rub.  At 18:58, E.P. is finally rolled onto his back.  When E.P. was rolled onto his back, Ms. Lou remembers a deputy saying, "He pissed himself."[108]  After rolling E.P. onto his back, Ms. Lou observed Eric had urinated on himself, his eyes were slits (with one slit larger than the other), his lips were blue and there was foam coming out of his mouth.[109]

At 20:31, Deputy Gaudet begins CPR.  Ms. Lou complained about the CPR being performed improperly with the hands too low on E.P.'s body.[110]  Her complaint was ignored.  CPR was performed by Deputy Gaudet until 23:35 when Detective Vaught took over and continued CPR until 25:02.[111]  While CPR is being performed, Deputy Brian Kahrs spoke with Deputy Vega, went back to his patrol car for a camera, and took two separate sets of photographs of Daren Parsa's injuries while CPR was being performed on his dying son and subsequently deleted them.[112]  The actions of Deputy Kahrs in taking these photos at this time were clearly improper and were the

---

[105] R. Doc. 154-3 – Laser Tag Video – 18:12-18:20.
[106] R. Doc. 154-3 – Laser Tag Video.
[107] R. Doc. 155-3 – Guidry Statement, p. 2.
[108] Ex. C. – Donna Lou Dep., 184:7-16;
[109] Ex. C. – Donna Lou Dep., 185:15-186-10.
[110] Ex. C. – Donna Lou Dep., 186:23-187-18; 192:22-24.
[111] R. Doc. 154-3 – Laser Tag Video – 20:35-25:02.
[112] R. Doc. 154-3 – Laser Tag Video – Deputy Kahrs arrives (21:09); talks to Vega (22:25); returns with camera (24:18); takes first set of photos (24:29); takes second set of photos (25:06).

only actions by a JPSO deputy regarding the incident with E.P. for which Sheriff Lopinto has expressed concern or regret.[113]

At 27:25, E.P. is wheeled off in a gurney and placed in an ambulance. However, his parents were not allowed to leave to go to the emergency room as they were told by deputies that the event was a crime scene.[114] As a result, E.P. died alone at the hospital while his parents were being detained in the parking lot by JPSO deputies. When they were finally allowed to leave and go to their son at the hospital, they were informed by medical personnel that their only son was already dead.

Plaintiffs' have also presented expert testimony which disputes this statement of fact. Plaintiffs' police expert, Jeff Noble, reviewed the tape and also opined that E.P. was not actively resisting but more likely struggling to breath as a result of the prone restraint.[115] Mr. Noble further opined that the prone restraint of E.P. by both Deputies Pitfield and Vega constituted excessive force.[116] All deputies observed and/or assisted in this excessive restraint of E.P. Further, Mr. Noble opined that the pain compliance technique employed by Deputy Vega constituted the use of excessive force.[117] All of the deputies were in the immediate vicinity of the events when Deputy

---

[113] R. Doc. 150-5 – Lopinto Dep., 240:9-249:6.

[114] Ex. B – Daren Parsa Dep., 179:15-186-25.

[115] R. Doc. 142-8 – Noble Report, ¶ 61 ("The deputies claim that EP was actively resisting and that they had no other option other than maintain EP in the prone position is absurd."); ¶ 61(d) ("A reasonable police officer would know that a subject's movement in these circumstances is likely being done to help the subject breathe and is not active resistance."); ¶ 61(e) ("While it would have been safe and reasonable for two deputies to roll EP on his side even if he was kicking to place him in the recovery position, it is unconscionable that after the arrival of multiple deputies, none of whom are assisting in holding EP, that the deputies somehow could not have placed EP in a recovery position when the known consequence of their failure to do so may cause the death of EP.")

[116] R. Doc. 142-8 – Noble Expert Report, ¶ 60 ("The deputies' use of force by maintaining EP in a prone position after he had been handcuffed and placing their body weight on his back in these circumstances where EP needed medical intervention, not a jail cell, was excessive, objectively unreasonable, and inconsistent with generally accepted police practices.").

[117] R. Doc. 142-8 – Noble Expert Report, ¶ 63 – ("If Deputy Vega used a pain compliance hold in this manner, in these circumstances, his use force was excessive, objectively unreasonable, and inconsistent with generally accepted police practices. Deputy Mehrtens acknowledged that Vega uses this pain compliance technique in his statement to JPSO as follows: "I turn around and I see the struggle happening again. Deputy Vega has technique, you know, when somebody starts struggling, you have handcuffs on them, you just begin to slightly elevate the arms so that you can just maintain control of the upper torso, um, he begins doing that….").

