UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DONNA LOU, ET AL.                    *        CIVIL ACTION NO. 21-80

VERSUS                               *        SECTION "D" (2)

SHERIFF JOSEPH P, LOPINTO,           *        Judge Wendy B. Vitter
III, ET AL.                                   Magistrate Judge Donna P. Currault

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF DEPUTY VEGA'S MOTION FOR PARTIAL SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56 (R. Doc. 171-3)**

1.       **This case involves the death of an individual (E.P.) who violently attacked his father and the responding Deputy that was called to the scene in the parking lot of the Westgate Shopping Center in Metairie, La. on January 19, 2020. The call for service was made by a horrified onlooker. R. Doc. 1.**

It is not contested that this case involved the in-custody death of an individual (E.P.) who is a 16-year-old severely autistic child who physically assaulted his father during an involuntary sensory outburst or "melt-down" related to his disability, i.e., severe autism. This sensory outburst resulted in E.P. manifesting self-injurious and aggressive behaviors towards himself, as well as his father and JPSO Deputy Pitfield who was the first responding deputy. The description of the incident and mindset of the onlooker are not facts, but statements of opinion and are denied.  For further response, it was at the request of Ms. Donna Lou, E.P.'s mother, that Heather Hilton, the manager at Laser Tag, called JPSO Deputy Pitfield who was a JPSO deputy working a special off-duty detail on the premises and told him that there was an incident involving an autistic child and his father.[1]

2.       **The Defendant J.P.S.O. Deputies were called to the scene based upon a report from a business manager that E.P. was violently out of control and severely beating his own father, Plaintiff, in the parking lot. *Id.***

---

[1] Ex. A - Heather Hilton Statement, pp. 9-10 ("I got on the phone.  I let Victory know that uh, you know there's a man with his autistic child um, it's an autistic adult child.  They're outside.  They're in a confrontation.  It's getting pretty serious, can you please come over here.")

**Disputed.** The defendants' description of the incident by the business manager to Deputy Pitfield is inaccurate and is disputed.[2]

3.    **The Defendant J.P.S.O. Deputies arrived to find a horrifying scene. E.P. had severely injured his father. E.P. had bitten a piece of his fathers face off, leaving open and obvious trauma.**

**Disputed as worded**. This Statement of Fact does not identify any specific deputy or the time of their alleged observation.  Plaintiffs do not dispute that Mr. Parsa had a bite injury on his chin for which he subsequently received medical treatment, caused by the behavior of his son, E.P. due to a sensory outburst E.P. was experiencing related to his severe autism. This behavior took place prior to the deputies' arrival.  In their statements shortly after the incident, none of the deputies described the scene upon arrival as "horrifying."

If this Statement of Fact is attempting to describe Deputy Pitfield's initial arrival on the scene, Plaintiffs' dispute that he arrived to a horrifying scene.  At 08:11 on the video, Deputy Pitfield's vehicle can be seen approaching with emergency lights activated.[3]    Deputy Pitfield arrives to the scene and parks adjacent to the Parsa vehicle.[4]  At this time, E.P. and his father are standing next to the family vehicle and there is no struggle or physical encounter taking place.[5] Mr. Parsa informed Deputy Pitfield that E.P. was autistic.[6]  Once Pitfield approached, E.P. began "stimming", flailing  his arms and slapping himself, then his father and then Deputy Pitfield.[7] Deputy Pitfield appears to call for back-up on his radio.[8]  At 08:51 on the videotape, Deputy

---

[2] See Footnote 1.
[3] R. Doc. 154-3 – Laser Tag Video - 08:11.
[4] R. Doc. 154-3 – Laser Tag Video - 08:29.
[5] R. Doc. 154-3 – Laser Tag Video - 08:29-08:34.
[6] Ex. B - Daren Parsa Dep., 208:20-209:3.
[7] R. Doc. 154-3 – Laser Tag Video - 08:36-08:49; Ex. B - Daren Parsa Dep., 208:20-209:3.
[8] R. Doc. 154-3 – Laser Tag Video - 08:42-08:44.

Pitfield takes E.P. to the ground.[9]   Deputy Pitfield remains seated on E.P.'s backside for 7  minutes

and 9 seconds, until 16:00 on the video tape, when he is relieved by Deputy Vega.[10]

If this statement of fact refers to the time period when other deputies arrived, Plaintiffs'

dispute that as well as set forth in response to Statement of Fact Nos. 7-9.

4.     **The Defendant J.P.S.O. Deputies did as best they could to manage E.P. While trying
to gain control over E.P., E.P. bit Deputy Pitfield, causing injury.**

**Disputed**.  The JPSO deputies did not do "as best they could to manage E.P.," because they

failed to use specific management techniques they had been trained on. For example, each deputy

was trained to immediately place a restrained person in the "recovery position" (i.e., place them

on their side or seated upright) to avoid the risk of positional asphyxia.[11] None of the deputies

placed E.P. in the recovery position until it was too late – after he had gone limp and urinated on

himself.

Similarly, the deputies were trained to use a "SWARM" technique to prevent potential

death from positional asphyxia, even when dealing with a violently resisting person. Per that

training, deputies were to work together to take a suspect down and then "apply a hobble restraint

to the  ankles  and roll the subject into an upright seated position…. Position the subject so that he

or she can lean back against a fixed object.  This helps relieve pressure on the diaphragm and make

breathing easier."[12]   None of the deputies used the SWARM technique. They also failed to

positioned E.P. so that he would be able to breathe, until it was too late

---

[9] R. Doc. 154-3 – Laser Tag Video – 08:51-08:54.
[10] R. Doc. 154-3 – Laser Tag Video – 08:41-16:00.
[11] R. Doc. 144-3 - Pizzolato Dep., p. 64:9-12 - (Q. When do you train them to put them in the recovery position?  A. I train them never to leave anybody in a prone position); Pizzolato, 68:1-2 (A. I train to not leave somebody in a prone position).
[12] R. Doc. 156-11 – RIPP Hobble Training Power Point, pp. 46-47.

JPSO Standard Operating Procedures # 8, entitled Restraining Devices & Defensive Devices Policy, requires the use of the Total Appendage Restraining Procedure (TARP) with the RIPP Hobble devices with "extremely violent prisoners." None of the deputies used the TARP or RIPP Hobble device. Further, while all deputies are provided a RIPP Hobble after training,[13] only Deputies Gaudet and Estrada had a RIPP Hobble on the scene.[14]

The deputies knew that E.P. was autistic, "special needs", was essentially non-verbal and obese. JPSO trains its deputies that: 1) people suffering from diminished capacity are at increased risk of death from prone restraint;[15] 2) people who are obese are at increased risk of death from prone restraint;[16] and 3) sitting on an obese person's legs instead of back may not relieve pressure and still poses risks during prone restraint.[17] According to JPSO's 30(b)(6) witness, six deputies at a scene is a sufficient number of deputies to restrain someone in the recovery position and avoid the dangers of positional asphyxia.[18] Nevertheless, Pitfield and Vega, in sequence, sat on E.P.'s backside, holding him in prone restraint for over 9 minutes, almost 4 minutes of time which E.P. was fully handcuffed. During this extended period, they did not roll him over or sit him upright into the recovery position or even attempt to do so. Instead, more physical pressure was applied after he was fully handcuffed, including leg shackles, other deputies physically holding E.P. down, and application of a pain compliance technique and a choke-hold by Deputy Vega. None of the deputies intervened to place E.P. in recovery position despite having knowledge of the serious risk of death to E.P. by positional asphyxia and the opportunity to intervene.

