1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF LOUISIANA

3

4    DONNA LOU, ET AL           CIVIL ACTION
                                NO. 21-80
5    VS.

6    SHERIFF JOSEPH P.          SECTION "D" (2)
     LOPINTO, III, ET AL
7                               JUDGE WENDY B. VITTER
                                MAGISTRATE JUDGE
8                               DONNA P. CURRAULT

9                    *   *   *

10

11        Deposition of DAREN PARSA, taken in

12   the above-entitled cause, pursuant to the

13   following stipulation, before Ann M. Downs,

14   a Certified Court Reporter, authorized to

15   administer oaths of witnessess and to take

16   depositions, pursuant to Title 13 of the

17   State of Louisiana, given in the offices of

18   the Jefferson Parish Sheriff's Office, 1233

19   Westbank Expressway, Fifth Floor, Harvey,

20   Louisiana 70058, on the 19th day of

21   September, 2022 commencing at 9:02 a.m.

22                    *   *   *

23

24

25

KELLY & ASSOCIATES, L.L.C.
Certified Court Reporters
(504)891-6333

```
 1   APPEARANCES:

 2

 3   Representing Donna Lou, et al:

 4        THE COCHRAN FIRM MID-SOUTH
          BY:  ANDREW CLARKE, ESQ.
 5        One Commerce Square
          400 South Main, Suite 1700
 6        Memphis, Tennessee 38103

 7

 8

 9   Representing Sheriff Joseph P. Lopinto,
       III, et al:

10        MARTINY & ASSOCIATES
11        BY:  FRANZ L. ZIBILICH, ESQ.
               JEFFREY D. MARTINY, ESQ.
12        131 Airline Drive, Suite 201
          Metairie, Louisiana 70001

13             -- and --

14        LINDSEY M. VALENTI, ESQ.
15        1233 Westbank Expressway
          Building B, Fifth Floor
16        Harvey, Louisiana 70058

17

18

19   Representing Victory Real Estate
       Investments LA, LLC and Westgate
20       Shopping Center:

21        THOMPSON, COE, COUSINS & IRONS
          BY:  CHRISTOPHER W. KAUL, ESQ.
22        601 Poydras Street, Suite 1850
          New Orleans, Louisiana 70130
23

24

25
```

```
 1   APPEARANCES CONTINUED:

 2

 3   Also Present:   Donna Lou
                     Tim Anclade
 4                   Nick Vega
                     Myron Gaudet
 5                   Ryan Vaught
                     Steven Mehrtens
 6

 7

 8   REPORTED BY:

 9

10   ANN M. DOWNS
     Certified Court Reporter
11

12

13                   INDEX

14                EXAMINATION

15
                                          PAGE
16
     By Mr. Zibilich...................      6
17
     By Mr. Kaul.......................    265
18

19

20                 EXHIBITS

21
```

```
22   Ex. D-1    E-mail....................   112

23   Ex. D-2    E-mail....................   115

24   Ex. D-3    E-mail....................   132

25   Ex. D-4    E-mail....................   137
```

KELLY & ASSOCIATES, L.L.C.
Certified Court Reporters
(504)891-6333

| 1 | EXHIBITS CONTINUED: | | PAGE |
| --- | --- | --- | --- |
| 2 | | | |
| 3 | Ex. D-5 | E-mail..................... | 141 |
| 4 | Ex. D-6 | Photograph................ | 149 |
| 5 | Ex. D-7 | Photograph................ | 149 |
| 6 | Ex. D-7A | E-mail................... | 152 |
| 7 | Ex. D-8 | E-mail.................... | 156 |
| 8 | Ex. D-9 | E-mail.................... | 159 |
| 9 | Ex. D-10 | E-mail................... | 164 |
| 10 | Ex. D-11 | E-mail................... | 168 |
| 11 | Ex. D-12 | Lawsuit................... | 170 |
| 12 | Ex. D-13 | Photograph............... | 242 |
| 13 | Ex. D-14 | Photograph............... | 242 |
| 14 | Ex. D-15 | E-mail................... | 243 |
| 15 | Ex. D-16 | E-mail................... | 248 |
| 16 | Ex. D-17 | E-mail................... | 249 |
| 17 | Ex. D-18 | E-mail................... | 250 |
| 18 | Ex. D-19 | E-mail................... | 251 |
| 19 | Ex. D-20 | E-mail................... | 253 |
| 20 | Ex. D-21 | E-mail................... | 254 |
| 21 | Ex. D-22 | E-mail................... | 254 |
| 22 | Ex. D-23 | E-mail................... | 255 |
| 23 | Ex. D-24 | E-mail................... | 255 |
| 24 | Ex. D-25 | E-mail................... | 260 |
| 25 | Ex. D-26 | Letter.................... | 262 |

1                   S T I P U L A T I O N

2          It is hereby stipulated and agreed by

3     and between all parties that the deposition

4     of DAREN PARSA is hereby being taken pursuant

5     to the Federal Rules of Civil Procedure for

6     all purposes.  That all formalities of

7     signing, sealing, certification and filing

8     are hereby waived.  That all objections, save

9     those as to the form of the question and the

10    responsiveness of the answer are reserved

11    until the time of the trial of the cause.

12                   *   *   *

13          DAREN PARSA, 117 Acadia Lane,

14          Destrehan, Louisiana 70047, a

15          witness having been first duly

16          sworn in the cause to tell the

17          truth, testified on his oath as

18          follows:

19    MR. ZIBILICH:

20          All right, good morning.  Do you

21    want to introduce yourself, Mr. Clarke,

22    so we get it all on the record?

23    MR. CLARKE:

24          Andy Clarke for the plaintiffs.

25    MR. ZIBILICH:

```
 1            Franz Zibilich on behalf of the
 2        Jefferson Parish Sheriff's Office
 3        deputies as well as the sheriff of
 4        Jefferson Parish along with Jeff
 5        Martiny.
 6        MR. KAUL:
 7            And Chris Kaul on behalf of
 8        Westgate Center.
 9  BY MR. ZIBILICH:
10  Q.    Good morning, Mr. Parsa.
11  A.    Good morning.
12  Q.    I want to tell you it's a pleasure to
13  meet you and I'm sorry for your loss.  Have
14  you had your deposition taken before?
15  A.    Twice.
16  Q.    Twice?
17  A.    That I can recall.
18  Q.    Do you recall what kind of cases they
19  were?
20  A.    The first was about 25 years ago, it was
21  at work when I was working in a psychiatry
22  clinic in California and it was one of my
23  patients had some type of case going on.  I
24  can't recall exactly what it was but I was
25  called in for the deposition.
```

1    Q.    Were you a witness or were you a party

2    to the lawsuit or both?

3    A.    No, I wasn't a party to the lawsuit.

4    Q.    So they wanted to take some testimony

5    from you to see what it is that you knew

6    about the case?

7    A.    Exactly.

8    Q.    What did you know about the case?

9    A.    Jeez, I wish I could remember.  If I

10   said it, I would be really guessing.

11   Q.    So you don't recall?

12   A.    No.

13   Q.    And then there was at least one other

14   occasion where you had your deposition taken?

15   A.    Yes, that was in 2002.  I was in a car

16   accident and it was a deposition regarding

17   that.

18   Q.    Where did that car accident take place?

19   A.    In Mobile, Alabama.

20   Q.    And I take it your deposition got taken

21   in connection with you suing somebody like an

22   insurance company or whoever it was that hit

23   you?

24   A.    No, I hit the other person.

25   Q.    So they took your deposition because

```
1    they claimed that you were at fault?
2    A.    Correct.
3    Q.    And do you recall what the outcome of
4    that particular lawsuit was?
5    A.    It was settled.
6    Q.    Your insurance company paid the people?
7    A.    That's correct.
8    Q.    I take it they figured you were either
9    wrong or it was an economic thing to do?
10   A.    (Witness nods.)
11   Q.    So I didn't go over the rules but you
12   just broke one so now it reminded me of the
13   rules.  The court reporter here does not know
14   her mm-hmms from her hmm-mms.
15   A.    Oh, okay.
16   Q.    She can't see real good so she doesn't
17   know what your nods mean.  The only thing she
18   can do because the only thing she's doing is
19   watching her little toy.  The only thing she
20   can do is take down what it is that she
21   hears.
22   A.    Okay.
23   Q.    So if I ask you a question and you give
24   me one of those mm-hmms, uh-huhs, I'm
25   probably just going to stare at you.
```

1    A.    Okay.

2    Q.    You'll figure it out that what it is

3    that I'm looking for is an actual verbal

4    response, fair enough?

5    A.    That's fair.

6    Q.    I'm also going to assume that if you

7    don't understand my question that you'll stop

8    me.

9    A.    Okay.

10   Q.    Because on the other side of that coin,

11   if you answer my question, I'm going to have

12   the assumption that you, in fact, did under-

13   stand it.  Otherwise, you would not have

14   answered it.

15   A.    Okay.

16   Q.    Is that fair enough?

17   A.    Yes.

18   Q.    Your date of birth?

19   A.    April 25th, 1966.

20   Q.    So that makes you 56 years old?

21   A.    That's correct.

22   Q.    And where were you born?

23   A.    Kansas City, Missouri.

24   Q.    Here we go already.  I got married there

25   once.

```
 1         MR. CLARKE:
 2             For the record, I've never been
 3         married in Kansas City, Missouri of most
 4         of the states that I've been married.
 5         MR. ZIBILICH:
 6             It's a great town.
 7  BY MR. ZIBILICH:
 8  Q.    And did you go to school in Kansas City?
 9  A.    Yes, I did.
10  Q.    Where did you go to school?
11  A.    I went to high school through there, all
12  the way from kindergarten through high school
13  and then after --
14  Q.    What was the name of the school?
15  A.    The high school?  Rockhurst High School.
16  Q.    Wow, what a small world.  Okay.
17  A.    And after high school, I went to -- in
18  Kansas City, they have a combined under-
19  graduate medical school, it's a six-year
20  program.  It's University of Missouri, Kansas
21  City.
22  Q.    Well, my ex is a lot older than you,
23  sir, but she went to those same schools.
24  Wow.  So you started this college's six-year
25  program in 1984?
```

1    A.    That's correct.

2    Q.    And you concluded in 1990?

3    A.    That's correct.

4    Q.    And you obtained a degree in what?

5    A.    It was a BA in biology and an M.D.

6    Q.    And what did you do after that?  We're

7    up to about 1990 now.

8    A.    1990 to '91 I took a year and took film

9    and video classes at University of Kansas.

10   Q.    And what did you do after that?

11   A.    Then I went to Ochsner Medical for a

12   psychiatry residency.

13   Q.    And which Ochsner?

14   A.    The one on Jefferson Highway.

15   Q.    And you obtained a doctorate there?

16   A.    Well, it's a psychiatric residency

17   program so after one year of internship, you

18   get a medical license.  And then after

19   completing the residency, you've completed

20   the psychiatry residency.

21   Q.    So does that make you a doctor?

22   A.    Yes.

23   Q.    So with M.D. behind your name or some

24   other kind of doctor?

25   A.    I still have the M.D. from medical

1   school and so after psychiatry residency,

2   there wasn't any additional letters I guess

3   after my name after that.  It was just I

4   completed the psychiatric residency.

5   Q.    So your name reads Daren Parsa, M.D.?

6   A.    That's correct.

7   Q.    And have you been working here in the

8   New Orleans area since you obtained that

9   degree?

10  A.    After I finished the residency program,

11  I went to California and worked in Lancaster,

12  California for Kaiser Permanente from August

13  of '95 until December of '97.

14  Q.    What did you do there?

15  A.    It was a psychiatry clinic.  And then in

16  January of '98, I moved back to this area and

17  I began working for the Department of Health

18  and Hospitals Region 3 in a community mental

19  health clinic.

20  Q.    And what did that work entail?

21  A.    Psychiatric evaluations and medication

22  management.

23  Q.    So you're working at a facility or are

24  you seeing patients individually or some sort

25  of combination?

1    A.    It's a clinic.  It's an outpatient

2    clinic so it's one-on-one with patients.  So

3    it would be patients coming in for

4    psychiatric evaluations and then following

5    them after that for their medication manage-

6    ment.

7    Q.    So these patients are referred to the

8    medical facility or these are your patients

9    or a combination?

10   A.    It's -- well, it's mostly people who

11   come in on their own, schedule appointments

12   and they see a counselor and get an assess-

13   ment done.  And then they get the psychiatric

14   evaluation if the counselor feels they need a

15   psychiatric evaluation so that's one route

16   that they would see me.

17        And then the other route would be from

18   the hospital, if someone was admitted to the

19   psychiatric facility and then I would see

20   them.  They call it an aftercare so I would

21   see them following their hospitalization.

22   Q.    And in this capacity, do you have the

23   occasions to be on call?

24   A.    No.

25   Q.    And have you had this same job since?

1    A.    Yes.

2    Q.    When did you meet your wife?

3    A.    In March of 1993.

4         MR. ZIBILICH:

5              Did he get it right?

6         MS. LOU:

7              Yes.

8    BY MR. ZIBILICH:

9    Q.    And where did you all meet?

10   A.    Charity Hospital psychiatric unit.

11   Q.    What was the occasion?

12   A.    We were working there.  We were both in

13   residency programs.  I was through Ochsner,

14   we would rotate through Charity Hospital.

15   Donna was a Tulane psychiatry resident and

16   they rotated through Charity Hospital so we

17   met there.

18   Q.    So you all were both 27 years old at the

19   time?

20   A.    I was almost 27.  I was 26 and Donna was

21   also 26.

22   Q.    Now this deposition today, what, if

23   anything, did you do to prepare for it?

24   A.    Spoke with Mr. Clarke.

25   Q.    When?

```
1   A.    On Mondays, we would speak.

2   Q.    Don't tell me what you all talked about.

3   Just tell me when.

4   A.    It was on Mondays for the past six weeks

5   or so.

6   Q.    So I take it most of those are tele-

7   phonically?

8   A.    Correct.

9   Q.    And how long would those conversations

10  take?

11  A.    About an hour.  Sometimes two hours.  It

12  was through the video, through --

13  Q.    Teleconference.

14  A.    Teleconference, that's it.

15  Q.    Did you read anything in preparation for

16  today's deposition?

17  A.    The things that we looked at, we had to

18  give for the interrogatory and the production

19  and looked at the coroner's report.  I think

20  that's it.

21  Q.    Did you read the statement that you and

22  your wife gave to Sergeant Dowling?

23  A.    I listened to it.  I listened to the

24  video -- I listened to the audio recording.

25  And then yeah, I read the statement that I
```

```
 1   gave.
 2   Q.    This was a statement that the two of you
 3   gave together for lack of a better word,
 4   correct?
 5   A.    That's correct, in the emergency room,
 6   that's correct.
 7   Q.    Throughout all of your education in the
 8   field that you're in, can you start from the
 9   beginning of time and tell me every class
10   that touched on autism.
11   A.    (No response.)
12   Q.    If you miss one or two, it's not going
13   to be the end of the world.  I have a copy of
14   your transcript sealed under this table and
15   I'll remind you.
16   A.    I don't remember.  I did a psychiatry
17   rotation in medical school so I'm sure --
18   Q.    That would be in Kansas City?
19   A.    Kansas City, yeah.
20   Q.    And it touched on autism?
21   A.    It did I would think.  I can't remember
22   but I'm sure it probably did.
23   Q.    So if you can't remember, I take it you
24   can't remember what you learned?
25   A.    I can't remember what I learned at that
```

1  one, so I don't know how much I learned at

2  that particular time.

3  Q.    Go to the next class that you took.

4  A.    That would be in my psychiatry

5  residency.

6  Q.    Which would have been here?

7  A.    Correct, yeah.

8  Q.    And did you take any autism classes

9  relative to that residency or did you do

10  anything relative to that residency that put

11  in you contact with autistic folks?

12  A.    I think my first experience was actually

13  in the emergency room.  I had --

14  Q.    Which would have been at Ochsner or

15  Charity?

16  A.    At Ochsner, yeah.  And I did my -- this

17  is my ER rotation which would have been fall

18  of 1991 and someone with autism came in

19  through the emergency room and he was non-

20  verbal.  And I can't recall exactly.  It was

21  for I believe a medical purpose that he was

22  there.

23  Q.    So what were you faced with?

24  A.    It was someone who was nonverbal who was

25  doing a lot of hand flapping, and I wish I

1    could remember exactly why that person was

2    there.

3    Q.    What were you supposed to do?

4    A.    As the intern, it was to get the

5    history, see what the problem was, come up

6    with what I thought would be the appropriate

7    treatment and then I would discuss it with

8    the attending staff at the emergency room.

9    Q.    So for whatever it is that you did on

10   that day, what were you taught before doing

11   whatever it was that you were doing that day

12   in order to allow you to do whatever it was

13   that you were doing that day with that

14   patient?

15   A.    (No response.)

16   Q.    In other words, how were you prepared to

17   deal with that autistic person on that day?

18   A.    It would be from I guess what I had

19   learned in medical school.  The hand flapping

20   was something that was associated with autism

21   and the person wasn't verbal and that could

22   be associated with autism so that I would

23   have to get a history from someone else, you

24   know, from a family member.

25   Q.    So what were you going to do with that

1    history?  I mean you haven't communicated to

2    me anything that leads me to believe that you

3    had learned anything about the stuff and

4    that's what I'm driving at.

5    A.    Oh, sure.  I guess I'm trying to under-

6    stand what you're getting at.

7    Q.    I'm trying to figure out what training

8    you had in autism that would have enabled you

9    to be able to treat somebody with autism.

10   A.    I see.  At that point, I knew I had to

11   just -- I had to get information from family,

12   from someone else other than him.  And so in

13   terms of with him, I knew I had to do that

14   and to understand that the hand flapping that

15   he was doing was related to his autism.

16   Q.    So horrible example but I go to the

17   doctor and he admits me.  He gives me some

18   medicine and runs me up the street.  He tells

19   me he's got to perform surgery.  There's a

20   list of choices that he has.  What choices

21   did you have on that day?  Was this the first

22   time you had ever dealt with an autistic

23   individual?

24   A.    Yes, it was, yeah.

25   Q.    What were you attempting to accomplish?

1    A.    To find out why he was there and what
2    we could do to treat it.
3    Q.    So why was he there?  He had had an
4    episode?
5    A.    No, it wasn't related to his autism and
6    I wish I could remember.  I haven't thought
7    of this in a long time but that was my first
8    contact with someone with autism after
9    medical school.  And I know it was for a
10   medical reason but I can't remember exactly.
11   Q.    So you just dismissed the autism
12   component of this?
13   A.    No, I didn't because I had to understand
14   that he wasn't able to communicate with me
15   and I would have to get history from family.
16   Q.    So what was the object?
17   A.    (No response.)
18   Q.    To send him home?  To commit him?  To do
19   what?
20   A.    To assess what the problem was and what
21   we could do to treat it.  And in an emergency
22   room at that point, you have to decide is
23   this someone who needs to be admitted to the
24   hospital?  Can they be treated as an
25   outpatient and discharged from the emergency

1    room?  And so it was difficult because he

2    wasn't verbal so he couldn't really tell me

3    what was the problem.  That's what I

4    remember.

5    Q.   So you knew enough to be able to do

6    something?

7    A.   Yeah, yeah, to be able to --

8    Q.   You just don't remember what it is that

9    you did?

10   A.   Yeah, I can't remember what exactly but

11   I know I had to keep him calm, you know, not

12   escalate him, get him more agitated because

13   he was nervous and I think that's why he was

14   flapping his hands.

15   Q.   What did you do to keep him calm?

16   A.   I guess just try to give him his space

17   and understand that he wasn't able to

18   communicate with me and to try to talk with

19   someone else who could be able to speak for

20   him.

21   Q.   So how big was the room that you were

22   examining him in?

23   A.   Oh, it was small.  It was in an ER bed

24   so it was in the ER.

25   Q.   Ten feet by six feet?

1    A.    Yeah -- well, I'm trying to -- yeah,

2    that's probably about right.

3    Q.    And how many people were in this room?

4    A.    When I was with him, just me and then --

5    Q.    He didn't have his parents or anybody

6    with him that could communicate to you?

7    A.    Not at that point.  I had to leave to

8    speak to the parent outside.  And then I came

9    back in with the staff and then we spoke with

10   the parent I remember.  But I wish I could

11   remember what exactly the --

12   Q.    How do you give somebody space in a ten-

13   foot-by-six-foot room?

14   A.    Well, to not crowd against him I guess,

15   yeah.

16   Q.    Okay.  When is the next time in your

17   doctor role that you came in contact with an

18   autistic individual?

19   A.    (No response.)

20   Q.    I notice you struggling.  Did there ever

21   come a time where you treated with any degree

22   of regularity autistic individuals?

23   A.    Yes, yes.

24   Q.    When did that start?

25   A.    That was at the community mental health

1   clinic where I'm working now.

2   Q.    What year did you start there?

3   A.    1998.

4   Q.    1998, 24 years ago.  All right.  Tell me

5   what that job entails.

6   A.    It's psychiatric evaluations and medica-

7   tion management.

8   Q.    I can only assume not knowing that when

9   you talk about dealing with psychiatric

10  individuals, they come in every different

11  shade in the Crayola box.

12  A.    That's correct, yeah.

13  Q.    I know there's so such thing as a

14  typical day but tell me how often in this

15  capacity that you come in contact with

16  individuals with autism?

17  A.    I would say probably I had maybe 10 to

18  15 cases.

19  Q.    In life?

20  A.    Yeah, I believe so.  Yeah, it's probably

21  maybe around in that area.  It may be 15,

22  maybe up to 20.  I don't think it's more than

23  20.

24  Q.    So that's 20 over 24 years?

25  A.    Yeah.

1    Q.    Less than one a year?

2    A.    Yeah, but I would see them -- some of

3    them over a long period of time.

4    Q.    So other than your vague recollection of

5    the autism training that you had in what I'll

6    call med school, once you started this job in

7    1998 -- strike the question.

8         Right before you started this job in

9    1998, did you have to take any additional

10   classes in autism since that was probably

11   going to be something that you would have to

12   deal with in your capacity at that facility?

13   A.    Yes, it was when I did my board

14   certification, during that time.

15   Q.    So during your board certification, what

16   were you certified in?

17   A.    Adult psychiatry, general psychiatry.

18   Q.    Not adolescent?

19   A.    No.

20   Q.    Did you have to take any classes in

21   order to get certified that was specifically

22   geared towards autism?

23   A.    No.

24   Q.    None?

25   A.    No.

1  Q.    Did you ever take any classes geared
2  towards adolescent autism?
3  A.    No.
4  Q.    Have you taken any classes other than
5  what you took in med school that you struggle
6  with remembering which is okay that had as
7  it's main object or collateral object autism?
8  A.    It wasn't necessarily a specific class.
9  I had to learn about developmental disabili-
10 ties as part of my psychiatry residency
11 program and then as part of the board
12 certification.
13 Q.    But you never had the occasion to treat
14 somebody who has adolescent autism?
15 A.    I'm sorry I'm taking so long.
16 Q.    Take your time.  I want you to get it
17 right.  You used the word adult psychiatry.
18 I don't know what that stuff means.
19 A.    It's 18 and over is adult psychiatry.
20 Q.    Do you know whether or not 18-year-olds
21 are treated any differently than teens and
22 preteens?
23 A.    Well, there's usually different issues
24 involved.  With younger than 18, they're
25 typically in school so that can be a big

1    issue.  After 18, then typically they're not

2    in school so it becomes more in line with how

3    they can function in the community.

4    Q.    Have you ever been arrested before?

5    A.    No.

6    Q.    I take it you've never been convicted of

7    anything?

8    A.    No.

9    Q.    Do you have the occasion to teach?

10   A.    I was a preceptor for nurse practi-

11   tioners who rotate through the clinic as part

12   of their school.

13   Q.    So what do you teach?

14   A.    They would just sit with me.

15   Q.    And watch?

16   A.    Watch, yeah.

17   Q.    But you don't take on any teaching

18   duties --

19   A.    No.

20   Q.    -- relative to your job?

21   A.    No.

22   Q.    Do you have the occasion to treat

23   parents of autistic individuals?

24   A.    Yes.

25   Q.    And is that something that you do

1   regularly?

2   A.    Not regularly.  It depends if the

3   patient I have has an autistic child and then

4   that can sometimes be an issue.

5   Q.    So I decide I need to go to the shrink

6   hypothetically.  You're a shrink --

7   A.    That's right.

8   Q.    -- for lack of a better word, correct?

9   And I'm talking to you about my issues with

10  the divorce and my wife wants full custody

11  and she wants money and the whole thing is a

12  mess and you would talk to me for an hour

13  maybe once every two weeks about such matters

14  if that's what I needed to talk about,

15  correct?

16  A.    Well, my role -- that would be interest-

17  ing but my role is more the medication

18  management part of it.

19  Q.    So I got to be more messed up than I am,

20  messed up enough to be on medication?

21  A.    Well, yeah, or the medicine could be

22  helpful for you.

23  Q.    But you only treat people that need

24  medicine?

25  A.    Pretty much, yeah, for the most part.

1   Q.    How long have you been treating

2   Mr. Clarke?

3        MR. CLARKE:

4            Undiagnosed.  And to get back to

5        your questions, no convictions.

6        MR. ZIBILICH:

7            Okay, thanks.

8   BY MR. ZIBILICH:

9   Q.    So I'm trying to learn obviously what it

10  is that you know about autism.

11  A.    Oh, sure, yeah, yeah.

12  Q.    So I'm this now hypothetical medicated

13  patient of yours and we're talking about my

14  issues and I say and look, on top of every-

15  thing else, we have a 15-year-old and he's

16  very autistic and he's out of control right

17  now.  Can we talk about that.

18  A.    Yeah.

19  Q.    Is that something you would be talking

20  to me about if I wanted to talk about such

21  matters?

22  A.    Sure, sure, yeah.

23  Q.    And is that something that you encounter

24  with some degree of regularity?

25  A.    Occasionally, it can come up.

1    Q.    It's one of those words, I like
2    quantifying stuff.  How often?
3    A.    I wish I could do it for you, yeah.  I
4    had a patient who did have a child with
5    autism and I saw her for probably about maybe
6    five, six years.  And before then, I didn't
7    really have anybody for quite awhile who had
8    that and I haven't seen this person in about
9    a year.
10   Q.    Okay.  So again hypothetically because I
11   don't want anybody breaking any HIPAA rules
12   or any of that kind of stuff.  Hypotheti-
13   cally, I'm really struggling with this
14   autistic kid of mine.  I really am.  It's
15   impacting all sorts of things in my life,
16   where I can go, when I can go, finding a
17   baby-sitter.  I mean the whole gauntlet.
18   A.    Yeah.
19   Q.    Do you have a book of dos and don'ts
20   that you could give me or talk to me about?
21   A.    Well, I would probably refer that
22   person, you know, to one of the counselors
23   who could spend more time really assessing.
24   Q.    You're too busy for me?  You're going to
25   send me somewhere else?

```
 1   A.   I got another person, yeah, they're
 2   stacked up.
 3   Q.   So somebody that would be better suited
 4   to deal with me than you?
 5   A.   Well, I think I would try to listen to
 6   what the issues were.
 7   Q.   Issues are everything.  My life is a
 8   mess.  I mean I can't go anywhere.  The older
 9   brother and sister went away to college.
10   They can't help me anymore.  I don't have a
11   life.
12   A.   I would say Mr. Zibilich, you've got a
13   lot of issues going on and I want to help you
14   with the symptoms for your medications and I
15   want to make sure I do as good a job as
16   possible with that.  We have another -- we
17   have a counselor here I would really like you
18   to see who could really spend much more time
19   with you to assess.
20   Q.   Okay.  That works.  So does this --
21        MR. CLARKE:
22            Can I speed this up?  Do you know
23        the difference between a psychologist
24        and psychiatrist?
25        MR. ZIBILICH:
```

1          Yeah, I do.  One of them gives you

2     medicine.  The other one don't.

3     MR. CLARKE:

4          There you go, Brother.

5     MR. ZIBILICH

6          Come on, but thanks for the quiz.

7  BY MR. ZIBILICH:

8  Q.    So does this counselor have a book of

9  dos and don'ts, a pamphlet, something to help

10 me?

11 A.    Well, they -- I don't know about a

12 pamphlet.

13 Q.    Literature?

14 A.    Yeah, but there's -- a big help could be

15 there's The Arc which is an organization that

16 can help kids with intellectual disabilities

17 that many times kids with autism have that.

18 There is the OCDD, Office of Citizens with

19 Developmental Disabilities and I would refer

20 you to that organization.

21 Q.    All right.  So now I'm in your office

22 and I have a severely autistic child and the

23 child is 12, 13, 14, and he's severely

24 autistic and he's really big and strong and

25 he breaks things and I'm fearful of having

```
 1    people over at my house and letting him kind
 2    of sit at the dinner table with us because he
 3    can have an episode and something bad can
 4    happen.  Are there any dos and don'ts in that
 5    scenario?
 6    A.    Dos in terms of things to do to help
 7    with him to stay calm and dont's with things
 8    to avoid, I think the dos would be a routine,
 9    to set up a routine in his life.
10    Q.    That's like a schedule?
11    A.    A schedule, yeah, exactly.
12    Q.    Where did you learn that?
13    A.    That was actually -- sad to say, that
14    was when ███ developed his autism.
15    Q.    How did you learn that?  I mean is there
16    materials on that that a schedule is a good
17    thing?
18    A.    Well, we had -- after he was diagnosed,
19    we had a behavioral therapist who worked with
20    us.
21    Q.    And that's when ███ was about three?
22    A.    Yeah, he had just turned four.
23    Q.    What year was he born?
24    A.    2003.
25    Q.    So this would have been 2007?
```

33

```
1    A.    2007, that's correct, yeah.

2    Q.    So by 2007 or before, you and your wife

3    recognized that something's not right here?

4    A.    Yeah, it started when he was about a

5    year and a half, he lost his language.  And

6    we didn't know what was going on.  We just

7    thought maybe he had a hearing problem.  And

8    we took him to an ENT doctor and then he had

9    an audiologist who worked with her -- worked

10   with him.  She was a female.  And it was

11   inconclusive and so we were referred to this

12   thing called early steps where they have

13   someone come to your home and would work with

14   █████ with his language.  And it helped to a

15   small degree.  His language did improve some

16   but it wasn't where it should be.  It wasn't

17   to a level of a typical child.

18   Q.    And at the time you were living in St.

19   Charles Parish?

20   A.    That's correct.

21   Q.    Same place you live now?

22   A.    That's correct.

23   Q.    So time goes on and he's not getting

24   better?

25   A.    Yeah, that's it.  And when he was --
```

1    that's correct.  And when he was three and

2    ten months or so, three and nine months, he

3    began exhibiting some odd behaviors.

4    Q.    Odd how?

5    A.    He would stare at his hands and he would

6    have tantrums where he would have a really

7    high shriek.  And then he would be sensitive

8    to certain lights that he wasn't sensitive to

9    before.

10   Q.    What kind of lights?

11   A.    Well, we went to see Donna's parents and

12   this was May of 2007 and there's a light that

13   came through their window and for some

14   reason, he would go like this (witness

15   indicating) and run through there.  If he

16   wanted to get from one part of the room to

17   the other, he would do this (witness

18   indicating) and he hadn't done that before.

19   Q.    And how old was he?

20   A.    He was three.

21   Q.    And that's the first time you all

22   noticed that?

23   A.    Yeah, that's when we first started

24   seeing the unusual behaviors.  Now at this

25   time -- and I'm going all over the place and

1    I apologize.

2    Q.    No, no, don't.  I apologize for having

3    to talk about it but it's something we have

4    to do.

5    A.    Sure, I totally understand.  ███   had

6    been into day-treatment programs -- not day

7    treatment -- day-care programs.  And the

8    first was when he was two and that was in the

9    fall of 2005 to the early part of 2006, and

10   the people at that program saw that ███

11   wasn't interacting the way the other kids

12   would act.  He would sometimes just look,

13   stare at a shiny ball and wouldn't play with

14   the other kids the way the other kids would

15   play.  And we thought that well, maybe -- we

16   didn't know why this was happening.  And we

17   thought well, maybe he's just -- maybe it's

18   not a good fit for him.  Maybe it's just not

19   the right place.  So we went to a different

20   day-care program a few months after that.

