1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF LOUISIANA

3        CASE NO.  2:21-cv-00080

4

5    DONNA LOU and DAREN PARSA, on their own behalf and
     on behalf of their deceased minor child, E.P.

6                    Plaintiffs,

7

8                    VERSUS

9

10   SHERIFF JOSEPH P. LOPINTO, III, CHAD PITFIELD, RYAN
     VAUGHT, STEVEN MEHRTENS, SHANNON GUIDRY, NICK VEGA,

11   MANUEL ESTRADA, MYRON GAUDET, JOHN DOES 1-3,
     VICTORY REAL ESTATE INVESTMENTS LA, LLC D/B/A

12   WESTGATE SHOPPING CENTER, ABC INSURANCE COMPANY,
     and XYZ INSURANCE COMPANY,

13

14                   Defendants.

15

16

17        DEPOSITION OF DONNA LOU, given in the

18   above-entitled cause, pursuant to the following

19   stipulation, before Sandra P. DiFebbo, Certified

20   Shorthand Reporter, in and for the State of

21   Louisiana, at JPSO, 1233 Westbank Expressway, Fifth

22   Floor, Harvey, Louisiana, on the 14th day of

23   November, 2022, commencing at 9:04 AM.

24

25

```
1   APPEARANCES:

2            THE COCHRAN FIRM MID-SOUTH
             BY:  ANDREW CLARKE,
3            ATTORNEY AT LAW
             One Commerce Square
4            40 South Main, Suite 1700
             Memphis, Tennessee  38103
5            Representing the Plaintiffs

6            MARTINY & ASSOCIATES
             BY:  FRANZ ZIBILICH,
7            ATTORNEY AT LAW -and-
             JEFFREY D. MARTINY,
8            ATTORNEY AT LAW
             131 Airline Drive
9            Suite 201
             Metairie, Louisiana  70001
10           -and-
             LINDSEY M. VALENTI, ATTORNEY AT LAW
11           LEGAL ADVISOR
             1233 Westbank Expressway
12           Building B, Fifth Floor
             Harvey, Louisiana  70058
13           Representing JPSO Defendants

14
             THOMPSON, COE, COUSINS & IRONS, LLP
15           BY:  CHRISTOPHER KAUL,
             ATTORNEY AT LAW
16           601 Poydras Street
             Suite 1850
17           New Orleans, Louisiana  70130
             Representing Victory Real Estate
18           Investments LA, LLC, and Westgate
             Shopping Center
19

20   Also Present:  Daren Parsa, Tim Anclade,
                     Nicholas Vega, Myron Gaudet, Solomon
21                   Burke

22   Reported By:

23
             Sandra P. DiFebbo
24           Certified Shorthand Reporter
             State of Louisiana
25
```

**KELLY & ASSOCIATES**
**(504) 891-6333**

```
 1

 2        E X A M I N A T I O N              I N D E X

 3                                            Page

 4   BY MR. ZIBILICH:                          5

 5   BY MR. KAUL:                             202

 6

 7        E X H I B I T                       I N D E X

 8                                            Page

 9

10   Exhibit 1                                99

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1          S T I P U L A T I O N

2

3          It is stipulated and agreed by and

4   between Counsel for the parties hereto that the

5   deposition of DONNA LOU is hereby being taken

6   pursuant to the Federal Rules of Civil Procedure

7   for all purposes in accordance with law;

8          That the formalities of reading and

9   signing are specifically waived;

10          That the formalities of sealing,

11   certification, and filing are hereby specifically

12   waived.

13          That all objections, save those as to

14   the form of the question and responsiveness of the

15   answer are hereby reserved until such time as this

16   deposition or any part thereof is used or sought to

17   be used in evidence.

18               * * * * *

19          Sandra P. DiFebbo, Certified Shorthand

20   Reporter, in and for the State of Louisiana,

21   officiated in administering the oath to the

22   witness.

23

24

25

```
 1              DONNA LOU, 117 Acadia Lane, Destrehan,
 2        Louisiana 70047, having been first duly sworn,
 3        was examined and testified on her oath as
 4        follows:
 5   EXAMINATION BY MR. ZIBILICH:
 6        Q.   Good morning, Ms. Parsa.
 7        A.   Good morning.
 8        Q.   You know the drill.  You've seen this
 9   enough times by now I'm sure.
10        A.   I have been to some depositions. That's
11   true.
12        Q.   Have you been to any depositions other
13   than the depositions that were taken in this case?
14        A.   No, I have not.
15        Q.   The rules are pretty simple.  I ask
16   questions.  Assuming your lawyer doesn't object,
17   you answer the questions.  If you do not understand
18   one of my questions, just let me know what it is
19   that you don't understand, and I'll do my best to
20   explain it.  I will take the position, however,
21   that if you answer my question, then, therefore,
22   you must have understood it.  Fair enough?
23        A.   Fair enough.
24        Q.   Give me your full name.
25        A.   Donna Lou.
```

```
1          Q.    Your last name?

2          A.    I actually kept my maiden name.

3          Q.    Which is?

4          A.    Lou, L-O-U.

5          Q.    What is your birth date?

6          A.    11/15/66.

7          Q.    Happy birthday.

8          A.    Thank you.

9          Q.    And where did you grow up?

10         A.    In Greenwood, Mississippi.

11         Q.    And what years did you live in Greenwood,

12  Mississippi?

13         A.    I lived in Greenwood, Mississippi -- I

14  was born there, and I lived there until age 17,

15  almost 18, when I left to go to college.

16         Q.    I take it you went to grammar school and

17  high school in Greenwood?

18         A.    I did.

19         Q.    Any episodes while you were in grammar

20  school or high school?

21         A.    I'm not sure what you mean, any episodes.

22         Q.    Were you ever tossed out of school,

23  disciplined, or anything like that?

24         A.    Oh, no.

25         Q.    I didn't think. So where did you go to
```

1    college?

2         A.    I went to college here in Newcomb,

3    Tulane.

4         Q.    And what program did you major in?

5         A.    I was a psychology major.

6         Q.    And how many years of education does it

7    take to become a psychology major?

8         A.    I had a Bachelor of Science.  It takes,

9    typically, four years, so I finished in three.

10        Q.    And then what?

11        A.    Then I took a year off.

12        Q.    And then what?

13        A.    And then after college I took the year

14   off.  Then I went to medical school.

15        Q.    Where did you go to medical school?

16        A.    At Tulane.

17        Q.    So let me see if I got this right.  You

18   started medical school in about 1986?

19        A.    I started -- I completed high school in

20   1984.  I finished college in 1987.

21        Q.    So 1989?

22        A.    1989.

23        Q.    '88 you started medical school?

24        A.    I finished in '92.

25        Q.    What is your medical degree in?

```
 1            A.    I decided to choose a residency and

 2     specialize in psychiatry and then a fellowship in

 3     child and adolescent psychiatry.

 4            Q.    The fellowship was obtained where?

 5            A.    It was all at Tulane.

 6            Q.    All at Tulane.  So you completed all of

 7     this by when?

 8            A.    I completed all of this, like I said

 9     before, medical school in 1992.  With my residency

10     and fellowship, I completed that in '98.

11            Q.    So in 1998, you began your working

12     career?

13            A.    That is true.

14            Q.    And tell me where you first worked.

15            A.    I first worked at the -- for the

16     Department of Health & Hospitals for the State of

17     Louisiana at a community mental health clinic.

18            Q.    Where?

19            A.    A community mental health clinic.

20            Q.    Were was that?

21            A.    In Terrebonne Parish, Houma.

22            Q.    What did you do for those folks?

23            A.    I was the psychiatrist there, the child

24     and adolescent psychiatrist, and I did more of the

25     med management of children that came.
```

```
 1          Q.    What does that entail?

 2          A.    First -- well, first time is I have to

 3   evaluate them to see if they met the criteria for

 4   -- you know, are diagnosed, and then --

 5          Q.    Criteria for what? To see if they were

 6   eligible for some program?

 7          A.    To see if they had whatever the diagnosis

 8   may be, if it was depression, if it was ADHD.  Just

 9   diagnoses.  And then from that had to determine

10   whether or not they needed medication or not or did

11   they need just counseling.  If they needed

12   counseling, then refer them to the social worker

13   that was at the clinic, or if they needed testing,

14   such as IQ testing, to refer them to the

15   psychologist that was at the clinic.

16          Q.    You did that for how long in Houma?

17          A.    I did that for a little over two years.

18          Q.    Did you have one supervisor or more than

19   one supervisor?

20          A.    When I was in --

21          Q.    When you were in Houma at this community

22   place.

23          A.    You mean as a psychiatric supervisor or

24   do you mean is there a clinic supervisor or --

25          Q.    I'm looking to see who you reported to,
```

```
 1    who your boss was.
 2          A.   As far as my clinical work, my diagnosis
 3    and medication, that was me independently doing
 4    that.  I didn't run the clinic, so there was a
 5    clinic supervisor that would determine, you know,
 6    who -- the hiring practices.  There is someone that
 7    did the billing.
 8          Q.   You had nobody to report to?
 9          A.   I was independent as far as my diagnosing
10    and medication.
11          Q.   As far as any other concepts or aspects
12    of your job, did you have anybody to report to?
13          A.   Like if I was sick, I had to call in sick
14    and say, you know, I am out today or I have a
15    doctor's appointment or whatnot.  That I would have
16    to report and talk about that and say, you know --
17          Q.   Well, how did they measure or did they
18    measure whether you were doing a decent job or not,
19    if you had nobody to report to?
20          A.   The diagnosis that I gave and the
21    medications that I gave were dependent on the
22    patient that I saw, and they came to me, and we
23    looked at the medications.  We'd try them out.  If
24    they didn't work, that patient came back, or if
25    they called the nurse and say, hey, I'm having some
```

1   side effects with this medicine or it doesn't seem

2   to be working, then they would let me know, and the

3   person would come back in and see me and make a

4   determination whether or not the medication needed

5   to be changed or not or that person needed to be

6   hospitalized.

7         Q.   But there was nobody there to grade your

8   paper?

9         A.   At that point in time, once you are

10  finished with medical school, and you have your

11  job, and that is -- you are independent with that.

12        Q.   So how many people reported to you during

13  this two-year period?

14        A.   When you say reported --

15        Q.   Worked under you.  Worked with you.

16        A.   I'm not sure where you are -- I'm not

17  understanding your question.

18        Q.   I'm the patient.  I'm 16 years old,

19  whatever.  I come in.  My parents bring me in, and

20  they think I have ADD.  So what do you do?  You

21  interview me?

22        A.   Oh, I would interview you, and, also, I

23  would need to talk to your parents and get some

24  family history from them.

25        Q.   Were there any other people on your staff

12

```
1    that participated in the process of interviewing or
2    in the process of recommending medications or the
3    like?
4         A.   Oh, okay.  I see where you are going.  At
5    first, before they enter the clinic, there is also
6    a -- there was a screening process.  This is to my
7    recollection.  This is over like 20 years ago.  So
8    there was a screening process where the social
9    worker would, you know, give a review of the
10   patient that would come in and say, hey, I think
11   this kid might need some medication.  I'm going to
12   refer this person to see you, and that's how the
13   process usually --
14        Q.   So there was only one other person, you
15   and the social worker?
16        A.   There was more than one social worker at
17   the time.
18        Q.   How many?
19        A.   Again, this is recollection.  There were
20   some that were for child and adolescent.  There
21   were some for adults.  I can't give you -- I can't
22   remember.
23        Q.   Do you remember any of their names?
24        A.   First names.  Karen and Julie are two
25   that worked with the child and adolescent.
```

```
 1          Q.   So you left there in about 2000?
 2          A.   I worked there for about two years.  That
 3    would be correct.
 4          Q.   Have you spoken to either one of those
 5    ladies in the last 22 years?
 6          A.   No.
 7          Q.   No. Have you spoken with anybody else
 8    that worked at that community clinic in the last 22
 9    years?
10          A.   I lost touch with those people.  Once I
11    had my child, I lost touch.
12          Q.   Why did you leave that place in 2000?
13          A.   In 2000 I left because I was asked to do
14    a lot of forensic work.  They wanted me to do a lot
15    of forensic psychiatry work, and I wasn't trained
16    in that.  I wasn't as comfortable doing so, and I
17    just decided that wasn't for me.
18          Q.   When did you meet your husband?
19          A.   Okay.
20          Q.   Here is a quiz.
21          A.   So I met my husband during my internship
22    year at Charity Hospital.  Well, I worked for
23    Tulane, but we rotated through Charity Hospital.
24          Q.   This is what, '96, '95?
25          A.   This was -- I finished medical school in
```

1   1992.  My internship year would have been 1993.

2        Q.   You met him under what circumstances?

3        A.   He was also rotating through Charity

4   Hospital, the third floor.  That was the

5   psychiatric -- adult psychiatric floor at the time.

6   He was going through at Ochsner for his residency,

7   and I was at Tulane.  We met there on the third

8   floor.

9        Q.   The rest is history?

10       A.   I guess.  If you want to call it that

11  way.  The rest is history.  He asked me to do an

12  ABG for him, and I went ahead and did the arterial

13  blood gas for a patient of his, and I guess love

14  blossomed, I guess.

15            MR. CLARKE:

16                 Over blood gases.

17  BY MR. ZIBILICH:

18       Q.   So what year did y'all get married?

19       A.   We got married in 1998.

20       Q.   So during this first couple of years of

21  marriage, you were commuting back and forth to

22  Houma?

23       A.   Yes.

24       Q.   That was a five-day-a-week gig?

25       A.   That was five days of work a week, yes.

```
 1          Q.    And he was working here in the New
 2    Orleans area?
 3          A.    No.
 4          Q.    Where was he working at the time?
 5          A.    He also worked in the river parishes
 6    region as well.  He worked in Labadieville.
 7          Q.    I'm familiar.  Okay.  So y'all took two
 8    cars to work?
 9          A.    There were times, though -- I think, if I
10    remember correctly, and, again, this is over 20
11    years ago.  I think he worked some in Labadieville
12    and at times he worked in Houma.  The reason I sort
13    of remember him working in Houma is because I was
14    sick at the time, and they asked that I go home,
15    and he was able to drive home.  So he worked part
16    time some in Houma and part time in Labadieville.
17          Q.    So, in your undergraduate work, did you
18    take any classes at all that dealt with autism?
19          A.    In college?
20          Q.    Undergrad, yes.
21          A.    I had -- in college, I took the basic
22    psychology courses.
23          Q.    How many psychology courses did you take?
24          A.    I don't remember how many there were that
25    I needed to take to get my Bachelor of Science.
```

1     Q.   That was your major?

2     A.   That was my major.

3     Q.   So, I mean, if I were to guess that you

4   took six to eight psychology courses, would I be

5   that far off?

6     A.   I would -- I don't really remember.  I'm

7   trying to think.  I took a general psychology --

8   part of it was a general psychology course.  I took

9   an experimental psychology course.  We had to take

10  some statistics with that.  There was an animal

11  psychology course I had to take, because I remember

12  having to write a paper about going to the zoo.  We

13  did -- I took a child and adolescent psychology

14  course.

15    Q.   I'm not that far off.  That's about six.

16    A.   No.  That's about right, yeah.

17    Q.   Did any of those classes have any

18  chapters, any lectures, any components relative to

19  autism?

20    A.   This is going back to 19 --

21    Q.   I'm going back 30 years.

22    A.   Exactly.  There was no, to my knowledge,

23  or to my recollection, any specific course I took

24  that was called autism or developmental disorders.

25  There was nothing that was that.  Not to my

17

```
 1    recollection.
 2         Q.   When did you first learn that there
 3    existed such a thing as autism?
 4         A.   I know for sure that I heard of autism
 5    when I was doing my -- in my med school years.  I'm
 6    not so certain if I knew about it in my college
 7    years.
 8         Q.   So as we sit here today, your best
 9    recollection is you didn't even know what autism
10    was until you got into that school?
11         A.   You mean as far as the descriptors or
12    hearing the word?
13         Q.   Both.
14         A.   I may have heard the word, but what all
15    that it entailed -- I probably knew more about
16    autism when I was in med school, in residency,
17    rather than college.  I'm sure, you know, that in
18    my child and adolescent psychology class I took in
19    college, it was probably mentioned, but as far as
20    --
21         Q.   You have no particular recollection of
22    that in undergraduate school?
23         A.   I didn't have a -- in undergraduate
24    school, there was definitely not a particular
25    course on just autism.  At least at Tulane.
```

```
1        Q.   As opposed to some other school you went
2   to?
3        A.   No.  That's the only -- but I don't know
4   what other colleges have, but as far as Tulane,
5   that was --
6        Q.   Okay.  So then you go to med school.  Do
7   you recall what classes you took your first year?
8        A.   My first class at med school?
9        Q.   I recall what classes I took my first
10  year of law school.
11       A.   I do recall some.
12       Q.   Tell me which ones you remember.
13       A.   We had physiology.  We had microbiology.
14  We had anatomy.  Those were some of the classes
15  that -- we had biochemistry.
16       Q.   That's first semester or first year?
17       A.   Those were within the first year.  I
18  can't -- you know, if you're asking what I had in
19  the very first semester, honestly, I can't --
20       Q.   Okay.  So as we sit here today, you don't
21  recall taking any classes that touched on autism
22  your first year of med school?
23       A.   No.
24       Q.   Second year of med school.  Do you recall
25  what classes you took?
```

```
 1        A.    Second year of med school.  I'm trying to
 2   think, because those aren't -- you don't do your
 3   clinical -- more of the clinical work until the
 4   third or fourth year, so it's -- I'm trying to
 5   remember.
 6        Q.    Second year you are still on the lecture
 7   circuit, more or less?
 8        A.    You are still on the lecture circuit.
 9   That's correct.
10        Q.    Do you recall any classes having subparts
11   relative to autism your second year?
12        A.    Not that I recall.
13        Q.    So now we're into clinical work.
14        A.    Third year.
15        Q.    Your third year.  Do you recall what
16   clinical work you did your third year?
17        A.    Third year we -- you did rotations, if I
18   remember correctly.  Again, this is many years ago,
19   too.  Third year you did clinical rotations, sort
20   of get an overview of all of the different -- like
21   primary care, internal medicine.  We did
22   pediatrics, psychiatry, general surgery, and then
23   you had -- from the general surgery, you sort of --
24   if I remember correctly, the third year you do like
25   a lottery, I guess.  I don't know if that is the
```

```
1   correct word, but you put down your choices of what
2   specialty surgeries you wanted to do or requested.
3   You didn't necessarily get what you wanted, but you
4   -- like I got neurosurgery and cardiothoracic
5   surgery for my choices.
6        Q.   So at this point in time, during your
7   third year, when you're starting to do clinics, you
8   hadn't decided what you wanted to be in life yet?
9        A.   I knew I wanted to work with children,
10  because I really like children, and I wanted to do
11  that.  I thought about pediatrics.  I thought about
12  psychiatry, and then I thought, well, you know,
13  there is child psychiatry.  You could sort of join
14  those two together and have my love of working with
15  children, and, also, from my background of
16  psychology and psychiatry and --
17       Q.   Still no autism through your third year?
18       A.   Through the third year we may have
19  touched on it.  I'm trying to remember.  We may
20  have touched on it.  Again, there is no -- you
21  don't have a clinical rotation, at least when I was
22  working or when I was in med school of just autism.
23  There was no autism clinic.  There wasn't, you
24  know, a semester or whatever that was devoted.  This
25  is autism.
```

```
 1        Q.   I'm not necessarily looking to see if
 2   there was a semester, but was there at least a
 3   test?  Was there at least a couple of lectures?
 4   Was there anything through your third year that
 5   had, as its focus, autism?
 6        A.   There was no specific test that was all
 7   on autism.
 8        Q.   Was there any specific test that touched
 9   on autism?
10        A.   I don't recall, but if there was, it
11   would maybe -- you know, it may be a question, but
12   I don't remember there being a test on --
13        Q.   Anything from that class that you can
14   regurgitate to us today?  Do you remember anything
15   about it?
16        A.   About the class?
17        Q.   About whatever it was that they touched
18   upon in autism, whether it was your third year,
19   fourth year, second year in med school.
20        A.   It probably was that there -- with
21   autism, that that is a condition.  Again, then,
22   autism wasn't as well-known as it is now, because
23   the numbers have increased.  So then it --
24        Q.   The number of autistic people have
25   increased?
```

```
 1        A.   The CDC has reported that the number of
 2   cases of autism has been increasing throughout the
 3   years.
 4        Q.   Does that mean that more people are being
 5   diagnosed or that there are just more people with
 6   it?
 7        A.   I believe that it is more people -- if
 8   they're with it, they've had to be diagnosed with
 9   it by someone.  Whether that's a psychologist or
10   psychiatrist or a pediatrician, someone has had to
11   diagnose that to say that they are living with that
12   condition.
13        Q.   So you made a statement that there are
14   more people today diagnosed with autism than, say,
15   in the year 2000; is that correct?
16        A.   We're in '22.  Yes.  The numbers are
17   increasing.
18        Q.   Any earthly idea what the percentage
19   increase is?
20        A.   I believe now that it's one in 44 kids
21   are being diagnosed with autism, I believe.  You
22   have to look at the CDC statistics to actually --
23        Q.   Any idea what it was in twenty -- 2000?
24        A.   In 2000, there -- at one point, and I
25   can't remember the exact date.  There was like one
```

```
 1   in a hundred and something kids were diagnosed.
 2        Q.   Okay.   Now I'm into your fourth year
 3   doing clinic work again.   Anything that touched on
 4   autism there?
 5        A.   In my fourth year I was doing -- what was
 6   I doing the fourth year?   I was doing some --
 7        Q.   Just like my fourth year in law school.
 8   It was very memorable.
 9             MR. CLARKE:
10                  I don't give out stars much.   That's
11                pretty good.
12             THE WITNESS:
13                  I don't know about fourth year law
14                school.
15             MR. ZIBILICH:
16                  I knew I was going to --
17             MR. CLARKE:
18                  There's only three years of law
19                school.
20             THE WITNESS:
21                  Oh, okay.   I don't know what law
22                school is like.
23             MR. ZIBILICH:
24                  When you go to night school because
25                you are poor, and you have to work for
```

```
 1                     a living, it's three and half to four.
 2               THE WITNESS:
 3                    That's why I was like I don't get
 4               it.  Okay.  Four years. So the fourth
 5               year you are still doing rotations. You
 6               get to be more specific about where you
 7               want to go.  You could actually travel
 8               somewhere else.  Like you can ask, you
 9               know, for a -- you can go do a rotation
10               somewhere you think you might want to
11               go.  Like if you think you might want
12               to move to Atlanta, you could ask --
13               you can ask Emory, I'd like to do a
14               rotation in whatever specialty.
15  BY MR. ZIBILICH:
16       Q.   Did you go someplace else your fourth
17  year?
18       A.   My fourth year I -- I was pretty much a
19  homebody kind of person, so I really stayed in the
20  area.  I didn't -- to my recollection, I remember
21  being in California, because my sister was there,
22  but I can't remember if I was there visiting her
23  and had a friend that was also doing a rotation
24  there, or if I -- I don't actually remember doing a
25  rotation, but that, you know --
```

```
1         Q.   Both of your rotations were here locally?

2         A.   Yes.

3         Q.   Did any of those involve autism?

4         A.   As far as did I ever see a child with

5    autism there or --

6         Q.   Yeah.

7         A.   -- if I had any lectures with autism?

8         Q.   Both.  Anything.  I'm looking for any

9    knowledge that you garnered while you were in

10   undergraduate school or med school relative to

11   autism.

12        A.   Again, there are no specifics that I had

13   that were just classes in autism.  I never had a

14   class on autism, because in med school they try to

15   get more a rounded view of things, and so you get

16   -- you learn about this.  You learn about autism.

17   You might learn about the ADHD that you mentioned.

18   So they give you a little slice of life, if you

19   want to call it, about each kind of diagnosis.

20        Q.   Do you remember learning about how to

21   diagnose autism?

22        A.   In medical school?

23        Q.   Uh-huh.

24        A.   In medical school, I don't recall seeing

25   a client with autism, in medical school.
```

```
1          Q.    So now we're up to the year 2000.  You've

2     left the job in Houma.  Where do you go next?

3          A.    Actually, I took a six-month break, and

4     then I decided to work at the -- still with the

5     Department of Health and Hospitals doing community

6     health work for Orleans Parish, and the same kind

7     of job description as I gave you previously in

8     Houma.

9          Q.    Did you have a supervisor there?

10         A.    Same kind of job description like I gave

11    you in Houma.  Same thing.

12         Q.    Did you have any other people that worked

13    either under you or with you?

14         A.    With the social workers, we worked in

15    conjunction, like I mentioned in Houma.  They were

16    -- they saw the patient, and if they thought they

17    needed medication, they would have that person come

18    to see me.  If they did therapy with that patient,

19    if there were ever any questions, my door was

20    always open for them to come and say, hey, I got a

21    question about this kid.  What do you think.

22         Q.    Where was the office?

23         A.    The office was on -- I think, if I

24    remember correctly, it was on General DeGaulle.

25         Q.    On this side of the river?
```

```
1        A.   Yes.

2        Q.   Is the office still there?

3        A.   I don't know.

4        Q.   Did your paycheck come from the State of

5   Louisiana or the City of New Orleans or do you

6   recall?

7        A.   I think it was from the Department of

8   Health and Hospitals, State of Louisiana.

9        Q.   What was your salary?

10       A.   I don't even remember.

11       Q.   Six figures?

12       A.   I don't know.  I honestly don't remember.

13       Q.   Do you feel like you were getting paid

14   fairly?

15       A.   Yes.

16       Q.   This is around 2000. Where was your

17   husband working in 2000?

