UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| DONNA LOU, ET AL. | |
| Plaintiffs, | |
| v. | CIVIL ACTION NO. 21-80 |
| SHERIFF JOSEPH P. LOPINTO, III, ET AL. | SECTION "D" (2) |
| Defendants, | Judge Wendy B. Vitter |
| | Magistrate Judge Donna P. Currault |

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**

The United States respectfully submits this Statement of Interest under 28 U.S.C. § 517[1] to address the application of Title II of the Americans with Disabilities Act (ADA or Title II), 42 U.S.C. §§ 12131-12134, to law enforcement interactions with people experiencing disability-related crises.

Plaintiffs brought this action against the Jefferson Parish Sheriff and Jefferson Parish Sheriff's Office (JPSO) deputies (Defendants), alleging constitutional violations, violations of the ADA and Section 504 of the Rehabilitation Act, and state law violations.  Compl. ¶¶ 14-24, 385-481.  Plaintiffs' claims arise out of the death of their sixteen-year-old child, who was autistic, while JPSO deputies responded to the child's disability-related crisis.  Compl. ¶¶ 1-3. Plaintiffs assert, among other things, that Defendants violated the ADA and Rehabilitation Act by failing to reasonably accommodate their child's known disability during Defendants' interactions with and restraint of the child.  Compl. ¶¶ 365-84, 430-56.

---

[1] The Attorney General is authorized "to attend to the interests of the United States" in any case pending in federal court.  28 U.S.C. § 517.

Defendants moved for partial summary judgment, arguing, in part, that Plaintiffs' ADA and Rehabilitation Act claims fail as a matter of law because: (1) Defendants' actions did not constitute disability-based discrimination; and (2) the child posed a risk to himself and others and the scene was not secured, rendering the ADA inapplicable.  *See Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000);[2] Mem. in Supp. of Mot. for Partial Summ. J. (Defs. Mem.) at 1-2.

This Statement of Interest addresses the ADA's application to law enforcement agencies' services, programs, and activities.  First, Title II and its implementing regulation prohibit law enforcement agencies from denying individuals with disabilities the opportunity to participate in or benefit from their aids, benefits, or services and requires them to afford people with disabilities "an opportunity to participate in or benefit from" their services that is "equal to that afforded others" and is "as effective in affording equal opportunity to obtain the same result."  28 C.F.R. § 35.130(b)(1)(i)-(iii).  That includes the law enforcement agencies' systems for responding to 911 calls and officers' response to those calls.  Where necessary to avoid discrimination against people with disabilities in these systems, law enforcement agencies and their officers are required to make "reasonable modifications" to their policies, practices, or procedures.  28 C.F.R. § 35.130(b)(7).  Failure to do so may violate the ADA, and the record here contains evidence that Defendants failed to modify their procedures to accommodate E.P.'s disabilities and thereby provide E.P. with access to safe and secure emergency response services.  A reasonable jury could thus find that Defendants discriminated against E.P. based on disability.

Second, the exigent circumstances standard set forth in *Hainze* does not bar Plaintiffs' Title II claim.  Under *Hainze*, the Fifth Circuit held that Title II only applies to an officer's on-

---

[2] The United States does not address Defendants' assertion that Plaintiffs' ADA claim is barred by qualified immunity.  Defs. Mem. at 13-15.

the-street responses to reported disturbances after the officer has secured the scene and ensured that there is no threat to human life.  *Hainze*, 207 F.3d at 801.  Once the scene is secure and no threat to human life exists, law enforcement officers must make reasonable modifications to accommodate an individual's known or obvious disability-based limitations.  *Id.* at 802; *Windham v. Harris Cty.*, 875 F.3d 229, 237-38 (5th Cir. 2017).  Here, record evidence supports Plaintiffs' claim that the scene was secure early on in Defendants' response.  Indeed, the record includes evidence that could support a conclusion that the scene was secure the entire time.  The record further contains ample evidence to support that Defendants knew, or it was obvious, that the child had disability-based limitations.  There is also evidence that Defendants could have provided any number of reasonable accommodations once the scene was secure, and thereby afforded the child a safe and effective law enforcement response.  As such, *Hainze* should not apply as a matter of law.

