**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**DONNA LOU, ET AL.**                                    **CIVIL ACTION**

**VERSUS**                                                          **NO. 21-80**

**JOSEPH P. LOPINTO, III, ET AL.**                  **SECTION: D (2)**

## ORDER AND REASONS

Before the Court is Defendants Victory Real Estate Investments LA, LLC's and Westgate Investors NO, LLC's d/b/a Westgate Shopping Center (collectively, "Victory and Westgate's") Motion for Summary Judgment.[1]  Plaintiffs oppose the Motion,[2] and Victory and Westgate have filed a Reply.[3]

After careful consideration of the parties' memoranda and the applicable law, the Motion is **GRANTED in part and DENIED in part.**

## I.     FACTUAL AND PROCEDURAL BACKGROUND[4]

In the instant Motion, Victory and Westgate seek summary judgment and dismissal of all claims asserted against them by Plaintiffs in this civil rights case.[5] While Plaintiffs allege that Victory and Westgate are directly liable for their own negligence, Victory and Westgate assert that there is no factual allegation in the Complaint giving rise to Plaintiffs' conclusory allegation of direct negligence.[6]  As such, Victory and Westgate contend that Plaintiffs assert only one claim against

---

[1] R. Doc. 138.
[2] R. Doc. 142.
[3] R. Doc. 149.
[4] The Court set forth the facts of this case in great detail in its May 18, 2023 Order and Reasons (R. Doc. 208) and, for the sake of brevity, they will not be repeated here.
[5] R. Doc. 138 at p. 1.
[6] R. Doc. 138-2 at p. 3 (*citing* R. Doc. 1 at ¶ 27).

them, arising from a theory of vicarious liability for the actions and omissions of their private security detail, defendant Deputy Chad Pitfield.[7]  Victory and Westgate claim that the undisputed evidence shows that they had no control over Deputy Pitfield's training, policy, methods, or actions and, as such, there was no employer-employee relationship for which Victory and Westgate can be held vicariously liable.[8]  Instead, Victory and Westgate assert that Deputy Pitfield is an independent contractor, and that they did not exercise sufficient control over Deputy Pitfield to be held vicariously liable for his actions.[9]  Alternatively, if the Court finds that they are vicariously liable for the actions of Deputy Pitfield, Victory and Westgate assert that it is undisputed that Deputy Pitfield's conduct did not cause E.P.'s injuries.[10]  Accordingly, Victory and Westgate assert that they cannot be held liable in this matter.

Plaintiffs oppose the Motion, asserting that they do not seek to hold Victory and Westgate liable as the direct employers of Deputy Pitfield, and instead seek to hold them liable for Deputy Pitfield's acts and omissions under the "borrowed employee" doctrine.[11]  Plaintiffs contend that the borrowed employee doctrine has been applied to paid detail officers like Deputy Pitfield, and that Victory and Westgate are liable for the actions of their borrowed employees "regardless of whether they are independent contractors or not."[12]  Plaintiffs assert that the borrowed employee doctrine, which has a nine-factor test, is distinct from the five-factor

---

[7] R. Doc. 138 at p. 1.
[8] *Id.*; R. Doc. 138-2 at p. 3 (*citing* R. Doc. 138-4 at pp. 2 & 8; R. Doc. 138-5 at pp. 2-3, 9, & 12).
[9] R. Doc. 138 at p. 1; R. Doc. 138-2 at pp. 3 & 5-11.
[10] R. Doc. 138 at p. 1; R. Doc. 138-2 at pp. 1 & 11-14.
[11] R. Doc. 142 at p. 1 (*citing* R. Doc. 1 at ¶¶ 27, 63)
[12] R. Doc. 142 at p.1 (citing *Benelli v. City of New Orleans*, 478 So.2d 1370 (La. App. 4 Cir. 1985)); R. Doc. 142 at pp. 4-6.

independent contractor/employee analysis.[13]  Plaintiffs argue that the Motion should be denied because Victory and Westgate failed to address whether Deputy Pitfield was an employee borrowed from the Jefferson Parish Sheriff's Office ("JPSO"), which is Plaintiffs' theory of the case.[14]  Plaintiffs further assert that the Motion should be denied because a reasonable juror could find that Deputy Pitfield was a borrowed employee.[15]  Finally, Plaintiffs assert that the Motion should be denied because "it is very much disputed" whether Deputy Pitfield's restraint of E.P. caused his injuries, especially since the Jefferson Parish Coroner's Office found that prone positioning was a contributing cause of E.P.'s death.[16]

In response, Victory and Westgate assert that Plaintiffs' "borrowed employee" argument is a red herring, since there is no substantial difference between that analysis and the independent contractor analysis vis-à-vis an employer's vicarious liability.[17]  Victory and Westgate claim that none of the cases cited by Plaintiffs reference the word "borrowed" and that those courts performed the independent contractor analysis in determining the employment status of a worker.[18]  Victory and Westgate assert that under either analysis, the right to control is paramount.[19]  Nonetheless, Victory and Westgate claim that under the *Ruiz* test, the totality of the

---

[13] R. Doc. 142 at p. 2 (citing *Mays v. Director, Office of Workers' Compensation Programs*, 938 F.3d 637 (5th Cir. 2019)); R. Doc. 142 at pp. 3-4.

