**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| DONNA LOU and DAREN PARSA, on their own behalf and on behalf of their deceased minor child, E.P. | ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| SHERIFF JOSEPH P. LOPINTO, III, CHAD PITFIELD, RYAN VAUGHT, STEVEN MEHRTENS, SHANNON GUIDRY, NICK VEGA, MANUEL ESTRADA, MYRON GAUDET, JOHN DOES 1-3, VICTORY REAL ESTATE INVESTMENTS LA, LLC and WESTGATE INVESTORS NO LLC D/B/A WESTGATE SHOPPING CENTER, ABC INSURANCE COMPANY, and XYZ INSURANCE COMPANY, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

CIVIL ACTION NO. 21-80

SECTION: "D" (2)

Judge Wendy B. Vitter

Magistrate Judge Donna P. Currault

**FIRST AMENDED COMPLAINT**

COME NOW the Plaintiffs, by and though the undersigned counsel and for cause of action against the Defendants, both jointly and severally, would respectfully state as follows:

## I.    INTRODUCTION

1.      This case involves the tragic death of a 16-year-old severely autistic child, (E.P.), while in the custody and care of deputies with the Jefferson Parish Sheriff's Office (JPSO) in the parking lot of the Westgate Shopping Center in Metairie, La. on January 19, 2020.

2.      E.P. was the only child of Donna Lou and Daren Parsa, both of whom were present when he died before their eyes. He was held down in a prone position, on his stomach, handcuffed, shackled, arms and legs held down, head, shoulder and neck encircled by the arm of a deputy, with JPSO deputies applying their own body weight as a restraint, while he was suffering from an acute

sensory episode or "outburst" related to and caused by his severe autism.

3.      The JPSO deputies knew that E.P. was obese. They knew that he was autistic and a "special needs child."  They knew he had been involved in recent physical exertion. They knew E.P. was in a crisis situation and that the family needed help. They knew he was unarmed.  Yet they persisted in dangerously and forcefully restraining E.P. without appropriately monitoring his condition, until they killed him.

4.      The danger of a serious risk of death related to the use of restraints and physical pressure applied to an overweight/obese person in a prone position, especially following a period of physical exertion, has been known for decades by law enforcement agencies across the U.S., including the various Sheriffs, Command Staff, trainers and deputies of JPSO, as well as the Courts, including those in the Fifth Circuit U.S. Court of Appeals.

5.      The physical restraint of E.P. in JPSO custody began with a 6'3", very large, over-300-pound deputy taking E.P. to the ground, striking him and then sitting on E.P.'s back, holding him face down, for approximately seven minutes. Eventually there were a total of seven JPSO deputies involved, sitting on, handcuffing, shackling, holding down, or standing by E.P. as he was restrained and held face down on his stomach against the hard surface of the parking lot. The final application of excessive force against E.P. involved a deputy using his forearm to place a choke/neck hold around E.P.'s head, shoulder and neck, as he lay in a prone position, with a deputy on his back, and other deputies holding down his arms and legs, while he was handcuffed and in leg shackles.

6.      In addition to the obvious and well-established danger of prone, pressurized restraint involving persons who are obese/overweight following physical exertion, there is also a well-known, heightened risk of subjecting a person with autism to prone restraint especially with physical pressure/force applied, due to hypotonia (low muscle tone) and compromised or non-

existent verbal communication and processing issues, as well as other conditions which are commonly associated with persons with severe Autism Spectrum Disorders (ASD), including E.P.

7.      **9 minutes and 6 seconds**. This is how long this extremely dangerous, life-threatening and forceful prone restraint, involving the use of the deputies' body weight and holds, mechanical restraints, choke/neck hold, following a period of physical exertion, was applied to an unarmed, obese 16-year-old severely autistic child in the midst of a sensory outburst or meltdown.

8.      During that 9 minutes and 6 seconds, there were several clear and distinct opportunities, when E.P. was secured, was calm, was not actively resisting, when the JPSO deputies failed to de-escalate, failed to appropriately reduce the use of force against E.P., and failed to intervene to prevent the use of excessive force by other deputies.

9.      Once E.P. was handcuffed, they did not roll him onto his side. They did not sit him up or stand him up. They did not secure him in a vehicle.  They did not continuously monitor him. Instead, they continued to hold him face down, on his belly, while applying unreasonable and excessive force, resulting in his death. It wasn't until his body had gone limp and he had urinated on himself that the deputies rolled him into "recovery position."  By then it was too late.

10.      And throughout this whole ordeal, up until the moment he died, the only word E.P. said, and indeed his final word spoken in life, was "Firetruck."

11.      The parents of E.P. have filed this lawsuit to seek justice and accountability for the death of their only child. They also seek to ensure that no other severely autistic, overweight/obese child who is experiencing a sensory overload crisis or outburst caused by and related to his or her disability, or his or her parents and loved ones, experiences such a terrible and completely preventable loss of life while in the custody and care of law enforcement officers as happened here.

## II.      JURISDICTION AND VENUE

12.     This action is brought pursuant to 42 USC 1983, 1988, Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131, 12132 and Section 504 of the Rehabilitation Act (29 U.S.C. § 794), the First, Fourth, Ninth and Fourteenth Amendments to the U.S. Constitution. This Court has original jurisdiction over Plaintiffs' claims of federal civil and constitutional rights violations pursuant to 28 U.S.C. §§ 1331, 1343(a)(3). This Court has supplemental jurisdiction over Plaintiffs' claims arising under the State of Louisiana constitution and laws.

13.     Venue is proper in the Eastern District of Louisiana under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to these claims occurred in Jefferson Parish, Louisiana, situated in the Eastern District of Louisiana.

### III.      PARTY PLAINTIFFS

14.     Plaintiff **Donna Lou** is the mother of decedent E.P. and is of suitable age and capacity to file this suit. At all relevant times during this suit, Plaintiff was a resident of St. Charles Parish in the Eastern District of Louisiana. She is a proper plaintiff for survival and wrongful death actions, as E.P. died leaving no spouse or children to survive him.

15.     Plaintiff **Daren Parsa** is the father of decedent E.P., and is of suitable age and capacity to file this suit. At all relevant times during this suit, Plaintiff was a resident of St. Charles Parish in the Eastern District of Louisiana. He is a proper plaintiff for survival and wrongful death actions, as E.P. died leaving no spouse or children to survive him.

### IV.      PARTY DEFENDANTS

16.     Defendant **Sheriff Joseph P. Lopinto, III** is a person of suitable age and capacity and is an adult resident of the Eastern District of Louisiana. At all relevant times herein, he is the duly elected Sheriff for the Parish of Jefferson, State of Louisiana and is the chief law enforcement

4

officer for the Parish of Jefferson. He is the head of the Jefferson Parish Sheriff's Office ("JPSO") and as Sheriff is the final policymaker.  Defendant Lopinto is responsible for the staffing, supervision, administration, policies, practices, procedures, and customs of the JPSO. He is responsible for the hiring, training, supervision, discipline, and control of the JPSO staff, supervisors, and deputies. He is the employer of the JPSO deputies involved as defendants in this lawsuit and is liable both directly and vicariously for the actions of said deputies complained of herein.[1] He is also responsible for the policies, procedures, training, assignments, supervision and discipline of JPSO deputies who are authorized and assigned to work "off-duty" details on "public assignment" and is accountable for their actions. He is sued in his individual and official capacities. In his official capacity he is a public entity organized in the State of Louisiana and providing services in Jefferson Parish, Louisiana

17.    Defendant **Chad Pitfield** is a person of suitable age and capacity and an adult resident, on information and belief, of the Eastern District of Louisiana. At all relevant times herein, he was a deputy of the JPSO on "special detail" or "public assignment" at the Westgate Shopping Center who participated in the incident that resulted in the death of E.P. He is being sued in his individual and official capacities.

18.    Defendant **Ryan Vaught** is a person of suitable age and capacity and an adult resident, on information and belief, of the Eastern District of Louisiana. At all relevant times herein, he was a deputy of the JPSO who participated in the incident that resulted in the death of E.P. He is being sued in his individual and official capacities.

19.    Defendant **Steven Mehrtens** is a person of suitable age and capacity and an adult resident, on information and belief, of the Eastern District of Louisiana. At all relevant times

---

[1] When the terms "actions" or "acts" are used herein, it is intended to also include the failure to act, *i.e.*, omissions.

herein, he was a deputy of the JPSO who participated in the incident that resulted in the death of E.P. He is being sued in his individual and official capacities.

20.     Defendant **Shannon Guidry** is a person of suitable age and capacity and an adult resident, on information and belief, of the Eastern District of Louisiana. At all relevant times herein, she was a deputy of the JPSO who participated in the incident that resulted in the death of E.P.  She is being sued in her individual and official capacities.

21.     Defendant **Nick Vega** is a person of suitable age and capacity and an adult resident, on information and belief, of the Eastern District of Louisiana. At all relevant times herein, he was a deputy of the JPSO who participated in the incident that resulted in the death of E.P. He is being sued in his individual and official capacities.

22.     Defendant **Manuel Estrada** is a person of suitable age and capacity and an adult resident, on information and belief, of the Eastern District of Louisiana. At all relevant times herein, he was a deputy of the JPSO who participated in the incident that resulted in the death of E.P. He is being sued in his individual and official capacities.

23.     Defendant **Myron Gaudet** is a person of suitable age and capacity and an adult resident, on information and belief, of the Eastern District of Louisiana. At all relevant times herein, he was a deputy of the JPSO who participated in the incident that resulted in the death of E.P. He is being sued in his individual and official capacities.

24.     Defendants **Pitfield, Vaught, Mehrtens, Vega, Guidry, Estrada and Gaudet** are collectively described as the "**JPSO Deputy Defendants.**"

25.     Defendants **John Doe 1**, **John Doe 2**, and **John Doe 3** (Collectively described as "**JPSO John Doe Deputy Defendants**"), on information and belief are persons of suitable age and capacity and adult residents of the Eastern District of Louisiana. At all relevant times herein, they were deputies of the JPSO who were present at the scene of the incident that resulted in the

death of E.P.  Does 1 and 2 are the JPSO deputies who told Donna Lou and Daren Parsa they could not leave the scene and go to the hospital where their son was. The identity of Does 1 and 2 may be the same as two of the other JPSO Deputy Defendants. Doe 3 is the ranking officer who told E.P.'s psychologist that the parents could not leave the scene. Does 1-3 are being sued in their individual and official capacities

26.     Defendant **ABC Insurance Company** is a yet-unidentified insurance company which, on information and belief, provides coverage for Sheriff Lopinto and the JPSO Deputy Defendants for damages incurred by the plaintiffs in excess of the amount of coverage provided by the Louisiana Sheriffs' Association self-insurance fund and is named as a defendant in this action pursuant to the Louisiana Direct Action Statute which was in effect at the time of this incident. La. R.S. 22:1269.

**27.**     Defendants **Victory Real Estate Investments LA, LLC** and **Westgate Investors NO, LLC** together d/b/a Westgate Shopping Center, aka Victory Real Estate Investments, LLC, aka Victory Real Estate Investments LLC, ("Victory" or "Westgate Shopping Center") are Columbus, Georgia-based and privately-held commercial real estate investment companies. They do business in Louisiana with charter numbers of 41678177K and 41494223Q. At all times relevant herein, Defendant Pitfield was working "special detail" on behalf of Victory and on "public assignment" on the premises of the Westgate Shopping Center. Therefore, Victory was the special employer of Defendant Pitfield, and Defendant Pitfield was the borrowed employee of Victory. On information and belief, Victory exercised supervision over Pitfield, had the obligation to pay Pitfield, furnished the place of performance of the work, and had the authority to fire Pitfield from the special employment position. Defendant Victory is directly liable for its own corporate negligence as well as for the acts and omissions of its servants, employees, borrowed employees, contractors and agents, including Pitfield, by virtue of the doctrines of agency, apparent agency,

implied agency, employer/employee relations, master-servant relations, loaned servant relations, joint-venture, joint and several liability, *respondeat superior*, vicarious liability and contract.

28.     The Defendant **XYZ Insurance company** is a yet-un-identified insurance company which provided insurance coverage for Victory and Deputy Pitfield, in his capacity as working a "special detail" on "public assignment" on the premises of the Westgate Shopping Center at all relevant times herein and is responsible for payment of damages and is a defendant in this action pursuant to the Louisiana Direct Action Statute which was in effect at the time of this incident.

## V. STATEMENT OF FACTS

### A.  The Defendant JPSO Deputies Used Unreasonable and Excessive Force and Physical Restraint Against E.P. Which Resulted in His Death[2]

29.     On January 19, 2020, 16-year-old E. P. accompanied his parents on a recreational outing at the Laser Tag located in the Westgate Shopping Center in Metairie, La.  This was a regular event for this family of three, who were welcomed by and had enjoyed similar occasions at this family entertainment center many times before, for about six (6) years.

30.     E.P. is the only child of Donna Lou and Daren Parsa.

31.     E.P. had Severe Autistic Spectrum Disorder (ASD), a life-long condition which impacted all of his activities of daily life and for which there is no cure.

32.     While at Laser Tag, E.P. and his father played games, as they had often done before. When they got ready to leave, the family walked outside in the parking lot, headed to their car.

33.     While they were in the parking lot, E.P. began to experience a sudden sensory outburst or "melt-down" caused by and related to his severe autism.

34.     A sensory overload or outburst or "melt-down" for a person with severe autism like

---

[2] All of the JPSO and John Doe Deputy Defendants in this lawsuit are deputies with the JPSO. The use of the term "deputies" is intended to be all-inclusive regardless of the rank or detective status of any individual.

E.P. is a crisis event which involves the involuntary, neurological flooding of the brain circuitry, described sometimes as like a "storm" in the brain, causing behaviors, in E.P.'s instance, which can manifest themselves in self-injurious and/or aggressive behaviors towards others. While not technically a "seizure," it is similar to a seizure in that it is not volitional or intentional but is caused by and related to his severe autism.

35. E.P. began to slap himself in the head, a behavior which is a common physical trait for many persons on the Severe Autistic Spectrum Disorder and is a readily observable manifestation of the person's disability and anxiety.

36. Along with other repetitive motions, this repetitive head slapping is sometimes referred to as type of "stimming" and can be an attempt by the person with autism to calm themselves when confronted with frustration, anxiety and/or inability to communicate. It can also be used by the individual as a self-calming or self-soothing technique to try to avert or mitigate the severity of an outburst or as self-injurious behavior. It is a visible sign that the person may be experiencing or is about to experience an outburst.

37. On January 19, 2020, in the Westgate Shopping Center parking lot, E.P., who was non-verbal, began slapping at himself and slapping and grabbing at his father as part of his meltdown caused by his autism.

38. The physical encounter between E.P. and his father lasted about 5 minutes.

39. Due to his disability and impaired motor skills, instead of making a fist E.P. would flap his hands and arms in a kind of flailing motion resulting in open-handed slapping.

40. When he was having an outburst, E.P. would also sometimes bite, which can be a common behavior of a person with severe autism who is in crisis. During this outburst, E.P. bit his father, who was bleeding.

41. The manager at the Laser Tag, who was familiar with the family from their frequent

visits, asked Donna Lou, E.P.'s mother, whether she wanted her to call the police on the family's behalf for assistance. The parents responded affirmatively.

42.     The shopping center where Laser Tag is located, Westgate Shopping Center, is owned and operated by Victory.

43.     On information and belief, Victory d/b/a Westgate Shopping Center hired, authorized and/or provided security officers for its tenants, customers and visitors.

44.     On Jan. 19, 2020, Westgate Shopping Center's security included JPSO Deputy Chad Pitfield.

45.     Westgate Shopping Center provided a phone number to its tenants by which they could summon the security chosen and hired by Westgate Shopping Center.

46.     Pitfield was a JPSO Reserve Deputy, assigned to Crime Scene for the Sheriff's office and working "off-duty" / "public assignment" on the premises of the Westgate Shopping Center.

47.     Deputy Pitfield received the call from the Laser Tag manager, who called him on the phone number provided to tenants at the Westgate Shopping Center, at the request of E.P.'s parents.

48.     The Laser Tag manager informed Pitfield that "there's a man with his autistic child, um, it's an autistic adult child. They're outside. They're in a confrontation. It's getting pretty serious, can you please come over here."[3]

49.     She also informed Pitfield that the Dad and son were struggling by the car and Mom was inside.

50.     Pitfield described the Laser Tag manager on the call speaking "calmly", and that it

---

[3] Transcribed Audio Tape Statement of Heather Hilton, JPSO, p. 10, Jan. 19,2020. The supplemental report prepared by JPSO investigators includes transcribed audio taped statements from deputies as well as witnesses to this incident, which are referenced herein.

was a "little longer conversation than I would have assumed, but it was just simply…hey, we have a, a family that comes here all the time. Uh, the child is special needs. Uh, him and dad are arguing and fighting in the front of the, in the front and we're gonna need you to come over here."[4]

51.    Prior to arriving on the scene, Pitfield understood that the person he was *en route* to handle was a person with autism or special needs.

52.    Prior to arriving on the scene, Pitfield understood that the person he was *en route* to handle was a person with a disability.

53.    Prior to arriving on the scene, Pitfield regarded the person that he was *en route* to handle was a person with a disability.

54.    Once on the scene, Pitfield understood that E.P. was a person with a disability.

55.    Once on the scene, Pitfield regarded E.P. as a person with a disability.

56.    When Deputy Pitfield arrived, at 1:28:25 p.m.,[5] the physical encounter between E.P. and his father had ended.  E.P. was standing by the open door to the back seat of the family car, and his father was standing near him.

57.    Deputy Pitfield responded to the call driving a JPSO car with lights activated, wearing a JPSO cap and a JPSO uniform with identification signifying that he was a JPSO Deputy.

58.    He left the lights on his vehicle activated after he stepped out of the vehicle.

59.    Pitfield used his JPSO radio to contact other JPSO deputies to assist him in restraining E.P., calls to which other JPSO deputies responded.

60.    He also contacted EMS and was in communication with JPSO Dispatch.

61.    The handcuffs he used to restrain E.P. were standard equipment of JPSO for which

---

[4] Transcribed Audio Tape Statement of Chad Pitfield, JPSO, Jan. 22, 2020, p. 2 (Pitfield)
[5] The encounter between E.P. and his father, as well as the responding JPSO deputies was captured, at least in part, by videos taken by cameras at Laser Tag. These videos will be provided separately to the Court. Due to policies and practices of the defendant Sheriff Lopinto, none of the deputies were wearing body-worn cameras (BWC).

he had been trained to use by JPSO.

