UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DONNA LOU, ET AL. | * | CIVIL ACTION NO. 21-80 |
| VERSUS | * | SECTION "D" (2) |
| SHERIFF JOSEPH P, LOPINTO, III, ET AL. | * | Judge Wendy B. Vitter<br>Magistrate Judge Donna P. Currault |

**Plaintiffs' Memorandum for Renewed Motion for Partial Summary Judgment**

On January 19, 2020, Jefferson Parish Sheriff's Office deputies restrained E.P., an autistic 16-year-old, on the asphalt of a parking lot. They cuffed and shackled E.P., and held him in a face-down, prone position. They sat on E.P. for over nine minutes. E.P. stopped breathing. He died.

The next day, JPSO began seeking criminal search warrants for information about E.P.'s background. Over the family's objection, JPSO used search warrants to obtain E.P.'s school grades, pediatric medical records, and the medical records of E.P.'s father.

But none of the search warrant applications identified any alleged crime. Instead, they used language like "no charge at this time" or "for generalized law enforcement inspection." Or they simply left the "violation of" section of the warrant application blank.

At deposition, JPSO admitted that it did not *describe* any crime because it did not *suspect* any crime. Specifically, JPSO's representative testified that the "only crime that could have conceivably been considered at that point would be one by deputy or deputies against" the minor E.P. And **"JPSO didn't have any reason to suspect a crime was committed against EP at the time of this search warrant application."** In short: no reason to even <u>suspect</u> any crime.

But criminal search warrants without a crime are forbidden by the Fourth Amendment to the United States Constitution. That amendment bars any warrant from issuing except "upon probable cause" of a crime.

And so JPSO's admitted use of criminal search warrants without even the <u>suspicion</u> of a crime – much less probable cause – indisputably violates the Fourth Amendment. Despite the

unconstitutionality of these search warrants, JPSO testified that the use of these search warrants was consistent "with the way Sheriff Lopinto requires that [search warrants] be used."

Thus, there are no disputed facts on this issue. The only question is a legal one: was it constitutional for Sheriff Lopinto's deputies to seek, obtain, and execute criminal search warrants in the absence of any suspected crime?

The Fourth Amendment to the U.S. Constitution says no. The U.S. Supreme Court says no. The Fifth Circuit says no. The answer is clear.

Plaintiffs previously brought this motion (Doc. 93). This Court denied the motion because it was unclear whether Plaintiffs' complaint brought a Fourth Amendment claim for these violations (Doc. 208). Plaintiffs have now amended their complaint with the Court's permission to make their search warrant claim clear, and so re-bring this motion.

Because it was unconstitutional for the Jefferson Parish Sheriff's Office to execute criminal search warrants in the absence of any suspected crime, partial summary judgment should issue on Plaintiffs' unconstitutional search warrant claim against Sheriff Lopinto in his official capacity.

## I.      Factual Background

On January 19, 2020, E.P. died in the custody and care of deputies with the Jefferson Parish Sheriff's Office in the parking lot of the Westgate Shopping Center in Metairie, Louisiana.[1]

On January 20, 2020, JPSO began seeking criminal search warrants. On that day, JPSO's Keith Dowling submitted a warrant application, swearing under oath that "probable cause exists for the issuance of a search warrant" for E.P.'s East Jefferson General Hospital EMS records.[2] In the field for "violation of revised statute," Dowling wrote "No charge at this time."[3] No crime was identified anywhere in the warrant application.

---

[1] Doc. 9 (Answer) at pg. 9, admitting ¶ 1.
[2] Doc. 93-4 (Search Warrants and Search Warrant Applications) at 1.
[3] *Id.*

The same day, Dowling sought another search warrant for "any and all medical records from [E.P.'s] hospital visit on Sunday, January 19, 2020."[4] This application also said "No charge at this time."[5] No crime was identified in this warrant application either.

That same day, Dowling applied for a search warrant for E.P.'s father's East Jefferson medical records.[6] (E.P.'s father is Plaintiff Daren Parsa.) This application also said "No charge at this time."[7] No crime was identified in this warrant application either.

