**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**DONNA LOU, ET AL.**                          **CIVIL ACTION**

**VERSUS**                                             **NO. 21-80**

**JOSEPH P. LOPINTO, III, ET AL.**         **SECTION: D (2)**

## ORDER AND REASONS

Before the Court is a Partial Motion to Dismiss the Federal Claims Against Sheriff Lopinto in His Official Capacity Pursuant to Fed. R. Civ. P. 56, filed by Sheriff Joseph P. Lopinto, III ("Sheriff Lopinto").[1]  Plaintiffs oppose the Motion,[2] and Sheriff Lopinto has filed a Reply.[3]

After careful consideration of the parties' memoranda and the applicable law, the Motion is **GRANTED in part and DENIED in part.**

## I.      FACTUAL AND PROCEDURAL BACKGROUND[4]

In the instant Motion, Sheriff Lopinto seeks summary judgment on Plaintiffs' federal claims asserted against him in his official capacity on the basis that Plaintiffs cannot prove that Sheriff Lopinto instituted an official policy, practice, or custom that was the moving force behind any alleged constitutional harm or that was the proximate cause of E.P.'s death.[5]  While Sheriff Lopinto claims there is no factual support for Plaintiffs' claims, he believes Plaintiffs have asserted official capacity claims against him for: (1) his alleged failure to train and educate his officers

---

[1] R. Doc. 144.
[2] R. Doc. 156.
[3] R. Doc. 184.
[4] The Court set forth the facts of this case in great detail in its May 18, 2023 Order and Reasons (R. Doc. 208) and, for the sake of brevity, they will not be repeated here.
[5] R. Doc. 144 at p. 1; R. Doc. 144-1 at p. 1.

regarding the use of force; and (2) his failure to adequately supervise, monitor, and evaluate the performance of his deputies regarding their compliance with the laws and policies, practices, and customs regarding several topics, including the use of force and dealing with persons with autism.[6]  Sheriff Lopinto contends that to recover for a failure to train theory brought against a supervisory official in his official capacity under *Monell v. Department of Social Services*, a plaintiff must demonstrate that there was inadequate training, that the failure to train amounted to deliberate indifference to the right of persons with whom the policy came in contact, and that the municipality's policy actually caused a constitutional injury.[7]  Sheriff Lopinto argues that Plaintiffs cannot establish any of these elements because it is undisputed that the Jefferson Parish Sheriff's Office ("JPSO") provided extensive training in all of the areas identified in the Complaint,[8] and because Plaintiffs have failed to show that a policy, pattern, or negligent training/supervision was the moving force behind E.P.'s death.[9]  As such, Sheriff Lopinto claims that he is entitled to summary judgment and dismissal of Plaintiffs' official capacity claims.[10]

Plaintiffs oppose the Motion, asserting that because the Motion only addresses Plaintiffs' *Monell* claims based upon failure to train, their *Monell* claims based upon failure to supervise and ratification remain for trial.[11]  Plaintiffs then assert that the

---

[6] R. Doc. 144-1 at pp. 2-3.

[7] *Id.* at pp. 11-12 (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).  *See,* R. Doc. 144-1 at pp. 7-11 (citing *Monell,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

[8] R. Doc. 144-1 at pp. 4-6, 12-13, & 15 (*citing* R. Doc. 144-3 at pp. 35-175; R. Doc. 144-4).

[9] R. Doc. 144-1 at p. 15.

[10] *Id.*

[11] R. Doc. 156 at pp. 1-2 (*citing* R. Docs. 150 through 150-5).  *See,* R. Doc. 156 at p. 4 (*citing* R. Doc. 1 at ¶¶ 319 & 417(c)-(f)).

Motion should be denied as to failure to train because they have abundant evidence to support a *Monell* claim for failure to train based upon: (1) Sheriff Lopinto's ratification of the deputies' conduct, confirming that their conduct is the best evidence of JPSO's training policies; (2) training deficiencies, including that JPSO provides no training about the use of force on persons with autism; and (3) JPSO's policies, customs, and practices in eliminating oversight, supervision, or discipline of deputies involved in in-custody deaths, such that the JPSO training is whatever the deputies have done.[12]   As such, Plaintiffs argue that the Motion should be denied.