Vega employed this pain compliance technique. Finally, Mr. Noble opined that if Deputy Vega used a choke hold, it would have been an improper use of deadly force.[118] All of the deputies were in the immediate vicinity when Deputy Vega employed a choke hold and Ms. Lou testified that she told the deputies that E.P. was having trouble breathing and they were choking E.P.[119]

10. **Deputy Vaught can be seen at the 14:13 mark of the video wearing a blue, buttoned down dress shirt (Exhibit 1). Deputy Vaught arrives on scene and attempts to help Deputy Pitfield secure E.P.'s hands in handcuffs.** *Id.* **He places one set of handcuffs on E.P.'s left wrist and attempts to secure that hand with the right hand.** *Id.* **Deputy Vaught goes hands off of E.P. at the 14:33 mark.** *Id.* **At the 18:09 mark, he attempts to place the leg shackles on E.P. with the help of Estrada.**

Undisputed that these are some of Vaught's actions. It is disputed that Deputy Vaught only "attempted" to handcuff E.P. In fact, he successfully applied the handcuffs to E.P.

11. **Deputy Vaught was the first Deputy to arrive on scene after Deputy Pitfield; he assisted Pitfield in handcuffing E.P. and then left to speak with E.P.'s father believing that it was safe for him to do so.** *See* **Deposition of Deputy Vaught, attached as Exhibit 2, at 121-124.**

Undisputed that these are some of Vaught's actions. Deputy Vaught would not have left Deputy Pitfield with E.P. unless he believed it was safe to do so.

12. **Deputy Vaught "figured [that E.P.'s] mother was there talking to him, and she could do a little bit more good than maybe [he] could do."** *Id.* **at 138:11-13.**

Undisputed that Vaught said this.

13. **At or about the 17:34 mark, Deputy Vaught returns to where Deputy Vega has now taken over for Deputy Pitfield. Exhibit 1.**

Undisputed.

---

[118] R. Doc. 142-8 – Noble Expert Report, ¶ 64 ("Moreover, if Deputy Vega placed his arm on EP's neck as stated by Ms. Lou, that use of force would be excessive, objectively unreasonable and inconsistent with generally accepted police practices. Any use of a choke hold would be the application of deadly force and completely unreasonable under the circumstances.").

[119] Ex. C – Donna Lou Dep., 195:4-8 ("He's having trouble breathing. He is having trouble breathing. He is in a chokehold just like the man from New York, Eric Garner, died. It is just like the man from Baton Rouge, how he died.").

14. **Deputy Vaught at no time saw Deputy Vega choke E.P. or apply any type of choke hold; he never heard anyone, including E.P.'s parents complain that E.P. was being choked. Exhibit 2, 156-157.**

    **Disputed.** Vaught was present when Ms. Lou complained about Deputy Vega choking E.P. Vaught was also present during the chokehold. Rather than intervene to put E.P. in recovery position, Deputy Vaught assisted Deputy Vega in holding E.P. down until he urinated on himself and went limp.

15. **Deputy Mehrtens, wearing a windbreaker with "Sheriff" on the back is seen arriving on scene at the 14:25 mark. Exhibit 1.**

    Undisputed.

16. **Upon his arrival on-scene, Deputy Mehrtens did not perceive a need to assist Deputy Pitfield.** *See* **Deposition of Deputy Mehrtens, attached as Exhibit 3, at 66:17-20.**

    Undisputed that Mehrtens said this.

17. **Deputy Mehrtens did observe E.P.'s resistance to Deputy Pitfield's efforts to control him.** *Id.* **at 67-68.**

    It is disputed that Deputy Mehrtens "observe(d) E.P.'s resistance to Deputy Pitfield's effort to control him." When Detective Mehrtens arrived on the scene, he observed that E.P. "was face down on the ground, he had two (2) sets of handcuffs and his hands were handcuffed behind his back, with Deputy Pitfield sitting on his buttocks area."[120] Deputy Mehrtens said when he arrived, "there wasn't, there wasn't a struggle, it didn't appear to be a struggle."[121] Deputy Mehrtens can be seen on the video standing in the immediate area with his hands in his pockets from 14:45 until 16:30.[122]

18. **Deputy Mehrtens observed Deputy Pitfield to be sitting on E.P.'s "buttocks."** *Id.* **at 69:10-11.**

---

[120] R. Doc. 155-2 - Mehrtens Statement, p. 3.
[121] *Id.*
[122] R. Doc. 154-3 – Laser Tag Video – 14:45-16:30.