---

[13] *Id.* at *88*:14-23.
[14] R. Doc. 142-3 - Pitfield Dep., 48:4-14; R. Doc. 156-5 - Vaught Dep., 92:8-7; 94:20-21; R. Doc. 156-7 - Guidry Depo., 41:18-25; 43:20-25; R. Doc. 105-9 - Vega Depo, 164:22-165:8; R. Doc. 156-6 - Mehrtens Dep., 34:24-35:7; R. Doc. 156-8 - Estrada Dep., 24:16-23; R. Doc. 156-9- Gaudet Dep., 69:7-15.
[15] R. Doc. 144-3 – Pizzolato Dep., 53:13-22.
[16] R. Doc. 144-3 – Pizzolato Dep., 53:23-24; 66:15-67:12.
[17] R. Doc. 144-3 – Pizzolato Dep., 53:23-24; 66:15-67:12.
[18] R. Doc. 144-3 -Pizzolato Dep., 90:21-94:19.

Plaintiffs submit that the deputies' failure to comply with their specific policies and training and clearly established law with respect to dealing with subjects held in prone restraint, especially those who are obese, given the known risks involved with prone restraint and the obvious vulnerabilities of E.P. to death by positional asphyxia, demonstrates that they did not do the best they could to manage the situation.

**5.     Regrettably, E.P. expired on the scene.**

It is unclear whether E.P. expired on the scene or en route to the hospital, but that distinction is not relevant to Defendant's motion.  There is little evidence that JPSO regrets the incident, given Sheriff Lopinto's choice not to conduct an internal affairs investigation or critical incident review, his decision to indemnify the deputies for punitive damages should the jury find that they acted willfully, intentionally or with malice, his ratification of the conduct of the deputies and his decision to not review or change any policy, practices, training, or procedures as a result of the actions of the deputies which resulted in the death of E.P.[19]

**6.     The entire incident was caught on surveillance cameras, the video of which is attached as Exhibit 1.**

It is disputed that the "entire incident" was caught on surveillance cameras. It is not disputed that security video tapes from the Laser Tag captured many key elements of this incident, albeit without any audio, which is obviously an element of the "entire incident" which is missing. It is also undisputed that Sheriff Lopinto made the decision to not require or provide his deputies with body cameras, which, if properly utilized, would have recorded all or almost all of the events, at close range, with audio.

**7.     The video speaks for itself and clearly shows that the scene was never secure prior to E.P.'s demise.**

---

[19] R. Doc. 150-5 – Lopinto Dep., 169:15-18; 178:8-21.

**Disputed.** This alleged fact is contradicted by other of Defendants' alleged material facts filed in support of their Motion for Partial Summary Judgment on Bystander Claims.[20] It is also contradicted by the video and the deputies' own statements.

Specifically, this alleged fact is contradicted by Defendants' alleged Fact # 23, which contends that Pitfield told Guidry that "I pretty much have him under control."[21] It is also contradicted by alleged Fact # 16, that "Deputy Mehrtens did not perceive a need to assist Deputy Pitfield."[22] And alleged Fact # 11, that Vaught "left to speak with E.P.'s father believing that it was safe for him to do so."[23] It cannot be the case that (1) the "scene was never secure" <u>and also</u> (2) that Pitfield had E.P. under control, that there was no need to assist Pitfield, and that it was safe for Vaught to walk off.

This alleged fact is also contradicted by the video of the interactions between JPSO deputies and E.P. The video initially shows an altercation, in which the severely autistic minor slaps at himself, his father, and Deputy Pitfield. At 10:13 the video shows that Pitfield has put E.P. face-down on the ground, and is sitting on his back. Detective Vaught arrived at 14:09 on the video, and helped handcuff E.P. without any issues. Additional deputies arrive and can be seen to treat the situation as "secured" and, indeed, rather than taking any action in order to secure the scene, they stand around and talk to each other.[24] What the video shows is a group of officers milling about as Deputy Pitfield and then Deputy Vega take turns sitting on top of a face-down, handcuffed, leg-shackled, obese, severely autistic minor for an extended period of time without anyone putting him in recovery position until it is too late.

---

[20] R. Doc. 169-3.
[21] Id. at Fact # 23.
[22] Id. at Fact # 16.
[23] Id. at Fact # 11.
[24] R. Doc. 154-3 – Laser Tag Video – 14:09 – 16:00.

This alleged fact is also contradicted by the deputies' initial statements, in which the deputies described many points at which the scene was "under control," "was calm," and "everything was fine:"

a. Deputy Vaught said when he handcuffed EP, EP was not resisting and was "moving little bit but he wasn't trying to resist or pull his- -pull his arm away."[25] Detective Vaught said EP did not resist after he was handcuffed,[26] and he did not place EP in a recovery position after he was handcuffed because he went to speak with Mr. Parsa.  Detective Vaught said he would not have left Deputy Pitfield alone if he did not believe it was safe to do so.[27]  Detective Vaught said it was possible for the six deputies to put EP in a recovery position.[28]

b. Deputy Mehrtens said when he arrived, EP "was face down on the ground, he had two (2) sets of handcuffs and his hands were handcuffed behind his back, with Deputy Pitfield sitting on his buttocks area."[29]  Deputy Mehrtens said when he arrived, "there wasn't, there wasn't a struggle, it didn't appear to be a struggle."[30]  Deputy Mehrtens further stated, "I didn't see a struggle so there was no need for me to engage him."[31]

c. Deputy Vega said when he arrived, Deputy Pitfield was on EP's "butt area," and he believed Deputy Pitfield had control.[32]  Deputy Vega switched positions with Deputy Pitfield to continue the prone restraint of EP.  During the transfer, Deputy Vega noted that EP was calm and not offering any resistance.[33]  While restraining EP in the prone position, Deputy Vega used a pain compliance technique on EP by elevating EP's handcuffed hands behind his back.[34]  While Deputy Vega denies he used a choke hold, he did acknowledge that he put his forearm underneath EP's chin, while connecting his hands.[35]  However, the forensic evidence reveals that Deputy Vega did utilize a forearm bar choke hold which impacted EP's ability to breathe.[36]

---

[25] R. Doc. 155-4 - Vaught statement at 5.

[26] R. Doc. 156-5 - Vaught Dep., at 122.

[27] *Id.* at 123.

[28] *Id.* at 110.

[29] R. Doc. 155-2 - Mehrtens Statement, p. 3.

[30] *Id.*

[31] *Id.* at 4.

[32] R. Doc. 18-5 - Vega Statement, p. 2.

[33] *Id.* at 5.

[34] R. Doc. 155-2 - Mehrtens Statement at 6 ("Deputy Vega has technique, you know, when somebody starts struggling, you have handcuffs on them, you just begin to slightly elevate the arms so that you can just maintain control of the upper torso, um, he begins doing that….").

[35] R. Doc. 18-5 - Vega Statement at 6; R. Doc. 105-9 - Vega Dep., 129:16-130:24.