21   Q.    Give me the names of the first two-day

22   care programs.

23   A.    The first one was Children's Day Out.

24   Q.    Which is where?

25   A.    In Destrehan.

1    Q.    Still open?

2    A.    It's still there.  It's in a Methodist

3    Church in Destrehan.

4    Q.    And the other one?

5    A.    And the other one was Prime Steps which

6    is in Kenner.

7    Q.    Kenner?

8    A.    Yeah.

9    Q.    And where in Kenner?

10   A.    It's near Esplanade Mall.  It's like a

11   block off of Williams.

12   Q.    Still open?

13   A.    I don't know.  I don't know if Prime

14   Steps is still open.

15   Q.    So how long was he at the second place?

16   A.    He was there for -- he went in I believe

17   around September of 2006 and then was there

18   until January, February of 2007.

19   Q.    So now it's getting time to start

20   kindergarten or preschool?

21   A.    Preschool, yeah.  And at that point,

22   same thing that they told us at Children's

23   Day Out they told us at Prime Steps, that he

24   wasn't interacting with the other children,

25   he was having some severe tantrums.

```
 1   Q.    How did those tantrums play out back
 2   then?
 3   A.    He would drop to the floor and cry loud,
 4   loudly crying.  And you know?  We didn't --
 5   Q.    Would he get in tussles with the other
 6   kids?
 7   A.    No, not that I recall.  There -- at
 8   that point, I don't recall any episodes in
 9   terms of there.  More of just he was -- they
10   had to actually I believe restrain him at one
11   point.
12   Q.    Who's they, the teacher?
13   A.    Yeah, the teacher at Prime Steps because
14   he was having a severe tantrum.
15   Q.    Was the teacher having troubles
16   disciplining him?
17   A.    I think he was just having a tantrum in
18   the classroom and I'm not sure exactly what
19   the details were.  I don't recall any like
20   aggressive behaviors so much but just --
21   Q.    Did he react -- I'm sorry, go ahead.
22   A.    But something had happened where he had
23   a severe tantrum in the classroom.
24   Q.    And how often would those occur?
25   A.    I don't think the tantrums were terribly
```

1    often.

2    Q.    I don't know what terribly often is.

3    A.    I know.  I wish I could you give you a

4    better --

5    Q.    Once a week, twice a week, once a day?

6    A.    I don't know if they're even more than

7    once a month.  I think it was more that he

8    wasn't interacting with the other kids and

9    she was concerned that she thought he was --

10   she and the owner of Prime Steps was

11   concerned that he might be autistic.

12        And so I brought this up to the child

13   psychiatrist at the clinic where I worked and

14   I said, you know, this person who runs this

15   Prime Steps thinks ███ may be autistic and

16   she said yeah, I kind of think he may because

17   she had seen him.  Donna had brought ███ to

18   the clinic on a couple of occasions and she

19   had seen him and how he was and she thought

20   that he may well be on the spectrum.

21   Q.    Prior to you all bringing him to the

22   clinic on this occasion to get assessed, I

23   mean that was the goal to get him assessed,

24   right, at your clinic?

25   A.    No, it wasn't.  Donna was just visiting

1    me with ███ yeah.  And she would come to
2    visit with ███ sometimes and just see me
3    over lunch.
4    Q.    And someone over at your employment
5    place --
6    A.    Exactly.
7    Q.    -- thought that maybe he was autistic?
8    A.    Correct, exactly.
9    Q.    So now it's time to get him assessed?
10   A.    That's exactly it.
11   Q.    Prior to that, you did not think he was
12   autistic?
13   A.    We weren't sure.  We were back and forth
14   on this because he was so engaging with us
15   and I guess maybe because I hadn't had too
16   much experience with autistic kids prior to
17   then.  And it just didn't seem to fit the
18   picture of that guy I told you about in the
19   emergency room that was flapping his hands.
20   It just didn't seem to fit that.
21        But then when we heard from two different
22   day-care centers and then heard from this
23   child psychiatrist that we respected, then we
24   thought okay, then this really is it.  So
25   that's when we decided to get him assessed

1    and she recommended this place called Munroe-

2    Meyer

3    Q.    Which is where?

4    A.    Which is in Omaha, Nebraska?

5    Q.    Nebraska?

6    A.    Yes.

7    Q.    And he's about four years old?

8    A.    Yeah, that was July of 2007 so it was

9    close to his fourth birthday.

10    Q.    So did you all go to Omaha?

11    A.    We did.

12    Q.    And how long did you all stay there?

13    A.    It was about three days.

14    Q.    Three days?

15    A.    Yeah.

16    Q.    What did we learn?

17    A.    Yeah, they ended up diagnosing him with

18    pervasive developmental disorder not other-

19    wise specified which basically it's not

20    meeting all the criteria for an autism

21    diagnosis.

22    Q.    It could be autism.  It could be

23    something else?

24    A.    Yeah, yeah.  That's it, or maybe just

25    not quite enough symptoms to meet that

1    diagnosis of autism so yeah.

2    Q.    Any prescriptions, any dos and don'ts

3    from that point?

4    A.    They recommended ABA therapy which is

5    the acronym for applied behavior analysis.

6    Q.    What does that entail?

7    A.    They call it -- it's ABC therapy.  It's

8    antecedent behavior consequence.  Essentially

9    it's saying when you see the behavior, what

10   happened before the behavior and then what

11   was the consequence of the behavior and see

12   what the function of the behavior was, was it

13   trying to escape something?  Was the child

14   when they had an episode of let's say a

15   tantrum, were they trying to escape being

16   told to do something or were they wanting

17   something and they couldn't get it and they

18   were frustrated?

19        And then the consequences looking at

20   okay, what did we do in response to that and

21   maybe did we do something that just made him

22   want to do the behavior even more.  And it's

23   trying to come up with a treatment plan to

24   where the consequence lessens the behavior

25   rather than --

```
1    Q.    It's almost like Pavlov?

2    A.    Yeah, yeah, it's behavior therapy, yeah.

3    That's it exactly, yeah.

4    Q.    All right.  So we're treating him at

5    home trying to alter behavior.  If he does X,

6    then you all react with Y?

7    A.    That's correct, yeah.

8    Q.    But we're not having any conversations

9    where we're talking reason?

10   A.    Right, right.  Yeah, it's setting up a

11   routine where he understands -- first I guess

12   it's analyzing why the behavior is happening.

13   Because ████ had really limited language and

14   so it was really difficult to tell why he

15   would have a tantrum at that point.

16   Q.    Limited language is one of those

17   concepts that I hear it but --

18   A.    Yeah.

19   Q.    Could he recite his ABCs when he was

20   five years old?

21   A.    No.

22   Q.    Could he count numbers when he was five

23   years old?

24   A.    He could count probably up to maybe a

25   few numbers, maybe up to 5, maybe 10.  He
```

```
 1   couldn't --
 2   Q.    Did he say good morning Mommy and Daddy
 3   in the morning?
 4   A.    No.
 5   Q.    Was there any communication?
 6   A.    No, it would be if he wanted an ice
 7   cream sandwich, he could say ice cream
 8   sandwich.  You couldn't have a conversation
 9   with him.  You couldn't say hey, ███ what
10   happened at -- you know, what was that TV
11   show you watched?  Can you tell me what
12   happened?  He wouldn't be able to tell you.
13   Or if once he was in school, if you asked him
14   ███ how did school go today, he would just
15   say school today.
16   Q.    So now it's kindergarten time.  Where do
17   you send him?
18   A.    At New Sarpy Elementary, yeah.
19   Q.    And he sits in a class with all of the
20   rest of the kids?
21   A.    No, he was in a separate class.
22   Q.    How did that work?
23   A.    He was in -- he had a special ed teacher
24   and he would be in a resource room.
25   Q.    By himself?
```

KELLY & ASSOCIATES, L.L.C.
Certified Court Reporters
(504)891-6333

1    A.    With a special ed teacher.

2    Q.    But no other students?

3    A.    Gosh, I'm trying to remember if he had

4    other students with him at that point.  They

5    had a resource room with other students and I

6    could be wrong on this but at least at that

7    point in kindergarten, I think it was more

8    one teacher working with him but I could be

9    wrong on that.

10    Q.    What did they work on?

11    A.    A part of it was improving -- helping

12    with his language.  They actually had an

13    occupational therapist to help with --

14    Q.    This is something that someone you all

15    hired or the school provided?

16    A.    The school, all the school.

17    Q.    Okay.

18    A.    An occupational therapist would work

19    with him, try to help him with writing.  They

20    had a sensory room to try to find other means

21    to -- if he's feeling frustrated, other means

22    to deal with that frustration.

23    Q.    Let me ask you this.  You must have

24    learned that they were using a sensory room?

25    A.    Yeah.

1    Q.    Did that concern you or your wife at

2    all?

3    A.    We thought it was helpful.

4    Q.    Did you warn them that the sensory room

5    is great but no bright lights?

6    A.    Well, it's interesting because with

7    that, it wasn't consistent.  Some bright

8    lights he was okay with and some sounds would

9    bug him and some sounds wouldn't at all.  So

10   it was -- for instance at the school, the

11   fire alarm really bothered him.

12   Q.    Consistently?

13   A.    Consistently, yeah.

14   Q.    Because what I think I heard you just

15   say is sometimes hypothetically this light on

16   top of me would bother him and then sometimes

17   it wouldn't?

18   A.    No, I gave you the wrong idea.  And

19   again this is hypothetically.  For instance,

20   these lights maybe bothered him for some

21   reason but the lights in that room didn't.

22   Q.    Similar lighting?

23   A.    Yeah, but there might be something a

24   little bit different about these lights that

25   are different than those lights.

46

1    Q.    And could it be that one day these

2    lights would bother him and then one day

3    these lights would not bother him?

4    A.    It was pretty consistent.

5    Q.    Consistent?

6    A.    Yeah, like the fire alarm was

7    consistently a problem whereas -- and I'll

8    give you an example.  We started taking ███

9    to Chuck E. Cheese when he was two and he

10   loved Chuck E. Cheese and Chuck E. Cheese

11   gets pretty loud but that never bothered him.

12   Whereas the fire alarm did bother him

13   consistently and so certain things.

14   Q.    I'm going to show my age now.  I haven't

15   been to a rock concert in a million years.

16   Don't start laughing at me.

17        MR. CLARKE:

18            You called it a rock concert.  I

19            mean that shows your age there.

20   BY MR. ZIBILICH:

21   Q.    Strobe lights, not a good thing?

22   A.    It depends.   ███   loved disco balls of

23   all things.

24   Q.    Disco balls?

25   A.    Disco balls, the kind you get at -- we

1   would go to Spencer Gifts at Esplanade Mall.

2   he loved going into Spencer Gifts.  They had

3   all these disco balls and lava lamps and he

4   just loved going in there.

5       And for his birthday present, one of the

6   things he always wanted was for me to get a

7   disco ball and it's the kind of thing that

8   you plug in and it just spins around and it

9   has the lights and so he liked it.  So that

10  was one thing that he enjoyed that he was

11  good with.

12      On the flip side, certain like -- there's

13  a movie theater in Kenner, the Grand Theater

14  and they had a certain light there that

15  really bugged him.  So it was just -- and it

16  was consistently, that light bugged him and

17  the disco ball, he loved it.  So I guess

18  that's the hardest thing with a kid with

19  autism I guess just from my personal experi-

20  ence, it's inconsistent.  Inconsistent not in

21  terms of the same thing but inconsistent like

22  gee, these sounds bug him and these sounds

23  don't bother him at all.

24  Q.    And they're very similar or could be?

25  A.    To us it might seem that way but there's

1  something about it that's different.

2  Q.   So take me through the next three grades

3  of school.

4  A.   Then second, third and fourth grade all

5  at New Sarpy and he actually did well there,

6  he improved.

7  Q.   What improved?

8  A.   His behavior improved, the tantrums

9  became overall less.  This was -- I'm sorry,

10  the first, second and third grade and

11  behavior problems were minimal at home.

12  Q.   That's a hard word to quantify.

13  A.   I know.  I know.

14  Q.   Was it once a week?

15  A.   Less than that, yeah.  I would say less

16  than -- if the episodes happened, typically

17  they were very minor, it was a tantrum.

18  Q.   How long would they last typically?

19  A.   Within 30 seconds, I mean it was fast.

20  And the worst scenario would be maybe a hand

21  slap to himself or to me or Donna but it

22  would be very quick.

23  Q.   So now we're talking about six, seven

24  and eight years old?

25  A.   Yeah, up until through eight.

49

```
1   Q.    So is he on medicine by this time?
2   A.    He started medicine in first grade and
3   initially that was more for verbal tics, that
4   he would have these.  They're kind of a loud
5   shrieking noise that would scare the teacher.
6   It was disruptive to the class and it was
7   very random.  And because it was disruptive
8   to the class, we saw a child psychiatrist,
9   Dr. Many.
10  Q.    Doctor who?
11  A.    Cecile Many.
12  Q.    Where is she?  M-A-N-Y?
13  A.    M-A-N-Y, that's correct.
14  Q.    Where is she?
15  A.    She was at Tulane.  She's retired since
16  then and she started him on risperidone which
17  it's an antipsychotic medicine but they use
18  it for tics.
19  Q.    Is that unusual to prescribe such items
20  to a six-year-old?
21  A.    It can happen.  I think it depends on
22  the degree of the disruption.  If it's a
23  serious enough problem and you have to look
24  at the pros and cons and we wanted ███ to
25  succeed in school.  So we thought it would be
```

1    a good idea and it was a low dose at that

2    point.

3    Q.    So during these three years, first

4    second and third grade, is he capable of

5    learning anything?

6    A.    Yeah, he improved.  His speech improved

7    some.  He was actually writing, learning to

8    write.  It was not -- it was writing in terms

9    of, you know, not -- I can't think of the

10   word.

11   Q.    Is his writing substantive?

12   A.    Yeah, it wasn't like writing a story in

13   terms of I went to the --

14   Q.    I took Fido for a walk?

15   A.    Right, right.

16   Q.    So what did he write?

17   A.    It was more copying words but once he

18   got to third grade, again if I remember this

19   correctly, they were helping him to write,

20   you know, more things that were more like --

21   try a simple story.  And so they were helping

22   him and prompting him along with that.

23   Q.    What about communication skills at home,

24   anything substantive by this time?

25   A.    It was still very basic.

1    Q.    Ice cream?

2    A.    Ice cream, but they were trying to get

3    him to talk more in sentences.   Rather than

4    just say ice cream, it would be I want ice

5    cream.   He loved opposites.   He loved --

6    Q.    He loved what?

7    A.    Opposites.   Like he would say opposite

8    of Wal-Mart is and I would have to figure out

9    what the opposite of --

10        MR. CLARKE:

11            I would like to know the answer to

12        that.

13        MR. ZIBILICH:

14            Sounds like Clarke.   Sounds like

15        Clarke.

16   BY MR. ZIBILICH:

17   Q.    So does there come a time in the next

18   year or two where we got an escalation?

19   A.    There was one time in second grade that

20   in February of second grade where he had been

21   sick for a week and then he got better and

22   then we had him go back to school that next

23   week.   And that's when we first saw those

24   rageful episodes.   And it lasted for about,

25   probably about three weeks or so.

1   Q.    Was this rage directed at things or

2   people or both?

3   A.    Both.

4   Q.    So tell me how these rages played out at

5   age seven, second grade.

6   A.    So he would get angry.  He would start

7   slapping.  It would be open-handed slapping

8   either to me or Donna.  There would be some

9   slapping on himself and just loud shrieking.

10  Q.    So were you equipped at that particular

11  point in time to know what to do when that

12  occurred?

13  A.    Well, we discussed it with our -- we had

14  that therapist, the behavior therapist with

15  us and at that point, it was me restraining

16  him.

17  Q.    How did you restrain him?

18  A.    I would lay him on his side and I would

19  lay on my side and I would put my arm over

20  him like this (witness indicating.)

21  Q.    To make him immobile.

22  A.    Right.

23  Q.    You would try to lock up his arms?

24  A.    No, I would put him over.  Like if he's

25  -- I feel bad for you.  I don't know how to

53

1   say this.

2   Q.    That's okay.

3   A.    He would be laying on his side and then

4   I would on my side next to him and I would

5   put my arm over him and I was able to --

6   Q.    To keep his arms from flapping?

7   A.    That's correct, yeah.

8   Q.    So this started about age seven?

9   A.    Seven.  It lasted about three weeks and

10  then it just frizzled out and then he did

11  really well.  This was second grade, and it

12  got better.

13  Q.    Was he hitting any of the kids at

14  school?

15  A.    I'm trying to remember if there was any

16  incidents.  I don't recall any.  Donna, when

17  you talk with her, she may be able to recall

18  this much better.  But I don't recall another

19  child being hit during that time but I could

20  be wrong on this.

21  Q.    By second grade, are the teachers having

22  to restrain him?

23  A.    I believe they were, yeah.

24  Q.    Had you given instructions to the

25  teachers as to how to restrain him?

1    A.    Not at that point.

2    Q.    Not at that point?

3    A.    No.

4    Q.    Was the restraining methodology used by

5    you something that you just came up with or

6    it was something that you were taught?

7    A.    Something that I came up with.

8    Q.    Was it something that you discussed with

9    the psychiatrist or psychologist?

10   A.    Yes, I did, yeah.

11   Q.    And I take it that they thought that the

12   methodology employed by you was appropriate?

13   A.    Yes.

14   Q.    Any dos and don'ts at that particular

15   point in time, don't hold him too long, a

16   minute is enough.  Two minutes is too long,

17   any dos and don'ts?

18   A.    No.

19   Q.    You hold him until he stops?

20   A.    Right.

21   Q.    Until the behavior stops?

22   A.    That's correct.

23   Q.    And you as well as the professionals

24   thought that was the appropriate thing to do,

25   hold him until he stops?

1  A.    That's right.

2  Q.    So let's move forward a little bit

3  further.  How old is he when we have to go to

4  Baltimore?

5  A.    He was 11.

6  Q.    So tell me a little bit about ages 9 and

7  10 before we get to there.

8  A.    Absolutely, yeah.  That all happened in

9  August of 2012.  Up until then, he actually

10  --

11  Q.    So he's nine years old?

12  A.    Nine years old, okay.  He just turned

13  nine and up until then, he had actually been

14  doing well from that three-week period up

15  until then.  And two things happened that

16  were --

17  Q.    The three-week period that he was not

18  well?

19  A.    Correct, exactly.  That he went to the

20  upper elementary school.  At that point in

21  fourth grade is when you would go from the

22  lower elementary which is where he had been

23  since pre-K to the upper elementary.  It was

24  a big change for him.  He had been there from

25  pre K through third grade.  And then about

```
 1   two weeks into the school year --
 2   Q.    Into the fourth grade?
 3   A.    Yeah.
 4   Q.    So now we're talking about nine years
 5   old more or less?
 6   A.    Exactly, exactly.
 7   Q.    Okay.
 8   A.    Then we had to evacuate for Hurricane
 9   Isaac and it was two big changes all at one
10   time and that's when the behavior really
11   escalated.
12   Q.    Ratcheted up?
13   A.    Exactly.
14   Q.    And how did it manifest itself?
15   A.    Slapping himself, open-handed slapping
16   me or Donna and open-handed slapping himself.
17   Q.    I know you probably won't remember this
18   to a degree but like what was his size at age
19   nine?
20   A.    Oh, man.
21   Q.    Over a hundred pounds?
22   A.    Probably.
23   Q.    Big kid?
24   A.    He was pretty big.  His weight really
25   went up was after that.  And I'll bore you
```

```
 1   real quick with this but where this whole --
 2   there was two ratchets where it went up and
 3   that's a good way to put it.  It ratcheted up
 4   in August.
 5   Q.    At age nine?
 6   A.    At age nine.
 7   Q.    Right before the school year?
 8   A.    That's it.  That's it.  And then in
 9   January of I guess that would be 2013, we
10   thought it would be best for ███ to go to a
11   school specifically for autism.  So that we
12   took him out of the public school and put him
13   in this place called the Chartwell Center in
14   New Orleans and it's a grade school.
15   Q.    I want to go back to August.
16   A.    Sure, sure.
17   Q.    I want to go back to August.  So the
18   fourth-grade school year is getting ready to
19   start.
20   A.    Yeah.
21   Q.    And the behavior is ratcheting up.
22   A.    Yeah, during the school year, yeah.
23   Q.    Actually August is right before school
24   starts.
25   A.    Well, actually he was doing good before
```

1  school started.  It was when he started
2  school.
3  Q.    Okay.
4  A.    And actually even when he was in the
5  first two weeks of school, he was crying a
6  lot but it wasn't the aggressive behaviors,
7  even the self-injurious behaviors that I
8  remember at that point.  Where it turned into
9  that is when we evacuated for Hurricane Isaac
10 which was two weeks into the school year.
11 Q.    Where did you go?
12 A.    To Donna's folks in Greenwood,
13 Mississippi.
14 Q.    So there's a change there.
15 A.    Yeah.
16 Q.    And I'm not a shrink.  And I've heard a
17 lot of people sometimes, they're resistant to
18 change and change can sometimes alter
19 behavior.
20 A.    Right.
21 Q.    Is it your belief that that particular
22 change, i.e., the evacuation maybe contri-
23 buted to the alteration in his behavior?
24 A.    Yeah.
25 Q.    And when I say alteration, at this

1    particular point in time, that the episodes

2    are getting worse?

3    A.    That's right.

4    Q.    The episodes are getting more intense?

5    A.    Exactly.

6    Q.    The episodes are getting more frequent?

7    A.    That's right.

8    Q.    Do you think when you all get back from

9    Greenwood, Mississippi that this is a good

10   time to go talk to the teachers, the

11   principal, the superintendent of schools, to

12   somebody about hey, man, be prepared.  We

13   might have a problem here.  I just want to

14   forewarn you.  Did you do that?

15   A.    We had an IEP and we actually spoke --

16   Q.    You had a who?

17   A.    Individualized education plan.

18   Q.    IEP.

19   A.    IEP.

20   Q.    I thought you said IAP.  Go ahead.

21   A.    And the school is seeing this, too.  The

22   behavior was at school as well as at home.

23   Q.    Are you worried about him hurting a kid?

24   A.    Well, yeah, absolutely.  I didn't want

25   anyone to get hurt.

1    Q.    Of course not.  So you made it perfectly

2    clear to the school system that you got a

3    potential problem on your hands?

4    A.    They saw the problem.

5    Q.    So you didn't have to tell them?

6    A.    I didn't have to tell them, no.

7    Q.    You think they saw the problem?

8    A.    They told us.

9    Q.    They told you?

10   A.    Yeah.

11   Q.    What did they tell you?

12   A.    That they saw that his behavior was

13   worse.  And I think -- and this is another

14   thing going on at this time is that part of

15   the issue with fourth grade was that up

16   through third grade, he had a behavior plan

17   in his school.  And in the fourth grade, we

18   were concerned that the school wasn't

19   following the behavior plan.

20        And so -- and Donna would be able to tell

21   you a lot more about this.  But the worry was

22   was they weren't following the behavior plan.

23   And the schools were aware of his behavior

24   issues which is why they had the behavior

25   plan.

```
 1    Q.    So is he interacting in the fourth grade
 2    with all the kids as if he was the same as
 3    them?
 4    A.    No, no.  He was in a separate --
 5    Q.    Still in a separate classroom?
 6    A.    Yeah, it was special ed.
 7    Q.    Does he get to go to the cafeteria with
 8    the rest of the kids?
 9    A.    I believe -- well, he had an aide with
10    him.
11    Q.    And the purpose of the aide was to make
12    sure no other kids got hurt?
13    A.    Well, it was just to make sure ███ did
14    okay.
15    Q.    That he didn't hurt anybody including
16    himself?
17    A.    That wasn't -- yeah, that was I'm sure
18    part of it I would think.
19    Q.    What about when there was recess, did he
20    get to go to recess with the rest of the
21    kids?
22    A.    Jeez, I don't know if it was at the same
23    exact time or not.
24    Q.    Don't know?
25    A.    I'm not sure.
```

1  Q.    So here we are.  I retracked you back to

2  August.  You wanted to go to January.

3  A.    Sure.

4  Q.    So let's go to January the following

5  year.

6  A.    We put him in Chartwell School.

7  Q.    Which is where?

8  A.    In New Orleans.

9  Q.    Okay.  So you had to drive him to school

10  every day from St. Charles?

11  A.    That's it.

12  Q.    Then you had to turn around and drive

13  back because you were working in St. Charles

14  or you were at --

15  A.    Well, Donna would take him to school.

16  Q.    Okay.

17  A.    And for the first few months, it went

18  really well but then with about a week left

19  in school --

20  Q.    So now we're talking about May?

21  A.    May, exactly.  He had an aggressive

22  outburst in the car to Donna when she was

23  driving during the school trip.

24  Q.    At this point in time, have you all

25  begun using some sort of harness seat or not

```
 1   yet?
 2   A.    Not yet.
 3   Q.    Was he seated in the front seat or the
 4   back seat when this episode happened?
 5   A.    The back seat.
 6   Q.    In a kid chair or just sitting in the
 7   car if you know?
 8   A.    I'm trying to remember if he was even
 9   needing a booster seat then.  I'm not sure.
10   Q.    So what happened?
11   A.    He attacked Donna while she was driving
12   and she had to pull over and then that
13   following Saturday, he had another outburst
14   in the car.
15   Q.    Were you in the car this time?
16   A.    I was in the car, yeah.
17   Q.    Tell me what happened.  Where were you?
18   A.    We were visiting my -- my parents came
19   to visit and we were in New Orleans.
20   Q.    So this is what, 2003?
21   A.    2013.
22   Q.    I mean 2013, not '03.  So he's 10 years
23   old?
24   A.    Yeah, he was almost 10.
25   Q.    Okay.
```

1   A.    And he became aggressive in the car and

2   I had to hold him down in the back seat while

3   Donna drove home.  And at that point, it

4   became dangerous to take him out because of

5   that.

6   Q.    So at this point in time, you're

7   thinking that you and your wife have to alter

8   your behavior?

9   A.    Right.

10   Q.    So do you get some help from some

11   medical personnel, some therapists, some

12   something?

13   A.    We had that ABA therapy, we had that

14   since 2007 ongoing so we still had that.

15   Q.    There's a little bit of difference

16   between 4 years old and 10 years old and I'm

17   sure his size makes a huge difference at this

18   point as far as being able to control him?

19   A.    That's it exactly.

20   Q.    So what do we do?

21   A.    Then we saw Dr. Many who was his child

22   psychiatrist and she changed the medicine

23   from risperidone to Abilify.

24   Q.    What does that stuff do?

25   A.    It's an antipsychotic.  The two

1    medicines that are used for irritability and

2    aggressiveness in autism that are FDA

3    approved at least at the time were

4    risperidone and Abilify.  And she had tried

5    going up on the risperidone dose but it

6    didn't seem to work.  It just made him too

7    sluggish so she switched him to Abilify.

8    Q.    Is his school telling you -- I mean I

9    think about parent-teacher night when I was a

10   little punk and whatever they told my father,

11   the message was sent loud and clear to me

12   when he got home later that night that some

13   behavior, as in mine, needed to be altered.

14   Is the school concerned now about any safety

15   issues?

16   A.    Well, at this point he was out of

17   school.

18   Q.    It's the summer.

19   A.    Yeah.  And so --

20   Q.    So are you concerned about safety issues

21   at this point?

22   A.    Yeah, exactly.

23   Q.    So your concern consists of him maybe

24   hurting your wife?

25   A.    Yeah, and/or taking him out was

1    dangerous because we didn't want him to have

2    an episode in the car.  We didn't want him to

3    have an episode in a --

4    Q.    Restaurant?

5    A.    Restaurant.

6    Q.    Chuck E. Cheese?

7    A.    Chuck E. Cheese, right, exactly.

8    Q.    So what did we do?

9    A.    He stayed home and he got really

10   agitated.  That was a really severe point.

11   Q.    So you've now, quote, altered your

12   schedule, quote, for lack of a better phrase?

13   A.    Yeah.

14   Q.    So what is it that you all are not doing

15   or had stopped doing that heretofore you were

16   doing before the danger ratcheted up?

17   A.    Going out.

18   Q.    Going out at all?

19   A.    Yeah, it was minimal.  Before we would

20   go to Chuck E. Cheese.  We would go to

21   Adventure Quest which is another play area.

22   We would go to the mall, Esplanade Mall,

23   Clearview Mall.  He liked going to those

24   places and we couldn't go anymore.  And so he

25   had to stay home and we got into a viscous

1  cycle where we couldn't -- ██████ was agitated

2  because we couldn't leave but we couldn't

3  leave because he was agitated.

4  Q.   Do you think he understood that?

5  A.   I don't think so.  I think -- you know,

6  the outbursts never served a purpose for him.

7  It was never for anything gee, I want this

8  and I'm not going to get it so I'm going to

9  have an outburst.  I think it was -- it

10  didn't seem to --

11  Q.   Let me go there for a second.  What I

12  think you just told me is the outbursts came

13  from right field?

14  A.   It seemed to, yeah.

15  Q.   The outbursts were not predictable by

16  you or your wife?

17  A.   I think, yeah, at that point it was

18  difficult to predict, yeah.

19  Q.   We had talked before about if X, then Y,

20  then consequences.  There was no necessarily

21  -- what's the word I'm looking for?

22       MR. CLARKE:

23           Correlation.

24       MR. ZIBILICH:

25           No, that's a good word but that's

```
 1          not my word.
 2     BY MR. ZIBILICH:
 3     Q.    There was no preview of what might be
 4     coming in the next minute or two?
 5     A.    Well, typically there would be a -- ███
 6     wouldn't typically launch straight into a
 7     full-on outburst.  Usually there would be a
 8     tantrum.  He would make a high-pitched squeal
 9     sound.
10     Q.    So that's putting the car in first gear?
11     A.    Yeah.
12     Q.    And then you knew something was coming
13     next?
14     A.    You got it, exactly.  And sometimes
15     first gear would go back to neutral but you
16     had to be on alert.
17     Q.    So the school year is now over.  We're
18     getting ready for what, sixth grade?
19     A.    This will be fifth grade.
20     Q.    Fifth grade.
21     A.    Yeah, fifth grade.
22     Q.    Now do we have a plan?
23     A.    Home school and that didn't work out
24     well.
25     Q.    So this plan of home school, your idea,
```

1   your wife's idea, therapist's idea?

2   A.   It was both of our ideas, Donna and I.

3   We were -- didn't feel safe for him going

4   back to Chartwell School.

5   Q.   Because you were scared that you were

6   going to get in a wreck on the way?

7   A.   Exactly, exactly.

8   Q.   And likewise, I guess you got to be

9   thinking wow, the last couple times he hit

10  me, it's starting to hurt a little bit?

11  A.   Yeah, I think the main worry was I

12  didn't want anything to happen on that trip,

13  on that commute.

14  Q.   What about happening to another kid?

15  A.   Oh, sure, even when he got to the

16  school, I didn't want anything to happen

17  there either.

18  Q.   Did the school ever warn you hey,

19  listen, I don't know if we can control this

20  kid anymore?

21  A.   They wanted us back.  Yeah, Chartwell

22  wanted us back and we said we're worried

23  about the drive and we're just scared about

24  something happening and so we said no.  But

25  they -- no one there said don't come back.

```
 1    Q.     Where did you go to school to learn how
 2    to home school?
 3    A.     Well, that was -- yeah, my wife had
 4    unfortunately the honors of that duty.
 5    Q.     Did she have a syllabus, some books?
 6    A.     Yeah, she had some materials.  She did,
 7    yeah.
 8    Q.     So this goes on for a whole year for
 9    fifth grade?
10    A.     That's correct.
11    Q.     And so the episodes are ratcheting up
12    again?
13    A.     Yeah, they were.  Once he actually
14    started getting depressed because he started
15    just not -- seemed to be like losing interest
16    in anything.
17    Q.     How did you know he was depressed?  I
18    mean he didn't come up to you one day and say
19    Pops, I'm depressed.
20    A.     By looking at him.  You know, ███ would
21    smile a lot.  He would be happy.  He would
22    smile.  He would interact with us and he
23    wouldn't do it as much or nearly as much.
24    And so he just seemed down.  He looked
25    depressed.
```

1   Q.    So the area in St. Charles Parish that

2   you all live, it's quasirural?