18       A.   In 2000, he was still working the same

19   place, State of Louisiana, Department of Health and

20   Hospitals.

21       Q.   What kind of money was he making then?

22       A.   I don't know.

23       Q.   Were y'all living in St. Charles Parish

24   in 2000?

25       A.   Were we living in St. Charles Parish in
```

28

```
 1   2000, yes.
 2        Q.    When had y'all moved to St. Charles
 3   Parish?
 4        A.    We moved to St. Charles Parish -- well,
 5   when we married, we --
 6        Q.    That's where you established your
 7   matrimonial domicile?
 8        A.    Yes.
 9        Q.    That would have been in what year?
10        A.    We got married in 1998.
11        Q.    Your son was born in 2004?
12        A.    No.
13        Q.    2002?
14        A.    In between those.
15        Q.    2003.  All right.
16        A.    There you go.
17        Q.    So you kept this job on General DeGaulle
18   from 2000 to when?
19        A.    I actually quit before my -- I got
20   pregnant with ▇▇▇▇ and I quit before he -- before
21   I delivered.  I had quit my third trimester of
22   pregnancy with ▇▇▇▇▇  I was an older mom when I
23   gave birth to ▇▇▇▇ and I actually -- we struggled
24   with fertility issues, and so I wanted to make sure
25   that I could carry this pregnancy.
```

29

```
 1        Q.   Had you had any previous pregnancies that
 2   you didn't carry?
 3        A.   No, I hadn't, because we had the
 4   difficulty getting pregnant, and so that was --
 5        Q.   Any pregnancies after ████
 6        A.   No.
 7        Q.   So he was born in 2003.  Have you worked
 8   since he was born?
 9        A.   No, I have not.
10        Q.   When did you learn that ████was
11   autistic?
12        A.   We got a diagnosis that ████ was on the
13   autism spectrum at three.  He was almost -- three,
14   almost four.
15        Q.   So that's 2006, 2007?
16        A.   What years did you say again?
17        Q.   2006 or 2007-ish?
18        A.   Right, because he was born in 2003, so
19   2007 he would be about four. 2006, 2007.  That's
20   correct.
21        Q.   So you learned it because there was a
22   diagnosis then. Was there a suspicion prior to then
23   that he was on the spectrum?
24        A.   There was a suspicion.
25        Q.   That suspicion came from you, came from
```

```
1    your husband, came from the both of y'all?  How did

2    it come about?

3         A.   There was a suspicion that ████ had

4    autism.  ████ had words at ten months of age.

5         Q.   Had what?

6         A.   Words.

7         Q.   That means he could speak?

8         A.   He was having just the simple words that

9    kids have at that age like momma, dada.  He had

10   those, and then he lost his words, which can happen

11   with kids in autism.

12        Q.   How did you learn that?

13        A.   That you could lose words?

14        Q.   Uh-huh.

15        A.   That's one of the things that I did learn

16   in autism.  Again, there is no class on autism.

17        Q.   You learned that while you were still in

18   school?

19        A.   Yes.  In residency.  Well, training,

20   whatever you want to call it.

21        Q.   All right.  So you had these suspicions

22   early on, about 2004?

23        A.   When he was about 18 --

24        Q.   2004, 2005?

25        A.   Yes.  And so he lost his words.  My
```

```
 1   sister had also come to visit with her husband and

 2   her kids, and she also noticed that ███ wasn't

 3   orienting to his name.  Like if you said ███ he

 4   wouldn't turn to see, you know, who is calling my

 5   name.

 6        Q.   Did that make you think he was hard of

 7   hearing?

 8        A.   That's what I was going to lead up to.

 9   That was one of the concerns.  Like is he just --

10   can he just not hear, and so we brought him up to

11   -- we brought ███ to his pediatrician at the time.

12        Q.   Who was whom?

13        A.   That was Dr. Scott Zander at the time.

14        Q.   Where is Zander's office?

15        A.   At that time -- I don't know where it is

16   now, because he is not our -- he wasn't -- he

17   didn't continue to be ███ pediatrician, but it

18   was in Metairie.  So we did have those concerns.

19   We brought it up to him, to Dr. Zander, that is,

20   and said, you know, we're concerned about ███  He

21   doesn't seem to orient to his name.  He's lost his

22   words.  You know, we just, you know, we are worried

23   about him.  And Dr. Zander said, "Well, let's get

24   him an audiology hearing test.  Let's get that

25   done, and then let's look about getting an ENT,"
```

```
 1   ear, nose, and throat doctor.  So we followed

 2   through.  He had the audiology exam done, and the

 3   audiologist said it was inconclusive as far as the

 4   hearing, and she said but he has this speech delay.

 5   Maybe he has autism.  Why don't I go ahead or why

 6   don't you go ahead and try this -- it is called

 7   Early Steps.

 8        Q.   Early who?

 9        A.   Early Steps.  S-T-E-P-S.  It's a resource

10   that we can -- that is for people that we think may

11   -- for their children.  They may have some

12   developmental delay, or, you know, whatever, but

13   it's a resource for you to use.  They also have

14   speech therapy.  So we heeded that advice.  If it

15   turns out he does not have autism or it turns out

16   -- or whatever it may be, what would you have to

17   lose, is what she said.  You know, he is going to

18   get speech.  So we said okay, and then we -- I

19   called, and ████ was actually able to get into

20   Early Steps, and that's from zero to three.

21        Q.   That's what?

22        A.   Zero to three as far as ages.

23        Q.   So we're talking about now this audiology

24   test, et cetera, was sometime around the 18-month

25   age bracket, right?
```

```
 1        A.    Uh-huh.

 2        Q.    Tell me what goes on during the next

 3   year, year and a half, as far as development, as

 4   far as suspicions of autism, behavioral things, et

 5   cetera.

 6        A.    So Early Steps was -- actually, they came

 7   to your home and offered the services.    ████ had

 8   speech services through the Early Steps at the home

 9   until age three.  And then once that ended, ████

10   still needed some speech therapy services, so

11   privately we hired a speech therapist that also

12   came to our home to help out with ████

13        Q.    When you say you hired somebody

14   privately, I couldn't help but think just now that

15   this is something you did on your own without

16   consulting whoever it was that was treating him

17   medically.  Was there any particular reason for

18   that?

19        A.    Actually, speech therapy was recommended

20   by the --

21        Q.    I got confused when you said on your own.

22        A.    But since -- because then we had the --

23   because birth to three was Early Steps.  We knew he

24   needed speech therapy services from -- you know,

25   they worked with ████ and they knew that he needed
```

```
 1   the services, because he still wasn't at age level.
 2        Q.   So he is about two now?
 3        A.   He is birth to three.  So three, and then
 4   after, when the services ended at three, we decided
 5   that he needed speech therapy as well to continue
 6   with that.
 7        Q.   So you thought the deal was at that time
 8   that he had a speech problem as opposed to an
 9   autism problem?
10        A.   No.  I didn't say that.  I said he had
11   some --
12        Q.   That's why I'm asking, because I want you
13   to help me.
14        A.   He had some speech issues, which kids
15   with autism can have.  Not all have such a
16   difficulty with speech.
17        Q.   How do you know that?  When did you learn
18   that?
19        A.   When did I --
20        Q.   How did you learn that?
21        A.   When did I learn that and how did I learn
22   that.  That was probably something that I learned
23   in residency for sure.  Probably when I was
24   studying for my board exams, because I had to get
25   -- well, I didn't have to get board certified, but
```

1   I decided to get board certified.

2        Q.   If you want to make the big bucks in this

3   town, you got to get board certified.

4        A.   I don't know.  I don't know about that,

5   but, anyway, with the board certification, I

6   remember studying that as well, and that was --

7        Q.   So during this zero to three time, more

8   importantly during this 18 month to three time when

9   he is starting to be treated, audio, speech, any

10  suspicions at this point that he might be autistic?

11       A.   There were.

12       Q.   These are suspicions that you and your

13  husband had?

14       A.   They were.

15       Q.   And along with these suspicions, did you

16  go to the library?  Did you go to the medical

17  library?  Did you go start reading up on autism?

18       A.   You do get concerned, as you put it,

19  because why is my child not developing.

20       Q.   My question is not so much whether you

21  are concerned.  I got that.  My question is whether

22  or not you attempted to go educate yourself

23  consistent with your concerns.

24       A.   You do go, and you try to find out more

25  information about it.  We did get more concerned,

```
 1   and, actually, I think we touched on it briefly

 2   earlier, that because of our concerns, when ███

 3   was almost four -- he was three but almost four --

 4   we said, let's get him evaluated, and we went to

 5   Omaha, Nebraska, to the Munroe Meyer Institute.

 6        Q.   Before you went to Omaha -- I know this

 7   is a stupid question.  I don't know how else to ask

 8   it.  Did you go to the library and check out books

 9   to educate yourself to attempt to confirm your

10   suspicions or were you still just going through the

11   process of having individual specialists look at

12   him?

13        A.   No.  I mean, I did look for information

14   about ███.

15        Q.   Where did you go?

16        A.   Not specifically about ███, but about

17   autism, maybe some concerns, and --

18        Q.   Where did you go get your information?

19        A.   The information was -- I went to -- you

20   know, I went -- we had -- you do Google search.

21        Q.   Did you Google it?

22        A.   Google search autism, and, you know, and

23   you try to get to the information that are relevant

24   to psychiatry that were researched based.  You want

25   to make sure that you're getting -- pediatrics.
```

```
 1    Those kind of resources.
 2         Q.   So until you went to Omaha -- I didn't
 3    mean to interrupt you.  Were you finished?
 4         A.   Yes.  Thank you.
 5         Q.   Until you went to Omaha, did you consult
 6    with any, for lack of a better phrase, specialist
 7    in child autism to help guide you in what direction
 8    you needed to go?
 9         A.   I think Daren, my husband, might have
10    brought that up with you during his deposition,
11    that I had taken ▇▇▇▇ to visit him.
12         Q.   To visit whom?
13         A.   I'm sorry.  To my husband, to Daren.
14         Q.   You took your son to visit your husband?
15    Is that what you just told me?
16         A.   For lunchtime.
17         Q.   I'm really bad with pronouns.
18         A.   I took my son to visit my husband Daren
19    during lunchtime at his workplace, because I -- we
20    are very family oriented, and I wanted him to see
21    daddy, you know.  And so I took him there, and the
22    child psychiatrist that was there saw ▇▇▇▇, and she
23    said, you know --
24         Q.   What is her name?
25         A.   Dr. Betty Muller.  And said I think -- I
```

```
 1   wonder if ███ may have autism, just from her
 2   observation of him, with the interactions with my
 3   husband, Daren, and myself.
 4        Q.    What was so different about those
 5   interactions with your husband, Daren, as opposed
 6   to the three-and-a-half years' previous
 7   interactions between your son and your husband
 8   Daren?
 9        A.    I think for -- if there was anything
10   different about it?  You mean as far as --
11   specifics.
12        Q.    As far as it sounded to me like a light
13   bulb went off as a result of this particular visit.
14        A.    I don't think the light bulb went off,
15   per say.  I think as we talked about previously, I
16   think we were seeing -- we had our suspicions we
17   talked about.  We saw a little bit more, learned a
18   little bit more, and then she saw that.  I think
19   there were steps along the way that we would go
20   like he's not really developing the way that we had
21   -- like typical or we had hoped. You know, there
22   were things that were there.  He would put his
23   fingers up.  I don't know how to -- I know you are
24   typing it, but he would have his fingers up, and I
25   don't know how to describe this, and flick his
```

```
 1   fingers, I guess.
 2          Q.   Age three or four about?
 3          A.   Right.
 4          Q.   By the way, at that age, could he count?
 5          A.   Could he count?
 6          Q.   Did he know his numbers to ten?
 7          A.   I don't remember him knowing -- to my
 8   recollection, I don't remember him knowing that.
 9          Q.   Did he ever know his numbers to ten?
10          A.   Did he ever? Yes.
11          Q.   About when?
12          A.   That's a -- let's see.  I know they
13   worked with him at school and Pre-K and
14   kindergarten, first grade.
15          Q.   This is ages four, five, and six?
16          A.   I would say -- I would think for sure by
17   first grade, because that's really when they were
18   working on those blocks and putting them out and
19   counting.  You know, let's -- because they gave him
20   a physical -- a visual to, you know, one, two,
21   three, four.  So, you know, he learned that
22   counting mechanism.  I remember him doing that in
23   first grade.
24          Q.   So he goes to Omaha.  You go with him?
25          A.   We both do.  My husband and I both do.
```

```
 1          Q.   So I --

 2          A.   Along with his grandparents.  Daren's

 3   parents.

 4          Q.   How long was that trip?

 5          A.   How to get to Omaha from Kansas City? We

 6   had actually been --

 7          Q.   Believe it or not, I know how to get to

 8   Omaha from Kansas City.  I know that's hard to

 9   believe.

10          A.   I actually don't remember how long it

11   took to get from -- so you might be a better guess.

12   I don't remember.

13          Q.   It's a really boring ride.

14          A.   It was.  I don't remember how many hours

15   actually the car ride was.

16          Q.   So that wasn't really my question.  How

17   long were you at the facility in Omaha?

18          A.   How long?  Okay.  For Omaha, if I

19   remember correctly, it was a one-day evaluation.  I

20   don't remember spending the night in --

21          Q.   Was he diagnosed after the one day?

22          A.   I'm not sure if it was one day or two

23   days.

24          Q.   I don't care if it was two days or ten

25   days.
```

```
1          A.    But when he was diagnosed, he was

2    diagnosed on the autism spectrum at the time.

3               MR. CLARKE:

4                    Let him finish his question.

5               THE WITNESS:

6                    I'm so sorry.  I didn't mean to

7                 speak over you.

8               MR. ZIBILICH:

9                    This is my fault.  I know better.  I

10                know this court reporter for a million

11                years.  I am supposed to ask my

12                question and shut up until you are

13                done.

14              MR. CLARKE:

15                   You're welcome, Franz.

16   BY MR. ZIBILICH:

17        Q.    So he is diagnosed as what at this point?

18        A.    In Omaha he got diagnosed under the

19   autism spectrum.  He was diagnosed at that time.

20   They had the diagnosis of pervasive developmental

21   disorder not otherwise specified.

22        Q.    Up until this point in time, he is about

23   four years old.  He is now formally diagnosed,

24   correct?

25        A.    Yes, sir.
```

```
 1         Q.   Have there been any behavioral issues up
 2   until this point in time?
 3         A.   Behavioral?
 4         Q.   I know you don't have any other kids to
 5   compare it to, but I'm thinking about temper
 6   tantrums or any other behavioral issues that -- I
 7   mean, you are the expert, not me.  I've never had
 8   any kids.
 9             MR. CLARKE:
10                  You didn't reproduce? That's good.
11             MR. ZIBILICH:
12                  You ought not to laugh at him.  It
13                  just makes him worse.
14   BY MR. ZIBILICH:
15         Q.   Did you notice any behavioral issues up
16   until this point?
17         A.   With ████ at the time, he did have some
18   temper tantrums.  He had that -- with autism, he
19   had that restrictive and repetitive behaviors that
20   he -- with his -- if -- he was really into trains
21   at the time, and with that diagnosis, the
22   restricted, repetitive behavior, when you have
23   autism, that if a train was moved out of the way,
24   he would get upset.  He needed that structure and
25   routine to, you know --
```

43

```
1         Q.    Were these temper tantrums reported to
2    either Dr. Zander or Dr. Muller?
3         A.    With the temper tantrums, we didn't --
4    for Dr. Zander, he was not our pediatrician, as I
5    said, for the entire period of ███████ life.  Dr.
6    Babin became ████████ pediatrician.
7         Q.    Where is his office?
8         A.    Dr. Babin is in Destrehan.  It was after
9    Katrina is when Dr. Babin became ████████
10   pediatrician.
11        Q.    So he was only two years old at the time?
12        A.    Right.  Because after Katrina, everything
13   was a mess.  So Dr. Babin became his pediatrician.
14   We had those concerns.
15        Q.    The concerns of temper tantrums?
16        A.    We had the concerns of him possibly
17   having autism.  Those were actually discussed with
18   --
19        Q.    Babin?
20        A.    -- the Omaha people as well.  And Dr.
21   Babin at that time was seeing ████████  I believe that
22   he knew we were going up to see the people in
23   Omaha, and Dr. Muller was also aware that we were
24   going to see -- she actually helped us ask someone
25   who should we get to look at him that had expertise
```

1  in autism, and that place happened to be in Omaha,

2  Nebraska.

3      Q.    Let's get back to my question.  When is

4  it that you first recalled reporting to any medical

5  personnel the temper tantrum issue?

6      A.    That would have to be -- to my

7  recollection, again, we went to Omaha, Nebraska,

8  because we had to give them an idea of what ███

9  was like.  They wanted what were his behaviors

10 like, what was his speech like.  They wanted to get

11 an overview, when I spoke to them, before they

12 would even consider an evaluation.  We also had to

13 do -- we had to fill out paperwork.

14     Q.    Did you tell the people in Omaha about

15 the temper tantrums or is this something that you

16 just didn't think was that big of a deal and you

17 passed?

18     A.    Oh, they were aware.

19     Q.    They were aware.  They were aware because

20 you told them --

21     A.    Uh-huh.

22     Q.    -- or were they aware because they

23 discovered it on their own?

24     A.    No.  They were aware.  Like I said, we

25 had to give the information to them about --

```
 1        Q.   So you told them. Tell me exactly what
 2   you told them about temper tantrums?
 3        A.   Again, that was -- you are asking me
 4   something that is many years ago, so this is going
 5   to be to the best of my recollection.
 6        Q.   Do the best you can.
 7        A.   We talked about, like I said earlier, his
 8   restrictive, repetitive behaviors and how he got
 9   upset when trains were moved.  We talked about, if
10   I remember correctly, about the flicking of the
11   hands.  I think at that time ████ may have been
12   with our cabinet doors, opening and closing them,
13   opening and closing them with force.  We talked
14   about, if I remember correctly, that he was
15   fascinated with the doorknob, like the shiny
16   doorknob, and would just look at it.  And so those
17   are the behaviors that we talked about with him.
18   We talked about the tantrum behavior that he had.
19        Q.   Was he breaking things by that age?
20   Breaking glasses, breaking doorknobs, breaking
21   things?
22        A.   To my knowledge, or to my recollection, I
23   don't recall ████ breaking doorknobs.  I don't
24   recall him breaking glasses.
25        Q.   Breaking anything by age four.
```

```
 1          A.    I don't recall that.
 2          Q.    This deposition right here that you
 3   mentioned.
 4          A.    That I mentioned?
 5          Q.    Yeah, you did.
 6          A.    Which one is that?
 7          Q.    Your husband's.
 8          A.    Oh, okay.
 9          Q.    You read it?
10          A.    No.  I never read it.
11          Q.    You mentioned that he said something
12   during the deposition.  That's what led me to --
13          A.    I remembered from sitting in.  I remember
14   some things.  I can't say I remember everything
15   from that deposition.  That's seven hours.
16          Q.    Do you remember him saying anything that
17   you thought was just stone flat wrong?
18          A.    You have to let me see it.  I have to
19   review the whole thing.  I don't remember.
20          Q.    I'm relying on your memory.  It's so good
21   that you had remembered that little detail.  I'm
22   just asking you, off the top of your head, do you
23   remember anything that he said where that's just
24   wrong?
25          A.    I can't recall the whole deposition.
```

47

```
 1   There were times I remember going out to the
 2   bathroom, so there are some things that I may not
 3   have been privy to.
 4        Q.   Do you recall anything that he said that
 5   you thought, that's wrong?
 6        A.   If I could see it, maybe.  I could go
 7   over the seven hours on the deposition.
 8        Q.   No, I'm not.  You think I am going to sit
 9   here and go through 300 pages with you?  I'm not
10   doing that.  I'm just asking you, vis-a-vis your
11   memory, do you recall anything like that?
12        A.   Do I recall anything that was flat out
13   wrong?
14        Q.   Yep.
15        A.   I'm trying to go through everything that
16   I'm thinking that I remember from sitting here when
17   I'm not in the bathroom.
18             MR. CLARKE:
19                  Take your time.
20   BY MR. ZIBILICH:
21        Q.   All right.  If you think of something
22   along the course of today, even if we are talking
23   about something else, just stop me.  I remember
24   now, Mr. Zibilich.  He said such and such.  I don't
25   know why he said that.  It was wrong.
```

48

```
 1          A.   Okay.
 2               MR. CLARKE:
 3                    I think he says you were a nice guy
 4               or something.
 5               MR. ZIBILICH:
 6                    That I said that he was a nice guy?
 7               That doesn't sound like a question.  It
 8               sounds like a declarative statement.
 9               MR. CLARKE:
10                    I'm good at those.
11  BY MR. ZIBILICH:
12          Q.   All right.  So, ma'am, have you ever been
13  involved in any previous lawsuits?
14          A.   No.
15          Q.   Never sued anybody before?
16          A.   No.
17          Q.   Ever been sued?
18          A.   No.
19          Q.   Ever been sued as a doctor?
20          A.   No.
21          Q.   Ever been sued as a medical provider?
22          A.   No.
23          Q.   Ever been disciplined as pertains any of
24  your work since you graduated from medical school?
25          A.   No.
```

```
1        Q.   Can you give me a list of every doctor
2   who ever treated your son, as best you can recall?
3   We have mentioned three so far.  We've mentioned
4   Babin, Zander, and Muller.
5        A.   We are not talking about speech
6   therapists, only people with an MD degree?
7        Q.   Anybody, anybody.
8        A.   Oh, anybody including speech therapists,
9   occupational therapists --
10        Q.   Speech therapists, occupational
11   therapists, social workers, the gamut.
12        A.   Okay, okay.  So I'm going to start back
13   to --
14        Q.   If you can do it chronologically, you get
15   extra points for that.
16        A.   I get a gold star?  Just kidding.  I'm
17   trying to think.  So the first person that he saw
18   was Scott Zander right after his birth.  We saw
19   him, as we spoke about, until ████ was -- after
20   Katrina.  Then we went to Dr. Babin.  Dr. Babin was
21   his pediatrician from that age until his death.  So
22   that covers his pediatrician medical people. Speech
23   therapy, we had -- I don't remember her name, but
24   it was through the Early Steps from zero to three.
25        Q.   What is Babin's first name?
```

```
 1        A.    Thomas.

 2        Q.    Do you know where his office is today?

 3        A.    It's still in Destrehan.

 4        Q.    Okay.  All right.

 5        A.    And then -- so we had speech therapy that

 6   we mentioned.  He had that from Early Steps from

 7   birth to three, and then we had Michelle Bell for

 8   speech therapy after we couldn't -- you know, after

 9   Early Steps terminated from three.  And then █████

10   was enrolled in St. Charles Parish School District,

11   and when they evaluated █████ to see if he needed

12   special ed services, which he qualified for, he

13   received speech therapy through St. Charles Parish

14   School District.  And so those were up until his

15   death.  And so he's had various speech therapists

16   through the school district.

17        Q.    Any other MDs other than the ones that

18   you have mentioned?  Babin would be the fourth.

19        A.    The other MDs besides -- the fourth?  We

20   had Zander --

21        Q.    Third I mean. Zander, Muller, Babin.

22        A.    Okay.  Let me go ahead and do -- the

23   occupational therapy he also received during -- for

24   school services through St. Charles Parish School

25   District.  As far as other physicians that have
```

```
 1    seen ███ that was Munroe Meyer, Dr. Wayne Fisher,

 2    who gave him the diagnosis of pervasive

 3    developmental disorder not otherwise specified.

 4         Q.    Where is Dr. Fisher?

 5         A.    He was -- I don't know where he is now.

 6    At the time we saw him in Nebraska.  So he saw him

 7    at age four.  He also had a geneticist that worked

 8    with him at the time to rule out if there was any

 9    genetic reason for ███ having autism.  I don't

10    remember that name of that geneticist in Munroe

11    Meyer that we saw, but he had a geneticist that saw

12    him there.  ███ saw Dr. Cecile Many.

13         Q.    How do you spell that one?

14         A.    M-A-N-Y is her last name.  He saw her.

15         Q.    What kind of doctor was she?

16         A.    She was a child and adolescent

17    psychiatrist.  When Dr. Many retired, that's when

18    he actually received services through Dr. Muller.

19         Q.    Tell me about Dr. Many's interactions

20    with y'all.  What did she or he have to say after

21    the various sessions?

22         A.    Dr. Many is -- she also diagnosed him

23    with autism.