## INTEREST OF THE UNITED STATES

This litigation implicates the proper interpretation and application of Title II of the ADA. The United States Department of Justice implements and enforces Title II of the ADA.[3]  42 U.S.C. §§ 12133–12134; 28 C.F.R. Part 35 (delegating authority to the Department of Justice to promulgate regulations under Title II).  Congress charged the Department of Justice with implementing Title II of the ADA by promulgating regulations, issuing technical assistance, and bringing suits in federal court to enforce the statute.  42 U.S.C. §§ 12133-12134, 12206.  The Department of Justice therefore has an interest in supporting the proper and uniform application

---

[3] The Department of Justice is also charged with enforcing Section 504, 29 U.S.C. § 794(a), and with coordinating federal agencies' implementation and enforcement of Section 504, 28 C.F.R. Part 41; Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (Nov. 2, 1980); *see also* 28 C.F.R. § 0.51(b)(3).

of the ADA, and in furthering Congress's intent to create "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities" and reserve a "central role" for the federal government in enforcing the ADA's standards.  *Id.* §§ 12101(b)(2)-(3).  Of particular relevance to this case, the Department is the agency designated for implementing Title II as to "[a]ll programs, services, and regulatory activities relating to law enforcement."  28 C.F.R. § 35.190(b)(6).  The United States therefore has a strong interest in the proper interpretation of Title II and its corresponding regulations in law enforcement contexts.

## FACTUAL BACKGROUND

Plaintiffs are the parents of E.P., a sixteen-year-old with autism who died while JPSO deputies responded to the child's disability-related crisis.  Answer, § 1, ECF No. 9 (admitting paragraph 1 of Complaint).  Defendants include numerous JPSO deputies.  *Id.* at §§ V-XII.  Prior to his death, E.P. experienced a disability-related "sudden sensory outburst or 'melt-down'" in a shopping center parking lot.  *Id.* at § 1 (admitting paragraph 33 of Complaint).[4]  With the parents' consent, a business manager called a Defendant JPSO deputy for help, informing Deputy Pitfield that E.P. was a "child with special needs" and that E.P.'s parents were present.  Pitfield Dep. at 113:13-16, ECF No. 142-3; Answer, § 1, ECF No. 9 (admitting paragraphs 47 and 49 of Complaint).

Video footage shows that prior to Defendants' arrival, E.P. repeatedly slapped his own head and slapped at and wrestled with his father for approximately four minutes.  Defs. Ex. 1 at 13:24:29-13:28:28.  During this time, E.P. at times held his father's torso and arm, pulled his father's shirt off, and bit his father.  *Id.*  No bystanders appear to be near E.P. and his father, nor

---

[4] Plaintiffs have further described E.P.'s "sudden sensory outburst or 'meltdown' caused by and related to his severe autism" as an "involuntary, neurological flooding of the brain circuitry" that can lead to "self-injurious and/or aggressive behaviors towards others."  *See* Compl. ¶¶ 33-34.

does anyone appear to be in imminent danger throughout this time. *Id.* Moreover, E.P. has no weapon. *Id.*

Deputy Pitfield arrived at the scene in a JPSO car with the lights activated, and he left the lights on when he exited the car. Answer, § 1, ECF No. 9 (admitting paragraph 57-58 of Complaint). Deputy Pitfield later provided a statement that he knew "something else [was] going on with this child and this [was] clearly . . . the special needs child that they had told me . . . about." Answer, § 1, ECF No. 9 (admitting paragraph 66 of Complaint).

When Deputy Pitfield exited his car, the video footage shows that E.P. was not hitting anyone and was partially seated in a car. Defs. Ex. 1 at 13:28:30-13:28:34. Deputy Pitfield approached the car where E.P. was sitting, and E.P. started slapping his head again. *Id.* at 13:28:34-313:28:36. When E.P. then slapped at his father and Deputy Pitfield, Deputy Pitfield took E.P. to the ground without much effort. Answer, § 1, ECF No. 9 (admitting paragraphs 68-69 of Complaint). E.P. bit Deputy Pitfield's leg. *Id.* (admitting paragraph 70 of Complaint). Deputy Pitfield proceeded to use handcuffs to restrain E.P. on the ground and sat on E.P.'s hips and butt. *Id.* (admitting paragraphs 72 and 74 of Complaint). According to Deputy Pitfield, E.P.'s mother then was calming E.P. down and, at some point, she told Deputy Pitfield that E.P. was autistic. *Id.* (admitting paragraph 81 of Complaint); Pitfield Dep. at 171:9-11, ECF No. 142-3. Deputy Pitfield also told E.P. to calm down. Pitfield Dep. at 157:21-25, ECF No. 142-3.

Other deputies arrived on the scene, and eventually at least six marked and unmarked police vehicles surrounded E.P., several with flashing lights. *See*, *e.g.*, Defs. Ex. 1 at 13:36:43-13:39:00. Deputy Pitfield told some of the deputies that E.P. had autism. Pitfield Dep. at 171:37:02, ECF No. 142-3. Various defendants, through statements or deposition testimony, indicated that they knew about E.P.'s disability:

- Deputy Vega stated that he knew E.P. had autism before getting on him.  Vega Dep. at 123:7-9, ECF No. 105-9.