[14] R. Doc. 142 at pp. 2 & 6-8.

[15] R. Doc. 142 at pp. 2 & 8-10.

[16] R. Doc. 142 at pp. 2 & (*citing* R. Doc. 142-4 at p. 2); R. Doc. 142 at pp. 11-12.

[17] R. Doc. 149 at p. 1.

[18] *Id*. at p. 2 (citing *Bolden v. Tisdale*, 2021-00224 (La. 1/28/22), 347 So.3d 697; *Benelli v. City of New Orleans*, 478 So.2d 1370 (La. App. 4 Cir. 1985); *Harris v. Pizza Hut of Louisiana, Inc.*, 455 So.2d 1364 (La. 1984); *Cappo v. Vinson Guard Service, Inc.*, 400 So.2d 1148 (La. App. 2 Cir. 1981)).

[19] R. Doc. 149 at p. 3.  *See, Id*. at pp. 3-4.

circumstances show that they did not borrow Deputy Pitfield "to the extent that they should be held vicariously liable for his actions."[20]  Victory and Westgate also claim that the cases cited by Plaintiffs in their Opposition brief are factually distinguishable and, therefore, not controlling.[21]  Victory and Westgate further assert that JPSO deputies held E.P. in a prone position after Deputy Pitfield was no longer involved, and that the evidence cited by Plaintiffs does not isolate the effects of Deputy Pitfield's actions from those of the other deputies.[22]  As such, Victory and Westgate contend that their evidence that E.P. was unharmed at the time Deputy Pitfield ceased his involvement is undisputed.[23]

## II.   LEGAL STANDARD

Summary judgment is appropriate where there is no genuine disputed issue as to any material fact, and the moving party is entitled to judgment as a matter of law.[24]  A party moving for summary judgment must inform the Court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, that show that there is no such genuine issue of material fact.[25]  If the moving party carries its burden of proof under Rule 56, the opposing party must direct the Court's attention to specific evidence in the record which demonstrates that the non-moving party can

---

[20] R. Doc. 149 at p. 4 (citing *Ruiz v. Shell Oil Co.*, 413 F.2d 310 (5th Cir. 1969)).  *See,* R. Doc. 149 at pp. 4-7.
[21] R. Doc. 149 at pp. 7-9.
[22] R. Doc. 149 at pp. 1 & 9.
[23] *Id*. at p. 9.
[24] Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986).
[25] *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552.

satisfy a reasonable jury that it is entitled to a verdict in its favor.[26]  This burden is not satisfied by some metaphysical doubt as to alleged material facts, by unsworn and unsubstantiated assertions, by conclusory allegations, or by a mere scintilla of evidence.[27]  Rather, Rule 56 mandates that summary judgment be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.[28]  In resolving a motion for summary judgment, the Court must review the facts and inferences in the light most favorable to the non-moving party, and the Court may not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes.[29]

## III.   ANALYSIS

The Complaint presents two theories under which Victory and Westgate could be liable for the injuries of Plaintiffs and E.P.: (1) for their own negligence; and (2) vicariously for the negligence of Deputy Pitfield.[30]  The Court will address each of these theories in turn.

### A. Victory and Westgate are entitled to summary judgment on Plaintiffs' claim of direct negligence.

Plaintiffs allege in their Complaint that Victory and Westgate are "directly liable for [their] own corporate negligence as well as for the acts and omissions of its servants, employees, borrowed employees, contractors and agents, including Pitfield

---

[26] *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.
[27] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[28] *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2552.
[29] *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).
[30] R. Doc. 1 at ¶¶ 27, 64, & 477.

. . . .”[31]  In their Motion, Victory and Westgate assert that there is no factual allegation giving rise to Plaintiffs' conclusory allegation of direct negligence.[32]  Plaintiffs failed to address this argument in their Opposition brief, and failed to identify any negligent act for which Victory and Westgate could be held independently liable.  As such, Plaintiffs have not carried their burden to establish that Victory and Westgate owed them a duty that was breached, and Plaintiffs' claim for the independent negligence of Victory and Westgate is dismissed with prejudice.

### B. Victory and Westgate are not entitled to summary judgment regarding their vicarious liability for Deputy Pitfield.