62.     When Pitfield arrived on the scene, he was acting in his capacity as a deputy sheriff in the course and scope of his employment and under color of law.

63.     When Pitfield arrived on the scene, he was also acting as an agent, servant, and borrowed employee of Victory d/b/a Westgate Shopping Center, in the course and scope of his employment.

64.     At 1:28:31, Deputy Pitfield exited his car and approached E.P.'s father.

65.      An audio and video recording taken by a bystander of that moment and aired on local television shows E.P.'s father telling Pitfield "he has autism."[6]

66.     According to Pitfield's statement to JPSO investigating deputies, "I know something, something else is going on with this child and this is clearly, this is clearly the special needs child that they had told me, uh, about."[7]

67.     At 1:28:37, E.P. left the family car and is seen on the video flailing his arms and slapping himself on the head. After slapping himself in the head, E.P. began flailing and slapping at his father.

68.     As Deputy Pitfield turned away, E.P. began slapping at Pitfield. Pitfield responded by taking E.P. to the ground,[8] or as Pitfield described it "escorting" him down "to a prone position".[9]

69.     According to Pitfield, it did not take "that much effort."[10]

70.     Deputy Pitfield then stated that E.P. bit his leg.

71.     At 1:28:54 Pitfield responded by hitting E.P. with a "single strike…towards the

---

[6] "Video shows attack before 16-year-old died in JPSO custody," WWLTV.
[7] Pitfield, p. 26.
[8] Video 1 at 8:51.
[9] Pitfield, p. 7.
[10] Pitfield, p. 17.

head area."[11]

72.    According to Pitfield, he realized he needed more than a single pair of handcuffs due to E.P.'s size and retreated to his car to get a second pair of cuffs, while E.P.'s father held E.P.

73.    According to Pitfield he placed one handcuff on E.P. and then "mount[ed] him from the back." [12]

74.    According to Pitfield, he then sat on E.P.'s hips, "on his butt."[13]

75.    The video shows Pitfield sitting on E.P.'s backt,[14] as E.P. was laying on his stomach.

76.    Pitfield remained seated on E.P.'s back, with E.P. in a prone position, face down on the hard surface of the parking lot, for approximately seven minutes, from 1:29:15 p.m. to approximately 1:36:02 p.m.

77.    In the Laser Tag video Deputy Pitfield presents as a very large, seriously overweight adult male.

78.    When he applied for employment with JPSO on July 24, 2007, he stated that he was 6'3' tall and weighed 365 pounds.[15]

79.    As Pitfield sat on E.P.'s back, E.P.'s mother sat down next to E.P. and stroked

---

[11] Pitfield, p. 7. See also Video 1 at 8:54
[12] Pitfield, p. 10.
[13] Pitfield, p. 10.
[14] Video 1, at 8:54. The JPSO supplemental report, prepared by JPSO Detectives doing the follow-up investigation of the incident included statements from the deputies who made self-serving and false statements regarding the amount of force and pressure used on E.P., the deputies' positioning on E.P.'s back and the hold on his neck, and monitoring of E.P., to try and minimize responsibility for their use of excessive force on E.P. which resulted in his death. These false and misleading statements nevertheless reveal that the deputies were well aware of the serious danger of the application of pressure on the back and neck of an individual in E.P.'s condition and situation and were attempting to create a false narrative to cover-up their misconduct.
[15] In the JPSO supplemental report in a case involving the death of an obese minor during prone restraint, which included the deputies' body weight, none of the deputies were asked their height or weight or were measured or weighed, though the investigating detectives could clearly see that Pitfield, in particular, was very large and overweight and had sat on E.P.'s back for an extended period of time.

E.P.'s hand, telling him that he should calm down because everything was going to be okay. Apparently E.P. heard a siren as he said "fire truck."

80.     E.P.'s mother, Donna Lou, placed some clothing under E.P.'s head to cushion and protect his head as he has been known to bang his head during an outburst.

81.     According to Defendant Pitfield, the intervention by E.P.'s mother was "calming him down."[16]

82.     By 1:32:16, Deputy Pitfield, using his JPSO radio, called in that he was dealing with a "mental patient," and other responding deputies were advised that it was a mental health situation.

83.     At 1:34:20, JPSO Detective Ryan Vaught arrived, in plainclothes, in response to Pitfield's radio calls and JPSO Dispatch.

84.     Vaught stated that he was responding to a call for "an officer asking for assistance…Um, he was uh, struggling um, with a subject. Um I believe the comment he used that uh, that someone was having a 'mental episode.'"[17]

85.     Vaught "activated [his] lights and sirens" and responded to the call. [18]

86.     When he walked up to Deputy Pitfield, Pitfield told Vaught "that the kid has or the individual that he's trying to arrest is um, special needs. Um." [19]

87.     Prior to arriving on the scene, Vaught understood that the person he was *en route* to handle was a person with autism or special needs.

88.     Prior to arriving on the scene, Vaught understood that the person he was *en route* to handle was a person with a disability.

---

[16] Pitfield, p. 14.
[17] Transcribed Audio Tape Statement, Detective Ryan Vaught, 22 January, 2020, p. 1 (Vaught).
[18] Vaught, p.2
[19] Vaught, p. 4.

89.     Prior to arriving on the scene, Vaught regarded the person that he was *en route* to handle to as a person with a disability.

90.     Once on the scene, Vaught understood that E.P. was a person with a disability.

91.     Once on the scene, Vaught regarded E.P. as a person with a disability.

92.     Vaught assisted Pitfield in securing E.P., such that both of E.P.'s hands were cuffed behind his back using two sets of handcuffs. Detective Vaught placed a handcuff on E.P.'s left hand and attached it to the other open handcuff. [20]

93.     Once handcuffed, E.P. failed to pose any danger to the deputies or others due to the restraints and his physical and mental disabilities.

94.     Later, Vaught was asked by JPSO detectives about this moment, and he described it as follows: "*Q: You're meeting resistance? A: No, no, no, not—not—not really, no……Q: Okay. A: Um, he was, he was um, moving a little bit but he wasn't trying to resist or pull his—pull his arm away.*" [21] And "*Q: Okay and again, no measurable resistance at the point where you secure his left hand and are able to—to cuff him, cuff him to the cuffs that Deputy Pitfield has?*" *A: No, um, there—there was no active resistance from him. I was able to—to handcuff him and get them behind his back.*"[22]

95.     When Detective Vaught was asked if E.P. was talking, he replied "I hear a lot of uh, not talking, but I hear a lot of moaning, groaning, uh, none or inaudible stuff. Just a lot of grunting." [23]

96.     Donna Lou, E.P's mother, informed the deputies that when  E.P. was agitated, it was best to have fewer people as he didn't do well with a lot of people around him. This

---

[20] Vaught, p. 4.
[21] Vaught, p. 4-5. *Emphasis added*
[22] Vaught, p. 12. *Emphasis added*
[23] Vaught, p. 5.

information was ignored.

97.   At this point, Deputy Pitfield and Detective Vaught both knew that E.P. was obviously obese, with a big belly.

98.   Pitfield had been told that he was "autistic" and "special" and told Vaught that E.P was "special needs."[24]

99.   They also both knew that E.P. was essentially non-verbal as far as communication was concerned. The only word Pitfield heard E.P. say was "firetruck". The only sounds Vaught heard were unintelligible and characterized as moans and groans, inaudible sounds and grunts.

100.   Pitfield and Vaught were both aware that E.P. had been involved in some kind of physical struggle or exertion. Pitfield was sitting on the back of E.P. who was in a prone position, on his stomach, face down, handcuffed behind his back. They knew E.P. was not resisting.

101.   Proper police procedures and the clearly-established constitutional mandate that law enforcement officers only use that amount of force which is reasonable under the circumstances.

102.   Once E.P. was secured, Deputies Pitfield and Vaught, as well as the other deputies as they arrived on the scene, were required to de-escalate and reduce their use of force and weight.

103.   They should have relieved E.P. from the extremely dangerous, pressurized restraint position and put him in a "recovery position" by simply turning him on his side, sitting him up, or standing him up or securing him in a vehicle,  any of which would have removed the pressure from E.P's back, gotten him out of the prone position, off his belly, and would have avoided the known, obvious and deadly risks of compressional/positional asphyxia and in-custody death which were clearly involved in this situation.

104.   Instead, Deputy Pitfield continued to sit on E.P.'s back using his own substantial

---

[24] Vaught, p. 4-5.

body weight to maintain pressure to hold E.P. in a face-down prone position after he was secured.

105.    Vaught says he stayed in the "immediate area" … "just to ensure that he doesn't start to act out and try to get up and run away or do anything that can be harmful to himself or others."[25]

106.    Despite his close proximity and observation of the situation and having the opportunity to do so, Detective Vaught failed to intervene or do anything to de-escalate or mitigate the situation or intervene to prevent the potentially life-threatening danger involved in the on-going restraint and use of force against E.P., or to constantly monitor his situation.

107.    Detective Stephen Mehrtens arrived at 1:34:20 p.m.

108.    He arrived with his vehicle's lights on, and left them on and flashing as he exited the vehicle.

109.    When he arrived, he described E.P.'s position as "Uh, at the time I physically observed him, he was face down on the ground, he had two (2) sets of handcuffs and his hands were handcuffed behind his back with Deputy Pitfield sitting on his buttocks area. Um." [26]

110.    He stated, "*At the time I arrived there wasn't, there wasn't a struggled (sic), it didn't appear to be a struggle*…"[27]

111.    In his audio statement to investigating officers, Detective Mehrtens was asked: "So, once he's handcuffed, what occurs? A: *Once he's handcuffed, myself, personally, I didn't see a struggle so there was no need for me to engage him, you know, or the, what was transpiring with the struggle portion at the point, s*o I immediately start looking at dad…." [28]

112.    Detective Mehrtens describes in his statement that he and Detective Vaught both

---

[25] Vaught, p. 6.
[26] Mehrtens, p. 3.
[27] Transcribed statement, Detective Stephen Mehrtens, p. 3, 4 (Mehrtens). *Emphasis added*
[28] Mehrtens, p. 4.*Emphasis added*

talk with E.P.'s father "for a minute."

113.     This discussion occurred at 1:35:10 p.m.

114.     After describing that conversation, he was asked and answered the following: "Q: So where is Deputy Pitfield right now?  A: He's still with, with uh, the subject on the ground. *Q: Non struggle?  A: No struggle*." [29]

115.     Detective Mehrtens was aware that there had been a struggle before he got to the parking lot from Pitfield's radio calls requesting units on two different occasions and understood that Pitfield "was in an altercation, attempting to put somebody in cuffs, because he does say, um, you know, "I got one (1) subject I cannot get him in the, in the handcuffs." [30]

116.     Mehrtens also knew that E.P. was autistic and "special needs." Mehrtens noted that he knew about the dangers of 'excited delirium' and that he knew a person in E.P.'s situation is in danger of dying by being restrained in the prone position.  Despite this knowledge, Mehrtens did nothing to alleviate the concerns associated with being restrained in the prone position.

117.     Mehrtens knew that E.P. was handcuffed, was not resisting and was calm: "Oh yeah, from uh, from the point that I, that I arrived is when people were, I think it was the mother and the father, you know, he's special needs, he's got autism. Um, and that's also another reason why, you know, *Deputy Pitfield has got him under control, we train on this a lot, so we, we know that if he's autistic there's there are things, excited delirium, there's all, there's all kinds of stuff that can take place with somebody with any kind of mental illness or disability, so to engage him at that point just wasn't necessary, he was calm, everything was fine."* [31]

118.     However, Mehrtens did not roll E.P. over, sit him up, or monitor his breathing.

119.     Prior to arriving on the scene, Mehrtens understood that the person he was *en route*

---

[29] Mehrtens, p. 4.*Emphasis added*
[30] Mehrtens, p. 3.
[31] Mehrtens, p. 10.*Emphasis added*

to handle was a person with autism or special needs.

120.    Prior to arriving on the scene, Mehrtens understood that the person he was *en route* to handle was a person with a disability.

121.    Prior to arriving on the scene, Mehrtens regarded the person that he was *en route* to handle to as a person with a disability.

122.    Once on the scene, Mehrtens understood that E.P. was a person with a disability.

123.    Once on the scene, Mehrtens regarded E.P. as a person with a disability.

124.    Despite the fact that an obviously obese, autistic minor, after physical exertion, lay handcuffed in a prone position  on his large stomach, with a very large Deputy Pitfield sitting on his back, using his heavy body weight to hold him down, when there was no current struggle, there was no resistance, "*he was calm, everything was fine,*" Detectives Pitfield, Vaught, and Mehrtens, as well as the other responding JPSO deputies who began arriving at the scene, despite their close proximity and observation of the situation and having the opportunity to do so, did nothing to de-escalate or mitigate or intervene to prevent the potentially life-threatening danger by the continued, pressurized restraint of E.P. in the prone position.

125.    Instead, Deputy Pitfield remained sitting on E.P.'s back using his own substantial body weight to maintain pressure to hold E.P. in a face-down prone position after he was secured.

126.    When Deputy Nick Vega arrived at 1:34:42 p.m., he knew that Deputy Pitfield was requesting units and EMS.

127.    He noticed Deputy Pitfield who he described as in a "good position, he looked tired but he looked okay." [32]

128.    Vega was asked about Pitfield's control of the situation: "*Q: And it's your*

---

[32] Transcribed Audio Statement of Deputy Nick Vega, JPSO, Undated, p. 1 (JPSO Item No. A-15489-20) (Vega).

*perception that he had control. A: It appeared to be...yeah."* [33] E.P. "was fully handcuffed and there was two sets."[34]

129.   Deputy Vega spoke with Deputy Pitfield and with E.P.'s mom. "And we talking to the kid . . . To calm down, you know it's okay... it's okay." He heard E.P. saying "firetruck, firetruck" when E.P. heard a siren.[35]

130.   Vega told investigative detectives that by this time he "kind of get the picture" that E.P. has "some special needs."[36]

131.   When he was asked if anybody told him about E.P. being "special needs" he responded, "I… not directly, I overheard that he was a special needs kids, but you can…you can obviously tell because when he yells "Firetruck" you can hear the speech and…and the way he's talking and how the sirens set him off, he wasn't like, somebody else."[37]

132.   Prior to arriving on the scene, Vega understood that the child was a person with autism or special needs.

133.   Prior to arriving on the scene, Vega regarded the person that he was *en route* to handle was a person with a disability.

134.   Once on the scene, Vega understood that E.P. was a person with a disability.

135.   Once on the scene, Vega regarded E.P. as a person with a disability.

136.   Deputy Shannon Guidry arrived on the scene at 1:34:42 p.m. around the same time and coming from the same direction as Deputy Vega.

137.   She told investigating detectives that she was responding to a call of "officer needs assistance regarding two males fighting, he was trying to intervene", and that the officer had

---

[33] Vega, p. 2.*Emphasis added*
[34] Vega, p. 2-3.*Emphasis added*
[35] Vega, p. 3.
[36] Vega, p. 4.
[37] Vega, p. 4.

injuries from what she could remember… so we responded Code uh, lights and sirens."[38]

138.    She thought that she and Deputy Manuel Estrada were some of the first "uniforms" on the scene.

139.    According to Deputy Guidry, when she arrived E.P. was on his belly and handcuffed with Deputy Pitfield "straddling" him.

140.    According to Deputy Guidry, she didn't see any restriction to E.P.'s breathing upon her arrival. She also observed that "the kid was, I wouldn't say he was verbalizing anything, you couldn't make out what he saying. He was just kind of, the first thing I noticed, I asked Chad (Deputy Pitfield) ...  I said, "Is he autistic?" And Chad said, "Yes, severely". I just recognized it."[39]

141.    Deputy Guidry also reported that E.P. was saying "firetruck", something like "I don't want the firetruck. So, it was kind of incomplete sentences and a lot of mumbling."[40]

142.    Deputy Guidry observed that "*Chad (Deputy Pitfield) had him restrained and everything was fine.*"[41]

143.    Deputy Guidry thought either she or Deputy Estrada requested an ETA for EMS.[42] "At some point" Deputy Guidry says she "walked off" or was talking to Manny (Deputy Estrada).[43]

144.    Deputy Guidry was previously an EMT.[44]

145.    She knew the importance of making sure that E.P. was able to breathe while he was being restrained in a prone position, with Pitfield sitting on him.

---

[38] Transcribed Statement of Deputy Shannon Guidry, Undated, JPSO Item No. A-15489-20, p. 1 (Guidry).
[39] Guidry, p. 2.
[40] Guidry, p. 3.
[41] Guidry, p. 2.*Emphasis added*
[42] EMS had been previously contacted to provide medical attention for E.P.'s father who was bleeding from having been bitten. On information and belief, EMS was not alerted that there was a 16 year old obese non-verbal child who had experienced a sensory outburst caused by his autism who was being held down on his stomach, in a prone position with pressure by multiple deputies and mechanical restraints, for an extended period of time.
[43] Guidry, p. 2.
[44] Guidry, p. 2.

146.    Prior to arriving on the scene, Guidry understood that the person she was *en route* to handle was a person with autism or special needs.

147.    Prior to arriving on the scene, Guidry understood that the person she was *en route* to handle was a person with a disability.

148.    Prior to arriving on the scene, Guidry regarded the person that she was *en route* to handle to as a person with a disability.

149.    Once on the scene, Guidry understood that E.P. was a person with a disability.

150.    Once on the scene, Guidry regarded E.P. as a person with a disability.

151.    All of the JPSO Deputy Defendants knew the importance of making sure a person restrained in a prone position can breathe.

152.    All of the JPSO Deputy Defendants knew the importance of turning a restrained, prone person on their side once they are secured.

153.    All of the JPSO Deputy Defendants knew the importance of removing weight from the back of a restrained, prone person and rolling them on their side once they are secured.

154.    All of the JPSO Deputy Defendants knew the importance of maintaining continuous breathing observation of someone who is restrained in a prone position.

155.    However, instead of maintaining continuous breathing observation of E.P. or ensuring that someone else was doing continuous breathing monitoring, Guidry simply walked away.