On January 21, 2022, Dowling contacted the St. Charles Parish Sheriff's Office and asked them to apply for a search warrant for all documents "associated with" E.P. from E.P.'s high school.[8] The warrant application used a JPSO item number, and sought all records associated with E.P.'s "courses of study, including grades, progress reports, and all associated notes."[9] It sought all video footage of E.P. in his classroom, and a range of other materials.[10] The application said that it was for "purposes of generalized law enforcement inspection."[11] No crime was identified in this warrant application either.

On January 22, 2020, Dowling applied for a warrant for <u>all</u> of E.P.'s pediatric medical records from Ormond Pediatrics and Doctor Thomas Babin.[12] This application also said "No charge at this time."[13]  No crime was identified in this warrant application either.

On January 23, 2020, JPSO contacted the New Orleans Police Department and asked them to apply for a search warrant application for unedited video in the possession of the WWL TV

---

[4] *Id*. at 5.
[5] *Id*.
[6] *Id*. at 13.
[7] *Id*.
[8] *Id*. at 24. ("Sergeant Keith Dowling of the Jefferson Parish Sheriff's Office is seeking any and all relevant Destrehan High School documents and safety protocols associated with" E.P.)
[9] *Id*. at 23.
[10] *Id*.
[11] *Id*. (emphasis added.)
[12] *Id*. at 9.
[13] *Id*.

station.[14] NOPD complied, and applied for a warrant "on behalf of the Jefferson Parish Sheriff's Office."[15] This application left the "violation of" section completely blank.[16] No crime was identified in this warrant application either.

On February 7, 2020, Keith Dowling filed a seventh and final search warrant application. He sought permission to search the contents of a DVR device obtained from E.P.'s school, which contained video surveillance of E.P. in the classroom.[17] Once again, Dowling noted "No charge at this time."[18] No crime was identified in this warrant application either.

Nobody from JPSO told E.P.'s family that they were seeking these search warrants. Nobody from JPSO asked for their consent, or asked for a HIPAA or FERPA release to obtain the records.[19] E.P.'s family objected to the search warrants they learned about from E.P.'s school and doctor.[20] (The family did not learn until much later that JPSO had also sought Daren Parsa's medical records, as well as raw footage from WWL TV.)

Each of these search warrant applications was approved by a judge. One of the seven was subject to an unsuccessful motion to quash. But <u>none</u> of the applications identified any crime that any person was suspected of committing. That is because JPSO testified at deposition that it had no reason to suspect that a crime had been committed at all. JPSO's representative explained that:

> Q.    Does that mean that at that point there was not a suspected crime?
>
> A.    The only reason the Homicide Division investigated that is arguably use of force. The only crime that could have conceivably been considered at that point would be one by deputy or deputies against Eric Parsa.
>      . . .

---

[14] *Id*. at 17 ("On Thursday January 23, 2020 Det. Steven Phillips of the New Orleans Police Department, Intelligence Unit, was contacted by the Jefferson Parish Sheriff's Office concerning a death investigation which occurred in Jefferson Parish.")
[15] *Id*. at 18.
[16] *Id*.
[17] *Id*. at 27.
[18] *Id*.
[19] Doc. 94-5 at 60:14-22 ("Q. EP's family did not consent to the obtaining of this information, correct? . . . They didn't seek their permission, to my knowledge. We simply obtained the warrants.")
[20] Doc. 94-5 at 60:24-61:9 ("Q. Do you know whether the family specifically objected to these warrants? . . . A. . . . the answer would be they did object.")

Q.      Did JPSO have suspicion that its deputies committed crimes against EP at the time of the search warrant application?

[A.]    I'm not trying to be difficult. Suspicion of -- no, no direct suspicion, but in the interest of thoroughness and the obligation to conduct the investigation, things of this nature were done to obtain all of the information.

Q.      Yeah. I understand that. And so JPSO didn't have any reason to suspect a crime was committed against EP at the time of this search warrant application, agreed?