In response, Sheriff Lopinto asserts that Plaintiffs' Opposition brief is largely non-responsive to his Motion.[13]   Sheriff Lopinto maintains that Plaintiffs have no evidence to support a *Monell* claim via ratification, and adopts his opposition to Plaintiffs' Motion for Partial Summary Judgment regarding *Monell*-by-Ratification.[14] Sheriff Lopinto likewise asserts that Plaintiffs have no evidence to establish deliberate indifference through a pattern of similar unconstitutional conduct or the single-incident exception. [15]   Sheriff Lopinto maintains that Plaintiffs have no evidence to show that any alleged negligent training was the moving force behind E.P.'s death.[16]   Finally, Sheriff Lopinto asserts that Plaintiffs offer only conclusory statements regarding a written policy or lack of policy, which the Court does not have to accept.[17]

---

[12] R. Doc. 156 at pp. 2-3, 7-8, & 16-24.
[13] R. Doc. 184 at pp. 1-2.
[14] *Id*. at p. 2 (*citing* R. Docs. 150 & 167).
[15] R. Doc. 184 at pp. 2-7.
[16] *Id*. at p. 7.
[17] *Id*. at p. 8.

## II.    LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate where there is no genuine disputed issue as to any material fact, and the moving party is entitled to judgment as a matter of law.[18]  A party moving for summary judgment must inform the Court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, that show that there is no such genuine issue of material fact.[19]  If the moving party carries its burden of proof under Rule 56, the opposing party must direct the Court's attention to specific evidence in the record which demonstrates that the non-moving party can satisfy a reasonable jury that it is entitled to a verdict in its favor.[20]  This burden is not satisfied by some metaphysical doubt as to alleged material facts, by unsworn and unsubstantiated assertions, by conclusory allegations, or by a mere scintilla of evidence.[21]  Rather, Rule 56 mandates that summary judgment be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.[22]  In resolving a motion for summary judgment, the Court must review the facts and inferences in the light most favorable to the non-moving party, and the Court

---

[18] Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986).

[19] *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552.

[20] *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

[21] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[22] *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2552.

may not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes.[23]

### B. *Monell* Liability

The Supreme Court has held that a suit against a governmental officer in his official capacity is the same as a suit against the entity of which the officer is an agent.[24]   Governmental entities "are not vicariously liable for the actions of their employees under § 1983."[25]   Instead, a municipality may be subject to liability pursuant to 42 U.S.C. § 1983 when the municipality maintains an unconstitutional policy or custom.[26]   These claims are often referred to as *"Monell* claims," in reference to the Supreme Court case by the same name.[27]   To establish *Monell* liability under § 1983, a plaintiff must show that (1) an official policy (2) promulgated by a policymaker (3) was the moving force behind the violation of a constitutional right.[28]   According to the Fifth Circuit, "A failure-to-train action is a type of *Monell* claim."[29]   "The failure to train can amount to a policy if there is deliberate indifference to an obvious need for training where citizens are likely to lose their constitutional rights on account of novices in law enforcement."[30]   To prevail on a failure-to-train theory, a plaintiff must

---

[23] *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

[24] *McMillian v. Monroe Cty.*, 520 U.S. 781, 785 n.2, 117 S.Ct. 1734, 1737, 138 L.Ed.2d 1 (1997) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985)) (internal quotation marks omitted).

[25] *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

[26] *Valle v. City of Houston*, 613 F.3d 536, 541-42 (5th Cir. 2010) (citation omitted).

[27] 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

[28] *Hicks-Fields v. Harris Cty., Texas*, 860 F.3d 803, 808 (5th Cir. 2017) (quotation and internal quotation marks omitted).

[29] *Henderson v. Harris Cty., Texas*, 51 F.4th 125, 130 (5th Cir. 2022) (quoting *Hutcheson v. Dallas Cty.*, 994 F.3d 477, 482 (5th Cir. 2021)) (internal quotation marks omitted).

[30] *Hutcheson*, 994 F.3d at 482 (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 849 (5th Cir. 2009)) (internal quotation marks omitted).

prove that: (1) the municipality's training procedures were inadequate; (2) the municipality was deliberately indifferent in adopting its training policy; and (3) the inadequate training policy directly caused the violations in question.[31]

## III.   ANALYSIS

While Sheriff Lopinto's Motion seeks summary judgment and dismissal of "the claims against Sheriff Lopinto in his official capacity,"[32] Plaintiffs correctly note that the Motion addresses *only* Plaintiffs' *Monell* claims based upon a failure to train.[33] Accordingly, the Court addresses only whether Sheriff Lopinto has carried his burden of proving that he is entitled to summary judgment and dismissal of Plaintiffs' *Monell* claims that are based upon JPSO's failure to train its deputies.