It is not disputed that Deputy Mehrtens stated that he observed Deputy Pitfield to be seated on E.P.'s "buttocks."

19.    **At about the 17:14 mark of the video, Exhibit 1, Mehrtens is assisting Deputy Vega in attempting to control E.P.; Deputy Mehrtens is holding E.P.'s right arm and Deputy Vega is attempting to prevent E.P. from biting. Exhibit 2, at 84-86.**

It is not disputed that Detective Mehrtens assisted Deputy Vega in restraining E.P. after Deputy Vega employed a pain compliance technique.  It is disputed that Deputy Vega was "attempting to prevent E.P. from biting" when he placed him in a choke-hold.

20.    **Deputy Mehrtens did not observe Deputy Vega place his hands on E.P.'s throat; he did not observe Deputy Vega choking him or applying a choke hold. *Id.*, at 86-87; 88:8-10, 21-23; 89:-34.  He did not hear anyone complain that E.P. was being choked. *Id.* at 87, 105.**

**Disputed.** It is not disputed that Deputy Mehrtens testified at his deposition that he did not see Deputy Vega choke E.P. or apply any type of choke hold or hear Ms. Lou complain about a chokehold.

However, Plaintiffs dispute that this statement is truthful and contest this statement as Deputy Mehrtens was actively engaged in restraining E.P. while Deputy Vega choked E.P., other deputies observed Deputy Vega place E.P. in a head hold and Ms. Lou complained about Deputy Vega choking E.P. which was heard by numerous deputies on the scene as set forth in response to Statement of Facts Nos. 8 & 9.

21.    **The moment that E.P. ceased resisting, Deputy Mehrtens and Deputy Vega placed him in the recovery position. *Id.*, at 91-93.**

**Disputed.** It is disputed that the moment E.P. "ceased resisting", Deputy Mehrtens and Deputy Vega placed E.P. in the recovery position.   Efforts to breathe in order to save one's own life, do not constitute "active resistance" justifying the use of continued restraint. E.P. was not

placed in recovery position until after he urinated on himself and his body went limp, as Deputy

Vega applied the chokehold on his neck.

As set forth in response to Statement of Facts 7-9, there were many opportunities to place

E.P. in recovery position throughout this encounter but deputies failed to do so until E.P.'s body

finally collapsed due to his inability to breathe, which led directly to his death.

**22.     Deputy Guidry, dressed in Uniform with a baseball hat, is seen putting on blue gloves
and comes into frame of the video at the 15:10 mark. She never has any physical
interaction with E.P. or the other Deputies. Exhibit 1.**

**Disputed.** It is not disputed that Deputy Guidry arrives on the scene around the 15:10 and

puts on blue gloves. The Plaintiffs' dispute that Deputy Guidry did not have any interaction on the

scene with E.P. or other deputies as such interactions can be observed on the video tape.[123]

**23.     "When Deputy Guidry] arrived on the scene, Deputy Pitfield was in the process of
securing [E.P.]. It was still an active scene. [Deputy Pitfield] was still trying to get [E.P.]
under control. He had him under control for the most part, but [E.P.] was still bucking
and trying to bite. And when [Deputy Guidry] arrived on scene, he [Deputy Pitfield]
told [her], he said, 'Shannon, I pretty much have him under control. There is not much
you can do,' looking at my size. And there were two other detectives already on the
scene as well."** *See* **Deposition of Deputy Guidry, attached as Exhibit 4, at 50:5-14.**

It is not disputed that Deputy Guidry made these comments in her statement to JPSO. It is

disputed that Deputy Pitfield was "still trying to get E.P. under control."  This alleged statement

by Deputy Pitfield that he had E.P. "under control for the most part" disputes the Individual

Defendants' arguments that E.P. never stopped resisting.

**24.     E.P. "was on the ground, and Pitfield was securing [him], but [Pitfield] was sitting
on [E.P.'s] legs closer to where the back of his knee bends, trying to keep him under
control, calm him down until we could get EMS on the scene." Id. at 51:21-25.**

It is not disputed that Deputy Guidry made these comments in her statement to JPSO.  This

statement disputes the Individual Defendants' arguments that E.P. never stopped resisting.

---

[123] R. Doc. 154-3 – Laser Tag Video – 14:40 – 27:25.