[36] R. Doc. 142-7 - Sperry Report Excerpt - ("The physical findings at autopsy confirm that Vega utilized a "forearm bar" choke hold which significantly impacted [E.P.]'s airway and ability to breathe.")

    d.      Deputy Guidry said she was not actively involved in controlling EP, and when she arrived, Deputy Pitfield was trying to control EP. Deputy Pitfield said he "pretty much" had EP under control and there was nothing she could do.[37]  Further, Deputy Guidry said if a person is in a recovery position and actively resisting, deputies would be able to control the person.[38]

    e.      Deputy Gaudet did not see EP violently struggle between 14:00 – 15:12 on the video and he did not see a struggle when Deputy Vega exchanged positions with Deputy Pitfield at 16:00 on the video.[39]

    f.      Deputy Estrada testified that when he arrived, two detectives, Deputy Vega and Deputy Pitfield were already at the scene.[40]  Deputy Estrada said he did not see a struggle where he believed Deputy Pitfield needed his help.[41]  Deputy Estrada said he did not see a struggle when Deputy Vega transitioned with Deputy Pitfield.[42]

    g.      Sergeant Dowling who performed a homicide investigation of this incident and was involved in taking many of the deputies' statements also acknowledged that EP was calm during many periods of time.[43]

    h.      Sheriff Lopinto admitted after watching the tape that there were several occasions during the prone restraint where the deputies could have placed EP in the recovery position including: 1) after Detective Vaught arrived and assisted Pitfield in cuffing EP behind his back;[44] 2) after other deputies arrived and there were five officers on the scene during video between 14:33 – 15:00;[45]3) on the video tape from 15:00 – 15:28, Sheriff Lopinto stated that it was not physically impossible to place EP into the recovery position and noted that the issue was "whether or not it was reasonable" to place him in the recovery position;[46] 4) on the video tape from 16:00 – 16:29, Sheriff Lopinto acknowledged that there was no resistance which would preclude placing EP in the recovery position[47] and that "there is nothing other than their [deputies] observances that precludes them from putting him in the recovery position;"[48] and 5) after review of the video tape, Sheriff Lopinto provided the following response with respect to whether EP should have been placed in the recovery position: "And, again as you are pausing it second by second by second,

[37] R. Doc. 156-7 - Guidry Dep., 49-50.

[38] *Id.* at 74.

[39] R. Doc. 156-9 - Gaudet Dep., 96-98.

[40] R. Doc. 156-8 - Estrada Dep., 93.

[41] *Id.* at 95.

[42] *Id.* at 100.

[43] R. Doc. 155-5 - Dowling Dep. at 112:14-19 ("Q. The interviews, like Deputy Vega, when he gave his interview, he said that when they moved to switch out, that Mr. Parsa wasn't offering any resistance, correct? A. That's when they realized that he had stopped resisting, yes."); *Id.* at 122:6-8 ("Q. And doesn't he state when he got there he put his handcuff on, and there was no resistance? A. No resistance to the handcuff."

[44] R. Doc. 150-5 - Lopinto Dep., 222.

[45] *Id.* at 226.

[46] *Id.* at 211-215.

[47] *Id.* at 217-218.

[48] *Id.* at 225.

it makes it look like there is numerous opportunities, but if you let it run out from the changes of, you know, his reactions 30 seconds apart, 30 seconds apart, you know, I'm going to tell you no at this moment, yes at this moment.  No at this moment, yes at this moment, right. And so, you know, you have the ability to pause every second and ask me that same question, and I'm going to go back to the one where he is resisting and say this is why they weren't."[49] Significantly, Sheriff Lopinto could not state whether any movements by EP while restrained were efforts to resist, efforts to breathe, or were caused by a lack of oxygen caused by the effects of the prone restraint on an obese suspect.[50]

Plaintiffs' have also presented expert testimony to dispute the narrative that the scene was not secure or that E.P.'s occasional movements in response to the continued, pressurized restraint being applied, amounted to intentional resistance (or as defense counsel repeatedly falsely asserts, "extreme violence".) First, Plaintiffs' forensic pathologist, Dr. Kris Sperry reviewed the tape and noted that E.P.'s behavior appeared to be manifestations of his Severe Autism Spectrum Disorder and oxygen deficiency.[51] Second, Plaintiffs' police expert, Jeff Noble, reviewed the tape and also opined that E.P. was not actively resisting but more likely struggling to breath as a result of the prone restraint.[52] Finally, Plaintiffs' autism expert, Dennis Debbaubt, reviewed the video tape and

---

[49] *Id.* at 235.

[50] *Id.* at 235-237.

[51] R. Doc. 156-4 - Dr. Sperry Expert Report – which notes: 1) "While [EP] made certain movements while being restrained by Pitfield, it is my opinion that these movements were not willful, active resistance or efforts to harm the officers, but behavioral manifestations of his autism and evidence of oxygen deficiency which was resulting from his continuous and prolonged restraint." (Page 4); 2) "Again, at this time, it doesn't appear that [EP] is offering any real resistance or danger to the deputies.  As previously noted, the actions of [E.P.] appear to be consistent with the physical manifestation of his SASD and oxygen deficiency stemming from the prolonged restraint." (Page 6); and 3) "The inability of the autistic person to understand and comprehend commands, and especially an individual with Severe Autistic Spectrum Disorder, who are confronted by or otherwise involved in an incident with law enforcement officers, can result in disaster if the officer(s) decide to continue to utilize a prone restraint against an obese, severely autistic person." (Page 11).

[52] R. Doc. 142-8 – Noble Report, ¶ 61 ("The deputies claim that EP was actively resisting and that they had no other option other than maintain EP in the prone position is absurd."); ¶ 61(d) ("A reasonable police officer would know that a subject's movement in these circumstances is likely being done to help the subject breathe and is not active resistance."); ¶ 61(e) ("While it would have been safe and reasonable for two deputies to roll EP on his side even if he was kicking to place him in the recovery position, it is unconscionable that after the arrival of multiple deputies, none of whom are assisting in holding EP, that the deputies somehow could not have placed EP in a recovery position when the known consequence of their failure to do so may cause the death of EP.")

opined that E.P. conduct was consistent with having a sudden, sensory outburst or meltdown and not active resistance.[53]

8.    **It is uncontested, and the video clearly shows that E.P.'s parents, who were both present at the scene, themselves never took any action to intervene in or bring a stop to the Deputies' actions.**

**Disputed.** It is undisputed that E.P.'s parents never took any physical actions to intervene or to bring a stop to the deputies' actions. Plaintiffs recognized and did not challenge the authority of the deputies as law enforcement officers and assumed that the deputies were properly trained and knew what they were doing. However, Plaintiffs dispute that they did not take "any action" to intervene in this situation.

When Deputy Pitfield first arrived, Mr. Parsa informed him that E.P. was autistic which, to a properly trained deputy, should have alerted him that special precautions needed to be taken. When Deputy Pitfield was sitting on E.P. who was being held face down on the asphalt parking lot, Ms. Lou attempted to prevent injury to E.P. by placing a jacket under his head as a cushion. She was instructed by Deputy Pitfield to remove the jacket/cushion. She complied with his order. Both parents recognized that E.P.'s behaviors manifested that he was experiencing a sensory outburst, and tried to calm and soothe him in order to assist him in recovering from the physical and emotional consequences of the melt-down.