3   A.    It's suburban.

4   Q.    You have a fenced-in yard?

5   A.    No.

6   Q.    Was he allowed to go outside by himself?

7   A.    We had a play structure and I would go

8   out there with him.

9   Q.    Is that something like you put him in a

10   playpen so that he can't get out?

11   A.    No, it was a swing and it was like a

12   ladder to climb up on and he would stay

13   within the play structure and he loved

14   basketball.

15   Q.    So he wasn't uncoordinated.  He knew how

16   to do that stuff?

17   A.    For basketball, he didn't dribble.  He

18   would just stand with the basketball in front

19   of the hoop and shoot --

20   Q.    Shoot.

21   A.    -- repeatedly and he could just do that

22   for an hour.

23   Q.    So we're ten years old now.  The fifth

24   grade is ending.  Has he begun doing damage

25   to the house?

1    A.    Yes, that's --

2    Q.    So tell me when that happened.

3    A.    That was around May, end of May of 2013.

4    Q.    So this is the end of fifth grade?

5    A.    End of fourth grade.

6    Q.    Fourth grade.  I have one of these late

7    birthdays so I got confused.

8    A.    Yeah.

9    Q.    So what does he start doing around the

10   house?

11   A.    He would stand up against the wall and

12   bang his head against the wall and to the

13   point where a hole would be made.  And

14   sometimes he would tantrum on the ground and

15   kick and that would put a hole in the wall.

16   Those were the main things.

17   Q.    You all didn't save pictures of those

18   things, huh?

19   A.    Yeah, we have pictures.

20   Q.    You do have pictures?

21   A.    Mm-hmm, yeah.

22   Q.    So I've heard you use the word schedule

23   and I think about routine.  I can remember I

24   watched Rawhide at 7:00 o'clock on Fridays.

25   I don't know why I remember such matters.  I

```
 1    couldn't tell you what's on TV in 213.  Did
 2    he have a time to go to bed?
 3    A.    Yeah, 9:00 o'clock.
 4    Q.    9:00 o'clock.  Was there some stuff that
 5    went on before 9:00 o'clock whether it was
 6    prayers, story telling, TV program, dessert?
 7    How did that go?
 8    A.    At that point, we generally, we would
 9    eat dinner probably around 5:00 and then ███
10    and I would sometimes just listen to music
11    together.  He had an iPad so we would watch
12    videos.
13    Q.    He knew how to operate the iPad?
14    A.    Yeah, he could do -- for the stuff that
15    he needed, he could do it, yeah.
16    Q.    Okay.
17    A.    We had a computer and he loved the PBS
18    Kids and they had these like games on PBS
19    Kids so he would play those.
20    Q.    So we talked about standing next to the
21    wall head banging, kicking walls from the
22    ground.  During this time period, is any of
23    this violence directed towards you?
24    A.    Yes.
25    Q.    How often?
```

```
 1    A.    I would say at least once a week.
 2    Q.    Out of nowhere?
 3    A.    Yeah, it would be -- yeah, the tantrum
 4    where we would hear him first.
 5    Q.    Make the loud screams?
 6    A.    Make the noises, yeah.
 7    Q.    Okay.
 8    A.    And then it was kind of like these
 9    steps.  The lowest step was the tantrum where
10    he maybe just would drop to the ground.
11    Q.    So what is he now, 140 pounds?
12    A.    At this point, yeah, he was getting
13    around that.  Around fifth grade, kind of
14    getting -- when I was blabbing on about the
15    medicine, the Abilify helped to some degree
16    with the irritability but his weight really
17    shot up then.
18    Q.    So he's bigger than your wife at ten
19    years old?
20    A.    Yeah, he was heavier.
21    Q.    Capable of hurting her?
22    A.    Yeah.
23    Q.    Were you ever concerned about leaving
24    your wife alone in the house with him?
25    A.    Yeah.
```

1   Q.    Starting at what age?

2   A.    I would say probably around that point.

3   And worried that I didn't want anything to

4   happen.  I didn't want her to get hurt.  I

5   didn't want him to get hurt, yeah.

6   Q.    So it's 9:00 o'clock.  It's time to go

7   to bed.  Do you lock him in his room?

8   A.    No.

9   Q.    He's capable if you all go to sleep of

10  walking out the room?

11  A.    Well, his room was next to our room.  We

12  have -- they're close.  They're not like

13  right next to each other.  But typically I

14  would lay down next to him to get him to go

15  to sleep and that was just part of the

16  routine.  And I would lay next to him and

17  when he went to sleep, then I would get up

18  and go to my bed.

19  Q.    And leave the door open?

20  A.    Yeah.

21  Q.    And he never got up in the middle of the

22  night to go to the refrigerator, to go bang

23  his head up against the wall, to go outside?

24  A.    No, that never happened.

25  Q.    No pets?

1   A.   No.

2   Q.   At any point in time, did you all ever

3   have what I'll use, for lack of a better

4   phrase, a safe room?

5   A.   No, we didn't have that, no.

6   Q.   Did there come a point in time where you

7   had to lock him in his room at night?

8   A.   No.

9   Q.   Never?

10  A.   That never happened.

11  Q.   You hesitated there.

12  A.   Yeah, we never locked him in his room.

13  Yeah, never -- that never happened.

14  Q.   So fifth grade is over with.   Now what?

15  A.   Then sixth grade, he went into homebound

16  school.

17  Q.   So we did one year of home schooling and

18  it didn't work?

19  A.   Didn't work.

20  Q.   So now we're going where?

21  A.   It's the Harry Hurst Middle School.   We

22  did homebound.   And homebound, you're part of

23  the school.   You're enrolled in the school

24  but your services are at home.

25  Q.   Where is homebound?

1   A.    It's at Harry Hurst Middle School but he

2   was receiving -- he had a teacher coming to

3   the house.

4   Q.    So we're still at the house?

5   A.    Still at the house, that's right.

6   Q.    And the teacher comes every day?

7   A.    No, it was maybe three days a week,

8   something like that.

9   Q.    And this is during the sixth grade?

10   A.    Yeah, that's correct.

11   Q.    What kind of classes did he take in the

12   sixth grade?

13   A.    (No response.)

14   Q.    I mean he's not on a sixth-grade level?

15   A.    No, no.  It was more like on probably a

16   second- or third-grade level.  And it was

17   kind of similar to what he was taking back

18   when he was in third grade.

19   Q.    It was the same teacher throughout the

20   whole entirety of the sixth grade?

21   A.    Well, we were only there until December.

22   We did homebound because backtracking some,

23   when things were very difficult, we had him

24   on a waiting list for Kennedy Krieger

25   Hospital.

1   Q.   This is Baltimore?

2   A.   Baltimore, yeah.  So we came up on the

3   waiting list in the beginning of December of

4   2014.

5   Q.   So from September or August to December,

6   this teacher, male or female?

7   A.   Female.

8   Q.   Same teacher?

9   A.   Same one, yeah.

10   Q.   Comes around two or three times a week?

11   A.   Yeah, and I'm not sure if it's two or

12   three times but --

13   Q.   I'm not going to hold you to that.  Does

14   his teacher stay in the house by herself with

15   him?

16   A.   No, Donna's with her.

17   Q.   Does he have tantrums that you know of

18   through hearsay --

19   A.   Yeah.

20   Q.   -- while you're not there with your wife

21   and the teacher?

22   A.   Right, he did.

23   Q.   And what happens?

24   A.   The tantrum resolved and he calmed down.

25   Q.   Were either one of them big enough to

```
 1   bear-hug him similarly to the way you did it?
 2   A.    No, no.
 3   Q.    So what do they do?  Do they go to the
 4   donut shop and wait for it to stop?
 5   A.    Yeah.  Well, actually in July around
 6   that summer, our -- we had two psychologists
 7   working with us at that point.  And they
 8   found that when ███ was having a tantrum and
 9   it was escalating to being a more severe
10   episode, that the best thing actually is to
11   give him his space and actually move away
12   from him and move to another part of the
13   house.
14   Q.    So this is the first time that I've
15   heard a dos and a don't.
16   A.    Okay.
17   Q.    That you actually were taught from
18   somebody.
19   A.    Yeah, yeah.  They were specifically to
20   this, yeah.
21   Q.    So somebody -- what's the shrink's name?
22   A.    Dr. Martha Hamilton and Nicole Lasserre,
23   they're the psychologists.
24   Q.    And where are they?
25   A.    They're both in New Orleans.
```

1   Q.    They're both local?

2   A.    They're local, yeah.

3   Q.    So I think what I just heard you say is

4   if he were to have a tantrum at approximately

5   age 10 or 11 in the house with your wife and

6   this female teacher, the advice was for them

7   to leave?

8   A.    To move away from him, yeah.

9   Q.    To move away from him.  Same room,

10  different room?

11  A.    Different room.

12  Q.    Outside, yard?

13  A.    Possibly even that, yeah.

14  Q.    And not worry about what he might do in

15  the house, what he might break next?

16  A.    Yeah, I think by staying in the house,

17  that actually was escalating things further,

18  would make things worse.

19  Q.    So they thought?

20  A.    Yeah.

21  Q.    Okay.

22  A.    And it seemed to work.

23  Q.    Before we get into Baltimore, can you

24  give me a list of all of his doctors from a

25  tender age until his death?

1    A.    Yeah, sure.  His first was Dr. Zander

2    which was his pediatrician from birth until

3    two.  And then after Katrina --

4    Q.    So Katrina he's two years old.

5    A.    Two years old, yeah.  We went to a local

6    pediatrician, Dr. Thomas Babin.

7    Q.    Babin, B-A-B-I-N.

8    A.    That's it.

9    Q.    I think I know him.

10   A.    So it was him and then in 2009, he

11   started seeing Dr. Cecile Many.

12   Q.    M-A-N-Y, the one we talked about before.

13   A.    That's right, child psychiatry.  And

14   then in 2014, he started -- Dr. Many retired

15   and so he started seeing Dr. Betty Muller,

16   M-U-L-L-E-R.  And then he stayed with Dr.

17   Muller until she retired in 2018 and then he

18   was with -- his child psychiatrist was Dr.

19   Maegen Vincent.

20   Q.    Who's still around?

21   A.    She's still around, yeah.

22   Q.    And she saw him up until when?

23   A.    Until his death, yeah, yeah.

24   Q.    How often did she see him?

25   A.    Every three months.

1   Q.    So go over with me briefly if you don't

2   mind the history of the medications.

3   A.    Sure.   The first was the risperidone and

4   that was in 2009.   And then after that, I

5   believe maybe around 2010, there was another

6   medicine called Tenex.   It may have been

7   2011, it was somewhere in that range.   But

8   that was to help with impulsivity.

9         And then after the Tenex was added, he

10  continued with that until 2013.   The

11  risperidone was changed to Abilify and that

12  was during that time when the behavior was

13  getting severe.   And then there was another

14  -- because the -- it was still happening,

15  there was another medicine called Trileptol.

16  Q.    How do you spell that?

17  A.    T-R-I-L-E-P-T-O-L, and that, it's a mood

18  stabilizer.   And he remained on those until

19  he went to Kennedy Krieger.   And at Kennedy

20  Krieger -- well, the Tenex may have been

21  stopped at some point in 2014.   I can't

22  remember but at Kennedy Krieger, they kept

23  the Abilify.   They stopped the Trileptol

24  because they didn't feel like that was

25  helpful.

1          And then backtracking some, and I'm

2    sorry, about this.  This is in 2013 when

3    we're talking about █████ getting more

4    depressed and not smiling and not seeming to

5    want to do too much of anything, he was

6    started on Prozac which is an antidepressant.

7    And so when he went to Kennedy Krieger, they

8    kept him on the Abilify and the Prozac.

9    Q.    Did the Prozac slow him down?

10   A.    No, it was hard to say how much it did.

11   He did seem to get a little bit less

12   depressed after we started that.  He was

13   smiling more but at the same time, we started

14   going out and doing things, brief little

15   things.

16   Q.    After how long a hiatus from such

17   matters?

18   A.    About maybe two months.

19   Q.    When was Isaac?

20   A.    Isaac was August of 2012.  And so the

21   periods where things got worse, there was

22   August 2012 and then May 2013.  And the

23   Prozac was started somewhere in the summer of

24   2013.  And then when he went to Kennedy

25   Krieger, they kept him on the Abilify and the

1    Prozac.

2    Q.    So you're a psychiatrist and you

3    prescribe drugs and so I would assume that

4    you know the impact and effects of these

5    drugs typically.

6    A.    Yeah.

7    Q.    And of course, they're not the same with

8    everybody.

9    A.    Sure, yeah.

10   Q.    And sometimes there's a 30-day time

11   before the stuff is in your system and starts

12   working.

13   A.    Yeah.

14   Q.    Did you notice any changes with him as

15   medications were getting changed?

16   A.    You know, with the Abilify, we saw -- he

17   seemed to get less irritable.  And then with

18   the Prozac, he did seem a little bit less

19   depressed so yeah.

20   Q.    So how do you find out about this place

21   in Baltimore?

22   A.    That was my wife.  She -- while all this

23   was happening, she was researching where we

24   could go.  And Kennedy Krieger was the place

25   that's supposed to be one of the preeminent,

```
 1    maybe the preeminent place to deal with --
 2    Q.    Is it associated with Hopkins?
 3    A.    It's right next to it, yeah.  I mean
 4    they're literally attached to each other.
 5    Q.    I don't know why I knew that.  Mr.
 6    Clarke probably told me.
 7          MR. CLARKE:
 8              You're going.  At 1:30, I need to
 9          take a Diet Coke break.
10          MR. ZIBILICH:
11              We can stop now before we get into
12          Baltimore, take ten minutes.
13                  (Off the record 10:28 a.m.
14              Back on the record 10:40 a.m.)
15    BY MR. ZIBILICH:
16    Q.    So before we get into Baltimore, and
17    none of this is easy.
18    A.    Sure.
19    Q.    I just want you to understand.  It's a
20    lot easier for me when I got a jerk sitting
21    in your chair so that's a compliment to you.
22        On the date of the incident, what part of
23    your face did he bite?
24    A.    It was like right here (witness
25    indicating).
```

```
1   Q.   That's what I thought, the right side?

2   A.   The right side.

3   Q.   Have you had any plastic surgery?

4   A.   No, it healed up.  I saw a plastic

5   surgeon, yeah.

6   Q.   I want to say it came out pretty good.

7   A.   Yeah, it healed up well.  Yeah, the

8   plastic surgeon was pleased.  He didn't have

9   to do anything.

10  Q.   Do you have any idea how big a chunk

11  that was that was taken out of your face?

12  A.   Yeah, it was pretty good size.

13  Q.   Have you ever seen it?

14  A.   I saw a picture, yeah.

15  Q.   I mean the dimensions are just like

16  unbelievable.

17  A.   Yeah, it was --

18       MR. CLARKE:

19            Object to the form.

20       MR. ZIBILICH:

21            Good Lord, it took you an hour and

22       38 minutes.  I must be a real good boy.

23       MR. CLARKE:

24            I'm tying to let you go.  I think

25       the more that I poke you, the harder it
```

```
 1           will be.  You are getting a little --
 2           just go on.
 3   BY MR. ZIBILICH:
 4   Q.    All right.  So it's around August when
 5   we go to Baltimore?
 6   A.    December.
 7   Q.    December, that's right, after the first
 8   semester.
 9   A.    That's it.
10   Q.    This would be fifth grade?
11   A.    That's right.
12   Q.    So your wife finds this place, does her
13   research.  The three of you all go to
14   Baltimore?
15   A.    That's correct, yeah.
16   Q.    How long are you all there for?
17   A.    Four and a half months.
18   Q.    Four and a half months.  That was
19   awfully nice of your employer to allow that
20   to happen.
21   A.    I know.  I know.  They were very nice,
22   yeah.
23   Q.    So what is the object?  What is the
24   plan?  I'm sure you must have had some idea
25   what was going to go on during those four and
```

1  a half months before you left.

2  A.    Yeah, we had spoken with them before and

3  I guess our understanding, and it turned out

4  to be true, is that the first part of it is

5  mostly observation, you know, where they see

6  how the child is doing and try to figure out

7  why they're having the behaviors.  And then

8  the second phase is to come up with a treat-

9  ment protocol.  And then the third phase is

10 to try implementing the protocol and then

11 tweaking it however they felt like they

12 needed to do it.

13 Q.    So does the observation include watching

14 interactions that -- can I call him E.P.?

15 A.    Yeah.

16 Q.    Watching or making observations of E.P.

17 and the two of you all?

18 A.    That was part of it, yeah.

19 Q.    So observation, next stage?

20 A.    Yeah, next stage was that treatment

21 plan.

22 Q.    So I guess they're happening at the same

23 time?

24 A.    Yeah, the observation part was yeah, it

25 was probably about the first three and a half

1    weeks or so.   And I remember they met with us

2    around the end of December and they said that

3    we're not sure what the problem is.   It's not

4    clear.   That ███ sometimes will -- I'm going

5    to go off track and I'm sorry.

6         But with other kids there, they would do

7    things that they would think okay, this kid

8    doesn't like whatever it is.   We're going to

9    do that.   And then we'll see okay, when we do

10   this, then this kid has this type of

11   behavior.   Okay.   Now we know what we're

12   dealing with.

13   Q.    Were they aware before you all got there

14   of his violent episodes?

15   A.    Yeah, yeah, exactly.

16   Q.    I don't know whether you filled out an

17   application.

18   A.    Yeah, sure.

19   Q.    I'm sure there was some sort of inter-

20   view.

21   A.    You're exactly right.   There was an

22   application that we did in April where we had

23   to describe --

24   Q.    That's why you were on the waiting list?

25   A.    That's it, exactly.

1    Q.    Tell me about those first three and a

2    half weeks.  I mean here we are.  We're in a

3    different environment.

4    A.    Yes.

5    Q.    Are you all staying at the facility?  Is

6    he staying at the facility and you all are in

7    a hotel?  How is this working?

8    A.    We were at the Ronald McDonald House in

9    Baltimore and he was at the facility.  And so

10   he stayed there around the clock.

11   Q.    But you visited him every single day?

12   A.    Every day, every day, yeah.

13   Q.    The routine hadn't changed I take it?

14   A.    That's it.  Every day, exactly.  And

15   they had a routine there.  And they had a

16   certain time for visiting hours every day.  I

17   believe it was 4:00 o'clock to 7:00 o'clock

18   so we would be there 4:00 o'clock to 7:00

19   o'clock each day.  And then weekends, it was

20   9:00 o'clock till 7:00 o'clock I believe so

21   we would be there Saturday and Sunday.

22   Q.    Any episodes with him during that three

23   and a half weeks?

24   A.    When he was on the unit, they did.  He

25   did, yeah.

```
1    Q.    And what did those consist of?
2    A.    It was the head banging and the head
3    slapping and the open-handed slapping.
4    Q.    Any of it directed at people?
5    A.    At the workers, yeah.  And they expected
6    it.  That was part of the -- they all wore
7    like shin guards and arm pads.
8    Q.    Had he begun his biting by this point?
9    A.    That had started up, yeah.  That had
10   started up prior.  So yeah, it had.
11   Q.    So they were prepared for that as well?
12   A.    They were, yeah.
13   Q.    So it's best to cover up as much limbs
14   and stuff.  It's like I shouldn't say this.
15   A.    No, no.  I know what you're saying.
16   Q.    Like I got a friend that's got a dog
17   that's the cutest dog in the world but don't
18   put your face too close to the dog's face
19   because it snaps.
20   A.    Yeah, they had to do that with all their
21   patients.  That was just part of the routine
22   because, you know, they had to know it was
23   possible.  And there was about, I'm guessing,
24   I'm thinking there was maybe 18 kids on this
25   unit, 20, something like in that neighbor-
```

1    hood.

2    Q.    Would he interact with the other kids?

3    A.    No.

4    Q.    That's a no?

5    A.    No, he wouldn't probably have anyway but

6    typically they had some game -- like game

7    nights and they had a movie night but ████

8    typically would just stay to himself.

9    Q.    So we've gone through these two initial

10   phases and then what happens?

11   A.    Then they came up with a treatment

12   protocol.  And --

13   Q.    Was it in writing?

14   A.    Yeah, it is.

15   Q.    You got it?

16   A.    Uh-huh, yes.  I'm sorry, yes.  They came

17   up with a treatment plan.  Once he was

18   discharged, they came up with that.

19   Q.    And you still have that at home?

20   A.    Yes.

21   Q.    And you gave that to your lawyer?

22   A.    Yes.

23   MR. CLARKE:

24        I think we produced that, Franz.

25   MR. ZIBILICH:

93

```
 1              I haven't seen it.  You saw it?
 2       MR. MARTINY:
 3              I got to double check.
 4       MR. CLARKE:
 5              I mean we have produced that with
 6         the Kennedy Krieger records.
 7   BY MR. ZIBILICH:
 8   Q.    I have no reason to disbelieve you.  So
 9   the short version of what the treatment plan
10   consisted of?
11   A.    It would be to try to ignore certain
12   behaviors, have independent and interactive
13   time.  What independent time is -- and this
14   is following how the activities were --
15   Q.    So I'm probably getting into a dos-and-
16   don'ts thing here.
17   A.    Correct, yeah.
18   Q.    It's only taken me an hour and 45
19   minutes.  Okay.
20   A.    Yeah, independent time was alternating
21   with interactive time every 30 minutes.  And
22   independent time would be ████ would be
23   allowed to do things on his own.  Interactive
24   time was when he would engage with activities
25   with me or Donna or we had a company called
```

1    Autism Spectrum Therapies that worked with us

2    once he was out of the hospital.  And they

3    had workers from there who came to the house.

4    And then it was trying to -- as far as the

5    behavior is concerned, they would keep data

6    on that.

7    Q.    Let me ask this question.  So he's 10 on

8    the verge of 11 now.

9    A.    He's 11.

10   Q.    What month is his birthday?

11   A.    August 15th, 2003 so he's 11.

12   Q.    So this has been going on now for eight

13   years?

14   A.    Well, the severe consistent behavior at

15   this point had started May 2013.

16   Q.    Okay.

17   A.    And I should say it started in August of

18   2012, ratcheted up in May of 2013.  So by the

19   time we got out of the hospital, it was April

20   of 2015.

21   Q.    But I mean you had some inkling of a

22   diagnosis of autism --

23   A.    Yes.

24   Q.    -- as of three years old?

25   A.    Yeah.

1    Q.    Now he's 11?

2    A.    That's right.

3    Q.    It has progressively gotten worse during

4    that eight-year period with some ups and some

5    downs?

6    A.    Yeah, I hate to correct me.

7    Q.    No, go ahead.

8    A.    I don't want to be a nitpicker or any-

9    thing but things were improving up until

10   August 2012.  And it was really hopeful and

11   then --

12   Q.    So this was like his ninth birthday?

13   A.    Yeah, that's it.  It was that one-two

14   bunch of going to the upper elementary and

15   then the May 2013.

16   Q.    And the hurricane and the evacuation, et

17   cetera?

18   A.    Exactly.

19   Q.    So you've now had a lot of years of

20   experiencing something that you really

21   heretofore had not been trained on in medical

22   school.

23   A.    Sure.

24   Q.    Are you reading up on every possible

25   book on autism during this time period?

```
 1   A.     I wouldn't say that, no.
 2   Q.     No?
 3   A.     No.
 4   Q.     You're still relying on others who are
 5   more specialized?
 6   A.     Sure, yeah.
 7   Q.     And you trust these folks as opposed to
 8   grading their paper by learning this stuff
 9   yourself?
10   A.     That's right.
11   Q.     So you still didn't convince yourself
12   that you are expert on how to deal with
13   autistic adolescents at this point?
14   A.     You know, I think in terms of with ████
15   I guess you could say I was an expert.
16   Q.     Sure, because you were hands-on with
17   him.
18   A.     Yeah, but other kids are just so
19   different.
20   Q.     So we get back from Baltimore.  When is
21   it now?
22   A.     April of 2015.
23   Q.     So what do we do with him?  Are we going
24   to put him in school?
25   A.     Yeah, that was the recommendation of the
```

```
 1   hospital, yeah.
 2   Q.    So you put him where?
 3   A.    At Harry Hurst Middle School.
 4   Q.    Same place he had been before?
 5   A.    That's right.
 6   Q.    Is Harry Hurst Middle School a place
 7   where he goes physically or is this a place
 8   where we're going to still send somebody over
 9   to the house?
10   A.    It's physically now.  It was homebound
11   and now it's in person.
12   Q.    So now it's in a school setting?
13   A.    Yeah, and he's in a separate classroom
14   at this point.
15   Q.    By himself?
16   A.    By himself.
17   Q.    With a teacher?
18   A.    That's it, yeah.
19   Q.    And what he's now, 170 pounds?
20   A.    When he came out, he was about -- yeah,
21   roughly.
22   Q.    When he came out of what, Baltimore?
23   A.    Baltimore, he was about 160 pounds.
24   Q.    Really, he's large now?
25   A.    Yeah, yeah.
```

1    Q.    And if I had to guess, I used to guess

2    weights and ages at Pontchartrain Beach.

3    What are you, about a dollar seventy-five, a

4    dollar eighty?

5    A.    Oh, man.  I wish.  200 pounds.

6    Q.    Really?

7          MR. CLARKE:

8              Getting old.  It's a perishable

9          skill.  You're going to have to go back

10         to wherever your little sideshow is.

11         MR. ZIBILICH:

12             The man didn't stand up and I didn't

13         get to test his muscle mass.

14         MR. CLARKE:

15             It seems a little invasive for just

16         a guess.

17   BY MR. ZIBILICH:

18   Q.    So I mean you don't want to go one-on-

19   one with him anymore.  I mean he's as strong

20   as an ox.

21   A.    Well, yeah.  At this point, the hospital

22   recommended having -- they had two people --

23   I'm babbling on here.  But they had a

24   restraint that ideally would require three

25   people but could be potentially done with two

99

1    people.

2    Q.    If you got two people available?

3    A.    Correct.

4    Q.    So how's the new school working out?

5    A.    He had several episodes of outbursts.

6    They have two aides and a teacher.  He's in a

7    separate classroom and he has outbursts more

8    days than not.

9    Q.    So this has got to be incredibly

10   disappointing after spending all this time in

11   Baltimore?

12   A.    I don't know.  You know, I kind of

13   expected it because it was such a change, you

14   know.  I mean he had been in homeschool for a

15   year and a half.  And now suddenly the stuff

16   in the hospital that he was doing, suddenly

17   that's being done in the school.  So I

18   expected it was going to be an adjustment

19   period.  So it wasn't -- I guess I wasn't too

20   disappointed.  I kind of expected it wasn't

21   going to go real smoothly.

22   Q.    And this is now almost a daily

23   occurrence at school?

24   A.    More days than not I would say, yeah.

25   Q.    Is there a plan?  What are we trying to

1    do to offset this if anything?

2    A.    They kept the protocol with the school.

3    The Autism Spectrum Therapies was working

4    with him to try to target his behaviors and

5    try to find ways to lessen them, trying to

6    find replacement behaviors.  So that instead

7    of going into an outburst, that he would have

8    another way to deal with it or maybe find

9    other things that would prevent the burst

10   from happening in the first place.

11   Q.    So this is April 2014 or April 2013?

12   A.    This is April 2015.

13   Q.    2015, okay.

14   A.    Yeah.

15   Q.    So this is going on every day, every

16   other day.  This goes on for how long?

17   A.    At school, it continues through -- then

18   he goes into seventh grade and it continues

19   there but things start to improve at school.

20   The behaviors become less often, less out-

21   bursts.

22   Q.    What do you attribute that to?

23   A.    I think he was adjusting to this treat-

24   ment plan, his treatment protocol.

25   Q.    So now we're in the summer of 2017?

1    A.    Yeah, summer of 2015.

2    Q.    I mean '15, I'm sorry.

3    A.    That's it.  And I think he was adjusting

4    to having people in the house, these workers.

5    If it was just Donna, there would be two

6    workers.  If I was there, there would be one

7    worker because ideally they wanted three

8    adults present and things improved.

9    Q.    Are we still having occasional episodes

10   at the house?

11   A.    Yeah, they would still happen but they

12   gradually became less.

13   Q.    And is the biting ratcheting up?

14   A.    It's continuing.

15   Q.    I mean these aren't nibbles.  These are

16   full-blown bites?

17   A.    Yeah, they could be, yeah.  It really

18   varied.  It wasn't -- it wasn't consistent.

19   Sometimes it could be more intense and some-

20   times it could be less intense.  The bites at

21   that point from what I recall weren't as

22   frequent.  It was much more that open-handed

23   hand-slap.

24   Q.    So during the course of his teenage

25   years, about how many times were you bitten?

1    A.    That's a great question.

2    Q.    Too many to count?

3    A.    Well, no.  I would say maybe --

4    Q.    Twice a month?

5    A.    No, definitely not that.

6    Q.    Less?

7    A.    Less than that.

8    Q.    Once a month?

9    A.    No, less than that even, yeah.  I would

10   say me actually being bitten, actually this

11   is going back to --

12   Q.    You can go back as far as you want.  I'm

13   trying to figure out the total number of

14   times that he has actually bitten you.

15   A.    Bitten me, the number of episodes in

16   which I got bit would be maybe ten.

17   Q.    Ten in life?

18   A.    Now life, it was different.  When he was

19   two, he would do playful bites.

20   Q.    I don't care about those.

21   A.    So actually like aggressive biting, God,

22   I don't want to be wrong on this but I'm

23   guessing as far as the number of episodes of

24   him actually biting me during an episode is

25   maybe 10 to 15 episodes.

1    Q.    Were there any occasions where you had
2    to go get stitched?
3    A.    No.
4    Q.    Never?
5    A.    Never, the first time I got stitched for
6    a bite was the day he died.
7    Q.    The one in your face?
8    A.    Yeah, and my hand.
9    Q.    So we finished this school year.  What
10   happens the next year?
11   A.    Then seventh grade, he stays within the
12   school and actually things still -- a lot of
13   outbursts in the school.  And at home, we're
14   talking now spring of 2016.
15   Q.    So now he's 12 years old, almost 13?
16   A.    Yeah, this is spring of '16.  12,
17   exactly.  Actually his behavior at home
18   improves.  It's much, much less.  He has far
19   fewer outbursts.  I think he's adapting to
20   the Autism Spectrum Therapies and I think
21   they were adapting to him.  I think they were
22   learning okay, maybe we don't need to be so
23   strict on this.  Maybe we need to focus more
24   on this and so I think that both things were
25   kind of coming together and things really

1   were improving during that time.  And school

2   was -- it was still happening pretty often at

3   school, not quite as often and I wish I could

4   quantify that better but at home, it was in

5   the spring --

6   Q.    So it's calming down at home and getting

7   worse at school?

8   A.    No, no, getting better at school.

9   Q.    Getting better.

10  A.    It's still happening but it's improving

11  on both fronts but it's still happening.

12  Q.    Now it's the next school year.  We're

13  going into the eighth grade?

14  A.    Eighth grade, yeah.

15  Q.    Where are we going?

16  A.    Things are getting a lot better.  But --

17  Q.    We're talking about 2016 now?

18  A.    2016, that's it.  Autism Spectrum

19  Therapies withdrew services in August of

20  2016.

21  Q.    Why?

22  A.    Our worker was a male.  We had a male

23  worker and he moved and they didn't have a

24  male worker to replace him.  And they felt

25  like they needed because of ████ size a

1  male worker to work with him.
2  Q.    Is he 200 pounds yet or on the verge?
3  A.    Not yet, not yet but getting there.  So
4  they withdrew their services and that was
5  terrifying.
6  Q.    Now we're talking about September of
7  2016?
8  A.    September of 2016.  So we -- Donna and I
9  were trying to find care workers and Donna
10  really tried hard to find people but we
11  couldn't find anybody.  So what we did is we
12  kept a routine and we kept the same basic
13  routine that the hospital had implemented and
14  then we continued with what Autism Spectrum
15  Therapies had with us, we carried that on and
16  things improved.  We still had Dr. Hamilton
17  and Dr. Lasserre helping but things got
18  better.
19  Q.    They improved enough that you thought it
20  was going to be safer to start taking him out
21  again?
22  A.    Yeah.
23  Q.    You need a minute?
24       MR. CLARKE:
25            Let's just take a break.