24         Q.    How old was he then?

25         A.    He saw Dr. Many when he was in first
```

52

```
 1    grade.
 2          Q.    Five years old, six years old?
 3          A.    Yeah, five, six.
 4          Q.    Okay.
 5          A.    And, I'm sorry, what was she -- what kind
 6    of concerns did she have?
 7          Q.    Yeah.  I mean, did she tell y'all, for
 8    instance, all right, well, I've seen him two or
 9    three times.  Watch out for this.  Be careful of
10    that.  Don't do this.  Any instructions at all from
11    her relative to what to watch out for?  Be careful
12    because I think if X happens, it triggers Y.
13          A.    Well, in conjunction with ███ receiving
14    his psychiatric services for medication through Dr.
15    Many, he was also receiving ABA therapy services
16    that we had at home.  And so Dr. Many covered the
17    medication aspect, so we'd let her know what was
18    going on with ███ and she, you know, she worked
19    in conjunction with what we told her was going on
20    in the ABA therapy. But they never -- so they were
21    not always -- they weren't separate.  They -- what
22    we knew was going on with the ABA, we also let Dr.
23    Many know what was going on there and vice versa.
24    So it was always this integrated treatment.
25          Q.    What sort of medications was he on during
```

```
1    this time period?
2         A.   With Dr. Many?
3         Q.   Uh-huh.
4         A.   He also was diagnosed with a tic
5    disorder, so he was on Risperdal at the time and I
6    believe Tenex.
7         Q.   What is that?
8         A.   Tenex actually was used off-label.  It's
9    an anti-hypertensive type of medication that can be
10   used off-label for people that have impulsivity.
11        Q.   Risperdal is to calm him?
12        A.   Risperdal was used for the irritability
13   with autism.  He also was on Prozac at one point
14   for some anxiety and depression that he had at one
15   point.  We talked about -- he's had various
16   diagnoses throughout his life, obsessive compulsive
17   disorder being one of them.  At the time, that was
18   something that she thought might help with that,
19   with -- I guess we talked about how things got
20   moved out and that would be upsetting.  So that was
21   another medication that he was on.  At one point,
22   the Risperdal --
23        Q.   Who is prescribing these three things?
24        A.   Dr. Many.  And at one point the Risperdal
25   did get switched to Abilify.
```

```
 1        Q.    I'm familiar.  So where is Dr. Many's
 2   office or where was it?
 3        A.    At that time, when we saw her, it was at
 4   Tulane Downtown.
 5        Q.    And when, if ever, did he stop seeing
 6   her?
 7        A.    She retired.  She stopped seeing him.  We
 8   started seeing Dr. Muller --
 9        Q.    When was that?
10        A.    When ████ was in fifth grade.
11        Q.    Ten years old, eleven?
12        A.    Yes.  Ten, eleven.
13        Q.    What did the new doctor prescribe or do
14   differently, if anything, from Dr. Many?
15        A.    Dr. Muller -- again, we're still having
16   ABA at the time.  At that time, ████ also in fifth
17   grade, had Dr. Hamilton and Dr. Lasserre, L-A-S-S-
18   E-R-R-E, on board through the Greater New Orleans
19   Resource Center.  They came on board, and they also
20   worked with ████ with some ABA therapy.  Dr.
21   Muller, again, was the prescribing physician.  She
22   actually had ████ on -- she kept him on Abilify.
23   She also diagnosed him with autism.  She also had
24   an intellectual -- thought ████ had an intellectual
25   disability unspecified.  She wasn't quite sure
```

```
1    what.
2         Q.    Does that go with the autism, or is that
3    a mutually exclusive event or it can run together?
4         A.    It can.
5         Q.    So we're up to about age 11 right now. My
6    question is, have any of these doctors ever sat you
7    down and given you an instructional series?  For
8    instance, I visited with ███ today.  I noticed
9    XYZ.  Be careful if such and such happens, or if he
10   is confronted with such and such, you need to be
11   ready for some other trigger to happen, to watch
12   out for, and this is what I recommend you do, if
13   one of these things happens.
14        A.    When ███ had behaviors that would
15   happen, it was actually recommended that we step
16   away, because they found that the more people that
17   were involved or around ███ when he had these
18   behaviors could escalate the behaviors.
19        Q.    Even if it's his own parents?
20        A.    Even if his own parents that were --
21        Q.    Crowding him.
22        A.    Even if his own parents, because there is
23   a -- you could inadvertently cause that behavior to
24   increase but not meaning so.  We have had -- ███
25   has had behaviors before, so they were actually
```

```
 1   seen by the ABA therapist and Dr. Muller.  At one
 2   time she came to --
 3        Q.   So about what age is ███████ when you first
 4   hear this advice?
 5        A.   When we first hear this advice?  We have
 6   heard that advice since -- he's been having ABA
 7   therapy since -- to my recollection, I believe that
 8   it was fourth -- around fourth grade, fifth grade.
 9        Q.   Nine, ten, 11 years old.  This is the
10   first time that you have heard from someone in the
11   medical field if he starts having -- I'm not going
12   to interchange outbursts and -- what's the other
13   word y'all use?
14             MR. CLARKE:
15                  Behaviors.
16   BY MR. ZIBILICH:
17        Q.   Rough day, behaviors, but you have now
18   been placed on notice by somebody, some medical
19   person, that when certain things happen, the first
20   thing you should do is step away?
21        A.   Should the first thing you happen -- I'm
22   sorry.  What would you --
23        Q.   Well, forget the first part.  One of the
24   things that you should do, if he is having a
25   behavior, for lack of a better word, is to step
```

```
 1    away?
 2         A.   If he is having behavior issues, if he is
 3    having an outburst, if it's feasible to step away
 4    to not give it attention, then to step away,
 5    because that could actually -- again, the crowding
 6    could make his behaviors worse.  So that is
 7    something that we were told to do.
 8         Q.   So it's a little bit like a spoiled kid.
 9    Ignore him.  Step away from him and ignore him.  Is
10    that the advice you were receiving?
11         A.   I think for you saying a spoiled kid --
12         Q.   Well, I was a spoiled kid.  That's what
13    they did with me.
14              MR. CLARKE:
15                   It didn't work.
16              THE WITNESS:
17                   It's very different from -- you are
18                talking about maybe a typical kid, and
19                ███    had these delays.
20    BY MR. ZIBILICH:
21         Q.   I got you.  I'm trying to get --
22              MR. CLARKE:
23                   Can we go to the restroom?
24              MR. ZIBILICH:
25                   Sure. I forgot to tell you, you can
```

```
 1                    stop whenever you want to.

 2              THE WITNESS:

 3                    Oh, thank you.

 4                    {BRIEF RECESS, 10:13-10:20}

 5  BY MR. ZIBILICH:

 6        Q.    So which doctor told you the best thing

 7  to do is to kind of not crowd him, kind of walk

 8  away when he is having a behavioral issue?

 9        A.    More than one.

10        Q.    Which ones?

11        A.    Dr. Hamilton, Dr. Lasserre, Dr. Muller.

12        Q.    So that was the consensus?

13        A.    Yes.

14        Q.    That was the consensus?

15        A.    Yes, sir.

16        Q.    And you heard these instructions from

17  these three doctors you just mentioned on more than

18  one occasion?

19        A.    Did I hear them saying that when █████ is

20  there not to --

21        Q.    Uh-huh.

22        A.    Yes.

23        Q.    And this was during what ages of █████

24  that you would hear these instructions?

25        A.    █████ at that time, when Dr. Lasserre and
```

1   Dr. Hamilton came on board to offer ███ services

2   in fifth grade, Dr. --

3        Q.   So he is nine, ten, 11?

4        A.    -- was his physician at the time, so

5   fifth grade, yes.

6        Q.   Did any of these doctors ever tell you

7   that while they were in a session with ███ that

8   they experienced an episode such that they needed

9   to walk away which possibly triggered that advice

10  to the two of you?

11       A.   I am going to make sure I understand this

12  question correctly.

13       Q.   I guess -- let me take the question down.

14  It was about nine questions.

15       A.   Yes.

16       Q.   Did any of these three doctors, whose

17  names you just mentioned, ever relay to you that

18  they had had experiences with ████ behavior being

19  out of sorts while they were in a session with him?

20       A.   So I'm going to see if I understand this

21  correctly.  Have any of the -- you are saying the

22  three people, Dr. Lasserre, Dr. Muller, and Dr.

23  Hamilton, had they ever seen or witnessed ████

24  having an episode --

25       Q.   Yeah, yeah, yeah.

1    A.    -- and what they should do which --

2    Q.    And what they did.

3    A.    Actually, yes.  They were at our house.

4    Q.    Who is they?

5    A.    Dr. Muller was at our house, and I

6 believe Dr. Hamilton might have been at the time,

7 too, but I'm not certain about Dr. Hamilton.  But

8 Dr. Muller was.  ████ had an outburst, and they

9 said -- I was at home.

10    Q.    You were or you were not?

11    A.    I was at home.  I was always at home with

12 ████   I was home with ████ , because I was his

13 parent, his mom, while Daren is at work.  And they

14 had everybody step outside to the front porch.  So

15 we, with the doctors that were there and his

16 treating physicians, and myself, we got on the

17 front porch.

18    Q.    So you stepped away. Did they ever tell

19 you to ignore him and step away?

20    A.    If you are stepping away, then you're not

21 present.

22    Q.    So you are ignoring him? Is that what you

23 are telling me?

24    A.    You are ignoring that behavior.  If

25 that's -- if you are stepping away, you're not

```
 1   giving it attention.

 2        Q.   So prior to receiving this advice from

 3   these three doctors over time, did you ever do the

 4   same thing when he had an outburst before you

 5   learned of that advice? Before you learned of the

 6   advice to step away, were there occasions that the

 7   two of you, in fact, stepped away before learning

 8   that was the correct approach?

 9        A.   So were there -- let me make sure I

10   understand this question correct, too.  So you're

11   asking were there -- previous to Dr. Muller, Dr.

12   Hamilton, Dr. Lasserre giving that information

13   about to step away, did we do that as well, to step

14   away completely from that situation?  From my

15   recollection, we stayed with ███ during the time

16   period and tried to deal with his behaviors at the

17   time, and we knew that giving it more attention was

18   not necessarily a helpful thing.

19        Q.   How did you know that?

20        A.   We didn't step away like, you know,

21   outside the porch.

22        Q.   This was a learning mechanism?

23        A.   I think for us, with having a child with

24   autism and developmental disability, even though it

25   is something that as he changes, as his behavior
```

```
 1   changes, as he grows, we have to learn.  We learn

 2   as things happen.

 3        Q.   So you learned that the approach that you

 4   had heretofore taken, before receiving the advice,

 5   was not necessarily the best widget?

 6        A.   It was not the most helpful, and I think

 7   we gave that information to our treating -- we gave

 8   that information to our treating physicians and to

 9   our treating psychologist, ABA therapist, so that

10   we could get the best help in how to deal with

11   ████ s behaviors and whatever treatment may be

12   necessary for him.  We relied on them for their

13   expertise.

14        Q.   Did y'all continue to follow that advice

15   as time went on?

16        A.   As far as like --

17        Q.   As far as walking away.

18        A.   -- removing ourselves from the situation?

19   We removed ourselves from the situation.

20        Q.   So when he is perpetrating a violent act,

21   maybe with the stove, maybe with the burner, would

22   you try to interrupt that or would you walk away?

23        A.   First of all, I think those kind of

24   behaviors, what you are talking about as violent,

25   were part of his outbursts.  Those were those kind
```

63

```
1   of disruptive behaviors that were mentioned as part
2   of his manifestations of his behaviors that would
3   present themselves during his outbursts, and as far
4   as like to intervene during those time periods, I
5   did not try to intervene during those time periods.
6        Q.   Let him break the burner?
7        A.   That's an object.
8        Q.   So I guess what I'm driving at here is,
9   I'm trying to learn whether there were exceptions
10  to the rule of walk away and whether or not those
11  exceptions were explained to you pending the degree
12  of the behavior or outburst?
13       A.   I believe that, to my recollection, if
14  things were severe enough that you noticed, that,
15  you know, as far as ███████ behaviors, you would
16  always -- if he is self-injuring himself, and you
17  witnessed that, you don't want to be --
18       Q.   That's a hard one to walk away from?  Is
19  that what you are trying to tell me?
20       A.   To be passed out.  I mean, we did
21  periodic checks with ██████  You could hear.  You
22  know, you can hear from the porch if things are
23  going on.  If you don't hear anything for a while,
24  which would be a really scary thing, right, if you
25  are not hearing anything, then you go, let's check
```

```
 1    on him.  So there is safety that was involved.  I
 2    mean, you definitely had to worry, be concerned
 3    about his safety as well.  So there were checks.
 4    You could hear him. You could --
 5        Q.   Was this advice that was given to you?
 6    I'm sorry.
 7        A.   You could look through the -- we have our
 8    side windows.  You could peek through the window.
 9    Was that advice that was given to us?
10        Q.   Yeah.  Was the advice given to you that
11    on certain occasions walking away is not the right
12    approach?  You mentioned if he was hurting himself.
13        A.   I didn't say that that wasn't the right
14    approach.  I don't think anyone ever said to us
15    that's not the right approach.  I don't think --
16    that word wasn't used.  I think ███████ safety
17    played a factor into all of this, and I think his
18    psychiatrist, his treating -- his treatment team
19    were concerned, and they, you know, they -- you do
20    monitor the best you can to ensure his safety as
21    well.
22        Q.   So what I'm trying to get here is a list
23    of all the recommendations and advices that you
24    received from these doctors that would assist y'all
25    in handling various different types of episodes.
```

```
 1   You understand what I'm looking for?
 2        A.   I think so.  You are looking for an all-
 3   encompassing list.
 4        Q.   Yeah.  Well, I mean, it doesn't have to
 5   be -- I'm looking for as much on the list as you
 6   can share with me.
 7        A.   I think for ███, as far as what the
 8   doctors presented to us, as far as his behaviors,
 9   we already mentioned about the more people that are
10   around could escalate behaviors.  So that's one.
11   They also -- so that goes with the attention as
12   well.  Not giving it attention, because you could
13   inadvertently cause that behavior to get worse.  So
14   that's one thing.  The other things they had
15   mentioned to us is that for, you know, for ███,
16   for him to try to do a structure and routine.  That
17   would probably help him with his behavior, to keep
18   structure and routine in best that you can.
19        Q.   I'm talking about once the behavior
20   manifests itself.  Once he is in it.  I'm looking
21   for whatever other advices that y'all received from
22   the various medical personnel and psychiatrists.
23        A.   When the behavior starts, it's like the
24   outburst starts.  It's like a seizure, and there is
25   a beginning, and then, you know, eventually there
```

```
1    is going to be an end point.  So it's, you know,

2    monitor it while it's going on to ensure his

3    safety, and, of course, you want to --

4         Q.   This is advice you received or this is

5    something you developed?

6         A.   This is something -- I'm going to finish

7    this off first.  Make sure that he is safe.  You

8    want to make sure that -- you know, we want to make

9    sure that you guys are safe as well, but was it

10   something that we discovered on our own or was it

11   something that our treating -- treatment providers

12   mentioned to us?  It's something that I believe our

13   treatment providers gave us that information to --

14        Q.   What information is that?

15        A.   To not give it attention.  To be in your

16   spot.

17        Q.   It's the same advice.  Any other advice

18   you received from them?  I got the walk away.  I

19   got the --

20        A.   He had consequences for behaviors.  He

21   had consequences that he lost his privileges when

22   that happened.  If something was broken, if it was

23   feasible, he had to help clean up.  So it wasn't

24   that there were no consequences for him.  He had

25   those consequences.
```

1        Q.    I'm not talking about right now, without

2    interrupting you.

3        A.    Oh, sorry.

4        Q.    After consequences.  I'm talking about

5    when he is in the midst of it.

6        A.    When he is in the midst of it --

7        Q.    What sort of advice, other than the

8    advice that you've already shared with me, did you

9    receive from these personnel, if any?

10       A.    The one that keeps coming to the mind is

11   what we've been talking about.

12       Q.    Not a problem.  Okay.  All right.  So,

13   hypothetically, and maybe this happened for real.

14   ███ is ten, 11, 12 years old.  He is having an

15   episode.  The episode involves him hurting himself.

16   Did that ever happen?

17       A.    ███ engaged in head slapping and head

18   banging.

19       Q.    Beating his head up against a wall?

20       A.    The head banging.

21       Q.    Against what?

22       A.    The head banging.  He would head bang

23   against our Sheetrock wall.  He would head bang on

24   our carpeted floor.

25       Q.    Significant enough to like put a hole in

```
 1    the wall?
 2         A.   The Sheetrock. He would be able to put a
 3    hole through the Sheetrock.
 4         Q.   Was that something that the ignored
 5    advice would work, or maybe does daddy have to then
 6    literally get hands-on and tackle him and get him
 7    away?
 8         A.   What would happen with the Sheetrock -- I
 9    think one thing that we learned from the Sheetrock
10    is our Sheetrock wasn't that thick, to be honest,
11    so it was thin.  It was easy to put a hole in.
12    That's one thing.  The second thing is our
13    pediatrician and our treatment team, they knew
14    about ████ having those kind of behaviors.  They
15    also had witnessed it as well, and that was with
16    Dr. Babin.
17         Q.   Where was this?
18         A.   They witnessed it at our home.
19         Q.   The same episode you told me about
20    earlier, when y'all walked out onto the porch?
21         A.   They had witnessed -- I'm not sure if it
22    was that episode or not, but they had witnessed it.
23    We had our ABA people as well that came to the
24    home.  I'm sorry.  What was the question again?
25         Q.   Were there certain things that ████ did
```

```
1    that compelled you to go hands-on with him?
2         A.    Before we learned our methods from our
3    treatment team, when ████ was smaller, that we,
4    with ████, that we were able to pick him up when he
5    was like a toddler.
6         Q.    Were there any episodes once he was --
7    once you were counseled by these people as to what
8    to do, where the episode was so severe that either
9    you or daddy had to go hands-on with him?  By
10   hands-on I mean just grab him, get him away from
11   whatever it was that he was doing, as opposed to
12   ignore him?
13        A.    As I said before, when it was -- we'd
14   step away from the situation.
15        Q.    I got that.  I'm trying to ask you --
16        A.    So if he is having objects that -- you
17   may hear stuff, like objects being, you know --
18        Q.    Tossed?
19        A.    Could be, and you ignore that, because
20   that is an object, and so --
21        Q.    Let me try again then.  Were there ever
22   occasions where he was hurting himself, once he is
23   ten, 11, 12 years old or more, to such an extent
24   that either you or daddy had to go hands-on with
25   him to keep him from hurting himself?
```

```
 1          A.   I think the advice that we got from Dr.

 2    --

 3          Q.   No, no.  That's not my question.  My

 4    question is not an advice question.  My question

 5    is, was there ever an occasion, one or more, where

 6    he was hurting himself, banging his head up against

 7    something, a headboard, a wall, or something, or

 8    doing something other than head, where maybe he is

 9    hurting himself, where either you or daddy had to

10    go hands-on with him?

11          A.   As far as what you were doing, that

12    description, like tackling him --

13          Q.   Any kind of hands-on.  That's just me

14    being descriptive.

15          A.   I don't think --

16          Q.   I'm very demonstrative.

17          A.   No one tackled him like that. When ███

18    engaged in those behaviors, we -- when ███ engaged

19    in those behaviors, as far as the head banging and

20    the head slapping, we were removed from the

21    situation, but we would -- when we would hear that

22    things were calmed down, we wouldn't hear any --

23    ███ would have shrieking, or if we didn't hear

24    anything, we would reenter the home, assess ███,

25    and so we did not tackle him at those times, as you
```

```
1    put it.
2         Q.   If I was demonstrating tackling, I should
3    not have been.  I am talking about putting him in a
4    bear hug to keep him from doing whatever the heck
5    it was that he was doing.
6         A.   As far as the bear hug, I never saw Daren
7    do like a bear hug for █████ with the head banging.
8         Q.   Did you ever see Daren go hands-on with
9    him in any way, shape, or form to prevent him from
10   hurting himself?
11        A.   We're talking about ages of ten to 11?
12        Q.   Ten, 11, 12, 13, 14.
13        A.   As far as the head banging, that he -- if
14   █████ was engaged in head banging, again, we would
15   go into the home when he was calm.
16        Q.   Forget head banging for a second.  Were
17   there ever any occasions ever, ever, where █████ was
18   doing something that caused either you or Mr. Parsa
19   to go hands-on with him to stop it?
20        A.   Again, we -- when the behaviors -- when
21   we listened to -- the behaviors had quieted down
22   then --
23        Q.   Okay.  So you are in the house as opposed
24   to out the house?
25        A.   We're in the house now.  His behavior --
```

```
 1   he had calmed down.
 2        Q.   Forget that.  It's a brand new episode.
 3   It's a brand new hypothet.
 4        A.   It's a new outburst.  Okay.
 5        Q.   An outburst is coming on.  It's an ugly
 6   one, and there is a concern that he is going to
 7   hurt himself.  Have you or your husband ever gone
 8   hands-on with him or do you walk away 100 percent
 9   of the time?
10        A.   When he is having an outburst, we walk
11   away.
12        Q.   Every time?
13        A.   Again, there is monitoring that still
14   goes on, because you are still hearing.
15        Q.   I'm not talking about once you are
16   outside.  I'm talking about as it's happening, you
17   walk away every time, is your testimony?
18        A.   Well, as it's happening.  Once we hear
19   things happening, once things are happening, we
20   were given the advice by our treatment providers to
21   --
22        Q.   Walk away?
23        A.   -- head out.
24        Q.   And you followed that advise 100 percent
25   of the time?
```

```
 1        A.    We followed their treatment.  They were
 2   the experts.
 3        Q.    So are you telling me, ma'am, under oath
 4   that your husband never went hands-on with your
 5   son, once your son was 11 or 12 years old, ever in
 6   life?
 7        A.    I can't remember like your description of
 8   like the bear hugging or the, you know --
 9        Q.    The grabbing him to remove him from
10   whatever obstacle he was breaking.
11             MS. VALENTI:
12                  Touching him in any capacity.
13             MR. ZIBILICH:
14                  Right.
15             THE WITNESS:
16                  Again, we were not there to witness
17               him with a stove.  We were outside of
18               the home.
19   BY MR. ZIBILICH:
20        Q.    So what happened --
21        A.    I'm not sure.
22        Q.    Did you ever see your son attack your
23   husband?
24        A.    Has my son hit ██████ before?
25        Q.    Have you ever seen your son attack your
```

```
 1    husband?
 2         A.   My son has hit ████    My son.  My son,
 3    ████  has hit my husband Daren before, yes.
 4         Q.   Many, many times?
 5         A.   He has hit him before.
 6         Q.   More than ten times?
 7         A.   That's possible.
 8         Q.   More than 30?
 9         A.   I didn't keep track of things.  You have
10    the data collection sheets.
11         Q.   I do. So you are not telling me under
12    oath, or maybe you are, that when your son hit your
13    husband, that your husband would just kind of push
14    him away and walk off?
15         A.   I think we had learned methods of how to
16    deal with ████ behaviors at that time. We're
17    talking about fifth grade, sixth grade, right?
18         Q.   Fifth, sixth, seventh, eighth.  All the
19    way until he is a teenager, at least.
20         A.   I know that we had not mentioned ████
21    hospitalization yet.  So we had learned techniques
22    like for biting, for example.  You push in instead
23    of pulling out.  I think at one point somebody told
24    us that you pinch the nose lightly.  Then you have
25    to, you know, open up your mouth, and then as well
```

1    as you block behaviors.  You know, if he is

2    hitting, you do your best to block it.  I know I'm

3    doing --

4        Q.    That's okay.  You are describing it and

5    talking.

6        A.    So you block the behaviors, if possible.

7    If for some reason you're not, you know, in that

8    midst of trying to remove yourself, so you block

9    it.  If you --

10       Q.    This is advice that you've heard?

11       A.    This is advice that was given to us, yes,

12   by the treatment team.

13       Q.    You are telling me that when he is

14   flailing his arms and looking like he is going to

15   break things, nobody ever gave you advice to put

16   your arms around his arms to keep him from moving

17   them? That was never told to you?

18       A.    Did anybody ever tell us to give him a

19   bear hug type of restraint?  No.

20       Q.    Just to hold his arms so that he can't do

21   whatever it is that he is doing with them?

22       A.    Now, as far as when we're by ourselves?

23   You are talking about with Daren and me by

24   ourselves?

25       Q.    Uh-huh.

```
 1        A.    We didn't have the ABA therapist with us?

 2        Q.    Uh-huh.

 3        A.    We were by ourselves.  Again, we were

 4   told to remove ourselves from the situation the

 5   best that we could.

 6        Q.    You are telling me, during all of this

 7   time period, you never physically attempted to keep

 8   him from flailing his arms, whether it was to hit

 9   himself or to hit somebody else or to hit an

10   object?

11        A.    Blocking is what we were told to do.

12        Q.    Just blocking?

13        A.    Blocking.

14        Q.    And you are telling me even in spite of

15   the fact that's what you were told to do, you never

16   tried to confine his arms to keep him or to prevent

17   him from doing that?

18        A.    I think for ███████ again, that they also

19   found that --

20        Q.    That's not my question, not what they

21   found.  My question is what you did.

22        A.    What we did as far as like -- as far as,

23   now, again, when ██████ was a toddler, I'd remove

24   him.  I would pick him up from a situation.  When

25   he is fifth grade, sixth grade, I'm not -- you know
```

```
 1    my height.
 2         Q.    You're not capable?
 3         A.    I'm not capable of doing anything like
 4    that.
 5         Q.    What about your husband?  Did you ever
 6    see him try to restrain his arms?
 7         A.    Not that I can recall.
 8         Q.    But y'all had restraints for this young
 9    man, didn't you?
10         A.    What do you mean by restraints?
11         Q.    Implements to restrain him.
12         A.    Can you be more specific?
13         Q.    Did you have any restraints for him?  You
14    had a car restraint, right?
15         A.    That's a safety harness, right, for
16    safety in the car.
17         Q.    Did you have any other restraints for
18    him?
19         A.    Can you be more specific what you mean by
20    restraints?
21         Q.    Any, any.
22         A.    At times we had to physically restrain
23    him.  As far as other -- you mean to help -- I
24    guess I -- can you give me --
25         Q.    You are going someplace where I've been
```

1    trying to get you to go for 20 minutes.  Tell me

2    about the times when you had to physically restrain

3    him.

4         A.    When we physically restrain him, that's

5    when we had our -- Autism Spectrum Therapies was

6    our behavioral ABA therapy agency that was with us

7    at the time, and so they --

8         Q.    What sort of behavior caused you to

9    physically restrain him?

10        A.    When ████ had aggressive behaviors, and

11   when he had excessive self-injurious behaviors,

12   they were there to help us with not only with the

13   behaviors but also with other issues with ████ as

14   well as academics and working on social skills.

15        Q.    Tell me about physically restraining him.

16   Did you ever see that done or did you ever do it

17   either in the company of these specialists or

18   outside the company of these specialists?

19        A.    With the specialists at our home, they

20   restrained.  It was always in a face-up position,

21   which is the supine position.  That was what we

22   were always told to do as a recommendation by

23   Kennedy Krieger Institute where ████ had been

24   hospitalized, as well as Autism Spectrum Therapies.

25        Q.    What had he done that caused him to be

```
 1   restrained?