- Deputy Guidry stated that she "just assumed he was autistic" when she arrived. Guidry Statement, Pls. Ex. B at 4, ECF No. 155-3.

- Deputy Mehrtens stated that E.P.'s parents told him that E.P. had "special needs" and "autism."  Mehrtens Statement, Pls. Ex. A at 9, ECF No. 155-2.

- Deputy Vaught stated that he was responding to a call for help with someone having a "mental episode" and that he was told when he arrived that E.P. had "special needs." Vaught Statement, Pls. Ex. C at 2, 4, ECF No. 155-4.

- Deputy Gaudet stated that he was told that E.P. was a "special needs kid."  Gaudet Statement at 4-5, ECF No. 18-6.

At least one Defendant also described having some knowledge of autism and disability-related behaviors. "Mehrtens Statement, Pls. Ex. A at 10, ECF No. 155-2.

For approximately nine to ten minutes, Defendants kept E.P. pinned face down on the ground, handcuffed and shackled, using their own bodyweight to restrain him for much of the time.  Defs. Ex. 1 at 13:29:14-13:39:39; *see also*, *e.g.*, Vaught Statement, Pls. Ex. C at 6, ECF No. 155-4 (describing placing shackles on E.P.'s ankles).  Throughout, the video shows deputies walking around the parking lot calmly.  Defs. Ex. 1 at 13:29:14-13:39:39.  Defendants' descriptions of the scene at various points are consistent with the video:

- Deputy Mehrtens described a time when E.P. was "under control . . ., he was calm, everything was fine."  Mehrtens Statement, Pls. Ex. A at 9-10, ECF No. 155-2.

- Deputy Guidry described a time when "everything was fine . . . [and] under control." Guidry Statement, Pls. Ex. B at 2, ECF No. 155-3.

- Deputy Vaught described times when E.P. was not resisting.  Vaught Statement, Pls.
  Ex. C at 4-5, 12, ECF No. 155-4.

Defendants admit that they did not reasonably modify their procedures while interacting

with E.P.  Lopinto Suppl. Interrogatory Responses at 4, ECF No. 151-6 ("The factual backdrop

of the incident sued upon did not implicate a need for an accommodation.  Therefore, an

accommodation was not provided.").  Two admitted that they did not roll E.P. to his side, and all

Defendants admit that they never sat E.P. up, stood him up, or put him in a JPSO car.  Answer,

§ 1, ECF No. 9 (admitting paragraphs 118, 156, 245-47 of Complaint).  E.P. was eventually

taken to the hospital.  Answer, § 1, ECF No. 9 (admitting paragraph 267 of Complaint).

According to Defendants, "E.P. expired on the scene."  Defs. Statement of Uncontested Facts,

¶ 5.

The only word that E.P. said throughout this encounter was "firetruck."  Answer, § 1,

ECF No. 9 (admitting paragraph 79 of Complaint); Pitfield Dep. at 171:3-5, ECF No. 142-3.

## LEGAL BACKGROUND

Title II of the ADA provides that no individual with a disability "shall, by reason of such

disability, be excluded from participation in or be denied the benefits of the services, programs,

or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C.

§ 12132.[5]  The statute defines "public entity to include any State or local government" and "any

department, agency, special purpose district, or other instrumentality of a State or States or local

government."  *Id*. 12131(1)(A), (B).   By its plain terms, Title II applies to all governmental

---

[5] The Complaint also alleges violations of Section 504 of the Rehabilitation Act, 29 U.S.C.
§ 794.  Because the ADA and the Rehabilitation Act involve the same substantive standards and
are generally subject to the same analysis, this Statement applies to both claims.  *See Melton v.
Dallas Area Rapid Transit*, 391 F.3d 669, 671 n.1 (5th Cir. 2004).

entities, including law enforcement agencies.  *Id*. 12131(1)(A), (B).  Moreover, the statutory text

contains no "exception that could cast the coverage of" law enforcement entities "into doubt."

*Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998).

Law enforcement entities are subject to Title II's anti-discrimination mandate with

respect to all of their operations, including interactions with the public.  The reference to

"services, programs, or activities," 42 U.S.C. 12132, is an all-inclusive phrase that covers

everything that a public entity does.[6]   28 C.F.R. pt. 35, app. B, subp. A § 35.102, at 698

(2020).[7]  As the appendix issued with the regulation explains, "[t]he general regulatory obligation

to modify policies, practices, or procedures requires law enforcement to make changes in

policies that result in discriminatory arrests or abuse of individuals with disabilities."  28 C.F.R.

pt. 35, app. B, subp. B, § 35.130, at 707 (2020).  Thus, "activities" under Title II include

everything a law enforcement agency does, including its emergency response services,

interactions with or detention of members of the public, and making arrests.  In the Fifth Circuit,

as discussed below, law enforcement's Title II obligations during on-the-street responses to

reported disturbances are triggered after the officer has secured the scene and ensured that there

is no threat to human life.  *See Hainze*, 207 F.3d at 801.