1. *Victory and Westgate are not entitled to summary judgment on the basis that Deputy Pitfield was an independent contractor.*

Plaintiffs assert in their Complaint that Victory and Westgate are vicariously liable for the actions and omissions of Deputy Pitfield on the basis that they were "the special employer of Defendant Pitfield, and Defendant Pitfield was the borrowed employee of [Victory and Westgate]."[33]  Although Victory and Westgate recognize that Plaintiffs have alleged that Deputy Pitfield was "acting as an agent, servant, and borrowed employee of Victory d/b/a Westgate Shopping Center," [34] Victory and Westgate argue that they are not liable for the acts and omissions of Deputy Pitfield because he was an independent contractor, not an employee.  Victory and Westgate

---

[31] R. Doc. 1 at ¶ 27.
[32] R. Doc. 138-2 at p. 3 (*citing* R. Doc. 138-1 at ¶ 5; R. Doc. 1, *in globo* & at ¶ 27).
[33] R. Doc. 1 at ¶ 27.  *See*, *Id.* at ¶¶ 63 & 477.
[34] R. Doc. 138-2 at p. 2 (*quoting* R. Doc. 1 at ¶¶ 48-63).

claim that Deputy Pitfield is an independent contractor because they did not exercise control over his training, policy, methods, or actions.[35]

At the outset, the Court finds that Victory and Westgate's Motion is not responsive to the theory of vicarious liability asserted against them in the Complaint, as it fails to mention, much less address, the borrowed employee doctrine set forth in Plaintiffs Complaint.[36]  While the Motion could be denied on that basis alone, the Court believes it appropriate to address the arguments made by Victory and Westgate in their Motion.  In doing so, the Court finds that Victory and Westgate have failed to carry their burden of proving that it is undisputed that Deputy Pitfield was an independent contractor.  According to the Louisiana Supreme Court, "The single most important factor to consider in deciding whether the employer-employee relationship exists, for purposes of La. C.C. art. 2320, is the right of the employer to control the work of the employee."[37]  The Louisiana Supreme Court further held that, "The four primary evidentiary factors considered in deciding whether such an employer-employee relationship exists relate to whether the alleged employer has the right or duty, relative to the employee, of: (1) selection and engagement; (2) payment of wages; (3) power of dismissal; and (4) power of control."[38]  No one factor is controlling; instead, the totality of the circumstances must be considered.[39]

---

[35] R. Doc. 138 at p. 1; R. Doc. 138-2 at pp. 3, 5, 6, & 9-11.
[36] *See* R. Doc. 1 at ¶¶ 27 & 63.
[37] *Bolden v. Tisdale*, 2021-00224 (La. 1/28/22), 347 So.3d 697, 708 (citing authority).
[38] *Id.*
[39] *Id.* (citation omitted).

In contrast, "An independent contractor relationship presupposes a contract between the parties, the independent nature of the contractor's business, and the nonexclusive means the contractor may employ in accomplishing the work." [40] According to the Louisiana Supreme Court, it should appear that the contract calls for specific piecework as a unit to be done according to the independent contractor's own methods, without being subject to the control and direction of his employer, except as to the result of the services to be rendered.[41] "It must also appear that a specific price for the overall undertaking is agreed upon; that its duration is for a specific time and not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach."[42] The Louisiana Supreme Court has made clear that determining whether an individual is an independent contractor or an employee requires consideration of the control over the work reserved by the employer.[43] "In applying this test it is not the supervision and control which is actually exercised which is significant; the important question is whether, from the nature of the relationship, the right to do so exists."[44] Victory and Westgate recognize this point in their Motion.[45]

Here, Plaintiffs have submitted evidence demonstrating that Victory and Westgate had the right to, and did, exercise control over Deputy Pitfield. Specifically,

---

[40] *Id.* at 709 (citing *Hickman v. Southern Pacific Transport Company*, 262 So.2d 385, 390 (La. 1972)).
[41] *Bolden*, 347 So.3d at 709 (citing *Hickman*, 262 So.2d at 390).
[42] *Bolden*, 347 So.3d at 709 (citing *Hickman*, 262 So.2d at 390-91).
[43] *Bolden*, 347 So.3d at 709 (citing *Hickman*, 262 So.2d at 391).
[44] *Bolden*, 347 So.3d at 709 (citing *Hickman*, 262 So.2d at 391).
[45] R. Doc. 138-2 at p. 6 (quoting *Bolden v. Tisdale*, 2021-0024 (La. 1/28/22), 347 So.3d 697, 708) ("The single most important factor to consider in deciding whether the employer-employee relationship exists, for purposes of La. C.C. art. 2320, is the *right* of the employer to control the work of the employee.") (emphasis added).