156.    Guidry did not roll E.P. on his side, place him in a recovery position, or sit him up.

157.    Deputy Manuel Estrada arrived at the scene, close in time with Deputy Guidry and Deputy Vega and told investigative detectives that he was responding to a "108" call (Police Needs Assistance) from Deputy Pitfield, who he said had requested help "about two or three times on the

radio, step it up." [45]

158.    Once he arrived, Estrada claims that he "kinda just stayed back". [46]

159.    Prior to arriving on the scene, Estrada understood that the person he was *en route* to handle was a person with autism or special needs.

160.    Prior to arriving on the scene, Estrada understood that the person he was *en route* to handle was a qualified person with a disability.

161.    Prior to arriving on the scene, Estrada regarded the person that he was *en route* to handle to as a qualified person with a disability.

162.    Once on the scene, Estrada understood that E.P. was a qualified person with a disability.

163.    Once on the scene, Estrada regarded E.P. as a person with a disability.

164.    According to Pitfield, Vaught, Mehrtens, Guidry and Vega, prior to making the "switch" where Deputy Pitfield got off E.P. and Deputy Vega took his place, Deputy Pitfield had E.P. "under control."

165.    In the moments before Vega switched places with Pitfield, E.P. was "fully handcuffed" and secured.

166.    In the moments before Vega switched places with Pitfield, there was no struggle.

167.    In the moments before Vega switched places with Pitfield, E.P. was offering no active resistance and was subdued.

168.    In the moments before Vega switched places with Pitfield, E.P. was "calm" and "everything was fine." [47]

169.    At the time of the switch from Pitfield to Vega, it was clear that E.P. was secured,

---

[45] Transcribed Audio Tape Statement Deputy Manuel Estrada, JPSO, 23 January 2020, p. 1 (Estrada).
[46] Estrada, p. 2
[47] Mehrtens, p. 10.

handcuffed, calm, not resisting and posed no danger.

170.    At the time when deputies made the "switch" from Pitfield to Vega, there were six JPSO personnel (Pitfield, Vaught, Mehrtens, Vega, Guidry and Estrada), in the immediate presence of E.P.

171.    At the time when deputies made the "switch" from Pitfield to Vega, E.P. was lying face-down in a prone position, with his hands handcuffed behind his back.

172.    At the time of the switch from Pitfield to Vega, there was absolutely no legitimate law enforcement purpose for the continued prone, pressurized restraint of E.P. in this condition under these circumstances.

173.    Before making the "switch" from Pitfield to Vega, E.P. had already been held down in a prone position, face down on the hard surface of the parking lot, controlled by the significant body weight of Deputy Pitfield, for approximately seven minutes.

174.    The only intelligible words E.P. uttered during this entire time was "firetruck."

175.    At 1:36:02, the "switch" from Pitfield to Vega was made and the prone, pressurized restraint of a handcuffed E.P. continued.

176.    Deputy Pitfield removed himself while deputy Vega took his place on E.P.'s back side, using his own body weight to maintain pressure on E.P., leaving E.P. face down, in the prone position.

177.    While Deputy Vega does not appear to be as large or heavy as Deputy Pitfield,[48] his involvement did not result in a de-escalation of force but instead intensified the use of force and pressure applied to E.P.

178.    According to Deputy Vega, E.P. was offering no resistance ("No, he was fine at

---

[48] JPSO investigating detectives failed to ask or include information in the supplemental report relating to Deputy Vega's height and weight on Jan. 19, 2020 or indeed of any of the deputies involved.

this point"),[49] yet he continued to be restrained in the prone position with Vega on his back.

179.    According to Detective Mehrtens' statement to JPSO investigative detectives, he remembered "Deputy Vega come on scene and he asked Pitfield 'do you want to, do you want to switch out.'"[50]

180.    Initially, according to Mehrtens: "I'm thinking, you know, he's now been in a struggle with this, this guy for several minutes and of course he's going to be kind of wore out, so I'm thinking they're just switching for that purpose to just try and can get somebody that can be fresh and have a little bit more control…a better mindset then somebody who is now exhausted right, um, so they switch out and it's not too long after they switch out that he starts to get combative again."[51]

181.    Instead of de-escalating or placing E.P. in "recovery position," the deputies proceeded to continue this unreasonable and excessive use of force deployed against E.P. under these extremely dangerous, life-threatening circumstances.

182.    There were now six deputies participating and surrounding E.P. and failing to intervene despite having knowledge of the situation and the opportunity to do so.

183.    Deputy Myron Gaudet then arrived on the scene, making it seven JPSO deputies.

184.    Gaudet told JPSO investigating detectives that when he arrived, he saw Nick Vega "on the guy…and they're kinda talking about what's going on."[52]  He was asked "Q: What position is he in?  A: At this time, he is on, he's prone and Nick is on his uh, on his back."[53]

185.    Deputy Vega confirms that he is sitting there, on E.P.'s back, telling E.P. to calm

---

[49] Vega, p. 5
[50] Mehrtens, p. 5
[51] Mehrtens, p. 6. At the same time that Deputy Mehrtens noted that Deputy Pitfield might be "kind of wore out" and need a "fresh" replacement, he did not take any steps to check to see whether E.P. was also "kind of wore out" or in need of monitoring or being re-positioned.
[52] Transcribed Audio Statement, Deputy Myron Gaudet, JPSO, Undated, Item #A-154889-20, p. 2 (Gaudet)
[53] Gaudet, JPSO, p,3

down, after he "[took] over."

186.    Deputy Vega stated, "I'm sitting there, I got my hands on the cuffs and I'm putting (sic) him on his back, I'm like, "It's going to be okay, calm down, calm down. It's going to be okay. And the mom is steadily…*Q: Is there resistance at this point? A: No he was fine, at this point.* But then all of a sudden, it went from zero to one hundred."[54]

187.    Prior to arriving on the scene, Gaudet understood that the person he was *en route* to handle was a person with autism or special needs.

188.    Prior to arriving on the scene, Gaudet understood that the person he was *en route* to handle was a person with a disability.

189.    Prior to arriving on the scene, Gaudet regarded the person that he was *en route* to handle to as a qualified person with a disability.

190.    Once on the scene, Gaudet understood that E.P. was a person with a disability.

191.    Once on the scene, Gaudet regarded E.P. as a qualified person with a disability.

192.    While Vega restrained E.P. in the prone position, Vega pushed E.P.'s hands (which were cuffed behind his back) upwards, pushing E.P.'s face even more forward into the cement.

193.    Detective Mehrtens reported that "I turn around and I see the struggle happening again. Deputy Vega has technique, you know, when somebody starts struggling, you have handcuffs on them, you just begin to slightly elevate the arms so that you can just maintain control of the upper torso, um, he begins doing that and from some point, and I don't recall when, from me traveling from the unit down there, the the individual's arms go over his head and he's now got his hands flat on the ground…still handcuffed…."[55]

194.    Deputy Vega pushed E.P.'s handcuffed arms up as a pain-compliance technique.

---

[54] Vega, p. 5 *Emphasis added.*
[55] Mehrtens, p. 6

195.     This pain compliance technique was inappropriate and served no law enforcement purpose, especially with a person with severe autism, and simply serve to cause unnecessary pain and to punish E.P.

196.     The use of this technique of Deputy Vega's to force compliance through the use of inflicting pain and discomfort, was an unjustified and unreasonable use of force.

197.     It is also a technique which is inappropriate and excessive for use against an autistic person who is in crisis.

198.     Vega pushed so hard that E.P.'s arms hyper-extended and went forward, over his head.[56]

199.     Deputy Vega responded by putting his full weight on E.P.s' back and wrapped his arm across E.P.'s body.[57]

200.     Deputy Vega told E.P.'s mother to move away from her son's side.

201.     She complied with his order.[58]

202.     Deputy Mehrtens held E.P.'s right arm down, "in a kind of an "L" shape on the ground" as "three (3) or four (4) of us" were "trying to control him" as E.P. was trying to get up.[59]

203.     At some point, Deputy Vaught laid down on E.P.'s left leg while a "plainclothes deputy" was on his right leg.

204.     Deputy Estrada assisted in restraining E.P. and handed shackles to Vaught, who placed the shackles on E.P.'s legs.[60]

205.     Deputy Vega also put E.P. in a neck hold.

206.     Deputy Vega also put E.P. in a choke hold.

---

[56] Hypermobility or hyper-extension, i.e., being "double-jointed" is a characteristic commonly seen in persons with autism.
[57] Video 1 at 17:00.
[58] Vega, p. 6.
[59] Mehrtens, p. 6.-7. Mehrtens also refers to E.P. trying to overcome six (6) people.
[60] Pitfield, p. 20.

207.   Deputy Gaudet stated that "I saw when Nick Vega was on top of him. *Nick's arm was in circled around his head, shoulder and neck* and Nick clearly was trying to stop him from biting people that's what Nick had said."[61]

208.   Deputy Vega informed JPSO investigating detectives that he "put my forearm right here, underneath his chin to try to maintain some control and to keep him from hitting his head and doing anything else."[62]

209.   Deputy Vega's neck or choke hold further reduced E.P.'s ability to breathe.

210.   Deputy Vega remained in this position, with his body weight on E.P.'s back and his arm circled around E.P.'s head, shoulder and neck until Deputy Gaudet moved in to switch and take over from Vega in order to continue with the prone restraint of E.P. with a third deputy.

211.   At that point, E.P. was still on his stomach, in a prone position, being held down by multiple deputies who were holding down his arms and legs and pressing on his body.

212.   He was handcuffed, shackled, with his head, shoulder, and neck encircled by Deputy Vega's arm.

213.   And even then, none of the seven (7) deputies made any effort to de-escalate or mitigate the use of force or to intervene to roll him over on his side or sit him up or stand him up or to place in him in "recovery position."

214.   In addition, no-one was constantly monitoring E.P. or even checked to make sure that he was able to breathe.

215.   Rather than relieve the pressure and place E.P. in a recovery position, the deputies simply began the process to substitute a *third* deputy, Deputy Gaudet, to take the place of Deputy Vega, to continue to hold E.P. in this extremely dangerous, life-threatening and ultimately life-

---

[61] Gaudet, p. 6 *Emphasis added*.
[62] Vega, p. 6.

ending, pressurized prone position.

216.    At 1:38:50 pm Deputy Vega removed his body weight from E.P.'s back and his arm from around his head, shoulder and neck, to facilitate Deputy Gaudet substituting for him.

217.    As Deputy Gaudet was in the process of relieving Deputy Vega, it was noticed that E.P. had gone "limp" and had urinated.[63]

218.    Gaudet described it as "Nick gets up and he's essentially limp. Um, now we-we rolled him to the rescue position. Which is on his side."[64]

219.    According to Deputy Pitfield, it was not until after E.P.'s mother cried out that E.P. was being choked, that deputies responded and rolled him into recovery position.[65]

220.    By then it was too late. E.P. was dying.

221.    In total, E.P. had been held in a face-down, prone position, under the body weight and physical pressure of deputies sitting on his back for a total of **nine minutes and six seconds**.

222.    During the period of restraint, E.P. was handcuffed, shackled, his arms and legs held down and his head, shoulder and neck encircled by Deputy Vega's arm.

223.    It was clearly foreseeable that E.P. might have breathing difficulties during this encounter.

224.    E.P. was substantially overweight, weighing 321 pounds, 5'8" tall and a body mass index of 46.05, at the time of his death.[66]

225.    Pitfield was 6'3".

226.    Pitfield weighed over 300 pounds.[67]

---

[63] Vega, p. 7.
[64] Gaudet, p. 3.
[65] Pitfield, p. 21.
[66] JP Coroner's Forensic Examination Report at 3.
[67] Pitfield's employment files indicate he was 6 foot 3 inches and weighed three-hundred-and-sixty-five pounds when he applied for a position with the JPSO in July, 2007. While Deputy Pitfield's weight on Jan. 19, 2020 is not disclosed in the JPSO report, it is obvious from the video that he is quite large and it appears that he weighed over 300 pounds on that date.

227.     Because E.P.'s hands were secured behind his back, that put a cumulative weight of over 600 pounds on E.P.'s chest, which was pressed against the hard surface of the parking lot.

228.     And then the second deputy to get on his back and extend the pressurized, prone restraint, Deputy Vega, unjustifiably and unreasonably escalated the use of force, including using unnecessary pain compliance techniques and the application of a choke/neck hold and full body pressure restraint, while other deputies held down E.P.'s arms and legs, and completely foreclosed any hope of E.P. being able to breathe or to survive and resulted in his death.

229.     The JPSO Defendant Deputies were aware of the serious risk to E.P.'s ability to breathe while restrained in a prone position.

230.     The JPSO Defendant Deputies each knew that they had a duty to ensure that E.P. was able to breathe.

231.     No JPSO Defendant Deputy complied with their duty to ensure that E.P. was able to breathe.

232.     Defendant Pitfield says he told E.P.'s mother, who was trying to cushion her son's head from possible injury, not to put a piece of clothing by E.P.'s face because he "needs to be able to breathe."[68]

233.     Defendant Guidry says when she first got to the scene, she looked to see where Pitfield was sitting to see if there was any "restriction to his breathing."[69]

234.     Vega told Deputy Gaudet to "watch his brachial, because we didn't want to put any pressure."[70]

235.     All of the deputies were familiar with "recovery position" which "is for breathing

---

[68] Pitfield, p. 13.
[69] Guidry, p. 2.
[70] Vega, p. 10-11.

purposes…to make sure there's nothing, there's nothing wrong, blocking that at all." [71]

236.   Every objectively reasonable and properly trained officer knows that continued restraint of an obese person in the prone position through the use of body weight poses unreasonable risk of death which is alleviated by simply removing the pressure and rolling the person on their side.

237.   Rolling a restrained person onto their side can be done without endangering the involved officers.

238.   But these deputies persisted with their excessive use of force and restraint and/or failed to intervene to prevent the excessive use of force and restraint by rolling E.P. on his side or properly monitoring his condition.

239.   Restraining a person in a face-down prone position is a high-risk position for compressional/positional asphyxia.

240.   Placing pressure on the back of a person in a face-down prone position increases the risk of compressional/positional asphyxia.

241.   Proper police procedures and the clearly-established constitutional mandate that law enforcement officers only use that amount of force which is reasonable under the circumstances, required the deputies to de-escalate and relieve E.P. from this pressurized restraint position once E.P. was secured.

242.   JPSO Deputy Defendants should have put him in a "recovery position" by simply turning him on his side or sit him up, standing him up, or securing him in a vehicle – any of which would have removed the pressure on E.P.'s back, gotten him out of the prone position, off his belly, and would have avoided the known and deadly risks of compressional/positional asphyxia and in-custody death involved in this situation.

---

[71] Pitfield, p. 22.

243. E.P. was secured with both handcuffs and leg restraints prior to going limp and urinating himself.

244. No JPSO Deputy Defendant rolled E.P. into a recovery position until after he went limp and urinated himself.

245. No JPSO Deputy Defendant sat E.P. up.

246. No JPSO Deputy Defendant stood E.P. up.

247. No JPSO Deputy Defendant secured E.P. in a JPSO vehicle.

248. Despite the obvious and known serious and life-threatening dangers of this situation and the critical importance of maintaining constant monitoring of E.P. to ensure that his breathing was not compromised and that undue pressure was not being applied, the JPSO deputies each failed to do so and failed to take steps to ensure that anyone else was doing so, throughout this incident.

249. In addition, on information and belief, none of the deputies took command of the situation or gave necessary and appropriate instructions to the others to safely and reasonably secure the scene and assign duties, including but not limited to establish a perimeter, control the sensory environment, monitor  E.P.'s breathing, ensure that relevant information was obtained from E.P.'s parents regarding E.P.'s disability, triggers, and appropriate calming techniques, or any other basic and reasonable police practices to ensure the security and safety of E.P. and others at the scene.

250. In addition, on information and belief, throughout this entire incident, the JPSO deputies made no reasonable efforts to contact, either directly or through dispatch, EMS, supervisors, command staff, training staff, CIT,  and/or other persons with JPSO or local mental health, behavioral and/or crisis organizations or resources, who had appropriate knowledge, training and skill with dealing with persons experiencing a sensory outburst due to autism, for advice, support, and/or instructions on how to proceed with regard to appropriate care for E.P.

251.     Defendant deputies knew, must have known or should have known, that this type of restraint and use of force under these circumstances against an obese person with severe autism and/or other forms of intellectual/developmental disabilities and/or mental illness, carried a heightened risk of in-custody death, yet they disregarded those obvious and well-established risks.

252.     The continued and persistent restraint of E.P. in this manner and under these circumstances constituted the use of excessive, unwarranted and unjustified force, which served no legitimate law enforcement purpose and was contrary to nationally recognized law enforcement standards, JPSO policies and training and clearly established law.

253.     The law is well established that when law enforcement officers continue to use force even once someone is on the ground and no longer resisting, an individual who is subjected to that force has a "well-recognized excessive-force claim."[72]

254.     As JPSO policy provides, and defendant JPSO deputies were aware, an "officer may only use enough force to overcome the amount of resistance or aggression met."[73]

255.     In addition, the law is well established in the 5th Circuit, U.S. Court of Appeals, that a suspect's mental impairment is an important fact in determining whether force was reasonable in the context of constitutional analysis.[74]

256.     Other circuits have concurred, holding that when mental impairment is present and apparent in a police encounter, it "must be reflected in any [Fourth Amendment] assessment of the government's interest in the use of force."[75]

257.     Thus, when police officers perceive signs of a person's mental disability, they

---

[72] *Peña v. City of Rio Grande City*, 879 F.3d 613, 620 (5th Cir. 2018).
[73] JPSO SOP-25 at pg. 1.
[74] *Rockwell v. Brown*, 664 F. 3d 985, 992 (5th Cir. 2011).
[75] *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003).

"should make a greater effort to take control of the situation through less intrusive means."[76]

258.     As is admitted in their own statements, the JPSO deputies were aware of E.P.'s disability, that he was a "special needs" child and that he was autistic. However, these deputies failed to take any of this into consideration in their persistent and continued use of unjustified and excessive use of restraint and force against E.P.

259.     Instead, the fact that E.P. was severely autistic resulted in him being denied appropriate and reasonable care and treatment by the deputies which would have been afforded to a person who was not autistic, who was handcuffed, secured, and not actively resisting.

260.     The force used on E.P. was excessive. It was not a split-second decision. Instead, the officers *continued* using excessive force and indeed escalated, rather than de-escalate the use of force, even after E.P. was subdued, not resisting and surrounded by numerous JPSO deputies.