A.      No. No particular reason to believe so, agreed.[21]

The representative specifically pointed out that there was "was no indication of wrongdoing on [the officers'] part."[22]

Later in the deposition, the JPSO representative again confirmed that there was no suspicion of crime:

Q.      Okay. But with this [search warrant], like the one before, there was no indication to believe that a crime had been committed, but JPSO wanted these records for these other reasons, agreed?

A.      For the investigative purposes I've stated, yes.

Q.      But, otherwise, my statement is correct?

A.      As I remember it, yes.[23]

When asked why Dowling would repeatedly swear under oath that "probable cause exist[s]" even though there was no suspicion of a crime, JPSO's representative explained that the "probable cause" section of the warrant application was <u>pro forma language</u>" that could not be removed.[24]

---

[21] Doc. 94-5 at 42:25-43:6; 44:16-45:11 (objections omitted).
[22] Doc. 94-5 at 63:21-22.
[23] Doc. 94-5 at 54:5-12.
[24] Doc. 94-5 at 45:17-46:9 ("Q. But in the absence of basis to suspect crimes, I don't understand. What was the probable cause in this scenario? Probable cause of what, that Keith Dowling's work was the basis for this search warrant? . . [A.] That's pro forma language. Keith Dowling doesn't generate that language. This is almost fill in the blank at this stage. He has no control over the language, deposes and says the probable cause exists. Q. Yeah. That's form language, right? A. Correct.")

The representative was then asked whether it is JPSO's position that there was or was not probable cause. The representative refused to answer that question.[25]

But despite the absence of probable cause, JPSO testified that the use of these search warrants was consistent with JPSO and the Sheriff's directives and requirements:

> Q.    Is there any way in which the search warrants related to EP were used or obtained -- is there any way in which that diverged from the way JPSO requires its search warrants be used?
>
> A.    I don't believe so, no.
> . . .
> Q.    I mean, is there anything about the substance, the physical means, the content? Is there anything about the search warrants for EP that is inconsistent with the way Sheriff Lopinto requires that they be used?
>
> A.    The answer to that would be no.[26]

Not only were these crime-less search warrants consistent with Sheriff Lopinto's directives, but they were also part of JPSO's routine practices. The JPSO representative confirmed at deposition that the office "routinely" obtains search warrants for "death investigations" even in the absence of a suspected crime.[27]

Dowling himself confirmed that there was no probable cause on which to base the warrants. He confirmed that his investigation was regarding the use of force by JPSO deputies,[28] and not any possible crimes by any other persons, such as Daren Parsa, Donna Lou, or E.P.[29] He gave the following testimony:

---

[25] JPSO's representative was asked this question six times. Doc. 94-5 at 46:10-20, 46:22-47:7, 47:9-25, 48:2-25, 49:2-20, 51:20-52-13. Each time, the representative refused to answer whether or not JPSO contends there was probable cause. He only provided non-responsive answers, like "The judge believed so by issuing the warrant." *Id*. at 47:6-7.

[26] Doc. 94-5 at 16:7-17:15.

[27] Doc. 94-5 at 33:20-34:6 ("We have routinely gotten search warrants on what we've defined at the outset as a death investigation. During my career, my experience, we have obtained warrants on the basis of no definitive established cause and manner of death. It is at that juncture a death investigation, and yet we have secured search warrants on that basis. Perhaps no crime has occurred. Perhaps no crime has been committed. We do not know, so we seek a search warrant in furtherance of determination, for the sake of a better term.")