### A. Whether JPSO's training procedures were inadequate.

In Count Two of the original Complaint, Plaintiffs allege that, "Sheriff Lopinto failed to properly screen, hire, train, investigate and discipline officers, including the Officer-Defendants."[34]   Plaintiffs allege Sheriff Lopinto should be held liable in his official capacity for failing to train his officers on a wide variety of topics set forth in Paragraph 417, which provides, in pertinent part, the following:

> 417. Sheriff Lopinto is liable for the unconstitutional and discriminatory actions of the defendant deputies as described herein, due to the following policies, procedures, rules, practices, customs and/or usages of JPSO which were in effect at the time of this incident and which were the underlying cause of the death of E.P. and the injuries of the Plaintiffs:

---

[31] *Ratliff v. Arkansas Cty., Texas*, 948 F.3d 281, 285 (5th Cir. 2020) (quoting *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010)) (internal quotation marks omitted).
[32] R. Doc. 144 at p. 1; R. Doc. 144-1 at pp. 7, 10, & 16.
[33] R. Doc. 144-1 at pp. 11-15; *See, Id*. at pp. 4-6.
[34] R. Doc. 1 at ¶ 410.

. . . .

c. Failure to adequately train his officers, including the Defendant Deputies regarding obvious and recurring law enforcement activities with respect to: 1) stops; 2) searches; 3) seizures; 4) dealing with persons with mental illness and/or intellectual/developmental disabilities, including autism; 5) dealing with persons of diminished capacity; 6) apprehension of suspects; 7) use of force, including deadly force; 8) use of restraints; 9) protection of individual's civil rights; and 10) among other things, illustrating deliberate indifference and reckless disregard for the rights of the public, including E.P. and the Plaintiffs.

d. Failure to train and educate its officers with respect to use of force applications which he knew, must have known or should have known, that deputies were utilizing in the field and which posed a serious risk of injury or death including the excessive use of body weight during restraint and using Head-Holds or Locks, in deliberate indifference to and reckless disregard of the welfare of the public at large, including E.P. and the Plaintiffs; . . . .[35]

Elsewhere in the original Complaint, Plaintiffs allege that:

the JPSO policies, practices, training, oversight and accountability regarding the issues and circumstances involved in this lawsuit including but not limited to use of force, restraints, positional/compression asphyxia, and encounters and interactions with persons with developmental disabilities, in particular autism, including but not limited to use of force and restraint, are inadequate and unreasonable and deviate from clearly established law of which any reasonable deputy should be aware.[36]

In the instant Motion, Sheriff Lopinto asserts that Plaintiffs cannot satisfy the first element of their *Monell* failure-to-train claim because "the JPSO provided extensive training in all the areas identified in Plaintiffs' Complaint and throughout

---

[35] R. Doc. 1 at ¶ 417.

[36] R. Doc. 1 at ¶ 306.  The Court notes that the First Amended Complaint, filed on May 23, 2023, contains the same allegations regarding Plaintiffs' *Monell* failure-to-train claims (R. Doc. 215 at ¶¶ 306, 410, & 417), and does not allege any additional topics about which Sheriff Lopinto failed to train his deputies.  *See*, *Id*. at ¶¶ 482-532.

the entirety of this litigation."[37]  Sheriff Lopinto points to the deposition testimony of JPSO's corporate representatives, JPSO Sergeant Michael Pizzolato and JPSO Sergeant Michael Voltolina, Jr., both of whom testified that JPSO trains its deputies on the topics listed in the original Complaint, including the use of force, restraining persons in the prone position,[38] and dealing with persons with emotional and intellectual challenges, including autistic persons.[39]

Plaintiffs seem to assert in their Opposition brief that JPSO's training policies are deficient because JPSO provides no training on the use of force on persons with autism, including those experiencing a sensory melt-down.[40]  Plaintiffs also assert that JPSO provides no training on the use of force to restrain an autistic person, especially regarding the well-known, heightened risk of death during prone restraint of those individuals.[41]  In support of this position, Plaintiffs point to a report prepared by their expert, Jeffrey J. Noble, a retired Deputy Chief of Police with the Irvine Police Department in California, in which Deputy Noble asserts that although "Sheriff Lopinto acknowledged that dealing with persons suffering from intellectual disabilities was becoming an issue for law enforcement well before 2014," "JPSO does not have any policy or provide training to deputies on dealing with persons with intellectual disabilities even though the training academy had completed training

---

[37] R. Doc. 144-1 at p. 12.

[38] *Id*. at pp. 12-13 (*citing* R. Doc. 144-3 at pp. 100-101, 103-109, 117-119, 161-163, 174-175 & 53-55, 64-66, 68, 70, 79, 91, 135, & 172).