25.   **After her initial approach to the scene, Deputy Guidry begins to assist Mr. Parsa and did not observe the interactions between E.P. and the other Deputies.** *Id.* **at 53.**

Disputed. It is not disputed that Deputy Guidry approached Mr. Parsa at some point during this incident.  It is disputed that Deputy Guidry did not observe any interactions between E.P. and the deputies.[124]  Deputy Guidry was in the immediate area of the events and had numerous interactions with other deputies and the Plaintiffs as can be seen in the video tape.[125]  Further, Deputy Guidry testified that she observed the time period when Deputy Vega employed a pain compliance technique, although she does not describe the actions as a pain compliance technique.[126]  Deputy Guidry also testified that she observed Deputy Vega with his hands around E.P.'s head.[127] During this period of time, Deputy Guidry remembers Ms. Lou stating that E.P. was not breathing.[128]

26.   **Deputy Guidry did not observe Deputy Vega use any "pain compliance" technique; she observed E.P. trying to get up and pull his hands in front of him and Deputy Vega trying to maintain control.** *Id.***, at 66.**

Disputed as set forth in response to Statement of Fact No. 25.

27.   **Deputy Guidry did not observe Deputy Vega choke or use a choke hold on E.P.** *Id.* **at 66-67.**

Disputed as set forth in response to Statement of Fact No. 25.

28.   **Deputy Guidry did not hear anyone say anything about E.P. being choked or unable to breath.** *Id.* **at 75-76.**

---

[124] R. Doc. 154-3 – Laser Tag Video – 14:40 – 27:25.
[125] R. Doc. 154-3 – Laser Tag Video – 14:40 – 27:25.
[126] R. Doc. 156-7 – Guidry Dep., 66:7-18.
[127] R. Doc. 156-7 – Guidry Dep., 66:20-67:14.
[128] R. Doc. 155-3 – Guidry Statement, p. 2. ("So Nick had his arm around him and Myron was down below, I guess checking to make sure everything was okay, and the kid was still, everything was fine. And then I hear the mom said, 'I don't know if he's breathing, I don't know if he's breathing.' And Myron said, 'He's breathing, his stomach is going up and down. He's breathing.' And then Myron said, 'Let's put him on his side.'").

**Disputed**.  Deputy Guidry testified that she observed Deputy Vega with his hands around E.P. 's head.[129] During this period of time, Deputy Guidry remembers Ms. Lou stating that E.P. was not breathing.[130] Despite hearing Ms. Lou state that E.P. was not breathing, Deputy Guidry failed to intervene or to place E.P. in recovery position.

29. **Deputy Guidry did not perceive any need to "intervene," because "[n]o one was doing anything wrong." *Id*. at 73:20-21.**

It is not disputed that Deputy Guidry testified that she did not intervene because she did not believe that anyone was doing anything wrong.  However, Plaintiffs dispute that Deputy Guidry failed to perceive any facts which required her to intervene as set forth in response to Statement of Fact No. 9 & 25.

30. **At some point, Deputy Guidry does recall Deputy Gaudet say "[l]et's put [E.P.] in the recovery position." *Id*. at 78:16-18.**

Undisputed.  For further response, Deputy Guidry remembers Ms. Lou stating that E.P. was not breathing prior to Deputy Gaudet suggesting to place E.P. in the recovery position.[131]

31. **Deputy Estrada, in full JPSO uniform with sunglasses, can be seen next to Guidry at the 15:30 part of the video; he arrives on scene at the 14:57 mark of video. Exhibit 1. At the 17:31 mark, he can be seen opening his trunk to get leg shackles from his car. *Id*.**

Undisputed.

32. **When Deputy Estrada arrived on scene he did not observe anything that required is assistance or intervention. *See* Deposition of Deputy Estrada, attached as Exhibit 5, at 97-100.**

---

[129] R. Doc. 156-7 – Guidry Dep., 66:20-67:14.
[130] R. Doc. 155-3 – Guidry Statement, p. 2. ("So Nick had his arm around him and Myron was down below, I guess checking to make sure everything was okay, and the kid was still, everything was fine. And then I hear the mom said, 'I don't know if he's breathing, I don't know if he's breathing.' And Myron said, 'He's breathing, his stomach is going up and down. He's breathing.' And then Myron said, 'Let's put him on his side.'").
[131] R. Doc. 155-3 – Guidry Statement, p. 2. ("So Nick had his arm around him and Myron was down below, I guess checking to make sure everything was okay, and the kid was still, everything was fine. And then I hear the mom said, 'I don't know if he's breathing, I don't know if he's breathing.' And Myron said, 'He's breathing, his stomach is going up and down. He's breathing.' And then Myron said, 'Let's put him on his side.'").