After Deputy Vega utilized a choke hold on E.P., Ms. Lou testified that she told the deputies that E.P. was having trouble breathing and they were choking E.P. which was denied and/or

---

[53] R. Doc. 156-3 – Debbaudt Report, pp. 15-16 ("It is well-known and documented in law enforcement and first responder's literature that subjecting autistic persons to prone, pressurized restraint poses significant risk of asphyxia.   Non-verbal, severely autistic persons are unable to understand or comprehend even the simplest commands which may be interpreted as resistance or intentional disobedience. The continued, prone restraint of severely autistic children, especially those who are obese and non-verbal, is known to law enforcement to pose a significant risk of catastrophic outcomes.").

ignored.[54]

Further, when additional deputies arrived, Ms. Lou advised the deputies that crowding E.P. was not helpful and can make matters worse.[55]  Her advice was ignored. At 18:05 on the videotape, Ms. Lou leaves the immediate area and goes to her vehicle to attempt to find E.P.'s treatment plan in the hopes the deputies would listen to her.[56]

When Ms. Lou complained about the actions of the deputies' actions which she observed, she was told repeatedly, "Let us do our job.  Let us do our business."[57]

In addition to Ms. Lou's testimony, many of the deputies confirmed that Ms. Lou complained about the deputies' actions. There is no indication that any of the deputies responded to her complaints or that they changed their behaviors as a result of her statements.

Deputy Guidry acknowledged that Ms. Lou complained that E.P. was not breathing.[58]

Deputy Estrada acknowledged that Ms. Lou was complaining that the deputies were killing her son[59] and that the deputies were choking him.[60]

Deputy Vega acknowledged that Ms. Lou complained about him choking E.P.[61]  This

---

[54] Ex. C – Donna Lou Dep., 181:6-182:2; 183:10-16; 185:24-186:10; 195:4-11; 197:1-9. ("He's having trouble breathing. He is having trouble breathing. He is in a chokehold just like the man from New York, Eric Garner, died. It is just like the man from Baton Rouge, how he died.").

[55] Ex. C – Donna Lou Dep., 182:9-183:21; 195:16-19.

[56] Ex. C – Donna Lou Dep., 182:20-25; 183:1-7

[57] Ex. C – Donna Lou Dep., 182:9-183:21; 195:4-19; 197:1-9.

[58] R. Doc. 155-3 – Guidry Statement, p. 2 ("So Nick had his arm around him and Myron was down below, I guess checking to make sure everything was okay, and the kid was still, everything was fine. And then I hear the mom said, "I don't know if he's breathing, I don't know if he's breathing." And Myron said, "He's breathing, his stomach is going up and down. He's breathing." And then Myron said, "Let's put him on his side."")

[59] Ex. D – Estrada Statement, p. 5 ("She was I remember her standing, um, by the door, the open door of her SUV and she kept fooling around with her phone and she, she just I remember just hearing her shout y'all are killing my son when all we were doing was trying to control him." "She just kept, she was hysterical.").

[60] R. Doc. 156-8 – Estrada Dep., pp. 119-120; Ex. D. – Estrada Statement, p. 7 (Q. I usually don't share information (inaudible) but the reason I'm asking you, she asserts that she, she said out loud whether it's you're choking him, or y'all killing him but you're cooperating.  She.  She was audible about that.  She was saying things like that. A. Yea, she was saying things like that but the whole time we weren't hurting him.  We were just trying to control him.).

[61] R. Doc. 105-9 – Vega Dep., 129:16-130:24; R. Doc. 18-5 – Vega Statement, p. 6 (Q.  So the mother, who makes an assertion, two fold actually that he was choked and that she asserted it at the time.  Did you ever hear her say anything about him being choked.  A. I did.  Q. Did you hear her say that. A. Yes.  Q.  So she did do that.  A. Yes.).

complaint was made in front of all the deputies on the scene.[62] Deputy Vega also acknowledged that he understood why Ms. Lou complained that he was choking E.P.[63] Despite her complaints about E.P. being choked, Deputy Vega ignored her comment and persisted in his hold until E.P. had urinated on himself and then went limp.

9.     **Deputy Vega "consider[ed] E.P. on that day [to be] extremely violent." *See* Deposition of Deputy Nicholas Vega, attached as Exhibit 2, at p. 112:3-5. E.P. was actively resisting up until the second that you realized that he went limp." *Id.*, at 113.**

Plaintiffs dispute and deny that E.P. was objectively, "extremely violent." In the deputies' initial statements not long after the incident, the deputies described many points at which the scene was "under control," "was calm," and "everything was fine:"

a.     Deputy Vaught said when he handcuffed EP, EP was not resisting and was "moving little bit but he wasn't trying to resist or pull his- -pull his arm away."[64] Detective Vaught said EP did not resist after he was handcuffed,[65] and he did not place EP in a recovery position after he was handcuffed because he went to speak with Mr. Parsa. Detective Vaught said he would not have left Deputy Pitfield alone if he did not believe it was safe to do so.[66] Detective Vaught said it was possible for the 6 deputies to put EP in a recovery position.[67]

b.     Deputy Mehrtens said when he arrived, EP "was face down on the ground, he had two (2) sets of handcuffs and his hands were handcuffed behind his back, with Deputy Pitfield sitting on his buttocks area."[68] Deputy Mehrtens said when he arrived, "there wasn't, there wasn't a struggle, it didn't appear to be a struggle."[69] Deputy Mehrtens further stated, "I didn't see a struggle so there was no need for me to engage him."[70]

c.     Deputy Vega said when he arrived, Deputy Pitfield was on EP's "butt area," and he believed Deputy Pitfield had control.[71] Deputy Vega switched positions with

---

[62] R. Doc. 18-5 – Vega Statement, p. 10 (Q. Who was she saying that to, do you know. A. Everybody that was standing around).
[63] R. Doc. 18-5 - Vega Statement, p. 10 (Q. Well you can see that maybe, it's a perception thin, maybe that's a legitimate perception from her standpoint. A. Oh absolutely, I could understand her perception of it.)
[64] R. Doc. 155-4 - Vaught statement at 5.
[65] R. Doc. 156-5 - Vaught Dep., at 122.
[66] *Id.* at 123.
[67] *Id.* at 110.
[68] R. Doc. 155-2 - Mehrtens Statement, p. 3.
[69] *Id.*
[70] *Id.* at 4.
[71] R. Doc. 18-5 - Vega Statement, p. 2.

Deputy Pitfield to continue the prone restraint of EP. During the transfer, Deputy Vega noted that EP was calm and not offering any resistance.[72] While restraining EP in the prone position, Deputy Vega used a pain compliance technique on EP by elevating EP's handcuffed hands behind his back.[73] While Deputy Vega denies he used a choke hold, he did acknowledge that he put his forearm underneath EP's chin, while connecting his hands.[74] However, the forensic evidence reveals that Deputy Vega did utilize a forearm bar choke hold which impacted EP's ability to breathe.[75]

d.  Deputy Guidry said she was not actively involved in controlling EP, and when she arrived, Deputy Pitfield was trying to control EP. Deputy Pitfield said he "pretty much" had EP under control and there was nothing she could do.[76] Further, Deputy Guidry said if a person is in a recovery position and actively resisting, deputies would be able to control the person.[77]

e.  Deputy Gaudet did not see EP violently struggle between 14:00 – 15:12 on the video and he did not see a struggle when Deputy Vega exchanged positions with Deputy Pitfield at 16:00 on the video.[78]

f.  Deputy Estrada testified that when he arrived, two detectives, Deputy Vega and Deputy Pitfield were already at the scene.[79] Deputy Estrada said he did not see a struggle where he believed Deputy Pitfield needed his help.[80] Deputy Estrada said he did not see a struggle when Deputy Vega transitioned with Deputy Pitfield.[81]

g.  Sergeant Dowling who performed a homicide investigation of this incident and was involved in taking many of the deputies' statements also acknowledged that EP was calm during many periods of time.[82]

h.  Sheriff Lopinto admitted after watching the tape that there were several occasions during the prone restraint where the deputies could have placed EP in the recovery position including: 1) after Detective Vaught arrived and assisted Pitfield in cuffing

---

[72] *Id.* at 5.