1     MR. ZIBILICH:

2          Go take a quick little walk.

3     THE WITNESS:

4          Okay.  Thanks.

5               (Off the record 11:00 am.

6          Back on the record 11:05 a.m.)

7  BY MR. ZIBILICH:

8  Q.    All right.

9  A.    Sorry about that.

10 Q.    No, no, that's okay.  I'm sure this is

11 not fun.  While we're all sitting here, do

12 you recognize any of the guys seated in this

13 room?

14 A.    Well, I watched the video and I

15 recognize that gentleman there.

16 Q.    The one with the beard?

17 A.    The beard, yeah.

18 Q.    You recognize him as what?

19 A.    As one of the deputies on the scene.

20 Q.    On the scene?

21 A.    Yeah, that's from the video.

22 Q.    You have no independent recollection of

23 him?

24 A.    Minimal.  I remember deputies at the

25 scene but I don't recall --

1   Q.   The gentleman over here with the beard

2   that you pointed at that's got the suit on,

3   the blue shirt and the red tie, correct?

4   A.   That's correct, yeah.

5   Q.   Did you see him ever have his hands on

6   your son?

7   A.   I don't remember that.

8   Q.   You don't remember him having his hands

9   on your son?

10  A.   I don't recall.

11  Q.   Do you remember him doing anything

12  wrong?

13  A.   Well, I think where it comes down to,

14  and this is probably jumping ahead, and I

15  blame myself is that ███ was in a prone

16  position and I didn't say take him out of the

17  prone position.

18  Q.   Okay.  The gentleman over here with the

19  short-sleeved shirt on and the T-shirt under

20  it, do you recognize him from anywhere?

21  A.   No, he may have been at the scene but I

22  don't specifically remember him.

23  Q.   And the gentleman with the glasses, do

24  you recognize him?

25  A.   I remember from the video.

```
 1   Q.    What do you remember him doing, if
 2   anything?
 3   A.    He was on during the restraint and I
 4   hope I'm not getting this wrong but on ████
 5   left side, that ████ -- he was on ████ left
 6   side during the video when I watched of the
 7   restraint.
 8   Q.    And the other gentleman over here with
 9   the short-sleeved shirt, looks like he hasn't
10   shaved in about three days, do you recognize
11   him?
12   A.    He may be the second deputy who got on
13   top of ████
14   Q.    Let me ask you this.  Is it true that
15   there was never more than one person sitting
16   on top of your son at any one given point in
17   time?
18   A.    Right, there was one person each time.
19   Q.    Only one?
20   A.    Only one.
21   Q.    There was never more than one?
22   A.    That's what I recall.
23   Q.    All right.  So we're in the eighth grade
24   now?
25   A.    That's correct.
```

```
 1    Q.    So that would be 2016?

 2    A.    That's right.

 3    Q.    And we're getting towards September?

 4    A.    Yeah, yeah.

 5    Q.    Do you remember sending your attorney a

 6    whole bunch of e-mails that described, or

 7    maybe your wife did, that described various

 8    events involving █████████

 9    A.    I would have to look at it and see.

10          MR. CLARKE:

11              You're talking about interroga-

12          tories?

13    BY MR. ZIBILICH:

14    Q.    I'm talking about -- I'll just read one.

15    A.    Sure.

16    Q.    I've got all kind of doodle on it so I'm

17    just going to ask you if you remember this.

18    This is dated from you, September 10th and

19    11th, home behaviors, Monday September the

20    12th.  I guess you sent it at about 6:24 a.m.

21          Saturday was a very rough day.  ███████

22    engaged in 21 AGG, 506 SIB, 36 DIS, one

23    biting others and one drop with tantrums.

24    Does that sound like something you would

25    write?
```

110

```
 1    A.    Yeah, or Donna.

 2    Q.    What is a 21 AGG?

 3    A.    That's aggressive incidents.

 4    Q.    What is a 560 SIB?

 5    A.    SIB is self-injurious behavior.

 6    Q.    And what is the 36 DIS?

 7    A.    That's disruptive behavior, that would

 8   be like throwing things or anything, property

 9   damage.

10    Q.    It goes on to say that ███ invited you

11   to go on his 3:00 o'clock snack outing with

12   his dad.  ███ must have invited mom?

13    A.    Apparently he invited me.

14    Q.    He invited you to go on his 3:00 o'clock

15   outing with you.  It's a funny little

16   sentence.

17    A.    Okay.

18    Q.    But I mean I don't care about sentence

19   structure.  I just want to know what

20   happened.

21    A.    Sure.  ███ had a 3:00 o'clock snack

22   time on weekends so to go on outing, that

23   ███ may have said Daddy, go out.

24    Q.    He didn't say the word McAlister's?

25    A.    I wouldn't think he would.  He might
```

1    have said --
2    Q.    I don't know.
3    A.    Yeah, typically.
4    Q.    That's why I'm asking questions because
5    I don't know.
6    A.    Sure, yeah.
7    Q.    He had decided he had wanted to go
8    McAlister's for a cookie.  So how did he
9    communicate that to you, cookie?
10   A.    Cookie, yeah.
11   Q.    He got his cookie at McAlister's and had
12   to wait since it had to be placed in a
13   plastic bag since it was freshly baked.  He
14   waited well and ate his cookie there.
15       He requested another cookie and I told
16   him that he could not have one.  He walked to
17   the car and got in the car with no problems.
18   He then told Daren that he wanted me to drive
19   so I got into the driver's seat.  I presume
20   that's mom.
21       ████ then changed his mind and said he
22   wanted dad to drive and me in the third row.
23   As I climbed into the third row, ████ hit me
24   once in the back.  Is that you going into the
25   third row with him?  Is that how that works?

```
 1    A.    Can I look at that?  I am so sorry.
 2    It's hard for me to --
 3         MR. ZIBILICH:
 4              Jeffrey, you got a clean copy?
 5         MR. MARTINY:
 6              It's the first one.
 7    BY MR. ZIBILICH:
 8    Q.    I'm marking this as Daren 1.  I'm going
 9    to give you a chance to read it.
10    A.    (Witness complies.)
11         MR. CLARKE:
12              Do you know what the date of that
13         was?
14         THE WITNESS:
15              September 12th.
16         MR. ZIBILICH:
17               It's on there.  It says September
18         the 12th, 2016, 6:24 a.m.
19         MR. CLARKE:
20              I'm trying to find it on my
21         computer.
22         THE WITNESS:
23              The behaviors were September 10th
24         and 11th.
25    BY MR. ZIBILICH:
```

1    Q.    Do you recognize that e-mail?

2    A.    This is one that, yeah, Donna had --

3    Q.    It looks like it's written by your wife.

4    A.    Yeah.

5    Q.    Is the behavior that is described in

6    there pretty accurate?

7    A.    I'm sure it is.

8    Q.    I mean you were there?

9    A.    Yeah, yeah.

10   Q.    How much of this behavior on this

11   particular date, whether it's the 11th or the

12   10th, occurred before you all went to

13   McAlister's?

14   A.    I think this was all before going.  I

15   don't think we ever even left if I'm reading

16   this right.

17   Q.    Say that again.  You think all this head

18   banging, hit daddy, hit mommy all happened

19   before you went to McAlister's?

20   A.    I think so.  ███ invited me to go on

21   his 3:00 o'clock, decided he wanted to go to

22   McAlister's for a cookie.  He got his cookie

23   at McAlister's, okay.  I'm wrong there.

24   Q.    I can't tell.  That's why I'm asking.

25   This is not a trick question.  They got a

1    bunch of dangling participles in there and

2    I'm just trying to figure out if some of this

3    stuff happened before going to McAlister's,

4    if any of this stuff happened before going to

5    McAlister's or if some of it happened before

6    and some of it happened after if you can

7    decipher and figure that out?

8    A.    Sure, sure.  He got his cookie at

9    McAlister's so this is after we had left, we

10   left home and went to McAlister's.  And then

11   he got his cookie and then he wanted a second

12   cookie and then he couldn't have a second one

13   because he was only supposed to have one.

14   Q.    Where is McAlister's?

15   A.    It's in Kenner.  It's on Esplanade.

16   Q.    That's a nice little ride from St.

17   Charles Parish.

18   A.    It's about 15 minutes.

19   Q.    15 minutes, okay.

20   A.    So this is the drive home.

21   Q.    So my question is still the same.  How

22   much of this rough day and the things that

23   are described in this e-mail happened before

24   you went to McAlister's?

25   A.    Nothing.

1    Q.    None of it?

2    A.    None of it, yeah.

3    Q.    I'm going to show you another one that's

4    dated October the 18th.  Apparently it's

5    referred to stuff that happened on October

6    the 17th and I'm going to mark this as Daren

7    2 which means I won't feel like writing that

8    much so I'm going to call it D-2.

9         MR. CLARKE:

10             What day was that, the 17th you

11        said?

12        MR. ZIBILICH:

13             It is written on the 18th allegedly

14        talking about matters that occurred on

15        the 17th.

16        MR. CLARKE:

17             Okay.  I'm just trying to pull it up

18        on my computer.

19        MR. ZIBILICH:

20             You can read over your client's

21        shoulder.

22        MR. CLARKE:

23             I can read it on the computer screen

24        too.

25        THE WITNESS:

```
 1              Okay.
 2    BY MR. ZIBILICH:
 3    Q.    Do you recall this episode?
 4    A.    Yes.
 5    Q.    Pretty significant, huh?
 6    A.    Yeah, it was.
 7    Q.    Scary?
 8    A.    For me, the worry for me was just I
 9    didn't want Donna to get hurt and I didn't
10    want ████ to get hurt.  It just the worry
11    was, you know -- yeah, it was scary, yeah.
12    Q.    Let me ask you this.  We're talking
13    about the fall of 2016, correct?
14    A.    That's right.
15    Q.    He's a 13-year-old young man at this
16    point, over 200 pounds?
17    A.    Not quite but close.
18    Q.    Strong as a bull?
19    A.    He could get strong, yeah.
20    Q.    By the way, as of this date, had he
21    started lifting weights yet?
22    A.    No.
23    Q.    Had not started lifting weights?
24    A.    No.
25    Q.    I notice that that made you smile.
```

1    A.    He never lifted.  No, he didn't.

2    Q.    He never lifted weights?

3    A.    Well, he did some physical -- an

4    exercise program with a trainer.

5    Q.    At the school?

6    A.    Yeah, we actually had one who started

7    working with him about a year later at home.

8    Q.    At home?

9    A.    Mm-hmm, yes.

10   Q.    Did it consist of a bench press?

11   A.    No.

12   Q.    What did it consist of?

13   A.    It was a ball that they would toss back

14   and forth.

15   Q.    A weighted ball?

16   A.    A weighted ball, yeah.  And then there

17   was a rope that he would pull back on.

18   Q.    Like he would at a gym?

19   A.    Yeah, mm-hmm, that's right.

20   Q.    That either had tension --

21   A.    Yeah.

22   Q.    -- or was less elastic or has weights on

23   it?

24   A.    Yeah, it was just an elastic band, yeah.

25   Q.    Which makes you stronger?

1    A.    Yeah.

2    Q.    Which makes muscles get bigger?

3    A.    Yeah, yeah.

4    Q.    Whose idea was that?

5    A.    Well, I think we wanted -- I think it

6    was all of ours, me and Donna's and his

7    psychologist wanted -- we wanted to increase

8    ███████ activity level.  And ██████ --

9    Q.    Wanted him to get more adept at hurting

10   you?

11   A.    No, we were worried about the weight

12   gain and we were worried about him not

13   getting much exercise.  He wasn't interested

14   in sports and so we tried to do something to

15   give him -- I guess two reasons.  One is for

16   health reasons, just for his own personal

17   health and to try to get him interested in

18   things that involved physical activity.

19   Q.    You never thought that would be

20   dangerous to get him even stronger than he

21   already was?

22   A.    Well, it's -- that's the flip side of

23   that.

24   Q.    So it was something you thought about

25   but you weighed it all out and said go for

1   it?

2   A.   Well, it's all a balance.  I tell you,

3   that's the toughest thing is it's a balance.

4   Q.   So we're talking about the fall of 2016.

5   Have we gotten back into our routine of going

6   to regular places?  The e-mail before talked

7   about McAlister's.

8   A.   Yeah, we were starting to.

9   Q.   Starting to go where?

10   A.   We were going out to McAlister's would

11   be one place and that would be mainly just to

12   get a cookie.

13   Q.   It's a long ride for a cookie.

14   A.   Yeah, they got good cookies.

15   Q.   I think the place is a dump.

16   A.   Well, ██████ liked their cookies.

17   Q.   Don't they have one near to the office

18   that we used to go to?  Yeah, it's a dump.

19   Go ahead.  I'm sorry.

20   A.   I thought it was pretty good.

21   Q.   Somebody's dump might be somebody else's

22   Taj Mahal.

23   A.   Right, right, yeah.

24   Q.   I must have had something I didn't like.

25   I'm not teasing you about McAlister's.

1    A.    It's probably me.   Yeah, I think ███

2    loved certain things.   He loved the cookie

3    and that was a special treat for him and so

4    going there was a treat.

5    Q.    So that was a once-a-week outing?

6    A.    It wasn't.   He would have an outing on

7    weekends and so that could be an outing.

8    Q.    I'm back to what we talked about a

9    couple hours ago when we were talking about a

10   schedule.

11   A.    Yeah, yeah, that's it.

12   Q.    Is McAlister's on the schedule?

13   A.    Not every week, no.   That was one of the

14   places we could go but it wasn't set.

15   Q.    So does he know the difference between a

16   Saturday and a Monday?

17   A.    Yes.

18   Q.    He does?

19   A.    Not so much -- mainly because that's

20   when school would be Monday.   Saturday would

21   be a weekend.

22   Q.    Did he have a certain Saturday morning

23   cartoon or something that he watched that

24   made him relate to today's Saturday?

25   A.    Well, Saturday was, I would take him out

1   to Taco Tico.

2   Q.    That was before the cookie?

3   A.    Taco Tico may have been, yeah.

4   Q.    It could have been the same day?

5   A.    If it was a Saturday, yeah.  We went to

6   Taco Tico most Saturdays and ███ and I would

7   have lunch there

8   Q.    As of October of 2016, we haven't

9   started the laser tag thing yet?

10  A.    Oh, we had been going to laser tag right

11  around -- we had been going there.

12  Q.    Since when?

13  A.    Since -- that actually has been even

14  with probably around that time.

15  Q.    Around that time?

16  A.    Yeah.

17  Q.    Can you recall the first time you went

18  to the laser tag?

19  A.    First was actually back in 2014.

20  Q.    You have a good memory.  How do you know

21  that to be sure?

22  A.    I remember it was before we went to

23  Baltimore.

24  Q.    So he would have been about 11?

25  A.    Yeah, it was probably around 11, yeah.

1   Q.    So whose idea was it to go to a laser

2   tag?

3   A.    Probably mine.

4   Q.    Yours?

5   A.    Yeah, yeah.

6   Q.    And that was the one that was located on

7   Veterans and Power?

8   A.    That's right.

9   Q.    And if that started in the fall of 2016

10  hypothetically or thereabouts, once a month?

11  A.    I don't want to interrupt.

12  Q.    Interrupt me.  Look, I'm making updates.

13  I don't know.

14  A.    It became a routine part of his week.

15  He loved laser tag and ███████ they were great

16  with him there, you know.  The people, they

17  were great.  They were very welcoming and we

18  would go there typically right when they

19  opened.

20  Q.    Which is what time?

21  A.    At 11:00 o'clock.

22  Q.    On a weekend?

23  A.    On a weekend, yeah and so there were

24  very few people there.  And he loved arcades

25  since he was two.  When we went to Chuck E.

1   Cheese, he loved it.  He absolutely loved it.

2   And then we went to Adventure Quest probably

3   when he was about five.

4   Q.    How often would you go back in 2016 to

5   laser tag?

6   A.    It was nearly once a week.  It was part

7   of his routine and he loved it.

8   Q.    And you liked to go there when there

9   were less people why?

10  A.    Because there was less -- it would be

11  safer, you know.  There would be less people

12  there.

13  Q.    It would be more safe for you?

14  A.    Yeah.

15  Q.    More safe mama?

16  A.    Yeah.

17  Q.    More safe for him?

18  A.    And more safe for the people.

19  Q.    More safe for the people that are there?

20  A.    Absolutely, yeah.

21  Q.    So you had a concern even back then

22  about other folks' safety?

23  A.    Yeah, yeah, absolutely.

24  Q.    So in the same e-mail, halfway down, he

25  initially wanted a few Reese's Pieces but

1   then decided on popcorn.  He poured the

2   popcorn into a bowl and sat down to eat.  He

3   then tossed the bowl of popcorn on the floor

4   and went to the room with the tent and

5   dropped slash tantrummed there.  What room is

6   the tent?

7   A.    The tent in 2016, I'm trying to think

8   where we had that then.  I mean to answer

9   this.  I'm just trying to remember where it

10  was.  We had a tent, like a regular tent that

11  you would have for camping.  It would be like

12  a one-person tent or maybe two-person tent

13  and that was a place ███ just liked to go

14  and lay down in.

15  Q.    Was it in his bedroom?

16  A.    No, it was -- at one point we had it in

17  the family room and then at another point we

18  had it in sort of like a -- it's supposed to

19  be a dining room but it sort of turned into

20  more of a storage room but it was in one of

21  those two rooms, either the family room or

22  the dining room.

23  Q.    In the first part of this thing, it says

24  during these two tantrums before the burst,

25  he had 5 HB and 66 HS.  What's an HS?

1    A.    Head slaps.

2    Q.    You all count them?

3    A.    Yeah.

4    Q.    Why?

5    A.    We had to collect data.  It helps the

6    psychologist.

7    Q.    So this all gets reported to his

8    doctors?

9    A.    Dr. Hamilton and Dr. Lasserre, that's

10   right.

11   Q.    With nine kicks to the floor.  While

12   having these two tantrums, he was in his

13   parents' bedroom lying down not playing

14   anything.  He looked as if he had been

15   tearful and I could hear saying things like,

16   quote, time out, quote.  Quote, stop hitting

17   and stop yelling, quote.  These are his words

18   or is this you or mama telling him?

19   A.    Oh, here we go.  No, those are his

20   words.

21   Q.    So those are words he can speak?

22   A.    Yeah.

23   Q.    So is he saying time out?  And by the

24   way, is he kind of like using a normal voice

25   or is he screaming?

1  A.    It's kind of a -- it could be screaming

2  and it could be -- it wouldn't be in a calm

3  voice.  It would be in an anxious voice but

4  maybe loud, maybe normal.

5  Q.    I don't know if you can answer this

6  question and if you can't, don't try to

7  patronize me.  Just say I can't.

8  A.    No, sure.

9  Q.    Is he still screaming time out because

10  he knows he's just messed up?

11  A.    He would say things when he was going

12  into an agitated state that sometimes they

13  would be associated with things that would

14  happen or that people had told him previously

15  when he was in an agitated state.  So time

16  out would have been at some point someone

17  told him time out and then he would say that.

18  Someone had probably told him stop hitting

19  and so he would say stop hitting.  He would

20  repeat things sometimes that other people

21  would say.

22  Q.    Would that be something he would scream

23  together?  In other words, time out, stop

24  hitting, stopping yelling?  Is he parakeeting

25  one of you all?

A.    Well, he would say it within that
moment.  So he might yell at one point stop
hitting or no hitting, not usually like lined
up one after the other.  It would be -- the
most common ones would be no hitting ████ or
just no hitting.

Q.    Did he know what that meant?

A.    I think at that point, it's really hard
to say because he was getting ramped up at
that point and it's hard to say.  I think
when he was saying no hitting ████, it was
like I know I shouldn't hit ████ but I feel
like --

Q.    That means hitting himself?

A.    Right, slapping himself or banging his
head.

Q.    It goes on to talk about this outburst
happening between 7:40 and 8:05.  That's like
25 minutes.

A.    Yeah.

Q.    That's kind of --

A.    You know, we would usually do our bursts
from the moment that the first -- they call
it a combined target behavior which is
hitting, any kind of disruptive behavior or

1  self-injury and stuff.  That's when we would

2  time it, start it.  And then we would end it

3  when the last one happened.

4  Q.    This is a pretty significant amount of

5  time, wouldn't you say?

6  A.    But it didn't go that intensity for 25

7  minutes.  It was usually, it would ramp up.

8  It would maybe be 10 minutes of -- and not

9  every time but it might be 5 minutes, it

10  might be 15 minutes but somewhere in that

11  range of the intense part.  And then the

12  remaining part would be, you know, very

13  little.  I think if I remember correctly that

14  to consider it part of a single episode, that

15  there had to be -- and I think it's 1 minute,

16  it may have been 2 but I think it's 1 minute

17  of no behavior and then another episode.

18      So what would happen is like in the

19  latter part -- like let's say in the last 10

20  minutes or 15 minutes or however much, it may

21  be hardly anything.  He may be just calming

22  down but do this (witness indicating) and

23  then nothing happens for another 58 seconds

24  and then he does again and so you can't end

25  the episode.  It goes on until there's a full

1    minute.

2    Q.    So what I'm hearing is the beginning of

3    an episode could be high intensity for 10

4    minutes?

5    A.    Yeah, and this is the other interesting

6    thing.  It would ramp up but it wouldn't be

7    -- typically, it wouldn't be like bam, full

8    blast.  That would be really unusual.

9    Usually it would be -- like you said before,

10   first gear would be the vocalizations.

11   Second gear would be head slapping.  Third

12   geared would be the head banging.  Fourth

13   gear would be aggressiveness.  And it could

14   take even five minutes.

15   Q.    So this could go on for five minutes?

16   A.    Yeah.

17   Q.    And take a break for a few seconds and

18   then start again?

19   A.    Usually what would happen is that it

20   would be a buildup and the buildup could be a

21   minute, it could be five minutes.  It could

22   be somewhere in that range and then it would

23   be the intense part of it for a period of

24   time and then there would be a wind-down time

25   after.

1    Q.    A wind-down time for --

2    A.    For the episode.  And when I say wind-

3    down, like the last --

4    Q.    So it never stopped, it just wasn't as

5    ramped up?

6    A.    Yeah, as long as there was some kind of

7    one of those behaviors whether it's self-

8    injury, aggressiveness or disruption, as long

9    as there's one of those episodes within a

10   minute, you know, it had to be a full minute

11   without any of those and then you would end

12   the episode.  But usually if it says like

13   7:40, 8:05, and I'm not sure exactly.  I'm

14   guessing.

15   Q.    That's fine.

16   A.    But let's say this is a typical thing,

17   it might be 7:40 to 7:45 he gets ramped up.

18   7:45 to 7:55, it's more intense and then 7:55

19   to 8:05, things are calming down.

20   Q.    So on this particular day, it was

21   especially violent.  He did a bunch of stuff

22   on this day.  I mean Sheetrock in the wall,

23   printers, phones.

24   A.    Yeah, this was a severe one, yeah.

25   Q.    And it occurred five or six weeks from

1    the one before?

2    A.    That's right, yeah.

3    Q.    And there could have been some in

4    between but just for whatever reason were not

5    reduced to e-mails because they weren't as

6    severe?

7    A.    Yes, that's correct, yeah.

8    Q.    So the only ones that you really write

9    down are the ones that are severe?

10    A.    Most likely, yeah.  Those would be the

11    severe ones.

12    Q.    I mean the suggestion is not that he

13    went from September the 11th through October

14    the 17th with no episodes?

15    A.    No.

16    Q.    That's not what we're trying to suggest,

17    is it?

18    A.    No.

19    Q.    So approximately how many episodes would

20    there have been between September 11th and

21    October 17th?  And I'm not looking for an

22    exact number.  I just feel like your memory

23    is such that you know about certain periods

24    when it's up, down.

25    A.    I'm thinking that these are the big

```
 1  episodes.  Now an episode could be him
 2  slapping his head three times on September
 3  20th and it was quick and it was over and
 4  nothing happened.  So there could have been
 5  multiple episodes between.
 6  Q.    In that six-week period.
 7  A.    Yeah, yeah.
 8  Q.    Is it fair for me to say it was likely
 9  there were multiple episodes during that
10  period?
11  A.    I would say so, yeah.  And it could have
12  been --
13  Q.    Small?
14  A.    Small, yeah.
15  Q.    Twice a week?
16  A.    I would say maybe one to two a week
17  maybe.
18  Q.    I'm going to show you the next one which
19  for Mr. Clarke's purpose is dated January the
20  2nd.  I'm marking it as D-3 and ask you to
21  take a second to read that.
22  A.    (Witness complies.)
23  Q.    Got it?
24  A.    I think so.
25  Q.    ████'s totals thus far at the top colon
```

1   AGG 30.   Thus far, what does that mean, for

2   the day?

3   A.   I would think.

4   Q.   SIB 1,049.   You all have a counter?

5   A.   We tried to count as best we could.

6   Q.   And what are those again?

7   A.   Self-injurious behaviors, head slaps.

8   Q.   Head slaps, stomach slaps?

9   A.   And head bangs.

10   Q.   Head butts up against the wall?

11   A.   Head bangs, usually his head against the

12   wall or the floor.

13   Q.   Has bruises on stomach and redness on

14   forehead and cheeks that will likely bruise.

15   What's DIS again?

16   A.   Disruptive behavior.

17   Q.   What does a disruptive behavior consist

18   of?

19   A.   It could be anything.   It could be

20   hitting, you know, hitting a table real hard

21   to throwing something.   Putting a hole in the

22   wall would be kind of a more extreme end of

23   that.

24   Q.   Did he curse?

25   A.   No.

1    Q.    Would he say something to you before

2    he directed some activity, violent activity

3    towards you?  You know, I might said F you as

4    I'm coming after you.

5    A.    He might say hit daddy.

6    Q.    That's a substitute for F you or some-

7    thing along those lines?

8    A.    You know, the thing is with ███ I tell

9    you, it wasn't like -- as soon as these

10   things were over, he would be hi, Daddy.  Hi,

11   Daddy.  It wasn't like a typical thing some-

12   one going yeah, I'm fucking mad at my dad and

13   asshole.  It wasn't like that.  It was he had

14   this -- he couldn't verbalize well so he

15   would be frustrated and the frustration would

16   be there and then it would cross a line where

17   it would turn into an outburst.

18        And it was mainly me and Donna because we

19   were the ones there, you know.  And it wasn't

20   necessarily -- it wasn't personal.  At least

21   I didn't take it that way.  It was just we

22   were there and he had this uncontrollable

23   feeling that just took over and then this

24   would happen.

25   Q.    So the last two sentences on this

1    e-mail, ███████ had requested an outing for

2    dinner.  How does he do that?

3    A.    Go out.

4    Q.    Go out.  And I told him that it was his

5    turn to make his dinner tonight.  He knows

6    how to make dinner?

7    A.    Very simple stuff.  Donna was trying to

8    get him to do some really basic things like

9    make a peanut butter sandwich.

10   Q.    Nothing where you are boiling hot water

11   or anything like?

12   A.    No, it was sandwiches and, you know,

13   basic things.

14   Q.    With a knife?

15   A.    No, with I guess a butter knife to

16   spread the peanut butter.

17   Q.    So is he like into breaking knobs and

18   stuff like that?

19   A.    Well, he would use too much force, and

20   it wasn't intentional.  I tell you.  Like one

21   thing when we would go out, we were trying to

22   work with him or even at home, he would use

23   too much force to open doors.  And it wasn't

24   anything other than he wouldn't modulate his

25   strength well and he would use too much

```
 1    force.  So it -- sometimes that would happen
 2    even outside of an outburst.
 3    Q.    So what's interesting here is it says
 4    when Daren tried to put the magnetite
 5    protective cover back on the window after
 6    ████ was able to grab the handle and pull the
 7    magnetite off, so he could pull a handle out
 8    of a socket?
 9    A.    What magnetite is -- do you know what
10    magnetite is?
11    Q.    (Shakes head.)
12    A.    It's basically with our house, we didn't
13    want ████ to throw an object through a
14    window.  And so it was like a plexiglass
15    cover that you put on the inside of windows
16    so that God forbid, if he has an outburst and
17    throws something, it's not going to crash
18    through the window.
19        The magnetite would have a little -- if I
20    remember right, I hope I'm not screwing this
21    up.  But there's a little thing that you
22    could pull on to remove the magnetight and he
23    was trying to pull that off I guess while I
24    was putting it back.
25    Q.    How did he break your beard trimmer that
```

1    night or that day?

2    A.    He threw it.

3    Q.    He just threw it?  Okay.  The next one

4    is -- and by the way, between October 17th of

5    '16 and January 2nd of '17, there's a strong

6    likelihood that he had weekly outbursts

7    during that time period as well, just not

8    significant enough to get written down?

9    A.    Yeah, during that time I would have to

10   look at it.  If it was an episode, you know,

11   it could have just been like a head slap.  It

12   may have been.  I'm not sure.

13        MR. ZIBILICH:

14             The next one is dated May 20th and

15        I'm marking it D-4.  I just passed it to

16        Mr. Parsa.

17   BY MR. ZIBILICH:

18   Q.    I ask that you take a second to read

19   that.

20   A.    (Witness complies.)

21   Q.    Do you have any idea what time of the

22   day this stuff went on that's contained in

23   D-4?

24   A.    It says 3:00 p.m. till -- this must have

25   been a little after 3:00.

1    Q.    Do you know if on this particular

2   Saturday whether McAlister's had been in

3   play?

4   A.    I don't think so but I'm not sure.  I

5   couldn't say.

6   Q.    Do you know if on this particular

7   Saturday laser tag had been in play?

8   A.    I'm not for sure.  I'm not for sure.

9   Q.    Let me ask you this.  When you go do

10   laser tag -- to use the famous New Orleans

11   phrase, it ain't there no more, the one that

12   you all went to.

13   A.    Right, right.

14   Q.    When you went to laser tag, did you pay

15   with cash or credit card?

16   A.    Either one.  Usually -- yeah, either

17   one.  Sometimes cash, sometimes credit card.

18   Q.    If you paid in cash, did you have to

19   sign in?

20   A.    No.

21   Q.    So if you paid in cash, I wouldn't know

22   whether you were there or not?

23   A.    No.

24   Q.    It's not one of those things where you

25   took videos or photos every time you went?

1    A.    Not every time, no.

2    Q.    Sometimes?

3    A.    Sometimes.

4    Q.    The consequence of his behavior which is

5    contained in the e-mail is that he lost

6    outings for the rest of the day.

7    A.    Yeah.

8    Q.    He knew what that meant?

9    A.    Well, --

10    Q.    Or it just didn't happen?

11    A.    Well, I think usually on that kind of a

12    thing he would say -- we would have a plan.

13    Q.    You would what?

14    A.    We would have a plan of where we were

15    going to go for dinner.

16    Q.    You would talk about it hours ahead of

17    time?

18    A.    Mm-hmm.

19    Q.    In about three hours after my nap, we're

20    going to go to McAlister's?

21    A.    Well, we would say we're going to get

22    food at Chili's for dinner and so he would

23    know.  So he would know that we were supposed

24    to go to wherever it was supposed to be or

25    whatever the place was and he would lose the

1  outing.

2  Q.    Are you trying to suggest to me that he

3  was cognizant enough to know that there was

4  actually a consequence to the behavior?

5  A.    I think he did, yeah.  I think afterward

6  he did.  While it was happening, you know, I

7  don't think he was probably in a state of

8  mind to be able to understand that.  But

9  afterward, we would tell him okay,  ███

10 we're not going to get food, let's say, at

11 Chili's tonight and he would know oh, okay.

12 Q.    He would acknowledge that he messed up?

13 A.    He would -- if you were to -- sometimes

14 he would come to me and his way of coming to

15 me, he would say hi, Daddy, hi, Daddy or hi,

16 Mommy.  I think he knew okay, I did something

17 I shouldn't have done.

18 Q.    So that was a first cousin to I'm sorry?

19 A.    No, that was -- he would say I'm sorry.

20 No, sorry.  He would say sorry, Daddy.  Like

21 he wouldn't say I'm sorry, Daddy.  He would

22 say -- no, what am I saying?  Jesus, I'm

23 getting all confused here.