 2        A.    Where?

 3        Q.    Any time. Any time and every time.

 4        A.    At the hospital, at home, if he had

 5   aggression towards someone as part of his outburst,

 6   that could lead to a restraint.

 7        Q.    Who would do the restraints?  Daddy?

 8        A.    The restraints were -- dad could be part

 9   of it.  I could be part of it.  Autism Spectrum

10   Therapies, the behavior therapist, could be part of

11   it.

12        Q.    That required hands-on to restrain him?

13        A.    As far as -- I'll go through the

14   restraint with you.

15        Q.    Okay.  Please. This is the taught

16   restraint?

17        A.    This is the restraint that Kennedy

18   Krieger Institute taught to us.  Taught us.  They

19   also taught the school.  They also taught Autism

20   Spectrum Therapies.  So with the restraint

21   procedure that they -- again, it was always, always

22   face up, a supine position.  Never put pressure on

23   joints.  Always use the least amount of force.

24        Q.    Tell me how they restrained him.

25        A.    Can I demonstrate?
```

```
 1        Q.   Yep.

 2        A.   Can I demonstrate on you?

 3             MR. CLARKE:

 4                  Yes.

 5             THE WITNESS:

 6                  Well, of course, you are on the

 7             floor, right, so it's supine position.

 8             I mean not -- yeah, supine position.

 9             And I'm only one person, so I have one

10             arm, but it is going to be reciprocal

11             on the other arm or the other -- but

12             you place an arm on the meaty portion.

13             This is between the elbow and the

14             shoulder.  You place an arm here.  You

15             place an arm between the --

16   BY MR. ZIBILICH:

17        Q.   The wrist and the elbow.

18        A.   Wrist and the elbow here, so you're not

19   on any kind of joints, and you use the least amount

20   of force that's needed for the restraint. Again,

21   this is on the other side.  I'll demonstrate that.

22   And, again, no pressure.  Thank you, Andy.  No

23   pressure on joints at all.  There was supposed to

24   be minimal to no talking during the restraint.

25   There are also -- how it was you also -- you know,
```

```
 1    if there are like -- for whatever reason we were
 2    always taught there is less people that should be
 3    involved in the restraint, and, you know, if --
 4         Q.   Describe to me -- I'm sorry.  I thought
 5    you were finished.  Go ahead.
 6         A.   And to have a calm voice or be calming
 7    around it.  You don't want to agitate anything by,
 8    you know, running out screaming.
 9         Q.   So there are -- say that screaming thing
10    again.
11         A.   I said no one needs to be screaming.
12         Q.   No one needs to be screaming?
13         A.   We shouldn't be screaming, because that
14    can agitate behaviors.  People should not be
15    screaming.
16         Q.   So I've got two ends of the spectrum
17    here.  One end of the spectrum is he does
18    something, you walk away.  You go to the porch,
19    right?
20         A.   That is -- well, let me -- when Autism
21    Spectrum --
22         Q.   Is that not what you described earlier
23    today, that certain scenarios are such that the
24    best thing to do, per what you were taught, is to
25    walk away and go to the porch?
```

82

```
 1        A.    That was what was taught, and then when
 2   -- especially when Daren and I were by ourselves,
 3   because they realized it was just two people, and
 4   I, being my size, that --
 5        Q.    Okay.  Got it.  And on the other end of
 6   the spectrum, there are situations where you have
 7   to go hands-on and restrain him, correct?
 8        A.    When Autism Spectrum Therapies was in our
 9   home, they were helping out with that as part of
10   the treatment plan, but after there was a point,
11   though, when they, too, realized that restraints
12   may be not helping.
13        Q.    But they taught you the restraints?
14        A.    The hospital.  The hospital taught us the
15   restraints.  KKI. Kennedy Krieger taught us
16   restraints.
17        Q.    So the hospital is teaching you something
18   different than these at-home people?
19        A.    That's not what I said.  Kennedy Krieger
20   Institute, when ████ was -- because Autism Spectrum
21   Therapies started working with ████ after we came
22   back from the hospital.  So at Kennedy Krieger
23   Institute is where they -- ████ was there, and
24   that's where they evaluated him for four and a half
25   months, and they decided at that time that if ████
```

83

```
 1    had to be restrained, that the method I showed you
 2    would be one that we should use.
 3         Q.   And you would agree with me, would you
 4    not, that there were occasions, once ███ was back
 5    home, at ages ten, 11, 12, 13, where his actions
 6    caused either you or your husband or both of y'all
 7    in tandem to have to physically restrain him, true?
 8         A.   That was in conjunction with Autism
 9    Spectrum Therapies being in the home.
10         Q.   So there was situations when the autism
11    specialty people were in the home that the behavior
12    was such that he needed to be restrained, and, in
13    fact, they taught y'all how to do that?
14         A.   Actually, Kennedy Krieger taught Autism
15    Spectrum Therapies how to restrain ███
16         Q.   I stand corrected. But, none the less,
17    there were occasions where he had to be restrained
18    and, in fact, was restrained, correct?
19         A.   There were times that ███ required
20    restraint from when Autism Spectrum was in our home
21    that we restrained, and, again, like we were saying
22    how ███changed.  As his behaviors changed, as he
23    changed, things changed, so there was a point where
24    Autism Spectrum Therapies also weren't restraining
25    him any more at all when they were in our home.
```

84

```
 1        Q.    Was there ever an occasion where either
 2   you or your husband or the two of you together were
 3   forced to restrain him?
 4        A.    Were there ever any occasions where my
 5   husband and I had to restrain ████   When ████   came
 6   back from Kennedy Krieger Institute --
 7        Q.    How old?
 8        A.    Okay.  So ████ was -- he went to Kennedy
 9   Krieger sixth grade, so he was --
10        Q.    Twelve, 13?
11        A.    That age, and that we came back.  There
12   were times where we were following the treatment
13   plan that was given to us from Kennedy Krieger
14   Institute that we tried to restrain ████  and,
15   again, my size, it wasn't successful, and so --
16        Q.    But you tried?
17        A.    We tried, and so that's when --
18        Q.    You say we.
19        A.    My husband and I.
20        Q.    You said you couldn't get it
21   accomplished.  Could your husband get it
22   accomplished?
23        A.    By myself, one person?
24        Q.    Uh-huh.
25        A.    No, because you see we took one arm each.
```

1          Q.   Did the two of y'all together success-

2     fully physically restrain him on any occasions once

3     he was in the fifth, sixth, seventh grade?

4          A.   As far as restraining him just without

5     each arm with us -- one arm for me, one arm for

6     him, we were successful in that.  When he was --

7     after he came out of the hospital, we had

8     difficulty with it.  That is when Autism Spectrum

9     Therapies said, you know, this is probably

10    something that with my size that --

11         Q.   So you had difficulty with it, but,

12    nonetheless, there were occasions where in spite of

13    the difficulty, you accomplished it?

14         A.   We attempted.

15         Q.   On how many occasions?

16         A.   I can't give you -- the data is there.  I

17    can't give you a --

18         Q.   The data meaning your timeline that you

19    had already handed me?

20         A.   I don't know what that is.

21         Q.   Or your husband handed me?

22         A.   I don't know what that is.

23         Q.   It is something you handed me last time.

24    Is that the data you are talking about?

25         A.   Oh, these are -- are these the e-mails?

```
1          Q.   No.   These are outbursts and behaviors.
2          A.   This must be from e-mails, because I
3    don't know anything like that, but I --
4              MR. CLARKE:
5                   Let me see what it is.
6              THE WITNESS:
7                   I didn't go through to read them.
8              MR. CLARKE:
9                   I didn't give you that.
10             MR. ZIBILICH:
11                  Yeah, you did.
12             MR. CLARKE:
13                  I don't have it.
14             THE WITNESS:
15                  I don't have anything like that
16                either.  I don't know what that is.
17             MR. ZIBILICH:
18                  It must be my work product.  You
19                can't have it.
20             MR. CLARKE:
21                  I think it is, Franz.  I was trying
22                to say it politely.
23    BY MR. ZIBILICH:
24         Q.   So what separated behavior that allowed
25    you -- what I'm talking about right now is ages 11,
```

```
 1   12, 13, 14.  What was the differential in the

 2   behavior where you would walk away versus the

 3   behavior where y'all would attempt to physically

 4   restrain him?

 5        A.   What was the differences in behavior?

 6        Q.   Yeah.  What made which option the

 7   preferable option on that occasion?

 8        A.   Previously, before going to Kennedy

 9   Krieger, that was what Dr. Muller --

10        Q.   Tell me after Kennedy Krieger.

11        A.   I'm getting my timeline in my head.  We

12   were told to remove ourselves from the situation.

13   Kennedy Krieger was where we learned restraint

14   mechanisms, how to do it appropriately so as not to

15   cause harm to ███████  Autism Spectrum Therapies

16   learned the restraint procedure from Kennedy

17   Krieger, who they actually sent people to train

18   Autism Spectrum Therapies' personnel staff how to

19   properly and safely restrain.  They also were at

20   our house, Autism Spectrum Therapies, daily, so

21   they also were tracking behaviors and how to best

22   respond to ██████ if something happened.  We followed

23   their advice as to what to do should an outburst

24   occur and took their lead from them.

25        Q.   I think you forgot my question.
```

```
 1          A.    I guess I may have.
 2          Q.    The people who trained the people at your
 3   house from Kenny whatever --
 4          A.    Kennedy Krieger.
 5          Q.    Kenny Krieger.  Kenny Krieger is the pro?
 6          A.    It's where █████ went.  They have a lot of
 7   experience in --
 8          Q.    A lot of experience in dealing with
 9   adolescent autism, correct?
10          A.    They have experience in developmental --
11   in dealing with people with neurodevelopmental
12   disorders, including autism.
13          Q.    And they actually, literally, taught your
14   people --
15          A.    Uh-huh.
16          Q.    -- who came to the house?
17          A.    Uh-huh.
18          Q.    Who taught you how to physically restrain
19   him?
20          A.    Autism Spectrum Therapies did not teach
21   us.  Kennedy Krieger Institute taught us.
22          Q.    Kenny Krieger taught y'all.  My question
23   is still the same.  I've got two scenarios, one
24   where you walk away and one where you physically
25   restrain him.  How do you know which one to do,
```

1   once he is back from Kenny Krieger?  How do you

2   know, based on his behavior, is this a walk away or

3   is this a physical restraint?

4        A.    If ███ has disruptive behaviors, such as

5   breaking objects, that was objects.  That wasn't

6   something that he got restrained with.  I don't

7   guess that's the right word, restrained with, but

8   got restrained.  I don't think I need that at the

9   end, with.  So that was something that --

10       Q.    That's a walk-away.

11       A.    That something you don't -- you know,

12  that's an object.  If he is hurting somebody, that

13  is something that you block first.  You attempt --

14  the attempts were blocking to try to prevent the

15  behavior.  And then, if you were able to block, and

16  if you had enough -- you know, we talked about that

17  I am small.  They had the other people from AST

18  that were involved at our home at the time.  Then

19  you could restrain.

20       Q.    I think I heard you this time.

21       A.    If you blocked first.

22       Q.    If he is hurting or attempting to hurt

23  somebody, we block first and physically restrain

24  second?

25       A.    If that is something that needed to be

done.

Q. If he is throwing objects up against the wall, that's a thing. We walk away?

A. If it's an object against the -- if he is throwing objects against the wall, that is something that can be ignored.

Q. It's a walk-away?

A. It's a walk-away, but --

Q. So now that we understand --

A. But can I --

Q. Sure. You can say whatever you want.

A. It depends on the severity of the behaviors. When you are asking about as far as with the walk-away, if [REDACTED] just did (indicating), I mean, that's --

Q. That's not hurting somebody. I understand.

A. But that's, you know, that's a touch. I mean, we had to count that as behavior, but --

Q. So there are clearly, in everyday life, back when he is an adolescent, 11, 12, 13, 14, where you are experiencing behaviors from [REDACTED] correct?

A. Uh-huh.

Q. And some of those experiences and some of

```
 1    those behaviors result in walking away?

 2         A.   Did some of those behaviors result in

 3    walking away?  Yes.

 4         Q.   Yes.  You just explained that to me.  And

 5    some of those behaviors result in physical

 6    restraint, correct?

 7         A.   Some of those behaviors did result in

 8    physical restraint when Autism Spectrum Therapies

 9    was involved.

10         Q.   Now my question to you is, between the

11    ages of 11 and 15, how many occasions did we have

12    to physically restrain him?

13         A.   I can't -- that's with Autism Spectrum

14    Therapies that was involved.  They were involved at

15    the time.  I can't give you --

16         Q.   Is it dozens?

17         A.   ████ died in 2020 at the age of 16, and

18    here we are at 20 -- I'm trying to rely on memory

19    from -- you know, here we are in 2022, so that's

20    two years, three, four, five years plus.

21         Q.   I'm talking about 2005 to 2008, more or

22    less.  Can we say it's dozens?  Is it hundreds?

23         A.   As far as restraints?

24         Q.   Yep.

25         A.   I honestly -- I don't recall exactly how
```

92

```
 1   many restraints that may have happened.
 2        Q.   When I said '05 to '08, I really meant
 3   2015 to 2018.
 4             MR. ZIBILICH:
 5                  Thank you, Jeff.
 6             MR. CLARKE:
 7                  They were both talking, so I thought
 8               they knew better than me.
 9             THE WITNESS:
10                  I don't recall exactly how many
11               restraints happened during that time
12               period.
13   BY MR. ZIBILICH:
14        Q.   You can't give me a ball park?
15        A.   We kept data.  I'm sure it's on the data
16   sheets, that, you know, I always let the treatment
17   providers know about ████ behaviors, what was
18   going on, so they could help us deal with it, but I
19   can't --
20        Q.   Do we still have these data sheets?
21        A.   Do you still have them? I don't know if
22   you still have them.
23             MR. CLARKE:
24                  We gave them to him.
25             MR. ZIBILICH:
```

```
1                    That's the same ones I had?  Okay.

2              I called them something different.

3              Okay.

4  BY MR. ZIBILICH:

5       Q.   I'm tired of beating this dead horse.

6  Pardon the pun.  I'm tired of it.  I'm led to

7  believe from your testimony that you are suggesting

8  that there was very few, if ever, any occasions

9  when it was just you and your husband having to

10 perform a physical restraint?

11      A.   The periods of time that you talked

12 about, from those ages, like I said, I was smaller,

13 and so we did make some attempts, but we reported

14 that information to Autism Spectrum Therapies, and

15 they said, you guys, hands off.

16      Q.   Were any of the attempts successful?

17      A.   Were any of the attempts successful?

18      Q.   Right, to physically restrain him when

19 need be, and it was just the two of you.

20      A.   It was very difficult, and we expressed

21 that to Autism Spectrum Therapies at the time, and

22 they said given the difficulty with me being the

23 size that I am for us to back away.

24      Q.   That's not an answer.  Were there any

25 times, albeit that it was extremely difficult,
```

```
1   where the two of you successfully physically
2   restrained him during that time period?
3        A.   Were they successful?
4        Q.   Uh-huh.
5        A.   The attempts were not successful.
6        Q.   Never?
7        A.   I mean, with my size, it was --
8        Q.   You're telling me the two of you were
9   never able to successfully physically restrain him
10  as you were taught?  As y'all were taught.
11       A.   As far as like being completely
12  successful, that --
13       Q.   Uh-huh.
14       A.   -- at home, when that happened?
15       Q.   Uh-huh.
16       A.   When ████ -- when we got -- when ████ got
17  discharged from the hospital, we actually -- I'm
18  trying to remember this correctly.  The Kennedy
19  Krieger people were actually there, and I can't
20  remember with confidence whether or not Daren was
21  there, but ████ did have an outburst when they were
22  there training the Autism Spectrum Therapy people.
23  I know that I was a part of that restraint.  I
24  can't remember if ████ -- Daren was part of that
25  restraint or not, but there were two people, with
```

1   me involved, that we handled that restraint under

2   the supervision of the KKI people.

3        Q.   You told me that the people that worked

4   in-house, when you offered them the information how

5   difficult it was to physically restrain him, they

6   told you don't do it anymore?

7        A.   They told us that if it's too difficult

8   just with the two of us to back away.

9        Q.   Don't do it. Did you report that to

10  Kennedy Krieger?

11       A.   That was reported to Kennedy Krieger.

12       Q.   By whom?

13       A.   Autism Spectrum Therapies.  They, you

14  know, they took over that.  They -- KKI, Kennedy

15  Krieger, and their treatment plan had said if there

16  were any questions or concerns, or that they had --

17  that they were open to having Autism Spectrum

18  Therapies call them.

19       Q.   How do you know they got called?

20       A.   Autism Spectrum Therapies and I, or us,

21  Daren included, we had this communication.  And so

22  when they saw ███ being restrained, they also

23  called up and said, hey, we are seeing these

24  restraints, and, you know, they spoke to Dr.

25  Zarcone.

96

```
1        Q.    We talked about the restraints in the
2   car.  Were there any other types of restraints that
3   y'all ever used, straps, ties, anything along those
4   lines?
5        A.    You mean ████  safety harness to keep
6   him safe in the car?  We had the safety harness for
7   him, and then to secure the safety harness even
8   further we had zip ties that we used to secure the
9   harness.
10       Q.    Any other kind of straps?
11       A.    He kept his seat belt on.
12       Q.    Any other kind of straps?
13       A.    No.
14       Q.    Any other devices at home?
15       A.    That we used to restrain him?
16       Q.    Uh-huh.
17       A.    As far as physical restraints?
18       Q.    As far as anything.  Yeah.
19       A.    There was one time where ████ had a ABA
20  therapist mention like a soft Posey, and that was
21  it.
22       Q.    What was that utilized for?
23       A.    When ████ -- this was before Kennedy
24  Krieger Institute where things were at its roughest
25  point that necessitated us that he needed
```

97

```
 1   hospitalization.  That was used for hitting, and
 2   then they found --
 3        Q.   Tell me about how the device worked.
 4        A.   It was a soft Posey, and then when that
 5   -- that actually seemed to escalate behaviors, so
 6   that was like taken off the table by his ABA --
 7   that was the supervision.  She recommended it from
 8   his ABA therapist.
 9        Q.   So were there ever occasions where it is
10   the middle of the night, and he is waking up or
11   having a bad dream and causing damage in the
12   bedroom or maybe leaving the bedroom and causing
13   damage in the house where y'all had to get
14   involved?
15        A.   █████, when he woke up in the middle of
16   the night, he usually came from his bedroom to our
17   bedroom, and then he would come and sleep between
18   us.
19        Q.   Were there ever times that something
20   happened during the middle of the night that caused
21   y'all to have to restrain him?
22        A.   Not that I recall.
23        Q.   Here is my favorite question of the day.
24   How did you find Mr. Clark?
25        A.   Oh, how we found Mr. Clarke.  Mary
```

```
 1    Howell, she was our family lawyer, and we didn't
 2    know -- obviously, we were so distraught after that
 3    day, and we needed someone to help us navigate
 4    through all this.
 5            Q.   How did you meet Mary Howell?
 6            A.   She was actually recommended.
 7            Q.   By whom?
 8            A.   She was recommended by a pathologist.
 9            Q.   You said Mary Howell was your family
10    lawyer.  Don't tell me any conversations you had
11    with her.  Your family lawyer in what regard?
12            A.   She helped us navigate and find them.  I
13    mean him and William Most.
14            Q.   Okay.  She never did any legal work for
15    you?
16            A.   She helped us find them and navigate --
17    you know, this was -- it was just such a --
18            Q.   Who is the pathologist that recommended
19    her?
20            A.   I don't recall her name.  I know it's --
21    I don't recall her name.  I know it's someone -- we
22    were searching for pathologists.  She wound up not
23    being the pathologist that we hired.  I guess that
24    is the right word, but I don't remember her name.
25            MR. ZIBILICH:
```

```
 1                    Off the record.
 2                {OFF-THE-RECORD DISCUSSION}
 3   BY MR. ZIBILICH:
 4        Q.    Ma'am, I'm going to show you something
 5   that I've just marked as Lou Exhibit Number 1.
 6        A.    This is actually the first time I've seen
 7   this, too.
 8        Q.    That's the question.  Have you ever seen
 9   that before?
10        A.    The answer to this is today was the first
11   time that Andy --
12        Q.    You read it before we started today?
13        A.    I read it just when he handed them out.
14        Q.    So you read it before we started the
15   deposition today?
16        A.    I read it when we -- before -- yes.
17        Q.    You weren't reading it while I was asking
18   you questions?
19        A.    No.
20        Q.    So you must have got it before.
21        A.    I got it just this morning when he was
22   handing them out.
23        Q.    Do you remember anything that it says?
24        A.    I'd like to have a copy of it, but you
25   can ask me questions.
```

```
1        Q.    I'm not going to ask you questions about
2   it.  I'm just going to ask you if you recall
3   reading those words before the deposition today?
4        A.    Yes.  I read the words on this card
5   before the deposition.
6        Q.    Do you have any opinion as to the advice
7   on those cards?
8        A.    Some of these tips for interactions with
9   persons with autism are some of these things I've
10  been told before by our treatment providers as well
11  as school.  School was an integral part of █████
12  treatment as well.
13       Q.    Let's talk about school.  Let's talk
14  about when he was enrolled in the St. Charles
15  Parish School District.  When did that happen?
16       A.    We discussed he got enrolled at age four
17  and was in the developmentally delayed Pre-K
18  program at New Sarpy Elementary.
19       Q.    Did you do or did you and your husband do
20  any research regarding what sort of schooling would
21  be appropriate for him before signing him up in the
22  St. Charles Parish District?
23       A.    ██████was in special education.  He got
24  evaluated and was in special education at New
25  Sarpy.  Did we do any kind of research to find out?
```

```
1    I think we had just gotten the diagnosis.  Being

2    close to age four, he started preschool at four.

3    It was recommended for ████ that if he -- whatever

4    school he went to that he have social -- if he

5    could, have social interactions with others, with

6    peers, because that would help with his language

7    they thought in modeling peers.

8         Q.   How long was he at that school?

9         A.   At New Sarpy Elementary, he attended from

10   Pre-K up until third grade.

11        Q.   Was there any reason why he didn't

12   continue with that program or just concluded at

13   third grade?

14        A.   That's lower elementary.  It concluded in

15   third grade.

16        Q.   Where did he go after that?

17        A.   Fourth grade is when he started going to

18   Ethel Schoeffner Elementary School.

19        Q.   That's fourth through seventh?

20        A.   Fourth through seventh is what Ethel

21   Schoeffner School goes up to, yes.

22        Q.   Was there ever an incident at that school

23   wherein they either threatened to throw your son

24   out or something along those lines?

25        A.   They never said threatened -- there was
```

1  never a threat to throw my son out.  ███   had an

2  IEP.

3      Q.    What does that mean?

4      A.    Individualized Education Program that he

5  had had since age, I believe, age four.  Once you

6  get identified as special education or special

7  needs, they develop an Individualized Education

8  Plan that, as it works out, that is individualized.

9  Everything is specific to him.  Along the way, ███

10 had a Behavior Intervention Plan as part of his

11 IEP.  And so they looked at ███ goals, what

12 things he needed academically.  Of course the IEP.

13 They looked at what behaviorally he may need.  They

14 looked at if he needed speech, because he had a --

15 he was diagnosed with a -- from the school

16 district, a severe receptive, meaning understanding

17 --

18     Q.    Okay.  I'll make it easier for you.  I

19 asked the wrong question.  Was there ever an

20 incident between ███ and a teacher there?

21     A.    As far as -- can you be more specific

22 please?

23     Q.    The teacher got hurt.

24     A.    I never got told that a teacher got hurt.

25     Q.    Did you ever get told that ███ got

1   physical with the teacher?

2       A.   ████ -- we had behavior -- school did

3   behavior tracking sheets for ████  That was part

4   of his plan, IEP, the plan. Can I specifically

5   remember in fourth grade if he actually --

6       Q.   Well, fourth through seventh.

7       A.   Fourth through seventh.  He didn't attend

8   -- he did not attend Schoeffner to fifth, sixth,

9   and seventh grade.

10      Q.   Where did he attend fifth, sixth, and

11  seventh?

12      A.   ████ -- fourth grade, part of fourth

13  grade, he attended Schoeffner.  ████ -- for the

14  second half of ████ fourth grade he attended

15  ChartMill School.

16      Q.   I got all of that.  I'm trying to get to

17  the incident where there was an incident with a

18  teacher.

19      A.   I'm not --

20      Q.   You're not sure of that?

21      A.   No.  Do you have anything for me to --

22  for fourth grade?

23      Q.   It doesn't necessarily have to be fourth

24  grade.  It is any grade in the St. Charles Parish

25  system.