## DISCUSSION

The Department submits this Statement of Interest to clarify the appropriate application

---

[6] Notably on this point, the Rehabilitation Act of 1973, which served as a model for Title II, expansively defines the phrase "[p]rogram or activity," 29 U.S.C. §§ 701-97, as "all of the operations of" a covered entity."  29 U.S.C. § 794(b).  Because Title II cannot "be construed to apply a lesser standard" than those under Section 504 of the Rehabilitation Act, 42 U.S.C. § 12201(a), the phrase "services, programs, or activities" in the ADA shares this broad meaning.

[7] Here, Plaintiffs brought claims against the Sheriff and JPSO deputies but not separately against the Parish's emergency response system.

of Title II to law enforcement encounters with people experiencing disability-related crises.  As explained below, law enforcement agencies' failure to provide people with disabilities with an equal opportunity to benefit from their services or reasonably modify their procedures to avoid discrimination can violate the ADA.  Further, Title II, including the requirement to make reasonable modifications, applies to Defendants' interactions with E.P., and the exigent circumstances standard of *Hainze* does not bar Plaintiffs' claims.

## I.      Law Enforcement Entities Must Provide Equal Opportunity to Individuals with Disabilities to Benefit from their Aids, Benefits, or Services.

Defendants argue that Plaintiffs' ADA claim should be dismissed because there is "no evidence that the Deputies responding to the scene discriminated against E.P. based upon his disability."  Defs. Mem. at 10.  Defendants' argument misconstrues the ADA's requirements. Title II prohibits law enforcement agencies from denying individuals with disabilities the opportunity to participate in or benefit from their aids, benefits, or services and requires them to afford people with disabilities, including people with intellectual and developmental disabilities, "an opportunity to participate in or benefit from" their services that is "equal to that afforded others" and is "as effective in affording equal opportunity to obtain the same result."  28 C.F.R. § 35.130(b)(1)(i)-(iii).

Law enforcement agencies and their officers also have an affirmative obligation to make "reasonable modifications to their policies, practices, or procedures where necessary to avoid discrimination against a person with a disability, unless doing so would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).  The Fifth Circuit has repeatedly held that a public entity's obligation to make reasonable modifications is triggered when the entity knows that someone has a disability and needs a modification, including when the need for a modification is obvious, regardless of whether a modification is requested.  *See*,

*e.g.*, *Windham*, 875 F.3d at 237-38 (explaining that a plaintiff can prevail on a Title II reasonable modification claim by showing that they directly and specifically requested a modification or "by showing that 'the disability, resulting limitation, and necessary reasonable accommodation' were 'open, obvious, and apparent'"); *Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 296 (5th Cir. 2012) (holding that a "failure to expressly 'request' an accommodation is not fatal to an ADA claim where the defendant otherwise had knowledge of the individual's disability and needs but took no action"). The Fifth Circuit further recognizes that "a plaintiff need not request, or even know, the particular reasonable accommodation he ultimately requires." *Windham*, 895 F.3d at 237 n.11.

 In *Phillips v. Prator*, the Fifth Circuit recently applied this standard in a context similar to the facts here. The court reversed dismissal of a Title II claim, holding that the plaintiffs had plausibly alleged that a sheriff's deputy knew that a child with severe autism and who was nonverbal needed accommodations, understood the limitations imposed by the autism, and understood how to accommodate the child. No. 20-30110, 2021 U.S. App. LEXIS 22947, at *10-12 (5th Cir. Aug. 3, 2021) (unpub.). The plaintiffs alleged that the child left his classroom while upset and did not want to return. *Id.* at *1. He at times was kicking at school staff and the sheriff's deputy who responded. *Id.* In reversing dismissal of the Title II claim, the court relied on allegations that the child stuck his fingers in his ears and stood still against a wall with his head down for five minutes and did not respond to three school administrators or the sheriff's deputy who flanked him and told him to calm down. *Id.* at *10-11. These alleged facts were "clear signals that [the child] could not comprehend what was happening" and that the need for reasonable modifications was "plausible." *Id.* at *10.