Deputy Pitfield and Victory and Westgate's Fed. R. Civ. P. 30(b)(6) corporate representative, Gina Christopher, testified that Victory and Westgate chose the times and the location of Deputy Pitfield's security detail, which was confined to the Westgate Shopping Mall.[46]  Christopher also testified that Victory and Westgate had the ability to cancel, terminate, or remove their security detail.[47]  The Court notes, however, that Christopher further testified that Donald A. Canatella, Jr., a retired reserve deputy with JPSO[48] and the administrator of the security detail for Victory and Westgate, selected and scheduled the officers who performed security detail for Victory and Westgate.[49]  Deputy Pitfield and Deputy Canatella testified that Victory and Westgate paid them directly for their security detail work and that the work was performed on the Victory and Westgate property.[50]  Victory and Westgate point out that Deputy Pitfield and Deputy Canatella testified that when working security detail for Victory and Westgate, they followed the policies and procedures issued by JPSO, and that Victory and Westgate did not provide any policies for them to follow while working security detail.[51]  Victory and Westgate also point out that they did not provide tools or equipment for their security detail other than a cell phone, and that the officers used their own uniform, weapon, vehicle and tools.[52]

---

[46] R. Doc. 142-2 at pp. 25 & 32-33; R. Doc. 138-5 at p. 9.
[47] R. Doc. 142-2 at pp. 30-33.
[48] R. Doc. 142-6 at p. 8.
[49] R. Doc. 142-2 at pp. 21-22 & 28.
[50] R. Doc. 142-3 at pp. 38 & 98.  *See*, R. Doc. 142-6 at pp. 19 & 27-28 (when asked how he got paid for his work at Victory and Westgate, Deputy Canatella testified that, "I fill out the time sheets, the payroll sheets, and I submit them to pay - - submit them to Victory, and Victory sends us a check."). *See also*, R. Doc. 142-2 at pp. 19, 26-28, & 34.
[51] R. Doc. 138-5 at pp. 2-3 & 12; R. Doc. 142-3 at pp. 32, 36-37 & 231; R. Doc. 142-6 at pp. 10-11.
[52] R. Doc. 138-2 at p. 11 (*citing* R. Doc. 138-4 at pp. 7 & 8; R> Doc. 138-5 at pp. 4, 5, 6, 7 & 8).

Based on the foregoing evidence, the Court finds that Plaintiffs have raised a genuine issue of material fact regarding who exercised control over the work performed by Deputy Pitfield while on security detail, which is the only factor of the independent contractor analysis addressed by Victory and Westgate in their Motion.[53] The Court therefore finds that Plaintiffs have raised a genuine dispute regarding whether Deputy Pitfield was an independent contractor.  As such, Victory and Westgate have failed to show that they are entitled to judgment as a matter of law on the basis that Deputy Pitfield was an independent contractor at the time he performed security detail for Victory and Westgate.

   2.   *Victory and Westgate are not entitled to summary judgment on the basis that Deputy Pitfield was not a borrowed employee.*

In their Reply brief, Victory and Westgate assert that there are no substantial differences between the borrowed employee analysis and the independent contractor analysis vis-à-vis an employer's vicarious liability, and further argue that Deputy Pitfield was not a borrowed employee because they did not exercise sufficient control over him.[54]  In *Ruiz v. Shell Oil Co.*, the Fifth Circuit set forth the following nine factors that courts should consider when determining whether a person qualifies as a borrowed employee:

1. Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?
2. Whose work is being performed?
3. Was there an agreement, understanding, or meeting of the minds between the original and borrowing employer?
4. Did the employee acquiesce in the new work situation?

---

[53] *See*, R. Doc. 138-2 at pp. 5-11.
[54] R. Doc. 149.

5. Did the original employer terminate his relationship with the employee?
6. Who furnished tools and place for performance?
7. Was the new employment over a considerable length of time?
8. Who had the right to discharge the employee?
9. Who had the obligation to pay the employee?[55]

The Fifth Circuit has made clear that, "Although no single one of these factors is decisive, the first is the most critical."[56]   Additionally, "[t]he central question in borrowed servant cases is whether someone has the power to control and direct another person in the performance of his work."[57]   The Fifth Circuit has long noted that, "a careful distinction must be made between authoritative direction and control, and mere suggestion as to details or the necessary co-operation, where the work furnished is part of a larger undertaking."[58]   Further, a borrowing employer "gives direct orders to its borrowed servant."[59]

Turning to the first factor, Christopher, the corporate representative of Victory and Westgate, testified that when Victory and Westgate purchased the shopping center from the previous owner in 2006, "the security came along with it."[60]   While there was no written or oral contract for the security services, Victory and Westgate received "[t]he same services that were being provided to the previous owner," and they expected those services to include patrolling the property and ensuring the

---

[55] *Mays v. Director, Office of Workers' Compensation Programs*, 938 F.3d 637, 641-42 (5th Cir. 2019) (quoting *Gaudet v. Exxon Corp.*, 562 F.2d 351, 355 (5th Cir. 1977) (citing *Ruiz*, 413 F.2d 310, 312-13 (5th Cir. 1969)) (internal quotation marks omitted).
[56] *Mays*, 938 F.3d at 642 (citing *Hall v. Diamond M Co.*, 732 F.2d 1246, 1249 (5th Cir. 1984)).
[57] *Mays*, 938 F.3d at 642 (quoting *Hebron v. Union Oil Co. of Cal.*, 634 F.2d 245, 247 (5th Cir. 1981)) (internal quotation marks omitted).
[58] *Mays v. Director, Office of Workers' Compensation Programs*, 938 F.3d 637, 643-44 (5th Cir. 2019) (quoting *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 313 (5th Cir. 1969)) (internal quotation marks omitted).
[59] *Mays*, 938 F.3d at 644 (citing authority).
[60] R. Doc. 142-2 at pp. 14 & 41.