261.     JPSO Deputies Pitfield, Vaught, Mehrtens, Vega, Guidry, Estrada and Gaudry each had the duty, knowledge and opportunity to intervene to prevent the seriously life-threatening danger involved with the extremely dangerous method of restraint and excessive force used against E.P. yet they failed to do so.

262.     Their failure to intervene contributed to the death of E.P.

263.     Some of the JPSO Deputy Defendants began to attempt CPR on E.P.

264.     Donna Lou and Daren Parsa observed that the JPSO Deputy Defendants' chest compressions were not correct; the deputies' hands were on E.P.'s diaphragm rather than his sternum, and thus the compressions were too low on E.P.'s body to be fully effective.

265.     Donna Lou tried to intervene, identified herself as a physician and offered to aid in

---

[76] *Crawford v. City of Bakersfield*, 944 F.3d 1070, 1078 (9th Cir. 2019) (citation omitted). *See also, e.g., Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 900 (4th Cir. 2016) ("Armstrong's mental health was . . . a fact that officers must account for when deciding when and how to use force."); *Champion v. Outlook Nashville, Inc*., 380 F.3d 893, 904 (6th Cir. 2004) ("[T]hat the police were confronting an individual whom they knew to be mentally ill . . . must be taken into account when assessing the amount of force exerted.").

the CPR process, but the deputies refused her offer of assistance and told her to stay back and let them do their job.

266.    As E.P.'s parents watched, their only son turned blue, was foaming at the mouth, his eyes were flipped. He was unresponsive and dying.

267.    E.P. was then taken by ambulance to East Jefferson Hospital.

268.    Donna Lou and Daren Parsa had called E.P.'s psychologist to come help with the situation, and she arrived shortly after the ambulance left with E.P.

269.    Donna Lou and Daren Parsa were told by JPSO and/or John Doe Deputy Defendants that they had to remain at the shopping center parking lot and could not leave to be with their son.

270.    A nurse from East Jefferson Hospital informed Donna Lou and Daren Parsa via telephone that their son was in cardiac arrest and they needed to get to the hospital "immediately."

271.    Donna Lou and Daren Parsa each asked different members of JPSO Deputy Defendants (specifically, JPSO John Doe Deputies 1 & 2) if they could leave to go to the hospital.

272.    They were both told they could not leave.

273.    E.P.'s psychologist told a ranking officer on the scene (Doe 3) that "these people need to be with their son," and asked if they could follow the ambulance to the hospital.

274.    Doe 3 said they could not leave and threatened to arrest the psychologist if she didn't "get out of [his] face."

275.    Donna Lou and Daren Parsa understood that they were forbidden from leaving the scene, against their will.

276.    Eventually, a ranking JPSO officer allowed Donna Lou and Daren Parsa to leave the scene and go to the hospital.

277.    But Donna Lou and Daren Parsa were told they could not take their car, because it

was a "crime scene."

278.    So Donna Lou and Daren Parsa had to get a ride to the hospital from E.P.'s psychologist.

279.    Donna Lou and Daren Parsa asked JPSO and/or John Doe Deputy Defendants if they could have a police escort to get to the hospital faster, and were denied. Another deputy did offer to escort them if they had permission but once they got permission to leave, they didn't see that deputy so left immediately on their own, with E.P.'s psychologist.

280.    E.P. died as a direct result of the actions of the JPSO deputies. While the deputies attempted to obfuscate and justify their use of force, body pressure and restraint by their own self-serving statements, the facts clearly show that the prolonged, pressurized prone restraint of E.P., the deputies use of excessive force and body weight, the use of a choke/neck hold and mechanical restraints, and other force used on E.P., and their failure to monitor E.P. during these events directly and proximately caused the death of E.P. as a result of asphyxia.

281.    At all times relevant herein, each of the defendant deputies was acting under color of law and in the course and scope of their official duties and employment.

**B.    Cause of Death**

282.    The Jefferson Parish Coroner's Office (JPCO) concluded that E.P. "died as a result of Excited Delirium due to an Acute Psychotic Episode in the setting of Severe Autistic Spectrum Disorder and Disruptive Behavior Disorder. *Contributing factors include Morbid Obesity with Prone Positioning and Cardiomegaly.* The manner of death is classified as Accident."[77]

283.    The "prone positioning" of E.P. while being restrained by JPSO deputies was identified by the Coroner's office as a contributing factor in the cause of death of E.P. and is a legal cause of his death while in JPSO custody.

---

[77] JP Coroner's Forensic Examination Report at 2. *Emphasis added.*

284.     The finding of "Excited Delirium" (E.D.) by the JPCO is a controversial and highly disputed finding of dubious scientific value.

285.     In addition, to the extent that "excited delirium" has been recognized in the past as a cause of death, E.P. exhibited none of the signs associated with this "theory" other than his death occurred in law enforcement custody. E.P. did not exhibit characteristics allegedly associated with "excited delirium" such as extreme body heat, presence of cocaine or other illicit drugs, removal of clothing, behavior which is highly abnormal for the individual, etc. Instead, E.P.'s actions were entirely consistent with his long-standing medical condition of ASD.

286.     In addition, E.P. sustained injuries consistent with the use of a chokehold or neckhold.

287.     E.P. did not die of "excited delirium" and his death was not accidental.

288.     E.P.'s death is properly characterized as a homicide as his death was caused directly and proximately by the actions of the deputies and their prolonged restraint of E.P. through their use of excessive force, their collective body weight, and use of various unnecessary and unreasonable holds and use of force, including choke/neck hold.

289.     On information and belief, the JPCO failed to follow established and appropriate in-custody death investigation procedures by failing to keep an open and objective mind and do their own independent investigation of the circumstances surrounding E.P.'s death, as demonstrated by pre-judging the cause of death before evaluating all relevant information, including the videos and in relying upon JPSO to provide it with information such as school and medical records of  E.P. rather than doing their own independent investigation free from the influence and bias of JPSO, which resulted in a biased and scientifically unsound result.

**C.     The Serious Risks of Death Related to the Use by Law Enforcement of Restraint in the Prone Position and Compression/Positional Asphyxia Are Well Known.**

290.     The risks of prolonged restraint in the prone position, compression and positional

asphyxia has been well-known to the law enforcement community for over 25 years.[78]   Litigation

---

[78] "Law Enforcement Custody Deaths," Police Chief Magazine, (1988); "Model Policy - Transportation of Prisoners" - International Association of Chiefs of Police - National Law Enforcement Policy Center (April 30, 1990);   "Model Policy - Transportation of Prisoners Concepts and Issues Paper" - International Association of Chiefs of Police National Law Enforcement Policy Center (August 1, 1990); "Transportation of Prisoners II," International Association of Chiefs of Police Training Key # 412  (1991); "Occupant Restraint Risk Management," Law Enforcement Television Network (LETN), (90 Minute Video), Carrollton, Texas (4/29/92-4/30/92); Final Report of the Custody Death Task Force (6/92) (Prepared by Asst. Chief Krosch, Lt. Vickey Binkerd and ME Brian Blackburne); "Task Force Report: Some In-Custody Deaths Cited as Preventable," Law Enforcement Quarterly (August-October 1992) (Author - San Diego Police Department); "Positional Asphyxia During Law Enforcement Transport," American Journal of Forensic Medicine and Pathology, Vol. 13, No. 2 (1992) (Authors - Dr. Reay, Dr. Fligner, Dr. Stilwell & Dr. Arnold); "The Perils of Investigating and Certifying Deaths in Police Custody," American Journal of Forensic Medicine and Pathology, Vol 13, No. 2 (1992) (Author - Dr. Luke & Dr. Reay); LAPD: Revised Procedures -- Cord Cuff Leg Restrainer, LAPD (October 1992); "Minimizing Restraint Risk Exposures," Law Enforcement Network Television (LETN), Risk Reduction Videotape (11/24/92); "Metro-Dade Police Department In Custody Death Task Force" banning the use of the hog-tie procedure (Fall 1992);"Custody Death Syndrome," International Association of Chiefs of Police Training Key # 429 (12/7/92); "Restraint Asphyxiation in Excited Delirium, " American Journal of Forensic Medicine and Pathology, Vol. 14, No. 4 (1993) (Authors - Dr. O'Halloran & Dr. Lewman); "Positional Asphyxia During Law Enforcement Transport - Letter to the, Editor," American Journal of Forensic Medicine and Pathology, (1993) (Author - Dr. Reay); Instructors Certification Workbook, RIPP Restraints, Inc. First Edition 1989, Second Edition 1994; S.D.P.D. - Procedures regarding Handcuffing, Searching and Transporting Prisoners, (January 15, 1994); "Pepper Spray and In-Custody Deaths," International Association of Chiefs of Police, Science and Technology, (March 1994) (Authors - Granfield, Onmen and Petty, M.D.); Standards for Law Enforcement Agencies, Commission for the Accreditation of Law Enforcement Agencies, Chapter 71, Transportation of Prisoners (April 1994); "Focus on Use of Force," FBI Law Enforcement Bulletin (May 1994) (Author - John Hunter); "The Record Straight," Police (May 1994) (Authors - Dennis McCauley); "Deaths Prompt Shifts in Police use of Hog-tying," L.A. Times (May 16, 1994); "Police Custody Death Syndrome," Law Enforcement Technology, (July 1994) (Authors - Dr. Todd Burke and Joseph Reynolds); "Chattanooga PD may pay for hog-tying arrestee, failure to have CPR masks available," Tennessee Law Enforcement Bulletin (7/6/94); Memphis Police Department, Policy & Procedures, Section Firearms, Rules on Chemical Irritants Agents, Section F (prohibition on hog-tying) (July 15, 1994); Shelby County Sheriff's Department, Policy Bulletin RE: Leg Restraints (prevents hog-tying and re-training officers in the use of the LR-2 Restraint Device) (7/22/94); "Sudden Custody Death Syndrome: the Role of Hogtying," Criminal Law Update (Fall 1994) (Authors - Garth Savage, Claire Cropper, Michael Lang); Settlement of <u>Brunson v. Shelby County</u>, No. 91-3008 (W.D. Tenn.) for $3,500,000.00 plus lifetime medical care for a 22 year old black man who suffered anoxic brain damage rendering him a vegetable after being hog-tied in (October 1994); "Sudden Death in Individuals in Hobble Restraints During Paramedic Transport," Annals of Emergency Medicine (May 1995) (Authors - Dr. Sam Stratton, Dr. Chris Rogers, Karen Green, R.N.); "Positional Asphyxia - Sudden Death," National Law Enforcement Technology Center (June 1995); "Sudden In Custody Deaths," The Aslet Journal November/December 1995 (Author - Steve Bunting); "Handcuffs & Restraints," The Police Chief (January 1996) (Author - Lois Pilant); "Hog-tying: Is it the Use of Deadly Force," American Jails (January/February 1996) (Author - Thomas A Rosazza); "Constitutional and Practical Implications of Police Restraint Procedures," Criminal Law Bulletin, January/February 1996 (Authors - Geoffrey Alpert, Andrew Clarke, Mike Cosgrove & William Smith); "Combative Subjects Require Special Care," Police Magazine (July 1996); "Grasping for Breath," Police Magazine (July 1996) (Author - Sgt. Dennis McCauley); "Model Policy - Transportation of Prisoners" - International Association of Chiefs of Police - National Law Enforcement Policy Center (October 1, 1996); "Model Policy - Transportation of Prisoners Concepts and Issues Paper" - International Association of Chiefs of

stemming from in-custody deaths occurring during restraint in the prone position has been
extensive throughout the country.[79]

291. The Sheriffs of Jefferson Parish (*viz.* Sheriff Harry Lee (April 1, 1980-Oct. 1,
2007), Sheriff Newell Normand (Oct. 1, 2007 – August 31, 2017), and Sheriff Joseph P. Lopinto,
III, Sheriff, March 24, 2018-present)[80] have likewise been aware of and on notice of the dangers

---

Police National Law Enforcement Policy Center (October 1, 1996); "Avoiding Injury During the Restraint
Process," Lt. James F. Albrecht (New York City Police Department; "Hogtying of Suspects is Banned in
Los Angeles," New York Times National (July 5, 1997) - LAPD banned hog-tying as part of a $750,000.00
settlement with family of man who died after being hog-tied; "The Prone Restraint - Still a Bad Idea,"
Policy Review IACP National Law Enforcement Policy Center, Spring 1998; "Death In Custody," Clinics
in Laboratory Medical, Forensic Pathology, Part I, Volume 18, No. 1, March 1998 (Author Donald Reay,
M.D.); "Asphyxial Death During Prone Restraint Revisited," American Journal of Forensic Medicine and
Pathology (March 2000) (authors Ronald O'Halleran, M.D. and Janice Franks, M.D). "Preventing Restraint
Asphyxia," Training Video produced by Georgia Bureau of Investigation and Dr. Kris Sperry; "A New
Phony Explanation of Custody Deaths: 'Excited Delirium,'" L.A. Times, April 21, 2003; "Excited
Delirium," 60 Minutes II, aired December 10, 2003. (MANY MORE ARTICLES CAN BE PUT HERE IF
GO THIS ROUTE WHICH IS KINDA DICKY)

[79] Vizbaras v. Prieber, 761 F.2d 1013 (4th Cir. 1985); Owens v. Atlanta, 780 F.2d 1564 (11th Cir. 1986);
DeLuna v. Farris, 841 F.2d 312 (9th Cir. 1987); Brisk v. City of Miami Beach, 726 F.Supp. 1305 (S.D. FL
1989); Simpson v. Hines, 903 F.2d 400 (5th Cir. 1990); Ketchum v. Albuquerque Police Department, 958
F.2d 381 (Table) (10th Cir. 1992); King v. Davis, 980 F.2d 1236 (8th Cir. 1992); Renalde v. City and
County of Denver, 807 F.Supp. 668 (D. Colo 1992); Jones v. Thompson, 818 F.Supp. 1263 (N.D. Ill. 1993);
Littlewing v. Rayl, 839 F.Supp. 1369 (D. ND, Southwestern Division 1993); Elmes v. Harris, No. 03A0l-
9310-CV-00372 (Tenn. App. May 20, 1994) - 1994 WL 228763; Huffman v. Fiola, 850 F.Supp. 833 (N.D.
Cal. 1994); Melendez v. City of Worchester, 870 F.Supp. 11 (D. Mass. 1994); Animashaun v. O'Donnell,
No. 91-C2632 (N.D. Ill. February 21, 1995) - 1995 WL 77302; and (N.D. Ill. 12/06/94) - 1994 WL 685021;
Price v. San Diego, 165 F.R.D. 614 (S.D. Cal. 1996); Phillips v. City of Milwaukee, 928 F.Supp. 817 (E.D.
Wis. 1996); Cottrell v. Caldwell, 85 F.3d 1480 (11th Cir. 1996); Maynard v. Hopwood, 105 F.3d 1226 (8th
Cir 1997); Price v. San Diego, 990 F.Supp. 1230 (S.D. Cal. 1998); Gutierrez v. San Antonio, 139 F.3d 441
(5th Cir. 1998); Swans v. City of Lansing, 65 F.Supp.2d 625 (W.D. Mich 1998); Johnson v. Cincinnati, 39
F.Supp.2d 1013 (S.D. Ohio 1999); Wagner v. Bay City, Texas, 2000 U.S. App. Lexis 23863 (5th Cir
9/27/00); Young v. City of Mt. Ranier, 2001 U.S. App. Lexis 1328 (4th Cir. 1/31/01); Cruz v. City of
Laramie, 239 F.3d 1183 (10th Cir. 2/15/01); Keeney v. City of New London, 196 F.Supp. 190 (D. Conn.
3/25/02); Tobias v. County of Putnam, 191 F.Supp.2d 364 (S.D.N.Y. 2002); McIntire v. City of Boulder,
2003 WL 1880633 (10th Cir. 2003); Pliakos v. City of Manchester, 2003 WL 21687543 (D.N.H. 2003);
Unzueta v. Steele, 291 F.Supp.2d 1230 (D. Kansas 2003); Garrett v. Athens-Clarke County, Georgia, 378
F.3d 1274 (11th Cir. 2004). (NEED UPDATE IF GO THIS ROUTE)

[80] On information and belief, Sheriff Lopinto was Acting Sheriff of JPSO following the resignation of
Sheriff Normand until such time as Sheriff Lopinto was himself elected sheriff. On information and believe,
before becoming Sheriff, defendant Lopinto acted as legal liaison between the department and its attorneys
and later became one of the attorneys representing the JPSO, including defending the Sheriff and deputies
in cases alleging civil rights violations including use of excessive force.

of prone restraint and positional/compressional asphyxia involving in-custody death for decades.

292.    Jefferson Parish Sheriff Harry Lee was sued and judgment entered against him on March 22, 1993 in *Dorothy Williams, et al v Sheriff Harry Lee, et al*, Docket No. 89-11943, Civil District Court for the Parish of Orleans. In that case, the Court found that: "Joel C. Williams (born 2 October 1961) died on 19 June 1987 as a direct result (cause-in-fact) of being restrained in a four-point restraint (commonly referred to as "hog-tied") by Jefferson Parish Sheriff deputies following his arrest on misdemeanor charges following an automobile accident in which Williams's car ran off the road. Williams died of positional asphyxia (also known as positional hypoxia) which was known at the time and is known as a risk of the four-point restraint."

293.    The trial court's decision was affirmed by the 4th Circuit Court of Appeals, 633 So2d 976 (March 15, 1994) and the Louisiana Supreme Court denied writs on June 3, 1994. 637 So2d 502.

294.    A federal lawsuit was filed against JPSO Sheriff Harry Lee, et al on March 8, 1995 in the matter of *Dezanne Sullen et al. versus Harry Lee*, *et al.*, USDC No. 95-0767 involving the in-custody death of Rene Alexander on March 13, 1994, related to hog-tying and positional asphyxia. That case was resolved through settlement before trial.

295.    On March 14, 1994, the day following the in-custody death of Rene Alexander, JPSO Major Gary Schwabe issued an Inter-Office Memorandum "effective immediately, the practice of applying four-point restraints in the rear position will be discontinued. In the event the use of four-point restraints are necessary for the safety and security of the arrestee and/or officers they will only be placed in the front position."

296.    On Nov. 11, 1994 all JPSO Personnel were notified of the danger of "positional asphyxia" and instructed "to reduce the possibility of 'positional asphyxia' prisoners should be transported in an upright seated position. A prisoner should have the ability to change positions to

40

facilitate their breathing."