[28] Doc. 155-5 at 66

[29] *See id.* at 89

```
     Q.   Did you conclude that there was probable
cause that any officer of the Jefferson Parish
Sheriff's Office committed a crime?
     A.   No.
     Q.   When you sought the warrants?
     A.   No.                                       30
```

## II.      Legal Standard

### A.      Summary Judgment Standard[31]

Summary judgment is appropriate where there is no genuine disputed issue as to any material fact, and the moving party is entitled to judgment as a matter of law.[32] A party moving for summary judgment must inform the Court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, that show that there is no such genuine issue of material fact.[33] If the moving party carries its burden of proof under Rule 56, the opposing party must direct the Court's attention to specific evidence in the record which demonstrates that the non-moving party can satisfy a reasonable jury that it is entitled to a verdict in its favor.[34] This burden is not satisfied by some metaphysical doubt as to alleged material facts, by unsworn and unsubstantiated assertions, by conclusory allegations, or by a mere scintilla of evidence.[35] Rather, Rule 56 mandates that summary judgment be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.[36] In resolving a motion for summary judgment, the Court must review the

---

[30] *Id*. at 77:1-6.
[31] This standard is drawn from this Court's order in Doc. 211.
[32] Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986).
[33] *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552.
[34] *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.
[35] *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994)
[36] *Celotex Corp*., 477 U.S. at 323, 106 S.Ct. at 2552.

facts and inferences in the light most favorable to the non-moving party, and the Court may not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes.[37]

**B.      42 U.S.C. § 1983, Qualified Immunity, and *Monell*.**

Title 42 U.S.C. § 1983 creates a damages remedy for the violation of federal constitutional or statutory rights under color of state law. Specifically, it provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.[38]

Because § 1983 merely provides a remedy for designated rights, rather than creating any substantive rights, "an underlying constitutional or statutory violation is a predicate to liability."[39] To establish § 1983 liability, the plaintiff must establish the following three elements: (1) deprivation of a right secured by the United States Constitution or federal law; (2) that occurred under color of state law; and (3) was caused by a state actor.[40]

Qualified immunity is a defense that individual government officials may assert against claims for money damages. It is not a defense available to government entities, or public officials in their official capacities.[41]

In this motion, Plaintiffs seek partial summary judgment against Sheriff Lopinto in his official capacity. Sheriff Lopinto is the final policymaker under Louisiana law within Jefferson

---

[37] *International Shortstop, Inc. v. Rally's, Inc*., 939 F.2d 1257, 1263 (5th Cir. 1991).
[38] 42 U.S.C. § 1983.
[39] *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) (citation omitted).
[40] *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004) (citation omitted)
[41] *Gates v. Texas Dept. of Protective & Reg. Services*, 537 F. 3d 404, 436 (5th Cir. 2008) ("governmental entities are not entitled to qualified immunity"), *citing Owen v. City of Independence*, 445 U.S. 622, 657 (1980).

Parish. In his official capacity, the Sheriff is the governmental entity itself.[42] Accordingly, the defense of qualified immunity is not available to Sheriff Lopinto in his official capacity.[43]

In his official capacity, Lopinto can be liable for constitutional violations pursuant to the *Monell* doctrine. Under *Monell v. Department of Social Services*, municipalities and local governing bodies are subject to liability for constitutional violations involving official policies or practices.[44] *Monell* liability consists of three elements: "(1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose 'moving force' is the policy or custom."[45] *Monell* is satisfied when an authorized policymaker approves a subordinate's decision and the basis for it.[46]

**C.    The Constitution requires that "no warrants shall issue, but upon probable cause."**

The Fourth Amendment provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment thus establishes that "a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity."[47]

---

[42] *Rogers v. Smith*, 20-cv-517-JTM-DMD, Doc. 195 (E.D. La., May 13, 2022) ("A claim against the Sheriff in his official capacity amounts to a claim against the municipality itself.") *See also Thomas v. Pohlmann*, No. 16-30798, 2017 WL 1031282, at *5 (5th Cir. March 15, 2017).

[43] *Anderson, supra* ("Municipalities and local governing bodies cannot plead qualified immunity as a defense. *See Howell v. Town of Ball*, 827 F.3d 515, 527 (5th Cir. 2016).")

[44] *See* 436 U.S. 658, 690 (1978).

[45] *Davis v. Tarrant Cnty, Tex.*, 565 F.3d 214, 227 (5th Cir. 2009) (*citing Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003)).

[46] *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

[47] *Kentucky v. King*, 563 U.S. 452, 459 (2011).