[39] R. Doc. 144-1 at p. 13 (*citing* R. Doc. 144-4, *in globo*).

[40] R. Doc. 156 at pp. 3 & 18-21.

[41] *Id*. at p. 7.

materials for dealing with autistic persons in 2018."[42]  Deputy Noble opines that,

"This illustrates that Sheriff Lopinto and the JPSO have actual knowledge of the need

for training for dealing with people suffering from intellectual disabilities but has

[sic] failed to provide this training to its [sic] deputies."[43]  Deputy Noble further

opines that, "The policies maintained by the Sheriff Lopinto [sic] and the JPSO with

respect to Use of Force/Restraint and Internal Affairs are outdated, unreasonable and

inadequate and fail to conform to generally accepted law enforcement standards and

practices as set forth herein."[44]

Plaintiffs also direct the Court to a report from their expert, Dennis Debbaudt,

who opines that, "the JPSO does not have any particular policies covering the ADA

or dealing with persons with intellectual and developmental disabilities, such as

autism," and that none of the training materials provided to CIT officers, set forth in

a Powerpoint produced to Plaintiffs, "address dealing with persons suffering from

intellectual disabilities or developmental, such as autism."[45]  Debbaudt notes that,

"While Sgt. Voltolino [sic] testified concerning a course on de-escalation and autism

provided by himself in conjunction with the JPCO, training materials from that class

have not been produced to evaluate."[46]  Debbaudt further opines that, "Sheriff

Lopinto and the JPSO did not have proper policies or training in effect regarding law

enforcement encounters with persons with autism at the time of the death of [E.P.]

---

[42] R. Doc. 142-8 at ¶ 85 (*citing* "Lopinto deposition at 28-29").  The Court notes that Plaintiffs did not
submit a copy of that deposition with Deputy Noble's expert report.
[43] R. Doc. 142-8 at ¶ 85.
[44] *Id*. at ¶ 87.
[45] R. Doc. 156-3 at p. 16, ¶ 6.
[46] *Id*.

while in the custody of JPSO deputies."[47]  Debbaudt opines that, "It is further my opinion that JPSO deputies did not have proper training or guidance from appropriate policies on how to deal with persons suffering from autism, including the significant risks of utilizing prone restraint on such persons, especially if they are obese and non-verbal . . . ."[48]

The Court finds that Plaintiffs have presented sufficient evidence which raises a genuine issue of material fact from which a reasonable jury could conclude that JPSO's training policies are inadequate regarding the use of force or restraint on individuals with intellectual disabilities, including autism.  Although the Sheriff relies on the testimony of Sgts. Pizzolato and Voltolina, the Court notes that while Sgt. Voltolina testified that JPSO deputies receive Crisis Intervention Training ("CIT") regarding "Substance Abuse with Mental Illness, Louisiana Mental Health Law and Patrol, Crisis Intervention Training, and Deescalation with Suicidal Patients,"[49] and outside training regarding "Deescalation with Autism" from the coroner's office,[50] the outside training does not specifically address the restraint of persons with autism.[51]  Further, Sheriff Lopinto does not address or otherwise contradict Plaintiffs' expert evidence in his Reply brief.[52]  As such, Sheriff Lopinto has failed to carry his burden of showing that he is entitled to summary judgment on

---

[47] *Id.* at pp. 16-17, ¶ 7.
[48] *Id.*
[49] R. Doc. 151-9 at pp. 53-54.
[50] *Id.* at pp. 54-57.
[51] *Id.* at p. 62.  The Court notes that Plaintiffs' expert, Dennis Debbaudt, noted in his February 4, 2023 expert report that no documentation regarding the "Deescalation and Autism" course or its contents "has been produced by the Defendants" at that time.  R. Doc. 156-3 at p. 1, n.1.
[52] *See, generally*, R. Doc. 184.

Plaintiffs' failure-to-train claims based upon inadequate training regarding the use of force or restraint on individuals with intellectual disabilities, including autism. Because Plaintiffs did not address the adequacy of JPSO's training regarding any of the remaining topics listed in their original Complaint, the Court finds that Sheriff Lopinto has carried his burden of proving that he is entitled to summary judgment and dismissal of Plaintiffs' failure-to-train claims based upon inadequate training regarding those remaining topics.