It is not disputed that when Deputy Estrada arrived on the scene, he has stated that he didn't observe anything that required his assistance to the other deputies. This would not have been the case if E.P. was actively resisting the deputies or if the situation was not under control. However, it is disputed that there was no need for Deputy Estrada to intervene as he clearly saw an obese person on his stomach, restrained in a prone position in a situation where the deputies did not need any assistance to restrain him, yet he failed to intervene or place E.P. in recovery position.

33. **Deputy Estrada did not observe Deputy Vega choke E.P. or use any sort of choke hold on E.P.** *Id*., **at 113.**

**Disputed.** It is not disputed that Deputy Estrada testified that he did not see Vega choke E.P. However, it is disputed whether Deputy Estrada saw Deputy Vega choke E.P. as he was in the immediate vicinity. Further, Deputy Estrada acknowledged that Ms. Lou was complaining that the deputies were killing her son[132] and choking him.[133] Despite hearing this information, Deputy Estrada failed to intervene or to place E.P. in recovery position.

34. **Deputy Estrada did not hear E.P.'s mother or father, or anyone else say anything to the effect that E.P. was being choked.** *Id*. **at 118.**

**Disputed**. Further, Deputy Estrada acknowledged that Ms. Lou was complaining that the deputies were killing her son[134] and choking him.[135]

35. **Deputy Estrada was able to apply leg shackles to E.P. to prevent E.P. from kicking.** *Id*. **at 114-15.**

---

[132] Ex. D – Estrada Statement, p. 5 ("She was I remember her standing, um, by the door, the open door of her SUV and she kept fooling around with her phone and she, she just I remember just hearing her shout y'all are killing my son when all we were doing was trying to control him." "She just kept, she was hysterical.").

[133] R. Doc. 156-8 – Estrada Dep., pp. 119-120; Ex. D – Estrada Statement, p. 7 (Q. I usually don't share information (inaudible) but the reason I'm asking you, she asserts that she, she said out loud whether it's you're choking him, or y'all killing him but you're cooperating. She. She was audible about that. She was saying things like that. A. Yea, she was saying things like that but the whole time we weren't hurting him. We were just trying to control him.).

[134] Ex. D – Estrada Statement, p. 5 ("She was I remember her standing, um, by the door, the open door of her SUV and she kept fooling around with her phone and she, she just I remember just hearing her shout y'all are killing my son when all we were doing was trying to control him." "She just kept, she was hysterical.").

[135] R. Doc. 156-8 – Estrada Dep., pp. 119-120; Ex. D – Estrada Statement, p. 7 (Q. I usually don't share information (inaudible) but the reason I'm asking you, she asserts that she, she said out loud whether it's you're choking him, or y'all killing him but you're cooperating. She. She was audible about that. She was saying things like that. A. Yea, she was saying things like that but the whole time we weren't hurting him. We were just trying to control him.).

Undisputed that Deputy Estrada was able to apply leg shackles. It is also undisputed that the application of the leg shackles and holding down E.P.'s legs further compromised his ability to breathe.

**36.    By the time that E.P. "went blue" other Deputies and EMS were already attending to E.P.** *Id.***, at 118.   Deputy Estrada "wasn't hands-on. As soon as [E.P.] went blue in the face, then, [E.P.] was[placed] in [the] recovery [position]."** *Id.* **at 122:8-10.**

It is not disputed that E.P. went blue as a result of the prolonged, pressurized prone restraint. It is disputed that other Deputies and EMS were already working on E.P. when E.P. turned blue and was placed in the recovery position.

Based on the video tape, Deputies Estrada and Vaught shackle E.P.'s legs by 18:12.  At this point, Detective Vaught is restraining E.P.'s legs, Deputy Vega is on E.P.'s backside and Detective Mehrtens restraining E.P. from Vega's right side.[136]  At 18:20, Deputy Gaudet taps Deputy Vega on the back and appears to be telling Deputy Vega to move out of the way.  As Deputy Gaudet assesses E.P., Deputy Vega, Deputy Vaught and Deputy Mehrtens are all still restraining E.P. in the prone position.[137]