[73] R. Doc. 155-2 - Mehrtens Statement at 6 ("Deputy Vega has technique, you know, when somebody starts struggling, you have handcuffs on them, you just begin to slightly elevate the arms so that you can just maintain control of the upper torso, um, he begins doing that….").

[74] R. Doc. 18-5 - Vega Statement at 6; R. Doc. 105-9 - Vega Dep., 129:16-130:24.

[75] R. Doc. 142-7 - Sperry Report Excerpt - ("The physical findings at autopsy confirm that Vega utilized a "forearm bar" choke hold which significantly impacted [E.P.]'s airway and ability to breathe.")

[76] R. Doc. 156-7 - Guidry Dep., 49-50.

[77] *Id.* at 74.

[78] R. Doc. 156-9 - Gaudet Dep., 96-98.

[79] R. Doc. 156-8 - Estrada Dep., 93.

[80] *Id.* at 95.

[81] *Id.* at 100.

[82] R. Doc. 155-5 - Dowling Dep. at 112:14-19 ("Q. The interviews, like Deputy Vega, when he gave his interview, he said that when they moved to switch out, that Mr. Parsa wasn't offering any resistance, correct? A. That's when they realized that he had stopped resisting, yes."); *Id.* at 122:6-8 ("Q. And doesn't he state when he got there he put his handcuff on, and there was no resistance? A. No resistance to the handcuff."

EP behind his back;[83] 2) after other deputies arrived and there were five officers on the scene during video between 14:33 – 15:00;[84]3) on the video tape from 15:00 – 15:28, Sheriff Lopinto stated that it was not physically impossible to place EP into the recovery position and noted that the issue was "whether or not it was reasonable" to place him in the recovery position;[85]  4) on the video tape from 16:00 – 16:29, Sheriff Lopinto acknowledged that there was no resistance which would preclude placing EP in the recovery position[86] and that "there is nothing other than their [deputies] observances that precludes them from putting him in the recovery position;"[87] and 5) after review of the video tape, Sheriff Lopinto provided the following response with respect to whether EP should have been placed in the recovery position: "And, again as you are pausing it second by second by second, it makes it look like there is numerous opportunities, but if you let it run out from the changes of, you know, his reactions 30 seconds apart, 30 seconds apart, you know, I'm going to tell you no at this moment, yes at this moment.  No at this moment, yes at this moment, right. And so, you know, you have the ability to pause every second and ask me that same question, and I'm going to go back to the one where he is resisting and say this is why they weren't."[88] Significantly, Sheriff Lopinto could not state whether any movements by EP while restrained were efforts to resist, efforts to breathe, or were caused by a lack of oxygen caused by the effects of the prone restraint on an obese suspect.[89]

Plaintiffs' have also presented expert testimony to dispute the Defendants' false narrative that the scene was not secure or that E.P.'s occasional movements in response to the continued, pressurized restraint being applied, amounted to intentional resistance (or as defense counsel repeatedly asserts, "extreme violence.").  First, Plaintiffs' forensic pathologist, Dr. Kris Sperry reviewed the tape and noted that E.P.'s behavior appeared to be manifestations of his Severe Autism Spectrum Disorder and oxygen deficiency.[90]  Second, Plaintiffs' police expert, Jeff Noble,

---

[83] R. Doc. 150-5 - Lopinto Dep., 222.
[84] *Id.* at 226.
[85] *Id.* at 211-215.
[86] *Id.* at 217-218.
[87] *Id.* at 225.
[88] *Id.* at 235.
[89] *Id.* at 235-237.
[90] R. Doc. 156-4 - Dr. Sperry Expert Report – which notes: 1) "While [EP] made certain movements while being restrained by Pitfield, it is my opinion that these movements were not willful, active resistance or efforts to harm the officers, but behavioral manifestations of his autism and evidence of oxygen deficiency which was resulting from his continuous and prolonged restraint." (Page 4); 2) "Again, at this time, it doesn't appear that [EP] is offering any real resistance or danger to the deputies.  As previously noted, the actions of [E.P.] appear to be consistent with the physical manifestation of his SASD and oxygen deficiency stemming from the prolonged restraint." (Page 6); and 3) "The inability of the autistic person to understand and comprehend commands, and especially an individual with Severe Autistic Spectrum Disorder, who are confronted by or otherwise involved in an incident with law enforcement officers,

reviewed the tape and also opined that E.P. was not actively resisting but more likely struggling to

breath as a result of the prone restraint.[91] Mr. Noble reviewed the evidence in this case and opined

that the prone restraint of E.P. by both Deputies Pitfield and Vega constituted excessive force.[92]

All deputies observed and/or assisted or failed to intervene in this excessive restraint of E.P.

Further, Mr. Noble opined that the pain compliance technique employed by Deputy Vega

constituted the use of excessive force.[93]  All of the deputies were in the immediate vicinity of the

events when Deputy Vega employed this pain compliance technique yet none of them did anything

to intervene.  Finally, Mr. Noble opined that if Deputy Vega used a choke hold, it would have been

an improper use of deadly force.[94]  All of the deputies were in the immediate vicinity when Deputy

Vega employed a choke hold and Ms. Lou testified that she told the deputies that E.P. was having

trouble breathing and they were choking E.P.[95]   Finally, Plaintiffs' autism expert, Dennis

---

can result in disaster if the officer(s) decide to continue to utilize a prone restraint against an obese, severely autistic person." (Page 11).

[91] R. Doc. 142-8 – Noble Report, ¶ 61 ("The deputies claim that EP was actively resisting and that they had no other option other than maintain EP in the prone position is absurd."); ¶ 61(d) ("A reasonable police officer would know that a subject's movement in these circumstances is likely being done to help the subject breathe and is not active resistance."); ¶ 61(e) ("While it would have been safe and reasonable for two deputies to roll EP on his side even if he was kicking to place him in the recovery position, it is unconscionable that after the arrival of multiple deputies, none of whom are assisting in holding EP, that the deputies somehow could not have placed EP in a recovery position when the known consequence of their failure to do so may cause the death of EP.")

[92] R. Doc. 142-8 – Noble Expert Report, ¶ 60 ("The deputies' use of force by maintaining EP in a prone position after he had been handcuffed and placing their body weight on his back in these circumstances where EP needed medical intervention, not a jail cell, was excessive, objectively unreasonable, and inconsistent with generally accepted police practices.").

[93] R. Doc. 142-8 – Noble Expert Report, ¶ 63 – ("If Deputy Vega used a pain compliance hold in this manner, in these circumstances, his use force was excessive, objectively unreasonable, and inconsistent with generally accepted police practices.  Deputy Mehrtens acknowledged that Vega uses this pain compliance technique in his statement to JPSO as follows: "I turn around and I see the struggle happening again. Deputy Vega has technique, you know, when somebody starts struggling, you have handcuffs on them, you just begin to slightly elevate the arms so that you can just maintain control of the upper torso, um, he begins doing that….").