24 Q.    We had this conversation about an hour

25 and a half ago and it wasn't the same.

1    A.     He said hi, Daddy.  He would say hi,

2    Daddy or hi, Mommy.  He wouldn't say sorry.

3    He would not say that.

4    Q.     But you equate hi, Daddy and hi, Mommy

5    to I'm sorry?

6    A.     Correct, I took it that was his way of

7    doing that, correct.

8    Q.     And again between the dates of January

9    the 2nd, 2017 and May 20th of the same year,

10   same, maybe once a week tantrums?

11   A.     Let's see, that was 2017.

12   Q.     Mm-hmm.

13   A.     I wish I could remember this.  I used to

14   know the number of days in each year when he

15   would have an episode and I can't fricking

16   remember.

17   Q.     Okay.

18   A.     But I'm not sure if it was weekly.

19   Q.     I'm going to show you the next one.

20   It's dated June 16th in parentheses Friday,

21   D-5, burst, what does burst mean?

22   A.     Outburst.

23   Q.     Okay.  Got it.

24   A.     Yeah, I think so.

25   Q.     So this burst was an hour, was it not?

1    A.    Yeah, from the beginning to the end.

2    Yeah, from the first of those behaviors to

3    the very end of the behavior, within each

4    minute of that time he had at least one

5    behavior.

6    Q.    That seems to me to be rather signifi-

7    cant energy for one of these outbursts even

8    with some intermittent times to be an hour.

9    Is that significant to you?

10   A.    You know, it's hard to say with this.  I

11   would have to look at like the data exactly

12   if we even have that but I don't think during

13   that time he was going --

14   Q.    Full-blown?

15   A.    Yeah, yeah.  This could have been he did

16   the -- it started, came out and said hit

17   Mommy, began hitting Donna, biting Donna.

18   And then she leaves the house so then he

19   ratchets up inside the house and bangs the

20   stove and bends the burners on the stove.

21   Q.    But it's not shocking to you that an

22   episode such as this one would last nearly an

23   hour?

24   A.    Well, it would be if it was continuous.

25   A lot of times with ███    the most intense

```
 1   part of it would maybe be -- typically was
 2   about 15 minutes or so.  And then the rest of
 3   it could have been ████ laying on the ground
 4   and slapping himself, you know, or doing
 5   anything.  Just there wasn't a full minute,
 6   over a minute where nothing happened.
 7   Q.   Let see if I heard you just now
 8   correctly.  You said it was never for more
 9   than a minute during an entire episode where
10   zero happened?
11   A.   Well, for it to be considered an
12   episode, yeah, to be considered a single
13   episode.
14   Q.   He banged on the stove and bent the
15   burners on the stove.  Those are the knobs?
16   A.   That's actually the burner.
17   Q.   The grill?
18   A.   The grill part which on our stove isn't
19   exactly high most fabulous quality I guess
20   but he was able to grab it and bend it back.
21   Q.   And any earthly idea of how many pounds
22   of force it takes to accomplish that?
23   A.   With our stove, it's probably not a huge
24   amount.
25   Q.   You think you could do it?
```

1   A.   I could do it.  I think my mom could do

2   it.  It's not a real high-quality -- at least

3   at the time it wasn't a real high-quality

4   thing.

5   Q.   Did he know how to turn the stove on?

6   A.   We had -- I'm trying to remember.  We

7   did something to protect from that.  But I

8   never did that, thank God.  That never

9   happened.  And I believe we had things on it.

10  We replaced the gauges on the stove with

11  other things that made it more difficult.  We

12  did something to lessen the likelihood.

13  Q.   Like opening a pill bottle kind of

14  device?

15  A.   Yeah, it was some kind of safety thing.

16  I hope I'm not getting this wrong but thank

17  goodness, he never turned on the stove.  That

18  never happened.

19  Q.   He broke the new toilet lid.

20  Interestingly enough, he had picked up the

21  pieces.  How many pieces did he break the

22  toilet lid into?

23  A.   Boy, we're not sure but there were

24  several pieces of this toilet lid that were

25  put into the garbage can afterward.

1  Q.    I mean is that something he would have

2  used a hammer or he did that with his bare

3  hands?

4  A.    With his bare hands.

5  Q.    You could do that?

6  A.    I don't know.  I'm out of shape.  For

7  him, with the toilet lid wasn't -- it would

8  be doable I guess for me to do it.  It would

9  just be a matter of him, you know, getting it

10  off and slamming it on the ground but it did

11  take a fair -- a certain force to do that,

12  yeah.

13  Q.    Is he 200 pounds by this time?  We're

14  talking about summer of 2017?

15  A.    Yeah, he would be 200.

16  Q.    250?

17  A.    Getting close to that, yeah.

18  Q.    Do you recall the interview with

19  Sergeant Dowling and you and your wife after

20  the incident?

21  A.    Yeah.

22  Q.    Do you recall telling him that the

23  outbursts went from every day to once a week

24  to twice a week to once a month, to once

25  every two months and now once every few

1    months.

2    A.    Yeah.

3    Q.    Do you recall telling Sergeant Dowling

4    that there had not been any recent outbursts

5    in the last three months?

6    A.    That's correct, yes.

7    Q.    And that's true?

8    A.    That's true.

9    Q.    Is seems to me that we don't have a

10   consistent time line here, not that I'm

11   looking for a mean or a median or any of that

12   sort of stuff.  Sometimes you report some-

13   thing after three months.  Sometimes you

14   report something after three weeks.  Was that

15   the way of the world that his episodes were

16   not necessarily time contiguous or time

17   consistent?

18   A.    You mean like in terms of the length of

19   the time?

20   Q.    Well, the length of the time for sure.

21   I mean we've seen that.  There's no average

22   amount of time for an outburst.

23   A.    Yeah.

24   Q.    But there's also no average time span in

25   between outbursts.

1  A.  Well, it was getting less frequent.  The

2  frequency was improving from 2017 to 2018, it

3  improved, much fewer episodes and then 2018

4  to 2019, there were much fewer episodes.

5  Q.  Do you recall an outburst, what's the

6  name of the haircut joint?

7  A.  Super Cuts.

8  Q.  At Super Cuts?

9  A.  It wasn't an outburst there.

10  Q.  So if I told you there was an episode

11  five days before the date that brings us

12  here, you would not disagree with that?

13  A.  Yeah, you're talking about the Super

14  Cuts incident with the toilet paper roll?  He

15  didn't have an outburst there.

16  Q.  But if I told you it was five days

17  whether you want to call it German chocolate

18  cake doesn't matter to me.  If I told you it

19  happened five days before this incident that

20  brings us here today, would you disagree with

21  me?

22  A.  I don't recall any outbursts five days

23  before.

24  Q.  If I told you you all were in the Super

25  Cuts and something happened five days before,

1    would you disagree with me?  Am I crazy?  Is

2    it five days?

3    A.    Yeah, I would disagree in that --

4    Q.    I only care about the date.  I don't

5    care about what you label it.

6         MR. CLARKE:

7              Whatever happened at Super Cuts, did

8         it happen five days before?

9         THE WITNESS:

10             Oh, okay.

11        MR. CLARKE:

12             If you recall.

13        THE WITNESS:

14             I see.  Yeah, that happened at Super

15        Cuts.

16   BY MR. ZIBILICH:

17   Q.    What happened there?

18   A.    After his haircut, we went into the

19   bathroom and he was in the -- sitting on the

20   toilet for several minutes and the toilet

21   paper roll was attached to the wall and he

22   used -- from what I remember, he used a lot

23   of force to monkey around with that and it

24   came out of the wall.

25   Q.    I'm going to show you what I'm marking

1    as D-6.  Does that look like what it is you

2    just described?

3    A.    Yeah, he was pulling on the toilet paper

4    roll and it came out of the wall.

5    Q.    You thought that took force or no?

6    A.    It took force, yeah.

7    Q.    It took significant force, did it not?

8    A.    Yeah, he did things a lot of times with

9    too much force, that's correct.

10   Q.    I'm going to show you what I'm marking

11   as D-7.  D doesn't stand for defendant, it

12   stands for Daren and ask you if you recognize

13   that photograph?

14        MR. CLARKE:

15            Listen to the question first.

16        MR. ZIBILICH:

17            There he goes.

18        THE WITNESS:

19            Can you repeat the question?

20   BY MR. ZIBILICH:

21   Q.    Do you recognize that photograph?

22   A.    It looks like it's similar to this one.

23   Q.    Except it shows the length of the bolts

24   into the wall, does it not?

25   A.    Yes.

1    Q.    And you would agree with me, would you
2    not, that this is not something you can just
3    delicately pull off the wall?  It's going to
4    take some significant force?
5    A.    It would take some force, yes, mm-hmm.
6    Q.    And you don't equate the force that was
7    utilized by ▮▮▮ on that day at the Super
8    Cuts to be episodic?
9    A.    You know, the intention for me -- and
10   this gets into a gray area but for me, an
11   aggressive or I should say a disruptive
12   behavior was one where it's an intentional
13   I'm going to bang on this thing and knock it
14   out of the wall.  And from my memory of this,
15   it wasn't that.  In fact, I know it wasn't
16   that.  It was him monkeying with it and then
17   he somehow got it detached from the wall.  It
18   did take a lot of force but it was him
19   playing around with it with too much force.
20   Q.    So we talked about the burners on the
21   stove that he bent.
22   A.    Well, he bent it up.
23   Q.    Up, down, sideways, he bent it.
24   A.    I should say because it wasn't -- from
25   my memory of it, it wasn't like he took this

1  metal thing and bent the metal. He bent it

2  up off of the stove so it was at an angle.

3  Q.   If you had to guess as to what took more

4  force to do, the bending of the burners or

5  the yanking the toilet paper container out of

6  the wall?

7  A.   I guess it would probably be -- I guess

8  maybe the toilet paper. But I guess the

9  burner, the intention was to bend the burner.

10  Q.   So what's the difference? What's the

11  difference in --

12  A.   In his thought? One is him being angry

13  and a burst really agitated and that

14  happening in association with that. The

15  Super Cuts, he wasn't agitated. He was

16  playing with it. He was trying to get the

17  thing out and he did use too much force but

18  it wasn't the intention within an angry

19  episode to cause property destruction. It's

20  a fine line, I know.

21  Q.   So if you were guessing, you would guess

22  the bending of the burner was more connected

23  to anger than the pulling of the toilet paper

24  dispenser out of the wall?

25  A.   Yes, that's correct.

1    Q.    And you would admit that that's a guess?

2    A.    Well, he wasn't angry at Super Cuts so

3    that part wouldn't be a guess.

4    Q.    So prior to Super Cuts, you had only

5    seen some sort of forceful violence

6    associated with anger?

7    A.    No, I had seen it before.  With using

8    too much force, he did that.  We were trying

9    to work with him.  He did that even outside

10   of angry outbursts.

11   Q.    I'm going to show you what I'm marking

12   as D-7 which is an August 26th episode with

13   an e-mail dated 6:31 p.m.

14   A.    Okay.

15   Q.    So this is Saturday.  Did we go to laser

16   tag earlier that day?

17   A.    It's possible.

18   Q.    But don't know?

19   A.    I don't know for sure.

20   Q.    I guess we would consider it lucky that

21   this episode happened at a Popeye's as

22   opposed to at laser tag?

23         MR. CLARKE:

24             Object to the form.

25         THE WITNESS:

1          Well, it's rough either way.

2    BY MR. ZIBILICH:

3    Q.    I could be wrong but I would envision --

4    and you correct me if I'm wrong.  I would

5    envision more people being at the laser tag

6    at 4:30 in the afternoon than at the Popeye's

7    in Kenner?

8    A.    Yeah, I would say we would go to

9    Popeye's, you know, when it's less crowded.

10   So yeah, laser tag would have probably been

11   more crowded at that time.

12   Q.    Did you see the part in this episode

13   where the lady was blocking ████ exit to

14   get out?

15   A.    Yeah, she happened to be standing there

16   and so she was there.

17   Q.    And he was in the middle of an episode?

18   A.    It had just started.

19   Q.    The scariest part is when it just

20   starts, right?

21   A.    Well, the scariest is about three

22   minutes in.  It's usually we get some time to

23   kind of -- where things ratchet up and then

24   if it reaches the most intense level, it's

25   typically, again this is typically would be

1    maybe a few minutes into it.

2    Q.    This woman could have been hurt bad by

3    him?

4    A.    It's possible.

5    Q.    Did there ever come a time after an

6    episode like this that is described on August

7    the 26th where you and the wife sat down and

8    said man, we're putting a lot of people in

9    danger.  We got to stop taking him to these

10   places.

11   A.    I tell you, it's such a balance.

12   Q.    What balance are we talking about?

13   A.    The balance is what's best for ▇▇▇▇

14   Q.    Your kid's happiness versus the possible

15   danger to others?

16   A.    Well, it's a balance.  He's my son.  I

17   love him.  I want him to have a full life.  I

18   don't want to lock him in the house and

19   putting him in a residential place when he's

20   improving is a very hard decision to make and

21   especially he has such limited verbal skills.

22   If something bad happened to him, he would't

23   be able to tell us.

24        But then also we had to balance it with

25   the public safety.  That was always on our

1   mind.  He did not want anyone hurt.  At the
2   very least, we did not want anybody hurt.
3   Q.    Of course, you didn't.
4   A.    That was our huge fear.  So that's
5   something, yeah, Donna and I really wrestled
6   with this all the fricking time.  We wanted
7   ███ to have a good life, do the things that
8   brought him joy but not hurt anybody.  We
9   didn't want anyone to get injured and we
10  tried to work things in a way that would
11  avoid that as best as we could.
12  Q.    So the same e-mail that says Dad was
13  able to get ███ out of Popeye's but in the
14  parking lot he hit and tried to bite Dad
15  multiple times.  He also grabbed Mom's hair
16  and pulled her towards him with two bite
17  attempts on Mom's head.  That could have just
18  as easily been that lady's hair that he was
19  grabbing?
20  A.    Well, he was in the car when this
21  happened.  You have to picture our car.  We
22  got this Honda Pilot.  His spot was the third
23  row and we had a safety harness for him.  And
24  so he got in the third row.  I was trying to
25  get him into his safety harness with the back

1   open and then get him attached to where the

2   safety harness would attach.  And in the

3   process of that, that's where the bite

4   attempts, the bites happened.

5   Q.   But the episode starts in a public

6   place?

7   A.   Yeah.

8   Q.   And as I understand your balance, you

9   want to balance the public safety as against

10  your son living as full a life as he possibly

11  could?

12  A.   Yes.

13  Q.   While recognizing that somebody could

14  have easily been hurt in any one of these

15  episodes and hurt bad?

16  A.   Well, we were trying to do everything we

17  could to avoid that.

18       MR. ZIBILICH:

19            All right.  The next one is D-8,

20       September 19th, Mr. Clarke.

21  BY MR. ZIBILICH:

22  Q.   You take a second to read that.

23  A.   Okay.

24  Q.   So the bottom line here is this is two

25  days in a row of bad stuff?

1    A.    Yeah.

2    Q.    Two days in a row of significant

3    tantrums?

4    A.    Yeah.

5    Q.    Luckily these tantrums happened at home?

6    A.    That's correct.

7    Q.    If either one of these tantrums would

8    have happened out in the public, this could

9    have had a very bad ending?

10   A.    Yes, something bad could have happened,

11   yeah.

12   Q.    And you're still a proponent of the

13   balancing act?

14   A.    Yeah, I love my son.  I love my son.  I

15   wanted him to have -- I wanted him -- I

16   didn't want to lock him in the house, you

17   know.

18   Q.    He hit the TV multiple times.  What did

19   he hit the TV with?

20   A.    His hand, just open hand.

21   Q.    Like the screen?

22   A.    No, he didn't hit it with a fist.

23   Q.    The screen?

24   A.    Yeah.

25   Q.    Well, I can pip a pinball machine and

```
 1   get just as much action out of the bottom of

 2   my palm.  I'm showing my age again?

 3        MR. CLARKE:

 4            Do they have pinball machines

 5        anymore?

 6        MR. ZIBILICH:

 7            Just at the illegal places I'm

 8        going to drop you off at.

 9        THE WITNESS:

10            It doesn't take a heck of a lot to

11        --

12   BY MR. ZIBILICH:

13   Q.   Go ahead.  Go for it.

14        MR. CLARKE:

15            No, no, no.

16        MS. PARSA:

17            It doesn't take much to take your

18        hand and hit a screen, it will break it.

19        MR. CLARKE:

20            You're thinking about TVs when you

21        were young, Franz.

22        MR. ZIBILICH:

23            When I was young.

24   BY MR. ZIBILICH:

25   Q.   How did he break the toilet tank lid?
```

1   A.    Picking it up and throwing it on the

2   floor.

3   Q.    Okay.  The next one is D-9.  It's

4   October 23rd and as with the other questions

5   that I asked you, between the various dates,

6   you certainly believe that there were

7   multiple episodes in between each date?

8   A.    It could have been head slaps, yeah.

9   There could have been.

10  Q.    It certainly wasn't no episodes?

11  A.    Very unlikely, yeah, yeah.

12  Q.    Got it.

13  A.    I think so.

14  Q.    So this is yet another situation barely

15  a month after the last episode that was a

16  two-day tantrum where we have another two-day

17  tantrum here?

18  A.    That's correct.

19  Q.    Do you find that just a little bit

20  inconsistent with what it is that you told

21  Sergeant Dowling with the spreads between

22  tantrums?

23  A.    Well, this is 2017.

24  Q.    I got you.

25  A.    When I was talking to Sergeant Dowling,

1    that was talking that was 2019.

2    Q.    So when you said what you said to

3    Sergeant Dowling, you believe in your mind

4    that it was limited to, what, just a few

5    months before his death?

6    A.    Well, in 2019 --

7    Q.    Because it doesn't have a time thing on

8    it.

9    A.    Now what's that again?

10   Q.    You're not talking in terms of time

11   boundaries?

12   A.    I'm sorry.

13   Q.    Of time, of time boundaries.  In other

14   words, it says here he stated that the

15   outbursts went from every day to once a week

16   to twice a week to once a month to once every

17   two months and now once every few months.

18   A.    Yeah.

19   Q.    You said there had been no recent

20   outbursts in the last three months.  So is

21   the time period limited just to the previous

22   three months or does it go further back?  It

23   has to go further back.

24   A.    Well, yeah.  In 2019, his previous

25   episode from January 19, 2020 was in October

1  and then the episode prior to October that
2  I remember was July of 2019.
3  Q.   Okay.  So this says that on Sunday
4  October 22nd, ███ had two AGGs.  He hit Mom
5  once in the chest at Adventure Quest when he
6  was unsuccessful in getting the minature golf
7  ball up the ramp into the Aztec stone god's
8  mouth.  Prior to this aggression, he had a
9  drop and had been tantruming about not
10 getting the ball in the hole.  Were you there
11 that day?
12 A.   I believe I was.
13 Q.   You don't remember this?
14 A.   I believe I should have been.  Usually
15 -- I don't remember Donna taking ███ to
16 laser tag by herself so I would think I would
17 have been.
18 Q.   Mom was telling him that it was okay and
19 that we don't always get everything right
20 when mom got hit.  Later on the day, ███
21 came after Daren and hit him once before
22 riding bikes.
23     So this is one that happens in public.  I
24 assume that the Adventure Quest was not open
25 just for you, your wife and ███

1    A.    Right, right.

2    Q.    I can safely assume, can I not, that

3    there were other people there?

4    A.    Yeah, there may have been, yeah.  I'm

5    sure there were.  Now with Adventure Quest

6    like with laser tag, we would try to go there

7    when there were few people.  We would go

8    there typically when they had opened or soon

9    to their opening time.

10   Q.    So it's safer when there's only a few

11   people that can potentially get hurt than

12   when there's a lot of people that could

13   potentially get hurt?

14   A.    Well, it's more likely to happen when

15   there's a lot of people.

16   Q.    It happened on this day.

17   A.    Yeah.

18   Q.    And your belief is there was not a lot

19   of people?

20   A.    Yeah, it can still happen but it's less

21   likely to happen.

22   Q.    But it did happen?

23   A.    It did happen, yeah.

24   Q.    And again I ask you as of this date when

25   it happened, in spite of your safety concerns

1  concerning going when there are fewer people
2  there, you nonetheless said I'm going to keep
3  doing this even though it's dangerous?
4  A.    It's still a balancing act.  I'm going
5  to sound like a broken record.
6  Q.    No, no, no.  You're entitled to do that.
7  You're not worried about the legal ramifica-
8  tions they could have had on you and your
9  wife --
10  A.    Sure.
11  Q.    -- had he hurt somebody else?
12  A.    Absolutely, that was in my mind the
13  whole time, yeah.
14  Q.    But it didn't stop you from going to
15  these places?
16  A.    Because we tried to do the best we
17  could.  We did things to try to lessen the
18  risk and it's because we loved our son.
19  Q.    Okay.
20  A.    I guess the flip side of that is, we
21  keep him locked up in the house and that
22  doesn't seem like a good alternative either.
23  Q.    I guess his happiness and your love for
24  him and wanting him to be happy trumped the
25  potential safety to others?

1    A.   No, if it was trumped, we wouldn't have

2    given a darn about the safety of others.  We

3    did and we tried to do things to avoid that

4    risk as best we could.

5         MR. ZIBILICH:

6             The next one is D-10 which,

7         Mr. Clarke, is dated November 28th and

8         November 29th allegedly written on

9         November 29th at 9:15 p.m.

10   BY MR. ZIBILICH:

11   Q.   I'm just a little confused.  On November

12   28th ███ returned home from looking at

13   houses?  First line, what does that mean?

14   A.   That means I would sometimes take ███

15   out in the car and ███ called it looking at

16   houses or just houses and he would be in the

17   back row of the car in the safety harness and

18   we would listen to music and drive around the

19   neighborhood.

20   Q.   So this is yet another occasion where we

21   had multiple tantrums over a two-day period?

22   A.   That's true.

23   Q.   And on this one, a neighbor got lucky by

24   being able to block --

25        MR. CLARKE:

```
 1            Object to the form.
 2   BY MR. ZIBILICH:
 3   Q.    A neighbor was fortunate not to get hit
 4   by ████  although ████ was trying to hit him,
 5   correct?
 6   A.    That's correct.
 7   Q.    As to all of these episodes that we've
 8   talked about, I notice that you've never
 9   called for the police.
10   A.    No.
11   Q.    Why is that?
12   A.    We were afraid something bad could
13   happen.
14   Q.    Like?
15   A.    He could get possibly injured.
16   Q.    That was the only motivation for not
17   calling the police?
18   A.    That's the main one I can think of right
19   now.
20   Q.    Did the police in your neighborhood know
21   about ████
22   A.    Donna met with the St. Charles Parish
23   Sheriff's Office in 2018 because we were
24   worried that if they got called, they
25   wouldn't understand ████  So that was her
```

```
 1   way to try to get them to know ████
 2   Q.    And as I understand, and of course this
 3   is for another day, your wife believes that
 4   she talked to Sheriff Champagne himself or do
 5   you know that?
 6   A.    I don't know.  I remember that she spoke
 7   with Officer Fahrig was the one who came to
 8   the house.  I hope I'm not mangling his name.
 9   Q.    That's all right.  If you won't, Clarke
10   will, trust me.
11        MR. ZIBILICH:
12             You would have no shot at Champagne.
13          Trust me on this, no shot.
14   BY MR. ZIBILICH:
15   Q.    So on this day, November 29th, he hits
16   your wife 25 times, grabs her hair and bites
17   her 10 more times.  That's what it says?
18   A.    I believe so, yes.
19   Q.    And how is she going to control him if
20   he charges at one of the neighbors who are
21   trying to intercede?
22   A.    Yeah, I know.
23   Q.    That's that balance thing again?
24   A.    Balance, yeah.  It's -- one thing I
25   should say, too, is when ████ had these
```

1    episodes, he was in a huge amount of
2    distress.  He was --
3    Q.    That makes it better?
4    A.    No, it makes me -- you know, to see the
5    -- he didn't ask to have autism.
6    Q.    I got it.
7    A.    And he didn't ask for this.  He went to
8    the hospital.  He had workers working with
9    him.  He was struggling and trying to deal
10   with a horrible situation and unfortunately
11   these episodes happened as an outgrowth of
12   his condition.  So yeah, I guess I had to
13   throw that in.
14   Q.    That's okay.
15        MR. CLARKE:
16            You doing lunch at any time?
17        MR. ZIBILICH:
18            I could take a break now.
19        MR. CLARKE:
20            I mean if you're at a stopping
21   point.
22        MR. ZIBILICH:
23            I'm not but it's okay.  Unlike you,
24   I will clear my head and I will remember
25   where I was.

1               (Off the record 12:22 p.m.

2            Back on the record 1:10 p.m.)

3        MR. ZIBILICH:

4            There is two D-7s.  We just changed

5        one to D-7A.

6    BY MR. ZIBILICH:

7    Q.    I'm going to get off this train as soon

8    as Jeffrey brings me copies of what I want

9    but since they're not here, I'm going to ask

10   you about what I have marked as D-11 which

11   talks about an event on Saturday, December

12   the 30th.  And it's also got some other dates

13   on here as well we'll talk about after you've

14   had a chance to read it.  Got it?

15   A.    Yes.

16   Q.    So this particular exhibit talks about

17   an array of incidents which occurred December

18   21st, December 22nd, December 25th, December

19   26th and December 30th, correct?

20   A.    That's correct.

21   Q.    And the bottom line is that he has

22   tantrums of all different types over this

23   time period?

24   A.    That's true.

25   Q.    Short ones, long ones, intense ones,

1   less intense ones?

2   A.    Yes.

3   Q.    Not a lot of predictability as to when a

4   tantrum starts, how long it's going to last.

5   Is that fair?

6   A.    Yeah, I would say that the time, yeah,

7   you couldn't tell necessarily.  The length of

8   time could vary.  Now like the 8:08-to-9:00-

9   o'clock one is the longest one, that's the

10  most severe one and it's hard to say how much

11  time was in the intense part of the outburst.

12  Q.    Well, we can tell it's significant

13  because of the totals that I added up, 110

14  head bangs, 93 head slaps, 93 DISs, two holes

15  in the wall, two AGGs to Dad and three BOs to

16  Dad, three drops.  Drops is just when he hits

17  the floor?

18  A.    Yeah, tantrum and going to the floor,

19  yeah.

20  Q.    But my question is really behind when a

21  tantrum starts, I was about to compare you to

22  a weatherman but that would be unfair because

23  the weatherman is wrong 50 percent of the

24  time and they still get the same amount of

25  pay.  But using that as an almost analogy --

1    A.    Sure.

2    Q.    You can't predict once a tantrum starts

3    whether this is a 4-minute version, a

4    9-minute version or 50-minute version?

5    A.    It would be difficult to tell.  Some-

6    times with the head banging, and I'm going to

7    look through this again but once it got to

8    the head banging, then it was going to be

9    more likely to be an intense one.  But --

10   Q.    So the commonality if I heard you

11   correctly just now is, if head banging is

12   involved in the first moments of a tantrum,

13   there's a little bit more predictability

14   about what will happen next?

15   A.    Yeah.

16   Q.    I'm now going to mark this next exhibit

17   as Exhibit D-12 and it's very simply a copy

18   of a lawsuit.  And I'm just going to guide

19   you because we're not going to sit here and

20   read this whole thing but have you had the

21   opportunity to read the lawsuit?

22   A.    No, I haven't.

23   Q.    You've never read it?

24   A.    No.

25   Q.    So you have no idea whether the

1    allegations in here are factually accurate?

2    A.    I relied on my attorneys.

3    Q.    Okay.

4         MR. CLARKE:

5              And let me interpose an objection

6         that I don't -- he's testified he hasn't

7         read it.  Information that I have told

8         him about the complaint is obviously

9         privileged so --

10        MR. ZIBILICH:

11             I'm not looking for that.

12        MR. CLARKE:

13             Okay.  So understand if he asks you

14        questions about things, it's not what I

15        have talked to you about or what I have

16        explained to you.

17        THE WITNESS:

18             Okay.

19   BY MR. ZIBILICH:

20   Q.    So you're telling me you've never read

21   this?

22   A.    Correct.

23   Q.    So we're going to start at the

24   beginning.  Paragraph 2 says E.P. was the

25   only child of Donna Lou and Daren Parsa.

1  I've never asked you this and it doesn't
2  really matter.  The child's not adopted, is
3  he?
4  A.    No.
5  Q.    Both of whom were present when he died
6  before their eyes.  He was held down in a
7  prone position on his stomach, handcuffed,
8  shackled, arms and legs held down, head,
9  shoulder and neck encircled by the arm of a
10 deputy with JPO deputies applying their own
11 body weight as a restraint.  Is that
12 suggestive of more than one deputy applying
13 their own weight as a restraint at one time
14 or can we go back to how you answered the
15 question a couple hours ago that there was
16 only one deputy on him at any point in time?
17      MR. CLARKE:
18          Object to the form.
19 BY MR. ZIBILICH:
20 Q.    Okay.  You can answer it.
21 A.    When I watched the video, it looked like
22 there was one deputy sitting on him.  And
23 then after a period of time, then he was
24 replaced by the second deputy on him.  And
25 then there were other deputies toward the end

1    of this episode who crowded around the scene

2    but were not physically, you know, sitting on

3    top of him.

4    Q.   If I were to point at a couple of

5    deputies in this room, could you tell me

6    when, if ever, they knew that E.P. was

7    autistic?

8    A.   I told the first deputy that he was

9    autistic.

10   Q.   And that was the first one on the scene?

11   A.   First one, that's correct.

12   Q.   Do you have any way of knowing whether

13   the second, third, fourth, fifth or sixth

14   deputy upon arrival on the scene knew that

15   E.P. was autistic?

16   A.   We saw the first deputy call in for

17   backup but I don't know exactly what he said.

18   Q.   So the question is still the same.   Do

19   you know for sure when it is, if ever, that

20   the other deputies who arrived on the scene

21   learned that EP was autistic?

22   A.   Yeah, I'm not sure if they learned that.

23   Q.   You don't know if they knew?

24   A.   Yeah.

25   Q.   And if they did know, you don't know

1   when they knew?

2   A.    Correct.

3   Q.    Or how they found out?

4   A.    Right.

5   Q.    Which brings me to the next question.

6   At any point in time as deputies were

7   arriving, were you announcing to any of them

8   by the way, ████ is my son down there and

9   he's autistic?

10  A.    No, I wish I had.  I wish I had.

11  Q.    So I'm not grading your paper.  I'm not

12  going to grade --

13  A.    I know.

14  Q.    -- the New Orleans Saints football

15  quarterback display yesterday.  I'm not going

16  to Monday-morning-quarterback what anybody

17  did.

18  A.    Sure.

19  Q.    But the way you just answered that led

20  me to believe that why didn't you?

21  A.    I was in shock.  That's all I can say.

22  I was in shock.  I was in disbelief thinking

23  I can't believe this is happening.  I was out

24  of breath.  I wish I had.  I wish I had been

25  in the state of mind at that point where I

1    had said those things.

2    Q.    Okay.  I'm going to go to Paragraph

3    No. 5.  It's on Page 2.  It says the physical

4    restraint of E.P. in JPSO custody began with

5    a 6'3", very large over-300-pound deputy

6    taking E.P. to the ground, striking him and

7    then sitting on E.P.'s back.  Is this some-

8    thing you saw?

9    A.    I saw it in the video.  This is one of

10    the videos I saw.

11    Q.    So you saw it on the video?

12    A.    Yeah.

13    Q.    Paragraph No. 6, I'm going to go to the

14    last line.  Did ███████ have hypotonia?

15    A.    He was never -- you know?  There was one

16    -- when he was three, and I hope I'm not

17    screwing this up but he saw a neurologist who

18    I believe may have said something about

19    hypotonia but as far as I recall, there was

20    no -- I don't recall any diagnoses after that

21    but children with autism frequently have

22    hypotonia.

23    Q.    And I agree with that statement, not

24    that it matters what I agree with, but you

25    can't swear under oath right now whether or

1    not your son was actually diagnosed with

2    hypotonia?