```
 1        A.    As far as fourth, fifth, sixth, seventh,
 2   I know from your -- I know from behavior reports
 3   that ████ has -- you know, when they send the
 4   parent notification of restraint letters, that ████
 5   -- they would say ████ has hit a teacher or
 6   aggressed towards a teacher.
 7        Q.    Did y'all get called in to have to
 8   discuss that matter?
 9        A.    We had IEPs.  Again, ████ was on a
10   Behavior Intervention Plan.  We -- when ████ had
11   behaviors, as such that we mentioned, where there
12   was aggression, and, by law, they had to give a
13   parent notification letter of restraint or
14   seclusion, which included a brief description of
15   like ████ hit the teacher, and it would give a
16   duration of how long it lasted, and it would give
17   the people that were involved in the restraint, but
18   it wouldn't tell me specifically who, you know.
19        Q.    Did you ever have to threaten to sue the
20   St. Charles Parish School District?
21        A.    We never threatened to sue the St.
22   Charles Parish School District.
23        Q.    What did you do?
24        A.    What did we do?
25        Q.    The way you say we never threatened, it
```

1    leads me to believe you did something else.

2         A.   Well, when ███ had a behavior problem,

3    we went up and had another -- I called for an IEP

4    meeting, because you can have as many IEP meetings

5    as necessary, if you want to discuss behaviors.

6    ███ treatment team consisted of, you know, the

7    home -- our home team, I'm going to call it, as far

8    as the psychologist, the ABA therapist, and the

9    school, and that is going to encompass the

10   teachers, you know, the psychologists and other

11   staff members that are involved.  The speech

12   therapist, if need be.  They had a very good

13   working relationship, that after ███ got out of

14   KKI, they had case management meetings where they

15   meet every four to six weeks so that the school

16   knew what was going on at home, and the home knew

17   what was going on at school so that they could give

18   the best treatment in both environments.

19        Q.   I'll get back to this after lunch.

20        A.   Okay.  Are we going to lunch now?

21        Q.   No.

22        A.   Are we breaking?  I didn't know.

23        Q.   If you want to, we can.

24        A.   Yeah.  Actually, I would like a break.

25             {LUNCHEON RECESS, 11:20-12:28}

```
 1    BY MR. ZIBILICH:
 2         Q.    Did you have the occasion, ma'am, to
 3    speak with Mr. Clarke during the lunch hour?
 4         A.    We talked about -- he told me how well --
 5    well, he thought I was doing okay.
 6         Q.    Did y'all talk about any details of
 7    previous testimony or anticipated testimony?
 8         A.    We talked about just I was doing okay.
 9         Q.    When these people came by to observe you,
10    your husband, and your son, and give you these
11    helpful hints on how to deal with him, did they
12    ever pass you out any pamphlets or worksheets or
13    anything along those lines?
14         A.    You mean the Autism Spectrum Therapies
15    people?
16         Q.    Yeah.
17         A.    Did they ever give us any pamphlets?
18         Q.    Yes.  Any reading materials that could
19    possibly corroborate some of the things you talked
20    to me about earlier today.
21         A.    We were given the treatment protocols.
22         Q.    Do you still have those?
23         A.    I think they were given for production.
24    I'm not certain.
25         Q.    I don't have them.  All right.  I'm
```

```
 1   asking for them. I'm asking for them.

 2             MR. CLARKE:

 3                  Let me ask them --

 4             THE WITNESS:

 5                  That's the discharge thing. It has

 6               the discharge --

 7             MR. CLARKE:

 8                  We did give them to him.  That's the

 9               Kennedy Krieger records.

10   BY MR. ZIBILICH:

11        Q.   Okay.  Do you have any other written

12   materials from any sources relative to autism that

13   you may have received from schools, from doctors,

14   from teachers, from anywhere?

15        A.   About autism itself or about --

16        Q.   Yeah.

17        A.   -- as it pertains to ███████ --

18        Q.   Both.

19        A.   -- specifications for autism?

20        Q.   Both, both.

21        A.   We have for the school ███████ autism

22   intervention IEPs, Individualized Education Plan.

23   That's mentioned there.  They do evaluations and

24   train on revaluations at school.  So it's there.

25   And as far as a diagnosis, they are in his medical
```

```
 1   records from his treating home team, home
 2   psychiatrist.
 3       Q.   Have either you or your husband gone back
 4   to the Laser Tag since the date?
 5       A.   It's too hard to go back, no.
 6       Q.   Have you attempted to contact any of the
 7   folks that worked at the Laser Tag since the date?
 8   When I say the date, the day of this incident.
 9       A.   So January 19, 2020 have we made any
10   contact with them?
11       Q.   Yep.
12       A.   I think that some of the people came to
13   ████s funeral and offered their condolences.
14       Q.   Do you recall any of them by name?
15       A.   I'm not sure.  I can't be positive.  We
16   may have -- I'm not sure.  The manager.  I can't
17   remember for certain, but I know that they came,
18   and they -- at one point, ████ enjoyed roller ball,
19   and they had autographed his roller ball for him.
20       Q.   Okay.
21       A.   And I think -- I did afterwards, because
22   I requested cards, because ████ loved playing
23   cards, and their playing cards, so I asked if I
24   could purchase some for him to put in ████
25   casket, because I wanted to put some things that he
```

1   enjoyed in his casket, and playing cards were one

2   of them, so I did contact them and ask if I could

3   purchase some from them.

4        Q.   It's special cards from the Laser Tag?

5   Decks of cards we're talking about?

6        A.   Playing cards, but for some reason he

7   liked those, and so they did bring some to the

8   funeral.

9        Q.   All right.  I'm familiar with AA.  I'm

10  familiar with GA.  I'm familiar with NA.  Are there

11  ever -- are there any parenting classes relative to

12  people who have autistic youths that you're aware

13  of where you sit around in a group with other

14  people who are similarly situated?

15       A.   There are support groups for people with

16  autism.  Well, they actually have people with

17  autism that are higher functioning as well as the

18  parent groups.

19       Q.   Have you been?

20       A.   We had our individualized plan.

21       Q.   I don't know what that means.

22       A.   That's from our treatment providers that

23  we're supposed to --

24       Q.   Have you ever been to one of those group

25  --

1      A.   I did.  I did when ▓▓▓▓▓ was first

2  diagnosed.  The one that was closest to us, because

3  there weren't that many around, was Children's

4  Hospital.

5      Q.   In Uptown New Orleans?

6      A.   It was late in the evening, and then I

7  did the drive back.  It was just too --

8      Q.   How many times did you go?

9      A.   If I remember correctly -- again, that

10 was when ▓▓▓▓▓ was first diagnosed.  It was maybe

11 two times.

12     Q.   Am I correct that you are still not back

13 working?

14     A.   No.  I gave up my career to be ▓▓▓▓▓▓

15 mom, and I knew that he was special needs, and I

16 knew that he would require more time and commitment

17 from me as a mom.

18     Q.   What do your daily activities consist of

19 today, 2022?

20     A.   I sit at the cemetery.

21     Q.   Pardon?

22     A.   I sit at the cemetery with my son,

23 because that is the only way I can be close to him.

24 I get there.  School starts at -- because it is at

25 the St. Charles Borromeo Catholic Church, and they

```
 1   have a school there.  The teachers come in around
 2   7:30.  I try to get there so I can get a parking
 3   spot.  And then I pull out my portable chair, like
 4   from Academy Sports.  I have my bag full of, you
 5   know, water.  I have a battery charger.  I play
 6   ███ his songs that he loved.  Sometimes I go to
 7   the library to check out the hotspot that's there,
 8   and I play the movies that he loved.  So I'm there
 9   from 7:30 until like 11:30, and then I go home, and
10   I get something to eat, and then carpool.  I try to
11   beat the carpool, people that come pick up their
12   kids in the afternoon.
13        Q.   You carpool for other people?
14        A.   No.  I don't carpool with people.  The
15   people that are carpooling that pick up their
16   children from school.  I try to -- now that they
17   opened up the different gate, so I'm able to bypass
18   that.  So I am able to go down the little road by
19   the graves that are down below, because ███ is
20   buried in the mausoleum, outdoor mausoleum.  I get
21   there, and I spend my time with him there until it
22   gets dark.
23        Q.   This is something you do every day of the
24   week?
25        A.   (Witness nods head.)
```

```
1          Q.    Weekends included?

2          A.    Yes, I do.  Yes.

3          Q.    Do you see people there that you know?

4          A.    I met people that were there that their

5    loved ones have been buried there.  I met some.

6          Q.    Who have you met?

7          A.    And I've met Father John, who is there.  I

8    met Father Jude that was there.  I think he is now

9    a priest here on the West Bank. I've met --

10         Q.    Father John still there, affiliated with

11   the Catholic Church up there?

12         A.    He is.  I met Ronald, who he sold us our

13   plot, so he helps, you know -- I see him when he is

14   trying to help people buy their plots for their

15   loved ones that have died.  I have seen Brett.  He

16   is the facilities manager.  I've gotten to see the

17   people that do the inscriptions for the marble.  I

18   met them.  I found out that some are firemen.  I've

19   met a mom who lost her husband.  She is in the

20   forties.  She has 11 kids.  I've met another --

21         Q.    I think they are trying to get you some

22   Kleenex.

23         A.    I met another woman who lost her husband,

24   and I've met a gentleman who lost his wife.  I met

25   a mom, another mom, that lost her mother to
```

```
 1   dementia.

 2        Q.    These people are there every day or you

 3   see these people intermittently?

 4        A.    Some I've seen intermittently.  One that

 5   lost her husband, she comes fairly often.  Leslie

 6   is a man that I met.  He comes fairly often, but I

 7   know there are times when he said he had a stroke,

 8   and so he wasn't able to come.  He was visiting his

 9   living relatives, because he is in his seventies.

10   He wanted to visit them before they passed away.

11        Q.    Do you still see Miss Schaefer?

12        A.    Yes.

13              MR. CLARKE:

14                   If you need to take a break at any

15              time.  I don't want you to try to --

16   BY MR. ZIBILICH:

17        Q.    How often do you see Miss Schaefer?

18        A.    We're seeing her weekly.

19        Q.    You've seen her when?

20        A.    We were seeing her weekly, and then it

21   changed to every two weeks, and there are times,

22   though, when she was unavailable for her own

23   personal reasons, and those are times that we

24   weren't able to see her.

25        Q.    Have you seen her at all in 2022?
```

```
 1          A.    Yeah.  Like, you know, like I mentioned,
 2    we were seeing her every two weeks, but the times
 3    that she is not available for personal reasons, we
 4    didn't have contact with her.
 5          Q.    The therapist that went to the Laser Tag
 6    shortly after the incident, who was that?
 7          A.    She is a psychologist.
 8          Q.    What is her name?
 9          A.    Dr. Martha Hamilton.
10          Q.    Is it the same Hamilton that we were
11    talking about earlier today?
12          A.    Yes.
13          Q.    How did she get notified on that day?
14          A.    By me.  I was so frantic to get
15    information, because when ████ went into the
16    ambulance, I was asking the deputies that were
17    there, can anybody please tell me what is going on
18    with my son.  Give me any kind of information,
19    please.  Just let me know, and I wasn't getting any
20    kind of information.
21          Q.    Do you recall which deputies you spoke
22    to?
23          A.    I don't remember names. I didn't look at
24    badge names.
25          Q.    What about faces?
```

```
 1          A.    I was so distraught.
 2          Q.    Can you tell me if any of the deputies
 3    that you asked about what was going is sitting in
 4    this room right now?
 5          A.    I was so distraught when I asked about
 6    can anybody give me information, I was just -- I'm
 7    like now.  You know, it was just -- I --
 8          Q.    Look around this room right now and tell
 9    me if you recognize talking to any of those faces
10    that you see in this room right now?
11          A.    I really wouldn't remember.  I can't
12    remember.
13          Q.    Okay.
14          MR. CLARKE:
15                Are you okay?  You want to just go
16            compose yourself for one minute?
17          THE WITNESS:
18                That would be a good idea.
19                {BRIEF RECESS, 12:41-12:50}
20    BY MR. ZIBILICH:
21          Q.    Mr. Most.  Mr. Clarke or Mr. Most.  Who
22    was involved in this case?
23          A.    I think it was Mr. Most.
24          Q.    How did you find him?
25          A.    Mary helped us find this team together.
```

```
 1          Q.    Mary Howell assembled this team.

 2          A.    She helped us find them.

 3          Q.    Other than the people that have been

 4    deposed, are you aware of any eyewitnesses who may

 5    testify in this case?

 6          A.    No.

 7          Q.    Why are you putting yourself through

 8    this?

 9          A.    Because I want justice for ████ and I

10    don't want anybody else that -- you see this is so

11    horrible as a parent.

12          Q.    What do you want?  Tell me what you want.

13          A.    There needs to -- justice for ████ and

14    that this happens to no one else, so no one else

15    has to feel this kind of pain and heartache that I

16    have to deal with, and that there should be change.

17    This is what --

18          Q.    So you're not in this for the money?

19          A.    I'm not in this for the money. I'm  in

20    this for --

21          Q.    You don't want any money?

22          A.    That's a legal decision that you guys

23    make when there is a lawsuit case.  I don't know. I

24    know that I want justice for ████  I know I don't

25    want any parent -- no parent to have to go through
```

```
 1   this kind of -- this feelings, you know, of never

 2   having to see your child anymore, that it's being

 3   -- you know, no parent should have to go through.

 4   You should not be having to bury your child before

 5   you die.  It has been unbearable.

 6        Q.   What does justice equal to you?

 7        A.   Justice.  I don't think it's what -- you

 8   guys figure out what justice is.

 9        Q.   I'm not asking us guys.  I'm asking you.

10        A.   I think that's the legal system.

11        MR. CLARKE:

12             Hang on a second.  What we have

13          discussed as to what justice is would

14          not be discoverable.  Do you agree?

15        MR. ZIBILICH:

16             Okay.  Do I agree?

17        MR. CLARKE:

18             Yeah, with that.

19        MR. ZIBILICH:

20             No, but if she doesn't want to

21          answer the question, it's okay with me.

22        MR. CLARKE:

23             No, no.  I'm objecting that what we

24          talked about, what justice means --

25        MR. ZIBILICH:
```

```
 1                    Who is we?
 2             MR. CLARKE:
 3                  Me and my client, is attorney-client
 4              privilege.
 5             MR. ZIBILICH:
 6                  Okay.
 7   BY MR. ZIBILICH:
 8        Q.   Are you active on Facebook, ma'am?
 9        A.   Am I active on Facebook?  I'm not active
10   on Facebook.
11        Q.   Any other social media?
12        A.   I'm not active on any kind of social --
13   like Twitter.  If you are talking about -- I'm not
14   active on Twitter.  I'm not active on whatever else
15   there is.
16        Q.   So I have gathered from the last few
17   months that you, you and your husband, keep pretty
18   good records and memorialized a lot of stuff.  Is
19   that a fair assessment of y'all?
20        A.   As an autism parent, the treatment
21   providers tell you to keep data, and you keep data
22   so they can give you the best advice on how to --
23        Q.   And you do it.  You keep track of --
24        A.   We do our best.
25        Q.   -- events?
```

1          A.    We do our best to keep track of --

2          Q.    You categorize events as to whether they

3     are outbursts or -- what's the other word y'all

4     use?

5          A.    Behaviors.  Some people use meltdown.

6     I'm not sure if that's the other word that you're

7     describing or want.

8          Q.    But y'all categorize the events that you

9     memorialize by category?  By category, right?

10         A.    When you say category, you mean if there

11    is aggression, it is aggression.  If it's self-

12    injurious behavior, self --

13         Q.    Yes.  Yeah.

14         A.    Those are disruptions --

15         Q.    Yes.

16         A.    Yes.  There are categories like that that

17    we use.

18         Q.    Did y'all keep track of all of the

19    damages that your son caused?

20         A.    We kept track of those kind of damages

21    and gave those to our treatment providers.

22         Q.    I'm talking about damages to the house.

23         A.    They were -- Dr. Hamilton was aware.  She

24    came to our house weekly.

25         Q.    Whether it's a hole in the Sheetrock,

```
 1    whether it's a broken toilet seat, whether it's a
 2    broken burner on the stove, you kept track of all
 3    of that stuff?
 4         A.   She was aware of the things that we
 5    mentioned.
 6         Q.   That's not my question.
 7         A.   We kept track.
 8         Q.   My question is did you keep track of it
 9    all?
10         A.   As best as we could, we kept track of
11    that information.
12         Q.   Is that stuff memorialized anywhere?
13         A.   I think in those e-mails that you have.
14         Q.   Is that stuff memorialized in any other
15    manner?
16         A.   Those were the things that we gave to our
17    treatment physicians so they would be aware of it.
18         Q.   Did you keep track of or did he cause any
19    physical damages to the school building ever? Any
20    of the schools he went to?
21         A.   You are talking about New Sarpy?
22         Q.   I'm talking about any school he went to.
23         A.   Physical.  You mean like as far as like
24    he --
25         Q.   If he broke something.
```

121

```
 1          A.   He broke a pencil sharpener.  I don't
 2   know what grade it was.  I don't remember.  It was
 3   in elementary, New Sarpy Elementary, so it had to
 4   be anywhere from Pre-K to third grade, that I
 5   remember.
 6          Q.   Did y'all ever have to pay monies back to
 7   a school or to a piece of property or to a building
 8   because of something that he broke?
 9          A.   The pencil sharpener.  We replaced the
10   pencil sharpener.
11          Q.   What about the incident in the bathroom
12   shortly before his death?
13          A.   What incident?
14          Q.   Where he pulled the thing out of the
15   wall.
16          A.   What location?
17          Q.   At Supercuts.
18          A.   Did we -- I'm sorry.  Would you repeat
19   the question?
20          Q.   Do you remember the incident at
21   Supercuts?
22          A.   I know from the deposition what y'all are
23   talking about.  I wasn't in the bathroom with him,
24   so I can't speak to --
25          Q.   Is that something that had to be
```

```
 1   reimbursed?
 2        A.    I can't speak to actually what happened
 3   in the bathroom, so as --
 4        Q.    Okay.  So you don't know?
 5        A.    Did we reimburse them?
 6        Q.    Right.
 7        A.    The answer to that one is we did not
 8   reimburse any money to Supercuts.  I think Daren
 9   said in his deposition, if I remember correctly,
10   and I know you have it, but I think he said he told
11   the lady at Supercuts about what happened in the
12   bathroom when he was present with █████.
13        Q.    So was there ever any previous occasions
14   where he had an episode while at Laser Tag?
15        A.    When you say -- he's head slapped there
16   before.
17        Q.    What else?
18        A.    He had some vocalizations there before.
19        Q.    More than one occasion?
20        A.    The vocalizations for like he would do
21   the squeals.  He had that on more than one
22   occasion, the squeals.  We talked about that day
23   itself was -- you know, we know about that.
24        Q.    Were there any other occasions where you
25   thought it was best to get him out of there?
```

1        A.   Not that I can recall.  I know that █████
2  -- there were times where ██████-- he verbalized.
3  Again, he had some, what they taught him at school,
4  some functional communication, like go home.  There
5  were times where ██████ verbalized himself, "Go
6  home."
7        Q.   He would say home?
8        A.   Home, go home.
9        Q.   One word.  He would say home?
10        A.   Or two words, go -- nothing -- you know,
11  he wouldn't say these complete sentences, like I
12  want to go home now because of whatever.
13        Q.   Okay.  So on the occasion that brings us
14  here today, it was preceded by home or words to
15  that effect?
16        A.   He requested to go home.
17        Q.   He was playing with a new thing he had
18  not seen or something happened.  He wanted to go
19  home.
20        A.   He was playing some -- he had been
21  playing some -- I wouldn't say something new that
22  he had not seen before, because we had been going
23  to the Laser Tag for many years, and he, from what
24  Daren said, requested to go home.  I was actually
25  speaking to Kyle at the front desk or whatever

```
 1    where you buy your tickets at Laser Tag, which is

 2    in the middle.  Well, front but in the middle.  I

 3    don't know if you've been to Laser Tag or not, but

 4    it's the middle portion.  So I was speaking to --

 5         Q.   To use a New Orleans phrase, "Ain't there

 6    no more."

 7         A.   Oh.  So I was talking to Kyle about

 8    opportunities for special needs kids in Destrehan,

 9    because he had previously gone to Destrehan.

10         Q.   So about how many other occasions did

11    something go on where ███ said home or go home?

12         A.   In his lifetime?

13         Q.   At the Laser Tag, yeah.

14         A.   Oh, at Laser Tag.  From the seven years

15    that we've gone there, seven -- I don't know if I

16    can give an accurate amount.

17         Q.   Dozens?

18         A.   I can give a best guess.

19         Q.   Go ahead.

20         A.   Best guess ten, 15, maybe.  I don't know.

21         Q.   Were there ever occasions at the Laser

22    Tag where ███ did not say home but you thought it

23    was in everybody's best interest to get him out of

24    there?

25         A.   Were there ever times when -- there were
```

1      --

2           Q.    Leaving was not precipitated by ███ --

3           A.    Requesting.

4           Q.    -- wishing to go, but you or your husband

5      saw something that thought it's time to get out of

6      here.

7           A.    If it became very crowded, then we

8      thought, well, maybe this might -- all these people

9      around him might agitate things, because we always

10     tried to gauge.  We went early in the morning,

11     tried to gauge the scene, so to speak, or whatever,

12     the amount of people.  That if it seemed like it

13     was getting overwhelming or too crowded --

14          Q.    How many is overwhelming?  More than ten,

15     more than 20?

16          A.    Well, Laser Tag is pretty spread out, so

17     it depended on where the people were congregated.

18     If he is on the left side of it, and they are on

19     the right side, and they stay on the right side,

20     then that's --

21          Q.    You felt safe?

22          A.    Not in the vicinity.  He is not exactly

23     --

24          Q.    You felt more safe?

25          A.    That -- it felt that there were -- there

126

```
 1   weren't crowding.
 2        Q.    I take it you were always concerned about
 3   the possibility that he might hurt somebody?
 4        A.    I think we had a concern that -- of ████
 5   We had a concern for the community.  We had a
 6   concern that -- you know, the community was at the
 7   forefront of our minds.  We always thought about
 8   it.  When you have a child with autism, you have to
 9   -- it takes a lot of planning.  You plan the best
10   that you can for the day.  You put in that routine
11   and structure that they seem to respond to.  You
12   also -- you know, you put in these safety measures
13   that we did.
14             You know, we did our best to keep the
15   community safe.  We took him out.  We wanted him to
16   also, just like a typical kid would, always enjoy
17   those kind of things.  So like we followed our
18   treatment providers that -- and school.  They
19   wanted us to generalize those skills to the
20   community, and we -- to help him become
21   independent, and we followed their rules.  They
22   wanted us to practice money skills out in the
23   environment.  We did that.  Laser Tag was kind
24   enough to be patient with us in letting us count
25   out coins and money for ████ to buy stuff there.
```

```
1   Like, you know, there is a little snack bar, so he
2   could practice those money skills.  We practiced
3   money skills at Sam's.  They wanted us to do that,
4   to have him out in the community.
5          Q.   Who wanted him out in the community?
6          A.   Our treatment providers have that as
7   goals for him to be out in the community.  The
8   school had that as goals for us to -- you know, for
9   him to -- for us to try to continue those skills
10  out in the community.
11         Q.   Let me ask you this.  Is it fair to say
12  that y'all would not let him roam around Laser Tag
13  by himself?
14         A.   There was either me or Daren close by.
15         Q.   How close is close? Close as you and I
16  are?
17         A.   Oh, that is --
18         Q.   Closer?
19         A.   It depends.  Sometimes we're right next
20  to him.  Sometimes we're this close to him. Depends
21  like if he --
22         Q.   Two to five feet is a good guess?
23         A.   Two to five feet.  So what are we here
24  about?  Yeah.  That's probably appropriate, because
25  if he is doing his -- he played roller ball at
```

1    times, which is like a little bowling.  You want to

2    make sure that you're -- you know, I'm sorry.  Like

3    just what I did, but you are going to be a distance

4    where you don't hit somebody when you are bowling

5    the ball.

6         Q.   Dr. Hamilton, did he know that you --

7         A.   She, she.

8         Q.   She.  Did she know that y'all took him to

9    Laser Tag?

10        A.   Oh, she knew.

11        Q.   All the other doctors did, too?

12        A.   They knew.

13        Q.   If they all walked in here right now, and

14   I asked them, they would say what you are telling

15   me right now, we knew he went to Laser Tag?

16        A.   Dr. Hamilton knew.  When we had the ABA

17   people, they actually attended or came with us at

18   times to our other -- to whatever outings that we

19   had that they attended as well.

20        Q.   Y'all didn't keep that from anybody?

21        A.   No.  They knew.

22        Q.   There were other occasions --

23        A.   And school knew.

24        Q.   There were other occasions outside of

25   Laser Tag where there were issues that arose where

```
 1   y'all had to get him out of a certain place,

 2   whether it's a McDonald's or some other type place

 3   like that.  Is that not so?

 4        A.   There was a time where there was a

 5   Popeye's incident that Daren had spoken about.

 6        Q.   Any others that you can recall?

 7        A.   That we got him out of?

 8        Q.   Uh-huh.

 9        A.   That were in the community?  There was a

10   time at Chuck E. Cheese where we got him out

11   because it was becoming overwhelming.

12        Q.   What does that mean?  Something was about

13   to trigger him or something did trigger him?

14        A.   There were a lot of people that were

15   there, and he was starting to do his squealing

16   noises, and we decided to take him out.

17        Q.   Are you on any medicine today?

18        A.   Nope.

19        Q.   Have you been prescribed medicine as a

20   result of --

21        A.   Oh, wait.  I took Tylenol, actually, but

22   sorry.  But as far as any other --

23        Q.   Are you on any prescribed medications?

24        A.   No, I'm not.

25        Q.   I take it neither you or --
```

```
 1          A.    Husband?

 2          Q.    You or your husband or Dr. Schaefer think

 3   you should be on medicine?

 4          A.    No one has mentioned that to me.

 5          Q.    You are a doctor.  You don't think you

 6   need to be on medicine, do you?

 7          A.    I think for individuals I think that's a

 8   choice.  If I was practicing, you know, that's a

 9   choice whether or not someone wants to go through

10   therapy or not.  That's a choice.  And I'm -- you

11   know, go ahead. I think you were about to ask

12   something.