Here, the record is replete with facts showing that several Defendants knew about E.P.'s disability before or on arrival to the scene and that others learned of his disability during the encounter.  *See supra* at 4-7.   Further, like the child in *Phillips*, E.P.'s behavior, such as slapping his head, and failure to say anything other than "firetruck," could be construed as "clear signals" of E.P.'s disability-related limitations and need for reasonable modifications.  *See Phillips*, 2021 U.S. App. LEXIS 22947, at *10.  E.P.'s parents were also present at the scene to provide information to Defendants.  And at least one officer had some knowledge of autism and disability-related behaviors.  Mehrtens Statement, Pls. Ex. A at 10, ECF No. 155-2.

Plaintiffs have also put forth evidence that the deputies, who knew they were responding to a call for assistance with a child experiencing a behavioral health crisis, used force inappropriately to respond to a child's known disability-related behavior.  *See, e.g.*, Answer, § 1, ECF No. 9 (admitting paragraphs 68-69 of Complaint) (Deputy Pitfield, a 6'3", 365-pound man, took E.P. to the ground without much effort); *id*. (admitting paragraphs 72-74 of Complaint) (Deputy Pitfield proceeded to use handcuffs to restrain E.P. on the ground and sat on E.P.'s hips and butt); Defs. Ex. 1 at 13:29:14-13:39:39 (for approximately nine to ten minutes, Defendants kept E.P. pinned face down on the ground, handcuffed and shackled, using their own bodyweight to restrain him for much of the time).  Thus, a factual dispute exists as to whether Defendants used force inappropriately against E.P. that they would not otherwise have used against someone without a disability, and thereby failed to provide E.P. with equal and effective access to emergency services.  *See*, *e.g.*, *Hobart v. City of Stafford*, 784 F. Supp. 2d 732, 758 (S.D. Tex. 2011) (denying city's motion for summary judgment because the court could not hold "as a matter of law that [youth with a disability] was not denied benefits or discriminated against *because of* his disability").

Modifications that may have been reasonable for officers to implement, depending on the circumstances and existing services, include dispatching crisis intervention trained officers or arranging for a mobile crisis team to respond; using de-escalation strategies; removing distractions and providing time and space to calm the situation when the child poses no significant safety threat; and avoiding or minimizing touching a child whose disability makes them sensitive to touch.  If available, officers should enlist a child's parent, guardian, treating medical professional, or another trusted support person, to help to effectively communicate with the child and de-escalate the situation.[8]  *See*, *e.g.*, *Phillips*, 2021 U.S. App. 22947, at *11 (describing similar strategies as "commonsense tactics" that could have been used instead of a Taser to make reasonable modifications for a child with severe autism who was nonverbal). Many of these possible modifications are consistent with Plaintiffs' proposed modifications, such as rolling E.P. onto his side, minimizing lights and noise, giving E.P. space and creating more space, obtaining information from E.P.'s parents about how to accommodate his disability, and reducing the force used as E.P. resisted less.  Pl. Br. at 7; Pl. Compl. at ¶¶ 337-41.  Defendants do not address the reasonableness of Plaintiffs' proposed modifications.  However, because abundant facts show that Defendants were on notice of E.P.'s disability, a reasonable jury could conclude that Defendants should have reasonably modified their procedures in restraining E.P.,

---

[8] *See*, *e.g.*, U.S. Dep't of Justice Civil Rights Division and U.S. Attorney's Office, Western District of Kentucky, Civil Division, *Findings Report: Investigation of the Louisville Metro Police Department and Louisville Metro Government* at 67-68 (Mar. 2023), https://www.justice.gov/crt/case-document/file/1572951/download (discussing reasonable modifications that law enforcement agencies can make to avoid discrimination against people with behavioral health disabilities); Statement of Interest of the United States at 8-9, *A.V. v. Douglas County School District RE-1*, 586 F. Supp. 3d 1053 (D. Col. 2022) (Civ. Action No. 21-cv-00704-WJM-SKC), ECF No. 51 (providing examples of possible reasonable modifications available to law enforcement officers when interacting with or arresting a child with a known disability).

and these proposed modifications are reasonable under the circumstances of this case.

Therefore, Defendants' bare assertion that they did not engage in disability-based discrimination

is unavailing.

**II.     The 5th Circuit's Exigent Circumstances Exception to Title II is Narrow and Material Facts are in Dispute about its Application to this Case.**

Defendants argue, based on *Hainze*, that the ADA is inapplicable here because the scene

was never secure and E.P. posed a risk to himself and others.  Defs. Mem. at 8, 10-12.  But

*Hainze* requires a fact-intensive analysis, and the briefing and factual record here could lead a

reasonable jury to find that the scene was secure very early, if not immediately, in the encounter,

and E.P. never posed any threat to human life.  *Hainze* cannot be applied here as a matter of law

because of the disputed material facts about when the scene was secured and what kind of safety

threat, if any, existed.