safety of patrons, tenants, and the shopping center.[61]   Christopher testified that Victory and Westgate selected the times and confined the location of the security patrol to the Westgate Shopping Mall, but they did not provide any policies that the security detail had to comply with.[62]   Christopher further testified that Victory and Westgate had the ability to cancel, terminate, or remove the security officers, including Deputy Pitfield.[63]

Deputy Pitfield testified that he was supposed to follow the JPSO policies and procedures, including policies and procedures regarding public assignments, when performing security detail.[64]   Deputy Pitfield also testified that JPSO did not impose any additional training requirements for him to perform security detail.[65]   Deputy Canatella likewise testified that the Public Assignment Policy for JPSO applied to the security detail services provided to Victory and Westgate.[66]   Deputy Canatella further testified that he sometimes went to the Westgate Shopping Center with a sign-in sheet to ensure that officers, including Deputy Pitfield, showed up for their security detail but he did not testify to giving any other directions to Pitfield in the performance of the detail.[67]

The evidence before the Court shows that Victory and Westgate owned the shopping center where Deputy Pitfield performed security detail, they set the hours and location of that work, they paid him directly, and they had the ability to cancel,

---

[61] *Id.* at pp. 14-15 & 19.  *See also*, *Id.* at pp. 29 & 43-44.
[62] R. Doc. 142-2 at pp. 25 & 32-33; R. Doc. 138-5 at p. 9.
[63] R. Doc. 142-2 at pp. 30-33.
[64] R. Doc. 138-5 at pp. 2-3 & 12; R. Doc. 142-3 at pp. 36-37 & 231.
[65] R. Doc. 142-3 at p. 32.
[66] R. Doc. 142-6 at pp. 10-11.
[67] R. Doc. 142-6 at pp. 29 & 40.

terminate, or remove Deputy Pitfield.  The Court therefore rejects as baseless Victory and Westgate's assertion that they "exercised no right of control over Defendant Pitfield" and that Deputy Pitfield "was given direction, entirely from Jefferson Parish Sheriff's Office (JPSO)."[68]  While there is evidence before the Court showing that Deputy Pitfield relied upon the policies and training he received from JPSO while working security detail and that Deputy Canatella selected the officers who worked the security detail,[69] Victory and Westgate have not directed the Court to evidence showing that JPSO exercised control over Deputy Pitfield's security detail work beyond the JPSO policies and procedures that he followed.   The Court finds that genuine issues of material fact exist regarding who exercised control over Deputy Pitfield and the work he performed while working security detail for Victory and Westgate.[70]  As such, the first factor, who has control over the employee, is neutral regarding the existence of a borrowed employee relationship.

Regarding the second factor, whose work is being performed, the parties agree that Deputy Pitfield's security detail was performed for the benefit of Victory and Westgate.[71]  Plaintiffs have also provided evidence showing that while working security detail, officers were not allowed to do work for other people.[72]  As such, this factor weighs in favor of a borrowed employee relationship.

---

[68] R. Doc. 149 at p. 4 (*citing* R. Doc. 138-2; R. Doc. 142 at p. 8).

[69] R. Doc. 142-6 at pp. 14-15.

[70] Although this dispute precludes summary judgment, the Court will consider the remainder of the factors.  *See, Delozier v. S2 Energy Operating, LLC*, 498 F. Supp. 3d 884, 895-96 (E.D. La. 2020) (finding that material facts in dispute regarding who had control over the employee and whether the conduct of the parties altered the terms of the Master Service Agreement between the two employers precluded summary judgment on the issue of borrowed employee status).

[71] R. Doc. 142 at pp. 8-9 (*citing* R. Doc. 142-2 at p. 34); R. Doc. 149 at pp. 4-5

[72] R. Doc. 142-2 at p. 20; R. Doc. 142-3 at p. 99; R. Doc. 142-6 at pp. 27-28.

The third factor considers whether there was an agreement, understanding, or meeting of the minds between the original and the borrowing employer. The parties seem to agree that there was an agreement between Victory and Westgate and JPSO's special detail coordinator to have JPSO deputies provide security detail.[73] While Victory and Westgate discount this factor because the agreement did not include the words "borrow" or "loan,"[74] Victory and Westgate ignore clear authority, including the case they cite in support of their position, stating that it is the parties' actions, rather than the language of the agreement, that determines whether someone is a borrowed employee.[75] Nevertheless, there is no evidence before the Court that there was an agreement between JPSO and Victory and Westgate that Deputy Pitfield would become Victory and Westgate's employee. This factor therefore weighs against a borrowed employee relationship.