297.    On March 22, 2019, a federal lawsuit was filed against JPSO Sheriff Joseph Lopinto III, *et al*. in the matter of *Boutte v Lopinto III*, 19-cv-09613 involving the in-custody death of Keeven Robinson on May 10, 2018 related to asphyxia and blunt force injuries.

298.    On information and belief, there are other incidents involving in-custody deaths and JPSO deputies in which the improper use of restraints, prone positioning, use of choke/neck holds and excessive force resulted in and contributed to serious injury and/or death of persons in JPSO custody.

299.    On information and belief, JPSO deputes, including those involved with the in-custody death of E.P. and the investigation of same, have been trained for years in the serious, life-threatening dangers of in-custody deaths relating to positional/compressional asphyxia and prone restraint, including the dangers of death involving the prone restraint of subjects who are obese/overweight/large bellies and have been engaged in physical exertion/struggle and the critical importance of  immediately placing a person in this situation in an upright or "recovery" position and to avoid placing pressure on their backs or doing anything that could interfere with their ability to breathe.

300.    On information and belief, this training was sufficient to place Defendants on notice of the risk of death associated with the way they treated E.P.

301.    This training was insufficient, however, to cause JPSO Deputy Defendants to actually take steps to intervene and to mitigate the risk of death.

302.    Further, it is obvious that any reasonable person, let alone an objective and reasonably trained deputy, knows and understands that prolonged restraint in the prone position of obese persons can cause death and, that to mitigate these risks, extra weight on a restrained person should be removed.

303.    This can be easily accomplished by simply rolling a person onto their side or sitting them up.

304.    In addition, JPSO deputies are trained or should have been trained to closely and constantly monitor individuals who are restrained in a prone position, especially an individual who is obese and has been engaged in physical exertion, for breathing and any conditions which may impair or impede respiration.

305.    Despite this knowledge and training, Sheriff Lopinto and his predecessors have failed to properly supervise, discipline or otherwise hold accountable deputies who failed to comply with the law, JPSO policy and training, including in this incident, and failed to exercise due care to properly protect individuals in JPSO custody from the known dangers of positional/compression asphyxia, thereby condoning and excusing the use of excessive force by JPSO deputies in these situations, including in the deputies involved in this incident.

306.    In the alternative, on information and belief the JPSO policies, practices, training, oversight and accountability regarding the issues and circumstances involved in this lawsuit including but not limited to use of force, restraints, positional/compression asphyxia, and encounters and interactions with persons with developmental disabilities, in particular autism, including but not limited to use of force and restraint, are inadequate and unreasonable and deviate from clearly established law of which any reasonable deputy should be aware.

307.    In addition, Sheriff Lopinto has deliberately refused and failed to require or provide Body-Worn Cameras (BWC) for JPSO deputies which would provide contemporaneous recordings, including video and audio, of misconduct by JPSO deputies, in order to prevent the exposure and disclosure of deputies' misconduct and to obstruct accountability and liability for their actions.

308.    Sheriff Lopinto knew, must have known or should have known of these deficiencies

yet failed to take appropriate action to address and/or remedy them.

309.    The JPSO investigation of the circumstances of E.P.'s death was inadequate, outrageous and unreasonable. Sheriff Lopinto failed to properly supervise and/or require that the JPSO detectives conducting the investigation into E.P.'s death collect important information, including but not limited to documenting the height and weight of every deputy involved, conduct a review of policies, procedures and training which contributed to E.P.'s death, including questioning the deputies regarding their own training and knowledge and their failure to place E.P. in recovery position, sit or stand him up, as well as other deficiencies.

310.    In addition, Sheriff Lopinto failed to provide any oversight or quality control review regarding the investigation and report by JPSO of this incident and instead condoned and ratified a report that contained false information, was incomplete and designed to obfuscate and insulate the Sheriff and the deputies from accountability and liability for their actions.

311.    In addition, Sheriff Lopinto failed to follow established and accepted law enforcement policies and procedures for conducting a post-critical incident review of an in-custody death, including but not limited to a review of policies, training, supervision, use of force, individual and systemic issues/problems, etc., exhibiting his deliberate indifference to the rights and in-custody death of E.P. and to the lack of reasonable accommodation for E.P. based upon his disability, thereby ratifying and condoning the misconduct and unreasonable, excessive and discriminatory practices of his deputies and the inadequate and unreasonable policies and training of the JPSO.

312.    Instead of conducting a critical incident review of an in-custody death, JPSO officers engaged in an attempt to use their police powers to collect information in an effort to insulate themselves from liability.

313.    JPSO obtained and served criminal search warrants on E.P.'s doctor, even though

43

JPSO conceded that it was not investigating a crime.

314.    JPSO caused St. Charles Parish Sheriff's Office to request and obtain a search warrant for E.P.'s school records, on the basis of a "violation of a pending death investigation" and "generalized law enforcement inspection."

315.    These warrants were on their face absurd. A proper search warrant can only seek the fruits, instrumentalities, or evidence of a crime. *United States v. Lefkowitz*, 285 U.S. 452, 465–66 (1932).

316.    But neither a "violation of a pending death investigation" nor "generalized law enforcement inspection" describes a crime.

317.    Indeed, a warrant for a "generalized law enforcement inspection" is the exact "general warrant" that the framers of the constitution wrote the Fourth Amendment to prevent. *See Coolidge v. New Hampshire*, 403 U.S. 443 (1971).

318.    JPSO thus improperly used its criminal investigatory powers in an effort to collect evidence to protect it from civil liability.

319.    In choosing to inadequately and inappropriately investigate the cause of E.P.'s death, Sheriff Lopinto ratified the JPSO Deputy Defendants' actions which led to E.P.'s death.

320.    Upon information and belief, Sheriff Lopinto failed to require or perform an Internal Affairs or critical incident investigation of this critical incident and the in-custody death of E.P., exhibiting his deliberate indifference to the rights and in-custody death of E.P. and to the lack of reasonable accommodation for E.P. based upon his disability, thereby ratifying and condoning the misconduct and unreasonable, excessive and discriminatory practices of his deputies and any supervisory personnel involved in this incident.

321.    Further upon information and belief, Sheriff Lopinto failed to take disciplinary action against any of the deputies involved with in-custody death of E.P. despite deputies use of

excessive force, violations of JPSO policies and training, exhibiting his deliberate indifference to the rights of E.P. and his parents and to the lack of reasonable accommodation for E.P. and discrimination against him based upon his disability, thereby ratifying and condoning the conduct of his deputies.

322.   These actions by Sheriff Lopinto were done intentionally, with deliberate indifference, reckless disregard, and/or with negligence.

**D.   E.P. and Autism**

323.   When E.P. was three years old it was apparent that he had Autism Spectrum Disorder though the severity and full extent of his disability was not fully diagnosed for some time. In 2007 he was diagnosed with Pervasive Developmental Disorder which is included in the Autism Spectrum Disorder. (ASD). A "motor examination" of E.P. by a neurologist found that "his tone is decreased" and that he was "hyperextensive."

324.   Over the course of his short life, E.P.'s disabilities manifested themselves in the following: obesity, severe intellectual and developmental impairments, difficulty communicating, severely impaired verbal expression and impaired reception, physical impairments and sensory overload outbursts or crises which involved self-injurious behaviors, aggression and disruptions, among other behaviors.

325.   Triggers to E.P.'s behavioral outbursts included loud noises, such as yelling, loudspeakers, loud rumbling noises like garbage trucks, fire alarms, and too many people around him if he was experiencing an outburst.

326.   E.P. also had several characteristics which are often identified with ASD, including had hyper-mobility ("double-jointed"/hyperextension) and low muscle tone. He was prone to biting as both a defensive measure and as a method of communicating extreme frustration and sensory overload. During times of crisis or as a precursor to an outburst, he often used repeated

movements, such as slapping at his head and banging his head. The use of repetitive stimulation or "stimming" motions was common with E.P. and many persons with autism.

327.    Related to his autism, E.P. had diminished fine motor skills which affected his ability to do certain movements with his hands. When he was experiencing an aggressive outburst, he would often flail his arms and use his hands in a slapping type motion, instead of making a fist.

328.    E.P.'s disabilities, including his weight and his extremely limited ability to express himself verbally and limited receptive language skills, put him particularly at risk of the known danger of restraint in the prone position due to asphyxia.

329.    The death of their only child and the way that he died has devastated E.P.'s parents and has caused severe and profound sorrow, grief, loss of love and affection and serious emotional and mental suffering and distress, among other injuries.

**E.    Individuals with Autism Spectrum Disorder (ASD), including E.P., have a heightened risk of death related to prone restraint.**

330.    Individuals with Autism Spectrum Disorder (ASD) have a heightened risk of death related to prone restraint.

331.    Law enforcement agencies, including Sheriff Lopinto and JPSO staff, trainers and deputies and the defendants in this case, know, must have known, or should have known of the wide-spread public controversies and challenges surrounding law enforcement encounters with persons who are mentally ill and who have intellectual and/or developmental disabilities and the inadequacies of their existing policies, practices, training, oversight and accountability regarding these encounters.

332.    People with developmental disabilities are estimated to be up to seven (7) times more likely to come into contact with police than a member of the general public, including as victims, persons in need of care, "wanderers," crisis intervention, such as "outbursts," acting "suspiciously," emergency commitments, as well as alleged violations of law, among other law

enforcement encounters.

333.    In the U.S., it is estimated that from one out of five (1 out of 5) to one out of seven (1 out of 7) incidents involving deaths of persons in custody of law enforcement involve individuals suffering from mental illness, which category includes persons with intellectual and developmental disabilities, such as Autism and Downs' Syndrome.

334.    Law enforcement agencies and first responders throughout the U.S. have known for years about the need for special policies, training, and accommodations regarding law enforcement interactions with persons with autism and especially regarding the potential enhanced danger of positional/compressional asphyxia and the use of prone restraint applied to persons with autism, including but not limited to the following:

   a. "Be aware that people with autism may have underdeveloped trunk muscles and may not be able to support their airway. After takedown, the individual should be turned on his or her side and be transferred into an upright position as soon as possible to allow normal breathing to occur." Training Key # 678, International Association of Chiefs of Police (IACP), © 2013.

   b. "Monitor the person's condition frequently to prevent further trauma or injury. Up to 40% of this population may have some form of seizure disorder." Training Key, #678, IACP, © 2013.

   c. "Realize the person may not understand the futility of resistance and continue an intense struggle. When the person is contained after restraint, continue the use of calming and non-threatening words and body language, de-escalation techniques, sensory scene management and simple words." Training Key #678, IACP, © 2013.

   d. "When possible, avoid using body weight to restrain the individual. When unavoidable, extreme caution should be exercised." Model Policy: Interactions

with Individuals with Intellectual and Developmental Disabilities. Updated August 2017. IACP.

e.  "Avoid using body weight to restrain a person with I/DD whenever possible. If unavoidable, extreme caution should be exercised. For people with certain types of disabilities, body weight restraints can be dangerous or harmful…for those with other types of I/DD, such as ASD, being subjected to a body weight restraint can be physically excruciating, as the person may experience physical stimuli much more intensely than individuals without I/DD."  Interactions with Individuals with Intellectual and Developmental Disabilities. Concepts and Issues Paper, IACP Law Enforcement Policy Center, Updated:  August, 2017.

f.  "If you must restrain a person with autism, consider the following tips to maintain safety for both yourself and the person being arrested: Avoid positional asphyxia. People with autism may have a difficult time supporting their airways during restraint due to underdeveloped chest muscles. Officers should turn the person on their side to ensure normal breathing." Law Enforcement Guide to Interacting with People with Autism, Illinois Attorney General, June, 2019.

g.  "Physical restraint should be used only after all other interventions have been tried and have failed. Restraint should never be the first reaction when a person with autism escalates…. Extreme care must be taken whenever restraining a person with autism. Never place a person with autism on his or her stomach. Persons with autism frequently have underdeveloped trunk, abdomen, and shoulder muscles or hypotonia. Placing them on their stomach may compromise their diaphragm, causing breathing difficulties. This action may lead to further struggle, often misinterpreted as attempts to get free, when actually the person is struggling to

breathe. Many persons with autism also have seizure disorders or other common medical conditions such as asthma. Restraining a person during a seizure or asthmatic attack can cause injury or death." Autism, Advocates, and Law Enforcement Professionals, Recognizing and Reducing Risk Situations for People with Autism Spectrum Disorders, Dennis Debbaubt, Jessica Kingsley Publishers, London and Philadelphia, 2002, p. 27.

h. "Support and constantly monitor breathing. Because they (subjects who may have an intellectual or developmental disorder, including autism) are often hypotonic, they often have difficulty breathing under stress. Also, their chest muscles may be weak and have difficulty supporting even their own weight, in some positions. Position your handcuffed subject on their side in the lateral recumbent (low-level fetal) position, meaning slightly bent at the waist and knees. If it is safe, sit them up. Consider transporting them in the lateral recumbent position in an ambulance. Every cop knows about positional asphyxia. Consider all your subjects with developmental disabilities to be at risk. The 'Autism tsunami', Joel Lashley, Police 1, July 7, 2008. Also see "Autism Spectrum Disorders, A Special Needs Subject Response Guide for Police Officers, Joel Lashley, Children's Hospital and Health System, (c) 2009.

i. "Avoid Manual Restraining: In prone position-Hypotonia and underdeveloped muscles may lead to hypoxia, trouble breathing. By crossing arms in front or behind patient-May restrict diaphragm movement in those with hypotonia, leading to respiratory compromise. Never use "hard" force to restrain person (such as putting your knee to their chest or using your body to hold the person down.)" Autism Preparedness for Emergency Medical Services Professionals, Dean R. Kelbe, Jr.,

Autism Preparedness for EMS Professionals, Revised 11/09 (emphasis in original).

**j.**   Never restrain a patient in a prone position, "hog-tie" the patient or use hobble restraints, as cases of sudden death have been reported. (Stratton, Rogers, Green, 1995 and Kupas & Wydro, 2002)." The ABC's of Autism, Dean R. Kelble, Jr., EMT-P, Autism EMS: Autism Preparedness for EMS, © 2009.

**k.**   "The segment on restraint and arrests highlights risks associated with physical control. People with autism typically lack the understanding that continued struggling may require officers to use a higher level of force to restrain them. Lights and sirens can create too much sensory input, causing even greater problems with communication and control. Approximately 40 percent of people with autism have seizures, which stress can trigger. Additionally, they may have underdeveloped trunk muscles making them unable to support their airways, which creates a high potential for positional asphyxia." FBI Law Enforcement Bulletin, March, 2005, Video Reviews of Autism and Law Enforcement, produced by Dennis Debbaudt and directed by Dave Legacy.

**l.**   "Persons with autism should never have their arms crossed in front of them or be held from behind. This may, once again, compromise the diaphragm in those with hypotonia. A more effective method is to have people on both sides holding the upper arm and wrist areas. Once a person with autism is down on the floor he or she should be released and geographical containment should be used. Geographical containment is the preferred method of control for a person with autism, a safe space should be provided for the person to calm him/herself through movement, rocking, packing, finger-flicking, hand-flapping, etc. Restraint may only serve to escalate apparently aggressive behaviors." Autism, Advocates, and Law

Enforcement Professionals, Recognizing and Reducing Risk Situations for People with Autism Spectrum Disorders, Dennis Debbaubt, Jessica Kingsley Publishers, London and Philadelphia, 2002, p. 27.

335.   In addition, since 2005 over 200,000 Communication Cards authored by Dennis Debbault, long-time trainer to law enforcement officers and agencies regarding law enforcement encounters with persons with autism, have been distributed nationally to officers and agencies, providing important information and necessary accommodations when dealing with persons with autism:

## Autism



### COMMUNICATION

*The person you are interacting with:*

- May be non verbal or have limited verbal skills
- May not respond to your commands or questions
- May repeat your words & phrases; your body language and emotional reactions
- May have difficulty expressing needs

### BEHAVIOR

- May display tantrums or extreme distress for no apparent reason
- May laugh, giggle or ignore your presence
- May be extremely sensitive to lights, sounds or touch
- May display a lack of eye contact
- May have no fear of real danger
- May appear insensitive to pain
- May exhibit self-stimulating behavior: hand flapping, body rocking or attachment to objects

### IN CRIMINAL JUSTICE SITUATIONS

- May not understand rights or warnings
- May become anxious in new situations
- May not understand consequences of their actions
- If verbal, may produce false confession or misleading statement

As with Alzheimers patients, persons with autism may wander. Persons with autism may be attracted to water sources, roadways, or peer into and enter dwellings.

## TIPS FOR INTERACTIONS WITH PERSONS WITH AUTISM

- Display calming body language; give person extra personal space
- Use simple language
- Speak slowly, repeat and rephrase questions
- Use concrete terms and ideas; avoid slang
- Allow extra time for response
- Give praise and encouragement
- Exercise caution during restraint
- Person may have seizure disorders and low muscle tone
- Avoid positional asphyxia. Keep airway clear. Turn person on side often.
- Given time and space, person may deescalate their behavior
- Seek advice from others on the scene who know the person with autism

If in custody, alert jail authorities.  Consider initial isolation facility.  Person would be at risk in general prison population.  REMEMBER: Each individual with autism is unique and may act or react differently.  PLEASE contact a professional who is familiar with autism.

Further Info: debbaudtlegacy.com                    ©Debbaudt/Legacy Productions, 2005

336.    Debbaudt's Communication Cards are available free of charge.

337.    Defendants should have utilized this information and implemented these accommodations in interacting with E.P.

338.    If Defendants had simply followed the advice on the Communication Cards, E.P. would not have died on January 19, 2020.

339.    In order to accommodate E.P.'s disability, once E.P. was secured JPSO Deputy Defendants should have minimized extraneous stimuli by turning off the lights of their vehicles, giving E.P. space, moving bystanders back, setting a perimeter, minimizing unnecessary talking, and generally calming the scene down.

340.    In order to accommodate E.P.'s disability, JPSO Deputy Defendants should have sought information from E.P.'s parents about how best to accommodate his disability.

341.    In order to accommodate E.P.'s disability, JPSO Deputy Defendants should have reduced their use of force as E.P.'s resistance decreased.

342.    There was no need to continue to use force on E.P. once E.P. was handcuffed and

there were numerous deputies on the scene.

343.    In addition, prior to the death of E.P., there had been widespread publicity, commentary, controversy and litigation regarding tragic and avoidable law enforcement encounters with persons with intellectual/developmental disabilities such as the in-custody asphyxial death of Ethan Saylor, a 26-year-old with Down syndrome on January 12, 2013 in Maryland"[81] and the shooting by law enforcement of the caretaker of an autistic person in Florida.