It is also "well recognized that the probable cause necessary to justify a search warrant is coextensive with the probable cause required to justify an arrest warrant."[48] That is to say, a "warrant must be based upon probable cause of criminal activity."[49]

"Probable cause exists when there are reasonably trustworthy facts which, given the totality of the circumstances, are sufficient to lead a prudent person to believe that the items sought [by a search warrant] constitute fruits, instrumentalities, or evidence of a crime."[50]

Thus, the Fifth Circuit has held that if there is "no crime," there cannot be probable cause.[51] Or as a section of this Court held, "where the facts and circumstances would not lead a prudent person to believe that a search warrant will uncover evidence of a *crime*, probable cause does not exist."[52]

JPSO has conceded this principle, explaining that "If there is no suspicion of a crime, I would have to think about a scenario where that might apply, and I can't right now. No crime, no investigation of a crime, no potential for one, I wouldn't know what our standing [for a search warrant] would be at that point."[53]

---

[48] *United States v. Brouillette*, 478 F.2d 1171 (5th Cir. 1973), *citing Giordenello v. United States*, 357 U.S. 480, 485-486, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958); 3 Wright, Federal Practice and Procedure § 662 (1969).

[49] *United States v. Tasto*, 586 F.2d 1068 (5th Cir. 1978) (per curiam).

[50] *Kohler v. Englade*, 470 F.3d 1104, 1109 (5th Cir. 2006) (internal quotation marks omitted); *see also United States v. Melancon*, 462 F.2d 82, 89 (5th Cir. 1972).

[51] *Johnson v. Thibodaux City*, 887 F.3d 726, 735 (5th Cir. 2018) (where there was "no crime," there was no probable cause).

[52] *Anderson v. Larpenter*, No. CV 16-13733, 2017 WL 3064805, at *9 (E.D. La. July 19, 2017) (emphasis in original) (holding that the defendants did not have probable cause for a search warrant "because no prudent person would believe that [the plaintiff's] statements" addressing the Parish President's fitness for office "could constitutionally form the basis of a crime"), citing *United States v. Rojas*, 671 F.2d 159, 165-66 (5th Cir. Unit B 1982) (Because "neither possessing nor transporting over $5,000 in currency is a crime," law enforcement officials "had neither probable cause that a crime had been or was being committed (probable cause for arrest) nor probable cause that a search of appellant's luggage would produce evidence of a crime."). See also State v. Jackson, 380 So. 2d 616, 619 (La. 1980 (probable cause requires facts that would "warrant a person of reasonable caution to believe that an offense has been committed").

[53] Doc. 94-5 at 35:17-22.

The "must be a crime" requirement for search warrants is reflected in Louisiana statutes as well. Louisiana's code of criminal procedure specifies four things subject to search warrants: (1) the subject of theft; (2) the means of committing an offense; (3) evidence tending to prove the commission of an offense; (4) bodily samples.[54] Probable cause is likewise a statutory requirement for any Louisiana search warrant.[55] And Louisiana law requires that a search warrant affidavit must allege *how* the property was evidence of a crime.[56]

Significantly for this motion, probable cause is decided on an objective standard, not a subjective one.[57] The actual mental thought process of the officers involved is not relevant to the analysis of a constitutional violation. For that reason, Fourth Amendment claims are susceptible to plaintiffs' summary judgment motions. For example, a section of this Court recently granted partial summary judgment to a plaintiff on a Fourth Amendment claim when the absence of probable cause was evident from the undisputed facts, regardless of the intent of the officers involved.[58]

Also, the fact that a warrant is signed by a judge is not a bar to a Fourth Amendment claim when "it is obvious that no reasonably competent officer would have concluded that a warrant should issue."[59] As this Court explained in *Larpenter,*

> "[T]he fact that a neutral magistrate issues a warrant is *not* dispositive of whether [an officer's] underlying actions were objectively reasonable." *Winfrey v. San Jacinto Cnty.*, 481 Fed. App'x 969, 978 (5th Cir. 2012) (emphasis added); *see also*

---

[54] Code of Criminal Procedure Arts. 161 and 163.1.