### B. Whether Sheriff Lopinto was deliberately indifferent in failing to adopt training policies regarding the use of force or restraint on persons with intellectual disabilities, including autism.[53]

Turning to the second element of Plaintiffs' failure-to-train *Monell* claim, the Fifth Circuit has held that, "To prove deliberate indifference at trial, Plaintiffs must show that, 'in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need.'"[54] A plaintiff can prove deliberate indifference in one of two ways – by alleging a "pattern of similar constitutional violations by untrained employees,"[55] or through the single-incident exception, which

---

[53] Because the Court has determined that Plaintiffs have carried their burden of proving a genuine dispute regarding whether JPSO had inadequate training concerning only the use of force or restraint on individuals with intellectual disabilities, including autism, the Court will only address the remaining two elements with respect to that training.

[54] *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

[55] *Hutcheson v. Dallas Cty., Texas*, 994 F.3d 477, 482 (5th Cir. 2021) (quoting *Peña v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018)) (internal quotation marks omitted). *See, Littell*, 894 F.3d at 624 (citing *Canton*, 489 U.S. at 390, 109 S.Ct. 1197) (same).

is "extremely narrow."[56]  Under the single-incident exception, a plaintiff "must prove that the highly predictable consequence of a failure to train would result in the specific injury suffered."[57]  "For a violation to be 'highly predictable,' the municipality 'must have failed to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face.'"[58]

Sheriff Lopinto asserts in his Motion that, "Plaintiffs cannot show that the Sheriff was deliberately indifferent to a known and obvious need to train."[59]  Sheriff Lopinto offers no other facts or evidence to support this assertion.  Instead, Sheriff Lopinto proceeds to discuss Fifth Circuit authority regarding deliberate indifference before concluding that, "Here, again, the JPSO provided extensive training to its Deputies in each and every area of concern identified by Plaintiffs in this litigation. Plaintiffs fail to meet the third [sic] element of their *Monell* claim."[60]  While not entirely clear, Sheriff Lopinto seems to assert that Plaintiffs cannot prove deliberate indifference because he provided adequate training on all of the topics listed in the original Complaint.  Instead of pointing out the absence of evidence regarding a pattern of similar constitutional violations or why the single-incident exception would not apply, Sheriff Lopinto merely repeats the same argument he made as to the first element of Plaintiffs' *Monell* failure-to-train claim.  The Court notes that Sheriff

---

[56] *Hutcheson*, 994 F.3d at 482 (citing *Peña*, 879 F.3d at 624; quoting *Valle v. City of Houston*, 613 F.3d 536, 549 (5th Cir. 2010)); *See, Littell*, 894 F.3d at 624 (citing *Canton*, 489 U.S. at 396, 109 S.Ct. 1197) (same).

[57] *Hutcheson*, 994 F.3d at 482-83 (quoting *Valle*, 613 F.3d at 549) (internal quotation marks omitted and cleaned up).

[58] *Hutcheson*, 994 F.3d at 483 (quoting *Littell*, 894 F.3d at 624-25 (cleaned up)).

[59] R. Doc. 144-1 at p. 14.

[60] *Id*. at p. 15.

Lopinto did not even reference deliberate indifference in his Statement of Uncontested Material Facts, which focuses entirely on the training provided to JPSO deputies.[61]   The Fifth Circuit has made clear that, "The moving party can meet its initial summary judgment burden by pointing to areas of the record indicating the absence of evidence supporting the nonmoving party's case,"[62] but that, "the moving party cannot meet its initial summary judgment burden merely by denying the allegations in the opponent's complaint."[63]   The Court finds the allegations in Sheriff Lopinto's Motion insufficient to meet his initial burden of demonstrating that there are no factual issues in dispute regarding the deliberate indifference element of Plaintiffs' *Monell* failure-to-train claim.[64]

In the Reply brief, Sheriff Lopinto actually addresses the deliberate indifference element and asserts that, "Plaintiffs clearly recognize that there is no pattern of similar unconstitutional conduct," and that, "Plaintiffs thus recognize that their claim in this case, albeit wanting, is one arising out of the 'single incident' exception."[65]   Sheriff Lopinto then seems to assert that the single-incident exception does not apply because "there is simply no credible argument that the Defendants' training constituted a 'complete failure to train.'"[66]   Both the Fifth Circuit and other Sections of this Court have held that, "Arguments raised for the first time in a reply

---

[61] R. Doc. 144-2.
[62] *American Mfrs. v. Colbert*, 48 F.3d 530 (5th Cir. 1995) (citing authority).
[63] *Id.* (*citing* 10A Wright, Miller & Kane, *Federal Practice and Procedure*, § 2727 at 131).
[64] *American Mfrs.*, 48 F.3d at 530 (citing authority).
[65] R. Doc. 184 at pp. 5 & 6.
[66] *Id.* at p. 6 (quoting *Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273, 288 (5th Cir. 2002); citing *Brown v. Bryan Cty., Okla.*, 462 (5th Cir. 2000)).

brief are generally waived."[67]  As explained by one of our sister courts, "it is improper for the movant to sandbag and raise wholly new issues in a reply memorandum.  The scope of the reply should be limited to addressing the arguments raised by the memorandum in opposition."[68]  This Court agrees and finds that, on that basis alone, the Motion could be denied to the extent Sheriff Lopinto seeks summary judgment based upon Plaintiffs' inability to prove deliberate indifference.