During this period of time, Deputy Guidry remembers Ms. Lou stating that E.P. was not breathing.[138]  At 18:42, Deputy Gaudet performs a sternum rub.  At 18:58, E.P. is finally rolled onto his back.  When E.P. was rolled onto his back, Ms. Lou remembers a deputy saying, "He pissed himself."[139]  After rolling E.P. onto his back, Ms. Lou observed Eric had urinated on himself, his eyes were slits (with one slit larger than the other), his lips were blue and there was

---

[136] R. Doc. 154-3 – Laser Tag Video – 18:12-18:20.
[137] R. Doc. 154-3 – Laser Tag Video.
[138] R. Doc. 155-3 – Guidry Statement, p. 2.
[139] Ex. C. – Donna Lou Dep., 184:7-16;

foam coming out of his mouth.[140]  CPR was not commenced by the JPSO deputies until 20:31, one minute and 33 seconds after E.P. had already gone limp and urinated on himself.

**37.**     **Deputy Gaudet arrives in frame at the 17:53 mark and is seen approaching E.P.'s left side. Exhibit 1.**

Undisputed.

**38.**     **Upon Deputy Gaudet's arrival, he assisted in placing E.P. in the recovery position; Deputy Gaudet had no other interaction with E.P. or the other Deputies and did not observe any of the interactions between E.P. and the other Deputies prior to that point.** *See* **Deposition of Deputy Gaudet, attached as Exhibit 6, at 101-103.**

It is not disputed that Deputy Gaudet eventually assisted in placing E.P. into the recovery position after Ms. Lou complained that E.P. was not breathing and he had urinated on himself and gone limp.

Plaintiffs dispute that Deputy Gaudet did not have any interactions with E.P. or the deputies prior to placing E.P. in the recovery position based on the video tape.  At 17:46, Deputy Gaudet arrives.  When Deputy Gaudet arrived, Ms. Lou advised the deputies that crowding E.P. can make matters worse.[141]  However, Ms. Lou is told by the deputies to let them do their job.[142]  At 18:20, Deputy Gaudet taps Deputy Vega on the back and appears to be tell Deputy Vega to move out of the way.  As Deputy Gaudet assesses E.P., Deputy Vega, Deputy Vaught and Deputy Mehrtens are all still restraining E.P. in the prone position and applying pressure on his body.[143]  During this period of time, Deputy Guidry remembers Ms. Lou stating that E.P. was not breathing.[144]  At 18:42, Deputy Gaudet performs a sternum rub.  At 18:58, E.P. is finally rolled onto his back.  When

---

[140] Ex. C. – Donna Lou Dep., 185:15-186-10.
[141] Ex. C – Donna Lou Dep., 182:9-183:21; 195:16-19.
[142] *Id.*
[143] R. Doc. 154-3 – Laser Tag Video.
[144] R. Doc. 155-3 – Guidry Statement, p. 2. ("So Nick had his arm around him and Myron was down below, I guess checking to make sure everything was okay, and the kid was still, everything was fine. And then I hear the mom said, 'I don't know if he's breathing, I don't know if he's breathing.' And Myron said, 'He's breathing, his stomach is going up and down. He's breathing.' And then Myron said, 'Let's put him on his side.'").

E.P. was rolled onto his back, Ms. Lou remembers a deputy saying, "He pissed himself."[145]  After

rolling E.P. onto his back, Ms. Lou observed Eric had urinated on himself, his eyes were slits (with

one slit larger than the other), his lips were blue and there was foam coming out of his mouth.[146]

However, no CPR was started until 20:31 when Deputy Gaudet began performing CPR.

Ms. Lou complained about the CPR being performed improperly with the hands too low on E.P.'s

body.[147]  There was no response to her complaint. CPR was performed by Deputy Gaudet until

23:35 when Detective Vaught took over and continued CPR until 25:02.[148]

RESPECTFULLY SUBMITTED,

WILLIAM MOST (BPR # 36914)
Most & Associates
201 St. Charles Ave., Ste. 114 #101
New Orleans, LA 70170
Tel: (504) 509-5023
williammost@gmail.com

/s/ Andrew C. Clarke
Andrew C. Clarke (TN BPR # 15409)
The Cochran Firm Midsouth
One Commerce Square, Suite 1700
(901) 523-1222 (Telephone)
aclarke@cochranfirmmidsouth.com

---

[145] Ex. C. – Donna Lou Dep., 184:7-16;
[146] Ex. C. – Donna Lou Dep., 185:15-186-10.
[147] Ex. C. – Donna Lou Dep., 186:23-187-18; 192:22-24.
[148] R. Doc. 154-3 – Laser Tag Video – 20:35-25:02.