[94] R. Doc. 142-8 – Noble Expert Report, ¶ 64 ("Moreover, if Deputy Vega placed his arm on EP's neck as stated by Ms. Lou, that use of force would be excessive, objectively unreasonable and inconsistent with generally accepted police practices.  Any use of a choke hold would be the application of deadly force and completely unreasonable under the circumstances.").

[95] Ex. C – Donna Lou Dep., 195:4-8 ("He's having trouble breathing. He is having trouble breathing. He is in a chokehold just like the man from New York, Eric Garner, died. It is just like the man from Baton Rouge, how he died.").

Debbaubt, reviewed the video tape and opined that E.P. conduct was consistent with having a sudden, sensory outburst or meltdown and not active resistance.[96]

**10.    At the time that Deputy Vega took over for Deputy Pitfield, E.P. was still resisting; "he was still turning, pulling up, fighting with his hands." *Id*., at p. 124. "He was picking himself up and turning side to side, like to the left, to the right. Rolling to one side and then to the other." *Id*., at p. 126.**

Disputed.  When Deputy Vega arrived, Deputy Pitfield was on EP's "butt area," and he believed Deputy Pitfield had control.[97]  Prior to the switch Deputy Vega observed that Deputy Pitfield "was pretty well spent at that point, so he asked to exchange. We exchanged."[98]   The transfer from Deputy Pitfield to Deputy Vega is captured on the video tape 16:02.  There is no struggle between E.P. and any deputy at that time.  Further, during the transfer, Deputy Vega noted that EP was calm and not offering any resistance.[99]  Further, Deputy Estrada said he did not see a struggle when Deputy Vega transitioned with Deputy Pitfield.[100]  Finally, Deputy Gaudet reviewed the video tape and did not see a struggle when Deputy Vega exchanged positions with Deputy Pitfield at 16:00 on the video.[101]   Despite there being 6 deputies on the scene and no resistance during the transfer, the deputies failed to roll E.P. into the recovery position.

**11.    "[F]rom the point we had switched out, it was a continual thing. Then he started picking his arms up from behind his back. So I was like okay. I tried to get his arms to stay down, but I couldn't. So basically I just held what I had, and then he kept pulling, and then I lost my balance, and he went over them." Exhibit 2, at p. 127.**

---

[96] R. Doc. 156-3 – Debbaudt Report, pp. 15-16 ("It is well-known and documented in law enforcement and first responder's literature that subjecting autistic persons to prone, pressurized restraint poses significant risk of asphyxia.   Non-verbal, severely autistic persons are unable to understand or comprehend even the simplest commands which may be interpreted as resistance or intentional disobedience. The continued, prone restraint of severely autistic children, especially those who are obese and non-verbal, is known to law enforcement to pose a significant risk of catastrophic outcomes.").
[97] R. Doc. 18-5 - Vega Statement, p. 2.
[98] R. Doc. 105-9 – Vega Dep., 120:23-25.
[99] *Id.* at 5.
[100] *Id.* at 100.
[101] R. Doc. 156-9 - Gaudet Dep., 96-98.

Plaintiffs dispute that any of E.P.'s actions constitute active resistance but were manifestations of his severe autism disorder and oxygen deficiency or reactions to the pain compliance technique and chokehold performed by Deputy Vega.

Further, Plaintiffs' dispute that E.P. attempted to pull his handcuffed arms up behind his back and pulled Deputy Vega forward, causing him to lose his balance. As noted by Deputy Mehrtens, Deputy Vega employed a pain compliance technique by pushing E.P.'s arms forward.[102]

Plaintiffs further dispute this Statement of Fact based on the following sequence of events identified by the video and other evidence.

Deputy Vega and Deputy Pitfield switch positions with Deputy Vega, taking over the prone restraint of E.P. at 16:00.[103] During the transfer, Deputy Vega noted that E.P. was calm and not offering any resistance.[104] With Deputy Vega now restraining E.P. in the prone position, E.P.'s mother remained at E.P.'s head area trying to calm and comfort him.[105] Deputy Vega is seen leaning forward and repositioning his body weight while holding E.P.'s. handcuffed arms.[106] At 16:55, Deputy Vega employs a pain compliance technique by pushing E.P.'s cuffed hand up behind his back.[107] As this is occurring, Detective Vaught and Mehrtens approach to assist Deputy Vega and go hands on with E.P.[108] By 17:13, E.P.'s arms are pushed above his head and onto the ground in front of him.[109]

---

[102] R. Doc. 154-3 – Laser Tag Video – 16:55-17:27; R. Doc. 155-2 - Mehrtens Statement at 6 ("Deputy Vega has technique, you know, when somebody starts struggling, you have handcuffs on them, you just begin to slightly elevate the arms so that you can just maintain control of the upper torso, um, he begins doing that….").
[103] R. Doc. 154-3 – Laser Tag Video – 16:00.
[104] R. Doc. 18-5 – Vega Statement at 5.
[105] R. Doc. 154-3 – Laser Tag Video - 16:02-17:24.
[106] R. Doc. 154-3 – Laser Tag Video – 16:00-17:00.
[107] R. Doc. 154-3 – Laser Tag Video – 16:55-17:27; R. Doc. 155-2 - Mehrtens Statement at 6 ("Deputy Vega has technique, you know, when somebody starts struggling, you have handcuffs on them, you just begin to slightly elevate the arms so that you can just maintain control of the upper torso, um, he begins doing that….").
[108] R. Doc. 154-3 – Laser Tag Video – 17:03-17:10 - (Mehrtens is to Vega's right and Vaught is to Vega's left).
[109] R. Doc. 154-3 – Laser Tag Video - 17:13.

At 17:14, Detective Vaught moves to E.P.'s legs and all six deputies are in the immediate vicinity of the events.  At 17:24, Detective Mehrtens places his knee on E.P.'s left back/side and Detective Vaught places his body weight on E.P. right side while Deputy Vega remains on E.P.'s backside.[110] At 17:25, Deputy Estrada goes to his patrol car to retrieve leg shackles.  While this is going on, all of the Defendants are either assisting Vega restrain E.P. or in the immediate vicinity watching the events.

After E.P.'s arms were pushed to the ground in front on him, Deputy Vega then performs a chokehold on E.P. while Detectives Mehrtens and Vaught continue to place their body weight on E.P.[111]  While Deputy Vega denies he used a choke hold, he did acknowledge that he put his forearm underneath E.P.'s chin and connected his hands together.[112] Ms. Lou testified that she told the deputies that E.P. was having trouble breathing and they were choking E.P.[113]  Deputy Vega acknowledged that Ms. Lou complained about him choking E.P.[114]  This complaint was made in front of all the deputies on the scene.[115]  Deputy Vega also acknowledged that he understood why Ms. Lou complained that he was choking E.P.[116] Despite her complaints about E.P. being choked, Deputy Vega ignored her comment and persisted in his hold until a deputy noticed that E.P. had urinated on himself and then went limp.  Further, Deputy Guidry acknowledged that Deputy Vega

---

[110] R. Doc. 154-3 – 17:23-17:27

[111] R. Doc. 154-3 – Laser Tag Video – 17:27-17:51.