3    A.    I would have to look at that.  Yeah, I

4    guess right now I can't because it would be

5    that neurology report from when he was three

6    that I think might have said something -- did

7    say something along those lines but I

8    couldn't swear a hundred percent under oath.

9    Q.    Paragraph No. 8, next page, Page 3,

10   during that 9 minutes and 6 seconds, I take

11   it that you believe it's 9 minutes and 6

12   seconds from either viewing or timing the

13   video?

14   A.    I believe so, yeah.

15   Q.    There was several clear and distinct

16   opportunities when E.P. was secured, was

17   calm, was not actively resisting.  How many

18   clear and distinct opportunities are you

19   talking about here?

20   A.    Well, when the first deputy got on top

21   of ████, ████ calmed down.

22   Q.    For how long?

23   A.    It was I would say from maybe after the

24   first minute, Donna was actually holding his

25   hand and ████ would not be allowing anyone to

```
1   hold his hand if he wasn't in a more calm

2   state.

3   Q.    How long was he calm?

4   A.    I would say from -- let's see.

5   Q.    Here I'm looking for seconds.

6   A.    Oh, sure.  God, I would have to look at

7   the video to really be specific.  But I would

8   say roughly I guess from a minute after the

9   first deputy did and then the other deputies

10  showed up.  Let's see, maybe about five

11  minutes after the first deputy got there.

12  Again this is just me approximating.  And

13  during most of that time, you know, Donna was

14  holding ████ hand so I would guess at least

15  four to five minutes that he was calm.

16  Q.    He was calm for four or five minutes?

17  A.    I would think.  Yeah, for him to be

18  holding Donna's hand and he heard fire truck

19  and to say he heard a fire truck sound, that

20  means if he's in the middle of a burst, he

21  wouldn't be attuned to things going on

22  externally and saying something like that.

23  Q.    Did you hear your wife during that four

24  or five minutes talking to ████

25  A.    No, I was standing just maybe a few feet
```

1    away.

2    Q.    She didn't utter a word?

3    A.    No, she was I think talking to him.

4    Q.    What was she saying?

5    A.    I don't know.  I think it was something

6    along the lines of it's going to be okay,

7    ███████    It's going to be okay.  You're going

8    to be okay, things of that nature.

9    Q.    How about calm down, ██████

10   A.    Don't think she -- as far as like -- it

11   wasn't in a raised voice.

12   Q.    How about calm down, █████?

13   A.    She wouldn't say -- I don't think she

14   would -- it would be more along the lines I

15   think it's okay, be calm.  It wouldn't be a

16   direct order.

17   Q.    So you're basing your answer based on

18   things that you have heard her say to him in

19   the past?

20   A.    Correct.

21   Q.    In other scenarios?

22   A.    That's right.

23   Q.    You're not basing is it on your recall

24   of this incident?

25   A.    No.

1   Q.    As a matter of fact, you can't tell me

2   under oath one way or another what she was

3   saying --

4   A.    Right.

5   Q.    -- while she had his hand held?

6   A.    That's right.

7   Q.    And as a matter of fact, during a lot of

8   the time where she had his hand held, you

9   were several feet away?

10  A.    I was just a few feet away.

11  Q.    How many is a few?

12  A.    Maybe about three or four.

13  Q.    Closer than you are to me right now?

14  A.    About this distance I would think.

15  Q.    Go to Page No. 6.  I'm going to read the

16  last sentence.  At all relevant times herein,

17  they were deputies -- which I think he wants

18  to say there were deputies, got to always

19  correct him, of the JPSO who were present at

20  the scene of the incident that resulted in

21  the death of E.P.  Does 1 and 2 are the JPSO

22  deputies who told Donna Lou and Daren they

23  could not leave the scene and go to the

24  hospital where their son was.  Is anybody in

25  this room that said that to you?

```
 1   A.    I don't recognize that person.
 2   Q.    Is that the same as saying to me that
 3   none of the deputies in this room said that?
 4   A.    I can't say that either.  I can't say
 5   for sure.
 6   Q.    You can't say either way?
 7   A.    No.
 8   Q.    Can you describe how many people it was
 9   that did say that?
10   A.    There was -- I remember one person.
11   Q.    One?  Male or female?
12   A.    Male.
13   Q.    Male?  Can you describe him at all?
14   A.    Probably in his 30s I guess and maybe
15   about medium height, maybe five ten but that
16   is me guessing.  I was still in a state of
17   shock at this point but this was after --
18   when we were told we couldn't go to the
19   hospital is when ███ was -- the ambulance
20   had left.
21   Q.    Obviously you're not looking to go to
22   the hospital until after ███ gone?
23   A.    Correct, yeah.
24   Q.    And how long was ███ gone when you made
25   your attempt to go to the hospital?
```

```
 1   A.    We had -- we got a call -- no, Donna
 2   spoke on the phone with an ER person who said
 3   your son is in cardiac arrest.  You need to
 4   get here now.
 5   Q.    So my question is still the same.  How
 6   long after ███ was taken from the scene was
 7   it that you attempted to leave the scene?
 8   A.    To that part?  It would have been the
 9   time it took for the -- well, first when the
10   ambulance left, we were trying to figure out
11   where the ambulance was going.  And --
12   Q.    What did you do to attempt to figure
13   that out?
14   A.    Asked people, ask deputies.
15   Q.    Who did you ask?
16   A.    I believe Donna did.
17   Q.    You didn't?
18   A.    I didn't.
19   Q.    So the question is still the same.  How
20   long after ███ left the scene was it when
21   you first attempted to leave the scene and
22   was told no?
23   A.    I would say -- again this would be a
24   guess but it would be from the time the
25   ambulance left to when the ambulance got to
```

1  the emergency room which was East Jefferson

2  Hospital which is I'm guessing maybe --

3  Q.    Six minutes?

4  A.    Yeah, probably that long.

5  Q.    So what did you do during those six

6  minutes?  If you didn't attempt to leave

7  during those six minutes, what were you

8  doing?

9  A.    I'm just standing there.  Donna's trying

10  to find out where they're taking ▓▓▓.  I'm

11  just standing there.

12  Q.    Why didn't you just get in your car?

13  A.    I think we didn't know where he was

14  going yet.  We didn't know yet.  And so once

15  we found out where he was, he was at East

16  Jeff and that the nurse and I believe Donna

17  got the phone -- the nurse -- again I'm not a

18  hundred percent on this but I believe the

19  nurse from the emergency room must have

20  called, somehow I believe it was the

21  deputies, somehow spoke with the JPSO person.

22      And then the JPSO, I guess the nurse was

23  trying to get information about ▓▓▓ and so

24  the deputy gave the phone to Donna and then

25  at that time, the nurse from the emergency

1   room said your son is in cardiac arrest and

2   you need to get here.  And then I asked a

3   deputy who was standing next to where we

4   were, we need to go and he said no, this is a

5   crime scene.  We have to get clearance from

6   somebody.  And so --

7   Q.    What made you tell him you needed to go.

8   Why didn't you just go?

9   A.    I wish I had.  Honest to God, I wish I

10   had.

11   Q.    So the nurse from the hospital didn't

12   call your wife because she didn't know your

13   wife's number.

14   A.    No, no.

15   Q.    The nurse called a JPSO --

16   A.    JPSO.

17   Q.    -- deputy on the scene who was kind

18   enough to hand the phone to your wife?

19   A.    Right, right.

20   Q.    Now as I read Paragraph No. 25, you had

21   a psychologist on the scene?

22   A.    That's right.

23   Q.    How did that psychologist get on the

24   scene and from where?

25   A.    That's Dr. Hamilton.

```
 1    Q.    That was my next question.  You saved
 2    me one.
 3    A.    And Donna was calling when ████ was in
 4    the ambulance frantically calling anybody to
 5    try to find anything.  She was just
 6    frantically trying to figure out what -- any
 7    kind of help because we didn't know what was
 8    going on.
 9    Q.    Did you hear this conversation?
10    A.    I heard Donna talk to Dr. Hamilton and
11    Dr. -- I didn't hear the whole conversation
12    on the phone.  I know she was calling Dr.
13    Hamilton and speaking to her.  And then Dr.
14    Hamilton drove from Norco where she lives out
15    to the scene.
16    Q.    And you were still at the scene?
17    A.    I was still at the scene.
18    Q.    And Norco is 20-plus minutes away?
19    A.    Yeah.
20    Q.    So that six-minute estimate before
21    doesn't really add because you didn't try to
22    leave after six minutes because the
23    psychologist wasn't there yet?
24        MR. CLARKE:
25             Object to the form.
```

1    BY MR. ZIBILICH:

2    Q.    Let me break it down.

3    A.    Yeah.

4    Q.    You told me a few minutes ago that you

5    surmise, for lack of a better word, that the

6    ambulance went straight to the hospital.

7    A.    Yeah.

8    Q.    We guessed that that was about six

9    minutes away.

10   A.    Yeah.

11   A.    And that at that moment almost, the

12   deputy passed the phone to your wife?

13   A.    Oh, no.  I don't know how long it was

14   between when the ambulance left to when Donna

15   got the phone call or when the deputy or

16   whoever it was from JPSO got the phone call

17   and then gave it to Donna.  I don't think

18   they would have called like right the minute

19   they got there.

20   Q.    So that phone call occurred before or

21   after Donna's conversation with the psycholo-

22   gist Dr. Hamilton?

23   A.    That was after.

24   Q.    So Dr. Hamilton --

25   A.    She was actually at the scene.  When we

1    were told we couldn't go, Dr. Hamilton was

2    present.

3    Q.    And you can't describe who told you you

4    couldn't go?

5    A.    I'm guessing.  I wish I did.  I wish I

6    got his name.  I know he was a male and he

7    was probably in his 30s I guess and he said

8    you can't go.  This is a crime scene.

9    Q.    What is a crime scene?

10   A.    The scene was a crime scene.  He used

11   the word crime scene.

12   Q.    Who changed his mind?

13   A.    No one, no one.

14   Q.    So how did you leave?

15   A.    I went to the front of laser tag, asked

16   another deputy and I said my son is in the

17   emergency room at East Jeff.  We were just

18   told he's in cardiac arrest and we need to

19   get there immediately and we need to go and

20   we were told we couldn't leave.  And then one

21   of the deputies there said that they would

22   find the ranking officer or whoever it was

23   they needed to get clearance from.

24   Q.    And they did?

25   A.    They did, yeah.

1    Q.    And you don't know who that ranking

2    officer was?

3    A.    No, I don't know who that was and it

4    took a couple of minutes for that to happen.

5    Q.    So you took your car to the hospital?

6    A.    No, we took Dr. Hamilton's because as

7    soon as -- I asked the deputy.  He said he's

8    going to go get clearance, he goes up and

9    there's several officers around in front of

10   laser tag.  After a period of time and I'm

11   not sure exactly how long, it wasn't terribly

12   long, a senior -- it looks like an older

13   gentleman JPSO came out of the entrance of

14   laser tag.  Someone said something to him and

15   I saw him kind of wave his hand, you know,

16   like this (witness indicating) and at that

17   point, I was just frantic.

18        And if I remember correctly, someone had

19   said we had to leave our vehicle there.  We

20   couldn't take our own vehicle but Dr.

21   Hamilton had her vehicle and so I got in Dr.

22   Hamilton's car and Donna was already there

23   with Dr. Hamilton and she drove us to the

24   emergency room.

25   Q.    So on Page 8, I'm lead to believe by

1   reading Paragraph 29 that you all had been

2   allegely visiting this laser tag for about

3   six years?

4   A.    Yeah, since around 2014.

5   Q.    So since he was 10 or 11?

6   A.    Correct.

7   Q.    And this was a Saturday or a Sunday?

8   A.    This was a Sunday.

9   Q.    A Sunday.  Tell me what time you woke up

10  that day.

11  A.    I woke up at 7:30.

12  Q.    You're pretty definitive about that.

13  A.    I remember that morning unfortunately.

14  Up until the burst started, I remember it

15  pretty well.

16  Q.    So what happened after you woke up?

17  A.    I went upstairs and watched a DVD.   ███

18  was still asleep.  And then around 9:30,  ███

19  woke up and I could hear him wake up.  I

20  heard him downstairs and so I went downstairs

21  and then we -- I took a shower and  ███  got

22  ready while we were taking a shower.  Donna

23  got ready and then we left our house.

24  Q.    Did you go to church?

25  A.    No.

1    Q.     Did you go to breakfast?

2    A.     Yeah, we went to Sonic.

3    Q.     And that's in St. Charles Parish or in

4    Kenner?

5    A.     It's in Kenner.

6    Q.     And what time did you get there?

7    A.     Probably about 10:45 or so, somewhere

8    around there.

9    Q.     And I haven't been to Sonic in a long

10   time.  Is that the drive-up place?

11   A.     That's it.

12   Q.     It's one of those drive-up places?

13          MR. CLARKE:

14              You had to go with the horse and

15          carriage?

16                  (Whereupon, a discussion was

17              held off the record.)

18   BY MR. ZIBILICH:

19   Q.     So you order at the drive-in and the

20   girl comes either in tennis shoes or skates

21   and she brings the food to the car?

22   A.     Right.

23   Q.     It still works that way?

24   A.     Yeah, that's it.

25   Q.     So was ██████ happy with his breakfast?

1    A.    Yeah, yeah.  He was.

2    Q.    Do you remember what he ordered or you

3    order for him?

4    A.    Well, it was a chicken, like a little

5    kiddy, one of the kiddy meals.  He had that

6    for breakfast.

7    Q.    And at this time he's about 325 pounds?

8    A.    Yeah, but that was -- after Izzo's --

9    not after Izzo's, after laser tag, we would

10   go to Izzo's on Sunday.

11   Q.    So he was saving up for the big meal?

12   A.    Saving up for the big meal, exactly.

13   Q.    So he got the kiddy deal?

14   A.    Got the kiddy meal.

15   Q.    And what time did you all leave there?

16   A.    It was quick.  It was probably about

17   10:00 -- close to 11:00 so maybe a little bit

18   before 11:00.

19   Q.    And then where did you go?

20   A.    To laser tag.

21   Q.    Straight to laser tag?

22   A.    Yeah.

23   Q.    And was there anything different about

24   this laser-tag visit than the typical laser-

25   tag visit if there is such a thing?

1   A.    There was not -- this had happened --

2   before this happened, the week before,

3   typically when we would go there, █████ would

4   do the spin-zone ride.  It's like this

5   bumper-car thing and he would just get in the

6   car and spin around in circles and he loved

7   doing that and he would do it four times.

8   And so we would do the four spin-zone rides.

9   Q.    You ride this with him or he rides it by

10  himself?

11  A.    Oh, yeah.  I do it with him, yeah, yeah.

12  Q.    Going around in circles sounds awful for

13  me.

14  A.    He loved it.  I wouldn't go in circles

15  but █████ loves going in circles.   And

16  typically after that, he would then go to the

17  laser tag arena, not to play laser tag.  He

18  just loved going in there.  And it was like a

19  maze so he would just get up and he would

20  never fire the gun.  He didn't know how to do

21  it.  You have to hold it in a certain way and

22  he had zero interest in that.  He liked just

23  walking around the maze and there's two

24  levels and he would go up and down in that.

25  Q.    By himself?

```
 1    A.    No, I would always be with him.

 2    Q.    Okay.

 3    A.    And this day after the spin zone, he

 4    said Izzo's.  He wanted to go to Izzo's then.

 5    So okay, we can go to Izzo's.

 6    Q.    So what are you there, for 20 minutes?

 7    A.    Yeah, for the first time, it was fast

 8    for the first part of this.  We were there,

 9    yeah, about 20 minutes.  That's about right.

10    And then we went to Izzo's and ████ gets half

11    of a burrito, bean burrito and --

12    Q.    Where is Izzo's?

13    A.    Izzo's, it's in Metairie on --

14    Q.    So you left laser tag?

15    A.    We left laser tag.  Yeah, that's it.

16    And we ate at Izzo's and then after Izzo's,

17    ████ said he wanted -- he said laser tag

18    because he hadn't done the laser tag arena

19    yet.  He had just done the spin zone and this

20    had happened before.

21    Q.    Where laser tag got interrupted?

22    A.    Yeah, got interrupted by lunch.  And

23    that happened the Sunday before, the exact

24    same scenario and it happened at times before

25    then as well.  And if he was doing well and
```

1    he had only done the spin zone and he wanted

2    to go back and finish his usual thing, things

3    were going well, then --

4    Q.    So what time did you all get back?

5    A.    It was a little before 1:00 o'clock,

6    right around 1:00 o'clock.

7    Q.    So this doesn't last very long either?

8    A.    Yeah, we got there at 1:00 and then

9    Donna -- we went to get tickets for laser tag

10   and they said it was going to be about five

11   minutes before the next laser tag.

12   Q.    Because it was a bigger crowd in there?

13   A.    Not much because again, that was a good

14   thing that when we came back -- and this has

15   happened before that when we go to laser tag

16   and there's too many cars, I would say █████

17   it's too busy.  They got birthday parties.

18   Let's go do something else and he would be

19   okay with that.  And when we got there --

20   Q.    And you think he understood that?

21   A.    I think he did, yeah.

22   Q.    But you can't swear to that for sure?

23   A.    Well, I think he understood and so we

24   went in.  Then we went to the laser tag arena

25   and waited, you know.  And we waited, it was

1   about five minutes.

2   Q.    Was that a phrase he repeated sometimes,

3   he says hit Mommy, hit Daddy, bite Mommy, too

4   crowded?  Is that one of the ones?

5   A.    He never said too crowded.  I never

6   heard that but he would say hit Daddy, hit

7   Mommy was typically when he was starting to

8   verbalize he was getting upset.

9   Q.    But too crowded was not part of his

10  vocabulary?

11  A.    No.

12  Q.    All right.  So you all didn't last there

13  that long?

14  A.    Well, yeah.  We went in to the laser tag

15  arena and then he said -- you know, they do

16  this little spiel where they explain the

17  laser-tag rules and then they open the chain

18  to go in.  And I went into the next room

19  where you put on your laser-tag stuff and I

20  went in there but ▇▇▇ didn't.  And so --

21  Q.    So you left him unattended?

22  A.    No, no.  I went right back to him and

23  said ▇▇▇, do you want to go in, buddy?  I

24  stepped away for just a second.  Once I saw

25  he wasn't following me, I went back to him.

```
1          Did you want to do laser tag and he said
2     no.  And I said okay.  Do you want to do
3     something else here?  Yeah.  So we stepped
4     out and I asked do you want to go, buddy?  Do
5     you want to go home?  No.  And so he walked
6     over by where there was this -- they had this
7     Star Wars game and he had never played it.
8     Q.    It's a new game?
9     A.    It had been there a long time but he had
10    a set path of stuff.
11    Q.    Okay.
12    A.    And so he wanted to try it and he
13    wouldn't say I want to play the Star Wars
14    game.  I can't remember if he just got in it
15    or what happened but he went to that game.
16    And I think he did get in it and I said do
17    you want to play this?  Yeah.
18         He did that.  He did really well.  He
19    played it, did the whole thing.  He actually
20    was smiling.  And then next to the Star Wars
21    game is this World War II fighter pilot game
22    and he had never played that one before
23    either and he didn't do well with that.  I
24    didn't do well either trying to help him do
25    well on that so that one didn't go as well as
```

1    the Star Wars one.

2    Q.    What does it do?

3    A.    It's like you're flying a World War II

4    airplane.

5    Q.    Like a simulator of sorts?

6    A.    Yeah, yeah, exactly.

7    Q.    Does it have lights?

8    A.    It's an old game so it wasn't really too

9    --

10   Q.    But it has lights?  It has different

11   lights than the rest of the place?

12   A.    It has a screen.  It was a screen.

13   Q.    It makes a different sound than the

14   stuff in the rest of the place?

15   A.    Yeah, because it's a different game,

16   yeah.  And at first I was thinking man, this

17   is great.   ████   is trying out new stuff.  And

18   that was a sign of growth when he would break

19   out of his usual routine.  I would be

20   thinking this is great.  He's moving on to a

21   new thing.  And then but after that, there's

22   ths Space Invaders game.  It's this great

23   big, two-player thing.

24   Q.    He's played that before?

25   A.    I believe he has.  I believe he did that

1  with me once a long time ago.  But it had
2  been a long time since we had done it and he
3  wanted to do it.  He got in it and I asked
4  hey, buddy, do you want to do this together?
5  Yeah.  And so we did that.  And the way you
6  put the money in at laser tag, you get this
7  card and you scan the thing so he actually
8  grabbed the card and he scanned it and did
9  that.
10       And we played it one time and then he
11  wanted to do a second time so I said okay,
12  sure.  Let's do it.  And he did it a second
13  time and did fine and then he did it a third
14  time.  And then at the end of the third time,
15  he said go home.  And I said okay, buddy.
16  And so I stood up and we both walked out.
17  Q.    Is that typical that he's the one to
18  call it a day?
19  A.    We would monitor him.  That's part of --
20  Q.    My question is on a given --
21  A.    Typical day?
22  Q.    -- typical day, is he the one that --
23  A.    Not typically because usually we had our
24  routine.  So usually he didn't have to do
25  that.  Usually it would be spin zone, laser

1    tag, big bass wheel.  He gets his cards using

2    the credits from the big bass wheel.  He

3    would get two decks of playing cards and we

4    would go so he didn't have to say go home.

5    He knew that was the thing.

6        But this day was different.  And so after

7    that, he said go home.  And go home was a

8    sign that okay, he's telling us something,

9    you know.

10   Q.    Something might be getting ready to

11   happen?

12   A.    Something might be coming up, yeah.

13   Q.    Like an outburst?

14   A.    Yeah, possibly.

15   Q.    Or what else?  What are the other

16   possibilities?

17   A.    Or no outburst.  It could go either way.

18   But the key then was just okay, I got to get

19   him to the car as fast as I can.

20   Q.    So you were nervous that something bad

21   was about to happen?

22   A.    I was nervous something bad could

23   happen.  And so we left and midway between

24   the entrance to laser tag and our car -- and

25   our car, we had it in the handicapped spot.

1   We would always get the closest spot to the

2   entrance so we can exit fast if we need to.

3   Halfway between, he stopped and slapped his

4   head a few times and then he became

5   aggressive.

6   Q.    So we established earlier that something

7   happened, whatever it is that you want to

8   call it, something happened five days

9   previous at the Super Cuts?

10  A.    Yeah.

11  Q.    It was something.  I'm not going to

12  debate you anymore.  Something happened.

13  A.    Yeah, yeah.

14  Q.    So what happened between the Super Cut

15  and the laser-tag day, anything in particular

16  those five days?

17  A.    There was a fire drill at the school and

18  so that was --

19  Q.    That's not a good thing?

20  A.    Yeah, he had a hard time with fire

21  drills.

22  Q.    So what happened?  Did he have an

23  episode at the school?

24  A.    No.

25  Q.    What did he have?

1    A.    Nothing that I can recall.  I don't

2    think he had anything.

3    Q.    So what's the point of this, telling me

4    about it?

5    A.    It was just something that happened, you

6    know.  Fire drills could be something that

7    could get him cranked up.

8    Q.    But as far as you know, he didn't get

9    cranked up?

10   A.    No.  Correct.

11   Q.    So when was the last, to use your

12   phrase, episode prior to the Super Cuts?

13   A.    Prior to Super Cuts?  It was October of

14   2018.

15   Q.    So now we're talking about two months

16   and change?

17   A.    Yeah.

18   Q.    Paragraph 33 talks about a sudden

19   sensory outburst or a meltdown.  Is there a

20   difference between the two?

21   A.    No, I think it's just two different

22   phrases for the same thing.

23   Q.    Read Paragraph 34 at the bottom if you

24   don't mind and tell me if you believe that to

25   be true.

1    A.    Yeah, I believe that's true.

2    Q.    So this paragraph talks about him

3    slapping himself and this is about when you

4    all were exiting the place?

5    A.    Right, yeah.

6    Q.    And that triggers you get him in the

7    car, let's get out of here?

8    A.    That's it exactly.

9    Q.    What does the word stimming mean in

10   Paragraph 36?

11   A.    It's self-stimulation.

12   Q.    The biting incident in the parking lot

13   we really don't see on the video.  Tell me

14   how that went down.

15   A.    At first it was mostly slapping and then

16   the biting --

17   Q.    What is slapping, his head or you or

18   both?

19   A.    His head and me, it would go back and

20   forth between slapping himself in the head

21   and slapping me.

22   Q.    And this is while you're trying to get

23   him in the car?

24   A.    Yes.

25   Q.    So when he doesn't want to get in the

1    car, how do we get that accomplished?

2    A.    Well, first he's in the middle of a

3    tantrum, this episode, so it's trying to lead

4    him into the car and unlock the car door and

5    trying to get him to the car as best as I

6    can.

7    Q.    So that requires you to almost usher

8    him?

9    A.    Yeah, to lead him.

10   Q.    So that requires you to be hands-on?

11   A.    Not necessarily, yeah.

12   Q.    How are you going to do it without --

13   A.    Lead him, I could walk toward it and he

14   would follow me or I would coax him along.

15   Q.    Even during an episode?

16   A.    Mm-hmm, yes.

17   Q.    So did you go hands-on with him?

18   A.    Well, he slapped me I believe in the

19   head and I end up going down as he was

20   slapping me and then he grabbed the back of

21   my shirt and pulled my shift off.

22   Q.    All the way off?

23   A.    All the way off, yeah.  And then the --

24   Q.    Is it fair to say at this point in time

25   while he's grabbing your shirt and pulling it

1   off he's totally out of control?

2   A.    Yeah, he's in the middle of an outburst,

3   a severe outburst, yeah.

4   Q.    And you know it ain't going to be good?

5   A.    It's not going well, yeah.

6   Q.    So your choices are get away from him,

7   see if you can calm him down with soothing

8   language?

9   A.    My goal is to get him in the car.

10  Q.    Which may require you to be hands-on?

11  A.    It could.

12  Q.    Which may make it worse?

13  A.    It's all -- you're going to hate the

14  word, it's all balance.

15       MR. CLARKE:

16            Depends.

17       THE WITNESS:

18            Depends.

19       MR. CLARKE:

20            By the way, my clients fight back.

21  BY MR. ZIBILICH:

22  Q.    So going hands-on, the balance here is

23  get him in the car, make it safer for the

24  rest of the world?

25  A.    Correct.

1   Q.    Get him in the car, make it unsafe for
2   me meaning you, possibly unsafe for you?
3   A.    Well, if I could get him in the car, I
4   could get him in a contained space where I
5   could let this play out.
6   Q.    About four hours ago one of the things I
7   remember, I don't write everything down.  One
8   of the things I remember is don't crowd him.
9   A.    Yeah, it's a balance.  It's a balance.
10  I mean yeah.
11  Q.    So sometimes you got to crowd him?
12  A.    Yeah, yeah, but you got to play it.  You
13  have to keep it in what's the safest thing
14  and if you're able to do it in a way that's
15  not going to endanger his life, you know.  So
16  if I could get him in the car in a way with
17  the least amount of activity that's going to
18  get him more agitated, then the better.
19  Q.    Did you guess wrong or just it simply
20  didn't work?
21  A.    He was just too agitated, yeah.
22  Q.    So I'm trying to picture how his face
23  gets close enough to your face to bite you.
24  A.    That's the -- I'm thinking what happened
25  with that was that -- and I'm not sure

1    exactly the moment that that happened but

2    he made his way with me, unfortunately back

3    -- instead of toward the car back to the

4    entrance of laser tag.

5    Q.    You don't want him going back in there?

6    A.    No, God no, and I was terrified.

7    Q.    Why not?

8    A.    Because there's people there.  I didn't

9    want anyone to get hurt.  And there were

10   three people who had gotten out of their

11   vehicle who are looking at us and I wasn't

12   looking at ███.  I was looking at those guys

13   and I was waving like this (witness

14   indicating) like for them to stay away.

15       In the video you can't really see it

16   because there's like an awning or something

17   blocking it but that's all happening.  And

18   from what it looks like, ███ -- while I'm

19   doing this, ███ is leaning in and that's

20   when I got bitten.  But I'm guessing because

21   I don't see it on the video.

22   Q.    Have you since that date spoken to

23   anybody that may have been in that parking

24   lot, anybody affiliated with laser tag or any

25   of the other businesses who could corroborate

```
 1   and testify relative to what you just said
 2   regarding the ushering of ███ and trying to
 3   get him in the car?
 4        MR. CLARKE:
 5             Object to form.
 6        THE WITNESS:
 7             I haven't spoken with anybody.
 8   BY MR. ZIBILICH:
 9   Q.   Do you have the names of anybody other
10   than deputies that may have seen something
11   like that?
12   A.   Heather.
13   Q.   Heather Hilton?
14   A.   Yeah, I didn't know her last name.
15   Q.   Is it Hilton?  So your goal at this
16   particular point in time when he starts
17   moving back towards laser tag, priority
18   number one, keep him out of there?
19   A.   Right.
20   Q.   Where's your wife?
21   A.   She's on the other side of the door
22   holding the door closed.
23   Q.   The allegations in Paragraph 48, the
24   laser tag manager informed Pitfield quote,
25   that there's a man with his autistic child,
```

1    it's an autistic adult child.  You didn't

2    supply that information, did you?

3    A.    No.

4    Q.    In Paragraph 56, when Pitfield arrived

5    at 1:28:25, and when did you say you got back

6    to laser tag?

7    A.    It was about 1:00 o'clock.

8    Q.    So it was really a short little visit

9    the second time?

10   A.    You know, our laser-tag visits were just

11   30 minutes so --

12   Q.    The physical encounter between E.P. and

13   his father had ended.  So what's going on

14   during that interval where you're hands on

15   with ███ and then all of a sudden you're

16   kind of like in a between stage?

17   A.    Yeah.

18   Q.    You're kind of waiting for Pitfield.  Do

19   you know a policeman's on the way?

20   A.    I know that Donna had said -- had asked

21   me should the manager call 911 or the police

22   and I said yes.  So I knew someone was going

23   to be coming.

24   Q.    This is new behavior, isn't it?  With

25   all those other episodes that we talked

1    about, not once did you all call the police?

2    A.    Correct, yeah.

3    Q.    What made this one different?

4    A.    Because we were in a public area.  It

5    was scary because we were right at the

6    entrance and I didn't want anyone -- it's one

7    thing █████ biting me.  It's another thing

8    █████ biting someone else.

9    Q.    So we know what happens after Pitfield

10   gets there.  He tries to help you get him in

11   the car.  It doesn't work.  He's got to put

12   him on the ground.

13   A.    It was -- well, before Pitfield got

14   there, I was standing by the car.    █████ was

15   between me and the car.  I got the door

16   opened for the rear driver's side and I was

17   trying to coax █████ into the car.  Come on,

18   buddy, get in the car, get in the car and he

19   wouldn't get in.

20        And then Pitfield showed up, the first

21   deputy and he approached us.  And then I

22   turned to him and said my son's autistic and

23   with me turning away from █████, then █████ --

24   up until this point had calmed down, then he

25   cranked up again.  And he slapped me on the

1   head a few times and then the deputy

2   intervened and then he started slapping the

3   deputy.

4   Q.   So the deputy gets him on the ground,

5   correct?

6   A.   I believe so.  I believe he pushed ████

7   down and then I follow ████ down because I

8   didn't want ████ doing anything more to the

9   deputy.  And so I was trying to hold ████

10  down, you know, keep him from --

11  Q.   Slightly different than the position

12  that you described about three hours ago

13  where you kind of bear-hugged him?

14  A.   That was different.  Actually pretty

15  similar because before -- you're talking

16  about the time in 2011?

17  Q.   Mm-hmm.

18  A.   I was laying down on my side and I had

19  my arm around him and that's how it happened

20  this time as well, not intending.  I wasn't

21  --

22  Q.   It was a little bit of difference, about

23  200 pounds difference, right?

24  A.   Yeah, 200-pound difference but the

25  method was similar.  It was me trying to

1   hold him and keep him.

2   Q.   So you and Pitfield and ███ are all on

3   the ground for a period of time together?

4   A.   Well, I think if I remember right,

5   Pitfield goes to his vehicle and I guess

6   gets, I don't know, I'm guessing maybe

7   handcuffs but I'm not sure.  And then comes

8   back and then he gets on top of ███ and when

9   he gets on top of ███ I step away.