13          Q.    Do you go to grief counseling?

14          A.    We have Dr. -- well --

15          Q.    Dr. Schaefer instead?

16          A.    Miss Schaefer.

17          Q.    I know she is not a doctor.

18          A.    Miss Schaefer, and then we also have

19   Tender Hearts.  It's an online thing from David

20   Kessler, who is a grief expert.  So he has this

21   thing that you join, and you get lessons about

22   grieving.

23          Q.    Just like support groups like AA, NA, GA.

24   You don't go to any support groups for grief

25   counseling or do you?
```

```
 1              MR. CLARKE:

 2                   What is GA?

 3              MR. ZIBILICH:

 4                   Gamblers Anonymous.

 5              MR. CLARKE:

 6                   Oh, okay.  I'm a successful

 7                candidate from AA.  I thought I knew

 8                all the As.

 9              MR. ZIBILICH:

10                   There is no such thing as a

11                successful candidate.  It's one day at

12                a time.  You ain't done.

13              MR. CLARKE:

14                   Well, I mean, this case is going to

15                make me drink.

16              THE WITNESS:

17                   So have I gone to any grief support

18                groups?

19              MR. ZIBILICH:

20                   Yes.

21              THE WITNESS:

22                   No, I have not.

23   BY MR. ZIBILICH:

24        Q.   Are you familiar with the phrase "excited

25   delirium?"
```

```
1          A.    I was not familiar with the phrase
2    "excited delirium" until ███████ report and from Dr.
3    Troxclair.
4          Q.    Which report are you talking about?
5          A.    Dr. Troxclair.
6          Q.    You are talking about the coroner's
7    report?
8          A.    The coroner, yes.
9          Q.    So you saw that phrase, and that was the
10   first time you had ever heard of it or saw it?
11         A.    That's nothing that I learned in medical
12   school.
13         Q.    Is that the first time you ever saw it or
14   heard of it, when you saw it in Dr. Troxclair's
15   report?
16         A.    When Dr. Troxclair actually reported that
17   to me, she had called me. ███████ died on the 19th.
18   The next day was Martin Luther King Day.  We had
19   spoken on that -- I guess it must be Tuesday,
20   because Monday was Martin Luther King Day.
21   Tuesday, and she said -- she asked the medications
22   that he was on.  She wanted to get a little bit of
23   history from me.  She mentioned excited -- I didn't
24   even really -- I think I may -- I didn't really
25   know what that was at that time, but she mentioned
```

```
 1    it then.
 2           Q.    What do you think it is?
 3           A.    Excited delirium?
 4           Q.    Uh-huh.
 5           A.    Now that I -- we actually spoke to her to
 6    find out what that was, and she --
 7           Q.    I'll ask the question a different way.
 8    What did she tell you it was?
 9           A.    She told -- well, actually, let me go
10    back, because Tim Genevay, who also works for the
11    coroner's office, also spoke with us about that,
12    and he told us that, typically, these are types of
13    cases where crack cocaine, I think, is maybe when
14    it first started, was involved in those cases.
15    People died from these episodes, I guess, while
16    they were high, I guess, from crack cocaine. So he
17    mentioned that to us.  He mentioned that she was
18    trying to -- that was her guess as to what was --
19    what had happened to ██████ and that they were
20    saying, you know, that it was just an episode that
21    suddenly happens, from what I remember her saying.
22    I remember from speaking with her, she said that
23    there is usually elevated temperature or -- I don't
24    know how elevated --
25           Q.    Have you done any reading or research on
```

```
 1    that phrase since you first learned it?
 2         A.    Excited delirium?
 3         Q.    Uh-huh.
 4         A.    I have looked that up.  I asked her
 5    actually to, when I spoke with her, are there
 6    things I could look at, because I had no
 7    familiarity with that term.
 8              MR. ZIBILICH:
 9                   Since our IT guy is here, I'll skip
10                a few things.  I'm ready to be plugged
11                in.
12              MR. CLARKE:
13                   We're already plugged in.  You want
14                the video?
15                   Now, if you want, I can be the one
16                to play it or you can let somebody else
17                do it.  This is the very beginning.
18              MR. ZIBILICH:
19                   Stop.  Don't start it yet. Off the
20                record.
21                   {OFF-THE-RECORD DISCUSSION}
22    BY MR. ZIBILICH:
23         Q.    Ms. Lou, do you recall what time y'all
24    arrived at the Laser Tag on the 19th?
25         A.    You are talking about the first time --
```

```
 1    Oh, I'm sorry.
 2                     {OFF-THE-RECORD DISCUSSION}
 3    BY MR. ZIBILICH:
 4         Q.   What day of the week was this?
 5         A.   This is January 19, 2020.  It was a
 6    Sunday.
 7         Q.   Do you recall what time y'all arrived?
 8         A.   From this, when this video was taken, we
 9    went to Laser Tag twice that day.
10         Q.   You went earlier, you left, you went
11    back?
12         A.   Correct.
13         Q.   Do you recall what time you went back?
14         A.   This time it was around one.
15         Q.   Around one in the afternoon?
16         A.   Yeah.
17         Q.   Did anything unusual happen prior to one
18    in the afternoon?
19         A.   No.
20         Q.   We had already had breakfast?
21         A.   Yes.
22         Q.   Lunch?
23         A.   Yes.
24         Q.   Do you recall where y'all had lunch?
25         A.   Izzo's out in Metairie.
```

```
1          Q.    Everything was normal there?

2          A.    Yes.

3          Q.    No indicia that ███ might be on the way

4    to having an episode?

5          A.    No.

6          Q.    Of course, you never would get indicia an

7    hour or two in advance of an episode.  It would

8    kind of come on pretty fast, wouldn't it?

9          A.    As far as you -- I'm sorry.

10         Q.    As far as ████ having an episode, whether

11   it's at the bottom or at the intense top, you

12   wouldn't usually be given an hour or two notice

13   that an episode is on the way?

14         A.    Well, we would always monitor his

15   behavior.  If there was something that we heard or

16   saw, then we would not go to that establishment. We

17   would --

18         Q.    Why did y'all leave the first time?

19         A.    ████ requested to go home.  I'm sorry. He

20   didn't say go home.  He wanted to go eat lunch at

21   Izzo's.

22         Q.    Was there something unusual about the

23   time of the day that you went on this particular

24   Sunday that why didn't you think about going to eat

25   first as opposed to waiting for him to tell you to
```

```
 1    go eat?
 2         A.    Well, with ████ we usually had a
 3    structure, but we also learned from his treatment
 4    providers that ████, if he made a request, if it's
 5    a reasonable request, to go ahead and honor that
 6    request.
 7         Q.    So there would be no discussion about,
 8    ████, it's really not the right time of the day. We
 9    just had breakfast.  It's too early, it's too late.
10    You stop what you are doing and just go do it?
11         A.    But it wasn't that day.  It was a
12    reasonable time to have --
13         Q.    To have lunch?
14         A.    Because Izzo's was open.
15         Q.    Why didn't you just go straight to Izzo's
16    as opposed to going to the Laser Tag?
17         A.    As we mentioned, ████ had a routine and
18    structured activities of the day that he normally
19    would participate in.
20         Q.    You are telling me two things.  You are
21    telling me the structure of the day was that you
22    should have gone to Laser Tag, but now you are
23    telling me it was the time of the day to go eat.
24         A.    He did go to Laser Tag in the morning.
25         Q.    But y'all didn't stay.
```

1         A.     He made a request to go have lunch.  That

2     was a reasonable request, since it was around

3     lunchtime, and through our treatment providers, if

4     there is a request which is reasonable, then to go

5     ahead and honor that.

6         Q.     That didn't alert you to anything, that

7     you had planned X, and he had planned Y?

8         A.     The structure, as far as activities, were

9     there.  That wasn't something that was atypical for

10    █████, actually.  That's something that we did

11    routinely on Sundays.

12        Q.     So you got to the Laser Tag at one.

13    That's a little bit later than you would normally

14    get there, true?

15        A.     That we normally would get there?

16        Q.     Uh-huh.

17        A.     I can't say that that is true.

18        Q.     Without reciting the page and line, I

19    specifically recall your husband telling me while

20    he was sitting in the same chair you are sitting in

21    right now, and I read it yesterday, that the plan

22    was usually to go there really early.

23        A.     That's the first time.  We mentioned he

24    went there twice, and so --

25        Q.     So that's my point.  So when you went the

```
 1   second time, that was a little bit different than

 2   the normal course of things?

 3        A.   We have done that before as well.

 4        Q.   You have gone there twice before in the

 5   same day?

 6        A.   Uh-huh.

 7        Q.   And you weren't a little concerned or a

 8   lot concerned that maybe when you got there the

 9   second time that it was going to be more crowded

10   than the first time?

11        A.   We always -- as part of our ABA therapy,

12   we learn these different measures.  You go, and

13   actually you survey the parking lot to see how

14   crowded it may look.  If we were unable to tell how

15   crowded it was by the parking lot, we're unsure,

16   then typically me, since my husband is usually the

17   driver, would go out and look, go to the

18   establishment, if it was Laser Tag, look to see how

19   crowded it was.

20        Q.   So how crowded was it on this occasion,

21   the second time?

22        A.   It was not that crowded.

23        Q.   More crowded than the first time you went

24   two hours before?

25        A.   There -- because we -- there were more
```

```
1    people the second time than there were the first
2    time.
3        Q.   But not enough to alarm you is what you
4    are telling me?
5        A.   Not enough to alarm me.
6        Q.   So how long were y'all in there?
7        A.   I don't wear a watch.  I didn't pull out
8    my cell phone to look at the exact time when we
9    left.  I guess the time there.  I don't -- it shows
10   13:20.  That would be 1:20.  If we got there around
11   one, it doesn't look like we're outside of the
12   building, at least from that time on -- at least 20
13   minutes, I guess, from this time stamp on the
14   video.
15       Q.   A very short visit?
16       A.   Yes.
17       Q.   What unusual, if anything, happened in
18   the Laser Tag that, in your belief, made the visit
19   so short?
20       A.   What made the visit short? That was -- I
21   mean, it wasn't -- I don't think that there -- ███
22   requested, as we talked about before, to go home or
23   go.  Something to that -- meaning let's leave the
24   place, and so, like we said, we had been told by
25   our treating providers, treatment providers, that
```

1    if ███ makes a request, if it's reasonable, to

2    honor it.  That's a very reasonable thing to honor.

3        Q.  So you all had been there dozens of times

4    prior to this event, correct?

5        A.   Probably more than dozens.

6        Q.  A hundred?

7        A.   We were there Saturdays, Sundays, when

8    ███ -- for those -- you know, for those years that

9    we've gone, we would do both weekends or both days

10   of the weekend.  We also did, at times, holidays.

11   ███ would say this, and we said, okay, if it's a

12   school holiday, this is the plan, the schedule that

13   we're going to do, because it's different as well

14   since he is not in school, so you would help him

15   organize his day.

16       Q.  How many times in the past had the visit

17   been as short as 20 minutes before ███ exercised

18   his right to say let's go?

19       A.   How many times did ███ -- I have no

20   idea.  I couldn't give you a best guess.  There was

21   -- it varied.

22       Q.  So it wasn't that unusual for him to --

23       A.   It varied depending on -- sometimes ███

24   had to wait for the spin zones that he loved, the

25   thing, if there was someone that was available to

1    activate the machine or whatever it was, the spin

2    zone.  There were times, like you said before,

3    where we practiced our social skills that the

4    school and the treatment providers requested us to

5    do.

6         Q.   That's not my question.  My question is

7    how many times prior to this date was the visit

8    short like this date?

9         A.   I can't give you an accurate.

10        Q.   Typically, how long would y'all stay

11   there, if there is such a thing as typically?

12        A.   How long would we stay there?

13        Q.   Two hours, the length of a movie?

14        A.   No.  We would not stay there two hours.

15        Q.   Less?

16        A.   It would probably be less than two hours.

17        Q.   But you would admit, would you not, that

18   20 minutes is quite short?

19        A.   Twenty minutes is a -- 20 minutes is, for

20   that episode, when he said go home, for that day,

21   20 minutes was -- I can't say it's always a short

22   time.  I mean, it's a relative term for --

23        Q.   Okay.  So on the other occasions where it

24   was only 20 minutes or so, and he wanted to go home

25   --

```
 1          A.    Because that morning, I mean, you know,

 2     we went to Izzo's.  He did his four spin zones.

 3     That might have been -- I don't know how long they

 4     last.  That might have been 15, 20 minutes as well.

 5          Q.    When he says, as my mother would say,

 6     when he says go home, y'all jump?

 7          A.    What do you mean by jump?

 8          Q.    You go home right now.

 9          A.    We listen if he says go home, and he

10     makes that request, then we go.

11          Q.    Right now?

12          A.    We go.

13          Q.    We don't dally.  We go.

14          A.    They go.  Like if I'm in the bathroom,

15     though, and Daren is like with him, they go, and I

16     look to see where -- I'll go to the car.  Are they

17     there or not.

18          Q.    That's happened before?

19          A.    From Laser Tag or anywhere?

20          Q.    Laser Tag.

21          A.    Where ██████ has requested to go home?

22          Q.    Yeah.

23          A.    He's requested to go home before from

24     Laser Tag.

25          Q.    On those occasions where he requested to
```

```
1    go home, was it followed up by an incident?

2           A.    When you say incident --

3           Q.    An outburst or an incident?

4           A.    Not always.

5           Q.    But sometimes?

6           A.    That particular day --

7           Q.    Well, I know about that particular day.

8    I'm talking about other days.

9           A.    There was an incident where he had a

10   tantrum in the car in the parking lot.

11          Q.    So sometimes let's go, after a short

12   period of time, is a precursor to an incident?

13          A.    I'm sorry.  Could you repeat that?  There

14   is a lot of sometimes.

15          Q.    Sometimes, after a 20-minute visit, a

16   shortened visit, when █████ says let's go, that is

17   often preceded by an incident? You said there was

18   an incident this one time in the car.

19          A.    You said -- let me make sure I

20   understand.  Short time if █████ spends -- I am

21   going to paraphrase that, and correct me if I'm

22   wrong.

23          Q.    Will do.

24          A.    Or if I misunderstand it as well.  But if

25   █████ is in Laser Tag for 20 minutes, a short period
```

```
 1  of time --
 2       Q.    And says let's go.
 3       A.    And says let's go, is there always -- is
 4  that always something that leads to an outburst?
 5  Is that correct?
 6       Q.    Not always, but does that -- does the
 7  racing form say the outburst may be on the way?
 8       A.    If he says to go home?
 9       Q.    Uh-huh.
10       A.    Not always.
11       Q.    But sometimes?
12       A.    It could.  I mean, he did it that day.
13       Q.    He's done it other days.
14       A.    To say go home? I think that other time
15  when I mentioned that he wanted to go home, and he
16  had the outburst in the car, and he wound up
17  slapping his head in the car.
18       Q.    So on previous occasions, let's go, after
19  a 20-minute stay, has been followed up by some sort
20  of incident or outburst?
21       A.    Not always.
22       Q.    Sometimes?
23       A.    It can happen.
24       Q.    Are you alerted that it can happen?
25       A.    Alerted in what aspect?
```

1      Q.   Just as the word is.  It's happened

2   before.   It may happen again.  Does it make you

3   more alert?

4      A.   I think we're cognizant that that --

5   always cognizant that we try to keep in the

6   forefront of our head that the community needs to

7   be protected and have ████ still enjoy the benefits

8   of what the ADA says, that he can be out in the

9   community and enjoy life just like everybody else

10  can.  So we -- you know, thankfully we -- you know,

11  he was able to -- the ADA decided to fight that so

12  that he could have the freedom and --

13     Q.   Okay.  That really wasn't my question.

14     A.   -- to be there.

15     Q.   Can you recap the 20 minutes what went on

16  inside?

17     A.   What went on inside, the 20 minutes

18  inside?  When we went inside, I purchased the Laser

19  Tag tickets, gave them to Daren.  Daren went with

20  ████ to the Laser Tag entrance where the actual

21  game of Laser Tag is played, the arena.  I don't

22  think they were ready for him yet, to set up the

23  actual game.  I was actually, as I said before, was

24  talking to -- I believe his name is Kyle, about

25  what kind of opportunities there may have been --

```
 1   there would be, present tense, for ▓▓▓▓ at
 2   Destrehan High School, given that Kyle had gone
 3   there before.  He was giving me some things where
 4   he knew special needs students were involved in at
 5   Destrehan High School, such as, you know, helping
 6   out the football team.  He did some things with --
 7   like depending on the person, with band, and there
 8   is some -- you know, so he knew of some social
 9   interaction kind of activities.
10        Q.   I'm more concerned with what was going on
11   with ▓▓▓▓ than what was going on with you and Kyle.
12        A.   And so Daren -- so I could see -- Like I
13   said, that thing is in the middle.  I could see
14   both sides, left and right. Daren -- they -- like I
15   said, they weren't able to get into the Laser Tag
16   because they had to wait.  They played some video
17   games.  And since I was talking to Kyle, I assumed
18   they did not play laser tag, because I then saw
19   them on this side playing video games.  They played
20   their video games.  I heard Daren said, "We're
21   leaving."
22        Q.   He said that to you?
23        A.   He said -- as Daren and ▓▓▓▓ were
24   leaving, I'm here at the -- say this is the middle.
25        Q.   He doesn't say Daren and ▓▓▓▓ are
```

```
 1   leaving. He tells you in first person singular.

 2   What did he say?

 3        A.   No.  Daren said, "We're leaving."

 4        Q.   We're leaving.  Who did he say it to?

 5        A.   He said it to me.

 6        Q.   That's what I asked.

 7        A.   But like he was probably about a distance

 8   from here, and I was --

 9        Q.   Okay.

10        A.   So I told Kyle, "I've got to go," and I

11   followed suit.

12        Q.   So did something happen on the way out

13   while y'all were still in the Laser Tag?

14        A.   As far as ▮▮▮▮ just said -- according to

15   -- according to what I heard, like Daren says to

16   me, "We're leaving," or "We're going to go right

17   now," so I turn and head out that direction as

18   well.

19        Q.   Did anything happen before you opened the

20   door to go outside?

21        A.   Not to my recollection.

22        Q.   So ▮▮▮▮ had not acted up yet?

23        A.   Not to my recollection.

24        Q.   Tell me when it was that ▮▮▮▮ acted up.

25        A.   I was headed outside.  They have one set
```

149

```
1   of doors, I guess, a vestibule, and the other set
2   of doors.  As I was headed out the second pair of
3   doors, I saw ██████ I'm sorry, head slap.
4        Q.   Nothing really unusual there, is there?
5        A.   As far as head slapping?
6        Q.   Uh-huh.
7        A.   That -- I mean, he -- that is part of an
8   outburst.
9        Q.   So an outburst is on the way?
10       A.   An outburst is happening.
11       Q.   It is happening, right.  So does that
12  mean run faster to the car?
13       A.   What this means when there is an
14  outburst, I witnessed Daren trying to escort ██████
15  to our safe place, as we've been told in our
16  treatment plan, and the safe place that was out in
17  the community would be our vehicle.
18       Q.   So does something happen on the way to
19  the vehicle?
20       A.   ██████ head slaps, and then during his
21  outburst, he is flailing his arms, and he slaps
22  Daren.
23       Q.   Is this witnessed, to your knowledge, by
24  any of the employees at Laser Tag?
25       A.   To my knowledge, I can only assume so.  I
```

```
 1   don't know for sure, but I would think so, because
 2   one of the managers came out and asked if we needed
 3   assistance.  So by that I would assume that she
 4   witnessed it.
 5        Q.   And so what is her exact words?  Do you
 6   need assistance?
 7        A.   I don't know her exact words, but I can
 8   --
 9        Q.   As best as you can remember.
10        A.   Do you want me to call somebody.  Do you
11   need help.
12        Q.   What is your answer?
13        A.   And my answer to her is, I said, "Let me
14   find out from Daren first," so I asked Daren, and
15   he says, "Yes."
16        Q.   Is it safe for me to say that that is
17   highly unusual, y'all having somebody call for
18   assistance?
19        A.   That -- is that highly unusual that we
20   called for someone to assist us?
21        Q.   Uh-huh.
22        A.   That has not happened, to my knowledge,
23   before.
24        Q.   So it never happened before?
25        A.   Not that I can recall.
```

```
1        Q.   So if it never happened before, forgive
2   my English, but then that would make it highly
3   unusual?
4        A.   That would be unusual.
5        Q.   Highly unusual, if it never happened
6   before?
7        A.   (Witness shrugs shoulders.)
8        Q.   You asked Daren if we needed assistance,
9   but yet it appears to me that these sort of
10  episodes have happened all the time out in the
11  public where the head slapping has occurred without
12  the need for assistance.  What made this one
13  different?
14       A.   I don't say that this happened all the
15  time.
16       Q.   I didn't say all the time. I said on many
17  occasions.
18       A.   Okay.  On many occasions, this has
19  happened before.  This time it was out in the
20  community.  Like the other times I mentioned to you
21  previously we were at home, you know, when ███ had
22  these behaviors.  This was out in the community.
23  There were people that actually were around, and we
24  wanted to make sure that the people were safe, and
25  so that's why we consented to help.  We needed this
```

1    -- we needed help.  We needed assistance for this

2    --

3         Q.    I got you.

4         A.    -- this time.

5         Q.    You are not trying to convince me or

6    maybe you are, that he had never been out in public

7    before and head slapped?

8         A.    ███████ been out in public before and head

9    slapped, but this time there was -- remember, we

10   were talking about he was flailing.  He was

11   aggressing to Daren.  He had some slapping.

12        Q.    Is this the first time he had been out in

13   public that had the combination of head slapping

14   and arms flailing?

15        A.    As far as the arms flailing and the

16   outburst in the community, where there are people

17   that were in very close proximity to where Daren

18   is, and Daren -- we were concerned about that.  We

19   needed that help.

20        Q.    So you are telling me it's the first time

21   we've had that combination ever, in the community?

22        A.    As far as ██████ having an outburst?

23        Q.    Yeah.

24        A.    ██████ has had an outburst before in the

25   community where it's been in a vehicle where he's

```
1   had an outburst, and we pulled over to the side of
2   the road before.
3               MR. ZIBILICH:
4                   Can you run it, please, sir?  I'll
5               tell you when to stop.
6                   {VIDEO PLAYED}
7   BY MR. ZIBILICH:
8       Q.   Ms. Lou, I can safely assume that this
9   whole time that this thing is running y'all are
10  still inside?
11      A.   I would assume so.  We're not out yet.
12              MR. ZIBILICH:
13                  Okay. I would tell you to fast
14              forward it 30 seconds, but the second I
15              do that, I'll miss my part, and I don't
16              have it marked.  Jeff, how much of this
17              noise happens before something happens?
18              Are we close?
19              MR. MARTINY:
20                  Go up 30 seconds, Solomon, and we'll
21              see where we're at. Hit it again.
22              MS. VALENTI:
23                  Here we go.
24              MR. CLARKE:
25                  It's 4:14, for the record.
```

```
 1              MR. ZIBILICH:

 2                   Okay.  Stop for a second.

 3    BY MR. ZIBILICH:

 4        Q.   All right.  We know the answer, but who

 5    are the two gentlemen that just walked out?

 6        A.   That's my son, ▇▇▇▇ and that's my

 7    husband, Daren.

 8        Q.   Are you able to hear whether there is any

 9    conversation going on between your husband and ▇▇▇

10    as they walk out?

11        A.   I don't recall any at that point.

12        Q.   As of the last three seconds, it looks

13    pretty normal.  Your husband trying to encourage,

14    for lack of a better word, ▇▇▇▇ to the car?

15        A.   It looks like my husband is getting the

16    safety harness ready to go to the vehicle.

17              MR. ZIBILICH:

18                   Okay.  Keep going.  Thanks.  Sorry.

19                   {VIDEO PLAYED}

20              MR. ZIBILICH:

21                   All right.  Stop.

22    BY MR. ZIBILICH:

23        Q.   So what is happening here?

24        A.   ▇▇▇▇ appears to have an outburst as a

25    manifestation of his autism that -- you know,
```

```
1   that's something which is a condition he didn't
2   chose to have, but he is flailing and --
3        Q.   Do you hear your husband talking to him?
4        A.   From that point, I don't remember
5   anything.  I don't recall anything.
6        Q.   I noticed or I couldn't help but notice
7   that your husband seemingly, when ███ is moving
8   towards him, drops the harness.  Did you notice
9   that?
10       A.   I see the harness here.
11       Q.   Did you notice your husband drop it about
12  a second or two ago?
13            MR. ZIBILICH:
14                Run it backwards for a couple of
15            seconds to show ███ when he starts
16            approaching daddy.
17                {VIDEO PLAYED}
18            MR. ZIBILICH:
19                Okay.  Stop.
20            THE WITNESS:
21                It looked like ███ grabbed the
22            harness.
23  BY MR. ZIBILICH:
24       Q.   It looks like ███ grabbed the harness.
25       A.   And it dropped.
```

```
1          Q.   Has this happened before, where the

2     harness gets ████ mad and makes the outburst worse?

3          A.   I don't believe the harness made ████

4     mad.  I mean, I think that is something that ████

5     grabbed from Daren, and then he dropped it, from

6     what it appears to me.

7          Q.   So you have never noticed the harness as

8     being a trigger before, like somebody is getting

9     ready to lock me up in a cage or a car?

10         A.   The harness is used as a safety measure.

11    ████ actually called it his astronaut vest at one

12    point, so it's something that he was quite familiar

13    with and assisted most of the time in --

14         Q.   Typically, the harness is not something

15    that triggers an outburst?