In *Hainze v. Richards*, the Fifth Circuit held that Title II only applies to an officer's on-

the-street responses to reported disturbances after the officer has secured the scene and ensured

that there is no threat to human life.  *See* 207 F.3d at 801 (creating exigency exception where the

plaintiff was armed with a knife and quickly approached police while ignoring repeated orders to

stop).[9]  *Hainze* itself delineates the exigency exception's limits, explaining that law enforcement

─────────────────────

[9] In a recent concurrence, Judge Ho noted that the *Hainze* exception "appears nowhere in the text of either the Americans with Disabilities Act or the Rehabilitation Act."  *Wilson v. City of Southlake*, 936 F.3d 326, 333 (5th Cir. 2019).  He further observed that "it is not surprising that every circuit to opine on this issue has to our knowledge rejected our approach."  *Id.* (citing *Gray v. Cummings*, 917 F.3d 1, 16-17 (1st Cir. 2019) (discussing *Hainze* and noting that"[o]ther circuits . . . have charted a different course, holding that Title II [of the ADA] applies without exception to ad hoc police encounters"); *Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014) ("We agree with the majority of circuits to have addressed the question that Title II applies to arrests."), *rev'd on other grounds*, 575 U.S. 600, 135 S. Ct. 1765, 191 L. Ed. 2d 856 (2015); *Seremeth v. Bd. of Cty. Comm'rs Frederick County*, 673 F.3d 333, 339 (4th Cir. 2012) ("[N]othing in the text of the ADA suggests that a separate exigent-circumstances

officers would have had a duty to accommodate the plaintiff's disability "[o]nce the area was secure and there was no threat to human safety."  207 F.3d at 802; *see also Wilson v. City of Southlake*, 936 F.3d 326, 331 (5th Cir. 2019) (explaining that "*Hainze* provides no authority for expanding the exception to include situations where there is no potentially life-threatening situation or even a real danger of physical harm").  Further, district courts in this circuit have repeatedly recognized that *Hainze* should be interpreted and applied narrowly.  *See, e.g., Van Velzor v. City of Burleson*, 43 F. Supp. 3d 746, 758 (N.D. Tex. 2014) ("The *Hainze* exception is applied narrowly, only in situations that legitimately present a threat of imminent danger and call for this sort of instantaneous decision-making."); *Salinas v. City of New Braunfels*, 557 F. Supp. 2d 771, 772-73, 775-76 (W.D. Tex. 2006) (describing *Hainze* as "stand[ing] for a limited proposition" and denying motion to dismiss a deaf plaintiff's ADA claim where police responded to a 911 call about the plaintiff's unconscious boyfriend and the plaintiff alleged that the scene was quickly secure and she was not a safety threat).

　　Simply put, not every law enforcement encounter with a person with a disability involves exigent circumstances that trigger the *Hainze* exception.  The Fifth Circuit has repeatedly

---

inquiry is appropriate."); *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1085 (11th Cir. 2007) (declining to follow *Hainze*).  Other circuit courts to address the issue likewise have held or assumed without deciding that Title II applies to arrests or related law enforcement conduct.  *See Haberle v. Troxell*, 885 F.3d 171, 180 (3d Cir. 2018); *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 988-89 (7th Cir. 2020); *Roberts v. City of Omaha*, 723 F.3d 966, 973 (8th Cir. 2013); *Gohier v. Enright*, 186 F.3d 1216, 1221 (10th Cir. 1999).  Often, these courts instead consider exigency as part of the analysis of a proposed modification's reasonableness.  *See*, *e.g.*, *Seremeth*, 673 F.3d at 339; *Bircoll*, 480 F.3d at 1085.  The United States interprets the ADA's application to arrest and detention of and law enforcement encounters with people with disabilities consistently with the majority approach of most other circuit courts.  *See* Br. for the United States as Amicus Curiae at 9-17, *Sheehan v. City & Cnty. of San Francisco,* 575 U.S. 600 (2015) (No. 13-1412); *see also* U.S. Dep't of Justice, *Examples and Resources to Support Criminal Justice Entities in Compliance with Title II of the Americans with Disabilities Act*, (Jan. 2017), https://www.ada.gov/cjta.html.

declined to apply *Hainze* when the interaction between police and the person with a disability posed no threat to human life.  For example, in *Wilson*, the Fifth Circuit reversed summary judgment, on ADA and Rehabilitation Act claims, for the defendant school resource officers and declined to find exigent circumstances in the context of an officer's response to a child with autism and other disabilities, who had a behavioral incident at school that included waving a plastic jump rope that the child called "nunchucks."  936 F.3d 326 at 331.  *See also Windham*, 875 F.3d at 232, 235 n.4 (noting that the *Hainze* exigent circumstances exception would not "apply on these non-exigent facts" during a traffic incident and field sobriety tests).  *Id.* at 235 n.4.