Turning to the fourth factor, whether the employee acquiesced in the new work situation, the Fifth Circuit has clarified that the question is not whether the individual agreed to become a borrowed employee, but whether he was aware of his work conditions and chose to continue working in them.[76] Plaintiffs assert that this factor weighs in favor of a borrowed employee relationship because Deputy Pitfield

---

[73] R. Doc. 142 at p. 9 (*citing* R. Doc. 142-2 at pp. 17-18 & 36); R. Doc. 149 at p. 5.

[74] R. Doc. 149 at p. 5 (citing *Musa v. Litton-Avondale Industries, Inc.*, 10-627 (La. App. 5 Cir. 3/29/11), 63 So.3d 243, 248).

[75] *Musa*, 63 So.3d at 247-47 (citing *Brown v. Union Oil Co. of Cal.*, 984 F.2d 674, 678 (5th Cir. 1993)) ("[T]hat court concluded that that type of provision did not automatically prevent borrowed-employee status from arising. Instead, the parties' actions in executing the contract could impliedly modify or waive the express provision.") (internal citations omitted).

[76] *Garner v. Pontchartrain Partners, LLC*, Case No. 22-30420, 2023 WL 1873089 (5th Cir. Feb. 9, 2023) (quoting *Mays v. Director, Office of Workers' Compensation Programs*, 938 F.3d 637, 645 (5th Cir. 2019)) (internal quotation marks omitted).

chose to do security detail.[77]  Victory and Westgate assert that this fact is irrelevant because it is "relevant more to Workers' Compensation cases."[78]  Based upon the undisputed evidence presented by Plaintiffs, the Court finds that Deputy Pitfield was aware of his working conditions at Victory and Westgate and voluntarily continued to work security detail for them.[79]  As such, this factor supports a borrowed employee relationship.

The fifth factor asks whether the original employer terminated his relationship with the employee.  Plaintiffs assert that Deputy Pitfield remained a reserve deputy for JPSO when he worked security detail for Victory and Westgate, and that Victory and Westgate simply borrowed him from JPSO to have a uniformed officer provide security and police presence on the property.[80]  Victory and Westgate concede that JPSO did not terminate its contract with Deputy Pitfield, but argue that this factor should weigh against vicarious liability on their part because "if Defendant Pitfield remained a reserve deputy for JPSO rather than terminating that relationship, it is *less* likely that Moving Defendants should assume vicarious liability for his actions."[81]

The Fifth Circuit has held that, "This factor does not require a lending employer to sever completely its relationship with the employee, because such a requirement would effectively eliminate the 'borrowed employee' doctrine."[82]  Victory

---

[77] R. Doc. 142 at p. 9 (*citing* R. Doc. 142-3 at pp. 27 & 35).

[78] R. Doc. 149 at p. 5.

[79] *See, Mays*, 938 F.3d at 645 (citing *Fontenot v. Mobil Oil Expl. & Producing Se., Inc.*, 997 F.2d 881 (5th Cir. 1993) ("[T]his court considers [a worker's] acceptance of a job that regularly sent him to temporary work places as acquiescence to each of those employment situations."))

[80] R. Doc. 142 at p. 9 (*citing* R. Doc. 142-3 at p. 24).

[81] R. Doc. 149 at p. 5 (emphasis in original).

[82] *Melancon v. Amoco Production Co.*, 834 F.2d 1238, 1246 (5th Cir. 1988) (citing *Capps v. N.L. Baroid-NL Industries*, 784 F.2d 615, 617-18 (5th Cir. 1986)).

and Westgate make this argument in their Reply brief.  Instead, "The emphasis when considering this factor should focus on the lending employer's relationship with the employee while the borrowing occurs."[83]  The undisputed evidence before the Court shows that JPSO did not terminate its relationship with Deputy Pitfield when he performed security detail for Victory and Westgate.  As to the relationship between JPSO and Deputy Pitfield while he was performing security detail for Victory and Westgate, Deputy Canatella testified that he selected the JPSO officers who worked security detail for Victory and Westgate[84] and that JPSO's Public Assignment Policy applied to that security detail.[85]  Deputy Pitfield likewise testified that he was required to follow JPSO's policies and procedures regarding public assignments while performing security detail,[86] but that JPSO did not impose any additional training requirements for him to perform security detail.[87]  Deputy Canatella further testified that he sometimes went to the shopping center with a sign-in sheet to ensure that officers, including Deputy Pitfield, showed up for their security detail.[88]  The evidence before the Court indicates that JPSO maintained its relationship with Deputy Pitfield and exercised nominal control over him while he worked security detail for Victory and Westgate.  As such, this factor weighs in favor of a borrowed employee relationship.