344.    The Louisiana state legislature, as well as schools, medical facilities and institutions, public and private, are well aware of the enhanced dangers of the use of prone restraint against students with intellectual and developmental disabilities.

345.    They have enacted laws and regulations prohibiting any type of restraint which "interferes with a student's breathing or ability to communicate with others" or which "places excessive pressure on the student's chest or back or that causes asphyxia". La. R.S.17:416:21(c)(3) regulating Behavior of Students with Exceptionalities; Use of Seclusion and Physical Restraint. Also see La. Administrative Code Title 28, Pt XLIII, Section 540.

**F.    The Duty and Obvious Need for Defendants to have Reasonable Policies and have Proper Training on Law Enforcement Encounters with Persons Experiencing a Sensory "Outburst" Crisis Due to Autism.**

346.    According to the Center for Disease Control (CDC), 1 out of 54 eight (8) year old children in the U. S. are diagnosed with Autism Spectrum Disorder (ASD).

347.    The CDC also estimates that 1-2% of the U.S. adult population is autistic.

348.    There are thousands of children and adults in the Greater New Orleans Metropolitan Area who have ASD. The percentage of the population with identified ASD in the U.S., including the Greater New Orleans Metropolitan Area and the State of Louisiana, is significant and rapidly

---

[81] *Estate of Robert Ethan Saylor, et al v Regal Cinemas, Inc.*, 2016 WL 4721254 (D.Md, Sept. 9, 2016), affirmed *Estate of Saylor v Rochford 698 Fed Appx. 72* (4th Cir (Md), Sept 29, 2017). Similar to E.P., Mr. Saylor was 5'6" tall and weighed 300 pounds.

growing as access to medical care, attention to early childhood development, and proper diagnosis increases.

349. The causes of autism are not known. And while every individual is unique, what is known is that: (a) 20-30% of people with this diagnosis are on the severe end of the spectrum, similar to E.P. (b) boys outnumber girls 4-1 (c) 30% or more of adolescents with autism are obese or overweight [82](d) about 40% of people with ASD also have Intellectual Disabilities (ID) (e) up to 40% are prone to seizures and (5) autism occurs across all races, ethnic groups, income and education levels, and lifestyles.

350. A significant number of persons diagnosed with ASD are also known to have (a) low muscle tone, making them potentially more susceptible to injury or positional/compressional asphyxia related to prone restraint, (b) hypermobility or hyperextension, *i.e.*, "double-jointed", (c) impairment of  receptive and expressive language, sometimes severe,  so that they may be non-verbal or have limited verbal skills and difficulty expressing their needs  and/or being understood (d) co-disabilities such as intellectual and physical disabilities (e) respiratory issues such as asthma (f) co-conditions such as depression, obsessive/compulsive disorder (OCD), attention-deficit-hyperactivity disorder (ADHD), aggression, self-injurious behaviors, and mood disorders and (g) are subject to sensory overload outbursts a/k/a "outbursts" or "meltdowns" which are involuntary, automatic "reflex" responses to stressors, which can result in self-injurious behaviors and injuries to others, such as hitting, kicking and biting.

351. There is no cure for autism spectrum disorder (ASD). ASD is a life-long disability.

352. While a number of persons on the spectrum lead successful and independent lives,

---

[82] A number of medications commonly prescribed for young people with ASD have side effects of weight gain. In addition, related physical disabilities, reduced access to participation in sports, using food as a soothing device, and other factors contribute to the high incidence of obesity in this age-group. In addition, Louisiana has one of the highest rates of childhood obesity in the country. In the 2016-17 National Survey of Children's Health, 19.1 percent of Louisiana children ages 10 to 17 were obese, much higher than the national average of 15.8 percent.

those diagnosed as severe will need life-time care, support and supervision of varying degrees.

353.    All persons with autism, including those diagnosed as severe like E.P., are entitled to access to public areas, accommodations, facilities, and services with reasonable accommodations for any disability which impacts their daily lives, including the services of law enforcement.

354.    It was foreseeable that persons with severe autism experiencing a sensory overload or "outburst" and/or their families and loved ones, within the jurisdiction of JPSO Sheriff Lopinto, would need to avail themselves of services of the JPSO.

355.    Defendants knew, must have known or should have known of the obvious need to ensure that appropriate policies, practices and training were in place in order to prevent in-custody deaths involving JPSO encounters with persons with autism and other intellectual/developmental disabilities who are experiencing crisis caused by and related to autism.

356.    It was also foreseeable that JPSO deputies would encounter persons who are autistic, including those who are on the severe end of the spectrum like E.P. and are experiencing an outburst or crisis and that deputies and dispatchers would need to be properly trained and have appropriate procedures, protocols, equipment and access to specially-trained deputies to insure the safety, security and appropriate, lawful handling of these encounters, without resorting to excessive force or causing undue harm or injury or death or discrimination on the basis of disability.

357.    It was foreseeable that deputies may have a need, on occasion, to physically restrain persons who have ASD and other intellectual and developmental disabilities, including those who are undergoing the crisis of a sensory outburst caused by and related to autism.

358.    Objectively-reasonably trained deputies would have been aware of the heightened risk, inherent danger and unreasonableness of using prone restraint, especially combined with

using body weight, mechanical restraints and the other forms of physical pressure as applied to persons with autism and which were applied to E.P.

359.   Objectively-reasonably trained deputies would also have been aware of the need to constantly monitor E.P.'s breathing and the imperative to quickly put him in "recovery position" as soon as he was handcuffed.

360.   The JPSO Deputy Defendants knew, must have known or should have known of the heightened risk of death from positional/compressional asphyxia due to prone restraint of a person with autism, yet failed to take appropriate and necessary measures to ensure the safety of E.P. and to protect him from harm and the known risks of their use of unreasonable force while he was in their custody and care.

361.   Sheriff Joseph P. Lopinto III knew, must have known, or should have known of the obvious need to adopt reasonable policies, procedures, training and oversight of his deputies in order to provide reasonable accommodations for persons with ASD who were in need of services by the JPSO in particular in situations similar to what occurred herein and to protect E.P. and others with autism from the use of excessive force and discriminatory policing due to their disabilities, yet failed to do so.

362.   His failure to do so ignored an obvious need and made it likely that constitutional violation would occur.

363.   Sheriff Lopinto failed to provide proper, reasonable training and ensure appropriate policies, procedures, protocols, equipment and access to specialized behavioral units to ensure the safety, security and appropriate, lawful handling of these encounters, including the encounter with E.P. by JPSO deputies as described herein, without resorting to excessive force or causing undue harm or injury.

364.   The failure of Sheriff Lopinto to ensure that vulnerable populations such as those

persons with ASD in general and E.P. in particular, are not exposed to unreasonable and excessive force by JPSO deputies, has resulted in discrimination based on disability and physical condition and failing to provide reasonable accommodations for law enforcement services.

**G.    The Defendants Failed to Provide Reasonable Accommodations for E.P.'s Disabilities**

365.    E.P. was a qualified person with a disability, diagnosed with Autistic Spectrum Disorder (ASD) and related disorders, including intellectual and physical disabilities.

366.    Like many other individuals with autism, E.P. engaged in predictable behaviors that were manifestations of his disability. E.P.'s manifestations during periods where he was experiencing a sensory outburst, included self-harm by slapping himself in the head, banging his head against walls and floors, as well as aggression towards others, such as slapping and biting.

367.    E.P.'s manifestations of these repetitive behaviors were particularly pronounced in frustrating situations and were susceptible to triggering and aggravation by his sensory environment, including sirens and crowding.

368.    While E.P.'s behaviors may seem atypical when compared to a non-disabled individual, his behaviors were entirely consistent for an individual with severe autism and represent a typical manifestation of his disability.

369.    In addition, E.P.'s disability prevented him from having the full intellectual and communicative capabilities of a non-disabled person, including severe impairment in his ability to receive information and verbally respond appropriately.

370.    His inability to communicate was obvious and observed by the JPSO Deputy Defendants.

371.    These defendants should have accommodated E.P. by adapting and modifying their procedures and protocols in order to accommodate his disabilities, but failed to do so.

372.    Furthermore, Defendants discriminated against E.P when they failed to reasonably

accommodate E.P. by using well-established law enforcement practices for interacting with persons with autism, including those experiencing an outburst, including but not limited to avoid physical restraint if possible, and if unavoidable, use extreme caution, constant monitoring, awareness that persons with autism may have underdeveloped trunk muscles and may not be able to support their airway, avoid positional asphyxia, keep airway clear, after take-down turn individual on side and transfer to upright position as soon as possible to allow normal breathing, realize the person may not understand the futility of resistance and may not be able to verbally communicate his or her needs.

373.   Other reasonable accommodations that Defendants failed to provide include:

a.   Realizing that the person is crisis is not consciously resisting but is responding to stimuli which provokes involuntary or reflexive physical reactions, and adjusting response to account for that.

b.   Managing vehicle approach and back-up, including disabling lights and sirens once the scene was secured.

c.   Managing the immediate environment to reduce outside stimulation, *i.e.*, sensory scene management.

d.   Using de-escalation techniques, including appropriate use of time and space. For example, only one person giving directions, in a quiet, calm voice.

e.   Seeking advice from others on the scene who know the person with autism, if the individual is in crisis and/or experiencing a sensory overload/outburst, and exhibiting self-harm or harm to others.

f.   Using common commands used in school and home settings, such as "Quiet Hands" or "Quiet Feet" or "stop hitting" or "no kicking" in firm voice.

g.   Declining to use pain compliance techniques, which are not likely to not work

reliably with persons with autism.

    h.  Understanding that biting is a common behavior for persons with autism in crisis, and preparing in advance for the risk of biting, including appropriate safety equipment and tactical training on passive techniques for preventing and releasing bites.

    i.  Monitoring the person's condition constantly to prevent further trauma or injury.

374. While every individual is unique, identifying characteristic behaviors of an individual with autism in the midst of an outburst is not a difficult or complex task for an individual with the proper knowledge and training on recognizing common behaviors associated with autism. This is why special training for law enforcement encounters with persons with autism is essential and has been readily available and used by many law enforcement agencies, for years.

375. Just as a deputy can be trained to understand that a person in a wheelchair cannot comply with a request to stand, a deputy can be trained to understand that a person with autism may not be able to understand complex verbal commands and/or may be nonverbal. Further, a deputy can be easily trained that when interacting with an individual with autism, alternative approaches, handling and restraint practices must be utilized and deputies must maintain heightened awareness of the dangers of positional/compressional asphyxia and in-custody death.

376. Reasonable training, properly developed, applied throughout the agency, including dispatchers, and regularly re-enforced and refreshed through on-going in-service training, using adult-learning techniques, with role-playing, scenarios and hands-on tactical training regarding appropriate methods of approach, de-escalation, use of appropriate equipment, use of force and when necessary, restraints, on persons with autism, along with specialized, trained behavioral units, would, among other services, provide reasonable accommodations for persons with autism in seeking services and would serve to protect them from being subjected by JPSO to the use of

excessive force and discriminated against due to their disability in access to law enforcement services.

377.    Despite the Defendants' knowledge of the obligation to reasonably accommodate individuals with autism and prevent discrimination and the use of excessive force, Defendants did not take adequate steps to ensure that it accommodated E.P.

378.    Nor did the Defendants take adequate steps to avoid discrimination on the basis of disability or to prevent the use of excessive force.

379.    Additionally, Defendants' stereotyping about persons with mental health and developmental disorders caused them to use more force on E.P. and keep him in a prone position while applying pressure, longer than they would have with a non-disabled person.

380.    Defendants' actions unjustly and wrongly punished E.P. by inflicting physical, emotional and mental pain and harm on him for his behaviors which were a result of and caused by his severe autism.

381.    Because Defendants failed to reasonably accommodate E.P.'s disability, he suffered injury, indignity and suffering, through the prolonged prone restraint described herein, ultimately leading to his death due to his disability.

382.    In interacting with and seizing E.P., and continuing to restrain him in a prone position using body weight to hold him down, handcuffs, shackles, restricting movement of his arms and legs and applying a choke or neck hold to his head, chin, shoulder and neck, resulting in his death, Defendants committed intentional discrimination by being aware of his need for accommodation but failing to reasonably accommodate his disability, per *Delano-Pyle*.

383.    Instead of providing reasonable accommodations and protecting E.P. from discrimination based upon his disability and physical condition and from the use of excessive force, the actions of the defendants resulted in E.P. being treated in a cruel, excessive and inhumane

way, including the use of excessive force as punishment.

384. Upon information and belief, Defendants' failure to promulgate policies and/or practices to accommodate individuals with autism has a predictable disparate impact on persons with disabilities, including E.P.

## VI. CAUSES OF ACTION

**Count One:** *Constitutional and Civil Rights Claims against JPSO and John Doe Deputy Defendants under 42 USC 1983 and the U.S. Constitution, in their Individual and Official Capacities*

385. Plaintiffs incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

386. The actions of the JPSO Deputy Defendants, *i.e.*, Pitfield, Vaught, Mehrtens, Vega, Guidry, Estrada and Gaudet in using excessive and unreasonable force in the seizure and restraint of E.P. and in failing to intervene or act to prevent such actions, despite having the opportunity and duty to do so, as set forth herein, violated the rights of E.P.. and his parents, Donna Lou and Daren Parsa, as guaranteed under the First, Fourth, Ninth and Fourteenth Amendments to the U.S. Constitution, to privacy, liberty, due process, equal protection, to be free from unreasonable search and seizure and to be free from the unjustifiable and excessive use of force, all in violation of 42 USC 1983.

387. The JPSO Deputy Defendants, acting together in concert and under the color of law, reached an understanding, engaged in a course of conduct and otherwise conspired among themselves to commit those acts described herein and to deprive E.P. and his parents, Donna Lou and Daren Parsa, of their constitutional and civil rights as set forth herein, in violation of 42 USC 1983.

388. The JPSO Deputy Defendants and JPSO John Doe Deputy Defendants had knowledge of the wrongs done and conspired to be done as described herein, had the power to

prevent or aid in the prevention of same, yet failed or refused to do so, in violation of 42 USC 1983.

389.    During the events described herein, JPSO Deputy Defendants were aware of the use of excessive force and restraint but did not intervene to prevent the violation of E.P.'s constitutional rights, even though they had the opportunity and duty to do so.

390.    The actions of the JPSO Deputy Defendants and JPSO John Doe Deputy Defendants in unlawfully seizing and preventing the plaintiffs  Donna Lou and Daren Parsa from going to the hospital to be near and with their son E.P. and in failing to intervene or act to prevent such seizure, despite having the opportunity and ability to do so, as set forth herein, violated the plaintiffs' rights as guaranteed under the First, Fourth, Ninth and Fourteenth Amendments to the U.S. Constitution, to privacy, liberty, due process, equal protection, to be free from unreasonable seizure.

391.    At all times relevant herein, JPSO Deputy Defendants and JPSO John Doe Deputy Defendants committed the acts described herein under the color of state law and by virtue of their authority as deputies of the JPSO and in the course and scope of their employment and substantially deprived E.P. of his clearly established rights, privileges and immunities guaranteed to him as a citizen of the United States pursuant to the First, Fourth, Ninth and Fourteenth Amendments in violation of 42 U.S.C § 1983, including, but not limited to:

a.      The right to freedom from unreasonable seizure;

b.      The right to freedom from the use of unreasonable, unjustified, and excessive force and summary punishment;

c.      The right to freedom from deprivation of liberty without due process of law;

d.      The right to receive timely and appropriate medical monitoring and attention;

e.      The right to freedom from arbitrary governmental activity which "shocks the conscience" of a civilized society in violation of his substantive due

process rights;

f.      The right to privacy;

g.      The right to liberty;

h.      The right to be free from deadly force.

i.      The right to freely move about.

392.    At all times relevant herein, JPSO Deputy Defendants and JPSO John Doe Deputy Defendants committed the acts described herein under the color of state law and by virtue of their authority as deputies of the JPSO and in the course and scope of their employment and substantially deprived Plaintiffs Donna Lou and Daren Parsa of their clearly established rights, privileges and immunities guaranteed to them as citizens of the United States pursuant to the First, Fourth, Ninth and Fourteenth Amendment in violation of 42 U.S.C § 1983, including, but not limited to:

a.      The right to freedom from deprivation of liberty without due process;

b.      The right to freedom from unconstitutional termination of their familial association with their son;

c.      The constitutional right to the society and companionship of their son;

d.      The right to freedom from arbitrary governmental activity which "shocks the conscience" of a civilized society in violation of his substantive due process rights;

e.      The right to privacy;

f.      The right to liberty;

g.      The right to freely move about.

h.      Unreasonable seizure without reasonable suspicion or probable cause, and a violation of substantive due process, in that Defendants prevented Donna Lou and Daren Parsa from leaving the scene to go the hospital.

393.    The actions of the defendant deputies described herein were the direct and proximate cause of the injuries, including his death, to E.P. and to his parents.

394.    The actions of the defendant deputies described herein were done with deliberate

indifference and were intentional, malicious, reckless, cruel and performed with malice.

395.    The Fifth Circuit has held that a suspect's mental impairment is an important fact in determining whether force was reasonable in the context of constitutional analysis.[83] Other circuits have concurred, holding that when mental impairment is present and apparent in a police encounter, it "must be reflected in any [Fourth Amendment] assessment of the government's interest in the use of force."[84]

396.    Thus, when police officers perceive signs of a person's mental disability, they "should make a greater effort to take control of the situation through less intrusive means."[85]

397.    As described above, the JPSO Defendant Deputies were aware of E.P.'s mental disability.

398.    But instead of using less force as a result of that disability, they used more force.

399.    And in their transcribed statements, the JPSO Defendant Deputies confirmed that E.P. was not exhibiting significant resistance after he was fully secured.