[55] Code of Criminal Procedure Arts. 161 (A) ("A search warrant may issue only upon probable cause established to the satisfaction of the judge, by the affidavit of a credible person, reciting facts establishing the cause for issuance of the warrant.")

[56] *See State v. Jackson*, 380 So.2d 616 (La.1980) (quashing search warrant when the "affidavit offered the magistrate no grounds upon which he could reasonably have concluded that the defendant's gun was probably connected with the airport shooting and therefore evidence of a crime.")

[57] *Whren v. United States*, 517 U.S. 806 (1996). *See also Lockett v. New Orleans City*, 607 F.3d 992, 998 (5th Cir.) (in determining whether there was probable cause, courts consider the "facts within the officer's knowledge-- not whether the officer was aware of the legal consequences of the facts."), cert. denied, 131 S. Ct. 507 (2010); Ulrich v. Pope Cnty., 715 F.3d 1054, 1060 (8th Cir. 2013) (". . . the existence of probable cause or arguable probable cause depends on the viewpoint of an objectively reasonable officer, not on the viewpoint of the particular arresting officer.")

[58] *Rogers v. Smith*, 20-cv-517-JTM-DMD, Doc. 195 (E.D. La., May 13, 2022)

[59] *Id.* at *9, *citing Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012).

*Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012) ("[T]he fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into [an officer's] objective reasonableness.").[60]

On January 24, 2023, in *Nevarez v. Coleman,* another section of this Court decided a motion with very similar elements, in which officers of other agencies used criminal search warrants to collect information after officers killed a person.[61] The Court explained that because "the evidence defendants purportedly sought to uncover could not possibly 'aid in a particular apprehension or conviction'," the Court would not "defer to a warrant based on an affidavit that does not 'provide the magistrate with a substantial basis for determining the existence of probable cause.'" Therefore, the court concluded that:

> A reasonable officer would understand that there is no probable cause to support a search warrant where, as here, the police were investigating their own use of force rather than pursuing an active criminal investigation.[62]

### III.    Analysis

### A.    Plaintiffs have standing to challenge JPSO's search warrants.

A plaintiff in federal court must have Article III standing. And as a general principle, "a person may not sue for the violation of another's civil rights."[63] Similarly, Fourth Amendment rights are "personal rights" which "may not be vicariously asserted" by a third party.[64] But when a person dies, the question arises of who can sue for the vindication of the decedent's civil rights. Because Section 1983 does not address the question of survival of a deceased's claim, 42 U.S.C. § 1988 directs that the law of the state in which the action is brought supplies the relevant rule.[65]

---

[60] *Larpenter, supra*, at *26.
[61] *Nevarez v. Coleman*, 21-cv-01855-SSV-MBN, 2023 U.S. Dist. LEXIS 11567, 2023 WL 372088, Doc. 60 (E.D. La. Jan. 24, 2023).
[62] *Id*. at pg. 23, citing Wooley v. City of Baton Rouge, 211 F.3d 913, 919 (5th Cir. 2000) and Mayfield v. Currie, 976 F.3d 482, 488 (5th Cir. 2020).
[63] *McGowan v. Maryland*, 366 U.S. 420 (1961).
[64] *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978).
[65] 42 U.S.C. § 1988 ("in all cases where [laws including 42 U.S.C. § 1983] are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause").

For that reason, the Fifth Circuit has held that Section 1988 "incorporates the right of survival under the state statute as part of the federal Act."[66] In Louisiana, Civil Code Articles 2315.1 and 2315.2 list the parties who may pursue survival and wrongful death actions. Those statutes define who has standing to pursue Section 1983 claims on a decedent's behalf.[67] If a person dies with no surviving spouse or children, the "surviving father and mother of the deceased" have standing to sue.[68]

Here, the Plaintiffs are E.P.'s parents. They are suing both on their own behalf and on behalf of their deceased son.[69] Because E.P. died without a spouse or children,[70] his parents have standing to sue. Thus, Plaintiffs are not suing for E.P.'s rights on their own behalf. They are suing for E.P.'s rights on E.P.'s behalf – as Louisiana law incorporated through 42 U.S.C. § 1988 allows them to do. Therefore, Plaintiffs have standing to challenge the search warrants for E.P.'s medical records and school records. And Plaintiff Daren Parsa has standing to challenge the search warrant for his medical records. Plaintiffs do not challenge the search warrant for WWLTV's records.