Nonetheless, the Court further finds that Plaintiffs have submitted evidence that raises a genuine dispute regarding whether Sheriff Lopinto was deliberately indifferent to a known and obvious need to train his deputies regarding the use of force or restraint on individuals with intellectual disabilities, including autism. Plaintiffs direct the Court to Sheriff Lopinto's deposition testimony, in which he confirmed that he "knew by 2014 that people with intellectual disabilities are becoming an issue with law enforcement."[69]  Plaintiffs' expert, Deputy Noble, opines in his report that, "This illustrates that Sheriff Lopinto and the JPSO have actual knowledge of the need for training for dealing with people suffering from intellectual disabilities but has failed to provide this training to its deputies."[70]

---

[67] *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) (citing *United States v. Jackson*, 426 F.3d 301, 304 n.2 (5th Cir. 2005); *Iteld, Bernstein & Associates, LLC v. Hanover Ins. Group*, Civ. A. No. 06-3418, 2009 WL 2496552, at *4 (E.D. La. Aug. 12, 2009) (Vance, J.) ("[A]rguments raised for the first time in a Reply brief are waived.").  *See, Little Tchefuncte River Association v. Artesian Utility Company, Inc.*, 155 F. Supp. 3d 637, 657 (E.D. La. 2015) ("[A]rguments cannot be raised for the first time in a reply brief.") (quoting *Benefit Recovery, Inc. v. Donelon*, 521 F.3d 326, 329 (5th Cir. 2008)).

[68] *Weems v. Hodnett*, Civ. A. No. 10-CV-1452, 2011 WL 2731263, at *1 (W.D. La. July 13, 2011) (Hornsby, M.J.) (citation omitted).

[69] R. Doc. 156 at p. 9 (*citing* R. Doc. 150-5 at p. 27).

[70] R. Doc. 142-8 at p. 48, ¶ 85.

Plaintiffs also rely on JPSO corporate representative Sgt. Voltolina's deposition testimony, during which he was asked, "Would you agree that autism is a prevalent issue that officers are likely to encounter in their careers in Jefferson Parish?" and he responded, "I think any law enforcement officer has the potential of dealing with someone with autism when one in 54 males are diagnosed."[71] Plaintiffs further point out that in 2018, Sgt. Voltolina began preparing a training module entitled "Autism Awareness" for CIT, "Because of the need for it in law enforcement."[72] Sgt. Voltolina confirmed that he "had an awareness at the time that law enforcement officers were interacting with persons with autism, and that created special needs and situations for officers to be trained on."[73] Sgt. Voltolina further testified that his training module has been available since 2018, that he made his supervisors aware of his training module in 2018, but that it has never been used by JPSO because a supervisor has never asked him to submit it for approval for implementation and training.[74]

Plaintiffs also point to their expert report from Debbaudt, who opines that, "it is reasonable and foreseeable that there have been and will continue to be encounters between members of the JPSO and persons with autism," including those who may be experiencing a sensory overload or "outburst."[75] Debbaudt also opines that it is "reasonable and foreseeable that these persons, and their caregivers on their behalf,

---

[71] R. Doc. 156 at p. 9 (*citing* R. Doc. 151-9 at p. 110).

[72] R. Doc. 156 at p. 11 (*citing* R. Doc. 151-9 at pp. 34, 38, 40-42, & 45-46). *See*, R. Doc. 151-9 at p. 47.

[73] R. Doc. 151-9 at p. 46.

[74] *Id.* at pp. 44-45 & 47-48.