[112] R. Doc. 18-5 - Vega Statement at 6; R. Doc. 105-9 - Vega Dep., 129:16-130:24.

[113] Ex. C – Donna Lou Dep., 195:4-8 ("He's having trouble breathing. He is having trouble breathing. He is in a chokehold just like the man from New York, Eric Garner, died. It is just like the man from Baton Rouge, how he died.").

[114] R. Doc. 105-9 - Vega Dep., 129:16-130:24; R. Doc. 18-5 - Vega Statement, p. 6 (Q.  So the mother, who makes an assertion, two fold actually that he was choked and that she asserted it at the time.  Did you ever hear her say anything about him being choked.  A. I did.  Q. Did you hear her say that. A. Yes.  Q.  So she did do that.  A. Yes.).

[115] R. Doc. 18-5 – Vega Statement, p. 10 (Q.  Who was she saying that to, do you know.  A.  Everybody that was standing around).

[116] R. Doc. 18-5 - Vega Statement, p. 10 (Q. Well you can see that maybe, it's a perception thin, maybe that's a legitimate perception from her standpoint.  A. Oh absolutely, I could understand her perception of it.)

had a hold on E.P.'s head area and Ms. Lou complained that E.P. was not breathing.[117]  Deputy

Estrada acknowledged that Ms. Lou was complaining that the deputies were killing her son[118] and

choking him.[119]  The forensic evidence reveals that Deputy Vega did utilize a forearm bar choke

hold which impacted E.P.'s ability to breathe.[120]

Further, Plaintiffs' forensic pathologist, Dr. Kris Sperry reviewed the tape and noted that

E.P.'s behavior appeared to be manifestations of his Severe Autism Spectrum Disorder and oxygen

deficiency.[121] Second, Plaintiffs' police expert, Jeff Noble, reviewed the tape and also opined that

E.P. was not actively resisting but more likely struggling to breath as a result of the prone

restraint.[122] Mr. Noble reviewed the evidence in this case and opined that the prone restraint of

---

[117] R. Doc. 155-3 – Guidry Statement, p. 2 ("So Nick had his arm around him and Myron was down below, I guess checking to make sure everything was okay, and the kid was still, everything was fine. And then I hear the mom said, "I don't know if he's breathing, I don't know if he's breathing." And Myron said, "He's breathing, his stomach is going up and down. He's breathing." And then Myron said, "Let's put him on his side."")

[118] Ex. D – Estrada Statement, p. 5 ("She was I remember her standing, um, by the door, the open door of her SUV and she kept fooling around with her phone and she, she just I remember just hearing her shout y'all are killing my son when all we were doing was trying to control him." "She just kept, she was hysterical.").

[119] R. Doc. 156-8 – Estrada Dep., pp. 119-120; Ex. D. – Estrada Statement, p. 7 (Q. I usually don't share information (inaudible) but the reason I'm asking you, she asserts that she, she said out loud whether it's you're choking him, or y'all killing him but you're cooperating. She. She was audible about that. She was saying things like that. A. Yea, she was saying things like that but the whole time we weren't hurting him. We were just trying to control him.).

[120] R. Doc. 142-7 - Sperry Report Excerpt ("The physical findings at autopsy confirm that Vega utilized a "forearm bar" choke hold which significantly impacted [E.P.]'s airway and ability to breathe.")

[121] R. Doc. 156-4 - Dr. Sperry Expert Report – which notes: 1) "While [EP] made certain movements while being restrained by Pitfield, it is my opinion that these movements were not willful, active resistance or efforts to harm the officers, but behavioral manifestations of his autism and evidence of oxygen deficiency which was resulting from his continuous and prolonged restraint." (Page 4); 2) "Again, at this time, it doesn't appear that [EP] is offering any real resistance or danger to the deputies.  As previously noted, the actions of [E.P.] appear to be consistent with the physical manifestation of his SASD and oxygen deficiency stemming from the prolonged restraint." (Page 6); and 3) "The inability of the autistic person to understand and comprehend commands, and especially an individual with Severe Autistic Spectrum Disorder, who are confronted by or otherwise involved in an incident with law enforcement officers, can result in disaster if the officer(s) decide to continue to utilize a prone restraint against an obese, severely autistic person." (Page 11).

[122] R. Doc. 142-8 – Noble Report, ¶ 61 ("The deputies claim that EP was actively resisting and that they had no other option other than maintain EP in the prone position is absurd."); ¶ 61(d) ("A reasonable police officer would know that a subject's movement in these circumstances is likely being done to help the subject breathe and is not active resistance."); ¶ 61(e) ("While it would have been safe and reasonable for two deputies to roll EP on his side even if he was kicking to place him in the recovery position, it is unconscionable that after the arrival of multiple deputies, none of whom are assisting in holding EP, that the deputies somehow could not have placed EP in a recovery position when the known consequence of their failure to do so may cause the death of EP.")

E.P. by both Deputies Pitfield and Vega constituted excessive force.[123]  Further, Mr. Noble opined that the pain compliance technique employed by Deputy Vega constituted the use of excessive force.[124]  Finally, Mr. Noble opined that if Deputy Vega used a choke hold, it would have been an improper use of deadly force.[125]  Finally, Plaintiffs' autism expert, Dennis Debbaubt, reviewed the video tape and opined that E.P. conduct was consistent with having a sudden, sensory outburst or meltdown and not active resistance.[126]

**12.     E.P. continued to kick as Deputy Vega was on him. *Id*., at 135.**

Plaintiffs dispute that any movement of E.P. legs during his restraint can be characterized as a kick, but were the result of oxygen deficiency.  From the time Deputy Vega began to restrain E.P. in the prone position (16:00) until E.P.'s legs are shackled (18:12), no "kick" can be observed on the video tape.  Further, Plaintiffs' forensic pathologist, Dr. Kris Sperry reviewed the tape and noted that E.P.'s behavior appeared to be manifestations of his Severe Autism Spectrum Disorder and oxygen deficiency.[127]  Second, Plaintiffs' police expert, Jeff Noble, reviewed the tape and also

---

[123] R. Doc. 142-8 – Noble Expert Report, ¶ 60 ("The deputies' use of force by maintaining EP in a prone position after he had been handcuffed and placing their body weight on his back in these circumstances where EP needed medical intervention, not a jail cell, was excessive, objectively unreasonable, and inconsistent with generally accepted police practices.").

[124] R. Doc. 142-8 – Noble Expert Report, ¶ 63 – ("If Deputy Vega used a pain compliance hold in this manner, in these circumstances, his use force was excessive, objectively unreasonable, and inconsistent with generally accepted police practices.  Deputy Mehrtens acknowledged that Vega uses this pain compliance technique in his statement to JPSO as follows: "I turn around and I see the struggle happening again. Deputy Vega has technique, you know, when somebody starts struggling, you have handcuffs on them, you just begin to slightly elevate the arms so that you can just maintain control of the upper torso, um, he begins doing that….").

[125] R. Doc. 142-8 – Noble Expert Report, ¶ 64 ("Moreover, if Deputy Vega placed his arm on EP's neck as stated by Ms. Lou, that use of force would be excessive, objectively unreasonable and inconsistent with generally accepted police practices.  Any use of a choke hold would be the application of deadly force and completely unreasonable under the circumstances.").