10  Q.   And of course, you got a hole in your

11  face?

12  A.   I have a bite wound, yeah.

13  Q.   So Pitfield is on top of him.  Can you

14  tell me which part of Pitfield's body, if

15  any, was in contact with what part of ███

16  body, if any?

17  A.   ███ was on his stomach and Pitfield was

18  sitting on his lower-back area or butt.

19  Q.   So you think it was above his buttocks,

20  on his buttocks or below his buttocks?

21  A.   Right around that area.

22  Q.   Okay.  If I told you it was below his

23  buttocks, you wouldn't have any reason to

24  disagree with me?

25  A.   It was probably a little bit above his

1  buttocks I think.  I'm thinking it might have
2  been a little bit around his waist.
3  Q.    So I got above buttock, I got buttocks
4  and I got below buttocks.  You're going with
5  the one that's closest to the neck?
6  A.    Buttocks to above buttocks.
7  Q.    So there's a time lag now before others
8  arrive.  And I take it you're utilizing that
9  time lag to have a conversation with
10 Pitfield?
11 A.    I am not and I regret it every, excuse
12 me, fucking day of my life.
13 Q.    So what did you want to talk to him
14 about?
15 A.    To say he shouldn't be in a prone
16 position.  I should have said I've got -- I'm
17 here.  Let's try -- we need to get him in a
18 different position than this.  The prone
19 position isn't safe.
20 Q.    So you didn't talk to him?
21 A.    No.
22 Q.    And you didn't get hands-on with him to
23 help him put him in the position you wanted?
24 A.    No.
25 Q.    You just kind of walked away?

1   A.    I didn't walk away but I was standing a

2   few feet away.

3   Q.    Distance you are from me now?

4   A.    Yeah, maybe a foot closer, something

5   like that.

6   Q.    Did you see ██████ bite Pitfield?

7   A.    No, I didn't.

8   Q.    So at the very least during that bite,

9   you kind of weren't paying attention to

10  Pitfield and ██████

11  A.    The bite from what I recall happened

12  when I was laying on the ground with ██████

13  And my head was facing the opposite direction

14  that ██████ head was facing if I remember

15  this correctly from watching the video.  And

16  that from watching the video, it looks like

17  that's the time when I'm holding ██████ that

18  ██████ grabs Pitfield's leg and that's when the

19  bite happens.

20       MR. CLARKE:

21            Franz, can we take a break?

22       MR. ZIBILICH:

23            Mm-hmm, always.

24            (Off the record 2:00 p.m.

25            Back on the record 2:10 p.m.)

```
 1    BY MR. ZIBILICH:
 2    Q.    So I take it that either some other
 3    source or the video led you to the conclusion
 4    that Pitfield was on his back for not quite
 5    seven minutes?
 6    A.    That would be from the videos, that's
 7    correct.
 8    Q.    And during those seven minutes, you
 9    didn't say one word to Pitfield?
10    A.    No.   While he was on his back, no, I did
11    not.
12    Q.    And during those seven minutes you claim
13    he was on his back or the video shows that,
14    you chose not to say one word to him?
15    A.    I didn't.   I wish I had.
16    Q.    Where was your wife during those seven
17    minutes?
18    A.    She was holding ██████ hand.
19    Q.    And how long did she hold his hand for?
20    A.    Until -- it was after the second deputy
21    got on ██████ back.
22    Q.    And did you hear her talking to him?
23    A.    I could see that she was talking to him
24    but I don't know exactly what she was saying.
25    I think from what she told me afterwards,
```

1   it's going to be okay.

2   Q.    Did you see the end of this event?

3   A.    It was difficult to see it.

4   Q.    It was difficult emotionally or it was

5   difficult physically?

6   A.    Because there were people around and I

7   remember once the second deputy got on top of

8   him --

9   Q.    It was the second deputy actually

10  replaced the first deputy?

11  A.    Replaced the first one, exactly.  Then

12  this is from looking at the video, that it

13  looks like I don't know.  I can't remember

14  which deputy it was but one of the deputies

15  seems to turn and say something to me and I'm

16  pointing at the entrance to laser tag.  I see

17  that in the video.

18  Q.    What's the signal there?

19  A.    I'm guessing I'm saying that this is

20  where it started.

21  Q.    So before lunch, I tried to ask you on

22  several occasions about the dos and the

23  don'ts of dealing with somebody with autism.

24  You certainly recall me asking you that.

25  A.    Sure, yeah.

215

1   Q.    Did you ever receive or is it contained
2   in the pamphlet or the literature the dos and
3   the don'ts when faced with an episodic event?
4   A.    In the protocol from the Kennedy
5   Krieger, there was information about that.
6   Q.    And one was give him some space?
7   A.    Right.
8   Q.    What else?
9   A.    Yeah, use a low tone of voice, don't
10  talk during the episode.
11  Q.    Your wife was talking to him, wasn't
12  she, calm down or whatever.  She was trying
13  to comfort him?
14  A.    Yeah.
15  Q.    She was talking to him?
16  A.    Talking to him, yeah.
17  Q.    What else?  Any other dos and don'ts you
18  remember?
19  A.    And then the prone position.
20  Q.    So repeat them again for me one more
21  time.
22  A.    Prone position, try not to talk during
23  the episode, don't crowd him and God, I can't
24  remember.
25  Q.    So did you hear any of the deputies

1  talking to him during the episode?

2  A.   I didn't hear it.

3  Q.   You didn't hear it because it didn't

4  happen or you just were someplace else?

5  A.   I didn't hear it.

6  Q.   So you don't know if you didn't hear it

7  because it didn't happen or if you didn't

8  hear it because you were off someplace?

9  A.   Yeah, it might have been just in my

10  state of mind I was in I just didn't hear it.

11  Q.   And at some point in time after or

12  through watching the video, more people kind

13  of get on the scene?

14  A.   Correct.

15  Q.   But you never told the people spread

16  out, spread them out.  This is no good all

17  these people around him?

18  A.   Donna did.

19  Q.   How do you know?

20  A.   Because I heard her say that.

21  Q.   You heard her say that?

22  A.   I actually heard her, yeah.

23  Q.   You can't remember what else she said?

24  A.   Well, at that point she was speaking in

25  a louder tone of voice than when she was

1    talking with ███████   They were very close

2    together.

3    Q.    So doing good with one rule and breaking

4    another?

5    A.    You know, I don't know because I think

6    given this circumstance, ███████ never had a

7    police officer sitting on top of him.  This

8    is a whole new thing and faced with this,

9    ███████ was calming down.  She was holding his

10   hand and it probably had been over a minute

11   since at that point or close to a minute

12   since he had done any head slapping or

13   biting.  So technically at that point, the

14   episode was over where you can talk to him.

15       I don't know if it had been exactly a

16   minute before she began talking.  I would to

17   look and see the bite on Pitfield and when

18   she actually was holding his hand.  But I

19   think in that crises moment, you know, we

20   were just trying to do what we could to deal

21   with the horrendous situation that we had

22   never been in before.

23   Q.    I take it it's your position that you

24   believe that the deputy should have rolled

25   him over prior to when they did?

```
 1    A.    Yes.

 2    Q.    How much sooner?

 3    A.    I would say once the first two deputies

 4    arrived on the scene, they could have rolled

 5    him over at that point.

 6    Q.    Could have or should have?

 7    A.    Should have.

 8    Q.    Even if he was fighting?

 9    A.    At that point, he wasn't fighting.

10    Q.    And you know that from your view of the

11    video or your view of the incident?

12    A.    From the video.  And somewhat from the

13    incident but much more so from the video.

14    Q.    Is ████ double-jointed?

15    A.    We had never known him to be double-

16    jointed before then.

17    Q.    You believe he is now?

18    A.    I don't know.  I don't know.

19    Q.    Well, you're aware of the fact that he

20    got his arms above his head some kind of way?

21    A.    Yeah, that's a horrible thought.  I

22    don't know if that was him or if that was

23    pushed over his head.  I don't know how that

24    happened but it happened.

25    Q.    If it happened without him being pushed,
```

1    that makes him double-jointed or do you know?

2    A.    I don't know.

3    Q.    I mean I don't do real well with

4    physiology.  You're trying to tell me you

5    don't do either?

6    A.    Physiology, not in psychiatry.

7    Q.    Did you ever ascertain or attempt to

8    discover whether or not he's double-jointed?

9    A.    No, not that I recall.

10   Q.    So in paragraph 210 on Page 27, it says

11   Vega remained in this position with his body

12   weight on E.P.'s back and his arms circled

13   around E.P.'s head, shoulder and neck until

14   Gaudet moved in to switch and take over from

15   Vega in order to continue with the prone

16   restraint of E.P. with a third deputy.  Who's

17   the third deputy?

18   A.    I didn't see that.

19   Q.    So you don't know whether this paragraph

20   is even true?

21   A.    I didn't see --

22         MR. CLARKE:

23             Hang on a second.  I'm going to

24         object.  You can ask him what he knows.

25         I put that in there.  Anything else is

1      based on my investigation.

2          MR. ZIBILICH:

3              You just answered my question.  I

4          wasn't going to go there but thank you.

5      BY MR. ZIBILICH:

6      Q.    I'm going to Page 34, Paragraph 264.

7      I'm going to read it out loud.  Donna Lou and

8      Daren Parsa observed that the JPSO deputy

9      defendants' chest compressions were not

10     correct.  The deputies' hands were on E.P.'s

11     diaphragm rather than his sternum and thus,

12     the compressions were too low on E.P.'s body

13     to be fully effective.

14         Do you recognize the deputy in this room

15     that was the compression deputy, if any?

16     A.    I don't recognize which one.

17     Q.    You don't recognize him because he's not

18     here or you just don't recognize him?

19     A.    I don't recognize him.

20     Q.    And who made these observations about

21     the compressions being wrong, you or Donna

22     Lou or the both of you?

23     A.    Donna is the first to have noticed it

24     and then I saw that afterward.

25     Q.    When did she tell you?

1    A.    As it was happening.

2    Q.    As it was happening?  So I take it that

3    you then relayed that information to whoever

4    the deputy was that was doing it wrong?

5    A.    No, I did not.

6    Q.    Why not?

7    A.    Again I wish I had.  I didn't.

8    Q.    You have no explanation as to why not?

9    A.    I -- for me, telling law enforcement

10   what to do is just something I had never

11   done.

12   Q.    That's your kid.  That's your kid that

13   you love.

14   A.    I know, that's why I beat myself up

15   every night.

16   Q.    It's mind boggling.  Did you hear Donna

17   Lou?

18   A.    I heard her say that.

19   Q.    You heard her say what?

20   A.    Say that they're doing the chest

21   compressions wrong.

22   Q.    Do you recognize anybody in this room

23   that she might have said that to?

24   A.    No.

25         MR. ZIBILICH:

```
 1              What's so funny about that?
 2         MR. CLARKE:
 3              It's the same question, you know,
 4         asked if she recognized it.
 5         MR. ZIBILICH:
 6              You're brilliant.  I heard you ask
 7         the same question 23 different ways from
 8         Sunday for a week but I'm still crazy
 9         about you.
10         MR. CLARKE:
11              I'm going call that sexual harass-
12         ment.
13         MR. ZIBILICH:
14              You got some strange definitions to
15         go with the rest of your strangeness.
16    BY MR. ZIBILICH:
17    Q.    Did Donna Lou get any reaction from the
18    deputy who was allegedly doing the compres-
19    sions wrong?
20    A.    I think they were just saying ma'am, let
21    us do our job.
22    Q.    Did she attempt to tell him how they
23    were wrong?
24    A.    I believe she did but I can't say that
25    for sure.
```

```
 1   Q.    And did she get adamant when they didn't
 2   listen to her?
 3   A.    She was very upset.
 4   Q.    Did she say it again?
 5   A.    I believe she did.
 6   Q.    And again?
 7   A.    I don't know.  I don't know if it was
 8   more than twice.
 9   Q.    And of course, you didn't chime in with
10   a bigger voice than your wife --
11   A.    No.
12   Q.    -- to see if maybe they didn't do any-
13   thing because they didn't hear her?
14   A.    Right.  No, I did not.  I didn't.
15   Q.    It says in Paragraph 271 that you and
16   your wife each asked different members of the
17   JPSO deputy defendants, specifically Deputies
18   John Doe 1 and 2, if they could leave to go
19   to the hospital.  Do you see that?
20   A.    Yes.
21   Q.    That would lead me to believe that the
22   persons what you asked were not people that
23   you have sued in this case.  Is my surmisal
24   correct?
25   A.    I don't know.  It could have been
```

1   someone.  I don't think it was but it could
2   have been.
3   Q.   It could have been somebody you sued but
4   it might be nobody you sued?
5   A.   It might have been another officer.
6   Q.   And if they're John Does, you still
7   don't know their name?
8   A.   Correct.
9   Q.   And if they're not defendants that you
10  sued, you still don't know their name?
11  A.   That's correct.
12  Q.   Nor can you describe to me the person
13  who told you that you could go to the
14  hospital?
15  A.   Yeah. No, I couldn't.
16  Q.   He was a male in his 30s?
17  A.   Well, the man who said I could go was a
18  different male.
19  Q.   A different male in his 30s?
20  A.   Right, he might have even been in his
21  40s but he was a different male.
22  Q.   In Paragraph 277, you allege that you
23  were told that you could not take your car
24  because it was a crime scene.
25  A.   That's correct.

1    Q.    Do you know if the person that told you

2    that is a defendant deputy or a John Doe?

3    A.    I'm not sure.

4    Q.    What do you know about the phrase

5    excited delirium?

6    A.    I didn't know anything about it until

7    after ████ had died.

8    Q.    You had never heard that phrase before

9    in all your years --

10   A.    Never.

11   Q.    -- with what it is that you do?

12   A.    No, never heard it before.

13   Q.    What is pervasive developmental

14   disorder?

15   A.    That's an old term regarding someone who

16   has a few features of autism but doesn't meet

17   the full criteria.

18   Q.    What does that mean?  That went way over

19   my head.

20   A.    Oh, man.  They have a thing called DSM,

21   Diagnostic Statistics Manual, and there was

22   the DSM-4 and then now it's the DSM-5.  And

23   basically to get criteria for a diagnosis,

24   it's got to meet a certain number of criteria

25   to meet that diagnosis.  And so if something

1    doesn't meet the full criteria for autism in

2    the DSM-4, then they would call it pervasive

3    developmental disorder not otherwise

4    specified or if they weren't sure.

5    Q.    So it sounds to me that you and your

6    wife were pretty much on top of things when

7    it came to taking ███ out somewhere?

8    A.    We did our best.

9    Q.    And you had various accoutrements, for

10   lack of a better word.  You had a specialized

11   seat?

12   A.    That's correct.

13   Q.    You had --

14   A.    It was a vest.

15   Q.    Pardon?

16   A.    A specialized vest for him.

17   Q.    You had some straps?

18   A.    That's correct.

19   Q.    What other things did you have?

20   A.    For going out?

21   Q.    Yeah.

22   A.    We had blankets sometimes.  Sometimes we

23   would bring blankets with us.

24   Q.    So the blankets were brought with you

25   just in case he decided to drop --

1    A.    Correct.

2    Q.    -- and start banging his head?

3    A.    Yeah, or sometimes just to calm down

4    from a tantrum, he would put a blanket over

5    himself and that would help him to calm down.

6    Q.    On the day in question, your wife went

7    and grabbed some coats or something, huh?

8    A.    That's correct.

9    Q.    What did I do with my pictures?  Any

10   other accoutrements?

11   A.    I think that was it.

12   Q.    Did he ever have like any leather

13   straps?

14   A.    Not leather straps.  It was --

15   Q.    The plastic ties?

16   A.    Oh, that was to secure the vest to the

17   third row seat.

18   Q.    I know this sounds silly.  Did you ever

19   carry any pepper spray or anything along

20   those lines just in case you had to use it in

21   a horrible situation?

22   A.    No, we didn't.

23   Q.    Was that ever recommended to you?

24   A.    No, not pepper spray.

25   Q.    Was anything else ever recommended to

1    you along those lines?

2    A.    We had -- in one of our last psychiatric

3    visits, there was a Zyprexa Zydis which was a

4    medicine to give for an emergency.

5    Q.    So is that something you shoot?

6    A.    No, it's a dissolvable tablet.

7    Q.    Dissolvable tablet, okay.  You were on

8    alert pretty much whenever you took him out?

9    A.    Yeah, we had to be aware, yeah.

10   Q.    And did you all ever have any protocol

11   that was given to you by the people in

12   Baltimore or from any other source as to what

13   to do, for lack of a better phrase, in case

14   he had an episode?

15   A.    It was to get him to a safe place.

16   Q.    Get him to a safe place.  And was there

17   any methodology that was described to you

18   that you should utilize in order to get him

19   to a safe place so that you or others might

20   not get hurt?

21   A.    Yeah, there was a thing called the

22   stinky hold.

23   Q.    Stinky hold?

24   A.    A stinky hold.  That was the name of it,

25   that you basically --

1   Q.    Mark it down at 2:27 I learned something

2   new or I'm about to learn something new.

3   A.    Yes, yes.  The stinky hold was you would

4   grab ███ by one arm and put the other hand

5   underneath his --

6   Q.    Armpit.

7   A.    -- armpit to help to guide him where you

8   needed him to go.

9   Q.    And you learned how to do this?

10  A.    That was the Kennedy Krieger, yes.

11  Q.    And you learned how to do this?

12  A.    That's correct.

13  Q.    Did you practice on him or a dummy or

14  something?

15  A.    On the worker, on the worker, the

16  person, the behavior therapist at the

17  hospital, he would be ███ and we would

18  practice on him.

19  Q.    And did you become adept at this?

20  A.    I hardly ever -- I didn't use it very

21  often.

22  Q.    Tell me about the times you did use it.

23  A.    I think there was maybe once or twice

24  when Autism Spectrum Therapies was working

25  with us after the hospital where there was an

1    incident where we had -- it was a double

2    stinky hold where the therapist was on one

3    side and I was on the other side of ███   and

4    we guided ██████

5    Q.    So what's the thought?  It's like being

6    a lifeguard?  If you pinch this position

7    right here real hard, it will stop him?

8    A.    No, it's not pinching.  It's open-

9    handed.  And it's like -- I wish I could do

10   it to myself.

11   Q.    You can do it to Mr. Clarke.  You can do

12   anything you want to him.

13   A.    It's like this, thumb underneath the

14   armpit, hand over here and then the other

15   hand like this.

16   Q.    So on those occasions, one or two that

17   you utilized this method on ██████ did it

18   work?

19   A.    Yes, during that time when Autism

20   Spectrum Therapies was working with us.

21   Q.    That is when he was at Baltimore?

22   A.    This was after he came home.

23   Q.    How old was he?

24   A.    He was 12.

25   Q.    12.  So I gather that you didn't want

1  him going back into the laser tag?

2  A.    No.

3  Q.    That was protocol thought number one?

4  A.    Yeah, once the burst happened, then

5  yeah, definitely didn't want him going back.

6  Q.    Did you articulate with your wife a plan

7  to get him in the car?

8  A.    At that point?  No, it was just -- once

9  it started, we didn't talk.

10  Q.    She never came to the car?  She guarded

11  the door, correct?

12  A.    Yeah, correct.

13  Q.    Was that something that was discussed,

14  stay there, guard the door?

15  A.    No, no.

16  Q.    Would it have been more helpful if she

17  would have helped you get him into the car?

18  A.    No, no.  It would have escalated things.

19  Q.    So you got lucky that she made that

20  decision because it wasn't planned?

21  A.    Well, she made a good choice and she's,

22  you know -- I trust her judgment.

23  Q.    So did you have a specific plan how to

24  get him in the car?

25  A.    It was at that point to try to coax him

1    into the car as best I can but that was in

2    the middle of a burst so it was difficult.

3    And finally once he started to come down a

4    little bit, I walked to the car knowing that

5    he was going to follow me and so he followed

6    me back to the car.

7    Q.    You guessed right that he would follow

8    you to the car?

9    A.    Yeah, I was pretty certain that that

10   would happen.

11   Q.    But based on past performance?

12   A.    Correct, yeah.

13   Q.    In Paragraph 324 on Page 44, it talks

14   about his disabilities, his difficulty

15   communicating, verbal expression impaired

16   reception, et cetera, et cetera.  And the

17   last line it says among other behaviors.  Can

18   you share with me what some of those other

19   behaviors are, if any?

20   A.    Let's see.  I can't think of any offhand

21   right now.

22   Q.    325, triggers to E.P.'s behavioral

23   outbursts included loud noises.

24   A.    (Witness nods.)

25   Q.    Illustrative of that is yelling but not

```
 1   exclusive, correct?
 2   A.    That's true.
 3   Q.    It could be any loud noise?
 4   A.    Yeah.
 5   Q.    Loudspeakers?
 6   A.    Could be.  He loves some speakers too.
 7   We loved listening to music in the car.
 8   Q.    Did you have a list of which speakers he
 9   liked and which speakers he didn't like?
10   A.    You know, I think the main thing with
11   ████  in terms of loud noises was sudden
12   unexpected noises.  Like in the car, we would
13   listen to music.  It was expected.  At home
14   we would listen to music.
15   Q.    What kind of music do he listen to?
16   A.    Classic rock, Beatles and The Who were
17   his favorites.
18   Q.    Loud rumbling noises like garbage
19   trucks, fire alarms and too many people
20   around him if he was experiencing an out-
21   burst?
22   A.    Yeah.
23   Q.    Any others?
24   A.    Tornado siren.
25   Q.    What is hypermobility at the top of Page
```

1    45, second line.

2    A.    Oh, yeah, double-jointed.

3    Q.    That's what hypermobility means?

4    A.    Yeah.

5    Q.    Okay.

6    A.    Yeah, those are frequently with -- yeah,

7    autism, those are associated with it.

8    Q.    Read Paragraph 328 to yourself if you

9    don't mind.

10   A.    (Witness complies.)

11   Q.    Is there some sort of scientific thing

12   that you know to be true or is that

13   Mr. Clarke putting something in there?

14   A.    No, that's true.  Regarding the prone

15   position?  Yeah, that was from his neurolo-

16   gist and his pediatrician both said that and

17   Kennedy Krieger said that as well.

18   Q.    Paragraph 332 talks about people with

19   development disabilities are estimated to be

20   up to seven times more likely, et cetera, et

21   cetera, et cetera.  Is this a scientific

22   statistic?

23         MR. CLARKE:

24              Or is it Mr. Clarke's?

25         MR. ZIBILICH:

1            If it's Mr. Clarke's input, I'm

2       okay.

3       MR. CLARKE:

4            I think you're getting into

5       Mr. Clarke's input.

6       MR. ZIBILICH:

7            Well, I didn't ask that.  If he

8       would have said no, I don't know, then I

9       could have added two and two and I would

10      come up with Clarke.

11      MR. CLARKE:

12           You have your method of goading.  I

13      have my method of goading.

14      THE WITNESS:

15           I know people with developmental

16      disabilities are more likely to have --

17      be in contact with the police.  I'm not

18      exactly sure if it's seven times.

19 BY MR. ZIBILICH:

20 Q.   Paragraph 334, I'm not going to have to

21 ask.  I know where all of this came from but

22 it starts off with A, be aware that people

23 with autism may have underdeveloped trunk

24 muscles.   Did ████ have underdeveloped trunk

25 muscles?

1    A.    He was never diagnosed with that so --

2    Q.    So you don't know?

3    A.    I don't know, yeah.

4    Q.    How old was he when he started lifting

5    the weights and playing with the heavy

6    medicine ball is what I'm going to call it

7    now?

8    A.    Our physical therapist -- fitness person

9    started in 2017.  I'm not sure.

10   Q.    So he was, what, 14 years old?

11   A.    He was 14, that's right.

12   Q.    Did you ever see him on the bench-press

13   machine?

14   A.    No.

15   Q.    That means he was never on one?  Do you

16   know if they did that at the school?

17   A.    I doubt that they did that at the school

18   but I couldn't say for sure.

19   Q.    But you can tell me he was incredibly

20   strong?

21   A.    He could be strong, yeah.  He had the

22   capability to be strong.

23   Q.    You have no idea how much he could lift?

24   A.    No.

25   Q.    On Page 54, have you ever measured

1    ████████ muscle tone.

2    A.    No.

3    Q.    Do you know what muscle tone is?

4    A.    The strength of the muscle and how tense

5    the muscle can get.

6    Q.    Do you know whether he had low muscle

7    tone?

8    A.    The only thing from a medical standpoint

9    that I recall is that neurology evaluation

10   when he was three.

11   Q.    Did anybody ever tell you post age three

12   that he had low muscle tone?

13   A.    Not that I can recall.

14   Q.    Did anybody ever measure his muscle

15   tone?

16   A.    No.

17   Q.    And you don't know whether he had low

18   muscle tone at age three or at any age?

19   A.    I'm pretty sure he had it at -- it was

20   diagnosed at age three but you're right.  I'm

21   can't say a hundred percent sure about that.

22   Q.    Did you ever hear your wife telling ████

23   while he was on the ground quiet hands, quiet

24   feet, stop hitting, no biting, no kicking?

25   A.    During that January 19th?  No, I didn't

1  hear those words.

2  Q.    You told me you read your statements,

3  correct?

4  A.    Yeah.

5  Q.    The statement --

6  A.    Yes, yes.

7  Q.    Do you recall how many people were in

8  the laser tag that day the second time you

9  went?

10 A.    Jeez, it wasn't --

11 Q.    It's the 1:00 o'clock visit.

12 A.    Yeah.  Gosh, I would say as far as

13 customers?

14 Q.    As far as everybody.

15 A.    Everybody?  As far as the staff and

16 people, maybe -- they had several staff.  I'm

17 sorry, I'm trying to count.  I'm guessing

18 maybe they had about maybe 8 to 10 staff,

19 maybe more and then customers, maybe 10 to 15

20 maybe.  I could be wrong.

21 Q.    Most of them would have been there at

22 11:00 o'clock?

23 A.    Yeah.

24 Q.    So this had you on heightened alert even

25 before you -- right after you walked through

1    the door?

2    A.    Well, you know, it wasn't terribly

3    crowded even on the second time so ▇▇▇▇ had

4    been there before when there was roughly that

5    number of people.  He had done well there

6    before so it was -- you know, I had to be a

7    little bit more alert than there was at 11:00

8    because there were more people there but it

9    wasn't me thinking oh, shit, this is too

10   many.

11   Q.    So we're doing the balance again?

12   A.    Doing the balance.

13   Q.    So when you pull up in the parking lot

14   the second time around, 1:00-ish, you don't

15   say too crowded, let's go home?

16   A.    No, no.

17   Q.    But you knew it was more crowded than it

18   was two hours previous?

19   A.    It was a bit more.  It was a little

20   more, not much more.

21   Q.    On Page 6 of your statement --

22         MR. CLARKE:

23            Do you have a copy of it for him?

24         I got it on my computer if that helps.

25   BY MR. ZIBILICH:

1    Q.    I'm just going to read it.  It's not
2    that much.  You say I opened the door to the
3    rear driver's side door.  Have you been
4    bitten yet?
5    A.    Yeah.
6    Q.    You had already been bitten?
7    A.    Had already been bitten.
8    Q.    That's what I'm driving at.  And then
9    you opened it and tried to coax him to get
10   into the vehicle but he didn't get in and
11   then he started biting me again.
12   A.    That was incorrect.  When I read that
13   and I had it wrong.
14   Q.    That's okay.  That's why we're here
15   today.  We're here today for as many I
16   changed my mind as you want.
17   A.    It wasn't --
18        MR. CLARKE:
19             I'll object to your statement.
20        MR. ZIBILICH:
21             I never knew how to make an
22        editorial comment after a question until
23        I learned weeks ago from you.
24        MR. CLARKE:
25             And you're doing it wrong so your

```
 1        grade is F.  All right?  Try again in a
 2        different depo.
 3   BY MR. ZIBILICH:
 4   Q.   So let's correct that statement.  I'll
 5   read the whole thing.  And opened it --
 6        MR. CLARKE:
 7             I'm going to show it to him if you
 8        don't mind.
 9        MR. ZIBILICH:
10             Go ahead.  I like it when you're
11        good for something.
12   BY MR. ZIBILICH:
13   Q.   So what part about that sentence is
14   wrong?
15   A.   The part where is it says then he
16   started biting me again and then he pulled me
17   to the ground.
18   Q.   Which part about that is wrong, the
19   biting or the pulled to the ground?
20   A.   Both.  What actually happened was that I
21   opened and tried to coax him in and then the
22   first deputy arrived.
23   Q.   That's a strange thing to kind of make
24   up that he started biting me again.  I
25   changed my mind.
```

1    A.    No, I got it wrong.  I got it wrong.

2    Q.    Okay.  I am now on No. 13.  Is this an

3    accurate depiction of the car harness?

4    A.    That's correct.

5    Q.    How long had you had that car harness?

6    A.    Since 2015.

7    Q.    And that was purchased why?

8    A.    Kennedy Krieger recommended it and

9    actually he was fitted for it at the hospital

10   to transport him safely.

11   Q.    I'm going to show you D-14 and ask you

12   if you can tell me what these things are?

13   A.    Sure.  Those are zip-tie cords to attach

14   the vest to the back of the chair in the

15   vehicle.

16   Q.    I know I've asked you this question

17   before.  Do you recollect any conversation

18   that you had with any of the deputies once

19   they arrived on that date?

20   A.    There was the one thing with me pointing

21   and I see myself talking in the video.  I'm

22   assuming I'm saying that's where it started.

23   Q.    So my question is, do you recollect

24   having any conversation and your answer is I

25   see myself talking?

1   A.     Correct.

2   Q.     But you don't recollect what you're

3   talking about?

4   A.     No.

5   Q.     You're assuming and presuming that

6   you're pointing so you must be saying some-

7   thing that's consistent with the point?

8   A.     That's correct.

9   Q.     Does he ever have to get restrained at

10  home?

11  A.     It was difficult to do that once he was

12  bigger.  And we found that actually us trying

13  to restrain him just made things worse.  It

14  escalated things.

15  Q.     What sort of things would trigger the

16  need to restrain him at home?

17  A.     An outburst.

18  Q.     The same things we've been talking about

19  all day?

20  A.     That's correct.

21  Q.     I'm going to mark these.  I'm probably

22  not going to have a bunch of questions about

23  them.  But D-15 is a burst on January 31st,

24  2018 and ask you to take a look at it.

25  A.     (Witness complies.)

1   Q.    Here's the second page.  I don't

2   necessarily need you to read the whole thing.

3   What I need you to tell me if you can is --

4   it's not listed in here.  Do you have any

5   recollection of this incident?

6   A.    I wasn't present.

7   Q.    So you don't remember it.

8   A.    No.

9   Q.    Okay.  That was easy.  I'm going to show

10  you now D-16 and my questions is always the

11  same.  In between these outbursts, there's

12  not a suggestion here that there were no

13  outbursts in between.  They just didn't rise

14  to whatever level this is?

15  A.    That's correct, yeah.

16  Q.    But I mean stuff is happening once a

17  week, twice a week?

18  A.    Yeah, it could be just him stamping his

19  foot on the ground.  We would have to count

20  that.

21  Q.    Let's put it this way.  There was never

22  a combination of medicines, therapy, et

23  cetera, where for six months no episodes

24  whatsoever?

25  A.    No, no six-month period.

1    Q.    Five months.

2    A.    Three months.

3    Q.    What three months were those?

4    A.    The last three.

5    Q.    Of his life?

6    A.    Actually there was the three months from

7    July to October and I don't know if it was

8    exactly three months.  It might have been a

9    few days shy or a couple of weeks shy but

10   there was the incident in July.  There was an

11   outburst in July, an outburst in October and

12   then in January.

13   Q.    Okay.  But that's not to suggest that

14   all was calm on the western front in between?

15   There was just no outbursts?

16   A.    At the end, it was.

17   Q.    It was.

18   A.    That's the thing.

19   Q.    Not counting Super Cuts?

20   A.    Not counting Super Cuts.

21   Q.    Because Super Cuts doesn't count?

22   A.    Yeah.

23   Q.    That was not an outburst?

24   A.    If you're going to go by outbursts being

25   one, disruptive incident, and then it gets

1    into the gray area was this an intended --

2    an intentional act of property destruction or

3    was it not which in my view at the time it

4    wasn't an intentional thing.  It was him

5    using too much force, but yeah, that's the

6    Super Cuts thing.  But I guess what I'm

7    getting at, things were improving.