16         A.   It's not aversive.  It is not aversive,

17    as you --

18              MR. ZIBILICH:

19                   Okay.  You can run it. Lovely.

20              MR. BURKE:

21                   We were right at about 4:15.

22                   {OFF-THE-RECORD DISCUSSION}

23                   {VIDEO PLAYED}

24              MR. ZIBILICH:

25                   Stop it for one second, please.
```

**KELLY & ASSOCIATES**
**(504) 891-6333**

```
 1   BY MR. ZIBILICH:

 2        Q.   Ms. Lou, are you able to overhear whether

 3   there is any conversation going on?

 4        A.   I don't recall any conversation going on.

 5        Q.   Are you issuing out any instructions

 6   during this last three or four seconds?

 7        A.   Observation.  Just looking.

 8        Q.   No.  Are you issuing out any

 9   instructions?

10        A.   No.  Just looking.

11             MR. ZIBILICH:

12                  Okay.  Keep going.

13                  {VIDEO PLAYED}

14             MR. ZIBILICH:

15                  Stop.

16   BY MR. ZIBILICH:

17        Q.   Why did you go inside, ma'am?

18        A.   I went inside to try to prevent ████ from

19   coming back inside.  I was holding the doors, and

20   then, also, I realized that they were close -- we

21   talked about more people involved and close

22   proximity would be worse, so I thought that my

23   being out there with them would escalate behaviors,

24   so twofold.  Trying to prevent others from coming

25   in.
```

```
 1          Q.   As your son and Daren are coming towards

 2   those doors, and you go in, are you hearing any

 3   conversation at all?

 4          A.   I don't recall any.

 5          Q.   I mean, would it be typical for Daren to

 6   say, ███, stop?

 7          A.   I don't recall any conversation.

 8              MR. ZIBILICH:

 9                   Okay.  We can keep going.

10                   {VIDEO PLAYED}

11   BY MR. ZIBILICH:

12          Q.   I take it the Laser Tag people have

13   already called for help by now, right?

14          A.   No, because I don't see me --

15              MR. ZIBILICH:

16                   Stop it then.

17              THE WITNESS:

18                   I don't see me opening the door to

19                ask Daren, because I asked Daren if he

20                needed help.

21   BY MR. ZIBILICH:

22          Q.   I thought you had told me earlier that on

23   the way out the Laser Tag people asked ya'll if you

24   needed assistance, and you said yes.

25          A.   No.  I don't recall you -- I don't recall
```

```
1    saying that.  I do recall --
2         Q.   So as of right now, they still haven't
3    asked y'all if you need assistance?
4         A.   I think there is a point where I open the
5    door.
6         Q.   So it just happened in the last second or
7    two?
8         A.   I'm sorry.  What happened?
9         Q.   It just happened in the last second or
10   two or three?
11        A.   What happened in the last second --
12        Q.   Where they asked you if you needed
13   assistance.
14        A.   No.  I would open the door.  When you see
15   me open the door --
16        Q.   You've already opened the door.  To go
17   back in or you are talking about opening the door
18   to go back out?
19        A.   I open again.  There is another -- I
20   think if you continue on, sir, there is going to be
21   a point where I open the door again, and that's
22   when I asked Daren if we need help, and it would be
23   at that point, maybe a few seconds before, that --
24        Q.   Okay.  So it hadn't happened yet?
25        A.   As far as Laser Tag people asking me if
```

```
 1   we need assistance --
 2         Q.   As best you can recall.
 3         A.   I don't believe so.  Once we see the door
 4   open, that would probably be the indicator that --
 5              MR. ZIBILICH:
 6                   Okay.  We can keep going.
 7                   {VIDEO PLAYED}
 8   BY MR. ZIBILICH:
 9         Q.   Any idea what Daren is trying to do
10   there?
11         A.   It looks like ███ is biting Daren's leg,
12   and Daren is probably trying to do his best to
13   prevent -- to get the bite released.
14         Q.   Are you watching from inside what is
15   going on right now?
16         A.   Yes. I'm not sure if the door opened.
17   That could -- possibly would be me.
18              MR. ZIBILICH:
19                   Do me a favor, Jeff.  From now on,
20                when I ask a question, tell me what the
21                 timer says.
22              MR. MARTINY:
23                   Okay.
24              MR. ZIBILICH:
25                   I can't see.
```

```
 1            MR. MARTINY:
 2                 13:28:10 counting right now.
 3            MR. ZIBILICH:
 4                 Okay.  All right.  So, obviously,
 5               the police have been called, because
 6               they're here.  What does it say now,
 7               Jeff?
 8            MR. MARTINY:
 9                 13:20:35.
10            MR. ZIBILICH:
11                 Stop it for a second.
12     BY MR. ZIBILICH:
13          Q.   What are you doing now, ma'am?
14          A.   I picked up his harness.
15          Q.   Where are you going?
16          A.   I'm going in that direction.
17          Q.   Why?
18          A.   I'm going in that direction.  A policeman
19     was there.
20          Q.   What are you going there for?
21            MR. CLARKE:
22                 Let her answer the question.
23            THE WITNESS:
24                 I'm going that direction.  My -- I'm
25               going in that direction.  I was just
```

```
 1                         going in that direction.  I don't --
 2    BY MR. ZIBILICH:
 3         Q.    My question is why?
 4         A.    Why?
 5         Q.    Yeah.
 6         A.    I'm going in that direction.  My son is
 7    there.  The policeman is there.  I don't know if
 8    the policeman is going to need information from me.
 9    I don't know -- I mean, I don't know what is --
10              MR. ZIBILICH:
11                   All right.  You can run it.
12                   {VIDEO PLAYED}
13              MR. ZIBILICH:
14                   Stop it.
15    BY MR. ZIBILICH:
16         Q.    What are you doing now?
17         A.    It looks like I'm observing.
18         Q.    Observing.  Are you talking to anybody?
19         A.    It's hard to tell if I'm talking to
20    anybody.
21         Q.    Had you started talking to anybody yet.
22              MR. BURKE:
23                   Do you want me to pull that area
24            closer?
25    BY MR. ZIBILICH:
```

```
 1        Q.   I'm the young man's mother.  Are you
 2   saying anything to anybody?
 3        A.   If you want to --
 4        Q.   No.
 5        A.   Okay.  Am I -- yes, ███ -- I am his mom.
 6        Q.   I know.  Have you --
 7        A.   Am I saying anything to anybody at that
 8   time?  To my recollection, I can't remember if I
 9   had told Mr. Pitfield or Deputy Pitfield if ███
10   had autism at that point or not, but I know there
11   was a point where he was told that -- I was told --
12   I told him, rather, that ███ has autism.
13             MR. ZIBILICH:
14                  So as we look at whatever the number
15              is -- what is it, Jeff?
16             MR. CLARKE:
17                  13:28:53.
18   BY MR. ZIBILICH:
19        Q.   As we look right now, you can't swear to
20   me whether you even opened your mouth yet and said
21   anything?
22        A.   I can't recollect that.  I do know that
23   I, at some point, that I told, like I said
24   previously --
25        Q.   But you can't swear to me right now
```

2222

222

164

1   whether or not that's happened yet?

2        A.   I cannot swear that that happened.  I just

3   know at some point I did tell them that ███ had

4   autism.   That was before ███ died.

5        Q.   What are you doing now?

6        A.   I don't know.  I'm sorry.  I was facing

7   you.  I'm not sure.  Could you please re --

8             MR. ZIBILICH:

9                  Yeah.  Let's go back.  If you can

10                 enlarge it, that would be wonderful.

11  BY MR. ZIBILICH:

12       Q.   What are you doing now?

13       A.   It looks like I'm just still observing.

14            MR. ZIBILICH:

15                 Okay.  Perfect.  You can run it.

16                 {VIDEO PLAYED}

17  BY MR. ZIBILICH:

18       Q.   What are you doing now?

19       A.   As we talked about, ███ has a history of

20  head banging.  I had concerns about that.  So I

21  went into the vehicle.  I have the jackets from --

22  because it was sort of cold that morning, so we had

23  them in the vehicle.  I got them out in case ███

24  had head banging.  There is also -- you know, ███

25  for a calming, sometimes he likes to have -- we

```
 1   found that at school and at home, a blanket or

 2   something to cover.

 3        Q.   Does it appear that ███ was calm right

 4   now?

 5        A.   From this moment right now, ███ is not

 6   calm.

 7             MR. ZIBILICH:

 8                  Time, Jeff.

 9             MR. MARTINY:

10                  It's too zoomed in to tell the time.

11               Pause that and zoom out to see the

12               clock.

13             MR. ZIBILICH:

14                  13:29:56.  Okay.  That's close

15               enough.  We don't need more zoom.

16               Perfect right there.

17   BY MR. ZIBILICH:

18        Q.   Are you having a conversation with Deputy

19   Pitfield right now?

20        A.   Could you go back, please?  I can look to

21   see if I'm facing him.  It's giving me motion

22   sickness.

23                  {VIDEO PLAYED}

24             THE WITNESS:

25                  I am getting a little bit of glare.
```

```
 1                    Is it possible to -- thank you.
 2   BY MR. ZIBILICH:
 3        Q.   Okay.  Are you having a conversation with
 4   anybody right now, 13:29:58?
 5             THE WITNESS:
 6                  If you can go back.
 7             MR. BURKE:
 8                  Yeah.  We went back 20 seconds.
 9             THE WITNESS:
10                  Okay.  It doesn't look like my mouth
11               is moving from the video.
12             MR. BURKE:
13                  I stopped the video.  It's on pause
14               right now.
15             THE WITNESS:
16                  So at this moment right now, it
17               looks like I'm observing Daren.
18   BY MR. ZIBILICH:
19        Q.   Is there a point in time to date, to
20   where we are right now, where you are giving
21   Pitfield any instructions?
22        A.   I think I've told him at this point that
23   ██████-- the reason why I have the blankets or coats
24   there is ██████ has head banging.  It was sometime at
25   the beginning of this that I recollect telling
```

```
 1   Mr. Pitfield that ███ has autism.
 2             MR. ZIBILICH:
 3                  Okay.
 4                  {VIDEO PLAYED}
 5   BY MR. ZIBILICH:
 6        Q.   Do you recall telling him -- do you
 7   recall telling Pitfield anything else up until this
 8   point?
 9        A.   With the coat.  I was trying to cover
10   ███
11        Q.   I'm not asking you what you were doing.
12   I'm asking you up until this point --
13             MR. CLARKE:
14                  Let her finish.  Hey, Franz, you got
15               to let her --
16             MR. ZIBILICH:
17                  She's got to be responsive to my
18               question.
19             THE WITNESS:
20                  I will get to your question.  That I
21               was covering him, and he asked me to
22               move the jacket, because I know that
23               that was something that is a calming
24               mechanism for ███ is to be covered.
25               So I was, in that aspect, you know,
```

```
1              doing that with ███    I was with ███
2    BY MR. ZIBILICH:
3         Q.   Is there a conversation going on right
4    now?
5         A.   It looks like Deputy Pitfield may be
6    talking.  I'm not sure.
7         Q.   13:31:53.
8         A.   I'm not sure.  It looks like his mouth
9    may be moving.
10        Q.   Do you recall what he is saying? Do you
11   recall what either yourself or Daren is saying?
12        A.   It appears that Daren -- I can't tell if
13   Daren is like trying to catch his breath or there
14   is -- or they're talking as well.
15        Q.   Suppose they're talking.  Do you remember
16   the substance of the conversation?
17        A.   I know there is a point where Daren also
18   told Mr. Pitfield that ███ had autism.
19             MR. CLARKE:
20                  Let the record reflect that this is
21               a video that is continually running
22               that he is asking questions about.
23   BY MR. ZIBILICH:
24        Q.   I'd let you stop it, ma'am, when there
25   comes a point where you can recall an actual
```

```
 1    conversation and what the substance of it was with

 2    the two or three of y'all that are there, meaning

 3    you, Pitfield, and your husband.

 4         A.   You can -- I'm sorry.  I was pointing.

 5         Q.   Don't be sorry.

 6         A.   I was pointing.  I didn't tell her.  I'm

 7    sorry.

 8         Q.   Is there a conversation going on right

 9    now?

10         A.   That's when I put the jacket over ███ so

11    -- like I said, it was like a calming thing, and

12    Mr. Pitfield says to -- you know, asked me to move

13    the jacket.

14         Q.   So the conversation is about the jacket?

15         A.   I think as it continues on a little bit

16    more, yes.

17         Q.   You can continue it then.

18              THE WITNESS:

19                   At this time with -- I guess you can

20              --

21         MR. CLARKE:

22              Stop it?

23              THE WITNESS:

24                   Yeah.

25         MR. CLARKE:
```

```
1                    Well, you need to say stop.
2              THE WITNESS:
3                    I'm sorry.  Stop it, but there is a
4              conversation with ███ and myself when
5              Mr. Pitfield is sitting on ████
6   BY MR. ZIBILICH:
7         Q.   Sitting on what?
8         A.   He is sitting on █████   He is sitting on
9   like the waist.  I'm sorry.  Like this part.  The
10  waist part of █████   The waistline near his
11  buttocks.
12        Q.   What are you telling █████
13             MR. CLARKE:
14                   Hang on.  Franz, you got to let her
15             finish.
16             THE WITNESS:
17                   Actually, I was holding █████ hand
18             and stroking his hand and saying,
19             █████ calm down.  Calm down.  It's
20             going to be okay.  It's going to be
21             okay.  You are doing a good job calming
22             down.  It's okay.  It's going to be
23             okay.  It's going to be okay."  And so
24             I'm having this conversation with him
25             as I'm stroking his hand, and he is
```

```
 1                        calming, and I didn't -- I didn't feel
 2                        at that point that I was -- my safety
 3                        was in jeopardy, because I'm right by
 4                        him, as we've discussed before, that,
 5                        you know, as we've seen.  █████ has some
 6                        aggression.  I did not feel unsafe with
 7                        him at that point.  I'm right next to
 8                        him.  I'm holding his hand.
 9                MR. ZIBILICH:
10                    Let the record reflect that the last
11                editorial is not responsive to anything
12                that I asked.
13                MR. CLARKE:
14                    Let's take a break.
15                MR. ZIBILICH:
16                    Okay.
17                    {BRIEF RECESS, 2:04-2:18}
18                MR. CLARKE:
19                    For the record, we're starting at
20                13:33:52.
21        BY MR. ZIBILICH:
22            Q.   Ma'am, here is my question to you, Ms.
23        Lou.  As he runs this thing, if and when you recall
24        having a conversation, not what you are thinking
25        about, but if and when you recall having a
```

```
 1   conversation, just say stop.  I'm saying such and
 2   such right now, and they're saying such and such
 3   back to me.  Fair enough?
 4        A.   Fair enough.
 5             MR. ZIBILICH:
 6                  Okay.  You can run it then.  It is
 7              running.
 8             MR. BURKE:
 9                  No.  I just started it.
10                  {VIDEO PLAYED}
11             MR. ZIBILICH:
12                  I'm going to stop it now.
13   BY MR. ZIBILICH:
14        Q.   So another gentlemen walked up.  Do you
15   recognize who that is?
16        A.   From the deposition, I believe that is
17   Mr. Vaught.
18        Q.   Okay.  And it appears he is either
19   looking at you or looking at ███████  Is there any
20   conversation transpiring right now between you and
21   anybody else on that scene?
22        A.   Not that I can recall.
23             MR. ZIBILICH:
24                  Okay.  Then we can run it.
25                  {VIDEO PLAYED}
```

**KELLY & ASSOCIATES**
**(504) 891-6333**

173

```
 1              MR. ZIBILICH:
 2                   Stop it.
 3   BY MR. ZIBILICH:
 4        Q.   Now I see another officer has arrived on
 5   the scene.  Do you see the same thing?
 6        A.   I have the glare.
 7              MR. ZIBILICH:
 8                   Go backwards two seconds.  He is
 9                coming from between the two cars.
10              MR. CLARKE:
11                   There is glare right here, Franz.
12              MR. ZIBILICH:
13                   That's okay.
14              MR. MARTINY:
15                   We could turn the lights off.
16              MR. ZIBILICH:
17                   Okay.  Run it.
18                   {VIDEO PLAYED}
19   BY MR. ZIBILICH:
20        Q.   See a gentleman walking up, ma'am?
21        A.   Is that -- I think that's Mr. Vaught that
22   we talked about before.
23              MR. ZIBILICH:
24                   Okay.  Keep running it.
25                   {VIDEO PLAYED}
```

```
 1   BY MR. ZIBILICH:
 2        Q.   Another gentleman is running up.  You see
 3   that?
 4        A.   I see this on the videotape, yes.
 5        Q.   Do you know who that is?
 6        A.   I think he was present.  I think I
 7   remember seeing him maybe sitting in that chair or
 8   one of the chairs here for someone else's
 9   deposition.  I don't recall his name.
10        Q.   So now another police officer is walking
11   up.  Now another one.  Do you see the two extras
12   that just came up?
13        A.   The lady with the ponytail and then this
14   -- that looks like Mr. Vega.
15        Q.   Here comes yet another one, correct,
16   entering the red circle?
17        A.   Yes.  That looks like another one.
18             MR. ZIBILICH:
19                  So stop it for a second.
20   BY MR. ZIBILICH:
21        Q.   Now you've got about five police officers
22   around, correct, maybe six?
23        A.   From the videotape, I see that.  From my
24   point of view, I was focused on ███████ on his head.
25        Q.   Not a problem.
```

175

```
 1        A.   I wasn't realizing who was there, but
 2   from the videotape, I do see that there are
 3   officers that are on the scene.
 4        Q.   Any conversation that you recall right
 5   now, either emanating from you, or from any other
 6   deputies that walked up, or the two deputies that
 7   were already there?
 8        A.   As far as speech to me?
 9        Q.   Speech to anybody.  They could be
10   speaking to one another.
11        A.   While ████ is on the ground, I was so
12   focused on ████ and his head at that point that I'm
13   not sure if ████ was then mentioning about the fire
14   truck then, and I'm having that conversation, so I
15   can't recall at that point.
16        Q.   You can't recall, you can't recall.
17             MR. ZIBILICH:
18                  Play it, please.
19                  {VIDEO PLAYED}
20   BY MR. ZIBILICH:
21        Q.   Same rules.  The second you recognize
22   that you're talking or somebody is talking to you,
23   or you hear somebody talking to one another, tell
24   him to stop.
25        A.   Okay.  Stop, please, because there is a
```

1    possibility -- I remember hearing a lady's voice,

2    which I guess must be her, that's on the scene,

3    saying that she had understood that someone -- an

4    officer had gotten bitten or hurt or something to

5    that effect.  I'm not sure of the exact words, but

6    it was something like that.

7         Q.   Okay.  Anything else?

8         A.   That's all that I can recall.

9              MR. ZIBILICH:

10                  Okay.  Play it.

11                  {VIDEO PLAYED}

12   BY MR. ZIBILICH:

13        Q.   Are you talking to ███ at all at this

14   point?

15        A.   With ███ and -- I know -- I see there is

16   a new man on ███ now.  I see throughout -- stop

17   it, please.  Throughout this I was telling ███

18   it's going to be okay.  You're doing a good job

19   calming down, and he had been calm, and I was --

20   because I could see the fear in his eyes, and I

21   wanted to be the person that he knew.  He didn't

22   know anybody else.  All these officers he didn't

23   know.  I was the person that is closest to him that

24   he could see that could assist in calming him down,

25   and he was.

```
 1        Q.   So to date, other than that part that you
 2   told me several minutes ago about announcing that
 3   your son was autistic, likely to Pitfield, and
 4   having a little baby conversation with Pitfield
 5   relative to the covering for his head, other than
 6   those two items and the constant telling ███ to
 7   calm down, you are doing good, it's going to be
 8   okay, there is no other conversation that you can
 9   recall up to this point; is that correct?
10        A.   The lady, you know, when she said --
11        Q.   The lady talking about the other deputy
12   being bitten?
13        A.   Right.  Up until this point, those were
14   things that I can recall, up to this point.
15        Q.   You don't recall any other conversation
16   up to this point?
17        A.   Not up to this point.
18        Q.   Okay.  Very well.
19             MR. ZIBILICH:
20                  Play it, please.
21             MR. CLARKE:
22                  13:36:40.
23             MR. ZIBILICH:
24                  Thank you, sir.
25                  {VIDEO PLAYED}
```

```
 1              THE WITNESS:
 2                   Stop, please.  Okay.  At this point,
 3              from the video, you know, I was facing
 4              ███, so from what I -- from what I
 5              heard when I was facing him, I heard
 6              someone say, "How did he do that?"  How
 7              did he get his arms over his head.  And
 8              I see from the video, I see -- from the
 9              video, I see Mr. Vega pushing ███  As
10              you can see him pushing, pushing,
11              pushing, pushing him, the arms.  Well,
12              the -- whatever.  The chain.  Whatever
13              you call it.  We see him pushing,
14              pushing, pushing him.  And then, like I
15              said I heard before, "How did he do
16              that?"  And which I took how did he get
17              his arms over his head, which I assume
18              that meant ███ when he said he.
19              MR. ZIBILICH:
20                   Stop for a second.
21   BY MR. ZIBILICH:
22         Q.   Do you have any opinion as to how he did
23   that?
24         A.   ███ had been diagnosed.  You know, he
25   had seen neurologists as well in his past, and he's
```

1    been diagnosed with low tone or hypotonia they call

2    it, as well as hyperextensive joints, so he's had

3    that diagnosis.  I've never seen him do that

4    before, with arms reaching over like that, but that

5    was something that on a physical examination that

6    one of his neurologists had mentioned that he had.

7         Q.    So is that a fancy word for being double

8    or triple jointed or do you know?

9         A.    That is hyperextensive joints.

10        Q.    There is a difference?

11        A.    I don't know about double or triple

12   joints.  I guess the layman's term would be like a

13   double jointed.  I don't know triple jointed.  I

14   don't know.  I never actually heard that expression

15   before, actually.

16        Q.    You were aware, prior to this date, that

17   he was double jointed?

18        A.    I was aware that he had in the past been

19   told or told to us on a physical examination that

20   he had low tone, low muscle tone, as well as having

21   the hyperextensive joints.

22        Q.    And it is your belief that hyperextensive

23   joints is tantamount to double jointed?

24        A.    I think that's the layman's term for it.

25        Q.    Okay.  Not a problem.  Anything else you

```
1   remember about what is transpiring right now

2   conversationally?

3       A.   Yes.  It may be a little bit more to it,

4   but there is a point where the arms come over, and

5   I think, because I'm focused on ███████ I think I

6   might have seen -- like the coroner of my eye was

7   -- like a bug or something was going to come

8   towards you, so you flinch. So I move this arm, and

9   someone tells me to move.  An officer that is.  An

10  officer tells me to move, and could --

11              MR. CLARKE:

12                  You want to play it now?

13              THE WITNESS:

14                  Yes, sir.

15                  {VIDEO PLAYED}

16              THE WITNESS:

17                  Right here, actually.

18              MR. ZIBILICH:

19                  Stop.

20              THE WITNESS:

21                  So I was a little bit -- a few

22               seconds ahead of time where the officer

23               tells me to move, and you notice that

24               he taps me, and I comply with that

25               request to move.  As you see, I get up.
```

```
 1            MR. ZIBILICH:
 2                 Okay.  Play it.  That was 13:37:23,
 3            by the way.
 4                 {VIDEO PLAYED}
 5            THE WITNESS:
 6                 Stop here.  I know you can't see it.
 7            It may be coming a little bit later,
 8            but it's hard to -- like the exact
 9            pinpoint time, but it's around this
10            time where there is a arm across ███
11            neck.  I'm not sure.  It may be coming
12            up a little bit.  I know we've seen it
13            on the video.  We've seen the neck --
14            the arm across the neck, I believe. And
15            I said -- I said -- I'm sorry.  It's
16            hard.  "You have a -- there is a arm
17            across his neck.  There is a arm across
18            his neck.  He is having trouble
19            breathing.  He is having trouble
20            breathing.  That is how the man in New
21            York died.  ███ Garner.  That is how
22            the man in Baton Rouge died.  There is
23            a -- you have him in a chokehold.  You
24            have an arm across his neck."  Then
25            somebody says, "That's not a choke-
```

```
 1                        hold," meaning one of the officers.  I
 2                        don't know which officer.
 3              MR. ZIBILICH:
 4                   Okay.  You ready?
 5                   {VIDEO PLAYED}
 6              MR. ZIBILICH:
 7                   Stop.
 8              THE WITNESS:
 9                   Yes.  I was going to ask you to
10                   stop.  As you see, more people come
11                   crowded actually around ███    They're
12                   bending over him.  They're crowding
13                   over him, and as we discussed earlier,
14                   the more people around ███    it can
15                   aggravate or escalate his behaviors.
16                   So I was telling someone that before I
17                   left to go --
18    BY MR. ZIBILICH:
19         Q.   Telling someone what?
20         A.   That the more people around ███   you
21    could escalate his behavior.  It could make
22    behaviors worse.  And so people were -- someone
23    said, "Ma'am, let us do our business.  Let us do
24    our business."  I thought, okay, if I had actual
25    proof, something in writing that showed that, that
```

```
 1   maybe someone would listen.  And so I was going to
 2   the vehicle, because we had before kept the
 3   treatment plan for ███ from Kennedy Krieger, the
 4   protocol that talked about more people involved can
 5   escalate behaviors.  So I was searching for that,
 6   so that's why I'm going in that direction, because
 7   I thought it was in the glove compartment.
 8        Q.   Okay.  Anything else you want to add
 9   before he starts?
10        A.   I was trying to tell them -- trying to
11   tell the officers that this is going to escalate.
12   The more people there, you know, it is going to
13   escalate behaviors.  It is going to escalate -- it
14   is going to make things worse, and I'm saying, you
15   know, when the chokehold, "He is having trouble
16   breathing.  He is having trouble breathing."
17             MR. ZIBILICH:
18                  It is 38:03.
19             THE WITNESS:
20                  "Let us do our job.  Let us do our
21              business."
22                  {VIDEO PLAYED}
23             THE WITNESS:
24                  Stop, please.
25   BY MR. ZIBILICH:
```

```
 1        Q.    You want to stop?