District courts have followed suit.  For example, in *Hobart*, a mother called 911 requesting a crisis intervention trained officer to help take her nineteen-year-old son, who had mental health disabilities, to the hospital to get medication.  784 F. Supp. 2d at 741, 743.  The mother told the 911 operator that her son was becoming violent but not hurting anyone, did not have any weapons, and was becoming delusional.  *Id.* at 741.  After an officer arrived, the teenager eventually ran down the hall toward the officer, with his arms raised or flailing, and either hit the officer's head or hit the officer's arms.  *Id.* at 742.  The officer responded by fatally shooting the youth.  *Id.* at 742-43.  The defendants moved to dismiss and for summary judgment on the parents' Title II claim, arguing, in part, that this case fell within the *Hainze* exigency exception.  *Id.* at 755, 757.  The court denied the motions, finding that there were factual questions about whether the youth posed "any serious threat, let alone 'threat of human life' [sic], and whether there was any need for the officer to 'secur[e] the scene.'"  *Id.* at 757-58 (citation omitted).

Another court denied a motion to dismiss an ADA claim even where a plaintiff with known mental health disabilities eventually obtained an officer's taser during the officer's attempt to serve an arrest warrant. *Rubin v. De La Cruz*, Civ. Action No. 4:21-CV-01148, 2022 U.S. Dist. LEXIS 172366, at *2, *17 (S.D. Tex. Sept. 22, 2022). Neither party alleged that the plaintiff was armed when an officer first approached her or that the plaintiff assaulted the officer before the officer shot her. *Id.* at *16. Further, the court distinguished *Hainze*, observing that the plaintiff obtained the officer's taser only "after the situation had gotten out of hand – which . . . might not have occurred if [the plaintiff] initially received the accommodations to which she was entitled." *Id.* at *16.

Where courts have applied the exigent circumstances exception to reject ADA claims, the person with a disability typically had a weapon or the defendant thought the person with a disability was reaching for a weapon. For instance, the plaintiff in *Hainze* was armed with a knife and was rapidly advancing on police when the police shot him. 207 F.3d at 801. And in *Allen v. Hays*, which Defendants cite, the Fifth Circuit affirmed *Hainze*'s application to a traffic stop where a driver was reaching for something, perhaps a gun on the back seat,[10] and ignored an officer's instructions to stop moving. No. 21-20337, 2023 U.S. App. LEXIS 9009, at *2-3, *25-26 (5th Cir. Apr. 14, 2023). Other cases applying the *Hainze* exigency exception likewise involved individuals who had a weapon or were thought to be armed. *See, e.g.*, *Munroe v. City of Austin*, 300 F. Supp. 3d 915, 931 (W.D. Tex. 2018) (decedent had a BB gun that appeared to be "an exact replica of a real handgun"); *Green v. City of Mission*, Civ. Action No. 7:118-CV-00049, 2018 U.S. Dist. LEXIS 80599, at *29 (S.D. Tex. May 14, 2018) (decedent led police on a

---

[10] The record included conflicting facts about whether there was a gun on the back seat. *Allen*, 2023 U.S. App. LEXIS 9009, at *4.

car chase and previously wielded an ax and machete); *Robertson v. City of Bastrop*, A-14-CV-0839-SS, 2015 U.S. Dist. LEXIS 146636, at *18-19 (W.D. Tex. Oct. 29, 2015) (plaintiff had a knife); *Rockwell v. City of Garland*, No. 3:08-cv-0251-M, 2013 U.S. Dist. LEXIS 115139, at *17-19 (N.D. Tex. Aug. 14, 2013) (person with mental health disabilities was armed or suspected to be armed); *DeLeon v. City of Alvin Police Dep't*, Civ. Action No. H-09-1022, 2010 U.S. Dist. LEXIS 126116, at *14-15 (S.D. Tex. Nov. 30, 2010) (victim with fresh knife wound and a witness reported that the plaintiff had stabbed victim).