---

[83] *Melancon*, 834 F.2d at 1246 (quoting *Capps*, 784 F.2d at 617-18) (internal quotation marks omitted).
[84] R. Doc. 142-6 at pp. 10 & 13-17.
[85] *Id*. at pp. 10-11.
[86] R. Doc. 142-3 at pp. 36-37.
[87] *Id*. at p. 32.
[88] R. Doc. 142-6 at p. 40.

The sixth factor, who furnished tools and the place for performance, is mixed. Plaintiffs have presented evidence that Victory and Westgate determined the location of the security detail and provided their security detail officers a cell phone,[89] but Plaintiffs concede that JPSO provided the officers' uniform, gun and vehicle.[90]  As such, the Court finds that this factor weighs against a borrowed employee relationship.

The seventh factor asks whether the new employment was over a considerable length of time.   Plaintiffs argue that this factor weighs in favor of a borrowed employee relationship because Deputy Pitfield worked security detail for Victory and Westgate for approximately four years.[91]  Victory and Westgate argue that this factor is irrelevant because workers' compensation is not at issue.[92]  While the Fifth Circuit has recognized that "scattershot findings abound" regarding what length of time suffices for borrowed employee status,[93] the Fifth Circuit has also held that seven years was a considerable amount of time[94] and that a year-and-a-half weighed in favor of finding borrowed employee status.[95]  The Court therefore finds that Deputy Pitfield's approximately four years of working security detail constitutes a considerable length of time, and that the seventh factor weighs in favor of borrowed employee status.

---

[89] R. Doc. 142-2 at pp. 25-26; R. Doc. 142-6 at pp. 25-26; R> Doc. 142-3 at pp. 96-97.
[90] R. Doc. 138-4 at pp. 7-8; R. Doc. 142-2 at pp. 43-44; R. Doc. 142-6 at pp. 20-21.
[91] R. Doc. 142 at pp. 9-10 (*citing* R. Doc. 142-3 at pp. 100-101).
[92] R. Doc. 149 at p. 6
[93] *Mays v. Director, Office of Workers' Compensation Programs*, 938 F.3d 637, 646 (5th Cir. 2019).
[94] *Melancon v. Amoco Production Co.,* 834 F.2d 1238, 1246 (5th Cir. 1988).
[95] *U.S. Fire Ins. Co. v. Miller*, 381 F.3d 385, 390 (5th Cir. 2004).

Turning to the eighth factor, who had the right to discharge the employee, the undisputed evidence before the Court shows that Victory and Westgate had the right to terminate Deputy Pitfield's security detail.[96]  Victory and Westgate concede that they had the right to discharge Deputy Pitfield from their security detail, but claim that, "This factor is not determinative."[97]  While Victory and Westgate are correct that this factor is determinative, the Court finds that it weighs in favor of a borrowed employee relationship.

The ninth and final factor, who has the obligation to pay the employee, likewise weighs in favor of finding a borrowed employee relationship.   Plaintiffs have presented evidence that Deputy Pitfield was paid by Victory and Westgate directly via check.[98]  Victory and Westgate concede that they paid Deputy Pitfield's wages for security detail, but contend that this factor is not determinative of borrowed employee status.[99]  Again, while not determinative, the Court finds that this factor weighs in favor of a borrowed employee relationship.

In sum, the Court finds that six factors weigh in favor of a borrowed employee relationship, two factors weigh against a borrowed employee relationship, and one factor—and  arguably the most important one—is neutral.  The Court therefore agrees with Plaintiffs that a reasonable jury could conclude that Deputy Pitfield was the borrowed employee of Victory and Westgate.  As such, Victory and Westgate have

---

[96] R. Doc. 142-2 at pp. 32-33; R. Doc. 142-3 at p. 100.
[97] R. Doc. 149 at p. 6 (citing *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 313 n.7 (5th Cir. 1969)).
[98] R. Doc. 142 at p. 10 (*citing* R. Doc. 142-3 at p. 38).  *See*, R. Doc. 142-6 at p. 19 (when asked how he got paid for his work at Victory and Westgate, Deputy Canatella testified that, "I fill out the time sheets, the payroll sheets, and I submit them to pay - - submit them to Victory, and Victory sends us a check.").
[99] R. Doc. 149 at pp. 6-7.

failed to carry their burden of proving that they are entitled to judgment as a matter of law on the basis that Deputy Pitfield is not a borrowed employee, and their Motion is denied as to that request.

### C. Victory and Westgate are not entitled to summary judgment on the basis that Deputy Pitfield's actions did not cause E.P.'s death.