400.    As Vaught put it, even before E.P. was fully cuffed, "there was no active resistance from him." According to Pitfield, there was no "struggle" after E.P. was fully secured.[86] According to Vega, E.P. was in "control" and "fully handcuffed" before Vega sat on him.[87] According to Mehrtens, "At the time I arrived there wasn't, there wasn't a struggled (sic), it didn't appear to be a struggle….."[88] According to Deputy Vega, E.P. was offering no resistance, ("No, he was fine at

---

[83] *Rockwell v. Brown*, 664 F. 3d 985, 992 (5th Cir. 2011).
[84] *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003).
[85] *Crawford v. City of Bakersfield*, 944 F.3d 1070, 1078 (9th Cir. 2019) (citation omitted). *See also, e.g., Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 900 (4th Cir. 2016) ("Armstrong's mental health was . . . a fact that officers must account for when deciding when and how to use force."); *Champion v. Outlook Nashville, Inc*., 380 F.3d 893, 904 (6th Cir. 2004) ("[T]hat the police were confronting an individual whom they knew to be mentally ill . . . must be taken into account when assessing the amount of force exerted.").
[86] 2020.1.22 - Transcribed Statement of Chad Pitfield.pdf at 18.
[87] 2020 - Transcribed Statement of Nick Vega.pdf at 2.
[88] Transcribed statement, Detective Stephen Mehrtens ,p. 3. See also, p. 4.

this point"),[89] yet he continued to be restrained in the prone position.

401.     And yet, even after E.P. was secured, the JPSO Defendant Deputies took no steps to deescalate the situation or modulate their use of force – until Dr. Lou pointed out that E.P. had stopped breathing and moving.

402.     The force used on E.P. – specifically, a quarter-ton of weight on E.P.'s chest for the nine minutes and six seconds – was excessive. It was not a split-second decision. Instead, the officers *continued* using the force even after E.P. was fully subdued and surrounded by a half-dozen JPSO officers. Furthermore, the officers were specifically notified that E.P. was autistic, but took no steps to deescalate the situation or modulate their use of force.

403.     The JPSO Defendant Deputies did not use force that was commensurate with the E.P.'s level of contemporaneous resistance.[90]

404.     When E.P.'s level of resistance decreased, the JPSO Defendant Deputies did not decrease their use of force.

**Count Two: Constitutional and Civil Rights Claims Against Sheriff Joseph P. Lopinto III in his Individual and Official Capacity**

405.     Plaintiffs incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

406.     The actions of the JPSO Defendant Deputies described herein violated E.P.'s federal and state constitutional and statutory rights as specified herein and resulted in his death.

407.     At all times relevant herein, each of the JPSO deputies named and involved in the restraint and use of unreasonable and excessive force against E.P. which resulted in and

---

[89] Transcribed statement of Deputy Vega Statement, p. 5.
[90] *See Joseph v. Bartlett*, 2020 WL 6817823 (5th Cir. 2020) ("even if Joseph failed to comply and struggled against the officers at certain points throughout the encounter, that resistance did not justify force indefinitely. . . . For an officer's force to be reasonable, it must be commensurate with the suspect's level of contemporaneous, active resistance."); *Waterman v Batton*, 393 F. 3d 471, 481 (4th Cir. 2005) ("force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated")

contributed to his death, were employees of Jefferson Parish Sheriff Joseph P. Lopinto III, were acting under color of law and by virtue of their authority as JPSO deputies and in the course and scope of their employment.

408.     As a direct and proximate result of the actions of the JPSO Defendant Deputies and the deliberately indifferent policies, practices and customs of the defendant Sheriff Lopinto, the constitutional and statutory rights, federal and state, of E.P. and his parents, were violated, and they sustained injuries and damages suffered for which the defendants are liable, as set forth herein.

409.     Sheriff Lopinto, individually and in his official capacity as duly elected Sheriff of Jefferson Parish and as the final policy maker, was under a constitutional duty: 1) to properly determine if his deputies, including the defendant deputies, were qualified to serve as police officers; 2) to provide his deputies, including the Defendants, with proper policy guidance to perform law enforcements functions including stops, searches, seizures,  dealing with persons with intellectual/developmental disabilities, dealing with persons of diminished capacity, apprehension of suspects, use of force, including deadly force, use of restraints, and the protection of individual's civil rights, among other things; 3) to provide to his deputies, including the defendant deputies, proper training to perform law enforcement functions including stops, searches, seizures,  dealing with persons with intellectual/developmental disabilities, dealing with persons of diminished capacity, apprehension of suspects, use of force, including deadly force, use of restraints and the protection of individual's civil rights; 4) to properly monitor and supervise his deputies, including the Defendant Deputies, for compliance with the policies, practices and customs of the JPSO with respect to stops, searches, seizures, dealing with persons with intellectual/developmental disabilities, dealing with persons of diminished capacity, apprehension of suspects, use of force, including deadly force, use of restraints and the protection of individual's civil rights; and 5) to properly investigate, discipline and hold accountable his deputies, including the Defendant

Deputies, for violation of the policies, practices and customs of the JPSO.

410. Plaintiffs aver that Sheriff Lopinto failed to properly screen, hire, train, investigate and discipline officers, including the Officer-Defendants.

411. Sheriff Lopinto permitted, encouraged, tolerated, and knowingly acquiesced in an official pattern, practice or custom of JPSO Deputies, including JPSO Defendant Deputies, of violating the constitutional rights of the public at large, including E.P. and the Plaintiffs.

412. Sheriff Lopinto had been put on notice of the need for policy and training due to the past positional and compressional asphyxiation deaths of persons in JPSO custody.

413. Sheriff Lopinto had been put on notice of the need for policy and training due to the national attention generated from in-custody positional and compressional asphyxiation deaths over the past 25+ years.

414. The actions of the JPSO Deputy Defendants as described herein, were unjustified, unreasonable, unconstitutional, excessive and grossly disproportionate to the actions of E.P., if any, and constituted an unreasonable search and seizure effectuated through the use of excessive and deadly force and a deprivation of Plaintiffs and E.P.'s constitutional rights secured to them by the First, Fourth, Ninth, and Fourteenth Amendment of the United States Constitution.

415. The actions of the JPSO Deputy Defendants described herein were in direct violation of the constitution, law and regulations of the United States and the State of Louisiana and the internal policies of the JPSO.

416. Sheriff Lopinto condoned, approved, ratified, facilitated and knowingly acquiesced in the actions of the JPSO Defendant Deputies described herein by failing to properly investigate, discipline and hold accountable the JPSO Deputy Defendants for their actions.

417. Sheriff Lopinto is liable for the unconstitutional and discriminatory actions of the defendant deputies as described herein, due to the following policies, procedures, rules, practices,

customs and/or usages of JPSO which were in effect at the time of this incident and which were

the underlying cause of the death of E.P. and the injuries of the Plaintiffs:

a.  Failure to properly hire and screen applicants to determine their fitness, both mentally, physically and ethically, to perform the duties of a law enforcement officer;

b.  Failure to have adequate and proper written policy guidance regarding obvious and recurring law enforcement activities with respect to: 1) stops; 2) searches; 3) seizures; 4) dealing with persons with mental illness and/or intellectual/developmental disabilities, including autism; 5)  dealing with persons of diminished capacity; 6)  apprehension of suspects; 7) use of force, including deadly force; 8) use of restraints; 9) protection of individual's civil rights; and 10) among other things, illustrating deliberate indifference and reckless disregard for the rights of the public, including E.P. and the Plaintiffs.

c.  Failure to adequately train his officers, including the Defendant Deputies regarding obvious and recurring law enforcement activities with respect to: 1) stops; 2) searches; 3) seizures; 4) dealing with persons with mental illness and/or intellectual/developmental disabilities, including autism; 5)  dealing with persons of diminished capacity; 6)  apprehension of suspects; 7) use of force, including deadly force; 8) use of restraints; 9) protection of individual's civil rights; and 10) among other things, illustrating deliberate indifference and reckless disregard for the rights of the public, including E.P. and the Plaintiffs.

d.  Failure to train and educate its officers with respect to use of force applications which he knew, must have known or should have known, that deputies were utilizing in the field and which posed a serious risk of injury or death including the excessive use of body weight during restraint and using Head-Holds or Locks, in deliberate indifference to and reckless disregard of the welfare of the public at large, including E.P. and the Plaintiffs;

e. Failure to adequately monitor and evaluate the physical condition of his deputies to determine if they were fit to perform their duties without unnecessarily endangering the public through substandard performance or inability to perform essential law enforcement functions in deliberate indifference to and reckless disregard of the welfare of the public at large, including E.P. and the Plaintiffs;

f. Failure to adequately supervise, monitor and evaluate the performance of his deputies, including the Defendant Deputies, regarding their compliance with the laws and policies, practices and customs with respect to: 1) stops; 2) searches; 3) seizures; 4) dealing with persons with mental illness and/or intellectual/developmental disabilities, including autism; 5)  dealing with

persons of diminished capacity; 6)   apprehension of suspects; 7) use of force, including deadly force; 8) use of restraints; 9) protection of citizen's civil rights; and 10) among other things, illustrating deliberate indifference and reckless disregard for the rights of the public, including E.P. and the Plaintiffs.

g. Failure to adequately respond to and investigate critical incidents and/or complaints by civilians regarding misconduct by JPSO deputies, including Defendant Deputies, with respect to: 1) stops; 2) searches; 3) seizures; 4) dealing with persons with mental illness and/or intellectual/developmental disabilities, including autism   5)   dealing with persons of diminished capacity; 6)   apprehension of suspects; 7) use of force, including deadly force; 8) use of restraints; 9) protection of citizen's civil rights; and 10) among other things, illustrating deliberate indifference and reckless disregard for the rights of the public, including E.P. and the Plaintiffs.

418.   Sheriff Lopinto knew or should have known that the above-referenced policies, practices, and/or customs, resulted in an underqualified, undertrained and unprofessional law enforcement agency that was ill-equipped to perform obvious and necessary law enforcement activities without exposing the public to unwarranted danger of injury and/or death.

419.   Sheriff Lopinto was on actual or constructive notice of the deficiencies with the policies, practices and customs of the JPSO which make deputy misconduct a foreseeable consequence.

420.   Sheriff Lopinto knew, must have known, or should have known that the above-referenced policies, practices, and/or customs, would likely lead to serious injury or death to citizens and that such injuries were foreseeable; yet, disregarded that risk.

421.   The aforementioned policies, practices and customs were inadequate in relation to the specific tasks their deputies must routinely perform and with respect to activities where there is an obvious need for proper policies, practices and customs and therefore, illustrated its deliberate indifference and/or reckless disregard to the consequences of officer misconduct.

422.   Sheriff Lopinto's above referenced policies, practices and/or customs violated E.P.'s and Plaintiffs' constitutional rights; and said policies, practices and/or customs were the

moving force behind and proximate cause of said violations.

423.     Sheriff Lopinto's above referenced policies, practices and/or customs demonstrated a deliberate indifference to the constitutional rights of the public, including E.P. and Plaintiffs, and was the proximate cause of the injuries and damages sustained by E.P and Plaintiffs, and evidenced a reckless or callous indifference to the federally protected rights of E.P. and Plaintiffs.

424.     Sheriff Lopinto is also directly responsible for the actions of the JPSO Deputy Defendants as described herein by virtue of the fact that he failed to require or perform an adequate investigation of this critical incident involving an in-custody death of an autistic 16-year-old minor and, therefore, ratified, condoned and approved the JPSO Deputy Defendants' conduct in this matter in all respects.

425.     By failing to recognize or correct the deficiencies with his policies, practices and customs, Sheriff Lopinto consciously disregarded the known and foreseeable consequences thereof.

426.     Sheriff Lopinto's deliberately indifferent policies, practices and customs were the moving force behind Plaintiffs' injuries and the deprivation of their constitutional rights.

427.     There is a direct causal link between the policies, practices and customs and the death of E.P. and the violation of Plaintiffs' constitutional rights.

428.     As a direct and proximate result of the foregoing policies, practices and customs of Sheriff Lopinto, the violation of the constitutional rights of the public by JPSO deputies was substantially certain to occur.

429.     The actions of the defendant deputies described herein, which were proximately caused by the policies, practices, customs and usages of Sheriff Lopinto, were the underlying cause of the death of E.P. and the injuries and damages to the Plaintiffs.

***Count Three*** – **Americans With Disabilities Act and Section 504 of the Rehabilitation Act**
*Sheriff Lopinto in his Official Capacity*

430.    Plaintiffs incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

431.    On information and belief, Sheriff Lopinto and the JPSO receive federal funds, thus bringing Sheriff Lopinto and the JPSO within the ambit of the Federal Rehabilitation Act.

432.    The actions of the Defendants described herein are in violation of Title II of the ADA, which prohibits discrimination by any public agency, and all of "the services, programs, or activities of a public entity." 42 U.S.C. §§ 12131, 12132 and Section 504 of the Rehabilitation Act (RA).

433.    Defendants are further in violation of federal regulations implementing Title II of the ADA which provides that "a public entity shall operate each service program, or activity so that the service, program or activity, when viewed in it entirely, is readily accessible to and usable by individuals with disabilities." 28 CFR Section 35.150(a).

434.    Defendants' actions are also in violation of federal regulations implementing Title II of the ADA which provide that a public entity may not "(i) deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; [or] (iii) provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1).

435.    Congress intended Title II to cover all police agency activities, including arrests.[91]

---

[91] *See* House Comm. Judiciary, H.R. Rep. No. 101 485, pt. 3, at 50 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 473 ("[T]o comply with the non-discrimination mandate, it is often necessary to provide training to public employees about disability. For example, persons who have epilepsy, and a variety of other disabilities, are frequently inappropriately arrested and jailed because police officers have not received proper training . . .")

Accordingly, federal regulations explicitly apply those provisions to law enforcement conduct during arrests.[92]

436.    "Title II of the ADA provides that no qualified individual with a disability shall, because of that disability, be excluded from participation in, denied the benefits of, or subjected to discrimination in the services, programs, and activities of all state or local government entities, including law enforcement, corrections, and justice system entities.  Such services, programs, and activities include . . . Law enforcement street interactions, taking and responding to complaints or calls for assistance, vehicle stops and searches, arrests, detentions, interviews, interrogations, and emergency responses."  https://www.ada.gov/cjta.html

437.    Twenty years ago, the Fifth Circuit, U.S. Court of Appeals, in *Hainze v. Richards* the Court ruled that the ADA "does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents . . . *prior* to the officer's securing the scene and ensuring that there is no threat to human life."[93]

438.    In compliance with the 5th Circuit's ruling in *Hainze*, Plaintiffs assert their ADA/RA claims against Defendants for their actions *after* E.P. was fully handcuffed by defendants Pitfield and Vaught, following which the Officer-Defendants, including Pitfield and Vaught, treated E.P. in ways inappropriate to his disability even *after* securing the scene, as described

---

[92] 28 C.F.R. pt. 35, app. B (2014) ("The general regulatory obligation to modify policies, practices, or procedures requires law enforcement to make changes in policies that result in discriminatory arrests or abuse of individuals with disabilities."); *id.* ("[T]itle II applies to anything a public entity does."); U.S. Dep. of Justice, Civil Rights Div., The ADA and City Governments: Common Problems (2008) ("When dealing with persons with disabilities, law enforcement agencies often fail to modify policies, practices, or procedures in a variety of law enforcement settings—including citizen interaction, detention, and arrest procedures. . . . When interacting with police and other law enforcement officers, people with disabilities are often placed in unsafe situations or are unable to communicate with officers because standard police practices and policies are not appropriately modified."); U.S. Dep. of Justice, Civil Rights Div., Commonly Asked Questions About The Americans With Disabilities Act And Law Enforcement (2006) ("The ADA affects virtually everything that officers and deputies do, for example: . . . arresting . . . suspects[.]"); U.S. Dep. of Justice, Civil Rights Div., Communicating with People Who Are Deaf or Hard of Hearing: ADA Guide for Law Enforcement Officers (2006).

[93] *Hainze v. Richards*, 207 F. 3d 795 (2000) (emphasis added).

herein.

439.     In addition, plaintiffs allege that the Fifth Circuit's decision in *Hainze* should be re-visited and reconsidered as in error, in light of years of differing and critical opinions from other U.S. Circuit Courts of Appeal as well as scholarly critiques which have identified *Hainze* as having been incorrectly decided and plaintiffs' herein assert violations of the ADA and Rehabilitation Act in the events leading up to the initial restraint of E.P.

440.     Discrimination under these federal statutes does not require animus towards people with disabilities.[94] Thus "[o]ne can intentionally violate a nondiscrimination law without possessing animus toward the class of people that the law protects."

441.     A defendant commits intentional discrimination where an employee of a public entity has knowledge of a plaintiff's disability but chooses not to accommodate him.[95]

442.     Defendants violated federal law and committed intentional discrimination even though they might not have had animus towards the class of people that the law protects. [96]

443.     E.P. was a qualified person with a disability.

444.     E.P. had a range of diagnoses, including Severe Autistic Spectrum Disorder, decreased muscle tone, and hyperextensive joints.

445.     JPSO Deputy Defendants, prior to arriving on the scene, understood that the child was a person with autism or special needs, and therefore a qualified person with a disability.

446.     JPSO Deputy Defendants, after arriving on the scene, understood that E.P. was a qualified person with a disability.

---

[94] *Carter v. Orleans Par. Pub. Sch*., 725 F.2d 261, 264 (5th Cir. 1984); *Esparza v. Univ. Med. Ctr. Mgmt. Corp*., No. CV 17-4803, 2017 WL 4791185, at *17 (E.D. La. Oct. 24, 2017)
[95] *Delano-Pyle v. Victoria Cty., Tex*, 302 F.3d 567, 575 (5th Cir. 2002); *see also Miraglia v. Bd. of Supervisors of Louisiana State Museum*, 901 F.3d 565 (5th Cir. 2018) (affirming "damages based on a defendant's knowledge of the plaintiff's disability and his decision not to accommodate him[.]")
[96] *Carter v Orleans Parish Pub School*, 725 F2d 261, 264 (5thCir. 1984); *Esparza v Univ. Med Ctr. Mgmt Corp*., No. CV 17-4803, 2017 WL 4791185, at *17 (E.D.La. Oct. 24, 2017).

447.    JPSO Deputy Defendants, prior to arriving on the scene, regarded the person they were *en route* to handle as qualified person with a disability.

448.    JPSO Deputy Defendants, after arriving on the scene, regarded E.P. as a qualified person with a disability.

449.    JPSO had a record of E.P.'s disability in the form of their dispatch records identifying E.P. as a "mental patient."

450.    The Defendant deputies, all employees of Sheriff Lopinto and the JPSO, a public entity, knew that E.P. had "autism" and was "special needs" yet chose not to accommodate him.[97]

451.    E.P. was entitled to reasonable accommodation in the provision of law enforcement services and safe and secure access to appropriate care, all of which were denied to him by the defendants.