**B.    This Court should grant summary judgment because Defendants admit that their warrants lacked probable cause.**

Here, JPSO admitted in its 30(b)(6) deposition that it did not have "any reason to suspect" any "crime that could have conceivably been considered at that point."[71] But JPSO sought, obtained, and executed criminal search warrants anyway. Because probable cause cannot exist in the absence of facts suggesting a crime, those admissions are sufficient to establish the Fourth

---

[66] Brazier v. Cherry, 293 F. 2d 401 fn. 20 (5th Cir. 1961). *See also See Rhyne v. Henderson County*, 973 F.2d 386, 390-91 (5th Cir.1992) (finding that standing under Texas wrongful death and survival statutes is incorporated into the Federal Civil Rights Statutes), *as cited in Pluet v. Frasier*, 355 F.3d 381 (5th Cir. 2004).
[67] *See Bedingfield v. Deen*, 09-cv-369 (W.D. La., July 27 2011).
[68] Civil Code Articles 2315.1(A)(2) and 2315.2(A)(2).
[69] See Doc. 1 at 1 (caption reads "DONNA LOU and DAREN PARSA, on their own behalf and on behalf of their deceased minor child, E.P.")
[70] Ex. A (Declaration of Daren Parsa).
[71] Doc. 94-5 at 45:6-11; 43:2-6.

Amendment violation.[72] No reasonably competent officer would have concluded that a warrant should issue in the absence of a suspected crime, given that the "probable cause" requirement is in the text of the Fourth Amendment.

And because Fourth Amendment claims are evaluated on an objective rather than subjective standard, it does not matter what the officers' actual purpose for the search warrants was. Perhaps JPSO violated the Fourth Amendment because it wanted "to gather as much information and paint as clear a picture of whoever Parsa was and what he was dealing with."[73] Or perhaps JPSO obtained E.P.'s school and medical records because it thought they would be useful in defending against an anticipated civil suit by E.P.'s family. It does not matter. The actual intent of the officers involved does not enter the Fourth Amendment analysis.

At deposition, JPSO's representative testified that the department felt an obligation to investigate the death of E.P., even in the absence of a suspected crime.[74] But Louisiana law sets out a process for obtaining records relating to a non-criminal death, and assigns those powers to coroners, not sheriffs. Specifically, coroners have the power to issue subpoenas duces tecum during the course of a death investigation, even where no crime is suspected.[75] The coroner can direct "the production of medical records and other documents relating to a deceased person which

---

[72] Reasonable suspicion "is a substantially lower standard than probable cause." *United States v. Norbert*, 990 F.3d 968, 977 (5th Cir. 2021). Thus, if there was no reasonable suspicion, then *a fortiori* there was no probable cause.

[73] Doc. 94-5 at 53:6-14. The "clear picture" theory is substantially undercut by JPSO's admission that it only used search warrants to investigate the background of the decedent. It did not use search warrants to seek any information about the background of the officers who killed E.P. Doc. 94-5 at 63:13-20 ("Q. So what search warrants were used related 14 to the officers involved?. . . No search warrants as it related to the officers involved. They were compliant with requests.") JPSO did not even ask the officers for any documents. *Id*. at 66:17-19 ("Q. But the short answer is no documents were requested from the deputies themselves, agreed? A. Agreed.")

[74] Note: JPSO's representative conceded that he could not have been investigating a crime committed by E.P. himself. That is the result of the doctrine of "abatement ab initio." Under that doctrine, there can be no criminal proceeding against a deceased person. *State v. McClow*, 395 So.2d 757 (La., 1981) ("Abatement ab initio of criminal proceedings has the effect of wiping the slate clean through indictment and conviction," and applies when defendant is dead.)