[75] R. Doc. 156-3 at pp. 7 & 16.

would need to avail themselves of services form the JPSO," and that, "It is also reasonable and foreseeable that, in the course of these encounters, deputies may need to physically restrain persons who have [autism], including those who are undergoing the crisis of a sensory outburst caused by and related to autism."[76]   Debbaudt further opines that:

> The need for law enforcement agencies to have reasonable and adequate policies and training to deal with encounters with persons with autism, including those on the severe end of the spectrum, as part of their duty to protect public safety and the safety of their officers, is obvious and has been known to law enforcement leaders and agencies for decades.  It is also well-known that the failure to have appropriate policies, practices and training creates a significant risk that such encounters, if not properly handled, could have catastrophic results, including death or serious bodily harm.[77]

Debbaudt concludes that, at the time of E.P.'s death, "any reasonable, competent law enforcement executive knew or should have known that deputies may need to physically restrain persons who have [autism], including those who are undergoing the crisis of a sensory outburst caused by and related to autism."[78]   Debbaudt further concludes that, at the time of E.P.'s death, "any reasonable, competent law enforcement executive knew or should have that there was an obvious need to ensure that appropriate policies, practices and training were in place in order to prevent catastrophic results during law enforcement encounters with persons with autism who are experiencing crisis caused by and related to autism."[79]

---

[76] *Id.*
[77] *Id.* at pp. 7-8.
[78] *Id.* at p. 16, ¶ 5.
[79] *Id.*

Sheriff Lopinto does not address or otherwise contest this evidence in his Reply brief.[80]  The Court finds that Plaintiffs have submitted sufficient evidence to raise a genuine dispute regarding whether, at the time of E.P.'s death, it was obvious to Sheriff Lopinto that the failure to train his deputies regarding the use of force or restraint on individuals with intellectual disabilities, including autism, was likely to lead to a violation of the Fourth Amendment rights of those individuals his deputies would encounter.[81]  Accordingly, Sheriff Lopinto is not entitled to summary judgment and dismissal of Plaintiffs' *Monell* failure-to-train claim based upon Plaintiffs' inability to prove his deliberate indifference to the need for training regarding the use of force or restraint on individuals with intellectual disabilities, including autism.

### C. Whether the inadequate training policies caused the constitutional violations in question.

Turning to the third and final *Monell* factor, Sheriff Lopinto asserts that Plaintiffs failed to plead or make any showing that any promulgated policy, pattern of misconduct, or alleged negligent training was the moving force behind E.P.'s death, and that, "There is simply no evidence adduced to support culpability or causation whatsoever."[82]  Plaintiffs' Opposition brief does not directly address the issue of causation.[83]  Plaintiffs, however, point out that the Jefferson Parish Coroner's Office found that E.P. "most likely" would have survived if the deputies had not restrained him face-down on the ground.[84]  Plaintiffs also assert that, "E.P. was held in the prone

---

[80] *See, generally*, R. Doc. 184.
[81] *Brown v. Bryan Cty., Okla.*, 219 F.3d 450, 460 (5th Cir. 2000).
[82] R. Doc. 144-1 at p. 15.
[83] *See, generally*, R. Doc. 156.
[84] *Id*. at p. 1 (*citing* R. Doc. 142-9 at pp. 64-65).

position for over 9 minutes despite the fact that there were numerous deputies on the scene who both handcuffed and leg shackled E.P. without placing him in the recovery position," and that, "As a result of the failure to place E.P. in the recovery position, he died of positional asphyxia."[85]   Plaintiffs then assert that, contrary to Sheriff Lopinto's assertions, "E.P.'s actions were 'not willful, active resistance, or efforts to harm the officers, but behavioral manifestations of his autism and evidence of oxygen deficiency which was resulting from his continuous and prolonged restraint.'"[86]   In response, Sheriff Lopinto repeats the same argument made in his Motion.[87]

While Plaintiffs did not address the issue of causation in their Opposition brief, the Court finds that they have submitted evidence with their Opposition brief that raises a genuine issue of material fact regarding the issue of causation.  Specifically, Plaintiffs submitted an expert report from Kris Sperry, M.D., a forensic pathologist, who opines that:

> It is my opinion, to a reasonable degree of medical certainty, that the prone restraint of [E.P.], with continuous weight upon his posterior body for all but a few seconds of a time period of more than nine minutes, caused progressive respiratory insufficiency as pressure forced his obese abdomen upwards, impairing adequate inhalation and exhalation, and the continual struggle likewise produced gradual systemic acidosis. Both of these conditions eventually culminated in the evolution of a lethal cardiac arrhythmia, which was fatal.  The appropriate pathologic diagnosis for his death is thus 'positional asphyxia,' or 'restraint asphyxia.'  The mechanism of his death is a sudden cardiac arrhythmia which arose from systemic acidosis and progressive respiratory insufficiency, caused by continual prone restraint with very significant body weight pressure being directed on his back, pressing [E.P.] into the underlying cement with superior displacement of his abdominal panniculus that impaired diaphragmatic excursion, and the exchange of