[126] R. Doc. 156-3 – Debbaudt Report, pp. 15-16 ("It is well-known and documented in law enforcement and first responder's literature that subjecting autistic persons to prone, pressurized restraint poses significant risk of asphyxia.   Non-verbal, severely autistic persons are unable to understand or comprehend even the simplest commands which may be interpreted as resistance or intentional disobedience. The continued, prone restraint of severely autistic children, especially those who are obese and non-verbal, is known to law enforcement to pose a significant risk of catastrophic outcomes.").

[127] R. Doc. 156-4 - Dr. Sperry Expert Report – which notes: 1) "While [EP] made certain movements while being restrained by Pitfield, it is my opinion that these movements were not willful, active resistance or efforts to harm the officers, but behavioral manifestations of his autism and evidence of oxygen deficiency which was resulting from his

opined that E.P. was not actively resisting but more likely struggling to breath as a result of the prone restraint.[128]

**13.    (At the 16:38 mark of the video) – "That's when he was trying to roll me off of him." *Id*., at 167.**

Disputed.  At 16:38, Deputy Vega is positioning his hands through E.P.'s handcuffs arms prior to employing a pain compliance technique.  Deputy Vega then employs a pain compliance technique by 16:54 and can be seen pushing E.P.'s hand-cuffed arms up over E.P.'s head.

Plaintiffs' forensic pathologist, Dr. Kris Sperry reviewed the tape and noted that E.P.'s behavior appeared to be manifestations of his Severe Autism Spectrum Disorder and oxygen deficiency.[129]  Second, Plaintiffs' police expert, Jeff Noble, reviewed the tape and also opined that E.P. was not actively resisting but more likely struggling to breath as a result of the prone restraint.[130] Mr. Noble reviewed the evidence in this case and opined that the prone restraint of

---

continuous and prolonged restraint." (Page 4); 2) "Again, at this time, it doesn't appear that [EP] is offering any real resistance or danger to the deputies.  As previously noted, the actions of [E.P.] appear to be consistent with the physical manifestation of his SASD and oxygen deficiency stemming from the prolonged restraint." (Page 6); and 3) "The inability of the autistic person to understand and comprehend commands, and especially an individual with Severe Autistic Spectrum Disorder, who are confronted by or otherwise involved in an incident with law enforcement officers, can result in disaster if the officer(s) decide to continue to utilize a prone restraint against an obese, severely autistic person." (Page 11).

[128] R. Doc. 142-8 – Noble Report, ¶ 61 ("The deputies claim that EP was actively resisting and that they had no other option other than maintain EP in the prone position is absurd."); ¶ 61(d) ("A reasonable police officer would know that a subject's movement in these circumstances is likely being done to help the subject breathe and is not active resistance."); ¶ 61(e) ("While it would have been safe and reasonable for two deputies to roll EP on his side even if he was kicking to place him in the recovery position, it is unconscionable that after the arrival of multiple deputies, none of whom are assisting in holding EP, that the deputies somehow could not have placed EP in a recovery position when the known consequence of their failure to do so may cause the death of EP.")

[129] R. Doc. 156-4 – Dr. Sperry Expert Report – which notes: 1) "While [EP] made certain movements while being restrained by Pitfield, it is my opinion that these movements were not willful, active resistance or efforts to harm the officers, but behavioral manifestations of his autism and evidence of oxygen deficiency which was resulting from his continuous and prolonged restraint." (Page 4); 2) "Again, at this time, it doesn't appear that [EP] is offering any real resistance or danger to the deputies.  As previously noted, the actions of [E.P.] appear to be consistent with the physical manifestation of his SASD and oxygen deficiency stemming from the prolonged restraint." (Page 6); and 3) "The inability of the autistic person to understand and comprehend commands, and especially an individual with Severe Autistic Spectrum Disorder, who are confronted by or otherwise involved in an incident with law enforcement officers, can result in disaster if the officer(s) decide to continue to utilize a prone restraint against an obese, severely autistic person." (Page 11).

[130] R. Doc. 142-8 – Noble Report, ¶ 61 ("The deputies claim that EP was actively resisting and that they had no other option other than maintain EP in the prone position is absurd."); ¶ 61(d) ("A reasonable police officer would know that a subject's movement in these circumstances is likely being done to help the subject breathe and is not active

E.P. by both Deputies Pitfield and Vega constituted excessive force.[131]  Further, Mr. Noble opined that the pain compliance technique employed by Deputy Vega constituted the use of excessive force.[132]  Finally, Mr. Noble opined that if Deputy Vega used a choke hold, it would have been an improper use of deadly force.[133]  Finally, Plaintiffs' autism expert, Dennis Debbaubt, reviewed the video tape and opined that E.P. conduct was consistent with having a sudden, sensory outburst or meltdown and not active resistance.[134]

RESPECTFULLY SUBMITTED,

WILLIAM MOST (BPR # 36914)
Most & Associates
201 St. Charles Ave., Ste. 114 #101
New Orleans, LA 70170
Tel: (504) 509-5023
williammost@gmail.com

/s/s Andrew C. Clarke
Andrew C. Clarke (TN BPR # 15409)
The Cochran Firm Midsouth
One Commerce Square, Suite 1700

---

resistance."); ¶ 61(e) ("While it would have been safe and reasonable for two deputies to roll EP on his side even if he was kicking to place him in the recovery position, it is unconscionable that after the arrival of multiple deputies, none of whom are assisting in holding EP, that the deputies somehow could not have placed EP in a recovery position when the known consequence of their failure to do so may cause the death of EP.")

[131] R. Doc. 142-8 – Noble Expert Report, ¶ 60 ("The deputies' use of force by maintaining EP in a prone position after he had been handcuffed and placing their body weight on his back in these circumstances where EP needed medical intervention, not a jail cell, was excessive, objectively unreasonable, and inconsistent with generally accepted police practices.").

[132] R. Doc. 142-8 – Noble Expert Report, ¶ 63 – ("If Deputy Vega used a pain compliance hold in this manner, in these circumstances, his use force was excessive, objectively unreasonable, and inconsistent with generally accepted police practices.  Deputy Mehrtens acknowledged that Vega uses this pain compliance technique in his statement to JPSO as follows: "I turn around and I see the struggle happening again. Deputy Vega has technique, you know, when somebody starts struggling, you have handcuffs on them, you just begin to slightly elevate the arms so that you can just maintain control of the upper torso, um, he begins doing that….").

[133] R. Doc. 142-8 – Noble Expert Report, ¶ 64 ("Moreover, if Deputy Vega placed his arm on EP's neck as stated by Ms. Lou, that use of force would be excessive, objectively unreasonable and inconsistent with generally accepted police practices.  Any use of a choke hold would be the application of deadly force and completely unreasonable under the circumstances.").

[134] R. Doc. 156-3 – Debbaudt Report, pp. 15-16 ("It is well-known and documented in law enforcement and first responder's literature that subjecting autistic persons to prone, pressurized restraint poses significant risk of asphyxia.   Non-verbal, severely autistic persons are unable to understand or comprehend even the simplest commands which may be interpreted as resistance or intentional disobedience. The continued, prone restraint of severely autistic children, especially those who are obese and non-verbal, is known to law enforcement to pose a significant risk of catastrophic outcomes.").

(901) 523-1222 (Telephone)
aclarke@cochranfirmmidsouth.com