8    Q.    What do you attribute the improvement

9    to?

10   A.    I think routine.

11   Q.    Luck, routine?

12   A.    And maturity.

13   Q.    Maturity?

14   A.    Maturity, that was our hope was that as

15   he would mature, these outbursts would become

16   less and less frequent.

17   Q.    Did any of these people ever, ever,

18   ever, ever tell you that they thought ████

19   was maturing?

20   A.    Yes.

21   Q.    Who?  I want to get a list of people

22   that told you that.

23   A.    Well, Dr. Muller had thought that as

24   he's -- as he gets older and he matures, then

25   in other cases of kids with autism, that the

1    bursts get less frequent and actually can

2    even go away.  And Dr. Hamilton was

3    definitely feeling like he was maturing and

4    improving.

5    Q.    Do you know what the legal phrase

6    specific intent means?

7    A.    No.

8    Q.    Do you know what the legal phrase mens

9    rea means?

10   A.    No, I've heard of it but I don't know

11   what it means.

12        MR. CLARKE:

13            We're going to have a law class

14        here, Professor Franz?

15        MR. ZIBILICH:

16            If you would like.  I've taught the

17        class once or twice.

18   BY MR. ZIBILICH:

19   Q.    Do you think his brain could formulate

20   intent?

21   A.    I don't know.  I don't know if -- the

22   thing with ███ is that ███ outside of an

23   outburst was very, very different than ███

24   during an outburst.

25   Q.    Sounds like it.

1    A.    So while he's in that state during an
2    outburst, I don't know how clear of an
3    understanding of intent he had.
4          MR. ZIBILICIH:
5              I'm going to show you D-16.
6          Mr. Clarke, this is dated February the
7          3rd, written on February the 4th.
8    BY MR. ZIBILICH:
9    Q.    The first outburst on this day was one
10   hour and 23 minutes, was it not?
11   A.    (No response.)
12   Q.    Pretty significant length of time, is it
13   not?
14   A.    It's pretty long, that's true.
15   Q.    But there's no reason for you to believe
16   that this is not true, is there?
17   A.    No.
18   Q.    Were you there?
19   A.    Yes.
20   Q.    So he's capable of having an outburst
21   that lasts an hour and 23 minutes clearly?
22   A.    Yeah, but it's -- the thing is, there
23   could be -- I don't want to look like I'm
24   minimizing stuff at all so I don't want to
25   come off that way.  But because -- and I have

1    to look at the data to see.

2    Q.    It's your data.  You all wrote it down,

3    not me.

4    A.    I don't have it in front of me.  I would

5    have to see was it from 6:30 to 7:10?  Was it

6    like a stomping on the ground once every 48

7    seconds?  Was it enough things to just sort

8    of keep this thing going that long.

9    Q.    I'm going to show what's been marked as

10   D-17.  This one is dated February the 8th,

11   even written on February the 8th.  This is

12   only five days after the previous outburst,

13   is it not?

14   A.    That's true.

15   Q.    Do you remember this day?

16   A.    I'm trying to remember it.

17   Q.    What's noteworthy to me is it was either

18   three bursts as described in this document or

19   one elongated burst because in between

20   bursts, I can't help but notice there was a

21   one minute in between and a three minute in

22   between assuming these numbers are correct.

23   A.    Yeah.

24   Q.    And the last burst if there was three is

25   42 minutes, another rather lengthy burst.

1    A.    Yeah, but during these times, it could

2    have been a matter of -- you know, I wish I

3    had the data in front of me because it's hard

4    to say.   Again I don't want to look like I'm

5    downplaying stuff but it's hard to say if the

6    first one and the third one was him banging,

7    hitting his foot against the ground.

8    Q.    I got you.   Those are your times, not

9    mine.

10   A.    Sure.

11   Q.    I'm going to show you D-18 which is

12   April 3rd, 2018, a couple months later and

13   this one starts off with a 44-minute burst,

14   does it not?

15   A.    That's right, yeah.

16   Q.    So once again I guess you don't know if

17   there were any calming periods and if so, how

18   long they lasted?

19   A.    That's right.

20   Q.    But we know that at least from this

21   sometimes when there's a stop, the document

22   indicates that it stopped.

23   A.    Yeah.

24   Q.    And sometimes it doesn't?

25   A.    Well, that's because the way we took

1    data at that time is that we had to separate

2    the bursts into, if it was a minute, I

3    believe it was a minute but a minute of no

4    activity, it might have been two minutes but

5    it was something along those lines.  So if he

6    had a burst from 4:45 to 5:00 o'clock, you

7    know, and the most intense part of the burst

8    was 4:50 to 5:00 o'clock and then he slapped

9    his -- he hit the ground with his foot a few

10   times and then it ended at 5:05.  And then

11   5:05 to 5:06 nothing happened but then 5:06

12   and 30 seconds he hits his foot against the

13   ground again, then that would start the next

14   burst if that makes sense.

15        MR. ZIBILICH:

16             The next one is D-19, May 28th,

17        Mr. Clarke, and May 29th.

18   BY MR. ZIBILICH:

19   Q.    So what we learn here is two days that

20   were significant enough to be written about

21   with bursts two days in a row, correct?

22   A.    That's true.

23   Q.    Now I can't help but note that the burst

24   on Tuesday is a 25-minute burst, is it not?

25   A.    That's true.

1    Q.    And earlier on that same day he had

2    a tantrum which lasted 46 minutes at the

3    Esplanade Mall, did it not?

4    A.    That was on May 28th.

5    Q.    My reading is it's May 29th.

6    A.    Yeah, I'm just trying to follow.

7    Q.    I'll slow down.

8    A.    Oh, I see what you mean, the two bursts,

9    the 29th, 6:45 to 7:10 and then 7:32 and

10   7:34.

11   Q.    So one of those bursts is 25 minutes and

12   the other is 46 minutes, correct?

13   A.    That's correct.

14   Q.    And he bit you six times breaking the

15   skin?

16   A.    Oh, I see, okay.  I hope I'm not getting

17   this wrong but at Esplanade Mall, he had a

18   tantrum from 3:30 to 4:16.

19   Q.    Mm-hmm.

20   A.    So that's just a tantrum, that's not an

21   outburst.  A tantrum is --

22   Q.    Since I don't have a scale in front of

23   me and I'm not trying to be ignorant.  Maybe

24   I am ignorant.

25   A.    No, no, no.  It's confusing to me too.

1   Q.    The difference between an outburst and

2   tantrum?

3   A.    Tantrum means he cries, he drops to the

4   ground but there's no those combined target

5   behaviors, no aggression, no self-injurious

6   behavior, no biting.

7   Q.    Is there any indicia as to when a

8   tantrum might morph into an outburst?

9   A.    Yeah, it's when he starts slapping his

10  head.

11       MR. ZIBILICH:

12            I'm going to show you D-20, July

13       19th, Mr. Clarke.

14  BY MR. ZIBILICH:

15  Q.    An outburst is worse than a tantrum?

16  A.    Yeah.   Tantrum, if I remember correctly,

17  doesn't even really involve any behaviors

18  that are self-injurious or aggressive or

19  biting.   It's just he may be yelling, crying,

20  dropping to the floor but nothing beyond

21  that.

22  Q.    So the second paragraph here leads me to

23  believe that we had a burst, a more signifi-

24  cant burst that lasted an hour and nine

25  minutes, true?

1    A.    That's correct.

2    Q.    Slapped his head 97 times, banged his

3    head 21 times on the floor and he banged the

4    stove 75 times bending the burner on the

5    stove and bending the stove covers, correct?

6    A.    That's correct.

7    Q.    And you don't believe that that takes

8    superhuman strength?

9    A.    No.

10   Q.    You wouldn't call it that?

11   A.    I wouldn't call it that.

12        MR. CLARKE:

13            I think the Westgate attorney might

14        have an opinion on that.

15        MR. KAUL:

16            Not my deposition.

17   BY MR. ZIBILICH:

18   Q.    This is D-21.  I'm getting close to the

19   end.  This is October the 10th, 2018.  So I

20   think I'm starting to get it.  When I read

21   the word head slaps, that's more akin to a

22   burst than a tantrum?

23   A.    Once he starts slapping his head, it

24   becomes a burst.

25   Q.    Okay.  Next one is D-22 which is January

1    the 10th, took me a long time to figure that

2    one out.   This is a burst because at one

3    point, we read about 42 head slaps and at

4    another point we read about 88 head slaps.

5    And then later on, we got a drop and a 105

6    head slaps with 13 head bangs.   That's a

7    pretty significant burst, is it not?

8    A.    Yes, it is.

9    Q.    And this is in January of 2019?

10   A.    That's correct.

11   Q.    The next one is January 13th, two days

12   later.   January 13th.   We got a burst here

13   that lasts 58 minutes, first sentence, do we

14   not?

15   A.    That's correct.

16   Q.    The next one is months later which is

17   July 18th which I'm marking as D-24.   This is

18   the one where you're scared you all are going

19   to get in a wreck on 310, right?

20   A.    That's correct.

21   Q.    That's got be scary.

22   A.    It was.

23   Q.    And this one is 55 minutes long.   And lo

24   and behold, it's in the parking lot of laser

25   tag.

1    A.    Now this was a separate -- well, let me

2    read it first.

3    Q.    Okay.  Take your time.

4    A.    Okay.

5    Q.    So in this one -- I'm sorry.  You're

6    still reading?

7    A.    Well, I'm trying to figure out the --

8    Q.    Sequence?

9    A.    Yeah.

10   Q.    I was having that issue.

11   A.    Because there was the -- okay.  I see.

12   Now I see.

13   Q.    So I know when you go to the store and

14   you buy an item, sometimes they tell you it's

15   good for a year.  It's good for two years.

16   It can withstand hundred-mile-an-hour

17   hurricane winds.  It can do this.  It can do

18   that.  Like the harness didn't stop him from

19   getting to you from the third row in that car

20   on this occasion?

21   A.    Now that's the thing.  That was before

22   we used this (witness indicating).

23   Q.    As a backup or in conjunction therewith?

24   A.    No, actually before we even bought

25   these.

1    Q.    But you bought them --

2    A.    In reaction to this.  Because he was

3    able to maneuver with that vest with the type

4    of attachment we had been using and get to

5    me, after it was over, the St. Charles Parish

6    deputies were nice enough to follow us home

7    and we spoke with them about what do we do?

8    We thought this was going to be a safe thing

9    and this happened and this scares us.  We

10   don't want this to happen and endanger any-

11   body.

12       And one of them said well, look up

13   alternatives.  What other ways you could

14   safely keep this vest on ███ so you can go

15   out where this won't happen again.  And I

16   believe, and I'm not a hundred percent sure,

17   but I believe Donna may have even brought up

18   zip ties as an alternative.  But again I'm

19   not a hundred percent sure on this.

20   Q.    And you all utilized those on his

21   wrists?

22   A.    No, not on wrists.  This is strictly to

23   attach the vest to the back of the seat.

24   Q.    Did you ever utilize any tool to use on

25   his wrists at any time in life?

1  A.    There was one time in I believe February

2  of 2014, we had a behavior therapist at that

3  point named Dawn Gilcrese who thought we

4  could do a posey which it's like a soft

5  restraint for his wrists to try to control

6  his behavior.   We used it one time and he

7  escalated dramatically with that and so we

8  never did it again.

9  Q.    So this is a really scary event, this

10  thing on the 310 --

11  A.    Yeah.

12  Q.    -- where I mean basically he flicks the

13  harness aside and can still get to you from

14  the third row.

15  A.    Well, actually he was in the harness.

16  This is the thing.   The harness was still on

17  him and I was using bungee cords and the

18  whole history of that is it used to be a

19  clip-on thing and then he could easily unclip

20  that.   And so I used a bungee cord that could

21  tie and I thought that could restrain him to

22  his seat.   And so --

23  Q.    Was that recommended to you when you got

24  the seat?

25  A.    No, it wasn't.

1   Q.   This was added to the seat?

2   A.   Added to the seat, yes.

3   Q.   Because the seat wasn't getting the job

4   done?

5   A.   Well, the clip to attach the vest to the

6   seat was pretty easy to get off.  And so we

7   spoke with our treatment, with Dr. Hamilton,

8   what other options can we do.

9   Q.   You need more security?

10   A.   You need more security, exactly.

11   Q.   So here we are, it's July.  It's 2019

12   and this incident has got to be one of the

13   two or three scariest ones yet.

14   A.   Yeah.

15   Q.   But not enough to keep you from bringing

16   him out in public where people can get hurt?

17   A.   You're going to kill me.

18   Q.   No, I'm not.

19   A.   But it's the balance.

20   Q.   I got you.

21   A.   I love him.

22   Q.   I'm trying to think if there was going

23   to be anything ever in life to change the

24   balance.

25   A.   It's --

1    Q.    It's okay.   October 11, burst, Exhibit

2    25.   This is the one you're going to tell me

3    was the last one prior to the January 19th

4    date, correct?

5    A.    That's correct.

6    Q.    Not counting the Super Cuts?

7    A.    Not cutting Super Cuts.

8    Q.    And maybe any other things that did not

9    rise to the level of burst.

10   A.    That's correct.

11   Q.    You're not going to tell me that between

12   October 11th and January 19th there were no

13   tantrums?

14   A.    There might have been tantrums but I

15   don't recall.

16   Q.    Well, of course there were tantrums.

17   A.    There might have been tantrums but he

18   was doing really well during that time.

19   Q.    So when did he start doing well after

20   this horrible incident on July 18th on I-310?

21   A.    When did he start?

22   Q.    Yeah, when did he start doing well?

23   This wasn't a well day.

24   A.    Yeah, but he had several well days

25   between then and here.

1    Q.    A whole bunch of well days in a row are

2    not indicative that tomorrow's going to be a

3    well day.  These bursts can come out of

4    nowhere?

5    A.    It can still happen.

6    Q.    Okay.  This is a 31-minute burst, is it

7    not?

8    A.    That's correct.  Well, let's see, let me

9    see.

10   Q.    I'm doing 2:54 to 3:25, I'm adding 25

11   and 6 and I'm getting 31.

12   A.    Sure, you got it.  You're right.

13   Q.    And it was followed up with a tantrum?

14   The burst was significant enough for you come

15   home early that day, was it not?

16   A.    That's correct.

17        MR. ZIBILICH:

18             All right.  I just want to grow up

19        and learn to be like Mr. Clarke and I'm

20        getting close.  I just need a minute to

21        go chat.  Let's take a few-minute break.

22                  (Off the record 3:12 p.m.

23             Back on the record 3:17 p.m.)

24   BY MR. ZIBILICH:

25   Q.    We are at the end here.  I'm going to

1    show you what I'm marking as Daren Exhibit

2    No. 26.   And this is a letter from someone at

3    St. Charles Parish relative to an incident at

4    the high school which I'm sure was provided

5    to me by Mr. Cooperative himself, Mr. Clarke.

6         MR. CLARKE:

7              No, this was produced from you to

8         me, Franz.

9         MR. ZIBILICH:

10             It was.

11        MR. CLARKE:

12             Produced from you to me in May of

13        2020.

14        MR. ZIBILICH:

15             I'm so used to you producing every-

16        thing, I just lost it for a moment.

17   BY MR. ZIBILICH:

18   Q.   As you read, can I safely assume that

19   you've never seen that before?

20   A.   That's correct.

21   Q.   Let the record so reflect.

22        MR. CLARKE:

23             You're kind of putting the Judge in

24        your depo as well?

25        MR. ZIBILICH:

```
 1              Off the record.
 2                   (Whereupon, a discussion was
 3              held off the record.)
 4  BY MR. ZIBILICH:
 5  Q.    You've had a chance to read that, sir?
 6  A.    Yes.
 7  Q.    And this is a letter from a St. Charles
 8  Parish Destrehan High teacher or employee to
 9  the superintendent of St. Charles Parish
10  Schools as I understand it; is that correct?
11  A.    That's correct.
12  Q.    Is there anything in this letter that
13  surprises you?
14  A.    Well, this wasn't his regular teacher so
15  I don't know if that -- he was apparently a
16  substitute teacher so I don't know if that
17  played a role in any of this.  Typically in
18  school, he did have outbursts but they were
19  able to restrain him safely.
20  Q.    That's what this letter describes.  This
21  letter describes an event slash outburst --
22  A.    That's correct.
23  Q.    -- with ████ back in the fall of 2017?
24  A.    That's right.
25  Q.    And it also describes some of the things
```

1    that the St. Charles Parish teachers had to

2    invoke to be safe when walking him throughout

3    the facility, does it not?

4    A.    Which part are you reading?  I'm sure it

5    is.  I'm not sure which part you're referring

6    to.

7    Q.    And it also describes an incident where

8    ███████ was struggling with four men, correct?

9    A.    Can you tell me what you're looking at?

10   Q.    I'm on Page 2, second to last paragraph

11   at the bottom.  I was ushered out of the room

12   and ███████ was still struggling with the four

13   men.

14   A.    Yeah, that's what it says.

15   Q.    All right.  Are you telling me that no

16   one from Destrehan High School or no one

17   affiliated with the St. Charles Parish school

18   superintendent's office ever mentioned this

19   incident to you all?

20   A.    I had heard of an incident at some point

21   about this person but I didn't know any of

22   the details of it.

23   Q.    But certainly these details seem

24   consistent with experiences that you and your

25   wife have had with ███████ during that same time

```
1   period?
2   A.    He had severe outbursts in 2017 that we
3   experienced.
4   Q.    That we talked about at length earlier
5   today?
6   A.    Sure, yeah.
7   Q.    Mr. Parsa, I know this has not been fun
8   but I thank you for your professionalism.  I
9   don't know if Counsel over here has any
10  questions or not.
11       MR. KAUL:
12           I do.  I have a few questions, sure.
13  BY MR. KAUL:
14  Q.    Good afternoon, Mr. Parsa.  We've met
15  before the deposition.  My name is Chris
16  Kaul.  I represent Victory and Westgate in
17  this lawsuit.
18       You've been asked a lot of questions
19  today.  I'm just going to try to fill in some
20  blanks.
21  A.    Sure.
22  Q.    But if any question seems repetitive,
23  it's not intentional.  I apologize.
24  A.    Sure.
25  Q.    I'm mainly going to ask you about the
```

1    incident on January 19th, 2020 and a few

2    general questions.

3        On the day of that incident in the

4    parking lot, did anybody from the laser tag

5    get involved?

6    A.    Not during the part where prior to █████

7    being restrained in the prone position.

8    After he was restrained, being restrained,

9    then Heather of the laser tag came out.  And

10   I believe looking at the video, I believe she

11   gave me like a paper towel or something to

12   put on my chin.

13   Q.    Heather's role, she's a manager at the

14   laser tag?

15   A.    She's one of the managers.

16   Q.    Her role is to kind of assist you a

17   little bit?

18   A.    She came out and gave me a paper towel,

19   that's correct.

20   Q.    And this was after the JPSO officers got

21   involved?

22   A.    Correct.

23   Q.    And the first JPSO officer who arrived

24   was Chad Pitfield?

25   A.    That's correct.

1    Q.    When he arrived, did he arrive in a

2    JPSO vehicle?

3    A.    I believe he did, yes.

4    Q.    Was he in a JPSO uniform?

5    A.    He was in a uniform.

6    Q.    What was your knowledge at the time -- I

7    understand a lawsuit's been filed.  You've

8    seen videos.  What was your understanding at

9    the time of Chad Pitfield, who he was

10   employed with at the time?

11   A.    Oh, I didn't know.

12   Q.    And I know it's been alleged in your

13   complaint that he was on a special detail

14   assignment for Westgate?

15   A.    That's correct.

16   Q.    Did you have any information about that

17   at the time of this incident?

18   A.    I didn't know specifically that he was

19   employed by Westgate, no.

20   Q.    Or that's your understanding?  You think

21   he was employed by Westgate?

22   A.    No, I did not know that.  I knew that

23   they were going to call for the sheriffs or

24   the police but I didn't know anything beyond

25   that.  I just knew he was a Jefferson Parish

1    sheriff's officer.

2    Q.    Do you have any understanding of how the

3    detail program for Westgate is operated?

4    A.    No.

5    Q.    Any information or knowledge about how

6    officers are scheduled or put into a schedule

7    to be on the premises at Westgate?

8    A.    No.

9    Q.    And you have no knowledge of who that

10   person is that creates the schedule for the

11   detail officer?

12   A.    No, I don't.

13   Q.    So if I told you the person at the time

14   of the incident who was coordinating and

15   scheduling the detail officers was not

16   employed by Westgate, would you have any

17   information to refute that?

18   A.    No.

19   Q.    Do you have any information about the

20   training Chad Pitfield received?

21   A.    No.

22   Q.    So you frequented the laser tag with

23   your son and other businesses at the Westgate

24   property, is that correct, for a number of

25   years?

1    A.    Mainly it was laser tag.

2    Q.    But you also mentioned Super Cuts?

3    A.    That wasn't at Westgate.

4    Q.    Okay.  It wasn't at Westgate.

5    A.    No.

6    Q.    Would you go to any of the other

7    businesses located at the Westgate property

8    at any time?  I think it was 2014 to 2020 is

9    when you would go there?

10    A.    I think we may have gone to Academy

11    Sports which I believe is on the other side

12    of Westgate Shopping Center.

13    Q.    I'll ask you this way.  If you had gone,

14    it may have been like a one off?

15    A.    Yeah.

16    Q.    It wasn't part of the typical procedure?

17    A.    No, no.

18    Q.    Where's the Super Cuts located?

19    A.    That was on Veterans closer to --

20    between Transcontinental and Clearview.

21    Q.    I don't want to -- I'm going to try to

22    fairly summarize I guess what you testified

23    to earlier.  That you frequented the laser

24    tag frequently on a weekly basis for a number

25    of years?

1   A.    Yes.

2   Q.    Did the people at laser tag know your

3   son was autistic?

4   A.    Yes, they did.

5   Q.    Now did they know he's autistic because

6   you took a concerted effort to initially

7   inform them or just because over the years

8   through small talk, through observation, they

9   discovered he was?

10   A.    We spoke with the laser-tag people.

11   Q.    Did you have any meetings?  I remember

12   some testimony about your wife having a

13   meeting with the St. Charles Parish Sheriff's

14   Office to kind of inform them about your son?

15   A.    Yes, yes.

16   Q.    Do you have any type of similar meeting

17   with anybody at laser tag?

18   A.    We spoke with people there on a pretty

19   regular -- definitely on a number of

20   occasions.

21   Q.    In terms of what?

22   A.    Like ███████ disability and having

23   autism.

24   Q.    Would you guys try to put any sort of

25   protocols or a plan in place for when you

```
 1   would arrive to make sure the stay was I
 2   guess a good balance of what you testified
 3   between ████ well being and also public
 4   safety?
 5   A.    Well, the staff was -- we didn't like
 6   come in and say you guys need to do this,
 7   this and that.  It wasn't anything like that.
 8   Q.    That was my next question.  Did you ever
 9   give them a dos-and-don'ts list as sort of
10   what's been talked about a lot today?
11   A.    Well, I'm trying to remember because
12   we've talked with them and we've talked with
13   some of the staff about what ████ likes and
14   some of the things that could upset him but I
15   can't say any really detail.  I don't know.
16   Q.    Ever provide them any information, any
17   materials to help them understand ████
18   condition better?
19   A.    Mainly just speaking with them.
20   Q.    Kind of going back to a question about
21   the detail program at Westgate, you have no
22   information about how they're paid?
23   A.    No.
24   Q.    What their tax struction --
25   A.    No.
```

1   Q.    Would you ever call ahead to laser tag

2   to let them know you were coming?

3   A.    No, not that I can recall.

4   Q.    You never called ahead and said hey,

5   what's the crowd like?  Is this a good time?

6   A.    We would drive past it and see.  We

7   would get there early and we would see if

8   it's a busy parking lot.  And if it was a

9   busy parking lot, we would say hey, buddy,

10  they're having a birthday party today.  Let's

11  go to, you know, do something else that day.

12  Q.    But never any coordination with laser

13  tag?

14  A.    No.

15  Q.    Aside from the incident on January 19,

16  2020, were there ever any prior outbursts at

17  laser tag?

18  A.    Not -- there were a couple of tantrums.

19  Q.    How do you distinguish a tantrum from an

20  outburst?  If that's been discussioned.  I

21  apologize.

22  A.    No, no, no.  It's confusing.  Tantrum

23  means he is screaming, crying, dropping to

24  the ground but not to the point of self-

25  injury or aggressiveness or biting.  And I'm

1    trying to recall.  There may have been --

2    there was at one time where there was some

3    head slapping but he was able to calm down.

4    And actually he utilized what we had been

5    teaching at home to cross his arms.  In this

6    case, he crossed his arms behind his back and

7    he calmed down and he went on.

8    Q.    Any idea when that would have been, what

9    year?

10   A.    That was actually -- actually that was

11   in '20.  Well, shit, that was the day before.

12   Yeah, that was January 18th.

13   Q.    At the laser tag?

14   A.    At the laser tag.

15   Q.    So you went back-to-back days?

16   A.    Yes, we've gone back-to-back days.

17   Q.    Prior to the January 18th tantrum, what

18   was the one most previous to that at the

19   laser tag?  I'm not asking about ones at home

20   or ones at other premises but just the laser

21   tag.

22   A.    The previous one within laser tag would

23   have been him having a tandem -- jeez, it

24   would have been there was a time in July 2019

25   when he had the tantrum outside in the

1    parking lot.

2    Q.    Okay.   That's the one you testified to

3    earlier?

4    A.    Yeah, yeah.   And then prior to then, he

5    had had I believe at least two episodes where

6    he would have a tantrum.   And they had this

7    game, I believe it was like a Jurassic Park

8    game or something like that where he would go

9    into it and it was in a corner of laser tag.

10   And he went there and he cried and he had a

11   tantrum and we gave him time to calm down but

12   it didn't lead to any self-injury,

13   aggressiveness.

14   Q.    You said he played the game or he was

15   near the game?

16   A.    He was near the game, yeah.

17   Q.    At any of these prior occasions, did you

18   have to get any officer involved?

19   A.    No.

20   Q.    At any of these prior, was anybody at

21   laser tag required to calm him down, end the

22   episode?

23   A.    No.

24   Q.    Was there anything about the day in

25   question that -- I mean I'm guessing with

1    ████, day in and day out for many years, like

2    you said before, you had become an expert at

3    studying his behavior.  Was there anything

4    about that day that -- and you kind of

5    testified earlier about he wanted to leave

6    and you went to Izzo's.  You came back but

7    you mentioned he played a few games for the

8    first time.

9    A.    That's right.

10   Q.    Was there a history of playing new games

11   or introducing a new activity that could

12   correlate or could give some kind of a

13   predictive element to outbursts or tantrums?

14   A.    Not really, no.  That was actually a

15   good thing.

16   Q.    You had mentioned that that was

17   encouraging for you.

18   A.    Yeah, yeah.

19   Q.    But sometimes it would go the opposite

20   direction and it would lead to --

21        MR. CLARKE:

22            Let him finish before you answer.

23        MR. KAUL:

24            Actually I cut him off so that's my

25        fault.

```
1    BY MR. KAUL:
2    Q.    My question is, can new activity some-
3    times lead to -- can it be something that
4    while you're encouraged, you're also a little
5    bit guarded because it could lead to some-
6    thing different?
7    A.    That's correct.
8    Q.    But are those new games in hindsight I
9    guess something you think about as something
10   that may have led to the incident that day,
11   his behavior?
12   A.    In hindsight.
13   Q.    There's a lot of questions about light
14   and sound.  Were there things about that game
15   that maybe stood out as introduced a new type
16   of light or a new type of sound that you
17   obviously couldn't predict what it would do?
18   A.    It's hard to say.  I wish I could give
19   you a definite answer.  I don't know.  That
20   would be about the best -- unfortunately the
21   best answer I could give.
22   Q.    So I guess nothing about that day in
23   hindsight, anything about that day stand out
24   to you as like a trigger for what occurred in
25   the parking lot?
```

1  A.    In hindsight, my -- something had
2  happened that he didn't want to do the laser
3  tag which at the time didn't surprise me too
4  much because we had been doing laser tag,
5  that laser tag pretty consistently for six
6  months.  And so him saying he didn't want to
7  do it didn't surprise me terribly much.
8  Because after a certain point, he might be
9  starting to get a little tired of it.
10     In hindsight looking back, then yeah, a
11  question was that?  Was that something?  So I
12  don't know.  It's really difficult to say.
13  Q.    You had no conversations with Chad
14  Pitfield about whether he was working for
15  JPSO, working a special detail or anything
16  like that?
17  A.    No, no.
18  Q.    All the information you have I'm assum-
19  ing came from your counsel's investigation
20  after the fact?
21  A.    That's correct.
22  Q.    And who was it who called Chad Pitfield?
23  A.    That was Heather the worker.
24  Q.    Was she prompted by either you or you
25  wife to make that call?

1   A.   She asked Donna should -- do you want us

2   to call the police or call the sheriff's

3   office.  And then Donna opened the door and

4   asked me and I said yes.

5   Q.   I guess my last question is, when Chad

6   Pitfield was replaced by whichever officer

7   came next to restrain your son, do you have

8   any recollection of your son's condition at

9   that time when Chad Pitfield --

10  A.   When the change-over happened, I

11  remember Donna still holding his hand and

12  Donna wouldn't be able to hold his hand

13  unless ████ was calm at that point.

14  Q.   Have you had any conversations with

15  anybody at Westgate since filing this

16  lawsuit?

17  A.   We spoke with -- I'm blanking on his

18  name.  He was one of the managers of laser

19  tag.  We spoke with him maybe a couple weeks

20  after ████ died and it was regarding the

21  video.

22  Q.   So you spoke with the manager of the

23  laser tag?

24  A.   Right.

25  Q.   It's your understanding laser tag is a

1    tenant of the building?

2    A.    Oh, I see.

3    Q.    The building is owned by Westgate.

4    A.    No, I haven't spoken with anyone.

5    Q.    You haven't spoken to anybody at

6    Westgate?

7    A.    No.

8         MR. KAUL:

9              That's all the questions I have.

10        MR. CLARKE:

11             Let the record reflect no, I'm not

12        asking any questions.

13        MS. VALENTI:

14             Let it accurately reflect.

15        MR. ZIBILICH:

16             So we're done.

17             (Deposition ends 3:38 p.m.)

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2          I, ANN M. DOWNS, Certified Court

3    Reporter, in and for the State of Louisiana,

4    as an officer before whom this testimony was

5    taken, do hereby certify that DAREN PARSA,

6    after having been duly sworn by me upon

7    authority of R.S. 37:2554, did testify as

8    hereinbefore set forth in the foregoing 279

9    pages; that this testimony was reported by me

10   in the stenotype reporting method, was

11   prepared and transcribed by me or under my

12   personal direction and supervision, and is a

13   true and correct transcript to the best of my

14   ability and understanding.

15          That the transcript has been prepared in

16   compliance with transcript format guidelines

17   required by the statute or by rules of the

18   board, and that I am informed about the

19   complete arrangement, financial or otherwise,

20   with the person or entity making arrangements

21   for deposition services; that I have acted in

22   compliance with the prohibition on

23   contractual relationships, as defined by

24   Louisiana Code of Civil Procedure Article

25   1434 and in rules and advisory opinions of

1   the board; that I have no actual knowledge

2   of any prohibited employment or contractual

3   relationship, direct or indirect, between a

4   court reporting firm and any party litigant

5   in this matter nor is there any such

6   relationship between myself and a party

7   litigant in this matter.  I am not related to

8   counsel or to the parties herein, nor am I

9   otherwise interested in the outcome of this

10   matter.

11       This certification is valid only for a

12   transcript accompanied by my original

13   signature and original stamped seal on this

14   page.

15

16

17

18

19

20

21

22                    _____

23                    ANN M. DOWNS
                      Certified Court Reporter
                      State of Louisiana
24                    Certificate Number 81041

25