 2        A.    Yes, sir.  This might be the point.

 3              MR. ZIBILICH:

 4                   Stop.

 5              THE WITNESS:

 6                   I think he did.

 7              MR. ZIBILICH:

 8                   39:04.

 9   BY MR. ZIBILICH:

10        Q.    Go ahead, ma'am.

11        A.    I think this may be the point where

12   someone said, "He pissed on himself.  He pissed on

13   himself," meaning ██████ and that's not ██████  ████

14   is potty trained.  He doesn't piss on himself.  He

15   doesn't pee on himself.  That's not ██████  That's

16   not ██████

17        Q.    Where is Daren right now?

18        A.    He is right next to me.

19        Q.    Do you hear him saying anything to

20   anybody?

21        A.    I don't recall.  I mean, Daren was in

22   shock.

23        Q.    There was a what?

24        A.    I think Daren was in shock.  I think we

25   were both in disbelief that this is actually
```

```
 1    happening.  You can --
 2              MR. CLARKE:
 3                   Play it?
 4              THE WITNESS:
 5                   Yes, sir.
 6                   {VIDEO PLAYED}
 7              THE WITNESS:
 8                   Could you pause it, please?
 9    BY MR. ZIBILICH:
10         Q.   Do we need to stop?
11         A.   I asked him to stop.
12              MR. CLARKE:
13                   She was going to say something.
14              THE WITNESS:
15                   Give me a minute.  ███████ when they
16               rolled him over, and when I saw, from
17               looking at him from head -- I mean from
18               toe to his head.  Excuse me.  Are you
19               -- I just want to make sure you are
20               paying attention.
21              MR. ZIBILICH:
22                   Oh, I am.
23              THE WITNESS:
24                   From toe to his head that I saw that
25               he had peed on himself, and I saw his
```

```
1              lips were blue.  There is foam coming
2              out of his mouth.  His eyes were slits
3              with one slit a little larger than the
4              other in one eye, and he wasn't
5              breathing.  And I said, "He's not
6              breathing.  He's not breathing."  And
7              then someone said, "I think I see his
8              stomach move,"  meaning an officer says
9              that.  And I said, "I don't think so.
10             I don't see him breathing."
11         MR. CLARKE:
12              Play it?
13         THE WITNESS:
14              Yes, please.
15              {VIDEO PLAYED}
16         THE WITNESS:
17              I can't tell if chest compressions
18           have begun yet.  Does anybody -- I
19           mean, I can't --
20         MR. CLARKE:
21              We can stop it for a second.
22         THE WITNESS:
23              If there is a part where there were
24           chest compressions.  You know, there is
25           going to be a part.  If I was talking,
```

```
 1                    and I missed it, but there is going to
 2                    be a point where there are chest
 3                    compressions that are going on, and I
 4                    say, "You are doing it wrong.  You are
 5                    doing it wrong.  I'm a doctor.  I'm a
 6                    physician.  Can I help?  Can I assist?
 7                    Can I help?"  And I said, "It's too
 8                    low.  You are doing it too low.  You
 9                    are doing it on the diaphragm.  It's
10                    too low."  And then I got told again,
11                    "Ma'am, let us do our business.  Let us
12                    do our job."
13                       So I'm not sure if we've gotten to
14                    that point or it's going to happen
15                    soon, but there is a point where I
16                    address who I am and what -- you know,
17                    what I could do to help, that I'm a
18                    physician.  I can help.  I can help.
19    BY MR. ZIBILICH:
20         Q.   So let me ask you this, ma'am.  From the
21    moment that you said words to the effect of he's
22    not breathing, there was an immediate reaction from
23    law enforcement?
24         A.   I said, "He is not breathing," and then
25    somebody said, "No, I think he has a breath."  So
```

```
 1    there was not an immediate thing, because someone

 2    said, "I see him.  I think he has a breath."

 3         Q.   So if I reverse this tape and go back 20

 4    seconds, you would agree with me, would you not,

 5    that within 15 or 20 seconds of you alleging or

 6    claiming that he is not breathing, chest

 7    compressions had started?

 8         A.   I don't remember how many seconds or

 9    minutes it would take, but chest compressions were

10    started at one point.  That is correct.

11         Q.   Okay.

12         MR. CLARKE:

13              Do you want to still watch this for

14           a while?

15         MR. ZIBILICH:

16              Yeah.

17         MR. BURKE:

18              Start it?

19         MR. ZIBILICH:

20              Yeah, please.

21              {VIDEO PLAYED}

22         MR. ZIBILICH:

23              We're almost done.  You can stop it

24           at 40:33.

25         THE WITNESS:
```

```
 1                    This looks like the chest --
 2  BY MR. ZIBILICH:
 3       Q.   Say it again, ma'am.
 4       A.   That actually looks like right then the
 5  chest compressions begin.
 6       Q.   You think that's when they began?
 7       A.   It appears so.  I mean, if you go back a
 8  little bit, it looks like somebody is bending down
 9  and starting to --
10            MR. ZIBILICH:
11                 I guess we better go up to 300
12              percent here.  It may or may not help.
13  BY MR. ZIBILICH:
14       Q.   Can you point to the person who is doing
15  the chest compressions allegedly wrong at this
16  point? We're at 40:23.
17       A.   I think we may have to back it up,
18  because I need to see when someone actually goes
19  down.  Looks like their hands are --
20       Q.   We'll go back ten or 15 seconds to see
21  what you see.
22                 {VIDEO PLAYED}
23            THE WITNESS:
24                 It looks like he gets turned over.
25            MR. ZIBILICH:
```

```
 1                    Stop.
 2   BY MR. ZIBILICH:
 3        Q.    So you believe that at 40:10 chest
 4   compressions have begun?
 5        A.    I don't see hands on his -- I can't see
 6   hands on his chest at this point.
 7        Q.    But you saw him rolled over, did you not?
 8        A.    He is rolled over.
 9        Q.    And part and parcel with him being rolled
10   over, the chest compressions immediately start, do
11   they not?
12        A.    I would need to see the video to have
13   more confirmation on that.
14        Q.    Well, the video speaks for itself.
15                    {VIDEO PLAYED}
16             MR. ZIBILICH:
17                    Stop.
18             THE WITNESS:
19                    It looks like -- okay.  Somebody is
20                 starting to -- it looks like their
21                 hands might be in a position.
22   BY MR. ZIBILICH:
23        Q.    That's the gentleman whose face would be
24   facing us, more or less?
25        A.    This?
```

```
 1         Q.    Yes.

 2         A.    It looks like --

 3         Q.    40:30.

 4         A.    I can't tell for certain, but it looks

 5    like those hands are in the position.

 6              MR. CLARKE:

 7                   13:40:30.

 8    BY MR. ZIBILICH:

 9         Q.    Do you recognize that person as being a

10    EMT or a policeman?

11         A.    I can't see his face.  I see what looks

12    like a badge on the sleeve.

13         Q.    Patch?

14         A.    Patch, sorry, on the sleeve.  It looks

15    like this person has maybe somewhat of a similar

16    kind of patch.

17                   {VIDEO PLAYED}

18              THE WITNESS:

19                   So we see it looks like somebody is

20                doing some up and down motion.

21              MR. ZIBILICH:

22                   40:34 up and down motions.  Stop for

23                a second.

24    BY MR. ZIBILICH:

25         Q.    Is that the gentleman that you suggest is
```

1  doing it wrong?

2      A.   That was the person that I saw doing

3  chest compressions.

4      Q.   The same one that is doing them right

5  now?

6      A.   If that was -- again, I don't recall the

7  face of the person.  I recall what I saw that was

8  done incorrectly.

9      Q.   You believe that this gentleman -- you

10  believe what we all just saw in the last three or

11  four seconds was being done wrong?

12      A.   If that is the gentleman that did the

13  first set of -- because the only time that I

14  remember afterwards was that somebody came and did

15  the automatic, where they could do the automatic.

16  So if that's the only person that appears on this

17  video doing chest compressions, then I would have

18  to say yes, that was the person that was doing the

19  chest compressions.

20      Q.   And suggest further that he is doing them

21  wrong?

22      A.   From what I viewed, from what I saw, the

23  hands looked like they were in the incorrect

24  position.

25      Q.   And where were you standing when you

1    believe you saw the hands in the incorrect

2    position?

3         A.   If you could -- let's go to the videotape

4    so we could get a precise maybe view.

5         Q.   You want to go forward or backwards?

6         A.   You might want to go backwards so we can

7    make sure and then go forward, please.

8                      {VIDEO PLAYED}

9    BY MR. ZIBILICH:

10        Q.   You see yourself?

11        A.   I'm right there.  Yes. I can see. There

12   is some space in between gentlemen.

13        Q.   It's the gentleman that is doing it now

14   that you believe is doing it wrong?

15        A.   That -- that gentleman with that --

16   again, if that's the one that did the chest

17   compressions, then that would be the gentleman that

18   I saw.  Here I am.  It looks like I have a better

19   view point.  As I walk around, there is more

20   clearance, and there -- I'm sorry.  Could you stop

21   it, please?  At some point in time in there some-

22   body says, "Narcan," meaning a law enforcement

23   officer says, "Narcan," and I said, "My son doesn't

24   use drugs.  He is not on drugs."

25                      {VIDEO PLAYED}

```
 1   BY MR. ZIBILICH:
 2        Q.   Is he still doing it wrong then?
 3        A.   I think I am distraught at that time
 4   trying to get comfort from my husband, so I don't
 5   know.  I can't.
 6        Q.   Is it safe for me to assume there is no
 7   more conversation?
 8        A.   I don't believe there is any more
 9   conversation, unless the officers are talking to
10   Daren about taking pictures.  I don't know.
11        Q.   Okay.  I'm done with this.  Now let's go
12   -- I'm sorry that we all had to look at that.  Now
13   that you have had this opportunity, do you have any
14   recollection of any conversation that went on
15   during that eight-, ten-, 12-minute cycle that we
16   had not yet mentioned?
17        A.   Just to clarify in my head, I'm going to
18   go through the ones that we talked about.
19        Q.   I remember the ones we talked about.
20        A.   Mr. Pitfield was told that ▇▇▇▇ had
21   autism by me.  That when I tried to put the orange
22   hoodie over him to -- because I knew it was a
23   calming mechanism, I was asked to move that, and I
24   complied.
25        Q.   Officer Guidry and the bite mark.
```

```
 1          A.    If that's her name.  I don't know.  So
 2    with her mentioning that.  I remember the --
 3          Q.    The chokehold.
 4          A.    -- chokehold and saying, "He's having
 5    trouble breathing.  He is having trouble breathing.
 6    He is in a chokehold just like the man from New
 7    York, ███████Garner, died.  It is just like the man
 8    from Baton Rouge, how he died."  I remember saying
 9    those complete words about those men, and, you
10    know, from ██████ Garner and the man from Baton
11    Rouge.
12          Q.    Narcan?
13          A.    I remember saying, "How did he do that?"
14          Q.    We're talking about the arms over the
15    head?
16          A.    Yes, sir.  And then I remember being told
17    multiple times throughout this, "Ma'am, let us do
18    our business.  Let us do our job."  And throughout
19    the whole thing I got told multiple times that. And
20    I got -- I remember, like I said, when the CPR was
21    done, that, "You're doing it wrong.  You are doing
22    it wrong.  I'm a doctor.  I'm a doctor.  Can I
23    assist?  Can I help?  Can I help?  You're doing it
24    wrong."  I remember saying that to the officers.  I
25    remember saying to them, and to my husband, because
```

```
1   it was out loud that, "That's not ███   He doesn't
2   piss on himself.  That's not him," and then saying
3   to them, "He's not breathing.  He's not breathing,"
4   and then someone saying, "Yes.  It looks like his
5   stomach is moving up and down."  And you mentioned
6   the Narcan.  I remember somebody mentioning the
7   Narcan.  And, you know, this was a conversation to
8   the officers, but my conversation with ███  was,
9   "You are doing a good job calming down.  You are
10  doing a great job," as I was able to be next to
11  him, calming him down, you know, because he didn't
12  have an understanding of what was going on.
13  Obviously, he's never been -- I assume that's
14  considered an arrest.  He's never been in shackles.
15  I'm sorry.  That is another word that I heard,
16  shackles.  I did hear shackles while I was down
17  there.  Shackles.  He has never been in handcuffs
18  and shackles.  He was scared.  I don't know -- you
19  know, he was scared.  He was scared.  I don't know
20  if it was sensory issues going on.  I don't -- you
21  know, the fear.  I mean, he had such fear in his
22  eyes.  You know, he didn't understand.  He didn't
23  understand what was going on.  He had never been --
24       Q.   We're going over right now, ma'am, what
25  it is that you said in conversations.
```

1     A.   Shackles.   Those things we talked about

2   before.   Let me do my business.   Again, that one

3   comes to my mind, because it was said multiple

4   times to me.   "Ma'am, let us do our business.   Let

5   us do our job," you know, and then when I tried to

6   tell them he is having trouble breathing, "Ma'am,

7   let us do our job."   This is how somebody -- "He is

8   in a chokehold."   "That's not a chokehold."   Just

9   --

10     Q.   Anything that you recall that we have not

11   gone over as pertains conversation?

12     A.   I can't recall anything else.   Those are

13   things that were striking to me.

14     Q.   Speaking of striking, did you ever see

15   anybody strike your son?

16     A.   I did not see at the time, but on the

17   video I do see Mr. Pitfield striking my son with a

18   closed fist in the area of the neck to the upper

19   back region.

20     Q.   One time?

21     A.   From the video, that's what I see.

22     Q.   One time?

23     A.   If that's what I see, one time.   That's

24   what  I see.

25     Q.   Well, I can't tell you what you see.   I

1    can only tell you what I see.

2          A.    That's what I saw, was one time.  Again,

3    that's just from the video.

4          Q.    Let me ask you this.  You've seen the

5    video several times, have you not?

6          A.    I've seen the video from the depositions

7    and so, yes, I've seen it several times.

8          Q.    How many of the defendant deputies do you

9    see ever lay a hand on ████████

10         A.    I see Mr. Pitfield on the video where he

11   hits ██████    I see people sitting on him.

12         Q.    How many people sitting on him?

13         A.    I saw Mr. Pitfield from the video sitting

14   on him and then -- you know, while I was there, and

15   on the video I see -- I think we found out that was

16   Nick Vega as the depositions have progressed.  That

17   he is sitting on him.  I see him pushing ██████████

18   hands.

19         Q.    Who is him? Vega again?

20         A.    Mr. Vega pushing ████████ hands, and, you

21   know, keep pushing forward and forward.

22         Q.    The question is do you see any of the

23   other deputies go as far to even lay a hand on

24   ██████    So far I've got Pitfield and Vega.

25         A.    The one that's doing CPR, whoever that

```
 1   person is.
 2        Q.   Now I got Pitfield, Vega, and CPR guy.
 3        A.   Those -- he laid hands with CPR.
 4        Q.   Anybody else?
 5        A.   I'm trying to remember.  Are you just
 6   talking about officers or are you talking bout EMS
 7   as well?
 8        Q.   I don't care about EMS.
 9        A.   Okay.  I just want to make sure, because
10   EMS did as well.  From the video I see -- yes.  I
11   am trying to run it through my head as a
12   recollection.  There is a -- is it Mr. Vault, I
13   think, that does the handcuffs, touches him to put
14   the handcuffs on?  One of them.  I think we learned
15   his name from the deposition.
16        Q.   Okay.  Anybody else?
17        A.   Again, there are some people that are
18   there.  I don't know the names.
19        Q.   I'm going to ask you, and I know I
20   already asked your husband.  What is the difference
21   between an outburst and a meltdown?
22        A.   Some people use that interchangeably.
23        Q.   But you don't or do you?
24        A.   We were -- again, you know, we went to
25   KKI, Kennedy Krieger Institute.  That's the
```

```
 1   terminology that they use as burst behavior.
 2        Q.   I distinctly recall asking your husband
 3   30 minutes worth of questions where I asked him the
 4   difference between an outburst and a meltdown.  It
 5   seems to me, in y'all's family, or at least in your
 6   husband's mind, one is different from the other.
 7        A.   Could you let me see or could you point
 8   out to me --
 9        Q.   In other words, from what I recall him
10   telling me is an outburst is not the same as a
11   meltdown.  That's what I recall him saying.
12        A.   Could you show me that?
13        Q.   No.
14        A.   Like what distinguishing factors --
15        Q.   No.  I'm asking you forget whether you
16   believe my interpretation of what your husband
17   said.  Forget it.  In your mind, is an outburst the
18   same as a meltdown?
19        A.   I think for us, again, our terminology
20   that we use from KKI is outburst.
21        Q.   I don't care us.  This is first person.
22   I mean, this is second person singular, you.
23        A.   That the -- what happened that we saw --
24        Q.   No, no, no, no, no.  This question is
25   directed to you, specifically to you.
```

```
 1          A.    When I said they, I meant I, that I saw.

 2          Q.    I like I better.

 3          A.    Yeah.  We're not -- what I saw was, on

 4   January --

 5          Q.    I don't care about this.  I want to know

 6   if, in your mind, is an outburst the same as a

 7   meltdown?

 8          A.    I think there are different degrees.  An

 9   outburst is something that --

10          Q.    So they are not the same?  Because you

11   just told me a few seconds ago that they are the

12   same.  They're interchangeable, was your exact

13   word.

14          A.    An outburst for us --

15          Q.    For you.

16          A.    For me.  I'm so used to being -- we're

17   co-parenting here all the time.

18          Q.    I understand.

19          A.    That for me, an outburst, for our

20   criteria that we learned, was that you had to have

21   three combined target behaviors, and that meant

22   that could be disruptions, that could be

23   aggression, that could be self-injurious behaviors.

24          Q.    I'm going to try one last time.  My

25   question is simple.  In your mind, is an outburst
```

```
 1    and a meltdown the same or interchangeable?
 2         A.   In my mind, again, in my mind, we have
 3    outburst.  The people's literature -- some says
 4    meltdown.  Do some of those behaviors -- I guess
 5    you have outburst.  You have meltdown.  You check
 6    off like the similarities between them.  There are
 7    similarities between outburst and meltdown.
 8         Q.   Are they interchangeable?
 9         A.   Are they interchangeable?  I think it
10    depends on who you ask.  For me, the outburst is
11    something that is just what we're familiar with.
12    That terminology is what we --
13         Q.   I don't know who we is.
14         A.   I'm sorry. I'm so used to saying we.
15         Q.   I know you are, and I'm not trying to be
16    ugly, but --
17         A.   I know.  I am only one person.
18         Q.   Right.
19              MR. ZIBILICH:
20                   Give me a couple of minutes.  I
21                might be done.
22                   {BRIEF RECESS, 3:01-3:07}
23              MR. ZIBILICH:
24                   I'm done.
25    EXAMINATION BY MR. KAUL:
```

```
 1          Q.   Good afternoon, ma'am.  My name is Chris

 2   Kaul.  We've met off, but I represent the

 3   defendants Westgate and Victory.  Do you know who

 4   Westgate is?

 5          A.   I think, from sitting here, from other

 6   previous depositions, I guess you guys or Westgate

 7   owns the shopping center, I think.

 8          Q.   But on the day of the incident, and all

 9   the times you've gone to Laser Tag, or any of the

10   other businesses on the property, did you know who

11   Westgate or Victory were?

12          A.   I had no idea who they were.

13          Q.   Do you have any knowledge about their

14   detail program that they have?

15          A.   No, I don't.

16          Q.   Are you aware of any complaints that were

17   made against Westgate related to their detail

18   program?

19          A.   I am not aware of anything like that.

20          Q.   Do you have any knowledge of any

21   complaints made against Chad Pitfield when he was

22   working as a detail officer on the Westgate

23   properties?

24          A.   I'm not aware of anything about Chad

25   Pitfield, you know, about him from the time period
```

```
1    that we were there at Laser Tag.

2         Q.   When Chad Pitfield had responded to the

3    scene and was on top of your son, were you saying

4    anything to him in terms of getting off or moving

5    or that he was causing a problem?

6         A.   I wish I had.  I wish I had -- I was so

7    focused on my son and the head banging and, you

8    know, trying to calm him down that I wish I had.  I

9    wish I had said get off my son.  You are sitting on

10   him.

11        Q.   When he switched positions with the next

12   officer who switched positions with Pitfield, were

13   you able to assess your son's situation at that

14   point?

15        A.   At that point, I was still focused on my

16   son's head, and that's where my focus and attention

17   really was on.  I could still hear stuff, but I --

18   I don't even realize until the videotape or

19   whatever you want to call it, the video, that the

20   switchover had occurred.

21        Q.   So I asked your husband that question.  I

22   said -- a similar question.  He said, "When the

23   changeover happened, I remember Donna still holding

24   his hand, and Donna wouldn't be able to hold his

25   hand unless ████ was calm at that point."  Do you
```

```
 1    have any reason to disagree with what your husband

 2    testified to a few weeks ago?

 3         A.   No.  If I was afraid of ████ I wouldn't

 4    be that close to him.  I am very close to him.  I

 5    was telling Mr. Zibilich that I was stroking my

 6    son's hand and telling him he is doing a good job

 7    of calming down.

 8         Q.   So is it fair to say when the switchover

 9    happened, when Chad Pitfield was replaced by

10    Officer Vega, your son was calm?

11         A.   When -- my son had calm periods

12    throughout that time.

13         Q.   Let me ask the question a different way.

14    Calm was your husband's word, not mine.

15         A.   Calm is a word that I would use as well.

16         Q.   Would it be fair to say that he wasn't in

17    need of any CPR, as we see later in the video, at

18    the point of the switchover?

19         A.   At the point of the switchover, because

20    that's when ████ -- ████ was still alive, because

21    he got his -- from the videotape, that, you know, I

22    had noticed that ████ hands were over his head.

23         Q.   That was before or after Chad Pitfield

24    switched?

25         A.   From the videotape, that's when Mr. Vega
```

```
 1   was doing that, so that would have to be -- in the
 2   videotape, you see Mr. Pitfield get up.
 3        Q.   My question is, when Mr. Pitfield got up,
 4   was there anything about your son's situation that
 5   caused you concern for things like need of CPR or
 6   was he in a chokehold of any kind?  You have used
 7   that word.
 8        A.   No, not with -- with Mr. Pitfield, he was
 9   not in a chokehold at that time.  That was, from
10   the videotape, was Mr. Vega was on top of ███ at
11   that point.
12        Q.   Have you had any conversations or talked
13   to anybody at Westgate since the day of the
14   incident?
15        A.   Meaning Laser Tag, and I spoke to Mr.
16   Zibilich.  They came to the funeral and to offer
17   their condolences, and I had called them to ask if
18   they could bring some of the cards that ███ loved
19   so I could put them in his casket.
20        Q.   But you haven't had any conversations
21   with anybody at the Westgate, LLC company?
22        A.   I don't even know who they are.  I don't.
23        Q.   When Officer Pitfield arrived on the
24   scene, do you have any idea in what capacity he was
25   arriving in, whether he was a private detail
```

```
 1   officer, whether he was a JPSO deputy?  Do you have
 2   any -- personally, do you have any individual
 3   knowledge of that?
 4        A.   No.  I don't know his -- I didn't know
 5   his quali -- all I saw was a uniform.
 6        Q.   You don't know anything about his
 7   training, who trained him?
 8        A.   I just saw a uniform.  I don't know his
 9   training.
10        Q.   Do you have any knowledge of Westgate's
11   protocols or policies or its security detail
12   program?
13        A.   I know nothing of Westgate's stuff I
14   recall.
15        Q.   Did you ever make any complaint to Laser
16   Tag of any kind?
17        A.   About?
18        Q.   Accommodations, or, you know --
19        A.   Oh, complaints.  I didn't make any
20   complaints.  They knew about ████   So there were
21   times where when ████ had trouble, like if he had
22   trouble waiting, or they felt like he was having
23   difficulty waiting, they would say, "Oh, we will
24   let you go ahead of time.  Let us know," but we
25   didn't really utilize that, because ████ was able
```

1   to actually wait, and that was part of something

2   that we were working on as part of his treatment

3   plan as well, is waiting. So exercising that in the

4   community to practice that skill at school and --

5        Q.   Is that the only time, the day of the

6   incident, is that the only time you ever required a

7   detail officer to respond across the many times you

8   and your family went to that property?

9        A.   Yes, sir.  That was the only time.

10        MR. KAUL:

11             That's all the questions I have.

12           Thank you.

13        MR. CLARKE:

14             I'm don't commit malpractice.

15        MR. ZIBILICH:

16             When did you stop?

17        MR. CLARKE:

18             I don't do it on this side.

19        MR. ZIBILICH:

20             Okay.  See you guys tomorrow.

21             [End of deposition, 3:15]

22

23

24

25

1                      C E R T I F I C A T E

2

3                      This certification is valid only for
a transcript accompanied by my original signature
4 and original required seal on this page.

5                      I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6 as the officer before whom this testimony was
taken, do hereby certify that DONNA LOU, after
7 having been duly sworn by me upon authority of R.S.
37:2554, did testify as hereinbefore set forth in
8 the foregoing 208 pages;

9                      That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10 or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11 ability and understanding;

12                      That the transcript has been
prepared in compliance with transcript format
13 guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14 prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15 and in rules and advisory opinions of the board;

16                      That I am not related to Counsel or
to the parties herein, nor am I otherwise
17 interested in the outcome of this matter.

18

19

20

21 _____
Sandra P. DiFebbo,
22 Certified Shorthand Reporter

23 Date:  _____

24

25