Contrary to Defendants' argument, applying the *Hainze* analysis here does not compel summary judgment for Defendants on Plaintiffs' Title II claim. *See* Defs. Mem. at 1, 9-12. Critically, nothing in the briefing suggests that E.P. had a weapon, that officers ever reasonably suspected he had a weapon, or that there was a threat to human life. Nor did these Defendants face the types of "split-second decisions" the court was concerned with in *Hainze*. 207 F.3d at 801-02. Defendants argue that a video of the incident shows that the scene was never secure. But the video could very well create questions of disputed material facts about whether exigency existed at all; when the first Defendant arrived at the scene, E.P. was partially seated in a car and not hitting anyone. The record contains no evidence that any bystanders were at risk or that weapons were involved. And at various points, at least six officers were present to keep the scene secure. *See*, *e.g.*, Defs. Ex. 1 at 13:28:30-13:39:39; *compare*, *e.g.*, *Hainze*, 207 F.3d at 801 (finding scene was not secure where person with disability was armed with a knife, near two people in a truck, and then advanced on officers while armed), *with Hobart*, 784 F. Supp. 2d at 741-43, 757-58 (refusing to find exigency as a matter of law when factual questions existed about police response to unarmed teenager with disability whose parents were only other people at the scene).

17

Moreover, even when E.P. started to hit himself, his father, and an officer, those actions are akin to other scenarios where courts have found that certain physical behaviors of a person with a disability gave rise to factual questions about whether exigency existed.  *See, e.g., Hobart*, 784 F. Supp. 2d at 742, 757-58 (teen with mental health disabilities ran down the hall toward an officer, raising or waving arms and hitting officer's arms or head); *Rubin*, 2022 U.S. Dist. LEXIS 172366, at *16.  Certainly, as Plaintiffs argue, even assuming the scene was not secure when the first Defendant arrived, by the time E.P. was handcuffed and his legs were shackled, the scene was secure and the safety threat resolved.  Therefore, *Hainze* no longer applied and Defendants' Title II obligation to make reasonable modifications was triggered.  *See Hainze*, 207 F.3d at 802 (explaining that law enforcement officers would have duty to accommodate a person's disability "[o]nce the area was secure and there was no threat to human safety").  Collectively, these facts contradict Defendants' argument that "the scene was never secure prior to E.P.'s demise" and that thus the ADA was inapplicable.  Defs. Mem. at 8-10.

Indeed, whether the scene was secure and no threat to human life existed, thereby triggering officers' reasonable modification obligation, are typically fact-intensive questions not suited for resolution on a motion for summary judgment.  For example, in *Hobart*, the court detailed the circumstances preceding a fatal police shooting of a nineteen-year-old who was experiencing a mental health crisis.  *See* 784 F. Supp. 2d at 740-43 (describing the officer and the mother's recounting of the unarmed teenager waving his arms and running toward the officer).  The court denied the defendant's summary judgment motion, concluding that there was "sufficient evidence to raise factual issues as to whether Aaron's actions could reasonably have been interpreted to present any serious threat, let alone 'threat of human life,' and whether there was any need for the officer to 'secur[e] the scene.'"  *Id.* at 757-58 (citation omitted)*; see also*

*Sullivan v. City of Round Rock*, No. A-14-CV-349-AWA, 2017 U.S. Dist. LEXIS 146312, 2017 WL 4001572, at *1 (W.D. Tex. Sept. 11, 2017) (noting prior summary judgment denial because of "fact questions surrounding whether Sullivan posed a threat or whether there was any need for officers to 'secure the scene'"); *Salinas*, 557 F. Supp. 2d at 783 (denying defendant's motion for summary judgment on claim of ineffective communication by police because, "[d]ue to the broad, encompassing language found in the ADA, the term 'effective' lends itself to a fact-intensive inquiry, making determination difficult on summary judgment").  Here, given the parties' factual disputes about when and whether the scene was secure and whether E.P. posed a threat to human life, *Hainze* should not bar Plaintiffs' Title II claim.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court consider this Statement of Interest in this litigation.

Dated: May 12, 2023

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

REBECCA B. BOND
Chief

ANNE S. RAISH
Principal Deputy Chief

ELIZABETH S. WESTFALL
Deputy Chief

/s/ Cheryl Rost
CHERYL ROST
Trial Attorney
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
150 M Street, N.E. (4CON)
Washington, D.C.  20002
(202) 598-9620
cheryl.rost@usdoj.gov

*Counsel for United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of May 2023, I electronically filed the foregoing Statement of Interest on behalf of the United States with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all parties.


By:    <u>/s/Cheryl Rost</u>
Cheryl Rost
Trial Attorney
NJBN 020982011
Attorney for the United States
U.S. Department of Justice
Civil Rights Division
Disability Rights Section
150 M Street, N.E. (4CON)
Washington, D.C.  20002
Phone: (202) 598-9620
Fax: (202) 307-1197
cheryl.rost@usdoj.gov