Victory and Westgate further assert, in the alternative, that if Deputy Pitfield is deemed their employee, summary judgment is warranted because the undisputed evidence shows that Deputy Pitfield did not cause E.P.'s injuries.[100]  Relying upon Plaintiffs' own testimony, Victory and Westgate claim it is undisputed that when Deputy Pitfield's involvement in the underlying incident ceased, he did not have E.P. in a chokehold and E.P. was calm and "thus unharmed."[101]  Plaintiffs argue that whether Deputy Pitfield's restraint of E.P. caused E.P.'s injuries "is very much disputed, considering that the Jefferson Parish Coroner's Office found that prone positioning was a 'contributing cause' of E.P.'s death."[102]  Plaintiffs assert that Victory and Westgate cite no authority for the premise that someone who is calm must necessarily be unharmed, and point out that in their Answer, Victory and Westgate denied that E.P. was calm when Deputy Pitfield was on top of him.[103] Plaintiffs further assert that the 308-pound Deputy Pitfield placed E.P. facedown, in a prone position, and sat on top of him,[104] and Dr. Dana Troxclair of the Jefferson

---

[100] R. Doc. 138 at p. 1; R. Doc. 138-2 at pp. 1 & 11-12.

[101] R. Doc. 138-2 at pp. 11-12 & 13 (*citing* R. Doc. 138-6 at pp. 2 & 3; R. Doc. 138-7 at p. 2; R. Doc. 138-5 at pp. 10-11).

[102] R. Doc. 142 at p. 2 (*citing* R. Doc. 142-4 at p. 2).

[103] R. Doc. 142 at p. 11 (*citing* R. Doc. 1 at ¶ 168; R. Doc. 10 at p. 3).

[104] R. Doc. 142 at pp. 11-12 (*citing* R. Doc. 1 at ¶ 76).

Parish Coroner's Office testified during a deposition that E.P. "most likely" would not have died if the JPSO officers had not placed him in the prone position.[105]  Plaintiffs also assert that their expert, Dr. Kris Sperry, will testify at trial that E.P. showed evidence of oxygen deficiency while Deputy Pitfield was on top of him,[106] and that their expert Jeff Noble will opine that E.P.'s movements while Deputy Pitfield was on him were "likely being done to help the subject to breathe."[107]

In response, Victory and Westgate argue that Plaintiffs failed to submit evidence to dispute their own evidence that E.P. was unharmed at the time that Deputy Pitfield ceased his involvement in the restraint of E.P.[108]  Victory and Westgate contend that Plaintiffs' evidence only addresses the actions of the JPSO officers as a group without isolating the result of Deputy Pitfield's conduct.[109]  Thus, Victory and Westgate argue that their evidence, which isolates the result of Deputy Pitfield's actions, is undisputed.[110]

The Court finds that Plaintiffs have submitted evidence to show that genuine issues of material fact exist regarding whether Deputy Pitfield's actions caused E.P.'s injuries, including his death.  Victory and Westgate do not dispute Plaintiffs' allegation that Deputy Pitfield placed E.P. in a prone position and sat on top of him,[111] and Plaintiffs have provided evidence showing that prone positioning was a

---

[105] R. Doc. 142 at p. 12 (*quoting* R. Doc. 142-9 at pp. 58 & 64-65).
[106] R. Doc. 142 at p. 12 (*citing* R. Doc. 142-7).
[107] R. Doc. 142 at p. 12 (*quoting* R. Doc. 142-8 at ¶ 61).
[108] R. Doc. 149 at p. 9.
[109] *Id.* (*citing* R. Doc. 142 at p. 12).
[110] R. Doc. 149 at p. 9.
[111] R. Doc. 142 at pp. 11-12 (*citing* R. Doc. 1 at ¶ 76).

contributing factor to E.P.'s death.[112]  Plaintiffs have also provided evidence that Dr. Troxclair, who performed E.P.'s autopsy, [113] testified during a deposition that E.P. "most likely" would not have died if the JPSO officers had "not had him in the prone position."[114]  The Court finds that this evidence is sufficient to raise a genuine dispute regarding the cause of E.P.'s death.  As such, Victory and Westgate have failed to carry their burden of proving that they are entitled to judgment as a matter of law on the basis that Deputy Pitfield's actions did not cause E.P.'s injuries.

## IV.   CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Defendants Victory Real Estate Investments LA, LLC's and Westgate Investors NO, LLC's d/b/a Westgate Shopping Center Motion for Summary Judgment[115] is **GRANTED in part and DENIED in part.**  The Motion is **GRANTED** to the extent that Victory and Westgate seek summary judgment on Plaintiffs' claim that they are liable for their direct negligence, and that claim is **DISMISSED with prejudice.**  The Motion is otherwise **DENIED.**

New Orleans, Louisiana, May 19, 2023.

_Wendy B Vitter_
_____
**WENDY B. VITTER**
**United States District Judge**

---

[112] R. Doc. 142-4 at p. 2; R. Doc. 142-9 at p. 57.
[113] R. Doc. 142-9 at pp. 23-26.
[114] *Id.* at pp. 58 64-65.
[115] R. Doc. 138.