452.    Despite the Defendants' knowledge of the obligation to accommodate persons with disabilities and avoid discrimination – including individuals that have autism – Defendants did not take adequate steps to accommodate E.P. nor did the Defendants take adequate steps to avoid discrimination on the basis of disability.

453.    In the alternative, and upon information and belief, Defendants' failure to promulgate policies and/or practices to accommodate individuals with autism has and had a predictable disparate impact on persons with disabilities, including E.P.

454.    Because Defendants failed to reasonably accommodate E.P.'s disability, he suffered greater injury, suffering, indignity and death, than individuals without an intellectual/ developmental disability who are handcuffed, secured and then placed in recovery position while in custody of the JPSO.

455.    Plaintiffs are entitled to all available remedies for relief pursuant to the ADA and

---

[97] *Delano-Pyle v Victoria Cty., Tex.,* 302 F3d 567, 575 (5th Cir 2002).

Section 504.

456.    The Defendants actions as described herein were intentional and/or done with deliberate indifference.

### Count Four – Violation of Louisiana Constitution and State Law
*All Plaintiffs against all Defendants in All Capacities*

457.    Plaintiffs incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

458.    The actions of the defendants as described herein, were done with negligence, gross negligence and/or intentionally and were arbitrary, capricious and unreasonable, in violation of Louisiana constitutional and statutory law.

459.    The actions of the defendants as described herein resulted in wrongful death, assault, battery, false arrest, false imprisonment, intentional infliction of emotional distress, loss of liberty, and violation of the rights to be secure against unreasonable seizures, the unjustifiable and excessive use of force and the right to privacy, (Art I, Section 5), the right to equal protection of the laws and individual dignity and to be protected from arbitrary, capricious and unreasonable discrimination against a person because of physical condition, (Art I, Section 2 and 3), the right to due process of law (Article 1, Section 2), the right to be free from arbitrary, capricious, or unreasonable discrimination based on physical condition (Art. 1, Section 12) and the right to freedom of movement.

460.    JPSO Deputy Defendants' actions caused the death of E.P.

461.    JPSO Deputy Defendants' actions contributed to the death of E.P.

462.    The Jefferson Parish Coroner's Office found that E.P.'s "prone positioning" was a "contributing factor" to his death.

463.    E.P.'s "prone positioning" was a "contributing factor" to his death.

464.    The plaintiffs are the father and mother of the deceased child, E.P. They were

present at all times and viewed the use of excessive force, unreasonable restraint and wrongful death of their only child, E.P and have suffered serious mental anguish and emotional distress, which was caused by the acts and omissions of the defendants as stated herein.

465.   The deceased, E.P., was never married and did not father any children.

466.   Plaintiffs, Donna Lou and Daren Parsa, are the surviving mother and father of the deceased, E.P., and therefore are the proper plaintiffs under La. Civ. Code art. 2315.1 and 2315.2 for wrongful death and survival actions.

467.   By virtue of their professional roles and by answering the call for service, JPSO Deputy Defendants had a duty to exercise due care.

468.   JPSO Deputy Defendants further assumed a duty when they actively prevented Plaintiffs from rendering care to their son.

469.   JPSO Deputy Defendants, when they actively prevented Plaintiffs from rendering care to their son, created an increased obligation to care for E.P. and special relationship between JPSO Deputy Defendants and E.P.

470.   JPSO Deputy Defendants, when they actively prevented Plaintiffs from leaving the scene to go to the hospital, and then at the hospital actively prevented Plaintiffs from visiting the body of E.P.

471.   JPSO Deputy Defendants breached their duty of care by their acts and omissions, including the choices not to do any of the following things once E.P. was secured: (1) remove weight; (2) roll E.P. into the "recovery position"; (3) sit E.P. up; (4) secure E.P. into a vehicle; (5) assign an officer to monitor E.P.'s breathing; or (6) make a call for the Mobile Crisis Unit of Jefferson Parish Human Services Authority.

472.   The actions and omissions of the defendant deputies herein were within the course and scope of their employment and defendant Sheriff Lopinto is vicariously liable for their acts

and omissions in accordance with Louisiana law. La. Civil Code Art. 2320.

473.    Defendant Sheriff Lopinto is obligated under Louisiana law to indemnify and pay any tort judgment for compensatory damages for which his deputies are liable for actions taken in the discharge of their duties that are within the scope of their employment.

474.    The defendant Sheriff Lopinto negligently hired, retained, supervised, failed to discipline and entrusted the defendant deputies in violation of Louisiana law and is directly liable for his actions.

475.    The defendant Sheriff Lopinto failed to insure that policies, procedures and practices of the JPSO prohibiting the actions of the defendants as described herein, relative to excessive use of force, unreasonable and dangerous use of restraints, and discrimination against persons with mental and behavioral disabilities, including intellectual and developmental disabilities such as autism, among others, were enforced and instead condoned, ratified or excused violations by his deputies, including the defendant deputies herein, so as to create a culture within the JPSO where these official policies, procedures and practices were ignored or rendered meaningless, with no consequence.

476.    On information and belief, the damages incurred by the plaintiffs in this incident are in excess of the amount of coverage provided by the Louisiana Sheriffs' Association self-insurance fund and ABC Insurance Company, as the excess carrier, is responsible for payment of damages above that amount.

477.    Defendant Victory d/b/a Westgate Shopping Center is liable for the actions and omissions of Defendant Pitfield, as stated herein, in his capacity as working a "special detail" on "public assignment" on the premises of the Westgate Shopping Center, and acting in the course and scope of his employment or agency, at all relevant times herein.

478.    The Defendant XYZ Insurance company provided insurance coverage for Victory

d/b/a Westgate Shopping Center and Deputy Pitfield, in his capacity as working a "special detail" on "public assignment" on the premises of the Westgate Shopping Center at all relevant times herein and is responsible for payment of damages and is a defendant in this action pursuant to the Louisiana Direct Action Statute which was in effect at the time of this incident. La. R.S. 22:1269.

479.     Defendant Insurance Companies ABC and XYZ, upon information and belief, have each issued or currently have in effect, one or more policies of insurance covering one or more of the Defendants named herein. For valuable consideration received, these policies obligated Defendant Insurance Companies, jointly and/or severally, to pay on behalf of their insured Defendant(s) any sums the insured Defendant(s) may become obligated to pay to Plaintiffs or to indemnify their insured Defendant(s) for any sums the insured Defendant(s) may become obligated to pay to Plaintiffs under the terms of their policies.

480.     Upon information and belief, Defendant Insurance Companies ABC and XYZ are liable to Plaintiffs for any and all damages incurred by reason of the insured Defendant(s)' acts, up to their policy limits, notwithstanding the fact that the insured Defendant(s) may themselves be able to assert claims of privilege or immunity from liability.

481.     Under Louisiana Revised Statute § 22:1269, Plaintiffs bring a direct action against Defendant Insurance Companies ABC and XYZ to recover any and all sums they are obligated to pay Plaintiffs on behalf of their insureds or to indemnify their insureds.

### Count Five – 42 U.S.C. § 1983 Claim for Unlawful Search Warrants
### (Against Sheriff Lopinto in his Official Capacity)

482.     Plaintiffs incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

483.    On January 19, 2020, E.P. died in the custody and care of deputies with the Jefferson Parish Sheriff's Office.[98]

484.    On January 20, 2020, JPSO began seeking criminal search warrants.

485.    On that day, JPSO's Keith Dowling submitted a warrant application, swearing under oath that "probable cause exists for the issuance of a search warrant" for E.P.'s East Jefferson General Hospital EMS records.[99]

486.    In the field for "violation of revised statute," Dowling wrote "No charge at this time."[100]

487.    No crime was identified anywhere in the warrant application.

488.    The same day, Dowling sought another search warrant for "any and all medical records from [E.P.'s] hospital visit on Sunday, January 19, 2020."[101]

489.    This application also said "No charge at this time."[102] No crime was identified in this warrant application either.

490.    That same day, Dowling applied for a search warrant for E.P.'s father's East Jefferson medical records.[103] (E.P.'s father is Plaintiff Daren Parsa.) This application also said "No charge at this time."[104]

491.    No crime was identified in this warrant application either.

---

[98] Doc. 9 (Answer) at pg. 9, admitting ¶ 1.
[99] Doc. 93-4 (Search Warrants and Search Warrant Applications) at 1.
[100] *Id*.
[101] *Id*. at 5.
[102] *Id*.
[103] *Id*. at 13.
[104] *Id*.

492.    On January 21, 2022, Dowling contacted the St. Charles Parish Sheriff's Office and asked them to apply for a search warrant for all documents "associated with" E.P. from E.P.'s high school.[105]

493.    The warrant application used a JPSO item number, and sought all records associated with E.P.'s "courses of study, including grades, progress reports, and all associated notes."[106]

494.    It sought all video footage of E.P. in his classroom, and a range of other materials.[107] The application said that it was for "purposes of generalized law enforcement inspection."[108]

495.    No crime was identified in this warrant application either.

496.    On January 22, 2020, Dowling applied for a warrant for all of E.P.'s pediatric medical records from Ormond Pediatrics and Doctor Thomas Babin.[109]

497.    This application also said "No charge at this time."[110]

498.    No crime was identified in this warrant application either.

499.    On January 23, 2020, JPSO contacted the New Orleans Police Department and asked them to apply for a search warrant application for unedited video in the possession of the WWL TV station.[111]

500.    NOPD complied, and applied for a warrant "on behalf of the Jefferson Parish Sheriff's Office."[112]

---

[105] *Id.* at 24. ("Sergeant Keith Dowling of the Jefferson Parish Sheriff's Office is seeking any and all relevant Destrehan High School documents and safety protocols associated with" E.P.)
[106] *Id.* at 23.
[107] *Id.*
[108] *Id.* (emphasis added.)
[109] *Id.* at 9.
[110] *Id.*
[111] *Id.* at 17 ("On Thursday January 23, 2020 Det. Steven Phillips of the New Orleans Police Department, Intelligence Unit, was contacted by the Jefferson Parish Sheriff's Office concerning a death investigation which occurred in Jefferson Parish.")
[112] *Id.* at 18.

501.     This application left the "violation of" section completely blank.[113]

502.     No crime was identified in this warrant application either.

503.     On February 7, 2020, Keith Dowling filed a seventh and final search warrant application.

504.     He sought permission to search the contents of a DVR device obtained from E.P.'s school, which contained video surveillance of E.P. in the classroom.[114]

505.     Once again, Dowling noted "No charge at this time."[115]

506.     No crime was identified in this warrant application either.

507.     Nobody from JPSO told E.P.'s family that they were seeking these search warrants.

508.     Nobody from JPSO asked for their consent, or asked for a HIPAA or FERPA release to obtain the records.[116]

509.     E.P.'s family objected to the search warrants they learned about from E.P.'s school and doctor.[117]

510.     The family did not learn until much later that JPSO had also sought Daren Parsa's medical records, as well as raw footage from WWL TV.)

511.     Each of these search warrant applications was approved by a judge.

512.     One of the seven was subject to an unsuccessful motion to quash.

513.     But none of the applications identified any crime that any person was suspected of committing.

---

[113] Id.

[114] Id. at 27.

[115] Id.

[116] Doc. 94-5 at 60:14-22 ("Q. EP's family did not consent to the obtaining of this information, correct? . . . They didn't seek their permission, to my knowledge. We simply obtained the warrants.")

[117] Doc. 94-5 at 60:24-61:9 ("Q. Do you know whether the family specifically objected to these warrants? . . . A. . . . the answer would be they did object.")

514.     That is because JPSO testified at deposition that it had no reason to suspect that a crime had been committed at all.[118]

515.     When asked why Dowling would repeatedly swear under oath that "probable cause exist[s]" even though there was no suspicion of a crime, JPSO's representative explained that the "probable cause" section of the warrant application was "pro forma language" that could not be removed.[119]

516.     But despite the absence of probable cause, JPSO testified that the use of these search warrants was consistent with JPSO and the Sheriff's directives and requirements.[120]

517.     These search warrants were obtained pursuant to the Sheriff's policy.

518.     These search warrants were obtained pursuant to JPSO's standard practice.

519.     The Sheriff's policy was the moving force for Dowling obtaining these search warrants.

520.     Not only were these crime-less search warrants consistent with Sheriff Lopinto's directives, but they were also part of JPSO's routine practices.

521.     The JPSO representative confirmed at deposition that the office "routinely" obtains search warrants for "death investigations" even in the absence of a suspected crime.[121]

---

[118] Doc. 94-5 at 42:25-43:6; 44:16-45:11

[119] Doc. 94-5 at 45:17-46:9 ("Q. But in the absence of basis to suspect crimes, I don't understand. What was the probable cause in this scenario? Probable cause of what, that Keith Dowling's work was the basis for this search warrant? . . [A.] That's pro forma language. Keith Dowling doesn't generate that language. This is almost fill in the blank at this stage. He has no control over the language, deposes and says that probable cause exists. Q. Yeah. That's form language, right? A. Correct.")

[120] Doc. 94-5 at 16:7-17:15.

[121] Doc. 94-5 at 33:20-34:6 ("We have routinely gotten search warrants on what we've defined at the outset as a death investigation. During my career, my experience, we have obtained warrants on the basis of no definitive established cause and manner of death. It is at that juncture a death investigation, and yet we have secured search warrants on that basis. Perhaps no crime has occurred. Perhaps no crime has been committed. We do not know, so we seek a search warrant in furtherance of determination, for the sake of a better term.")

522.     Dowling confirmed that there was no probable cause on which to base the warrants.[122]

523.     He confirmed that his investigation was regarding the use of force by JPSO deputies,[123] and not any possible crimes by any other persons, such as Daren Parsa, Donna Lou, or E.P.[124]

524.     The Constitution requires that "no warrants shall issue, but upon probable cause."

525.     It is "well recognized that the probable cause necessary to justify a search warrant is coextensive with the probable cause required to justify an arrest warrant."[125]

526.     That is to say, a "warrant must be based upon probable cause of criminal activity."[126]

527.     Here, Plaintiffs bring this claim for all the search warrants described above, except for the WWLTV search warrant.

528.     JPSO admitted in its 30(b)(6) deposition that it did not have "any reason to suspect" any "crime that could have conceivably been considered at that point."[127]

529.     But JPSO sought, obtained, and executed criminal search warrants anyway.

530.     Because probable cause cannot exist in the absence of facts suggesting a crime, those admissions are sufficient to establish the Fourth Amendment violation.[128]

---

[122] Doc. 155-5 at 77:1-6.

[123] Doc. 155-5 at 66

[124] *See id.* at 89

[125] *United States v. Brouillette*, 478 F.2d 1171 (5th Cir. 1973), *citing Giordenello v. United States*, 357 U.S. 480, 485-486, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958); 3 Wright, Federal Practice and Procedure § 662 (1969).

[126] *United States v. Tasto*, 586 F.2d 1068 (5th Cir. 1978) (per curiam).

[127] Doc. 94-5 at 45:6-11; 43:2-6.

[128] Reasonable suspicion "is a substantially lower standard than probable cause." *United States v. Norbert*, 990 F.3d 968, 977 (5th Cir. 2021). Thus, if there was no reasonable suspicion, then *a fortiori* there was no probable cause.

531.    No reasonably competent officer would have concluded that a warrant should issue in the absence of a suspected crime, given that the "probable cause" requirement is in the text of the Fourth Amendment.

532.    Sheriff Lopinto, in his official capacity, violated Plaintiffs' constitutional rights (either on their own behalf or on behalf of their deceased son, E.P.), when his agency obtained search warrants without probable cause.

## VII. Causation

533.    The actions of the defendants as described herein, were the proximate cause of the injuries and damages suffered by plaintiffs and to E.P. and as a result, the plaintiffs have been injured and suffered damages as set forth herein.

534.    The defendants are jointly and severally liable for the wrongs complained of herein, either by virtue of direct participation or by virtue of encouraging, aiding, abetting, conspiring, committing and/or ratifying or condoning the commission of the above-described acts.

535.    The actions of the defendants described herein were negligent, grossly negligent, intentional, arbitrary, capricious and unreasonable and/or deliberately indifferent.

536.    The actions and omission of the defendants as described herein, were intentional, malicious, reckless and performed with malice, entitling the Plaintiffs to a substantial award of punitive damages.

## VIII. Damages

537.    As a direct and proximate result of the Defendants' wrongful acts and omissions as described herein, Plaintiffs suffered severe injuries and the loss and death of their only son, for which they seek and are entitled to recover damages from the defendants, jointly and severally, for these injuries, to the fullest extent possible, under both federal and state law, as follows:

A. E.P. suffered severe physical, mental and emotional injuries, pain and suffering,

anguish, loss of liberty, loss of enjoyment of life, pre-death fear and terror, and death.

B. Donna Lou and Daren Parsa, the mother and father of E.P., suffered the loss of love, companionship and affection of their only son, E.P., loss of consortium, serious mental and emotional pain, suffering, anguish, and unlawful seizure and loss of liberty and loss of their family relationship and incurred funeral and burial costs.

C. Punitive damages are sought against the defendants in their individual capacity.

## IX. <u>PRAYER FOR RELIEF</u>

538.    WHEREFORE, Plaintiffs pray that after due proceedings, that there be judgment in their behalf and against all defendants, jointly and severally, as follows:

1. Compensatory and punitive damages.

2. Funeral and burial costs and other special damages.

3. Plaintiffs be awarded reasonable attorney's fees and all costs of these proceedings pursuant to 42 U.S.C. § 1988.

4. That judicial interest be awarded from the date of judicial demand.

5. That this matter be tried by a jury.

6. Declaratory relief and judgment that the acts complained of herein were unconstitutional.

7. All other relief which this Court deems just and proper.

Plaintiffs further reserve the right to notice of defect to this pleading and reserve the right to amend or supplement this Petition after discovery of any additional fact, law, or claim, the amendment of which to be performed by the filing of any subsequent pleading.

Respectfully submitted,

Donna Lou and Daren Parsa, by and through their counsel,

<u>/s/ William Most</u>
Most & Associates
William Most, La. Bar. No. 36914
Hope Phelps, La. Bar. No. 37259

201 St. Charles Ave., Ste. 114, #101
New Orleans, LA 70170
(504) 509-5053
williammost@gmail.com

Andrew Clarke
The Cochran Firm Mid-South (*pro hac vice* to be filed)
40 N Main St. #1700
Memphis, TN 38103
(901) 523-1222
aclarke@cochranfirmmidsouth.com