[75] La. Code of Crim. Pro. art. 103.

are necessary to classify the cause and manner of death."[76] Thus, it was the coroner's role, not the sheriff's, to investigate E.P.'s death in the absence of suspicion of a crime.

But JPSO did so anyway. And it did so explicitly pursuant to the directives of the Sheriff of Jefferson Parish. JPSO's representative testified that there is nothing "about the search warrants for EP that is inconsistent with the way Sheriff Lopinto requires that they be used."[77] That testimony establishes that the constitutional violations either flowed from JPSO policy or were subject to subsequent ratification – either of which is sufficient to satisfy *Monell.*

It is important to note that JPSO's use of these crime-less search warrants was not some minor, technical violation of the Fourth Amendment. JPSO's actions violated the very purpose of the Fourth Amendment itself. In the revolutionary era, the British use of "general warrants" was a "specific evil . . .   abhorred by the colonists" that animated the inclusion of the Fourth Amendment.[78] Those "general warrants" originated with the notorious Star Chamber, and were condemned by the House of Commons in 1766, shortly before the American Revolution.[79] The Supreme Court has therefore concluded that it "was the purpose of the Fourth Amendment to forbid" general warrants.[80]

For that reason, it is extremely disturbing that 254 years after the House of Commons condemned "general warrants," law enforcement officers in Louisiana are still seeking and executing warrants for "generalized law enforcement inspection" – even in the admitted absence of any suspected crime.

 When asked about this "generalized law enforcement inspection" language, JPSO's representative characterized it as describing a "fishing expedition" and "certainly" not the proper

---

[76] *Id.*
[77] Doc. 94-5 at 16:7-17:15.
[78] *Coolidge v. New Hampshire*, 403 US 443, 467 (1971).
[79] *Boyd v. United States*, 116 US 616, 625, 629 (1886).
[80] *Stanford v. Texas*, 379 US 476 (1965).

basis for a search warrant.[81] But then, when the representative was confronted with that precise language in a search warrant application submitted at the behest of JPSO, the JPSO representative tried to explain further. He said that "a more appropriate response to this is he is looking to inspect it. He doesn't know what he is inspecting it for."[82]

These crime-less search warrants were improper. They were also unconstitutional. And because they were not obtained pursuant to any criminal investigation or prosecution, the most common remedy for an unlawful search – suppression of evidence – is toothless in this context. There cannot be any suppression of evidence when there is no suspected crime. The *only* legal check on these constitutional violations is through Section 1983.

Partial summary judgment should issue.

### IV.    Conclusion

Partial summary judgment should issue on Plaintiffs' Fourth Amendment claim for unconstitutional use of search warrants, against Sheriff Lopinto in his official capacity, regarding the five search warrants for E.P.'s medical and school records, and the one search warrant for Daren Parsa's medical records.

RESPECTFULLY SUBMITTED,

Andrew C. Clarke (TN BPR # 15409)
The Cochran Firm Midsouth
One Commerce Square, Suite 1700
(901) 523-1222 (Telephone)
aclarke@cochranfirmmidsouth.com

*/s/ William Most*
WILLIAM MOST (La. Bar No. 36914)
Most & Associates
201 St. Charles Ave., Ste. 114 #101
New Orleans, LA 70170

---

[81] Doc. 94-5 at 37:2-38:25 ("Q. Is generalized law enforcement inspection a proper basis for a search warrant for JPSO's processes? . . . [A.] I don't recognize that term. I understand the words. I recognize your meaning. Your meaning sounds to me, a layman, more like fishing expedition, otherwise identified as generalized law enforcement inspection. Q. Right. And a fishing expedition is not a proper basis for a search warrant, agreed? A. A fishing expedition certainly would not be, no.")
[82] Doc. 94-5 at 56:10-13. (Emphasis added.)

16

Tel: (504) 509-5023; williammost@gmail.com