---

[85] R. Doc. 156 at pp. 6-7.
[86] *Id.* at p. 7 (*quoting* R. Doc. 156-4 at p.4).
[87] R. Doc. 184 at p. 7.

oxygen and carbon dioxide.  It is also my opinion, to a reasonable degree of medical certainty, that [E.P.] did NOT die of the Excited Delirium Syndrome, and furthermore, that the utilization of this syndromic diagnosis is improper and should not be used to explain [E.P.'s] death.[88]

Dr. Sperry also opines that, "When Deputy Vega was holding [E.P.] prone, Vega placed a forearm across the front of [E.P.'s] neck, an extremely dangerous neck restraint termed a 'forearm bar' hold," and that E.P.'s injuries "confirm Vega applied the forearm bar hold, and it is my opinion, to a reasonable degree of medical certainty, that this neck hold must be considered a contributory cause of [E.P.'s] death."[89]

Dr. Sperry further opines that E.P.'s death "should have been more properly called a 'Homicide,'" which, from a forensic pathology perspective, "means that a person's death was caused or contributed to by the action or actions of others."[90] According to Dr. Sperry, "The 'Findings' portion of the autopsy report clearly describes that [E.P.] was involved in a struggle with law enforcement officers, and that he was restrained in a prone position on the ground, until he physiologically decompensated and his condition rapidly deteriorated, until he died."[91]  Dr. Sperry concludes that, "This event sequence very clearly delineates that [E.P.] was held and restrained in a prone position by others, and that this restraint and the characteristics of this restraint are at least a contributing factor to his death, if not actually the primary causative factor."[92]  Dr. Sperry also concludes that, "It is also my opinion, to a reasonable degree of medical certainty, that if [E.P.] had not been

---

[88] R. Doc. 156-4 at pp. 11-12.
[89] *Id*. at p. 12.
[90] *Id*.
[91] *Id*. at pp. 12-13.
[92] *Id*. at p. 13.

restrained in a prone position with the body weight of officers (and one especially morbidly obese officer) been exerted on his posterior body surface, he would not have died."[93]

The Court finds the foregoing evidence sufficient to raise a dispute regarding whether Sheriff Lopinto's failure to train his deputies regarding the use of force or restraint on individuals with intellectual disabilities, including autism, caused E.P.'s death and the violation of his constitutional rights.   Plaintiffs have presented evidence to support their position that E.P.'s death would have been avoided had the JPSO deputies been trained regarding the use of force and restraint on individuals with intellectual disabilities, including autism.[94]  Sheriff Lopinto does not address or otherwise dispute this evidence in his Reply brief.[95]  Accordingly, the Court finds that Sheriff Lopinto has not carried his burden of proving that he is entitled to summary judgment on the basis that Plaintiffs cannot establish the causation element of their *Monell* claims that are based upon Sheriff Lopinto's failure to train his deputies regarding the use of force or restraint on individuals with intellectual disabilities, including autism.

## IV.   CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that the Partial Motion to Dismiss the Federal Claims Against Sheriff Lopinto in His Official Capacity

---

[93] *Id.*

[94] *Littell v. Houston Ind. Sch. Dist.*, 894 F.3d 616, 629 (5th Cir. 2018) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)) ("Plaintiffs' 'failure to train' theory will also require proof of causation: 'Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?'").

[95] *See, generally*, R. Doc. 184.

Pursuant to Fed. R. Civ. P. 56[96] is **GRANTED in part and DENIED.**  The Motion is **DENIED** to the extent that Sheriff Lopinto seeks dismissal of Plaintiffs' *Monell* claims that are based upon his failure to train JPSO deputies regarding the use of force or restraint on individuals with intellectual disabilities, including autism.  The Motion is **GRANTED** to the extent that Sheriff Lopinto seeks dismissal of Plaintiffs' *Monell* claims that are based upon his failure to train JPSO deputies regarding all of the other topics listed in Paragraph 417(c) and (d) in the original Complaint,[97] and those claims are **DISMISSED WITH PREJUDICE.**  The Motion is further **DENIED** to the extent Sheriff Lopinto seeks dismissal of Plaintiffs' *Monell* claims that are based upon Sheriff Lopinto's alleged failure to supervise and his alleged ratification of the deputies' actions.

New Orleans, Louisiana, June 13, 2023.

**WENDY B. VITTER**
**United States District Judge**

---

[96] R. Doc. 144.

[97] The Court notes that the First Amended Complaint contains identical allegations in ¶ 417 (c) and (d).  *See*, R. Doc. 215 at ¶ 417.